# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

### VENUE: SAN FRANCISCO

FILED

UNITED STATES OF AMERICA,

V.

MAR 2 1 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MICHAEL RICHARD LYNCH and
STEPHEN KEITH CHAMBERLAIN,

CR18-577 CRB

DEFENDANT(S).

## SUPERSEDING INDICTMENT

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1348 – Securities Fraud;
18 U.S.C. § 371 – Conspiracy;
18 U.S.C. § 2 – Aiding and Abetting; and
18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture

A true bill.

_____
Foreman

Filed in open court this ___21st___ day of
___March, 2019___.

ROSE MAHER

Clerk

NO BAIL WARRANT

THOMAS S. HIXSON
UNITED STATES MAGISTRATE JUDGE

Bail, $ _____

AO 257 (Rev. 6/78)

| DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT |
|---|

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT
☒ SUPERSEDING

┌─ OFFENSE CHARGED ─

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1348 – Securities Fraud;
18 U.S.C. § 371 – Conspiracy;
18 U.S.C. § 2 – Aiding and Abetting;
18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 –
Criminal Forfeiture

PENALTY:   See attachment.

☐ Petty
☐ Minor
☐ Misde-
    meanor
☒ Felony

**Name of District Court, and/or Judge/Magistrate Location**

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

┌─ DEFENDANT - U.S

▶ Michael Richard Lynch and Stephen Keith Chamberlain

DISTRICT COURT NUMBER

CR 18-00577 CRB

FILED

┌─ PROCEEDING ─

Name of Complainant Agency, or Person (& Title, if any)

FEDERAL BUREAU OF INVESTIGATION

☐ person is awaiting trial in another Federal or State
give name of court

☐ this person/proceeding is transferred from another district
per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on motion
of:
   ☐ U.S. ATTORNEY   ☐ DEFENSE

☐ this prosecution relates to a
pending case involving this same
defendant

☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding this
defendant were recorded under

}  SHOW
   DOCKET NO.

}  MAGISTRATE
   CASE NO.

MAR 21 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Name and Office of Person
Furnishing Information on this form      DAVID L. ANDERSON

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)      ADAM A. REEVES

┌─ DEFENDANT ─

IS *NOT* IN CUSTODY
   Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior
       summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

IS IN CUSTODY
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges
   If answer to (6) is "Yes", show name of institution

}  ☐ Federal   ☐ State

Has detainer   ☐ Yes     If "Yes"
been filed?    ☐ No      give date
                          filed _____

DATE OF
ARREST      ▶   Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED   ▶   Month/Day/Year
TO U.S. CUSTODY

☐ This report amends AO 257 previously submitted

┌─ ADDITIONAL INFORMATION OR COMMENTS ─

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT      Bail Amount: _____

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or
warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____      Before Judge: _____

Comments:

# ATTACHMENT TO PENALTY SHEET

## *United States v. Michael Richard Lynch and Stephen Keith Chamberlain*

## Case No. CR 18-00577 CRB

<u>Counts One through Fifteen:</u>

The maximum penalties for a conviction for conspiracy, in violation of 18 U.S.C. § 1349, and for wire fraud, in violation of 18 U.S.C. § 1343, are:

- a twenty (20) year term of imprisonment (18 U.S.C. § 1343);
- a $250,000 fine ( or twice the gross gain/loss, whichever is greater) (18 U.S.C. § 3571(b)(3) and (d));
- a three (3) year term of supervised release (18 U.S.C. § 3583(b )(2));
- a $100 special assessment (18 U.S.C. § 3013(a)(2)(A)); and
- restitution and asset forfeiture in amounts to be determined by the Court.

<u>Count Sixteen:</u>
Not more than 25 years imprisonment
Not more than $250,000 fine
Not more than 3 years supervised release
$100 special assessment

<u>Count Seventeen:</u>
Not more than 5 years imprisonment
Not more than $250,000 fine
Not more than 3 years supervised release
$100 special assessment

1  DAVID L. ANDERSON (CABN 149604)
2  United States Attorney

3

4  **FILED**

5  MAR 21 2019

6  SUSAN Y. SOONG
   CLERK. U.S. DISTRICT COURT
7  NORTHERN DISTRICT OF CALIFORNIA

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10  SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,               )   Case No. CR 18-577 CRB
                                            )
12          Plaintiff,                      )   <u>VIOLATIONS</u>: 18 U.S.C. § 1349 –
                                            )   Conspiracy to Commit Wire Fraud; 18
13      v.                                  )   U.S.C. § 1343 – Wire Fraud; 18 U.S.C.
                                            )   § 1348 – Securities Fraud; 18 U.S.C. § 371 –
14  MICHAEL RICHARD LYNCH and               )   Conspiracy; 18 U.S.C. § 2 – Aiding and
    STEPHEN KEITH CHAMBERLAIN,              )   Abetting; 18 U.S.C. §§ 981(a)(1)(C) &
15                                          )   982(a) & 28 U.S.C. § 2461 – Criminal
            Defendants.                     )   Forfeiture
16                                          )
                                            )   SAN FRANCISCO VENUE
17  _____)

18          S U P E R S E D I N G   I N D I C T M E N T

19      The Grand Jury charges:

20                  Introductory Allegations

21  A.      Autonomy Corporation plc

22          1.      Autonomy Corporation plc ("Autonomy") was a company incorporated in England and

23  Wales with a registered office in Cambridge, United Kingdom. Autonomy was the holding company of

24  a group of companies engaged in software development and distribution. Autonomy maintained dual

25  headquarters in San Francisco, California, and Cambridge.

26          2.      Autonomy's major subsidiaries included Autonomy, Inc. ("AU Inc."), with offices in San

27  Francisco and San Jose, California; Interwoven, Inc. ("Interwoven"), with offices in San Jose; and

28  ZANTAZ, Inc. ("Zantaz"), with offices in Pleasanton, California.

    SUPERSEDING INDICTMENT

3.      Autonomy was a public company whose shares were listed on the London Stock Exchange under the trading symbol "AU" and were bought, held, and sold by individuals and entities throughout the United States.  In 2010, $592,358,000 of Autonomy's $870,366,000 in reported revenues (approximately 68%) came from the United States and other countries in the Americas.

B.      The Defendants

4.      Defendant MICHAEL RICHARD LYNCH was a resident of the United Kingdom.  From approximately 1996 until 2011, he was the Chief Executive Officer ("CEO") of Autonomy.  He also was a director of Autonomy from approximately 1996 until 2011.  As Autonomy's CEO and a director, LYNCH was responsible for certifying Autonomy's publicly filed financial statements.  LYNCH was also responsible for the accuracy of statements made by him and others at Autonomy to market analysts, shareholders, and others persons in the investing public about the nature and composition of Autonomy's products, revenue, and expenses and its potential for growth.

5.      Defendant STEPHEN KEITH CHAMBERLAIN was a resident of the United Kingdom.  From approximately 2005 until 2011, he was Vice President of Finance at Autonomy.  CHAMBERLAIN was a qualified Chartered Accountant.  As one of Autonomy's most senior finance officers, CHAMBERLAIN was responsible for the preparation of Autonomy's financial statements.  CHAMBERLAIN also was responsible for the accuracy of statements made by him and others at Autonomy to Autonomy's independent auditor in the United Kingdom.

C.      Hewlett-Packard Company

6.      Hewlett-Packard Company ("HP") was a Delaware corporation with principal executive offices in Palo Alto, California.  HP provided computing and imaging products, technologies, software, and services to customers.

7.      HP was a public company whose shares were listed on the New York Stock Exchange under the trading symbol "HPQ" and were bought, held, and sold by individuals and entities throughout the United States.  HP securities were registered with the Securities and Exchange Commission under Section 12 of the Securities Exchange Act of 1934.

//

//

SUPERSEDING INDICTMENT              2

D.    HP's Purchase of Autonomy

8.    On or about August 18, 2011, HP and Hewlett-Packard Vision B.V. ("HP Vision"), an indirect wholly-owned subsidiary of HP, entered into an Offer Agreement with Autonomy and publicly announced an offer to acquire Autonomy for approximately $11 billion.

9.    On or about August 18, 2011, in a press release announcing the acquisition, HP emphasized that "Autonomy's recent operating and financial performance has been strong." HP also stated that "[o]ver the last five years, Autonomy has grown its revenues at a compound annual growth rate of approximately 55 percent and adjusted operating profit at a rate of approximately 83 percent." Among the acquisition's "[s]trategic and financial benefits," HP said Autonomy would enhance HP's financial profile because "Autonomy's strong growth and profit margin profile complement[ed] HP's efforts to improve its business mix by focusing on enterprise software and solutions. Autonomy [had] … a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010."

10.    Under the terms of the offer, HP, through HP Vision, offered to buy all the outstanding shares of Autonomy for £25.50 ($42.11) per share in cash.

11.    On or about October 3, 2011, when all conditions relating to the offer had been satisfied, HP's acquisition of Autonomy closed and HP acquired control of Autonomy. At or about that time, LYNCH and CHAMBERLAIN became employees of HP.

12.    On or about October 3, 2011, LYNCH owned or controlled approximately 7% of Autonomy's total outstanding shares of stock and CHAMBERLAIN owned or controlled approximately 99,000 shares of Autonomy's stock. After the acquisition closed, and their shares were acquired by HP, LYNCH received approximately $804 million and CHAMBERLAIN received approximately $4 million.

E.    Autonomy's Financial Statements

13.    From in or about 2004 to in or about July 2011, Autonomy issued quarterly and annual financial statements to the investing public in the United Kingdom, the United States, and other places. In its statements to the public, Autonomy said that the financial statements were prepared in accordance with regulations for public companies in the United Kingdom. Autonomy also stated that its annual

financial statements were audited, and its quarterly financial statements were reviewed, by an independent auditor in the United Kingdom.

14.     In its quarterly and annual reports, Autonomy stated that its financial statements had been prepared in accordance with International Financial Reporting Standards ("IFRS") and, in particular, the accounting requirements for revenue recognition defined by International Accounting Standard 18 – Revenue ("IAS 18").  In other public documents and conference calls with Autonomy analysts, Autonomy also claimed that it followed revenue recognition rules under United States Generally Accepted Accounting Principles ("US GAAP"), including Statement of Position ("SOP") 97-2, Software Revenue Recognition.  In its quarterly and annual financial statements, Autonomy made statements about the "revenue" it recognized in the quarter and its "gross margin," an alleged measure of its profitability.

15.     For example, Autonomy, in its quarterly financial statements, claimed to have revenues (in millions of U.S. dollars) and gross margins in the approximate amounts specified below:

| Quarter | Revenue | Gross Margin |
|---------|---------|--------------|
| Q1 2009 | $129.8 | 91% |
| Q2 2009 | $195.2 | 89% |
| Q3 2009 | $191.6 | 85.6% |
| Q4 2009 | $223.1 | 89.4% |
| Q1 2010 | $194.2 | 88.9% |
| Q2 2010 | $221.1 | 86.3% |
| Q3 2010 | $210.6 | 87.6% |
| Q4 2010 | $244.5 | 86.3% |
| Q1 2011 | $219.8 | 88.3% |
| Q2 2011 | $256.3 | 87.1% |

16.     In its annual reports and elsewhere, Autonomy held itself out as a "pure software" company.  For example, in its 2009 annual report, Autonomy claimed it "operates in the realm of pure software."  It stated: "Autonomy is one of the very rare examples of a pure software model."

SUPERSEDING INDICTMENT                    4

F.     HP Relied on Autonomy's Financial Statements

17.     Between January and August 2011, LYNCH and others acting on behalf of Autonomy provided Autonomy's financial statements and documents reflecting Autonomy's results for the year ended 2009, the year ended 2010, the first half of 2011, and other periods to persons at, or acting on behalf of, HP in the course of HP's consideration of whether to buy Autonomy and, if so, for what price.

18.     Among other information, HP relied on the accuracy and truthfulness of the statements and disclosures made in Autonomy's historically reported financial statements and other public statements including, but not limited to, Autonomy's claims about its financial performance, revenues, expenses, and products and its claim to be a "pure software" company with high gross margins.

The Scheme to Defraud

19.     Beginning in or about January 2009 and continuing through in or about October 2011, defendants LYNCH and CHAMBERLAIN, together with others including former Chief Financial Officer Sushovan Hussain, engaged in a fraudulent scheme to deceive purchasers and sellers of Autonomy securities about the true performance of Autonomy's business, its financial performance and condition, the nature and composition of its products, revenue and expenses, and its prospects for growth.

20.     The objectives of the scheme to defraud were, among other things, (a) to ensure that Autonomy reported that it had met or exceeded projected quarterly results for, among other things, revenue, gross margin, net income, and earnings per share, (b) to maintain and increase the defendants' positions within the company, and to enrich themselves and others through bonuses, salaries, and options, and (c) to artificially increase and maintain the share price of Autonomy securities to, among other things, make Autonomy attractive to potential purchasers.

21.     In or about 2011, LYNCH and others met with representatives of HP about a potential acquisition of Autonomy by HP.  At or about that time, LYNCH and others used Autonomy's false and misleading financial statements from 2009, 2010, and early 2011, and other false and misleading documents created by CHAMBERLAIN and others to make Autonomy more attractive to a potential purchaser like HP.

22.     In furtherance of the scheme to defraud, LYNCH, CHAMBERLAIN, Hussain, and others

SUPERSEDING INDICTMENT                    5

1  used a variety of means and methods, including:

2          a.      Artificially inflating revenues by, among other things, (i) backdating written

3  agreements to record revenue in prior periods; (ii) recording revenue on contracts that were subject to

4  side letters or other agreements with contingencies or other terms impacting revenue recognition;

5  (iii) improperly recording revenue for reciprocal or roundtrip transactions whereby Autonomy granted a

6  software license to a counterparty which purchased product or services from Autonomy at a greater

7  price; (iv) improperly recording revenue where all of the criteria in IFRS, IAS 18, and Autonomy's

8  revenue recognition policy had not been satisfied; and (v) structuring or restructuring contracts to

9  accelerate revenue recognition while reducing future recurring revenue;

10          b.      Making false and misleading statements to Autonomy's independent auditor

11  about the facts and circumstances of transactions allegedly supporting the recognition of revenue,

12  expenses, costs, and other items in Autonomy's financial statements, including, but not limited to,

13  (i) backdating contracts, invoices, agreements, and other documents in order to make it appear that they

14  had been reached with a counterparty in a prior period; (ii) falsely representing, among other things, that

15  Autonomy's auditors had been provided all relevant information and that there were no undisclosed side

16  letters; (iii) making false and misleading statements about whether the criteria in IFRS, IAS 18, and

17  Autonomy's revenue recognition policy had been satisfied; and (iv) making false and misleading

18  statements about Autonomy's research and development, marketing, and other expenses;

19          c.      Making false and misleading statements to market analysts covering Autonomy

20  about its financial statements, the true performance of its business, its financial condition, the nature and

21  composition of its products, revenue, and expenses, and its prospects for growth;

22          d.      Making false and misleading statements to Autonomy's regulators in response to

23  inquiries about its financial statements;

24          e.      Making false and misleading statements that Autonomy was a "pure software"

25  company while concealing the fact that Autonomy was engaged in hidden, loss-making resales of

26  hardware, separate from its disclosed practice of selling "appliances";

27          f.      Making false and misleading statements about Autonomy's alleged sales of

28  original manufactured equipment or "OEM" licenses, the alleged royalty revenues from such sales, and

SUPERSEDING INDICTMENT                    6

the Autonomy software products allegedly being used in equipment manufactured by other information technology companies;

        g.    Making and causing fraudulent entries to Autonomy's books and records;

        h.    Issuing materially false and misleading quarterly and annual reports;

        i.    Intimidating, pressuring, and paying-off persons who raised complaints about or openly criticized Autonomy's financial practices and performance; and

        j.    Intimidating and pressuring analysts and other persons who raised questions about or openly criticized Autonomy's financial practices and performance.

    23.    Also in furtherance of the scheme to defraud, LYNCH, CHAMBERLAIN, and others took the following actions, among others:

        a.    On or about April 23, 2009, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2009.

        b.    On or about July 16, 2009, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2009.

        c.    On or about October 20, 2009, Autonomy issued a press release about, among other things, its financial performance in the third quarter of 2009.

        d.    On or about December 31, 2009, Autonomy entered into a First Amendment to License and Distribution Agreement with a counterparty in the United States whereby the counterparty licensed "EDD" or electronic data discovery software for approximately $4 million plus maintenance and support.

        e.    On or about January 1, 2010, a co-conspirator called an officer of a counterparty in the United States that Autonomy was about to acquire and asked if the counterparty would agree to a transaction to license software from Autonomy, which ultimately was recorded as revenue in the fourth quarter of 2009.

        f.    On or about January 4, 2010, a co-conspirator caused a side letter to be signed respecting a transaction ultimately recorded as revenue in the fourth quarter of 2009.

        g.    On or about February 3, 2010, Autonomy issued a press release about, among other things, its financial performance in the fourth quarter (year-end) of 2009.

SUPERSEDING INDICTMENT       7

h.     On or about February 22, 2010, Autonomy issued its Annual Report and Accounts for the year ended 31 December 2009.

i.     On or about March 10, 2010, Autonomy paid a counterparty $1,425,000, by means of a check written on an account maintained at a financial institution in San Francisco, for "EDD Processing" that was not performed.

j.     On or about April 1, 2010, an Autonomy officer in the United States called the principal of a counterparty in the United States and asked if the counterparty would agree to a transaction to license software from Autonomy, which ultimately was recorded as revenue in the first quarter of 2010.

k.     On or about April 21, 2010, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2010.

l.     On or about April 21, 2010, LYNCH told the market and others following Autonomy securities "[w]e have very little interest in just selling hardware . . . what we are not doing here is acting as a generic company that resells hardware like Morse or something like that.  Obviously, those people do that business and we have no interest in it."

m.     On or about July 22, 2010, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2010.

n.     On or about July 28, 2010, LYNCH caused Autonomy to fire a finance officer in the United States who questioned whether Autonomy's financial statements were accurately stated.

o.     On or about October 19, 2010, Autonomy issued a press release about, among other things, its financial performance in the third quarter of 2010.

p.     On or about December 29, 2010, a co-conspirator directed Autonomy employees to prepare a side letter for a transaction that would not otherwise close in the fourth quarter of 2010.

q.     On or about January 18, 2011, CHAMBERLAIN caused an Autonomy employee in San Francisco to backdate a draft, unexecuted license agreement with a counterparty.

r.     On or about January 26, 2011, CHAMBERLAIN caused an Autonomy officer to e-mail a backdated license agreement to Autonomy's independent auditors.

SUPERSEDING INDICTMENT                    8

1          s.      On or about February 1, 2011, Autonomy issued a press release about, among

2 other things, its financial performance in the fourth quarter (year-end) of 2010.

3          t.      On or about February 22, 2011, while in the United States, a co-conspirator

4 directed an Autonomy officer to sign, on Hussain's behalf, a management representation letter to

5 Autonomy's independent auditors stating that there were no side letters excluded from Autonomy's

6 signed sales contracts.

7          u.      On or about February 22, 2011, Autonomy issued its Annual Report and Accounts

8 for the year ended 31 December 2010.

9          v.      On or about March 4, 2011, while in Palo Alto, LYNCH participated in a video

10 conference among participants in Palo Alto and the United Kingdom to present financial and other

11 information about Autonomy to HP.

12          w.      On or about April 4, 2011, a co-conspirator caused a counterparty in the United

13 States to prepare and backdate an agreement to license Autonomy software, which ultimately was

14 recorded as revenue in the first quarter of 2011.

15          x.      On or about April 14, 2011, a co-conspirator met in San Francisco with the

16 counterparty and an Autonomy officer and discussed a backdated licensing agreement.

17          y.      On or about April 21, 2011, Autonomy issued a press release about, among other

18 things, its financial performance in the first quarter of 2011.

19          z.      On or about July 27, 2011, Autonomy issued a press release about, among other

20 things, its financial performance in the second quarter of 2011.

21          aa.     On or about August 4, 2011, LYNCH, CHAMBERLAIN, and others caused

22 Autonomy to provide to HP and its advisors false and misleading listings of Autonomy's top contracts

23 and customers.

24          bb.     On or about August 18, 2011, to induce the offer by HP and HP Vision, LYNCH

25 executed a letter irrevocably undertaking to accept the offer, agreeing to recommend the offer to others,

26 and warranting that all information provided by him for inclusion in any document issued in connection

27 with the offer was true and accurate in all respects and not misleading in any respect.

28

SUPERSEDING INDICTMENT        9

cc.     On or about October 17, 2011, HP Vision wired £439,030,699.34 from Citibank account xx291, in the name of Hewlett-Packard Vision B.V., to Royal Bank of Scotland account xx035, in the name of Capita Registrars Limited Crest Clearing Account.

dd.     On or about October 17, 2011, HP Vision wired £127,335,580.50 from Citibank account xx291, in the name of Hewlett-Packard Vision B.V., to Royal Bank of Scotland account xx615, in the name of Capita Registrars Ltd Re: Hewlett-Packard Vision B.V./Autonomy Corporation Plc – Takeover Cash Consideration A/C.

ee.     On or about October 31, 2011, HP Vision wired £130,874,158.22 from Citibank account xx291, in the name of Hewlett-Packard Vision B.V., to Royal Bank of Scotland account xx035, in the name of Capita Registrars Limited Crest Clearing Account.

24.     As part of the scheme to defraud, LYNCH, CHAMBERLAIN, Hussain, and others, caused Autonomy to make materially false and misleading statements directly to HP regarding Autonomy's financial condition, performance, and business, including:

a.     Making false and misleading statements regarding the nature of Autonomy's products and concealing Autonomy's non-appliance hardware sales;

b.     Making false and misleading statements regarding the number and nature of Autonomy's OEM license sales and revenues;

c.     Making false and misleading statements regarding Autonomy's top customers;

d.     Making false and misleading statements regarding Autonomy's top contracts; and

e.     Making other false and misleading statements during HP's "due diligence" about Autonomy prior to announcing the acquisition.

COUNT ONE:     (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

25.     The factual allegations in Paragraphs 1 through 24 are re-alleged and incorporated by reference.

26.     Beginning in or about January of 2009, and continuing until in or about October 2011, in the Northern District of California and elsewhere, the defendants,

MICHAEL RICHARD LYNCH and
STEPHEN KEITH CHAMBERLAIN,

SUPERSEDING INDICTMENT                    10

and others, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud as to a material matter and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of executing such scheme and artifice and attempting to do so, did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

COUNTS TWO THROUGH FIFTEEN:      (18 U.S.C. §§ 1343 and 2 – Wire Fraud)

27.      The factual allegations in Paragraphs 1 through 24 are re-alleged and incorporated by reference.

28.      On or about the dates set forth below, in the Northern District of California and elsewhere, the defendants,

MICHAEL RICHARD LYNCH and
STEPHEN KEITH CHAMBERLAIN,

did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud as to a material matter and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of executing such scheme and artifice and attempting to do so, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, namely:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| TWO | 1/26/2011 | E-mail from J.S. in the Northern District of California to S.C. dated 1/26/2011 regarding "FW: autn_boa" |
| THREE | 2/1/2011 | Press release titled "Autonomy Corporation plc Announces Results for the Year Ended December 31, 2010," distributed from Cambridge, England, to the Northern District of California |
| FOUR | 2/3/2011 | Video conference involving participants in Palo Alto, California, and the United Kingdom |
| FIVE | 3/4/2011 | Video conference involving participants in Palo Alto, California, and the United Kingdom |

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| SIX | 4/4/2011 | E-mail from M.H. to S.E. in the Northern District of California dated 4/4/2011 regarding "Prisa VAR" |
| SEVEN | 4/21/2011 | Press release titled "Autonomy Corporation plc Trading Update for the Quarter Ended March 31, 2011," distributed from the United Kingdom to the Northern District of California |
| EIGHT | 7/27/2011 | Press release titled "Autonomy Corporation plc Announces Interim Results for the Six Months Ended June 30, 2011," distributed from United Kingdom to the Northern District of California |
| NINE | 8/1/2011 | Conference call to United States toll-free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| TEN | 8/2/2011 | Conference call to United States toll-free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| ELEVEN | 8/3/2011 | Conference call to United States toll-free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| TWELVE | 8/4/2011 | Conference call to United States toll-free number (866) 409-2889 by multiple numbers in the Northern District of California and United Kingdom |
| THIRTEEN | 8/4/2011 | E-mail from A.H. in the United Kingdom to F.M. and others in the Northern District of California regarding "Project Daniel 1Room" attaching "Data Room Updates 509381013.4DOC" |
| FOURTEEN | 8/5/2011 | E-mail from A.K. to M.S. and others in the Northern District of California regarding "RE: Tesla: Updated Legal DD Questions" |
| FIFTEEN | 10/4/2011 | E-mailed letter from Capita Registrars in the United Kingdom to M.S. and A.J. in the Northern District of California, requesting payments of £5,445,493,678.35 and £24,065,825.50 |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

COUNT SIXTEEN:          (18 U.S.C. §§ 1348 and 2 – Securities Fraud)

29.     The allegations in Paragraphs 1 through 24 are realleged and incorporated as if fully set forth here.

30.     In or about August 2011, in the Northern District of California and elsewhere, the defendant,

MICHAEL RICHARD LYNCH,

did knowingly and intentionally execute, and attempted to execute, a scheme and artifice (a) to defraud any person in connection with securities of HPQ, an issuer with a class of securities registered under

SUPERSEDING INDICTMENT          12

Section 12 of the Securities Exchange Act of 1934, and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of HPQ, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, and did aid and abet in the same.

In violation of Title 18, United States Code, Sections 1348 and 2.

COUNT SEVENTEEN:        (18 U.S.C. § 371 – Conspiracy)

31.    The allegations in Paragraphs 1 through 24 are realleged and incorporated as if fully set forth here.

32.    Beginning in or about October 2011, and continuing until in or about November 2018, in the Northern District of California and elsewhere, the defendants,

MICHAEL RICHARD LYNCH and
STEPHEN KEITH CHAMBERLAIN,

and others, did knowingly conspire to commit offenses against the United States, namely (a) circumventing a system of internal accounting controls of an issuer of securities registered under Section 12 of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Section 78m, (b) tampering with witnesses, victims, and informants, in violation of Title 18, United States Code, Section 1512, (c) obstructing proceedings before departments, agencies, and committees, in violation of Title 18, United States Code, Section 1505, and (d) engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

33.    The objectives of the conspiracy were, among other things, to cover up, conceal, influence witnesses to, and otherwise obstruct investigations of the scheme to defraud set forth in Paragraphs 19 through 24 by, among other things, (a) falsifying, destroying, and stealing business records of HP, (b) altering, destroying, mutilating, and concealing records, documents, and objects with intent to impair their integrity and availability for use in official proceedings, (c) paying hush money and other benefits to influence, delay, and prevent the testimony of persons in official proceedings, (d) otherwise obstructing, influencing, and impeding official proceedings, and (e) laundering the proceeds of the Autonomy acquisition.

//

SUPERSEDING INDICTMENT              13

Overt Acts

34.    In furtherance of the conspiracy and to effect the objects thereof, in the Northern District of California and elsewhere, LYNCH, CHAMBERLAIN, and others committed the following overt acts:

   a.    On or about October 7, 2011, LYNCH transferred £100,000,000 from an account at UBS to an account at HSBC Private Bank.

   b.    On or about October 7, 2011, LYNCH transferred £100,000,000 from an account at UBS to an account at Barclay's Private Bank.

   c.    On or about October 7, 2011, LYNCH transferred £100,000,000 from an account at UBS to an account at JP Morgan International Bank.

   d.    On or about October 7, 2011, LYNCH transferred £100,000,000 from an account at UBS to an account at Merrill Lynch Portfolio Managers.

   e.    On or about February 3, 2012, CHAMBERLAIN and Hussain directed an HP finance employee to falsely record approximately $5.5 million in revenue to be included in HP's financial statements for the period ending January 31, 2012.

   f.    In or about May 2012, Hussain instructed an HP executive to falsify a revenue forecast.

   g.    In or about May 2012, a co-conspirator caused the destruction of hard drives in HP's Cambridge office.

   h.    In or about May 2012, a co-conspirator instructed an HP employee to erase CHAMBERLAIN's laptop computer and any backup.

   i.    In or about May 2012, a co-conspirator attempted to remove the laptop of another co-conspirator from HP's offices.

   j.    On or about June 1, 2012, LYNCH transferred £20,000,000 from an account at UBS to an account at Merrill Lynch Portfolio Managers.

   k.    On or about July 6, 2012, LYNCH caused the incorporation of ICP London Limited ("Invoke") in the British Virgin Islands.  LYNCH used Invoke and entities affiliated with Invoke as a means to pay former Autonomy employees, including Hussain.

SUPERSEDING INDICTMENT                    14

1         l.     On or about July 29, 2012, in an interview with counsel for HP, LYNCH made

2 false and misleading statements to counsel for HP.

3         m.     In or around January 2013, and thereafter, LYNCH refused to return books and

4 records and other property belonging to HP.

5         n.     In or about February 2013, a co-conspirator stole HP's confidential information

6 by uploading thousands of documents from her company laptop to a USB device/pen drive, in violation

7 of HP's policies and internal controls.  The co-conspirator subsequently provided some or all of the

8 documents to LYNCH and Hussain.

9         o.     In or around May 2016, LYNCH caused an Invoke affiliate to hire

10 CHAMBERLAIN.

11         p.     On or about February 19, 2018, LYNCH purchased shares of an Invoke affiliate

12 from Hussain for approximately $3.5 million.

13         q.     On or about June 27, 2018, LYNCH purchased shares of an Invoke affiliate from

14 Hussain for approximately $730,000.

15     In violation of Title 18, United States Code, Section 371.

16
17 FORFEITURE ALLEGATION:     (18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture)

18     35.    The allegations in Paragraphs 1 through 34 are re-alleged and incorporated by reference

19 for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and

20 982(a), and Title 28, United States Code, Section 2461.

21     36.    Upon conviction of any of the offenses alleged in Counts One through Fifteen, the

22 defendants,

23                      MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN,

24

25 shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and

26 982(a), and Title 28, United States Code, Section 2461, any property, real and personal, which

27 constitutes or is derived from proceeds traceable to said violations, including but not limited to a sum of,

28 not less than $804 million by LYNCH and $4 million by CHAMBERLAIN, each sum representing the

SUPERSEDING INDICTMENT         15

1    amount of proceeds obtained as a result of the offenses alleged in Counts One through Fifteen.

2         37.    Upon conviction of the offense alleged in Count Sixteen, the defendant,

3                            MICHAEL RICHARD LYNCH,

4    shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and

5    982(a), and Title 28, United States Code, Section 2461, any property, real and personal, which

6    constitutes or is derived from proceeds traceable to said violations, including but not limited to a sum of,

7    not less than $804 million, representing the amount of proceeds obtained as a result of the offense

8    alleged in Count Sixteen.

9         38.    If, as a result of any act or omission of the defendant, any of said property

10            a.  cannot be located upon the exercise of due diligence;

11            b.  has been transferred or sold to or deposited with a third person;

12            c.  has been placed beyond the jurisdiction of the Court;

13            d.  has been substantially diminished in value; or

14            e.  has been commingled with other property, which cannot be divided without difficulty;

15   any and all interest defendant has in any other property shall be forfeited to the United States, pursuant

16   to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code,

17   Section 2461.

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

SUPERSEDING INDICTMENT          16

1      All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28,

2  United States Code, Section 2461.

3  DATED:  March 21, 2019                    A TRUE BILL

4

5                                            _____

6                                            FOREPERSON

7  DAVID L. ANDERSON
   United States Attorney

8

9  _____

10  HALLIE HOFFMAN
    Chief, Criminal Division

11

12  _____

13  ROBERT S. LEACH
    Assistant United States Attorney

14

15  _____

16  ADAM A. REEVES
    Assistant United States Attorney

17

18  _____

19  WILLIAM FRENTZEN
    Assistant United States Attorney

20

21

22

23

24

25

26

27

28

SUPERSEDING INDICTMENT                  17