Gary S. Lincenberg - State Bar No. 123058
  glincenberg@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Stephen Keith
Chamberlain

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>MICHAEL RICHARD LYNCH AND STEPHEN KEITH CHAMBERLAIN<br><br>    Defendants. | CASE NO. 3:18-cr-00577-CRB<br><br>**DEFENDANT STEPHEN CHAMBERLAIN'S NOTICE OF MOTION AND MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) AND LETTERS ROGATORY PURSUANT TO 28 U.S.C. § 1781 RELATING TO DAUD KHAN AND PAUL MORLAND; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Filed Concurrently with DECLARATION OF GARY S. LINCENBERG; [PROPOSED] ORDER<br><br>Date:      November 24, 2021<br>Time:      1:30 p.m.<br>Crtrm.:    6<br><br>Assigned to Hon. Charles R. Brever |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:**

PLEASE TAKE NOTICE that on November 24, 2021, or as soon thereafter as the matter may be heard, defendant Stephen Chamberlain, by and through counsel, will and hereby does move this Honorable Court for an order authorizing the Issuance of Subpoenas *Duces Tecum* pursuant to Federal Rule of Criminal Procedure 17(c)(1) and Local Rule 17-2(a), and for the Issuance of Letters Rogatory pursuant to 28 U.S.C. § 1781. The proposed subpoenas are attached as Exhibits 1, 3, 4, 5, 7, and 9 of the concurrently filed Declaration of Gary S. Lincenberg, and the proposed letters rogatory are attached as Exhibits 2, 6, and 8 of the same.

DATED:  November 1, 2021

Gary S. Lincenberg
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By: _____
Gary S. Lincenberg
Attorneys for Defendant Stephen Keith
Chamberlain

# TABLE OF CONTENTS

**Page** Toc86586777

I.    SUMMARY OF ARGUMENT ....................................................................................1

II.   BACKGROUND.........................................................................................................4

    A.    Allegations ........................................................................................................4

    B.    Analyst Testimony ...........................................................................................5

    C.    The J.P. Morgan Discovery...............................................................................6

        a.    Knowledge of Autonomy Accounting Practices ...............................6

        b.    Personal Animus ...............................................................................7

        c.    Personal Gain ....................................................................................8

        d.    Collusion ...........................................................................................9

III.  ADDITIONAL MATERIAL SOUGHT ....................................................................10

IV.   APPLICABLE LEGAL STANDARDS.....................................................................12

    A.    Federal Rule of Criminal Procedure 17(c) .....................................................12

    B.    Letters Rogatory .............................................................................................14

V.    THE REQUESTED SUBPOENAS AND LETTERS ROGATORY MEET THE RELEVANT LEGAL STANDARDS.........................................................................14

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Bowman Dairy Co.* v. *United States*,
341 U.S. 214 (1951) ........................................................................................... 13

*California v. Trombetta*,
467 U.S. 479, 485 (1984) .................................................................................. 13

*In re Martin Marietta Corp.*,
856 F.2d 619 (4th Cir. 1988) ............................................................................. 13

*United States* v. *Al Fawwaz*,
No. 98-cr-1023, 2014 WL 627083 (S.D.N.Y. Feb. 18, 2014) ........................... 14

*United States v. Johnson*,
No. 14-cr-412, 2014 WL 6068089 (N.D. Cal. Nov. 13, 2014) .......................... 16

*United States v. Komisaruk*,
885 F.2d 490 (9th Cir. 1989) ............................................................................. 13

*United States v. Krane*,
625 F.3d. 568 (9th Cir. 2010) ............................................................................ 13

*United States* v. *Lee*,
723 F.3d 134 (2d Cir. 2013) .............................................................................. 14

*United States v. Martinov*,
No. 11-cr-312, 2012 WL 3987329 (N.D. Cal. Sept. 11, 2012) ......................... 16

*United States v. Nixon*,
418 U.S. 683 (1974) ............................................................................ 1, 3, 13, 14

*United States* v. *Rajaratnam*,
753 F. Supp. 2d 317 (S.D.N.Y. 2011) ............................................................... 13

*United States* v. *Staples*,
256 F.2d 290 (9th Cir. 1958) ............................................................................. 14

*United States* v. *Tucker*,
249 F.R.D. 58 (S.D.N.Y. 2008) ......................................................................... 13

*United States* v. *Wedding*,
No. 08-cr-2386, 2009 WL 1329146 (S.D. Cal. May 13, 2009) ......................... 14

*United States* v. *Weisberg*,
No. 08-CR-347, 2010 WL 5027537 (E.D.N.Y. Dec. 3, 2010) ........................... 14

*United States* v. *Yousef,*
    327 F.3d 56 (2d Cir. 2003) ................................................................... 14

**Federal Statutes**

28 U.S.C. § 1781 ............................................................... 1, 2, 1, 14

**Other Authorities**

Federal Rule of Criminal Procedure Rule 17(c) ........................................ *passim*

Criminal Local Rule 17-2 ................................................... 2, 1, 13, 14

# MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Stephen Chamberlain respectfully requests that the Court issue subpoenas and letters rogatory to Daud Khan, Paul Morland, and their prior relevant employers pursuant to Federal Rule of Criminal Procedure 17(c)(1), Local Rule 17-2(a), and 28 U.S.C. § 1781. The proposed subpoenas and letters rogatory are attached to the accompanying Declaration of Gary S. Lincenberg ("Lincenberg Decl.") as Exhibits 1 through 9. These discovery requests seek relevant, specific, and admissible evidence, and are therefore authorized by *United States v. Nixon,* 418 U.S. 683, 700 (1974), as well as central to Chamberlain's defense to the charges contained in the Second Superseding Indictment. (ECF No. 21) ("SI").

## I.    SUMMARY OF ARGUMENT

The SI alleges that Chamberlain and his co-defendant, Dr. Michael Lynch (collectively, "Defendants"), along with others, defrauded purchasers and sellers of Autonomy securities, including, specifically, Hewlett-Packard Company ("HP") in connection with its purchase of Autonomy Corporation plc ("Autonomy") in August 2011. SI ¶¶ 19, 21. As they did in the earlier *United States v. Hussain* trial, the government appears likely to rely heavily on testimony from UK-based securities analysts Daud Khan and Paul Morland in connection with its claim that the market was deceived by Autonomy's financial statements and earnings calls. Khan and Morland have each already testified in *three* separate proceedings relating to HP's acquisition of Autonomy: the *Hussain* trial, UK civil trial[1], and UK Financial Reporting Council ("FRC") proceedings against Deloitte.[2] In each of these proceedings, Khan and Morland held themselves out as independent and objective analysts who were deceived by Autonomy's alleged misrepresentations.

But the discovery suggests the opposite: the two analysts were neither objective nor misled. Documents produced to Chamberlain in discovery indicate that Khan and Morland

---

[1] Autonomy Corp. Ltd. v. Lynch and Hussain, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.), referred to as "UK civil trial."

[2] Khan and Morland were the sole external fact witnesses to present evidence in the FRC proceedings.

improperly shared and discussed confidential research and rating decisions with one another; actively sought confidential internal information about Autonomy; engaged in concerted and improper efforts to depress Autonomy's share price for their and their short-selling clients' benefit; and improperly shared internal compliance matters with persons outside a regulated organization. Further, these documents make clear that Khan and Morland were vehemently antagonistic towards Autonomy and its management. The requested discovery is needed to demonstrate this misconduct, which Chamberlain believes will directly contradict the allegations against him.

More specifically, these documents show that Khan and Morland (who worked for separate companies) colluded with one another. They led a group of "bear" analysts (i.e., analysts who predicted that Autonomy's stock would decline) who closely coordinated their coverage of Autonomy. They peddled a negative view of Autonomy's growth prospects to other analysts, investors, and ultimately to HP. Additionally, the documents reveal that Khan and Morland were engaged in a long-running *personal* feud with Autonomy executives. They were closely aligned with "short sellers" who stood to profit handsomely if Autonomy's share price decreased. Indeed, the documents show that Khan and Morland made sport of "Autonomy bashing,"[3] that Khan likened Dr. Lynch to "Hitler,"[4] that Khan boasted about being like an "AK 47,"[5] and that Khan believed taking down Autonomy was his "ticket" to success.[6] In sum, these documents contradict key aspects of Khan and Morland's prior testimony, indicate that they were not misled by Autonomy management, and show that their behavior was unethical, likely a breach of their UK

---

[3] *See* Lincenberg Decl. Ex. 10 (Email from Paul Morland to Daud Khan (Sep. 5, 2009, 14:25)) at 3.

[4] *See* Lincenberg Decl. Ex. 11 (Chat Transcript between Daud Khan and Bram Cornelisse (Oct. 12, 2010, 16:27)) at 1.

[5] *See* Lincenberg Decl. Ex. 12 (Chat Transcript between Daud Khan and Sherief Bakr (Apr. 28, 2009, 18:24)) at 6.

[6] *See* Lincenberg Decl. Ex. 13 (Chat Transcript between Daud Khan and Peter McNally (Jan. 25, 2010, 15:30)) at 2.

regulatory obligations, and potentially criminal.[7]

The documents referenced above were produced to the government by Khan's former employer, J.P. Morgan Chase & Co. ("the J.P. Morgan documents"). The J.P. Morgan documents at issue are contained within a series of productions made by J.P. Morgan to the government between 2015 and 2018. Two of these productions related specifically to Khan, and consist of approximately 1000 of Khan's electronic communications covering the period from January 1, 2008 to August 31, 2011.[8] The government apparently obtained emails from only one of Khan's J.P. Morgan accounts from this period that hit on one or more of the following search terms: "Lynch," "Hussain," "Kanter," or "Autonomy*."

A party seeking pretrial production of documents "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Nixon,* 418 U.S. at 700. Chamberlain's request meets these three requirements. The Rule 17(c) subpoenas and letters rogatory requested here are necessary to obtain specific relevant and admissible evidence relating to the SI's allegations, including by establishing that these analysts (and the market more broadly) were not misled by Autonomy's financial statements (which Mr. Chamberlain helped prepare). Indeed, the emails produced to date are only the tip of the iceberg. First, "Chamberlain" was not even a search term that the government required J.P. Morgan to use to identify documents to be produced. Second, it is apparent from the documents produced that Khan used other email addresses while employed by J.P. Morgan aside from the email address from which the production was made. Third, the

_____

[7]   Khan and Morland were both subject to UK regulations that required them to, among other things, act with integrity and observe proper standards of market conduct. As research analysts, they were also prohibited from becoming involved in activities (other than the preparation of investment research) where such involvement was inconsistent with the maintenance of their objectivity. To the extent that Khan and Moreland procured confidential inside information, they may have also breached criminal prohibitions against insider dealing.

[8] Khan was on gardening leave from J.P. Morgan between April 2011–August 2011, so the production does not include any of his correspondence after April 2011. *See* Lincenberg Decl. Ex. 14 (Excerpt of Third Witness Statement of Daud Khan, *Autonomy Corp. Ltd. v. Lynch*, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.)) at § 10; *See* Lincenberg Decl. Ex. 15 (Excerpt of Daud Khan UK Testimony, Day 14, *Autonomy Corp. Ltd. v. Lynch*, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.)) at 19:22–20:2.

government has not produced any communications from Khan's prior or subsequent employers, even though Khan's coverage of Autonomy (and subsequent communications with HP) was not limited to the 2008 to 2011 timeframe.[9] Fourth, while there are extensive relevant communications between Khan and Morland from January 2009 to February 2010, inexplicably there are none before or after this period. Fifth, the search term used to identify Autonomy-related communications ("Autonomy*") would have missed communications referencing Autonomy by its common abbreviations "AU," "AUT," or stock ticker symbol "AUTN." Sixth, the government has not produced *any* communications from Morland's employers, so that, other than Morland emails produced in the Khan production, there has been no production of emails from this central witness. Seventh, the production does not include any emails or text messages from either Khan or Morland's personal accounts, despite clear evidence in the production that Khan used his personal Gmail account for business purposes (and that Khan was on leave from J.P. Morgan from April 2011 through September 2011—when the Autonomy acquisition was announced—and therefore surely would have relevant communications on his personal accounts from this period).

To remedy this critical deficiency, Mr. Chamberlain seeks the issuance of subpoenas to six entities, and related letters rogatory, to obtain documents which will allow counsel to effectively rebut the analysts' testimony and the government's claim that the Defendants misled investors and HP.

## II.  BACKGROUND

### A.  Allegations

The government alleges that Chamberlain, the former Vice President of Finance at Autonomy, schemed with others to present misleading information in its published financial statements which were shared with investors and analysts. *See* SI ¶¶ 5, 13, 14, 18. The government

---

[9] Khan was employed at investment bank Cazenove beginning in 2006. Cazenove was acquired by J.P. Morgan in 2010, and Khan remained with the company through September 2011. *See* Lincenberg Decl. Ex. 16 (Excerpt of First Witness Statement of Daud Khan, *Autonomy Corp. Ltd. v. Lynch*, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.)) at § 4. However, Khan testified that he began covering Autonomy in 2001. *Id.* at §§ 7–10, and he continued reporting on Autonomy's performance and provided information to HP after the acquisition in 2011. *See* Lincenberg Decl. Ex. 15 at 5:17–21.

also alleges that the Defendants intimidated and pressured analysts like Khan and Morland who questioned Autonomy's performance. *Id.* at ¶¶ 22(c), 22(j).

## B. Analyst Testimony

Daud Khan began covering Autonomy in 2001, and worked as an analyst for various investment firms (including Cazenove) from 2006 to 2011 (which was acquired by J.P. Morgan in 2010), and Berenberg from 2011 to 2015.[10] Khan continued to report on Autonomy after it was acquired by HP in 2011, issuing a research note in March 2013 about Autonomy and HP.[11]

Morland started covering Autonomy in 2005 when he was at Société Générale. He then moved to Arbuthnot Securities in late 2005, where he continued to report on Autonomy. Morland also covered Autonomy intermittently from July 2008 to June 2010 while he worked at Astaire Securities, and from June 2010 to June 2013 while at Peel Hunt.[12] Both Morland and Khan provided information to HP about Autonomy's financial reporting after the acquisition.[13]

In the *Hussain* trial, the government presented Khan and Morland as objective, independent market observers who found that Autonomy management presented deceptive information regarding (i) revenue from hardware sales; (ii) Original Equipment Manufacturer ("OEM") revenue; and (iii) cost allocation relating to the launch of its new Structured Probabilistic Engine ("SPE") product in Q3 2009, among other things.[14] They claimed that this inflated financial information led to an inflated share price.[15] Like Hussain, Chamberlain is charged with providing false information to analysts. *See* SI ¶ 22(c). The government alleges that Chamberlain

---

[10]  Lincenberg Decl. Ex. 16 at § 4; Lincenberg Decl. Ex. 14 at § 11.

[11]  *See* Lincenberg Decl. Ex. 17 (Daud Khan, "*Confessions of an Autonomy Bear*," BERENBERG BANK, Mar. 6, 2013).

[12]  Lincenberg Decl. Ex. 18 (Excerpt of First Witness Statement of Paul Morland, *Autonomy Corp. Ltd. v. Lynch*, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.)) at §§ 5–8.

[13]  *See, e.g.,* Lincenberg Decl. Ex. 19 (Email from Robert Binns to Paul Morland (Dec. 6, 2012, 09:03)) at 1; Lincenberg Decl. Ex. 15 at 5:17–21.

[14]  Lincenberg Decl. Exs. 20 and 21 (Trial Tr. *Passim, United States* v. *Hussain,* No. CR 16-462 CRB (N.D. Cal. March 27, 2018 and Apr. 13, 2018)).

[15]  *See id.*

was responsible for preparing Autonomy's financial statements, which were shared with analysts and investors, and that Autonomy and its executives, "intimidate[ed] and pressure[ed] analysts … who raised questions about or openly criticized Autonomy's financial practices and performance." *See* SI ¶ 22(j).[16] The government will likely rely on Khan and Morland to prove these allegations, and without the full picture of their communications, Chamberlain will be hampered in his ability to challenge the government's evidence.

### C. The J.P. Morgan Discovery

The J.P. Morgan documents include approximately 270 emails between Morland and Khan. These emails contradict key aspects of Khan and Morland's prior testimony. They negate the government's central contention that Khan and Morland were disinterested, passive observers who, along with other market participants, were duped by the Defendants. Yet these emails are inexplicably limited to a narrow timeframe: January 2009 to February 2010.

A review of all of the limited documents that were produced shows Khan and Morland (a) had knowledge of the very accounting practices which they claimed Autonomy concealed; (b) bore significant personal animus toward Autonomy and Autonomy management; (c) led a group of analysts who closely coordinated their research, improperly solicited and shared confidential information, coordinated ratings changes, and colluded in their efforts to attack Autonomy's management and depress its share price; and (d) were driven by personal agendas and worked with short sellers who would benefit from a price drop. The review also reveals the existence of related, relevant communications that have not been produced.

### a. Knowledge of Autonomy Accounting Practices

---

[16]  *See also* Lincenberg Decl. Ex. 22 (Government's Opening Statement, *United States v. Hussain*, No. CR 16-462 CRB (N.D. Cal. Feb. 26, 2018)) at 20:23-21:7. ("You will hear about the importance of revenue from some of the analysts who followed Autonomy. The analysts had the job of scouring the public domain for information about Autonomy, reading its financial statements, reading news reports, talking to Mr. Hussain, talking to Mr. Lynch, talking to anybody they could find who had information about the company, and then preparing reports or research that projected how Autonomy was going to do, what was its revenue going to be. And it sold those reports to investors who made investment decisions on whether to buy or sell Autonomy securities.")

Most pertinent to the government's allegations against Chamberlain, the J.P. Morgan documents reveal that Khan and other analysts discussed specific accounting practices that the government later claimed Autonomy concealed.[17] These emails directly contradict the government's theory that Autonomy misled the market regarding the composition of its revenue.[18]

Moreover, while Chamberlain does not yet have custodial documents from Morland, discovery produced to date from another financial institution includes an email that reflects Morland closely followed and was aware of Autonomy's hardware sales.[19] This undermines the government's closing argument in the *Hussain* trial that he was deceived in this regard.[20]

### b. Personal Animus

Khan testified that he did not have "negative or positive feelings" about members of Autonomy management,[21] and that there was never anything "personal" between himself and Autonomy management.[22] The emails show this was a lie. Indeed, in April 2009, Khan discussed with Sherief Bakr, an analyst at Citigroup Global, how Khan "[took] pleasure in windinhingup [*sic*]

---

[17] *See, e.g.,* Lincenberg Decl. Ex. 23 (Email from Daud Khan to Vijay Anand (Jan. 27, 2010, 14:03)) at 1 (discussing the breakdown of Autonomy's OEM revenue); Lincenberg Decl. Ex. 24 (Email from Daud Khan to John Gladwyn (May 1, 2009, 15:25)) at 1 (discussing the nature of Autonomy's OEM business).

[18] *See also* Lincenberg Decl. Ex. 25 (Email from Paul Morland to Daud Khan and Roger Phillips (Sep. 9, 2009, 15:35)) at 1 (discussing costs relating to the SPE product).

[19] *See, e.g.,* Lincenberg Decl. Ex. 26 (Email from Paul Morland to Michael Briest (July 23, 2010, 07:21)) at 1 ("I know you didn't consider the hardware sale material [on Autonomy's earnings call] yesterday," and added, "[t]here are only two ways to look at this. Either all your growth is coming from hardware or license sales are in reverse, [s]o I would say it is wrong to ignore hardware sales").

[20] *See* Lincenberg Decl. Ex. 27 (Government's Closing Argument, Transcript of Record, *United States v. Hussain*, No. CR 16-462 CRB (N.D. Cal. Apr. 23, 2018)) at 5775:17-20 ("Mr. Morland said that if he'd known about the scale of the hardware sales, that would have had a massive impact—negative impact on his evaluation of the company.").

[21] *See* Lincenberg Decl. Ex. 20 (Excerpt of Daud Khan Testimony, Transcript of Record, *United States v. Hussain*, No. CR 16-462 CRB (N.D. Cal. Mar. 27, 2018)) at 3029:20–22.

[22] *See* Lincenberg Decl. Ex. 28 (Excerpt of Daud Khan UK Testimony, Day 14, *Autonomy Corp. Ltd. v. Lynch*, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.)) at 56:11–16.

Lynch," and relished in being a "thorn in [Lynch's] side … then a dagger … then an **ak 47**."[23] Khan also expressed joy when Autonomy's stock performed badly, explaining how he was "over the moon," and even noting that he was "maybe being too hopeful but [he could] see an image of a hitler moment for Mike [Lynch], where his generals tell him the war is lost and that he has to step down."[24] These emails show that Khan was not, as the government claims, an objective analyst whose views were representative of "market understanding."

Morland was similarly hostile towards Autonomy, noting, for example, that he was looking forward to "Autonomy bashing" with Khan.[25] Since the government has not obtained any communications from Morland's former employers, most of Morland's communications are missing. But the emails that have been produced, like the example above, reveal Morland's contempt for Autonomy.

### c.   **Personal Gain**

Khan previously testified that he was not "working with" short sellers or advancing their interests,[26] that his coverage of Autonomy did not have "any material impact on [his] pay or reputation," and that he had no "agenda" in his reporting.[27] The J.P. Morgan documents flatly contradict this. For example, in a communication with Farringdon Capital[28], investor Bram Cornelisse told Khan that he was buying back more Autonomy stock, but that he would "keep a position." Khan replied, "well [I] hope you have made some money finally. . . next short to look at

---

[23]   *See* Lincenberg Decl. Ex. 12 at 6 (emphasis added).

[24]   Lincenberg Decl. Ex. 11 at 1.

[25]   Lincenberg Decl. Ex. 10 at 3.

[26]   Short sellers are generally investors who make trades designed to profit when a company's shares decrease. An analyst's "sell" recommendation may drive a company's share price down, and therefore benefit short sellers who profit from the decrease. *See* Lincenberg Decl. Ex. 15 at 15:16–22.

[27]   *See* Lincenberg Decl. Ex. 20 (Excerpt of Daud Khan Testimony, Transcript of Record, *United States v. Hussain*, No. CR 16-462 CRB (N.D. Cal. Mar. 27, 2018)) at 3046:1–14; Lincenberg Decl. Ex. 14 at §§ 4–5.

[28]   Farringdon Capital was a hedge fund which, according to Khan, shorted Autonomy's stock. Lincenberg Decl. Ex. 15 at 14:2–8.

is Software AG . . . ."[29] In another conversation with Khan in January 2011, Cornelisse told Khan that he was thinking of "**shorting some more**," and explained that he was "fully out at 1250, then reshorted a little at 1400 with the intention to do more at 1600."[30] These emails show Khan's close ties to an investor shorting Autonomy and contradict Khan's testimony that he was not working on behalf of short sellers. Central to the government's attempt to prove deception is Khan's testimony that he is objective and has no agenda. To the contrary, in emails, Khan stated that he was "hoping Autonomy blows up and its [sic] my ticket outta here."[31] In showing that Khan was personally banking on Autonomy's failure, the emails undermine the government's proof.

### d.  Collusion

Both Khan and Morland denied ever working with either each other or other analysts when preparing research and reports about Autonomy. Khan testified that he and Morland were "competitors," not collaborators, and that he "didn't have access to other people's research notes."[32] Morland also testified that he did not generally read other analysts' materials.[33]

The J.P. Morgan documents, however, show a staggering amount of collusion. Khan and Morland regularly shared confidential information and coordinated their reporting.[34] They created an "Autonomy Discussion Group" with two other analysts, Kevin Ashton at Canaccord, and Roger

---

[29] Lincenberg Decl. Ex. 11 at 2.

[30] Lincenberg Decl. Ex. 29 (Chat Transcript between Bram Cornelisse and Daud Khan (Jan. 11, 2011, 15:51)) at 1 (emphasis added). *See also* Lincenberg Decl. Ex. 30 (Email from Daud Khan to Paul Morland (July 29, 2009, 14:55)) at 1 (Khan says, "just spoke with [L]one [P]ine – they would be happy to support a deal.").

[31]  Lincenberg Decl. Ex. 13 at 2.

[32] Lincenberg Decl. Ex. 28 at 79:16–21; Lincenberg Decl. Ex. 20 (Excerpt of Daud Khan Testimony, Transcript of Record, *United States v. Hussain*, No. CR 16-462 CRB (N.D. Cal. Mar. 27, 2018)) at 3062:19–23.

[33] Lincenberg Decl. Ex. 31 (Excerpt of Paul Morland UK Testimony, Day 13, *Autonomy Corp. Ltd. v. Lynch*, Claim No. HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.)) at 5:18–20.

[34] *See, e.g.*, Lincenberg Decl. Ex. 32 (Email from Daud Khan to Paul Morland (Jan. 27, 2009, 15:27)) at 1 (Khan explained his "proprietary" analysis to Morland in calculating Autonomy's cumulative cash deficit).

Phillips at Evolution Securities, to coordinate (improperly) negative coverage about Autonomy's stock.[35] Khan, Morland, Ashton, and Phillips swapped theories about Autonomy and strategized about how to persuade other analysts and investors that Autonomy's share price was over-valued while maintaining an appearance of independence.[36] Morland and Khan even discussed confidential changes in recommendations.[37] Khan and Morland even tried to hide the extent of their communications.[38] In addition, the J.P. Morgan documents reveal that Khan solicited confidential information from internal sources and shared it with a select group of analysts, including Morland and David Toms at Numis.[39]

### III.     ADDITIONAL MATERIAL SOUGHT

The J.P. Morgan documents reveal significant gaps in the government's production to date. In particular, missing from the government's production are (1) additional emails and chats from Khan's tenure at J.P. Morgan; (2) communications from Khan's subsequent employers; (3) communications from Morland's employers; and (4) communications from Khan and Morland's personal email accounts and devices.

For instance, the J.P. Morgan documents include emails between Morland and Khan only from January 2009 to February 2010, even though other documents in the production extend through August 2011 (and Khan left J.P. Morgan in September 2011, after having been on leave since April 2011). Both Morland and Khan testified that they remained in contact beyond February 2010, including in July 2010 when Khan sent Morland information relating to

---

[35] *See* Lincenberg Decl. Ex. 33 (Email from Daud Khan to Kevin Ashton (Jan. 22, 2010, 11:24)) at 1.

[36] *See, e.g.*, Lincenberg Decl. Ex. 34 Email from Paul Morland to Daud Khan and Roger Phillips (Jan. 22, 2010, 13:02)) at 1.

[37] *See, e.g.,* Lincenberg Decl. Ex. 35 (Email from Daud Khan to Paul Morland, Roger Phillips and Kevin Ashton (Jan. 22, 2010, 12:48)) at 1; Lincenberg Decl. Ex. 24 at 1.

[38] *See, e.g.* Lincenberg Decl. Ex. 36 (Email from Paul Morland to Daud Khan (Sep. 21, 2009, 17:41)) at 1 (discussing keeping confidential that Khan had sent him an Autonomy internal document).

[39] *See* Lincenberg Decl. Ex. 37 (Email from Daud Khan to David Toms and Paul Morland (May 14, 2009, 09:05)) at 1.

Autonomy.[40] Khan also testified that, "[d]uring the time from 2011 onwards I've had conversations with a number of different analysts [including Morland] about the events post HP's announcement around the write-down."[41] Thus, there are at least two years of missing communications between Khan and Morland.

In addition, the government has not produced any communications from Khan's earlier tenure at Cazenove, nor from his subsequent employers, even though his involvement with Autonomy was not limited to 2008 to 2011. Indeed, both Morland and Khan worked closely with HP after HP's write-down of Autonomy in November 2012.[42] Khan also testified that he was put in contact with HP's lawyers by Morland after the write-down.[43]

The Khan/J.P. Morgan documents all appear to have been produced from the email address Daud.Khan@Cazenove.com (with a limited number of emails to DKHAN5@Bloomberg.net). The production also includes several chat communications, but only where those chats were later forwarded to the email system. Thus, it is highly likely that there are additional chats beyond those that were forwarded by email. It is also apparent from other documents included in the J.P. Morgan productions that Khan also used the J.P. Morgan email addresses Daud.Khan@jpmorgan.com and Daud.Khan@JPMResearchmail.com. These email handles were used by Khan professionally at least between April 16, 2010 and November 24, 2010.[44]

Finally, the government has not produced any communications from Khan's personal

---

[40] *See* Lincenberg Decl. Ex. 28 at 79:22–80:3.

[41] *See* Lincenberg Decl. Ex. 15 at 5:5–11.

[42] On November 20, 2012, HP announced a write down of Autonomy, citing Autonomy's alleged accounting improprieties. *See, e.g.*, Lincenberg Decl. Ex. 19 at 1 (In December 2012, Binns wrote to Morland, "Thanks for your note to HP Investor Relations, and I appreciate your offer of engagement. I'll set up a call so we can better understand your input").

[43] Lincenberg Decl. Ex. 15 at 5:17–21.

[44] *See* Lincenberg Decl. Ex. 38 (Email from Daud Khan to Kristopher Drankiewicz (Apr. 16, 2010, 07:44)) at 1; Lincenberg Decl. Ex. 39 (Email from Daud Khan to Leopold Arminjon (Sep. 8, 2010, 06:00)) at 1; Lincenberg Decl. Ex. 40 (Email from Daud Khan to Unknown Recipient (Sep. 8, 2010, 06:00)) at 1; Lincenberg Decl. Ex. 41 (Email from Lee Kirbach to Daud Khan and others (Oct. 6, 2010, 14:57)) at 1, Lincenberg Decl. Ex. 42 (Email from Lee Kirbach to Daud Khan and others (Nov. 24, 2010, 16:23)) at 1.

Gmail account, Daud.Khan@gmail.com. The documents produced reveal that Khan used his personal Gmail account for work purposes on numerous occasions between at least February 2006 and January 2010.[45] Moreover, there are no emails to or from Khan after April 2011 in the production sets, while Khan was on leave from J.P. Morgan pending his departure.[46] Emails from this period are critical, as HP announced its intention to acquire Autonomy in August 2011. As Khan had covered Autonomy for nearly a decade at that stage, he surely corresponded with other analysts and investors about the impact of the acquisition.

Indeed, Khan was cited in an anonymous hit piece about Autonomy that circulated in September 2011. Specifically, two former Autonomy employees, Harald Collet and Alex Marshall, sent an anonymous email under the pseudonym "Joe Bloggs" to numerous market participants condemning Autonomy's business practices.[47] Collet and Marshall listed Khan (who was on gardening leave at the time) at his Gmail account as a knowledgeable contact from whom recipients could obtain further information.[48] The materials sought are therefore likely to further demonstrate Khan and Morland's concerted efforts to undermine Autonomy, and therefore are central to defend against the government's core allegation that the Defendants intentionally deceived Khan, Morland and other market participants.

## IV. APPLICABLE LEGAL STANDARDS

### A. Federal Rule of Criminal Procedure 17(c)

Under Rule 17(c) of the Federal Rules of Criminal Procedure, which governs the issuance of subpoenas *duces tecum* in federal criminal proceedings,

---

[45] *See, e.g.*, Lincenberg Decl. Ex. 43 (Email from Daud Khan to Daud Khan (Jan. 10, 2010, 21:13)) 1; Lincenberg Decl. Ex. 44 (Email from Daud Khan to Daud Khan (Jan. 18, 2010, 19:13)) at 1; Lincenberg Decl. Ex. 45 (Email from Daud Khan to Michael Lynch (Feb. 6, 2006, 22:35)) at 1. *See also*, a September 16, 2011 email sent by former Autonomy employees identifying issues about Autonomy's finances, citing Khan as a person to speak with about these concerns, and listing Khan's personal Gmail account (Daud.Khan@gmail.com) as his contact information. *See* Lincenberg Decl. Ex. 46 (Email from Harald Collet to Alex Marshall, to (Sep. 16, 2011, 14:58)) at 5.

[46] *See* Lincenberg Decl. Ex. 14 at § 10.

[47] *See* Lincenberg Decl. Ex. 15 at 24:11–17.

[48] *See* Lincenberg Decl. Ex. 46 at 5.

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

Fed. R. Crim. P. 17(c); *see also* Crim. L. R. 17-2(a). The "chief innovation" of Rule 17(c) is "to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." *Bowman Dairy Co.* v. *United States*, 341 U.S. 214, 220 (1951).

In *United States* v. *Nixon*, the Supreme Court held, in the context of a prosecution subpoena to the President of the United States, that the prosecution:

> [M]ust show (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

418 U.S. at 699–700. In short, the party seeking production of documents "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id.* at 700; *see also United States v. Komisaruk*, 885 F.2d 490, 494 (9th Cir. 1989).[49]

In considering whether to grant a pre-trial subpoena, courts "engage[] in a 'discretionary, case-by-case inquiry'" considering the *Nixon* factors and the purposes for which documents are sought. *United States v. Krane*, 625 F.3d. 568, 574 (9th Cir. 2010) (quoting *United States v. Bergeson*, 425 F.3d 1221, 1225 (9th Cir. 2005)).

---

[49] To the extent that the admissibility prong of the *Nixon* standard requires a defendant to demonstrate that the evidence sought will be admissible at trial *before* he has had an opportunity to review and evaluate such evidence, the standard arguably runs afoul of the "Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor." *In re Martin Marietta Corp.*, 856 F.2d 619, 621 (4th Cir. 1988) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)). As a result, some courts have ruled that a criminal defendant seeking material from a third party need only show that the requested items are "(1) reasonable, construed as 'material to the defense,' and (2) not unduly oppressive for the producing party to respond." *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008); *see also United States v. Rajaratnam*, 753 F. Supp. 2d 317, 321 n.1 (S.D.N.Y. 2011) ("[I]t remains ironic that a defendant in a breach of contract case can call on the power of the courts to compel third-parties to produce any documents '*reasonably calculated to lead to the discovery of admissible evidence*,' . . . while a defendant on trial for his life or liberty does not even have the right to obtain documents '*material to his defense*' from those same third-parties.") (emphasis added)(citation omitted).

**B.** **Letters Rogatory**

With respect to those materials Chamberlain seeks that are discoverable under Rule 17(c) and located abroad, the Court may issue letters rogatory to appropriate judicial authorities of the countries in question for assistance in gathering documents. *See United States v. Weisberg*, No. 08-CR-347, 2010 WL 5027537, at *2 (E.D.N.Y. Dec. 3, 2010). Letters rogatory are "the medium, in effect, whereby one country, speaking through one of its courts, requests another country, acting through its own courts . . . to assist the administration of justice in the former country." *United States* v. *Al Fawwaz*, No. 98-cr-1023, 2014 WL 627083, at *2 (S.D.N.Y. Feb. 18, 2014).

Federal courts have statutory authority to issue letters rogatory in both civil and criminal cases under 28 U.S.C. § 1781. *See United States* v. *Lee*, 723 F.3d 134, 142 n.6 (2d Cir. 2013). Federal courts also have inherent authority to issue letters rogatory. *See United States* v. *Staples*, 256 F.2d 290, 292 (9th Cir. 1958); *United States* v. *Wedding*, No. 08-cr-2386, 2009 WL 1329146, at *1 (S.D. Cal. May 13, 2009). The decision to issue letters rogatory lies within a court's sound discretion. *Al Fawwaz*, 2014 WL 627083, at *2. Requests for the issuance of letters rogatory are one of the "procedural tools" at the disposal of a criminal defendant to obtain evidence located in a foreign country. *See United States* v. *Yousef*, 327 F.3d 56, 112 & n.46 (2d Cir. 2003).

## V.    THE REQUESTED SUBPOENAS AND LETTERS ROGATORY MEET THE RELEVANT LEGAL STANDARDS

Here, the records Chamberlain seeks are properly sought under Rule 17—and, for records located in a foreign country, via letters rogatory—because the elements of the *Nixon* test are satisfied: (i) the records are relevant, admissible, and specific evidence that is highly material to Chamberlain's defense; (ii) Chamberlain cannot otherwise obtain the records in advance of trial, nor can he properly prepare for trial without obtaining the documents in advance of trial; and (iii) Chamberlain is making this application in good faith, not as part of a general "fishing expedition." *See Nixon*, 418 U.S. at 699–700.

The government, HP, and the FRC each have relied heavily on the testimony of Khan and Morland to support the claim that the market was deceived by Autonomy's alleged misrepresentations. Khan and Morland are expected to testify again in this trial about the same

topics: they will likely testify that they objectively followed Autonomy for many years and that Autonomy management misled market participants about Autonomy's revenues, products, and future anticipated growth.

The discovery pertaining to Khan and Morland shows that such testimony would be misleading and incomplete. In fact, it appears that Khan and Morland were not misled by Autonomy's financial disclosures. To the contrary, they were aligned with short seller clients and staked their professional prospects on driving down Autonomy's share price. And they engaged in this highly improper behavior not independently, but by cooperating and colluding with each other, and urging others to join their club. In short, while they repeatedly testified under oath that they were trustworthy, independent analysts, in fact Khan and Morland were determined to help drive down Autonomy's stock price. Their communications reveal a deep-seated animus toward Autonomy and its executives. The discovery materials show that Khan and Morland were far from disinterested, objective, and independent market observers diligently trying to analyze Autonomy's finances in aid of investors.

What defense counsel have seen thus far, however, appears to be only a sliver of Khan and Morland's relevant communications. For example, Morland's custodial documents are entirely missing from the government's production, as are communications from Khan's and Morland's other employers, communications between the two of them after February 2010, and all communications to or from their personal email handles.

Chamberlain needs these additional materials in advance of trial so that he can effectively prepare his defense and present a complete picture at trial about what Khan and Morland did—and actually knew—as analysts reporting on Autonomy. The additional materials will show that Khan and Morland's testimony does not prove that the conduct of Autonomy's management deceived anyone. Chamberlain has identified with specificity, based on a careful review of the materials he has received from the government thus far, a narrowly defined and tailored set of additional materials he seeks to ensure that he is able to effectively rebut the government's anticipated claim that the market was misled by any alleged misrepresentations by Autonomy.

The evidence sought is directly relevant to the elements of the allegations in the

indictment. Courts routinely grant Rule 17(c) subpoenas for materials in such circumstances, even if those materials can also be used for impeachment. *See, e.g.*, *United States v. Johnson*, No. 14-cr-412, 2014 WL 6068089, at *2 (N.D. Cal. Nov. 13, 2014); *United States v. Martinov*, No. 11-cr-312, 2012 WL 3987329, at *2 (N.D. Cal. Sept. 11, 2012). Here, the government appears poised to repeat its incomplete and misleading presentation about what the market—and by extension, HP—purportedly knew and did not know about Autonomy. Chamberlain is entitled to defend himself against this presentation by demonstrating that the very analysts who claimed to be misled were, in fact, not misled or defrauded by the financial statements and other information released by the Defendants.

* * *

For the foregoing reasons, Mr. Chamberlain respectfully requests that the Court issue the subpoenas and letters rogatory attached as Exhibits 1 through 9 to the accompanying Declaration of Gary S. Lincenberg.

DATED: November 1, 2021

Gary S. Lincenberg
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By: _____
          Gary S. Lincenberg
          Attorneys for Defendant Stephen Keith
          Chamberlain