STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
Assistant United States Attorneys

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    Fax: (510) 637-3724
    Email:  Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 18-577 CRB |
| Plaintiff, | UNITED STATES' STATUS REPORT |
| v. | Hearing Date:  February 16, 2022 |
| MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN, | |
| Defendants. | |

This matter is set for status conference on February 16, 2022.  The government respectfully submits the following status report regarding the extradition of Michael Lynch to the United States.

On November 29, 2018, the Grand Jury returned an indictment charging Lynch and Stephen Chamberlain with one count of conspiracy to commit wire fraud; fourteen counts of wire fraud; and one count of securities fraud.

On March 21, 2019, the Grand Jury returned a superseding indictment, adding an additional count of conspiracy, under 18 U.S.C. § 371, to commit the crimes of obstruction of justice, violation of internal controls at a public company, and money laundering.

On September 17, 2019, the government issued a formal request for extradition, which was formally delivered to the U.K. Central Authority on or about November 21, 2019.  ECF No. 49-1.

On July 22, 2021, following a multi-day hearing, District Judge Michael Snow of the City of Westminster Magistrates' Court issued Findings of Fact and Reasons, rejecting Lynch's challenge to extradition, ordering that extradition is compatible with Lynch's rights, and sending the case to the U.K. Secretary of State for the Home Department for a decision as to whether Lynch was to be extradited. *See* Attachment A.

After District Judge Snow declined to extend the deadline for the Secretary of State to render an extradition decision, Lynch applied for judicial review by the U.K. High Court of Justice.  Lynch contended the Secretary of State should delay decision whether to order extradition order until a judgment was rendered in a U.K. civil case initiated by Hewlett Packard against Lynch and Sushovan Hussain.  Trial in that civil case took place before Justice Robert Hildyard and ended in January 2020. On January 26, 2022, the High Court dismissed Lynch's application.  *See* https://www.judiciary.uk/wp-content/uploads/2022/01/Lynch-v-Westminster-judgment-260122.pdf.

On January 28, 2022, Justice Hildyard delivered a draft judgment to the parties in the U.K. civil case and published a Summary of Conclusions.  Justice Hildyard held the HP "Claimants have substantially succeeded in their claims in these proceedings."  *See* https://www.judiciary.uk/wp-content/uploads/2022/01/Autonomy-v-Lynch-summary-280122.pdf.

Later, on January 28, 2022, the Secretary of State issued an Order for Extradition Pursuant to Section 93(4) of the Extradition Act 2003, directing that Lynch be extradited to the United States.

The government understands that Lynch has 14 days from the date of the extradition order to apply for permission to appeal to the U.K. High Court (there is no appeal as of right).  There is no deadline for the High Court to decide whether to grant or refuse permission to appeal.  If permission is granted, the case is set for an appeal hearing, and judgment follows after.  Again, there is no firm deadline for the hearing or for the U.K. High Court to render a decision.  This entire process may take months, through the remainder of 2022 and into 2023.  The losing party in the U.K. High Court also may seek permission to appeal to the U.K. Supreme Court.  There is no appeal as of right.

.

STATUS REPORT
CASE NO. CR 18-577 CRB

1  DATED:  February 9, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

/s/

_____
ROBERT S. LEACH
ADAM A. REEVES
Assistant United States Attorneys

STATUS REPORT
CASE NO. CR 18-577 CRB

# ATTACHMENT A

**In the City of Westminster Magistrates' Court**

**The Government of the United States of America**

**V**

**Michael Richard Lynch**

**Findings of fact and reasons**

**Mr Mark Summers QC leading Ms Rachel Barnes for the Government.**

**Mr Alex Bailin QC leading Mr Aaron Watkins for the defendant.**

1.   The Government of the United States of America ('the Government') has submitted a Request for the extradition of Michael Richard Lynch ('the Defendant'). The Defendant is accused in the US of conduct between January 2009 and November 2018, particularised in a Superseding Indictment containing 17 counts constituting: (i) conspiracy to commit wire fraud (count 1); (ii) wire fraud and aiding and abetting wire fraud (counts 2-15); securities fraud and aiding and abetting securities fraud (count 16); and conspiracy to conceal the above (count 17). The principal allegations in the Superseding Indictment arise out of the sale of Autonomy Corporation plc ('Autonomy'), a UK software company, to Hewlett-Packard ('HP'), a US company, in October 2011. The Defendant was the founder and former Chief Executive Officer of Autonomy.

2.   The United States of America has been designated a Category 2 territory pursuant to s.69 of the Extradition Act 2003. Part 2 of the Extradition Act 2003 ("the 2003 Act") applies, as amended.

3.   The Request was issued on 17 September 2019 and transmitted to the UK Central Authority on 20 November 2019. The Government's extradition request was certified as valid by the Secretary of State under s.70 of the 2003 Act on 26 November 2019. In compliance with

1

ss.70(10)-(11), the Secretary of State sent the request to the Court, together with certificate of validity, pursuant to s.70(9) of the 2003 Act. A warrant for the Defendant's arrest was issued by District Judge Zani on 14 January 2020, under s.71 of the 2003 Act.

4.    The Defendant was arrested, by appointment, in the United Kingdom under s71 of 2003 Act on 5 February 2020 and appeared before the Chief Magistrate at Westminster Magistrates' Court on the same day. At the initial hearing, no issues were raised under s.72 of the 2003 Act. During the hearing, the defendant indicated that he did not consent to his extradition to the US, the extradition hearing was formally opened. Following a full bail application, the defendant was remanded on conditional bail, which he has enjoyed since that hearing.

5.    The defendant indicated in a Skeleton Argument dated 24 December 2020 that he intended to argue four issues in opposition to extradition:

- **Dual criminality s.78(4)(b) and s.137:** the alleged conduct did not occur *'within the United States'* for the purposes of s.137(3)(a); and *'the conduct alleged, if properly transposed as required by s.137, would [not] yield any offence triable in the UK'* under s.137(3)(b);

- **Passage of time s.79(1)(c) and s.82:** the conduct dates back to 2009, the (first) indictment was not issued until 2018 and the extradition request was not made until 2019; extradition would be both oppressive and unjust in these circumstances;

- **Forum s.79(1)(e) and ss.83A-E**: the Defendant is a British citizen with lifelong links to the UK; the alleged conduct concerns the takeover of a UK company which applied UK accounting standards and was audited by a UK auditor; *'this is a factual matrix, par excellence, which should engage the protection of the forum bar'*;

2

- **Article 3 ECHR s.87**: extradition would expose the Defendant to detention in substandard prison conditions; the impact of those conditions is to be considered by reference to the Defendant's *'specific health needs'* and *'his ability to prepare for trial'*;

- **Abuse of process:** a *'number of interlinked issues'* are to be raised, *'the core of which is that the Government has presented and relies upon a significantly distorted picture, including inter alia: (i) misleading content, (ii) material omissions, and (iii) jurisdiction'*. The alleged abuse appears to be of the type identified in ***Zakrzewski v Regional Court in Lodz, Poland*** [2013] 1 WLR 324.

### The criminal proceedings

8. Mr Summers has prepared a helpful opening note setting out the Government's case. I have heavily relied on that note when preparing the summary that follows.

9.    Between 2013 and 2015, the UK Serious Fraud Office ('SFO') conducted an investigation into certain aspects of the sale of Autonomy to HP. In January 2015, the investigation was closed, and the SFO released the following statement:

> *'...The Director of the Serious Fraud Office has closed the SFO's investigation into the sale of Autonomy to the Hewlett-Packard company (HP) in 2011. This investigation was commenced in early 2013, following a referral from HP. In respect of some aspects of the allegations, the SFO has concluded that, on the information available to it, there is insufficient evidence for a realistic prospect of conviction. In respect of other aspects and on the application of well-established principles, jurisdiction over the investigation has been ceded to the US authorities whose investigation is ongoing…."*

3

10. The US Department of Justice investigation commenced in late 2012. On 29 November 2018, a grand jury sitting in San Francisco, California returned an Indictment against the Defendant and Autonomy's former Vice President of Finance Stephen Chamberlain ('Chamberlain'), charging them with conspiracy and wire fraud.

11. On 21 March 2019, a second San Francisco grand jury returned a Superseding Indictment against the Defendant and Chamberlain, charging them with the following criminal offences contrary to United States Federal law:

- Count 1: conspiracy to commit wire fraud, in violation of Title 18, US Code, s.1349, carrying a maximum penalty of 20 years' imprisonment;

- Counts 2-15: wire fraud and aiding and abetting wire fraud, in violation of Title 18, US Code, ss.1343 and 2, each carrying a maximum penalty of 20 years' imprisonment;

- Count 16: securities fraud and aiding and abetting securities fraud, in violation of Title 18, US Code, ss.1348 and 2, carrying a maximum penalty of 25 years' imprisonment;

- Count 17: conspiracy to (a) circumvent internal accounting controls of a registered issuer of securities, (b) tamper with witnesses, (c) obstruct proceedings, and (d) launder the proceeds of crime, in violation of Title 18, US Code, s.371, carrying a maximum penalty of 5 years' imprisonment.

12. On 21 March 2019, the US District Court for the Northern District of California (San Francisco) issued a warrant for the Defendant's arrest.

13. The Defendant's co-accused, Chamberlain, has voluntarily surrendered to the US District Court to face these charges. Several pre-trial hearings have taken place. Although, unlike Mr Chamberlain, the Defendant has not attended those hearings, he has instructed a lawyer to represent him before the US court. No trial date has yet been fixed.

14. The former Chief Financial Officer of Autonomy, Sushovan Hussain ('Hussain') has been separately prosecuted in the US for offences in connection with the sale of Autonomy to HP. On 20 November 2016, Hussain was indicted by a grand jury in San Francisco for conspiracy, wire fraud, and securities fraud. Following a jury trial, on 30 April 2018 Hussain was found guilty of all counts against him. On 13 May 2019, he was sentenced to a term of 5 years' imprisonment. An appeal was heard by the Court of Appeals 9th Circuit on 26 August 2020 where the Court ruled:

1) Mr "Hussain defrauded a domestic victim".
2) The statute of limitations had been suspended in his case and that the prosecution was not time barred.
3) There was sufficient evidence to support his conviction for securities fraud (Count 16 on Mr Lynch's superseding indictment).

**The conduct alleged**

15. The conduct forming the basis of the request for extradition is summarised in the affidavit of William Frentzen, Assistant US Attorney for the Northern District of California.

**Overview**

16. The Defendant was the founder and former CEO of Autonomy. Autonomy was a public software company, with dual headquarters in San Francisco and in Cambridge, UK. It was listed on the London Stock Exchange, with shares bought, held and sold by individuals and entities throughout the United States (and elsewhere). The Government assert that in 2010, over $590 million (approximately 68%) of Autonomy's approximately $870 million reported revenues came from the United States and other countries in the Americas. The company's major subsidiaries included Autonomy Inc (with offices in San Francisco and San Jose, California), Interwoven Inc (with offices in San Jose), and Zantaz Inc (with offices in Pleasanton, California).

17. Hewlett Packard is a US public company, incorporated in Delaware, with principal executive offices in Palo Alto, California. HP is listed on the New York Stock Exchange.

18. In October 2011, Autonomy was sold to HP for approximately $11.7 billion. This was the second largest acquisition in HP's history. The Defendant personally received approximately $804 million for the sale of his shares in Autonomy.

19. The central allegation is that prior to the sale, between January 2009 and October 2011, to deceive purchasers and sellers of Autonomy securities about the true performance of Autonomy's business, its' financial performance and condition, the nature and composition of its products, revenue and expenses, and its' prospects for growth. It is alleged that the Defendant was the leader of the corporate conspiracy to fraudulently inflate the reported revenue, earnings and value of Autonomy, in order to make the company more attractive to potential purchasers HP.

20. It is alleged that a consequence of the conspirators' fraudulent activity, HP was persuaded to purchase the shares in Autonomy at a significant overvalue. Following the purchase, Autonomy failed to meet its projections for the first two quarters of FY2012. On 20 November 2012, following an internal investigation, HP announced a $8.8 billion impairment charge (write-down) relating to the Autonomy acquisition.

21. Subsequently, between October 2011 and November 2018, the Defendant is further alleged to have conspired with others to conceal the fraudulent nature of the accounting at Autonomy, and to obstruct investigations into the fraud, through conduct including the making of false and misleading statements to HP's General Counsel, the theft and destruction of documents, and the payment of '*hush money'* to former Autonomy employees to influence, delay and prevent their testimony.

**The scheme to defraud**

22. It is alleged that following its initial public offering in 2000, Autonomy initially grew quickly, mostly through its development and sale of software products that facilitated the search of unstructured data. The company's main software product was called '*Intelligent Data Operating Layer'*, or IDOL, and was designed to sort and process unstructured data. By late 2009, Autonomy's share price had risen considerably, because of the company's perceived ability to meet consistently, or exceed, the market's earnings estimates, and its claims of '*organic growth'* in the demand for IDOL.

23. The Government allege that, "although, from the outside, Autonomy appeared to be very successful, the reality inside the company was quite different. By January 2009, the company was struggling to sell enough software, and recognise enough revenue, to meet Autonomy's quarterly earnings estimates and sustain the company's

record of growth. Rather than fall short of expectations and suffer the reduction in share price that would follow, the Defendant authorised Hussain (the CFO of Autonomy) and another employee, Michael Sullivan, to sell millions of dollars of hardware at a loss, in order to hit revenue projections. The demand for IDOL still did not grow, and so the Defendant, Hussain and Chamberlain (Vice President of Finance) embarked on an ever-growing, multi-faceted scheme to falsely inflate Autonomy's public reported revenues and ensure that the company hit the market's earnings estimates.

24. As CEO, the Defendant was the public face of Autonomy. It is alleged that in this capacity, he personally made false and misleading public disclosures to financial analysts, investors, and HP about the nature and composition of Autonomy's products, revenues, expenses, and potential for growth. This included false claims that large volumes of '*low margin*' hardware sales, which Autonomy was often making at a loss, were instead '*high margin*' and profitable software sales. The Defendant also made false statements regarding the amount of '*original manufactured equipment*', or 'OEM', revenue that Autonomy reported on a quarterly basis – sometimes inflating those figures by over 100% – to give the false impression that other software providers were incorporating Autonomy's IDOL software into their products, when they were not. This gave a false impression regarding Autonomy's potential for recurring income in the future.

25. The fraudulent scheme also involved the production and approval of false and misleading financial statements, which fed the myth that Autonomy was growing consistently with market expectations. As a director and CEO of the company, the Defendant was responsible for certifying Autonomy's publicly filed financial statements. He certified that the financial statements were true and accurate, and that they complied with the relevant accounting standards, when he knew this was not the case. These false and misleading financial

statements were provided to, and relied upon by, HP in its purchase of Autonomy in 2011. They were also – as the Defendant knew – used by HP to advertise its purchase of Autonomy to potential investors and purchasers of HP stock.

26. During the ten quarters from January 2009 to June 2011, at least six types of fraudulent device were used to artificially inflate Autonomy's revenue:

- Revenue recognition fraud: This involved backdated contracts and side agreements. Hidden side agreements included agreements by Autonomy to purchase non-existent services from its customers, thereby '*balancing out*' its transactions. In addition, Autonomy frequently backdated deals that were made in the following quarter to meet the numbers expected for the previous quarter. For example, in the second quarter of FY2009, a purported sale of $6 million of hardware to Morgan Stanley was backdated to the previous quarter and covered up with fraudulent invoices;

- Channel stuffing: This involved reciprocal deals and '*round-trip'* financing with '*value-added resellers'*, or 'VARs',[1] in which Autonomy retained effective control over the goods sold, and made misleading statements about the likelihood of the re-sale of the software by the VAR to end-users. For example, in the first quarter of FY2010, Autonomy purported to sell $11 million in software to a VAR called MicroTech, for later resale to the Vatican. MicroTech was never under any obligation to sell the product on to the Vatican; Autonomy retained that obligation. When Autonomy was unable to sell to the Vatican, it provided funds through fraudulent transactions for MicroTech to pay for the software it never resold or needed;

- <u>Acceleration of deferred revenues streams</u>: Autonomy accelerated deferred revenues streams from acquired subsidiary companies like Zantaz and Interwoven. For example, income was accelerated from recurring fees, to recognise revenue earlier than it should have been recognised, while giving the false impression of additional future revenue streams;

- <u>Resale of hardware at a loss</u>: Autonomy made false and misleading statements to the investing public that characterised the low margin hardware sales as high margin '*appliance*' sales. For example, millions of dollars' worth of laptops, monitors and other generic computer parts were sold by Autonomy to Bank of America and other customers at a loss, without any associated sales of software; these were falsely represented to the public as sophisticated '*appliance*' sales;

- <u>Scale of OEM sales</u>: Autonomy made false and misleading statements to investors about the number of and revenue from OEM sales. The Defendant instructed an employee to renegotiate OEM deals so that payments and revenue were structured upfront in exchange for no recurring OEM fees;

- <u>Circular/reciprocal transactions</u>: These included Autonomy purchasing software and/or services from other companies that it did not need or meaningfully use, in exchange for the buyer purchasing an equivalent amount of Autonomy software – often for millions of US dollars. For example, from the first quarter of FY2009 until the sale of the company in 2011, Autonomy made sales of software to a company called Capex. In exchange for the sales to Capex, and in order to pay for those sales, Autonomy paid Capex for '*electronic data discovery*' services that it neither wanted nor received.

10

27. Through using these methods to '*manage earnings'* at Autonomy, the Defendant and his co-conspirators were able to ensure that Autonomy continued to meet or exceed the performance expectations set by the market analysts who covered Autonomy every quarter. Other methods included:

- Making false and misleading statements to Autonomy's independent auditor (Deloitte) about the facts and circumstances of transactions allegedly supporting the recognition of revenue, expenses, costs, and other items in Autonomy's financial statements, including (i) backdating contracts, invoices, agreements, and other documents in order to make it appear that they had been reached with a counterparty in a prior period; (ii) falsely representing, among other things, that Autonomy's auditors had been provided with all relevant information and that there were no undisclosed side letters; (iii) making false and misleading statements about whether the accounting criteria and Autonomy's revenue recognition policy had been satisfied; and (iv) making false and misleading statements about Autonomy's research and development, marketing, and other expenses;

- Making false and misleading statements to market analysts covering Autonomy about its financial statements, the true performance of its business, its financial condition, the nature and composition of its products, revenue, and expenses, and its prospects for growth;

- Making false and misleading statements to Autonomy's regulators in response to inquiries about its financial statements;

- Making and causing fraudulent entries to Autonomy's books and records;

- Issuing materially false and misleading quarterly and annual reports;

- Intimidating, pressuring, and paying-off persons who raised complaints about or openly criticized Autonomy's financial practices and performance. For example, on 28 July 2010, the Defendant caused Autonomy to fire a finance officer in the United States who questioned whether Autonomy's financial statements were accurately stated; and

- Intimidating and pressuring analysts and other persons who raised questions about or openly criticized Autonomy's financial practices and performance.

28. These measures kept Autonomy's share price comparatively high. But for this fraudulent activity, Autonomy's share price and overall value would have diminished substantially.

29. The Defendant was well aware of this fraudulent activity. Among the evidence in the possession of US prosecutors is a notebook which contains notes made by Chamberlain of a meeting he had with the Defendant on or around 19 November 2009. At that meeting, Autonomy's '*circular transactions*' or roundtrips with a number of customers were discussed. According to the notes, the two also discussed '*early rev[enue] rec[ognition]*', by recognising revenue when deals had not yet closed, sales of hardware at low margin or at a loss, and other '*bad'* business deals. Chamberlain had some concerns about the fraudulent accounting, but he instructed Autonomy employees not to stop or change practices.

30. Further, the Defendant was kept appraised of sales projections and ongoing sales deals, through spreadsheets and emails from Hussain. Hussain also provided the Defendant with annual projections of '*management deals'* (which involved fraudulent

revenue recognition) and '*low margin'* deals (which reflected the hardware sales). The projections showed not only that the Defendant was aware of the fraudulent activity in the previous year, but he was aware that it was necessary to maintain and even increase the fraudulent activity in coming years to meet market expectations.

**HP's purchase of Autonomy**

31. In November 2010, the Defendant met with a US investment banker, Frank Quattrone ('Quattrone') in London, and suggested that he was open to selling Autonomy. On 26 January 2011, Quattrone provided a '*teaser pitch'* to HP's Chairman. The pitch included Autonomy's 2009 annual revenues, and a chart illustrating Autonomy's '*IDOL Software Business Model'*.

32. Between February and July 2011, further meetings took place involving the Defendant (by video), Quattrone, Hussain and representatives of HP. On 3 February 2011, the Defendant presented a PowerPoint presentation of Autonomy's FY2010 '*results'*. A subsequent meeting with HP's Head of Mergers & Acquisitions, Shane Robison, and others from HP, was held at HP's Palo Alto office on 4 March 2011. Hussain and Quattrone attended the meeting in person. The Defendant and Andrew Kanter ('Kanter'), Autonomy's Chief Operating Officer and General Counsel, attended by video. During the meeting, the Defendant and Hussain delivered a further PowerPoint presentation containing Autonomy's (false and misleading) publicly reported financial information.

33. There followed further meetings between the Defendant and HP's CEO, Leo Apotheker ('Apotheker'). On 21 July 2011, HP's Board authorised Apotheker to offer up to $11.7 billion for Autonomy.

34. On 26 July 2011, HP sent a detailed due diligence request list to Kanter. Autonomy resisted many of the requests, in particular the request for access to Autonomy's accountant's working papers. In lieu of responding to certain of the requests, the Defendant and Hussain repeatedly referred HP to Autonomy's publicly available financial statements. HP thus placed considerable reliance on these financial statements in assessing Autonomy's revenues, its profitability, and ultimately its value.

35. During HP's due diligence of Autonomy, the Defendant and his co-conspirators Hussain and Chamberlain lied to HP in at least three ways:

- First, they passed off Autonomy's financial statements as accurate – when they were not – and as audited by Deloitte – when Autonomy had lied to and misled Deloitte in order to obtain Deloitte's audit opinion. As stated above, Deloitte had not been given complete and accurate information regarding the facts and circumstances of transactions allegedly supporting the recognition of revenue, expenses, costs and other items in Autonomy's financial statements;

- Secondly, in response to a request from HP, the Defendant, Hussain and Chamberlain prepared a list of Autonomy's top 40 customers and contracts, and then removed more than $142 million in hardware sales and at least $19 million in other VAR-related revenue. This deception reinforced HP's false belief that it was buying a '*pure software*' company with a record of hitting market expectations;

- Thirdly, Autonomy misled HP regarding the nature of its revenues by concealing, in its due diligence disclosures, more than $105

14

million loss-generating hardware sales in FY2010 alone, and another approximately $40 million in Q1 FY2011 and Q2 FY2011.

36. In August 2011, following a public announcement of HP's offer to purchase Autonomy for approximately $11 billion, two former Autonomy OEM sales managers, now working at Bloomberg, wrote and disseminated widely an anonymous set of whistle-blower allegations concerning Autonomy's purported OEM sales. Under the pseudonym '*Joe Bloggs*', they emailed around 25-30 financial journalists and analysts, raising suspicions – based only on publicly available information – about the accuracy of Autonomy's OEM sales claims. The allegations were forwarded by the journalists and analysts to HP for comment.

37. On or around 1 September 2011, HP contacted the Defendant to ask him about the OEM allegations. In his reply, the Defendant falsely claimed that Autonomy's *'OEM numbers are part of our audited statement'*. He stated that how Autonomy characterised its revenue was up to Autonomy and him. He also stated that Autonomy *'[didn't] go out and sell'* OEM deals, and that the OEM sign-up rate of 10-15 per quarter (which the whistle-blowers had described as having an *'uncanny consistency'*) was constant because of *'new product development'* cycles at Autonomy's OEM customers.

38. The acquisition of Autonomy proceeded, and the deal closed on 3 October 2011. HP acquired Autonomy and its shares through an indirect wholly-owned subsidiary, Hewlett-Packard Vision BV (an acquisition vehicle, or 'Bidco', incorporated shortly before the public announcement in August 2011).

39. Following the sale of Autonomy, the Defendant, Chamberlain, and Hussain became employees of HP. From October 2011 to May 2012, Autonomy operated as an independent division of HP. The

Autonomy division missed its projections for HP's first quarter FY2012 (ending January 2012) and missed them badly for the second quarter FY2012 (ending April 2012).

40. In March 2012, Chamberlain left Autonomy. In May 2012, the Defendant, Hussain and Kanter also left."

41. In November 2012, HP announced a $8.8 billion write-down in connection with its acquisition of Autonomy.

**Count 17 Concealing the fraud and obstructing justice**

42. The Government allege that "Between October 2011 and November 2018, whilst employed by HP and afterwards, the Defendant is alleged to have been part of a conspiracy to cover up, conceal, influence witnesses to, and obstruct investigations into, the scheme to defraud summarised above. The conduct carried out in furtherance of this separate conspiracy included the following:

- Falsification, destruction and theft of business records belonging to HP: The Defendant and his co-conspirators refused to return documents that belonged to HP, stole additional Autonomy documents that belonged to HP, and attempted to destroy evidence of the fraud at Autonomy, including through the destruction of hard-drives in the UK and the wiping of Chamberlain's laptop (and its backup) containing accounting records (all in circumvention of HP's system of internal controls);

- False and misleading statements made to HP's General Counsel: On 29 July 2012, the Defendant had a two-hour meeting with HP's General Counsel, during which he falsely stated, among other things, that he did not know that Autonomy treated hardware sales as marketing expenses in its financial statements, that the volume

of Autonomy's hardware sales in 2010 alone amounted to more than $100 million, and that Autonomy wrote off debt owed to it to meet or exceed the market expectations;

- Paying '*hush money*' to influence, delay or prevent the testimony of witnesses: In July 2012, the Defendant incorporated a company, ICP London Ltd ('Invoke') in the British Virgin Islands. The Defendant used Invoke and affiliated entities (including 'Darktrace') as a means to employ and pay former Autonomy employees, including Hussain;

- Laundering the proceeds of the Autonomy acquisition: Financial records show monetary transactions performed by the Defendant and his co-conspirators involving their proceeds from the fraud".

**Sufficiency of documents**

43. My first task as the appropriate judge at the extradition hearing is to determine that the documents sent to me by the Secretary of State include the documents and information required by section 78(2), namely the documents referred to in section 70(9) (that is the request and the section 70 certificate; particulars of the person whose extradition is requested; particulars of the offence specified in the request; and in the case of a person accused of an offence, a warrant for his arrest issued in the Category 2 territory) have been served. The parties agree that these documents have been served.

44. As I am satisfied that the paperwork is in order, I must go on to decide the three questions specified in section 78(4).

45. The first question is whether, on a balance of probabilities, the person appearing or brought before me is the person whose extradition is requested. It is not disputed that the defendant is the person whose extradition is requested.

17

46. The second question is whether the offences specified in the request are extradition offences.

**Issue 1: Are the offences extradition offences?**

47. As the request seeks the defendant's extradition for prosecution s137(3) of the 2003 Act applies. That section states:

137 Extradition offences: person not sentenced for offence

(1) This section sets out whether a person's conduct constitutes an "extradition offence" for the purposes of this Part in a case where the person—

(a) is accused in a category 2 territory of an offence constituted by the conduct, or

(b) has been convicted in that territory of an offence constituted by the conduct but not sentenced for it.

(2) The conduct constitutes an extradition offence in relation to the category 2 territory if the conditions in subsection (3), (4) or (5) are satisfied.

(3) The conditions in this subsection are that—

(a) the conduct occurs in the category 2 territory;

(b) the conduct would constitute an offence under the law of the relevant part of the United Kingdom punishable with imprisonment or another form of detention for a term of 12 months or a greater punishment if it occurred in that part of the United Kingdom;

(c) the conduct is so punishable under the law of the category 2 territory.

48. The burden to satisfy these conditions is on the Government. It must satisfy them to the criminal standard.

49. The test under s137 (3)(a) is not the same test as that set out in s83 A(2)(a).

50. *Belgium v Armas* [2006] 2 AC 1; *R (Bermingham) v SFO* [2007] QB 727 at §§83-86, *Norris v USA* [2008] 1 AC 920 are all authorities confirming that conduct is nonetheless regarded in law as '*in'* the USA for the purposes of s.137 if its harmful effects were felt there.

**Section 137 (3)(a) challenge**

51. The defence submit that conditions (3) (a) and (b) have not been met. The Defendant's challenge is summarized at paragraphs 54 to 60 of Mr Bailin's skeleton argument. The challenge in relation to counts 1-16 is both that the conduct did not occur in the USA and that the offences are not extradition offences.  It is submitted that the conduct in Count 17 would not be an offence in this jurisdiction.

52. The Government's response is set out at paragraphs 60 to 64 of Mr Summers' Skeleton Argument.

**The evidence**

53. The main evidence relied upon by the defendant was the evidence of Kelwin Nicholls. He is a partner at Clifford Chance solicitors who has represented the defendant for 4 years, mainly in relation to the civil proceedings brought against the defendant in respect of the losses that followed from the sale of Autonomy. His evidence was that Autonomy was not purchased by HP in the USA but through a Dutch special purchase vehicle (Bidco). The purschase price consisted of $7.9 billion from cash held offshore and $3.2 billion transferred from HP's accounts in the USA to an offshore account and then to Bidco. Autonomy's assets were transferred to companies in the UK and abroad. Autonomy was separated from HP by "thousands" of subsidiaries from HP after its' purchase.

54. He accepted that on 20 November 2012 HP announced it was to write down the value of Autonomy by $8.8 billion, attributing more than $5.5 billion of that to fraud, it specifically alleged past misconduct by Autonomy management between 2009-2011.

55. Following write down a tranche of claims, including derivative shareholder claims and securities claims, was brought against HP in the USA. Those claims were settled in 2014 "with HP resolving as part of the settlement to commence proceedings against Dr Lynch and Mr Hussain in the UK to seek redress for the alleged harm suffered by HP in connection with the acquisition".

56. Bidco instituted civil proceedings against the defendant and Mr Hussain in the UK. HP is not a claimant in the English civil claim. Mr Nicholls' asserted that the issuance of proceedings in this jurisdiction is clear evidence that "HP itself considered that the harmful events and damage arising from the acquisition occurred in the UK". He stated that the allegations in Counts 1-15 of the indictment are substantially the same as the claims brought in the civil proceedings.

57. He stated that any harm felt by purchasers/sellers of Autonomy's shares, by Deloitte, Autonomy's regulators and to market analysis was felt in the UK.

58. In relation to count 16 the Government has only been able to identify two HP shareholder victims based in the US (one of whom made a profit).

59. When cross-examined he stated, inter alia, that:

a) He represents the defendant in the civil proceedings in the UK for which his firm is paid. His firm has a litigation interest in the outcome of the civil and extradition cases.

b) He denied that through his statements he had engaged in advocacy for the defendant. He accepted that where he had stated in his

second statement, when referring to the defendant, that "this is not the action of a man trying to cover up an alleged fraud" that this could be regarded as advocacy and should not have been included. He accepted that his description of the practice of destroying computer hard drives  as being standard practice had not been referred to in the civil proceedings, he again denied that he was involved in advocacy for the defendant but stated that he had made this reference as he was trying to "provide context".

c) He stated that he was not accusing the Government, the US prosecutor or Mr Leach of bad faith, or willful or intentional misrepresentation.

d) He was not claiming that the underlying evidence in the case was misleading.

e) On a number of occasions where he challenged the completeness of the Government's statements he was relying on information from the defendant. He conceded that the Government was not bound to accept or acknowledge the defendant's case.

f) The defendant was physically in the USA when the following events took place in furtherance of the sale:

- When an email was sent in March 2010.

- An earnings call in April 2010.

- The Oracle meeting on 8 April 2011.

- A meeting with the CEO of HP on 12 April 2011.

g) Autonomy did a significant amount of business in the USA and received significant revenue there.

h) Autonomy had significant subsidiary companies in the USA.

i) He had no reason to doubt that 65% of Autonomy's staff were employed in the USA.

j) Autonomy maintained a headquarters in the USA.

k) Significant volumes of its shares (a minimum of 36%) were held in the USA.

l) Its head of marketing was based in the USA.

m) All of the companies approached about the sale of Autonomy were based in the USA.

n) He conceded that Bidco was and is owned indirectly by HP. It was a special purpose vehicle when it was created. It was formed to effect the acquisition of Autonomy.

o) At least $3.2 billion of the purchase price was provided by the HP Group in New York. He accepted that the balance of the purchase price was provided by the HP group.

p) The civil claim against the defendant in this jurisdiction has been brought by Bidco. Part of its' claim was brought against Autonomy, Autonomy has admitted liability and joined the proceedings against the defendant.

q) Bidco was the only party that could bring the claim. The claim had to be brought in the UK due to a clause in the acquisition contract.

r) The amount of the loss suffered was not agreed in the civil claim.

s) Discovery in the civil proceedings consisted of 11 million documents. Analysis of those documents required that use of technology, and involved 6 or 7 UK based lawyers and 6 or 7 US lawyers working on those documents for about a year. The Government has not had access to those documents.

60. The Government's evidence is set out in in the affidavits of Mr Frentzen and Mr Leach (Assistant United States Attorneys),the statements of John Donegan and Stephen Ogden and a letter from Mr Duff a case controller at the Serious Fraud Office,

61. Mr Leach's states that "Dr Lynch committed multiple overt acts in furtherance of the alleged conspiracy while in the United States". He sets out meetings that took place in the USA, in furtherance of the conspiracy, on:

- 1 April 2011.
- 8 April 2011.
- 12 April 2011.

62. He also detailed numerous acts by Mr Hussain in the United States in furtherance of the conspiracy. He stated that "Dr Lynch negotiated with HP representatives in the United States".

63. On Mr Leach's most conservative estimate, HP had been deceived by at least $1.7 billion. The US District Court has recognised that the loss was '*enormous'*. Moreover at Mr Hussain's sentencing hearing General Counsel for HP stated that the purchase price was '*not merely theoretical dollars paid out by some faceless corporation. It's real money in every respect and it deprived the company of the ability to pursue other opportunities...[the defendant] robbed HP of those opportunities, and we will never know the full extent of that loss...'* .

64. He described how the financial loss extended far beyond the money it paid for Autonomy; it includes the costs of the purchase of Autonomy, and after the fraud was uncovered, defending lawsuits, assisting multi-jurisdictional investigations; etc all of which '*forced [HP] to divert resources away from business operations*'. Moreover, '*The company has expended tremendous resources to shine a light on the truth and achieve justice*', including by bringing civil proceedings [Leach §115]. '*The amount of time, resources, and energy that the company devoted to the Autonomy investigation and all the aftermath, it is staggering...'*

65. Mr Leach described how the intended loss was aimed at HP's predominantly US-based investors.

66. Mr Leach described how the 'harm' caused to HP by the fraud in counts 1-16 was significant. He provided the following statement from HP's General Counsel at Mr Hussain's sentencing hearing: It '*has inflicted immeasurable harm to us, to our reputation, and to our brand. Founded almost 80 years ago, HP is an iconic institution in*

*Silicon Valley and we spent decades earning the trust of our [349,000] employees and our customers and our investors...The aftermath of the acquisition and the disclosure of the fraud, public reaction to HP's write-down of Autonomy was swift and harsh. In fact, to protect himself...Dr. Lynch, began a smear campaign against us in an effort to undermine the truth....The Autonomy fraud has cast a long shadow on our company...*'

67. Mr Duff recognized "that huge financial losses were caused in the Requesting State".

**Ruling**

68. The fact that the defendant was located outside the USA when some of his conduct occurred does not mean that his conduct did not occur in that country (**Tesler v USA [2011] EWHC 52 paragraph 34).**

69. The test I must apply to determine whether the conduct occurred in the USA is whether the "effects of his action were felt there" (per Lord Hope paragraph 35 of **Office of the King's Prosecutor, Brussels v Cando Armas and Another [2006] 2 A C 1**) or whether "the relevant conduct substantially took place in the category 1/2 country as well as elsewhere" (per Laws LJ **Bermingham and others v Government of the United States of America and Another [2007] W W.L.R 635**). Not all of the harm is required to be felt in the requesting state (paragraph 40 of **Armas**).

70. Mr Nicholls is a solicitor acting for the defendant in both the civil and extradition proceedings where he has an interest in the litigation outcome. I have concerns about whether it is appropriate for him to be a witness on his client's behalf. My concerns deepen as there

has been a clear blurring of the lines between factual statements and advocacy (see paragraph 58 b) above.

71. My concerns are deepened by Mr Nicholl's approach on receipt of the Government's evidence. Mr Leach explained at paragraph 21 of his statement that the Defendant's wife was a citizen of the USA who renounced her citizenship in May 2013 during the course of the criminal investigation (Mr Lynch did not refer to this in his statement at all). Mr Nicholls responded at paragraph 13 of his second statement that Mr Leach "gives the misimpression that Dr Lynch's wife …..renounced her US citizenship because of the US criminal investigation. This is not the case….I am informed …that she commenced the expatriation process well before the sale of Autonomy". This evidence, if it is accurate, should have been provided directly by the Defendant's wife who could have provided the necessary detail. The way in which it has been obtained suggests that the Government's evidence have been passed to the Defendant for comment, the comments were then included in Mr Nicholl's statement. This approach is consistent with Mr Nicholl's advocating on behalf of the Defendant.

72. I reject the attempts to draw a direct comparison between civil proceedings undertaken on behalf of HP and criminal proceedings undertaken by an independent prosecutor who is not bound to present the same evidence, in the same way and whose focus is different from the recovery of loss.

73. I am satisfied that statements made by Mr Nicholls in relation to the standing of the evidence in the civil proceedings is a partisan view of the effect of the evidence and could easily be mistaken as being unarguable when the interpretation remains hotly contested.

74. In any event, even on Mr Nicholls own evidence it is agreed that the defendant performed alleged overt acts in furtherance of the

25

conspiracy, this is sufficient to establish that conduct occurred in the USA for the purposes of s137(3)(a).

75. Further, I reject the suggestion that loss was not caused in the UK as HP had chosen to purchase Autonomy through Bidco. HP is an American company. The money used to purchase Autonomy was HP's money whether it was held offshore (as part of it was) or within the USA (as part of it was). I have directly quoted from Mr Nicholl's evidence at paragraph 34 above. On his evidence HP settled the shareholders claims and HP resolved to seek redress for the alleged harm suffered by it. Bidco was clearly not the loser, harm is not to be assessed solely on the basis of where the money was paid.

76. I have no doubt that significant financial and reputational harm was caused, both directly and indirectly,  within the USA to HP and its' shareholders.

77. The harm in relation to count 17 would have been felt in the USA.


78. I am satisfied so that I am sure that the requirements of s137(3)(a) are met in respect of all the charges.

**Section (3)(b) challenge**

79. The evidence relied on is the same.

**My approach**

80. I am not required to identify a mirror offence in this jurisdiction for each of those charged by the Government.

81. I must be satisfied to the criminal standard that the allegations are extradition offences.

26

82. Transposing this conduct to England and Wales: (a) a conspiracy planned and perpetrated entirely abroad to defraud (transposed) English victims constitutes an offence under English law. (b) As regards fraud by false representation contrary to ss. 1 and 2 of the Fraud Act 2006, multiple acts of misrepresentation occurred in the (transposed) UK by the defendant, his co-accused and agents, as well as the intention to expose to loss (transposed) UK companies. (c) As regards false accounting contrary to s.17 of the Theft Act 1968, it is alleged that the defendant and his co-accused and agents made use in the (transposed) UK of Autonomy's financial statements which the defendant knew were materially false, misleading or deceptive. (d) Both of these statutory offences are 'Group A' offences pursuant to s.1(2) CJA 1993 and s.2(3) provides that an English court has jurisdiction to try a Group A offence where any one of the constituent elements of the offence occurs in England and Wales. In respect of statutory fraud, this will include, if the fraud involved an intention to cause a loss or to expose another to a risk of loss and the loss occurred, that occurrence (s.2(1A)(b)).

83. Mr Bailin submitted in respect of count 17 that there is no evidence that the conduct described in paragraph 34 of the superseding indictment would amount to an offence at all.

84. However, I am satisfied that the paragraph cannot be considered in isolation but needs to be put in the context of the two preceding paragraphs. I am satisfied that paragraphs 32 and 33 set out the nature of the offending and its' objectives. Paragraph 34 provides details of the acts that make up the offending and cannot be properly understood in isolation.

85. The Government's allegation in count 17 is that the defendant did and caused to be done various acts tending and intended to

27

conceal his unlawful conduct (the antecedent fraud) and this concerned efforts to derail and divert US-based investigations and potential proceedings. Had such acts been done with the intention of obstructing an investigation by a duly appointed body *in the United Kingdom* the defendant would be guilty of the offence of perverting (and of conspiring to pervert) the course of justice. English common law does not require proceedings to be pending or to have commenced for a defendant to be guilty of perverting: ***Sharpe and Stringer*** (1938) 26 Cr App R 122; ***Wilde*** [1960] Crim LR 116; ***R v Rafique*** [1993] QB 843; ***R v T*** [2011] EWCA Crim 729. Nor does it require that the defendant was aware of the particular investigation in question or its scope: ***USA v Dempsey (No 1)*** [2018] 4 WLR 110 at §§33-34. Perverting by interfering with a potential witness can be committed where there is no evidence of any bribe, threat, undue pressure or other unlawful means: ***R v Toney*** [1993] 1 WLR 364 at p368B.

**Ruling**

86. I am satisfied so that I am sure that the allegations are extradition offences. I reject this challenge.

87. I am satisfied that the neither of the bars under s80 or 81 apply.

**Issue 2: Passage of time-s82 2003 Act**

88. The first issue that I must determine is when time starts to run for the purpose of s82.

89. Mr Bailin submits that I can separate counts 1-16 from count 17. Mr Summers submitted that "As a matter of law, the passage of time for s.82 is to be measured (in accusation cases) from the last date of alleged offending (***Hunt v Belgium*** [2006] EWHC 165 (Admin) at §20)".

90. Mr Bailin relies on the authority of **FK v Germany [2017] EWHC 2160 (Admin)** at [86] where, he submits that, Hickinbottom LJ rejected the same argument, deprecating such an "unduly legalistic" approach, and acknowledged that the court can examine the passage of time as it applies differently to multiple counts.

91. Mr Summers submitted that the Court in *FK v Germany* was not referred to *Hunt*. Nevertheless, he relies upon paragraph 86 of the judgement:

> *'...Where there is more than one charge, the court needs to consider...the nature of the offending, including whether the offences are associated and whether they form a course of criminal conduct. Where there are, say, two discrete offences, many years apart, it may be that it would be unjust or oppressive to extradite on the earlier offence, but not on the later. Here, the alleged offences were committed over a period of seven years; but the nature of the alleged offending was that all were part of a Ponzi scheme, the illegality of which, by the very nature of the scheme, is kept from the victims for as long as possible, by (e.g.) making payments to earlier investors from capital invested by new investors as a false "return". Therefore, whilst I accept that, in respect of the earliest offence, the period for consideration is from 2007, the Appellant cannot properly rely upon any part of that period in which, it is alleged expressly or by necessary implication, he deliberately hid the offending...'* (§86)

92. Mr Bailin submitted that there is no longer connection between the acts in count 17 and any inability to charge counts 1-16 because of those acts. I do not accept submission.

93. Count 17 is not an entirely unconnected and minor extradition offence. It alleges a conspiracy to '*cover up, conceal, influence witnesses to, and otherwise obstruct investigations of the scheme to defraud'* in counts 1-16. The allegations are clearly connected.

94. I am satisfied that I should not to separate the counts when considering s82 in this case and that the passage of time to be measured is from the last date of the alleged offending. The latest period of offending contained in the indictment is late November 2018, time runs from that date.

95. Even if I were persuaded to separate the counts, which I am not, applying **FK,** the defendant would not be able to rely upon the period between October 2011 and November 2018 (as alleged in count 17) as he "*cannot properly rely upon any part of that period in which, it is alleged expressly or by necessary implication, he deliberately hid the offending*'.

96. The first indictment was issued later in that month on 29 November 2018 and the superseding indictment on 21 March 2019. The Request was issued on 17 September 2019, transmitted on 20 November 2019 and certified on 26 November 2019.

97. It is submitted on behalf of the Defendant that others were charged earlier, Mr Hussain was indicted in November 2016; Mr Egan was charged in November 2017. The defence submits that the Government should have indicted the defendant (and Chamberlain) in November 2016. However, it is important to note that neither Hussain nor Egan were implicated in the count 17 obstruction '*which by its nature makes it more difficult to bring charges'*. Further, the Government states that the evidence against the defendant (Autonomy's CEO) and Chamberlain (Autonomy's vice president of finance) emerged with clarity more recently than the evidence surrounding Hussain, including from investigations abroad and from the Hussain proceedings.

98. It has been asserted that the Government is guilty of culpable delay. In considering that assertion I take into account:

  a) The allegations are extremely complex.
  b) The fraud is "one of the largest frauds ever prosecuted by the US Department of Justice". Discovery in the UK ran to 11 million pages and in the US to tens of millions of documents.
  c) It took about 1 year for a defence team of between 12-14 lawyers to undertake their analysis of discovery on the documents disclosed in this country alone.
  d) The Government allege that their enquiry was interfered with by the Defendant (count 17).
  e) The civil trial in this jurisdiction lasted for 9 months.

99. I am satisfied that, against this background, the length of time that it has taken to obtain the indictment cannot be criticised.

100.   The defendant has provided no evidence of injustice. It has been asserted on his behalf that a long time has passed and that memories are bound to have faded. However, it is clear that the Defendant has been aware of the possibility of criminal charges since before November 2016, he had to prepare his civil case (he gave evidence for 20 days before Hildyard J). He has not suggested that he had or will have any difficulty in preparing his defence.

101.   Defence submissions (although again not from, the Defendant has not given evidence that his case was prejudiced) claim injustice because of the potential effect on his civil trial. I am satisfied this is irrelevant to this challenge as the injustice/oppression must be connected to the effects of his extradition. In other words this bar is forward looking.

102.   It is suggested that the decision to delay has allowed the Government to take advantage of the information and material Dr Lynch filed to contest the civil trial. Reliance is placed on the obiter comment of Hildyard J that "prejudice is in the advantage gained by peering into the [Dr Lynch's] case and brief" and such prejudice "cannot be erased or nullified".

103.   There is no evidence that the Government sought to gain such an advantage. There is no evidence of any advantage gained or how it may result in an injustice to the Defendant.

104.   The Defendant suggests that the two-year delay between the indictment of Mr Hussain and the Defendant were tactical, in order to try to '*flip*' Hussain into giving evidence for the prosecution. The assertion is based upon implication. Mr Leach's direct evidence is that the delay was caused by:

**(i)** the defendant's continued obstruction of the investigation into him '*which by its nature makes it more difficult to bring charges*'

**(ii)** ongoing investigations and evidence gathering. The evidence against the defendant (Autonomy's CEO) and Chamberlain (Autonomy's vice president of finance) has emerged with clarity more recently than the evidence surrounding Hussain, including from investigations outside USA and from the proceedings against Mr Hussain.

105.   Even if the reason for the delay was solely to "flip" Mr Hussain, which is not my finding, I would not conclude that it would be unjust to order the Defendant's surrender.

106.   I am satisfied that it is not unjust to order the Defendant's surrender.

107.   The submissions on oppression are put on 2 grounds. The Defendant was one of the founding partners of a company called "Invoke" that was established in 2012. It invests in other substantial companies who employ substantial numbers of people. The Defendant statement asserts that he is now employed as a consultant by this company. It is submitted that "extradition would have a substantial impact on the company and its's staff." There is no evidence to substantiate this submission.

108.   The Defendant is married and has two daughters who are now aged 15 and 17 years. Beyond the obvious distress, no evidence has been called to oppression. I address the Defendant's health issues below, but there is no evidence that would justify a finding that his physical condition is such that it would be oppressive to order his extradition (no challenge has been raised independently pursuant to s91 2003 Act).

109.   I am satisfied that it is not unjust or oppressive to order his surrender.

**Issue 3: s83A 2003 Act- Forum**

110.   Section 83A EA 2003 provides as follows:

83A Forum

(1) The extradition of a person ("D") to a category 2 territory is barred by reason of forum if the extradition would not be in the interests of justice.

(2) For the purposes of this section, the extradition would not be in the interests of justice if the judge—
      (a) decides that a substantial measure of D's relevant activity was performed in the United Kingdom; and
      (b) decides, having regard to the specified matters relating to the interests of justice (and only those matters), that the extradition should not take place.

(3) These are the specified matters relating to the interests of justice—

(a) the place where most of the loss or harm resulting from the extradition offence occurred or was intended to occur;

(b) the interests of any victims of the extradition offence;

(c) any belief of a prosecutor that the United Kingdom, or a particular part of the United Kingdom, is not the most appropriate jurisdiction in which to prosecute D in respect of the conduct constituting the extradition offence;

(d) were D to be prosecuted in a part of the United Kingdom for an offence that corresponds to the extradition offence, whether evidence necessary to prove the offence is or could be made available in the United Kingdom;

(e) any delay that might result from proceeding in one jurisdiction rather than another;

(f) the desirability and practicability of all prosecutions relating to the extradition offence taking place in one jurisdiction, having regard (in particular) to—

    (i) the jurisdictions in which witnesses, co—defendants and other suspects are located, and

    (ii) the practicability of the evidence of such persons being given in the United Kingdom or in jurisdictions outside the United Kingdom;

(g) D's connections with the United Kingdom.

(4) In deciding whether the extradition would not be in the interests of justice, the judge must have regard to the desirability of not requiring the disclosure of material which is subject to restrictions on disclosure in the category 2 territory concerned.

(5) If, on an application by a prosecutor, it appears to the judge that the prosecutor has considered the offences for which D could be prosecuted in the United Kingdom, or a part of the United Kingdom, in respect of the conduct constituting the extradition offence, the judge must make that prosecutor a party to the proceedings on the question of whether D's extradition is barred by reason of forum.

(6) In this section *"D's relevant activity"* means activity which is material to the commission of the extradition offence and is alleged to have been performed by D.

111.    Mr Summers has conceded on behalf of the Government that '*a substantial measure*' of the defendant's conduct was performed in the UK, such that it is open to the defendant to argue forum. Mr Baillin invited me to rule on by how much this test has been passed but no longer pursues this invitation. I would in any event have declined to so as this is not an exercise that the section requires me to undertake.

112.   I therefore must determine, having regard only to the '*specified matters'* listed in s.83A(3), whether it has been shown *by the defendant* that extradition should *not*, in the interests of justice, take place: s.83A(2)(b). The '*specified matters*' enjoy no hierarchy or pre-allocated weight (***Dibden v France*** [2014] EWHC 3074 (Admin) at §18). I am   required to reach an overall '*value judgment'* (***Atraskevic v Lithuania*** [2016] 1 WLR 2762 at §14) following an '*evaluation'* of the respective weights of, rather than a numerical balancing of, the factors (***USA v McDaid*** [2020] EWHC 1527 (Admin) at §44).

113.   The defence submissions are set out at paragraphs 4 to 35 of their Skeleton Argument. The Government's position is detailed at paragraphs 6 to 42 of its Skeleton Argument.

**The evidence**

114.   The Government's evidence consisted of:

a)  The affidavit of Assistant Untied States Attorney William Frentzen.

b)  The affidavit of Assistant United States Attorney Robert Leach.

c)  The statement of John Donegan.

d)  The statement of Stephen Ogden.

e)  The Prosecutor's Belief of Mr Ronan Duff a solicitor employed by the Serious Fraud Office.

115.   The Defendant's evidence consisted of:

a)  Two witness statements from Kelwin Nicholls.

b)  Two witness statements of Christopher Morvillo.

c)  The Defendant's statement.

116.   I apply that evidence to the matters specified in s83A(3):

a. "**the place where most of the loss or harm resulting from the extradition offence occurred or was intended to occur":**

117.    Location of harm is usually a "very weighty factor":  **Love v Government of USA [2018]EWHC 172 (Admin)** (paragraph 28)**, Scott v USA [2018} EWHC 2021 (Admin)** (37)**.** However, even where all the harm occurred in the Requesting State, that is not definitive: **Love** [17], **USA V McDaid [2020]EWHC 1527 (Admin)** [24][2]. There is no statutory definition of "loss or harm resulting from the extradition offence" within s.83A. In cases of alleged financial loss and harm, the Court must distinguish between how quantifiable loss or damage has been caused and (legally and factually) to whom.

118.    My findings and ruling at paragraph 67 to 76 are clearly relevant.

119.    Counts 1-15: I am satisfied that the financial loss to be wrought by this fraud was always *intended* to fall on a US-based entity. Those were the only companies targeted by the defendant and his US-based agent. Those companies were targeted before the incorporation of Bidco.

*120.*   I am satisfied that the loss actually fell, on HP; a USA-based company. Its shareholders were predominantly (79%) US-based. It paid $11.7 billion for Autonomy based upon the alleged fraud perpetrated by the defendant and his co-conspirators. Once the fraud emerged a year later, HP was forced to issue an $8.8 *billion* write-down on the value of the asset it had acquired. It is the Government's case that on the most conservative estimate possible, it had been deceived by at least $1.7 billion.

121.   I am satisfied that loss extends far beyond the money HP paid for Autonomy; it includes, defending lawsuits, assisting multi-jurisdictional investigations; etc all of which '*forced [HP] to divert resources away from business operations*'. Moreover, '*The company has expended tremendous resources to shine a light on the truth and achieve justice*', including by bringing civil proceedings. '*The amount of time, resources, and energy that the company devoted to the Autonomy investigation and all the aftermath, it is staggering...*' .

122.   Mr Bailin submits that I am not entitled to take into account reputational harm under this subsection. I agree with Mr Summer's submission that the forum assessment is not to be confused with the dual criminality assessment. Harm is made a relevant factor by statute, I am satisfied that I am required to take it into account.

123.   I am satisfied that the intended loss in count 16 was aimed at HP's predominantly US-based investors.  It is common ground that actual loss was suffered by a US shareholder.

124.   I am satisfied that 'harm' was caused to HP by the fraud in counts 1-16. The fraud '*visited lasting reputational injury*' on HP. It '*has inflicted immeasurable harm to us, to our reputation, and to our brand. Founded almost 80 years ago, HP is an iconic institution in Silicon Valley and we spent decades earning the trust of our [349,000] employees and our customers and our investors...The aftermath of the acquisition and the disclosure of the fraud, public reaction to HP's write-down of Autonomy was swift and harsh. In fact, to protect himself...Dr. Lynch, began a smear campaign against us in an effort to undermine the truth....The Autonomy fraud has cast a long shadow on our company...*'.

125.   I accept that the defendant's alleged fraudulent actions also caused *harm'* in the UK as the UK's financial reputation was tarnished by the defendant's fraudulent activity. I accept that the harm caused to the UK financial institutions is the '*significant and serious'* harm as recognised by the SFO. However, similar reputational damage would have been caused to financial institutions within the USA. That harm is abstract and impossible to quantify. The harm financial losses caused to HP were huge and the reputational harm caused to HP in the USA significant and long lasting.

126.   I am satisfied that the intended 'harm' under count 17 was to the US investigations into counts 1-16.

127.   I am satisfied that the huge financial losses caused to HP in the USA, the losses suffered by American investors and the significant reputational damage caused to HP strongly favours extradition.

b)  "**the interests of any victims of the extradition offence":**

128.   I have found most of the financial and reputational loss that fell on HP and its' predominately US based shareholders.

129.   I agree that HP and its' US investors have an interest in securing local criminal justice *'according to their own local laws and procedures'*, per **Love** at §29, and as quickly as possible. As the High Court held in **Wyatt v USA** [2019] EWHC 2978 (Admin) at §15:

'...*The interests of the victims of an alleged extradition offence include the convenience of giving evidence but are not limited to that...the victims of a crime have an interest in the legal proceedings beyond the narrow compass of being a witness and giving*

*evidence. They should, if they wish, be able to attend a trial. They should be in a position to have continuing contact with the prosecuting authorities. They are likely to wish a prosecution to take place in the jurisdiction where they suffered the harm relied upon, subject to their domestic legal order culminating, if there is a conviction, in an appropriate local sentence. This case involves corporate victims, although acting through individuals and owners... The judge cannot be faulted for having considered this to be a statutory factor which weighed in favour of extradition, nor for thinking it an important matter...*'

130.    I am satisfied that the fact that the civil proceedings had to be brought in this country as a consequence of a clause in the contract does not lessen the interests of the victims in having the criminal charges tried in their jurisdiction. I agree that their interests will not be satisfied by the outcome of a civil claim that the Defendant has vigorously defended and the outcome of which he is likely to appeal.

131.    I agree that their interests are not satisfied by the conviction of Mr Hussain as it is alleged that the defendant was the Chief Executive Officer of Autonomy and leader of the conspiracy who, after the purchase, "conduct a smear campaign [against HP] to undermine the truth". There is a clear public interest in the trial of the CEO of a major public company, who was responsible for an alleged fraud causing very significant losses.

132.    The interests of the victims strongly favour trial in the USA.

c)  "**any belief of a prosecutor that the United Kingdom, or a particular part of the United Kingdom, is not the most appropriate jurisdiction in which to prosecute D in respect of the conduct constituting the extradition offence;":**

133.    The SFO is a designated prosecutor for the purposes of s.83A (SI 2013/2388). The SFO investigated this matter in 2013-2015 and

ceded its investigation to the USA based on the evidence and information then available.

134.   Ronan Duff, a solicitor with the SFO has issued a detailed and reasoned statement of belief that the UK is **not** the most appropriate forum for this prosecution. He stated, inter alia, that:

i)   In March 2014 the SFO decided that there was insufficient evidence to continue their investigation (the equivalent of the threshold test was applied).

ii)  Before announcing its decision it communicated it to the US investigators. They then shared information that they had obtained from a number of co-operating witnesses in the US. The SFO considered that the disclosures were primarily of evidence to the VAR issue and did not materially change the picture in relation to the hardware deals. It also noted that the witness disclosures would not have constituted admissible evidence for the English courts. Further enquiries followed. The SFO then carefully applied the guidance on concurrent jurisdictions. It decided in December 2014 to cede jurisdiction to the US on the VAR issue and to close its' investigation into the hardware deals. Its' reasons for doing so are set out in paragraph 15 of Mr Duff's statement. I place great weight on the statement that factors that led to the ceding included:

a)   "The extent to which any prosecution would need to rely on the evidence of the US cooperating witnesses, their testimony providing key evidence of dishonesty which was otherwise difficult to prove

b)   The likely difficulties in securing the evidence of the US cooperating witnesses in admissible form for the purposes of prosecution before the English courts

c)   The anticipated difficulties in securing all relevant unused material ……for the purposes of discharging the SFO's disclosure duties…

d) The delay which the above difficulties-assuming they were surmountable-would cause to the charging and trial timetable for any SFO prosecution.

iii) Mr Duff conducted his review approaching the question of jurisdiction afresh. He concluded that England and Wales is not the most appropriate jurisdiction in which to prosecute the Defendant. He accepted that a prosecution in this jurisdiction was not impossible but his belief is that the USA is the more appropriate jurisdiction. He formed that belief because:

1) He placed significant weight on all the prosecutions taking place in one jurisdiction.

2) The alleged conduct resulted in harm in both jurisdictions, but with identifiable victims being predominately in the USA.

3) Complications in securing admissible evidence from the US based witnesses. "The specific complication arising …from the Requesting State's reliance on co-operating witnesses". He "can state on the basis of US Witness Disclosures, that the evidence of the cooperating witnesses in question is highly probative of the question whether the arrangements….were dishonest. Were such evidence not available to an English court, any prosecution of this aspect of the case …would…be considerably weakened, if not wholly undermined".

4) Very significant delay would result from a prosecution in this jurisdiction. The US prosecutors are ready to proceed.

135.   I agree that the Act was '*not intended to invite a review of the prosecutor's belief as to the more appropriate jurisdiction on grounds short of irrationality...*' (***Dibden*** at §35; ***Shaw*** at §§51, 59). Mr Duff's belief is not irrational, it is considered and reasonable. The Administrative court gave the following guidance at paragraphs 18-20 of **Wyatt v USA**:

*'...It is almost inevitable that a prosecutor will take into account the statutory factors found in section 83A(3) in forming a belief. It would be very odd not to do so. Factors such as the interests of the victims, the availability of evidence, the location of harm, delay, the defendant's connections with the United Kingdom and the prospect of multiple prosecutions could be influential in forming a belief. The prosecutor is not, however, limited by the statutory factors in the same way that the judge is. He may take anything that rationally bears on the question into account. Obvious examples would include the dynamics of a trial and the practical implications of having to investigate alleged offences and prosecute them here, including resource implications. There may also be differences between the legal regimes in the requesting state and England and Wales which could have an impact on admissibility of evidence or raise other legal issues...Thus, the judge is required to have regard to the prosecutor's belief; and that may be based largely on the statutory factors or may extend well beyond them. Yet the prosecutor's belief is an independent factor that weighs in the balance. It may be, for example, that the judge's provisional view having regard to all factors except the prosecutor's belief would be not to favour extradition. Then, taking into account the prosecutor's belief the balance may tip the other way. Whether or not that is the case, the belief must weigh in the balance...'*

136.  There is nothing irrational about Mr Duff's belief. His belief strongly favours trial extradition.

**d)"were D to be prosecuted in a part of the United Kingdom for an offence that corresponds to the extradition offence, whether evidence necessary to prove the offence is or could be made available in the United Kingdom":**

137.   I agree with Mr Baillin's submission that, applying **Scott** , I am required to consider whether the evidence of the cooperating witness is necessary to prove the extradition offences.

138.   He submits that neither Mr Leach nor Mr Duff has "demonstrated how this requirement is satisfied". He relies on the evidence of Mr Nicholls to undermine the importance of the cooperating witnesses in the light of the way the civil trial was conducted and his assessment of the effect of any evidence given on the importance of their evidence.

139.   I have already noted my concerns about Mr Nicholl's lack of independence. I find his assessment of the importance of evidence given in a civil trial to which the Government was not a party, to be unpersuasive. I note that:

i)      He has not seen the evidence that Mr Egan will give in the criminal case.

ii)     Miss Anderson, Joel Scott and Alan Rizek did not give evidence in the civil case.

iii)    He has not seen the evidence presented to the Grand Jury.

iv)    He has not seen the evidence prepared by Mr Collet or Mr Marshall.

140.   I agree that it is not a correct legal proposition that I am required to see the statements of the witnesses to undertake my own assessment of their importance. I am entitled to take it to account the statements of Mr Leach, the behaviour of the SFO and the belief of Mr Duff. I note that it was the Witness Disclosures by the Government that led the SFO to continue its enquiries. The SFO ceded the investigation of the VAR issue to the US because of the key evidence of the cooperating witnesses and the likely difficulties in securing their evidence.

141.  I am quite satisfied that the evidence of the cooperating witnesses is of significant importance to the case. Prosecution would be considerably weakened if not wholly undermined by the absence of their evidence.

142.  I now must consider whether evidence necessary to prove the case could be available in the UK.

143.  The defendant relies on the evidence of Mr Morvillo to establish that the evidence of cooperating witnesses could be made available. Mr Morvillo is a lawyer and partner in the firm of Clifford Chance based in their office in New York. He has acted for the Defendant since November 2012. His primary focus is on the US proceedings against the Defendant, although he has been involved in aspect of the civil case in this jurisdiction.

144.  It appears that the cooperating witnesses have entered into different types of non-prosecution agreements with the US prosecutors relating to evidence that they can be required to give in the USA. Mr Morvillo has only seen Mr Egan's deferred prosecution agreement. Mr Morvillo was of the opinion that the terms of the agreement were wide enough to ensure that the US Department of Justice could compel him to give evidence.

145.  Mr Morvillo posited that novel and untried procedures are available to secure immunity for the witnesses to obtain immunity from prosecution in the US for evidence given in the UK. Procedures exist to allow the SFO to apply for the witnesses to be given immunity from prosecution in the UK. Neither Mr Leach nor Mr Morvillo were aware of such procedures being used previously.

146.  The reality of the position is that it is unclear whether the witnesses would cooperate and if not whether they could be compelled by US prosecutors to give evidence in the UK. The procedures to obtain their cooperation (mutual legal assistence, the

use of 1782 and 6003 process in the US and the use of s71 of SOCPA in the UK), will undoubtedly lead to significant delay.

147.    I agree with Mr Duff when he stated that '*Seeking to 'convert' such witnesses into witnesses for the Crown in an English criminal proceeding would give rise to considerable complexity and uncertainty of outcome*'. It is far from clear that the entire corpus of US evidence would be transferable to the UK.

148.    Applying ***Ejinyere v USA [2018] EWHC 2841 Admin*** at paragraph 29 I am '*entitled, in our view, to recognise that adducing live evidence in the UK would be less straightforward than in the US, to note the fact that the documentary evidence was extensive and to conclude that the process of obtaining the evidence was likely to be less certain than in the US...*'.

149.    This is a factor that strongly favours extradition.

### e) "any delay that might result from proceeding in one jurisdiction rather than another":

150.    Mr Morvillo was of the opinion that any trial in the USA is unlikely to proceed until the summer or fall of 2023.

151.    The DoJ investigation has been underway for over eight years. It is wide-ranging and complex, and involves predominantly US-based witnesses. Evidence has been gathered in a way that ensures compliance with rules of evidence that are specific to US court proceedings. An indictment has been issued. The US is trial ready.

152.    The SFO's involvement in the case ceased in 2015. Proceedings in the UK would require UK investigators and prosecutors to acquaint themselves with, investigate, and prepare this matter for trial in order to arrive at the position in which the US prosecutor presently stands. This would involve consideration of a

huge volume of material. Including, for example, the transcripts and nuances of Mr Hussain's 37-witness trial. Disclosure alone in that trial involved the Defendant's solicitors employing 12-14 lawyers to work exclusively on it for 12 months. Disclosure in the criminal trial in the USA runs to at least tens of millions of documents, documents that the SFO are likely to be required to consider if it is to meet its' disclosure obligations. Preparing for trial in this jurisdiction would inevitably be an '*enormously'* lengthy process which '*would severely undermine the efficiency of the proceedings*'. I agree with Mr Duff's assessment '*Significant delay'* would be '*inevitable'* if the trial were conducted in this jurisdiction. In addition the SFO would be required to consider the material provided in the civil proceedings in this jurisdiction.

153.   I am satisfied that the SFO would take considerable time before it was able to make a decision to charge, further substantial delays would follow before a trail could commence in this jurisdiction. I am satisfied that any trial in this jurisdiction would result in considerable additional delay.

154.   This factor strongly favours trial in the USA.

f)      **"the desirability and practicability of all prosecutions relating to the extradition offence taking place in one jurisdiction, having regard (in particular) to—(i) the jurisdictions in which witnesses, co-defendants and other suspects are located, and (ii)the practicability of the evidence of such persons being given in the United Kingdom or in jurisdictions outside the United Kingdom":**

155.   The Defendant's challenge is set out at paragraphs 27 to 30 of his skeleton argument. The Government's response is set out at paragraphs 32 to 37 of its' skeleton.

156.   I agree that this is not a case in which different countries can sensibly prosecute distinct portions of conduct. That being so, '*it is*

>   *strongly preferable that all prosecutions be pursued in one jurisdiction. Doing so avoids the potential for one proceeding to undermine the other by virtue of procedural differences, differences in evidential admissibility, disclosure rules, sentencing regimes and so on...'* [**Duff** §36-39 & 15(i)].

157.   I accept that as a matter of public policy it is desirable that co-conspirators are tried in the same jurisdiction. I recognize that a joint trial with Mr Hussain is not possible as he has already been tried in the USA. Mr Egan was charged but will not be tried as he has entered into a deferred-prosecution agreement with the US authorities, he will therefore not be tried jointly with the Defendant. The section does not require a joint prosecution but requires me to consider the desirability and practicability of all prosecution**s** taking place in one jurisdiction. I am satisfied that the section requires me to consider a wider question than all the co-conspirators being tried at the same time. I remind myself of the guidance given by the court in ***Ejinyere*** at paragraph 38:

>   *'the advantage that flows from having all prosecutions in one jurisdiction is not limited to the possibility of trying all co-defendants at the same time. There are also benefits from trying all co-defendants under the same law, before the same courts and ensuring that all those convicted are sentenced under the same sentencing regime'*.

158.   Even where joint trials are not possible, s.83A(3)(f) remains a '*weighty'* factor in favour of extradition (***Ejinyere*** at §46; ***McDaid*** at §§45, 49).

159.   Mr Chamberlain will be tried on the same count in the USA. Judge Breyer, the trial judge, has indicated that he wishes to try Mr Chamberlain and the Defendant jointly.

160.    I accept that the USA is the only jurisdiction that can try count 17. Mr Chamberlain faces the same count, if extradition is refused the Defendant would never be prosecuted for that count whereas his subordinate will be tried on it.

161.    Mr Morvillo has raised the possibility of the trials of Mr Hussain and the Defendant being severed. He accepted that the starting point was a motion for severance. The court would approach such a motion as follows:

- A joint trial will normally be in the interests of justice.
- The applicant must show potential prejudice from a joint trial.
- The court will balance the desirability of a joint trial against the Defendant's right to due process.

162.    Mr Hussain has not applied for severance. The Defendant has not given evidence that he will apply for severance. I am satisfied that the possibility of such an application is no more than theoretical.

163.    The Defendant complains of an inequality of arms if there is a trial in the USA as the prosecution witnesses have been granted immunity whereas immunity has not be granted to defence witnesses. As a consequence, the Defendant submits that his witnesses may refuse to give evidence placing him at a significant disadvantage. Mr Morvillo points to the refusal of Judge Breyer to grant immunity to six proposed defence witnesses in the Hussain trial. Mr Hussain ultimately called one witness. There is no evidence confirming whether the Judge's refusal to grant immunity was the reason for their not giving evidence.

164.    It is apparent from Mr Morvillo's evidence that the Judge has the power to grant defence witnesses immunity if a defendant can satisfy the court that a refusal to do so would result in distorted fact

finding. Mr Hussain was unable to meet the test, as a consequence the application was refused.

165.   I am satisfied that the Defendant is able to make an application to the court for defence witness immunity which will be granted if he can satisfy the test. I do not accept that any injustice follows from this procedure or that any inequality of arms results.

166.   I am satisfied that this is a very weighty factor in favour of extradition.

g) "D's connections with the United Kingdom":

167.   The only evidence of the Defendant's connections to the UK are contained within his written statement (I place no weight on the hearsay evidence provided by Mr Nicholl's). However, that evidence is untested as the Defendant did not give evidence on oath. I do accept, with some hesitation, the following:

a)  The defendant is a UK national.
b)  He is married. His wife was a citizen of the US but is now solely a British citizen.
c)  He has two daughters now aged 15 and 17 years.
d)  He owns property in the UK. He does not own property in the USA.
e)  He is a fellow of the Royal Society.
f)  He is a fellow of the Royal Academy of Engineering.
g)  He has been an advisor to a Prime Minister.
h)  He is the Deputy Lieutenant of Suffolk.
i)  He has been a board member at the Crick Institute, a non executive Director of the BBC, a trustee at Kew and the National Endowment for Science.
j)  He was awarded an OBE.
k)  He receives treatment in the UK for his health issues.
l)  He is a consultant to a company called Invoke.

168.   I accept the Defendant's ties to the UK are strong and long-standing. This is an important factor against extradition.

**The evaluative process**

169.   '*The matters relevant to an evaluation of 'the interests of justice' for these purposes are found in section 83A(2)(b). They do not leave to the court the task of some vague or broader evaluation of what is just. Nor is the bar a general provision requiring the court to form a view directly on which is the more suitable forum, let alone having regard to sentencing policy or the potential for prisoner transfer, save to the extent that one of the listed factors might in any particular case require consideration of it...*' (***Love*** at §22).

170.   All of the specified matters in section 83A(2)(b) strongly favour trial in the USA save for the Defendant's connections to the UK that are an important factor against extradition. However, the Defendant's connections to the UK do not affect his ability to be extradited.

171.   The preponderance and collective weight of the specified matters in this case satisfies me that  extradition to the USA is in the interests of justice.

**Issue 3; Section 87-Article 3**

172.    Mr Bailin has made it clear that the Defendant's challenge is not a generalized attack on the Bureau of Prisons federal prison estate but relates specifically to the inability of the prisons to deal with the Defendant's health conditions in a manner that does not demean his dignity and would amount to a real risk of cruel and inhuman treatment.

173.    It is common ground between the parties that there is no real risk that the Defendant will be detained pre-trial or during the trial or held in custody pending appeal. The defendant's case is now limited to post-conviction detention at FCI Butner and where it is asserted that there is a real risk that he will receive such inadequate healthcare that it will violate Article 3.

**The law**

174.    The relevant legal principles in relation to prison conditions and Article 3 ECHR were clearly set out in ***Dempsey v USA (No. 2)*** [2020] 1 WLR 3103 at paragraph 43: '*The test is whether there are substantial grounds for believing that the requested person would face a real risk of being subjected to torture or inhuman or degrading treatment in the receiving country. The test is a stringent one. It is not easy to satisfy'*: *'Strong evidence'* is required to establish a violation of Article 3 by reference to prison conditions when the requesting state is a well-established democratic country, like the USA: ***Hafeez v USA*** [2020] 1 WLR 1296 at paragraph 66.

**The evidence**

175.    The Government has not challenged the description of the Defendant's health conditions.

176.    The Defendant decided not to give evidence but instead rely upon a statement in which he has described the effects of his conditions and his response to them. There is no corroboration for how he responds to attacks or symptoms beyond his untested statement. For example he stated that if "I pass out from a laryngospasm episode, someone has to inject me with adrenaline, which I carry with me". There is no independent evidence that he carries adrenalin or from anyone who has injected him with it, or

how frequently he suffers attack or when he last suffered one.

177.   He has described his regime for dealing with his intestinal issues in general terms, however, that description lacks detail. For example he does not describe how frequently it is necessary for him to undertake his cleaning regime and how it fits in a life style that has involved long flights. I note that he has sat through 2 long days at this court without difficulty and without requesting a break.

178.   He stated that he has to sleep in an upright position and occasionally in a chair but has provided no independent evidence that he does so.

179.   As part of his case the Defendant relies on very lengthy statements from his own lawyers. In respect of this challenge he relies on medical notes and a brief report from Professor Cohen. I am unable to accept the Defendant's uncorroborated assertions, where independent evidence should be readily available and when he has not subjected himself to cross-examination.

180.   I am satisfied that the Defendant suffers from:

a) Laryngospasm. I am satisfied his symptoms are untreated they will lead to "choking sensations and he is unable to breath. These episodes are scary and he cannot breathe for up to 90 seconds….". He suffers attacks of varying severity approximately every 3 months. He requires daily medication and has been advised to carry an adrenalin injector for severe attacks.

b) Acid reflux

c) Sleep apnoea for which he uses a CPAP machine at night.

d) His lower intestinal condition requires him to follow a cleaning or hygiene regime, a low fibre diet and taking Imodium every few weeks. He is susceptible to a relapse if he does maintain his regime. "If he is unable to manage himself accordingly he may

develop further sceptic complications….These conditions may precipitate the need for further formal assessment….with a view to surgical intervention".

181.   Dr Pelton has provided evidence on behalf of the Government. He is currently the Western Regional Medical Director for the United States Department of Justice, Federal Bureau of Prisons. He is responsible for overseeing delivery of medical care in the Region. His evidence can be summarized as follows:

a) The BOP is committed to providing inmates in its custody with quality medical care that is consistent with community standards.

b) Every institution maintains a Health Services Unit.

c) He has seen the report of Joel Sickler dated 31 July 2020, the report of Professor Cohen and the Defendant's statement.

d) The BOP cannot predict to which BOP institution the defendant will be assigned.

e) Designation of the defendant's prison-level will be tailored to reflect his security and program needs, any safety concerns, and medical needs. All that can be said with certainty is that, in view of his medical complaints the defendant will most likely be designated as a '*Care Level Three'* inmate (i.e. '*outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications*'), he will be monitored for his chronic medical conditions.

f) The BOP can provide appropriate care to him. BOP institutions classified as Level-3 institutions '*manage inmates with potentially unstable medical problems*'.

182.   The Defendant relies on 2 reports prepared by Joel Sickler. Mr Sickler is a litigation specialist who has "expertise on Federal sentencing" who has "developed an expertise on the Federal prison system". He has founded his own company called "Justice Advocacy". He is a prisons advocate. He is not a doctor. He is not a

lawyer.

183.    Mr Sickler's evidence was that the Defendant would serve his sentence at FCI Butner Low. He accepted that Dr Pelton was not dishonest and had not lied to the court. He stated that Dr Pelton is "probably an extraordinary professional who is extremely well meaning". His evidence was that although the policies were excellent they would not be delivered on the ground. His sources of information were staff at FCI Butner, brief conversations with staff at the location, clients who had been housed there, reading a significant number of litigation cases, open source material.

184.    He accepted that the BOP "*can and does provide adequate health care in a range of cases*" and that the suggested variety and unpredictability of healthcare provision '*is not a conclusion that indicts the entire BOP system*'.

185.    His conclusion was that "The general environment makes maintaining hygiene a real challenge. For someone with Dr Lynch's requirements that is likely to escalate to the level of degradation and humiliation".

186.    When cross-examined he stated inter alia that:

i)      Despite being made fully aware of the Defendant's health conditions he asserted in his first report (completed prior to Dr Pelton's statement) that the Defendant was likely to serve his sentence at 1 of 2 other identified prisons, neither of which was FCI Butner Low. He explained that this was because he was not focused on the Defendant's medical needs when he prepared that report.

ii)     He agreed that the Defendant would be assigned Care level 3 and serve any sentence in a low security prison.

iii)    He has not been inside FCI Butner beyond reception and the visitors centre.

iv)    He stated that the prison had 690 inmates, the maximum occupancy is 1,000.

v)    He agreed that the first example he gave of a prisoner who had not received appropriate care was not a prisoner detained at FCI Butner Low. He agreed that none of the clients' listed at paragraph 33 of his second report had obtained judgement against FCI Butner Low.

vi)    He accepted that none of his clients had obtained a court decision that the treatment in FCI Butler Low was less than excellent.

vii)    He was referred to the statement of Christopher Liwag who had prepared that statement in response to a report that Mr Sickler had prepared for Mr Hussain's sentencing hearing. Mr Liwag challenge the accuracy a number of statements contained within that report. Mr Sickler did not accept those challenges save he accepted that his assertions that minimum security prisons employed armed guard towers and uses dogs on regular patrol was incorrect.

viii)    He accepted that:

- Hearing aids were common.
- Epi pens would be available, although with delays and significant practical problems with their use. He denied that the Defendant would be allowed to have the pen in his possession. Practical problems in obtaining it may endanger his client.
- A foam pillow may be provided.
- He would be provided with a CPAP.
- Medication would be approved for the Defendant's intestinal condition.
- A sits bath is medically suitable for the Defendant's condition. It would be available but its' use, cleaning and storage would make him unpopular with other prisoners. Access to it when required would be a problem

- The prison can provide a medically suitable diet if it is willing to do so.

ix)    He accepted that inmates have access to the courts in relation to claims of inadequate healthcare. The BOP also has an established internal complaints process.

187.   I was unimpressed by the sources of Mr Sickler's information which are unnamed, generalized and presented in a misleading way. I have significant doubts that he is an expert. His first report was prepared in a casual way which overlooked the central issue, he confidently identified prisons in that report where the defendant would serve that sentence, an opinion that he completely changed in his second report. He accepted that at least one statement that he made in Mr Hussain's sentencing report was incorrect (others were contested by Mr Ligwag). He demonstrated hostility to the criminal justice system in the USA when he said that he was "skeptical of the courts being prepared to listen to prisoner's complaints". At one point he suggested that prison staff regard prisoners as "sub-human".

188.   I am satisfied that Mr Sickler was an unreliable partisan witness who has exaggerated his evidence that he has presented, on occasions in a misleading way.

**Findings:**

189.   The USA is a well-established democratic country. Dr Pelton's evidence is entirely credible and leaves me in no doubt that the Defendant will serve any sentence in a level 3 prison whose purpose is to care for the chronically ill.

190.   The Defendant's evidence, unsupported by independent non-governmental reports or adverse judicial findings, does not lead me to conclude that there are substantial grounds for believing that the Defendant faces a real risk of him being subjected to Article 3 non-

compliant treatment.

191.   I reject this challenge.

**Issue 4: Abuse of process.**

192.   The defendant's submission is found on an assertion that the Request contains material misrepresentations and omissions of facts relevant to the substance of the extradition request. It relies on the "wholesale avoidance of the [on-going] civil trial which "has resulted in the Government advancing a case in the extradition proceedings which is inconsistent with the case advanced by HP and the evidence before the High Court".

193.   He specifically complains of:

i)   Material misrepresentations and omission as to the location and nature of conduct relevant to this Court's assessment of the forum bar".

ii)   Material misrepresentations as to the location and nature of loss and harm relevant to the forum bar.

iii)   The existence of the SFO's concurrent investigation.

iv)   The Government's claim for jurisdiction. The Defendant sought to rely on the evidence of a retired US District Judge to evidence this challenge. This issue had been aired before Judge Breyer during the Hussain trial, Judge Breyer rejected both challenges and ruled that the charges were not time barred and that the court had jurisdiction. Mr Hussein appealed to the US Court of Appeal for the 9th Circuit which upheld his rulings. A second report by Judge Scheindlin sought to challenge those rulings suggesting that they needed to be resolved in the Supreme Court (Mr Hussain has not renewed his appeal). I was satisfied that I was being

invited to rule upon a clear dispute regarding the interpretation of US law both in relation to both of these issues and the suggestion that count 17 is duplicitous.

194.   Guidance on the last issue was provided by the former President of the Queen's Bench Division in **Spain v Murua** [2010] EWHC 2609 (Admin). The court ruled at paragraph 58 that the abuse jurisdiction prohibits '*a detailed critique of the law of the requesting state*'. I was satisfied that this was what I was being invited to do. I ruled that the evidence of Judge Scheindlin was inadmissible and rejected this part of the challenge.

195.   The Defendant does not allege bad faith on the part of the Government.

**The law**

196.   Guidance was provided by Lord Sumption at paragraph 13 of **Zakrzewski v Regional Court of Lodz (2013) 2 All ER 93** as follows:

13 I agree with this statement, subject to four observations. The first is that the jurisdiction is exceptional. The statements in the warrant must comprise statutory particulars which are wrong or incomplete in some respect which is misleading (though not necessarily intentionally). Secondly, the true facts required to correct the error or omission must be clear and beyond legitimate dispute. The power of the court to prevent abuse of its process must be exercised in the light of the purposes of that process. In extradition cases, it must have regard, as Sir Anthony May observed, to the scheme and purpose of the legislation. It is not therefore to be used as an indirect way of mounting a contentious challenge to the factual or evidential basis for the conduct alleged in the warrant, this being a matter for the requesting court. Third, the error or omission must be material to the operation of the statutory scheme. No doubt errors in some particulars (such as the

identity of the defendant or the offence charged) would by their very nature be material. In other cases, the materiality of the error will depend on its impact on the decision whether or not to order extradition. The fourth observation follows from the third. In my view, Ms Cumberland was right to submit to Sir Anthony May in Murua that the sole juridical basis for the inquiry into the accuracy of the particulars in the warrant is abuse of process. I do not think that it goes to the validity of the warrant. This is because in considering whether to refuse extradition on the ground of abuse of process, the materiality of the error in the warrant will be of critical importance, whereas if the error goes to the validity of the warrant, no question of materiality can arise. An invalid warrant is incapable of initiating extradition proceedings. I do not think that it is consistent with the scheme of the Framework Decision to refuse to act on a warrant in which the prescribed particulars were included, merely because those particulars contain immaterial errors.

197.   I take this to be authority for the proposition that the sole juridical basis to enquire into the accuracy of the particulars of the warrant (or Request) is through a claim of abuse of process.

198.   The President of the QBD provided further guidance at paragraph 12 of **Government of the Untied States of America v Ilan Schlesinger (2013) EWHC 2671 (Admin):**

"It is very clear that the scheme of the Act, and such authority as there is, lead to the very clear conclusion that in determining the issue of dual criminality the court examines the documents constituting the extradition request. It determines on the basis of that material whether the conduct alleged in the documents constitutes an offence under the law of England and Wales".

199.    There is no juridical basis to consider defence evidence as part of this challenge.

**Ruling**

200.    The first difficulty for the Defendant in maintaining his challenge is that the asserted omissions do not go to particulars that the Request is aimed at addressing as these are not required by the Treaty. Forum is not in the Treaty, it is a creation of the 2003 Extradition Act. When the US settles an extradition request it does so according to the Treaty requirements. The burden for raising forum as an issue rests on the Defendant, the Request is not required to address it. If forum is raised the Defendant serves evidence and the Government responds. That is what happened in this case. It is not an abuse of process for a Request not to include something which the Treaty does not require.

201.    I agree with Mr Summers submission that abuse is limited to '*statutory particulars'* within a request i.e. the information *required to be contained within* an extradition request and necessary to enable the Court to decide one of the mandatory statutory questions upon which the burden of proof rests with the state. I am satisfied that the alleged abuse is outside the jurisdiction set by  **Zakrewski.**

202.    The second difficulty is that the Defendant's approach involves taking allegations contained within the extradition request, examining them against evidence adduced (by HP) in the civil trial, and suggesting that they were '*undermined'* or '*shown to be wrong'*. I agree that it is a fundamental principle of extradition law that I must not entertain challenges to the merits of the Government's factual allegations. Issues of guilt or innocence are exclusively matters for the courts of the requesting state. '*Extradition proceedings are not a criminal trial…guilt or innocence will not be decided'* (***R (B) v***

*Westminster Magistrates' Court* [2015] AC 1195, per Lord Hughes at §66).

203.   I am satisfied that this challenge is being used as an "*indirect way of mounting a contentious challenge to the factual or evidential basis for the conduct alleged in the warrant, this being a matter for the requesting court'*.

204.   ***Belbin v France* [2015] EWHC 149 (Admin)** is authority confirming that the abuse jurisdiction is exceptional. It is a '*residual'* jurisdiction and will not apply if the argument can (and here should) be raised under a statutory bar. The same arguments have been deployed when raising the Forum bar, as a result they cannot found a challenge on the basis of abuse.

205.   The first issue I must address when considering this challenge is whether the Request comprise statutory particulars which are wrong or incomplete. I am satisfied that the particulars are not wrong or incomplete. I am satisfied that the particulars sets out the conduct alleged against the defendant and address the statutory particulars.

206.    The second issue is whether the matters relied on by the Defendant are "clear and beyond legitimate dispute". Mr Leach '*strongly refutes any suggestion that the extradition request contains misleading content or material omissions*'. The challenges based on claimed inconsistencies derived from the civil trial are not agreed, on the contrary these are all contentious issues comprising indirect challenges to the factual and evidential basis of the conduct alleged in the extradition request, analysis of which invites the me to engage in '*a debatable analysis of arguably discrepant evidence'* (***Murua***).

207.   The Government was not a party to the civil suit which was brought on behalf of HP. The Government's criminal allegations are based on its own evidence. The Government's conduct of criminal

proceedings is not bound by the way HP chose to run its civil suit. The court held at paragraph 21 of **USA v Shlesinger** that : '*The fact that the respondent's account contradicts what is said by the Government cannot give rise to a claim that the conduct was not fairly and accurately described*'.

208.   The third issue is whether the error goes to the validity of the warrant. I am satisfied that it does not.

209.   I am satisfied that the conduct complained of does not amount to an abuse of process.

210.   I refuse to stay these proceedings as an abuse.

211.   As I am satisfied that extradition is compatible with the defendant's Convention rights, I must send this case to the Secretary of State for a decision as to whether the defendant is to be extradited.

Michael Snow

Appropriate Judge

22 July 2021

62