IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States,<br>        Plaintiff,<br>   v.<br>Michael Richard Lynch,<br>        Defendant. | Case No. 18-cr-00577-CRB-1<br><br>**ORDER GRANTING BAIL AND IMPOSING CONDITIONS ON RELEASE** |

After lengthy extradition proceedings in the United Kingdom, Defendant Michael Richard Lynch ("Lynch") has finally landed on our shores to stand trial, accompanied by the United States Marshals Service. After a bail hearing, the Court now determines whether Lynch is a serious risk of flight, and what conditions might reasonably assure his appearance at trial, pursuant to 18 U.S.C. § 3142.

Presently, based upon the circumstances of the defendant, it is clear that he presents a serious and substantial risk of flight. A number of factors lead to this conclusion.

Mr. Lynch has vigorously contested extradition for nearly four years. As recently as last month, the defendant publicly announced that his extradition proceedings constitute a "legal overreach into the United Kingdom."[1] He has no significant ties either to this District or the United States. He is a citizen of the United Kingdom, owns no property in the United States, and resides abroad. Further, he has significant financial resources

---

[1] Mark Sweney, Autonomy Founder Mike Lynch Loses Appeal Against Extradition to US, Guardian (Apr. 21, 2023), https://www.theguardian.com/business/2023/apr/21/autonomy-founder-mike-lynch-loses-appeal-against-extradition-to-us-hewlett-packard ("The United States' legal overreach into the UK is a threat to the rights of all British citizens and the sovereignty of the UK.").

estimated at $450 million, which could easily sustain him for the remainder of his life, were he to abscond.

Added to these personal circumstances is the fact that the subject matter of the indictment has been litigated before this Court and the United Kingdom. While the Court has no opinion concerning the defendant's culpability, his alleged co-conspirator, the Chief Financial Officer of the defendant's company, was convicted of multiple counts of fraud. Those convictions were affirmed on appeal notwithstanding the claim that this Court did not have jurisdiction, the very same claim that Lynch has advanced in his unsuccessful attempt to defeat extradition.

For all these reasons, flight from prosecution appears to this Court to be almost a certainty. Indeed, if it were the only inquiry, the court would order detention. However, the Bail Reform Act requires a determination as to whether conditions of release can be fashioned which would assure a defendant's presence at trial, given the individual circumstances of this defendant. Because of Lynch's unique financial resources, the Court concludes that there are certain restrictions that, if met, will reasonably assure his presence at trial. These minimum restrictions are set forth below.

## I.     BACKGROUND

### A.     The Indictment

In the superseding indictment in this case, the government alleges the following:

From 1996 to 2011, Lynch was the CEO and a director of Autonomy, a public software company incorporated in the United Kingdom. SI (dkt. 21) ¶¶ 1, 3–4. From 2009 to 2011, Lynch, his co-defendant and Vice President of Finance Stephen Chamberlain, and Chief Financial Officer Sushovan Hussain[2] "engaged in a fraudulent scheme to deceive purchasers and sellers of Autonomy securities about the true

---

[2] After trial in 2018, Hussain was convicted of conspiracy to commit wire fraud, wire fraud, and securities fraud, and sentenced to sixty months in prison. See Jury Verdict, United States v. Hussain, 16-cr-462, dkt. 394 (Apr. 30, 2018); Minute Entry re: Sentencing, dkt. 552 (May 13, 2019). Hussain's convictions were affirmed on appeal. See United States v. Hussain, 972 F.3d 1138 (9th Cir. 2020).

1    performance of Autonomy's business," including by artificially inflating revenue figures,
2    and making false and misleading statements to Autonomy's independent auditor, market
3    analysts, and regulators.  Id. ¶¶ 19, 22.  In 2011, Lynch met with representatives from HP
4    about a potential acquisition of Autonomy, using the false and misleading financial
5    statements created by Chamberlain to "make Autonomy look more attractive to a potential
6    purchaser like HP."  Id. ¶ 21.

7    In August 2011, HP agreed to acquire Autonomy for $11 billion, noting in the press
8    release announcing the acquisition that "Autonomy's recent operating and financial
9    performance has been strong."  Id. ¶¶ 8–9.  Because Lynch owned seven percent of
10   Autonomy's outstanding shares at the time the deal closed, he made approximately $804
11   million from the acquisition.  Id. ¶ 12.  The indictment charges Lynch with conspiracy to
12   commit wire fraud, wire fraud, securities fraud, and a conspiracy to commit offenses
13   against the United States.  Id. ¶¶ 25–34.

### B. Procedural History

In September 2019, the government issued a formal request for Lynch's extradition, delivered to the U.K. Central Authority in November 2019.  See ECF 49-1.  On July 22, 2021, District Judge Michael Snow rejected Lynch's extradition challenge, and on April 21, 2023, that ruling was affirmed by the U.K. High Court. Having exhausted his appellate rights, Lynch was extradited to the United States and appeared before this Court on May 11, 2023.

## II. LEGAL STANDARD

Pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3142 governs pretrial detention of criminal defendants.  See United States v. Hir, 517 F.3d 1081, 1085–86 (9th Cir. 2008).  While defendants are ordinarily entitled to go free before trial, in "rare circumstances," a court may order a defendant detained.  United States v. Motamedi, 767 F.2d 1403, 1405 (9th Cir. 1985); see also United States v. Townsend, 897 F.2d 989, 994 (9th Cir. 1990).  To detain a defendant pretrial, the Court must find by a preponderance of the evidence that that the defendant presents a serious risk of flight, and that "no condition

or combination of conditions will reasonably assure the appearance" of the defendant. See Motamedi, 767 F.2d at 1406; 18 U.S.C. § 3142(e).

In determining whether there are conditions of release that will reasonable assure the appearance of a defendant and the safety of the community, the Court considers: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

### III. DISCUSSION

The Court first addresses Lynch's risk of flight, and then the conditions that would reasonably assure his appearance at trial.[3]

#### A. Risk of Flight

Lynch clearly presents a serious risk of flight, for at least three reasons.

First, Lynch is not facing these charges voluntarily. After spending over three years fighting extradition in his native United Kingdom and exhausting his remedies there, Lynch was finally extradited on and appeared before the Court for the first time on May 11, 2023, more than four years after the initial indictment in this case was filed. Clearly, Lynch's conduct signifies that he would rather be in the United Kingdom—or perhaps anywhere else—than in the United States facing these charges. See, e.g., United States v. Amar, 300 F. Supp. 3d 287, 290 (D.D.C. 2018) (holding that the defendant represents a risk of flight in part because he is a citizen of Israel and "the last time he was in Israel Defendant fought his extradition for nearly seven months, and consented only after receiving two adverse court rulings"); United States v. Botero, 604 F. Supp. 1028, 1034 (S.D. Fla. 1985) (reasoning that while the defendant may have had "entirely legitimate

---

[3] The parties—and the Court—agree that Lynch does not present a danger to the community.

tactical reasons for resisting extradition, the fact remains that the defendant has absented himself from this jurisdiction and refused to answer these charges"), aff'd, 853 F.2d 928 (11th Cir. 1988); United States v. Jones, 143 F. Supp. 3d 78, 85 (W.D.N.Y. 2015) (concluding that the defendant was a flight risk in part because he "did not voluntarily produce himself to face these charges" but instead fought extradition in the United Kingdom), aff'd, No. 15-3723 (2d Cir. Feb. 11, 2016); cf. United States v. Khashoggi, 717 F. Supp. 1048, 1050–51 (S.D.N.Y. 1989) (finding that because the defendant "waived his right to appeal extradition in Switzerland and travelled immediately to the United States for arraignment . . . [that] evince[d] a willingness, albeit overdue, to submit to the jurisdiction of this Court"). While Lynch has argued that exhausting his legal remedies in extradition proceedings does not indicate that he would resort to illegal remedies by absconding before trial in this case, the Court is convinced that Lynch's "refusal to voluntarily return is indicative of a mental state which could easily rationalize flight on legal, moral, or intellectual grounds." Botero, 604 F. Supp. at 1034.

  Second, Lynch has significant financial resources with which to fund flight. At his bail hearing, Lynch's counsel represented that he is worth between $400 and $450 million, with approximately $93 million of those assets in unencumbered shares of publicly traded stock. Courts frequently find that defendants with such vast wealth present a substantial risk of flight. See Townsend, 897 F.2d at 996 (affirming an order of pretrial detention where defendants had "access to substantial sums of cash"); United States v. Madoff, 586 F. Supp. 2d 240, 248–49 (S.D.N.Y. 2009) (affirming an order of 24-hour home monitoring and $10 million bond where the government argued that the defendant had "assets that [could] not be effectively restrained"); United States v. Epstein, 425 F. Supp. 3d 306, 323 (S.D.N.Y. 2019) ("The Defendant's vast wealth and influential contacts have provided him with the means to pay individuals to assist him in unlawful endeavors, including potentially fleeing the jurisdiction."); United States v. Esposito, 309 F. Supp. 3d 24, 31 (S.D.N.Y.) (holding that the defendant posed a risk of flight in part because "there is a high probability that Esposito has access to significant amounts of . . . liquid assets"), aff'd, 749

F. App'x 20 (2d Cir. 2018).

Third, Lynch does not have significant ties to United States, and particularly to the San Francisco area. While Lynch's alienage is not dispositive, see Motamedi, 767 F.2d at 1408, he has not been living or working in the United States, nor does he have family ties here. Lynch is a British citizen; while his wife was once a U.S. citizen, she is now solely a British citizen; they have two teenage children, and all live in the United Kingdom; and he owns property in the United Kingdom, and not the United States. In short, there is nothing keeping him here, beyond the charges he faces in this Court.

Accordingly, given Lynch's years-long fight against extradition from the United Kingdom, coupled with his vast wealth and lack of significant connections to the United States, the Court finds that Lynch presents a serious risk of flight.

### B. Conditions to Reasonably Assure Lynch's Appearance

Considering the four required factors under 18 U.S.C. § 3142(g), the Court finds that there are (stringent) conditions of release that will reasonably assure Lynch's appearance at trial.

First, there is no question that the charged offenses and underlying circumstances alleged—wire fraud, securities fraud, and conspiracy to commit offenses against the United States, involving years of falsified records culminating in a deal worth billions— are serious. See, e.g., Townsend, 897 F.2d at 994 (holding that charges against the defendants, which included a violation of 18 U.S.C. § 371, were "accusations . . . of sophisticated criminal conduct" that weighed against granting bail); United States v. Cohen, No. C 10-00547 SI, 2010 WL 5387757, at *7 (N.D. Cal. Dec. 20, 2010) (finding that charges, including wire fraud, were serious even if the defendant faced a sentence between four and nine years, because "[y]ears in prison, even if only a few, represents a significant hardship for Mr. Cohen considering his former luxurious lifestyle"); United States v. Possino, No. CR 13-00048-SVW-3, 2013 WL 1415108, at *1–3 (C.D. Cal. Apr. 8, 2013) (charges for a "pump and dump" securities fraud scheme were serious and weighed in favor of pretrial detention).

6

   Second, the weight of the evidence is undoubtedly substantial. Because of the multi-year delay in moving this case forward, the Court has the benefit of two "fiercely litigated" proceedings on the same events: First, a 29-day criminal trial in this Court against Autonomy's Chief Financial Officer, Sushovan Hussain, who was convicted on wire fraud, conspiracy to commit wire fraud, and securities fraud charges, see United States v. Hussain, No. 16-CR-00462-CRB, 2018 WL 3619797, at *1 (N.D. Cal. July 30, 2018), aff'd, 972 F.3d 1138 (9th Cir. 2020), and aff'd, 818 F. App'x 765 (9th Cir. 2020); and second, a 93-day civil trial in the United Kingdom, which "may rank amongst the longest and most complex in English legal history." Judgment ¶ 7, ACL Netherlands BV v. Lynch [2022] EWHC 1178 (Ch) (17 May 2022), 2022 WL 01557021.  While Lynch "vigorously denied both the fact of and his involvement in any impropriety" in the civil proceedings, Justice Hildyard found that HP had "substantially succeeded" in its case against Lynch.  Id. ¶ 5; Summary ¶ 3.  While the Court is mindful that this is the least important of the factors to be considered, Motamedi, 767 F.2d at 1408, and passes no judgment on Lynch's guilt or innocence, Townsend, 897 F.2d at 995, it does not escape the Court's attention that the evidence has already been tested so thoroughly.

   Third, as discussed in the prior section, Lynch's lack of connection to the United States and the San Francisco area, coupled with his immense wealth, require more stringent conditions of release than would otherwise apply in a comparable case where the defendant has more ties to the community.  See, e.g., United States v. Treselyan, 20-cr-549, 2021 WL 3055040, at *3 (D. Ariz. July 20, 2021) (holding that the "defendant's personal and professional connections to the United States are sufficient to mitigate the risk of flight when coupled with the additional conditions of release" ordered, including electronic monitoring and home detention, but no security personnel).  While Lynch's resources would allow him to fund flight, they can also fund the kind of extraordinary supervision that courts have routinely held can reasonably assure such a defendant's appearance.  See Madoff, 586 F. Supp. 2d at 244 (describing the conditions imposed on Madoff's pretrial release, including a $10 million bond and home detention with 24-hour

7

1   monitoring at his wife's expense); United States v. Dreier, 596 F. Supp. 2d 831, 833–34

2   (S.D.N.Y. 2009) (accepting a defendant's bail package that included a $10 million bond

3   and home detention secured by on-premises security guards, who were allowed to use

4   "temporary preventive detention and the use of reasonable force to thwart any attempt to

5   flee"); Esposito, 309 F. Supp. 3d at 32 (holding that the presence of an armed guard, rather

6   than video surveillance, was necessary to offset the defendant's risk of flight, and the

7   increased cost of the guard was "marginal in light of Esposito's significant resources"); cf.

8   Possino, 2013 WL 1415108, at *6 (finding that the defendant's risk of flight was not

9   mitigated by hiring a security service to escort him to the courthouse, rather than 24-hour

10  monitoring, because the Court "assume[d] Defendant cannot fund [the] expensive

11  monitoring" necessary "to offset the flight risk").  Though the Court must impose "the

12  least restrictive . . . combination of conditions" that will reasonably assure Lynch's

13  appearance, 18 U.S.C. § 3142(c)(1)(B), as prior cases before this Court have made

14  abundantly clear, strict restrictions on wealthy defendants' security are necessary to

15  prevent them from attempting to use those resources to circumvent their supervision.  See

16  Order Denying Motion for Compassionate Release at 2, United States v. Cohen, 10-cr-

17  547-CRB, dkt. 659 (N.D. Cal. June 22, 2022) (discussing a prior defendant's attempt to

18  bribe one of his security guards while on pretrial release).

19      Fourth, because Lynch does not present a danger to the community, this final factor

20  weighs in favor of release.  See Townsend, 897 F.2d at 996.

21  **IV.    CONCLUSION**

22      Accordingly, it is hereby ordered that Defendant Michael Richard Lynch be

23  released from custody upon the satisfaction of the following conditions, in addition to the

24  standard conditions, pursuant to 18 U.S.C. § 3142(c). This order shall be operative, and

25  Defendant released, only when each of the following conditions are met:

26      1.  Defendant shall deliver to the Clerk of Court a bond in the amount of
            $100 million, secured by $50 million in cash or unencumbered shares
27          of publicly traded stock, accompanied by power of sale.

28

2. Defendant shall be confined to an address in the city and county of San Francisco, subject to the approval of the United States Attorney's Office and the Court, and may only travel for meetings with counsel, medical appointments, and court appearances, all of which must be located in the city and county of San Francisco. Any further travel must be approved by the United States Attorney's Office and the Court.

3. Defendant shall be guarded on a 24-hour basis by a private security company at Defendant's expense, including video surveillance and armed guards. The costs of supplying the private security for six months shall be paid in advance. The private security company, the security arrangement, and any changes thereto, shall be approved by the United States Attorney's Office and the Court.

4. Defendant shall surrender all travel documents of any kind whatsoever, including any document which may be used to enter or exit any country, genuine or not. Defendant shall not apply for or otherwise obtain any new travel documents, genuine or not.

5. Defendant shall be subject to strict supervision by Pretrial Services and adhere to any other conditions imposed by the Court.

**IT IS SO ORDERED.**

Dated: May 11, 2023



CHARLES R. BREYER
United States District Judge