Jonathan M. Baum (SBN: 303469)
**Steptoe & Johnson LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten (Admitted Pro Hac Vice)
Brian M. Heberlig (Admitted Pro Hac Vice)
Michelle L. Levin (Admitted Pro Hac Vice)
Nicholas P. Silverman (Admitted Pro Hac Vice)
Dwight J. Draughon (Admitted Pro Hac Vice)
Drew C. Harris (Admitted Pro Hac Vice)
**Steptoe & Johnson LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

Christopher Morvillo (Admitted Pro Hac Vice)
Celeste L. Koeleveld (Admitted Pro Hac Vice)
Daniel S. Silver (Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MICHAEL RICHARD LYNCH and
STEPHEN KEITH CHAMBERLAIN,

Defendants.

Case No.: 3:18-cr-00577-CRB

Judge: Hon. Charles Breyer

**DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

Date: November 1, 2023
Time: 1:30 pm
Court: Courtroom 6 – 17th Floor
Date Filed: September 29, 2023
Trial Date: March 18, 2024

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT ............................................................................. 1

II.   BACKGROUND ............................................................................................... 2

III.  ARGUMENT ..................................................................................................... 5

    A.   Count One Alleges a Duplicitous Conspiracy With Impermissibly Extraterritorial Subparts And Must Be Dismissed .................................................................. 5

      1.   Duplicitous Conspiracies Are Impermissible .............................................. 5

      2.   Count One Charges Two Separate Schemes.................................................. 7

      3.   The Two Separate Schemes Cannot be Charged as One .............................. 9

      4.   Lumping the Two Conspiracies Together Conceals that Each Has Fatal Legal Deficiencies, Including Extraterritoriality .................................................. 10

      5.   The Duplicitous Conspiracy Jeopardizes Dr. Lynch's Fifth and Sixth Amendment Rights ................................................................................................ 17

      6.   Dismissal is the Only Remedy Sufficient to Cure the Defect..................... 18

    B.   Counts Two Through Fifteen Must Be Dismissed as Impermissibly Extraterritorial.... 19

    C.   Count Sixteen Fails to State an Offense ........................................................ 21

IV.  CONCLUSION................................................................................................. 24

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

# <u>TABLE OF AUTHORITIES</u>

<u>Page Nos.</u>

**Cases**

*Abney* v. *United States*,
   431 U.S. 651 (1977) ..................................................................................................18

*Absolute Activist Value Master Fund Ltd.* v. *Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ......................................................................................15

*Bascuñán* v. *Elsaca*,
   927 F.3d 108 (2d Cir. 2019) ............................................................................*Passim*

*Ciminelli v. United States*,
   143. S. Ct. 1121 (2023)...........................................................................................2, 23

*Griffin* v. *United States*,
   502 U.S. 46 (1991) ...................................................................................................19

*Kelly* v. *United States*,
   140 S.Ct. 1565 (2022).................................................................................................22

*Morrison* v. *Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) .......................................................................................1, 10, 11

*Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014) ....................................................................................14

*RJR Nabisco, Inc.* v. *Eur. Cmty*,
   579 U.S. 325 (2016) ................................................................................................11

*Russell* v. *United States*,
   369 U.S. 749 (1962) ................................................................................................22

*Salinas* v. *United States*,
   522 U.S. 52 (1997) ....................................................................................................6

*SEC* v. *Stein*,
   906 F.3d 823 (9th Cir. 2018) ................................................................................2, 22

*United States* v. *Aguilar*,
   756 F.2d 1418 (9th Cir. 1985) ................................................................................19

*United States* v. *All Assets Held at Bank Julius*,
   251 F. Supp. 3d 82 (D.D.C. 2017)...........................................................................14

3:18-cr-00577-CRB

*United States* v. *Arbelaez*,
    719 F.2d 1453 (9th Cir. 1983) ..................................................................................6

*United States* v. *Chesney*,
    10 F.3d 641 (9th Cir. 1993) ....................................................................................22

*United States* v. *Elbaz*,
    52 F.4th 593 (4th Cir. 2022) ...................................................................................11

*United States* v. *Fernandez*,
    388 F.3d 1199 (9th Cir. 2004) ..................................................................................6

*United States* v. *Garcia*,
    400 F.3d 816 (9th Cir. 2005) ....................................................................................6

*United States.* v. *Garlick*,
    240 F.3d 789 (9th Cir. 2019) ...................................................................................12

*United States* v. *Gordon*,
    844 F.2d 1397 (9th Cir. 1988) ...........................................................................6, 7, 9

*United States* v. *Hardy*,
    762 F. Supp. 1403 (D. Haw. 1991) ....................................................................18, 19

*United States* v. *Hayes*,
    99 F. Supp. 3d 409 (S.D.N.Y. 2015) .......................................................................11

*United States* v. *Hussain*,
    Case No. 16-cr-00462-CRB-1, 2017 WL 4865562 (N.D. Cal. Oct. 27, 2017) .....................4, 11

*United States* v. *Hussain*,
    972 F.3d 1138 (9th Cir. 2020) ..................................................4, 11, 12, 15, 17, 20

*United States* v. *Jinian*,
    725 F.3d 954 (9th Cir. 2013) ...................................................................................16

*United States* v. *King*,
    200 F.3d 1207 (9th Cir. 1999) ..................................................................................6

*United States* v. *Lapier*,
    796 F.3d 1090 (9th Cir. 2015) .................................................................................18

*United States* v. *Mandell*,
    752 F.3d 544 (2d Cir. 2014) ....................................................................................15

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

*United States* v. *Mastelotto,*
717 F.2d 1238 (9th Cir. 1983) ............................................................6

*United States* v. *McLellan,*
959 F.3d 442 (1st Cir. 2020) ............................................................12

*United States* v. *Moran,*
759 F.2d 777 (9th Cir. 1985) ............................................................6

*United States* v. *Otis,*
127 F.3d 829 (9th Cir. 1997) ............................................................6

*United States* v. *Sidorenko,*
102 F. Supp. 3d 1124 (N.D. Cal. 2015) .....................................11, 20

*United States* v. *Smith,*
373 F.3d 561 (4th Cir. 2004) ............................................................7

*United States* v. *Sturdivant,*
244 F.3d 71 (2d Cir. 2001) ............................................................7

*United States* v. *Thomas,*
893 F.2d 1066 (9th Cir. 1990) ..........................................................19

*United States* v. *UCO Oil Co.,*
546 F.2d 833 (9th Cir. 1976) ............................................................7

*WesternGeco LLC* v. *ION Geophysical Corp.,*
138 S. Ct. 2129 (2018) ..................................................................11

*Yates* v. *United States,*
354 U.S. 298 (1957) ....................................................................19

**Statutes and Rules**

18 U.S.C. § 1343 ..........................................................................11, 20

18 U.S.C. § 1348 ...................................................................... *Passim*

18 U.S.C. § 1349 ..........................................................................11

Fed. R. Crim. P. 7(c)(1) ...............................................................22, 23

Fed. R. Crim. P. 8(a) ......................................................................6

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

Fed. R. Crim. P. 12(b)(3)(B) ................................................................................................ 19

Fed. R. Evid. 403 ................................................................................................................... 19

Fed. R. Evid. 404(b) .............................................................................................................. 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>NOTICE OF MOTION AND MOTION</u>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:

PLEASE TAKE NOTICE that on November 1, 2023, or as soon thereafter as counsel may be heard, in Courtroom 6, 17th Floor of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Michael Richard Lynch will and hereby does move the Court to dismiss Counts 1 through 16 of the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B) for joining two or more offenses in the same count (duplicity) and for failure to state an offense under any of the criminal statutes it invokes.

This motion is based upon the following Memorandum of Points and Authorities, oral argument, and the pleadings and exhibits on file with the Court.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

1

2

3    Dated: September 29, 2023

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

/s/ Christopher Morvillo
Christopher Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437

Reid H. Weingarten (Admitted Pro Hac Vice)
Brian M. Heberlig (Admitted Pro Hac Vice)
Michelle L. Levin (Admitted Pro Hac Vice)
Nicholas P. Silverman (Admitted Pro Hac Vice)
Dwight J. Draughon (Admitted Pro Hac Vice)
Drew C. Harris (Admitted Pro Hac Vice)
**Steptoe & Johnson LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

Jonathan M. Baum (SBN: 303469)
**Steptoe & Johnson LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

*Attorneys for Defendant*
*Michael Richard Lynch*

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    SUMMARY OF ARGUMENT

This case arises from the sale of a British software company, Autonomy plc, to a Dutch company, HP Vision B.V. (or "Bidco"), a subsidiary of Hewlett-Packard Company ("HP").  In 2011, after a brief period of due diligence, Bidco, using British pounds sterling, purchased all outstanding shares of Autonomy for £25.50 per share.  The government alleges that Dr. Lynch and others artificially inflated Autonomy's share price, to the detriment of HP and other Autonomy shareholders.

In other words, this is a case about securities fraud.  But the constitutional presumption against extraterritoriality bars the government from charging Dr. Lynch with securities fraud based on alleged inflation of the share price of a British company like Autonomy.  *See Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 273 (2010) (affirming dismissal of Section 10(b) class action as impermissibly extraterritorial absent a purchase or sale of a security in the U.S. or of a security listed on a U.S. exchange).  The allegations the government brings instead fail to meet the elements of the crimes charged.  The Court should therefore dismiss Counts One through Sixteen of the Superseding Indictment ("SI").

*First*, the government levies a duplicitous conspiracy charge in Count One, alleging in a single count two factually distinct conspiracies to commit wire fraud through two separate schemes: (1) a conspiracy to defraud ordinary purchasers and sellers of Autonomy shares on the London Stock Exchange, where Autonomy shares were listed, between 2009 and 2011; and (2) a conspiracy to induce Bidco to purchase Autonomy in 2011.  Lumping these two conspiracies together is highly prejudicial because it obscures the fact that neither, standing alone, alleges sufficient domestic contacts to overcome the constitutional presumption against extraterritoriality.  Count One must therefore be dismissed.

*Second*, the government alleges fourteen impermissibly extraterritorial counts of wire fraud in Counts Two through Fifteen.  Counts Two, Three, and Six through Eight appear to relate to the alleged scheme to defraud ordinary purchasers and sellers of Autonomy securities on the London Stock Exchange, and Counts Four, Five, and Nine through Fifteen appear to relate to the

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

alleged scheme to defraud Bidco. The SI alleges that each of these various wires transited the Northern District of California. But the government must allege more to render an otherwise extraterritorial fraud scheme domestic: the wires must be a "core component" of the scheme to defraud. *See Bascuñán* v. *Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019). The government does not—and cannot—allege this as to any of the wires charged in Counts Two through Fifteen. Counts Two through Fifteen must therefore be dismissed.

*Third*, Count Sixteen, charging Dr. Lynch with securities fraud in violation of 18 U.S.C. § 1348, is fatally deficient because it fails to allege essential elements of the offense. Count Sixteen charges Dr. Lynch with fraudulently inducing others to purchase shares not of Autonomy, but of HP. But nowhere in the SI is it alleged that Dr. Lynch *intended* to induce anyone to purchase or sell shares of HP. *See SEC* v. *Stein*, 906 F.3d 823, 829 (9th Cir. 2018) (holding that Section 1348 requires that the defendant acted with intent to defraud"). And any such allegation would in fact be nonsensical, because Dr. Lynch did not stand to gain anything by inducing others to sell or purchase shares of HP. Nor does the SI allege, as required by Section 1348, that Dr. Lynch deprived HP shareholders of a property interest or that he obtained money or property from HP shareholders. At most, Dr. Lynch could in theory have deprived HP shareholders of the "right to control" their shares, but that right does not constitute a property interest. *See Ciminelli* v. *United States*, 143. S. Ct. 1121, 1128 (2023). Count Sixteen must therefore be dismissed.

## II.    BACKGROUND

Dr. Lynch, a citizen of England, is the founder and former Chief Executive Officer of Autonomy. At all times between 2009 and 2011, Autonomy was fundamentally a U.K.-centric business. Autonomy listed its shares on the London Stock Exchange. All major decisions about the strategic direction of the company, its revenue-generating operations, and its compliance with financial reporting obligations were made in England. Autonomy employed sophisticated software engineering, sales, finance, and accounting teams to conduct Autonomy's daily business. Although Autonomy had offices on various continents, including in the United States, the management group that ensured its financial fitness, and that made sure it met the public-

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

company reporting obligations imposed upon it by English law, all worked out of Autonomy's headquarters in London and Cambridge, England, where Dr. Lynch and the rest of his executive team had their offices. Autonomy published its quarterly and annual reports from its headquarters in Cambridge, in accordance with English regulations and U.K. accounting standards. An independent auditor in England—Deloitte UK—reviewed and audited these reports. *See* SI ¶¶ 13–14 .

On August 18, 2011, Bidco, a Dutch company, and Autonomy entered an agreement for Bidco to acquire Autonomy. The deal closed on October 3, 2011. SI ¶¶ 8, 11. HP, Bidco's parent company, announced an $8.8 billion impairment charge "related to Autonomy" about a year later. HP claimed the majority of the impairment was "linked to serious accounting improprieties, misrepresentations and disclosure failures." HP referred the matter to the U.K.'s Serious Fraud Office, the U.K.'s Financial Reporting Council, the Department of Justice ("DOJ"), and the Securities and Exchange Commission ("SEC"). HP also filed a civil suit in England against Dr. Lynch and Sushovan Hussain, Autonomy's former CFO.

The DOJ investigated HP's allegations for four years before indicting Hussain on November 10, 2016. Over two years later, the grand jury indicted Dr. Lynch and Steve Chamberlain, Autonomy's former Vice President of Finance, on November 29, 2018, for one count of conspiracy to commit wire fraud and thirteen counts of substantive wire fraud. The following year, on March 21, 2019, the grand jury returned the SI, adding another substantive wire fraud count, a securities fraud count, and a general conspiracy count.

Counts One through Sixteen allege that Dr. Lynch was involved in three separate schemes:

*First*, the SI alleges that Dr. Lynch and others carried out a wire fraud scheme to deceive purchasers and sellers of Autonomy shares between January 2009 and October 2011. SI ¶ 19. Dr. Lynch and others allegedly artificially inflated revenues, made and caused fraudulent entries to Autonomy's books and records, issued materially false and misleading quarterly and annual reports, intimidated or pressured persons who raised complaints, and made false and misleading statements to Autonomy's independent auditors, market analysts, and Autonomy's regulators, in

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

order to effectuate this scheme.  SI ¶ 22.  As alleged, this scheme was not directed at HP at all, but was instead perpetrated between 2009 and mid-2011 with the intent of defrauding Autonomy's shareholders.  This scheme could not have been charged as a standalone securities fraud or wire fraud scheme under U.S. criminal laws.

*Second*, the SI alleges that Dr. Lynch and others carried out a separate wire fraud scheme, with an altogether different purpose of "inducing" Bidco to acquire Autonomy.  SI ¶ 21.  In this scheme—which involved different conduct, different means, different participants, different times, and different targets from the alleged scheme to defraud Autonomy shareholders—the government alleges that Dr. Lynch and others made misrepresentations during the August 2011 negotiations and due diligence process that culminated in Bidco's purchase of Autonomy in October 2011.  The due diligence process—which offered Bidco access to confidential, non-public information not available to ordinary holders of Autonomy shares—was governed by the U.K. takeover code and managed by British attorneys in the U.K.  Like the first scheme, the gravamen of this scheme— which did not involve any domestic securities transaction and therefore could not have been charged as securities fraud—is focused abroad in the U.K.  The charge does not belong in a U.S. courtroom. [1]

*Third*, the SI alleges a securities fraud "scheme" to defraud not Autonomy's shareholders, but HP's shareholders, in violation of 18 U.S.C. § 1348.  Count Sixteen couches its allegations solely in the language of the securities fraud statute, alleging that, in August 2011, Dr. Lynch violated Section 1348 by executing a scheme and artifice to defraud in connection with securities

---

[1] Even if the Court does not agree that the conspiracy alleged in Count One is duplicitous, Dr. Lynch respectfully submits that Count One should nonetheless be dismissed along with Counts Two through Fifteen for the reasons set forth in Sushovan Hussain's pretrial motion to dismiss the charges against him, namely, because the alleged wire fraud scheme is impermissibly extraterritorial.  Def. Sushovan Hussain's Mot. to Dismiss Indictment, *United States* v. *Hussain*, No. 16-cr-462 (N.D. Cal. Aug. 25, 2017) (Dkt. 113).  Although Dr. Lynch recognizes that Mr. Hussain's pretrial motion was denied by this Court, *United States* v. *Hussain*, No. 16-cr-462, 2017 WL 4865562 (N.D. Cal. Oct. 27, 2017), in a decision that was later affirmed on appeal, *United States* v. *Hussain*, 972 F.3d 1138 (9th Cir. 2020), Dr. Lynch raises the argument here to preserve it for future appellate review.

of HPQ, and to obtain money and property in connection with the purchase and sale of securities of HPQ by means of false and fraudulent pretenses.  SI ¶ 30.  The SI does not add any allegations in Count Sixteen regarding any additional conduct, any transaction involving HPQ securities, or any connection between Dr. Lynch and HPQ securities.  In particular, there is no allegation that Dr. Lynch defrauded anyone, or sought to obtain, or deprived anyone of, money or property, as required by Section 1348.  Indeed, Dr. Lynch's alleged conduct did not involve a property interest at all.  The government's effort to find some offense to levy against Dr. Lynch therefore fails, and Counts One through Sixteen of the SI must be dismissed.

## III.   ARGUMENT

### A.   Count One Alleges a Duplicitous Conspiracy With Impermissibly Extraterritorial Subparts And Must Be Dismissed

The conflation of two separate and distinct conspiracies in Count One of the SI risks prejudice to Dr. Lynch by (1) obscuring fatal legal deficiencies that would undermine each of the two conspiracies standing alone; (2) creating uncertainty that a jury would reach a unanimous verdict as to each individual conspiracy; (3) failing to provide Dr. Lynch with proper notice as to what alleged "overall agreement" he must defend against; and (4) putting Dr. Lynch at risk of double jeopardy in subsequent prosecutions.  Most problematic is the unacceptable risk that Dr. Lynch will be convicted based solely on conduct related to the alleged Autonomy shareholder scheme, even though that scheme is impermissibly extraterritorial and has nothing to do with HP or Bidco.  The alleged Bidco scheme—standing alone—is likewise impermissibly extraterritorial, standing alone, and cannot serve as a basis for convicting Dr. Lynch of wire fraud, either.

#### 1.   Duplicitous Conspiracies Are Impermissible

To prove a conspiracy, the government must prove there was an agreement among two or more individuals to engage in conduct that, if completed, would satisfy the elements of the substantive criminal offense that the conspirators agreed to commit.  *See Salinas* v. *United States*, 522 U.S. 52, 65 (1997).  A single count in an indictment may not "join[] two or more distinct and separate offenses."  *United States* v. *Garcia*, 400 F.3d 816, 819 (9th Cir. 2005); Fed.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

R. Crim. P. 8(a).  If a contested charge in an indictment cannot be read to allege a single unified scheme, the conspiracy charge is deemed duplicitous.  *United States* v. *Gordon*, 844 F.2d 1397, 1401 (9th Cir. 1988) (holding that a single conspiracy count that encompassed two separate conspiracies—a conspiracy to defraud the government and a conspiracy to obstruct justice—was duplicitous); *United States* v. *Mastelotto*, 717 F.2d 1238, 1244 (9th Cir. 1983) (identifying duplicity analysis as an assessment of "whether the indictment itself can be read to charge only one violation in each count"), *overruled on other grounds by United States* v. *Miller*, 471 U.S. 130, 135–36 (1985).

"Whether an indictment is duplicitous is a question of law."  *United States* v. *King*, 200 F.3d 1207, 1212 (9th Cir. 1999).  To determine whether a conspiracy charge is duplicitous, courts will assess "whether there was one overall agreement to perform various functions to achieve the objectives of the conspiracy."  *United States* v. *Arbelaez*, 719 F.2d 1453, 1457 (9th Cir. 1983); *see also United States* v. *Fernandez*, 388 F.3d 1199, 1226 (9th Cir. 2004) (holding that "[a] single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators."); *United States* v. *Otis*, 127 F.3d 829, 835 (9th Cir. 1997).  The existence of an overall agreement may be gleaned from "the nature of the scheme, the identity of the participants, the quality, frequency, and duration of each conspirator's transactions, and the commonality of times and goals."  *Gordon*, 844 F.2d at 1401; *see also United States* v. *Moran*, 759 F.2d 777, 784 (9th Cir. 1985) ("The standard for determining the existence of a single conspiracy is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy.").  Not all factors need be present, however, and indeed, the analysis in *Gordon* turned only on the nature of the scheme and the commonality of time (or lack thereof).  *Gordon*, 844 F.2d at 1401.

Duplicitous counts can prejudice a defendant or violate his rights in several ways, including by: (1) failing to provide the defendant with adequate notice of the charges he faces, in violation of the Sixth Amendment; (2) resulting in a non-unanimous verdict; (3) creating double jeopardy risks; and (4) creating problems regarding the admissibility of evidence.  *See, e.g., United States* v. *Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001); *United States* v. *UCO Oil Co.*, 546

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

F.2d 833, 835 (9th Cir. 1976); *see also United States* v. *Smith*, 373 F.3d 561, 563 (4th Cir. 2004) ("When an indictment impermissibly joins separate offenses that occurred at different times, prosecution of the earlier acts may be barred by the statute of limitations.").

### 2.    Count One Charges Two Separate Schemes

Count One impermissibly alleges two separate conspiracies, involving different participants, targeting different alleged victims, via different means, for different purposes. There is no overarching agreement.

***The first conspiracy alleged in Count One*** of the SI is the conspiracy to defraud Autonomy shareholders between 2009 and 2011.  The SI alleges that Dr. Lynch and the alleged co-conspirators engaged in a scheme to "deceive purchasers and sellers of Autonomy securities about the true performance of Autonomy's business, its financial performance and condition, the nature and composition of its products, revenue and expenses, and its prospects for growth."  SI ¶ 19.  The alleged objectives of this scheme were to "ensure[] that Autonomy reported that it had met or exceeded projected quarterly results, . . . to maintain and increase the defendants' position within the company and to enrich themselves," and "to artificially increase and maintain the share price of Autonomy securities."  SI ¶ 20.  This scheme is about Autonomy shareholders— not HP or Bidco, whom the government distinguishes from Autonomy shareholders, *see, e.g.*, SI ¶ 21, and not HP's own shareholders, SI ¶ 30.

This first scheme, which on the government's telling began as early as 2009—years before Bidco and Autonomy discussed any acquisition—is alleged to have involved:

- Revenue recognition issues—"inflating revenues" by "improperly recording" various sales despite backdated contracts, side letters, reciprocal arrangements, and in other instances where the (English) accounting standards went unmet, SI ¶¶ 22.a, 23.d–.f, 23.i–.j, 23.p–.r, 23.t, 23.w, 23.x;

- "Making and causing fraudulent entries to Autonomy's books," SI ¶ 22.g.

- "Issuing materially false and misleading quarterly and annual reports" for each quarter from the start of 2009 to the middle of 2011, SI ¶¶ 22.h, 23.a–.c, 23.g-–.h, 23.k, 23.m, 23.o, 23.s, 23.u; and thereby

- "Increas[ing] and maintain[ing] the share price of Autonomy securities," SI ¶ 20.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

1
2
3
4
5
6

Each of these "means and methods" comprises predominantly actions allegedly taken in another country by Autonomy executives, sales managers, accounting supervisors and accounting teams, and allegedly directed at persons looking to buy and sell shares of Autonomy on the London Stock Exchange.  Those purchasers and sellers based their purchase and sale decisions exclusively on publicly available information about Autonomy.  These means and methods had nothing to do with HP and Bidco.

7
8
9
10
11
12
13

**_The second, separate and distinct conspiracy alleged in Count One_** is a conspiracy to defraud Bidco and HP in connection with the 2011 acquisition.  The SI alleges that in 2011, "Dr. Lynch and others met with representatives of HP about a potential acquisition of Autonomy by HP," and used "false and misleading documents created by [alleged co-conspirators] to make Autonomy more attractive to a potential purchaser like HP."  SI ¶ 21.  This scheme is entirely different from the first scheme in terms of its scope, its object, the means used, the persons involved, and the alleged victim.

14

As part of this second scheme to defraud, it is alleged that:

15
16

- Autonomy executives including Dr. Lynch made various misrepresentations to HP and Bidco, during their due diligence period, about "the nature of Autonomy's products," its "hardware sales," and its "top customers" and "top contracts," SI ¶¶ 23.a–.d;

17
18

- Lynch and Hussain executed a letter "to induce the offer by HP and [Bidco], . . . warranting that all information provided … was true and accurate," SI ¶ 23.bb; and

19
20

- Relying on these alleged misrepresentations, Bidco bought and paid for Autonomy through a series of offshore wire transfers, SI ¶¶ 23.cc–.e.

21
22
23
24
25
26
27

The crux of this second scheme appears to be an alleged effort by Autonomy's executives to "obtain[] money or property" from Bidco "by means of false or fraudulent . . . representations," all or substantially all of which happened in England.  Indeed, the due diligence process for the acquisition—the bulk of which occurred in August 2011—was carried out in the U.K., governed by the U.K. takeover code and managed by a U.K.-based law firm.  The culmination of the alleged scheme was Bidco's acquisition of Autonomy, paid for in pound sterling, with money changing hands entirely outside the United States.  *See* SI ¶¶ 23.cc–.ee.

28

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

### 3.     The Two Separate Schemes Cannot be Charged as One

Count One charges two conflicting conspiracies lacking an overall agreement.  "The relevant factors in determining the existence of such an 'overall agreement' are the nature of the scheme, the identity of the participants, the quality, frequency and duration of each conspirator's transactions, and the commonality of times and goals."  *Gordon*, 844 F.2d at 1401.  Here, as in *Gordon*, the very different nature of the two schemes and the lack of commonality in times and goals lead to the conclusion that Count One is duplicitous.

First, as described above, the two alleged schemes are separate and potentially contradictory.  The first scheme involves allegations that Dr. Lynch and others conspired to misrepresent Autonomy's finances to the public by not disclosing certain information, with a goal of inflating reported revenues and in turn Autonomy's share price.  The scheme had nothing to do with Bidco or any other potential acquirer of Autonomy.  Conversely, the second scheme involves allegations that Dr. Lynch and others conspired to mislead Bidco and HP about the nature of Autonomy's business and finances, making information about that business and finances available exclusively to HP in a private data room in the U.K.  HP thus had the ability to ask for commercially sensitive information not available to the public.  Had Dr. Lynch and others in fact artificially inflated Autonomy's share price as a result of the first alleged scheme, that effort may have worked at cross purposes to the second alleged scheme, in which Autonomy sought to convince Bidco to purchase Autonomy at a substantial premium over its share price, a goal potentially made more difficult if that share price was already too high.

Moreover, the schemes involve entirely different alleged victims and were allegedly effectuated through entirely different means, without commonality of time and goals.  The first alleged conspiracy dates back to 2009, while the other arose in earnest in mid-2011.  There is no allegation that Dr. Lynch or any alleged co-conspirator engaged in conduct prior to mid-2011 with the intent to defraud Bidco, or any other potential acquirer of Autonomy.  Nor does the government plead that Bidco or HP reviewed Autonomy's pre-2010 published financials or earnings calls in which the alleged Autonomy-shareholder focused wire fraud occurred.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 4.      Lumping the Two Conspiracies Together Conceals that Each Has Fatal Legal Deficiencies, Including Extraterritoriality

Aside from lacking a unifying principle, neither of the two conspiracies alleged in Count One can satisfy each of the elements of a wire fraud conspiracy.  *First*, the alleged conspiracy to defraud Autonomy shareholders fails because it lacks sufficient domestic U.S. contacts to render a properly domestic application of the wire fraud conspiracy statute.  *Likewise*,  the alleged conspiracy to defraud HP fails because it did not rely on wires even incidentally—as required to transform ordinary fraud into wire fraud—let alone as a "core component" of the scheme—as required to render an otherwise extraterritorial scheme domestic.  In an apparent effort to plead around these deficiencies, the government lumps the two distinct conspiracies into a single count, trying to plug gaps in each with allegations regarding the other.  This is impermissible and highly prejudicial to Dr. Lynch.[2]

#### a.      The Presumption Against Extraterritoriality Applies

The presumption against extraterritoriality protects against cases with ancillary U.S. touchpoints, because "[i]t is a rare case of prohibited extraterritorial application that lacks *all* contact" with the U.S.  *Morrison*, 561 U.S. at 266 (emphasis in original).  The longstanding presumption prohibits the extraterritorial application of U.S. law absent a "clearly expressed" intention of Congress to the contrary.  *Id.* at 255.  The presumption safeguards international comity and focuses on matters of true concern to Congress.  *Id.* at 272.

Determining whether a statute applies to extraterritorial conduct involves a two-part inquiry.  First, the government must show a "clear statement of extraterritorial effect" in the statute.  *Id.* at 265.  Second, absent a clear statement of extraterritorial effect in the statute, the government must show a proper domestic application of the statute.  *Id.* at 266; *RJR Nabisco, Inc.* v. *Eur. Cmty*, 579 U.S. 325, 335 (2016).  This analysis requires that courts look to the statute's "focus of Congressional concern."  *Morrison*, 561 U.S. at 266.  A statute's focus is "the

---

[2] As noted earlier, *see* footnote 1 above, the Court has previously considered whether the wire fraud charges, considering the alleged schemes to defraud Autonomy shareholders and HP as a whole, are impermissibly extraterritorial.  The Court has not considered the extraterritoriality of each scheme standing alone.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

object of its solicitude," including the conduct it seeks to regulate and the interests it seeks to protect. *WesternGeco LLC* v. *ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018).

This Court and the Ninth Circuit addressed the extraterritorial application of the wire fraud statute, 18 U.S.C. § 1343, and a conspiracy to commit wire fraud, 18 U.S.C. § 1349, which involves the same extraterritoriality analysis,[3] in connection with the prosecution of Sushovan Hussain. While the Ninth Circuit did not consider whether the wire fraud statute applies extraterritorially, proceeding directly to step two of the two-part *Morrison* inquiry, *see United States* v. *Hussain*, 972 F.3d 1138, 1142–43 (9th Cir. 2020), this Court concluded that the statute does not apply extraterritorially, *see United States* v. *Hussain*, No. 16-CR-00462-CRB, 2017 WL 4865562, *2 (N.D. Cal. Oct. 27, 2017) (citing *United States* v. *Sidorenko*, 102 F. Supp. 3d 1124, 1129 (N.D. Cal. 2015)). The dispositive question under the two-step *Morrison* inquiry is thus whether the SI includes sufficient domestic conduct relevant to the "focus" of the wire fraud statute to sustain the wire fraud charges.

To evaluate the focus of the statute to determine proper domestic applications, courts look to the elements of wire fraud: (1) a scheme to defraud; (2) the use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud. *United States.* v. *Garlick*, 240 F.3d 789, 792 (9th Cir. 2019). In its decision in *Hussain*, the Ninth Circuit identified the wire fraud statute's "focus" as the use of a wire in furtherance of a scheme to defraud. *Hussain*, 972 F.3d at 1145 (citing *Bascuñán*, 927 F.3d at 122). Dr. Lynch respectfully submits, however, that the Ninth Circuit did not go far enough, and should additionally have required that the use of the wire be "essential" to the scheme, meaning a "core component" of the fraud, not merely incidental to it. *See Bascuñán*, 927 F.3d at 122; *see also United States* v.

---

[3] The extraterritoriality analysis is the same because the same elements apply both to substantive wire fraud under 18 U.S.C. § 1343 and to wire fraud conspiracy under 18 U.S.C. § 1349. *See, e.g.*, *United States* v. *Elbaz*, 52 F.4th 593, 605 (4th Cir. 2022) (holding that "the conspiracy conviction was a domestic application of the statute in so far as the object of the conspiracy was domestic wire fraud."); *United States* v. *Hayes*, 99 F. Supp. 3d 409, 421 (S.D.N.Y. 2015) (finding that the presumption against extraterritoriality was irrelevant to a conspiracy to commit wire fraud where the culpable conduct of the substantive count of wire fraud occurred in the United States).

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

*McLellan*, 959 F.3d 442, 470 n.7 (1st Cir. 2020).  The Ninth Circuit declined to adopt this "core component" requirement, which it deemed potentially relevant only to wire fraud schemes with foreign victims, *Hussain*, 972 F.3d at 1144 n.2 (citing *Bascuñán*, 927 F.3d at 122, and *McLellan*, 959 F.3d at 470 n.7), a requirement the Ninth Circuit noted had not been met because it identified HP, a domestic company, as the victim of the scheme to defraud.  *Id.*

Absent the "core component" requirement, the test adopted by the Ninth Circuit—and applied in the *Hussain* decision—allows a conviction where the domestic wires are incidental to the fraud, merely because they occurred during or in the course of the fraud, a result that is inconsistent with the "focus" of the wire fraud statute.  *See Bascuñán*, 927 F.3d at 122 (use of wire "must be essential, rather than merely incidental, to the scheme to defraud," meaning that use of wire must be both (1) "in furtherance" of scheme to defraud, and (2) "a core component of the scheme").  Although Dr. Lynch recognizes that *Hussain*'s extraterritoriality analysis of the wire fraud statute is controlling, Dr. Lynch presents his argument as to the "core component" requirement to preserve it for appellate review.

### b.     The Conspiracy to Defraud Autonomy Shareholders is Impermissibly Extraterritorial

Here, the alleged conspiracy to defraud Autonomy shareholders lacks virtually any connection to the United States, and the scant U.S. touchpoints in the SI are at best incidental to the scheme, not in furtherance of it, much less "essential" or "core" components of the alleged fraud.  Thus, whether the Court applies the Ninth Circuit's "in furtherance" test, or the Second Circuit's "core component test," the scheme to defraud Autonomy shareholders is impermissibly extraterritorial—an issue that neither this Court nor the Ninth Circuit has yet addressed. Autonomy was an English company, whose shares were bought and sold in England, on the London Stock Exchange.  The "means and methods" identified in the SI—revenue recognition issues, allegedly fraudulent entries in Autonomy's books, allegedly false and misleading quarterly and annual reports—all comprise conduct that occurred in another country.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

Indeed, the indictment is replete with allegations of misconduct that occurred beyond this country's borders—as even a cursory review of the government's alleged "means and methods" makes clear.  The government claims that Dr. Lynch ("and others"):

- Instructed Autonomy's finance department to recognize revenue when "all of the criteria in IFRS, IAS 18, and Autonomy's revenue recognition policy had not been satisfied . . . ."  SI ¶ 22.a; *see also* SI ¶ 22.b.  There is no allegation that Autonomy's revenue-recognition decisions were made in the United States or made in accordance with U.S. policies.  (Quite the contrary: IFRS and IAS 18 are U.K. accounting standards, and Autonomy's finance department was located, and made decisions, in England.)

- Made "false and misleading statements to Autonomy's independent auditor about the facts and circumstances of transactions allegedly supporting the recognition of revenue . . . ."  SI ¶ 22.b.  There is no allegation that any of these statements were made in the U.S.  Autonomy was audited by Deloitte UK, whose personnel lived and worked in England.

- Made "false and misleading statements to market analysts covering Autonomy about its financial statements . . . ."  SI ¶ 22.c; *see also* SI ¶ 22.e.  The government never alleges that any U.S.-based market analysts attended Autonomy's presentations.

- Made "false and misleading statements to Autonomy's regulators in response to inquiries about its financial statements."  SI ¶ 22.d.  Here, the government appears to have in mind the Financial Reporting Review Panel, a committee that operates under the purview of the U.K. Financial Reporting Council.

- "Issu[ed] materially false and misleading quarterly and annual reports."  SI ¶ 22.h.  But Autonomy's quarterly and annual reports were prepared by its finance department in England, reviewed by Deloitte UK, approved in England, and published in England (and the indictment never alleges otherwise).

The alleged "means and methods of the wire fraud conspiracy" likewise lean heavily on extraterritorial conduct: Autonomy's decisions about when to recognize revenue—which were taken in England; the preparation and publication of press releases—which happened in England, *see, e.g.,* SI ¶¶ 23.a–.c, 23.g, 23.k, 23.m, 23.o, 23.s, 23.y, 23.z; and the company's issuing annual reports—which happened in England, SI ¶¶ 23.h, 23.u.  Recognizing these shortcomings, the government bends over backwards to find "wires" into the United States—claiming, for instance, that "Autonomy entered into a[n agreement] with a counterparty in the United States," SI ¶ 23.d.  But even taking those allegations at face value, they certainly do not constitute "a substantial

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

1
2
3
4
5
6
7

amount of conduct in the United States." *United States* v. *All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 103 (D.D.C. 2017).  The core of the government's first scheme—the alleged scheme to defraud Autonomy shareholders—is not these incidental agreements or e-mails that represent no more than a blip on the radar screen of a company with nearly $1 billion in annual revenues.  Rather, it is Autonomy's decisions about whether to recognize revenue on those underlying deals and its announcements to the market—"means and methods" that occurred entirely in England.

8
9
10
11
12
13
14
15
16
17
18
19
20

And while the SI lists various contacts between Autonomy's business and the United States in paragraphs 1–3, virtually all of those contacts are irrelevant to the wire fraud conspiracy.  For example, the SI states that Autonomy had U.S. offices (¶ 1), that it had U.S. subsidiaries (¶ 2), and that it had large revenues from U.S. customers (¶ 3).  The SI also notes that Autonomy shares "were bought . . . by individuals and entities throughout the United States," SI ¶ 3, but those individuals purchased those shares on the London Stock Exchange, of course, just as other shareholders located around the world did.  The government cannot be suggesting that worldwide jurisdiction, wherever shareholders are located, is therefore appropriate.  Incidental U.S. investors provide an insufficient domestic nexus to police alleged fraud in foreign securities markets.  *See Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) (stating that § 10(b) does not apply to "predominantly German" conduct even though "false statements may have been intended to deceive investors worldwide").

21
22
23
24

Notably, neither this Court nor the Ninth Circuit has considered whether the scheme to defraud Autonomy shareholders, standing alone, is impermissibly extraterritorial, and it undoubtedly is.  As the government plainly recognized, it could not have charged Dr. Lynch with securities fraud vis-à-vis Autonomy shareholders,[4] and the only conceivable domestic nexus for

25
26
27
28

---

[4] For conduct to fall within Section 10(b)'s reach, the securities at issue must be listed on a domestic exchange, or the purchase or sale of the security at issue must have been made in the U.S.  *United States* v. *Mandell*, 752 F.3d 544, 548 (2d Cir. 2014) (transaction "is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States"); *see also Absolute Activist Value Master Fund Ltd.* v.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

1
2
3
4
5
6
7
8
9
10
11
12

its wire fraud charge against Dr. Lynch is the alleged scheme to defraud HP.  While that hook, as discussed below, is also inadequate to charge Dr. Lynch with wire fraud, the allegations against Dr. Lynch would not survive an extraterritoriality challenge absent HP.  Without HP as the alleged victim, the government would be left purely with U.K.-focused allegations of efforts by Dr. Lynch and his teams in London and Cambridge to inflate Autonomy's share price.  As noted above, the government's allegations as to the Autonomy shareholder scheme focus almost exclusively on extraterritorial conduct, and the isolated wires the government manages to work into its narrative cannot be said to have furthered the scheme to defraud, much less to have been a "core component" of it.  And, although the scheme fails the "in furtherance" test, the Ninth Circuit has left the door open to a "core component" requirement in wire fraud cases foreign victims, *see Hussain*, 972 F.3d at 1144 n.2, which the scheme also fails to meet.  The scheme to defraud Autonomy shareholders cannot serve as a basis for conviction.

13
14

### c.   The Conspiracy to Defraud HP is Extraterritorial, and is not a Wire Fraud Conspiracy to Begin With

15
16
17
18
19
20
21
22
23
24

Nor can the alleged conspiracy to defraud HP, which is likewise impermissibly extraterritorial, serve as a basis for conviction.  HP chose to purchase Autonomy not via its U.S. parent company or any other U.S. entity, but via a Dutch special purpose entity.  This transaction was effectuated under English law, not under the law of California or any other U.S. state, using offshore income beyond the reach of U.S. taxes.  The government obfuscates the clear corporate boundaries between HP and Bidco (a parent and subsidiary, which, according to HP's English lawyers, had "literally hundreds of companies" between them), stretching to portray HP and Bidco as one and the same.  *See, e.g.*, SI ¶¶ 8 (claiming that "HP and Hewlett-Packard Vision B.V. … entered into an Offer Agreement with Autonomy"); 12 (claiming, incorrectly, that Dr. Lynch's shares were "acquired by HP"); 17 (alleging that Dr. Lynch "gave and otherwise

25
26
27
28

*Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).  Nowhere does the SI allege that Autonomy shares were traded in the United States, or that they were purchased or sold here.

3:18-cr-00577-CRB

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

provided" financial statements to "persons at, or acting on behalf of, HP"). They are not, and HP sought to stay as far away from this deal as possible.

Moreover, even assuming HP and not Bidco was the victim, its U.S. dealings with Autonomy were eclipsed by the negotiations abroad and the foreign focus of the Bidco transaction. There is no allegation that early 2011 meetings between HP and Autonomy amounted to anything more than a generic meet-and-greet, and all subsequent meetings and negotiations took place abroad, with a due diligence process conducted in the U.K. under U.K. law and an offer to purchase Autonomy using foreign currency flowing through foreign banks.

Even more problematic for the government, the alleged HP conspiracy lacks any non-incidental connection to U.S. *wires*. In other words, even if the HP conspiracy were fully domestic—and it is not—it would not qualify as a wire fraud conspiracy. Even a fully domestic wire fraud conspiracy must rely on wires as a part of the scheme. *United States* v. *Jinian*, 725 F.3d 954, 960–61 (9th Cir. 2013) ("A wire communication is in furtherance of a fraudulent scheme if it is incident to the execution of the scheme, meaning that it need not be an essential element of the scheme, just a step in the plot… [T]he relevant question at all times is whether a wire is part of the execution of the scheme as conceived by the perpetrator at the time . . . . "). As with any multi-billion-dollar purchase by a sophisticated buyer, HP's decision to purchase Autonomy was based on a due diligence process, involving the examination of documents in a virtual "data room." There is no allegation that this due diligence process involved U.S. wires even in a non-incidental respect, let alone that the wires were a "core component" of the scheme. Thus, the HP conspiracy is deficient whether under an extraterritoriality analysis or a purely domestic analysis.

The Ninth Circuit rejected Hussain's extraterritoriality challenge to the conspiracy count, *Hussain*, 972 F.3d at 1145 n.3, but that decision addressed extraterritoriality by examining the conspiracy alleged in Count One as a whole, without regard for the two separate and distinct conspiracies contained in that count and without focusing separately on the domestic contacts—or lack thereof—of each scheme. Also, the Ninth Circuit failed to apply *Bascuñán*'s "core component" test. Although the Court did say in passing in a footnote that the use of wires to

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

1   defraud HP was a "core component" of the fraud, *id.* at 1144 n.2, that assertion included no in-

2   depth analysis of the wires nor any explanation of how those wires furthered the scheme or were

3   in any way "core" to it.  For these reasons, Dr. Lynch submits that the Court should find the

4   alleged conspiracy to defraud Bidco impermissibly extraterritorial.  If the Court nonetheless

5   views the Ninth Circuit's decision as controlling, Dr. Lynch respectfully submits this argument

6   to preserve it for later appellate review.

7               ***d.***      ***Lumping Two Deficient Conspiracies Together is Highly***
                              ***Prejudicial***
8

9           Including both conspiracies in a single count obscures the legal and factual deficiencies

10  of each and is therefore prejudicial.  While the lack of U.S. contacts in the Autonomy-

11  shareholders conspiracy would be obvious if it were properly pleaded as a stand-alone count, the

12  SI papers over that gap by including the somewhat more domestic-seeming HP conspiracy (and

13  glossing over the distinction between HP and Bidco) alongside it.  Similarly, the lack of a

14  connection to U.S. wires in the HP/Bidco conspiracy would be obvious if that conspiracy were

15  pleaded as a stand-alone count, but that gap is obscured by the inclusion of wires that are

16  relevant only to the Autonomy-shareholder conspiracy.  Thus, there is a risk that the jury will

17  improperly aggregate elements from each conspiracy to conclude that the elements of wire fraud

18  conspiracy have been met in Count One, whereas if each conspiracy had been properly pleaded

19  in separate counts, the jury would spot the deficiencies.

20          **5.      The Duplicitous Conspiracy Jeopardizes Dr. Lynch's Fifth and Sixth**
                      **Amendment Rights**
21

22          A duplicitous indictment compromises a defendant's Fifth Amendment protection against

23  double jeopardy.  *See United States* v. *Hardy*, 762 F. Supp. 1403, 1408 (D. Haw. 1991) (citing

24  *Abney* v. *United States*, 431 U.S. 651, 654 (1977)) ("A duplicitous indictment may also

25  eviscerate the defendant's Fifth Amendment protection against double jeopardy, because of a

26  lack of clarity concerning the offense for which he is charged.").  As pleaded, the Count One

27  conspiracies are ambiguous, and there is a risk that after an acquittal by a jury on Count One,

28  further charges would be brought against Dr. Lynch for a conspiracy already included in Count

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

One.  Thus, Dr. Lynch's subsequent double jeopardy defenses would be compromised in violation of the Fifth Amendment.

A duplicitous indictment also jeopardizes the assurance of a unanimous jury verdict in violation of the Sixth Amendment.  Criminal convictions require a unanimous jury verdict, and a duplicitous charge creates a risk that a jury will convict a defendant without unanimously agreeing to the defendant's culpability on each of the underlying conspiracies.  *See United States* v. *Lapier*, 796 F.3d 1090, 1092 (9th Cir. 2015) (holding the failure to give specific unanimity instruction was plain error where evidence supported two discrete conspiracies, because half of the jury could have found the defendant guilty of joining one conspiracy while the other half could have found the defendant guilty of joining a second, completely independent conspiracy).  Just as in *Lapier*, in the present case, half of a jury could find that Dr. Lynch joined the first conspiracy, while the other half finds that he joined the second, separate conspiracy.  The extraterritorial challenges to the two alleged conspiracies increase the risk of a Sixth Amendment violation.  There is substantial risk that the jury would aggregate the domestic contacts from each conspiracy to find that Count One was domestic, where there would not be a unanimous verdict if the domestic nature of the conspiracies had each been pleaded separately.  Furthermore, if the conspiracy included a legally deficient basis for conviction—such as an extraterritorial object, *see United States* v. *Thomas,* 893 F.2d 1066 (9th Cir. 1990) (extraterritoriality of statute is question of law)—the conviction on that conspiracy count would be subject to reversal on appeal.  *See Yates* v. *United States*, 354 U.S. 298, 311–312 (1957) (setting aside conspiracy verdicts where the jury could have convicted on an overt act that was legally deficient); *Griffin* v. *United States*, 502 U.S. 46, 59 (1991) ("Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law").

### 6.    Dismissal is the Only Remedy Sufficient to Cure the Defect

Courts in the Ninth Circuit have dismissed a duplicitous count or required the lower court to amend a judgment and re-sentence a defendant on separate counts.  *See Hardy*, 762 F. Supp. at 1409–10 (dismissing one count of conspiracy where the allegations charges two separate and distinct conspiracies, including one "self-contained criminal transactions" in connection with a

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

1   business transaction.); *United States* v. *Aguilar*, 756 F.2d 1418, 1422–23 (9th Cir. 1985) (holding

2   that using an election to cure duplicity is acceptable under certain conditions, and the defendant

3   must be properly notified of the charges against him).

4          Here, a duplicitous conspiracy is highly prejudicial, and dismissal is the only possible

5   cure.  Evidence about a conspiracy against Autonomy shareholders, which is extraterritorial, is

6   irrelevant and prejudicial to an alleged conspiracy to defraud HP during an acquisition.  Even if

7   this Court finds that the conspiracy to defraud Autonomy shareholders is not extraterritorial,

8   trying the two conspiracies as one would jeopardize Dr. Lynch's Fifth and Sixth Amendment

9   rights.  Additionally, duplicitous charges will create a risk that the jury will hear prohibited and

10  prejudicial evidence, where the government may attempt to introduce uncharged bad acts that are

11  not part of an "overall agreement" in violation of Fed. R. Evid. 404(b) and 403.

12         Moreover, jury instructions cannot cure the prejudice.  Hearing the evidence on each of

13  the separate schemes would be confusing for the jury in reaching a unanimous verdict.  There

14  would be no certainty that the jury were reaching a unanimous decision on an overall conspiracy

15  versus one of the two separate conspiracies.  Thus, Count One is defective because it joins two or

16  more offenses in one count, *see* Fed. R. Crim. P. 12(b)(3)(B)(i), and must be dismissed.

17  **B.     Counts Two Through Fifteen Must Be Dismissed as Impermissibly**
            **Extraterritorial**

18         Like the wire fraud conspiracy alleged in Count One, the substantive wire fraud counts

19

20  alleged in Counts Two through Fifteen—some of which relate to one scheme and some to the

21  other—involve impermissible extraterritorial applications of the wire fraud statute and should

22  therefore be dismissed.  Each of the substantive wire fraud counts alleges that Dr. Lynch

23  transmitted, and caused to be transmitted, wire communications through interstate and foreign

24  commerce in furtherance of a scheme and artifice to defraud, in violation of 18 U.S.C. § 1343.

25  That each count invites an impermissibly extraterritorial application of U.S. law is unsurprising

26  given that the case concerns allegations that a foreign company, listed on a foreign exchange,

27  operated a scheme under foreign accounting rules in a foreign country for years before it entered

28  an acquisition by a foreign company under foreign takeover laws.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

As discussed above, the wire fraud statute lacks an express statement of extraterritoriality, so the government must show a permissible domestic application.  *Sidorenko*, 102 F. Supp. 3d at 1133; *see also Bascuñán*, 927 F.3d at 121.  This requires proof that each charged wire was in furtherance of, and "essential" to or a "core component" of the scheme.  *Bascuñán*, 927 F.3d at 122.

None of the wires pleaded in Counts Two through Fifteen satisfies this test.[5]  *First*, Counts Two, Three, and Six through Eight all apparently relate to the alleged scheme to defraud purchasers and sellers of Autonomy shares on the London Stock Exchange.  Not only are the wires alleged in these counts only tangentially related to this alleged scheme, but they also have nothing to do with HP or Bidco.  Specifically:

- Count Two and Six are each internal Autonomy e-mails with attachments concerning a company called Discover Technologies.  There is no allegation that any Autonomy shareholder or anyone from HP would have seen these e-mails during the relevant period, let alone that the e-mails were a "core component" of any alleged effort to defraud either of those entities.

- Count Three is a press release announcing Autonomy's 2010 year-end results.  Here again, there is nothing connecting this press release to anyone's decision to purchase Autonomy shares—or to Bidco's decision to purchase Autonomy.

- Counts Seven and Eight are press releases announcing Autonomy's results for the first quarter of 2011 and the first half of 2011, respectively.  Similar to Count Three (announcing Autonomy's 2010 year-end results), there is nothing connecting these press releases to any shareholder's decision to purchase Autonomy shares or to HP's decision to purchase Autonomy.

---

[5] This Ninth Circuit rejected Hussain's challenge to his conviction on the substantive wire fraud counts, which contain the same allegations as those against Dr. Lynch, on extraterritoriality grounds, *Hussain*, 927 F.3d at 1140, but that decision provides no barrier to the Court's consideration of Dr. Lynch's arguments because the Ninth Circuit did not consider the schemes to defraud Autonomy shareholders and to defraud Bidco separately.  In addition, the Ninth Circuit failed to adopt *Bascuñán*'s "core component" test or to apply it in a meaningful way.  Although Dr. Lynch recognizes that *Hussain* is controlling in this latter respect, Dr. Lynch is preserving this aspect of his challenge to *Hussain* for later appellate review.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

The extraterritorial nature of these allegations is readily apparent, especially when these wire fraud counts are divorced from the scheme to defraud HP, to which they are completely unrelated.  Counts Two, Three, and Six through Eight must therefore be dismissed.

*Second*, Counts Four, Five, and Nine through Fifteen all apparently relate to the alleged scheme to defraud HP (meaning Bidco), but the alleged wires are not core to that scheme, either. Specifically:

- Counts Four and Five are video conferences between HP and Autonomy in February and March 2011.  There is no allegation that statements made during these video conferences were a "core component" of HP's decision to purchase Autonomy.

- Counts Nine through Twelve are conference calls between HP and Autonomy.  There is no allegation that statements made on these calls were a "core component" of HP's decision to purchase Autonomy.

- Count Thirteen is an e-mail from Autonomy to HP, which merely informs U.S. recipients that documents are available in the virtual due-diligence data room.  This e-mail is clearly not a "core component" of—nor even incidental to—the alleged HP fraud.

- Similar to Count Thirteen, Count Fourteen is an e-mail from Autonomy to HP giving the status on various due-diligence items (and primarily stating either that documents are already in the data room or will be uploaded to it).  Here again, this e-mail is neither a "core component" of nor incidental to the alleged HP fraud.

- Finally, Count Fifteen is a payment request letter from a U.K. secretarial service after HP's acquisition of Autonomy had already been agreed in principle.  Far from being a core component of the scheme, this letter appears to be a mere formality restating the need for payment, which had already been agreed by HP.

In sum, this small and random assortment of e-mails, releases, and calls were not, even in the government's own telling, core components of either of the alleged schemes to defraud.  The wire fraud charges therefore fail under *Bascuñán*.  927 F.3d at 122.

### C.   Count Sixteen Fails to State an Offense

Count Sixteen alleges that, in or about August 2011, Dr. Lynch knowingly and intentionally executed "a scheme and artifice (a) to defraud any person in connection with *securities of HPQ*" and (b) to obtain, by means of fraudulent statements, "money and property in connection with the purchase and sale of *securities of HPQ* . . ." in violation of 18 U.S.C. § 1348. SI ¶ 30 (emphasis added).  This allegation fails because the SI does not—and cannot—allege that

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

Dr. Lynch had either the intent to defraud HP shareholders or to obtain money or property from HP shareholders.  Count Sixteen must therefore be dismissed.

An indictment must contain a "definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  Further, an indictment must contain each of the elements charged, otherwise it is defective.  *See United States* v. *Chesney*, 10 F.3d 641, 643 (9th Cir. 1993) ("An indictment's failure to state an element of the charged offense is a fundamental defect.").  An indictment must include each element of the crimes charged "to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." *Russell* v. *United States*, 369 U.S. 749, 768 (1962).

Section 1348 requires that the government prove that Dr. Lynch (1) "knowingly executed or attempted to execute a scheme or plan to defraud" or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises"; (2) "acted with the intent to defraud"; and (3) that "the scheme to defraud was in connection with" HP securities. *Stein*, 906 F.3d at 829.  Federal fraud statutes are "limited in scope to the protection of property rights." *Kelly* v. *United States*, 140 S. Ct. 1565, 1571 (2022).  Thus, the government must prove that Dr. Lynch intended to deprive HP shareholders of a tangible, traditional property interest.

Here, Count Sixteen is fatally flawed because it fails to allege that Dr. Lynch intended to deprive HP shareholders of a property interest as required by Section 1348(1), or to obtain money or property from HP shareholders as required by Section 1348(2).  First, the SI does not allege a violation of Section 1348(1) because Dr. Lynch did not stand to gain anything by depriving HP shareholders of any property interest.  He was not himself an HP shareholder, nor was he otherwise in a position to profit based on purchases or sales of HP shares or changes in HP's share price.  Thus, there is no reason Dr. Lynch would intend to fraudulently induce anyone to purchase HP securities.  Indeed, HP itself is the only entity that would obviously stand to gain from any fraudulent efforts to induce others to buy HP shares, as HP would benefit from the resulting higher share price.  But it would be nonsensical to allege in Count Sixteen that Dr. Lynch defrauded HP shareholders in order to benefit HP, given that the government alleges across Counts One through Fifteen of the SI that Dr. Lynch victimized HP.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

For a similar reason, the SI does not allege a violation of Section 1348(2), which would require that Dr. Lynch intended to obtain money or property from HP shareholders.  Dr. Lynch had no means of obtaining money or property from HP shareholders, whether he induced them to purchase HP shares or not.

The most that the government could possibly allege is that Dr. Lynch in some way deprived HP shareholders of economic information that could have influenced their decision to purchase or sell HP shares.  But "the right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest" that could give rise to a fraud claim.  *Ciminelli*, 143 S. Ct. at 1128.  In other words, whether the government is proceeding under Section 1348(1) or Section 1348(2), it must show that Dr. Lynch intended to defraud HP shareholders of a traditional property interest.  No such showing can be made.

Thus, Count Sixteen fails to state an offense in violation of Fed. R. Crim. P. 7(c)(1) because it fails to provide the essential facts constituting the offense charged.  Count Sixteen must therefore be dismissed.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE
THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

## IV.   CONCLUSION

For the reasons stated herein, Dr. Lynch respectfully requests that the Court dismiss Counts One through Sixteen of the Superseding Indictment.

Dated: September 29, 2023

Respectfully submitted,

/s/ Christopher Morvillo
Christopher Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437

Reid H. Weingarten (Admitted Pro Hac Vice)
Brian M. Heberlig (Admitted Pro Hac Vice)
Michelle L. Levin (Admitted Pro Hac Vice)
Nicholas P. Silverman (Admitted Pro Hac Vice)
Dwight J. Draughon (Admitted Pro Hac Vice)
Drew C. Harris (Admitted Pro Hac Vice)
**Steptoe & Johnson LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

Jonathan M. Baum (SBN: 303469)
**Steptoe & Johnson LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

*Attorneys for Defendant*
*Michael Richard Lynch*

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO DISMISS COUNTS ONE THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT