# EXHIBIT U

Case 3:18-cr-00021-CRB Document 25 Filed 04/27/18 Page 2 of 20

Sean Hecker (*pro hac vice*)
Derek Wikstrom (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000
Fax: (212) 909-6836
shecker@debevoise.com
dwikstrom@debevoise.com

Nanci L. Clarence (SBN 122286)
Josh A. Cohen (SBN 217853)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, CA 94109
Tel: (415) 749-1800
Fax: (415) 749-1694
nclarence@clarencedyer.com
jcohen@clarencedyer.com

Attorneys for Defendant
ROBERT BOGUCKI

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT BOGUCKI,<br><br>Defendant. | CASE NO. CR-18-0021 CRB<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS**<br><br>Date: May 23, 2018<br>Time: 1:30 p.m.<br>Courtroom: 6 |

PLEASE TAKE NOTICE that on May 23, 2018 at 1:30 p.m., or as soon thereafter as this matter may be heard, in the courtroom of the Honorable Charles R. Breyer, United States District Judge, Defendant Robert Bogucki will, and hereby does, move this Court pursuant to Federal Rule of Criminal Procedure 12 to dismiss the Superseding Indictment against him with prejudice as time-barred. This motion is based on the supporting memorandum of law; the declaration of

Derek Wikstrom in support; the pleadings and records on file in this matter; and such evidence and argument as may be presented prior to and at the hearing on this motion.

Dated: April 27, 2018

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By /s/
Sean Hecker
Derek Wikstrom

CLARENCE DYER & COHEN LLP

By /s/
Nanci L. Clarence
Josh A. Cohen

Attorneys for Defendant Robert Bogucki

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .......................................................................................................................... 2

    A.    The Original Indictment and Motion to Dismiss ........................................................ 2

    B.    Superseding Indictment and Parties' Stipulation ....................................................... 3

ARGUMENT ................................................................................................................................ 5

I.    FIRREA's Ten-Year Limitations Period Applies Only When the Conduct Exposed a Financial Institution to a Sufficiently Direct Actual, or a New or Increased Risk of, Loss ................................................................................................ 5

II.    The Government Has Not Demonstrated a Loss or an Effect on Barclays Sufficient to Apply the Extended Limitations Period ............................................... 7

    A.    Barclays's Declination Does Not Establish a Causal Link Under Section 3293(2) ......................................................................................................... 7

    B.    Barclays Did Not Face a New or Increased Risk of Loss Due to the Holding, Sale, and Purchase of Cable Options ........................................................ 11

III.    The Superseding Indictment Does Not Properly Allege an Effect on Financial Institutions A and B ............................................................................................... 12

IV.    The Government Waived Its FIRREA Theory ....................................................... 13

CONCLUSION ........................................................................................................................... 14

# TABLE OF AUTHORITIES

**CASES**

*Holy Trinity Church v. United States*, 143 U.S. 457 (1892) .......................................................... 10

*Musacchio v. United States*, 136 S. Ct. 709 (2016) ....................................................................... 14

*Staples v. United States*, 511 U.S. 600 (1994) ............................................................................... 11

*Toussie v. United States*, 397 U.S. 112 (1970) ............................................................................... 11

*United States v. Agne*, 214 F.3d 47 (1st Cir. 2000) ................................................................... 5, 13

*United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438 (S.D.N.Y. 2013) ........................ 7

*United States v. Bouyea*, 152 F.3d 192 (2d Cir. 1998) .............................................................. 6, 12

*United States v. Countrywide Financial Corp.*, 961 F. Supp. 2d 598 (S.D.N.Y. 2013) .............. 7, 8

*United States v. Esterman*, 135 F. Supp. 2d 917 (N.D. Ill. 2001) .................................................. 11

*United States v. Ghavami*, 23 F. Supp. 3d 148, 163-64 (S.D.N.Y. 2014) ........................................ 8

*United States v. Granderson*, 511 U.S. 39 (1994).......................................................................... 10

*United States v. Grass*, 274 F. Supp. 2d 648 (M.D. Pa. 2003) ............................................ 6, 11, 13

*United States v. Mullins*, 613 F.3d 1273 (10th Cir. 2010) ......................................................... 6, 13

*United States v. Pelullo*, 964 F.2d 193 (3d Cir. 1992) ........................................................ 6, 12, 13

*United States v. Radley*, 632 F.3d 177 (5th Cir. 2011) ................................................................. 13

*United States v. Rubin/Chambers*, 831 F. Supp. 2d 779 (S.D.N.Y. 2011) ...................................... 9

*United States v. Scott*, 705 F.3d 410 (9th Cir. 2012) ................................................................ 4, 14

*United States v. Serpico,* 320 F.3d 691 (7th Cir. 2003) ................................................................... 6

*United States v. Stargell*, 738 F.3d 1018 (9th Cir. 2013) .......................................................... 6, 11

*United States v. Ubakanma*, 215 F.3d 421 (4th Cir. 2000) ...................................................... 5, 11

*United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013) ........................... 7

**STATUTES**

12 U.S.C. § 1833a .................................................................................................................... 5, 12

18 U.S.C. § 1341 ............................................................................................................................ 5

18 U.S.C. § 1343 ............................................................................................................... 3, 5

18 U.S.C. § 3282 .................................................................................................................. 3

18 U.S.C. § 3292 ............................................................................................................... 3, 4

18 U.S.C. § 3293 ...........................................................................................................*passim*

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 101-54 (1989) ............................................................................................... 5

**OTHER AUTHORITIES**

Fed. R. Crim. P. 12 ............................................................................................................... 1

Filmon M. Sexton, *The Financial Institutions Reform, Recovery, and Enforcement Act of 1989: The Effect of the "Self Affecting" Theory on Financial Institutions*, 19 N.C. Banking Inst. 263 (2015) ...................................................................................................... 7

U.S. Chamber Institute for Legal Reform, *The FIRREA Revival: Dredging up Solutions to the Financial Crisis* (October 2014) .......................................................................... 7

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Robert Bogucki respectfully submits this memorandum of law in support of his Motion to Dismiss the Superseding Indictment pursuant to Fed. R. Crim. P. 12.[1]

## PRELIMINARY STATEMENT

The Superseding Indictment against Mr. Bogucki is a transparent and futile effort to salvage a time-barred prosecution. The government's belated assertion that Mr. Bogucki's alleged conduct "affect[ed] a financial institution," such that it is subject to a ten-year statute of limitations under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 18 U.S.C. § 3293(2), is unprecedented in this Circuit. To accept it, the Court would have to conclude that virtually *every* act by a bank employee, and *every* foreign-exchange transaction, is subject to FIRREA's extended limitations provision. This is not what Congress intended, and it is decidedly not the law.

Neither of the government's FIRREA theories withstands scrutiny. Theory number one – that Mr. Bogucki "affect[ed]" a financial institution because he worked at one – lacks a sufficient causal nexus between the purportedly unlawful conduct and any actual, or risk of, "loss" by Barclays. Theory number two – that *other* banks were "affect[ed]" because they participated in the market where the options at issue were traded – lacks any causal nexus at all. Having faced no new or increased risk of loss as a result of the conduct at issue, these banks suffered no "effect" within the meaning of the FIRREA statute.

The so-called victim of Mr. Bogucki's alleged offense was not a financial institution at all; it was Hewlett-Packard ("HP"). This fact goes a long way toward explaining the government's reticence to charge FIRREA out of the gate, and it calls into question the government's decision to charge FIRREA now. Absent any colorable basis for doubling the limitations period, the Court should find that the new indictment, like the previous one, comes too late. The charges against Mr. Bogucki should accordingly be dismissed.

---

[1] References to exhibits refer to the exhibits attached to the Declaration of Derek Wikstrom in Support of Defendant Robert Bogucki's Motion to Dismiss.

# BACKGROUND

**A. The Original Indictment and Motion to Dismiss**

The U.S. Department of Justice Criminal Division ("DOJ" or the "government") filed its original Indictment on January 16, 2018, charging Mr. Bogucki with a wire fraud conspiracy and six substantive counts of wire fraud. In brief, the allegations against Mr. Bogucki are as follows.

In August 2011, HP agreed to purchase a British company, Autonomy. Indictment ¶¶ 16, 23. U.K. regulations required HP to demonstrate, at the time it signed the agreement (and months before the acquisition would close), that it had access to British pounds sufficient to complete the transaction. *Id.* ¶ 17. HP could do so by purchasing pounds outright (in a "spot" transaction – a trade of one currency for another), or by entering into a contract for either a right (an "option") or an obligation (a "futures" contract) to purchase pounds at some point in the future. This financial requirement exposed HP to the risk of currency price fluctuations. HP wished to hedge its risk that the price of pounds would increase, while enjoying the benefits of any price decrease. To do so, it purchased £6 billion in options from Barclays in an August 2011 transaction. *Id.* ¶ 21. The options were a series of contracts between Barclays and HP that gave HP the right to purchase pounds, six months in the future, at the prevailing August 2011 price. *Id.* ¶¶ 19-20. The options were, in effect, an insurance contract, protecting HP against the risk that the price of pounds might increase. Barclays, as the trade counterparty, was effectively an insurance provider, owning the risk that pounds might appreciate in price while being obligated under the options contract to sell pounds to HP six months into the future at the August 2011 price. Barclays was, of course, free to hedge its risk. Indeed, failing to hedge its risk would have caused Barclays to exceed regulatory risk limits.

The risk of pound appreciation did not materialize. In fact, the price of pounds fell between the signing and closing of the Autonomy deal. As a result, HP was able to buy pounds at a discount on the open market, and did not need to exercise the options. Instead, HP decided to "unwind" the options by selling them back to the market to recapture their residual value. *Id.* ¶ 24. This unwind is the sole focus of the government's case against Mr. Bogucki. In sum, the government alleges that between September 27, 2011 and October 4, 2011, Mr. Bogucki and

1 others at Barclays engaged in a scheme to defraud HP in connection with the unwind.

2     Mr. Bogucki moved to dismiss the Indictment as untimely, arguing that the final act
3 alleged took place on October 4, 2011, *see id.* ¶¶ 53, 56, 58, 59, and therefore was outside of the
4 applicable five-year statute of limitations under 18 U.S.C. § 3282(a). ECF Nos. 27, 28. In
5 responding to Mr. Bogucki's motion to dismiss, the government conceded that the five-year
6 statute of limitations under Section 3282(a) applied but claimed that the conduct charged in the
7 original Indictment was timely because it had obtained, shortly before the expiration of the
8 limitations period, an order purporting to toll the statute of limitations based on the submission of
9 a Mutual Legal Assistance Treaty ("MLAT") Request, under 18 U.S.C. § 3292(a).

10     Based on the limited circumstantial evidence available to him and the suspicious timing of
11 the MLAT Request, Mr. Bogucki requested discovery and an evidentiary hearing to probe whether
12 the tolling order was obtained improperly – *i.e.*, whether the MLAT Request was pretextual,
13 designed not to secure evidence from abroad, but merely to toll the fast-approaching statute of
14 limitations. On March 9, 2018, based on its finding that the defense had made a "showing that
15 raises a serious question as to whether or not the affidavit – the declaration supporting it – was
16 accurate in material respects," the Court granted Mr. Bogucki's request for a hearing and ordered
17 the government to produce discovery related to the MLAT Request. Ex. 1, at 13.

18     **B.    Superseding Indictment and Parties' Stipulation**

19     Rather than produce documents and participate in an evidentiary hearing that would have
20 shed light on the circumstances of the MLAT Request and the accuracy of the representations
21 made to obtain the tolling order, the government now attempts to cure the untimeliness of its
22 claims with the filing of the Superseding Indictment. ECF Nos. 54, 55, 56. The Superseding
23 Indictment is virtually identical to the original Indictment except in one respect: it asserts, in
24 conclusory fashion, that the conspiracy and wire fraud charged under 18 U.S.C. § 1343 "*affect[ed]*
25 *a financial institution*" (emphasis added). According to the government, the insertion of these
26 four words invokes the FIRREA statute, and thereby doubles the limitations period from five years
27 to ten. *See* 18 U.S.C. § 3293(2) ( "No person shall be prosecuted, tried or punished for a violation
28 of, or a conspiracy to violate … section 1341 or 1343, if the offense affects a financial institution

1  … unless the indictment is returned or the information is filed within 10 years after the
2  commission of the offense.").[2]

3  The Superseding Indictment charges that the alleged scheme to defraud affected three
4  financial institutions: Barclays PLC and Barclays Bank PLC (hereafter referred to simply as
5  "Barclays"), and two unnamed financial institutions identified as "Financial Institution A" and
6  "Financial Institution B." ECF No. 54 ¶¶ 57, 59. Although the Superseding Indictment is devoid
7  of specific allegations as to the actual loss or risk of loss sustained by any of these entities, the
8  government supplied additional information about its FIRREA theories in a letter to defense
9  counsel on March 29, 2018. First, the government claims that Mr. Bogucki's alleged conduct
10 affected Barclays by exposing it to the risk of loss associated with the holding, sale, and purchase
11 of cable options between August and October 2011, as well as reputational harm, and legal and
12 regulatory expenses. Ex. 2, at 2. Second, the government claims that the conduct affected
13 Financial Institutions A and B by exposing them to changes in the value of foreign exchange
14 ("FX") options by virtue of the institutions' participation in the FX options market at the time of
15 the HP unwind. *Id*. Though the Superseding Indictment refers only to Financial Institutions A
16 and B, the government expressed the view in its letter that "*all* participants in the FX options
17 market, were exposed to [this] increased risk" as a result of Mr. Bogucki's alleged conduct. *Id*.
18 (emphasis added).

19 Days after filing the Superseding Indictment aimed at extending the statute of limitations –
20 and only after this Court ordered discovery and a hearing to examine evidence of pretext relating
21 to its tolling application – the government stipulated that it would no longer defend or otherwise
22 rely upon the tolling order obtained under 18 U.S.C. § 3292 to argue that these or any future
23 charges against Mr. Bogucki are timely. *See* ECF No. 56 ¶ 1. The government now relies solely
24 upon 18 U.S.C. § 3293(2) to establish the timeliness of its Superseding Indictment. *Id.*

---

[2] Notably, the government was free to argue that the FIRREA limitations period applied to the *original* indictment. *See United States v. Scott*, 705 F.3d 410, 415 (9th Cir. 2012) (party must raise a theory in briefing or at oral argument to preserve it). Having foregone that opportunity, the government apparently returned to the grand jury to create the illusion that the legal landscape has changed – and to sidestep a claim of waiver. The Court should not be deceived.

4  Case No. CR-18-0021 CRB
MOTION TO DISMISS

Mr. Bogucki moves to dismiss the Superseding Indictment on the grounds that FIRREA does not properly apply to the conduct alleged in this case.

## ARGUMENT

To avail itself of the ten-year limitations period under FIRREA, the government must prove that the crime alleged in the Superseding Indictment "affect[ed]" a financial institution. But to prove an effect, the government must establish a sufficient causal nexus between Mr. Bogucki's conduct and an actual, new or increased risk of loss to a financial institution. Each of the government's theories would read that requirement out of the law, rendering it superfluous. The government's attempt to expand FIRREA's reach so dramatically should be rejected.

**I.  FIRREA's Ten-Year Limitations Period Applies Only When the Conduct Exposed a Financial Institution to a Sufficiently Direct Actual, or a New or Increased Risk of, Loss**

Congress enacted FIRREA as a legislative response to the 1980s savings and loan crisis. *See* H.R. Rep. No. 101-54, at 464 (1989), *as reprinted in* 1989 U.S.C.C.A.N. 86, 260.  FIRREA creates new civil causes of action for fraud against financial institutions, and adds additional criminal penalties to frauds that "affect[] a financial institution." *See* 12 U.S.C. § 1833a; 18 U.S.C. §§ 1341, 1343 (statutory maximums for mail or wire fraud increased from 20 to 30 years).  Congress also noted that, at the time FIRREA was enacted, there was a "tremendous backlog in pending criminal investigations," which warranted an extension of the limitations period to ten years for certain conduct affecting a financial institution. H.R. Rep. No. 101-54, at 464, U.S.C.C.A.N. at 260.  FIRREA therefore adds to 18 U.S.C. § 3293 the provision: "No person shall be prosecuted, tried, or punished for a violation of, or a conspiracy to violate … section 1341 or 1343, if the offense *affects a financial institution* … unless the indictment is returned or the information is filed within 10 years after the commission of the offense." (emphasis added).

Courts have grappled with the precise scope of the word "affect." Some courts have interpreted FIRREA to apply only where "financial institutions themselves were harmed or victimized in any way, or that they were intended to be so harmed or victimized by the fraud scheme." *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000); *see also United States v.*

*Agne*, 214 F.3d 47, 51 (1st Cir. 2000) (holding that FIRREA's ten-year limitations period is unavailable unless there is "some negative consequence to the financial institution"); *United States v. Grass*, 274 F. Supp. 2d 648, 655 (M.D. Pa. 2003) (holding that the financial institution must be "victimized by the fraud" (citation omitted)). Other circuits have defined "affect" more broadly, but even those courts have recognized some reasonable limits – *i.e.*, that the effect on the financial institution cannot be too attenuated. *See United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010) ("[T]here may be some point where the 'influence' a defendant's wire fraud has on a financial institution becomes so attenuated, so remote, so indirect that it cannot trigger the ten-year limitations period because it does not in any meaningful sense 'affect' the institution."); *United States v. Pelullo*, 964 F.2d 193, 216 (3d Cir. 1992) (questioning whether the effect of a fraud was "unreasonably remote"). In perhaps the broadest reading given to the term "affect," the Second Circuit adopted a quasi-proximate cause standard that measures whether the conduct and the effect on the financial institution are "sufficiently direct." *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998).

In addition to requiring a sufficient causal nexus, most courts have held that the effect must result in some harm. Importantly, the Ninth Circuit has held that a financial institution is "affect[ed]" for purposes of Section 3293(2) only if the fraud created an actual loss or a "new or increased risk of loss to financial institutions." *United States v. Stargell*, 738 F.3d 1018, 1022-23 (9th Cir. 2013) (finding that a loan based on a fraudulent tax return "affected" the bank even absent an actual loss since the loan increased the risk of loss for the bank). Other circuits have recognized the same requirement. *See Mullins*, 613 F.3d at 1278-79; *United States v. Serpico*, 320 F.3d 691, 694-95 (7th Cir. 2003). Further, an alleged fraud that involves a bank taking some action it would otherwise have taken in the ordinary course of its business does not create a "new or increased risk of loss." *See Stargell*, 738 F.3d at 1022.

Notwithstanding the varied interpretations of "affect," the dominant approach requires a sufficiently direct link between the alleged fraud and the effect on the financial institution, which must entail an actual loss or, at a minimum, a new or increased risk of loss.

## II. The Government Has Not Demonstrated a Loss or an Effect on Barclays Sufficient to Apply the Extended Limitations Period

The government advances two separate theories to establish an "effect" on Barclays, neither of which should prevail.

### A. Barclays's Declination Does Not Establish a Causal Link Under Section 3293(2)

The government first contends that Barclays was "affect[ed]" by the conduct alleged in the Superseding Indictment because Barclays purportedly suffered reputational harm, legal and regulatory expenses, potential civil liability, and the cost of restitution and disgorgement. This is an attempt to expand the bounds of the self-affecting theory, the application of which is a matter of first impression in this Circuit. The self-affecting theory emerges from a series of recent district court decisions in the Southern District of New York ("SDNY"), positing that fraud "affects a financial institution" where a defendant is employed by that financial institution and conspires with it to commit an alleged fraud against someone else – in other words, a bank can be both the perpetrator of the alleged fraud and the affected entity, even if the bank is not victimized in any way. *See, e.g.*, *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013); *United States v. Countrywide Financial Corp.*, 961 F. Supp. 2d 598 (S.D.N.Y. 2013); *United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438 (S.D.N.Y. 2013). In those SDNY decisions, the courts held that bank settlements or guilty pleas based on the conduct in which the bank itself conspired "affect" the financial institutions. Although Section 3293(2) was enacted to *protect* banks from fraud, not to subject them to increased penalties based on their own settlement agreements, certain district courts have accepted and applied the novel self-affecting theory in both civil and criminal cases. *See* Filmon M. Sexton, *The Financial Institutions Reform, Recovery, and Enforcement Act of 1989: The Effect of the "Self Affecting" Theory on Financial Institutions*, 19 N.C. Banking Inst. 263, 265 (2015) (describing the self-affecting theory as "absurd" and reflective of "an impermissible reading" of FIRREA because Congress enacted the statute to punish "pervasive insider abuse and fraud of the savings and loan crisis and [it] was not intended to punish financial institutions for losses incurred from their own conduct"); *see also* U.S. Chamber Institute for Legal Reform, *The FIRREA Revival: Dredging up Solutions to the*

*Financial Crisis* at 6-7 (October 2014) (observing, in the civil context, that the self-affecting theory makes FIRREA "applicable to conduct far afield from conduct that threatens the financial integrity of the financial institution").[3]

The government's attempt to invoke the self-affecting theory in this case, however, rests not on a plea agreement or even a civil settlement, but on an agreement by the government to decline prosecution, which was reached on February 28, 2018, 43 days after Mr. Bogucki was first indicted (the "Declination"). Under the terms of this agreement, DOJ declined to prosecute Barclays and "clos[ed] its investigation of [Barclays PLC] concerning frontrunning of foreign exchange ('FX') transactions connected to the Hewlett-Packard Company ('HP') from August to October 2011." Ex. 3, at 1. In exchange, Barclays agreed to pay "$12,896,011 USD in combined restitution and disgorgement" without admitting that any criminal conduct occurred.[4] *Id*. at 2.

Ironically, the government points to its own decision *not* to prosecute Barclays to argue that Barclays was affected by the scheme for which it will not be charged. According to the government, this is so because Barclays was exposed to downstream litigation and regulatory costs, including the $12 million it disgorged as part of the Declination.

This argument fails. To implicate FIRREA, a payment by a financial institution must be a "direct consequence[] of [the] Defendant['s] charged conduct." *United States v. Ghavami*, 23 F. Supp. 3d 148, 163-64 (S.D.N.Y. 2014). While some courts have found that FIRREA's "affecting" requirement was met where a financial institution has been fined, sued, or entered into a monetary settlement, the payments in those cases took the form of significant penalties for admitted wrongdoing. *See id.* at 159 n.6 ($160 million payment, including $145 million fine, with admission of wrongdoing by the bank); *see also Countrywide Fin. Corp.*, 961 F. Supp. 2d at 605 (holding that the defendant financial institution was affected by the fraud, because the financial

---

[3] *Available at* http://www.instituteforlegalreform.com/uploads/sites/1/firrea.pdf.

[4] The disgorgement figure was presented without explanation, and the Declination stated only that "[t]he Disgorgement Amount has been determined by the Fraud Section to be the full amount of restitution and disgorgement owed by Barclays, including disgorgement of *certain* of Barclays' profits from the conduct at issue." Ex. 3, at 2 (emphasis added). In other words, it appears that Barclays, in fact, was able to keep some of the profits resulting from the market-making activity at issue.

institution "has paid billions of dollars to settle" claims made as "a result of the fraud here alleged"). By contrast, where a settlement agreement merely returns a bank to the status quo ante, with no admission of liability or misconduct, there is no "loss" to the bank within the meaning of FIRREA. *See United States v. Rubin/Chambers*, 831 F. Supp. 2d 779, 784 (S.D.N.Y. 2011) (rejecting a bank settlement agreement as evidence of an effect on a financial institution, because "unlike the Non-Prosecution Agreements, [it] does not contain an express admission of guilt").

Here, there is no "direct link" between Mr. Bogucki's alleged conduct and the payment Barclays made pursuant to the Declination. For one thing, the Declination does not contain any admission of wrongdoing by Barclays. It also encompasses conduct that did not involve Mr. Bogucki at all; the entirety of the payment may have been attributable to conduct completely unrelated to his actions.[5] Moreover, the agreement contained no fine or other monetary penalty; the entirety of the $12 million payment constituted disgorgement of a portion of the gains Barclays made as a result of its trading activity, rather than any net loss to the bank.

In reality, Barclays may have settled with the government for any number of reasons unrelated to Mr. Bogucki's alleged misconduct. The bank may have wished to avoid collateral consequences. It may have feared the adverse publicity from a protracted investigation. Or it may simply have preferred a quick resolution to prolonged litigation – especially where the resolution involved no admission of wrongdoing and only a partial disgorgement of its profits. Given the many considerations that may have caused Barclays to enter into the Declination, Barclays's modest payment was not a "direct consequence" of the charges contained in the Superseding Indictment.

The implications of holding otherwise are chilling. Under the government's expanded self-affecting theory, prosecutors manufacture a FIRREA "effect" – and thereby double the statute of limitations – simply by choosing to investigate a financial institution. The government could

---

[5] The investigation culminating in the Declination was focused primarily on the August 2011 transaction, as opposed to the unwind of HP's options between September 27, 2011 and October 4, 2011, which is the sole focus of the charges in the Superseding Indictment. Specifically, the government was investigating whether two Barclays spot traders – not Mr. Bogucki – had engaged in a separate front-running scheme.

do so regardless of the outcome of the investigation; even if it declined to bring charges and obtained no admission of wrongdoing, the costs borne by the bank in the course of the investigation would, under the government's theory, be enough to double the limitations period. Thus, such an interpretation would enable the government to manufacture the "effect," and therefore the FIRREA violation, by commencing an investigation of a financial institution. In the government's reading of FIRREA, an investigation is a self-fulfilling prophecy, imposing an effect by virtue of the government's intervening conduct. There is no evidence Congress intended to give DOJ the power to trigger the longer FIRREA limitations period (and enhanced statutory maximum penalties) in this way.

Most importantly, the government's proposed application of the self-affecting theory would expose *every* bank employee charged with a predicate FIRREA offense to an extended ten-year limitations period (along with increased penalties) no matter how pedestrian the crime. Under basic principles of corporate criminal liability, any allegation of fraud against a bank employee would necessarily "affect" a financial institution and thereby trigger FIRREA's ten-year statute of limitations. There is no indication that Congress intended that FIRREA apply so broadly.

As this Court recently noted, a "statute of limitations is a determination by the Congress of the United States that no prosecution can be brought after a certain period of time because it's unfair to the defendant." Ex. 1, at 5. This Court further observed that Congress has made exceptions that "may run contrary to what a statute of limitations is designed to do," but these are exceptions "that one can say make[] sense in the overall balancing of policy considerations in terms of how prosecutions are conducted." *Id.* at 6. A construction of FIRREA that doubles the limitations period for every offense committed by an employee of a financial institution would eviscerate these bedrock principles without any countervailing justification. To prevent this result, the Court should give the statutory language "a sensible construction that avoids attributing to the legislature either an unjust or an absurd conclusion." *United States v. Granderson*, 511 U.S. 39, 56 (1994) (citations and internal quotation marks omitted); *see also Holy Trinity Church v. United States*, 143 U.S. 457, 461 (1892) (court should presume that legislature did not intend statute to

lead to "injustice, oppression, or an absurd consequence"). Principles of due process and statutory interpretation also counsel against adopting the government's expansive interpretation of the self-affecting theory and accompanying five-year extension of the limitations period with respect to Mr. Bogucki, given that the term "affect[ed]" is susceptible to multiple interpretations. *See Staples v. United States*, 511 U.S. 600, 619, n.17 (1994) (an ambiguous criminal statute is to be construed in favor of the accused); *Toussie v. United States*, 397 U.S. 112, 115 (1970) ("[C]riminal limitations statutes are to be liberally interpreted in favor of repose." (citations and internal quotation marks omitted)).

### B. Barclays Did Not Face a New or Increased Risk of Loss Due to the Holding, Sale, and Purchase of Cable Options

Alternatively, the government claims that the conduct alleged in the Superseding Indictment "affect[ed]" Barclays because the bank was exposed to risk through its participation in FX options trading. The fatal flaw in this contention is straightforward: As one of the world's most active participants in the FX options market, Barclays routinely assumes the risk of loss associated with trading FX options. The bank did not assume this risk because of Mr. Bogucki's alleged misconduct; rather, its assumption of that risk was inherent in the bank's business model. An alleged fraud that causes a bank to do something it would have done anyway in the ordinary course of its business simply does not create a "*new or increased* risk of loss." *See Stargell*, 738 F.3d at 1022 (emphasis added); *see also Grass*, 274 F. Supp. 2d at 655 ("[r]outine costs for transactions which, from the bank's point of view, are completely normal do not satisfy this standard"); *United States v. Esterman*, 135 F. Supp. 2d 917, 920 (N.D. Ill. 2001) (rejecting the government's contention that a bank was affected where the bank "was called upon to do nothing more than to honor the authorizations that were wholly regular from the bank's perspective"); *Ubakanma*, 215 F.3d at 426 ("mere utilization of the financial institution" is not enough).

Moreover, the government's risk-of-loss theory flies in the face of its claim that the alleged "front-running" scheme was intended to *reduce* Barclays's exposure to trading risk by permitting it to offload risk without informing HP. The Superseding Indictment in fact hinges on the existence of an alleged scheme to "enrich Barclays," *see* ECF No. 54 ¶ 15, a theory under which

Barclays incurred substantial financial benefit based upon conduct aimed to "defraud HP of money and property." *Id.* ¶ 14; *see also id.* ¶ 16 ("manipulat[ing] the FX market in Barclays' favor"); *id.* ¶ 55 ("[T]he scheme…enabled Barclays to make millions of dollars by acquiring the options from HP at a discounted and favorable price."). Barclays could not have faced a "new and increased risk of loss" due to its trading activity when it allegedly incurred substantial financial benefit from a purported fraud aimed at HP. As a result, this theory, too, must be rejected.

### III. The Superseding Indictment Does Not Properly Allege an Effect on Financial Institutions A and B

The government also contends that two other banks, Financial Institutions A and B, were "exposed to increased risk as a result of the conspirators' criminal activity." *See* Ex. 2, at 2. This back-up theory of FIRREA liability rests on the novel and startling premise that Mr. Bogucki's alleged offenses "affect[ed]" "*all participants* in the FX options market," of which Financial Institutions A and B are just illustrative examples. *Id.* (emphasis added). This claim should fail on that basis alone: a hypothesized effect cannot be sufficiently direct while also applying to every single market participant; otherwise, *any* wire fraud in *any* public market would "affect[] a financial institution," a result that neither the statutory text nor the legislative history supports, and one that even the broadest cases have not contemplated.

To be sure, Section 3293(2) applies to a "broader class of crimes" than those in which "the financial institution is the object of fraud." *Bouyea*, 152 F.3d at 195 (quoting *Pelullo*, 964 F.2d at 216). But this does not obviate the government's obligation to demonstrate that the effect of the fraud on the financial institution is "sufficiently direct." *Id.* Here, the government seeks to extend FIRREA to every market participant, no matter how attenuated the link between that participant and the alleged fraud. Taken to its logical conclusion, this overly broad reading of "affects" has potentially breathtaking consequences. A bank would be subject to virtually infinite civil penalties under FIRREA's per-violation penalty regime. *See* 12 U.S.C. § 1833a(b)(1), (2) (authorizing penalties of up to $1 million per violation, and for continuing violations, a maximum of up to $1 million per day or $5 million per violation, whichever is less). Similarly, a bank employee would be subject to a ten-year limitations period and a higher statutory maximum

1 sentence whenever there are other players in the market. Simply put, FIRREA would apply in
2 every scenario where there is alleged misconduct involving market trades. The plain language of
3 Section 3293(2) cannot be stretched this far. *See Pelullo*, 964 F.2d at 216; *see also Agne*, 214 F.3d
4 at 52 (observing that "there [is] a limit to the statute's reach" where the effect is too attenuated).

5      But the government's theory regarding the "effect" on Financial Institutions A and B has
6 another fatal flaw: it requires the Court to ignore the criminal activity that forms the crux of the
7 allegations in the Superseding Indictment. The government has not alleged that the FX options
8 trading *itself* was unlawful or that Mr. Bogucki engaged in any sort of market manipulation related
9 to that trading.[6] Instead, the Superseding Indictment alleges that Mr. Bogucki defrauded HP by
10 concealing *from HP* trades he was allegedly required to disclose *to HP*. Under the government's
11 own theory, therefore, the scheme at issue had nothing to do with Financial Institutions A or B.
12 There is no sense in which Mr. Bogucki's alleged failure to notify HP of Barclays's trading
13 activity had a "direct" effect on Financial Institution A, Financial Institution B, or any other
14 participant who happened to be in the market. *See, e.g.*, *Mullins*, 613 F.3d at 1278 (observing that
15 there "may be some point where the 'influence' a defendant's wire fraud has on a financial
16 institution becomes so attenuated, so remote, so indirect that it cannot trigger the ten-year
17 limitations period because it does not in any meaningful sense 'affect' the institution"); *Grass*, 274
18 F. Supp. 2d at 655 (holding that the financial institution must be "victimized by the fraud"
19 (citation omitted)).

20 **IV. The Government Waived Its FIRREA Theory**

21      The government was not required to supersede in order to assert a FIRREA theory in
22 response to Mr. Bogucki's initial motion to dismiss for untimeliness. The statute of limitations is
23 an affirmative defense, and the government is not required to include facts in the indictment that

---

[6] Nor could it. The government cannot use the wire fraud statute to circumvent its inability to charge a market manipulation theory that is unavailable to it under applicable law. *Cf. United States v. Radley*, 632 F.3d 177, 185 (5th Cir. 2011) ("[W]hen the government's allegations charge market manipulation and cornering as the 'scheme to defraud,' and our preceding discussion explains why this is not criminal conduct . . . , the same scheme cannot alone be re-characterized and rendered illegal as wire fraud.").

Case 3:18-cr-00021-CRB Document 25 Filed 04/27/18 Page 19 of 19

1  anticipate the defense.  *See Musacchio v. United States*, 136 S. Ct. 709, 718 (2016) (explaining

2  that a "statute-of-limitations defense becomes part of a case only if the defendant puts the defense

3  in issue," and where the defendant fails to press such a defense, "the Government does not

4  otherwise have the burden of proving that it filed a timely indictment").  By failing to argue, when

5  opposing the defendant's motion to dismiss the original Indictment, that 18 U.S.C. § 3293(2)

6  purportedly supplies the applicable statute of limitations, the government waived its right to assert

7  that the ten-year limitations period applies.  *See United States v. Scott*, 705 F.3d 410, 415 (9th Cir.

8  2012) (party must raise a theory in briefing or at oral argument to preserve it).  For this reason,

9  too, the Court should reject the government's attempt to resuscitate this time-barred prosecution.

## CONCLUSION

For the reasons set forth above, defendant Robert Bogucki respectfully requests that the Court dismiss the Superseding Indictment with prejudice.

Dated:  April 27, 2018                    Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By   /s/
     Sean Hecker
     Derek Wikstrom

CLARENCE DYER & COHEN LLP

By   /s/
     Nanci L. Clarence
     Josh A. Cohen

Attorneys for Defendant Robert Bogucki