# EXHIBIT F

| | |
|---|---|
| 1. On behalf of | Claimants |
| 2. Initials/Surname of witness | C J R Goodfellow |
| 3. Statement No | 2 |
| 4. Date | 17 November 2018 |

<u>Claim No. HC-2015-001324</u>

**IN THE HIGH COURT OF JUSTICE**
<u>**BUSINESS AND PROPERTY COURTS**</u>
<u>**OF ENGLAND AND WALES**</u>
<u>**BUSINESS LIST (ChD)**</u>

**B E T W E E N :**

(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)
(2) HEWLETT-PACKARD VISION BV
(3) AUTONOMY SYSTEMS LIMITED
(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.

<u>**Claimants**</u>

-and-

(1) MICHAEL RICHARD LYNCH
(2) SUSHOVAN TAREQUE HUSSAIN

<u>**Defendants**</u>

---

**SUPPLEMENTAL WITNESS STATEMENT OF CHRISTOPHER JAMES ROBIN GOODFELLOW**

---

I, CHRISTOPHER JAMES ROBIN GOODFELLOW of The Old Manse, 49 High Street, Burwell, Cambridge, Cambridgeshire, CB25 0HD, STATE AS FOLLOWS:

1. I make this Supplemental Witness Statement on behalf of the Claimants in connection with the above-named proceedings. The Claimants' solicitors have drawn to my attention certain statements made by the First Defendant, Dr Lynch, in his Witness Statement dated 14 September 2018 and asked me to respond. This is my second witness statement in these proceedings. I refer below to the first Witness Statement I made in these proceedings dated 14 September 2018 as "**Goodfellow 1**" and adopt the definitions used therein.

2. Except where it otherwise appears, the facts and matters to which I refer in this Supplemental Witness Statement are within my own knowledge and are true. Where facts are from another source, I identify the source and I believe them to be true. Where the source of my understanding or information is from the Claimants' solicitors, I have identified this in the Supplemental Witness Statement but without any waiver of legal professional privilege.

1

3.  I have not attached the documents to which I refer in this Supplemental Witness Statement. Instead I have provided document references for those documents. I understand that the document references are the Document Production IDs allocated to the documents by the parties as part of the disclosure in the current proceedings. In certain instances, I have relied upon these documents to refresh my recollections and refer to the specific content of a number of them.

**Digital Safe**

4.  Dr Lynch states the following at paragraph 448(a) of his Witness Statement: "*Digital Safe licences had value to customers and could be used without significant Autonomy support. Digital Safe licences were used by customers onsite and at third-party data centres, where they were operated by the customers and third-party providers*". I disagree. As I explained at paragraph 18 of Goodfellow 1, only people who are extremely familiar with Digital Safe (i.e. people who work or have worked at Autonomy) can readily understand it and, as I explained at paragraph 19 of Goodfellow 1, although a customer might buy a licence to use Digital Safe software, in practice, the customer would not be able to do anything with it without significant Autonomy support because only Autonomy could build and operate and thereafter manage Digital Safe. Dr Lynch goes on to assert the following as support for his statements:

    (a) "*Digital Safe was written in industry-standard language and protocol...*" (paragraph 448(a)). Dr Lynch similarly states that: "*Digital Safe was not exceptionally complex—it was written in industry-standard language that could be understood by most qualified engineers*" (paragraph 470). Digital Safe was, like the vast majority of software, written in industry standard language. That does not mean, though, that a Digital Safe system could be practically built and managed by most (non-Autonomy) qualified engineers, or that they could easily understand how it worked. What Dr Lynch says here is, to my mind, the equivalent of saying that the topic of any book that is written in English is capable of being understood by someone who speaks English; you can read the words on the page without properly understanding what is being said.

    (b) "*The Digital Safe code base was also sold standalone under the brand name Autonomy Consolidated Archive (or ACA)*" (paragraph 448(a)); and "*Digital Safe (sometimes sold under the brand name ACA) was sold as a standalone solution*" (paragraph 470). As I explained at paragraph 25(i) of Goodfellow 1, ACA was used by Autonomy as an umbrella term for various archiving solutions. Digital Safe itself was not provided as a standalone solution because it required Autonomy implementation and operation services. The on-premise ACA products, for example EAS and CAMM, could be and often were sold on a standalone basis. The

2

HP-SEC-02933706

on-premise ACA products may have shared some code with Digital Safe, but that does not mean that they were the same solutions, nor that they required the same level of input and involvement from Autonomy to implement and manage. As an extreme example, I could probably show that Digital Safe and Facebook share some code – such is the nature of software engineering – but they are clearly not the same thing.

**Hardware**

5. Dr Lynch states at paragraph 126 of his Witness Statement: "*Autonomy sold several different types of hardware, including: servers and storage, often to customers with significant archiving needs; laptops and PCs, at times as part of a customer's technology refresh; ….. and customised hardware to run a specific solution for a customer*"; at paragraph 127 of his Witness Statement: "*Hardware could be pre-loaded with software or sold without any software preloaded, but subsequently intended for use with Autonomy's software. For example, Autonomy sold servers to some of its larger software customers with significant archiving needs. Depending on the customer's need, the servers were at times sold with Autonomy software pre-loaded and at other times sold without software pre-loaded. In the latter situation, it was expected or hoped that the customer or Autonomy would load the software onto the servers at the site where they would be used*"; and at paragraph 130 of his Witness Statement: "*In Q3 2009 CitiGroup bought EMC hardware from Autonomy for $18.6 million….. CitiGroup ran Autonomy on hardware it purchased from Autonomy.*"

6. As I said at paragraph 7 of Goodfellow 1, Digital Safe was Autonomy's hosted archiving offering, although on occasion customers asked for it to be deployed on their own premises (with Autonomy providing the initial implementation services, followed by 24/7 managed services – see paragraph 24 of Goodfellow 1). Citibank was one such customer, as I explained at paragraph 25(e) of Goodfellow 1.

7. I have been shown a copy of document headed "*Affiliated Computer Services EMC Quote(s) for Resell to Autonomy*" containing the supplier quotes for the EMC hardware that Autonomy sold to Citibank in Q3 2009 {**D003626343**}. I have looked at the quotes that were for more than $1,000,000 (see pages 1, 3, 4, 6, 18 and 26 of the document) and been asked by the Claimants' solicitors whether any of the hardware that was the subject of those quotes was used for Citibank's on-premise Digital Safe. The answer is "no". For the few customers who wanted to have Digital Safe deployed on their own premises, "white-label" hardware was used. Whilst it would technically have been possible for the EMC hardware to have been used for this purpose in the future, this would have been a very significant project that I would have been aware of at the time as a person at Autonomy with oversight of Autonomy's hosted offerings. The same

HP-SEC-02933707

applies to any Dell or Hitachi servers that Autonomy purchased and on-sold to customers. Customising the servers for customers' on-premise Digital Safes would have been a very significant project that I would have been aware of at the time.

8. Dr Lynch also states at paragraph 127 of his Witness Statement: "*At times, for one-stop shopping, customers would buy hardware such as laptops from Autonomy. These could be used with Autonomy software that ran on laptops (such as Legal Hold) and with many other types of software.*" It is true that a portion of Legal Hold could be run on laptops (as one of its functions is to collect data from laptops); but I struggle to see why it follows that customers with or wanting Legal Hold would therefore buy laptops from Autonomy. To my mind, there is no logical connection between the two.

9. Dr Lynch also states at paragraph 138(b) of his Witness Statement: "*There were several other benefits to the company in occasionally selling hardware at a loss. For example, Autonomy could leverage its buying power to negotiate discounts on hardware that we needed for our own storage centres. Autonomy purchased hardware from companies like EMC and Dell. Having purchased hardware from them for onward sale to various strategically important customers of Autonomy, we were better placed to negotiate discounts when it came to buying hardware for Autonomy itself.*" I was not aware of Autonomy ever exercising such leverage when purchasing hardware for its own use and doubt that this happened. In the case of Hitachi, who I understand from the Claimants' solicitors is one of the hardware manufacturers whose hardware Autonomy resold to third party customers, Autonomy never purchased Hitachi hardware for its own internal use.

### DiscoverTechnologies LLC ("DiscoverTech") and Citi

10. Citi was an existing Zantaz/Autonomy customer, which, by 2010, had become one of Autonomy's largest accounts. I had a significant amount of involvement in Autonomy's relationship with Citi. As I explained at paragraph 25(e) of Goodfellow 1, Citi used an on-premise hybrid of EAS and Digital Safe that was called First Archive.

11. During Q1 2010, I was involved in Autonomy's attempts to conclude a sale to Citi of archive storage cells (a hardware product with software embedded). Citi had a pressing need for more storage cells to increase the capacity in its archive as it was at risk of running out of storage {**D002967233**}. My role in this transaction primarily related to monitoring Citi's storage cell requirements so that storage cells could be ordered and implemented in good time.

12. A great deal of effort was put into concluding a transaction with Citi by quarter end. For example, on 15 March 2010, Mr Hussain emailed Robert Mark (an Autonomy salesperson), copying me in, stating: "*It is vital we get a deal out of citi for additional

4

*servers ... I authorize you to provide the further 10% discount for a deal this quarter*" {**D002912559**}. On 16 March 2010, Mr Hussain sent a further email to Mr Mark (copied to me) instructing Mr Mark to "*offer 35% discount on the larger deal*" to Citi, and responded on 17 March 2010 "*[i]f he says no give him another 5%*" bringing the total authorised discount to 40% {**D002898019**}.

13. On 18 March 2010, Mr Hussain sent a "*[s]pecial end of quarter offer*" to Citi (which was forwarded to me and Mr Mark that same day) {**D002892071**}. The revised proposal included both a 6 month (32 cells) and 12 month (64 cells) requirement at 25% and 35% reductions respectively. The total price for the 12 month capacity (64 cells) plus 1 year's maintenance and support was $5,488,538.

14. I have been shown a copy of an email dated 25 March 2010 in which Mr Mark emailed Mr Crumbacher confirming that the Citi storage cell deal appeared "*dead for the quarter*" but that he and Mr Hussain were "*taking one last run at it*" {**D002849855**}. The deal did not close in Q1 2010.

15. On 31 March 2010, Zantaz entered into a sales agreement with DiscoverTech for end-user Citi for 62 instances of "*Zantaz Digital Safe Smart Cell Software*" (the software component of the archive storage cells) for $5,775,000 (comprising $5.5 million for a software licence and $275,000 for one year's maintenance and support) {**D001290987**} ("**the DiscoverTech VAR Agreement**"). I have been shown a copy of an email from Alex Con Hon (of Autonomy) to Malcolm Hyson (of DiscoverTech) dated 31 March 2010 confirming that the "*Zantaz Digital Safe Software*" was ready to download on Autonomy's Customer Support Site (CSS) {**D002805094**}.

16. In an email dated 31 March 2010 from Mr Crumbacher to Mr Egan (copied to me and Mr Scott), Mr Crumbacher referred to a conversation which he had just had with me where I informed him that "*this is no longer a hardware resale deal but, instead, a software resale*" {**D002814230**}. I do not recall the events leading up to this conversation specifically but I believe that I received a phone call from Mr Crumbacher that day (31 March 2010) where he asked for the storage cells to be shipped immediately (to DiscoverTech). I would have explained that this was impossible as it required physical delivery of both hardware and software and we did not have the required hardware available to deliver. I confirmed that we could, though, deliver the software almost instantly. I recall that it was Autonomy's focus to deliver a product, whether hardware or software, by the end of the quarter to enable it to recognise revenue. Delivering software was the only means of achieving that.

17. I was aware at the time of the existence of the DiscoverTech VAR Agreement and that the DiscoverTech VAR Agreement was for software only (not hardware with the software

HP-SEC-02933709

embedded, as was under negotiation between Autonomy and Citi). However, I did not appreciate at the time, that the software was licensed under the DiscoverTech VAR Agreement for substantially the same price as the storage cell deal that was being discussed between Autonomy and Citi (which included hardware and software). This struck me as odd when I learned about it as I would have expected the price paid by DiscoverTech for the software alone to be materially less than the price which we had been discussing with Citi for delivery of the storage cells (which included the hardware on which the software was to be loaded).

18. In April 2010, Citi expressed renewed interest in purchasing archive storage cells from Autonomy (see for example {D002786365}). Attempts were made to encourage Citi to transact through DiscoverTech. However, in an email dated 14 May 2010 from Mr Mark to me, Mr Mark confirmed "*Citi won't do a reseller deal*" {D002608694}. Citi didn't want to go through the lengthy and complex process of setting up a new vendor.

19. Instead, on 9 September 2010, Zantaz entered into a direct agreement with Citi relating to the sale of 48 "*Archive Storage Cells*" (a hardware product with software embedded) to be "*used in connection with First Archive Systems*" for $4,193,280 {D000351961}. Autonomy delivered the storage cells directly to Citi. In fact, a number of storage cells were shipped to Citi in advance of the direct agreement being signed to cover Citi for the immediate period {D002130739}.

20. As far as I am aware, other than the fact DiscoverTech was party to the DiscoverTech VAR Agreement, DiscoverTech played no role in the transaction between Autonomy and Citi. Given my involvement with Citi, if DiscoverTech was so involved, I would expect to have known about it. Furthermore, as far as I am aware, the negotiations with Citi concerned only the sale of archive storage cells (a combination of hardware and software), not a sale of the software only.

**StorHouse**

21. At paragraph 426 of his Witness Statement, Dr Lynch states: "*StorHouse was being used by customers in the intelligence community*". Although I did for a period of time have security clearance, that had expired by the end of Q4 2009 when Autonomy first bought StorHouse, so if StorHouse was subsequently used by the intelligence community, I would not have had detail of the precise use case. However, given my role as Chief Technology Officer of Infrastructure and my involvement with StorHouse (as I described at paragraphs 66 to 79 of Goodfellow 1), if StorHouse was used by customers in the intelligence community, I would expect to have known about it in general terms, even if I did not have detailed knowledge of the specific use to which it was being put. As far as

HP-SEC-02933710

I am aware, StorHouse was never used by a customer, whether in the intelligence community or otherwise (see also paragraphs 77 and 78 of Goodfellow 1).

22. At paragraph 419 of his Witness Statement, Dr Lynch states that *"Autonomy had prospects lined up that needed the software [StorHouse] and had been asked to provide a solution for a highly classified intelligence application, which involved handling structured data. For these reasons, it was necessary to acquire the software reasonably quickly"*. I was not aware at the time (and am not aware now) of any of the *"prospects"* that Dr Lynch refers to. As I explained at paragraphs 74 to 79 of Goodfellow 1, I was involved in Autonomy's unsuccessful attempts to integrate StorHouse with Digital Safe. If Autonomy genuinely intended to use StorHouse for other use cases for particular customers, again, I would expect to have known about it (notwithstanding that I did not have security clearance at the relevant time), even if I did not know the specific details of the particular use case.

I believe that the facts stated in this Supplemental Witness Statement are true.

*...Goodfellow...*

SIGNED

CHRISTOPHER JAMES ROBIN GOODFELLOW

17th November 2018

DATED

7

HP-SEC-02933711

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | C J R Goodfellow |
| 3. | Statement No | 2 |
| 4. | Date | 17 November 2018 |

<u>Claim No. HC-2015-001324</u>

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (CHD)**

**B E T W E E N:**

(1)  ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)
(2)  HEWLETT-PACKARD VISION BV
(3)  AUTONOMY SYSTEMS LIMITED
(4)  HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.

**Claimants**

-and-

(1) MICHAEL RICHARD LYNCH
(2) SUSHOVAN TAREQUE HUSSAIN

**Defendants**

---

**SUPPLEMENTAL WITNESS STATEMENT OF**
**CHRISTOPHER JAMES ROBIN GOODFELLOW**

---

Travers Smith LLP
10 Snow Hill
London  EC1A 2AL
Tel: 020-7295 3000
Fax: 020-7295 3500
Ref: TPR/AAK/JJB/SEL

HP-SEC-02933712

|   |                          |                |
|---|--------------------------|----------------|
| 1. | On behalf of            | Claimants      |
| 2. | Initials/Surname of witness | C J R Goodfellow |
| 3. | Statement No            | 2              |
| 4. | Date                    | 17 November 2018 |

<u>Claim No. HC-2015-001324</u>

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>BUSINESS AND PROPERTY COURTS</u>
<u>OF ENGLAND AND WALES</u>
<u>BUSINESS LIST (ChD)</u>

B E T W E E N:

(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)
(2) HEWLETT-PACKARD VISION BV
(3) AUTONOMY SYSTEMS LIMITED
(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.

<u>**Claimants**</u>

-and-

(1) MICHAEL RICHARD LYNCH
(2) SUSHOVAN TAREQUE HUSSAIN

<u>**Defendants**</u>

---

INDEX OF EXHIBITS TO THE
SUPPLEMENTAL WITNESS STATEMENT OF CHRISTOPHER JAMES ROBIN GOODFELLOW

---

|   | Paragraph | Production ID |
|---|-----------|---------------|
| 1 | 7         | D003626343    |
| 2 | 11        | D002967233    |
| 3 | 12        | D002912559    |
| 4 | 12        | D002898019    |
| 5 | 13        | D002892071    |
| 6 | 14        | D002849855    |
| 7 | 15        | D001290987    |
| 8 | 15        | D002805094    |

HP-SEC-02933713

| 9  | 16 | D002814230 |
|----|----|------------|
| 10 | 18 | D002786365 |
| 11 | 18 | D002608694 |
| 12 | 19 | D000351961 |
| 13 | 19 | D002130739 |

HP-SEC-02933714