1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 11

1 | ALEX G. TSE (CABN 152348)
Acting United States Attorney

2

BARBARA J. VALLIERE (DCBN 439353)
3 | Chief, Criminal Division

4 | ADAM A. REEVES (NYBN 2363877)
ROBERT S. LEACH (CABN 196191)
5 | WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

6

450 Golden Gate Avenue, Box 36055
7 | San Francisco, California 94102-3495
Telephone: (415) 436-7534
8 | Fax: (415) 436-7234
Robert.Leach@usdoj.gov
9 | Adam.Reeves@usdoj.gov
William.Frentzen@usdoj.gov

10

Attorneys for United States of America
11

12 | UNITED STATES DISTRICT COURT

13 | NORTHERN DISTRICT OF CALIFORNIA

14 | SAN FRANCISCO DIVISION

15 | IN RE GRAND JURY INVESTIGATION ) Case No. CR 14-90491 MISC EMC
NO. 2012R02242,                     )
16 |                                 ) **UNDER SEAL**
                                    )
17 |                                 ) JULY 27, 2018 DECLARATION OF
                                    ) AUSA ROBERT S. LEACH IN
18 |                                 ) SUPPORT OF THE UNITED STATES'
                                    ) *EX PARTE* APPLICATION FOR AN
19 |                                 ) ORDER SUSPENDING THE
                                    ) RUNNING OF THE STATUTE OF
20 |                                 ) LIMITATIONS PURSUANT TO 18
                                    ) U.S.C. § 3292
21 |                                 )
                                    )
22 |

ORIGINAL
FILED

JUL 27 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

F    ED

JUL 27 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ALEX G. TSE (CABN 152348)
Acting United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

ADAM A. REEVES (NYBN 2363877)
ROBERT S. LEACH (CABN 196191)
WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7534
    Fax: (415) 436-7234
    Robert.Leach@usdoj.gov
    Adam.Reeves@usdoj.gov
    William.Frentzen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GRAND JURY INVESTIGATION NO. 2012R02242, | Case No. CR 14-90491 MISC EMC |
| | **UNDER SEAL** |
| | JULY 27, 2018 DECLARATION OF AUSA ROBERT S. LEACH IN SUPPORT OF THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE RUNNING OF THE STATUTE OF LIMITATIONS PURSUANT TO 18 U.S.C. § 3292 |

I, Robert S. Leach, state the following:

    1.    I am an Assistant United States Attorney for the Northern District of California. I am one of the prosecutors assigned to this case. I submit this declaration in support of the United States' *Ex Parte* Application for an Order Suspending the Running of the Statute of Limitations Pursuant to 18 U.S.C. § 3292, filed concurrently.

USAO 00003306

1    2.    A grand jury in this district (Grand Jury 17-3) is conducting an investigation of former

2    senior officers of Autonomy Corporation plc ("Autonomy"), including former Chief Executive Officer

3    Michael Lynch, former Vice President of Finance Stephen Chamberlain, and former Chief Operating

4    Officer and General Counsel Andrew Kanter, for the following possible criminal offenses: 15 U.S.C.

5    §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18

6    U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities fraud), and 18 U.S.C. § 1349 (attempt and

7    conspiracy). To date, no indictment has been returned with respect to Lynch, Chamberlain, and Kanter.

8    On November 10, 2016, a prior grand jury (Grand Jury 16-1) returned an indictment against Sushovan

9    Hussain, Autonomy's former Chief Financial Officer, charging him with one count of conspiracy to

10   commit wire fraud, in violation of 18 U.S.C. § 1349, and fourteen counts of wire fraud, in violation of

11   18 U.S.C. § 1343. On May 4, 2017, the grand jury returned a superseding indictment, adding a count of

12   securities fraud, in violation of 18 U.S.C. § 1348. I understand Grand Jury 16-1 expired on or about

13   November 16, 2017. The government has been presenting evidence to Grand Jury 17-3 since on or

14   about March 15, 2018.

15   3.    Attached as Exhibit 1 is a true and correct copy of the January 29, 2016 Declaration of

16   AUSA Robert S. Leach in Support of the United States' *Ex Parte* Application for an Order Suspending

17   the Statute of Limitations Pursuant to 18 U.S.C. § 3292.

18   4.    Attached as Exhibit 2 is a true and correct copy of the June 7, 2016 Declaration of AUSA

19   Robert S. Leach in Support of the United States' *Ex Parte* Application for an Order Suspending the

20   Running of the Statute of Limitations Pursuant to 18 U.S.C. § 3292.

21   5.    In addition to the official requests attached to my prior declarations, the United States has

22   gathered additional evidence from and conducted numerous witness interviews in foreign countries.

23   6.    On May 1, 2017, the Office of International Affairs of the Department of Justice

24   submitted a Supplemental Request for Assistance in the Investigation of Autonomy Corporation to the

25   Central Authority of the United Kingdom (the "Supplemental UK MLAT"). A true and correct copy of

26   the Supplemental UK MLAT and the transmittal letter are attached as Exhibit 3.

27

28

USAO 00003307

1    7.    Attached as Exhibit 4 is a true and correct copy of cover letter I received from OIA

2 enclosing a CD from the UK's Serious Fraud Office, which included documents from Slaughter and

3 May responsive to the Supplemental UK MLAT.  Attached as Exhibit 5 is a true and correct copy of the

4 cover letter from the UK Central Authority dated December 13, 2017.  The United States has not yet

5 received documents in response to the request for Ernst & Young documents.

6    8.    Attached as Exhibit 6 is a true and correct copy of the Court's January 29, 2016 Order

7 Suspending the Running of the Statute of Limitations Under 18 U.S.C. § 3292.

8    9.    Attached as Exhibit 7 is a true and correct copy of the Court's June 7, 2016 Second Order

9 Suspending the Running of the Statute of Limitations Under 18 U.S.C. § 3292.

10    I declare under penalty of perjury that the foregoing is true and correct.

11 Dated:  July 27, 2018

12

13    ROBERT S. LEACH
    Assistant United States Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Leach Decl. re *Ex Parte* Applic. re Statute of Limitations
Case No. CR-14-90491 MISC EMC                3

# EXHIBIT 1

USAO 00003309

1 | BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

2 |

3 | DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

4 | ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)

5 | Assistant United States Attorneys

6 | 450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

7 | Telephone: (415) 436-7534
Fax: (415) 436-7234

8 | Robert.Leach@usdoj.gov
Adam.Reeves@usdoj.gov

9 |

Attorneys for United States of America

10 |

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14 | IN RE GRAND JURY INVESTIGATION        )   Case No. CR 14-90491 MISC EMC
NO. 2012R02242,                       )

15 |                                       )   **UNDER SEAL**
                                        )

16 |                                       )   DECLARATION OF AUSA ROBERT S.
                                        )   LEACH IN SUPPORT OF THE

17 |                                       )   UNITED STATES' *EX PARTE*
                                        )   APPLICATION FOR AN ORDER

18 |                                       )   SUSPENDING THE STATUTE OF
                                        )   LIMITATIONS PURSUANT TO 18

19 |                                       )   U.S.C. § 3292
                                        )

20 | _____    )

21 | I, Robert S. Leach, state the following:

22 |        1.       I am an Assistant United States Attorney for the Northern District of California. I am one

23 | of the prosecutors assigned to this case. I submit this declaration in support of the United States' *Ex*

24 | *Parte* Application for an Order Suspending the Statute of Limitations Pursuant to 18 U.S.C. § 3292,

25 | filed concurrently.

26 |        2.       A grand jury in this district is conducting an investigation of former senior officers of

27 | Autonomy Corporation plc ("Autonomy"), including former Chief Executive Officer Michael Lynch,

28 | former Chief Financial Officer Sushovan Hussain, former Vice President of Finance Stephen

LEACH DECL. RE EX PARTE APPLIC. RE STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC

1  Chamberlain, and former Chief Operating Officer and General Counsel Andrew Kanter, for the

2  following possible criminal offenses: 15 U.S.C. §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371

3  (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities

4  fraud), and 18 U.S.C. § 1349 (attempt and conspiracy).

5                                     The Investigation

6        3.    The following information is to the best of my knowledge and belief and is based on

7  information provided to me by federal law enforcement officers, information obtained in connection

8  with the investigation, and my review of documents and testimony relevant to this investigation,

9  including the documents attached hereto.

10       4.    Autonomy was a software developer with dual headquarters in the United Kingdom and

11  San Francisco, California. Prior to October 2011, Autonomy was a publicly traded company whose

12  shares were listed on the London Stock Exchange. As a public company, Autonomy issued quarterly

13  and annual financial statements that were disseminated to the public by means of interstate and foreign

14  wires. In or about October 2011, Hewlett-Packard Company ("HP"), headquartered in Palo Alto,

15  California, bought Autonomy for approximately $11 billion. Among other things, the grand jury is

16  investigating whether executives at Autonomy fraudulently inflated Autonomy's revenues in its

17  financial statements and whether HP was defrauded by executives at Autonomy because HP relied on

18  the alleged accuracy of Autonomy's financial statements in deciding to buy Autonomy.

19       5.    In its statements to the public (two of which are attached below), Autonomy claimed that

20  its financial statements were prepared in accordance with International Financial Reporting Standards

21  ("IFRS"). Attached to this declaration as Exhibit A is a true and correct copy of International

22  Accounting Standard 18 *Revenue*. Under this standard, revenue from the sale of goods shall be

23  recognized when all of the following conditions have been satisfied:

24            (a)    the entity has transferred to the buyer the significant risks and
                     rewards of ownership of the goods;

25
              (b)    the entity retains neither continuing managerial involvement to the
26                   degree usually associated with ownership nor effective control
                     over the goods sold;

27
              (c)    the amount of revenue can be measured reliably;

28

USAO 00003311

(d)     it is probable that the economic benefits associated with the transaction will flow to the entity; and

(e)     the costs incurred or to be incurred in respect of the transaction can be measured reliably.

6.     Among other things, the grand jury is investigating whether executives at Autonomy fraudulently inflated Autonomy's alleged revenue by improperly recording revenue on software sales in violation of certain of the above-quoted criteria in IFRS. More specifically, the grand jury is investigating, among other possible schemes, whether executives at Autonomy used certain so-called "value added resellers" ("VARs") to carry out a scheme to falsify Autonomy's financial statements by pretending Autonomy had complied with IFRS when it really had not. Evidence gathered by the grand jury indicates that, from 2009 to 2011, Autonomy often recorded revenue on alleged sales to certain VARs who purportedly bought the software for resale to a specific customer or "end user." Evidence gathered by the grand jury also indicates that Autonomy recognized revenues from sales to certain VARs even though (1) Autonomy did not transfer the significant risks and rewards of ownership of the goods; (2) Autonomy did retain continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold; and (3) it was not probable that the economic benefits associated with the transaction would flow to Autonomy.

7.     The grand jury investigation extends to multiple VAR transactions which Autonomy may have used to improperly recognize revenue in this manner. At least four of those VAR transactions involve evidence located in foreign countries. Those four transactions involved the following entities: (1) Sales Consulting S.R.L. ("Sales Consulting"); (2) Microtechnologies, LLC ("MicroTech"); (3) Auxilium Tech S.R.L. ("Auxilium"); and (4) Red Ventures S.R.L. ("Red Ventures").

8.     Attached to this declaration as Exhibit B is a true and correct copy of HP-SEC-01406405 to HP-SEC-01406415, which I understand was produced to the Securities and Exchange Commission ("SEC") by HP in a parallel civil investigation, and which purports to be e-mail among Autonomy personnel titled "Poste One off for Your records." The document includes an agreement dated December 31, 2009, in which Autonomy allegedly licensed software to Sales Consulting, a VAR in Rome, Italy, for €1,500,000 for resale to Poste Italiane ("Poste"). My research indicates Poste is in

USAO 00003312

1  Italy.   The document also includes a separate letter dated December 31, 2009, purportedly signed by

2  Kanter.

3       9.     Attached to this declaration as Exhibit C is a true and correct copy of HP-SEC-01429938-

4  951, which I understand was produced to the SEC by HP, and which purports to be a press release titled

5  "Autonomy Corporation PLC Announces Results for the Twelve Months and Fourth Quarter Ended

6  December 31, 2009."

7       10.    Attached to this declaration as Exhibit D is a true and correct copy of HP-SEC-01550349,

8  which I understand was produced to the government by HP.  I understand this is an excerpt from an

9  exhibit to a claim made by HP subsidiaries in a UK court.  According to the document, Autonomy

10  recognized €1,500,000 of the revenue for the sale to Sales Consulting in its Q4 2009 (Year End)

11  financial statements.  Although the government seeks further evidence in Italy to verify this, it appears

12  that, in the end, neither Autonomy nor Sales Consulting ever re-sold the software to Poste or any other

13  end-user; and Sales Consulting never made any payments to Autonomy under the agreement.

14       11.    Attached to this declaration as Exhibit E is a true and correct copy of HP-SEC-01309275-

15  277, which I understand was produced to the SEC by HP, and which purports to be a fax from Sales

16  Consulting advising Autonomy that Sales Consulting had been placed into liquidation.

17       12.    Attached to this declaration as Exhibit F is a true and correct copy of HP-SEC-

18  00129022-23, which I understand was produced to the SEC by HP, and which purports to be a memo

19  from Hussain to Autonomy's board regarding a possible transaction with Bibliotheca Apostolica

20  Vaticana ("BAV"), the Vatican Library, which is located in Vatican City State.

21       13.    Attached to this declaration as Exhibit G is a true and correct copy of HP-SEC-01596101,

22  which I understand was produced to the government by HP, and which purports to be an e-mail from an

23  Autonomy salesman to Hussain and others.  The document suggests that in or around February 2010,

24  Autonomy contemplated partnering with Postecom, S.p.A. ("Postecom"), a subsidiary of Poste located

25  in Rome, Italy, to act as a value added reseller which would resell Autonomy's archiving system to

26  BAV.

27

28

LEACH DECL. RE EX PARTE APPLIC. RE STATUTE OF LIMITATIONS
CASE NO. CR-14-90491 MISC EMC                    4

1    14.    Attached to this declaration as Exhibit H is a true and correct copy of HP-SEC-

2    01596272-276, which I understand was produced to the government by HP, and which purports to be an

3    e-mail from an Autonomy salesman to Hussain and others.  The document suggests that, in late March

4    2010, Autonomy received a letter of intent between Postecom and BAV, which generally stated that

5    Postecom had had preliminary discussions about possible involvement in the archiving project and

6    intended to complete verification activities necessary to complete a collaboration proposal.  The letter of

7    intent further suggested that BAV was seeking financing for the project.  According to its terms, the

8    letter of intent was not binding on Postecom or BAV.  The government's investigation to date

9    demonstrates that, by March 31, 2010, when the Q1 2010 closed, Autonomy had no binding agreement

10   with BAV or Postecom.

11   15.    Attached to this declaration as Exhibit I is a true and correct copy of MICROTECH

12   082784-787, which was marked as Exhibit 265 during grand jury testimony.  The government's

13   investigation to date, based on this document and other information, reveals that, on April 1, 2010, one

14   day after Q1 2010 had closed, Autonomy approached a representative of MicroTech, another VAR

15   based in Virginia, seeking MicroTech's agreement to pay Autonomy $11 million for software,

16   purportedly for resale to BAV.

17   16.    Attached to this declaration as Exhibit J is a true and correct copy of Cronin0003277-280,

18   which was marked as Exhibit 266 during grand jury testimony.  The document reflects that on April 1,

19   2010, Steve Truitt (MicroTech's COO) returned an $11 million purchase order dated March 31, 2010, to

20   John Cronin, who is believed to be a consultant to MicroTech and Autonomy.

21   17.    Attached to this declaration as Exhibit K is a true and correct copy of HP-SEC-01550355,

22   which I understand was produced to the government by HP.  I understand this is an excerpt from an

23   exhibit to a claim made by HP subsidiaries in a UK court.  According to the document, Autonomy

24   recognized $11 million in revenue on the MicroTech deal.  Based on the government's investigation to

25   date, MicroTech appears to have had no relevant contact with BAV and undertook no efforts to sell

26   Autonomy software to BAV.  While it did make some payments to Autonomy on the $11 million order,

27   MicroTech did so with money from a roundtrip transaction with Autonomy, whereby Autonomy made

28

1   purchases from MicroTech (and a related party) and then MicroTech made payments to Autonomy for

2   the license to BAV. From April 2010 through 2011, Autonomy continued to attempt to consummate a

3   sale of software to BAV or an intermediary, but no deal was reached.

4        18.    Attached to this declaration as Exhibit L is a true and correct copy of a printout from the

5   Vatican Library's website, reflecting that Monsignor Cesare Pasini is the Prefect of the Vatican Library.

6        19.    Attached to this declaration as Exhibits M, N, and O are true and correct copies of HP-

7   SEC-00094071-74, 0094086-88, and 00130127-28, which I understand were produced to the SEC by

8   HP, and which reflect that in and after December 2010, Lynch and Hussain personally met and

9   corresponded with Monsignor Pasini about the possible digitization project.

10       20.    Attached to this declaration as Exhibit P is a true and correct copy of HP-SEC-

11  00520732, which I understand was produced to the SEC by HP, and which appears to be an e-mail dated

12  April 11, 2010, in which Kanter was asked to prepare a draft license agreement between Autonomy and

13  Auxilium.

14       21.    Attached to this declaration as Exhibit Q is a true and correct copy of HP-SEC-1596378-

15  392, which I understand was produced to the government by HP, and which appears to be Kanter's

16  response.

17       22.    Attached to this declaration as Exhibit R is a true and correct copy of HP-SEC-01656672-

18  73, which was produced to the government by HP, and which reflects that Auxilium signed a product

19  schedule, dated March 31, 2010, to pay €1,300,000 for the right to sublicense Autonomy software to

20  BAV for a specified number of users and to pay €125,000 in support and maintenance, and that

21  Autonomy recognized €1,300,000 in revenue on the Auxilium transaction in Q1 2010. The

22  government's investigation to date reveals that Auxilium made no payments to Autonomy and Auxilium

23  does not appear to have made any sale of Autonomy software to BAV.

24       23.    Attached to this declaration as Exhibit S is a true and correct copy of HP-SEC-01639621-

25  633, which I understand was produced to the government by HP, and which appears to be Autonomy's

26  press release for Q1 2010 stating that Autonomy exceeded earnings expectations of analysts following

27  Autonomy stock.

28

USAO 00003315

1    24.    Attached to this declaration as Exhibit T is a true and correct copy of HP-SEC-01550364,

2    which I understand was produced to the government by HP. I understand this is an excerpt from an

3    exhibit to a claim made by HP subsidiaries in a UK court. According to the document, Autonomy

4    recognized revenue on a license agreement, dated September 30, 2010, whereby Autonomy purported to

5    license software to Red Ventures for €2,000,000 for resale to Poste. Payment under the agreement was

6    due beginning December 2010. Red Ventures made no payments by that date, or at any point. Red

7    Ventures does not appear to have made any sale of the listed software to Poste, nor did Autonomy ever

8    consummate a sale of such software to Poste. The government's investigation to date reveals that

9    Autonomy appears to have been attempting to sell software directly to Poste prior to September 30,

10   2010, and after the purported sale to Red Ventures. Documents produced in the investigation reflect

11   that Red Ventures was located in Italy.

12                                        The Official Requests

13   25.    Attached to this declaration as Exhibit U is a true and correct copy of a Diplomatic Note,

14   which was sent at my office's request on August 10, 2015, by the Embassy of the United States of

15   America to the Holy See to the Secretariat of State for the Holy See and the Vatican City State. The

16   Diplomatic Note attached a list of questions and documents the USAO and FBI wished to discuss.

17   26.    Attached to this declaration as Exhibit V is a true and correct copy of a Note Verbale

18   dated October 8 2015, which was received from the Secretariat of State for the Holy See and the Vatican

19   City State.

20   27.    Attached to this declaration as Exhibit W is a true and correct copy of Diplomatic Note,

21   No. 3-2016. On January 14, 2016, at my office's request, the Embassy of the United States of America

22   to the Holy See delivered the Diplomatic Note to the Secretariat of State, enclosing a Request for

23   International Judicial Assistance from the Office of International Affairs of the Department of Justice

24   ("OIA"). The Secretariat of State has requested a translated version of the request, which is being

25   prepared, and has yet to provide a substantive response.

26   28.    On December 23, 2015, OIA made an official request to the Central Authority of Italy for

27   legal assistance in obtaining evidence, pursuant to the 2006 U.S.-Italy Mutual Legal Assistance

28

USAO 00003316

1  Instrument.  A true and correct copy of the letter transmitting the request, which at the time had not been

2  translated into Italian, is attached as Exhibit X.

3      29.  On January 4, 2016, OIA delivered a translated version of the request to the Central

4  Authority of Italy.  A true and correct copy of the letter transmitting the translated version of the request

5  is attached as Exhibit Y.  The request seeks business records, including agreements, correspondence, and

6  e-mails, from Sales Consulting, Auxilium, Red Ventures, Postecom, and Poste, which will evidence

7  whether Autonomy appropriately recorded revenue on the transactions.  Specifically, the request seeks:

8      • From Sales Consulting, for the period December 2009 to October
9        2011, all agreements with Poste and/or Autonomy; all communications
         with Autonomy relating to any sale to Sales Consulting and/or any
10       resale of Autonomy software by Sales Consulting; all communications
         with Poste relating to any sale of Autonomy software; all documents
11       reflecting efforts by Sales Consulting to resell Autonomy software;
         and financial statements for the periods ended December 31, 2009,
12       2010, and 2011.

13     • From Auxilium, for the period December 2009 to October 2011, all
14       agreements with BAV (or any other unit/agency of the Vatican City
         State and/or Holy See) and/or Autonomy; all communications with
15       Autonomy relating to any sale to Auxilium and/or any resale of
         Autonomy software by Auxilium; all communications with BAV or
16       Postecom relating to any sale of Autonomy software; all documents
         reflecting efforts by Auxilium to resell Autonomy software; and
17       financial statements for the periods ended December 31, 2009, 2010,
18       and 2011.

19     • From Postecom, for the period December 2009 to October 2011,  all
20       agreements with BAV relating to Autonomy; all agreements with
         Autonomy; all communications with Autonomy relating to any sale of
21       software to BAV; all communications with BAV relating to any sale
         of Autonomy software; and all documents reflecting efforts by
22       Auxilium and/or Postecom to resell Autonomy software.

23     • From Red Ventures, for the period December 2009 to October 2011,
24       all agreements with Poste and/or Autonomy; all communications with
         Autonomy relating to any sale of software to Poste and/or any resale of
25       Autonomy software by Red Ventures; all communications with Poste
         relating to any sale of Autonomy software; all documents reflecting
26       efforts by Red Ventures to resell Autonomy software; and financial
         statements for the periods ended December 31, 2009, 2010, and 2011.

27

28

USAO 00003317

1
    • From Poste, for the period December 2009 to October 2011, all
2
      agreements with Sales Consulting, Red Ventures, and/or Autonomy;
      all communications with Autonomy relating to any sale of certain
3
      software to Poste; and all communications with Sales Consulting
      and/or Red Ventures relating to any sale and/or resale of Autonomy
4
      software.

5  Italy has not yet responded to the MLAT.

6      I declare under penalty of perjury that the foregoing is true and correct.

7  Dated:  January 29, 2016

8

9                          ROBERT S. LEACH
                        Assistant United States Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

USAO 00003318

# EXHIBIT A

USAO 00003319

EC staff consolidated version as of 16 September 2009.          EN – EU IAS 18
FOR INFORMATION PURPOSES ONLY

# International Accounting Standard 18
## *Revenue*

## Objective

Income is defined in the *Framework for the Preparation and Presentation of Financial Statements* as increases in economic benefits during the accounting period in the form of inflows or enhancements of assets or decreases of liabilities that result in increases in equity, other than those relating to contributions from equity participants. Income encompasses both revenue and gains. Revenue is income that arises in the course of ordinary activities of an entity and is referred to by a variety of different names including sales, fees, interest, dividends and royalties. The objective of this Standard is to prescribe the accounting treatment of revenue arising from certain types of transactions and events.

The primary issue in accounting for revenue is determining when to recognise revenue. Revenue is recognised when it is probable that future economic benefits will flow to the entity and these benefits can be measured reliably. This Standard identifies the circumstances in which these criteria will be met and, therefore, revenue will be recognised. It also provides practical guidance on the application of these criteria.

## Scope

1    This Standard shall be applied in accounting for revenue arising from the following transactions and events:

   (a)    the sale of goods;

   (b)    the rendering of services; and

   (c)    the use by others of entity assets yielding interest, royalties and dividends.

2    This Standard supersedes IAS 18 *Revenue Recognition* approved in 1982.

3    Goods includes goods produced by the entity for the purpose of sale and goods purchased for resale, such as merchandise purchased by a retailer or land and other property held for resale.

4    The rendering of services typically involves the performance by the entity of a contractually agreed task over an agreed period of time. The services may be rendered within a single period or over more than one period. Some contracts for the rendering of services are directly related to construction contracts, for example, those for the services of project managers and architects. Revenue arising from these contracts is not dealt with in this Standard but is dealt with in accordance with the requirements for construction contracts as specified in IAS 11 *Construction Contracts*.

5    The use by others of entity assets gives rise to revenue in the form of:

   (a)    interest—charges for the use of cash or cash equivalents or amounts due to the entity;

   (b)    royalties—charges for the use of long-term assets of the entity, for example, patents, trademarks, copyrights and computer software; and

   (c)    dividends—distributions of profits to holders of equity investments in proportion to their holdings of a particular class of capital.

6    This Standard does not deal with revenue arising from:

   (a)    lease agreements (see IAS 17 *Leases*);

   (b)    dividends arising from investments which are accounted for under the equity method (see IAS 28 *Investments in Associates*);

1

USAO 00003320

    (c)    insurance contracts within the scope of IFRS 4 *Insurance Contracts*;

    (d)    changes in the fair value of financial assets and financial liabilities or their disposal (see IAS 39 *Financial Instruments: Recognition and Measurement*);

    (e)    changes in the value of other current assets;

    (f)    initial recognition and from changes in the fair value of biological assets related to agricultural activity (see IAS 41 *Agriculture*);

    (g)    initial recognition of agricultural produce (see IAS 41); and

    (h)    the extraction of mineral ores.

## Definitions

7    The following terms are used in this Standard with the meanings specified:

    *Revenue* is the gross inflow of economic benefits during the period arising in the course of the ordinary activities of an entity when those inflows result in increases in equity, other than increases relating to contributions from equity participants.

    *Fair value* is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction.

8    Revenue includes only the gross inflows of economic benefits received and receivable by the entity on its own account. Amounts collected on behalf of third parties such as sales taxes, goods and services taxes and value added taxes are not economic benefits which flow to the entity and do not result in increases in equity. Therefore, they are excluded from revenue. Similarly, in an agency relationship, the gross inflows of economic benefits include amounts collected on behalf of the principal and which do not result in increases in equity for the entity. The amounts collected on behalf of the principal are not revenue. Instead, revenue is the amount of commission.

## Measurement of revenue

9    **Revenue shall be measured at the fair value of the consideration received or receivable.**

10    The amount of revenue arising on a transaction is usually determined by agreement between the entity and the buyer or user of the asset. It is measured at the fair value of the consideration received or receivable taking into account the amount of any trade discounts and volume rebates allowed by the entity.

11    In most cases, the consideration is in the form of cash or cash equivalents and the amount of revenue is the amount of cash or cash equivalents received or receivable. However, when the inflow of cash or cash equivalents is deferred, the fair value of the consideration may be less than the nominal amount of cash received or receivable. For example, an entity may provide interest free credit to the buyer or accept a note receivable bearing a below-market interest rate from the buyer as consideration for the sale of goods. When the arrangement effectively constitutes a financing transaction, the fair value of the consideration is determined by discounting all future receipts using an imputed rate of interest. The imputed rate of interest is the more clearly determinable of either:

    (a)    the prevailing rate for a similar instrument of an issuer with a similar credit rating; or

    (b)    a rate of interest that discounts the nominal amount of the instrument to the current cash sales price of the goods or services.

    The difference between the fair value and the nominal amount of the consideration is recognised as interest revenue in accordance with paragraphs 29 and 30 and in accordance with IAS 39.

---

See also SIC-31 *Revenue — Barter Transactions Involving Advertising Services*

2

USAO 00003321

EC staff consolidated version as of 16 September 2009.
FOR INFORMATION PURPOSES ONLY

EN – EU IAS 18

12    When goods or services are exchanged or swapped for goods or services which are of a similar nature and value, the exchange is not regarded as a transaction which generates revenue. This is often the case with commodities like oil or milk where suppliers exchange or swap inventories in various locations to fulfil demand on a timely basis in a particular location. When goods are sold or services are rendered in exchange for dissimilar goods or services, the exchange is regarded as a transaction which generates revenue. The revenue is measured at the fair value of the goods or services received, adjusted by the amount of any cash or cash equivalents transferred. When the fair value of the goods or services received cannot be measured reliably, the revenue is measured at the fair value of the goods or services given up, adjusted by the amount of any cash or cash equivalents transferred.

## Identification of the transaction

13    The recognition criteria in this Standard are usually applied separately to each transaction. However, in certain circumstances, it is necessary to apply the recognition criteria to the separately identifiable components of a single transaction in order to reflect the substance of the transaction. For example, when the selling price of a product includes an identifiable amount for subsequent servicing, that amount is deferred and recognised as revenue over the period during which the service is performed. Conversely, the recognition criteria are applied to two or more transactions together when they are linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole. For example, an entity may sell goods and, at the same time, enter into a separate agreement to repurchase the goods at a later date, thus negating the substantive effect of the transaction: in such a case, the two transactions are dealt with together.

## Sale of goods

14    Revenue from the sale of goods shall be recognised when all the following conditions have been satisfied:

(a)    the entity has transferred to the buyer the significant risks and rewards of ownership of the goods;

(b)    the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;

(c)    the amount of revenue can be measured reliably;

(d)    it is probable that the economic benefits associated with the transaction will flow to the entity; and

(e)    the costs incurred or to be incurred in respect of the transaction can be measured reliably.

15    The assessment of when an entity has transferred the significant risks and rewards of ownership to the buyer requires an examination of the circumstances of the transaction. In most cases, the transfer of the risks and rewards of ownership coincides with the transfer of the legal title or the passing of possession to the buyer. This is the case for most retail sales. In other cases, the transfer of risks and rewards of ownership occurs at a different time from the transfer of legal title or the passing of possession.

16    If the entity retains significant risks of ownership, the transaction is not a sale and revenue is not recognised. An entity may retain a significant risk of ownership in a number of ways. Examples of situations in which the entity may retain the significant risks and rewards of ownership are:

(a)    when the entity retains an obligation for unsatisfactory performance not covered by normal warranty provisions;

(b)    when the receipt of the revenue from a particular sale is contingent on the derivation of revenue by the buyer from its sale of the goods;

(c)    when the goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity; and

3

USAO 00003322

EC staff consolidated version as of 16 September 2009.                                    EN – EU IAS 18
FOR INFORMATION PURPOSES ONLY

    (d)    when the buyer has the right to rescind the purchase for a reason specified in the sales contract and the entity is uncertain about the probability of return.

17    If an entity retains only an insignificant risk of ownership, the transaction is a sale and revenue is recognised. For example, a seller may retain the legal title to the goods solely to protect the collectibility of the amount due. In such a case, if the entity has transferred the significant risks and rewards of ownership, the transaction is a sale and revenue is recognised. Another example of an entity retaining only an insignificant risk of ownership may be a retail sale when a refund is offered if the customer is not satisfied. Revenue in such cases is recognised at the time of sale provided the seller can reliably estimate future returns and recognises a liability for returns based on previous experience and other relevant factors.

18    Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. In some cases, this may not be probable until the consideration is received or until an uncertainty is removed. For example, it may be uncertain that a foreign governmental authority will grant permission to remit the consideration from a sale in a foreign country. When the permission is granted, the uncertainty is removed and revenue is recognised. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount or the amount in respect of which recovery has ceased to be probable is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

19    Revenue and expenses that relate to the same transaction or other event are recognised simultaneously; this process is commonly referred to as the matching of revenues and expenses. Expenses, including warranties and other costs to be incurred after the shipment of the goods can normally be measured reliably when the other conditions for the recognition of revenue have been satisfied. However, revenue cannot be recognised when the expenses cannot be measured reliably; in such circumstances, any consideration already received for the sale of the goods is recognised as a liability.

## Rendering of services

20    When the outcome of a transaction involving the rendering of services can be estimated reliably, revenue associated with the transaction shall be recognised by reference to the stage of completion of the transaction at the end of the reporting period. The outcome of a transaction can be estimated reliably when all the following conditions are satisfied:

    (a)    the amount of revenue can be measured reliably;

    (b)    it is probable that the economic benefits associated with the transaction will flow to the entity;

    (c)    the stage of completion of the transaction at the end of the reporting period can be measured reliably; and

    (d)    the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.[*]

21    The recognition of revenue by reference to the stage of completion of a transaction is often referred to as the percentage of completion method. Under this method, revenue is recognised in the accounting periods in which the services are rendered. The recognition of revenue on this basis provides useful information on the extent of service activity and performance during a period. IAS 11 also requires the recognition of revenue on this basis. The requirements of that Standard are generally applicable to the recognition of revenue and the associated expenses for a transaction involving the rendering of services.

22    Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount, or the amount in respect of which recovery has ceased to be probable, is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

---

[*]  See also SIC-27 *Evaluating the Substance of Transactions in the Legal Form of a Lease* and SIC-31 *Revenue Barter Transactions Involving Advertising Services*

4

EC staff consolidated version as of 16 September 2009.
FOR INFORMATION PURPOSES ONLY

EN – EU IAS 18

23      An entity is generally able to make reliable estimates after it has agreed to the following with the other parties to the transaction:

     (a)      each party's enforceable rights regarding the service to be provided and received by the parties;

     (b)      the consideration to be exchanged; and

     (c)      the manner and terms of settlement.

     It is also usually necessary for the entity to have an effective internal financial budgeting and reporting system. The entity reviews and, when necessary, revises the estimates of revenue as the service is performed. The need for such revisions does not necessarily indicate that the outcome of the transaction cannot be estimated reliably.

24      The stage of completion of a transaction may be determined by a variety of methods. An entity uses the method that measures reliably the services performed. Depending on the nature of the transaction, the methods may include:

     (a)      surveys of work performed;

     (b)      services performed to date as a percentage of total services to be performed; or

     (c)      the proportion that costs incurred to date bear to the estimated total costs of the transaction. Only costs that reflect services performed to date are included in costs incurred to date. Only costs that reflect services performed or to be performed are included in the estimated total costs of the transaction.

     Progress payments and advances received from customers often do not reflect the services performed.

25      For practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period unless there is evidence that some other method better represents the stage of completion. When a specific act is much more significant than any other acts, the recognition of revenue is postponed until the significant act is executed.

26      **When the outcome of the transaction involving the rendering of services cannot be estimated reliably, revenue shall be recognised only to the extent of the expenses recognised that are recoverable.**

27      During the early stages of a transaction, it is often the case that the outcome of the transaction cannot be estimated reliably. Nevertheless, it may be probable that the entity will recover the transaction costs incurred. Therefore, revenue is recognised only to the extent of costs incurred that are expected to be recoverable. As the outcome of the transaction cannot be estimated reliably, no profit is recognised.

28      When the outcome of a transaction cannot be estimated reliably and it is not probable that the costs incurred will be recovered, revenue is not recognised and the costs incurred are recognised as an expense. When the uncertainties that prevented the outcome of the contract being estimated reliably no longer exist, revenue is recognised in accordance with paragraph 20 rather than in accordance with paragraph 26.

## Interest, royalties and dividends

29      **Revenue arising from the use by others of entity assets yielding interest, royalties and dividends shall be recognised on the bases set out in paragraph 30 when:**

     (a)      **it is probable that the economic benefits associated with the transaction will flow to the entity; and**

     (b)      **the amount of the revenue can be measured reliably.**

30      **Revenue shall be recognised on the following bases:**

     (a)      **interest shall be recognised using the effective interest method as set out in IAS 39, paragraphs 9 and AG5–AG8;**

5

EC staff consolidated version as of 16 September 2009.
FOR INFORMATION PURPOSES ONLY

EN – EU IAS 18

(b)    royalties shall be recognised on an accrual basis in accordance with the substance of the relevant agreement; and

(c)    dividends shall be recognised when the shareholder's right to receive payment is established.

31    [Deleted]

32    When unpaid interest has accrued before the acquisition of an interest-bearing investment, the subsequent receipt of interest is allocated between pre-acquisition and post-acquisition periods; only the post-acquisition portion is recognised as revenue.

33    Royalties accrue in accordance with the terms of the relevant agreement and are usually recognised on that basis unless, having regard to the substance of the agreement, it is more appropriate to recognise revenue on some other systematic and rational basis.

34    Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount, or the amount in respect of which recovery has ceased to be probable, is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

## Disclosure

35    An entity shall disclose:

(a)    the accounting policies adopted for the recognition of revenue, including the methods adopted to determine the stage of completion of transactions involving the rendering of services;

(b)    the amount of each significant category of revenue recognised during the period, including revenue arising from:

    (i)    the sale of goods;

    (ii)    the rendering of services;

    (iii)    interest;

    (iv)    royalties;

    (v)    dividends; and

(c)    the amount of revenue arising from exchanges of goods or services included in each significant category of revenue.

36    An entity discloses any contingent liabilities and contingent assets in accordance with IAS 37 *Provisions, Contingent Liabilities and Contingent Assets*. Contingent liabilities and contingent assets may arise from items such as warranty costs, claims, penalties or possible losses.

## Effective date

37    This Standard becomes operative for financial statements covering periods beginning on or after 1 January 1995.

38    Cost of an Investment in a Subsidiary, Jointly Controlled Entity or Associate (Amendments to IFRS 1 First-time Adoption of International Financial Reporting Standards and IAS 27 Consolidated and Separate Financial Statements), issued in May 2008, amended paragraph 32. An entity shall apply that amendment prospectively for annual periods beginning on or after 1 January 2009. Earlier application is permitted. If an entity applies the related amendments in paragraphs 4 and 38A of IAS 27 for an earlier period, it shall apply the amendment in paragraph 32 at the same time.

6

USAO 00003325

# EXHIBIT B

USAO 00003326

To:       Brent Hogenson[Brent.Hogenson@autonomy.com]; Percy
Tejeda[Percy.Tejeda@autonomy.com]; 'Aline Pels'[apels@autonomy.com]; 'Matt
Stephan'[matt.stephan@autonomy.com]
Cc:       Trish Williamson[Trish.Williamson@autonomy.com]
From:     Julie Dolan
Sent:     Tue 1/5/2010 6:26:47 AM
Importance:      Normal
Subject:  Poste One Off for Your records
2009-12-31-SC-Poste-OneOff-executed.pdf

I will provide the fully executed version this week.


Kind Regards


Julie Dolan

Autonomy Corporate Counsel

Direct    ██████████████

Mobile    ██████████████


The information contained in this message is for the intended addressee only and may
contain confidential and/or privileged  information.  If you are not the intended
addressee, please delete this message and notify the sender, and do not copy or
distribute this message or disclose its contents to anyone.  Any views or opinions
expressed in this message are those of the author and do not necessarily represent
those of Autonomy Systems Limited or of any of its associated companies.  No reliance
may be placed on this message without written confirmation from an authorised
representative of the company.  Autonomy Systems Limited, Registered Office:
Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number
03063054.

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01406405

Autonomy One Off Reseller Agreement

31 December 2009 ("Effective Date")

Sales Consulting S.r.l.
Via Nicolo' Tartaglia 11
00167 Roma
Italy



Dear Sirs:

This document sets forth the terms of the One Off Reseller Agreement ("Agreement") between Autonomy Systems Limited ("Autonomy") and Sales Consulting S.r.l. ("Reseller") under which Autonomy will supply the Autonomy products listed in Exhibit A ("Autonomy Software") to Reseller and grant Reseller the right to resell and provide first line support services for said Autonomy Software to the end user Poste Italiane ("End User"). Autonomy shall provide Reseller with second line support services in accordance with Autonomy's then current support terms ("Maintenance Services"). Autonomy's current the current Maintenance Services are set out in Exhibit B.

1.      Products Licensed and Services Provided.  Reseller should only place an order with Autonomy when Reseller has received an order from the End User.  Upon Autonomy's receipt of a valid purchase order identifying the end user name, address, email address and the licence fees set forth in Section 2, Autonomy shall provide to Reseller, and Reseller will resell to End User, the Autonomy Software.  For orders equal or greater than $100,000 USD, further evidence of sell through in the form of a purchase order or other form of order between Reseller and End User shall also be provided. Reseller shall resell the Autonomy Software to End User subject to the terms set forth in Autonomy's End User Agreement and Product Use Certificate, which will accompany the Autonomy Software Products. In addition, upon Autonomy's receipt of a valid purchase order and the support fees referred to in Section 2, Autonomy shall provide one year of second line Maintenance Services for the Autonomy Software Products.  If End User wishes to renew another one year Maintenance Services, Autonomy shall provide them to Reseller in consideration for the price separately agreed by Autonomy and Reseller. To the extent that Reseller has subscribed to receive Maintenance Services and so long as Reseller has paid all fees associated with such Maintenance Services, Autonomy will provide Reseller with Maintenance Services. The term of Maintenance Services shall be for one year (1) term. Reseller may purchase additional consulting services from Autonomy on behalf of End User, if agreed to in writing by Autonomy.

2.      Fees and Payment Terms.  Reseller shall pay to Autonomy the license fees set forth in Exhibit A for the Autonomy Software licensed to End User.  All such fees are exclusive of applicable taxes (including consumption tax), customs, and duties. In addition, Reseller shall pay to Autonomy the annual support fee set forth in Exhibit A, in consideration of Autonomy's provision of Maintenance Services to Reseller for the Autonomy Software.  Any charges payable by Reseller under this Agreement shall be paid within thirty (30) days after receipt of Autonomy's invoices by Reseller unless otherwise agreed between the parties in Exhibit A. Reseller shall be responsible for all applicable national and local taxes applied to the transaction hereunder, however designated, arising from or based upon this Agreement, except for those taxes based on Autonomy's income.  Reseller has no right to return any ordered Autonomy Software and/or have the fees refunded. Neither does Reseller have any right to return a Autonomy Software and have it exchanged against another Autonomy Software or against a credit for a future order of a Autonomy Software.

3.      Delivery.  Upon receipt of a valid purchase order and the licence fees set forth in the applicable Exhibit, Autonomy shall ship the Autonomy Software, F.O.B. Autonomy's facility, electronically, via FTP or, if requested, via overnight delivery to End User at the address set forth in the relevant Exhibit. Following execution of this Agreement Reseller may receive a temporary access code allowing temporary access to and temporary use of the Autonomy Software.  Unless otherwise specified in Exhibit A such temporary access code may expire ninety (90) days from the date of delivery of the Autonomy Software. Upon receipt by Autonomy of all applicable fees in accordance with this Agreement and receipt of the applicable purchase order, Reseller will receive an access code that will allow for Reseller's and in turn End User's use of and access to the Autonomy Software (i) with respect to Autonomy Software licensed

OneOffReseller (ver.2008.3)
Autonomy Systems Limited Company Number 3063054

Autonomy Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406406

USAO 00003328

for a perpetual term (as set out in Exhibit A), on a permanent basis, subject to the terms of this Agreement, or (ii) with respect to Autonomy Software licensed for a fixed term (as set out in Exhibit A) until the Expiry Date (as set out in Exhibit A), subject to the terms of this Agreement. In the event Reseller fails to timely pay applicable fees, Autonomy may withhold delivery of such further access code, which will result in Reseller's and in turn End User's inability to access and use the Autonomy Software after expiry of the temporary license key.

4.    No Representations/Ownership.    Reseller shall not make any representations or warranties about the Autonomy Software to End User, and represents and warrants it has not made any such representations or warranties. No licence or other rights in or to the Autonomy Software, or the intellectual property rights therein, are granted to Reseller. All intellectual property rights in and to the Autonomy Software are and shall remain the exclusive property of Autonomy.

5.    DISCLAIMERS AND LIMITS ON LIABILITIES. EITHER PARTY SHALL NOT BE LIABLE TO THE OTHER FOR ANY LOST REVENUE, LOST PROFITS OR OTHER CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY UNDER THIS AGREEMENT EXCEED THE AMOUNTS PAID BY RESELLER TO AUTONOMY HEREUNDER EXCLUDING DAMAGES ARISING OUT OF (1) PROPERTY DAMAGE DUE TO GROSS NEGLIGENCE OF EITHER PARTY, BUT NOT MORE THAN TWO TIMES THE FEES PAID BY RESELLER, (2) BREACH OF CONFIDENTIALITY OR (3) INFRINGEMENT ON THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS OF AUTONOMY SOFTWARE PRODUCTS.   EXCEPT AS PROVIDED HEREIN, AUTONOMY MAKES NO REPRESENTATIONS OR WARRANTIES TO RESELLER OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE AUTONOMY SOFTWARE PRODUCTS INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT.

6.    WARRANTY. Autonomy warrants each Autonomy Software only to End User pursuant to the terms of the applicable Autonomy Software Licence Agreement, and no warranty is extended to Reseller or any third parties, except to the Reseller as an end user for demonstration purposes.

7.    INDEMNITY. VAR shall indemnify Autonomy from, and defend Autonomy against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any claim relating to any breach of (a) Autonomy's intellectual property and (b) Section 8 (Confidentiality).

8.    CONFIDENTIALITY.    Both parties acknowledge that the Autonomy product(s), documentation, terms of this Agreement, and all other information clearly marked as confidential ("Confidential Information") is confidential and proprietary to Autonomy. Both parties agrees to safeguard such Confidential Information with a degree of care commensurate with reasonable standards of industrial security for the protection of trade secrets and proprietary information so that no unauthorized use is made of such information and no disclosure of any part of their contents is made to anyone other than your employees, subsidiaries or parent company of both parties agents or consultants whose duties reasonably require such disclosure.

9.    Miscellaneous. Both parties shall not disclose the terms of this Agreement, including the applicable Exhibit, to any third party. Failure by either party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.  Any waiver, amendment, supplementation or other modification or supplementation of any provision of this Agreement shall be effective only if in writing and signed by both parties.  If for any reason a court of competent jurisdiction finds any provision or portion of this Agreement to be unenforceable, that provision of this Agreement shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement shall continue unmodified except as necessary to avoid unfairness. This Agreement, including the Exhibits, represent the entire Agreement between the parties hereto concerning the subject matter hereof and supersedes any and all prior correspondence, quotations and negotiations.  Reseller expressly agrees that this Agreement and the Exhibits hereto shall have priority over any contrary terms or conditions contained in any purchase order or other form hereafter delivered by Reseller to Autonomy.  This Agreement is valid for the specific transaction between Autonomy and

2

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406407

USAO 00003329

Reseller pursuant to the purchase order to be placed by Reseller to Autonomy on or before 31 December 2009 only.  Reseller expressly agrees that this Agreement and the Exhibits hereto shall have priority over any additional or inconsistent terms contained on such purchase orders or other forms hereafter delivered by Reseller to Autonomy.

**Autonomy Systems Limited**                                    **Sales Consulting S.r.l.**

By: _____                    By: _____

Name: _____                    Name: LEONARDO SERGIO MARICA

Title: _____                    Title: AMMOE UNICO

Date: _____                    Date: _____

3

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01406408

USAO 00003330

**Exhibit A**
**PURCHASE ORDER**

31 December 2009 ("Effective Date")

| To: | Autonomy Systems Limited |
|-----|--------------------------|
|     | Cambridge Business Park |
|     | Cowley Road |
|     | Cambridge CB4 0WZ ("Autonomy") |

| From: | Sales Consulting S.r.l. |
|-------|-------------------------|
|       | Via Nicolo' Tartaglia 11 |
|       | 00197 Roma |
|       | Italy ("VAR") |

This Purchase Order is issued under and pursuant to that certain One Off Reseller Agreement dated as of 31 December 2009 (the "Agreement"), between VAR and Autonomy. This Purchase Order is for end user Poste Italiane ("End User") The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement. All other terms and conditions contained in the Agreement shall remain in full force and effect.

1. Software; Authorized Environment; Authorized Use/Users; Restrictions on Use

| Content Management Software |
|------------------------------|
| TeamSite User |
| TeamSite Additional CPU |
| TeamSite Additional 10-Branch Pack |
| TeamSite Additional Store |
| MediaBin Services for TeamSite (Windows Platform Only) |

| Targeting & Engagement Software |
|---------------------------------|
| Interwoven LiveSite - quad core CPU |
| LiveSite Non-Production Server - quad core CPU |

| Content Intelligence Software |
|-------------------------------|
| MetaTagger Server |
| MetaTagger Standby Server |
| MetaTagger Non-Production Server |

| Content Provisioning Software |
|-------------------------------|
| OpenDeploy Reciever |

2. Platform        :   Windows

4

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406409

USAO 00003331

Exhibit A
**PURCHASE ORDER**

31 December 2009 ("Effective Date")

| To: | Autonomy Systems Limited<br>Cambridge Business Park<br>Cowley Road<br>Cambridge CB4 0WZ ("Autonomy") |
|---|---|

| From: | Sales Consulting S.r.l.<br>Via Nicolo' Tartaglia 11<br>00197 Roma<br>Italy ("VAR") |
|---|---|

This Purchase Order is issued under and pursuant to that certain One Off Reseller Agreement dated as of 31 December 2009 (the "Agreement"), between VAR and Autonomy. This Purchase Order is for end user Poste Italiane ("End User") The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement. All other terms and conditions contained in the Agreement shall remain in full force and effect.

1. Software; Authorized Environment; Authorized Use/Users; Restrictions on Use

| **Content Management Software** |
|---|
| TeamSite User |
| TeamSite Additional CPU |
| TeamSite Additional 10-Branch Pack |
| TeamSite Additional Store |
| MediaBin Services for TeamSite (Windows Platform Only) |
| **Targeting & Engagement Software** |
| Interwoven LiveSite - quad core CPU |
| LiveSite Non-Production Server - quad core CPU |
| **Content Intelligence Software** |
| MetaTagger Server |
| MetaTagger Standby Server |
| MetaTagger Non-Production Server |
| **Content Provisioning Software** |
| OpenDeploy Reciever |

2. Platform          : Windows

4

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406410

USAO 00003332

| 3. | Number of Copies | : | One each of (1) above |
|---|---|---|---|
| 4. | Number of Instances | : | One each of (1) above per Server above |
| 5. | Territory of Software installation | : | Italy |
| 6. | Licensee Technical Support Contacts | : | Name: _____<br>Phone: _____<br>E-mail: _____ |
| 7. | License Fee | : | €1,500,000, excluding VAT, invoiced immediately |
| 8. | Support Fee (first year) | : | 15% of License Fee per annum (€225,000), excluding VAT, for Standard Support Services, first year to be invoiced immediately and thereafter invoiced annually in advance of each anniversary of the Commencement Date. |
| 9. | License and Support Fee Payment Terms | : | 50% (€862,500) 120 days from date of invoice<br>50% (€862,500) 180 days from date of invoice |
| 10. | Delivery | : | Shipped EXW Point of Manufacture (per Incoterms 2000) via electronic delivery to the contact in Section 6 above. |
| 11. | Commencement Date | : | On the Effective Date. |
| 12. | Expiry Date | : | None, subject to termination pursuant to Agreement |
| 13. | Additional Deployment Terms | : | 1. For a period of three (3) years from the Effective Date ("Deployment Period"), VAR may allow End User to deploy and put into production, on an as needed basis, perpetual licenses of the Software products listed in above table. The annual Support Services Fee, as described below, is not subject to change by reason of Licensee's actual deployment of Software licenses.<br><br>2. For clarity, "put into production" shall mean the Software is placed in operational use by End User for its internal use only on End User's intranet and internet environment. At the end of the Deployment Period, End User shall not have the right to deploy any additional perpetual licenses to the Software.<br><br>4. At the end of the Deployment Period, VAR may not allow End User to deploy any additional Software licenses, and VAR and Autonomy will agree in writing on the final quantities of the Software that End User will be thereafter authorized to use in production. Within thirty (30) days from the expiration of the Deployment Period, Customer shall provide Interwoven with a written document signed by an authorized officer of End User and VAR which documents the final quantities of the Software licenses deployed and put into production, including the number of Branches, Stores, Servers, and the address of each such installation. Autonomy reserves the right to audit VAR and End User to verify the total number of licenses deployed by End User and to ensure End User's compliance with the terms and conditions of provisions of this Purchase Order. VAR shall be liable for ensuring End User's compliance.<br><br>5. End User's right to deploy and put into production the Software licenses during this Deployment Period shall be limited to the deployment for benefit of or by the corporate structure of End User as of the Effective Date and does not include the right to deploy and put into production the Software licenses by any acquired or merged entities after the Effective Date. |

5

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406411

USAO 00003333

*NOTE: Except to the extent otherwise specified in this Product Schedule, Licensee shall be entitled to install and use the Software on one (1) Server for Production Use with two (2) CPUs per Server.*

*Applicable Definitions:*

**Branch:** means the project unit represented in certain Software to manage content for a certain group of Users. A Branch contains the content for a website or a collection of related content (such as the program files for a software application or the image and text files for a book).

**CPU:** a single core central processing unit on a computer.

**Developer:** an individual employed and authorized by Licensee to Use and access the functionality of the Development Software for purposes of developing or administrating the Software, regardless of whether the individual is actually using or accessing the Software at any given time.

**Development Software:** the tool and other portions of the Software which are used to incorporate the Run-Time Software into other products or software and/or to and enable the Run-Time Software to provide the applicable functionality.

**Document:** as a document section or page from a multi-paged or single paged document (e.g., a page in .pdf or .doc document) that is no more than 4096 characters in size.

**Non-Production Use:** development, quality assurance, testing, and disaster recovery usage.

**Production Use:** live or fall-over usage for commercial, business or production purposes.

**Run-Time Software:** the portion of the Software which executes the functionality of the Software.

**Servers:** computing devices acting as a server for a network of interconnected computing devices, whether within an enterprise or other Web, intranet or internet environment and including virtual machines or logical partitions, upon which the Software may be installed or accessed. All Servers shall be owned and/or leased and controlled by Licensee.

**Store:** means as follows: (a) for licensees of MetaTagger, a single database, filesystem or similar information storage system used to store input files and/or generated metadata; or (b) for licensees of TeamSite, a file-based repository or database used to store and manage content assets.

**User:** an individual authorized by Licensee to use or access the functionality of the Software, regardless of whether the individual is actually using or accessing the applicable Product at any given time.

6

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406412

USAO 00003334

Description:  Program errors that prevent some function or process from substantially meeting functional specification, but have a reasonable work-around.

Autonomy Response: Autonomy shall use commercially reasonable efforts to provide a work-around to Reseller and shall exercise commercially reasonable efforts to include the fix for the error in the next software maintenance release.

C) Priority III Errors.

Description:  Program errors that prevent some portion of a function from substantially meeting functional specification but do not seriously affect the overall performance of the function.

Autonomy Response: Autonomy may include the fix for the error in the next major release of the Product.

8

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406413

USAO 00003335

# Autonomy

December 31, 2009

Autonomy Systems Limited
Cambridge Business Park
Cowley Road,
Cambridge CB40WZ, UK
www.autonomy.com

Dear Mr. Zignani,

I am happy to confirm on behalf of Autonomy Systems Limited ("Autonomy") the following relating to Sales Consulting S.r.l. ("Sales Consulting") purchase of Autonomy technology for resale to Poste Italiane pursuant to a purchase order dated the date hereof. Sales Consulting will receive a discount of E300,000 for this transaction.

In the unlikely event that Poste Italiane decides not to pursue its current project, Autonomy will consent to a resale by Sales Consulting of the Poste Italiane licence (or similar Autonomy's products) to a number of different customers for similar purposes and for a combined similar value. Autonomy will not require an additional purchase order provided the total values reflect the same, but must be notified of the details relating to such purchases. All other terms and conditions of the purchase order remain unchanged. Specifically, the payment terms of the purchase order shall not change regardless of the consent to resale.

Autonomy will take every effort to support Sales Consulting with respect to this transaction, and are particularly please to be working with Sales Consulting given your expertise on Autonomy's technology and investment in the account.

Please do not hesitate to contact me with any questions or for any additional assistance.

Best regards,

Andrew Kanter
Company Secretary
Autonomy Systems Limited

HP-SEC-01406414

USAO 00003336

## Autonomy

Autonomy Systems Limited
Cambridge Business Park, Cowley Road,
Cambridge, CB4 0WZ
Tel +44 (0) 1223 448 000
Fax +44 (0) 1223 421 040
www.autonomy.com

# Proof of Delivery

**Courier – must return POD to Autonomy to: JULIE DOLAN**

**Date Despatched:** 31 December 2009

**Contact Name:** Gianluca Zignani

**Company Name:** Sales Consulting S.r.l.

**Company Address:** Via Nicolo' Tartaglia 11 – 00187 Rome – Italy

| Qty | Item | Description |
|-----|------|-------------|
| 1 | Software DVD | As set forth on the attached spreadsheet<br><br>Your Order n. _____ dated 31 December 2009 |

**Received by:**

**Signature:** _____

**Print Name:** _____ LEONARDO SERGIO CARREGA _____

**Title:** _____ AMM. DE UN. CO _____

**Date Received:** 31st December 2009

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01406415

USAO 00003337

# EXHIBIT C

USAO 00003338



AUTONOMY CORPORATION PLC ANNOUNCES RESULTS FOR
THE TWELVE MONTHS AND FOURTH QUARTER ENDED DECEMBER 31, 2009

*Record Full Year and Q4 results with strong organic growth; Full Year EPS (adj.) up 42%;
Highest revenues and profits in Autonomy's history; Full Year revenues up 47%; Full Year
Profit from Operations (adj.) up 59%*

Cambridge, England -- February 3, 2010 -- Autonomy Corporation plc (LSE: AU. or AU.L), a global
leader in infrastructure software, today reported financial results for the twelve months and fourth
quarter ended December 31, 2009.

Financial Highlights
- Record full year revenues of $740 million, up 47% from 2008 including strong organic growth of
  16%[1], and the successful integration of Interwoven
- Gross profits (adj.) at $652 million for full year, up 42% from 2008; gross margins (adj.) at 88%
- Record full year operating margins (adj.) at 44%, compared to 41% in 2008
- Record full year profit before tax (adj.) at $323 million, up 55% from 2008
- Record full year fully diluted EPS (adj.) of $0.97 (versus consensus of $0.97), up 42% from 2008.
  Fully diluted EPS (IFRS) of $0.80 up 31% from 2008
- Full year and Q4 2009 revenue, profits and cash conversion in line with analyst consensus

[1] See supplemental metrics on page 5.

Commenting on the results, Dr. Mike Lynch, Group CEO of Autonomy said today: "We are pleased to
announce another excellent set of results for Autonomy.  Over the last five years, we have seen a five
year adjusted EPS CAGR of 73% and Autonomy has grown to become one of Europe's largest
software companies.  Looking back on 2009, despite an economic environment that can be described
at best as difficult, and an unhelpful FX headwind, Autonomy produced outstanding results with
adjusted profit from operations growing by 59% at a time when most of our software peers have seen
small or negative growth.  We delivered this strong growth on top of an exceptionally strong
performance in Q4 2008."

Dr. Lynch continued: "During 2009 Autonomy did a lot of work to prepare for a possible upturn in
2010, including significant new IDOL product developments, launches and expansion of our IDOL
hosted capabilities. After this exceptional expenditure we are now seeing our cost base return to its
traditional model with an operating margin of 50% in the fourth quarter. The driver for our business is
the need for computers to understand and process human friendly information automatically.  We
believe this driver will continue to accelerate, and as customers find discretionary budgets again we
expect to see good growth in the Meaning Based Marketing ('Promote') applications of our technology
alongside our resilient information governance ('Protect') applications.  On the larger theme of
Meaning Based Computing, we have extended our technologies from the unstructured world to the
structured, with validation of this endeavour with the first IDOL SPE customers signed and first
showcase events."

"We continue to see our strongest growth in the new models of the software industry such as OEM
and cloud computing. Whilst it may still take a little time for people to understand how these models
differ from traditional software businesses, we believe the momentum in these areas is accelerating."

Dr. Lynch concluded:  "We begin 2010 with the strongest Meaning Based Computing portfolio in the
industry and an ever-expanding understanding in the market of the challenges associated with
unstructured information.  With our unmatched product portfolio, scale and vision, we look forward to
the challenges to be presented in 2010 regardless of the challenges of the environment.  At the very end of Q4 2009 we
began to see some indicators of an initial improvement in the macro environment, which gives us
confidence in the outlook for 2010, and accordingly we are adjusting our business plan."

Page 1

## Twelve Month 2009 highlights

- Cemented Autonomy's position as the industry leader, dominating enterprise search with the largest market share and fastest growth, and achieving top marks from Gartner for eDiscovery technology
- Successful launch of IDOL SPE, Arcpliance, ICE, IDOL Social Media and Interwoven product range built on IDOL
- Winner of industry accolades, including: Her Majesty the Queen's Award for Enterprise 2009 and Britain's Most Admired Software Company Award 2009
- Acknowledged as the leader in cloud computing and the hottest enterprise software company
- 68 deals over $1 million and 47 new OEM agreements signed during 2009
- Record net profit (adj.) of $232.6 million, up 57% from 2008 (IFRS: $191.6 million, up 45%)
- R&D investment up 26% year-on-year.
- Very strong cash collection from customers; cash collection at 102% of revenues Q4′09
- One of the highest revenue to cash conversion ratios in the industry
- Cash conversion for 2009 at 80%, 91% when lagged by to allow one quarter for the cash to be collected and 99% when adjusting for lagging by one quarter and paying down of the acquired Interwoven trade debt
- Positive cash flow generated by operations of $286.6 million (2008: $178.6 million), up 60%
- Gross cash of $242.8 million with debt of $197.5 million, giving net cash of $45.3 million.

## Fourth quarter 2009 Highlights

- Blue chip fourth quarter wins include: American Airlines, Amgen, AT&T, BAE Systems, Boeing, Charles Schwab, Citi, Ericsson, KPMG, McAfee, Merck, Peugeot Citroen, Qatar Airways, Santander, Whirlpool and Wolters Kluwer, as well as new and repeat licenses with multiple government, defence and intelligence agencies around the globe including in the US, the UK, NATO, Australia, Brazil, the Netherlands, Romania and Sweden
- 12 OEM deals signed including new deals and extensions with McAfee, HP, Trend Micro and Sybase
- Strong organic growth of 18% from Q4 2008
- Record quarterly revenue of $223.1 million, up 53% from Q4 2008
- Gross margin (adj.) back in targeted range at 89%
- Record profit before tax (adj.) of $111.0 million, up 51% from Q4 2008 (IFRS: $96 million, up 36%)
- Operating margin (adj.) returns to record highs of 50% (Q4 2008: 50%), confirming one-time nature of IDOL SPE investment in Q3 2009
- Fully diluted EPS (adj.) of $0.33, up 35% from 2008 (IFRS: $0.29, up 21%)
- Record cash collection of $216.0 million generated from Q3 2009 revenues of $191.6 million; positive cash flow generated by operations of $72.2 million (Q4 2008: $58.0 million), up 25%
- Cash conversion at forecast levels of 58% (Q4 CFFO/Q4 adj EBITDA), reflecting the fact that the Q4 2009 cash flow generated by seasonally weaker Q3 2009 business is divided by the seasonally stronger Q4 2009 EBITDA, and payment of Q3 2009 exceptional payables of $24 million relating to new product launch (adjusting for this: 78%). Cash conversion is 97% (Q4 CFFO/Q3 adj EBITDA) when lagged by one quarter to reflect growth
- Average selling price for meaning-based technologies at $390,000 (Q4 2008: $400,000)
- Deferred revenue increased to $178.5 million (Q4 2008: $99.2 million)
- DSOs back in normal range at 88 days (Q4 2008: 84 days) due to strong cash collection during the quarter
- Cost base returned to traditional model after Q3 2009 product launch costs, with fixed cost base modulated by seasonal marketing spend and revenue-tracking sales commissions

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429939

USAO 00003340

## Twelve Month and Fourth Quarter Financial Highlights

### Revenues

Revenues for the twelve months ended December 31, 2009, totalled $739.7 million, up 47% from $503.2 million for the twelve months ended December 31, 2008. During 2009 there were 66 deals over $1.0 million. In 2009, Americas revenues of $517.2 million represented 70% of total revenues, and Rest of World revenues of $222.5 million represented 30% of total revenues.

Revenues for the fourth quarter of 2009 totalled $223.1 million, up 53% from $145.4 million for the fourth quarter of 2008. During the fourth quarter of 2009 there were 24 deals over $1.0 million. In the fourth quarter of 2009, Americas revenues of $162.3 million represented 73% of total revenues, and Rest of World revenues of $60.8 million represented 27% of total revenues.

The increase in revenues in the year and the fourth quarter is a combination of strong organic growth and the successful integration of Interwoven.

### Gross Profits and Gross Margins

Gross profits (adj.) for the twelve months ended December 31, 2009, were $651.9 million, up 42% from $458.2 million for the twelve months ended December 31, 2008. Gross margins (adj.) for the twelve months ended December 31, 2009, were 88%, compared to 91% for the twelve months ended December 31, 2008. Gross profits (IFRS) for the twelve months ended December 31, 2009 were $602.3 million, up 37% from $438.7 million for the twelve months ended December 31, 2008. Gross margins (IFRS) for the twelve months ended December 31, 2009 were 81%, compared to 87% for the twelve months ended December 31, 2008. Gross margins were impacted at the beginning of 2009 as a result of the Interwoven acquisition, and in Q3 2009 by the IDOL SPE Quick Start program, but have returned to historic levels in Q4 2009 as planned.

Gross profits (adj.) for the fourth quarter of 2009 were $199.4 million, up 50% from $133.1 million for the fourth quarter of 2008. Gross margins (adj.) for the fourth quarter of 2009 were 89%, compared to 92% for the fourth quarter of 2008. As previously announced, the one-time additional costs in Q3 2009 from the IDOL SPE Quick Start program were not repeated in Q4. Gross profits (IFRS) for the fourth quarter of 2009 were $184.8 million, up 44% from $128.7 million for the fourth quarter of 2008. Gross margins (IFRS) for the fourth quarter of 2009 were 83%, compared to 89% for the fourth quarter of 2008.

### Profit from Operations and Operating Margins

Profit from operations (adj.) for the twelve months ended December 31, 2009 was $328.9 million, up 59% from $207.5 million for the twelve months ended December 31, 2008. Operating margins (adj.) were 44% in 2009, up from 41% in 2008. Profit from operations (IFRS) for the twelve months ended December 31, 2009 was $272.2 million, up 46% from $186.5 million for the twelve months ended December 31, 2008. Operating margins (IFRS) were 37% in 2009 consistent with 37% in 2008. Operating margins (adj.) have increased year on year due to the increased revenues and the operating leverage within the Autonomy business model. Operating margins (IFRS) are static due to higher non-cash charges related to the purchased intangibles acquired with Interwoven.

Profit from operations (adj.) for the fourth quarter of 2009 was $112.6 million, up 55% from $72.6 million for the fourth quarter of 2008. Operating margins (adj.) were 50% in the fourth quarter of 2009, consistent with 50% in the fourth quarter of 2008. Profit from operations (IFRS) for the fourth quarter of 2009 was $96.9 million, up 37% from $70.9 million for the fourth quarter of 2008. Operating margins (IFRS) were 43% in the fourth quarter of 2009 compared to 49% in the fourth quarter of 2008. Operating margins (adj.) have returned to record highs of 50% following the completion of the IDOL SPE quick start spend in Q3 2009. Operating margins (IFRS) have decreased due to the higher non-cash amortization of purchased intangibles.

### Taxation

The effective tax rate for the twelve months ended December 31, 2009, was as forecast at 26.0%, down from 29.1% for the twelve months ended December 31, 2008. The decrease from 2008 is a combination of the full year impact of the change in the UK corporation tax rate from 30% to 28% combined with the standard utilisation of losses during 2009.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429940

USAO 00003341

The effective tax rate in the fourth quarter of 2009 was 27.5%, up from 27.1% in the fourth quarter of 2008.

**Foreign Exchange Impact**

The effect on revenue of movements in foreign exchange rates in the twelve months ended December 31, 2009, was a decrease of $7.9 million compared to 2008 (i.e. if revenues were reported for each quarter using the same exchange rates as those prevailing in the previous year, revenues in 2009 would have been $7.9 million higher, or $747.6 million). In 2009 the U.S. Dollar strengthened versus Sterling to an average of $1.57 versus $1.86 in 2008.

The effect on revenue in the fourth quarter of 2009 of movements in foreign exchange rates was an increase of $1.2 million compared to the fourth quarter of 2008. In the fourth quarter of 2009 the U.S. Dollar weakened slightly versus Sterling to an average of $1.63 versus $1.58 in the fourth quarter of 2008.

**Net Profits**

Net profit (adj.) for the twelve months ended December 31, 2009, was $232.6 million, or $0.97 per diluted share, compared to net profit (adj.) of $148.0 million, or $0.63 per diluted share, for the twelve months ended December 31, 2008. Net profit (IFRS) for the twelve months ended December 31, 2009, was $191.6 million, or $0.80 per diluted share, compared to net profit (IFRS) of $131.7 million, or $0.61 per diluted share, for the twelve months ended December 31, 2008.

Net profit (adj.) for the fourth quarter of 2009 was $80.5 million, or $0.33 per diluted share, compared to net profit (adj.) of $58.5 million, or $0.25 per diluted share, for the fourth quarter of 2008. Net profit (IFRS) for the fourth quarter of 2009 was $69.4 million, or $0.29 per diluted share, compared to net profit (IFRS) of $51.4 million, or $0.24 per diluted share, for the fourth quarter of 2008.

**IAS 38 Charges and Capitalization**

Under IAS 38 the company is required to capitalize certain aspects of its research and development activities. R&D capitalization for the twelve months ended December 31, 2009, was $24.7 million (2008: $11.2 million), offset by amortization charges of $8.9 million (2008: $4.8 million) during the year arising from historical R&D capitalization. The capitalization and offsetting charges resulted in a net credit (before tax) in the year of $15.8 million (2008: $6.4 million). R&D capitalization increased in the year primarily due to the new IDOL SPE product reaching commercial exploitation phase in Q3 2009, but returned to historical levels in Q4 2009. The net margin impact for the full year is 2% (2008: 1%).

R&D capitalization in the fourth quarter of 2009 was $5.6 million (Q4 2008: $2.4 million). Capitalization has returned to traditional levels of approximately 2.5% of revenues after completion of IDOL SPE in Q3 2009. Q4 2009 R&D capitalization is offset by amortization charges of $3.2 million (Q4 2008: $1.5 million) arising from historical R&D capitalization. The capitalization and offsetting charges resulted in a net credit (before tax) in the quarter of $2.4 million (Q4 2008: $0.9 million), and a net margin impact of 1% (Q4 2008: 1%).

**Balance Sheet and Cash Flow**

Cash balances were $242.8 million at December 31, 2009, an increase of $43.6 million from $199.2 million at December 31, 2008 (prior to the Interwoven acquisition). Movements in cash flow during 2009 of note (other than those discussed above) included:

- Acquisition of Interwoven Inc for an aggregate consideration of approximately $800 million funded by an underwritten placing of ordinary shares, a new revolving credit facility from Barclays and a portion of Interwoven and Autonomy's cash reserves;
- Early repayment of the Interwoven credit facility of $37.5 million;
- Expenditure on product development, resulting in a cash outflow of $24.7 million (2008: $11.2 million). The increase in R&D spend in 2009 is attributed to new R&D efforts associated with the acquisition of Interwoven and the one-off spend in relation to the development of new products;
- One-off costs incurred at the end of Q3 2009 relating to the new IDOL SPE product, which were paid in full in Q4 2009; and

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429941

USAO 00003342

- Whilst there were no acquisitions in the quarter, Autonomy invested $4.3 million in a public offering of shares by blinkx plc.

Trade receivables at December 31, 2009, were $230.2 million, compared to $141.3 million at December 31, 2008. Accounts receivable days sales outstanding were 88 days at December 31, 2009, compared to 84 days at December 31, 2008 and 97 days at September 30, 2009. As forecast, DSOs returned to the company's normal range of 85-90 days after one-off factors that impacted Q3 2009. Deferred revenues were $173.5 million at December 31, 2009, compared with $99.2 million at December 31, 2008. Despite the difficult economic climate, bad debt write off in the year was less than 1% of revenues.

Accrued income at December 31, 2009 was not material, at under 5% of revenues.

Supplemental Metrics

Autonomy is supplying supplemental metrics to assist in the understanding and analysis of Autonomy's business.

Twelve Months Ended Dec. 31, 2009

| | |
|---|---|
| Organic Growth* | 16%[1] |
| Cash conversion (LTM CFFO/LTM adj EBITDA**) | 80% |
| Cash conversion (legged to account for growth and seasonality of the business) | 91% |
| Cash conversion (legged to account for growth and seasonality of the business and acquired Interwoven trade debt) | 99% |
| Cash conversion as a percentage of the theoretical maximum (97%) | 91% |

Three Months Ended Dec. 31, 2009

| | |
|---|---|
| Product including hosted and OEM* | $153m |
| Service revenues* | $9m |
| Deferred revenue release (primarily maintenance)* | $61m |
| OEM derived revenues* | $27m |
| Organic Growth* | 18%[1] |
| Deals over $1 million | 24 |
| Tax rate | 28% |
| Available tax losses* | $218m |
| Cash conversion (Q4 CFFO/Q4 adj EBITDA**) | 58% |
| Cash conversion (legged to account for growth and seasonality of the business) | 97% |

- LTM revenue with terms >365 days in normal range (<2% of revenues)
- Accrued income in normal range (<5% of revenues)

* The above items are provided for background information and may include qualitative estimates.
** Adj EBITDA is defined as operating cash flow before movements in working capital.

[1] The company integrates acquired businesses immediately upon acquisition such that it is not possible to identify results from acquired businesses separately from the results of the group. In order to estimate organic growth the company has combined the reported results for Autonomy and Interwoven for 2008, adjusted for $66m in FY2008 and $19m in Q4 2008 of discontinued operations, and then compared this to the reported results for the enlarged group in 2009.

Q4 Product Sales

During the fourth quarter of 2009, major customer wins included: American Airlines, Amgen, AT&T, BAE Systems, Boeing, Charles Schwab, Citi, Ericsson, KPMG, McAfee, Merck, Peugeot Citroen, Qatar Airways, Santander, Whirlpool and Wolters Kluwer, as well as new and repeat licenses with multiple government, defence and intelligence agencies around the globe including in the US, the UK, NATO, Australia, Brazil, the Netherlands, Romania and Sweden. Repeat business from existing customers accounted for approximately 45% of revenue for the quarter.

Strategic Partnerships and OEMs

Autonomy's OEM Program continued to grow strongly during Q4 2009. Agreements were signed with 12 customers during the quarter, including new and extended agreements with McAfee, HP, Trend Micro and Sybase.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429942

USAO 00003343

## Q4 Corporate Developments
During the fourth quarter of 2009 Autonomy continued to extend its market leadership with the introduction of key new and upgraded IDOL technologies, including the launches of:

- Industry's first Collection to the Cloud service for eDiscovery and compliance;
- New archiving appliance for organizations seeking a simplified yet scalable solution to regulatory challenges;
- New capabilities in Autonomy iManage to cater for updated Federal Data Privacy requirements under the HIPAA; and
- Autonomy Records Management solutions achieved renewed US DoD 5015.2 certification.

During the fourth quarter Autonomy was recognised in multiple ways for its market leadership and unmatched technology, including being:

- Awarded the highest possible rating in the December 2009 Gartner MarketScope for eDiscovery;
- Named "Technology Provider of the Year" at the British Legal Awards 2009;
- Lauded as the "Biggest Contribution to Business Technology" at the UK IT Industry Awards 2009; and
- Voted Britain's most admired Software Company, BMAC 2009.

## Scheduling of Conference Call and Further Information
Autonomy's results conference call will be available live at www.autonomy.com on February 3, 2010, at 9:00 a.m. GMT/4:00 a.m. EST/1:00 a.m. PST.

From time to time the company answers investors' questions on its website which may include information supplemental to that set forth above.  Questions and answers can be found at: www.autonomy.com/investors/questions.

## About Autonomy Corporation plc
Autonomy Corporation plc (LSE: AU. or AU.L), a global leader in infrastructure software for the enterprise, spearheads the Meaning Based Computing movement.  IDC recently recognized Autonomy as having the largest market share and fastest growth in the worldwide search and discovery market.  Autonomy's technology allows computers to harness the full richness of human information, forming a conceptual and contextual understanding of any piece of electronic data, including unstructured information, such as text, email, web pages, voice, or video. Autonomy's software powers the full spectrum of mission-critical enterprise applications including pan-enterprise search, customer interaction solutions, information governance, end-to-end eDiscovery, records management, archiving, business process management, web content management, web optimization, rich media management and video and audio analysis.

Autonomy's customer base is comprised of more than 20,000 global companies, law firms and federal agencies including: AOL, BAE Systems, BBC, Bloomberg, Boeing, Citigroup, Coca Cola, Daimler AG, Deutsche Bank, DLA Piper, Ericsson, FedEx, Ford, GlaxoSmithKline, Lloyds Banking Group, NASA, Nestlé, the New York Stock Exchange, Reuters, Shell, Tesco, T-Mobile, the U.S. Department of Energy, the U.S. Department of Homeland Security and the U.S. Securities and Exchange Commission. More than 400 companies OEM Autonomy technology, including Symantec, Citrix, HP, Novell, Oracle, Sybase and TIBCO.   The company has offices worldwide.   Please visit www.autonomy.com to find out more.

Autonomy and the Autonomy logo are registered trademarks or trademarks of Autonomy Corporation plc. All other trademarks are the property of their respective owners.

| | |
|---|---|
| **Financial Media Contacts:** | **Analyst and Investor Contacts:** |
| Edward Bridges / Heya Chelhot | Marc Geall, Head of IR and Corporate Strategy |
| Financial Dynamics | Autonomy Corporation plc |
| +44 (0)20 7831 3113 | +44 (0)1223 448 000 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429943

USAO 00003344

**AUTONOMY CORPORATION plc**
**CONDENSED CONSOLIDATED INCOME STATEMENT**
(in thousands, except per share amounts)

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
| Continuing operations | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 |
| Revenues (see note 3) | 739,638 | 503,229 | 223,111 | 145,387 |
| Cost of revenues (excl. amortization) | (87,747) | (45,038) | (23,686) | (12,257) |
| Amortization of purchased intangibles | (49,650) | (19,489) | (14,601) | (4,424) |
| Total cost of revenues | (137,397) | (64,527) | (38,287) | (16,681) |
| Gross profit | 602,291 | 438,702 | 184,824 | 128,706 |
| Operating expenses: | | | | |
| Research and development | (98,785) | (78,410) | (26,141) | (18,862) |
| Sales and marketing | (170,797) | (135,159) | (45,621) | (32,219) |
| General and administrative | (60,627) | (42,624) | (17,046) | (10,395) |
| Other costs – | | | | |
| Post-acquisition restructuring costs | (846) | (1,157) | — | — |
| Gain on foreign exchange | 942 | 5,141 | 852 | 3,699 |
| Total operating expenses | (330,113) | (252,209) | (87,956) | (57,775) |
| Profit from operations | 272,178 | 186,493 | 96,868 | 70,931 |
| Share of (loss) profit of associate | (273) | (2,196) | 457 | (962) |
| Interest receivable | 1,205 | 3,353 | 230 | 1,064 |
| Interest payable | (7,044) | (1,943) | (1,795) | (541) |
| Profit before income taxes | 266,066 | 185,707 | 95,757 | 70,492 |
| Income taxes (see note 4) | (74,515) | (53,958) | (26,363) | (19,097) |
| Net profit | 191,551 | 131,749 | 69,394 | 51,395 |
| Basic earnings per share (see note 5) | 0.81 | 0.61 | 0.29 | 0.24 |
| Diluted earnings per share (see note 5) | 0.80 | 0.61 | 0.29 | 0.24 |
| Weighted average number of ordinary shares outstanding | 237,531 | 214,523 | 240,017 | 215,628 |
| Weighted average number of ordinary shares outstanding, assuming dilution | 240,555 | 217,158 | 243,418 | 218,048 |

**Reconciliation of Adjusted Financial Measures**

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
| | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 |
| Gross profit | 602,291 | 438,702 | 184,824 | 128,706 |
| Amortization of purchased intangibles | 49,650 | 19,489 | 14,601 | 4,424 |
| Gross profit (adj.) | 651,941 | 458,191 | 199,425 | 133,130 |
| Profit before income taxes | 266,066 | 185,707 | 95,757 | 70,492 |
| Amortization of purchased intangibles | 49,650 | 19,489 | 14,601 | 4,424 |
| Share-based compensation (see note 5) | 7,173 | 5,484 | 1,994 | 1,132 |
| Post-acquisition restructuring costs | 846 | 1,157 | — | — |
| Gain on foreign exchange | (942) | (5,141) | (852) | (3,699) |
| Share of loss (profit) of associate | 273 | 2,196 | (457) | 962 |
| Profit before tax (adj.) | 323,066 | 208,892 | 111,043 | 73,311 |
| Provision for income taxes | (90,268) | (60,891) | (30,571) | (19,861) |
| Net profit (adj.) | 232,798 | 148,001 | 80,472 | 53,450 |
| Profit from operations | 272,178 | 186,493 | 96,868 | 70,931 |
| Amortization of purchased intangibles | 49,650 | 19,489 | 14,601 | 4,424 |
| Share-based compensation (see note 5) | 7,173 | 5,484 | 1,994 | 1,132 |
| Post-acquisition restructuring costs | 846 | 1,157 | — | — |
| Gain on foreign exchange | (942) | (5,141) | (852) | (3,699) |
| Profit from operations (adj.) | 328,905 | 207,482 | 112,611 | 72,788 |

The accompanying notes are an integral part of these consolidated financial statements

Page 7

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429944

USAO 00003345

AUTONOMY CORPORATION plc
CONDENSED CONSOLIDATED BALANCE SHEET

| | As at | |
|---|---|---|
| | (unaudited) | |
| | Dec 31, 2009 | Dec 31, 2008 |
| | $'000 | $'000 |
| **ASSETS** | | |
| Non-current assets: | | |
| Goodwill | 1,287,042 | 796,632 |
| Other intangible assets | 399,277 | 98,694 |
| Property and equipment, net | 33,886 | 27,350 |
| Equity and other investments | 16,608 | 7,441 |
| Deferred tax asset | 24,015 | 13,467 |
| Total non-current assets | 1,760,828 | 943,584 |
| Current assets: | | |
| Trade receivables, net | 230,219 | 141,252 |
| Other receivables | 45,231 | 35,554 |
| Total trade and other receivables | 275,450 | 176,806 |
| Inventory | 486 | 715 |
| Cash and cash equivalents | 242,791 | 199,218 |
| Total current assets | 518,727 | 376,739 |
| TOTAL ASSETS | 2,279,555 | 1,320,323 |
| | | |
| **CURRENT LIABILITIES** | | |
| Trade payable | (14,926) | (12,434) |
| Other payables | (54,517) | (19,511) |
| Total trade and other payables | (69,443) | (31,945) |
| Bank loan | (52,375) | (10,637) |
| Tax liabilities | (43,338) | (27,905) |
| Deferred revenue | (164,931) | (89,794) |
| Provisions | (2,731) | (426) |
| Total current liabilities | (332,818) | (160,707) |
| Net current assets | 185,909 | 216,032 |
| | | |
| **NON-CURRENT LIABILITIES** | | |
| Bank loan | (145,152) | (26,594) |
| Deferred tax liabilities | (85,087) | (2,537) |
| Deferred revenue | (8,576) | (9,414) |
| Other payables | (1,020) | (1,171) |
| Provisions | (5,123) | — |
| Total non-current liabilities | (244,958) | (39,716) |
| Total liabilities | (577,776) | (200,423) |
| NET ASSETS | 1,701,779 | 1,119,900 |
| | | |
| Shareholders' equity: | | |
| Ordinary shares (1) | 1,333 | 1,214 |
| Share premium account | 1,130,767 | 798,279 |
| Capital redemption reserve | 135 | 135 |
| Own shares | (845) | (905) |
| Merger reserve | 27,589 | 27,589 |
| Stock compensation reserve | 21,959 | 14,846 |
| Revaluation reserve | 4,499 | 2,987 |
| Translation reserve | (12,032) | (18,261) |
| Retained earnings | 528,374 | 294,016 |
| TOTAL EQUITY | 1,701,779 | 1,119,900 |

(1)  At December 31, 2009, 600,000,000 ordinary shares of nominal value 1/3 pence each authorized,
240,574,304 issued and outstanding; as of December 31, 2008, 600,000,000 ordinary shares of nominal
value 1/3 pence each authorized, 215,817,197 issued and outstanding.

The accompanying notes are an integral part of these consolidated financial statements

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429945

USAO 00003346

## AUTONOMY CORPORATION plc
### CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
| | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
| | $'000 | $'000 | $'000 | $'000 |
| **Cash flows from operating activities:** | | | | |
| Profit from operations | 272,176 | 169,493 | 98,888 | 70,931 |
| Adjustments for: | | | | |
| Depreciation and amortization | 81,083 | 38,408 | 25,480 | 9,576 |
| Share based compensation | 7,173 | 5,484 | 1,994 | 1,132 |
| Foreign currency movements | (942) | (5,141) | (852) | (3,699) |
| Post-acquisition restructuring costs | 846 | — | 250 | — |
| Other non-cash items | 128 | 353 | 1 | 353 |
| Operating cash flows before movements in working capital | 360,466 | 225,597 | 123,751 | 78,293 |
| Changes in operating assets and liabilities (net of impact of acquisitions): | | | | |
| Receivables | (78,396) | (54,870) | (13,021) | (25,978) |
| Inventories | 235 | (154) | (33) | 51 |
| Payables | 4,267 | 8,210 | (38,503) | 5,591 |
| Cash generated from operations | 286,572 | 178,783 | 72,194 | 57,957 |
| Income taxes paid | (36,551) | (32,447) | (10,368) | (8,519) |
| Net cash provided by operating activities | 250,021 | 146,336 | 61,826 | 49,438 |
| **Cash flows from investment activities:** | | | | |
| Interest received | 1,127 | 3,321 | 152 | 1,064 |
| Purchase of property, plant and equipment and intangibles | (34,429) | (14,285) | (11,031) | (3,480) |
| Purchase of investments | (6,449) | (2,327) | (4,297) | — |
| Expenditure on product development | (24,722) | (11,159) | (5,574) | (2,415) |
| Acquisition of subsidiaries, net of cash acquired | (630,052) | (6,226) | (1,522) | (167) |
| Net cash used in investing activities | (694,525) | (30,676) | (22,272) | (4,998) |
| **Cash flows from financing activities:** | | | | |
| Proceeds from issuance of shares, net of issuance costs | 24,668 | 17,409 | 7,472 | 1,918 |
| Proceeds from share placing, net of issuance costs | 308,512 | — | — | — |
| Interest on bank loan | (5,340) | (1,943) | (1,380) | (541) |
| Repayment of bank loan | (37,450) | (10,700) | — | — |
| Drawdown of bank loan | 200,000 | — | — | — |
| Payment of arrangement fee | (3,846) | — | — | (2,675) |
| Net cash provided by (used in) financing activities | 486,544 | 4,766 | 6,092 | (1,298) |
| Net increase in cash and cash equivalents | 42,040 | 120,426 | 45,646 | 43,142 |
| Beginning cash and cash equivalents | 199,218 | 92,571 | 200,732 | 165,695 |
| Effect of foreign exchange on cash and cash equivalents | 1,533 | (13,779) | (3,587) | (9,619) |
| Ending cash and cash equivalents | 242,791 | 199,218 | 242,791 | 199,218 |

### AUTONOMY CORPORATION plc
### CONDENSED CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
| | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
| | $'000 | $'000 | $'000 | $'000 |
| Net profit | 191,551 | 131,749 | 69,394 | 51,895 |
| Revaluation of equity investment | 1,512 | (7,176) | (987) | (4,156) |
| Translation of overseas operations | 6,229 | (42,062) | (3,995) | (29,206) |
| Other comprehensive income | 7,741 | (49,238) | (4,982) | (33,362) |
| Total comprehensive income | 199,292 | 82,511 | 64,432 | 18,033 |

The accompanying notes are an integral part of these consolidated financial statements

Page 9

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429946

USAO 00003347

AUTONOMY CORPORATION plc
CONDENSED CONSOLIDATED STATEMENT OF CHANGES IN EQUITY

| | Ordinary shares | Share premium | Capital redemption reserve | Own shares | Merger reserve | Sub-total |
|---|---|---|---|---|---|---|
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| At January 1, 2008 | 1,196 | 780,888 | 135 | (981) | 27,589 | 808,827 |
| Retained profit | — | — | — | — | — | — |
| Other comprehensive income | — | — | — | — | — | — |
| Stock compensation | — | — | — | — | — | — |
| Share options exercised | 18 | 17,391 | — | — | — | 17,409 |
| EBT options exercised | — | — | — | 76 | — | 76 |
| Deferred tax on stock options | — | — | — | — | — | — |
| At Dec 31, 2008 | 1,214 | 798,279 | 135 | (905) | 27,589 | 826,312 |

| | Sub-total Forwarded | Stock comp'n reserve | Revaluation reserve | Translation reserve | Retained earnings | Total |
|---|---|---|---|---|---|---|
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| At January 1, 2008 | 808,827 | 9,438 | 10,163 | 23,801 | 146,084 | 998,313 |
| Retained profit | — | — | — | — | 131,749 | 131,749 |
| Other comprehensive income | — | — | (7,176) | (42,062) | — | (49,238) |
| Stock compensation | — | 5,484 | — | — | — | 5,484 |
| Share options exercised | 17,409 | — | — | — | — | 17,409 |
| EBT options exercised | 76 | (76) | — | — | — | — |
| Deferred tax on stock options | — | — | — | — | 16,183 | 16,183 |
| At Dec 31, 2008 | 826,312 | 14,846 | 2,987 | (18,261) | 294,016 | 1,119,900 |

| | Ordinary shares | Share premium | Capital redemption reserve | Own shares | Merger reserve | Sub-total |
|---|---|---|---|---|---|---|
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| At January 1, 2009 | 1,214 | 798,279 | 135 | (905) | 27,589 | 826,312 |
| Retained profit | — | — | — | — | — | — |
| Other comprehensive income | — | — | — | — | — | — |
| Stock compensation | — | — | — | — | — | — |
| Share placing | 103 | 308,409 | — | — | — | 308,512 |
| Share options exercised | 16 | 24,079 | — | — | — | 24,095 |
| EBT options exercised | — | — | — | 60 | — | 60 |
| Deferred tax on stock options | — | — | — | — | — | — |
| At Dec 31, 2009 | 1,333 | 1,130,767 | 135 | (845) | 27,589 | 1,158,979 |

| | Sub-total Forwarded | Stock comp'n reserve | Revaluation reserve | Translation reserve | Retained earnings | Total |
|---|---|---|---|---|---|---|
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| At January 1, 2009 | 826,312 | 14,846 | 2,987 | (18,261) | 294,016 | 1,119,900 |
| Retained profit | — | — | — | — | 191,551 | 191,551 |
| Other comprehensive income | — | — | 1,512 | 6,229 | — | 7,741 |
| Stock compensation | — | 7,173 | — | — | — | 7,173 |
| Share placing | 308,512 | — | — | — | — | 308,512 |
| Share options exercised | 24,095 | — | — | — | — | 24,095 |
| EBT options exercised | 60 | (60) | — | — | — | — |
| Deferred tax on stock options | — | — | — | — | 42,807 | 42,807 |
| At Dec 31, 2009 | 1,158,979 | 21,959 | 4,499 | (12,032) | 528,374 | 1,701,779 |

The accompanying notes are an integral part of these consolidated financial statements

Page 10

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429947

USAO 00003348

AUTONOMY CORPORATION plc

NOTES TO THE CONDENSED SET OF CONSOLIDATED FINANCIAL STATEMENTS FOR THE
THREE AND TWELVE MONTHS ENDED DECEMBER 31, 2009 - UNAUDITED

1.   General information

The accompanying quarterly and twelve month consolidated financial statements of Autonomy Corporation plc are based on the company's financial statements which are prepared in accordance with International Financial Reporting Standards as adopted for use in the EU ("IFRS"). The quarterly and twelve month consolidated financial statements have been prepared using accounting policies consistent in all material respects with those to be applied in the Company's Annual Report for the year ended December 31, 2009 and those applied in the Company's Annual Report for the year ended December 31, 2008.

Quarterly and twelve month information is unaudited, but reflects all normal adjustments which are, in the opinion of management, necessary to provide a fair statement of results and the company's financial position for and as at the periods presented. The results of operations for the three months and twelve months ended December 31, 2009, are not necessarily indicative of the operating results for future operating periods. The financial information set out in the announcement does not constitute the company's statutory accounts for the years ended December 31, 2009 or 2008. The financial information for the year ended December 31, 2008, is derived from the statutory accounts for that year which have been delivered to the Registrar of Companies. The auditors reported on those accounts; their report was unqualified, did not draw attention to any matters by way of emphasis without qualifying their report and did not contain a statement under s498(2) or (3) Companies Act 2006 or equivalent preceding legislation. The quarterly and twelve month information should be read in connection with the company's audited Consolidated Financial Statements and the notes thereto for the year ended December 31, 2008. The audit of the statutory accounts for the year ended December 31, 2009, is not yet complete. These accounts will be finalised on the basis of the financial information presented by the directors in this preliminary announcement and will be delivered to the Registrar of Companies following the company's annual general meeting. This announcement was approved by the Board of Directors on February 2, 2010.

2.   Accounting policies

Whilst the financial information included in this quarterly and twelve month announcement has been computed in accordance with International Financial Reporting Standards (IFRSs), this announcement does not itself contain all of the disclosures required by IFRSs.

Basis of preparation
The same accounting policies, presentation and methods of computation are followed in the condensed set of financial statements as applied in the group's 2008 Annual Report, except for as described below.

Adoption of new and current standards
In the current financial year, the group has adopted International Financial Reporting Standard 8 "Operating Segments" as required, and applied these principles throughout the year. IFRS 8 requires operating segments to be identified on the basis of internal reports about components of the Group that are regularly reviewed by the Chief Executive to allocate resources to the segments and to assess their performance. In contrast, the predecessor Standard (IAS 14 "Segment Reporting") required the group to identify two sets of segments (business and geographical), using a risks and rewards approach, with the group's system of internal financial reporting to key management personnel serving only as the starting point for the identification of such segments. The adoption of this standard has resulted in no changes in the segmental disclosures provided in note 3 of this condensed set of financial statements, or in any prior periods.

Going Concern
The group has considerable financial resources together with a significant number of customers across different geographic areas and industries. At December 31, 2009 the group has cash balances of $242.8 million and total debt of $167.5 million. The group has no net debt. As a consequence, the directors believe that the group is well placed to manage business risks successfully despite the current uncertain economic outlook.

After making enquiries and considering the group cash flow forecasts the directors have a reasonable expectation that the group has adequate resources to continue in operational existence for the foreseeable future. Accordingly, they continue to adopt the going concern basis in preparing the twelve month and quarterly consolidated financial statements

Adjusted Results
Although IFRS disclosure provides investors and management with an overall view of the company's financial performance, Autonomy believes that it is important for investors to also understand the performance of the company's fundamental business without giving effect to certain specific, non-recurring and non-cash charges. Consequently, the non-IFRS (adj.) results exclude share of profit/loss of associates, post-acquisition restructuring

Page 11

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429948

USAO 00003349

costs and non-cash charges for the amortization of purchased intangibles, share-based compensation, non-cash translational foreign exchange gains and losses and associated tax effects.  Management uses the adjusted results to assess the financial performance of the company's operational business activities.

See reconciliations on page 7.

3.      Segmental information

The Company is organized internally along group function lines with each line reporting to the group's chief operating decision maker, the Chief Executive Officer.  The primary group function lines include:  finance; operations, including legal, HR, and operations, marketing, sales and technology.  Each of these functions supports the overall business activities, however they do not engage in activities from which they earn revenues or incur expenditure in their operations with each other.  No discrete financial information is produced for these function lines.  The company integrates acquired businesses and products into the Autonomy model such that separate financial data on these entities is not maintained post acquisition.

The group has operations in various geographic locations however no discrete financial information is maintained on a regional basis. Decisions around the allocation of resources are not determined on a regional basis and the chief operating decision maker does not assess the group's performance on a geographic basis.

The group is a software business that utilises its single technology in a set of standard products to address unique business problems associated with unstructured data.  The group offers over 500 different functions and connectors to over 400 different data repositories as part of its product suite.  Each customer selects from a list of options, but underneath from a single unit of the proprietary core technology platform.  As a result, no analysis of revenues by product type can be provided.

Each of the group's virtual brands is founded on the group's unique Intelligent Data Operating Layer (IDOL), the group's core infrastructure for automating the handling of all forms of unstructured information. Separate financial information is not prepared for each virtual brand and used to assess its performance for the purpose of resource allocation decisions. The pervasive nature of the group's technology across each brand requires decisions to be taken at the group level and financial information is prepared on that basis.

A significant proportion of the group's cost base is fixed and represents payroll and property costs which relate to the multiple function lines of the group. As a result the business model drives enhanced performance though growing sales and accordingly group wide revenue generation is the key performance metric that is monitored by the chief operating decision maker.  The revenue financial data used to monitor performance is a prepared and compiled on a group wide basis. No separate revenue financial analysis is maintained on revenues from any of the virtual brands.

The Company's chief operating decision maker is the group's Chief Executive Officer, who evaluates the performance of the Company on a group wide basis and any elements within it on the basis of information from junior executives and group financial information and is ultimately responsible for entity-wide resource allocation decisions.

As a consequence of the above factors the group has one operating segment in accordance with IFRS 8 "Operating Segments". IFRS 8 also requires information on a geographic basis and that information is shown below.

The group's operations are located primarily in the United Kingdom, the US and Canada. The company also has a significant presence in a number of other European countries as well as China, Japan, Singapore and Australia. The following tables provide an analysis of the group's sales and net assets by geographical market based upon the location of the group's customers.

|  | Twelve Months Ended | | Three Months Ended | |
|---|---|---|---|---|
|  | (unaudited) | | (unaudited) | |
|  | Dec 31, 2009 | Dec 31, 2008 | Dec 31, 2009 | Dec 31, 2008 |
|  | $'000 | $'000 | $'000 | $'000 |
| Revenue by region: |  |  |  |  |
| Americas | 517,185 | 324,287 | 162,341 | 95,722 |
| Rest of World | 222,503 | 178,942 | 60,770 | 49,665 |
| Total | 739,688 | 503,229 | 223,111 | 145,387 |

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01429949

USAO 00003350

3.    Segmental information (continued)

Information about these geographical regions is presented below:

| | Twelve Months Ended (unaudited) | | | | | |
| | Dec 31, 2009 | | | Dec 31, 2008 | | |
| | Americas $'000 | ROW $'000 | Total $'000 | Americas $'000 | ROW $'000 | Total $'000 |
|---|---|---|---|---|---|---|
| Result by region | 212,775 | 59,307 | 272,082 | 139,104 | 43,405 | 182,509 |
| Post-acq'n restruct. costs | | | (846) | | | (1,157) |
| Gain on foreign exch. | | | 942 | | | 5,141 |
| Operating profit | | | 272,178 | | | 186,493 |
| Share of loss of associate | | | (273) | | | (2,196) |
| Interest receivable | | | 1,205 | | | 3,353 |
| Interest payable | | | (7,044) | | | (1,943) |
| Profit before tax | | | 266,066 | | | 185,707 |
| Tax | | | (74,515) | | | (53,958) |
| Profit for the period | | | 191,551 | | | 131,749 |

| | Three Months Ended (unaudited) | | | | | |
| | Dec 31, 2009 | | | Dec 31, 2008 | | |
| | Americas $'000 | ROW $'000 | Total $'000 | Americas $'000 | ROW $'000 | Total $'000 |
|---|---|---|---|---|---|---|
| Result by region | 76,549 | 19,467 | 96,016 | 48,982 | 18,250 | 67,232 |
| Gain on foreign exch. | | | 852 | | | 3,699 |
| Operating profit | | | 96,868 | | | 70,931 |
| Share of profit (loss) of associate | | | 457 | | | (962) |
| Interest receivable | | | 230 | | | 1,064 |
| Interest payable | | | (1,798) | | | (541) |
| Profit before tax | | | 95,757 | | | 70,492 |
| Tax | | | (26,363) | | | (19,097) |
| Profit for the period | | | 69,394 | | | 51,395 |

4.    Income taxes

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
| | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 |
|---|---|---|---|---|
| Tax charge by region: | | | | |
| UK | 46,413 | 41,148 | 22,562 | 16,810 |
| Foreign | 28,102 | 12,810 | 3,801 | 2,287 |
| Total | 74,515 | 53,958 | 26,363 | 19,097 |

5.    Share based compensation

Share based compensation charges have been charged in the consolidated income statement within the following functional areas:

| | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
| | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 |
|---|---|---|---|---|
| Research and development | 1,926 | 1,654 | 535 | 304 |
| Sales and marketing | 3,517 | 2,739 | 978 | 555 |
| General and administrative | 1,730 | 1,091 | 481 | 273 |
| Total share based compensation charge | 7,173 | 5,484 | 1,994 | 1,132 |

Page 18

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429950

USAO 00003351

**6.    Earnings per share**

The calculation of the basic and diluted earnings per share is based on the following data:

|  | Twelve Months Ended (unaudited) | | Three Months Ended (unaudited) | |
|---|---|---|---|---|
|  | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 | Dec 31, 2009 $'000 | Dec 31, 2008 $'000 |
| Earnings for the purposes of basic and diluted earnings per share being net profit | 191,551 | 191,749 | 69,394 | 51,395 |
| **Number of shares** | | | | |
| Weighted average number of ordinary shares for the purposes of basic earnings per share | 237,531 | 214,523 | 240,017 | 215,628 |
| Effect of dilutive potential ordinary shares: | | | | |
| Share options | 3,024 | 2,635 | 3,401 | 2,420 |
| Weighted average number of ordinary shares for the purposes of diluted earnings per share | 240,555 | 217,158 | 243,418 | 218,048 |

Earnings per share (adj.) is calculated by dividing the net profit (adj.) amounts shown on page 7 by the share denominators shown above.

**7.    Related Party Transactions**

There have been no related party transactions, or changes in related party transactions described in the latest annual report, that could have a material effect on the financial position or performance of the group in the financial year.

Page 14

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01429951

USAO 00003352

# EXHIBIT D

USAO 00003353

9.  SALES CONSULTING S.R.L. ("SALES CONSULTING") / POSTE ITALIANE (Q4 2009)

| Autonomy Entity | ASL |
|---|---|
| VAR | Sales Consulting |
| Proposed End-User | Poste Italiane |
| Date of Sales Agreement | 31 December 2009 |
| Licence Fee | €1,500,000 (plus €225,000 support and maintenance) |
| Payment Terms | Payable in two instalments:<br>50% (€862,500) due within 120 days of invoice date<br>50% (€862,500) due within 180 days of invoice date |
| Payment Received | No payments received from Sales Consulting in relation to this transaction |
| Sales Invoice Date | 31 December 2009 |
| Date Product Delivered | 31 December 2009 |
| Revenue Recognition on VAR Transaction | Licence revenue of €1,500,000 (at a GBP equivalent value of £1,361,409 and a USD equivalent value of $2,249,400) was recorded on 31 December 2009 in ASL's general ledger but transferred on the same date by an intercompany journal and recognised as revenue in Interwoven Inc. Support and maintenance of €225,000 (at a GBP equivalent value of £204,211 and a USD equivalent value of $326,738) was deferred, on the same date, to be recognised over the following year in ASL's general ledger. |
| Transaction between Autonomy and End-User | No transaction concluded. |
| Ultimate Conclusion of VAR Transaction | On 24 May 2010, Sales Consulting informed ASL that, as of 6 May 2010, they had been placed into liquidation.<br><br>By Q2 2011, a total bad debt provision of $1,567,577 had been recorded in respect of this deal. In Q3 2011, the invoice was written off in full. |
| False Accounting | Non-compliance with IAS 18 paragraph 14(a) and (d). |

12

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01550349

USAO 00003354

# EXHIBIT E

USAO 00003355

08-LUG-2010 16:09 Da:100 SERVI.

# Sales Consulting S.r.l. in Liquidazione

## COVER PAGE FAX

**OBJECT:** COPY our Comunications n. Prot.: Lettera-041-gz  del 24 maggio 2010

Number page: 1+2

TO:   AUTONOMY SYSTEM Ltd
       Cambridge Business Park
       Cowley Rd, Cambridge
       CB40WZ, UK
       Mr. Chamberlein,
       Mr.Kanter,
       Mr. Broll,
       Mr. Sushovan;

TO:   Internal legal consultant Mr. Petrucci Simone.

FROM: Rubeno Saverio Liquidatore Via Erminio Spalla 53 00142 Rome Italy;

Regards

Legal Representative
Mr. Rubeno Saverio

RACHEL

Sales Consulting S.r.l. Socio Unico in Liquidazione
Sede Legale: Via Erminio Spalla, 53 - 00142 Roma
Codice Fiscale e Partita IVA 

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01309275

USAO 00003356

# Sales Consulting S.r.l. in Liquidazione

Spett.le
AUTONOMY SYSTEM Ltd
Cambridge Business Park
Cowley Rd. Cambridge
CB40WZ, UK

Prot.: Lettera-041-gz          del 24 maggio 2010

Dear Steven Chamberlein,
as anticipated through Mr. Corrado Broli, on May 6th 2010 the company Sales Consulting Srl, in Via Nicolò Tartaglia 11, Rome, was placed in liquidation in accordance with the legislation in force in Italy.

The reasons that led the propriety to that decision are:

- Budget losses recorded in fiscal and financial management 2009;
- Very strong market restrictions and competition from large corporations due to the global financial crisis;
- Massive cuts in spending budget of the public administration and as a consequence of private too;

Moreover, the customer named Poste Italiane SpA, who had already expressed some difficulties with its delays (which we communicated to you in the email dated in april), is not in the right condition to acquire software applications and related services throughout 2010.

It is therefore with great regret that our company cannot maintain the conditions for the acquisition of the rights to the software registered by you on December 31st, 2009. We therefore ask you to adhere to one of the following requests, in order to close all negotiations easily and in partnership, which are object of our agreement on the customer named Poste Italiane:

A) A credit note issued by you for the total amount recorded on invoice No 4436-ASL dated 12/31/2009;
B) The resale to third party customers with total support by you in the research of the same as per your formal commitment dated 12/31/2009 which we include to the present letter;
C) The handover of the contract-agreement to resellers-third party vendors to the company indicated by you;

Given the state of irremediable difficulties our company is facing we believe it would be useful to reach a formal agreement not later than June 30th, 2010.

Awaiting for your prompt reply.

Yours sincerely

Legal Representative
Mr. Ruhana Saverio

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01309276

USAO 00003357

09-LUG-2010 16:09 Da:100 SERVI...          065053282         H:00441C   TUE/TEL

**Autonomy**

December 31, 2009

Autonomy Systems Limited
Cambridge Business Park
Cowley Road,
Cambridge CB4 0WZ, UK
www.autonomy.com

Dear Mr. Zignani,

I am happy to confirm on behalf of Autonomy Systems Limited ("Autonomy") the following relating to Sales Consulting S.r.l. ("Sales Consulting") purchase of Autonomy technology for resale to Poste Italiane pursuant to a purchase order dated the date hereof. Sales Consulting will receive a discount of £300,000 for this transaction.

In the unlikely event that Poste Italiane decides not to pursue its current project, Autonomy will consent to a resale by Sales Consulting of the Poste Italiane licence (or similar Autonomy's products) to a number of different customers for similar purposes and for a combined similar value. Autonomy will not require an additional purchase order provided the total values reflect the same, but must be notified of the details relating to such purchases. All other terms and conditions of the purchase order remain unchanged. Specifically, the payment terms of the purchase order shall not change regardless of the consent to resale.

Autonomy will take every effort to support Sales Consulting with respect to this transaction, and are particularly please to be working with Sales Consulting given your expertise on Autonomy's technology and investment in the account.

Please do not hesitate to contact me with any questions or for any additional assistance.

Best regards,

Andrew Kanter
Company Secretary
Autonomy Systems Limited

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01309277

USAO 00003358

# EXHIBIT F

USAO 00003359

Memorandum to the Board of Autonomy Plc
Approval to proceed with the Vatican transaction

Prepared by:   Sushovan Hussain (CFO & Peter Menell (CTO)

Date:          27th November 2009

For the past 2 years we have been in discussions with the Vatican investigating an opportunity to digitally preserve the priceless manuscripts held in the Vatican Library. The project has been formally known as 'Digitalizzazione dell'Archivio della Biblioteca Apostolica Vatican).

The scale and significance of the project is immense both in practical and cultural terms. The library and the attached so called "secreted archives" house over 170 kilometers of shelving containing parchment and papyrus dating back to the first century AD. The repository amounts to arguably the world's greatest single concentration of original art, philosophy, politics, science and multidenominational religious works. Original material from some of the most significant and iconic historical figures from the last two millennia known to be present include that from Botticelli, Dante, Michelangelo, Louis XIV of France, Henry VIII of England and Napoleon Bonaparte, Galileo, St. Peter, Martin Luther and Mozart. The library also includes among other items whole preserved religious pieces such as a 6th century Matthew's Gospel Old Testament Book of kings, Absolution for leaders of Templar, and the Gutenberg Bible. Many works have been lost to history due to errors or omissions in cataloging and the fact is that only 12% of the inventory to date has undergone any form of academic inspection. This project will have an impact not only through the ability to codify and index this material for the first time and hence illuminating its hidden intellectual wealth but also for the first time permitting universal popular access around the world through it digital presence.

The current projected time line to complete the digital capture of the sources within the library alone is a minimum of 10 years using a purpose built 24/7 scanning vault containing 60 specially constructed optical platforms. A project of this scale and potential historical and cultural impact has not yet been attempted elsewhere and nor could it be given the singular nature of the collection. Thus the Vatican has approached Autonomy for our unique technological leadership and guidance in creation and analysis of such a complex index.

We have analysed the requirements and have negotiated directly with the Vatican state a fee of Euro 75 million (approximately $106 million) over a 10 year period for the provision of hardware, software, maintenance and services to deliver the project. We have also agreed a fee of Euro 35.9 million (approximately $51 million) as the initial purchase order to cover software, hardware, maintenance and services for the initial 3 year period. Please note that we would never be required to (or allowed to) access or touch the source manuscripts – this work will be carried out by the Vatican librarians. We would provide services to make sure the hardware and software works in accordance with the contract. Having entered into contractual negotiations we have agreed that the contract will be directly with the Vatican state and that the contract and first purchase order will be signed by the Secretary of State. Our principal contact during the negotiations has been with Cardinal Farina (Chief Librarian of the Vatican, and President of the Vatican School for Paleography) and Msgr Cesare Pasini (The Vatican Library Prefect). The payment terms have been agreed at 120 days and the standard technical warranty is for 1 year with monies refundable if the product cannot be repaired and replaced in the event of technical problems. The technical specification is straight forward and we have been involved in its preparation. The project would start in January 2010.

As a completely separate item, the Vatican extended a formal invitation to Autonomy to participate in a foundation that they propose to eventually establish to conduct this digital bibliography. The costs and technological input into such a program are understandably immense and the Vatican is looking for partners who can not only scientifically advise at this

FOIA CONFIDENTIAL TREATMENT REQUESTED

specialist level but who recognize the potential cultural impact to the world. Other members of the proposed foundation are the Italian Government, Finmecanica and Banco Uni Credito among others. UNESCO, the United Nations Educational, Scientific and Cultural Organization, has previously offered to assist and may be involved in the future. The foundation would be Vatican controlled entity designated for the delivery of the project only.

In recognition of this historic opportunity and chance to participate on a select intimate level we propose to donate Euro 10 million over the projected lifetime of the project (10 years). The initial donation would be Euro 2 million. The Vatican have stated that if the foundation is not established then any donation made would be refunded. In addition we would only make any commitments after our contract with the Vatican and PO is signed.

The proposed donation would not only secure one of the 5 board positions within the foundation and allow witness to the creation of this archive but from a pragmatic R&D protective accelerate many of our in-house research programs. By definition these programs rely on and are a function of data types and variance. Amongst other sources from within the foundation we would have access to unique written and pictorial Indo-European and Semitic language group data that will accelerates all forms of our ICR, OCR and Script recognition algorithms. Core routines that lie at the heart of IDOL data acquisition. The despite the historical content the outlying nature of this data will I predict dramatically boost contemporary edge case handling and overall transitional variance handling of both written and graphical material. When R&D and cultural significance are jointly considered such a charitable contribution would seem more than justified.

In addition, in our minds this is an utterly and supremely worthy cultural endeavor in which to have a chance at participation but also given the importance of Italy to Autonomy in business terms this will provide a huge lift in our Italian profile and publicity for which a charitable contribution of this size is a relatively small amount to secure.

**Approval required**
Given that this is the most important, the largest ever contract and the potentially the most public contract that we will have ever signed, we request the Board's authority to enter into the contract on the basis of the negotiated outcome described above.

In addition we request the Board's authority to commit to the donation of Euro 10 million over a 10 year period with the first tranche being Euro 2 million.

FOIA CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT G

USAO 00003362

From:      Corrado Broli [corradob@autonomy.com]
Sent:      Thursday, February 26, 2010 12:10 PM
To:        peter.menell sushovan
Cc:        march 2
Subject:   Poste Italiane for EAV

I met Mr. Cuturi (Managing Director of Postecom) about their sponsorship/partnership. They
are evaluating the possibility to put 20/25 M€ in the project (for Phase 1) but would like to
agree an exclusivity with us regarding similar projects. They can take in charge the e-
commerce part of the project.

He would like to involve Mr. Sarmi (CEO of Poste Italiane) in the next meeting with us.
Because of this he will give me a confirmation tomorrow afternoon about the meeting on
Thursday 4 March. I'll keep you informed asap.

Ciao,
Corrado

P.S. Since I'm now travelling by train the line is not always available but please call me
for any details you need.

FOIA CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT H

USAO 00003364

From:            Marco Zanchini [marcoz@autonomy.com]
Sent:            Sunday, March 28, 2010 8:50 PM
To:              Sushovan Hussain; Corrado Broli
Cc:              'Julie Dolan'; 'Andrew Kanter'; marcoz@autonomy.com; peterm@autonomy.com
Subject:         Re: FW: MOU-POSTE-02.doc ultima release
Attachments:     Letter of Intent.doc

Here it is. Forgive me not using the correct legal language.
Ciao
Marco

-----Original Message-----
From: "Sushovan Hussain" <sushovanh@autonomy.com>
To: "'Corrado Broli'" <corradob@autonomy.com>, "'Marco A. Zanchini'"
<marcoz@autonomy.com>
Cc: "'Julie Dolan'" <julied@autonomy.com>, "'Andrew Kanter'"
<andrewk@autonomy.com>
Date: Sun, 28 Mar 2010 12:59:52 +0100
Subject: FW: MOU-POSTE-02.doc  ultima release

> Can we have this translated please asap.
>
>
>
>
>
> From: Corrado Broli [mailto:corradob@autonomy.com]
> Sent: 28 March 2010 08:53
> To: Sushovan Hussain
> Cc: Peter Menell
> Subject: I: MOU-POSTE-02.doc ultima release
>
>
>
> Sushovan,
>
> please find here attached a copy (in Italian) of the LOI signed by
> BAV and Postecom.
>
>
>
> Ciao,
>
> Corrado
>
>
>
> Disclaimer: The information contained in this message is for the
> intended addressee only and may contain confidential and/or privileged
> information.
> If you are not the intended addressee, please delete this message and
> notify the sender; do not copy or distribute this message or disclose
> its contents to anyone. Any views or opinions expressed in this
> message are those of the author and do not necessarily represent those

                                    1

FOIA CONFIDENTIAL TREATMENT REQUESTED              HP-SEC-01596272

> of Autonomy Systems Limited or of any of its associated Companies. No
> reliance may be placed on this message without written confirmation
> from an authorised representative of the Company.
>
>
> _____
>
> Da: Luciano Ammenti [mailto:ammenti@vatlib.it]
> Inviato: sabato 27 marzo 2010 23.59
> A: Corrado Broli
> Oggetto: Fwd: MOU-POSTE-02.doc ultima release
>
>
>
> *************************************************
>    Biblioteca Apostolica Vaticana
>
> Responsabile Coordinamento dei Servizi Informatici
> C.E.D Director Luciano Ammenti
> Tel. 39+0669885004 39+0669879448 39+0669879523
> Fax. 39+0669884795 39+0669885327 :-) :-) :-) :-)
>
> *************************************************
>

4

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01896273

Letter of Intent

between

Biblioteca apostolica Vaticana, located at Citta' del Vaticano, Palazzo Apostolico, in the person of the Prefect, Reverendo Monsignor Cesare Pasini (from here denominated "BAV");

and

Postecom S.p.A. P. IVA 05838841004, located in Rome, Viale Europa, 175 by the Legal Representative Giovanni Caturi (from here denominated Postecom)

(jointly referred to as 'parties' or singularly 'party')

Given that

a) BAV and Autonomy Systems Ltd. ("Autonomy") have told Postecom reserved and public information relating to the project of digitalization of BAV's manuscripts developed by them in collaboration and based on the use of Autonomy's software (the "Progetto BAV") and have entertained with Postecom preliminary discussions on the possible involvement of Postecom in BAV's project;

b) The type of role that Postecom declared to be ready to cover, in the hypothesis of its involvement, is in the completition of the operative development of BAV's project, according to agreements that have to be perfected between the parties, as also eventually e-commerce operations;

c) Postecom, in the next sixty days, has the intention of finalizing the verification activities that she has started, in order to be able to communicate, by the expiration of this deadline, a complete proposal on the opportunities of collaboration within the BAV project;

d) In this view, based on Postecom's proposal, BAV has agreed to be available, and for the term of sixty days starting from the signature of the present document, not to close agreements or issue proposals or undergo discussions with third parties that foresee the collaboration with entities, different from Postecom, for a role equal or similar to the one that is at present under discussion for the assignement to Postecom.

This said, between the parties is agreed what follows:

1   PREAMBLE
    Preambles constitute an integral and substantial part of this agreement.

2   OBJECT OF AGREEMENT – DUTIES BETWEEN PARTIES
2.1 Parties agree that for the term of sixty days elapsing from the signature of the present agreement, BAV will not agree or will not formulate proposals or will not entertain any discussions with third parties that foresee the entrusting to a third party, different from Postecom, of a role identical or

analogous to that which parties are at present discussing of entrusting to Postecom, in other words a role that is pertaining to the fulfilment of the BAV project.

2.2   For the same period expressed above Postecom agrees not to sign agreements or formulate proposals or entertain in any case discussions with third parties that foresees the development by Postecom, in collaboration with third parties different from BAV and Autonomy, of projects similar to the BAV project.

2.3   At the expiration of the period outlined at paragraph 2.1 Postecom will unfold to BAV the terms of its collaboration proposal in respect to the BAV project. If this communication will not arrive within the required time, BAV will be free of the obligation mentioned in paragraph 2.1

2.4   Should Postecom within the period outlined in paragraph 2.1, communicate its collaboration proposal, Parties will discuss based on this and in good faith the terms of their possible collaboration. In any case it will be excluded for BAV any obligation, even preliminary, to negotiate on the base of this proposal, in conformity to previsions of article 5.

3   PRIVACY

3.1. Each party recognises the reserved nature of any information exchanged with each other for the execution of the present Agreement and before it and thus it commits to:
a) do not disclose and / or communicate to third parties, in part or in whole in written or verbal or graphical or on magnetic media or any other form any whatsoever information received by the other party without its preventive written consent;
b) not to use as a whole or in part any communication whatsoever transmitted from the other Party for a scope that is different from the execution of the verification and analisys that are covered in this agreement;
c) not to disclose or communicate to third parties the fact that it is participating to the project that is covered in this agreement;
d) not to disclose or communicate to third parties, as a whole or in part, the results of the activities developed in relation to this agreement, independently of their completition.

Parties mutually agree that are not to be considered reserved, in any case, the following:
   a)   information already of public domain at the moment of their communication or that became such subsequently without the party that has received them violating the present agreement;
   b)   information whose disclosure has previously been authorized in written form by the party that has disclosed them.

4   BEGINNING AND DURATION

The present agreement has a duration of 60 (sixty) days commencing on its signature by both parties. It is understood however that arrangements contained in this agreement related to privacy as the commitment undertaken by parties will remain effective even after the end on whichever cause of the present agreement so that information as mentioned in article 3 will be reserved for the following 5 (five) years.

FOIA CONFIDENTIAL TREATMENT REQUESTED

5    NON OBLIGATION TO SIGN
The present agreement does not bind the parties in signing any collaboration contract; in any case nothing shall be given for activities undertaken in the execution of this agreement.

6    COMMUNICATION TO THE PUBLIC
None of the parties will be able to output press releases or public announcement of any type in realtion to the subjects covered in this agreement unless there is an explicit consent from BAV and the other Parties, with the exception of the communictions required by law or by a legitimate disposition of an Administration.

7    REALTIONSHIPS BETWEEN PARTIES
The relationship between Parties is between independent subscribing entities that dispose of, each in its activity branch, a structure and and an organization completely autonomous and independent. None of the provision of the present agreement has to be interpreted as a means to constitute a partnership or a joint venture.

8    APPLICABLE LAW AND ARBITRATION
The present agreement is governed by vatican law and all eventual controversies realted to it will be dealth upon exclusively by a body of three umpires located in the Vatican city. The decision of the body will be according to the law and definitive. In case Parties do not reach an agreement the naming of the president of the body will be the President fo the Vatican Tribunal.

Undersigned in two originals in the Vatican City on the 25th of March 2010

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596276

# EXHIBIT I

USAO 00003370

From:        John Cronin
To:          Steve Truitt
Sent:        4/1/2010 4:44:28 PM
Subject:     order
Attachments: 2010-03-001 Micro Tech - Vatican.doc

Steve,
Here is the order for.
It needs to be signed and emailed back to me, assuming it meets your expectation.

From: Steve Truitt [mailto:STruitt@microtech.net]
Sent: Thursday, April 01, 2010 5:33 PM
To: John Cronin
Subject: RE: transaction

Should I send to Cynthia?

Steve Truitt
Executive Vice President and Chief Operating Officer (COO)
703-674-9185

From: John Cronin [mailto:john.cronin@fedbd.com]
Sent: Thursday, April 01, 2010 5:18 PM
To: Steve Truitt
Subject: RE: transaction

AU says they have confirmed the transfer on their end... which I guess means it left their account.
Let me know what you find out on that

From: Steve Truitt [mailto:STruitt@microtech.net]
Sent: Thursday, April 01, 2010 5:12 PM
To: John Cronin
Subject: RE: transaction

Not as of 3:00 will check as soon as I get out of this meeting and will get check out.

Steve Truitt
Executive Vice President and Chief Operating Officer (COO)
703-674-9185

From: John Cronin [mailto:john.cronin@fedbd.com]
Sent: Thursday, April 01, 2010 4:28 PM
To: Steve Truitt
Subject: transaction

I just talked w/ Dave re the most recent AU conversations.
I'm available to help w/ this... am awaiting details from AU.

Did the deposit make it to you?



CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 082784

PURCHASE ORDER
Under
Autonomy Government Reseller Agreement
Dated as of June 29, 2006

PURCHASE ORDER NO. ___AUT-03-20-001___

Purchase Order Date:          March 31, 2010 ("Effective Date")

| From: | MicroTech, LLC ("Reseller")<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182 |
| --- | --- |
| Ship to: | MicroTech, LLC<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182<br><br>Shipping Method: Electronic, such as via FTP transfer |
| To: | Autonomy, Inc.<br>One Market, Spear Tower, 19th Floor<br>San Francisco, CA 94105 |

1. Software:             IDOL Server licensed for the following operations:
                              (i)     Retrieval – Advance
                              (ii)    Retrieval – Lite
                              (iii)   Retrieval – Parametric
                              (iv)    Retrieval – Standard
                              (v)     Spelling Correction
                              (vi)    Summarisation
                              (vii)   Hyperlinking
                              (viii)  Script & Icon Recognition
                              (ix)    OCR
                              (x)     Z39.50 Federation

                         Connectors for use with IDOL server:
                              All currently available connectors

                         Autonomy LiquidOffice

                         Autonomy FITS Plugin

                         Autonomy SPE

                         Autonomy Mediabin
                              (i)  FITS image resampling

                         Autonomy Archive Solution with the following
                         operations:
                              (i) Digital Safe Core Appliance
                              (ii) Dual-write functionality
                              (iii) Compression
                              (iv) User Interface Portal
                              (v) Object Splitting and Combination

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH                    MICROTECH 082785

2.  Languages : All Autonomy supported languages including Latin, Greek and Hebrew.

3.  Platform : All current Autonomy supported platforms

4.  Number of Copies : One each of (1) above

5.  Number of Instances : Unlimited

6.  Number of Production Servers : Unlimited

7.  Number of Non-Production Servers : Unlimited

8.  Authorized Use : Licensee may use the Software and Hardware for the BAV for the project entitled "Digitalizzazione dell'Archivio della Biblioteca Apostolica Vaticana" for storage, processing and search of scanned manuscript images currently held in the Vatican Library.

9.  Authorised Number of Uses : 200 concurrent users

10. Territory of Software Installation : Vatican Territory

11. Fees (Software License, Support and Maintenance) :

|  | Phase 1 $ |
|---|---|
| Software plus first year Support and Maintenance | 11,550,000 |
|  |  |
|  |  |

17. Payment Terms : Licensee shall pay Autonomy in accordance with the following:

| Amount | Due and Payable |
|---|---|
| $11.55 million | 90 days from the Effective Date |

18. Software Delivery : Shipped ExWorks point of manufacture (per Incoterms

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 082786

Address                    2000) via electronic delivery

20.Commencement Date    :   On Effective Date

21.Expiry Date           :   30 March 2013

Signature below represents Reseller's agreement to purchase the products and services referenced above pursuant to terms of the Autonomy Government Reseller Agreement dated June 29, 2009, and the terms set forth above.

Company signature      _____

Name                   ___Steven B. Truitt___

Title                  ____CDD_____

Date                   ___3/31/2010_____

CONFIDENTIAL TREATMENT
REQUESTED BY MICROTECH

MICROTECH 082787

# EXHIBIT J

USAO 00003375

From:       Steve Truitt <STruitt@microtech.net>
Sent:       Thursday, April 1, 2010 6:08 PM
To:         John Cronin <john.cronin@fbdbd.com>
Subject:    Vatican
Attach:     3466_001.pdf

Latest po.


Steve Truitt
Executive Vice President and Chief Operating Officer (COO)
703-674-9185


From: MTcolorcopier@microtech.net [mailto:MTcolorcopier@microtech.net]
Sent: Thursday, April 01, 2010 6:05 PM.
To: Steve Truitt
Subject: Attached Image



Cronin0008277

PURCHASE ORDER
Under
Autonomy Government Reseller Agreement
Dated as of June 28, 2006

PURCHASE ORDER NO. AUT-03-20-001

Purchase Order Date:          March 31, 2010 ("Effective Date")

| | |
|---|---|
| From : | MicroTech, LLC ("Reseller")<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182 |
| Ship to: | MicroTech, LLC<br>8330 Boone Blvd., Suite 600<br>Vienna, VA 22182 |

Shipping Method: Electronic, such as via FTP transfer

| | |
|---|---|
| To: | Autonomy, Inc.<br>One Market, Spear Tower, 19th Floor<br>San Francisco, CA 94105 |

1.  Software:                 IDOL Server licensed for the following operations:
  (i)     Retrieval – Advance
  (ii)    Retrieval – Lite
  (iii)   Retrieval – Parametric
  (iv)    Retrieval – Standard
  (v)     Spelling Correction
  (vi)    Summarisation
  (vii)   Hyperlinking
  (viii)  Script & Icon Recognition
  (ix)    OCR
  (x)     Z39.50 Federation

Connectors for use with IDOL server:
  All currently available connectors

Autonomy LiquidOffice

Autonomy FITS Plugin

Autonomy SPE

Autonomy Mediabin
  (i)  FITS Image resampling

Autonomy Archive Solution with the following
operations:
  (i) Digital Safe Core Appliance
  (ii) Dual-write functionality
  (iii) Compression
  (iv) User Interface Portal
  (v) Object Splitting and Combination

Cronin0003278

2. Languages : All Autonomy supported languages including Latin, Greek and Hebrew.

3. Platform : All current Autonomy supported platforms

4. Number of Copies : One each of (1) above

5. Number of Instances : Unlimited

6. Number of Production Servers : Unlimited

7. Number of Non-Production Servers : Unlimited

8. Authorized Use : Licensee may use the Software and Hardware for the BAV for the project entitled "Digitalizzazione dell'Archivio della Biblioteca Apostolica Vaticana" for storage, processing and search of scanned manuscript images currently held in the Vatican Library.

9. Authorised Number of Uses : 200 concurrent users

10. Territory of Software Installation : Vatican Territory

11. Fees (Software License, Support and Maintenance) :

| | Phase 1 $ |
|---|---|
| Software plus first year Support and Maintenance | 11,550,000 |
| | |
| | |

17. Payment Terms : Licensee shall pay Autonomy in accordance with the following:

| Amount | Due and Payable |
|---|---|
| $11.55 million | 90 days from the Effective Date |

18. Software Delivery : Shipped ExWorks point of manufacture (per Incoterms

Cronin0003279

USAO 00003378

Address                          2000) via electronic delivery

20. Commencement Date      :    On Effective Date

21. Expiry Date             :    30 March 2013

Signature below represents Reseller's agreement to purchase the products and services referenced above pursuant to terms of the Autonomy Government Reseller Agreement dated June 28, 2006, and the terms set forth above.

Company signature _____

Name                            Steven B. Truitt

Title                           COO

Date                            3/31/2010

Cronin0003280

# EXHIBIT K

USAO 00003380

## 13. MICROTECH / VATICAN LIBRARY (Q1 2010)

| Autonomy Entity | Autonomy Inc |
|---|---|
| VAR | MicroTech |
| Proposed End-User | Vatican Library |
| Date of Sales Agreement | 31 March 2010 purchase order (issued under a 29 June 2006 agreement) |
| Licence Fee | $11,000,000 (plus $550,000 support and maintenance) |
| Payment Terms | Due within 90 days (by 29 June 2010) |
| Payment Received | Payments totalling $9,221,332 received as follows:<br>$500,000 (on 14 October 2010)<br>$4,321,332 (on 31 December 2010)<br>$2,000,000 (on 21 April 2011)<br>$2,400,000 (on 30 June 2011 but cheque dated 1 July 2011) |
| Sales Invoice Date | 31 March 2010 |
| Date Product Delivered | 31 March 2010 |
| Revenue Recognition on VAR Transaction | Licence revenue of $11,000,000 was recognised as revenue immediately on 31 March 2010. Support and maintenance of $550,000 was deferred, to be recognised over the following year. |
| Transaction between Autonomy and End-User | No transaction concluded. |
| Ultimate Conclusion of VAR Transaction | On 31 December 2010, a payment of $9,600,000 was made by ASL (via an Autonomy bank account) to MicroTech in relation to a licence for the use for three years of an ATIC. On the same date, a payment of $6,305,140 was received by Autonomy Inc from MicroTech, of which $4,321,332 was allocated against the invoice raised to MicroTech in relation to this transaction (and the remainder was allocated to other amounts outstanding from MicroTech).<br><br>The Autonomy group received no discernible value in return for ASL's payment of $9,600,000.<br><br>During Q2 and Q3 2011, a further $4,400,000 was paid to Autonomy Inc by MicroTech in relation to this transaction.<br><br>On 11 October 2011, the outstanding balance of $2,328,668 that MicroTech owed to Autonomy Inc in relation to this transaction was written off. |
| False Accounting | Non-compliance with IAS 18 paragraph 14(a), (b) and (d). |

18

# EXHIBIT L

USAO 00003382

## Administration

Print

### ARCHIVIST AND LIBRARIAN OF THE HOLY ROMAN CHURCH

His Excellency Most Reverend
Msgr Jean-Louis Bruguès, O.P.

### PREFECT

**Msgr Cesare Pasini**

 **Tel:**
+39/06698.79400

 **Fax:**
+39/06698.85327

### VICE PREFECT

**Dr Ambrogio M. Piazzoni**

 **Telefono:**
+39/06698.79481

 **Fax:**
+39/06698.85804

### COUNCIL

The Council is a consultative organ which assists the Librarian and the Prefect in dealing with the most important matters regarding the activities of the Library. It is presided by the Librarian and has the following members: the Prefect, the Vice Prefect, the Department Directors, the Secretary and the Bursar.

USAO 00003383

# EXHIBIT M

USAO 00003384

To:        'pasini@vatlib.it'[pasini@vatlib.it]
Cc:        'ammenti@vatlib.it'[ammenti@vatlib.it]; 'Corrado Broli'[corradob@autonomy.com]
From:      Sushovan Hussain
Sent:      Sun 12/19/2010 5:17:50 PM
Importance:        Normal
Subject:   RE: Commercial proposal on the digitisation of the Vatican library

Dear Monsignor Cesare Pasini,

I would like to say a heartfelt thank you for your gift. It is a marvelous gift and I will treasure it. Also thank you for attending the meeting last Wednesday. The meeting gave me a deeper understanding as to the commercial framework that may facilitate our shared goal. Following on from the meeting, we at Autonomy have given great thought on how we could structure a solution to the goal of digitizing the Vatican library. I have explored some of these ideas with Corrado Broli and he has shared them with Mr. Luciano Ammenti. In this letter I set out my latest thinking and I hope that the Vatican library will be able to socialize the commercial terms with other parts of the Vatican state for financing.

<u>Commercial proposal</u>

To make the project viable I believe it is necessary to break it down into a smaller initial phase. We therefore propose that the project is broken down into a one year production pilot which will provide the Vatican with a fully functioning system and infrastructure and a maximum of 3,800 books and manuscripts indexed and archived. There will then be 9 more years left to archive and index the whole of the library.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00094071

USAO 00003385

The cost for this one year production system is proposed at <u>Euro 13.0 million</u>. At a high level this includes:

Scanners, cameras, data centre build out, hardware and software

Operators and tutors (Vatican Library employees but paid for by Autonomy)

At the end of the year Vatican Library will have 2 fully functioning data centres and 3,800 documents captured and processed. The overall cost over 10 years (including the 1 year production pilot described above) is estimated to be Euro 100.5m (made up of scanners, software, hardware etc of $77.5m and operators and tutors of Euro 23 million). These costs can be confirmed during the first year build out phase as both of us gain more experience and at this stage can be part of a Memorandum of Understanding for the whole project.

<u>Technical validation</u>

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00094072

USAO 00003386

We have been working with the Vatican Library now for nearly two years. During this extended period of time we have completed several technical proofs of concept and pilots. Our team has remained constant throughout this period. We have shared these with the Vatican and very positive feedback has been received. In addition it is Autonomy's core business to build out data centres and host many petabytes of data in highly secure facilities. So we have no problem in guaranteeing the quality and timeliness of our work. Finally Autonomy is a large company with a market value of $6 billion and we have over $1 billion of cash on our balance sheet. So financially we are very strong and are able to provide a full end-to-end service for the Vatican Library.

Financing proposal

We at Autonomy view this project as a vital gift to history. So we have considered the maximum investment that we can provide to the project at E6.5 million. This should kick start the project and if the Vatican Library is able to finance the remaining E6.5m then the project can commence with immediate effect as we have already negotiated the contract. The thoughts I had as to how the Vatican Library could finance are a combination of own cash, further gifts from the Vatican state and others could be interested in providing secured financing because there will be hardware and data centres at the end of the project with value for collateral.

We would like to start the project as soon as possible and are available to assist in any way including making presentations to qualified others.

Yours sincerely,

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00094073

USAO 00003387

Sushovan Hussain

Chief Financial Officer

Autonomy Corp plc

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00094074

USAO 00003388

# EXHIBIT N

USAO 00003389

To:      sushovanh@autonomy.com[sushovanh@autonomy.com]
From:    Mike Lynch
Sent:    Tue 12/28/2010 10:19:13 AM
Subject: Fwd: Guidelines

how should i reply


X-Spam-Processed: autonomy.com, Thu, 23 Dec 2010 16:32:14 +0000
        (not processed: spam filter heuristic analysis disabled)
X-Rcpt-To: mrl@autonomy.com
X-MDRcpt-To: mrl@autonomy.com
X-Return-Path: pasini@vatlib.it
X-Envelope-From: pasini@vatlib.it
X-MDaemon-Deliver-To: mrl@autonomy.com
From: "mons. Cesare Pasini" <pasini@vatlib.it>
To: <mrl@autonomy.com>
Cc: <angelab@autonomy.com>,
        <sushovanh@autonomy.com>,
        "Corrado Broli" <corradob@autonomy.com>
Subject: Guidelines
Date: Thu, 23 Dec 2010 17:32:08 +0100
X-Mailer: Microsoft Office Outlook 12.0
Thread-Index: AcuivvD/dKEVN3o/RVKOZ!DqhyAadw==
X-Virus-Scanned: by bsmtpd at autonomy.com
X-MDAV-Processed: autonomy.com, Thu, 23 Dec 2010 16:32:15 +0000

Dear Mr. Lynch,
 Â Â Â Â Â Â Â Â Â Â Â Â Â  I remember with pleasure meeting with you, your
wife and Dr. Sushovan last December 11 and having the chance to share the
importance of the Vatican Libraryâ€™s manuscript digitalization project – a project
that has great universal value, i.e. safeguarding the great treasures of humanity at
the service of the sameÂ  humanity. On that occasion I listened with deep gratitude
and joy to your promise to apply the maximum flexibility in order to guarantee the
start of this project.
 Â Â Â Â Â Â Â Â Â Â Â Â Â  I think that it is a good idea to let you know â€' in an
informal way but for the precise purpose of finding a concretely practical way â€' the
guidelines that in a relatively brief time frame, could lead to the constitution of a
Foundation specifically dedicated to the Project and to the stipulating of an
agreement worthy of the Project itself.
 Â Â Â Â Â Â Â Â Â Â Â Â Â  The first point, as I understand it, is finding the
capital to provide to the Foundation, necessary to launch the planning and executive
activities. In this regard, the involvement of Autonomy is crucial. In fact, the minimum
capital needed to be able to start the project the first year appears to be €6,000,000
of which €5,000,000 should be invested by Autonomy and €1,000,000 by the Holy

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00094086

USAO 00003390

See within the six following months.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â  The Vatican Library will also devote to the project a year in kind value of €1,250,000, for a total of 10 years and therefore €12,500,000, covering two locations of the Information Technology department (one on Via della Conciliazione 5 and the other at Castelgandolfo), 32 fully equipped rooms, necessary electrical power, security guards and insurance for the manuscripts being moved, the use of the local conservation deposit site on Via della Conciliazione 5 and CED and administration personnel (4+2 people). On the other hand, Autonomy will furnish software, licenses and personnel necessary for the development and maintenance of the web interface and digital database research software, for the estimated in kind value of €7,000,000 in the first triennial.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Autonomy will be bound to guarantee only the start-up of the project and the completion of the first year. All of the payments for the third parties suppliers hardware and software installed by Autonomy within the first three years, will be paid to Autonomy by installments on 36 months. The €6,000,000 conferred to the Foundation will be used by the same to pay for the technology from the first year on, and the remaining capital of €7,500,000, necessary to complete the first triennial will be tied exclusively to the Foundationsâ€™ ability to raise funds.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â  For the first five year of the project, Autonomy shall be guaranteed to remain as the main contractor of the project and a member of the Vatican Foundation. Members of the board of the Foundation shall be appointed in equal numbers by Autonomy and the Vatican Library, with the exception of the chair who will be designated by the Holy See. For the same period, Autonomy will be alongside the Vatican Library in every scientific conference and media event as the main sponsor of the Digital preservation project.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Until the end of the fifth year of the project, equipment will be considered property of the Foundation (or joint property of Autonomy and Vatican Library). Only after the fifth year, the equipment will come into the full ownership of the Vatican Library, which, in light of the then existing capital of the Foundation, may autonomously decide whether to continue the process of digitizing or decrease the pace of the work depending on the economic feasibility.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Dear Mr. Lynch, we really want to reach a solution with the flexibility you need, and al-ready dream of the day in which we could attend an audience with the Holy Father, with you and your wife, at which we present the project by then up and running.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Warmest regards,
don Cesare Pasini

—

Mons. Cesare Pasini
Prefetto
Biblioteca Apostolica Vaticana

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00094087

USAO 00003391

Cortile del Belvedere
V-00120 CittÃ  del Vaticano

prefetto@vatlib.it


Dr Mike Lynch OBE FREng

CEO Autonomy

www.autonomy.com

The information contained in this message is for the intended addressee only and may contain
confidential and/or privileged information. If you are not the intended addressee, please delete
this message and notify the sender, and do not copy or distribute this message or disclose its
contents to anyone. Any views or opinions expressed in this message are those of the author and
do not necessarily represent those of Autonomy Systems Limited or of any of its associated
companies. No reliance may be placed on this message without written confirmation from an
authorised representative of the company. Autonomy Systems Limited, Registered Office:
Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 08068054.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00094088

USAO 00003392

# EXHIBIT O

USAO 00003393

| | |
|---|---|
| **From:** | Sushovan Hussain [sushovanh@autonomy.com] |
| **Sent:** | Wednesday, January 19, 2011 8:02 AM |
| **To:** | 'Marco A. Zanchini' |
| **Subject:** | FW: Guidelines |

**From:** Mike Lynch [mailto:mrl@autonomy.com]
**Sent:** 11 January 2011 22:49
**To:** pasini@vatlib.it
**Subject:** re:Guidelines

Dear Mons. Pasini,

Thank you very much for your letter and please accept my apologies, for the delay in my response as I have been trying to find a route forward and awaiting feedback from third parties. Thank you also for your kind hospitality and your gift Angela and I will treasure it always.

As I said at our meeting, I myself and Autonomy also share your belief that the Vatican Library manuscript digitalization project has great universal value. We also agree with the Vatican that the best way for achieving this is through the setting up of a Foundation through which capital can be raised and the project can be run. Whilst my colleague Mr. Broli has tried very hard to gain sponsors this has not been successful to date. We will carry on trying.

In terms of the project financing, if I understand the figures correctly, Autonomy would be investing Euro 5 million and the Vatican would invest Euro 1 million for a one year project. Whilst this sounds interesting to us, I fear I may not be able to convince our board to approve this as they would be concerned the project was under funded and too important to risk under funding such important work. There would also be a complication as they would have to be informed our year 1 costs from third party suppliers is around Euro 6 million.

I have been thinking long and hard about how we could kick this project off. Perhaps an idea would be to go ahead on an even smaller scale project say Euro 2 million. We would invest Euro 1 million and the library would invest Euro 1 million. We could agree on the machines and small scale build out which would provide a showcase with which to make publicity and therefore gather sponsors. If at the end of the period sponsors have not come forward then we could discuss different financing strategies.

I sincerely hope we can reach a solution to the financing issue which would allow this great work to commence and my colleague Mr. Hussain is available to meet with you at any time.

Yours sincerely and my best wishes for the new year,


Mike Lynch

1

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-00130127

USAO 00003394

Dr Mike Lynch OBE FREng

CEO Autonomy

www.autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

2

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00130128

USAO 00003395

# EXHIBIT P

USAO 00003396

| | |
|---|---|
| From: | Corrado Broli [corradob@autonomy.com] |
| Sent: | Sunday, April 11, 2010 6:31 AM |
| To: | Andrew Kanter |
| Cc: | Sushovan Hussain |
| Subject: | RE: BEE Team |

Andy,

could you please prepare the paperwork (3 MEuro + 5% maintenance) for:

AUXILIUM Group
via Giulio Vincenzo Bona, 85
00156 Roma

The CEO is Mr. Luca Mastroianni

Ciao and thanks,
Corrado

Disclaimer: The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender; do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated Companies. No reliance may be placed on this message without written confirmation from an authorised representative of the Company.

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** venerdì 9 aprile 2010 9.46
**To:** 'Corrado Broli'
**Subject:** RE: BEE Team

**From:** Corrado Broli [mailto:corradob@autonomy.com]
**Sent:** 09 April 2010 08:39
**To:** Andrew Kanter
**Subject:** BEE Team

Andy,

could you please prepare a new "2x" version changing the amount from 7 to 5 Million Euro + 5% support & maintenance ? The VAR agreement should be signed by BEE Sourcing instead of BEE Team.

Thanks,
Corrado

Disclaimer: The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender; do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated Companies. No reliance may be placed on this message without written confirmation from an authorised representative of the Company.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00520732

USAO 00003397

# EXHIBIT Q

USAO 00003398

To:         'Corrado Broli[sbroli@autonomy.com]
From:       Andrew Kanter
Sent:       Sun 4/11/2010 2:38:36 PM
Importance:          Normal
Subject:    docs
2008-07-17 Autonomy VAR agreement3.doc
2.1.doc

attached

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01696376

USAO 00003399

Autonomy

PRODUCT SCHEDULE

1. Software                        :   IDOL Server licensed for the following operations:
                                       (i)      Retrieval – Advance
                                       (ii)     Retrieval – Lite
                                       (iii)    Retrieval – Parametric
                                       (iv)     Retrieval – Standard
                                       (v)      Spelling Correction
                                       (vi)     Summarisation
                                       (vii)    Hyperlinking
                                       (viii)   Script & Icon Recognition
                                       (ix)     OCR
                                       (x)      Z39.50 Federation

                                       Connectors for use with IDOL server:
                                            All currently available connectors

                                       Autonomy LiquidOffice

                                       Autonomy FITS Plugin

                                       Autonomy SPE

                                       Autonomy MediaBin
                                       (i)    FITS image resampling

                                       Autonomy Archive Solution with the following operations:
                                       (i)      Digital Safe Core Appliance
                                       (ii)     Dual-Triple functionality
                                       (iii)    Compression
                                       (iv)     User Interface Portal
                                       (v)      Object Splitting and Combination

2. Languages                       :   All Autonomy supported languages including Latin, Greek and Hebrew.

3. Platform                        :   All current Autonomy supported platforms

4. Number of Copies                :   One each of (1) above

5. Number of Instances             :   Unlimited

6. Number of Production            :   Unlimited
   Servers

7. Number of Non-                  :   Unlimited
   Production Servers

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01596379

8.  Authorized Use : Licensee may use the Software and Hardware for the BAV for the project entitled "Digitalizzazione dell'Archivio della Biblioteca Apostolica Vaticana" for storage, processing and search of scanned manuscript images currently held in the Vatican Library.

9.  Additional warranty : For a period of twelve (12) months from the date of initial delivery each component of the Software to VAR, the Software will substantially perform in accordance with the Autonomy's standard data sheets. Further, at any time during the first 180 days from the date of this purchase order, should VAR request a demonstration of the Software in situ and such demonstration fails to meet the applicable specifications set forth in the standard data sheets, then such failure would also entitle VAR to invoke a warranty breach.

The above warranty applies only to problems reported by VAR to Autonomy in writing during the aforesaid warranty period. The foregoing warranty shall not apply to any Software that has been modified either than by Autonomy, or that has been improperly installed or used in any manner other than as authorized under this Agreement. LICENSEE'S SOLE AND EXCLUSIVE REMEDY UNDER ANY WARRANTY SHALL BE LIMITED TO SUPPORT OR REPLACEMENT OF THE SOFTWARE. IN THE EVENT AUTONOMY IS NOT ABLE TO SUPPORT OR REPLACE THE SOFTWARE, LICENSEE MAY TERMINATE THE AGREEMENT AND/OR RECEIVE A REFUND FOR THE APPLICABLE SOFTWARE FEES.

10. Authorised Number of users : 200 concurrent users

11. Territory of Software installation : Vatican Territory

12. Fees (Software License, Support and Maintenance) : Software plus first year Support and Maintenance        Euro 3,150,000

17. Payment Terms : Licensee shall pay Autonomy in accordance with the following:

| Amount | Date and Payable |
|---|---|
| Euro 3 million | 90 days from the Effective Date |
| Euro 150,000 | 120 days from the Effective Date |

18. Software Delivery Address : Shipped ExWorks point of manufacture

20. Commencement Date : 31 March 2010

21. Expiry Date : 31 March 2013

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596380

USAO 00003401



Autonomy

This AUTONOMY VALUE ADDED RESELLER AGREEMENT ("Agreement") is entered into as of 31 March 2010 ("Effective Date") between Autonomy Systems Limited, part of the Autonomy Group, with offices located at Autonomy House, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, UK ("Autonomy"), and AUXILIUM Group, with offices at Via Stalio Vincenzo Bona, 85, 00156 Rome ("VAR").

1.   DEFINITIONS AND CONSTRUCTION.

   1.1   Definitions.  In this Agreement and the Exhibits to this Agreement, the terms set forth below shall have the following meaning:

      (a)   "Autonomy Trade Marks" shall mean such trade marks, service marks, logos and designs owned by Autonomy and used by VAR from time to time in relation to the Autonomy Products, including those listed in Exhibit A.

      (b)   "Confidential Information" shall have the meaning set forth in Section 19.

      (c)   "End Users" shall mean third party entities for whom VAR provides Services in respect of Autonomy Products.

      (d)   "Enhancement" shall mean a change or addition to the Autonomy Products, other than an Error Correction or a New Release, that (i) improves the function of, (ii) adds a new function to or (iii) substantially enhances the performance of an Autonomy Product, provided that Enhancements shall not include any improvements or new functions, in any form, that have a value or utility separate from the use of the Autonomy Products and that may be priced and offered separately from the Autonomy Products.

      (e)   "Error Correction" shall mean a change to any Autonomy Product that allows such Autonomy Product to re-establish material conformity with the specifications for such Autonomy Product.

      (f)   "New Release" shall mean any revision of the Autonomy Products, other than an Enhancement or an Error Correction, for which the version or revision number of such Autonomy Product is increased by a whole number.

      (g)   "Products" shall mean the software and associated products and materials specified in Exhibit A.

      (h)   "Services" shall mean services provided to an End User by VAR which may include demonstration, pre-sales support, installation, customisation, training and other consulting or integration of the Autonomy Products.

      (i)   "Term" shall have the meaning set forth in Section 14.

      (j)   "Territory" shall mean the territory set forth in Exhibit A.

      (k)   "VAR Program Fees" shall mean the VAR program fees specified in Exhibit C.

   1.2   Reference, Headings and Interpretation.  In this Agreement and the Exhibits to this Agreement: (a) the Exhibits to this Agreement shall be incorporated into and deemed part of this Agreement and all references to this Agreement shall include the Exhibits; (b) references to any law, legislative act, rule or regulation shall include any changes, supplements, successors or replacements thereto; (c) the Section headings are for reference and convenience only and shall not be considered in the interpretation of this Agreement; and (d) in the event of a conflict between this Agreement and any of the Exhibits, the terms of this Agreement shall prevail.

2.   APPOINTMENT.  Autonomy hereby appoints VAR, and VAR hereby accepts such appointment, to act as Autonomy's non-exclusive reseller of Autonomy Products in the Territory.

3.   OBLIGATIONS OF VAR.

   3.1   Performance.  VAR agrees with Autonomy that VAR shall: (a) use its best efforts to promote, market and sell Autonomy Products to End Users within the Territory, and perform Services in connection therewith, all in accordance with the terms and conditions contained herein; (b) maintain a sufficient number of VAR's sales personnel, pre-sales and consulting personnel trained in the features and functions of the current version of the Autonomy Products to (i) actively solicit orders for the Autonomy Products from End Users; (ii) properly inform and demonstrate to End Users the features and capabilities of the Autonomy Products; and (iii) provide or arrange provision of pre- and post-sales technical assistance, service and support to End Users; (c) require VAR's sales, pre-sales, consulting and technical personnel to attend Autonomy's training classes as may be required by Autonomy; and (d) not make any representations, warranties, conditions or guarantees with respect to the specifications, features or capabilities of the Autonomy Products that are inconsistent with or in addition to those made by Autonomy in writing.

Page 1
Autonomy VAR Agreement
20080717

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01598391

USAO 00003402

3.2     Territory and Customers.  (a) The Autonomy Products may be distributed by VAR only in the Territory set forth on Exhibit A.  (b)  Autonomy reserves the right to sell the Autonomy Products directly to customers inside or outside the Territory.

3.3     Sales.  (a) Except as otherwise provided in this Agreement, VAR shall assume all responsibility and liability to its customers with respect to the Autonomy Products.  (b) VAR shall require each customer to enter into a standard software licence agreement with VAR containing terms no less restrictive that those set forth in Autonomy's standard licence agreement available at www.autonomy.com/content/EULA.

3.4     Advertising and Promotion.  With respect to the promotion of the Autonomy Products:  (a) VAR shall be responsible for all costs associated with VAR's promotional activity for the Autonomy Products.  (b) All co-operative advertising activities shall be coordinated and approved by Autonomy in writing.  (c) The parties shall discuss from time to time VAR's promotional and advertising plans for the Autonomy Products.  VAR shall not publish, issue or display or authorise the publication, issuance or display of any advertisement or promotional materials relating to the Autonomy Products without Autonomy's prior written approval.  Autonomy may supply Autonomy's own promotional and advertising materials to VAR for inclusion in VAR's own promotional and advertising materials for the Autonomy Products.  (d) VAR agrees that Autonomy may refer to VAR and the Autonomy Products licensed by VAR's End Users with other Autonomy customers or prospective customers and that Autonomy may provide to third parties VAR's name and the names of End Users.

3.5     Marketing Plan.  Within 30 days of the Effective Date, and on approximately a quarterly basis, VAR and Autonomy shall develop, mutually approve and update a "Joint Business Plan" for promotion of the Autonomy products.

3.6     Business Practices.  VAR agrees with Autonomy: (a) to conduct business in a manner which reflects favourably at all times on the Autonomy Products and the good name, goodwill and reputation of Autonomy; (b) to avoid deceptive, misleading or unethical practices that are or might be detrimental to Autonomy or the Autonomy Products, including but not limited to disparagement of Autonomy or the Autonomy Products; (c) to make no false or misleading representations with regard to Autonomy or the Autonomy Products; (d) to comply with all applicable international, national and local laws and regulations in performing its duties hereunder and in any of its dealings with respect to the Autonomy Products, including without limitation all import and export regulations; and (e) that VAR shall, in all correspondence, documents and applications concerning the Autonomy Products, identify the Autonomy Products as originating from Autonomy.

3.7     Expenses.  Except as otherwise provided in this Agreement, VAR shall bear the entire cost and expense of the performance of its obligations under this Agreement, including bad debt expenses, inventory losses, Autonomy Product returns, commissions and taxes.

3.8     Press Releases.  VAR shall make no public statement regarding this Agreement and the Autonomy Products without Autonomy's prior written approval.  At Autonomy's election, within 30 days of the Effective Date VAR and Autonomy shall issue a joint and mutually agreed upon press release relating to this Agreement.  VAR further agrees to cooperate with and support Autonomy in its press release and publicity materials.

3.9     Leads.  With respect to any Lead provided to VAR by Autonomy, VAR agrees not to market or sell any products competitive with the Autonomy Products to such Lead for the specific Lead opportunity identified, and will promptly notify Autonomy if such Lead is considering purchasing a competitive product.  "Lead" means a potential customer with whom VAR had conduct as a result of the use of any Autonomy resource (human, financial, electronic or otherwise) that played a substantial factor in the introduction or sale of the Autonomy Products.

4.     OBLIGATIONS OF AUTONOMY.

4.1     Initial Delivery.  Following completion by VAR's delegates of the training course detailed in Exhibit C Section 3, Autonomy will deliver to VAR one copy of the Autonomy Products.  VAR may make additional copies of the Autonomy Products only to the extent required for demonstration, training or development purposes and in accordance with Exhibit C and Exhibit D.  Autonomy shall make available to VAR, at Autonomy's standard pricing, reasonable quantities of Autonomy's sales and technical brochures.

4.2     Training.  Autonomy may make available to VAR training courses as available at Autonomy's discounted partner pricing.

4.3     Support.  (a) With respect to VAR, provided VAR is current in its payment of the VAR Program Fees, Autonomy shall provide to VAR support and maintenance services for the Autonomy Products in accordance with its then-current support service policies for VAR's internal use only.  These support service policies support matters to be logged by VAR into, and initiated solely through, the Autonomy electronic helpdesk system (currently known as Autanaher).  Autonomy will not be liable for any failures or delays arising as a result of VAR's failure to properly log tickets.  (b) With respect to End Users, all support of Autonomy Products to End Users shall be provided by VAR.

5.     ORDERS.  VAR shall submit to Autonomy a written purchase order for Autonomy Products setting forth the information in Exhibit E hereto and, if requested, a copy of a signed End User Licence Agreement between the End User and VAR.  Autonomy has the right to reject any purchase order prior to shipment.  Once the Autonomy Products on a

Page 2
Autonomy VAR Agreement
20080717

USAO 00003403

purchase order have been shipped by Autonomy, VAR may not cancel or amend the purchase order without the prior written consent of Autonomy. In the event of any conflict between the terms of a purchase order and this Agreement, the terms of this Agreement shall prevail.

6.    PRICE/ PRICING.

6.1    Price to VAR. All Autonomy Products purchased by VAR from Autonomy shall be sold to VAR at the fees and/or discounts specified in Exhibit C. Autonomy reserves the right to change its prices, terms and conditions at any time prior to acceptance of an order.

6.2    Support Payments. With respect to each End User, Autonomy shall issue an invoice to VAR for support annually in advance commencing on the first day on which the sale is made.

6.3    Pricing by VAR. VAR is free to determine its own prices and per copy fees to End Users. Autonomy may from time to time publish suggested wholesale or retail prices and per copy fees, provided, however, that such prices and fees are suggestions only and VAR is and shall be free to determine the actual prices and per copy fees at which the Autonomy Product will be licensed to its End Users.

6.4    VAR Program Fees. In consideration of VAR's payment to Autonomy of the VAR Program Fees, VAR shall be entitled to: (a) the license rights as set forth in this Agreement; (b) Autonomy support services; and (c) purchase Autonomy training classes to be held at Autonomy training facilities. The VAR Program Fees shall be invoiced annually by Autonomy and shall be due within 30 days after the date of such invoice.

7.    PAYMENTS. (a) Upon receipt and acceptance of an order for the Autonomy Products, Autonomy shall deliver an invoice to VAR indicating the amount due for the Autonomy Products. (b) Charges set forth in such invoice shall be due and payable to Autonomy within 30 days of the date of Autonomy's invoice. (c) VAR shall not be relieved of its obligations to pay fees owed to Autonomy hereunder by the non-payment of fees by an End User. (d) Balances past due shall accrue interest until paid in full at the lower of (i) 0.5% per month or (ii) the maximum rate permitted by law. (e) VAR shall be responsible for timely payment of all taxes (including without limitation, sales, value added and withholding taxes), fees import and export fees and duties arising from the performance by the parties of the terms of this Agreement, other than taxes based upon the net income of Autonomy, or VAR shall furnish Autonomy with appropriate tax exemption certificates.

8.    SHIPPING. Autonomy Products shall be shipped by means and on media agreed between the parties, and in the absence of agreement otherwise shall be ExWorks point of manufacture (per Incoterms 2000) and delivery may be electronic, such as via FTP. Autonomy may at its discretion make any New Releases and Error Corrections available for downloading by VAR from Autonomy's web site. Autonomy shall not be liable for any delay in delivery or failure to give such notice of delay. VAR shall bear all expenses of physical shipment.

9.    REPORTS, NOTICES AND AUDITS.

9.1    Sales Reports. VAR agrees to provide Autonomy from time to time as Autonomy may reasonably request, order and sales reports detailing its End Users (including contact names and details), Autonomy Products sold, prices and revenue accrued, for purposes of monitoring VAR's obligations under the terms of this Agreement.

9.2    Other Reports. VAR shall furnish to Autonomy, at Autonomy's request, such periodic forecasts, budgets and promotional schedules as Autonomy may reasonably request. VAR will notify Autonomy in writing within five working days of any (i) knowledge of any claimed or suspected defects in the Autonomy Products; (ii) knowledge of any claim or proceeding involving the Autonomy Products; or (iii) (A) change in the management or voting control of VAR; or (B) transfer of all or substantially all of VAR's assets.

9.3    Records. VAR shall keep and maintain full, true and accurate records containing all data reasonably required for the accurate verification of VAR's performance under the terms of this Agreement.

9.4    Inspection. For the term of this Agreement and for a period of two years after the date of termination, VAR shall make available to Autonomy for inspection and copying, upon reasonable written notice, all books and records of VAR that pertain to VAR's performance of and compliance with its obligations, warranties and representations under this Agreement including, to the extent reasonably necessary, access to all facilities of VAR in which VAR performs its obligations under this Agreement.

10.    SOFTWARE LICENSES.

10.1    Grant of License to Resell Autonomy Products. Subject to the terms of this Agreement, Autonomy hereby grants to VAR, during the term of this Agreement, a limited, nonexclusive, non-transferable right and license to distribute copies of the Autonomy Product to VAR's customers.

10.2    Grant of License for Demonstration, Training and Project Development. Provided that VAR has met the requirements set forth in this Agreement and Exhibits, Autonomy hereby grants to VAR a non-exclusive, non-transferable license to reproduce and use a reasonable number of copies of the Autonomy Products, except those that contain third

Page 3
Autonomy VAR Agreement
20060717

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01596283

party royalty bearing technology, solely for (a) demonstrating the Autonomy Products on VAR's premises or at trade shows or seminars; (b) providing training on VAR's premises; (c) demonstrating the Autonomy Products at a prospective End User's site; (d) the development of VAR's internal expertise of Autonomy Products; and (e) the development, testing, support and delivery by VAR of Services to End Users.

**10.3    License Exclusions.**  Except as provided in Sections 10.1 and 10.2, VAR shall have no rights in respect of any intellectual property rights owned or used by Autonomy, including with respect to Autonomy Products, and VAR acknowledges that, except as expressly provided in this Agreement, it shall not acquire any rights in respect of them and that all such intellectual property rights are and shall remain vested in or controlled by Autonomy.  No other rights to Autonomy Products are granted by Autonomy to VAR, or may be granted by VAR to any third party.  Specifically, but not by way of limitation, VAR shall not:  (a) appoint third parties to market, sublicense or otherwise distribute the Autonomy Products, and neither VAR nor any of its employees, agents or representatives may manufacture, reproduce or sublicense (except as otherwise expressly permitted herein) the Autonomy Products, or distribute derivative works of the Autonomy Products; (b) except as required to be allowed by applicable law, modify, change, decompile, disassemble, reverse compile or reverse engineer the Autonomy Products without Autonomy's prior consent; (c) rent, electronically distribute or timeshare the Autonomy Products or market the Autonomy Products by interactive cable or remote processing services; (d) use the Autonomy Products provided to VAR hereunder in any way for its own internal business purposes; (e) use the Autonomy Products for the purposes of conducting comparative analysis, evaluations or product benchmarks without Autonomy's prior written approval; (f) provide the Autonomy Products to any person or entity other than a licensed End User of the Autonomy Products; or (g) do or authorise any third party to do any act which would or might invalidate or be inconsistent with any intellectual property rights of Autonomy and shall not do or authorise any third party to do any act which, by its omission, would have that effect.

**11.    ENHANCEMENTS AND NEW RELEASES.**

**11.1    Enhancements and New Releases.**  Autonomy may provide Enhancements or New Releases to VAR for inclusion in, or as replacements for, the Autonomy Products.  Upon the delivery of any such Enhancements or New Releases to VAR by Autonomy, each such Enhancement or New Release shall become part of, or replace the applicable Autonomy Products, for purposes of this Agreement.

**11.2    Restricted Releases.**  If VAR receives any version of the Autonomy Products marked as alpha, test or otherwise designated as a "Restricted Release": (a) VAR shall promptly report to Autonomy any error discovered in the Restricted Release; (b) Autonomy shall have no obligation to deliver Enhancements or New Releases for the Restricted Release; (c) Autonomy shall have no obligation to support the Restricted Release; (d) VAR shall provide Autonomy with appropriate test data for the Restricted Release if necessary to resolve errors in the Restricted Release encountered by VAR; (e) the Restricted Release shall be provided to VAR on an as-is basis with no warranty of any kind, express or implied, shall be deemed experimental and may contain errors; (f) neither party shall be responsible or liable to the other for any losses, costs or damages of whatever nature arising out of or in connection with the performance or non-performance of the Restricted Release; (g) VAR's use of the Restricted Release shall be for testing purposes only and shall not be related in any way to production applications or to VAR's delivery of Services to an End User; and (h) VAR shall not distribute the Restricted Release to third parties without the prior written consent of Autonomy.

**12.    PROPRIETARY MARKINGS.**

**12.1    License Grant.**  Subject to and conditioned upon VAR's compliance with the terms and conditions of this Agreement, Autonomy hereby grants to VAR a non-exclusive, non-transferable right to use within the Territory the Autonomy Trademarks, solely in conjunction with VAR's performance under this Agreement.  Any reference to, or use of, the Autonomy Trademarks must follow Autonomy's trademark guidelines and contain appropriate trademark notices.  Upon termination of this Agreement, VAR will immediately cease all use of any Autonomy name, trademark or logo.  The Autonomy logos may not be altered by any party other than Autonomy.

**12.2    Retention of Rights.**  Autonomy expressly reserves all rights not specifically granted by VAR hereunder.  Without limiting the generality of the above, VAR expressly agrees that Autonomy retains all right, title, and interest in and to all of the Autonomy Trademarks.  All use of the Autonomy Trademarks by Partner will inure to the benefit of Autonomy.  VAR shall not at any time represent that it is the owner of the Autonomy Trademarks, shall not dispute the validity of the Autonomy Trademarks and shall not at any time register, or cause to be registered, in its name or in the name of any other person, or use or employ during or after the Term, any of the Autonomy Trademarks or any trademark, service mark, trade name, logo or design resembling or similar to any of the Autonomy Trademarks.  VAR agrees to use the Autonomy Trademarks in advertisements, letterheads or otherwise only as may be approved in advance in writing by Autonomy.

**13.    INTELLECTUAL PROPERTY RIGHTS.**

**13.1    Limited Rights.**  Except as provided in Sections 10.1, 10.2 and Section 12, VAR shall have no rights, express or implied, in respect of any intellectual property rights owned or used by Autonomy in relation to the Autonomy Products, including copyright in the Autonomy Products, and VAR acknowledges that, except as expressly provided in this Agreement, it shall not acquire any such rights and that all such are and shall remain vested in or controlled by Autonomy.

Page 4
Autonomy VAR Agreement
20000717

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01598384

USAO 00003405

13.2    Notification of Infringement.  VAR will immediately inform Autonomy in writing of any infringement of Autonomy's intellectual property rights relating to the Autonomy Products or the Autonomy Trademarks coming to VAR's attention, or any claim coming to VAR's attention that the Autonomy Products or the Autonomy Trademarks infringe the intellectual property rights of a third party.

13.3    Maintenance of Rights.  During the term of this Agreement VAR shall take all such steps as Autonomy's cost as Autonomy may reasonably require to assist Autonomy in maintaining the validity and enforceability of the intellectual property rights of Autonomy in the Autonomy Products or the Autonomy Trademarks.

14.    TERM AND TERMINATION.

14.1    Term.  The initial term of this Agreement shall commence on the Effective Date and continue until the first anniversary thereof, and automatically renew for a period of one year on the annual anniversary of the Effective Date (each one year period being the "Term"), unless (a) this Agreement is terminated earlier pursuant to this Section 14; or (b) either party notifies the other at least 30 days prior to the end of any one year term that such party does not desire to renew this Agreement.

14.2    Termination by Autonomy.  Notwithstanding the provisions of Section 14.1, Autonomy may terminate this Agreement with immediate effect upon notice to VAR in the event that; (a) VAR attempts to assign this Agreement without the consent of Autonomy; or (b) there is a direct or indirect change in ownership or control or corporate reorganization of VAR including a sale, transfer or lease of all or any substantial part of its assets other than in the ordinary course of business.

14.3    Termination by Either Party.  Either party may terminate this Agreement upon notice to the other party in the event that the other party (a) ceases conducting business in the normal course, (b) commits an act of bankruptcy, (c) is adjudicated bankrupt, (d) enters into liquidation, whether compulsory or voluntary (other than for the purposes of amalgamation or reconstruction), (e) compounds with its creditors generally, (f) has a receiver, administrator, administrative receiver, liquidator or manager appointed over all or any of its assets, (g) suffers execution or distress, (h) becomes unable to pay its debts as they fall due; or (i) takes or suffers any similar action in consequence of debt.

14.4    Termination for Default.  If either party defaults in the performance of any of its material obligations (or repeatedly defaults in the performance of any of its other obligations) under this Agreement and does not cure such default within 10 days of receipt of a notice of default, then the non-defaulting party may, by giving notice to the defaulting party, terminate this Agreement as of the termination date specified in the notice.

14.5    Termination for Convenience.  Either party may terminate this Agreement upon 60 days' prior notice to the other party.

14.6    Effect of Termination or Expiration.  Upon termination or expiration of this Agreement: (a) VAR shall immediately cease (i) the advertising, promotion, resale and distribution of the Autonomy Products; (ii) using any of the Autonomy Trademarks; and (iii) promoting itself as a partner or associated with Autonomy; (b) the due dates of all outstanding invoices to VAR for the Autonomy Products will automatically be accelerated so they become due and payable by the effective date of termination, even if longer terms had been previously agreed; (c) all or part of any orders received from VAR which have not been shipped as of the date of termination or expiration, even if previously accepted, may be cancelled by Autonomy without liability to either party; (d) at Autonomy's option and request, and at VAR's expense, VAR shall immediately destroy or return to Autonomy all marketing and proprietary materials and any manuals or other technical documentation relating to the Autonomy Products and any and all other property of Autonomy in the possession or control of VAR; and (e) each party shall warrant to the other within five days of termination that all Confidential Information of the other party then in its possession has been destroyed or returned.  Autonomy shall not be liable to VAR for damages of any kind, including incidental or consequential damages, on account of the termination of this Agreement.

14.7    Rights.  Termination of this Agreement shall not prejudice the rights of the parties, which may have arisen on or before the date of termination.

14.8    Discontinued Autonomy Products.  This Agreement shall automatically terminate as to any Autonomy Product if Autonomy ceases to manufacture or sell such Autonomy Product.

15.    RELATIONSHIP OF THE PARTIES.  (a) During the Term, VAR shall act as an independent contractor and neither this Agreement nor the performance of any of the obligations under this Agreement shall constitute or constitute VAR as an agent or legal representative of Autonomy for any purpose, nor shall this Agreement be deemed to establish a joint venture, partnership or any other legal entity.  (b) VAR will not have, and will not represent that it has, any power, right or authority to bind or commit Autonomy, or to assume or create any obligation or responsibility, express or implied, written or oral, on behalf of or in Autonomy's name, except as herein expressly provided.

16.    REPRESENTATIONS AND WARRANTIES.

16.1    By Autonomy.  (a) Autonomy represents and warrants that (i) it has the right to license the Autonomy Products to VAR; and (ii) for a period of ninety (90) days from the date of shipment of the Autonomy Products to VAR

Page 6
Autonomy VAR Agreement
20080717

FOIA CONFIDENTIAL TREATMENT REQUESTED                                      HP-SEC-01608325

pursuant to this Agreement, the Autonomy Products will perform in all material respects with the technical specifications provided by Autonomy for the Autonomy Products where the Autonomy Products are loaded onto suitably configured equipment and set up to process data in accordance with the technical specifications for the Autonomy Products. (b) All warranty claims not made in writing or not received by Autonomy within the time period specified above shall be deemed waived. Autonomy's warranty and obligation is solely for the benefit of VAR, who has no authority to extend this warranty to any other person or entity. (c) Autonomy shall have no liability under the warranty in Section 16.1(a) if the non-performance is attributable to (i) VAR's incorporation, attachment or otherwise engagement of any attachment, feature, program or device to the Autonomy Products, or any misuse, alteration or modification of the Autonomy Products by VAR, or any part thereof; (ii) failure to provide a suitable installation environment; (iii) use of supplies or materials not meeting specifications; (iv) use of the Autonomy Products for other than the specific purpose for which the Autonomy Products are designed; or (v) use of the Autonomy Products on any systems other than hardware platforms specified by Autonomy for the Autonomy Products.

**16.2** Disclaimer. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AUTONOMY DISCLAIMS ANY AND ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, WITH RESPECT TO THE AUTONOMY PRODUCTS, IMPLIED WARRANTIES OF QUALITY AND FITNESS FOR A PARTICULAR PURPOSE. AUTONOMY DOES NOT WARRANT THAT THE AUTONOMY PRODUCTS OR THE FUNCTIONS CONTAINED IN THE AUTONOMY PRODUCTS WILL MEET VAR'S OR ANY END USER'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION OR BE ERROR FREE.

**17. INDEMNIFICATION.**

**17.1** Indemnity by Autonomy. Autonomy shall indemnify VAR from, and defend VAR against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any claim that any Autonomy Product infringes any intellectual property right of any third party save that Autonomy shall not be liable for any such claim that arises as a result of (i) any modification of the Autonomy Product by VAR, or (ii) use of a superseded release of the Autonomy Product if the infringement would have been avoided by the timely implementation of an Error Correction or Enhancement supplied by Autonomy.

**17.2** Indemnity by VAR. VAR shall indemnify Autonomy from, and defend Autonomy against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any claim relating to VAR's advertising, promotion, resale, distribution, storage or transportation of the Autonomy Products unless otherwise provided pursuant to Section 17.1 above.

**18. REMEDIES AND LIMITATION OF LIABILITY.**

**18.1** Remedies. In the event of any claim relating to the Autonomy Products, Autonomy's sole and exclusive liability to VAR for any such claim, and VAR's sole and exclusive remedy in respect of such claim, shall be, at Autonomy's discretion, support or the replacement of the Autonomy Products.

**18.2** LIMITATION OF LIABILITY. EXCEPT IN THE EVENT OF PERSONAL INJURY OR DEATH AS A RESULT OF NEGLIGENCE, AUTONOMY SHALL NOT BE LIABLE FOR, NOR SHALL THE MEASURE OF DAMAGES INCLUDE, UNDER ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, TORT STRICT LIABILITY OR OTHERWISE, ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF PROFITS OR LOSS OF BUSINESS) ARISING OUT OF OR RELATING TO AUTONOMY'S PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT. IN NO EVENT WILL AUTONOMY'S AGGREGATE LIABILITY TO VAR EXCEED THE TOTAL AMOUNTS PAID BY VAR TO AUTONOMY PRIOR TO THE DATE ON WHICH THE LOSS OR DAMAGE GIVING RISE TO THE CLAIM AROSE.

**19. CONFIDENTIAL INFORMATION.** The parties have imparted and may from time to time impart to each other certain Confidential Information (as defined below) and the parties may otherwise obtain Confidential Information concerning the business and affairs of the other pursuant to the Agreement. Each party agrees that it will use such Confidential Information solely for the purposes of the Agreement, and that it shall be held in confidence by the receiving party to the same extent is at least the same manner as such party protects its own confidential or proprietary information. Each party shall not disclose, publish, release, transfer or otherwise make available such Confidential Information, directly or indirectly, to any third party without the disclosing party's consent. For the purposes of this Agreement, "Confidential Information" shall mean all information and documentation of a party disclosed to or accessed by the other party in connection with this Agreement, including (a) all information of a party that is not permitted to be disclosed to third parties under local laws or regulations; (b) information relating to a party's customers, employees, technology, operations, facilities, markets, products, capacities, systems, procedures, security practices, research, development, business affairs and finances, ideas, concepts, innovations, inventions, designs, business methodologies, improvements, trade secrets, copyrightable subject matter, patents and other intellectual property and proprietary information; (c) the terms of this Agreement; and (d) any information developed by a party by reference to the other party's information. Except to the extent that any applicable law provides otherwise, "Confidential Information" shall not include information that (a) is independently developed by the receiving party without violating the disclosing party's proprietary rights, as shown by the receiving party's written records; (b) is or becomes publicly known other than through unauthorized disclosure; (c) is disclosed by a party to a third party free of any obligation of confidentiality; or (d) is already known by the receiving party at the time of disclosure, as shown by such party's written records, and such party

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01698286

USAO 00003407

has no obligation of confidentiality other than pursuant to this Agreement or any confidentiality agreements entered into before the Effective Date.

20.     NOTICES.  Any notice required or permitted to be delivered hereunder shall be in writing and shall be deemed to have been effectively given: (a) immediately upon personal delivery or delivery by facsimile transmission with confirmation receipt; (b) two days after deposit with a commercial overnight courier with tracking capabilities; or (c) five days after being sent by first-class pre-paid post or registered or certified mail, to the respective addresses of the parties set forth above. All transmissions shall be marked for the attention of the company General Counsel.

21.     ASSIGNMENT.  VAR shall not, without the prior written consent of Autonomy, assign or transfer this Agreement or any amounts payable pursuant to this Agreement by any means, including without limitation by operation of law, change in control, merger, corporate reorganization or otherwise. Autonomy's consent to any assignment of this Agreement shall not constitute Autonomy's consent to further assignment. This Agreement shall be binding on the parties and their respective successors and permitted assigns. Any assignment in contravention of this subsection shall be void.

22.     WAIVER.  Failure or neglect by either party to enforce at any time any of the provisions of this Agreement shall not be construed as a waiver of either party's rights under this Agreement nor in any way affect the validity of the whole or any part of this Agreement nor prejudice either party's rights to take subsequent action.

23.  ENTIRE AGREEMENT; AMENDMENT.  This Agreement sets forth the complete and exclusive agreement between the parties with respect to its subject matter and supersedes any and all other written or oral agreements previously existing between the parties with respect to such subject matter. No alterations, modifications or additions to this Agreement shall be valid unless made in writing and signed by a Director or Officer of each party. The terms of any purchase orders or the like submitted by the Licensee which conflict with any terms in this Agreement or whether or not countersigned as accepted by Autonomy shall not be binding on Autonomy, regardless of Autonomy's failure to object to such terms.

24.     GOVERNING LAW.  This Agreement shall be governed by and construed in accordance with English law and the parties submit and consent to the exclusive jurisdiction of the English courts.

25.     SEVERABILITY.  If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

26.     REMEDIES.  The parties agree that a material breach of this Agreement adversely affecting Autonomy's proprietary rights in the Autonomy Products would cause irreparable injury to Autonomy for which monetary damages would not be an adequate remedy and that Autonomy shall be entitled to equitable relief in addition to any remedies it may have hereunder or at law.

27.     NON-SOLICITATION.  Each party agrees that it will not, directly or indirectly, solicit for employment any employee of the other party who becomes known to the other party in connection with the transactions contemplated by this Agreement, other than pursuant to general solicitations for employment not directed at the other party, at any time from the Effective Date until six months following the termination hereof.

28.     COUNTERPARTS.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one single agreement between the parties.

29.     SURVIVAL.  Section 1 (Definitions and Construction), Section 7 (Payments), Section 9.3 (Records), Section 9.4 (Inspection), Section 13 (Intellectual Property Rights), Section 14.0 (Effect of Termination or Expiration), Section 16 (Remedies and Limitation of Liability), Section 19 (Confidential Information), Section 20 (Notices), Section 24 (Governing Law), Section 27 (Non-Solicitation) and Section 29 (Survival) shall survive any termination or expiration of this Agreement.

Executed by a duly authorised signatory for each of the parties on the date set out above.

AUTONOMY SYSTEMS LIMITED.                          AUXILIUM Group

Signed: _____                  Signed: _____

Name: _____                    Name: _____

Title: _____                   Title: _____


Page 7
Autonomy VAR Agreement
20080717

EXHIBIT A

SECTION 1: AUTONOMY PRODUCTS

| Autonomy IDOL server |
| --- |
| Other Autonomy Products as they be offered to VAR for resale from time to time |

SECTION 2: TERRITORY

| ITALY |
| --- |

SECTION 3: AUTONOMY TRADEMARKS

Autonomy 

Virage

Verity

Cardiff

Ultraseek

merid(o)

ZANTAZ

* Autonomy, Inc.®, Virage, Inc.®, Verity, Inc.®, Cardiff Software, Inc.®, Ultraseek®, Zantaz® and Meridio®
* These product names as marked in this Exhibit A

Page A-1

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC 01569588

EXHIBIT B

FORM OF PURCHASE ORDER

PURCHASE ORDER

[DATE]

From:   [VAR]
        [ADDRESS]

To:     [AUTONOMY ENTITY NAME]
        [AUTONOMY ENTITY ADDRESS]

This Purchase Order is issued under and pursuant to a Value Added Reseller Agreement dated [          ] entered into between Autonomy and VAR ("the Agreement").

The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement provided Autonomy has signed this Purchase Order accepting it. All other terms and conditions contained in the Agreement shall remain in full force and effect.

| | | | |
|---|---|---|---|
| 1. | End User | : | [XX] |
| 2. | Software | : | [XX] |
| 3. | Language | : | [XX] |
| 4. | Platform | : | [XX] |
| 5. | Number of Instances | : | One each of (1) above per server below/ |
| 6. | Number of Production Servers | : | and [XX] for Failover/distribution [to be used if end user is licensed failover/distribution above] |
| 7. | Number of Non-Production Servers | : | [XX] for development, [XX] for QA/testing, [XX] for backup/disaster recovery |
| 8. | Number of Production CPUs | : | [XX] |
| 9. | Number of Developers | : | [XX] |
| 10. | Maximum Number of Documents | : | [XX] |
| 11. | Authorised Production Use | : | [ ] Internet |

[ ] Password-protected Extranet for _____ [ WHO CAN ACCESS]

[ ] On-Line Service

Restrictions:

[ ] Name of Application: _____

[ ] Application Description: _____

Other restrictions:

_____ [LIMIT TO DIVISION/GROUP, TYPE OF USAGE, OTHER]

Page B-1

FOIA CONFIDENTIAL TREATMENT REQUESTED

12. If Internet or Extranet, Number : [XX]
    of Users

13. If On-Line Service, domain : www._____ for use solely for _____ [DESCRIBE]
    address and usage

14. If On-Line, will Licensee receive : [  ] Yes
    compensation for use
                                         [  ] No

15. Territory of Software Installation : [XX]

16. Technical Support Contacts : VAR Technical Contact
                                   Name: _____
                                   Phone: _____
                                   E-mail: _____

                                   End User Technical Contact
                                   Name: _____
                                   Phone: _____
                                   E-mail: _____

17. License Fee : [XX], invoiced immediately

18. Support Fee (first year) : [First / Second Line Support]

                               [XX]% of License Fee per annum, first year to be invoiced immediately and
                               thereafter to be invoiced annually on each anniversary of the Commencement
                               Date

19. License and Support Fee : 30 days from date of invoice
    Payment Terms

20. Delivery Address : Shipped ExWorks point of manufacture (per Incoterms 2000) via electronic
                       delivery, and, if requested, hard copy to:

                       _____
                       _____
                       _____
                       _____

21. Commencement Date : On Effective Date

22. Expiry Date : [XX] [None]; subject to termination pursuant to Agreement

---

[If No, add:] Licensee acknowledges that the Software may be shipped with certain libraries and other code that are not
licensed under this Agreement, but rather are provided to Licensee pursuant to the terms and conditions of separate open-
source licence agreements ("Open Source Code"). Such separate licence terms are provided on the Product disc in the
ThirdPartyLicense.txt file. Any support, warranty or indemnification Autonomy provides for the Product does not extend to
Open Source Code. Notwithstanding the terms to the contrary in this section, to the extent that the Product includes any
Open Source Code that is licensed under the GNU Lesser General Public Licence ("LGPL Code") or Apache Code, Licensee
may modify the Open Source Code or the Product for Licensee's own use and reverse-engineer the Open Source Code in the
Product solely to the extent necessary to debug Licensee's modifications, in both cases solely to the extent necessary for
Licensee to modify the LGPL Code and/or Apache Code and relink the modified LGPL Code/Apache Code to the Product.

Applicable Definitions:

CPU: a single core central processing unit on a computer.

Developer: an individual employed and authorized by Licensee to Use and access the functionality of the Development
Software for purposes of developing or administrating the Application, regardless of whether the individual is actually using or
accessing the Software at any given time.

Development Software: the tool and other portions of the Software which are used to incorporate the Run-Time Software in
the Application and enable the Run-Time Software to provide the applicable functionality within the Application.

Page B-2

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01698390

USAO 00003411

Documents: For the purpose of this Contract a "Document" shall be defined as a discreet section or page from a multi-paged or single paged document (eg, a page in .pdf or .doc document) that is no more than 4096 characters in size.

Non-Production Use: development, quality assurance, testing, and disaster recovery usage.

On-Line Services: any dial-up, remote access, interactive, Internet-based or other on-line service or World Wide Web site supported by one or more servers.

Production Use: live or fail-over usage for commercial, business or production purposes.

Run-Time Software: the portion of the Software which must be incorporated in an Application to execute the search, retrieval and other functionality of the Software.

Servers: computing devices acting as a server for a network of interconnected computing devices, whether within an enterprise or other Web, intranet or internet environment, which are owned/leased and controlled by Licensee, upon which the Product may be installed or accessed.

Users: an individual authorised by Licensee to use or access the functionality of the Product, regardless of whether the individual is actually using or accessing the applicable Product at any given time.

| VAR Signature | Accepted   by |  |
|---|---|---|
|  | Autonomy |  |
| Name | Name |  |
| Title | Title |  |
| Date |  | Date |

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01596281

USAO 00003412

EXHIBIT C

SECTION 1:  AUTONOMY VAR PROGRAM FEES

The fee payable pursuant to Section 8.4 is USD$25,000.00 annually.

SECTION 2:  SUBLICENCE FEES

Pursuant to Clause 8.1 the price discount (off of Autonomy list price) to VAR shall be as follows: 25%.

SECTION 3:  TRAINING

Following payment of the VAR program fees, VAR shall be entitled to one training day of free training for two delegates at an applicable Autonomy Training course.

Page C-1

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01596352

USAO 00003413

# EXHIBIT R

USAO 00003414

FOIA CONFIDENTIAL TREATMENT REQUESTED

| Reporting period | Posting Date | Description | General ledger account | Dr £ | Cr £ | Dr £ | Cr £ | Reference to supporting document |
|---|---|---|---|---|---|---|---|---|
| (i) An adjustment was made to write off the bad debit in relation to the $8 Mercateo invoice. (see transaction no. 2 above) | | | | | | | | |
| Q3 2011 | 30-Sep-11 | On 30 September 2011, this AR balance invoice was fully written off in ASH's general ledger. At this stage, debtors were reduced by £3,277,262 (the GBP equivalent of this original invoice amount of €3,969,976). | Accounts receivable | | 3,277,262 | | 3,643,649 | HP-SEC-01665297 to HP-SEC-01665298 (& HP-SEC-01665299); HP-SEC-01665297 |
| | | | AR translation | | 3,277,262 | | 3,643,649 | HP-SEC-01665297 to HP-SEC-01665298 (& HP-SEC-01665299); HP-SEC-01665297 |
| | | | AR translation (incl debtor expense (P&L)) | 3,277,262 | | 3,643,649 | | HP-SEC-01665299 to HP-SEC-01665298 relates to HP-SEC-01665297 (as HP-SEC-01665299 to HP-SEC-01665298) |
| (ii) An adjustment was made to reclassify and then to remove the remaining balance from the balance sheet | | | | | | | | |
| Q3 2016 / Q4 2016 | 29-Feb-16 | As a result, balance of £1,007,256 relating to deferred income from Q3 2016 continued to be recorded on the balance sheet. This was subsequently transferred to prepayments and then, within, built against opening reserves during 2016. | Deferred revenue - Income / Prepaid expense - acquisition | 1,007,256 | 1,007,256 | | | HP-SEC-01665297 HP-SEC-01665297 |
| Q4 2016 | 31-Oct-16 | | Prepaid expense - acquisition / Retained earnings - opening | 1,007,256 | 1,007,256 | 1,624,930 | 1,624,930 | HP-SEC-01665563, HP-SEC-01665565 (tab "Oct 16", row 19) HP-SEC-01665563 (tab "Oct 16", row 7) |

Notes:
[accounting entries in Anthony Systems Limited as recorded in GBP. The USD figures above shown are generally translated at a rate of $1.67 = £1.00]
[references have been rounded to be balanced transactions based on the timing and the amount of the account]
[HP-SEC-01665297 to HP-SEC-01665298 (the amount written off in AR for September 2011 is £3,277,262). (see HP-SEC-01665297)]

# EXHIBIT S

USAO 00003417

AUTONOMY CORPORATION PLC ANNOUNCES RESULTS FOR
THE FIRST QUARTER ENDED MARCH 31, 2010

*Record Q1 results with strong EPS growth in line with analysts' consensus estimates;
EPS (adj.) up 44%; Revenues up 50%; Profit from operations (adj.) up 48%*

Cambridge, England – April 21, 2010 -- Autonomy Corporation plc (LSE: AU. or AU.L), a global
leader in infrastructure software, today reported financial results for the first quarter ended March 31,
2010.

Financial Highlights
* Record first quarter revenues of $194.2 million (versus analysts' consensus of $193 million), up
  50% from Q1 2009 including strong organic growth of 17%[1]
* Gross profits (adj.) at $172.6 million, up 48% from Q1 2009; gross margins (adj.) at 89%
* Q1 operating margins (adj.) at 44%
* Record Q1 profit before tax (adj.) at $85.3 million, up 47% from Q1 2009
* Record Q1 fully diluted EPS (adj.) of $0.25 (versus analysts' consensus of $0.25), up 44% from
  Q1 2009. Fully diluted EPS (IFRS) of $0.21 compared to $0.15 in Q1 2009

[1] See supplemental metrics on page 3.

Commenting on the results, Dr Mike Lynch, Group CEO of Autonomy said today: "We entered 2010
with strong momentum after significant market share gains in 2009, aided by strong product
positioning and increased marketing expenditure at a time when other companies were scaling back.
This strength is now reinforced with discretionary spend being made available as companies look to
invest for growth. Whilst Q1'10 reflected the expected seasonality as one of our traditionally weaker
quarters, the stronger pipeline and improved closure rates mean that we are growing more confident
about a possible recovery. Customers have resumed planning for larger projects, the main effects of
which we expect to see in the second half."

Dr Lynch continued: "Also during the quarter, Chairman Robert Webb QC fulfilled his commitment to
appoint two new non-executive directors to Autonomy's Board. We are privileged to be joined by
Jonathan Bloomer and Dr Frank Kelly, each of whom brings a wealth of experience."

Dr Lynch concluded: "Understanding of the applicability of IDOL SPE continues to increase and
interest in this nascent market together with new product launches in the meaning based marketing
and protect areas strengthen our overall offering. We continue to make our technology available
across a host of platforms from OEM and software license to appliance and cloud. These are likely to
be strong growth drivers in 2010 and underpin our positive outlook, but we also remain mindful of the
fragility of the global macro-economic environment. We have been able to raise sufficient capital at
an attractive rate to facilitate the next phase of our strategy and so look forward to the rest of the
year."

First quarter 2010 Highlights
* Blue chip first quarter wins include: AT&T, Genentech, Lloyds Bank, American Automobile
  Association, Carnival Cruises, Citi, Kraft, O2, Samsung, Tesco, Visa, Bank of America and Bayer,
  as well as new and repeat licenses with multiple government, defence and intelligence agencies
  around the globe, including in the United States, the United Kingdom, the European Commission,
  Canada, Spain and Abu Dhabi
* 11 OEM deals signed including new deals and extensions with Adobe, McAfee and Siemens
* Repeat business accounted for 51% of revenue in Q1
* Strong organic growth of 17% from Q1 2009
* Record Q1 revenue of $194.2 million, up 50% from Q1 2009
* Gross margins (adj.) in targeted range at 89%
* Record Q1 profit before tax (adj.) of $85.3 million, up 47% from Q1 2009 (IFRS: $68.8 million, up
  38%)
* Operating margins (adj.) stable at 44% (Q1 2009: 45%)
* Fully diluted EPS (adj.) of $0.25, up 44% from Q1 2009 (IFRS: $0.21, up 41%)

Page 1

FOIA CONFIDENTIAL TREATMENT REQUESTED                        HP-SEC-01639621

* Positive cash flow generated by operations of $85.5 million (Q1 2009: $51.1 million), up 67%
* Average selling price for meaning-based technologies continues to increase.
* Deferred revenue increased to $172.2 million (Q1 2009: $163.7 million)
* DSOs increased slightly to 93 days (Q1 and Q4 2009: 88 days) due to an outstanding government related debtor and the timing of significant commercial customer payments received just after quarter end.  This is expected to return to the normal range of 85-90 days during Q2 2010.

Revenues
Revenues for the first quarter of 2010 totalled $194.2 million, up 50% from $129.8 million for the first quarter of 2009 due to strong organic growth and full quarter Interwoven contribution.  During the first quarter of 2010 there were 19 deals over $1.0 million.  In the first quarter of 2010, Americas revenues of $135.6 million represented 70% of total revenues, and Rest of World revenues of $58.6 million represented 30% of total revenues.

Gross Profits and Gross Margins
Gross profits (adj.) for the first quarter of 2010 were $172.6 million, up 48% from $117.0 million for the first quarter of 2009.  Gross margins (adj.) for the first quarter of 2010 were 89%, compared to 90% for the first quarter of 2009.  Gross profits (IFRS) for the first quarter of 2010 were $158.1 million, up 42% from $111.6 million for the first quarter of 2009.  Gross margins (IFRS) for the first quarter of 2010 were 81%, compared to 86% for the first quarter of 2009.

Profit from Operations and Operating Margins
Profit from operations (adj.) for the first quarter of 2010 was $86.2 million, up 48% from $58.1 million for the first quarter of 2009.  Operating margins (adj.) were 44% in the first quarter of 2010, consistent with 45% in the first quarter of 2009.  Profit from operations (IFRS) for the first quarter of 2010 was $73.1 million, up 45% from $50.3 million for the first quarter of 2009.  Operating margins (IFRS) were 38% in the first quarter of 2010 compared to 39% in the first quarter of 2009.

Taxation
The effective tax rate in the first quarter of 2010 was 28%, in line with the forecast 2010 full year effective tax rate (2009: 28%) and down from 31% in the first quarter of 2009.  Pending the completion of a s382 tax study, which considers the potential availability of further US tax losses, the full year tax rate may decrease from the current forecast level of 28% should further acquired losses become available.

Foreign Exchange Impact
The effect on revenue in the first quarter of 2010 of movements in foreign exchange rates was a decrease of approximately $0.9 million compared to the fourth quarter of 2009.  In the first quarter of 2010 the U.S. Dollar strengthened slightly versus Sterling to an average of $1.56 versus $1.63 in the fourth quarter of 2009 (Q1 2009: $1.44).

Net Profits
Net profit (adj.) for the first quarter of 2010 was $61.7 million, or $0.25 per diluted share, compared to net profit (adj.) of $40.2 million, or $0.17 per diluted share, for the first quarter of 2009.  Net profit (IFRS) for the first quarter of 2010 was $49.7 million, or $0.21 per diluted share, compared to net profit (IFRS) of $34.6 million, or $0.15 per diluted share, for the first quarter of 2009.

IAS 38 Charges and Capitalization
Under IAS 38 the company is required to capitalize certain aspects of its research and development activities.  R&D capitalization in the first quarter of 2010 was $6.6 million (Q1 2009: $3.3 million; Q4 2009: $5.6 million), reflecting a full quarter of Interwoven contribution.  Q1 2010 R&D capitalization is offset by amortization charges of $3.6 million (Q1 2009: $1.8 million; Q4 2009: $3.2 million) arising from historical R&D capitalization.  The capitalization and offsetting charges resulted in a net credit (before tax) in the quarter of $3.1 million (Q1 2009: $1.5 million; Q4 2009: $2.4 million), and a net margin impact of 1.6% (Q1 2009: 1.2%; Q4 2009: 1.1%).

FOIA CONFIDENTIAL TREATMENT REQUESTED                                    HP-SEC-01639622

USAO 00003419

### Balance Sheet and Cash Flow
Cash balances were $910.9 million at March 31, 2010, an increase of $668.1 million from $242.8 million at December 31, 2009.  Movements in cash flow during the first quarter of 2010 of note included:

* Repayment of the Interwoven credit facility of $54 million;
* Acquisition of MicroLink LLC;
* Net proceeds of Autonomy's convertible bond offering; and
* Purchasing of inventory of $10 million for Q2 2010 sales, most of which have now completed.

Adjusting for purchase of inventory and monies received immediately after quarter end, primarily from government debtors, cash conversion was over 100%.  Trade receivables at March 31, 2010, were $211.4 million, compared to $230.2 million at December 31, 2009.  Accounts receivable days sales outstanding were 93 days at March 31, 2010, compared to 88 days at March 31, 2009 and at December 31, 2009.  Deferred revenues were $172.2 million at March 31, 2010, compared with $173.5 million at December 31, 2009 showing normal seasonality.  Despite the difficult economic climate, bad debt write off in the quarter was less than 1% of revenues.

Accrued income at March 31, 2010 was not material, at under 5% of revenues.

### Supplemental Metrics
Autonomy is supplying supplemental metrics to assist in the understanding and analysis of Autonomy's business.

#### Three Months Ended March 31, 2010

| | |
|---|---|
| Organic Growth* | 17%[1] |
| Cash conversion (LTM CFFO/LTM adj EBITDA**) | 81% |
| Cash conversion (lagged to account for growth and seasonality of the business) | 89% |
| Cash conversion as a percentage of the theoretical maximum (87%) | 93% |
| Product including hosted and OEM* | $121m |
| IDOL Product | $47m |
| IDOL Cloud | $45m |
| Service revenues* | $11m |
| Deferred revenue release (primarily maintenance)* | $62m |
| OEM derived revenues* | $29m |
| OEM Dev | $3m |
| OEM Ongoing | $26m |
| Deals over $1 million | 19 |
| Tax rate* | 28% |
| Available tax losses* | $187m |
| LTM revenue with terms >365 days in normal range (<2% of revenue) | |
| Accrued income in normal range (<5% of revenues) | |

* The above items are provided for background information and may include qualitative estimates.
** Adj. EBITDA is defined as operating cash flow before movements in working capital.
[1] The company integrates acquired businesses immediately upon acquisition such that it is not possible to identify results from acquired businesses separately from the results of the group.  In order to estimate organic growth the company has combined the reported results for Autonomy and Interwoven for Q1 2009 leading to a pro forma adjustment of $35 million from Interwoven revenues from January 1, 2009 up to March 17, 2009.

### Q1 2010 Product Sales
During the first quarter of 2010, major customer wins included:  AT&T, Genentech, Lloyds Bank, American Automobile Association, Carnival Cruises, Citi, Kraft, O2, Samsung, Tesco, Visa, Bank of America and Beyer.  Repeat business from existing customers accounted for approximately 51% of revenue for the quarter.  Q1 2010 business also included new and repeat licenses with multiple government, defence and intelligence agencies around the globe, including in the United States, the United Kingdom, the European Commission, Canada, Spain and Abu Dhabi.

### Strategic Partnerships and OEMs
Autonomy's OEM Program continued to grow strongly during Q1 2010.  Agreements were signed with 11 customers during the quarter, including new and extended agreements with Adobe, McAfee and Siemens.

Page 3

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639623

## Q1 2010 Corporate Developments

During the first quarter of 2010 Autonomy continued to extend its market leadership with the introduction of key new and upgraded IDOL technologies, including the launches of:

- World's first Meaning Based multichannel customer interaction analytics application;
- New innovations across Autonomy's Meaning Based Marketing (MBM) platform;
- Unique integrated web content management, search, optimization and rich media on a single platform;
- DSMail self-service archiving solution for email management, governance and eDiscovery; and
- Industry-leading eDiscovery technology now available on an easy to use appliance.

During the first quarter Autonomy was recognised in multiple ways for its market leadership and unmatched technology, including being:

- Rated "Strong Positive" in Gartner's eDiscovery market report; and
- Receiving top honours at the sixth annual law technology news awards for Autonomy's end-to-end eDiscovery platform.

## Scheduling of Conference Call and Further Information

Autonomy's results conference call will be available live at www.autonomy.com on April 21, 2010, at 9:30 a.m. BST/4:30 a.m. EST/1:30 a.m. PST.

From time to time the company answers investors' questions on its website which may include information supplemental to that set forth above. Questions and answers can be found at: www.autonomy.com/investors/questions.

## About Autonomy Corporation plc

Autonomy Corporation plc (LSE: AU. or AU.L), a global leader in infrastructure software for the enterprise, spearheads the Meaning Based Computing movement. IDC recently recognized Autonomy as having the largest market share and fastest growth in the worldwide search and discovery market. Autonomy's technology allows computers to harness the full richness of human information, forming a conceptual and contextual understanding of any piece of electronic data, including unstructured information, such as text, email, web pages, voice, or video. Autonomy's software powers the full spectrum of mission-critical enterprise applications including pan-enterprise search, customer interaction solutions, information governance, end-to-end eDiscovery, records management, archiving, business process management, web content management, web optimization, rich media management and video and audio analysis.

Autonomy's customer base is comprised of more than 20,000 global companies, law firms and federal agencies including: AOL, BAE Systems, BBC, Bloomberg, Boeing, Citigroup, Coca Cola, Daimler AG, Deutsche Bank, DLA Piper, Ericsson, FedEx, Ford, GlaxoSmithKline, Lloyds Bank, NASA, Nestlé, the New York Stock Exchange, Reuters, Shell, Tesco, T-Mobile, the U.S. Department of Energy, the U.S. Department of Homeland Security and the U.S. Securities and Exchange Commission. More than 400 companies OEM Autonomy technology, including Symantec, Citrix, HP, Novell, Oracle, Sybase and TIBCO. The company has offices worldwide. Please visit www.autonomy.com to find out more.

Autonomy and the Autonomy logo are registered trademarks or trademarks of Autonomy Corporation plc. All other trademarks are the property of their respective owners.

**Financial Media Contacts:**
Edward Bridges / Haya Herbert-Burns
Financial Dynamics

**Analyst and Investor Contacts:**
Marc Geall, Head of IR and Corporate Strategy
Autonomy Corporation plc

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639624

USAO 00003421

AUTONOMY CORPORATION plc
CONDENSED CONSOLIDATED INCOME STATEMENT
(in thousands, except per share amounts)

| | Three Months Ended (unaudited) | |
|---|---|---|
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Revenues (see note 3) | 194,180 | 129,779 |
| Cost of revenues (excl. amortization) | (21,542) | (12,789) |
| Amortization of purchased intangibles | (14,534) | (5,354) |
| Total cost of revenues | (36,076) | (18,143) |
| Gross profit | 158,104 | 111,636 |
| Operating expenses: | | |
| Research and development | (27,762) | (20,610) |
| Sales and marketing | (42,900) | (28,760) |
| General and administrative | (17,255) | (11,288) |
| Other costs: | | |
| Post-acquisition restructuring costs | — | (846) |
| Profit (loss) on foreign exchange | 2,961 | (433) |
| Total operating expenses | (84,976) | (61,337) |
| Profit from operations | 73,128 | 50,299 |
| Share of loss of associate | (338) | (441) |
| Interest receivable | 807 | 623 |
| Interest payable | (4,797) | (504) |
| Profit before income taxes | 68,800 | 49,977 |
| Income taxes (see note 4) | (19,086) | (15,461) |
| Net profit | 49,714 | 34,516 |
| Basic earnings per share (see note 6) | $ 0.21 | $ 0.15 |
| Diluted earnings per share (see note 6) | $ 0.21 | $ 0.15 |
| Weighted average number of ordinary shares outstanding | 240,888 | 231,704 |
| Weighted average number of ordinary shares outstanding, assuming dilution of options and convertible loan notes | 251,349 | 235,348 |

Reconciliation of Adjusted Financial Measures

| | Three Months Ended (unaudited) | |
|---|---|---|
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Gross profit | 158,104 | 111,636 |
| Amortization of purchased intangibles | 14,534 | 5,354 |
| Gross profit (adjusted) | 172,638 | 116,990 |
| | | |
| Profit before income taxes | 68,800 | 49,977 |
| Amortization of purchased intangibles | 14,534 | 5,354 |
| Share-based compensation (see note 5) | 1,494 | 1,124 |
| Post-acquisition restructuring costs | — | 846 |
| (Profit) loss on foreign exchange | (2,961) | 433 |
| Interest payable on convertible loan notes | 3,419 | — |
| Share of loss of associate | 338 | 441 |
| Profit before income taxes (adjusted) | 85,324 | 58,175 |
| Provision for income taxes | (23,670) | (17,997) |
| Net profit (adjusted) | 61,654 | 40,178 |
| | | |
| Profit from operations | 73,128 | 50,299 |
| Amortization of purchased intangibles | 14,534 | 5,354 |
| Share-based compensation (see note 5) | 1,494 | 1,124 |
| Post-acquisition restructuring costs | — | 846 |
| (Profit) loss on foreign exchange | (2,961) | 433 |
| Profit from operations (adjusted) | 86,195 | 58,056 |

The accompanying notes are an integral part of these consolidated financial statements

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639625

USAO 00003422

AUTONOMY CORPORATION plc
CONDENSED CONSOLIDATED BALANCE SHEET

| | As at (unaudited) | |
| --- | --- | --- |
| | March 31, 2010 $'000 | December 31, 2009 $'000 |
| **ASSETS** | | |
| Non-current assets: | | |
| Goodwill | 1,343,524 | 1,287,042 |
| Other intangible assets | 401,902 | 399,277 |
| Property and equipment, net | 30,822 | 33,886 |
| Equity and other investments | 14,599 | 15,608 |
| Deferred tax asset | 20,153 | 24,015 |
| Total non-current assets | 1,810,500 | 1,759,828 |
| Current assets: | | |
| Trade receivables, net | 211,409 | 230,219 |
| Other receivables | 47,883 | 45,231 |
| Total trade and other receivables | 259,292 | 275,450 |
| Inventory | 10,250 | 486 |
| Cash and cash equivalents | 910,876 | 242,791 |
| Total current assets | 1,180,418 | 518,727 |
| TOTAL ASSETS | 2,990,918 | 2,278,555 |
| | | |
| **CURRENT LIABILITIES** | | |
| Trade payable | (11,639) | (14,926) |
| Other payables | (47,447) | (54,517) |
| Total trade and other payables | (59,086) | (69,443) |
| Bank loan | (78,163) | (52,375) |
| Tax liabilities | (35,201) | (43,338) |
| Deferred revenue | (164,557) | (164,931) |
| Provisions | (2,480) | (2,731) |
| Total current liabilities | (339,487) | (332,818) |
| Net current assets | 840,931 | 185,909 |
| | | |
| **NON-CURRENT LIABILITIES** | | |
| Bank loan | (65,522) | (145,152) |
| Convertible loan notes | (644,824) | — |
| Deferred tax liabilities | (85,668) | (86,087) |
| Deferred revenue | (7,627) | (6,576) |
| Other payables | (2,178) | (1,020) |
| Provisions | (4,618) | (5,123) |
| Total non-current liabilities | (810,837) | (244,958) |
| Total liabilities | (1,150,324) | (577,776) |
| NET ASSETS | 1,840,594 | 1,701,779 |
| | | |
| Shareholders' equity: | | |
| Ordinary shares (1) | 1,337 | 1,333 |
| Share premium account | 1,236,511 | 1,130,767 |
| Capital redemption reserve | 135 | 135 |
| Own shares | (803) | (845) |
| Merger reserve | 27,589 | 27,589 |
| Stock compensation reserve | 23,411 | 21,959 |
| Revaluation reserve | 1,688 | 4,499 |
| Translation reserve | (26,324) | (12,032) |
| Retained earnings | 577,050 | 528,374 |
| TOTAL EQUITY | 1,840,594 | 1,701,779 |

(1)  At March 31, 2010, 600,000,000 ordinary shares of nominal value 1/3 pence each authorized, 241,342,371 issued and outstanding; as of December 31, 2009, 600,000,000 ordinary shares of nominal value 1/3 pence each authorized, 240,574,304 issued and outstanding.

The accompanying notes are an integral part of these consolidated financial statements

Page 6

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639626

USAO 00003423

## AUTONOMY CORPORATION plc
### CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Three Months Ended | |
|---|---|---|
| | (unaudited) | |
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Cash flows from operating activities: | | |
| Profit from operations | 73,126 | 50,299 |
| Adjustments for: | | |
| Depreciation and amortization | 26,631 | 10,543 |
| Share based compensation | 1,494 | 1,124 |
| Foreign currency movements | (2,961) | 433 |
| Post-acquisition restructuring costs | — | 596 |
| Other non-cash items | — | 126 |
| Operating cash flows before movements in working capital | 98,292 | 63,121 |
| Changes in operating assets and liabilities (net of impact of acquisitions): | | |
| Receivables | 1,578 | (8,492) |
| Inventories | (9,767) | 247 |
| Payables | (4,627) | (3,735) |
| Cash generated by operations | 85,476 | 51,141 |
| Income taxes paid | (23,780) | (10,781) |
| Net cash provided by operating activities | 61,696 | 40,360 |
| | | |
| Cash flows from investment activities: | | |
| Interest received | 221 | 623 |
| Purchase of property, plant and equipment | (17,623) | (4,078) |
| Purchase of investments | (2,500) | (880) |
| Expenditure on product development | (6,573) | (3,284) |
| Acquisition of subsidiaries, net of cash acquired | (55,952) | (610,763) |
| Net cash used in investing activities | (82,427) | (618,477) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from issuance of shares, net of issuance costs | 7,165 | 7,755 |
| Proceeds from share placing, net of issuance costs | — | 308,512 |
| Proceeds from convertible loan notes, net of issuance costs | 765,912 | — |
| Interest on bank loan | (1,272) | (201) |
| Repayment of bank loan | (53,906) | — |
| Drawdown of bank loan | — | 200,000 |
| Payment of arrangement fee | — | (3,500) |
| Net cash provided by financing activities | 717,899 | 512,566 |
| | | |
| Net increase (decrease) in cash and cash equivalents | 697,168 | (65,551) |
| Beginning cash and cash equivalents | 242,791 | 199,218 |
| Effect of foreign exchange on cash and cash equivalents | (29,083) | (1,352) |
| Ending cash and cash equivalents | 910,876 | 132,315 |

## AUTONOMY CORPORATION plc
### CONDENSED CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME

| | Three Months Ended | |
|---|---|---|
| | (unaudited) | |
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Net profit | 49,714 | 34,516 |
| | | |
| Revaluation of equity investment | (2,811) | 1,394 |
| Translation of overseas operations | (14,292) | 62 |
| Other comprehensive income | (17,103) | 1,456 |
| Total comprehensive income | 32,611 | 35,972 |

The accompanying notes are an integral part of these consolidated financial statements

Page 7

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639627

USAO 00003424

AUTONOMY CORPORATION plc
CONDENSED CONSOLIDATED STATEMENT OF CHANGES IN EQUITY

| | Ordinary shares | Share premium | Capital redemption reserve | Own shares | Merger reserve | Sub-total |
|---|---|---|---|---|---|---|
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| At January 1, 2010 | 1,333 | 1,130,767 | 135 | (845) | 27,589 | 1,158,979 |
| Retained profit | — | — | — | — | — | — |
| Other comprehensive income | — | — | — | — | — | — |
| Stock compensation | — | — | — | — | — | — |
| Share options exercised | 4 | 7,929 | — | — | — | 7,933 |
| EBT options exercised | — | — | — | 42 | — | 42 |
| Equity element of convertible loan notes | — | 97,815 | — | — | — | 97,815 |
| Deferred tax on stock options | — | — | — | — | — | — |
| At March 31, 2010 | 1,337 | 1,236,511 | 135 | (803) | 27,589 | 1,264,769 |

| | Sub-total Forwarded | Stock comp'n reserve | Revaluation reserve | Translation reserve | Retained earnings | Total |
|---|---|---|---|---|---|---|
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| At January 1, 2010 | 1,158,979 | 21,959 | 4,499 | (12,032) | 528,374 | 1,701,779 |
| Retained profit | — | — | — | — | 49,714 | 49,714 |
| Other comprehensive income | — | — | (2,311) | (14,282) | — | (17,193) |
| Stock compensation | — | 1,494 | — | — | — | 1,494 |
| Share options exercised | 7,933 | — | — | — | — | 7,933 |
| EBT options exercised | 42 | (42) | — | — | — | — |
| Equity element of convertible loan notes | 97,815 | — | — | — | — | 97,815 |
| Deferred tax on stock options | — | — | — | — | (1,038) | (1,038) |
| At March 31, 2010 | 1,264,769 | 23,411 | 1,688 | (26,324) | 577,050 | 1,840,594 |

The accompanying notes are an integral part of these consolidated financial statements

Page 8

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639628

AUTONOMY CORPORATION plc

NOTES TO THE CONDENSED SET OF CONSOLIDATED FINANCIAL STATEMENTS FOR THE
THREE MONTHS ENDED MARCH 31, 2010 - UNAUDITED

1.   General information

Quarterly information is unaudited, but reflects all normal adjustments which are, in the opinion of management, necessary to provide a fair statement of results and the company's financial position for and as at the periods presented.  The results of operations for the three months ended March 31, 2010, are not necessarily indicative of the operating results for future operating periods.   The quarterly financial statements should be read in connection with the company's audited Consolidated Financial Statements and the notes thereto for the year ended December 31, 2009.  The information for the year ended December 31, 2009 does not constitute statutory accounts as defined in section 435 of the Companies Act 2006.  A copy of the statutory accounts for that year has been delivered to the Registrar of Companies.   The auditors reported on those accounts; their report was unqualified, did not draw attention to any matters by way of emphasis and did not contain a statement under section 498(2) or (3) of the Companies Act 2006.

2.   Accounting policies

Whilst the financial information included in this quarterly announcement has been computed in accordance with International Financial Reporting Standards (IFRSs) as adopted by the European Union, this announcement does not itself contain all of the disclosures required by IFRSs.

Basis of preparation
The same accounting policies, presentation and methods of computation are followed in the condensed set of consolidated financial statements as applied in the group's 2009 Annual Report, except for as described below.

Adoption of new and current standards
The accounting policies adopted in the preparation of the interim condensed consolidated financial statements are consistent with those followed in the preparation of the Group's financial statements for the year ended 31 December 2009, except for the adoption of new standards and interpretations. In the current financial year, the Group has adopted International Financial Reporting Standard 3 (Revised 2008) "Business Combinations" and International Accounting Standard 27 (Revised 2008) "Consolidated and Separate Financial Statements" as required, and will apply these principles throughout the year. Adoption of these standards did not have any significant effect on the financial position or performance of the Group.

Going Concern
The group has considerable financial resources together with a significant number of customers across different geographic areas and industries.  At March 31, 2010 the group had cash balances of $911 million and total debt of $789 million. The group has no net debt.  As a consequence, the directors believe that the group is well placed to manage business risks successfully despite the current uncertain economic outlook.

After making enquiries and considering the cash flow forecasts of the group the directors have a reasonable expectation that the group has adequate resources to continue in operational existence for the foreseeable future.  Accordingly, they continue to adopt the going concern basis in preparing the twelve month and quarterly consolidated financial statements

Adjusted Results
Although IFRS disclosure provides investors and management with an overall view of the company's financial performance, Autonomy believes that it is important for investors to also understand the performance of the company's fundamental business without giving effect to certain specific, non-recurring and non-cash charges. Consequently, the non-IFRS (adj.) results exclude share of profit/loss of associates, post-acquisition restructuring costs and non-cash charges for the amortization of purchased intangibles, share-based compensation, non-cash translational foreign exchange gains and losses and associated tax effects.  Management uses the adjusted results to assess the financial performance of the company's operational business activities.

See reconciliations on page 5.

Page 9

FOIA CONFIDENTIAL TREATMENT REQUESTED          HP-SEC-01639629

USAO 00003426

3.       Segmental information

The Company is organized internally along group function lines with each line reporting to the group's chief operating decision maker, the Chief Executive Officer.  The primary group function lines include:  finance; operations, including legal, HR and operations; marketing; sales; and technology.   Each of these functions supports the overall business activities, however they do not engage in activities from which they earn revenues or incur expenditure in their operations with each other.  No discrete financial information is produced for these function lines.  The company integrates acquired businesses and products into the Autonomy model such that separate financial data on these entities is not maintained post acquisition.

The group has operations in various geographic locations however no discrete financial information is maintained on a regional basis. Decisions around the allocation of resources are not determined on a regional basis and the chief operating decision maker does not assess the group's performance on a geographic basis.

The group is a software business that utilises its single technology in a set of standard products to address unique business problems associated with unstructured data.  The group offers over 500 different functions and connectors to over 400 different data repositories as part of its product suite.  Each customer selects from a list of options, but underneath from a single unit of the proprietary core technology platform.  As a result, no analysis of revenues by product type can be provided.

Each of the group's virtual brands is founded on the group's unique Intelligent Data Operating Layer (IDOL), the group's core infrastructure for automating the handling of all forms of unstructured information.  Separate financial information is not prepared for each virtual brand to assess its performance for the purpose of resource allocation decisions. The pervasive nature of the group's technology across each brand requires decisions to be taken at the group level and financial information is prepared on that basis.

A significant proportion of the group's cost base is fixed and represents payroll and property costs which relate to the multiple function lines of the group.  As a result the business model drives enhanced performance though growing sales and accordingly group wide revenue generation is the key performance metric that is monitored by the chief operating decision maker.  The revenue financial data used to monitor performance is prepared and compiled on a group wide basis. No separate revenue financial analysis is maintained on revenues from any of the virtual brands.

The Company's chief operating decision maker is the group's Chief Executive Officer, who evaluates the performance of the Company on a group wide basis and any elements within it on the basis of information from junior executives and group financial information and is ultimately responsible for entity-wide resource allocation decisions.

As a consequence of the above factors the group has one operating segment in accordance with IFRS 8 "Operating Segments".  IFRS 8 also requires information on a geographic basis and that information is shown below.

The group's operations are located primarily in the United Kingdom, the US and Canada.  The company also has a significant presence in a number of other European countries as well as China, Japan, Singapore and Australia.  The following tables provide an analysis of the group's sales and net assets by geographical market based upon the location of the group's customers.

|  | Three Months Ended (unaudited) | |
| --- | --- | --- |
|  | March 31, 2010 | March 31, 2009 |
|  | $'000 | $'000 |
| Revenue by region: | | |
| Americas | 135,595 | 86,183 |
| Rest of World | 58,585 | 44,596 |
| Total | 194,180 | 129,779 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639630

USAO 00003427

Information about these geographical regions is presented below:

| | Three Months Ended (unaudited) | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2010 | | | March 31, 2009 | | |
| | Americas | ROW | Total | Americas | ROW | Total |
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| Result by region | 55,484 | 14,683 | 70,167 | 38,629 | 13,049 | 51,578 |
| Post-acq'n restr. costs | — | | — | | | (846) |
| Profit (loss) on foreign exch. | | | 2,961 | | | (433) |
| Operating profit | | | 73,128 | | | 50,299 |
| Share of loss of associate | | | (336) | | | (441) |
| Interest receivable | | | 307 | | | 623 |
| Interest payable | | | (4,797) | | | (504) |
| Profit before tax | | | 68,800 | | | 49,977 |
| Tax | | | (19,086) | | | (15,461) |
| Profit for the period | | | 49,714 | | | 34,516 |

4.    Income taxes

| | Three Months Ended (unaudited) | |
|---|---|---|
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Tax charge by region: | | |
| UK | 13,399 | 7,443 |
| Foreign | 5,687 | 8,018 |
| Total | 19,086 | 15,461 |

5.    Share based compensation

Share based compensation charges have been charged in the consolidated income statement within the following functional areas:

| | Three Months Ended (unaudited) | |
|---|---|---|
| | March 31, 2010 | March 31, 2009 |
| | $'000 | $'000 |
| Research and development | 401 | 302 |
| Sales and marketing | 733 | 551 |
| General and administrative | 360 | 271 |
| Total share based compensation charge | 1,494 | 1,124 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639631

USAO 00003428

6.    Earnings per share

The calculation of the basic and diluted earnings per share is based on the following data:

| | Three Months Ended (Unaudited) | |
|---|---|---|
| | March 31, 2010 $'000 | March 31, 2009 $'000 |
| Earnings for purpose of basic earnings per share, being net profit | 49,714 | 34,516 |
| Effect of dilutive potential ordinary shares: | | |
| Interest on convertible loan notes (net of tax) | 2,254 | — |
| Earnings for the purposes of diluted earnings per share (IFRS) | 51,968 | 34,516 |
| | | |
| **Number of shares** | | |
| Weighted average number of ordinary shares for the purposes of basic earnings per share | 240,886 | 231,704 |
| Effect of dilutive potential ordinary shares: | | |
| Share options | 3,231 | 3,644 |
| Convertible loan notes | 7,224 | — |
| | | |
| Weighted average number of ordinary shares for the purposes of diluted earnings per share | 251,343 | 235,348 |

Earnings per share (adj.) is calculated by dividing the net profit (adj.) amounts shown on page 5 by the share denominators shown above.

7.    Related Party Transactions

There have been no related party transactions, or changes in related party transactions described in the latest annual report, that could have a material effect on the financial position or performance of the group in the financial period.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639632

USAO 00003429

INDEPENDENT REVIEW REPORT TO AUTONOMY CORPORATION PLC

We have been engaged by the company to review the condensed set of financial statements in the quarterly financial report for the three months ended March 31, 2010, which comprises the condensed consolidated income statement, the condensed consolidated balance sheet, the condensed consolidated statement of changes in equity, the condensed consolidated statement of comprehensive income, the condensed consolidated statement of cash flows and related notes 1 to 7. We have read the other information contained in the quarterly financial report and considered whether it contains any apparent misstatements or material inconsistencies with the information in the condensed set of financial statements.

This report is made solely to the Company in accordance with International Standard on Review Engagements 2410 "Review of Interim Financial Information Performed by the Independent Auditor of the Entity" issued by the Auditing Practices Board.   Our work has been undertaken so that we might state to the Company those matters we are required to state to them in an independent review report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company, for our review work, for this report, or for the conclusions we have formed.

Directors' responsibilities

The quarterly financial report is the responsibility of, and has been approved by, the directors.

As disclosed in note 2, the annual financial statements of the Company are prepared in accordance with the recognition and measurement criteria of IFRSs as adopted by the European Union.  The condensed set of financial statements included in this quarterly financial report has been prepared in accordance with the accounting policies the group intends to use in preparing its next annual financial statements.

Our responsibility

Our responsibility is to express to the Company a conclusion on the condensed set of financial statements in the quarterly financial report based on our review.

Scope of Review

We conducted our review in accordance with International Standard on Review Engagements (UK and Ireland) 2410, "Review of Interim Financial Information Performed by the Independent Auditor of the Entity" issued by the Auditing Practices Board for use in the United Kingdom. A review of quarterly financial information consists of making inquiries, primarily of persons responsible for financial and accounting matters, and applying analytical and other review procedures. A review is substantially less in scope than an audit conducted in accordance with International Standards on Auditing (UK and Ireland) and consequently does not enable us to obtain assurance that we would become aware of all significant matters that might be identified in an audit. Accordingly, we do not express an audit opinion.

Conclusion

Based on our review, nothing has come to our attention that causes us to believe that the accompanying quarterly financial information is not prepared, in all material respects, in accordance with the recognition and measurement criteria of IFRSs as adopted for use in the EU and the basis set out in note 2.

Deloitte LLP
Chartered Accountants and Statutory Auditors
April 21, 2010
Cambridge, UK

Page 13

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01639633

USAO 00003430

# EXHIBIT T

USAO 00003431

## 19. RED VENTURES S.R.L. ("RED VENTURES") / POSTE ITALIANE (Q3 2010)

| | |
|---|---|
| Autonomy Entity | ASL |
| VAR | Red Ventures |
| Proposed End-User | Poste Italiane |
| Date of Sales Agreement | 30 September 2010 |
| Licence Fee | €2,000,000 (plus €100,000 support and maintenance) |
| Payment Terms | Payable within 90 days from the date of the invoice |
| Payment Received | No payments received from Red Ventures in relation to this transaction |
| Sales Invoice Date | 14 October 2010 |
| Date Product Delivered | 30 September 2010 |
| Revenue Recognition on VAR Transaction | Licence revenue of €2,000,000 (at a GBP equivalent value of £1,722,057 and a USD equivalent value of $2,755,291) was accrued on 30 September 2010 in ASL (no invoice had been raised at this time). In October 2010, an invoice was raised to Red Ventures and £1,721,615 posted to licence revenue in ASL. The accrual was reversed on 31 October 2010.<br><br>Support and maintenance of £86,081 (at a USD equivalent value of $137,730) was deferred in October 2010, to be recognised over the following year. |
| Transaction Between Autonomy and End-User | No transaction concluded. |
| Ultimate Conclusion of VAR Transaction | On 30 September 2011, the invoice total of £1,807,695 was classified as bad debt and written off. |
| False Accounting | Non-compliance with IAS 18 paragraph 14(a) and (d). |

27

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01550364

USAO 00003432

# EXHIBIT U

USAO 00003433

No. 143-2015

The Embassy of the United States of America to the Holy See presents its compliments to the Secretariat of State and has the honor to inform the Secretariat that the United States Attorney's Office (USAO) and the Federal Bureau of Investigation (FBI) are currently investigating the financial reporting of Autonomy, a public company.   As part of the investigation, the USAO and FBI are requesting information concerning a potential transaction in 2010 connected to the Vatican Apostolic Library.

The Embassy respectfully asks if Monsignor Cesare Pasini, Prefect of the Vatican Apostolic Library, would be willing to speak to investigators from the USAO and FBI about this investigation.   The investigators are seeking information from Monsignor Pasini to aid their investigation of Autonomy.   Neither Monsignor Pasini, nor the Holy See or Vatican City State is a target of this investigation.

DIPLOMATIC NOTE

USAO 00003434

The Embassy has the honor to attach to this request a list of the questions that the investigators hope to ask Monsignor Pasini in person and another document with background on the case.

The Embassy of the United States of America to the Holy See takes this opportunity to renew to the Secretariat of State the assurances of its highest consideration.

Embassy of the United States of America to the Holy See

Rome, ITALY          August 10, 2015

USAO 00003435

# EXHIBIT V

USAO 00003436



SECRETARIAT OF STATE

No. 82.962

## NOTE VERBALE

The Secretariat of State presents its compliments to the Embassy of the United States of America and has the honor to acknowledge Verbal Note No. 143-2015 of 10 August 2015, transmitting the request of the United States Attorney's Office (USAO) and the Federal Bureau of Investigation (FBI) to interview Monsignor Cesare Pasini, Prefect of the Vatican Apostolic Library, regarding an investigation by the USAO and FBI into the association *Autonomy*.

The Secretariat of State, grateful for the Verbal Note's precision in indicating that Monsignor Pasini, the Holy See and Vatican City State are not under investigation, is pleased to inform the Embassy that it will willingly consider how to assist in the question raised once the Secretariat has received, through normal diplomatic channels, a formal request of international judicial assistance from the competent American judicial authorities, which must include the questions to be posed to Monsignor Pasini.   As the Holy See does not allow representatives of the requesting Party to participate in the interview, the questioning will be conducted by judges of the Vatican Tribunal.

The Secretariat of State avails itself of the occasion to renew to the Embassy of the United States of America the assurance of its highest consideration.

From the Vatican, 8 October 2015

The Embassy of the United States of America
Via Sallustiana, 49
00187 Roma

USAO 00003437

# EXHIBIT W

USAO 00003438

No. 3 - 2016

The Embassy of the United States of America to the Holy See presents its compliments to the Secretariat of State and has the honor to transmit the enclosed message from the United States Department of Justice requesting time-sensitive international judicial assistance with a criminal investigation into the activities of Autonomy Corporation plc, ("*Autonomy*").

The Embassy has the further honor to refer to the Note Verbale from the Secretariat of State of the Holy See and Vatican City State, dated October 8, 2015, in which the Vatican City State graciously agreed to entertain a request by the United States Department of Justice for investigatory assistance.

The Embassy had the privilege of conveying to the Secretariat of State on August 10, 2015, Note Verbale No.143-2015, wherein the United States Attorney's Office (USAO) and the Federal Bureau of Investigation (FBI) communicated details of the ongoing investigation into some aspects of Autonomy's financial reporting affairs, and requested assistance in the investigation.

DIPLOMATIC NOTE

USAO 00003439

The Embassy had the further privilege of conveying the United States Department of Justice request for information pertaining to a potential transaction in 2010 connected to the Vatican Apostolic Library.

The Embassy of the United States of America to the Holy See takes this opportunity to renew to the Secretariat of State the assurances of its highest consideration.

Enclosure: As stated.

Embassy of the United States of America to the Holy See,

Rome, ITALY             January 14, 2016.





U.S. Department of Justice

Criminal Division
*Office of International Affairs*

JEC:CMP
182-

*Washington, D.C.  20530*

December 18, 2015

TO:        Secretariat of State for the Holy See and Vatican City State

SUBJECT:    Request for International Judicial Assistance in the Criminal Investigation of
            Autonomy Corporation

In accordance with the Note Verbale from the Secretariat of State of the Holy See and
Vatican City State, dated October 8, 2015, the United States Department of Justice submits this
Request for International Judicial Assistance.  The United States Attorney for the Northern
District of California (the prosecutor) is conducting an investigation into the activities of
Autonomy Corporation plc ("Autonomy"), a software developer located in San Francisco,
California, and the United Kingdom, which is suspected of defrauding Hewlett-Packard
Company ("HP") into acquiring the outstanding shares of Autonomy in October 2011.
Autonomy induced HP into acquiring Autonomy in part based on Autonomy's publicly reported
financial results.

The prosecutor is investigating whether Autonomy misstated its publicly reported
financial results by improperly recording revenue on software transactions when there was no
final sale, when the purported purchaser lacked the ability or intent to pay, and when Autonomy
retained effective control over the software sold.  The prosecutor is investigating, among other
things, whether Autonomy properly recorded revenue on the following transactions:

USAO 00003441

- A purported license agreement, dated March 31, 2010, whereby Autonomy purported to
  license software to Microtechnologies, LLC ("MicroTech"), an entity based in Virginia
  in the United States, for $11 million for resale to the *Biblioteca Apostolica Vaticana*
  ("BAV").

- A purported license agreement, dated March 31, 2010, whereby Autonomy purported to
  license software to Auxilium Tech S.R.L. ("Auxilium"), an Italian entity, for €2,500,000
  for resale to BAV.

The prosecutor's investigation to date reveals that Autonomy was in discussions with
BAV and an Italian entity, Postecom S.p.A., both before and after March 31, 2010, regarding a
possible sale of Autonomy software to BAV to create a digital archive of materials in the Vatican
Library. Those discussions included Monsignor Cesare Pasini and Mr. Luciano Ammenti. The
prosecutor's investigation to date reveals that no agreement was reached to acquire Autonomy
software.

The prosecutor therefore respectfully seeks business records, including agreements,
correspondence, and emails, from BAV relating to its dealings with Autonomy, MicroTech (if
any), Auxilium (if any), and Postecom, and testimony from Monsignor Cesare Pasini and Mr.
Luciano Ammenti, which will enable the prosecutor to determine whether Autonomy
appropriately recorded revenue on the transactions with MicroTech and Auxilium.

## CONFIDENTIALITY

The details of this U.S. criminal investigation are considered sensitive. Therefore, please
treat this document, its contents, the fact that this request has been made and the results of its
execution as confidential and do not disclose it publicly or share it with the subjects of the
investigation. Also, please instruct all those who must be made aware of this request for

2

purposes of its execution that the request, its contents and subject matter are to be kept confidential and should not be shared with the subjects of the investigation nor disclosed publicly. Any transfer of information to others may seriously jeopardize the ongoing investigation.

### URGENCY

Please inform the executing authority that the U.S. authorities respectfully request that the records be produced no later than **April 30, 2016.**

### THE FACTS

Autonomy was a company incorporated in England and Wales with a registered office in Cambridge, United Kingdom. Its principal activities were software development and distribution. Autonomy maintained dual headquarters in San Francisco, California, and Cambridge, England, UK. Autonomy was a publicly traded company whose shares were listed on the London Stock Exchange and were bought, held, and sold by individuals and entities throughout the United States.

During the period 2009 through July 2011, Autonomy published financial results on a quarterly basis. It stated that its financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS"). IFRS accounting requirements for revenue recognition are defined largely by International Accounting Standard 18 – Revenue ("IAS 18"), which provides in relevant part as follows:

14. Revenue from the sale of goods shall be recognised when all the following conditions have been satisfied:

(a) the entity has transferred to the buyer the significant risks and rewards of ownership of the goods;

3

USAO 00003443

(b) the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;

(c) the amount of revenue can be measured reliably;

(d) it is probable that the economic benefits associated with the transaction will flow to the entity; and

(e) the costs incurred or to be incurred in respect of the transaction can be measured reliably.

Autonomy also stated or suggested that it followed Generally Accepted Accounting Principles in the United States for software revenue recognition.

Between 2009 and March 2010, Autonomy personnel, including its Chief Financial Officer Sushovan Hussain, Peter Menell, Julie Dolan, and Corrado Broli, were pursuing a transaction with BAV, whereby Autonomy software would be used to digitize and archive materials in the Vatican Library. In December 2009, Autonomy provided Monsignor Pasini and Mr. Ammenti draft proposals, but none were accepted.

In or around February 2010, Autonomy contemplated partnering with Postecom, a subsidiary of Poste Italiane, to deliver an archiving system to BAV. Documents reflect that Autonomy had discussions and/or meetings with Giovanni Cuturi of Postecom regarding a potential partnership. In late March, Autonomy was provided a letter of intent between Postecom and BAV, which generally stated that Postecom had had preliminary discussions about possible involvement in the archiving project and intended complete verification activities necessary to complete a collaboration proposal; suggested that BAV was seeking financing for the project; and provided for a 50-day period during which BAV would not sign a competing proposal. The letter stated that it did not bind Postecom or BAV to sign a collaboration agreement.

Autonomy had no binding agreement with BAV or Postecom on or before March 31, 2010. Nonetheless, on or about April 1, 2010, Autonomy approached a representative of

4

MicroTech, seeking MicroTech's agreement to pay Autonomy $11 million for software, purportedly for resale to BAV. On or about April 1, 2010, MicroTech signed and returned an $11 million purchase order. The purchase order was backdated to March 31, 2010. Autonomy recorded $11 million in revenue on the MicroTech transaction for the quarter ended March 31, 2010, which revenue was included in Autonomy's publicly reported results and enabled Autonomy to meet expectations of analysts following Autonomy stock.

In addition, on or after April 11, 2010, Autonomy entered into a purported license agreement with Auxilium, whereby Auxilium agreed to pay €2,500,000 for the right to sublicense Autonomy software to BAV and to pay €125,000 in support and maintenance. The agreement was backdated to March 31, 2010. Autonomy recorded license revenue in respect of the Auxilium transaction, which revenue was included in Autonomy's publicly reported results.

MicroTech appears to have no relevant contact with BAV and took no efforts to sell Autonomy software to BAV. Auxilium made no payments to Autonomy. Auxilium does not appear to have made any sale of the listed software to BAV.

From April 2010 through 2011, Autonomy continued to attempt to consummate a sale of software to BAV or an intermediary, but no deal was reached. Documents reflect that Monsignor Pasini may have met personally with Hussain and the CEO of Autonomy, Mike Lynch.

The United States Department of Justice reiterates its prior assurance that Monsignor Pasini, Luciano Ammenti and the Holy See and Vatican City State are not the targets of this investigation.

## THE OFFENSES

| | |
|---|---|
| 18 U.S.C. § 371. | Conspiracy to commit offense |
| 18 U.S.C. § 1341. | Fraud by wire, radio, or television. |
| 18 U.S.C. § 1348. | Securities and commodities fraud. |

5

USAO 00003445

18 U.S.C. § 1349.      Attempt and conspiracy.

## NEED FOR ASSISTANCE

The prosecutor is seeking documents from BAV to determine whether it was appropriate for Autonomy to record revenue; whether Autonomy's financial statements were misstated; and whether Autonomy's senior officers intended to misstate Autonomy's financial statements. The prosecutor needs documents from BAV to determine whether, with respect to the purported sales, Autonomy genuinely transferred the significant risks and rewards of ownership of the goods; whether Autonomy retained continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold; and whether it was probable that the economic benefits associated with the transaction would flow to Autonomy.

### Documents Needed

A.   Business Records

1.      For the period December 2009 to October 2011, please provide complete, certified copies of the following records of BAV:

a. All agreements, memoranda of understanding, and/or letters of intent with Autonomy, Postecom, Poste Italiane, Auxilium, and/or any purported reseller of Autonomy software regarding the sale/acquisition of Autonomy Software.

b. All communications (including emails and correspondence) with Autonomy relating to any sale/acquisition of Autonomy software.

c. All communications (including emails and correspondence) with the following entities relating to Autonomy:  Postecom, Poste Italiane, Auxilium, and/or any purported reseller of Autonomy software.

d. All communications relating to Lynch, including communications relating any

6

possible or actual financial donations, contributions, or funding to any foundation to benefit

BAV or the Vatican City State.

Testimony Needed

We respectfully request that the Vatican Tribunal interview Monsignor Pasini and Mr.

Armentti and ask the following questions:

1.      What is your full name?

2.      What is your date of birth?

3.      Where do you reside?

4.      What is your title?

5.      How long have you held that role?

6.      In 2009, were you working on a project to digitize and archive material in the
Vatican Library?

7.      Please describe the project.

8.      Were you considering Antonomy as a software provider in connection with the
project?

9.      Why?

10.     Were you considering other hardware or software providers?

11.     Please describe your interactions with Autonomy in 2009.  With respect to
meetings, conference calls, or other interactions, please describe: the location, the participants,
and the terms discussed.

12.     In 2009, did Autonomy provide BAV any written proposals?  What did they
consist of?

13.     How were those received?

14.     Did BAV reach an agreement with Autonomy by end of year 2009?

15.     Why not?

7

16.    How did you perceive the negotiations with Autonomy at that time – for example, were you optimistic a deal would be done?

17.    Did you continue discussions with Autonomy between January 2010 and March 2010? Please describe those discussions. With respect to meetings, conference calls, or other interactions, please describe: the location, the participants, and the terms discussed.

18.    How did Postecom become involved in the project?

19.    With whom at Postecom did you have significant interactions?

20.    Did BAV reach a binding agreement with Autonomy or Postecom by the end of March 2010?

21.    If not, why not?

22.    How did you perceive the negotiations with Autonomy and Postecom at that time – for example, were you optimistic a deal would be done?

23.    Are you familiar with a firm called MicroTech? Auxilium? What are they?

24.    Please describe your communications, if any, with Autonomy and/or Postecom regarding MicroTech and/or Auxilium.

25.    Was there any discussion with Autonomy or Postecom about the use of resellers, such as MicroTech or Auxilium?

26.    Were you aware that Autonomy had sold software to MicroTech or Auxilium for resale to BAV? If so, when did you learn that?

27.    Did you ever have any intention of purchasing software from MicroTech? Auxilium?

28.    What role, if any, did MicroTech and Auxilium have in the project?

29.    After March 31, 2010, please describe your interactions with Autonomy regarding the project? Who did you meet with when? Was any firm agreement reached? Why not?

30.    To the extent not already stated, please describe your communications with the following: (a) Mike Lynch, (b) Sushovan Hussain, (c) Andy Kanter, (d) Corrado Broli, (e) Pete Menell, (f) Julie Dolan, and (g) Giovanni Cuturi.

8

31.     During negotiations with Autonomy, was there any discussion of Autonomy, or any officer or director including Mike Lynch, making a contribution to the Vatican or affiliated entity?  Was there discussion of creation of a foundation?  What did that involve?

32.     Describe all communications relating to MicroTech.

33.     Did BAV end up using another vendor for the project?  Why?

## PROCEDURES TO BE FOLLOWED

### Authentication of Official Records

Under United States law, foreign official records are usually admitted into evidence at trial only after the party offering them proves, through a qualified witness (who either gives testimony at trial or provides a certification), that:

1.     the records are true and accurate copies of records maintained by a foreign government office or agency;

2.     the foreign government office or agency is authorized by foreign law to maintain them; and

3.     the foreign official providing the records is doing so in his or her official capacity.

The testimony of a qualified witness may be unnecessary to establish authenticity where a qualified witness provides a certification containing essentially the same information noted above.  Therefore, please:

1.     Have the custodian (or other person authorized by law) providing the records attach an attestation that the records are true and correct, maintained by a governmental office or agency as authorized by law, and provided in his or her official capacity.  In the event that the custodian (or other authorized person) does not have a formal certificate, stamp, or seal of attestation bearing this information, have him or her complete and attach an Attestation of Authenticity of Official Records (Form A, attached);

2.     Have an official whose signature and official position are known to the U.S. Embassy certify as to the genuineness of the signature and official position of the custodian (or other authorized person) attesting that the records are official

9

USAO 00003449

records provided in an official capacity. Please then permit an appropriate official of the U.S. Embassy to attach a Final Certification as to the genuineness of the signature and official position of the official certifying as to the genuineness of the signature and official position of the custodian (or other authorized person) attesting that the records are official records provided in an official capacity (Form B, attached); and

3.      Transmit the records with attachments to the Office of International Affairs or as otherwise arranged by the appropriate authorities of the Vatican with the Office of International Affairs.

If the custodian (or other person authorized by law) ordered to provide official records fails, after a diligent search, to discover such records, the we request that the custodian, acting in his official capacity, complete and attach an Attestation of Absence of Official Records (Form C, attached). We further request that this attestation be authenticated as prescribed above.

Authentication of Business Records

Under United States law, foreign business records are usually admitted into evidence in a proceeding in the United States after the party offering them proves, through the testimony at trial of a qualified witness, that:

1.      the records produced are true and accurate copies of original records in the custody of the business;

2.      the business made or kept the originals in the ordinary course of business and as a regular business practice; and

3.      the originals were made, at or near the time of the occurrence of the transactions they record, by a person who either had knowledge of those transactions or received the information from a person with such knowledge.

The testimony of a qualified witness may be unnecessary at trial in the United States where that witness makes or provides a written declaration in a foreign jurisdiction that (1) contains essentially the same information noted in items 1 through 3 above, and (2) subjects the

10

witness to criminal penalties under the laws of the foreign jurisdiction if the declaration is false.

Accordingly, please have the appropriate authorities in the Vatican City State do the following:

1.  Require each bank/business official producing records to appear, complete, and sign a Certificate of Authenticity of Business Records (Form D, attached); and

2.  Attach the completed certificate to the corresponding records produced by the business official; and

3.  Transmit the records with attachments to the Office of International Affairs or as otherwise arranged by the appropriate authorities of the Vatican with the Office of International Affairs.

In addition, please invite each official producing records to appear, if it should become necessary, at a date to be determined, in the United States, at the expense of the United States government, to testify at trial. If the witness chooses not to appear in the United States, a formal deposition of the witness at some future date may be requested.

## NEED FOR PROCEDURE REQUESTED

The execution of the attached Certificate of Authenticity of Official Records is needed to receive the requested official records into evidence in accordance with the requirements of United States law. Ordinarily, foreign public records may be received into evidence if they purport to be executed or attested in an official capacity by a person authorized by the laws of the foreign country to make the execution or attestation and are accompanied by an apostille, pursuant to the Hague Convention, certifying the official position and the genuineness of the signature of the official who produced the records.

Ordinarily, business records may be received into evidence only if a competent representative of the business appears at trial as a witness and testifies as to the authenticity of the records and the manner in which they are prepared and maintained at the business. However, with respect to foreign business records, the appearance and testimony at trial of a representative

11

USAO 00003451

of a foreign business may not be required if the records (or true copies thereof) are accompanied

by a written declaration such as the attached certificate.  The statute permitting this procedure

(Title 18, United States Code, Section 3505) requires an executed certificate.

      Please accept the assurances of our highest esteem.

Jason E. Carter
Acting Deputy Director
Office of International Affairs
Criminal Division

12

USAO 00003452

FORM A

## ATTESTATION OF AUTHENTICITY OF OFFICIAL RECORDS

I, _____, attest that my position with the Vatican City State is
(Name)

_____ and that in that position I am authorized by the laws of the Vatican City State
to attest that the documents attached hereto and described below:

(1)     are true copies of official records which are authorized by the laws of the Vatican City
State

to be recorded or filed in _____, which is a
(Name of Public Office or Agency)
government office or agency.

(2)     set forth matters that are required by the laws of the Vatican City State to be reported and
recorded or filed.

Description of Documents:

(SEAL)

_____
(Signature)

_____
(Date)

13

USAO 00003453

FORM B

<u>Final Certification</u>

|  |  |
|---|---|
| _____<br>(Country) | ) |
|  | ) |
|  | ) |
|  | ) |
| _____<br>(State, province, etc.) | ) |
|  | ) |
|  | ) |
| _____<br>(City) | )  ss: |
|  | ) |
|  | ) |
|  | ) |
| _____<br>(Name of consular post)<br>of the United States of America | )<br>) |

I certify that the annexed document is executed by the genuine signature and seal of the following named official who, in an official capacity, is empowered by the laws of the Vatican City State to execute that document: (typed name of official who executed the annexed document)

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
(Signature of Consular Officer)
(Typed name of Consular Officer)
(Title of Consular Officer)
Consul of the United States of America

DATE:

14

USAO 00003454

FORM C

## ATTESTATION OF ABSENCE OF OFFICIAL RECORDS

I, _____ [NAME], attest that my position with the Holy See and Vatican City State is [OFFICIAL TITLE] and that in that position I am official custodian of records for the [RELEVANT AGENCY], which is required to record or report matters, or file with respect to matters, that are required by the laws of the Vatican City State to be regularly recorded, reported or filed by this agency/organization.

I further attest that I have made, or caused to be made, a diligent search for the following records:

(set forth description of record(s) for which the search was conducted)

and that no such record(s) is/are found to exist therein.

I certify that the records for which a search was conducted set forth matters which are required by the laws of the Vatican City State to be recorded or filed and reported, and such matters regularly are recorded or filed and reported by _____ [RELEVANT AGENCY] _____ .

(SEAL)

_____
(Signature)

_____
(Date)

USAO 00003455

FORM D

## CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I, _____ (Name), attest on penalty of criminal punishment for false

statement or false attestation that I am employed by _____

(Name of Business from which documents are produced) and that my official title is

_____ (Official Title). I further state that each of the records attached

hereto is the original or a duplicate of the original of records in the custody of

_____ (Name of Business from which documents are

produced). I further state that:

    A)    such records were made at or near the time of the occurrence of the matters set

           forth, by (or from information transmitted by) a person with knowledge of those

           matters;

    B)    such records were kept in the course of a regularly conducted business activity;

    C)    the business activity made the records as a regular practice; and

    D)    if any of such records is not the original, such record is a duplicate of the original.


_____          _____
    (Signature)                                            (Date)

Sworn to or affirmed before me, _____ (Name), a _____ (notary

public, judicial officer, etc.), this_____ day of_____, 20____.

16

USAO 00003456

# EXHIBIT X

USAO 00003457



**U.S. Department of Justice**
Criminal Division
Office of International Affairs

United States Embassy – Rome, Italy

| Embassy Address: | U.S. Mail: | Tel: |
|---|---|---|
| Via Vittorio Veneto 119/A | DOJ, Unit 2500, Box 23 | Fax: |
| 00187 Rome, Italy | DPO AE 09624-0023 | Email: |

23 dicembre 2015

**VIA CORRIERE**

Dott. Stefano Opilio
Direttore, Ufficio II, D.G.A.P
Ministero della Giustizia
Via Arenula, 70
00186 Roma

Oggetto:   Richiesta di assistenza giudiziaria nell'indagine ai danni di Autonomy
Corporation

Egr. Dott. Opilio,

Si trasmette ai sensi del vigente Trattato di Mutua Assistenza tra gli Stati Uniti
d'America e la Repubblica Italiana in Materia Penale, l'unita richiesta di assistenza giudiziaria
in lingua inglese, con preghiera di inoltrarla all'Autorità competente per l'esecuzione.

Si rende noto che vi invieremo la traduzione italiana dopo le festività Natalizie.

Si coglie l'occasione per rinnovare i sensi della più alta stima e considerazione.

Distinti saluti.

Cristina M. Posa
Department of Justice Attaché

USAO 00003458

# EXHIBIT Y

USAO 00003459



**U.S. Department of Justice**
Criminal Division
Office of International Affairs

United States Embassy – Rome, Italy

| Embassy Address: | U.S. Mail: | Tel.: |
| --- | --- | --- |
| Via Vittorio Veneto 119/A | DOJ, Unit 9500, Box 23 | Fax: |
| 00187 Rome, Italy | DPO AE 09624-0023 | Email: |

4 gennaio 2016

VIA CORRIERE
Dott. Stefano Opilio
Ufficio II, D.G.A.P
Ministero della Giustizia
Via Arenula, 70
00186 Roma

Oggetto:    Richiesta di assistenza giudiziaria nelle indagini penali a carico di Autonomy
            Corporation

Gentile Dott. Opilio,

        Si trasmette la traduzione in lingua italiana della richiesta giudiziaria in oggetto, con
preghiera di inoltrarla all'Autorità competente per l'esecuzione. Abbiamo già trasmesso la
richiesta in lingua inglese al suo ufficio il 23 dicembre 2015.

        Si coglie l'occasione per rinnovare i sensi della più alta stima e considerazione.

                                        Distinti saluti.

                                        Cristina M. Posa
                                        Department of Justice Attaché

# EXHIBIT 2

USAO 00003461

1 | BRIAN J. STRETCH (CABN 163973)
United States Attorney

2

DAVID R. CALLAWAY (CABN 121782)
3 | Chief, Criminal Division

4 | ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
5 | Assistant United States Attorneys

6 |   450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
7 |   Telephone: (415) 436-7534
Fax: (415) 436-7234
8 |   Robert.Leach@usdoj.gov
Adam.Reeves@usdoj.gov

9

10 | Attorneys for United States of America

**ORIGINAL
FILED**

JUN — 7 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

11 |                UNITED STATES DISTRICT COURT

12 |              NORTHERN DISTRICT OF CALIFORNIA

13 |                 SAN FRANCISCO DIVISION

14 | IN RE GRAND JURY INVESTIGATION          )   Case No. CR 14-90491 MISC EMC
     NO. 2012R02242,                        )
15 |                                         )   **UNDER SEAL**
                                            )
16 |                                         )   DECLARATION OF AUSA ROBERT S.
                                            )   LEACH IN SUPPORT OF THE
17 |                                         )   UNITED STATES' *EX PARTE*
                                            )   APPLICATION FOR AN ORDER
18 |                                         )   SUSPENDING THE RUNNING OF
                                            )   THE STATUTE OF LIMITATIONS
19 |                                         )   PURSUANT TO 18 U.S.C. § 3292
                                            )
20 | _____)

21 |      I, Robert S. Leach, state the following:

22 |      1.    I am an Assistant United States Attorney for the Northern District of California.  I am one

23 | of the prosecutors assigned to this case.  I submit this declaration in support of the United States' *Ex*

24 | *Parte* Application for an Order Suspending the Running of the Statute of Limitations Pursuant to 18

25 | U.S.C. § 3292, filed concurrently.

26 |      2.    A grand jury in this district is conducting an investigation of former senior officers of

27 | Autonomy Corporation plc ("Autonomy"), including former Chief Executive Officer Michael Lynch,

28 | former Chief Financial Officer Sushovan Hussain, former Vice President of Finance Stephen

LEACH DECL. RE EX PARTE APPLIC. RE STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC

USAO 00003462

1   Chamberlain, and former Chief Operating Officer and General Counsel Andrew Kanter, for the

2   following possible criminal offenses: 15 U.S.C. §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371

3   (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities

4   fraud), and 18 U.S.C. § 1349 (attempt and conspiracy).  To date, no indictment has been returned.

5                                              The Investigation

6          3.       The following information is to the best of my knowledge and belief and is based on

7   information provided to me by federal law enforcement officers, information obtained in connection

8   with the investigation, and my review of documents and testimony relevant to this investigation,

9   including the documents attached hereto.

10         4.       Autonomy was a software developer with dual headquarters in the United Kingdom and

11  San Francisco, California.  Prior to October 2011, Autonomy was a publicly traded company whose

12  shares were listed on the London Stock Exchange.  Autonomy issued quarterly and annual financial

13  statements that were disseminated to the public by means of interstate and foreign wires.  In or about

14  October 2011, Hewlett-Packard Company ("HP"), headquartered in Palo Alto, California, bought

15  Autonomy for approximately $11 billion.[1]  HP acquired Autonomy by means of a cash offer by its

16  wholly owned subsidiary, Hewlett-Packard Vision B.V. ("HP Vision"), to buy the outstanding shares of

17  Autonomy for £25.50 ($42.11) per share.  Among other things, the grand jury is investigating whether

18  executives at Autonomy fraudulently inflated Autonomy's revenues in its financial statements and made

19  false and misleading statements to HP to induce it to buy Autonomy.

20         5.       In its publicly disseminated financial statements, Autonomy claimed that its financial

21  statements were prepared in accordance with International Financial Reporting Standards ("IFRS").

22  Attached to this declaration as Exhibit A is a true and correct copy of International Accounting Standard

23  18 *Revenue*.  Among other things, the grand jury is investigating whether executives at Autonomy

24  fraudulently inflated Autonomy's alleged revenue by improperly recording revenue on software sales in

25

26

27  [1]         In or around 2015, HP changed its name to "HP Inc." and spun out "Hewlett Packard Enterprise

28  Company" as a new company.  For ease of reference, I refer to all three entities as HP.

LEACH DECL. RE EX PARTE APPLIC. RE STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC                                2

USAO 00003463

1   violation of certain criteria in IFRS. The grand jury is also investigating whether executives at

2   Autonomy concealed from HP substantial sales of third-party computer hardware.

3         6.       Attached as Exhibit B is a true and correct copy of HP-SEC-01661598-625, titled "Capita

4   Registrars Limited and Hewlett-Packard Vision B.V. Agreement for the Provision of Receiving Agent

5   Services Relating to the Acquisition of Autonomy Corporation plc," which was produced to the

6   government by HP.

7         7.       Attached as Exhibit C is a true and correct copy of HP-SEC-01662046-070, an e-mail

8   regarding "Exercise of Autonomy Options Under HP offer," which was produced to the government by

9   HP.

10        8.       Attached as Exhibit D is a true and correct copy of HP-SEC-01661629-131, a letter dated

11  October 4, 2011, which was produced to the government by HP.

12        9.       Attached as Exhibit E is a true and correct copy of HP-SEC-00669637-638, an e-mail

13  dated July 30, 2011, which was produced by HP and reflects that Hussain's cellphone was

14  ███████7012.

15        10.      Attached as Exhibit F is a true and correct copy of CITI007142-7146, an e-mail dated

16  July 21, 2010, which I understand was produced by Citibank and reflects Hussain's cellphone was

17  4███████9540.

18        11.      Attached as Exhibit G is a true and correct copy of a letter to me and AUSA Adam A.

19  Reeves dated February 10, 2016, from counsel to HP.

20        12.      Attached as Exhibit H is a true and correct copy of HP-SEC-01649854-855, an e-mail

21  dated April 23, 2010, which was produced by HP.

22        13.      Attached as Exhibit I is a true and correct copy of HP-SEC-01650576-577, an e-mail

23  dated June 15, 2010, which was produced by HP.

24        14.      Attached as Exhibit J is a true and correct copy of HP-SEC-01650413-414, an e-mail

25  dated March 12, 2010, which was produced by HP.

26        15.      Attached as Exhibit K is a true and correct copy of HP-SEC-01650403-404, a UBS Sale

27  Instruction Form that appears to be signed by Kanter, which was produced by HP.

28

USAO 00003464

1    16.    Attached as Exhibit L is a true and correct copy of HP-SEC-01662036, titled "List of

2 Irrevocable Undertakings Autonomy Corporation plc," which was produced by HP.

3    17.    During the investigation, the United States received information from authorities in the

4 United Kingdom that, as of March 2013, Lynch held an account at Credit Suisse AG in London; that

5 Angela Bacares held Account number ▆▆▆▆ at HSBC plc; and that Lynch held at J.P. Morgan

6 International Bank Limited in the United Kingdom Account numbers ▆▆▆, ▆▆▆, ▆▆, and

7 ▆▆▆. I understand that Bacares is Lynch's wife and at certain times was an Autonomy employee.

8    18.    During the investigation, the United States received information from authorities in the

9 Bailiwick of Guernsey and the United Kingdom that, in 2008, Lynch and Bacares each established

10 accounts with Merrill Lynch Portfolio Managers Limited, which was acquired by the Julius Baer group

11 of companies in or around July 2013.  The United States received information that the assets were

12 transferred to account or relationship number ▆▆▆▆ held by Lynch and account or relationship

13 number ▆▆▆▆ held by Bacares.

14                              The Official Request

15    19.    On January 29, 2016, the Office of International Affairs of the Department of Justice

16 submitted a Request for Assistance in the Investigation of Autonomy Corporation to the Central

17 Authority of the United Kingdom (the "UK MLAT").  A true and correct copy of the UK MLAT and the

18 transmittal letter are attached as Exhibit M. The United Kingdom has not yet produced documents in

19 response to the UK MLAT.

20    20.    Attached as Exhibit N is a true and correct copy of the Court's January 29, 2016 Order

21 Suspending the Running of the Statute of Limitations Under 18 U.S.C. § 3292.

22    I declare under penalty of perjury that the foregoing is true and correct.

23 Dated: June 7, 2016

24

25    ROBERT S. LEACH
      Assistant United States Attorney

26

27

28

# EXHIBIT A

USAO 00003466

EC staff consolidated version as of 16 September 2009.
FOR INFORMATION PURPOSES ONLY

# International Accounting Standard 18
# *Revenue*

## Objective

Income is defined in the *Framework for the Preparation and Presentation of Financial Statements* as increases in economic benefits during the accounting period in the form of inflows or enhancements of assets or decreases of liabilities that result in increases in equity, other than those relating to contributions from equity participants. Income encompasses both revenue and gains. Revenue is income that arises in the course of ordinary activities of an entity and is referred to by a variety of different names including sales, fees, interest, dividends and royalties. The objective of this Standard is to prescribe the accounting treatment of revenue arising from certain types of transactions and events.

The primary issue in accounting for revenue is determining when to recognise revenue. Revenue is recognised when it is probable that future economic benefits will flow to the entity and these benefits can be measured reliably. This Standard identifies the circumstances in which these criteria will be met and, therefore, revenue will be recognised. It also provides practical guidance on the application of these criteria.

## Scope

1   This Standard shall be applied in accounting for revenue arising from the following transactions and events:

(a)   the sale of goods;

(b)   the rendering of services; and

(c)   the use by others of entity assets yielding interest, royalties and dividends.

2   This Standard supersedes IAS 18 *Revenue Recognition* approved in 1982.

3   Goods includes goods produced by the entity for the purpose of sale and goods purchased for resale, such as merchandise purchased by a retailer or land and other property held for resale.

4   The rendering of services typically involves the performance by the entity of a contractually agreed task over an agreed period of time. The services may be rendered within a single period or over more than one period. Some contracts for the rendering of services are directly related to construction contracts, for example, those for the services of project managers and architects. Revenue arising from these contracts is not dealt with in this Standard but is dealt with in accordance with the requirements for construction contracts as specified in IAS 11 *Construction Contracts*.

5   The use by others of entity assets gives rise to revenue in the form of:

(a)   interest—charges for the use of cash or cash equivalents or amounts due to the entity;

(b)   royalties—charges for the use of long-term assets of the entity, for example, patents, trademarks, copyrights and computer software; and

(c)   dividends—distributions of profits to holders of equity investments in proportion to their holdings of a particular class of capital.

6   This Standard does not deal with revenue arising from:

(a)   lease agreements (see IAS 17 *Leases*);

(b)   dividends arising from investments which are accounted for under the equity method (see IAS 28 *Investments in Associates*);

1

USAO 00003467

EC staff consolidated version as of 16 September 2009,
FOR INFORMATION PURPOSES ONLY                    EN – EU IAS 18

(c)    insurance contracts within the scope of IFRS 4 *Insurance Contracts*;

(d)    changes in the fair value of financial assets and financial liabilities or their disposal (see IAS 39 *Financial Instruments: Recognition and Measurement*);

(e)    changes in the value of other current assets;

(f)    initial recognition and from changes in the fair value of biological assets related to agricultural activity (see IAS 41 *Agriculture*);

(g)    initial recognition of agricultural produce (see IAS 41); and

(h)    the extraction of mineral ores.

## Definitions

7    The following terms are used in this Standard with the meanings specified:

*Revenue* is the gross inflow of economic benefits during the period arising in the course of the ordinary activities of an entity when those inflows result in increases in equity, other than increases relating to contributions from equity participants.

*Fair value* is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction.

8    Revenue includes only the gross inflows of economic benefits received and receivable by the entity on its own account. Amounts collected on behalf of third parties such as sales taxes, goods and services taxes and value added taxes are not economic benefits which flow to the entity and do not result in increases in equity. Therefore, they are excluded from revenue. Similarly, in an agency relationship, the gross inflows of economic benefits include amounts collected on behalf of the principal and which do not result in increases in equity for the entity. The amounts collected on behalf of the principal are not revenue. Instead, revenue is the amount of commission.

## Measurement of revenue

9    Revenue shall be measured at the fair value of the consideration received or receivable.

10    The amount of revenue arising on a transaction is usually determined by agreement between the entity and the buyer or user of the asset. It is measured at the fair value of the consideration received or receivable taking into account the amount of any trade discounts and volume rebates allowed by the entity.

11    In most cases, the consideration is in the form of cash or cash equivalents and the amount of revenue is the amount of cash or cash equivalents received or receivable. However, when the inflow of cash or cash equivalents is deferred, the fair value of the consideration may be less than the nominal amount of cash received or receivable. For example, an entity may provide interest free credit to the buyer or accept a note receivable bearing a below-market interest rate from the buyer as consideration for the sale of goods. When the arrangement effectively constitutes a financing transaction, the fair value of the consideration is determined by discounting all future receipts using an imputed rate of interest. The imputed rate of interest is the more clearly determinable of either:

(a)    the prevailing rate for a similar instrument of an issuer with a similar credit rating; or

(b)    a rate of interest that discounts the nominal amount of the instrument to the current cash sales price of the goods or services.

The difference between the fair value and the nominal amount of the consideration is recognised as interest revenue in accordance with paragraphs 29 and 30 and in accordance with IAS 39.

---

See also SIC-31 *Revenue – Barter Transactions Involving Advertising Services*

2

EC staff consolidated version as of 16 September 2009,                    EN – EU IAS 18
FOR INFORMATION PURPOSES ONLY

12      When goods or services are exchanged or swapped for goods or services which are of a similar nature and value, the exchange is not regarded as a transaction which generates revenue. This is often the case with commodities like oil or milk where suppliers exchange or swap inventories in various locations to fulfil demand on a timely basis in a particular location. When goods are sold or services are rendered in exchange for dissimilar goods or services, the exchange is regarded as a transaction which generates revenue. The revenue is measured at the fair value of the goods or services received, adjusted by the amount of any cash or cash equivalents transferred. When the fair value of the goods or services received cannot be measured reliably, the revenue is measured at the fair value of the goods or services given up, adjusted by the amount of any cash or cash equivalents transferred.

## Identification of the transaction

13      The recognition criteria in this Standard are usually applied separately to each transaction. However, in certain circumstances, it is necessary to apply the recognition criteria to the separately identifiable components of a single transaction in order to reflect the substance of the transaction. For example, when the selling price of a product includes an identifiable amount for subsequent servicing, that amount is deferred and recognised as revenue over the period during which the service is performed. Conversely, the recognition criteria are applied to two or more transactions together when they are linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole. For example, an entity may sell goods and, at the same time, enter into a separate agreement to repurchase the goods at a later date, thus negating the substantive effect of the transaction; in such a case, the two transactions are dealt with together.

## Sale of goods

14      Revenue from the sale of goods shall be recognised when all the following conditions have been satisfied:

(a)      the entity has transferred to the buyer the significant risks and rewards of ownership of the goods;

(b)      the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;

(c)      the amount of revenue can be measured reliably;

(d)      it is probable that the economic benefits associated with the transaction will flow to the entity; and

(e)      the costs incurred or to be incurred in respect of the transaction can be measured reliably.

15      The assessment of when an entity has transferred the significant risks and rewards of ownership to the buyer requires an examination of the circumstances of the transaction. In most cases, the transfer of the risks and rewards of ownership coincides with the transfer of the legal title or the passing of possession to the buyer. This is the case for most retail sales. In other cases, the transfer of risks and rewards of ownership occurs at a different time from the transfer of legal title or the passing of possession.

16      If the entity retains significant risks of ownership, the transaction is not a sale and revenue is not recognised. An entity may retain a significant risk of ownership in a number of ways. Examples of situations in which the entity may retain the significant risks and rewards of ownership are:

(a)      when the entity retains an obligation for unsatisfactory performance not covered by normal warranty provisions;

(b)      when the receipt of the revenue from a particular sale is contingent on the derivation of revenue by the buyer from its sale of the goods;

(c)      when the goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity; and

3

USAO 00003469

EC staff consolidated version as of 16 September 2009.
FOR INFORMATION PURPOSES ONLY

EN – EU IAS 18

(d)    when the buyer has the right to rescind the purchase for a reason specified in the sales contract and the entity is uncertain about the probability of return.

17    If an entity retains only an insignificant risk of ownership, the transaction is a sale and revenue is recognised. For example, a seller may retain the legal title to the goods solely to protect the collectibility of the amount due. In such a case, if the entity has transferred the significant risks and rewards of ownership, the transaction is a sale and revenue is recognised. Another example of an entity retaining only an insignificant risk of ownership may be a retail sale when a refund is offered if the customer is not satisfied. Revenue in such cases is recognised at the time of sale provided the seller can reliably estimate future returns and recognises a liability for returns based on previous experience and other relevant factors.

18    Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. In some cases, this may not be probable until the consideration is received or until an uncertainty is removed. For example, it may be uncertain that a foreign governmental authority will grant permission to remit the consideration from a sale in a foreign country. When the permission is granted, the uncertainty is removed and revenue is recognised. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount or the amount in respect of which recovery has ceased to be probable is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

19    Revenue and expenses that relate to the same transaction or other event are recognised simultaneously; this process is commonly referred to as the matching of revenues and expenses. Expenses, including warranties and other costs to be incurred after the shipment of the goods can normally be measured reliably when the other conditions for the recognition of revenue have been satisfied. However, revenue cannot be recognised when the expenses cannot be measured reliably; in such circumstances, any consideration already received for the sale of the goods is recognised as a liability.

## Rendering of services

20    When the outcome of a transaction involving the rendering of services can be estimated reliably, revenue associated with the transaction shall be recognised by reference to the stage of completion of the transaction at the end of the reporting period. The outcome of a transaction can be estimated reliably when all the following conditions are satisfied:

(a)    the amount of revenue can be measured reliably;

(b)    it is probable that the economic benefits associated with the transaction will flow to the entity;

(c)    the stage of completion of the transaction at the end of the reporting period can be measured reliably; and

(d)    the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.[*]

21    The recognition of revenue by reference to the stage of completion of a transaction is often referred to as the percentage of completion method. Under this method, revenue is recognised in the accounting periods in which the services are rendered. The recognition of revenue on this basis provides useful information on the extent of service activity and performance during a period. IAS 11 also requires the recognition of revenue on this basis. The requirements of that Standard are generally applicable to the recognition of revenue and the associated expenses for a transaction involving the rendering of services.

22    Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount, or the amount in respect of which recovery has ceased to be probable, is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

---

[*]    See also SIC-27 *Evaluating the Substance of Transactions in the Legal Form of a Lease* and SIC-31 *Revenue - Barter Transactions Involving Advertising Services*

4

USAO 00003470

23      An entity is generally able to make reliable estimates after it has agreed to the following with the other parties to the transaction:

    (a)      each party's enforceable rights regarding the service to be provided and received by the parties;

    (b)      the consideration to be exchanged; and

    (c)      the manner and terms of settlement.

It is also usually necessary for the entity to have an effective internal financial budgeting and reporting system. The entity reviews and, when necessary, revises the estimates of revenue as the service is performed. The need for such revisions does not necessarily indicate that the outcome of the transaction cannot be estimated reliably.

24      The stage of completion of a transaction may be determined by a variety of methods. An entity uses the method that measures reliably the services performed. Depending on the nature of the transaction, the methods may include:

    (a)      surveys of work performed;

    (b)      services performed to date as a percentage of total services to be performed; or

    (c)      the proportion that costs incurred bear to the estimated total costs of the transaction. Only costs that reflect services performed to date are included in costs incurred to date. Only costs that reflect services performed or to be performed are included in the estimated total costs of the transaction.

Progress payments and advances received from customers often do not reflect the services performed.

25      For practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period unless there is evidence that some other method better represents the stage of completion. When a specific act is much more significant than any other acts, the recognition of revenue is postponed until the significant act is executed.

26      When the outcome of the transaction involving the rendering of services cannot be estimated reliably, revenue shall be recognised only to the extent of the expenses recognised that are recoverable.

27      During the early stages of a transaction, it is often the case that the outcome of the transaction cannot be estimated reliably. Nevertheless, it may be probable that the entity will recover the transaction costs incurred. Therefore, revenue is recognised only to the extent of costs incurred that are expected to be recoverable. As the outcome of the transaction cannot be estimated reliably, no profit is recognised.

28      When the outcome of a transaction cannot be estimated reliably and it is not probable that the costs incurred will be recovered, revenue is not recognised and the costs incurred are recognised as an expense. When the uncertainties that prevented the outcome of the contract being estimated reliably no longer exist, revenue is recognised in accordance with paragraph 20 rather than in accordance with paragraph 26.

## Interest, royalties and dividends

29      Revenue arising from the use by others of entity assets yielding interest, royalties and dividends shall be recognised on the bases set out in paragraph 30 when:

    (a)      it is probable that the economic benefits associated with the transaction will flow to the entity; and

    (b)      the amount of the revenue can be measured reliably.

30      Revenue shall be recognised on the following bases:

    (a)      interest shall be recognised using the effective interest method as set out in IAS 39, paragraphs 9 and AG5–AG8;

USAO 00003471

    (b)    royalties shall be recognised on an accrual basis in accordance with the substance of the relevant agreement; and

    (c)    dividends shall be recognised when the shareholder's right to receive payment is established.

31    [Deleted]

32    When unpaid interest has accrued before the acquisition of an interest-bearing investment, the subsequent receipt of interest is allocated between pre-acquisition and post-acquisition periods; only the post-acquisition portion is recognised as revenue.

33    Royalties accrue in accordance with the terms of the relevant agreement and are usually recognised on that basis unless, having regard to the substance of the agreement, it is more appropriate to recognise revenue on some other systematic and rational basis.

34    Revenue is recognised only when it is probable that the economic benefits associated with the transaction will flow to the entity. However, when an uncertainty arises about the collectibility of an amount already included in revenue, the uncollectible amount, or the amount in respect of which recovery has ceased to be probable, is recognised as an expense, rather than as an adjustment of the amount of revenue originally recognised.

## Disclosure

35    An entity shall disclose:

    (a)    the accounting policies adopted for the recognition of revenue, including the methods adopted to determine the stage of completion of transactions involving the rendering of services;

    (b)    the amount of each significant category of revenue recognised during the period, including revenue arising from:

        (i)    the sale of goods;

        (ii)    the rendering of services;

        (iii)    interest;

        (iv)    royalties;

        (v)    dividends; and

    (c)    the amount of revenue arising from exchanges of goods or services included in each significant category of revenue.

36    An entity discloses any contingent liabilities and contingent assets in accordance with IAS 37 *Provisions, Contingent Liabilities and Contingent Assets*. Contingent liabilities and contingent assets may arise from items such as warranty costs, claims, penalties or possible losses.

## Effective date

37    This Standard becomes operative for financial statements covering periods beginning on or after 1 January 1995.

38    Cost of an Investment in a Subsidiary, Jointly Controlled Entity or Associate (Amendments to IFRS 1 First-time Adoption of International Financial Reporting Standards and IAS 27 Consolidated and Separate Financial Statements), issued in May 2008, amended paragraph 32. An entity shall apply that amendment prospectively for annual periods beginning on or after 1 January 2009. Earlier application is permitted. If an entity applies the related amendments in paragraphs 4 and 38A of IAS 27 for an earlier period, it shall apply the amendment in paragraph 32 at the same time.

6

USAO 00003472

# EXHIBIT B

USAO 00003473

# CAPITA
## REGISTRARS

CAPITA REGISTRARS LIMITED

AND

HEWLETT-PACKARD VISION B.V.

AGREEMENT
FOR THE PROVISION OF
RECEIVING AGENT SERVICES

RELATING TO THE ACQUISITION OF
AUTONOMY CORPORATION PLC

Receiving Agent Agreement v3.2

Capita Registrars Limited
Registered Office: The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU.
Registered in England No. 2605568. VAT No. 618184140.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661598

USAO 00003474

DATE: 19 August 2011

PARTIES:

(1)    **Capita Registrars Limited**, a company registered in England with registered number 2605568 and having its registered office situated at The Registry, 34 Beckenham Road, Beckenham, Kent, BR3 4TU ("**Capita**"); and

(2)    **Hewlett-Packard Vision B.V.**, incorporated in The Netherlands a with registered number 53342577 and having its registered office situated at Startbaan 16, 1187 XR Amstelveen, The Netherlands (the "**Offeror**"),

each a "party" and together the "parties".

BACKGROUND:

A.    Capita is in the business of providing receiving agent services.

B.    The Offeror has made the Offer to acquire the entire share capital of the Offeree.

C.    The Offeror now wishes to appoint Capita as its receiving agent in connection with the Offer to provide, or procure the provision of, the Services, on the terms and conditions set out below.

IT IS AGREED AS FOLLOWS:

1.     **DEFINITIONS AND INTERPRETATION**

1.1    Unless the context otherwise requires, when used herein, the following words and expressions shall have the meanings ascribed below:

"Affiliate"          means, in respect of a party, any company which is a direct or indirect "holding company" or "subsidiary" of that party or the direct or indirect "subsidiary" of such "holding company", as such terms are defined in section 1159 of the Companies Act 2006;

"Agreement"          means this agreement and all Schedules attached to it;

"CREST"              means the computer based system for the transfer of uncertificated securities operated by Euroclear UK & Ireland;

27471                                    © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED          HP-SEC-01661599

| | |
|---|---|
| "Effective Date" | means the date of this Agreement; |
| "Euroclear UK & Ireland" | means Euroclear UK & Ireland Limited (a subsidiary of Euroclear SA), which operates CREST; |
| "Fees" | means the fees and charges set out in the Fee Schedule as amended from time to time; |
| "Fee Schedule" | means the Fee Schedule attached hereto as Schedule 2 or such replacement Fee Schedule issued pursuant to clauses 5 or 6, from time to time; |
| "Forms of Acceptance" | means the forms of acceptance to be posted to Offeree Shareholders under the terms of the Offer; |
| "Information Rights Register" | means a register maintained by or on behalf of the Offeree of persons nominated to enjoy information rights pursuant to the Companies Act 2006; |
| "Offer" | means the offer by the Offeror; |
| "Offer Document" | means the offer document dated on or about 22 August 2011; |
| "Offer Period" | means the period from the Effective Date to the last date on which the Offer is capable of acceptance; |
| "Offeree" | means Autonomy Corporation Plc; |

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661600

USAO 00003476

| "Offeree Shareholders" | means the shareholders of the Offeree and shall include where the shares are held jointly, each joint holder of the relevant shares and the duly authorised representative of any shareholder; |
|---|---|
| **"Persons with Information Rights"** | means persons specified on the copy Information Rights Register provided to Capita by the Offeree; |
| "Services" | means the services to be provided by Capita, as set out in the Services Schedule attached hereto as Schedule 1 or such replacement Services Schedule issued pursuant to clause 5, from time to time. |

1.2    Terms not otherwise defined in this Agreement shall have the same meaning given to them in the Offer Document.

1.3    References in this Agreement to a **"clause"** or **"Schedule"** shall mean a clause, or Schedule of this Agreement.   References to legislation, regulations, orders or rules shall mean such legislation, regulations, orders or rules, as amended from time to time or any replacement legislation, regulations, orders or rules, from time to time.

1.4    Any reference in this Agreement to a "day" means a business day, which is not a Saturday or Sunday and on which the London Stock Exchange is open for business.

1.5    Clause headings are for convenience only and do not affect the interpretation of this Agreement.

2.    **APPOINTMENT AND CAPITA'S DUTIES**

2.1    Capita's appointment

From the Effective Date, the Offeror appoints Capita, which accepts such appointment, to be receiving agent and escrow agent in respect of the Offer to provide the Services on the terms and conditions set out in this Agreement.

27471                                    © 2011 Capita Registrars Limited. All rights reserved.

2.2     Performance standards

Capita shall use all reasonable skill and care in the performance of its obligations under this Agreement and shall maintain all necessary authorisations and other approvals in compliance with all applicable statutory, legal, and regulatory requirements in force in England ("**Regulatory Requirements**") for the provision of the Services.

2.3     Proper Instructions

(a)     Capita shall accept, and shall be entitled to act upon, proper and reasonable instructions in relation to the Services, which may be given to Capita from time to time, as described in this clause ("**Proper Instructions**").

(b)     Proper Instructions shall, for the purposes of this Agreement, mean written, emailed, facsimiled or any other electronic instructions in respect of the Services issued or purported to be issued by any person(s) authorised by the Offeror, (including, but not limited to, the Offeror's corporate advisers/brokers, solicitors or principal registrar, where relevant). When acting pursuant to Proper Instructions, Capita shall not be under any duty to make any enquiry as to the genuineness or authenticity of such instructions so long as the instructions reasonably appear to be genuine and authentic and do not contain any manifest error on their face. The Company shall indemnify Capita for any liabilities it may suffer in connection with any change to the acceptance criteria or to the terms of the Offer after the Offer Document is published.

(c)     Where Capita receives evidence of the authority of any person(s) to act under sub-clause (b) above, it will consider such authority in full force and effect until receipt of written notice to the contrary.

(d)     In instances agreed in advance with Capita, Capita may also act pursuant to Proper Instructions given by telephone provided that written confirmation of such instructions is sent to Capita as soon as practicable.

2.4     Service continuity

Capita will take all reasonable steps to:

(a)     ensure the continued performance and operational resilience of the Services by means of contingency, back-up and disaster recovery facilities and processes; and

27471                              © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01681602

USAO 00003478

(b)   fully restore the Services as soon as practicable in the event of non-availability or failure of Capita's systems for whatever reason.

2.5   Dissentient services

The Offeror agrees to appoint Capita (or an Affiliate of Capita) to administer the register of the Offeree's non-assenting shareholders on its behalf. Such services shall be subject to separate fees and charges to be agreed between the parties at the relevant time. The Offeror agrees that Capita may transmit the details of such non-assenting shareholders to its Affiliate, Capita Tracing Solutions Limited, so that Capita Tracing Solutions Limited may carry out an asset reunification program on an exclusive basis to try to locate the relevant non-assenting shareholders, provided that such program shall be at no cost to the Offeror.

## 3.   THE OFFEROR'S DUTIES

3.1   Information and assistance

The Offeror undertakes to perform this Agreement in compliance with all the Regulatory Requirements applicable to it, including its Articles, and to:

(a)   give such information or assistance as shall be reasonably necessary to enable Capita to perform its obligations under this Agreement;

(b)   promptly provide and/or instruct any third parties (including but not limited to, where relevant, corporate advisers/brokers, solicitors, Euroclear UK & Ireland, the Offeree's principal registrar and/or former registrar, as applicable) to provide such information, records and other materials as Capita may, from time to time, request to enable it to perform the Services;

(c)   inform Capita of any treasury shares as defined in section 724(5) of the Companies Act 2006, acquired by the Offeree, if applicable to the provision of the Services by Capita;

(d)   furnish Capita with draft copies of the documents to be issued to Offeree Shareholders in order that Capita shall have sufficient and reasonable time to review and comment on such documents prior to publication;

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-0166:1603

USAO 00003479

(e)  instruct its printers or mailing house to provide Capita with, by no later than the date of publication of the Offer Document, sufficient copies of the Offer Document in hard copy to meet requests for copies of such documents; and

(f)  ensure that any shareholder forms relating to the Services that are published on a website of the Company or an Affiliate and are capable of being downloaded, are clearly marked as "void" or "specimen" or otherwise clearly marked to indicate that they may not be used in connection with the Services.

The Offeror acknowledges that Capita will need to liaise (where applicable) with the Offeree's corporate nominee or depositary (the "**Nominee**") prior to the Effective Date in connection with the provision of the Services. The Offeror authorises Capita to contact the Nominee directly in connection with the provision of the Services both before and after the Effective Date and shall procure that the Nominee promptly provides all reasonable assistance to Capita as it may require to assist Capita in providing the Services.

3.2  Due diligence

Capita reserves the right to carry out due diligence on the Offeror under applicable Regulatory Requirements during the term of this Agreement.   The Offeror agrees to promptly provide all relevant documentation and information reasonably requested by Capita and the provision of the Services shall be conditional on the Offeror continuing to satisfy all due diligence requirements imposed by the Regulatory Requirements.   Where a suitable introduction certificate has been provided to Capita by the Offeror's advisers the amount of such documentation and information is likely to be significantly reduced.

3.3  Exclusive appointment

The Offeror shall not instruct any third party to provide, and shall not itself provide, services similar to the Services during the term of this Agreement.

4.  **TERM**

4.  This Agreement shall commence on and from the Effective Date and shall, unless earlier terminated in accordance with clause 14, continue until the completion of the Services.

27471                          © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

**5.    CHANGE CONTROL PROCEDURE**

5.1    Any request by a party to this Agreement (the "**Requesting Party**") for a change to the scope of the Services shall be reasonably considered by the other party (the "**Other Party**"). Both parties, acting reasonably at all times, agree to discuss the proposed change(s) and negotiate any consequential amendments required to this Agreement as a result including, without limitation, the time and costs within which implementation can be achieved and the impact on the Fees from the date of the implementation of the change.    Changes required as a result of changes to the Regulatory Requirements shall become effective as soon as practicable following the request from the Requesting Party.    No other change to this Agreement shall be effective unless it is in writing and signed by or on behalf of each party.

5.2    All costs of any change caused by changes to the Regulatory Requirements shall be borne by the Offeror.  Capita will inform the Offeror of the total costs of any such change.

**6.    PAYMENT OF FEES AND EXPENSES**

6.1    In consideration for the provision of the Services the Offeror shall pay the Fees to Capita in accordance with the Fee Schedule.

6.2    In addition, Capita is entitled to recover from the Offeror all reasonable out of pocket expenses incurred in connection with the Agreement.  Out of pocket expenses shall include but not be limited to postage, Euroclear UK & Ireland message and network charges, reports, telephony services, electronic transmission charges, mailing, stationery, banking charges, printing, photocopying, courier expenses, and reasonable travelling expenses incurred in connection with the provision of the Services.

6.3    Capita will invoice the Offeror according to the invoice period set out in the Fee Schedule and the Offeror shall pay such invoice according to the payment terms set out in the Fee Schedule.

6.4    Capita shall be entitled to charge interest on any amounts owing from the Offeror but which are unpaid, at an annual rate equal to four percent (4%) above the base interest rate established by Capita's main UK bank, from time to time, from the due date until the date of payment in full.

6.5    The Offeror agrees that Capita may from time to time require legal advice in connection with the provision of the Services.  Capita shall be solely responsible for obtaining any such advice but the reasonable cost of such advice will be chargeable to the Offeror.

27471                                     © 2011 Capita Registrars Limited, All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                          HP-SEC-01661605

USAO 00003481

6.6   The Fees and any expenses or disbursements incurred in connection with the provision of Services are quoted exclusive of any value added tax ("VAT"), which shall be payable by the Offeror in addition thereto (unless an exemption applies).

6.7   The parties acknowledge that the Fees for the Services have been calculated taking into account the recoverability of input VAT wholly or partly attributable to the provision of the Services.

6.8   Where as a result of any change of law, any new or amended VAT ruling, any new or altered practice or interpretation of H.M. Revenue & Customs ("HMRC") or any Court or tribunal decision (which events shall be referred to individually or collectively as a "Change of Law") Capita revises the Fees to take into account any resulting irrecoverable input VAT or increased recoverable VAT, any resulting increase in the Fees will be payable (plus VAT if applicable) by the Offeror.

6.9   Where as a result of any Change of Law the Fees for Services already supplied are deemed, as a result of such change, to have borne an amount in respect of VAT which was not VAT properly due thereon ("Overpaid VAT") and the Offeror requests in writing that Capita seeks a refund of the overpaid VAT from HMRC, Capita shall take the necessary action to claim a refund of the Overpaid VAT to the fullest amount permitted under UK legislation and will remit to the Offeror a sum equal to the amount actually received from HMRC in respect of such claim, less any costs and expenses incurred in relation to the claim.

6.10   Capita shall not be required to take any action referred to in clause 6.9 which involves engaging in any litigation or dispute with HMRC or any other tax authority or any third party, and shall not be obliged to take or omit to take any action which it, in its sole discretion, believes is or could be contrary to the interests of its business.

6.11   For the avoidance of doubt, save in accordance with clause 6.9, Capita shall have no liability to pay any amount to the Offeror in respect of any Overpaid VAT.

7.   **MATERIAL INTEREST**

Capita hereby notifies and discloses that it and its Affiliates:

(a)   undertake similar services to those provided under this Agreement for other companies;

27471                                 © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01661606

USAO 00003482

(b)    may act as agent or make arrangements for the Offeror or on its instructions in relation to transactions in which it is also acting for other companies; and

(c)    may from time to time receive and retain remuneration from a third party in consequence of performing its functions under this Agreement.

8.    **CAPITA'S WARRANTIES**

8.1    Capita warrants that:

(a)    it has full capacity and authority and all necessary consents to enter into and to perform this Agreement and to provide the Services; and

(b)    this Agreement is executed by its duly authorised representative with full power and authority to bind Capita.

8.2    All of the warranties specified in this clause 8 are without prejudice to any other warranties expressed in this Agreement. Each such warranty shall be construed as a separate warranty and shall not be limited or restricted by reference, or inference from, the terms of any other warranty or any other term.

8.3    Capita acknowledges and agrees that compliance by it with each such warranty shall not relieve it of any of its other obligations under this Agreement.

9.    **OFFEROR'S WARRANTIES**

9.1    The Offeror represents, warrants and undertakes to Capita that:

(a)    it has full capacity and authority and all necessary consents to enter into and to perform this Agreement;

(b)    this Agreement is executed by its duly authorised representative with full power and authority; and

(c)    all the responses and information provided to Capita by the Offeree and Offeror (and their advisers, representatives and agents) are true, accurate and not misleading in any material respect; and

(d)    that any shares of the Offeree held in its name or on its behalf, either at the commencement of the Offer Period, or that may subsequently be purchased in its name or on its behalf during the Offer Period and any shares held by it either directly or indirectly that are used for the purposes of the statement required by the final paragraph of Rule

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661607

USAO 00003483

17.1 (Announcement of Acceptance Levels) of the Takeover Code and specifically for inclusion in the Receiving Agent Certificate, do not fall into the category described in Note 8 on Rule 10 (Borrowed shares) of the Takeover Code.

9.2     All of the warranties specified in this clause 9 are without prejudice to any other warranties expressed in this Agreement. Each such warranty shall be construed as a separate warranty and shall not be limited or restricted by reference, or inference from, the terms of any other warranty or any other term.

9.3     The Offeror acknowledges and agrees that compliance by it with each such warranty shall not relieve it of any of its other obligations under this Agreement.

10.     LIABILITY

10.1    Subject to clauses 10.2 and 10.3, the aggregate liability of Capita and its Affiliates, or its or their directors, officers, employees, or agents under this Agreement (including, but not limited to, contractual or tortious liability, including negligence, breach of statutory duty, restitution or otherwise) for any damage or other loss howsoever caused arising out of or in connection with this Agreement or the provision of the Services will be limited to the lesser of:

(a)     £250,000; or

(b)     an amount equal to five (5) times the fee payable to Capita hereunder.

10.2    Notwithstanding anything to the contrary in this Agreement (but subject to clause 10.3), neither Capita, or its Affiliates, or any of Capita or its Affiliates' directors, officers, employees, or agents shall have any liability of any type (including, but not limited to, contractual or tortious liability, including negligence and non-fraudulent misrepresentation, breach of statutory duty, restitution or otherwise), for any special, incidental, indirect or consequential loss or damages, or direct or indirect loss of profits, opportunity or goodwill, loss of reputation or customers or any other pure economic loss in connection with or arising out of this Agreement or the Services.

10.3    Nothing in this clause 10 excludes or limits liability for death or personal injury caused by Capita's negligence, for fraud or any other liability which cannot be excluded by law.

27471                           © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                                    HP-SEC-01681608

10.4    Nothing in this clause 10 shall exclude or limit the right of Capita to recover, or the obligation of the Offeror to pay, any sums due and payable under this Agreement including, without limitation, any Fees.

10.5    In the event that Capita relies on the Offeror or any third parties (including but not limited to, where relevant, the Offeree, corporate advisers/brokers, solicitors, Euroclear UK & Ireland or the Offeror's principal and/or former registrar, as applicable) to forward, in a timely manner, documents, materials or information necessary for Capita to conduct the Services or to otherwise cooperate with Capita in order for Capita to perform its obligations, Capita shall not be liable to any party for errors, delays or other consequences arising from such failure.

10.6    Where under the Disclosure Rules and Transparency Rules published by the Financial Services Authority ("FSA"), Capita has been appointed to maintain an insider list for the purposes of recording the details of those having access to inside information (the "Insider List") Capita shall use reasonable efforts to update and maintain the Insider List, but shall have no liability whatsoever in respect of any errors in doing so.

11.    INDEMNIFICATION

11.1    The Offeror shall indemnify, defend and hold harmless Capita and its Affiliates, and its and their directors, officers, employees and agents (each, a "Capita Indemnified Party"), from and against any and all losses, damages, liabilities, professional fees (including but not limited to legal fees), court costs, and expenses (collectively "Losses") incurred by the Capita Indemnified Party resulting or arising from any breach of the Agreement and in addition any third-party claims, actions, proceedings, investigations or litigation relating to or arising from or in connection with this Agreement or the Services contemplated herein, except to the extent such Losses are determined to have resulted solely from the fraud or wilful default of the Capita Indemnified Party seeking indemnity under it.

11.2    Capita shall give the Offeror prompt notice of any such claim or lawsuit (including a copy of such claim or lawsuit) served upon it and shall fully co-operate with the Offeror and its legal representatives in the investigation of any matter the subject of indemnification. Capita shall not unreasonably withhold its approval of the settlement of any claim, liability, or action covered by this indemnification provision.

27471                           © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED    HP-SEC-01661609

USAO 00003485

## 12.  CONFIDENTIALITY

12.1    It is understood that during the course of this Agreement, a party (the "**Receiving Party**") may receive or be exposed to data and information that is confidential or proprietary to the other party (the "**Disclosing Party**") or its licensors. All such data and information (including but not limited to, data, documents, methodologies, software, trade secrets, personnel records, business strategies, pricing and financial arrangements and commercial affairs), whether written, machine readable or verbal, made available, disclosed, or otherwise made known to a party and its employees or Affiliates as a result of this Agreement (whether disclosed before, on or after the date of this Agreement) shall be considered confidential and shall be considered the sole property of the Disclosing Party (hereinafter "**Confidential Information**").

12.2    The Confidential Information shall be used by the Receiving Party only for purposes of this Agreement. The Receiving Party agrees that it will not reveal, publish or otherwise disclose the Confidential Information of the Disclosing Party or the terms of this Agreement to any third party without the prior written consent of the Disclosing Party, except that each party may disclose Confidential Information:

12.2.1    to its Affiliates, agents and professional advisers or as necessary in the performance of this Agreement or the Services, provided that such persons are made aware of the confidentiality obligations set out herein; and

12.2.2    to the extent obliged to do so by any Regulatory Requirement, an order of any competent judicial, governmental or regulatory body or the rules of any listing authority of stock exchange on which the party's securities are traded.

12.3    The foregoing obligations shall not apply to Confidential Information to the extent that it can be shown, by verifiable written records:

12.3.1    to be publicly available at the time of its disclosure or to have become publicly available thereafter other than as a result of a breach of this Agreement by the Receiving Party; or

12.3.2    to have been in the possession of or to be known by the Receiving Party prior to its receipt from the Disclosing Party; or

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661610

USAO 00003486

12.3.3 to have become available to the Receiving Party from a source other than the Disclosing Party, which source is not bound by any duty of confidentiality owed in relation to such Confidential Information.

12.4 Notwithstanding clauses 12.1 and 12.2, Capita may disclose for marketing purposes the fact that the Offeror is a client of Capita.

12.5 The Offeror agrees that Capita may use the Offeror's name and logo to the extent necessary for the purpose of the provision of the Services for the term of this Agreement. The Offeror shall not use the name or logo of Capita in any publicly issued documents, without the prior written consent of Capita.

12.6 Neither this Agreement nor the disclosure of Confidential Information by one party to another shall be taken as implying an assignment, licence or transfer to the Receiving Party of patents, know-how, copyright, trade secrets or any other intellectual property rights in the Confidential Information.

12.7 The Offeror agrees that Capita may utilise information contained in the Offeree's share register for the purposes of informing the Offeree Shareholders of other services provided by Capita or its Affiliates, and in respect of providing such services.

## 13. DATA PROTECTION

13.1 All parties shall comply at all times with the Data Protection Act 1998 ("DPA") and any regulations made under the DPA.

13.2 Capita acknowledges that it holds personal data as a "Data Processor" as defined by the DPA and, in such capacity undertakes that it shall only act on the instructions of the Offeror and in accordance with this Agreement in relation to the processing of any personal data as part of the Services.

13.3 The Offeror authorises Capita to use and disclose such personal data as is necessary for the performance of this Agreement and/or the Services, to any person with legal, administrative or regulatory power over Capita in respect of the Services; or Capita's Affiliates who are involved in carrying out functions related to the Services including such Affiliates which are outside of the EEA in countries which do not have similar protections in place regarding the information and its use. Capita shall ensure that any such Affiliates have put in place proper security measures to ensure at least the same level of protection of the personal data as is required under the DPA.

27471                             © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01661611

13.4    The Offeror agrees to comply with the obligations of a **"Data Controller"** as defined in the DPA in respect of all personal data processed under this Agreement and undertakes that:

13.4.1   it has made and shall maintain sufficient registrations and/or notifications under the DPA so that it may control personal data;

13.4.2   it shall provide Capita with details of any material changes to the registrations and notifications referred to in clause 13.4.1; and

13.4.3   it shall ensure that where personal data is supplied to or disclosed to Capita by the Offeror it has made all necessary disclosures to and obtained all consents from the data subjects so that the processing of such personal data by Capita in the manner set out in this Agreement shall fully comply with the DPA.

## 14.   TERMINATION

14.1    Either party may terminate this Agreement:

14.1.1   if the other party commits a material breach of its obligations under this Agreement (including a payment default) which that party has failed to remedy within 14 days of receipt of a written notice to do so from the first party; or

14.1.2   if a resolution is passed or an order made for the winding-up, dissolution or administration of the other party, or if the other party is declared insolvent or if an administrator, administrative receiver, manager or provisional liquidator (or similar officer to any of the foregoing in the relevant jurisdiction) is appointed over the whole of or a substantial part of the other party or its assets or undertakings.

14.2    If this Agreement is terminated, the parties shall promptly meet to prepare a close-out schedule and Capita shall cease performing all work not necessary for the orderly close-out of the Services. The Offeror shall pay Capita the Fees in respect of all work actually performed, and reimburse Capita for all Fees and expenses incurred, including, but not limited to, all non-cancellable costs incurred prior to termination but paid after the termination date. The Offeror shall pay for all actual costs, including time spent by Capita personnel to complete activities associated with the termination and close-out of the Services, including the fulfilment of any Regulatory Requirements, if applicable.

© 2011 Capita Registrars Limited, All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED   HP-SEC-01661612

USAO 00003488

14.3    Upon termination of this Agreement and against payment of all sums owing to Capita by the Offeror, all materials and data of the Offeror, regardless of the method of storage or retrieval, shall be delivered to the Offeror in such form as is then in the possession of Capita at the Offeror's risk and expense. Capita, however, reserves the right to retain, at its own cost, and subject to the confidentiality provisions herein, copies of all materials that may be needed to satisfy Regulatory Requirements or resolve disputes regarding the Services, where applicable.

## 15.    FORCE MAJEURE

15.1    No party will be liable for a delay or failure to carry out any of its obligations under this Agreement to the extent to which this is caused by any event beyond the reasonable control of the relevant party including, without limitation, strikes, labour disputes, natural disasters, war, riot, vandalism, terrorism, civil commotion, malicious damage, compliance with any law or governmental order, rule, regulation or direction or any overriding emergency procedures, failures of utility or telecommunications supply, accident, breakdown of plant or machinery, fire, flood and storm ("Force Majeure"). Notwithstanding the foregoing, nothing in this Agreement shall excuse a delay or failure to comply with a payment obligation under it.

15.2    The party whose performance has been delayed or prevented by Force Majeure shall promptly notify the other party on becoming aware of the Force Majeure and the parties shall take all reasonable steps to overcome and mitigate the effects of Force Majeure by the operation of contingency plans, back-up or disaster recovery or other relevant procedures as soon as reasonably practicable.

## 16.    ASSIGNMENT AND SUBCONTRACTING

16.1    The parties cannot assign any of their contractual rights and obligations referred to in this Agreement without the prior written consent of the other party, save that Capita may assign its rights and obligations to any of its Affiliates, provided that, in its reasonable opinion, such Affiliate has the necessary expertise and resources to carry out such obligations.

16.2    Capita may sub-contract certain aspects of the provision of the Services provided that Capita shall, at all times, remain responsible for the provision of the Services and be liable for all acts and omissions of its sub-contractors to the extent that, had such acts and omissions been of Capita, Capita would have been liable in connection with this Agreement.

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661613

USAO 00003489

17. **GENERAL**

17.1   Notices

17.1.1   Any notice required or permitted to be given under this Agreement shall be sent, in writing, to the address or number set out below or to such other address or number notified in accordance with clause 17.2.2, and shall be deemed given:

(a)   on the date received if delivered personally or by an overnight delivery service;

(b)   two (2) business days after the date of posting if sent by first class post;

(c)   five (5) business days after the date of posting if sent by airmail; or

(d)   upon dispatch if sent by fax,

in the case of Capita to:

Capita Registrars Limited
The Registry
34 Beckenham Road
Beckenham
Kent
BR3 4TU

Fax: 020 7901 0197

Attention: The Company Secretary

in the case of the Offeror to:

Hewlett-Packard Vision B.V.
Startbaan 16
1187 XR Amstelveen
The Netherlands

Fax:

Attention: The Company Secretary

17.1.2   Any party may amend its details for service of notices at any time by written notice.

17.2   Non-waiver

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661614

No failure, delay, relaxation or forbearance on the part of any party in exercising any right, power or privilege provided by law or under this Agreement will operate as a waiver of it, nor will any single or partial exercise of it preclude any further exercise or the exercise of any other right, power or privilege under this Agreement or otherwise.

17.3    Entire Agreement and modifications

This Agreement (including the Schedules) sets forth and will constitute the entire agreement between the parties in respect of its subject matter and supersedes all previous agreements (oral or written), negotiations and communications in respect of the same subject matter. It may be amended, varied or modified only in writing, signed by a duly authorised person of each of the parties.

17.4    Contracts (Rights of Third Parties) Act 1999

Any third party referred to in clauses 10 and 11 of this Agreement has the right to enforce such rights under this Agreement in accordance with the provisions of the Contracts (Rights of Third Parties) Act 1999. Except as stated in this clause 17.4, the parties to this Agreement do not intend that any of its terms will be enforceable by virtue of the Contracts (Rights of Third Parties) Act 1999 by any person not a party to it.

17.5    Survival of clauses

The rights and obligations of the parties, which by intent or meaning have validity beyond such termination (including, but not limited to, rights with respect to confidentiality, ownership, indemnification and liability limitations) shall survive the termination of this Agreement.

17.6    Severability

If any provisions herein are found to be illegal or unenforceable on the grounds that they are overly broad or in conflict with applicable laws or policy, it is the intent of the parties that such provisions be replaced, reformed or narrowed so that their original business purpose can be accomplished to the extent permitted by law, and that the remaining provisions shall not in any way be affected or impaired thereby.

17.7    No partnership, etc.

The parties acknowledge and agree that nothing in this Agreement or the provision of the Services shall be taken to constitute, create

27471                              © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01661615

or imply a joint venture, partnership or formal business association of any kind.

17.8    Counterparts

This Agreement may be executed in any number of counterparts, and by the parties to it on separate counterparts, but shall not be effective until each party has executed at least one counterpart. Each counterpart shall constitute an original of this Agreement, but all the counterparts shall together constitute one and the same instrument.

18.    **GOVERNING LAW AND JURISDICTION**

This Agreement and any contractual or non-contractual claim or dispute arising out of or in connection with it will in all respects be governed and construed in accordance with the laws of England and all parties submit to the exclusive jurisdiction of the English courts.

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

This **Agreement** has been signed by the parties' duly authorised representatives:

For and on behalf of )
**Capita Registrars Limited** )

Name:  GARY ANGUS
        Authorised Signatory

Signed for and on behalf of )
**Hewlett-Packard Vision B.V.** )

Name:  SERGIO LORELIO

Title:  Director

In the presence of:

Signature:

Name:  EMMA WALTON

Title:  ATTORNEY

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661617

USAO 00003493

## SCHEDULE 1

### THE SERVICES

In Capita's capacity as receiving agent and escrow agent it shall provide the following Services in connection with the Offer.

1    Provide assistance in the preparation of the Offer documents (including commenting on proofs of, inter alia, the forms of acceptance ("**Forms of Acceptance**") and the Offer Document to be sent to the Offeree Shareholders and, where applicable, to Persons with Information Rights) and in particular in relation to the procedure for acceptance of, and settlement of consideration under, the Offer.

2    Request from the registrars of the Offeree a copy of the register of members (giving details of Offeree Shareholders holding shares in both certificated and uncertificated form) together with a copy of the Information Rights Register at the date of the announcement of the Offer or, such other date as may be agreed between Capita and the Offeror (the "**Copy Register(s)**") and, on a daily basis, to liaise with the said registrars and Euroclear UK & Ireland to the extent necessary and practicable to obtain duplicate register update requests ("**RURs**"), copies of all documents which would lead to a change in the register and any such other information to ensure that information is received to keep the list of holders and, where appropriate, Persons with Information Rights up to date.

3    Make available a file to the appointed printers or mailing house for the purposes of personalising the Forms of Acceptance and despatch of the Offer Document or, where applicable, a website notification letter and Forms of Acceptance.

4    Provide to the appointed printers or mailing house, details of Persons with Information Rights for the purposes of despatch of a copy of the Offer Document or, where applicable, a website notification letter.

5    Notify Euroclear UK & Ireland in a timely manner of the details of the Offer for corporate action purposes.

6    During the Offer Period (including any extension thereof):

6.1    Receive from certificated shareholders the Forms of Acceptance in respect of the Offer together with share certificates and/or other documents of title or transfers to escrow ("TTE") from CREST holders in accordance with the terms of the Offer and verify such forms or TTE to the Copy Register;

6.2    Maintain an escrow account to which Offeree Shares may be transferred by Offeree Shareholders sending a TTE Instruction;

27471                              © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01661618

USAO 00003494

6.3     Act as escrow agent in respect of the shares transferred to an escrow balance in connection with the acceptances under the Offer in accordance with the facilities and requirements of CREST and in accordance with the provisions of the Offer Document;

6.4     Deal with any queries and correspondence arising in relation to the completion of the Forms of Acceptance;

6.5     In the event that any Form of Acceptance has been improperly completed or executed, or the share certificate(s) and/or other document(s) of title accompanying such a Form of Acceptance are not in the proper form for transfer (as requested by the Instructions set out in the Form of Acceptance) or if in either case some other irregularity in connection with any tender of share certificate(s) and/or other document(s) of title make reasonable enquiries into such irregularity to cause such action to be taken as is necessary and appropriate to correct such irregularity;

6.6     Capita shall not be under any duty to give notice of any defects or irregularities in documents and/or CREST instructions received, and will not incur any liability for failure to give any such notice;

6.7     Upon request of any Offeree Shareholder, furnish to such person (except for any person in jurisdictions where, under the terms of the Offer, documents may not be sent unless the Offeror previously authorises such furnishing in writing) copies of the Offer Document, any supplements to the Offer Document, Forms of Acceptance, any revisions thereof and the other materials referred to in the Offer Document as being available to Offeree Shareholders provided that the Offeror has supplied Capita with sufficient copies of such documents to meet such requests;

6.8     Upon request of any Person with Information Rights, furnish to such person (except for any person in jurisdictions where, under the terms of the Offer, documents may not be sent unless the Offeror previously authorises such furnishing in writing) copies of the Offer Document and any supplements to the Offer Document being made available to Offeree Shareholders provided that the Offeror has supplied Capita with sufficient copies of such documents in hard copy form "marked "For Information Only" to meet such requests in accordance with Rule 19.9 of the Takeover Code;

6.9     Obtain, from the registrars of the Offeree, any brokers to the Offeror appointed from time to time or such other persons as the Offeror may designate, transfers, or from Euroclear UK & Ireland, duplicate RURs, in respect of purchases of shares by or on behalf of the Offeror and to verify them to the Copy Register;

27471                                    © 2011 Capita Registrars Limited. All rights reserved.

6.10   Report to the Offeror with details of all valid acceptances under the Offer received and purchases made, (such reports being made, where appropriate, at an appropriate time of day and containing the relevant information to enable the Offeror to comply in all respects with the requirements of Rule 17 of the Takeover Code);

6.11   Ensure that all acceptances and purchases counted as valid meet the requirements set out in Notes 4 and 5 on Rule 10 of the Takeover Code and, if appropriate, Note 6 on Rule 10 of the Takeover Code; and

6.12   Issue at the request of the Offeror any certificate complying with Note 7 on Rule 10 of the Takeover Code and to address such certificate to the Offeror.

7.     Following confirmation that the Offer is declared or becomes unconditional in all respects:

7.1    Effect the processing of the individual Forms of Acceptances and/or TTE instructions (including, for the avoidance of doubt, acceptances received after the Offer becomes, or is declared, unconditional in all respects) and calculate the actual entitlements due to individual accepting shareholders of the Offeree under the terms of the Offer;

7.2    In the case of Offeree shares in certificated form, calculate the amount of stamp duty or stamp duty reserve tax due on each individual transfer to the Offeror (or such person as it may nominate), prepare for signature by the Offeror or agent appointed by the Offeror for such purpose any and all forms of transfer and/or other such document(s) necessary in order to register transfers of Offeree shares to the Offeror (or such person as it may nominate), to arrange for the stamping of forms of transfer by HMRC (subject to being placed in funds by or on behalf of the Offeror to meet the costs of any stamp duty or stamp duty reserve tax); and to deliver to the registrars of the Offeree valid Forms of Acceptance and/or such forms of transfer and/or other document(s) in favour of the Offeror (or such person as it may nominate) together with the relevant share certificates or other documents of title so as to receive the resultant share certificate(s) for Offeree shares for onward transmission to the Offeror (or such person as it may nominate);

7.3    In the case of Offeree shares in uncertificated form, make the relevant calculation for stamp duty or stamp duty reserve tax, the arrangements for the payment of stamp duty or stamp duty reserve tax and in addition to do all such things as are necessary to effect the transfer of such shares to the Offeror (or such person as it may nominate) in accordance with the facilities and requirements of CREST (subject to being placed in funds by or on behalf of the

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661620

USAO 00003496

Offeror to meet the costs of any stamp duty or stamp duty reserve tax payable in connection therewith);

7.4    Issue to accepting shareholders of the Offeree the consideration and to despatch (subject to being placed in funds by or on behalf of the Offeror), in accordance with the terms of the Offer and within the time periods required by Rule 31.8 of the Takeover Code (subject to the provisions for overseas Offeree Shareholders resident in jurisdictions where documentation in relation to the Offer may not be sent) and the authority contained in the Forms of Acceptance, such consideration due to accepting shareholders of the Offeree under the terms of the Offer, provided that no consideration will be sent to an accepting shareholder until its document(s) of title to the relevant Offeree shares has been received or the relevant TTE has settled; and

7.5    Open, maintain and operate a bank account for the purpose of issuing cash entitlements to or, where relevant, crediting member accounts of accepting shareholders of the Offeree and make the relevant payment on being placed in funds by or on behalf of the Offeror.

8    Assist in the preparation, in accordance with instructions received from or on behalf of the Offeror, for despatch on the applicable date(s), of notices pursuant to sections 974 to 991 of the Companies Act 2006 and deal with the compulsory acquisition of shares held by non-assenting Offeree Shareholders and, the Offeror agrees to appoint Capita to administer the register of such non-assenting shareholders on its behalf. Such services shall be subject to separate fees and charges to be agreed, in a separate agreement signed between Capita and the Offeror at the relevant time.

9    If the Offer does not become or is not declared unconditional or lapses, return all share certificates and/or other documents of title together with the appropriate Forms of Acceptance to the persons entitled thereto, within 14 days of the Offer lapsing; or immediately after the lapsing of the Offer (or within such longer period as the Panel may permit, not exceeding 14 days of the lapsing of the Offer) give instructions to Euroclear UK & Ireland to transfer all Offeree shares held in escrow balances and for which we are the escrow agent for the purposes of the Offer to the original available balances of the shareholders concerned, in accordance with the provisions of the Offer Document.

10    Receive from any Offeree Shareholder wishing to exercise their withdrawal rights (where permitted under Rule 34 of the Takeover Code) a valid notice of withdrawal and, to return all share certificates and/or other documents of title lodged with the appropriate Form of Acceptance and , where relevant, transfer all Offeree shares held in escrow balances to the original available balances of the Offeree Shareholders concerned.

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661621

11      Comply in all respects with Appendix 4 to the Takeover Code and to inform and consult with the Offeror and its advisers if we require direct access to the Panel on Takeovers and Mergers.

12      Undertake:

12.1    Not to send or distribute any documents (including, without limitation, the Offer Document and the Forms of Acceptance) in or into a jurisdiction where documentation in relation to the Offer may not, under the terms of the Offer, be sent, unless the Offeror previously authorises such sending or distribution in writing; and

12.2    Not to send Forms of Acceptance to Persons with Information Rights; and

12.3    To notify you immediately of any Form of Acceptance which appears to have been executed in, or sent from, a jurisdiction where documentation in relation to the Offer may not, under the terms of the Offer, be sent or which provides an address in any such jurisdiction for the delivery of the consideration under the Offer, or which does not include the warranty relating to overseas shareholders contained in the form of acceptance; or

12.4    To notify you immediately of any Restricted Escrow Transfer.

13      In relation to documents received, check by purely visual inspection to see if the same reasonably appear on their face to be genuine. Capita shall not be held responsible if it treats as valid any document which appears on its face to have been properly completed and executed but which later proves to have been executed fraudulently or otherwise without authority. If Capita is unable to determine the validity of any document reference shall be made to the Offeror, who will make a decision and instruct Capita in writing of the action to be taken.

14      Not withstanding any other clause of this Agreement, or any or deemed term and condition of the Offer, Capita shall only process original duly completed Forms of Acceptance, bearing the original signature(s) of the shareholder(s), which are received by the deadline(s) for the receipt of Forms of Acceptance. Forms of Acceptance delivered by email or facsimile or other electronic transmissions or copies will not be accepted or processed.

15      Capita shall not process any Forms of Acceptance received that have been or appear to have been published on and/or downloaded from a website.

27471                          © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED

16    Capita shall not be responsible for any document(s) or notice(s) delivered by or on behalf of an Offeree Shareholder to any address other than the Capita address specified for the delivery of such document(s) or notice(s).

27471                              © 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                        HP-SEC-01661623

USAO 00003499

## SCHEDULE 2

### FEE SCHEDULE

The Offeror shall pay Capita's Fees in accordance with the payment schedule below. Capita will invoice the Offeror in arrears. Settlement of our invoice is to be strictly on presentation and payment shall be made into such bank account as Capita shall nominate.

| | |
|---|---|
| Professional advisory fee (to include a central point of corporate action expertise; liaising with the Offeror's corporate and legal advisers et cetera; undertaking detailed review of the offer documentation; providing specialist guidance and advice on the timetable, offer terms and processes (ensuring adherence to market best practice); assisting in the drafting of forms of acceptance; ensuring key project milestones are achieved; providing Euroclear UK & Ireland with details of the corporate action and/or supporting the Offeror in any application(s) to be made to Euroclear UK & Ireland; undertaking full security reconciliation with CREST (where appropriate); participating in conference calls and/or attending logistics meetings; and project planning). | £200 per hour |

The above is subject to a separate minimum advisory fee of £2,250

| | |
|---|---|
| Cost per Offeree Shareholder/Persons with Information Rights | £5.45 per Shareholder based on the issue of personalised forms of acceptance |
| Set-up and maintenance of the Copy Registers in accordance with the Takeover Code | £200 set-up fee plus 15p per register update received |

The above are subject to a separate minimum aggregate processing fee of £5,000

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED           HP-SEC-01661624

USAO 00003500

| | |
|---|---|
| Undertaking the extraction and return of forms of acceptance and share certificates with enclosure letter and/or inputting TFE instructions to return shares held in escrow balances in connection with notices of withdrawal received in accordance with the Takeover Code | £10 per notice of withdrawal and/or ESA message received |
| Management and facility fee where the consideration settlement cycle is to be a period of five or less business days after the receipt of an acceptance (or any official closing date) under the terms of the offer or, if required by the offeror | £795 per settlement |
| Opening premises on non-business days (if required by the terms of the offer and/or the Takeover Code) | £5,000 per day. |

27471

© 2011 Capita Registrars Limited. All rights reserved.

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01661625

# EXHIBIT C

USAO 00003502

**To:** 'Andy Ward'[Andy.Ward@computershare.co.uk]; 'Barke, Carli (Shareholder Services)'[CBarke@capitaregistrars.com]
**Cc:** '#UK CS BRS Key Account Team - Client Support'[KeyAccountSupportTeam@computershare.co.uk]; 'Andrew Kanter'[andrewk@autonomy.com]
**From:** Lisa Harris
**Sent:** Tue 10/4/2011 4:32:03 AM
**Importance:** Normal
**Subject:** RE: Exercise of Autonomy Options under HP offer
exercise by person.xlsx

Hi Andy,


Please find attached the spreadsheet that we discussed.


All these staff are exercising options YESTERDAY 3rd October – please issue share certificates BUT DO NOT POST THEM TO THE STAFF – you need to put them into new accounts and let Capita know this information.


Hi Carli – these staff have all accepted HP's offer and are selling these shares to HP for £25.50 – HOWEVER the monies is not to go to the individuals but should all come to Autonomy Corporation Ltd – the total is £126,304,458 and the bank account details are:


A/C name:    Autonomy Corporation PLC

A/C number  ████████

Sort code:   20-17-19

Bank:        Barclays Bank

             St Andrews Street

             Cambridge


Many thanks,

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662048

USAO 00003503

LISA HARRIS

Group Financial Controller



* lisah@autonomy.com

The information contained in this message is for the intended addressee only and
may contain confidential and/or privileged information. If you are not the
intended addressee, please delete this message and notify the sender, and do
not copy or distribute this message or disclose its contents to anyone. Any views
or opinions expressed in this message are those of the author and do not
necessarily represent those of Autonomy Systems Limited or of any of its
associated companies. No reliance may be placed on this message without
written confirmation from an authorised representative of the company.
Autonomy Systems Limited, Registered Office: Cambridge Business Park,
Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Andy Ward [mailto:Andy.Ward@computershare.co.uk]
**Sent:** 30 September 2011 12:23
**To:** 'Barke, Carli (Shareholder Services)'; Lisa Harris
**Cc:** #UK CS BRS Key Account Team - Client Support
**Subject:** RE: Exercise of Autonomy Options under HP offer

Carli,

I'm sure it won't be a problem this end – I'll speak to our processing team.

Can you confirm the timeframe that you'll need this turned around in?

Thanks

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01662049

Andy

**From:** Barke, Carli (Shareholder Services) [mailto:CBarke@capitaregistrars.com]
**Sent:** 30 September 2011 12:19
**To:** Andy Ward; Lisa Harris
**Cc:** #UK CS BRS Key Account Team – Client Support
**Subject:** RE: Exercise of Autonomy Options under HP offer

Andy

We need to block off this allotment in terms of acceptance and payment so will require new accounts to be set up. This should just be a case of using new reference numbers for each account – obviously I do not know how your system works but we use this process (which is not manual) regularly.

Kind regards

**Carli Barke**

Corporate Actions Manager

Capita Registrars

Capita Registrars, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU

**T:** +44 (0) 20 8639 2112  |  **F:** +44 (0)20 8639 2142  |  **E:** cbarke@capitaregistrars.com

www.capitaregistrars.com

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662050

USAO 00003505

Please consider the environment before printing this email


**Shareholders** can contact us on:
UK: 0871 664 0321 (calls cost 10p per minute plus network extras.)
International: +44 (0) 208 639 3399
Lines are open 9am - 5.30pm, Monday - Friday, excluding public holidays.


**From:** Andy Ward [mailto:Andy.Ward@computershare.co.uk]
**Sent:** 30 September 2011 11:18
**To:** 'Lisa Harris'
**Cc:** #UK CS BRS Key Account Team - Client Support; Barke, Carli (Shareholder Services)
**Subject:** RE: Exercise of Autonomy Options under HP offer


Carli,


Please can you clarify why you require us to open new accounts for each individual on the expected list. This will cause a large amount of manual work as we will have to inspect the details of every person listed on the schedule.


Lisa -- if there is no option but to check all the records, I am sure you will appreciate the amount of work this will cause my team. As such, there will be additional resource needed and we will levy appropriate charges to bring in additional personnel.


When can we expect the allotment details are when do you require this to be completed?


Kind regards

Andy

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662051

USAO 00003506

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** 30 September 2011 11:10
**To:** Andy Ward
**Cc:** #UK CS BRS Key Account Team - Client Support; 'Barke, Carli (Shareholder Services)'
**Subject:** RE: Exercise of Autonomy Options under HP offer

Hi Andy,

I'm afraid have no idea which staff already have accounts — this would be a private matter.

I can confirm that the allotment will all be in one batch — and will be communicated on a spreadsheet — I have attached a draft of the spreadsheet (all with no names), is this going to be enough information for you?  Obviously we'll have real names and addresses on the real thing.  Do you prefer first name and surname in separate columns?

BTW it's 427 staff not 472 — my typo, sorry.

Many thanks,

LISA HARRIS

Group Financial Controller

(  +44 (0) 1223 448011

6 +44 (0) 1223 448040

* lisah@autonomy.com

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662052

USAO 00003507

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Andy Ward [mailto:Andy.Ward@computershare.co.uk]
**Sent:** 30 September 2011 10:06
**To:** 'Lisa Harris'
**Cc:** #UK CS BRS Key Account Team - Client Support; 'Barke, Carli (Shareholder Services)'
**Subject:** RE: Exercise of Autonomy Options under HP offer

Lisa,

This is possible for us to do, however we would need confirmation beforehand of which staff already have accounts and the respective reference numbers. This will need to be provided to us in a spreadsheet so that we can have resource put in place prior to the allotment date(s).

Can you confirm if the allotments will be keyed as a single batch or will they be spread across multiple allotments?

Thanks

Andy

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662053

USAO 00003508

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** 30 September 2011 10:01
**To:** Andy Ward
**Cc:** #UK CS BRS Key Account Team - Client Support; 'Barke, Carli (Shareholder Services)'
**Subject:** FW: Exercise of Autonomy Options under HP offer

Hi Andy,

I have been talking with Cally Greatbanks about the allotment of shares for staff exercising options when the HP offer goes unconditional.  Please see below an eMAIL form Carli Brake at Capita, she is dealing with the shareholders acceptances.

We expect 472 staff to exercise options over just under 5 million shares.

Carli has stated that it is important that the shares allotted are:-

·      Issued in certificate form, however

·      The certificates should not be printed out

·      The allotments should be to new accounts for each person (some staff will already have shares, these new allotments should be put in a different account)

Please can you confirm that you will be able to do this, or let me know if you have any questions.

I have copied Carli into the eMAIL as I am unfamiliar with the terminology and process; she can jump in if I have misunderstood what Capita need!

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-01662054

Many thanks,

LISA HARRIS

Group Financial Controller

( +44 (0) 1223 448011

6 +44 (0) 1223 448040

* lisah@autonomy.com

The information contained in this message is for the intended addressee only
and may contain confidential and/or privileged information. If you are not the
intended addressee, please delete this message and notify the sender, and do
not copy or distribute this message or disclose its contents to anyone. Any
views or opinions expressed in this message are those of the author and do not
necessarily represent those of Autonomy Systems Limited or of any of its
associated companies. No reliance may be placed on this message without
written confirmation from an authorised representative of the company.
Autonomy Systems Limited, Registered Office: Cambridge Business Park,
Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Barke, Carli (Shareholder Services)
[mailto:CBarke@capitaregistrars.com]
**Sent:** 30 September 2011 09:06
**To:** Lisa Harris
**Cc:** Andrew Kanter
**Subject:** RE: Exercise of Autonomy Options under HP offer

Morning Lisa

Thank you for your e-mail. Effectively I will need a copy of the allotment list you
send to Computershare confirm the registration details of the shareholders for
which Autonomy will be arranging payment through payroll including the

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01862055

USAO 00003510

relevant number of shares. I will also need confirmation that you have received correctly completed exercise and accept forms for all these shareholders and are happy for capita to process such acceptances on this basis. All allotments should be in certificate form for the above process to work.

Alongside this, to aid the above process, it would be helpful if you could instruct Computershare NOT to produce certificates for these option allotments and also confirm this to Capita.

Please provide the allotment lists to me and Computershare on the same day so we can keep a close eye on this. As discussed all allotments should be to 'new' accounts and not combined with any holding they currently have on the register – please confirm this with Computershare also.

Once I have the above information/confirmation, we can arrange for the funds relating to these acceptances to be chaps to Autonomy to arrange payment through payroll. Please provide the account details in due course.


Many thanks



**Carli Barke**

Corporate Actions Manager

Capita Registrars


Capita Registrars, The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU

 **T:** +44 (0) 20 8639 2112  |  **F:** +44 (0)20 8639 2142  |  **E:** cbarke@capitaregistrars.com

www.capitaregistrars.com

FOIA CONFIDENTIAL TREATMENT REQUESTED

Please consider the environment before printing this email

**Shareholders** can contact us on:
UK: 0871 664 0321 (calls cost 10p per minute plus network extras.)
International: +44 (0) 208 639 3399
Lines are open 9am - 5.30pm, Monday - Friday, excluding public holidays.

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** 28 September 2011 13:39
**To:** Barke, Carli (Shareholder Services)
**Cc:** 'Andrew Kanter'
**Subject:** Exercise of Autonomy Options under HP offer

Hello Carli

I hope you can read my attachments -- we have a new scanner which I have yet to master!

I have attached my own HP election form so you can see the format of what staff are completing – I was able to attach all my option certificates when I submitted my form but the majority of staff have ticked the declaration on the 2nd page that they have lost these.  Our HR department has a copy of everyone's option certificates on file .

The forms do look slightly different dependent on whether the options that staff are electing to exercise were granted under:-

·    Autonomy UK plan rules

·    Autonomy US plan rules

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662057

USAO 00003512

- Discovery Mining plan rules

- Optimost plan rules

- Interwoven, Verity, Virage, Zantaz or Cardiff plan rules

I have also attached a "no-names" version of the spreadsheet showing everyone that is exercising based on today's vested options – there are 3 thousand options vesting next week and 3 hundred the week after, this would increase the numbers exercising.

I have spoken to Computershare and am waiting for them to get back to me regarding what they do with the share certificates.

Many thanks,

LISA HARRIS

Group Financial Controller

( +44 (0) 1223 448011

6 +44 (0) 1223 448040

* lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

HP-SEC-01662058

USAO 00003513

Click here to report this email as spam.

***********************************************************************************
*

This email and any files transmitted with it are confidential and
intended solely for the use of the individual or entity to whom they
are addressed. If you are not the intended recipient, please e-mail
the sender immediately by replying to this message and delete the
material from any computer.

This Message is attributed to the sender and may not necessarily
reflect the view of Capita Registrars Limited, its subsidiaries or
associates.

If you would like to find out more about Capita Registrars Limited,
please visit our website at http://www.capitaregistrars.com

Registered Office:
The Registry
34 Beckenham Road
Beckenham
Kent
BR3 4TU

Registered in England no: 2605568

Any regulated business is conducted by Capita IRG Trustees
Limited which is authorised and regulated by the Financial Services
Authority (http://www.fsa.gov.uk/register/, number 184113).
Registered office as above. Registered in England no: 2729260

Part of The Capita Group Plc.

***********************************************************************************
*

This email and any attachment to it are confidential. Unless you are the intended
recipient, you may not use, copy or disclose either the message or any
information contained in the message. If you are not the intended recipient, you
should delete this email and notify the sender immediately.

FOIA CONFIDENTIAL TREATMENT REQUESTED                              HP-SEC-01662059

Any views or opinions expressed in this email are those of the sender only, unless otherwise stated. All copyright in any Capita material in this email is reserved.

All emails, incoming and outgoing, may be recorded by Capita and monitored for legitimate business purposes.

Capita exclude all liability for any loss or damage arising or resulting from the receipt, use or transmission of this email to the fullest extent permitted by law.

Computershare Investor Services PLC is registered in England & Wales Company No. 3498808. Registered Office: The Pavilions, Bridgwater Road, Bristol BS13 8AE. Computershare Investor Services PLC is authorised and regulated by the Financial Services Authority, Registered Office: 25 The North Colonnade, Canary Wharf, London E14 5HS.

Please visit the following website to read the Computershare legal notice:
http://www.computershare.com/disclaimer/emea

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662060

USAO 00003515



| STE_EMP_ID | AUDIT_ID | | | | |
|---|---|---|---|---|---:|
| 2580 | 401 | Alan | Acheff | | 3,604 |
| 4750 | 404 | Richard | Adegboyega | | 334 |
| 5152 | 1978 | Gazi | Ahmad | | 1,859 |
| 3158 | 2504 | M dazir S. | Ahmad | | 2,264 |
| 5707 | 4099 | Jason | Albert | | 1,250 |
| 3919 | 409 | Jeffrey | Aldridge | | 1,000 |
| 5125 | 2231 | John | Alfini | | 83 |
| 4862 | 255 | John | Allan | | 4,500 |
| 8842 | 910198 | Sarah | Ambrose | | 19,292 |
| 3159 | 2089 | Amol | Anand | | 1,015 |
| 3129 | 421 | John | Andrews | | 7,500 |
| 3164 | 2034 | Afreyn | Ararhs | | 958 |
| 5185 | 2524 | Nsfi | Araujo | | 44,999 |
| 4610 | 424 | David | Archibald | | 85 |
| 2352 | Con 1 | Barry | Arike | | 20,000 |
| 3820 | 134 | Peyt | Armarn | | 15,000 |
| 5155 | 2602 | Tracy | Aubarn | | 11,849 |
| 3574 | 2866 | Sunjay | Aurora | | 75,417 |
| 2890 | 482 | Eloy | Avila | | 76,988 |
| 5768 | 165 | Unal | Aya Aresti | | 9,760 |
| 4930 | 435 | Jennifer | Bailey | | 1,689 |
| 4604 | 290 | Darren | Baldwin | | 6,000 |
| 5800 | 5002 | Sharad | Bansal | | 5,000 |
| 5822 | 920307 | Andrew | Barclay | | 5,000 |
| 4813 | 1221 | Deborah | Baron | | 10,492 |
| 8676 | 910248 | Stuart | Barrett | | 7,297 |
| 4892 | 1323 | Julio | Barton | | 1,000 |
| 8820 | Blx 1 | Andrew | Bayls | | 20,000 |
| 5179 | 2134 | Chris | Bazelgette | | 1,247 |
| 4752 | 1348 | Robert | Belknap | | 137 |
| 4829 | 1 | Jeffrey | Bell | | 5,498 |
| 5180 | 2289 | James | Bennett | | 133 |
| 5154 | 2299 | Jason | Berdin | | 1,566 |
| 5901 | 5046 | Seetkisha | Betsegeweb | | 2,250 |
| 2830 | 910007 | David | Bettinson | | 15,000 |
| 5807 | 5004 | Manjunath | Bharadwaj | | 5,000 |
| 4763 | 1298 | Nicholas | Billacl | | 2,434 |
| 3010 | 910349 | Ian | Black | | 79,397 |
| 8359 | 910202 | Sean | Blanchflower | | 98,744 |
| 3081 | 481 | Jeffrey | Blank | | 3,897 |
| 8445 | 910232 | Paula | Boddy | | 1,000 |
| 5015 | 22 | Jack | Bogart | | 7,783 |
| 3192 | 2170 | Daniel | Bolerid | | 1,859 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662061

USAO 00003516



| | | | | | |
|---|---|---|---|---|---|
| 4922 | 74 | Greg | Bollen | | 1,210 |
| 3604 | 470 | Serge | Bonta | | 12,016 |
| 3882 | 900033 | Vance | Briggs | | 41,501 |
| 2770 | 361 | Corrado | Broli | | 935 |
| 4849 | 910235 | Natasha | Brown | | 584 |
| 5204 | 2759 | Tom | Brown | | 1,336 |
| 5711 | 990725 | Derek | Brown | | 10,000 |
| 5825 | 990459 | Steven | Bruce | | 25,000 |
| 4926 | | Jadedsue | Hensel | | 330 |
| 3207 | 2300 | Jason | Buchner | | 890 |
| 3686 | 980317 | Sarah | Burke | | 2,083 |
| 3395 | 900064 | Michael | Byrns | | 34,087 |
| 4351 | 404 | Scott | Byren | | 2,750 |
| 5213 | 2670 | Sarah | Cabasso | | 236 |
| 4849 | 1246 | Dennis | Carmen | | 19 |
| 5173 | 249 | Justin | Carreiro | | 2,516 |
| 5080 | 2686 | Jemniel R. | Carter | | 2,022 |
| 2832 | 505 | Anna | Catalano | | 34,679 |
| 3088 | 2069 | Arnout | Cator | | 2,957 |
| 3653 | 910292 | Stephen | Chamberlain | | 98,655 |
| 3361 | 900073 | Christopher | Charl | | 4,084 |
| 3327 | 508 | Michael | Chang | | 8,125 |
| 4885 | 903 | Timothy | Chang | | 4,696 |
| 3237 | 28 | Leslie | Chapman | | 2,750 |
| 4647 | 312 | Gregory | Chase | | 130 |
| 2873 | 513 | Edward | Chau | | 1,006 |
| 3562 | 43 | Svitlana | Chaykovska | | 333 |
| 5098 | 2483 | Michelle | Chea | | 2,520 |
| 3606 | 174 | Tung Jin | Chew | | 11,000 |
| 4757 | 255 | Parag | Chikber | | 1,094 |
| 3712 | 521 | Paul | Chisolpé | | 590 |
| 4868 | 910296 | Siong | Chin | | 1,000 |
| 4913 | 322 | Stephen | Chu | | 8,625 |
| 5087 | 2066 | Arilit | Chowdhury | | 1,250 |
| 2567 | 910083 | Allen | Chu | | 6,084 |
| 3857 | 47 | Miles | Clarke | | 2,279 |
| 5111 | 2390 | Nick | Clarke | | 630 |
| 5713 | 980767 | Alexis | Clart | | 750 |
| 5632 | 910343 | Graham | Collier | | 584 |
| 5330 | 320225 | David | Collier | | 10,000 |
| 4685 | 589 | Jacqueline | Conneau | | 148 |
| 4896 | 72 | Alexis | Con Hon | | 3,613 |
| 4838 | 348 | Shane | Connelly | | 8,028 |
| 3049 | 347 | Jeffrey | Cornelius | | 3,000 |
| 3964 | 550 | Benjamin | Cruon | | 666 |
| 5603 | | Vinay | Chakravarthy | | 2,250 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662082

USAO 00003517



| | | | | |
|---|---|---|---|---|
| 3154 | 553 | Joseph | Cronin | 27,764 |
| 4883 | 554 | James | Grunbacher | 4,154 |
| 3232 | 557 | Laura | Dann | 658 |
| 4725 | 558 | Mark | Daoust | 917 |
| 4588 | 559 | Brian | DeRosa | 12,682 |
| 3298 | 900899 | Martyn | Davis | 333 |
| 8648 | 562 | Cynthia | Davis | 1,500 |
| 4901 | 910283 | Sophie | Dazia | 5,167 |
| 5719 | 5300 | Keith | Deane | 20,000 |
| 3890 | 2402 | Laurent | Dalorme | 3,000 |
| 2988 | 558 | Elizabeth | Demidian | 952 |
| 2939 | 162 | Frederic | Demongeot | 6,500 |
| 3207 | 583 | Kevin | Dodson | 1,210 |
| 4868 | 910808 | Julie | Dolan | 72,778 |
| 8686 | 589 | Stacey | Dougherty | 8,329 |
| 5684 | 66 | Robert | Duke | 2,333 |
| 3519 | 585 | Richard | Eads | 679 |
| 3412 | 1134 | Nicole | Ward | 107,933 |
| 3674 | 597 | Christopher | Egan | 247,083 |
| 5080 | 2620 | Ray | Eluke | 5,000 |
| 5014 | 2049 | Andrew | Elsner | 7,916 |
| 5730 | 5501 | Richard | Ellis | 16,000 |
| 5017 | 2769 | Susan | Emery | 1,588 |
| 5022 | 2081 | Barbara | Estes | 232 |
| 5035 | 36 | James | Everett | 183 |
| 5025 | 2287 | Shaneen | Pan | 4,524 |
| 5058 | 841 | Jean-Philippe | Parrot | 8,000 |
| 4651 | 613 | Joel | Fernandez | 44 |
| 3894 | 910318 | Stephan | Fielding | 584 |
| 5841 | 931278 | Edward | Filby | 10,000 |
| 3368 | 618 | Justin | Flora | 83 |
| 3834 | 910286 | Michael | Flint | 1,250 |
| 5029 | 2248 | Glenn | Fong | 500 |
| 4356 | 604 | Blake | Foster | 37 |
| 3174 | 129 | Justin | Fuga | 28,493 |
| 2802 | 900057 | Darren | Gallagher | 12,641 |
| 5035 | 2210 | Elip | Gambetta | 685 |
| 4945 | 634 | Alvin | Garcia | 375 |
| 2749 | 636 | Christine | Gardiner | 1,200 |
| 5098 | 2176 | David | Gaskins | 1,858 |
| 5039 | 2488 | Mohammed | Gazal | 502 |
| 3330 | 42 | Michael | Geddes | 2,667 |
| 5040 | 2272 | Ilan | Gendelman | 697 |
| 5042 | 2083 | Barbara | Gerth | 406 |
| 2754 | 900055 | Christopher | Goodfellow | 65,134 |
| 5053 | 2558 | Partha Sarathi | Govind | 2,265 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662063



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4859 | 13 | Steven | Graff | | | | 14,528 |
| 4920 | 600 | Benjamin | Greene | | | | 8,028 |
| 5713 | 4069 | Steven | Greenfeld | Apt 1011 | | | 1,250 |
| 5460 | 176 | Phillip | Greenwood | Guildén Mordén | | | 19,283 |
| 5056 | 2810 | Valentina | Gribkova | | | | 445 |
| 5828 | 981071 | Federico | Grosso | Via Sofia | | | 3,334 |
| 4636 | 666 | Lluis | Grübe | | | | 850 |
| 5809 | 5080 | Claudila | Gurza | Masa Calista Apt, Beltandur I Outer Ring Road | | | 2,250 |
| 5598 | 171 | Adam | Guthrie | | | | 27,000 |
| 3955 | 669 | Gilmore | Gutierrez | | | | 7,166 |
| 5845 | 531003 | Timothy | Halbert | | | | 10,000 |
| 3814 | 1348 | Evan | Heimner | | | | 1,000 |
| 5070 | 2829 | Richard | Hammond | ABW | | | 464 |
| 5699 | 930034 | Dermot | Hardy | | | | 3,000 |
| 5700 | 677 | Danny | Harlin | | | | 833 |
| 5244 | 313275 | Elizabeth Jane | Harris | Oakington | | | 26,164 |
| 5078 | 2841 | Wayne | Harris | | | | 27,900 |
| 3375 | 681 | Jeffrey | Hartkopf | | | | 6,156 |
| 5074 | 2251 | Gabriel | Hartnett | | | | 755 |
| 5483 | 275 | Rachel | Haverfield | Cheveley | | | 18,200 |
| 4873 | 688 | Peter | Hedge | | | | 3,599 |
| 4868 | 588 | Leviskila | Henry | | | | 82 |
| 4876 | 690 | Bryan | Herger | 3535 Piedmont Rd, | | | 2,249 |
| 5075 | 2285 | Garth | Hermanson | | | | 916 |
| 3854 | 681 | Yvetta | Hernandez | St. | | | 3,438 |
| 5078 | 2628 | Ricardo | Hessel | | | | 3,175 |
| 5079 | 2389 | Kevin | Hicks | Lane | | | 7,276 |
| 4845 | 810314 | Adam | Hickson | Mitcham | | | 300 |
| 4795 | 1259 | Kimberly | Hill | | | | 3,278 |
| 5043 | 810310 | Jason | Holland | 1-14-13 Sakashita        Itabashi-Ku, | | | 1,542 |
| 5665 | 910030 | John | Horman | | | | 2,000 |
| 4923 | 2240 | Geoff | Hornsby | Exhide St        Near Chaskanson | | | 6,530 |
| 2954 | 144 | Henry | Horst | 10 Munich | | | 1,168 |
| 5846 | 910051 | Mark | Houghton | Lower Cambourne | | | 3,000 |
| 5697 | 705 | Marcia | Howard | | | | 1,082 |
| 3356 | 703 | Mike | Huang | | | | 806 |
| 2818 | 910344 | David | Humphrey | Little Wilbraham | | | 50,994 |
| 3692 | 910581 | Sushovan | Hussain | 2 Chipstead Lane Riverhead | | | 345,000 |
| 4909 | 303 | Nigel | Hutchinson | Oromore | | | 42,400 |
| 4935 | 712 | B. Lee | Hutton | | | | 110 |
| 4984 | 810819 | Katerina | Ilina | | | | 854 |
| 4970 | 810567 | Sudarshan | Iyengar | 18/2, 8th cross, HAL 3rd Stage | | | 558 |
| 4971 | 2441 | Mark | Jackson | | | | 5,667 |
| 4974 | 2704 | Shelly | Jais | | | | 243 |
| 5702 | 4 | Oliver | Jeal | | | | 1,000 |
| 5663 | 726 | Clare | Johnson | Fleming Road        Clifford Hundred | | | 9,000 |

HP-SEC-01662064

USAO 00003519



| | | | | | |
|---|---|---|---|---|---|
| 4987 | 2278 | Ivy Lim | Jong | | 580 |
| 3850 | | Saha | Walli | | 6,000 |
| 4888 | 2111 | Brian | Joyce | | 688 |
| 4891 | 2276 | Ish | Jumani | | 529 |
| 4879 | 795 | Daniel | Junger | | 8,722 |
| 4988 | 2708 | Shreejit | K | | 186 |
| 4884 | 910020 | Malte | Kadirkamanathan | | 40,000 |
| 5850 | 5021 | Robin Jith | Kalpala | | 2,250 |
| 1614 | 278 | Andrew | Kantar | | 560,000 |
| 5009 | 215 | Hussain | Kassum | | 788 |
| 5001 | 2079 | Atul | Kawethekar | | 2,788 |
| 5002 | 2771 | Svetlana | Keytsner | | 329 |
| 5708 | 990351 | David | Kemp | | 10,000 |
| 3302 | 010006 | Graeme | Kennedy | | 834 |
| 5007 | 2641 | Rohit | Korhekar | | 405 |
| 5008 | 2582 | Rizwan | Khan | | 12,939 |
| 4742 | 749 | Jarod | Kidd | | 696 |
| 5811 | 5056 | Adithya | Kiri | | 2,250 |
| 2646 | 910185 | April | Kirkup | | 2 |
| 4743 | 1807 | John | Klink | | 3,262 |
| 5724 | 4057 | Thomas | Knoblech | | 1,250 |
| 5596 | 2221 | Erich | Kolb | | 271 |
| 5599 | 2239 | Eugene | Kratochvil | | 848 |
| 3968 | 757 | Helen | Ku | | 5,000 |
| 4353 | 1294 | Shain | Kuang | | 105 |
| 4915 | 768 | Qiao | Kuang | | 8,765 |
| 5601 | 2479 | Michael | Kuehn | | 627 |
| 3884 | 770 | Kathy | Kuehne | | 9,000 |
| 5606 | 2247 | Shish | Kumar | | 709 |
| 5607 | 2875 | Satoru | Kumeshiro | | 80,117 |
| 5671 | 1343 | James | LaBarge | | 696 |
| 4745 | 776 | Jason | Labitiola | | 5,989 |
| 4853 | 777 | Beth | Ladd | | 14,000 |
| 3386 | 773 | Michael | Lai | | 36,000 |
| 4999 | 45 | Troy | Lantz | | 940 |
| 3922 | 178 | Daniel | Lau | | 33,913 |
| 9615 | 2309 | Jean | Lavigne | | 1,162 |
| 5616 | 2341 | John | Law | | 906 |
| 5618 | 2492 | Minh | Le | | 1,870 |
| 3640 | 80 | Richard | Leavitt | | 333 |
| 3810 | 953 | Yik Koon | Lee | | 3,041 |
| 8585 | 789 | Mielle | Lee | | 6,250 |
| 9869 | 146 | Charles | Lemaire | | 6,874 |
| 5615 | 2133 | Chin Ying | Li | | 65 |
| 5316 | 2842 | Wokyun | Li | | 4,388 |
| 5529 | 2759 | Su-Kang | Lim | | 132 |



| | | | | | |
|---|---|---|---|---|---|
| 4850 | 808 | Courtney | Bloedier | | 2,500 |
| 5705 | 2 | chui | Liu | | 1,250 |
| 2572 | 815 | Adjoa | Lhuzo | | 500 |
| 5657 | | Nina | Modina | | 2,671 |
| 1638 | 2074 | Ashley | Lobb | | 849 |
| 4941 | 910007 | Moazzam | Lodhi | | 1,210 |
| 5640 | 2138 | Chris | Loosch | | 87 |
| 5645 | 2804 | Jay | Lung | | 1,132 |
| 4657 | 822 | Jennifer | Look | | 33 |
| 4589 | 824 | Sergio | Lora | | 1,210 |
| 2895 | 86 | David | Lord | | 11,411 |
| 5704 | 910483 | James | Lorson | | 44,000 |
| 5647 | 2216 | Ellen Y.T | Lu | | 259 |
| 2916 | 900005 | Fernando | Luchi | | 80,480 |
| 5725 | 4000 | Eric | Lundgren | | 1,250 |
| 2782 | 827 | chau | Ly | | 1,756 |
| 3338 | 279 | Michael | Lynch | | 435,000 |
| 5648 | 2480 | Michael | Lysejko | | 906 |
| 3373 | 19 | Edouard | Ma Pode | | 1,250 |
| 5850 | 2177 | Davlann | Mackenzie | | 906 |
| 5652 | 2185 | David | Madsen | | 255 |
| 3654 | 2725 | Surahsder | Mago | | 1,307 |
| 3192 | 234 | kelly | Mah | | 11,516 |
| 3522 | 85 | Marvin | Mah | | 11,855 |
| 4375 | 1338 | Robert | Mark | | 14,849 |
| 2307 | 849 | Alfred | Marsella | | 25,285 |
| 7521 | 164 | Alastair | Martin | | 98,640 |
| 5516 | | Andrew | Martin | | 403 |
| 4576 | 1200 | Rudy | Martono | | 1,030 |
| 8940 | 847 | Michael | Matear | | 5,500 |
| 3658 | 70 | Alfred | Matosha | | 7,876 |
| 4916 | 129 | Keith | Mawhinney | | 28,425 |
| 4940 | 82 | Michael | Mayer | | 550 |
| 5534 | 2751 | Shaald | Mazumdar | | 348 |
| 4669 | 1312 | Joseph | McCaskill | | 1,085 |
| 4895 | 291 | Bernadette | McCoy | | 5,830 |
| 4657 | 1207 | Debra | McCulloch | | 34 |
| 8118 | 11 | John | McDonnell | | 4,126 |
| 3834 | 858 | Arnold | McElroy | | 1,088 |
| 5495 | | Peter | Menell | | 155,418 |
| 4581 | 868 | Sandrine | Merhy | | 157 |
| 2808 | 348 | Emmanuel | Mériot | | 28,584 |
| 3944 | 870 | Donald | Millar | | 3,000 |
| 5558 | 2547 | Pamela | Joneja | | 3,587 |
| 4502 | 1082 | Valentijn | Minsenko | | 850 |
| 5554 | 2792 | Shawn | Marqitta | | 14,999 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662066

USAO 00003521



| | | | | | |
|---|---|---|---|---|---|
| 5812 | 5000 | Parveen | Mittal | | 15,000 |
| 5557 | 2585 | Rafiq | Mohammad | | 54,582 |
| 8970 | 67 | Sayeed | Khawja Mohammad | | 1,000 |
| 8559 | 2451 | Michael | Montano | | 23,711 |
| 4902 | 1319 | Cynthia | Montes | | 838 |
| 8744 | 830 | Timothy | Mora | | 8,214 |
| 6723 | 4029 | Scott | Morgan | | 1,250 |
| 8468 | 87 | Peter | Morrison | | 5,000 |
| 5585 | 2082 | William J. | Moyer | | 1,456 | 29 Sep 11 |
| 5543 | 487 | Robert | Murphy | | 9,210 |
| 5564 | 3745 | Stephen | Murphy | | 5,000 |
| 5565 | 2250 | James | Murray | | 46,161 |
| 5567 | 2500 | Mohit | Nautreja | | 16,041 |
| 3815 | 56 | Shawn | Nagase | | 13,977 |
| 5818 | 5058 | Vijayalakshmi | Nair | | 2,250 |
| 5872 | 2344 | John | Narbaitz | | 427 |
| 5814 | 5013 | Navaneel | Paul | | 2,250 |
| 8219 | 818 | Kitty | Nedersigt | | 298 |
| 2818 | 894 | David | Neubert | | 30,677 |
| 5849 | 140 | Matthew | Nevada | | 2,000 |
| 5874 | 2787 | Tegger | Newman | | 2,149 |
| 4855 | 3 | Nicholas | Ng | | 19,132 |
| 5575 | 2778 | Tamary | Nguyen | | 207 |
| 5579 | [redacted] | Julia | Swanson | | 2,309 |
| 3411 | 903 | Neele | Nolvo | | 208 |
| 4876 | 900451 | Annette | O'Connell | | 2,826 |
| 5697 | 920244 | James | O'Gara | | 1,000 |
| 3384 | 2775 | Takashi | Oguchi | | 1,853 |
| 5585 | 2487 | Mohammad Hafs | Omar | | 250 |
| 4604 | 1380 | Cheryl | O'Neill | | 8,729 |
| 1896 | 950181 | Emily | Orren | | 9,000 |
| 4925 | 329 | Serkan | Ozbek | | 7,931 |
| 5815 | [redacted] | Jayaraman | Parameswaran | | 5,000 |
| 2851 | 147 | Dominic | Page | | 1,124 |
| 5469 | 2345 | John | Palmisano | | 1,859 |
| 5226 | 5006 | Meenavantalam | Panidipati | | 2,250 |
| 3488 | 2783 | Lefteris | Papadopoulos | | 1,316 |
| 5475 | 2637 | Robert | Patrick | | 871 |
| 5476 | 2848 | Wendy | Paus | | 388 |
| 2681 | 298 | Robert | Pearson | | 4,000 |
| 2504 | 319 | Aline | Pels-Gerritsen | | 84 |
| 4353 | 1371 | Stacy | Peng | | 83 |
| 4703 | 940 | Glenn | Petschko | | 47,800 |
| 4305 | 961 | Ruben | Perez | | 1,000 |
| 8521 | Con2 | Richard | Perle | | 20,000 |
| 2570 | 910085 | Bishthao | Pham | | 1,476 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662067

USAO 00003522



| | | | | | | |
|---|---|---|---|---|---|---|
| 3483 | 2053 | Anthony | Philips | | | 5,889 |
| 4815 | 1287 | Rashmi | Pillai | | | 24 |
| 3313 | 205 | Richard | Pinazza | | | 167 |
| 5487 | 2442 | Mark | Pivonay | | | 2,063 |
| 5490 | 2281 | James | Pope | | | 50 |
| 5491 | 2781 | Tim | Portar | | | 232 |
| 3955 | 54 | Todd | Postan | | | 500 |
| 5879 | 920231 | Poppy | Prentis | | | 63,500 |
| 3489 | 150 | Randall | Puttern | | | 10,605 |
| 2822 | 910838 | David | Pye | | | 8,591 |
| 3974 | 968 | Cornelius | Quinn | | | 5,249 |
| 4872 | 110 | Kevin | Rase | | | 20,000 |
| 4910 | 188 | Ion J | Raine | | | 8,640 |
| 4303 | 1266 | Viswanathan | Rajamannar | | | 2,319 |
| 3690 | 72 | Sakarear | Ramaraj | | | 1,681 |
| 3468 | 2828 | Vinod | Ramaswamy | | | 97 |
| 5677 | 974 | Adam | Ramjane | | | 1,000 |
| 5840 | 900018 | Christopher | Rayzun | | | 15,000 |
| 5978 | 910324 | Andrew Robert | Reid | | | 3,084 |
| 4887 | 1272 | Ann | Reigelman | | | 147 |
| 2705 | 910183 | Bryan | Reilinger | | | 1,983 |
| 3533 | 22 | Robert | Richardson | | | 500 |
| 4854 | 910012 | Jose | Rivera | | | 7,433 |
| 4362 | 937 | Andrew | Roach | | | 916 |
| 3659 | 57 | Koby | Roberts | | | 500 |
| 3767 | 1001 | Tyshenia | Robinson | | | 4,715 |
| 5512 | 2542 | Oliver | Rorld | | | 494 |
| 4426 | 1008 | Chad | Rosner | | | 665 |
| 3150 | 206 | Joshua | Ross | | | 2,611 |
| 3517 | 2347 | John M. | Rossi | | | 289 |
| 3518 | 2005 | Adam | Rossio | | | 1,250 |
| 5727 | 4085 | Margarita | Safranova | | | 1,250 |
| 5805 | 5006 | Segolse | M?r? | | | 2,290 |
| 5523 | 2491 | Milind | Sahasrabudhe | | | 1,457 |
| 5525 | 2267 | Hiroaki | Sakamoto | | | 522 |
| 5837 | 910317 | George | Saktivelz | | | 25,000 |
| 4851 | 1014 | Jorge | Salazar | | | 3,000 |
| 4870 | 58 | Edward | Sampone | | | 2,157 |
| 5986 | 2244 | Ghanashyam | Satpathy | | | 30 |
| 5878 | Blk2 | Matthew | Schoybeler | | | 8,834 |
| 3107 | 910415 | Joel | Scott | | | 13,359 |
| 5409 | 2599 | Rajib | SenGupta | | | 6,641 |
| 5863 | 1294 | Veena | Setlur | | | 1,750 |
| 3695 | 179 | Robert | Severn | | | 2,000 |
| 5416 | 2286 | Yin | Shen | | | 232 |
| 3835 | 928 | Ilan Qing | Shi | | 110000 | 10,000 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662068

USAO 00003523



| | | | | | | |
|---|---|---|---|---|---|---|
| 5921 | | Mallikarjan | Segall | | 560030 | 1,673 |
| 2912 | 1000 | Eugene | Shih | | 94526 | 6,857 |
| 5413 | 2661 | Samer | Shwayhat | | 10011 | 4,231 |
| 3603 | 81X8 | Serena | Siefer | | | 2,500 |
| 5421 | 2450 | Michael | Silano | | 11115 | 7,211 |
| 8054 | USXC54 | Graham | Sills | | C89 8TZ | 10,000 |
| 4791 | 1275 | Johnpm | Silvestre | | 94507 | 806 |
| 3426 | 2071 | Arvind | Singhal | | 95135 | 8,749 |
| 5460 | 2303 | Jason | Smith | | 85120 | 10,706 |
| 5804 | 5001 | Natarajan | Srinivasan | | 560103 | 7,500 |
| 5447 | 2084 | Barbara | Stein | | 60687 | 1,458 |
| 5449 | 2286 | David M. | Stone | | 94501 | 1,577 |
| 4907 | 1075 | Zhengwei | Su | | 2538 | 1,415 |
| 4752 | 1078 | Joseph | Sullivan | | 2048 | 4,574 |
| 4764 | 1077 | Michael | Sullivan | | 3748 | 57,969 |
| 5982 | SIX0234 | Matthew | Sullivan | | CB41GN | 10,000 |
| 5808 | 5010 | Suma | Vallish | | 560070 | 2,250 |
| 4813 | 221 | James | Swaringen | | 78028 | 2,210 |
| 5432 | 281 | Leeming | Tang | | CX19 6AU | 4,900 |
| 4894 | 1279 | Christopher | Tang | | 94112 | 250 |
| 5383 | 1274 | Imran | Tawfiq | | 93103 | 696 |
| 5986 | 2080 | Biljo | Thomas | | 62172 | 916 |
| 4813 | 1299 | Thanh | Tran | | 95119 | 5,907 |
| 4765 | 1059 | Jared | Tucker | | 2822 | 11,583 |
| 4885 | | Alan | Turner | | 92127 | 666 |
| 5849 | 2657 | Shamsunder | Vaghmare | | 60645 | 52 |
| 5847 | 2233 | Ganesh | Vaidyanathan | | 95031 | 1,760 |
| 4794 | 1108 | Jason | Vanni | | 1780 | 54 |
| 4641 | 1236 | Feng | Vang | | 55209 | 3,750 |
| 4753 | | Jennifer | Velley | | 2148 | 45 |
| 5851 | 2668 | Smiti | Velayudham | | 75098 | 1,123 |
| 3680 | 1115 | Antonio | Villarreal | | 75068 | 666 |
| 5802 | 5078 | Vikram | Vishal | | 560043 | 2,250 |
| 3359 | 2459 | Maureen | Voong | | 94070 | 435 |
| 3950 | SLO400 | Srinivas | Voora | | 75008 | 4,000 |
| 5217 | 156 | Huy | Vu | | SE17BU | 7,000 |
| 4595 | 2287 | Bojan | Vukojevic | | 94558 | 3,951 |
| 2974 | 1122 | Agustina | Wall | | 95148 | 1,420 |
| 5360 | 2563 | Paul | Walter | | SE110XX | 3,805 |
| 5426 | 293 | Clare | Welsh | | PB27 8GH | 10,000 |
| 2738 | 1119 | Charles | Walton | | 12405 | 2,783 |
| 3553 | 230 | Roger | Wang | | 94024 | 59,847 |
| 5264 | 2471 | Sarah | Waterhouse | | S63 8DU | 1,201 |
| 3844 | 282 | Sarah | Webster | | N16 8TA | 3,700 |
| 3369 | 2081 | Anna | Weinberger | | 94115 | 18,999 |
| 5574 | 2313 | Jeffrey | Westover | | 75234 | 2,089 |

HP-SEC-01662069

USAO 00003524



| | | | |
|---|---|---|---|
| 5375 | 2098 | Robert | Whitaker |
| 6522 | 75 | Buddy | Whittenburg |
| 4708 | 1281 | Gerald | Widmann |
| 5880 | 2888 | Walter | Wojdechowski |
| 5890 | 2481 | Makiko | Yakata |
| 4549 | 1139 | Samuel | Yan |
| 4630 | 1289 | Emily | Yee |
| 5357 | 2284 | Ang | Yeong Hwan |
| 2738 | 510198 | Timothy | Young |
| 5159 | 2915 | Jeff | Young |
| 3025 | 163 | Kwan Mo | Yuen |
| 5260 | 2406 | Leonid | Zarkhin |
| 5361 | 2269 | Hong | Zhao |
| 5262 | 2412 | Suyu | Zhea |
| 5264 | 2823 | Jianping | Zhuang |
| 5708 | 4098 | Jack | Zito |

| | |
|---|---|
| 27513 | 1,587 |
| 75202 | 110 |
| 95980 | 8,702 |
| 60105 | 1,859 |
| 103-0081 | 164 |
| 94588 | 13,459 |
| 94588 | 210 |
| 641278 | 252 |
| 94103 | 57,599 |
| 60189 | 4,735 |
| T3A 5V9 | 500 |
| 54087 | 116 |
| 60564 | 4,182 |
| 60069 | 310 |
| 95014 | 677 |
| 11980 | 500 |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662070

USAO 00003525

# EXHIBIT D

USAO 00003526

# CAPITA

REGISTRARS

4 October 2011

Our ref: TO81/27471/1

The Directors
HEWLETT-PACKARD VISION B.V.
Startbaan 16
1187 XR Amstelveen
The Netherlands

By email to:

cau.eydorowitz@georgeson.com
domenic.brancati@georgeson.com
mark.harwood@georgeson.com
dominic.dennis@georgeson.com
ezra.efellari@otcomason.com
bmoar@gibsondunn.com
Sally.Wokes@SlaughterandMay.com
Gary.SABOAN@SlaughterandMay.com

trolla@wsgpartners.com
dbowells@wsgpartners.com
AndyJohnson@hp.com
Manish.Sarin@hp.com
Sergio.leteller@hp.com
ProjectfostaCrn5@barclayscapital.com
Jennifer.Williams@SlaughterandMay.com

Emma.walton@hp.com
David.altenaur@hp.com
SSaqawam@gibsondunn.com
JRoberts@gibsondunn.com
sowiess@gibsondunn.com
sgdka.ochriger@capitalvct.com
Peter.Sugdan@SlaughterandMay.com

Dear Sirs,

**RECOMMENDED CASH OFFER FOR AUTONOMY CORPORATION PLC ("AUTONOMY")**

We write to advise you that following the offer being declared wholly unconditional, cash funding is required to meet payments to be issued on 7 October 2011 in respect of those Autonomy shareholders who have submitted valid acceptances by 3 October 2011

The funding amounts required are set out in the table below and relate to:

- The cheques to be posted to certificated acceptors;
- The payments to be credited to CREST accounts in respect of uncertificated acceptors;
- The amount of stamp duty reserve tax ("SDRT") required in respect of the shares being acquired from uncertificated acceptors;
- The amount of stamp duty required in respect of the shares being acquired from certificated acceptors;
- Payment in connection with our provisional Receiving Agent fees. Please note that the final invoice detailing all the Receiving Agent's fees, expenses and any further payment amounts due will be issued at expiry of the offer.

| | Autonomy Shares Accepted | Cash Consideration to be issued / Receiving Agent Fee | Stamp Duty Reserve Tax "SDRT" Required | Stamp Duty Required* |
|---|---|---|---|---|
| CREST | 212,486,340 | £5,418,401,670.00 | £27,092,008.35 | Not applicable |
| CERTIFICATED | 935,606 | £23,857,953.00 | Not applicable | £121,300.00 |
| CERTIFICATED | 1,635 | £41,692.50 | Not applicable | Tax Exempt |
| RECEIVING AGENT FEE | Not applicable | £44,680.00 | Not applicable | Not applicable |
| | 213,423,581 | £5,442,346,195.50 | £27,092,008.35 | £121,300.00 |

* (at the rate of ½ % of the value of the consideration above £1,000.00 per acceptance rounded up to the nearest £5 multiple)

Corporate Actions

The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TH
Tel 0871 664 0321 (calls cost 10p per minute plus network extras lines are open 8am – 9.30pm Monday – Friday)
Fax 020 8639 3047
Email newissue@capitaregistrars.com www.capitaregistrars.com
A trading name of Capita Registrars Limited

Registered office The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU Registered in England No 2605568
Part of The Capita Group Plc, www.capita.co.uk

A CONFIDENTIAL TREATMENT REQUESTED

# CAPITA

Please therefore arrange to credit the following payments to the account details specified below.

The requested payments below must be credited to the accounts specified by no later than 6 October 2011 in order to ensure payments can be released on the due date.

**Payment 1 Details**

| Bank | Royal Bank of Scotland Plc |
|---|---|
| BIC | RBOSGB2L |
| Sort Code | 15-10-00 |
| IBAN | GB21RBOS15100022369035 |
| Address | London City Office, 62/63 Threadneedle Street, London EC2R 8LA |
| Account Name | Capita Registrars Limited CREST Clearing Account |
| Account No. | 22369035 |
| Net Amount Required | £  5,445,493,678.35 |

**Payment 2 Details**

| Bank | Royal Bank of Scotland Plc |
|---|---|
| BIC | RBOSGB2L |
| Sort Code | 15-10-00 |
| IBAN | GB49RBOS15100023083615 |
| Address | London City Office, 62/63 Threadneedle Street, London, EC2R 8LA |
| Account Name | Capita Registrars Ltd Re: Hewlett-Packard Vision B.V./ Autonomy Corporation plc – Takeover Cash Consideration A/C |
| Account No. | 23083615 |
| Net Amount Required | £  24,065,825.50 |

We also take this opportunity to attach two block transfer forms relating to the certificated shares accepted in this settlement which kindly arrange to be signed, but not dated, and returned to us as soon as possible. The reason that there are two block transfer forms is that in accordance with new stamp duty rules consideration of £1,000 or less per acceptance is not subject to Stamp Duty. Therefore block transfer form 1 relates to stamp duty to be paid where consideration is greater than £1,000 per acceptance and block transfer form 1A relates to where consideration is £1,000 or less per acceptance. The declaration that the transfer is exempt from Ad Valorem stamp duty at the bottom of block transfer form 1A also requires to be signed at the same time. On receipt of the stamp duty monies we will arrange for the appropriate transfer to be stamped by HMRC in order that HEWLETT-PACKARD VISION B.V. can become the registered holder of the AUTONOMY CORPORATION PLC shares.

Corporate Actions

The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU
Tel 0871 664 0321 (calls cost 10p per minute plus network extras lines are open from 9am – 5.30pm Monday – Friday)
Fax 020 8639 3047
Email newissues@capitaregistrars.com www.capitaregistrars.com
A trading name of Capita Registrars Limited

Registered office: The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU  Registered in England No. 2605568
Part of The Capita Group Plc  www.capita.co.uk

DIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661630

USAO 00003528

# CAPITA
## REGISTRARS

With regards to the CREST acceptances, once the SDRT amount has been received we will arrange for these shares to be firstly transferred from the relevant participants by means of Transfers from Escrow into the name of Capita Registrars Limited, and thereafter transferred to HEWLETT-PACKARD VISION B.V.

At this point we would mention that additional amounts, which will not be known until later, may be required on 17 October 2011 to settle the CREST/certificated holders in respect of the second settlement, which is scheduled below, together with the details of the subsequent settlements.

| Settlement | Acceptances Received | Capita to advise on Funding Requirements | CREST and Certificated Funds Required on | Consideration Posted |
|---|---|---|---|---|
| 2 | 04/10/11 – 10/10/11 | 11/10/11 | 17/10/11 | 18/10/11 |
| 3 | 11/10/11 – 17/10/11 | 18/10/11 | 24/10/11 | 25/10/11 |
| 4 | 18/10/11 – 24/10/11 | 25/10/11 | 31/10/11 | 01/11/11 |
| 5 | 25/10/11 – 31/10/11 | 01/11/11 | 07/11/11 | 08/11/11 |
| 6 | 01/11/11 – 07/11/11 | 08/11/11 | 14/11/11 | 15/11/11 |
| 7 | 08/11/11 – 14/11/11 | 15/11/11 | 21/11/11 | 22/11/11 |

If you have any questions, then please do not hesitate to contact us.

Yours faithfully,

Authorised Signatory

Corporate Actions

The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU
Tel 0871 664 0321 (calls cost 10p per minute plus network extras lines are open from 9am – 5.30pm Monday – Friday)
Fax 020 8639 2197
Email corpactions@capitaregistrars.com www.capitaregistrars.com
A trading name of Capita Registrars Limited

Registered office The Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU. Registered in England No. 2605568
Part of The Capita Group Plc. www.capita.co.uk

CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01661631

# EXHIBIT E

USAO 00003530

To:       Sarin, Manish[manish.sarin@hp.com]
From:     Hsiao, Emily (SCD)
Sent:     Sat 7/30/2011 11:36:16 AM
Importance:        Normal
Subject:  RE: WGL
WGL from Tesla_7.30.11.xlsx

See attached.

**From:** Sarin, Manish
**Sent:** Saturday, July 30, 2011 6:53 AM
**To:** Hsiao, Emily (SCD)
**Subject:** FW: WGL

Emily – from this list strip out our contact details and make a WGL for Tesla only.  Then
please circulate to us internally, Barclays, PW, Freshfields & Gibson.

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** Saturday, July 30, 2011 1:00 AM
**To:** Sarin, Manish
**Subject:** WGL

Attached is updated with a second tab for us.

Regards

--Andy

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-0066963

USAO 00003531

This document produced in native file format only

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00669638

USAO 00003532



**Internal**

**Arsenal**

| Name | Title |
|---|---|
| Mike Lynch | CEO |
| Sushovan Hussain | CFO |
| Andrew Kanter | COO |
| Peter Menell | CRO |
| Steve Chamberlain | VP Finance |

**External**

**Qatalyst**

Frank Quattrone
George Boutros
Jonathan Turner
Ian Macleod
Jean Tardy-Joubert
Adrian Dollard
Brian Cinoe
Nadja Gehriger
Alan Brannen
Gajan Rajanathan
Michael Hughes
Daniel Reckles
Peter Spellanis

**Slaughter and May**

| Name | Title | | Assistant |
|---|---|---|---|
| Stephen Cooke | Partner | | Assistant: Alexandra Ireland |
| Gary Osborn | Partner | | Assistant: Amy Michielssens |
| Sally Wokes | Associate | | Assistant: Alexandra Ireland |

**Morgan, Lewis & Bockius LLP - Anti-trust**

| Name | Title | | |
|---|---|---|---|
| Harry T. Robins | Partner | hrobins@morganlewis.com \| www.mc 212.309.6728 | Assistant: Evelyn Perry \| 212.809.8081 \| eperry@morganlewis.com |

# EXHIBIT F

USAO 00003534

| From: | Robert Mark <robert.mark@autonomy.com> |
|-------|-----------------------------------------|
| Sent: | Wednesday, July 21, 2010 9:00 AM |
| To: | Ian.robert.adams@citi.com |
| Subject: | Re: Disk purchase |

His cell -
447595219540

Robert Mark
    Director, Global Accounts
    Autonomy, Inc.
    P: 631-385-8766 | F: 631-367-6581
    C: 516-445-5033
    robert.mark@autonomy.com

----- Original Message -----
From: Adams, Ian Robert <ian.robert.adams@citi.com>
To: Robert Mark
Sent: Wed Jul 21 05:45:25 2010
Subject: RE: Disk purchase

Robert,


What number is he on today ?


Ian


From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 21 July 2010 13:09
To: Adams, Ian Robert [CCC-OT_IT]
Subject: Re: Disk purchase


Ian, please call Sushovan directly to discuss further.

Robert

Robert Mark
    Director, Global Accounts
    Autonomy, Inc.
    P: 631-385-8766 | F: 631-367-6581
    C: 516-445-5033
    robert.mark@autonomy.com

----- Original Message -----
From: Adams, Ian Robert <ian.robert.adams@citi.com>
To: Robert Mark
Sent: Wed Jul 21 03:53:54 2010

1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CITIGROUP

CITI007142

USAO 00003535

Subject: RE: Disk purchase

Robert,


I am advised that we have no way to pay a company who is not an approved supplier. If the invoice comes from you that is fine. I need to get this closed today.


Ian



From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 20 July 2010 23:09
To: Adams, Ian Robert [CCC-OT_IT]
Subject: RE: Disk purchase


Ian, I spoke with my legal folks and they have quickly revised the documents that are required for an order (Addendum and Order Form), to result in no changes to terms and Citi's rights, but simply allow for a third party to invoice and be paid on our behalf (please see the attached documents with redlines showing the changes). If this is acceptable, the discounts remain as they were and the documents reflect this. Sushovan has not authorized any other option.


Robert


Robert Mark

Director, Global Accounts

Autonomy, Inc.

P: 631-385-8766 | F: 631-367-6581

C: 516-445-5033

robert.mark@autonomy.com

---

From: Adams, Ian Robert [mailto:ian.robert.adams@citi.com]
Sent: Tuesday, July 20, 2010 4:36 AM
To: Robert Mark
Subject: RE: Disk purchase


Robert,


Please urgently let me know the situation. I believe there is risk here and need to determine how I manage it.

2

CITI007143

USAO 00003536

Ian

From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 19 July 2010 20:27
To: Adams, Ian Robert [CCC-OT_IT]
Subject: RE: Disk purchase

With all due respect, that's not really fair. We've continued to find ways to maintain the original discount that we offered multiple times, which cost us money due to holding the inventory over for so long. There was no valid reason that Sourcing couldn't add the reseller other than executing the process. That said, I will of course see what I can do.

Robert

Robert Mark

Director, Global Accounts

Autonomy, Inc.

P: 631-385-8766 | F: 631-367-6581

C: 516-445-5033

robert.mark@autonomy.com

---

From: Adams, Ian Robert [mailto:ian.robert.adams@citi.com]
Sent: Monday, July 19, 2010 1:46 PM
To: Robert Mark
Subject: RE: Disk purchase

Like I said, I would have expected more given the relationship.

Give me a price for new disks please.

Ian

From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 19 July 2010 18:45
To: Adams, Ian Robert [CCC-OT_IT]
Subject: RE: Disk purchase

3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CITIGROUP

CITI007144

USAO 00003537

Ian, I've been discussing this with Joe for a number of months, so the supplier could already have been approved. I've also been telling him as well as you staff that we're running out of storage, but no one has reacted to that. I can easily resolve it but we would have to purchase new cells at new prices and that will impact the discount we offered.

Robert Mark

Director, Global Accounts

Autonomy, Inc.

P: 631-385-8766 | F: 631-367-6581

C: 516-445-5033

robert.mark@autonomy.com

From: Adams, Ian Robert [mailto:ian.robert.adams@citi.com]
Sent: Monday, July 19, 2010 8:29 AM
To: Robert Mark
Subject: RE: Disk purchase

Robert,

It's a long process for us to get a supplier accredited to use. We are out of runway on these disks and need to get them in. This is going to get very ugly. I need you to step up and resolve it on your side.

Ian

From: Robert Mark [mailto:robert.mark@autonomy.com]
Sent: 16 July 2010 17:17
To: Adams, Ian Robert [CCC-OT_IT]
Subject: RE: Disk purchase

Ian, I don't think it's necessary for me to say that our relationship continues to be extremely important to Autonomy, as evidenced by the continued support resources we provide, as well as the no-charge DSMail offer we made to you.

That said, this purchase has been the most frustrating of all. It dates back to Q4 of last year, but I won't take you through all the detail. Suffice to say we've repeatedly made discount offers to close the deal within each of the last 2 quarters, tying up inventory that we were then not able to move. Where we are now is, we've agreed to honor the last discount we offered even though we didn't close by June 30th. However, in order to do that, we need to process the order through one of our reseller partners (which we do all the time), as they have the cells at the price point that allows this. We've provided a short paragraph to amend our agreement that provides for us to use a third party to bill, and Citi to pay, with absolutely no change to the terms or your rights under our agreement.

4

Joe Angelucci continues to tell me that he doesn't want to do this through our reseller, though we're maintaining our offer of 13TB cells for the price of 10TB, plus a 15% discount on top of that, which combined totals a 35% discount. I don't know where to go from here.

Robert

---

Robert Mark

Director, Global Accounts

Autonomy, Inc.

phone: (631) 385-8766 | fax: (631) 367-6581

cell: (516) 445-5033

robert.mark@autonomy.com

---

From: Adams, Ian Robert [mailto:ian.robert.adams@citi.com]
Sent: Fri 7/16/2010 11:31 AM
To: Robert Mark
Subject: Disk purchase

Robert,

What is going on. The guy's tell me Autonomy are being deliberately obstructive. I would have thought our relationship was stronger than that, despite our current checks in the market place.

This is one step from Otto calling Mike Lynch. Why are we here and can we not get this resolved ?.

Ian

5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CITIGROUP

CITI007149

USAO 00003539

# EXHIBIT G

USAO 00003540

# Morgan Lewis

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY  10178-0060
Tel.  +1.212.309.6000
Fax: +1.212.309.6001
www.morganlewis.com

Martha B. Stolley
Partner
+1.212.309.6858
mstolley@morganlewis.com

February 10, 2016

### VIA FEDERAL EXPRESS

Adam A. Reeves, Esq.
Robert S. Leach, Esq.
Assistant U.S. Attorney
United States Attorney's Office
450 Golden Gate Avenue, 11ᵗʰ Floor
San Francisco, CA 94102

Re:   *Autonomy*

Dear Mr. Reeves and Mr. Leach:

As you know, we represent Hewlett-Packard Enterprise ("HPE" or the "Company") in the above-referenced matter.  We write in response to the Department of Justice's ("DOJ") January 27, 2016 written request for documents confirming whether the bank accounts previously noted by HPE as belonging to Mike Lynch ("Lynch") and Sushovan Hussain ("Hussain") are the same bank accounts Autonomy used to set up direct deposit payments for each of them.  The DOJ also requested that HPE confirm the time period during which those bank accounts were used by Autonomy for direct deposit payments.  Enclosed please find a CD containing responsive documents, Bates Nos. HP-SEC-01657266-HP-SEC-01658604.

Please note that a number of the documents are multi-tabbed spreadsheets that have been redacted to preserve the confidentiality of bank account information regarding former and/or current Autonomy employees that either are not involved in, or not the focus of, the DOJ's investigation in the above-referenced matter.  Given the DOJ's ongoing interest in Steve Chamberlain, Andy Kanter, and Pete Menell, however, we left intact their financial information.[1]

Because of the redactions, we were unable to produce the spreadsheets in native format.  In an effort to make the documents as comprehensible as possible, we are providing formatted .pdf versions of the spreadsheets and also are producing hard copy color print-outs on oversized paper.  Nevertheless, the data spans multiple pages, making it difficult to track.  Accordingly, we have distilled the key information from these spreadsheets in the chart below:

---

[1] None of the enclosed documents reference Joel Scott or Stouffer Egan.

Almaty  Astana  Beijing  Boston  Brussels  Chicago  Dallas  Dubai  Frankfurt  Harrisburg  Hartford  Houston  London  Los Angeles  Miami  Moscow
New York  Orange County  Paris  Philadelphia  Pittsburgh  Princeton  San Francisco  Santa Monica  Silicon Valley  Tokyo  Washington  Wilmington
DB1/ 86400049.1

Adam A. Reeves, Esq.
Robert S. Leach, Esq.
February 10, 2016
Page 2

| Name of Account Holder | Dates Bank Account Used by AU Payroll | Bank Sort Code | Bank Account No. |
|---|---|---|---|
| Mike Lynch | 2005 through his departure | ██████ | ██████ |
| Sushovan Hussain | 2005-2006 | ██████ | ██████ |
| | 2007-2010 | ██████ | ██████ |
| | 2011 through his departure | ██████ | ██████ |
| Steve Chamberlain | 2005 through his departure | ██████ | ██████ |
| Andrew Kanter | 2005 through his departure | ██████ | ██████ |
| Peter Menell | 2005 through his departure | ██████ | ██████ |

\* \* \* \* \* \* \* \*

The materials and the information contained herein (HP-SEC-01657266-HP-SEC-01658604) represent information that is confidential within the contemplation of the applicable provisions of the Freedom of Information Act ("FOIA") and the rules of the Commission which implement that Act, 17 C.F.R. § 200.83, ("Rule 83") and is furnished solely for the use of the Commission and DOJ. Accordingly, we request the documents, and the information contained therein, be afforded confidential treatment pursuant to FOIA and the rules of the Commission implementing the Act. Pursuant to Rule 83, a request for confidential treatment has also been delivered to the Commission's FOIA Office. In accordance with Rule 83, please notify the undersigned of any request for disclosure of the materials made pursuant to the FOIA. After completion of the investigation concerning the above referenced matter, we ask that all confidential materials be returned to us.

The requests set forth in the preceding paragraphs also apply to any memoranda, notes, transcripts or other writings of any sort whatsoever that are made by, or at the request of, any employee of the SEC or DOJ and which (1) incorporate, include or relate to any of this letter and its enclosures; or (2) refer to any conference, meeting, or telephone conversation relating to this letter and its enclosures between HPE, its current or former employees, representatives, agents, auditors or counsel on the one hand and employees of the SEC or DOJ on the other.

---

[2] The bank sort code identifies the bank and the branch where the account is held.

Adam A. Reeves, Esq.
Robert S. Leach, Esq.
February 10, 2016
Page 3

This letter is not intended to and does not waive any applicable privilege or other legal basis under which information may be protected from disclosure. If it is concluded that any of the enclosed materials disclose privileged matter, such disclosure is inadvertent. By the production of this letter and its enclosures, HPE does not intend to and has not waived the attorney-client privilege or any other protections.

To further promote confidentiality, the enclosed CD is being produced with password protection. The password will be sent separately via email.

Finally, we note that HPE is making every effort to produce documents as quickly and as efficiently as possible. However, the inadvertent disclosure of material protected by the attorney-client, work product or any other applicable privilege may occur during the course of these productions. We respectfully request that the Commission and DOJ allow for the "clawback" of any such privileged materials upon prompt notification by HPE.

Please feel free to contact me should you have any questions.

Sincerely,

Martha B. Stolley

Enclosure

cc:    ENF-CPU
U.S. Securities and Exchange Commission
100 F St., N.E. Mailstop 5973
Washington, D.C. 20549-5973

Jason Habermeyer, Esq. (without enclosures)
Attorney, Division of Enforcement
U.S. Securities and Exchange Commission
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

Freedom of Information Officer (without enclosures)
Office of Freedom of Information and Privacy Act Operations
Securities and Exchange Commission Operations Center
100 F Street NE
Mail Stop 5100
Washington, D.C. 20549

DB1/ 86400049.1

# EXHIBIT H

USAO 00003544

To:      Lisa Harris[lisah@autonomy.com]
Cc:      payroll@autonomy.com[payroll@autonomy.com]
From:    payroll@autonomy.com
Sent on behalf of:   sh-ukcorporatedealing@ubs.com
Sent:    Fri 4/23/2010 7:53:48 AM
Subject: [payroll] Options | 23/04/10
disclaim.txt

Lucy,

I can confirm that we have sold 129,459 shares at 1858p per share.

Kind regards

Warren

Warren Carroll
Corporate Broking
UBS Limited
1 Finsbury Avenue
London
EC2M 2PP
Tel. 020 7568 6219
Fax. 020 7336 3219

---

**From:** Lucy Brown [mailto:lucy.brown@autonomy.com]
**Sent:** 23 April 2010 12:17
**To:** sh-ukcorporatedealing@ubs.com
**Cc:** payroll@autonomy.com
**Subject:** Options | 23/04/10

Hi Tara & Warren,

Please see attached spreadsheet. Paperwork will be e-mailed later today.

Selling all shares:

Sushovan Hussain -- needs to be announced

Peter Menell (min £18.00)

Ann Reigelman

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-0164985

USAO 00003545

Shashi Mazumdar

William A Turner

Many thanks,

Lucy Brown | Accounts Assistant | +44 1223 488 564

*The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.*

# EXHIBIT I

USAO 00003547

To:        Poppy Prentis[Poppy.Prentis@autonomy.com]
Cc:        payroll@autonomy.com[payroll@autonomy.com]
From:      payroll@autonomy.com
Sent on behalf of:    sh-ukcorporatedealing@ubs.com
Sent:      Tue 6/15/2010 8:41:37 AM
Subject:   [payroll] Options | 15/06/10
disclaim.txt

Gemma

I confirm we have sold 27,986 shares @ 1957.4563p

Kind regards


Tara Blyth
Director
UBS Investment Bank
1-2 Finsbury Ave
London EC2M 2PP
ph: 020 7568 2205
fax:020 7568 7722
tara.blyth@ubs.com




From: Gemma Reavley [mailto:gemmar@autonomy.com]
Sent: 15 June 2010 11:54
To: sh-ukcorporatedealing@ubs.com
Cc: payroll@autonomy.com
Subject: Options | 15/06/10


Hi Tara & Warren,


Please see attached spreadsheet. Paperwork will be e-mailed later today.


Selling all shares:


Michael D'Auria

Nandeep Singh


FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-0165057

USAO 00003548

Blynda Stallings

Kailash Kothari

Joel Scott

Jean-Pierre

Steve Chamberlain

Rachel Haverfield


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*
Gemma Reavley
Payables Supervisor
Autonomy Systems Limited, Cowley Road Business Park, Milton Road, Cambridge CB4 0WZ

Tel: +44 (0) 1223 448106
Fax: +44 (0) 1223 448040
E-Mail: gemmar@autonomy.com

The information contained in this message is for the intended addressee only and may
contain confidential and/or privileged information. If you are not the intended addressee,
please delete this message and notify the sender, and do not copy or distribute this message
or disclose its contents to anyone. Any views or opinions expressed in this message are those
of the author and do not necessarily represent those of Autonomy Systems Limited or of any
of its associated companies. No reliance may be placed on this message without written
confirmation from an authorised representative of the company. Autonomy's search
technology is becoming a *de facto* standard for companies.

Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road,
Cambridge CB4 0WZ, Registered Number 03063054.

Consider the environment. Please don't print this e-mail unless you really need to

FOIA CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT J

USAO 00003550

To:        Lisa Harris[lisah@autonomy.com]
Cc:        payroll@autonomy.com[payroll@autonomy.com]
From:      payroll@autonomy.com
Sent on behalf of:   sh-ukcorporatedealing@ubs.com
Sent:      Fri 3/12/2010 8:23:47 AM
Subject:   [payroll] Options | 12/03/10- Kanter
disclaim.txt

Lucy

I confirm we have sold 40,000 shares @1721.864p

Kind regards

Tara Blyth
Director
UBS Investment Bank
1-2 Finsbury Ave
London EC2M 2PP
ph: 020 7568 2205
fax: 020 7568 7722
tara.blyth@ubs.com


**From:** Lucy Brown [mailto:lucy.brown@autonomy.com]
**Sent:** 12 March 2010 10:26
**To:** sh-ukcorporatedealing@ubs.com
**Cc:** payroll@autonomy.com
**Subject:** Options | 12/03/10


Hi Tara & Warren,


Please see attached spreadsheet. Paperwork will be e-mailed later today.


**Selling all shares:**

Todd R Poston

Percy Tejeda

David Lord


FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-0165041

USAO 00003551

Selling all shares with minimum price £17.15:

Andrew Kanter

Kind regards,

Lucy Brown | Accounts Assistant | +44 1223 488 564

*The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.*

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-0165041

USAO 00003552

# EXHIBIT K

USAO 00003553

 **UBS** Investment Bank

UBS Limited
1 Finsbury Avenue
London EC2M 2PF

www.ubs.com

# SALE INSTRUCTION FORM (ESOP)
# PAYE version

Dear Sir/Madam,

**Sale of shares under the arrangements established by UBS Limited for employees/executives of Autonomy Corporation (the "Facility")**

In connection with the option(s) set out below granted to me to acquire Ordinary shares of 1/3p each in Autonomy Corporation (the "Company"), I, ~~ANDREW HUNTER~~ _____ (please insert your name), have completed a Notice of Exercise in respect of the following options: ↓ SUBJECT TO LIMITS IN ATTACHED INSTRUCTIONS ↓

| Date of Grant | Option price per share (A) | Number of shares to be exercised (B) | Exercise Cost (A) x (B) |
|---|---|---|---|
| 17 DEC 04 | 149p | 21,450 | $31,960.50 |
| 01 AUG 05 | 229p | 50,000 | $114,500.00 |
| 11 SEP 06 | 384p | 25,000 | $96,000.00 |
| | TOTALS | | $242,460.50 |

Please accept the following instructions:

**1. EXERCISE FINANCE (Loan)**

*Please tick one box*

(i)   Please pay the full amount now due to the Company on my behalf, being £ 242,460.50 ☒ **or**

(ii)  Please pay £ _____ to the Company on my behalf which, together with my contribution of £ _____ will total the full amount now due to the Company. ☐ **or**

(iii) I do not require funding from UBS Limited and have paid the full amount now due to the Company from my own resources. ☐

*(I can confirm that in order for UBS Limited to effect same day execution an instruction to sell the shares must be received by 2.30pm)*

**2. TRANSFER OF SHARES TO SPOUSE**

*Please tick if required*

Following the issue or transfer of shares, I wish to transfer _____ shares to my spouse, whose full name is _____ ☐

*NB: Shares will only be transferred to your spouse provided sufficient shares are sold in your name to meet your obligations relating to the loan transaction and costs, tax and NI (if applicable). If your spouse wishes to sell any of these shares, he/she needs to complete the Spouse Sale Form.*

**3. SALE OF SHARES**

Following the issue or transfer of shares, I hereby irrevocably authorise you forthwith, in accordance with the terms and conditions of the Facility:

*Please tick one box*

(i)   to sell _ALL_ shares in my name. ☒ **or**

(ii)  to sell sufficient shares in my name to cover, as near as possible, repayment of my loan and costs. ☐ **or**

(iii) to sell sufficient shares in my name to cover repayment of my loan and costs and to raise an additional £ _____ ☐

UBS Investment Bank is a business group of UBS AG
UBS Limited is a subsidiary of UBS AG
UBS Limited is incorporated as a limited liability company in England & Wales. Registered Address: 1 Finsbury Avenue, London EC2M 2FP. Regulated in the UK by the Financial Services Authority Company Number: 1055362
UBS Limited is a member of the London Stock Exchange

*Effective 09 June 2003*

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-0165040

USAO 00003554

**4.PROCEEDS OF SALE**

I understand that the proceeds of the sale, after deduction of sums due to UBS Limited under the Facility, will be paid to the Company, who will deduct the appropriate taxes and pay the balance to me.

**5.SHARES BEING RETAINED**

I understand that the shares which I acquire will be issued or transferred by the Company into a nominee company of UBS Limited for the purposes of settlement. Any shares which I retain should be:

*Please tick one box*

(i)     Registered in my own name and a share certificate should be issued and sent to me in due course;     ☐ *or*

(ii)    Registered in the name of the following CREST member and the shares transferred to the following CREST account:     ☐

| Name of CREST Member: | |
|---|---|
| CREST Participant Code: | CREST Member Account ID: |

**6.DECLARATION AND AUTHORITY**

I have read and understood the terms and conditions of the Facility and understand that, these are applicable to me in relation to these instructions. I confirm that I shall meet my obligations under the Facility in that I shall repay my loan and associated costs from the proceeds of sale arising from the sale of shares in my name. If such proceeds are not sufficient I shall repay the amount outstanding on the loan immediately on demand.

I can confirm that in effecting transactions set out in these instructions I am not in possession of any Unpublished Information in respect of the Company nor are the transactions being effected during any Close Period in relation to the Company to which I am subject.

I understand that the exercise of this option may give rise to an income tax and/or employees' national insurance liability which is required to be paid to the Inland Revenue under the deduction at source arrangements (PAYE).

I confirm my agreement that the above references to "associated costs" and the references to "costs" above shall include not only the interest and transaction costs referred to in the terms and conditions of the Facility (as amended from time to time) but also any income tax and employees' national insurance liabilities for which the Company (or any subsidiary of it) is liable to account for in connection with the exercise of my option and accordingly I hereby irrevocably authorise and instruct UBS Limited to act on the instructions of the Company with regard to the calculation of any such liabilities and I understand that additional shares will be sold as necessary to put the Company in funds to pay any such liabilities.

I can confirm that any issue or transfer of shares to my spouse specified overleaf is a gift which falls within category L in the Schedule to the Stamp Duty (Exempt Investment) Regulations 1987.

I hereby authorise UBS Limited or any person nominated by them to complete all relevant documentation and/or input all relevant computerised instructions necessary in order to effect this transfer. I hereby authorise the Company to pass to UBS Limited any information and to keep such records as UBS Limited may require for regulatory reasons in connection with this Facility which the Company may have in its possession.



| Signed | | Date 12 NOV 2009 |
|---|---|---|
| Full Name | ANDREW KRASKO | |
| Residential Address | | |

UBS Investment Bank is a business group of UBS AG
UBS Limited is a subsidiary of UBS AG
UBS Limited is incorporated as a limited liability company in England & Wales  Registered Address: 1 Finsbury Avenue, London EC2M 2PP. Regulated in the UK by the Financial Services Authority
Company Number: 1095362
UBS Limited is a member of the London Stock Exchange

Effective 09 June 2003

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-0165040

# EXHIBIT L

USAO 00003556

LIST OF IRREVOCABLE UNDERTAKINGS

AUTONOMY CORPORATION PLC

| IRREVOCABLE UNDERTAKING | NO. OF SHARES | REGISTERED SHAREHOLDING | REGISTERED SHARES HELD | VALIDLY ACCEPTED | BALANCE OUTSTANDING | DATE ACCEPTED | COMMENTS |
|---|---|---|---|---|---|---|---|
| Michael Lynch | 19,798,546 | UBS Private Banking Nominees Limited (Mainpool ACCT) | 19,188,046 | 19,188,046 | 0 | Tuesday, August 23, 2011 | |
| | | HSBC Client Holdings Nominee (UK) Limited 686179 ACCT | 610,500 | 610,500 | 0 | Wednesday, August 24, 2011 | |
| Sushovan Hussain | 9,978 | Sushovan Hussain | 6,978 | 6,978 | 0 | Friday, August 26, 2011 | |
| | | Sushovan Tareque Hussain | 3,000 | 3,000 | 0 | Monday, September 05, 2011 | |
| Richard Gaunt | 2,372,601 | UBS Private Banking Nominees Limited (Mainpool ACCT) | 2,372,601 | 2,372,601 | 0 | Monday, August 22, 2011 | |
| Robert Webb | 8,941 | Robert Stopford Webb | 8,109 | 8,109 | 0 | Tuesday, August 30, 2011 | |
| | | BBHISL Nominees Limited 120077 ACCT | 832 | 832 | 0 | Friday, August 26, 2011 | |
| TOTALS: | 22,190,066 | | 22,190,066 | 22,190,066 | 0 | | |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01662036

USAO 00003557

# EXHIBIT M

USAO 00003558



MDR:KJH:JEC:MHP:jmf
DOJ No. 182-53177

**U.S. Department of Justice**

Criminal Division
Office of International Affairs

_Washington, D.C. 20530_

January 29, 2016

<u>VIA E-MAIL AND FEDEX</u>

Jude DeSouza
United Kingdom Central Authority
Home Office
3rd Floor, Seacole Building
2 Marsham Street
London, England SW1P 4DF

SUBJECT:   <u>Request for Assistance in the Investigation of Autonomy Corporation</u>

Dear Mr. DeSouza:

Attached is a request for assistance pursuant to the 1994 Treaty of Mutual Legal Assistance in Criminal Matters between the United States of America and the United Kingdom, as amended by the 16 December 2004 Instrument and exchange of notes. Should you have any questions regarding the assistance requested, please contact me by telephone at 202-598-8012 or by e-mail at Martyna.Pospieszalska@usdoj.gov. In my absence, please contact Jason Fischer, International Affairs Specialist, by telephone at 202-305-1995 or by e-mail at Jason.Fischer@usdoj.gov. Thank you for your assistance in this matter.

Sincerely,

Mary D. Rodriguez
Acting Director

By: _Gw E. Midda_ for _____

Martyna H. Pospieszalska
Trial Attorney

Enclosure



**U.S. Department of Justice**

Criminal Division

MDR:KJH:JEC:MHP:jf
DOJ No. 182-53177

*Office of International Affairs*                                    *Washington, D.C. 20530*

January 29, 2015

TO:        The Central Authority of the United Kingdom

SUBJECT:   <u>Request for Assistance in the Investigation of Autonomy Corporation</u>

The Central Authority of the United States of America requests the assistance of the
Central Authority of the United Kingdom under the 1994 Treaty of Mutual Legal Assistance in
Criminal Matters between the United States of America and the United Kingdom, as amended by
16 December 2004 Instrument and exchange of notes ("the Treaty"). The United States Attorney
for the Northern District of California ("the prosecutor") and the Federal Bureau of Investigation
(collectively, "the U.S. authorities") have been investigating violations of U.S. criminal law
involving a scheme to defraud Hewlett-Packard Company ("HP") based on Autonomy
Corporation plc's ("Autonomy") materially misstated financial statements. U.S. authorities are
investigating whether Autonomy misstated its financial performance in annual and quarterly
reports as a part of a scheme to defraud HP and others.

Autonomy was a publicly traded company in the United Kingdom until its sale in
October 2011 to HP. The investigation to date reflects that individuals at Autonomy including
Michael Richard Lynch ("Lynch"), Sushovan Tareque Hussain ("Hussain"), Stephen Keith
Chamberlain ("Chamberlain"), Andrew Mark Kanter ("Kanter"), and other senior officers of
Autonomy caused financial statements with material misstatements to be released. Accordingly,
the U.S. authorities seek assistance in obtaining bank and brokerage records of several accounts
in the UK to demonstrate these accounts received money from the scheme to defraud. The U.S.

authorities also seek records from the receiving agent that was involved with HP's acquisition of Autonomy, who is believed to possess evidence that the alleged conspirators tendered their Autonomy shares and received payment for them. Finally, the U.S. authorities seek phone records for one of the alleged conspirators.

## CONFIDENTIALITY

The details of this criminal investigation are considered sensitive. Accordingly, please keep this request confidential in all respects, and do not share its contents, its subject matter, or the fact that the request has been made with any private persons (including the subjects of the investigation), or any government officials whose knowledge is not absolutely necessary for purposes of executing this request. In addition, please advise all who must be made aware of this request for assistance that the request, its contents, and its subject matter are to be kept confidential and should not be shared. If the request cannot be executed without public disclosure, the United States asks that the authorities of the United Kingdom notify the Central Authority of the United States before any action is taken towards execution.

## THE FACTS

Autonomy was a company incorporated in England and Wales with a registered office in Cambridge, United Kingdom. Its principal activities were software development and distribution. Autonomy maintained dual headquarters in San Francisco, California, and Cambridge, United Kingdom. Autonomy was a publicly traded company whose shares were listed on the London Stock Exchange and were bought, held, and sold by individuals and entities throughout the United States, including the Northern District of California.

USAO 00003561

Lynch co-founded Autonomy and served as its Chief Executive Officer (CEO) from 1996 until May 2012.  Hussain was the Chief Financial Officer (CFO) of Autonomy from June 2001 until May 2012.  Chamberlain was the Vice President of Finance from 2005 until March 2012.  Kanter was Autonomy's Chief Operating Officer (COO) and General Counsel from 2001 to May 2012.

From 2009 through July 2011, Autonomy published annual and quarterly reports including its financial results.  Autonomy stated in its annual and quarterly reports that its financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS").  Autonomy also stated or suggested that it followed Generally Accepted Accounting Principles ("GAAP") in the United States for software revenue recognition.  For example, Autonomy stated on its website:

> for revenue recognition we voluntarily adhere to the principles set out in US GAAP SOP 97-2, which is far more detailed, prescriptive and conservative than IFRS, and that has made it the 'gold standard' for other software companies like Oracle and Microsoft.

Lynch, Hussain, Chamberlain, and Kanter each reviewed Autonomy's quarterly reports.  Lynch and Hussain also signed statements of responsibility with respect to Autonomy's 2009 and 2010 annual reports, as well as its reports for the quarters ended June 2009, June 2010, and June 2011.  Lynch and Hussain, along with Kanter, also participated in calls with analysts who followed Autonomy's stock.

During the period from at least the first quarter of 2009 through October 2011, Lynch and others engaged in a scheme designed to falsely inflate the revenue that Autonomy had earned, and would report those false revenues in its annual and quarterly reports.  As a result, Lynch and others were able to create the false appearance that the company was growing quickly, and

3

thereby inflate the price of Autonomy's stock. For example, in certain instances where Autonomy was unable to close a sale of software with a client by the end of a quarter, Autonomy claimed to have "sold" the software to a "value added reseller" (VAR) instead.[1] However, Autonomy had not satisfied certain IFRS requirements concerning its sale to the VAR, including that Autonomy had not transferred to the buyer the significant risks and rewards of ownership of the goods; it retained effective control over the goods sold; and it was not probable that the economic benefits associated with the transaction would flow to Autonomy. In fact, the VARs lacked the ability or intent to pay and had no independent use for the software.

In addition to improperly recognizing revenue on certain "VAR" transactions in violation of the IFRS requirements, Autonomy also engaged in certain reciprocal transactions whereby it sold software to a customer at one price and purchased products or services from the same customer at a greater price – thus resulting in a "roundtrip" of cash that made Autonomy's revenue (and growth) greater than they really were. Finally, Autonomy also failed to disclose that it engaged in substantial sales of third-party computer hardware, without modification and unaccompanied by any Autonomy software. Omitting this information made Autonomy look like a quickly growing software company rather than a more slowly growing hardware company. After HP acquired Autonomy, HP discovered that Autonomy owed a substantial amount to an HP competitor for computer hardware and ultimately learned of the full scope of Autonomy's hardware sales.

Hussain's Telephone Numbers

E-mails and documents provided by HP and other records obtained by U.S. authorities, demonstrate that Hussain used two cellular phone numbers to communicate with Autonomy

[1] A VAR is a company that adds features or services to an existing product and then resells it.

4

USAO 00003563

employees and others in the U.S. relating to VAR and other transactions throughout the scheme:

█████████████, operated by Vodaphone, and ███████████ operated by Telefonica UK

Limited. For example, U.S. phone records reflect that ████████████ was used to call the CFO

of one of the VARs on or about January 1, 2010. The CFO of the VAR has indicated to U.S.

authorities that Hussain called him that day to request that the VAR agree to a software sale, on

which Autonomy ultimately improperly recognized revenue in their reports for the year 2009.

U.S. phone records also reflect that ████████████ was used on or about April 4, 2011, to call

an Autonomy employee located in the U.S. who was responsible for facilitating VAR

transactions. In addition, ████████████ was provided as the contact number for Hussain on a

contact list for those working on HP's acquisition of Autonomy.

<u>Barclays PLC & UBS AG Accounts Utilized by Autonomy Officers</u>

During the scheme to inflate Autonomy's value and shares, Autonomy made payments,

including payment for their salaries, to Lynch into Barclays PLC ("Barclays Bank") account

number ████████; to Hussain into HSBC account number ████████; and to Chamberlain into

Barclays Bank account number ████████[2] Hussain, Chamberlain, and Kanter also exercised

stock options through accounts held by UBS AG ("UBS") in London, but the account numbers

remain unknown. U.S. authorities learned of these bank accounts and stock option exercises

from information in the possession of HP, including a spreadsheet of stock option exercises by

Hussain, Chamberlain, and Kanter.

---

[2] U.S. authorities do not know the address for these accounts. Barclays Bank appears to be a subsidiary of Barclays PLC, which is located at 1 Churchill Place, London E14 5HP, United Kingdom, telephone number +44207116100.

USAO 00003564

<u>HP's Acquisition of Autonomy</u>

In or around December 2010 or January 2011, Lynch authorized an investment banker based in California to approach HP and others about the possibility of acquiring Autonomy. On or about August 18, 2011, HP and Hewlett-Packard Vision B.V. ("HP Vision"), an indirect wholly-owned subsidiary of HP, entered into an Offer Agreement with Autonomy and publicly announced an offer to acquire the outstanding shares of Autonomy for £25.50 ($42.11) per share in cash. The offer directed that acceptances be delivered to Capita Registrars Limited ("Capita"), located at the Registry, 34 Beckenham Road, Beckenham, Kent BR3 4TU (Telephone

█████████████), which acted as a receiving agent for the offer and handled payment of acquisition funds to Autonomy shareholders.

To facilitate the sale, Capita opened bank accounts at the Royal Bank of Scotland to receive payments from HP. Specifically, account number ██████ (Sort Code 15-10-00) was opened under the name "Capita Registrars Limited CREST Clearing Account," and account number ██████ (Sort Code 15-10-00) was opened under the name "Capita Registrars Limited Re: Hewlett-Packard Vision B.V. / Autonomy Corporation plc – Takeover Case Consideration A/C." Lynch, Hussain, Chamberlain, and Kanter were among those who accepted the offer. Each tendered their shares as part of the acquisition and received millions of dollars as a result. Angela Maria Bacares ("Bacares"), Lynch's wife and at times an Autonomy employee, also tendered shares in her name and profited as a result of the acquisition.

<u>Accounts Suspected of Receiving Proceeds of the Sale of Autonomy to HP</u>

Prior to October 2011, according to e-mails and account statements between Lynch and a UBS money manager provided to U.S. authorities by HP, Lynch and Bacares maintained a wealth management and/or securities brokerage account or accounts holding Autonomy shares at

6

USAO 00003565

UBS in London. The account number(s) is unknown. As of March 2013, U.S. authorities have have determined that Lynch continues to be associated with accounts at UBS in London, but those account number(s) remain unknown.

The U.S. authorities also have learned through investigation that, in 2008, Lynch and Bacares each established accounts with Merrill Lynch Portfolio Managers Limited in the UK. In or around July 2013, Merrill Lynch Portfolio Managers Limited was acquired by Julius Baer Group and custody of the assets in the accounts were transferred to Guernsey. Assets in the Merrill Lynch and Julius Baer accounts contain part of the proceeds that Lynch received from the sale of Autonomy. Lynch holds relationship number ▮▮▮▮ and Bacares holds relationship number ▮▮▮▮. Although the assets in the account were transferred to Guernsey, U.S. authorities believe Julius Baer Group affiliates in the UK -- Julius Baer International Limited and Julius Baer Portfolio Managers Limited -- may still hold relevant records because that is where Lynch resides.

Finally, during the course of their investigation, the U.S. authorities have learned that Lynch maintained bank, brokerage, or investment accounts at J.P. Morgan International Bank Limited in the UK, including account numbers ▮▮▮, ▮▮▮, ▮▮▮ ▮▮▮; that, as of March 2013, Lynch held an account at Credit Suisse in London (account number unknown); and that Bacares held private bank account number ▮▮▮ (Sort Code 400731) at HSBC in the UK, which may have received proceeds from the Julius Baer accounts. As of January 2014, Hussain also held an account at HSBC Bank PLC in the UK, but the account number remains unknown. In order to further the investigation into the scheme, as well as identify assets that may be subject to forfeiture under U.S. law, U.S. authorities seek the assistance of the

7

USAO 00003566

appropriate UK authorities to identify the bank accounts currently unknown to U.S. authorities, and to obtain bank records for the accounts outlined in this request.

## THE OFFENSES

**18 U.S.C. § 371.   Conspiracy to commit offense or to defraud United States.**

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be . . . imprisoned not more than five years . . . .

**18 U.S.C. § 1343.  Fraud by wire, radio or television.**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be . . . imprisoned not more than 20 years . . . . If the violation occurs in relation to . . . or affects a financial institution, such person shall be . . . . imprisoned not more than 30 years . . . .

**18 U.S.C. § 1348.  Securities and commodities fraud.**

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 15 U.S.C 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d); or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any of any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under Section 12 of the Security Exchange Act of 1934 (15 U.S.C*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d). such] security . . . shall be . . . imprisoned not more than 25 years . . . .

**18 U.S.C. § 1349.  Attempt and conspiracy.**

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## PERSONS AND ENTITIES INVOLVED

**TARGETS/SUBJECTS**

1.   **MICHAEL RICHARD LYNCH**
     Alias:                           Dr. Michael Lynch
                                      Mike Lynch

USAO 00003567

Date of Birth: █████
Place of Birth: United Kingdom
Citizenship: United Kingdom
Passport Number: UK passport (█████)
Address: ████████████████

**2.   SUSHOVAN TAREQUE HUSSAIN**
Date of Birth: █████
Place of Birth: Bangladesh
Citizenship: United Kingdom
Passport Number: UK passport (█████)
Address: ██████████████████

**3.   STEPHEN KEITH CHAMBERLAIN**
Alias: Steve Chamberlain
Date of Birth: █████
Citizenship: United Kingdom
Race: Caucasian
Passport Number: UK passport (█████)
Address: ████████████

**4.   ANDREW MARK KANTER**
Alias: Andy Kanter
Date of Birth: █████
Place of Birth: United States
Citizenship: United States
Address: ███████████

**5.   ANGELA MARIA BACARES**
Alias: Angela Lynch
Date of Birth: █████
Place of Birth: United States
Citizenship: United Kingdom
Passport Number: UK passport (█████)
Address: ████████████████

## ASSISTANCE REQUESTED

### I.    Bank and Brokerage Records

For the period from January 1, 2009, to the present, please provide complete certified

records from BARCLAYS PLC (including, without limitation, BARCLAYS BANK PLC and

9

USAO 00003568

any subsidiary and/or affiliate), located at 1 Churchill Place, London E14 5HP, United Kingdom,

relating to:

      1.    Account ▉▉▉▉ held by Michael Richard Lynch;

      2.    Account ▉▉▉▉ held by Stephen Keith Chamberlain; and

      3.    any and all any accounts traceable to these accounts held by or for the

          benefit of:

          a.    Michael Richard Lynch; and/or

          b.    Stephen Keith Chamberlain.

For the period from January 1, 2009, to the present, please provide complete certified

records from CREDIT SUISSE AG (including, without limitation, Credit Suisse Securities

(Europe) Ltd, Credit Suisse (UK) Limited, Credit Suisse International, and any subsidiary or

affiliate), located at One Cabot Square, London E14 4QJ, United Kingdom, relating to any

accounts held by or for the benefit of Michael Richard Lynch.

For the period from January 1, 2009, to the present, please provide complete certified

records from HSBC BANK PLC (and any subsidiary or affiliate), located at 8 Canada Square,

London E14 5HQ, relating to:

      1.    Account number ▉▉▉▉ held by Angela Bacares;

      2.    Account number ▉▉▉▉ held by Sushovan Tareque Hussain; and

      3.    any and all any accounts traceable to these accounts held by or for the

          benefit of:

          a.    Angela Bacares; and/or

          b.    Sushovan Tareque Hussain.

For the period from January 1, 2009, to the present, please provide complete certified

records from J.P. MORGAN INTERNATIONAL BANK LIMITED (including, without

limitation, J.P. Morgan Securities plc, J.P. Morgan Limited, and any subsidiary or affiliate),

located at 1 Knightsbridge, London SW1X 7LX, United Kingdom, relating to the following

accounts held by or for the benefit of Michael Richard Lynch:

      1.    Account number ▉▉▉▉

10

2.  Account number ███ ;
3.  Account number ███ ;
4.  Account number ███ ; and
5.  any and all any accounts traceable to these accounts held by or for the benefit of Michael Richard Lynch.

For the period from January 1, 2013, to the present, please provide complete certified records from JULIUS BAER INTERNATIONAL LIMITED and JULIUS BAER PORTFOLIO MANAGERS LIMITED (including, without limitation, any subsidiary or affiliate) relating to:

1.  account or relationship numbers ███, held by Michael Richard Lynch, and/or ███, held by Angela Maria Bacares; and
2.  any and all any accounts traceable to these accounts held by or for the benefit of Michael Richard Lynch and/or Angela Maria Bacares.[3]

For the period from January 1, 2009, to the present, please provide complete certified records from MERRILL LYNCH INTERNATIONAL (including, without limitation, Merrill Lynch International Bank Limited, Merrill Lynch Portfolio Managers Limited, and any subsidiary or affiliate), located at 2 King Edward Street, London EC1Q 1 HQ, United Kingdom, relating to any accounts held by or for the benefit of Michael Richard Lynch and/or Angela Maria Bacares.

For the period from January 1, 2011, to May 2012, please provide complete certified records from ROYAL BANK OF SCOTLAND PLC (including, without limitation, any subsidiary or affiliate), located at City Office, 62/63, Threadneedle Street, London EC2R 8LA, relating to:

1.  Account number ███ held in the name of "Capita Registrars Limited CREST Clearing Account" (Sort Code 15-10-00); and
2.  Account number ███ held in the name of "Capita Registrars Limited Re: Hewlett-Packard Vision B.V. / Autonomy Corporation plc – Takeover Case Consideration A/C" (Sort Code 15-10-00).

---

[3] Please note U.S. authorities have also requested these documents from the Bailiwick of Guernsey. However, UK authorities seek any records that may remain in the United Kingdom.

11

USAO 00003570

For the period from January 1, 2009, to the present, please provide complete certified records from UBS AG (including UBS Group, UBS AG, Investment Bank, UBS Wealth Management, UBS Securities Limited, and any parent, subsidiary, or affiliate), located at 1 Finsbury Avenue, London EC2M 2PP, United Kingdom, relating to:

1.    trading in Autonomy securities (including options) by Michael Richard Lynch, Sushovan Tareque Hussain, Andrew Mark Kanter, and/or Stephen Keith Chamberlain;

2.    any and all any accounts traceable to these accounts held by or for the benefit of
   a.    Michael Richard Lynch;
   b.    Sushovan Tareque Hussain;
   c.    Stephen Keith Chamberlain;
   d.    Andrew Mark Kanter; and/or
   e.    Angela Maria Bacares;

3.    Communications with Michael Richard Lynch, Sushovan Tareque Hussain, Andrew Mark Kanter, and/or Stephen Keith Chamberlain.

Records from the above-listed banks should include, but not be limited to:

- original signature cards;
- documentation of account opening;
- account ledger cards;
- periodic account statements;
- records (copied front and back) of all items deposited, withdrawn, or transferred;
- wire transfers;
- correspondence to, from, or on behalf of the account holder;
- shares and/or securities purchased and/or sold;
- copies of electronic recordings of any conversations;
- instructions relating to the receipt or transfer of any funds into or out of the account;
- powers of attorney and other banking authorizations; and
- memoranda related to the account.

Additionally, the period from January 1, 2009, to the present, please provide all identifying information of any accounts held at BARCLAYS PLC, CREDIT SUISSE AG, HSBC BANK PLC, J.P. MORGAN INTERNATIONAL BANK LIMITED, JULIUS BAER INTERNATIONAL LIMITED, JULIUS BAER PORTFOLIO MANAGERS LIMITED,

12

USAO 00003571

MERRILL LYNCH INTERNATIONAL, ROYAL BANK OF SCOTLAND PLC, and UBS AG

or elsewhere held in the name of or for the benefit of Michael Richard Lynch, Sushovan Tareque

Hussain, Andrew Mark Kanter, Stephen Keith Chamberlain; and/or Angela Maria Bacares.  The

identifying information should include the bank name, bank address, account number, account

holder(s), account signatories, account balance, and account opening documents.

II.    **Business Records**

    For the period January 1, 2011, to May 2012, please provide complete certified records

from CAPITA REGISTRARS LIMITED (including, without limitation, Capita PLC and any

subsidiary and/or affiliate) relating to:

1. services performed by CAPITA REGISTRARS LIMITED in connection with the HP's acquisition of Autonomy;
2. payments to Autonomy shareholders in connection with the HP acquisition;
3. Michael Richard Lynch, Sushovan Tareque Hussain, Stephen Keith Chamberlain, and/or Andrew Mark Kanter, including, without limitation, communications with any of them; payments to any of them; and documents relating to their acceptance of the offer;
4. acceptances of HP and HP Vision's offer by UBS AG, CREDIT SUISSE AG, MERRILL LYNCH INTERNATIONAL, J.P. INTERNATIONAL BANK LIMITED, and/or any subsidiary or affiliate.

    For the period from January 1, 2011, to May 2012, please provide complete certified

records from ROYAL BANK OF SCOTLAND PLC (including, without limitation, any

subsidiary or affiliate) relating to:

1. the bank's services in connection with the HP's acquisition of Autonomy;
2. Capita Registrars Limited's services in connection with HP's acquisition of Autonomy.

Records from CAPITA REGISTRARS LIMITED and ROYAL BANK OF SCOTLAND PLC

should include, but not be limited to:

- agreements and communications with HP, HP Vision, Autonomy, or Autonomy shareholders;

13

- correspondence with Michael Richard Lynch, Sushovan Tareque Hussain; Stephen Keith Chamberlain, and/or Andrew Mark Kanter;
- Spreadsheets showing payments to shareholders;
- Bank documents & statements; and
- Wire transfers.

For the period from January 1, 2009, to May 31, 2012, please provide complete certified records from VODAPHONE relating to phone numbers ███████████, and records from TELEFONICA UK LIMITED relating to phone numbers ███████████.

Records from VODAPHONE and TELEFONICA UK LIMITED should include, but not be limited to account statements showing calls made and received, and subscriber information.

## PROCEDURES TO BE FOLLOWED

### I.   Business/Bank Records

Under United States law, foreign business records are usually admitted into evidence in a proceeding in the United States after the party offering them proves, through the testimony at trial of a qualified witness, that:

1.   the records produced are true and accurate copies of original records in the custody of the business;

2.   the business made or kept the originals in the ordinary course of business and as a regular business practice; and

3.   the originals were made, at or near the time of the occurrence of the transactions they record, by a person who either had knowledge of those transactions or received the information from a person with such knowledge.

The testimony of a qualified witness may be unnecessary at trial in the United States where that witness makes or provides a written declaration in a foreign jurisdiction (*i.e.*, the United Kingdom) that (1) contains essentially the same information noted in items 1-3 above and (2) subjects the witness to criminal penalties under the laws of the foreign jurisdiction if the declaration is false. Article 8(5) of the Treaty provides for such a declaration.

14

In accordance with Article 8 of the Treaty, please have the appropriate authorities in the United Kingdom do the following:

1. require each bank/business official producing records to complete, and sign the attached Certificate of Authenticity of Business Records;

2. attach the completed certificate to the corresponding records produced by the bank/business official and transmit the records with certificate, through or as directed by the Central Authority for the United Kingdom, to the Office of International Affairs, U.S. Department of Justice.

In accordance with Article 10(2) of the Treaty, please invite each bank/business official producing records to appear, if it should become necessary, at a date to be determined, in San Francisco, California, at the expense of the United States government, to testify at trial.

We thank you for your assistance with this matter and ask that you keep us apprised of all developments.

29 January 2016
_____
Date

Sincerely,

Kenneth J. Harris
Acting Deputy Director
Office of International Affairs
Criminal Division
U.S. Department of Justice

15

USAO 00003574

CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I, _____ (Name), attest on penalty of criminal punishment for false

statement or false attestation that I am employed by _____

(Name of Business from which documents are produced) and that my official title is

_____ (Official Title). I further state that each of the records attached

hereto is the original or a duplicate of the original of records in the custody of

_____ (Name of Business from which

documents are produced).  I further state that:

      A)  such records were made at or near the time of the occurrence of the matters set forth, by (or

           from information transmitted by) a person with knowledge of those matters;

      B) such records were kept in the course of a regularly conducted business activity;

      C) the business activity made the records as a regular practice; and

      D) if any of such records is not the original, such record is a duplicate of the original.

_____ (Signature)

_____ (Date)

Sworn to or affirmed before me, _____(Name), a ____ (notary public, judicial
officer, etc.), this _____ day of _____, 20_____.

16

USAO 00003575

# EXHIBIT N

USAO 00003576

FILED

JAN 29 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  BRIAN J. STRETCH (CABN 163973)
   Acting United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division
4  ROBERT S. LEACH (CABN 196191)
   ADAM A. REEVES (NYBN 2363877)
5  Assistant United States Attorneys
6     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
7     Telephone: (415) 436-7534
      Fax: (415) 436-7234
8     Robert.Leach@usdoj.gov
      Adam.Reeves@usdoj.gov
9
   Attorneys for United States of America
10

11                 UNITED STATES DISTRICT COURT
12                NORTHERN DISTRICT OF CALIFORNIA
13                    SAN FRANCISCO DIVISION
14
   IN RE GRAND JURY INVESTIGATION          )  Case No. CR 14-90491 MISC EMC
15 NO. 2012R02242,                         )
                                           )  [PROPOSED] ORDER SUSPENDING
16                                         )  THE RUNNING OF THE STATUTE OF
                                           )  LIMITATIONS UNDER 18 U.S.C.
17                                         )  § 3292
                                           )
18                                         )  UNDER SEAL
                                           )
19                                         )
                                           )
20

21      Upon application of the United States, indicating that evidence of offenses, namely 15 U.S.C.

22 §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18

23 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities fraud), and 18 U.S.C. § 1349 (attempt and

24 conspiracy), is in the Vatican City State and in Italy, the Court finds, by a preponderance of the

25 evidence, that an official request has been made to the Vatican City State for evidence of the foregoing

26 offenses and it reasonably appears that such evidence is in the Vatican City State. The Court further

27 finds, by a preponderance of the evidence, that an official request has been made to Italy for evidence of

28 the foregoing offenses and it reasonably appears that such evidence is in Italy.

[PROPOSED] ORDER SUSPENDING STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC

1    WHEREFORE, it is ordered that the United States' *Ex Parte* Application for an Order

2  Suspending the Statute of Limitations Pursuant to 18 U.S.C. § 3292 is GRANTED.

3    It is further ordered that the running of the statute of limitations for the foregoing offenses is

4  SUSPENDED beginning on August 10, 2015, the date on which the official request to the Vatican City

5  State was made, and ending on the date on which the Vatican City State takes final action on the request.

6    It is further ordered that the running of the statute of limitations for the foregoing offenses is

7  SUSPENDED beginning on December 23, 2015, the date on which the official request to Italy was

8  made, and ending on the date on which Italy takes final action on the request.

9    It is further ordered that the Clerk of the Court shall seal this Order, as well as the United States'

10  *Ex Parte* Application for an Order Suspending the Statute of Limitations and the Declaration of AUSA

11  Robert S. Leach in support thereof, pending further order of the Court.

12    IT IS SO ORDERED.

13  Dated: ___1/29___, 2016

14

15

16    THE HONORABLE ~~JAMES DONATO~~
      United States District Judge

17

18  cc: Robert S. Leach

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER SUSPENDING STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC            2

USAO 00003578

# EXHIBIT 3

USAO 00003579



**U.S. Department of Justice**

Criminal Division

VAA:WHG:JEC:EEM:jmf

_Office of International Affairs_                    _Washington, D.C. 20530_

May 1, 2017

VIA E-MAIL AND FEDEX

Deborah Hand
United Kingdom Central Authority
Home Office
3rd Floor, Seacole Building
2 Marsham Street
London, England SW1P 4DF

    Re:   Supplemental Request for Assistance in the Investigation of Autonomy
           Corporation; OIA Reference Number: 182-53177 (please use when responding)

Dear Ms. Hand:

    Enclosed please find a supplemental request for assistance concerning the above-referenced matter. The original request was dated January 29, 2015. This supplemental request incorporates by reference the original request. Further to the assistance sought in the original request, the prosecutor seeks additional business records.

    Please do not hesitate to contact me at (202) 305-1643 or at Erin.Mikita@usdoj.gov or International Affairs Specialist Jason Fischer at (202) 305-1995 or at Jason.Fischer@usdoj.gov if you have any questions.

                    Sincerely,

                    Vaughn A. Ary
                    Director

        By:  _Erin E. Mikita_

                    Erin E. Mikita
                    Trial Attorney

Enclosure



**U.S. Department of Justice**

Criminal Division

VAA:WHG:JEC:EEM:jf
DOJ No. 182-53177

*Office of International Affairs*          *Washington, D.C. 20530*

TO:        The Central Authority of the United Kingdom

SUBJECT:    Supplemental Request for Assistance in the Investigation of Autonomy
               Corporation

      The Central Authority of the United States of America requests further assistance of the

Central Authority of the United Kingdom pursuant to the 1994 Treaty of Mutual Legal

Assistance in Criminal Matters between the United States of America and the United Kingdom,

as amended by the 16 December 2004 Instrument and exchange of notes (the Treaty).

      The United States Attorney's Office for the Northern District of California (the

Prosecutor) and the Federal Bureau of Investigation (collectively, the U.S. authorities) have been

investigating violations of U.S. criminal law involving a scheme to defraud Hewlett-Packard

Company (HP) and others based on Autonomy Corporation plc's (Autonomy) materially

misstated financial statements. U.S. authorities are investigating whether Autonomy misstated

its financial performance in annual and quarterly reports and made other misstatements as part of

a scheme to defraud HP and others.

      On January 29, 2016, the United States transmitted a request to the United Kingdom

asking for bank, brokerage, and business records (Original Request). The United Kingdom has

provided certain records and continues to respond to the Original Request. The Original Request

is hereby incorporated by reference in its entirety.

      The United States now seeks assistance in obtaining additional business records,

specifically: (1) documents related to a "data room" established by Autonomy's U.K. counsel

USAO 00003581

Slaughter and May in connection with HP's due diligence prior to acquisition of Autonomy and (2) documents prepared by Ernst & Young LLP in the United Kingdom in connection with an audit of an Autonomy subsidiary's financial statements. The United States is requesting documents from Slaughter & May because the Prosecutor believes they will help evidence the representations Autonomy made and the information Autonomy provided to HP during due diligence. The United States is requesting documents prepared by Ernst & Young LLP because the Prosecutor believes they will help evidence the falsity of Autonomy's financial statements.

## CONFIDENTIALITY

The details of this criminal investigation are considered sensitive. Accordingly, please keep this request confidential in all respects, and do not share its contents, its subject matter, or the fact that the request has been made with any private persons (including the subjects of the investigation) or any government officials whose knowledge is not absolutely necessary for purposes of executing this request. In addition, please advise all who must be made aware of this request for assistance that the request, its contents, and its subject matter are to be kept confidential and should not be shared. If the request cannot be executed without public disclosure, the United States asks that the authorities of the United Kingdom notify the Central Authority of the United States before any action is taken towards execution.

## ADDITIONAL FACTS

As stated in the Original Request, in late 2010 or early 2011, Michael Richard Lynch (Lynch), co-founder of Autonomy and its Chief Executive Officer from 1996 until May 2012, authorized an investment banker based in California to approach HP and other companies about the possibility of acquiring Autonomy.

2

USAO 00003582

On or about February 3, 2011, Lynch and Sushovan Tareque Hussain (Hussain), Autonomy's Chief Financial Officer from June 2001 until May 2012, participated in a video conference with HP representatives in Palo Alto, California, to discuss Autonomy's business and performance. On or about March 4, 2011, Lynch and Hussain participated in a second video conference with HP representatives to discuss Autonomy's business and performance. Ultimately, HP decided to conduct due diligence of Autonomy prior to making an offer to acquire Autonomy.

Autonomy engaged Slaughter and May, a U.K. law firm located at One Bunhill Row, London, EC1Y 8YY, to advise it in connection with the potential HP acquisition. On or about August 1, 2011, Slaughter and May established a virtual "data room," referred to as Project Daniel 1Room, to enable Autonomy to share documents with HP and its advisors. The data room, available at https://1room.slaughterandmay.com/eRoom/fac1/ProjectDaniel, provided a web-based environment where users could share and view files. Data room users were given a password and the ability to log onto the website to review available information. Between August 1, 2011, and the date of the acquisition (approximately October 3, 2011), Autonomy officers forwarded documents to Slaughter and May to be uploaded into the data room. After Slaughter and May uploaded documents into the data room, data room users received an e-mail indicating that new documents had been added.

For example, on or about August 4, 2011, Anthony Hartley, a trainee solicitor with Slaughter and May, e-mailed HP's advisers alerting them that documents had been added to the data room. These documents included files titled "I.D-01-Copy of Top 40 contracts 2010-11 FINAL-r.pdf" and "I.D-02-Copy of Top 40 Customer Analysis 2010-2011 FINAL-r.pdf" as well as redacted versions of customer contracts. On or about August 5, 2011, an Autonomy officer

3

USAO 00003583

represented to HP that lists of Autonomy's top 40 customers by revenue and top 40 contracts by revenue had been placed in the data room.

U.S. authorities' investigation has revealed that the lists of top 40 customers and top 40 contracts by revenue provided by Autonomy and uploaded to the data room did not accurately represent Autonomy's top 40 customers and top 40 contracts by revenue. The list of Autonomy's top 40 customers omitted customers that purchased exclusively hardware, as well as hardware revenue from Autonomy customers who purchased both hardware and software. The list of Autonomy's top 40 contracts by revenue omitted at least two contracts involving only the sale of hardware, as well as other contracts that might have alerted HP to questionable accounting practices by Autonomy. U.S. authorities believe that the omissions from the lists of top 40 customers and top 40 contracts were intended to conceal Autonomy's questionable accounting practices. Moreover, U.S. authorities believe the omissions were intended to conceal the significance of its hardware sales. U.S. authorities believe Autonomy failed to disclose that it engaged in substantial sales of third-party computer hardware, without modification and unaccompanied by any Autonomy software, because omitting this information made Autonomy look like a quickly growing software company rather than a more slowly growing hardware company.

In or after 2012, after the acquisition, HP commenced an internal investigation into accounting improprieties, disclosure failures, and misrepresentations by Autonomy, including one of its subsidiaries, Autonomy Systems Limited (ASL), with a registered office in Berkshire, England. The internal investigation revealed extensive errors in ASL's previously-issued financial statements.

4

On or about February 15, 2013, ASL hired Ernst & Young LLP, a U.K. accounting firm with offices at Apex Plaza, Forbury Road, Reading, Berkshire RGI IYE (+44 118 928 1100) and 1 More London Place, London, SE1 2AF (+44 20 7951 2000), to audit the financial statements of ASL, as ASL is required to file accurate audited financial statements in the United Kingdom. Ernst & Young LLP performed extensive audit work, and by December 2013, it had incurred approximately £1.6 million in fees.

On or about January 31, 2014, ASL issued its Report and Financial Statements for the 10 month-period ending October 31, 2011, which restated ASL's previously-issued financial statements for the year ending December 31, 2010, principally relating to the recognition of revenue and costs (the ASL Report).[1]  As a result, ASL's revenue for the year ending December 31, 2010, was substantially reduced.  The financial results in the ASL Report reflected adjustments for transactions by other Autonomy subsidiaries, which contributed to Autonomy's overall revenue in 2010 and the first two quarters of 2011.  The ASL Report thus quantified the magnitude by which Autonomy's published annual and quarterly reports had been misstated.

The ASL Report included a report by Ernst & Young LLP, signed by one of its partners, David Hales, in which Ernest & Young LLP stated that it could not express an opinion on the financial statements.  Ernst & Young LLP listed various reasons for its disclaimer of opinion, stating that "[i]f additional information and evidence had been available to the [Board of Directors of ASL], including information that might be identified from the ongoing investigations, further adjustments might have been required to the reported results."  Ernst & Young LLP also stated that, regardless of its disclaimer of an opinion on the financial statements,

---

[1] After it became an HP subsidiary, ASL delayed filing the restatement as it investigated possible irregularities.

5

USAO 00003585

it held the opinion that the information given in the ASL Report for the financial year for which the financial statements were prepared were consistent with the financial statements.

The United States anticipates Ernst & Young's audit work papers will help establish the falsity of the Autonomy financial statements upon which HP relied in making its decision to proceed with the acquisition.

## THE OFFENSES

There are no new offenses under investigation since the transmission of the Original Request.

## PERSONS AND ENTITIES INVOLVED

There are no new persons and entities involved since the transmission of the Original Request.

## ASSISTANCE REQUESTED

### Business Records

A.  For the period July 1, 2011, to October 31, 2011, please provide complete certified copies of non-privileged records from Slaughter and May relating to the data room known as Project Daniel 1Room, including:

1.  Documents placed in the Project Daniel 1Room;

2.  E-mails to users of the Project Daniel 1Room;

3.  Documents provided by Autonomy for placement in the Project Daniel 1Room;

4.  Documents that show the location of the servers where the Project Daniel 1Room was maintained; and

5.  Documents that show the location of the servers where from which e-mails to users of the Project Daniel 1Room were sent.

6

To the extent the documents requested in (4) and (5) are not available, please provide a sworn statement from a person at Slaughter and May with knowledge as to the location of the servers.

B.  For the period 2013 to 2014, please provide complete certified copies of records from Ernst & Young LLP relating to its engagement to audit the financial statements of ASL and/or any Autonomy affiliate, including:

1.    All work papers relating to the engagement;

2.    All documents provided by ASL and/or Autonomy in the audit;

3.    All permanent files;

4.    All billing records; and

5.    All communications between ASL, Autonomy, and Ernst & Young LLP.

## PROCEDURES TO BE FOLLOWED

### Business Records

Under United States law, foreign business records are usually admitted into evidence in a proceeding in the United States after the party offering them proves, through the testimony at trial of a qualified witness, that:

1.    The records produced are true and accurate copies of original records in the custody of the business;

2.    The business made or kept the originals in the ordinary course of business and as a regular business practice; and

3.    The originals were made, at or near the time of the occurrence of the transactions they record, by a person who either had knowledge of those transactions or received the information from a person with such knowledge.

The testimony of a qualified witness may be unnecessary at trial in the United States where that witness makes or provides a written declaration in a foreign jurisdiction (*i.e.*, the United

7

USAO 00003587

Kingdom) that (1) contains essentially the same information noted in items one through three above and (2) subjects the witness to criminal penalties under the laws of the foreign jurisdiction if the declaration is false.

In accordance with Article 8(5) of the Treaty, please have the appropriate authorities in the United Kingdom do the following:

1. Require each bank/business official producing records to complete, and sign the attached Certificate of Authenticity of Business Records (Appendix A).

2. Attach the completed certificate to the corresponding records produced by the bank/business official and transmit the records with certificate, through or as directed by the Central Authority for the United Kingdom, to the U.S. Department of Justice, Criminal Division, Office of International Affairs.

In accordance with Article 10(2) of the Treaty, please invite each bank/business official producing records to appear, if it should become necessary, at a date to be determined, in San Francisco, California, at the expense of the United States government, to testify at trial.

## CONTACT

Please contact Trial Attorney Erin Mikita at the Office of International Affairs at +1-202-305-1643 or Erin.Mikita@usdoj.gov should you have any questions concerning this request.

We thank you for your continued assistance in this matter concerning Autonomy Corporation.

28 April 2017
Date

Jason E. Carter
Acting Deputy Director
Office of International Affairs
Criminal Division
U.S. Department of Justice

8

USAO 00003588

**APPENDIX A**
**CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS**

I, _____ (Name), attest on penalty of criminal punishment for

false statement or false attestation that I am employed by

_____ (Name of Business from which documents are

produced) and that my official title is _____ (Official Title). I

further state that each of the records attached hereto is the original or a duplicate of the original

of records in the custody of _____

(Name of Business from which documents are produced).  I further state that:

      A)  such records were made at or near the time of the occurrence of the matters set forth,

          by (or from information transmitted by) a person with knowledge of those matters;

      B) such records were kept in the course of a regularly conducted business activity;

      C) the business activity made the records as a regular practice; and

      D) if any of such records is not the original, such record is a duplicate of the original.

_____ (Signature)

_____ (Date)

Sworn to or affirmed before me, _____(Name), a ____ (notary public,
judicial officer, etc.), this _____day of _____, 20_____.

# EXHIBIT 4

USAO 00003590



**U.S. Department of Justice**

Criminal Division

VAA:WHG:JEC:EEM:jmf

*Office of International Affairs*                    *Washington, D.C. 20530*

December 18, 2017

<u>VIA FEDERAL EXPRESS</u>
Robert Leach
Assistant United States Attorney
U.S. Attorney's Office
Northern District of California
450 Golden Gate Avenue,
Box 36055
San Francisco, CA 94102

> Re:   Request for Assistance in the Investigation of Autonomy Corporation; OIA
>       <u>Reference Number: 182-53177 (please use when responding)</u>

Dear Mr. Leach:

Pursuant to your request for assistance in the above-referenced matter, enclosed please find evidence from the United Kingdom, consisting of a CD from the SFO. This letter supplements the ones dated October 28, 2016, November 23, 2016, January 12, 2017, April 6, 2017, June 22, 2017, August 29, 2017, and October 17, 2017, sending materials to you. This office is forwarding these materials as received and is not retaining a copy. Please review the material and advise within 30 days whether the evidence completes the execution of your request.

Article 7 of the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters governs the use limitations applicable to this material. Should you anticipate the need to use the materials for a different purpose, please consult this office in advance for the purpose of obtaining authorization.

Please confirm by email to International Affairs Specialist Jason Fischer at Jason.Fischer@usdoj.gov that you have received the enclosed evidence. If you have any questions, please do not hesitate to contact me at (202) 305-1643, or Erin.Mikita@usdoj.gov.

Sincerely,

Vaughn A. Ary
Director

By: *[signature]*
Erin E. Mikita
Trial Attorney

Enclosure

USAO 00003591

# EXHIBIT 5

USAO 00003592



# Home Office

International Criminality Unit
2nd Floor Peel          T +44 (0)20 7035 4040
2 Marsham Street        F +44 (0)20 7035 6986
London
SW1P 4DF                **www.gov.uk/government/
                        organisations/home-
                        office**

Department of Justice
Criminal Division                           UKCA Ref:    I1088700US
Office of International Affairs
1301 New York Avenue NW
Washington DC 20005                          Your Ref:    182-53177
USA

13 December 2017

Dear Sir/Madam

**LETTER OF REQUEST FOR LEGAL ASSISTANCE IN THE MATTER OF MICHAEL
RICHARD LYNCH & OTHERS (AUTONOMY CORPORATION)**

I write further to your letter of request dated 29 January 2016.

Please find enclosed hard drive and letter from SFO.

Please note that this evidence may not be used for any purpose other than that specified
in your letter of request. Should you wish to use this evidence for any purpose which was
not outlined in the original request, you must seek the consent of the UK Central Authority
in advance of the material being used for such other purpose.

Please note that as your request has now been fully executed, we have closed our file in
relation to this matter.

If you require any further assistance from UK Central Authority in relation to this case,
please send a supplementary letter of request, quoting the UK Central Authority reference
number above.

I would be grateful if you would acknowledge receipt of this letter.

Yours faithfully,

Deborah Hand
UK Central Authority
*On behalf of the Secretary of State*
D 0207 035 0691
E deborah.hand@homeoffice.gsi.gov.uk
W www.gov.uk/mutual-legal-assistance-mla-requests

**SFO** | serious
fraud
office

2-4 Cockspur Street  London  SW1Y 5BS
Director:  David Green CB QC

**Private & Confidential**
Deborah Hand
UKCA
International Criminality Unit
Home Office
Peel Building 2nd Floor
2 Marsham Street
London SW1P 4DF

**Your Ref:**  I 1088700US

**Our Ref:**  MLA/USA/96816

13 December 2017

Dear Deborah,

## LETTER OF REQUEST FOR LEGAL ASSISTANCE IN THE MATTER OF MICHAEL RICHARD LYNCH & OTHERS (AUTONOMY CORPORATION)

I refer to the above letter of request dated 1 May 2016 referred to this Office under section 15 (2) of the Crime (International Co-operation) Act 2003 by the Secretary of State. I confirm that evidence has been obtained on behalf of the U.S. authorities.

I enclose the following electronic documents on an encrypted hard drive from Slaughter & May to be transmitted to the U.S. authorities:

| Letter of Request reference | Evidence to be transmitted |
|---|---|
| Page 6 | 1. Snapshot of the contents of the 1Room before it was closed down in 2013. 2. Copies of documents provided by Autonomy officials to Slaughter and May via email for uploading to 1Room in the period 01/07/2011- 31/10/2011. 3. Communications relating to the setting up of the 1Room hosted by Rackspace Managed Hosting Limited. 4. Affidavit of Jonathan Cotton of Slaughter and May. 5. SFO Letter dated 13 December 2017 to the U.S. DOJ. 6. Letter dated 20/10/2017 from Slaughter & May to the SFO. |

Please note that the password to the encrypted hard drive will be given to you by email. If you have any queries regarding the above, please do not hesitate to contact me.

USAO 00003594



2-4 Cockspur Street  London  SW1Y 5BS
Director:  David Green CB QC

Yours sincerely,

*Clyde Marklew*

**Clyde Marklew**
Senior Investigator
Direct Tel:   +44 (0)20 7239 7321
Email:       clyde.marklew@sfo.gsi.gov.uk

USAO 00003595

**SFO** | serious
fraud
office

2-4 Cockspur Street  London  SW1Y 5BS
Director:  David Green CB QC

Robert Leach
Trial Attorney                          Your Ref:       DOJ No. 182-41909
U.S. Department of Justice
Criminal Division, Fraud Section        Our Ref:        MLA/USA/01812

                                        Date:           13 December 2017

Dear Robert

**RE: MICHAEL LYNCH, SUSHOVAN HUSSAIN, STEPHEN CHAMBERLAIN,
ANDREW KANTER AND ANGELA BACARES**

I refer to the letter of request dated 28 May 2017 referred to this Office under section
15(2) of the Crime (International Co-operation) Act 2003 by the Secretary of State for the
Home Office.

We enclose evidence obtained from Slaughter and May. This includes one encrypted
hard drive and signed affidavit. The evidence enclosed on the hard drive is detailed in
broad terms in the attached letter from them dated 20 October 2017:

1. Snapshot of the contents of the 1Room before it was closed down in 2013.
2. Copies of documents provided by Autonomy officials to Slaughter and May via
   email for uploading to 1Room in the period 01/07/2011- 31/10/2011.
3. Communications relating to the setting up of the 1Room hosted by Rackspace
   Managed Hosting Limited.

The password for the encrypted electronic material will be sent to you by email.

Please note that we have not conducted a review of this material but have relied on the
description above to identify the content of the material produced. There does appear to
be personal data included on the hard drive and we expect that you will apply appropriate
safeguards to this material.  Should you find that material has been omitted please let
me know so that I can take steps to remedy the position.  Should you find that Slaughter
& May have provided material that was not within the scope of your letter of request or
is otherwise sensitive or irrelevant, I would be grateful if you would delete it or otherwise
embargo it and notify me immediately.

Should you have any further questions regarding this material please do not hesitate to
contact me.

USAO 00003596



**SFO** | serious
fraud
office

2-4 Cockspur Street  London  SW1Y 5BS
Director:  David Green CB QC

Yours sincerely

**Clyde Marklew**
Senior Investigator
International Assistance
Direct Tel: +44 (0)20 7239 7321
Email: clyde.marklew@sfo.gsi.gov.uk

# SLAUGHTER AND MAY

One London Row
London EC 1Y 8YY
T +44 (0)20 7600 1200
F +44 (0)20 7090 5000

**By email and by hand**

20 October 2017

Your reference
MLA/USA/96816

Our reference
JCC/SCHO/TZB

Serious Fraud Office
2-4 Cockspur Street
London
SW1Y 5BS

Direct line
+44 (0)20 7090 4090

For the attention of Clyde Marklew

Dear Sirs

**Investigation into the affairs of Michael Lynch, Sushovan Hussain, Stephen Chamberlain, Andrew Kantner and Angela Bacares**

1.     We refer to the notice dated 31 August 2017 and issued under Section 2 of the Criminal Justice Act 1987 requiring Slaughter and May (the "Firm") to produce certain documents to you for onward production to the United States Department of Justice (the "Notice").

2.     We also refer to the communications between you and this Firm regarding the scope of the Notice and timing for our response, including our email of 18 July 2017 (Cotton), your email (Marklew) of 28 September 2017, our email (Cotton) of 6 October 2017, and your email (Marklew) of the same date.

3.     We have gathered information to respond to the requests through the use of electronic searches using key words and other methods.

<u>Request 1</u>

4.     As discussed, there is no pre-existing list of documents uploaded to the 1Room. However, as agreed, please see the folder entitled *'Request 1'* on the USB drive entitled *'Slaughter and May's response to the SFO's Notice dated 31 August 2017'* for copies of all documents we believe were located on the 1Room as at June 2013.

5.     By way of background, we understand that access to the 1Room for individuals external to this Firm was deactivated on 19 September 2011. In November 2012, access to the 1Room for this Firm's deal team was deactivated. In June 2013, the external server on which the 1Room was hosted was closed down. Prior to closure, a copy of the contents of the 1Room was taken. Please note that the copy therefore represents a snapshot of the contents of the 1Room as at June 2013. We understand that it was possible for

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SJ Cooke | JD Boyce | JO Twentyman | HL Davies | AO Jolly | NC Lane | A Nazstd | RJ Todd | Authorised and regulated |
| SM Edge | MEM Harrell | DJC Schaffer | JC Purvis | S Mawdgt | LMC Cheng | DR Robertson | WJ Torte | by the Solicitors |
| NPG Boardman | N von Bismarck | STM Lee | RA Sumray | JS Nevin | RJ Smith | TA Vickers | OJ Wicker | Regulation Authority |
| PFJ Bennett | PWH Brian | AC Cleaver | JC Cotton | JA Papanicholu | MDTAS Corbett | RA Innes | DJO Elzable | Firm SRA number 55386 |
| CH Horten | JM Fenn | DR Johnson | RJ Turnill | JM Zaman | PIR Dickson | CP McClatfin | CVK Bonoy | |
| PP Chappatte | AC Johnson | S Middlemiss | WRC Watson | RA Byk | IS Johnson | CL Phillips | P de Falco | |
| PH Stacey | O Galbraith | RA Swallow | CNR Jefis | GA Miles | RM Jones | SVK Wakes | SNL Hughes | |
| CWY Underhill | SRB Powell | CS Cameron | SR Nichols | GS O'Keefe | EJ Fife | NSA Bonasti | PR Linnard | |
| OA Wareham | AG Ryde | CA Connolly | MJ Tobin | T Pharoah | JP Stacey | MJM Cox | KA O'Connell | |
| DL Fielder | JAD Marks | PJ Comin | DG Waddes | MD Zerdin | LJ Wright | ROT Jsona | N Young | |
| MD Bennett | DA Wittmana | BJ-PF Louveaux | BKP Vu | RL Cousin | JP Clark | V MacDuff | | |
| RD de Carle | TS Boxell | E Michael | EC Brown | BJ Kingsley | WHJ Ellison | PL Muda | | |
| SP Hall | SJ Luder | KR Ogle | RA Chaplin | IAM Taylor | AM Lyle-Smythe | Oi Storey | | |
| A Baard | AJ McClean | PC Snell | J Edwards | DA Ives | SC Macknay | DM Taylor | | |

LT 547795002

# SLAUGHTER AND MAY

One Bunhill Row
London EC1Y 8YY
T +44 (0)20 7600 1200
F +44 (0)20 7090 5000

documents to be added/removed during the period the 1Room was active and no audit trail was kept of such additions/removals.

6.    Please see our response to Requests 2 and 3 below, for copies of the documents provided to this Firm for upload to the 1Room and the name of the Autonomy official who provided them.

### Requests 2 and 3

7.    Our searches identified that documents for the data room appear to have been sent to us as attachments to emails and on portable storage devices.

8.    Please see the folder entitled 'Requests 2 and 3 (A)' on the USB drive entitled 'Slaughter and May's response to the SFO's Notice dated 31 August 2017' for copies of documents sent to this Firm by Autonomy officials via email for uploading to 1Room in the period 1 July 2011 – 31 October 2011 (the "Relevant Period").

9.    As specified in the Notice, we have not provided you any privileged material, such as the emails to which the documents provided by Autonomy officials to this Firm were attached. However, as requested, we have identified the individuals from Autonomy responsible for providing us the documents.  With the exception of documents smad001:00002601; smad001:00002607; and smad001:00002213, which were provided by Mr Richard Gaunt, the documents smad001:00005394; smad001:00005406; and smad001:00005429 provided by Mr Stephen Chamberlain, all material provided to this Firm by Autonomy was sent by Mr Andrew Kantner.

10.   Please also see the folder entitled 'Requests 2 and 3 (B)' on the USB drive entitled 'Slaughter and May's response to the SFO's Notice dated 31 August 2017' for copies of all documents sent to this Firm on portable storage devices by Mr Andrew Kantner for uploading to the 1Room.

### Request 4

11.   Please see the folder entitled 'Request 4' on the USB drive entitled 'Slaughter and May's response to the SFO's Notice dated 31 August 2017' for copies of all emails between members of this Firm in the Relevant Period relating to the setting up of the 1Room. As previously explained, we understand that the dataroom was branded as a Slaughter and May "1Room", but was a third party proprietary software product/platform called eRoom7, supplied to the Firm by a company called Documentum and hosted for the Firm by RackSpace Managed Hosting Limited.

12.   Please note that, where appropriate, redactions have been made to privileged material contained in the emails responsive to Request 4.

USAO 00003599

# SLAUGHTER AND MAY

One Bunhill Row
London EC1Y 8YY
T +44 (0)20 7600 1200
F +44 (0)20 7090 5000

13.   Please let us know if you have any questions on any of the above by contacting Jonathan
      Cotton of this Firm.

Yours faithfully,

*Slaughter and May*

Encs.

USAO 00003600

## CERTIFICATE OF AUTHENTICITY OF
## BUSINESS RECORDS

1.  I, Jonathan Charles Cotton, attest on penalty of criminal punishment for false statement
    or false attestation that I am a Partner of Slaughter and May.

    I further state that each of the records supplied on the USB drive entitled *'Slaughter and
    May's response to the SFO's Notice dated 31 August 2017'* is a duplicate of the original
    of records that I believe were or are in the custody of Slaughter and May.

    I further state that:

    (A)   Such records were kept in the course of a regularly conducted business activity;

    (B)   The business activity made the records as a regular practice; and

    (C)   If any of such records is not the original, such record is a duplicate of the
          original.


J. C. COTTON                                    20 OCTOBER 2017
Signature                                       Date


Sworn to or affirmed before me  SAMANTHA HAWLEY  (Name), a

Commissioner of Oaths  (Commissioner of Oaths, judicial officer etc), on

20  (day) of  October  (Month) 2017.

At  1 Bunhill Row, London, EC1Y 8YY.

ADDLESHAW GODDARD LLP
60 CHISWELL STREET
LONDON
EC1Y 4AG

# EXHIBIT 6

USAO 00003602

FILED

JAN 29 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1   BRIAN J. STRETCH (CABN 163973)
    Acting United States Attorney
2
    DAVID R. CALLAWAY (CABN 121782)
3   Chief, Criminal Division

4   ROBERT S. LEACH (CABN 196191)
    ADAM A. REEVES (NYBN 2363877)
5   Assistant United States Attorneys

6      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
7      Telephone: (415) 436-7534
       Fax: (415) 436-7234
8      Robert.Leach@usdoj.gov
       Adam.Reeves@usdoj.gov
9
    Attorneys for United States of America
10

11                UNITED STATES DISTRICT COURT
12               NORTHERN DISTRICT OF CALIFORNIA
13                  SAN FRANCISCO DIVISION
14
    IN RE GRAND JURY INVESTIGATION        )   Case No. CR 14-90491 MISC EMC
15  NO. 2012R02242,                       )
                                          )   [PROPOSED] ORDER SUSPENDING
16                                        )   THE RUNNING OF THE STATUTE OF
                                          )   LIMITATIONS UNDER 18 U.S.C.
17                                        )   § 3292
                                          )
18                                        )   **UNDER SEAL**
                                          )
19                                        )
                                          )
20  _____)

21       Upon application of the United States, indicating that evidence of offenses, namely 15 U.S.C.

22  §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18

23  U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities fraud), and 18 U.S.C. § 1349 (attempt and

24  conspiracy), is in the Vatican City State and in Italy, the Court finds, by a preponderance of the

25  evidence, that an official request has been made to the Vatican City State for evidence of the foregoing

26  offenses and it reasonably appears that such evidence is in the Vatican City State. The Court further

27  finds, by a preponderance of the evidence, that an official request has been made to Italy for evidence of

28  the foregoing offenses and it reasonably appears that such evidence is in Italy.

[PROPOSED] ORDER SUSPENDING STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC

1    WHEREFORE, it is ordered that the United States' *Ex Parte* Application for an Order

2  Suspending the Statute of Limitations Pursuant to 18 U.S.C. § 3292 is GRANTED.

3    It is further ordered that the running of the statute of limitations for the foregoing offenses is

4  SUSPENDED beginning on August 10, 2015, the date on which the official request to the Vatican City

5  State was made, and ending on the date on which the Vatican City State takes final action on the request.

6    It is further ordered that the running of the statute of limitations for the foregoing offenses is

7  SUSPENDED beginning on December 23, 2015, the date on which the official request to Italy was

8  made, and ending on the date on which Italy takes final action on the request.

9    It is further ordered that the Clerk of the Court shall seal this Order, as well as the United States'

10  *Ex Parte* Application for an Order Suspending the Statute of Limitations and the Declaration of AUSA

11  Robert S. Leach in support thereof, pending further order of the Court.

12    IT IS SO ORDERED.

13  Dated: ___1/29___, 2016

14

15

16    THE HONORABLE ~~JAMES DONATO~~
      United States District Judge   *EDWARD CHEN*

17

18  cc: Robert S. Leach

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER SUSPENDING STATUTE OF LIMITATIONS
CASE NO. CR-14-90491MISC EMC          2

USAO 00003604

# EXHIBIT 7

USAO 00003605

1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  ROBERT S. LEACH (CABN 196191)
   ADAM A. REEVES (NYBN 2363877)
5  Assistant United States Attorneys

6     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
7     Telephone: (415) 436-7534
      Fax: (415) 436-7234                          I hereby certify that the annexed
8     Robert.Leach@usdoj.gov                        instrument is a true and correct copy
      Adam.Reeves@usdoj.gov                          of the original on file in my office.
                                                     ATTEST:
9                                                        SUSAN Y. SOONG
   Attorneys for United States of America         Clerk, U.S. District Court
10                                                  Northern District of California
                                                   By
11              UNITED STATES DISTRICT COURT        Date

12              NORTHERN DISTRICT OF CALIFORNIA

13                 SAN FRANCISCO DIVISION

14  IN RE GRAND JURY INVESTIGATION    )  Case No. CR 14-90491 MISC EMC
    NO. 2012R02242,                   )
15                                    )  **UNDER SEAL**
                                      )
16                                    )  [PROPOSED] SECOND ORDER
                                      )  SUSPENDING THE RUNNING OF
17                                    )  THE STATUTE OF LIMITATIONS
                                      )  UNDER 18 U.S.C. § 3292
18                                    )
                                      )
19                                    )

20          On January 29, 2016, upon an application of the United States dated January 29, 2016, indicating

21  that evidence of offenses, namely 15 U.S.C. §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371

22  (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities

23  fraud), and 18 U.S.C. § 1349 (attempt and conspiracy), is in the Vatican City State and in Italy, the

24  Court issued an Order Suspending the Running of the Statute of Limitations Under 18 U.S.C. § 3292

25  (the "January 29, 2016 Order"). The Court found, by a preponderance of the evidence, that an official

26  request had been made to the Vatican City State for evidence of the foregoing offenses and it reasonably

27  appeared that such evidence was in the Vatican City State. The Court also found, by a preponderance of

28  the evidence, that an official request had been made to Italy for evidence of the foregoing offenses and it

USAO 00003606

1   reasonably appeared that such evidence was in Italy. The Court ordered that the running of the statute of

2   limitations for the foregoing offenses is suspended beginning on August 10, 2015, the date on which the

3   official request to the Vatican City State was made, and ending on the date on which the Vatican City

4   State takes final action on the request. The Court further ordered that the running of the statute of

5   limitations for the foregoing offenses is suspended beginning on December 23, 2015, the date on which

6   the official request to Italy was made, and ending on the date on which Italy takes final action on the

7   request.

8        On June 7, 2016, the United States submitted a second *Ex Parte* Application for an Order

9   Suspending the Running of the Statute of Limitations Pursuant to 18 U.S.C. § 3292 (the "June 7, 2016

10   Application"), indicating that evidence of the foregoing offenses is in the United Kingdom. The Court,

11   having considered the June 7, 2016 Application and the supporting declaration, hereby ORDERS as

12   follows:

13        (1)    The June 7, 2016 Application is GRANTED.

14        (2)    The Court finds, by a preponderance of the evidence, that an official request has been

15   made to the United Kingdom for evidence of the foregoing offenses and it reasonably appears that such

16   evidence is in the United Kingdom.

17        (3)    The running of the statute of limitations for the foregoing offenses is SUSPENDED

18   beginning on January 29, 2016, the date on which the official request to the United Kingdom was made,

19   and ending on the date on which the United Kingdom takes final action on the request.

20        (4)    With respect to evidence requested from the Vatican City State, the Court's January 29,

21   2016 Order is continued and the running of the statute of limitations for the foregoing offenses is

22   suspended beginning on August 10, 2015, the date on which the official request to the Vatican City State

23   was made, and ending on the date on which the Vatican City State takes final action on the request.

24        (5)    With respect to evidence requested from Italy, the Court's January 29, 2016 Order is

25   continued and the running of the statute of limitations for the foregoing offenses is suspended beginning

26   on December 23, 2015, the date on which the official request to Italy was made, and ending on the date

27   on which Italy takes final action on the request.

28

[PROPOSED] SECOND ORDER SUSPENDING THE RUNNING OF THE STATUTE OF LIMITATIONS UNDER 18 U.S.C. § 3292,
CASE NO. CR-14-90491MISC EMC       2

USAO 00003607

1    It is further ordered that the Clerk of the Court shall seal this Order, as well as the United States'

2   *Ex Parte* Application for an Order Suspending the Running of the Statute of Limitations and the

3   Declaration of AUSA Robert S. Leach in support thereof, pending further order of the Court.

4    IT IS SO ORDERED.

5   Dated: __6 / 7__, 2016

6

7
                                        THE HONORABLE EDWARD M. CHEN
8                                        United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] SECOND ORDER SUSPENDING THE RUNNING OF THE STATUTE OF LIMITATIONS UNDER 18 U.S.C. § 3292,
CASE NO. CR-14-90491MISC EMC          3

USAO 00003608