# EXHIBIT 38

1 | BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

2

3 | DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

4 | ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
5 | Assistant United States Attorneys

6 | 450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
7 | Telephone: (415) 436-7534
Fax: (415) 436-7234
8 | Robert.Leach@usdoj.gov
Adam.Reeves@usdoj.gov
9

Attorneys for United States of America

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

SAN FRANCISCO DIVISION

13

IN RE GRAND JURY INVESTIGATION ) Case No. CR 14-90491 MISC EMC
14 | NO. 2012R02242, )
)
15 | ) **UNDER SEAL**
)
16 | ) THE UNITED STATES'
) *EX PARTE* APPLICATION FOR AN
17 | ) ORDER SUSPENDING THE
) STATUTE OF LIMITATIONS
18 | ) PURSUANT TO 18 U.S.C. § 3292
_____ )

19        The United States respectfully applies, *ex parte*, for an order suspending the running of the

20 | statute of limitations for the offenses at issue in the above-referenced grand jury investigation.  This

21 | application is supported by the January 29, 2016 Declaration of AUSA Robert S. Leach (concurrently

22 | filed) and the legal authorities discussed below.  In this investigation, which centers on the sale of a

23 | software company in the United Kingdom to a major tech company in the Northern District of

24 | California, important evidence is located in foreign countries.  The United States has made official

25 | requests for that evidence to the foreign countries.  Pursuant to 18 U.S.C. § 3292, the Court should

26 | suspend the running of the statute of limitations for the offenses at issue during the pendency of the

27 | government's requests to the foreign countries for this evidence.  Because this application relates to an

28 | ongoing grand jury investigation, which is secret pursuant to Federal Rule of Criminal Procedure 6(e),

RECEIVED ORIGINAL FILED
JAN 29 2016      JAN 29 2016
SUSAN Y. SOONG      SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT      CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA      NORTHERN DISTRICT OF CALIFORNIA

1 the United States respectfully requests that the Court seal this application, the concurrently filed

2 declaration, and the concurrently submitted [Proposed] Order Suspending the Running of the Statute of

3 Limitations. *See* Criminal Local Rule 6-2(b).

**FACTUAL BACKGROUND**

5 **I.   The Investigation**

6      A grand jury in this district is conducting an investigation of former senior officers of Autonomy

7 Corporation plc ("Autonomy"), including former Chief Executive Officer Michael Lynch, former Chief

8 Financial Officer Sushovan Hussain, former Vice President of Finance Stephen Chamberlain, and

9 former Chief Operating Officer and General Counsel Andrew Kanter, for the following possible

10 criminal offenses: 15 U.S.C. §§ 78j(b) & 78ff (securities fraud), 18 U.S.C. § 371 (conspiracy), 18 U.S.C.

11 § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (securities fraud), and 18 U.S.C.

12 § 1349 (attempt and conspiracy). *See* Declaration of AUSA Robert S. Leach in Support of United

13 States' *Ex Parte* Application for an Order Suspending the Statute of Limitations Pursuant to 18 U.S.C.

14 § 3292, dated January 29, 2016 ¶ 2 ("Leach Decl."). To date, no indictment has been returned by the

15 grand jury. *Id.*

16      Autonomy was a software developer with dual headquarters in the United Kingdom and San

17 Francisco, California. *Id.* ¶ 4. Prior to October 2011, Autonomy was a publicly traded company whose

18 shares were listed on the London Stock Exchange. *Id.* As a public company, Autonomy issued

19 quarterly and annual financial statements that were disseminated to the public by means of interstate and

20 foreign wires. *Id.* In or about October 2011, Hewlett-Packard Company ("HP"), headquartered in Palo

21 Alto, California, bought Autonomy for approximately $11 billion. *Id.* Among other things, the grand

22 jury is investigating whether executives at Autonomy fraudulently inflated Autonomy's revenues in its

23 financial statements and whether HP was defrauded by executives at Autonomy because HP relied on

24 the alleged accuracy of Autonomy's financial statements in deciding to buy Autonomy. *Id.*

25      In its statements to the public, Autonomy claimed that its financial statements were prepared in

26 accordance with International Financial Reporting Standards ("IFRS"). *Id.* ¶ 5. Under IFRS, revenue

27

28

USAO 00002277

1  from the sale of Autonomy's software products should have been recognized only if the following

2  conditions were satisfied:

    (a)    the entity [i.e. Autonomy] has transferred to the buyer the
                significant risks and rewards of ownership of the goods;

    (b)    the entity retains neither continuing managerial involvement to the
                degree usually associated with ownership nor effective control
                over the goods sold;

    (c)    the amount of revenue can be measured reliably;

    (d)    it is probable that the economic benefits associated with the
                transaction will flow to the entity; and

    (e)    the costs incurred or to be incurred in respect of the transaction can
                be measured reliably.

*Id.* ¶ 5 (attaching Exhibit A at 3). Failure to comply with any of these five criteria would have required

that revenue on the transaction be deferred until all criteria were satisfied. Among other things, the

grand jury is investigating whether executives at Autonomy fraudulently inflated Autonomy's alleged

revenue by improperly recording revenue on software sales in violation of certain of the above-quoted

criteria in IFRS. *Id.* ¶ 6.

## II.    The Value Added Resellers or VARs

    More specifically, the grand jury is investigating, among other possible schemes, whether

executives at Autonomy used certain so-called "value added resellers" ("VARs") to carry out a scheme

to falsify Autonomy's financial statements by pretending Autonomy had complied with IFRS when it

really had not. From 2009 to 2011, Autonomy often recorded revenue on alleged sales to VARs who

purportedly bought the software for resale to a specific customer or "end user." *Id.*

    Evidence gathered by the grand jury indicates that Autonomy recognized revenues from sales to

certain VARs even though (1) Autonomy did *not* transfer the significant risks and rewards of ownership

of the goods; (2) Autonomy *did* retain continuing managerial involvement to the degree usually

associated with ownership or effective control over the goods sold; and (3) it was *not* probable that the

economic benefits associated with the transaction would flow to Autonomy. *Id.* Failure to comply with

one of these criteria – let alone all three – may have required Autonomy to defer any revenue from the

THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE STATUTE OF LIMITATIONS
PURSUANT TO 18 U.S.C. § 3292, CASE NO. CR-14-90491 MISC EMC

3

USAO 00002278

1 | relevant transaction.  Instead of doing that, however, the executives improperly recognized the revenue

2 | before the IFRS criteria were all satisfied thereby fraudulently inflating the company's alleged revenues.

3 |       The grand jury investigation extends to multiple VAR transactions which Autonomy may have

4 | used to improperly recognize revenue in this manner.  At least four of those VAR transactions involve

5 | evidence located in foreign countries.  Those four transactions involved the following entities: (1) Sales

6 | Consulting S.R.L. ("Sales Consulting"); (2) Microtechnologies, LLC ("MicroTech"); (3) Auxilium Tech

7 | S.R.L. ("Auxilium"); and (4) Red Ventures S.R.L. ("Red Ventures").  *Id.* ¶ 7.  Each transaction is

8 | described separately below:

9 | **A.**   <u>**Sales Consulting**</u>

10 |       In an agreement dated December 31, 2009, Autonomy allegedly licensed software to Sales

11 | Consulting, a VAR in Rome, Italy, for €1,500,000.  *Id.* ¶ 8 (attaching Exhibit B at HP-SEC-01406406-

12 | 01406413).  As a VAR, Sales Consulting agreed to resell the Autonomy software to Poste Italiane

13 | ("Poste"), in Italy, the so-called end-user specified in the license agreement.  *Id.*  Pursuant to the

14 | agreement, Sales Consulting was supposed to begin paying Autonomy 50% of the €1,500,000 on April

15 | 30, 2010, four months after the sale was executed.  *Id.* ¶ 8 (attaching Exhibit B at HP-SEC-01406411).

16 | On the basis of this alleged VAR transaction, Autonomy recognized €1,500,000 of the revenue for this

17 | sale to Sales Consulting in its Q4 2009 (Year End) financial statements dated February 3, 2010.  *Id.*

18 | ¶¶ 9-10 (attaching Exhibits C & D).

19 |       That was improper, however, because, in a separate letter or side agreement, also dated

20 | December 31, 2009, Autonomy's Andrew Kanter simultaneously promised Sales Consulting that:

21 |         • it would "receive a discount of €300,000 for this transaction" (drawing
22 |           into question whether the recognition of €1,500,000 in revenue was
reliable);

23 |         • Autonomy would consent to a resale to a different end-user than Poste
24 |           (drawing into question whether there was legitimate demand for the
software); and

25 |

26 |         • "Autonomy [would] take every effort to support Sales Consulting with
          respect to this transaction" (drawing into question whether Autonomy
27 |           really transferred to Sales Consulting the significant risks and rewards

28 |

USAO 00002279

of ownership of the software and whether it retained continuing managerial involvement).

*Id.* ¶ 8 (quoting Exhibit B at HP-SEC-01406414).  By itself, this side agreement suggests that Autonomy improperly recognized the €1,500,000 in revenue from the alleged sale to Sales Consulting because the sale violated multiple aspects of the IFRS revenue recognition criteria Autonomy said it followed.

Although the government seeks further evidence in Italy to verify this, it appears that, in the end, neither Autonomy nor Sales Consulting ever re-sold the software to Poste or any other end-user; and Sales Consulting never made any payments to Autonomy under the agreement.  *Id.* ¶ 10 (attaching Exhibit D).  Indeed, on or about May 24, 2010, Sales Consulting advised Autonomy that it had been placed into liquidation.  *Id.* ¶ 11 (attaching Exhibit E).  Given that Kanter knew Sales Consulting needed a discount and help selling the software, there is evidence that Autonomy had reason to doubt the probability that the economic benefits – all €1,500,000 – would actually flow to Autonomy.  This is another reason why recognizing all €1,500,000 was improper under IFRS.

For these reasons, the alleged VAR sale to Sales Consulting was a sham motivated by the discount and enticements in Kanter's side agreement.  All of which shows that recognizing €1,500,000 in revenue for this VAR transaction was improper under IFRS and that executives at Autonomy knew it. In this way, Autonomy defrauded HP and possibly others by their false claim that Autonomy's financial statements complied with IFRS.

**B.    MicroTech**

For two years, from at least 2008 to early 2010, Autonomy pursued another major transaction with Biblioteca Apostolica Vaticana ("BAV"), the Vatican Library, which is located in Vatican City State.  *Id.* ¶ 12 (Exhibit F).  If it actually closed, Autonomy software would be used to digitize and archive materials in the Vatican Library, a major coup for the company.  *Id.*

In or around February 2010, Autonomy contemplated partnering with Postecom, S.p.A. ("Postecom"), a subsidiary of Poste located in Rome, Italy, to act as a value added reseller which would resell Autonomy's archiving system to BAV.  *Id.* ¶ 13 (Exhibit G).  In late March 2010, Autonomy received a letter of intent between Postecom and BAV, which generally stated that Postecom had had

THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE STATUTE OF LIMITATIONS PURSUANT TO 18 U.S.C. § 3292, CASE NO. CR-14-90491 MISC EMC

5

USAO 00002280

1  preliminary discussions about possible involvement in the archiving project and intended to complete

2  verification activities necessary to complete a collaboration proposal. *Id.* ¶ 14 (attaching Exhibit H).

3  The letter of intent further suggested that BAV was seeking financing for the project. According to its

4  terms, the letter of intent was not binding on Postecom or BAV. *Id.* By March 31, 2010, when the Q1

5  2010 closed, Autonomy had no binding agreement with BAV or Postecom. *Id.*

6         Nevertheless, on April 1, 2010, one day *after* Q1 2010 had closed, Autonomy approached a

7  representative of MicroTech, another VAR based in Virginia, seeking MicroTech's agreement to pay

8  Autonomy $11 million for software, purportedly for resale to BAV. *Id.* ¶ 15 (attaching Exhibit I). On

9  April 1, 2010, MicroTech signed and returned an $11 million purchase order. *Id.* ¶ 16 (attaching Exhibit

10  J). The purchase order was backdated to March 31, 2010. *Id.*

11         On the basis of this backdated contract, Autonomy recognized $11 million in revenue. *Id.* ¶ 17

12  (attaching Exhibit K). But, MicroTech appears to have had no relevant contact with BAV and

13  undertook no efforts to sell Autonomy software to BAV. While it did make some payments to

14  Autonomy on the $11 million order, MicroTech did so with money from a roundtrip transaction with

15  Autonomy, whereby Autonomy made purchases from MicroTech (and a related party) and then

16  MicroTech made payments to Autonomy for the license to BAV. From April 2010 through 2011,

17  Autonomy continued to attempt to consummate a sale of software to BAV or an intermediary, but no

18  deal was reached. *Id.* Emails show that one of Autonomy's primary contacts at BAV was Monsignor

19  Cesare Pasini, who, according to the Vatican Library's website, is the Prefect of the Vatican Library. *Id.*

20  ¶ 18 (attaching Exhibit L). In and after December 2010, nearly *nine* months after Autonomy recognized

21  the $11 million in revenue from the sale to Microtech and falsely claimed no ongoing managerial

22  involvement with BAV, Lynch and Hussain personally met and corresponded with Monsignor Pasini

23  about the possible digitization project. *Id.* ¶ 19 (attaching Exhibits M, N, and O). These facts suggest

24  that Autonomy did not comply with IFRS, as it claimed, when it recognized the $11 million in revenue,

25  because, among other problems, the significant risks and rewards of ownership of the software never

26  really transferred from Autonomy to MicroTech.

27

USAO 00002281

C.   **Auxilium**

On top of that, Autonomy recognized another €1,300,000 in revenue in Q1 2010 based on another backdated contract relating to BAV, this time an alleged license agreement with Auxilium, another VAR in Rome, Italy. On or about April 11, 2010, Kanter was asked to prepare a draft license agreement between Autonomy and Auxilium, which he backdated to March 31, 2010. *Id.* ¶¶ 20-21 (attaching Exhibits P & Q at HP-SEC-01596378-80). Ultimately, Auxilium signed a product schedule, dated March 31, 2010, to pay €1,300,000 for the right to sublicense Autonomy software to BAV for a specified number of users and to pay €125,000 in support and maintenance. *Id.* ¶ 22 (attaching Exhibit R). But Auxilium made no payments to Autonomy and Auxilium does not appear to have made any sale of Autonomy software to BAV. *Id.* All of which again draws into question whether the significant risks and rewards of ownership of the software ever really transferred from Autonomy to Auxilium in compliance with IFRS.

Even though neither deal was completed in the quarter, Autonomy recognized $11 million in revenue on the MicroTech transaction and €1,300,000 on the Auxilium transaction in Q1 2010. This fraudulently recognized revenue enabled Autonomy to meet the earnings expectations of analysts following Autonomy stock. *Id.* ¶ 23 (attaching Exhibit S at 1).

D.   **Red Ventures**

Finally, Autonomy recognized revenue on a license agreement, dated September 30, 2010, whereby Autonomy purported to license software to Red Ventures for €2,000,000 for resale to Poste. Documents produced in the investigation reflect that Red Ventures was located in Italy. *Id.* ¶ 24 (attaching Exhibit T). Payment under the agreement was due beginning December 2010. Red Ventures made no payments by that date, or at any point. Red Ventures does not appear to have made any sale of the listed software to Poste, nor did Autonomy ever consummate a sale of such software to Poste. Autonomy appears to have been attempting to sell software directly to Poste prior to September 30, 2010, and after the purported sale to Red Ventures. The continued involvement of Autonomy with Red Ventures after September 30, 2010 suggests, again, that Autonomy retained ongoing managerial

USAO 00002282

1  involvement in the sale, which along with Red Ventures' failure to pay undermines the company's claim

2  that the €2,000,000 was properly recognized as revenue. *Id.*

3  **II.    The Official Requests for Evidence in the Vatican City State and Italy**

4      Based on the above, it reasonably appears that evidence of the offenses under investigation is

5  located in the Vatican City State and Italy.

6      **A.    The Official Request to the Holy See and the Vatican City State**

7      On August 10, 2015, the Embassy of the United States of America to the Holy See delivered a

8  Diplomatic Note, No. 143-2015, to the Secretariat of State for the Holy See and the Vatican City State.

9  *Id.* ¶ 25 & Ex. U.[1]  The Diplomatic Note stated that:

10          [T]he United States Attorney's Office (USAO) and the Federal Bureau of
            Investigation (FBI) are currently investigating the financial reporting of
11          Autonomy . . . . As part of the investigation, the USAO and FBI are
            requesting information concerning a potential transaction in 2010
12          connected to the Vatican Apostolic Library [BAV].  The Embassy
            respectfully asks if Monsignor Cesare Pasini, Prefect of the Vatican
13          Apostolic Library, would be willing to speak to investigators from the
            USAO and FBI about this investigation.
14

15  *Id.*  The Diplomatic Note attached a list of questions and documents the USAO and FBI wished to

16  discuss. *Id.*

17      On or about October 8 2015, the Secretariat of State responded via a Note Verbale,

18  acknowledging the Diplomatic Note "of 10 August 2015, transmitting the request of the [USAO and

19  FBI] to interview Monsignor Cesare Pasini" *Id.* ¶ 26 & Ex. V.  The Note Verbale stated:

20          The Secretariat of State . . . will willingly consider how to assist in the
            question raised once the Secretariat has received, through normal
21          diplomatic channels, a formal request of international judicial assistance
            from the competent American judicial authorities, which must include the
22          questions to be posed to Monsignor Pasini.  As the Holy See does not
            allow representatives of the Requesting Party to participate in the
23          interview, the questioning will be conducted by judges of the Vatican
            Tribunal.
24

25  *Id.*

26

___

27      [1]    There is no treaty between the Vatican City States and the United States providing for mutual legal assistance.

28  THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE STATUTE OF LIMITATIONS
PURSUANT TO 18 U.S.C. § 3292, CASE NO. CR-14-90491 MISC EMC

On January 14, 2016, the Embassy of the United States of America to the Holy See delivered a Diplomatic Note, No. 3-2016, to the Secretariat of State, enclosing a Request for International Judicial Assistance from the Office of International Affairs of the Department of Justice ("OIA"). *Id.* ¶ 27 & Ex. W. The Request sought the production of the following records of BAV during the period December 2009 to October 2011:

- All agreements, memoranda of understanding, and/or letters of intent with Autonomy, Postecom, Poste Italiane, Auxilium, and/or any purported reseller of Autonomy software.

- All communications (including e-mails and correspondence) with Autonomy relating to any sale to Autonomy software.

- All communications (including e-mails and correspondence) with the following entities relating to Autonomy: Postecom, Poste Italiane, Auxilium, and/or any purported reseller of Autonomy software.

- All communications relating to Lynch, including communications relating any possible or actual financial donations, contributions, or funding to any foundation to benefit BAV or the Vatican City State.

*Id.* The Request also seeks testimony of Monsignor Pasini and another BAV witness believed to have information about BAV's dealings with Autonomy and provides a list of questions. *Id.* The Secretariat of State has requested a translated version of the request, which is being prepared, and has yet to provide a substantive response. *Id.*

**B.    The Official Request to Italy**

On December 23, 2015, OIA made an official request to the Central Authority of Italy for legal assistance in obtaining evidence, pursuant to the 2006 U.S.-Italy Mutual Legal Assistance Instrument ("Instrument"). *Id.* ¶ 28. A copy of the letter transmitting the request, which at the time had not been translated into Italian, is attached to the Leach Declaration as Exhibit X. On January 4, 2016, OIA delivered a translated version of the request to the Central Authority of Italy. *Id.* ¶ 29. A copy of the letter transmitting the translated version of the request is attached to the Leach Declaration as Exhibit Y. The request seeks business records, including agreements, correspondence, and e-mails, from Sales

THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE STATUTE OF LIMITATIONS PURSUANT TO 18 U.S.C. § 3292, CASE NO. CR-14-90491 MISC EMC

9

USAO 00002284

1  Consulting, Auxilium, Red Ventures, Postecom, and Poste, which will evidence whether Autonomy

2  appropriately recorded revenue on the transactions. *Id.* ¶ 29.  Specifically, the request seeks:

- From Sales Consulting, for the period December 2009 to October 2011, all agreements with Poste and/or Autonomy; all communications with Autonomy relating to any sale to Sales Consulting and/or any resale of Autonomy software by Sales Consulting; all communications with Poste relating to any sale of Autonomy software; all documents reflecting efforts by Sales Consulting to resell Autonomy software; and financial statements for the periods ended December 31, 2009, 2010, and 2011.

- From Auxilium, for the period December 2009 to October 2011, all agreements with BAV (or any other unit/agency of the Vatican City State and/or Holy See) and/or Autonomy; all communications with Autonomy relating to any sale to Auxilium and/or any resale of Autonomy software by Auxilium; all communications with BAV or Postecom relating to any sale of Autonomy software; all documents reflecting efforts by Auxilium to resell Autonomy software; and financial statements for the periods ended December 31, 2009, 2010, and 2011.

- From Postecom, for the period December 2009 to October 2011,  all agreements with BAV relating to Autonomy; all agreements with Autonomy; all communications with Autonomy relating to any sale of software to BAV; all communications with BAV relating to any sale of Autonomy software; and all documents reflecting efforts by Auxilium and/or Postecom to resell Autonomy software.

- From Red Ventures, for the period December 2009 to October 2011, all agreements with Poste and/or Autonomy; all communications with Autonomy relating to any sale of software to Poste and/or any resale of Autonomy software by Red Ventures; all communications with Poste relating to any sale of Autonomy software; all documents reflecting efforts by Red Ventures to resell Autonomy software; and financial statements for the periods ended December 31, 2009, 2010, and 2011.

- From Poste, for the period December 2009 to October 2011, all agreements with Sales Consulting, Red Ventures, and/or Autonomy; all communications with Autonomy relating to any sale of certain software to Poste; and all communications with Sales Consulting and/or Red Ventures relating to any sale and/or resale of Autonomy software.

*Id.* ¶ 29.  Italy has not yet responded to the MLAT.  *Id.*

28  THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE STATUTE OF LIMITATIONS
PURSUANT TO 18 U.S.C. § 3292, CASE NO. CR-14-90491 MISC EMC
10

USAO 00002285

1

<u>**LEGAL ANALYSIS**</u>

2    I.      <u>**The Relevant Statute**</u>

3            Title 18, United States Code, Section 3292 provides:

4                   (a)(1)  Upon application of the United States, filed before return of an
                    indictment, indicating that evidence of an offense is in a foreign country,
5                   the district court before which a grand jury is empaneled to investigate the
                    offense shall suspend the running of the statute of limitations for the
6                   offense if the court finds by a preponderance of the evidence that an
                    official request has been made for such evidence and that it reasonably
7                   appears, or reasonably appeared at the time the request was made, that
                    such evidence is, or was, in such foreign country.
8

9                   (2)  The court shall rule upon such application not later than thirty days
                    after the filing of the application.
10

11                  (b)  Except as provided in subsection (c) of this section, a period of
                    suspension under this section shall begin on the date on which the official
12                  request is made and end on the date on which the foreign court or
                    authority takes final action on the request.
13

14                  (c)  The total of all periods of suspension under this section with respect to
                    an offense—
15

16                          (1)  shall not exceed three years; and

17                          (2)  shall not extend a period within which a criminal case must be
                            initiated for more than six months if all foreign authorities take
18                          final action before such period would expire without regard to
                            this section.
19

20                  (d)  As used in this section, the term "official request" means a letter
                    rogatory, a request under a treaty or convention, or any other request for
21                  evidence made by a court of the United States or an authority of the
                    United States having criminal law enforcement responsibility, to a court or
22                  other authority of a foreign country.

23    For the reasons set forth here, the evidence in this case supports an order suspending the

24    statute of limitations in this case for the period authorized by 18 U.S.C. § 3292.

25

26

27

28    <small>THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE STATUTE OF LIMITATIONS
      PURSUANT TO 18 U.S.C. § 3292, CASE NO. CR-14-90491 MISC EMC</small>

11

USAO 00002286

1  **II.   The Statute of Limitations Should Be Suspended Because Official Requests Have Been Made for Evidence in Foreign Countries**

2

3          A suspension of the running of the statute of limitations is appropriate when the district court

4  finds, by a preponderance of the evidence, "that (1) an official request has been made for the evidence

5  and (2) it reasonably appears or appeared at the time the request was made that the evidence of the crime

6  is or was in a foreign country." *United States v. Jenkins*, 633 F.3d 788, 797 (9th Cir. 2011).  The

7  Section 3292 preponderance standard is quite broad and may be satisfied by "'something of evidentiary

8  value . . . tending to prove it reasonably likely that evidence of the charged offenses is in a foreign

9  country.'"  *Id.* at 798 (alteration in original) (quoting *United States v. Trainor*, 376 F.3d 1325, 1332-34

10  (11th Cir. 2004)).  For example, in *Jenkins*, the Ninth Circuit held that a suspension order was

11  adequately supported by the sworn declaration of a person knowledgeable about the grand jury

12  investigation and the evidence already recovered "tending to indicate that further evidence of the

13  offenses was abroad." *Id.*

14          The Ninth Circuit has interpreted the term "evidence" in Section 3292 broadly and in light of

15  "the reality of grand jury investigations."  *DeGeorge v. United States District Court*, 219 F.3d 930, 937

16  (9th Cir. 2000) ("*DeGeorge I*"); *United States v. DeGeorge*, 380 F.3d 1203, 1213-14 (9th Cir. 2004)

17  ("*DeGeorge II*").  In *DeGeorge I*, the Ninth Circuit denied a mandamus petition by a defendant seeking

18  to vacate a district court order denying his motion to dismiss certain counts as time barred.  The

19  defendant argued the government's Section 3292 application was invalid because "evidence" in Section

20  3292 means admissible, documentary, evidence that is unobtainable in the United States and essential to

21  bringing charges.  The Ninth Circuit stated that the defendant's interpretation was "entirely without

22  textual support in the statute." *DeGeorge I*, 219 F.3d at 937.  Noting that grand jury investigations are

23  "'unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal

24  trials,'" the Ninth Circuit observed that "Congress could have limited the type of evidence the

25  government could seek pursuant to section 3292 in the manner DeGeorge suggests above, but it did

26  not." *Id.* at 938 (quoting *United States v. Calandra*, 414 U.S. 338, 343 (1974)).  Although the Ninth

27  Circuit noted that the government's official request was for both documents and testimonial evidence,

28  The United States' *Ex Parte* Application for an Order Suspending the Statute of Limitations Pursuant to 18 U.S.C. § 3292, Case No. CR-14-90491 MISC EMC

12

USAO 00002287

1   the Ninth Circuit also observed that the statute clearly was not cabined only to "documentary evidence";

2   it wrote: "because Congress used the unlimited word 'evidence' in section 3292(a)(1), not 'foreign

3   records,' this aspect of the statute is plain, and we disregard DeGeorge's legislative history argument

4   [that "evidence" means "documentary evidence"]." *Id.* Ultimately the Ninth Circuit concluded the

5   district court's interpretation of "evidence" for purposes of Section 3292 was not clearly erroneous and

6   denied the mandamus petition.

7          In *DeGeorge II*, the defendant raised essentially the same arguments on direct review, which the

8   Ninth Circuit reviewed anew because a more deferential standard of review applied in *DeGeorge I*.

9   *DeGeorge II*, 380 F.3d at 1213. The defendant argued that the Section 3292 order was invalid because

10  the evidence sought was already in the government's possession and was not material or essential to the

11  charges. The Ninth Circuit again rejected DeGeorge's arguments and stated: "Regardless of whether it

12  would be good policy to impose the requirements urged by DeGeorge before allowing suspension of the

13  statute of limitations, Congress did not do so." *Id.*

14         An application for an order pursuant to 18 U.S.C. § 3292 is appropriately made *ex parte* to the

15  court for the district in which the grand jury investigation is taking place. *See DeGeorge I*, 219 at 937

16  (finding "no basis" for argument that a Section 3292 application cannot be made ex parte); *DeGeorge II*,

17  380 F.3d at 1213-14.

18         An application under Section 3292 must be made prior to the return of an indictment. *See United*

19  *States v. Miller*, 830 F.2d 1073, 1076 (9th Cir. 1987) ("The statute itself specifies the only relevant time

20  the application must be made: 'before return of an indictment.'"). The period of suspension begins on

21  the date on which the official request was made. *See* 18 U.S.C. § 3292(b). "The statute plainly

22  contemplates that the starting point for tolling the limitations period is the official request for evidence,

23  not the date the § 3292 motion is made or granted." *United States v. Bischel*, 61 F.3d 1429, 1434 (9th

24  Cir. 1995); *see also Jenkins*, 633 F.3d at 799 ("[T]he only temporal requirements of a § 3292 application

25  are (1) that the official request for evidence in a foreign country be made before the statute of limitations

26  expires and (2) that the application for suspension be submitted to the district court before the indictment

27  is filed.").

28  THE UNITED STATES' *EX PARTE* APPLICATION FOR AN ORDER SUSPENDING THE STATUTE OF LIMITATIONS
     PURSUANT TO 18 U.S.C. § 3292, CASE NO. CR-14-90491 MISC EMC
                                               13

USAO 00002288

1  The period of suspension ends on "the date on which the foreign court or authority takes final

2  action on the request." 18 U.S.C. § 3292(b).  A foreign country is not deemed to have taken "final

3  action" on an official request until it has made a "dispositive response" – that is, "disposition, up or

4  down, of each of the items" in the official request.  *Bischel*, 61 F.3d at 1434; *see Jenkins*, 633 F.3d at

5  800; *United States v. Hagege*, 437 F.3d 943, 955-56 (9th Cir. 2006).

6  **A.     The Statute of Limitations Should Be Suspended from August 10, 2015
7            Until the Vatican City State Takes Final Action**

8  Here, the statutory elements for issuance of an order under Section 3292 are satisfied, based on

9  the August 10, 2015 Diplomatic Note, which requested witness statements from Monsignor Pasini.

10  First, the Diplomatic Note meets the definition of "official request" because it is a "request for

11  evidence" "made by" "an authority of the United States having criminal law enforcement responsibility"

12  to an "authority of a foreign country."  *See* 18 U.S.C. § 3292(d).  Under the statute, "official requests"

13  are not limited to letters rogatory or treaty requests, but also include "*any other request* for evidence" by

14  DOJ (which unquestionably has criminal law enforcement responsibility) to a foreign authority.  *Id.*

15  (emphasis added).  Nothing more under the statute is required.  In any event, the Diplomatic Note was a

16  form of a letter rogatory or treaty request because it was an official communication between the

17  Embassy of the United States to the Holy See and the Secretariat of State to the Vatican, bearing an

18  official seal and an assigned number, all of which distinguish the Diplomatic Note from routine,

19  informal forms communication.  Moreover, there is no MLAT between the United States and the

20  Vatican City State and thus no means, other than Diplomatic Note, to secure its assistance.

21  Second, it reasonably appears Monsignor Pasini is in the Vatican City State, based on publicly

22  available information and the Note Verbale.  In addition, documents already produced in the

23  investigation demonstrate that he has relevant information relating to transactions under investigation.

24  For these reasons, the Court should find that an official request has been made to the Vatican

25  City State for evidence of the offenses under investigation and that it reasonably appears that such

26  evidence is in the Vatican City State.  The Court should further suspend the statute of limitations for

27  such offenses beginning August 10, 2015, the date of the official request.

28

USAO 00002289

**B.      The Statute of Limitations Should Also Be Suspended from December 23, 2015 Until Italy Takes Final Action**

The statutory elements for issuance of an order under Section 3292 are also satisfied based on the MLAT to Italy.  The MLAT is an official request because it is "a request under a treaty or convention" and a "request for evidence made by . . . an authority of the United States having criminal law enforcement responsibility, to . . . [an] authority of a foreign country."  In addition, it reasonably appears that evidence of the offenses – business records of Italian resellers and their supposed customers in Italy and the Vatican City State – is located in Italy.

For these reasons, the Court should find that an official request has been made to the Italy for evidence of the offenses under investigation and that it reasonably appears that such evidence is in Italy.  The Court should further suspend the statute of limitations for such offenses beginning December 23, 2015, the date OIA delivered the untranslated version of the official request, or, at the latest, January 4, 2016, the date OIA delivered the translated version of the official request.

## CONCLUSION

Based on the foregoing, the United States respectfully requests that the Court grant the application and enter the proposed order suspending the statute of limitations under 18 U.S.C. § 3292 beginning on August 10, 2015, based on the official request to the Vatican City State.  The Court should also suspend the statute of limitations beginning on December 23, 2015, based on the official request to Italy.  Further, because the grand jury investigation is ongoing, and premature disclosure of its existence, nature, and focus could have an adverse impact on it, the United States requests that the Court file this application, the accompanying declaration, and any order under seal until further order of the Court.

Dated:  January 29, 2016

Respectfully Submitted,

BRIAN J. STRETCH
Acting United States Attorney

ROBERT S. LEACH
ADAM A. REEVES
Assistant United States Attorneys

USAO 00002290