Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437

Jonathan M. Baum (SBN: 303469)
**Steptoe & Johnson LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten (Admitted Pro Hac Vice)
Brian M. Heberlig (Admitted Pro Hac Vice)
Michelle L. Levin (Admitted Pro Hac Vice)
Nicholas P. Silverman (Admitted Pro Hac Vice)
Dwight J. Draughon (Admitted Pro Hac Vice)
Drew C. Harris (Admitted Pro Hac Vice)
**Steptoe & Johnson LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

*Attorneys for Defendant*
*Michael Richard Lynch*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN,

Defendants.

Case No.: 3:18-cr-00577-CRB

Judge: Hon. Charles Breyer

**DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO DISMISS COUNTS ONE THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT**

Date: November 29, 2023
Court: Courtroom 6 – 17th Floor
Date Filed: October 24, 2023
Trial Date: March 18, 2024

# TABLE OF CONTENTS

**Page Nos.**

**I. SUMMARY OF ARGUMENT ........ 1**

**II. ARGUMENT ........ 3**

A. Count One Is Duplicitous and Dismissal Is the Only Adequate Remedy ........ 3

1. Each Scheme Is Impermissibly Extraterritorial and Cannot Serve as a Basis of Conviction ........ 3

2. Count One Does Not Allege a Single Overall Conspiracy ........ 6

3. The Only Appropriate Remedy Is Dismissal ........ 9

B. Counts Two Through Fifteen Are Impermissibly Extraterritorial and Therefore Must Be Dismissed ........ 10

C. Count Sixteen Fails to State an Offense and Must Be Dismissed ........ 12

**III. CONCLUSION ........ 16**

**TABLE OF AUTHORITIES**

**Page Nos.**

**Cases**

*Bascuñán* v. *Elsaca*,
927 F.3d 108 (2d Cir. 2019) ........ 10

*Ciminelli* v. *United States*,
143 S. Ct. 1121 (2023) ........ 3, 12, 14, 15

*Gross* v. *Damon Corp*,
No. 94-cv-4457 (RPP), 1995 WL 138612 (S.D.N.Y. Mar. 29, 1995) ........ 7

*Hamling* v. *United States*,
418 U.S. 87 (1974) ........ 12

*Kelly* v. *United States*,
140 S. Ct. 1565 (2020) ........ 3, 12, 14

*Morrison* v. *Nat'l Australia Bank Ltd.*
561 U.S. 247 (2010) ........ 4

*Richards* v. *Jefferson County*,
517 U.S. 793 (1996) ........ 1, 5–6

*S.E.C.* v. *Gruss*,
859 F. Supp. 653 (S.D.N.Y. 2012) ........ 4, 5

*S.E.C.* v. *World Cap. Mkt.*,
864 F.3d 996 (9th Cir. 2017) ........ 5

*S.E.C.* v. *Worldcom Inc.*,
No. 02-cv-4963 (JSR), 2003 WL 22004827 (S.D.N.Y. Aug. 26, 2003) ........ 7

*United States* v. *Arbelaez*,
719 F.2d 1453 (9th Cir. 1983) ........ 6

*United States* v. *Blaszczak*,
56 F.4th 230 (2d Cir. 2022) ........ 6

*United States* v. *Bryan*,
868 F.2d 1032 (9th Cir. 1989) ........ 6

*United States* v. *Fernandez*, 388 F.3d 1199 (9th Cir. 2004) .......... 6

*United States* v. *Garlick*, 240 F.3d 789 (9th Cir. 2019) .......... 4

*United States* v. *Hussain*, 972 F.3d 1138 (9th Cir. 2020) .......... *passim*

*United States* v. *Hussain*, CR 16-462 CRB, 2017 WL 4865562 (N.D. Cal., Oct. 27, 2017) .......... 5

*United States* v. *Moran*, 759 F.2d 777 (9th Cir. 1985) .......... 8

*United States* v. *Morse*, 785 F.2d 771 (9th Cir. 1986) .......... 7

*United States* v. *Newman*, 664 F.2d 12 (2d Cir. 1981) .......... 7

*United States* v. *Zavala*, 839 F.2d 523 (9th Cir. 1988) .......... 12

**Statutes**

Securities Exchange Act Section 10(b), 15 U.S.C. § 78(j) .......... 4

Securities Act Section 17(a), 15 U.S.C. § 78(q) .......... 4

18 U.S.C. § 2 .......... 14

18 U.S.C. § 1343 .......... 13, 14

18 U.S.C. § 1348 .......... 13, 14

**Rules**

FED. R. CRIM. P. 7(c)(1) .......... 2, 11, 12

## I. SUMMARY OF ARGUMENT

In his opening brief, Dr. Lynch established that the conspiracy alleged in Count One is duplicitous in a way that masks that each conspiracy within that count is impermissibly extraterritorial. That duplicity, Dr. Lynch further argued, also undermines Counts Two through Fifteen, which are also extraterritorial. And Count Sixteen must be dismissed because it fails to allege that Dr. Lynch intentionally engaged in securities fraud in connection with HP's securities.

In response, the government focuses on Dr. Lynch's duplicity argument without meaningfully contesting the extraterritoriality of its alleged schemes, insisting the conspiracy in Count One holds together even though the two alleged schemes are contradictory. The government also asserts that Dr. Lynch's arguments are somehow foreclosed by the prior proceedings involving Sushovan Hussain, Autonomy's former CFO who was convicted of wire fraud and securities fraud in 2018. *See generally United States* v. *Hussain*, CR 16-462 CRB (N.D. Cal.). At the pretrial conference on June 27, 2023, however, the Court made clear that there is no "rule of the case" based on the *Hussain* proceedings. Pretrial Conference Tr. 12, June 27, 2023 (ECF No. 191). Nor could there be such a "rule of the case," because "it would violate the Due Process Clause . . . to bind [Dr. Lynch] to a judgment rendered in an earlier litigation to which [he was] not part[y]." *Richards* v. *Jefferson County*, 517 U.S. 793, 794 (1996). Yet the government hides behind the *Hussain* proceedings rather than meeting Dr. Lynch's arguments head on.

Contrary to the government's claim, the Ninth Circuit's decision in *United States* v. *Hussain*, 972 F.3d 1138 (9th Cir. 2020), does not "foreclose[] [Dr. Lynch's] argument that Count 1 offends the presumption against extraterritoriality," Gov. Opp. (ECF No. 235) 1, because the Ninth Circuit did not consider extraterritoriality in the context of Dr. Lynch's duplicity argument. Nor has this Court "found 'dubious' Hussain's insistence the indictment there alleged 'two different schemes,'" *id.* at 1; the Court's observation in a footnote could not have decided the duplicity issue, which was not raised or briefed. Thus, the Court had no occasion to consider

Dr. Lynch's argument that Count One alleges two separate, contradictory schemes, and that those separate schemes are impermissibly extraterritorial. The first, a conspiracy to defraud Autonomy shareholders, alleges an agreement to inflate Autonomy's share price. But this agreement to inflate the share price would undermine the goal of the second conspiracy, which alleges an agreement to mispresent Autonomy's value in order to induce Bidco to acquire it, because any efforts to inflate Autonomy's share price would make it a less attractive acquisition target for Bidco. Count One is therefore duplicitous. Moreover, each conspiracy, properly viewed on its own, is impermissibly extraterritorial and cannot serve as a basis for conviction. Count One must be dismissed.

Nor does the Ninth Circuit's decision in "*Hussain* foreclose[] [Dr. Lynch's] extraterritoriality challenge," to Counts Two through Fifteen, as the government asserts. Gov. Opp. 1. The government ignores the fact that Dr. Lynch's challenge builds on his duplicity challenge to Count One, a challenge that was not presented to the Ninth Circuit. The government does not dispute that some of these substantive counts relate to the alleged Autonomy shareholder scheme and others relate to the alleged Bidco scheme. In each instance, the Superseding Indictment ("SI") fails to plausibly allege that the wires actually furthered the scheme to which it relates. Counts Two through Fifteen should therefore be dismissed as well.

Regarding Count Sixteen, the government again argues that the charge should be upheld because it "mirrors the . . . offense that was affirmed in *Hussain*." Gov. Opp. 1. The government even chides Dr. Lynch for not discussing the Ninth Circuit's decision in *Hussain*. *Id.* at 11. But the issue in the *Hussain* appeal was the sufficiency of the evidence against Mr. Hussain, and the Court's ruling on that issue plainly cannot have any relevance to Dr. Lynch, nor can it foreclose his argument that Count Sixteen does not meet the pleading standards of FED. R. CRIM. P. 7(c)(1). Count Sixteen is defective because it fails to provide the essential facts necessary to apprise Dr. Lynch of the crime charged, namely, the manner in which Dr. Lynch allegedly intended to defraud purchasers of HP securities—as opposed to Autonomy shares—and to obtain money or property by means of false or fraudulent pretenses in connection with

purchases of HP securities. Moreover, Count Sixteen cannot plausibly make such an allegation, as Dr. Lynch explained in his motion to dismiss, because Dr. Lynch allegedly defrauded HP and could, at most, have affected only HP shareholders' right to control their assets, which does not amount to a property right. Def. MTD (ECF No. 218) 22–23. The Ninth Circuit's decision in *Hussain* obviously did not consider Dr. Lynch's attack on Count Sixteen, which relies in part on two Supreme Court decisions—*Kelly* and *Ciminelli*—that were decided after *Hussain* was decided. Count Sixteen should also be dismissed.

## II. ARGUMENT

### A. Count One Is Duplicitous and Dismissal Is the Only Adequate Remedy

#### 1. Each Scheme Is Impermissibly Extraterritorial and Cannot Serve as a Basis of Conviction

The government devotes its opposition to Dr. Lynch's motion to dismiss Count One to disputing that Count One is duplicitous. The government thus does not seriously contest that, viewed separately, the alleged scheme to defraud ordinary purchasers and sellers of Autonomy shares on the London Stock Exchange and the alleged scheme to defraud Bidco are impermissibly extraterritorial. As Dr. Lynch explained in his motion to dismiss, the alleged scheme to defraud Autonomy shareholders from 2009 to 2011 lacked virtually any connection to the United States. The alleged "means and methods" of the scheme, according to the SI, all comprise conduct in England, Def. MTD 12–13, and actions core to the scheme—including decisions about whether to recognize revenue and announcements to the market—occurred entirely in England. *Id.* at 13–14. Against that backdrop, Autonomy's relatively few contacts with the United States were irrelevant to the alleged scheme, and the alleged wire transactions were likewise incidental to the scheme, rather than in furtherance of it. *Id.* at 12–14.

The government has no response to this characterization of the Autonomy shareholder scheme as extraterritorial. Nor does the government seriously contest that it could or would have brought charges based on the Autonomy shareholder scheme if Bidco had never purchased Autonomy. Under *Morrison*'s two-step inquiry, it cannot be said that the isolated wire transfers

the government identifies in Counts Two, Three, and Six through Eight—the only wire communications specified anywhere in the SI that appear to relate to the Autonomy shareholder scheme—were anything but incidental to that scheme.[1] To qualify as sufficiently domestic to meet the "focus" of the wire fraud statute, however, the wire communications must at minimum be "in furtherance of," and not merely incidental to, the fraudulent scheme. Def. MTD at 11 (citing *United States* v. *Garlick*, 240 F.3d 789, 792 (9th Cir. 2019)). A conspiracy alleging solely a scheme to defraud Autonomy shareholders (without Bidco in the picture) would not have survived an extraterritoriality analysis under *Morrison* and would have been subject to dismissal.[2] It follows that the Autonomy shareholder scheme—standing alone—would be an improper basis of conviction.

---

[1] While some of the overt acts listed in Count One may involve wire communications in the United States, the overt acts do not include any specificity about those communications, much less does the SI explain how those overt acts furthered the alleged scheme to defraud purchasers and sellers of Autonomy shares on the London Stock Exchange.

[2] In a bizarre footnote, the government suggests that the Supreme Court's decision in *Morrison* has no relevance, apparently because Congress attempted to broaden the extraterritorial reach of Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act after that decision was announced. Gov. Opp. 7 n.2. But the MTD does not rely upon *Morrison* to suggest anything about the extraterritorial reach of the Securities Act or the Securities Exchange Act. Instead, Dr. Lynch relies on *Morrison* for the two-part test that it announced to determine whether a particular application of a statute is impermissibly extraterritorial. *See, e.g.*, Def. MTD 10 ("Determining whether a statute applies to extraterritorial conduct involves a two-part inquiry") (citing *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265–66 (2010)). The government argues that the Ninth Circuit's decision in *Hussain* controls. Gov. Opp. 7 n.2. But *Hussain* itself cites *Morrison* for the exact same reason that Dr. Lynch cites it. *See Hussain*, 972 F.3d at 1142 ("In *Morrison* [], the Supreme Court devised a two-step framework for analyzing issues of extraterritoriality") (internal citation omitted). It is difficult to see how citing *Morrison* is somehow improper.

Moreover, even if it were true, as the government asserts, Gov. Opp. 7 n.2, that Congress overruled *Morrison* as to enforcement actions by the United States and the SEC under Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act—a proposition about which there has been considerable debate in the courts, *see, e.g., SEC* v. *Gruss,* 859 F. Supp. 2d 653, 664 n.4 (S.D.N.Y. 2012) (observing that Section 929P "may have restored the Second Circuit's 'conduct and effects' test for actions brought by the SEC or the [DOJ]"), and no

The alleged scheme to defraud Bidco likewise does not withstand scrutiny for being impermissibly extraterritorial. As Dr. Lynch explained in his MTD, Def. MTD 15–16, HP designed its acquisition of Autonomy to be extraterritorial, and the resulting Bidco scheme has scant touchpoints to the United States. The government does not dispute that early meetings between HP and Autonomy amounted to no more than generic meet-and-greets, or that the due diligence process in mid-2011 was conducted in the U.K. under U.K. law, or that the purchase of Autonomy was made in foreign currency with money flowing through foreign banks. Moreover, the wires the government identifies in Counts Four, Five, and Eight through Fifteen were, at best, incidental to the alleged scheme. Once again, viewed in isolation, the Bidco scheme does not pass muster under *Morrison* and should not serve as a basis for conviction.

Instead of disputing Dr. Lynch's extraterritoriality argument as to each scheme, the government suggests that the Court has "rejected similar analysis in *Hussain*." Gov. Opp. 6. This argument fails for a number of reasons. First, the Court did no more in *Hussain* than express skepticism in a footnote and in passing about the existence of two separate schemes. Mr. Hussain did not make a duplicity argument, and the Court therefore did not need to examine each scheme in isolation. Indeed the Court concluded by saying it "need not decide the issue" because of its ruling on Hussain's extraterritoriality argument, which attacked the alleged conspiracy as a whole. *See* Order Denying Motion to Dismiss, *United States* v. *Hussain*, CR 16-462 CRB, 2017 WL 4865562, at *5 n.3 (N.D. Cal. Oct. 27, 2017) (ECF No. 129). Second, as the Court made clear at the June 27, 2023 pretrial conference, there is no "rule of the case" based on the *Hussain* proceedings, June 27 Hr'g Tr. 12, and any effort to bind Dr. Lynch based on proceedings to which he was not a party would violate the Due Process Clause. *See Richards*,

---

decision in the Ninth Circuit, *see SEC* v. *World Cap. Mkt., Inc.*, 864 F.3d 996, 1008 n.10 (9th Cir. 2017)—the government would still have to satisfy the "conduct and effects" test that predated *Morrison* and that was codified in Dodd-Frank. The government does not argue (nor could it) that the Autonomy shareholder scheme—where the alleged conduct occurred almost exclusively in England and the effects were likewise felt by purchasers and sellers of Autonomy shares on the London Stock Exchange—would meet the "conduct and effects" test.

517 U.S. at 794. Dr. Lynch is advancing arguments that have not been previously considered while preserving his challenges to issues that have been decided. Dr. Lynch's duplicity argument, which exposes the extraterritorial nature of the allegations in Count One, is not an argument that has been advanced previously, and Dr. Lynch deserves to have that argument considered on its own merits.

**2. Count One Does Not Allege a Single Overall Conspiracy**

The two separate schemes cannot be lumped together into a single conspiracy. Multiple Ninth Circuit cases make clear that a conspiracy count involving multiple schemes or actions is duplicitous absent a single, "overall agreement." *See, e.g.*, *United State*s v. *Fernandez*, 388 F.3d 1199, 1226 (9th Cir. 2004) ("A single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators"); *United States* v. *Arbelaez*, 719 F.2d 1453, 1457 (9th Cir. 1983) (holding that duplicity analysis turns on "whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy"). Count One fails to meet the "overall agreement" standard because it involves two schemes that took place at different times, involved different acts and actors, and—most crucially—were factually contradictory. Indeed, the more recent alleged scheme (to induce Bidco to purchase Autonomy by misrepresenting its value) would be much more difficult to accomplish as a result of the earlier alleged scheme (to misrepresent Autonomy's value to Autonomy shareholders).

The government characterizes as "sophistry" the argument that a sale to Bidco might be made more difficult by alleged efforts to falsely inflate Autonomy's share price. Gov. Opp. 5. The government compounds its confusion by misstating the defense argument as "the conspirators . . . prefer[ring] to sell Autonomy at a certain premium over its share price at the expense of a lower overall price." *Id.* That misses the point. Of course Bidco had to purchase Autonomy at a premium over its share price. That is how stock-purchase acquisitions work. And far from being sophistry, Dr. Lynch's argument is based on perhaps the most fundamental tenet of economics, namely, that any rational purchaser would rather pay a lower price than a

higher price.[3] If Autonomy falsely inflated its share price from 2009 to 2011, as the government alleges, then this plainly would have made it more difficult to later sell the company to Bidco—or any other rational buyer who prefers lower prices to higher prices—because the buyer would have to pay a premium over an already inflated share price.

Moreover, the government's overly simplistic characterization of the supposed single conspiracy obscures important differences between the two schemes. The government describes the conspiracy as having the "objective . . . to fraudulently inflate Autonomy's value so as to drive up the price of its shares and of the company itself." Gov. Opp. 5. The government further alleges that Bidco/HP relied upon much the same information as Autonomy shareholders. *Id.* at 6. But this ignores that a potential acquiror will necessarily rely upon different information in deciding whether to acquire a company than shareholders relied upon in deciding whether to buy, sell or hold shares. This is because any information (including misinformation) available to shareholders would already be priced into the shares at the time the acquiror purchases, and the acquiror must purchase at a premium to the current share price. An acquiror will pay a premium over share price only if the acquiror believes that the company was underpriced or believes that it

[3] Further betraying a fundamental misunderstanding of acquisitions, the government elsewhere states that defendants had the object "to *artificially increase* Autonomy's share price to make it attractive to potential purchasers." Gov. Opp. 2, citing SI ¶ 2 (emphasis added). This is 180 degrees opposite of economic reality. Indeed, companies often employ various tactics to increase share price—from poison pills to share buybacks to acquisitions of other companies—as a *defense* to attempted acquisitions. And multiple courts have observed that lower, not higher, share prices attract acquirors. *See, e.g.*, *S.E.C.* v. *Worldcom, Inc.*, No. 02-cv-4963 (JSR), 2003 WL 22004827, at *64 (S.D.N.Y. Aug. 26, 2003) ("This in turn may give rise to technical downward pressure on the stock price, which could make MCI an even more attractive target for an acquisition"); *Gross* v. *Damon Corp.*, No. 94-cv-4457 (RPP), 1995 WL 138612, at *4 (S.D.N.Y. Mar. 29, 1995) (observing that if "the target company's share prices remain at a lower level than would result from disclosure; this may result in a lower acquisition price for the bidder, thereby making the merger more attractive to the bidder"); *cf. United States* v. *Newman*, 664 F.2d 12, 17–18 (2d Cir. 1981) ("In a tender-offer situation, the effect of increased activity in purchases of the target company's shares is, similarly, to drive up the price of the target company's shares; but this effect is damaging to the offering company because the tender offer will appear commensurately less attractive.").

can unlock additional value (for example, through synergies or efficiencies realized by the acquisition). Whether the decision to purchase is based on a belief that the shares are underpriced or upon a belief that it can unlock additional value, the acquiror will necessarily rely principally on additional information besides that which shareholders relied upon in setting the share price through their buying and selling.

In sum, the two schemes alleged in Count One are (i) inconsistent and contradictory, because Bidco would have preferred a lower share price and Autonomy shareholders a higher share price, and (ii) necessarily rely on different evidence, because any alleged misinformation that Autonomy shareholders relied upon was already reflected in the share price by the time Bidco decided to purchase Autonomy at a large premium to share price. Because Count One alleges multiple conspiracies, it is duplicitous.

The government argues that the Ninth Circuit has found a single conspiracy to exist in "far more diffuse activities than alleged here," Gov. Opp. at 5, but it identifies no cases in which the Ninth Circuit (or any other court) found that contradictory schemes relying on different evidence constituted a single conspiracy. Indeed, each of the cases that the government cites involve efforts to achieve a common overarching goal, albeit through various actions. In *United States* v. *Moran*, the Ninth Circuit found that a conspiracy count alleging an agreement to launder money and an agreement to defraud the IRS was not duplicitous because it alleged "an overall agreement among the parties to misstate and misrepresent income to the IRS, wherein Moran's function was to set up the laundering of funds to conceal from the IRS the identities of individuals who had realized income from unlawful importation and distribution of narcotics." 759 F.2d 777, 784 (9th Cir. 1985). The *Moran* indictment plainly alleged a single scheme with a single common goal—avoidance of tax liabilities. Likewise, the indictment in *United States* v. *Morse* alleged a single conspiracy involving four separate fraudulent tax-shelter schemes, with each subsequent scheme substituting for a previous scheme that had failed. 785 F.2d 771 (9th Cir. 1986). The common objective there was clear—to profit from the creation of fraudulent tax shelters. *Id.* at 775. Finally, *United States* v. *Bryan*, like *Morse*, also involved tax shelters. 868

F.2d 1032 (9th Cir. 1989). There, the government charged a single conspiracy to defraud both taxpayers and the IRS, based on the creation of fraudulent tax shelters. *Id.* at 1037-1038. Again, there was a clear, common objective—as in *Morse*, to profit from the creation of fraudulent tax shelters.

There is no such common objective unifying the two schemes alleged in Count One. Nowhere is this more apparent than the government's own description of the supposed common objective: "to fraudulently inflate Autonomy's value so as to drive up the price of its shares and of the company itself." Gov. Opp. 5. This is so general as to be devoid of any factual content. The government's description merely appends the word "fraudulently" to a description of virtually all actions taken by all public companies, whose *raison d'etre* is to increase share price and increase the value of the company itself (which is really just another way of saying "increase share price"). If this is all that is necessary to satisfy the common-objective criterion, then it is hard to imagine any set of conspiracies within a single business, no matter how disparate, that would not satisfy it.

**3. The Only Appropriate Remedy Is Dismissal**

The government's facile suggestion that the duplicity can be remedied by having the government elect between the two schemes or by giving the jury a unanimity instruction, Gov. Opp. 7–8, fails to grapple meaningfully with the problem. If Dr. Lynch is correct, the government cannot "elect" one scheme or the other, because each is impermissibly extraterritorial. At most, the Autonomy shareholder scheme may serve as background to the alleged Bidco scheme, but such background evidence would have to be severely limited to avoid undue prejudice to Dr. Lynch. Indeed, the issue as to the Bidco scheme is what Autonomy told Bidco and what Bidco relied on; quarterly reports, press releases and earnings calls in 2009, 2010, and 2011 do not fall into that category. And a decision to accelerate revenue from one quarter to another in the same fiscal year has no impact on annual revenue announced in annual reports and cannot have been material to Bidco. Given the scope of the two conspiracies and the anticipated breadth of the government's case, "background" evidence could span events taking

place over many years and involve dozens, if not hundreds, of transactions, communications, and other documents. No court would countenance the introduction of such a wide range of Rule 404(b) evidence, even under the guise of "background" to a conspiracy, given the obvious and overwhelming prejudice. The potential for that prejudice counsels in favor of dismissal of Count One at the outset.

Furthermore, the notion that "any duplicity here could easily be addressed through jury instructions," Gov. Opp. at 8, ignores the severe prejudice that would result from allowing the government to introduce a jumble of undifferentiated evidence about the two alleged schemes. If the Court were to determine at the conclusion of evidence that a duplicity instruction is necessary, the jury would be left to pick through that jumble and sort out which pieces of evidence relate to which conspiracy, in order to then determine whether the elements of each conspiracy are satisfied. Count One is duplicitous because it joins two separate conspiracies in a single count. The prejudice created by this duplicity cannot be cured by a jury instruction. Dismissal is required.

**B. Counts Two Through Fifteen Are Impermissibly Extraterritorial and Therefore Must Be Dismissed**

The government avoids directly addressing Dr. Lynch's arguments as to each of the substantive wire fraud charges in Counts Two to Fifteen by arguing, incorrectly, that these challenges are foreclosed by *United States* v. *Hussain* and that Dr. Lynch has conceded as much. Gov. Opp. 8–9. To the contrary, as expressly stated in the MTD, *Hussain* "provides no barrier to the Court's consideration of Dr. Lynch's arguments because the Ninth Circuit did not consider the schemes to defraud Autonomy shareholders and to defraud Bidco separately." Def. MTD 20 n.5. While Dr. Lynch conceded that *Hussain*'s treatment of the Second Circuit case, *Bascuñán v. Elsaca*, is controlling, *see id*. (citing 927 F.3d 108 (2d. Cir. 2019)), that concession does not foreclose Dr. Lynch's challenge to Counts Two to Fifteen, as the government suggests.

As argued in the MTD, when the two conspiracies in Count One are properly considered as separate, it is clear that each has fatal deficiencies, and these deficiencies carry through to the underlying substantive wire fraud counts.

*First*, as to the substantive wire fraud counts that relate to the Autonomy shareholder scheme, Counts Two, Three, and Six through Eight: while *Hussain* found that domestic wires need not be a "core component" of a scheme involving U.S. victims, the Ninth Circuit has not ruled on the applicable standard for a wire fraud case involving *only* non-U.S. victims. *See Hussain*, 972 F.3d at 1144 n.2 (recognizing that *Bascuñán* requires that the use of wires be a "core component" of a scheme to defraud that otherwise lacks U.S. contacts). Plainly, however, the logic of *Hussain* dictates that if the wires themselves are the only domestic element of the scheme, then those wires must be closely tied to the fraud. The wires allegedly tied to the Autonomy-shareholder fraud (described in Counts Two, Three, Six, Seven, and Eight) bear, at most, a tangential relationship to the fraud. Def. MTD 20. In the absence of any other domestic "hook," they cannot suffice to overcome the presumption against extraterritoriality.

In particular, as argued in Dr. Lynch's motion to dismiss:

- Counts Two and Six are internal Autonomy e-mails, and there is no allegation that any Autonomy shareholder would have been aware of them, let alone been defrauded by them. *Id.*

- Count Three is a press release announcing Autonomy's 2010 results, and Counts Seven and Eight are press releases announcing Autonomy's results for the first quarter of 2011 and the first half of 2011, respectively. There is no allegation connecting the transmission of these press release via U.S. wires to any person's decision to purchase Autonomy shares. *Id.*

Because the alleged wires were not "in furtherance" of the Autonomy shareholder scheme, these Autonomy-shareholder-scheme-related counts must be dismissed.

*Second*, as to the Bidco scheme, which does allege a U.S. victim (albeit implausibly, as it requires ignoring HP's deliberately created corporate structure and treating Dutch Bidco as if it were actually just U.S.-based HP), the SI fails to plausibly allege that any of the wires sent in connection with the HP-acquisition scheme were actually in furtherance of the fraud, as required

by *Hussain* where there is a U.S. victim. For example, Count Thirteen is merely an e-mail informing U.S.-recipients of the availability of unspecified documents in a data room; Count Fourteen is a similar e-mail updating on the status of certain due-diligence items; and Count Fifteen is a *pro forma* payment request from a U.K. secretarial service following the acquisition. The SI is devoid of any facts or description linking these wholly ministerial communications to efforts to further the scheme to defraud HP. Accordingly, the Bidco-scheme-related counts must also be dismissed.

**C. Count Sixteen Fails to State an Offense and Must Be Dismissed**

The SI does not contain any description of facts that are essential to Dr. Lynch's understanding of the offense charged in Count Sixteen. Accordingly, Count Sixteen must be dismissed for failure to state an offense. At best, Count Sixteen alleges that Dr. Lynch deprived HP shareholders of certain economic information that may have influenced their decision to purchase or sell HP shares. But this theory of fraud is foreclosed by the Supreme Court's recent decisions in *Ciminelli* v. *United States*, 143 S. Ct. 1121 (2023), and *Kelly* v. *United States*, 140 S. Ct. 1565 (2020), providing an additional basis for dismissal.

The Federal Rules of Criminal Procedure require an indictment to contain a "definite written statement of the *essential facts* constituting the offense charged." FED. R. CRIM. P. 7(c)(1) (emphasis added). But the SI contains *no facts* that articulate what Dr. Lynch did to defraud HP shareholders or obtain money or property from them. *See* Def. MTD 21, 23. The government points out that the SI "tracks the offense in the words of the statute" and is therefore sufficient. Gov. Opp. 10. "Invoking statutory language, however, does not relieve the government of its duty to furnish the defendant with a sufficient description of the charges against him, in order to allow him to prepare his defense." *United States* v. *Zavala*, 839 F.2d 523, 529 (9th Cir. 1988); *see also Hamling* v. *United States*, 418 U.S. 87, 117–18 (1974) ("Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform

the accused of the specific offence, coming under the general description, with which he is charged.”).

Nor does Count Sixteen’s incorporation of the SI’s introductory allegations satisfy Rule 7(c)(1), as the government argues, pointing to the allegation that Dr. Lynch “executed a letter irrevocably undertaking to accept [HP’s] offer . . . and warranting that all information provided by him for inclusion in any document issued in connection with the offer was true and accurate in all respects and not misleading in any respect.” Gov. Opp. 3 (citing SI ¶ 23(bb)). That irrevocable undertaking, according to the SI, was executed “to induce the offer by HP and HP Vision.” SI ¶ 23(bb). It had nothing to do with purchasers of HP securities, as the government now asserts. The SI thus fails to apprise Dr. Lynch of what he did that was purportedly directed at any person or entity other than “HP and HP Vision,” meaning Bidco. Far from being a “factual defense,” *cf*. Gov. Opp. 11, Dr. Lynch’s argument rests on his Fifth Amendment right to be indicted by a grand jury and on Rule 7’s pleading requirements. Count Sixteen does not meet those requirements because it utterly fails to provide any description of facts and circumstances to explain why Dr. Lynch would intend to defraud HP’s shareholders, to the benefit of no one except his other alleged victim, HP.

Rather than addressing the paucity of factual allegations related to Count Sixteen in the SI, the government tries to sidestep the issue by arguing that Dr. Lynch’s “contention that he did not ‘stand to gain anything by depriving HP shareholders of any property interest’ . . . is foreclosed by *Hussain*.” Gov. Opp. 11. The government is wrong. The Ninth Circuit’s *Hussain* decision did not address the sufficiency of the securities fraud count in the *Hussain* indictment. Instead, the Ninth Circuit, considering an appeal of this Court’s Rule 29 decision, found that Mr. Hussain had waived any argument that the government’s trial evidence had failed to prove intent to commit securities fraud, and that it would not be a miscarriage of justice to let the conviction stand. *Hussain*, 972 F.3d at 1145–46. The Ninth Circuit then stated, in *dicta*, that it would reach the same result on *de novo* review, because sufficient “evidence would allow a rational jury to find that Hussain had the requisite *mens rea*.” *Id*. at 1146. The Ninth Circuit’s decision was

confined to a review of the trial evidence presented at Mr. Hussain's trial. It had nothing to do with Dr. Lynch's argument here.

Dr. Lynch also argues in the MTD that, at most, Count Sixteen alleges that Dr. Lynch deprived HP shareholders of economic information that could have influenced their decision to purchase or sell HP shares, and, under recent Supreme Court precedent finding the "right to control" theory of fraud to be insufficient, this allegation cannot give rise to a fraud claim. Def. MTD 22–23 (citing *Ciminelli*, 143 S. Ct.at 1128, and *Kelly*, 140 S. Ct. at 1571). The government attempts to distinguish *Ciminelli* and *Kelly* by arguing that "both involve[d] wire fraud, not securities fraud." Gov. Opp. 11. But the operative language in the wire fraud offense is substantively identical to the language in the securities fraud offense charged in Count Sixteen under 18 U.S.C. § 1348, and Section 1348, like the wire fraud statute, is a property offense by its plain terms. The wire fraud statute at issue in *Ciminelli* and *Kelly* refers to "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. In nearly identical terms, Section 1348 refers to "a scheme or artifice (1) to defraud any person . . . ; or (2) to obtain, by means of false or fraudulent pretenses, representations or promises, any money or property in connection with the purchase or sale of" securities. 18 U.S.C. § 1348. As the Supreme Court explained in *Ciminelli*, although that statutory language "is phrased in the disjunctive, we have consistently understood the 'money or property' requirement to limit the 'scheme or artifice to defraud' element because the 'common understanding' of the words 'to defraud' when the statute was enacted referred 'to wronging one in his property rights.'" *Ciminelli*, 143 S. Ct. at 1126 (citations omitted). Consistent with the view that the language of Section 1348, like that of Section 1343, involves "wronging one in his property rights," the government recently asked the Second Circuit to reverse an appellant's convictions under Section 1348 "in consultation with the Office of the Solicitor General to reflect the Department of Justice's post-*Kelly* position on the scope of 'property' under 18 U.S.C. §§ 1343 and 1348." Gov. Br. on Remand, *United States v. Blaszczak*, No. 18-2811, 2021 WL 1249121, at *2 (2d Cir. Apr. 2, 2021)"

It therefore cannot seriously be maintained that the right-to-control theory survives as to Section 1348 even though it no longer exists for wire fraud.

The government's other effort to distinguish *Ciminelli* and *Kelly* on the ground that "[n]either dealt with the aiding and abetting/willfully causing statute" (*i.e.*, 18 U.S.C. § 2), Gov. Opp. 11, fares no better. The fact that Dr. Lynch is charged with willfully causing a violation of Section 1348 by executing an irrevocable undertaking does not eliminate the government's burden to establish that the object of the offense Dr. Lynch purportedly caused was money or property. Dr. Lynch cannot have sought to obtain money or property from anyone purchasing HP shares. As Dr. Lynch has explained, at most, Dr. Lynch allegedly deprived purchasers of HP shares of information they might have wanted to know in deciding whether to purchase the shares. That right-to-control assets does not amount to a property right and cannot support Dr. Lynch's conviction under Section 1348.

**III. CONCLUSION**

For the reasons stated herein and in Dr. Lynch's Motion to Dismiss, Dr. Lynch respectfully submits that Counts One through Sixteen of the Superseding Indictment should be dismissed.

Dated: October 24, 2023

Respectfully submitted,

/s/ Christopher J. Morvillo

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437

Jonathan M. Baum (SBN: 303469)
**Steptoe & Johnson LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten (Admitted Pro Hac Vice)
Brian M. Heberlig (Admitted Pro Hac Vice)
Michelle L. Levin (Admitted Pro Hac Vice)
Nicholas P. Silverman (Admitted Pro Hac Vice)
Dwight J. Draughon (Admitted Pro Hac Vice)
Drew C. Harris (Admitted Pro Hac Vice)
**Steptoe & Johnson LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

*Attorneys for Defendant*
*Michael Richard Lynch*