1

Jonathan M. Baum (SBN: 303469)
**Steptoe & Johnson LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

Christopher Morvillo (Admitted Pro Hac Vice)
Celeste L. Koeleveld (Admitted Pro Hac Vice)
Daniel S. Silver (Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437
christopher.morvillo@cliffordchance.com

Reid H. Weingarten (Admitted Pro Hac Vice)
Brian M. Heberlig (Admitted Pro Hac Vice)
Michelle L. Levin (Admitted Pro Hac Vice)
Nicholas P. Silverman (Admitted Pro Hac Vice)
Dwight J. Draughon (Admitted Pro Hac Vice)
Drew C. Harris (Admitted Pro Hac Vice)
**Steptoe & Johnson LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

*Attorneys for Defendant*
*Michael Richard Lynch*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RICHARD LYNCH and<br>STEPHEN KEITH CHAMBERLAIN,<br><br>Defendants. | Case No.: 3:18-cr-00577-CRB<br><br>Judge: Hon. Charles Breyer<br><br>**DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT**<br><br>Date: November 29, 2023<br>Time: 1:30 pm<br>Court: Courtroom 6 – 17th Floor<br>Date Filed: October 24, 2023<br>Trial Date: March 18, 2024 |

## **TABLE OF CONTENTS**

I.   SUMMARY OF ARGUMENT ............................................................................. 1

II.  REPLY TO "RELEVANT FACTS" ................................................................. 3

   A.  HP Turns Against Autonomy Before Closing the Acquisition ........................... 4

   B.  HP Botches the Post-Acquisition Integration of Autonomy ............................... 5

   C.  HP Improperly Ties an $8.8-Billion Autonomy Write Down to Fraud Without Support.... 6

III. ARGUMENT ....................................................................................................... 9

   A.  The Court Should Dismiss Count Seventeen Because It Alleges Multiple Conspiracies, Not a Single Conspiracy ........................................................................ 9

      1.  The Indictment Does Not and Cannot Charge a "Conspiracy" to "Cover Up and Conceal" Instead of a Conspiracy to Commit the Object Offenses........................... 10

      2.  Count Seventeen Alleges Multiple Agreements, Not a Single Agreement to Commit the Several Objects of Count Seventeen.................................................... 11

   B.  If the Court Declines to Dismiss Count Seventeen in Its Entirety, It Should Dismiss Several Defective Objects of the Conspiracy.................................................... 13

      1.  The Government Appears to Concede That It Will Not Pursue Count Seventeen to the Extent It Charges Conspiracy to Violate 18 U.S.C. § 1957 or 18 U.S.C. § 1512, and the Court Should Therefore Dismiss Those Objects of the Conspiracy..................... 13

      2.  The Indictment Fails to State an Offense for Conspiracy to Obstruct a Proceeding in Violation of 18 U.S.C. § 1505, and the Court Should Therefore Dismiss That Object of the Conspiracy ......................................................................... 15

      3.  The Indictment Fails to State an Offense for Conspiracy to Commit Money Laundering in Violation of 18 U.S.C. § 1957, and the Court Should Therefore Dismiss That Object of the Conspiracy ................................................................. 16

IV.  CONCLUSION......................................................................................................... 17

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Braverman v. United States*,
5
   317 U.S. 49 (1942)................................................................................9

6

*Gasca-Ramirez v. Holder*,
7
   409 F. App'x 148 (9th Cir. 2011) ....................................................2, 11

8

*N.J. Media Grp. Inc v. United States*,
9
   836 F.3d 421 (3d Cir. 2016)...............................................................14

10

*United States v. Adamson*,
   291 F.3d 606 (9th Cir. 2002) .............................................................14

11

*United States v. Bhagat*,
12
   436 F.3d 1140 (9th Cir. 2006) ...........................................................16

13

*United States v. Broce*,
14
   488 U.S. 563 (1989)............................................................................9

15

*United States v. Fleming*,
16
   215 F.3d 930 (9th Cir. 2000) ........................................................15, 16

17

*United States v. Gordon*,
   844 F.2d 1397 (9th Cir. 1988) .....................................................1, 11, 12

18

*United States v. Hussain*,
19
   3:16-cr-00462-CRB (N.D. Cal.) ..........................................................8

20

*United States v. Kaplan*,
21
   490 F.3d 110 (2d Cir. 2007)...............................................................14

22

*United States v. Lee*,
23
   No. 5:06 CR 0424 JW, 2009 WL 724042 (N.D. Cal. Mar. 18, 2009) ....................14

24

*United States v. Manarite*,
   44 F.3d 1407 (9th Cir. 1995) .............................................................11

25

*United States v. Short*,
26
   857 F.2d 1479 (9th Cir. 1988) ...........................................................14

27

*United States v. Zanzucchi*,
   892 F.2d 56 (9th Cir. 1989) ..............................................................14

28

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

**Statutes**

15 U.S.C. § 78m ........................................................................................9, 11, 12, 13, 15

18 U.S.C. § 371 .........................................................................................................1, 10

18 U.S.C. § 1503 .......................................................................................................15, 16

18 U.S.C. § 1505 .................................................................................................... *passim*

18 U.S.C. § 1512 .........................................................................................2, 9, 11, 13

18 U.S.C. § 1957 .................................................................................................... *passim*

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

I.      **SUMMARY OF ARGUMENT**

The government's brief in response to Dr. Lynch's motion to dismiss Count Seventeen is heavy on factual narrative but light on legal analysis.  The government's argument only underscores that Count Seventeen is mispleaded in numerous ways and should be dismissed.

To hear the government tell it in the "Relevant Facts" section, ordinary business transactions, and reasonable efforts by Dr. Lynch to defend himself, were actually part of a nefarious scheme to hide alleged previous misconduct at Autonomy.  In truth, Autonomy's post-acquisition accounting was appropriate; and it was internal strife, disorder, and mismanagement within HP that drove Autonomy's underwhelming post-acquisition financial performance.  Rather than admit its struggles to the market, HP scapegoated Autonomy's prior management, writing down Autonomy's value and publicly attributing the majority of the write down to alleged accounting improprieties without any factual basis or reasoned analysis.  HP's actions prompted Dr. Lynch to respond with the truth.

The government's legal argument uses this misleading "Relevant Facts" narrative in an attempt to unify separate alleged conspiracies—arguing that post-acquisition accounting, third-party document disposal/storage efforts, and Dr. Lynch's efforts to counter HP's false narrative were part of an overarching "conspiracy to cover[ ]up and conceal the underlying fraud."  Resp. to Mot. to Dismiss Cnt. 17 at 1, Dkt. 233 (Oct. 13, 2023) ("Resp.").  That attempt fails, for two reasons.  First, an agreement to "cover up and conceal" is no criminal conspiracy at all; only agreements to commit federal crimes are conspiracies under 18 U.S.C. § 371.  The allegations in the indictment reflect four agreements to commit specific federal crimes occurring at different times and involving different parties to the agreements.  Second, the government does not contest Dr. Lynch's application of the four Ninth Circuit factors for analyzing the duplicity of a conspiracy charge.  *See United States v. Gordon*, 844 F.2d 1397, 1401 (9th Cir. 1988).  Under *Gordon*, the conspiracies' differing times, participants, and goals all support the conclusion that the government has inappropriately charged multiple alleged conspiracies as one.  Count Seventeen should be dismissed as duplicitous.

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1       If the Court declines to dismiss the entire Count on duplicity grounds, it should

2 nonetheless dismiss three of its four objects.  The Court should dismiss the money-laundering

3 (18 U.S.C. § 1957) and witness-tampering (18 U.S.C. § 1512) objects because the Response

4 relies upon the government's claim that it has "narrowed the allegations in Count Seventeen" to

5 exclude these objects.  The Bill of Particulars, absent further order of the Court, merely expresses

6 the government's present intention not to pursue those objects and purports to reserve the right to

7 seek a conviction on these grounds in rebuttal or even in the government's case-in-chief upon

8 supplemental notice.  Bill of Particulars at 6, Dkt. 230 (Oct. 8, 2013) ("BOP").  This hollow

9 promise fails to give Dr. Lynch the certainty and protection provided by a court-ordered bill of

10 particulars.  Accordingly, the Court should strike with prejudice those portions of Count

11 Seventeen that the government has represented are outside the scope of the "narrowed" version

12 of that Count, or order the government to file a Bill of Particulars with the traditional safeguards.

13       The Court should also dismiss the money-laundering (18 U.S.C. § 1957) object and the

14 obstruction (18 U.S.C. § 1505) object because they are legally deficient.  The government fails to

15 contest Dr. Lynch's arguments that the obstruction statute does not apply extraterritorially or that

16 Count Seventeen fails to plead a conspiracy to commit money laundering, and the government

17 therefore should be deemed to concede those arguments.  *See, e.g.*, *Gasca-Ramirez v. Holder*,

18 409 F. App'x 148, 149 (9th Cir. 2011).  In response to Dr. Lynch's argument that the

19 government has improperly alleged an obstruction conspiracy without specifying a "pending

20 proceeding," as required by § 1505, the government concedes that no such proceeding existed at

21 the time of the alleged conspiratorial agreement.  Because the SI does not allege any qualifying

22 pending proceeding of which Dr. Lynch was aware until over a year after the conspiracy

23 allegedly began, the Court should strike the allegations in Count Seventeen relating to the

24 obstruction object.

25       Count Seventeen fails, and the government's attempt to defend it is illogical, both as a

26 matter of fact and law.  Dr. Lynch respectfully requests that the Court dismiss Count Seventeen

27 of the Superseding Indictment.  In the alternative, Dr. Lynch respectfully requests that the Court

28 dismiss Count Seventeen insofar as it alleges a conspiracy to violate 18 U.S.C. §§ 1505,

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1512, 1957; strike references to those statutes from SI ¶ 32; strike SI ¶¶ 33(c), (e); and strike SI ¶¶ 34.a-.d, .g-.q.

## II.   REPLY TO "RELEVANT FACTS"

The government's response spins an elaborate tale about the events following HP's acquisition of Autonomy beginning in October 2011.  The government describes a post-acquisition world in which Dr. Lynch and others endeavored to hide their alleged fraud while working at HP by falsifying books and records to deceive innocent and unsuspecting HP; HP forthrightly disclosed the supposed fraud and associated financial impact to the market and the authorities following a thorough internal investigation; and documents were stolen and destroyed and false statements were made to the public by Dr. Lynch and others in furtherance of an elaborate cover up.  But the government's tale is just that: a fictional world, from start to finish.

The government's tale hinges on its assertion that, "[o]nce in a major public company with appropriate internal controls and accounting standards, the defendants and Autonomy struggled," prompting them to enter into the coverup conspiracy alleged in Count Seventeen. Resp. at 3.  While Autonomy did struggle within HP's flailing bureaucracy, the root cause was HP's utter failure to properly integrate the companies.  HP abandoned the acquisition's animating purpose of synergies arising from HP shifting its focus to software.  Instead of capitalizing on Autonomy's software capabilities, HP moved resources and opportunities *away* from Autonomy.  Eventually, with the rest of HP's business and its share price tanking, HP's leadership faced a choice: take responsibility for the legacy business's underperformance or shirk responsibility by blaming others.  HP's leadership opted to protect itself and to scapegoat Autonomy's former management by taking an unsupported write down, rather than acknowledging that HP had consistently mismanaged Autonomy's integration and failed to achieve the wildly optimistic synergies HP had projected before the acquisition.  Dr. Lynch was forced to defend himself and Autonomy to combat the ensuing media war waged by HP's leaders, lawyers, and press apparatus.

Against that backdrop, the government converts a few inconsequential events into a supposed effort to conceal and cover-up an alleged fraud.  A $5-million revenue accrual—amidst

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1   a $40-million revenue shortfall—becomes an effort to conceal wrongdoing from HP, even

2   though similar revenue accruals were both taken by Autonomy before the acquisition *and taken*

3   *by HP after the acquisition*.  Entries in an internal deal tracker—which has nothing to do with

4   revenue forecasting—become an effort to conceal future revenue shortfalls.  Routine hardware

5   disposal—consistent with internal policies and controls and prior conduct—becomes

6   "suspicious," Resp. at 4, and "suspicious" becomes obstruction of justice.  Nearly a year later, a

7   former HP employee—who realized after she left HP that she had documents on a thumb drive

8   refuting HP's claims about accounting irregularities—came forward to help set the record

9   straight.  The government mischaracterizes her actions as a brazen theft orchestrated by Dr.

10  Lynch (despite Dr. Lynch's counsel promptly apprising the government and HP of the

11  documents and their relevance to the allegations).  Bizarrely, Dr. Lynch's efforts to defend

12  himself *publicly* against HP's orchestrated media campaign are now twisted into unfounded

13  claims of obstruction.

14          In short, as the government's "relevant facts" reveal, the alleged "conceal and cover-up"

15  conspiracy rests on misguided assumptions and unsubstantiated arguments untethered from the

16  allegations in the indictment.  When the actions of Dr. Lynch and other former Autonomy

17  employees are seen in the proper context, the government's "conceal and cover-up" conspiracy

18  devolves into separate, duplicitous conspiracies that fail to state an offense.

19          A.      **HP Turns Against Autonomy Before Closing the Acquisition**

20          The acquisition of Autonomy by HP was the brainchild of then-HP CEO Leo Apotheker.

21  HP's business had been stagnating, and Apotheker wanted to shift HP's focus from selling

22  printers and other conventional computer hardware to selling software products, which are

23  typically much more profitable.  Because Apotheker saw massive potential synergies in a deal

24  with Autonomy, he was willing to pay an extraordinarily high premium of more than 60% above

25  Autonomy's market price.

26          HP's board and upper management did not share Apotheker's vision, and in retrospect

27  the acquisition was doomed from the start.  At a board meeting on August 16, 2011, HP CFO

28  Cathie Lesjak stabbed Apotheker in the back by criticizing his plan in front of the board without

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1    warning.  Despite reservations, HP's board ultimately authorized the acquisition.  The

2    announcement—which also included a string of negative company news—was poorly received,

3    and HP shares lost 25% of their value in a single day.  Under intense pressure from shareholders

4    to abandon the deal, in late-September 2012, the board abruptly fired Apotheker.  Still, HP was

5    bound by its acquisition agreement with Autonomy, and it completed the acquisition in October

6    2012.

7        **B.    HP Botches the Post-Acquisition Integration of Autonomy**

8            The government asserts that the defendants engaged in a so-called "cover up and

9    conceal" conspiracy because upon joining HP, Autonomy struggled to meet revenue targets

10   under HP's revenue recognition practices.  Resp. at 3.  As alleged by the government, the

11   defendants responded to these struggles by agreeing in October 2011 (despite the fact that the

12   struggles occurred after October 2011) to "cover[ ]up their past fraud."  *Id.*  But that is not what

13   the SI alleges and that is not what happened.

14           Instead, with the architect of the Autonomy deal terminated, new-CEO Meg Whitman

15   quickly abandoned Apotheker's software strategy and refocused HP on its existing traditional

16   hardware sales.  This meant that integrating Autonomy and growing HP's software business was

17   no longer a priority, and Autonomy suffered as a result.

18           The impetus for HP's acquisition of Autonomy was that synergies could be achieved

19   through integration of Autonomy's innovative technologies, but with Apotheker and his team

20   gone, that never happened.  Moreover, HP was unable to execute a basic integration.  Multiple

21   failures on the part of HP management led to Autonomy's poor performance under HP.

22   Unsurprisingly, the atmosphere within HP after the acquisition was toxic.  Autonomy's culture,

23   which was based on speed, growth and innovation, was suffocated by HP's lumbering

24   bureaucracy.  Soon, Autonomy employees began to leave in droves.

25           Against this backdrop, the government's allegations of a cover-up make no sense.  A

26   $5.5-million revenue accrual (SI ¶ 34.e) would make no difference against Autonomy's quarterly

27   miss of $40 million and total revenues of $288 million—and in any event, accruing revenue is a

28   common and acceptable accounting practice, and this particular accrual was entirely in line with

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

accruals from prior quarters.  The allegedly "falsif[ied] revenue forecast" (SI ¶ 34.f), meanwhile, was no such thing: the allegation relates to a set of entries in the company's sales-management system, which was used to track deals and leads, *not* to predict revenues.  There was no reason to falsify entries in that system.  The government's sundry allegations of improper document destruction are not only baseless, but also implausible, given that by May 2012, HP had owned Autonomy for more than six months, and had full and unfettered access to its books, records, and other documents and property.  And given that HP's general counsel telegraphed HP's intention to make Dr. Lynch the "fall guy" for HP's mismanagement of Autonomy during a confrontational June 2012 meeting, it should be no surprise that Dr. Lynch advised the general counsel that he was prepared to defend himself against public attacks.

### C.   HP Improperly Ties an $8.8-Billion Autonomy Write Down to Fraud Without Support

The government links HP's $8.8-billion write down to Autonomy's alleged fraud, Resp. at 4, but in truth, the write down was caused by HP's cratering stock price and the demise of Autonomy's business under HP.

HP was required to review its intangible assets periodically to determine if an "impairment" (*i.e.*, a diminution in value) had occurred, necessitating a write down of the value of assets.  In mid-June 2012, some at HP questioned whether there was a need to take such a write down against Autonomy's book value in light of its reduced earnings forecast following the unsuccessful integration.  HP analyzed Autonomy's value and concluded in July 2012 that Autonomy was worth *$13.7 billion*, much more than what HP paid for it, and that no write down was necessary.[1]  Moreover, HP concluded that Autonomy's poor performance was due to difficulty executing within the HP environment and the loss of Autonomy's legacy management team.

HP's share price, however, continued to fall, and ultimately triggered another impairment analysis.  This time, HP had to decide where to cast blame, across its many business units and

---

[1] HP's September 10, 2012 Form 10-Q stated that the fair value of Autonomy approximated the carrying value (that is, no impairment was necessary).

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1   assets, for the decrease in value.  Autonomy was performing poorly, but several of HP's business

2   units were doing worse.  Nonetheless, HP decided to protect senior management and the board

3   by saddling Autonomy with the impairment.  Blaming Autonomy allowed HP to obscure failings

4   in its core hardware business, which Whitman had publicly committed to fixing.

5        In mid-October 2012, HP's internal accountants presented Whitman with an Autonomy

6   valuation asserting that Autonomy's synergies with HP were worth $0, *i.e.*, that HP did not

7   expect to achieve any of the billions of dollars in revenue growth it had predicted by combining

8   Autonomy with its existing business.  Zeroing out the synergies would reveal that HP had been

9   unable to achieve the synergies projected when it bought Autonomy, suggesting that HP had

10  botched the integration, and that the write down was HP's fault.  So, the night before a board

11  meeting to discuss the write down, HP's finance team redid the calculation.  The very next day,

12  on October 23, 2012, the model was revised to include $2.3 billion of synergies. To compensate

13  for the extra value, HP arbitrarily increased the discount rate used in the valuation model—

14  increasing this subjective factor to levels that HP's own finance employees considered to be

15  "crazy" and "nonsensical."  These final write down numbers were contrived and devoid of

16  reliability, accuracy, or validity.

17       Contrary to the government's implicit argument that the write down was driven by HP's

18  outside counsel finding fraud, *see* Resp. at 4, a detailed internal HP impairment analysis dated

19  October 2012 includes no mention of fraud.  Indeed, it appears that HP's outside counsel had

20  conducted *no interviews* as of the time that the write down was presented to HP's board in

21  October; the government's statement that nine interviews had been conducted "*[b]y* early

22  November 2012," Resp. at 4 (emphasis added), appears to refer exclusively to a handful of

23  interviews that took place *in* early November 2012.  By mid-November, though, HP's outside

24  counsel's work was not nearly far enough along to have informed the write down—and certainly

25  not to have quantified it; for instance, a November 16, 2012 presentation made by HP's outside

26  counsel to the SEC includes no quantification of any loss in value caused by Autonomy's alleged

27  accounting improprieties and admits that counsel was "still investigating all of these

28  transactions."  In short, the write down was not derived from a comprehensive internal

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1  investigation, but rather was a product of HP's cratering share price and HP senior

2  management's need to save face after failing entirely to accomplish the ambitious synergies

3  projected when acquiring Autonomy.

4        HP provided a different version of events to the public.  On November 20, 2012, HP

5  announced that it would take a write down of $8.8 billion against Autonomy's book value, and

6  attributed exactly $5.2 billion of this write down to "serious accounting improprieties,

7  misrepresentation[s] and disclosure failures discovered by an internal investigation by HP and

8  forensic review into Autonomy's accounting practices prior to its acquisitions."  The SEC later

9  conducted an "investigation [that] included a consideration of HP's public disclosures about

10  Autonomy."  *See* May 3, 2017 Declaration of AUSA Adam A. Reeves ¶ 8, *United States v.*

11  *Hussain*, 3:16-cr-00462-CRB (N.D. Cal.), ECF No. 51.

12        At the same time, HP launched a massive media campaign against Dr. Lynch, which it

13  codenamed "Project Sutton."  Project Sutton laid out in detail which government officials,

14  politicians, and other influential persons HP would contact, with the ultimate aim of protecting

15  CEO Meg Whitman.  Project Sutton also included sending letters to the SEC and the UK Serious

16  Fraud Office outlining the claims against Dr. Lynch and his management team and requesting an

17  investigation—all in an attempt to keep the narrative focused on Dr. Lynch.

18        At the time of the write down, there had been no "internal investigation" and no "forensic

19  review" supporting HP's claim of a $5.2 billion fraud.  HP's own finance team admitted as

20  much: On November 29, 2012, *after* the write down was announced, an HP executive asked a

21  member of the finance team about the analysis of the accounting irregularities and

22  misrepresentation purportedly identified as part of the write down.  The finance team member

23  answered bluntly: "We've never formally prepared anything to attribute the irregularities to the

24  amount of the write down."

25        HP's own auditors would not go along with the plan.  Following the write down, HP's

26  auditors refused to sign off on proposed language in HP's 2012 annual report attributing the

27  majority of the write down to fraud.  To the contrary, the auditors concluded that the price HP

28  had paid for Autonomy was not inflated by the alleged accounting irregularities.  Indeed, even if

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1   everything HP claimed was true, HP's auditors concluded that it would not have made a material

2   difference: "[T]he resulting reduction in the valuation was approximately $300 million.  Given

3   the wide range of valuations at the time of the acquisition a $300 million change in valuation is

4   not expected to have altered the Company's purchasing decision or the overall amount paid."

5        In the face of HP's all-out campaign to further its misguided narrative, it is no wonder

6   that Dr. Lynch was eager to defend himself with the truth: that Autonomy's reported financial

7   results were accurate and complete, and that HP, not Autonomy, was to blame for the events

8   following the acquisition.  And Dr. Lynch did so with documents he had available, including

9   HP's own documents, some of which Dr. Lynch received from a former HP employee, as his

10   attorneys explained to HP's attorneys and to the government.  Far from covering up and

11   concealing, Dr. Lynch acted openly and transparently to defend himself against HP's spurious

12   allegations.

## III.   ARGUMENT

### A.   The Court Should Dismiss Count Seventeen Because It Alleges Multiple Conspiracies, Not a Single Conspiracy

The test for whether Count Seventeen is duplicitous is whether it alleges "[a] single

agreement to commit several [*i.e.*, four] crimes" or "multiple agreements to commit separate

crimes."  *United States v. Broce*, 488 U.S. 563, 570–71 (1989) ("[M]ultiple agreements to

commit separate crimes constitute multiple conspiracies.").  This determination is made by

identifying "the agreement" that "embraces and defines [the conspiracy's] objects."  *See*

*Braverman v. United States*, 317 U.S. 49, 53 (1942).  Here, "the agreement" alleged in Count

Seventeen is one "to commit offenses against the United States, namely: (a) circumventing a

system of internal accounting controls … in violation of [15 U.S.C. § 78m], (b) tampering with

witnesses … in violation of [18 U.S.C. § 1512], (c) obstructing [agency] proceedings … in

violation of [18 U.S.C. § 1505], and (d) engaging in [money laundering] in violation of [18

U.S.C. § 1957]."  SI ¶ 32.[2]

_____

[2] The government's Response declines to address object offenses (b) and (d), implying that they
are "moot" as a result of the Bill of Particulars.  *See* Resp. at 7 & n.2.  As explained *infra*, the

Dr. Lynch's motion, however, explained that the specific allegations in the SI revealed multiple agreements, not a single agreement to commit each of the four alleged object offenses. The co-conspirators lacked common interests or goals, there was no consistency in which actors were involved in the different object offenses, and there were clear breaks in time between alleged concerts of action. Moreover, there are fatal deficiencies in the government's alleged conspiracy. For example, there was no agency proceeding pending, and it was therefore impossible to conspire to obstruct such a pending proceeding.

In response to Dr. Lynch's motion, the government makes two arguments—neither of which has merit. First, the government argues that the SI alleges a conspiracy to "conceal" and "cover up"—as opposed to a conspiracy to commit the object offenses. This is incorrect; the SI purports to allege a conspiracy to commit four distinct offenses. (If the government's characterization were correct and the SI pleaded a general conspiracy to conceal rather than an agreement to commit specific crimes, then Count Seventeen would fail to state an offense.) Second, the government cannot save a duplicitous conspiracy count by dropping two of the four conspiracies charged in the count through its Bill of Particulars.

        1.     <u>The Indictment Does Not and Cannot Charge a "Conspiracy" to "Cover Up and Conceal" Instead of a Conspiracy to Commit the Object Offenses</u>

Apparently conceding that the object offenses were subject to separate agreements at various times from 2011 through 2018, the government attempts to unify each of those separate conspiracies under one umbrella conspiracy "to cover[ ]up and conceal." Resp. at 1; *accord id.* at 2, 6, 7. The government's argument fails for two reasons.

First, the government's argument contradicts the charging paragraph (SI ¶ 32), which describes the alleged conspiratorial agreement as one to commit four object offenses, not a conspiracy to cover up and conceal.

Second, an agreement to cover up and conceal is not a conspiracy under 18 U.S.C. § 371. The relevant portion of Section 371 criminalizes only conspiracies to commit federal crimes, and

_____

Bill of Particulars contains too many caveats to moot the duplicity analysis as to those object offenses long as they remain in the SI.

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1  covering up and concealing are not federal crimes.  *See* 18 U.S.C. § 371; Ninth Cir. Model Jury

2  Instr. 11.1 (requiring proof beyond a reasonable doubt of "an agreement" "to commit [a] crime");

3  *United States v. Manarite*, 44 F.3d 1407, 1414 (9th Cir. 1995) (holding that each object of a

4  multi-object conspiracy must constitute a criminal offense).  Setting aside the failure of the

5  indictment to make such allegation, an overarching conspiracy to cover up and conceal would

6  not fix the inherent problem that the SI alleges separate agreements to violate different laws and

7  therefore alleges multiple conspiracies.

8     2. <u>Count Seventeen Alleges Multiple Agreements, Not a Single Agreement</u>
     <u>to Commit the Several Objects of Count Seventeen</u>

9

10    The government does not contest Dr. Lynch's argument that the *Gordon* factors, as

11  applied to the four schemes in Count Seventeen, weigh in favor of a finding of multiple

12  conspiracies, and therefore concedes that argument.  *E.g.*, *Gasca-Ramirez v. Holder*, 409 F.

13  App'x 148, 149 (9th Cir. 2011) ("The government does not contest Gasca's argument that he has

14  exhausted his administrative remedy, and thus concedes that he has.").  Instead of addressing

15  whether the purported conspiracy to violate four statutes is really four conspiracies, the

16  government has voluntarily "narrowed the allegations in Count Seventeen" by indicating that it

17  does not intend to prove the § 1512 witness tampering object and § 1957 money laundering

18  object in its case-in-chief.  *See* Voluntary Bill of Particulars at 6, Dkt. 230 (Oct. 8, 2023); *see*

19  Resp. at 8 (claiming that the remaining allegations are a conspiracy "that was carried out" "in

20  violation of 15 U.S.C. § 78m(b) [and] 18 U.S.C. § 1505").  The government claims that this

21  narrowing of its case-in-chief "moots" the question of whether Count Seventeen charges multiple

22  conspiracies in a single count.  The government is wrong for two reasons.

23    First, the money laundering object and witness tampering allegations remain in the SI,

24  and the Bill of Particulars purports to "reserve[] the right to prove these allegations" "to rebut

25  arguments made by the defendants at trial" or with supplemental notice.  In other words, the

26  government purports to state that if the defendants successfully rebut the remaining two objects

27  of Count Seventeen, it can resuscitate the § 1512 witness tampering object and § 1957 money

28  laundering object, either in rebuttal or otherwise at the government's discretion.  As of this

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

moment, Count Seventeen still contains four object offenses, and it is still duplicitous.  For the reasons explained in Dr. Lynch's opening motion § III.A.5, the Court should dismiss the SI and resort to election only as alternative relief. [3]

Second, even as limited by the Bill of Particulars, Count Seventeen remains duplicitous because it impermissibly combines an alleged agreement to circumvent HP's internal accounting controls (*i.e.*, a conspiracy to violate 15 U.S.C. § 78m) with a series of later agreements to shred documents, refuse to return HP's property, and obtain copies of documents (*i.e.*, conspiracies to violate 18 U.S.C. § 1505).  The *Gordon* factors counsel in favor of a finding of multiple conspiracies because:

- The multiple conspiracies involved different agreements at different times.  *See* MTD § III.A.1.  The conspiratorial agreement to violate 15 U.S.C. § 78m occurred no later than February 3, 2012, and continued no later than May 2012.  *See* SI ¶¶ 34.e, 34.f; *see also* Reply Supp. Motion to Dismiss Counts as Time-Barred and for Discovery § I.C.1.  The conspiracy to violate 18 U.S.C. § 1505 could not have occurred until November 16, 2012 when an agency proceeding first began.[4]  The government appears to argue that the § 1505 conspiracy continued "through 2018," Resp. at 4, even though the Superseding Indictment alleges no acts in furtherance of a § 1505 conspiracy after early 2013. Moreover, the referenced SEC investigation ended in 2016, and—as explained in Dr. Lynch's opening motion and unrebutted by the Response—investigations by the FBI, U.S. Attorney's Office, and grand jury do not qualify as pending proceedings under § 1505.  *See* MTD § III.B.1.a & n.10.

---

[3] For the reasons discussed in Section III.B, *infra*, to the extent the Court credits the government's argument that it has "narrowed the allegations in Count Seventeen," the Court should construe the Voluntary Bill of Particulars as election and strike the references to witness tampering and money laundering from SI ¶¶ 32-34.  *See* MTD at 18 ("In the alternative, the Court should order the government to elect the conspiracy on which it will proceed and strike the remaining objects and overt acts as surplusage.").

[4] In the absence of a pending proceeding, any shredding of hard drives or requests to wipe a departed employee's computer before November 16, 2012 could not have been in furtherance of a conspiracy to violate § 1505 because such a conspiracy was legally impossible.

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

- The multiple conspiracies involved different people. *See* MTD §§ III.A.2-.3. The Voluntary Bill of Particulars accuses Mr. Chamberlain of furthering a conspiracy to violate 15 U.S.C. § 78m, but it makes no such allegations against Dr. Lynch. BoP at 5-6. And the Voluntary Bill of Particulars accuses Dr. Lynch of "the remaining aspects of the conspiracy," but it seems to exculpate Mr. Chamberlain of any involvement in those "remaining aspects." *Id.* at 6. No co-conspirator is alleged to have participated in both conspiracies.

- The multiple conspiracies involved different goals and responded to different impetuses. *See* MTD § III.A.4. The conspiracy to violate 15 U.S.C. § 78m was allegedly designed to conceal Autonomy's post-acquisition performance. *Id.* at 6. The conspiracy to violate § 1505 occurred after HP accused Dr. Lynch of fraud and was either part of Dr. Lynch's attempt to reveal exculpatory facts or part of Dr. Lynch's attempt "to 'destroy' HP," Resp. at 5, depending on which litigant you ask. In either case, the § 1505 conspiracy was had nothing to do with any attempt to conceal Autonomy's post-acquisition performance (nor with any pending agency proceeding).

*         *         *

Even if the Court narrows Count Seventeen consistent with the Voluntary Bill of Particulars, the Count remains duplicitous and should be dismissed.

**B.    If the Court Declines to Dismiss Count Seventeen in Its Entirety, It Should Dismiss Several Defective Objects of the Conspiracy**

1.    The Government Appears to Concede that It Will Not Pursue Count Seventeen to the Extent It Charges Conspiracy to Violate 18 U.S.C. § 1957 or 18 U.S.C. § 1512, and the Court Should Therefore Dismiss Those Objects of the Conspiracy

Following the Voluntary Bill of Particulars, the government's opposition brief describes Count Seventeen as charging "one agreement among the co-conspirators to cover-up and conceal the accounting fraud at Autonomy that was carried out initially in violation of 15 U.S.C. § 78m(b) (false books and records) and later 18 U.S.C. § 1505 (obstruction)." Resp. at 8; *see also id.* at 5 n.1, 7 n.2 (discussing the ways in which the Voluntary Bill of Particulars "narrowed the allegations in Count Seventeen"). The government should be held to these limits.

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

As noted above, however, the Voluntary Bill of Particulars is insufficient to ensure that any trial of Count Seventeen excludes the alleged objects to violate 18 U.S.C. § 1512 and 18 U.S.C. § 1957.  *See supra* § III.A.2 (noting that the government reserves the right to resuscitate these objects).  Permitting the government to modify the contours of its case to undo the Voluntary Bill of Particulars significantly undermines the core functions of a bill of particulars: (1) to "sufficiently apprise[ the defendant] of the charges against him so as to enable him to prepare for trial," (2) to ensure that he is "not . . . misled or unfairly surprised at trial," and (3) to "protect[] against any double jeopardy."  *United States v. Short*, 857 F.2d 1479 (9th Cir. 1988).

Ordinarily, a bill of particulars that "affirmatively misled" a defendant by "lull[ing him] into failing to prepare a defense against the government's argument" would lead to a constructive amendment or prejudicial variance.  *United States v. Zanzucchi*, 892 F.2d 56, 58 (9th Cir. 1989); *see also United States v. Lee*, No. 5:06 CR 0424 JW, 2009 WL 724042, at *3 (N.D. Cal. Mar. 18, 2009) ("Once a bill of particulars is issued, the government is strictly limited to the particulars it has specified within and cannot thereafter amend and expand the charges against defendants."); *United States v. Adamson*, 291 F.3d 606, 609–10 (9th Cir. 2002) (reversing conviction based on evidence outside scope of representations made by the government in the indictment and at a pretrial hearing); *N.J. Media Grp. Inc v. United States*, 836 F.3d 421, 429 (3d Cir. 2016) ("[T]he government is strictly limited to proving what it has set forth in [a bill of particulars]."); *United States v. Kaplan*, 490 F.3d 110, 129 (2d Cir. 2007) ("A variance . . . occurs when the charging terms remain unaltered but the facts proven at trial differ from those alleged in the indictment or bill of particulars.").  Here, though, the government attempts to make an end run around this protection of a criminal defendant's rights, seeking to gain the ability to pursue any portion of Count Seventeen, as charged in the Superseding Indictment, at its discretion, while essentially immunizing itself from a subsequent judicial determination that evidence it introduces constituted a constructive amendment or a prejudicial variance.

The Court should do what the government will not and strike with prejudice those portions of Count Seventeen that the government has represented are outside the scope of the "narrowed" version of that Count: Paragraph 33(c), Paragraph 33(e), and the attendant overt acts

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1    ((a)-(d), (j), (k), (o), (p), and (q)).  In the alternative, the Court should order the government to

2    refile its Bill of Particulars consistent with the statement that Count Seventeen charges only a

3    conspiracy to violate 15 U.S.C. § 78m(b) (false books and records) and later 18 U.S.C. § 1505,

4    and without the offending language "reserv[ing] the right to prove these allegations upon

5    reasonable supplemental notice to the defendants."

6              2.    The Indictment Fails to State an Offense for Conspiracy to Obstruct a
                     Proceeding in Violation of 18 U.S.C. § 1505, and the Court Should
7                    Therefore Dismiss That Object of the Conspiracy

8                    a.    *The Government Concedes That 18 U.S.C. § 1505 Does Not Apply
                           Extraterritorially*
9

10   The government does not contest Dr. Lynch's argument that § 1505 does not apply

11   extraterritorially.  *See* Dkt. 219 at 29-31.  Because § 1505 does not apply extraterritorially, the

12   obstruction object of the conspiracy should be dismissed.

13                   b.    *The Government Concedes That It Cannot Meet the "Pending
                           Proceeding" Element of § 1505*
14

15   Count Seventeen is also defective because § 1505 applies only to efforts to obstruct a

16   "pending proceeding," and the SI "identifies no 'pending proceeding,' generically referring to

17   'investigations of the scheme to defraud' and 'official proceedings.'"  Dkt. 219 at 28, 29 ("The

18   absence of specifics in the SI is not a mere failure of form; rather, the government had no

19   pending proceeding to name because there was no pending proceeding prior to at least late

20   2012.").

21   The government responds with complete reliance on *United States v. Fleming,* 215 F.3d

22   930 (9th Cir. 2000), arguing that the SI's use of the statute's language is sufficient to charge a

23   conspiracy to violate § 1505.  Resp. 7-8.  The government is wrong, and its reliance on *Fleming*

24   is misguided; *Fleming* affirms that an essential element of an obstruction charge is a pending

25   proceeding.  In *Fleming*, the indictment at issue charged the defendant with two counts of

26   violating 18 U.S.C. § 1503 by "attempt[ing] to influence, intimidate and impede [a] Senior

27   United States District Court [judge] in the discharge of his duties . . . in the case of NICHOLAS

28   VICTOR FLEMING v. STATE BAR OF CALIFORNIA."  *Fleming*, 215 F.3d at 935 (emphasis

1   added).  The court held that the indictment's reference to the district court's "duties" in a specific

2   "case" was sufficient to allege "that [the federal judge] had duties in [the defendant's] pending

3   proceeding against the State Bar of California."  *Id.* at 935.  The court did not hold that the

4   indictment could forego mentioning the pending proceeding altogether; instead, it held that the

5   indictment's failure to include a more ornate identification of "Fleming v. State Bar of California

6   as a 'pending proceeding'" was harmless error because the district court instructed the jury that

7   "in order to find [the defendant] guilty, it had to find that a judicial proceeding was pending at

8   the time of the alleged offense."  *Id.* at 935-36.

9          Thus, the *Fleming* indictment was sufficient because it named the proceeding that was

10  pending under 18 U.S.C. § 1503.  That is not true here.  The indictment against Dr. Lynch is

11  entirely devoid of any allegation specifying the existence of a pending proceeding.  *See* Dkt. 219

12  at 28-29.  In the absence of such an allegation, it is not "implicit in the charge" that Dr. Lynch

13  intentionally "interfered with, or obstructed the course of" any particular pending proceeding as

14  required by § 1505.  *United States v. Bhagat*, 436 F.3d 1140, 1148 (9th Cir. 2006).

15         The government's opposition goes one step further and concedes that in fact, there was

16  no pending proceeding at the time of the conspiracy's formation in October 2011.  The SEC did

17  not begin a potentially qualifying proceeding until November 16, 2012, and no allegation could

18  possibly imply that proceeding was the subject of an October 2011 conspiratorial agreement.

19  Count Seventeen's obstruction object should be dismissed.[5]

20              3.    <u>The Indictment Fails to State an Offense for Conspiracy to Commit
                    Money Laundering in Violation of 18 U.S.C. § 1957, and the Court</u>
21              <u>Should Therefore Dismiss That Object of the Conspiracy</u>

22         The government does not contest Dr. Lynch's argument that Count Seventeen fails to

23  plead a conspiracy to commit money laundering under 18 U.S.C. § 1957.  *See* Dkt. 219 at 31-32.

24

25

26

27  [5] In the alternative, the overt acts in furtherance of the obstruction object predating Dr. Lynch's
    knowledge of the allegedly pending proceeding (that is, overt acts (g) (destruction of HDDs), (h)
28  (Chamberlain laptop), (i) (Kanter laptop), and (l) (Schultz interview)) should be struck from the
    indictment as surplusage.

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

Because the indictment fails to state an offense for conspiracy to violate § 1957, the money laundering object of the conspiracy should be dismissed.

## IV.    CONCLUSION

For the reasons stated herein, Dr. Lynch respectfully requests that the Court dismiss Count Seventeen of the Superseding Indictment.  In the alternative, Dr. Lynch respectfully requests that the Court dismiss Count Seventeen insofar as it alleges a conspiracy to violate 18 U.S.C. §§ 1505, 1512, 1957; strike references to those statutes from SI ¶ 32; strike SI ¶¶ 33(c), (e); and strike SI ¶¶ 34.a-.d, .g-.q.


Dated: October 24, 2023                    Respectfully submitted,


                                           /s/ Reid Weingarten
                                           Reid H. Weingarten (Admitted Pro Hac Vice)
                                           Brian M. Heberlig (Admitted Pro Hac Vice)
                                           Michelle L. Levin (Admitted Pro Hac Vice)
                                           Nicholas P. Silverman (Admitted Pro Hac Vice)
                                           Dwight J. Draughon (Admitted Pro Hac Vice)
                                           Drew C. Harris (Admitted Pro Hac Vice)
                                           **Steptoe & Johnson LLP**
                                           1114 Avenue of the Americas
                                           New York, NY 10036
                                           Telephone: (212) 506-3900

                                           Jonathan M. Baum (SBN: 303469)
                                           **Steptoe & Johnson LLP**
                                           One Market Street
                                           Steuart Tower, Suite 1070
                                           San Francisco, CA 94105
                                           Telephone: (510) 735-4558
                                           jbaum@steptoe.com

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Christopher J. Morvillo (Admitted Pro Hac Vice)
Celeste L. Koeleveld (Admitted Pro Hac Vice)
Daniel S. Silver (Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNT SEVENTEEN OF THE SUPERSEDING INDICTMENT