Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal
Assistance between the United States of America and the European Union signed
25 June 2003,
as to the application of the Treaty between the Government of the United States
of America and the Government of the United Kingdom of Great Britain and Northern
Ireland on Mutual Legal Assistance in Criminal Matters signed 6 January 1994

1.      As contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance
between the United States of America and the European Union signed 25 June 2003
(hereafter "the Mutual Legal Assistance Agreement"), the Governments of the United
States of America and the United Kingdom of Great Britain and Northern Ireland
acknowledge that, in accordance with the provisions of this Instrument, the Mutual
Legal Assistance Agreement is applied in relation to the bilateral Treaty between the
Government of the United States of America and the Government of the United
Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal
Matters signed 6 January 1994 (hereafter "the 1994 Mutual Legal Assistance Treaty")
under the following terms:

(a)     Article 4 of the Mutual Legal Assistance Agreement shall be applied as set forth
        in Article 16 bis of the Annex to this Instrument to provide for the identification
        of financial accounts and transactions, in addition to any authority already
        provided under the 1994 Mutual Legal Assistance Treaty;

(b)     Article 5 of the Mutual Legal Assistance Agreement shall be applied as set forth
        in Article 16 ter of the Annex to this Instrument to provide for the formation and
        activities of joint investigative teams, in addition to any authority already
        provided under the 1994 Mutual Legal Assistance Treaty;

(c)     Article 6 of the Mutual Legal Assistance Agreement shall be applied as set forth
        in Articles 6 and 16 quater of the Annex to this Instrument to provide for the
        taking of testimony of a person located in the Requested Party by use of video
        transmission technology between the Requesting and Requested Parties, in
        addition to any authority already provided under the 1994 Mutual Legal
        Assistance Treaty;

(d)     Article 7 of the Mutual Legal Assistance Agreement shall be applied as set forth
        in Article 4 (1) of the Annex to this Instrument to provide for the use of
        expedited means of communication, in addition to any authority already
        provided under the 1994 Mutual Legal Assistance Treaty;

(e)     Article 8 of the Mutual Legal Assistance Agreement shall be applied as set forth
        in Article 1 (1 bis) of the Annex to this Instrument to provide for mutual legal
        assistance to the administrative authorities concerned, in addition to any
        authority already provided under the 1994 Mutual Legal Assistance Treaty;

(f)     Article 9 of the Mutual Legal Assistance Agreement shall be applied as set forth
        in Article 7 of the Annex to this Instrument to provide for limitations on use of
        information or evidence provided to the Requesting Party, and the conditioning
        or refusal of assistance on data protection grounds.

1

2.      The Annex reflects the integrated text of the operative provisions of the 1994 Mutual Legal Assistance Treaty and the Mutual Legal Assistance Agreement that shall apply upon entry into force of this Instrument.

3. (a)  This Instrument shall apply to the United States of America and to Great Britain and Northern Ireland.  Subject to subparagraph b), the application of the 1994 Mutual Legal Assistance Treaty to the Channel Islands, the Isle of Man, and any other territory of the United Kingdom to which the 1994 Mutual Legal Assistance Treaty may apply in accordance with its terms, shall remain unaffected by the Mutual Legal Assistance Agreement and this Instrument.

(b)      This Instrument shall not apply to any territory for whose international relations the United Kingdom is responsible unless the United States of America and the European Union, by exchange of diplomatic notes duly confirmed by the United Kingdom in accordance with Article 16(1)(b) of the Mutual Legal Assistance Agreement, agree to extend its application thereto with such technical modifications as may be agreed between the United States of America and the United Kingdom.  Such application may be terminated by either the United States of America or the European Union by giving six months' written notice to the other through the diplomatic channel where duly confirmed between the United States of America and the United Kingdom in accordance with Article 16(2) of the Mutual Legal Assistance Agreement.

4.      In accordance with Article 12 of the Mutual Legal Assistance Agreement, this Instrument shall apply to offences committed before as well as after it enters into force.

5.      This Instrument shall not apply to requests made prior to its entry into force; except that, in accordance with Article 12 of the Mutual Legal Assistance Agreement, Articles 4(1), 6 and 16 quater of the Annex shall be applicable to requests made prior to such entry into force.

6.  (a)  This Instrument shall be subject to the completion by the United States of America and the United Kingdom of Great Britain and Northern Ireland of their respective applicable internal procedures for entry into force.  The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland shall thereupon exchange instruments indicating that such measures have been completed.  This Instrument shall enter into force on the date of entry into force of the Mutual Legal Assistance Agreement.

(b)  In the event of termination of the Mutual Legal Assistance Agreement, this Instrument shall be terminated and the 1994 Mutual Legal Assistance Treaty shall be applied.  The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Instrument.

DONE at London, in duplicate, this 16 day of December 2004.

FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF
THE UNITED KINGDOM OF GREAT
BRITAIN AND NORTHERN IRELAND:

3

ANNEX

TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF
AMERICA AND THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT
BRITAIN AND NORTHERN IRELAND ON MUTUAL LEGAL ASSISTANCE IN
CRIMINAL MATTERS

## CONTENTS

| | |
|---|---|
| Article 1 | Scope of Assistance |
| Article 2 | Central Authorities |
| Article 3 | Limitations on Assistance |
| Article 4 | Form and Contents of Requests |
| Article 5 | Execution of Requests |
| Article 6 | Costs |
| Article 7 | Confidentiality and Limitations on Use |
| Article 8 | Taking Testimony and Producing Evidence in the Territory of the Requested Party |
| Article 9 | Records of Government Agencies |
| Article 10 | Personal Appearance in the Territory of the Requesting Party |
| Article 11 | Transfer of Persons in Custody |
| Article 12 | Location or Identification of Persons |
| Article 13 | Service of Documents |
| Article 14 | Search and Seizure |
| Article 15 | Return of Documents and Articles |
| Article 16 | Assistance in Forfeiture Proceedings |
| Article 16 bis | Identification of Bank Information |
| Article 16 ter | Joint Investigative Teams |
| Article 16 quater | Video Conferencing |
| Article 17 | Compatibility with Other Arrangements |
| Article 18 | Consultation |
| Article 19 | Definition |
| Article 20 | Termination |

4

## ARTICLE 1

### Scope of Assistance

1. The Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, for the purpose of proceedings as defined in Article 19 of this Treaty.

1*bis*. Mutual legal assistance shall also be afforded to a national administrative authority, investigating conduct with a view to a criminal prosecution of the conduct, or referral of the conduct to criminal investigation or prosecution authorities, pursuant to its specific administrative or regulatory authority to undertake such investigation. Mutual legal assistance may also be afforded to other administrative authorities under such circumstances. Assistance shall not be available for matters in which the administrative authority anticipates that no prosecution or referral, as applicable, will take place. Requests for assistance under this paragraph shall be transmitted between the Central Authorities designated pursuant to Article 2 of this Treaty, or between such other authorities as may be agreed by the Central Authorities.

2. Assistance shall include:

   (a) taking the testimony or statements of persons;

   (b) providing documents, records, and evidence;

   (c) serving documents;

   (d) locating or identifying persons;

   (e) transferring persons in custody for testimony (or other purposes);

   (f) executing requests for searches and seizures;

   (g) identifying, tracing, freezing, seizing, and
       forfeiting the proceeds and instrumentalities of
       crime and assistance in related proceedings; and

   (h) such other assistance as may be agreed between Central Authorities.

3. This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

## ARTICLE 2

### Central Authorities

1. Central Authorities shall be established by both Parties.

2. For the United States of America, the Central Authority shall be the Attorney

5

General or a person or agency designated by him. For the United Kingdom, the Central Authority shall be the Secretary of State for the Home Department or a person or agency designated by him.

3. Except as otherwise provided in this Treaty, requests under this Treaty shall be made by the Central Authority of the Requesting Party to the Central Authority of the Requested Party.

4. The Central Authorities shall communicate directly with one another for the purposes of this Treaty.

ARTICLE 3

Limitations on Assistance

1. The Central Authority of the Requested Party may refuse assistance if:

    (a) the Requested Party is of the opinion that the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy;

    (b) the request relates to an offender who, if proceeded against in the Requested Party for the offence for which assistance is requested, would be entitled to be discharged on the grounds of a previous acquittal or conviction; or

    (c) the request relates to an offence that is regarded by the Requested Party as:

        (i) an offence of a political character; or

        (ii) an offence under military law of the Requested Party which is not also an offence under the ordinary criminal law of the Requested Party.

2. Before denying assistance pursuant to this Article, the Central Authority of the Requested Party shall consult with the Central Authority of the Requesting Party to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting Party accepts assistance subject to these conditions, it shall comply with the conditions.

6

## ARTICLE 4

### Form and Contents of Requests

1.a) Requests for mutual legal assistance and communications related thereto may be made and responded to by expedited means of communications, including fax or e-mail, with formal confirmation of requests to follow where required by the Requested Party.

b) In urgent cases, requests for mutual legal assistance may be made orally but shall be confirmed in writing within ten days.

c) The Requested Party may respond by any such expedited means of communication.

2. The request shall include the following:

    (a)  the name of the authority conducting the proceedings to which the request relates;

    (b)  the subject matter and nature of the proceedings for the purposes of which the request is made;

    (c)  a summary of the information giving rise to the request;

    (d)  a description of the evidence or information or other assistance sought; and

    (e)  the purpose for which the evidence or information or other assistance is sought.

3. To the extent necessary and possible, a request shall also include:

    (a)  the identity, date of birth and location of any person from whom evidence is sought;

    (b)  the identity, date of birth and location of a person to be served, that person's relationship to the proceedings, and the manner in which the service is to be made;

    (c)  available information on the identity and whereabouts of a person to be located;

    (d)  a precise description of the place or person to be searched and of the articles to be seized;

    (e)  a description of the manner in which any testimony or statement is to be taken and recorded;

    (f)  a list of questions to be asked of a witness;

7

(g)   a description of any particular procedures to be followed in executing the request;

(h)   information as to the allowances and expenses to which a person asked to appear in the territory of the Requesting Party will be entitled;

(i)   any other information which may be brought to the attention of the Requested Party to facilitate its execution of the request; and

(j)   requirements for confidentiality.

4. The Requested Party may ask the Requesting Party to provide any further information which appears to the Requested Party to be necessary for the purpose of executing the request.

## ARTICLE 5

### Execution of Requests

1.   As empowered by this Treaty or by national law, or in accordance with its national practice, the Requested Party shall take whatever steps it deems necessary to give effect to requests received from the Requesting Party. The courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

2.   When execution of the request requires judicial or administrative action, the request shall be presented to the appropriate authority by the persons appointed by the Central Authority of the Requested Party.

3.   The method of execution specified in the request shall be followed to the extent that it is not incompatible with the laws and practices of the Requested Party.

4.   If the Central Authority of the Requested Party determines that execution of the request would interfere with ongoing proceedings or prejudice the safety of any person in the territory of the Requested Party, the Central Authority of that Party may postpone execution, or make execution subject to conditions determined necessary after consultation with the Requesting Party. If the Requesting Party accepts the assistance subject to the conditions, it shall comply with the conditions.

5.   The Central Authority of the Requested Party shall facilitate the participation in the execution of the request of such persons as are specified in the request.

6.   The Central Authority of the Requested Party may ask the Central Authority of the Requesting Party to provide information in such form as may be necessary to enable it to execute the request or to undertake any steps which may be necessary under the laws and practices of the Requested Party in order to give effect to the request received from the Requesting Party.

8

7. The Central Authority of the Requesting Party shall inform the Central Authority of the Requested Party promptly of any circumstances which make it inappropriate to proceed with the execution of the request or which require modification of the action requested.

8. The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the outcome of the execution of the request. If the request is denied, the Central Authority of the Requested Party shall inform the Central Authority of the reasons for the denial.

## ARTICLE 6

### Costs

1. The Requested Party shall, subject to paragraphs (2) and (3) of this Article, pay all costs relating to the execution of the request, except for the fees of expert witnesses and the allowances and expenses related to the travel of persons pursuant to Articles 10 and 11 of this Treaty, which fees, allowances, and expenses shall be paid by the Requesting Party.

2. If the Central Authority of the Requested Party notifies the Central Authority of the Requesting Party that execution of the request might require costs or other resources of an extraordinary nature, or if it otherwise requests, the Central Authorities shall consult with a view to reaching agreement on the conditions under which the request shall be executed and the manner in which costs shall be allocated.

3. Unless otherwise agreed by the Requesting and Requested Parties, the Requesting Party shall bear the costs associated with establishing and servicing the video transmission under Article 16 quater. Other costs arising in the course of providing assistance (including costs associated with travel of participants in the Requested Party) shall be borne in accordance with the other provisions of this Article.

## ARTICLE 7

### Confidentiality and Limitations on Use

1. The Requested Party shall, upon request, keep confidential any information which might indicate that a request has been made or responded to. If the request cannot be executed without breaching confidentiality, the Requested Party shall so inform the Requesting Party, which shall then determine the extent to which it wishes the request to be executed.

2. The Requesting Party may use any evidence or information obtained from the Requested Party:

(a) for the purpose of its criminal investigations and proceedings;

(b) for preventing an immediate and serious threat to its public security;

9

(c) in its non-criminal judicial or administrative proceedings directly related to investigations or proceedings:

    (i)     set forth in subparagraph (a); or

    (ii)    for which mutual legal assistance was rendered under Article 1 (1 bis) of this Treaty;

(d) for any other purpose, if the evidence or information has been made public within the framework of proceedings for which they were transmitted, or in any of the situations described in subparagraphs (a), (b) and (c); and

(e) for any other purpose, only with the prior consent of the Requested Party.

3. (a) This Article shall not prejudice the ability of the Requested Party in accordance with this Treaty to impose additional conditions in a particular case where the particular request for assistance could not be complied with in the absence of such conditions. Where additional conditions have been imposed in accordance with this subparagraph, the Requested Party may require the Requesting Party to give information on the use made of the evidence or information.

(b) Generic restrictions with respect to the legal standards of the Requesting Party for processing personal data may not be imposed by the Requested Party as a condition under subparagraph (a) to providing evidence or information.

4. Where, following disclosure to the Requesting Party, the Requested Party becomes aware of circumstances that may cause it to seek an additional condition in a particular case, the Requested Party may consult with the Requesting Party to determine the extent to which the evidence or information can be protected.

## ARTICLE 8

Taking Testimony and Producing Evidence in the Territory of the Requested Party

1. A person in the territory of the Requested Party from whom evidence is requested pursuant to this Treaty may be compelled, if necessary, to appear in order to testify or produce documents, records, or articles of evidence by subpoena or such other method as may be permitted under the law of the Requested Party.

2. A person requested to testify or to produce documentary information or articles in the territory of the Requested Party may be compelled to do so in accordance with the requirements of the law of the Requested Party. If such a person asserts a claim of immunity, incapacity or privilege under the laws of the Requesting Party, the evidence shall nonetheless be taken and the claim be made known to the Requesting Party for resolution by the authorities of that Party.

10

3. Upon request, the Central Authority of the Requested Party shall furnish information in advance about the date and place of the taking of the evidence pursuant to this Article.

4. The Requested Party shall allow persons specified in the request to ask questions of the person whose testimony or evidence is being taken, through a legal representative qualified to appear before the courts of the Requested Party.

5. Documentary information produced pursuant to this Article may be authenticated by the attestation of a person competent to do so in the form indicated in Appendix A to this Treaty. No further authentication or certification shall be necessary in order for such documentary information to be admissible in evidence in proceedings in the territory of the Requesting Party. Documentary information produced pursuant to this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.

## ARTICLE 9

### Records of Government Agencies

1. The Requested Party shall provide the Requesting Party with copies of publicly available records of government departments and agencies of the Requested Party.

2. The Requested Party may provide a copy of any record or information in the possession of a government department or agency but not publicly available to the same extent and on the same conditions as to its own law enforcement or judicial authorities. The Requested Party may refuse a request pursuant to this paragraph entirely or in part.

3. Official records provided pursuant to this Article shall be authenticated by the Central Authority of the Requested Party in the manner indicated in Appendix B to this Treaty. No further authentication or certification shall be necessary in order for such records to be admissible in evidence in proceedings in the territory of the Requesting Party. Records provided pursuant to this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.

## ARTICLE 10

### Personal Appearance in the Territory of the Requesting Party

1. A request under this Treaty may seek assistance in facilitating the appearance of any person in the territory of the Requesting Party for the purpose of giving evidence before a court or of being identified in, or otherwise by his presence assisting, any proceedings.

2. The Central Authority of the Requested Party shall:

11

(a) ask a person whose voluntary appearance in the territory of the Requesting Party is desired whether he agrees to appear; and

(b) promptly inform the Central Authority of the Requesting Party of his answer.

3. If the Central Authority of the Requesting Party so indicates, a person agreeing to appear in the territory of the Requesting Party pursuant to this Article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty, by reason of any acts or convictions which preceded his departure from the territory of the Requested Party.

4. The safe conduct provided for by this Article shall cease fifteen days after the Central Authority of the Requesting Party has notified the Central Authority of the Requested Party that the person's presence is no longer required, or if the person has left the territory of the Requesting Party and voluntarily returned to it.

ARTICLE 11

Transfer of Persons in Custody

1. A person in the custody of one Party whose presence in the territory of the other Party is sought for the purpose of providing assistance under this Treaty shall be transferred for that purpose if the person and both Parties consent.

2. For the purposes of this Article:

(a) the Requesting Party shall be responsible for the safety of the person transferred and shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the Requested Party;

(b) the Requesting Party shall return the person transferred to the custody of the Requested Party as soon as circumstances permit and in any event no later than the date upon which he would have been released from custody in the territory of the Requested Party, unless otherwise agreed by both Central Authorities and the person transferred; and

(c) the Requesting Party shall not require the Requested Party to initiate extradition proceedings for the return of the person transferred.

ARTICLE 12

Location or Identification of Persons

1. The Requested Party shall make best efforts to ascertain the location or identity of persons specified in the request.

12

2. The Central Authority of the Requested Party shall promptly communicate the results of its inquiries to the Central Authority of the Requesting Party.

## ARTICLE 13

### Service of Documents

1. The Requested Party shall, as far as possible, effect service of any document relating to or forming part of any request for assistance properly made pursuant to this Treaty by the Requesting Party, including any subpoena or other process requiring the appearance of any person before any authority or tribunal in the territory of the Requesting Party.

2. Service of any subpoena or other process by virtue of paragraph (1) of this Article shall not impose any obligation under the law of the Requested Party to comply with it.

3. The Central Authority of the Requesting Party shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting Party a reasonable time before the scheduled appearance.

4. The Requested Party shall return a proof of service in the manner specified in the request.

## ARTICLE 14

### Search and Seizure

1. The Requested Party shall execute a request for the search, seizure and delivery of any article to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party and it is carried out in accordance with the laws of that Party.

2. The Requested Party may refuse a request if it relates to conduct in respect of which powers of search and seizure would not be exercisable in the territory of the Requested Party in similar circumstances.

3. Every official who has custody of a seized article shall certify the continuity of custody, the identity of the article and the integrity of its condition in the form indicated in Appendix C to this Treaty. No further authentication or certification shall be necessary in order to establish these matters in proceedings in the territory of the Requesting Party. Certification under this Article may also be provided in any other form or manner as may be prescribed from time to time by either Central Authority.

4.  The Central Authority of the Requested Party may require that the Requesting Party agree to terms and conditions which the Requested Party may deem necessary to protect third party interests in the item to be transferred.

## ARTICLE 15

### Return of Documents and Articles

The Central Authority of the Requesting Party shall return any documents or articles furnished to it in the execution of a request under this Treaty as soon as is practicable unless the Central Authority of the Requested Party waives the return of the documents or articles.

## ARTICLE 16

### Assistance in Forfeiture Proceedings

1.  The Parties shall assist each other in proceedings involving the identification, tracing, freezing, seizure or forfeiture of the proceeds and instrumentalities of crime and in relation to proceedings involving the imposition of fines related to a criminal prosecution.

2.  If the Central Authority of one Party becomes aware that proceeds or instrumentalities are located in the territory of the other Party and may be liable to freezing, seizure or forfeiture under the laws of that Party, it may so inform the Central Authority of the other Party. If the Party so notified has jurisdiction, this information may be presented to its authorities for a determination whether any action is appropriate. The said authorities shall issue their decision in accordance with the laws of their country and the Central Authority of that country shall ensure that the other Party is aware of the action taken.

3.  A Requested Party in control of forfeited proceeds or instrumentalities shall dispose of them according to its laws. Either Party may transfer forfeited assets or the proceeds of their sale to the other Party to the extent permitted by their respective laws, upon such terms as may be agreed.

## ARTICLE 16 bis

### Identification of Bank Information

1.  (a)  Upon request of the Requesting Party, the Requested Party shall, in accordance with the terms of this Article, promptly ascertain if the banks located in its territory possess information on whether an identified natural or legal person suspected of or charged with a criminal offence is the holder of a bank account or accounts. The Requested Party shall promptly communicate the results of its enquiries to the Requesting Party.

14

(b) The actions described in subparagraph (a) may also be taken for the purpose of identifying:

    (i)     information regarding natural or legal persons convicted of or otherwise involved in a criminal offence;

    (ii)    information in the possession of non-bank financial institutions; or

    (iii)   financial transactions unrelated to accounts.

2.  In addition to the requirements of Article 4(2) of this Treaty, a request for information described in paragraph 1 shall include:

(a) the identity of the natural or legal person relevant to locating such accounts or transactions;

(b) sufficient information to enable the competent authority of the Requested Party to:

    (i)     reasonably suspect that the natural or legal person concerned has engaged in a criminal offence and that banks or non-bank financial institutions in the        territory of the Requested Party may have the information requested; and

    (ii)    conclude that the information sought relates to the criminal investigation or proceeding; and

(c) to the extent possible, information concerning which bank or non-bank financial institution may be involved, and other information the availability of which may aid in reducing the breadth of the enquiry.

3.  Unless subsequently modified by exchange of diplomatic notes between the European Union and the United States of America, requests for assistance under this Article shall be transmitted between:

(a) for the United Kingdom:
    (i) The Lord Advocate, where the request relates only to Scotland;
    (ii) The Secretary of State for Northern Ireland, where the request relates only to Northern Ireland;
    (iii) The Secretary of State for the Home Department, in all other cases; and

(b) for the United States of America, the attaché responsible for the United Kingdom of the:
    (i) U.S. Department of Justice, Drug Enforcement Administration, with respect to matters within its jurisdiction;
    (ii) U.S. Department of Homeland Security, Bureau of Immigration and Customs Enforcement, with respect to matters within its jurisdiction;
    (iii)U.S. Department of Justice, Federal Bureau of Investigation, with respect to all other matters.

4.  The United States of America and the United Kingdom shall provide assistance under this Article with respect to money laundering and terrorist activity punishable under the laws of both the Requesting and Requested Parties, and with respect to such

15

other criminal activity as to which they may notify each other.

5. The Requested Party shall respond to a request for production of the records concerning the accounts or transactions identified pursuant to this Article in accordance with the other provisions of this Treaty.

## ARTICLE 16 ter

### Joint Investigative Teams

1. Joint investigative teams may be established and operated in the respective territories of the United States of America and the United Kingdom for the purpose of facilitating criminal investigations or prosecutions involving the United States of America and one or more Member States of the European Union where deemed appropriate by the United States of America and the United Kingdom.

2. The procedures under which the team is to operate, such as its composition, duration, location, organization, functions, purpose, and terms of participation of team members of a State in investigative activities taking place in another State's territory shall be as agreed between the competent authorities responsible for the investigation or prosecution of criminal offences, as determined by the respective States concerned.

3. The competent authorities determined by the respective States concerned shall communicate directly for the purposes of the establishment and operation of such team except that where the exceptional complexity, broad scope, or other circumstances involved are deemed to require more central coordination as to some or all aspects, the States may agree upon other appropriate channels of communications to that end.

4. Where the joint investigative team needs investigative measures to be taken in one of the States setting up the team, a member of the team of that State may request its own competent authorities to take those measures without the other States having to submit a request for mutual legal assistance. The required legal standard for obtaining the measure in that State shall be the standard applicable to its domestic investigative activities.

## ARTICLE 16 quater

### Video Conferencing

1. The use of video transmission technology shall be available between the United States of America and the United Kingdom for taking testimony in a proceeding for which mutual legal assistance is available of a witness or expert located in the Requested Party. To the extent not specifically set forth in this Article, the modalities governing such procedure shall be as otherwise provided under this Treaty.

2. The Requesting and Requested Parties may consult in order to facilitate resolution of legal, technical or logistical issues that may arise in the execution of the request.

16

3.  Without prejudice to any jurisdiction under the law of the Requesting Party, making an intentionally false statement or other misconduct of the witness or expert during the course of the video conference shall be punishable in the Requested Party in the same manner as if it had been committed in the course of its domestic proceedings.

4.  This Article is without prejudice to the use of other means for obtaining of testimony in the Requested Party available under applicable treaty or law.

5.  The Requested Party may permit the use of video conferencing technology for purposes other than those described in paragraph 1 of this Article, including for purposes of identification of persons or objects, or taking of investigative statements.

## ARTICLE 17

### Compatibility with Other Arrangements

Assistance and procedures set forth in this Treaty shall not prevent either of the Parties from granting assistance to the other Party through the provisions of other international agreements to which it may be a party, or through the provisions of its national laws. The Parties may also provide assistance pursuant to any arrangement, agreement, or practice which may be applicable between the law enforcement agencies of the Parties.

## ARTICLE 18

### Consultation

1. The Parties, or Central Authorities, shall consult promptly, at the request of either, concerning the implementation of this Treaty either generally or in relation to a particular case. Such consultation may in particular take place if, in the opinion of either Party or Central Authority, the expenses or other resources required for the implementation of this Treaty are of an extraordinary nature, or if either Party has rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty.

2. With respect to any matter for which assistance could be granted under this Treaty, neither Party shall enforce any compulsory measure requiring an action to be performed by any person located in the territory of the other Party, unless the Party proposing such enforcement has first exhausted the procedures established in paragraphs (3) and (4) of this Article.

17

3. If a Party is aware that its authorities are intending to take measures referred to in paragraph (2) of this Article, its Central Authority shall inform the other Central Authority, who may request consultations. If the other Party is aware of or considers that the authorities of the first Party have taken or are about to take any such measures, its Central Authority may request consultations. Thereafter, the Central Authorities shall consult with a view to determining whether the assistance sought can be provided under this Treaty, or otherwise resolving the matter.

4. Where consultations fail to resolve the matter, or unreasonable delay may be jeopardizing the successful completion of a proceeding, either Central Authority may give the other written notice to that effect.

5. Unless otherwise agreed by the Parties, the obligations under paragraphs (2), (3) and (4) of this Article shall have been fulfilled 21 days after receipt of this written notice, provided that this is not less than 60 days after receipt of the request referred to in paragraph (3) above.

6. Even in those cases in which the Parties' obligations under this Article have been fulfilled, each Party shall continue to exercise moderation and restraint.

ARTICLE 19

Definition

For the purposes of this Treaty, "proceedings" means proceedings related to criminal matters and includes any measure or step taken in connection with the investigation or prosecution of criminal offences, including the freezing, seizure or forfeiture of the proceeds and instrumentalities of crime, and the imposition of fines related to a criminal prosecution.

ARTICLE 20

Termination

Either Party may terminate this Treaty by means of a written notice to the other Party. Termination shall take effect six months following the date of notification.

18

Appendix A

CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I,(Name), attest on penalty of criminal punishment for false statement or false attestation that I am employed by (Name of Business from which documents are produced) and that my official title is (Official Title). I further state that each of the records attached hereto is the original or a duplicate of the original of records in the custody of (Name of Business from which documents are produced).  I further state that:

     A)  such records were made at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those, matters;

     B)  such records were kept in the course of a regularly conducted business activity;

     C)  the business activity made the records as a regular practice; and

     D)  if any of such records is not the original, such record is a duplicate of the original.

_____

_____
     (Signature)                                          (Date)

Sworn to or affirmed before me,

_____,
                                       (Name)

a _____, this _____ day
(notary public, judicial officer, etc.)

of _____, 20\_\_.

19

Appendix B

ATTESTATION OF AUTHENTICITY OF FOREIGN PUBLIC DOCUMENTS

I, (Name), attest on penalty of criminal punishment for false statement or attestation that my position with the Government of (Country) is (Official Title) and that in that position I am authorized by the law of (Country) to attest that the documents attached and described below are true and accurate copies of original official records which are recorded or filed in (Name of Office or Agency) which is a government office or agency of the Government of (Country).

Description of Documents:

_____

(Signature)

_____

(Title)

_____

(Date)

20

Appendix C

## ATTESTATION WITH RESPECT TO SEIZED ARTICLES

I, (Name), attest on penalty of criminal punishment for false statement or attestation that my position with the Government of (Country) is (Title). I received custody of the articles listed below from (Name of Person) on (Date), at (Place). I relinquished custody of the articles listed below to (Name of Person) on (Date) at (Place) in the same condition as when I received them (or if different, as noted below).


Description of Articles:



Changes in condition while in my custody·



Official Seal

_____

(Signature)


_____

(Title)


_____

(Place)


_____

(Date)

21