Jonathan Matthew Baum (SBN: 303469)
**Steptoe & Johnson LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Dwight J. Draughton
Drew C. Harris
**Steptoe & Johnson LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone:  (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

## NORTHERN  DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>MICHAEL RICHARD LYNCH and<br>STEPHEN KEITH CHAMBERLAIN,<br><br>    Defendants. | Case No.: 3:18-cr-00577-CRB<br><br>Judge: Hon. Charles Breyer<br><br>**DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) AND TO COMPEL THE GOVERNMENT TO PRODUCE *BRADY* MATERIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  November 29, 2023<br>Court:  Courtroom 6 – 17th Floor<br>Date Filed:  November 14, 2023<br>Trial Date:  March 18, 2024 |

## TABLE OF CONTENTS

Page Nos.

SUMMARY OF ARGUMENT ................................................................ v

MEMORANDUM OF POINTS AND AUTHORITIES ................................ 1

I.   BACKGROUND ............................................................... 1

    A.   Overview ................................................................ 1

    B.   The Lead-Up to the Write-Down ........................................ 2

    C.   The Write-Down ....................................................... 5

II.  APPLICABLE LEGAL STANDARDS ....................................... 9

    A.   Federal Rule of Criminal Procedure 17(c) ............................. 9

    B.   The Government's *Brady* Obligation ................................... 10

III. THE REQUESTED SUBPOENAS ........................................... 11

    A.   Requested Subpoenas .................................................. 11

    B.   The Requested Materials Are Relevant and Admissible ................. 12

IV.  THE COURT SHOULD COMPEL THE GOVERNMENT TO PROVIDE THE REQUESTED MATERIALS FROM HP AND DELOITTE ............... 15

V.   CONCLUSION ............................................................ 15

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

i

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page Nos.</u>

3
*Brady* v. *Maryland*,
    373 U.S. 83 (1963) ................................................................................................. iv, 10

4

5
*Kyles* v. *Whitley*,
    514 U.S. 419 (1995) ..................................................................................................... 10

6

7
*United States* v. *Bergeson*,
    425 F.3d 1221 (9th Cir. 2005) ..................................................................................... 10

8

9
*United States* v. *Blanco*,
    392 F.3d 382 (9th Cir. 2004) ....................................................................................... 10

10

11
*United States* v. *Coburn*,
    No. 2:19-cr-00120 (KM), 2023 WL 6210864 (D.N.J. July 20, 2023) ....................... 10

12

13
*United States* v. *Connolly*,
    No. 16-cr-00370-CM, 2019 WL 2120523, (S.D.N.Y. May 2, 2019) .................. 11, 14

14
*United States* v. *Holovacko*,
    781 F. App'x 100 (3d Cir. 2019) ................................................................................. 10

15

16
*United States* v. *Hussain*,
    No. 3:16-cr-00462 (CRB) (N.D. Cal) .................................................................Passim

17

18
*United States* v. *Komisaruk*,
    885 F.2d 490 (9th Cir. 1989) ......................................................................................... 9

19

20
*United States* v. *Krane*,
    625 F.3d 568 (9th Cir. 2010) ....................................................................................... 10

21

22
*United States* v. *Nixon*
    418 U.S. 683 (1974) ................................................................................................. 9, 10

23

24
*United States* v. *Rajaratnam*,
    753 F. Supp. 2d 317 (S.D.N.Y. 2011) .......................................................................... 9

25
*United States* v. *Risha*,
    445 F.3d 298 (3d Cir. 2006) ....................................................................................... 10

26

27
*United States* v. *Tucker*,
    249 F.R.D. 58 (S.D.N.Y. 2008) .................................................................................... 9

28

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

1

2

**Rules**

3

Fed. R. Crim. P. 17(c) ........................................................................................... iv, 9, 11

Crim. L.R. 17-2 ......................................................................................................... iv, 9

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

iii

1

## NOTICE OF MOTION AND MOTION

2
TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:

3
PLEASE TAKE NOTICE that on November 29, 2023 at 1:30 p.m., or as soon thereafter

4
as counsel may be heard, in Courtroom 6, 17th Floor of the United States District Court for the

5
Northern District of California, 450 Golden Gate Avenue, San Francisco CA 94102, Defendant

6
Michael Richard Lynch will and hereby does move the Court to issue subpoenas to Hewlett

7
Packard ("HP"), PricewaterhouseCoopers ("PwC"), Ernst & Young ("EY"), and Deloitte LLP

8
("Deloitte") pursuant to Federal Rule of Criminal Procedure 17(c)(1), and Local Rule 17-2(a).

9
The proposed subpoenas are attached to the accompanying Declaration of Daniel Silver as

10
Exhibits 1 through 4.  In addition, Dr. Lynch will and hereby does move the Court to compel the

11
government to produce records in the possession of HP and Deloitte pursuant to *Brady* v.

12
*Maryland*, 373 U.S. 83, 87 (1963).

13
This motion is based upon the following Memorandum of Points and Authorities, the

14
Declaration of Daniel Silver submitted herewith, oral argument, and the pleadings and exhibits

15
on file with the Court.

16

17

18

19

20

21

22

23

24

25

26

27

28

---

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

## SUMMARY OF ARGUMENT

Unlike in *United States* v. *Hussain*, No. 3:16-cr-00462 (CRB), the period *after* the acquisition will be front and center in the government's case against Dr. Lynch. The government made this clear in its Voluntary Bill of Particulars ("VBOP") (ECF No. 230), asserting that Count Seventeen "charges a conspiracy to conceal from HP and eventually the government, and otherwise make false and misleading statements about, the truth of Autonomy's financial performance *before and after* the 2011 acquisition . . . ." *Id.* at 5-6 (emphasis added). Thus, the government plans to "adduce evidence about the aftermath of the acquisition" including the post-acquisition "underperformance of [] Autonomy" and "false and misleading statements by [Dr. Lynch] to HP and to the public regarding the financial performance of Autonomy and HP made between 2011-2016." *Id.* at 5. In essence, Count Seventeen charges a seven-year post-acquisition conspiracy that seeks to blame Dr. Lynch for Autonomy's struggles under HP's dysfunctional ownership and twists his efforts to defend himself against HP's $5 billion fraud accusation into a scheme to obstruct the government's investigation and mislead the public about HP's claims.

Documents uncovered since the *Hussain* trial, however, expose the lie in HP's claim that the Autonomy write-down was caused by a $5 billion fraud perpetrated by Dr. Lynch. To the contrary, these documents show that the real reason for the write-down was that HP actively thwarted the integration of Autonomy; failed to execute on the wildly optimistic synergies it had projected to achieve from integrating Autonomy; and then, with its stock price crumbling under the weight of its own mismanagement, circled the wagons to protect its new leaders and wantonly accused Dr. Lynch of a $5 billion fraud.

Contrary to its public statements in November 2012, HP performed no real analysis or investigation to support its allegations of fraud. Rather, HP's internal analysis attributed the bulk of the write-down to the loss of projected synergies caused by HP's mismanagement of the integration of Autonomy into its business. But this was not a story HP wanted the market to hear, so it adopted a false narrative. EY, HP's external auditor, refused to sign off on HP's claims. Indeed, contemporaneous communications reveal that EY and HP finance executives

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

v

disagreed with HP's public statements about the write down, HP prepared no written analysis of the impact of the alleged fraud on Autonomy's value, and the SEC investigated HP for misleading the market with unsupported statements about the magnitude of Autonomy's alleged fraud.  Put simply, the write-down was a fabrication and demonstrating this will be central to Dr. Lynch's defense against the government's allegations: 1) about the reasons for Autonomy's post-acquisition underperformance; and 2) that Dr. Lynch engaged in obstruction by misleading HP and the public about events that supposedly led to the write-down.

To defend against the government's meritless allegations about Autonomy's underperformance and corroborate his good faith belief as to the falsity of HP's public claims in November 2012, Dr. Lynch requires discovery that will undermine the basis for those claims. However, there are significant gaps in the discovery produced to date.  Therefore, for the reasons set forth below, the Court should grant Dr. Lynch's request for Rule 17 subpoenas to HP and its external advisors at EY, PwC, and Deloitte for discovery relating to the events preceding the write-down and its aftermath, and also order the government to comply with its *Brady* obligations to obtain such material from HP and Deloitte.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

vi

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   BACKGROUND

### A.   Overview

On November 20, 2012, HP announced an $8.8 billion write-down of Autonomy and attributed over $5 billion of that write-down to fraud.  The government's theory, conveyed in its VBOP, is that Dr. Lynch is responsible for the circumstances that led to the write-down.  But records that have come to light since the *Hussain* trial and testimony from HP witnesses in the civil action brought by HP in the U.K. reveal that HP simply made this $5 billion fraud number up out of thin air.  The write-down was pure theatre conceived and executed because HP was in rapid decline and needed to conceal the fact that Autonomy's growth had collapsed under HP's mismanagement.

Contrary to HP's public statements, HP's internal analysis shows that the write-down had little, if anything to do with alleged fraud.  HP's own finance team saw through the charade (and said so in writing) and HP's auditors at EY refused to sign off on HP's claim.  But HP went forward with this wild accusation, and the government has followed suit.  Several of the government's key witnesses, HP CEO Meg Whitman, CFO Cathie Lesjak, and General Counsel John Schulz, each made false statements to the investing public when they announced the write-down that are contradicted by the contemporaneous record.

### B.   HP's Botched Integration of Autonomy

Shortly after the acquisition announcement in August 2011 and prior to the deal closing in October of 2011, HP fired its former-CEO, Leo Apotheker, and asked its Chief Technology Officer, Shane Robison to leave.  Without the architects of the deal in place to oversee the integration, Autonomy's chances for success were doomed from the start.  A series of missteps by HP followed, including:

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

1

- HP failed to execute upon the planned combination of Autonomy and HP's Vertica unit to create a revolutionary new data analytics product;[1]
- HP's sales commission model incentivized the HP sales team to sell products that *competed* with Autonomy software;[2]
- HP sales reps would often discount Autonomy software in packaged deals to boost their sales of other HP products, so Autonomy's bottom line suffered;[3]
- Fed up with the stifling HP environment, Autonomy personnel left in droves.[4]

These examples highlight the institutional dysfunction that smothered Autonomy under HP's mismanagement.  Contrary to the government's allegations, these obstacles led to Autonomy's underperformance and highlight the need for additional discovery from HP.

### B.    The Lead-Up to the Write-Down

As the forgoing illustrates, it is no wonder Autonomy struggled in the wake of the acquisition.  Dr. Lynch was a casualty of the blame game, ultimately leading to his termination in May 2012.[5]  In the summer of 2012, HP considered whether there was a need to take a write-

---

[1] Silver Decl. Ex. 5 (Excerpt of Meg Whitman U.K. Testimony, Day 26, *Autonomy Corp. Ltd. v. Lynch*, Claim No HC-2015-001324 (High Court of Justice, Chancery Division, London, U.K.) ("*U.K. Civil Trial*") (Bates HP-SEC-02934078)) at 41:15 to 42:17.

[2] Silver Decl. Ex. 6 (Email from Christina Sagemueller to Nitin Kher (June 13, 2012, 08:58) (Document ID POS00333618)) at 2.

[3] Silver Decl. Ex. 7 (Email from Mike Lynch to Bill Veghte (April 26, 2012, 11:01) (Document ID POS00290450)) at 1.

[4] Silver Decl. Ex. 8 (Email from James Drake to Randy Cairns (Sept. 11, 2012, 06:50) (Document ID POS00371006)) at 1.

[5] In June 2012, HP asked Christopher Yelland, Autonomy's CFO at the time, to conduct a "rebasing" exercise to determine what Autonomy's revenues and expenses would have been for 2010-2012 if Autonomy had followed HP's accounting policies and US GAAP accounting rules rather than IFRS.  Later in the fall of 2012, Yelland also began an exercise aimed at restating the accounts of Autonomy's U.K. operating subsidiary, Autonomy Systems Ltd. ("ASL"), for 2010 and finalizing its accounts for 2011.  During this exercise, Yelland re-calculated ASL's historic revenue by removing revenue that he believed had been improperly recognized.  In performing this analysis, it appears that Yelland worked closely with attorneys from Morgan Lewis & Bockius ("Morgan Lewis"), who were advising HP in connection with an internal investigation relating to Autonomy, and with PwC, HP's forensic consultants for this internal review.  Ultimately EY, HP's external auditor, refused to sign off on Yelland's conclusions.  This restatement exercise wasn't completed until 2014, long after HP announced the write-down in November 2012.  The government has made clear that it intends to elicit testimony (as it also did in the *Hussain* trial) from Yelland regarding his post-acquisition analysis of Autonomy's accounts.

---

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

2

down against Autonomy's book value (the value of the company as reflected on HP's balance sheet) in light of its reduced earnings forecast following the unsuccessful integration of Autonomy's business into HP.   In July, after having had full access to Autonomy's books and records for almost one year, HP internally concluded that Autonomy was worth $13.7 billion, $2 billion *more* than what HP had recently paid for it.   On July 31, 2012, HP's accountants concluded that Autonomy's poor performance was due to "*execution issues caused by challenges with operating Autonomy in the HP environment*" and noted that HP's leadership did "*not believe the short-term decline in revenue and operating margin is [] indicative of longer term revenue and margin projections for [Autonomy]*."[6]   In short, there was no claim of fraud.

Meanwhile, HP's overall business was in dire straits.   Between May and November 2012, HP's share price lost 50% of its market value.   By late summer, this share price decline meant that HP had to write down the value of its assets to accord its book value with the market value of HP's shares.   As Lesjak herself admitted during testimony, the ensuing impairment exercise was an arbitrary accounting construct.[7]   Despite the fact that several other HP business units were flailing, HP decided to blame Autonomy to deflect attention from its own mismanagement of the Autonomy integration and the fact that HP's core business was in shambles.

What ensued was a mockery of an impairment exercise.   In the run-up to the write-down, HP's calculations shifted erratically.   For example, on October 5, 2012, new "discount rates" were applied to the business units, with an arbitrarily higher discount rate applied to lower Autonomy's value.[8]   This randomness was not lost on HP's finance team who vented that the

---

[6] Silver Decl. Ex. 9 (Memo drafted by Betsy Branch (July 31, 2012) (Bates HP-SEC-00253796)) at 5.

[7] Silver Decl. Ex. 10 (Excerpt of Cathie Lesjak U.K. Testimony, Day 27, *U.K. Civil Trial* (Bates HP-SEC-02934147)) at 126:22-24 and 128:18-20; Silver Decl. Ex. 11 (Excerpt of Cathie Lesjak U.K. Testimony, Day 28, *U.K. Civil Trial* (Bates HP-SEC-02934173)) at 8:1-6.

[8] The discount rate is a subjective variable used to calculate the present value of a business, which is supposed to represent the cost and risk required to achieve future growth.   Generally, projected future cash flows are reduced by the discount rate (expressed as a percentage) to arrive

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

3

process didn't make any sense.  For example, on October 6, 2012, HP accountant Meeta Sunderwala wrote that the results were "*nonsensical*" and that to sufficiently reduce Autonomy's book value they would "*have to add twice as much (and probably more) premium to the discount rates than the increment already added. Crazy!*"[9]

The calculations continued their unprincipled wild swings throughout October as HP's internal accountants prepared presentations for Whitman regarding the write-down, eventually presenting Whitman with an Autonomy valuation that attributed nothing to synergies.[10] Whitman realized that zeroing out the synergies would show that she had been unable to achieve the growth HP predicted when it bought Autonomy.  As a result, the night before a board meeting to discuss the write-down, Whitman instructed her finance team to redo the calculation. As Sunderwala put it in an email on October 23, 2012, "*Meg wants the final value to include some synergies.*"[11]  The following day, after receiving revised numbers with synergies included from Lesjak, Whitman responded "*Ok . . . The synergy thing just seemed awfully negative especially since we have not really been able to get this organized given everything else we have had on our plate.*"[12]

Inexplicably, the model was redone to include $2.3 billion of synergies.  But this maneuver *increased* Autonomy's valuation, so HP needed to find a way to cut it back down

---

at an estimated present value of the business.  Thus, the higher the discount rate, the lower the valuation.

[9] Silver Decl. Ex. 12 (Email from Meeta Sunderwala to Lynda Wong, Kathryn Harvey, and John Blank (October 6, 2012, 15:26) (Bates HP-SEC-00685589)) at 1.  Her teammate agreed, saying, "*Wow, we are going to have to use some crazy discount rates to get this down to 30%." See* Silver Decl. Ex. 12 (Email from Kathryn Harvey to Meeta Sunderwala, Lynda Wong, and John Blank (October 7, 2012, 20:42) (Bates HP-SEC-00685589)) at 1.

[10] Silver Decl. Ex. 13 (Presentation by HP prepared by Meeta Sunderwala and Steven Fieler (October 21, 2012, 6:36) (Bates HP-SEC-00849834)) at 6.

[11] Silver Decl. Ex. 14 (Email from Meeta Sunderwala to Andy Johnson, Manish Sarin, and Erin Kim (October 23, 2012, 17:16) (Bates HP-SEC-00213658)) at 1.

[12] Silver Decl. Ex. 15 (Email from Meg Whitman to Cathie Lesjak (October 24, 2012, 16:02) (Bates POS00388360)) at 1.  Notably, in the version of this document produced by the government, Whitman's exchange with Lesjak was inexplicably redacted by HP as privileged. Silver Decl. Ex. 16 (Email from Meg Whitman to Cathie Lesjak with redactions applied (October 24, 2012, 16:02) (Bates HP-SEC-02156066)) at 1.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

4

again.  HP's accountants once again resorted to its arbitrary fiddle-factor—the discount rate—increasing Autonomy's to 16%.  When the write-down was broken down for HP's Board, the impairment was shown against HP's previous $17.1 billion internal valuation of Autonomy (which included HP's wildly optimistic synergies); a valuation vastly above the purchase price of $11 billion and almost three times Autonomy's market value at the time of the acquisition.  This aggressive projection of the synergies—that HP had never disclosed to the public—left no margin for error on HP's part.

In the board presentation, the write-down (against the $17.1 billion internal valuation) was attributed to: a) Yelland's rebasing exercise ($1.3 billion) (of which only approximately 5% related to Yelland's conclusions regarding the treatment of accelerated revenue recognition and so-called "reciprocal deals" under GAAP); b) lower margins ($2.9 billion) (mostly caused by HP's business decision to shift to software as a service ("SAAS") deals and increased investment in research and development); c) lower forecast growth rates ($1.8 billion) (driven by lower sales forecasts under HP); d) the effect of lower projected synergies due to HP's integration failures ($5.3 billion); and e) the inflated subjective discount rate ($3.6 billion) (the number that HP's own accountants called "nonsensical").  This left a carrying value of $2.2 billion.[13]  Contrary to what HP told the market in November, fraud allegations had virtually nothing to do with the write-down.

## C.    The Write-Down

On November 20, 2012, HP announced that it would take a write-down of $8.8 billion against Autonomy's book value.  It attributed *"more than $5 billion"* of this write-down to *"serious accounting improprieties, misrepresentation[s] and disclosure failures."*[14]  HP's press release stated that it had

---

[13] Silver Decl. Ex. 17 (Presentation by HP prepared by Meeta Sunderwala, Cathie Lesjak, and George Kadifa (October 24, 2012) (Bates HP-SEC-01571600)) at 2.

[14] Silver Decl. Ex. 18 (HP Press Release (November 20, 2012) (Bates HP-SEC-00246151)) at 1. HP's Form 8-K, filed that same day, stated that the *"majority of this impairment charge relates*

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

5

*"launched its internal investigation into these issues after a senior member of Autonomy's leadership team came forward, following the departure of Autonomy founder Mike Lynch, alleging that there had been a series of questionable accounting and business practices at Autonomy prior to the acquisition by HP. . . . HP initiated an intense internal investigation, including a forensic review by [PwC] of Autonomy's historical financial results. . . ."*[15]

However, HP's internal communications tell a staggeringly different story and reveal that it had no support for its claim of a $5 billion fraud stemming from any "*intense internal investigation.*"[16]  Indeed, Morgan Lewis and PwC only conducted eight interviews just days before the write-down, all of which occurred *after* HP settled on the amount of the write-down. There had only been the arbitrary accounting exercise that HP's own finance team called "*nonsensical.*"[17]  EY, in its November 5, 2012 memorandum to HP regarding the impairment, noted that the write-down was primarily driven by changes in forward-looking sales forecasts and expectations around synergies, and did not attribute any quantifiable portion of the write-down to alleged fraud.[18]  In a subsequent December 2012 memorandum, EY concluded that revenue adjustments due to alleged accounting irregularities would not have had a material impact on HP's original valuation of Autonomy ("*less than $300 million*") and therefore the

---

*to accounting improprieties and disclosure failures at Autonomy . . . that occurred prior to HP's acquisition of Autonomy, misrepresentations made to HP in connection with its acquisition of Autonomy, and the impact of those improprieties, failures and misrepresentations on the expected future financial performance of the Autonomy business over the long-term."* Silver Decl. Ex. 19 (HP's Form 8-K (November 20, 2012) (Bates HP-SEC-00342904)) at 3.

[15] Silver Decl. Ex. 18 at 1.

[16] Contrary to HP's claim that its "internal investigation" was predicated on a whistleblower's report, EY had explicitly flagged to HP in November 2011 that Autonomy's 2011 revenue included $115 million from hardware sales.  Silver Decl. Ex. 20 (Presentation by EY to HP (November 11, 2011) (Bates HP-SEC-02154253)) at 3.

[17] Silver Decl. Ex. 21 (Email from Kathryn Harvey to Meeta Sunderwala, Lynda Wong, and John Blank (October 7, 2012, 17:42) (Bates HP-SEC-01590124)) at 1.

[18] Silver Decl. Ex. 22 (Memorandum prepared by EY for HP (November 5, 2012) (Bates EY-HP-ALAK-EM-000038)) at 13.

---

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

"*known accounting errors [do] not materially impact the valuati*on" at the time of the acquisition.[19]

But there is more:  HP's internal communications show that its own finance team disagreed with HP's public statements.  After HP's announcement, Paul Curtis, a senior member of the HP Finance Team wrote in a chat, "*I think the language our execs used was a bit strong[,] most of what I read yesterday was spin and speculation . . . I think this could make HP look stupid. . . .*"[20]  In the same chat, Antonia Anderson, a key government witness and HP-Autonomy finance employee, noted "*the hardware being disclosed separately isn't an absolute requirement at a level of 10% of total sales,*" and Curtis responded that Deloitte "*were ok with it – it is not like it was hidden[,] disclosure is very judgmental.*"[21]

In the days following the write-down, HP scrambled to try to justify its claims.  Internal communications show that senior HP executives—and HP's own external auditors—thought HP's public statements were flat wrong.  On November 29, 2012, an HP executive contacted Lesjak and asked for help in producing a chart that could be shared with the media to explain how the alleged accounting irregularities impacted HP's valuation of Autonomy.  Lesjak, in turn, contacted a member of the finance team and asked, "*[f]rom whom did you get the [valuation] analysis [] on the impact of the accounting irregularities and misrepresentations?*"  The finance team member responded, "*[w]e've never formally prepared anything to attribute the irregularities to the amount of the write down.*"[22]  Meaning that HP had not performed *any* analysis to support its public accusation that there had been a $5 billion accounting fraud.[23]

---

[19] Silver Decl. Ex. 23 (Memorandum prepared by EY for HP (December 2012) (Bates EY-HP-GMX-12-015243)) at 3.

[20] Silver Decl. Ex. 24 (Chat Transcript between Paul Curtis and Antonia Anderson (November 21, 2012, 18:47) (Bates HP-SEC-02762566)) at 2.

[21] *Id.*

[22] Silver Decl. Ex. 25 (Email from Marc Levine to Cathie Lesjak (November 30, 2012, 19:54) (Bates HP-SEC-00194420)) at 1.

[23] In the U.K. trial, Lesjak testified that she had a verbal conversation with Andy Johnson, VP of Strategy and Corporate Development at HP, regarding the calculation of the amount of the write-

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

7

Contemporaneous communications also show that HP executives were confused as to what was included in the $5 billion figure. For example, following the write-down, HP's PR team discussed with Lesjak how best to explain the calculation of the write-down. In its exchange with Lesjak, the team noted that it needed clarification as to whether failed synergies were "*part of the $5 billion portion of the write down that has been described as attributable to 'accounting improprieties, misrepresentation and disclosure failures'*" or "*the more than $3 billion that we've attributed to the trading value of HP stock and other factors.*"[24] Lesjak replied that the write-down had been calculated off of HP's internal $17.1 billion valuation (which it never disclosed) rather than the public carrying value of $11 billion. She wrote:

> *[i]f you look at this relative to what we were carrying the Autonomy asset for on our books, the $11.1B, the analysis is more complicated. . . . The $6B of accounting issues is probably still right but it is not a science to determine this with a carrying value of $11.1B. . . . I think this debate is the reason I wonder if we really want to go down this path and if we do how best to show it.*[25]

Thus, Lesjak admitted that there was no "scientific" way to determine how HP had arrived at a $5 billion fraud calculation from Autonomy's $11 billion purchase price. In a separate thread, responding to a question from HP's head of investor relations, Sunderwala confirmed that the $5 billion reduction in value due to the alleged fraud actually encompassed the loss of unrealized synergies—meaning that it could not have been attributable to any pre-acquisition fraud.[26]

HP's own auditors at EY also saw through this ruse. Two days *before* the write-down, EY objected to language in the impending press release attributing the "*majority*" of the write-

---

down attributable to fraud, and that Johnson had written some calculations on a whiteboard. Silver Decl. Ex. 26 *U.K Civil Trial* (Bates HP-SEC-02934180)) at 34:22 – 36:23.

[24] Silver Decl. Ex. 27 (Email from Michael Kuczkowksi to Henry Gomez, John Schultz, and Cathie Lesjak (December 12, 2012, 16:03) (Bates HP-SEC-00621850)) at 3.

[25] *Id.* at 1.

[26] Silver Decl. Ex. 28 (Email from Meeta Sunderwala to Rob Binns, Betsy Branch, and Al Gross (December 11, 2012, 19:23) (Bates HP-SEC-00253252)) at 2.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

8

down to fraud—but HP went ahead anyway.[27]  Following the write-down, EY again refused to sign off on the same problematic language in HP's 2012 annual report.[28]

EY was not alone in its skepticism.  The discovery material reveals that the SEC investigated HP in the wake of the write-down regarding whether HP misled the market by falsely stating that more than $5 billion of the write-down was attributable to fraud.  Internal communications from HP reflect HP's struggle to justify its prior statements.  On December 13, 2012, Sunderwala stressed that "*it would be extremely difficult to calculate the portion of the impairment that relates to accounting improprieties/misrepresentations. . . .*"[29]

In sum, while the government alleges that Dr. Lynch is responsible for the circumstances that led to the write-down and that he spent years following the write-down misleading the public about what occurred, in reality, HP made false accusations about Dr. Lynch in an attempt to blame him for HP's own missteps.  Dr. Lynch is entitled to discovery regarding the events leading up to the write-down and its aftermath to mount a defense to these allegations.

## II.    APPLICABLE LEGAL STANDARDS

### A.    Federal Rule of Criminal Procedure 17(c)

Rule 17(c) of the Federal Rules of Criminal Procedure governs the issuance of subpoenas *duces tecum* in federal criminal proceedings.  Fed. R. Crim. P. 17(c); *see also* N.D. Ca. Crim. L.R. 17-2(a).  In *United States* v. *Nixon*, the Supreme Court held, in the context of a prosecution subpoena to the President of the United States, the prosecution:

> [M]ust show (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such

---

[27] Silver Decl. Ex. 29 (Email from Rob Binns to Kevin Asher, Betsy Branch, and Marc Levine (November 18, 2012, 15:28) (Bates HP-SEC-00640934)) at 1.

[28] Silver Decl. Ex. 30 (Email from Kevin Asher to Marc Levine, Betsy Branch, Meeta Sunderwala (December 23, 2012, 14:15) (Bates HP-SEC-01590886)) at 1.

[29] Silver Decl. Ex. 31 (Email from Meeta Sunderwala to Betsy Branch (December 12, 2012, 12:23) (Bates HP-SEC-00252370)) at 2.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

9

inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

418 U.S. 683, 699–700 (1974).  In short, the party seeking production of documents "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity."  *Id.* at 700; *see also United States* v. *Komisaruk*, 885 F.2d 490, 494 (9th Cir. 1989).[30]

In considering whether to grant a pre-trial subpoena, courts "engage[] in a 'discretionary, case-by-case inquiry'" considering the *Nixon* factors and the purposes for which documents are sought.  *United States* v. *Krane*, 625 F.3d 568, 574 (9th Cir. 2010) (quoting *United States v. Bergeson*, 425 F.3d 1221, 1225 (9th Cir. 2005)).

## B.    The Government's *Brady* Obligation

"The government has an obligation under *Brady* v. *Maryland* to provide exculpatory evidence to a criminal defendant."  *United States* v. *Blanco*, 392 F.3d 382, 387 (9th Cir. 2004); *see also Brady* v. *Maryland*, 373 U.S. 83, 87 (1963).  This obligation extends to "any favorable evidence known to the others acting on the government's behalf in the case[.]"  *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995).  The central concern of *Brady* is implicated when the prosecution engages in joint fact-finding with a third party.  "There is no question that the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession."  *United States* v. *Risha*, 445 F.3d 298, 303 (3d Cir. 2006).  The key question in assessing this duty is "whether a prosecutor may be deemed to have 'constructive possession' of the evidence, meaning that, 'although a prosecutor has no actual knowledge, he should nevertheless have

---

[30] Some courts have ruled that a criminal defendant seeking material from a third party need only show that the requested items are "(1) reasonable, construed as 'material to the defense,' and (2) not unduly oppressive for the producing party to respond."  *United States* v. *Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008); *see also United States* v. *Rajaratnam*, 753 F. Supp. 2d 317, 321 n.1 (S.D.N.Y. 2011) ("[I]t remains ironic that a defendant in a breach of contract case can call on the power of the courts to compel third-parties to produce any documents '*reasonably calculated to lead to the discovery of admissible evidence*,' . . . while a defendant on trial for his life or liberty does not even have the right to obtain documents '*material to his defense*' from those same third-parties.") (emphasis added) (citation omitted).

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

10

known that the material at issue was in existence.'" *United States* v. *Coburn*, Civ. No. 2:19-cr-00120 (KM), 2023 WL 6210864, at \*10 (D.N.J. July 20, 2023) (citing *Risha*, 445 F.3d at 303).

The degree of collaboration between the government and the third-party bears directly on whether the prosecution has constructive possession.[31] If a third party "has worked very closely with law enforcement to assist with [an] investigation, prosecutors may sometimes be considered to have constructive possession of evidence held by the third party." *United States* v. *Holovacko*, 781 F. App'x 100, 105 (3d Cir. 2019). Evidence gathered pursuant to a third-party investigation is attributable to the government if "there is a sufficiently close nexus between the state and the challenged action." *United States* v. *Connolly,* No. 16-cr-00370-CM, 2019 WL 2120523, at \*10, (S.D.N.Y. May 2, 2019) (citation omitted). In *Connolly*, the district court found that the defendants' former employer, Deutsche Bank, had cooperated so thoroughly with the government's investigation that "Deutsche Bank's investigation pretty much *was* the Government's investigation." *Id*. at \*13 (emphasis original).[32]

## III.   THE REQUESTED SUBPOENAS

### A.   Requested Subpoenas

Dr. Lynch is seeking the following subpoenas.[33]

- To HP for all records and communications between October 1, 2011 and January 31, 2014 relating to i) the write-down of Autonomy; ii) the restatement of ASL's 2010 accounts and the filing of ASL's 2011 accounts; iii) Deloitte's audit work for

---

[31] The Third Circuit has articulated several factors used to assess whether the prosecution should be considered to have constructive possession of documents held by a third party. *See Risha*, 445 F.3d at 304. Those factors include: "whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control' . . . and . . . whether the entity charged with constructive possession has 'ready access' to the evidence." *Id*. Although *Risha* involved cooperation between federal and state prosecutors, the Third Circuit recently applied the *Risha* factors to a case involving a private third party. *See United States* v. *Holovacko*, 781 F. App'x 100, 105 (3d Cir. 2019).

[32] In the *Hussain* trial, this Court denied the defendant's motion to compel the government to obtain *Brady* material from HP and directed the defendant to proceed instead via Rule 17(c) subpoenas. *See* Transcript of Proceedings at 18, *United States* v. *Hussain,* No. CR 16-462 (CRB) (N.D. Cal. May 10, 2017)*,* ECF No. 64. However, Hussain's application predated *Connolly*.

[33] The full text of the proposed subpoenas is included as Exhibits 1-4 of the Silver Declaration.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

Autonomy; iv) EY's post-closing review of Autonomy's 2011 accounts; and v) the integration of Autonomy into HP.

- To PwC, for all records and communications between May 1, 2012 and January 31, 2014 relating to i) HP's write-down of Autonomy in November 2012; ii) the restatement of ASL's 2010 accounts; and iii) the filing of ASL's 2011 accounts.
- To Deloitte, for all records and communications between October 1, 2011 and December 31, 2012 relating to i) Deloitte's review of ASL's 2011 accounts; ii) the restatement of ASL's 2010 accounts; and iii) Deloitte's termination by HP as Autonomy's external auditor.
- To EY, for all records and communications between October 1, 2011 and January 31, 2014 relating to i) the write-down of Autonomy; ii) the review and preparation of ASL's 2011 accounts; iii) the restatement of ASL's 2010 accounts; and iv) the post-closing review of Autonomy's 2011 accounts.

### B.     The Requested Materials Are Relevant and Admissible

There are significant gaps in the discovery produced to date regarding the events leading up to and following the write-down, as well as Yelland's restatement analysis.[34]  Yelland testified that he worked with PwC on the restatement exercise[35] and documents produced by the government reveal that Yelland coordinated closely with both PwC and Morgan Lewis.[36]  However, the government has produced only a handful of communications between HP and PwC relating to PwC's post-acquisition investigation of Autonomy.[37]  These communications do not reflect the full scope of PwC's work, and the government has not produced any internal communications from PwC regarding the restatement, PwC's review of Autonomy's accounting practices, or the write-down.  Given that Yelland's restatement analysis is a centerpiece of the government's case, and that PwC's investigation purportedly formed the basis for HP's

---

[34] Dr. Lynch made substantially similar requests for discovery in a letter to the government dated July 13, 2023.  However, the government failed to produce any additional materials.

[35] Silver Decl. Ex. 32 (Excerpt of Christopher Yelland Testimony, Transcript of Record, *United States v. Hussain*, No. CR 16-462 CRB (N.D. Cal Apr. 17, 2018) ("*U.S. v. Hussain*") (Bates INVOKE_00158279) at 5187:21 – 5188:7.

[36] Silver Decl. Ex. 33 (Email from Christopher Yelland to Josh Drew, Robert Particelli, Paul Roeder, dhales@uk.ey.com, and john.f.tracey@uk.pwc.com (April 3, 2013, 10:58) (Document ID POS00424252)) at 1.

[37] *See, e.g.,* Silver Decl. Ex. 34 (Email from Rebecca Rossiter to Antonia Anderson (November 26, 2012, 19:09) (Bates HP-SEC-00755188)) at 1–2.

---

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

12

allegation of fraud in November 2012, it is essential that Dr. Lynch receive all communications from HP and PwC relating to PwC's work on the restatement and the write-down.

With respect to Deloitte, it is apparent from the materials produced by HP in the U.K. civil case that HP fired Deloitte as Autonomy's auditor on November 20, 2012—the same day as the write-down.[38]  In an email regarding Deloitte's termination, when describing his work with Deloitte on preparing the 2011 ASL accounts (later filed by Yelland in 2014 with the restatement), Yelland wrote that HP "*obviously do[es] not agree with Deloitte on the treatment of certain items.*"[39]  This contemporaneous "disagreement" between HP and Deloitte regarding Autonomy's accounting practices and the ASL accounts is crucial to Dr. Lynch's defense as it reflects that Deloitte stood behind its accounting judgments long after the acquisition and even when challenged by HP.  These materials will also directly contradict the accounts filed by Yelland with the restatement that the government has said in its VBOP it intends to rely on again.  However, Dr. Lynch has not received any discovery from HP or Deloitte regarding the circumstances leading to Deloitte's termination or the nature of these disagreements.

On November 16, 2012, a few days before the write-down, HP made its first presentation to the SEC regarding its investigation of Autonomy.  Notably, HP did not reference a $5 billion fraud, nor did HP attempt to quantify the amount of the alleged fraud in anyway.[40]  As set forth above, following the write-down, the SEC investigated the accuracy of HP's public disclosures regarding the portion of the write-down purportedly attributable to fraud.  However, Dr. Lynch has not received any discovery from HP regarding this investigation or its communications with the SEC.  Given the importance of this matter to HP, any communications with the SEC would likely have been vetted by CEO Whitman, CFO Lesjak, and General Counsel Schultz—all of whom are on the government's witness list and who made or authorized the offending statements

---

[38] Silver Decl. Ex. 35 (Email from Betsy Branch to Michael Flint and Christopher Yelland (November 20, 2012, 15:27) (Bates POS00403333)) at 2.
[39] *Id.* (Email from Christopher Yelland to Betsy Branch (November 20, 2012, 16:10)) at 1.
[40] Silver Decl. Ex. 36 (Presentation by HP to the SEC prepared by Leslie Caldwell, Susan Resley, and Martha Stolley (November 16, 2012) (Bates HP-SEC-02348204)).

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

13

to the marketplace.  Any information in the correspondence between the SEC and HP that undermines HP's claims of a $5 billion accounting fraud by Autonomy is critical to (a) corroborate Dr. Lynch's good faith when publicly defending himself, and (b) impeach the credibility of important government witnesses at trial.

The discovery produced to date also reflects that EY disagreed with HP's characterization of the write-down.  Specifically, EY objected to language in HP's press release issued at the time of the write-down and in HP's 10-K attributing the "*majority*" of the write-down to fraud.[41] However, the government has not produced any internal communications from EY relating to EY's analysis of the impairment.  In addition, the discovery produced does not reveal whether or how the disagreement between HP and EY regarding the characterization of the write-down was resolved.  This dispute between HP and its auditor regarding HP's statements surrounding the write-down is directly relevant to Dr. Lynch's defense to the government's claim that he misled the public following HP's allegations.

Finally, it is apparent that EY also conducted audit work relating to Yelland's restatement.[42]  On June 17, 2013, Yelland wrote that "*[t]he EY audit work and some of our own investigation work is also ongoing and there will inevitably be some form of audit qualification[.]*"[43]  EY ultimately refused to sign off on the restatement.[44]  However, Dr. Lynch has not received any communications from HP or EY regarding EY's audit work on the restatement.  Given the centrality of the restatement analysis to the government's case, Dr. Lynch needs to obtain communications from EY and HP regarding EY's work with Yelland.

---

[41] Silver Decl. Ex. 29 & 30.

[42] Silver Decl. Ex. 37 (Email from Christopher Yelland to Marc Levine, Roberto Putland, Paul Roeder, Joel Scott, Jeremy Cox, and Rob Binns (June 17, 2013, 12:23) (Document ID POS00428644)) at 2.

[43] *Id.*

[44] Silver Decl. Ex. 38 (Excerpt of Christopher Yelland Testimony, Transcript of Record, *U.S. v. Hussain* (Apr. 17, 2018) at 5210:24 – 5211:13 (Bates INVOKE_00158302); Silver Decl. Ex. 39 (Autonomy Systems Limited Report and Financial Statements for 10 months ended 31 October 2011 (Bates HP-SEC-01575611)) at 12.

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

14

**IV.    THE COURT SHOULD COMPEL THE GOVERNMENT TO PROVIDE THE REQUESTED MATERIALS FROM HP AND DELOITTE**

The Court should also order the government to obtain the requested materials from HP and Deloitte pursuant to its *Brady* obligations.  HP effectively functioned as an arm of the government throughout this investigation.  HP made more than ten presentations to the government pertaining to Autonomy's alleged wrongdoing, conducted dozens of witness interviews and provided summaries of those interviews to the government, prepared witness binders for the government to aid in their interviews, and performed (at the government's request) extensive forensic analyses of Autonomy's transactions.[45]  As post-*Hussain* caselaw makes clear, this close collaboration between HP's and the government rendered HP effectively an arm of the government for purposes of its investigation.  *See, e.g.*, *Connolly*, 2019 WL 2120523, at *13.

In addition, after the government intervened to broker a settlement between HP and Deloitte and agreed to share statements of Deloitte witnesses with HP,[46] Deloitte entered into a formal cooperation agreement with the government.  In that agreement, Deloitte committed to provide "*all documents, records, or other evidence in [its] possession, custody, or control*" to the government "*when requested to do so*" by the United States Attorney's Office.[47]  Rather than require the defendant to proceed solely by subpoena, the court should compel the government to comply with its *Brady* obligations to obtain the requested materials from HP and Deloitte.

**V.    CONCLUSION**

For the reasons herein, the motion should be granted.

---

[45] *See* Silver Decl. Ex. 40 (Declaration of Brook Dooley, *United States* v. *Hussain*, No. CR 16-462 CRB, ECF No. 46 (N.D. Cal Apr. 26, 2017)).

[46] *Id*. at Ex. E.

[47] Silver Decl. Ex. 41 (Cooperation Agreement between Deloitte LLP and the United States Attorney's Office, *In re Autonomy Investigation* (April 28, 2016) (Bates USAO 00002668)).

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17(c) – 3:18-CR-00577-CRB

15

Dated: November 14, 2023

Respectfully submitted,

By: /s/ Christopher J. Morvillo
Christopher J. Morvillo

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**CLIFFORD CHANCE US LLP**

Jonathan Matthew Baum (SBN: 303469)
**STEPTOE & JOHNSON LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Dwight J. Draughton
Drew C. Harris
**STEPTOE & JOHNSON LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

*Attorneys for Defendant*
*Michael Richard Lynch*

---

DEFENDANT MICHAEL RICHARD LYNCH'S MOTION FOR ISSUANCE OF SUBPOENAS PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 17(c)  – 3:18-CR-00577-CRB