United States

V

(1) Michael Richard Lynch
(2) Stephen Chamberlain

---

## Summary of independent expert accounting opinions of Steven Brice FCA

## 8 November 2023

---



**Private & Confidential**

United States Attorney's Office
11th Floor, Federal Building
450 Golden Gate Avenue, Box 36055
San Francisco
California 94102

Date:        8 November 2023

Dear Sir / Madam

**United States V (1) Michael Richard Lynch (2) Stephen Chamberlain**

I have been instructed as an Independent Expert Accountant by the United States Attorney's Office in the matter of United States versus Dr Michael Richard Lynch and Mr Stephen Chamberlain.  Dr Lynch is the former chief executive officer of Autonomy Corporation plc and Mr Chamberlain is the former vice president of finance.

I understand that my duty as an Independent Expert Accountant is to help the Court by giving independent assistance by way of objective, unbiased opinion on matters within my expertise, both in preparing reports and giving oral evidence.  I understand that this duty overrides any obligation to the party by whom I am engaged or the person who has paid or is liable to pay me.  I confirm that I have complied with, and will continue to comply with, that duty.

I confirm that I have not entered into any arrangement where the amount or payment of my fees is in any way dependent upon the outcome of the case.  I know of no conflict of interest of any kind which would prevent me from acting in this matter.

I confirm that the contents of this summary report are true to the best of my knowledge and belief and that the opinions I have expressed represent my true and complete professional opinion.

Yours faithfully

**Steven Brice**
Partner



**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**Summary of independent expert accounting opinions of Steven Brice FCA**

# Contents

Page

**1    Introduction** ................................................................................................... **6**

1.1    My qualifications and experience .......................................................... 6

1.2    Summary background ........................................................................... 6

1.3    My instructions .................................................................................... 7

1.4    My instruction in United States versus Sushovan Tareque Hussain ................... 7

1.5    The available information ...................................................................... 8

1.6    Scope of this summary report .............................................................. 9

**2    Summary of my opinion in relation to software sales transactions** ..................... **10**

2.1    Introduction ....................................................................................... 10

2.2    The starting point for my analysis: the software sales transactions reported by Autonomy as revenue during the Relevant Period ............................... 10

2.3    The applicable accounting standards .................................................. 14

2.4    Overview to my summary conclusions ................................................ 16

2.5    My summary conclusions in relation to Misstatements arising from transactions with resellers which contained one or more revenue recognition issues ........... 19

2.6    My summary conclusions in relation to Misstatements arising from transactions which contained linked or reciprocal transactions ............................... 24

2.7    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services ... 25

2.8    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than royalties ............................ 29

2.9    My summary conclusions in relation to Misstatements arising from transactions which contain timing errors ................................................................. 31

2.10   My summary conclusions in relation to Misstatements arising from transactions which contain errors of valuation .......................................................... 32

**3    Summary of my opinion in relation to hardware sales transactions** .................... **34**

3.1    Introduction ....................................................................................... 34

3.2    The starting point for my analysis: the hardware sales transactions reported by Autonomy as revenue during the Relevant Period ............................... 34

3.3    Overview to my summary conclusions ................................................ 36

3.4    My summary conclusions in relation to the inappropriate accrual or deferral of revenue arising from hardware sales transactions between reporting periods .. 38

3.5    My summary conclusions in relation to the inappropriate reporting of all or part of the cost of purchasing the hardware as being a "*Sales and marketing*" expense ................................................................................................. 41

**mazars**

3.6     My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions........................ 43

**4      My summary conclusions in relation to the revenue streams reported by Autonomy from Q1 2010 onwards ............................................................. 46**

4.1     Introduction........................................................................................................ 46

4.2     The starting point for my analysis: the revenue streams reported by Autonomy in its commentary to the market ...................................................................... 46

4.3     Applicable financial reporting requirements........................................................ 47

4.4     Overview to my summary conclusions ............................................................... 49

4.5     My summary conclusions in relation to the reporting of the IDOL OEM revenue stream .............................................................................................................. 50

4.6     My summary conclusions in relation to the reporting of the IDOL Cloud revenue stream .............................................................................................................. 52

4.7     My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions in their other financial information ........................................................................................... 55

4.8     My summary conclusions in relation to the double reporting of the reported IDOL OEM and IDOL Cloud revenue streams............................................................ 57

**5      Summary of my overall conclusions ..................................................................... 59**

**Appendices**

Curriculum Vitae of Steven Brice                                          Appendix A

Documents I have relied upon                                              Appendix B

The Software Focus Transactions                                          Appendix C

The hardware sales transactions per the Quarterly Revenue Breakdowns     Appendix D
compared with the hardware sales transactions recorded in the Hardware Ledger

The Hardware Focus Transactions                                          Appendix E

Narrative explanation relating to each Software Focus Transaction for which I   Appendix F
have identified a Misstatement

**mazars**

# 1    Introduction

## 1.1    My qualifications and experience

1.1.1    I am Steven Brice, a Partner and Head of Accounting Technical Services for Mazars LLP ("**Mazars**"), the UK firm of the Mazars Group.  The Mazars Group is an international, integrated and independent organisation specialising in audit, advisory, accounting and tax services, with a direct presence in more than 95 countries drawing on the expertise of 47,000 professionals.

1.1.2    I am a Fellow of the Institute of Chartered Accountants in England and Wales (the "**ICAEW**") and I have over 25 years of technical accounting experience.  I regularly advise clients and audit teams on the application of International Financial Reporting Standards ("**IFRS**") when preparing or auditing financial information and am routinely instructed to review financial statements for compliance with IFRS.  I hold a current Practising Certificate and have Responsible Individual status for audit work within Mazars which means that I can take responsibility for audit work and sign audit reports.

1.1.3    Given my experience, I am routinely engaged as an expert accountant to consider matters involving the accounting treatment of particular transactions under various accounting frameworks and I have provided independent expert evidence in a number of different forums, including in the High Court of England and Wales and the International Dispute Resolution Centre in London.

1.1.4    Further details of my qualifications and experience are set out in my curriculum vitae in Appendix A, including a list of publications that I have authored in the last 10 years and a listing of the matters in which I have testified as an expert at trial or by deposition in the last four years.

## 1.2    Summary background

1.2.1    This summary report is provided in the matter of United States versus Dr Michael Richard Lynch ("**Dr Lynch**") and Mr Stephen Chamberlain ("**Mr Chamberlain**").  Dr Lynch is the former chief executive officer of Autonomy Corporation plc ("**Autonomy**"), a company that was incorporated in England and Wales[1].   Mr Chamberlain is the former vice president of finance.

---

[1] Autonomy's major subsidiaries comprised (i) Autonomy, Inc. ("**AU Inc**"), Interwoven, Inc. ("**Interwoven**") and ZANTAZ, Inc. ("**Zantaz**"), all of which were incorporated in the United States; and (ii) Autonomy Systems Limited ("ASL"), a company incorporated in England and Wales

**mazars**

1.2.2    Hewlett-Packard Company ("**HP**") acquired all the outstanding shares in Autonomy on or about 3 October 2011.

1.2.3    According to the Superseding Indictment it is alleged that, between 2009 and 2011, Dr Lynch and Mr Chamberlain engaged in a scheme to defraud HP (as well as other purchasers and sellers of Autonomy securities) about the true financial performance of Autonomy's business, its financial condition and its prospects for growth.

## 1.3    My instructions

1.3.1    I have been provided with a significant volume of documents, to which I refer in Section 1.5.

1.3.2    My instructions relate to the period 1 January 2009 to 30 September 2011 (the "**Relevant Period**").  Based upon my review of the information provided to me, I have been instructed to:

   (a)    review software sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales transactions were properly reported in accordance with the applicable accounting standards;

   (b)    review hardware sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales were properly reported and disclosed in accordance with the applicable accounting standards; and

   (c)    review the revenue streams reported by Autonomy during the Relevant Period[2] and give my opinion on whether the description of these streams is consistent with the nature of the underlying transactions.

1.3.3    This report reflects a summary of the opinions I have reached in addressing my instructions, including the bases and reasons for reaching my conclusions.  I note that at the date of my report my work is ongoing.

## 1.4    My instruction in United States versus Sushovan Tareque Hussain

1.4.1    I was previously instructed as an independent expert accountant by the United States Attorney's Office in the matter of United States versus Mr Sushovan Tareque Hussain.  Mr

---

[2] As explained further in Section 4, this specifically includes IDOL Product, IDOL OEM, IDOL Cloud, services and deferred revenue release as reported in the financial information published with Autonomy's quarterly and annual financial statements

mazars

Hussain was the former Chief Financial Officer of Autonomy.  I issued a summary of my expert accounting opinions in that matter in a report dated 31 October 2017 ("**My Hussain Report**").

1.4.2   The issues I was instructed to address in My Hussain Report covered certain of the issues I am instructed to address in this report.  I note that I have received a significant amount of additional information since I issued My Hussain Report.  Where opinions have developed as a result of the additional information I have now seen, I have noted so in this summary report.

## 1.5   The available information

1.5.1   The conclusions in this summary report are based on my experience and on the evidence I have seen.  If further evidence becomes available to me, these conclusions may change.

1.5.2   For the purposes of my work, I have been provided with a significant number of documents. This information includes:

(a)    contemporaneous information (such as contracts, emails and downloads from accounting records);

(b)    the audit working papers used by Deloitte LLP ("**Deloitte**") when auditing or reviewing the financial reports issued during the Relevant Period together with the report of the Financial Reporting Council's Disciplinary Tribunal relating to Deloitte's audits and reviews during the Relevant Period[3];

(c)    the pleadings, disclosure, witness testimonies, expert reports, transcripts and Judgment in the matter of United States versus Sushovan Tareque Hussain; and

(d)    the pleadings, disclosure, witness testimonies, expert reports and transcripts in a related case in the High Court in London (the "**High Court Proceedings**")[4].

1.5.3   In total I have been provided with more than 650,000 documents.  In light of the number of documents provided to me, I have used an eDiscovery Platform to undertake targeted searches and reviews, aimed at identifying the documents of relevance to my instructions.  I provide in Appendix B a list of the documents I have relied upon in preparing this summary report.

---

[3] Report titled "*Explanatory Memorandum to the Tribunal Report*" in the matter of The Executive Counsel to the Financial Reporting Council versus (1) Deloitte LLP (2) Richard Knights (3) Nigel Mercer
[4] (1) ACL Netherlands B.V. (as successors to Autonomy Corporation Limited) (2) Hewlett-Packard The Hague B.V. (as successors to Hewlett-Packard Vision B.V.) (3) Autonomy Systems Limited (4) Hewlett-Packard Enterprise New Jersey, Inc versus (1) Michael Richard Lynch (2) Sushovan Tareque Hussain

## 1.6    Scope of this summary report

1.6.1    It should be noted that the work I have completed does not constitute an audit and, other than as expressly set out in this report, I have not verified or in any other way checked the information set out in the documents I have reviewed.

1.6.2    In completing my work, I have been assisted by individuals within the Forensic and Investigation and Accounting Technical Services teams at Mazars.  I have supervised and reviewed their work and I confirm that the opinions expressed in this summary report are my own.

1.6.3    Mazars' fees for this engagement are not contingent on the outcome of the proceedings. Mazars is being compensated at a rate of $693 per hour for my time and between $39 and $693 per hour for staff working under my direction.

1.6.4    I have prepared this report solely for the use in these proceedings.  It is confidential in all respects other than to be used in the proceedings as appropriate.  This summary report should not be used, reproduced or circulated for any other purpose without my prior written consent. Mazars accepts no responsibility to third parties in relation to the matters in this summary report and / or for any breaches of this obligation.

1.6.5    Some figures in this report have been rounded and as a result some tables may include rounding differences.

mazars

# 2 Summary of my opinion in relation to software sales transactions

## 2.1 Introduction

2.1.1 I am instructed to review software sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales were properly reported in accordance with the applicable accounting standards. In this section of my report, I provide a summary of my opinion.

## 2.2 The starting point for my analysis: the software sales transactions reported by Autonomy as revenue during the Relevant Period

2.2.1 I have identified, for each quarter[5] during the Relevant Period (apart from Q3 2011), spreadsheets that break down Autonomy's revenue by customer and by revenue type (for example licence, hosting, maintenance and services)[6]. I refer to these spreadsheets as the "**Quarterly Revenue Breakdowns**".

2.2.2 I have compared the total revenue amounts in the Quarterly Revenue Breakdowns to the total revenue reported in Autonomy's quarterly financial statements[7] and I have found that they agree. The total revenue reported by Autonomy in both the Quarterly Revenue Breakdowns and the quarterly financial statements is shown in Table 2.1:

---

[5] Autonomy issued financial information on a quarterly basis. I refer to the period 1 January 2010 to 31 March 2010 as "**Q1 2010**", to the period 1 April 2010 to 30 June 2010 as "**Q2 2010**", to the period 1 July 2010 to 30 September 2010 as "**Q3 2010**", *et seq*

[6] HP-SEC-00739438 and SEC-AUSA5-EPROD-000641095

[7] HP-SEC-00567458 (Q1 2009), HP-SEC-00009847 (Q2 2009), HP-SEC-00025166 (Q3 2009), HP-SEC-00097914 (Q4 2009), HP-SEC-00009127 (Q1 2010), FTIGJ00002722 (Q2 2010), HP-SEC-00155426 (Q3 2010) and HP-SEC-00024459 (Q4 2010), HP-SEC-00024002 (Q1 2011), HP-SEC-00564873 (Q2 2011)

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

**mazars**   Summary of independent expert accounting opinions of Steven Brice FCA

**Table 2.1: Total revenue reported by Autonomy in the Relevant Period (apart from Q3 2011)**

| Quarter | Revenue ($m) |
|---------|--------------|
| Q1 2009 | 129.8 |
| Q2 2009 | 195.2 |
| Q3 2009 | 191.6 |
| Q4 2009 | 223.1 |
| Q1 2010 | 194.2 |
| Q2 2010 | 221.1 |
| Q3 2010 | 210.6 |
| Q4 2010 | 244.5 |
| Q1 2011 | 219.8 |
| Q2 2011 | 256.2 |
| **Total** | **2,086.1** |

2.2.3    I have also compared the quarterly revenue reported by Autonomy in the Relevant Period with the consensus of market analysts' expectations for revenue in each quarter.  My analysis is provided in the graph below:

**Figure 2.1: Quarterly revenue reported by Autonomy in the Relevant Period compared with market consensus[8]**



2.2.4    Given the quantum of some of the sales transactions, this consistent pattern of achieving actual revenues at or very close to market analysts' expectations is perhaps surprising.  I am

---

[8] The market consensus is based upon the mean average as reported by S&P Capital IQ

**mazars**

therefore evaluating this matter further in terms of whether similarly situated companies report revenues which are at or very close to market analysts' expectations.

2.2.5    The Quarterly Revenue Breakdowns identify a number of transactions in each quarter as being "*Hardware*".  Hardware sales transactions are not relevant to this section of my report – my summary conclusions in relation to hardware are instead provided in Section 3 – and it is therefore necessary to exclude them from my analysis.  The revenue reported by Autonomy, excluding revenue from hardware sales transactions, in the Quarterly Revenue Breakdowns is shown in Table 2.2:

**Table 2.2: Total revenue reported by Autonomy in the Relevant Period (apart from Q3 2011), excluding revenue from hardware sales transactions**

| Quarter | Total reported revenue ($m) | Hardware revenue ($m) | Revenue excluding hardware ($m) |
|---------|-----------------------------|-----------------------|----------------------------------|
| Q1 2009 | 129.8 | 0.0 | 129.8 |
| Q2 2009 | 195.2 | 6.0 | 189.2 |
| Q3 2009 | 191.6 | 42.2 | 149.4 |
| Q4 2009 | 223.1 | 7.2 | 215.9 |
| Q1 2010 | 194.2 | 7.1 | 187.1 |
| Q2 2010 | 221.1 | 31.1 | 190.1 |
| Q3 2010 | 210.6 | 26.7 | 183.9 |
| Q4 2010 | 244.5 | 35.5 | 209.0 |
| Q1 2011 | 219.8 | 20.1 | 199.7 |
| Q2 2011 | 256.2 | 20.8 | 235.4 |
| **Total** | **2,086.1** | **196.7** | **1,889.4** |

2.2.6    According to the Quarterly Revenue Breakdowns, the total revenue excluding hardware sales transactions (of $1,889.4 million) is comprised of 4,052 line items.  In order to address my instruction in relation to software sales transactions, it is therefore necessary to identify a smaller population of transactions to focus upon.  Using the Quarterly Revenue Breakdowns, I have therefore identified all transactions of more than $2 million[9].  I summarise in Table 2.3 the total value and number of these transactions by quarter:

---

[9] The witness statement of Mr Welham in the High Court Proceedings, dated 14 September 2018, explained that the Deloitte audit team undertook "*audit work in respect of all sales made by Autonomy of more than $1m*".  In the context of the materiality for Autonomy's financial statements (which I discuss further in Section 2.3 below), a testing threshold of $1m is not unreasonable. However, in relation to the analysis in this section, analysing all software sales transactions greater than $1m would significantly increase the size of the population (to more than 500 transactions).  Therefore, I have increased the size of my testing threshold for the software sales transactions to $2m, thereby reducing the number of identified transactions

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**

Summary of independent expert accounting opinions of Steven Brice FCA

Table 2.3: Transactions greater than $2 million reported as revenue by Autonomy in the Relevant Period (apart from Q3 2011), excluding revenue from hardware sales transactions

| Quarter | Revenue excluding hardware ($m) | Total value of contracts over $2m (excluding hardware) ($m) | Number of contracts over $2m (excluding hardware) |
|---------|--------------------------------|-------------------------------------------------------------|--------------------------------------------------|
| Q1 2009 | 129.8 | 74.6 | 15.0 |
| Q2 2009 | 189.2 | 123.2 | 20.0 |
| Q3 2009 | 149.4 | 96.0 | 17.0 |
| Q4 2009 | 215.9 | 157.4 | 25.0 |
| Q1 2010 | 187.1 | 141.0 | 18.0 |
| Q2 2010 | 190.1 | 141.7 | 19.0 |
| Q3 2010 | 183.9 | 139.2 | 21.0 |
| Q4 2010 | 209.0 | 143.8 | 21.0 |
| Q1 2011 | 199.7 | 153.9 | 24.0 |
| Q2 2011 | 235.4 | 187.2 | 28.0 |
| **Total** | **1,889.4** | **1,358.1** | **208.0** |

2.2.7   Whilst for most of the transactions in Table 2.3 the Quarterly Revenue Breakdowns cite a client name, there are certain transactions which only have a generic description, such as "*hosting*", "*services*" or "*maintenance*".  Without the client name, I am unable to identify the underlying transactional documents and give my opinion on whether these transactions have been accounted for in accordance with the applicable accounting standards.

2.2.8   By excluding the transactions with generic descriptions in the Quarterly Revenue Breakdowns[10], I have arrived at the software sales transactions that I will focus on in this section of my report (the "**Software Focus Transactions**")[11].   The Software Focus Transactions are summarised by quarter in Table 2.4 below and a full list by client is provided in Appendix C:

---

[10] I have also excluded certain transactions which refer to "*Microlink*".  These transactions appear to relate to revenue generated by MicroLink, LLC, a reseller which was acquired by Autonomy in January 2010.  Without the client name, I am unable to identify the underlying transactional documents and give my opinion on whether these transactions have been accounted for in accordance with the applicable accounting standards

[11] I note that in My Hussain Report I was instructed to "*review the lists identifying Autonomy's Top 40 Contracts and Top 40 Customers provided to HP as part of the due diligence process with my software and hardware samples, noting any apparent omissions from those lists*" (My Hussain Report, paragraph 1.2.3(e)).  I noted four software transactions which were omitted from the Top 40 Contract list and 10 customers omitted from the Top 40 Customer list.  The four software transactions which were omitted remain Software Focus Transactions and therefore my conclusions in this regard have not changed

**mazars**

**Table 2.4: The Software Focus Transactions**

| Quarter | Total value of contracts over $2m ($m) | Number of contracts over $2m | Total value of Software Focus Transactions ($m) | Number of Software Focus Transactions |
|---|---|---|---|---|
| Q1 2009 | 74.6 | 15.0 | 27.0 | 5.0 |
| Q2 2009 | 123.2 | 20.0 | 40.0 | 9.0 |
| Q3 2009 | 96.0 | 17.0 | 20.6 | 6.0 |
| Q4 2009 | 157.4 | 25.0 | 68.1 | 13.0 |
| Q1 2010 | 141.0 | 18.0 | 48.0 | 8.0 |
| Q2 2010 | 141.7 | 19.0 | 49.5 | 9.0 |
| Q3 2010 | 139.2 | 21.0 | 45.1 | 10.0 |
| Q4 2010 | 143.8 | 21.0 | 51.7 | 12.0 |
| Q1 2011 | 153.9 | 24.0 | 61.0 | 13.0 |
| Q2 2011 | 187.2 | 28.0 | 72.7 | 13.0 |
| **Total** | **1,358.1** | **208.0** | **483.7** | **98.0** |

2.2.9   Autonomy therefore reported total revenue relating to the Software Focus Transactions during the Relevant Period (apart from Q3 2011) of $483.7 million.  This is around 23%[12] of the total revenue reported by Autonomy in these quarters during the Relevant Period.

## 2.3   The applicable accounting standards

### International Financial Reporting Standards

2.3.1   Autonomy stated that its financial statements were prepared in accordance with IFRS.  IFRS comprises Standards referred to as IFRS, as well as other Standards such as "*International Accounting Standards*" (typically known as "**IAS**"), with each Standard devoted to a particular type of transaction or item in a set of financial statements.  Reference should also be made to the "*Conceptual Framework For Financial Reporting*" (the "**Conceptual Framework**").  Whilst not a Standard *per se*, it sets out the concepts which underpin all Standards within IFRS, as well as assisting preparers of financial statements in applying IFRS and assisting auditors in forming an opinion on whether financial statements comply with IFRS[13].

### What does compliance with IFRS mean?

2.3.2   Information is not accounted for in accordance with IFRS if a misstatement (being an omission from or misstatement to the financial statements) exists that is deemed to be "*material*"[14].

---

[12] Being $483.7m / $2,086.1m

[13]  In this summary report, I have referred to and quoted the standards that were extant for the preparation of Autonomy's financial statements for the year ended 31 December 2010.  Whilst the standards I refer to were in force throughout the Relevant Period, they may have been subject to some minor consequential amendments arising from changes to other standards in IFRS. Moreover, I note that the Conceptual Framework was introduced in September 2010 as a replacement for the "*Framework for the Preparation and Presentation of Financial Statements*" (the "**Framework**").  Where I refer to the Conceptual Framework, I also provide references to the equivalent guidance within the Framework

[14] IAS 8 "*Accounting Policies, Changes in Accounting Estimates and Errors*" ("**IAS 8**") states that "*Financial statements do not comply with IFRSs if they contain either material errors or immaterial errors made intentionally to achieve a particular presentation of an entity's financial position, financial performance or cash flows*".  (IAS 8, paragraph 41)

Pursuant to IFRS, materiality (including the question of whether an identified misstatement is material) is assessed by reference to an item's "*size*" as well as its "*nature*"[15].

2.3.3    In relation to an item's size, accountants will typically ascribe a materiality by applying a percentage to an identified metric, such as revenue or net profit.  Deloitte determined its materiality by applying a percentage to the reported revenues of Autonomy[16].  Where revenue is selected as the appropriate starting point Mazars would typically arrive at a figure for materiality by applying between 0.5% to 2% to the stated revenue figure.

2.3.4    In Table 2.5 below, I summarise the computed materiality using these percentages, and I also set out the materiality that Deloitte used in its audit or review of Autonomy's financial statements[17]:

Table 2.5: Materiality during the Relevant Period (excluding Q3 2011)[18]

| Quarter | Autonomy's Consolidated Revenue ($m) | Mazars' materiality methodology | | Deloitte's assessed materiality ($m) |
| | | Low (0.5% of revenue) ($m) | High (2.0% of revenue) ($m) | |
|---|---|---|---|---|
| Q1 2009 | 129.8 | 0.6 | 2.6 | 3.7 |
| Q2 2009 | 195.2 | 1.0 | 3.9 | 5.4 |
| Q3 2009 | 191.6 | 1.0 | 3.8 | 3.6 |
| Q4 2009 | 223.1 | 1.1 | 4.5 | N/A |
| **Full year 2009** | **739.7** | **3.7** | **14.8** | **20.0** |
| | | | | |
| Q1 2010 | 194.2 | 1.0 | 3.9 | 5.0 |
| Q2 2010 | 221.1 | 1.1 | 4.4 | 4.9 |
| Q3 2010 | 210.6 | 1.1 | 4.2 | 4.3 |
| Q4 2010 | 244.5 | 1.2 | 4.9 | N/A |
| **Full year 2010** | **870.4** | **4.4** | **17.4** | **22.5** |
| | | | | |
| Q1 2011 | 219.8 | 1.1 | 4.4 | 5.5 |
| Q2 2011 | 256.2 | 1.3 | 5.1 | 5.5 |

---

[15] IAS 1 "*Presentation of Financial Statements*" ("**IAS 1**") provides the following definition for "*material*": "*Omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements. Materiality depends on the size and nature of the omission or misstatement judged in the surrounding circumstances.  The size or nature of the item, or a combination of both, could be the determining factor.*
*Assessing whether an omission or misstatement could influence economic decisions of users, and so be material, requires consideration of the characteristics of those users. The Framework for the Preparation and Presentation of Financial Statements states in paragraph 25 that 'users are assumed to have a reasonable knowledge of business and economic activities and accounting and a willingness to study the information with reasonable diligence'.  Therefore, the assessment needs to take into account how users with such attributes could reasonably be expected to be influenced in making economic decisions*".  (IAS 1, paragraph 7)
[16] ISA 320 "*Materiality in planning and performing an audit*" ("**ISA 320**") explains the requirements of an auditor when determining a financial statement materiality.  Whilst ISA 320 enables auditors to apply professional judgment when determining financial statement materiality, the guidance contained therein explains that for profit generating entities the benchmark for determining materiality is typically profit before tax rather than revenue
[17] I note that Autonomy did not produce quarterly financial statements for Q4 as instead it produced annual financial statements for the financial year then ended.  Accordingly Deloitte did not calculate a materiality for Q4
[18] Deloitte's reports to the audit committee titled: "*Report to the Audit Committee on the Q1 2009 Review*", "*Report to the Audit Committee on the Q2 2009 Review*", "*Report to the Audit Committee on the Q3 2009 Review*", "*Report to the Audit Committee on the 2009 Audit*", "*Report to the Audit Committee on the Q1 2010 Review*", "*Report to the Audit Committee on the 2010 Interim Review*", "*Report to the Audit Committee on the Q3 2010 Review*", "*Report to the Audit Committee on the 2010 Audit*", "*Report to the Audit Committee on the Q1 2011 Review*", "*Report to the Audit Committee on the Q2 2011 Review*"

**mazars**

2.3.5    Given Deloitte's assessed materiality is broadly consistent with the range suggested by the Mazars methodology, I have adopted Deloitte's materiality methodology when considering the transactions.

2.3.6    That is to say, for example, a misstatement of more than $4.3m in Q3 2010 would be deemed a material error by quantum by Deloitte and mean that the quarterly financial statements were not prepared in accordance with IFRS.

## 2.4    Overview to my summary conclusions

2.4.1    For each of the Software Focus Transactions, I have sought to identify contemporaneous information pertaining to the transaction in order to understand its underlying substance and economic reality.  This information comprises, for example:

(a)    contractual documentation between Autonomy and its counterparty;

(b)    email correspondence between (i) individuals within Autonomy in relation to the Software Focus Transaction; (ii) individuals within Autonomy's counterparty in relation to the Software Focus Transaction; (iii) Autonomy and its counterparty in relation to the Software Focus Transaction; and (iv) Autonomy and Deloitte in relation to the Software Focus Transaction;

(c)    financial records of Autonomy, such as general ledgers, customer ledgers and bank confirmations of payments or receipts; and

(d)    financial information of Autonomy's counterparty, such as financial statements and bank confirmations of payments or receipts.

2.4.2    Based on this information, I have then considered how this revenue should have been accounted for pursuant to the requirements of IFRS and Autonomy's published accounting policies[19].  I have considered both the date on which any revenue should be recognised and the amount of that revenue.

2.4.3    I have then compared my assessment with the amount and/or timing of revenue actually reported by Autonomy during the Relevant Period.  Where a difference exists between my assessment and the actual reporting for a specific quarter, I have identified this as a "**Misstatement**".

---

[19] IAS 8 explains that "*Accounting policies are the specific principles, bases, conventions, rules and practices applied by an entity in preparing and presenting financial statements*".  (IAS 8, paragraph 5)

**mazars**

2.4.4    Of the Software Focus Transactions totalling $483.7 million, my overview conclusions are that:

(a)    transactions with a total reported revenue of $102.8 million appear to have been accounted for in accordance with IFRS; and

(b)    I have identified the existence of a Misstatement in respect of timing and/or amount (that is, my assessment of the amount of revenue that should have been recognised is different to the revenue actually reported by Autonomy) in relation to transactions with a total reported revenue of $380.9 million.

2.4.5    I summarise these overview conclusions in Table 2.6 below:

**Table 2.6: My overview conclusions for the Software Focus Transactions by quarter**

| Quarter | Reported revenue ($m) | Reported revenue of the Software Focus Transactions ($m) | Reported revenue of the Software Focus Transactions for which: | |
|---|---|---|---|---|
| | | | No Misstatement was identified ($m) | A Misstatement was identified ($m) |
| Q1 2009 | 129.8 | 27.0 | 5.3 | 21.7 |
| Q2 2009 | 195.2 | 40.0 | 12.4 | 27.5 |
| Q3 2009 | 191.6 | 20.6 | 8.3 | 12.3 |
| Q4 2009 | 223.1 | 68.1 | 11.7 | 56.3 |
| Q1 2010 | 194.2 | 48.0 | 5.6 | 42.4 |
| Q2 2010 | 221.1 | 49.5 | 17.6 | 31.9 |
| Q3 2010 | 210.6 | 45.1 | 2.7 | 42.4 |
| Q4 2010 | 244.5 | 51.7 | 14.4 | 37.4 |
| Q1 2011 | 219.8 | 61.0 | 16.8 | 44.2 |
| Q2 2011 | 256.2 | 72.7 | 7.9 | 64.8 |
| **Total** | **2,086.1** | **483.7** | **102.8** | **380.9** |

2.4.6    In relation to the transactions where I have identified a Misstatement, I have assessed the total Misstatement to be $308.2 million.  The Misstatements are summarised by quarter in the table below:

**mazars**

Table 2.7: The Misstatements identified in relation to the Software Focus Transactions by quarter

| Quarter | Reported Revenue of the Software Focus Transactions ($m) | Misstatement identified in relation to Software Focus Transactions ($m) |
|---|---|---|
| Q1 2009 | 27.0 | (21.7) |
| Q2 2009 | 40.0 | (26.7) |
| Q3 2009 | 20.6 | (11.3) |
| Q4 2009 | 68.1 | (46.8) |
| Q1 2010 | 48.0 | (32.5) |
| Q2 2010 | 49.5 | (25.6) |
| Q3 2010 | 45.1 | (27.0) |
| Q4 2010 | 51.7 | (29.0) |
| Q1 2011 | 61.0 | (33.2) |
| Q2 2011 | 72.7 | (54.6) |
| **Total** | **483.7** | **(308.2)** |

2.4.7    Given the materiality ranges identified in Table 2.5, the Misstatements in each quarter were clearly material.  This means that the financial statements in each quarter were not prepared in accordance with IFRS.

2.4.8    In addition, I note that following HP's acquisition of Autonomy in October 2011, HP undertook to restate the comparative figures in ASL's financial statements for the period 1 January 2011 to 31 October 2011[20] (the "**Restatement**")[21].   Where relevant, I have considered the Restatement when reviewing the Software Focus Transactions.

2.4.9    I have identified six principal reasons why the Misstatement exists – that is, reasons why these Software Focus Transactions were not accounted for in accordance with IFRS:

(a)    certain transactions with resellers contained one or more revenue recognition issues;

(b)    certain transactions contained linked or reciprocal transactions;

(c)    certain transactions were accounted for as a sale of goods rather than the rendering of services;

(d)    certain transactions were accounted for as a sale of goods rather than royalties;

(e)    certain transactions contained timing errors; and

---

[20] HP had changed ASL's reporting financial period from 31 December to 31 October to be consistent with HP

[21] I note that the Restatement was reported in pounds sterling, whereas my summary conclusions on the Software Focus Transactions are prepared in US dollars

mazars

(f)       certain transactions contained errors of valuation.

2.4.10    I address each of these areas in turn in Sections 2.5 to 2.10 below. In Appendix F I provide a narrative explanation relating to each Software Focus Transaction for which I have identified a Misstatement.  Whilst the conclusions in these schedules are my carefully considered view based upon the information I have reviewed, these appendices are still a work in progress, and they should be read with this caveat in mind.  For this reason, they have been marked as draft and subject to change.  I will identify in further iterations of these schedules if there any fundamental changes to the analysis contained in the draft schedules.

## 2.5    My summary conclusions in relation to Misstatements arising from transactions with resellers which contained one or more revenue recognition issues

2.5.1    A number of the Software Focus Transactions relate to instances where Autonomy sold software licences to value added resellers (often referred to as a "**VAR**").  Typically, the VAR would not purchase the software for its own use but instead would acquire the right to sell the software licence on to a named end-user.

2.5.2    Autonomy recognised revenue arising from transactions with VARs as a "*sale of goods*".  In this regard, IAS 18 distinguishes between revenue generated from the "*sale of goods*", the "*rendering of services*" and the "*use by others of entity assets*"[22].

2.5.3    In order to recognise revenue from the sale of goods under IFRS, there are five criteria that **must** be met.  Importantly, if one or more of these criteria is not met, the revenue cannot be recognised (and thus the recognition of any revenue in relation to that transaction would be a misstatement).

2.5.4    Based upon my review of the contemporaneous information, I have identified that for many of the Software Focus Transactions which relate to sales to VARs, one or more of the revenue recognition criteria in IFRS had not been met and therefore revenue should not have been recognised:

(a)       in order to recognise revenue under IFRS, the entity must have transferred to the buyer (in the case of the Software Focus Transactions, the VAR) the "*significant risks and rewards of ownership of the goods*"[23].  However, I have identified that, in relation to a number of the Software Focus Transactions, the risks and rewards of

---

[22] IAS 18 "*Revenue*" ("**IAS 18**"), paragraph 1
[23] IAS 18, paragraph 14(a)

mazars

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

ownership had clearly not been transferred to the VAR.  The evidence I have seen includes, for example, (i) evidence that the VAR made no efforts to sell the software licence it had acquired to the named end-user[24], and (ii) evidence that the VAR could not have independently sold the software licence it had acquired to the named end-user, because the only route through which it would have been able to do so was via a restructuring of the end-users' existing contractual agreements with Autonomy[25];

(b)     in order to recognise revenue under IFRS, the reporting entity must not retain "*continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold*"[26].   However, I have identified that, in relation to a number of the Software Focus Transactions, Autonomy retained continuing managerial involvement in the software sold to the VAR.  The evidence I have seen includes, for example, evidence that Autonomy continued to negotiate the sale to the named end-user even after it had completed the sale to the VAR[27]; and

(c)     in order to recognise revenue under IFRS, it must be "*probable that the economic benefits associated with the transaction will flow to the entity*"[28].   However, I have identified that in relation to a number of the Software Focus Transactions, it was not probable[29] that Autonomy would receive an inflow of economic benefit from the VAR.  The evidence I have seen includes, for example, (i) financial information for the VAR which demonstrates that the payment obligation imposed on the VAR would exhaust its cash reserves or net assets[30], (ii) financial information for the VAR which demonstrates that the VAR was loss making or was otherwise unable to fund the purchase of the software[31], (iii) in certain instances where Autonomy did ultimately receive an inflow of economic benefit from the VAR, evidence that this inflow was facilitated by Autonomy first remitting cash to the VAR (in relation to purchases made from the VAR by Autonomy) or by Autonomy requesting that funds owed to Autonomy relating to a separate transaction completed with the named end-user be remitted to the VAR instead of Autonomy[32], and (iv) evidence that

---

[24] For example, Software Focus Transaction #050, named "*MicroTech*" in Q1 2010

[25] For example, Software Focus Transaction #028, named "*IBM/Ameriprise*" in Q3 2009

[26] IAS 18, paragraph 14(b)

[27] For example, Software Focus Transaction #046, named "*PMI (Discover)*" in Q1 2010

[28] IAS 18, paragraph 14(d)

[29] In IFRS, "*probable*" means more likely than not

[30] For example, Software Focus Transaction #038, named "*Dell – Morgan Stanley*" in Q4 2009

[31] For example, Software Focus Transaction #069, named "*Veterans Affairs / National Archive, Big 4, Iron*" in Q3 2010

[32] For example, Software Focus Transaction #121, named "*USPS archive – mt*" in Q2 2011

**mazars**

Autonomy did not receive any inflow of economic benefit from the VAR, and instead later cancelled the amount owed by the VAR[33].

2.5.5 As a consequence of one or more of these revenue recognition issues, the revenue from certain VAR transactions should not have been recognised.

2.5.6 In addition to the revenue recognition issues explained above, the revenue recognised for certain of the transactions with VARs should not have been recognised because, when considered against the requirements of IFRS, the transaction had no apparent substance. In this regard, a fundamental qualitative characteristic of financial statements prepared under IFRS is that they should present a "*faithful representation*" of the transactions and events that they purport to represent[34]. Achieving a "*faithful representation*" requires that transactions are presented in accordance with their "*substance and economic reality*", and not merely their legal form[35]. For certain of the Software Focus Transactions with VARs, based upon the available contemporaneous evidence I have seen, there is no apparent economic substance to the transactions.

2.5.7 In practice, when considering whether a particular transaction has economic substance, it is important to consider whether the other party to the transaction would be held to its terms. Applying this to the Software Focus Transactions relating to transactions with VARs, I have considered whether it is reasonable to conclude that the VAR would have been held to the terms of its agreement with Autonomy. The evidence I have seen which leads to a conclusion that certain of the Software Focus Transactions had no apparent economic substance includes:

(a) evidence that the Software Focus Transaction was executed in a very short space of time (over a matter of hours), with little to no negotiation (or, in some instances, with Autonomy drafting unexplained and uncontested increases to the amount that the VAR would owe Autonomy following the transaction), and on the last day of Autonomy's reporting period[36];

---

[33] For example, Software Focus Transaction #090, named "*Bank of Montreal*" in Q1 2011

[34] The Conceptual Framework explains that "*Financial reports represent economic phenomena in words and numbers. To be useful, financial information must not only represent relevant phenomena, but it must also faithfully represent the phenomena that it purports to represent*". (Conceptual Framework, paragraph QC12)

[35] The Conceptual Framework explains that "*In assessing whether an item meets the definition of an asset, liability or equity, attention needs to be given to its underlying substance and economic reality and not merely its legal form*". (Conceptual Framework, paragraph 4.6)

[36] For example, Software Focus Transaction #105, named "*UBS – capax*" in Q2 2011

(b)     evidence that the VAR had no realistic prospect of being able to pay the amounts owed to Autonomy unless the VAR was successful in selling the software to the named end-user[37];

(c)     the named end-user having no apparent need to purchase the software licence from the VAR, for example when: (i) the only apparent route through which the sale of the software licence to the named end-user could be achieved required a restructuring of existing contracts with Autonomy which the VAR was unable to enact[38]; and (ii) the individual through whom the transaction with the VAR was executed was also the co-founder of the named-end user (to whom the VAR now had the right to sell the software licence)[39];

(d)     the existence of a pattern of behaviour between Autonomy and the VAR which has resulted in transactions collectively indicating that transactions did not appear to have economic substance;

(e)     evidence that, in the absence of a transaction between the VAR and the named end-user occurring (or if Autonomy entered a transaction with the named end-user, rather than the VAR), Autonomy either cancelled the amounts owed by the VAR in relation to the Software Focus Transaction[40], or facilitated the VAR's settlement of the amounts owed by first remitting cash to[41], or arranging for cash to be remitted to[42], the VAR; and

(f)     evidence that, following the completion of a transaction between Autonomy and the end-user, Autonomy paid the VAR a commission despite the VAR having no apparent involvement in the transaction[43].

2.5.8   The Software Focus Transactions with Misstatements arising from transactions with VARs which contained one or more revenue recognition issues are set out in the table below:

---

[37] For example, Software Focus Transaction #045, named "*FSA – Capax*" in Q1 2010

[38] For example, Software Focus Transaction #065, named "*Amgen*" in Q3 2010

[39] For example, Software Focus Transaction #041, named "*MircoLink/DiscoverTech*" in Q4 2009

[40] For example, Software Focus Transaction #089, named "*UBS*" in Q1 2011

[41] For example, Software Focus Transaction #088, named "*Mcafee - Capax*" in Q1 2011

[42] For example, Software Focus Transactions #079a, named "*discover tech baml*" #079b, named "*capax baml*" and #079c, named "*BAML extra*" in Q4 2010

[43] For example, Software Focus Transaction #040a, named "*Capax*" in Q4 2009

**mazars**

**Table 2.8: Software Focus Transactions with Misstatements arising from transactions with VARs which contained one or more revenue recognition issues[44],[45]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q1 2009 | 011 | Capax Global | 7.5 |
| Q2 2009 | 017 | Integracion | 3.0 |
| Q2 2009 | 020 | NSA | 4.8 |
| Q3 2009 | 026 | Kraft | 4.0 |
| Q3 2009 | 028 | IBM/Ameriprise | 3.8 |
| Q4 2009 | 033 | Federal (Microtech) | 9.5 |
| Q4 2009 | 038 | Dell - Morgan Stanley | 4.7 |
| Q4 2009 | 040a | Capax | 6.0 |
| Q4 2009 | 040b | Capax | 4.0 |
| Q4 2009 | 041 | MicroLink/DiscoverTech | 2.0 |
| Q4 2009 | 043 | Poste | 2.2 |
| Q1 2010 | 045 | FSA - Capax | 4.3 |
| Q1 2010 | 046 | PMI (Discover) | 4.2 |
| Q1 2010 | 050 | MicroTech | 11.0 |
| Q1 2010 | 051 | DiscoverTech - Citi 32 cells | 5.5 |
| Q3 2010 | 062 | Poste Italiane - Cyber Crime | 2.4 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 069 | Veterans Affairs / National Archive, Big 4, Iron | 10.0 |
| Q4 2010 | 079a | discover tech baml | 7.0 |
| Q4 2010 | 079b | capax baml | 1.7 |
| Q4 2010 | 079c | BAML extra | 3.5 |
| Q4 2010 | 080 | MicroTech doi | 4.0 |
| Q4 2010 | 082 | KPMG | 6.0 |
| Q1 2011 | 085 | Bank of America - MT | 3.9 |
| Q1 2011 | 088 | Mcafee - Capax | 5.0 |
| Q1 2011 | 089 | UBS | 8.0 |
| Q1 2011 | 090 | Bank of Montreal | 2.9 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q2 2011 | 101 | ABBOTT LABS - dt | 8.6 |
| Q2 2011 | 105 | UBS - capax | 7.7 |
| Q2 2011 | 120 | Dell Hyatt - mt | 5.3 |
| Q2 2011 | 121 | USPS archive - mt | 7.0 |

2.5.9    In correcting these Misstatements, I have reversed the revenue originally recognised by Autonomy in relation to the sale of the software licence to the VAR.  In some instances, Autonomy entered into a direct transaction with the named end-user after the date of the VAR agreement, but did not recognise revenue in relation to these subsequent sales.  In those situations, I have recognised the revenue arising from these subsequent direct sales in accordance with their substance[46].

---

[44] Software Focus Transactions #011 and #040b would have also given rise to Misstatements as they were accounted for as a sale of goods rather than as royalties (see Section 2.8 below)
[45] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to one Software Focus Transaction (not including certain other trivial adjustments)
[46] That is, either as the sale of a good or the provision of a service

mazars

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

## 2.6 My summary conclusions in relation to Misstatements arising from transactions which contained linked or reciprocal transactions

2.6.1 When applying the revenue recognition requirements of IFRS, the criteria are "*usually applied separately to each transaction*"[47]. However, under IFRS, the criteria are applied to two or more transactions together when the transactions are "*linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole*"[48]. IFRS provides an example of a linked transaction: "*an entity may sell goods and, at the same time, enter into a separate agreement to repurchase the goods at a later date, thus negating the substantive effect of the transaction; in such a case, the two transactions are dealt with together*"[49]. When considering whether the revenue recognition criteria should be applied to two or more transactions together, the entity should adopt the approach which provides a faithful representation of the economic substance of the transactions.

2.6.2 I have identified a number of Software Focus Transactions which, pursuant to the requirements of IFRS, should have been considered together with certain other linked transactions entered into by Autonomy. Further, when considering the linked transactions together, it is clear that the revenue recognition requirements of IFRS were not met and therefore the revenue should not have been recognised.

2.6.3 The evidence I have seen which demonstrates that the Software Focus Transactions should have been considered together with other transactions includes: (i) transactions entered into in close time proximity to each other, negotiated by the same individuals, and their mutual existence is acknowledged in the negotiations[50], (ii) transactions which are economically co-dependant; that is, one party's ability to settle the amounts due to the counterparty in relation to its purchase is wholly dependant upon that party first receiving cash from the counterparty in relation to its sale[51], (iii) a lack of evidence existing (which evidence I would expect to exist) to support the amounts payable by the parties as being fair value[52], and (iv) evidence that the transactions were entered into above the fair value of the products or services sold[53].

---

[47] IAS 18, paragraph 13
[48] IAS 18, paragraph 13
[49] IAS 18, paragraph 13
[50] For example, Software Focus Transaction #081, named "*VMS*" in Q4 2010
[51] For example, Software Focus Transaction #066, named "*Vidient*" in Q3 2010
[52] For example, Software Focus Transaction #071, named "*EMC*" in Q3 2010
[53] For example, Software Focus Transaction #039, named "*file tech*" in Q4 2009

2.6.4    The Software Focus Transactions with Misstatements arising from transactions which contained linked or reciprocal transactions are set out in the table below:

**Table 2.9: Software Focus Transactions with Misstatements arising from transactions which contained linked or reciprocal transactions[54,55]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q2 2009 | 019 | VMS | 8.6 |
| Q4 2009 | 036 | Vidient Systems | 2.5 |
| Q4 2009 | 039 | file tech | 8 |
| Q1 2010 | 049 | FileTek | 8.5 |
| Q3 2010 | 066 | Vidient | 2 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 081 | VMS | 4.8 |
| Q1 2011 | 084 | Tottenham | 6.4 |

2.6.5    In correcting these Misstatements, I have accounted for the linked sales and purchases to and from the same customer as a single transaction.  If this results in an outflow of economic benefit from Autonomy, the revenue recognition criteria of IFRS has not been met, and no revenue is recognised.

## 2.7    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services

2.7.1    As I explain above, IFRS distinguishes between revenue derived from the "*sale of goods*" and revenue derived from the "*rendering of services*"[56].  Whilst revenue from the sale of goods is typically recognised under IFRS when the risks and rewards of ownership of the goods are passed to the buyer, where an entity enters into an agreement to perform a service for its customer, IFRS requires the revenue to be recognised over the period in which the services are performed.  Specifically, IFRS requires the entity to apply what is described as the "*percentage of completion*" method[57], subject to which revenue is recognised by reference to the percentage of the work completed at the end of the reporting period.

---

[54] Were it not for the linked transaction, Software Focus Transactions #039, #049, #066 and #071 would have nevertheless given rise to Misstatements as they were accounted for as a sale of goods rather than as royalties (see Section 2.8 below)

[55] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to three Software Focus Transactions (not including certain other trivial adjustments)

[56] IAS 18, paragraph 1

[57] IAS 18, paragraph 20

**mazars**

2.7.2    Moreover, pursuant to IFRS, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a "*straight-line basis*"[58].  Under the "*straight-line basis*", the total consideration due to the entity for the provision of the service is recognised as revenue evenly over the period in which the service is performed.

2.7.3    During the Relevant Period, Autonomy offered customers what it described as a "*Software-as-a-Service and hosted delivery model in the cloud, where the solution is run on hardware owned by Autonomy in a dedicated data centre*"[59].  From my review of the Software Focus Transactions, it appears that Autonomy's "*hosted delivery model*" included the provision of services related to:

(a)    the hosting and archiving of customer data (such as emails) in data centres owned and operated by Autonomy; and

(b)    the hosting of customer data for the purposes of eDiscovery services.

2.7.4    In certain of the Software Focus Transactions, Autonomy sold both a software licence to a customer and also entered into an agreement with that customer to provide ongoing hosted archiving or hosted eDiscovery services for a set period of time[60].  In these transactions, Autonomy recognised the total consideration[61] it was due to receive in relation to the software licence as revenue as if it were all for the sale of goods.

2.7.5    For these Software Focus Transactions, I have first considered whether the commercial effect of the sale of the software licence can be understood without reference to the ongoing hosting or eDiscovery service.  If the two elements cannot be understood without reference to one another, IFRS requires that the elements be accounted for as a single transaction.  As a result, the consideration payable to Autonomy in relation to the software licence should have been considered a prepayment in relation to future hosted archiving or hosted eDiscovery service, and should have been recognised under IFRS as revenue using the "*percentage of completion*" method over the period for which the hosted services were to be performed.

2.7.6    Determining whether the commercial effect of the sale of the software licence can be understood without reference to the ongoing hosting or eDiscovery service requires a

---

[58] Unless there is evidence that some other method better represents the stage of completion of the service. (IAS 18, paragraph 25)

[59] Autonomy's FY2010 Annual Report and Accounts, page 12.  Autonomy's FY2009 Annual Report and Accounts contained an equivalent description

[60] The actual Software Focus Transaction is invariably the value of the software licence sold to the customer

[61] Less, in many instances, an immaterial carve out of consideration deemed to be attributable to ongoing maintenance and support services Autonomy had also simultaneously undertaken to provide

**mazars**

consideration of the specific events and conditions surrounding each of the Software Focus Transactions.  However, I have seen evidence that, for certain of the Software Focus Transactions, the sale of the software licence was connected to the provision of an ongoing hosted archiving or hosted eDiscovery service (and thus the revenue should have been recognised over the period the services were to be performed).  The evidence I have seen includes:

(a)    evidence that the software sold to the customer was restricted in its use, such that it could only be used by the customer in relation to the ongoing hosting services that Autonomy had simultaneously agreed to provide (or was already providing) to the customer[62];

(b)    evidence that, whilst not restricted in its use, the software sold to the customer was to be used as an element of the ongoing hosting services Autonomy had simultaneously agreed to provide (or was already providing) to the customer, and that it would not make commercial sense for the customer to use it in any other way[63];

(c)    evidence that Autonomy had proposed the sale of the software licence to the customer as part of a restructuring of the customer's pre-existing arrangements for hosting services.  This is especially relevant when (i) the proposed restructure discounted or waived amounts payable by the customer in relation to its pre-existing arrangements for hosting services, with the net effect of the restructure being a projected cash saving to the customer[64,65], (ii) the extent or level of the pre-existing hosted services provided by Autonomy were unaffected by the sale of the software licence to the customer in the proposed restructure, and/or (iii) Autonomy's proposals had identified that the software licence had been included in the restructure because it enabled Autonomy to recognise revenue on the transaction immediately[66];

(d)    evidence that Autonomy's customer considered the specific software licenced to be inconsequential to the transaction, for example (i) evidence that the customer had sought to acquire an ongoing hosted archiving or hosted eDiscovery service, rather

---

[62] For example, Software Focus Transaction #013, named "*BofA*" in Q1 2009

[63] For example, Software Focus Transaction #058, named "*Metlife DS*" in Q2 2010

[64] That is, the cash cost of the software licence plus the anticipated cash cost of the services under the restructured arrangement was less than the anticipated cash cost of the services under the pre-existing arrangement

[65] For example, Software Focus Transaction #086, named "*DB Restructure*" Q1 2011

[66] For example, Software Focus Transaction #077, named "*Amgen*" in Q4 2010

than a software licence, or communications from the customer to Autonomy informing Autonomy that it did not intend to use the software licence[67], (ii) evidence that the software licence fee was set before Autonomy and the customer had decided what pieces of software were to be included in the transaction, or that the software licence fee payable by the customer was unaltered by the addition or removal of pieces of software[68], and (iii) evidence that the customer had already acquired a licence for the software, or otherwise had unfettered access to the software, via its previous agreements with Autonomy[69]; and

(e)      evidence that Autonomy internally considered the sale of the software licence incidental to the transaction, for example by internally describing the transaction as "*hosting*", or similar[70].

2.7.7    A Misstatement arises when Autonomy accounted for the sale of software licences and the provision of services separately, despite it not being possible to understand the commercial effect of the series of transactions without reference to one another.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

---

[67] For example, Software Focus Transaction #032, named "*Schwab*" in Q4 2009
[68] For example, Software Focus Transaction #087, named "*Morgan Stanley DS*" in Q1 2011
[69] For example, Software Focus Transaction #077, named "*Amgen*" in Q4 2010
[70] For example, Software Focus Transaction #102, named "*JPMC – EDD*" in Q2 2011

**Table 2.10: Software Focus Transactions with Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services[71]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|-----|----------------------------------|-------------------------------------------------------------------|
| Q1 2009 | 013 | BofA | 9.2 |
| Q2 2009 | 022 | JP Morgan Chase | 6.4 |
| Q4 2009 | 032 | Schwab | 3.4 |
| Q4 2009 | 035 | Morgan Stanley | 12.0 |
| Q1 2010 | 048 | B of A | 8.9 |
| Q2 2010 | 053 | BP | 13.5 |
| Q2 2010 | 058 | Metlife DS | 7.0 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 063 | Citadel | 3.7 |
| Q3 2010 | 067 | Bank of America | 2.7 |
| Q4 2010 | 076 | Ahold | 2.8 |
| Q4 2010 | 077 | Amgen | 5.7 |
| Q4 2010 | 078 | Bank of America | 2.0 |
| Q1 2011 | 086 | DB Restructure | 7.1 |
| Q1 2011 | 087 | Morgan Stanley DS | 5.0 |
| Q1 2011 | 093 | Johnson & Johnson | 2.3 |
| Q2 2011 | 102 | JPMC - EDD | 2.6 |
| Q2 2011 | 109 | USPS, eDiscovery | 6.3 |
| Q2 2011 | 116 | MetLife | 5.5 |
| Q2 2011 | 117 | National Bank of Canada | 3.0 |

2.7.8    In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised in relation to the sale of the software licence, and instead recognise the revenue over the period for which Autonomy was providing the hosted archive or hosted eDiscovery service[72].  I also note that under IFRS any income arising from the rendering of services required separate disclosure[73].

## 2.8    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than royalties

2.8.1    As I explain above, IFRS distinguishes revenue derived from the "*sale of goods*" from revenue derived from "*the use of an entity's assets*"[74], including the entity's patents, trademarks, copyrights and computer software (so-called "*royalty arrangements*").

---

[71] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to two Software Focus Transactions (not including certain other trivial adjustments)

[72] In doing so, I have applied the guidance of IAS 18.25, insofar as I have recognised the licence fee on a "*straight line*" basis, unless there is evidence that a more appropriate systematic basis might be applied

[73] IAS 18, paragraph 35(b)[ii]

[74] IAS 18, paragraph 1

**mazars**

2.8.2    Under IFRS, revenue earned from royalty arrangements should be recognised on an accrual basis in accordance with the substance of the relevant agreement[75].  For example, if an agreement entitles an entity to receive a five per cent royalty in relation to each sale by a third party, the entity would recognise revenue based on five per cent of total sales made by the third party.

2.8.3    Certain of the Software Focus Transactions relate to royalty arrangements whereby Autonomy granted counterparties the right to sell Autonomy's software, or the right to embed Autonomy's software in its own software for onward sale.  In these Software Focus Transactions relating to royalty arrangements, Autonomy received an up-front, non-refundable payment from the counterparty, against which future royalty payments would offset until the payment was exhausted[76].  Autonomy recognised these up-front payments as revenue at a single point in time, on the date on which it entered the royalty arrangement.

2.8.4    In my opinion these up-front, non-refundable payments were, in substance, the prepayment of royalty fees that were to be earned over the duration of the relevant royalty arrangement.  The prepayment of a royalty fee does not alter the substance of the underlying royalty arrangement and therefore revenue from the royalty arrangements should still have been recognised on an accrual basis.

2.8.5    A Misstatement therefore arises for those Software Focus Transactions where Autonomy recognised a prepaid royalty as revenue on the date on which it entered the royalty arrangement, as opposed to recognising revenue from the royalty arrangement on an accrual basis in accordance with the terms of the arrangement.

2.8.6    Further, under IFRS, revenue from royalty arrangements should only be recognised when it is probable that[77]:

(a)    "*the economic benefits associated with the transaction will flow to an entity; and*

(b)    *the amount of revenue can be measured reliably*".

2.8.7    Reliably measuring the amount of revenue that is earned from a royalty arrangement requires the entity to have an appropriate basis from which to measure the amount of revenue.  In my experience, for most royalty arrangements, the basis will be periodic royalty reports shared

---

[75] IAS 18 explains that "*Royalties accrue in accordance with the terms of the relevant agreement and are usually recognised on that basis unless, having regard to the substance of the agreement, it is more appropriate to recognise revenue on some other systematic and rational basis*".  (IAS 18, paragraph 33)

[76] And thereafter, any further royalties would be payable to Autonomy in line with the terms of the agreement

[77] IAS 18, paragraph 29

**mazars**

by the counterparty to the reporting entity.  However, other appropriate bases might instead include the entity's experience of similar royalty arrangements.

2.8.8    In the absence of an appropriate basis, the amount of revenue cannot be measured reliably and therefore no revenue should have been recognised.  A Misstatement therefore arises for Software Focus Transactions where Autonomy recognised the full pre-paid royalty as revenue despite not having evidence that the royalty had been earned in accordance with the terms of the contract.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.11: Software Focus Transactions with Misstatements arising from transactions being accounted for as a sale of goods rather than royalties**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|-----|------------------------------|-------------------------------------|
| Q1 2009 | 012 | Verdasys | 5.0 |
| Q2 2009 | 018 | EMC | 4.7 |
| Q2 2011 | 106 | Rand | 2.3 |

2.8.9    In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the prepaid royalty on an accruals basis.  Unless there is evidence which suggests a more appropriate basis is available[78], I have assumed that the prepaid royalty was earned as revenue evenly over the duration of the arrangement.  I also note that under IFRS any income arising from royalties required separate disclosure[79].

## 2.9    My summary conclusions in relation to Misstatements arising from transactions which contain timing errors

2.9.1    As I explain above, in order to recognise revenue under IFRS, the entity must have transferred to the buyer the "*significant risks and rewards of ownership of the goods*"[80].  IFRS provides examples of situations where an entity might retain the significant risks and rewards of ownership of the goods, including "*when the goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity*"[81].  In such situations, IFRS requires revenue to be deferred until the installation process is complete.

---

[78] For example, periodic reports showing the sales of Autonomy software made by the counterparty, or confirmation from the counterparty as to the value of sales made
[79] IAS 18, paragraph 35(b)[iv]
[80] IAS 18, paragraph 14(a)
[81] IAS 18, paragraph 16(c)

**mazars**

2.9.2   A number of the Software Focus Transactions were sales of goods which included a significant installation process and, in certain instances, it was projected that the installation process would be ongoing for a number of months before the software could "go live". However, Autonomy recognised the revenue from the sale of this software before the installation was complete.  In such instances a Misstatement therefore arises.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.12: Software Focus Transactions with Misstatements arising from transactions which contain timing errors[82]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|---|----------------------------------|-------------------------------------------------------------------|
| Q3 2009 | 027 | Pfizer | 4.5 |
| Q4 2009 | 044 | Goldman Sachs | 2.0 |
| Q2 2010 | 057 | BNP Paribas | 2.7 |
| Q3 2010 | 064 | Xcel Energy | 3.2 |
| Q3 2010 | 072 | Mattel | 3.7 |

2.9.3   In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the revenue when the installation was complete.

## 2.10   My summary conclusions in relation to Misstatements arising from transactions which contain errors of valuation

2.10.1   IFRS requires revenue to be recognised at the "*fair value*"[83] of the consideration received or receivable[84].   Whilst in most instances, the fair value of the consideration received or receivable is the amount of cash (or cash equivalents) received, there are exceptions.

2.10.2   Where an entity enters into a transaction with a counterparty which it subsequently acquires (or from whom it subsequently acquires trade and assets)[85], the amount of the cash or cash equivalents receivable in a transaction might not be an indicator of the fair value of consideration.   This is because the parties may be subsidising the transaction via the exchange of consideration notionally related to the business combination.  In such situations, the acquiring entity is therefore required under IFRS to determine[86]:

---

[82] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to two Software Focus Transactions (not including certain other trivial adjustments).  I now do not consider the adjustments in relation to these two Software Focus Transactions necessary

[83] IAS 18 defines fair value as follows: "*Fair value is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction*".  (IAS 18, paragraph 7)

[84] IAS 18 explains that "*The amount of revenue arising on a transaction is usually determined by agreement between the entity and the buyer or user of the asset. It is measured at the fair value of the consideration received or receivable taking into account the amount of any trade discounts and volume rebates allowed by the entity*".  (IAS 18, paragraph 10)

[85] The acquisition of an entity (or certain trade and assets of an entity) is referred to as a "*Business Combination*"

[86] IFRS 3 "*Business Combinations*" ("**IFRS 3**"), paragraph 51 (with guidance at IFRS 3, paragraph B50)

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

mazars   Summary of independent expert accounting opinions of Steven Brice FCA

(a)  whether the previous transactions with the acquired entity were separate from the acquisition, or whether, in substance, the transactions formed part of the acquisition; and, if the latter

(b)  what the "*fair value*" of the transactions was, with such amounts included in the total value of the consideration.

2.10.3  When these requirements are applied, parties would be prevented from artificially inflating or deflating the purchase price of an acquisition via the simultaneous transfer of assets at below or above their fair value.

2.10.4  I have identified one Software Focus Transaction in respect of which Autonomy engaged in a number of transactions with a counterparty in the period prior to a business combination.  This resulted in Misstatements as follows:

(a)  Autonomy failed to determine that certain transactions were linked to the business combination, and therefore failed to assess the fair value of the transaction; and

(b)  for transactions which Autonomy did consider to be part of the business combination, the fair value determined by Autonomy was misstated.

2.10.5  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.13: Software Focus Transactions with Misstatements arising from errors of valuation[87,88]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|-----|----------------------------------|------------------------------------------------------------------|
| Q2 2011 | 096 | Iron Mountain - OEM | 16.5 |

2.10.6  In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the revenue at its fair value.

---

[87] Notwithstanding the errors of valuation, Software Focus Transaction #096 would have nevertheless given rise to a Misstatement as it was accounted for as a sale of goods despite partially relating to a royalty arrangement (see Section 2.8 above)

[88] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to one Software Focus Transaction (not including certain other trivial adjustments)

---

**mazars**

# 3    Summary of my opinion in relation to hardware sales transactions

## 3.1    Introduction

3.1.1    I am instructed to review hardware sales transactions reported by Autonomy during the Relevant Period as revenue and give my opinion on whether these sales were properly accounted for and disclosed in accordance with the applicable accounting standards.  In this section of my report, I provide a summary of my opinion.

## 3.2    The starting point for my analysis: the hardware sales transactions reported by Autonomy as revenue during the Relevant Period

3.2.1    As noted in Section 2 above, using the Quarterly Revenue Breakdowns (which I have found agree to the total revenue reported in the quarterly financial statements), I have identified the revenue reported by Autonomy in each quarter during the Relevant Period (apart from Q3 2011) that arose from hardware sales transactions.  The total revenue reported by Autonomy arising from hardware sales transactions in each period is shown in Table 3.1:

Table 3.1: Total revenue arising from hardware sales transactions reported by Autonomy in the Relevant Period (apart from Q3 2011)[89]

| Quarter | Hardware revenue ($m) |
|---------|----------------------|
| Q1 2009 | 0.0 |
| Q2 2009 | 6.0 |
| Q3 2009 | 42.2 |
| Q4 2009 | 7.2 |
| Q1 2010 | 7.1 |
| Q2 2010 | 31.1 |
| Q3 2010 | 26.7 |
| Q4 2010 | 35.5 |
| Q1 2011 | 20.1 |
| Q2 2011 | 20.8 |
| **Total** | **196.7** |

3.2.2    Given the materiality ranges identified in Table 2.5, with the exception of Q1 2009 (in which no hardware revenue was recognised) the revenue recognised from hardware transactions was material.

---

[89] These are hardware sales of Autonomy, Inc. only.  There are also small amounts of hardware sales in ASL and Autonomy ETalk totalling approximately $3 million over the period Q1 2009 to Q2 2011

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

mazars

3.2.3    Whilst the Quarterly Revenue Breakdowns include information relating to the hardware sales transactions – such as (in most instances) the relevant customer – they do not provide other information, such as the relevant invoice numbers or dates.

3.2.4    I have also been provided with downloads from the Autonomy general ledger[90] and have identified one particular ledger account called "*470000 – Hardware Revenue – CDF*" (the "**Hardware Ledger**").   At face value, this would appear to be the ledger in which Autonomy recorded the revenue from hardware sales transactions.   The Hardware Ledger is helpful because in addition to the relevant customer name, it records other information, such as invoice numbers, that are not recorded on the Quarterly Revenue Breakdowns.

3.2.5    I have compared the revenue from hardware sales transactions per the Quarterly Revenue Breakdowns with the transactions recorded in the Hardware Ledger and have found that the figures broadly agree.   My analysis is provided in Appendix D.

3.2.6    According to the Hardware Ledger, the revenue arising from hardware sales transactions is comprised of over 1,000 hardware sales transactions.   In order to address my instructions, it is necessary to identify a smaller population of transactions to focus upon.   I have therefore identified invoices from the Relevant Period (apart from Q3 2011) of more than $1 million[91].   It is these transactions I will focus on in order to address my instructions (the "**Hardware Focus Transactions**")[92,93].    The Hardware Focus Transactions are summarised by the quarter in which each invoice was posted to the Hardware Ledger in Table 3.2 below and a full list by client and invoice is provided in Appendix E.

---

[90] The general ledger is the hub of the accounting system, each dedicated to a particular type of transaction (such as revenue from hardware transactions) or to a category of party with whom the entity transacts (such as suppliers or related companies)

[91] As noted in footnote 9 above, the witness statement of Mr Welham in the High Court Proceedings, dated 14 September 2018, explained that the Deloitte audit team undertook "*audit work in respect of all sales made by Autonomy of more than $1m*".   On the basis that this testing threshold of $1m is not unreasonable, I have adopted it in my testing of the hardware sales transactions

[92] I do not have a complete population of relevant documents for all of the Hardware Focus Transactions, and I have not identified any documents for one Hardware Focus Transaction

[93] I note that in My Hussain Report I was instructed to "*review the lists identifying Autonomy's Top 40 Contracts and Top 40 Customers provided to HP as part of the due diligence process with my software and hardware samples, noting any apparent omissions from those lists*" (My Hussain Report, paragraph 1.2.3(e)).   I noted three hardware transactions which were omitted from the Top 40 Contract list and 10 customers omitted from the Top 40 Customer list.   The three hardware transactions which were omitted remain Hardware Focus Transactions and therefore my conclusions in this regard have not changed

Table 3.2: Hardware Focus Transactions

| Quarter | Total value of Hardware Focus Transactions ($m) |
|---|---|
| Q3 2009 | 34.2 |
| Q4 2009 | 3.5 |
| Q1 2010 | 14.3 |
| Q2 2010 | 15.2 |
| Q3 2010 | 12.0 |
| Q4 2010 | 17.1 |
| Q1 2011 | 7.5 |
| Q2 2011 | 7.9 |
| **Total** | **111.7** |

3.2.7   Autonomy therefore reported total revenue relating to the Hardware Focus Transactions during the Relevant Period (apart from Q3 2011) of $111.7 million.  This is around 5.4%[94] of the total revenue reported by Autonomy in these quarters during the Relevant Period.

## 3.3   Overview to my summary conclusions

3.3.1   For each of the Hardware Focus Transactions, I have sought to identify contemporaneous information pertaining to the transaction in order to understand its underlying substance and economic reality.  This information comprises, for example:

(a)   documents sent between Autonomy and its hardware suppliers, such as agreements, quotes, purchase orders, and invoices;

(b)   documents sent between Autonomy and its customers, such as agreements, quotes, purchase orders and invoices and delivery documents;

(c)   audit working papers where relevant; and

(d)   general ledger postings (including the Hardware Ledger) and other underlying accounting information.

3.3.2   In summary, I understand from the contemporaneous information that:

(a)   the majority of transactions recorded in the Hardware Ledger appear to be simply resales to customers of products purchased from third parties (such as Dell or EMC). I have not seen any evidence to suggest that Autonomy software was loaded onto this hardware before its onward sale to a third party customer;

---

[94] Being $111.7m / $2,086.1m

**mazars**

(b)     the products purchased from third parties were mostly hardware products although, in certain transactions, part of the products sold appear to have been third party software;

(c)     most of these sales were made at a loss to Autonomy, because the price at which the hardware was sold by Autonomy was less than the price at which it had been purchased;

(d)     initially, the cost of purchasing the hardware was primarily reported in Autonomy's quarterly financial statements in both "*Cost of revenues*" and "*Sales and marketing*" costs (often applying a 50:50 split).  In mid-2010 the practice changed and most of the cost of purchasing the hardware was reported as a "*Cost of revenues*" with primarily just the loss that Autonomy made on each sale being reported as "*Sale and marketing*" costs; and

(e)     journals posted in the Hardware Ledger moved the recognition of revenue from hardware sales transactions between quarters.

3.3.3     Having identified the underlying substance and economic reality of the Hardware Focus Transactions, I have then considered whether these transactions were properly accounted for and disclosed in accordance with IFRS.  Based upon the information I have seen, my overview conclusions are as follows:

(a)     in breach of the requirements of IFRS, Autonomy would inappropriately accrue or defer the recognition of revenue arising from certain hardware sales transactions between reporting periods.  This led to material misstatements in the revenue reported by Autonomy during the Relevant Period;

(b)     in breach of the requirements of IFRS, Autonomy would inappropriately report part of the cost of purchasing the hardware as being a cost of "*Sales and marketing*". This led to material misstatements in the reported "*Cost of revenues*" (and thus the computed "*Gross profit*"), as well as a material misstatement in the reported cost of "*Sales and marketing*"; and

(c)     in breach of the requirements of IFRS, Autonomy did not make any disclosure about the existence of a material amount of revenue arising from hardware sales transactions.

3.3.4     I address each of these areas in turn in Sections 3.4 to 3.6 below.

**mazars**

### 3.4 My summary conclusions in relation to the inappropriate accrual or deferral of revenue arising from hardware sales transactions between reporting periods

3.4.1   The recognition of revenue from the sale of goods is required by IFRS to take place on the date that the transfer of the "*significant risks and rewards of ownership of the goods*" takes place[95].  In most cases, the date of the transfer of the risks and rewards of ownership of the goods "*coincides with the transfer of the legal title or the passing of possession to the buyer*"[96].

3.4.2   In the Hardware Ledger, there are a number of journals which defer revenue recorded following the posting of invoices for specific named customers to the subsequent quarter.  In addition, in four quarters journals were posted which either accrued the revenue (that is, brought forwards the date on which the revenue was reported) or deferred the revenue (that is, delayed the date on which the revenue was reported), as follows[97]:

(a)   two journals meant that $6.2m of revenue was accrued and recognised in Q2 2009 rather than in Q3 2009;

(b)   two journals meant that $7.7m of revenue was deferred and not recognised in Q1 2010 and instead was recognised in Q2 2010;

(c)   one journal meant that $7.8m of revenue was deferred and not recognised in Q2 2010 and instead was recognised in Q3 2010; and

(d)   one journal meant that $3.9m of revenue was deferred and not recognised in Q1 2011 and instead was recognised in Q2 2011.

3.4.3   In practice, there are various reasons why an entity might appropriately post journals which have the result of accruing or deferring revenue between reporting periods.  For example:

(a)   an entity may accrue revenue (that is bring forwards the reporting of revenue) because the relevant posting in the ledger had not been made (perhaps because there had been a delay in the issuance of the invoice) but the goods had been delivered and the revenue recognition criteria of IFRS had been met; and

---

[95] IAS 18, paragraph 14
[96] IAS 18, paragraph 15
[97] Hardware Ledger

**mazars**

(b)     an entity may defer revenue (that is delay the recognition of the revenue) because there had been a delay in the delivery of the goods meaning that the revenue recognition criteria of IFRS had not been met at the period end.

3.4.4     I have sought to review the information underpinning the sales transactions that were accrued or deferred from one period to another, and I have identified that, in certain instances, journals or other entries posted by Autonomy were not appropriate.   These journals meant that revenue arising from hardware sales was misstated in two reporting periods; the period in which the income is recognised is overstated and the period in which the revenue should have been reported is understated. Where the quantum of any such misstatements is material, the financial statements cannot be said to have been prepared in accordance with IFRS.

3.4.5     I provide two examples below:

Example of inappropriate accrual of income: the reporting of $6.0m of revenue in Q2 2009 rather than Q3 2009

3.4.6     Autonomy accrued $6m in the Hardware Ledger in Q2 2009 and recognised this as revenue (rather than in Q3 2009).  This revenue represents a sale by Autonomy to Morgan Stanley of $6m of Hitachi Data Systems ("**HDS**") hardware which was ordered by Morgan Stanley[98], invoiced to Morgan Stanley by Autonomy[99], shipped to Morgan Stanley[100] and invoiced by HDS to Autonomy[101] all in Q3 2009.  The revenue recognition criteria of IFRS were therefore not met until Q3 2009 and revenue should not have been recognised until this quarter.   The sales invoice was posted to the Hardware Ledger in Q3 2009, but the reversal of the accrual recognised in Q2 2009 meant that the net impact on revenue was $0.

3.4.7     In conclusion, revenue in Q2 2009 was overstated by $6m and revenue in Q3 2009 was understated by $6m.

Example of inappropriate deferral of income: the reporting of $5.6m of revenue in Q3 2010 rather than Q1 2010

3.4.8     Two journals posted to the Hardware Ledger in Q1 2010 had the effect of deferring $5.6m of sales from Q1 2010 to a later quarter[102].   This deferral comprised 23 separate invoices for

---

[98] HP-SEC-01654186-01654188
[99] HP-SEC-01654189
[100] HP-SEC-01654198-01654212 and HP-SEC-01654193-01654196
[101] HP-SEC-01654191
[102] The two journals deferred revenue of $4.47m and $3.28m, in total $7.75m.  A breakdown of the revenue deferred between customers is provided in the attachment to Mr Chamberlain's email to Cynthia Watkins on 8 April 2010. (HP-SEC-00100357-00100359)

sales by Autonomy of HDS hardware to Morgan Stanley.  These are listed on an Autonomy tracking spreadsheet that also records the date the products were delivered against each invoice[103].  The products for each of these 23 invoices were delivered in Q1 2010.

3.4.9   One of these invoices is over $1m in value and therefore was one of my Hardware Focus Transactions.  The documents available to me for this transaction show that in Q1 2010:

   (a)      HDS provided a quote to Autonomy[104];

   (b)      Morgan Stanley issued a purchase order to Autonomy[105];

   (c)      Autonomy issued a purchase order to HDS[106];

   (d)      the products were shipped to Morgan Stanley[107];

   (e)      Autonomy issued its invoice to Morgan Stanley[108]; and

   (f)      HDS issued its invoice to Autonomy[109].

3.4.10   The Master Purchase Agreement between Autonomy and Morgan Stanley dated 30 June 2009 states that title and risk of loss passes to Morgan Stanley upon shipment from the manufacturer and that the products are deemed accepted upon delivery to the specified address[110].  It is evident therefore that the revenue recognition criteria of IFRS were met in Q1 2010 and revenue should have been recognised in this quarter.  Given the remaining 22 invoices were also shipped in Q1 2010 and would have been covered by the same Master Purchase Agreement, it is reasonable in my opinion to assume that each of these sales also met the IFRS revenue recognition criteria in Q1 2010 and should have been recognised in this quarter.  Accordingly, revenue in Q1 2010 was understated by $5.6m and revenue in Q3 2010 was overstated by this amount.

3.4.11   In Q2 2010, whilst the two journals referred to were reversed, a separate journal deferred $7.8m of revenue to Q3 2010.  The $5.6m of sales to Morgan Stanley were part of this deferral and therefore ultimately this revenue was not recognised until Q3 2010.

---

[103] HP-SEC-01855197
[104] HP-SEC-01655154
[105] HP-SEC-01655149-01655150
[106] HP-SEC-01655152
[107] HP-SEC-01655153
[108] HP-SEC-01655147
[109] HP-SEC-01655155
[110] HP-SEC-01654676-01654684, clause 2 and clause 5

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**Summary of independent expert accounting opinions of Steven Brice FCA**

3.4.12    Deloitte included this particular transaction (and one other from the $5.6m total) in its Q3 2010 hardware revenue testing and concluded that in their opinion the revenue should have been recognised in Q1 2010[111].

## 3.5    My summary conclusions in relation to the inappropriate reporting of all or part of the cost of purchasing the hardware as being a "*Sales and marketing*" expense

3.5.1    My review of the available information has identified that Autonomy reported part of the cost of purchasing the hardware that it would then sell to third parties as being a "*Sales and marketing*" expense[112].

3.5.2    In my view, pursuant to the requirements of IFRS, the cost to Autonomy of purchasing the hardware should have been reported as a "*Cost of revenues*" and not as a "*Sales and marketing*" expense for the following reasons:

(a)    pursuant to IFRS, "*inventories*" are assets "*held for sale in the ordinary course of business*"[113] and specifically "*encompass goods purchased and held for resale*"[114]. It is therefore clear that where goods are held at the end of the reporting period, this should be reported as part of inventory.  A reporting entity is required by IFRS to report in its financial statements the "*amount of inventories recognised as an expense during the period*"[115], and IFRS notes that this is "*often referred to as cost of sales*"[116].  In my view, "*cost of sales*" is analogous with "*cost of revenues*", being the term that Autonomy used.  Therefore, Autonomy was required to report as part of its "*Cost of revenues*" the cost of all inventory (goods purchased and held for resale) recognised as an expense; and

(b)    in its 2010 consolidated financial statements Autonomy disclosed that:

---

[111] Q3-8130 Hardware Testing.xls

[112] For example, as described in the "*Strategic Deals Memorandum*", DEL00100362-DEC00100369

[113] IAS 2 "*Inventories*" ("**IAS 2**"), paragraph 6 defines inventories as follows: "*Inventories are assets: (a) held for sale in the ordinary course of business; (b) in the process of production for such sale; or (c) in the form of materials or supplies to be consumed in the production process or in the rendering of services*"

[114] IAS 2, paragraph 8

[115] IAS 2, paragraph 36(d)

[116] IAS 2, paragraph 38

(i) "*Cost of revenues*" included the "*costs of product media, product duplication, hardware and manuals*"[117], confirming that the cost of purchasing hardware for resale should be included in this cost component; and

(ii) "*sales and marketing costs comprise the costs of the sales force, commissions and costs of promoting new products and entering into new markets*"[118], confirming that the cost of hardware should not be included in this cost component.

3.5.3 I note that I have seen evidence that Autonomy justified its practice to report the cost of hardware as a cost of "*Sales and marketing*" by reference to there being a strategic partnership in place with the hardware suppliers[119].  However:

(a) my review of the available information suggests that no such strategic marketing alliance was in place – the transactional documents appear to reflect the buying and selling of hardware.  Where contemporaneous documents refer to the potential for marketing, this appears to be from Autonomy's perspective[120] or is at the sole discretion of the hardware supplier[121]; and

(b) if, pursuant to a strategic partnership agreement, marketing was undertaken by the hardware supplier in addition to its supply of the hardware goods (and I have seen no evidence to suggest this was the case), the fair value of these services could be reported as part of the cost of "*Sales and marketing*" if the component of that cost could be reliably measured.  It would also need appropriate disclosure (including in the accounting policies reflected above).

3.5.4 As a result, in my view, the "*Cost of revenues*" in Autonomy's quarterly financial statements were understated and the reported costs of "*Sales and marketing*" were overstated.  Further, the computed gross profit and gross profit margin (which are both important measures of profitability) were also misstated.  Importantly, I have seen evidence that the users of the financial statements were particularly interested in the gross profit margin – for example in an earnings conference call from Q2 2010 an analyst at Piper Jaffray asked "*you saw that spike in appliance sales, that inventory moving through.  Did that have any gross margin impact?*"

---

[117] Autonomy's FY2010 Annual Report and Accounts, page 51
[118] Autonomy's FY2010 Annual Report and Accounts, page 52
[119] For example, as described in the "*Strategic Deals Memorandum*", DEL00100362-DEC00100369
[120] For example, the purchase orders issued by Autonomy to Dell, such as US-PWC 00002646
[121] For example, the "Joint Marketing Efforts" clause in Attachment B to the Value Added Reseller Agreement between Dell and Autonomy.  (US-PWC 00002327-00002338)

**mazars**

and an analyst at Nomura International asked "*I just wanted to come back to the gross margin* […] *So, is it possible that you might get in Q3/Q4 more of slightly lower margin hardware-related deals?*"[122].

## 3.6 My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions

3.6.1 Autonomy's financial statements disclose that the "*group is a software business*"[123] and do not make reference to Autonomy's sales of hardware products. Importantly, the nature and economic realities of Autonomy's software sales transactions were significantly different to the nature and economic realities of Autonomy's hardware sales, for example:

(a) whilst Autonomy described that its software business had a fixed cost base[124], which means that incremental revenue is additive to reported profit, the cost base for hardware sales was clearly not fixed (because every incremental sale required Autonomy to purchase the goods)[125]; and

(b) whilst software was a high margin business, it is clear from my analysis of the Hardware Focus Transactions that the hardware business was a low margin business (and many of the transactions were actually loss making).

3.6.2 In addition to the significant difference between the two business models including a different nature and economic reality to the relevant transactions, by reference to the materiality thresholds in Table 2.5 the quantum of hardware sales was material.

3.6.3 Given the above, pursuant to the requirements of IFRS, Autonomy should have disclosed the existence of a material amount of revenue being generated from hardware sales transactions, which were significantly different in nature and economic reality to the software sales transactions that were described in the financial statements. My conclusion is based upon the following:

(a) IFRS requires "*fair presentation*", including the "*faithful representation*" of the effects of transactions[126]. In particular, fair presentation requires an entity to provide additional disclosures to "*enable users to understand the impact of particular*

---

[122] EMC-HP-026620 and EMC-HP-026623

[123] Autonomy's FY2010 Annual Report and Accounts, page 58

[124] "*A significant proportion of the group's cost base is fixed*". (Autonomy's FY2010 Annual Report and Accounts, page 58)

[125] "*the business model drives enhanced performance though growing sales*". (Autonomy's FY2010 Annual Report and Accounts, page 58)

[126] IAS 1, paragraph 15

*transactions*"[127].  Without a separate disclosure in relation to the hardware sales transactions, users would not be able to understand their impact;

(b)      IFRS requires that an entity should "*present separately items of a dissimilar nature or function unless they are immaterial*"[128].  The hardware sales transactions were clearly items of a dissimilar nature and were material, and therefore should have been presented separately;

(c)      the Conceptual Framework to IFRS requires:

(i)      financial statements to "*represent economic phenomena in words and numbers*"[129] and for this information to not only represent relevant phenomena, but it must also "*faithfully represent the phenomena that it purports to represent*"[130].  The representation of a material amount of hardware sales as being software sales is not a faithful representation; and

(ii)     financial statements to be "*complete*"[131] in that they include "*all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations*"[132].  Of particular relevance to the hardware sales transactions, the Conceptual Framework further provides that "*For some items, a complete depiction may also entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature*"[133].  Explanations regarding the hardware sales transactions were therefore required in order to enable the users of the financial statements to understand how Autonomy was generating its revenue;

(d)      IFRS required Autonomy to disclose the amount of revenue included in "*each significant category of revenue*"[134].  In my view, revenue from hardware sales

---

[127] IAS 1, paragraph 17(c)

[128] IAS 1, paragraph 29

[129] Conceptual Framework, paragraph QC12; equivalent guidance on "*Faithful Representation*" and "*Substance over form*" is found at paragraphs 33 to 35 of the Framework

[130] Conceptual Framework, paragraph QC12

[131] Conceptual Framework, paragraph QC12; equivalent guidance on "*Completeness*" is found at paragraph 38 of the Framework

[132] Conceptual Framework, paragraph QC13

[133] Conceptual Framework, paragraph QC13

[134] "*An entity shall disclose: (a) the accounting policies adopted for the recognition of revenue, including the methods adopted to determine the stage of completion of transactions involving the rendering of services; (b) the amount of each significant category of revenue recognised during the period, including revenue arising from: (i) the sale of goods; (ii) the rendering of services; (iii) interest; (iv) royalties; (v) dividends; and (c) the amount of revenue arising from exchanges of goods or services included in each significant category of revenue*".  (IAS 18, paragraph 35)

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
**Summary of independent expert accounting opinions of Steven Brice FCA**

mazars

transactions was a significant category of revenue and therefore required separate disclosure;

(e)     IFRS required Autonomy to disclose the amount of hardware inventory they had recognised as an expense during the period[135]; and

(f)     IFRS requires a reporting entity to disclose separate financial information (including revenue and segment profits) for each "*operating segment*"[136].  Had this information for hardware sales transactions been disclosed, the information would certainly have been helpful for the users of the accounts because it would have enabled them to understand the nature and financial effects of these transactions.  Autonomy would have been required to disclose this information if Dr Lynch, the chief operating decision maker of Autonomy[137], regularly reviewed the operating results relating to hardware in order to assess performance.  Even if Dr Lynch did not regularly review the operating results relating to hardware, meaning that Autonomy only had one operating segment, Autonomy was required by IFRS to report the revenues for "*each product and service, or each group of similar products and services*"[138].  This therefore required Autonomy to separately disclose the revenues for hardware sales[139].

---

[135]  "*The financial statements shall disclose… (d) the amount of inventories recognised as an expense during the period*".  (IAS 2, paragraph 36)

[136]  IFRS 8 "*Operating segments*" ("**IFRS 8**"), paragraph 5

[137]  Autonomy's FY2010 Annual Report and Accounts, page 58

[138]  IFRS 8, paragraph 32

[139]  The only reason for not doing so, per paragraph 32 of IFRS 8, is if "*the necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed*".  Not only was there no disclosure that the information on hardware revenues was not available, this information was clearly available as it was recorded separately in the Hardware Ledger

# 4 My summary conclusions in relation to the revenue streams reported by Autonomy from Q1 2010 onwards

## 4.1 Introduction

4.1.1 I am instructed to review the revenue streams reported by Autonomy during the Relevant Period and give my opinion on whether the description of these streams is consistent with the nature of the underlying transactions[140].  In this section of my report I provide a summary of my opinion.

## 4.2 The starting point for my analysis: the revenue streams reported by Autonomy in its commentary to the market

4.2.1 From Q1 2010 onwards, Autonomy reported the following revenue streams in the financial information published with its quarterly and annual financial statements[141]:

(a) "*IDOL Product*", which is described as licensed software paid for up-front with an ongoing support and maintenance stream;

(b) "*IDOL Cloud*", which is described as a Software-as-a-Service (SaaS) model;

(c) "*IDOL OEM*", which is where Autonomy's IDOL is embedded inside other software companies' products;

(d) "*Deferred revenue release*", which stems from support and maintenance contracts recognised in arrears; and

(e) "*Services*", which relate to third party and internal implementation consultants and training[142,143].

---

[140] I note that in My Hussain Report I was instructed to "*comment on Autonomy's compound annual growth rate reported in HP's press release dated 18 August 2011*" (My Hussain Report, paragraph 1.2.3(d)).  In addressing these instructions I recalculated Autonomy's compound annual growth rate over the five year period from 2005 to 2010 adjusting 2010 consolidated revenue for the total adjustments arising from HP's restatement exercise.  This resulted in a compound annual growth rate of 49%, 6% lower than that reported in the HP press release

[141] These revenue streams were not reported in Autonomy's annual or quarterly financial statements themselves

[142] Refer to the Autonomy presentation "*Q3 09 Results 20 October 2009*" (HP-SEC-00025157-HP-SEC-00025179) for Autonomy's first identification of these revenue streams

[143] Given the low monetary value and nature of this revenue stream I have done no further analysis in respect of services

**mazars**

4.2.2    The sum of the revenues reported in these revenue streams agrees to the total revenues reported by Autonomy in its quarterly financial statements, as shown for the period Q1 2010 to Q2 2011 in the table below:

Table 4.1: Quarterly breakdown of revenue across the reported revenue streams from Q1 2010 to Q2 2011

| $m | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 |
|---|---|---|---|---|---|---|
| IDOL Product | 46.0 | 62.4 | 58.3 | 84.3 | 54.4 | 68.5 |
| IDOL Cloud | 45.5 | 46.9 | 46.6 | 50.6 | 52.7 | 64.3 |
| IDOL OEM | 29.1 | 37.5 | 31.2 | 34.5 | 37.2 | 47.1 |
| Services | 11.0 | 11.0 | 10.0 | 9.0 | 9.0 | 8.8 |
| Deferred revenue release | 62.0 | 63.0 | 64.0 | 66.0 | 66.5 | 67.5 |
| **Total** | **193.7** | **220.8** | **210.1** | **244.4** | **219.8** | **256.2** |

4.2.3    The table above illustrates that the total of the reported IDOL Cloud and IDOL OEM revenues were generally increasing across the period, whereas IDOL Product revenue was fluctuating. Additionally, the total reported IDOL Cloud and IDOL OEM revenues were 163.0% of IDOL Product revenues in Q1 2010 and 162.8% of reported IDOL Product revenues in Q2 2011 (with a peak of 166.7% in Q1 2011).

## 4.3    Applicable financial reporting requirements

4.3.1    The above-mentioned revenue streams were not reported in Autonomy's quarterly financial statements themselves but were instead disclosed to the market within the accompanying management commentary provided by Autonomy[144] alongside its quarterly financial statements.

4.3.2    Given Autonomy was listed on the London Stock Exchange, it was required to comply with the requirements of the Disclosure and Transparency Rule ("**DTR**").  The DTR:

(a)        required that Autonomy prepare a management report to accompany its annual financial statements.  Such management reports were required to provide a fair

---

[144] For example by way of financial information published with its quarterly and annual financial statements, trading updates, results presentations, or investor Q&As

**mazars**

review of the business, including a balanced and comprehensive analysis of the financial performance[145];

(b)    required that Autonomy prepare a management report to accompany its interim financial statements[146].  Autonomy was required to also provide a responsibility statement attesting that the management report provided a fair review of the information required[147]; and

(c)    required Autonomy to make interim management statements within the first and second six months of its financial year[148], which were required to provide *inter alia* a general description of the financial performance during the relevant period[149]. Such statements, like all disclosures to the market, were covered by the requirement of the DTR that issuers take reasonable care to ensure that any information reported is not "*misleading, false or deceptive*"[150].

4.3.3    Further, it is my view that the above-mentioned revenue streams were an element of Autonomy's "*other financial reporting*", which is explained in the Preface to IFRS as being "*information provided outside financial statements that assists in the interpretation of a complete set of financial statements that assists in the interpretation of a complete set of financial statements or improves users' ability to make efficient economic decisions*"[151].

4.3.4    The Conceptual Framework explains that a fundamental qualitative characteristic of useful financial information is that it faithfully represents what it purports to represent[152], and is "*complete, neutral, and free from error*"[153].  As such, it is my opinion that the revenue streams reported by Autonomy to the market in its "*other financial reporting*" should have reflected Autonomy's definitions of those revenue streams.

---

[145] "*The management report must contain: 1. a fair review of the issuer's business; and 2. a description of the principal risks and uncertainties facing the issuer.  The review required by DTR 4.1.8 R must: 1. be a balanced and comprehensive analysis of: a) the development and performance of the issuer's business during the financial year; and b) the position of the issuer's business at the end of that year, consistent with the size and complexity of the business; 2. include, to the extent necessary for an understanding of the development, performance or position of the issuer's business: a) analysis using financial key performance indicators; and b) where appropriate, analysis using other key performance indicators including information relating to environmental matters and employee matters; and 3. include references to, and additional explanations of, amounts included in the issuer's annual financial statements, where appropriate*".  (DTR, paragraphs 4.1.8 and 4.1.9)

[146] DTR, paragraph 4.2.7

[147] DTR, paragraph 4.2.10(3)

[148] DTR, paragraph 4.3.2

[149] DTR, paragraph 4.3.5

[150] DTR, paragraph 1.3.4

[151] Preface to IFRS, paragraph 7

[152] Conceptual Framework, paragraph QC4; equivalent guidance on "*Faithful Representation*" and "*Substance over form*" is found at paragraphs 33 to 35 of the Framework

[153] Conceptual Framework, paragraph QC12

**mazars**

4.3.5    Finally, I note that pursuant to the Companies Act 2006, Autonomy was required to prepare a fair review of its business and a balanced and comprehensive analysis of its financial performance[154].  In my opinion, this requirement is again consistent with a requirement that the revenue streams reported by Autonomy to the market in its "*other financial reporting*" should have reflected Autonomy's definitions of those revenue streams[155].

## 4.4    Overview to my summary conclusions

4.4.1    In my opinion, the revenue streams disclosed in Autonomy's "*other financial reporting*" did not faithfully represent the nature of the revenues generated by Autonomy, and did not constitute a fair and balanced analysis of Autonomy's financial performance.  I have reached this conclusion because:

(a)    certain Software Focus Transactions were reported as having generated IDOL OEM revenues, despite those Software Focus Transactions not matching Autonomy's depiction of the IDOL OEM revenue stream[156].  I note that for certain of these Software Focus Transactions I have proposed adjustments which would reduce the revenue recognised;

(b)    certain Software Focus Transactions were inappropriately reported as having generated IDOL Cloud revenues, despite those Software Focus Transactions not meeting Autonomy's depiction of the IDOL Cloud revenue stream.  I note that for certain of these Software Focus Transactions I have proposed adjustments which would reduce the revenue recognised;

(c)    sales of hardware were reported as having generated IDOL Product revenues, despite hardware sales not meeting Autonomy's depiction of the IDOL Product revenue stream; and

---

[154] "*The business review must contain – a) a fair review of the company's business, and b) a description of the principal risks and uncertainties facing the company.  The review required is a balanced and comprehensive analysis of – a) the development and performance of the company's business during the financial year, and b) the position of the company's business at the end of that year, consistent with the size and complexity of the business.  In the case of a quoted company the business review must, to the extent necessary for an understanding of the development, performance or position of the company's business, include – a) the main trends and factors likely to affect the future development, performance and position of the company's business; and […] the review must, where appropriate, include references to, and additional explanations of, amounts included in the company's annual accounts*".  (Companies Act 2006, Section 417)

[155] Moreover, I note that auditors performing reviews or audits or annual or quarterly information were required to review accompanying financial information to identify material inconsistencies between that information and the information presented in the quarterly or annual financial statements themselves.  (ISRE 2410 "*Review of Interim Financial Information Performed by the Independent Auditor of the Entity*" and ISA 720 A "*Other information and documents containing audited financial statements*")

[156] I note that throughout the Relevant Period, Autonomy reported revenue arising from its OEM business using various terms, including: "*IDOL OEM*", "*OEM derived revenues*" and "*IDOL OEM derived revenues*"

---

**mazars**

(d)      revenues associated with certain transactions were reported within both the IDOL
OEM and IDOL Cloud revenue streams[157].

## 4.5    My summary conclusions in relation to the reporting of the IDOL OEM revenue stream

4.5.1    "*IDOL OEM*" is not a term which is defined in IFRS.  However, in its "*other financial reporting*",
Autonomy depicted its IDOL OEM revenue stream in the following ways:

(a)      in its presentation titled "*Q3 09 Results 20 October 2009*"[158], Autonomy described
its "*OEM Dev*" revenue as comprising "*a development licence fee that is paid upfront
and is non-refundable*" and "*OEM Ongoing*" revenue as "*Revenues from sales of
OEMs' products*";

(b)      in its document "*Investor Relations Bulletin: 19 October 2010*"[159], Autonomy
explained that "*IDOL OEM revenues do not generate deferred revenue as the
royalties are paid quarterly in arrears*";

(c)      in its "*Financial Overview*" provided alongside the financial statements for the year
ended 31 December 2010[160], Autonomy explained that "*IDOL OEM is where
Autonomy's IDOL is embedded inside other software companies' products. IDOL is
now embedded in most major software companies' products addressing most
software vertical markets.  This is a particularly important revenue stream as it
generates ongoing business across the broadest product set possible, in addition to
up-front development licences*"[161];

(d)      in its presentation titled "*Autonomy Q1 trading update*"[162], Autonomy described its
IDOL OEM revenue stream as where customers "*Purchase a royalty-paying
competitor's product – this model does not generate deferred revenue*"; and

(e)      in its presentation "*Autonomy Q2 and H1 Results*"[163], Autonomy described "*cloud
and OEM*" as "*recurring models*".

---

[157] And, as a consequence, were excluded from the IDOL Product revenue stream
[158] HP-SEC-00025157-HP-SEC-00025179
[159] SEC-AUSA5-EPROD-000492750
[160] Autonomy's FY2010 Annual Report and Accounts, page 15
[161] Equivalent descriptions were included in Autonomy's "*Trading Update for the Quarter Ended March 31, 2011*" and "*Trading Update for the Quarter Ended 30 June 2011*"
[162] HP-SEC-00159120, page 105
[163] SEC-AUSA5-EPROD-000714279

4.5.2    As explained above, in my opinion, the transactions reported within the IDOL OEM revenue stream should have had characteristics which were consistent with Autonomy's depiction of the IDOL OEM revenue stream to the market.  In the light of Autonomy's own description of the IDOL OEM revenue stream, in my opinion transactions classified as generating IDOL OEM revenue should have the following key characteristics:

    (a)    the transaction should relate to a sale in which Autonomy's software was embedded into the customer's product for the customer to sell-on to third parties.  As such:

        (i)    I do not consider that transactions to non-software companies are consistent with Autonomy's depiction of IDOL OEM revenue; and

        (ii)    I do not consider that arrangements with software companies where the software company would simply sell-on Autonomy's software without first embedding it into its own product are consistent with Autonomy's depiction of IDOL OEM revenue; and

    (b)    the transaction should generate recurring revenues for Autonomy[164].  As such I do not consider that transactions involving one-off, pre-paid royalties (where amounts were recognised immediately by Autonomy) are consistent with Autonomy's depiction of IDOL OEM revenue[165].

4.5.3    In Section 2 above I explained that I have reviewed the Software Focus Transactions and considered whether they were properly accounted for in accordance with IFRS.  Throughout that process I also considered whether, in my opinion, the Software Focus Transactions reported as giving rise to IDOL OEM revenues had characteristics which were consistent with Autonomy's depiction of the IDOL OEM revenue stream.

4.5.4    My analysis has identified that the following Software Focus Transactions were reported as generating IDOL OEM revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL OEM revenue stream:

---

[164] If disclosed as "*OEM Ongoing*"
[165] If disclosed as "*OEM Ongoing*"

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

Table 4.2: Software Focus Transactions I have identified which were reported as generating IDOL OEM revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL OEM revenue stream

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as IDOL OEM ($m) |
|---|---|---|---|
| Q1 2010 | 048 | B of A | 8.9 |
| Q1 2010 | 049 | Filetek | 8.5 |
| Q2 2010 | 055 | Amgen Info Governance | 4.5 |
| Q2 2010 | 058 | MetLife DS | 7.0 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 066 | Vidient | 2.0 |
| Q3 2010 | 067 | Bank of America | 2.7 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q3 2010 | 072 | Mattel | 3.7 |
| Q4 2010 | 074 | Prisa | 9.0 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q4 2010 | 081 | VMS | 10.8 |
| Q1 2011 | 084 | Tottenham | 6.4 |
| Q1 2011 | 088 | Mcafee – Capax | 5.0 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | 092a | KPMG | 5.4 |
| Q2 2011 | 096 | Iron Mountain – OEM | 16.5 |
| Q2 2011 | 120 | Dell Hyatt - mt | 5.3 |
| Q2 2011 | 121 | USPS archive – mt | 7.0 |
| Q2 2011 | 102 | JPMC – EDD | 2.6 |
| Q2 2011 | 105 | UBS – capax | 7.6 |
| Q2 2011 | 106 | Rand | 2.3 |

## 4.6 My summary conclusions in relation to the reporting of the IDOL Cloud revenue stream

4.6.1 "*IDOL Cloud*" is also not a term which is defined in IFRS.  However, in its "*other financial reporting*", Autonomy depicted its IDOL Cloud revenue stream in the following ways:

(a)  in its presentation titled "*Q3 09 Results 20 October 2009*"[166], Autonomy described its IDOL Cloud revenue as being "*Solutions for which the major party is executed in the SaaS or hosted model*".  Autonomy's description continued:

(i)  "*In hosted, the customer has access to our IDOL software running on our hardware, single tenant*";

(ii)  "*In SaaS, the customer has access to our IDOL software running on our hardware, multi tenant.  For hosted or SaaS, no licence revenues are generated*"; and

---

[166] HP-SEC-00025157-HP-SEC-00025179

**mazars**

(iii)    "*These customers may occasionally separately buy IDOL licence to run on their hardware systems for the purpose of feeding information to our hosted/SaaS system.  This licence sale is recognised as a normal software licence as Autonomy has no ongoing obligations in relation to it*";

(b)    in its document "*Investor Relations Bulletin: 19 October 2010*"[167], Autonomy explained that "*IDOL Cloud delivers Autonomy's IDOL Cloud delivers Autonomy's product on a Software as a Service (SaaS) basis, which is invoiced monthly in arrears and does not generate deferred revenue. As a result, any organic revenue growth analysis needs to bear in mind that headline rates of growth are understated given the shift away from license sales (recognised immediately) to subscription fees (recognised over time). SaaS revenues are generally considered to be higher quality over the long term given their predictable, sticky characteristics*";

(c)    in its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010[168], Autonomy explained that "*IDOL Cloud delivers Autonomy's IDOL on a Software-as-a-Service (Saas) model, which is generally invoiced monthly in arrears and generally does not generate deferred revenue. There are two key drivers of cloud revenues for Autonomy: the first and most significant relates to complex processing of information delivered as a service, the second relates to the quantity of data under management*"[169];

(d)    in its presentation titled "*Autonomy Q1 trading update*"[170], Autonomy described its IDOL Cloud revenue stream as "*Subscribe to our Software as a Service (billed monthly) – this model does not generate deferred revenue*"; and

(e)    in its presentation "*Autonomy Q2 and H1 Results*"[171], Autonomy described "*cloud and OEM*" as "*recurring models*".

4.6.2    As explained above, in my opinion, the transactions reported within the IDOL Cloud revenue stream should have had characteristics which were consistent with Autonomy's depiction of the IDOL Cloud revenue stream to the market.  In the light of Autonomy's own description of

---

[167] SEC-AUSA5-EPROD-000492750

[168] Autonomy's FY2010 Annual Report and Accounts, page 15

[169] Equivalent descriptions were included in Autonomy's "*Trading Update for the Quarter Ended March 31, 2011*" and "*Trading Update for the Quarter Ended 30 June 2011*"

[170] HP-SEC-00159120, page 105

[171] SEC-AUSA5-EPROD-000714279

the IDOL Cloud revenue stream, in my opinion transactions reported as generating IDOL Cloud should have the following characteristics:

(a)    the transaction should be for the provision of ongoing services.  As such, (subject to the single exception set out in paragraph 4.6.3 below) I do not consider that transactions of the sale of software licences are consistent with Autonomy's depiction of IDOL Cloud revenue;

(b)    the majority of the revenue reported in the IDOL Cloud revenue stream should relate to transactions related to the complex processing of information delivered as a service, with transactions related to the hosting of data also being a significant contributor; and

(c)    the transaction should generate recurring revenue for Autonomy.  As such I do not consider that transactions involving the recognition of revenue in one-off, lumpsum amounts are consistent with Autonomy's depiction of IDOL Cloud revenue.

4.6.3   Autonomy's depiction of the IDOL Cloud revenue stream in its "*Q3 09 Results 20 October 2009*"[172] does explain that "*customers may occasionally separately buy IDOL licence to run on their hardware systems* […] *This licence sale is recognised as a normal software licence as Autonomy has no ongoing obligations in relation to it*".  In my opinion, this disclosure is unclear as to whether the "*licence sale*" is recognised within the IDOL Cloud revenue stream or within the IDOL Product revenue stream.  In any event, to the extent that the sale of a software licence was reported within the IDOL Cloud revenue stream, in my opinion:

(a)    the transaction should be for a software licence installed on the customer's hardware.  As such, I do not consider that transactions in which a software licence was purchased and installed on Autonomy's hardware are consistent with Autonomy's depiction; and

(b)    notwithstanding the above, from its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010 onwards[173], Autonomy's depiction of the IDOL Cloud revenue stream made no reference to the inclusion of software licences whatsoever.  As such from 31 December 2010, in my opinion no revenue related to the sale of a software licence should be reported as IDOL Cloud revenue.

---

[172] HP-SEC-00025157-HP-SEC-00025179
[173] See, for example, Autonomy's FY2010 Annual Report and Accounts, page 15

4.6.4    In Section 2 above I explained that I have reviewed the Software Focus Transactions and considered whether they were properly accounted for in accordance with IFRS.  Throughout that process, I also considered whether, in my opinion, the Software Focus Transactions reported as giving rise to IDOL Cloud revenues had characteristics which were consistent with Autonomy's depiction of the IDOL Cloud revenue stream.

4.6.5    My analysis has identified that the following Software Focus Transactions were reported as having generated IDOL Cloud revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL Cloud revenue stream:

**Table 4.3: Software Focus Transactions I have identified which were reported as generating IDOL Cloud revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL Cloud revenue stream**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as IDOL Cloud ($m) |
|---|---|---|---|
| Q1 2010 | 046 | PMI (Discover) | 4.2 |
| Q1 2010 | 048 | B of A | 4.5 |
| Q1 2010 | 051 | Discover tech – Citi 32 cells | 5.5 |
| Q2 2010 | 053 | BP | 12.2 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 063 | Citadel | 3.7 |
| Q3 2010 | 064 | Xcel Energy | 2.4 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 076 | Ahold | 2.8 |
| Q4 2010 | 077 | Amgen | 5.7 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q4 2010 | 080 | Microtech doi | 4.0 |
| Q4 2010 | 079b | capax baml | 1.7 |
| Q4 2010 | 079c | BAML extra | 3.5 |
| Q1 2011 | 086 | DB Restructure | 7.1 |
| Q1 2011 | 087 | Morgan Stanley DS | 5.0 |
| Q1 2011 | 089 | UBS | 8.0 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | 093 | Johnson & Johnson | 2.3 |
| Q2 2011 | 101 | ABBOTT LABS – dt | 8.6 |
| Q2 2011 | 120 | Dell Hyatt – mt | 5.3 |
| Q2 2011 | 102 | JPMC – EDD | 2.6 |
| Q2 2011 | 109 | USPS, eDiscovery | 6.3 |
| Q2 2011 | 117 | National Bank of Canada | 1.5 |
| Q2 2011 | 116 | Metlife | 5.5 |

## 4.7    My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions in their other financial information

4.7.1    As mentioned above, in accordance with the DTR, Companies Act 2006 and the Conceptual Framework, Autonomy was required to provide a balanced and comprehensive analysis of its financial performance.   Of particular relevance to the hardware sales transactions, the

Conceptual Framework further provides that for certain items a complete depiction may also involve explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature[174].

4.7.2   Furthermore, as mentioned in Section 3.5, in accordance with IFRS Autonomy was required to provide a fair representation and to present separately items of a dissimilar nature or function unless they are immaterial.  As such, Autonomy was required to disclose that revenue was being generated from the sale of hardware products.

4.7.3   However, as discussed in Section 3.5 above, in breach of IFRS, Autonomy did not include any disclosure on the existence of a material amount of hardware sales transactions.

4.7.4   My analysis has identified that the following hardware transactions were reported as generating revenue in the IDOL Product or deferred revenue release revenue streams, despite being hardware transactions which should have been disclosed separately:

---

[174] The Conceptual Framework states that "*For some items, a complete depiction may also entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature*".  (Conceptual Framework, paragraph QC13)

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

Table 4.4: Hardware transactions which were reported in the IDOL Product or deferred revenue release revenue streams

| Quarter | Quarterly Revenue Breakdown name | Revenue reported as IDOL Product ($m) | Revenue reported as deferred revenue release ($m) |
|---|---|---|---|
| Q1 2010 | Fannie Mae | 1.3 | |
| Q1 2010 | Morgan Stanley | | 0.6 |
| Q1 2010 | SHI International Corp | | 5.2 |
| Q2 2010 | Insight | 2.5 | |
| Q2 2010 | JPMorgan Chase Bank N.A. | 0.5 | |
| Q2 2010 | Metro Business Systems | 1.3 | 3.5 |
| Q2 2010 | Morgan Stanley | 0.5 | 5.6 |
| Q2 2010 | SHI International Corp | 16.1 | |
| Q3 2010 | Insight | 2.4 | |
| Q3 2010 | SHI International Corp | 4.1 | |
| Q3 2010 | Zones, Inc | 10.5 | |
| Q3 2010 | Q2'Revenue - Hardware | | 8.7 |
| Q3 2010 | Low margin | 0.9 | |
| Q4 2010 | Amulet Hotkey | 1.1 | |
| Q4 2010 | Bank of New York Mellon | 1.4 | |
| Q4 2010 | Insight | 0.2 | |
| Q4 2010 | JPMorgan Chase Bank, N.A. | 1.7 | |
| Q4 2010 | Morgan Stanley | 6.3 | |
| Q4 2010 | Progressive Insurance | 1.2 | |
| Q4 2010 | SHI International Corp | 6.4 | |
| Q4 2010 | Low margin from deferred | | 2.1 |
| Q4 2010 | Toronto Police Service + Fannie Mae | 0.1 | |
| Q4 2010 | Union Pacific Railroad | 0.3 | |
| Q4 2010 | Video Monitoring Services | 6.0 | |
| Q4 2010 | Zones, Inc | 8.6 | |
| Q1 2011 | Amulet Hotkey | 1.9 | 2.1 |
| Q1 2011 | Bank of New York Mellon | 3.2 | |
| Q1 2011 | Insight | 0.4 | |
| Q1 2011 | JPMorgan Chase Bank, N.A. | 0.2 | |
| Q1 2011 | Northwestern Mutual Life | 0.1 | |
| Q1 2011 | SHI International Corp | 12.3 | |
| Q2 2011 | Amulet Hotkey | | 1.2 |
| Q2 2011 | SHI International Corp | 3.3 | |
| Q2 2011 | Closed – poppy | 12.4 | |
| Q2 2011 | Deferred Hardware | | 3.9 |

## 4.8   My summary conclusions in relation to the double reporting of the reported IDOL OEM and IDOL Cloud revenue streams

4.8.1   As shown in Table 4.1, Autonomy reported revenue across five revenue streams (IDOL Product, IDOL Cloud, IDOL OEM, service and deferred revenue release).  Aggregating the revenues derived from these five revenue streams agrees to the total revenues reported in Autonomy's quarterly financial statements.  This confirms that the revenues generated by an individual transaction is only reported in one of the five revenue streams.

**mazars**

4.8.2    However, I have identified several instances in the Quarterly Revenue Breakdowns where the revenue generated from a single transaction was reported within both the IDOL OEM and IDOL Cloud revenue streams.  I set out these transactions in the table below[175]:

**Table 4.5: Transactions within the Quarterly Revenue Breakdowns which were reported within both the IDOL OEM and IDOL Cloud revenue streams**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as both IDOL OEM and IDOL Cloud ($m) |
|---------|-----|------------------------------------|------------------------------------------------------|
| Q1 2010 | N/A | EDD hosted | 3.5 |
| Q1 2010 | N/A | services + maintenance | 3.0 |
| Q1 2010 | 48 | B of A | 4.5 |
| Q2 2010 | 59 | JPMC | 8.7 |
| Q2 2010 | N/A | EDD hosted | 3.2 |
| Q3 2010 | 65 | Amgen | 9.0 |
| Q3 2010 | 71 | EMC | 5.7 |
| Q4 2010 | 74 | Prisa | 0.9 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q1 2011 | N/A | GCPD | 0.2 |
| Q1 2011 | N/A | BBC | 1.7 |
| Q1 2011 | 91 | Prisa | 3.6 |
| Q1 2011 | N/A | ATG | 0.5 |
| Q2 2011 | 102 | JPMC - EDD | 2.6 |
| Q2 2011 | 120 | Dell Hyatt -mt | 5.3 |

4.8.3    It is my view that reporting a single transaction within both the IDOL OEM and IDOL Cloud revenue streams overstates these revenue streams in a manner which is inconsistent with the requirements and guidance of the Conceptual Framework, DTR and Companies Act 2006 set out in Section 4.3 above.

---

[175] I note that these transactions were not double reported in Autonomy's total revenue disclosed to the market, because a consequence of the double reporting in the IDOL OEM and IDOL Cloud revenue streams meant that Autonomy's IDOL Product revenue stream was understated by an equivalent amount as the amount reported in the IDOL OEM revenue stream

**mazars**

# 5      Summary of my overall conclusions

5.1.1   Based on the information I have seen, my summary conclusions are that, in Autonomy's quarterly financial statements issued during the Relevant Period:

(a)      the revenue from software sales transactions was not reported in accordance with IFRS (as I identified in Section 2);

(b)      the revenue from hardware sales transactions was not reported or disclosed in accordance with IFRS (as I identified in Sections 3 and 4.7); and

(c)      the descriptions of the IDOL OEM, IDOL Cloud and IDOL Product revenue streams were not reported or disclosed in accordance with the DTR, Conceptual Framework or Companies Act 2006 (as I identified in Section 4).

5.1.2   As a result, Autonomy's quarterly reporting – including both the financial statements and the commentary in the annual report – did not provide a faithful representation of Autonomy's financial performance during the Relevant Period.

5.1.3   By way of illustration, in the chart below I set out the revenue reported in respect of Q2 2011 by Autonomy broken down by revenue stream, as well as my assessment of that revenue (again broken down by revenue stream) had the financial statements been prepared in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006:

**mazars**

Figure 5.1: Revenue reported by Autonomy by revenue stream in Q2 2011 and my assessment of that revenue had it been reported in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006[176]



5.1.4    As discussed in paragraph 4.2.3, in Q2 2011 the total of the reported IDOL Cloud and IDOL OEM revenues were 162.8% of reported IDOL Product revenues.  However, as can be seen from the figure above, the total of the IDOL Cloud and IDOL OEM revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements would have only made up 69.1% of the IDOL Product revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements.

5.1.5    Further, the figure above shows that, although reported revenues were split broadly evenly over the IDOL Product and IDOL Cloud revenue streams (with IDOL Cloud revenue making up 93.9% of IDOL Product revenue), in actual fact IDOL Cloud revenue was significantly less than IDOL Product revenue, at just 58.2%.  With respect to the IDOL OEM revenue stream, reported revenue made up 68.9% of IDOL Product revenue.  If the financial statements had been prepared in accordance with the relevant requirements IDOL OEM revenue would have made up 11.0% of IDOL Product revenue.  In summary, if revenues had been reported in

---

[176] For the purposes of this chart I separate out hardware revenue recognised in the quarter.  However, at this stage I have not made any adjustments to the quantum of hardware revenue recognised in the quarter as my analysis of this category of sales is ongoing

accordance with the relevant requirements, IDOL Product revenue would have been far greater than that of IDOL Cloud and IDOL OEM.

5.1.6    In addition to this, if revenue had been reported in accordance with the relevant requirements hardware would have made up 10.4% of total revenue, compared to 0% in the reported revenue.