1  Jonathan Matthew Baum (SBN: 303469)   Christopher J. Morvillo
   **Steptoe LLP**                        Celeste L.M. Koeleveld
2  One Market Street                      Daniel S. Silver
3  Steuart Tower, Suite 1070              (Admitted Pro Hac Vice)
   San Francisco, CA  94105               **Clifford Chance US LLP**
4  Telephone: (510) 735-4558              31 West 52nd Street
   jbaum@steptoe.com                      New York, NY 10019
5                                         Telephone: (212) 878-3437
6  Reid H. Weingarten                     christopher.morvillo@cliffordchance.com
   Brian M. Heberlig
7  Michelle L. Levin
   Nicholas P. Silverman                  *Attorneys for Defendant*
8  Dwight J. Draughon                     *Michael Richard Lynch*
   Drew C. Harris
9  **Steptoe LLP**
10 1114 Avenue of the Americas
   New York, NY 10036
11 Telephone: (212) 506-3900

12

13                 **UNITED STATES DISTRICT COURT**

14                **NORTHERN  DISTRICT OF CALIFORNIA**

15

16 UNITED STATES OF AMERICA,              Case No.: 3:18-cr-00577-CRB

17          Plaintiff,                     Judge: Hon. Charles Breyer

18      vs.                               **DEFENDANT MICHAEL RICHARD
                                          LYNCH'S MOTION *IN LIMINE* TO ADMIT
19 MICHAEL RICHARD LYNCH and              POST-ACQUISITION EVIDENCE**
20 STEPHEN KEITH CHAMBERLAIN,
                                          Date:  February 21, 2024 at 2 p.m.
21          Defendants.                    Court:  Courtroom 6 – 17th Floor
                                          Date Filed:  January 17, 2024
22                                         Trial Date:  March 18, 2024
23

24

25

26

27

28

# TABLE OF CONTENTS

Page Nos.

I.    INTRODUCTION ................................................................................................ 1

II.   THE POST-ACQUISITION EVIDENCE SHOULD BE ADMITTED ...................... 2

    A.   Post-Acquisition Evidence Demonstrates that Allegedly Withheld Information was not Material to HP's Decision to Acquire Autonomy, and that HP Witnesses' Claims to the Contrary Are False............................................................ 2

    B.   Post-Acquisition Evidence Rebuts the Government's Version of Events and Establishes that HP Was Not Defrauded ................................................ 7

    C.   Post-Acquisition Evidence Demonstrates that Dr. Lynch Had No Intent and No Motive to Defraud and Supports His Anticipated Testimony .............................. 13

III.  CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

## Cases

**Page Nos.**

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ............................................................................... 7

*Neder v. United States,*
    527 U.S. 1 (1999) ......................................................................................... 2, 7

*United States v. Bogucki,*
    No. 18-CR-00021-CRB-1, 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) ................. 2, 3

*United States v. Galecki,*
    89 F.4th 713 (9th Cir. Dec. 27, 2023) ................................................................ 3, 4

*United States v. Green,*
    698 F. App'x 879 (9th Cir. 2017) ......................................................................... 2

*United States v. Hanley,*
    190 F.3d 1017 (9th Cir. 1999) ............................................................................. 2

*United States v. Lindsey,*
    850 F.3d 1009 (9th Cir. 2017) ............................................................................. 2

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015) ................................................................................ 7

*United States v. Schena,*
    No. 5:20-CR-00425-EJD-1, 2022 WL 2910185 (N.D. Cal. July 23, 2022) .............. 2, 4

*United States v. Stever,*
    603 F.3d 747 (9th Cir. 2010) ............................................................................... 6

*United States v. Yang,*
    Case No. 16-CR-00334-LHK, 2019 WL 5536213 (N.D. Cal. Oct. 25, 2019) .............. 3

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
    579 U.S. 176 (2016) ....................................................................................... 3, 5

1

2

**Statutes and Rules**

3

18 U.S.C. §1343 ................................................................................................................ 2

Fed. R. Crim. P. 17(c) .................................................................................................... 13

Fed. R. Crim. P. 29 ........................................................................................................... 3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SUMMARY OF ARGUMENT

Defendant Michael Richard Lynch moves *in limine* to offer evidence that is critical for him to mount a full and fair defense, including *Brady* material that exculpates Dr. Lynch and makes clear that he is innocent.  Specifically, Dr. Lynch seeks to offer at trial:

(i)      evidence that senior HP executives were fully aware of Autonomy's hardware sales before the deal was signed, and did nothing to stop or even investigate the circumstances of such sales (all before a purported whistleblower came forward in May 2012);

(ii)     evidence of HP's mismanagement of Autonomy, leading to substantial revenue misses in Q1 and Q2 2012, which Dr. Lynch witnessed during his tenure as CEO of HP-Autonomy until May 2012;

(iii)    evidence that HP falsely blamed more than $5 billion of its $8.8 billion write-down of Autonomy's value on a purported fraud in November 2012, when HP knew full well that HP's own failures to achieve the synergies it had projected after the acquisition were the cause of any drop in Autonomy's value; and

(iv)    evidence that Christopher Yelland's hindsight-infused restatement of Autonomy's accounts was falsely designed to support HP's blame-Autonomy game and its litigation strategy.

As explained further in this motion *in limine*, this evidence is crucial to demonstrating the lack of materiality of information that was allegedly withheld from HP during the acquisition process; to impeaching the credibility of witnesses the government will call to try to establish materiality; to rebutting the government's allegation that HP was in fact defrauded and suffered substantial losses; and to establishing Dr. Lynch's lack of intent and motive to defraud, particularly since Dr. Lynch will testify at trial.

The evidence is also necessary to meeting and rebutting the government's anticipated proof about events that post-date HP's acquisition of Autonomy in October 2011.  Although it has not yet specified exactly what or how, the government has made clear that it intends to rely on post-acquisition evidence at trial.  In its Supplementary Bill of Particulars ("SBOP") filed on

December 18, 2023, *see* ECF No. 271, the government stated that "[b]roadly," it would "not seek to adduce evidence of facts and circumstances after approximately October 2011, when HP's acquisition of Autonomy was consummated." SBOP at 5.  Leaving a hole big enough to drive a truck through, the government continued:

> There will be exceptions, however.  Those exceptions will be for percipient witnesses and other witnesses evaluating or discussing Autonomy during the relevant period of 2009-2011 after-the-fact.  For example, these exceptions include, but are not limited to, ASL's restatement and the testimony of Christopher Yelland, Antonia Anderson, John Schultz, Joel Scott, Steven Brice, and possibly others.

SBOP at 5.  Without further specifying what facts and circumstances these witnesses will testify about, the government promised to make a motion *in limine* "with regard to these exceptions and seek the Court's prior approval before adducing evidence relating to events occurring after [] October 2011."  *Id.*  At a minimum, then, it appears that the government anticipates calling several witnesses who will testify regarding actions they took following the acquisition.

If the *Hussain* trial is any guide, the government—while "broadly" disclaiming reliance on post-acquisition evidence—will offer proof that HP was in fact the victim of a massive fraud; that HP was "shocked" when it learned about the hardware sales and other purported accounting irregularities after the acquisition; that Autonomy would have been worth drastically less to HP if it had known about the hardware sales and the alleged accounting irregularities prior to negotiating a purchase price; that Autonomy missed its revenue targets in Q1 and Q2 2012 because it could no longer rely on pre-acquisition fraudulent practices; and that the alleged fraud caused substantial losses to HP and its shareholders.

But the government should not be permitted to rely on post-closing evidence—such as Yelland's Restatement, testimony from Anderson, Scott, and Schultz, and other evidence it claims establishes that HP was defrauded and suffered significant losses—to argue that the deal was disastrous for HP and that HP vastly overpaid for Autonomy, while Dr. Lynch is precluded from presenting exculpatory evidence that puts the lie to the government's case.  Dr. Lynch must be permitted to present evidence that there was no fraud, and that HP's statements regarding the reasons for Autonomy's purported poor performance were false.  That evidence will demonstrate what was and what was not material to HP; that Dr. Lynch was not responsible for any

diminution in value of Autonomy following the acquisition; that Autonomy remained the successful company with the magical product that HP purchased even though HP failed to achieve the synergies it projected; and that the write-down had nothing to do with Autonomy's accounting practices.  Due process and fairness require Dr. Lynch's motion to be granted, and any effort by the government to seek to preclude such exculpatory evidence while presenting a cherry-picked, false narrative to the jury should be rejected.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Evidence from the post-acquisition period undermines the government's allegations of accounting fraud at every step in the chronology of events and impugns the bases for HP's claim of fraud and the credibility of its witnesses.  The exculpatory evidence is critical to Dr. Lynch's defense and should be admitted to rebut the government's version of events, particularly in light of the government's stated intention to offer post-acquisition evidence and Dr. Lynch's intention to testify in his own defense.  Specifically, the post-acquisition *Brady* evidence is relevant and admissible for the following three reasons:  (i) it demonstrates that information HP alleges was withheld during the due diligence process—such as evidence of hardware sales—was not material to HP's decision to purchase Autonomy, and therefore HP was not defrauded; (ii) it counters the government's theory of the case by establishing that HP was not the victim of a massive fraud but instead scapegoated Autonomy for its own failure to integrate and support Autonomy following the acquisition; and (iii) it supports Dr. Lynch's defense that he did not intend to defraud HP and that he had no motive or incentive to do so.

During the *Hussain* trial, the defense was permitted to present limited post-closing evidence, including limited cross-examination of former HP employee Manish Sarin about an email regarding Autonomy's hardware sales that he received after the closing, a brief stipulation about the transfer of Autonomy's books and records to HP after the closing and about Sushovan Hussain's continued employment at Autonomy after the acquisition, and cross-examination of Yelland about his preparation of the ASL Restatement of accounts.  The vast majority of Hussain's proffered post-closing evidence was precluded, however, and the defense was severely hamstrung in its ability to rebut the government's presentation regarding materiality, reliance, causation, and loss.  Dr. Lynch respectfully disagrees with the rulings in the *Hussain* trial, which the Ninth Circuit affirmed as within the Court's discretion.  But this trial is not *Hussain* 2.0, and the evidentiary rulings in *Hussain* are not binding here.  The trial of Dr. Lynch involves different allegations, different evidence, and a different defense, including—most crucially—Dr. Lynch's anticipated testimony about his state of mind.  These differences require a fresh examination of

the relevance, admissibility, and probative value of the post-acquisition evidence.  As set forth herein, that fresh examination—made with the clean slate to which Dr. Lynch is entitled—leads to the conclusion that the post-acquisition exculpatory evidence must be admitted.

## II.     THE POST-ACQUISITION EVIDENCE SHOULD BE ADMITTED

### A.     Post-Acquisition Evidence Demonstrates that Allegedly Withheld Information was not Material to HP's Decision to Acquire Autonomy, and that HP Witnesses' Claims to the Contrary Are False

To establish that Dr. Lynch and others defrauded HP, the government must prove that information allegedly withheld from HP during the due diligence process was "material."  *See United States v. Bogucki*, No. 18-CR-00021-CRB-1, 2019 WL 1024959, at *2 (N.D. Cal. Mar. 4, 2019) (citing Ninth Circuit Model Jury Instruction 8.124 and 18 U.S.C. § 1343).  "[A] false statement satisfies the materiality element of wire fraud if it has 'a natural tendency to influence, or [is] capable of influencing,' the decision of the decisionmaking body to which it was addressed."  *Id.* at *2 (citing *United States v. Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017) (internal quotation marks omitted)); *see also Neder v. United States*, 527 U.S. 1, 16 (1999).  "It need not actually have influenced a decisionmaker."  *Id.* (citing *Neder,* 527 U.S. at 16).  "Whether or not a statement is so capable is evaluated objectively."  *Id.* (citing *Neder,* 527 U.S. at 16).  "In addition, materiality must be assessed in the context in which the communications occurred; in consequence, industry practices, agreements between the parties, and other information known to the parties at the time of the allegedly false statements are relevant to assessing those statements' materiality."  *Id.* (citing *United States v. Green*, 698 F. App'x 879, 880 (9th Cir. 2017)).

Thus, while a victim's gullibility is generally not relevant, *see United States v. Hanley*, 190 F.3d 1017, 1023 (9th Cir. 1999), "evidence of the circumstances surrounding a victim's entanglement in the fraudulent scheme may be admissible for other purposes.  Indeed, documents and other information available to the parties can be useful for determining materiality."  *United States v. Schena*, No. 5:20-CR-00425-EJD-1, 2022 WL 2910185, at *4 (N.D. Cal. July 23, 2022) (citing *Bogucki*, 2019 WL 1024959, at *4).  "Relatedly, a victim's

knowledge of the fraud could serve as relevant impeachment evidence." *Id.* (citing *United States v. Yang*, 16-CR-00334-LHK, 2019 WL 5536213, at *3 (N.D. Cal. Oct. 25, 2019)).

In *Bogucki*, for example, the Court determined that the materiality of alleged misstatements had not been established by examining the context in which the misstatements occurred. Even though the purported victim—an HP trader named Nesper—testified that he believed Bogucki's representations about his currency trading activity at Barclays, the Court concluded that those representations were not material "in light of the relationship of the parties, the agreement governing their interactions, industry practice, HP's own dishonesty, and Nesper's expectations as to Barclays' dishonesty." *Bogucki,* 2019 WL 1024959, at *7. That context, the Court found in granting Bogucki's Fed. R. Crim. P. 29 motion for a judgment of acquittal, precluded a jury finding beyond a reasonable doubt "that it was objectively reasonable for HP to be influenced by the statements the Government [had] identified." *Id.*

The context of allegedly false and misleading statements was similarly dispositive in the Ninth Circuit's recent decision in *United States v. Galecki*, 89 F.4th 713 (9th Cir. 2023), in which the Court reversed the defendants' convictions for mail and wire fraud in connection with the sale of "potpourri" containing cannabis that was, contrary to the coded language the defendants used with retailers, meant to be smoked. That coded language was not deceptive to the retail shops to whom it was addressed, however, because those retail shops understood full well that they were receiving a cannabis-laced product meant to be smoked, not an air freshener, despite the fact that the defendants explicitly stated that the "potpourri" was "not for human consumption." In reaching this conclusion, the Court emphasized that "materiality is judged in relation to the persons *to whom the statement is addressed.*" *Id*. at 737 (emphasis in original) (citations omitted). "Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar,* 579 U.S. 176, 193 (2016)). The Court concluded that the defendants' representations about their "potpourri" were not "materially false" because "the purchasers all understood, and were in on, the charade." *Id.* at 738. That conclusion, in turn, was supported by testimony from owners and employees of the smoke shops

who actually purchased and sold the products.  *Id.*  Materiality, in other words, was not judged in the abstract, but in the context in which the representations were made.  *See also Schena*, 2022 WL 2910185, at *4–5 (observing that "evidence of the circumstances surrounding a victim's entanglement in the fraudulent scheme may be admissible for other purposes, such as materiality and impeachment").

Likewise here, even though the materiality of misrepresentations is judged objectively, the context of the alleged misrepresentations regarding hardware sales is critical to determining materiality.  In other words, materiality must be judged in relation to HP, "the persons *to whom the statement is addressed*."  *Galecki*, 89 F.4th at 737 (emphasis original).  Indeed, the government will doubtless elicit testimony from HP witnesses that they were unaware of Autonomy's hardware sales and would have found them material had they known about them. To counter that evidence, Dr. Lynch must be permitted to elicit testimony that (i) confirms that HP was advised during due diligence of hardware sales and understood that those sales were not appliances; (ii) demonstrates that hardware sales were not material to HP's valuations of Autonomy and, by extension, HP's decision to acquire Autonomy; and (iii) undermines the credibility of HP witnesses who claim that they were "shocked" when they purportedly learned about hardware sales for the first time after the acquisition.

Thus, Dr. Lynch should be allowed to present post-acquisition evidence of how HP built substantial low-margin, pass-through hardware sales into Autonomy's revenue forecasts for throughout 2012.  At the percentage of revenue and margins they were projecting, Yelland and other HP executives could not have understood these hardware sales to have been appliance sales.  Moreover, the hardware revenue was treated as part of license revenue, just as it had been by Autonomy pre-acquisition.  That hardware sales continued seamlessly as normal, pass-through sales from pre-acquisition to post-acquisition corroborates Dr. Lynch's position that HP learned about the hardware sales during the acquisition and did not think they were just appliances, as Sarin and Andy Gersh of KPMG now maintain.

Dr. Lynch should also be permitted to present evidence that when Cathie Lesjak, Sarin, Yelland, and others were presented with evidence of Autonomy's hardware sales after the

acquisition, they did not act surprised or shocked, nor did they cry foul.  A month after the acquisition, on November 11, 2011, for example, HP's auditor, Ernst & Young ("EY"), made a presentation—the "Q4 FY'11 CFO update"—to Lesjak.  Although the presentation consisted of only three slides, including a simple four-bullet slide which stated that Autonomy's "[r]evenue includes $115M of hardware[,]" Lesjak did not flinch at this information, nor did anyone else.  Likewise, on November 15, 2011, Kathryn Harvey brought to Sarin's attention via email that Autonomy had "approximately $100M/year in revenue coming from the sale of Dell HW [hardware] products," which did not, in her view, "have any impact on our valuations."  Although Sarin has testified since that he was "astonished" upon learning of Autonomy's hardware revenues, Sarin expressed no surprise or concern when he received this email.  Instead, he responded matter-of-factly that the hardware revenues may have been part of Autonomy's efforts "to grow their 'appliance' business ie. Autonomy software bundled on industry-standard Dell hardware," and even noted that such activities could prove to be beneficial.

"[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  *Universal Health Servs.*, 579 U.S. at 193 (cleaned up) (citation omitted).  Had the hardware sales truly been hidden from HP and had they truly been material, one would certainly expect HP to cry foul when presented with evidence of those sales right after the acquisition.  That HP failed to react, when told about hardware, in a manner consistent with being defrauded plainly supports an inference that it was not defrauded.  Post-acquisition evidence would likewise demonstrate that purported revelations about Autonomy's reseller deals, so-called reciprocal transactions, and hosting revenues were not revelations at all.

Dr. Lynch should also be allowed to present evidence of HP's valuations of Autonomy after the acquisition (including both valuations created by HP internally, and valuations created for HP by its consultants and auditors)—valuations that did not change materially despite the purported revelations about hardware sales and accounting irregularities.  For example, in summer 2012, HP considered whether there was a need to take a write-down against Autonomy's book value (the value of the company as reflected on HP's balance sheet) in light of its reduced earnings forecast following the unsuccessful integration of Autonomy's business into HP.  Even

at that point in July, after hearing from a whistleblower about alleged accounting misconduct and having had full access to Autonomy's books and records for almost one year, HP internally concluded that Autonomy was worth $13.7 billion, $2 billion *more* than what HP had recently paid for it.  HP's accountants attributed Autonomy's poor performance to the challenges of operating Autonomy in the HP environment.  As a result, HP's leadership did not see Autonomy's temporary struggles as indicative of longer-term revenue and margin projections.  In short, there was no claim of fraud.  Even after the write-down, when HP claimed that over $5 billion of the $8.8 billion write-down of Autonomy was attributable to accounting misconduct at Autonomy before the acquisition, EY concluded that revenue adjustments due to alleged accounting irregularities would not have had a material impact on HP's original valuation of Autonomy ("less than $300 million"), and therefore the "known accounting errors [do] not materially impact the valuation" at the time of the acquisition.[1]

The government may argue that HP could have had other reasons not to react to information about hardware sales, but that does not mean evidence of HP's reaction is not logically relevant and probative.  *See United States v. Stever*, 603 F.3d 747, 754 (9th Cir. 2010) ("logically relevant evidence" cannot be dismissed "as speculative").  The fact that senior HP executives like Sarin and Lesjak did not blink when they received evidence of hardware sales shortly after the acquisition, that HP continued hardware sales after the acquisition in a manner that shows they knew all along that those sales were not appliances, and that knowledge of those sales and other adjustments due to alleged accounting irregularities had no material impact on HP's valuation of Autonomy, supports an inference that the hardware sales and the accounting irregularities were either known to HP, and/or were not material to HP.  If the government introduces evidence of HP's subjective understanding of Autonomy's hardware sales as evidence of materiality, as it did in *Hussain*, defense evidence (including post-acquisition evidence) that the "victim" understood the hardware sales and proceeded to deal anyway is at least as probative

---

[1] As noted *infra* at 8, one of HP's preacquisition models valued Autonomy at $17.6 billion, taking synergies into account.

of materiality as the subjective views of investors like HP.  *See Neder*, 527 U.S. at 24 (a statement is not material if it is "incapable of influencing the intended victim"); *cf. Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir. 1975) ("subjective reliance" and materiality share "same causal nexus").  This is particularly true because of HP's sophistication.  *See United States v. Litvak*, 808 F.3d 160, 185 (2d Cir. 2015) (victim's "sophistication" is relevant to "adequacy of [defendant's] disclosure" and "materiality").

Finally, evidence that the hardware sales were not material to HP also tends to disprove fraudulent intent.  It makes no sense to hide something that makes no difference to the person being kept in the dark.  The evidence should be admitted.

**B.      Post-Acquisition Evidence Rebuts the Government's Version of Events and Establishes that HP Was Not Defrauded**

Dr. Lynch anticipates that the government—consistent with the allegations in the superseding indictment—will argue that HP was in fact victimized and defrauded by Autonomy and that the acquisition was catastrophic for HP's shareholders.  Such arguments featured prominently in the *Hussain* trial, where the government alleged in its opening that "HP determined to buy Autonomy for nearly $11 billion," *Hussain* Tr. at 46:1–2, "based on the false financial statements the defendant had prepared, and based on the false statements he made in the due diligence," *id.* at 45:24–46:1, and argued that "[t]he deal ultimately proved disastrous for HP," *id.* at 46:3.  The government will also argue that Autonomy faltered after the acquisition with substantial revenue misses that can be attributed to Autonomy's inability, as part of HP, to engage in the accounting improprieties and revenue-inflating maneuvers that kept it afloat before the acquisition.  And the government will doubtless insist that the magnitude of the loss to HP— which it claimed spent $11 billion on "a Pinto" when it thought it was buying "a Cadillac," *Hussain* Tr. at 42:15—is directly attributable to those accounting irregularities, which enabled Autonomy to falsely inflate the value of the company.  Indeed, by suggesting that HP got a Pinto when it thought it was buying a Cadillac for $11 billion, the government will ask the jury to conclude that Dr. Lynch caused a massive multi-billion-dollar loss even if reliance and causation are not elements of the alleged offenses.

To counter the notion that HP was defrauded and that it suffered a massive loss, as reflected *inter alia* in Yelland's Restatement and in the so-called "balance sheet of fraud" (the government's running tally in its closing argument in the *Hussain* trial of allegedly improper revenue that Autonomy recognized from 2009 to 2011), Dr. Lynch should be permitted to present exculpatory evidence—including evidence from after the acquisition—that rebuts each of these points the government is expected to make at trial.  Thus, Dr. Lynch seeks to offer:

*Evidence that HP's valuation of Autonomy turned on anticipated synergies from combining HP's Vertica, which handled structured data, with Autonomy's IDOL, which handled unstructured data, for a combined juggernaut that would corner the data processing and storage market across HP's vast consumer network*: [2]  The acquisition was the brainchild of Leo Apotheker, HP's prior CEO, and Shane Robison, HP's CTO and Apotheker's top deputy. Apotheker and Robison predicted massive potential synergies from the deal—particularly in combining Autonomy's IDOL unstructured data search and analytics capabilities with the structured data capabilities of HP's Vertica division.  Because of these potential synergies (and not because of anything Dr. Lynch told them about Autonomy's business), Apotheker was willing to pay an extraordinarily high premium of more than 60% above Autonomy's market share price to close the deal.

In support of the acquisition, HP relied on a discounted cash flow ("DCF") model to value Autonomy.  This model—as its name implies—focused on Autonomy's profits and cash generation.  In mid-July 2011, an HP consultant calculated Autonomy's standalone value, relying on a DCF model, at $10.3 billion and the value of Autonomy—considering potential synergies that could be achieved through combining it with HP—at $17.6 billion.  HP's board ultimately authorized HP management to pursue an acquisition of Autonomy for up to $11.7 billion, a 60% premium over Autonomy's market capitalization.

---

[2] Evidence regarding HP's pre-acquisition valuation of Autonomy was admitted at the *Hussain* trial.  It is recounted here to provide context for the post-acquisition evidence Dr. Lynch seeks to offer.

*Evidence that integration failures, not fraud, were responsible for Autonomy's revenue misses in Q1 and Q2 2012*:  During his tenure at HP, Dr. Lynch witnessed institutional dysfunction that smothered Autonomy under HP's mismanagement.  Following Apotheker's and Robison's departures, HP failed to execute the planned combination of Autonomy with HP's Vertica unit to create a revolutionary new data analytics product.  In addition, HP's sales commission model incentivized the HP sales team to sell products that competed with Autonomy software, and HP sales reps would often discount Autonomy software in packaged deals to boost their sales of other HP products, so Autonomy's bottom line suffered.  Fed up with the stifling HP environment, Autonomy personnel left in droves.

Contrary to the government's allegations, these obstacles led to Autonomy's underperformance, not Autonomy's purported inability to engage in accounting improprieties and irregularities once Autonomy became part of HP.  Autonomy's sales efforts were also impaired by its inability to recognize upfront revenue on hybrid hosting transactions.  HP determined not to engage in these transactions not because such deals were in any way improper, but because HP could not meet the more stringent requirements for revenue recognition under U.S. GAAP and then decided, for commercial reasons, not to pursue such deals.

*Evidence that HP's valuation of Autonomy—including its own valuations and those prepared for it by its auditors and consultants—did not change materially even after the rebasing exercise, making an impairment unnecessary in Q3 2012*:  As noted earlier, HP internally concluded that Autonomy was worth *more* than what HP had recently paid for it, and that Autonomy's poor performance in Q1 and Q2 2012 was due to the challenges of operating Autonomy in the HP environment, not any preacquisition accounting improprieties, such as those relating to hardware sales, reseller deals, or hybrid hosting transactions.  Indeed, post-acquisition evidence shows that HP was fully aware of all aspects of Autonomy's business, including hardware sales, reseller and reciprocal deals, and hosting transactions, and how it accounted for that business.  That knowledge was fully baked into HP's pre- and post-acquisition forecasts.

*Evidence that HP determined to scapegoat Autonomy for its own performance failures, not only within Autonomy but across all of HP's business units*:  A precipitous decline in HP's

share price from May to November 2012 meant that HP had to write down the value of its assets to accord its book value with the market value of HP's shares.  As Lesjak herself has admitted, the ensuing impairment exercise was an arbitrary accounting construct.  Despite the fact that several other HP business units were flailing, HP decided to blame Autonomy to deflect attention from its own failure to achieve the synergies it had initially projected and the fact that HP's core business was in shambles.

What ensued was a mockery of an impairment exercise, with HP's calculations shifting erratically.  Throughout October, HP's finance team—acting at the direction of Meg Whitman and Lesjak—prepared varying calculations for the write-down that finance team members called "crazy" and "nonsensical."  The night before a presentation to HP's board about the write-down, when Whitman expressed concern that one calculation attributed nothing to synergies—which Whitman thought would expose her inability to achieve the growth HP predicted when it bought Autonomy—the team fiddled with the numbers, adjusting the discount rate once again to an even more nonsensical number to allow the final figures to reflect $2.3 billion in synergies where none had appeared the day before.  In the ensuing board presentation, the vast majority of the write-down was attributed to metrics reflecting post-acquisition failings, such as lower margins, lower forecast growth rates, and lower projected synergies, along with the inflated subjective discount rate that HP's own accountants had called "nonsensical."  Contrary to what HP told the market in November, however, fraud allegations had virtually nothing to do with the write-down.

*Evidence that the write-down was in fact not traceable to accounting irregularities or fraud*: On November 20, 2012, when HP announced that it would take a write-down of $8.8 billion against Autonomy's book value, it attributed more than $5 billion of this write-down to "serious accounting improprieties, misrepresentation[s] and disclosure failures*,*" and maintained that it had launched an "intense internal investigation" in response to revelations from a purported whistleblower.

But HP's internal communications told a staggeringly different story and revealed that it had no support for its claim of a $5 billion fraud stemming from any "intense internal investigation."  Indeed, Morgan Lewis & Bockius ("Morgan Lewis") and

PricewaterhouseCoopers ("PwC") only conducted eight interviews just days before the write-down, all of which occurred *after* HP settled on the amount of the write-down.  There had only been the arbitrary accounting exercise that HP's own finance team called "nonsensical."  HP had not performed *any* analysis to support its public accusation that there had been a $5 billion accounting fraud, and HP scrambled in the days following the write-down to try to justify its claims.

Meanwhile, EY repeatedly disagreed with HP's stated reason for the write-down and its assessment of Autonomy's accounting practices.  In its November 5, 2012, memorandum to HP regarding the impairment, EY noted that the write-down was primarily driven by changes in forward-looking sales forecasts and expectations around synergies, and did not attribute any quantifiable portion of the write-down to alleged fraud.  And as noted earlier, in a subsequent December 2012 memorandum, EY concluded that revenue adjustments due to alleged accounting irregularities would not have had a material impact on HP's original valuation of Autonomy ("less than $300 million"), and therefore the "known accounting errors [do] not materially impact the valuation" at the time of the acquisition.[3]

EY also thought HP's public statements were flat wrong.  Two days *before* the write-down, EY objected to language in the impending press release attributing the "*majority*" of the write-down to fraud—but HP went ahead anyway.  Following the write-down, EY again refused to sign off on the same problematic language in HP's 2012 annual report.  EY was not alone in its skepticism.  The SEC investigated HP in the wake of the write-down regarding whether HP misled the market by falsely stating that more than $5 billion of the write-down was attributable to fraud.

This evidence regarding the write-down is relevant and material to counter the government's allegation that HP's acquisition of Autonomy was "disastrous" for HP because of

---

[3] That the alleged accounting irregularities had an impact of "less than $300 million" (out of $11.7 billion, or about 2.5%) also establishes lack of motive.  It makes no sense to engage in a complex accounting fraud for three years, only to achieve a relatively small impact on the valuation of the company—an impact that is comparable to share price movements on any given day.

alleged fraud, and that Yelland's Restatement reflects the magnitude of that alleged fraud.  In fact, the alleged accounting improprieties did not have a material impact on HP's valuation of Autonomy, which was based on a discounted cash-flow model and turned on anticipated synergies.  HP's claims to the contrary in connection with the write-down were false.  In other words, when HP finally did cry foul in November 2012, it sounded a false alarm.

*Evidence that Deloitte disagreed with Yelland's restatement exercise, indicating that the Restatement was an artificial construct designed to support HP's determination to scapegoat Autonomy*:  Meanwhile, HP fired Deloitte as Autonomy's auditor late in 2012, around the time of, or shortly after, the write-down.  Throughout the rebasing exercise and in the lead up to the write-down, Yelland expressed frustration that Deloitte refused to go along with his misguided efforts to restate Autonomy's historical accounts.  Dr. Lynch does not have full details because he has received very limited discovery about Yelland's communications with Deloitte and Deloitte's internal communications at around the time when Deloitte was fired, but the fact that Deloitte disagreed with Yelland's analysis and defended Autonomy's preacquisition accounting practices plainly supports Dr. Lynch's defense.

*Evidence that Yelland's Restatement was prepared in close coordination with, and heavily influenced by, an internal investigation conducted by Morgan Lewis and assisted by PwC*:  In the fall of 2012, Yelland began yet another exercise—around the time of the write-down and seemingly in conjunction with it—aimed at restating the accounts of Autonomy's U.K. operating subsidiary, Autonomy Systems Ltd. ("ASL"), for 2010 and finalizing its accounts for 2011.  During this exercise, Yelland re-calculated ASL's historic revenue by removing revenue that he believed—based on after-the-fact developments and changes in accounting policy—had been improperly recognized.

The government relied heavily on Yelland's Restatement during the *Hussain* trial, and it has made clear its intention to feature the Restatement prominently here.  Dr. Lynch is separately moving to exclude the ASL Restatement and Yelland's opinion testimony about the hypothetical impact of the restatement on the parent company Autonomy's Group's accounts.  If the Court permits that evidence over Dr. Lynch's objection, it will be critical for Dr. Lynch to present the

full context in which Yelland prepared the Restatement, including the fact that it was prepared hand-in-hand with the attorneys who were conducting an internal investigation with a view to litigation.[4]  EY, HP's external auditor, ultimately refused to sign off on Yelland's conclusions. This restatement exercise wasn't completed until 2014, long after HP announced the write-down in November 2012.[5]

The government will likely argue that the post-acquisition evidence Dr. Lynch seeks to offer is irrelevant to whether HP was defrauded as of October 2011, when it acquired Autonomy. But the government itself relies on the aftermath of the acquisition—including the Restatement and the notion that HP bought a Pinto—to argue that HP was in fact defrauded and that it suffered a massive loss.  In other words, the government relies on what happened after the acquisition to prove that there was a fraud.  The government should not be permitted to tell its version of those events without allowing Dr. Lynch to present his counter-story.

### C. Post-Acquisition Evidence Demonstrates that Dr. Lynch Had No Intent and No Motive to Defraud and Supports His Anticipated Testimony

Finally, post-acquisition evidence will be a critical part of Dr. Lynch's anticipated trial testimony.  Evidence of what happened after the acquisition—what Dr. Lynch saw, heard, and did when he became CEO of HP-Autonomy, how Autonomy struggled as HP completely mismanaged the integration, the circumstances of Dr. Lynch's termination and subsequent interview by HP General Counsel John Schultz (which the government intends to cover in its case-in-chief), and how HP scapegoated Autonomy and blamed the write-down on alleged pre-acquisition accounting misconduct—demonstrates that Dr. Lynch had no motive or intent to defraud, had no intent to conceal anything from HP, and did not defraud HP.

---

[4] During the *Hussain* trial, the defense was given latitude to explore fully the circumstances in which the Restatement was prepared, and Dr. Lynch anticipates being afforded the same latitude.

[5] The post-acquisition evidence upon which Dr. Lynch seeks to rely is recounted in greater detail in Dr. Lynch's Motion for Issuance of Subpoenas Pursuant to Fed. R. Crim. P. 17(c) and to Compel the Government to Produce *Brady* Material, ECF No. 255 (November 14, 2023).  As set forth in that motion, however, there are gaps in the evidence available to Dr. Lynch.  Dr. Lynch accordingly respectfully renews his request for the relief requested in that motion, which was largely unopposed by the government.

To begin with, Dr. Lynch's decision to continue to run Autonomy after it was acquired by HP, and after all of its books and records would be conveyed to HP, exposing all of Autonomy's business and accounting practices, is utterly inconsistent with an intent to defraud.  Dr. Lynch should therefore be permitted to present evidence that he and his senior Autonomy management team worked for HP-Autonomy after the acquisition, that they openly discussed Autonomy's accounting practices and hardware sales, and that HP had full access to all of Autonomy's financial records, including the trial balances, which were conveyed to HP immediately after the acquisition.[6]  In addition, Autonomy made sure that HP had access to Deloitte's workpapers.  It defies common sense that Dr. Lynch and his senior management team would perpetrate a massive fraud on HP before the acquisition, only to go work for HP after acquisition, knowing full well that HP would have full access to Autonomy's books and records and its finance team right after the acquisition.

Dr. Lynch should also be permitted to explain to the jury what happened after the acquisition to his hugely successful cash-laden company with what Whitman called a "magical" software product, including the circumstances that led to his termination and to HP's outrageous allegation that he had engaged in a massive fraud.  Thus, Dr. Lynch will testify about how, when he and his executive management team began working for HP, all of the promise and power of Apotheker's vision for Autonomy within HP had evaporated with Apotheker's and Robison's departures.  At that point, Autonomy became essentially an unwanted stepchild, unsupported by Whitman and the rest of her executive team.  Dr. Lynch will detail how HP utterly failed to integrate Autonomy in any sensible way and how Autonomy suffered as a result, missing revenue targets by substantial margins in Q1 2012 and Q2 2012.  Autonomy personnel left in droves.

Dr. Lynch will also recount how, even worse, rumors about alleged accounting irregularities and purportedly hidden hardware sales began to circulate, falsely impugning Dr. Lynch, his team, and his company.  That testimony is necessary at least in part for Dr. Lynch to

---

[6] This evidence was admitted via only a brief stipulation in the *Hussain* trial.

provide context for his interview with Schultz in June 2012, a few weeks after Dr. Lynch was fired in late May. Although Dr. Lynch does not have full details regarding the events that precipitated that interview because HP has maintained attorney-client privilege over Schultz's actions, it appears that Schultz was conducting an internal inquiry (at least in part) in response to information that Scott, the purported whistleblower, provided shortly after Dr. Lynch left HP. Schultz and Scott are on the government's witness list, and Dr. Lynch expects that the government will accuse Dr. Lynch of lying during his interview with Schultz about hardware sales, reseller deals, and other purported accounting misconduct in an effort to cover up the alleged fraud. It will therefore be critically important for Dr. Lynch to describe the events that led up to his termination and subsequent interview with Schultz, so that the jury understands his state of mind during the interview.

Dr. Lynch will also describe how the other shoe dropped in November 2012, when to his shock and dismay, HP blamed the "majority" of its $8.8 billion write-down of Autonomy's value on alleged accounting improprieties and irregularities at Autonomy before the acquisition. Dr. Lynch will explain to the jury why that accusation is completely misguided. For over 11 years, Dr. Lynch has been fighting back against these false accusations. That fight has included uncovering the evidence recounted above that demonstrates that the write-down (like Yelland's Restatement) was an artificial construct designed to scapegoat Autonomy for HP's failings. Dr. Lynch should be permitted to explain to the jury how he got here and why he is innocent.

## III.   CONCLUSION

For the foregoing reasons, Dr. Lynch should be permitted to introduce evidence of what happened after the acquisition. As the government has made clear, it intends to introduce such evidence via Yelland, Anderson, Schultz, Scott, and others. If these witnesses are permitted to testify about what they saw and witnessed and did after the acquisition, Dr. Lynch should be permitted to do the same, to rebut the government's version of events, impeach the credibility of its witnesses, and demonstrate his innocence of the crimes charged

1

Dated: January 17, 2024

2

Respectfully submitted,

3

By: _/s/ Christopher J. Morvillo_
Christopher J. Morvillo

4

5

Christopher J. Morvillo
Celeste L.M. Koeleveld

6

Daniel S. Silver
(Admitted Pro Hac Vice)

7

**CLIFFORD CHANCE US LLP**

8

Jonathan Matthew Baum (SBN: 303469)

9

**STEPTOE LLP**
One Market Street

10

Steuart Tower, Suite 1070
San Francisco, CA  94105

11

Telephone:  (510) 735-4558
jbaum@steptoe.com

12

13

Reid H. Weingarten
Brian M. Heberlig

14

Michelle L. Levin
Nicholas P. Silverman

15

Dwight J. Draughon
Drew C. Harris

16

**STEPTOE LLP**

17

1114 Avenue of the Americas
New York, NY 10036

18

Telephone:  (212) 506-3900

19

20

*Attorneys for Defendant*
*Michael Richard Lynch*

21

22

23

24

25

26

27

28