# EXHIBIT 2



DATE:      January 7, 2013

SUBJECT:    Memorandum of Interview with Joel Scott – January 7, 2013

| Tab No. | Document Description |
| --- | --- |
| 1 | 9/14/2009 email from Guiao to Chamberlain<br>9/2009 email chain between Scott, Sullivan, Guiao, Chamberlain<br>9/2009 email chain between Guiao and Chamberlain |
| 2 | 6/29/2009 emails between Crumbacher, Scott, Egan, Chamberlain, Diane Kennelly, and Mark Kaufmann |
| 3 | 12/2009 emails re. Morgan Stanley deal |
| 4 | 5/2010 emails between Chamberlain, Scott, Guiao, Stephan, and Crumbacher |
| 5 | 6//3-4/2009 emails from Percy Tejeda to Timothy Naprawa, Agnes Pak, Anthony Bettencourt, and Joel Scott |
| 6 | 12/31/2010 communications and orders between Autonomy, Capax, MicroTech, and Discovertech |
| 7 | 12/31/10 Discovertech-Autonomy Letter Agreement |
| 8 | 3//7-8/2011 emails between Guiao, Scott, Baiocco and Kanter |
| 9 | 1/25/2011 emails between Guiao, Egan, and Chamberlain |
| 10 | 1/18/2011 emails between Guiao, Chamberlain, and Scott |
| 11 | 1/24/2011 emails between Guiao, Chamberlain, Egan, and Scott |
| 12 | 4/1/2011 emails between Crumbacher, Baiocco, and Scott |
| 13 | 12/23/2009 emails and purchase quotation re. MicroTech's license purchase |
| 14 | 12/23/2010 emails between Scott, Hussain, Menell, and Chamberlain |
| 15 | Undated Memo re. Proposed ATIC – attached to emails in Tab 14 |
| 16 | Undated ATIC Proposal – attached to emails in Tab 14 |
| 17 | 9/27/2011 emails between Scott, Lynch, Hussain, Menell, Truitt, and Chamberlain |
| 18 | 1/11/2012 emails between Hussain, Lynch, Truitt, and Kanter |
| 19 | 3/2011 emails re. Morgan Stanley and HP deals |
| 20 | 8/13/2010 emails between Lynch, Hussain, and Still |
| 21 | 9/29/2010 email from Crumbacher to Szukalski<br>9/30/2010 email from Scott to Crumbacher<br>9/30/2010 FileTek-Autonomy Letter Agreement |
| 22 | Q3 2010 results analysis (subject to Audit committee clearance) |

## I.    Interview Overview

On January 7, 2013, Leslie Caldwell, Susan Resley, and Martha Stolley of MLB conducted an in person interview of Joel Scott ("Scott"), Autonomy's current COO-US and former General Counsel. The interview was held at the San Francisco offices of MLB. Sarah Nolton of PWC and Jenny Harrison of MLB also attended. The interview lasted approximately four hours and was in connection with HP's internal investigation of Autonomy's acquisition.

Morgan, Lewis & Bockius LLP

FOIA CONFIDENTIAL TREATMENT REQUESTED
HP-SEC-00329246
EXH 5157-0001

## II.    Background and Responsibilities

Scott currently is Autonomy's COO-US, working out of the Sunnyvale offices.

## III.   Hardware

### A.    *Beginning of Hardware Resales*

Scott could not recall how Autonomy's plan to resell hardware arose. It may have been a topic during an off-site. He vaguely recalled a discussion of hardware resales at a meeting with about 20 people during the annual sales kick off in Miami in January 2009. He did not recall discussions of hardware at the off-sites that he attended in Europe, specifically in Como, Italy or France, UK.

At the time, Scott did not notice any particular trigger or ramp up in hardware resales; however, it sounded right that the first significant hardware resale was in the second quarter of 2009 with Hitachi hardware. Scott recalled a resale to Morgan Stanley that occurred at the beginning of Autonomy's hardware resales.

### B.    *EMC*

Autonomy purchased hardware from EMC and then resold it to customers. When it did so, the final customers wanted to know the terms of their purchase (warranty, return policy, etc.). Scott did not recall any contracts, but did think that the P.O.s had contractual language stating that the sales' terms were the same as EMC's own terms. (See Tab 1).

In order for Autonomy to recognize revenue on the sale of EMC hardware, it had to be the seller and owner of the hardware, even if just for a millisecond. (Tab 1). If Autonomy never owned the hardware, it was not selling anything and could not recognize revenue. Therefore, Autonomy had to purchase the hardware from EMC and also have a contractual relationship with the customer.

Autonomy stopped purchasing hardware from EMC after the third quarter in 2009. Scott did not know the reason for this, but thought Mike Sullivan may have stated that EMC did not want to sell anymore.

### C.    *Morgan Stanley*

Scott did not know what the "commitment letter" was in the Tab 2 email. He speculated that it was a letter or part of a contract drafted by Mark Kaufmann ("Kaufmann"), who worked for Sidley Austin LLP and was Morgan Stanley's counsel in the deal. The letter or contract probably stated that Morgan Stanley was allowed to purchase $20 million worth of hardware from Autonomy for just $14 million. Scott speculated that Steven Chamberlain ("Chamberlain") would not have liked such an overt statement of the deal and hence stated that the commitment letter draft was bad (see Tab 2).

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329247
EXH 5157-0002

The Morgan Stanley deal was mostly driven by Jim Crumbacher ("Crumbacher"), but occasionally Scott dealt with Kaufmann.

In December 2009, Levius Guiao ("Guiao") sent out a proposal listing and evaluating the hardware and software that Autonomy proposed to sell to Morgan Stanley. (Tab 3). Scott thought the proposal originated with Stouffer Egan ("Egan") and Guiao simply circulated it. Morgan Stanley pushed back on this, not wanting an evaluation or assigned values. (Tab 3). Sushovan Hussain ("Hussain") then informed them that the Morgan Stanley legal department shut down the deal. Scott could not imagine Kaufmann shutting down the deal, but suspected that someone in-house at Morgan Stanley (perhaps Jeff) shut it down. After Morgan Stanley shut down the deal, there was a flurry of activity around December 31, including the creation of a P.O. for MicroTech that included the same software as the Morgan Stanley deal, but no hardware (Tab 3).

Scott did not recall the December 2009 Morgan Stanley/MicroTech deal specifically, but he speculated that probably Egan came in and demanded a P.O. for MicroTech and they created one. (Tab 3). Scott assumed that Egan spoke with MicroTech before requesting the P.O. because the email request was sent at 6:30pm PST and the deal had to be closed by midnight. He guessed no hardware was included in the MicroTech P.O. because Autonomy did not have any hardware to deliver (Scott assumed that Dell had the hardware) and if there was no delivery, the deal could not be recognized, which was the entire purpose in bringing in Mircotech.

Scott did not know that Morgan Stanley never purchased the software from MicroTech or that Morgan Stanley eventually completed the hardware deal directly with Autonomy. Things were always busy, chaotic, and reactive at Autonomy, so there was never any time to compare software and hardware deals and note that they were for the exact same price.

Diane Kennelly was Egan's contact at Morgan Stanley. Scott thought she was involved in procurements, not the legal department.

### D.    *Flexibility to Recognize*

In reference to Tab 4, Scott guessed that there may have been too much revenue in one quarter, especially as hardware sales were such big sales. Too much revenue was a problem if it made the revenue stream look "wacky" or volatile instead of being consistently flat or increasing. Scott guessed that most hardware P.O.s stated that a product was deemed delivered once Autonomy acknowledged the customer's receipt of the product. Therefore, Autonomy could drop revenue into the next quarter by not "acknowledging" delivery until the next quarter.

Scott believed that when he wrote "I have an idea", he meant that he could put Mike Mooney ("Mooney") in touch with Brocade if Autonomy needed a new source of hardware (see Tab 4). He did not think he discussed this with Hussain, just Mooney.

### E.    *End of Hardware Re-Sales*

Scott guessed that there was some conversation between himself, Hussain, and Chamberlain where Hussain stated he did not want any more hardware deals if they could not recognize a

Morgan, Lewis & Bockius LLP

-3-

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00329248**
**EXH 5157-0003**

certain level of revenue from them.  Scott then asked Hussain if he wanted to continue with the hardware transactions.  (Tab 5 (my notes refer to Scott Binder Tab 3 here, but it does not look like what was discussed)).  Scott could not recall any big discussion regarding cessation of the hardware sales.

IV.   **Resellers**

Scott never heard any reseller referred to as a "revenue accelerator".  However, Autonomy recognized the reseller revenue, so in that sense resellers did "accelerate" recognition of revenue.  On a handful of occasions, Scott asked Andrew Kanter ("Kanter"), Hussain, and Chamberlain if it was acceptable to recognize accelerated revenue.  He was consistently told that, under IFRS, Autonomy could recognize a reseller deal as revenue as long as there was a legitimate belief that there was an end user.  Scott never did any independent review of IFRS.

Scott never tracked or cross referenced reseller deals to see what had or had not closed.  He was dealing with many other things and putting out many fires, so never had time to track deals.

A.   *Bank of America/Amgen Deal*

When Autonomy's deal with Amgen did not close by the quarter's end, the reseller Capax replaced Amgen.  If Scott signed off on this deal, it was because Hussain or Egan told him to do so.  He did not have the authority to bring in a reseller on his own.  Usually Capax was brought in after some discussion between Hussain, Egan, and John Baiocco ("Baiocco").

Ultimately, Amgen ended up purchasing directly from Autonomy for $15 million.  Scott did not know if they assigned payments to anyone, but he definitely knew Amgen paid $15 million for Autonomy products because Amgen currently is trying to get their money back due to issues they had with the products.

Discovertech was also brought in, along with Capax, as a reseller for the Amgen/Bank of America deal.  Scott thought this was weird and did not know why Discovertech was also brought in.  He speculated it was to clean up other transactions or because a single reseller did not have the financial wherewithal to take on the entire financial risk.  He explained that the clause in the Bank of America contract allowing Autonomy to assign payment obligations to a reseller was the vehicle used to allow a reseller to take the money and provide it to Autonomy.  He speculated that the money probably went to Capax, then Capax paid Discovertech, and then both Capax and Discovertech paid Autonomy.

MicroTech was also involved in the Amgen/Bank of America deal, although Scott could not recall their involvement in the day-to-day workings.  The documents in Tab 6 confused Scott regarding MicroTech's role in the deal.  He speculated that Hussain or Chamberlain must have been in town to tell Legal how to structure the deal because it was too cagey to have been done as part of Legal's ordinary business.  Scott suggested that Dave or Egan may be able to clarify the cash flow.  Scott had difficulty understanding why MicroTech's purchase from Autonomy would be shipped to Capax and Discovertech.  While not completely understanding how the deal worked, Scott drew the diagram below regarding the cash flow between all the involved entities and came up with the following explanation: MicroTech gave Autonomy a P.O. for $22.5

Morgan, Lewis & Bockius LLP

-4-

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00329249
EXH 5157-0004

million to be shipped to Capax and Discovertech because Capax and Discovertech had given MicroTech orders for $15 million and $7 million respectively. Autonomy recognized revenue on the $22.5 million MicroTech-Autonomy deal. Then, Bank of America formed a deal with Autonomy, but Autonomy assigned its payments to Capax and Discovertech ($15 million and $7 million respectively) and Autonomy never showed the Bank of America contract to its auditors so as to not double count the revenue.



Discovertech's "one off reseller agreement" appears to contemplate a direct deal between Autonomy and Bank of America (Tab 7). Scott speculated that this was a one off reseller because otherwise there would have been a P.O. This was a way to achieve the same purpose without a reseller agreement. The final paragraph of the agreement stated that Bank of America could pay Autonomy directly. Scott speculated that this language allowed Autonomy to work out a deal with Discovertech in case Bank of America did not want to go through Discovertech. However, Autonomy could not legitimately recognize revenue when the final paragraph of the arrangement suggested that there may be a future deal directly between Autonomy and the end user. This paragraph was removed from a later draft of the agreement (maybe by Chamberlain or Poppy Prentis) probably because it made it impossible to recognize revenue in that quarter.

Scott was surprised he used the term "MAF" (or marketing assistance fee) because he rarely ever used the term. The fee probably referred to what Autonomy paid Capax and Discovertech for the Bank of America deal. Because the deal flowed from Capax and Discovertech through MicroTech to Autonomy (see drawing above), Capax and Discovertech did not collect their usual margins. Instead, Autonomy probably paid them a MAF. Scott could not explain why Autonomy paid both MicroTech's margin and MAFs to Capax and Discovertech. (Tab 8).

Guiao emailed Chamberlain and Scott in February 2011 asking about margins. Guiao probably asked because he knew the net amount, but needed to break down what each entity was entitled to be based on the different margins.

Scott found the order in Tab 9 to be weird, but thought that maybe it referred just to the Discovertech branch of the agreement and ignored the Capax branch. However, even then, the flow was from Bank of America to Discovertech to MicroTech to Autonomy, while this document inverted Discovertech and MicroTech (refers to Bank of America paying MicroTech, who then had an order with Discovertech, who then had an agreement with Autonomy).

Scott could not shed any light on the document in Tab 10. He suggested that Antonia Anderson may be helpful as she worked at Deloitte at that time.

Scott believed the letter referred to in Tab 11 is the Amgen letter, especially when he learned it was signed in February 2011. He did not know what the $3.6 million was. He guessed that the email was more for Hussain than himself and so he forwarded it right back to Guiao because he

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329250
EXH 5157-0005

did not want to be bothered with it. Scott was not sure who Stewart Barret was, but thought he may work for Autonomy.

Hussain emailed that, for audit reasons, it was not possible to sign a Bank of America deal in the first quarter of 2011 (see Tab 11). Scott first wondered whether it was Bank of America's audit reasons or Autonomy's. It did not sound like Hussain to say they could not take a deal. Scott then decided the email was "nonsense" and "bullshit", especially as Hussain sent the email to a broad audience. Hussain never genuinely wrote emails like this. Instead of taking it for its face value, Scott thought it was one of Hussain's ways to make the deal happen in the fourth quarter of 2010.

B.    *Capax/UBS*

ACA stands for "Autonomy Consolidated Archive", which is the new brand for Autonomy's digital safe. Scott thought this name was a recent development and was surprised when "ACA Support" appeared in the first and second quarters of 2011. He was not sure if the "ACA Support" referred to a different product or if the Autonomy Consolidated Archive name was used earlier than he originally thought.

Scott believed the UBS deal was a UK deal driven by Hussain in the UK. He did not know why a US reseller was used for a UK deal except that Autonomy had relationships with US resellers or perhaps there was an auditing reason.

Crumbacher's email in Tab 12 was his way of saying "eff you" to Egan. Crumbacher intentionally wrote the email in a way that, if the deal was legitimate like Egan claimed, Egan should not have any issues with the way it was written. Scott did not know enough about the company's statements that the deals were fine under SOP 97-2 to comment on it. He did not know how a company could say it complied with US GAAP, when it did not.

Baiocco was a determined guy (sometimes calling fifteen times over two days), but he appeared to be a straight shooter. Scott suspected that on Baiocco's end, the deals were probably kosher.

C.    *Capax/EAS and EDD*

Autonomy discontinued EAS because it was not a good product and Autonomy had its own similar products. Autonomy then paid Capax 85% to manage the EAS business. Scott could not understand why Autonomy paid Capax to manage EAS since Autonomy did not get anything out of the arrangement. It was possible there was a good business reason, but it puzzled Scott.

Along with EAS, Autonomy's arrangement with Capax regarding EDD also puzzled Scott. Capax paid Autonomy for software which Capax could sell licenses to until they reached $25 million in sales of the product. Capax could also resell Autonomy's EDD services and Autonomy gave Capax 10% off the normal services costs. It did not make sense for Autonomy to give Capax the right to resell and have them only pay 10%. It also did not make sense for Autonomy to give Capax its product and thereby enable Capax to compete with them. Finally, Antonia Anderson and the finance department were never aware of the $25 million cap. Scott

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00329251**
**EXH 5157-0006**

stated he would try to obtain a copy of the agreement and suggested contacting Baiocco for background on the agreement.

### D. *MicroLink*

Prior to Autonomy's acquisition of MicroLink, MicroLink had a long relationship with Autonomy – they were working together since before Scott joined Autonomy. MicroLink was one of Autonomy's resellers and a service partner for federal business. Scott speculated that Autonomy used MicroLink for federal business because MicroLink had many security clearances and so could do many deals with the federal government. Moreover, MicroLink had good relationships with the federal government and had Autonomy products on a GSA schedule.

Scott's main contact at MicroLink was David Truitt ("Truitt"), although Scott did speak with other guys at MicroLink too. Truitt had a relationship with Scott's former boss, Frank Pau, as well as with Hussain and Truitt's brother, Dan Truitt, in the federal group. Scott's gut feeling was that Truitt was a good guy who tried to do the right thing on his side of the deals. He felt Truitt would be straight about any questions presented to him, but he was spooked and rattled by the SEC subpoena.

Scott's main dealings with MicroLink occurred whenever Autonomy owed MicroLink money. Truitt usually called Scott, asking him to be MicroLink's advocate because Truitt knew Hussain would ignore him. When MicroLink owed Autonomy money, Scott was less involved. He may have received or made calls (he could not recall any specific calls), but could not influence any payment. He speculated that Truitt's excuse to not pay was that the end user had not yet paid.

Scott remembered IRS, but could not recall the specifics of a deal between Autonomy and IRS where MicroLink was the reseller.

Autonomy acquired MicroLink in early 2010, but Scott was not involved in any of the acquisition discussions. He recalled a meeting between Eagan, Hussain, Kanter, Truitt, and Tim Wharton ("Wharton") in December 2009, but did not learn of the acquisition until its announcement in January 2010. He was not involved in the due diligence, but would not be surprised if little due diligence was completed.

After the acquisition, MicroLink was not integrated into Autonomy because it could not be. Since MicroLink did classified deals with the government and Autonomy was a UK company, the federal government required that MicroLink and Autonomy enter into a proxy agreement whereby Autonomy could not influence MicroLink. This meant that Autonomy could not give legal support, tech support, payroll, etc.; essentially, MicroLink had to remain completely independent of Autonomy. Given this separation, Scott acted like Autonomy's "ambassador" to MicroLink in that he was invited to MicroLink's quarterly meetings and was called if they had a question.

There is an HP-Autonomy-MicroLink meeting tomorrow (January 8, 2013) regarding HP's integration of MicroLink. Currently, MicroLink is still separated from HP because it falls into a UK subsidiary of HP.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

After Autonomy's acquisition of MicroLink, Truitt founded Discovertech. Scott recalled that Truitt wanted to sell software, but Scott believed that Discovertech's services work kept it afloat. Scott speculated that after the sale of MicroLink, Truitt did not have to work and so Discovertech was just an experiment. Scott was not aware of anyone from MicroLink being involved with Discovertech, but he would not be surprised if people from MicroLink, like Wharton, were involved with Discovertech since MicroLink was a small company and everyone was very close.

Truitt left MicroLink, but most of the other people are still there. For example, Wharton shifted from the number two position into the number one MicroLink position, based in Virginia. John Cronin used to work at Autonomy, but has since gone to head up MicroLink sales. Mike Brunick is head of federal sales, but probably will not be helpful because he has been around for only about a year. Scott did not think that Woody Walton worked for MicroLink, but rather was a sales engineer for Autonomy.

> E. *MicroTech*

Scott did not know much about MicroTech. He talked with Steve Truitt less than 5 times and they were not substantial conversations.

> 1. MicroTech Purchase of ControlPoint

Autonomy had no practice of having purchase quotes ready for when needed. Deals at Autonomy tended to be more reactive and involved little planning. Instead, Egan just came in at the end of a quarter and requested P.O.s. Scott guessed that the purchase quote of $10 million for 40,000 ControlPoint licenses (Tab 13) was a quote, not a P.O., because they were purchasing the software for internal use, not a resale. Therefore, it was more of an internal license. Scott did not know who drafted it, but he probably gave the assignment to Crumbacher or Guiao.

ControlPoint, the software licensed in the purchase quote (Tab 13) was an Autonomy product providing policy management to SharePoint tools (so to detect fraud, etc.).

MicroTech did not have 40,000 employees, so they would not have need for 40,000 licenses. It is possible that MicroTech was going to sell off the product in pieces (e.g. sell 100 licenses to customer A and 100 licenses to customer B). Scott was not sure if MicroTech had a sufficiently large sales force to sell 40,000 licenses, but just a couple of big sales could cover the full 40,000. If MicroTech was going to re-sell the licenses, Hussain or Egan may have limited MicroTech's market (for example only allowing MicroTech to sell to federal users) so that Autonomy was not undercut in the market. Scott never saw MicroTech actually do anything with the 40,000 licenses.

Scott did not know why the deal was not completed as a reseller deal. He speculated that perhaps they already had too many MicroTech reseller deals (for example if MicroTech had already given Autonomy five P.O.s) and yet another deal would make Deloitte worry about MicroTech's credit-worthiness. However, an auditor would still want to know about MicroTech's credit-worthiness given the way this deal was structured. Scott speculated that perhaps Autonomy could tell Deloitte that this deal was not dependent on a third party customer and therefore was more reliable.

Morgan, Lewis & Bockius LLP

-8-

FOIA CONFIDENTIAL TREATMENT REQUESTED

2.    ATIC MobileLab

Scott negotiated with MicroTech on the price for the Mobile Lab and got the price down to $3.3 million (Tab 14). However, the next day, the price went up to $9.6 million (Tab 14). Scott could not understand this price jump from $3 to $9.6 million. He first speculated that the fees for this deal went to cover the Vatican deal, but then was not sure when he learned that the fees did not match up with the Vatican deal. He then speculated that perhaps the $3.3 million was just for one year and the $9.6 million was for a three year commitment.

Hussain asked Scott to prepare the business argument for the entire ATIC purchase. Tab 15 may be the business argument memo Scott drafted. He took most of the content for the memo directly from the ATIC Proposal (Tab 16). Scott could not recall the specifics about drafting the memo, but he was sure the turnaround was quick. The usual pattern at Autonomy was to give him a proposal, get a quick business rationale, and then get approval. He probably discussed the MicroTech proposal with Truitt, but it could also have been Steve.

The business purpose of ATIC was to help Autonomy penetrate the federal market. MicroLink was better than Autonomy in the federal market (Scott lumped MicroTech and MicroLink together because they were very similar). Given MicroLink/MicroTech's successes in the federal market, MicroTech could use its lab, demo facility, and relationship with the federal government to showcase Autonomy products. Scott felt that it could have been a successful project, although he acknowledged that once Autonomy acquired MicroLink, Autonomy should have acquired access to the federal market and therefore did not need MicroTech's assistance.

After Scott completed the memo, he never heard about the project again. As far as he knows, nothing ever came of the purchase of ATIC. Autonomy spent $11 million on services (which was particularly a lot given how cheap Autonomy was) and did not do anything with them.

F.    *Discovertech and Abbott Labs*

Scott recalled "Abbott Labs" as a reseller arrangement and believed it never closed, but was not sure. If it never closed with the end user, Scott guessed that it was just written off or there was a simultaneous payment between Autonomy and Discovertech where Autonomy purchased something from Discovertech for the same amount that Discovertech owed Autonomy.

Scott could not recall any disputes arising in late August to September 2011 over what Autonomy owed Discovertech, except that Truitt would often call Scott when Autonomy owed Discovertech anything. Tab 17 refreshed Scott's memory and he recalled that there was a real sale that stressed him because Autonomy was selling Discovertech items and, if they did not get and ship the items, they could not recognize it as revenue. He did not think the emails related to a dispute regarding fees and what Discovertech was owed, rather it was a literal purchase.

After looking at the emails in Tab 18, Scott explained that Kanter essentially told Discovertech to "eff off" and Truitt just had to suck it up.

G.    *FileTek*

Morgan, Lewis & Bockius LLP

-9-

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329254
EXH 5157-0009

Scott's main contact with FileTek was Gary Szukalski, although Bill Loomis was FileTek's ultimate decision maker.

### 1.    Software Purchase

Scott was involved in negotiating Autonomy's purchase of software from FileTek.   Hussain or Egan told Scott that FileTek had a great product and that he should try to purchase it within a given price range.  Scott went back and forth with Szukalski a few times to lower the price. There was no deep or extensive negotiation, but rather a few emails and calls to settle on a number.  Scott's best guess was that the whole purchase was teed up by Egan.

Despite all the statements about how great the FileTek software was, Autonomy never used the software.  About a month ago (November or December of 2011), Fernando told Scott that he had never heard of FileTek's software and that it was never used in Autonomy's digital safe.  FileTek probably deployed Autonomy's software given how excited Szukalski sounded about it. However, it was a very large software purchase.  Scott did not know the specifics of FileTek's size, but $8 million is a large purchase for any company.

There was another software purchase between FileTek and Autonomy in March 2011.  Based on Tab 19, Scott explained that the deal was specific to Morgan Stanley and HP.  He guessed that the Morgan Stanley and HP contracts show that Autonomy listed and shipped FileTek products to Morgan Stanley and HP.  He was probably anxious on that last day because FileTek did not want to give Autonomy the product until Autonomy had paid and so it was a last-minute fire drill.  The fact that there were similar payments on the same day was probably so that FileTek was never out of pocket.

Generally, Scott tried to stay away from the day-to-day deal making because he disliked it and had other things to deal with.  He was plugged in to some degree, but he usually had Crumbacher and Guiao deal with it; he trusted them to do the job correctly.

### 2.    Veterans' Affairs (VA)

Scott could not recall a deal with the VA in the third quarter of 2010 and certain emails (Tab 20) could not refresh his memory.  He only recalled that FileTek was a reseller, but not on many deals.

Scott still could not recall the VA deal, even when shown emails between himself and Crumbacher discussing the reseller agreement (Tab 21).  He speculated that FileTek was selected as the reseller instead of MicroLink, even though it was a federal deal, because MicroLink had too many outstanding payments.

Scott was not aware if the deal with the VA ever went through.  He was also not aware of the partnership between Lockheed Martin and Autonomy.

### H.    *Tikit and KPMG*

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00329255
EXH 5157-0010

Scott originally did not think he was involved in the formation of the Tikit/KPMG deal nor in the drafting of the documents. However, because Rob Sass was involved in the Tikit/KPMG deal and Scott recalled working with Sass on a search engine deal, he thought he may have been involved with Tikit/KMPG.

Regardless of Scott's involvement, the deal was mostly conducted by Neil Araujo ("Araujo"). Scott was aware that Tikit was unsure about the deal and Araujo had to give his own personal assurances that it was a legitimate deal. It is slightly odd that Autonomy used a UK reseller, Tikit, for a US deal; however, Tikit was a long-term reseller with iManage, which had been acquired by Interwoven, so Araujo had a relationship with them. Scott guessed that Hussain, wanting to complete the KPMG deal, somehow stumbled upon Tikit and decided to use them to complete the deal.

Scott did not recall any issues with Tikit after the deal was completed. He guessed that KPMG completed a deal directly with Autonomy and that perhaps Tikit was paid a marketing assistance fee (MAF).

       I.     *VMS*

Crumbacher and Nicole Eagan worked on VMS. Scott recalled how frustrated Crumbacher was with the deal. VMS negotiated to use Autonomy's software as well as to have developers and resources onsite. Autonomy then licensed VMS' products to show customers how Autonomy's products work. However, Scott did not think Autonomy did much with the VMS products. Someone in marketing told Scott that they used the VMS products, but Scott was skeptical about the extent they were used.

Scott recalled an earlier deal with VMS for $2-3 million, but it was the later one that frustrated Crumbacher.

       J.     *Viadent*

Scott recalled Viadent, but as an OEM. Autonomy sold to them and they would sell to Autonomy at the same time.

       K.     *Latin America Resellers*

Scott worked on some Latin America deals and felt that everyone he worked with were "dead beats" and the Latin American market in general was a miserable market. Some Autonomy sales reps were ineffective and shady. For example, either Neil Goldfarb or Fernando Castellanos submitted a P.O. that they had signed on behalf of the customer without any authorization and so should never have been submitted. Another sales rep, Herman Kanter, brought in a big deal ($3-5 million), but ultimately the reseller never paid. The end user had problems with the software and so never paid the reseller, who then never paid Autonomy.

Ivan Rothman, on Autonomy's legal team, spoke Spanish and so often conversed with the Latin American resellers about payments owed to Autonomy. Hussain did not like to write off bad

Morgan, Lewis & Bockius LLP

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329256
EXH 5157-0011

debt, so he continued to have Autonomy chase the Latin American accounts. However, Hussain only brought up the Latin American resellers' debt at the very end of the quarter.

There were three Latin American resellers that Autonomy often used, including Telematica and Factor Integracion.

V.    **OEM**

Autonomy acquired KeyView from Verity. It is a "file cracker" product that allows a user to extract text from many different file types (pdf and others). This is a valuable product for OEMs and so is a popular Autonomy product for its OEM customers. That being said, OEMs only have a small dollar value to Autonomy. For example, this quarter (Q1, 2013), the OEM business is forecasting only $1.6 million and a quarter with $6 million for all Americas OEM business would be a great quarter.

Some OEMs, when the contract was done correctly, would pay royalties for their use of KeyView. Others would just pay everything up front. Since Autonomy was quarterly driven, there was less focus on on-going revenue and so the royalties were never worth much. Antonia Anderson or Scott could locate the companies who are paying royalties. For past companies who paid royalties, Scott suggested speaking to Mooney or Michael Chang.

Scott was curious about if ex-Autonomy OEM employees had been contacted because Chad Raynal had been asking Scott about the investigation. Raynal came to Autonomy with the Verity acquisition and ran the OEM team until when he quit in 2008. His wife, Emily Raynal, continues to work for Autonomy

VI.    **Termination of Brent Hogenson**

While Hussain loved Brent Hogenson ("Hogenson"), Scott felt, from day one, that there was something odd and untrustworthy about Hogenson. For example, Hogenson would fight Autonomy about everything, even things that were not his decision. Autonomy was brutal during an acquisition of a company, but Scott felt that Hogenson was just "being a jerk" and trying to "spin things" for his own way. Moreover, Hogenson acted strangely and deliberately before he made the allegations against Autonomy. For example, he bought a new computer and used two computers at work. He also asked Scott for a list of all software that had not been shipped by the end of the quarter, which Scott thought was a strange question and felt that Hogenson was looking for something. Hogenson acted based on his own agenda and that agenda did not appear to be doing the right thing for the sake of doing the right thing. It is possible that Hogenson was motivated by money, but Scott felt that something else motivated Hogenson because Hogenson reached out to everyone (SOF, SEC, internally, etc.) quickly and so did not appear to only be looking for a settlement.

When Autonomy discovered that $3 million had been stolen through payroll, there was a lot of speculation regarding Hogenson's role and if he was involved in the theft or at least aware of it. Mike and Kanter put Scott in charge of the investigation and brought in Kroll to do a forensic review. Kroll's report showed some problematic items going beyond the payroll scandal. It showed Hogenson taking unauthorized, aggressive actions, such as Hogenson authorizing

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00329257**
**EXH 5157-0012**

payments to entities that helped influenced a deal with an end user. Hussain never paid such entities, but Hogenson just pushed such payments through. Scott guessed that this usually occurred on Interwoven deals because Interwoven had a past practice of making such payments and Hogenson came from Interwoven.

Lynch said it was Scott's decision as to what should be done with Hogenson. In retrospect, Lynch wanted the decision to terminate Hogenson to be made by someone not involved with accounting. After looking at the Audit Committee Results Analysis (Tab 22), Scott felt that Hogenson was at fault for the payroll fraud but also was not. On the one hand, Hogenson was responsible for knowing what was going on and he ran a sloppy organization. But, by the same argument, Hussain should be at fault because he should also have known what was going on.

When Scott terminated Hogenson, he probably gave the standard line that he was an at-will employee. Scott recalled going through the audit results with Hogenson and Kroll employees, pointing out the problematic issues and informing Hogenson that he would no longer be working at Autonomy. Scott was comfortable letting Hogenson go since he did not trust him and felt he had some agenda. Upon being fired, Hogenson was calm and matter of fact, not angry or surprised.

Scott was not involved with the settlement discussions between Hogenson and Autonomy. Kanter took over the negotiations once Autonomy was ready to settle and worked with Hogenson's outside counsel. Scott's main involvement was driving to San Jose to get the final agreement signed. He was not aware as to how Autonomy and Hogenson arrived at the final number. Scott has not talked to Hogenson since the settlement was finalized.

No one at Autonomy seemed particularly concerned about Hogenson's allegations against Autonomy, but Scott noted that it was the first time he had seen Autonomy settle with someone. Normally, Mike's (Lynch?) view was to not settle with anyone. Scott thought Mike (Lynch?) and Kanter both said the reason they settled with Hogenson was not because Autonomy had done anything wrong, but because the bad publicity could harm Autonomy, even if the stories were not true.

Percy Tejeda ("Tejeda") and Reena Prasad ("Prasad") were both terminated around the same time as Hogenson. Tejeda was close with Hogenson and Scott felt the same way about Tejeda as he did about Hogenson (untrustworthy, had an agenda), but to a lesser degree. Scott could not recall how the decisions were made to fire Tejeda and Prasad; he only remembered that Prasad was crying when she left. Hussain may have said that they cannot trust Hogenson, Tejeda, and Prasad. Scott did not think Lynch discussed Tejeda and Prasad, only Hogenson. Scott was not involved in the settlement negotiations with Tejeda and Prasad. Instead, he let outside counsel deal with them. His only interaction was getting approval of the settlement amounts from Kanter.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329258
EXH 5157-0013