Jonathan Matthew Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Dwight J. Draughon
Drew C. Harris
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

Gary S. Lincenberg (SBN: 123058)
Ray S. Seilie (SBN: 277747)
Michael C. Landman (SBN: 343327)
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067
Telephone: (310) 201-2100
glincenberg@birdmarella.com

*Attorneys for Defendant*
*Stephen Keith Chamberlain*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN,<br><br>Defendants. | Case No.: 3:18-cr-00577-CRB<br>Judge: Hon. Charles Breyer<br>**DEFENDANTS' JOINT MOTION *IN LIMINE* TO PRECLUDE USE OF MISLEADING ACCOUNTING-RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS**<br><br>**(Lynch MIL No. 6)**<br><br>Date: February 21, 2024 at 2 p.m.<br>Court: Courtroom 6 – 17th Floor<br>Date Filed: January 17, 2024<br>Trial Date: March 18, 2024 |

# TABLE OF CONTENTS

Page Nos.

I.     **INTRODUCTION** ............................................................................ 1

II.    **BACKGROUND AND PRIOR PROCEEDINGS** ........................................... 1

III.   **ARGUMENT** .................................................................................... 2

      A.    APPLICABLE LAW ................................................................ 2

      B.    USE OF UNFAIRLY PREJUDICIAL TERMINOLOGY ....................... 2

      1.   Reciprocal / Round-trip / Quid Pro Quo / Barter Transactions .................. 3

      2.   Side Letters and Side Agreements ......................................... 8

      3.   "Channel Stuffing" .................................................... 10

      4.   "Inflated" hardware revenue ........................................ 12

      5.   "Organic growth" .................................................. 12

      6.   "You can't book revenue on sales if you cannot collect the money." ......... 13

      7.   Statement of Position (SOP) 97-2 under U.S. GAAP ....................... 14

      8.   The So-Called "Dark Period" ......................................... 14

      C.    USE OF IMPROPER AND PREJUDICIAL HYPOTHETICAL QUESTIONS . 15

IV.   **CONCLUSION** ................................................................... 16

DEFENDANTS' JOINT MOTION IN LIMINE TO PRECLUDE USE OF MISLEADING ACCOUNTING-RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS (LYNCH MIL NO. 6) – 3:18-CR-00577-CRB

i

1

## <u>TABLE OF AUTHORITIES</u>

2                                                                                    <u>Page Nos.</u>

### Cases

3

4

*Active Sports Lifestyle USA LLC v. Old Navy, LLC*,
5       No. SACV 12-00573, 2013 WL 11239385 (C.D. Cal. Nov. 21, 2013)....................................15

6

*Barillas v. City of Los Angeles*,
7       No. CV-18-08740-CJC (ASx), 2021 WL 4434977 (C.D. Cal. Apr. 12, 2021) ....................3, 11

8    *Fanucchi & Limi Farms v. United Agri Prods.*,
        414 F.3d 1075 (9th Cir. 2005) ...........................................................................................9
9

*Inntrepreneur Pub Co. v. East Crown Ltd.*,
10      [2000] 2 Lloyd's Rep. 611 ...............................................................................................10

11

*Marani v. Jackson*,
12      183 Cal. App. 3d 695 (Cal. Ct. App. 1986) .......................................................................9

13

*Rock Advertising Ltd v. MWB Bus. Exch. Ctrs. Ltd.*,
14      [2018] UKSC 24 ...............................................................................................................10

15  *SEC v. Sabhlok*,
        495 F. App'x 786 (9th Cir. 2012) .....................................................................................2
16

17  *United States v. Figueroa-Lopez*,
        125 F.3d 1241 (9th Cir. 1997) ..........................................................................................2
18

19  *United States v. Rigas*,
        490 F.3d 208 (2d Cir. 2007)..............................................................................................2
20

21

### Statutes and Rules

22  Fed. R. Evid. 403 ..............................................................................................................9, 15

23  Fed. R. Evid. 611 ...................................................................................................................15

24  Fed. R. Evid. 701 .....................................................................................................................2

25  Fed. R. Evid. 702 .....................................................................................................................2

26

27

28

---

1

## **NOTICE OF MOTION AND MOTION**

2   TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:

3          PLEASE TAKE NOTICE that on February 21, 2024, at 2:00 pm or as soon thereafter as

4   counsel may be heard, in Courtroom 6, 17th Floor of the United States District Court for the

5   Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants

6   Michael Richard Lynch and Stephen Keith Chamberlain will and hereby do move the Court to

7   preclude the use of misleading accounting-related terminology and improper hypothetical

8   questions.

9          This motion is based upon the following Memorandum of Points and Authorities, the

10   Declaration of Celeste L.M. Koeleveld, any oral argument, and the pleadings and exhibits on file

11   with the Court.

12

13   Dated: January 17, 2024                    Respectfully submitted,

14                                              */s/ Christopher J. Morvillo*

15                                              Christopher J. Morvillo (Admitted Pro Hac Vice)
                                                Celeste L. Koeleveld (Admitted Pro Hac Vice)
16                                              Daniel S. Silver (Admitted Pro Hac Vice)
                                                **Clifford Chance US LLP**
17                                              31 West 52nd Street
                                                New York, NY 10019
18                                              Telephone: (212) 878-3437
                                                christopher.morvillo@cliffordchance.com
19

20                                              Reid H. Weingarten (Admitted Pro Hac Vice)
21                                              Brian M. Heberlig (Admitted Pro Hac Vice)
                                                Michelle L. Levin (Admitted Pro Hac Vice)
22                                              Nicholas P. Silverman (Admitted Pro Hac Vice)
                                                Dwight J. Draughon (Admitted Pro Hac Vice)
23                                              Drew C. Harris (Admitted Pro Hac Vice)
24                                              **Steptoe LLP**
                                                1114 Avenue of the Americas
25                                              New York, NY 10036
                                                Telephone: (212) 506-3900
26

27

28

1

2

Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

*Attorneys for Defendant*
*Michael Richard Lynch*

Gary S. Lincenberg
Ray S. Seilie
Michael C. Landman
**Bird, Marella, Boxer, Wolpert,**
**Nessim, Drooks, Lincenberg,**
**Rhow, P.C.**

*Attorneys for Defendant*
*Stephen Keith Chamberlain*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **SUMMARY OF ARGUMENT**

2       Defendants Michael Richard Lynch and Stephen Keith Chamberlain jointly move *in*

3   *limine* to preclude the use of misleading accounting-related terminology and improper

4   hypothetical questions.  In particular, the government should be precluded from eliciting

5   testimony from unqualified lay witnesses about allegedly improper accounting practices.  The

6   government should also be precluded from misusing certain accounting-relating terminology—

7   especially accounting terms of art—to suggest that the defendants engaged in improper

8   accounting practices to further the alleged fraud.  Finally, the government should be precluded

9   from eliciting speculative testimony from witnesses regarding what they might have wanted to

10  know and what they would have done had they known such information.  In a case that alleges

11  an accounting fraud, it is critical that accounting terms be used correctly and that witnesses are

12  not permitted to offer speculative and revisionist testimony.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendants Michael Richard Lynch and Stephen Chamberlain hereby move *in limine* for an order precluding inaccurate and prejudicial use of accounting terminology and other pejorative language.  Lay witnesses should not be permitted to offer unqualified opinions and commentary about accounting practices or to misuse accounting terms to misleadingly suggest to the jury that the defendants engaged in improper accounting practices in furtherance of a scheme to defraud.  In addition, the government should not be permitted to question its witnesses with hypothetical scenarios that assume the existence of disputed "facts" and invite witnesses to speculate about whether they *would* have wanted to know that fact and whether it *might* have made a difference.  The danger of unfair prejudice from such questions far outweighs any probative value.

## II.    BACKGROUND AND PRIOR PROCEEDINGS

This case alleges an accounting fraud.  Dr. Lynch, Mr. Chamberlain, and others are alleged to have misrepresented Autonomy's financial statements in furtherance of an effort "to deceive purchasers and sellers of Autonomy securities about the true performance of Autonomy's business, its financial performance and condition, the nature and composition of its products, revenue and expenses, and its prospects for growth."  Superseding Indictment ("SI") ¶ 19.  The alleged accounting-related misconduct includes, for example: (i) artificially inflating revenues by improperly recording revenue on so-called "reciprocal" or "roundtrip" transactions and where all of the revenue recognition criteria under the applicable IFRS accounting standards had not been met, *see* SI ¶ 22.a; and (ii) making false statements to Autonomy's independent auditor about the facts and circumstances of various transactions relating to cost allocation and the recognition of revenue.  *See* SI ¶ 22.b.

In lay terms, Autonomy is alleged to have cooked its books to make it more attractive to potential purchasers of Autonomy shares, including HP.  Whether Autonomy engaged in improper accounting practices, however, is not something that can be determined by a lay person with no accounting background.  Yet, in the *Hussain* trial, the government relied on lay

witnesses unschooled in accounting principles and not competent to offer accounting-related opinions to present confusing, inaccurate, and prejudicial testimony about key accounting concepts.

## III.   ARGUMENT

### A.   APPLICABLE LAW

To understand whether Autonomy's accounting practices were in fact improper requires accounting expertise.  Although Fed. R. Evid. 701 allows lay witnesses to offer opinion testimony, the opinion must (i) be based on the witness's perception, (ii) helpful to clearly understanding the witness's testimony or determining the fact in issue, and (iii) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  *See United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (holding that lay testimony was improperly admitted because it was "based on the perceptions, education, training, and experience of the witness").  Thus, even if a witness has some passing familiarity with accounting issues, where that witness was not involved in the contemporaneous accounting, that witness cannot opine based on what he or she reviewed years later on the application of accounting principles unless the witness has the requisite expertise.  *See, e.g., SEC v. Sabhlok*, 495 F. App'x 786, 787 (9th Cir. 2012) (unpublished) (finding error in allowing lay witnesses to testify "about general legal and accounting principles that related to their financial review"); *United States v. Rigas*, 490 F.3d 208, 223 (2d Cir. 2007) (lay witness appropriately testified "only to [a company's] accounting records and not regarding the appropriateness of the accounting treatment") (alteration adopted).

### B.   USE OF UNFAIRLY PREJUDICIAL TERMINOLOGY

In the *Hussain* case, the government repeatedly elicited testimony and made arguments that either misapplied accounting terminology or described transactions using pejorative terms. The government's case is either persuasive on the facts or not.  It should not be based on embedding pejorative terminology in the jurors' minds when the correct terminology will likely be described by other witnesses.  Where it is clear that an accounting term is being misapplied or the prejudicial effect is apparent on its face, such terminology should be excluded.  In addition,

lay witnesses not qualified as experts should not be permitted to offer opinion testimony related to whether Autonomy correctly recognized revenue or accurately stated its financial accounts. The government should be required to present competent testimony from its witnesses that will accurately explain the meaning of technical accounting terms, and accounting opinions should be offered only by properly qualified witnesses, so that the jury is not confused or misled by complex terminology and concepts. *See Barillas v. City of Los Angeles*, No. CV-18-08740-CJC (ASx), 2021 WL 4434977, at *13 (C.D. Cal. Apr. 12, 2021) (admission of terminology proper *provided that* a witness is able to "explain the technical meaning of these words to the jury, and the jury is capable of understanding them").

### 1.    Reciprocal / Round-trip / Quid Pro Quo / Barter Transactions

During its examination of non-accountant witnesses in *Hussain*, the government elicited terms such as "reciprocal," "round-trip," "quid pro quo," and "barter" transactions to suggest to the jury that such transactions were improper.  There is nothing inherently wrong, however, with two companies buying and selling goods or services from one another, and this is especially common in the software industry.  The question is not the transactions *per se*, but how to account for the transactions, which in Autonomy's case turned on the application of International Financial Reporting Standards, or IFRS.  IFRS does not use the terms "reciprocal," "round-trip," "quid pro quo," or "barter" to describe transactions between companies that are buying and selling goods from each other.  Under International Accounting Standard (IAS) 18.12, no revenue is recognized on the exchange or swap of similar goods or services, while revenue on an exchange of dissimilar goods or services is measured at the fair value of those goods or services (with an adjustment made to reflect the amount of any cash transferred).  The defense is unaware of any exchange or swap transaction at issue in this case.  As for transactions that are "linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole," IAS 18.13 requires the revenue recognition criteria to be applied to the series of transactions together.  Whether the transactions are "linked," in turn, is a fact-specific question of accounting judgment that requires considering the circumstances of each transaction, including whether the contractual documentation for a transaction refers to the other potentially

1  linked transaction.

2  Rather than leaving such accounting concepts to witnesses with accounting expertise, the

3  government and its witnesses peppered the *Hussain* trial with inaccurate and misleading

4  terminology and definitions, prejudicing the jury against "reciprocal," "round-trip," and "quid pro

5  quo" deals, and implying that such deals are inherently wrong.  For example, in its opening

6  remarks, the government defined a "reciprocal transaction" as "a deal where one party buys

7  something and sells something to another at or around the same time *at an inflated price*."

8  *Hussain* Tr. at 31:19–22 (emphasis added).  This was incorrect and prejudicial.  Entities can

9  certainly buy something and sell something to one another, but that does not imply that the price

10  was "inflated."  Rather, each purchase or sale is accounted for separately if the "commercial

11  effect" of the purchase or sale can be understood without reference to the other purchase or sale,

12  such as if the contracts are independent of each other.  The government should not be permitted

13  to indiscriminately cast aspersions on all transactions that involve common purchasers and

14  sellers, either in opening or closing remarks or through witness testimony.

15  The government and its witnesses similarly misled the jury in their use of the term

16  "barter."  A "barter" deal refers to a swap or exchange of goods where no cash changes hands,

17  and that is how Autonomy used the term on its website and in presentations to analysts.  Yet, the

18  government and its witnesses in the *Hussain* trial often conflated "barter" deals with any series of

19  transactions where companies buy and sell products to each other at or around the same time,

20  including transactions where each transaction is paid for separately and in cash.

21  Thus, for example, Marc Geall (who is not an accountant) was asked to define a "barter

22  deal," which he said was "a deal between two counterparties in the software industry" that "could

23  be . . . effectively the swapping of products" with both parties "potentially recogniz[ing]

24  revenues, but there wouldn't necessarily be any cash flow between them. Like a swap deal."

25  *Hussain* Tr. at 837:12–17.  Although this definition included the notion that a cashless swap

26  deal—transactions in which Autonomy did not engage—the definition is nonetheless overbroad

27  and dangerously misleading.

28  While questioning William Loomis, the CEO of one of Autonomy's customers, the

government again elicited misleading and confusing testimony from a lay witness regarding "barter" transactions.  This time the government conflated two of its pejorative terms, asking: "What amount of money do you think you would have been comfortable with if there had been no **reciprocal barter** transaction?"  *Id.* at 2439:19–21 (emphasis added).  "Reciprocal" and "barter" transactions are not the same.  The latter involves an exchange of goods without monetary consideration, something not alleged to have happened in this case.  "Reciprocal" is not a term of art defined in IFRS; it is the government's pejorative term for a potentially linked transaction.  The conflicting use of accounting terms highlights the prejudicial effect of using misleading terminology to suggest impropriety to the jury.  Moreover, Loomis's unqualified opinion testimony on the definition of a barter transaction conflicted with Geall's unqualified opinion testimony.  *Compare id.* at 2424:11–19 (Loomis testifying that barter transaction is a "two-sided transaction" when "the supplier is also a [] purchaser"), *with id.* at 837:12–17 (Geall testifying that a barter deal is "effectively the swapping of products . . . [s]o both would recognize revenues . . . but there wouldn't necessarily be any cash flow between them").

The government then went further in its closing, improperly equating "barter" with "roundtrip" and characterizing a series of transactions between Capax and Autonomy as "a barter deal," *id.* at 5728:12, even though Autonomy paid Capax in cash for EDD services and Capax paid Autonomy in cash for IDOL software.  The products were not "swapped" or "bartered"; they were purchased and sold for cash.  To make matters worse, the government then accused Mr. Hussain of lying to investors and analysts about whether Autonomy did barter deals.  *Id.* at 5728:10–12.  The only falsehood, however, was the government's self-generated, inaccurate definition of a barter transaction, which it then used to prejudice Mr. Hussain.

Another misused term is "quid pro quo" deals, which former Autonomy salesman (and non-accountant) Stouffer Egan defined as "[a] deal where there are two components to the deal: One where we would sell something to the customer and one where we would buy something—

do a reciprocal or opposite transaction[.]" *Id*. at 2008:7–10.[1]  The government went on to ask Mr. Egan whether a "quid pro quo" deal was the same as a "round-trip" deal, to which Mr. Egan responded "Yes." *Id.* at 2008:14–17.  This was improper.  Using words like "quid pro quo" and "round-trip"—which are no more than pejorative slang—suggests something improper.  Plus, accounting turns on the analysis of evidence and use of judgment by trained professionals.  Mr. Egan is not an accountant.  He is not qualified to define accounting concepts.  He lacks expertise as to the proper accounting treatment of transactions.  Nor does he have percipient knowledge of the actual accounting treatment of the transactions about which he testified.

Mr. Egan went still further, opining about whether the contracts for the "quid pro quo" deals "should be linked," *id*. at 2009:1, and whether "deals were related," meaning "[w]ere they linked, one was dependent on the other." *Id*. at 2064:14.  Thus, Mr. Egan was asked whether the transactions between Autonomy and FileTek were "linked":  government counsel even walked Egan through Deloitte's audit committee report and asked if Deloitte's analysis of whether the transactions were "linked" comported with his understanding of those transactions.  *Id*. at 2071:9–24.  This testimony was highly improper.  As noted earlier, whether transactions are considered "linked" under IAS 18.13 "in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole," is a question that requires the application of accounting judgment and expertise.  Mr. Egan was in no position to apply such judgment.  Whether Mr. Egan considered the transactions "linked" in layman's terms had nothing to do with whether they were linked in accordance with the applicable accounting standards.  Predictably, the government then used Mr. Egan's highly improper and prejudicial testimony in its closing argument to argue that Mr. Hussain had lied to Deloitte about whether the Autonomy and FileTek transactions were "linked." *Id*. *at* 5752:18–19.  That argument too was improper.

---

[1] This definition of a "reciprocal" transaction is different from the one the government gave to the jury during opening statements in the *Hussain* trial: "[A reciprocal transaction is], as a general matter, [] a deal where one party buys something and sells something to another at or around the same time *at an inflated price*." *Hussain* Tr. at 31:19–22 (emphasis added).  Contrary to the government's definition, Mr. Egan made no reference to any inflated purchase price.

DEFENDANTS' JOINT MOTION IN LIMINE TO PRECLUDE USE OF MISLEADING ACCOUNTING-RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS (LYNCH MIL NO. 6) – 3:18-CR-00577-CRB

6

Another improper argument advanced by the government through its questioning of witnesses is the notion that Autonomy should not have been permitted to recognize revenue on a so-called "reciprocal" transaction, where Autonomy purchased a product it did not "need." "Need" is not the test for determining commercial rationale; the proper question is whether Autonomy had a commercial rationale for acquiring the product.  "Need" puts it too narrowly.

The manner in which the government is likely to elicit testimony regarding pejorative slang dressed up as technical accounting terms from lay witnesses creates a significant risk of unfair prejudice to the defense.  Jurors may be misled into relying on inaccurate lay witness testimony about complicated accounting terms and will undoubtedly be confused when accounting experts provide different and conflicting definitions of such terms.  In *Hussain*, it was not until actual accountants testified, mid-way through the government's case-in-chief, that the jury heard from potentially qualified witnesses regarding key accounting concepts.  *Id.* at 3189:5–13.  For example, on cross examination, former Deloitte auditor Antonia Anderson testified that there was nothing wrong with buying a product from a customer at the same time that you are selling a product to that customer, which was common in the software industry.  *Id.* Thus, the fact that Autonomy bought software or services from its customer at or around the same time it sold software or services to that customer does not make it an improper "reciprocal" or "round-trip" transaction.  Rather, under IFRS, two transactions should only be considered to be "linked" if they are "linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole."[2]

Moreover, IFRS provides a singular example of a "linked" transaction: "an entity may sell goods and, at the same time, enter into a separate agreement to repurchase the goods at a later date, thus negating the substantive effect of the transaction; in such a case, the two

[2] Not surprisingly, the government's own expert Steven Brice does not use the terms "round-trip," "barter," or "quid pro quo" to describe any of the transactions at issue in this case. This is because such terms do not fit within the applicable IFRS framework and clearly do not apply based on the facts of the case. Such pejorative terms are simply not necessary to describe the alleged fraudulent accounting practices.

transactions are dealt with together."  *See* IAS 18.13.  None of the transactions at issue here falls

neatly within this example, and it is a matter of accounting judgment whether transactions are

"linked in such a way that the commercial effect cannot be understood without reference to the

series of transactions as a whole."  That will be for the jury to decide after it hears the applicable

facts and accounting principles.  But the government should not be able to put the cart before the

horse by eliciting conclusions about the accounting treatment of a particular transaction from lay

witnesses like Egan and Loomis.  It will be hard enough for the jury to understand the actual

accounting principles without being misdirected by incorrect and prejudicial lay opinion

testimony.  Unless and until the government lays a foundation for the term and establishes the

witness's competence to opine whether a particular transaction meets that definition, the

government should not be permitted to use in arguments or elicit from witnesses prejudicial

terms such as "reciprocal," "round-trip," "quid pro quo," or "barter" transaction.

### 2.   Side Letters and Side Agreements

Another accounting concept where the government has wreaked havoc by injecting its

own definition into the case is the concept of a side letter or a side agreement that may affect

revenue recognition to the extent that it alters the payment terms of a contract.  The government

should not be permitted to alter application of the accounting rules in this way.  A side letter or

side agreement is an agreement that alters the terms of a contract.  *See Hussain* Tr. at 1857:22–

24; 1868:5–18 (defining a side letter as an "auxiliary agreement" that "changes" the "obligations"

in a contract).  It is fundamentally different from "words of comfort" by a salesman (like Mr.

Egan) offering assurances to a reseller that Autonomy will make sure that the reseller is not left

"holding the bag" if a deal with an end-user does not close.[3]  *See Hussain* Tr. at 1979:12–20.

Such assurances, while potentially "comforting" to the reseller, do not alter the terms of the

contract between the reseller and Autonomy, particularly where the contract contains an

integration clause requiring that any modification be in writing and signed by all parties.  Parties

---

[3] Koeleveld Decl. Ex. 1 (Excerpt of Christopher "Stouffer" Egan testimony from U.K. civil trial (May 7, 2019) (Bates HP-SEC-02930502)).

DEFENDANTS' JOINT MOTION IN LIMINE TO PRECLUDE USE OF MISLEADING ACCOUNTING-RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS (LYNCH MIL NO. 6) – 3:18-CR-00577-CRB

8

to contracts—particularly sophisticated parties like those at issue here—understand such terms. Thus, the reseller understands that it is still on risk—as each of the resellers testified—for its obligations pursuant to the contract.[4]  To insist that such words of comfort are a side agreement, as the government has, conflates these two separate concepts and injects a new definition of side agreement into the case, one that was not in effect at the time of the transactions.  It is not the government's place to rewrite the rules after the fact.  Doing so misleadingly expands the definition of an accounting concept to encompass all discussions surrounding a contract, regardless of their impact on the contract itself.

The government should also be precluded from misusing this term because, under the government's expansive definition, oral side agreements are irrelevant to the accounting allegations in this case.  Side agreements are only relevant to revenue recognition to the extent they create new rights or obligations or change existing rights and obligations in the original contract.  The oral assurances the government misleadingly casts as side agreements did not change the obligations of either party in the underlying contract, so they are irrelevant to revenue recognition.  At the very least, recasting mere assurances or words of comfort as consequential oral amendments is confusing, misleading, and a waste of time under Rule 403.

Further, to the extent any side agreements did exist, such side agreements would be unenforceable based on the integration clauses in the original contracts.  Under California law, where a written agreement is intended to be the complete and exclusive statement of the terms of the contract, evidence of additional terms cannot be used to explain or supplement the agreement.  *See Fanucchi & Limi Farms v. United Agri Products*, 414 F.3d 1075, 1081 (9th Cir. 2005) (finding an oral agreement modifying the terms of a contract invalid because the contract stated that the written agreement could not be contradicted by evidence of any prior, contemporaneous, or subsequent oral agreements); *Marani v. Jackson*, 183 Cal. App. 3d 695, 705–06 (Cal. Ct. App. 1986) (excluding evidence of an oral agreement where the original contract included a provision "precluding modification other than in writing before completion

---

[4] *See id.*

DEFENDANTS' JOINT MOTION IN LIMINE TO PRECLUDE USE OF MISLEADING ACCOUNTING-RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS (LYNCH MIL NO. 6) – 3:18-CR-00577-CRB

9

of a particular transaction").  Likewise, under U.K. law, an oral modification to a written contract is not effective where the written contract states that oral modifications are not permitted.  *Rock Advertising Ltd v. MWB Business Exchange Centres Ltd* [2018] UKSC 24; *see also Inntrepreneur Pub Co. v. East Crown Ltd.* [2000] 2 Lloyd's Rep. 611 ("The purpose of an entire agreement clause is to preclude a party to a written agreement threshing the undergrowth and finding in the course of negotiations some (chance) remark or statement (often long forgotten or difficult to recall or explain) on which to found a claim. . . .").

In this case, the written agreements contained integration clauses requiring that all modifications be in writing and signed by the parties.  The relevant contractual provision typically provides that, "This Agreement sets forth the complete and exclusive agreement between the parties with respect to its subject matter and supersedes any and all other written or oral agreements previously existing between the parties with respect to such subject matter.  No alterations, modifications or additions to this Agreement shall be valid unless made in writing and signed by a Director or Officer of each party. . . ."[5]  In his testimony, Mr. Egan confirms his understanding of the integration clauses, explaining that he did not believe any oral side agreements would be binding.  Mr. Egan testified, "I didn't think they were binding. They had been done explicitly with [Hussain's] approval and following his process, so I just didn't think that they were side letters as defined in that which should not be done."[6]  The government should not be permitted to call "words of comfort" an oral side agreement when the parties agreed to integration clauses, which explicitly forbid any modifications to the agreement unless made in writing.

### 3.    "Channel Stuffing"

During the *Hussain* trial, the government repeatedly accused Mr. Hussain of "channel stuffing," without providing qualified witness testimony to describe the meaning of that term.

---

[5] *See*, *e.g.*, Koeleveld Decl. Ex. 2 at ¶ 23 (Value Added Reseller Agreement (June 30, 2009) (Bates HP-SEC-01770707)).

[6] Koeleveld Decl. Ex. 3 (Excerpt of Christopher "Stouffer" Egan testimony from U.K. civil trial (May 8, 2019) (Bates HP-SEC-02930462)).

*Hussain* Tr. at 26:6, 27:11, 33:6, 35:3, 35:11; 5721:14–19.  For example, in its opening

statement, the government defined channel stuffing as "where you inflate your sales figures by

deliberately sending more product into a channel, say a distribution channel, than demand for

that product warrants."  *Hussain* Tr. at 26:6–9.  The government then proceeded to suggest that

any transaction in which a deal with an end user ultimately did not close is an example of

channel stuffing, *id.* at 35:11 (citing a deal with Abbott Labs), demonstrating that the

government's definition was impermissibly overbroad.  And evidence presented at trial on this

issue was even more problematic.  Asked to define "channel stuffing," Geall (who again is not an

accountant) opined that "[c]hannel stuffing is recognizing revenues before the customer or the

end customer has received the product."  *Id.* at 900:9–10.  That definition is plainly incorrect,

and Geall applied it incorrectly to a situation where Autonomy acquires a reseller that has not yet

sold the license to an end-user.  When a court allows witnesses to use improper terminology to

discuss accounting principles, it gives the government license to apply accounting principles

improperly to the facts.  The government then argued in closing that Mr. Hussain had engaged in

"channel-stuffing in order to falsely inflate Autonomy's quarterly revenues," *id.* at 5721:15–18,

an untethered accusation, given the vague and overbroad definitions of "channel stuffing"

bandied about during the trial.

   Allowing such definitions threatens extreme prejudice to the defendants.  The

government should only use the term "channel stuffing" if it is used by a witness competent to

explain to the jury what it means.  *See Barillas*, 2021 WL 4434977, at *13.  And it should not be

permitted to use a term that has no relevance to this case.  Properly understood, "channel

stuffing" involves flooding a distribution network with unwanted product, where the product

then goes unsold and unpaid for and is subject to a right of return.  That did not occur here.

Resellers purchased Autonomy software when the risk of owning the product was mitigated by

the prospect of a sale to an already-identified end-user.  No channel was blindly stuffed full of

unwanted product, and no revenue was recognized unless Autonomy determined, with Deloitte's

review and approval, that the reseller's debt was collectible.  The relatively few occasions on

which such a debt was not collected is consistent with ordinary bad debt provisions for a

DEFENDANTS' JOINT MOTION IN LIMINE TO PRECLUDE USE OF MISLEADING ACCOUNTING-
RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS (LYNCH MIL NO. 6) – 3:18-
CR-00577-CRB

11

company like Autonomy.

Moreover, the question is not whether Autonomy engaged in channel stuffing, but whether it properly recognized revenue under IFRS applying IAS 18.  Whether a "channel" was being "stuffed" is not one of the criteria under that accounting rule.  The fact that the government's 61-page expert report does not use this term once suggests that the term is not pertinent to explain the alleged accounting fraud the government charged.  Accordingly, the jury should not be invited to speculate about whether channel stuffing occurred and whether it was somehow improper or fraudulent.

### 4.       "Inflated" hardware revenue

The government should not be able to suggest that hardware sales "inflated" Autonomy's revenue because that is an inaccurate statement of undisputed fact.[7]  As the Court correctly recognized during the *Hussain* trial, "hardware sales didn't inflate the revenues." *Hussain* Tr. at 3778:6–7.  Rather, the allegation with respect to hardware sales was that "[t]hey simply weren't defined [i.e., disclosed]." *Id.* at 3778:7.  The government did not and does not appear to dispute this contention.  Accordingly, the Court should prevent juror confusion by precluding the government from arguing or eliciting testimony about hardware sales as "inflating" revenue.

### 5.       "Organic growth"

The government should not be permitted to admit Mr. Egan's chart on purported "organic growth."[8]  The use of the terminology "organic growth" is misleading to the jury and prejudicial.  Again, Mr. Egan is not an accountant.  Moreover, his definition of organic growth is inconsistent with that used by accountants and analysts. *Hussain* Tr. at 1991:15–18 (defining organic growth as "the revenue [Autonomy] would have done on a normal course of continuing without any of the deals that I was referring to in our discussion").  HP employee Manish Sarin later testified that "organic growth" is commonly understood as the sale of a company's products that is not the

---

[7] The government argued in *Hussain* that hardware sales were used to "inflate the overall revenue." *Hussain* Tr. at 5819:10–15.

[8] Koeleveld Decl. Ex. 4 (Copy of Christopher "Stouffer" Egan's "organic growth revenue chart" (Government exhibit 2797)).

product of an acquisition.  *Id.* at 3477:15–19.  However, not all witnesses agree on the scope of "organic growth," for example, whether it should include both software and hardware sales. There is accordingly a great risk that the jury will be confused by inconsistent definitions of "organic growth," especially when the question is how Autonomy defined the term for its shareholders and investors and whether anyone was misled by its use of the term.  The Court should police the government's improper use of accounting terminology so that only qualified witnesses, with appropriate expertise, testify on such topics.[9]

6.      **"You can't book revenue on sales if you cannot collect the money."**

The defense seeks to preclude the government from inaccurately oversimplifying core accounting principles.  In closing arguments in *Hussain*, for example, the government said: "You can't book revenue on sales if you cannot collect the money."  *Hussain* Tr. at 5843:2–3.  This is not accurate.  Under IFRS, you can "book revenue," so long as it is "*probable* that the economic benefits associated with the transaction will flow to the entity making the sale."  IAS 18.14(d) (emphasis added).  The government and defense accounting experts agree that the term "probable" for purposes of this collectability analysis means there is a greater than 50% chance that payment will be received by the seller.  The government's argument could cause jurors to believe that revenue recognition was improper just because Autonomy was later unable to collect from its customers in certain instances, rather than understanding that the applicable test is whether Autonomy believed there was a greater than 50% chance that it would be able to collect the money at the time the revenue was booked.  The Court should ensure that the government's opening and closing arguments precisely state applicable accounting principles in the manner in which such principles are stated by the appropriate government witnesses.

---

[9] Another term that is not consistently defined is OEM revenue, or revenue from Original Equipment Manufacturers, which is not an accounting or IFRS-mandated metric.  Autonomy had its own definition of OEM revenue and related measures, such as OEM-derived revenue and revenue from IDOL Cloud, IDOL Product and License.  Witnesses should not be permitted to assign their own definitions to these terms.

DEFENDANTS' JOINT MOTION IN LIMINE TO PRECLUDE USE OF MISLEADING ACCOUNTING-RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS (LYNCH MIL NO. 6) – 3:18-CR-00577-CRB

13

### 7. Statement of Position (SOP) 97-2 under U.S. GAAP

During the *Hussain* trial, the government presented evidence that, while Autonomy's financial statements unambiguously stated that Autonomy's accounting followed IFRS, Autonomy sometimes referred to Statement of Position (SOP) 97-2, a software revenue recognition rule under U.S. GAAP.  As the testimony made clear, the revenue recognition rules under SOP 97-2 are similar to IAS 18, *Hussain* Tr. at 4726:24–4727:21, and Mr. Hussain made it clear in analyst calls that Autonomy only used SOP 97-2 "where IFRS is silent," *id*. at 4736:16-22.  Nevertheless, the government suggested in questioning and argument that the references to SOP 97-2 were somehow improper and misleading to analysts and investors.  *Id*. at 5824:13-16 (AUSA Reeves: "Mr. Hussain said Autonomy followed U.S. GAAP and SOP 97-2 when it served his purposes to do so").  To avoid unfair prejudice and jury confusion, references to SOP 97-2 should be precluded at trial.  There is no evidence that HP or any other investor was misled in any way by scattered references to SOP 97-2, and defending against implications that Autonomy's limited and caveated references to SOP 97-2 were somehow nefarious will cause undue delay and confuse the issues.  Either Autonomy misstated its financial accounts under IFRS or it did not, but the sideshow about SOP 97-2 should be avoided.

### 8. The So-Called "Dark Period"

During the *Hussain* trial, the government and its witnesses, including Christopher Yelland, referred to the period between July and September 2011 as a "dark period" because Autonomy did not file a quarterly statement for Q3 2011 in light of the acquisition by HP. *Hussain* Tr. at 5116:17–20.  While of course this time period was less transparent to the public because the acquisition pre-empted a Q3 2011 quarter-end review, there is nothing improper about that.  Further, the government should not be permitted to suggest that this period *was not transparent to HP*.  Indeed, Mr. Yelland made clear that "the dark period is not included in any published Autonomy group results and doesn't form part of any HP published results so it's dark *to the market*," *id*. at 5116:25–5117:2 (emphasis added), not to HP.  Nevertheless, the government argued that the "dark period" is "where all the bodies are being buried in order to cover up what has actually happened."  *Id*. at 5839:23–25.  Such argument is improper.  There

DEFENDANTS' JOINT MOTION IN LIMINE TO PRECLUDE USE OF MISLEADING ACCOUNTING-RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS (LYNCH MIL NO. 6) – 3:18-CR-00577-CRB

14

was nothing hidden or "buried" from HP during the so-called dark period when Autonomy's

books were prepared for the transition to HP.  To avoid such an inaccurate suggestion, the

government and its witnesses should be instructed not to use the term "dark period" at all.

### C.     USE OF IMPROPER AND PREJUDICIAL HYPOTHETICAL QUESTIONS

The government frequently asked witnesses during the *Hussain* trial (1) whether they

would have wanted to know something, and (2) whether that information *might have* impacted

the witness's decision-making.  Such questions lack probative value, are unfairly prejudicial, and

improperly suggest to the jury that the government has established facts that are squarely in

dispute.  The Court's "control over the mode and order of examining witnesses and presenting

evidence" under Fed. R. Evid. 611(a) gives it the power to prevent such speculative, hypothetical

questioning that may mislead the jury, and the minimal probative value of such questions is far

outweighed by its unfair prejudicial impact under Fed. R. Evid. 403.

Hypothetical questions along the lines of "would you have wanted to know" and "might

this have impacted your decision" lack probative value because they will always elicit the

government's desired response and essentially permit the government to argue its case through

hypothetical questions.  The answers will then be used to suggest that certain information was

withheld and that it is material.  But the fact that a witness "would have liked to have known"

something (that allegedly was not disclosed) is not the same as saying that the information

(assuming it was not disclosed) is material to an accounting decision or that it should have been

disclosed.  And an answer that says no more than "anything's possible" is plainly lacking in

probative value, but the jury may give it undue weight just because the answer is given by an

accountant or an analyst who appears to have some specialized knowledge or expertise.

Where a hypothetical line of questioning has the potential to mislead the jury, it is

properly excluded.  *See Active Sports Lifestyle USA LLC v. Old Navy, LLC*, No. SACV 12-

00573, 2013 WL 11239385, at *9 (C.D. Cal. Nov. 21, 2013).  Here, hypothetical questions that

rely on alternative or disputed facts, and that are phrased in what is effectively "anything's

possible" language, will confuse the issues, prejudice the defense, and mislead the jury.  Such

DEFENDANTS' JOINT MOTION IN LIMINE TO PRECLUDE USE OF MISLEADING ACCOUNTING-RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS (LYNCH MIL NO. 6) – 3:18-CR-00577-CRB

15

1   questioning should not be allowed.

2   **IV.      CONCLUSION**

3              For these reasons, the Court should grant defendants' joint motion *in limine* to preclude

4   the use of misleading accounting-related terminology and improper hypothetical questions.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated: January 17, 2024                    Respectfully submitted,

2                                               By:   _/s/ Christopher J. Morvillo_
3                                               Christopher J. Morvillo

4                                               Christopher J. Morvillo
5                                               Celeste L.M. Koeleveld
                                                Daniel S. Silver
6                                               (Admitted Pro Hac Vice)
                                                **CLIFFORD CHANCE US LLP**
7
                                                Jonathan Matthew Baum (SBN: 303469)
8                                               **STEPTOE LLP**
9                                               One Market Street
                                                Steuart Tower, Suite 1070
10                                              San Francisco, CA  94105
                                                Telephone:  (510) 735-4558
11                                              jbaum@steptoe.com

12                                              Reid H. Weingarten
13                                              Brian M. Heberlig
                                                Michelle L. Levin
14                                              Nicholas P. Silverman
                                                Dwight J. Draughon
15                                              Drew C. Harris
16                                              **STEPTOE LLP**
                                                1114 Avenue of the Americas
17                                              New York, NY 10036
                                                Telephone:  (212) 506-3900
18
19                                              *Attorneys for Defendant*
20                                              *Michael Richard Lynch*

21                                              By:   _/s/ Gary S. Lincenberg_
                                                Gary S. Lincenberg
22
23                                              Gary S. Lincenberg
                                                Ray S. Seilie
24                                              Michael C. Landman
25                                              **BIRD, MARELLA, BOXER, WOLPERT,**
                                                **NESSIM, DROOKS, LINCENBERG &**
26                                              **RHOW, P.C.**

27                                              *Attorneys for Defendant*
28                                              *Stephen Keith Chamberlain*