# EXHIBIT 2



**AUTONOMY, INC.**
**VALUE ADDED RESELLER AGREEMENT**

This AUTONOMY VALUE ADDED RESELLER AGREEMENT ("Agreement") is entered into as of May __, 2009 ("Effective Date"), between AUTONOMY, INC. with offices located at One Market Plaza, Spear Tower, 19th Floor, San Francisco, CA 94105 ("Autonomy"), and Capax Discovery LLC, with offices located at 1955 Wehrle Drive, Williamsville, NY 14231-0490 ("VAR").

1. **DEFINITIONS AND CONSTRUCTION.**

    1.1  Definitions. In this Agreement and the Exhibits to this Agreement, the terms set forth below shall have the following meanings:

    (a) "Autonomy Trade Marks" shall mean such trade marks, service marks, logos and designs owned by Autonomy and used by VAR from time to time in relation to the Autonomy Products, including those listed in Exhibit A.

    (b) "Confidential Information" shall have the meaning set forth in Section 19.

    (c) "Documentation" means the user, operating and technical manuals, and other user documents delivered by Autonomy with the Autonomy Products, whether in printed or electronic form.

    (d) "Enhancement" shall mean a change or addition to the Autonomy Products, other than an Error Correction or a New Release, that (i) improves the function of, (ii) adds a new function to or (iii) substantially enhances the performance of an Autonomy Product, provided that Enhancements shall not include any improvements or new functions, in any form, that may be priced and offered separately from the Autonomy Products.

    (e) "End Users" shall mean third party entities for whom VAR provides Services in respect of Autonomy Products.

    (f) "Error Correction" shall mean a change to any Autonomy Product that allows such Autonomy Product to re-establish material conformity with the Documentation for such Autonomy Product.

    (g) "New Release" shall mean any revision of the Autonomy Products, other than an Enhancement or an Error Correction, for which the version or revision number of such Autonomy Product is increased by a whole number.

    (h) "Products" or "Autonomy Products" shall mean the software and associated products and materials specified in Exhibit A.

    (i) "Services" shall mean services provided to an End User by VAR which may include demonstration, pre-sales support, installation, customisation, training, maintenance and support services, and other consulting or integration of the Autonomy Products.

    "Term" shall have the meaning set forth in Section 14.

    (j) "Territory" shall mean the territory set forth in Exhibit A.

    (k) "VAR Program Fees" shall mean the VAR program fees specified in Exhibit C.

    1.2  References, Headings and Interpretation. In this Agreement and the Exhibits to this Agreement: (a) the Exhibits to this Agreement shall be incorporated into and deemed part of this Agreement and all references to this Agreement shall include the Exhibits; (b) references to any law, legislative act, rule or regulation shall include any changes, supplements, successors or replacements thereto; (c) the Section headings are for reference and convenience only and shall not be considered in the interpretation of this Agreement; and (d) in the event of a conflict between this Agreement and any of the Exhibits, the terms of this Agreement shall prevail.

2. **APPOINTMENT.** Autonomy hereby appoints VAR, and VAR hereby accepts such appointment, to act as Autonomy's non-exclusive reseller of Autonomy Products in the Territory.

3. **OBLIGATIONS OF VAR.**

    3.1  Performance. VAR agrees with Autonomy that VAR shall: (a) use commercially reasonable efforts to promote, market and sell Autonomy Products and Services to End Users within the Territory, and perform Services in connection therewith, all in accordance with the terms and conditions contained herein; (b) maintain a sufficient number of VAR's sales personnel, pre-sales and consulting personnel trained in the features and functions of the current version of the Autonomy Products to (i) solicit orders for the Autonomy Products from End Users; (ii) properly inform and demonstrate to End Users the features and capabilities of the Autonomy Products; and (iii) provide or arrange provision of pre- and post-sales technical assistance, service and support to End Users; (c) require VAR's sales, pre-sales, consulting

Autonomy VAR Agreement v2.0                                                    22090313
Page 1

FAST\42439484.2

and technical personnel to attend Autonomy's training classes as may be required by Autonomy; and (d) not make any representations, warranties, conditions or guarantees with respect to the specifications, features or capabilities of the Autonomy Products that are inconsistent with or in addition to those made by Autonomy in writing.

3.2 Territory and Customers. (a) The Autonomy Products may be marketed by VAR only in the Territory set forth on Exhibit A. (b) Autonomy reserves the right to sell the Autonomy Products directly to customers inside or outside the Territory.

3.3 Sales. (a) Except as otherwise provided in this Agreement, VAR shall assume all responsibility and liability to End Users with respect to the Autonomy Products. (b) VAR shall require each customer to enter into a standard software license agreement with VAR containing terms no less restrictive that those set forth in Autonomy's standard license agreement available at www.autonomy.com/content/EULA.

3.4 Advertising and Promotion. With respect to the promotion of the Autonomy Products: (a) VAR shall be responsible for all costs associated with VAR's promotional activity for the Autonomy Products. (b) All co-operative advertising activities shall be coordinated and approved by Autonomy in writing. (c) The parties shall discuss from time to time VAR's promotional and advertising plans for the Autonomy Products. VAR shall not publish, issue or display or authorize the publication, issuance or display of any advertisement or promotional materials relating to the Autonomy Products without Autonomy's prior written approval (which approval will not be unreasonably withheld, delayed or denied). Autonomy may supply Autonomy's own promotional and advertising materials to VAR for inclusion in VAR's own promotional and advertising materials for the Autonomy Products. (d) VAR agrees that Autonomy may refer to VAR and the Autonomy Products licensed by VAR's End Users with other Autonomy customers or prospective customers and that Autonomy may provide to third parties VAR's name and the names of End Users.

3.5 Marketing Plan. Within 30 days of the Effective Date, and on approximately a quarterly basis thereafter during the Term, VAR and Autonomy shall develop, mutually approve and update a "Joint Business Plan" for promotion of the Autonomy Products.

3.6 Business Practices. VAR agrees with Autonomy: (a) to conduct business in a manner which reflects favourably at all times on the Autonomy Products and the good name, goodwill and reputation of Autonomy; (b) to avoid deceptive, misleading or unethical practices that are or might be detrimental to Autonomy or the Autonomy Products, including but not limited to disparagement of Autonomy or the Autonomy Products; (c) to make no false or misleading representations with regard to Autonomy or the Autonomy Products; (d) to comply with all applicable international, national and local laws and regulations in performing its duties hereunder and in any of its dealings with respect to the Autonomy Products, including without limitation all import and export regulations; and (e) that VAR shall, in all correspondence, documents and applications concerning the Autonomy Products, identify the Autonomy Products as originating from Autonomy.

3.7 Expenses. Except as otherwise provided in this Agreement, each party shall bear the entire cost and expense of the performance of its obligations under this Agreement, including bad debt expenses, inventory losses, Autonomy Product returns, commissions and taxes.

3.8 Press Releases. Neither party shall make any public statement regarding this Agreement and the Autonomy Products without the other party's prior written approval, except to the extent required by applicable law, rule, regulation or order. Subject to the mutual agreement of the parties, within 30 days of the Effective Date, VAR and Autonomy shall issue a joint and mutually agreed upon press release relating to this Agreement. Each party further agrees to reasonably cooperate with and support the other party in its press release and publicity materials.

3.9 Leads. With respect to any Lead provided to VAR by Autonomy, VAR agrees not to market or sell any products competitive with the Autonomy Products to such Lead for the specific Lead opportunity identified and will promptly notify Autonomy if such prospect is considering purchasing a competitive product. "Lead" means a potential customer with whom VAR had contact as a result of the use of any Autonomy resource (human, financial, electronic or otherwise) that played a substantial factor in the introduction or sale of the Autonomy Products.

4. **OBLIGATIONS OF AUTONOMY.**

4.1 Initial Delivery. Autonomy will deliver to VAR one copy of each of the Autonomy Products (including the related Documentation). VAR may make additional copies of the Autonomy Products and Documentation only to the extent required for marketing, promotion, demonstration, training, support, maintenance, or development purposes and in accordance with Exhibit C and Exhibit D. Autonomy shall make available to VAR, at Autonomy's standard pricing (subject to an applicable discount to the extent set forth on Exhibit C), reasonable quantities of Autonomy's sales and technical brochures.

4.2 Training. Autonomy will provide fifteen (15) days of training to VAR at no charge, such training credit to be used by VAR within one hundred eighty days of the Effective Date of this Agreement. . Autonomy will make available to additional VAR training courses and related documentation available at Autonomy's discounted partner pricing.

4.3 Support. (a) With respect to VAR, Autonomy shall provide to VAR support and maintenance services for the Autonomy Products in accordance with its then-current support service policies for VAR's use in accordance with this Agreement. Those terms require support matters to be logged by VAR into, and initiated solely through, the Autonomy electronic helpdesk system (currently known as Automater). Autonomy will not be liable for any failures or delays arising

Autonomy VAR Agreement v2.0  
Page 2

22090313

FAST42439464 2

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01770708

as a result of VAR's failure to properly log tickets, nor shall any support provided despite such failure be a waiver of these terms. (b) With respect to End Users, all support of Autonomy Products to End Users shall be provided by VAR.

5. **ORDERS.**

   5.1 **Purchase Orders.** VAR shall submit to Autonomy a written purchase order for Autonomy Products and/or Services setting forth the information in Exhibit B hereto and, if requested, a copy of a signed End User License Agreement between the End User and VAR. Autonomy has the right to reject any purchase order prior to shipment and will endeavour to notify VAR in writing of such rejection. Once the Autonomy Products on a purchase order have been shipped by Autonomy, VAR may not cancel or amend the purchase order without the prior written consent of Autonomy. In the event of any conflict between the terms of a purchase order and this Agreement, the terms of this Agreement shall prevail. With respect to purchase orders relating to Services only, once submitted to Autonomy, VAR may not cancel or amend the purchase order without the prior written consent of Autonomy. Such purchase orders relating to Services only shall be subject to acceptance by Autonomy.

   5.2 **iShop Orders.** To the extent authorized by Autonomy in writing with respect to specified Autonomy Products distributable by VAR hereunder, VAR may elect to submit an order through Autonomy iShop Order online ordering system (each such order an "iShop Order"), subject to the following terms and subject to the terms of this Agreement:

   (a) iShop Orders are subject to Autonomy's acceptance, order procedures, and policies. Autonomy may evidence its acceptance of an iShop Order by delivery of the Autonomy Products specified therein.

   (b) Each iShop Order shall specify the name of the End User as well as address, telephone number, email address, and such other information as may be required by the iShop Order online ordering system for the completion of the applicable iShop Order form. VAR shall not be entitled to acquire Autonomy Products through submission of iShop Orders without a corresponding End User.

   (c) Each iShop Order shall be executed by VAR. Upon execution and submission thereof, each iShop Order shall constitute VAR's non-cancellable, irrevocable, and non-modifiable commitment to purchase from Autonomy the Autonomy Products specified therein. Prices set forth in an applicable iShop Order shall be in accordance with the terms of this Agreement.

   (d) Autonomy shall not be liable to VAR, End User, or any third party for its failure to fill orders submitted to fill orders submitted through the iShop order online ordering system, or for any delay in delivery of the Autonomy Products ordered thereby.(e)  Autonomy shall have no obligation to ship Autonomy Products ordered by VAR, through the iShop Order online ordering system or otherwise, if, upon such time as such order is received by Autonomy, VAR is otherwise in breach of its obligations under this Agreement.

   (f) For each iShop Order placed by VAR in which the aggregate fees due thereunder are in excess of One Hundred Thousand United States Dollars (US $100,000.00), VAR shall, in addition to submitting said iShop Order and upon Autonomy's request, provide Autonomy with a written purchase order or other written ordering document acceptable to Autonomy between VAR and End User, signed and dated by the End User, which lists the applicable payment terms, the Autonomy Product (including applicable number of licenses and any pertinent restrictions on use applicable thereto) to be supplied to End User, the total license fee, maintenance fees, and such other terms as Autonomy may request.

   (g) Any terms, conditions, or restrictions or the like submitted by the VAR through a purchase order, other ordering document, or otherwise, which conflict with any terms of this Agreement and the applicable iShop Order submitted by VAR hereunder, whether or not countersigned as accepted by Autonomy, shall not be binding on Autonomy, regardless of Autonomy's failure to object to such terms.

6. **PRICE; PRICING.**

   6.1 **Price to VAR.** All Autonomy Product licenses purchased by VAR from Autonomy shall be sold to VAR at the fees and/or discounts specified in Exhibit C. Autonomy reserves the right to change its prices, terms and conditions and such change will be effective thirty (30) days after notice to VAR of any such change.

   6.2 **Support Payments.** With respect to each End User, Autonomy shall issue an invoice to VAR for support annually in advance commencing on the first day on which the Product is delivered either to VAR or to the End User. Provided the End User is current in its payment of all Support Fees, the renewal rate shall be the previous year's rate plus an increase not to exceed the rate in increase of the Consumer Price Index for Urban Wage Earners and Clerical Workers ("CPI-W"), US City Average, All Items, for the 12 month period immediately preceding renewal of Support for which such data is available.

   6.3 **Pricing by VAR.** VAR is free to determine its own prices and per copy fees to End Users. Autonomy may from time to time publish suggested wholesale or retail prices and per copy fees, provided, however, that such prices and fees are suggestions only and VAR is and shall be free to determine the actual prices and per copy fees at which the Autonomy Product will be licensed to its End Users.

   6.4 **VAR Program Fees.** In consideration of VAR's payment to Autonomy of the VAR Program Fees, VAR shall be entitled to: (a) the license rights as set forth in this Agreement; (b) Autonomy support services; and (c) purchase

Autonomy VAR Agreement v2.0                                                                         22090313
Page 3

EAST\42439464.2

FOIA CONFIDENTIAL TREATMENT REQUESTED                                        HP-SEC-01770709

Autonomy training classes to be held at Autonomy training facilities. The VAR Program Fees shall be invoiced annually by Autonomy and shall be due within 30 days after the date of such invoice.

    6.5    **Support for Existing Autonomy EAS Customers.** Subject to Autonomy's acceptance of an applicable purchase order from VAR relating to purchase by VAR of support Services described in Section 4.3 above, VAR has the right to provide support to existing Autonomy customers with a valid license to use Autonomy's EAS Products. Such valid licenses may have been purchased by End User from Autonomy, VAR, or an authorized third party Autonomy reseller. Such support shall be purchased by VAR on an annual basis as described in Section 6.2, and VAR must be current on support from Autonomy in order to provide corresponding support to an End User. VAR will take first call and be responsible for first-line and second-line support and, for clarification and without expanding Autonomy's obligations pursuant to Section 4.3 above, Autonomy shall only provide third-line support, including any applicable Updates and patches to the Products. For calendar quarters Q2 and Q3 of 2009 or until new agreement supersedes this agreement, the amount payable to Autonomy from VAR for the support Services referenced in this Section 6.5 shall be fifteen percent (15%) of the total support and maintenance fee received by Autonomy or otherwise attributed by Autonomy in connection with the corresponding End User's original EAS license to be supported, subject to the Consumer Price Index calculation in 6.2. The parties shall agree upon the appropriate payment for any EAS support transactions after Q3 2009.

7.    **PAYMENTS.** (a) Upon receipt and acceptance of an order for the Autonomy Products, Autonomy shall deliver an invoice to VAR indicating the amount due for the Autonomy Products. (b) Charges set forth in such invoice shall be due and payable to Autonomy within 45 days of the date of Autonomy's invoice. (c) VAR shall not be relieved of its obligations to pay fees owed to Autonomy hereunder by the non-payment of fees by an End User. (d) After notice from Autonomy, balances past due shall accrue interest until paid in full at the lower of (i) 0.5% per month or (ii) the maximum rate permitted by law. (e) VAR shall be responsible for timely payment of all taxes (including without limitation, sales, value added and withholding taxes), fees import and export fees and duties arising from the performance by the parties of the terms of this Agreement, other than taxes based upon the net income of Autonomy, or VAR shall furnish Autonomy with appropriate tax exemption certificates.

8.    **SHIPPING.** Autonomy Products shall be shipped by means and on media agreed between the parties, and in the absence of agreement otherwise shall be ExWorks point of manufacture (per Incoterms 2000) and delivery may be electronic, such as via FTP. Autonomy may at its discretion make any Products, New Releases and Error Corrections available for downloading by VAR from Autonomy's web site. Autonomy shall not be liable for any delay in delivery or failure to give such notice of delay. VAR shall bear all expenses of physical shipment.

9.    **REPORTS, NOTICES AND AUDITS.**

    9.1    **Sales Reports.** VAR agrees to provide Autonomy from time to time (but no more frequently than monthly) as Autonomy may reasonably request, order and sales reports detailing its End Users (including contact names and shipping addresses), and Autonomy Products sold, prices, and revenue accrued for purposes of monitoring VAR's obligations under the terms of this Agreement.

    9.2    **Other Reports.** VAR shall furnish to Autonomy, at Autonomy's request, such periodic forecasts, budgets and promotional schedules as Autonomy may reasonably request. VAR will notify Autonomy in writing within five working days of any (i) knowledge of any claimed or suspected defects in the Autonomy Products; or (ii) knowledge of any claim or proceeding involving the Autonomy Products or (iii) (A) change in the management or voting control of VAR; or (B) transfer of all or substantially all of VAR's assets..

    9.3    **Records.** VAR shall keep and maintain full, true and accurate records containing all data reasonably required for the accurate verification of VAR's performance under the terms of this Agreement.

    9.4    **Inspection.** For the term of this Agreement and for a period of two years after the date of termination, VAR shall make available to Autonomy for inspection and copying, upon reasonable written notice, all books and records of VAR that pertain to VAR's performance of and compliance with its obligations, warranties and representations under this Agreement including, to the extent reasonably necessary, access to all facilities of VAR in which VAR performs its obligations under this Agreement.

10.    **SOFTWARE LICENSES.**

    10.1    **Grant of License to Resell Autonomy Products.** Subject to the terms of this Agreement, Autonomy hereby grants to VAR, during the term of this Agreement, a limited, nonexclusive, non-transferable right and license to distribute copies of the Autonomy Products to End Users.

    10.2    **Grant of License for Demonstration, Training and Project Development.** Provided that VAR has met the requirements set forth in this Agreement and Exhibits, Autonomy hereby grants to VAR a non-exclusive, non-transferable license to reproduce and use a reasonable number of copies of the Autonomy Products (except those that contain third party royalty bearing technology, of which Autonomy shall endeavour to notify VAR in writing) solely for (a) demonstrating the Autonomy Products; (b) providing training with respect to the Autonomy Products; (c) demonstrating the Autonomy Products at a prospective End User's site; (d) the development of VAR's internal expertise of Autonomy Products; and (e) the development, testing, support and delivery by VAR of Services to End Users.

FOIA CONFIDENTIAL TREATMENT REQUESTED                                                HP-SEC-01770710

10.3 License Exclusions. Except as provided in Sections 10.1 and 10.2, VAR shall have no rights in respect of any intellectual property rights owned or used by Autonomy or its licensors, including with respect to Autonomy Products, and VAR acknowledges that, except as expressly provided in this Agreement, it shall not acquire any rights in respect of them and that all such intellectual property rights are and shall remain vested in or controlled by Autonomy and its licensors. No other rights to Autonomy Products are granted by Autonomy to VAR, or may be granted by VAR to any third party. Specifically, but not by way of limitation, VAR shall not: (a) appoint third parties to market, sublicense or otherwise distribute the Autonomy Products, and neither VAR nor any of its employees, agents or representatives may manufacture, reproduce or sublicense (except as otherwise expressly permitted herein) the Autonomy Products, or distribute derivative works of the Autonomy Products; (b) except as required to be allowed by applicable law, modify, change, decompile, disassemble, reverse compile or reverse engineer the Autonomy Products without Autonomy's prior consent; (c) rent, electronically distribute or timeshare the Autonomy Products or market the Autonomy Products by interactive cable or remote processing services (provided, however, nothing herein shall be deemed to affect any distribution rights otherwise contemplated in that certain License and Distribution Agreement between the parties dated as of March 31, 2009); (d) use the Autonomy Products provided hereunder for its own internal purpose (unless otherwise specified herein); (e) use the Autonomy Products for the purposes of conducting comparative analysis, evaluations or product benchmarks without Autonomy's prior written approval; (f) provide the Autonomy Products to any person or entity other than a licensed End User of the Autonomy Products; or (g) do or authorize any third party to do any act which would or might invalidate or be inconsistent with any intellectual property rights of Autonomy and shall not do or authorize any third party to do any act which, by its omission, would have that effect.

11. **ENHANCEMENTS AND NEW RELEASES.**

11.1 Enhancements and New Releases. Autonomy will provide Enhancements or New Releases to VAR for inclusion in, or as replacements for, the Autonomy Products when and if such Enhancements or New Releases are generally made commercially available by Autonomy, so long as the required payments have been made under this Agreement. Upon the delivery of any such Enhancements or New Releases to VAR by Autonomy, each such Enhancement or New Release shall become part of, or replace the applicable Autonomy Products, for purposes of this Agreement.

11.2 Restricted Releases. If VAR receives any version of the Autonomy Products marked as alpha, beta or otherwise designated as a "Restricted Release": (a) VAR shall promptly report to Autonomy any error discovered in the Restricted Release; (b) Autonomy shall have no obligation to deliver Enhancements or New Releases for the Restricted Release; (c) Autonomy shall have no obligation to support the Restricted Release; (d) VAR shall provide Autonomy with appropriate test data for the Restricted Release if necessary to resolve errors in the Restricted Release encountered by VAR; (e) the Restricted Release shall be provided to VAR on an as-is basis with no warranty of any kind, express or implied, shall be deemed experimental and may contain errors; (f) neither party shall be responsible or liable to the other for any losses, claims or damages of whatever nature arising out of or in connection with the performance or non-performance of the Restricted Release; (g) VAR's use of the Restricted Release shall be for testing purposes only and shall not be related in any way to production applications or to VAR's delivery of Services to an End User; and (h) VAR shall not distribute the Restricted Release to third parties without the prior written consent of Autonomy.

12. **PROPRIETARY MARKINGS.**

12.1 License Grant. Subject to and conditioned upon VAR's compliance with the terms and conditions of this Agreement, Autonomy hereby grants to VAR a non-exclusive, non-transferable right to use within the Territory the Autonomy Trademarks, solely in conjunction with VAR's performance under this Agreement. Any reference to, or use of, the Autonomy Trademarks must follow Autonomy's trademark guidelines (which will be provided to VAR from time to time) and contain appropriate trademark notices. Upon termination of this Agreement, VAR will immediately cease all use of any Autonomy Trademark. The Autonomy Trademarks may not be altered by any party other than Autonomy.

12.2 Retention of Rights. Autonomy expressly reserves all rights not specifically granted to VAR hereunder. Without limiting the generality of the above, VAR expressly agrees that Autonomy retains all right, title, and interest in and to all of the Autonomy Trademarks. All use of the Autonomy Trademarks by Partner will inure to the benefit of Autonomy. VAR shall not at any time represent that it is the owner of the Autonomy Trademarks, shall not dispute the validity of the Autonomy Trademarks and shall not at any time register, or cause to be registered, in its name or in the name of any other person, or use or employ during or after the Term, any of the Autonomy Trademarks or any trademark, service mark, trade name, logo or design resembling or similar to any of the Autonomy Trademarks. VAR agrees to use the Autonomy Trademarks in advertisements, letterheads or otherwise only as may be approved in advance in writing by Autonomy.

13. **INTELLECTUAL PROPERTY RIGHTS.**

13.1 Limited Rights. Except as provided in Sections 10.1, 10.2 and Section 12, VAR shall have no rights, express or implied, in respect of any intellectual property rights owned or used by Autonomy in relation to the Autonomy Products, including copyright in the Autonomy Products, and VAR acknowledges that, except as expressly provided in this Agreement, it shall not acquire any such rights and that all such are and shall remain vested in or controlled by Autonomy.

13.2 Notification of Infringement. VAR will promptly inform Autonomy in writing of any infringement of Autonomy's intellectual property rights relating to the Autonomy Products or the Autonomy Trademarks coming to VAR's attention, or any claim coming to VAR's attention that the Autonomy Products or the Autonomy Trademarks infringe the intellectual property rights of a third party.

Autonomy VAR Agreement v2.0  22090313
Page 5

FAST/42439464.2

FOIA CONFIDENTIAL TREATMENT REQUESTED                                    HP-SEC-01770711

13.3　Maintenance of Rights. During the term of this Agreement VAR shall take all such steps at Autonomy's cost as Autonomy may reasonably require to assist Autonomy in maintaining the availability and enforceability of the intellectual property rights of Autonomy in the Autonomy Products or the Autonomy Trademarks.

## 14. TERM AND TERMINATION.

14.1　Term. The initial term of this Agreement shall commence on the Effective Date and continue until the first anniversary thereof, and automatically renew for a period of one year on the annual anniversary of the Effective Date (each one year period being the "Term"), unless (a) this Agreement is terminated earlier pursuant to this Section 14; or (b) either party notifies the other at least 30 days prior to the end of any one year term that such party does not desire to renew this Agreement.

14.2　Termination by Autonomy. Notwithstanding the provisions of Section 14.1, Autonomy may terminate this Agreement with immediate effect upon notice to VAR in the event that VAR attempts to assign this Agreement without the consent of Autonomy; or (b) there is a direct or indirect change in ownership or control or corporate reorganization of VAR including a sale, transfer or lease of all or any substantial part of its assets other than in the ordinary course of business.

14.3　Termination by Either Party. Either party may terminate this Agreement upon notice to the other party in the event that the other party (a) ceases conducting business in the normal course, (b) commits an act of bankruptcy, (c) is adjudicated bankrupt, (d) enters into liquidation, whether compulsory or voluntary (other than for the purposes of amalgamation or reconstruction), (e) has a receiver, administrator, administrative receiver, liquidator or manager appointed over all or any of its assets.

14.4　Termination for Default. If either party defaults in the performance of any of its material obligations (or repeatedly defaults in the performance of any of its other obligations) under this Agreement and does not cure such default within 30 days of receipt of a notice of default, then the non-defaulting party may, by giving notice to the defaulting party, terminate this Agreement as of the termination date specified in the notice.

14.5　Termination for Convenience. Either party may terminate this Agreement upon 60 days' prior notice to the other party. 14.6　Effect of Termination or Expiration. Upon termination or expiration of this Agreement: (a) VAR shall immediately cease (i) the advertising, promotion, resale and distribution of the Autonomy Products; (ii) using any of the Autonomy Trademarks; and (iii) promoting itself as a partner or associated with Autonomy; (b) all or part of any orders received from VAR which have not been shipped as of the date of termination or expiration, even if previously accepted, may be cancelled by Autonomy without liability to either party; (c) at Autonomy's option and request, and at VAR's expense, VAR shall immediately destroy or return to Autonomy all marketing and proprietary materials and any manuals or other technical documentation relating to the Autonomy Products and any and all other property of Autonomy in the possession or control of VAR; and (e) each party shall warrant to the other within five days of termination that all Confidential Information of the other party then in its possession has been destroyed or returned. Autonomy shall not be liable to VAR for damages of any kind, including incidental or consequential damages, on account of termination of this Agreement. Notwithstanding the foregoing, in this event this Agreement becomes terminated by Autonomy pursuant to Section 14.5 above, VAR shall have the right to continue to provide Services to End Users for a period of one (1) year following the date of such termination, solely to the extent required pursuant to the agreement between VAR and each such End User, and, to the extent necessary for fulfilment of such obligations, this Agreement shall remain in full force and effect until termination of said Services.

14.7　Rights. Termination of this Agreement shall not prejudice the rights of the parties, which may have arisen on or before the date of termination.

14.8　Discontinued Autonomy Products. This Agreement shall automatically terminate as to any Autonomy Product if Autonomy ceases to manufacture or sell such Autonomy Product.

## 15.　RELATIONSHIP OF THE PARTIES.
(a) During the Term, VAR shall act as an independent contractor and neither this Agreement nor the performance of any of the obligations under this Agreement shall be construed to constitute either party as an agent or legal representative of the other party for any purpose, nor shall this Agreement be deemed to establish a joint venture, partnership or any other legal entity. (b) Neither party will have, nor will it represent that it has, any power, right or authority to bind or commit the other party, or to assume or create any obligation or responsibility, express or implied, written or oral, on behalf of or in the other party's name, except as herein expressly provided.

## 16.　REPRESENTATIONS AND WARRANTIES.

16.1　By Autonomy. (a) Autonomy represents and warrants that (i) it has the right to license the Autonomy Products to VAR; and (ii) for a period of ninety (90) days from the date of shipment of the Autonomy Products to VAR or the applicable End User pursuant to this Agreement, the Autonomy Products will perform in all material respects with the Documentation provided by Autonomy for the Autonomy Products where the Autonomy Products are loaded onto suitably configured equipment and set up to process data in accordance with the Documentation for the Autonomy Products. (b) All warranty claims not made in writing or not received by Autonomy within the time period specified above shall be deemed waived. Autonomy's warranty and obligation is solely for the benefit of VAR and its End Users, who have no authority to extend this warranty to any other person or entity. (c) Autonomy shall have no liability under the warranty in Section 16.1(a) if the non-performance is attributable to (i) VAR's incorporation, attachment or otherwise engagement of any attachment, feature, program or device to the Autonomy Products, or any misuse, alteration or modification of the

Autonomy VAR Agreement v2.0　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　22090313
Page 6

FAST\42439484.2

FOIA CONFIDENTIAL TREATMENT REQUESTED　　　　　　　　　　　　　　　　　　　　　　　HP-SEC-01770712

Autonomy Products by VAR, or any part thereof; (ii) failure to provide a suitable installation environment; (iii) use of supplies or materials not meeting specifications; (iv) use of the Autonomy Products for other than the specific purpose for which the Autonomy Products are designed; or (v) use of the Autonomy Products on any systems other than hardware platforms specified by Autonomy for the Autonomy Products.

16.2 Disclaimer. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AUTONOMY DISCLAIMS ANY AND ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, WITH RESPECT TO THE AUTONOMY PRODUCTS, IMPLIED WARRANTIES OF QUALITY AND FITNESS FOR A PARTICULAR PURPOSE. AUTONOMY DOES NOT WARRANT THAT THE AUTONOMY PRODUCTS OR THE FUNCTIONS CONTAINED IN THE AUTONOMY PRODUCTS WILL MEET VAR'S OR ANY END USER'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION OR BE ERROR FREE.

17. **INDEMNIFICATION.**

17.1 Indemnity by Autonomy. Autonomy shall indemnify and hold harmless VAR from, and defend VAR against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any claim that any Autonomy Product or any Autonomy Trademark infringes any intellectual property right of any third party save that Autonomy shall not be liable for any such claim that arises as a result of (i) any modification of the Autonomy Product by VAR, or (ii) use of a superseded release of the Autonomy Product if the infringement would have been avoided by the timely implementation of an Error Correction or Enhancement supplied by Autonomy.

17.2 Indemnity by VAR. VAR shall indemnify Autonomy from, and defend Autonomy against, any damages, losses, liability (including settlements and judgments) or expenses (including attorneys' fees and expenses) arising out of or relating to any third party claim relating to VAR's negligence, misconduct, misrepresentation, or breach of this Agreement.

18. **REMEDIES AND LIMITATION OF LIABILITY.**

18.1 Remedies. In the event of any claim that the Autonomy Products are defective in breach of the limited warranty set forth in Section 16.1(ii) of this Agreement, Autonomy shall, at its discretion, repair or replace the defective Autonomy Products. Such obligation shall be Autonomy's sole and exclusive liability to VAR for any such claim and VAR's sole and exclusive remedy in respect such claim,

18.2 LIMITATION OF LIABILITY. EXCEPT (I) IN THE EVENT OF PERSONAL INJURY OR DEATH AS A RESULT OF NEGLIGENCE, (II) WITH RESPECT TO EACH PARTY'S OBLIGATIONS OF CONFIDENTIALITY, (III) WITH RESPECT TO VAR'S INFRINGEMENT, VIOLATION, OR MISAPPOPRIATION OF AUTONOMY'S INTELLECTUAL PROPERTY RIGHTS IN AND TO THE AUTONOMY PRODUCTS, OR (IV) WITH RESPECT TO ANY CLAIM FOR INDEMNITY UNDER THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE FOR, AND THE MEASURE OF DAMAGES SHALL NOT INCLUDE, UNDER ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, TORT STRICT LIABILITY OR OTHERWISE, ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF PROFITS OR LOSS OF BUSINESS) ARISING OUT OF OR RELATING TO AUTONOMY'S PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT. EXCEPT (I) IN THE EVENT OF PERSONAL INJURY OR DEATH AS A RESULT OF NEGLIGENCE, (II) WITH RESPECT TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS AND OBLIGATIONS OF CONFIDENTIALITY, (III) VAR'S INFRINGEMENT, VIOLATION, OR MISAPPOPRIATION OF AUTONOMY'S INTELLECTUAL PROPERTY RIGHTS IN AND TO THE AUTONOMY PRODUCTS OR (IV) WITH RESPECT TO ANY CLAIM FOR INDEMNITY UNDER THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY'S AGGREGATE LIABILITY TO VAR EXCEED THE TOTAL AMOUNTS PAID BY VAR TO AUTONOMY PRIOR TO THE DATE ON WHICH THE LOSS OR DAMAGE GIVING RISE TO THE CLAIM AROSE.

19. **CONFIDENTIAL INFORMATION.** The parties have imparted and may from time to time impart to each other certain Confidential Information (as defined below) and the parties may otherwise obtain Confidential Information concerning the business and affairs of the other pursuant to this Agreement. Each party agrees that it will use such Confidential Information solely for the purposes of this Agreement, and that it shall be held in confidence by the receiving party to the same extent in at least the same manner as such party protects its own confidential or proprietary information. Each party shall not disclose, publish, release, transfer or otherwise make available such Confidential Information, directly or indirectly, to any third party without the disclosing party's consent. For the purposes of this Agreement, "Confidential Information" shall mean all information and documentation of a party disclosed to or accessed by the other party in connection with this Agreement, including (a) all information of a party that is not permitted to be disclosed to third parties under local laws or regulations; (b) information relating to a party's customers, employees, technology, operations, facilities, markets, products, capacities, systems, procedures, security practices, research, development, business affairs and finances, ideas, concepts, innovations, inventions, designs, business methodologies, improvements, trade secrets, copyrightable subject matter, patents and other intellectual property and proprietary information; (c) the terms of this Agreement; and (d) any information developed by a party by reference to the other party's Information. Except to the extent that any applicable law provides otherwise, "Confidential Information" shall not include information that (a) is independently developed by the receiving party without violating the disclosing party's proprietary rights, as shown by the receiving party's written records; (b) is or becomes publicly known other than through unauthorized disclosure; (c) is disclosed by a party to a third party free of any obligation of confidentiality; or (d) is already known by the receiving party at the time of disclosure, as shown by such party's written records, and such party has no obligation of confidentiality other than pursuant to this Agreement or any confidentiality agreements entered into before the Effective Date.

Autonomy VAR Agreement v2.0  
Page 7

22090313

EAST\42438484.2

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01770713

20. **NOTICES.** Any notice required or permitted to be delivered hereunder shall be in writing and shall be deemed to have been effectively given: (a) immediately upon personal delivery or delivery by facsimile transmission with confirmation receipt; (b) two days after deposit with a commercial overnight courier with tracking capabilities, or (c) five days after being sent by first class pre-paid post or registered or certified mail, to the respective addresses of the parties set forth above. All transmissions shall be marked for the attention of the company General Counsel with copies to the respective Presidents and Chief Financial Officers.

21. **ASSIGNMENT.** VAR shall not, without the prior written consent of Autonomy, assign or transfer this Agreement or any amounts payable pursuant to this Agreement by any means, including without limitation by operation of law, change in control, merger, corporate reorganization or otherwise. Autonomy's consent to any assignment of this Agreement shall not constitute Autonomy's consent to further assignment. This Agreement shall be binding on the parties and their respective successors and permitted assigns. Any assignment in contravention of this subsection shall be void.

22. **WAIVER.** Failure or neglect by either party to enforce at any time any of the provisions of this Agreement shall not be construed as a waiver of either party's rights under this Agreement nor in any way affect the validity of the whole or any party of this Agreement nor prejudice either party's rights to take subsequent action.

23. **ENTIRE AGREEMENT; AMENDMENT.** This Agreement sets forth the complete and exclusive agreement between the parties with respect to its subject matter and supersedes any and all other written or oral agreements previously existing between the parties with respect to such subject matter. No alterations, modifications or additions to this Agreement shall be valid unless made in writing and signed by a Director or Officer of each party. The terms of any purchase orders or the like submitted by the VAR which conflict with any terms in this Agreement whether or not countersigned as accepted by Autonomy shall not be binding on Autonomy, regardless of Autonomy's failure to object to such terms.

24. **GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of the State of California and the United States without giving effect to principles of conflicts of law and the parties submit and consent to the exclusive jurisdiction in the state and federal courts in San Francisco, California.

25. **SEVERABILITY.** If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

26. **REMEDIES.** The parties agree that a material breach of this Agreement adversely affecting Autonomy's proprietary rights in the Autonomy Products may cause irreparable injury to Autonomy for which monetary damages may not be an adequate remedy and that Autonomy shall be entitled to seek equitable relief in addition to any remedies it may have hereunder or at law.

27. **NON-SOLICITATION.** Each party agrees that it will not, without the prior approval of the other party, directly or indirectly, solicit for employment any employee of the other party who becomes know to the other party in connection with the transactions contemplated by this Agreement, other than pursuant to general solicitations for employment not directed at the other party, at any time from the Effective Date until six months following the termination hereof.

28. **COUNTERPARTS.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one single agreement between the parties.

29. **SURVIVAL.** Section 1 (Definitions and Construction), Section 3.6 (Press Releases), [Section 4.3 (Support)], Section 7 (Payments), Section 9.3 (Records), Section 9.4 (Inspection), Section 13 (Intellectual Property Rights), Section 14.6 (Effect of Termination or Expiration), Section 15 (Relationship of the Parties), Section 17 (Indemnification), Section 18 (Remedies and Limitation of Liability), Section 19 (Confidential Information), Section 20 (Notices), Section 24 (Governing Law), Section 27 (Non-Solicitation) and Section 29 (Survival) shall survive any termination or expiration of this Agreement.

This Agreement shall be null and void and of no effect unless signed and returned by VAR to Autonomy on or before June 30, 2009.

Executed by a duly authorized signatory for each of the parties on the date set out above.

| AUTONOMY, INC | Capax Discovery LLC |
|---|---|
| Signed: | Signed: |
| Name: Andrew Kanter | Name: John Baiocco |
| Title: Company Secretary | Title: Managing Partner |

Autonomy VAR Agreement v2.0         22090313
Page 8

FAST\424394R4.2

FOIA CONFIDENTIAL TREATMENT REQUESTED                                    HP-SEC-01770714

EXHIBIT A

## SECTION 1: AUTONOMY PRODUCTS

| EAS Parent Server, Child Server and CAL Software (excluding EAS Entourage) |
|---|
| Aungate Investigator Software |
| Introspect EDD Software |
| Introspect Review and Production Software |
| EAS Software (including all authorized functionalities and client access licenses, but not including EAS Web Access and EAS Entourage |
| VideoLogger (provided solely for use in conjunction with the above software products, and for no other use) |
| Softsound (provided in English, solely for use in conjunction with the above software products, and for no other use) |

| Other Autonomy Products as may be offered to VAR for resale from time to time |
|---|

## SECTION 2: TERRITORY; OTHER RESTRICTIONS

| United States, Canada and EMEA |
|---|
| Without Autonomy's prior written consent, VAR will not resell the Product to an End User in any transaction that results in Autonomy receiving less than US $25,000.00 recognizable license revenue (in the aggregate) from such transaction. |

## SECTION 3: AUTONOMY LOGOS AND TRADEMARKS









Autonomy, Inc.®, Virage, Inc.®, Verity, Inc.®, Cardiff Software, Inc.®, Ultraseek®, ZANTAZ®, Meridio®, Interwoven®
Those product names as marked in this Exhibit A

Autonomy VAR Agreement v2.0　　　　　　　　　　　　　　　　　　　　　　　　　　22090313
Page A-1
FAST\42439484.2

FOIA CONFIDENTIAL TREATMENT REQUESTED　　　　　　　　　　　　　HP-SEC-01770715

**EXHIBIT B**

**FORM OF PURCHASE ORDER**

*Autonomy reserves the right to amend or replace this Purchase Order at any time upon 30 days prior notice to VAR.*

**PURCHASE ORDER**

[DATE]

From: [VAR]
[ADDRESS]

To: [AUTONOMY ENTITY NAME]
[AUTONOMY ENTITY ADDRESS]

This Purchase Order is issued under and pursuant to a Value Added Reseller Agreement dated [        ] entered into between Autonomy and VAR ("the Agreement").

The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement provided Autonomy has signed this Purchase Order accepting it. All other terms and conditions contained in the Agreement shall remain in full force and effect.

1. End User : [XX]
2. Software : [XX]
3. Languages : [XX]
4. Platform : [XX]
5. Number of Instances : One each of (1) above per server below
6. Number of Production Servers : [XX]
7. Number of Non-Production Servers : [XX] for development, [XX] for QA/testing, [XX] for backup/disaster recovery and [XX] for Failover/Distribution [to be used if end user is licensed failover/distribution above]
8. Number of Production CPUs : [XX]
9. Number of Developers : [XX]
10. Maximum Number of Documents : [XX]
11. Authorized Production Use : [ ] Intranet

[ ] Password-protected Extranet for _____ [ WHO CAN ACCESS]

[ ] On-Line Service

Restrictions:

[ ] Name of Application: _____

[ ] Application Description: _____

Other restrictions:

[E.G., LIMIT TO DIVISION/GROUP; TYPE OF USAGE; OTHER]

12. If Intranet or Extranet, Number of Users : [XX]
13. If On-Line Service, domain address and usage : www._____, for use solely for _____ [DESCRIBE]

Autonomy VAR Agreement v2.0
Page B-1
FAST\42439464.2

22090313

FOIA CONFIDENTIAL TREATMENT REQUESTED          HP-SEC-01770716

| | | |
|---|---|---|
| 14. If On-Line, will Licensee receive compensation for use | | [ ] Yes |
| | | [ ] No |
| 15. Territory of Software installation | : | [XX] |
| 16. Licensee Technical Support Contacts | : | Name: _____<br>Phone: _____<br>E-mail: _____ |
| | | Name: _____<br>Phone: _____<br>E-mail: _____ |
| 17. License Fee | : | [XX] US Dollars, invoiced immediately |
| 18. Support Fee (first year) | : | 12.5% of License Fee per annum, first year to be invoiced immediately and thereafter to be invoiced annually on each anniversary of the Commencement Date |
| 19. License and Support Fee Payment Terms | : | 30 days from date of invoice |
| 20. Delivery Address | : | Shipped ExWorks point of manufacture (per Incoterms 2000) via electronic delivery, or hard copy to: _____ |
| 21. Commencement Date | : | On Effective Date |
| 22. Expiry Date | : | [XX], subject to termination pursuant to Agreement |

Applicable Definitions:

**CPU:** a single core central processing unit on a computer.

**Developer:** an individual employed and authorized by Licensee to Use and access the functionality of the Development Software for purposes of developing or administrating the Application, regardless of whether the individual is actually using or accessing the Software at any given time.

**Development Software:** the tool and other portions of the Software which are used to incorporate the Run-Time Software in the Application and enable the Run-Time Software to provide the applicable functionality within the Application.

**Documents:** a document section or page from a multi-paged or single paged document (e.g., a page in .pdf or .doc document) that is no more than 4096 characters in size.

**Non-Production Use:** development, quality assurance, testing, and disaster recovery usage.

**On-Line Service:** any dial-up, remote access, interactive, Internet-based or other on-line service or World Wide Web site supported by one or more servers.

**Production Use:** live or fail-over usage for commercial, business or production purposes.

**Run-Time Software:** the portion of the Software which must be incorporated in an Application to execute the search, retrieval and other functionality of the Software.

**Servers:** computing devices acting as a server for a network of interconnected computing devices, whether within an enterprise or other Web, intranet or internet environment, upon which the Product may be installed or accessed.

**User:** an individual authorized by Licensee to use or access the functionality of the Product, regardless of whether the individual is actually using or accessing the applicable Product at any given time.

VAR signature  _____

Name           _____

Title          _____

Date:          _____

Order Accepted by Autonomy  _____

Date           _____

Autonomy VAR Agreement v2.0            22090313
Page B-2
FAST\42439464.2

FOIA CONFIDENTIAL TREATMENT REQUESTED                                    HP-SEC-01770717

## EXHIBIT C

### SECTION 1: AUTONOMY VAR PROGRAM FEES

The fee payable pursuant to Section 6.4 is $20,000.00 annually; provided, however, such fee shall be waived for the first year of the Agreement. Thereafter, such fee may be waived by Autonomy with Autonomy's written consent and approval. VAR Program Fees are hereby waived.

### SECTION 2: SUBLICENSE FEES

Pursuant to Clause 6.1 the price discount (off of Autonomy list price) to VAR shall be as follows: 10%.

### SECTION 3: TRAINING

VAR may purchase training services from Autonomy at a discount of 20% off of Autonomy's standard rates during the first year of this Agreement, and at Autonomy standard rates thereafter.

FOIA CONFIDENTIAL TREATMENT REQUESTED                                HP-SEC-01770718