# EXHIBIT 3

```
 1  A.  I don't know. I don't know if I explicitly did that.
 2  Q.  Well, we can come back to that also.
 3        In the next paragraph:
 4        "Mr Egan, at all times, tried to ensure that the
 5      finance team was fully aware of all details of
 6      transactions in which he was involved ..."
 7        Did you tell the finance team about the fact that
 8      there were, on your evidence, side agreements or
 9      pretextual emails?
10  A.  I did not.
11  Q.  So that statement was a lie, wasn't it?
12  A.  It was not. At that time I believed that statement to
13      be accurate and I signed off on it. I did not think of
14      the pretextual emails or some of the oral agreements as
15      side letters at the time.
16  Q.  So you didn't regard what you've described as oral
17      arrangements in your witness statement as constituting
18      side letters; is that correct?
19  A.  Could you say that again? I didn't follow you.
20  Q.  I think your evidence is that you made various oral
21      agreements which you've described in your witness
22      statement; is that correct?
23  A.  I did make various oral agreements and yes they are
24      described in my witness statement. And just to be clear
25      about this question that you're asking, some of those
```
                                  13

```
 1      were disclosed and discussed with members of the finance
 2      department, but not all of them.
 3  Q.  Which members of the finance department do you say you
 4      discussed them with?
 5  A.  At a minimum, for instance -- I don't remember the
 6      detail of each one, but at a minimum Steve Chamberlain
 7      and Sushovan Hussain.
 8  Q.  Do you say anyone else?
 9  A.  Not that I can recall.
10  Q.  Now, those agreements that you've referred to in your
11      evidence, are you saying that when you wrote this letter
12      or when your lawyers wrote this letter in November 2013
13      you did not regard those as side agreements?
14  A.  Yes. Side letters, side agreements.
15  Q.  And the reason for that is that you didn't think that
16      they had any effect; is that right?
17  A.  I didn't think they were binding. They had been done
18      explicitly with Sushovan's approval and following his
19      process, so I just didn't think that they were side
20      letters as defined in that which should not be done.
21  Q.  We'll come to look at some of those in due course.
22        Throughout this very long process that you've been
23      involved with, with lots of lawyers, your lawyers have
24      been Ramsey & Ehrlich, is that right?
25  A.  That's correct.
```
                                  14

```
 1  Q.  When were they first engaged by you?
 2  A.  I don't recall the exact date.
 3  Q.  Obviously some time before 18 November 2013?
 4  A.  I don't know that that's obvious, sorry.
 5  Q.  Sorry, I only say that because --
 6  A.  I'm not aware of the chronology quite as well.
 7  Q.  I'm sorry, I interrupted.
 8  A.  Oh, because of this letter: yes. Sorry.
 9  Q.  So some time before that?
10  A.  Correct, yes.
11  Q.  Now you've seen that date, do you think it was quite
12      a long time before that?
13  A.  I believe it was -- so I can give it to you better with
14      respect to milestones. I met with HP lawyers a number
15      of times, three or four times and I think some time
16      within 60 days or 90 days after that, because they
17      recommended that I do engage a lawyer, I had rung up and
18      engaged Ramsey & Ehrlich.
19  Q.  Okay, so that was probably fairly early in 2013?
20  A.  I believe so. I just don't have that date handy.
21  Q.  Thank you.
22        Have their bills been paid by HP?
23  A.  They have.
24  Q.  Including the bill for dealing with this Air Force
25      letter?
```
                                  15

```
 1  A.  All bills --
 2  Q.  All bills, including --
 3  A.  -- so yes.
 4  Q.  Right. Did HP pay your lawyers for dealing with the DoJ
 5      when you entered into the deferred prosecution agreement
 6      with them?
 7  A.  They did.
 8  Q.  Have you entered any sort of agreement with HP to
 9      cooperate with them?
10  A.  I have not.
11  Q.  Why do you think that HP are prepared to pay your
12      lawyers' fees?
13  A.  My understanding is that via some agreement they were
14      bound to pay the legal fees of most of the Autonomy
15      executives, I think barring the situation where they
16      might actually be in conflict with the individual. My
17      understanding was that, as it stood, as legal matters
18      arose, they were obligated to pay and they would have to
19      work hard to not pay.
20  Q.  Right. What, even if the employee had been involved in
21      a fraud, are you saying that HP still had to pay?
22  A.  I'm not saying that, I'm just saying that my
23      understanding was they were obligated to pay the legal
24      bills of various Autonomy personnel excepting when they
25      had reason to not and then they would have to go through
```
                                  16