# EXHIBIT 8

| | |
|---|---|
| **From:** | Anderson, Antonia <antonia.anderson@hp.com> |
| **Sent:** | Tuesday, January 21, 2014 1:39 AM |
| **To:** | jhine@uk.ey.com |
| **Cc:** | mbutler1@uk.ey.com; dhales@uk.ey.com; Yelland, Christopher <chris.yelland@hp.com>; Miskin, Andrew <andrew.miskin@hp.com> |
| **Subject:** | Revenue memo |
| **Attach:** | Application of revenue policies and work performed - revised structure - current.docx |

Hi Jacqui,

Revised memo attached with your responses to your comments.

Thanks

Antonia

Antonia Anderson

Director of Revenue

Autonomy, an HP company

MLAT_AU 00074679

Cambridge Business Park

Cowley Road

Cambridge

CB4 0WZ

antonia.anderson@hp.com

Direct tel: 01223 488580

Fax: 01223 448040



# Application of revenue policies and work performed

## Contents

Introduction ........................................................................................................................... 3

Executive summary ............................................................................................................... 4

1    Application of revenue policies ...................................................................................... 9

    1.1    License revenue ...................................................................................................... 9

    1.1    Support revenue ..................................................................................................... 9

    1.1.1    Support rates ..................................................................................................... 9

    1.1.2    Support and warranty terms .......................................................................... 10

    1.2    Payment terms ..................................................................................................... 11

    1.3    Hardware sales: Gross vs. Net & Accounting for Associated Costs .................... 11

    1.4    Professional services ............................................................................................ 12

    1.5    Solution deliverables ............................................................................................ 12

    1.6    Managed services and hosting .............................................................................. 13

2    Errors identified ....................................................................................................... ~~15~~14

3    Work undertaken to review accounting for revenue transactions in 2011, 2010, 2009 & earlier ................................................................................................................................. 18

    3.1    License revenue .................................................................................................... 20

    3.2    Support and Maintenance ..................................................................................... 26

    3.3    Hosted and managed service revenue .................................................................. 27

    3.4    PS revenue ............................................................................................................ 27

    3.5    Hardware resale .................................................................................................... 30

    3.6    Assurance gained from other procedures ............................................................ 31

    3.6.1    Global review of credit notes, provisions and bad debt expense ..................... 31

    3.6.2    Review of 2009 global debtors ......................................................................... 32

    3.6.3    Review of Deloitte Audit Committee Reports .................................................. 33

    3.6.4    Post balance sheet events ................................................................................. 33

    3.6.5    Alignment with Morgan Lewis and other parties ............................................ 33

4.    Resellers ................................................................................................................... 35

5.    Reciprocal deals ...................................................................................................... 39

6.    Collectability ........................................................................................................... ~~43~~42

7.    Managed Services and hosting contracts ................................................................ ~~46~~45

8.    Solution deals (Red projects) .................................................................................. ~~49~~48

MLAT_AU 00074681

9.   Transfer Pricing........................................................................................... 51~~50~~

10.   Acquisitions.............................................................................................. 55~~54~~

Appendix A Reference to supporting documents ................................................. 59~~58~~

MLAT_AU 00074682

## Introduction

HP legal have engaged external counsel Morgan Lewis, and forensic accountants PwC to investigate a number of transactions from the pre-acquisition period. The current Autonomy finance team have also conducted investigations. This work has highlighted inappropriate accounting for revenue transactions. The misstatements are sufficiently large that those that fall in the 2010 financial year will be corrected as a prior period adjustment. FY 2011 draft financial statements will be amended as appropriate.

From the review of revenue contracts, it is clear that all the prior year adjustments are as a result of misstatements rather than through any changes to policies.  The policies have not changed although the policy wording has been made more consistent with other UK HP entity accounts.

The first section of this document explains the detailed application of the revenue accounting policies described in the financial statements and set out in "Autonomy - Accounting issues and proposed resolutions".

The second section explains the nature of the errors identified and the adjustments made.

The remaining sections sets out the work undertaken to materially address the misstatements related to revenue recognition for FY10 and FY11 (including the opening 2010 balance sheet and summarizes the adjustments found.

As a result of the work described in this memo it is concluded that adequate work has been done to address the risk, risk of residual error is low and adjusted revenue is reasonably stated.

MLAT_AU 00074683

## Executive summary

In June 2012, following the departure of the previous key directors in May 2012, the Autonomy finance team started a review into certain revenue accounting matters relating to pre-acquisition sales contracts. A rebasing exercise was performed which reached preliminary conclusions on all deals with over $1m of license revenue recognized upfront, the impact of cleanup bookings made by Autonomy during Q3 11 (the 'dark period') and cleanup bookings made by HP during FY12 related to 2011 and prior as well as the red project report.  Around the same time HP's legal counsel, Morgan Lewis, engaged PWC to review a sample of revenue contracts from the pre-acquisition period between 2009 and 2011. The finance team's review has resulted in identification of significant adjustments all of which have been treated as correction of error.

A risk based approach has been taken and on the basis of work done, management consider that all significant errors have been identified and corrected. Although some residual risk may remain due to the nature of reasons for the original misrepresentations and may be uncovered through the ongoing investigation, the combination of specific contract reviews as well as review of post contract issue indicators such as subsequent payment issues or credit notes, customer settlements and red project status is considered by the finance team to mitigate the residual risk of significant unidentified adjustments.

Therefore, as a result of the work described in this memo it is concluded that adequate work has been done to address the risk, risk of residual error is low and adjusted revenue is reasonably stated.

## Overall Context

The scale of revenue misrepresentation, the centralised management and accounting control environment, and the fact patterns behind the deals investigated together indicate that the accounting improprieties in revenue related matters were pervasive and with high involvement of senior management. The nature of the software business also lends itself to relatively easy manipulation of transactions in order to accelerate and/or falsely report revenue. Revenue and revenue related transactions were therefore considered the highest risk area for financial misstatement. As Autonomy was a highly centralised globally managed business with centralised revenue finance decision making, the revenue work has been primarily considered on a global basis with the impacts on ASL through the inbound transfer pricing from other sales subsidiaries being considered as a follow on consequence.

## Reported and adjusted results

**Autonomy Group Revenue 2010 and 2011 (pre-adjustment and post adjustment)**

|  | Reported revenue $'000 | Adjustments $'000 | Adjusted revenue $'000 | Reported revenue $'000 | Adjustments $'000 | Adjusted revenue $'000 |
|---|---|---|---|---|---|---|
| License | 394,537 | (180,820) | 213,716 | 333,967 | (87,296) | 246,671 |
| Hardware resale | 105,557 | - | 105,557 | 88,421 | - | 88,421 |
| S&M | 209,304 | (265) | 209,039 | 185,967 | (1,488) | 184,479 |
| Services | 65,451 | (820) | 64,631 | 40,042 | 2,030 | 42,072 |
| Hosting | 95,513 | 24,423 | 119,936 | 135,951 | 29,227 | 165,178 |
| TOTAL | 870,361 | (157,482) | 712,879 | 784,348 | (57,527) | 726,821 |

MLAT_AU  00074684

The UK entities, in particular ASL, are impacted by global revenue and cost recognition.  Under the transfer pricing (TP) arrangements the majority of the overseas revenue, net of costs and a commission, is returned to ASL. As a result of the work performed, adjustments to decrease 2011 global revenue by $57.5m have been calculated (2010: $157.5).

The tables below show ASL revenue pre and post adjustment in 2010 and 2011. The total adjustment impacting ASL revenue in 2011 was £49.0m which was made up of £7.6m adjustment to direct revenue and £41.4m adjustment to transfer pricing income. Direct revenue adjustment of £2.4m and transfer pricing related adjustments of £76.9m were also made to opening ASL reserves in 2010.

**ASL 2011 revenue**

|  | 2011 (pre-adjustments) £'000 | Adj £'000 | 2011 (post-adjustments) £'000 |
|---|---|---|---|
| Licence | 32,224 | (8,013) | 24,211 |
| S&M | 9,405 | (532) | 8,872 |
| Services | 8,458 | 906 | 9,364 |
| TP | 72,449 | (41,382) | 31,067 |
| **Total Revenue** | 122,536 | (49,022) | 73,514 |

**ASL 2010 revenue**

|  | 2010 (pre-adjustments) £'000 | Adj £'000 | 2010 (post-adjustments) £'000 |
|---|---|---|---|
| Licence | 47,603 | (21,035) | 26,568 |
| S&M | 8,141 | (192) | 7,949 |
| Services | 4,683 | (472) | 4,211 |
| TP | 115,206 | (75,708) | 39,498 |
| **Total Revenue** | 175,632 | (97,407) | 78,225 |

### Nature of misstatements

The adjustments arose from the correction of errors in the following areas:

| Description | Explanation |
|---|---|
| Accelerated VAR deal (including both those that were reciprocal and those with no reciprocal element) | This relates to deals where revenue was recognized at the point the deal was signed with a VAR but there is evidence at that time that all criteria for rev rec had not been achieved at that point in time which leads to these adjustments constituting an error. |

MLAT_AU 00074685

| | The circumstances on each specific deal varies but from a high level the error was caused by the following:<br><br>• Financial strength of reseller not sufficient to pass collectability test without being contingent on end user being signed and paying.<br>• Collectability not assured due to significant outstanding debtors with VAR<br>• Previously established history of refunding the VAR, either through crediting invoices or through a reciprocal purchase. Any deals should have been deferred until end user deal was signed and/or cash receipt to confirm that deal was full and final.<br>• Continued management involvement beyond signing of reseller deal<br>• Side letters in place protected reseller from risk the end user deal would not materialise<br>• Delivery had not been made to reseller at point of rev rec<br><br>Pervasive issues have been found in this area in all periods reviewed (2009, 2010 and 2011). In general the presumption that risks and rewards have transferred to these resellers in accordance with the form of the contract was not valid throughout the accounting periods in question. |
|---|---|
| Reciprocal - non VAR | Deals identified where there was an associated refund via a 'purchase' from the customer, or a barter agreement where the revenue transaction is not considered to have real separable commercial substance. In these cases both the sale and purchase were negotiated contemporaneously and were therefore linked from the outset. |
| Collectability | Deals where there is evidence from the time of revenue recognition that collectability was not probable at the time of the deal. Whilst some of these were identified through a review of bad debt write offs, the circumstances at the time of the sale indicate that the initial revenue recognition was wrong. |
| Solution Deliverables | Deals where license was recognized upfront despite not meeting criteria for accounting as a separate element due to significant customisation of software being required to meet the deliverable and/or scope of deliverables being so vague as to render any estimate cost to complete unreliable. |
| Upfront hosting license revenue | Deals where license was recognized upfront despite not meeting criteria for accounting as a separate element due to either the license not being separable from the hosted service or the fair value of the hosted service not being reliably estimated. |
| Other | Various other non-pervasive causes of error including:<br><br>• Deals where revenue was recognized in advance of delivery to customer |

MLAT_AU 00074686

| | <ul><li>Onerous warranty clauses – revenue should be deferred until the warranty has expired.</li><li>Additional carve out should have been calculated to cover existing support stream.</li><li>Revenue accrued without contractual support and without meeting the rev rec criteria</li></ul> |
|---|---|

## Work done

Extensive revenue review has been carried out. 83% of UK license revenue has been subject to specific review and of the non-UK license revenue recorded in 2011 arising on deals of value greater than $100k, 84% (2010: 75%) has been subject to review or testing of some form.

All deals with over $1m of upfront license revenue have been reviewed. The initial review identified deals that exhibited risk factors that had been identified through a combination of the initial rebasing work, Morgan Lewis/PWC's investigation work (including formal report outputs and review of interview summaries) and from our work done on UK revenue. The risk factors included deals via resellers, deals linked to software purchase ((or in some cases other purchases eg consultancy) from the customer or reseller or license + hosting contracts where license was recognised upfront. It is reasonable to assume that the same risk areas would be present globally due to the same revenue control environment and management team being in place worldwide and as management override is the cause for many of the errors found.

The deals categorised as high risk, of which there were 29, totalled £67.5m of the £110m revenue. For these deals we reviewed the contracts, accounting entries and cash receipts. The remaining deals were categorised as low risk (using the same criteria), as they were typically direct sales with known end users. For these types of deals it would be expected that any significant issues would manifest themselves in non-payment in the form of credit notes or subsequent bad debt write offs. We therefore relied upon complimentary work done, to address residual risks in the remaining revenue of £42.5m. This work was done on a global basis covering both UK and non-UK deals.

Complimentary work was performed to identify any residual risk in license, PCS, hosting or professional services revenue and included review of the clean-up in the dark period of global bad debts and credit notes over $100k and beyond the dark period of global bad debts and credit notes over $500k. During the dark period (July – September 2011) Autonomy raised credit notes of $73m and bad debt write offs and provision increases of $43m which included clean-up of items back to 2009 and prior.  In addition, reviews of global accrued income balances at period end over $100k and ongoing global red report of solution deals and legal provision report were performed. This complimentary work has provided comfort that material issues in low risk large deals and smaller deals in general have been identified and adjustments recorded where the conclusion on the original revenue recognition position is inappropriate. This complimentary work found relatively few additional issues as the majority of the issues related to dark period clean-up had already been identified through specific large deal reviews.

Deals below $100k in licenses have not been reviewed as they are considered low risk. The senior management were only involved in larger deals whilst the small deals are subject to less specific

negotiation and are therefore more standard (with an on line self service system even being used for an element of the business).  We have identified only minimal issues in deals under $100k through the preparation of documents and evidence to support EY's sample testing in the UK which supports the reasonableness of our conclusion on a global basis. The risk of fundamental errors in the US on small deals is therefore considered to be low and, given that this represents high volume low value business, any errors are likely to be offsetting between periods.

Other than the resulting impact to non license revenue from misrecognition of the license element of a contract, the risk of misstatement in other annuity type revenue streams is considered low with limited opportunity to misstate support or Saas type revenue on annuity contracts and only small error rates found in the UK detailed testing of these contracts.

Impacts of pre 2010 inappropriate revenue recognition have been addressed through review of large deals from 2009 (i.e. deals >$1m license revenue) review of all debtors over $500k for subsequent payment as an indication of revenue issues and balance sheet review for purchased software as this was where reciprocal deals typically capitalised the refund.

Following this review and resulting adjustments, the finance team consider that revenue is reasonably stated; sufficient review has been performed to conclude that the accounts are fairly stated with respect to revenue and that there are no accounting estimates that give risk to significant risks.

## Remaining uncertainties

Pwc's investigation work is ongoing and is likely to be ongoing at the time the accounts are signed. Investigation work by Morgan Lewis and other parties is also likely to continue for the foreseeable future and there is therefore a risk that until these investigations are concluded, further adjustments may be identified which could impact the periods for which these financial statements are prepared.

Due to the extensive revenue review carried out by the Autonomy finance team, the ongoing investigation is not considered to affect our conclusion as to whether we can prepare accounts in accordance with the CA2006. There are no specific areas where we would expect the investigation to find new or conflicting areas of adjustment, however, due to the scale of the issues found, potential regulator action and importance to the company, it must be considered to be a significant uncertainty requiring disclosure.

**Commented [DH1]:** A: What is now ongoing on revenue?
AA this wording is taken from the agreed wording in the 19 point memo. Not considered necessary to create revised wording in this doc.

**Commented [DH2]:** A: Need to be clear on what is relevant for the audit and what is to support the ongoing case.
AA this wording is taken from the agreed wording in the 19 point memo. Not considered necessary to create revised wording in this doc.

**Commented [DH3]:** A: Refinement of wording? AM updated wording available?
AA this wording is taken from the agreed wording in the 19 point memo. Not considered necessary to create revised wording in this doc.

MLAT_AU  00074688

# 1    Application of revenue policies

Prior to acquisition by HP, the Autonomy Group prepared Group financial statements under International Financial Reporting Standards ("IFRS") and prepared individual UK subsidiary accounts under UKGAAP. Following acquisition (October 2011), the general ledger has been maintained under US GAAP and HP Group accounting policies. The policies are described in largely the same way in both the 2010 and 2011 statutory accounts. The application of accounting policies in each area is discussed below.

*For each revenue stream, revenue is not recognised unless and until the below criteria are met:*

- *Persuasive evidence of an agreement with a customer exists, being a signed contract or purchase order;*
- *Delivery of the software has taken place, in accordance with the contract;*
- *Collectability of the consideration is probable; and*
- *The fee has been contractually agreed and is not subject to adjustment or refund.*

*If an acceptance period is required, turnover is recognised upon the earlier of customer acceptance or the expiration of the acceptance period. Until acceptance is received revenue is deferred.*

## 1.1    License revenue

In the case of license revenue it is recognized when risks and rewards have been transferred which is at the point in time when the above four criteria have been met.

## 1.1    Support revenue

*Turnover from customer support and maintenance is recognised rateably over the term of the support period.*

*If customer support and maintenance is included free or at a discount in a license agreement, as part of a multiple element arrangement, these amounts are allocated out of the license fee at their fair market value based on the value established by independent sale of the customer support and maintenance.*

### 1.1.1    Support rates

Support rates are discussed in more detail in the memo "PCS". In the pre-acquisition period the rates for the support offerings were as follows:

|  | US | Non-US |
|---|---|---|
| First line | 14.4-21.6% | 12-18% |
| 2nd line/OEM | 7-13% | 7-13% |
| >$1m (new) | 5% | 5% |

MLAT_AU  00074689

| | | | |
|---|---|---|---|
| >$1m (premium) | | 10% | 10% |

Fair value of PCS in 2010 and 2011 has been evidenced by the majority of new deals being transacted at the relevant rates and renewals generally being priced at that same percentage. PCS has been shown to be profitable at these rates and profit to be in line with industry norms which further supports fair value is reasonable.

### 1.1.2    Support and warranty terms

*Support*

Non-standard support under US GAAP causes associated license revenue to be recognized ratably because VSOE is only established for standard support and therefore only when standard support is sold can license revenue be separated and recognized upfront.

However, pre-acquisition Autonomy reported its group consolidated accounts under IFRS and its UK subsidiary accounts under UK GAAP. Therefore as we are using fair value under UK GAAP, deviations from standard support do not cause an issue except when the non-standard terms create a contingency or fair value cannot be established. (UK GAAP defines fair value  as the amount at which goods or services could be exchanged in an arm's length transaction between informed and willing parties, other than in a forced or liquidation sale).

Any contingencies that arise as a result of non-standard support terms need to be accounted for.

**Example:** GCPD is a contract that has significant non-standard support including:

1) On-site resource between hours of 9:00-17:00 Monday to Friday (excl UK holidays).  For one site.
2) Out of hours standby call out service to provide on-site support within 2.5 hours. For one site.
3) Response and resolution times with service level credits of £1k payable per day for failure to meet (capped at 10% of the annual support fee) – no adjustment made as considered immaterial and applied to the next quarterly period.

The contract effective date was 30 September 2010, however, the support fee began from 1 Jan 2011 and therefore 3 months implied support was carved out. No further adjustments were made. This was because additional fees were charged for the onsite and out of hours resource – the fees were reviewed in comparison with the time effort required to provide each of these and the salary levels of individuals involved. On this basis the additional fees charged appear reasonable because they recovered costs plus a reasonable margin. The service level credits were not adjusted because the maximum credit available was considered immaterial and is also applied to the next quarterly period fees.

*Warranty*

No accrual has been made for standard warranty provisions as based on history of warranty claims (per the legal team, only two claims noted) the amount would be immaterial. As we are using fair

MLAT_AU  00074690

value under UK GAAP, deals with non-standard warranty terms are adjusted where they are deemed to create a contingency because any potential liability relating to the warranty cannot be estimated (based on the complex nature of the non-standard terms) and therefore revenue is deferred until the end of the warranty term because this contingency cannot be measured. **Examples:** Play Ltd is a contract that includes significant additional warranties, breach of which could result in Autonomy being required to provide additional software, hardware or reconfiguration. Credit Agricole is a contract that in addition to significant additional warranties gives the customer the right to terminate the agreement for refund if Autonomy has not satisfactorily repaired/replaced it within 45 days. For both of these contracts, revenue has been deferred until the warranty period has expired.

### 1.2    Payment terms

Prior to HP acquisition, Autonomy regularly entered into license transactions with payment terms exceeding 90 days. Through our reviews we have found cases of poor collectability and subsequent write offs. This therefore raises questions over the initial assessment of collectability at the outset of the deal. HP has a policy that license revenue transactions with payment terms greater than 90 days must be accounted for on a cash receipt basis. This is an HP group policy and is not a requirement of UK GAAP. However a pragmatic approach is needed and subsequent write off has been used as a guide to identifying deals where revenue may have been inappropriately recognized. We have therefore reversed revenue on deals where the debt was subsequently written off where there were also signs at the outset of the deal that collectability was not assured. There are class examples where the circumstances are pervasive across a region where this approach has been taken such as Latin American and Italian resellers where there was poor history of collecting debts in this region. There are also specific examples such as Knowledge Capital Corp detailed later in the memo (Collectability section).

### 1.3    Hardware sales: Gross vs. Net & Accounting for Associated Costs

A number of hardware pass through transactions were entered into between 2009 and 2012. Typically Autonomy acted as an intermediary between the OEM and the End User, sometimes with additional channel partners also being present in the sales chain either between the OEM and Autonomy, or between Autonomy and the final customer and hardware was sold at a loss. Each of these transactions except one involved Autonomy Inc . One transaction was contracted through Autonomy Systems Limited as it was for a UK location of JPMC.

A number of questions arise from these transactions.

1) Should these transactions be recorded "Gross" or "Net" i.e. do they qualify as revenue under UK GAAP
2) Treatment of linked hardware costs

While the total number and value of hardware transactions in the UK is very small (£300k), the number and value in the US is much more significant and consequently has the potential to make a significant impact on the UK financial statements due to transfer pricing.

1) Gross vs. Net Assessments.

Under UK GAAP there is limited specific revenue recognition guidance. FRS 5 does provide some guidance but this is not as extensive, as for example revenue recognition under US GAAP.

The application note to FRS 5 describes revenue as "the revenue resulting from exchange transactions under which a seller supplies to customers the goods or services that it is in the business to provide." (Application Note G to FRS 5.G11)

The final section of this Application Note describes how to determine whether a seller is acting as an agent (leading to net accounting) or as a principal (leading to gross accounting). The general principles require that to conclude that the seller is acting as a principal it should normally have exposure to all significant benefits and risks associated with at least one of the following:

a)  Selling price: the ability, within economic constraints, to establish the selling price with the customer, either directly or, where the selling price of an item is fixed, indirectly by providing additional goods or services or adjusting the terms of a linked transaction; or
b)  Stock: exposure to the risks of damage, slow movement and obsolescence, and changes in suppliers' prices.

Additional factors include:

a)  Performance in part of the services, or modification to the goods supplied;
b)  Assumption of credit risk; and
c)  Discretion in supplier selection

Overall there is mixed evidence: for example Autonomy was bearing credit risk but did not have primary responsibility for providing the goods. However the fact that the losses associated with the transactions were borne by Autonomy is considered an overriding indicator in that this would be incompatible with the normal status of an agent. It is therefore concluded that Autonomy was choosing to engage in transactions at a loss and acting as principal. Therefore accounting should be on a gross basis which is consistent with the view given by PWC.

### 1.4    Professional services

Where professional services have been included free of charge or at below the established fair value rates, a carve out from the license fee has been done. Whilst there was no requirement to perform a US GAAP VSOE study or otherwise the rates used for these carve outs were consistent with standalone services being sold and were at rates similar to the list price rates in FY 2012. The rates used in 2012 are a relevant benchmark as these were set on acquisition using the rates sold at in 2011 as a guide (plus input from the business). Rates per day were carved out at approximately USD 1500, GBP 1000 and EUR 1250.

### 1.5    Solution deliverables

Autonomy typically sells software, support and in some cases professional services for implementation. However, for some customers, Autonomy has committed to deliver a solution for the customer that involves the above components sold under terms that create a contingency on the license such that if the services are not completed, the license fee would be refundable. Additionally, in certain cases, this has required Autonomy to develop software in order to deliver the

MLAT_AU  00074692

solution. This is inherently risky as the work is unprecedented and the costs involved cannot be reliably estimated from the outset.

Application Note G to FRS 5 addresses situations such as these where there are multiple components to revenue.  As the components cannot be separately identified (i.e. the license cannot be used independently of the other services provided and have no standalone value to the customer they should be treated as one revenue stream.

Therefore where a solution deliverable has been committed to, revenue should be recognized on a percentage completion basis unless there is a reason that costs cannot be reliably estimated (such as developing new software or where the scope of work is excessively vague) in which case profit should be deferred until the uncertainties are no longer present. In this latter scenario revenue is recognized to the extent of costs incurred i.e.at a 0% margin.  Where a future loss is foreseen, revenue will be reversed to the extent possible and a loss provision recorded for any future losses.

Costs have been estimated by taking the time input required to complete the services, estimated by the project manager, multiplied by a fully absorbed cost per day.

### 1.6    Managed services and hosting

The elements sold in hosting contracts are license, support and data hosting plus associated services. Autonomy sells three types of services where customer data is hosted in Autonomy environment on behalf of the customer: back-up, archiving and eDiscovery.  The accounting policy is outlined below:

*Turnover for managed services is recognised as the services are delivered. The services may comprise of a combination of hosted services and software as part of a multiple element arrangement, as described below, and where applicable an assessment is performed to determine whether software elements can be separated from on-going service elements. In the situation where the elements cannot be separated, the license turnover is recognised rateably over the service period.*

Application Note G to FRS 5 addresses situations where there are multiple components to revenue. Where the components cannot be separately identifiable (i.e. cannot be used independently of the other services provided and have no standalone value to the customer), they should be treated as one revenue stream.  In the case of hosted revenue, this would mean recognising all of the revenue for a contract rateably over the term.   For the components of the contract to be accounted for separately, there must be a reliable fair value for those elements.

*Back-up*

For the back-up service, the licence can be used independently and a reliable fair value can be obtained for the services provided.   The licence element may therefore be accounted for on delivery to the customer. In 2011 we have accounted for these contracts as separate elements (the only contracts sold as hosted back up licenses in this year are two contracts of this type in the US, for a total of $1m). In 2012 and beyond we will account for such contracts as a single element as this is considered to be a more appropriate application of the revenue policy given the commercial substance of the transaction.  No adjustment should be made in 2011 as is the original accounting is not considered to be erroneous.

MLAT_AU  00074693

*Archiving*

Archiving licences cannot be used independently, as they require substantial proprietary Autonomy knowledge, and so cannot be treated as a separate component to the services provided.

*eDiscovery*

eDiscovery licences can be used independently; however, due to the nature of the numerous and varying services provided, it is not feasible to retrospectively obtain a reliable fair value for the components.

An adjustment has been made to 2010 and 2011 so that the revenue from hosted Archiving and eDiscovery licences are recognized rateably across the term of the contract. This adjustment has involved restating the position on all hosted archiving and eDiscovery licenses i.e. the practice started in 2008 and all hosted licenses signed since then were considered in calculating the adjustment.

A separate memo has been prepared to discuss this accounting approach in more detail. Please refer to "Hosted Licences" document.

MLAT_AU 00074694

## 2   Errors identified

The net impact of all adjustments arising from this work on FY10 and FY11 as it impacts the UK statutory entities is shown below. The table presents the adjustment by the cause of the misstatement and separately shows the impact of the adjustment on revenue, costs and net transfer pricing.

| Description | Explanation | Section ref |
|---|---|---|
| Accelerated VAR deal (including both those that were reciprocal and those with no reciprocal element) | This relates to deals where revenue was recognized at the point the deal was signed with a VAR but there is evidence at that time that all criteria for rev rec had not been achieved at that point in time which leads to these adjustments constituting an error.<br><br>The circumstances on each specific deal varies but from a high level the error was caused by the following:<br><br><ul><li>Financial strength of reseller not sufficient to pass collectability test without being contingent on end user being signed and paying.</li><li>Collectability not assured due to significant outstanding debtors with VAR</li><li>Previously established history of refunding the VAR, either through crediting invoices or through a reciprocal purchase. Any deals should have been deferred until end user deal was signed and/or cash receipt to confirm that deal was full and final.</li><li>Continued management involvement beyond signing of reseller deal</li><li>Side letters in place protected reseller from risk the end user deal would not materialise</li><li>Delivery had not been made to reseller at point of rev rec</li></ul>Pervasive issues have been found in this area in all periods reviewed (2009, 2010 and 2011). In general the presumption that risks and rewards have transferred to these resellers in accordance with the form of the contract was not valid throughout the accounting periods in question. | 4 & 5 |

MLAT_AU 00074695

| Reciprocal - non VAR | Deals identified where there was an associated refund via a 'purchase' from the customer, or a barter agreement where the revenue transaction is not considered to have real separable commercial substance. In these cases both the sale and purchase were negotiated contemporaneously and were therefore linked from the outset. | 5 |
|---|---|---|
| Collectability | Deals where there is evidence from the time of revenue recognition that collectability was not probable at the time of the deal. Whilst some of these were identified through a review of bad debt write offs, the circumstances at the time of the sale indicate that the initial revenue recognition was wrong. | 6 |
| Solution Deliverables | Deals where license was recognized upfront despite not meeting criteria for accounting as a separate element due to significant customisation of software being required to meet the deliverable and/or scope of deliverables being so vague as to render any estimate cost to complete unreliable. | 8 |
| Upfront hosting license revenue | Deals where license was recognized upfront despite not meeting criteria for accounting as a separate element due to either the license not being separable from the hosted service or the fair value of the hosted service not being reliably estimated. | 7 |
| Other | Various other non-pervasive causes of error including:<br><br>• Deals where revenue was recognized in advance of delivery to customer<br>• Onerous warranty clauses – revenue should be deferred until the warranty has expired.<br>• Additional carve out should have been calculated to cover existing support stream.<br>• Revenue accrued without contractual support and without meeting the rev rec criteria | Section 3.6.1.B |

MLAT_AU  00074696

**Summary of adjustments by cause of the adjustment**

| ASL statutory adjustments | Impact on 2010 opening reserves | Revenue 2010 | TP2010 | Cost 2010 | Profit 2010 | Revenue 2011 | TP 2011 | Cost 2011 | Profit 2011 |
|---|---|---|---|---|---|---|---|---|---|
| | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 |
| Accelerated VAR deal - no reciprocal element | 8,136 | 1,243 | 7,060 | (712) | 7,590 | 758 | (7,299) | (558) | (7,099) |
| Collectability | 8,263 | 3,338 | (3,404) | (3,489) | (3,555) | 379 | (4,314) | (2,298) | (6,232) |
| Onerous contract clause | - | 2,391 | - | - | 2,391 | (2,376) | - | - | (2,376) |
| Reciprocal - non VAR | - | 1,037 | 10,194 | 1,517 | 12,747 | 4,168 | (2,784) | (3,251) | (1,867) |
| Reciprocal - VAR | 34,052 | 5,121 | 14,285 | 594 | 20,000 | (1,335) | (1,619) | (6,144) | (9,098) |
| Revenue recognised prior to product delivery | - | - | - | - | - | 10 | 8,175 | - | 8,185 |
| Solution Deliverables | 5,896 | 5,185 | 5,724 | - | 10,909 | (12,276) | (970) | 3,070 | (10,177) |
| Support carve out | - | 296 | - | - | 296 | 2,069 | - | - | 2,069 |
| Upfront hosting license revenue | 17,212 | 2,232 | 24,092 | - | 26,324 | 1,490 | 7,226 | - | 8,717 |
| Write off accrued income - license, support and hosted | 396 | 407 | 767 | - | 1,173 | (448) | - | (160) | (608) |
| Transfer Pricing Adjustment | - | - | (4,549) | - | (4,549) | - | 32,693 | - | 32,693 |
| Other | 225 | (113) | (168) | (62) | (343) | (12) | 282 | (31) | 239 |
| | 74,180 | 21,137 | 54,000 | (2,152) | 72,985 | (7,571) | 31,389 | (9,372) | 14,446 |

| Interwoven UK statutory adjustments | Impact on 2010 opening reserves | Revenue 2010 | TP2010 | Cost 2010 | Profit 2010 | Revenue 2011 | TP 2011 | Cost 2011 | Profit 2011 |
|---|---|---|---|---|---|---|---|---|---|
| | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 |
| Reciprocal - VAR | - | - | - | - | - | - | 960 | (960) | - |
| Upfront hosting license revenue | 2 | 3 | (1) | - | - | (1) | (1) | - | (2) |
| | 2 | 3 | (1) | - | - | (1) | 959 | (960) | (2) |

| Meridio statutory adjustments | Impact on 2010 opening reserves | Revenue 2010 | TP2010 | Cost 2010 | Profit 2010 | Revenue 2011 | TP 2011 | Cost 2011 | Profit 2011 |
|---|---|---|---|---|---|---|---|---|---|
| | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 |
| Write off accrued income - license, support and hosted | 20 | (15) | - | - | (15) | (5) | - | - | (5) |
| | 20 | (15) | - | - | (15) | (5) | - | - | (5) |

| Zantaz UK statutory adjustments | Impact on 2010 opening reserves | Revenue 2010 | TP2010 | Cost 2010 | Profit 2010 | Revenue 2011 | TP 2011 | Cost 2011 | Profit 2011 |
|---|---|---|---|---|---|---|---|---|---|
| | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 | £'000 |
| Upfront hosting license revenue | 0 | - | 49 | - | 49 | - | (17) | - | (17) |
| Write off accrued income - license, support and hosted | - | - | - | - | - | - | 305 | - | 305 |
| | - | - | 49 | - | 49 | - | 288 | - | 288 |

MLAT_AU 00074697

## 3   Work undertaken to review accounting for revenue transactions in 2011, 2010, 2009 & earlier

The UK entities, in particular ASL, are impacted by global revenue and cost recognition.  Under the transfer pricing (TP) arrangements the majority of the overseas revenue, net of costs and a commission, is returned to ASL. Overall 59% of pre-adjusted revenue in ASL (42% post adjustments) was derived from the net transfer pricing transferred from other group companies.

The tables below show ASL revenue pre and post adjustment in 2010 and 2011. Transfer pricing related adjustments of £47.4m were also made to opening ASL reserves in 2010.

**ASL 2011 revenue**

|  | 2011 (pre-adjustments) £'000 | Adj £'000 | 2011 (post-adjustments) £'000 |
|---|---|---|---|
| Licence | 32,224 | (8,013) | 24,211 |
| S&M | 9,405 | (532) | 8,872 |
| Services | 8,458 | 906 | 9,364 |
| TP | 72,449 | (41,382) | 31,067 |
| **Total Revenue** | 122,536 | (49,022) | 73,514 |

**ASL 2010 revenue**

|  | 2010 (pre-adjustments) £'000 | Adj £'000 | 2010 (post-adjustments) £'000 |
|---|---|---|---|
| Licence | 47,603 | (21,035) | 26,568 |
| S&M | 8,141 | (192) | 7,949 |
| Services | 4,683 | (472) | 4,211 |
| TP | 115,206 | (75,708) | 39,498 |
| **Total Revenue** | 175,632 | (97,407) | 78,225 |

The work performed must therefore consider the US and other non-UK revenue as well as UK revenue, as there is a significant impact from the inbound transfer pricing to ASL as a result of the US revenue contracts.

**Autonomy group revenue (pre and post adjustment)**

MLAT_AU 00074698

| | Reported revenue $'000 | Adjustments $'000 | Adjusted revenue $'000 | Reported revenue $'000 | Adjustments $'000 | Adjusted revenue $'000 |
|---|---|---|---|---|---|---|
| License | 394,537 | (180,820) | 213,716 | 333,967 | (87,296) | 246,671 |
| Hardware resale | 105,557 | - | 105,557 | 88,421 | - | 88,421 |
| S&M | 209,304 | (265) | 209,039 | 185,967 | (1,488) | 184,479 |
| Services | 65,451 | (820) | 64,631 | 40,042 | 2,030 | 42,072 |
| Hosting | 95,513 | 24,423 | 119,936 | 135,951 | 29,227 | 165,178 |
| TOTAL | 870,361 | (157,482) | 712,879 | 784,348 | (57,527) | 726,821 |

The work performed has been carried out from two perspectives. Firstly, specific deal reviews have been carried out which cover a sample of deals from the UK and across the group. Secondly checks for completeness have been performed by looking at different areas such as bad debts in subsequent periods, credit notes, findings from the various investigations, large deals from 2009, etc. This work is explained in detail in the following section and coverage of that work with respect each revenue stream, both UK and non-UK, is discussed.

As a result of the work described in this memo it is concluded that adequate work has been done to address the risk, risk of residual error is low and adjusted revenue is reasonably stated.

MLAT_AU 00074699

## 3.1    License revenue

**A**      **Review of 2010 and 2011 Deals**

*UK Contracts:*

All deals over $1m and any others included in EY's sample selection have been reviewed and adjustments proposed based on reassessment of accounting treatment. For 2011 this included all deals >$0.5m. In 2010 this included the majority 23 of 28 deals  which is 94% by value of the deals.

This review encompassed review of all contractual terms, proof of delivery, proof of payment for subsequent cash receipt or otherwise and assessment of substantive nature of support and associated services. Contracts with high risk resellers were also reviewed against payments to resellers to identify reciprocal transactions Adjustments were identified relating to deferring revenue on solution deliverables (Eg Tottenham, Euronews); net accounting with reciprocal purchases (Eg Mercedes, Tottenham), collectability issues, relicensing and onerous contract clauses.

**2011 coverage**

| 2011 contract reviews | Total | | Specific contracts tested | | | Coverage vs original revenue value | Other work done | Value of deals with issues noted |
|---|---|---|---|---|---|---|---|---|
| | # | £'m | # | £'m | % | % | | £'m |
| >$1m | 15 | 18.6 | 15 | 18.6 | 58% | 58% | Channel deals in high risk<br>Deals with potential linked sale and purchases<br>Hosted license contract restatement<br>non UK/US license deals >$1m | (10.0) |
| $500k - $1m | 10 | 4.0 | 10 | 4.0 | 12% | 12% | Microlink<br>Bad debt write offs Q3 2011 and FY 12<br>Bad debt provisions created in Q3 2011 and FY 12<br>Credit notes created in Q3 2011 and FY12 | (0.5) |
| $100k to $500k | 45 | 6.8 | 7 | 1.9 | 6% | 6% | Hosted license contract restatement for deals via NIBS<br>Channel deals in high risk | (0.4) |
| <$100k | n/a | 2.9 | 0 | - | n/a | n/a | Hosted license contract restatement for deals via NIBS | - |
| **Total ASL license revenue** | n/a | 32.2 | | 24.4 | 76% | 76% | | |
| **ASL Transfer pricing income** | n/a | 131.6 | 29 | 67.8 | n/a | n/a | As above for >$1m and $500k-$1m | (58.6) |

This table shows the number and value of contracts that were specifically reviewed by size of contract and lists the other areas where work was performed. The adjustment is the total adjustment posted for each deal threshold.

The adjustment shown is the revenue reversal from 2011 contracts only and does not reflect any subsequent release where relevant. For example, hosted license revenue recognized upfront on 2011 deals has been reversed in the above adjustment; the adjustment shown above does not also reflect the ratable revenue recognized instead on either those contracts from 2011 or prior. However our total adjustments take this into account. The above table shows the value of upfront license revenue in the year and compares to how much of that value was then removed through the work performed.

This shows that the level of adjustments found when reviewing contracts below $1m was significantly lower than the adjustments relating to the above $1m deals.  Review of contracts below $1m found several small adjustments arising from various issues but did not identify any pervasive type of issue in this tranche. It should be noted that of the £0.9m adjustments noted above on deals

MLAT_AU  00074700

below <$1m, £0.5m of these adjustments relate to one deal (Metropolitan Police) which was also identified through the solution deal review described later in this document. The risk that similar errors are present in the non-UK contracts below $1m has been addressed as red projects have been reviewed on a global basis. £300k of the adjustments related to deal via an Italian reseller. Italian resellers have been reviewed as a class issue due to the collectability issues in that region, therefore there is no risk that further unadjusted errors of this type could be present and resellers have been considered as a class issue globally in section 4. The remaining £100k adjustment relates to a support roll up which is considered to be a non-pervasive issue in deals of this size as no other instances were found.

The transfer pricing income tested represents the gross license value of those revenue contracts. It does not reflect transfer pricing income arising in ASL from prior year contracts or transfer pricing income on other non-license revenue streams or transfer pricing expense relating to cost reimbursement of other group companies.  The adjustment to UK transfer pricing of £58.6m is made up of £32.3m relating to adjustments on non-UK hosted license contracts in 2011 and £26.3m relates to other non-UK and US license deals from 2011.

**B      2010 Contracts**

| 2010 contract reviews | Total | | Specific contracts tested | | | Other work done | Value of deals with issues noted |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | # | £'m | # | £'m | % | | £'m |
| >$1m | 18 | 28.4 | 18 | 28.4 | 60% | Channel deals in high risk<br>Deals with potential linked sale and purchases<br>Hosted license contract restatement<br>non-UK/US license deals >$1m | (17.4) |
| $500k - $1m | 10 | 4.4 | 5 | 2.2 | 5% | Microlink<br>Bad debt write offs Q3 2011 and FY 12<br>Bad debt provisions created in Q3 2011 and FY 12<br>Credit notes created in Q3 2011 and FY'12 | (2.1) |
| $100k to $500k | 76 | 10.6 | - | - | 0% | Hosted license contract restatement for deals via NIBS<br>Channel deals in high risk | (1.2) |
| <$100k | n/a | 4.2 | - | - | n/a | Hosted license contract restatement for deals via NIBS | (0.0) |
| Total ASL license revenue | | 47.6 | | 30.6 | 64% | | |
| ASL Transfer pricing income | n/a | 163.9 | 28 | 91.4 | n/a | As above for >$1m and $500k-$1m | (94.5) |

Of the £3.3m adjustments on deals below $1m, £2.1m was discovered via the other work done listed in the table and discussed later in the memo and £1.1m was discovered through the contract review The adjustments were made up of the following errors:

Errors identified from contract review

- Support roll up £123k: Only one instance identified and as discussed in 2011 coverage, not considered to present a pervasive issue.
- Collectability issues £498k: Had this deal not been identified via a specific contract review it would have been identified via the bad debt write offs in the dark period and as that review was done globally, significant issues relating to non-UK contracts have been addressed.
- Onerous warranty clause £576k: from the review of specific UK contract for deals <$1m, there was only one instance of errors from onerous warranty clauses. There is therefore no reason to expect this is a prevalent issue outside of the UK for the reasons discussed earlier in the memo (i.e. same management team etc).

Errors identified from other work:

MLAT_AU 00074701

- License + hosting adjustment £554k: identified through the hosted license restatement which has been adjusted on a global basis.
- Collectability issues £321k: identified via the bad debt write offs in the dark period and as that review was done globally, significant issues relating to non-UK contracts have been addressed.
- Resellers £440k: Resellers have been considered as a global issue in Section 4
- Accrued income $798k: revenue was inappropriately accrued across 4 contracts and therefore reversed. Review of accrued license income globally has addressed the risk that unadjusted errors outside of UK remain.

It is important to note that out of the <$1m contracts reviewed, all adjustments bar one would have been identified via the bad debt write off review which was carried out globally. The one exception is the support roll up described above which is not considered to be a widespread issue outside of the UK which is further supported by the fact that no similar issues were found in US contract review. This global review only identified two further adjustments in the US which evidences that issues are not as prevalent in the US accounting environment.

*Non-UK Contracts:*

All non-UK deals greater than $1m have been subject to review as discussed in Review of 2010 and 2011 deals section, this amounts to £110m of license revenue in 2011 (2010: £123.7m), equivalent to 63% of non-UK license revenue. £108.5m of this is in the US. This is the majority of the revenue and contains the majority of the risk.

In addition, where we have found material issues in the UK we have performed focused review below $1m on these type of deals in the US for deals both greater than and less than $1m – eg reseller deals, license + hosting, reciprocal, credit notes and bad debt booked in the dark period and beyond, ongoing red project reports and litigation reports and that work is described in the subsequent sections of this memo. This work and the results of the UK work above allow us to conclude that residual risks in small deals below $1m is low.

The value of contracts reviewed outside of UK contracts where these certain specific risks were present were as follows:

- Resellers (non-reciprocal) £20.6m (2010: £20.3m)
- Reciprocal (mostly resellers) £16m (2010: £25.8m), the deals in 2011 which were considered to be reciprocal were with resellers so to avoid duplication are only included in this line
- License + hosting £33.5m (2010: £36.8m)
- PS red project listing £1m (2010: £5.6m)

For the deals where these specific risks were present we reviewed the contracts, accounting entries and cash receipts.

The remaining deals were categorised as low risk (using the same criteria), as they were typically direct sales with known end users. For these types of deals it would be expected that any significant issues would manifest themselves in non-payment in the form of credit notes or subsequent bad debt write offs. We therefore relied upon complimentary work done, see below, to address residual

MLAT_AU 00074702

risks in the remaining revenue of £42.5m. This work was done on a global basis covering both UK and non-UK deals.

| | 2011 non-UK £'000 | 2010 non-UK £'000 |
|---|---|---|
| **Total license revenue** | **176,505** | **198,982** |
| | | |
| **total deals> $1m (all subject to review)** | **110,079** | **123,705** |
| **risk contract >$1m:** | | |
| reseller | 20,389 | 18,370 |
| reciprocal | 16,258 | 25,786 |
| license + hosting | 29,947 | 34,238 |
| red project | 949 | 5,623 |
| **risk contracts** | **67,543** | **84,017** |
| | | |
| **total deals $100k - $1m (risk contract only subject to review)** | **30,660** | **46,159** |
| **risk contracts within $100k - $1m:** | | |
| reseller | 193 | 1,902 |
| reciprocal | - | - |
| license + hosting | 3,533 | 2,564 |
| red project | - | - |
| **risk contracts** | **3,726** | **4,466** |
| **Less than $100k** | **35,766** | **29,118** |

In addition to specific risk areas we have performed complimentary work to identify any residual risk and have looked at all bad debts globally over $500k, all credit notes globally over $500k and all credit notes and bad debt write offs globally from dark period over $100k, review of global accrued income balances at period end over $100k and review of ongoing red report and legal provision report. This gives comfort that there are no further significant issues (on deals over these thresholds) as any issues would eventually manifest themselves through non-payment or legal issues or reciprocal reseller payments, all of which have been subject to review.

This leads to an implied further coverage of £3.3m on deals over $500k in 2011 (2010: £5.6m), total coverage of £117m (2010: £134m).

84% of deals over $100k in 2011 have been subject to review (plus additional work to a lower threshold of $100k during the dark period) (2010: 75%).

20% of revenue in 2011 is less than $100k (2010: 15%) and no work has been performed in this area as the deals are considered to be low risk for several reasons:

Firstly, because senior management were involved in large deals requiring adjustment and were not engaged in deals below that size, there is low risk of misstatement due to management override.

MLAT_AU 00074703

Secondly, deals <$100k have less specific negotiation and therefore are more likely to be standard, particularly i-shop orders through Interwoven which is a self service order system the majority of which are on standard terms.

And lastly, UK deals less than $100k have been included in the sampling population and no issues were found on deals less than $100k therefore this confirms the above rationale that they are low risk.

**B      Review of 2009 deals**

A global review of the 2009 deals was completed in order to make appropriate adjustments to the 2010 opening balance sheet and reserves.  As a result, we are only looking for errors/adjustments which have an impact to profit such that opening retained earnings in 2010 needs restating; gross vs. net accounting is irrelevant for this review unless the associated cost was originally capitalised.

The 2009 deals >$100k documents were extracted. This included a total of 538 deals and a total licence value of $305m split as follows:

| | Number of deals | % of deals | Total value (USD) | % of value |
|---|---|---|---|---|
| Licence fee ≥US$5m | 9 | 2% | 72,086,058 | 24% |
| Licence fee ≥US$1m <US$5m | 49 | 9% | 112,570,060 | 37% |
| Licence fee <US$1m | 480 | 89% | 120,359,516 | 39% |
| **Total** | **538** | | **305,015,633** | |

This was filtered to obtain a list of all contracts >$1m in licence fee, which were reviewed for risk factors. Where the deal had the following characteristics, further review was undertaken.

- Deal via one of the 8 resellers identified below (see Reseller section for full list) - 18 contracts in this category
- Deal was linked to a software purchase from the customer or reseller — 4 contracts in this category, 1 of which was via a reseller in the above category but only included once here to avoid duplication
- Deal was subsequently written off or credited in dark period (write offs outside this period would be identified in the review of 2009 debtors in next section)

This review involved inspection of contracts and assessment of accounting entries booked, review of cash collection and reciprocal payments made to resellers and bad debt write offs. Adjustments proposed where appropriate to restate the transfer pricing income in ASL.

In the case of contracts >$5m license fee where no specific issues from the above list were identified, these were also reviewed to confirm that payment was made.

The following items that had not been adjusted in other workings were identified and adjusted:

MLAT_AU  00074704

| | Total licence fee (USD) |
|---|---|
| Deals linked to purchase from customer | 20,871,429 |
| Deals with resellers re-signed direct* | 12,670,527 |
| Deals subsequently written off | 5,966,912 |
| Deals linked to investment in Microlink | 9,523,810 |
| **Total** | **49,032,678** |

*includes two <$1m deals identified in the course of the review (total license US$947,700)*

Note: the table above does not include further adjustments that were made as part of the debtor, credit note or MicroLink reviews. Nor does it include the adjustments related to hosted contracts.

The deals that were subsequently written off ($6.0m) were adjusted to reverse the initial revenue recognize. because there is a lack of payment history from South and Central American and Italian customers. One further deal with Firmware Technologies was also adjusted since the deal was written off in 2011 and at the 2009 year end, it was already well overdue.  Emails at the time show that Firmware's ability to pay Autonomy was dependent on them receiving funds from customer and the signing of an impending deal.

The deal linked to investment in Microlink is described in more detail in the section on Microlink below and the separate Microlink memo.

See the 2009 Big deals schedule for detailed review and adjustments.

MLAT_AU  00074705

## 3.2    Support and Maintenance

### A      UK

Support revenue was reviewed as part of our specific UK deal contract review and no significant issues were found. The total support revenue reviewed via these contracts was £0.7m in 2011 and £0.7m in 2010. Outside of small isolated errors, no recurring themes of issues were found.

### B      Non-UK

Fair value of PCS has been assessed in the PCS memo.

Global support revenue of $206.6m has been adjusted to $205.4m, of which $0.7m was UK contract related.

Support revenue was reviewed in detail as part of our specific UK license deal contract review Errors found in support were all related to the original license sale. We did not note any errors relating to the actual amortization of the support revenue.  Furthermore, minimal adjustments were identified through review of recognition of standalone support renewals as part of the sample provided to EY. Also no standalone support related issues were found through review of credit notes and debtors, described elsewhere in the memo.Outside of small isolated errors, no recurring themes of issues were found.

Therefore it is concluded for support revenue recognition is materially correct on a global basis outside of knock on impacts of errors in upfront license revenue recognition.  It is reasonable to conclude on a global basis as management was involved in the majority of deals found to have issues. Management only engaged in the large value deals. The same revenue control environment was in place globally - the same management team were responsible for the UK, US and ROW sales teams and worldwide accounting controls and processes. All revenue recognition judgments and decisions were made by the head office team in Cambridge.

Finally, in order to avoid excess complexity, two simplifying assumptions have been made in non-UK revenue adjustments. Firstly where license revenue was deferred on US contracts, no corresponding adjustment was made to defer the support revenue, therefore our adjusted numbers record this revenue too early. Secondly, where reciprocal arrangements were identified and net accounted, the support element of this was not factored into the adjustment so too much revenue is recognized over the support term. The effect of these two simplifications to our work are offsetting and have been quantified to show the impact as revenue being too high by £5k which is not considered sufficiently material to adjust.

MLAT_AU  00074706

### 3.3    Hosted and managed service revenue

During 2010 and 2011 Autonomy sold hosting contracts via two types of contract.

- upfront billing typically structured as a license sale contract (and recognized as license in pre-adjusted numbers)
- pay as you go or monthly billed type contracts

All upfront type contracts have been reviewed and restated as part of the work on hosted contracts and separability of elements of the contract. See Hosting section – section 5.

There is not considered to be a material risk of revenue misstatement associated with the monthly billed contracts as revenue is typically billed and recognized in the month the service is delivered.

**A    UK**

No significant issues were identified through UK contract review. Excluding one isolated error of £350k on a service subscription contract which is not significant, the remaining adjustments found on the remaining sample of £1.9m were less than 1% of the population by revenue value in aggregate.

**B    Non-UK**

The risk that the isolated error in the UK (i.e. upfront recognition of a multi-month service subscription) could occur in the US has been addressed by reviewing all US contracts of this type (Optimost) to ensure they have been spread ratably over more than one month. Out of 119 contracts where revenue was recognized in 2011 in the US all except 6 were recognized over more than one month. It is likely that in these 6 cases the 1 month of revenue represented either the first or last month of the subscription being the only month that fell into 2011, but given that all 6 contracts were individually less than $10k and $32k in total there is extremely low potential for this error to have recurred.

Given the low error rate in the UK, it was considered appropriate to rely only on the complimentary work performed to identify any isolated major issues. No issues were identified through global balance sheet review  (bad debts globally over $500k, all credit notes globally over $500k and all credit notes and bad debt write offs globally from dark period over $100k, review of global accrued income balances at period end over $100k and review of ongoing red report and legal provision report). The work done is considered sufficient to conclude revenue was appropriately recognized or adjusted and that the residual risk of error is low.

### 3.4    PS revenue

**A    UK**

Prior to acquisition Autonomy did not have a common global time recording system used by PS staff to record time worked on projects and their estimates of time to complete.

MLAT_AU  00074707

Information on time worked and estimates to complete is required to assess whether a project is loss making; to ascertain the proportion of a fixed price project to recognise as revenue during an accounting period; and to determine the number of hours to invoice a customer in a given period for a time and materials contract.

This information was instead tracked by project managers and the admin team within the PS group and provided to finance for invoicing and accounting when required.

Given the amount of time that has elapsed it has been challenging to locate the instruction from the project management team regarding the hours worked to instigate billing or release from deferred revenue.

Where necessary for larger projects accounted on a percentage completion or zero margin basis, or to determine the overall expected loss on a contract, estimates of time incurred at a point in time and estimates of costs to complete have all been provided by and confirmed by the relevant project managers.

This is considered by management to be as valid a source of data as it would be had it come from a time recording system because in both sources, the project manager is responsible for the data so it is effectively the same source.

A small population of large solution deals which all exhibited issues was identified (the red projects). The initial accounting had treated these solution deals as upfront license despite not meeting the criteria for separate recognition.  These have all been reviewed, adjusted and the results described further in the Solution deals section, Section 8.

Total pre-adjusted PS revenue in ASL in 2011 is £4.2m. Excluding the red projects and license contracts with PS which have been specifically reviewed the total remaining PS revenue is £3.8m.

Within this remaining 2011 PS revenue, there are 131 projects with an average order value of £29k. At the end of October 2011 there were 19 active projects which on average would imply a 2.1 month project life.  This short project life span is also evidenced by the relatively low deferred and accrued balances at period ends. ASL pre-adjusted accrued revenue at 2011 was £0.5m, (2010: £0.3m) post adjustment £0k (2010: £0.13m) and pre-adjusted deferred revenue was £0.6m (2010: £0.6m), post adjustment £0.6m (2010: £0.6m). Therefore the total contract value on active projects is approximately £550k (the number of active projects multiplied by the average value). This therefore provides limited potential for error or opportunity for misstatement.

Depending on the contract terms and the value of the contract this was either recognised on invoicing or if invoiced upfront and deferred it would be recognised as the PS team inform finance that the time has been worked. Whilst the timing of revenue recognition on these orders has not specifically been tied back to PS records as part of an exercise to review the original accounting, the risk of significant error is considered to be low. This risk is low due to the short life span of a project meaning that few projects overlap different financial periods. Also, due to the large number of low value orders, it is likely that if there are any errors through either accelerated or decelerated revenue recognition these are compensated by offsetting adjustments from the previous year.

MLAT_AU  00074708

There is no evidence from the red project report or credit and collection issues that timing of invoicing was artificially accelerated versus the contractual terms. The adjustments made to the accrued revenue balances in 2011 are made up of adjustments to old accrued amounts from 2009 or accruals relating to PS on large license deals. The revenue was accrued at end of 2011 in respect of smaller value PS projects.

Given all of the circumstances above, management do not consider they present a significant risk to the true and fair nature of the accounts.

**B      Non-UK**

As described in more detail in the red project section, a common theme in UK large deals was selling solution deals as license contracts. This practice has not been found in the review of large US license contract sales and for the reasons outlined above it is not considered necessary to review small value deals for this behavior. The red project report that has been reviewed post period end is on a global basis and has not highlighted any significant red projects to those already adjusted. Work has been performed on credit notes and bad debts (all bad debts globally over $500k, all credit notes globally over $500k and all credit notes and bad debt write offs globally from dark period over $100k, review of global accrued income balances at period end over $100k and review of ongoing red report and legal provision report). The work done is considered sufficient to conclude revenue was appropriately recognized or adjusted and that the residual risk of error is low.

MLAT_AU 00074709

### 3.5    Hardware resale

The accounting policy for hardware resale transactions has been reviewed. See hardware section of Accounting Policy Memo.  Autonomy Inc had a practice between 2009 and 2012 at selling hardware (mainly from purchased from Dell, but also EMC and Hitachi initially) to customers. Autonomy had an agreement with the hardware supplier that they could insert themselves into a contract between the supplier and the end user to act as a reseller to the customer. Hardware was sold at a loss. Revenue and costs were gross accounted.  There is only one deal in the ASL accounts for 2010-2011 which follows this practice – a sale to JPMC for approx. £300k of hardware in 2011. The underlying contracts for these transactions were reviewed as well as a sample of purchase orders, invoices and delivery notes.  No adjustments have been made to the original gross accounting.  However, we have concluded that gross accounting is correct which also agrees with PwC's conclusion.  Therefore, no correction to the transfer pricing in ASLs books is required.

A proof of delivery could not be located for the ASL hardware sale to JPMC in 2011 but no evidence was found that contradicted the original accounting as having been delivered in 2011. Outside of this one missing data point, this review did not highlight any adjustments and further, no issues were found through balance sheet review (all bad debts globally over $500k, all credit notes globally over $500k and all credit notes and bad debt write offs globally from dark period over $100k, review of global accrued income balances at period end over $100k and review of ongoing red report and legal provision report). The work done is considered sufficient to conclude revenue was appropriately recognized or adjusted and that the residual risk of error is low.

It should be noted that although the treatment of segmental reporting and allocation of cost of sales to marketing was incorrect, these issues only impacted the group consolidated reporting as the vast majority of the hardware revenue was in the US subsidiaries.  The amount in the UK subsidiary ASL was insignificant (£0.3m).

MLAT_AU 00074710

### 3.6    Assurance gained from other procedures

#### 3.6.1    Global review of credit notes, provisions and bad debt expense

##### A    *Bad debt expense:*

Provisions and write offs from Sept 2011 to date are captured in two documents – Bad debt costs Q3'11 V10 and Autonomy AR reserves invoice detail walkforward. The walkforward document includes all provisions made between 30 September 2011 and 30 September 2012 as well as any write offs after 30 September 2011 and up to 30 September 2012. The Bad debt costs document includes all write offs that were made on 30 Sept 2011.

All write offs greater than £63k ($100k) from Bad debt costs Q3'11 V10 were reviewed to ensure correct treatment. All write offs over this threshold from 2009 and 2010 had already been covered in the other work carried out. See Bad debt costs Q3'11 V10, write offs tab for details of where these deals had already been covered. For deals prior to 2009, an additional adjustment of £200k was identified to opening retained earnings and intercompany balance.

All provisions and write offs >$500k (£310k) from the walkforward schedule have been reviewed to ensure that all adjustments have been proposed where appropriate. Deals were either already reviewed as part of the procedures set out above or proposed for adjustments here.

The provision walkforward schedule was annotated to explain where deals had already been reviewed and where this was not the case the deal was reviewed. This resulted in additional adjustments proposed for deals via the Latin American reseller Integracion de Negocios ($5m of bad debt expense reversed in total over 2010 and 2011) and Knowledge Capital Corp ($1m revenue reversal in 2010 and $1m bad debt expense reversal in 2011). Integracion de Negocios was a reseller that Autonomy sold to end users via but most deals were provided for in 2010 and 2011 and written off in 2011 and 2012. The deals that have been adjusted date from 2009 and should not have been recognized upfront owing to the already existing collectability issues on 2008 deals. Knowledge Capital was a new OEM customer where the OEM was given 4 month payment terms, despite no previous payment history with the group or any information regarding their creditworthiness.

##### B    *Credit notes*

###### *Dark period credit notes*

The period between July and October 2011 is referred to as the dark period because during this period Autonomy did not publicly report financial information. We are aware that during this period a clean-up exercise was performed resulting in large bad debt expenses and a high volume of credit notes were raised therefore all credit notes raised in this period were reviewed which confirmed that ERP was the only system with large unusual credit notes, and all of the ERP credit notes >$100k had been reviewed as part of the other analyses already. See "Dark period credit notes – all systems" for data. The total value of credit notes through ERP <$100k is $400k and was therefore not reviewed further. The table below shows the total number of credit memos issues in the dark period. For ERP, this includes both credit notes issued to customers as well as credit memos required to facilitate a bad debt write off (the debit entry recorded in revenue is the transferred to bad debt expense).

MLAT_AU 00074711

| System | # of credit memos in period | Average value per credit note ($) | Total value ($) |
|--------|------|-------------|-------------|
| ERP | 44 | 1,417,227 | 62,357,988 |
| Epicor | 96 | 11,636 | 1,117,056 |
| NIBS* | 50 | 57,085 | 2,854,250 |
| Netsuite | 254 | 16,664 | 4,232,656 |
| Softrax | 84 | 29,197 | 2,452,548 |
| **Total** | | | **73,014,498** |

* average for NIBS skewed higher due to large contractual Deutsche Bank credit of $1.2m

### *Credit notes post Dark Period*

Three deals were identified that were pre acquisition but were credited post acquisition. These were identified through review of the daily license booking report which captures any reconciling credits greater than $500k. Two do not represent a pre-acquisition adjustment required – Siemens Medical and Symantec. Both of these credits were issued as part of the selling cycle in 2012 and so it is correct that the debit to revenue is in 2012. The other debit to revenue identified in this way, although not a credit note, related to AT&T accrued income. Revenue was accrued relating to a compliance issue with this customer. Autonomy accrued $1,271k of revenue which was based the number of users AT&T were exceeding their license terms by and therefore owed Autonomy. This was subsequently settled at circa $100k of revenue. The accrued amount was written off in 2012.  As there was nothing to support the initial revenue accrual (there is no correspondence with AT&T that they accept the fee) and adjustment was proposed to reverse £671k of transfer pricing income in 2010 and adjust for the cost to increase transfer pricing income in 2012.

### 3.6.2   Review of 2009 global debtors

Global debtor reports as at 31 December 2009 were filtered for items >$500k. Any deals that had been adjusted as part of the 2009 big deal review were not re-reviewed here. The remaining list was then reviewed for payment detail to confirm that they had been paid.

MLAT_AU  00074712

| | Total value of debtors listing (USD) | Total value of items ≥$500k (USD) | % coverage | Items requiring adjustment (USD) | % error (of items ≥$500k relative to debtor) |
|---|---|---|---|---|---|
| ROW & Meridio | 34,079,970 | 18,097,060 | 53% | - | 0% |
| Interwoven | 41,511,074 | 5,358,279 | 13% | - | 0% |
| Zantaz | 21,619,755 | 4,500,000 | 21% | - | 0% |
| Virage | 722,694 | - | 0% | - | 0% |
| Autonomy Inc | 128,253,724 | 93,326,643 | 73% | 7,835,000 | 8% |
| Etalk | 7,086,163 | 2,270,050 | 32% | - | 0% |
| Verity | 8,090,666 | 1,540,000 | 19% | - | 0% |
| **Total** | **241,364,046** | **125,092,032** | **52%** | **7,835,000** | **6%** |

Only three debts were identified that were subsequently written off and require adjustment owing to the fact there is a lack of payment history from South and Central American customers. We have reviewed 49% of the total debtors and identified an adjustment of 6% of items reviewed.

Two other potential bad debt schedules prepared by Credit and Collections were also reviewed. These included deals from 2007-2010. On the first, "Prasad Interview Memo (Tab 1) (Legal Workings Unknown)", all items >$300k were reviewed in order to give 77% coverage and adjusted where necessary on the 2009 debtors schedule. On the second, "Prasad Interview Memo (Tab 4) (Problem Accounts 6 11 BH)" any 'bill to' customer with >$500k potential bad debts were reviewed in order to give 78% coverage. Within this sample all items >$100k were adjusted where necessary and this lead to $3,485k of adjustments further to those listed in the table above

### 3.6.3   Review of Deloitte Audit Committee Reports

The report from Deloitte to the Audit Committee regarding the audit of the year ending 2010 was reviewed to ensure any deals discussed had been reviewed already as part of our work. This was found to be the case and so no additional deals were identified as part of reviewing this document.

### 3.6.4   Post balance sheet events

All the work documented in this memo was carried out post balance sheet. Any information discovered in the period between 31 October 2011 and the finalisation of the statutory accounts has been factored into the accounting where appropriate. Group wide reviews which are now part of Autonomy's internal control processes such as the Red Report (a review which flags potential loss making contracts) and the Legal Report (a running list of all legal disputes and the likely outcome and financial impact) have been reviewed alongside this work to ensure that any issues arising after the balance sheet date on pre-acquisition contracts are considered as part of the statutory reporting.

### 3.6.5   Alignment with Morgan Lewis and other parties

The review and adjustments preparation was carried out alongside review of the PwC conclusions in their interim report. There are no deviations between the two pieces of work.  Where PWC were unable to conclude (Mercedes contract) the adjustment has been made on the balance of evidence available regarding whether this should be net accounting. GRRO also reviewed a sample of the contracts and their feedback has been incorporated.

**Commented [MB4]:** A: Need to determine where management conclusion is documented, recognize the judgments in this conclusion, and evaluation of all available evidence

AA the conclusion is documented in the 2010 stat tracker:

IDOL 7 and Virage Audio software. Perpetual licence fees of £1,007,398, first year support at 5% of £50,369.90 and up to 20 days of free professional services, with additional services to be provided on T&M basis at £500 per day (non compliant rate). Support was renewed in 2011 but not 2012. There was a reciprocal deal for $9m sponsorship entered into at about the same time which if considered linked requires net accounting (not gross). Given that Mercedes declined their support renewal in Mar 2012 owing to the fact the IDOL SW had not been working for the last 2 years this deal appears reciprocal and revenue has been reversed. (Revenue released proportional to costs charged). Costs of sponsorship also amended to allocate in line with the contract as these were incorrectly recognised on an equal quarterly basis from start of contract and the sponsorship rights received were more in 2010 (hence the higher price that year) than 2011.

Further this is documented in the reciprocal deals table as follows:

Emails show that the license sales and the sponsorship contract were negotiated together. Support was not renewed beyond sponsorship period. When support was declined, Mercedes explained to the support renewals team that "due to the software still not working for over two years [they were] not planning on renewing the maintenance". Further Matts KNutsson from Autonomy PS team said they had proposed to Mercedes to deliver free services to fix the issues, but Mercedes had declined. Mercedes have never made any claims for product issues.

Through our audit procedures it became apparent that customer did appear to be using a part of the software acquired – the Virage piece. Given a bundled price was sold for IDOL plus Virage we would not be able to assign a value for the Virage element and would still be net accounting the arrangement to nil revenue. I have added this latter sentence into the 2010 stat tracker now.

MLAT_AU  00074713

The 2011 and 2010 UK contracts (>$1m and EY sample) and US contracts >$1m review results were shared with Morgan Lewis who reviewed and confirmed they had not seen any information that would contradict the conclusions documented in the trackers.

We have proposed adjustments on the basis of certain fact patterns we have seen. Morgan Lewis provided email evidence that supported the conclusions reached for the contracts they had reviewed. Morgan Lewis agreed with us on these conclusions. The in depth work done by PwC and Morgan Lewis, and evidence gathered, gives us confidence to apply our conclusions to all deals with similar fact patterns.

Subsequent to the conclusions being reached Morgan Lewis also released write-ups of interview summaries with various internal and some external parties. There was nothing in these that was inconsistent with our conclusions.



MLAT_AU 00074714

## 4.    Resellers

This relates to deals where revenue was recognized at the point the deal was signed with a VAR but there is evidence at that time that all criteria for rev rec had not been achieved at that point in time which leads to these adjustments constituting an error.

The circumstances on each specific deal varies but from a high level the error was caused by the following:

- Financial strength of reseller not sufficient to pass collectability test without being contingent on end user being signed and paying.
- Collectability not assured due to significant outstanding debtors with VAR
- Previously established history of refunding the VAR, either through crediting invoices or through a reciprocal purchase. Any deals should have been deferred until end user deal was signed and/or cash receipt to confirm that deal was full and final.
- Continued management involvement beyond signing of reseller deal
- Side letters in place protected reseller from risk the end user deal would not materialise
- Delivery had not been made to reseller at point of rev rec
-

Pervasive issues have been found in this area in all periods reviewed (2009, 2010 and 2011). In general the presumption that risks and rewards have transferred to these resellers in accordance with the form of the contract was not valid throughout the accounting periods in question.

> **Commented [MB5]:** A: Can a comment be added positioning the premise for these adjustments – i.e. what position have management taken with regard to the point at which they believe previous management should not have taken revenue because a pattern / history of refunding was in place; in the memo we highlight the deals that have been reversed, but are there any instances prior to these that evidence the pattern?
>
> AA no – initial large deals with these resellers should have been deferred on the basis of the first cause of error in this list – adjustments put through to that effect. i.e. management knew end user deals had not closed and knew that reseller could not pay without end user customer paying reseller.

Initial reviews of large deals indicated pervasive evidence of issues with certain resellers.  Therefore, further work has been completed to address this risk more comprehensively In addition to the review of 2010 and 2011 UK contracts >$1m and EY's additional sample, "Transactions via resellers" lists all transactions with the following resellers and documents whether further analysis is required to ensure all adjustments have been made. The 2010 and 2011 review work identified that there was a practice of deal acceleration (and in some cases roundtrip structures created) with the following resellers and so these were selected for further review in this analysis:

- Microlink (acquired by Autonomy Jan 2010)
- Discovertech (reseller spun out of Microlink prior to Autonomy acquisition)
- Microtech
- Filetek
- Vidient*
- Capax
- Zenith
- Tikit

* Note: whilst Vidient was not a reseller to an identified end user, the agreement was an OEM arrangement that allowed them to distribute licenses to sublicensees, as such they have been included for analysis in the reseller section.

Autonomy's accounting policy for deals with resellers was that it would recognise revenue if all product sold subject to resale were delivered in current period [to reseller], no right of return policy exists, collection is probable and the fee is fixed and determinable. Autonomy therefore generally

MLAT_AU 00074715

accounted for sales to reseller on delivery to reseller on the premise that all the risks and rewards of ownership had transferred at this point. From our review of reseller deals over course of 2009 – 2011 it is clear that the risks and rewards had not transferred in many cases as deals often ended up signing directly with end user in a later period or a reciprocal arrangement was created whereby reseller was refunded for the amounts paid to Autonomy on the sale; in these scenarios the reseller was protected from credit risk. There was therefore a precedence created by these deals that the sale was not final at the point of sale to the reseller and as such recognizing revenue at this point was not appropriate. All reseller deals reviewed where there is precedence of these circumstances have been adjusted to recognise revenue when there is conclusive evidence of a final sale i.e. payment from reseller which is not linked to a reciprocal purchase. Outside of this group of resellers there is no evidence that sale was not final at point of sale to reseller and so no adjustments are required.

*Deal size distribution – 2010 and 2011*

The following table summarises the invoices in 2010 and 2011 to the main resellers.  All invoices greater than $100k have been reviewed.  Note, the number of invoices shown in the table below is larger than the number of deals as one deal can be invoiced over several invoices and further invoice and rebills where an error was made in the initial invoice also shows gross. Other work has been done to review 2009 large deals, >$1m deals worldwide, 2009 debtors and to identify deals that were facilitated by reciprocal payments all payments and receipts over $500k were reviewed in 09, 10 and 11. All debtors greater than $500k have been reviewed.  As there is a risk that there will be reciprocal payments with these resellers, we have looked at these for 2009, 2010 and 2011.  See following section.

| Invoice size | Capax | Discover tech | Filetek | Microlink | Microtech | Realise Limited | Tikit Ltd | Zenith Gulf Security Systems |
|---|---|---|---|---|---|---|---|---|
| < $100k | 56 | - | - | 11 | 5 | - | - | 2 |
| < $500k | 1 | 7 | - | 9 | 5 | 1 | - | 3 |
| < $1m | 5 | 6 | 1 | 1 | 2 | - | - | 2 |
| < $2m | - | 6 | - | 2 | 12 | 1 | 1 | - |
| < $5m | 10 | 9 | 1 | - | - | - | 2 | 1 |
| > $5m | 1 | 2 | 1 | - | 1 | - | - | - |
| Credits | 11 | 17 | - | - | 14 | 1 | - | 2 |
| | 84 | 47 | 3 | 23 | 39 | 3 | 3 | 10 |

The summary tab of "Transactions via resellers" shows the total value of invoices with supposed end users via these resellers (i.e. where reseller was acting in capacity as a reseller and an end user on each deal was named at the time. There are other deals with these resellers that are for own use, however, these deals had all already been reviewed in the 2010 and 2011 large deal reviews. The reseller deals were assessed as follows:

MLAT_AU 00074716

|  | Acting as a reseller |
|---|---|
| Capax: | All deals over £100k had already been reviewed in Statutory contract review tracker 2010 and 2011. No further review was undertaken of deals below this threshold. The total deals below £100k was £470k. |
| Discovertech: | The invoices in the table above relate to seven deals via this reseller which had already been reviewed as part of the US specific contract review. |
| Filetek: | All invoices in above table were reviewed and related to one deal via reseller which was already reviewed and adjusted in 2010 US deal review |
| MICROLINK, LLC | 2 deals >$1m reviewed in US deal review. Of the remaining 31 deals, only 9 were larger than $250k and remaining adjustments were identified through the credit and bad debt write off review |
| MicroTech LLC | There are 8 other deals that were not picked up through the US deal review, all 8 deals are $300k or less in license value individually and total £600k, no adjustments proposed. |
| Realise Limited | Only deal is via Credit Suisse - reviewed in 2010 UK Deal review |
| Tikit Ltd | $6.3m of this relates to KPMG deal reviewed in 2010 UK deal review, no further review or adjustment proposed on remaining $30k |
| Zenith Gulf Security Systems | These invoices relate to 2 deals already reviewed in UK reviews of 2010 and 2011 and 6 other deals. Cash collections were reviewed for remaining 6 deals totaling $1.7m, and $430k of revenue was reversed as a result. |

The above analysis has been performed on transactions through ERP.  It appears that all unusual transactions (round trip, subsequently written off, etc) were through ERP and it is therefore expected to capture all required adjustments. However to ensure completeness of review, reports from NIBS, Softrax, Epicore and Netsuite were reviewed for any deals via this list of resellers. (These reports are saved in Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\reseller reports).  There were no license deals via these resellers and no deals via resellers over $1m, except one deal with Iron Mountain as reseller which had already been reviewed. This shows that Autonomy's usual reseller business is low value and the large transactions do represent a distinct group of transactions that can be isolated.

| Billing system | Deals via above resellers? | Large deals via resellers? (>$1m) |
|---|---|---|
| ERP: analysis above | Yes - analysis discussed above | Yes - analysis discussed above |
| NIBS (2009 – 2011): | No deals via above resellers | no deals via resellers over $1m |
| Softrax (2009 – 2011): | No deals via above resellers | no deals via resellers over $1m |
| Epicore (2011): | Only one revenue transaction recorded with above resellers – Capax - $13k in Q2 2011 | no deals via resellers over $1m |
| Netsuite (June 11 – Oct 11) | No deals via above resellers | Only 1 deal via reseller over $1m which is $9.5m with Iron Mountain and has been considered separately in the 2011 deal tracker |

The work has identified the relevant sale and purchase details for each sale and purchase >$500k.

MLAT_AU 00074717

| | | Number of invoices | | |
|---|---|---|---|---|
| | | <$100k | $100k-$1m | >$1m |
| **Filetek** | Sales | 2 | 1 | 4 |
| | Purchases | 0 | 1 | 6 |
| **Tikit** | Sales | 9 | 2 | 5 |
| | Purchases | 6 | 7 | 0 |
| **Discovertech** | Sales | 3 | 14 | 16 |
| | Purchases | 1 | 3 | 4 |
| **Capax** | Sales | 215 | 13 | 16 |
| | Purchases | 2308 | 77 | 5 |
| **Microtech** | Sales | 72 | 28 | 19 |
| | Purchases | 16 | 4 | 2 |
| **Microlink** | Sales | 140 | 49 | 9 |
| | Purchases | 119 | 9 | 4 |

*Purchases from Realise and Zenith*

Purchases from Realise are not included in the above table as they were reviewed as part of the review work on the investment accounting and are largely made up of a large number of small value amounts relating to consultancy services Realise had provided.

No purchased were made from Zenith.

From the review, it was clear that the majority of large items identified in this process had already been covered in the 2009, 2010 and 2011 deal review work. The summary tab of "Vendor & Customer Activity Details Extracts – Up-dated" includes a summary of findings for each of the resellers/customers.

Only three items were identified as requiring an adjustment beyond those found via large deal reviews. These were software purchases of $9.3m made in 2009 from Microlink. $8.5m of these were capitalised in Autonomy Inc in 2009, although the NBV at Y/E 2009 was only $4.3m. This has been adjusted to set against 2009 TP revenue received from Microlink revenue in Autonomy Inc.

*Completeness of resellers reviewed*

As our approach has focussed on certain resellers with known issues, worldwide deals via ERP via resellers were reviewed more widely. The table below shows the total value of sales via resellers in 2010 and 2011 above a total of $500k. All deals have either been reviewed elsewhere; are an aggregate of lower value deals or reseller paid for deal in full with no evidence of purchases from those resellers. The total value of deals via resellers where reseller has sold less than $500k in a FY is approximately £6m in 2011 (2010: £9m).  As a result we are confident that all reseller issues on deals above $500k have been addressed.

MLAT_AU  00074718

| Reseller | 2010 $'000 | 2011 $'000 | Note |
|---|---|---|---|
| CAPAX GLOBAL | 17,429 | 630 | in reseller list above |
| FILETEK, INC | 10,000 | 0 | in reseller list above |
| TASC | 0 | 3,893 | no issues, noted - 3rd party reseller to US Government agencies - deal paid |
| MicroTech LLC | 8,679 | 5,795 | in reseller list above |
| DISCOVER TECHNOLOGIES, LLC | 7,000 | 19,345 | in reseller list above |
| Tikit Ltd | 5,996 | 0 | in reseller list above |
| Auxilium Tech SrL | 3,309 | 0 | adjusted in 2010 statutory tracker |
| Comercializadora Cobal's | 2,500 | 0 | adjusted in 2010 statutory tracker |
| Realise Limited | 1,795 | 0 | adjusted in 2010 statutory tracker |
| Zenith Gulf Security Systems | 1,163 | 3,738 | in reseller list above |
| Steria Limited | 993 | 114 | adjusted in 2010 statutory tracker |
| Kainos Software Ltd | 742 | 371 | various smaller deals - no individual deal over $500k therefore no review |
| SHI INTERNATIONAL CORP. | 711 | 170 | various smaller deals - no individual deal over $200k therefore no review |
| Bell Canada (Partner) | 689 | 0 | 2010 deal paid in full in Q1 2010 |
| Specialist Computer Centres | 619 | 209 | various smaller deals - no individual deal over $500k therefore no review |
| COMPUTACENTER | 549 | 0 | various smaller deals - no individual deal over $500k therefore no review |
| Resi Informatica SPA | 525 | 0 | adjusted in 2010 statutory tracker |
| Jinangsu Wiscom System Ltd | 505 | 26 | various smaller deals - no individual deal over $200k therefore no review |
| PC-Ware Information Technology | 487 | 1,536 | reseller to European Commission - reviewed in 2011 tracker - no issues |
| Capgemini UK plc | 422 | 1,553 | HMRC's system integrator - reviewed in 2011 tracker - no issues |
| Beijing Com & Lan System Tech | 297 | 565 | various smaller deals - no individual deal over $500k therefore no review |
| OPEN TEXT CORPORATION | 113 | 529 | End user for 2011 deal was Catholic Health Initiatives, no issues |

## 5.   Reciprocal deals

A number of transactions have been identified where a purchase contract was entered into with a reseller or end user. No substance has been identified behind the purchase other than a means to refund the reseller or end user for the payment they had made to Autonomy in relation to the sale Autonomy had made to them. These transaction have been described in various terms throughout our memos and adjustment workings – net accounted deals, reciprocal deals, round trip transactions etc but this note serves to clarify that all these transactions share the common theme that purchase contract was constructed to allow refund to the customer.

*Analysis of reseller cash transactions*

Payments to and receipts from resellers and customers with known reciprocal purchases in 2009, 2010 and 2011 were analysed. This analysis has helped identify a pattern of payments where timing of receipt from reseller occurs around the same time Autonomy made a payment to them. As a result, adjustments have been proposed to net account reciprocal arrangements where there is no evidence to support the value on each side of the arrangement.

The table below summarises the deals that were treated as being reciprocal with a purchase and explains the rationale for that treatment – i.e. what evidence links the transactions.

Behind all these deals where software (or other purchase eg marketing, consultancy) was purchased there is a general pattern where multi-million dollar purchases were ordered and paid for within a matter of days which was also often close to the date when payment was received from customer. There is minimal contractual paperwork surrounding the transactions. These circumstances are unusual and do not reflect normal business practice.

*Review of capitalized software*

In order to identify any other potentially reciprocal purchases that remained on the balance sheet, fixed asset registers from February 2013 were reviewed for items of capitalized software >$1m 2013 (as these were the first reports prepared that included historic data for all entities i.e. all additions and disposals are shown as separate line items so the report can be used to review historic assets,

MLAT_AU 00074719

even those disposed of and written off the ledger). From this process, three software purchases from Microlink in 2007 and 2008 were identified in AU Inc along with with a $532k purchase from 2007 identified on a further review of AU Inc capitalized software. The two 2008 purchases were for AIS, software that is not known to have been used – see table in reciprocal deals section above). An adjustment was therefore made to treat these purchases as if they had been netted against revenue or expensed in full in the year of purchase – an adjustment to retained earnings as these purchases were pre-2009.



MLAT_AU 00074720

| Deal (customer) | Year | Reciprocal with: | Evidence linking the sale and purchase transactions |
|---|---|---|---|
| CREDIT SUISSE - via reseller Realise | 2010 | Minority stake in Realise | Only £826k paid of £1.4m deal and this was paid on the same date as the investment. The investment agreement set out the payment from both parties for the sales and purchases and therefore linked the transactions. |
| KPMG International Cooperative | 2010 | Various | Sideletter allows Tikit to treat as a prepayment for future orders should the edeil with end user KPMG not close. Offsets made with IWOV Uk and ASL AP with Tikit for reseller commissions and support and maintenance fees. Adjustment has been made to net account for these offsets and to recognise revenue as the remaining prepayment was used up. |
| Filetek Inc | 2010 | Filetek Storhouse software | Discussions that pwc held with Darren Gallagher (Head, Development), Sean Blanchflower (Head, Research and Development) and Roger Wang (Vice President, Development) cast significant doubt on the commercial bona fides of the purchases from Filetek.  Subsequent to  these discussions, Morgan Lewis have conducted further interviews (not all of which pwc attended) and confirmed to pwc on 16 April 2013 that: "We found no evidence that the Storhouse software was used.  To the contrary, all of the people we interviewed confirmed that it was not used internally or integrated into any customer's software". |
| US Dept of Veteran Affairs (Filetek) | 2010 | Filetek Storhouse software | See above re Filetek Storhouse |
| Filetek | 2009 | Filetek Storhouse software | See above re Filetek Storhouse |
| McAfee (Capax Global) | 2011 | Capax Utility Software and Connectors | Per interview minutes with Capax, there was no end user deal although Capax did pay Autonomy for the deal in full. It is therefore assumed that Capax were able to this as Autonomy were paying them for software services that were not being delivered. |
| CAPAX | 2009 | EOD payments | Per interview minutes with Capax, Autonomy were sendingpurchase orders and paying for several hundred thousands of dollars of services work each month but Capax was not providing any EOD services for these payments because Autonomy did not refer any customers to them.It is therefore assumed that the sale and purchase are reciprocal. |
| Microlink | 2009 | Search analysis tool (SAT) & Autonomy/Sharepoint Integration Suite (AIS) for MOSS ('Sharepoint 2007') | Neither Mohit Mutreja or Sean Blanchflower had heard of either AIS for MOSS or SAT and confirmed that the search analysis tool had never been used internally or evaluated. |
| Microlink | 2007/2008 | AIS | Neither Mohit Mutreja or Sean Blanchflower had heard of either AIS for MOSS or SAT and confirmed that the search analysis tool had never been used internally or evaluated. |
| Microlink | 2009 | | Neither Mohit Mutreja or Sean Blanchflower had heard of either AIS for MOSS or SAT and confirmed that the search analysis tool had never been used internally or evaluated. |

MLAT_AU 00074721

| Deal (customer) | Year | Reciprocal with: | Evidence linking the sale and purchase transactions |
|---|---|---|---|
| Vatican Library (Microtech) | 2010 | "Advanced Technology Innovation Centre" (ATIC) | PWC found no documentary evidence of development or deployment of the ATIC. Over $4m payment for the Vatican deal was received on same date as Autonomy paid Microtech for the ATIC. Per discussion with Fernando Lucini, a deal was never closed with the Vatican. Autonomy spent a lot of time delivering demos but ultimately they went with another provider. |
| Microtech LLC | 2011 | Maintenance | $700k of this deal was treated as reciprocal with the purchase from Microtech of maintenance services work. |
| Hewlett Packard (Microtech LLC) | 2011 | Federal Cloud Solution | Discussion with Morgan Lewis - HP did not purchase the licence from Microtech - there was no deal with the supposed end user. The federal cloud solution was ordered and paid for on the same day. The following day Microtech paid for the HP deal in full. It is not normal business practice to pay for the full cost of such a large purchase upfront. |
| Prisa (Discover Technologies LLC) | 2011 | Discoverpoint software | Sean Blanchflower was aware that this had been loaded into the delivery system but was not aware of any sales of this software. |
| Thinktech (Discover Technologies LLC) | 2011 | Discoverpoint software | Sean Blanchflower was aware that this had been loaded into the delivery system but was not aware of any sales of this software. |
| Discovertech (Microtech) | 2009 | Purchase of Microlink (Discovertech-Microtech deal) | Email evidence links the acquisition of ML, and the purchase of Discoverpoint from Discovertech via Microtech. |
| Mercedes-Benz Grand Prix Ltd | 2010 | Sponsorship | Emails show that the license sales and the sponsorship contract were negotiated together. Support was not renewed beyond sponsorship period. When support was declined, Mercedes explained to the support renewals team that "due to the software still not working after two years [they were] not planning on renewing the maintenance". Further Matts KNutsson from Autonomy PS team said they had proposed to Mercedes to deliver free services to fix the issues, but Mercedes had declined. Mercedes have never made any claims for product issues. |
| Tottenham Hotspur plc (2011 extension to original 2010 deal) | 2011 | Sponsorship | Customer entered into this deal at the same time as an increase in sponsorship fees was committed to. As they were negotiated together this has been adjusted to net account. |
| Video Monitoring Services (VMS) | 2010 | VMS data feed | No evidence of value as per Sean Blanchflower, we use a similar product from a different company and have not made any sales of the product. |
| Video Monitoring Services (VMS) | 2010 | | No evidence of value as per Sean Blanchflower, we use a similar product from a different company and have not made any sales of the product. |
| Video Monitoring Services (VMS) | 2009 | VMS Software - broadcast content, internet content, advertising content | No evidence of value as per Sean Blanchflower, we use a similar product from a different company and have not made any sales of the product. |
| EMC Corporation | 2010 | Hardware and software | Correspondence stated that" the software sold to EMC a component of the swap transaction last year and that [they] don't use the software". As a result the sale and purchase were clearly negotiated together and they have been adjusted to be net accounted |
| Vidient Systems Inc | 2009 | Vidient software | Sean Blanchflower said this has never been embedded in any Autonomy products available for sale, although it may have been used in demos. |
| Vidient Systems Inc | 2010 | Smartcatch analytics software | Sean Blanchflower said this has never been embedded in any Autonomy products available for sale, although it may have been used in demos. |

MLAT_AU 00074722

## 6.  Collectability

Deals where there is evidence from the time of revenue recognition that collectability was not probable at the time of the deal. Whilst some of these were identified through a review of bad debt write offs, the circumstances at the time of the sale indicate that the initial revenue recognition was wrong. Current management have looked for evidence that showed credit –worthiness had been assessed for some deals but either no evidence was found or in some cases, eg Firmware, there is evidence that creditworthiness was considered to be weak yet revenue was recognized.

Commented [MB6]: A: Can we also add a comment here that outlines that current management have looked for evidence that showed credit worthines had been assessed for the deals / categories below, but none found.

AA done

A number of deals were identified where there was evidence from the time of revenue recognition that collectability was not probable at the time of the deal. The total net revenue adjustments to direct ASL revenue in respect of these deals was £x0.38xm in 2011 (2010: XX£3.34m). The total revenue adjustments to ASL TP income in respect of these deals was to increase TP income by £3.4m in 2011 (2010: £4.3m) (the net impact on 2010 and 2011 is to increase TP income beause the associate bad debt expense has been removed for deals where revenue was originally recognised in 2009 or prior). The most significant adjustments (those relating to upfront revenue recorded of greater than £500k) are as follows:

| Section | FY in which license revenue recorded | Bad debt expense originally recorded (£'000) | | | Customer /reseller | Description | Contracting group entity |
|---|---|---|---|---|---|---|---|
| | | Prior to 2010 | 2010 | 2011 | | | |
| 3.6.1 | Prior to 2010 | 0 | 1,921 | 1,278 | Integracion de Negocios (various end users) | Existing collectability issues at end of 2008. AR balance at 31 March 2009 which is date of first deal in 2009 was $834k, all of which was overdue for payment. Approximately 25% of the balance was overdue by over 180 days, a further 13% overdue by more than 90 days.  Approximately $5m further revenue was recognized in 2009 despite overdue debts. Ultimately written off. | Non-UK |
| 3.6.1 | 2010 | 0 | 0 | 625 | Knowledge Capital Corp | Revenue was recognized upfront for this new OEM customer who was given extended payment terms (4 months). Lack of both previous payment history with the group and any information regarding creditworthiness | Non-UK |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | and extended payment terms evidence collectability was not probable. Ultimately written off. | |
| n/a | 2010 | 0 | 0 | 500 | Baobab | Revenue was recognized upfront for this new customer. Lack of both previous payment history with the group and any information regarding creditworthiness evidences collectability was not probable. Ultimately written off. | ASL |
| n/a | 2010 | 0 | 1722 | n/a | Red Ventures (end user Poste Italiane) | Revenue was recognized upfront for this new reseller. Lack of both previous payment history with the group and any information regarding creditworthiness evidence collectability was not probable. Further, the group was already experiencing collectability issues with other resellers in Italy, including resellers selling to Poste Italiane. | ASL |
| n/a | 2010 | 0 | 0 | 1,563 | Comercializadora Cobal (end users TV Azteca SA de CV and Centro de Investigacion y Segu) | Revenue was recognized upfront for this reseller through which was a new customer in 2010. Lack of both previous payment history with the group and any information regarding creditworthiness evidence collectability was not probable. Further, the group was already experiencing collectability issues with other resellers in Latin America (See Integracion de Negocios above and Telematica Lefic below). Ultimately written off. | Non-UK |
| 3.6.2 | 2009 | 0 | 0 | 1,738 | Allotech De Colombia SA and Camsa Konzern SA de CV | $836K license revenue was recognized relating to this Columbian reseller deal. Poor payment history (reseller had not paid for previous deal in 2007), extended payment terms, and lack of any information regarding creditworthiness evidences that collectability was not | Non-UK |

MLAT_AU 00074724

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | probable. $1600k was recognized relating to this Mexican reseller deal. Lack of both previous payment history with the group and any information regarding creditworthiness evidence collectability was not probable. Further, the group was already experiencing collectability issues with other resellers in Latin America (See Integracion de Negocios above and Telematica Lefic below). Ultimately both deals written off. | |
| 3.1.1.B | 2009 | 0 | 871 | 534 | AS Computado ras y Servicios | This deal was signed at the end of 2009 at which point there were many other Mexican resellers who were overdue for payment. There was no previous payment history and extended payment terms were given. All of this evidences collectability not probable. Deal was ultimately written off in dark period. | Non-UK |
| 3.1.1.B | 2009 | 0 | 0 | 1,405 | Sales Consulting S.r.l. / Poste Italiene | Extended payment terms of 150 days were given on this deal via Italian reseller. This along with the lack of payment history or credit review evidences collectability was not probable. Ultimately written off. | ASL |
| 3.1.1.B | 2009 | 0 | 605 | 0 | Firmware Technologi es | Emails at the time show that Firmware's ability to pay Autonomy was dependent on them receiving funds from customer and the signing of an impending deal. Therefore collectability could not be concluded as probable. | Non-UK |
| 3.6.2 | 2009 | 1,059 | 1,781 | 31 | Telematica Lefic | The first large deal was signed via this reseller in Q1 2008 (the only other previous deal of $20k from 2007 remained unpaid at that point). Extended payment terms were given (split 50:50 between 90 and 180 days | Non-UK |

MLAT_AU 00074725

| | | | | | despite no credit information and lack of payment history. Ultimately deals were provided and written off in later periods. | |
|---|---|---|---|---|---|---|

In areas where there was a class issue eg the 8 resellers, deals have been moved to a cash receipt basis due to uncertainty over collectability. There are a number of deals in this class where cash was received and the adjustments have therefore deferred the revenue to that point. For other contracts we have used the fact they were collected as evidence that they were collectible from the outset where no contradictory information was found.

## 7. Managed Services and hosting contracts

Deals where license was recognized upfront despite not meeting criteria for accounting as a separate element due to either the license not being separable from the hosted service or the fair value of the hosted service not being reliably estimated.

As noted in section one, a decision was made to account for the archiving and eDiscovery hosting contracts on a rateable basis over the service term rather than recognising the licence element up-front. A separate memo has been prepared to discuss this accounting approach in more detail. Please refer to "Hosted Licences" document. As a result of this decision, adjustments have been made to the 2010 and 2011 accounts. We have explained below how this adjustment was calculated.

### Review of all hosted contracts with license value greater than $1m

The list of hosted license contracts was obtained from the $100k reports produced by management each quarter. In order to ensure the list was complete, DigitalSafe and Introspect reports were obtained from NIBS. All customers with hosted licence revenue greater than $1m were reviewed to ensure the contracts had been accounted for appropriately. This involved a full review of the contracts, the accounting entries and the contracts and accounting entries for the previous deals with the customer for the hosted service, including comparison of fee structure from one deal to the next with that customer.

The fair value carve out for services and subsequent payments were considered, however, through the work carried out in the next section, the conclusion was reached to account for Digital safe and Introspect licenses ratably, so no adjustments were proposed resulting from the >$1m deal review for hosted contracts.

There were no issues identified relating to non-payment of invoices for the >$1m hosted license contracts reviewed.

| | Deals in sample >$1m | |
|---|---|---|
| | # | Value ($'000) |
| 2010 | 12 | 64,208 |

MLAT_AU 00074726

| 2011 | 13 | 44,892 |
|------|-----|--------|

*Adjustment to rateable revenue recognition*

Section one of this report summarises the accounting policy for hosting revenue and the rationale for changing archiving and eDiscovery licence revenue to rateable recognition over the contract term. The previous treatment carved out the proposed fair value of the support and other services and recognized the revenue across the term of the contract or when the service was provided. As there has been no change to the treatment of support and other services, only the licence revenue component requires adjustment. The work carried out in this section compiled all the hosted Digital Safe, Introspect and Connected licenses sold and calculated the adjustment to switch to account for these licenses ratably.

Hosted Digital Safe, Introspect and Connected licenses have been billed through NIBS, ERP or Netsuite.

NIBS:

As Zantaz was acquired in the second half of 2007, a report of all DigitalSafe and Introspect revenue from 2008 to 2011 was obtained from NIBS. The licence revenue from this report was extracted and used in the analysis.

ERP:

ERP is used to bill other licence revenue as well as hosting, therefore the hosted licenses needed to be extracted from the data from this system. The ERP sales report for the same period was filtered by licence revenue with a Zantaz product description. This provided a list of 46 customers with a total licence value of $66,891k. All contracts less than $100k were assumed to be on premise licences rather than hosted. There were certain contracts billed through ERP that had been sold via Microlink. Microlink's status as a US Federal provider prevents their finance team from sharing contracts. However, the purchase orders provided shows that these were orders of on-premise license. Furthermore, there are no billings for additional hosting fees through ERP and as there is no evidence of separate hosting the Microlink contracts have been excluded from the adjustment. For all other customers/licences through ERP, the contracts have been reviewed to determine whether they are hosted or on premise. Those licences which are on premise have been added to the analysis.

Some small value contracts were noted as being hosted by the US finance team. A check has been included to ensure all contracts in 2010 and 2011 have been included. The $100k reports include whether a contract has hosted revenue; all those with hosted revenue have been checked against the analysis. Any additional hosted licences have been added to the analysis.

Netsuite:

This system was used from June 2011 onwards. 6 hosted licenses were billed via this system in the accounting period and have been included in the analysis.

MLAT_AU 00074727

In order to calculate the adjustment, the start date and term of the licence are required.  The contracts were reviewed and details added to the analysis.  Licences which were small in value were not reviewed.  Instead, a weighted average term was calculated based on all other contracts in the analysis and applied from the invoice date.

The analysis includes formulae showing how the calculations were performed for each licence.  A summary table below the analysis sets out the adjustments for each year and for each type of licence.  Three BP licences have been excluded from the adjustment as they were accounted for rateably when initially recognized.

The adjustments made are as follows:

|  | Archiving ($) | eDiscovery ($) | Total adjustment ($) |
|---|---|---|---|
| **2009 adjustments:** | | | |
| DR: Licence revenue | 18,458,512 | 1,268,760 | 19,727,272 |
| CR: Hosting revenue | (8,726,276) | (676,432) | (9,402,709) |
| CR: Deferred revenue | (42,750,248) | (1,733,502) | (44,483,749) |
| DR: Retained earnings | 33,018,013 | 1,141,174 | 34,159,186 |
| | | | |
| **2010 adjustments:** | | | |
| DR: Licence revenue | 42,448,954 | 21,244,378 | 63,693,332 |
| CR: Hosting revenue | (19,914,668) | (3,819,869) | (23,734,537) |
| CR: Deferred revenue | (65,284,534) | (19,158,011) | (84,442,544) |
| DR: Retained earnings | 42,750,248 | 1,733,502 | 44,483,749 |
| | | | |
| **2011 adjustments:** | | | |
| DR: Licence revenue | 29,334,972 | 10,454,802 | 39,789,774 |
| CR: Hosting revenue | (18,295,059) | (7,728,147) | (26,023,206) |
| CR: Deferred revenue | (76,324,446) | (21,884,666) | (98,209,112) |
| DR: Retained earnings | 65,284,534 | 19,158,011 | 84,442,544 |

MLAT_AU 00074728

## 8. Solution deals (Red projects)

Deals where license was recognized upfront despite not meeting criteria for accounting as a separate element due to significant customisation of software being required to meet the deliverable and/or scope of deliverables being so vague as to render any estimate cost to complete unreliable.

There a number of contracts that Autonomy accounted for as separate license, support and services transactions which per the contract and in practice are solution deliverables when the elements are not separable and should be accounted for as a solution. Post-acquisition, these contracts received management's scrutiny as they were absorbing costs to deliver the services but no revenue left to recognise as the majority of the contract value has been recognized as license revenue.

The following table shows the contracts identified and a summary of the issues and adjustment.

| Customer | Total Contract Value | Legal entity | Summary |
|---|---|---|---|
| BBC Monitoring | £6m | ASL | There was never an enforceable contract from the outset. All revenue should have been deferred until ultimately contract was cancelled and credited in 2013. |
| Euronews | £1m | ASL | Value of services was hugely undervalued in the contract. Fair value of entire contract should have been recognized as services performed with revenue being recognized equal to costs incurred. Loss provision was recorded in 2011 for foreseeable loss based on remaining costs to complete. |
| ECSSR (via Zenith) | £2m | ASL | Services and License split should have been allocated with higher value for services. |
| Met Police | £1m | ASL | Value of services was hugely undervalued in the contract. Fair value of entire contract should have been recognized as services on a percentage completion basis. At the end of 2011 revenue should be deferred and a loss provision recorded. |
| Prisa | £7m | Autonomy Spain | Services and License split should have been allocated with higher value for services. No revenue should have been recognized until December 2011 when the SOW was signed. |
| Tottenham (2010 original deal) | £4m | ASL | No scope was ever agreed to deliver the contract under. Revenue should have been deferred until such point when scope was agreed and costs to complete could be estimated. |

MLAT_AU 00074729

From this review it is clear that this was a specific way of structuring large solution contracts in EMEA and APJ where although there were complex services involved, the contract structure was heavily skewed towards license revenue which was recognized upfront. This was not the case in AMS.



MLAT_AU 00074730

## 9. Transfer Pricing

Transfer pricing charges are made between the Autonomy group companies for both costs and revenues. These return revenue invoiced in entities other than Autonomy Systems Limited to ASL, whilst providing relief for the costs incurred by the entity. Some entities are also entitled to a profit share. This transfer pricing is governed by transfer pricing agreements between the companies.

For transactions adjusted in entities other than ASL, a corresponding adjustment has been made to correct for the transfer pricing charges that would have been made in relation to that transaction.

The table below shows the % of revenue and costs that were transfer priced back to ASL, via PLC, in 2011 when it was invoiced by the following companies:

| | Autonomy Inc | Interwoven Inc | Zantaz Inc | Verity Inc | Virage Inc |
|---|---|---|---|---|---|
| Basic revenue share | 96.5% | 96.5% | 96.5% | 96.5% | 96.5% |
| Basic cost share | 100% | 100% | 100% | 100% | 100% |
| Profit share | n/a | 56% | 77% | n/a | n/a |
| Effective revenue share | 96.5% | 54.04% | 74.305% | 72.38% | 96.5% |
| Effective cost share* | 100% | 56% | 77% | 100% | 100% |

*Costs that fall into the marketing, Tech, support categories may be transfer priced at different %, however none of the cost transfers from the revenue adjustments fell into this category. Also note that there were no adjustments in Interwoven Inc, Verity Inc and Virage Inc that related to cost items.

The reason that Interwoven Inc and Zantaz Inc transfer pricing % are not at 96.5% of revenue is that these companies also receive a profit share as a result of their original ownership of the IP. This profit share changes from year to year and is governed by the transfer pricing agreements – details of profit share for those companies receiving one are shown below:

| | Interwoven Inc | Zantaz Inc | Verity Inc | Etalk |
|---|---|---|---|---|
| 2009 | 67% | 30% | 31% | 20% |
| 2010 | 56% | 23% | 25% | 17% |
| 2011 | 44% | 23% | 25% | 17% |

There is a further complication to the transfer pricing where the sales rep responsible for the deal is employed by a company other than the company invoicing the sale. In this case, the deal is included in the attributable revenue for the company that employs the rep, and for some companies this results in their receiving a 3.5% share of the deal revenue. No adjustment has been made for this 3.5% in the ASL transactions as it was not considered material. It has however been adjusted in the US adjustments where necessary. The detailed description of transfer pricing for different invoicing/sales rep combinations is below:

### Deal invoiced by AU Inc, sold by AU Inc, ASL or Zantaz Inc rep
AU Inc will keep 3.5% of the revenue and the remaining 96.5% will be transferred back to ASL via plc.

MLAT_AU 00074731

*Deal invoiced by AU Inc, sold by Zantaz UK rep*

AU Inc will keep 3.5% of revenue and 96.5% will be transferred back to ASL via plc. However, Zantaz UK will also receive 3.5% of the revenue as a result of it being included in their attributable revenue. The 3.5% is transferred out of Zantaz Inc reduces the amount of the % profit share that is transferred via transfer pricing via plc to ASL.  Thus in 2011, for example, 0.8% cost remains in Zantaz Inc and ASL therefore actually receives 93.8%.

*Deal invoiced by AU Inc, sold by Digital LLC rep*

Digital LLC receives 3.5% of the revenue and the remaining 96.5% is transfer priced to ASL.

*Deal invoiced by AU Inc, sold by Verity Canada*

Verity Canada receives 3.5% of the revenue (transfer priced from ASL via plc and Verity Inc), AU Inc keeps 3.5% of the revenue and ASL receives the remaining 93%.

*Deal invoiced by ASL, sold by Zantaz UK*

Zantaz UK receives 3.5% of the revenue from Zantaz Inc. This reduces Zantaz Inc's profit share transfer to ASL (via plc) although this is less than the amount transferred to Zantaz UK and, for example, in 2011 results in a reduction of 0.8% of revenue in Zantaz Inc. ASL keeps the remaining 97.3% of revenue.

*Deal invoiced by Zantaz Inc, sold by Zantaz UK*

Zantaz UK receives 3.5% of the revenue from Zantaz Inc. This reduces Zantaz Inc's profit share transferred to ASL (via plc) resulting, in 2011, in 24.89% of revenue remaining in Zantaz Inc and 71.61% being transferred to ASL.

*Deal invoiced by Zantaz Inc, sold by Digital LLC*

Digital LLC receives 3.5% of the revenue as a result of the attributable revenue, but this is transferred from AU Inc. At 2011 TP% rates, for example, 74.305% of the revenue booked in Zantaz Inc is transferred in transfer pricing to ASL (via plc), thus 25.695% of the revenue remains in Zantaz Inc.

*Deal invoiced by Zantaz Inc, sold by Verity Inc*

Verity Inc receives 3.5% of the attributable revenue from ASL (via plc). However, at 2011 TP% rates, 75% of this is then transferred back to ASL as profit share leaving just 0.875% of revenue in Verity Inc. Zantaz Inc retains 25.695% of the revenue invoiced and the other 73.43% is transferred in transfer pricing to ASL (via plc).

*Deal invoiced by Zantaz Inc, sold by Autonomy Inc, ASL or Zantaz Inc rep*

With 2011 TP% rates, Zantaz Inc retains 25.695% of the revenue invoiced. The remaining 74.305% is transferred in transfer pricing to ASL (via plc).

*Deal invoiced by Zantaz Inc, sold by Interwoven UK*

Zantaz Inc retains 25.695% of the revenue invoiced at 2011 TP% rates. The remaining 74.305% is transfer priced to ASL (via plc). Interwoven UK receives 3.5% of the revenue in TP from Interwoven Inc. This means Interwoven Inc's profits are reduced and therefore the transfer pricing of Interwoven Inc profit share to ASL is also reduced by 66% of the 3.5% that has been transferred to Interwoven UK (resulting in a reduction of 1.96% of the revenue in Interwoven Inc), and leaving the remaining 72.765% of the revenue in ASL.

MLAT_AU 00074732

*Transfer Pricing Verification and Reconciliation*

A number of adjustments were made to correct the transfer pricing journals that had previously been made in the 2011 draft stats:

*Exchange rate*

Firstly, in relation to the exchange rate used. In the original draft transfer pricing working a US$/GBP exchange rate of 1.5628 was used. However, in the revenue workings we have used 1.6. It was considered that 1.6 was a more appropriate exchange rate to use given that this was an averaged rate over the year (whereas the 1.5628 was the year-end exchange rate). In a copy of the transfer pricing working, the exchange rate was changed to 1.6 and the resulting difference from the original journal was posted in the column 'TP adjustment for US$ forex rate to 1.6' in the Adjustments summary. This adjustment is calculated on the sheet "Transfer pricing adjustment for forex rate 2011".

*TP% and excluded cost items*

A comparison of the TP% for revenue, costs and profit share in the TP agreements with those used in the draft TP calculation identified a number of discrepancies. It was also identified during this work that a number of cost items had been excluded from the 2011 transfer pricing workings, for example amortisation of intangibles.

An adjustment was made to the transfer pricing to correct the necessary TP%'s and add back the non-exceptional costs but remove the accelerated write down of goodwill, R&D and capitalised software. The adjustment was calculated by adjusting the costs and TP% in the 2011 TP working with corrected forex rate, and the movement in the TP journal was then posted in the summary of adjustments as the 'TP verification' adjustment. The TP costs to be adjusted are analysed in the spreadsheet called "1st Jan to 31st Oct 2011 DDS TB – LC" and the TP%' in the spreadsheet called 'TP Agreement and Calculation review UPDATED'.  The adjustment is summarised in the spreadsheet called 'Transfer pricing verification_updated%_3.9.13'.

In 2010 there was similarly an adjustment made to correct the TP% in the calculations to align with the TP agreements. This adjustment is summarised in the spreadsheet ' Transfer pricing 2010 – adjustment for %'.

*Reconciliation*

In order to confirm that the transfer pricing adjustments had been calculated correctly for all the adjustments made reconciliations were performed. Copies of the transfer pricing workings for 2009, 2010 and 2011 were used and columns were inserted to enable the adjustments to revenue and costs to be included in the TB input into the calculation. Where necessary, adjustments were also made to the attributable revenue figures in the calculation. The final TP journal after all adjustments (forex, TP%, excluded cost items, and revenue and cost accounts preparation adjustments where relevant) had been put through the working was then compared to the total TP revenue figures from the latest draft statutory accounts. Any difference were investigated and corrected as necessary.

The reconciliation's are performed in the spreadsheets called 'Transfer pricing overall reconciliation 2010 stats' and 'Transfer pricing overall reconciliation 2011 with SADs'

MLAT_AU 00074733

In the 2010 transfer pricing reconciliation there was a difference in the Verity Inc and ASL position as a result of the impact of split of income/costs re: Cardiff ledger items. As this is not possible to adjust on an individual deal by deal basis, a single adjustment was prepared in the spreadsheet called 'Transfer pricing reconciliation 2010 – after adjustment for %' to transfer the difference in Verity Inc to ASL. This resulted in a remaining difference in ASL of £1.2m.



MLAT_AU 00074734

## 10.    Acquisitions

Autonomy made a number of acquisitions in 2010 and 2011. These were CA's information governance business (i.e. trade and asset purchase not an equity purchase), Microlink, a minority stake in the reseller Realise in 2010, and Iron Mountain's digital archiving, eDiscovery and online backup businesses in 2011. Sales made to acquisition targets near to the acquisition dates were specifically reviewed to ensure that there was justification for the fair value of these transactions.

### A       CA

The day before the acquisition of certain trade and assets from CA, CA signed a $2.35m OEM deal for Autonomy Keyview and IDOL as well as a $250k deal for internal use of IDOL and Message Manager. This amount was paid by customer on 21 July 2010.

CA originally signed an OEM contract in August 1999 and paid $355k for a 3 year OEM term for Keyview software. The 2010 agreement was $2,350k for a 4 year term for IDOL and Keyview. It was also noted that Autonomy contacted CA in 2008 regarding CA's unexpected royalty return in 2007. It had been Autonomy's understanding that the agreement was terminated in 2007. Although the value of the 2010 deal is significant higher than the 1999 deal the value does not seem unreasonable as it is for a longer term (4 years rather than 3), it includes additional software (IDOL) and it likely includes a settlement for the prior years where CA had not been invoiced but were clearly distributing the software based on the 2008 correspondence. No information has been reviewed that would suggested the sale lacks value and is reciprocal with the purchase and as such  no adjustment has therefore been made for this deal. The Message Manager deal was for a four year term and gave CA to the rights to use the software internally over that period. This is the software that CA had sold to Autonomy as part of the acquisition. It seems commercially reasonable that CA would want to negotiate the rights to keep using the software for internal purposes and it is difficult to separate this from the acquisition. However as the license value was £300k it is not material and no further review was undertaken.

### B       Realise

There was a Q2 2010 deal with Realise for end user Credit Suisse. Only a proportion of the deal was paid and the remainder provided in 2011. The payment was made on 20 December 2010 and was reciprocal with the purchase of the minority stake in Realise; this is evidenced by the timing of the payments and the link in the investment agreement. The revenue has therefore been adjusted to set against the amount paid to Realise under the terms of the acquisition for professional services already provided. Further details are included on the 2010 contract review tracker.

### C       Iron Mountain

Autonomy acquired Iron Mountain on 6 June 2011. On the same date Autonomy signed two license sale contracts and one hosted service contract with Iron Mountain.

The first was a license for IDOL search: license fee $1.5m, invoiced through ERP, inv # 10009-ANA. The invoice was considered by management to be below fair value and was adjusted to a higher value ($7m) which management considered to be consistent with other similar transactions.

MLAT_AU 00074735

The second license was a prepaid fee for ARM as well as the software acquired from Iron Mountain (Livevault and Connected), such that Iron Mountain could resell this software to end users and pay royalties of between 50% and 70% to Autonomy. The fee paid was prepaid royalty fees split $1.5m ARM and $8m Digital products. The reseller contract was invoiced through Netsuite for total of $9.5m. Part of the initial $9.5m of invoices had to be credit/rebilled for $6.5M in June 2012 to ensure the AR aging showed the correct age, as this tranche was not due until June 2012.  As of March 2013, Iron Mountain had reported royalties due to Autonomy of $3.5m with an annual recurring run rate of $3.5m. Iron Mountain were paying the invoices as due until they were put on hold as part of ongoing discussions regarding other amounts due from each party relating to the transaction. As Iron Mountain continue to resell the software, this suggests that there was genuine value to this contract and gross accounting was appropriate.

The hosted service deal was a prepaid fee for Connected, Livevault and DRCCM for internal use by Iron Mountain. Autonomy continue to invoice Iron Mountain on a monthly basis for excess internal usage under this contract which confirms that they continue to leverage value form the products and evidences that it has standalone value.

As it appears there was genuine value on both sides of the sale and acquisition relating to the contracted value of license and services, no adjustments have been made to net the accounting with the acquisition accounting. Although there is no direct evidence for Iron Mountain using the IDOL search license, $1.5m is not an unreasonable fee for this license and the conclusion reached on the other two contracts has been applied to the search license sale.

The adjustment to revalue upwards the IDOL search deal has been reviewed in more detail. This was a consolidation only adjustment and was not pushed down to DDS so the revenue in the draft statutory accounts for this deal is based on $1.5m.

The calculation below was prepared by former management to support the upwards valuation of the $1.5m license deal to $7m.

MLAT_AU 00074736

| | Licensed software | Date | Term | End date | Licence | Maintenance (est 3 years 5%) |
|---|---|---|---|---|---|---|
| Verdasys | | 31-Mar-09 | 3.25 years | 30-Jun-12 | 5 | 0.75 |
| EMC | | 29-Sep-10 | 6 years | 29-Sep-16 | 5.007 | 0.75105 |
| EMC | | 30-Jun-09 | 3 years | 30-Jun-12 | 4.345 | 0.65175 |
| | **Total licence** | | **7.25 years** | | **9.352** | |
| Filetek | additional software and term extension | 31-Mar-10 | 5.75 years | 31-Dec-16 | 8.5 | 1.53 |
| Filetek | SPE basic | 31-Dec-09 | 5 years | 31-Dec-14 | 8 | 1.44 |
| | **Total licence** | | **7 years** | | **16.5** | |
| VMS | Extensive list of software | 30-Jun-09 | Perpetual | | 4.8 | 0.7 |
| VMS | Additional software | 31-Dec-10 | Perpetual | | 8.6 | 1.3 |
| | **Total licence** | | **Perpetual** | | **13.3** | |
| Capax | Aungate, Introspect, EDD | 31-Mar-09 | 5 years | 31-Mar-14 | 7.5 | 1.1 |
| Capax | additional software and term extension | 31-Dec-09 | 6 years | 31-Dec-15 | 4 | 0.6 |
| Capax | extension to UK datacenters | 31-Mar-11 | | 31-Dec-15 | 1.6 | 0.2 |
| | **Total licence** | | **6.8 years** | | **13.1** | |
| HP | Various | 31-Mar-11 | 5 years | 31-Mar-16 | 8 | 0.96 |

A perpetual licence shall be considered as a 5 year license. It is not realistic to assume a greater life than this.

| Average price above equals: | | $m | |
|---|---|---|---|
| Verdasys | | 7.7 | |
| EMC | | 6.4 | |
| Filetek | | 11.8 | fundamental part of offering |
| VMS | | 13.3 | fundamental part of offering |
| Capax | | 9.6 | fundamental part of offering |
| HP | | 8.0 | |
| Average | | 9.5 | |
| | | | |
| Excluding items where Autonomy is a fundamental part of the customers offering: | | 7.4 | |
| | | | |
| Value associated with licence for Q2 2011 transaction with IRM | | 7.0 | |

It is believed that the list of deals above was intended to represent similar deals. The deals listed appear to be OEM deals whereas the Iron Mountain sale was an internal use sale for IDOL server, so it is not clear why OEM deals have been used as the comparative group. However, this approach of a bespoke fair value assessment based on a small group of deals is not considered to be sufficient to result in an upwards valuation of the deal and is not consistent with the rest of the group's accounting for license as the residual amount. Autonomy do not seek to fair value their software products. Software license value is accounted for under the residual method after ensuring support and services have been accounted for at fair value. IDOL is sold on a value based pricing model, not a price list based model. It is therefore not possible to fair value a product with such a widely variable selling price and there is no reliability or basis to revalue an individual deal in this more. For reference, there are a number of other sales over the course of 2010 and 2011 which are for a similar range of products to the Iron Mountain sale which have been sold at widely varying pricing – e.g. AT&T ($200k), Dassault ($1.2m) and SAIC ($369k). This undermines the reliability of the limited deal review above.

### D    Microlink

Autonomy made a large number of sales to Microlink in the 2 quarters prior to acquisition on 4 Jan 2010. The receivables from Microlink at the end of 2009 totalled $23m. It is evident from Microlink's balance sheet at acquisition that Microlink did not have the means to pay the majority of this balance. The subsequent writedown of the inventory, and the writedown of the payables in

MLAT_AU 00074737

Microlink's books, also indicates that there was no bona fide end user deal which would have enabled the debt to be paid as it fell due.

It is therefore considered necessary to reverse $11.8m of revenue from the sales to Microlink in the last 2 quarters of 2009.

The $23m of receivables also included $6.9m remaining balance from an own use sale to Microlink from Q4 08 of $11m. Although we have no evidence that the treatment of the original sale was incorrect the remaining debt was effectively forgiven by AU Inc on acquisition. This debt forgiveness should have been treated as a revenue reversal, rather than being capitalized as an intangible investment by AU on consolidation.

Of the remaining $4.3m of receivables at acquisition, $3.5m related to a federal government deal 'sold' to Microlink  in Q2 2009. The deal was then sold by Autonomy to the end user during 2009 with the cash collected in March 2010. This second sale was not recorded by Autonomy and the cash collected was used to offset the $3.5m 'receivable' from Microlink. Although many aspects of the accounting are incorrect there is no net impact on the transfer pricing income received by ASL for the full year 2009 or 2010.

The remaining $0.8m receivables at acquisition have no issues noted. The larger items are not in inventory at acquisition and appear on Microlink's own trade receivables, so appear to have been sold on.

The above transactions all occurred in the US companies' books. However the corrections also impact ASL's results via the inbound transfer pricing from the US companies. The combined impact on ASL's results is to reduce retained earnings bwfd into 2010 by £7.4m and reduce 2010 revenue by £2.6m, with a net reduction in i/co receivables from the US subsidiaries of £10.0m.

This work does not consider other purchase transactions with Microlink in 2009 and sales transactions that were not remaining in Autonomy's accounts receivable. These have been considered as part of the 2009 review of large deals, resulting in other adjustments. Full adjustment details are in the spreadsheet: "Microlink" and described in the 'Microlink memo'.

There is also an adjustment made for a $10m deal with MicroTech as reseller and DiscoverTech as end user which was made at the end of 2009 days before the Microlink acquisition. This is considered reciprocal with the Microlink acquisition – for detailed explanation see the separate Microlink Memo. This adjustment has been made on the 2009 Big deals schedule. All deals with Microlink in 2009 and 2010 have been reviewed. All 2008 deals which were in debtors at the 2009 balance sheet date were also reviewed.

MLAT_AU 00074738

## Appendix A Reference to supporting documents

The following support documents, saved in the specified folder location, have been referred to in this memo.

"Autonomy - Accounting issues and proposed resolutions"

Review of 2010 and 2011 deals

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Statutory contract review – tracker - 2010

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Statutory contract review –tracker - 2011

Review of 2009 deals

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\2009 Big deals

2009 debtors working

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Debtors 2009

Additional Debtors schedules prepared by Credit and Collections

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Prasad Interview Memo (Tab 1) (Legal Workings Unknown)

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Prasad Interview Memo (Tab 4) (Problem Accounts 6 11 BH)

Reseller cash transactions

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Vendor & Customer Activity Details Extracts – Up-dated

Carve out rate analysis 2010

Z:\Financial Reporting\Audit papers\2010 audit papers\2010 audit papers\Q4 2010 audit papers\Revenue

Bad debt costs Q3'11 V10

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Bad debt provision files

Autonomy AR Reserves - Invoice Detail Walkfwd Sched 103112_042313 (2) - AA comments added.xlsx

MLAT_AU  00074739

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Bad debt provision files

Autonomy AR adjustments - bad debts Oct'11 - adj booked as part of opening balance sheet adj in 2012.xlsx

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Bad debt provision files

Dark period credit notes – all systems

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests

Review of reseller deals outside of ERP

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\reseller reports

Microlink adjustment

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Microlink.xlsx

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Microlnk from 2007 and 2008.xlsx

Hosting adjustment

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Hosting adjustment – rateable rev rec

Transfer pricing verification and reconciliation

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Transfer pricing adjustment for forex rate 2011

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\1st Jan to 31st Oct 2011 DDS TB – LC

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\TP Agreement and Calculation review UPDATED

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Transfer pricing verification_updated%_3.9.13

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Transfer pricing 2010 – adjustment for %

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Transfer pricing reconciliation 2010 – after adjustment for %

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\Transfer pricing overall reconciliation 2011 with SADs

MLAT_AU 00074740

Z:\Financial Reporting\Audit papers\2011 audit papers\Oct 2011\EY data requests\ Transfer pricing overall reconciliation 2010 stats



MLAT_AU 00074741