# EXHIBIT 11

| | |
|---|---|
| **From:** | Cappell, Shana R. <scappell@morganlewis.com> |
| **Sent:** | Tuesday, June 25, 2013 1:53 PM |
| **To:** | Dave Hales/08698M/Audit/Reading/ErnstYoung/GB <dhales@uk.ey.com>; chris.yelland@hp.com; kevin.asher@ey.com; kpringle@uk.ey.com; Stolley, Martha B. <mstolley@morganlewis.com>; Resley, Susan D. <sresley@morganlewis.com>; Eric Schweiker <eric.m.schweiker@hp.com> |
| **Subject:** | RE: Follow up from our call today |
| **Attach:** | HP - Autonomy - Interview Summaries.zip |

As it turns out, the file is small enough that it can go by regular email. I am attaching a zip file with the interview summaries.

Thanks,

Shana

**Shana R. Cappell**
**Morgan, Lewis & Bockius LLP**
101 Park Avenue | New York, NY 10178-0060
Direct: 212.309.7132 | Main: 212.309.6000 | Fax: 212.309.6001
scappell@morganlewis.com | www.morganlewis.com

Assistant: Donna C. Weekes | 212.309.7172 | dweekes@morganlewis.com

**From:** Cappell, Shana R.
**Sent:** Tuesday, June 25, 2013 4:46 PM
**To:** 'Dave Hales/08698M/Audit/Reading/ErnstYoung/GB'; Chris.Yelland@hp.com; kevin.asher@ey.com; kpringle@uk.ey.com; Stolley, Martha B.; Resley, Susan D.; 'Schweiker, Eric'
**Subject:** Follow up from our call today

All,

I am attaching the following documents:

• HP-side search terms

• AU-side search terms

• Custodian list

• Describing of Axcelerate and its capabilities

I will be sending you the interview summaries in a separate email via secure file transfer.

Thanks,

Shana

**Shana R. Cappell**
**Morgan, Lewis & Bockius LLP**
101 Park Avenue | New York, NY 10178-0060

Direct: 212.309.7132 | Main: 212.309.6000 | Fax: 212.309.6001
scappell@morganlewis.com | www.morganlewis.com

Assistant: Donna C. Weekes | 212.309.7172 | dweekes@morganlewis.com

DISCLAIMERThis e-mail message is intended only for the personal useof the recipient(s) named above. This message may be anattorney-client communication and as such privileged andconfidential and/or it may include attorney work product.If you are not an intended recipient, you may not review,copy or distribute this message. If you have received thiscommunication in error, please notify us immediately bye-mail and delete the original message.[attachment "HP - Autonomy - Interview Summaries.zip" deleted by Dave Hales/08698M/Audit/Reading/ErnstYoung/GB]

MLAT_AU 00072855

# Morgan Lewis
### C O U N S E L O R S   A T   L A W

**DATE:**   January 17, 2013

**SUBJECT:**   Memorandum of Interview with Michael Mooney – January 17, 2013

| Tab No | Document Description |
|---|---|
| 1 | 11/27-28/2010 emails between Egan, Mooney, Scott, and Hussain re. SMS calls |
| 2 | 9/15/2010 email from Hussain to Lynch |
| 3 | 9/21/2010 email from Mooney to Hussain re. Amgen models |
| 4 | 9/30/2010 email from Tom Flanagan to Egan |
| 5 | 12/22/2010 emails between Michael Chang, Hussain, Chamberlain, and Mooney. |
| 6 | 12/1/2010 emails between Mooney and Hussain re. Amgen deal |
| 7 | 3/22/2011 email from Mooney to Glenn Fong, Jim Crumbacher, Trish Williamson, and Emily Raynal |
| 8 | 3/29/2011 email from Mickie Lee re. amendment to McAfee user agreement |
| 9 | 3/29/2011 email from Hussain to Mooney re. McAfee deal |
| 10 | 3/31/2011 email from Scott requesting review of Capax/McAfee P.O. |
| 11 | 3/31/2011 email from Jorge Salazar and attached Capax/McAfee P.O. |
| 12 | 4/6/2011 email from Hussain to Mooney asking for a call re. DKO and McAfee |
| 13 | 5/12/2011 email from Mooney to Hussain |
| 14 | 4/30/2010 email from Dean Revard to Hogenson re. TXU/Capax deal |
| 15 | 6/2-3/2010 emails between Monica Baum, Andrew Northrop, Michael Chang, Tim Young, Percy Tejeda, and Mooney re. Deloitte deal |
| 16 | 7/13-14/2009 emails between Craig Steury, Marc Geall, and Fernando Castellanos re. SFPD |
| 17 | 12/13/2010 email from Hussain to Egan, Mooney, Scott, and Sullivan re. DOI deal |
| 18 | 12/172010 emails between Chamberlain, Egan, Mooney, and Hussain re. FileTek/VA |

## I.   Interview Overview

On January 17, 2013, Leslie Caldwell, Susan Resley, and Martha Stolley, all of Morgan Lewis and Bockius ("MLB") conducted an in-person interview of Michael Mooney ("Mooney"), VP of Field Sales Operations at Autonomy.  Jenny Harrison of MLB also attended.  The interview lasted approximately two and a half hours and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices. This was the second time Mooney was interviewed in connection with this investigation.

At the beginning of the interview, Ms. Stolley told Mooney that the same circumstances apply as last time he was interviewed.  Specifically, Ms. Stolley provided Mooney with "UpJohn Warnings" by advising him that the interview was part of HP's internal investigation, that it was privileged and that Mooney should keep the discussion confidential. Ms. Stolley further advised Mooney that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

MLAT_AU 00072856

Mooney stated that Josh Drew of HP answered Mooney's questions regarding the "UpJohn Warnings" after his last interview.  He stated that he wants to cooperate with HP's investigation, but do so in a way that is also good for him.

II.     **Background and Responsibilities**

Mooney joined Autonomy through the acquisition of Verity.  At Verity, he was responsible for sales, including federal sales.  He continued in that capacity once he transitioned over to Autonomy, although the structure and positions at Autonomy were less defined than at other companies.  He did not have any direct reporting relationship, but Stouffer Egan ("Egan") was often involved with Mooney's work.

Typically, Mooney was responsible for setting a group's sales strategy, compiling forecast reviews, or helping close deals.  He was mostly responsible for the Federal and Latin American sales groups at Autonomy.

While Mooney lives in Pleasanton and has an executive assistant in the Autonomy Pleasanton office, he often frequents the San Francisco and Palo Alto offices.  These days, he is mostly in the Palo Alto offices.

III.     **OEM**

For a long time, Mooney was responsible for Autonomy's OEM team, as well as some other teams.  In November 2012, Mooney's job changed, but the OEM team still currently reports to him – he just also gained new responsibilities.

The current OEM team consists of Matt Brombah, John Lawson, Dave Busiac, Thomas Simonson, and Dale Freelove.  Mooney recently moved two members off the team, Nat Semple and Steve Gibson, and added two members, John Ridley and another person in Japan.  Three of the OEM team members also work in direct sales (Matt Brombah, Thomas Simonson, and Dale Freelove).

In an OEM deal, Autonomy sells its own technology to a customer who uses that technology to better its own products.  IDOL is one of several Autonomy products that can be "OEM'ed".

IV.     **Resellers**

There was no formal communication at Autonomy of what deals closed during the preceding quarter.  Over his time at Autonomy, Mooney only recalled one or two announcements of big deals closing.  Specifically, he recalled a congratulatory email after the closing of Eli Lilly, the biggest deal ever.  This email probably came from Hussain, not Lynch.  Given this lack of announcement of closings, and the fact that reseller deals were not separated from end users, it was difficult to know when a deal closed through a reseller.  Thus, Mooney could not recall any specific deals where a reseller was brought in to close a deal.  He also did not recall discussing resellers taking over a deal during any SMS call.

MLAT_AU 00072857

An SMS call was a weekly, four-five hour conference call where a core set of management called each sales rep individually to get an update on their sales. Typically, there were many people on the calls, but not many chimed in. Mooney was always present unless he absolutely could not make it, in which case he had to find a replacement (see Tab 1). Hussain was invited and usually participated. Egan showed up frequently. There also was a representative from the Legal and Finance Departments (including Joel Scott, Jim Crumbacher, or Rachel Haverfield). On Mooney's calls there was usually no belittling.

### A.    *Latin America*

Despite being an emerging market, Latin America was always a small market for Autonomy and so was never largely staffed. Fernando Castellanos was in charge of the Latin America region until he left Autonomy and took a job with a competitor (probably in 2010). At that point, Frederico Grosso replaced Castellanos as head of the region. Neil Goldfarb was on the Latin American team during Castellanos's era. Goldfarb was based in San Diego and covered Mexico and Autonomy's Teleform product. Before joining Autonomy, he managed the Latin America market for another company, Cardiff. Herman Kanter was a Latin American team member, based in Miami. Jorge Cadena was also on the team, as was Pedro Ibar.

Mooney's role in the Latin American market primarily involved hiring the team. He also maintained a forecast and occasionally had customer meetings, usually in the U.S. or Mexico City. Such meetings were with the end user, reseller, or sometimes both.

### 1.    Use of Resellers in Latin America

Use of a VAR network was the main market strategy in Latin America, meaning the area was accessed mostly through resellers. They used this approach because Autonomy did not have a large presence there and because they did not want direct contractual relationships due to language issues with the end user. Given this strategy, Mooney only had infrequent contact with the end users.

Unlike in the U.S., where a reseller was typically brought in at the end of the quarter when direct negotiations between Autonomy and the end user failed, in Latin America there was usually always a VAR who was intimately involved in – and often leading – the end user negotiations from the start. It was rare for Autonomy to deal with an end user without a VAR.

Mooney recalled a deal where a Canadian VAR was brought in to place an order for a Mexican end user, but it was a Canadian-based company that had business in Mexico and the final order was done by the Canadian parent company.

### 2.    Collection of Latin American Debts

Payment issues plagued the Latin American deals. Largely, the resellers did not fulfill their obligations to pay. Mooney was not usually involved with collections, but Hussain occasionally sent him a list of Latin American deals to get involved with and ensure payment. Usually, the balances were high on such deals.

MLAT_AU 00072858

Mooney recalled a particular deal with Aguas Calientes (a county) as the end user and Telematica as the VAR. This deal involved three orders: one for the primary project, another for surveillance, and a third piece Mooney could not recall. Mooney met with the VAR's principal, Ignacious, in San Francisco to discuss outstanding payments. Ignacious said that Autonomy did not adequately support Telematica, so they missed deliverables, which caused Aguas Calientes to refuse to pay. Autonomy claimed there was an outstanding invoice that Telematica owed, but Ignacious claimed that Telematica never made the order.

Mooney also had trouble with collections from other large Latin America resellers. He recalled a collection call with the principal at Integracion regarding a few outstanding invoices. The principal maintained that a couple of the invoices did not have an end user. Integracion was willing to pay, but since it did not have the revenue from the end user, it had to pay out of future margins from future deals. When Mooney pressed Castellanos about the lack of an end user, Castellanos admitted that there was no end user or that something had changed. Lack of an end user was not a common complaint – at least on the few deals that Mooney was pulled in on. Mooney speculated that usually a valid end user agreement was in place when an Autonomy-VAR agreement was signed, or at least the end user arrangement was far along in the process, even if not fully consummated. Even in the Integracion situation, Mooney felt that Integracion thought it would finalize a deal with the end user.

Mooney was not involved with the writing off of debt, so he could not say if Autonomy wrote off outstanding Latin American invoices. However, such write offs would not surprise him.

When involved in Latin American collections, Mooney mostly dealt with Hussain. In some cases, he reached out to the legal team, working with Ivan Rothman due to Rothman's Spanish language skills. When asked about Reena Prasad, he could not recall interacting with "him or her".

     B.    *Capax*

Mooney recalled one or two times when Capax was brought in at the last minute to close a deal, but those deals were fairly insignificant.

     1.    Amgen

Mooney was actively involved in the Amgen sales cycle, working on pricing methodology, managing the account, negotiating with Amgen, and interacting with the sales team. Mooney thought about Amgen since his last interview when he was asked about an Amgen deal going through a reseller. He still cannot recall any VAR's involvement with Amgen. He was mostly involved with Amgen's direct deals.

Mooney negotiated directly with Amgen on several deals. The initial $2 million deal with Amgen was followed by a $4.5 million deal and then by a complex $13 million deal (although he warned these numbers could be incorrect). The large deal involved license and hosting fees, which were usually separate (hosting fees were not included in licensing fees).

MLAT_AU 00072859

Mooney worked with Michael Chang on the large Amgen deal. Chang was the sales rep who conducted the day-to-day interface, assisting Mooney and meeting with the customer.

In September 2010, Hussain wrote that they were "behind implementation schedule, code red, Mooney looking at $12 million" (Tab 2). In order for Amgen to be comfortable with a $12 million deal with Autonomy, past deals with Autonomy needed to be successful. Therefore, the "implementation" Hussain referred to was the implementation of past deals. Each deal was based on the current situation, but was also impacted by prior deals.

On September 21, 2010, Mooney emailed Hussain regarding various "Amgen models" (Tab 3). For complex deals like Amgen, Mooney built several models (negotiation positions) to frame the discussion with the customer and direct the customer's decision. Essentially, the models provided Amgen with enough information for it to feel that it was making the decision.

Hussain forwarded on Mooney's Amgen models, stating that they need to "structure a deal that is recognizable" (Tab 3). Mooney was not copied on this email and could not explain what it meant. He noted that the deal was career-making/breaking at Amgen given its size and scope. Given this worry, it was possible that Amgen did not like Mooney's options, in which case Mooney probably called Hussain about the problem.

By the end of the quarter (end of September 2010), there was probably pressure to close the Amgen deal. Hussain always put pressure on the sales reps to close by the quarter's end.

Despite the pressure to close, Tom Flanagan, the Amgen CEO, informed Egan that they could close in the fourth quarter, but not the third (Tab 4). Mooney and Chang were the primary communicators on the Amgen deal, but Egan sometimes ran sales with Mooney and probably had a prior meeting with Flanagan. Therefore, it was not strange for Flanagan to email Egan, and not Mooney. Egan pushed to close in the third quarter by offering special incentives to Amgen, but Amgen still refused.

On December 21, 2010, Chang emailed that the Amgen deal closed. Mooney responded the next day that they should "be able to recognize very close to what's been committed. ($7.4M)" (Tab 5). Mooney did not think he would get Amgen to commit to such a high value, rather he expected just a commitment for the $3.3 million in license fees. However, he got a commitment to the service offering as well as the license.

While Mooney remembered the Amgen deal closing, he did not recall Capax being involved. However, use of a reseller was not necessarily something known by the person negotiating directly with the end user. Egan probably made the decision to bring in a reseller. Mooney did not recall being asked to reach out to a reseller. He did not know what happened to Capax once the deal closed directly with Amgen. Based on Mooney's interactions with Amgen, he speculated that, given how difficult Amgen was during negotiations, Amgen probably would not want to go through a third party.

MLAT_AU 00072860

On December 1, 2010, Mooney emailed Hussain, stating that he expected "a major issue will be around SLA credits. We have a max of 10% of monthly fees. They have flatly rejected the max stating that is a deal killer arguing that if the service is down they should not have to pay (uncapped)" (Tab 6). SLA credits are credits for when the customer of a hosted offering company paid for services and the services were not performed correctly. It would be the same as a refund for any hourly bills when some of the hours were spent eating lunch, not working.

2.     McAfee

McAfee was an Autonomy customer with whom Mooney had several contacts. He worked mostly with Ron Wills, who was based in Texas, but he was also familiar with McAfee's Vice President of Sales, Michael DeCesare.

In March 2011, Mooney negotiated with McAfee for a $5 million deal. The prior McAfee deals were for $1 million and $400,000, so $5 million was larger than normal. The negotiations were initially successful and McAfee was receptive; however, by the end of the quarter, McAfee did not see the value at the price point Mooney was at. Hussain still pressured to have the deal completed by the quarter's end.

On March 22, 2011, Mooney emailed Glenn Fong, Jim Crumbacher, Trish Williamson, and Emily Raynal regarding the McAfee license, specifically asking Jim Crumbacher for Interwoven software license documents for McAfee and requesting information to be provided to McAfee (Tab 7).

On March 29, 2011, Mickie Lee drafted an amendment to the McAfee user agreement, referencing a $5 million license deal (Tab 8). It was common for Mooney to ask Lee to draft such amendments, but he could not recall specifically doing so for the McAfee deal. When in active pursuit of a deal, he often asked for a draft agreement, even when not yet at that point in the negotiations.

On March 30, 2011, Mooney reported that "McAfee is dead for this quarter", to which Hussain questioned if McAfee understood that Autonomy could save them a lot (Tab 9). Mooney did not recall these exchanges, but he did recall the McAfee deal falling through in March 2011. After it fell through, Mooney disengaged with McAfee (meaning he stopped working on any McAfee deal) because there were better uses for his time than working on a dead deal.

On March 31, 2011, Scott emailed a Capax/McAfee P.O. asking for review/approval (Tab 10). Mooney did not recall the Capax P.O.; as far as he knew, the deal was dead. Capax had a relationship with McAfee as a consultant, so it was possible McAfee was receptive to Capax.

Mooney could not speak to the other paperwork evidencing Capax closing the McAfee deal (Tab 11).

MLAT_AU 00072861

On April 6, 2011, Hussain asked Mooney to call him to discuss "dko and mcafee" (Tab 12). Mooney did not remember the email.  He could not recall what "dko" stood for, but speculated that it was a government account, perhaps "Defense Knowledge Online".

In May 2011, Mooney updated Hussain on McAfee, stating there was an organizational change at McAfee and that he would try to schedule a meeting at McAfee (Tab 13).  Mooney remembered the change in leadership.  He may have reached out, but could not recall any real discussions related to the deal.

Mooney did not recall McAfee ever mentioning its interaction with Capax.

> 3. TXU

In April 2010, Dean Revard emailed Hogenson regarding a TXU deal.  Revard complained that Mooney placed Revard's TXU deal through Capax in order to recognize revenue in the second quarter of 2009.  When Revard closed the deal with TXU the following quarter, TXU paid Capax; however, Capax never paid Autonomy and Revard would not be paid until Capax did so (Tab 14).

Mooney recalled the TXU deal but did not recall placing it through Capax or even that Capax was involved.  TXU wanted Autonomy to sell and operate a system, which was something Autonomy did not normally do.  Mooney speculated that perhaps Capax was involved because it operated the system for TXU onsite.

Mooney was skeptical that he brought Capax in while Revard was still negotiating with TXU.  He noted that Revard did not state where he learned that information.  Mooney never talked with Revard about this deal.

Mooney also did not know how often a sales rep was not paid until a reseller paid.  Despite being Revard's boss, Mooney had little say in commissions since all commission decisions were made by Hussain.

Assuming Mooney did place the deal through Capax, he was not sure if he called Capax since he did not have a practice of calling them.  He did not recall if he had direct contact with Capax regarding closing deals.  He did occasionally speak with John Baiocco at Capax when Baiocco could not get in touch with Hussain or Egan.

> 4. EDD Processing

Autonomy does EDD processing through its service center in Boston.  Companies contract with Zantaz (Autonomy) for their processing (de-dupe, review, production, etc.), usually based on a per document rate.  Autonomy also offers a product (known through the years as OnGate, Introspect, and other names) that does the same actions as the service center, but by the customer itself.  Both streams, the service center and product, were revenue generators.

MLAT_AU 00072862

Autonomy may have had a reason to outsource EDD processing.  For example, Autonomy would need to outsource if they did not have capacity, although Mooney was not sure why they would not have capacity.  Also, Autonomy may have outsourced EDD processing if the client was a top secret government client that had specific data center requirements.  Mooney also recalled discussions about establishing relationships with Indian companies who would provide EDD processing as well as legal review, a service that Autonomy did not offer.

Mooney heard that Capax and Autonomy had a deal where Capax got Autonomy products at a discounted rate.  However, Mooney never worked with Capax on any EDD processing venture and so could only speculate.

> 5.      Eli Lilly

Mooney recalled a $23 million deal with Eli Lilly, but did not think that the deal went through a reseller.

> 6.      Kraft

Mooney recalled multiple Kraft transactions.  He was most intimately involved in a Media Bin deal for Kraft and he did not recall a VAR being involved.

> C.      *Deloitte*

In 2007, Mooney worked on a deal where Deloitte purchased Autonomy's Introspect software (software for processing and review).  It was one of the earliest and largest (worth a couple million) deals in that category.

A few years later, Deloitte wanted an appliance that consultants could take with them to do quick collections and identifications of people of interest (i.e. custodians).  Such an appliance would be a combination of software and hardware, both provided by Autonomy.  Mooney could not recall if Deloitte specifically requested Dell, but Autonomy obtained some initial estimates on hardware prices from Dell.  Mooney speculated that an Autonomy employee in Procurement gave a Dell sales rep the specifications for the required hardware, and then Dell responded with price quotes.  Autonomy packaged its software with the Dell hardware and sold the entire unit to the end user.  The software was usually Autonomy software, but occasionally it also contained software from a third party that Autonomy used as part of its system (e.g. a required database).

In June 2010, Andy Northrop asked Mooney if the appliance should be priced as a single unit or split between hardware and software (Tab 15).  Typically, appliances were priced as a single unit, not separated out, because otherwise a customer may be tempted to find the hardware on its own for a cheaper price.

Autonomy never closed the appliance deal with Dell and, as far as he knew, it was not completed through a reseller.

Bruce Hartley ran the e-discover practice at Deloitte.  Mooney initially sold to him.

MLAT_AU 00072863

D.    *SFPD*

A July 2009 email referenced "SFPD" (Tab 16).  Mooney could not recall the deal, but speculated that "SFPD" stood for "San Francisco Police Department".  He did not recall Craig Steury, the author of the email, but Marc Geall ran Autonomy's surveillance products.  "San Francisco Police Department" thus made sense if the deal involved a security application. However, Mooney was not sure why Fernando Castellanos was involved with a San Francisco deal since he focused on Latin America and was based in Dallas.

Mooney recalled the San Francisco Police Department being on a forecast, possibly for a video surveillance type usage focusing on license plate recognition.  Mooney was not willing to invest in the project unless he had commitment from the customer.  If MicroLink was involved, it was because it was willing to invest in resources where Mooney was not willing to do so.

E.    *Federal Program*

Mooney ran the federal group, which consisted of a core nucleus of Dan Truitt, Alan Smith, and Raj Srivatsan – all three of whom are still with Autonomy.  Mike Brunick was added as a manager in 2011.  Since then, the group has grown to thirteen.  Jim Still was part of the federal group when he worked at Verity, but has been less active in the group post-Autonomy acquisition.  Jim Still bounced around a lot, running different groups.  Sameer Kalbag was also involved with the federal group; however, while still working at Autonomy, he is no longer in the federal group.  Woody Walton was head of the systems engineering group (pre-sales technical team).

The federal market differed from other markets in that the budget cycles were different and often resellers or systems integrators were involved.  The resellers included: Raytheon, Lockheed, MicroLink, MicroTech, and others that were used less frequently.  The contract process between Autonomy and a federal customer often involved the use of an intermediary.  Certain government mandates required contracts go through small or minority-owned businesses, so Autonomy used intermediaries in those markets.

Companies can directly hold their own GSA schedule or can have a reseller hold it (or can do both).  Autonomy initially held its own GSA schedule and also had resellers, like MicroLink, hold it.  Over time, Autonomy chose not to hold its own GSA.

1.    MicroLink

Prior to the Autonomy acquisition, Autonomy used MicroLink as a federal reseller and MicroLink carried Autonomy's GSA schedule.  This relationship between MicroLink and Autonomy predated Mooney's employment at Autonomy.

Mooney had very few interactions with MicroLink.  He had a few conversations with their sales managers, implementation/consultation employees, and MicroLink's owner, David Truitt (brother of Dan Truitt).

MLAT_AU 00072864

Mooney did not know why Autonomy acquired MicroLink, but he speculated as to several reasons.  First, Autonomy wanted to increase its consulting footprint and MicroLink had a strong consulting service.  Second, MicroLink could carry "clear people" with access to federal deals; while Autonomy had difficulty getting such clearance since it was a U.K. company.  Finally, there were rumors that accounting between the two firms needed to be cleaned up.  Specifically, MicroLink took some Autonomy orders before an end user deal closed and, when the deal did not close, MicroLink could not pay Autonomy.

After the Autonomy acquisition of MicroLink, Autonomy employees could meet with MicroLink employees after giving two weeks' notice to the proxy board and notifying Joel Scott.  Mooney set up a few meetings through this process in order to increase synergy between the two groups.  However, these attempts were not successful as there was no market impact from working closer together.

Mooney did not recall IRS as a MicroLink account.  He vaguely recalled All State but could not recall any connection to MicroLink.  Finally, he did not recall "unnamed US Intelligence Agency" as an Autonomy customer through MicroLink.

     2.     MicroTech

MicroTech was a minority owned entity that had preferential treatment with some contracts.  Given Mooney's position, he mostly only saw MicroTech in a federal context; however, he thought it also had a commercial aspect.

Mooney only participated in MicroTech deals indirectly.  He saw some deals marked as closed, when his understanding was different.  DOI may have been one of those deals

Steve Truitt (brother to David and Dan Truitt) was involved with MicroTech.  Mooney did not recall ever speaking with Steve Truitt.  They may have met, but they never had any extensive communication.

     a.     Department of the Interior (DOI)

Mooney recalled seeing a DOI deal on a forecast, meaning it was discussed during a SMS call.  However, he could not recall the details.  He guessed that Raj Srivatsan was the sales rep on the deal.  He was not aware if that deal closed.  Given the hundreds of deals Mooney saw over the quarters, he typically only recalled the large ones.

Mooney was not aware of a $4 million deal that closed with MicroTech for end user DOI.

Mooney could not recall the circumstances surrounding Hussain's email on December 13, 2010 to Egan, Scott and himself stating "DOI said no" (Tab 17).

     b.     Mobile Lab

MLAT_AU 00072865

Mooney was not aware of a 2010 proposal for the purchase of a mobile lab unit from MicroTech nor was he aware of any portable data center that was developed jointly between MicroTech and Autonomy.

Mooney, and perhaps someone from federal sales like Dan Truitt, met with MicroTech for a tour of a demo center for which MicroTech were requesting Autonomy software.  It was a portable, self-sustaining data center that could be shipped to places like Afghanistan.  Mooney was unsure if this demo center was the same mobile unit Autonomy purchased.  He was unaware of any discussions for Autonomy to buy the demo center.

Mooney did not know if the demo center was ever completed, but it was in its final build phase when he toured it and MicroTech pitched it as something they could deliver.

          c.       Federal Cloud Platform

The federal government currently has a strong emphasis on cloud products.  Mooney believed MicroTech responded to some federal bids regarding cloud products, but could not say which ones.  Mooney was unaware of any Autonomy investment with MicroTech in cloud development.

         3.       Discovertech

Mooney heard Discovertech was another Dave Truitt company (or a different Truitt brother).  Egan mentioned Discovertech, but Mooney could not recall the context.  Mooney believed it was a reseller, but one that was not used very often.

         4.       FileTek

FileTek was a company run by Gary Szukalski, a former Autonomy employee.  There were rumors that Autonomy purchased products from FileTek.  Hussain once asked Mooney to include some FileTek products on a deal (perhaps a deal with HP).  The FileTek products probably did benefit the customer, but Mooney refused to include them because, at that point in the negotiation phase, it did not make sense since it would interrupt the sales cycle and raise more issues than benefits.

          a.       Veterans' Affairs (VA)

Autonomy had an ongoing relationship with the VA, but Mooney did not recall participating on any negotiations with them.  He also did not recall a deal to digitize the VA's national archives.  He was aware Autonomy had several deals with the VA, the largest one being an email archiving deal.  Mooney did not remember a large deal ($10 million) with the VA that closed through a reseller.

On December 17, 2010, Steve Chamberlain asked Egan and Mooney who was close to "the VA deal we sold through FileTek" because $3 million was overdue.  Mooney replied stating that Stouffer was closer to the deal (Tab 18).  These emails did not trigger any recollection for

MLAT_AU 00072866

Mooney, but he explained that he and Egan ran things together and it was common for him to get emails that should have been directed to Egan alone.

Phil Stevenson was on Autonomy's federal team after coming to Autonomy from a reseller. His only account was the VA.

MLAT_AU 00072867



**Morgan Lewis**
COUNSELORS AT LAW

DATE:        January 9, 2013

SUBJECT:     Memorandum of Interview with Reena Prasad – January 9, 2013

| Tab No. | Document Description |
|---------|---------------------|
| 1 | Spreadsheet: Legal Working Unknown |
| 2 | 6/22 - 7/4/2010 emails between Prasad, Chamberlain, and Hogenson |
| 3 | 6/22 - 7/6/2010 emails between Prasad, Chamberlain, and Hogenson |
| 4 | Spreadsheet: Problem Accounts 6.11 BH |
| 5 | Series of Spreadsheets |
| 6 | 6/28-7/1/2010 emails between Chamberlain, Hussain, Kanter, Lynch, Prasad |
| 7 | 6/17/2010 email from Prasad to Hogenson |

## I.  **Interview Overview**

On January 9, 2013, Susan Resley and Martha Stolley of MLB conducted an in person interview of Reena Prasad ("Prasad"), former Director of Americas Credit and Collections at Autonomy. The interview was held at the San Francisco offices of MLB.  Sarah Nolton of PWC and Jenny Harrison of MLB also attended. Prasad was represented by Cliff Palefsky ("Palefsky").  The interview lasted approximately three hours and was in connection with HP's internal investigation of Autonomy's acquisition.

Ms. Stolley provided Prasad with "Upjohn Warnings" by advising her that the interview was part of HP's internal investigation, that it was privileged and that Prasad should keep the discussion confidential. Ms. Stolley further advised Prasad that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

## II.  **Background and Responsibilities**

After graduating from UC Davis, Prasad worked for HP for a little over a year in their Roseville office.  In June 2000, she started working at Interwoven and worked there through Autonomy's acquisition of Interwoven in January 2009.  She continued to work at Autonomy until she was terminated in July 2010.  She currently works at Nexgen, a small family business that focuses on staffing nurses.

Prasad initially worked in Customer Accounting Services at Interwoven (processing orders and working with invoices and collections).   She was promoted to supervisor within a few months, then on to manager and senior manager.  Before Autonomy's acquisition of Interwoven, she was Senior Manager of Worldwide Collections, reporting to Percy Tejeda ("Tejeda").  In April 2010, she was promoted to Director of Americas Credit and Collections.  As Director, Prasad reported

MLAT_AU 00072868

to Brent Hogenson ("Hogenson").  She was based in the San Jose office, but also worked in Autonomy's other California offices (Pleasanton and San Francisco).

III.   **Director of Americas Credit and Colletions**

In April 2010, Autonomy created the new Director of Americas Credit and Collections position and placed the collections departments of each Autonomy entity (Zantaz, etalk, Autonomy, and Interwoven) under its direction.  Prior to this arrangement, each group ran its own collection department: Helen Ku managed San Francisco, Ying managed Pleasanton (assisted by Kelly Kim who eventually worked under Prasad) and Richard Eads handled etalk (supported by Antonio and Ray Coronado who both reported to Prasad after her promotion).  Antonio also dealt with the Latin American deals.

Prasad took the Director job with the goal of cleaning up Autonomy's books and making the collections process more documented.  When she first began, she was shocked by the many invoices on the books that were old (100-400 days past due) and for large amounts.  The more she dug into the accounts, the more surprised she became at the many invoices that were never cleaned up or written off.  At Interwoven, Prasad never saw an outstanding account that was over a year old, but Autonomy had some invoices that were 300-400 days past due.  Some large deals made in 2008 were still on Autonomy's books in 2010.  Some had extended payment plans, but none of the earlier payments had been made.

There was a big difference between Autonomy and Interwoven's approaches to collections. Things were not run as cleanly or tightly at Autonomy as they were at Interwoven.  Interwoven generally kept past due accounts much lower and documented everything.  Interwoven also had a more aggressive collection process (early follow-up invoices and reaching out to customers).

Despite having old outstanding debts, Autonomy's DSO (Day Sales Outstanding) never appeared out of control, usually hovering around 90 days.  It was never out of control because the aging was so large and there were so many new deals.  Autonomy continued to book newer deals through the same customers, causing the entire aging to grow and the older "stinky" stuff to become just a small percentage so that the DSO did not look too alarming.

Prasad did not experience any push back from the people who reported to her.  They gave her what information they had and sent weekly updates on all their accounts.  Prasad jumped in and became more involved on the older or bigger accounts.  Prasad also worked with the sales reps given their relationships with the reseller or end user.  The sales rep she specifically recalled speaking to was Neil Goldfarb.

   A.   *Accounts "With Legal"*

As Prasad dug into Autonomy's records, she was informed that many accounts were "with legal".  "With legal" accounts tended to be problematic and were essentially hands off accounts to Prasad.  Many Latin American orders were "with legal".  She did not think Capax was "with legal" because she contacted Capax and therefore it was probably not "with legal".

MLAT_AU 00072869

When the legal department at Interwoven was involved in collections, they worked with Prasad, communicating and providing updates. However, when the legal department was involved at Autonomy, others needed to be more hands off. Prasad still hounded the Autonomy legal team to get current updates that she could report to the Finance Department, but they were not very open to sharing.

Prasad dealt with several different people in the Autonomy legal department, including Joel Scott ("Scott") and Monica Baum. She also communicated with Jorge Salazar, who was not an attorney but was in legal and who, while helping her get information, was not overly helpful. She worked closely with Ivan Rothman on some Latin American deals. Levius Guiao was not very helpful and was not willing to work with her, but Mickie Lee was helpful and was not resistant to working with her. She did not deal with the UK attorneys very much, but recalled Julie Dolan and Andy Kanter. Prasad also found Helen Ku helpful, but Ku did not have much information to hand over. Prasad did not deal much with Stouffer Egan ("Egan") or Sullivan, but did get updates from Mooney and his sales team.

Prasad hounded the legal team for information on various "with legal" accounts. Eventually, Chamberlain had her consolidate her information requests and direct them all to Jim Crumbacher ("Crumbacher"). Prasad created a spreadsheet of all the accounts she had been told were "with legal" and sent it to Crumbacher. The "Legal Working Unknown" spreadsheet (Tab 1) may be this document, although it may not be the final draft that was submitted to Crumbacher.

An account was escalated to legal for many reasons, for example it would be referred to legal (and worked from collections, sales, and finance) if the customer refused to pay and gave a reason. For the accounts already with legal, Prasad could not say why they were there.

     B.    *Collections Process*

In a perfect world, after an invoice was generated for an order, a collection team member followed up seven to ten days later by reaching out to the customer with a courtesy call or email to ensure that the invoice was received and there were no questions. Collections then reached out to Accounts Payable and confirmed a scheduled payment date or the check number if it had already been processed. If there was a problem, like if there was a service issue or delayed payment, the collections team involved the sales rep and escalated the matter to whoever signed the contract on the customer side.

An order 30-60 days past due was ramped up quite a bit. Jessica Martin and Prasad compiled spreadsheets highlighting such accounts and forwarded them to Chamberlain and Hogenson. Prasad had weekly calls with Chamberlain regarding any accounts worth over $100,000 and over 60 days past due. During these calls, Chamberlain was generally pleasant. They had a good working relationship and he often gave her positive feedback and praises. Often Antonio participated on the calls if there were Latin American issues or Kelly Kim participated if there were Zantaz issues. Hogenson was not on these calls, but Prasad regularly discussed with him.

When faced with a problematic collection, Prasad first reached out internally and then, depending on the response, she went externally to the customer. If it was a "hands off" account, she only went externally when specifically asked to do so.

MLAT_AU 00072870

C.    *Write-Offs and Bad Debt Percentage*

In order to fix Autonomy's messy collections practice, Prasad pushed for the writing off of old, "dead" accounts.  However, she received push back on this by Autonomy's management.

Before an account was written off, it was labeled as problematic.  Prasad recommended for a problematic account to be completely written off when it was "dead", i.e. when she believed that they could never recover any money (e.g. bankruptcy, out of business, been on aging report for years, customer refused to pay, sales reps involved had moved on, person who signed the contract was gone).

While on a visit to the US, Matt Stephan ("Stephan"), who reported to Chamberlain, took Prasad into a conference room and pulled up the Autonomy website to show her that Autonomy communicated a specific percentage (probably of bad debt) and so they could not write off as much as Prasad was pushing for.  Prasad had several interactions with Stephan about the same subject matter.  He was much more helpful and transparent than Chamberlain.

A short while after her interaction with Stephan, Prasad received an email from Chamberlain stating that they cannot "ramp up" the percentage or else it will raise alarms.  (Tab 2).  Prasad understood this email to mean that they wanted to keep the write offs and bad debt down to a certain percentage.  Prasad responded wanting to know how much she could write off and stating that "June credits are still subject to internal review and coding".  (Tab 3).  This statement meant that they had not actually been credited or written off yet.  Cindy Johnson or Helen Ku issued the credit.  Chamberlain then requested support for Prasad's proposed write offs.  This was strange because he had been in on the calls discussing those deals.

Prasad noted that Chamberlain was "pissy" on both write offs and reserves.  (Tab 3).  She was never told a percentage for the reserves, but noted that a ramp up in reserves would not look good to the public.  She did not recall Chamberlain responding to her questions regarding reserves (see Tab 3).

Prasad tried to avoid carrying over bad invoices into the next quarter, so the end of June was her deadline.  In early July, when that deadline had passed, Chamberlain came back with a new tone wanting any new information on the bad debts (see Tabs 2 and 3).  Prasad then added a "Comments for Steve" column to her spreadsheet where she made notes supporting her decisions to write off certain debts.

Autonomy wrote off a couple million dollars in the first quarter of 2010 before Prasad was promoted.  It was approved and credited, but then was put back on the books.  Prasad told Chamberlain that the provisions for those accounts needed to be cleaned up, but Chamberlain was unresponsive.

D.    *Spreadsheets*

Prasad compiled various spreadsheets, usually of problem deals involving several million dollars.  She could not recall the frequency with which she compiled the spreadsheets, but

MLAT_AU 00072871

believed it was around weekly. She would go deal by deal, assessing outstanding payments and generally cleaning up Autonomy's mess.

Prasad looked over the "Problem Accounts 6.11 BH" Spreadsheet (Tab 4) and commented on various line items. She could not recall what the color coding meant, but "no EU" meant no end user and "W/O" meant write off. She explained that the "Updates" column were not her recommendations, but rather were just notes to Hogenson. Her recommendations for write offs or provisions were in the "Steve Comments" column in another spreadsheet. In that spreadsheet (see Tab 5 for an example), she would recommend a write off when it was highly, highly unlikely or impossible to collect. Cell M2 referenced an Eli Lilly deal. The deal had been invoiced, but Prasad could not recall any specifics other than discussing the collections for the deal with Hogenson and Chamberlain. Cell M16 noted that the licenses were never downloaded. Prasad was not sure who told her this, but it was probably confirmed by someone with technical expertise. Her understanding was that Autonomy delivering the license key was sufficient delivery; it did not matter if the customer ever actually used the key. For other line items, Prasad could not remember any specifics, but suggested looking at the Collection Notes for those resellers (see below).

The "Problem Accounts 6.11 BH" Spreadsheet (Tab 4) also had a worksheet entitled "By Bill to Net". This was a summary ordered by "bill to" including combined amounts of all of a reseller's deals.

Finally, the "Problem Accounts 6.11 BH" Spreadsheet (Tab 4) had a worksheet entitled "Problem Account Summary". Prasad was not sure why this spreadsheet did not include MircoTech and why there was a discrepancy in the Capax numbers ($15.69, but only $9 million under the "By Bill to Net" worksheet). The Capax discrepancy may have been because Eli Lilly's $6 million was not included in the "By Bill to Net" worksheet. Prasad also was not sure why Capax's payment of the TXU debt was not listed here even though Prasad corresponded with Capax regarding the payment. She wondered if perhaps it was a new deal and so was not problematic enough to make it on this chart. Hogenson or Chamberlain would have been the ones to tell Prasad to leave something off the chart.

Prasad also sent a spreadsheet to Chamberlain that listed all the problem accounts Prasad recommended provisions or write offs for and explained the reasons for those recommendations in a "Comments to Steve" column (see for example Tab 5). Eli Lilly was not included on this spreadsheet even though it was marked "high risk" on the "Problems Accounts 6.11 BH" Spreadsheet (Tab 4). It was marked "high risk" because there was no end user (Tab 4); however, the Capax-end user deal was projected to close in the second quarter and so Autonomy still expected payment. Since payment was not impossible, in fact was expected, the Eli Lilly deal was not included on Chamberlain's spreadsheet. Prasad acknowledged that "no EU" contradicted the projection that it "should close in the second quarter".

When reviewing another spreadsheet she had created (Tab 5), Prasad noted three columns that were: a) if a prior manager thought it should be written off in the past; b) Prasad's recommendation; c) write offs when the debt was considered dead.

MLAT_AU 00072872

E.      *Other Aspects of Being Director of Americas Collections and Credits*

Prasad had little interaction with the Autonomy auditors and had only a little bit more interaction with auditors when she was at Interwoven.  At Autonomy, they only occasionally came by her desk, asking a few questions about the collections process.  She did not recall showing them any collections spreadsheets or discussing the bigger amounts that were past due.  Autonomy did not have any formal policy to direct auditors to management if they asked about certain accounts.

After Prasad asked Chamberlain about standard guidelines for payments in transit, Chamberlain emailed Hussain stating that Prasad's questions must be answered carefully.  (Tab 6).  Prasad found Chamberlain's email interesting.  She noted that she was working under Interwoven at that time, where they were pretty tight about what was considered "cash in transit", needing proof that the payment had actually left the customer's accounts payable.  There were occasions when Autonomy counted cash in transit, but Prasad did not know the specifics as she was not directly involved.

Interwoven had a policy of keeping Word documents on the shared drive recording all interactions with collections and a customer.  These "Collection Notes" were saved on Interwoven's Z-Drive and were saved by partner (like Tikit) or end user; essentially whoever the billing contact was.  The documents included internal notes, call logs, emails, and notes taken contemporaneously with conversations.  For Interwoven partners, like Tikit, the Collection Notes should go back further since it was originally an Interwoven practice.  Autonomy only started keeping such records under Prasad's tenure as Director (April to July of 2010).

Prasad would share her various frustrations with others and they with her.  Ganesh Vaidyanathan's office was right next to Prasad's desk and he would often talk about how challenging life was.  She also recalled talking about frustrations with Percy Tejeda in Revenue and Hogenson in Finance.  Hogenson consistently said they had to clean it all up.  At the end of June, Hogenson told her to put all her findings on a spreadsheet and get it out there.  Prasad knew they would not be able to write off $10-15 million in one quarter, but still tried to get it cleaned up as Hogenson requested.

IV.   **Resellers**

When collecting from some resellers, Prasad was sometimes told by Chamberlain that she did not need to pursue an account.  For example, at one point Prasad was told to back off the pressure on Capax and Baiocco.  She had been somewhat aggressively calling and emailing Baiocco in order to get Capax to pay an invoice.  She then had a call with Hogenson and Chamberlain where they discussed that there was no end user on the Capax deal (Prasad could not recall who brought up the account).  Chamberlain had some insight into the situation and knew that there was no end user.  He did not try to argue that there was an end user for the deal.

Prasad recommended for the writing off of four Capax entries with FSA listed as the end user, even though they were not all due yet.  (Tab 5).  Chamberlain made a snippy comment to Prasad, asking for the basis of her recommendation to write off accounts that were not yet due.  (Tab 3).  Prasad's rationale for the write off was that there was no end user (based on what Baiocco had told her), so Capax would never get paid and Capax only paid Autonomy when it got paid by the

MLAT_AU 00072873

end user.  Since there was no end user, Prasad concluded that all four entries – even though not currently due – should be written off.  (Tab 5).

Prasad recalled Tikit and knew that there was a large KPMG deal, but could not recall any specifics.  Similarly, Prasad knew the name "FileTek" but could not remember any specifics.

Discovertech rang a bell, but she did not remember any connection between Discovertech and MicroTech.  Her team did not make any progress in collecting form Discovertech and was told to leave it in the executive's (Hussain and Egan) hands.  Similarly, MicroTech was a "hands off" account.

Prasad recalled that MicroTech was a "hands off account", but she did not remember David Truitt or Steve Truitt.  She thought that Autonomy never closed a deal with the Vatican Library, but could not recall the details.  She believed Chamberlain told her about the Vatican Library deal, perhaps because MicroTech was a "hands off" account.  Generally, Prasad thought MicroTech, Discovertech, and Capax were all "hands off" deals, but an email (Tab 7) showed her having some discussions with them, so perhaps they were not completely "hands off".

Prasad could not recall a specific reseller refusing to pay Autonomy until Autonomy paid them, but it sounded familiar.  If a reseller did make such an argument, it would be in the Collection Notes.

Prasad had quarterly collection goals so she spoke with Hogenson regarding MicroTech because she did not want to be measured against the $13 million debt that was out of her hands.  He told her that she would not be hurt by it.

Prasad's general response to the MircoTech deal was surprise, but no longer shock; she just shook her head at yet another problematic account.  Hogenson was also surprised when Prasad gave him the details.  He had a different mentality than Chamberlain.  Hogenson wanted Prasad to get in there and see what she could find out, while Chamberlain wanted her to be hands off if any higher level discussion of the account was going on.

V.     **Prasad's Termination from Autonomy**

In the end of June and beginning of July 2010, Prasad was doing well at work.  She received great reviews from Chamberlain, but those good reviews started to decline in July.

One morning, Prasad arrived at her desk in San Jose and received an email stating that she was being relocated to the San Francisco office along with some other colleagues.  The email did not provide a good explanation for the relocation – at least as far as Prasad can remember.  The next day she, along with Tejeda, Hogenson, Fong, and Ganesh Vaidyanathan all moved up to the San Francisco office without even packing up their San Jose desks.  No work spaces were prepared for them in San Fransisco, so they just worked at empty desks or other people's work stations.

Shortly after Prasad's relocation to San Francisco, the embezzlement scandal erupted.  A few days later, Prasad, along with other people in the Finance Department, was interviewed by two gentlemen in a San Francisco Autonomy conference room, but they were not part of Autonomy.

MLAT_AU  00072874

Prasad did not know if they were lawyers or investigators. They questioned her about Autonomy's policies, processes, and her responsibilities, but nothing specific about embezzlement. Given the timing, Prasad thought it was related to the embezzlement scandal, but she was in a different department to where the scandal occurred. It was not a comfortable or friendly conversation; rather, she felt that she was on the hot seat.

After the interview, it was business as usual in the San Francisco office for a short period of time (a week or two). Then Hogenson did not come in to the office. He called Prasad from home, which was strange because he rarely worked from home. There were unsettled feelings and speculation raging through the office regarding what was going on and why Hogenson was not in the office.

During her last week of employment at Autonomy, the UK office stopped responding to Prasad's emails without giving any explanation why. This was noticeable because usually she communicated with them every day. Tejeda also felt the same unresponsiveness. Then the UK office, Chamberlain specifically, asked Prasad for various types of documents, primarily credit requests with approvals and invoice copies, but still did not respond to Prasad's own emails.

On July 30, 2010, Scott and Guiao came to Tejeda's desk, which was right next to Prasad's, and escorted him to a conference room. A short while later, they came back and Tejeda said good bye and left. Scott and Guiao then had Prasad follow them into a conference room and told her she was terminated, effective immediately. She was completely caught off guard and asked why. The only response was that she was an at will employee. She was then asked to open her bag and return anything that belonged to Autonomy. Scott and Guiao escorted her back to her desk where she had to leave anything personal that potentially had work items on it and was escorted out of the building.

At this point, Prasad was crying in the street, so she went to her sister's place in San Francisco. Hogenson heard what happened, probably from Tejeda, and called to tell her that it was not her fault. Prasad continued to get calls from Autonomy employees, like Monica Baum, asking about various work projects because they did not know she had been let go. Later, Hussain or Chamberlain sent out an email stating that any Autonomy employee contacted by Hogenson, Tejeda, or Prasad should contact management.

Palefsky explained that, in his view, Hogenson, Tejeda, and Prasad were viewed as a tight team and, when Hogenson raised his own issues with Autonomy management, Prasad was an innocent bystander who got shot. Often an employer will have an auditor or consultant come in before firing someone and Palefsky speculated that Autonomy used the embezzlement scandal as a cover for investigating Prasad, Hogenson, and Tejeda and thus the interview of Prasad by the two gentlemen a few weeks before her termination was not regarding the embezzlement, but rather her termination.

Palefsky found, in his negotiations with Dan Crowley (Autonomy's outside counsel), that the reason for Prasad's termination was "a moving target". Autonomy was being a bully in an oppressive negotiation, alleging that Prasad had approved a debt settlement without authorization, when in fact Prasad had obtained Hogenson's approval and Hogenson had sent the

MLAT_AU 00072875

paperwork on to Scott.  Eventually, Prasad settled because of personal financial reasons and because she did not want her reputation destroyed.

MLAT_AU 00072876



**DATE:**       November 20, 2012

**SUBJECT:**    Memorandum of Interview with Joel Scott – November 15, 2012

| Tab. No. | Document Description |
|----------|---------------------|
| 1 | 11/23/09 – Emails between Livius Guiao, Chamberlain, Sullivan, Hussain, Scott |
| 2 | 12/28-29/09 – Emails between Hussain, Chamberlain, Scott and Egan |
| 3 | 4/22/10 – Email between Scott and Hussain |
| 4 | Purchase Order between Dell, Autonomy and AIG |
| 5 | 9/15/09 – Email from Hussain to Sullivan |
| 6 | Agreement between Autonomy and Microtech for federal cloud platforms |
| 7 | Proposal for MicroTech and Vatican Library, Email dated 1/1/2011 between Scott, Egan and Hussain |

I.    **Introduction**

On November 15, 2012, Leslie Caldwell, Susan Resley and Martha Stolley, all of MLB, conducted an in-person interview of Joel Scott ("Scott"), Autonomy's former General Counsel. Josh Drew of HP participated by phone. Andrew Purdy and Kate Emminger, both of MLB, also attended the interview. The interview lasted approximately two and a half hours and was in connection with HP's internal investigation of HP's acquisition of Autonomy. Prior to the interview, Scott turned over his laptop computer for imaging.

Ms. Caldwell provided Scott with "Upjohn Warnings" by advising him that the interview was part of HP's internal investigation, that it was privileged and that Scott should keep the discussion confidential. Ms. Caldwell further advised Scott that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

**Background and Responsibilities**

Scott grew up in Canada and attended Stanford Law School. After law school he worked at Gibson Dunn, then worked for several small tech companies including Brocade, and Snowcap. He began working as Associate General Counsel for Autonomy in October or November of 2005, right before Autonomy purchased Verity. Scott believed he became General Counsel, the

MLAT_AU 00072877

title he now holds, sometime in 2009.

Scott's title changes were not contemporaneous with changes in his work duties – Scott described them as "separate paths". When Scott began as Associate General Counsel, his job was to manage all sales transactions in the Americas. His boss was Autonomy's COO, Frank Pau ("Pau"). When Scott started, Autonomy employed around 250 people and its revenue was approximately $70 million. As Scott's responsibilities changed, he was asked to oversee various programs and departments. For example, Scott oversaw all US facilities work, HR, sales hires, inside sales for the Americas, the SF office and other various projects. Scott said it's always been hard to describe his core job function, but that he enjoyed the variety. He attributed this variety to the fact Autonomy was very unstructured. Around 2009, Scott wasn't sure what one task would be dominating his time, but thought he spent most of his time interviewing potential salespeople.

When Scott first started, he reported to Pau and later Scott reported to Andy Kanter ("Kanter"). Even while reporting to Pau, Scott had frequent, though inconsistent, contact with Kanter. Scott described Kanter's communications as "transactional" and "very short". Scott never felt friendly with Kanter. Kanter was mostly in the UK, as were Mike Lynch ("Lynch"), Sushovan Hussain ("Hussain"), and Pete Menell. Lynch visited the US for a month each March, but the other three visited only a few days each year. When Scott began reporting to Kanter, Scott would attend offsite management meetings a couple times a year. The meetings were usually in the UK or Europe. Scott had never been to the Cambridge office until a few months before this interview, and had spent maybe "10 minutes" in the London office.

## II.     <u>Discussion with John Schultz Regarding Autonomy's Practices</u>

In April or May 2012, Scott received a phone call from John Schultz ("Schultz"). He believed the call concerned "a funny thing with Mike", maybe the severance agreement or something along those lines. During this phone call, Scott asked to meet with Schultz. Something that came up during the call triggered Scott to describe several issues he was aware of during his tenure at Autonomy, Scott met with Schultz, and other members of HP's legal team, Gabriel Buigas, Kristin Major and Tom Perkins at HP's headquarters.

He believed Lynch had already left Autonomy at the time of the meeting, because after the acquisition Lynch directed the staff not to interact with HP at all and to direct all communication through Lynch or Kanter. Scott believed this directive was no longer in force when he spoke with Schultz and therefore, Lynch was likely no longer at the company.

Scott requested the meeting with Schultz because he wanted to ensure HP had the same visibility into Autonomy that Scott did. Scott was surprised that Schultz was unaware of the issues. Scott didn't remember bringing anything with him to the meeting, which lasted a few hours.

At the meeting, Scott told Schultz about Autonomy's practices concerning hardware sales, and resellers. He also discussed Brent Hogenson's allegations. They also discussed OEM agreements with companies already acquired by Autonomy and reciprocal deals where Scott was unconvinced the products Autonomy purchased were actually being used.

-2-

MLAT_AU 00072878

III.    **Hardware**

Scott was not involved with hardware ("HW") transactions, but knew there were many. Scott recalled deals with HDS, EMC, and maybe Dell, where Autonomy would purchase HW and resell to end users it at a 10% discount. Scott believed that 5% went back to the OEM and a 5% discount was passed on to the end user, so that Autonomy "sat in the middle." Scott recalled a Master Agreement with many attached P.O.s. Scott believed HW sales began around 2010 or 2011. Scott said he could "count on a couple of hands" the number of appliances sold with Autonomy software. Scott reviewed an email that discussed possible appliances utilizing Dell HW and Autonomy software. He did not recall any agreement with Dell. (Tab 1).

Scott didn't recall the first HW transaction but said Mike Sullivan ("Sullivan") drove most of the sales, at least with EMC. Scott believed Sullivan was likely also the interface with Dell. Scott thought the HDS interface was likely Stouffer Egan ("Egan").

Scott speculated there were HW sales of somewhere between $15 and $40 million each quarter. He was not sure if the hardware sales were used to fill revenue gaps, but thinks Hussain may have told Sullivan to "sell X dollar amount of HW."

Even though Sullivan was based in Boston, Scott interacted frequently though inconsistently with Sullivan. Scott thought he had a good relationship and reasonable friendship with Sullivan, stating they would sometimes talk or have a beer together. Scott had this sort of relationship with many members of the US management team. Sullivan and Scott talked about HW deals, but not in detail.

Scott did recall hearing that HW revenue was captured in OEM revenue. He wasn't sure where he had heard it or who had said it, but he thought he had heard it.

Scott didn't know what was relayed to the market about HW sales.

A.    *Rationale of HW Sales*

Egan explained to Scott that HW sales helped maintain its profit margin. With HW sales, Autonomy could continue to grow revenues while keeping the margins in check. Egan believed that if the margins kept going up, the stock price would face pressure. Scott didn't think this rationale made much sense. He may have asked "Why take a loss on HW sales?"

B.    *"Strategic Partnership with EMC"/ General Relationship with EMC*

Scott didn't believe there was a strategic partnership between Autonomy and EMC. Scott thought Autonomy may have looked at acquiring one part of EMC's business, but didn't think it was related to a strategic partnership. EMC and Autonomy completed an OEM business with RSA. Scott thought there were several OEM deals with EMC, but didn't recall their sizes and didn't believe they were part of a strategic relationship. Scott recalled "real" talk about developing an appliance but he never saw anything "very robust".

Scott never saw anything explaining the end of EMC's relationship with Autonomy.

MLAT_AU 00072879

Scott didn't recall a Q309 purchase of $45 million of hardware from EMC, where Autonomy sold to customers for $36 million. He thought the numbers didn't seem right because it's such a big discount.

### C.    Dell HW Sales

Scott wasn't sure of any marketing efforts with Dell.  (*See* last email in the chain on Tab 1). Scott was not aware of an agreement with Dell or EMC to develop an appliance, but he thought it was possible. Scott recommended that we ask Hussain or Sullivan. Scott wasn't sure what the end of the email meant ( Tab 1:  Hussain wrote "This is ok as long as there is autm software included"), but it made him question his presumption that the HW deals didn't include Autonomy software.

When shown a string of December 2009 emails regarding Morgan Stanley, (Tab 2), Scott surmised that it was an "Stouffer deal." Scott speculated that it was related to Arcpliance because it refers to HW with Autonomy software loaded on it. Scott speculated the email referred to a deal pushed by the Autonomy salesperson, TJ LaPore. Scott reiterated he wasn't sure if this was the deal they were talking about.  He did remember that Egan wanted the deal to get done, and Morgan Stanley wanted a commitment for deeply discounted hardware. Scott had no recollection of two P.O.s. Scott said it wouldn't have surprised him if Autonomy couldn't get the HW deal done, but could at least ship the software. He added that Livius Guaio was primarily responsible for drafting the hardware agreements and working with Chamberlain.

### D.    Arcpliance and Appliance Development

At one point, Hussain, Lynch, Egan and Menell pushed to enter the appliance market. Scott thought the push was prompted because Clearwell, an e-discovery company, was cutting into the market share.

Scott was not aware of an agreement with Dell or EMC to develop an appliance, but he thought it was possible. Scott recommended asking Hussain or Sullivan.

Scott recalled a press release about Arcpliance, but didn't recall a formal agreement with any HW company for it. Scott never saw or touched an Arcpliance. He recalled a few sales of Arcpliance, but nothing very large.

Scott remembered attempts to design a HW sales template for an appliance, but it was never completed because there were too many challenges in adapting their software sales template. Scott thought this was typical of Autonomy because the company itself wasn't very structured.

### E.    Hardware Accounting Practices

Scott didn't know how the quarterly number was determined, but guessed that Hussain would tell Sullivan how much HW to sell. Scott described a "brick wall" around company revenue information, so he didn't know if the number was determined in order to fill revenue gaps. Hussain handled the revenue and set the goals. Based on Hussain's personality, Scott believed

MLAT_AU 00072880

Hussain set the numbers and told people to go get it done. Scott suggested Sullivan would know more because Scott wasn't involved in the actual sales, other than papering the deals and maybe working with HDS.

When asked about an April 22, 2010 email about allocating funds to marketing (Tab 3), Scott couldn't remember the context. He speculated that an auditor told them Autonomy couldn't allocate a portion to marketing and so Scott went back to see if Hussain still wanted the HW deals if it couldn't be allocated to marketing.

When Scott questioned Autonomy's accounting practices, Hussain was very clear that every accounting practice was vetted by the auditors. Scott had never heard of specific issues with the auditors, but described Hussain as "pretty tenacious", intense and aggressive. Thus, Scott could imagine Hussain fighting with the auditors to get his way. However, Scott had no first hand dealings with the auditors and stressed this was only speculation.

F.    *P.O.s and Marketing Expenses*

Scott signed the P.O.s that were brought to him by Jorge Salazar ("Salazar").[1] Salazar would bring him approximately 20 P.O.s at a time, so guessed there would be 50 or 60 P.O.s per quarter.  Scott believed someone working with Sullivan told Salazar what P.O.s to create. Scott described his involvement in the approval process as essentially "scribble [ing] on the P.O.s". The P.O.s would look like the document in Tab 4, which Scott identified as a deal with Dell and AIG. Scott wasn't sure if the format was specific to Dell, but recalled the P.O.s looking similar to that document.

The prices on the POs varied. Some were as low as $100, or even $7. Scott always assumed the items purchased were servers, but agreed that a server wouldn't be sold for $7. Scott did not recall seeing orders for notebooks or mice.

Scott believed that marketing language was included in the P.O.s for a purpose, but didn't recall specifics. Scott recalled discussions around allocating part of the HW cost as marketing expense. . Scott believed that the marketing angle would be been driven by Hussain, rather than by Dell.

G.    *Bonuses*

There was a period in which Scott reviewed all sales compensation. The reviews didn't happen on a consistent basis, and Scott said he struggled with the task because he felt he couldn't make an "educated decision" about the compensation.

Scott remembered he was cc'ed on an email from Hussain, describing a $200,000 bonus that Sullivan was to receive for HW sales. Hussain approved the bonus. The bonus surprised Scott and Scott thought it was crazy because he didn't think someone could receive a bonus for selling HW. But when Scott asked Sullivan about it, Sullivan would just laugh it off or downplay it.

---

[1] Salazar began work at Autonomy in 2006 or 2007 and is currently a Contract Manager at Lithium. Salazar left Autonomy before the HP acquisition when Agnes Pak became General Counsel at Lithium.

MLAT_AU 00072881

Regarding an email dated 9/15/09 from Hussain to Sullivan regarding a bonus for "extracting" a letter from EMC (Tab 5), Scott thought the email was consistent with other things he'd heard, but Scott had never heard of the $50,000 specifically.

## IV.   **Resellers**

Scott was uncomfortable with how Autonomy used resellers. Scott believed resellers were used when a deal would not close in a particular quarter.

Scott raised the issue with Kanter and Scott felt "the answer was very clear". He was told that as long as there was a reasonable belief the deal would close, then the revenue could be taken from a reseller sale. Kanter added that if the deal did not close, Kanter and Hussain would deal with it. Scott also asked Chamberlain and Hussain, but eventually concluded that the UK's IFRS rules were different from GAAP and thus the practice was legitimate.

Scott believed there was always an end user for the reseller deals, and thought Hussain's forecast sheets would confirm this belief. However, Scott clarified there were some European deals with which he had no visibility.

Scott believed the reseller took the risk and would be on the hook if the end user deal didn't go through. If the end user deal went through, the reseller would get a 10% margin. Scott wasn't sure of the resellers' size and thought they were relatively small companies. He wasn't sure if or how they had the financial wherewithal to cover large deals. Scott speculated if the resellers were truly on the hook for a deal that didn't go through, the resellers would have financial problems.

Scott recalled that Autonomy purchased products and services from the resellers. He said that some of the deals made no sense for Autonomy. For example, Autonomy OEM'ed some of Discovertech's technology. Making inbound OEM deals was not typical for Autonomy, so it seemed odd to Scott.

Scott guessed Egan would make the call to involve the reseller, because Scott couldn't figure how else the reseller would know about the deal.

Scott didn't know how or if Autonomy sales persons received commission when resellers stepped in. Hussain or Chamberlain would have decided the compensation issue, but Scott guessed that the sales people got compensated at the time the deal was recognized. Scott surmised that maybe there wasn't a consistent practice.

### A.   *Vatican Library Deal*

Scott had heard of the Vatican deal because it was big. Scott thought it was a $30 million deal. Hussain, Pete, Fernando Eugini, and Corrado Broli were involved. Scott thought it was likely driven by Hussain or Pete. Scott would have expected to hear a lot of buzz if it had closed even though it was a European deal. Scott believed he would have heard if the deal had closed during the annual sales meeting when the Salesperson of the Year award was given. He never heard of the deal closing.

MLAT_AU 00072882

Scott didn't recall that Microtech stepped in as a reseller, but that possibility didn't surprise him. It didn't surprise him because he felt there were only a few resellers Autonomy dealt with, specifically Capax, Microtech and Microlink. Scott believed Egan had conversations with Microlink and Microtech.

Re $2.3 million write off of Vatican sale in 2011: Hussain rarely wrote off debt and Scott said Autonomy was still chasing bills in Latin American that had not been paid for years. Thus, Scott found it odd that Autonomy would have written off some of what Microtech owed. It suggested to him that the end user deal never came though.

     B.    *Microtech Purchase Agreements*

Scott said it was hard to distinguish between Microtech, Microlink and Discovertech because they were all related. Scott believed Dave Truitt connected all three, and perhaps Tim Wharton. Wharton would occasionally call Scott and ask for help when Autonomy owed any of those entities. Scott would follow up with Chamberlain or Hussain.

When Autonomy purchased Microlink, Scott was asked to be the conduit. Because Microlink was subject to a proxy agreement, Autonomy was not allowed to be very involved in Microlink's business.

Scott knew of other purchase agreements for services from either Microtech or Microlink, but wasn't sure exactly which company. Any purchase agreement would be related to software services, such as installation. Scott remembered a "mobile unit" project in which the unit (which he compared to a bus) would showcase different products to the federal government. Scott thought the project started independently, but Autonomy later funded part of it. Scott thought the project was a good idea because Autonomy's federal sales were "anemic" and thought this project could assist.. However, Scott didn't think Autonomy had the "discipline" for utilizing the project. Scott thought this project occurred around 2011.

Scott was asked about an August 15, 2011 agreement between Autonomy and Microtech for Federal Cloud Platform which he signed on behalf of Autonomy (Tab 6), Scott thought it was odd that the contracting party was Autonomy UK (versus Autonomy, Inc). Scott further thought it was odd that the agreement was governed by California law when Autonomy UK was the party. Scott thought the agreement might have been for the mobile unit discussed above, and thought the named amount of $8.2 million sounded like the amount of that project. Scott remembered a detailed proposal for the mobile unit, but didn't remember the contract specifically, and didn't recall seeing this document. Scott recalled that the proposal was "very light on the contract". Scott recalled a flurry of activity or rush around this contract, but didn't remember much more about timing. He noted the date on the agreement was August 15, and thought a rush would have made more sense on a date closer to the end of the quarter. Scott didn't recall any rush to pay on it, nor an email to pay $8.2 million. However, Scott stated he wouldn't have been surprised by an email requesting an immediate $8.2 million payment. When asked to speculate whether the $8.2 million agreement could have been designed to pay an amount Microtech owed Autonomy, Scott agreed with that assumption. Scott speculated that since Microtech or Microlink didn't have the financial wherewithal to cover deals that weren't

-7-

MLAT_AU 00072883

closed with an end user, this contract would enable Microtech or Microlink to pay Autonomy. Thus, if there was a rush to pay Microlink or Microtech, it's likely so they could turn around and pay Autonomy quickly.

### C.     Capax/Amgen/Bank of America

Scott knew less about Capax, but thought of it in the "same bucket" as Microtech. Scott thought Egan had the relationship with Capax. Scott recalled drafting an agreement to sublicense Autonomy's EDD technology at a very large discount, perhaps around 80%. Scott thought it was a legitimate deal but didn't understand why they would get such a large discount.

#### 1.     Amgen

Scott recalled an Amgen Q310 deal because it was a big deal. Scott wasn't sure of the exact timing, but remembered doing a few different deals with Amgen. Scott was pretty sure they committed to $15 million because Amgen has recently begun complaining that the EDD software doesn't work the way they thought it would. He does not know when the Amgen deal closed, i.e., did it close in 2010.  He also does not know if the deal was cancelled or if and when Capax stepped in as the reseller.

#### 2.     Bank of America

Scott recalled the Bank of America deal was a restructure, where a hosting fee was replaced with an upfront license fee. Scott surmised the structure had to do with revenue recognition. Hussain and Egan were both heavily involved, as were Chamberlain and Jim Krawkowski, the salesperson. Hussain was driving the deal. Livius Guaio drafted the contract. Scott was on site for the three days of negotiations, but wasn't sure when the deal closed.

Mike Mooney ("Mooney") was taken off the Bank of America deal, but Scott didn't recall why.[2] He offered his views on the subject and compared Mooney to Egan.  He described Egan as a "great evangelist" but not a great salesperson, whereas Mooney was a great negotiator. Scott described Egan as "essentially Lynch's son", so Scott thought that if Egan wanted in on a big deal, he would get it and Mooney couldn't do much about it. Scott reiterated he wasn't positive this is what happened, but it was his assumption.

Scott recalled that two different resellers became involved with the Bank of America deal, but didn't remember the deal closing in a specific quarter. Scott recalled a paragraph in the Bank of America agreement providing that Bank of America would pay a third party (versus Autonomy directly). Scott thought this allowed the two resellers to invoice Bank of America. Scott had no idea why the deal was broken up between two resellers, but thought that maybe neither reseller had the financial wherewithal to take the whole deal. Scott believed Egan would have driven the deal with the resellers.

---

[2] Mooney had advised us during his interview that he had been involved with the deal, but was taken off.

MLAT_AU  00072884

Scott thought Capax was involved.  He did not recall the 12/31/10 letter between Capax and Autonomy in which Capax cancelled the 9.45 million agreement with Amgen and replaced it with a $9.45 million reseller agreement with Bank of America. (Tab 8)  He thinks that Microtech or Discovertech was involved as a reseller as well (it was DiscoverTech). He was not sure how or if the resellers dealt with each other, but thought one reseller may have given another reseller a P.O. Scott didn't believe he drafted the actual deal, but remembered creating the "deal flow".

      D.    *Department of Veteran Affairs/FileTek*

Scott didn't remember much about the Veteran Affairs deal. He recalled it was a big deal, maybe around $4 - 7 million, but he wasn't sure. He thought perhaps a reseller stepped in, and surmised it was Microlink or Microtech.

After Scott was told FileTek was involved with the V.A. deal, he said that was "interesting" because FileTek wasn't a large reseller, unless there were deals he didn't know about. Scott knew Autonomy OEM'd a deal with FileTek and purchased FileTek's technology. Scott didn't think it made sense, but Pete, Hussain, Lynch and Kanter were all adamant it was great technology that would compress the storage in the Digital Safe product.

Gary Szakowski, FileTek's President, used to work at Autonomy.  Scott believed that Autonomy received a good discount for the software compared to the list price, but wasn't sure if it was the best use of Autonomy's money. Scott said it seemed like Autonomy legitimately received software. When asked about any connection between a VA reseller deal and Autonomy's purchase of FileTek software, Scott's assumed the  numbers "tied off" and that Autonomy purchased FileTek software was because there was a reseller deal where an end user didn't finalize.

      E.    *Viadent*

Viadent was a company owned by Pau, Scott's former Autonomy boss. Autonomy OEM'ed Viadent into their security and surveillance products. Scott recalled a $3 million project. Scott remembered that Vidient then OEMed Autonomy's product and that they were excited to have the product. Scott remembered that Autonomy paid Vidient, but then thought Vidient went bankrupt before Vidient paid Autonomy. Scott thought Autonomy bought more software than it sold to Vidient.

      F.    *Tikit*

Scott didn't know much about Tikit other than it was an international partner. Scott thought it was a partner of iManage, which Autonomy acquired as part of the 2009 Interwoven acquisition. Scott was friendly with Neil Araujo ("Araujo"), who leads the iManage business. Scott remembered that Hussain pushed Araujo for Tikit to take a resale deal. Scott thought the end user was KPMG. However, Araujo needed to be convinced the risk was worth it and that all would end well. Scott wasn't sure if Autonomy offered Tikit any protection, but thought he had seen other deals where two different end users were offered for security purposes.

-9-

### G.   *Prisa*

Scott identified the Prisa deal as suspicious because currently Prisa is refusing to pay their bills.

## V.   **OEM**

Scott remembered Autonomy had about 300 OEM deals, but 90% of them were for KeyView, a very small product. KeyView is a "file cracker", used for reading the words in pdfs, or other types of files. Thus, to say that there were 300-400 OEM deals was, to Scott, "a lot of spin".

Scott did recall hearing that HW revenue was captured in OEM revenue. He wasn't sure where he had heard it or who had said it, but he thought he had heard it.

Scott thought claims that OEM IDOL was growing quickly would be hard to substantiate and felt it "didn't sound right at all". Scott admitted there could be something he wasn't aware of, but nothing he knew of would support that claim.

KeyView, which Scott thought was 90% of the OEM business Autonomy had, was originally called IDOL Keyview, so perhaps when Autonomy said that IDOL OEM was growing, it was because KeyView was once called IDOL KeyView. Keyview was frequently sold in OEM deals.

Scott couldn't see how Bank of America would ever be an OEM client because adding value on top of the Autonomy product before reselling is fundamental to the idea of OEM. OEM is not just a pass through deal.

At first Scott wasn't sure why the OEM revenue would be more attractive. He later guessed that high OEM revenue would give the impression Autonomy was becoming a "de facto platform", like Oracle, and that everyone was using Autonomy technology. He also speculated that OEM revenue usually has royalties attached, and perhaps that revenue stream might be attractive because it will grow.

At first, Hussain didn't want any royalties or annuities with the OEM business, which angered the sales team. One salesman, Chad Reynol, was so mad at this policy that he left Autonomy. However, around 2009 or 2010, Hussain changed the policy and said every OEM deal should have a royalty component, even for a small amount.

### A.   *Tottenham Hotspurs*

Scott learned about this deal a week before the interview. Scott believed Tottenham Hotspurs did an original deal, then a repurchase and it never resold. Tottenham bought a website with the goal of selling it to another soccer club, but apparently Tottenham was never happy with the site and has yet to resell it. Scott thought there seemed to be more involved in the Tottenham deal because the team had Autonomy logos on their jerseys, but Scott didn't know details about that.

Scott was very surprised the Tottenham deal was booked as IDOL OEM. Scott described the Tottenham deal as having two aspects. First, there was the hosting and consulting for the website. Second, there were the resales of the website. Scott didn't believe that either of these

MLAT_AU 00072886

were possible OEM transactions because Tottenham wouldn't have built anything on top of the Autonomy product for resale, it would have just been a straight resale.

VI.   **General**

    A.    *Quarter End*

Every quarter end had around 50 deals going on at the same time. Scott described the quarter end as "crazy".

    B.    *Blinx*

Blinx was an Autonomy video technology that was spun out of Autonomy and traded in the UK around 2006. Autonomy sold some software to Blinx, and maybe Aurasma sold or bought from Blinx. Scott believed there were definite transactions going both ways.

    C.    *DVL Games/Kanter*

Scott recently received an email that was sent to Kanter's old email address containing an offer letter for a job. The offer letter was virtually identical to Autonomy's offer letter. Later, Scott received a copy of an agreement between Autonomy and DVL for five years, with no right to terminate and 3% net. The agreement gave DVL use of all the Erasma technology. Scott found this agreement shocking because Erasma was Lynch's "baby" and Kanter had signed it a few days before he left Autonomy.

    D.    *Bonuses*

Scott didn't know specifically about any other bonuses besides the Sullivan HW bonus (see HW section above), but said that things operated "pretty haphazardly" so he wouldn't be surprised if Lynch or Hussain approved off cycle bonuses. Scott supposed Egan or Nicole Eagan would be at the top of that list. Scott couldn't think of any bonuses specifically, but said he wasn't surprised by the concept. Scott wasn't familiar with the "Mike Lynch" bonus. Scott mentioned an employee of the year awarded by Lynch, but Scott thought the bonus attached to that award was something small, like a weekend trip.

    E.    *Email from Hussain to Scott About Checks* (Last Page, Tab 7)

This email refers to making sure checks from resellers are "appropriately" dated. Scott thought this email, on the last page of the tab, was regarding checks that were mailed on Friday and therefore cashable on Friday, but not received until Saturday. Thus, they would check the dates to make sure it was in the quarter it was supposed to be. The email was not asking a customer to back date a check, i.e. to December 31.

    F.    *Deloitte*

Scott had no first hand visibility into Deloitte. However, Scott questioned Autonomy's practices several times and was always told every practice was vetted with the auditors, and that

-11-

Autonomy used UK accounting standards, not GAAP rules. When Brett Hogenson made his allegations, there was a review process and everyone said everything was ok, although Scott didn`t remember what topics were included in the review. Scott concluded everything was appropriate under IFRS. Scott also recalled being told by Kanter that the UK auditors have personal liability if Deloitte signed off on inappropriate accounting practices.

MLAT_AU 00072888



**DATE:**        January 7, 2013

**SUBJECT:**    Memorandum of Interview with Joel Scott – January 7, 2013

| Tab No. | Document Description |
|---------|---------------------|
| 1 | 9/14/2009 email from Guiao to Chamberlain<br>9/2009 email chain between Scott, Sullivan, Guiao, Chamberlain<br>9/2009 email chain between Guiao and Chamberlain |
| 2 | 6/29/2009 emails between Crumbacher, Scott, Egan, Chamberlain, Diane Kennelly, and Mark Kaufmann |
| 3 | 12/2009 emails re. Morgan Stanley deal |
| 4 | 5/2010 emails between Chamberlain, Scott, Guiao, Stephan, and Crumbacher |
| 5 | 6//3-4/2009 emails from Percy Tejeda to Timothy Naprawa, Agnes Pak, Anthony Bettencourt, and Joel Scott |
| 6 | 12/31/2010 communications and orders between Autonomy, Capax, MicroTech, and Discovertech |
| 7 | 12/31/10 Discovertech-Autonomy Letter Agreement |
| 8 | 3//7-8/2011 emails between Guiao, Scott, Baiocco and Kanter |
| 9 | 1/25/2011 emails between Guiao, Egan, and Chamberlain |
| 10 | 1/18/2011 emails between Guiao, Chamberlain, and Scott |
| 11 | 1/24/2011 emails between Guiao, Chamberlain, Egan, and Scott |
| 12 | 4/1/2011 emails between Crumbacher, Baiocco, and Scott |
| 13 | 12/23/2009 emails and purchase quotation re. MicroTech's license purchase |
| 14 | 12/23/2010 emails between Scott, Hussain, Menell, and Chamberlain |
| 15 | Undated Memo re. Proposed ATIC – attached to emails in Tab 14 |
| 16 | Undated ATIC Proposal – attached to emails in Tab 14 |
| 17 | 9/27/2011 emails between Scott, Lynch, Hussain, Menell, Truitt, and Chamberlain |
| 18 | 1/11/2012 emails between Hussain, Lynch, Truitt, and Kanter |
| 19 | 3/2011 emails re. Morgan Stanley and HP deals |
| 20 | 8/13/2010 emails between Lynch, Hussain, and Still |
| 21 | 9/29/2010 email from Crumbacher to Szukalski<br>9/30/2010 email from Scott to Crumbacher<br>9/30/2010 FileTek-Autonomy Letter Agreement |
| 22 | Q3 2010 results analysis (subject to Audit committee clearance) |

I.    **Interview Overview**

On January 7, 2013, Leslie Caldwell, Susan Resley, and Martha Stolley of MLB conducted an in person interview of Joel Scott ("Scott"), Autonomy's current COO-US and former General Counsel.  The interview was held at the San Francisco offices of MLB.  Sarah Nolton of PWC and Jenny Harrison of MLB also attended.  The interview lasted approximately four hours and was in connection with HP's internal investigation of Autonomy's acquisition.

Morgan, Lewis & Bockius LLP

II.      **Background and Responsibilities**

Scott currently is Autonomy's COO-US, working out of the Sunnyvale offices.

III.     **Hardware**

     A.      *Beginning of Hardware Resales*

Scott could not recall how Autonomy's plan to resell hardware arose.  It may have been a topic during an off-site.  He vaguely recalled a discussion of hardware resales at a meeting with about 20 people during the annual sales kick off in Miami in January 2009.  He did not recall discussions of hardware at the off-sites that he attended in Europe, specifically in Como, Italy or France, UK.

At the time, Scott did not notice any particular trigger or ramp up in hardware resales; however, it sounded right that the first significant hardware resale was in the second quarter of 2009 with Hitachi hardware.  Scott recalled a resale to Morgan Stanley that occurred at the beginning of Autonomy's hardware resales.

     B.      *EMC*

Autonomy purchased hardware from EMC and then resold it to customers.  When it did so, the final customers wanted to know the terms of their purchase (warranty, return policy, etc.).  Scott did not recall any contracts, but did think that the P.O.s had contractual language stating that the sales' terms were the same as EMC's own terms.  (See Tab 1).

In order for Autonomy to recognize revenue on the sale of EMC hardware, it had to be the seller and owner of the hardware, even if just for a millisecond.  (Tab 1).  If Autonomy never owned the hardware, it was not selling anything and could not recognize revenue.  Therefore, Autonomy had to purchase the hardware from EMC and also have a contractual relationship with the customer.

Autonomy stopped purchasing hardware from EMC after the third quarter in 2009.  Scott did not know the reason for this, but thought Mike Sullivan may have stated that EMC did not want to sell anymore.

     C.      *Morgan Stanley*

Scott did not know what the "commitment letter" was in the Tab 2 email.  He speculated that it was a letter or part of a contract drafted by Mark Kaufmann ("Kaufmann"), who worked for Sidley Austin LLP and was Morgan Stanley's counsel in the deal.  The letter or contract probably stated that Morgan Stanley was allowed to purchase $20 million worth of hardware from Autonomy for just $14 million.  Scott speculated that Steven Chamberlain ("Chamberlain") would not have liked such an overt statement of the deal and hence stated that the commitment letter draft was bad (see Tab 2).

MLAT_AU  00072890

The Morgan Stanley deal was mostly driven by Jim Crumbacher ("Crumbacher"), but occasionally Scott dealt with Kaufmann.

In December 2009, Levius Guiao ("Guiao") sent out a proposal listing and evaluating the hardware and software that Autonomy proposed to sell to Morgan Stanley.  (Tab 3).  Scott thought the proposal originated with Stouffer Egan ("Egan") and Guiao simply circulated it.  Morgan Stanley pushed back on this, not wanting an evaluation or assigned values.  (Tab 3).  Sushovan Hussain ("Hussain") then informed them that the Morgan Stanley legal department shut down the deal.  Scott could not imagine Kaufmann shutting down the deal, but suspected that someone in-house at Morgan Stanley (perhaps Jeff) shut it down.  After Morgan Stanley shut down the deal, there was a flurry of activity around December 31, including the creation of a P.O. for MicroTech that included the same software as the Morgan Stanley deal, but no hardware (Tab 3).

Scott did not recall the December 2009 Morgan Stanley/MicroTech deal specifically, but he speculated that probably Egan came in and demanded a P.O. for MicroTech and they created one.  (Tab 3).  Scott assumed that Egan spoke with MicroTech before requesting the P.O. because the email request was sent at 6:30pm PST and the deal had to be closed by midnight.  He guessed no hardware was included in the MicroTech P.O. because Autonomy did not have any hardware to deliver (Scott assumed that Dell had the hardware) and if there was no delivery, the deal could not be recognized, which was the entire purpose in bringing in Mircotech.

Scott did not know that Morgan Stanley never purchased the software from MicroTech or that Morgan Stanley eventually completed the hardware deal directly with Autonomy.  Things were always busy, chaotic, and reactive at Autonomy, so there was never any time to compare software and hardware deals and note that they were for the exact same price.

Diane Kennelly was Egan's contact at Morgan Stanley.  Scott thought she was involved in procurements, not the legal department.

D.      *Flexibility to Recognize*

In reference to Tab 4, Scott guessed that there may have been too much revenue in one quarter, especially as hardware sales were such big sales.  Too much revenue was a problem if it made the revenue stream look "wacky" or volatile instead of being consistently flat or increasing.  Scott guessed that most hardware P.O.s stated that a product was deemed delivered once Autonomy acknowledged the customer's receipt of the product.  Therefore, Autonomy could drop revenue into the next quarter by not "acknowledging" delivery until the next quarter.

Scott believed that when he wrote "I have an idea", he meant that he could put Mike Mooney ("Mooney") in touch with Brocade if Autonomy needed a new source of hardware (see Tab 4).  He did not think he discussed this with Hussain, just Mooney.

E.      *End of Hardware Re-Sales*

Scott guessed that there was some conversation between himself, Hussain, and Chamberlain where Hussain stated he did not want any more hardware deals if they could not recognize a

MLAT_AU 00072891

certain level of revenue from them.  Scott then asked Hussain if he wanted to continue with the hardware transactions.  (Tab 5 (my notes refer to Scott Binder Tab 3 here, but it does not look like what was discussed)).  Scott could not recall any big discussion regarding cessation of the hardware sales.

IV.   **Resellers**

Scott never heard any reseller referred to as a "revenue accelerator".  However, Autonomy recognized the reseller revenue, so in that sense resellers did "accelerate" recognition of revenue.  On a handful of occasions, Scott asked Andrew Kanter ("Kanter"), Hussain, and Chamberlain if it was acceptable to recognize accelerated revenue.  He was consistently told that, under IFRS, Autonomy could recognize a reseller deal as revenue as long as there was a legitimate belief that there was an end user.  Scott never did any independent review of IFRS.

Scott never tracked or cross referenced reseller deals to see what had or had not closed.  He was dealing with many other things and putting out many fires, so never had time to track deals.

A.   *Bank of America/Amgen Deal*

When Autonomy's deal with Amgen did not close by the quarter's end, the reseller Capax replaced Amgen.  If Scott signed off on this deal, it was because Hussain or Egan told him to do so.  He did not have the authority to bring in a reseller on his own.  Usually Capax was brought in after some discussion between Hussain, Egan, and John Baiocco ("Baiocco").

Ultimately, Amgen ended up purchasing directly from Autonomy for $15 million.  Scott did not know if they assigned payments to anyone, but he definitely knew Amgen paid $15 million for Autonomy products because Amgen currently is trying to get their money back due to issues they had with the products.

Discovertech was also brought in, along with Capax, as a reseller for the Amgen/Bank of America deal.  Scott thought this was weird and did not know why Discovertech was also brought in.  He speculated it was to clean up other transactions or because a single reseller did not have the financial wherewithal to take on the entire financial risk.  He explained that the clause in the Bank of America contract allowing Autonomy to assign payment obligations to a reseller was the vehicle used to allow a reseller to take the money and provide it to Autonomy.  He speculated that the money probably went to Capax, then Capax paid Discovertech, and then both Capax and Discovertech paid Autonomy.

MicroTech was also involved in the Amgen/Bank of America deal, although Scott could not recall their involvement in the day-to-day workings.  The documents in Tab 6 confused Scott regarding MicroTech's role in the deal.  He speculated that Hussain or Chamberlain must have been in town to tell Legal how to structure the deal because it was too cagey to have been done as part of Legal's ordinary business.  Scott suggested that Dave or Egan may be able to clarify the cash flow.  Scott had difficulty understanding why MicroTech's purchase from Autonomy would be shipped to Capax and Discovertech.  While not completely understanding how the deal worked, Scott drew the diagram below regarding the cash flow between all the involved entities and came up with the following explanation: MicroTech gave Autonomy a P.O. for $22.5

MLAT_AU 00072892

million to be shipped to Capax and Discovertech because Capax and Discovertech had given MicroTech orders for $15 million and $7 million respectively. Autonomy recognized revenue on the $22.5 million MicroTech-Autonomy deal. Then, Bank of America formed a deal with Autonomy, but Autonomy assigned its payments to Capax and Discovertech ($15 million and $7 million respectively) and Autonomy never showed the Bank of America contract to its auditors so as to not double count the revenue.



Discovertech's "one off reseller agreement" appears to contemplate a direct deal between Autonomy and Bank of America (Tab 7). Scott speculated that this was a one off reseller because otherwise there would have been a P.O. This was a way to achieve the same purpose without a reseller agreement. The final paragraph of the agreement stated that Bank of America could pay Autonomy directly. Scott speculated that this language allowed Autonomy to work out a deal with Discovertech in case Bank of America did not want to go through Discovertech. However, Autonomy could not legitimately recognize revenue when the final paragraph of the arrangement suggested that there may be a future deal directly between Autonomy and the end user. This paragraph was removed from a later draft of the agreement (maybe by Chamberlain or Poppy Prentis) probably because it made it impossible to recognize revenue in that quarter.

Scott was surprised he used the term "MAF" (or marketing assistance fee) because he rarely ever used the term. The fee probably referred to what Autonomy paid Capax and Discovertech for the Bank of America deal. Because the deal flowed from Capax and Discovertech through MicroTech to Autonomy (see drawing above), Capax and Discovertech did not collect their usual margins. Instead, Autonomy probably paid them a MAF. Scott could not explain why Autonomy paid both MicroTech's margin and MAFs to Capax and Discovertech. (Tab 8).

Guiao emailed Chamberlain and Scott in February 2011 asking about margins. Guiao probably asked because he knew the net amount, but needed to break down what each entity was entitled to be based on the different margins.

Scott found the order in Tab 9 to be weird, but thought that maybe it referred just to the Discovertech branch of the agreement and ignored the Capax branch. However, even then, the flow was from Bank of America to Discovertech to MicroTech to Autonomy, while this document inverted Discovertech and MicroTech (refers to Bank of America paying MicroTech, who then had an order with Discovertech, who then had an agreement with Autonomy).

Scott could not shed any light on the document in Tab 10. He suggested that Antonia Anderson may be helpful as she worked at Deloitte at that time.

Scott believed the letter referred to in Tab 11 is the Amgen letter, especially when he learned it was signed in February 2011. He did not know what the $3.6 million was. He guessed that the email was more for Hussain than himself and so he forwarded it right back to Guiao because he

MLAT_AU 00072893

did not want to be bothered with it.  Scott was not sure who Stewart Barret was, but thought he may work for Autonomy.

Hussain emailed that, for audit reasons, it was not possible to sign a Bank of America deal in the first quarter of 2011 (see Tab 11).  Scott first wondered whether it was Bank of America's audit reasons or Autonomy's.  It did not sound like Hussain to say they could not take a deal.  Scott then decided the email was "nonsense" and "bullshit", especially as Hussain sent the email to a broad audience.  Hussain never genuinely wrote emails like this.  Instead of taking it for its face value, Scott thought it was one of Hussain's ways to make the deal happen in the fourth quarter of 2010.

### B.   *Capax/UBS*

ACA stands for "Autonomy Consolidated Archive", which is the new brand for Autonomy's digital safe.  Scott thought this name was a recent development and was surprised when "ACA Support" appeared in the first and second quarters of 2011.  He was not sure if the "ACA Support" referred to a different product or if the Autonomy Consolidated Archive name was used earlier than he originally thought.

Scott believed the UBS deal was a UK deal driven by Hussain in the UK.  He did not know why a US reseller was used for a UK deal except that Autonomy had relationships with US resellers or perhaps there was an auditing reason.

Crumbacher's email in Tab 12 was his way of saying "eff you" to Egan.  Crumbacher intentionally wrote the email in a way that, if the deal was legitimate like Egan claimed, Egan should not have any issues with the way it was written.  Scott did not know enough about the company's statements that the deals were fine under SOP 97-2 to comment on it.  He did not know how a company could say it complied with US GAAP, when it did not.

Baiocco was a determined guy (sometimes calling fifteen times over two days), but he appeared to be a straight shooter.  Scott suspected that on Baiocco's end, the deals were probably kosher.

### C.   *Capax/EAS and EDD*

Autonomy discontinued EAS because it was not a good product and Autonomy had its own similar products.  Autonomy then paid Capax 85% to manage the EAS business.  Scott could not understand why Autonomy paid Capax to manage EAS since Autonomy did not get anything out of the arrangement.  It was possible there was a good business reason, but it puzzled Scott.

Along with EAS, Autonomy's arrangement with Capax regarding EDD also puzzled Scott. Capax paid Autonomy for software which Capax could sell licenses to until they reached $25 million in sales of the product.  Capax could also resell Autonomy's EDD services and Autonomy gave Capax 10% off the normal services costs.  It did not make sense for Autonomy to give Capax the right to resell and have them only pay 10%.  It also did not make sense for Autonomy to give Capax its product and thereby enable Capax to compete with them.  Finally, Antonia Anderson and the finance department were never aware of the $25 million cap.  Scott

MLAT_AU  00072894

stated he would try to obtain a copy of the agreement and suggested contacting Baiocco for background on the agreement.

### D.   *MicroLink*

Prior to Autonomy's acquisition of MicroLink, MicroLink had a long relationship with Autonomy – they were working together since before Scott joined Autonomy.  MicroLink was one of Autonomy's resellers and a service partner for federal business.  Scott speculated that Autonomy used MicroLink for federal business because MicroLink had many security clearances and so could do many deals with the federal government.  Moreover, MicroLink had good relationships with the federal government and had Autonomy products on a GSA schedule.

Scott's main contact at MicroLink was David Truitt ("Truitt"), although Scott did speak with other guys at MicroLink too.  Truitt had a relationship with Scott's former boss, Frank Pau, as well as with Hussain and Truitt's brother, Dan Truitt, in the federal group.  Scott's gut feeling was that Truitt was a good guy who tried to do the right thing on his side of the deals.  He felt Truitt would be straight about any questions presented to him, but he was spooked and rattled by the SEC subpoena.

Scott's main dealings with MicroLink occurred whenever Autonomy owed MicroLink money.  Truitt usually called Scott, asking him to be MicroLink's advocate because Truitt knew Hussain would ignore him.  When MicroLink owed Autonomy money, Scott was less involved.  He may have received or made calls (he could not recall any specific calls), but could not influence any payment.  He speculated that Truitt's excuse to not pay was that the end user had not yet paid.

Scott remembered IRS, but could not recall the specifics of a deal between Autonomy and IRS where MicroLink was the reseller.

Autonomy acquired MicroLink in early 2010, but Scott was not involved in any of the acquisition discussions.  He recalled a meeting between Eagan, Hussain, Kanter, Truitt, and Tim Wharton ("Wharton") in December 2009, but did not learn of the acquisition until its announcement in January 2010.  He was not involved in the due diligence, but would not be surprised if little due diligence was completed.

After the acquisition, MicroLink was not integrated into Autonomy because it could not be.  Since MicroLink did classified deals with the government and Autonomy was a UK company, the federal government required that MicroLink and Autonomy enter into a proxy agreement whereby Autonomy could not influence MicroLink.  This meant that Autonomy could not give legal support, tech support, payroll, etc.; essentially, MicroLink had to remain completely independent of Autonomy.  Given this separation, Scott acted like Autonomy's "ambassador" to MicroLink in that he was invited to MicroLink's quarterly meetings and was called if they had a question.

There is an HP-Autonomy-MicroLink meeting tomorrow (January 8, 2013) regarding HP's integration of MicroLink.  Currently, MicroLink is still separated from HP because it falls into a UK subsidiary of HP.

MLAT_AU 00072895

After Autonomy's acquisition of MicroLink, Truitt founded Discovertech. Scott recalled that Truitt wanted to sell software, but Scott believed that Discovertech's services work kept it afloat. Scott speculated that after the sale of MicroLink, Truitt did not have to work and so Discovertech was just an experiment. Scott was not aware of anyone from MicroLink being involved with Discovertech, but he would not be surprised if people from MicroLink, like Wharton, were involved with Discovertech since MicroLink was a small company and everyone was very close.

Truitt left MicroLink, but most of the other people are still there. For example, Wharton shifted from the number two position into the number one MicroLink position, based in Virginia. John Cronin used to work at Autonomy, but has since gone to head up MicroLink sales. Mike Brunick is head of federal sales, but probably will not be helpful because he has been around for only about a year. Scott did not think that Woody Walton worked for MicroLink, but rather was a sales engineer for Autonomy.

> E.   *MicroTech*

Scott did not know much about MicroTech. He talked with Steve Truitt less than 5 times and they were not substantial conversations.

> 1.   MicroTech Purchase of ControlPoint

Autonomy had no practice of having purchase quotes ready for when needed. Deals at Autonomy tended to be more reactive and involved little planning. Instead, Egan just came in at the end of a quarter and requested P.O.s. Scott guessed that the purchase quote of $10 million for 40,000 ControlPoint licenses (Tab 13) was a quote, not a P.O., because they were purchasing the software for internal use, not a resale. Therefore, it was more of an internal license. Scott did not know who drafted it, but he probably gave the assignment to Crumbacher or Guiao.

ControlPoint, the software licensed in the purchase quote (Tab 13) was an Autonomy product providing policy management to SharePoint tools (so to detect fraud, etc.).

MicroTech did not have 40,000 employees, so they would not have need for 40,000 licenses. It is possible that MicroTech was going to sell off the product in pieces (e.g. sell 100 licenses to customer A and 100 licenses to customer B). Scott was not sure if MicroTech had a sufficiently large sales force to sell 40,000 licenses, but just a couple of big sales could cover the full 40,000. If MicroTech was going to re-sell the licenses, Hussain or Egan may have limited MicroTech's market (for example only allowing MicroTech to sell to federal users) so that Autonomy was not undercut in the market. Scott never saw MicroTech actually do anything with the 40,000 licenses.

Scott did not know why the deal was not completed as a reseller deal. He speculated that perhaps they already had too many MicroTech reseller deals (for example if MicroTech had already given Autonomy five P.O.s) and yet another deal would make Deloitte worry about MicroTech's credit-worthiness. However, an auditor would still want to know about MicroTech's credit-worthiness given the way this deal was structured. Scott speculated that perhaps Autonomy could tell Deloitte that this deal was not dependent on a third party customer and therefore was more reliable.

MLAT_AU 00072896

2.      ATIC MobileLab

Scott negotiated with MicroTech on the price for the Mobile Lab and got the price down to $3.3 million (Tab 14).  However, the next day, the price went up to $9.6 million (Tab 14).  Scott could not understand this price jump from $3 to $9.6 million.  He first speculated that the fees for this deal went to cover the Vatican deal, but then was not sure when he learned that the fees did not match up with the Vatican deal.  He then speculated that perhaps the $3.3 million was just for one year and the $9.6 million was for a three year commitment.

Hussain asked Scott to prepare the business argument for the entire ATIC purchase.  Tab 15 may be the business argument memo Scott drafted.  He took most of the content for the memo directly from the ATIC Proposal (Tab 16).  Scott could not recall the specifics about drafting the memo, but he was sure the turnaround was quick.  The usual pattern at Autonomy was to give him a proposal, get a quick business rationale, and then get approval.  He probably discussed the MicroTech proposal with Truitt, but it could also have been Steve.

The business purpose of ATIC was to help Autonomy penetrate the federal market.  MicroLink was better than Autonomy in the federal market (Scott lumped MicroTech and MicroLink together because they were very similar).  Given MicroLink/MicroTech's successes in the federal market, MicroTech could use its lab, demo facility, and relationship with the federal government to showcase Autonomy products.  Scott felt that it could have been a successful project, although he acknowledged that once Autonomy acquired MicroLink, Autonomy should have acquired access to the federal market and therefore did not need MicroTech's assistance.

After Scott completed the memo, he never heard about the project again.  As far as he knows, nothing ever came of the purchase of ATIC.  Autonomy spent $11 million on services (which was particularly a lot given how cheap Autonomy was) and did not do anything with them.

F.      *Discovertech and Abbott Labs*

Scott recalled "Abbott Labs" as a reseller arrangement and believed it never closed, but was not sure.  If it never closed with the end user, Scott guessed that it was just written off or there was a simultaneous payment between Autonomy and Discovertech where Autonomy purchased something from Discovertech for the same amount that Discovertech owed Autonomy.

Scott could not recall any disputes arising in late August to September 2011 over what Autonomy owed Discovertech, except that Truitt would often call Scott when Autonomy owed Discovertech anything.  Tab 17 refreshed Scott's memory and he recalled that there was a real sale that stressed him because Autonomy was selling Discovertech items and, if they did not get and ship the items, they could not recognize it as revenue.  He did not think the emails related to a dispute regarding fees and what Discovertech was owed, rather it was a literal purchase.

After looking at the emails in Tab 18, Scott explained that Kanter essentially told Discovertech to "eff off" and Truitt just had to suck it up.

G.      *FileTek*

MLAT_AU 00072897

Scott's main contact with FileTek was Gary Szukalski, although Bill Loomis was FileTek's ultimate decision maker.

        1.      Software Purchase

Scott was involved in negotiating Autonomy's purchase of software from FileTek.   Hussain or Egan told Scott that FileTek had a great product and that he should try to purchase it within a given price range.  Scott went back and forth with Szukalski a few times to lower the price. There was no deep or extensive negotiation, but rather a few emails and calls to settle on a number.  Scott's best guess was that the whole purchase was teed up by Egan.

Despite all the statements about how great the FileTek software was, Autonomy never used the software.  About a month ago (November or December of 2011), Fernando told Scott that he had never heard of FileTek's software and that it was never used in Autonomy's digital safe.  FileTek probably deployed Autonomy's software given how excited Szukalski sounded about it. However, it was a very large software purchase.  Scott did not know the specifics of FileTek's size, but $8 million is a large purchase for any company.

There was another software purchase between FileTek and Autonomy in March 2011.  Based on Tab 19, Scott explained that the deal was specific to Morgan Stanley and HP.  He guessed that the Morgan Stanley and HP contracts show that Autonomy listed and shipped FileTek products to Morgan Stanley and HP.  He was probably anxious on that last day because FileTek did not want to give Autonomy the product until Autonomy had paid and so it was a last-minute fire drill.  The fact that there were similar payments on the same day was probably so that FileTek was never out of pocket.

Generally, Scott tried to stay away from the day-to-day deal making because he disliked it and had other things to deal with.  He was plugged in to some degree, but he usually had Crumbacher and Guiao deal with it; he trusted them to do the job correctly.

        2.      Veterans' Affairs (VA)

Scott could not recall a deal with the VA in the third quarter of 2010 and certain emails (Tab 20) could not refresh his memory.  He only recalled that FileTek was a reseller, but not on many deals.

Scott still could not recall the VA deal, even when shown emails between himself and Crumbacher discussing the reseller agreement (Tab 21).  He speculated that FileTek was selected as the reseller instead of MicroLink, even though it was a federal deal, because MicroLink had too many outstanding payments.

Scott was not aware if the deal with the VA ever went through.  He was also not aware of the partnership between Lockheed Martin and Autonomy.

       H.    *Tikit and KPMG*

MLAT_AU 00072898

Scott originally did not think he was involved in the formation of the Tikit/KPMG deal nor in the drafting of the documents.  However, because Rob Sass was involved in the Tikit/KPMG deal and Scott recalled working with Sass on a search engine deal, he thought he may have been involved with Tikit/KMPG.

Regardless of Scott's involvement, the deal was mostly conducted by Neil Araujo ("Araujo").  Scott was aware that Tikit was unsure about the deal and Araujo had to give his own personal assurances that it was a legitimate deal.  It is slightly odd that Autonomy used a UK reseller, Tikit, for a US deal; however, Tikit was a long-term reseller with iManage, which had been acquired by Interwoven, so Araujo had a relationship with them.  Scott guessed that Hussain, wanting to complete the KPMG deal, somehow stumbled upon Tikit and decided to use them to complete the deal.

Scott did not recall any issues with Tikit after the deal was completed.  He guessed that KPMG completed a deal directly with Autonomy and that perhaps Tikit was paid a marketing assistance fee (MAF).

> I.       *VMS*

Crumbacher and Nicole Eagan worked on VMS.  Scott recalled how frustrated Crumbacher was with the deal.  VMS negotiated to use Autonomy's software as well as to have developers and resources onsite.  Autonomy then licensed VMS' products to show customers how Autonomy's products work.  However, Scott did not think Autonomy did much with the VMS products.  Someone in marketing told Scott that they used the VMS products, but Scott was skeptical about the extent they were used.

Scott recalled an earlier deal with VMS for $2-3 million, but it was the later one that frustrated Crumbacher.

> J.       *Viadent*

Scott recalled Viadent, but as an OEM.  Autonomy sold to them and they would sell to Autonomy at the same time.

> K.       *Latin America Resellers*

Scott worked on some Latin America deals and felt that everyone he worked with were "dead beats" and the Latin American market in general was a miserable market.  Some Autonomy sales reps were ineffective and shady.  For example, either Neil Goldfarb or Fernando Castellanos submitted a P.O. that they had signed on behalf of the customer without any authorization and so should never have been submitted.  Another sales rep, Herman Kanter, brought in a big deal ($3-5 million), but ultimately the reseller never paid.  The end user had problems with the software and so never paid the reseller, who then never paid Autonomy.

Ivan Rothman, on Autonomy's legal team, spoke Spanish and so often conversed with the Latin American resellers about payments owed to Autonomy.  Hussain did not like to write off bad

MLAT_AU 00072899

debt, so he continued to have Autonomy chase the Latin American accounts. However, Hussain only brought up the Latin American resellers' debt at the very end of the quarter.

There were three Latin American resellers that Autonomy often used, including Telematica and Factor Integracion.

## V.   **OEM**

Autonomy acquired KeyView from Verity. It is a "file cracker" product that allows a user to extract text from many different file types (pdf and others). This is a valuable product for OEMs and so is a popular Autonomy product for its OEM customers. That being said, OEMs only have a small dollar value to Autonomy. For example, this quarter (Q1, 2013), the OEM business is forecasting only $1.6 million and a quarter with $6 million for all Americas OEM business would be a great quarter.

Some OEMs, when the contract was done correctly, would pay royalties for their use of KeyView. Others would just pay everything up front. Since Autonomy was quarterly driven, there was less focus on on-going revenue and so the royalties were never worth much. Antonia Anderson or Scott could locate the companies who are paying royalties. For past companies who paid royalties, Scott suggested speaking to Mooney or Michael Chang.

Scott was curious about if ex-Autonomy OEM employees had been contacted because Chad Raynal had been asking Scott about the investigation. Raynal came to Autonomy with the Verity acquisition and ran the OEM team until when he quit in 2008. His wife, Emily Raynal, continues to work for Autonomy

## VI.   **Termination of Brent Hogenson**

While Hussain loved Brent Hogenson ("Hogenson"), Scott felt, from day one, that there was something odd and untrustworthy about Hogenson. For example, Hogenson would fight Autonomy about everything, even things that were not his decision. Autonomy was brutal during an acquisition of a company, but Scott felt that Hogenson was just "being a jerk" and trying to "spin things" for his own way. Moreover, Hogenson acted strangely and deliberately before he made the allegations against Autonomy. For example, he bought a new computer and used two computers at work. He also asked Scott for a list of all software that had not been shipped by the end of the quarter, which Scott thought was a strange question and felt that Hogenson was looking for something. Hogenson acted based on his own agenda and that agenda did not appear to be doing the right thing for the sake of doing the right thing. It is possible that Hogenson was motivated by money, but Scott felt that something else motivated Hogenson because Hogenson reached out to everyone (SOF, SEC, internally, etc.) quickly and so did not appear to only be looking for a settlement.

When Autonomy discovered that $3 million had been stolen through payroll, there was a lot of speculation regarding Hogenson's role and if he was involved in the theft or at least aware of it. Mike and Kanter put Scott in charge of the investigation and brought in Kroll to do a forensic review. Kroll's report showed some problematic items going beyond the payroll scandal. It showed Hogenson taking unauthorized, aggressive actions, such as Hogenson authorizing

MLAT_AU 00072900

payments to entities that helped influenced a deal with an end user. Hussain never paid such entities, but Hogenson just pushed such payments through. Scott guessed that this usually occurred on Interwoven deals because Interwoven had a past practice of making such payments and Hogenson came from Interwoven.

Lynch said it was Scott's decision as to what should be done with Hogenson. In retrospect, Lynch wanted the decision to terminate Hogenson to be made by someone not involved with accounting. After looking at the Audit Committee Results Analysis (Tab 22), Scott felt that Hogenson was at fault for the payroll fraud but also was not. On the one hand, Hogenson was responsible for knowing what was going on and he ran a sloppy organization. But, by the same argument, Hussain should be at fault because he should also have known what was going on.

When Scott terminated Hogenson, he probably gave the standard line that he was an at-will employee. Scott recalled going through the audit results with Hogenson and Kroll employees, pointing out the problematic issues and informing Hogenson that he would no longer be working at Autonomy. Scott was comfortable letting Hogenson go since he did not trust him and felt he had some agenda. Upon being fired, Hogenson was calm and matter of fact, not angry or surprised.

Scott was not involved with the settlement discussions between Hogenson and Autonomy. Kanter took over the negotiations once Autonomy was ready to settle and worked with Hogenson's outside counsel. Scott's main involvement was driving to San Jose to get the final agreement signed. He was not aware as to how Autonomy and Hogenson arrived at the final number. Scott has not talked to Hogenson since the settlement was finalized.

No one at Autonomy seemed particularly concerned about Hogenson's allegations against Autonomy, but Scott noted that it was the first time he had seen Autonomy settle with someone. Normally, Mike's (Lynch?) view was to not settle with anyone. Scott thought Mike (Lynch?) and Kanter both said the reason they settled with Hogenson was not because Autonomy had done anything wrong, but because the bad publicity could harm Autonomy, even if the stories were not true.

Percy Tejeda ("Tejeda") and Reena Prasad ("Prasad") were both terminated around the same time as Hogenson. Tejeda was close with Hogenson and Scott felt the same way about Tejeda as he did about Hogenson (untrustworthy, had an agenda), but to a lesser degree. Scott could not recall how the decisions were made to fire Tejeda and Prasad; he only remembered that Prasad was crying when she left. Hussain may have said that they cannot trust Hogenson, Tejeda, and Prasad. Scott did not think Lynch discussed Tejeda and Prasad, only Hogenson. Scott was not involved in the settlement negotiations with Tejeda and Prasad. Instead, he let outside counsel deal with them. His only interaction was getting approval of the settlement amounts from Kanter.

MLAT_AU 00072901



**DATE:**    January 17, 2013

**SUBJECT:**    Memorandum of Interview with Joel Scott – January 17, 2013

| Tab No. | Document Description |
|---------|----------------------|
| 1 | 6/30/11 Email from Guiao to Scott re. the Abbott Reseller Agreement |
| 2 | 6/30/11 Email from Wilner to Sullivan stating that Abbott never authorizes forward-looking commitments |
| 3 | 6/29/11 Emails between Guiao, Chamberlain, Hussain, and Scott re. Abbot deal, culminating with Guiao sending Scott a amendment to Abbot deal and a P.O. for Capax |
| 4 | 8/22/11 Email from Scott to Hussain re. Dave Truitt's concerns about the Abbott reseller arrangement |

## I.    **Interview Overview**

On January 17, 2013, Leslie Caldwell, Susan Resley, and Martha Stolley, all of Morgan Lewis and Bockius ("MLB") conducted an in-person interview of Joel Scott ("Scott"), Autonomy's former General Counsel.  Jenny Harrison of MLB also attended.  The interview lasted approximately one hour and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices.  This was the third time Scott was interviewed in connection with this investigation.

## II.    **Resellers**

### A.    *Abbott Labs/Discovertech*

Scott recalled the name "Abbott", but could not recall any specifics of the deal.  He was surprised that it was a hosting deal because he did not recall Abbott Labs using the digital safe and, if it was a hosting transaction, it would have involved digital safe.

The discussed price of $9.75 million for the Abbott Labs deal sounded high to Scott.  He thought it was around $500,000.  $9 million also sounded high for the Discovertech deal if it was just for Abbott Labs.

Scott still did not remember the specifics regarding the Abbott Labs deal, even after shown an email where he forwarded a Capax P.O. to Guiao with Abbott Labs as the end user (Tab 1).  He did not know why Discovertech, not Capax, was ultimately used for the deal.  Probably Stouffer Egan ("Egan") or Sushovan Hussain ("Hussain") told Scott to create the Capax P.O. and then, a short time later, told him to create a different P.O. for Discovertech.

Scott did not recall contacting Capax or Discovertech before he created the P.O.s.  He usually just usually created them, sent them off to the reseller, and collected the signed copy.  He did not

MLAT_AU 00072902

know if Discovertech knew it was entering into such a contract, but assumed it did since it returned a signed copy of the P.O.  Generally, Egan or Hussain spoke with Dave Truitt at Discovertech and then had Scott prepare the P.O.  Scott could not think of a time when a reseller was not expecting a P.O. when he sent it one.

Scott was not aware that the General Counsel at Abbott Labs told Autonomy that Abbott Labs would never sign such a forward-looking deal (Tab 2).  Scott insisted that the Abbott Labs deal was not an unusual deal.  He believed that Autonomy still chased the Abbott Labs deal after the quarter end; they would not just give up on it.  While Scott was not in the loop on the General Counsel's statement (Tab 2), he was aware of the deal and involved in drafting of P.O.s (Tab 3).

Scott told Hussain that Dave Truitt balked at the possibility of post-HP acquisition issues (Tab 4).  Scott did not recall writing this email or speaking with Truitt; however, Hussain often told Scott to tell Truitt certain things.

The Abbott Labs deal did not stick in Scott's head because most of the transactions were probably done on June 30th, which, as the last day of the quarter, was always a very busy day.  There were always many demands to "do this, do this, do this" on the final day of the quarter and, since so much was going on, nothing stuck in his memory.

Discover Engine was a product that Autonomy bought from Discovertech.  Autonomy "OEM'ed" it in its own products, meaning Autonomy would buy it, then incorporate or bundle it with Autonomy's own product and then sell the full product to the customer.  Scott recalled other software purchases similar to Discover Engine that occurred toward the end of the quarter, such as Discover Point and some Capax software.  Such purchases made him raise his eyebrows and wonder if they were ways for Autonomy to compensate Discovertech or Capax.

Scott recalled a flurry of activity in June and July of 2011, right before the August 18 announcement of the HP acquisition.  He could not recall the specifics, but remembered some transactions right after the announcement, such as the purchase of Discover Engine software from Discovertech.  There could have been a legitimate business purpose for this "flurry of activity", but it was also possible that the transactions were used to give money back to whoever Autonomy purchased software from.  Scott could not recall if he questioned these transactions because there were many transactions that he asked Andy Kanter, Egan, and Hussain about.  He could not recall any specific transaction he questioned, but he did ask several times if certain deals were legitimate.  He never took any action beyond asking questions because he did not know what else to do.  He saw that nothing happened when other people raised issues.  For example, nothing happened after Brent Hogenson raised issues to Hussain, Egan, Deloitte, the SFO, and the SEC.

III.   <u>**Moving Forward**</u>

After discussing Abbott Labs, Ms. Caldwell told Scott that it was not productive to continue speaking with him unless he was going to be more candid.  She explained that he could help clarify many issues, but it appeared that he was not doing so because he did not want to acknowledge his own level of complicity.  The documents show that, as General Counsel, Scott

MLAT_AU 00072903

was an integral part of Autonomy, was a key player, and was in the middle of many "bad" deals. Scott's statements that he felt things were not kosher, but did not act, do not ring true.

Ms. Caldwell further told Scott that he probably will be approached by the government (either the SEC or criminal prosecutors) and he must decide how he will respond because they will not believe his current story since it is inconsistent with the documents.  As an example, Ms. Caldwell showed Scott an August 22, 2011 email from Scott informing Hussain that David Truitt was concerned he would not get paid due to the recently announced HP acquisition (Tab 4).  Ms. Caldwell was not accusing Scott of being the mastermind, but the email showed Scott was not just doing the paperwork.

Scott countered that he drafted and sent out P.O.s and chased payments, but he was never involved with revenue targets and never knew what debts were outstanding.  He also felt his career was limited at Autonomy because he did ask questions.  However, as Ms. Caldwell noted, his limit was fairly high as he was General Counsel and COO of the Americas.  Moreover, putting titles aside, the documents and testimony show that Scott played a key part.  He must have known the deals were bad after working on them for over two years.

Scott asked Autonomy management about certain deals and was consistently told that the IFRS was more relaxed that US laws; however, he never looked at IFRS himself.  Moreover, as Ms. Caldwell pointed out, Scott knew that sometimes the deals did not come to fruition and that Autonomy had a mechanism to compensate the reseller for taking the risk.

Scott struggled to determine what he could have done differently and asked Ms. Caldwell what she would have done.  She explained that she had never been in such a situation and that she understood it was difficult.  However, she warned Scott that the SEC and DOJ tend to hold lawyers to higher standards than rank-and-file employees.  Scott understood this, but felt that the SEC, Deloitte, and the UK regulators did nothing when Hogenson raised issues causing him to believe there was nothing he could do.  Scott could have quit, but he felt doing so would not solve anything.  He also never found another compelling job opportunity.  Given his intense work schedule at Autonomy (usually working from 5 am to 11 pm), he did not have any time to search for a new job.  He barely had any time with his family.

As soon as Scott had an opportunity to talk to someone without the threat of being fired, he contacted John Schultz and spoke with him.  This took a lot of courage since Scott was, and still is, afraid of Lynch's retaliation.  Ms. Caldwell acknowledged that Scott did the right thing when he offered to cooperate with HP, but after his initial meeting, he essentially stopped cooperating and has not been candid in his interviews.  Scott stated that he was very specific in his discussions with Schultz, but Ms. Caldwell pointed out that in his interviews with MLB, he has just speculated and not relayed any specific details.

Scott questioned what crimes he was possibly facing.  Ms. Caldwell explained that, based on her own personal interpretation, the documents raise criminal issues, such as mail or wire fraud.  However, she could not advise him as to which crimes stemmed from where.

MLAT_AU 00072904

Scott also wanted to know what Ms. Caldwell would currently do if she were in his position. Ms. Caldwell explained that she could not give him advice, but that she predicted the government will contact him and warned him that it is a crime to make a false statement to the federal government.

Ms. Caldwell could not advise Scott to seek counsel.  HP may provide him with recommendations for counsel.  Scott asked if HP would cover the costs of hiring counsel, but Ms. Caldwell did not know.  It would not be unheard of for a company to indemnify attorney fees, but Scott must raise the matter with HP's legal department.

Ms. Caldwell explained that HP wants to hear the true story, Scott's unvarnished recollection, even if that makes Scott look bad; however, Scott does not have to cooperate with the investigation.  The interviews' purpose is purely fact-finding, not making judgments or pointing fingers.  Ms. Caldwell acknowledged that documents can be taken out of context or look different with the benefit of hindsight, so hearing Scott's recollections was important to HP. However, Scott must think about himself and how he wants to handle the situation going forward.

Scott stated he would talk with HP about his options and then decide what to do next.  He intentionally did not obtain representation yet because he wanted to be helpful and not make the situation adversarial.  He has no loyalty to his former bosses and wanted to be as helpful as possible to HP.  Ms. Caldwell will inform Paul Roeder of today's conversation so that he will expect Scott's call.

MLAT_AU 00072905



DATE:            November 16, 2012

SUBJECT:        Memorandum of Interview with Mike Sullivan

| Tab No. | Document Description |
|---------|---------------------|
| 1 | 10/1-2/2009 Emails between Sushovan Hussain, Steve Chamberlain, Matt Stephan and Mike Sullivan. |
| 2 | 10/5/2009 Emails between Steve Chamberlain, Mike Sullivan, and Sushovan Hussain. |
| 3 | 10/14/2009 Strategic Deals Memorandum prepared by Sushovan Hussain and attached emails. |
| 4 | 9/13-11/13/2009 Emails between Sushovan Hussain, Mike Sullivan, and Mike Lynch. |
| 5 | 9/30/2010 Emails between Mike Sullivan, Sushovan Hussain, and others. |
| 6 | 10/8/2010 Email from Sushovan Hussain to Mike Sullivan. |

I.      **Interview Overview**

On November 15th, 2012, Leslie Caldwell of MLB conducted a follow-up telephone interview of Mike Sullivan ("Sullivan"), a former Autonomy executive.  Jenny Harrison of MLB also participated by phone.  The interview lasted approximately 45 minutes and was in connection with HP's internal investigation of Autonomy's acquisition.

II.     **Background**

Sullivan is currently a senior executive at HP.  He was formerly an executive at Autonomy.

III.    **Autonomy's Resale Arrangement with EMC**

        A.      *Sullivan's Bonus for "Extracting" Emails from EMC*

In the third quarter of 2009, Sullivan attended an off-site management retreat in Europe.  At the retreat, Mike Lynch ("Lynch") asked Sullivan if he would be able to resell $10 million of hardware at a loss that quarter and that, if so, Lynch would buy him a Porsche.  Sullivan responded that it would be easy to do so.  Sullivan set up the reselling project and sent Lynch an email saying he could easily sell more than $10 million and joked that that amount of revenue

MLAT_AU 00072906

was worth two Porsches.  While Sullivan took the Porsche comments as a joke, he did take seriously the mandate to sell hardware.

Despite the jokes about rewarding Sullivan with Porsches, Sullivan was taken by surprise when he received an email from Sushovan Hussain ("Hussain") offering him a $200,000-$300,000 bonus for delivering certain amounts of recognizable revenue and an additional $50,000 bonus for extracting an email that would allow Autonomy to "allocate the associated costs appropriately" (Tab 4, page 2).  Sullivan had not solicited or expected bonuses for his work reselling hardware.

At the time Sullivan received the email, he did not know what Hussain wanted in exchange for the $50,000 bonus, but he assumed Hussain wanted paperwork showing the revenue.  However, in hindsight, Sullivan speculated that Hussain was requesting him to get EMC to agree that the discount it was getting on the resale of hardware would be applied to some EMC/Autonomy research and development project.  He was not sure if the "extracted" email was the 9/18/2009 email from Bill Scannell included in Hussain's "Strategic Deals Memorandum" (Tab 3) and on which Deloitte said they relied.  Sullivan saw this email as meaningless because it did not obligate EMC to do anything.

After the quarter closed and the deal with EMC was complete, Hussain and Steve Chamberlain ("Chamberlain") made it clear that they wanted Sullivan to get EMC to agree to future investment commitments.  They pushed Sullivan to send EMC emails, ghost-written by Chamberlain, that contained aggressive language about EMC's investments (Tabs 1, 2).  However, Sullivan explained to Hussain and Chamberlain that EMC would not agree to such language.  Moreover, Sullivan would not ask EMC to agree to such language because it was not accurate and would thus upset EMC.  Instead, he only went as far as discussing a marketing program with EMC and how it would help build future relationships.  He thought that he sent an email to EMC similar to the draft he emailed Chamberlain on 10/5/2009 (Tab 2) and that Bill Scannell of EMC responded to the email.  Sullivan was not sure whether it was the 10/5 email or an earlier September email that was the one "extracted" from EMC.

Hussain and Chamberlain also asked Sullivan to get an email from EMC concerning standard reseller margins.  They suggested specific numbers, but Sullivan was unable to recall them.  In response to this request, Sullivan obtained an email from Mike Mussulli, EMC Regional Partner Manager, whom Sullivan did not know (Tab 3).  Sullivan then forwarded Mussulli's email on to Chamberlain (Tab 3), believing that Autonomy's auditors needed information concerning the reseller discounts.

Sullivan did not get any pushback from EMC for getting the Mussulli email, but perhaps because he made sure EMC felt comfortable and EMC was genuinely interested in working with Autonomy.  Moreover, Autonomy is a big customer of EMC and so EMC took good care of Sullivan and Autonomy.  As Sullivan previously stated in an earlier interview, EMC was more interested in selling to Sullivan, than in Autonomy being an EMC hardware reseller.  However, EMC also wanted to get introduced to Autonomy customers and become certified on Autonomy products.

MLAT_AU 00072907

Sullivan was never asked to manipulate the margin, but would be told that Autonomy would like something that substantiates a particular margin.

      B.    *Sullivan's Understanding of the Arrangement Between EMC and Autonomy*

Under the hardware reselling arrangement between EMC and Autonomy, the discount did not go on to the customer.   Instead, EMC kept the discount and thus made money on the transactions.

As Sullivan understood it, EMC did not have an obligation to invest these extra funds from the hardware reselling into any joint development with Autonomy.  Instead, the arrangement was a loose understanding that Autonomy and EMC should work on something together and it included few specifics.  No obligations arose out of the arrangement; rather, it was just an opportunity for EMC and Autonomy to explore different avenues together.

While EMC had no specific obligations under the arrangement with Autonomy, Sullivan believed that EMC did have a genuine interest in being Autonomy's standard hardware provider. EMC wanted to improve its relationship with Autonomy, especially given Autonomy's position as a dominant provider of storage and archiving for large clients.  Moreover, there were discussions about EMC selling Autonomy a new EMC product, Atmos, for internal use. Autonomy tried Atmos and put money into it, but it did not work well.

## IV.    <u>Review of the Strategic Deals Memorandum</u>

While Sullivan had never seen the 10/14/2009 Strategic Deals Memorandum ("Memo") before, he read over its description of the EMC deal and noted the parts that, in his opinion, were inaccurate or overstated (Tab 3).

Sullivan confirmed that the Memo accurately stated that he and the Autonomy management team had a strong connection with EMC and were developing the relationship to enhance Autonomy's presence in the application space.

Sullivan qualified the statement that Bill Scannell was his main contact at EMC by stating that he mainly worked with individual salespersons.  Moreover, he was doubtful about the strong language that Autonomy and EMC had a "strategic partnership" led by Bill, feeling that it overstated the partnership as there was no formal agreement.  However, Sullivan acknowledged that the general idea was to strategically do more with EMC and not just be a typical reseller of EMC hardware, so perhaps the language was not too great of an exaggeration.

Sullivan disagreed with the statement that EMC extended the Autonomy OEM agreements by 3 years, but acknowledged that perhaps Mike Mooney had signed an agreement he was not aware of, which extended the OEM agreements.

Sullivan also stated that it was false that EMC was spending monies to develop an appliance pre loaded with Autonomy software.  To his knowledge, this statement was not true since EMC was not obligated to spend any money on developing an appliance.  EMC was motivated to build such an appliance because they wanted to buy it, but it was a misleading exaggeration or speculation to say EMC was spending the money when Sullivan had not discussed it with them.

MLAT_AU 00072908

Sullivan commented on the Memo's statement that Autonomy was working on creating appliances encompassing e-discovery, archiving and compliance. While Autonomy did have some conversations with EMC regarding development of such an appliance, the discussions did not go far because EMC's hardware was not appropriate.

Sullivan emphasized that while Autonomy had invested a lot by allowing EMC to keep the reselling discount, he did not know what, if anything, EMC was investing in. EMC did invest time and energy into many things and did try to meet Autonomy's needs; however, there was nothing in the reselling agreement that committed EMC to spending the resale profits in certain ventures.

Hussain stated in the Memo that there were a "series of plans including seminars, trade show stands, customer specific events, sponsorships and incentive payments to the EMC salesforce to market the Autonomy sales". However, Sullivan noted that he never discussed those items with EMC. While Autonomy and EMC had good intentions to do more together and strengthen their relationship, there were only good will discussions. Specifically, Sullivan never talked about seminars, trade shows, or incentive payments. There was some talk about mutual customer sales and introductions, but those discussions were more tactical than anything else.

However, Sullivan did not believe he was part of all the conversations between Autonomy and EMC. He believed that Lynch and Hussain had discussions with EMC (Sullivan was not sure of who the involved EMC parties were) without him. He did not ask many questions about the meetings because he assumed they concerned a merger or acquisition.

## V.   Autonomy's Post-2009 Transactions with EMC

As far as Sullivan was aware, Autonomy only resold EMC hardware in 2009. Hussain often asked Sullivan to resell more EMC hardware; however, Sullivan never followed through with these requests.

One example of such a request by Hussain is seen in a 10/8/2010 email from Hussain to Sullivan (Tab 6). In the email, Hussain asks Sullivan if he can "get EMC to do some" reselling in order to get $30 million as it was a big quarter. Sullivan did not remember any reselling that happened due to this email. He may have reached out one more time to EMC, but nothing ever got to a point of discussion. Thus, this email does not mean Autonomy worked with EMC reselling hardware in 2010.

While Autonomy did not continue any reseller relationship with EMC, it did continue to purchase hardware from EMC for its own internal use. Thus, Autonomy continued to have dealings with EMC after 2009, even though it no longer resold EMC hardware.

For example, an email chain from 9/30/2010 (Tab 5) discussed the timing of a money transfer to complete a deal with EMC. Sullivan explained that this deal was not for the purchase and resale of EMC hardware, but rather was Autonomy's purchase of EMC equipment for internal use. Sullivan explained that Hussain demanded the checks be sent immediately because he was upset that while Autonomy was purchasing equipment from EMC, EMC and Documentum, an Autonomy customer recently acquired by EMC, were not purchasing anything from Autonomy.

MLAT_AU 00072909



DATE:          January 23, 2013

SUBJECT:       Memorandum of Interview with George Tziahanas – January 11, 2013

| Tab No. | Document Description |
|---------|---------------------|
| 1 | TAB 41 / BOFA – 11/10/10 email from S. Hussain to M. Lynch and P. Menell re: "big deals update," and emails from S. Egan and S. Hussain re: BofA deal |
| 2 | TAB 47 / BOFA – 12/18/10 email from S. Hussain to J. Krakoski et al. re: delay of deal approval by BofA Finance |
| 3 | TAB 1 / TZIAHANAS – 12/20/10 email from J. Krakoski to S. Hussain, S. Egan, et al. with draft email to send to BofA explaining why deal must close in 2010 |
| 4 | TAB 2 / UBS – 1/13/11 email from S. Hussain to S. Egan and M. Lynch re: negative feedback from Deloitte to UBS re: Autonomy installation |
| 5 | TAB 3 / UBS – 1/27/11 email from S. Hussain to G. Tziahanas, S. Egan and G. Perachio re: negative feedback from Deloitte and Goldman Sachs to UBS |
| 6 | TAB 1 / UBS SUPP. – 3/31/11 email from S. Hussain to S. Egan with subject "talk to george t re ubs" |

## I.     Interview Overview

On January 11, 2013, Martha Stolley and Susan Resley of Morgan Lewis conducted an in-person interview of George Tziahanas ("Tziahanas"), Global Head, Legal and Compliance Solutions for Autonomy.  The interview was held at the Chicago offices of Morgan Lewis.  Jay Hines-Shah of Morgan Lewis also attended the interview, and Worth MacMurray of PwC participated by telephone. The interview lasted approximately two hours and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices.  Subsequently, on January 14, 2013, at Tziahanas's request, Ms. Stolley and Ms. Resley conducted a brief telephone interview during which Tziahanas clarified a few ancillary facts.

Ms. Stolley provided Tziahanas with "Upjohn Warnings" by advising him that the interview was part of HP's internal investigation, that it was privileged and that Tziahanas should keep the discussion confidential.  Ms. Stolley further advised Tziahanas that Morgan Lewis represents HP and therefore, HP could choose to waive the privilege at its discretion.

## II.    Background

Tziahanas was hired in November 2008 to lead compliance solutions for Autonomy.  His background includes expertise in regulatory software such as archiving and supervision software for banks, hedge funds, and other regulated entities.  While Mike Sullivan ran the eDiscovery group, Tziahanas led Autonomy's group of e-discovery and archiving specialists both pre and post sale.  Recently he took on the role of portfolio manager, which includes investigation and e-discovery work for non-banking entities such as energy and pharmaceutical companies.

Morgan, Lewis & Bockius LLP

MLAT_AU 00072910

A.    Hardware Sales

Tziahanas described his involvement in hardware sales as very limited – primarily related to compliance cells Autonomy deployed for customers, such as Citi and BNP Paribas, that wished to store data on-site rather than in the cloud.  In these instances, the hardware and digital environment resides with the customer, but is managed remotely by Autonomy.  Tziahanas said compliance cells consisted of a standard server plus a hardware/software combination designed to meet regulatory requirements – e.g., the requirement that data be stored in an immutable form on a WORM (write once, read many) disc.

When asked about Arcpliance, Tziahanas said the idea behind this product was great in theory: to embed everything in the hardware stack in a single box, thus combining the cells and the front-end data processing.  However, according to Tziahanas, Arcpliance never got off the ground.

Tziahanas said that, until the recent public disclosures, he had no idea Autonomy was selling common hardware, such as "keyboards and mice."

B.    Resellers

Tziahanas said he had no idea Autonomy was working with resellers.  The agreements he saw were with the end user, like Bank of America, UBS, and JPMorgan Chase, not a reseller.  Tziahanas learned after the fact that one of the Bank of America deals he worked on had been passed through a reseller.  He learned this because, when Tziahanas was working on a later deal with Bank of America, Sushovan Hussain ("Hussain") suggested using a reseller mechanism "again."  As Hussain explained it, the bank / end user received a 3% credit for using a minority or woman-owned business.

Tziahanas also described a UBS deal where, according to Hussain, UBS wanted "payment terms" to spread out the license component over a period of years for budgetary purposes.  Hussain said it was ironic that Autonomy had to finance a deal for a bank.

## III.    Bank of America Deal in Q4 2010 / Q1 2011

Bank of America ("BofA") is a long-standing Autonomy client whose relationship with the company dates back to about 2003, when it was a ZANTAZ client.  Stouffer Egan ("Egan") owned the Bank of America relationship, although Jim Krakoski ("Krakoski") also was important to the relationship.  Tziahanas said BofA is and always has been a challenging customer.  He noted later in the interview that BofA recently has conducted two internal investigations into the 2011 deal with Autonomy.  (See section III.C.)

A.    Background of the Deal

Autonomy's 2011 deal with BofA actually consisted of two deals.  First, BofA needed support for an archiving and supervision system it had bought from Computer Associates ("CA") prior to Autonomy's acquisition of this business from CA.  At the same time, BofA also needed to update or replace Merrill Lynch's legacy, home-grown archive system known as CARS.  At an industry event held in California in October 2010, BofA approached Tziahanas and Egan and asked them to work out a deal for both systems.  Tziahanas and Egan proposed bringing all of

MLAT_AU 00072911

the bank's data – migrating about 750 Tb – into the cloud under Autonomy's Supervision platform.  Shortly thereafter, in late November or early December 2010, Egan, Tziahanas, and other Autonomy employees went to New York to work out the details and structure a deal with BofA.

Although a November 10, 2010 email from Hussain to Egan with the subject "big deals update" **(TAB 1)** describes Tziahanas as the "exec sponsor" of the BofA deal, Tziahanas said the email's characterization was not correct.  An executive sponsor is the person who leads the deal and, although Tziahanas quarterbacked early discussions with BofA, Hussain and Egan led the deal through the end of 2010.

Tziahanas explained that the reference at the bottom of this email chain to pricing the "CARS purchase" involved an early idea for Autonomy to buy Merrill Lynch's in-house archive system (CARS) through a pure asset purchase – including the application, content, and support.  The asset purchase idea was quickly abandoned: Tziahanas said Merrill Lynch would never go for it, and after giving it some thought, a representative of the bank officially said no to the idea.

In regards to a reference at the bottom of the email chain to a "$1m to 2m of hardware purchase" by BofA that would be "bought and paid for by Nov," Tziahanas explained that he had led this deal to bring up the number of licenses to BofA (and Merrill Lynch) for the Supervision surveillance product.  Because BofA wanted to push all of their data into Supervisor, rather than just selected data, Autonomy required that they pay for hardware to run the application, in addition to the hosting fee.  Tziahanas thought there was a separate line item of about $1.9 million in the overall Supervision hosting deal: $1.3 million for the hardware and $600,000 for the software, support, and maintenance.

B.     Autonomy's Failure to Close the Deal with BofA in 2010

Tziahanas said there was "super-intense" pressure from Hussain and everyone at Autonomy to close the deal with BofA in December 2010.  Tziahanas always inferred that he had to do everything it took to close a deal.  Hussain said Autonomy needed the BofA deal at all costs; although he also said the same thing about deals that were a tenth the size of the BofA deal, the pressure to close the BofA and UBS deals was intense.  Tziahanas twice referred to the BofA deal as "material" to Autonomy.

With regard to Hussain's statement in a December 18, 2010 email **(TAB 2)** that BofA's Finance team was "blocking the deal," Tziahanas believed the employee in charge of modeling the deal for BofA simply had a lot of things to work through before she could obtain approval.

Tziahanas said Hussain's email of December 20, 2010 **(TAB 3)** – describing an Autonomy "accounting disclosure" that would have made the BofA deal unworkable in 2011 – was consistent with something Hussain had told him at the time regarding an internal accounting change.[1]  Tziahanas also believed the issue involved Autonomy's intention to finance an acquisition during Q1 2011 with the proceeds of a Q4 2010 deal with BofA.  Tziahanas could not

---

[1] During our subsequent telephone interview on January 14, Tziahanas remembered more clearly that there was to have been some kind of accounting change that Autonomy or the London Stock Exchange was to adopt in 2011.

MLAT_AU 00072912

remember the specific acquisition target.  The acquisition did not go through and, according to Tziahanas, Autonomy never did another big acquisition other than Iron Mountain.[2]

Late in December 2010, Egan told Tziahanas that the deal with BofA fell apart and that Autonomy would be unable to close the deal in 2010.  At that point, Tziahanas's involvement in the deal was over.  After December 2010, Joel Scott ("Scott") and Livius Guiao ("Guiao") led the deal.  From BofA's side, Vince Debben led the deal, along with Brian Seward, who took a more active role later in the negotiations, and Tom Marinelli of the Procurement team.

Tziahanas had no idea until our interview that Autonomy had used resellers to close a $19.5-million "deal" for BofA on December 31, 2010.  He asked: "How do the mechanics of that work?  I've got the BofA contract."

      C.      Bank of America's Review of the Deal, and Recent Investigations

Tziahanas said BofA had "everyone and their brother involved" in the negotiations for the overall deal.  The total value of the deal was about $50 million over five years, with $19 million paid upfront.  From a timing perspective, the deal was funded from BofA's "transition budget" from the Merrill Lynch acquisition.  This was one reason everyone pushed to complete the deal quickly.  The bank's CFO had to sign off on the deal.  In addition, because the deal required BofA to upload all of its compliance data to Autonomy over a period of five years, the deal received internal scrutiny not only from Legal and Procurement, but also regulatory scrutiny from the Compliance team.

When discussing the bank's scrutiny, Tziahanas mentioned that BofA had independently initiated two internal investigations of the deal.  The first investigation, which has been closed, took place "several months ago" and concerned the timing of the deal, which apparently didn't follow BofA's protocols.  The second investigation began after the news of Autonomy's reseller practices was made public in late 2012.  Tziahanas did not know anything more about BofA's current investigation.

## IV.    Capax Involvement In Deals And Selling Services to Autonomy

Tziahanas knew of Capax from its role as a professional services group on a number of Autonomy deals.  However, in late 2011 or early 2012, he was at a hockey game with Capax Principal, John Baiocco ("Baiocco"), when Baiocco told him that Capax had financed "a whole lot of deals" for Autonomy, including Autonomy's deal with UBS.  This was the first time Tziahanas learned of Capax doing anything but consulting work and it surprised Tziahanas, who assumed Hussain would have gone to Barclay's or GE Capital, not a services reseller like Capax, to finance a deal.  (He knew there was something wrong about this and he did not want to hear anything more, so he did not ask Baiocco any questions.)

When asked why he was uncomfortable with Capax's involvement in the BofA deal, Tziahanas said there was nothing wrong in principle with financing a deal.  However, he was concerned at

---

[2] Tziahanas still remembered a discussion about the money not being there for Autonomy to make an acquisition.

MLAT_AU 00072913

the possibility that revenue had been booked before Autonomy actually signed the deal with the bank.

Tziahanas believed Capax's revenue from professional services, maintenance, and support was, at most, $20 million per year. He doubted Capax was financially capable of covering Autonomy's deals with end users, including the $9.45 million Capax agreed to "finance" on the BofA deal.

When asked about the $475,000 Autonomy paid Capax per month for EDD processing, Tziahanas commented, "So there's your revenue [for Capax to finance the BofA deal]." Tziahanas said he had no knowledge of Capax doing any EDD processing for Autonomy. He believed it was not reasonable for Capax to provide this volume of EDD services and said $475,000 per month was a material amount that Autonomy would rather do itself.

Tziahanas was less concerned with paying Capax $125,000 a month for EAS support to Autonomy customers. Although the EAS product was a legacy ZANTAZ archiving application, and despite the EAS customer base dwindling, there were tens of thousands of installed EAS users – enough to make Autonomy's support payments reasonable.

Tziahanas described NearPoint as an archiving solution Autonomy acquired from Iron Mountain geared for installations to smaller, generally legacy customers. NearPoint targeted a similar market as EAS, though it was not meant for the regulatory environment. In regards to a June 2011 agreement pursuant to which Autonomy paid Capax an upfront $2-million "ramp up fee" for NearPoint support, Tziahanas said the amount was "pretty high" and did not seem right.

And, in relation to a $6 million commercial software license agreement in August 2011, Tziahanas said there was not sufficient value in Capax's Introspect software tools to justify Autonomy paying Capax $6 million for the licenses. When we asked him about the $6 million license fee payment to Capax on August 11, 2011, Tziahanas immediately surmised, "that's the money for Capax to finance UBS."

## V.     UBS Deal in Q3 2011

In the fall of 2010, Tziahanas flew to Switzerland at Sushovan Hussain's request to meet with executives of UBS. Tziahanas, Hussain, and Fernando Lucini ("Lucini") met with UBS's CIO, Chief Compliance Officer, and relationship manager Sameem Jaffrey to discuss a possible solution for compliance software – UBS had been having problems with its existing software. At one point during the meeting, a UBS banker mentioned that Mike Lynch ("Lynch") kept all of his money with UBS. According to Tziahanas, Hussain stopped the meeting, stating that he was on the Autonomy Board, he could not have UBS contemplating a deal with Autonomy simply because of Lynch's financial ties with UBS, etc. The meeting restarted soon thereafter. Later, Hussain pointedly told Tziahanas "the Swiss are so corrupt." Nonetheless, Autonomy began working with UBS on a deal for global archiving, surveillance, supervision, and investigation software.

Serious negotiations ensued in January 2011. According to a January 13, 2011 email from Hussain (**TAB 4**), Deloitte had been trashing Autonomy to UBS. Tziahanas said this was probably done by Bruce Hartley or another member of Deloitte's e-discovery practice. And,

MLAT_AU 00072914

according to an email Tziahanas wrote on January 27, 2011 **(TAB 5),** a former Goldman Sachs representative was also trashing Autonomy to UBS.

Tziahanas told Hussain there was no way Autonomy could complete a deal with UBS in Q1 of 2011. The two sides were not even close by the end of March 2011. Tziahanas said Autonomy did not even have a "scope baked," meaning it was not clear by then what software UBS might acquire. Tziahanas said that Hussain's March 31, 2011 email telling Egan to "talk to george t re UBS" **(TAB 6)** indicated there would be no deal. Tziahanas continued to be involved in negotiations with and presentations to UBS during April and May 2011. In one such meeting, Hussain and Tziahanas walked into a meeting with Sarah Wilkinson and Sameem Jaffrey of UBS and were informed that Lynch was upstairs in a banker's office applying pressure to get the deal done.[3]

Tziahanas said it was also a long-shot for Autonomy to close the UBS deal in Q2 of 2011. He remembered that Autonomy's UK sales team flew to the US to draft contracts with UBS's Procurement team. Tziahanas said this was a painful set of negotiations to try to lock down the scope and contractual language. He described a later set of negotiations, when he and others from Autonomy were in the UK negotiating with UBS until 2:00 in the morning on June 29 or 30, 2011, trying unsuccessfully to close a deal before the end of Q2. The UBS deal did not close until August 2011.

When asked about Capax's UBS-related purchase orders to Autonomy for $8 million at the end of Q1 2011 and $7.6 million at the end of Q2 2011, Tziahanas "pieced together" these facts with his knowledge that UBS's first installment payment to Autonomy under the executed contract was about $7.6 million. (The total value of the contract was $35 million, with about $20 to $22 million in payments due from UBS during the first year.) Tziahanas surmised from the Capax numbers that it was financing the UBS deal, just as John Baiocco had told him.

## VI.   Miscellaneous

### A.   Other Deals And Resellers

The only Citi deal in 2010 that Tziahanas was aware of involved an effort by Autonomy to get Citi to switch from Orchestria to Autonomy. Autonomy completed a high-level proof of concept ("POC"), but was unable to convince Citi to buy Autonomy's application. Since then, Citi has been interested in buying more cells to increase its storage capacity.

Tziahanas also recalled an attempt to close two different deals with Deutsche Bank in December 2010. The first was to extend the Supervision product to Asia and more of the US. The second was a records management deal for outsourcing unstructured content to Deutsche Bank. Neither deal went anywhere.

When Ms. Resley asked if there was anything else Tziahanas thought was important, he referenced a deal with Manulife that he initially understood had closed in Q4 of 2010. Tziahanas later learned from Autonomy sales representative Patrick Ryan that the deal did not close in 2010. This deal was later closed, but Tziahanas did not know when.

---

[3] Tziahanas first discussed this meeting during the January 14 telephone interview.

MLAT_AU 00072915

Tziahanas had never heard of DiscoverTech, although he wondered if it was related to MicroLink. Tziahanas recalled that at the time Autonomy acquired MicroLink in 2010, the company had made statements to analysts that it intended to acquire a $2 billion company. Because the MicroLink acquisition was much smaller, approximately $50 million, Nicole Eagan wanted to assure the analysts that MicroLink was not the big acquisition that Autonomy had earlier touted.

Tziahanas had never heard of the reseller Tikit. In regards to FileTek, he said he had heard of the company but had never dealt with them. When asked if he had any visibility into reseller commissions or marketing assistance fees ("MAF"), Tziahanas laughed and said, "No, I didn't."

B.     Observations about Autonomy Employees

Tziahanas said that Lynch and Hussain ran a closely held company that did not share data. The "nucleus" consisted of Lynch, Hussain, Andy Kanter and Peter Menell. (Tziahanas said Menell was "certifiable." Not only did Menell try several times to have Tziahanas fired, he ran his group with "utter terror.") He added that Menell would raise issues which demonstrated that he did not understand the core engineering of AU's products (Menell's background is math, not engineering) The next ring consisted of persons who were trusted and had mechanisms to get things done: Egan, Nicole Eagan, and Ian Black (for a period of time). Joel Scott was trusted like Egan but mainly because he had the tools to effect how the organization operated – i.e., he was papering many important deals. Tziahanas described his relationship with Scott as "close."

MLAT_AU 00072916

**Morgan Lewis**
COUNSELORS AT LAW

DATE:         February 4, 2013

SUBJECT:    Memorandum of Interview with Woody Walton, Vice President, Federal
                    Technology, AU/HP – February 1, 2013

| Tab number | Document Description |
|---|---|
| 1. | Email of April 12, 2011 between Raj Srivatsan and Mike Sullivan. |
| 2. | Word proposal prepared by Microtech and Autonomy titled "Advanced Technology Innovation Center Featuring Autonomy-Based Technologies and Solutions." |
| 3. | August 15, 2011 invoice for $8.2M by Microtech to Autonomy concerning federal cloud proposal. |

## I.    Interview Overview

On Friday, February 1, 2013, at 11:00 a.m. EST, at Morgan Lewis's offices in Washington, DC, Susan Resley of Morgan Lewis conducted an in-person interview of Woody Walton ("Walton"), Vice President at federal technology at Hewlett Packard ("HP"). Martha Stolley and Vladimir Pavlovic participated by phone. Walton is a legacy Autonomy ("AU") employee. The interview lasted approximately 90 minutes. The interview focused on Walton's knowledge of a number of AU's deals in the federal and commercial space, including AU's use of resellers to facilitate these transactions. Walton was cooperative and said that he was there to help, but that he did not think he knew much.

Ms. Resley provided Walton with "Upjohn Warnings" by advising him that the interview was part of HP's internal investigation, and that it was privileged (and that the privilege belonged to HP, not to him individually) so Walton must keep the discussion confidential. She informed him that, while information gathered in the interview would be shared with HP and would form part of the factual investigation of this matter, his name would not be provided to other interviewees. Ms. Resley further advised Walton that Morgan Lewis represents HP and therefore, HP could choose to waive the privilege at its discretion.

## II.   Walton's Background and Responsibilities

Walton said that before he joined Autonomy, he was a customer. He was in U.S. Army for 10 years and ultimately in charge of U.S. Army portal search applications, where he became familiar with the Autonomy product. He came to Autonomy in 2004 as a tech specialist. In 2005, after some people left, he was promoted and took over the federal tech team. Walton has held the same position since. Walton's primary responsibilities are responding to RFPs and RFIs, and managing engagements with customers from the tech perspective. This involved preparing proof of concepts ("POCs"). Walton initially reported to Fernando Lucini, and now

Morgan, Lewis & Bockius LLP

reports to Eloy Avila, Autonomy's CTO, who is based in San Francisco. Walton also "kind of" reports along the sales chain, but he is primarily a tech guy.

Walton does not recall ever hearing of deals that haven't closed but were recorded, or any such business. He only heard of sales people scrambling to get deals closed, but he purposely kept himself away because he wanted to stay on the tech side.

Walton described the process of responding to an RFI or RFP: (1) Walton's team would respond to a customer's RFI or RFP; (2) if the customer selected Autonomy, Walton would give a demo and answer further questions; (3) if Autonomy made the next cut, he would prepare a Proof of Concept ("POC") – i.e. install the software in the customer's environment on a sample of the customer's data and conduct a demo. Autonomy always tried to make this process as quick as possible.

Walton knows Phil Stevenson as one of the sales reps, and that Mr. Stevenson was involved in some implementations in the federal space.

### III.   **Walton's Contacts with Senior Management**

Of Autonomy's senior management, Walton had occasional interaction with Peter Menell, even though Mr. Menell was a level removed from him. He added that a lot of people complained about Mr. Menell but that he never saw the side of Mr. Menell about which others complained. The only time he interacted with Mr. Menell was in the 2004-2005 timeframe, when Mr. Menell wanted Mr. Walton to fly to New Jersey and wait at the airport, just to see if a customer would show up.

Walton had no dealings with Messrs Lynch or Hussain. He had a little bit of contact with Andy Kantor, as Mr. Kantor was a mouthpiece for Messrs. Lynch and Hussain. Walton would sometimes receive emails Mr. Kantor sent to employees, but they never had direct contact.

Walton interacted with Stouffer Egan "maybe once a year," when Mr. Egan would call for tech support. Walton primarily dealt with sales people. Walton said that he heard of Stouffer ruining deals at the last moment, that he had a personality of a used car salesman, and that that rubbed some people the wrong way.

### IV.   **Specific Deals**

     a.   Veteran's Administration

Walton did not recall specifically putting together an RFP or RFI or assisting in a sales effort in 2010 for a deal with Veteran's Administration ("VA") but recalled that a VA deal popped up each quarter. He also could not recall being involved in a deal with VA in the range of $20-24M in Q2 2010. All of his team at the time was IDOL-focused, and Walton would probably outsource responses to any RFIs involving such a deal to another Autonomy tech team.

MLAT_AU 00072918

b.   Department of Interior

Walton is not sure whether he was involved in any sales efforts for the Department of Interior ("DOI") deal.  After he was shown an email chain dated April 12, 2011 (Tab 1), Walton said he did not recall anything about it.  Walton added that Sam Kalbag was on the email chain, and that he probably handled whatever needed to be done because he had come from sales.  Walton said that, as far as he knows, no new DOI deal came to fruition.

c.   Internal Revenue Service

Walton was involved in the original sale to the Internal Revenue Service ("IRS") through Microlink, which took place a couple of years ago (started in 2008).  According to Walton, IRS was always very difficult to work with and required difficult implementation.  Walton did a POC for IRS in 2008, after which IRS went so quiet for a while that his group assumed that IRS's funding dried up, but they came back after a year and fought hard on price.  Walton did not recall whether the deal closed in 2009 – he would only hear about deals that closed way after the fact, and only because he needed to add them to his list for bonus purposes.

**V.   Walton's Experience with Capax**

Walton knew Capax as Autonomy's partner used primarily for commercial deals.  He always thought of Capax as providing commercial services, and that they only recently got involved in federal.  He had recently heard of Autonomics, Capax's spinoff whose cloud Autonomy tried to use, but never had any interactions with Autonomics.  Walton first heard of Autonomics in the spring of last year, when one of the sales people heard that Autonomy tried to implement its technology in Autonomics' cloud project. Walton occasionally turned to Capax, if Autonomy needed services where Microlink did not have particular expertise, namely projects involving federal cloud.

Walton was not sure why Autonomy would turn to Capax as a reseller when Microlink and Microtech did a lot of federal deals for them.  He speculated that because federal customers always required three bidders, Capax may have been invited to submit a bid.

Walton could not recall any specific instances of deals for which he knew Capax was brought as a reseller, but said he would go through his emails and check.  Walton added that he knew Raj Srivatsan ) (a salesperson in the federal group) worked with Capax.

**VI.   Walton's Experience with Microtech**

Walton said that Microtech and Microlink were sister companies, and that Microtech was trying for years to become a partner of Autonomy.  Walton participated in discussions two years ago where Microtech told Autonomy it was building an appliance but did not have any actual use cases of how they were going to deploy Autonomy software in that appliance.  Roger Channing was the Microtech representative who was involved in these discussions.

MLAT_AU 00072919

Walton had moderate contact with Microtech.  He had his first meeting in person with Microtech earlier this year on a deal for FBI, and most of his previous interactions were on the phone.  Walton did not recall with whom he met, but said he spoke on the phone with Roger Channing, and others whose names he did not recall.  He never spoke with the Steve Truitt or Dave Truitt (of Microtech and Microlink).

Walton said that Microtech wanted to set up a lab with Autonomy's product in it, but that, as far as Walton knew, no work was done in that respect. According to Walton, had Microtech put together a use case, Autonomy would have considered it, but Microtech never did.  Walton was not sure what else a partnership would entail.  Walton was then shown and reviewed a document named "Advanced Technology Innovation Center Featuring Autonomy-Based Technologies and Solutions" (Tab 2).  He said a lab would probably look similar to the one conceived in the presentation, but noted that Microtech never had any deep knowledge of Autonomy's software, and that Microtech's expertise was in Sharepoint.

Walton participated in discussions concerning the use of Autonomy software in one of Microtech's mobile units.  Mr. Channing was his counterpart at Microtech.  Walton and Mr. Channing began this discussion back in 2010, when Mr. Channing was still at his previous company – CST.  Besides Walton and Mr. Channing, Dan Truitt was also involved in these discussions, because he was a Department of Defense ("DoD") representative and the best Autonomy salesman.  Walton may have had email discussions with Dan Truitt and possibly others about this, and the project was called the Cube project.  Walton reiterated that the discussions were brainstorming that never developed into a real project.  He said he would have known, and would have been involved, if the mobile unit/Cube ever developed, because he would be involved in the deployment of software.  He has never been advised that the software needed to be deployed in any project with Microtech.

Walton was not aware that Autonomy paid Microtech $9.6M to develop ATIC.  He was surprised to learn that Autonomy would pay for its software to be implemented in mobile labs, not the other way around.  He assumed that Microtech would pay for licensing rights.  Walton was not aware of any project or investment into Microtech that enabled Microtech to showcase the product to federal customers, and reiterated that would have known something like that.  Walton was never asked by Joel Scott or anyone else to give any opinions concerning projects with Microtech.

Walton did not recall discussions with Microtech in 2011 concerning federal cloud proposal, but added that Microtech had a federal cloud project.  Walton reiterated that  Microtech tried for years to partner with Autonomy, but discussions never progressed.  Microtech hired someone to help,who was not very good.  Walton was then shown and reviewed an 8/16/11 invoice concerning Microtech's proposal to develop federal cloud for Autonomy (Tab 3).  Walton said no conversations concerning the federal cloud proposal got to the level of detail showed in the document.  Walton was surprised, and said that he could not think of anyone else at Autonomy who could have been involved in these discussions.  He reiterated that he would necessarily have been involved in these discussions.  Walton does not recall any conversations with Fernando Lucini or Eloy Avila in 2011 concerning the federal cloud proposal.  He was not aware of Autonomy's $8.2M investment in Microtech for the federal cloud proposal.  He said

MLAT_AU 00072920

that Dan Truitt would have known of such a proposal and would have let Walton know.  Dan Truitt never told him about any such proposal.

Walton speculated that Microtech wanted some reselling business from Autonomy.  He knew this because he heard this from sales representatives, and added that every sales person in federal who was trying to close a deal knew this.

Walton did not really know what lines of Microtech's business were successful.  He thought Microtech had networking expertise, but it never got the Autonomy practice off the ground.  Walton also said Microtech did not know Autonomy's software.  He added that knowledge of the software was not really necessary for acting as a reseller, but that Microtech would need it if they were building cloud.  He knows more about Microlink than Microtech.

## VII.   Walton's Experience with Microlink

Walton said that Microlink hired a number of Autonomy people – for example Cory Moore, who was a tech specialist and worked for Autonomy briefly, before she joined Microlink.  Former Autonomy employees who moved to Microlink performed a number of tasks, from post-sale services to implementation of core software.  Walton noted that the existence of Microlink's security clearances was the main reason Autonomy outsourcedng to Microlink.  Because Autonomy was a foreign company, it was subject to hurdlse in the federal space, which is why it had to rely on partners.

Walton started working with Microlink when Cory Moore and Dave Tindell left Autonomy.  Microlink was also a GSA reseller, which allowed them to bid on federal projects.  Microlink was Autonomy's primary reseller, and was practically on every deal.  Walton recalled the following deals where Autonomy used Microlink: Defense Intelligence Agency (2010), Postal Service (2009) and Joint Special Ops Command (before Autonomy acquired Microlink).  Walton did not know what margin Autonomy gave Microlink.

Walton often had to fix Microlink's post sale support because it did not do a good job of configuring the software.  In such cases, Autonomy had to complete the project because Microlink would have completed all of its hours on its contract.  Walton did not know why Autonomy hired Microlink under these circumstances.  He recalled a Microlink employee (former Verity), Joe Cirka, who worked on the DIA deal, and who bugged the code so it would not work.  Walton thinks he did this so that Cirka could be hired back to fix the bug.  This occurred before the HP acquisition.  This was big news in the federal group, though Walton did not know who else at Autonomy knew about this, but said that it should have gone to Mr. Lucini.  According to Walton, this incident did not affect Autonomy's perception of Microlink, because Cirka was perceived as a rogue actor.  Microlink was not perceived as dishonest, even if they might have not always been diligent.  Walton also said that rumors were that people let go from Autonomy for performance found their way to Microlink, and added that Autonomy was a pretty stressful place to work, especially for sales people.

Walton did not know why Autonomy purchased Microlink in 2009 and did not know how/why Autonomy would integrate it.  After the Microlink acquisition, SSI rules set up a

MLAT_AU 00072921

firewall so that Autonomy and Microlink employees could not communicate unless certain protocols were met.  The firewall made it more difficult to work with Microlink and Microlink's employees were more secretive about their work than before the acquisition.

Walton reiterated his surprise that Autonomy paid for Microtech services (ATIC and federal cloud), and added that the Microlink acquisition made no sense at all.  He speculated that there had to be a different reason for the acquisition than one given by Autonomy, because Microlink did not provide what it was supposed to – clearances.

## VIII.   Walton's Involvement in Commercial Deals

In addition to federal, Walton worked on some commercial deals.  Examples are the NBA (post-sales) and the Rockland College deals.  Walton also confirmed that VMS was a customer but that he did no pre- or post-sale work for VMS.  His involvement in any deals was limited to providing tech advice.

Walton did not recall a Bank of America deal in the 2010/2011 timeframe.  He knew of a BofA POC in 2005 or so, but said it was for an IDOL search opportunity.  Similarly, he did not recall any deal with UBS in 2011.

## IX.   Other Issues

Walton knew Discovertech had some Sharepoint capability and had some conversations with Malcolm Hyson from Discovertech.  According to Walton, Autonomy did not incorporate any Discovertech software.  There was a time when Microlink developed Sharepoint technology for Autonomy, so Discovertech was competing with Autonomy's product, but he did not know where it ended up.  Walton said he was not familiar with Discovertech being a reseller.

Walton speculated that resellers really just "passed paper."  He never heard of Filetek acting as a reseller.  Similarly, he never heard of any Autonomy products that would incorporate Filetek software, and was not aware whether Autonomy purchased FileTek's Storhouse software for internal use.

Walton had never met Steve Truitt personally.  He knew and liked Dan Truitt, who was a good friend, and said that many people view Dan as being in collusion with his brothers, but that he never had that impression.  Walton added that Dan Truitt tried to separate himself from his brothers, and that he was sometimes frustrated with his brothers, especially Dave.  Dan did a lot of cleanup work for Microlink, and Dave built a business on the coattails of what Dan did.  Walton had recently met Bob Truitt (father), and knew Bob writes government contracts at Microlink, and is apparently very good at his job, but also in poor health.  Bob Truitt recently joined Microlink, but has a lot of experience in government contracts.

MLAT_AU 00072922



DATE:          December 28, 2012

SUBJECT:       Memorandum of Interview with Roger Wang – December 19, 2012


I.      **Interview Overview**

On December 19, 2012, Susan Resley and Martha Stolley of MLB conducted an in-person interview of Roger Wang ("Wang"), a project manager at Autonomy. Jenny Harrison of MLB was also present. The interview took place at Autonomy's Pleasanton office, lasted approximately one hour and was in connection with HP's internal investigation of Autonomy's accounting practices before, during, and after HP's acquisition of Autonomy.

Ms. Resley provided Wang with "Upjohn Warnings" by advising him that the interview was part of HP's internal investigation, that it was privileged and that Wang should keep the discussion confidential. Ms. Resley further advised Wang that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

Wang asked if the investigation was aimed at any particular individuals. Ms. Resley explained that the investigation's main focus is on former senior management of Autonomy who are no longer with the company.

Wang also explained that he had recently given his resignation to Autonomy and will be leaving in mid-January to work at a start up in San Mateo.


II.     **Background and Responsibilities**

Wang originally worked at Verity and began working at Autonomy six or seven years ago after Autonomy acquired Verity. He joined as a program manager and managed development initiatives and projects. Wang reported to Pete Menell ("Menell") for the majority of his time at Autonomy. He did not have regular calls or meetings with Menell and other team members, but rather would be contacted on a "as needed" basis.

III.    **Management and Working at Autonomy**

        A.    *Menell as Autonomy's CTO*

Menell was the stereotypical Autonomy manager: goal-oriented, cut-throat, straight to the point, and driven by the bottom line. He was Autonomy's Chief Technology Officer ("CTO") and, while he was intelligent, he was not a typical CTO. Usually, CTOs have deep computer science backgrounds and focus on technology; however, Menell did not come from a core development and technical background. Instead, he started on the sales engineering side, showing the product and talking to customers. Wang did not even think Menell's degree was in engineering. Instead,

MLAT_AU 00072923

Menell was more of an "executor" who "got stuff done." This goal-oriented, demanding approach contributed to Autonomy's growth and success in Wang's opinion.

### B. *Culture at Autonomy*

Menell and senior management often made unrealistic demands on the engineers, but it was hard to question and challenge such expectations. Management listened to any complaints about expectations, but still made the same unrealistic request. For example, after weeks were spent developing a digital safe product for Apple, a few days before it was to be delivered management told Wang that they did not want any footprint of another search engine in the product and demanded that the core search engine technology be changed to Autonomy's IDOL platform. Wang tried to explain to management that this would harm the product and was essentially like putting a brand new engine into a racecar and racing it without testing the engine. However, Menell still had Wang change the search engine technology, which, as Wang predicted, created issues with the product's stability.

Along with making unrealistic requests, management also rushed production without waiting for proper development and research of projects. Often before a proof of concept was adequately developed, it was demo'ed to the customer and then went straight into production. For example, management asked Wang and his team to find a more cost effective platform for the main storage machine of their archiving system. They assessed and tested different platforms and then were hastily asked to put one into production. Performance levels are important in data archiving, but management's only goal was to find a cheaper platform and put it into production as soon as possible.

While Autonomy was always hiring the top students from prestigious schools, management was not interested in bringing in seasoned developers. Also, after Autonomy acquired a company, the goal was to use that company's assets, but little attention was spent on integrating the employees. In fact, there was always a large attrition rate.

## IV. **FileTek/StorHouse**

### A. *Assessment of StorHouse*

In early 2010, Darren Gallagher and Sean Blanchflower asked Wang to assess FileTek's StorHouse product and determine if it could be integrated into Autonomy's Digital Safe product. StorHouse provided file and database archiving capabilities. Wang and his team assessed StorHouse and concluded that Autonomy could make use of the product, but that there was no huge benefit to using it because it required new software and hardware, internal training, and technical support. Wang also believed that Digital Safe mail had rudimentary features to store files and saw no real benefit for utilizing FileTek's product. He did not create a formal written assessment of StorHouse, but merely discussed the product with his managers and upper management in Cambridge. When Wang discussed his findings, he got the sense that he was not being asked if it made sense for Autonomy to purchase the software. Rather, he believed was being asked how Autonomy could integrate and implement the software after the fact.

MLAT_AU 00072924

Despite his assessment and the fact that there was no particular customer in mind for integrating the software, Autonomy purchased StorHouse and licensed it with unlimited rights to use it in hosted environments.  The idea was to use StorHouse as the first receiving point for data, to be then "handed off" to the Digital Safe for storage.  Wang was directed to deploy StorHouse, but, as Wang predicted, many things went wrong in the deployment and it never got to the deployment or production stages. It was difficult to deploy because it had to be installed manually and no one was familiar with the product.  The only place Storehouse was deployed was in the development environments (like a lab) for pure evaluation purposes, and even then it was not successfully deployed.

Wang found it interesting that Autonomy paid $10 million to FileTek for the software because Autonomy's general policy was to not have any third party licenses.  Whenever Autonomy acquired a company, it would systematically remove any third party licenses that company used and replace the software with Autonomy's own products, even if the third party license was central to a product and was therefore difficult to be removed.  Autonomy preferred having a product crippled than having a third party license, i.e., Apple example described earlier.  Wang speculated that Autonomy's dislike of third party licenses may stem from before Autonomy acquired Verity when Autonomy licensed a Verity product.  Verity and Autonomy were competitors, so Verity stopped licensing its product to Autonomy and Autonomy "got burned".

The StorHouse deal seemed suspicious to Wang given Autonomy's dislike of third party licenses, the large amount Autonomy paid FileTek, the fact that the software was not needed, and the speed at which the purchase took place in 2010.  Wang knew that Mark Seamans, FileTek's CEO or CFO, was an ex-Verity employee and probably had a relationship with Autonomy.  Moreover, FileTek had bought many IDOL licenses.

The StorHouse project eventually just fizzled away.  Wang was not involved with any subsequent analyses of or purchases from FileTek, but did hear that Autonomy had purchased FileTek software in 2011.

Wang was not aware that FileTek was a reseller of Autonomy software, but it did not surprise him because partnerships were often struck when "mutually beneficial."

Wang also noted that he previously spoke with PwC and HP's legal team about FileTek and gave them specific dates and sample emails.

   B.    *Other "Assessment" Projects*

Wang was involved in other situations like the FileTek-Storehouse scenario.  He was often asked to "assess" a product, but he usually felt that the question was how – not if – Autonomy could use it and that he had to be positive about its potential uses.  For example, for customers NetApp Rackable, Wang was asked to assess some products and see how they could be used in the Digital Safe environment.  He was "semi-instructed" to seem very positive about the products.  He did not believe that the discussions ever actually lead anywhere.

MLAT_AU 00072925

V.    **Resellers**

A.    *Microlink*

Wang had a brief engagement with Microlink, during which he felt that everyone he worked with from Microlink were "jackasses". While Autonomy had already acquired Microlink, it still operated independently from Autonomy. The Microlink employees with whom he worked badmouthed Autonomy products in front of customers, even though they technically worked for Autonomy.

B.    *DiscoverTech*

Wang managed a team that developed a version of the Introspect product at least 5 years ago. He was never asked to implement any software acquired from DiscoverTech.

C.    *Capax*

While the name "Capax" sounded familiar to Wang, he had no interaction with them. He thought he may have had a project manager from Capax.

Wang was involved during the initial stage of Autonomy's acquisition of Iron Mountain. Specifically, he was part of the team that removed Iron Mountain's third party licenses and installed IDOL. Since this was his only interaction with Iron Mountain, he was not aware of Capax's role in payment to Autonomy to "ramp up" Near Point (an onsite email archiving product originally created by Iron Mountain).

While Wang was not aware of Capax's involvement with Near Point, it did not sound right to him for Autonomy to pay a reseller to "ramp up" and resell an Autonomy product. He would be "very shocked" if Autonomy paid anyone to resell Autonomy products because he has never known Autonomy to be that generous.

D.    *Microtech*

Wang did not work on any joint development projects with Microtech. Wang did not work on any mobile unit that Autonomy was developing for federal customers. He knew that the VA and DOI (Department of the Interior) were large government customers of Autonomy, especially for the digital safe. However, he did not know much about the deals and so did not know if Autonomy sold to them directly or went through a reseller.

E.    *End Users/Other Deals*

Wang had heard that the Vatican Library was an Autonomy customer for an archiving product, but he was not involved with the project.

FSA sounded familiar, but Wang stated he would have to dig through his notes to find what he did with them. Bank of America is still a big customer, especially of the digital safe product. Wang was actively engaged with UBS on deploying the digital safe product, but he did not know

MLAT_AU 00072926

if they provided the product directly to UBS or through a reseller.  Amgen was sold a lot of POC products that never went anywhere, like AAA (Autonomy Anywhere Archive) which has since been killed off as a product.

Similarly, Wang had heard of Abbott Labs and KPMG, but he was not intimately familiar with them, only peripherally aware.  He had not heard of Tikit.

VI.    **Hardware**

    A.    *EMC*

EMC provided storage hardware to Autonomy.  Autonomy needed storage servers and other types of hardware.  At one point, Autonomy bought millions of dollars worth of EMC hardware and in turn EMC purchased Autonomy software licenses to IDOL.  It was not strange for EMC to purchase IDOL because they were involved with storage and so would need search technology.  However, Wang felt the deal was strange because Autonomy greatly overpaid for the servers.  Even if Autonomy had paid the list price for the servers with no discount, it should have received many more servers given what it paid to EMC.

    B.    *Arcpliance*

Arcpliance was a product that management tried to push, but it was never a realistic possibility.  In theory, it was the Digital Safe software on a single server deployed at the customers' site – like a toaster the customer could simply plug in on-location.  This was unrealistic because the Digital Safe was not designed to fit on one box.  Autonomy tried to develop a partnership with white box (non-brand name) and other vendors (like Dell), but the product was never completed.  Instead, "Arcpliance" became more of a marketing name than an actual appliance.  Instead of creating a digital safe on a single box, Autonomy deployed the original digital safe product onsite at the customers' location.  So customers may have purchased "Arcpliance" in their contract, but they essentially bought the original digital safe, not any new product.

VII.    **OTHER ISSUES**

    A.    *IDOL OEM*

IDOL is an Autonomy search technology product that can be deployed directly to the end user or can be bundled with other products.  IDOL OEM is a way the IDOL product was sold when bundled.  While the engine itself is the same, the license key is cut a little differently.  When bundled, the IDOL search engine is used in the background of the purchaser's own product, which is they sold to the general public.  It did not make sense to Wang for Bank of America, Tottenham Hotspurs, or Mattel to be OEMs for IDOL OEM, but he did not rule them out as OEMs because search engines do have many uses today and so it may be possible that they had some software connected to their product.  He was clear that he was speculating.

MLAT_AU 00072927

B.   *IDOL SPE*

Wang thought IDOL SPE was an "interesting offering". He compared it to situations where an infomercial takes a rubber band and markets it as a home gym. He felt that Autonomy had just taken the normal process for creating a database and transformed it into a language the search engine could understand. There was no fundamental shift in the engine, at least as far as Wang could see.

Wang could not say if Autonomy spent $50 million on research and development (R&D) of IDOL SPE as claimed by Autonomy because everyone was segmented into his own R&D group and never saw internal financial statements. However, in Wang's experience, Autonomy's claims of investment rarely translated into reality. Actual R&D is long term and focuses on something to sell in the future, while Autonomy's R&D was much more rushed to develop and implement something as quickly as possible.

MLAT_AU 00072928



DATE:         December 13, 2012

SUBJECT:      Memorandum of Interview with Antonia Anderson – December 6, 2012

## I.    Interview Overview

On December 6, 2012, Susan Resley and Martha Stolley of Morgan Lewis and Bockius ("MLB"), and John Archibald of PwC conducted an in person interview with Antonia Anderson ("Anderson"), Autonomy's current Director of Revenue.   The interview was held at the Cambridge offices of Autonomy ("AU").   Owen Hammond of MLB also attended.   The interview lasted approximately one and one-half hours and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices.

At the beginning of the interview, Ms. Resley explained that MLB is interviewing multiple Autonomy employees to gather facts about what happened at Autonomy before the HP acquisition.   Ms. Resley told Anderson that HP and MLB had reported certain issues to the Securities and Exchange Commission ("SEC") and to the UK's Serious Fraud Office ("SFO").   Ms. Resley requested that Anderson speak openly during the interview and clarified that the interview was not a deposition.   Ms. Resley advised that Anderson could offer opinion and speculate, as long as Anderson could explain a rational basis for this speculation.

Ms. Resley provided Anderson with "Upjohn Warnings" by advising Anderson the interview was part of HP's internal investigation, that it was privileged and that Anderson should keep the discussion confidential. Ms. Resley further advised Anderson that MLB represents HP and therefore, HP can choose to waive the privilege at its discretion.

Because of Anderson's tenure on the Deloitte audit team, much of the interview focused on her work at Deloitte.   At the end of the interview, Anderson expressed concern how the discussion of her time with Deloitte would be treated, given that HP, not Deloitte owned the privilege.   She recalled signing a confidentiality agreement with Deloitte.    Resley emphasized that the investigation was fact gathering and was focused, in part, on former management's representations to its outside auditors.

## II.    Background and Responsibilities

Anderson joined AU in May 2011 as Group Financial Accountant, which was a new role created following the Iron Mountain acquisition.   Prior to joining AU, Anderson worked for seven years at Deloitte, where she was assigned to the engagement team for AU.   She recalled that Steve Chamberlain ("Chamberlain") had mentioned during the 2010 year-end "wrap up" meal that he was expanding the team and, to Anderson, it seemed like a good time for her to move on.

Anderson's first large project at AU was to prepare a working capital summary for Iron Mountain, which was submitted by August 2011. She then started her current role as Revenue Director in September or October 2011, shortly before Poppy Prentis ("Prentis") resigned. Prentis left for personal reasons (she became pregnant, and is now no longer working). Anderson knows Prentis well, as Prentis was also on the Deloitte audit team. Anderson and Prentis had "overlapped" on the audit team for approximately one year. Prentis left Deloitte for another company and then joined AU, about 18 months before Anderson did. Prentis is a good friend of Anderson's and they see each other regularly.

III.     **Work on the AU Audit Team with Deloitte**

A.     Overview

Anderson had no specific software accounting background before joining the AU audit team. Since she was junior at that time, she learned much of what she now knows from working on the AU engagement.

The accounting for the Zantaz acquisition was the first large piece of work Anderson was involved in with the AU audit team. The last major matter that Anderson worked on was the AU 2010 year-end audit. Anderson was Audit Manager and reported to Lee Welham (Senior Manager) and Nigel Mercer (Partner). Richard Knights was the prior engagement partner and his role most likely ended with the 2009 year-end audit. (Rob Knight was also previously on the team as a Director, but ceased to be involved once he was promoted to partner.)

There was little partner involvement in the verification of individual transactions. This was delegated to junior partners and below. Partners led the audit committee calls and, although Anderson attended some of them, she did not play an active role. Chamberlain and Sushovan Hussain ("Hussain") were the main contacts at AU, the latter having contact with Deloitte on all the large deals. Hussain provided an "outline" of the deals to Deloitte. Certain questions were "filtered upwards" to Hussain. Anderson, Welham and Chamberlain had initial contact; then certain issues were escalated to a discussion between Hussain and Mercer (or Knights, during his tenure on the audit team). An example of an issue that was escalated was the booking of hardware sales as marketing expenses rather than as COGS.

Deloitte held private sessions with management and possibly the audit committee, although Anderson could not recall the details of these.

Anderson did not recall Deloitte taking issue with fact that the CFO (Hussain) was driving sales. She noted (from her experience of working at AU) that a customer often expected to see senior management present on the deal negotiations.

Anderson described a "healthy working relationship" between AU and Deloitte. The audit team raised issues and got "push back," but also got answers to their questions. She noted that, in the Cambridge finance sector, "everyone generally knows everyone." Anderson agreed with the proposition that it was "prestigious" to be auditing AU, as it was a high profile, listed company.

-2-

Anderson did not think that Deloitte failed to push AU management from fear of losing them as a client. She explained that there were methods and processes to be followed. Ultimately, the decisions on the "judgmental areas" were made by the partner, and she never had cause to question their work. She stated that Knights and Mercer would not have "signed off" on the financials if they were not happy with the explanations provided by management. Anderson also noted that AU undertook voluntary quarterly reporting when it was not required. As a result, there was no perceived lack of transparency.

B.      Quarterly reviews

The focus of the quarterly reviews was usually revenue, since this was identified as a risk area, and any large value deals. Every deal of $1m was looked at, as well as a sample of deals over $100,000. The audit team checked that the applicable revenue recognition criteria were satisfied and assured themselves that they had addressed their concerns through discussions with AU and requests for further information. One such area of concern was poor reseller payment history – i.e., slow pay.

C.      Vatican Library

Anderson recalled that Deloitte raised the Vatican Library deal with AU because Microtech was the reseller, and there was a large receivable balance (in the region of $10m, she thought). Anderson noted that Microtech had a high volume of deals, so it would not have been unusual for there to have been an outstanding balance against it. She believed the receivable re Vatican Library was resolved when Microtech paid its balance. Anderson recalled that Hussain and Peter Menell ("Menell") described the transaction to Deloitte.

Anderson remembered that the value of the deal initially was presented as between $80-$100m. There were then delays to the project and, finally, the deal "went through Microtech." The contract with Microtech was the first, and possibly the only, contract Anderson saw in relation to the Vatican Library deal. Anderson recalled that there was intense secrecy surrounding the deal and that the individuals that AU was dealing with at the Vatican were given code names, such as "Papyrus." She also remembered Menell was very proud of the deal and that he showed off a gift he was given by the Vatican, which was some kind of relic. Anderson was not sure whether the deal with the Vatican closed. She did not know why Microtech became involved but was sure there would have been a discussion with Deloitte about this.

Anderson now understands that the Vatican Library deal was never closed. Fernando Lucini told her that another company is now involved in this work and that the equipment given to the Vatican is being recovered.

D.      Resellers

1.   Use of Resellers in Deals

Anderson said that, as she understood it, the reseller took the risk and reward of the underlying software deal and, as a result, AU recognized the revenue upfront. If there was any mechanism in the contract that enabled a reseller to be refunded or that allowed the reseller to deliver the

-3-

software onwards to a third party, "this was different." According to Anderson, there might have been a couple of instances of this, but the issue arose in very few cases.

Deloitte's testing involved assessing whether the software was delivered and whether the payment history of the reseller suggested "payability." Resellers with a history of large deals in which they paid demonstrated "payability" for purposes of revenue recognition. If concerns were raised, Deloitte would request the financial statements for the reseller. Deloitte did not conduct any follow-up to see whether the deal with the end user closed. Sometimes the resellers paid when the invoice was raised but other times it had to be "raised as an adjustment." Anderson noted that many Italian resellers often proposed adjustments and had no payment history. Anderson stated that there was a general reluctance to post an adjustment, but there was nothing unusual about it; the same was true of all companies.

Anderson was surprised to learn that there were occasions when the reseller had not paid, but she emphasized that this happened in only a couple of cases. Further, she did not recall any examples of resellers trying to cancel a contract when/if they were unable to sell – i.e., there were no "returns." [Anderson stood by this statement despite her learning of the existence of at least one side letter – e.g., the Tikit situation.] The other contracts she saw were direct arrangements with the end user, although there were very few such arrangements. Generally there were not many cases where AU demonstrated that it was taking on the risk.

### 2. AU's Purchases from resellers

#### a. Purchases from Microtech

Anderson recalled conversations about AU's need to purchase a mobile unit (from Microtech in 2010) and stated that, if the necessity had been justified, the purchase would have been deemed reasonable. Anderson said that she remembered Hussain explaining the need for the unit but she could not remember the purpose of the unit either for AU or for Microtech. There was no direct contact between Deloitte and Microtech.

#### b. Software Purchases from Resellers

Deloitte made inquiries to ensure that the software AU purchased had a standalone value. For example, Menell would have been asked about the purpose of each software purchase. Another test of a legitimate purchase was to validate that the software had been loaded into the delivery system. She did not recall specific AU software purchases.

When asked if she felt Deloitte was misled about AU's purchases, Anderson said that she recalled Menell providing justifications at the time (though she could not recall any details). She said that now that she has learned that there was no value for AU in some of these purchases, "it feels strange."

### E. Hardware transactions

Anderson recalled seeing hardware sales sold at a loss beginning in 2009. These were described to Deloitte as part of a strategy to become a "one stop shop" for customers who wanted to

-4-

streamline their purchase. These customers were described as "big spenders" with AU and the exercise therefore was profitable overall. Anderson described a memorandum that was produced by AU to describe the basis of these sales. It was a "white paper" for action, rather than an analysis of specific sales, but it specified how much certain AU customers were spending, in support of the proposition that the strategy was working.

Anderson could not recall the types of hardware that were purchased, although she did remember seeing orders for "huge amounts" of laptops, in relation to some issues raised by Deloitte.

Anderson recalled participating in an Audit Committee call during which hardware sales were discussed. "It was always suggested that the hardware sales were a one-off, and would be reduced in the future," she commented. On the call, the non-executive directors of AU expressed some concern that the hardware sales "were not Autonomy's business." Deloitte's view was that if the sales continued at their highest previous level (she could not remember the rate of this "tipping point," possibly more than 10%), AU would have to disclose the hardware sales as a separate line item.

Anderson assumed that the sales never reached the "tipping point" again since the hardware sales were never ultimately disclosed as a separate line item. She only attended two calls during which this issue arose and the discussion was led both times by Hussain, Chamberlain, and Richard Knights (for Deloitte).

The hardware costs initially were booked as "marketing" expenses, but Anderson said the line item may have changed. According to Anderson, Deloitte would have a lot of documentation on this issue, and Deloitte's conclusions (and the basis for them) would have been reflected in their work papers. Additionally, it is possible that Deloitte's work papers contain notes of discussions with Chamberlain or Hussain. Copies of the purchase orders probably would not have been kept, though the orders most likely would have been referenced in a spreadsheet. The "white paper" describing AU's justifications for the sales as marketing expenses certainly would have been in Deloitte's work papers.

## IV.    **Working for AU**

### A.    Overview

The culture at AU was one of hard work. There was a hard push towards the quarterly review, and then a "lull." Anderson did not feel that she was under pressure to do anything she was uncomfortable with during her time at AU. She has seen things which, in hindsight, were different than how AU management presented them to Deloitte.

### B.    Reseller deals

Anderson remarked that, now that she is "on the AU side," it appeared that there are more cases of resellers not paying than she was aware of when she was at Deloitte. She noted, however, that auditors do not get to see everything: "everyone puts on their best performance for the auditors."

MLAT_AU 00072933

One example of a reseller deal with an "unclean trail" that she has seen since coming to the "AU side" is the Bank of America ("BoA") deal. It appeared to have been negotiated as a direct contract with BoA (in which case no revenue could be recognized), but it "purported to be a reseller deal" since a contract was also held with the reseller. If this had been raised without Anderson's knowledge, it would have been discussed with Hussain and Chamberlain and reflected in the work papers.

C.    Professional services

Another "surprise" to Anderson was the accounting treatment of professional services and consulting. While certain products – e.g., "off-the-shelf" products – required minimal consulting work and, therefore, no need to account for the difference between the consulting and the cost of the license, other products/licenses had "huge requirements" that were not accounted for. Anderson saw situations where the accounting of the maintenance portion of the contract was "very underplayed" – i.e., the work estimates in the contracts were "ridiculously low" in comparison with the work that was ultimately carried out. In some cases, the description of the services to be provided was in a different contract than the software license contract, and the former often was not supplied to Deloitte. Anderson believed this was done so that AU could collect the revenue for the maintenance element of the contract upfront, on delivery of the license.

Anderson cited the Euronews deal in early 2011 as an example – the maintenance contract was signed separately from the software license and only the license contract was provided to Deloitte. The license agreement showed $100,000 of services; however, the separate maintenance contract showed the cost of the services as approximately $1m.

D.    Purchases from resellers

Anderson cited a conversation she had with Sean Blanchflower ("Blanchflower") regarding AU's purchases from resellers. Blanchflower told Anderson that the EMC purchase was simply hardware and software that AU did not need. "Not knowing what value purchases had calls into question the other side," she explained.

Anderson said she was aware of various other "unclear" deals but could not recall the specifics.

E.    Hardware sales

Anderson explained that because Deloitte had agreed on the approach and because everything she saw was consistent with what AU previously had disclosed to Deloitte, she did not see any reason to change anything when she began her role in AU Revenue.

F.    Acquisition of AU by HP

Anderson described changes in the way AU management dealt with accounts after the HP acquisition.

MLAT_AU 00072934

All financial matters were discussed with Hussain.  He insisted that everything be funneled through him and prioritized.  Anderson did not draw any conclusions about this at the time but noted that the inferences might be quite different in the context of current events.  Anderson began to report to Lisa Harris, who in turn reported to Chamberlain.

Anderson was asked by Chamberlain and Hussain to adjust journal entries at the end of Q1 2012 – specifically, she was asked to add $5.5m to the revenue figures across "four streams".  Hussain and Chamberlain gave Anderson the impression that the original figures were lower than expected and told Anderson to confirm and check that no revenue had been missed.  Hussain and Chamberlain advised her that if they were mistaken, the revenue would be reversed to the amounts she had recorded.  However, the figures "went through" as Hussain and Chamberlain had requested.  Anderson did not know whether there was anything suspicious or strange, but felt uncomfortable.

Anderson explained that the revenue was ultimately reversed in the following quarter.  As a result, AU had to begin the next quarter on a "negative."  Anderson said she later reminded Hussain of this when they went through the forecasts together and had to insist on it when he complained that targets were too low.  AU therefore started that quarter "way off" its targets.  It seemed obvious to Anderson from the SMS that the licenses they had forecasted were not going to close and she approached Hussain for permission to de-commit from the forecasted figures.  Hussain refused to de-commit.

Generally speaking, the revenue targets were "ludicrous" and far beyond the capacity of the business, although she was aware that Boston Consulting Group did some business models for AU.  Anderson's impression was that Mike Lynch and Hussain derived the target figures on the basis of AU's ability to utilize the HP sales force and client book.  However, "AU did not understand what the processes at HP involved."  She stated that the HP way of doing things was much more bureaucratic than what AU was used to.  Even in her role, Anderson found it difficult to work out how to get some things done.  The sales team treated a request from HP as a pipeline deal but "did not realize that it had to go through 20 approvers at HP."

Anderson noted that Hussain was aware of what there was in terms of recurring revenue streams and he constantly was "interrogating" sales, as well as negotiating the large deals himself.  There was no lower level input on forecasting.

G.    Announcement by HP

Following the announcement by HP on November 20, 2012, Anderson spoke to Prentis.  She did not discuss her interactions with PwC.  Instead, they talked about how "people [Deloitte] knew all about the hardware" and there was nothing illegal about selling hardware.  What is more, Deloitte was satisfied that the level of hardware sales did not exceed approximately 10% of revenue.  She felt that it did not need to be disclosed separately and in retrospect believes that nothing was hidden between AU and Deloitte; both knew how much hardware was being sold and how it was reported.  Anderson reiterated her belief that, because of Deloitte's warning, if the level of hardware sales had increased, then AU would have disclosed it separately.  She did not believe that Deloitte "let them off."

-7-



DATE:            February 25, 2013

SUBJECT:         Memorandum of Interview with John Baiocco (Capax) – February 5, 2013

## I.   Interview Overview

On February 5, 2013, Martha Stolley of Morgan Lewis conducted an in-person interview of John Baiocco ("Baiocco"), Managing Partner of Capax Discovery LLC ("Capax"), in Morgan Lewis's New York office.  Also present from Morgan Lewis were Susan Resley (via phone) and Charles Manice.  Matt Shelhorse of PricewaterhouseCoopers ("PwC") also attended, along with Baiocco's counsel, John Jablonski of Goldberg Segalla LLP.  The interview lasted approximately four hours and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices.

Ms. Stolley advised Baiocco that Morgan Lewis did not represent him, that he could not assert any privilege over any statements made, and that HP might use the information provided as it saw fit.  Baiocco confirmed his understanding.

On February 11, 2013, Ms. Stolley conducted a follow-up interview of Baiocco by telephone, in which all of the above individuals participated by telephone, except Susan Resley

## II.   Background

Baiocco joined Capax as an employee in 1998, and in 2007-08 he and his partner Jerry Hawk ("Hawk") purchased a 60% interest in Capax.[1]  Advantage Professionals ("AP"),[2] Capax's predecessor that was founded in 1993, still owns 40% of the business and is responsible for Capax's back-office books and records, accounting and legal functions (functioning in some manner as a shared services center for Capax).  Baiocco acknowledged that Autonomy is one of two product suites that Capax offers – i.e., Autonomy is a very important business partner for Capax.

Capax's relationship with Autonomy formed when Hawk joined the firm.  Hawk previously was employed at the Associated Press ("AP"), which at that time had the largest implementation of Autonomy's IDOL product.  Hawk is a "technical" person[3] and, along with a few other key AP employees who joined Capax, had spent a long time learning and implementing IDOL.  In doing so, he developed a close relationship with Autonomy sales personnel.

---

[1] Baiocco noted that an unnamed partner recently purchased five percent interest in Capax from Baiocco and Hawk.

[2] According to Baiocco, the principals of Advantage Professionals are Anthony Ragusa, Joe Kreuz and Tom Thomson.  Butch Kreuz is Joe Kreuz's brother and Ragusa's right hand man, but Baiocco said he is not a principal.  As described by Baiocco, Ragusa is a businessman who has "his hands in everything."  NB: According to Advantage Professionals' website, Ragusa is not a member of "Our Team," which comprises Joe Kreuz, Tom Thomson, Mark Pautler, Jerry Tenenbaum and Dave Spadone.

[3] Baiocco commented that, in contrast to Hawk, he is a "business guy."

Based upon Hawk's skills, Autonomy began to hire Capax to perform product implementation of IDOL and Autonomy's other products.  From 2006 to 2009, Capax's work for Autonomy was a "pure professional service" implementation of IDOL.

### III.   Enterprise Archive Solution ("EAS") Support: Genesis of the VAR Relationship

The genesis of Capax's Value Added Reseller ("VAR") relationship with Autonomy was the EAS product Autonomy acquired through its purchase of Zantaz.  According to Baiocco, Autonomy was less interested in maintaining EAS and more interested in transitioning Zantaz's existing EAS customers to IDOL, and Capax wanted to be in a position to facilitate that transition.  To that end, Capax hired a number of ex-Zantaz employees and offered to keep the existing EAS customers happy by providing product support and selling them extensions to the existing license agreement (while also helping Autonomy pitch them on IDOL).   Autonomy subcontracted the EAS support to Capax and gave Capax a VAR agreement to resell the EAS license to Zantaz's existing customers.

The process of getting Autonomy to agree to the EAS support agreement took over eight months[4] – Baiocco commented, "It was never smooth with Autonomy," and it was tough to get complete information from them.  This was frustrating because Capax had hired support employees and had to cover their salaries while Autonomy dragged its feet.  Although Autonomy never put in writing the number of EAS customers Capax could expect under the agreement, Baiocco said it initially appeared to be between 700 and 1000, and he recalled that Stouffer Egan ("Egan"), Jim Crumbacher ("Crumbacher") and Pete Mennell ("Mennell") stated that the revenue opportunity was about $10 million a year.  The agreement was for an 85/15 split: if Capax sold EAS support directly to a customer, Capax returned 15% to Autonomy; if the customer signed with Autonomy, then Autonomy sent 85% to Capax on a month-by-month basis.

Capax also provided "Tier 2" support for EAS that was resold by another reseller, Essential (**TAB 1**).  Essential resold EAS and provided "Tier 1" support – e.g., more simplistic issues, such as is the monitor plugged in -- and then remitted 70% to Autonomy.  Autonomy then remitted 85% of that 70% to Capax, which provided the Tier 2 architectural program support.  Autonomy kept the source code, so any customized product development had to go through Autonomy.

Autonomy drafted all of the EAS Support purchase orders ("POs") that were exchanged between Capax and Autonomy.[5]   Autonomy never guaranteed a certain amount of EAS POs to Capax and, while still profitable, the EAS opportunity was less lucrative to Capax than expected because Autonomy kept the support for its large strategic customers (e.g., Citigroup, where Autonomy had someone full-time).  Ultimately, Capax provided support for a few hundred

---

[4] Baiocco was not sure who initiated this discussion, but knew that the agreement was signed in October 2009.

[5] The earlier POs contained two line items: 1) NET Outsourced EAS Support – Desc: For DIRECT, Current Clients; and 2) NET Outsourced EAS Support – For INDIRECT Clients, and the amounts were not round numbers (e.g., January 2010 -- $116,824.75 for Direct and $127,279.50 for Indirect); the figures appeared to be based on the number of customers. Starting in March 2010, the POs contained a third line item – Supplemental EAS Support, with a flat rate Unit Price of $125,000 .

MLAT_AU 00072937

clients, not 1,000, and Baiocco estimated that revenues were approximately $500K per month. Nonetheless, Baiocco said, EAS was a good product with a good market share, and it took time for customers to want to switch over to IDOL.

## IV.    "Supplemental EAS Support"

In January 2010, Autonomy began paying Capax an extra $125,000 a month for "Supplemental EAS Support." Baiocco initially explained that the money was to compensate Capax for the extra work Capax did for Autonomy's "bundled" clients (clients that bundled multiple Autonomy products, including EAS, in their purchase and service agreements). For these clients, Autonomy assigned what Baiocco characterized as a nominal value to the EAS Support portion, 85% of which went to Capax.[6] Baiocco said he complained bitterly to Egan, his primary contact at Autonomy, about this disproportionate work load and eventually someone at Autonomy came up with the Supplement EAS Support payments. Baiocco did not recall who came up with the $125,000 figure.

Pressed further, Baiocco admitted that, "truth be told," the Supplemental EAS payment was also a "catch-all" designed to compensate Capax for "thousands" of unbillable hours and write-offs related to the product implementation services Capax performed for Autonomy. He explained that Autonomy's sales force often underestimated the number of hours needed to implement IDOL, or sold "ahead of IDOL's capabilities," requiring extra hours for Capax to figure out a work-around. Baiocco explained that, once the number of hours in the work order had been reached, Capax could no longer bill but still had to complete the implementation. In addition, some customers did not even pay for the hours that were billed and those hours had to be written off. Baiocco kept his own tally of the unbillable hours,[7] which he presented to Egan in the hope that Autonomy would do something to compensate him. Baiocco felt that the Supplemental EAS was, in part, that compensation.

Baiocco said that, while no one at Autonomy, including Egan, ever explicitly said that the Supplemental EAS was to make Autonomy whole, to him that was one of the purposes though he agreed that it could have been used for that purpose. He did not recall specifically demanding that Capax be made whole; nor did he recall any emails discussing a quid-pro-quo arrangement, although "they [Autonomy] would never come out and say it flatly.". Nevertheless, he felt Egan and Andrew Kanter ("Kanter") heard his complaints and, one way or another, the Supplemental EAS payment came into being.

## V.    Electronic Data Discovery (EDD) Processing

In early 2009, Capax hired Steven Williams ("Williams") and Allen Gurney ("Gurney") to head up an E-Discovery practice, with the goal that Capax would offer a hosted solution.[8] Capax inadvertently asked two different Autonomy sales members, T.J. Lepore ("Lepore") and Jeff

---

[6] Baiocco mentioned that Capax initially got very little bundled work and the EAS Supplemental covered that shortfall. He added that for the bundled work Capax did get, the customers called too much and they were not part of the original estimate of 700-1,000 customers.

[7] Baiocco said Capax did not keep time sheets detailing the hours, but they tracked it internally.

[8] Prior to working at Capax, Williams had been an independent contractor for Autonomy and Gurney came from FiOS, another E-Discovery practice,.

MLAT_AU 00072938

Cornelius ("Cornelius"), for quotes and Egan quickly stepped in to negotiate a deal. Egan told Baiocco that, because of Williams and Gurney, Autonomy was prepared to sell Capax its EDD product and launch its E-discovery practice. The problem was that Autonomy wanted much more for the EDD license than Capax was prepared to pay.

According to Baiocco Egan promised him in a "handshake agreement"[9] that Autonomy would provide enough EDD business to Capax to cover Capax's quarterly payments on the purchase of the software, plus a 20% to 25% profit. So, in March 2009, Capax purchased a five-year license for the EDD software for $7.5 million, to be paid in quarterly installments of $968,750 over two years (what Baiocco called the "Direct Deal 1"). Shortly thereafter, Autonomy began sending Capax monthly purchase orders for $250,000 worth of EDD services (to cover the cost of the license agreement).

Autonomy kept promising to funnel customers to Capax but then failed to do so. For months after the agreement was signed, Capax did not actually perform EDD services for any customers, though Autonomy continued to pay Capax $250K a month for "EDD Processing." For whatever reason, Autonomy resisted sending Capax the license "keys," and it took nearly a year to build an operational platform. Because of this delay, Capax purchased a two-year license extension for $4.2 million by purchase order dated December 31, 2009 **(TAB 26)** (what Baiocco called "Direct Deal 2") – something Baiocco was not happy about, since it resulted in an additional quarterly payment by Capax to Autonomy of $1.05 million.

In an email dated March 4, 2010, Baiocco told Kanter that "we were promised more than a dollar for dollar on this. **(TAB 2)** We were promised a profit as well. Trying not to sound ungrateful in any way, just that we were nowhere near ready to do a deal like this." (When asked, Baiocco said his comment about "a deal like this" was a reference to price.) Attached to the email was an Excel spreadsheet – Baiocco's tally of "cash in, cash out" on the Autonomy deals. **(TAB 2A)** The spreadsheet clearly indicated that Capax did not pay Autonomy quarterly fees until Capax had received funds from Autonomy to cover those fees. Most often, the Autonomy payments were for "EDD Processing," though occasionally "Supplemental EAS" was referenced. The spreadsheet also supported Baiocco's claim that, when Autonomy "ran behind" (i.e., Autonomy had not sent Capax enough money to cover the fees due and a profit), Autonomy made a "catch-up" payment, such as the $1-million payment on September 27, 2009 for "EDD."[10]

In response to Baiocco's complaints, Kanter increased the monthly EDD Processing payments to Capax by $225,000, for a total of $475,000 a month. The additional $225K was retroactive to January 2010.

Through 2010, Autonomy continued to draft and submit the POs for EDD Processing ($250K) and Additional EDD Processing ($225K), despite the fact that Capax still was not providing any EDD services.

---

[9] Baiocco said he relied on "Stouffer's words."
[10] When asked whether the Supplemental EAS was also part of the "catch-up," Baiocco said that, although "it wasn't said that way," he guessed it was. Baiocco confirmed that, in his 9/22/10 spreadsheet, which he sent to Kanter on 9/29/10, "SUP" meant Supplemental EAS payments. **(TABS 3, 3A)**

MLAT_AU 00072939

On October 13, 2010, Baiocco forwarded to Kanter a Purchase Request for "outsourced specialist EDD Services @ $200.00 per GB; for European projects" for seven months for a total of $700,000 that Baiocco had received from Egan.  Baiocco asked Kanter, "What months do you want this to cover?  Who should receive the invoice and who will pay?"  It was clear from the wording that Baiocco had drafted the Purchase Request at the instructions of Autonomy.  Further, Baiocco conceded that the "European Projects" were entirely fictitious.  He said he did not care what Autonomy ordered, as long as it paid Capax.

Baiocco explained that he ran a "cash business," and as long as Autonomy was not going to stay current on its POs and payments to Capax, Capax was not going to stay current either.  Baiocco "highly doubted" that Egan told the collections department about their handshake agreement – he received repeated communications from the collections department demanding settlement of outstanding payments on myriad deals and agreements – but he did not care.[11]

Simply put, Capax did no EDD Processing for more than two years after the EDD agreement, but yet received payments from Autonomy for just that – EDD Processing.  It was not until mid to late 2011 that Capax finally started to perform limited EDD processing services and then, only because they hired some salespeople to work the small business market themselves.

NB:  Baiocco noted that the "handshake agreement" and the unstated high-level "make whole" understanding reflected in the EAS and EDD agreements did not translate to the large reseller transactions.  His insistence, however, was not entirely credible and he intimated on more than one occasion that he had certain expectations for the VAR deals as well.

## VI.    NearPoint Agreement

NearPoint was an archive product that Autonomy acquired in its acquisition of Iron Mountain, and, like EAS, Autonomy had little interest in sustaining it.  In mid-June 2011, Baiocco approached Autonomy, pitching to do the same thing for NearPoint as Capax had for EAS – i.e., keep the customers happy while Autonomy "sunsetted them out."  This was one of the few transactions in which Baiocco worked with Sushovan Hussain ("Hussain") as shown in Baiocco's June 13, 2011 exchange with Hussain (**TAB 4**).

Within two weeks of the start of discussions, on June 29, 2011, Autonomy and Capax signed a deal for Capax to take over NearPoint support, for which there would be a 50/50 split of the monies earned.  As part of the deal, Autonomy agreed to pay Capax a $2-million "ramp-up" fee, which Baiocco said was for Capax to purchase the license and also to set up facilities in California and India.[12]  However, when asked how much ramp-up work was really needed, Baiocco conceded that Capax did not have to exert much effort because they had hired Iron Mountain's NearPoint people, both the California and the India teams.  Baiocco then acknowledged that, looking back, "some" of the $2 million was probably easy money."

---

[11] In an email to Kanter dated May 13, 2010, Baiocco wrote, "Andy, I am getting stalked by your receivables folks. Can you give me a call to discuss. Not quite sure how to respond."

[12] In the explanation for the ramp-up fee in the Sixth Amendment to Capax's VAR Agreement, there is no mention of Capax purchasing licenses.

MLAT_AU 00072940

Furthermore, although the fee was not due until 60 days after receipt of Capax's invoice, Autonomy paid the $2 million in full the next day, on June 30, 2011. This was the same day that Capax paid off $1.5 million in payments due on the FSA deal (see below).

When Ms. Stolley noted the "coincidence," Baiocco remarked, "Yep, cash flow." Baiocco then recalled a conversation he had with Egan, during which he said, "'I guess you owe me about $2 million at this point, why don't you pay me?' And so we came up with NearPoint."

## VII.   $6 Million Purchase of Capax's Discovery "Staging Tools"

In August 2011, Autonomy signed a $6-million commercial software license agreement for what Baiocco called "staging tools." As part of its business, Capax regularly writes this type of software to improve product implementation or otherwise facilitate the E-Discovery process. Microsoft normally pays Capax to develop specific tools but, in this instance, Autonomy purchased the right to use Capax's existing tools.

Four months earlier, in late March of 2011, Capax sent teams of engineers to London and Chicago to demonstrate Capax's latest staging tools (a "bake-off") and to prepare for large e-discovery projects for BP and Deloitte that Autonomy had promised. In England, Capax signed a three-year lease of warehouse space and equipment in preparation for the BP and Deloitte projects and paid Autonomy $1.6 million for the right to use Autonomy software in Europe (Capax already used the Autonomy software in the U.S.). The project preparations were led by Steve Williams, Allen Gurney and Geoff Tucker; Baiocco had limited involvement. Ultimately, no BP or Deloitte work materialized and Capax had to pay hundreds of thousands of dollars to extract themselves from the leases.

Following this mess, on August 10, 2011, Autonomy agreed to purchase $6 million of Capax's staging tools, which Autonomy paid for the next day, on August 11. Baiocco did not recall who initiated the deal, but he conceded that the purchase was part of Autonomy's overall "catch up" for Capax. The fact was, although Capax's technical people believed in their work and Autonomy arguably had a need for the staging tools, the staging tools were not worth $6 million.

Indeed, Baiocco readily admitted that the $6 million deal raised a serious red flag for him – "it made no sense that Autonomy was just offering up money." He called Egan and "flat out" asked if this was a "real deal or a scam?" In response, he said, Egan exploded and cursed out Baiocco for insinuating that there was anything suspicious about the deal. "It was an outright fight," Baiocco said, that "ruined" his professional relationship with Egan. And Hussain never spoke with Baiocco again, passing right by him without speaking when they happened to be in the same place.

## VIII.   Capax as Reseller "Takes" Deals as VAR for 10% Commission

Although Baiocco did not specifically say so, it was clear from his description of Capax's role in the reseller deals that Capax never acted as a true reseller for Autonomy: Capax was never in the business of affirmatively selling the IDOL software; Capax was never part of the sales force that pitched the VAR deals; Capax never negotiated directly with the End User, nor did they assist Autonomy in negotiating with the End User or actually closing a deal; and Capax did not build

MLAT_AU  00072941

an inventory of Autonomy products or market them to a customer base.  With the exception of TXU and Eli Lilly, Baiocco said Capax never interacted with the end-user.[13]  And, while he could not say for certain, if he "had to guess," Baiocco would say that the end-users had no knowledge of Capax's involvement.  TXU and Eli Lilly were exceptions because those companies paid Capax directly and, therefore, after the deal closed, Capax was involved in arranging the logistics of payment (i.e., securing a Master Services Agreement from the procurement department).

In the first few reseller deals that Capax "financed," Egan called Baiocco a week before quarter-end to let him know that Capax might be needed.  But it was generally the practice that Autonomy called at the "eleventh hour," and it was always Egan who made the request.  Baiocco said he understood why:  "Their mission was always to close on their own."  Why give away a piece of the profits to Capax?  As an example, Baiocco described how he signed the TXU paperwork at 2 a.m. at a FedEx in upstate New York because it was still 11 p.m. in San Francisco.

Baiocco assumed Egan brought in Capax at the last minute because he "had to make his numbers, he had quotas he had to make on [quarterly] sales."  Baiocco denied ever paying for the deals on the last day of the quarter, but acknowledged that the software was delivered by the end of the quarter.  And, he insisted he had no idea until recently how software revenue is recognized in the U.S. versus the U.K. or how Autonomy was accounting for the Capax VAR transactions.

In the eleventh hour deals, Baiocco explained, Egan convinced Baiocco "unequivocally" that the deal was imminent, that it was 99% closed (e.g., missing one signature, etc.), and Baiocco agreed to do the deal with the expectation that it would close within 15-30 days.  When asked if Egan ever pressured Baiocco to take a deal, Baiocco said Egan "never put on the full court press . . . but he's a pretty good sales guy."

On the one hand, Baiocco insisted that Capax took some risk on these deals – they had to be "good for it" if the direct deal between Autonomy and the end user fell through.  On the other hand, although never expressly stated by Egan or others, Baiocco understood that, if a deal fell apart, Autonomy would have helped Capax resell the product to the another customer or would have "slotted in Capax" to the next customer that wanted IDOL.[14]  Baiocco cited the Amgen/Bank of America deal (where BofA replaced Amgen as the end user in a $9.45 million end-of-quarter reseller deal) as evidence of his understanding.

As further proof of this implicit agreement, Baiocco referenced the repeated demands for payment on various deals that he received from Reena Prasad ("Prasad") in Autonomy's collection department.  Baiocco "knew" that if he pushed Prasad to raise it up the chain to Egan or Chamberlain, she would be told to back off.  (Ultimately, however, Autonomy left Baiocco holding the bag in the fictitious Q1 2011 McAfee deal.)

---

[13] Baiocco stated that the end users were selected by Autonomy.

[14] According to Baiocco, the software licenses were relatively fungible and not uniquely tailored to the particular customer, and therefore could be transferred from one end user to another.

MLAT_AU 00072942

Except for TXU and Eli Lilly, the standard practice was for Autonomy to issue Capax a release letter once a direct deal closed.  When the deal did not close soon enough for Baiocco, he "stalked" his contacts at Autonomy for an update on the progress of the deal.  Baiocco said Autonomy often gave him the runaround, but he never thought to contact the end-user himself.

According to Baiocco, the deal was that Capax got 10% of the transaction value.  He did not care what Autonomy called it – VAR margin, Marketing Assistance Fee ("MAF"), Referral Partner Commission – it was all the same so long as 10% was paid to Capax.  And, he acknowledged that Capax did little or nothing towards facilitating a deal closing in exchange for the commission.  Baiocco let Autonomy draft all the paperwork ("they liked to keep control") whether the documents were purportedly from Capax or from Autonomy.  He rarely read the documents he signed – e.g., the invoices for MAF, or the Referral Partner Agreements, etc. Instead, he handed them off to "legal" (who was a paralegal) and back-office employees (i.e., the Advantage partners in charge of accounts payable/receivable).  Baiocco claimed that, for every "eleventh hour" deal Egan asked him to take, he consulted with his Advantage partners before accepting the deal.  Baiocco could not explain how his Advantage partners accounted for risk, explaining only that Advantage had accountants and a paralegal who worked with outside advisors to handle the paperwork.

During the follow-up phone interview on February 11, Baiocco reiterated his view that there was risk in taking the last-minute reseller deals, but then agreed that he expected Autonomy to "work to some solution" if a deal fell through.  Specifically, he felt Autonomy would have figured out a way to resell the licenses to another customer.  In the end, though, no one flat out told Baiocco "don't worry about it" and Baiocco "worried about those things till the end."

### a. TXU (Q2 2009: $1.7 million)

TXU was the first VAR deal that Capax "financed" for Autonomy and one of the few where the end-user paid Capax directly.  TXU wanted to pay for the E-Talk call center software over the course of 36 months ($47,000/month), whereas Autonomy wanted to be paid in a year.  In this way, it was unique among Capax's VAR deals.  Autonomy negotiated directly with TXU; Capax had no involvement in facilitating the transaction.[15]  After the deal had closed, Capax worked with TXU's procurement office.  The TXU deal was also unique in that Mike Mooney ("Mooney") closed the deal with Baiocco.

When asked about the "Notice of Alternative Payee" letter notifying TXU of Capax's financing of the deal, which was attached to Stacy Davis' ("Davis") September 30, 2009 email (**TAB 5**), Baiocco said that was unusual and guessed that it might have been related to the fact that TXU needed to pay Capax.  That said, he did not think Eli Lilly needed a similar letter and, overall, he assumed the end users had no idea Capax was involved in the deals.

Regarding Capax's delinquency in paying Autonomy on the TXU deal, Baiocco essentially admitted that Capax did not pay Autonomy because TXU had not paid Capax.  TXU was over six months late paying Capax because they did not purchase the hardware from Autonomy until

---

[15] At this point in the interview, Baiocco said, "I'll make it easy . . . for all of them [the nine deals discussed], that was the deal" – i.e., Autonomy did all of the selling and negotiating with the end user, without input from Capax.

MLAT_AU 00072943

November 2009, five months after having bought the software, and the software had to be installed onto the hardware before Autonomy shipped the package to TXU. As a result, TXU was not "up and running" until early 2010, at which point TXU began paying Capax. In spite of Prasad's hounding, Baiocco said, he "did a little tap dance" while ultimately not paying until Capax had been paid.

     b.  Kraft (Q3 2009: $4 million)[16]

Kraft was the next deal after TXU, and the whole process went very smoothly. Kraft closed the deal directly with Autonomy soon after the quarter-end and Autonomy issued Capax a release letter. Capax then invoiced Autonomy for its 10% marketing fee, "or whatever they [Autonomy] called it."

     c.  Eli Lilly (Q4 2009: $6.2 million)

The Eli Lilly deal is one of the few where Egan gave Baiocco a week's notice that Autonomy might need Capax to step in and also an example of Baiocco's having to "stalk" Autonomy about delays in a direct deal (like the FSA deal – see below).[17] Despite the advance notice, Capax did not interact directly with Eli Lilly and Autonomy, not Capax, prepared the pro forma invoices for the deal.

The direct deal between Eli Lilly and Autonomy did not close until June 2010, six months after Capax took the deal in Q4 2009 and then Eli Lilly refused to pay Capax on time because there were delays in implementation. In response to his constant emails asking about the status of the deal, Baiocco said he got different answers from different Autonomy people and "could never really trust where we were."

Other payment issues: Eli Lilly did not want to pay for support until the product was fully installed and then, they insisted on paying Autonomy directly for support.[18]
When the direct deal finally went through, it was for less than the Capax transaction -- $6.25 million versus $5.57 million – a shortfall of almost $700K. Baiocco said some of the shortfall was support, some of it "just went away." He did not remember how, but assumed Autonomy made up for it on "the back end … maybe through EDD Processing."

Interestingly, Capax invoiced Autonomy for Eli Lilly's marketing fee. Baiocco explained that was how it worked. Capax remitted all the money to Autonomy, and then billed for its 10% fee.

We asked Baiocco about communications with Brent Hogenson ("Hogenson"), who told Mike Lynch ("Lynch") and the Audit Committee that, when he called Baiocco to ask about payment on the Eli Lilly deal, Baiocco told him to speak with two high-level Autonomy people and said that Capax would not pay until the direct closed. Baiocco said the name Hogenson did not ring a bell and he did not remember talking with him. He also did not recall saying, "flatly," that

---

[16] We did not ask many questions about the Kraft deal because we did not have very much information about it.
[17] Baiocco's August 20, 2010 email exchange with Kanter is an example of his "stalking." In the email, "YT?" stands for "you there?" (**TAB 6**)
[18] On December 1, 2010, Eli Lilly rejected Capax's invoice for support services (**TAB 7**).

MLAT_AU 00072944

Capax would not pay until Lilly paid, but he did recall doing his "tap dance." He explained that he did "the same thing Autonomy did" – i.e., he promised to take care of it and then stalled for as long as he could. Regarding the two senior management, Baiocco said he did not know, but that one had to be Egan and the other probably was Kanter.

   d.  FSA (Q1 2010: $4.2 million)

True to form, prior to the closing on March 31, 2010, Capax had no involvement in the FSA deal and had no relationship with the end user. Indeed, Baiocco said he did not even know what the FSA was. He remembered that, in an effort to convince Capax to take the deal, Egan told him the FSA was the British equivalent of the SEC, implying that Autonomy would not do anything to mess with the FSA.

Further, Baiocco was not aware that Autonomy had tried to finance the deal through another reseller, Centennial,[19] and said he had never heard of the company.

After Autonomy brought in Capax, they continued to negotiate with the FSA for a direct deal. When asked if he knew a direct deal closed in August 2010, Baiocco said he had no idea; he assumed the deal did not close until September 2011, when Capax received a credit letter regarding the FSA deal from Autonomy. Baiocco said he "heard through the grapevine" that there were engineers at the FSA, and he recalled asking Egan and Chamberlain if the direct deal had closed. He said they would not confirm and instead suggested that the engineers were part of another deal with the FSA. As time passed, Baiocco became nervous and began to "stalk" Autonomy about a direct deal,[20] but he believed Autonomy when they told him the Capax deal was still alive – i.e., a direct deal had not been consummated.[21] If the deal had closed, he said, Autonomy should have sent Capax a letter releasing them from the deal; Capax did not get one until September 2011.

Capax's failure to make timely payments on the FSA deal seemed to corroborate Baiocco' claim. When asked about a comment by Prasad in Collections, that she had been told by "John B." that the FSA deal was "not a done deal,"[22] Baiocco said he did not recall speaking specifically with Prasad. He did, however, remember that collections hounded him about this deal. "Not a done deal," he said, meant that the deal "hadn't been closed on the other end" – i.e., there was no end user. At that point (July 2010), Baiocco said, he "wasn't ready to make a payment … I knew as soon as they went back to Chamberlain, he would tell them to back off."[23] By then, Baiocco was getting very nervous and started "really haggling" with Autonomy. Baiocco said if the deal had

---

[19] Emails indicate that Centennial was considered for the FSA deal up until mid-day on March 31, 2010, at which point Capax was brought in. The correspondence does not indicate why Centennial did not act as reseller.
[20] Baiocco said there should be multiple emails from him to Autonomy asking about the direct deal. "There's a thread from Chamberlain giving me every song and dance known to man …"
[21] Baiocco said it was very unusual for a VAR deal to remain in place once a direct deal had been closed.
[22] In an email to Steve Chamberlain dated July 6, 2010, Prasad recommended that certain deals, including FSA, be provided for (**TAB 8**).
[23] In fact, in the same email chain (**TAB 8**), Chamberlain questioned Prasad, clearly doubting the basis for her opinion regarding the FSA deal.

MLAT_AU 00072945

completely fallen apart, they would have "worked something out," Autonomy continued to tell him the deal was still alive.[24]

On the other hand, Baiocco had no explanation for why he sent an email to Egan and Kanter on October 6, 2010, attaching an invoice (#1233) for $450,000 in referral partner commission on the FSA deal (**TAB 9**).  Baiocco acknowledged that Capax did not invoice for their 10% (whatever Autonomy called it) until a direct deal had closed.  "As far as I'm concerned," Baiocco said, "I didn't close FSA until late into 2011, so I don't know why we would have billed this. . ."  Furthermore, attached to this same email was a copy of a Referral Partner Agreement signed by Baiocco, pertaining to end user FSA.  Baiocco seemed to question the existence of this email until Ms. Stolley showed it to him and, even then, insisted that the invoice was for a different deal, despite the associated Agreement.

During the February 11, 2013 follow-up interview, Baiocco said he had checked his records and had found a copy of Invoice #1233, which indicated that the $450,000 was related to the Kraft deal, not the FSA deal.  [NB: After this call, we conducted an unsuccessful search of the database for a copy of Invoice #1233 that references Kraft.[25]  Instead, we found an email dated December 30, 2010 from Chamberlain to Hussain indicating that Autonomy paid Capax $925,000 on October 7, 2010, $450,000 of which related to FSA (the other $475,000 was "early" payment for November EDD services) (**TAB 12**).][26]  Baiocco still could not explain why the invoice was attached to the Capax-FSA agreement and reiterated that he barely read the documents Autonomy sent him to sign, including the referral agreements:  "I think they [Autonomy] changed the words to fit their needs."  In attempting to explain the conflicting documents, Baiocco repeated that (1) he never knew a direct deal closed with FSA until September 2011; (2) he felt he was "covered" by his VAR agreement with Autonomy; and (3) if he signed any document to the contrary, it was "pure manipulation" by Autonomy.

Further confusing the issue, Baiocco acknowledged receiving an email on October 12, 2010 from Autonomy notifying him that Capax's account would be credited against payments received by Autonomy directly from the FSA.[27]  Baiocco nevertheless maintained his position that he was not aware, at that point, that a direct deal had closed, stressing Autonomy's use of the word "when" (versus "if") in regards to payments.  Baiocco could not think of a reason why Autonomy did not tell him the FSA direct deal had closed.

---

[24] See e.g., (**TAB 11**).  March 24, 2011 email from Chamberlain to Baiocco: "Sorry for the delay on this.  We are waiting for a document from the FSA that has been promised and promised and promised.  I need that before I can move this forward."

[25] Morgan Lewis has since discovered an October 7, 2010 email thread between Matt Stephan, Andrew Kanter and Steven Chamberlain – attached to a December 30 Chamberlain email to Hussain — indicating the $450,000 was paid on October 7, 2010 as part of a $925,000 payment made to Capax (the other $475,000 was "early" payment for November EDD services) (**TAB 12**).

[26] On March 11, 2013, Mr. Jablonski forwarded a PDF of Capax Invoice #1233, which references Kraft in the description and is marked "Paid."  In his email, Mr. Jablonski explained "[w]e believe that the invoice was mailed to Autonomy on our about the date, but do not have a record to confirm our belief." (**TAB 27**)

[27] During the interview, we referenced an October 8, 2010 email exchange among Kanter, Egan and Chamberlain discussing a draft of the email message to send to Baiocco.  Egan commented that the word "if" should be changed to "when," but otherwise okay (**TAB 10**).  The correspondence indicates a desire to avoid telling the FSA about Capax's involvement in the deal.  On March 8, 2013, Mr. Jablonski sent us a copy of the email Egan sent to Baiocco on October 12, 2010 (**TAB 28**).

MLAT_AU 00072946

On June 30, 2011, Capax finally made two payments on the FSA deal -- $450,000, due on April 30, 2010, and $1.05 million, due on March 31, 2011. Baiocco said he did so under "complete pressure" from Hussain and with the assumption that Autonomy would credit the money back to Capax. Baiocco insisted that the $1.5 million was "'good faith' money to get Autonomy's oldest receivables down. "Technically, it was put towards FSA, but it was really to get our debt down. … We didn't even mark those payments in our system as towards FSA." However, as noted in Section VI above, Capax only paid Autonomy for the FSA deal when they received the $2 million "ramp-up on the NearPoint Agreement from Autonomy.

Ultimately, Baiocco said, the FSA deal was a "complete miss" for Capax. When Autonomy sent Capax the release letter in September 2011, rather than credit Capax the $1.5 million they already paid, Autonomy simply released Capax from their obligation to pay the remaining $3 million (**TAB 13**). "It was Autonomy at its finest," Baiocco commented. When asked why he did not object, Baiocco said he had not noticed until he received the SEC subpoena in this action.

e.  Amgen / Bank of America (Q3-Q4 2010: $9.45 million)

While Baiocco did not recall the specifics of the Amgen deal, he did remember that someone at Autonomy (most likely Egan) called to say that Amgen was not happening and that Amgen was being replaced with Bank of America ("BofA") for the same amount, $9.45 million. The end user "swap" was Autonomy's idea, Baiocco said, and Autonomy drafted the Replacement Letter that memorialized the arrangement, which he and Egan later signed.[28]

Baiocco said that he first heard of the BofA deal when he was told of the "swap," which Baiocco initially assumed was on December 31, 2010 because of the date on the Replacement Letter (**TAB 14**). Ms. Stolley explained that, although the letter had a typed date of December 31, 2010, emails indicated that Autonomy (Livius Guiao) did not even draft the letter until January 11, 2011. In other words, the letter was backdated. Baiocco was confused ("Well, I never back-dated anything") and insisted that he it must have happened on December 31, although he had no specific recollection. During the February 11 phone interview, Baiocco said he had reviewed his records and discovered that, in fact, he had not received the draft swap letter from Egan until January 25, 2011 (**TAB 21**). Notably, in his email, Egan instructed Baiocco to "[p]lease sign, as is" – i.e., backdated to December 31, 2010.

When asked about DiscoverTech's role in the BofA deal, Baiocco said he did not recall whether it was DiscoverTech or Microtech, but he remembered Egan told him that the other reseller had a better relationship with BofA, had taken a bigger "chunk" of the deal, and would pay Capax their $9 million.[29] Ultimately, Baiocco did not care which way the money flowed, as long as Capax received their $900,000 in fees, which Autonomy paid. (Baiocco was unaware that Microtech acted as "lead reseller" and did not really remember a PO between Capax and Microtech; he only recalled talking to Jenny Taylor and Dave Truitt at Microtech.

---

[28] Baiocco cited the end user swap as a sign that Autonomy intended to "make Capax whole" on the Amgen deal.
[29] A provision in the BofA agreement resulted in the cancellation of maintenance fees, so Autonomy issued Capax a credit memo for $450,000 in support and maintenance.

MLAT_AU 00072947

Baiocco chuckled at Capax Controller Dave Spadone's ("Spadone") March 24, 2011 email, in which he bluntly told Chamberlain that Capax would only remit the $9 million it owed Autonomy on the BofA deal after Autonomy paid Capax's $900K fee **(TAB 15)**.  Baiocco had to apologize to Chamberlain and smooth the waters.

Baiocco said he was not aware that Autonomy closed a direct deal with Amgen in Q4 2010.  He replied that he was not sure what Capax would have done if a deal had not gone through.  "Probably would have fought Autonomy for awhile," he said, noting that Capax had only paid on the McAfee deal (see below) "because of the HP factor."

> f.   Merrill Lynch (Q4 2010: $1.8 million)

Despite the fact that he had included a small Merrill Lynch deal in the nine transactions he previously listed for Ms. Stolley, Baiocco did not recall the $1.8-million PO dated December 31, 2010 for end-user Merrill Lynch that he signed **(TAB 16)**.  When asked about the language in the PO that read in substance, "in the unlikely event End User, instead, enters into a direct agreement with Autonomy, then VAR shall distribute the Software to End User...," – clearly anticipating a direct deal – Baiocco said he never personally read the language in the POs.  He passed them on to Capax legal (which, in fact, is a paralegal since their outside attorney died).  Baiocco commented that Capax legal never said no to a VAR deal.

> g.   DKO (Q4 2010: $2.3 million)

As with the other deals, Capax had no interaction with the end user, Defense Knowledge Online, which is under the Department of the Army.  Nor did Capax bid on any RFQ.  Baiocco recalled receiving something regarding the DKO deal the afternoon of December 31, 2010 (he remembered two or three different transactions that day).

According to Baiocco, Autonomy "first ran to us," then decided that Microtech had a better relationship with DKO, so Microtech paid off Capax.

Baiocco never really asked Autonomy any questions about Microtech's connection to DKO (or DiscoverTech's link to BofA).  "They [Autonomy] would never have given us a straight answer if I had asked."  Besides, he added, he had no reason to doubt Autonomy and he knew Capax did not have a BofA or DKO relationship.  When asked about the rules associated with reselling to a government entity, Baiocco recalled that, in pitching the deal to him, Egan unequivocally stated that Capax would never deal directly with DKO.

Baiocco said he was surprised Autonomy did the DKO deal through Microtech, but it did not make a difference since Capax got paid their partner referral commission – although there was an issue with the amount of Capax's fee.  Apparently, the deal actually closed for $60,000 to $80,000 more than the deal Capax "took" and there was confusion around whether Capax was entitled to 10% fee of the original deal or 10% of the ultimate deal with Microtech.  In an angry email to Jim Crumbacher dated July 11, 2011, Baiocco asked, "[W]hat are u protecting your selves from here?" **(TAB 17).**  Baiocco explained that he was "on edge" at that point because he knew "something was happening with an acquisition."  He felt that Autonomy was preparing to

MLAT_AU 00072948

be acquired, cleaning up its books and clearing out its aging receivables, and he was worried that the people he had been dealing with (i.e., Egan and Kanter) would no longer have the authority to continue their arrangements with Capax.[30]

   h.  McAfee (Q1 2011: $5.25 million)

Reflecting on the McAfee deal, Baiocco recalled that it raised a red flag.  At the time, he was in favor of the deal because McAfee was a huge public advocate for Autonomy and Egan convinced him that the deal was imminent.  So, Capax signed a PO on March 31, 2011 for $5 million in licenses and $250,000 in support and maintenance (**TAB 21**).  Baiocco had no idea that, on March 30, 2011, Autonomy had called the deal "dead" (**TAB 22**).  Soon after, Baiocco began asking questions about the status of the deal, but he could not get anyone at Autonomy to respond.  For months, Autonomy stonewalled Baiocco.  No one returned calls and, unlike on other deals, no one even bothered to give him a "song and dance."  Nevertheless, Baiocco maintained the belief that the deal was alive.

Ultimately, Capax paid the full $5.25 million in two installments of $2.625 – August 15 and September 1, 2011.  Baiocco said he made the August payment in response to "lots of big pressure" from Autonomy, who were demanding money on McAfee but still could not tell him where the deal was.  Capax paid in September, Baiocco said, because they had a lot of business to protect.  "We didn't want our first interaction with HP to be sour."  Capax never was reimbursed for the McAfee deal,[31] though at least they received a 10% fee, which "took some of the sting out" (**TAB 23**).

   i.  UBS (Q1 2011: $8 million; Q2 2011 $7.6 million)

Baiocco recalled that the UBS deals were unusual in their size and in the fact that he felt affirmative pressure from Autonomy to take the second deal.  Due to the size and sequential nature of the deals – i.e., the first $8-million deal had not been done when Autonomy asked Capax to take on a second (almost) $8-million UBS deal – Baiocco also felt pressure from his partners, who were nervous about Capax's exposure.  Baiocco remembered asking Autonomy for something to show that the first UBS deal was imminent.  To convince Capax to step into the second deal, Egan forwarded a June 30, 2011 email from Julie Dolan (Autonomy Legal), attaching a "300-page agreement" signed by Autonomy but not by UBS.  Baiocco recalled that this included a supply order and production description.[32]

---

[30] Baiocco said he "could tell you within five minutes when Autonomy was being bought," based on the sudden change of character of the high-level people:  They ("Joel, Sushovan …") started demanding money on various deals, including McAfee, even though they could not (or would not) tell Baiocco where the deal was.  (See McAfee deal below.)  Baiocco asked Egan straight out; Egan replied, "You're right, I can't tell you, but I will tell you that nothing is happening."  Baiocco said he was on a plane when the acquisition was announced.  He called Egan the next day and Egan hung up on him.

[31] Capax still owns the licenses, which are not term limited, and they are attempting to sell them – "I think we may have a guy," Baiocco commented.

[32] Morgan Lewis had been unable to locate a copy of this email.

MLAT_AU 00072949

Capax never interacted with anyone at UBS and never made any payments on the UBS deals. A direct deal between Autonomy and UBS closed in July 2011. Baiocco said he did not recall finding out until he received "soft copies" of the August 11, 2011 credit notes cancelling Capax's debt **(TAB 24)** – though he said he may have known before that. August 11, 2011 was the same day Autonomy paid Capax $6 million on the August 10, 2011 Software License Agreement.

Capax received a $1,644,733 commission on the UBS deals, which Chamberlain directed Harris to "process immediately" on September 2, 2011. **(TAB 25)**.

## IX.     Baiocco's General Impressions Re: Autonomy

Baiocco said that Kanter was one of the few people who fielded tough questions, while others buried their heads in the sand. But, in his opinion, only Lynch, Hussain and perhaps Mennell were part of Autonomy's "inner circle," and everyone else – Egan, Kanter and Scott – was merely doing their bidding. He described Lynch, whom he had met once at a conference, as an "easy to follow" person with a dynamic "conquer the world" mentality.

Autonomy never paid on time and usually stonewalled Baiocco when he tried to get information about payments owed. For example, it took three months for Capax to be paid on its EDD handshake agreement with Egan.**(TAB 18)**.[33]

When asked, Baiocco said Autonomy never offered to invest in or buy Capax, and he never suggested it. Further, Baiocco refuted the rumor that Hussain had a financial interest in Capax. Baiocco thought maybe people misperceived his sit-down with Hussain in April 2011, when he pitched a big government award that Capax's sister company, Autonomix, had just won.[34] Hussain expressed great interest initially, which Baiocco thought may have fed the rumor that Hussain owned a piece of Capax. Ultimately, though, Hussain completely lost interest – "I guess the HP thing cropped up," Baiocco said.

Looking back at the overall Autonomy relationship, Baiocco felt that Capax did not do "as good as we should have," noting the number of unbillable hours Capax had to expend in professional services to implement Autonomy products. "We took a lot of bullets for those guys," Baiocco commented – e.g., Autonomy sales people sold capabilities that Autonomy products did not have and then Capax had to deal with the frustrated clients when it came to implement the product. The relationship between the two companies was "one of those things" – sometimes good, sometimes rocky. Now, Capax has a strong relationship with HP and Baiocco attributes great value to the steady stream of professional services implementation work that Capax does for HP.

Recent contacts with Autonomy people: Egan has emailed Baiocco twice about getting together for coffee, but Baiocco ignored both emails. And Baiocco spoke very briefly with Kanter right

---

[33] Baiocco's February 22, 2010 email to Kanter reflected his hounding Autonomy for payment.
[34] Seven companies were contracted in a $2.5-billion deal and Autonomix was the only company with a suite of Autonomy products that won a piece of the award. Baiocco discussed the award with Kanter in an email dated May 10, 2011 **(TAB 19)**.

MLAT_AU 00072950

after the Autonomy investigation story broke to tell Kanter that he could not attend the Autonomy Christmas party in London.  Baiocco said Kanter tried to talk about the investigation, but Baiocco told him he couldn't talk.

## X.        Capax Lease of 105 Picadilly

Ms. Stolley commented that there was a lot of back-and-forth correspondence about Capax's rent-free use of Autonomy's offices at 105 Picadilly in London.  Baiocco explained that he originally thought that the free rent was another way that Autonomy made Capax whole for their various dealings.  As it turns out, however, Capax was tricked because, in London, "rent" is only one-third of the cost of occupying a space.  Maintenance charges, taxes and fees make up the remaining two-thirds of the actual costs.  Autonomy had no use for the space anyway, so ultimately they were the true winners since Capax had to cover their costs.

## XI.       The SEC Subpoena

The SEC's December 19, 2012 subpoena to Capax technically covered every email or letter between Capax and Autonomy (**TAB 20**), but Capax's attorneys were able to negotiate a narrower scope limited to key custodians and the nine deals discussed above.

MLAT_AU 00072951

| Tab No. | Document Description |
|---------|---------------------|
| 1 | September 16, 2009 Baiocco email to Crumbacher (CTRL: 01231021) |
| 2 | March 4, 2010 Baiocco email to Kanter (CTRL: 04913669) |
| 2A | "Capax Aging Report" Excel spreadsheet attached to Baiocco's March 4, 2010 email to Kanter (CTRL: 04913665) |
| 3 | September 29, 2010 Baiocco email to Kanter (CTRL: 04961182) |
| 3A | "Capax Aging Report" Excel spreadsheet attached to Baiocco's September 29, 2010 email to Kanter (CTRL: 04961176) |
| 4 | June 13, 2011 Hussain email to and Baiocco (CTRL: 03235614) |
| 5 | September 30, 2009 Davis email to Baiocco (CTRL: 01003501) |
| 6 | August 20, 2010 Baiocco email to Kanter (CTRL: 04916162) |
| 7 | December 1, 2010 Mancuso email to Baiocco (CTRL: 01351867) |
| 8 | July 6, 2010 Prasad email to Chamberlain (HP 0000492) |
| 9 | October 6, 2010 email to Egan and Kanter (CTRL: 04961779) |
| 10 | October 12, 2010 Kanter and Chamberlain email thread (CTRL: 03586628) |
| 11 | March 24, 2011 Chamberlain email to Baiocco (CTRL: 02991063) |
| 12 | December 30, 2010 Chamberlain email to Hussain, attaching proof of payment to Capax for the FSA deal (CTRL: 03594516) |
| 13 | September 7, 2011 Letter from Scott to Baiocco (HP 000512) |
| 14 | December 31, 2010 dated letter from Baiocco to Egan (HP 0000556) |
| 15 | March 24, 2011 Email between Spadone, Baiocco and Chamberlain (CTRL: 02991134) |
| 16 | December 31, 2011 $1.8 million POs for end-user Merrill Lynch (CTRL: 01132033) |
| 17 | July 11, 2011 Baiocco and Crumbacher exchange (CTRL: 01358060) |
| 18 | February 22, 2010 Baiocco email to Kanter (CTRL: 04913435) |
| 19 | May 10, 2011 emails between Baiocco and Kanter (CTRL: 04965978) |
| 20 | December 19, 2012 SEC Subpoena Issued to Baiocco ((Received from Baiocco's Counsel) |
| 21 | January 25, 2011 Email from Egan to Baiocco (Received from Baiocco's Counsel) |
| 22 | March 30, 2010 Mooney Hussain email exchange on "Dead" McAfee deal (CTRL: 03604804) |
| 23 | August 31, 2011 Scott letter to Capax, countersigned by Baiocco on paying Marketing Fee for MacAfee (CTRL: 05722948) |
| 24 | August 11, 2011 Chamberlain email to Ku instructing her to credit UBS invoices in full (CTRL: 06651644) |
| 25 | September 2, 2011 Chamberlain Email to Harris attaching August 31, 2011 Scott letter to Capax, countersigned by Baiocco on paying Marketing Fee for UBS (CTRL: 05722972) |
| 26 | December 31, 2009 Capax $4.2 Million Purchase Order (CTRL: 06651458) |
| 27 | October 6, 2010 Capax Invoice #1233 received from Baiocco's counsel on March |

MLAT_AU 00072952

| | 11, 2013. |
|---|---|
| 28 | October 12, 2012 Egan email to Baiocco on receiving payments under the FSA deal |

MLAT_AU 00072953



DATE:        December 30, 2012

SUBJECT:     Memorandum of Interview with Sean Blanchflower – December 7, 2012


I.    **Interview Overview**

On December 7, 2012, Susan Resley and Martha Stolley of Morgan Lewis and Bockius ("MLB"), and John Archibald of PwC conducted an in person interview with Sean Blanchflower ("Blanchflower"), Autonomy's current Head of Research and Development ("R&D"). The interview was held at the Cambridge offices of Autonomy ("AU"). Owen Hammond of MLB also attended. The interview lasted approximately one and half hours and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices.

At the beginning of the interview, Ms. Resley explained that MLB is interviewing multiple AU employees to gather facts about what happened at AU before the HP acquisition. Ms. Resley told Blanchflower that HP and MLB had reported certain issues to the Securities and Exchange Commission ("SEC") and to the UK's Serious Fraud Office ("SFO"). Ms. Resley requested that Blanchflower speak openly during the interview and clarified the interview was not a deposition. Ms. Resley explained that Blanchflower could speculate or offer opinion, as long as Blanchflower could explain a rational basis for this speculation.

Ms. Resley provided Blanchflower with "Upjohn Warnings" by advising Blanchflower that the interview was part of HP's internal investigation, that it was privileged and that Blanchflower should keep the discussion confidential. Ms. Resley further advised Blanchflower that MLB represents HP and therefore, HP can choose to waive the privilege at its discretion.

II.    **Background and Responsibilities**

Blanchflower joined AU in 2000 as a researcher. In 2001, he was one of two writers for the first IDOL server. At this time, he reported to Peter Booth, who was Head of Engineering, until he was effectively replaced in 2001 or 2002 by Peter Menell ("Menell"), who took the CTO role when Richard Gaunt stepped back from management of the company.

In 2004, Blanchflower was made Head of R&D, at which time he managed 20 people. In the six years to 2010, his (indirect) team grew to more than 500 globally, through various acquisitions. In 2010, following the Interwoven acquisition, Blanchflower shared his role with an individual who came from Interwoven (Frazier?). Following the HP acquisition, the roles of the two Heads of R&D were segregated. Blanchflower managed the IDOL team (around 150 engineers), and his colleague (Frazier) managed a much larger team focused on the IDOL applications.

   A.    Autonomy's acquisitions

AU acquired several companies which shaped Blanchflower's team and the way it developed AU's software. Blanchflower explained that initially AU's philosophy was not to use original equipment manufacturers ("OEM's") in its business as there is little that AU could not create itself. His view was that AU abandoned this philosophy once it began to acquire other companies. Often, there were equivalents of the software being proposed for acquisition which were available in the market for free.

Some of AU's acquisitions included:

Virage: The technology obtained as a result of the acquisition "died quickly".

Verity: AU acquired Verity in 2005, and was a similar scenario to Virage. There was significant overlap with AU's existing products, but Verity was AU's larger competitor. The IDOL technology ultimately took over and the Verity team eventually left, which may have been AU's plan all along in his opinion.

Zantaz and Iron Mountain: Because their products primarily used the IDOL server, IDOL was essentially "slotted in" to their existing product.

III.   **FileTek Purchase**

    A.   Background

Blanchflower was often asked to evaluate companies and the products they offered. There was "always" a company looking to sell its business and when it approached AU on this basis, Blanchflower would be asked to look into the potential target's technology. He would "go through the motions" and, in almost all cases, concluded that there was nothing of great value in the target company's products.

    B.   Evaluation of Filetek

In late December 2009, Menell asked Blanchflower and Darren Gallagher ("Gallagher"), who also reported to Menell, to evaluate FileTek. Menell made this request this verbally ("he never did anything in writing"). Blanchflower said that when Menell requested something, "he always wanted it *"today!""* He added that "Menell was always mysterious about everything". Blanchflower explained that he worked on a project with Menell, he never knew the whole picture and would be given a discrete task without any context. Therefore, it was not necessarily unusual that he did not know anything about FileTek.

Because Gallagher's email response to Menell with an initial analysis occurred on 30 December 2009, Blanchflower stated that it was a safe assumption that Menell had spoken to them on the same day.[1]

Blanchflower used white papers and other information on Filetek's website to construct an analysis of the technology it offered. At this point, Blanchflower had no idea of the purpose of this evaluation, but this was not unusual. For example, Blanchflower conducted an analysis of

---

[1]   During the meeting, Blanchflower reviewed his laptop and referenced emails contained in a FileTek email file.

Morgan, Lewis & Bockius LLP

MLAT_AU 00072955

Zantaz prior to its acquisition, but never knew (and never felt the need to ask) the purpose of the evaluation. The only times Blanchflower could recall being aware of the purpose of such an evaluation was in the case of Yield, which was a very small acquisition (less than $1m), and [Engini], a potential transaction that fell through. Blanchflower thought he was asked to conduct an evaluation of FileTek on the premise that it was a potential acquisition target but he had no indication that was the case.

Blanchflower recalls having to "fish" for AU's potential uses of Filetek's software, StorHouse. He ultimately came up with four or five options, but described most of them as "stretched". Of these, incorporation into Digital Safe was the best "use case". Other potential uses included incorporation within Introspect or ["connected life" in Iron Mountain]. He recalled that a link to the files on an FTP site was sent to Chris Goodfellow for download. Blanchflower thought at the time that this was part of the testing and evaluation process. Blanchflower and Gallagher did not spend much time on the project. He recalled drafting the email to Menell with Gallagher, and did not recall looking at the software from the FTP site. He said that Gallagher "may have had a look".

Blanchflower explained that it was common to receive software downloads via FTP for the purposes of testing. This might be done through a testing license (a license for a short, fixed period of time) or the software might simply be a demo version. The executable files (like those that were loaded to the FTP site) have very little value in and of themselves because they have limited time value or require a full license to properly use the software. He said that to spend as much as $10m on software (as AU did with FileTek), one would certainly want to conduct a thorough evaluation of that software first. In these circumstances, one would likely request a 14-day testing license, which would normally be granted free of charge. That did not occur here.

Blanchflower, referred to his email inbox and noted that activity concerning Filetek appeared to cease for some time. The next emails began May 2010, when one of Blanchflower's colleagues requested more detail on how StorHouse could be integrated into DigitalSafe. Blanchflower's email outbox reflected that he was asked to select someone on the team to determine how StorHous would integrate with DigitalSafe. After May 2010, Blanchflower heard nothing further in relation to Filetek. The next time he heard about FileTek was in response to questions PwC recently asked about various invoices.

Blanchflower never had any involvement, or contact, with Filetek beyond searching their website for the purposes of the evaluation. It was, in theory, possible that he contacted someone on the technical side at Filetek regarding any specific questions that he had, but he did not recall doing that.

C.    Purchases of StorHouse

Blanchflower had "no idea" that Filetek had been purchased, and was very surprised to learn this was done on December 31, 2009, i.e. the day before Menell requested the evaluation. Blanchflower stated: "there are always reasons for doing things, good or bad, illegal or not." He said that he was not a businessman and never understood these things.

MLAT_AU 00072956

Given the lack of communication regarding FileTek after May 2010, he found the second purchases of StorHouse in 2011 "very odd". He speculated that he was not aware of this because the product had gone straight to the DigitalSafe team, but it knows now that this was not the case.

D. Use of StorHouse

Perhaps more surprising to Blanchflower was that AU spent money on a product that never reached deployment. Blanchflower knows that the Digital Safe team never deployed StorHouse. Blanchflower said that although he was sure of this fact, if MLB wanted "a guarantee" that it was never deployed, the Head of Development at Digital Safe at the time, Roger Wang ("Wang") could provide this.

Blanchflower clarified that nothing in Gallagher's email to Menell suggested that the product was put into use. He and Gallagher had simply selected certain customers who might benefit from its use.

He also suggested that we check on operations team "installs", since it is in theory possible that StorHouse was applied in some way that fell outside of the scope of the suggestions made by Gallagher and Blanchflower. However, he noted that this theory would involve a presumption that StorHouse had been deployed and he had not been involved in the deployment. He found this presumption "inconceivable". He suggested that we contact Don Avant, who is based in London. He would be able to confirm if there was any installation or development.

E. VA Hospital

Blanchflower never heard of any deal or other matter concerning the VA Hospital. He noted however, that it was entirely possible that there was such a deal and he never heard about it. His only role within a deal would be the original underlying R&D, and he would not be involved in the deal again, unless any post-sales professional services became required.

Blanchflower might have been expected to find out that a deal had gone through if he received a support "ticket" (i.e. a request for assistance). Blanchflower never received a ticket concerning the VA.

IV. **Resellers**

Blanchflower noted that in the course of the investigation, Antonia Anderson ("Anderson") asked about various unusual invoices (in the course of PwC's investigations), including Vidient, VMS, and a list of companies. He recalls telling Anderson *"this seems to be the who's who of dodgy deals"*. By this he meant that the companies he had been asked to evaluate, and which he had concluded were of no value to AU, all seemed to be listed there in one place. He described it as "odd" seeing them there all together. Blanchflower could not recall any of the other names that he recognized, but noted that he still had all of his emails from the evaluations he conducted and it would be possible to cross-check the names against these.

A. Discovertech and Microtech

MLAT_AU 00072957

Blanchflower never heard of these companies but recalls looking them up briefly on the Internet after he saw their names on the list that Anderson showed him. He would not be surprised if he had not heard of all customers, since AU has 60,000, and he only saw customers whose tickets were "escalated" to him. He might only know, therefore, the top 50 customers.

V.    **Vatican Library**

Blanchflower stated that the R&D work done for this project was very real but that he understood the deal with the Vatican Library never went through.

This was to be a 10-year project to "digitize" the Vatican Library. It involved the high-resolution scanning of the physical documents and a large scale indexing of the library's documents using the metadata from the scans (almost like a library card for each document). The scanned information, *i.e.* the ancient manuscript, would be "OCR'd" and any pictures digitally recognized.

Blanchflower described the processes that would be employed as "fascinating", and "highly technical". Some of the facilities would use high-resolution images to recognize some script on the library's medieval documents that had been rubbed out when the parchment was re-used by the monks, AU's software would make new links between previously unassociated texts, based on the similarity of the monks' illustrations, which occasionally accompanied the text. He explained that there was also a lot of discussion and research into the most appropriate file format in which to store the images, in order that the format used did not become irrelevant in the future. Ultimately a connector for Photoshop, which was based on a format invented by NASA in the 1970s, was chosen.

A pilot was approved in the first half of 2009. Blanchflower heard that AU was trying to close the deal but that the Vatican did not have the money. He understood that the technical set up provided to the library was not charged in order to keep the Vatican interested. He understands that, ultimately, the Sales team gave up.

Blanchflower explained that, when Menell left, Fernando Lucini, ("Lucini"), under whose remit the project then fell, began asking questions and discovered that the equipment was still at the Vatican Library. Lucini has now retrieved all of this equipment. Having retrieved the equipment, it is evident that the Vatican had been using it. They had a full technical set up, including the servers that would host the information. It appeared, however, that only the scanning equipment had been used but not the software. (The process of scanning the documents was going to take 10 years and the library wanted to get a "head start".) The camera used for the scanning had been used heavily, which was evident from the fact that it had been rebuilt by the manufacturer, a requirement after 100,000 images had been taken with the camera. None of the images, however, had been processed.

VI.   **R&D Spends**

    A.   IDOL SPE

Blanchflower explained the premise of IDOL SPE was "let's start with the marketing and worry about whether we can do it later". More specifically, the idea with developing SPE was to first

MLAT_AU 00072958

run some "demos", then see if this encouraged sales, and, if it became successful, to begin to solidify the product.

The reason is that IDOL is designed to be flexible; it can be adapted for anything. The problem SPE was that the idea was to do clever new things with IDOL, based on the specific requirements of a potential customer, and so one did not necessarily know where to begin in terms of developing it. In other words, because the concept of the product was to address specific "problems" in a bespoke way, it was, by definition, not flexible in the same way as IDOL.

The marketing of the product was central: the idea was that they would "talk about clever things" and build some demos based on some example uses.

When asked about AU's representations of a very large R&D budget for SPE, Blanchflower explained that the financing aspects of his department were always a mystery. He was interested to hear the amounts spent on R&D, when he did, since he was never involved in the calculations. Blanchflower believes that if he had heard that there was a "big push" on R&D, with a spend of something like $20m, he would certainly have remembered this.

Blanchflower explained that, although he is aware of no customer that has SPE, they have made certain aspects of it present within IDOL. The principal is exactly the same as IDOL, so other elements can be simply built in to the existing platform. Blanchflower noted that it is, perhaps, a question of definition, but conceptually, SPE is simply an improvement upon IDOL. He could firmly say, however, that there was no R&D effort expended on SPE per se. The only activities that were undertaken involved creating some demos. That would involve one week's work for one person and that interns may have been involved.

Blanchflower's perception was that big projects like this were always driven directly by Lynch and thought it was "inconceivable" that any requests made by Menell were not simply handed down from Lynch.

      B.     Documentary records of R&D Costs

Approximately once a quarter, he would participate in calls with Deloitte in which the quarter's deals were discussed. Blanchflower would then provide the Finance department, spreadsheets of the amount of time his department spends on R&D-related work, versus other (e.g. support) work. He did this from 2009 to the end of year, 2012, at which point HP decided to cease this. Although he does not know how these spreadsheets were used, he recalls that, every now and again, Poppy Prentis would ask him if anyone had missed any time, and he would have to go back to his team and check (every now and again, he would discover that the development managers themselves had forgotten to add their own time).

## VII.   **Other Issues**

Blanchflower described the Arcpliance as a "marketing creation." He said that if there was any development at all, it was minimal.

MLAT_AU 00072959



DATE:         December 30, 2012

SUBJECT:      Memorandum of Interview with Corrado Broli – December 5, 2012

## I.    INTERVIEW OVERVIEW

On December 5, 2012, Susan Resley and Martha Stolley of Morgan Lewis conducted a telephonic interview of Corrado Broli, a sales executive based in Milan, Italy.  Bob Particelli of HP also participated on the call.  The interview lasted approximately one hour and focused on Broli's role in the Vatican Library negotiations.  Broli explained that he had been ill but was willing to cooperate and answer questions.  As the salesperson primarily involved in the Vatican Library negotiations for nearly four years, Broli confirmed:

- The Vatican Library deal was never finalized – i.e., there was no deal.

- AU never sold or even provided the Vatican Library with any software license.

- The Vatican Library never paid AU for any software.

Particelli thanked Broli for participating in the call and reiterated that HP was conducting an investigation of AU's prior practices.  Broli was given "Upjohn Warnings" and was advised that MLB was engaged by HP to conduct the investigation and that Particelli and MLB were HP's attorneys, not his, and that the attorney-client privilege belongs to HP.  HP can therefore waive the privilege or disclose protected information, but he cannot.  The interviewers asked that he keep the interview confidential and not discuss it with anyone.  He stated that he understood.  He also was told that the interview was not like a court proceeding so he could speculate or offer opinion so long as he was clear that he was speculating and offered some basis for the speculation.

## II.   BACKGROUND

Broli joined AU in 1999 as a sales executive.  He advised us that he did not work very much in 2011 because of illness.

## III.  VATICAN DEAL

### A.    Background

Broli recalls initiating discussions with the Vatican Library Chief Information Officer approximately four years ago.  The idea was to digitize approximately 80,000 archived manuscripts in 10 years, then archive and store those manuscripts digitally.

MLAT_AU 00072960

Broli said that the project was very important and that AU wanted to be involved in the "best way."  A number of key managers were involved in the project, including Mike Lynch, Sushovan Hussain, Pete Menell, Fernando Lucini, Andy Kanter, Sean Blanchflower, Steve Chamberlain, Marco Zaccini (sp) and Julie Dolan.  No one from US AU management was ever involved in any of the Vatican Library discussions.  Menell was most interested in the deal.  An official from the Library gave Menell an ancient manuscript because Menell was seen as a scholar of sorts.  Broli worked most closely with Hussain and Dolan in developing a proposal.

The proposal was to digitize 80,000 manuscripts for €75 million; however, payments were to be made in installments and, over time, the amounts fluctuated.  The proposal was structured as a software, hardware [in the form of camera and scanning equipment] and services deal.

### B.    Negotiation Efforts Through 2010

Broli recalled a number of meetings in December 2009 and said they were very close to signing the contract in December 2009.  According to Broli, Hussain and others really wanted to get the deal signed by December 31, 2009, so everyone put all of their efforts into it.  Nonetheless, the deal did not close in Q4 2009.

Negotiations continued and, in 2010, Broli spent three months in Rome.  In order to demonstrate AU's abilities, AU designed a pilot scanner that the Vatican Library could test.  *The Vatican Library did not pay for any product.*

Despite extensive discussions, the Vatican could not commit to a deal because it could not obtain financing.  Because of the financing challenges, several Italian partners were introduced to assist with the financing, specifically Poste Italiane, Auxilium and Mechanica.  None of the potential partnerships were successful.  *Broli never participated in any discussions with US resellers and never brought in any US resellers.  He never heard of Microtech.*

Broli said that, because of the financing difficulties, his discussions with the Vatican Library ceased in June 2010.

### C.    Renewed Negotiations in 2011

Broli said that, shortly after the HP acquisition in 2011, he began working with the HP ESS team in order to develop a new proposal for the Vatican Library.  The proposal was significantly less than what had previously been discussed: digitizing 8,000 manuscripts, which would run between €2.5-5 million for software and some professional services.  HP and the Vatican Library could not reach a deal.  Ultimately, the project went to EMC.

## IV.    OTHER ITALIAN DEALS

Through a brief review of documents, some suspicious reseller deals appeared to have involved Broli.  When asked about Resi (in which reseller Resi was not obligated to pay), Broli claimed he had no knowledge.  He said that he did work on direct deals with other customers, including Vodafone Italy, the Ministry of Health and Sky Media.  Many of the deals did not close.

MLAT_AU 00072961



DATE:       February 4, 2013

SUBJECT:    Memorandum of Interview with Michael Brunnick, VP of Federal Sales, AU/HP
            – January 31, 2013

| Tab number | Document Description |
|---|---|
| 1. | Word proposal prepared by Microtech and Autonomy titled "Advanced Technology Innovation Center Featuring Autonomy-Based Technologies and Solutions" |

## I.   Interview Overview

On Thursday, January 31, 2013, at 11:00 a.m. EST, at Morgan Lewis's offices in Washington, DC, Susan Resley of Morgan Lewis and Worth MacMurray of PwC conducted an in-person interview of Michael Brunnick ("Brunnick"), Vice President of Federal Sales at Hewlett Packard ("HP").  Martha Stolley and Vladimir Pavlovic of Morgan Lewis participated by phone.  Brunnick is a legacy Autonomy ("AU") employee.

The interview lasted approximately two hours.  The interview focused on Brunnick's knowledge of a number of AU's deals in the federal space, including AU's use of resellers to facilitate federal transactions.  Brunnick was cooperative and noted that he views MLB and PwC as "good guys" and that he hopes that the investigation will be good for business.  Brunnick recalled many details concerning the deals asked about, and provided valuable information.  Ms. Stolley and Ms. Resley asked Brunnick to search his emails concerning several deals, and Mr. Brunnick is willing to do so.

Ms. Resley provided Brunnick with "Upjohn Warnings" by advising him that the interview was part of HP's internal investigation, and that it was privileged ( but the privilege was held with HP and not Brunnick) so Brunnick must keep the discussion confidential.  She informed Brunnick that, while information gathered in the interview would be shared with HP and would form part of the factual investigation of this matter, his name would not be provided to other interviewees.  Ms. Resley further advised Brunnick that Morgan Lewis represents HP and therefore, HP could choose to waive the privilege at its discretion.

## II.   Brunnick's Background and Responsibilities

MLAT_AU 00072962

Brunnick joined Autonomy in May 2011, from a rival business, Open Tech Solutions. He is a VP of Federal Sales, responsible for all business Autonomy does with U.S. federal government, and was hired by Mike Mooney and Stouffer Egan. Brunnick was hired with a specific mandate to revamp the federal sales business: Autonomy was not doing as much federal business as management thought it should and it only had a small team that was not doing very much. Brunnick was tasked with creating some real partnerships in the federal space with a view toward improving that business. When he joined, he realized he needed to "fix" things. He also observed that the federal group was understaffed.

Brunnick had no direct predecessor at Autonomy. His latest predecessor was Jim Still, who left in November 2010, but Mr. Still was not focused strictly on federal space. An interim replacement for Mr. Still was Sam Kalbag, who was a technical engineer, not salesman (though Mr. Kalbag was able and managed to perform relatively effectively, even though sales were outside of his expertise).

### III.   Autonomy – State of Federal Business and Culture

When Brunnick joined, Autonomy was a fairly immature business and, except for a few boutique partners, had no good relationships in the federal space. It was very "cozy," however, with two partners – Microlink and Microtech. Autonomy's close relationships with Microlink and Microtech were detrimental to the business over the long term, by driving other potential partners away, who felt it was too difficult to compete for Autonomy's business. When Brunnick arrived, Autonomy had already acquired Microlink, though the two were still very much different businesses culturally. It is not unusual for a foreign company to have a relationship with a domestic reseller, particularly in the federal space. He believed that Microlink employees were competent. Microlink had offices in the same building as Microtech, though the two companies occupied different spaces and were different companies.

Autonomy has had good technology and it was aware of that, and its reputation. Autonomy's was the best search engine on the market, and a relatively easy sell, but the company's offering was fairly immature otherwise, and limited in its ability to sell complete solutions instead of search technology only. Autonomy's customers weren't happy with the customer support, and its products were often perceived overly complicated, so that many customers ultimately thought they overpaid. Autonomy was a very sales driven company and its focus was its quarterly performance, not long-term customer satisfaction.

This culture was pervasive and came straight from the top. By the time that Brunnick joined, Autonomy had stopped its practice of weekly "SMS" calls, where every sales person had to participate, and where Messrs. Lynch and Hussain examined the results and routinely yelled and cursed at sales people. By the time Brunnick joined Autonomy, the company had become too large for these calls, but their legacy was felt, and sales people were still visibly nervous at a mention of these calls. Sales people put up with this culture because they were extremely well paid compared to elsewhere in the industry – there were no ceilings on commissions, and some people earned over $1M per year. Each sales manager had several people working for him/her, and was called "cell" leader, a reference chosen because of its similarity with terrorist organizations. There could be no communications with other "cells," no group calls, no pep

MLAT_AU 00072963

talks: only sales mattered, and low performers were commonly shamed.  Brunnick had not observed any direct evidence of this, but he knew these were the rumors and Brunnick thought they were true.

At about the time Brunnick joined, there were rumors about deals being manufactured, or the timing calibrated, in order to fulfill quarterly goals.  Brunnick had no direct knowledge of any such deals in the federal group.  When Brunnick arrived at Autonomy, he made clear to the members of his "cell" that he would run business differently.  Brunnick believed that Autonomy's emphasis on recording revenue as soon as possible hurt the business, because customers often required a discount on a sale in order to pay in a particular quarter.  A more sound practice would be to wait 60 or 90 days and collect the full amount when the deal was planned to close.  Again, Brunnick had no direct knowledge of this practice, but heard rumors from the sales people.  Some of the information about these "funny deals" may be speculation or "salespeople paranoia."

Brunnick heard that, execs would fly in and finish negotiations on a deal.  Stouffer Egan most often closed the deal directly with a customer.  During Brunnick's one-and-a-half years at Autonomy, working directly under Mr. Lynch, he never met or spoke with Lynch.  Brunnick thinks that Mr. Lynch was uninvolved with federal.  Mr. Lynch had a reputation of yelling and cursing at sales people on the "SMS" calls.  Brunnick had often spoken with Mr. Hussain.  Mr. Hussain had a way of making people do things he wanted but in a hostile manner.

In the federal space, Autonomy had less control over the deal process because of the RFI and/or RFP processes.  It was difficult to change the timing of the deal – because federal procurement is a black box – but a promise by a federal customer was much more solid than a promise by a commercial customer.  Brunnick embraced these concepts, because he thought it was better for business in the long term, but it was not common for the Autonomy culture.

## IV.  **Particular Deals in Federal Space**

### a.  Veteran's Administration

One region of Veteran's Administration ("VA") is Autonomy's regular customer, and was customer when Brunnick joined.  VA purchased software from Autonomy.  Usually, software is bought as a perpetual license, so the sale is typically a one-time thing, but Autonomy always tried to put pressure to upsell, either by trying to have VA buy software for other regions, or for more users in the same region.

VA was unable to make up its mind in the period around Q2 2011 concerning whether to purchase any software solutions.  At the time, VA operated in the series of data centers, and seemed to have had a mandate to consolidate IT, but the challenge was that it needed to consolidate money across different regions first.  VA's package included an on-premise, perpetual license, and VA was at the time trying get away from perpetual licenses and switch to "pay as you go."  Brunnick's sense was that, even though RFIs were out there, VA was indecisive because technology was moving too fast for it.  Brunnick met with James Babe (?) of

-3-

VA sometime in the summer of 2011, and it was still a period of RFIs; no RFP had yet come. Brunnick thinks no RFP ever came from VA.

Brunnick was not aware of any September 2010 deal made with a reseller prior to his arrival to Autonomy for a sale to VA for $10M, related to the big four RFI.  He was surprised to learn about this deal, because VA was nowhere near making a decision in 2010, and even in 2011.

Brunnick is not familiar with Filetek and he has never heard that Filetek assisted Autonomy in obtaining a VA deal.  Filetek was not involved in the pitch Brunnick's team made. His team worked with Iron Bow.

### b.  Department of Interior

Brunnick was responsible for any deals with Department of Interior ("DOI"), and DOI was a customer of Zantaz (which Autonomy acquired).  Zantaz had Cloud – a great product and a great service.  DOI was an existing customer, happy with product, happy with service, but had a long contract (5 years).  The program director at DOI was John Montel, whom Brunnick previously knew.  DOI was happy with the AU Cloud service and functionality, but was unhappy with the price because the product was becoming commoditized.  In September 2012, Brunnick's team made a pitch to reduce the price and extend the contract, but DOI refused.  DOI eventually went with Open Tech solutions, Brunnick's former company, which really went down in price.

Brunnick and people in his "cell" thought an RFP from DOI was coming in the summer of 2011, but it actually came in 2012.  Brunnick heard about attempts to renegotiate the DOI deal in 2010 from one of salesmen on his team – Raj Srivatsan.  Brunnick believes DOI is still paying Autonomy for the data hosted on Autonomy's cloud (it costs money to take the data off the cloud) and he was personally involved in discussions concerning this in May/June 2012.

### c.  U.S. Postal Service

Brunnick mentioned that sometime in the last few weeks, as he was pulling some historical reports and showing them to Alan Smith, Mr. Smith remarked that it was strange that U.S. Postal Service deal was coded as a $4.8M license deal in Q2 2011 where in fact it was a $7.6 hosting deal in Q3 2011.  Mr. Smith recalled Autonomy had replaced HP at USPS, and that towards the end of the deal Stouffer Egan flew in and had a lot of furtive discussions to which Mr. Smith had no access – so Mr. Smith thought Autonomy would take the USPS deal from him, but in the end it did not.  Brunnick only saw the figures as pointed out by Mr. Smith, never saw any deal documents.

## V.  Autonomy's Use of Resellers – Microtech

Brunnick recalls a small deal or deals in December 2011 in which Autonomy used Microtech as reseller.  He is not aware of any other deals but recalls that Tony Jimenez of Microtech sent a note to Steve Greney (partner manager at Autonomy and now HP and former CFO at Zantaz) requesting to discuss a partnership between Microtech and Autonomy, given that the two companies do $25M of business.  Since joining, Brunnick has only done about $1M/year

-4-

in federal deals with Microtech, and overall at the time, there was much less than $25M in federal sales, and most of it done through Microlink.  Brunnick did not know where Jimenez got the $25M figure.  Brunnick doubled the federal business since he arrived, and there is around $20M overall currently in it.  Greney had no specific predecessor at Autonomy.

Microtech was a very good company from a PR perspective; Jimenez was especially savvy at PR.  Other than PR, Microtech had a reputation as being a good organization and doing good work.

### A.     Federal Cloud

Brunnick is not aware of any projects or investments Autonomy made in Microtech, but he recalls receiving an email about this from PwC.  He recalled conversations as to whether it made sense for Microtech to develop a federal cloud but a decision was made not to chase that.  In this context, Brunnick (along with Maurice Lethbridge) met with Microtech at least three times around the fall of 2011: with Bob Truitt (dad), Steve Truitt, Roger Channing (CTO) plus others.  He did not recall whether these discussions were before or after the HP acquisition announcement.  Brunnick last spoke with Microtech on this topic probably about a year ago, and was frustrated that the discussions never seemed to progress to the next step.  On the other hand, Microtech was frustrated with Autonomy's excuses relating to its firewall.

The only other Autonomy person Brunnick recalled participating in the federal cloud discussions with Microtech was Mike Mooney.  He could not recall if Joel Scott, Stouffer Egan or anyone from Cambridge participated.  To the extent anything was memorialized from these discussions, Mr. Lethbridge would have it.  Brunnick will also look for any relevant emails or documents.

Brunnick was not aware of Autonomy's $8.2M cloud deal with Microtech.  He was not surprised at the question because a PwC person had asked him about it before, but he knew nothing about the deal, and had been surprised to learn of it because he was in charge of Microtech.  Brunnick will search his email for any relevant documents, but Mr. Lethbridge is more likely to have additional information.

### B.     Mobile Unit (ATIC)

Brunnick visited Microtech a number of times, including their mobile data centers, of which they were very proud – but those centers did not feature any Autonomy technology or solutions.  Microtech demo center at Microtech's office was the only facility that demonstrated Autonomy technology but it demonstrated other products.  Brunnick reviewed the proposal that appears to be prepared together by Microtech and Autonomy, named "Advanced Technology Innovation Center Featuring … Autonomy-Based Technologies and Solutions" (Tab 1) and said this did not surprise him, because it was not unheard of to discuss potential projects.  This was even less unusual given that Microtech had several Autonomy developers on staff.  Brunnick was, however surprised to learn that Autonomy paid Microtech $9.6M for this proposal in December 2010.  Brunnick speculated that proposal seemed like not enough work for that kind of money.  Brunnick said it was hard to tell what a correct figure would be, and that there was a lot of good hardware from "big guys," but Brunnick did not know how much hardware cost.

-5-

VI. **Autonomy's Use of Resellers – Microlink**

Of the Truitts, Brunnick only knows Dan Truitt. He described Dan as one of the best sales people on Brunnick's team. Steve Truitt was the CFO of Microtech. The Truitts' familial relationship between Autonomy, Microlink and Microtech was not an issue, according to Brunnick, because the world of federal business is small, so family members routinely do business with each other.

Dan Truitt would say that he was pretty sure there's funny stuff going on at Autonomy, and that he did not want to know anything about it. Dan Truitt was frustrated with AU pushing deals at discounts in order to get revenue sooner – he would have preferred to wait and get paid full amount. He also said that his brothers know not to talk about Dan about "that stuff" and that they understand that he does not want to know.

Brunnick was not sure what Microlink offered Autonomy, but said that there was a strong relationship, and that only lately three people left Autonomy to work for Microlink – one was John Cronin, who was cooperative and creative. Brunnick thought the 10% margin Autonomy gave Microlink was too much, but it was not unheard of. Brunnick noted that a high margin was frustrating for sales people because it lowered their commissions.

Brunnick had little access to Microlink employees because he needed to give notice each time he wanted to go there. This practice was not unusual and was dictated by the government's desire to ensure the American subsidiaries were actual companies, not just shells for foreign companies. Nonetheless, these high standards caused some frustrations. He found Microlink people to be tight-lipped, and it was hard to get information from Microlink.

Brunnick never had any instruction to go through a particular person at Autonomy to get access to Microlink – he had direct contact at Microlink. According to Brunnick, the integration of Microlink became easier just several weeks ago, when former Autonomy employees became HP employees, so same clearance requirements did not apply any more – Brunnick can now walk into Microlink without giving an advance notice.

VII. **Other**

Brunnick said that he never had dealings with Discovertech, never met with them or worked with them.

Brunnick said he did not know Autonomy is going to be acquired by HP, but that it made sense. Autonomy had held on to a flat startup structure for a long time because it anticipated being acquired, and did not want to waste time creating processes when it would need to adapt to buyer's structure and processes anyway. Nonetheless, Brunnick was surprised to learn about the acquisition.

Brunnick had no involvement in the Q4 2010 Bank of America Deal – this preceded his tenure and was a commercial deal, not federal. Brunnick said that Steve Truitt would probably

MLAT_AU 00072967

be the best person to ask about commercial deals, as he was Autonomy's primary interface; he also mentioned Jenny Taylor, who was a process order person (for federal/state/local deals).

Brunnick did not know whether Autonomy had a data center of its own, or who maintains Autonomy's IT system, because he worked out of the Falls Church location, and said that all was contracted out of San Francisco.

MLAT_AU 00072968



DATE: November 30, 2012

SUBJECT: Memorandum of Interview with Chris Chan - November 29, 2012

On November 29, 2012, Martha Stolley from Morgan Lewis and Eric Schweiker from Hewlett Packard, interviewed Chris Chan via telephone. The purpose of this interview was to gather information relevant to an ongoing investigation by HP regarding Autonomy's practices prior to acquisition.

Mr. Chan was interviewed because in June of 2012 he informed Michael Menz, who is in charge of HP's Investigations & Forensics, that sometime in May of 2012, after Steve Chamberlain left Autonomy ("AU"), Andrew Kanter asked Mr. Chan to wipe out the data on Chamberlain's laptop. At the beginning of the interview, Ms. Stolley explained that Morgan Lewis was retained by HP to assist in fact gathering. She also explained that this interview was not the last opportunity to discuss the issues. Further, Ms. Stolley emphasized that Morgan Lewis is HP's attorney, not Mr. Chan's, she asked Mr. Chan to keep everything discussed in the interview confidential and explained that if he has any questions or additional comments he can reach out to her or Mr. Schweiker. At the close of the interview, Ms. Stolley asked Mr. Chan for an in-person meeting in London next week, to which he agreed.

**Chris Chan's Background**

Mr. Chan has been with Autonomy for six years. He is the head of IT for AU UK, however, informally, for the last four years, he has been the IT manager for the AU Cambridge office, which is where he currently works. One of Mr. Chan's responsibilities was to look after the ERP system, which is an accounts receivable system used by AU and a large part of AU's infrastructure. Since Sushovan Hussain's departure, Mr. Chan has learned more about the ERP system and managed the program. Mr. Chan offered to answer any further questions about ERP and the invoices created or canceled through it, and added that whether invoices were generated through ERP depended on the entity being invoiced.

**Chris Chan's Relationships with Other AU Employees**

Mr. Chan discussed his relationships with Andrew Kanter, Peter Menell, and Steve Chamberlain. With respect to Kanter, Mr. Chan explained that he was repeatedly instructed to seek Kanter's approval on all US-related legal matters, even though Joel Scott was AU's general counsel for the US at the time. Mr. Chan and Kanter are Facebook friends, but they have not been in contact via Facebook or otherwise since Kanter left AU.

With respect to Menell, Mr. Chan said that he was the CTO of AU until 2010 or 2011, when he asked for a reduction in responsibilities to focus on his personal life. His reduced role was that of a Chief Research Officer. Although, Menell's title changed, Menell remained in control of the IT group and Mr. Chan still sought his approval for all IT-related matters.

Morgan, Lewis & Bockius LLP

Lastly, Mr. Chan spoke about his relationship with Chamberlain, who was AU's CFO.  Mr. Chan and Chamberlain had a good working relationship, which was important because Mr. Chan worked with Chamberlain closely on the ERP system and frequently communicated with Chamberlain about client specifications needed for the system.  Mr. Chan and Chamberlain are Facebook friends, but they have not been in contact via Facebook or otherwise since Chamberlain left AU.

**Destruction of Chamberlain's Laptop and Data**

After Chamberlain left AU, Mr. Chan backed up the data on Chamberlain's laptop and stored the laptop in one of AU's server rooms.  In May 2012, Mr. Chan told Menell that he routinely backed up the data from laptops of terminated employees.  (Mr. Chan said there were many terminated employees at the time and he did not recall whether he specifically mentioned Chamberlain's laptop to Menell during their conversation.)  At the time, the backup was part of the normal process at AU when employees left the company.  However, prior to the acquisition, there was no active backup process for employee laptops at AU.   In fact, Mr. Chan explained, he was told by Menell <u>not</u> to conduct any backup as the process was too costly.  Though he followed Mr. Menell's instruction, Mr. Chan did not agree that the process would have been expensive and said he believes that a company of AU's size and capabilities could easily have backed up employee laptops.

A day after that conversation, Mr. Chan was asked to see Kanter.  He was not given the context of the meeting with Kanter.  At the meeting, Kanter told him to erase Chamberlain's backup and to wipe the laptop hard drive.  In response to this unusual request, Mr. Chan emphasized that this was the only copy of Chamberlain's data and asked Kanter whether he was sure he wanted it wiped.  Kanter confirmed and told Mr. Chan that he (Kanter) had a copy of Chamberlain's data, which he wanted to be the only copy.  Mr. Chan did not know the details of the AU-HP relationship at the time, so he assumed Kanter's request for destruction of Chamberlain's data was due to his paranoia as a result of the situation with HP.

After the meeting, Mr. Chan followed the instructions and deleted Chamberlain's data from the server and wiped his hard drive, using a dBand CD and quit setting, which completely overwrote the drive in a manner that would not allow future forensic data recovery.  After completing this process, Mr. Chan emailed Kanter to confirm that he had wiped Chamberlain's data as requested.  Kanter never replied to the email.  [Mr. Chan forwarded a copy of this email to Mike Menz (HP IT) and promised to forward a copy to Ms. Stolley.]

For two weeks after erasing the data, Mr. Chan did not hear anything about the laptop.  On the day that Mike Lynch sent out an email informing everyone of his departure, Menell asked Mr. Chan to investigate whether this was a legitimate email sent by Lynch because his departure was not yet cleared with AU.  Mr. Chan confirmed that the email came from Lynch.

In June 2012, when working with Menz on a checklist of needed data, Mr. Chan told Menz that he had been instructed by Kanter to wipe Chamberlain's laptop.

In retrospect, Mr. Chan now understands that Kanter probably did not have a copy of Chamberlain's data and he does not believe that Chamberlain knew of Kanter's request to wipe

MLAT_AU 00072970

the laptop.  In his opinion, Chamberlain was ready to leave for his new position and was not interested in what Kanter did after his departure.

**Laptops of Other Terminated/Departed AU Employees**

Mr. Chan did not back up the data on other individuals who left AU, including Lynch, Menell, Sushovan Hussain and Vanessa Colomar.  At the time of departure, their laptops went to HR and Mr. Chan was instructed not to do back-ups by Menz, who dealt himself with backing up the data and conducting forensic imaging.

**Kanter's Laptop**

Mr. Chan thought Kanter's laptop had been collected.  When asked about an incident involving Suzanne Howarth, Mr. Chan said he was not in the office at the time.  He later inferred from what he heard that:  Kanter's laptop had been placed in a locked cabinet, where other laptops were secured, to be handed over to IT.  IT realized that the laptop was gone and reviewed security tapes, which revealed that Howarth had removed the key to the cabinet.  The laptop was later discovered in Howarth's office drawer and moved to a locked server room to which only IT had access.

**Vanessa Colomar**

Vanessa Colomar was the head of communications for AU and worked in the London office. On several occasions, Mr. Chan worked with her to send out corporate communications.  She left the company at the end of May 2012.  Mr. Chan did not inventory her laptop.  He inquired with Menz about her laptop, but has not heard back yet.  Menz asked Mr. Chan to retain the laptops of all terminated individuals but not to back up their data.  There are laptops stored in a storage room in the Cambridge office.  Mr. Chan did not have a list but said he would check for Colomar's laptop and get back to Ms. Stolley or Mr. Schweiker.

Regarding Colomar's mail server data, Mr. Chan first said that nothing was done to this data so if he looked for it now, some email data should be available.  However, although AU had no limitations on the volume of electronic data users stored, due to an AU policy, emails were only retained on a server temporarily until contact was made with the server by the recipient of the email.  Once that contact was made, the email was downloaded to the recipient's laptop computer and removed from the server.  Therefore, email data would be on the laptops, but not on the servers.  Mr. Chan said he already had gone through the server data and created a list of users; whatever was found was gathered and handed over to Menz.

MLAT_AU 00072971



DATE:   November 21, 2012

SUBJECT:   Memorandum of Interview with Jim Crumbacher – November 14, 2012

| Doc. No. | Document Description |
|----------|---------------------|
| 1 | 2/2/10 Email chain between Crumbacher and Tejeda |
| 2 | 6/28/10 Email chain between Crumbacher, Tejeda, Lara, and Kanter |

## I.   Interview Overview

On November 14, 2012, Susan Resley and Martha Stolley of MLB conducted an in person interview of Jim Crumbacher ("Crumbacher"), former Assistant Counsel at Autonomy. The interview was held at the San Francisco offices of MLB. Josh Drew, of HP, participated by phone. Kate Emminger of MLB also attended. The interview lasted approximately two hours and was in connection with HP's internal investigation of Autonomy's acquisition. Before the interview, Crumbacher submitted his laptop for imaging.

Ms. Stolley provided Crumbacher with "Upjohn Warnings" by advising him that the interview was part of HP's internal investigation, that it was privileged and that Mooney should keep the discussion confidential. Ms. Stolley further advised Crumbacher that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

## II.   Background and Responsibilities

Crumbacher is an attorney licensed in CA, with an expired license in Missouri. Crumbacher has worked with Autonomy for over five years. Crumbacher started at Autonomy as Senior Corporate Counsel, then became Assistant Counsel under Joel Scott ("Scott"). Crumbacher worked in Autonomy's legal department until the HP acquisition. Crumbacher is now the Head of Sales Operations at Autonomy and no longer works in a legal capacity.

## III.   Hardware ("HW")

### A.   *Morgan Stanley*

Crumbacher generally didn't work with HW resales. He worked on Morgan Stanley deals and remembered one in 2009 that included HW. Crumbacher remembered the deal involved a software license, services, and some HW resales of Hitachi HW. There was a pre-existent Hitachi relationship that Autonomy had acquired through the acquisition of Zantaz. Mike Sullivan ("Sullivan") managed this relationship. Crumbacher drafted purchase orders (P.O.s) and other documents for the deal. The P.O.s essentially said Autonomy would sell Morgan Stanley $20 million of HW for $13.5 million. Crumbacher wasn't sure these were the exact numbers, but thought it was close to these figures. Crumbacher said there wasn't a written agreement between Hitachi and Autonomy, but the "deal" was that Autonomy would pay Hitachi whatever Morgan Stanley would have paid for the HW.

MLAT_AU 00072972

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

Crumbacher wasn't sure what the purpose of selling HW at such a big loss was, but he assumed it was to incentivize Morgan Stanley to do the rest of the software deal. Crumbacher assumed the HW was a negotiated part of the deal. Crumbacher didn't know who would have originally suggested Autonomy become a Hitachi reseller. Crumbacher surmised it could have started with Mike. Crumbacher described the transaction as "multi-faceted" with an agreement that Hitachi HW would be sold. An Autonomy sofware component was also sold, but it was not integrated with the HW. Crumbacher thought the HW was an important component to the overall deal, but the HW had nothing to do with the software. Crumbacher didn't know how or why the HW became involved because by the time the deal came to his desk, it was already written and packaged.

Crumbacher described the last week of every quarter as "insane". Thus, he couldn't remember exactly what quarter the Morgan Stanley Hitachi deal occurred, but he thought the deal was the first step towards Autonomy's HW resales. Prior to that, Crumbacher remembered buying EMC HW for Autonomy's data centers, but not for resale.

Morgan Stanley was a big Autonomy customer and there had been sales without HW both before and after the one described above. Crumbacher didn't know what prompted the deal with the large HW discount. Crumbacher thought this deal was the only Morgan Stanley deal involving HW.

Crumbacher recalled cajoling about HW sales and reseller deals being used to boost revenue. However, Crumbacher didn't recall that tone around the Morgan Stanley deal. Crumbacher felt that HW was part of the Morgan Stanley deal and was not used to boost revenue.

Crumbacher recalled a Letter of Agreement between Autonomy and Morgan Stanley that explained the HW agreement. It specified a time period that Morgan Stanley would request the HW equipment. When Morgan Stanley needed this equipment, Morgan Stanley would send an order to Crumbacher. Crumbacher would then get a quote from Hitachi and arrange to fulfill it for Morgan Stanley. Over the period of year, Crumbacher estimated he received around thirty P.O.s for HW from Morgan Stanley. When the deal first closed, Crumbacher remembered processing six P.O.s. and then the rest of the P.O.s were scattered.

Crumbacher speculated the revenue from the Morgan Stanley HW deal was not recognized all at once. He thought the revenue would be recognized with each P.O. he received.

Theoretically, Crumbacher agreed that if Autonomy needed to increase revenue, it could send Stouffer Egan ("Egan") to Morgan Stanley in a specific quarter and ask if Morgan Stanley needed a certain amount of equipment. However Crumbacher didn't think that was what was happening – he didn't feel there was that sort of "cadence" to it. Crumbacher felt it was random, rather than a push every three months.

Crumbacher said he would have been involved in a Q409 sale of Dell HW to Morgan Stanley, but only the "papering" of it.

Crumbacher didn't recall who the sales person was for the Morgan Stanley deals. Egan handled

MLAT_AU 00072973

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

the U.S. relationship, but Sushovan Hussain ("Hussain") handled the U.K. relationship. Crumbacher recalled Morgan Stanley revenue every quarter.

### B.   Rationale for HW sales and Revenue Recognition

Crumbacher recalls water cooler conversations surmising the HW sales were for revenue boosting purposes, especially considering the Dell backpacks sold, but Crumbacher didn't really know much about it.

Crumbacher speculated that Cambridge management would require a certain number of HW deals each quarter. Crumbacher had no real basis for that belief, but had talked to Livius Guiao ("Guiao") about it. Crumbacher didn't think the Morgan Stanley deal, described in the section above, was one of these required HW deals.

Crumbacher had no idea what Deloitte or the market was told about HW sales. Crumbacher didn't know how big the HW sales were, other than the Morgan Stanley HW deal. Crumbacher got the sense that the HW sales were important to fill revenue gaps. Crumbacher thought this because he heard from Guiao that Mike Lynch ("Lynch") and Hussain would put a lot of pressure on the sales people to meet these HW sales goals.

Crumbacher didn't know where HW sales would have been reported in the revenue categories. Crumbacher knew the company used UK accounting standards, but didn't understand the UK standards very well.

### C.   Arcpliance

Crumbacher remembers being told about Arcpliance. He remembers it was an archiving appliance embedded with Autonomy software. He remembers being told the product launched but only remembered a few being sold. Crumbacher wasn't sure from where the HW for the product came.

### D.   Strategic Relationships and Marketing Agreements

Crumbacher had never heard of a strategic relationship with a HW supplier, but Crumbacher thought it made a little sense.

Crumbacher did not know about a joint marketing program with Hitachi, but clarified that his involvement with Hitachi was limited to Morgan Stanley.

### E.   Other HW Sales Details

Crumbacher had no idea how much HW revenue was sold each quarter.

Crumbacher imagined that Mike Sullivan ("Sullivan") felt pressure to sell HW because Hussain and Lynch and the Cambridge management team wanted certain sales numbers.

MLAT_AU 00072974

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

## IV.   **OEM**

Crumbacher described OEM as a "uniform" concept, stating if anyone else described OEM in a different way, it probably wasn't accurate.

### A.   *Tottenham Hotspurs*

Crumbacher stated that "nothing would surprise [him], having been at Autonomy as long as [he] was" but nonetheless agreed that an OEM deal with the Tottenham Hotspurs seemed odd. Crumbacher speculated that Tottenham could have distributed software in an app, but Crumbacher also felt this seemed internal, not necessarily a resale situation.

Crumbacher did mention that the Tottenham Hotspurs team had the Erasma logo on their jerseys. Erasma is a subsidiary of Autonomy. Erasma is a virtual browser that augments reality. Crumbacher thought maybe if people pointed Erasma at the jersey, maybe a revenue generating mechanism would pop up and therefore Autonomy could call the deal OEM.

### B.   *Mercedes Benz OEM*

The only possible Mercedes benz OEM Crumbacher could think of would be an application embedded into an actual car.

## V.   **Resellers**

As Crumbacher understood IFRS rules, a company could sell a deal at a discount to a reseller. The company could then take the revenue in a quarter if there was a reasonable likelihood the end user deal would close. When the end user deal went through, the reseller sold the deal to the end user at the original price and the reseller kept the delta. However, Crumbacher thought that if the end user deal didn't go through, the reseller deal would be cancelled too.

Crumbacher found the resellers suspicious because the deals were always done on the last day of the quarter for an end user who hadn't yet signed a deal.

The only role Crumbacher played in the reseller deals is that he typed the P.O.s. Scott would get a call or an email describing what P.O.s needed to be created and then Scott would ask Crumbacher to write the P.O.s.

Crumbacher did hear talk about end users not wanting to use resellers, but Crumbacher wasn't sure why.

Crumbacher felt it was "pretty clear" that Autonomy used resellers to boost revenue.

Crumbacher wasn't sure how the payment terms were decided.

Crumbacher, Guiao and Scott mainly handled the reseller deal paperwork.

MLAT_AU 00072975

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

Crumbacher remembered doing the reseller P.O.s in a hurry, with the impression that it was so important "your job depend[ed] on it."

### A.   *Capax*

Crumbacher had more contact with Capax than with other resellers. Crumbacher thought he was involved in almost all of the Capax deals. Capax was one of the larger resellers. The "management partner" at Capax was John Baiocco ("Baiocco"). Crumbacher described Baiocco as "pushy." Because of this trait, other Autonomy employees would avoid his calls, but Crumbacher would always answer. Thus, Baiocco called Crumbacher frequently. Baiocco would call Crumbacher and ask about certain deals. Crumbacher would then follow up with either Hussain or Kanter, who handled Capax. Baiocco didn't strike Crumbacher as "smarmy", just as pushy.

Crumbacher felt like every quarter he would get a Capax P.O. request.

### 1.   **Capax's Electronic Discovery Services for Autonomy**

Capax also has a professional services division. Crumbacher was told Capax handled some electronic discovery ("EDD") for Autonomy, such as processing documents. Autonomy would pay Capax a monthly fee for these services. Kanter would start this payment process by sending an email to the financial department requesting a P.O. for Capax. The February 2, 2010 email (Tab 1) is evidence of this process.

Crumbacher didn't believe that Capax was actually doing the EDD. Crumbacher remembered one month when Crumbacher couldn't get the PO done, so he asked Sullivan about Capax's EDD deal. Sullivan didn't know about the deal. Crumbacher found this very odd because Sullivan runs Autonomy's EDD. Thus, Crumbacher thought this deal was some sort of "quid pro quo" deal but Crumbacher felt he didn't have any strong basis to believe that.

A 2/24/10 email chain from Crumbacher to Percy Tejeda (Tab 2) also explains this EDD situation. Crumbacher explained that Kanter had requested Crumbacher to start the P.O. process every month because the EDD numbers were fixed. A customer list would be attached to the P.O.

Crumbacher recalled one email that said "I understand from [Hussain] that this quarter is a particularly high need for EDD services." After that email the P.O. amount was increased. Crumbacher found it weird.

Crumbacher felt that EAS was actually something that Capax did.

### 2.   **Amgen**

Crumbacher was not involved in any Amgen deals. He did remember writing a cancellation of a purchase order for an Amgen and Bank of America deal, but didn't remember if he drafted the actual deal.

MLAT_AU 00072976

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

B.   *Other Resellers*

1.   **Federal Resellers**

Crumbacher felt that the federal resellers were necessary because Autonomy couldn't sell directly to the federal government. Crumbacher mentioned Microlink, Microtech and Discovertech as the federal resellers.

Autonomy eventually bought Microlink, but before that Crumbacher believed it was owned by Dave Truitt ("Truitt") and Dave Cronin ("Cronin"). Crumbacher thought Truitt and Cronin had a relationship with someone at Autonomy.

Crumbacher didn't know why Autonomy bought Microlink and he wasn't involved in the transaction. Crumbacher heard rumors it was cheaper for Autonomy to own Microlink sell through them. Microlink was kept as a reseller after Autonomy acquired it. The reason Crumbacher thought Microlink was kept as a reseller because he remembered Autonomy had to comply with "complicated rules" about foreign owners of U.S. federal government resellers.

2.   **FileTek**

Crumbacher didn't remember FileTek as a reseller, but "wouldn't be surprised if they were." Crumbacher did recall Autonomy bought software from them. The FileTek software was used in Autonomy data centers for optimization and storage. Crumbacher also thought that FileTek bought software from Autonomy.

C.   *Department of Veteran's Affairs*

Crumbacher didn't remember much about this deal, other that it was an "enormous" contract. Crumbacher thought the deal went through a reseller and thought it was probably one of the federal resellers like Microlink or Discovertech. The idea FileTek was the reseller for this deal surprised Crumbacher because Crumbacher didn't think FileTek was on the list of approved federal resellers. However, Crumbacher thought FileTek was based in Washington D.C. and thought it was therefore possible FileTek was actually a federal reseller.

D.   *Vatican Library*

Crumbacher had never heard anything about a Vatican Library deal. This didn't surprise him because he rarely heard about any deals outside of the U.S. Crumbacher described it as two separate legal departments – the Cambridge team and the U.S. team. There was very little interaction between the two legal departments.

VI.   **General Comments**

U.K. management, typically Lynch or Hussain, visited the U.S. at least once a year. Lynch had rented a house in the U.S. Chamberlain would visit occasionally but usually only for a business need. Kanter visited once in awhile but not often.

MLAT_AU 00072977

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

When asked about the work culture at Autonomy, Crumbacher stated, "I've worked in better places." Crumbacher felt the culture was "not terribly conducive to personal growth or speaking your mind."

While working in the legal department, Crumbacher did feel Autonomy's business was doing well. Crumbacher said the British management team had a good way of making employees feel the company was bigger or more important that it was, and that revenue was continually growing. Crumbacher never felt the business slow down, so even in hindsight didn't feel that was an inaccurate statement.

### A.    *HP Acquisition*

Crumbacher learned about the HP acquisition only on the day it was announced. Crumbacher had no sense that an acquisition was pending. Crumbacher had worked at other companies who had been acquired and said he could "smell it" when an acquisition was about to happen, but he had no hint of HP's acquisition of Autonomy.

### B.    *"Shady" Business Practices*

Crumbacher found a few of Autonomy's practices to be "shady." Crumbacher didn't think the practices were sustainable. Crumbacher described it as "borrowing from Peter to pay Paul." Crumbacher didn't feel a collapse was imminent, he just felt the practices would have to stop eventually. Crumbacher found reselling HW, and taking revenue up front for hosting and software licensing fees to be two of the "shady" practices.  However, Crumbacher admitted it was hard to know if something was wrong because the company used UK revenue recognition rules.

MLAT_AU 00072978



**DATE:**      January 8, 2013

**SUBJECT:**   Memorandum of Interview with Jim Crumbacher – January 8, 2013

| Tab No. | Document Description |
|---|---|
| 1 | Capax Revenue Summary – Projected Through April 1, 2011 |
| 2 | 2/2/2010 emails between Tejeda and Crumbacher |
| 3 | 11/3/2010 email from Crumbacher to Hussain |
| 4 | 2/26/2010 emails between Tejeda and Crumbacher |
| 5 | 3/31/2010 EDD Processing Purchase Order |
| 6 | 3/31/2011 Capax/UBS Purchase order |
| 7 | 3/31/2011 emails between Baiocco, Scott, and Crumbacher |
| 8 | 4/1/2011 emails between Egan, Crumbacher, Scott, and Baiocco<br>3/31/2011 Capax/UBS Purchase Order |
| 9 | 3/31/2011 Sales Order Report<br>3/31/2011 Invoice<br>3/31/2011 Invoice<br>3/31/2011 Second Amendment to License and Distribution Agreement |
| 10 | 9/30/2010 Purchase Order Exhibit B of Autonomy Value Added Reseller Agreement |
| 11 | 9/30/2010 Sales Order Report<br>9/30/2010 Invoice |
| 12 | 9/30/2010 emails between Baiocco, Crumbacher, Stephan, Chamberlain, and Hussain |
| 13 | 1/25/2011 emails between Crumbacher and Rothman |
| 14 | 1/25/2011 emails between McCarthy, Crumbacher, and Stephan |
| 15 | 1/31/2011 emails between Scott, Crumbacher, Scott, Egan, and Chamberlain |
| 16 | 3/30/2010 email from Crumbacher to Egan, Kanter, Hussain, and Scott |
| 17 | 3/31/2010 Purchase Order |
| 18 | 3/31/2010 emails between Crumbacher, and Trish Williamson |
| 19 | 4/22/2010, 4/26/2010, 5/4/2010 emails between Crumbacher, Kanter |
| 20 | 6-7/2010 emails between Prasad, Chamberlain, and Hogenson |
| 21 | 9/29/2010 email from Crumbacher to Szukalski |
| 22 | 1/26/2011 email chain |
| 23 | 12/21/2010 emails between Chamberlain, Paul, Araujo, and Scott |
| 24 | 12/22/2010 emails between Paul, Crumbacher, Chamberlain, Sass, and Scott |
| 25 | 12/23/2010 emails between Crumbacher, Scott, and Paul |
| 26 | 2/10/2011 emails between Scott and Crumbacher |
| 27 | 2/14/2011 emails between Scott, Paul and Crumbacher |
| 28 | 12/27/2010 emails between Kanter, Hussain, Crumbacher, and Egan |
| 29 | 2/3-2/4/2011 emails between Crumbacher and Wharton |
| 30 | 9/17/2010 emails between Alan Smith, Crumbacher, Baum, Still, and Scott |
| 31 | 8/23/2010 emails between Crumbacher, Michael Guilfoyle, and Elizabeth Lederer |

MLAT_AU 00072979

I.    **Interview Overview**

On January 8, 2013, Susan Resley and Martha Stolley of MLB conducted a follow-up, in person interview of Jim Crumbacher ("Crumbacher"), Autonomy's Vice President of Americas Sales Operations, and formerly Autonomy's Associate General Counsel.  The interview was held at the San Francisco offices of MLB.  Sarah Nolton of PWC and Jenny Harrison of MLB also attended.  The interview lasted approximately two and a half hours and was in connection with HP's internal investigation of Autonomy's acquisition.

Ms. Stolley provided Crumbacher with "Upjohn Warnings" by reminding him that the interview was privileged and that Crumbacher should keep the discussion confidential. Ms. Stolley further advised Crumbacher that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

Crumbacher was curious as to how many more meetings he would be asked to attend.  Ms. Stolley told him that while it is difficult to say, it will probably be one to three more.

II.    **Resellers**

A.    *General Information*

In order to recognize revenue in a particular quarter, Autonomy often brought in a reseller when a forecasted deal was not going to close in that quarter.  Crumbacher never considered if the plan was for the reseller to actually resell to the end user or if it was just a way to fill in a gap and the final deal would eventually be between Autonomy and the end user.  In some cases, it seemed clear that the final deal would be between the end user and Autonomy directly.  For example, since Bank of America had a complex, pre-existing contract with Autonomy, it was unlikely that they would agree to create a new contract with a reseller.  Thus, any reseller deal based on a Bank of America deal was more to just fill a gap.

This early recognition of revenue through resellers made Crumbacher uncomfortable at first.  However, Steven Chamberlain ("Chamberlain") explained that it was acceptable under IFRS to take a deal through a reseller as long as there was a reasonable expectation that there will be a deal with the end user after the quarter closes.  Crumbacher was aware this was not acceptable under US law (there would have to be evidence of the end user deal as part of the transaction), but felt there was a legitimate gap between US and UK rules.  After Chamberlain explained the IFRS rule in legal terms, Crumbacher accepted it and did not see any reason to question further.  He never checked IFRS to see if Chamberlain was correct and, as far as he knew, neither did Joel Scott ("Scott") or Mickie Lee.

If the end user formed a direct deal with Autonomy after a reseller had already stepped in, Autonomy would send a letter agreement to the reseller acknowledging the release of the reseller's obligations.  Autonomy also returned any money the reseller had already paid, but did not give the reseller anything else in return for stepping in at the last minute.  This situation only happened a few times, for example with Kraft.

MLAT_AU 00072980

During the year before HP's acquisition, the San Francisco office saw a few more European deals, like UBS, go through resellers because the San Francisco office had eight hours more than the UK office before the quarter closed due to time zones. US deals used California time zones, while the UK probably used GMT.

Autonomy did do legitimate sales with resellers. In such situations, the reseller submitted a P.O. to Crumbacher. This was different from the process for other resellers, like Capax, where Andrew Kanter ("Kanter") asked Crumbacher to draft the P.O.

Crumbacher did not believe that legitimate resellers were required to pay upfront. At most, it would be net 30, but he did not recall anything paid upfront except for particular cases where, due to revenue recognition rules, there had to be an upfront payment. He specifically did not recall Capax ever having to make an upfront payment – they were always on payment plans.

Occasionally, a reseller (especially the Latin American resellers) stated it would not pay Autonomy until it had been paid by the end user. The standard response was that Autonomy did not care if the end user had not paid, the reseller still must pay.

Autonomy used one-off reseller agreements when a new reseller had an end user, but it was not clear if they were going to sell the product. Once an entity proved that it could sell, it sometimes got a reseller agreement, but not always.

While Autonomy dealt with many resellers, it never had a formal reseller channel with particular reseller managers, meaning there was no formal, documented program for reseller development and no team to manage all the resellers. It was an odd process. The resellers received very little product training and there was no lead management. At HP, there is a reseller channel team.

> B.   *Capax*

Crumbacher was aware that Capax is still an active reseller; however, he had no visibility into what they sell or who at Autonomy still works with them.

While Crumbacher could not recall if he drafted the original VAR agreement between Capax and Autonomy, he remembered drafting every amendment to the agreement. He noted that there is a separate agreement with Capax for its EDD role (License Agreement).

Before the HP-acquisition, Crumbacher often communicated with Capax, especially at the end of the quarter. John Baiocco ("Baiocco") often called Crumbacher since no one else at Autonomy answered his calls because he "was annoying" and, since there was no defined reseller channel program at Autonomy, he had no single contact at Autonomy. Baiocco's main business contact was probably Stouffer Egan ("Egan"). Egan usually reached out to Baiocco when he needed a reseller. Sushovan Hussain ("Hussain") and Kanter also communicated with Baiocco.

Usually, on the last day of the quarter, Scott came to Crumbacher or Levius Guiao ("Guiao") and had them write up a P.O. for a Capax order under the Capax VAR Agreement. The deal was already in bullet point form and Crumbacher or Guiao simply had to put it into a P.O. format (about five minutes of work). The P.O. was then signed by Baiocco and submitted, all on the last

MLAT_AU 00072981

day of the quarter.  Sometimes it was Baiocco, not Scott, who requested a P.O. from Crumbacher based upon some deal Baiocco had arranged with Hussain or Kanter.  Having not heard about the deal through Autonomy, Crumbacher had to confirm the deal at Autonomy before issuing the P.O.  The NearPoint deal originated in this manner.

Kanter asked Crumbacher to keep a running total of the Capax deals, so Crumbacher created a chart ("Capax Revenue Summary Chart") with side-by-side comparisons of the money coming in and going out related to Capax (see Tab 1).  When initially asked to create the chart (he could not recall the date), he obtained the Capax P.O.s and noticed random ones.  He researched these random ones and learned that Autonomy reimbursed Capax for equipment they had to purchase.  Such expenditures were not included in revenue, so Crumbacher made a note on the chart not to include the amount in the summary chart (see Tab 1).  Crumbacher could not recall making a similar chart for any reseller other than Capax.  He could not recall if he updated the chart on a monthly or quarterly basis.

Apart from the Capax Revenue Summary Chart (Tab 1), Crumbacher never compared money coming in from Capax reseller deals and going out with Autonomy-Capax deals.  However, looking back today, he guessed that the total amount probably balanced out.

### 1.    Capax and EAS

Early in Crumbacher's tenure at Autonomy, he was asked to draft the EAS Outsourcing Arrangement with Capax.  Scott gave him the details of what to draft, but Crumbacher suspected that Kanter had given the assignment to Scott.  Crumbacher never questioned why Autonomy outsourced the support for EAS to Capax because, since EAS was a discontinued product, it did not make sense for Autonomy to continue to provide the support.  While Crumbacher questioned the Capax-EDD deal (see below), he did not think that the EAS deal was bogus, especially since Capax continues to support EAS customers today.

### 2.    Capax and EDD

As part of the EDD deal, Autonomy licensed software to Capax upon which Capax could build a product that would compete with part of Autonomy's business.  Crumbacher thought that such creation of a competitor was not the best business decision; however, EDD services involve more software than what Autonomy licensed, so it was not a completely poor decision.  Crumbacher did not understand why Autonomy paid Capax for the performance of EDD services.

Autonomy and Capax had a license and distribution agreement.  The Introspect license was paid over time, while P.O.s for services performed on Autonomy's behalf were paid with a flat fee.  (Note that in the Capax Revenue Summary Chart (Tab 1), there are columns for "Payments from Capax on Introspect License" and "Payments by Autonomy to Capax for Subcontracted EDD Services (Purchase Order Date)").  Kanter raised the flat fee a few times.  Crumbacher never asked about these increases because to do so would be career suicide, but he speculated that they were used to fund money back to Capax.

MLAT_AU 00072982

Crumbacher recalled discussing the email in Tab 2 during the HP investigation interview on November 14, 2012. No one ever explained the EDD deal to Crumbacher; rather, he just generated the P.O. He assumed, at the time the email was sent, that there were EDD services being performed. When Percy Tejeda ("Tejeda") asked for evidence of performance, Crumbacher sought evidence of the services from Mike Sullivan ("Sullivan"). Sullivan was never heavily involved with Capax, but e-discovery was under his watch. Sullivan told Crumbacher that he was not aware of any EDD services. Crumbacher sent Hussain several Capax P.O.s for EDD services (Tab 3), but there was no evidence that the services in the P.O.s were ever completed. Today, as far as Crumbacher knows, those EDD services were "99.9% bogus" and were never performed. Since Crumbacher's only role was to start the P.O. process, he could not speculate as to Baiocco's reaction if asked for documentation of Capax rendering EDD services to Autonomy.

Crumbacher labeled items as EDD services only when they were already so characterized. For example, when he stated they should "include [the $500,000] as one of the 'EDD services' payments and move on" (Tab 4), the $500,000 was already referenced as EDD services. Crumbacher also noted that the chart line in the Tab 4 emails was different from the Capax Revenue Summary Chart (Tab 1). He presumed Tejeda gave him the information to generate the chart. Crumbacher frequently worked with Tejeda (Autonomy's Controllor) and generally liked him since he was a nice guy.

A standard P.O. for EDD processing, drafted on the last day of the quarter is in Tab 5.

3.       Capax and NearPoint

Autonomy acquired NearPoint, a low end digital processing software, after Autonomy's acquisition of Iron Mountain. Less than two months after the acquisition, Autonomy formed a deal with Capax that was similar to the EAS deal in that both involved Autonomy outsourcing support for discontinued products that came from acquired companies. Despite the similarities, Crumbacher only found the NearPoint deal odd. It was odd because it happened so quickly and because it included an upfront payment of $2 million to help "ramp up" the product. While not knowing what "ramp up" meant, Crumbacher included general language in the P.O. based on his interpretation of "ramp up". Crumbacher could almost "feel the wink and nod" when told to draft the NearPoint P.O., but he did not know for sure if the NearPoint deal was a way to fund money to Capax.

4.       Capax and UBS

Crumbacher could not recall when Capax was brought in for the UBS deal, even after he was shown a P.O. associated with the deal (Tab 6).

Two issues were discussed in the emails in Tab 7: ACA (Autonomy Consolidated Archive) and the signed UBS deal. In an email to Scott, Baiocco stated that there was a new Capax VAR Amendment concerning ACA support and that there was a UBS deal. Baiocco asked for a ACA support order, which is a way of subcontracting ACA support on the UBS deal. Crumbacher explained that even though Baiocco was asking to outsource support, there was no end user agreement and so there was no need to outsource support at that point in time. Crumbacher

MLAT_AU 00072983

assumed that Baiocco knew the deal had not yet closed and was just reminding Autonomy that they had promised Capax the ACA support for the UBS deal once it went through.  Kanter and Egan often made representations to Baiocco and he frequently reminded Autonomy of them. (See Tab 8).

Along with the $8 million to UBS, there is documentation of a Capax-Capax deal (see Tab 9). Crumbacher explained that this was an amendment to the Introspect License, not the VAR Agreement.  Capax's license of Introspect from Autonomy had some limitations, including that it could only be used in the US.  This amendment allowed Capax to use Introspect in the UK.

5.      Collecting from Capax

Crumbacher was not aware of any difficulties in collecting from Capax.  Their payments tended to coincide with Autonomy's payments, but they were not notoriously difficult with payment.

C.      *Amgen/Bank of America*

Amgen is still an Autonomy customer.  Crumbacher felt direct customer negotiations with Amgen were a "pain in the ass", although he did not do the negotiations himself.

When a deal between Amgen and Autonomy did not close by the end of the quarter, Capax was brought in on September 30, 2010 and a $9.45 million P.O. was issued for services and maintenance with Amgen listed as the end user (Tab 10).  The P.O. was probably drafted by Crumbacher or Guiao, or maybe Scott or Mickie Lee.  Crumbacher did not recall drafting the P.O., but he drafted several every quarter and they involved just five minutes of work, so he probably would not recall it even if he had drafted it.

Crumbacher could not explain the Sales and Invoices for $9.45 million also dated on September 30, 2010 that listed Bank of America as the end user (Tab 11).  He speculated that maybe Guiao created these documents while working on other P.O.s and accidentally mixed up "Amgen" and "Bank of America".  However, there was no Bank of America deal in September 2010, so Guiao should not have had "Bank of America" in his mind.

Crumbacher was not aware that Bank of America and Amgen were connected on a deal.  In fact, he was confused when asked to discuss the Bank of America/Amgen deal.  He had heard that Capax once wanted to swap someone out for Bank of America, but he did not know it was Amgen.  He could not explain why Capax would make such a request.  He suggested speaking with Guiao or Scott.

Crumbacher was not sure what the email in Tab 12 pertained to.  The $475,000 referenced in the emails sounded like EDD services and he felt the email made him look like Scott's "whipping boy", but he could not elaborate further on the email.

Crumbacher often communicated with Ivan Rothman (former senior corporate counsel in Autonomy's San Francisco office).  Crumbacher could not recall the Bank of America deals discussed in the Tab 13 emails, nor could he understand why they compared them to Amgen deals.

MLAT_AU 00072984

Matt Stephan in the Finance Group once asked if software was ever delivered under the two Bank of America reseller deals because delivery was usually required before revenue could be recognized. Crumbacher reported back to Finance that those deals involved an increase in license rights to a product Bank of America already had, so there was no need to ship additional software. (Tab 14).

Crumbacher did not recall MicroTech's involvement in the Bank of America deal. He also did not remember the specifics about a Deloitte confirmation letter (Tab 15); he only recalled that Capax received the standard confirmation/audit letter from Deloitte.

Crumbacher was aware of a Bank of America deal that Autonomy acquired from Computer Associates. He thought there was something wrong with the deal, potentially performance issues. Most of the deals Autonomy got from Computer Associates had something wrong with them.

> D.   *FSA (Financial Services Authority)*

In March 2010, Crumbacher drafted documents for Centennial to act as a reseller on the FSA deal (see Tab 16). Crumbacher did not think he began or ended this deal, but rather just worked on it for Julie Dolan while it was night in the UK and then she picked it back up in the morning. When Crumbacher stated the "unique nature of this transaction" he meant that this was essentially a one time deal. In this deal, Autonomy did not license the software for resale, but rather did so for the support and benefit of FSA. This was not common, so they had to change the standard VAR Agreement language, limiting the use just to FSA.

Tab 17 is a P.O. for Capax, not Centennial, with FSA as the end user. Crumbacher speculated that Capax replaced Centennial as the reseller for the FSA deal because the Centennial deal did not close. He could not recall much about the deal because he just picked it up for the UK and never thought of it as his deal. He could not recall working with Centennial before or after the FSA deal. On occasion, a US reseller was involved with a UK deal, potentially because Autonomy was connected to fewer resellers in the UK.

Tab 18 contains an email from Crumbacher sent through the CRF (Contract Request Form) email alias. Since it was sent by Crumbacher, the time stamp would be based on California's time zone. Crumbacher noted that the email may not refer to the FSA deal since it simply states "Capax" and it was not uncommon to have more than one deal with a particular reseller at the end of a quarter.

With regard to Tab 19, Crumbacher could not explain why he broke out the payments. Lines 41 and 42 were probably references to a chart, made with information obtained from Tejeda. He did not know why he did not include FSA/Capax in the schedule of payments, but speculated that, based on the categories in the Capax Revenue Summary Chart (Tab 1), none of the categories were for resold software, but rather were all for fixed fees. Crumbacher thought the chart was attached to one of the emails in Tab 19. He doubted he could located the chart now because most of his old Autonomy email was deleted during two mailbox crashes and a move to a new

MLAT_AU 00072985

mailbox.  Capax was not required to pay any down payment, as shown by the fact that nothing was paid on the FSA deal by April 26 – a month after the deal was closed.

Reena Prasad ("Prasad") sent emails regarding a problematic high risk accounts report (see Tab 20).  Crumbacher did not recall these emails or the report.  Prasad noted a couple of deals lacked end users and so were high risk.  Crumbacher did not know of any deals where an end user was never named and speculated that Prasad meant deals that never closed.  He could only think of one deal, with end user Honeywell, that never closed.  It was a small deal ($425,000) and was probably in 2010.

     E.    *Latin American Resellers*

The Latin American reseller program was different from Autonomy's approach to other resellers in that there was a more organized channel that dealt with the Latin American resellers.  Members of this channel team were Autonomy contractors ("non-employee employees") and included, among others, Herman Kanter, Frederico Grosso, Neil Goldfarb, and Fernando Castallanos.

Crumbacher generally felt that the Latin American reseller deals were questionable.  Historically (i.e. pre-HP acquisition), they involved large deals and collections were always an issue.  Collections for these deals were done in the US, but with the assistance of the sales rep in the region.

Crumbacher did not draft a Latin American reseller agreement per se.  There was usually a master agreement for the Autonomy-reseller relationship and just a P.O., not an agreement, for each individual deal.  Occasionally, Crumbacher had to change the standard P.O. language for a Latin American reseller deal for some reason.

One of the larger Latin American resellers was Telematica.  Aguas Calientes (a city) was an end user in a $7.5 million deal.

     F.    *FileTek*

Autonomy's main contact at FileTek was Gary Szukalski who used to work at Autonomy and was high up at FileTek.  FileTek was not a reseller that Autonomy used every quarter.

Crumbacher was not involved in the negotiations between Autonomy and the VA.  He believed he touched the VA contract, but thought Guiao did most of the work on the VA deal.  While Crumbacher sent the agreement to Szukalski (Tab 21), it took just five minutes to input the information into a template, so it was not surprising that Crumbacher could not recall it.

During a weekly sales forecast SMS call, Crumbacher later learned that Autonomy lost the VA deal to Rand.  This was particularly painful and comical because Rand used Autonomy-licensed software in its product.  Crumbacher could not recall who announced the lost deal on the SMS call, but it could have been Jim Still or Phil Stevenson.  It may be possible to search SMS for when the VA lead was closed as "lost", but older records are not reliable.  Crumbacher believed it was lost prior to HP's acquisition.  The references to Rand in Tab 22 were not in relation to the

MLAT_AU 00072986

lost VA deal; rather, they involved an order for delivery of third party software that Autonomy acquired from Rand.

It took a while for Autonomy to lose the VA deal, so Crumbacher never connected that FileTek's reseller agreement had the VA as an end user and that the VA never came through as an end user. Crumbacher did not make this connection when he drafted the license sales for Autonomy's purchase of FileTek licenses. For that deal, he was involved in drafting the P.O. and negotiating with FileTek's lawyer, Patrick Howard or Bill Loomis. He focused on the purchase, not any past relationships, and simply did not remember that FileTek was going to sell to the VA. Moreover, FileTek was also only used as a reseller once, so it was not in his mind that FileTek was a reseller.

FileTek and Autonomy had a buy-sell arrangement: they licensed software from Autonomy and Autonomy licensed software (StorHouse) from them. Crumbacher was not sure of FileTek's purpose for licensing Autonomy's software, but he believed Autonomy used the StorHouse software. Chris Goodfellow wanted to use StorHouse and Scott or Sullivan also told Crumbacher that Storehouse was deployed and used by Autonomy. However, Crumbacher never confirmed that it was actually deployed.

G.   *Tikit and KPMG*

Crumbacher and Alex Paul, another Autonomy attorney who has since left, drafted a proposal and contract for KPMG to add to the Interwoven and Verity licenses. Rob Sass ("Sass") was also involved in the negotiations. Tab 23 shows discussions between Chamberlain and Araujo. Paul was scared of everyone at Autonomy and so tended to bring every potential issue to Crumbacher. Crumbacher could not recall the particular issue in Tab 23.

In Tab 24, Sass was still trying to close the KPMG deal. Crumbacher explained that KPMG had many internal requirements (e.g. they could only cut P.O.s for certain amounts or P.O.s had to be cut on certain days). Autonomy worked to structure around those financial needs.

Tab 25's documents include a draft letter agreement. Crumbacher wrote the letter to get around some issue, but it was eventually shot down.

By the end of the quarter, the KPMG deal still had not closed, so Tikit was brought in as a reseller. While Crumbacher knew the details of the KPMG deal, it was Dolan in the UK who drafted the reseller agreement. This did not surprise Crumbacher because Dolan was "Hussain's girl", so if Hussain had a deal that had not gone through (KPMG) and had a reseller on hand (Tikit), he probably just handed it to Dolan to draft up.

Crumbacher did not find out that the KPMG deal went through a reseller until after the Tikit deal was signed. In fact, he and Alex Paul continued to negotiate with KPMG through February. When they did find out, Sass then had to ask KPMG to go through a reseller. The KPMG Board did not like that idea (Tab 26) and so Crumbacher had to remove the Tikit Alternate Payee language that he had added to KPMG's payment terms (Tab 27).

MLAT_AU 00072987

When KPMG formed a direct deal with Autonomy, Autonomy probably backed out the Tikit P.O. and relieved them of their obligation.  Crumbacher did not recall that Tikit's agreement included the granting of credits if the deal did not close with KPMG.

Crumbacher could not recall the specifics, but knew there was a mechanism in the Amendments providing for crediting back certain maintenance amounts to KPMG.  Essentially, the KPMG deal modified a prior deal by adding software and re-doing the maintenance portion.  KPMG was then credited for the payments it had made under the old maintenance agreement.  Glen Fong (current Autonomy employee) and Sass would know more about the maintenance credits.

      H.     *VMS*

When asked about VMS, Crumbacher groaned because it was such a painful deal, with protracted negotiations on both sides.  Autonomy had a buy-sell arrangement with VMS (we buy from you, you buy from us).  Nicole Eagan handled Autonomy's business side, but Egan had already set up what software was being purchased at what price.  Nicole Eagan gave good reasons for purchasing VMS software (social media, marketing), but Crumbacher still did not see much intrinsic value in their software.  On the other side, VMS did have a legitimate interest in Autonomy's software.

Kanter's email regarding "solid termination in change in control" (Tab 28) refers to a clause in the agreement that if VMS is bought, the Autonomy license will terminate.  Such a clause was common in Autonomy's licenses.

      I.     *MicroTech and MicroLink*

Crumbacher could not recall any specific deals, but knew that MicroLink conducted deals with the federal government.  He mentioned that MicroTech, MicroLink and Discovertech are all owned by the same people and so it was difficult to distinguish between them.

Crumbacher was informed that Autonomy has no control rights over MicroLink because it is a federal government reseller owned by a foreign entity.  (Tab 29).

An issue arose in a DEA deal and Crumbacher suggested using MicroTech as a reseller instead of MicroLink and then have MicroTech sell to the DEA in the following quarter.  (Tab 30).  They had to use a federal reseller since it was a federal deal.  Crumbacher asked the sales rep to have Monica Baum find out if the software was on MicroTech's GSA.  If so, then MicroTech could be used as the reseller.  Crumbacher could not recall the specific issue and thought it was probably discussed on an SMS call, which was why he simply referred to it as the "DEA problem" in the emails instead of expanding on it.  He thought it may have been that the DEA had to use new year funds for the purchase and so had to wait one more quarter.  Thus, Crumbacher suggested using MicroTech as a reseller, so long as the software was on MicroTech's GSA.

      J.     *PMI*

MLAT_AU 00072988

Crumbacher believed PMI involved Philip Morris and a reseller.  He thought it was done overseas, but that the San Francisco office probably did an order at some point.

K.    *Digital Management Inc. (DMI)*

Tab 31 refers to a deal between DMI, the Department of the Treasury, and another party Crumbacher could not recall.  It was not an end of quarter deal and was only for $70,000. Autonomy had to use DMI as a reseller with the Department of the Treasury as the end user because DMI had the contract to resell Legacy software to the federal government, while Autonomy had the rights.  This was a CA deal (Computer Associates) and so Elizabeth Lederer was involved.

MLAT_AU 00072989



DATE:         December 21, 2012

SUBJECT:      Memorandum of Interview with Julie Dolan – December 6, 2012

I.     **Interview Overview**

On December 6, 2012, Susan Resley and Martha Stolley of Morgan Lewis & Bockius ("MLB"), and John Archibald of PwC conducted an in person interview with Julie Dolan ("Dolan"), Autonomy's current Senior Corporate Counsel. The interview was held at the Cambridge offices of Autonomy ("AU"). Owen Hammond of MLB also attended. The interview lasted approximately one and half hours and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices.

At the beginning of the interview, Ms. Resley explained that MLB is interviewing multiple Autonomy employees to gather facts about what happened at Autonomy before the HP acquisition. Ms. Resley told Dolan that HP and MLB had reported certain issues to the Securities and Exchange Commission ("SEC") and to the UK's Serious Fraud Office ("SFO"). Ms. Resley requested that Dolan speak openly during the interview and clarified the interview was not a deposition. Ms. Resley explained that Dolan could offer opinion or speculate, as long as Dolan could explain a rational basis for this speculation.

Ms. Resley provided Dolan with "Upjohn Warnings" by advising Dolan the interview was part of HP's internal investigation, that it was privileged and that Dolan should keep the discussion confidential. Ms. Resley further advised Dolan that MLB represents HP and therefore, HP can choose to waive the privilege at its discretion.

Dolan was visibly nervous, especially at the outset of the meeting, and expressed some concerns about whether her involvement in these interviews, or her statements might be disclosed to the press. Ms. Resley explained that the purpose of the interview was to gather information. While information from Dolan might be disclosed by HP, at its discretion, to public regulators, the purpose was not to provide information to the media.

II.    **Background and Responsibilities**

Dolan is in-house counsel for Autonomy. She was hired in 2007, beginning work in August of that year. The legal team is a small one, with three lawyers plus administrative staff. Dolan technically reported to Rachel Haverfield ("Haverfield"); however, during the first three years that Dolan worked at AU, Haverfield took several maternity leaves. During most of this period, Dolan reported directly to Andrew Kanter ("Kanter").

Before joining AU, Dolan worked for Fair Isaac in San Francisco, and often traveled to London for quarter-end. Dolan left Fair Isaac for BasePoint Analytics. Because she missed the "crazy" quarter-end rush of a technology company, she joined AU.

MLAT_AU 00072990

### III.    Andrew Kanter

Kanter was not a micro-manager and Dolan was given freedom in her work.  Dolan is still in touch with Kanter.  Kanter has a house in London and Dolan understands that he is now working with Mike Lynch ("Lynch").  Kanter and Dolan had lunch together shortly before the November 20 announcement (perhaps in October).  It was a nervous lunch, as Dolan did not know why Kanter had asked to meet her and, it soon became apparent that Kanter was "fact-gathering".  She did not know anything and said she provided no information to Kanter.  Nevertheless, the lunch was informal, and the majority of the conversation covered trivial matters, such as this year's office Christmas party.  There was some discussion on Kanter's departure in May.  Kanter apologized for not saying goodbye properly before he left AU.  Kanter also asked Dolan to send his apologies to Sarah Ambrose, who works in HR, because he felt he put in a very difficult position during his departure and negotiation of his severance package.  Dolan had no idea, until Kanter told her during this lunch, that Kanter and other management figures had hired lawyers during this period.  She recalled that there had been arguments about whether they resigned or been fired.  Kanter was "emphatic" that he had resigned and had not been fired.

Dolan heard that Kanter was meeting with other employees and speculated that he was trying to encourage more people to leave AU.  He asked her questions about who was still at AU, and who had been placed in management positions.

### IV.    Sushovan Hussain

Sushovan Hussain ("Hussain") was a huge driver of sales.  Hussain used come to Dolan's office every day to push sales and close deals, and he would negotiate large deals himself.  This did not seem odd to Dolan since AU, despite being a FTSE 100 company, was run like a start-up.

Hussain effectively acted as the worldwide head of sales (Dolan compared his role to that of Jan Zadak, at HP), and relied on Steve Chamberlain to "crunch the numbers".  She described him as the knowledge base of all sales.

Everyone was "pushed to the limit" on sales all of the time.  The atmosphere was tough and there were always unpleasant SMS (sales) calls.  Hussain was tough on the sales reps; but this was in keeping with the work environment at AU: "You worked long hours and were always worried about your back."

While Dolan was not involved in setting quarter-end targets, the legal team was involved in the SMS calls and played a very commercial role (unlike the purely legal role it now plays under HP).  For instance, when Hussain did not attend SMS calls, which was often, he asked Dolan and/or Haverfield to pose questions to the sales team – e.g., what their quota was, how they were driving the sales, etc.  The legal team had to "grill" the sales reps, yet help with deals at the same time, so they did not necessarily act as the "bad guys" on the SMS calls.  This role often was played by Ian Black and Fernando Lucini, who also were involved in driving sales.

Dolan assumed that Hussain is now working with Lynch.

MLAT_AU 00072991

V.      **Peter Menell**

Dolan has had no contact with Peter Menell ("Menell") since he left AU.  During her lunch with Kanter, Kanter told Dolan that Menell had asked for Al Martin's number (Al Martin is Dolan's partner, who works as technician at AU), but Menell never called Al Martin.

VI.     **Hardware sales**

Dolan recalled that if there was a "crunch" at the end of the quarter, Hussain asked the sales team, "*Can we sell them some hardware?!*" (i.e., as a reseller of hardware).

When asked about appliance sales, she described an appliance as AU's software on someone else's hardware.  Dolan was unsure of the manufacturer of the hardware usually used but guessed that it may have been HP.  On the other hand, the equipment supplier might have been a company called Insight (this is the only name Dolan had heard in this regard) but Dolan was unsure, as the details were never contained in the contract and drafting the contract was her only involvement in hardware transactions.  As far as Dolan was aware, EMC was never used in the UK (although she had heard the name before), and she was not involved with US sales at all.

At this point, Dolan was shown an email from Kanter to Dolan directing her to draft a "one-pager" contract between EMC and AU.  Dolan did not specifically recall this request since Kanter regularly sent emails asking her to draft documents.  Dolan did not consider it strange that AU intended to work with a partner, in this case EMC.  After considering the email more closely, Dolan understood that the partner was to develop the appliance and the software license under a six-month development license.  Dolan had no idea of the proper or appropriate length of such a license.  She pointed out that AU's only obligation under the contract was to provide software.  The grant of the license was free of charge.

Dolan often received vague requests like this, in response to which she did what she was asked – i.e., she drafted a contract – often without any knowledge of the identity of the customer.

She noted that AU was run by three or four people: Lynch, Hussain, Kanter and possibly Menell.  Previously, only Kanter handled the "strange" agreements.  Only when top management trusted you would you be asked to handle those types of projects.  Once Dolan had developed a working relationship with Hussain, she was asked to do these kinds of task.  Dolan did not challenge Hussain, or anyone else, on the commercial context of such contracts.  Dolan asked questions only about the subject matter of the contracts – e.g., the software, the fees, the license period, etc.  The legal department was involved in drafting the specific terms of the agreement, and raised and considered issues of contractual protection only.

Dolan was shown the EMC "one-pager" document and had a vague recollection of drafting it.  She described it as a non-binding "agreement to agree," which created no obligation on either side.  To Dolan, it showed that the parties "intended to be friends;" she expected to see another agreement within six months.  The six-month time limit stated in the contract may have been included in order to get the deal closed.  AU typically did not suggest letters of intent or memoranda of agreement; however, customers often insisted on them when, for example, they

MLAT_AU 00072992

wanted to "lock in" AU or to ensure an agreement was reached within a certain time period. The LOIs or MOUs often were vague. The agreement with EMC was an example of that.

## VII.     Reseller transactions

Dolan recalls drafting VAR agreements and various orders from those VARs.

### A.     Use of resellers at quarter end

Most of AU's business was sold through resellers. Dolan did not, in principle, see anything unusual about this. When specifically asked about the use of resellers to close deals at the end of a quarter, Dolan reiterated that (speaking from a purely non-US perspective) it was very normal to work with resellers. Ultimately, resellers were AU's customers; this is whom AU sold its software to. AU negotiated with the resellers and the resellers negotiated with the end users. A small number of customers were direct end user agreements.

Sometimes Dolan saw a deal go through a reseller if the deal was not going to close by the end of the quarter. For example, Dolan recalled working on a deal at quarter end that the team could not close by the last day of the quarter. Not long after midnight, or early the next day, Dolan received an electronic notice that the deal closed with an end user. The email notice was automatic and Dolan thought the management did not realize that she was included on the circulation list.

The reseller deals often were high value, such as UBS and (perhaps) the FSA. Dolan recalled "non-stop" work on the UBS deal, then a lull for a few weeks when the quarter ended, followed by a resumption of work to close the deal. Dolan believed that the UBS deal closed in July 2011. Dolan heard recently that the lender (i.e., the reseller) had demanded payment. (AU had used the reseller agreement to "finance" the deal.)[1] Dolan did not know how the reseller contract and the direct AU-UBS contract were reconciled. She assumed that the reseller contract simply "fell away" once the other contract was signed.

Dolan never raised her concerns about these contracts with anyone. She "was loyal to them" (i.e., the management); she "drank the kool-aid." The members of the management team were all very intimidating – especially Lynch, whom Dolan described as "very tough." Dolan was "very scared" walking into Lynch's office. "You did what you were told," she commented. Hussain was also intimidating at first, but less so once Dolan built a working relationship with him.

### B.     Resellers and Risk

Dolan recalled drafting language allowing "a fair amount" of resellers to sell to third parties. The idea was to ensure that the reseller had a "safety net" if the end user did not take the whole of the purchase. When asked for her view on this type of transaction, Dolan stated that, since AU was not subject to GAAP rules, she saw no issues with this language.

---

[1] Capax was the reseller on the deal, which closed on June 30, 2011.

MLAT_AU 00072993

Sometimes those provisions were drafted into the purchase order, but "you had to be careful" – for revenue recognition purposes, Dolan recalled having to include very specific language, something like "within [●] months of [date], the reseller must sell to a third party."  Dolan could not remember the exact language.

Dolan recalled that Steve Chamberlain pushed back with the sales groups on these kinds of transactions.  She remembered being told to be careful because "you can't evidence that you don't have a deal done."

     C.      Specific Reseller deals

        1.   Tikit

Tikit was a Worksite (iManage) partner.  Dolan recalled drafting orders for this reseller, including for the KPMG deal, which Neal Araujo and Hussain worked on in the UK.  Kanter was involved in drafting the "emergency purchase order."  AU and Tikit wanted to ensure that Tikit could resell the license if KPMG did not purchase anything.  Dolan drafted a separate letter giving KPMG the right to resell.  She believed that AU was protected through this type of arrangement since AU sold 'out-of-the-box' software, so it was easy for the reseller to sell to other end users.

Dolan recalled that, in late December 2010, Tikit representatives were in a conference room in London, where they had been negotiating with Araujo and Hussain.  Dolan received a call from Hussain, who asked her to quickly prepare a purchase order.  She sent the draft order and letter to Kanter to review, and Tikit signed "there and then."  Dolan assumed that this took place at the end of the quarter, hence the rush.  She had no idea what stage of negotiation AU and KPMG were in.

        2.   Meridio

Dolan recalled drafting several purchase orders or side letters for Meridio customers.  She had no recollection of the decision to incorporate a provision in the contract rather than in a side letter that allowed the reseller to sell to third parties (as was the case with KPMG).  She speculated that it was generally more convenient to put it in the contract.

        3.   Vatican Library

Dolan was involved in the "potential deal" with the Vatican Library to provide hardware and software to preserve and store its archived materials.  She later discovered, after Lynch and Kanter teased her at a Christmas party, that she was only involved because she has an Irish surname, whereas Kanter was Jewish.

Menell "loved the deal; it was his baby."

MLAT_AU 00072994

Dolan spent one or two weeks in November 2010 and all of December 2010 in Rome and Vatican City. Dolan did not know when negotiations began, as she only became involved in November. She recalled being in Venice in December for the AU Christmas party and being called to a meeting with Lynch at 8 am on the Sunday morning after the party to discuss the deal.

The deal never closed. Dolan recalled that the Vatican representatives were very good negotiators and ultimately it came down to a disagreement on the numbers. There was a push to close the deal at quarter end in December 2010, then a lull, and then work picked up again in mid-January. The same thing kept happening, and ultimately the deal never went ahead. Hussain was desperate for the revenue. Every quarter, he asked Corrado Broli (the sales executive in Milan) whether it was going to close. The value for the transaction kept changing; everything from $20 million down to $5 million was discussed.

In January 2011, demo projects were set up as a "proof of concept." Production was physically set up so that the hardware and software could be used and the outcome could be retained. The Vatican wanted a long "proof of concept" ("POC") period, which they extended again and again.

Dolan believed that the deal would close: "all the signs looked right." The only risk was the Vatican not obtaining funding. Dolan was not aware of a reseller and believed that the use of a reseller must have been a last minute move. She did not see any automatic notifications in relation to this deal, as she had with others, and she did not know what reseller might have been involved.[2] She recalled that Poste Italiane may have been a possible reseller or funding source.

This was a very "hush hush" deal and everyone was sensitive about discussing it. It later looked like the deal was going to close, as Dolan was asked to draft an agreement, possibly around the end of December 2010. Dolan was not aware of any deal being closed with the Vatican Library. As far as she knew, the project never made it past the POC stage.

According to Dolan, Broli's deals were always "confused." He had a good working relationship with Hussain and he worked with him and no one else. Although Broli seemed to bring in new deals, he rarely complied with the targets in the deal pipeline and, according to Dolan, no one knew about his deals until the very last minute. He never joined the SMS calls and no one ever knew what he was doing. He simply "turn[ed] up" at quarter end. Dolan assumed he had good relationships with partners (i.e., resellers) in Italy that could give him deals. Broli was in trouble all the time and still gets in to trouble for not keeping management apprised of deals. (Dolan recalled a time when Broli submitted five years of expenses at one time.) Dolan said she thinks Broli is still employed because it is very difficult to fire people in Italy.

### 4. Other resellers

Dolan had very little involvement in US transactions. There was one deal with HSBC, which she worked on because HSBC had insisted on dealing with the UK legal team rather than the US team.

---

[2] The Microtech-Vatican Library reseller deal closed on March 31, 2011.

MLAT_AU 00072995

Dolan had heard the names Microlink and Microtech and recalled seeing purchase orders coming in from them. Dolan had no knowledge of a "Federal cloud" deal.

Dolan had never come into contact with FileTek or DiscoverTech. She vaguely recalled drafting an OEM contract with DiscoverTech. In general, Kanter told her "*draft this*" and she did so, though she knew nothing of the context. On this particular contract, Dolan recalled asking Kanter for the license information. Kanter told her the reseller did not have to pay royalties to AU until it had hit millions in revenue. Dolan had no idea why this arrangement was put in place.

Dolan knew of Capax as she was involved in making arrangements for AU's new offices in London. One of the floors of AU's old office space at 105 Piccadilly had time left on the lease. AU sublet the space to Capax, which was trying to develop its EAS product in the UK. Kanter told Dolan there was to be a special arrangement with Capax whereby funds owed to Capax by AU were deducted from the lease. (Essentially, Capax got the lease for free.) Kanter later "went back" on this instruction. Dolan did not know how much Capax ultimately paid for the lease.

## VIII.    Other deals

### A.    BP

This was a license deal with hosted services and the revenue was recognized upfront. Hussain brought in the deal. Dolan assumed that the manner in which the revenue was recognized for this deal was in accordance with the rules: the finance team (i.e., Steve Chamberlain and Poppy Prentis) approved and "it also had to go through the auditors."

### B.    Aurasma

Aurasma was Lynch's baby; he was involved in all decisions. Kanter also was involved. As of very recently, the Aurasma software had produced no revenue for AU. Previously, AU simply provided services to customers to get the technology "out there."

In 2012, Kanter asked Dolan to draft an OEM agreement related to Aurasma – specifically, a contract for the provision of the software that the customer needed to perform certain tasks, which Kanter specified. Dolan worked with James Loxam ("Loxam").

It did not surprise her that there was no provision in this contract for embedding the Aurasma software in to the customer's product. However, Dolan thought it strange that AU simply gave away the entire product to another company. When Dolan asked Loxam why, he guessed that AU was better able to get the product to the market quicker using a third party. Dolan assumed that there were no fees because the deal was purportedly supposed to achieve saturation of the market.

MLAT_AU 00072996

When the contract was drafted, Kanter instructed Dolan to insert the name "93 Million Miles" as the counterparty. Dolan said she found it strange that Richard Gaunt's[3] signature appeared on the contract when it came back to AU, although did not ask anyone about this.

Dolan later learned that 93 Million Miles is Richard Gaunt's company. She was told by Fernando Lucini that Loxam had gone to work at 93 Million Miles.

C.  Tottenham Hotspurs[4]

Dolan was involved in negotiating and drafting the Tottenham Hotspurs' (the "Spurs") sponsorship and license agreements. Dolan never questioned the nature of the deal; the software was simply discounted from the cost of the sponsorship.

Dolan remembered Kanter mentioning that someone at the club had loaned money to Lynch's business years ago and, now, the Spurs did not have a team sponsor. In the negotiations, it was understood that a Spurs representative with contacts in the Middle East would refer clients to AU as part of the contract. There were provisions in the contract that obliged the parties to agree to extend the period, or waive a breach, if a certain value of client referrals was not made by a certain date. Close to the deadline for these referrals, Kanter requested that Dolan draft an agreement for the license of certain software to a beverage company. Later, when Dolan had drafted the contract based on the software requirements specified by Kanter, Kanter told Dolan to change the counterparty to the Spurs, on the understanding that the Spurs were to sell the software to the beverage company.

Dolan found this strange, as this software license almost exactly matched the first one with the Spurs. The license was granted virtually for free.

---

[3] Richard Gaunt is one of the original founders of Autonomy.
[4] The Hotspurs ("Spurs") are a football club based in Tottenham, London.

MLAT_AU 00072997



DATE:        November 21, 2012

SUBJECT:     Memorandum of Interview with Stouffer Egan – November 14, 2012

| Tab No. | Document Description |
|---------|---------------------|
| 1 | 12/23/09 Emails between Hussain and Egan |
| 2 | 12/28-29/09 Emails between Egan, Hussain, Scott and Chamberlain |
| 3 | 11/16/10 Email from Hussain to Egan |
| 4 | 3/4-6/10 Emails between Egan, Sullivan and Hussain |
| 5 | |
| 6 | Chart titled "Capax Revenue Summary – Projected Through April 1, 2011" |
| 7 | 12/24/10 Emails between Egan, Hussain, Chamberlain, Marinelli, and more. |
| 8 | 11/17/09 Email from Hussain to Mooney, Sullivan and Egan |
| 9 | 12/21/09 -1/29/10 Emails between Particelli, Egan, Mooney, Hussain, and more. |
| 10 | 2/11/10 - Email regarding "Goodwill" |

I.    **Interview Overview and Impressions**

On November 14th, 2012, Leslie Caldwell, Susan Resley, and Martha Stolley of MLB conducted an in-person interview of Autonomy's CEO, Stouffer Egan ("Egan"). Josh Drew of HP participated by phone. Kate Emminger of MLB also attended and drafted notes of the interview. The interview lasted approximately three hours and was in connection with HP's internal investigation of Autonomy's accounting practices. Prior to the interview Egan provided his laptop for imaging.

Ms. Caldwell provided Egan with "Upjohn Warnings" by advising him that the interview was part of HP's internal investigation, that it was privileged and that Harris should keep the discussion confidential. Ms. Caldwell further advised Egan that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

MLAT_AU 00072998

It was the collective impression of the lawyers interviewing Egan that Egan was evasive and not entirely forthcoming during the interview, even when shown documents and emails that he had drafted.   He also advised us that Friday, November 16 would be his last day with Autonomy. He was planning to be out of the country for a week (Paris) beginning Sunday, November 18.

Egan stated he had spoken with Autonomy personnel about the investigation since his first interview earlier in the summer. Ms. Caldwell advised him to maintain confidentiality moving forward and should not speak with others in the company. Egan voiced some concerns regarding the nature of the interview, and requested clarification as to whether he should speculate or treat it like a deposition. Ms. Caldwell emphasized that this interview was only for internal investigation purposes and, as such, he could speculate (assuming there was a basis for it) and offer his impressions. She advised him there would be no transcript of the interview and that Egan would not be asked to sign any interview statement documents.

Egan expressed some concern about ramifications from Mike Lynch ("Lynch") whom he described as a "formidable character." Egan added that when Lynch left, Egan could have taken Lynch's side or HP's side and Egan chose HP. He said that since that time, Lynch has reached out to him and that at one point Lynch's wife called Egan's wife (they are friendly so it was not out of the blue). He was concerned that things he said during the interview would be shared with Lynch. Ms. Caldwell repeated that the interview would be kept confidential, unless HP chose to waive the attorney client privilege. Ms. Caldwell further clarified that MLB had no current plans to talk to Lynch.

II.   **Background**

Egan joined Autonomy as a VP in 2001 and became CEO about a year later. Before Autonomy, Egan was the VP of Corporate Development for Dataware, a public US company. Egan said he learned of Autonomy because the management at Dataware was trying to sell Dataware. Egan previously lived in Boston but moved to the West Coast a little more than nine years ago to work at Autonomy.

Before the HP acquisition, Egan felt he reported to Sushovan Hussain ("Hussain") because he talked to Hussain every day, but on paper Egan reported to Lynch.

Right before the acquisition, Egan had very few direct reports because he "was more matrixed". Mike Sullivan never reported to Egan, and Mike Mooney might have reported to Egan at some point.

III.   **Hardware Sales**

  A.   *Background and Business Purpose*

Autonomy resold hardware, sometimes with software and sometimes without software. The hardware was sold at a loss but Egan wasn't sure if Autonomy always knew it would be a true loss or just a "deeply discounted" sale. Egan said Autonomy didn't worry about a specific ratio between hardware and software, because management was more concerned with making the

MLAT_AU 00072999

"whole deal" and showing that they valued the customer. Autonomy resold hardware to move sales forward generally. Hardware became an incentive because customers knew they were buying hardware at a discount. Egan believed Autonomy tried to buy large amounts of hardware in order to get a volume discount to pass along to customers. Egan assumed that software purchased by the customer would be installed on the resold hardware. Autonomy didn't care if it made or lost money on the hardware sales because they hoped to make it up on software sales.

Egan wasn't sure when Autonomy began selling hardware sales began, but recalled that it was after Autonomy acquired Zantaz because that business offered hosted operations. Autonomy mgmt felt that hardware sales could fill a gap that would enable Autonomy to sell an entire hosting solution that included hardware storage. In other words, Autonomy would sell a customer a hosting package that included cooling, hardware, and software. Egan compared this package model to HP's IAP offering.

Egan said he had a good relationship with Mike Sullivan. Egan dealt with Sullivan fairly regularly and more so after "Mike" left. Egan did not remember talking to Mike about hardware sales, but stated that he was aware the hardware sales were happening.

Egan would sign off on almost every purchase in San Francisco and would sign off on hardware sales. The invoices would be for both internal use and resale. Egan remembered signing off on Dell purchases, especially small ones for $100 or $500. Egan thought Dell invoices were the most common. Egan said he didn't know what type of hardware was being purchased. He assumed it was mostly servers and storage, and was surprised to hear it might have been mice or notebooks.

Egan didn't remember why Autonomy started working with Dell and didn't know who at Autonomy had the relationship with Dell.

Egan believed Hussain's rationale for the hardware sales was to make Autonomy more like a typical software company of Autonomy's size. Hussain preferred that the hardware and software sales be integrated, or heading towards integration, but didn't mind only hardware was sold as the latter would boost the customer relationship. Egan also believed Hussain wanted the revenue line increased, especially after the 2008 market crash. Per Egan, Hussain believed hardware was one way to accomplish this goal. Egan vaguely remembered that Hussain would brag because profits were too high and Autonomy couldn't show investors such high numbers every quarter because investors would come to expect it.

Egan never felt that software was thrown into a deal just to sell hardware. Egan believed if it was sold as a combo, the software was a "real deal". He did acknowledge occasionally hardware was sold without software.

Egan believed hardware sales were insignificant, but noted that in a given quarter every last dollar is important.

-3-

MLAT_AU  00073000

B.     *Egan's Customers and Hardware Sales*

1.     **Morgan Stanley**

Egan was Autonomy's relationship manager with Morgan Stanley and worked with them extensively. This relationship began shortly after the Zantaz acquisition because Morgan Stanley was a big Zantaz customer. Because Morgan Stanley had previously purchased IBM hardware, Egan worked hard to replace IBM with Autonomy.

Egan was involved in all Morgan Stanley deals, but stated he played no role in buying hardware for Morgan. However, when shown a 2/11/10 email where he advised Hussain that he would "rather use good will [with Morgan] on hw deals, etc." (Tab 10), Egan admitted that HW was sold to Morgan as a favor.  Frank Cook was the Relationship Manager at Morgan Stanley. Egan wasn't familiar with any sale of EMC hardware to Morgan Stanley in Q309 and repeatedly stated it was hard to remember particular deals because he was involved in so many.

Christian Lucas was an investment banker at Morgan Lewis, but was Lynch's and Hussain's contact. He did not know why an investment banker would be involved in hardware deals but speculated that certain deals, as one referenced in an email, (see Tab 1) went to Christian because Lynch and Hussain wanted it completed during that quarter.

Egan reviewed the Morgan Stanley deal proposal (Tab 2), to ensure the numbers were correct, but didn't prepare the proposal presentation. The proposal intended to integrate software that Morgan didn't use, but DS mail could run on the hardware, so it could be sold with compatible hardware, but Autonomy was already hosting the Morgan mail archive.

Egan didn't remember specific details of an email from Hussain wishing him "good luck" on the Frank Cook call (Tab 3), . Egan thought Hussain was asking them to capitalize on buying hardware because Hussain wanted a sale.

2.     **Other Customers**

Egan also worked with JPMC. The only JPMC hardware sale he recalled was one that occurred right after JPMC purchased WaMu and Bear Stearns. Because WaMu and Bear Sterns were collapsing very quickly, they had to "suck up a huge amount of data". Thus, hardware would have been loaded with Autonomy software. Egan didn't remember who the hardware seller was. Egan's JPMC contacts were Paul McEwen and Fernando Castanhanas(?).

Egan also worked with Deustche Bank but didn't recall being involved in hardware sales with them; Egan did not deal with AIG, Bank of New York, nor SHI. Egan was familiar with Citi, but only worked with them occasionally.

When shown an email chain from early 2010 about resale of Dell hardware to UBS (Tab 9), Egan said Autonomy was in a huge pursuit of UBS, who was not a customer. Egan believed that Autonomy expected to do a large software deal in the same time frame as the hardware deals. Significant UBS software deals were completed, but Egan didn't recall when. Egan didn't have

-4-

much to do with UBS, but has a cousin in law that worked there so Egan would be asked to call and check if they were talking to the right people.

### C.   *Hitachi*

Any hardware transactions involving Morgan Stanley likely involved Hitachi because Morgan Stanley had a relationship with Hitachi. Although Egan claimed he played no role in the hardware aspect of the deals, he knew the process. He explained that Autonomy reached out to Hitachi and asked it to become a reseller. Egan also explained that this reseller deal was part of an effort to sell Hitachi a different OEM deal. This was done to encourage the relationship with Morgan Stanley and sell them more OEM or software. Egan explained that he believed this relationship is why Hussain tried to get more hardware and services into the mix and be more like a software company of comparable size.

When shown the email from 12/23/2009 (Tab 1), Egan agreed that Dell must have been involved with Morgan Stanley based on the email, but only recalled Hitachi's involvement with Morgan Stanley.

Egan believed that the email from Hussain on 3/6/10 (Tab 4) concerned the Hitachi deal in which capped the discount. Egan thinks the email was saying that Egan could do more deals, but not at the prior discount. The discount would have to be less.

*Hardware Accounting*

Egan acknowledged that Autonomy wanted to maximize the numbers attributed to software and minimize the numbers for hardware. Hussain believed software was more attractive than hardware. Egan remembered that Morgan had a different amortization schedule for hardware versus software and so they wanted to separate the sales. Autonomy did not. Eventually, they compromised.

Despite the emphasis on software versus hardware, Egan knew there were boundaries. Management pushed back if they thought Hussain was changing the value, or if he wanted to give too deep of a discount. Egan thought these limits were based on certain accounting and VSOE principles.

### D.   *Hardware Products including Arcpliance*

Autonomy began developing products that incorporated Autonomy software in hardware such as search appliances, archive storage appliances. Arcpliance was an example. It was not successful, and Egan did not remember selling it.

### E.   *Strategic Relationship between EMC and Autonomy*

Egan didn't recall a specific strategic relationship between EMC and Autonomy but said that as a general sales technique, they were always trying to think of ways to work with companies to sell more. Otherwise, Egan only remembered possible M&A work with EMC in 2010. Egan didn't recall that EMC ever said it was willing to sell hardware to Autonomy.  Egan was not involved

-5-

with EMC hardware sales. Egan had met representatives from Bloomberg [an EMC end user] but didn't know Autonomy had sold them hardware.

F.     *Post HP Acquisition*

Following the HP acquisition, there were a lot of questions about whether Autonomy would stop selling Dell products because Dell was a clear competitor to HP. Mike Sullivan raised that question.

IV.   **OEM**

Egan described the "bright line" difference between general software license sales and OEM as the following: General software license sales occurred when a customer purchased the software and installed it for their own general use. OEM occurred – or at least gray area occurred – when the customers would purchase the software to embed in a product and sell to customers for the customers use. Mike Mooney often managed OEM software sales.

Another email references a highly confidential OEM deal (Tab 1) which probably was with Dell. Autonomy did a lot of work on it and the deal never went through. Egan speculated that Hussain was trying to convince Dell of the software value. Another rep level employee from Texas was involved in this deal, as was Mike Mooney.

Egan had no idea how OEM was determined nor how the revenue was reported nor why OEM revenue would be more attractive than license revenue.

A.     *IDOL OEM and Tottenham Hotspurs*

In this revenue category, products in the IDOL family would be sold and distributed as part of another product that goes out. The final product is not necessarily software but IDOL becomes part and parcel of the customer's final product.

Egan didn't know anything about Tottenham Hotspurs but it didn't sound to him like a proper IDOL OEM allocation. He said it "would be a stretch to think of Tottenham Hotspurs as an OEM." However, Egan speculated that if Tottenham created a phone app with IDOL then perhaps it could be considered OEM. Egan mentioned the possibility of something like the Erasma app. He also said that the use of the OEM on the Hotspurs' website would be more tenuous.

B.     *Bank of America and OEM*

Egan wasn't aware of any Bank of America OEM deals, but again speculated on the possibility of an app.

V.    **Resellers**

Autonomy utilized resellers for as long as Egan has been at the company. Egan didn't specifically recall when Autonomy began working with Microtech, Capax, or FileTek. There

-6-

were lots of resellers, some successful, some not. Capax was a successful reseller probably because they did great service work. The commercial benefit of utilizing resellers was that Autonomy made more sales. The other benefit – though Egan hesitated to call it a commercial benefit – is that resellers would buy a potential deal at a discount if Hussain needed the revenue in that quarter. Hussain involved resellers when deals didn't close at the end of the quarter. Ultimately, the reseller was on the hook if the end user deal didn't come through. Autonomy delivered the product to the reseller, who held the software. Therefore the reseller took 100% of the risk. When introducing a reseller to a deal, Hussain preferred resellers with relationships with the customer so that the reseller wasn't a company introduced just for the sake of the deal. Autonomy paid commissions to sales people only when the end user purchased the deal from the reseller, so that the sales people were still involved in the success of the sale.

At the end of the interview, Egan stated that "resellers bought ahead of customers."

  A.    *Capax*

Autonomy started working with Capax four or five years ago. Egan didn't know why or how the relationship started and his specific deals with them only started two and a half to three years ago.

Capax was involved in Autonomy's EDD processing. Autonomy had a program where they wanted other companies to incorporate EDD software processing on their platform. Capax participated in this program and "invested" in Autonomy in this way. He provided no further details

Capax has a general reseller agreement and could sell Autonomy software at any time. Capax did a lot of work with Amgen and they had a good relationship with Amgen. Capax was an approved supplier for Amgen.

Capax often "stepped up" to take deals that weren't closing promptly because Capax was able to take the risk. Not every company would take such a big risk because the reseller was on the hook if the deal didn't go through.

John Biacco was Egan's contact at Capax.

90% of Egan's dealings with Capax were customer satisfaction problems because Capax handled the service side of the sale of Autonomy products.

  1.    **Amgen**

Egan didn't recall being heavily involved with any Amgen deals, other than in a bad customer satisfaction situation. Egan was involved with starting the pitch process and closing a deal. Tom Flannigan was the person at Amgen that needed to approve sales, so Egan did the initial meeting with him about enterprise search and then requested his final approval on the sales. The October 8, 2010 email with Capax was a reflection of those encounters (LOOSE TAB – now tab 5). That chain shows that on September 30, Amgen advised Egan that the deal would not close in Q310. Egan said he recalled that point. He could not explain Hussain's comment in the October 8 email

-7-

saying "Capax is heavily involved."

In Q310, Capax became the reseller of the Amgen Deal. It was swapped out or traded off "in some sort" in Q410. Egan was involved with the corresponding Bank of America deal, which was very big and difficult. Egan didn't recall why the deal was swapped out.

Egan had no specific recollection that Amgen did not want a reseller agreement with Capax but did recall "comforting" Amgen around the reseller agreement.[1] Egan didn't know how Amgen was ultimately handled but generally recalled that the Amgen deal with Capax was swapped out for a Bank of America deal. Mike Mooney was involved with Amgen. Egan's impression, refreshed by the December 31, 2010 agreement (Tab 5 – loose) was that Autonomy relieved Capax but not Amgen. He believed that Amgen ultimately purchased software from Autonomy in 4Q10.

### 2. Bank of America

The Bank of America deal was very long and drawn out, but ultimately was a $19-23 million deal. Thomas Marinelli was a relationship manager at Bank of America and Egan believed an document was about this deal, based on the dollar sizes and the names, but he didn't recall the time frame (Tab 6). Bank of America had a very long approval process requiring around 17 different signatures and this contributed to not closing the deal in Q4, as hoped. Therefore, Capax "stepped up" to buy the software for the client in Q410, but Egan didn't think Capax bought all of the deal, just part of it, as evidenced in email (Tab 7). Discovertech might have stepped up and bought the other part.

Egan didn't know how the invoicing and payments for the Bank of America deal were structured because it was very complicated. Hussain often didn't get involved in structuring deals but Chamberlain and Hussain structured this deal.

### B. *FileTek and the Department of Veteran's Affairs*

Egan worked with FileTek but not as much as with Capex. Gary Szakawski and another person were the contacts there. Gary used to work for Autonomy.

### 1. Department of Veterans Affairs

Egan did not recall participating in negotiations for the VA deal in 3Q10, but had a few meetings with them. He believed that when the deal wasn't going to close in the "ideal" quarter, FileTek stepped up and bought the software.

FileTek was involved with this deal rather than Microtech because Egan thought FileTek had some previous dealings with Veteran Affairs.[2]

---

[1] This contradicts Livius Guiao believed the deal with Amgen fell apart because Amgen did not want to work with Capax.
[2] We understand from other interviews that Microtech had the relationship with federal entities.

MLAT_AU 00073005

2.    **Autonomy Purchase of FileTek Software**

The tech team purchased a software product from FileTek. A simplified explanation of the product is that it was used for data compression. This sale was not considered the same transaction as the Department of Veterans Affairs deal. However, there was a certain knowledge that each side (FileTek and Autonomy) wouldn't have done one deal if the other deal hadn't been done, although it would never be talked about. The transactions marked the two companies relationship with each other.

C.    *Microtech*

Microtech had a relationship with Autonomy, both professionally and personally. David Truitt of Microtech is Dan Truitt's brother. Both worked in "the federal space".

Microtech has some services, similar to what Capax does. Microtech is mostly a "body shop" meaning it places Microtech service personnel on Autonomy accounts.

1.    **Vatican Library**

Egan had no involvement with the Vatican Library deal. However, Egan "introduced" Microtech to Hussain as a reseller to step up and "take bets on the deal". Egan believed the only relationship Microtech had with the Vatican was as the reseller for the Autonomy deal, and did not provide the Vatican with any other services.

Egan didn't know much about the Vatican deal, but knew it took a long time to close, which was often blamed on "Italy issues". The Italian Post Office might have been the ultimate funding source. Pete Minell traveled there frequently. Hussain was involved. Egan presumed Corrado Broli was involved because he handled most of the Italy deals.

VI.    **Micellaneous Issues**

A.    *Quarter End*

Egan described the end of every quarter as a "mad dash" to get more revenue. Even if the numbers looked great in a certain quarter, Hussain always wanted more. Hussain's management technique was to make it appear that he always needed a lot more sales and people were "screwing it up" if they didn't meet their goals. Egan called quarter end an "artificial fire drill". Certain emails reflect this process (Tab 8). Egan didn't believe the quarter to quarter business model was sustainable.

Hussain would defer revenue and wasn't as concerned with increasing backlog as increasing revenue. If Hussain felt the practice would cannibalize future earnings, Hussain would increase deferred revenue. Egan said essentially Hussain would give him a prescription on the deal Egan could make. He was also told by Hussain that "under IFRS you can do these practices."

-9-

B.    *Compensation*

Egan didn't remember a direct offer for more compensation if business was completed in a certain quarter. However, Egan didn't ever really know what his compensation would be and constantly thought that if he performed well enough each quarter, he might get a nice bonus. However, many quarters went by without a bonus and the pressure was so great with each new quarter that Egan never felt it was appropriate to ask Lynch or Hussain to review the work and see if he deserved a bonus.

C.    *News of the Acquisition*

Egan never felt that Lynch wanted to sell Autonomy and was shocked when the HP acquisition was announced.  He learned of the deal when he received a call on the day of the announcement. The only indication Egan had of the deal occurred when he was asked to cooperate on a deal with the US Post Office that would ultimately take a lot of business away from HP. Egan thought that Bill Vechty called him regarding this topic.

-10-



DATE:         December 9, 2012

SUBJECT:      Memorandum of Interview with Stouffer Egan – November 30, 2012

| Doc. Num. | Document Description |
|---|---|
| 1 | 8/19/2010 - Email Chain between Egan, Hussain, and Kanter |
| 2 | 4/12/2010 - Email from Hussain to Egan, Scott and Chamberlain |
| 3 | 8/1 - 15/2011 - Email Chain between Chamberlain, Hussain, Lynch, Menell, Egan and others. |
| 4 | PowerPoint Presentation titled "An Unprecedented Deal" |
| 5 | 10/2 - 6/2009 - Email Chain between Scott, Menell, Kanter, Egan and Hussain |
| 6 | 6/22/2010 - 7/6/2010 – Email Chain between Chamberlain, Hogenson, and Prasad |
| 7 | 3/14-15/2011 – Email Chain between Chamberlain, Hussain, Harris, and Scott |
| 8 | 4/14/2010 – Letter from John Baiocco at Capax |

I.    **Interview Overview**

On November 30, 2012, Leslie Caldwell and Susan Resley of Morgan Lewis ("MLB") conducted an in person follow up interview with Stouffer Egan ("Egan"), the former CEO of Autonomy, Inc., the US branch of Autonomy. The interview occurred on Egan's last day at Autonomy and was held at MLB's San Francisco offices. Kate Emminger of MLB also attended. The interview lasted approximately three hours and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices.

II.   **Background**

Ms. Caldwell and Ms. Resley had conducted one previous interview with Egan.   During this interview (which occurred on Egan's last day of work), Egan expressed a desire to help HP, and to "get the bad guys".

As the interview began, Ms. Caldwell spoke with Egan about the activity that had transpired since Egan's first interview. Ms. Caldwell specified that the investigation now involved the U.S. Security and Exchange Commission ("SEC"), the U.S. Department of Justice ("DOJ"), and the U.K. Serious Frauds Office ("SFO"). Ms. Caldwell noted that the SEC, DOJ and SFO currently expect HP's MLB legal team to provide continuous updates regarding the investigation. Ms. Caldwell clarified that the MLB legal team has no power to make anyone outside HP talk with them, but that the SEC and DOJ have subpoena power. Thus, those agencies will likely be requesting certain interviews. Ms. Caldwell also told Egan that the general overview of the facts learned in various interviews will be shared with the SEC, DOJ and SFO.

MLAT_AU 00073008

In response, Egan stated he expected information to be shared with the government, and was concerned about being "stuck in the middle". Egan clarified he was "not talking to the other side of the equation", meaning Mike Lynch ("Lynch"), but that Lynch is "very frightening" to him because Lynch is a fighting person. Egan also described Lynch as unforgiving, ruthless and well-resourced.

Egan requested clarification about how the information would be reported to the government. Ms. Caldwell explained that the legal team would file reports about specific situations, explaining what the legal team thought happened and who was involved. The report would also include various documents supporting these findings. Interview notes will not be submitted. Ms. Caldwell also explained the reasons for sharing this information – namely, because she hoped Egan would be candid. Egan replied that his candidness was a given and that he felt compelled to provide guidance about what topics were a waste of time, or were "rabbit holes." He thought that, in retrospect, he had a sense of what was going on based on things he would hear internally at Autonomy.

III.   **Resellers**

Egan believed all the resellers used by Autonomy were real and viable companies. He further believed the current news coverage about Autonomy was "scaring the bejesus out of them." Joel Scott ("Scott") and Robert Youngjohns ("Youngjohns") are currently addressing this issue and Autonomy is working to ensure the resellers are not scared off. Egan strongly felt that investigating whether the resellers are shell businesses would be a waste of time.

A.   *General Reseller Processes*

Sushovan Hussain ("Hussain") would decide when and if a reseller, which he referred to as an "acceleration partner" would be brought into a deal. At the end of the quarter, Hussain would ask for deals that were "at the point" that a reseller could be brought in, but were clearly not going to close in that quarter. In other words, Hussain would ask for deals that were "mature enough or inevitable enough" so that the resellers would be "willing to go 'at risk'" and put the money upfront in order to earn a margin when the end user paid. The resellers wouldn't want to take something that was "pie in the sky".

Once Hussain decided a deal needed an acceleration partner, Hussain would ask Egan to call Capax, Microtech or Microlink, depending on whom Hussain wanted to be involved. At that point, the reseller usually wanted more information about the deal and often spoke with the salesperson about the deal's size and likelihood. The reseller would then decide if they wanted to go 'at risk' and pay for the deal. That decision would be relayed to Hussain. Hussain then make the ultimate decision about whether the reseller would become involved. So, Hussain would reject a reseller's interest, and sometimes a reseller would reject it. One reason a reseller might reject a deal was if the reseller hadn't yet been paid on another deal the reseller accelerated.

Egan remembered at least one instance of telling a reseller "Hussain may not even want this deal, but he wants the paperwork." Egan never knew if Hussain would put a resold deal in revenue,

-2-

MLAT_AU 00073009

put it in deferred, put it in backlog, or just rejected it. But because timing was the main issue, Hussain would ask for possible deals before the quarter end and Egan would hear about it only if Hussain rejected the deal.

Occasionally, a reseller would come forward with a deal that wasn't going to close in the quarter and ask if Autonomy wanted the reseller to buy it ahead of time.

Resellers agreed to go at risk for deals because they would receive a margin on a deal which was usually 10% of the entire contract price. Egan remembered one time when he was asked to offer the reseller 5% because it was a big deal that was already signed but the paperwork couldn't get in by midnight. Thus, Hussain believed there was not much risk associated with the deal and therefore the margin should be lower.

Egan found the reseller deals to be "doubly stressful" because once a reseller had accelerated the deal, it added a layer of stress. Egan then had to worry about not only closing the reseller deal, but also about closing the deal for end user.

Hussain wanted the resellers to pay up front, but they usually paid in installments, even if nothing was happening.

Egan recalled that certain reseller deals were written off. When that happened, the reseller would be relieved of its burden. Egan remembered that Discovertech once held two deals of the same dollar amount. One of these two deals was written off, and Discovertech was paid on the other one. However, Discovertech was paid on the wrong invoice and the situation had to be sorted out.

B.   *Autonomy's Purchase of Resellers' Goods / Maintaining Relationships with Resellers*

Resellers' businesses had other products and services. The resellers would sell these products and services directly to Autonomy, and wanted Autonomy to facilitate selling their product to the end customer. Some products were competitive with Autonomy products and sometimes the reseller product was better, or more in sync with customer needs. This meant that occasionally customers would reject the Autonomy product, but want the reseller product. Egan said Autonomy was "pretty adamant" about selling Autonomy products, rather than reseller products. However, when a reseller would lose money after taking a deal at risk because the end user didn't come through, Autonomy's purchase of the reseller's product became a way maintain the relationship, rather than sticking the reseller with a huge loss. Egan didn't believe this practice was necessarily part of taking the at risk deal.

Egan also believed that when the end user deal didn't come through or would not materialize, Autonomy would occasionally make a business decision to purchase products from resellers, or to license the reseller's products in other deals. In this way, Autonomy hoped to keep resellers happy and wanting to continue engaging with Autonomy. Autonomy often made business decisions with the goal of keeping the resellers happy. Autonomy didn't want to have resellers end their entire relationship with Autonomy just because the reseller lost money when a deal

MLAT_AU  00073010

with an end user fell through.

C.   *Marketing Assistance Fee*

Marketing assistance fees were applied when the reseller played a role in obtaining a deal, but in the end the deal went directly through Autonomy, rather than through the reseller. Egan compared the situation to buying an Apple product from the Apple store rather than buying an Apple product from Best Buy. Egan explained that sometimes the customer preferred to buy directly, even though its essentially the same deal. Thus, when the reseller had been a catalyst for the deal but the customer preferred to buy directly from Autonomy, the reseller would be given a marketing assistance fee.

Regarding an email chain about marketing assistance fees dated August 19, 2010 (Tab 1), Egan explained that this fee was different than when a reseller went at risk on a deal. In the at risk situation, the reseller would owe Autonomy 90% of the contract price and keep the usually 10% margin, but for a marketing assistance fee, Autonomy paid out a certain fee to the reseller.

End users were eventually told about reseller involvement on the deal. However, Egan believed there was some variation regarding that conversation's timing. Occasionally, the end user would know about the reseller's involvement in the same quarter that the reseller accelerated the deal. Occasionally the end user wouldn't know until the deal actually closed. Egan thought that occasionally the end user payment went straight to Autonomy, even if a reseller was involved, and in that case, a "marketing assistance fee" might have resulted.

D.   *Auditors and Resellers*

Egan often "chased" auditors to obtain the reseller deal confirmations. Egan did this at Hussain's direction. The audit confirmations were letters from the auditors confirming a certain set of invoices. Egan often called the auditors for these confirmation letters at quarter end.

An April 12, 2010 email referencing the audit confirmations was one example of this task (Tab 2). Egan believed that the final sentence in Hussain's email ("I am sure they will show a healthy net asset number.") was not "code" for asking the reseller to misrepresent their financial health. Egan thought Hussain was simply putting his thoughts into email for transparency's sake. Egan thought it was a hint for someone not to "screw it up" because occasionally Egan would get "tied around the axle on some communication that is not accurate and completely inapposite for what you are trying to do."

In the same email (Tab 2), when Hussain writes "The auditors have also asked for confirmation that there are no side agreements", Egan said he was not aware of any side agreements and felt making them was an easy way to lose your job at Autonomy. Egan did note that there was a certain "implicitness of not letting [resellers] suffer a huge loss" but he was not aware of side agreements spelling out that point.

Egan had no interaction with Deloitte, although he did believe that many years ago Deloitte would call him and ask about certain deals. Egan thought maybe this corresponded to when Autonomy was traded on NASDAQ. Otherwise, Egan sent all the US financials to the UK. Egan

-4-

MLAT_AU 00073011

did recall Deloitte employees visiting the San Francisco office once a year, but felt that these meetings were not substantive encounters. Egan felt the visit was just something Deloitte had to say they did, rather than something Deloitte did to find information or perform actual audits. Egan thought it was possible that someone in the San Francisco finance department dealt with auditors more regularly than he did.

Hussain was constantly giving parameter adjustments to stay within the accounting rules for resellers. Egan believed a reseller couldn't have a certain amount of overdue payment relative to how much business the reseller completed. Egan felt there was a lot of attention paid to what was allowed by Deloitte's auditors. Deloitte was often concerned with whether the reseller had the financial wherewithal to take the risk for a deal.

      E.     *Microtech, Microlink and Autonomy*

The relationship between Microtech began through Autonomy's relationship with Microlink, which was a long term service partner. The relationship with Microlink began before Egan joined Autonomy. Egan met Microlink "fairly shortly after joining the company." Microlink was commonly a federal partner with Autonomy. Egan described Microlink as very successful in the federal market, but not as glamorous as Lockheed Martin or CSC. Egan originally didn't know who Microtech was, but as he gained more familiarity with the federal market, he came to know Microlink.

Microtech and Microlink had an advantage in closing government contracts because they were either minority owned, or veteran owned and gained preference in federal bids. Also the companies were American owned, which was an advantage because being a British entity, Autonomy often faced problems with the federal government. Egan also expressed frustration with making widespread federal contracting deals because units within the federal government didn't speak with each other. So, for example if a deal was made with someone at the DOJ, that person would never talk with someone at the Office of Social Security. Thus, the size of the reseller became important.

Egan wasn't sure if Microlink began first or if Microtech began first. Dave Truitt works for Microlink, Steve Truitt works for Microtech and Dan Truitt works for Autonomy. Egan wasn't sure how these relationships developed. In other words, Egan wasn't sure if Dan worked for Autonomy first and suggested Autonomy work with Microlink, or if Microlink suggested Autonomy hire Dan.

Egan believed Autonomy purchased Microlink because Autonomy was struggling to do federal business, and Microlink seemed to be handling it for Autonomy. Thus, Lynch realized that federal sales were different than commercial sales and since Microlink handled those sales more efficiently than Autonomy, Autonomy should just acquire Microlink. Egan stated that even after Microlink's acquisition, Autonomy continued to use Microtech because there was still a business need for Microtech's resale work and to accelerate deals. Egan thought Autonomy "could use four more Microtechs."

      1.    <u>Microlink</u>

MLAT_AU 00073012

Microlink sold and serviced Autonomy software. Microlink was an official Autonomy reseller that would sell Autonomy's software on its own. Microlink completed many federal sales, which were more involved. Microlink did all the same services Autonomy did. Microlink could provide all onsite services that a customer needed. Egan described Microlink as the "single largest employer of Autonomy skill sets in the world." Autonomy often lost talent to Microlink because Autonomy's post-sale tech people realized Microlink would pay better and offered better quality of work life.

2.   Microtech

Egan described Microtech as a very real, very large company. He believed it was a "rabbit hole" to investigate whether it was a "real" provider of products and services.

Autonomy began working with Microtech once Autonomy became aware of them. Egan didn't think Microlink created Microtech, because he thought Microtech was just as old as Microlink. To Egan, Microtech felt "higher up on the food chain." For example, Microlink only provided services, but Microtech was doing contracts in the $10s of Millions range. At the time the relationship started, Autonomy considered contracts of this size to be very large. Egan's impression was that Microtech had a lot of capability in data center, networking and data center consulting areas, but he wasn't entirely sure what else they did.

 Both Capax and Microtech have cloud platforms that are highly conforming and the companies went through all the hurdles to become secure government providers. Egan said the government often declares a standard and then there is a corresponding rush to be the company that can capture that standard. Both Capax and Microtech have done that with great success.

3.   Microtech/Vatican

Egan's opinion was that the Vatican deal never closed. Egan held this opinion because he knew Microtech's repayment was constantly delayed. Microtech would call Egan asking for payment on the deal, and Egan would follow up on their behalf. The response Egan always received was that payment processing was slow because the deal was in Italy. Egan believed that if the deal had been completed, the P.O.s would have "flowed to the reseller better." He repeatedly said that the deal "never officially consummated."

Despite his belief the business deal never closed, Egan held a strong opinion that there was actual onsite work completed at the Vatican Library. He believed this because he could think of several anecdotes supporting this assumption. For example, Egan remembered Pete Menell ("Menell") showed Egan a replica of a priceless book given to every cardinal. Egan thought someone within the Vatican Library gave it to Menell as a gift because Menell likely befriended the employee during Menell's frequent visits. Egan described Menell as an "academic" and thought Menell was genuinely excited about the project. Another anecdote supporting this belief was that the Autonomy team working on the Vatican deal asked Egan to introduce them to contacts at Apple because the Vatican wanted to optimize the online archives for presentation on Apple products. Egan also remembered being told that Menell had done really well connecting with the personnel at the Vatican because he was an academic who truly appreciated the value of the Vatican Library. Egan was told about another software company's sales rep who walked into

-6-

the Library and angered the Vatican personnel because his first comment was "wow this is where they filmed [the movie] *The Da Vinci Code*." Egan didn't believe such anecdotes could have been made up simply to convince Egan the deal was legitimate. Thus, Egan believed the tech people assigned to the deal had begun processing the project, but Egan wasn't sure if the "business consummation" had happened.

Egan agreed that, given Menell's interest and the prestige of working at the Vatican library, the closing of the deal would have been broadcast within Autonomy.  This lacking communication was another reason Egan believed the deal never closed. Thus, the software work he thought had been completed was likely done ahead of the deal at Autonomy's own peril and expense. Egan also advised that evidence of "cutting the license" and installing the software could be found, if significant technical work had in fact been done.

Regarding Apple's involvement, Egan remembered seeing commentary from an Apple employee regarding who would be the right person to talk about the project. Egan supposed this must have happened before Autonomy's falling out with Apple. Autonomy had made a contract with Apple but the service didn't go well, so Apple sued. Otherwise, Egan didn't remember the timing of the Vatian deal.

Egan stated he played no role in the Vatican deal, other than making the introduction to Apple.

Egan wasn't sure if the Vatican deal was a competitive bid situation, but did remember the anecdote with the Da Vinci code reference and thus assumed it was.

Egan had never heard of EMC's involvement or association with the Vatican deal.

Egan didn't recall any specific public or internal representations that Autonomy digitized the Vatican Library, but he didn't remember "braggy style references" to it. Egan wasn't sure if this was at an internal meeting or made by a sales rep who mistakenly put it into a pitch. However Egan did recall hearing "a little trumpet about it."

He understood Microtech's involvement with the deal to be a reseller, meaning they purchased the deal expecting to earn a margin on it but did not offer any skills or services included in the deal. Egan likened Microtech's involvement to financing the deal. Egan was told Microtech's involvement was legal, but now Egan wasn't sure. Microtech would ask Egan about payment on the deal, and Egan would ask UK management. When Egan asked, Egan was told there was a "large amount of bureaucratic budget flow for the deal", which is what delayed the deal but also why Autonomy wanted to involve a reseller.

Egan assumed Corrado Broli ("Broli") was involved because Egan associated Broli with all the Italian deals. However, Egan could not specifically recall Broli's involvement with the Vatican deal. Broli had connections with the Italian government, and thus Egan wasn't sure if those connections translated to the Vatican.

Egan also thought that "Poste" was involved with the deal, which seemed typical of Italy. Egan thought the company was part of the Post Office and also a large IP provider.

-7-

MLAT_AU 00073014

Egan didn't remember much involvement with the Vatican deal, other than introducing the topic to Microtech and then later following up as to why it was taking so long for Microtech to get paid. Egan felt like he was never satisfied with the answers he was given about why the deal wasn't closing and thought the deal took too long. Egan's contact at Microtech was Steve and another man whose name Egan didn't remember.

Egan didn't remember any reassurances that the Vatican deal was less risky for a reseller to take, but Egan felt he would have referred those types of questions directly to Hussain.

Egan thought that language in a PowerPoint presentation titled "An Unprecedented Deal" (Tab 4), was created for either the Miami kick off meeting or the HP Information Management meeting in Las Vegas. Both meetings were intended to internally "rally the troops" following the acquisition. Egan and Gerard Brossard, who was in charge of Autonomy from HP's perspective, presented at the Miami meeting. All information on the slides, including information about Autonomy digitizing the Vatican archives, was taken from an existing template presentation that Lynch and the UK office would have given Egan. Egan called Lynch a "micromanager in general", but particularly interested in this sort of marketing message. Egan thought the message was designed to be impressive and make people proud. Regarding other statements on the slides, Egan had never heard of the Jerome Kerviel situation on the first "Things you may not know about Autonomy" slide. Egan had never heard of the Milan Metro work. Egan knew Tesco was real, and John Lewis was real. The rest seemed true. Egan believed that the statement about two billion people using Autonomy products every day was actually conservative because Autonomy supports some very public platforms like Bloomberg. Egan knew that Lynch is good friends with Tom Secunda, and that Bloomberg has a huge system and is hugely reliant on Autonomy products.

> 4.   Microtech/Federal Cloud Platform

Egan recalled the federal cloud platform, but wasn't directly involved with it. Egan described it as a "compliant ready investment in gaining future federal revenue that [wa]s very hardware and software stack intensive." Egan recalled it was Microtech's idea to create it, but he believed it was a valuable investment for both parties. Egan thought it had been offered to customers, but he wasn't sure how successful it had been. Egan remembered thinking it was a good business decision, but probably not something Autonomy would have done if Microtech hadn't needed to be "made whole."

Egan thought that a "FISMA" reference in an August 15, 2011 email between Steve Chamberlain and Hussain (Tab 3) was a reference to the federal cloud platform. Egan remembered a rush to pay Microtech but couldn't recall specifically why. Egan thought it likely the payment was rushed because Hussain wanted to balance out the books. This email chain occurred two days before HP's acquisition was announced. Egan appeared hesitant to say outright that Hussain wanted the books to be in order before the final diligence call on August 16, but hinted towards it. Egan also acknowledged the reseller could have been driving the rush since they would want information about the Vatican purchase order or an alternative.

After the proposal, the federal cloud platform became a UK Microtech project, so Egan wasn't

-8-

sure how much more activity occurred with it. Egan suggested talking to Pete Menell's former department about it. Egan knew more about the Capax cloud project.

F.      *Capax*

Autonomy's relationship with Capax predated Egan. Egan postulated that the relationship resulted from one of Autonomy's acquisitions. Egan believed that Capax currently has the greatest amount of "trained, happy Autonomy skilled" employees, perhaps more than Autonomy itself.

 Both Capax and Microtech have cloud platforms that are highly conforming and the companies went through all the hurdles to become secure government providers. Egan said the government often declares a standard and then there is a corresponding rush to be the company that can capture that standard. Both Capax and Microtech have done that with great success.

Capax and Autonomy had a Value Added Reseller Agreement. It was amended to involve Capax's EAS work. EAS was a software product for which Capax provided service. Regarding an October 2, 2009 email from Scott to John Baiocco (Tab 5, end of email chain) Egan wasn't sure why the service agreement wasn't separate. Egan described EAS as a "crap product that Autonomy acquired through [Zantaz]". EAS was a mail archiving system for low end customers, or customers that had only 25-30 employees. Autonomy tried to upgrade customers to another product. Autonomy experienced a big defection of EAS support employees to Capax. Thus, Autonomy decided Capax would provide support for the EAS system. Egan thought the decision made good business sense because Capax was better than Autonomy at it and the work was already being subcontracted. Egan believed an element of keeping Capax a happy reseller was involved, but Egan didn't think this line of inquiry would be very fruitful for the investigation. As part of the deal, Autonomy would keep some big customer relationships directly, but Egan thought the decision of who to keep and who to farm out to Capax was made based on "who you would want to piss off and who not."

EDD was completely separate from the EAS agreement. Capax wanted to become a provider of EDD processing. Autonomy historically had farmed out a lot of EDD processing work because it was a "surge and shortage business," where the customer demanded that a lot of data be processed quickly. Autonomy felt the line of business was not an engine to create more business, but more of a subcontractor area, so when Capax wanted to become involved it gave Autonomy an opportunity to sell Capax Autonomy software, and allow Capax to do the service.

Egan believed Autonomy purchased Capax services both to maintain a good relationship with Capax and to ensure Capax wouldn't lose a large amount of money if a deal Capax took became "at risk."

Regarding a July 6, 2010 email (Tab 6), where Reena Presand described the Capax/FSA deal deal as "high risk", Egan thought it was referring to a deal that wasn't yet sold through. Egan didn't recall any FSA deal with Capax. Egan did know FSA is an Autonomy customer because he recently met with Bank of England, which FSA was folded into. Egan would not have been involved in FSA negotiations because it would have been handled in the UK office.

-9-

MLAT_AU 00073016

Egan felt that the Amgen situation informed the decision to split a Bank of America deal between Capax and Discovertech. Amgen said it didn't want a reseller involved with its deal. This decision left Capax holding an unclosed deal. Egan thought that Amgen hadn't been told about the Capax's involvement until after Capax had already bought the deal. However, Egan recalled that Capax was a big supplier for Amgen.

Egan wasn't sure what the "credit" referenced in a March 15, 2011 email meant (Tab 7). Egan thought it might have had to do with splitting the Bank of America deal. Egan noted that splitting transactions among resellers was rare and he didn't believe there were good reasons to ever do it. Egan did think that perhaps the deal was split for accounting reasons. Egan recalled that Hussain was often concerned with ensuring the reseller's involvement complied with accounting standards, which was related to the size of the deal, as it compared to the size of the reseller and whether or not they had the financial wherewithal to take on certain deals.

     1.    <u>Capax Owners</u>

Egan believed John Baiocco had six partners. Baiocco and one other partner owned relatively large portions of Capax, while the rest of the partners owned the remainder. Egan believed this because Baiocco often referred to asking other partners about fiduciary decisions.

Egan was previously asked if Hussain was a Capax owner, which Egan flatly rejected. Egan said that information would shock him more than HP's recent announcement. Although he acknowledged it might be crazy, Egan maintains the view Hussain is a highly ethical person who would be incensed by such an accusation. Egan further stated that Hussain didn't really make much money and Egan thought he was "massively under the spell of one of the most powerful human characters on the planet." Egan thought Hussain "got screwed into doing something," but that Hussain would never do something self beneficial. Egan also felt Baiocco was "transparent' and a good friend of his. Egan thought Baiocco would have offered a part ownership of Capax to Egan before Baiocco offered it to Hussain. Baiocco is nervous about appearing in the newspaper in connection with this, and Egan thought that would bring out Hussain's ownership too.

Egan also saw Hussain push back on Lynch's unethical ideas. Egan didn't think he was particularly privy to those conversations, but Egan saw Hussain be worked by Lynch just as hard as the rest of management was worked. In describing this pressure, Egan choked up and almost began to cry. Egan described how management was often forced to travel last minute, and stay there in case a client needed them, despite their families being far away. Egan thought Lynch would push his employees until the point Lynch truly felt they would quit.

Egan thought that $75 million in 2010 revenue for Capax seemed realistic (Tab 8). Egan thought it seemed consistent with headcount, global presence and information Egan had heard about Capax.

     G.    *Discovertech*

The relationship with Discovertech started after Dave Truitt left Autonomy. Dave Truitt only worked for Autonomy because Autonomy acquired Microlink. When Dave Truitt left, he created the same type of company as Microlink. Thus, Discovertech is mostly a services and reseller

MLAT_AU 00073017

company. Egan thought Discovertech might be more oriented towards software development than Microlink. Egan wasn't sure if Discovertech was created to develop Autonomy software, but Egan knew that eventually Autonomy used the Discovertech software. Egan said this type of work would not have been done if Discovertech hadn't purchased "at risk" deals from Autonomy.

Egan remembered an Abbott deal and wasn't surprised it was resold at risk, but Egan didn't remember which reseller participated. When told that the Abbot deal closed on June 30, 2011, the same day a software distribution agreement with Discovertech was signed, Egan stated it didn't surprise him, especially because the date was at the end of the quarter. Thus, Egan believed the quarter end drove both, not necessarily another reason. However, Egan did believe neither deal would have happened if there wasn't an "opposite side of the ledger issue." Egan remembered the Abbott deal closing so felt there was no particular reason for those transactions to be related. Egan thought Abbot was handled by Rafiq Mohammadi or Neal Arrajo's unit in Chicaco. Egan wasn't directly involved.

Egan remembered Discoverpoint Engine was a product Autonomy purchased. Egan remembered Hussain put a fair amount of effort into making sure this product, and others, was put to use. However, the general reaction to purchasing this product was that Autonomy didn't need it. Egan often felt stuck in the middle on this discussion because he wasn't involved in technical development, but knew that customers sometimes preferred non-Autonomy products. Egan did recall discussions about the products where people felt that Autonomy didn't need the product because Autonomy software could do the same thing.

    H.    *FileTek*

Autonomy purchased a FileTek product that could take a larger set of data and represent it on a disk as fewer files. Thus, Autonomy used it in hosted operations, a service Autonomy offered. Egan wasn't sure if the product was actually used, but he knew the rationale behind its purchase was to use it in hosted operations for very large archive customers.

    I.    *VMS*

Egan thought this topic was not worthwhile for the investigation. He explained VMS was a customer with a long standing relationship with Autonomy, dating back to before Autonomy acquired Verity. Egan remembered this because at one point Autonomy had completely replaced Verity in VMS's system, which was a huge victory for Autonomy. VMS is a company that "digests" all the news and sold customers a product that could give the customer information on whenever the company was mentioned in the news. Egan recalled this was his first $1 Million deal, and it occurred so long ago that a $1 Million deal was "big potatoes." Egan became good friends with VMS's CIO and VMS would often provide references for Autonomy products.

Eventually VMS needed to update their system to capture video rather than just text. Autonomy was very good at that and completed the work. When VMS entered this deal, Autonomy licensed VMS's software so that it could be used in Autonomy's demos. Egan found this to be "logical and well rationalized." Egan believed the cost of Autonomy's license for the VMS software was relatively low. However, Egan did agree that one deal likely would not have happened without

-11-

MLAT_AU 00073018

the other, or perhaps one deal wouldn't have been as large. Egan truly had no idea VMS was going to declare bankruptcy, though in retrospect admitted he shouldn't have been too surprised. Autonomy did investigate acquiring VMS on two separate occasions, but the acquisition was never fully pursued.

J.    *Blinx*

Egan thought this line of investigation would not be fruitful. Blinx is a product originally incubated by Autonomy and then eventually spun off. It provides a publicly accessible service that Egan called "Google for searching video." The company is a publically traded. Because the project was started at Autonomy, there is a lot of Autonomy software in it.  At one point, Egan wondered why Autonomy wouldn't extend Blinx's license in order to fill a revenue gap. However, Egan was told that the auditors wouldn't like this strategy because Blinx was too related to Autonomy. Egan felt Blinx was "obviously something Lynch and Autonomy had an investment in."

When Blinx was spun out of Autonomy, Egan was told the UK employees had some obligation to invest in Blinx with their own money. Egan felt it was a "bullied" requirement and the employees talked about it as if they "had to" invest their own money. Egan never "had to" invest in Blinx but thought maybe the situation indicated he was excluded from this particular scheme. Regardless, the deal seemed to be more than just a spin out.

Egan also explained that Blinx's CEO, Suranga Chandratillake, who is about to leave Blinx, was a former Autonomy US employee and handpicked by Lynch to be Blinx's CEO. Egan felt Chandratillake was Lynch's "pawn" and that Lynch picked him partially because has young, probably 28 at the time, and thus Chandratillake would feel indebted to Lynch. Despite this influence, Egan confidently vouched for Chandratillake's character.

K.    *Tikit*

Egan had never heard of this company, prior to seeing their name in the press coverage. Egan didn't know anything about it and didn't believe investigating the company would be fruitful.

## IV.    **Deal Restructuring**

Egan felt that restructuring hosting deals to license deals were "rabbit holes." Egan had firsthand knowledge of those deals and thought management at time took great care to ensure the deals were very well rationalized. Egan says he now felt like a pawn in the deals.

## V.    **Information Egan Wanted HP to  be Aware of**

Egan was hesitant to offer the following information, but ultimately reiterated he thought HP should know what "the other side" knew and how they would use this against HP in any subsequent litigation.

After Autonomy was acquired by HP, and Egan became an HP employee, he participated in three deals he felt were very similar to deals Autonomy had previously done. Egan felt the

MLAT_AU 00073019

difference between these deals and the HP deals were that the Autonomy deals were smaller and surrounded by less "formality." Egan described the deals as follows:

### A.  *DreamWorks*

Egan thought HP's relationship with DreamWorks could be problematic. According to Egan, HP effectively funds DreamWorks' HP purchases by buying marketing. Egan felt the relationship was easily rationalized, and called it a "love fest." Egan believed HP got value in the relationship because Jeffry Katzenberg, DreamWorks' CEO, "stands on stage and raves about HP." Egan knew about the relationship because after HP acquired Autonomy, DreamWorks wanted to be the first HP user of Autonomy products. However, ultimately HP knew DreamWorks was essentially going to ask for HP to pay for it. Egan went through the approval process for the deal and HP would get essentially the exact same amount DreamWorks spends, and the revenue would have been recognized. Egan did ask Chris Yelland about the deal, and Yelland thought the revenue might have been backed out. Thus, Egan felt HP was being conservative and that new management had scrutinized the relationship. However, Egan was concerned that Lynch would use this information to spin press coverage or convince a jury it was a similar practice to what Autonomy did.

### B.  *General Motors (GM)*

Recently, Randy Mott left HP and went to work for GM. GM had previously outsourced its IT to HP. Randy decided to take the IT work back in house, and reached out to HP asking how to do it. This dialogue began just last quarter. Autonomy participated in this deal and sold $80-90 Million dollars in licensing fees from GM. Egan felt this deal was partially a "settlement" for taking the IT work in house. Egan thought there would be a lot of email traffic documenting the sale as different. Egan wasn't sure about the surrounding accounting practices, but was again concerned this situation would be discovered and used by Lynch.

### C.  *JPMC*

The final deal worrying Egan was a JPMC deal for $2 Million of Autonomy legal software. Egan knew JPMC went through the entire sales process and was excited about the purchase, but then "had some epiphany" that they couldn't use it because of a decommission problem with Microsoft. Thus, JPMC came back to Autonomy and admitted their mistake, asking for Autonomy to give them some value back because the software was "literally going to sit on the shelf." Egan felt there was a lot of documentation about the deal, and eventually Autonomy discounted EDD processing work it was doing for JPMC in order to maintain goodwill. Egan didn't think Lynch currently knows about this deal, but thought Lynch could easily find it out and use it against HP. Egan felt many employees would talk to Lynch because he is a "scary guy" and the employees would want "to stay in his good graces."

### VI.   **HP Acquisition**

Egan knew nothing about HP's acquisition of Autonomy. Looking back, he remembered that Lynch "basically put a choke on [Egan] with Bill Vechty and any conversations [Egan] had with him." Egan felt Lynch didn't want Egan to talk freely about anything with Vechty.  However,

MLAT_AU 00073020

Egan still didn't think this was much information because for over a decade, Egan had heard Lynch say things that Egan felt were designed to make employees optimistic.


Egan knew that when HP acquired Autonomy, all of the UK employee's options vested but the US employee's unvested options were rolled into an HP equivalent. When asked to explain, the group said it was due to an old forgotten contract clause. Egan found this explanation ridiculous.

## VII.   General Information and Concluding Remarks

Egan explained that software licenses do get "cut", even if just in a presale setting. Egan explained this situation as "proof of concept" or POC, wherein the sales rep wants to show that the software can handle whatever "hurdles" the customer might be concerned about.

Egan was contacted by Nicole Eagan the weekend after HP's announcement. Egan thought Eagan was trying to get information from him. Egan believes Eagan works for Lynch because UK Autonomy employees frequently see her near Lynch's new offices, which are across the square from Autonomy's London offices. Egan described Eagan as nice and generally well liked, but vulnerable to Lynch's "spell."

Since the date of the interview was Egan's last day, Egan gave Ms. Caldwell and Ms. Resley his personal email and suggested they email him with any questions. Ms. Caldwell and Ms. Resley also asked that Egan email them if he thought of anything further, or if something in the press jogged his memory. Ms. Caldwell requested that Egan send this information directly to her, rather than to HP. Egan asked if he should expect to be contacted by government enforcement authorities. Ms. Caldwell said he likely would be contacted at some point, and didn't know exactly what they would do, but she would be surprised if Egan was contacted in the near future. Egan asked what to do if the press called him with questions. Ms. Caldwell reminded him she wasn't his lawyer, and that she couldn't tell him not to speak with the media.

MLAT_AU 00073021



DATE:            January 9, 2013

SUBJECT:      Memorandum of Interview with Stouffer Egan – January 8, 2013

| TAB | Description |
|-----|-------------|
| 1 | 1/1/11 – Email between J.Scott, S.Hussain and S.Egan |
| 2 | 12/28/09 – Email between A.Kanter and J.Scott |
| 3 | 12/23/09 – Autonomy Purchase Quotation to MicroTech for US$10,000,000 |
| 4 | 12/29/09 - Email between S.Hussain, S.Chamberlain and J.Scott with attached "Confidential Proposal to Morgan Stanley Software and Dell Server Promotion" |
| 5 | 12/31/09 – Purchaser Order Under Autonomy Government Reseller Agreement for US $4,788,800. |
| 6 | 1/12 - 21/09 – Email chain between L.Guiao, S.Chamberlain, S.Egan, D.Kennelly, and F.Cook. |
| 7 | 12/23/09 – Email between S.Hussain and S.Egan |
| 8 | 3/11 - 31/10 – Email chain between S.Hussain, S.Egan, A.Kanter and M.Stephan |
| 9 | 9/30/09 – 10/1/09 – Email chain between S.Egan, S.Hussain, J.Scott, S.Chamberlain |
| 10 | 10/27/09 – Email chain between M.Lynch, P.Menell, A.Kanter, and S.Hussain |
| 11 | June 2010 – Capax Revenue Summary through 4/1/11 drafted by Jim Crumbacher |
| 12 | 10/6/10 – Email chain between A.Kanter, S.Hussain and S.Egan |
| 13 | 10/10/10 – Email chain between A.Kanter, S.Chamberlain, S.Egan and S.Hussain |
| 14 | 12/31/10 - Letter from Capax to Autonomy titled "Re: Replacement of Purchase Order" |
| 15 | 9/30/10 - Autonomy Sales Order Report for Capax |
| 16 | 9/30/10 - Invoice to Capax for Bank of America Invoice Number 7770-ANA |
| 17 | 9/30/10 - Invoice to Capax for Bank of America Invoice Number 7771-ANA |
| 18 | 11/1/10 – Email between P.Mennell, M.Lynch, S.Hussain, and S.Egan |
| 19 | 12/20/10 – Email chain between S.Hussain, J.Krakoski |
| 20 | 2/10 - 11/11 – Email chain between S.Chamberlain, J.Scott, L.Guiao and D.Truitt |
| 21 | 1/24/11 – Email chain between S.Egan, S.Hussain and J.Scott |
| 22 | 1/25/11 – Email chain between S.Egan, S.Chamberlain, and L.Guiao |
| 23 | 7/19/10 – Email between J.Still, S.Egan, M.Mooney, and S.Hussain |
| 24 | 8/7/10 – Email between M.Lynch, J.Still, S.Hussain, M.Mooney, S.Egan, B.Rellinger, P.Menell and M.Sullivan August 7, 2010 email |
| 25 | 8/25/10 – Email between S.Hussain, S.Egan and P.Menell |
| 26 | 8/26/10 – Email between J.Still, and S.Hussain |
| 27 | 9/8/10 – Email between S.Hussain and S.Egan |
| 28 | 9/27/10 – Email between S.Hussain and S.Egan |
| 29 | 9/30/10 – Email between J.Crumbacher, S.Egan, S.Chamberlain, and M.Stephan |
| 30 | 9/30/10 – Email between J.Crumbacher and J.Scott |
| 31 | 10/1/10 – Email between S.Chamberlain, S.Egan and S.Hussain |
| 32 | 10/1 - 14/10 – Email chain between S.Chamberlain, S.Egan and S.Hussain |

MLAT_AU 00073022

| 33 | 4/16/11 - Email between S.Hussain, M.Mooney, S.Kalbag and S.Egan |

I.    **Interview Overview**

On January 8, 2013, Leslie Caldwell, Susan Resley, and Martha Stolley, all of Morgan Lewis and Bockius ("MLB") conducted an in-person interview of Stouffer Egan ("Egan"), former CEO of Autonomy U.S. Sarah Nolton of PwC and Kate Emminger of MLB also attended. The interview lasted approximately four and a half hours and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices. This was the third time Egan was interviewed in connection with this investigation.

At the beginning of the interview, Ms. Resley thanked Egan for participating in this third interview. Ms. Resley reminded Egan of the interview structure, explaining that HP had engaged MLB to conduct the investigation, and MLB had engaged PwC for assistance in the investigation. Ms. Resley informed Egan that MLB, on behalf of HP, has reported the investigation findings to the SEC, SFO and DOJ.

Ms. Resley provided Egan with "UpJohn Warnings" by advising him that the interview was part of HP's internal investigation, that it was privileged and that Egan should keep the discussion confidential. Ms. Resley further advised Egan that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

Egan requested clarification about confidentiality, asking how he should handle interactions with other Autonomy or HP employees. Both Ms. Resley and Ms. Stolley requested that Egan not speak about the interviews and, if asked, to simply reply that he couldn't talk about it. Ms. Resley clarified that Egan could discuss public documents, but that all topics discussed during the interviews must be kept confidential. Ms. Resley also told Egan that the government would likely interview Egan and ask if Egan and discussed the issues with anyone else. If Egan had participated in conversations outside these interviews, the government would question Egan extensively about these other conversations. Thus, Ms. Resley advised and instructed Egan to keep the interviews confidential. Egan stated that George Kadifa and Robert Youngjohns, both of whom were Egan's former supervisors at HP, had asked him to discuss returning to work for HP, but Egan was unsure if he would return. Egan expressed a desire to help rebuild Autonomy's reputation but was unsure if working for HP again was the right decision.

Egan also requested confirmation that the interview format, purpose, and underlying circumstances of this third interview were the same the previous interviews. Ms. Resley confirmed that the format was the same and explained that the investigation was still in a fact gathering stage so the only real change now is that there are more documents available to reference.

A.    **Resellers Generally**

In the last two weeks of every quarter, Egan felt Autonomy sales managers generally knew what deals were going to close and what deals were going to miss the quarter end due to legal negotiations or a lacking signature. Thus, if Sushovan Hussain felt that Autonomy's revenue was

MLAT_AU 00073023

going to be short for a specific quarter, he would ask the CEOs of the various units which deals were "going to miss by a signature," but that were "fundamental and big" so that a reseller could be brought in to close it in the quarter. Thus, Hussain would find out which deals were available, and then Hussain would find out if any resellers were willing to take the deals.

At quarter end, Autonomy would reach out to resellers and ask if the reseller could commit a certain amount, even before the reseller knew who the end user was. As Egan understood it, Hussain would check on a reseller's cash position to see if there was some reason the reseller couldn't take the deal. Thus, Hussain would generally investigate reseller availability by checking to see if the reseller wanted to do it, if the reseller could do it financially and if the reseller was able to pay 25% of the cash up front. Egan thought this 25% was the standard down payment necessitated by Hussain. This general check-in wasn't a binding agreement, but it would indicate which resellers were willing and able to take deals.

Deciding what deal would be taken to which reseller was "inherently collaborative." This was because the forecast for deals came from five or six different sources and often one person would not know about deals in another person's arena. Hussain might show a preference for a reseller depending on the reseller's DSOs or depending on how much risk the reseller had from a prior period. If a reseller had too much risk from a prior period, the reseller might not be eligible. Thus, Hussain managed this reseller specific information, but the final decision had multiple variables including what deals were available, what resellers wanted deals, the situations of each reseller relative to what was owed to Autonomy, the size of the reseller, and the reseller's history. Ultimately, the final call was Hussain's.

Willing resellers would then go "at risk." "At risk" was the term used inside of Autonomy, and it meant that a reseller was going to "put themselves on the hook for the deal." Egan described these reseller deals as "non-refundable and binding." Egan was insistent that the resellers were actually, fully on the hook for the deals they took at risk. Egan felt that there was "absolutely no way that [Hussain] was going to not collect cash from the resellers on the deal." Egan believed that, for each deal involving a reseller, Hussain earnestly believed the deal was going to happen and was "in range" such that the reseller would actually be on the hook. (However, see below section "When End User Deals Fell Through").

After a reseller had taken the deal, the reseller would often then become heavily involved in closing the deal. The reseller started a direct relationship with the end user, or otherwise tried to "embed" themselves with the end user. Occasionally, resellers were already involved with the end user company in a different capacity. With some deals, like the Vatican, the reseller wouldn't become involved with the end user at all. Egan confirmed that looking at reseller records would indicate the reseller was involved with the end user.

Egan didn't recall using the phrase "acceleration partner" to describe the resellers. Egan thought he might have said the resellers accelerated the deal or something similar, but didn't recall using the phrase "acceleration partner" internally at Autonomy. Egan recalled using the phrase "partner going at risk" while at Autonomy. Egan also thought Autonomy used the term "pre-buy" though at the interview wasn't sure if "pre-buy" was commonly used at Autonomy or if it was just a phrase he was now using.

MLAT_AU 00073024

When asked about 1/1/11 email from Hussain that states "Pls make sure we get the cheques from DT, MT and Capax dated appropriately" (TAB 1), Egan said this reference was to cash collection and that Hussain wanted to ensure checks received on 1/1 were dated 12/31 so that they could be put into the last quarter. If the check was dated 12/31, and a fax of the dated check was received on 12/31, then it was alright if the actual check arrived and cash was deposited on 1/1.

1.     <u>Auditor Involvement in Reseller Deals</u>

Egan emphasized that Hussain always gave Egan the impression that these reseller deals were being doing as if everything was audited. Thus, Egan said "it felt like you were with the auditor every moment." Hussain would tell Egan that the auditors dictated a certain prepay, a certain payment schedule, that the reseller had to come current on their prior deal and that the reseller had to give at least 10% to buy another deal. At the time, Egan felt Hussain's discussions with the auditors were actually ongoing because the requirements felt very rigid. Egan felt that what auditors dictated was often strange minutia, with no better rationale then "that's what the auditors say." He thought Hussain's rules felt similar and thus believed the directions were authentically from the auditors. Furthermore, Egan felt it was Hussain's place to argue with the auditors, not Egan's.

2.     <u>Rationale for Reseller Deals</u>

Egan agreed that the sole reason a reseller was brought into a deal was so that the revenue could be included in a certain quarter. However, Egan warned that while he thought this rationale was the main one, there were other views as to why resellers would be used. For example, another person might argue that seeding deals with resellers was an "investment in your overall channel." The resellers liked to be involved with the deal because the end user usually needed professional services support that the reseller could provide. Further, there was jockeying between various resellers to get the professional services business, so taking a deal at risk could give one reseller an edge over another reseller. Egan agreed that the resellers might have received the business without taking the deal at risk, but still thought that assisting to create this relationship was a true and valid rationale. Egan thought that a lot of material supporting this business rationale would exist, even if it was not actually the most important reason for letting resellers take deals at risk.

3.     <u>When End User Deals Fell Through</u>

While Egan insisted the resellers were completely on the hook for a deal taken at risk, Egan did agree that there were ways Autonomy could "fix" a situation so that a reseller could pay Autonomy. Furthermore, Egan said that when a deal went wrong or circumstances changed, Hussain wasn't going to make a reseller "cough up $9 Million" and pretend that the relationship would continue. Egan said that situation would be "too much of a hit." Egan described it as a "relationship ender" such that the reseller's relationship with Autonomy would end completely: the reseller would not take deals "at risk" and the reseller wouldn't do any further work with Autonomy. To remedy such situations, Autonomy would sometimes swap out deals with a different end user. In this situation, Autonomy would do all the work to exchange the deal. This situation was difficult for the sales person because the sales person had to do the work twice, but the double effort was never credited nor remembered. Egan called the method "grossly

Morgan, Lewis & Bockius LLP

MLAT_AU 00073025

inefficient."

If a reseller had taken a deal at risk and the end user deal dragged on, Autonomy would finally admit it wasn't going to happen. The reseller would then be holding an obligation to pay Autonomy, which affects DSOs and other business. Thus, Autonomy would find a way to fix it. Autonomy could find another deal to swap with the deal that fell through. In this situation, the reseller could end up in a surplus situation, so that the reseller "kinda got a freebie" because Autonomy gave them a bigger deal. Autonomy would just look at this situation as the reseller "ow[ing Autonomy] one." To find this replacement deal, Autonomy would pick another deal from the forecast. Egan expressed frustration at situations like this because the deal swap would change his quarterly progress towards sales goals.

### 4.    End User Resistance to a Reseller's Involvement

Egan said that when an end user didn't want to go through a reseller, it might create a problem, and he recalled occasions the end user could not or would not use the reseller to close the deal. However, Egan said that often it wasn't hard to convince the end user to use the reseller. Sometimes Egan would offer discounts to incentivize the end user to close the deal through the reseller. Sometimes there was another benefit the end user received by going through the reseller. For example, an end user might be able to avoid tax if the reseller was in another state.

When asked about other ways a reseller might be compensated when the end user deal fell through, Egan mentioned MicroTech and its "data center thing." Egan felt he didn't know much about it, but said that the initiative would not have happened if Autonomy hadn't been "owing" MicroTech. Egan felt that sometimes if an end user deal didn't go through, Autonomy would just write off the debt and forgive the reseller's debt. Or, Autonomy would "extend that much value through that relationship" by, for example, increasing the EDD work that MicroTech did. In Egan's opinion, the increase in business wouldn't have happened if Autonomy hadn't already owed MicroTech. However, despite Egan's strong opinion that a large part of the rationale for completing this EDD or other reseller product purchase deals was because Autonomy "owed" a reseller, Egan warned that work was done to get auditors' blessings on these purchases. Thus, Egan felt there would be plenty of information supporting the idea that these were real, valid purchases.

Egan felt that these sort of deals were also done by HP. For example, Egan said that JPMC had bought $2 Million of iManage software from Autonomy after a full sales cycle, but then realized they weren't using it and so came back to HP expecting a refund or way to return the value. Chris Yelland, Robert Schmitt and Egan did this for JPMC. Egan felt this action was very similar situation to what Autonomy did. Egan did agree that Autonomy's actions were distinguishable because there was no risk associated with the HP JPMC deal and the deal was fully completed with the actual end user.

Regarding a 12/28/09 email where Andy Kanter writes to Joel Scott "MT – How's it going?" and Scott responds "MT? That was drafted and out last week" and a 12/23/09 Autonomy Purchase Quotation to MicroTech from Autonomy for Software totally $US10,000,000.00, (TAB 2 and TAB 3), Egan thought this email appeared to be regarding Autonomy purchase of the OEM right to sell MicroTech's product. This transaction was an example of a transaction that would not

MLAT_AU 00073026

have happened but for Autonomy's owing MicroTech from an at risk deal that didn't go through. However, Egan warned that MicroTech's product in this instance was better than Autonomy's, so there was a great business rationale to Autonomy's buying it. Still, Egan believed that the deal would have never happen if Autonomy hadn't owed MicroTech the return of value in some capacity.

### 5.   Commission on Reseller Deals

No commission was paid to the sales person until the end user deal closed, even if a reseller had taken the deal at risk. For example, if Capax took a Kraft deal at risk, the commission wouldn't be paid when the deal was closed with Capax, but it would be paid once the deal with Kraft was closed. Egan thought the investigation may find a standalone situation where commission was paid when the reseller deal closed. However, Egan described this situation as a mistake, rather than the consistent policy.

Egan also clarified that sometimes commission was paid only when the end user paid the actual cash to Autonomy. For example, Egan explained, if there were extended payment terms, there was a specific commission formula based on when the end user paid. The sales team was told that this structure was dictated by the auditors. Egan felt it was explained in such a way that made "perfect sense."

### 6.   Credit Memos and Marketing Assistance Fees

When an end user refused to pay the reseller, insisting on going through Autonomy directly, Egan recalled Hussain had a mechanism to ensure the reseller still received their margin. Hussain called it a "credit memo." Essentially, the credit memo allowed invoicing to happen differently than the original deal supposed. Egan recalled that the credit memo split the terms and conditions from the invoicing because the terms and conditions were contractually the same between the end user and reseller. Thus the credit memo would "correct the fact that [the reseller] owed [Autonomy] money" because Autonomy had collected the money for the deal from the actual end user. Then Autonomy would pay the margin of 5 or 10 percent, called a Marketing Assistance Fee, directly to the reseller because the reseller wouldn't make the margin the usual way, which was reducing the amount received from the end user. The mechanism would relieve the reseller of their obligation to pay Autonomy. Egan wasn't sure he would call it a "fix" or "relief for the reseller."

### 7.   Marketing Assistance Fee

Egan explained that when a reseller went at risk they were entitled to a margin, usually 10 percent. Egan thought that margin would be written in the VAR agreement, or somewhere similar. Egan said that sometimes Autonomy negotiated the margin down to 5%, perhaps in a situation where there was very little risk associated with the deal because the deal was held up on someone's desk and closes the day after the quarter end. However, Egan recalled that usually the margin was 10%.

A marketing assistance fee would be incurred when a reseller took a deal at risk but for some reason the end user deal came directly through Autonomy. Thus, the reseller would likely send a

MLAT_AU 00073027

PO for the marketing assistance fee, "or they would bark for it." Egan wasn't sure how the fee was allocated, but thought it would have involved a credit memo as well.

### B.   Morgan Stanley – Hardware, Software and Reseller Deal

Egan recalled that the first Morgan Stanley hardware deal was though Hitachi.

Egan recalled that a deal from Mid-December 2009 where Autonomy received a price quote from Dell, and a hardware and software deal was being negotiated. When asked about a 12/29/09 email (TAB 4), with an attached proposal describing a hardware and software deal where the valuation changes, Egan remembers that the reason the software was eventually removed was because Morgan Stanley wanted the hardware separate from the software, but Hussain wanted just one PO for both hardware and software. Egan recalled that Morgan Stanley wanted software, but wasn't sure if ultimately Morgan Stanley bought that software with the hardware purchase. Egan thought that the software might have been given to Morgan Stanley at a later date. Egan recalled a "ton of wrangling" about the formatting of the PO due to the parsing of hardware and software and believes that that is the reason the deal didn't go through.

Egan explained that Morgan Stanley purchases huge sums of hardware each quarter. Egan felt that Hussain would have "clearly needed software to be with it" but could never get the deal done with both the software and the hardware.

Egan wasn't sure how the software and hardware were valued, but thought that based on the email, it seemed like Morgan Stanley suggested the value because it says "in lieu of previously submitted quotes." (TAB 4) Thus, the valuation was probably changed to be more in line of what Autonomy thought that Morgan Stanley would accept. The whole negotiation process, Egan felt, was based on trying to "work the room" between what Hussain wanted and what Morgan Stanley wanted. Egan recalled many reiterations during this negotiation, but couldn't remember who wanted what. Egan felt that Hussain probably wanted to split it his way so that he could increase the accounting attribution of the software, but Morgan Stanley had no budget for software and no way to buy the software because they were the hardware people. The department that Autonomy was negotiating with in Morgan Stanley wanted the software, but couldn't accept the paperwork with both hardware and software on it because that department only dealt with hardware. Thus, the paperwork documented hardware purchases and the software was give to Morgan Stanley to help the relationship. Morgan wanted to buy the software but didn't have the budget that quarter and the two divisions – the one that bought hardware and the one that bought software – couldn't reconcile a joint deal between themselves.

Egan wasn't sure if software was part of the hardware sales pitch and recommended asking Troy Huber and Al. Egan wasn't sure that the sales pitch involved free software, but speculated that Morgan STanely would have known the software was essentially free because Autonomy is very collaborative with Morgan Stanley. Troy was the main software client at Morgan Stanley, but he did a little hardware sales as well.

Egan had no idea how the figures of $4.78 million and 1 million were decided, but knew that they would have had to been approved by Hussain and only Hussain knew the parameters of the discounts he would approve.

MLAT_AU 00073028

After examining the 12/31/09 Purchase Order Under Autonomy Government Reseller Agreement (TAB 5), Egan admitted this was not the software bundle he had expected that Morgan Stanley would have wanted, when discussion the negotiations before, but agreed that the PO indicated that MicroTech took the Morgan Stanley deal at risk. The software on the PO is for DS Mail, which is a robust searching capability software. Egan had previously been thinking Morgan Stanley was getting the Verage video handling software with this hardware deal because Egan knew that Morgan Stanley had bought the Verage software. Egan thought this mistake was inconsequential because Troy and Morgan Stanley still wanted this software, and this software was likely discussed. Egan also thought that made sense then that the software was given to Morgan Stanley because Autonomy was having a hard time getting the software adopted by other customers. The rest of Autonomy's big bank clients were all archiving their mail through Autonomy, but using a poor search product that Autonomy acquired with Zantaz. This DSMail was a better product and gave Morgan Stanley a better way to parce mail and a better way to extend the user interface so that the user could search her own mail.

Egan didn't know how MicroTech got involved in this deal, but assumed he had been the person to initially contact MicroTech about it.

Egan felt that occasionally Autonomy would prepare paperwork without Autonomy confirming they would take a deal. That way, the paperwork would be ready if needed.

In relation to MicroTech taking the reseller deal at risk, Egan doubted that a 12/23/09 Autonomy PO for $10 Million from MicroTech was related (TAB 2 and TAB 3), Egan doubted it had anything to do with the MicroTech Morgan Stanley deal because "any time Lynch parted with 10 Million it would have been massively overdue." Egan described Lynch as cheap. Thus, Egan really didn't think this deal was related to the MicroTech Morgan Stanley deal. Additionally, Egan stated that Autonomy's history with Morgan Stanley indicated that the deals almost always closed, so MicroTech would have taken very little risk with the Morgan Stanley deal.

Regarding an email exchange involving Diane Kennelly (TAB 6), Egan said that Diane Kennelly works for Morgan Stanley, purchasing hardware only. Egan further indicated that the back and forth with her and the discount eventually offered would have been approved by Hussain. Egan thought that Kennelly asking if Autonomy is an authorized reseller for Dell was because she was worried about coordinating the deal. Thus, Egan thought this deal was the first time Autonomy sold Morgan Stanley Dell hardware, and Kennelly was just making sure she was getting the best deal. Egan thought the email chain looked like the same deal, but feels like it was a start over – which was a standard "cheeky" sales tactic to try to get a deal you couldn't get elsewhere from a new person in the company.

Egan was told that, based on the documents, it's clear that the PO finally goes through in February, but lists only hardware for $5.2 million, reflecting the offered $500,000 discount. However, Egan wasn't sure what would have happened then to the revenue booked from the MicroTech sale. Egan thought that the software eventually got to Morgan Stanley because he knew from the MicroTech paperwork that Morgan Stanley uses the software today. Egan didn't know how it was all accounted for. Egan thought he might have been involved in cleaning up the MicroTech deal if the pre-buy was higher than the actual deal. However, Egan felt that at the time it wouldn't have struck him as anything odd because Egan was juggling so many tasks all at

MLAT_AU 00073029

once. Egan would have been "fairly uninvolved with the hardware by mid Q1" because once a customer said yes to a deal, the rest of the process becomes mechanical and Egan wasn't involved, unless something like prompting was needed so a more senior person needed to call the client.

In regards to a 12/23/09 email with the subject line "A few additional points for your prep" and Egan writes about "General Deal points" (TAB 7), Egan explained that he was giving Hussain business reasons to justify losing money on hardware deals. These reasons were to give to the auditors, but thought that he was rationalized hardware loss sales deals when software was involved. This email, too, confirms that we – myself or Livius Guiao or Joel Scott - were under the impression that there was a live, collaborative dialogue with auditors about these business decisions. Also, the second part of this email was regards to a part of Autonomy that was trying to do a big OEM deal with Dell. Thus, the email rationalizes that one of the business benefits is that Dell would be pleased and it would build the relationship. Another part of the email is explaining the benefits of restructuring deals.

1.   <u>Hitachi Morgan Stanley</u>

In June of 2009 there was a Hitachi sale to Morgan Stanley. Egan recalled the deal and said that it was the one where Morgan Stanley bought $20 Million worth of inventory for $17 Million. Egan didn't recall if that deal included software. He thought it did, but that it was separate. Egan thought hardware was basically "opportunistically done" with this deal because Autonomy was just happy to have more revenue.

The Autonomy people that worked with Hitachi included Egan, Mike Sullivan, Livius Guiao and Joel Scott, but more likely Egan and Sullivan.

Egan agreed that the Hitachi and Morgan Stanley deal was the first one and recalled that it came about from the "pure need" for revenue. Egan recalled that Hussain and Mike had an epiphany that Morgan Stanley was going to purchase hardware anyway. Thus Hussain and Mike realized that other companies of our size sold both software and hardware, and thus they felt that there was an opportunity to become a "more consolidated bigger supplier." Egan didn't know where or when exactly this epiphany happened.

Egan thought that Autonomy inherited the Hitachi deal from Morgan Stanley.

Egan didn't recall who initiating the hardware sales conversation internally. Egan did remember that a person in the financial community told Autonomy about an HP Oracle deal where hardware and software was structred so that both companies acquired the other company's product and both sold the bundled product. Thus, each company was holding inventory for the appliance and each was recognizing revenue.

C.   **Capax**

MLAT_AU 00073030

(TAB 8) In this email, Egan said that Hussain's comment ("Do we not owe capax some monies?") was likely about the fact that Autonomy hadn't paid, and Hussain was likely withholding it. Thus, if [Chamberlain] saw that Capax owed Autonomy money, Autonomy would agree to pay them so Capax could pay Autonomy. Egan explained that there were three ways Autonomy could owe Capax money. First, Autonomy would pay bills on EDD. Second, Autonomy would owe bills on EAS. Third, Autonomy could owe Capax a marketing assistance fee.

Tom Leonard was a Capax Guy.

<blockquote>1.   <u>The Beginning of Capax's Relationship with Autonomy</u></blockquote>

Egan wasn't sure how Autonomy's relationship with Capax began. He guessed that the relationship started through the Zantaz acquisition. Egan thought that at the time he met Capax, there was already an existing relationship between Autonomy and Capax. Egan didn't remember when he first met John Baiocco, the CEO and Managing Partner of Capax, but thought it was two and a half or three years ago. Egan recalled that Jerry Hawk, who was a big Autonomy client and "champion sponsor" at the Associated Press, changed jobs and began working for Capax. Hawk was likely responsible for deepening Capax's relationship with Autonomy.

Egan did not recall the first deal he did with Capax.

<blockquote>2.   <u>The Capax / Kraft Deal</u></blockquote>

Egan recalled Autonomy's doing deals with Kraft, but did not recall a Kraft deal involving Capax. Nonetheless, it did not surprise Egan that Capax would have been involved in a Kraft deal, but Egan would have been surprised if it was a recent Kraft deal.

Egan did not remember a September 2009 deal with Kraft that referenced Capax and appeared to not be a new relationship with Capax. However, Egan believed this information confirmed his belief that the Capax relationship had existed for at least 2 or 3 years.

Regarding a 9/30/09 email (TAB 9), Egan thought the exchange was an example of Autonomy ensuring that the reseller could take the deal financially. Here, Egan thought that Capax owed money from another deal, TXU, and thus Chamberlain is trying to get payment on TXU so that Capax can take on another deal and Autonomy can let Capax take the Kraft deal so that Autonomy can recognize the revenue. Thus, this email is an example where Autonomy is making sure a reseller fulfills a precondition to make sure they can take on the deal per the auditors.

<blockquote>3.   <u>EAS and EDD Contracts between Autonomy and Capax</u></blockquote>

Egan didn't think that the December 2009 Amendment to Capax's VAR agreement allowing Capax to take first and second level support for EAS was necessarily to compensate Capax for a deal that fell through. Egan thought that if it was, it "would have been an unbelievable chuckle on our side about how well we would have done" and that "it would be hard to believe it satisfied [Capax]."

MLAT_AU 00073031

Egan felt this way because Autonomy struggled with the EAS product. Egan described it as failing for 80% of the customer base. Thus, with this EAS deal, Autonomy kept the strategic customers, but allowed Capax to provide service to the "noisy customers". The strategic customers included any company with whom Autonomy had a bigger relationship. Autonomy didn't want these bigger clients to feel abandoned by Autonomy.

In the agreement, Capax also had the right to up sell current EAS customers to a better product. Egan surmised that the idea of the agreement was born out of discussions to satisfy Capax because Capax was out of money on another deal. However, Egan was quick to point out that the deal had commercial value for Capax and was a huge relief for Autonomy. Capax kept 85% of the fees and Autonomy would keep 15% of the fees, but Capax would do the work.

At some point in 2009, Capax also took on EDD for Autonomy. Egan recalled that when Autonomy acquired Zantaz, Zantaz was subcontracting EDD processing to eight to ten vendors. Thus, Autonomy took this business in house. Egan reiterated that this decision illustrated how cheap Lynch was. The decision for Capax to handle this EDD processing was motivated by Autonomy's owing Capax for a failed deal. But again, Egan reiterated that the contract was also logical because the work was previously outsourced. Egan thought this deal was probably chosen because the auditors would agree with it. Capax also bought the software from Autonomy to do the EDD processing. Egan thought that there should be a contract illustrating this agreement but wasn't entirely positive.

When told that in February 2010 Capax's EDD outsourcing increased by $200,000 and EAS support increased by $125,000, Egan recalled that Capax had complained that the number of customers Capax was supporting was more than what they were compensated for. Egan recalled it was very difficult to get the money to compensate them for this difference out of Lynch. Thus, Egan recalled that Autonomy owed Capax money, but that the deal took forever to get approved. Egan thought the increase was likely 80% due to the actual discrepancy, and that some of the increase was to compensate Capax for a deal that didn't go through. Egan recalled that somehow Hussain preferred the EDD, but Egan didn't know why Hussain preferred it. Egan thought there would be many emails from John Baiocco complaining about the discrepancy and asking for the increase.

Egan felt that Autonomy's work culture was such at that Autonomy wouldn't sign off on deals Autonomy had agreed to. Thus, although Autonomy agreed to the EAS outsourcing and Capax had been working on it for three months, the email looks like Capax is insisting we start paying him (TAB 10) – on 10/27/09, Baiocco writes "I really need to get the October support billing in before the end of this month… I have my guys on the ground this month … and I am burning thru salaries, airfare and hotels etc. that coupled with the fact that we hired them 3 months ago based on original timelines, I really need the revenue in for October.") So, in the email chain, Egan sent this complaint to Hussain and Hussain outlines the EAS deal. Egan believed Hussain was wrong about the support element of his explanation. Egan also felt that Lynch had an "annoying habit" of pretending he didn't know anything (TAB 10, Lynch writing "this is all news to me"). Egan felt this forgetfulness happened often so that once the time came to actually sign a deal, everyone pretended they didn't know about it in front of Lynch. But Egan did agree

MLAT_AU 00073032

that part of the deal outlined in this email was to give back to Capax because they had taken a deal at risk that didn't go through.

Regarding a revenue summary through 4/1/11, drafted by Jim Crumbacher in late June of 2010, (TAB 11), where the payments going to Capax were relatively on par with the payments coming in from Capax, Egan didn't feel that the deals were purposely "cleanly" balanced in this way. Egan didn't think the risk, benefit and loss of each reseller deal was that clearly tracked. However, Egan felt that if there were repeated losses, there was some feeling that that Capax needed to be compensated, but there was no exact tallying of losses and gains. Egan did feel that deals paying Capax wouldn't have happened if Capax hadn't been also taking deals at risk for Autonomy, which in itself was a bit of tallying.

### 1.  FSA / Capax Deal

Ultimately the deal between Autonomy and FSA went directly through Autonomy in August 2010, despite Capax's involvement. Thus, Egan thought Kanter was writing about that fee. Egan thought his comments in an email (TAB 12, "I am comfortable that [Capax has] earned a marketing assistance fee in line with our standard terms. I have prepared the attached to document properly the transaction.") were simply because Kanter was "being a lawyer" and making a bigger deal about it than necessary. Egan believed that other paper work would show that Capax was owed the 10 percent. Egan described Kanter as an "ass cover in so many ways."

Regarding an email statement to be made to Baiocco (TAB 13, "I can confirm that the Financial Services Authority has been notified that if Autonomy receives payment directly in relation to the Autonomy/Capax/FSA transaction that Autonomy will apply such payments against Capax's account with Autonomy.") Egan thought that maybe FSA had very incremental payment terms. Thus, to him the email looked like Autonomy was saying that as FSA paid, Capax would be relieved. Egan thought perhaps this was something that Baiocco was requesting. Kanter was involved in the email chain because any time a contract that affected revenue recognition changed, Kanter would have to approve the change. Egan also thought this email could indicate the organic creation of the first credit memo and the formation of the process of letting a reseller know they were off the hook.

### a.  Centennial

Egan didn't recall exactly who Centennial was and why they were referred to on the FSA deal. Egan thought it might be an entity created only to take deals at risk. Egan speculated that the company was referred to Autonomy, but ultimately Autonomy couldn't use them because they were too much of a "shell company" and didn't meet the auditor requirements. Egan recalled going through this process with an entity, and thought maybe it was Centennial, but wasn't sure. Egan also commented that this rejection was another clue he had at the time that made him believe that Autonomy was complying with all IFRS requirements.

### 2.  Bank of America / Amgen

Regarding a 12/31/10 letter to Capax from Autonomy (TAB 14) replacing an Amgen deal with a Bank of America deal, Egan explained that "something went wrong" with the Amgen deal.

MLAT_AU 00073033

Capax had taken the Amgen deal at risk. Since the Bank of America deal was happening and was very large, Amgen was swapped out for $9.4 Million of the Bank of America deal. Egan didn't recall how or why the Amgen deal went wrong. Egan thought that Mike Mooney and Michael Chang handled the Amgen deal.

Egan recalled that Hussain and George Tziahanas were involved with the Bank of America deal. Tziahanas is a subject matter expert on legal compliance, and so Tziahanas was involved to assist. Jim Krakoski, who still works for Autonomy, was also involved, as were many others because the deal was very big.

Egan had been meeting with Tom Flanagan at Amgen.

Egan looked shocked upon hearing that a Capax PO references end user Amgen, but the sales order references Bank of America. Egan seemed to think it must have been an error because Egan believed the deals were separated by almost a year. In reality, the deals were separated by only four months. Egan still felt there was something odd about the timeline because Egan didn't recall even thinking about the very large deal with Bank of America until into Q4.

After being shown the 9/30/10 Autonomy Sales Order and Capax Invoices (TAB 15, 16, 17), Egan thought that this was something that seemed "really big". Egan thought that one document seemed altered and reiterated that the Bank of America negotiations didn't start until after 9/30. Egan specifically remembered a meeting in New York where he came up with the idea for the Bank of America deal. Egan thought his memory of this timeline was 90% accurate. Thus he felt that there was "no way that the Capax paper work" worked.

Egan said that Eloy Avila was the US CTO at HP, and probably still worked there.

Regarding (TAB 18), Egan thought the email made "perfect sense" because his memory was that the Bank of America deal started as Autonomy entered Q4 2010. Before that, he recalled working towards a Bank of America deal somewhere between 2 to 5 million, which would warrant the email. However, Egan strongly believed that at some point in Q4 he began realizing the deal could be between 15 to 20 Million. This large deal did not close by 12/31.

Regarding (TAB 14), Egan recalled that the Amgen deal went directly through Autonomy, despite Capax's involvement. Thus, to compensate Capax, Autonomy gave it the Bank of America deal. The Amgen deal switched to Bank of America on 12/31/10 and a one off reseller agreement is signed by Autonomy. Discover Tech also signed an agreement for $7.3 Million and then Discover Tech pays another $3 Million. Egan was unsure why the agreement between Autonomy and Discover Tech regarding Bank of America was a one off agreement. Egan thought that the one off agreement might be contemplating the first time the end user may want to go direct. Egan didn't recall the first time that Discover Tech did a deal with Autonomy, but thought that maybe this agreement was the first and that's why it was a one off agreement.

Regarding an email chain between Hussain, Krakowski and others (TAB 19), Egan felt the conversation might be difficult to figure out, but could be important. Egan thought the language in the email ("We will continue to emphasize the following theme: - No deal in 2011 – due to auditing reasons" etc.) was based on Hussain's attempt to push Bank of America into a deal.

MLAT_AU 00073034

Egan thought this inability was a fabrication, but that Hussain was attempting to get the business done, but knew that Autonomy wasn't going to turn away business.

Egan wasn't aware of any MicroTech Bank of America involvement.

When shown a 2/11/11 email (TAB 20) which included MicroTech POs to Discover Tech and Capax, Egan thought the situation felt familiar. Egan speculated that perhaps MicroTech was brought into the deal as some sort of "aggregator" or consolidator to top off the deal, since the actual deal was bigger than the sum of all its other parts. Thus, Hussain felt that for the convenience of cash collection, the deal could be aggregated into one reseller. Egan wasn't sure this was what happened, but thought it was possible. Egan also thought Autonomy possibly owed MicroTech for a deal that fell through. Egan recalled that Bank of America agreed to be invoiced by a third party. Thus, Egan felt that MicroTech probably compensated Capax, Discover Tech and the other resellers in this "aggregator" role. Egan thought that MicroTech then would have gotten the "windfall" from topping up the deal, since it was larger than anticipated. Egan thought it was also likely easier for MicroTech to pay the other resellers rather than have Autonomy handle the "marketing assistance fees" associated with the deals.

Regarding an email about signatures and "Don't you want the $3.6m from micro tech" (TAB 21), Egan thought that the Bank of America and Merrill Lynch deals were complicated such that Autonomy recognized two to three separate commits, which probably added up to $22 Million.

Egan wasn't sure what all these deals left for Autonomy, but wanted to think that Autonomy would have at least received the Amgen cash direct from Amgen.

Regarding a 1/25/11 email where Egan writes "Assume you want cash flows to be bofa/mt/dt/au not add another route?" (TAB 22), Egan thought that the first part of the email supported the idea that MicroTech aggregated the deal and then MicroTech paid the other resellers.

Egan didn't understand what the "CARS" acronym meant in reference to a Bank of America deal. Egan thought that CARM, which stood for Computer Associates Message Manager, or CAMMS were possibilities. Either of these products would have been part of the Computer Associates business line that Autonomy acquired.

### D.     Filetek / VA Deal

Egan recalled that Autonomy had an employee who Egan called "Mr. VA," who Egan described as having a "very strong relationship with everyone at the VA." Egan thought Mr. VA was Phil Stevenson and worked below Jim Still. Egan thought there was another management level between Stevenson and Still, but couldn't recall who it was.

Egan compared the VA system to the Federal Reserve System, which has a regional system structure with various regions for New York, New England, Mid-Atlantic, etc. Egan recalled that Autonomy was the message archiving supplier to one of those regions and that this relationship was important. Egan recalled that there was a potential VA deal whereby all the systems would be combined into a national archiving system. This deal went through the typical government procurement process, and Autonomy participated in and won the deal, but then it fell through

MLAT_AU 00073035

somehow.

There was also another VA deal, referenced to in a July 19, 2010 email called the "VA Big 4 Project" (TAB 23). Egan remembered this deal somehow involved a new hardware infrastructure. Due to Stevenson's relationships with the VA, Autonomy was supposed to win a very large archiving deal. However, this deal never happened.

Brian Rellinger was a professional services employee.

Regarding an August 7, 2010 email (TAB 24), where Lynch expresses strong feelings of anger and disappointment about the lack of success of the VA deal saying, among other instructions, "no meetings occur without someone with a brain present, NO F-ing abdications of responsibility or delegation", Egan said this behavior was typical of Lynch.

Egan felt like "everything to do in the federal government is confusing to the rest of us. It's like the normal rules don't apply. It's like operating in a different environment." Thus, Egan felt it was very hard to fully understand if the deal would go through with the VA.

Regarding an August 25th, 2010 email where Menell says "why is it even being considered for Q3? ... [because the] RFP publication date is yet to be determined" (TAB 25), Egan thought that Menell's job was to be tremendously cynical, even though he was right that the RFP wasn't yet published. However, Egan still felt that despite the RFP's lacking publication, it was more difficult to judge if the deal would come through because it was a big bureaucratic aggregate. Egan felt that Autonomy knew how much the deal would be because there is a federal system called SEWP (pronounced "soup"), which was a resource to see what was happening in the procurement system. Thus, based on SEWP, Autonomy thought it had the deal, but eventually the deal fell apart. SEWP stands for "Solutions for Enterprise-Wide Procurement."

In an August 26, 2010 email, Jim Still discusses the fact that the RFP comes out the first week of September, then refers to the SEWP procurement saying "SEWP is the process this would take regardless of direction the VA goes in. It's always been a SEWP procurement" (TAB 26). Egan was unsure what this email means but thought that SEWP was something that might have indicated the deal was more confirmed than it was.

Regarding a 9/8/10 Email from Hussain to Egan, Hussain asks "Which partner – would be through a SEWP partner – other than MT and ML. Immix?", (TAB 27) Egan agreed that based on the email the VA deal was not going through in Q3, but Egan didn't recall who Immix was. Egan thought that perhaps Immix was a poor abbreviation.

Egan believed that Filetek became involved in the VA deal the same way as the other resellers became involved in the deals, by asking which reseller would want to become involved and who could do it commercially.

Egan was insistent that Autonomy truly believed it had procured the VA deal, despite the fact that the RFP hadn't been sent out at the time that Filetek took the deal at risk. Egan said that he knew there was no RFP, but that Autonomy received assurances from Stevenson and that

MLAT_AU 00073036

Autonomy found the assurances believable. Egan thought that the RFP was just bureaucratic delay and a formality. For this deal, Egan knew that Autonomy was involved 3/4s of the entries in the bidding process and thus Autonomy thought they were getting the deal. Egan felt this contrived RFP process was "astonishingly part of the deal." Egan also described another supposedly frequent government process whereby the government would choose a vendor and then tell the vendor to plant three different bids with three different resellers. The government would then have the vendor tell the government which reseller had the lowest bid and the government would pick that one.

Regarding a 9/27/10 Email where Hussain has a list of deal names in the subject line, Egan responds "VA has issues but you know the actions" (TAB 28), Egan explained that he is basically saying that the deal is not going to happen and that each deal has action items, and Hussain knows what the action items are because he has the email or was on the call discussing it.

Regarding a 9/30/10 email from Chamberlain to Crumbacher and Matt Stephan (TAB 29), Egan confirmed that this back and forth with Crumbacher where he says "Can we get any $ today?" was a down payment request because Autonomy didn't have any history with Filetek. This down payment request was a consistent request with a new reseller.

Regarding Filetek negotiating on the terms of the reseller agreement, Crumbacher emails Scott about the edits Filetek made to the agreement, writing "Regarding their request that we provide assistance to them in "re-licensing" should the VA deal not come in, or to license to multiple licenses, Stouffer said no and will talk to Bill at Filetek" (TAB 30), Egan remembered the dialogue and thought that Autonomy offered Filetek the ability to relicense.

Egan thought that the rationale for Filetek's involvement on the deal given to the auditors was that Filetek is a large file storage business with some government supply business. This thought was in response to being shown a 10/1/10 email from Chamberlain stating "Stouff – reminder I need updated financials and a brief rationale why this has gone through Filetek. Just need to set out the expertise they bring to this opportunity and why it made sense to go through them." (TAB 31)

Egan said that Chamberlain would ask for the balance sheet on any reseller that wasn't public. (See TAB 32, 10/14/10 Email requesting FileTek's balance sheet) Egan recalled a conversation about Filetek needing to demonstrate they could pay because their cash totals were $7 Million and their total indebtedness was $10 Million. Egan remembered going through this process with "dozens and dozens" of small private entities. Thus, the company, or some related entity would say how they planned on paying, or how they would give more information. Egan thought sometimes this information came through a call to Bill Loomis. Egan didn't recall what Filetek provided to give financial comfort.

Egan thought that someone in Autonomy would have decided the $10 Million figure was a conservative amount for Filetek's pre-buy of the VA deal. Thus, Egan thought the VA was probably supposed to be a $13 Million. Egan believed that there was actually visibility into the deal and that Autonomy knew how much the deal would be for. To verify this information, Egan

MLAT_AU 00073037

suggested looking at the sales forecast database for the deal, and also at the emails between Stevenson and his manager. Egan warned that the sales forecast numbers in the database were often higher than what actually occurred. Egan thought that, from a practical standpoint, $10 Million could be a subset of the deal, but insisted the $10 Million would have been a real number. Egan further explained that if that wasn't the anticipated amount, Hussain wouldn't have let FileTek such a large amount because FileTek was new. Egan didn't think the number would have directly reflected the revenue shortfall for a quarter. Egan thought that if Hussain had a gap to fill, Hussain would ask for two deals rather than making up a large number on one deal.

Egan didn't remember a VA RFP in February 2011.

Regarding a 4/16/11 email to Sameer Kalbag where Egan writes "Can you provide a summary of where we stand with VA? When was the last time we had an exec meet the end customer?" (TAB 33), Egan recalled that Kalbag was a person from whom Egan could get an honest status update on the state of the VA deal. This was the reason Egan emailed Kalbag here. Egan spoke highly of Kalbag and said that he still worked for Autonomy.

Egan believed that nothing ever happened on the VA deal and therefore Autonomy purchased Filetek's software so that Filetek didn't lose money.

## II.   **Autonomy Employees and Culture**

### A.   Hussain

Egan felt that Hussain "made everyone feel that you were going to miss [quarter goals] no matter what." Egan described Hussain's pressure as a "convention." Egan said eventually he began to question the accuracy of Hussains' pressure, but that regardless of that truth, Hussain made Autonomy employees feel that they were not going to make their goals.

### B. Lynch

Egan described Lynch as very cheap.

MLAT_AU 00073038



DATE:          January 22, 2013

SUBJECT:       Memorandum of Interview with Stouffer Egan – January 17, 2013

**Tab No.**     **Description**

1               6/11 Email 8A status – UBS between G.Perachio, S.Hussain, S.Egan, J.Crumbacher,
                Wharton (Martha to send)

2               8/4 - 8/11 Email chain between S.Egan, S.Hussain, A.Kanter and S.Chamberlain

3               8/10/11 Commercial License Software Agreement between Autonomy and Capax

4               3/31/10 Agreement between Discover Tech and Autonomy for End User Philip
                Morris International

5               8/4/10 Email chain between A.Kanter, S.Hussain, S.Egan, J.Scott and
                S.Chamberlain

6               8/3-4/10 Email chain between S.Hussain, A.Kanter, P.Menell, S.Egan

7               1/11/12 Email chain between D.Truitt, S.Hussain, and A.Kanter

8               12/10/10 Email from S.Hussain to M.Lynch


I.    **Interview Overview**

On January 17, 2013, Susan Resley and Martha Stolley of Morgan Lewis and Bockius ("MLB")
conducted an in-person interview of Stouffer Egan ("Egan"), former CEO of Autonomy U.S.
Kate Emminger of MLB also attended. The interview lasted approximately two hours and was in
connection with HP's internal investigation of former Autonomy management and Autonomy's
business and accounting practices. This was the fourth time Egan was interviewed in connection
with this investigation.

At the beginning of the interview, Ms. Resley thanked Egan for participating in this fourth
interview. Ms. Resley provided Egan with "UpJohn Warnings" by advising him that the
interview was part of HP's internal investigation, that it was privileged and that Egan should
keep the discussion confidential. Ms. Resley further advised Egan that MLB represents HP and
therefore, HP could choose to waive the privilege at its discretion. Ms. Resley explained this
meant that HP could decide to share information with the government. Ms Resley explained that
HP was currently in the fact gathering process of the investigation.

Egan asked what he should do if contacted by the government. Ms. Resley clarified that MLB would not be representing Egan because MLB represents HP, but Ms. Resley did request that Egan notify MLB if the government contacted him in connection with this investigation. Ms. Resley explained that she wouldn't know when, why, or if the government would contact Egan because the government considered this a non-public investigation. As such, the government would not respond to inquiries about how the investigation was being conducted.

II.    **Resellers**

    A.    **The Process Generally**

Egan was generally the relationship manger for Capax, Discover Tech, and MicroTech. Egan was also the relationship manager for Microlink before Autonomy acquired that company. Egan also managed the FileTek relationship, but didn't feel that relationship was very involved. Eagan described FileTek as doing "just that one thing."

When asked about the general process for booking a deal through a reseller, Egan explained that when he called a reseller, the reseller generally knew the details of why he was calling. In explaining a reseller's mindset during this call, Egan said that occasionally the reseller would approach Autonomy with a deal the reseller wanted to pre-buy. Egan explained that the resellers were also in sales and therefore occasionally, the reseller would call Autonomy and say they had been working on a sale and just discovered it wouldn't close in the quarter for some reason – perhaps a specific procurement process. Therefore, the reseller would ask to pre-buy the deal on behalf of the end user to "keep the service going". Thus, Egan explained, the resellers "understood that [Autonomy] implicitly would" pre-sell deals. Egan couldn't think of a specific deal that this happened with, but thought that 20% of the reseller deals happened this way. Egan thought that Capax, Discover Tech and Microlink would have done deals this way. Egan recalled that MicroTech didn't have a large sales division and thus wouldn't have done as many deals this way.

Egan insisted that when a reseller pre-bought a deal, the reseller took on some risk. Egan was adamant that a reseller would not essentially know there was no risk associated with the deal. Egan explained this feeling, saying that the reseller would have to sign all of the paperwork with specific language saying that the reseller was on the hook and going to pay. Egan did admit that despite the paperwork, "in a disaster scenario [Autonomy] would probably try to find a way to fix it."

Egan maintained that contractually a reseller was completely on the hook, such that if Autonomy management changed, or if someone decided that reseller was disliked, then the reseller would have to pay. However, Egan thought the reseller could rationalize the paperwork by feeling that the reseller provided Autonomy with business and therefore Autonomy wouldn't put them in a bad situation. Egan resisted the term "unwritten understanding" because he was worried about the legal implications of the phrase. Egan maintained that Autonomy put "significant effort" towards a reseller knowing it was at risk with deals. Egan explained this effort by saying that the dialogue between Autonomy and the reseller was heavily about the deal, the expected time line, what might go wrong, and whether the value was fixed or likely to change. Egan explained that

MLAT_AU 00073040

if Autonomy thought the deal amount would change, then a reseller deal would be sold for a "conservative amount" because "no one wanted [the deal] to come in for a lesser amount."

When pushed to call the arrangement an "unwritten understanding", Egan said he felt that phrase implied a side letter. When everyone agreed that a side letter would be a written understanding, Egan finally admitted there was an unwritten understanding with the resellers. Egan said "I think [the resellers] felt solid confidence that [Autonomy] would take care of them, but no one got on the phone and said trust me, you are not on the hook here." Egan said it was important to Sushovan Hussain that the resellers always knew they took on the risk associated with the deal. Hussain went to "huge efforts" to avoid saying that the resellers were not at risk or would be taken care of. Egan thought the resellers were willing to take these deals because the resellers earned a lot of money for very little effort.

Often a reseller had no idea about the deal until right before the reseller was brought into the deal. Egan said that at the moment they were brought in there was usually an hour long conversation with the reseller about the deal.

Egan thought it was fair to say that even though Hussain wanted it explicitly written that the resellers were at risk, it was equally important that the resellers felt like they would be taken care of if the deal fell through. Egan agreed with this statement because even after a reseller deal was signed, Autonomy expended its efforts closing the end user deal, and "cannibalize[d] its own forecast." Egan thought Autonomy cannibalized its forecast because when an end user deal fell through after it had been resold, Autonomy would use another deal to "fill[] an old hold with a new prospect." Egan felt this practice was particularly frustrating as a sales person since he would put forth the effort of booking a new deal and then part of it would go towards "filling a hole."

Hussain always chose the deal and decided if it would go through a reseller. However, deciding which reseller the deal would go through was not just Hussain's choice. This specific decision was a joint effort that depended on various factors including accounts receivable. Egan said that Hussain knew if the reseller's status was sufficient to take on the deal, but Hussain didn't know if the reseller was willing to take on the deal. Egan said that in deciding to take a deal a reseller considered several factors, including if the account would require service after the deal.

Egan believed Capax and other resellers had refused deals, but he didn't remember any specific instances of it. Egan didn't think it would have been particularly memorable if Capax had said no to a deal. Egan explained this feeling by saying that ultimately, Egan wanted to close deals, so if a deal died, he just moved on to something else. Egan did believe that if Capax were to turn away a deal, the deal probably would have been a bad situation. Thus, Autonomy probably wouldn't have taken it to a reseller in the first place.

Egan felt Hussain would only give a reseller a deal amount that "he needed" because Hussain was cheap, and didn't want to give the reseller any more margin than was needed. Egan thought the reseller deals were "some insurance" if something went wrong at the end of the quarter. Thus, if Hussain thought $10 million exactly was needed to meet the forecast, Hussain would likely get $12 Million in reseller deals because Hussain might lose $1.4 Million "in the slop of

MLAT_AU 00073041

the end of the quarter."

Egan thought it was fair to say that reseller deals were done to close the gap, or to exceed expectations of what Autonomy would make in a certain quarter. Egan said there was "always a relationship for sure." Egan believed the primary determinate of how many deals to take and the size of the deals was what Autonomy needed to make the forecast number. Egan thought the reseller deal amount was also related to the project itself. Thus, if it was a multiyear end user project, the reseller deal would not just be for an arbitrary amount, but it would be related to a close milestone in the project, such as the yearly payment.

Egan's impression was that Hussain would look down the list of potential sales and pick deals that added up to the amount he needed to meet the forecast. Egan said that the reseller deal would be less than the end user deal was predicted to be because often the final deal closed at a smaller amount than what was predicted, especially if it was a big deal.

Egan said Hussain asked for reseller involvement via phone or email. Egan felt there was a lot of phone conversation at Autonomy, and that if Hussain called then Egan had to pick up, unless he was in a customer meeting. Egan felt there were many more phone conversations at Autonomy than at HP.

Egan generally also fielded updates on the status of the end user deal. Thus, if a reseller was nervous about an end user deal closing, Egan would follow up on the status.

### B.      The Beginning of the Reselling Practice

Egan didn't remember exactly when this reselling practice began. Egan thought that Microlink was likely the first to pre-buy a deal because Microlink was Autonomy's "closest partner."

Egan felt that this reseller pre-buy practice was fairly common. Egan recalled that there were many entities that would do this for other software companies.

Egan didn't recall whose idea it was to resell software in this way. Egan said that Plumtree and EMC utilized this practice frequently. Egan also felt that federal resellers participated in the practice. Egan explained that federal deals often had a "huge chain of suppliers." Egan called this chain a "solution stack." Thus, Egan thought the practice "grew up in [the federal supply chain] process" because certain companies would foster a sale, and other companies would buy the deal in speculation. Then, if the deal wasn't used, the deal went to a "different aspect." Egan said that ultimately the practice came to Autonomy because companies could "sense your freak out trying to get the thing done on the last day of the quarter" and a company would offer to pre-buy the deal with certain conditions.  Autonomy's reselling practice started almost exclusively with federal government deals.

### C.      Commission

Commission for deals sold through resellers would only be paid once an end user closed the deal.

### D.      Revenue booked for Reseller Deals

MLAT_AU 00073042

Egan explained that any time a reseller was involved, Egan never quite knew if Hussain would have actually booked the revenue for that quarter. Egan presumed that the purpose of the reseller deals was to book the revenue in the quarter. However, Egan reiterated that he personally never knew if Hussain would actually book the revenue, or if the reseller deal would be rejected based on an audit decision, or because Hussain decided not to put the deal in the quarter. Egan further explained that the reseller deal might not be booked because Hussain had to make the decision right at the end of the quarter, and Hussain never knew if "another actual organic deal was going through."

When reminded that Egan had previously said Hussain would go for the reseller deals even if the numbers at the end of the quarter were over the forecast, Egan confirmed he had made that statement, and insisted the two statements were consistent. Egan explained, saying that Hussain made everyone feel as if the quarter was always short. Egan said that this pressure started on the 15th of the last month of the quarter. Thus, Hussain would ask for possible reseller deals and Egan never knew if Hussain needed them as "back up in case another didn't happen." Egan also felt like "you just knew you weren't getting the straight answer." Egan said he always felt like he was being manipulated to perform, not for an evil reason.

Egan said it made sense that documents uncovered by the investigation have shown that revenue was booked as soon as a reseller was used. However, Egan maintained that at the time it happened, Egan didn't know if Hussain was booking revenue for all of the deals. Egan said that at the time, he could have guessed Hussain needed all the revenue, and that Hussain would likely use deferred revenue release, or "any other mechanism" at his disposal.

Egan said that after a deal was done, 80% of the time, an urgency to close the end user deal arose and thus Egan could tell the revenue was booked. Egan recalled that 1 of 15 deals would end by telling the reseller that the deal wouldn't be booked through a reseller. Egan agreed that 14 of 15 times, Hussain likely recognized the revenue, because of the corresponding scramble to finish the deal. Egan felt that when the pressure didn't come from Hussain, the deal likely didn't go through a reseller. However, this only happened 1 in 15 times, and Egan never knew the exact reason why. Egan speculated that the auditors said no to a reseller deal because the potential reseller was too small and didn't have a strong balance sheet. Egan believed a deal could even be denied for this reason even after a reseller had signed the agreement. However, this rejection happened very infrequently.

E.    **8A Status**

8A indicates the status of a reseller. Egan thought that all the resellers Autonomy used had 8A status, with the exception of FileTek. This status indicated that the companies were small, disadvantaged minority or veteran owned businesses. Egan thought HP probably also made a civic pledge to book a certain amount of business with 8A companies. The government is required to do a certain amount of business with 8A status businesses. Egan thought that the non 8A business are often more competitive and capable, but because the government has a certain quota for business with 8A status companies, those businesses were awarded the contracts. Thus, a company was more competitive in the government arena if it had an "8A in the arsenal."

MLAT_AU 00073043

Regarding an email to UBS about reasons to use an 8A, (TAB 1 – Martha to send), Egan thought the reference to Microlink was a typo. Egan believed this because the email was dated in June of 2011, at which time Autonomy owned Microlink, and it couldn't have been considered an 8A business. Egan thought the email author must have meant MicroTech. Glenn Perachio was the UK salesperson. 8A in the email referred to using one of the resellers. (3% is a rationale – double check in doc.) Egan explained that this email was the beginning of Hussain's process of taking the UBS deal through a reseller.

F.   **KPMG / Tikit**

Egan was involved with KPMG, but didn't recall Tikit. Egan didn't recall any KPMG deals going through a reseller.

G.   **MicroTech / Vatican**

Typically Egan didn't know about sales on the European forecast. However, Egan knew about the Vatican deal because Autonomy's management was excited about it and discussed the deal frequently. Thus, when the end user payment didn't come through to MicroTech, Egan was told that it was "typical Italy" and that Autonomy was waiting for the funding release through Poste.

Egan believed that to book the Vatican deal through the reseller, Hussain would have called Egan and Egan would have called Dave Truitt at MicroTech. Egan said he likely then put Truitt directly in touch with Hussain since Egan didn't know the details of the Vatican deal. Egan would likely have been told how much the end user deal was worth, and how much Autonomy wanted MicroTech to take. Usually the amount Autonomy wanted a reseller to take was less than what Autonomy thought the end user deal would close for. Egan didn't recall how much Hussain predicted the Vatican deal was worth, but felt it was bigger than $10 Million.

H.   **McAfee / Capax**

Egan remembered the McAfee deal, but not much about it. Egan recalled that Mike Mooney had a relationship with a buyer at McAfee. Egan was very surprised to hear that Autonomy received an explicit no from McAfee but then Autonomy resold the deal through Capax.

Egan said that he was likely the person who reached out to Capax for the deal, even if Mooney was handling the deal with McAfee. Egan explained that many times Egan had no knowledge of the actual end user status, but would received a briefing on the status for the reseller. Occasionally Egan put the reseller directly in touch with the sales rep, or even with the end user.

Egan said he was "the Capax person" generally, but thought Hussain or Andrew Kanter could have reached out to Capax on their own.

I.   **BP / Capax**

Egan didn't have a sense of any BP and Capax deals.

Regarding an email chain spanning 8/4/11 to 8/8/1 between Egan, Hussain, Kanter, and

MLAT_AU 00073044

Chamberlain, about the purchase of Discover Tech products, (TAB 2), Egan said the deal appeared to be of the "fix" variety, meaning that a deal Capax bought fell through, so Autonomy had to compensate Capax somehow. Egan couldn't see Autonomy buying a Capax product without a reason motivating the purchase because Autonomy was cheap. Thus, Egan felt that if Autonomy was spending money on something, there was "probably a synergy side to why that [was] being billed." Egan felt the same with the Formula One sponsorship, because Mike Lynch did not have an ego with sports so Egan felt that whatever money was spent there was spent for another reason.

Regarding an 8/10/11 Commercial License Software Agreement between Autonomy and Capax, where Autonomy pays $6 Million to use Capax software, (TAB 3), Egan felt this was also a "fix" agreement. Egan explained that "the circumstances would have to do with finding a way to compensate - if you will - Capax." However, Egan maintained that Autonomy would work to find some rational reason for the purchase. Hussain, Andrew Kanter and Pete Menell work hard to find an "acceptable way" to purchase the product. Despite this work and the rationalization, Egan felt that Menell wouldn't have been able to honestly say the software was worth the money. Egan also felt that all of these purchases were checked by auditors.

Egan described Hussain as a "genius" and thought Hussain was manipulating deals so that the auditors would approve them, but in reality the deal was done for other reasons. Egan felt Hussain wouldn't have done certain deals unless Hussain knew how to do them in a way that the auditors would approve.

J.     **FileTek**

Regarding an August 4 email, (TAB 2), Egan confirmed he was listing the products for sale in his email, but explained that someone else created the product list. Egan further explained that Kanter and Hussain were discussing the terms and conditions of the agreement, and Hussain approved the "shrink wrap" version of the terms and conditions, which involves a user clicking "accept" when the software installs. Egan thought that this "cavalier-ness" about approving the click through "shrink wrap" terms and conditions was good evidence to support the assertion that Hussain had another motivation for the purchase because Hussain was not scrutinizing the contract as carefully as he might have otherwise.

Regarding a certain clause in an agreement that Autonomy signs with a contingency to develop competitive products (TAB 3, End of Section 2) for a $6 Million purchase, Egan thought the provision made "perfect sense." Egan agreed the products Autonomy purchased were unnecessary, but he clarified that the products purchased related to Autonomy products and extended the value of Autonomy products. Thus, to Egan, this contract provision indicated that Kanter was "carefully protecting" whatever Autonomy might want to develop in the future.

Egan further explained that any core product with another company's product OEM'ed in would be stripped. However, these purchases were never core products, and thus, Autonomy wouldn't have treated it the same as other products that were stripped of non-Autonomy software.

Egan thought Autonomy began buying software to "end an open obligation." Egan thought this

MLAT_AU 00073045

motivated Autonomy's purchase of FileTek's software. Egan couldn't think of another reason that Autonomy would have purchased FileTek's software, and was comfortable saying that "one would not have happened without the other."

Egan was certain Autonomy employees internally used the purchased software, because Hussain "would be adamant that [Menell] did a full diligence project on it and that it was fully used." Egan felt that for software purchased for $15-20 Million, Hussain would have insisted that the software be used "for it to stay aboveboard." Egan wouldn't have been surprised to hear that Autonomy engineers didn't want to use it, but Egan would have been surprised to hear that the engineers were allowed to avoid using it.

### K.    Discover Tech

Discover Tech was founded by Dave Truitt, after Autonomy acquired Microlink. Discover Tech is a services and software company. Egan thought Truitt designed Discover Tech as a software company, but added a services branch to pay the bills.

#### 1.    Phillip Morris (PMI)

Egan recalled working with Philip Morris and remembered the whole business moved to Europe, under the name Altria. Egan thought the deal went through a reseller, but wasn't sure. Egan felt a reseller must have been involved because, Egan would not have been involved with a European deal otherwise. Egan explained that Hussain would "canvass the forecast for something that [was] just missing or highly certain." Then, Hussain would generally ask Egan to get a reseller involved, if Hussain wanted to use one of the companies whose relationship Egan managed (Capax, Discover Tech, MicroTech, Filetek, and Microlink pre-Autonomy acquisition).

Egan didn't remember a 3/31/10 deal that Discover Tech pre-bought, but thought it was possible this was the first time Discover Tech was used by Autonomy as a reseller. (TAB 4) Egan explained it was typical for Hussain to require a big down payment when the reseller was a new company with no payment history, which appears to be happening here. Egan felt that the 20% down payment outlined in the agreement (TAB 4, Section 2) was higher than normal, and thought the usual down payment would have been 10%. Egan also recalled Hussain's saying that the auditors are more comfortable when there is cash evidence from a reseller which indicates the reseller knows it is committed to the deal.

Egan recalled that Truitt "did very well in building Microlink," making a lot of money on reseller deals through Autonomy and also doing other business. Truitt made a lot of money when Autonomy bought Microlink. Thus, when Autonomy approached Truitt at his new company Discover Tech, Egan thought that Truitt was "as trusting and inside as anyone outside." Still, Egan thought that 20% was a high down payment.

Egan didn't recall PMI's rejecting a reseller, but if that had happened, Egan thought he would have been asked to communicate that decision to the reseller. After communicating that decision to the reseller, Egan directed them to Hussain or Steve Chamberlain so that the deal could be fixed. Egan recalled a letter of credit or a credit memo or some paperwork that would fix the situation so that the reseller still got paid their margin. Egan thought that the reseller would be

MLAT_AU 00073046

paid the margin directly from Autonomy, rather than taking if off the payment from the end user as they usually did. Egan recalled a cancellation letter or some other form of paperwork that would relieve the reseller's obligation. Egan suggested talking to Chamberlain or Hussain for details of the process.

When shown an email with a Marketing Assistance Fee reference (TAB 5) from 8/4/10, Egan didn't specifically remember the situation, but recalled that there would have been some mechanism to pay the reseller their margin if the end user wanted to pay Autonomy directly. Egan agreed that the term "marketing assistance fee" in that situation seemed inappropriate because the reseller is really due a margin. Egan thought this topic might be worth investigating because the fee required in this situation would have been because the reseller stepped up and pre-purchased a deal, but not for any actual marketing or sales assistance.

      2.    <u>Citi</u>

Egan vaguely remembered the Citi deal that was referenced in addition to the PMI deal, in an August 2010 email chain (TAB 6). Egan described the Citi deal as "as close to any kind of sure thing as anyone would get to do" because Citi had to purchase at regular intervals. Thus, Egan didn't feel that the Citi deal was the type that Hussain would have normally brought through a reseller. Egan thought that the decision to pre-buy a deal from Citi would have been "a piece of cake decision for any reseller." Egan thought there was no risk whatsoever on a Citi deal.

      3.    <u>Autonomy Purchase of Discover Tech software</u>

Egan felt that the purchase of Discover Tech software around the same time as the Citi and PMI deals, in Q1 of 2010, (referenced in email chain on 8/3/10, TAB 6) was only considered because another deal had fell through.

Discover Tech made "portlets or gadgets" and Autonomy had a product that "sits under Sharepoint." Sharepoint was a software product that grew organically. Sharepoint was pervasive, but also "a mess." Autonomy made a product that understood Sharepoint, but the user interface on that product wasn't very good. Egan explained that Autonomy's business model was such that it didn't value customer interface and thought that the customer would always want the product to be designed differently. Discover Tech made a similar product, but Discover Tech's product was better, which Egan seemed to think justified the purchase. However, Egan did specify that Autonomy would not have purchased the software "had there not been [another] reason."

Egan reiterated that Autonomy wouldn't buy a product just to buy the product, but that "it would be driven by a need to balance." However, Egan also thought that if a resold Citi or PMI deal was done directly, then the reseller's obligation would be cancelled, via a method handled by Chamberlain or Hussain. Egan never knew how the obligation would be cancelled, but felt that Chamberlain would "change the paperwork in the acceptable way that meant the payment obligation went away from the reseller and then the payment was received direct [from the end user to Autonomy]." The reseller would then be given their margin "because [the reseller] did everything they were supposed to do." Egan felt that when a deal went directly through Autonomy after a reseller purchased, the deal would reconciled in this way. Despite this general process, Egan agreed there was another reason that Autonomy purchased these large amounts of

MLAT_AU 00073047

software. Egan thus thought it was possible the resold deal was not cancelled after it was taken directly through Autonomy, and then a large software purchase made it possible for Autonomy to recognize the revenue several times.

Egan recalled telling John Baiocco from Capax and other resellers that after a resold deal went directly through Autonomy, Chamberlain would call with paperwork to credit the deal. Egan also remembered Baiocco saying that he had received that paperwork relieving Capax of the obligations. Egan felt this was not new information and that the investigation had covered this topic in detail several times before. Egan again mentioned a Discover Tech problem after the HP acquisition. Discover Tech was being chased by HP for payment, but Discover Tech wasn't actually owing because one bill had been paid and Hussain or Chamberlain had told Discover Tech the other would be written off. When Discover Tech started receiving bills for the deal that had been paid, it complained to Autonomy. Chris Yelland from HP was very aware of the situation, but Yelland never gave Egan a direct answer about how to handle it. Egan said he kept reminding Yelland that the resellers were important relationships. As far as Egan knew, the resellers were never contracted.

4.     Discover Tech after the HP Acquisition

When asked about a 1/11/12 email from Dave Truitt of Discover Tech, complaining about missing "margin fees" (TAB 7), Egan read the email for a long time and appeared to be confused or uncomfortable about it. Egan had never seen the email before, but was familiar with the general situation. Egan recalled Truitt was upset about and feeling snubbed. Egan recalled a lower dollar amount involved than what Truitt was demanding in the email, closer to $700,000. Egan said he felt like his hands were tied in this situation and that Truitt was "chasing money that he [wa] due for a margin" The deals had been taken through Discover Tech and recognized, but the end user deal never closed. Egan didn't know what deals the complaint related to, or how the time period correlated to HP's involvement. Egan did feel that, at the time of the email, everyone involved would have known of HP's involvement with Autonomy.  To this day, Truitt still feels as if Autonomy stiffed him out of agreed upon deals.

After the HP acquisition, the only reseller who had a fall out with Autonomy was Dave Truitt of Discover Tech. Egan felt that if any other reseller had a problem after the acquisition it would have come directly to Egan. Egan didn't believe that this email complaint (TAB 7) was related to the invoice mix up described earlier.

Egan didn't recall any reseller complaining that it was not paid by Autonomy. Egan thought most people felt they got exactly what was owed to them. Egan recalled some calculation arguments over $1000 or so, but no arguments over larger amounts.

L.     **VMS**

Egan called investigating VMS "a rat hole" because the deal was very well rationalized. Egan thought the deal would have happened regardless of Autonomy's owing VMS, but did admit the deal likely grew larger when it became reciprocal. However, Egan did not think this deal was like the other reseller deals. Egan stated VMS's bankruptcy raised red flags, but clarified that Autonomy had no clue that VMS would be going bankrupt.

MLAT_AU  00073048

Egan thought the VMS deal was logical because Autonomy had nothing similar to what VMS had, even though Autonomy had its own social network feed. VMS stood for "Video Monitoring Services" and was a capture network. As a commodity, VMS captured news feeds, television feeds, live radio and social network feeds. Egan said that the media capture was the "most unique" because legally a company can only capture media for fair reuse if it's captured in the local market. Thus VMS had devices in all 176 local radio markets that were capturing the feed locally. Autonomy looked into acquiring VMS, but the acquisition never went through.

VMS had a "huge need" for Autonomy's product. VMS considered changing their entire capture network to an electronic system, and Autonomy software handled this sort of data very well. Autonomy's software could capture the feed and transcribe it to PC hardware. However, this change was very large and risky. Egan recalled that part of the deal required Autonomy to provide onsite support, which proved challenging. Autonomy was required to provide VMS with six full time technicians in Times Square from Monday through Friday. However, the people assigned were consistently reassigned to other projects by Autonomy, or didn't show up. Al Marcella later took over the project and perhaps Eloy Avila as well.

Nicole Eagan was involved with VMS as a sponsoring executive. Egan thought that Eagan was good at "media type stuff and brainstorming" but that Eagan wasn't involved more than that. Eagan also worked with social media, and was involved to see if VMS could have access to the "Twitter fire hose" directly, since that would be the best way to capture that feed.

M.    **Vidient**

Egan said that "Vidient" sounded familiar, but admitted he might be thinking of a company named Radient, rather than Vidient.

N.    **TAB 8 – Hussain's Email Indicating Panic**

Regarding a Hussain email from 12/10/10 (TAB 8), that indicated a sense of panic around IDOL numbers and the financial health of Autonomy, Egan thought the email felt like "any number of a series of Lynch storms of disaster talk." Egan described Lynch as using "fire and brimstone" on some section of the business Lynch felt needed to perform better. Egan did recall a period where there were quality issues with IDOL, but felt that it was "typical of [Lynch] to make a big deal." Egan felt the email was "similar to their management style." Egan also thought the email corresponded to the time when the IDOL business was lagging.

Regarding the "cover up with BofA" language in the email (TAB 8), Egan thought it was referring to the sales teams' lack of performance. As a result, Hussain was saying that a large deal brokered by the management covered up the lacking sales team's performance. Egan felt Autonomy had a problem with its sales force because it wasn't run by the "machine" but rather it was "augmented" by management. Egan thought HP realized this fact very quickly and was disappointed because this type of sales structure is not sustainable.

Egan did admit it was possible Lynch was looking to sell Autonomy at the time, or was already starting the dialogue, and that the email is referring to what would make the sale harder.

MLAT_AU 00073049

MLAT_AU 00073050



**DATE:**      November 15, 2012

**SUBJECT:**   Memorandum of Interview with Livius Guiao – November 14, 2013

| Tab No. | Document Description |
|---------|----------------------|
| 1 | 6/22/10 – Email between Chamberlain, Tejeda and Guiao, Purchase Order from Capax to Autonomy |
| 2 | 12/15/09 – Email between Michael Faughnan, Hussain and Chamberlain |
| 3 | 9/30/10 – Emails between Hussain, Sullivan, Guiao, Scott, Chamberlain and Mooney |
| 4 | 3/10/11 – Emails between Hussain, Smith, Guiao, and Mohammad |

I.      **Interview Overview**

On November 14, 2012, Susan Resley and Martha Stolley conducted an in-person interview of Livius Guiao ("Guiao"), Associate General Counsel at Autonomy. Josh Drew, of HP, participated by phone. Kate Emminger of MLB also attended. The interview lasted approximately two hours and was in connection with HP's internal investigation of Autonomy's acquisition. After to the interview, Guiao turned over his lap top for imaging.

Ms. Stolley provided Guiao with "Upjohn Warnings" by advising him that the interview was part of HP's internal investigation, that it was privileged and that Guiao should keep the discussion confidential. Ms. Stolley further advised Guiao that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

Guiao requested clarification regarding the goals of the interview and Ms. Stolley clarified that the interviews are solely for fact finding so that MLB can properly advise HP. Thus, Ms. Stolley explained that there was no right or wrong answer.

II.     **Background and Responsibilities**

Guiao has worked at Autonomy for just under five years. He began working for Autonomy as Counsel, and became Associate General Counsel a little over a year ago.

Prior to HP's acquisition, the structure of Autonomy's legal department was "fairly flat", with Joel Scott ("Scott") leading and the rest of the legal team on one level. Guiao worked closely with Scott, Sushovan Hussain ("Hussain"), and Stouffer Egan ("Egan"). At times, Hussain would

MLAT_AU 00073051

directly ask Guiao, Scott or Jim Krumbacher ("Krumbacher") to complete deals for him. Guiao's impression was that Hussain trusted the three of them. Thus, when there was something that needed to get done, Hussain would go directly to Scott, Krumbacker or Guiao. Beyond these requested relationship, Guiao completed a variety of legal work, including litigation management, operational tasks, writing letters responding to customer complaints, and handling HR issues. Typically if an issue escalated into complicated litigation, the matter would be sent to an independent law firm. Guiao managed patents but did not handle patent prosecution.

III.   **Hardware**

The companies involved in hardware ("HW") sales were usually Dell or EMC. Hitachi may have been involved. Guiao was unaware of any HW sales outside the U.S.

A.   *The Beginning of the Hardware Sales*

Guiao didn't remember exactly when the HW sales began, but recalled the "trigger deal" involved Citibank or Citi Group. Guiao recalled it was a fairly large deal, with millions of dollars involved. Guiao said the deal was well documented. Guiao wasn't sure whose idea it was to begin HW sales, but recalled that Mike Sullivan ("Sullivan") and Hussain seemed to be driving the Citi deal from a business standpoint. Guiao also recalled Steve Chamberlain's ("Chamberlain") involvement in structuring the deal. This Citi deal was not typical of the rest of the HW deals because it was the first one. Guiao believed EMC was the HW company involved in the Citi deal.

Guiao thought Autonomy's HW sales originally began with fairly big customers and likely around 2009. But, as the HW sales evolved Guiao's impression was that Autonomy started reaching out to smaller customers. The smaller customer deals probably occurred in the last two or three quarters that the deals were done, which was likely early 2011. As the customers got smaller, the quantity of deals grew.

Guiao didn't specifically remember a proposal for Morgan Stanley at the end of 2009 (Tab 2).

B.   *General Process for Hardware Sales*

After the hardware sales evolved into a defined process, Sullivan would reach out to contacts in one of two categories, (1) Dell or (2) companies that had existing purchasing relationships with Dell, for example Citi. Eventually Sullivan or Hussain would go to the customer and offer to sell them HW at a 10% discount. Sullivan and Hussain knew the customer was already planning to buy this HW.

The deals were structured so that Autonomy would buy from Dell, and take 10% off the price before selling it to the customer. Autonomy would lose the 10%.

By the time Autonomy engaged with Dell, the process had been fairly defined. Autonomy would engage with customers - usually existing Autonomy customers, but not always – and Autonomy would offer to sell the customers HW. A Master Reseller Agreement was drafted for Autonomy to become a Dell hardware reseller. For each new customer, a new exhibit to that Agreement

MLAT_AU 00073052

would be created and entered. Also, a Master Purchaser Agreement between Autonomy and the customer was created. The customer knew Autonomy had this agreement with Dell.

The Master Purchaser Agreement had a "flow through" obligations warranty so that Autonomy had no warranty obligations. This mechanism flowed through the existing Dell warranty terms so that there were no new warranty negotiations. Autonomy did have delivery obligations, but the warranty obligations remained between Dell and the customer. The shipping terms used were generally FOB origin, but if the customer pushed back, Autonomy would add a term about insurance.

Sullivan would lead the business discussions and decide what needed to be purchased. Once that decision was made, Dell would send Autonomy a quote, and Autonomy would take off 10%. A P.O. would be sent from the customer to Autonomy and Autonomy would send Dell a P.O. Dell would handle delivery to the customer. The shipping terms used were generally FOB origin, but if the customer pushed back, Autonomy would add a term about insurance.

Generally, Dell would ship directly to the customer. The shipping information was listed on the P.O. Guiao was not aware of any time the HW would be shipped, held and later delivered to the customer. Guiao thought he would have been involved in such a scenario.

Guiao didn't recall any reason that EMC ended a relationship with Autonomy, and didn't recall the context of an email from Sullivan to Guiao about EMC (Tab 3).

Guiao found these HW sales to be strange. Guiao had never seen it at another company.

      C.     *Rationale for the HW Sales*

Guiao didn't believe the rationale for the HW sales was any secret. Guiao thought it was apparent Autonomy was looking for revenue. In particular, Guiao thought Hussain was looking for revenue, and pushing Sullivan for revenue, and found it in HW.

      D.     *Reservations About the HW Sales*

Guiao recalled questioning the HW sales, as did Scott and Krumbacher. Guiao remembered talking with Chamberlain a number of times, wondering if the deals made sense from a business standpoint. Guiao felt that Chamberlain was often "the voice of reason" and "torn up about it." Chamberlain responded by acknowledging Guiao's concerns, but telling Guiao that Hussain said Autonomy needed revenue and it was a business decision that had already been made. Chamberlain advised him to document it from a legal standpoint. Chamberlain never said he was uncomfortable with the hardware deals, but it was Guiao's impression that the deals were Hussain's decision.

Guiao also recalled complaining to Matt Stefan and Richard Eads in Texas, who covered Stefan's role after Stefan left.

      E.     *Revenue Recognition, Auditors and HW Sales*

MLAT_AU 00073053

Guiao had no idea how the HW sales revenue was recognized. Guiao had very little visibility into how revenue was recognized and Guiao thought maybe three people – likely Hussain, Chamberlain and Lynch – understood how Autonomy determined the numbers it reported.

Guiao didn't have any visibility into what Autonomy was telling the auditors or the market. Guiao said it was a close team consisting of Chamberlain, Hussain and Lynch that made these decisions. Guiao saw press releases, but nothing else.

Guiao was fairly certain that no U.S. legal staff was involved in press releases or earnings reporting calls. Guiao wasn't involved and he was fairly certain Scott wasn't involved. Guiao surmised that Andy Kanter ("Kanter") might have been involved.

Guiao was not involved with the Citi deal, other than documenting it from a legal standpoint. Thus, he had no idea how the revenue was recognized.

In order to close a deal in a specific quarter, Dell had to ship the HW. Guiao would call Dell to ask if Dell could deliver because often Dell had to first build and configure the HW. Thus, the deals would close once the P.O. was received, the deal was cut and Dell could deliver.

Guiao had no idea how much impact the HW sales had on Autonomy's valuation. However, Guiao knew the HW sales were "material" because there were millions of dollars sold every quarter. Guiao had no idea what Autonomy told the auditors about the HW sales, nor what Autonomy told the market or told HP during the acquisition. Guiao didn't know about the HP acquisition until it was announced. Guiao guessed that no one in the company other than Hussain, Lynch and Kanter knew about the discussions with HP. Guiao's guess was that HP was not aware of the HW sales because there was very little integration in the first quarter after the acquisition.

Guiao was sure, but thought it was possible that the drop in Autonomy's Q212 numbers was attributable to the lacking HW sales. He guessed other contributing factors included the lack of reseller deals and the change in when license deal revenue could be recognized. Guiao thought that generally five or six year license deals would be recognized all up front, but admitted this was only his impression.

      F.    *Marketing Language and "Strategic Relationships"*

Guiao didn't know how the revenue was reported, but did find it interesting that there was marketing language in the P.O.s for the HW sales. Guiao explained that each Dell quote or P.O. would include some documentation between Autonomy and Dell about a marketing provision. Guiao thought it must have been in the Autonomy P.O. to Dell.

The language stated that 50% of what was allocated in the P.O. was for a joint marketing program between Dell and Autonomy. Guiao had never heard of any other joint marketing program details.

When Guiao asked Chamberlain about the language, Chamberlain told Guiao not to worry about it and that Autonomy was working on it with Dell. Guiao thought it didn't "take a rocket scientist

MLAT_AU 00073054

to figure out" that Autonomy was trying to put revenue into a different bucket. Guiao thought the business impact of this practice would be that Autonomy's profit margin would look higher.

Guiao thought the "joint marketing program" would be put on the Dell P.O. to give the "joint" program further credibility. Guiao had no sense of an actual joint marketing program, other than "someone from Dell getting on the phone and figuring out what HW to sell". Guiao didn't believe there were any dedicated employees working on the "joint marketing program" but stressed it was just his impression and that he wouldn't necessarily have any visibility with it. Guiao did believe that since he was involved in the HW deals, he should have known if someone was working on a joint marketing program. However based on what Guiao did see, his guess was that no such program existed.

Guiao didn't believe there was a joint marketing program with EMC, but he wasn't sure.

As far as Guiao knew, there was no strategic relationship with any suppliers. Guiao described what he saw as "just a HW sale deal".

Guiao was fairly certain Chamberlain originally requested that the joint marketing language be put in the P.O.s. Guiao questioned it, but Chamberlain reassured Guiao "they were working on it." Guiao told Chamberlain he thought the language was put in the P.O.s to drive down the cost of goods sold and repeatedly asked if Chamberlain was sure he wanted to do it. Guiao thought Chamberlain got tired of answering these questions.

      G.    *Management and HW Sales*

Guiao said it was very obvious Hussain was driving the HW sales. Guiao would complain to Sullivan about the deals, and Sullivan would say he was under a lot of pressure from Hussain and that he needed the numbers. Guiao understood this through Sullivan's words and tone.

Guiao's impression was that Sullivan got a new number every quarter because at the end of each quarter, Guiao would get a lot of pressure to close the deals.

Guiao wasn't sure if Sullivan received certain compensation after meeting the HW goals, but he was sure that Sullivan had a certain goal to meet.

      H.    *Relationship Between HW Sales and Software Sales*

Guiao didn't really know how HW sales were related to software sales. He had never heard anything that might have grouped or related the two together, and there was nothing in the contracts that linked the purchase of software to HW.

      I.    *Large HW Deals*

Nothing specifically stood out to Guiao about deals with Zones, Inc, AIG, or Morgan Stanley.

      1.    **SHI**

MLAT_AU 00073055

Guiao thought SHI was a reseller for Bank of America, rather than an end user. Guiao thought Bank of America would send Autonomy to SHI to complete a deal because Bank of America had a relationship with them.

Guiao vaguely remembered giving SHI an additional 2% discount on a HW deal, but Guiao said this was rare. Most of the deals were 10% discounts, but Guiao said occasionally an additional 1 or 2% discount would be given. He believed the extra discount was given to get the deal "in the door" but he wasn't sure if it happened at the end of the quarter.

J.      *Types of HW Sold*

At first the HW sales were big servers and components. However, in the last two or three quarters, the purchase orders were for power cords or backpacks. Guiao thought the small purchases might be in conjunction with a bigger order, but the P.O.s only listed these small items. Guiao thought this was absurd and would make jokes about it.

Guiao questioned Chamberlain about the small items and Chamberlain would say "I hear you, but what do you want me to do?" Chamberlain said the customer was also purchasing other items, in addition to the backpacks. Guiao thought that by this point Chamberlain was "numb" to his questions.

K.      *Arcpliance*

Guiao believed that Arcpliance was a real product, but it never materialized into a popular offering. He thought it was a piece of HW with software loaded on it. Chris Goodfellow was responsible. Guiao thought it was a product that used Autonomy software to host the client's data on the client's property. Guiao drafted a contract for BNC, but otherwise the product didn't take off. There was no connection with Arcpliance and the other HW sales.

IV.     **HP Acquisition**

HW sales continued for at least a quarter after HP's acquisition. Guiao thought the acquisition would stop the HW sales because it was "awkward" to be an HP company selling Dell products. Guiao asked Sullivan if the acquisition would cause the HW sales to stop, and Sullivan said Autonomy was going to do it for the quarter after acquisition. Guiao wasn't sure if the HW sales continued any further beyond the first quarter after acquisition.

Guiao never got the impression that Autonomy was being shopped, but he didn't think he would have had any visibility there. Guiao believed that only the four person team would have known about it. Even in hindsight, Guiao couldn't think of any indication Autonomy was being shopped.

Guiao did feel like Autonomy was "building a house of cards", for example, by selling software licenses up front. However, Guiao didn't think Autonomy had to sell, but knew there were problems with certain practices.

MLAT_AU  00073056

A.   *Prior Autonomy Dealings with HP*

Guaio worked on an enterprise software deal with HP, as indicated by an email with negotiation ideas (Tab 4). Rafiq Mohammad was the VP driving the deal. The sales representative was Dan Burkness. Guiao explained the context and stated that Autonomy had been waiting for a deployment period to expire. In other words, HP had purchased a fairly broad five year license to use many Autonomy software products. HP had five years to deploy whatever products they wanted. Then at the end of the five year term, whatever software they deployed became a perpetual license. Guiao didn't believe that HP had deployed anything, and Autonomy was waiting for the end of the period, so Autonomy could resell the license.

Autonomy was not a reseller in this deal. Autonomy sold the software license directly to HP. Guiao thought this was a legitimate deal, but that HP negotiated hard to get a great deal on each software program. Guiao thought HP got a several million dollar discount.

V.   **Resellers**

There was no relationship between the reseller and the end user. The deals were done directly between Autonomy and the customer, and then the "paper" would be done through the reseller. The customer wasn't aware of a third party agreement, at least not at the time of the sale.

Guiao recalled occasions where the deal with close with a reseller at the end of a quarter, and then in the next quarter Autonomy would tell the client to pay the reseller and the client would ask who the reseller was. Guiao couldn't think of a specific time this happened.

Generally Hussain negotiated these reseller deals. Egan was also involved in some deals.

Guiao believed that a deal would close with the reseller for an amount less than the end user's contemplated amount. Thus, when the reseller sold the software to the end user, the reseller kept the difference. Guiao wasn't sure how the reseller was ultimately paid.

Some reseller deals went through Eads, and some HW sales might have also gone through Eads.

Guiao was only involved with drafting the P.O.s for resellers at the quarter end. When Hussain realized which deals weren't going to close, Hussain would call Scott and Scott would call Guiao or Krumbacher to draft the P.O. for a specified reseller, at a specified amount, with a specified end user. Ultimately this P.O. would be from the reseller to Autonomy, but Autonomy would draft it, send it to the reseller and the reseller would send back the signed copy. Guiao believed that ultimately the reseller was on the hook for paying.

After a reseller agreement had been signed for a certain deal, the end user close date varied. Eventually, a deal would be written with the end user and a provision would be inserted so that the end user would pay the reseller. Guiao admitted there may have been other closing methods, but this is the one method he remembered.

Every quarter, Guiao shared his skepticism about resellers with Scott, Chamberlain, Krumbacher and Eads. However, Scott would say that it was a business decision and Hussain was telling them

MLAT_AU 00073057

to do it. Chamberlain would also say it was a business decision and Hussain wanted to do it. Eads and Krumbacher were peers that commiserated about the practice.

Extended payment terms were fairly standard practice at Autonomy, for resellers and other customers. Guiao often saw terms for 90 days, 180 days or 6 months. Guiao remembers when Autonomy integrated into the HP policy of 30 days from invoice date, there was a lot of push back from the salespeople.

Guiao wasn't aware of a big reseller write off right before the acquisition.

A.   *Legitimate and Illegitimate Resellers*

Legitimate resellers did work with Autonomy, and Guiao described a "channel" for that. However, there were also "one off" resellers that weren't driven though the same channel. These one off dealers included resellers that would take deals so that it could close in a certain quarter. Guiao's impression was that these resellers had little to no involvement with the customer and were just brought in to close the deal in that quarter.

Guiao couldn't think of any of the legitimate resellers, but the "illegitimate" resellers included Capax, Microlink, Microtech, Filetech and Discovertech. Guiao thought Hussain had all the relationships with these resellers. Guiao thought these deals began between 2009 and 2010, but admitted he was guessing. Capax was the main reseller Guiao saw.

Guiao knew there was a relationship between Microlink and Microtech, but didn't know exactly what it was. Guiao suggested asking Scott.

Occasionally Guiao would talk with John Biacco, Capax's Founder and President, when Biacco still needed to be paid. Guiao would follow up with management about paying Capax.

Guiao knew Capax had a technology services branch, and that they provide first line support for ESA, but Guiao didn't know many details.

B.   *Amgen / Bank of America Deal*

At first, Guiao didn't recall a deal between Amgen and Capax that became a deal between Capax and Bank of America. However, after being shown a letter Guiao drafted that cancelled the Amgen deal and transferred it to Bank of America (Tab 4). Guiao vaguely remembered that an Amgen deal was closed through Capax, but Amgen later baulked at entering a contractual relationship with Capax. Therefore, the Bank of America deal replaced the Amgen deal. Guiao wasn't sure exactly why Amgen didn't want to deal with Capax, but he could see why a company wouldn't want to work with a company they didn't know. Guiao didn't recall a Discovertech and Bank of America P.O. during the same time. He said he might have drafted it, but he didn't recall anything specific. Guiao didn't recall the deal being broken up between two resellers, but suggested asking Hussain or Scott.

C.   *Microtech / Vatican Library*

MLAT_AU 00073058

Guiao was not involved in the Microtech Vatican Library deal, but had heard about the Vatican Library deal. He had heard it was a huge deal and Andy Kanter, Rachel Haverfield and maybe another person might have been involved. Guiao didn't hear much more about the deal and never heard that it closed. Guiao would have expected to hear some sort of announcement or press release if it had closed.

   D.  *Eli Lilly / Capax Deal*

Guiao wasn't sure about the context of an email about Eli Lilly and Capax (Tab 1), but thought there was some deal due from Capax to Autonomy and they were looking to offset it.

   E.  *Filetech / Dept. of Veteran Affairs*

Guiao wasn't familiar with this deal.

## VI. **IDOL OEM**

Guiao didn't find Autonomy's OEM business worrisome. The main concern seemed to be the lack of visibility with the numbers reported. Guiao thought no one in the company besides Hussain had any idea how the numbers were created. However, the OEM deals themselves seemed very straightforward and legitimate. The client would take Autonomy software, embed it in their product and resell their final product. The OEM client would pay either a flat fee or royalties.

Guiao thought OEM had to involve another software company and thought Bank of America could never be an OEM client.

Guiao did find a few reciprocal OEM deals strange, including one for Viadent with Frank Pau, the former General Counsel of Autonomy. Autonomy bought millions of dollars of Pau's software and Pau bought the same amount from Autonomy. As far as Guiao knew, it was shelfware and no one actually used this product. Guiao was involved on the legal side of the deal and Egan and Hussain negotiated it. Guiao thought Mike Mooney might have been involved as well.

Autonomy often sold OEM for flat fees and when the license was renewed, the support fee would be based only on that current term. However, HP aggregates its support fee as the client extends the contract. Guiao noted this as a difference in philosophy, but didn't think there was anything wrong with the way Autonomy did it.

Guiao thought the OEM numbers seemed a lot higher than what Autonomy was actually selling. Guiao thought he heard this from Mooney or Mike Chang. Guiao didn't think the OEM business was huge and acknowledged that the numbers he saw might have been different from what was reported.

Guiao called IDOL the "basis of every software product [Autonomy] sells" and thought it was sold directly, as well as being OEM'ed.

MLAT_AU 00073059

## VII.   __Other "Shady" Practices__

### A.   *Resales of Current Deals to Combine Service Pricing – the "Wrap and Roll"*

Guiao felt that one of Autonomy's "shady" practices was to combine multiple licenses in a resale a software license. For example, a customer would purchase one license for $100,000 with support at 20%, then later purchase another license for $100,000 with support at 20%, then later purchase another license for $100,000 with support at 20%. Thus, there would be $300,000 sales with 60% software support. So, Hussain would resell that same customer those same three licenses for an additional $100,000 with 20% support on all three products. That way, the customer saves money on support in the long run, but it's almost double dipping. Guiao confirmed these deals are all documented, and would be referred to as "wrap and roll".

### B.   *Hosting*

Autonomy would sell a digital software license for a certain number of years, and it would include hosting of data. The customer would pay up front and, based on some complicated formulas, would ultimately save money. Guiao felt this practice was "less shady", but questioned whether it was proper to sell services associated with hosting as a license. Guiao thought that, at its heart, the product was a hosting service as opposed to digital software licensing, even though software was involved. Guiao stated there was a software license delivered for the client to use to archive its own data, but Guiao thought the client probably never used it. Guiao thought the "practical reality" was that it was really a pre-pay of services.

MLAT_AU 00073060



DATE:        January 8, 2013

SUBJECT:     Memorandum of Interview with Livius Guiao – January 7, 2013

**TAB**     **Document Description**

1    12/28/09 – Email chain between S.Egan, S.Hussain, L.Guiao, S.Chamberlain, and
     J.Scott  with an attached proposal titled "Confidential Proposal To Morgan Stanley
     Software and Dell Server Promotion"

2    1/21/10 – Email chain between L.Guiao, S.Chamberlain, S.Egan and D.Kennelly with
     an attached order form for an Autonomy/Dell Server Promotion totaling US$5,288,800

3    12/31/09 – Email from L.Guiao to J.Scott with an attached MicroTech Purchase Order
     for End-User Morgan Stanley

4    9/22/09 – Email chain between S.Chamberlain, J.Scott, L.Guiao, M.Sullivan, and
     J.Capitel

5    Loose Document – An Email between Guiao and Chamberlain about Citi and Discover
     Tech (Ms. Resley Used)

6    6/23 - 24/11 – Email from S.Egan, J.Scott, J.Snider, D.Wilner and L.Guiao with
     various attachments including an Abbot License Proposal and Master Professional
     Services Agreement between Abbott and Autonomy

7    6/23 - 29/11 – Email between L.Guiao, S.Chamberlain, P.Prentis, M.Sullivan, E.Avila,
     J.Snider, and D.Wilner

8    8/10/11 - Email between L.Guiao and J.Salazar with attached agreement between
     Discover Tech and Autonomy, dated 6/30/11

9    6/30/11 – Agreement between Autonomy and Discover Tech for end user Hyatt

10   9/27/11 – Email chain between S.Hussain, J.Scott, M.Lynch, P.Menell, S.Chamberlain
     and D.Truitt

11   1/11/12 – Email chain between S.Hussain, M.Lynch, A.Kanter and D.Truitt

12   12/31/10 – Email between L.Guiao, S.Chamberlain and J.Scott

13   12/31/10 – Letter "Re: Replacement of Purchase Order" from Capax to Autonomy

Morgan, Lewis & Bockius LLP

14      12/31/10 – Agreement between Autonomy and Discover Tech for end user Bank of
        America

15      12/31/10 - Email between Guiao and Chamberlain where Chamberlain says "if there
        are the normal reseller agreements then go ahead"

16      2/10 - 11/11 – Email chain between S.Chamberlain, J.Scott, L.Guiao, and D.Truitt

17      1/18/11 – Email chain between J.Scott, L.Guiao,and  S.Chamberlain

18      1/24 - 25/11 – Email chain between L.Guiao, J. Scott, S.Egan and S.Chamberlain

19      3/2/11 – Email chain between J.Scott, L.Guiao and D.Truitt


I.      **Interview Overview**

On January 7, 2013, Leslie Caldwell, Susan Resley, and Martha Stolley, all of Morgan Lewis
and Bockius ("MLB") conducted an in-person interview of Livius Guiao ("Guiao"), Autonomy's
Associate General Counsel. Sarah Nolton of PwC and Kate Emminger of MLB also attended.
The interview lasted approximately two hours and was in connection with HP's internal
investigation of former Autonomy management and Autonomy's business and accounting
practices. This was the second time Guiao was interviewed in connection with this investigation.

At the beginning of the interview, Ms. Caldwell told Guiao that the interview would cover some
of the same things discussed at Guiao's first interview, but would also cover new topics. Ms.
Caldwell provided Guiao with "UpJohn Warnings" by advising him that the interview was part
of HP's internal investigation, that it was privileged and that Cairns should keep the discussion
confidential. Ms. Caldwell further advised Guiao that MLB represents HP and therefore, HP
could choose to waive the privilege at its discretion, and MLB nor Guiao would be able to
prevent HP from doing so.

II.     **Hardware**

        A.      **Dell Hardware Transactions Generally**

Guiao wasn't involved in engaging with Dell directly to begin hardware sales, but Guiao did
engage with Dell after direction from Mike Sullivan. Sullivan was the CEO of Autonomy's
Protect Division. Guiao's understanding was that Sullivan was working closely with Sushovan
Hussain. Guiao believed that Sullivan and Hussain drove the deals with Dell. Guiao handled the
documentation of the deals, as did Joel Scott ("Scott").

When asked whether Autonomy was also selling software to the hardware customers, Guiao
hesitated. Guiao then stated that he thought some of the early hardware customers were existing
Autonomy customers. Guiao's impression was that Sullivan would sell hardware to existing
software customers. Guiao guessed that this initial set of customers were both Autonomy and
Dell customers. However, Guiao didn't believe that generally Autonomy software was sold with

MLAT_AU 00073062

the hardware. Guiao felt that the hardware was sold without any software. Guiao thought this was especially true as the hardware program evolved.

Guiao stated that it was standard for Autonomy to buy the hardware and then sell it to a customer at a 10 % discount, so that Autonomy was losing 10% on the sale.

Guiao wasn't sure why Autonomy stopped working with EMC, but did know that the Dell relationship developed further than the EMC relationship. Guiao felt that Autonomy did a few larger transactions with EMC, but that the Dell relationship was much broader.

Dell was the biggest hardware partner vendor with whom Guiao worked. A contract between Autonomy and Dell authorizing resale of Dell hardware was created. Then, each time Autonomy sold hardware to a new customer, Guiao would memorialize that relationship, too. Once the master agreements were in place Guiao's team would process the POs. Generally, Guiao's team would take a quote from Dell, remove 10% of the price, and requote the hardware to the end user customer. The end user would then give Guiao's team a PO and Guiao's team would give Dell a PO. Guiao said this process was usually based on "fairly standard quotes". Autonomy paid the entire amount, and the end user paid the discounted price so that Autonomy "would eat the discount."

Guiao would question the hardware transactions by asking Sullivan or Scott, but was always told that Hussain needed the revenue and the deals were similar to the reseller deals. Guiao never liked working on the hardware deals nor the reseller deals, because "it didn't feel right." Guiao was accustomed to working for companies adhering to GAAP. Scott and Chamberlain told Guiao that the transactions were in accordance with IFRS, but Guiao still thought the deals didn't feel right. However, Guiao was told that it was a commercial decision so Guiao did as told. Guiao recalled hoping that the reseller deals wouldn't come in because Guiao knew he would have to quickly process them. Guiao was also uncomfortable working on the hardware deals because Guiao wasn't familiar with the customers or the equipment. Guiao became especially uncomfortable with the deals as the products became smaller – like the laptops and backpacks.

After the HP acquisition, Guiao assumed that Autonomy couldn't sell Dell hardware, but Sullivan told Guiao it was Hussain's decision and it continued one or two quarters past the HP acquisition.

B.   **"Joint Marketing Efforts"**

The only joint marketing efforts that Guiao recalled were done with Dell; Guiao did not recall any EMC joint marketing efforts. Guiao thought that Steve Chamberlain or Sullivan had asked for language in the Dell POs that allowed Autonomy to allocate some of the hardware revenue to marketing. Thus, the language on the POs regarding the Dell Marketing Program was language Autonomy created. Guiao surmised that the language could have been similar with the EMC transactions, but Guiao didn't specifically remember.

Guiao did recall some discussion about joint marketing of a hardware appliance, called Arcpliance, but he didn't remember the exact time frame. Guiao didn't know who supplied the

-3-

underlying hardware, but thought that it could have been EMC. Guiao speculated that if EMC had supplied the hardware, then there might have been a marketing program associated with EMC. Guiao recalled that as Autonomy transitioned from EMC to Dell products, there was some conversation about marketing language, but didn't believe it was related to Arcpliance, or to a specific product.

### C.    Business Rationale

Guiao did not know the business rationale for these sales. Guiao thought the rationale would have been determined by Sullivan and Hussain. Guiao's guess was that the hardware sales were done to show revenue. Guiao guessed that because he remembered a few times when the quarter end was approached, and Sullivan gave Guiao the impression that Sullivan was under a lot of pressure to bring in revenue from hardware sales.

### D.    Morgan Stanley

Guiao had a vague memory of the Q4 2009 hardware sale to Morgan Stanley. Guiao stated he couldn't speak to specifics, but could speak extensively about the general Dell hardware deal structures. (See above section "Dell Hardware Transactions Generally")

Guiao remembered working on a 12/28/09 document where Autonomy quotes to Morgan Stanley a deal with $1 Million in Dell hardware and $4.7 Million in software (TAB 1), but didn't remember the rationale behind the document, or how the hardware and software numbers were decided. Guiao thought Hussain or Stouffer Egan would have set the numbers for a Morgan Stanley deal. Guiao said he "had zero involvement in terms of numbers or allocating between hardware and software" and simply worked off the numbers that were given to him. Guiao thought this proposal was given to him by Egan, but wasn't entirely positive. Guiao said that he would not have drafted this proposal.

Guiao guessed that the value was assigned this way to show that Autonomy software was present in the deal, but he really was unsure.

Guiao was unsure if Morgan Stanley actually wanted software, explaining that he had no contact with Morgan Stanley in that capacity. The negotiations with Morgan Stanley were done by Egan or Hussain.

Regarding a 1/21/10 email chain where the hardware and software values changed so that the deal is for hardware and firmware totaling US $5,288,800 (TAB 2), Guiao didn't know why this change occurred but thought the change would have come from Egan.

Regarding an email where the Morgan Stanley client asks Guiao to remove the reference to software, and Guiao asks Chamberlain for permission (TAB 2), Guiao remembered this request but didn't know why it was requested. Guiao checked the request with Chamberlain because it was Guiao's standard practice to check with Chamberlain any time a change was made to a transactional document, so that everything would be in compliance with revenue recognition

-4-

standards. Guiao's assumption was that Autonomy wanted to recognize software revenue rather than hardware revenue, because Autonomy was a software company, but Guiao wasn't sure.

Guiao didn't recall when he learned that the Morgan Stanley deal would not close during Q4 of 2009, but felt it was common for Autonomy to engage with resellers when the quarter end was approaching and a deal wasn't closing promptly. Hussain drove these reseller engagements.

Guiao didn't recall any specifics about a reseller being engaged here, but wasn't surprised by it.

It was not Guiao's idea to put together a MicroTech reseller agreement for the Morgan Stanley deal, even if he had drafted it. Generally, Guiao was told by Scott that a reseller agreement needed to be drafted. Guiao's impression was that Scott took this direction from Hussain.

Guaio felt it was common to work on New Year's Eve, even as late as 7:00pm. Guiao made this statement after examining an email he had sent on 12/31/09 with an attached MicroTech Purchase Order Under Autonomy Government Reseller Agreement. (TAB 3)

Guiao did not remember having contact with MicroTech. Guiao often confused MicroTech, Microlink and Discover Tech because he didn't directly engage with those companies. Guiao suggested talking with Hussain and Scott about who were the principals were at those companies.

Guiao guessed that he might have sent a draft Purchase Order to MicroTech on New Year's Eve 2009. Guiao thought he probably created a MicroTech PO (TAB 3) and when shown the document said it looked very standard, and similar to the POs that were sent to all resellers. Guiao stated that the POs would generally be one or two page documents with an end user name, list of software and price. Guaio confirmed that the PO was for only software.

Guiao did not specifically remember the Purchase Order from 12/31/09 (TAB 3), but said that generally similar documents would be sent out, signed by the reseller and then processed by Autonomy.

Guiao did not speak with MicroTech before creating a document for them. Guiao assumed that someone spoke with them, and thought it would have been Egan, Hussain or Sullivan. When the deal was ready to close, Scott would ask Guiao to draft the document.

Guiao was not aware of how Autonomy recognized the revenue relating to any of these documents and had no visibility into revenue recognition at Autonomy. Guiao felt it was clear the reseller was involved so that Autonomy could include the revenue in a specific quarter, but had no idea what revenue was actually recognized when.

Guiao didn't know if the software listed on the MicroTech PO (TAB 3) was ever actually resold to Morgan Stanley. Guiao felt that generally the resellers didn't have much involvement with the end user. Autonomy would pull in a reseller when the deal wasn't closing in the quarter, but Autonomy would continue to work with the end user to close the deal. Guiao felt Capax, Discover Tech, and MicroTech had fairly limited contact with the end users and were pulled in

MLAT_AU  00073065

simply so that Autonomy could close a deal. But, Guiao wasn't aware what specifically happened with the Morgan Stanley deal after MicroTech became involved.

Guiao wasn't sure how or when Autonomy moved from software to only hardware. Guiao didn't recall this specifically happening but thought that Egan was driving that discussion. Guiao wasn't positive but seemed to recall that Morgan Stanley asked for a discount. Guiao wasn't sure if that's what the document was referring to (TAB 2) but based on the documents refreshing Guiao's memory, he thought there was an additional discount and recalled something about $500,000.

Guiao didn't know how or if Autonomy recognized revenue for the software sale to MicroTech. Guiao would have been shocked if anyone in the company other than Hussain and Chamberlain understood how Autonomy was recognizing revenue. Guiao had no visibility into it and understood that very few people did.

Guiao speculated that he would have asked someone how the Morgan Stanley deal changed from a $6 Million deal of combined hardware and software to solely a hardware sale. However, he didn't remember any specific questions or explanations regarding the deal's changing.

Guiao wasn't sure if he ever voiced any concerns about how this deal unfolded and recalled doing many hardware transactions.

### E.   Other Hardware Transactions – ACS, Hitachi, Citi

Regarding a reseller called ACS who was involved in a hardware deal (TAB 4), Guiao thought that ACS was Citi's authorized purchaser, so that a deal for Citi would have had to go through ACS. Guiao also thought the hardware involved in that deal was EMC hardware.

Guiao didn't work on any Q2 2009 deals of Hitachi hardware, but Crumbacher did. Guiao and Crumbacher shared an office at the time and thus, Guiao knew of the Hitachi deal because Guiao heard Crumbacher talking about it. Other than that, Guiao didn't know any details about the deal. Guiao's guess was that the Hitachi deal was the first big hardware deal. Guiao guess that the Citi/EMC deal also could have been the first hardware deal.

Guiao thought that the Citi deal only included hardware, but Guiao wasn't certain. Guiao did not believe that the Citi deal involved an appliance with Autonomy software embedded on it.

Guiao offered to check on the Hitachi resale of hardware in June 2009 to see who the customers were and what amounts were sold and if any hardware was involved.

Guiao wasn't sure what a reference to Discover Tech and Citi meant in an email (TAB 5 susan loose document) from Chamberlain to Guiao about Discover Tech.

Guiao didn't recall a deal between Discover Tech and Citi where Citi purchased Discover Tech software, or where Discover Tech was involved as a reseller.

-6-

III.   <u>**Resellers**</u>

Guiao guessed that when Autonomy was not able to close the deal in a quarter, Autonomy took it through a reseller, which happened frequently at the end of a quarter. Guiao didn't recall any situations where a reseller took a deal and then the end user deal didn't close, but it wouldn't surprise Guiao if that happened. Guiao offered to look back in his email for helpful information on this topic.

When a reseller took a deal at risk, but the end user didn't want to deal with the reseller, then there was language in the contracting allowing the end user to pay a designated fee and then Chamberlain would say the reseller didn't have to pay. When that didn't happen, Guiao wasn't sure who handled it, but assumed it would have been Chamberlain, Hussain, and Scott. In this situation, if Scott was involved, Guiao thought that Scott would do so "without having knowledge."

Guiao didn't recall any situations where the reseller was owed a balance and therefore Autonomy purchased products from the resellers to cancel out the balance. Guiao thought that there was a transaction with Capax where Autonomy purchased a license from Capax, but Guiao didn't know if its purpose was to cancel out other debt.

Guiao didn't recall credits offered to resellers but did recall some sort of fee that was occasionally due to resellers. Guiao thought there was a Capax situation like this, but wasn't sure if credits were given or some sort of refund was processed. Any credits processed would have been issued through Hussain or Chamberlain.

Guiao had never heard the term "acceleration partner" or "revenue acceleration partner" but Guiao wasn't surprised by the term.

A.   **Abbott Labs and Discover Tech**

Guiao didn't recall anything specific about Abbott Labs, but knew that Autonomy engaged with them.

Regarding a June 24th email with an Abbott MSA and a license proposal for $9 Million on June 30, 2011 (TAB 6) Guiao stated that it was a Stratefy agreement, which Autonomy acquired as part of Iron Mountain. Guiao stated that Iron Mountain had an archiving service called DRCCM. Thus, Guiao stated that there were a few instances where those existing deals were taken and Autonomy would try to sell them a license. Guiao thought this might have happened here, as it was done for DRCCM and Stratefy.

Guiao further described this practice, saying that generally the services agreements were for a certain period of time. Thus, Guiao's understanding is that Autonomy would sell a Stratefy license or similar e-discovery license for 3 or 5 years. Then the customer would pay up front and use the license for whatever the terms of the services would have been. Thus, the customer just paid upfront on the service. Guiao remembered that when the Iron Mountain acquisition closed, he was in Boston with Hussain. Guiao recalled Hussain's saying that after the acquisition,

-7-

Hussain wanted to push to convert the existing DRCCM to Autonomy licences. DRCCM is an Iron Mountain archiving and data hosting product similar to Autonomy's Digital Safe product.

Guiao didn't recall Autonomy trying to close a $9 Million license conversion deal with Abbot. After being shown an email where the contract was reduced from $9 Million to $2-3 Million (TAB 7), Guiao recalled the number being reduced, and also that the deal was driven by Jane Snider and David Wilner, her manager. Both these employees came to Autonomy when Stratefy was acquired. Guiao wasn't sure the reasoning behind the reduction in the deal, but guessed that Abbott resisted because they were used to paying the number consistently over time rather than all up front.

Guiao didn't recall Discover Tech's involvement with the Abbott deal, but wasn't surprised that Discover Tech was involved. Guiao didn't know how Hussain chose between all the resellers, but thought that Hussain must have been the decision maker, or perhaps Egan or Sullivan decided. Guiao did know that when Scott asked Guiao to draft a reseller agreement, Scott's direction came from Hussain.

Guiao didn't think that one transaction was generally split between multiple resellers, but did recall that it happened with the Bank of America deal. Guiao didn't know why Bank of America was split between multiple resellers.

Guiao thought that revenue recognition was probably somehow connected to the credit worthiness of the reseller, but wasn't sure how.

Guiao didn't know anything about the $9 Million agreement with Discover Tech and Abbott as the end user (TAB 8), which was dated the day after an email that said the Abbott deal was going to be reduced to 2 or 3 Million (TAB 7).

Guiao didn't specifically recall drafting a reseller deal for $9 Million with Abbott as the end user (TAB 6), but knew the direction to do so would have come from Scott. Guiao thought that he probably questioned this high number when he knew that the deal was going to be reduced, but didn't recall what answer Scott gave him.

Outside of standard administrative contact, Guiao did not talk with employees at Discover Tech about this deal.

Guiao thought that Autonomy closed the Abbott deal directly but wasn't entirely sure. Guiao assumed that if that happened, it would have been after the reseller transaction.

One off Reseller Agreements were named this way to distinguish between master reseller agreements that Autonomy could issue multiple POs from, as opposed to single stand alone agreements.

The Discover Tech agreement was called a "one off agreement" which Guiao agreed implied that this was Discover Tech's first deal with Autonomy because one off agreements were often used in for the first deal with a particular reseller (TAB 8).

-8-

Guiao wasn't sure how Discover Tech became a reseller but guessed that Hussain would have driven the relationship. Guiao thought that Scott would also know the origin of the relationship.

Guiao didn't think that Jane Snider still worked for Autonomy, but said that if she did then she hadn't sold anything in a long time.

Guiao recalled that a deal with Abbott Labs did close and agreed to check his email archive for more information.

### B.   Hyatt and Discover Tech

Guiao did not recall a deal through Discover Tech with Dell as the end user where Dell was sublicensing the product to Hyatt (TAB 9), but offered to dig in his email to see if he had other information.

Guiao didn't have any specific recollections about the Dell and Hyatt transaction, but might have worked on it. Even when shown an email where Guiao asked Jorge Salazar to pull the Abbott and Hyatt docs (TAB 8), Guiao did not recall why. Guiao's guess was that Scott would have asked for them, and so Guiao asked Salazar to retrieve them.

### C.   Autonomy's Discover Tech Software Purchase

Guiao didn't recall Autonomy's purchasing $4.4 Million of Discover Tech software on June 30, 2011. Guiao didn't know Discover Tech sold software and only worked with them in their reseller capacity. (TAB 10)

Guiao didn't recall any disputes between Discover Tech and Autonomy over reseller agreement amounts. (TAB 11) Generally, Guiao did remember resellers questioning the amounts due to them, but Guiao didn't recall specifics. Guiao didn't know how Autonomy would try to resolve these disputes. As far as Guiao knew, Chamberlain or Hussain would have made that decision.

### D.   Amgen / Bank of America Deal

Guiao didn't remember anything specific about the Capax / Amgen / Bank of America situation. Guiao recalled that the Amgen deal was "technically complicated" and thought it involved a hosted component. Guiao also thought that Amgen was asking for a lot of tech performance parameters. Guiao recalled Ivan Rothman or Hung Chang driving the deal. Ivan recently left Autonomy. Guiao remembered that the Amgen deal was negotiated extensively and the terms were very technical in nature. Guiao also recalled a customer who balked at paying a reseller. Guiao wasn't sure if the reseller who balked was Amgen, but thought it could have been.

When asked why third party language was in an agreement for a deal to go directly through Autonomy, Guiao explained that the deal was taken through a reseller and thus the reseller was obligated to pay Autonomy. Thus, finance wanted the terms to flow through from the end user to the reseller to Autonomy.

-9-

MLAT_AU 00073069

When asked about the Autonomy and Amgen negotiations in Q3 and Q4 of 2010, with involvement by Capax and Discover Tech on December 31, 2010 (TAB 12) and a cancellation letter draft replacing the Capax Amgen deal with the Bank of America deal (TAB 13), Guiao didn't recall his instructions on drafting the documents, but was "almost certain[]" instructions would have come from Scott. Guiao guessed that Scott would have received the directions from Hussain based on "the standard practice."

Guiao recalled that Egan was the relationship manager for Bank of America, and that Hussain was also involved. Guiao recalled that Bank of America requested many commercial credits and other financial mechanisms. Approval for those requests came from Hussain. Jim Prosocco(sp?) also managed the Bank of America relationship. Prosocco(sp?) still works for Autonomy.

Regarding the last paragraph in the Discover Tech One Off Reseller Agreement (TAB 14), Guiao said the language was not standard in One Off Reseller Agreements. Guaio said that someone would have instructed him to draft it. Guiao didn't recall why the language was in the agreement. Guiao agreed that the language made it seem that the deal would ultimately go directly through Autonomy. Guiao's guess was that whoever had told him to include the language contemplated that the end user deal was going to be negotiated and closed directly with Autonomy. Guiao wasn't sure why the paragraph was ultimately removed from the agreement, but thought it was possible that Discover Tech refused to accept the paragraph.

Guiao wasn't sure why there was no master agreement for Discover Tech since they were involved in the Bank of America deal, as well as the Abbot deal. Guiao thought that it was easier to do a one off agreement because those agreements were only one or two pages, as opposed to the ten to twelve pages that master agreements were. However, Guiao thought that there was always business contemplated with Discover Tech.

Regarding a 12/31/10 Email where Chamberlain says that "if these are the normal reseller agreements then go ahead" (TAB 15), Guiao explained that processing a reseller deal normally required approval so he thought that in the email Chamberlain was asking if the attached agreement was like the template PO. Chamberlain was then giving permission to go ahead with the agreement without actually seeing the document, assuming it was a standard agreement. The one off provision contemplating a direct sales through Autonomy was not a standard provision included in the reseller agreements.

Guiao wasn't sure how a reseller would be compensated if an end user ultimately closed a deal through directly Autonomy. Guiao said that situation was handled by finance. Guiao thought that maybe Scott was involved in it as well, as part of his operational responsibilities.

Guiao confirmed that John Baiocco was the principal at Capax, but Guiao didn't know him very well. Jim Crumbacher had a "decent relationship" with Baiocco as did Scott and Egan. Guiao communicated with Baiocco, but more just to get signatures or signed copies of agreements.

Guiao recalled that the Bank of America deal was very convoluted and recalled involvement with Discover Tech, Capax, and MicroTech but didn't recall the specific how and why of the

-10-

deal. In making this statement, Guiao was referencing a copy of Guiao's 2/11/11 email with documents for Bank of America, MicroTech, Discover Tech and Capax Guiao (TAB 16).

Regarding his 2/11/11 email to Chamberlain, where Guiao references determining margins (TAB 16) from Discover Tech to MicroTech, Guiao wasn't sure what exactly was going on. Guiao thought the margin reference was about determining what money was due to the resellers. Guiao wasn't sure why MicroTech was pulled into the deal. Guiao thought that Scott might be able to answer some of those questions and provide the rationale for involving the resellers in this deal.

Regarding his 1/18/11 email (TAB 17) with a reference to multiple resellers being involved in a single deal, Guiao wasn't sure why or how the transactions were broken out. Guiao wasn't sure why this would make the transaction easier for Chamberlain for auditing purposes, as it said in the email, but thought the direction make the transaction easier for auditing would have come from Chamberlain. Guiao thought it was possible that the involvement of multiple resellers was due to lacking creditworthiness of a single reseller. Guiao knew that creditworthiness was a factor in considering a reseller transaction, but didn't know if that specifically was the reason for multiple resellers on this deal.

Regarding a 1/24/11 email from Egan to Hussain and Scott in which Egan writes "Don't you want the $3.6m from micro tech? Or do you want it through DT as well?" (TAB 18), Guiao wasn't sure what was going on, but thought that Egan was asking Hussain who Hussain wanted to use for the $3.6 Million reseller transaction. Hussain would have made that decision. Guiao wasn't sure why they were trying to decide, since it seems the resellers were already in place at that time. Guiao guessed that Scott could answer that question since Egan's email is addressed to Hussain and Scott.

Guiao didn't know what a marketing assistance fee was and thought maybe it pertained to hardware sales, but that was the only context that came to mind for Guiao. When asked about a 3/2/11 email where Guiao follows up with Dave Truitt about several documents, including an MAF invoice (TAB 19), Guiao still didn't remember the term "MAF" and thought Scott might know. Guiao thought the email was just Scott reaching out to Truitt to ask if Truitt had any questions, and then Guiao reached out to Truitt in Scott's absence.

E.      **Eli Lilly**

Guiao remembered the Capax Eli Lilly deal as trying to close near the end of the quarter, but didn't remember much else.

Regarding negotiations in September 2009 where Capax stepped in to take the Eli Lilly deal, and then the deal appears to go direct through Autonomy in June of 2010, Guiao guessed that when the Eli Lilly deal didn't close in the right quarter, Autonomy closed it though Capax. Guiao thought there might have been some language in the agreement with Eli Lilly designating Capax as a payee so that Eli Lilly paid an invoice to Capax. However, Guiao thought the invoice would have had to come from Capax to Eli Lilly.

Guiao did not draft the entire Eli Lilly agreement, but thought it would have been a standard agreement including one or two provisions related to Eli Lilly's paying Capax. Guiao didn't

MLAT_AU 00073071

think the entire agreement would have been drafted around Capax's involvement.

Jeff Cornelius from Dallas was Autonomy's relationship manager for Eli Lilly. Cornelius was the account executive, but Guiao wasn't sure if Egan or Hussain was the management level person on the Eli Lilly account.

Guiao did not have much interaction with Brent Hogenson, but recalled that Hogenson came to Autonomy through the Interwoven acquisition. For awhile, some of the team members from Interwoven worked on revenue recognition with Guiao. Guiao recalled Reena Prasad was the main person. However, Guiao didn't interact with Hogenson much.

Guiao didn't remember a contact at Eli Lilly and didn't remember that Hogenson was involved in the deal. Guiao recalled that there were several different revenue recognition "players." Guiao recalled Cynthia Watkins, Andrew Percy(sp?), and Matt Stephan. Thus, Guiao didn't recall if Hogenson was ever involved in the Eli Lilly deal.

F.    **Capax**

1.    <u>EAS and EDD Contracts</u>

Guiao thought that either he or Crumbacher would have drafted the amendment to the Capax Agreement for first and second line support for EAS, but Guiao didn't recall it specifically. Guaio said that even if he had drafted the agreement, Guiao didn't recall being involved in any conceptual discussion for the deal. Anecdotally, Guiao recalled people discussing discontinuing EAS as a product and therefore Autonomy agreed that Capax would provide all EAS support. Guiao guessed that Hussain would have driven the deal.

Guiao didn't think he drafted the Capax EDD agreement and wasn't sure why Autonomy would have made that agreement since Autonomy handled EDD itself. The only thing Guiao could think of was that it was similar to EAS where Autonomy wanted to offload the product because it wasn't planning on supporting the product in the future. However, Guiao reiterated that was just a guess.

At the time, Guiao didn't get the impression that the EDD and EAS deals were to provide Capax with funds to pay Autonomy. However, Guiao thought Scott might be able to make that assessment. Guiao also said that, in hindsight, there were agreements Guiao didn't work on that "make me raise my eyebrows." Guiao didn't know that Capax sold software, so Guiao questioned why Autonomy would buy Capax's software and how Autonomy would use it.

Guiao thought that Scott, Crumbacher or he would have driven the deal for Autonomy to buy software from Capax, but Guiao was fairly certain he wasn't involved. Guiao thought someone else from legal could have been involved, but reiterated that Scott usually got a direction from Hussain and then Scott asked Guiao or Crumbacher to draft the assignment.

After an agreement was drafted, Guiao did not interact with clients and thus was never involved

-12-

in collecting payment from Capax. After an agreement was finished, Guiao would "throw them over the fence to the finance department and they would collect." Guiao never heard whether or not Capax was a good payer or a bad payer, but thought Helen Ku would have a better sense of how often Capax paid and if Capax paid on time.

IV.     **Autonomy's Culture**

     A.     **Joel Scott**

Guiao described Joel Scott as smart and a good boss who seemed to be under a lot of pressure and was often frustrated with that pressure. Scott "took a lot" from Hussain and Lynch, whereas everyone else had less contact with the UK team. As of the morning of the interview, Guiao found out that Scott was no longer Guiao's boss and Scott had been moved to a new department at HP.

     B.     **Sushovan Hussain**

Guiao described Hussain as "notoriously difficult" and "often unreasonably so."

-13-