# EXHIBIT 3



Autonomy Corporation Limited and Ors v Michael Richard Lynch and Anor

Day 37

June 25, 2019

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900
Email: transcripts@opus2.com
Website: https://www.opus2.com

**Page 141**

1  A. He's saying that they don't have -- HP currently does
2     not have a policy on this practice.
3  Q. No, he's not. He's saying there is not a revenue policy
4     which is breached by this practice?
5  A. Yes, so at the start of the paragraph he says "There is
6     not a revenue policy which is breached by this
7     practice", then later on he explains why and in the
8     middle of the paragraph says "HP currently does not have
9     a policy on this practice". So the fact that there
10    isn't a policy on the practice means that there is not
11    a revenue policy which is breached by the practice.
12 Q. HP has numerous revenue policies and if this practice
13    had been in breach of HP's revenue policies, that would
14    have been identified?
15 A. But HP did not have a policy on this practice, because
16    it's not a practice that HP had encountered.
17 Q. Now, can we look at the next item, which is "Reciprocal
18    arrangements":
19       "The rebasing exercise identified a number of
20    reciprocal arrangements entered into in FY10 and FY11.
21    Reciprocal arrangements can be valid business
22    transactions; the key accounting question is whether to
23    recognise the sale as revenue and the purchase
24    separately as a cost of sale (or fixed asset), or
25    whether the transactions should be recognised net ie

**Page 142**

1     within the same line in the P&L."
2        It's right to say, isn't it, that reciprocal
3     arrangements can be valid business transactions, yes?
4  A. Again, they can be. It depends upon the circumstances.
5  Q. In each case there's an accounting judgment to be made
6     about whether the transaction should be recognised
7     effectively net or gross, yes?
8  A. Agreed.
9  Q. Now, we were looking at your rebaselining presentation
10    of 17 July 2012. Could you go to bundle {K26/274/1}.
11    This is an email from Ms Sunderwala to Ms Branch, having
12    received your rebaselining PowerPoint. She says:
13       "Betsy,
14       "I spent some more time looking at Chris' file
15    tonight and realised that most of his 'rebasing' items
16    relate to revenue recognition and not to the opening
17    balance sheet work that my team has been working on. If
18    you look at page 4 of his deck, you will see three
19    sections (rev rec, exceptional cost items and opening
20    balance sheet items). We have never discussed the first
21    two sections and if you look at the narrative as to how
22    he describes these items, it looks like there is a lot
23    of estimation and judgment (not all built up from
24    specific deals etc) -- I do not think these items would
25    yet qualify as items that would be known to be

**Page 143**

1     'incorrect' under IFRS. On the rev rec items, either
2     PWC or GRRO will need to weigh in on the IFRS
3     conclusion."
4        So Ms Sunderwala's view was that your exercise
5     involved a lot of estimation and judgment, and that was
6     a fair summary, wasn't it?
7  A. I would agree that it involved judgment, because it was
8     a preliminary exercise. We hadn't, as I said before,
9     audited in depth and it took some time to do that.
10    I would not agree really with the estimation point,
11    because the vast majority of the work was built up deal
12    by deal.
13 Q. And it's right to say it was not intended to be
14    a summary of items that were known to be incorrect under
15    IFRS; that's fair, isn't it?
16 A. Yes, I agree we were not coming to firm IFRS
17    conclusions.
18 Q. Can we go to bundle {K26/291/1}. This is your email to
19    Ms Sunderwala and the subject is "First pass IFRS view".
20    You say:
21       "Hi,
22       "Good to meet you both last week.
23       "Here is my initial view of whether the rebasing
24    issues may also have IFRS issues, some of which we
25    discussed on [Thursday]. I'm not an IFRS expert and

**Page 144**

1     really look for yours and PWC's views."
2        So this is your first view on whether there may also
3     be issues of IFRS, correct?
4  A. Yes.
5  Q. It's an initial view, it's not purporting to be
6     definitive, correct?
7  A. Yes, in fact I did not want to do this exercise because
8     I had made it quite clear, I had thought, all the way
9     through to my colleagues, and from the outset, that we
10    were not trying in this exercise, under the timescales
11    we had, to draw firm IFRS conclusions. I was asked by
12    Mr Levine to do that. In my meeting with Meeta and
13    Betsy I had expressed considerable concern about doing
14    that and I was looking to get their support not to try
15    to do that exercise. They did discuss it with
16    Marc Levine and he fed back that he needed me to take at
17    least a view. So I did do this exercise, I was
18    extremely cautious in doing this exercise because I did
19    not -- I absolutely did not want any statements I made
20    about IFRS to be over-interpreted. So I was very
21    cautious about making any statement that matters may be
22    incorrect under IFRS.
23 Q. Well, you're making it clear in this document that you
24    are not an IFRS expert, correct?
25 A. At that point in time I was not an IFRS expert. I had