# EXHIBIT 5

| | |
|---|---|
| **From** | Yelland, Christopher |
| **To** | Miskin, Andrew <andrew.miskin@hp.com>; Anderson, Antonia <antonia.anderson@hp.com>; Flint, Michael <michael.flint@hp.com> |
| **Date** | 07 Jun 2013 at 15:19 |
| **Subject** | working draft of summary paper |

Hi

Please see attached my first draft for the 'committee' review. This must not be forwarded under any circumstances please

I need you to review this please:

- To ensure it is factually correct and that for you areas you can support **all** of the draft statements made. I'd rather you pull areas apart than others do later.
- There may also be areas missing
- I would like to add numbers for key areas once as we have the draft financials out.
- I would still like it to have more of a sense of the work done rather than the just the outcomes but need help here

The subsidiary papers that are relevant are:

- Investments and financing matters - Andy - in good shape but needs numbers and notes on work done/information accessed or missing. Also to add a summary of the FA work doen from Varuns paper I sent yesterday
- Fixed Assets - Varuns paper
- Revenue rec - Antonia's paper in 2nd draft stage
- Hosting paper - Antonia - Drafted
- Microlink paper - me - final draft subject to Morgan Lewis/PWC findings
- A paper on the dark period/exceptionals - should be Michael but needs help on revenue/debtors areas from Antonia and Andy can you set out a draft of the structure of the paper please
- A paper on costs and accruals/prepayments - Michael. Needs to be focused on the risks. I've summarized some in my message and we should discuss how far to expand this.

Regards

Chris

# DRAFT

## Basis of Preparation of the Autonomy UK Statutory Accounts

## Contents

1) Scope of Filings of the UK Statutory Accounts

2) Summary of Approach and Key Risk Areas

3) Availability of Evidence

4) Compliance with Applicable Laws and Regulations

5) Accounting Policies and Related Disclosures

6) Revenue Recognition

7) Investment and Financing Activities

## Scope of Filings of the UK Statutory Accounts

Following external legal advice the directors have concluded that we will not file consolidated accounts for FY11. Similarly we have concluded that we will not be refiling 2010 consolidated accounts, as although they are considered defective the refilling is voluntary. In both cases it is considered that there are no current investors to whom such consolidated filings would serve a useful purpose, the task of producing these is onerous, would create further excessive delays and it is unlikely we could produce sufficiently reliable consolidate financial statements upon which EY could express a valid audit opinion.

For clarity all further references to stat accounts in this document refers only to the 8 individual entity accounts (unconsolidated). These comprise

- ACL (holding company )
- ASL (main UK trading company, principal factory entity and intermediate holding company)
- AEHL (intermediate holding company principally for the US subsidiaries)
- Longsand (owner of the majority of the groups technology IP)
- Digital (minor UK trading company)
- Zantaz (minor UK trading company)
- Interwoven (minor UK trading company)
- Meridio (minor UK trading company, IP owner of Meridio IP and factory entity for Merido Inc)

The FY11 accounts cover a shortened 10 month period from 1/1/11 to 31/10/11. The 2010 comparatives cover the calendar year.

## Summary of Approach and Key Risk Areas

Our approach has been to focus on the major risk areas considering the Autonomy software business model, centralised management, group structure, share valuation drivers of growth, profitability and cashflow, a lack of internally documented policies and accounting controls and no available documentation from the periods under review regarding corporate governance in accordance with the common code for UK listed companies .

One of our conclusions from reviewing the results of the investigations by Autonomy Finance and the corporate Investigation led by HP legal, Morgan Lewis and PWC is that there was significant management override by the former executive directors of Autonomy and that their documentation of transactions via memo's, board packs, audit committee reports or emails cannot  be considered as reliable evidence for the purposes of preparing the FY11 statutory accounts or reviewing the accuracy of the 2010 comparatives.

We have therefore decide to review transactions and balances in high risk areas from first principals for example reviewing transactions  against original accounting documentation, subsequent events (in which the significant passage of time since the balance sheet date gives good visibility), established fact patterns through more in depth investigations of a limited sample of transactions (by PWC/Morgan Lewis) and followed though with broader work on classes of transactions with similar patterns.

A summary of the high risk areas is shown below. These are discussed further in subsequent sections of this paper and in more specifc papers where necessary.

**High risk areas identified are:**

**Revenue recognition.**

We have found substantial issues with the validity and timing of revenue transactions predominantly in the UK and US related to channel sales, reciprocal sales and purchases with high risk channel partners and organizations sponsored, end user solution sales, and the accounting treatment of hosted deals. These deals tend to have common fact patterns including significant involvement of the former directors and tend to be high value deals with upfront license revenue recognized. The population of smaller deals appears to be discrete with such issues being relatively minor in comparison. We are therefore confident that our approach, combined with EY detailed audit work on debtors testing, has reasonably addressed the accounting risks related to revenue recognition, debt valuation and the treatment of reciprocal purchases from these resellers .

**Investment activities:**

There were a number of acquisitions and investments during FY10 and FY11. We noted significant revenue transactions with organizations acquired prior to or at acqn, some of which were the subject of allegations considered by the Audit Committee around that time. We have reviewed these and made a number of adjustments to revenue, the initial recording of investments, estimated remaining economic life of related intangibles and considered impairment matters.

The acquisitions were supported by external valuations and purchase agreements and are of businesses with elements of related technology and/or significant customer bases and/or complimentary professional services capabilities. The commercial rationale for the acquisitions has also been reviewed against available documentation, however the authors of this were the previous executive directors, and as noted above we do not consider such evidence wholly reliable. Therefore the appropriateness of the commercial rationale for the acquisitions and price paid cannot be conclusively proven by the current directors.

**Carrying values of investments and intangibles.**

The carrying values of investments and intangibles have been reviewed and adjusted as follows:

- Purchased IP is principally the group IP sold to Longsand in Sept 11 against which impairment has been booked.
- Purchased goodwill related to the CA acquisition occurring in 2010 remains on the balance sheet but with a revised and shortened estimated useful life.
- The investment in Blinkx is valued at market prices for these listed shares. We are unable to locate share certificates for 27,510,046 (£41.3m) of the 45,684,416 (£68.5m) shares held by PLC directly (excl the 496,844 shares held by the EBT). HP UP Legal are in the process of obtaining replacement share certificates. Blinkx PLC also reported the shareholding as at 2 Aug 2012 in their March 2012 Financial statements.
- The cost of investments in subsidiaries have been reviewed for impairment at the balance sheet date using the company valuations within the group valuation used for HP's impairment analysis at the end of FY12 as these are considered our best estimate of the valuation at the end of FY11. Impairments have been booked as appropriate
- Purchase software. There is no remaining material purchase software at the balance sheet date once reciprocal transactions with resellers have been reversed.

**Financing activities**

The principal source of finance during the periods under review was the convertible loan notes. The accounting treatment has been confirmed against the contractual agreements and the implied interest rate used in the relevant calculation is considered reasonable compared to normal corporate bond yields at that time.

Debt financing was also used and this accounting treatment has been restated as it is considered more appropriate to accounting for the financing gross ie separately from the debt.

**Recording of trade costs, liabilities and contingencies**

Autonomy generally tended to under record liabilities and accruals and overstate prepayments. The magnitude of these issue is much smaller than the issues identified in revenue recognition and investment activities. The issues are also easier to identify through reviews of subsequent transactions. However the risk areas addressed include

- Autonomy did not accrue properly for people based costs ie bonuses, holiday pay, commissions and related employers taxes. Retrospective adjustments have been made as appropriate.
- Purchase accruals made in the UK companies were understated. We have identified a general ledger report allowing us to reasonably recreate the accruals required through comparison of invoice dates and accounting dates. Retrospective adjustments have been made as appropriate.
- Current litigation matter reports, and 'red project' services reports have been reviewed to address risks of further other unrecorded liabilities and contingencies, which become apparent from information arising since the balance sheet date. Adjustments have been made as appropriate.
- Prepayments have been reviewed against supporting documentation. There has been some limitation to verifying these are certain invoices cannot be located. In these circumstance the prepayments have been removed unless other supporting documentation can be located.
- Contingencies arising from potential breaches of laws and regulations are covered elsewhere in this report

**Accuracy of transactions amongst group companies**

It is evidence that Autonomy Finance considered accuracy of the entity level accounts to be secondary in nature. This creates risks to the accuracy of the entity level accounts. We have identified risks and issue in the following areas

- Investments recorded in the wrong entities
- Investments recorded at amounts which reflect the carrying value in group accounts rather than the value appropriate for the entity level accounts
- Intercompany balance (need a comment on the reconciliation and the gross verses net treatment)

It should be noted however that it is not inappropriate under the TP regime in place for resources applied to customer contracts to be located in and recorded in different legal entities. The transfer pricing in effect reimburses each entity for the efforts incurred in selling and/or delivering the related contract.

**Compliance with applicable laws and regulations**

Need to summarise the later section of this report when produced. However consideration needs to be made as to whether laws have been breached and what the potential consequences are the necessary disclosures.

We also need to conclude whether we are able to comply with the companies act in preparing these financial statements.

## Availability of Evidence

**Change in management**

Autonomy's management structure during the period in question was highly centralized with key transactions being managed and transacted directly by the executive directors, COO and VP Finance. Non of these individuals remain and, as noted above, the directors previous documentation of the activities of the companies is not considered reliable for the purposes of preparing the financial statements. The former group finance controller as left the company during the preparation of the accounts. Non of the current directors or senior accounting staff were employed by Autonomy during the periods in question.  Given these facts it is not possible for the current directors to be wholly certain as to the motives behind and appropriateness of all activities and transactions of the companies, despite the investigation work performed by Morgan Lewis, PWC, HP Legal and current Autonomy Finance.

**Scope of investigations**

Formal investigations for HP management have been underway since June 2012. These have been focused on the primary issues related to revenue related business practices, revenue recognition and related disclosures in the group financial statements. Conclusions found for the sample of deals tested have been instrumental in establishing certain facts patterns which have enabled broader conclusions to be reached on the population of large deals. Our big deal revenue conclusions have also been tested against the investigation findings to ensure there are no known disconnects. However whilst these investigation have generated substantial outputs they are ongoing and further facts may arise which affect our current understanding of and accounting for these periods in question.

The investigations have been focused on revenue related matters as this is the primary area of risk identified. The investigation has not focused on disbursements other than those to the high risk group of channel partners and has not investigated more general accounting instructions. However other than reciprocal payments and MAF payments to channel partners we have not identified inappropriate payments to third parties either through the general accounting work or through anything that has come to the attention of the investigators. This is therefore not considered a high risk area.

The investigation has also not reviewed general accounting instructions other than those which relate to the sampled revenue transactions. There is therefore a risk that there are inappropriate accounting instructions of which we are unaware. However given we are reviewing significant transactions for the period in question wherever possible from first principals, and reviewing the current balance sheet against new valuations and subsequent events, the residual risks in this area are not considered high.

More recently Investigations have begun by various UK and US authorities. These are likely to be protracted in nature and may reveal further facts which affect our current understanding of and accounting for these periods in question. As noted above there is also a risk that there are contingent liabilities due to breaches of laws or regulations, however these are not quantifiable at this early stage.

**Company records**

All Deloitte reports to the audit committee have been located. However whilst certain board minutes, board packs have been located these remain incomplete. Reviews of the information found have not provided substantive facts which alter our conclusions on the treatment of transactions during these periods and it has been previously noted that we do not consider papers prepared by the previous directors or finance VP to be reliable evidence. However there is inevitably some risk that the missing documents may contain information which would impact our conclusions.

We have also be unable to locate certain purchase invoices and supporting contracts. These are both for expenses and capital purchases. (need to add in conclusions on volume and materiality of these) Where they are not located there are risks that the asset, in the form of fixed asset or deferred cost) may not be valid and cannot be verified. We have therefore written down any such assets (need to add amounts and conclusion on materiality). There also some risk that the expense itself may not be a bona fide business expense. However, given that neither we have not found instances of inappropriate disbursements in any of the areas of procurement from within which these missing invoice arise, this is not considered a high risk area.

Andy – also need to add the key missing investment and financing docs

Finally there are storage areas in Cambridge which were not properly catalogued or organized. We will/have performed an exercise to catalogue the files as labeled and will/have reviewed files which appear to have key content. However it is not feasible to review every document. Given the current finance teams unfamiliarity with some of these files it is possible that they contain documents may have been overlooked and which would alter our understanding of the accounting periods in question.

## Compliance with Applicable Laws and Regulations

Need legal input on this section to determine the extent to which the company have or may have broken laws and regulations, the potential impacts and the necessary disclosures – narrative below is intended to incidate only the scope of the narrative required.

Investigations for HP and Autonomy management and performed by Morgan Lewis, PWC, HP Legal and Autonomy Finance begun in June 2012 and are at an advance stage although remain ongoing . Investigations by US and UK authorities including the DOJ, SFO and FRC have begun more recently and are in their early stages.

The ongoing internal and external investigations may reveal further information as to whether the companies have breached laws and regulations. In the opinion of the directors  at this time it is true that/likely that/uncertain whether laws and regulations have been broken by the company in the following areas:
- Compliance UK or company law and accounting regulations (eg regarding the revenue recognition issues, corp governance)
- Compliance with US company law and accounting regulations (given that the US results impact UK companies via transfer pricing and the US companies were managed from the UK).
- Fraudulent transactions, bribes or illegal inducements – eg the reciprocal transactions and related MAF payments (esp where the transaction as a taken as a whole is considered to be a net loss of value to Autonomy)

The potential financial impacts of these issues for the company is not able to be quantified by the directors at this point in time (we need to decide if we consider whether consequences for the company are likely but not quantifiable or wholly uncertain).

We also need to conclude whether we are able to comply with the companies act in preparing these financial statements.

Also need to obtain legal advice on the require disclosures in the directors report and notes to the accounts.

## Accounting Policies and Related Disclosures

Autonomy's accounting policies were not internally documented. The policies in previous published UK stat accounts are high level, as would be expected.

Our default approach is to ensure Autonomy's UK accounting policies are aligned with HP UK Ltd's. The HP UK Ltd accounting policies are generally (but not completely) aligned with HP's AFM.

As a result there is one area where we will implement a change in accounting policy. This relates to R&D which was previously capitalized but which will now be treated as expense as incurred. This is consistent with HP UK Ltd' s accounting policy and, although HP's US Gaap based AFM does require capitalization once certain tests are met, Autonomy's R&D does not meet these tests and therefore the end result is consistent with the AFM.

In other area's the policy will not change but will be redrafted to be more consistent wth HP UK Ltd's wording. Whilst these policies will remain unchanged, the application of the accounting policies will differ to prior Autonomy treatment in certain cases:

- Goodwill, where the life of certain intangibles has been shortened on a prospective basis
- Revenue, where we have adopted more typical UK practice. There are 2 key areas where will not adopt the HP AFM in applying UK GaaP regarding VSOE and the credit period hurdle. These are discussed further in the revenue section.

With the exception of R&D capitalisiation the adjustments made to the previously published 2010 UK Stats and the previously drafted FY11 UK stats are due to errors and misstatements. Where the 2010 aggregate impact is fundament to the reader of the accounts, the 2010 entity stats will be restated in the FY11 filings. The errors are considered fundamental for ACL Ltd, ASL Ltd, Merideo Ltd and Digital Ltd. For other entities the impact of the 2010 errors will be included in the FY11 P&L account and disclosed as appropriate.

A fuller description of the work done and conclusions regarding policies is contained in the documents below:

Accounting policies and disclosures :

Application of revenue policies :

## Revenue Recognition

**Scope**

The impact on the UK stat accounts is either directly through deals recorded in the UK or indirectly through deals booked in other entities with the majority of the revenue being returned to ASL via transfer pricing agreements.

**Policies**

Revenue policies were not internally documented. Policy documentation in the previously published statutory accounts is at a summary level, as would be expected. No change in the disclosed revenue policies, as described in the stats, is required by our approach. In general we are adopting HP's method of applying revenue recognition policies with limited exceptions:

- VSOE where we will continue to us a UK GaaP based fair value approach.  US Gaap VSOE is significantly more restrictive and Autonomy has no 2010/2011 VSOE studies which would demonstrate compliance. Adoption of US GaaP would therefore result in all license revenue for FY10 and FY11 becoming ratable and a restatement of opening FY10 reserves. This would be overly conservative and unnecessary in the context of UK GaaP accounting .
- Collectability. Due to the passage of time we have sufficient information to assess the ultimate collectability of debts, rather than retrospectively apply set credit period rules to periods where such rev rec hurdles were not contemplated.

The revenue based adjustments we have made to the 2010 stat accounts are therefore as a result of errors or misstatements found, rather than from any change in policy.

It should also be noted that we see no evidence of Autonomy implementing SOP97-2, contrary to certain public comments made by Autonomy management of the time.

**Risk areas and work done**

The rebasing exercise (a high level review of all upfront license rev rec >$1m globally performed in June/July 2012) indicated high risk areas to be:

- A frequent pattern whereby deals were placed into certain resellers ahead of, or in the absence of, end user deals. Settlement of these debts was sometimes facilitated via reciprocal payments from the Autonomy group. Many of the reciprocal payments were for software which was capitalized in Autonomy's books. Other debts were settled via Autonomy later selling the deal direct and either directing cash via the resellers or applying it directly to the resellers debt in Autonomy's books. Other debts were credited or written off in the 'dark period' or FY12.
- A small number of high value solution deals were sold, primarily in the UK, whereby Autonomy attributed the vast majority of the revenue to the license element with a minimal amount attributed to professional services. The SOW was generally vague and often not signed in the same quarter as the license. The license element was generally incorrectly recognized upfront. A

- high proportion of these large license deals were subsequently not successful. This population of deals was found to be discrete from the general population of run rate proserve deals in both the magnitude of issues and size of engagement
- Sponsorship agreements: Sales were made to the 2 key organizations sponsored by Autonomy. These needed to be examined to determine if they were reciprocal in nature and whether the 2 sides of the transactions should be recognized independently. Generally it was found that the deals should be net accounted.
- Revenue recognition on hardware sales. The vast majority of stand alone 'strategic' hardware sales were made in the US with insignificant amounts in the UK. The impact on the UK stats is therefore only via the transfer pricing as there are no UK entity level disclosure issues. The key determination for transfer pricing is whether the revenue should be gross or net accounted. Autonomy previously recognized these sales gross. This treatment was review by AU finance and PWC and was confirmed to be appropriate.
- Revenue recognition on 'hosting' deals. Autonomy had a business practice whereby solutions generally provided under SaaS type contracts were sold under an alternative contractual construction in which the software was separated out in the contract and considered to be a license sale. The contract then provided for Autonomy to host the license and customer data and perform certain services. This provided the same solution as the SaaS type contract. Certain new sales were made this way and other existing customer were converted to the new contracts. These contracts were generally in the US. We have reviewed this treatement and determined that for Archiving and eDiscover solutions, the vast majority of such sales, it is not appropriate to account for the elements separately and restatements have been made. For the backup and recovery solution we concluded it is arguable to separate them, and whilst our preferred approach for open accounting periods would be to recognise all revenue as a single element, this is considered to be a change in an application of an accounting policy and no restatement is therefore required of previously closed periods.

Work performed on revenue areas to ensure completeness and accuracy includes:

1. A detailed review of all UK contracts and subsequent cash collection with upfront revenue >$1m, plus an extended sample determined by EY. ==Coverage to add==
2. A review of all US deals >$1m for the risk factors noted above and deeper review of deals exhibiting these risk factors. ==Coverage to add==
3. Review of all payments of $500k made by Autonomy group companies to the high risk reseller list, for evidence of reciprocal payments against accelerated or nonexistent channel deals
4. Review of bad debts provisions and credit notes from the dark period in 2011 (June to Oct) and from FY12 > $500k (~£300k).
5. Review of the current 'red project' reporting to ensure all open proserve related deals from 2011 or prior, which have current material issues, have been captured.
6. Review of the PWC work on selected deals (at least one was reviewed from each category) to ensure alignment. The PWC work was performed in significant depth including email reviews and interviews with (primarily) Autonomy staff.  This established that certain fact patterns were supported by deeper evidence. Where we have seen similar fact patterns on other deals outside of the PWC sample we can therefore have reasonable confidence in our conclusions. ==Coverage to add==

7. A review of our conclusions on all deals by Morgan Lewis to ensure that our conclusions on deals examined by them, beyond the PWC sample, were consistent and gather further email evidence to support the fact patterns we noted. ==Coverage to add==.
8. In order to adjust the reserves bfwd to 2010 we also reviewed in all 2009 contracts >$5m, any contracts >$1m with risk factors noted above and the collection or writeoff record of all debts >$500k at the end of 2009.

It should be noted that the passage of time (we are now over 18mths since the FY11 year end) assists with the completeness of a number of the reviews above.

As a result of the work done above we have made adjustments to the UK entities profit of £m to reserves bfwd to 2010, £'m for 2010 and £'m for FY11.

==Finally a check will be made to ensure that the impact on the transfer pricing does not reduce the net TP result below the de minimis amount required to cover the sales entities costs in accordance with the TP agreements of that time.==

Fuller documentation of the revenue recognition work done can be found in the following document.

## Investment and Financing Activities

Matters considered below are covered in more detail in the following document:

A summary of the scope of work and results is below

- Intangible Assets – Capitalized R&D. As noted previously this will be removed via a change in accounting policy.  There is no indication that the original capitalized amounts were incorrect as these are supported by analysis prepared to substantiate the claims for income tax relief.
- Purchased software – almost all purchased software has been removed from the balance sheet of ASL and net accounted against revenue (from UK or overseas TP revenue) as they were found to be reciprocal transactions made with resellers to facilitate payments of amounts owed to the Autonomy Group companies. Prior period adjustments have been made. See revenue documents for more details.  The remaining purchased software NBV at the end of FY is minimal at £'k
- Purchase IP: Longsand. Longsand purchased all IP owned by ASL for £2.971bn in exchange for shares. The transaction was filed with Companies House recording an increase in share capital of this amount. Longsand also bought the IP of ACL for £423k in exchange for a promissory note. The valuation of the IP at the end of FY11 was £369m. Legal advice is that we cannot restate the original transaction, as the share capital has been recorded at Companies House, so instead an impairment of the IP in Longsand, and of the investment in Longsand by ASL has been recorded in Oct FY11.
- Acquisitions: During 2010 and FY11 the companies within the Autonomy group made 3 acquisitions being Microlink, a records business from CA, a digital backup and recovery business from Iron Mountain, and one investment being the purchase of 19.99% of the share capital of Realise. The accounting for these investments was reviewed against the purchase agreements, transactions entered into with the entities prior to or on acquisition (for transactions of a reciprocal nature) and subsequent accounting, the remaining estimated life of the goodwill and indicators of impairment. Misstatements have been corrected in the initial recording of the investment value, the recording of which Autonomy entity made the purchase, the recording of revenue and related transactions for reciprocal or overvalued sales. Changes in estimate of the remaining economic life of the goodwill purchased have been made on a prospective basis as there is no evidence that they were clearly wrong when originally estimated on acquisition ( are they supported by external valuation reports?).
- Carrying value of investments in group Companies:  Carrying values of investments in group companies have been reviewed against the valuation performed as part of the Autonomy impairment exercise in Q4 FY12. The valuation was performed by Duff and Phelps then broken into entity level values by Economic Partners in Q1 13. These are considered to be our best estimate of the values of the companies at the end of FY11, as the key factors leading to the reduction in value (compared to HP's acquisition price) are considered to have existed at the

FY11 balance sheet date and are not considered to have changed substantially during FY12. Impairments have been booked in the FY11 results. ==Need to say why not prior periods==
- Carrying values of investments Blinkx: These are valued to market price, Blinkx being a listed company. The reduction in share price since the balance sheet date will be disclosed as a non adjusting post balance sheet event.
- Tangible fixed assets: The majority of the fixed asset balance is represented by IT equipment. We have undertaken a validation exercise to verify the IT equipment in the FA listings against original accounting documents. Where these cannot be located we concluding that the assets existence at the end of FY11 cannot be verified and they will be written off in FY11.  Adjustments will not be made to prior periods as we do not have evidence that the original treatment was incorrect. Where the invoices have been located we have reviewed the details with the IT organizations to establish management ownership and appropriateness of capitalization. We have found that certain purchase should not have been capitalized and appropriate adjustments have been made to reverse the original accounting entries (unless these occurred in prior periods in entities which will not be restated -  in which case they will be treated as FY11 disposals). A program of physical verifications is underway but may not be concluded prior to the financial statements being filed.
- Accounting for the EBT: Autonomy group has certain assets in an Employee Benefit Trust, being cash (previously share in ACL but these were sold to HP on acquisition) and shares in Blinkx. The accounting for these has been reviewed and it is concluded that the cash should be shown as a restricted asset. Previously it has been included in cash. Gains on the investments are being appropriately credited to revaluation reserves.. This has been restated in the 2010 comparatives.
- Convertible loans: The accounting for the convertible loans issues in 2010 was reviewed against the contractual documentation and confirmed as appropriate. These loans were acquired by HP on 4 Nov 2011, shortly after the balance sheet date.
- Debt financing: Autonomy entered into financing agreements related to sales contracts with very extended payments terms. Autonomy previously accounted for these net ie the financing was netted against the receivables. However following a review of the contracts the appropriate treatment is considered to be to show the financing balance separately. This has been restated in the 2010 comparatives.