1    PATRICK D. ROBBINS (CABN 152288)
     Attorney for the United States
2    Acting Under Authority Conferred by 28 U.S.C. § 515

3    MARTHA BOERSCH (CABN 126569)
     Chief, Criminal Division
4
     ROBERT S. LEACH (CABN 196191)
5    ADAM A. REEVES (NYBN 2363877)
     KRISTINA N. GREEN (NYBN 5226204)
6    ZACHARY G.F. ABRAHAMSON (CABN 310951)
     Assistant United States Attorneys
7
         450 Golden Gate Avenue, Box 36055
8        San Francisco, California 94102-3495
         Telephone: (415) 436-7014
9        Fax: (415) 436-7234
         Email:  Robert.Leach@usdoj.gov
10
     Attorneys for United States of America
11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                      SAN FRANCISCO DIVISION
14
     UNITED STATES OF AMERICA,            )   Case No. CR 18-577 CRB
15                                        )
            Plaintiff,                    )   1/17/2024 DECLARATION OF AUSA ROBERT S.
16                                        )   LEACH IN SUPPORT OF UNITED STATES'
        v.                                )   MOTION *IN LIMINE* NO. 2: TO ADMIT CERTAIN
17                                        )   EVIDENCE OF DR. LYNCH'S CONTROL,
     MICHAEL RICHARD LYNCH AND            )   KNOWLEDGE, AND INTENT
18   STEPHEN KEITH CHAMBERLAIN,           )
                                          )   Pretrial Conference:  February 21, 2024
19          Defendants.                   )   Trial Date:  March 18, 2024
                                          )
20   _____)

21          I, ROBERT S. LEACH, declare:

22          1.      I am an Assistant United States Attorney ("AUSA") in the United States Attorney's

23   Office for the Northern District of California.  I am an AUSA assigned to this case.  I submit this

24   declaration in support of the United States' United States' Motion *In Limine* No. 2: To Admit Certain

25   Evidence of Dr. Lynch's Control, Knowledge, And Intent.

26          2.      Attached as Exhibit A is a true and correct copy of excerpts of an FBI report of an

27   interview of Joel Scott, Bates-numbered US_FBI_00003517, 19-20.

28

     DECL.,
     CASE NO. CR 18-577 CRB                    1

3.      Attached as Exhibit B is a true and correct copy of excerpts of an FBI report of an interview of Alex Marshall, Bates-numbered US_FBI_00027986-87.

4.      Attached as Exhibit C is a true and correct copy of a witness statement provided by Stouffer Egan in *ACL Netherlands BV v. Lynch.*

5.      Attached as Exhibit D is a true and correct copy of a witness statement provided by Daud Khan in *ACL Netherlands BV v. Lynch.*

6.      Attached as Exhibit E is a true and correct copy of excerpts of an FBI report of an interview of Marc Geall, Bates-numbered US_FBI_00027815.

7.      Attached is a true and correct copy of proposed Trial Exhibit 4422.

8.      Attached is a true and correct copy of proposed Trial Exhibit 1274.

9.      Attached is a true and correct copy of proposed Trial Exhibit 11408.

10.     Attached is a true and correct copy of proposed Trial Exhibit 11189.

11.     Attached is a true and correct copy of proposed Trial Exhibit 11402.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


DATED: January 17, 2024                    _____/s/_____
                                           ROBERT S. LEACH
                                           Assistant United States Attorney

# EXHIBIT A

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry _05/30/2014_

Joel Scott, prior Chief Operating Officer, Autonomy, was interviewed at the San Francisco, California, office of the United States Attorney. Present during the interview was John Owens, Jerome Roth, and Jesse Creed, who represented Scott during the interview. Also present during the interview was Special Agent (SA) Keigan Park (FBI), Forensic Accountant Marlene Smith (FBI), Robert Leach (U.S. Attorney's Office), Samantha Choe (SEC), Adrienne Miller (SEC), Jason Habermeyer (SEC), and Cary Robnett (SEC).

Scott was interviewed pursuant to a proffer agreement with the United States Attorney's Office and the Federal Bureau of Investigation (see 1A file). After being advised of the identities of all persons present during the interview, Scott provided the following information:

Scott grew up in Montreal, Canada, and attended McGill University, where he majored in English and Philosophy. Scott came to the United States (US) in 1995 to be a law student at Stanford University. Scott graduated from Stanford in 1998 and took a job at Gibson Dunn, in Century City. Approximately one year later, Scott moved to San Francisco, to be closer to his parents (his father was diagnosed with Lou Gehrig's disease) and continued to work for Gibson Dunn for another year. When Scott quit Gibson Dunn, he had no plans. Scott took six months off, during which there was the ".com" implosion. After that, it was difficult for Scott to find a job, especially since he was a litigator and not a transactional lawyer. Scott eventually found a job with Real Names. It was Scott's first "in house" job. Real Names was "upfront" with Scott and told him they would run out of cash in nine months. Due to this, Scott found a posting at Brocade and cold called their General Counsel. Scott got a job and worked at Brocade for three and a half years. In mid 2005, Scott found a job with a music start up named SNOCAP in downtown San Francisco. The job was far different from his expectations, and a couple of months in, when he was looking for a different job, he found a job posting on Craigslist for Autonomy. Since Autonomy was virtually across the street from SNOCAP, he applied. Scott got a call from Frank Pao and joined Autonomy at the end of 2005.

Scott advised that at Brocade, he was an attorney working on sales transactions. Scott was a Corporate Counsel, who reported to the Director of Legal Affairs. His position evolved to business operations, where he

---

Investigation on _02/05/2014_ at _San Francisco, California, United States (In Person)_

File # _318A-SF-2582907-302_ Date drafted _02/12/2014_

by _Keigan M. Park_

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

318A-SF-2582907-302

Continuation of FD-302 of  Interview of Joel Scott (prior Autonomy)      , On   02/05/2014  , Page   3 of 22



Scott advised he was made General Counsel at Autonomy sometime around the
end of 2007 or beginning of 2008, and became COO approximately a year
later.

Scott reiterated his dislike for the SMS sales calls.  Scott felt like it
was a "thankless" role.  The SMS calls would "drill" into details and would
waste a lot of time. Scott estimated he spent approximately 20 hours a week
on tasks related to the SMS calls.  Scott also advised that Stouffer Egan
"owns U.S. sales," and was not always on the SMS calls. If Scott was in
charge, he would have run them differently.  Scott suggested that the calls
be put together with sales managers and have them be responsible to
Autonomy management. Scott's suggestion was dismissed.

Sushovan Hussain and sometimes Mike Lynch would berate an employee for
underperforming or not being on the calls. Scott advised he had also taken
heat from Egan for not being on the SMS calls. Scott indicated he reported
to Andrew Kanter, but took direction from Egan, Peter Menell, Nicole Eagan,
and Hussain.

In 2011, Scott's job title changed again.  At 2:00 A.M. on January 1, 2011,

US_FBI_E-00003519

318A-SF-2582907-302

Continuation of FD-302 of _Interview of Joel Scott (prior Autonomy)_ , On _02/05/2014_ , Page _4_ of _22_

Lynch sent an encrypted note detailing how U.S. sales were a disaster and asked what needed to be done to fix it. Scott replied via e-mail that Autonomy had five separate sales forces which overlapped. It was not uncommon for two different Autonomy sales teams to be working on two different solutions, at two different prices, for the same company. Lynch called Scott and told him he was going to bring in Nicole Eagan as COO. Lynch wanted someone with an "iron fist" and it was not Scott. Eagan became the COO of Autonomy Americas and Stouffer Egan's CEO role was narrowed. Scott was made Chief Administrative Officer. Lynch told Scott that it was all his fault that U.S. sales were a disaster. Scott thought it was unfair that it was made out to be all Scott's fault.

Stouffer Egan advised Scott to never send an e-mail like that again and told Scott to go to the annual sales meeting in Miami. At the meeting, Lynch announced Eagan as the next COO. Scott advised he had a conversation with Lynch in which Lynch said "don't you get it, think acquisition." Scott thought that Lynch wanted Eagan to be COO, as she had more credentials, and represented better.

Scott advised he was not happy. They were at the Ritz Hotel, in Miami, Florida, for the Autonomy sales kick off meeting. Scott recalled meeting with Lynch. There was a pool to the left of them and Scott was standing at Lynch's table. It was a fairly short conversation. Lynch said "don't you get that I'm the pilot." "Don't try to ask the pilot to fly the plane when I am in charge of the plane." Scott remembered feeling upset. Lynch then said "you can never leave, we are like the Mafia, we are like family." Scott advised he walked off still upset.



# EXHIBIT B

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry  10/25/2018

    ALEX MARSHALL was interviewed at the United States Attorney's Office in San Francisco, CA. Tim Crudo and Laura Seegal from Coblentz Patch Duffy and Bass were present and represented MARSHALL. Assistant United States Attorney Adam Reeves was also present. After being advised of the identity of the interviewing Agent and the nature of the interview, MARSHALL provided the following information:

    MARSHALL was born in Mexico and has lived in New Jersey, Spain, and the United Kingdom. He is a US, UK, and Mexican citizen. MARSHALL attended Stanford University for his undergraduate degree from 2001 to 2005. MARSHALL's first job out of school was at Autonomy starting in 2005. MARSHALL met ELOY AVILA, a supervisor at Autonomy, while he was working on a student project. AVILA interviewed MARSHALL over the phone and then MARSHALL went to Autonomy's offices at 1 Market Street in San Francisco for an interview with STOUFFER EGAN. MARSHALL also did a demo of Autonomy software to WILLIAM BLACK.



Investigation on  10/22/2018  at  San Francisco, California, United States (In Person)

File #  318A-SF-2582907-302                                       Date drafted  10/23/2018

by  Alexandra E. Bryant

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

US_FBI_E-00027986

318A-SF-2582907-302

Continuation of FD-302 of (U) Interview of Alex Marshall , On 10/22/2018 , Page 2 of 7



**SHOWN HC0000356 Email from Mike Lynch 05/20/2008**

MARSHALL met LYNCH approximately three times in person. MARSHALL had talked to LYNCH when he was thinking of leaving Autonomy again and LYNCH convinced him to stay. LYNCH told MARSHALL he ran Autonomy like the Mafia and now it was time to take some skin off of MARSHALL's back. MARSHALL took this as LYNCH trying to knock a young professional down to size.

From a technology standpoint it seemed like Autonomy was ignoring its OEM business. This conflicted with LYNCH being involved in it and MENNEL saying OEM was important to the business.

**Shown HC0000490 Email from Alex Marshall on 9/22/2008**

US_FBI_E-00027987

# EXHIBIT C

| 1. | On behalf of | Claimants |
|----|----|----|
| 2. | Initials/Surname of witness | C B Egan |
| 3. | Statement No | 1 |
| 4. | Date | 13 September 2018 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**B E T W E E N:**

**(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY**
**CORPORATION LIMITED)**
**(2) HEWLETT-PACKARD VISION BV**
**(3) AUTONOMY SYSTEMS LIMITED**
**(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.**

**Claimants**

**-and-**

**(1) MICHAEL RICHARD LYNCH**
**(2) SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

---

**WITNESS STATEMENT OF CHRISTOPHER BRADLEY EGAN**

---

I, CHRISTOPHER BRADLEY EGAN of                                    STATE AS FOLLOWS:

1.  From 2004 until 2012, I was Chief Executive Officer of Autonomy, Inc., the U.S. subsidiary
    of Autonomy Corporation plc. During that period, I was responsible for Autonomy's sales
    activities in North and South America. I make this Witness Statement on behalf of the
    Claimants in connection with the above named proceedings. Except where it otherwise
    appears, the facts and matters to which I refer in this Witness Statement are within my
    own knowledge and are true. Where I state facts obtained from another source, I
    identify the source and I believe them to be true. Where the source of my understanding
    or information is the Claimants' lawyers, I have identified this in this Witness Statement
    but without any waiver of legal professional privilege.

2.  I have not attached the documents to which I refer in this Witness Statement. Instead I
    have provided references to those documents. I understand that the document

HP-SEC-02930190

references are the Document Production IDs allocated to the documents by the parties as part of the disclosure in the current proceedings. I have relied upon these documents to refresh or confirm my recollection of the matters stated in this Witness Statement and to state facts with precision (for example, the specific sums involved in individual transactions) where my own memory, unaided by documents, would not allow that degree of precision. I refer to the specific content of a number of the documents referenced in this statement.

**Professional History and Background**

3.  I received a BA in Economics from Trinity College in Hartford, Connecticut in 1991. Upon graduation, I worked at Glaxo Pharmaceuticals in a sales capacity. In 1995 I joined Dataware Technologies (**"Dataware"**), a Massachusetts-based company that developed software products that enabled customers to manage and distribute a wide variety of information via a variety of media including the internet and CD-ROM. At Dataware, I served primarily as a salesperson, eventually managing big sales deals before helping the company sell off its assets as the business began to fail.

4.  One of the companies I approached to sell Dataware's assets was Autonomy. I was impressed with what I saw at Autonomy, and applied for a job there. In March 2001, I joined Autonomy. Initially, I was located in Boston and sold licenses to use Autonomy software to customers located on the East Coast of the United States. Within about six months, I was given responsibility for managing sales on the U.S. East Coast; and, within a year, I was promoted to Head of Sales for the entire United States.

5.  In 2003, I moved to San Francisco, California and was given the title Chief Executive Officer of Autonomy in the Americas. Although my title changed, I remained in a sales and sales management capacity. I hired sales people, defined sales incentives, and developed sales forecasts. I frequently dealt directly with individual customers, particularly on larger transactions. However, I did not have profit and loss responsibility for any part of Autonomy's business and did not have accounting or financial reporting responsibilities. Accounting issues were dealt with by Autonomy's finance team, led by Sushovan Hussain, Autonomy's CFO; financial reporting issues were the responsibility of Mr. Hussain and Autonomy's CEO, Dr. Michael Lynch.

6.  Autonomy held itself out as having dual headquarters, one in Cambridge and the other in San Francisco. This was, in part, for marketing and branding reasons. Many of the best and largest software companies in the world are located in the San Francisco Bay area, and Cambridge is renowned for its academic research in math and the sciences.

7.  During the period 2008 to May 2012, I reported to Dr. Lynch and Mr. Hussain. I had frequent interaction with both Dr. Lynch and Mr. Hussain, particularly with regard to the

HP-SEC-02930191

achievement of quarterly sales goals, sales to specific large customers, and sales activity in general.

8.    I also dealt frequently with Andrew Kanter, Autonomy's Chief Operating Officer and General Counsel (particularly around legal issues), Pete Menell, Autonomy's Chief Technical Officer (particularly around technical support for sales activities), and Joel Scott, Autonomy Inc's Chief Operating Officer and General Counsel (particularly regarding legal support for sales activities).

9.    In the sections that follow, I describe the sales management process at Autonomy in general.  I then describe four types of transactions that were used by Autonomy to meet its quarterly revenue targets: (a) sales to companies that we referred to as "Value Added Resellers" (**"VARs"**), (b) deals that I understand from the Claimants' lawyers are called "reciprocal transactions" in the context of this case, but which I referred to as "*quid pro quo*" or "*round-trip*" deals during the period 2008-2011, (c) sales by Autonomy of third party computer hardware that Autonomy purchased from EMC, Dell or Hitachi and resold, and (d) data hosting service arrangements on which revenue had been recognized as the data hosting service was provided but which we converted into a combination of a software license on which revenue was recognized when the license agreement was executed and a significantly reduced data hosting service fee.  I then describe or refer to transactions in which I was directly involved which exemplify various of these practices.

### The Sales Management Process

10.    Autonomy sold licenses to use particular identified Autonomy software.  In general, the software was developed by Autonomy prior to the time of sale and was licensed without modification to our customers. In most cases, minimal additional cost was incurred in connection with the sale of an individual license to a specific customer (the only direct costs of sales were things like sales commissions, contract review, sales engineering effort etc.).  Software was maintained electronically.  Immediately upon the signing of sales documentation, Autonomy delivered a copy of the software to its licensee over the Internet.  As a result, individual license sales were highly profitable.  There was no material incremental cost of sales.

11.    Autonomy also provided a data hosting service.  Autonomy ingested, indexed, stored and managed customer data for a fee.  In concept, the fee for the data hosting service was based on the volume of a customer's data that Autonomy ingested and managed and transactions on that data.  Unlike the software licensing aspect of its business, data hosting was subject to the ongoing cost of purchasing and maintaining the computer equipment that was used to store customer data, real estate costs associated with the

HP-SEC-02930192

data centers at which that computer equipment was located (and the related costs of power) and the salaries of the Autonomy employees who managed Autonomy's data hosting systems.

12.     Autonomy was a public company. Its shares were traded on the London Stock Exchange. Autonomy issued annual reports and quarterly reports to its shareholders and to the public. These reports contained financial statements describing, among other things, the company's revenues and profits during the relevant reporting periods and commentary describing the company and what was said to be its performance during the reporting period.

13.     Autonomy's fiscal year was the same as the calendar year; its fiscal quarters were the calendar quarters. Autonomy's financial statements were said to have been prepared in accordance with the International Financial Reporting Standards (**"IFRS"**). I am not trained as an accountant. During the period that I describe in this Witness Statement, my understanding of IFRS was based on what I was told by others, primarily Mr. Hussain. I was told that in order for revenue to be recognized on the sale of a software license in a particular financial period, Autonomy needed (a) written evidence of a binding purchase commitment by our customer, (b) evidence of delivery of the software to the customer before the end of the fiscal period, and (c) sufficient evidence that the customer had the financial ability to pay for the software license fee in accordance with the terms of the license agreement (which often required payments spread out over time). Almost all software licensing transactions had two components: the license itself (which gave the customer the right to use the software defined in the license on the terms stated in the license) and one year of "support and maintenance". Support and maintenance covered providing updates to, and bug fixes for, the licensed software and supporting its use by answering questions about how to use the software properly. I understood that, while license revenue was recognized in the then-current quarter (if the requirements stated above were satisfied), support and maintenance revenue was recognized rateably over the course of the year during which the support and maintenance service was provided. Typically, the customer signed up for the next year's support and maintenance as the end of a particular service year approached. I emphasize that I am here stating my understanding as it existed in the 2008-2011 period. I am not competent to state that my understanding was correct as an accounting matter.

14.     Data hosting services were provided under contracts that, in most cases, covered multiple (three to five) years of service. I understood that, prior to the restructuring of these contracts as described at paragraphs 45 to 49 below, revenue was recognized on data hosting services in the financial periods in which the service was provided, as distinguished from the financial period in which a data hosting service contract was signed. The service fee was payable monthly and was typically based on the amount of

HP-SEC-02930193

data that was ingested into, and then stored in, computer systems owned and maintained by Autonomy.

15. Mr. Hussain was both Autonomy's Chief Financial Officer and the de facto Head of Sales for the entire company. At the beginning of each financial period, Dr. Lynch and Mr. Hussain established the company-wide revenue target for that period.  We then managed the sales side of the business based on these quarterly targets. I and others provided sales forecasts to Mr. Hussain and Dr. Lynch.  The targets, as I understood them, were designed to meet "market expectations" -- the consensus estimates of the market analysts who followed Autonomy of Autonomy's revenue in future financial periods.

16. During the period 2008-2011, Autonomy's reported revenues grew from year to year. Based on this reported track record, the analysts' projections of Autonomy's future revenue also increased. The pressure to meet these revenue goals was intense. Generally, if a company failed to meet "market expectations", the price of its stock was likely to fall.  The bigger the miss, the bigger the fall.  By contrast, the "market" placed substantial value on companies whose revenues were reported to be growing and whose performance was thought to be predictable -- i.e., companies that consistently met market expectations.  The stock price of those companies tended to rise.  The growth of reported revenue and the market analysts' resulting growing expectations for revenue fed on each other. They caused Dr. Lynch and Mr. Hussain's internal revenue targets to become higher and higher and increasingly difficult to meet, putting more and more pressure on both me, as the person responsible for managing substantial portions of the sales in North and South America -- the U.S. alone accounted for a majority of Autonomy's worldwide revenue -- and the sales force more generally.

17. Autonomy used a computerized sales management system called "SMS". Sales personnel inputted into SMS information regarding contacts with prospective customers and the status of prospective transactions.  Every Monday, a multi-hour sales management call was conducted.  Mr. Hussain often led at least part of the call.  I often led and usually participated in the call.  Individual salespersons were brought onto the call, asked to report on the status of the individual deals for which they were responsible, and pressed to complete deals by the end of the then-current quarter.  Not infrequently, sales personnel were treated harshly during these calls and on one rare, but memorable, occasion, an individual was even fired on the spot during a call.

18. Mr. Hussain was a very detail-oriented, hands-on manager.  He often tracked deals in great detail.  He kept in close contact with members of the sales force, directing which deals to pursue and what prices to negotiate. Mr. Hussain maintained his own spreadsheet which listed all of the deals that might close in the quarter and information

HP-SEC-02930194

about the status of each deal, including the efforts being made to close them.  The spreadsheet identified the deals that had closed to that point in the quarter, deals that were projected to close in the quarter, and the deals that Autonomy needed to close in order to meet its goal for that quarter.  The intense focus was on closing deals that would allow the company to recognize revenue in whatever was the current quarter.  From time to time, Mr. Hussain shared the current version of his revenue spreadsheet with me (see e.g., {**D003579864**}.  I believe that he provided current versions of the spreadsheet to Dr. Lynch on a regular basis, as Dr. Lynch referred to them as "Sush's sheet".  Dr. Lynch also paid very close attention to Autonomy's revenues, particularly as we approached the end of a quarter.  From time to time, he would circulate his own analyses of where we were in terms of hitting his and Mr. Hussain's revenue targets {**D002834718**}, {**D002834719**}.

19.    Mr. Hussain frequently got directly involved in deals, meeting with customers and VARs.  For most large deals, he made or approved the majority of key decisions relating to price and other terms.  On occasion a reseller would discuss a transaction with Dr. Lynch, however, it occurred more frequently with Mr. Hussain as he was more accessible to them. At times, Dr. Lynch would help close a large deal by contacting individuals who held high positions in the organization to which Autonomy was attempting to make a sale (e.g., investment bankers at banks to which Autonomy was selling its products).

20.    Mr. Hussain came to the United States four to five times per year for meetings in San Francisco and elsewhere.  As I have already said, I interacted with Mr. Hussain frequently.  I spoke to him almost every day by phone.  Towards the end of a quarter, I often spoke to him multiple times a day.  Mr. Hussain seemed to know every material deal in the U.S. pipeline.  He repeatedly emphasized the revenue targets he needed the U.S. to hit to help him meet the larger company targets and external revenue expectations each quarter. I had a high level of interaction with Dr. Lynch, although not as regular as my interaction with Mr. Hussain.  There were times when I spoke with Dr. Lynch multiple times a day, and other times when I would not speak with Dr. Lynch for weeks.  I usually had a call with Dr. Lynch every quarter in order to update him on the status of big deals.  These were short conversations, but on certain occasions, they included the fact that particular "at-risk" deals (in the sense I explain below) were being sold to resellers.

21.    As I have already said, I felt extreme pressure to meet the revenue goal for each quarter.  The pressure only increased as time passed and the revenue targets grew in size.  It was my impression that Mr. Hussain was under even more pressure from Dr. Lynch to achieve the revenue goals.  I recall a discussion with Mr. Hussain in which he told me that if I thought there was a lot of pressure on me, it was even worse for him. Over time, that pressure led to the four types of transactions that, as I mentioned earlier, were used

HP-SEC-02930195

to meet revenue goals and that were different from the standard software licensing and data hosting deals that I have described above.

**Value Added Resellers**

22. VARs are commonly used in the software business. They are a channel through which software sales are made. In many instances, VARs provide additional value to a software company's products by modifying or adding features to the software itself or by providing a service to an end-user associated with the software (for example, integrating new software with the customers' existing computer systems). VARs of this type make money by charging the end-user for the value they have added to, or provided with, the software. Some VARs merely purchase and resell software to their own customers. They act as sales organizations and make a profit by purchasing a software license at one price and reselling the same license to an end-user at a higher price.

23. Software is unlike other, more tangible products because it can be delivered more or less instantaneously. As a result, a VAR ordinarily has no need to maintain an inventory of software. The VAR establishes a relationship as a reseller with the software supplier. Then, it locates customers for the supplier's software or the package consisting of the supplier's software and the VAR's value-add.

24. Prior to 2008/9, Autonomy frequently sold its software through resellers. For any individual transaction, we required the VAR to first obtain a purchase commitment from its customer, the end-user. Then, and only then, would we accept an order from the VAR for the relevant software. We would accept the order and transmit a copy of the software to the VAR electronically and authorize the VAR to then send the software to its customer (i.e. the end-user) electronically (with or without modifications made by the VAR). Because of the near instantaneous delivery of software, the VAR had no reason to bear the cost and risk of purchasing software licenses, incurring a liability to the software supplier, and carrying the software in inventory in the hope that it would be able to resell that software at some indefinite time in the future. The VAR made its margin by selling the software for more money than it paid Autonomy for the license, and/or by charging for the provision of associated software enhancements or services.

25. However, beginning in around 2008 or 2009, I began to sell software licenses to VARs where the VAR purchased the license in advance of agreeing to a sale with an end-user. The group of VARs that engaged in this practice expanded over time, as did the number and size of this type of deal. These transactions occurred when Autonomy had attempted to license its software to a particular end-user, but was unable to complete the sale before the end of a quarter. In order to recognize the revenue that would have been recognized in that quarter if a sale to the end-user had been completed, Autonomy

HP-SEC-02930196

sold a license for the same software at the same price to a VAR just before the end of a quarter, for resale to the identified end customer. Autonomy recognized revenue on the sale to the VAR in the then-current quarter. In most cases, Autonomy and the VAR did not negotiate over price and the VAR had no prior contact with the end-user/prospective customer, before and even after its transaction with Autonomy.  After the quarter ended, Autonomy continued its efforts to sell the same software license to the same end-user that it had been pursuing before quarter end. In most cases, the VAR did not participate in these sales efforts -- indeed I often asked the VAR not to get involved in the selling effort as it would increase the risk of the end-user rejecting the deal entirely -- and the VAR had little or no input into, or control over, the terms of sale to the end-user. In the transactions that I understand from the Claimants' lawyers to be at issue in these proceedings, the VARs added no value to the process of selling to the end-users. In most instances, the VARs had no relevant relationship with the end-users.  From Autonomy's perspective, the VARs' primary value, for which they were paid a substantial fee, was to provide a vehicle through which Autonomy could recognize revenue in the quarter in which transactions with the VARs occurred. In many instances, Autonomy succeeded in making a sale to the end-user in a later financial period, either on the same terms as its sale to the VAR or on different terms.  In other situations, no sale could be made to the prospective end-user.

26.    I discussed this shift in approach to Autonomy's use of VARs with Mr. Hussain. Mr. Hussain defined the parameters of the practice; I implemented it. Mr. Hussain ultimately determined which deals, and in what amounts, would be taken to a VAR, and which VAR to approach. In view of the significant financial cost of these deals (i.e. the fees paid to the VARs for taking them on), no one else (apart from Dr. Lynch) had the authority to make that decision. Mr. Hussain described the VAR deals to me as "acceleration deals". I was not privy to what deals were or were not recognized in any given quarter. I often told the VARs that these deals were being made so that Autonomy could achieve its revenue goals for the quarter.

27.    Mr. Hussain gave me specific instructions to follow so that these deals would be accepted by Autonomy's auditors (Deloitte). For instance, Mr. Hussain had me collect information regarding the VARs' financial status. He kept track of the VARs' outstanding payment obligations to Autonomy so that he could choose a VAR with sufficient financial reserves relative to its existing and proposed payment obligations to Autonomy to pass auditor scrutiny. Once Mr. Hussain chose which deal to take to which VAR, it was my job to contact the VAR and ask it to accept the deal.

28.    Mr. Hussain provided guidance to me regarding what was, and was not, acceptable to communicate in my conversations with VARs. He laid out explicit rules about what could be offered as incentive to the VARs, what was required of the VARs, and what could not

HP-SEC-02930197

be part of any deal. He instructed me to tell the VAR that in order for Autonomy to be able to recognize revenue, the VAR would have to sign a document that stated a binding obligation to pay for the software, that Autonomy would deliver the software to the VAR before the end of the quarter, and that there had to be sufficient evidence that the VAR could pay for the software regardless of whether a sale was made to the end-user. He also emphasized that it was vital that the VAR confirm to Deloitte that the VAR owed the money to Autonomy and intended to pay. I was also instructed by Mr. Hussain to say, and did say, to the VAR orally that Autonomy would continue its efforts to sell to the end-user; often that the VAR was not expected to participate in those sales efforts; and, importantly, that Autonomy would do everything in its power to help ensure the VAR would not be left "holding the bag". On some occasions, Autonomy completed the sale to the end-user and caused the end-user to pay the VAR, which, in turn, allowed the VAR to pay Autonomy. On other occasions, if the end-user paid Autonomy directly, the VAR was relieved of its payment obligation.

29.    At Mr. Hussain's direction, I assured the VARs that if Autonomy was ultimately unable to close a deal with an end-user, there were various options that Autonomy had to "fix" the situation for the VAR so that it would not end up having to pay for the software from its own resources. Over time, this happened and Mr. Hussain came up with a number of different ways of handling this, including buying products that Autonomy did not need from the VARs to offset losses from deals that we did not manage to sell through to the end-users. Mr. Hussain made it clear that our assurances about the VAR not being left holding the bag could not be put in writing. We realized, of course, that if we left the VAR "holding the bag," we would be unable to do future transactions with that VAR as it would probably ruin the relationship.

30.    The incentive for the VAR to take the license in order to help Autonomy reach its revenue goal for the quarter was that the VAR would be paid a "margin" or fee on the deal, which, typically, was 10% of the deal price. For its part the VAR had to sign a purchase order relating to individual deals and, if asked, to confirm to Deloitte that the VAR remained responsible to Autonomy to pay for the deal, and that there were no side letters or other agreements in place between Autonomy and the VAR. Therefore, although referred to as "at risk" deals (because no deal had yet been concluded with the end-user), the VAR was not truly at risk of incurring any loss on the transaction given our pledge that Autonomy would do everything in its power to help ensure that the VAR would not be left holding the bag. I felt very personally obligated to make sure that the VAR would be made whole on the purchase. Any concern the VAR might have had at the outset about the possibility of Autonomy reneging on its pledge would have been dispelled over time by our actual practice of never in fact allowing a VAR to suffer a loss.

HP-SEC-02930198

31.    On several occasions, no sale was able to be made to the prospective end-user. I believe that each time this occurred, we found a "fix" for the deal so that the VAR did not have to pay for the software with its own funds. I cite certain examples below

32.    I participated in the practice of generating internal emails at Autonomy that were designed to create the appearance of legitimacy for the 10% payments to the VARs and the fixes that we used to get money to the VARs so that the VARs would pay their paper obligations to Autonomy. The other members of the senior management at Autonomy – Dr. Lynch, Mr. Hussain, Mr. Kanter and Dr. Menell -- similarly generated documentation that was designed to give the appearance of legitimacy to these transactions.

33.    The deals with the VARs were almost always entered into right at the end of each quarter, after Mr. Hussain had determined that a sale to a particular end-user could not be completed in that quarter and when he was able to determine the size of the gap between that quarter's revenue target and the sales that had been made, or would be made, to non-VAR customers before the end of the quarter. In my opinion, the practical effect of VAR deals of this type was to accelerate into the current quarter revenue that would otherwise have been recognized in a later quarter, assuming that a sale to the end-user could be made in a later quarter. This helped Autonomy to meet its revenue target for the current quarter. However, the problem this created for me was that, in the following quarter, I had to spend time and effort attempting to close the end-user transaction so that the VAR would be protected. I also had to make all of the sales in the following quarter that we otherwise needed in order to meet the following quarter's sales goal. In concept, we were borrowing revenue from a future quarter to achieve the revenue goal in the current quarter. However, in the following quarter, we had to close end-user deals just to enable the VAR to "pay back" the "debt" incurred in the prior quarter.

34.    This practice started on a relatively small scale involving a small number of end-user deals that were very likely to close in the near future. Over time, the number and size of the deals increased, and, in certain cases, the probability that the end-user deal would be completed decreased. The hole in which we started each new quarter -- the implied obligation to find a way to complete the old end-user deals (or find some other solution) -- grew larger and larger. At the same time, the revenue targets that had to be satisfied with new deals continued to increase. The ever-increasing revenue targets, in turn, created the need for yet more transactions of the type that I have just described and other revenue-generating tactics that I will describe in this Witness Statement. In my view, this pattern ultimately became unsustainable.

HP-SEC-02930199

**Quid Pro Quo Deals**

35.   Companies sometimes purchase products from, and sell products to, each other at standard prices or at prices where the value of what is purchased or sold is readily determinable.  Software of the type sold by Autonomy is different.  The price charged for licensing the same software to two different customers frequently is different.  It is often based on the value to the customer of the software that is licensed.

36.   After the 2008 financial crisis, Autonomy was doing large multimillion dollar deals and revenue goals were always going up.  One of the ways in which Autonomy met the larger goals was to do round trip transactions with customers who had a product Autonomy could buy.  Mr. Hussain directed me to find "*quid pro quo*" deals – deals in which Autonomy could buy goods or services from another company, and in turn, that company would use the funds from the sale to purchase software from Autonomy.  The point of these deals was effectively to find revenue for Autonomy that was easier to get than a conventional sale because the buyer was getting something good for its own business in return.

37.   In the deals that I understand from the Claimants' lawyers are challenged in this case, Mr. Hussain or I identified another company's product or service that Autonomy could purchase, even though Autonomy otherwise had no intent or plan to purchase that product or service, which was unwanted, unused or overpriced.  I would then approach the other company and propose what I called a "*quid pro quo*" or "*round trip*" deal.  Autonomy would offer to purchase the other company's product or service if, in return, that company would agree to license identified software from Autonomy.  In most cases, the money that Autonomy paid to the other company to buy its product or service gave the other company the funds with which to purchase the license from Autonomy.  An incentive for the other company was that Autonomy would pay more for the other company's product or service than the other company was asked to pay Autonomy for the license to use Autonomy's software.  The price difference -- which we referred to as the "*delta*" or the "*spread*" -- was effectively the other company's incentive for the deal.  The amount of the price difference in favor of the other company was often the principal subject of negotiation when Autonomy proposed a "*quid pro quo*" deal.  Because Autonomy's purchase financed the other company's purchase from Autonomy and because the spread was, at times, substantial -- even millions of dollars -- it was relatively easy to convince the third parties to enter into *quid pro quo* deals of this type.

38.   Mr. Hussain principally set the price to be charged for the Autonomy software and directed the negotiation of the spread.  Again, he instructed me as to how to ensure that those deals were to be structured so as to be acceptable to Deloitte.  To make the case that the revenue from the sale element of these deals could be recognized, I wrote

HP-SEC-02930200

emails explaining how Autonomy would get value from the products that it purchased. But in reality, I knew that Autonomy would not have purchased the products without the related purchase by the third party.

39.    I also wrote emails suggesting that the purchase price was the result of real negotiations with the third party. But, in truth, there were no real negotiations. Mr. Hussain directed the terms of each purchase, and I would then relay those terms to the third party who, for the most part, readily accepted the terms of the proposed *quid pro quo* transaction because the third party always received more money than it was required to pay Autonomy.

40.    Dr. Lynch was aware of, and was required by Autonomy's internal procedures to approve, all purchases made by Autonomy in the amounts involved in these deals. Mr. Hussain, Dr. Lynch, Mr. Kanter and Dr. Menell also generated emails whose purpose, in my opinion, was to create the appearance that Autonomy had a genuine need for the other company's product or service. From Autonomy's perspective, the reason for the round trip deals was that they generated revenue that was recognized in the financial period in which Autonomy's sale to the third party was made. The revenue would not otherwise have been recognized because, except for the *quid pro quo* feature, the other party would not have purchased the Autonomy software license, or would not have paid the price that it did pay to license the Autonomy software.

41.    I disliked these deals as they did not contribute to any of my personal goals and only served to increase the company targets to levels that were always harder for me to hit in subsequent quarters. I justified my participation in most of these deals as I assumed that Deloitte would see both sides of the paperwork and I felt they must know that, even though contractually separated, these deals must be implicitly related, given that they were to and from the same reseller. However, I followed Mr. Hussain's explicit guidance to never link the transactions in the paperwork. I relied upon Mr. Hussain's assurances that while these deals were "undesirable" and had no, low, or negative margin, they were technically allowed. Rather than push back on, or question the propriety of, these transactions, I agreed to actively look for *quid pro quo* deals. I relied on Mr. Hussain's assurances that as long as the deal met the criteria he set out, it was acceptable to recognize the revenue from the sales under IFRS.

42.    As I have already said (at paragraph 29 above), Autonomy also purchased products or services that it did not need from VARs as a way of channelling money to them, in order to fix deals that could not be resold to the intended reseller as described above.

HP-SEC-02930201

**Hardware Sales**

43. Beginning in the second quarter of 2009, Autonomy purchased computer hardware from hardware manufacturers, principally Dell, EMC, and Hitachi. It then resold that hardware to customers, without adding any Autonomy software. In most instances, it purchased the hardware at one price and then resold it at a lower price, thus making it relatively easy to sell the hardware, but causing Autonomy to suffer a loss on the transaction. Initially, I understood from discussion with Mr. Hussain and Dr. Lynch that a reason for making these sales was to engender goodwill with customers that were also customers for Autonomy software; and that was always a stated reason for these money-losing sales. However, it was also clear to me over time that a principal reason for these money-losing sales was to generate revenue that could be recognized in the quarter in which the sale was made so that Autonomy could achieve its revenue target and thus meet market expectations. This benefit was discussed as a primary motivation for doing these deals amongst myself and others, including Mr. Hussain and Dr. Lynch.

44. I was involved in making this type of hardware sale when Autonomy first began this practice in Q2 2009, but was involved only occasionally thereafter. To my knowledge, Mike Sullivan, the CEO of Autonomy Zantaz, was tasked by Dr. Lynch and Mr. Hussain with managing most of the hardware reselling. I was more tasked with selling software licenses. As a general matter, I did not know which companies had purchased hardware from Autonomy or how much third-party hardware was being sold. When I was involved in selling software licenses to end-users, I usually did not know whether hardware had been sold to that end-user and when I was not involved in, or aware of, a hardware sale I did not use the fact of a prior or contemporaneous hardware sale to promote the software sale that I was trying to make. For example, I discuss below a very large software licensing and data hosting transaction with Bank of America that I was closely involved in and which we eventually executed in Q1 2011. I did not know at the time, but have since been informed, that in 2010 Autonomy resold, at a loss, more than $30 million of Dell hardware to a reseller called SHI who, in turn, on-sold the hardware to Bank of America. Had I known about this at the time, it may well have been useful information in our discussions with Bank of America. However, I did not know about it, and I never heard Dr. Lynch or Mr. Hussain, refer to these hardware sales during our extensive negotiations with Bank of America.

**Data Hosting Transactions**

45. Autonomy purchased a company called Zantaz in 2007. Zantaz was in the software and data hosting business. Zantaz stored customer data as a service to the customer on Digital Safe systems that were maintained at data centers controlled by Zantaz (or in some cases by a third party such as IBM). The customer's data was managed using

HP-SEC-02930202

Zantaz's Digital Safe software and the Digital Safe systems were maintained by Zantaz employees. In lay terms, the customer's data was stored "in the cloud". The data hosting service was usually provided under a multi-year contract. The customer paid for the service on a per megabyte basis. Zantaz and, immediately after its purchase of Zantaz, Autonomy was paid either in advance or on a monthly basis by the customer. In either case, it recognized revenue in each quarter in which the service was provided. This part of Autonomy's business was managed by Mr. Sullivan (who had been an officer of Zantaz). I understand that he and others have submitted witness statements describing this business in far more detail than I can provide.

46.   After Autonomy acquired Zantaz, I was, and others who reported to me were, involved in a different type of deal structure for what was, in fact, the same data hosting service. The customer would license the Digital Safe software that Autonomy was using to manage its data. Autonomy would recognize revenue on the sale of the license in the quarter in which the license agreement was entered into. In exchange, the customer would pay a significantly lower ongoing per megabyte storage fee and the total cost to the customer of the arrangement was significantly reduced on a per megabyte basis. This had the practical effect of accelerating into the current quarter a significant portion of the revenue associated with the data hosting relationship. The incentive for Autonomy was that it accelerated revenue recognition and incentivized the customer to put additional data into the arrangement, thus helping Autonomy to meet its revenue goal for the quarter. The incentive for the customer was that it achieved significant aggregate cost savings on a per megabyte basis.

47.   With the encouragement, and often the participation of Mr. Hussain and Dr. Lynch, I, along with the Autonomy sales force, restructured existing data hosting contracts from the old Zantaz models to the new license model. I sought out existing customers whose hosting contracts I could restructure, with the aim of obtaining large upfront license fees in exchange for a reduction in ongoing storage rates and an overall cost saving for the customer on a per megabyte basis. In most cases, the actual service arrangement did not change. The customer's data continued to be stored at the same Autonomy-owned or controlled data centers and, in relation to the transactions that I understand from the Claimants' lawyers are challenged in this case, the entire Digital Safe system, including the licensed software, continued to be used, managed and maintained by Autonomy employees.

48.   Sometimes, these deals were relatively easy to do. Autonomy approached its existing customers and offered a significant aggregate price reduction on a per megabyte basis, for providing exactly the same service. We often created spreadsheet models that were designed to demonstrate to the customer how much the customer could save by agreeing to the license-based arrangement. During a sales pitch to a customer I focused

HP-SEC-02930203

heavily on the cost reductions; customers had less interest in the structure and more interest in reducing their data storage costs.

49.   In a number of cases we approached a customer even after we had already restructured its data hosting contract once. In these circumstances we sold another license to the customer in exchange for a further lowering of its per megabyte data storage fee. I discuss one of these re-restructuring deals with Morgan Stanley in Q4 2009 in further detail below as an example of this type of deal (other examples being a further restructuring deal with Morgan Stanley in Q1 2011 and a restructuring deal with Deutsche Bank in Q1 2011). Morgan Stanley and Deutsche Bank were key customers who each had existing data hosting arrangements in place with Zantaz before the Autonomy acquisition.  They were among our largest hosted customers so these restructuring deals were important to achieving revenue targets for the quarters in which they took place. These institutions, as well as Autonomy, understood, based on statements that Mr. Hussain, Dr. Lynch, I, and others made to them, that the data hosting service would continue as before, with data being hosted, and associated services being performed, by Autonomy at Autonomy's data centers.  After the banks purchased licenses to Digital Safe, very little or nothing changed except the paperwork, fee and payment structure -- a point that we repeatedly made to the customers.  After we had restructured Morgan Stanley's and Deutsche Bank's Digital Safe arrangements once, we restructured their arrangements a second time, and in the case of Morgan Stanley a third time.  During these re-restructures, we further reduced the ongoing storage rates in exchange for further upfront license fees and with the hope of new higher volumes.  This gave the banks additional cost savings and gave Autonomy the opportunity to pull more future revenue into the relevant quarter.  We added in new software as part of the re-restructures in order to differentiate the software being licensed from software that had already been licensed under previous restructures and to enable recognition of the new licence fee.  It was the further savings and not the additional software being licensed that motivated the customers.

50.   I will now provide examples of the transactions in which I was involved and in which one or another of the techniques that I have described was used.

<u>Microlink</u>

51.   The first VAR with which Autonomy did business of the type that I have described in paragraphs 22 to 34 was a company named Microlink.  Microlink was primarily in the business of providing software and system integration services to the U.S. Government, often involving Autonomy products.  The Chief Executive and majority owner of Microlink was David Truitt.  Over time, Mr. Truitt and I developed a strong working and personal relationship.

HP-SEC-02930204

52. In around 2008 and 2009, Autonomy did a series of what I called "*at risk*" VAR deals with Microlink. They followed the pattern I have described in the section above headed "Value Added Resellers". In my discussions with Mr. Truitt I followed the guidance that Mr. Hussain gave me as described in paragraphs 28 and 29 above. In many instances, Microlink was not involved in the pursuit of the sale with the end-user. In some situations where the end-user deal could not be completed by the end of a particular quarter, Autonomy asked Microlink to submit a purchase order to Autonomy. The purchase order identified the software that we were attempting to license to the end-user customer and stated that the software was to be licensed to Microlink for sublicense to the end-user. Autonomy would invoice Microlink for the software, deliver the identified software to Microlink, and recognize revenue on this paper transaction in the quarter that was ending.

53. I then continued to attempt to sell a license to use the same software to the true customer. On many occasions, either Autonomy or Microlink succeeded in making the sale to the end-user; on others, the end-user sale was delayed for a long period of time, but eventually was made. In yet other situations, no sale to the end-user was ever made. I believe that in one way or another, including, ultimately, Autonomy's purchase of Microlink, we made sure that Microlink never suffered a loss on these deals, in accordance with the understanding between Mr. Truitt and me in respect of these deals.

54. As the end of 2009 approached, Microlink owed Autonomy a large sum of money {**POS00138500**}, {**POS00138501**}, some as the result of end-user deals that had not yet closed, but which might close in the future; some as the result of situations where we knew that the end-user deal would likely never occur; and some as the result of software licensed by Microlink that was for Microlink's own use. My layman's understanding was that if Autonomy were to acquire Microlink, Microlink's debt to Autonomy with respect to these deals would be effectively forgiven because Microlink would be a part of Autonomy. From my perspective, and I believe the perspective of Dr. Lynch, Mr. Hussain, and Mr. Kanter, that was one reason for Autonomy to purchase Microlink.

55. I was involved in the process of bringing David Truitt and Mr. Hussain together so that they could discuss a possible purchase of Microlink; but with one exception, namely the $10 million transaction with DiscoverTech which I refer to below (paragraph 57), I was not involved in the negotiation of Autonomy's purchase of Microlink. Autonomy ultimately purchased Microlink.

56. After January 4, 2010, Microlink was a wholly-owned subsidiary of Autonomy. Mr. Truitt remained at Microlink as its CEO throughout 2010.

HP-SEC-02930205

57.  Autonomy's purchase of Microlink had an element to it that could be viewed as *quid pro quo*. Shortly prior to the sale of Microlink to Autonomy, the owners of Microlink, David Truitt, and his minority partner, Tim Wharton, created a new business named DiscoverTech. Autonomy agreed to purchase Microlink (including its debt to Autonomy) for $55 million, and Mr. Truitt agreed that DiscoverTech would license Autonomy software for $10 million. I believe Messrs. Truitt and Wharton put a portion of the $55 million that was paid to them for the purchase of Microlink into DiscoverTech so that DiscoverTech could purchase ControlPoint software for $10 million from Autonomy and Autonomy could recognize revenue of $10 million on the license sale.

### Q1 2009

#### Capax Discovery - First EDD Quid Pro Quo Deal

58.  As I have mentioned, Autonomy acquired Zantaz in 2007. Zantaz was in the data hosting and e-Discovery business. One of Zantaz's digital archiving software products was called Enterprise Archive Solution (**"EAS"**). Autonomy decided to contract out to a company named Capax Global the role of providing software support for many (mostly the smaller) EAS customers.

59.  In March 2009, I saw, and discussed with Mr. Hussain, an opportunity for Autonomy to enter a *quid pro quo* arrangement with Capax.

60.  John Baiocco was the Managing Partner of Capax. I knew Mr. Baiocco was interested in getting into the electronic data discovery ("EDD") business[1], but when a license to use EDD was proposed, Mr. Baiocco declined to pay the proposed license fee. I discussed the matter with Mr. Hussain to determine whether this presented an opportunity to recognize significant revenue in Q1 2009, and, with his approval, I then approached Mr. Baiocco myself in around March 2009. I proposed that Capax license EDD software for a term of five years for $7.5 million (plus $750,000 for two years of support and maintenance). In return, and with Mr. Hussain's approval, I told Mr. Baiocco that Autonomy would agree to underwrite Capax's purchase by paying Capax a monthly fee that would fund its license purchase in full. I told Mr. Baiocco that the license to use EDD software and Capax's corresponding payment obligations would be recorded in a contract that would state that Capax was obligated to pay the full amount. I described the payments from Autonomy to Capax as monthly and at will, but said that it was Autonomy's intention to pay them until the licensne was fully underwritten or Capax was generating sufficient revenue from use of the licenses to pay the license off early. This was an oral side agreement. At Mr. Hussain's direction, this oral agreement was not

---

[1] EDD is a product that allows a service provider, like Autonomy, to ingest, maintain, and search a large body of documents that are captured, analysed, produced, and used in the course of litigation.

HP-SEC-02930206

to be documented.  I also told Mr. Baiocco that Autonomy would do everything in its power to help Capax ultimately earn a profit on the transaction.  Mr. Baiocco agreed to proceed on that basis {**D002964374**}.

61.   On March 31, 2009, the last day of the quarter, Autonomy and Capax Discovery, executed a license and distribution agreement relating to EDD software.  The license fee was $7.5 million, payable in instalments {**D007004015**}. Autonomy submitted a series of purchase orders to Capax Discovery for EDD services to be rendered; Capax then billed, and Autonomy paid, for services that were not actually being performed and that, for a substantial period of time, Capax Discovery was not capable of performing {**US Exhibit 2559**}.  Mr. Hussain and Dr Lynch approved these payments (see e.g., {**D003484314**}, {**D004088476**}, {**D004088477**} and {**D004088478**}).

62.   I generated emails that created the appearance that Capax was actually providing overflow EDD services for Autonomy.  In those emails I referenced Autonomy's true bandwidth constraints with respect to its EDD processing and used those constraints as a stated reason for paying Capax for EDD services that were not performed. See, for example, {**HP-SEC-00768022**}. I knew that Mr. Kanter and Mr. Hussain had made similar pre-textual statements. Mr. Kanter confirmed: "*I'm OK with the subcontracting on the EDD side as we have volume issues*" {**D003470452**} and Mr Hussain stated: "*We have been sub contracting EDD services to Capax*" {**D003489552**}.  In fact, the payments to Capax Discovery were designed to allow Capax Discovery to pay for the license that we sold to it so that Autonomy could recognize $7.5 million of revenue in Q1 2009.

63.   In order to demonstrate to Deloitte that Capax Discovery was capable of paying the $7.5 million license fee, we requested that Mr. Baiocco provide to us a financial statement. Mr. Baiocco provided financial statements for Capax Global, but, in an accompanying letter, made it clear that Capax Global was not agreeing to be responsible for the debts of Capax Discovery {**D004342818**}, {**D004342819**}.

<u>Q3 2009</u>

<u>Capax Discovery/Kraft</u>

64.   Kraft Foods was a long-time Autonomy customer.  During Q3 2009, I met with Kraft personnel in an effort to persuade them to convert Kraft's then-existing data hosting relationship from a pure fee-for-service arrangement into a license plus hosting deal of the type that I have described in paragraphs 45 to 49 above.

65.   In late September 2009, it became clear that although the Kraft licensing deal was very likely to occur, it would not be closed before the end of the quarter.

HP-SEC-02930207

66. At Mr. Hussain's direction, I approached Mr. Baiocco (Capax Discovery) with a proposal. I told him about the status of the Kraft deal, including the fact that I expected it to close shortly after the end of the quarter. I asked Capax Discovery to act as a VAR, to submit a purchase order for a Digital Safe license for onward licensing to Kraft, and to agree to pay $4 million for that software -- the same price I had been discussing with Kraft. To my knowledge, Capax had no prior relationship with Kraft. I followed the guidance that Mr. Hussain gave me as described in paragraphs 28 and 29 above. I told Mr. Baiocco that Autonomy would continue its efforts to close a deal with Kraft and, when we were successful, we would get Kraft to pay its license fee to Capax so that Capax, in turn, could pay Autonomy. I also told him that, if for some reason we could not get Kraft to pay Capax, we would find another way to make sure that Capax did not have to reach into its own pocket to make a payment to Autonomy. I agreed that Autonomy would pay Capax 10% of the purchase price for assisting us by submitting a purchase order that said that Capax Discovery was obligated to pay for the software under the terms of its VAR agreement with Autonomy. I told Mr. Baiocco that the 10% fee arrangement was the normal margin for resold deals.

67. Mr. Baiocco agreed to go forward. On September 30, 2009, Autonomy prepared for Capax Discovery a Value Added Reseller Agreement and a purchase order that Capax Discovery then signed and sent back to Autonomy {**D003607773**}, {**D003607774**}. The purchase order was for a license to Digital Safe software for on-sale to Kraft. The license fee was $4 million (plus $200,000 for one year of support and maintenance). There was no negotiation of price with Capax.

68. Immediately prior to September 30, 2009, Capax Discovery was in arrears on a payment due under the EDD software license agreement that I have described at paragraphs 60 to 63 above. On September 25, 2009, Mr. Hussain sent me an email in which he said *"Need paperwork for capax I suggest $750k or so?   They have to pay the o/s [outstanding] amounts. We may have to use capax for the K [Kraft] deal"* {**D003626992**}. I have been informed by the Claimants' lawyers that on September 30, in order to help to demonstrate to Autonomy's auditors that Capax Discovery remained a satisfactory credit risk, Autonomy paid Capax Discovery the sum of $1 million for EDD services that Capax Discovery had not actually performed (and was not then capable of performing); and that on the same day, Capax Discovery paid $968,750 to Autonomy, in compliance with its payment obligation under the EDD software license agreement.

69. After September 30, 2009, I continued to pursue a deal with Kraft. Capax Discovery did not participate in that effort. Autonomy ultimately succeeded in closing a direct Autonomy-to-Kraft licensing transaction.

HP-SEC-02930208

70. After Autonomy's deal with Kraft was complete, I asked the Kraft representatives if Kraft would be willing to take its license from Capax Discovery or to pay Capax Discovery as Autonomy's designated payee. Kraft was unwilling to involve Capax Discovery in the transaction in any capacity.

71. As a result, we had to find another way to make Capax Discovery whole, consistent with the intent of the deal we had agreed to with Mr. Baiocco. On December 29, 2009, Autonomy entered into an agreement with Capax Discovery in which Autonomy agreed to relieve Capax Discovery of its obligation to pay the fees due under its September 30, 2009 purchase order, to return to Capax Discovery the $400,000 deposit that it had paid to Autonomy with respect to that transaction, and to pay Capax Discovery its 10% "profit" ($400,000) with respect to the Kraft transaction {**CAPAX_000760**}. Mr. Hussain approved all of this. In an email dated December 28, he said that, "... *the referral fee should be paid to capax [sic] as it was contracted*" {**D003246827**}. Capax did not refer Kraft to Autonomy; the $400,000 fee paid to Capax was not a referral fee. It was a fee for signing a purchase order "at risk" so that Autonomy could recognize $4 million of revenue in Q3 2009.

## Q4 2009

### Capax Discovery - Second EDD Quid Pro Quo Deal

72. On Saturday, December 26, Dr. Lynch sent an email to Mr. Hussain and me (among others) in which he asked whether Mr. Scott and I should go to New York to see Morgan Stanley[2] "*given the criticality to the quarter and the short amount of time left*" {**D003249915**}. The next day, Sunday, December 27, Mr. Hussain replied that Autonomy needed, among other things, a deal with Capax Discovery in order to reach its revenue goal {**D003249809**}.

73. At Mr. Hussain's direction, I approached Mr. Baiocco with two deals in the space of two or three days. I told Mr. Baiocco that Autonomy needed his assistance again, and proposed another EDD licensing arrangement. Capax Discovery would buy an additional license for $4 million, plus 5% for a year of software maintenance. The $4 million license fee was to be on top of the $7.5 million fee that Capax Discovery agreed to pay at the end of Q1 2009.

74. Capax Discovery had not performed any actual EDD services for Autonomy. Nevertheless, I agreed that Autonomy would increase the monthly amount it was paying for EDD services by $225,000 per month (from $250,000 to $475,000 per month) in order to fund this new purchase, whether or not Capax actually provided EDD services to

---

[2] This was a reference to the Morgan Stanley hosting restructuring deal that I describe below.

HP-SEC-02930209

Autonomy or its customers. I told Mr. Baiocco that Capax Discovery would not have to pay Autonomy until it was first paid by Autonomy. I said that, as before, this part of our agreement would be in writing and would technically be at will on Autonomy's part but that we intended to execute it in full. I repeated the promise that, in the end, we would make all efforts to make sure that he / Capax would not get hurt and would earn a profit on the EDD arrangement. Mr. Baiocco agreed and, on December 31, 2009, executed an amendment to the existing EDD License and Distribution Agreement {D006977068}.

Capax Discovery/Eli Lilly

75.  Eli Lilly & Co, the pharmaceutical company, was a large Autonomy customer. During the second half of 2009, Autonomy attempted to persuade Eli Lilly to enter into a license plus data hosting deal.

76.  By mid-December 2009, I realized that Autonomy would not be able to close a deal with Eli Lilly before the year-end. As a result, on the last day of the quarter, I approached Mr. Baiocco with the second Q4 2009 deal. I said that Autonomy's efforts to sell a license to Eli Lilly were well advanced and that I believed that the deal would close shortly after year end. I asked if Capax Discovery would do a deal like the Kraft deal and license Digital Safe software for on-sale to Eli Lilly on the same basis as we had done the Kraft deal. This time, the license fee would be $6 million, plus 5% for one year of support and maintenance. I said that Autonomy would close the deal with Eli Lilly. Capax Discovery would not be required to participate in the sales effort. We agreed that if Capax took the deal on an "at risk" basis so that Autonomy could recognize revenue on the deal, Autonomy would pay Capax 10% of the contract price -- i.e., more than $600,000. There was no price negotiation. Mr. Baiocco agreed.

77.  Autonomy then prepared a purchase order in the amount of $5,986,827, plus $299,342 for maintenance. On December 31, 2009, Mr.Baiocco executed the purchase order on behalf of Capax Discovery and returned it to Autonomy {D003235551}, {D003235552}.

78.  After year-end, I continued to pursue a direct deal with Eli Lilly. Capax Discovery did not participate in these sales efforts. We did not consult with Capax Discovery about the terms of our deal with Eli Lilly. The process took longer than I had expected, but in mid-June 2010, we were able to close a deal with Eli Lilly for $5.3 million, plus $265,000 for one year of support and maintenance. Autonomy's agreement with Eli Lilly allowed Autonomy to designate a payee {D002419427}. Autonomy designated Capax Discovery. Dr. Lynch was aware of the use of a VAR and the fact that a deal was eventually reached with Eli Lilly because it led to an issue about the sales commission payable on the end-

HP-SEC-02930210

user deal that we had to address {**MRL00010471**} and because getting paid by Capax Discovery after it was paid by Eli Lilly later became an issue {**D001875217**}.

79.   I told Mr. Baiocco that the Eli Lilly deal had closed and that Eli Lilly had agreed to pay its license fee to Capax Discovery.

80.   It is my understanding that Eli Lilly did pay Capax Discovery as Autonomy's designated payee.

Certain MicroTech VAR Transactions

81.   As I have already explained, I had a long time relationship with David Truitt, who was the CEO of Microlink and who, as the year end approached, was in the process of selling Microlink to Autonomy.   Mr. Truitt was a part owner of a separate business, named MicroTech. Like Microlink, MicroTech sold services to U.S. Government customers.  From time to time in the past, MicroTech had acted as a VAR, in the traditional sense, reselling Autonomy software to U.S. Government agencies.  David Truitt's brother, Stephen Truitt, was the Chief Operating Officer of MicroTech.

82.   As the end of Q4 2009 approached, Mr. Hussain asked me to speak to David Truitt to see if MicroTech would be interested in taking on other "at risk" deals to help Autonomy reach its revenue goals.   I did speak to David Truitt. I followed the guidance that Mr. Hussain gave me as described in paragraphs 28 and 29 above. Shortly thereafter, Mr. Truitt told me that he had spoken to Steve Truitt and that MicroTech would be interested.

83.   On December 30 and December 31, 2009, I asked David Truitt if MicroTech would agree to purchase a number of "at risk" deals. The purpose of these deals was to get the revenue associated with the corresponding prospective end-user deals into the fourth quarter of 2009.  One of these deals was for Morgan Stanley as end-user in the amount of $4.89 million {**D002856733**}.  Autonomy ultimately made a sale directly to Morgan Stanley (of hardware, not the software that we had licensed to MicroTech).  Autonomy then cancelled MicroTech's debt {**D007110281**} and paid MicroTech 10% of the transaction price {**D002807615**}. A second deal was for the end-user Manufacturer's Life Insurance Co. ("**Manulife**") in the amount of $1.18 million {**D002856735**}.  Autonomy eventually sold a license to Manulife.  We cancelled MicroTech's debt {**D007122443**} and paid it 10% of the transaction price {**HP-SEC-00043369**}.

First FileTek Quid Pro Quo Deal

84.   In late December 2009, I conceived of, and Mr. Hussain approved, a round trip deal that would generate immediate and substantial ($8 million) recognizable revenue. The entire

HP-SEC-02930211

transaction was arranged over the course of two or three days. FileTek's Chief Operating Officer was Gary Szukalski, a former Autonomy employee. I knew from prior conversations with Mr. Szukalski that FileTek was interested in licensing IDOL but did not have the means to pay for a substantial license. My idea was that, in return for FileTek agreeing to pay a large sum to license IDOL, Autonomy would agree to license FileTek's StorHouse software for integration with Autonomy's Digital Safe software. Digital Safe software is primarily used to store and manage unstructured data -- for example, emails. My idea was that it might be possible for StorHouse to be used with Digital Safe to enhance Autonomy's structured data capabilities.

85. Autonomy's technical staff had not, to my knowledge, previously evaluated FileTek's StorHouse software or determined whether it was practical to combine it with our existing Digital Safe software. However, I now had a reason for a purchase from FileTek that would give FileTek both the money to purchase a license from Autonomy and, as I explain below, the incentive to license software from Autonomy. I presented my idea to Mr. Hussain. He approved it, but he made it clear that, if the deal were made, the documentation for each deal had to be entirely independent of each other.

86. On December 28, 2009, I emailed Mr. Szukalski to set up a call {**FT0012777**}. We spoke on the morning of December 29 {**FT0002036**}. I proposed a deal to FileTek. I said that Autonomy had money in its budget to make a purchase from FileTek and suggested that Autonomy would buy a license to use FileTek's StorHouse software if FileTek were willing to buy a license to use Autonomy's IDOL software. I told Mr. Szukalski that my proposal would do two things for FileTek: it would give FileTek the money it needed to license IDOL and the deal would be profitable for FileTek because Autonomy would pay FileTek more than FileTek would have to pay Autonomy. FileTek would keep the difference. Mr. Szukalski expressed interest and agreed to talk to his colleagues at FileTek. I told him that any deal had to be completed in the next two days, i.e. by December 31.

87. Mr. Szukalski responded promptly. He said that FileTek was prepared to discuss my proposal further. We talked numbers. After some back and forth, I proposed that Autonomy would license StorHouse software and support for $10,367,280 and that FileTek would license IDOL for $8,480,000 (of which $480,000 was for one year of support and maintenance). The difference, $1,887,280, would be FileTek's profit on the deal. I told Mr. Szukalski that the documentation of the two deals would have to be separate. I said that the documentation would say that each company was to pay for its license 30 days after signing, but that Autonomy would pay a few days early.

88. We reached agreement in principle with FileTek on December 29 or 30, 2009. It was only then that Autonomy did a technical analysis of StorHouse or set about developing evidence that could be said to establish the fair value of FileTek's StorHouse software

HP-SEC-02930212

{D003237536}, {D003237535}, and {D003236726}.  My understanding is that these analyses were performed to justify the value of the deal to Deloitte, not to decide whether to proceed with the overall transaction or how to price the deal.  Dr. Lynch was aware of the analysis and the documentation of the two deals as separate, independent transactions {D003230354}.

89.   In mid-January 2010, I asked Mr. Szukalski to send me an email that explained that FileTek purchased its IDOL license because the terms of a prior Autonomy license were unattractive for FileTek.  I suggested the language he might use {FT0002108}.  Mr. Szukalski obliged {FT0045151}.  This exchange did not reflect my understanding of the reasons for the deal (which was as described above).  It was generated to assist Autonomy in substantiating the value of the deal.

<u>Morgan Stanley Data Hosting Restructuring Arrangement</u>

90.   Morgan Stanley was one of Zantaz's data hosting customers.  In December 2009, I was involved in a deal to restructure Morgan Stanley's existing Digital Safe data hosting arrangement with Zantaz, which was by then part of the Autonomy group. Under the agreement, which was entered into on December 31, 2009, Morgan Stanley paid $12 million for a perpetual license to use the same software as had been perpetually licensed under the 2008 license agreement, plus "SPE basic" within version 8 of Digital Safe {D000352039}.

91.   The deal was important to the success of the quarter and a focus of Dr. Lynch and Mr. Hussain's attention {D003249640}. Dr. Lynch said that the completion of this deal was "*critical[] to the quarter*" {D003250051}.

92.   I was closely involved in the structuring of this deal, which I pitched to Morgan Stanley. Given its importance, I discussed the proposed deal in detail with Mr. Hussain.  In particular, we discussed its overall goal.  From Morgan Stanley's perspective, the deal was attractive because it would allow them to convert their long term, relatively expensive pre-existing agreement (which was charged on a pay-per-use basis) into an arrangement which would create cost savings for them over time, as I sought to show in a comparison I prepared at the time {US Exhibit 2947}.  It was a good deal for Autonomy because of the upfront revenue payable by Morgan Stanley ($12 million) and the incentive it offered to direct even more megabytes of data into the Digital Safe. As I discussed with Mr. Hussain, the transaction would allow Autonomy to accelerate revenue that would otherwise be due over time, meaning that we could recognize more upfront revenue.

93.   Although it appeared to be a very complicated deal, from Morgan Stanley's perspective, whether to enter into it was, when distilled down, an economic decision.  As I said in my

HP-SEC-02930213

email to Morgan Stanley of December 22, 2009, "*This deal can be accomplished with no changes to contracts other than to amend existing agreements with new software table and new rate table... Mike [Lynch] and Sushovan [Hussain] asked that I keep the offer very simple and show Morgan Stanley a pure savings option based upon a restructure that yields license revenue for savings*" {**D003261307**}.  On December 23, 2009, I was copied to an email that Mr. Hussain sent to Morgan Stanley, which said: "*The savings start the moment Morgan Stanley signs an amendment to the existing agreement that simply puts lower rates into effect coupled with a software license fee.  In this sense it is not even an offer that requires a legal review as it is purely financial and causes savings. It's quite simply "sign and save*"" {**D003257901**}.

94.   On December 28, 2009, Jim Crumbacher (an Autonomy in-house lawyer) sent to Mr. Scott and me a draft of the Morgan Stanley restructuring agreement, which made no reference to SPE {**D003247023**} {**D003247024**}.  I do not recall having any discussion with Morgan Stanley about SPE.  SPE was included in the deal at a very late stage.  The reason for this was that, for the revenue to be recognized, it was necessary to distinguish the software package under the restructured deal from that under the prior arrangement.  I discussed this issue with Mr. Hussain, including what would satisfy the appropriate level of distinction in order to enable revenue recognition.  I understood that we either had to add software or include a different version of the software to that previously provided.  Therefore, I understood that if we had not included SPE in the deal, and the deal had been restructured as it had originally been negotiated (without SPE), it would have threatened revenue recognition.  To my knowledge, based on my involvement in the negotiation with Morgan Stanley, SPE was not part of the commercial justification for Morgan Stanley's decision to restructure their existing arrangement.  Indeed, I believe that Morgan Stanley would have done the deal without SPE.

95.   I have been shown a transcript of the earnings call that took place on February 3, 2010 following the announcement of Autonomy's 2009 financial performance {**D003098631**}. That records Dr. Lynch as having stated that SPE was "*the key winning differentiator*" in closing the $12 million deal with Morgan Stanley.  Based on my involvement in the transaction, I do not think that was the case.

Q1 2010

MicroTech/Vatican Library

96.   In early 2010, I was aware that Autonomy had been attempting for a year or more to reach agreement on a very large deal with the Vatican Library (sometimes referenced as "BAV", which was an acronym for Biblioteca Apostolica Vaticana).  The project was to digitize the enormous and extremely valuable contents of the Vatican Library.

HP-SEC-02930214

Autonomy's sales effort was conducted at the highest level of the company: Mr. Hussain and Dr. Menell were principally involved.

97.   I was not involved in contacts with the Vatican Library because my sales responsibility was, as I have explained, primarily for sales to customers in the United States and, secondarily, for sales in the rest of the Americas. In a March 28, 2010 email to Mr. Hussain and me, Dr. Lynch said we needed $15 million of revenue from a "*VAT*" deal {**D002834718**}. In his email to Mr. Hussain and me dated March 31, 2010, he said that we need "*VAT 22.5*" to get to the revenue goal for the quarter {**D002815040**}, {**D002815041**}. No deal with the Vatican Library was concluded before the end of the quarter.

98.   Mr. Hussain asked me to see if MicroTech would agree to take a part of the deal that Autonomy was trying to sell to the Vatican Library.  He ultimately gave me the amount: $11.5m.  I contacted David Truitt and asked him whether MicroTech would take an $11.55 million Vatican Library deal on the usual terms.  David Truitt said he would check with Steve Truitt, the MicroTech COO.  At David Truitt's request, we then prepared a description of the deal terms for John Cronin, who, in this context, was acting for MicroTech {**US exhibit 714**}.  MicroTech agreed to take the deal.

99.   Autonomy was never able to reach an agreement with the Vatican Library.  We, therefore, needed a fix for the Vatican Library deal.  Although I was not directly involved, it is my understanding that Autonomy purchased certain rights to use a facility (called the "ATIC") in order to get money to MicroTech that MicroTech could then use to pay for part of the Vatican Library deal.

<u>Second FileTek Quid Pro Quo Deal</u>

100.   In Q1 2010 Mr. Hussain told me that we were short on revenue again. I therefore looked to do another *quid pro quo* deal.  Mr. Hussain and I agreed that I would present a second round trip deal to FileTek.  The rationale for the deal, which I laid out in an email to Mr. Hussain dated March 30, 2010, was that Autonomy expected an increase in its data hosting business because of its recent (separate) agreement to host Merrill Lynch data, and that, as a result, Autonomy could license additional rights relating to the volume of data that could be hosted by Autonomy using FileTek's StorHouse software {**D002826425**}.  The rationale was a pretext, as both Mr. Hussain and I knew.  Autonomy did not "need" the right to use StorHouse.

101.   On March 29, 2010, I spoke with FileTek's Mr. Szukalski, with whom I had made the *quid pro quo* deal at the end of 2009 {**FT0003230**}. I proposed that FileTek license additional Autonomy software before March 31.  In return, I said that Autonomy would purchase additional rights to use FileTek's StorHouse software in the following quarter for a

HP-SEC-02930215

purchase price that would substantially exceed the amount of FileTek's purchase from Autonomy.  The separation in time was a requirement established by Mr. Hussain.  Its purpose was to introduce two separate time periods as another fact establishing the deals as independent transactions.  Most of my discussion with Mr. Szukalski and FileTek's CEO, Bill Loomis, was about the spread -- the dollar amount by which Autonomy's purchase from FileTek would exceed the amount of FileTek's purchase from Autonomy.  The spread was a principal incentive to FileTek to do this *quid pro quo* deal.

102.   I agreed with Mr. Szukalski and Mr. Loomis that FileTek would license software from Autonomy in Q1 2010 for $8.5 million, plus one year of maintenance for $510,000, a total obligation of $9,010,000.  In return, I agreed that Autonomy would purchase additional rights to use FileTek's StorHouse software and related support for about $11.5 million in Q2 2010.  We agreed that the spread would be approximately $2.5 million. Mr. Hussain established the amount of the license fee for the Autonomy software and directed the negotiation of the amount of the spread; I conducted that negotiation.  Both halves of the agreement were reached orally at the end of March 2010.  FileTek's purchase from Autonomy was documented on March 31, 2010.  Autonomy's agreement to purchase additional rights to use StorHouse remained entirely oral at that point. Mr. Hussain told me that it should not be in writing.

103.   I have been shown an internal FileTek email from Mr. Loomis to Mr. Szukalski in which Mr. Loomis reported his conversation with me on the evening of March 31 relating to the method that would be used to make this deal appear to be two separate transactions.  Mr. Loomis' email states: "*They'll ask for quotes in about a week*", meaning that we (Autonomy) would seek a formal quote from FileTek for Autonomy's second StorHouse purchase early in the following quarter. Mr. Loomis' email also stated: "*STHS [StorHouse] license deal to be done after E release before 30th.... New target is 11.5M*" {**FT0002711**}.  To the best of my recollection, this accurately describes statements that I made to Mr. Loomis.  We agreed that in April 2010, after Autonomy's Q1 2010 earnings release was issued (and, thus, after Deloitte completed its Q1 2010 quarter review), I would ask FileTek for a price quotation for additional rights to use StorHouse.  I said that FileTek should submit a proposal that was priced at significantly (15% to 20%) more than $11.5 million so that Autonomy could then "negotiate" FileTek down to the amount on which we had already agreed {**FT0002711**}.  Autonomy did request a proposal in April 2010.  As I had suggested, FileTek came in high.  We then "negotiated the price down" to $11,518,214 {**D002647150**}.  I later constructed internal Autonomy emails that were designed to make it appear that Autonomy had a genuine need for increased rights to use FileTek software and that I obtained a "discount" from FileTek.   Autonomy management (Dr. Lynch, Mr. Hussain, Mr. Menell and Mr. Kanter) knew that the primary reason for the deal was Autonomy's need for additional revenue in Q1 2010 and that

HP-SEC-02930216

there was no actual need for additional rights to use FileTek's software. The price Autonomy paid FileTek was the result of the $2.5 million price spread on the combined deal that was agreed on March 31.

<u>Q3 2010</u>

<u>FileTek/U.S. Department of Veterans Affairs</u>

104.   Toward the end of Q3 2010, I was involved in a large VAR deal with FileTek.

105.   We were looking to sell a software license to The United States Department of Veterans Affairs (the **"VA"**), an existing Autonomy customer.  The potential deal was very large and, as Dr. Lynch made clear to me and others in no uncertain terms, very important to Autonomy {**D002136020**}.  Autonomy's prospects for the deal appeared very good. I understood that each potential bidder planned to include Autonomy software in its bid.

106.   The VA's procurement process was repeatedly delayed.  By early September 2010, the VA had not even issued the final request for proposal.  There was no prospect that a deal with the VA (and thus one of the bidders) would close by the end of the quarter.  Because of this delay, Mr. Hussain and I discussed the need to take the deal to a VAR in order to be able to recognize revenue in the quarter.  See his email to me of September 8, 2010 in which he asked me which "partner" (i.e. VAR) we should use {**D001980299**}.

107.   After discussion with Mr. Hussain, I took the deal to FileTek and asked if they would be interested in being a one-time reseller for the VA deal. They suggested that a partner of theirs be the reseller.  Mr. Hussain and I pursued this, but the partner in question did not pass the eligibility criteria for our resellers.  We therefore went back to FileTek and asked them to take the deal.  They said they would be interested, their upside being the margin that they would make.

108.   Mr. Hussain and I spoke to Mr. Szukalski and Mr. Loomis of FileTek about the deal  on September 30, 2010 (the last day of the quarter) {**FT0048221**}.  We told them that a large VA deal was likely to be concluded in the following quarter, that Autonomy's software was to be included in the proposals of each of the prime contractors that were competing for the VA deal so that, no matter who won, a sale of Autonomy software would be highly likely.  We proposed that FileTek sign a purchase order for $10 million (plus $500,000 for one year of maintenance).  FileTek would also have to pay $500,000 at the time of licensing to help Autonomy establish that FileTek was a good payor. Autonomy would be responsible for arranging a licensing transaction with the winning contractor; FileTek would not engage in the actual sales efforts.  If, for some reason, the VA deal was not completed, Autonomy would use all efforts to find another end-user for the same software or some other way to make sure that FileTek would get paid and

HP-SEC-02930217

could then pay Autonomy. We said that if FileTek was prepared to proceed, Autonomy would pay FileTek 10% of the deal price. FileTek agreed, and on September 30, 2010, FileTek and Autonomy entered into a VAR agreement {**FT 0000028**} that obligated FileTek to pay a total of $10.5 million to Autonomy {**FT0048221**}.

109. The VA continually postponed the issuance of a request for proposal. FileTek repeatedly pressed for status reports. In early February 2011, I spoke to Mr. Szukalski and said that one way or another Autonomy would find a solution. I have been shown a copy of an internal FileTek email from Mr. Szukalski to Mr. Loomis dated February 1, in which he described his telephone call with me {**FT0003551**}. As can be seen from Mr. Szukalski's email (point 5), I assured Mr. Szukalski that there was little to no risk for FileTek.

### Q4 2010

110. I have been shown a copy of an email from Mr. Hussain to Dr. Lynch dated December 10, 2010 in which Mr. Hussain expressed great concern about sales of IDOL in the United States. Mr. Hussain stated that *"We've covered up with bofa [Bank of America] and hopefully db [a hosting deal with Deutsche Bank] and Doi [the U.S. Department of the Interior] but if latter 2 don't happen it's totally bad"* {**D001546836**}. I was involved in each of these transactions, as well as a separate *quid pro quo* deal during Q4 2010.

### Bank of America

111. During Q4 2010, I was directly involved in efforts to reach agreement with Bank of America for a very large software licensing and data hosting agreement. Autonomy was on the cusp of closing a more than $20 million deal with Bank of America. The deal was the subject of intense interest by Dr. Lynch and focus by Mr. Hussain {**D001679001**}, {**MRL00014293**} and {D001459044}. Given its size, it was viewed as central to the success of the quarter {**D001741753**}. Dr. Lynch and Mr. Hussain were personally involved in the unsuccessful efforts to close the deal before year end {**D001457154**}, {**D001452865**}, {**D001505938**}, {**D001463580**} and {**D001679001**}. By way of example:

   (a) On December 17, 2010, I emailed Mr. Hussain a draft email that I was planning to send to Vince Debban (of Bank of America). It stated: *"Could I please appeal (in reality, beg) that you try to help us push this over the top with whomever deferred today? I could reiterate the deal strengths but I know you know all that. Rather, I suppose I should emphasize how material this can be for Autonomy and just how important this appeal is."* {**D001508479**}. Mr. Hussain responded later that day saying: *"Brilliant... Also I would add that we have spent so many man hours on this a little more to get the real benefits on both sides is worth fighting for I would send now"* {**D001507240**}.

HP-SEC-02930218

(b)   On December 21, 2010, I emailed various Bank of America individuals saying "...*Sushovan Hussain authorized us to extend a further $2M reduction in the license fee currently on offer for execution in 2010... We are extending this further savings to you all in the spirit of highlighting the unique savings opportunity before us in this year*" {**D001497625**}. I forwarded my email on to Dr. Lynch and Mr. Hussain {**D001491258**}.

(c)   On December 22, 2010, Dr. Lynch sent Simon Mackenzie-Smith (of Bank of America) an email (which was subsequently forwarded to me) saying: "*In order to incentivize the sign off this week we have given a 10% discount to that already agreed... it is in the interests of both parties and its [sic] a shame such a possibility would be lost*" {**MRL00009669**}.

112.   We pushed hard to try to close the deal in order to recognize the revenue in Q4 2010. Despite pushing hard, it became apparent at the very end of the year that, although a large transaction with Bank of America was likely to happen, they would not commit to a deal in time to allow Autonomy to recognize revenue in 2010 {**D001452845**}.

113.   As it had done before, Autonomy decided to take the deal to resellers in order to recognize the revenue in Q4 2010.  The deal was very large and Mr Hussain instructed that it should be broken into smaller pieces and sold to different resellers.

114.   Late on December 31, in an effort to get as much recognizable revenue relating to the Bank of America deal as possible, I spoke to John Cronin and/or David Truitt, in his capacity as majority owner of DiscoverTech.  By this time, I had done two prior deals with DiscoverTech on the terms that I have described above (i.e. following the guidance that Mr. Hussain gave me as described in paragraphs 28 and 29 above).  The prior deals involved the end-users Citicorp and Phillip Morris International.  In both cases, I later closed deals with the end-users and Autonomy cancelled DiscoverTech's corresponding obligations to Autonomy.

115.   I said that a Bank of America deal was well advanced, but could not be closed in time.  I asked if DiscoverTech would agree to take a part of the Bank of America deal on the usual terms.  The answer was "yes".  As usual, there was no price negotiation.  Autonomy prepared a letter agreement pursuant to which DiscoverTech would license certain identified software for sublicensing to Bank of America in exchange for a license fee of $7 million, plus $350,000 for one year of maintenance and support services {**D001450838**}, {**D001450839**}.  DiscoverTech's Chief Technical Officer, Malcolm Hyson, signed the agreement that night {**D001352901**}. DiscoverTech had not previously participated, and did not thereafter participate, in the efforts to sell software licenses to

HP-SEC-02930219

Bank of America. It was not involved in setting the terms of the deal that we later signed with Bank of America in February 2011.

116. Also late on December 31, 2010, Autonomy prepared and sent Capax's Mr. Baiocco a purchase order for particular software (Zantaz Supervisor (S6)) for sublicensing to Merrill Lynch & Co (a unit of Bank of America) for a fee of $1,830,600 (which included a two year support and maintenance fee). Mr. Baiocco executed that license agreement and faxed it back to Autonomy at 11:40 p.m. that night {D001450822}, {D001451306}. Like DiscoverTech, Capax did not participate in our continuing efforts to reach a deal with Bank of America and did not have any involvement in setting the terms of such a deal.

117. Three and a half weeks later, on January 25, 2011, I spoke to David Truitt, at Mr. Hussain's request. I asked if DiscoverTech would take an additional $3.5 million license (plus maintenance and support of $175,000) for resale to Bank of America {D001360218}. Also on January 25, 2011, I sent Mr. Truitt a letter agreement that was back-dated to December 31, 2010, covering this license {DISCOVERTECH005992}, {DISCOVERTECH005995}. On January 26, 2011, Mr. Truitt sent back the letter agreement, signed by DiscoverTech's Mr. Hyson {D001358104}, {D001358105}. On this version of the agreement, Mr. Hyson dated his signature "25 Jan 2011" {D001358105}; see also {D001354064}, {D001354065}. We then sent back another version of the same agreement, this time with the date December 31, 2010 physically typed in on the signature line. Mr. Hyson signed the agreement and sent it back to Autonomy {DISCOVERTECH000094}, {DISCOVERTECH000095}.

118. In January 2011, Mr. Hussain asked me to determine how payments that were to be made by Bank of America under our then-anticipated deal with Bank of America could be used to fund payments by the VARs to Autonomy on their "at risk" deals with Autonomy. This gave me an opportunity to solve the problem of getting money to Capax Discovery to allow it to satisfy its payment obligation under an "at risk" deal for Amgen (in the total sum of $9.45 million) as end-user done in Q3 2010. Autonomy drafted a letter for Capax in which Capax requested that its license to sell software to Amgen be converted to a license to sell software to Bank of America. The price remained the same. Capax then signed, and Autonomy approved, that request {CAPAX_001153}, {CAPAX_001154}.

119. Autonomy finally reached an agreement with Bank of America on February 9, 2011 {D001055421}. The agreement called for a payment by Bank of America of $19 million (net of an early payment discount of $500,000) to Autonomy or its designee. Autonomy designated MicroTech as the payment recipient. Bank of America paid MicroTech. MicroTech, in turn, paid $10 million to DiscoverTech, which then paid that $10 million to Autonomy with respect to DiscoverTech's Bank of America "obligation" to pay license

HP-SEC-02930220

fees of $7 million and $3.5 million. MicroTech paid Capax $9 million, which Capax then paid to Autonomy with respect to Capax's Amgen/Bank of America license fee "payment obligation".

120. Taken together, the Bank of America-related transactions recognized in Q4 2010 summed to a total of $12,164,182 of revenue. Autonomy paid MAFs (a) to DiscoverTech of $1,100,000 for its participation in the transactions that I describe in paragraphs 115 and 117 above, and (b) to Capax Discovery of $900,000 and $183,000 in relation to its participation in the Amgen transaction that I refer to at paragraph 118 above and the transaction that I describe in paragraph 116 above {D000211234}, {D000196962}, {D001057577}, {D001056027}, {D001153050}.

<u>Q1 2011</u>

<u>DiscoverTech/PRISA</u>

121. PRISA was an existing Autonomy customer. During Q1 2011, Autonomy attempted to interest PRISA in a deal {D001080530}. We were not successful.

122. In early April 2011, Mr. Hussain told me that he needed a deal to make up for a revenue shortfall in Q1 2011. He asked me to get DiscoverTech to take a deal for PRISA as end-user. He told me that the deal documents had to be dated March 31, 2011. I called David Truitt. I asked him, as a favor and as a one-time request, to do a deal that would be backdated to March 31. On April 4, 2011, I sent Mr.Truitt a letter agreement dated March 31 that gave DiscoverTech a license to sublicense to PRISA certain identified eDiscovery and archiving software. The license fee was $3.6 million, plus $200,000 for support and maintenance {DISCOVERTECH006268}. I asked that a signed purchase order be sent to my personal email, rather than my Autonomy email address, so that I could separate the signed license agreement (dated March 31) from the electronically dated covering email (which would be dated April 4 or 5) and could then provide a copy of the license agreement only to Autonomy for its records.

123. Mr. Truitt said that he was uncomfortable with this request. I said that I was equally uncomfortable with it. Nevertheless, Mr. Truitt agreed to have his CTO Malcolm Hyson sign the letter agreement. The signed agreement was sent to my personal email address {DISCOVERTECH000073}, {DISCOVERTECH000074}. I countersigned the agreement and dated my signature March 31, 2011 {DISCOVERTECH006268}. A week and a half later, on April 14, 2011, Mr. Hussain and I met with Mr. Truitt at Autonomy's office in San Francisco. Mr. Truitt expressed his unhappiness at being asked to backdate the PRISA VAR agreement and made it clear that he would not do this again. I recall that Mr. Hussain acknowledged Mr. Truitt's misgivings and assured him that it would not happen again.

HP-SEC-02930221

**Q2 2011**

MicroTech/HP

124. During June 2011, I worked on two related deals, one with the United States Postal Service and the other with HP. The Postal Service was using a data archiving system based on HP software. It was dissatisfied with that system and was interested in purchasing an alternative. At the same time, I engaged HP to determine whether HP would be interested in licensing Autonomy data archiving software so that HP could fix its problem with the Postal Service and the Postal Service could get the software it wanted without actually changing vendors.

125. As the end of the quarter approached, we were making good progress on the direct Postal Service deal, but not much progress on the HP side. Mr. Hussain asked me to take an HP deal to a reseller. I spoke to either David or Steve Truitt and asked that MicroTech take an HP deal. I explained the greater risk that MicroTech would be taking with respect to this deal because of the uncertainty of the end-user deals. I identified the paths that were available to get MicroTech paid. I said that we might be able to complete a sale to HP (but the prospects of such a sale were not in good shape at that time but that we would keep trying that route). Alternatively, we might be able to license the same software directly to HP's end customers like the Postal Service who had shown they were interested and needed the software as an alternative. In all events, I said we would use all efforts and means available to protect MicroTech from holding the bag.

126. MicroTech agreed to take the deal. Autonomy prepared, and Steve Truitt signed, a purchase order that included a license fee of $7 million and $350,000 for one year of maintenance {D000536285}, {D000536286}.

I believe that the facts stated in this Witness Statement are true.

SIGNED

CHRISTOPHER BRADLEY EGAN

9/13/18

DATED

| 1. | On behalf of | Claimants |
|---|---|---|
| 2. | Initials/Surname of witness | C B Egan |
| 3. | Statement No | 1 |
| 4. | Date | 13 September 2018 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

(1)     ACL NETHERLANDS B.V. (AS SUCCESSOR
TO AUTONOMY CORPORATION LIMITED)
(2)     HEWLETT-PACKARD VISION BV
(3)     AUTONOMY SYSTEMS LIMITED
(4)     HEWLETT-PACKARD ENTERPRISE NEW
JERSEY, INC.

**Claimants**

**-and-**

(1)  MICHAEL RICHARD LYNCH
(2)  SUSHOVAN TAREQUE HUSSAIN

**Defendants**

---

**WITNESS STATEMENT OF**
**CHRISTOPHER BRADLEY EGAN**

---

Travers Smith LLP

10 Snow Hill

London  EC1A 2AL

Tel: 020-7295 3000

Fax: 020-7295 3500

Ref: TPR/AAK/JJB/SEL

HP-SEC-02930223

| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | C B Egan |
| 3. | Statement No | 1 |
| 4. | Date | 13/09/2018 |

**Claim No. HC-2015-001324**

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES
BUSINESS LIST (ChD)

B E T W E E N:

(1)  ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY
CORPORATION LIMITED)
(2)  HEWLETT-PACKARD VISION BV
(3)  AUTONOMY SYSTEMS LIMITED
(4)  HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.

**Claimants**

-and-

(1)  MICHAEL RICHARD LYNCH
(2)  SUSHOVAN TAREQUE HUSSAIN

**Defendants**

---

**INDEX OF EXHIBITS TO THE
WITNESS STATEMENT OF CHRISTOPHER BRADLEY EGAN**

---

|   | Paragraph | Production ID |
|---|-----------|---------------|
| 1 | 18 | D003579864 |
| 2 |    | D002834718 |
| 3 |    | D002834719 |
| 4 | 54 | POS00138500 |
| 5 |    | POS00138501 |
| 6 | 60 | D002964374 |

| | | |
|---|---|---|
| 7 | 61 | D007004015 |
| 8 | | US Exhibit 2559 |
| 9 | | D003484314 |
| 10 | | D004088476 |
| 11 | | D004088477 |
| 12 | | D004088478 |
| 13 | 62 | HP-SEC-00768022 |
| 14 | | D003470452 |
| 15 | | D003489552 |
| 16 | 63 | D004342818 |
| 17 | | D004342819 |
| 18 | 67 | D003607773 |
| 19 | | D003607774 |
| 20 | 68 | D003626992 |
| 21 | 71 | CAPAX_000760 |
| 22 | | D003246827 |
| 23 | 72 | D003249915 |
| 24 | | D003249809 |
| 25 | 74 | D006977068 |
| 26 | 77 | D003235551 |
| 27 | | D003235552 |
| 28 | 78 | D002419427 |
| 29 | | MRL00010471 |

| | | |
|---|---|---|
| 30 | | D001875217 |
| 31 | 83 | D002856733 |
| 32 | | D007110281 |
| 33 | | D002807615 |
| 34 | | D002856735 |
| 35 | | D007122443 |
| 36 | | HP-SEC-00043369 |
| 37 | 86 | FT0012777 |
| 38 | | FT0002036 |
| 39 | 88 | D003237536 |
| 40 | | D003237535 |
| 41 | | D003236726 |
| 42 | | D003230354 |
| 43 | 89 | FT0002108 |
| 44 | | FT0045151 |
| 45 | 90 | D000352039 |
| 46 | 91 | D003249640 |
| 47 | | D003250051 |
| 48 | 92 | US Exhibit 2947 |
| 49 | 93 | D003261307 |
| 50 | | D003257901 |
| 51 | 94 | D003247023 |
| 52 | | D003247024 |

| | | |
|---|---|---|
| 53 | 95 | D003098631 |
| 54 | 97 | D002834718 |
| 55 | | D002815040 |
| 56 | | D002815041 |
| 57 | 98 | US Exhibit 714 |
| 58 | 100 | D002826425 |
| 59 | 101 | FT0003230 |
| 60 | 103 | FT0002711 |
| 61 | | D002647150 |
| 62 | 105 | D002136020 |
| 63 | 106 | D001980299 |
| 64 | 108 | FT0048221 |
| 65 | | FT 0000028 |
| 66 | 109 | FT0003551 |
| 68 | 110 | D001546836 |
| 69 | 111 | D001679001 |
| 70 | | MRL00014293 |
| 71 | | D001459044 |
| 72 | | D001741753 |
| 73 | | D001457154 |
| 74 | | D001452865 |
| 75 | | D001505938 |
| 76 | | D001463580 |

HP-SEC-02930227

| | | |
|---|---|---|
| 77 | | D001508479 |
| 78 | | D001507240 |
| 79 | | D001497625 |
| 80 | | D001491258 |
| 81 | | MRL00009669 |
| 82 | 112 | D001452845 |
| 83 | 115 | D001450838 |
| 84 | | D001450839 |
| 85 | | D001352901 |
| 86 | 116 | D001450822 |
| 87 | | D001451306 |
| 88 | | D001360218 |
| 89 | 117 | DISCOVERTECH005992 |
| 90 | | DISCOVERTECH005995 |
| 91 | | D001358104 |
| 92 | | D001358105 |
| 93 | | D001354064 |
| 94 | | D001354065 |
| 95 | | DISCOVERTECH000094 |
| 96 | | DISCOVERTECH000095 |
| 97 | 118 | CAPAX_001153 |

HP-SEC-02930228

| | | |
|---|---|---|
| 98 | | CAPAX_001154 |
| 99 | 119 | D001055421 |
| 100 | 120 | D000211234 |
| 102 | | D000196962 |
| 103 | | D001057577 |
| 104 | | D001056027 |
| 105 | | D001153050 |
| 106 | 121 | D001080530 |
| 107 | 122 | DISCOVERTECH006268 |
| 108 | 123 | DISCOVERTECH000073 |
| 109 | | DISCOVERTECH000074 |
| 110 | | DISCOVERTECH006268 |
| 111 | 126 | D000536285 |
| 112 | | D000536286 |

HP-SEC-02930229

# EXHIBIT D

| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | H B D Khan |
| 3. | Statement No | 1 |
| 4. | Date | 13/09/2018 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**B E T W E E N:**

### (1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY
### CORPORATION LIMITED)
### (2) HEWLETT-PACKARD VISION BV
### (3) AUTONOMY SYSTEMS LIMITED
### (4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.

**Claimants**

**-and-**

### (1) MICHAEL RICHARD LYNCH
### (2) SUSHOVAN TAREQUE HUSSAIN

**Defendants**

---

### WITNESS STATEMENT OF HAFEEZ BUX DAUD KHAN

---

I, HAFEEZ BUX DAUD KHAN of ████████████████████████████████, STATE
AS FOLLOWS:

1.   I am Vice President of Corporate Development at WANdisco, a technology company
     specialising in distributed computing. I make this Witness Statement on behalf of the
     Claimants in connection with the above named proceedings. Except where it otherwise
     appears, the facts and matters to which I refer in this Witness Statement are within my
     own knowledge and are true. Where facts are from another source, I identify the source
     and I believe them to be true. Where the source of my understanding or information is
     from the Claimants' lawyers, I have identified this in the Witness Statement but without
     any waiver of legal professional privilege.

HP-SEC-02929409

2.    I have not attached the documents to which I refer in this Witness Statement. Instead I have provided document references for those documents. I understand that the document references are the Document Production IDs allocated to the documents by the parties as part of the disclosure in the current proceedings. I have relied upon these documents to refresh my recollections and refer to the specific content of a number of them.

## Professional History and Background

3.    I graduated from Cambridge University in 1994 with an MA in Computer Science and Management Studies. I joined Price Waterhouse (now part of PricewaterhouseCoopers) in 1995 and qualified as a chartered accountant in 1998.

4.    I started work in the financial services industry as a technology analyst in 1999. I worked for Merrill Lynch (now Bank of America Merrill Lynch) for three and a half years. After that I worked for various institutions, including, from 2006 to 2011, Cazenove (which was acquired by JP Morgan in 2010) and, from 2016 to early 2018, Cannacord Genuity. I continued as an analyst up until February 2018 when I left Cannacord Genuity to join WANdisco.

5.    Throughout my time as an analyst, my focus was on software companies based in the UK, Europe and the US. My role was to provide analysis and investment recommendations for institutional investors, based primarily on analysis of publicly available financial data, and conversations with the management teams of the companies that I covered.

6.    In my research notes I would, broadly speaking, give one of three recommendations: (i) "outperform" (i.e. "buy"); (ii) "in-line" (i.e. "neutral") (where we believed that the share price was in line with the market); or (iii) "underperform" or "underweight" which was effectively a "sell" recommendation.

## Autonomy

7.    I first started covering Autonomy in 2001. It was around that time that I got to know Mike Lynch, Autonomy's CEO, and Sushovan Hussain, its CFO. Between 2001 and 2003, I was the Autonomy coverage analyst at Merrill Lynch. From around the end of 2006, I again took up full-time coverage of Autonomy when I joined Cazenove.

8.    Over the course of the ten or so years that I covered Autonomy, I attended numerous earnings calls. In this way, I was able to observe the relationship between Dr Lynch and Mr Hussain. Dr Lynch appeared to me very much the dominant figure in the relationship. As well as understanding every aspect of Autonomy's business, he had a very good grasp

2

HP-SEC-02929410

of accounting principles, and he tended to answer most of the questions asked by analysts during the earnings calls, even those that I might ordinarily have expected the finance director to answer. Mr Hussain, by contrast, came across as shy and reserved and invariably looked to Dr Lynch to field analysts' questions. The impression I got was that Mr Hussain did not relish these calls.

9.    I had what I believe was a good relationship with Dr Lynch and Mr Hussain up until around the time of the banking crisis in 2007/8. From late 2006 (when I resumed coverage of Autonomy) until mid-2007 I had a positive recommendation on Autonomy's stock. However, in my 1 June 2007 research note I switched from "buy" to "neutral" {**D006670280**}. I believed that the financial crisis would adversely impact the software industry because it would affect IT budgets, leading to less predictable financial results from Autonomy's licence business, and also a negative impact on the OEM business, which relied on third-party software companies selling products that had Autonomy's technology embedded in them. Consequently, despite the fact that Autonomy had, until that point, consistently delivered results that either met or exceeded the expectations of the analyst community, I was of the opinion that it would become much harder for Autonomy to sustain the rate at which it had grown historically (even though Autonomy management was telling investors that the changing regulatory environment would be positive for Autonomy). Accordingly, I moved my recommendation from positive to neutral.

10.   In my 21 January 2008 research note, as Autonomy's share price continued to rise, I moved my recommendation to "sell" {**D005015860**}. This was for two main reasons: (i) the macroeconomic climate was worsening; and (ii) based on its disclosures in respect of acquisitions, I started to suspect that the company was overstating its reported organic growth rates, by including growth that in fact resulted from acquisitions in its reported organic growth figures. By way of example, if a company's revenues increase from $100 million in one year to $120 million a year later, that is 20% growth. However, if there was an acquisition in the intervening period and that acquisition contributed $10 million of revenue, then organic growth would only be 10%. If the contribution from the acquisition was understated, the rate of organic growth would be overstated. As I said at page 3 of my research note dated 13 May 2008, my concern was that "*Autonomy's acquisition strategy is the primary vehicle for growth as it provides new customers to leverage IDOL sales*", and the "*model is unsustainable and requires Autonomy to continue making similar acquisitions to fuel the growth in IDOL.*" {**D005449503**}

11.   When I first moved to a negative recommendation, which was based on purely macroeconomic circumstances, there had been no objection from Autonomy. However, on 11 April 2008 I sent Dr Lynch a draft of the research note mentioned in the final sentence of the previous paragraph discussing my concerns about Autonomy's reported

3

HP-SEC-02929411

organic growth. Dr Lynch sent me an email later that day claiming that my draft "*knowingly contain[ed] inaccurate information*" {**D005543469**}. I have been shown an email that Andrew Kanter, the General Counsel and Chief Operating Officer of Autonomy, sent shortly thereafter to David Knox, the head of research at Cazenove. Mr Kanter reiterated what Dr Lynch had said to me. Mr Knox replied suggesting that he and I have a face-to-face meeting with Autonomy management {**D005541956**}.

12.     The meeting took place a few days later. The discussion centred on Autonomy's assertion that my calculations were inaccurate. Dr Lynch and Mr Hussain said that the published organic growth rates had been audited. Dr Lynch further said that if we were to persist and publish our note without further consultation with Autonomy, they would see that as an attack on their advisors (which I took to be a reference to Deloitte, Autonomy's auditors) and that they would have to respond. When asked by Mr Knox whether or not Dr Lynch was threatening either Cazenove or me, Dr Lynch responded that it was not a threat, but that as a public company Autonomy needed to defend itself. We agreed that following the meeting there would be a continued dialogue between Dr Lynch, Mr Hussain and me to try and address some of the company's concerns around my research note prior to publication. Ultimately, I made a few changes to my note without changing the core message of my organic growth calculation or my concerns about growth. None of the changes that I made related to information that I knew to be wrong (as Dr Lynch's email to me had alleged). Generally speaking, the changes involved adding more clarity as to the source of my assumptions (e.g. comments from Dr Lynch or Mr Hussain during the earnings calls). Where Autonomy provided explicit evidence to counter a figure used in the note, I incorporated it. The substance of the note remained unchanged, but the back and forth with Autonomy management delayed publication and led to a much longer note being published.

13.     A further delay arose when, prior to publication, Mr Knox told me that Mr Kanter had contacted him to say that Autonomy was aware that various fund managers had audio recordings and transcripts of conversations with me, which, Mr Kanter suggested, indicated that I was in breach of FSA regulations. I have recently been shown an email exchange between Mr Knox and Mr Kanter on this issue in early May 2008 {**D005471356**}; I do not believe I saw it at the time, but it reflects what Mr Knox told me. In his initial email, Mr Kanter wrote: "*It has come to our attention that there may have been highly questionable activities going on on behalf of your analyst Daud Khan. Now that there are some official matters related to this we feel it is probably not entirely appropriate for us to continue to speak directly with Daud.*" In response to Mr Knox's request that he clarify this, Mr Kanter wrote: "*We've been made aware that a number of fund managers have recordings and transcripts of calls with Mr Khan which they consider have issues. Whilst we have no detailed knowledge of the content of the calls,*

4

*we understand that transcripts have been made available to regulators. We believe that while these are under review it is probably not appropriate to have a direct dialog with Mr Khan. Once cleared there are of course no issues. Until then though it is better to continue working with another one of your analysts.*" Mr Knox subsequently informed me that he and members of the Cazenove Compliance department had listened to the audio recordings in question and concluded that there was no substance to Mr Kanter's claims. Cazenove therefore went ahead and published my research note (on 13 May 2008).

14.    Following the publication of my May 2008 research note, Autonomy stopped inviting me to its earnings calls. Autonomy management informed Mr Knox that the reason was that they believed there was an ongoing FSA investigation into me relating to the audio recordings. However, we never heard anything from the FSA (and, as I have said, Cazenove's internal compliance team had been through the relevant tapes and found nothing untoward). Whilst I was able to listen in to the earnings calls, I was unable to ask questions of Autonomy management because the facility to do so had been disabled for me. Nor was I allowed to communicate directly with Autonomy on a day-to-day basis – see, for example, my email exchange with Mr Hussain and Mr Kanter on 13 and 17 June 2008 {**D005334083**}. My only means of communication with the company was through my colleague Stacy Pollard and later, very indirectly, through company posts on the Q&A board on their website, where Autonomy addressed some of the issues raised in analysts' research notes.

15.    At the start of 2010, I had a conversation with an investor who had met with Marc Geall, Autonomy's Global Head of Investor Relations at the time. The investor told me that he had asked Mr Geall why I was banned from meetings, to which Mr Geall had responded that he was not aware of any reason why I should be excluded. I therefore sent Mr Geall an email on 8 January saying that I would like "*to clear all this up and re-instate a professional dialogue*". Mr Geall responded a couple of weeks later, saying that I was welcome to attend the next results presentation on 3 February 2010 {**D003155492**}.

16.    Nevertheless, Autonomy management continued what appeared to me to be a vendetta against me. I learned from Peter Elwin, the head of Accounting Research at JP Morgan Cazenove, that he had attended a meeting between Dr Lynch, Mr Hussain and members of JP Morgan's investment banking team in March 2010. Mr Elwin told me that Dr Lynch had said that by implying inaccurate reporting by Autonomy[1] I was effectively accusing Autonomy management of fraud and Dr Lynch was challenging me to come out and say it explicitly. Mr Elwin also told me that Dr Lynch had offered for the first time to allow

_____

[1] As I describe in this Witness Statement, I had concerns in relation to, among other things, Autonomy's reported organic growth figures and its cash conversion rate.

5

the JP Morgan investment banking team to participate in the next Autonomy transaction if I was replaced as the JP Morgan Cazenove analyst responsible for covering Autonomy. Jose Linares, the head of Research at JP Morgan, told me that the issue was escalated to JP Morgan's head office in New York. As it turned out, despite concerns within the JP Morgan investment banking team relating to the possible loss of business were I to continue to cover Autonomy, JP Morgan senior management did not ultimately bow to Dr Lynch's pressure and I remained the analyst covering Autonomy.

17.  One issue that was of particular interest to me, and other analysts, on the Q1 2010 earnings call that took place on 21 April 2010, was the line item in Autonomy's balance sheet for the quarter identifying inventory of approximately $10 million as at 31 March 2010. $10 million was an exceptional number. I had never seen Autonomy's inventory that high. Generally speaking, inventory on Autonomy's balance sheet was $500,000 or less, so to see an amount that was at least 20 times what we were accustomed to seeing led to a number of analysts, including myself, asking questions about it.

18.  During the earnings call, Autonomy attributed the inventory to hardware that was to be used in sales of "Arcpliance", Autonomy's archiving appliance. I have been shown a copy of the transcript of the call {D002256068}. Mr Hussain acknowledged (page 6) that Autonomy's "*inventory is higher than usual at approximately $10m…and is expected to return to much lower levels in following quarters*". He added that "*the Arcpliance sales do not have the normal associated training or services as other sales and their margin is still dominated by the software element*".

19.  Later in the call I asked (page 10 of the transcript) "*what the revenue would be for that amount of inventory and when we [were] likely to see that*". In response, Dr Lynch declined to give an exact number, citing commercial sensitivity, but stated that "*the software component of the revenue [was] far higher than the hardware component. So the software [was] still the bit that dominate[d] in terms of the costs of an Arcpliance.*" The overriding message was that the value of the appliance product that Autonomy was selling was in the software, and that there would be no particular impact on gross margin when the appliances were sold. This caused me to conclude that if there was $10 million of hardware being sold in Arcpliance, the overall revenues generated by the Arcpliance sales would be between $50 million and $100 million. Dr Lynch was insistent (page 13) that the $10 million of inventory was "*not hardware revenue*" and that Autonomy had "*very little interest in just selling hardware, and consequently the revenue that that goes for is not related to the hardware cost. It's solely a component of that sale. So what we are not doing here is acting as a generic company that resells hardware, like a Morse or something like that. Obviously those people do that business and we have no interest in it. It's merely a way of allowing customers in time critical situations to get the software up and running as soon as possible …*". Morse was a UK listed company that resold third-

6

party hardware, among other things. I understood Dr Lynch to be doing no more than confirming what I already understood, namely that Autonomy was a company that operated a "pure software model". I understood that term to mean that it provided little professional services and that its business comprised mainly software licences, related maintenance and support for its licensed software, cloud revenues, and royalty revenues from its OEM (original equipment manufacturer) business. As an analyst, I certainly would not expect a self-described software company, whether "pure" software or not, to resell third-party computer hardware, let alone in material amounts (and except as a medium for the company's software).

20.    On 25 June 2010, I published a note {D002362231} in which I made reference, in the "*Revenue Guidance Q2*" section, to the $10 million of hardware related to the Arcpliance inventory. I wrote that I expected sales of that product in the region of "*$30m or greater (i.e. gross margin of 66%+) given commentary on Autonomy's question board*" (page 3). This was a conservative estimate of the revenues that I expected to be generated by the Arcpliance sales. I continued to have concerns about Autonomy's organic growth and maintained my "underweight" recommendation.

21.    Following the publication of my June 2010 note, I was informed by my compliance team that someone at Autonomy, I believe Mr Kanter, had accused me of using social media to gain access to insider information about the company through contact with ex-employees of Autonomy. This led to an investigation of my social media accounts and other forms of communications such as my emails and instant messaging applications. The allegations were found to be groundless and I was cleared of any suggestion of wrongdoing.

22.    I now understand (from the Claimants' lawyers) that in 2009 Autonomy resold approximately $53 million of third-party computer hardware (unaccompanied by any Autonomy software), that in 2010 it resold more than $100 million of such hardware and that in the first half of 2011 it resold approximately $41 million of such hardware. I first heard about the existence of such hardware sales when HP announced its huge write-down of Autonomy in late 2012. However, it was not until much more recently, in the context of Mr Hussain's criminal trial in California (in which I was asked to, and did, give evidence), that I learnt about the scale of the reselling. I was shocked. I had followed Autonomy very closely for a number of years, read all of its quarterly press releases, its annual reports and any other publicly available literature about Autonomy and had attended (or listened in to) most, if not all, of the earnings calls. However, I had no idea about the hardware reselling.

23.    I am informed by the Claimants' lawyers that Mr Hussain asserts that a JP Morgan Cazenove research note dated 25 March 2011 {D006012629} is an example of market

HP-SEC-02929415

knowledge of the fact that Autonomy derived revenue from hardware transactions. I assume that Mr Hussain is referring to the following passage at page 6 of the report under the heading "Reduction in Gross Margin and the Cloud": "*The company explains the reduction in gross margin by the unexpected shift to the Cloud but it could be explained by the sale of additional hardware in the quarter which would have increased revenue but had little impact on gross profit. Clearly this is our own assumption and not supported by commentary from management but examples of appliance sales (hardware mixed with software) early in the year sets a precedent.*" If Mr Hussain is saying that this report, which I authored, demonstrates that I was aware of the hardware reselling referred to in the previous paragraph, then he is mistaken. As I have already said, I would not expect a company like Autonomy to be reselling third-party hardware. My reference to the possibility of "*additional hardware in the quarter*" was, as is clear from the context, a reference to the possibility of further appliance sales of the kind referred to above.

24. I have been asked how my valuations of Autonomy would have been affected had such hardware resales been disclosed at the time. I can best answer that question by first describing, in outline, my approach to valuing Autonomy. I applied a multiple to an estimate of its earnings per share. The multiple used is a matter of judgement, and chosen by reference to that implicit in the price at which comparable companies in the sector are trading. In my experience, the metrics that particularly drive the choice of multiple are organic growth and gross margin. As to the former, companies that are growing rapidly tend to trade at significantly higher multiples than more slowly growing companies. As to gross margin, of two otherwise similar companies, the one with greater operating leverage (which increases with margin) will trade at higher multiples: thus, for example, software companies often attract greater multiples than hardware companies, given the much higher margins that software sales tend to achieve. A further factor is cash conversion: valuations should ultimately be built around the cash that a company is expected to generate. Earnings multiples broadly use earnings as a proxy for cash, which is often a reasonable assumption; but I had concerns about Autonomy's cash conversion rate. This, and my scepticism about Autonomy's reported organic growth, eventually led me to apply lower multiples to my earnings estimate than Autonomy was then trading at, and lower still than was implied by some of the more bullish analysts' target prices.

25. Had I known at the time of the existence and scale of Autonomy's resales of third-party hardware, I expect that my valuations would have been significantly lower, because the revenue from, and revenue growth of, the actual software business would have been lower. I would have valued the hardware reselling business separately, given its very different nature from a valuation perspective. I understand from the Claimants' lawyers

8

that the Claimants contend that the hardware resales were loss-making; if so, I would certainly have given it a negative valuation. Even if the hardware business had been breaking even, I might well have ascribed some negative value to it, given the distraction that it represented from software.

26.   The market also has an expectation each quarter about what a company's revenues and profitability will be. When a company misses those expectations, there is generally a very negative reaction from investors and the stock price can fall anywhere from 10% to 50%. The fall in stock price is based on the perception that the company has not been able to manage expectations correctly and further concern from investors that future expectations will not be met. I am asked by the Claimants' lawyers to assume that absent the hardware sales in certain quarters, Autonomy would have missed these market expectations by a considerable amount. If that is right, then had the hardware sales been transparently reported, it would have been clear that but for such sales Autonomy was experiencing much slower growth than the market expected based on its past performance.   The result would likely have been a significant adverse effect on its share price.

#### Autonomy's OEM business

27.   I have been asked by the Claimants' lawyers to address my understanding of Autonomy's OEM model.   I touched briefly on this at paragraph 9 above.   My understanding of the model was as described by Mr Hussain at page 15 of the 2010 annual report: "*IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products. IDOL is now embedded in most major software companies' products addressing most software vertical markets.   This is a particularly important revenue stream as it generates ongoing business across the broadest product set possible, in addition to up-front development licenses.*" {**D001193844**}. I therefore understood (and I believe the market understood) that IDOL OEM revenue or OEM derived revenue comprised upfront fees and "ongoing business", i.e. royalties.   Further, I understood and, I believe, the market understood that all, or nearly all, IDOL OEM revenues arose from relationships with software companies.

28.   On the Q1 2010 earnings call that I discuss above, Dr Lynch said the following (see page 4 of the transcript {**D002256068**}): "*On the OEM side of the business, we sell to virtually all of the major names in the software industry through a royalty based model.   As we've mentioned before, that business acts like a tracker fund of the software industry.   So as wider software sales increase and the number of products coming to the market increase, so you would expect OEM revenues to increase.*"   The OEM business was often described in terms of the network effect of IDOL, Autonomy's signature technology, being embedded in third-party software companies' products and thus creating a high-margin

9

royalty model giving rise to a recurring revenue model (which, as I describe in the following section, commanded a high valuation).

29. I understand from the Claimants' lawyers that Dr Lynch alleges, amongst other things, that "IDOL OEM revenues" or "OEM derived revenues" included revenues derived from sales to customers of OEM customers. That was not my understanding of the substance of IDOL OEM revenue. I do recall someone from Autonomy management mentioning, I believe off-line, after an earnings call, that OEM revenues included direct sales to customers that had purchased software from an Autonomy OEM customer. I assumed that such a sale would be related to the original OEM purchase, allowing the customer to increase the functionality of the embedded software. Given the focus of the published disclosures on sales to software companies, a royalty model and recurring revenue, making no mention of the inclusion of sales to the customers of OEM customers, I assumed that this was a minor part of Autonomy's overall OEM revenues. I do not believe that the inclusion of such revenues was common knowledge amongst analysts. It was not a standard interpretation of OEM. If such sales had been material, this would have been significant from a valuation perspective as they would have involved costs which would not arise in a royalty model, and hence would not command as high a valuation in the same way as OEM revenue as it was described in the statements made by Dr Lynch and Mr Hussain referred to above.

30. I also understand from the Claimants' lawyers that Dr Lynch alleges that "IDOL OEM revenues" or "OEM derived revenues" were not limited to sales to software companies, but that OEMs could be hardware companies or any other business incorporating software into a product for onward sale, for example a football club incorporating Autonomy software into its website, with a view to selling that website to others. I understand that Dr Lynch also alleges that OEM includes any transaction where a company makes a component or part-system that is used in another's product, including sales where Autonomy's software was installed on another company's hardware, used by another company to provide services, or rebranded and sold by a reseller. I was not aware of the inclusion of any of these types of revenues in IDOL OEM, and they do not align with my understanding, as described above, that IDOL OEM was where IDOL was embedded inside other software companies' products.

## Hosting disclosures

31. Autonomy disclosed to the market that, after its acquisition of Zantaz Inc. ("**Zantaz**") (a hosting/cloud business), it began structuring certain new hosting deals to include the sale of a software licence (instead of using the SaaS model formerly adopted by Zantaz). This practice enabled Autonomy to recognise the fees from the licence upfront, which had the effect of pulling ongoing revenue out of future quarters and into the current

HP-SEC-02929418

quarter (as one-off licence revenue). As I set out in my research note dated 13 April 2011, *"a $50m contract recognised as cloud over a five year period could represent $2.5m of revenue per quarter. The same contract recognised with a 50% license portion would represent $25m upfront and $1.25m a quarter going forward"* {**D005986333**} (page 2). I suspected at the time that if Autonomy had stuck to Zantaz's SaaS model under which revenue was recognised over the term that the hosting services were provided, Autonomy would not have met its quarterly revenue targets so comfortably (or at all). This practice of selling licences in a hosting context contributed towards my negative valuation of Autonomy; I thought that swapping future recurring revenue for immediately recognisable non-recurring revenue was unsustainable and that Autonomy's hosting business would suffer in the long-term.

32. From Q3 2009 Autonomy's quarterly reports provided *"Supplemental Metrics"* which broke down total revenue by category, including (from Q1 2010) IDOL Cloud and IDOL Product. My understanding, based on what analysts were told at the time, was that IDOL Cloud comprised recurring revenue[2]. I understand from the Claimants' lawyers that the Claimants contend that the IDOL Cloud category included not just recurring revenue streams, but also non-recurring licence revenue (i.e. some of the upfront licence fees described in paragraph 31 above). I was not aware of this at the time. I understand from the Claimants' lawyers that it appears from certain Deutsche Bank reports that the Deutsche Bank analyst covering Autonomy, Mr Geall, thought that the IDOL Cloud category contained some licence revenue. I do not know how Mr Geall came to that understanding, but I suspect that given his prior role (as Global Head of Investor Relations at Autonomy for parts of 2009 and 2010), he knew more than the rest of the market about exactly what was going into each revenue category. I believe that the market generally understood the IDOL Cloud category as I did, namely a representation of only recurring revenue streams; when a company presents you with a cloud figure, you assume it is recurring revenue, as is the norm for software companies.

33. Personally, I did not use the revenue breakdowns to value Autonomy as I did not trust what was being put into each category. I describe my approach in paragraph 24 above. However, I am aware that some analysts did use the "sum of parts" approach in arriving at their valuation; I believe this was the purpose for which the revenue breakdowns were provided by Autonomy.[3] At the time it was clear that recurring revenue streams (i.e. cloud but not licence) commanded higher market valuations – this was because they had

---

[2] For example, the 2010 annual report stated that *"IDOL Cloud delivers Autonomy's IDOL on a Software-as-a-Service (SaaS) model, which is generally invoiced monthly in arrears"* {**D001193844**} (see page 15). Dr Lynch also said, in his Chief Executive's Review, that *"[The IDOL OEM and] IDOL Cloud routes are highly attractive to us as they turn one-off sales into multi-year committed annuity streams"* (see page 4 of the same report).

[3] The *"Supplemental Metrics"* were expressly stated in Autonomy's quarterly reports to *"assist in the understanding and analysis of Autonomy's business"* {**D003523860**} (page 4).

HP-SEC-02929419

the benefit of being visible and predictable. Cloud revenue typically attracted a five to seven times valuation multiple whereas licence revenue only attracted a three to five times multiple. If Autonomy's reported IDOL Cloud revenues were being boosted by the inclusion of one-off licence fees, then analysts would have been incorrectly attributing a higher multiplier to revenue that should have been ascribed a lower multiplier. Their "sum of parts" valuation of Autonomy should have been correspondingly lower.

34.    In late 2010, software companies began shifting towards selling cloud-based deals and those companies consequently experienced a slow-down in licence growth. This trend was generally well-received by the market given that analysts valued cloud revenue higher than corresponding licence revenue. Around the same time, Autonomy began to emphasise its cloud business. I noted in my research note dated 25 March 2011 that *"Cloud was mentioned 51 times on the Q4 conference call, compared with 9 times in Q3 and twice in Q2"* {**D006012629**} (page 15). I personally think Autonomy did so to ease market fears about a drop in licence growth and because it had seen that cloud growth was being viewed positively by the market. In my research note dated 25 October 2010 I stated: *"The company indicates that growth in cloud is understating near term revenue growth for the sake of longer term recurring revenue"* (page 6). This made no sense to me given that I knew that Autonomy had, in part, moved from a longer term SaaS hosting model to a shorter term licence-based hosting model. I explained in my note that my analysis *"paints the reverse picture of a business sacrificing long term growth for short-term revenue growth"* {**D001770109**}, i.e. the pulling forward of longer term, future revenues into upfront licence fees in the short term (as addressed in paragraph 31 above).

35.    I understand from the Claimants' lawyers that Dr Lynch and Mr Hussain suggest that the publication by Autonomy of a "Commit" figure (which is said not to have included recognised revenue from hosting licences) means that, despite non-recurring licence being included in a recurring revenue category, the market was not misled about the amount of future revenue from hosting deals. Having reviewed Autonomy's quarterly reports, it appears as though the Commit figure was only published from Q4 2010 onwards and Autonomy only provided a proper definition[4] for it in Q1 2011. In any event, I do not think that Commit provided clarity in respect of future hosting revenues. Its definition included deferred revenue (for example, maintenance fees attaching to software sales), so it did not map to just recurring hosting revenue. Also, Autonomy did not tell us the drawdown, i.e. how much revenue from Commit was released to IDOL Cloud / the income statement each quarter. We had no real idea of how Commit was constructed or the time period it related to; it was therefore, at least so far as I was

---

[4] *""Commit" represents contracted revenues not yet recognised in the financial statements and includes deferred revenue"."* {**D000925907**} (page 4).

HP-SEC-02929420

concerned, a meaningless metric of little use to analysts. Importantly, hosting arrangements involve variable and unpredictable data volumes so, even assuming the Commit figure was properly understood, it could only have provided an estimate of future cloud revenues. For an insight into Autonomy's future hosting revenues, it was much more helpful to refer to the amount of recognised cloud revenue in a given quarter (drawing on the IDOL Cloud category) and, given the recurring nature of the revenue, let that inform one's view about future quarters.

I believe that the facts stated in this Witness Statement are true.

*[signature]*

SIGNED

HAFEEZ BUX DAUD KHAN

13/9/18

DATED

HP-SEC-02929421

| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | H B D Khan |
| 3. | Statement No | 1 |
| 4. | Date | 13/09/2018 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (CHD)**

**B E T W E E N:**

**(1)     ACL NETHERLANDS B.V. (AS SUCCESSOR**
**TO AUTONOMY CORPORATION LIMITED)**
**(2)     HEWLETT-PACKARD VISION BV**
**(3)     AUTONOMY SYSTEMS LIMITED**
**(4)     HEWLETT-PACKARD ENTERPRISE NEW**
**JERSEY, INC.**

**Claimants**

--and-

**(1)  MICHAEL RICHARD LYNCH**
**(2)  SUSHOVAN TAREQUE HUSSAIN**
**Defendants**

**WITNESS STATEMENT OF**
**HAFEEZ BUX DAUD KHAN**

Travers Smith LLP
10 Snow Hill
London  EC1A 2AL
Tel: 020-7295 3000
Fax: 020-7295 3500
Ref: TPR/AAK/JJB/SEL

HP-SEC-02929422

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | H B D Khan |
| 3. | Statement No | 1 |
| 4. | Date | 13/09/2018 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**B E T W E E N:**

**(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY**
**CORPORATION LIMITED)**
**(2) HEWLETT-PACKARD VISION BV**
**(3) AUTONOMY SYSTEMS LIMITED**
**(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.**

**Claimants**

**-and-**

**(1) MICHAEL RICHARD LYNCH**
**(2) SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

**INDEX OF EXHIBITS TO THE**
**WITNESS STATEMENT OF HAFEEZ BUX DAUD KHAN**

| | Paragraph | Production ID |
|---|---|---|
| 1 | 9 | D006670280 |
| 2 | 10 | D005015860 |
| 3 | | D005449503 |
| 4 | 11 | D005543469 |
| 5 | | D005541956 |
| 6 | 13 | D005471356 |
| 7 | 14 | D005334083 |
| 8 | 15 | D003155492 |
| 9 | 18 | D002256068 |
| 10 | 20 | D002362231 |
| 11 | 23 | D006012629 |
| 12 | 27 | D001193844 |

HP-SEC-02929423

|    | Paragraph | Production ID |
|----|-----------|---------------|
| 13 | 28        | D002256068    |
| 14 | 31        | D005986333    |
| 15 | 32        | D001193844    |
| 16 | 33        | D003523860    |
| 17 | 34        | D006012629    |
| 18 |           | D001770109    |
| 19 | 35        | D000925907    |

HP-SEC-02929424

# EXHIBIT E

Case 3:18-cr-00577-CRB  Document 296-1  Filed 04/17/24  Page 69 of 102


FD-302 (Rev. 5-8-10)

- 1 of 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     09/25/2018

   MARC GEALL was interviewed via telephone (1-800-356-8278).  August
Gugelmann represented GEALL during the call.  Assistant United States
Attorney (AUSA) Robert Leach and FBI Special Agent Sarah Bak also
participated in the interview.

   GEALL published his first Deutsche Bank Autonomy report for Q3 of 2010.
Sometime after this report was published in October 2010, GEALL met DEREK
BROWN for a social beer. This interaction may have been in late 2010 or
early 2011; it was likely after the acquisition, when GEALL still worked
for Deutsche Bank, and after BROWN started his new role. BROWN described
to GEALL a meeting that occurred with MIKE LYNCH, a GLG investor, PHILIP
PEARSON, and another colleague. The purpose of the described meeting was
to discuss the Q3 report written by GEALL. After the meeting, LYNCH
suggested that himself and BROWN walk back to the office. LYNCH was angry
and upset. LYNCH said how important he was and that he could get GEALL
killed.

   After GEALL published his report, he did not have any conversations
with LYNCH, nor did investor relations reach out to GEALL regarding the
report. GEALL had limited interaction with BROWN; he would have met him at
a results meeting. There was no talk about OEM or inflation of hardware
sales. GEALL believed that BROWN was well respected as an investor
relations person. BROWN had a long time relationship with AUTONOMY and he
may have advised AUTONOMY prior to the IPO. BROWN left AUTONOMY because
there would have been no need for an investor relations person anymore.

---

Investigation on  08/31/2018  at  San Francisco, California, United States  (Phone)

File #  318A-SF-2582907                                    Date drafted  09/01/2018

by  Sarah Bak

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

US_FBI_E-00027815

# TRIAL EXHIBIT

# 4422

Preparer: THM 23/01/2011
Reviewer: [            ]

IFRS 8 - Accounting for Operating Segments (FY 2010 memo)2241a: [ PAGE \* MERGEFORMAT ]/[

**Objective:** To review the conclusion reached in the prior year with regards the
appropriateness of management's conclusion that Autonomy has just one Operating
Segment; to consider what changes to the business have taken place during FY 2010
and whether they might alter the conclusion reached in the prior year; and to consider
any change to the financial and operational data provided to Dr Mike Lynch (CEO and
determined Chief Operating Officer) which might indicate that Autonomy now has
more than one Operating Segment in accordance with IFRS 8.

**Conclusion:** We concur with management's conclusion that Autonomy continues to
have just one Operating Segment, being IDOL.

### Background to Autonomy and the way the business is operated

#### *Company background*

Autonomy is a UK Listed global provider of enterprise software to the commercial
market. It currently employs around 1,800 staff and has global offices spanning North
America, Western Europe, Australia, Asia-Pacific, Japan and China.

With a market capitalisation of $5.6 billion, Autonomy resides within the FTSE 100
group of companies in the UK.

#### *Operational structure*

As a result of six historical acquisitions, Autonomy currently operates using 12
business units, which generally represent a combination of either a sub-consolidation
(relating to a previously acquired company) or an individual statutory entity (such as
Autonomy Corporation plc). These business units can be seen on the 'Current
Quarter' tab in the group consolidation template (<2272>).

These business units are used by the group to employ people legally, retain the
employment of those who have joined the group through acquisition, invoice
customers and pay suppliers.

Whilst separate financial information is prepared (quarterly) for each business unit for
the purpose of producing the group consolidation, in no way are these business units
operated or monitored like individual companies/Operating Segments.

No forecasts are prepared on a business unit basis, and those in managerial positions
within the group are not assessed or rewarded on the financial performance of
anything other than the group as a whole.

As a result of the fact that the majority of the historical acquisitions made by
Autonomy have been entire companies (as opposed to trade and assets), it is initially
the case that the business unit post acquisition resembles more of a standalone entity
than any of the other business units. However, immediately post acquisition,

Autonomy year-end group audit file (31/12/10)
Period End:  31/12/2010[ DATE \* MERGEFORMAT ] [ TIME \* MERGEFORMAT ]

Preparer: THM 23/01/2011
Reviewer: [            ]

IFRS 8 - Accounting for Operating Segments (FY 2010 memo)2241a: [ PAGE \* MERGEFORMAT ]/[

Autonomy integrates all areas of that newly acquired business into the overall Autonomy Group. Some examples of what these means in practice are outlined below:

- The acquired software is immediately integrated with Autonomy's core operating platform (IDOL), instantly improving it and adding significant value. The software is then categorised into one of Autonomy's marketed product offerings, being Promote, Power or Protect.

- The sales teams within a business unit are able to sell any of Autonomy's software anywhere in the world – in no way are they assessed or rewarded for selling just the legacy software that the acquired company previously traded with. The sales teams then meet on a global level and discuss all revenue deals that are taking place around the world – it is very much the case that Autonomy has one unified sales force that only resides and operates within these existing business units as a result of these historic acquisitions.

- The R&D team members within each business unit are part of a single centralised R&D team which is run by Pete Menell (Autonomy CRO) in Cambridge. These team members will be working on a wide range of the Autonomy R&D products, relating to any of the software offerings. The resource of the global R&D team is monitored centrally and can be pooled to work on any piece of work depending on its priority. Again, these R&D employees only reside and operate within these existing business units as a result of these historic acquisitions.

- Whilst each business unit generally has its own finance team (again a result of historic acquisitions) who are responsible for posting entries to the underlying general ledgers, the production of financial information for each business unit and the production of the group consolidation is centralised within the Cambridge finance team. This results in a highly centralised finance structure whereby the Cambridge finance team has ultimate control over all general ledgers (through direct remote access), the allocation of financial and staffing resource and even things such as control over the disbursement of all global payroll payments. Again, no individual finance team around the world is required to monitor or is assessed on the financial performance of a particular business unit.

*Control exercised and financial information reviewed by the Chief Operating Decision Maker*

As noted in our prior year Operating Segments memo (on file at 2241c), the Chief Operating Decision Maker at Autonomy is Dr Mike Lynch (CEO). We review this position in more detail below, but some examples of the way in which he monitors the business and exercises control are outlined below:

- Mike Lynch has to approve all new hires within the group;
- Mike Lynch must approve all purchase orders over $30k within the group; and
- The marketing budget is determined by Mike Lynch.

---

Autonomy year-end group audit file (31/12/10)
Period End: 31/12/2010[ DATE \* MERGEFORMAT ] [ TIME \* MERGEFORMAT ]

Preparer: THM 23/01/2011
Reviewer: [                    ]

IFRS 8 - Accounting for Operating Segments (FY 2010 memo)2241a: [ PAGE \* MERGEFORMAT ]/[

Mike Lynch also only ever reviews and considers financial and resource information at a group level, with no consideration given to individual product lines or business units.

As a result of his continued involvement in the above, Mike Lynch has the overall say in what happens to the group as a whole. It is a very unusual level of control for a FTSE 100 CEO to have but the above examples serve to reinforce the fact that Mike Lynch is clearly the Chief Operating Decision Maker of the group.

**Applicable guidance from IFRS 8**

The applicable guidance from IFRS 8 has been outlined in our prior year memo (reviewed by NAA) at **2241c** but it has been reiterated here for reference:

IFRS 8 defines an Operating Segment as a component of an entity:

- that engages in business activities from which it may earn revenues and incur expenses (including revenues and expenses relating to transactions with other components of the same entity);

- whose operating results are regularly reviewed by the entity's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance; and

- for which discrete financial information is available.

The term **'chief operating decision maker'** identifies a function, not necessarily a manager with a specific title. That function is to allocate resources to and assess the performance of the Operating Segments of an entity. Often the chief operating decision maker of an entity is its chief executive officer or chief operating officer but, for example, it may be a group of executive directors or others.

In light of this guidance, we must consider if there have been any changes to the underlying nature of the business, or the way in which the group is operated, which would require us to change the conclusion reached in the prior year with regards the number of Operating Segments and who is considered to be the chief operating decision maker. This work has been outlined below.

**Audit work performed to support the continued assumption that Mike Lynch is the Chief Operating Decision Maker**

In order to audit the continued assumption that Mike Lynch is the Chief Operating Decision Maker, we have:

- Reviewed the organisational structure of the business;

- Reviewed the board minutes to evaluate if other Chief Operating Decision Makers now exist within the organisation;

Autonomy year-end group audit file (31/12/10)
Period End:  31/12/2010[ DATE \* MERGEFORMAT ] [ TIME \* MERGEFORMAT ]

K17/366/3

Preparer: THM 23/01/2011
Reviewer: [                    ]

IFRS 8 - Accounting for Operating Segments (FY 2010 memo)2241a: [ PAGE \* MERGEFORMAT ]/[

- Attended meetings with the following people, on the following dates, to determine (amongst other things) their view on who the Chief Operating Decision Maker is:

  - o Robert Webb (Non-Executive Chairman) (Nigel Mercer met on 7 July 2010);

  - o Board of Directors (Nigel Mercer met on 7 September 2010);

  - o Jonathan Bloomer (Chairman of the Audit Committee) (Nigel Mercer met on 13 October 2010 and 17 December 2010);

  - o Mike Lynch (CEO) (Nigel Mercer met on 13 October 2010);

  - o Frank Kelly (Audit committee member, Non-Executive) (Nigel Mercer met on  2 December 2010);

  - o Sushovan Hussain (CFO) (Nigel Mercer met (amongst other times) on 12 January 2011);

  - o Andrew Kanter (COO) (Nigel Mercer met on 13 January 2011); and

  - o Pete Menell (CRO) (Tom Murray met on 20 January 2011).

- Reviewed the current level of involvement of Mike Lynch in a) setting the strategic vision of the business, b) approving the forecast and budgeting process, c) evaluating performance, d) approving internal management positions, e) bringing additional new director resource to the business, f) participating in board meetings, g) discussions with key financiers and investors, h) the day to day operations of the business including procurement decisions and recruitment decisions.

- We have also reviewed the responsibility structure of the business and noted that no person has profit and loss responsibility at any geographical level or accounting centre level; no person has authority to commit to expenditure above $10,000 without executive approval.

The result of our review in the current year indicates that there has been no change in the structure of the organisation which would lead us to conclude that Mike Lynch is no longer the Chief Operating Decision Maker. In fact it is very clear that he is actively involved in all areas of the business, making key strategic decisions on areas such as procurement, recruitment, acquisitions and communications with the market and financiers.

### Audit work performed to support the continued assumption that the group has a single Operating Segment

As outlined in the background section above, the group has gone through a number of commercial and organisational changes in the 2010 financial year, which we must consider in turn below to ensure that the conclusion reached in the prior year with regards Autonomy having a single Operating Segment is still appropriate. Note that a significant amount of audit work and documentation was carried out in the prior year to support the first year conclusion on IFRS 8, and this was signed off by Phil Barden

K17/366/4

Preparer: THM 23/01/2011
Reviewer: [          ]

IFRS 8 - Accounting for Operating Segments (FY 2010 memo)2241a: [ PAGE \* MERGEFORMAT ]/[

of NAA. As such, we are more concerned in the current year with any changes to the
business which might mean that the prior year conclusion is now no longer valid.

Each change has been considered in turn below. We then summarise with some
narrative on the underlying nature of the group which is in place at 31 December 2010
and which have been present throughout FY 2010.

### *Acquisition of Microlink LLC in Q1 2010*

In Q1 2010 Autonomy acquired 100% of the partnership units of Microlink LLC.

Microlink LLC was one of Autonomy's largest VARs before the point of acquisition.
They specialised in selling Autonomy's products into the US Federal Government
sector, which is a highly regulated area requiring specific clearance levels.

Autonomy previously had the relevant clearance themselves (as a result of the legacy
Verity acquisition) but that clearance expired in Q4 2009.

Due to the regulation inherent in the US Federal Government sector, following the
acquisition of Microlink LLC by Autonomy, the position with regards the clearance
held by Microlink LLC was put under review. This is a standard procedure when a
foreign company acquires a US company with such clearance.

In order to attempt to retain this clearance, certain Chinese walls have had to be put in
place between Autonomy and Microlink. This is so that it is not seen that a UK
company is controlling a US company who has the relevant government clearance
levels. This has involved certain measures such as a 'Proxy Board' being put in place
at Microlink, who must review the information moving between the two parties. In
addition to that, certain key members of the Autonomy executive team cannot be seen
to be issuing direct orders to Microlink.

Given the procedures which are in place we must consider whether Microlink could
be considered to be a separate Operating Segment for the purpose of Autonomy's
IFRS 8 disclosures.

Firstly, to put Microlink into perspective within the group we have outlined the
following financial line items: Revenue generated from the Microlink business unit in
2010 was $28.0 million, which represents approximately 3% of the total group
revenue balance. Accounts receivable at 31 December 2010 total $5.6 million which
represents approximately 2% of the total group trade receivables balance. As
evidenced here, the Microlink business unit represents a very small proportion of the
total group.

We have reviewed the situation with Microlink and conclude that it would not meet
the criteria for classification as an Operating Segment for the following reasons:

Autonomy year-end group audit file (31/12/10)
Period End: 31/12/2010[ DATE \* MERGEFORMAT ] [ TIME \* MERGEFORMAT ]

Preparer: THM 23/01/2011
Reviewer: [                    ]

IFRS 8 - Accounting for Operating Segments (FY 2010 memo)2241a: [ PAGE \* MERGEFORMAT ]/[

- No separate financial information on Microlink is provided to Mike Lynch
  (verified to the numerous schedules provided to Mike);

- There is no separately discernible product range sold by Microlink. As with
  any other Autonomy business unit, the Microlink sales team is able to sell any
  of the Autonomy product range, albeit to the US Federal Government;

- The financial reports produced by the Microlink finance team are no different
  to those produced by any of the other business units, none of which are
  considered to be separate Operating Segments;

- Whilst there are certain Chinese walls in place (as outlined above) we note that
  the strategic direction of Microlink and its role within the group are still under
  the full control of Mike Lynch. Whilst Autonomy must appear to take
  appropriate steps to ensure they are not seen to be controlling Microlink, it is
  ultimately under the control of the group and its Chief Operating Decision
  Maker.

### Strategic hardware sales

Since Q3 2009, Autonomy has been selling hardware products at an overall loss as
part of a wider strategic move to secure additional licence revenue from major Digital
Safe customers. The level of these sales has continued to increase on a quarterly basis
and now contribute approximately 12% of the group's revenue in FY 2010.

On the basis that it now represents a relatively significant proportion of Autonomy's
business, we must consider whether it would meet the criteria to be classed as a
separate Operating Segment under IFRS 8.

We have considered the guidance in IFRS 8 and reviewed the nature of the way in
which these hardware transactions are processed, recorded and ultimately monitored
by Mike Lynch.

Following this review, we conclude that the strategic hardware sales would not
constitute a separate Operating Segment under IFRS 8. This is based on the following
rationale:

- No separate financial information is maintained on the hardware sales and no
  separate financial information is reported to Mike Lynch (noted per a review of
  the revenue spreadsheet prepared by the CFO for Mike). Some information on
  the level of hardware sales is prepared by management for the purpose of the
  audit process, but this is not information that is regularly prepared outside of
  that process and it is not data provided to Mike Lynch as part of his decision
  making process;

- There are no specific sales teams tasked with selling strategic hardware sales;

Autonomy year-end group audit file (31/12/10)
Period End: 31/12/2010[ DATE \* MERGEFORMAT ] [ TIME \* MERGEFORMAT ]

Preparer: THM 23/01/2011
Reviewer: [                    ]

IFRS 8 - Accounting for Operating Segments (FY 2010 memo)2241a: [ PAGE  \* MERGEFORMAT ]/[

- All hardware sales are normally negotiated and closed by members of senior group management but could in theory be sold by any sales person, in the same way as the software products;

- The transactions for these strategic hardware sales (both revenue and costs) are accounted for within the Autonomy Inc business unit (which in itself is not considered to be an Operating Segment) and these transactions are accounted for like any other revenue or cost item within that business centre;

- The strategic hardware sales are predominately related to Digital Safe (IDOL) sales and are a means to generate much more lucrative future IDOL software sales. On occasion the hardware is sold pre-loaded with IDOL and in other cases it is sold to customers for use with IDOL;

- No separate information on strategic hardware sales is presented or discussed at analyst presentations; and

- No mention of these sales/this product offering is made on the company website.

### *Autonomy's internal and external product branding*

During FY 2010 Autonomy has undergone a rebranding exercise to categorise their software products into three main categories, which will allow them to better target relevant markets.

The three new categories of software offerings are outlined below:

**"Power"** – Being an infrastructure platform for understanding human-friendly data

**"Protect"** – Being a selection of legal, regulatory and compliance solutions

**"Promote"** – Being a number of multichannel, customer interaction and revenue optimisation solutions

On the basis that to a reader of the financial statements and the Autonomy website, it would appear that these could be three distinct segments of the business, we must carefully examine the extent to which this is a marketing exercise and the extent to which it actually represents a change to the organisational and financial structure of the group which impacts on the information presented to the Chief Operating Decision Maker.

Having reviewed the nature of these virtual brands, and having had a number of conversations with management, we conclude that these do not constitute Operating Segments for the purposes of the group's IFRS 8 disclosures. This is due to the following:

- No financial information is prepared by the group, which analyses out the revenues or costs associated with each brand;

Autonomy year-end group audit file (31/12/10)
Period End:  31/12/2010[ DATE  \* MERGEFORMAT ] [ TIME  \* MERGEFORMAT ]

Preparer: THM 23/01/2011
Reviewer: [                    ]

IFRS 8 - Accounting for Operating Segments (FY 2010 memo)2241a: [ PAGE \* MERGEFORMAT ]/[

- Mike Lynch is not provided with any financial information which splits out any financial results by either product or by brand – all financial information provided to Mike Lynch is aggregated at a group level;

- All Autonomy products are based on the IDOL layer, and as this is pervasive throughout all product categories, this split of products into 'brands' is nothing more than what it appears, a branding exercise;

- The categories into which different products have been allocated has changed several times in recent years depending on the most recent output from the marketing department; no such revision of the product branding has had any impact on the financial or operational nature of the group, and this latest change is no different;

- No personnel are held accountable for the performance of any of these brands, which is largely a function of the fact that there are no separate operational or financial lines associated with them; and

- Whilst these brands are discussed at analyst meetings, the level of detail divulged is only at the level whereby Autonomy identifies customers who have transacted with products in a certain brand category. As emphasised above, as no financial information is maintained on these brands during the financial year, none is available to present;

- We note that the financial information presented within the Q4 2010 press release with regards the performance of these brands are a series of estimates made by management and are not evidence of underlying financial data being maintained for each brand.

## Conclusion on the existence of one Operating Segment

As noted above, as we examined this position in considerable detail in the prior year (with a final conclusion signed off by NAA) we have been more concerned in the current year with understanding any changes to the business which might impact our conclusion for the current year. Each of these changes has been reviewed above, with the overall conclusion being that they have not changed the conclusion reached by management in the prior year, that there is a single Operating Segment - IDOL.

To summarise and conclude this memorandum, we have outlined below some of the key features inherent across the group which supports this conclusion. This is in addition to the client prepared memo on file at **2241b**, which sets out management's rationale. All of the below items have been validated through discussion with the people outlined above and through the completion of our quarterly reviews and year-end audit:

- The revenue reports provided to Mike Lynch to evaluate business performance (note that he does not focus at all on costs as they are largely fixed in nature) do not break down revenues into products, divisions or brands;

POS00168126

**K17/366/8**

Preparer: THM 23/01/2011
Reviewer: [                    ]

IFRS 8 - Accounting for Operating Segments (FY 2010 memo)2241a: [ PAGE  \* MERGEFORMAT ]/[

- No other supplementary financial data is presented to the board to evaluate performance;

- The only all encompassing financial information which is prepared by management is the monthly consolidation packs, which are used for the purpose of quarterly reporting. Note that even within those consolidation packs, information is only analysed at the arbitrary business unit level, and there is no information maintained or produced for internal purposes that separately considers product P&L, geographic P&L, company P&L or divisional P&L;

- Cash flow forecasts used for the purpose of assessing the going concern assumption and for performing the goodwill/intangibles impairment analysis are all produced at a group-wide level. They all centre on the one consolidated revenue figure and assumed costs are a percentage of that revenue figure (i.e. sales and marketing expense considered to be 12% of revenue). This further highlights the fact that the way in which Autonomy's business is run is very different to that of any other FTSE 100 companies, with the main focus being on the group consolidated revenue figure;

- IDOL is pervasive in all of Autonomy's product and business offerings;

- Functions within the business such as sales and marketing and R&D are managed centrally, each by a single member of the senior executive. Resource is allocated anywhere in the world from a single pool of staff as and when it is needed. This reinforces the point that management does not consider there to be anything that might resemble a vertical segment within the group;

- The overall organisational hierarchy is very flat, with few middle managers. Those that might be in charge of a particular area of the group would have very little autonomy anyway as a result of the fact that all purchases over $10,000 must be approved by the appropriate combination of the CTO, CFO and CEO;

- All purchases over $30,000 must be approved by the CEO. In an organisation of this size, that means that very few transactions are processed within the group without direct authorisation from Mike Lynch being required. This is a very unique and rare situation for a FTSE 100 company to be in, and serves to support the fact that this business is unlike any other in the top 250 listed companies in the UK in the way that it is operated. This top down, single focus approach to the running of the group is reflective of the fact that the whole business revolves around one core element, being the IDOL layer and it is Mike's intention to continue to evidence strong organic growth in the sales of that core technology.

As outlined in the above summary, the prior year memorandum (2241c) and our review of key business changes during the year, we concur with management's conclusion (2241b) that, in accordance with the guidance provided by IFRS 8, Autonomy continues to have a single Operating Segment – IDOL.

We have reviewed the financial statement disclosures at document 2241d.

---

Autonomy year-end group audit file (31/12/10)
Period End:  31/12/2010[ DATE  \* MERGEFORMAT ] [ TIME  \* MERGEFORMAT ]

POS00168126

**K17/366/9**

# TRIAL EXHIBIT 1274

**From:**       Sushovan Hussain [sushovanh@autonomy.com]
**Sent:**       Friday, December 10, 2010 1:19 AM
**To:**         Mike Lynch
**Subject:**    Us idol


Really don't know what to do mike. As I guessed revenue fell away completely yet SMS report
shows massive activity. But I speak with the vp's who are far more accurate. Also stouff,
Joel and mike I think keep separate sheets and unless I am v wrong don't discuss the sheets
hence plane crashes and they don't know. We've covered up with bofa and hopefully db and Doi
but if latter 2 don't happen it's totally bad. There are swathes of reps with nothing to do
maybe chase imaginary deals.

So radical action is required, really radical, we can't wait any more.

Everywhere I look at us idol it's bad.

Sent from my iPhone

1

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00353598**
Exh 1274-0001

# TRIAL EXHIBIT

# 11408



Hello, K!

US MARKETS OPEN IN:  1H 31M 14S   In the news

🔻 **Dow Jones** +1.7%    🔻 **Nasdaq** +1.74%    🔻 **S&P 500** +1.89%    🔻 **BABA** +1.1%

HOME  ›  ENTERPRISE

# Mike Lynch Kept Piranhas In The Reception Area of Autonomy's Cambridge Headquarters

**Julie Bort**  Nov 28, 2012, 7:16 PM GMT

  

As the <u>public feud between Hewlett-Packard and Autonomy's former CEO Mike Lynch</u> heats up, more details are emerging on the man and the corporate culture he built at before HP spent $11.1 billion to acquire it.



Some of it is fun. Much of it is harsh.

For instance, Lynch was a fan of fictional spy James Bond and peppered the office, and his life, with Bond references. He named  's conference rooms after Bond villains like Dr. No and  r, and he drove a Bond-like sports car, an Aston Martin.

Jump to

Main content
Search
Account

ocked a fish tank in the reception area of the Cambridge headquarters with piranhas. The vicious fish were featured in the 1967 Bond film *You Only Live Twice*.

USAO 00006299

Former employees have described Lynch as a domineering man, not above berating or humiliating people and fostering a culture where other top execs did the same. There are tales of a marketing exec who was forced to pick up cigarette butts on the sidewalks outside the Cambridge office and another told to buy underwear for the finance chief on a business trip, reports <u>the Wall Street Journal</u>.

From as far back as 2008, employees on job rating site <u>Glassdoor</u> called senior management "evil." In 2009, <u>one described the environment</u> as "bullying and intimidation" with an "almost messiah approach to company philosophy - there shall be no opinion/thoughts/views/ other than the CEO."

If Lynch does view himself as a cross between James Bond and a James Bond villain, then it looks like this scuffle with HP is going to be full of drama for months, maybe years, to come.

**Don't miss: <u>Meg Whitman Blamed A Well-Respected HP Tech Executive For The Autonomy Disaster—And That's Ruffling Feathers</u>**

---

## Read next



FINANCE

**This Morgan Stanley veteran is ready to be CEO — it just might be somewhere else**

---

Jump to

Main content
Search
Account

**Was this article valuable for you?**

 

---

USAO 00006300

Jump to

Main content
Search
Account

USAO 00006301

**INSIDER**

**BUSINESS INSIDER**

    

 

* Copyright © 2023 Insider Inc. All rights reserved. Registration on or use of this site constitutes acceptance of our Terms of

Service and  Privacy Policy .

USAO 00006302

Contact Us    |    Masthead    |    Sitemap    |    Disclaimer    |    Accessibility    |    Commerce Policy    |    Advertising Policies

|    Coupons    |    Made in NYC    |    Jobs @ Insider

Stock quotes by finanzen.net    |    Reprints & Permissions

Your Privacy Choices

International Editions:    INTL    |    AS    |    AT    |    DE    |    ES    |    IN    |    JP    |    MX    |    NL    |    PL

USAO 00006303

# TRIAL EXHIBIT

# 11189

Share    ✉   🐦   f   🔗     Save ☆



&#8220;Your job is only done when your technology is everywhere,&#8221; Mike Lynch, the chief executive of Autonomy, says

MATT LLOYD FOR THE TIMES

## Swimming fast in piranha filled waters

Monday September 20 2010, 1.01am, The Times

Mike Lynch may be one of the better-known corporate survivors of the tech bubble that burst spectacularly after the turn of the century, but he is also one of the most unlikely. Autonomy, the company that he founded in 1996 and still leads, looked destined for the scrapheap in the dark days of 2002, when its shares were valued at less than the cash it had in the bank.

Worse, Dr Lynch's high-tech view of the world and often fractious relationship with the City meant that the critics were all to happy to add insult to injury. "We had the PR-value of Neil and Christine Hamilton and a good kicking was allowed."

The experience brought out the streetfighter in the 44-year-old. "It became a spur for success ... I felt like Tony Montana in the final scene of *Scarface*.

"The real tech entrepreneurs wanted to show they were right. If money was the main motivation, Autonomy would now be a US company."

Instead, Autonomy sits alongside ARM Holdings, another Cambridge-based chip design developer, as the country's largest technology companies and is a FTSE 100 stalwart.

USAO 00005974

ADVERTISEMENT

Share     Save

## sunny future

In this blog, Harold Hutchinson, Managing Director for Alternative Energy at Investec, considers the issue of development timetables for energy tec have a solar energy blind spot? More generally, how should w evolution of energy technologies? These questions may seem

Read blog

Autonomy is still routinely linked with a takeover by an American predator, drawn to its complex software that searches corporate and government databases, but in fact it is planning to reverse the trend and acquire a sizeable business in the United States in the coming months. The takeover will likely be of an obscure company that offers the sort of potential that may baffle City analysts, Dr Lynch is adamant that he will not throw caution into the wind. He learnt of the perils of overexpansion nearly a decade ago, when the company moved next door to Marconi's offices. The failed telecoms equipment company, which transformed the industrial powerhouse GEC into a posterchild for tech-boom excess, abandoned the building soon after Autonomy moved in.

"It was quite sad," Dr Lynch said. "They left the sign up on the building and the weeds started to grow up around it."

Yet the technology sector has moved on. Last week the TechMark Index, which comprises London-listed tech stocks, hit its highest level since 2001. CSR, another Cambridge-based company, has moved into Marconi's old offices and the so-called Cambridge Corridor — Britain's Silicon Valley — has a new vibrancy.

Dr Lynch argues that the sector has had to bide its time for the world to recognise its potential. "What we are doing is exactly what we said we would when we listed in 1998. Humanity always underestimates change but overestimates the speed with which it will happen. People will look back in 50 years' time at the period between 1999 and the next five years with awe."

SPONSORED


How those w ... t Vanessa Kirby channels panther spirit in a writ


new role

Autonomy's software finds patterns in the vast silos of data — including voice mails, internal documents and e-mails — that companies and governments store. This can be used for an array of complicated tasks, from tracking terrorists who have yet to be identified to uncovering dangerous problems with products. It was used to unpick rapidly the scandal at Enron by

USAO 00005975

revealing that certain staff had sent e-mails to external accounts and also helped to trace the activity of the Société

Share            Save

The software is based on the work of the Rev Thomas Bayes, an obscure 18th-century mathematician — indeed, the walls of Autonomy's offices feature images of some of history's greatest boffins. The foyer features Alan Turing and Descartes, the lifts display likenesses of Galileo and Euclid, and the physicists Wolfgang Pauli and Paul Dirac gaze out from the lavatory walls.

The celebration of what Dr Lynch calls "boffinism" is capped off with a lurid neon sign that displays the Bayesian logarithm. It is a world away from a traditional British corporate headquarters where a portrait of the chairman looms large over the boardroom.

The company also has a large tank filled with piranhas in the main atrium, and the fate of the predatory fish makes for a good analogy of the UK tech sector. "It's a horrible life being a piranha. As soon as one shows any sign of weakness, it won't be there in the morning. And as they get bigger, you end up with the one-piranha problem."

ADVERTISEMENT

It is lesson Dr Lynch is keen to remember. He has the graphic of a tombstone on his computer with the names of 40 companies that claimed to be "like Autonomy" before going bust or being absorbed by larger fish.

Autonomy does almost all its research and development in Cambridge and not in Silicon Valley, where its American peers operate. "We're sitting on a goldmine and we just need to get to the gold." A remark made, fittingly, in the Goldfinger Room, since Autonomy's meeting rooms are named after Bond villains.

Dr Lynch is proof that the long-term benefits of working in technology can be fruitful. He is ranked 162nd in *The Sunday Times* Rich List, with a £427 million fortune.

And he has no intention of leaving the company. "Your job is only done when your technology is everywhere." The company has taken steps to achieve that lofty aim after launching a product this year that uses its meaning-based search software to help companies to sharpen their marketing and sales efforts. It has even started to sponsor the shirts of Tottenham Hotspur to raise its profile.

USAO 00005976

Share    ✉    🐦    f    🔗    Save

Dr Lynch says that the trick to making sure that Autonomy is a long lived piranha is to maintain the attitude of a nimble fish:

predict exactly what will happen. We need to innovate, play around with things, respond quickly and reward people for being radical. We should never listen to the 86 reasons why something is a bad idea."

That is another lesson learnt from Marconi/GEC, where Dr Lynch worked one summer as a 16-year-old in the early 1980s. "There were amazing technological people there, but it was run by accountants," he said. "Bright ideas just wouldn't be pursued."

But bright ideas can earn a special fame, far greater than that of the mere plc chairman. If Dr Lynch achieves his ambition of making Autonomy's technology ubiquitous, along the lines of the offerings of Intel or Google, then his portrait may yet appear at Autonomy's HQ, whether he likes it or not.

ADVERTISEMENT

### Q & A

#### Who, or what, is your mentor?

John McMonigall for business and Dr Peter Rayner for research

#### Does money motivate you?

Only in as much as it allows you to back great ideas

#### What was the most important event in your working life?

Meeting the people who turned out to be my senior colleagues

ADVERTISEMENT

#### Which person do you most admire?

USAO 00005977

The Rev Thomas Bayes — an unsung, 18th-century hero whose work is now fundamentally changing the way that we think



Share    ▪   🐦   f   🔗      Save

**What gadget must you have?**

An obscenely large disk drive — we pass this way but once so let's record it — and the augmented reality handset, still being invented

**What does leadership mean to you?**

Providing clarity of vision and purpose

**How do you relax?**

I have two of the world's dimmest, untrainable dogs I try to teach new tricks

### CV

**Birth** June 16, 1965

**Education** Bancroft's School, Christ's College Cambridge

**Career**

**1991-2005** Neurodynamics (managing director, then board member) — company sold

**2000-2004** NCorp (founder, board member) — company sold

**1999-2004** Neurascript (founder, board member) — company sold to Dicom plc

**1996 to present** chief executive officer, Autonomy

**Boards and advisory roles**

**2001-2004** board member, Apax Partners; advisory board member Carlyle Group

**2000-2004** non-executive director Avocet

**2000-2002** non-executive director Paradigm Media Investments

**Current**

chief executive officer, Autonomy; advisory board member, APAX Partners;director, Foundation of Science and Technology; non-executive director, BBC; non-executive director, blinkx plc; non-executive director, Featurespace; trustee and chairman of the investment committee, the National Endowment for Science, Technology and the Arts

## Comments for this article have been turned off

Comments are subject to our community guidelines, which can be viewed here.

BACK TO TOP

USAO 00005978

Get in touch

| | |
|---|---|
| About us | Contact us |
| Help | The Times Editorial Complaints |
| The Sunday Times Editorial Complaints | Place an announcement |
| Classified advertising | Display advertising |
| The Times corrections | The Sunday Times corrections |
| Careers | |

More from The Times and The Sunday Times

The Times e-paper

The Sunday Times Wine Club

The Times Archive

Sunday Times Driving

The Sunday Times Rich List

Good University Guide

Newsletters

Best Places to Stay

Podcasts

Times Luxury

Best Places to Work

© Times Media Limited 2023.
Registered in England No. 894646.
Registered office: 1 London Bridge Street, SE1 9GF.

| | |
|---|---|
| Privacy & cookie policy | Licensing |
| Site map | Topics |
| Authors | Commissioning terms |
| Terms and conditions | |

USAO 00005979

# TRIAL EXHIBIT

# 11402



UK NEWS WEBSITE OF THE YEAR

# The Telegraph



News    Sport    Money    Business    Opinion    Israel    U

**Manage your account here**

We've made it easier for you to update your details, choose your newsletters, contact us and more.

# Profile: Mike Lynch, Autonomy founder

"I've never yet come across an engineer that can turn                    d Sugar on his BBC show The Apprentice.

*By* Richard Tyler

18 August 2011 • 8:14pm

   



'Engineer' Mike Lynch, 45, has just proved that pet theory wrong.

A man of numbers, labelled "Britain's Bill Gates", who likes nothing better than a pint of beer in his local pub in rural Suffolk, spent much of his Cambridge PhD and subsequent fellowship studying the work of an 18th Century vicar, Thomas Bayes, who dedicated own his life trying to prove the existence of God through mathematics.

Bayes pattern recognition techniques proved more useful at pulling meaning from electronic information than from scripture, Lynch found, and after developing a system for matching fingerprints for the Essex police force and another for reading car number plates, he set up Autonomy in 1996 to exploit the problem of unstructured data.

"Autonomy makes technology that allows computers to understand what information means," Lynch says simply, after complaining that it took at least three presentations before City analysts really got the potential of what he was doing.

Lynch turned that observation into a FTSE 100 software company now worth a putative $10bn, serving 16,000 clients that range from Nestle and the BBC to NASA and the US Department of Homeland Security.

He mixed a hard headed, blunt approach to business with a sense of humour derived from his Irish roots and early years growing up in Chelmsford, Essex.

Visitors to Autonomy's Cambridge head office are treated to conference rooms named after Bond villains, from Goldfinger to Dr No.

USAO 00006243

Worth around £400m according to the Sunday Times rich list even before any deal with HP, Lynch will now give Goldfinger a run for his money.

Born in Tipperary, his parents – his father, a fireman; his mother a nurse – moved to Essex when he was still a child. His intelligence helped him prosper, securing a scholarship to the nearby public school Bancroft's.

Lynch credits his early years with defining his choice of careers. "One of the reasons I ended up where I am today is that I didn't know what a solicitor or an accountant did. We didn't have any in my family or social circle." He built a business instead.

Growing Autonomy rapidly through acquisition – the last of US content management rival Interwoven for £559m in 2009, Lynch was long feted as the founder of Britain's leading technology company (before microchip specialist and Cambridge peer ARM Holdings joined the party).

Yet he also had his doubters. Likened to Manchester City – before its billions – by one noted City commentator in 2001, Lynch has had to fight hard to win credit from the City.

A public row that year with Merrill Lynch, the investment bank, did not help. One of the bank's analysts suggested Autonomy had lost key staff to Microsoft and that the US giant was developing rival products. Lynch hit the roof and formally complained to the London Stock Exchange about Merrill's comments.

"It is just about the worst thing that could happen," he complained. The City promptly closed ranks. Yet Lynch was right and Merrill formally apologised for factual errors in its advice note.

Now known as a man with a "dismissive view of technology awareness among City professionals" and "academic arrogance", Lynch battled on and Autonomy prospered.

Then a warning last October that its third quarter revenues would disappoint spooked investors and Lynch's standing again fell in line with Autonomy's stock.

One Deutsche Bank analyst – a former Automony senior manager – piled in. His critique was damming: "The management structure, control and systems at Autonomy are more representative of a start-up than a major global player," he wrote.

The City prefers professional managers groomed at BP and Proctor & Gamble. Hedge funds piled in, shorted the stock, despite rumours as early as last September that a US company was preparing a £5bn bid. At the time Lynch said: "We're sitting on a gold mine and we just need to get to the gold." It appears, almost a year on, he now has.

USAO 00006244

So Lynch appears to have had the last laugh. Unlike Lord Sugar, he is bullish about the UK's prospects and the international reach of its talented engineers and Autonomy's presence in the UK has also helped restore some confidence in the country's ability to commercialise its scientific ideas.

In a twist of fate that would appeal to Lynch's sharp sense of humour, Bayes is buried in Bunhill Fields, a stone's throw from London's Old Street, now dubbed Silicon Roundabout for its cluster of technology companies.

Lynch has admitted that he is a work-a-holic, enjoying the challenge of running a global business from the UK; waking up with Asia and going to bed talking to colleague on the West Coast. His laptop sits on his bed side table.

His strategy for coping with this pressure? "I live in rural Suffolk, which is a place that is 50 years back in time, and the conversation down the pub is the same as it has been for the last 100 years, which is how do you catch moles – which is a great unsolved problem, a bit like Fermat's last theorem was – and I find that when I am there and turn off the device, that's what gives me my recharge."

If the HP deal goes through, Lynch may have more time to tackle those problem moles.

---

## Breaking News Alerts Newsletter

Sign up to receive instant updates on the biggest news stories



Sign up

   

### More stories

 **Watch: Just Stop Oil protesters smash National Gallery painting**

 **BBC won't call Hamas terrorists because it fears losing access, Kirsty Young suggests**

 **Captain Tom Moore's family forced to demolish spa pool after losing planning appeal**

---

USAO 00006245

 **Former Hamas chief 'behind pro-Palestine Armistice Day protests'**

 **Tottenham's standing ovation after crushing Chelsea defeat summed up the madness**

 **Elderly poppy seller 'punched and kicked' by pro-Palestine protesters**

## More from The Telegraph

 **US offshore wind is holed and sinking**

 **Daily pill cuts breast cancer risk by half**

 **WeWork files for bankruptcy with liabilities of up to $50bn**

 **What I've learned since the attacks on Israel: people don't deem Jews worthy of solidarity and empathy**

USAO 00006246



**Met Police begs pro-Palestine activists to call off Armistice Day march**



**Israel's custom-built tanks are about to prove their worth in Gaza**

# More stories



**'If I was "contracted out" of the extra state pension, can I top up my contributions now?'**

 BECKY O'CONNOR

❝ 7 Nov 2023, 10:00am



**Harry and Meghan fly to Katy Perry concert on private jet – report**

*By* Telegraph Reporters

7 Nov 2023, 1:29am



**Daily pill cuts breast cancer risk by half**

*By* Laura Donnelly

7 Nov 2023, 12:01am

USAO 00006247

Profile: Mike Lynch, Autonomy founder

 

### Cary Grant's British accent to be heard for first time in new ITV drama

*By* Anita Singh

7 Nov 2023, 12:01am



### What is anastrozole and am I eligible for the breast cancer drug? All your questions answered

*By* Laura Donnelly

7 Nov 2023, 12:01am



### Could this pill do for breast cancer what statins did for heart disease?

*By* Laura Donnelly

7 Nov 2023, 12:00am

The Telegraph

Back to top ⌃

Follow us on:      

Help Centre

About us

Telegraph Extra

Reader Prints

Branded Content

Syndication and Commissioning

Guidelines

Privacy

Terms and Conditions

Advertising Terms

Fantasy Sport

UK Voucher Codes

Betting Offers

Modern Slavery

Tax Strategy

Broadband and Mobile Deals

USAO 00006248

Wine Cellar

The Chelsea Magazine Company

Manage Cookies

© Telegraph Media Group Limited 2023

USAO 00006249