# EXHIBIT 4

| SW-09-028 – MicroLink, LLC ("IBM/Ameriprise") ||
|---|---|
| Amount of sample item: | $3.825 million |
| Period initially recognised: | Q3 2009 |
| Date of contract: | 30 June 2009 |
| Total contracted amount: | $4.016 million |

**Summary of the transaction**

This transaction is respect of a Purchase Order ("**PO**") raised by MicroLink, LLC ("**MicroLink**") on 30 September 2009[1].  Although not specified in the PO, I assume that this PO was issued pursuant to a master "*Autonomy Government Reseller*" agreement between Autonomy and MicroLink[2].

The MicroLink PO named "*IBM*" as the end user of the software set out therein, which was described as "*Digital Safe limited to 20,000 Mailboxes*"[3].

On 30 September 2009, Autonomy recognised licence revenue of $3,825,000 in relation to the MicroLink PO, reflecting c.95% of the total value of the MicroLink PO.  The remaining c.5% of the value of the MicroLink PO was recorded as deferred maintenance revenue.

IBM was, at the date of the MicroLink PO, already a client of Autonomy.  In April 2002, IBM and Autonomy had entered into a Master Statement of Work (as amended) (the "**Master Statement of Work**"), subject to which Autonomy would provide a "*Digital Safe service*"[4,5].  The "*Digital Safe service*" was billed based on IBM's usage, derived from an agreed price per megabit of data retained or deleted[6].

In Q2 2009, Autonomy and IBM were in negotiations to restructure their existing contract.  In a proposal "*Last modified*" on 26 August 2009, Autonomy set out a restructuring proposal, in which the per megabit cost to IBM of data retention was reduced from c. $0.08 per megabit to c. $0.0008 per megabit.  This cost saving to IBM was partially offset by the proposal requiring IBM to purchase a Digital Safe licence from Autonomy at a cost of $4,000,000, however based on IBM's estimated future data retention levels, the proposal projected an overall $1.4 million cash saving to IBM over the duration of the proposed 3-year term[7].

---

[1] HP-SEC-02069302 to HP-SEC-02069308
[2] HP-SEC-01989644 to HP-SEC-01989659
[3] HP-SEC-02069302
[4] HP-SEC-02072990
[5] Autonomy's "*Digital Safe service*" was described as "*designed to archive electronically transmitted mail, documents and transaction in a non-tamper able format which may be retrieved by various search criteria.*  [Autonomy] *provides the service of managing and storing e-documents, and e-messages* […]" (HP-SEC-02072990)
[6] See HP-SEC-02069315 for a summary of IBM's "*Current Contracted Rates*" with Autonomy
[7] HP-SEC-02069315

| **SW-09-028 – MicroLink, LLC ("IBM/Ameriprise")** |
|---|

No restructuring was completed with IBM in Q3 2009[8] and discussions continued into Q1 2010.  A revised proposal was then circulated on 13 March 2010 in respect of which it was noted that "*IBM is in agreement*"[9].  The revised proposal was for a shorter duration (two years rather than three) and the licence cost was reduced from $4,000,000 to $2,571,000.  However, the much-reduced data retention rates were unchanged from previous iterations of the proposal, and the projected cash saving to IBM over the reduced term was of similar magnitude, being $1.2 million.

On 31 March 2010, Autonomy and IBM executed an agreement titled "*Amendment #06 to Statement of Work #4904T4001*"[10] (the "**IBM Contract Restructure**").  The software and services itemised in the IBM Software Restructure aligned with the software itemised in the PO with MicroLink, however the price of the software and services itemised in the IBM Contract Restructure was $2,699,550, comprising:

- "*Program Product License Fee for ZANTAZ Program Product*": $2,571,000 (the "**IBM Licence**"); and

- "*Annual Maintenance and Support Fees*": $128,550; and

The IBM Contract Restructure also set out "*Monthly Storage Fees*" of between $0.00079 and $0.000067 per megabit per month.

The general ledgers of Autonomy record that IBM settled the amounts due in relation to the IBM Contract Restructure on 30 June 2010.  The general ledgers also record that the debtor balance related to the MicroLink PO was reduced by $2,699,550 on the date of the IBM Contract Restructure, and that the remaining outstanding amount of $1,316,700 owed by MicroLink was converted to an intercompany debtor on 31 March 2010, following Autonomy's purchase of MicroLink on 4 January 2010.

**Issues identified by Mazars**

**A.  The transaction did not meet the revenue recognition requirements of IAS 18.14**

In my view the transaction did not meet the revenue recognition requirements of IAS 18.14 for the following reasons:

   a) at 30 September 2009, Autonomy retained managerial involvement of the software set out in the MicroLink PO, thereby failing to satisfy the criterion of IAS 18.14(b).  I have reached this conclusion because:

---

[8] HP-SEC-02069309
[9] HP-SEC-02070303
[10] HP-SEC-02072971

| SW-09-028 – MicroLink, LLC ("IBM/Ameriprise") |
|---|

    i. the Master Statement of Work already gave IBM access to the Digital Safe service[11] and in its direct negotiations with the IBM, Autonomy proposed the sale of a perpetual licence of Digital Safe as part of a restructure of this pre-existing agreement.  It is my view that the only rational route through which a sale of a perpetual licence of Digital Safe to IBM was possible was as part of a restructuring of the Master Statement of Work[12], and this was something that only Autonomy could have negotiated; and

    ii. Autonomy continued to negotiate the sale of the items set out in the MicroLink PO directly with IBM even after the MicroLink PO had been submitted.  These negotiations[13] continued until 31 March 2010, on which date executed the IBM Contract Restructure with Autonomy directly, as opposed to via MicroLink; and

b) at 30 September 2009 it was not reasonable to conclude that Autonomy would receive an inflow of economic benefit from MicroLink in relation to the MicroLink PO, and as such the transaction did not satisfy the criterion in IAS 18.14(d).  I have reached this conclusion because:

    i. at 31 October 2009 (1 month after SW-09-028 had been recognised as revenue) MicroLink had[14]:

- net liabilities of $2,415,874;
- net current liabilities of $3,038,583; and
- cash of only $362,069;

    ii. MicroLink's ability to settle amounts due to Autonomy appears to have been contingent on Autonomy first making purchases of software from MicroLink.  In 2009, Autonomy made the following purchases from MicroLink:

- a purchase of MicroLink's Search Analysis Tool ("**SAT**") software for $4,100,000.  This purchase was completed in Q1 2009 (i.e. prior to SW-09-028); and
- a purchase of resale and distribution rights in respect of MircoLink's Autonomy / SharePoint Integration Suite for MOSS ("**AIS**") software for $5.2 million.  This purchase was completed in Q3 2009; and

    iii. whilst Autonomy and MicroLink's "*Autonomy Government Reseller*" agreement[15] did contain a clause stating that MicroLink "*shall not be relieved of its obligations to pay*

---

[11] HP-SEC-02072990
[12] As otherwise IBM would be, in substance, paying twice for the same software
[13] Which included, *inter alia*, negotiations on price (HP-SEC-02069980) and technical specifications [ref]
[14] HP-SEC-01955881
[15] HP-SEC-01989644 to HP-SEC-01989659

| SW-09-028 – MicroLink, LLC ("IBM/Ameriprise") |
|---|
| *fees owed to Autonomy hereunder by the non-payment of such fees by an End-User* […]"[16], it is not clear that this contractual protection was applicable to SW-09-028 as the "*End-User*" (IBM) was not a government body[17]; <br><br> iv. I have been unable to identify that Autonomy ever received an inflow of economic benefit from MicroLink in relation to SW-09-028: <br><br> • my review of the general ledgers of Autonomy has identified that on 30 June 2010 Autonomy received cash of $2,699,550 in relation to the IBM Contract Restructure. This amount was received from IBM rather than MicroLink; and <br><br> • the remaining amount of $1,316,700 owed by MicroLink in relation to the PO was converted to an intercompany balance following Autonomy's purchase of MicroLink. I have not identified that this amount was ever settled. <br><br> My opinion that revenue should not have been recognised on SW-09-028 in Q3 2009 is consistent with the findings of the Honourable Mr Justice Hildyard, who concluded in relation to this transaction "*Revenue recognition in respect of the VAR sale was wrong. That is so notwithstanding the approval of that accounting by Deloitte and the Audit Committee*" [18]. <br><br> **B. The MicroLink PO had no economic substance** <br><br> Notwithstanding the above, it is also my view that the MicroLink PO did not have economic substance. I have reached this conclusion because: <br><br> a) the email correspondence I have seen in relation to SW-09-028 shows an ongoing discussion between Autonomy and IBM[19] throughout September 2009[20] regarding a "*Licence PCR for Ameriprise*". These discussions continued until 30 September 2009, on which day Ms Samantha Seabolt of IBM emailed Mr Jim Krakowski of Autonomy saying "*Jim, I am sorry to have to tell you we will not be able to get sign off today*"[21]. As noted by the Executive Counsel of the FRC, the fact that "*Autonomy had sought but failed to sell a licence to a specific end-user in a particular period, the end-user being an existing direct customer of Autonomy*" was a factor which "*should have raised serious concerns about the commercial substance of the sales*"[22]; |

---

[16] Autonomy Government Reseller agreement, clause 5.5 "*Payment*"; HP-SEC-01989644 to HP-SEC-01989659

[17] The customers covered by the Autonomy Government Reseller agreement were "*Federal Government*", "*State Government*" and "*Local Government*", with "Other" customers expressly excluded. Autonomy Government Reseller agreement, clause 3.2 "*Territory*"

[18] Civil Judgement, VAR Schedule Part I to V, paragraph 17(7)

[19] A pre-existing client of Autonomy, see Master Statement of Work dated 1 April 2002 (HP-SEC-02072990 to HP-SEC-02073003)

[20] HP-SEC-02068173 being an email from Mr Jim Krakowski (Autonomy) to Ms Samantha Seabolt (IBM) on 2 September 2009

[21] HP-SEC-02069309

[22] FRC Sanctions, paragraph 388. I note that the FRC Sanctions did not specifically relate to SW-09-028

| SW-09-028 – MicroLink, LLC ("IBM/Ameriprise") |
|---|
| b) the first email correspondence I have seen between MicroLink and Autonomy in relation to SW-09-028 was an email from Mr John Cronin to Mr Mike Mooney and Ms Cynthia Watkins at 6.28pm on 30 September 2009[1], the last day of Autonomy's quarterly reporting period.  The MicroLink PO was then submitted less than two hours later, at 7.49pm[23].  The speed at which the PO was finalised, alongside the fact that the PO was raised on the last day of Autonomy's reporting period, calls into question the economic substance of the PO.  Indeed, the Executive Counsel of the FRC noted Autonomy having "*sold the software to a VAR on the last day of the period and produced [m]anagement accounts which recognised the whole of the revenue on that sale in that period*" was a factor which "*should have raised serious concerns about the commercial substance of the sales*"[24]<br><br>c) at 11.16pm, Autonomy emailed the account "*po1358@microlinkllc.com*" informing it that its "*Autonomy Zantaz software per PO 00001358 is ready on Autonomy CSS*".  However, as explained above, the substance of the MicroLink PO (and subsequent IBM Contract Restructure) was not for a perpetual licence of Autonomy's software but instead related to IBM's right to use certain technology for a set period of time.  As such the 'delivery' of software to MicroLink in anticipation of MicroLink's eventual on sale of the software to the end-user does not accord with the substance of the intended eventual transaction with IBM;<br><br>d) the purported economic substance of the MicroLink PO was that MicroLink had assumed the risks and rewards of ownership the itemised Autonomy software, with intention that it (MicroLink) would then re-sell the software on to IBM.  This purported economic substance is undermined by the fact that on 2 October 2009 (i.e. two days after the MicroLink PO), Autonomy re-commenced its direct communications with IBM in relation to the sale of the same software itemised in the MicroLink PO[25].  Moreover, when IBM eventually did sign the IBM Contract Restructure, it was (a) an amendment to a pre-existing contract between Autonomy and IBM[26], as opposed to being a separate agreement between MicroLink and IBM and (b) was for a value some $1,316,700 lower than the value set out in the MicroLink PO[27]; and<br><br>e) IBM was a pre-existing customer of Autonomy and already had access to the software set out in the MicroLink PO via its master Statement of Work.  As explained above, it is my view that the only rational route through which a sale of the software set out in the MicroLink PO was possible was as part of a restructuring of this Master Statement of Work, a process which would have required a direct agreement between IBM and Autonomy, rather than a reseller such as |

---

[23] HP-SEC-02072971
[24] FRC Sanctions, paragraph 388.  I note that the FRC Sanctions did not specifically relate to SW-09-028
[25] HP-SEC-02069309; Email from Mr Jim Krakowski (Autonomy) to Ms Samantha Seabold (IBM), 2 October 2009
[26] Being "*Amendment #06 to Statement of Work #4904T4001*"; HP-SEC-02072971
[27] Being the total value of the MicroLink PO ($4,016,250) as compared to the total value of the IBM Licence Contract ($2,699,550)

| SW-09-028 – MicroLink, LLC ("IBM/Ameriprise") |
|---|

      MicroLink.  In my opinion this calls into question the economic and commercial substance of the MicroLink PO.  Whilst not stated in respect of this transaction specifically, I note that in the FRC Sanctions, the Executive Counsel to the FRC identified that one of the conditions which "*should have raised serious concerns about the commercial substance of the sales*" was where "*Deloitte had little to no evidence as to* […] *any rationale for why the end-user would purchase software from the VAR (rather than Autonomy)*"[28];

  f) I understand that it is alleged both Autonomy and MicroLink understood that, notwithstanding the terms of the MicroLink PO, MicroLink would not be left financially exposed should no deal with an end-user eventuate.  I further understand that:

      i. the purchases made by Autonomy of MicroLink software are alleged to have been undertaken for the purposes of providing MicroLink with a source of funds from which to clear its debts to Autonomy, rather being undertaken due to Autonomy's need for the purchased software; and

      ii. Autonomy's acquisition of MicroLink on 4 January 2010 was primarily driven by Autonomy's desire to relive MicroLink of its debts to Autonomy and to provide the owners of MicroLink with a further source of funds from which to make further purchases of software from Autonomy[29];

If these allegations are found to be correct, this further undermines the economic substance of the MicroLink PO.

IFRS requires that transactions are accounted for in a manner which reflects their economic substance and not merely their legal form.  It is my view that the MicroLink PO had no economic substance and as such I do not consider that any accounting entries should have been made in relation to it.

**C. The substance of the IBM Contract Restructure was not the sale of a good but was instead the provision of an ongoing hosting service**

For the reasons set out above, it is my view that the only rational route through which a sale of a perpetual licence of Digital Safe to IBM was possible[30] was via a restructuring of the Master Statement of Work, as subsequently eventuated in the IBM Contract Restructure.  To that end, I note that, in my opinion, the IBM Contract Restructure did not relate to the sale of a good but rather the provision of an ongoing hosting service.  I have reached this conclusion because:

  a) the terms of the IBM Contract Restructure confirmed that nothing within it would "*reduce, diminish or otherwise affect the extent and level of* [hosted Digital Safe services] *as provided*

---

[28] FRC Sanctions, paragraph 388
[29] See SW-09-033
[30] As envisaged in the MicroLink PO

| SW-09-028 – MicroLink, LLC ("IBM/Ameriprise") |
|---|
| to IBM by [Autonomy] *immediately prior to the* [IBM Contract Restructure]"[31].  As such, the inclusion of the IBM Licence in the IBM Contract Restructure did not amend or reduce any of Autonomy's responsibilities or obligations to IBM in relation to the pre-existing hosted "*Digital Safe services*";<br><br>b)  whilst the timing of the payments changed, the net effect of the IBM Contract Restructure was an anticipated cash saving to IBM of around $1.2 million[32].  As such, from IBM's perspective, the IBM Contract Restructure meant that it would receive the same service from Autonomy for less money.  In my view this suggests that the provision of the IBM Licence was incidental to IBM entering the IBM Contract Restructure;<br><br>c)  the IBM Contract Restructure confirms that the IBM Licence is not provided on a perpetual licence but was instead being provided for a two year period ending on 31 March 2012[33].  Moreover, the iterations of the proposals circulated by Autonomy to IBM make it clear that the value of the licence to be included in the restructuring was variable depending on the duration of the revised term agreed.  Both of these suggest that the IBM Licence was not a "sale of a good" where the rewards of ownership passed to IBM at the date of the IBM Contract Restructure, but was instead an element of an ongoing service that Autonomy provided over the agreed term.<br><br>Moreover, IAS 18.13 requires that transactions be accounted for together when their commercial effect cannot be understood without reference to the series of transactions as a whole.  As IBM already had access to the software set out in the IBM Licence via the Master Statement of Work, in my view it would not have made commercial sense for IBM to have purchased the IBM Licence without simultaneously agreeing to the components of the IBM Contract Restructure (i.e. the reduced data retention rates).  It is therefore my view that all of the elements of the IBM Contract Restructure should be accounted for together.<br><br>As such, in my opinion the IBM Contract Restructure should have been recognised as revenue on a straight line basis over the duration of the IBM Contract. |

---

[31] IBM Contract Restructure, Clause 3.0 (HP-SEC-02072971)
[32] HP-SEC-02070303
[33] IBM Contract Restructure, Clause 8.0 (HP-SEC-02072971)

**mazars**                                                                 **Software Focus Transaction SW-09-028**

| **SW-09-028 – MicroLink, LLC ("IBM/Ameriprise")** |
|---|
| **Conclusion and proposed adjustment** |
| In my opinion SW-09-028 did not satisfy the revenue recognition criteria of IAS 18 and the revenue recognised in Quarter 3 2009 in relation to SW-09-028 should be reversed. |
| In my opinion the eventual sale to IBM, set out in the IBM Contract Restructure did meet the revenue recognition criteria of IAS 18 regarding the provision of a hosting service over a set period of time.  As such the consideration due in relation to the IBM Licence should be recognised as revenue on a straight line basis over the 24 month period 1 March 2010 to 31 March 2012. |
| My adjustment is summarised in the table below: |

| SW-09-028 – MicroLink, LLC ("IBM/Ameriprise") | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Q1 2009 $000 | Q2 2009 $000 | Q3 2009 $000 | Q4 2009 $000 | Q1 2010 $000 | Q2 2010 $000 | Q3 2010 $000 | Q4 2010 $000 | Q1 2011 $000 | Q2 2011 $000 |
| **Original accounting** Revenue | | | 3,825 | | | | | | | |
| **Proposed adjustment** Revenue | | | (3,825) | | | 321 | 321 | 321 | 321 | 321 |
| **Adjusted accounting** Revenue | | | | | | 321 | 321 | 321 | 321 | 321 |