# EXHIBIT 6

United States

V

(1) Michael Richard Lynch
(2) Stephen Chamberlain

---

## Summary of independent expert accounting opinions of Steven Brice FCA

## 3 January 2024

---



**Private & Confidential**

United States Attorney's Office
11th Floor, Federal Building
450 Golden Gate Avenue, Box 36055
San Francisco
California 94102

Date:        3 January 2024

Dear Sir / Madam

**United States V (1) Michael Richard Lynch (2) Stephen Chamberlain**

I have been instructed as an Independent Expert Accountant by the United States Attorney's Office in the matter of United States versus Dr Michael Richard Lynch and Mr Stephen Chamberlain.  Dr Lynch is the former chief executive officer of Autonomy Corporation plc and Mr Chamberlain is the former vice president of finance.

I understand that my duty as an Independent Expert Accountant is to help the Court by giving independent assistance by way of objective, unbiased opinion on matters within my expertise, both in preparing reports and giving oral evidence.  I understand that this duty overrides any obligation to the party by whom I am engaged or the person who has paid or is liable to pay me.  I confirm that I have complied with, and will continue to comply with, that duty.

I confirm that I have not entered into any arrangement where the amount or payment of my fees is in any way dependent upon the outcome of the case.  I know of no conflict of interest of any kind which would prevent me from acting in this matter.

I confirm that the contents of this summary report are true to the best of my knowledge and belief and that the opinions I have expressed represent my true and complete professional opinion.

Yours faithfully

**Steven Brice**
Partner



**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**

**Summary of independent expert accounting opinions of Steven Brice FCA**

# Contents

**Page**

**1    Introduction** .......................................................................................................... **6**

1.1    My qualifications and experience ......................................................... 6
1.2    Summary background ........................................................................... 6
1.3    My instructions ..................................................................................... 7
1.4    My instruction in United States versus Sushovan Tareque Hussain ................... 8
1.5    The available information ...................................................................... 8
1.6    Scope of this summary report .............................................................. 9

**2    Summary of my opinion in relation to software sales transactions** ..................... **10**

2.1    Introduction ......................................................................................... 10
2.2    The starting point for my analysis: the software sales transactions reported by Autonomy as revenue during the Relevant Period ............................................. 10
2.3    The applicable accounting standards ................................................... 14
2.4    Overview to my summary conclusions .................................................. 16
2.5    My summary conclusions in relation to Misstatements arising from transactions with resellers which contained one or more revenue recognition issues............ 19
2.6    My summary conclusions in relation to Misstatements arising from transactions which contained linked or reciprocal transactions ............................................ 25
2.7    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services ... 26
2.8    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than royalties............................. 30
2.9    My summary conclusions in relation to Misstatements arising from transactions which contain timing errors ................................................................ 32
2.10   My summary conclusions in relation to Misstatements arising from transactions which contain errors of valuation.................................................... 33

**3    Summary of my opinion in relation to hardware sales transactions** ..................... **35**

3.1    Introduction ......................................................................................... 35
3.2    The starting point for my analysis: the hardware sales transactions reported by Autonomy as revenue during the Relevant Period ............................................. 35
3.3    Overview to my summary conclusions .................................................. 37
3.4    My summary conclusions in relation to the inappropriate accrual or deferral of revenue arising from hardware sales transactions between reporting periods and the inappropriate early recognition of hardware sales ...................................... 39

3.5     My summary conclusions in relation to the inappropriate reporting of all or part of the cost of purchasing the hardware as being a "*Sales and marketing*" expense ......................................................................................................................... 44

3.6     My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions ........................ 46

**4       My summary conclusions in relation to the revenue streams reported by Autonomy from Q1 2010 onwards ........................................................................... 49**

4.1     Introduction...................................................................................................... 49

4.2     The starting point for my analysis: the revenue streams reported by Autonomy in its commentary to the market................................................................................ 49

4.3     Applicable financial reporting requirements....................................................... 50

4.4     Overview to my summary conclusions ............................................................... 52

4.5     My summary conclusions in relation to the reporting of the IDOL OEM revenue stream............................................................................................................... 53

4.6     My summary conclusions in relation to the reporting of the IDOL Cloud revenue stream............................................................................................................... 55

4.7     My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions in their other financial information............................................................................................ 59

4.8     My summary conclusions in relation to the double reporting of the reported IDOL OEM and IDOL Cloud revenue streams............................................................. 60

**5       My review of the Taylor Report and the Levitske Report ...................................... 63**

5.1     Introduction...................................................................................................... 63

5.2     My summary comments on the Taylor Report.................................................... 63

5.3     My summary comments on the Levitske Report................................................. 66

**6       Summary of my overall conclusions ...................................................................... 73**

**Appendices**

| | |
|---|---|
| Curriculum Vitae of Steven Brice | Appendix A |
| Documents I have relied upon | Appendix B |
| The Software Focus Transactions | Appendix C |
| The hardware sales transactions per the Quarterly Revenue Breakdowns compared with the hardware sales transactions recorded in the Hardware Ledger | Appendix D |
| The Hardware Focus Transactions | Appendix E |
| Narrative explanation relating to each Software Focus Transaction for which I have identified a Misstatement | Appendix F |
| Narrative explanation for Hardware Focus Transactions for which I have identified a Misstatement | Appendix G |
| My comments on Sections 2 to 6 of the Taylor Report | Appendix H |
| My comments on Appendix 3 to the Taylor Report | Appendix I |
| My corrected version of Mr Levitske's analysis of year-over-year revenue growth | Appendix J |
| My comments on the analyses relating to software in the Levitske Report | Appendix K |
| My corrected version of Mr Levitske's analyses of the adjustments relating to software | Appendix L |
| The revenue reported by Autonomy by revenue stream and my assessment of that revenue had the financial statements been prepared in accordance with relevant requirements | Appendix M |

**mazars**

# 1   Introduction

## 1.1   My qualifications and experience

1.1.1   I am Steven Brice, a Partner and Head of Accounting Technical Services for Mazars LLP ("**Mazars**"), the UK firm of the Mazars Group.  The Mazars Group is an international, integrated and independent organisation specialising in audit, advisory, accounting and tax services, with a direct presence in more than 95 countries drawing on the expertise of 47,000 professionals.

1.1.2   I am a Fellow of the Institute of Chartered Accountants in England and Wales (the "**ICAEW**") and I have over 25 years of technical accounting experience.  I regularly advise clients and audit teams on the application of International Financial Reporting Standards ("**IFRS**") when preparing or auditing financial information and am routinely instructed to review financial statements for compliance with IFRS.  I hold a current Practising Certificate and have Responsible Individual status for audit work within Mazars which means that I can take responsibility for audit work and sign audit reports.

1.1.3   Given my experience, I am routinely engaged as an expert accountant to consider matters involving the accounting treatment of particular transactions under various accounting frameworks and I have provided independent expert evidence in a number of different forums, including in the High Court of England and Wales and the International Dispute Resolution Centre in London.

1.1.4   Further details of my qualifications and experience are set out in my curriculum vitae in Appendix A, including a list of publications that I have authored in the last 10 years and a listing of the matters in which I have testified as an expert at trial or by deposition in the last four years.

## 1.2   Summary background

1.2.1   This summary report is provided in the matter of United States versus Dr Michael Richard Lynch ("**Dr Lynch**") and Mr Stephen Chamberlain ("**Mr Chamberlain**").  Dr Lynch is the former chief executive officer of Autonomy Corporation plc ("**Autonomy**"), a company that was incorporated in England and Wales[1].   Mr Chamberlain is the former vice president of finance.

---

[1] Autonomy's major subsidiaries comprised (i) Autonomy, Inc. ("**AU Inc**"), Interwoven, Inc. ("**Interwoven**") and ZANTAZ, Inc. ("**Zantaz**"), all of which were incorporated in the United States; and (ii) Autonomy Systems Limited ("**ASL**"), a company incorporated in England and Wales

Case 3:18-cr-00577-CRB   Document 297-7   Filed 01/17/24   Page 8 of 80

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

1.2.2   Hewlett-Packard Company ("**HP**") acquired all the outstanding shares in Autonomy on or about 3 October 2011.

1.2.3   According to the Superseding Indictment it is alleged that, between 2009 and 2011, Dr Lynch and Mr Chamberlain engaged in a scheme to defraud HP (as well as other purchasers and sellers of Autonomy securities) about the true financial performance of Autonomy's business, its financial condition and its prospects for growth.

## 1.3   My instructions

1.3.1   I have been provided with a significant volume of documents, to which I refer in Section 1.5.

1.3.2   My instructions relate to the period 1 January 2009 to 30 September 2011 (the "**Relevant Period**").  Based upon my review of the information provided to me, I have been instructed to:

    (a)   review software sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales transactions were properly reported in accordance with the applicable accounting standards;

    (b)   review hardware sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales were properly reported and disclosed in accordance with the applicable accounting standards;

    (c)   review the revenue streams reported by Autonomy during the Relevant Period[2] and give my opinion on whether the description of these streams is consistent with the nature of the underlying transactions; and

    (d)   review and comment on the Summary of Independent Expert Accounting Opinions of Mr Greig Taylor ("**Mr Taylor**") dated 7 December 2023 (the "**Taylor Report**") and the Expert Report of Mr John Levitske ("**Mr Levitske**") also dated 7 December 2023 (the "**Levitske Report**") in so far as it is within the scope of my expertise.

1.3.3   This report reflects a summary of the opinions I have reached in addressing my instructions, including the bases and reasons for reaching my conclusions.  I submitted a summary report on 8 November 2023 (my "**Interim Report**") at which date I noted that my work was ongoing.

---

[2] As explained further in Section 4, this specifically includes IDOL Product, IDOL OEM, IDOL Cloud, services and deferred revenue release as reported in the financial information published with Autonomy's quarterly and annual financial statements

**mazars**

## 1.4    My instruction in United States versus Sushovan Tareque Hussain

1.4.1    I was previously instructed as an independent expert accountant by the United States Attorney's Office in the matter of United States versus Mr Sushovan Tareque Hussain.  Mr Hussain was the former Chief Financial Officer of Autonomy.  I issued a summary of my expert accounting opinions in that matter in a report dated 31 October 2017 ("**My Hussain Report**").

1.4.2    The issues I was instructed to address in My Hussain Report covered certain of the issues I am instructed to address in this report.  I note that I have received a significant amount of additional information since I issued My Hussain Report.  Where opinions have developed as a result of the additional information I have now seen, I have noted so in this summary report.

## 1.5    The available information

1.5.1    The conclusions in this summary report are based on my experience and on the evidence I have seen.  If further evidence becomes available to me, these conclusions may change.

1.5.2    For the purposes of my work, I have been provided with a significant number of documents. This information includes:

(a)    contemporaneous information (such as contracts, emails and downloads from accounting records);

(b)    the audit working papers used by Deloitte LLP ("**Deloitte**") when auditing or reviewing the financial reports issued during the Relevant Period together with the report of the Financial Reporting Council's ("**FRC's**") Disciplinary Tribunal relating to Deloitte's audits and reviews during the Relevant Period[3];

(c)    the pleadings, disclosure, witness testimonies, expert reports, transcripts and Judgment in the matter of United States versus Sushovan Tareque Hussain;

(d)    the pleadings, disclosure, witness testimonies, expert reports and transcripts in a related case in the High Court in London (the "**High Court Proceedings**")[4]; and

---

[3] Report titled "*Explanatory Memorandum to the Tribunal Report*" in the matter of The Executive Counsel to the Financial Reporting Council versus (1) Deloitte LLP (2) Richard Knights (3) Nigel Mercer
[4] (1) ACL Netherlands B.V. (as successors to Autonomy Corporation Limited) (2) Hewlett-Packard The Hague B.V. (as successors to Hewlett-Packard Vision B.V.) (3) Autonomy Systems Limited (4) Hewlett-Packard Enterprise New Jersey, Inc versus (1) Michael Richard Lynch (2) Sushovan Tareque Hussain

**mazars**

(e)      the expert reports of Mr Taylor and Mr Levitske and a Summary of Expert Opinions of Philippe Cerf, dated 7 December 2023 (the "**Cerf Report**")[5].

1.5.3     In total I have been provided with more than 650,000 documents.  In light of the number of documents provided to me, I have used an eDiscovery Platform to undertake targeted searches and reviews, aimed at identifying the documents of relevance to my instructions.  I provide in Appendix B a list of the documents I have relied upon in preparing this summary report.

## 1.6     Scope of this summary report

1.6.1     It should be noted that the work I have completed does not constitute an audit and, other than as expressly set out in this report, I have not verified or in any other way checked the information set out in the documents I have reviewed.

1.6.2     In completing my work, I have been assisted by individuals within the Forensic and Investigation and Accounting Technical Services teams at Mazars.  I have supervised and reviewed their work and I confirm that the opinions expressed in this summary report are my own.

1.6.3     Mazars' fees for this engagement are not contingent on the outcome of the proceedings.  Mazars is being compensated at a rate of $693 per hour for my time and between $39 and $693 per hour for staff working under my direction.

1.6.4     I have prepared this report solely for the use in these proceedings.  It is confidential in all respects other than to be used in the proceedings as appropriate.  This summary report should not be used, reproduced or circulated for any other purpose without my prior written consent.  Mazars accepts no responsibility to third parties in relation to the matters in this summary report and / or for any breaches of this obligation.

1.6.5     Some figures in this report have been rounded and as a result some tables may include rounding differences.

---

[5] The Cerf Report does not respond to my Interim Report and primarily addresses matters that are outside the scope of my expertise.  As such, I do not comment on it further

**mazars**

# 2 Summary of my opinion in relation to software sales transactions

## 2.1 Introduction

2.1.1 I am instructed to review software sales transactions reported by Autonomy during the Relevant Period as revenue, and give my opinion on whether these sales were properly reported in accordance with the applicable accounting standards.  In this section of my report, I provide a summary of my opinion.

## 2.2 The starting point for my analysis: the software sales transactions reported by Autonomy as revenue during the Relevant Period

2.2.1 I have identified, for each quarter[6] during the Relevant Period (apart from Q3 2011), spreadsheets that break down Autonomy's revenue by customer and by revenue type (for example licence, hosting, maintenance and services)[7].  I refer to these spreadsheets as the "**Quarterly Revenue Breakdowns**".

2.2.2 I have compared the total revenue amounts in the Quarterly Revenue Breakdowns to the total revenue reported in Autonomy's quarterly financial statements[8] and I have found that they agree.  The total revenue reported by Autonomy in both the Quarterly Revenue Breakdowns and the quarterly financial statements is shown in Table 2.1:

---

[6] Autonomy issued financial information on a quarterly basis.  I refer to the period 1 January 2010 to 31 March 2010 as "**Q1 2010**", to the period 1 April 2010 to 30 June 2010 as "**Q2 2010**", to the period 1 July 2010 to 30 September 2010 as "**Q3 2010**", *et seq*

[7] HP-SEC-00739438 and SEC-AUSA5-EPROD-000641095

[8] HP-SEC-00567458 (Q1 2009), HP-SEC-00009847 (Q2 2009), HP-SEC-00025166 (Q3 2009), HP-SEC-00097914 (Q4 2009), HP-SEC-00009127 (Q1 2010), FTIGJ00002722 (Q2 2010), HP-SEC-00155426 (Q3 2010) and HP-SEC-00024459 (Q4 2010), HP-SEC-00024002 (Q1 2011), HP-SEC-00564873 (Q2 2011)

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

**Table 2.1: Total revenue reported by Autonomy in the Relevant Period (apart from Q3 2011)**

| Quarter | Revenue ($m) |
|---------|--------------|
| Q1 2009 | 129.8 |
| Q2 2009 | 195.2 |
| Q3 2009 | 191.6 |
| Q4 2009 | 223.1 |
| Q1 2010 | 194.2 |
| Q2 2010 | 221.1 |
| Q3 2010 | 210.6 |
| Q4 2010 | 244.5 |
| Q1 2011 | 219.8 |
| Q2 2011 | 256.2 |
| **Total** | **2,086.1** |

2.2.3    I have also compared the quarterly revenue reported by Autonomy in the Relevant Period with the consensus of market analysts' expectations for revenue in each quarter.  My analysis is provided in the graph below:

**Figure 2.1: Quarterly revenue reported by Autonomy in the Relevant Period compared with market consensus[9]**



2.2.4    Given the quantum of some of the sales transactions, this consistent pattern of achieving actual revenues at or very close to market analysts' expectations is perhaps surprising. Autonomy's consistent pattern of achieving actual revenues at or very close to market analysts' expectations is also surprising given that, in many quarters, internal accounting

---

[9] The market consensus is based upon the mean average as reported by S&P Capital IQ

**mazars**

records indicate that, even at the end of or after the quarter, Autonomy was not expecting that it would achieve market analysts' expectations.  For example:

(a)     in Q2 2010, market analysts' expectation was that Autonomy would achieve revenues of $222.4 million.  However, in a spreadsheet dated 30 June 2010, Autonomy's total projected revenue for Q2 2010 was only $217.6 million[10]. Autonomy eventually reported to the market that it had achieved revenues of $221.1 million in Q2 2010;

(b)     in Q4 2010, market analysts' expectation was that Autonomy would achieve revenues of $241.9 million.  However, in a spreadsheet dated 30 December 2010, Autonomy's total projected revenue for Q4 2010 was only $239.9 million[11]. Autonomy eventually reported to the market that it had achieved revenues of $244.5 million in Q4 2010; and

(c)     in Q2 2011, market analysts' expectation was that Autonomy would achieve revenues of $253.2 million.  However, in a spreadsheet dated 6 July 2011, Autonomy's total projected revenue was only $241.3 million[12].  Autonomy eventually reported to the market that it had achieved revenues of $256.2 million in Q2 2011.

2.2.5     The Quarterly Revenue Breakdowns identify a number of transactions in each quarter that I have been able to match to hardware sales per the general ledger.  Hardware sales transactions are not relevant to this section of my report – my summary conclusions in relation to hardware, including how I have identified these sales transactions, are instead provided in Section 3 – and it is therefore necessary to exclude them from my analysis in this section. The revenue reported by Autonomy, excluding revenue from hardware sales transactions, in the Quarterly Revenue Breakdowns is shown in Table 2.2:

---

[10] HP-SEC-00739256
[11] HP-SEC-00739191
[12] HP-SEC-00739432

**mazars**

**Table 2.2: Total revenue reported by Autonomy in the Relevant Period (apart from Q3 2011), excluding revenue from hardware sales transactions[13]**

| Quarter | Total reported revenue ($m) | Hardware revenue ($m) | Revenue excluding hardware ($m) |
|---|---|---|---|
| Q1 2009 | 129.8 | 0.0 | 129.8 |
| Q2 2009 | 195.2 | 6.2 | 189.0 |
| Q3 2009 | 191.6 | 38.0 | 153.6 |
| Q4 2009 | 223.1 | 9.4 | 213.7 |
| Q1 2010 | 194.2 | 11.8 | 182.4 |
| Q2 2010 | 221.1 | 31.1 | 190.1 |
| Q3 2010 | 210.6 | 26.8 | 183.7 |
| Q4 2010 | 244.5 | 35.5 | 209.0 |
| Q1 2011 | 219.8 | 20.1 | 199.7 |
| Q2 2011 | 256.2 | 20.9 | 235.3 |
| **Total** | **2,086.1** | **199.9** | **1,886.2** |

2.2.6    According to the Quarterly Revenue Breakdowns, the total revenue excluding hardware sales transactions (of $1,886.2 million) is comprised of 4,052 line items.  In order to address my instruction in relation to software sales transactions, it is therefore necessary to identify a smaller population of transactions to focus upon.  Using the Quarterly Revenue Breakdowns, I have therefore identified all transactions of more than $2 million[14].  I summarise in Table 2.3 the total value and number of these transactions by quarter:

**Table 2.3: Transactions greater than $2 million reported as revenue by Autonomy in the Relevant Period (apart from Q3 2011), excluding revenue from hardware sales transactions**

| Quarter | Revenue excluding hardware ($m) | Total value of contracts over $2m (excluding hardware) ($m) | Number of contracts over $2m (excluding hardware) |
|---|---|---|---|
| Q1 2009 | 129.8 | 74.6 | 15.0 |
| Q2 2009 | 189.0 | 123.2 | 20.0 |
| Q3 2009 | 153.6 | 96.0 | 17.0 |
| Q4 2009 | 213.7 | 157.4 | 25.0 |
| Q1 2010 | 182.4 | 141.0 | 18.0 |
| Q2 2010 | 190.1 | 141.7 | 19.0 |
| Q3 2010 | 183.7 | 139.2 | 21.0 |
| Q4 2010 | 209.0 | 143.8 | 21.0 |
| Q1 2011 | 199.7 | 153.9 | 24.0 |
| Q2 2011 | 235.3 | 187.2 | 28.0 |
| **Total** | **1,886.2** | **1,358.1** | **208.0** |

2.2.7    Whilst for most of the transactions in Table 2.3 the Quarterly Revenue Breakdowns cite a client name, there are certain transactions which only have a generic description, such as

---

[13] I note that hardware revenue, and therefore revenue excluding hardware, have been updated since my Interim Report.  An explanation of the changes is included in Appendix D

[14] The witness statement of Mr Welham in the High Court Proceedings, dated 14 September 2018, explained that the Deloitte audit team undertook "*audit work in respect of all sales made by Autonomy of more than $1m*".  In the context of the materiality for Autonomy's financial statements (which I discuss further in Section 2.3 below), a testing threshold of $1 million is not unreasonable.  However, in relation to the analysis in this section, analysing all software sales transactions greater than $1 million would significantly increase the size of the population (to more than 500 transactions).  Therefore, I have increased the size of my testing threshold for the software sales transactions to $2 million, thereby reducing the number of identified transactions

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

"*hosting*", "*services*" or "*maintenance*".  Without the client name, I am unable to identify the underlying transactional documents and give my opinion on whether these transactions have been accounted for in accordance with the applicable accounting standards.

2.2.8    By excluding the transactions with generic descriptions in the Quarterly Revenue Breakdowns[15], I have arrived at the software sales transactions that I will focus on in this section of my report (the "**Software Focus Transactions**")[16].  The Software Focus Transactions are summarised by quarter in Table 2.4 below and a full list by client is provided in Appendix C:

**Table 2.4: The Software Focus Transactions**

| Quarter | Total value of contracts over $2m ($m) | Number of contracts over $2m | Total value of Software Focus Transactions ($m) | Number of Software Focus Transactions |
|---|---|---|---|---|
| Q1 2009 | 74.6 | 15.0 | 27.0 | 5.0 |
| Q2 2009 | 123.2 | 20.0 | 40.0 | 9.0 |
| Q3 2009 | 96.0 | 17.0 | 20.6 | 6.0 |
| Q4 2009 | 157.4 | 25.0 | 68.1 | 13.0 |
| Q1 2010 | 141.0 | 18.0 | 48.0 | 8.0 |
| Q2 2010 | 141.7 | 19.0 | 49.5 | 9.0 |
| Q3 2010 | 139.2 | 21.0 | 45.1 | 10.0 |
| Q4 2010 | 143.8 | 21.0 | 51.7 | 12.0 |
| Q1 2011 | 153.9 | 24.0 | 61.0 | 13.0 |
| Q2 2011 | 187.2 | 28.0 | 72.7 | 13.0 |
| **Total** | **1,358.1** | **208.0** | **483.7** | **98.0** |

2.2.9    Autonomy therefore reported total revenue relating to the Software Focus Transactions during the Relevant Period (apart from Q3 2011) of $483.7 million.  This is around 23%[17] of the total revenue reported by Autonomy in these quarters during the Relevant Period.

## 2.3    The applicable accounting standards

### International Financial Reporting Standards

2.3.1    Autonomy stated that its financial statements were prepared in accordance with IFRS.  IFRS comprises Standards referred to as IFRS, as well as other Standards such as "*International Accounting Standards*" (typically known as "**IAS**"), with each Standard devoted to a particular type of transaction or item in a set of financial statements.  Reference should also be made to the "*Conceptual Framework For Financial Reporting*" (the "**Conceptual Framework**").

---

[15] I have also excluded certain transactions which refer to "*Microlink*".  These transactions appear to relate to revenue generated by MicroLink, LLC, a reseller which was acquired by Autonomy in January 2010.  Without the client name, I am unable to identify the underlying transactional documents and give my opinion on whether these transactions have been accounted for in accordance with the applicable accounting standards

[16] I note that in My Hussain Report I was instructed to "*review the lists identifying Autonomy's Top 40 Contracts and Top 40 Customers provided to HP as part of the due diligence process with my software and hardware samples, noting any apparent omissions from those lists*" (My Hussain Report, paragraph 1.2.3(e)).  I noted four software transactions which were omitted from the Top 40 Contract list and 10 customers omitted from the Top 40 Customer list.  The four software transactions which were omitted remain Software Focus Transactions and therefore my conclusions in this regard have not changed

[17] Being $483.7 million / $2,086.1 million

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
**Summary of independent expert accounting opinions of Steven Brice FCA**

Whilst not a Standard *per se*, it sets out the concepts which underpin all Standards within IFRS, as well as assisting preparers of financial statements in applying IFRS and assisting auditors in forming an opinion on whether financial statements comply with IFRS[18].

### What does compliance with IFRS mean?

2.3.2   Information is not accounted for in accordance with IFRS if a misstatement (being an omission from or misstatement to the financial statements) exists that is deemed to be "*material*"[19]. Pursuant to IFRS, materiality (including the question of whether an identified misstatement is material) is assessed by reference to an item's "*size*" as well as its "*nature*"[20].

2.3.3   In relation to an item's size, accountants will typically ascribe a materiality by applying a percentage to an identified metric, such as revenue or net profit.  Deloitte determined its materiality by applying a percentage to the reported revenues of Autonomy[21].  Where revenue is selected as the appropriate starting point Mazars would typically arrive at a figure for materiality by applying between 0.5% to 2% to the stated revenue figure.

2.3.4   In Table 2.5 below, I summarise the computed materiality using these percentages, and I also set out the materiality that Deloitte used in its audit or review of Autonomy's financial statements[22]:

---

[18]  In this summary report, I have referred to and quoted the standards that were extant for the preparation of Autonomy's financial statements for the year ended 31 December 2010.  Whilst the standards I refer to were in force throughout the Relevant Period, they may have been subject to some minor consequential amendments arising from changes to other standards in IFRS. Moreover, I note that the Conceptual Framework was introduced in September 2010 as a replacement for the "*Framework for the Preparation and Presentation of Financial Statements*" (the "**Framework**").  Where I refer to the Conceptual Framework, I also provide references to the equivalent guidance within the Framework

[19]  IAS 8 "*Accounting Policies, Changes in Accounting Estimates and Errors*" ("**IAS 8**") states that "*Financial statements do not comply with IFRSs if they contain either material errors or immaterial errors made intentionally to achieve a particular presentation of an entity's financial position, financial performance or cash flows*".  (IAS 8, paragraph 41)

[20]  IAS 1 "*Presentation of Financial Statements*" ("**IAS 1**") provides the following definition for "*material*": "*Omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements. Materiality depends on the size and nature of the omission or misstatement judged in the surrounding circumstances.  The size or nature of the item, or a combination of both, could be the determining factor. Assessing whether an omission or misstatement could influence economic decisions of users, and so be material, requires consideration of the characteristics of those users.  The Framework for the Preparation and Presentation of Financial Statements states in paragraph 25 that 'users are assumed to have a reasonable knowledge of business and economic activities and accounting and a willingness to study the information with reasonable diligence'.  Therefore, the assessment needs to take into account how users with such attributes could reasonably be expected to be influenced in making economic decisions*".  (IAS 1, paragraph 7)

[21]  ISA 320 "*Materiality in planning and performing an audit*" ("**ISA 320**") explains the requirements of an auditor when determining a financial statement materiality.  Whilst ISA 320 enables auditors to apply professional judgment when determining financial statement materiality, the guidance contained therein explains that for profit generating entities the benchmark for determining materiality is typically profit before tax rather than revenue

[22]  I note that Autonomy did not produce quarterly financial statements for Q4 as instead it produced annual financial statements for the financial year then ended.  Accordingly Deloitte did not calculate a materiality for Q4

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**Summary of independent expert accounting opinions of Steven Brice FCA**

mazars

Table 2.5: Materiality during the Relevant Period (excluding Q3 2011)[23]

| Quarter | Autonomy's Consolidated Revenue ($m) | Mazars' materiality methodology | | Deloitte's assessed materiality ($m) |
| | | Low (0.5% of revenue) ($m) | High (2.0% of revenue) ($m) | |
|---|---|---|---|---|
| Q1 2009 | 129.8 | 0.6 | 2.6 | 3.7 |
| Q2 2009 | 195.2 | 1.0 | 3.9 | 5.4 |
| Q3 2009 | 191.6 | 1.0 | 3.8 | 3.6 |
| Q4 2009 | 223.1 | 1.1 | 4.5 | N/A |
| **Full year 2009** | **739.7** | **3.7** | **14.8** | **20.0** |
| | | | | |
| Q1 2010 | 194.2 | 1.0 | 3.9 | 5.0 |
| Q2 2010 | 221.1 | 1.1 | 4.4 | 4.9 |
| Q3 2010 | 210.6 | 1.1 | 4.2 | 4.3 |
| Q4 2010 | 244.5 | 1.2 | 4.9 | N/A |
| **Full year 2010** | **870.4** | **4.4** | **17.4** | **22.5** |
| | | | | |
| Q1 2011 | 219.8 | 1.1 | 4.4 | 5.5 |
| Q2 2011 | 256.2 | 1.3 | 5.1 | 5.5 |

2.3.5   Given Deloitte's assessed materiality is broadly consistent with the range suggested by Mazars' methodology, I have adopted Deloitte's materiality methodology when considering the transactions.

2.3.6   That is to say, for example, a misstatement of more than $4.3 million in Q3 2010 would be deemed a material error by quantum by Deloitte and mean that the quarterly financial statements were not prepared in accordance with IFRS.

## 2.4   Overview to my summary conclusions

2.4.1   For each of the Software Focus Transactions, I have sought to identify contemporaneous information pertaining to the transaction in order to understand its underlying substance and economic reality.  This information comprises, for example:

(a)      contractual documentation between Autonomy and its counterparty;

(b)      email correspondence between (i) individuals within Autonomy in relation to the Software Focus Transaction; (ii) individuals within Autonomy's counterparty in relation to the Software Focus Transaction; (iii) Autonomy and its counterparty in relation to the Software Focus Transaction; and (iv) Autonomy and Deloitte in relation to the Software Focus Transaction;

---

[23] Deloitte's reports to the audit committee titled: "*Report to the Audit Committee on the Q1 2009 Review*", "*Report to the Audit Committee on the Q2 2009 Review*", "*Report to the Audit Committee on the Q3 2009 Review*", "*Report to the Audit Committee on the 2009 Audit*", "*Report to the Audit Committee on the Q1 2010 Review*", "*Report to the Audit Committee on the 2010 Interim Review*", "*Report to the Audit Committee on the Q3 2010 Review*", "*Report to the Audit Committee on the 2010 Audit*", "*Report to the Audit Committee on the Q1 2011 Review*", "*Report to the Audit Committee on the Q2 2011 Review*"

**mazars**

  (c)  financial records of Autonomy, such as general ledgers, customer ledgers and bank confirmations of payments or receipts; and

  (d)  financial information of Autonomy's counterparty, such as financial statements and bank confirmations of payments or receipts.

2.4.2  Based on this information, I have then considered how this revenue should have been accounted for pursuant to the requirements of IFRS and Autonomy's published accounting policies[24].  I have considered both the date on which any revenue should be recognised and the amount of that revenue.

2.4.3  I have then compared my assessment with the amount and/or timing of revenue actually reported by Autonomy during the Relevant Period.  Where a difference exists between my assessment and the actual reporting for a specific quarter, I have identified this as a "**Misstatement**".

2.4.4  Of the Software Focus Transactions totalling $483.7 million, my overview conclusions are that:

  (a)  transactions with a total reported revenue of $102.8 million appear to have been accounted for in accordance with IFRS; and

  (b)  I have identified the existence of a Misstatement in respect of timing and/or amount (that is, my assessment of the amount of revenue that should have been recognised is different to the revenue actually reported by Autonomy) in relation to transactions with a total reported revenue of $380.9 million.

2.4.5  I summarise these overview conclusions in Table 2.6 below:

---

[24] IAS 8 explains that "*Accounting policies are the specific principles, bases, conventions, rules and practices applied by an entity in preparing and presenting financial statements*".  (IAS 8, paragraph 5)

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

**mazars** Summary of independent expert accounting opinions of Steven Brice FCA

**Table 2.6: My overview conclusions for the Software Focus Transactions by quarter**

| Quarter | Reported revenue ($m) | Reported revenue of the Software Focus Transactions ($m) | Reported revenue of the Software Focus Transactions for which: | |
|---|---|---|---|---|
| | | | No Misstatement was identified ($m) | A Misstatement was identified ($m) |
| Q1 2009 | 129.8 | 27.0 | 5.3 | 21.7 |
| Q2 2009 | 195.2 | 40.0 | 12.4 | 27.5 |
| Q3 2009 | 191.6 | 20.6 | 8.3 | 12.3 |
| Q4 2009 | 223.1 | 68.1 | 11.7 | 56.3 |
| Q1 2010 | 194.2 | 48.0 | 5.6 | 42.4 |
| Q2 2010 | 221.1 | 49.5 | 17.6 | 31.9 |
| Q3 2010 | 210.6 | 45.1 | 2.7 | 42.4 |
| Q4 2010 | 244.5 | 51.7 | 14.4 | 37.4 |
| Q1 2011 | 219.8 | 61.0 | 16.8 | 44.2 |
| Q2 2011 | 256.2 | 72.7 | 7.9 | 64.8 |
| **Total** | **2,086.1** | **483.7** | **102.8** | **380.9** |

2.4.6    In relation to the transactions where I have identified a Misstatement, I have assessed the total Misstatement to be $308.2 million.  The Misstatements are summarised by quarter in the table below:

**Table 2.7: The Misstatements identified in relation to the Software Focus Transactions by quarter**

| Quarter | Reported Revenue of the Software Focus Transactions ($m) | Misstatement identified in relation to Software Focus Transactions ($m) |
|---|---|---|
| Q1 2009 | 27.0 | (21.7) |
| Q2 2009 | 40.0 | (26.7) |
| Q3 2009 | 20.6 | (11.3) |
| Q4 2009 | 68.1 | (46.8) |
| Q1 2010 | 48.0 | (32.5) |
| Q2 2010 | 49.5 | (25.6) |
| Q3 2010 | 45.1 | (27.0) |
| Q4 2010 | 51.7 | (29.0) |
| Q1 2011 | 61.0 | (33.2) |
| Q2 2011 | 72.7 | (54.6) |
| **Total** | **483.7** | **(308.2)** |

2.4.7    Given the materiality ranges identified in Table 2.5, the Misstatements in each quarter were clearly material.  This means that the financial statements in each quarter were not prepared in accordance with IFRS.

**mazars**

2.4.8    In addition, I note that following HP's acquisition of Autonomy in October 2011, HP undertook to restate the comparative figures in ASL's financial statements for the period 1 January 2011 to 31 October 2011[25] (the "**Restatement**")[26].

2.4.9    I have identified six principal reasons why the Misstatement exists – that is, reasons why these Software Focus Transactions were not accounted for in accordance with IFRS:

(a)    certain transactions with resellers contained one or more revenue recognition issues;

(b)    certain transactions contained linked or reciprocal transactions;

(c)    certain transactions were accounted for as a sale of goods rather than the rendering of services;

(d)    certain transactions were accounted for as a sale of goods rather than royalties;

(e)    certain transactions contained timing errors; and

(f)    certain transactions contained errors of valuation.

2.4.10    I address each of these areas in turn in Sections 2.5 to 2.10 below. In Appendix F I provide a narrative explanation relating to each Software Focus Transaction for which I have identified a Misstatement.

## 2.5    My summary conclusions in relation to Misstatements arising from transactions with resellers which contained one or more revenue recognition issues

2.5.1    A number of the Software Focus Transactions relate to instances where Autonomy sold software licences to value added resellers (often referred to as a "**VAR**").  Typically, the VAR would not purchase the software for its own use but instead would acquire the right to sell the software licence on to a named end-user.

---

[25] HP had changed ASL's reporting financial period from 31 December to 31 October to be consistent with HP

[26] I note that the Restatement was reported in pounds sterling, whereas my summary conclusions on the Software Focus Transactions are prepared in US dollars

2.5.2    Autonomy recognised revenue arising from transactions with VARs as a "*sale of goods*".  In this regard, IAS 18 distinguishes between revenue generated from the "*sale of goods*", the "*rendering of services*" and the "*use by others of entity assets*"[27].

2.5.3    In order to recognise revenue from the sale of goods under IFRS, there are five criteria that **must** be met.  Importantly, if one or more of these criteria is not met, the revenue cannot be recognised (and thus the recognition of any revenue in relation to that transaction would be a misstatement).

2.5.4    Based upon my review of the contemporaneous information, I have identified that for many of the Software Focus Transactions which relate to sales to VARs, one or more of the revenue recognition criteria in IFRS had not been met and therefore revenue should not have been recognised:

(a)    in order to recognise revenue under IFRS, the entity must have transferred to the buyer (in the case of the Software Focus Transactions, the VAR) the "*significant risks and rewards of ownership of the goods*"[28].  However, I have identified that, in relation to a number of the Software Focus Transactions, the risks and rewards of ownership had clearly not been transferred to the VAR.  The evidence I have seen includes, for example, (i) evidence that the VAR made no efforts to sell the software licence it had acquired to the named end-user[29], and (ii) evidence that the VAR could not have independently sold the software licence it had acquired to the named end-user, because the only route through which it would have been able to do so was via a restructuring of the end-users' existing contractual agreements with Autonomy[30];

(b)    in order to recognise revenue under IFRS, the reporting entity must not retain "*continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold*"[31].  However, I have identified that, in relation to a number of the Software Focus Transactions, Autonomy retained continuing managerial involvement in the software sold to the VAR.  The evidence I have seen includes, for example, evidence that Autonomy continued to negotiate

---

[27] IAS 18 "*Revenue*" ("**IAS 18**"), paragraph 1
[28] IAS 18, paragraph 14(a)
[29] For example, Software Focus Transaction #050, named "*MicroTech*" in Q1 2010
[30] For example, Software Focus Transaction #028, named "*IBM/Ameriprise*" in Q3 2009
[31] IAS 18, paragraph 14(b)

the sale to the named end-user even after it had completed the sale to the VAR[32]; and

(c)     in order to recognise revenue under IFRS, it must be "*probable that the economic benefits associated with the transaction will flow to the entity*"[33].   However, I have identified that in relation to a number of the Software Focus Transactions, it was not probable[34] that Autonomy would receive an inflow of economic benefit from the VAR.   The evidence I have seen includes, for example, (i) financial information for the VAR which demonstrates that the payment obligation imposed on the VAR would exhaust its cash reserves or net assets[35], (ii) financial information for the VAR which demonstrates that the VAR was loss making or was otherwise unable to fund the purchase of the software[36], (iii) in certain instances where Autonomy did ultimately receive an inflow of economic benefit from the VAR, evidence that this inflow was facilitated by Autonomy first remitting cash to the VAR (in relation to purchases made from the VAR by Autonomy) or by Autonomy requesting that funds owed to Autonomy relating to a separate transaction completed with the named end-user be remitted to the VAR instead of Autonomy[37], and (iv) evidence that Autonomy did not receive any inflow of economic benefit from the VAR, and instead later cancelled the amount owed by the VAR[38].

2.5.5     As a consequence of one or more of these revenue recognition issues, the revenue from certain VAR transactions should not have been recognised.

2.5.6     In addition to the revenue recognition issues explained above, the revenue recognised for certain of the transactions with VARs should not have been recognised because, when considered against the requirements of IFRS, the transaction had no apparent substance.   In this regard, a fundamental qualitative characteristic of financial statements prepared under IFRS is that they should present a "*faithful representation*" of the transactions and events that they purport to represent[39].   Achieving a "*faithful representation*" requires that transactions are presented in accordance with their "*substance and economic reality*", and not merely their

---

[32] For example, Software Focus Transaction #046, named "*PMI (Discover)*" in Q1 2010

[33] IAS 18, paragraph 14(d)

[34] In IFRS, "*probable*" means more likely than not

[35] For example, Software Focus Transaction #038, named "*Dell – Morgan Stanley*" in Q4 2009

[36] For example, Software Focus Transaction #069, named "*Veterans Affairs / National Archive, Big 4, Iron*" in Q3 2010

[37] For example, Software Focus Transaction #121, named "*USPS archive – mt*" in Q2 2011

[38] For example, Software Focus Transaction #090, named "*Bank of Montreal*" in Q1 2011

[39] The Conceptual Framework explains that "*Financial reports represent economic phenomena in words and numbers. To be useful, financial information must not only represent relevant phenomena, but it must also faithfully represent the phenomena that it purports to represent*".   (Conceptual Framework, paragraph QC12)

mazars

legal form[40].  For certain of the Software Focus Transactions with VARs, based upon the available contemporaneous evidence I have seen, there is no apparent economic substance to the transactions.

2.5.7   In practice, when considering whether a particular transaction has economic substance, it is important to consider whether the other party to the transaction would be held to its terms. Applying this to the Software Focus Transactions relating to transactions with VARs, I have considered whether it is reasonable to conclude that the VAR would have been held to the terms of its agreement with Autonomy.  The evidence I have seen which leads to a conclusion that certain of the Software Focus Transactions had no apparent economic substance includes:

(a)     evidence that the Software Focus Transaction was executed in a very short space of time (over a matter of hours), with little to no negotiation (or, in some instances, with Autonomy drafting unexplained and uncontested increases to the amount that the VAR would owe Autonomy following the transaction), and on the last day of Autonomy's reporting period[41];

(b)     evidence that the VAR had no realistic prospect of being able to pay the amounts owed to Autonomy unless the VAR was successful in selling the software to the named end-user[42];

(c)     the named end-user having no apparent need to purchase the software licence from the VAR, for example when: (i) the only apparent route through which the sale of the software licence to the named end-user could be achieved required a restructuring of existing contracts with Autonomy which the VAR was unable to enact[43]; and (ii) the individual through whom the transaction with the VAR was executed was also the co-founder of the named-end user (to whom the VAR now had the right to sell the software licence)[44];

---

[40] The Conceptual Framework explains that "*In assessing whether an item meets the definition of an asset, liability or equity, attention needs to be given to its underlying substance and economic reality and not merely its legal form*".  (Conceptual Framework, paragraph 4.6)

[41] For example, Software Focus Transaction #105, named "*UBS – capax*" in Q2 2011

[42] For example, Software Focus Transaction #045, named "*FSA – Capax*" in Q1 2010

[43] For example, Software Focus Transaction #065, named "*Amgen*" in Q3 2010

[44] For example, Software Focus Transaction #041, named "*MircoLink/DiscoverTech*" in Q4 2009

**mazars**

(d)     the existence of a pattern of behaviour between Autonomy and the VAR which has resulted in transactions collectively indicating that transactions did not appear to have economic substance;

(e)     evidence that, in the absence of a transaction between the VAR and the named end-user occurring (or if Autonomy entered a transaction with the named end-user, rather than the VAR), Autonomy either cancelled the amounts owed by the VAR in relation to the Software Focus Transaction[45], or facilitated the VAR's settlement of the amounts owed by first remitting cash to[46], or arranging for cash to be remitted to[47], the VAR; and

(f)     evidence that, following the completion of a transaction between Autonomy and the end-user, Autonomy paid the VAR a commission despite the VAR having no apparent involvement in the transaction[48].

2.5.8    The Software Focus Transactions with Misstatements arising from transactions with VARs which contained one or more revenue recognition issues are set out in the table below:

---

[45] For example, Software Focus Transaction #089, named "*UBS*" in Q1 2011

[46] For example, Software Focus Transaction #088, named "*Mcafee - Capax*" in Q1 2011

[47] For example, Software Focus Transactions #079a, named "*discover tech baml*" #079b, named "*capax baml*" and #079c, named "*BAML extra*" in Q4 2010

[48] For example, Software Focus Transaction #040a, named "*Capax*" in Q4 2009

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**   Summary of independent expert accounting opinions of Steven Brice FCA

**Table 2.8: Software Focus Transactions with Misstatements arising from transactions with VARs which contained one or more revenue recognition issues[49],[50]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q1 2009 | 011 | Capax Global | 7.5 |
| Q2 2009 | 017 | Integracion | 3.0 |
| Q2 2009 | 020 | NSA | 4.8 |
| Q3 2009 | 026 | Kraft | 4.0 |
| Q3 2009 | 028 | IBM/Ameriprise | 3.8 |
| Q4 2009 | 033 | Federal (Microtech) | 9.5 |
| Q4 2009 | 038 | Dell - Morgan Stanley | 4.7 |
| Q4 2009 | 040a | Capax | 6.0 |
| Q4 2009 | 040b | Capax | 4.0 |
| Q4 2009 | 041 | MicroLink/DiscoverTech | 2.0 |
| Q4 2009 | 043 | Poste | 2.2 |
| Q1 2010 | 045 | FSA - Capax | 4.3 |
| Q1 2010 | 046 | PMI (Discover) | 4.2 |
| Q1 2010 | 050 | MicroTech | 11.0 |
| Q1 2010 | 051 | DiscoverTech - Citi 32 cells | 5.5 |
| Q3 2010 | 062 | Poste Italiane - Cyber Crime | 2.4 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 069 | Veterans Affairs / National Archive, Big 4, Iron | 10.0 |
| Q4 2010 | 079a | discover tech baml | 7.0 |
| Q4 2010 | 079b | capax baml | 1.7 |
| Q4 2010 | 079c | BAML extra | 3.5 |
| Q4 2010 | 080 | MicroTech doi | 4.0 |
| Q4 2010 | 082 | KPMG | 6.0 |
| Q1 2011 | 085 | Bank of America - MT | 3.9 |
| Q1 2011 | 088 | Mcafee - Capax | 5.0 |
| Q1 2011 | 089 | UBS | 8.0 |
| Q1 2011 | 090 | Bank of Montreal | 2.9 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q2 2011 | 101 | ABBOTT LABS - dt | 8.6 |
| Q2 2011 | 105 | UBS - capax | 7.7 |
| Q2 2011 | 120 | Dell Hyatt - mt | 5.3 |
| Q2 2011 | 121 | USPS archive - mt | 7.0 |

2.5.9   In correcting these Misstatements, I have reversed the revenue originally recognised by Autonomy in relation to the sale of the software licence to the VAR.  In some instances, Autonomy entered into a direct transaction with the named end-user after the date of the VAR agreement, but did not recognise revenue in relation to these subsequent sales.  In those situations, I have recognised the revenue arising from these subsequent direct sales in accordance with their substance[51].

---

[49] Software Focus Transactions #011 and #040b would have also given rise to Misstatements as they were accounted for as a sale of goods rather than as royalties (see Section 2.8 below)

[50] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to one Software Focus Transaction (not including certain other trivial adjustments)

[51] That is, either as the sale of a good or the provision of a service.  In one transaction, being Software Focus Transaction #038 "*Dell – Morgan Stanley*", the subsequent transaction related to the sale of hardware

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

## 2.6    My summary conclusions in relation to Misstatements arising from transactions which contained linked or reciprocal transactions

2.6.1    When applying the revenue recognition requirements of IFRS, the criteria are "*usually applied separately to each transaction*"[52].   However, under IFRS, the criteria are applied to two or more transactions together when the transactions are "*linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole*"[53].   IFRS provides an example of a linked transaction: "*an entity may sell goods and, at the same time, enter into a separate agreement to repurchase the goods at a later date, thus negating the substantive effect of the transaction; in such a case, the two transactions are dealt with together*"[54].   When considering whether the revenue recognition criteria should be applied to two or more transactions together, the entity should adopt the approach which provides a faithful representation of the economic substance of the transactions.

2.6.2    I have identified a number of Software Focus Transactions which, pursuant to the requirements of IFRS, should have been considered together with certain other linked transactions entered into by Autonomy.   Further, when considering the linked transactions together, it is clear that the revenue recognition requirements of IFRS were not met and therefore the revenue should not have been recognised.

2.6.3    The evidence I have seen which demonstrates that the Software Focus Transactions should have been considered together with other transactions includes: (i) transactions entered into in close time proximity to each other, negotiated by the same individuals, and their mutual existence is acknowledged in the negotiations[55], (ii) transactions which are economically co-dependant; that is, one party's ability to settle the amounts due to the counterparty in relation to its purchase is wholly dependant upon that party first receiving cash from the counterparty in relation to its sale[56], (iii) a lack of evidence existing (which evidence I would expect to exist) to support the amounts payable by the parties as being fair value[57], and (iv) evidence that the transactions were entered into above the fair value of the products or services sold[58].

---

[52] IAS 18, paragraph 13
[53] IAS 18, paragraph 13
[54] IAS 18, paragraph 13
[55] For example, Software Focus Transaction #081, named "*VMS*" in Q4 2010
[56] For example, Software Focus Transaction #066, named "*Vidient*" in Q3 2010
[57] For example, Software Focus Transaction #071, named "*EMC*" in Q3 2010
[58] For example, Software Focus Transaction #039, named "*file tech*" in Q4 2009

**mazars**

2.6.4    The Software Focus Transactions with Misstatements arising from transactions which contained linked or reciprocal transactions are set out in the table below:

Table 2.9: Software Focus Transactions with Misstatements arising from transactions which contained linked or reciprocal transactions[59,60]

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|-----|----------------------------------|-------------------------------------------------------------------|
| Q2 2009 | 019 | VMS | 8.6 |
| Q4 2009 | 036 | Vidient Systems | 2.5 |
| Q4 2009 | 039 | file tech | 8 |
| Q1 2010 | 049 | FileTek | 8.5 |
| Q3 2010 | 066 | Vidient | 2 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 081 | VMS | 4.8 |
| Q1 2011 | 084 | Tottenham | 6.4 |

2.6.5    In correcting these Misstatements, I have accounted for the linked sales and purchases to and from the same customer as a single transaction.  If this results in an outflow of economic benefit from Autonomy, the revenue recognition criteria of IFRS has not been met, and no revenue is recognised.

## 2.7    My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services

2.7.1    As I explain above, IFRS distinguishes between revenue derived from the "*sale of goods*" and revenue derived from the "*rendering of services*"[61].  Whilst revenue from the sale of goods is typically recognised under IFRS when the risks and rewards of ownership of the goods are passed to the buyer, where an entity enters into an agreement to perform a service for its customer, IFRS requires the revenue to be recognised over the period in which the services are performed.  Specifically, IFRS requires the entity to apply what is described as the "*percentage of completion*" method[62], subject to which revenue is recognised by reference to the percentage of the work completed at the end of the reporting period.

---

[59] Were it not for the linked transaction, Software Focus Transactions #039, #049, #066 and #071 would have nevertheless given rise to Misstatements as they were accounted for as a sale of goods rather than as royalties (see Section 2.8 below)
[60] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to three Software Focus Transactions (not including certain other trivial adjustments)
[61] IAS 18, paragraph 1
[62] IAS 18, paragraph 20

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

2.7.2   Moreover, pursuant to IFRS, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a "*straight-line basis*"[63].  Under the "*straight-line basis*", the total consideration due to the entity for the provision of the service is recognised as revenue evenly over the period in which the service is performed.

2.7.3   During the Relevant Period, Autonomy offered customers what it described as a "*Software-as-a-Service and hosted delivery model in the cloud, where the solution is run on hardware owned by Autonomy in a dedicated data centre*"[64].  From my review of the Software Focus Transactions, it appears that Autonomy's "*hosted delivery model*" included the provision of services related to:

(a)   the hosting and archiving of customer data (such as emails) in data centres owned and operated by Autonomy; and

(b)   the hosting of customer data for the purposes of eDiscovery services.

2.7.4   In certain of the Software Focus Transactions, Autonomy sold both a software licence to a customer and also entered into an agreement with that customer to provide ongoing hosted archiving or hosted eDiscovery services for a set period of time[65].  In these transactions, Autonomy recognised the total consideration[66] it was due to receive in relation to the software licence as revenue as if it were all for the sale of goods.

2.7.5   For these Software Focus Transactions, I have first considered whether the commercial effect of the sale of the software licence can be understood without reference to the ongoing hosting or eDiscovery service.  If the two elements cannot be understood without reference to one another, IFRS requires that the elements be accounted for as a single transaction.  As a result, the consideration payable to Autonomy in relation to the software licence should have been considered a prepayment in relation to future hosted archiving or hosted eDiscovery service, and should have been recognised under IFRS as revenue using the "*percentage of completion*" method over the period for which the hosted services were to be performed.

2.7.6   Determining whether the commercial effect of the sale of the software licence can be understood without reference to the ongoing hosting or eDiscovery service requires a

---

[63] Unless there is evidence that some other method better represents the stage of completion of the service. (IAS 18, paragraph 25)
[64] Autonomy's FY2010 Annual Report and Accounts, page 12.  Autonomy's FY2009 Annual Report and Accounts contained an equivalent description
[65] The actual Software Focus Transaction is invariably the value of the software licence sold to the customer
[66] Less, in many instances, an immaterial carve out of consideration deemed to be attributable to ongoing maintenance and support services Autonomy had also simultaneously undertaken to provide

**mazars**

consideration of the specific events and conditions surrounding each of the Software Focus Transactions.   However, I have seen evidence that, for certain of the Software Focus Transactions, the sale of the software licence was connected to the provision of an ongoing hosted archiving or hosted eDiscovery service (and thus the revenue should have been recognised over the period the services were to be performed).   The evidence I have seen includes:

(a)     evidence that the software sold to the customer was restricted in its use, such that it could only be used by the customer in relation to the ongoing hosting services that Autonomy had simultaneously agreed to provide (or was already providing) to the customer[67];

(b)     evidence that, whilst not restricted in its use, the software sold to the customer was to be used as an element of the ongoing hosting services Autonomy had simultaneously agreed to provide (or was already providing) to the customer, and that it would not make commercial sense for the customer to use it in any other way[68];

(c)     evidence that Autonomy had proposed the sale of the software licence to the customer as part of a restructuring of the customer's pre-existing arrangements for hosting services.   This is especially relevant when (i) the proposed restructure discounted or waived amounts payable by the customer in relation to its pre-existing arrangements for hosting services, with the net effect of the restructure being a projected cash saving to the customer[69,70], (ii) the extent or level of the pre-existing hosted services provided by Autonomy were unaffected by the sale of the software licence to the customer in the proposed restructure, and/or (iii) Autonomy's proposals had identified that the software licence had been included in the restructure because it enabled Autonomy to recognise revenue on the transaction immediately[71];

(d)     evidence that Autonomy's customer considered the specific software licenced to be inconsequential to the transaction, for example (i) evidence that the customer had sought to acquire an ongoing hosted archiving or hosted eDiscovery service, rather

---

[67] For example, Software Focus Transaction #013, named "*BofA*" in Q1 2009

[68] For example, Software Focus Transaction #058, named "*Metlife DS*" in Q2 2010

[69] That is, the cash cost of the software licence plus the anticipated cash cost of the services under the restructured arrangement was less than the anticipated cash cost of the services under the pre-existing arrangement

[70] For example, Software Focus Transaction #086, named "*DB Restructure*" Q1 2011

[71] For example, Software Focus Transaction #077, named "*Amgen*" in Q4 2010

than a software licence, or communications from the customer to Autonomy informing Autonomy that it did not intend to use the software licence[72], (ii) evidence that the software licence fee was set before Autonomy and the customer had decided what pieces of software were to be included in the transaction, or that the software licence fee payable by the customer was unaltered by the addition or removal of pieces of software[73], and (iii) evidence that the customer had already acquired a licence for the software, or otherwise had unfettered access to the software, via its previous agreements with Autonomy[74]; and

(e)     evidence that Autonomy internally considered the sale of the software licence incidental to the transaction, for example by internally describing the transaction as "*hosting*", or similar[75].

2.7.7    A Misstatement arises when Autonomy accounted for the sale of software licences and the provision of services separately, despite it not being possible to understand the commercial effect of the series of transactions without reference to one another.   In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

---

[72] For example, Software Focus Transaction #032, named "*Schwab*" in Q4 2009
[73] For example, Software Focus Transaction #087, named "*Morgan Stanley DS*" in Q1 2011
[74] For example, Software Focus Transaction #077, named "*Amgen*" in Q4 2010
[75] For example, Software Focus Transaction #102, named "*JPMC – EDD*" in Q2 2011

**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of independent expert accounting opinions of Steven Brice
FCA

Table 2.10: Software Focus Transactions with Misstatements arising from transactions being accounted for as a sale of goods rather than the rendering of services[76]

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q1 2009 | 013 | BofA | 9.2 |
| Q2 2009 | 022 | JP Morgan Chase | 6.4 |
| Q4 2009 | 032 | Schwab | 3.4 |
| Q4 2009 | 035 | Morgan Stanley | 12.0 |
| Q1 2010 | 048 | B of A | 8.9 |
| Q2 2010 | 053 | BP | 13.5 |
| Q2 2010 | 058 | Metlife DS | 7.0 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 063 | Citadel | 3.7 |
| Q3 2010 | 067 | Bank of America | 2.7 |
| Q4 2010 | 076 | Ahold | 2.8 |
| Q4 2010 | 077 | Amgen | 5.7 |
| Q4 2010 | 078 | Bank of America | 2.0 |
| Q1 2011 | 086 | DB Restructure | 7.1 |
| Q1 2011 | 087 | Morgan Stanley DS | 5.0 |
| Q1 2011 | 093 | Johnson & Johnson | 2.3 |
| Q2 2011 | 102 | JPMC - EDD | 2.6 |
| Q2 2011 | 109 | USPS, eDiscovery | 6.3 |
| Q2 2011 | 116 | MetLife | 5.5 |
| Q2 2011 | 117 | National Bank of Canada | 3.0 |

2.7.8   In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised in relation to the sale of the software licence, and instead recognise the revenue over the period for which Autonomy was providing the hosted archive or hosted eDiscovery service[77].  I also note that under IFRS any income arising from the rendering of services required separate disclosure[78].

## 2.8   My summary conclusions in relation to Misstatements arising from transactions being accounted for as a sale of goods rather than royalties

2.8.1   As I explain above, IFRS distinguishes revenue derived from the "*sale of goods*" from revenue derived from "*the use of an entity's assets*"[79], including the entity's patents, trademarks, copyrights and computer software (so-called "*royalty arrangements*").

---

[76] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to two Software Focus Transactions (not including certain other trivial adjustments)
[77] In doing so, I have applied the guidance of IAS 18.25, insofar as I have recognised the licence fee on a "*straight line*" basis, unless there is evidence that a more appropriate systematic basis might be applied
[78] IAS 18, paragraph 35(b)[ii]
[79] IAS 18, paragraph 1

**mazars**

2.8.2    Under IFRS, revenue earned from royalty arrangements should be recognised on an accrual basis in accordance with the substance of the relevant agreement[80].  For example, if an agreement entitles an entity to receive a five per cent royalty in relation to each sale by a third party, the entity would recognise revenue based on five per cent of total sales made by the third party.

2.8.3    Certain of the Software Focus Transactions relate to royalty arrangements whereby Autonomy granted counterparties the right to sell Autonomy's software, or the right to embed Autonomy's software in its own software for onward sale.  In these Software Focus Transactions relating to royalty arrangements, Autonomy received an up-front, non-refundable payment from the counterparty, against which future royalty payments would offset until the payment was exhausted[81].  Autonomy recognised these up-front payments as revenue at a single point in time, on the date on which it entered the royalty arrangement.

2.8.4    In my opinion these up-front, non-refundable payments were, in substance, the prepayment of royalty fees that were to be earned over the duration of the relevant royalty arrangement.  The prepayment of a royalty fee does not alter the substance of the underlying royalty arrangement and therefore revenue from the royalty arrangements should still have been recognised on an accrual basis.

2.8.5    A Misstatement therefore arises for those Software Focus Transactions where Autonomy recognised a prepaid royalty as revenue on the date on which it entered the royalty arrangement, as opposed to recognising revenue from the royalty arrangement on an accrual basis in accordance with the terms of the arrangement.

2.8.6    Further, under IFRS, revenue from royalty arrangements should only be recognised when it is probable that[82]:

(a)      "*the economic benefits associated with the transaction will flow to an entity; and*

(b)      *the amount of revenue can be measured reliably*".

2.8.7    Reliably measuring the amount of revenue that is earned from a royalty arrangement requires the entity to have an appropriate basis from which to measure the amount of revenue.  In my experience, for most royalty arrangements, the basis will be periodic royalty reports shared

---

[80] IAS 18 explains that "*Royalties accrue in accordance with the terms of the relevant agreement and are usually recognised on that basis unless, having regard to the substance of the agreement, it is more appropriate to recognise revenue on some other systematic and rational basis*".  (IAS 18, paragraph 33)

[81] And thereafter, any further royalties would be payable to Autonomy in line with the terms of the agreement

[82] IAS 18, paragraph 29

**mazars**

by the counterparty to the reporting entity.  However, other appropriate bases might instead include the entity's experience of similar royalty arrangements.

2.8.8    In the absence of an appropriate basis, the amount of revenue cannot be measured reliably and therefore no revenue should have been recognised.  A Misstatement therefore arises for Software Focus Transactions where Autonomy recognised the full pre-paid royalty as revenue despite not having evidence that the royalty had been earned in accordance with the terms of the contract.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.11: Software Focus Transactions with Misstatements arising from transactions being accounted for as a sale of goods rather than royalties**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|-----|--------------|-----|
| Q1 2009 | 012 | Verdasys | 5.0 |
| Q2 2009 | 018 | EMC | 4.7 |
| Q2 2011 | 106 | Rand | 2.3 |

2.8.9    In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the prepaid royalty on an accruals basis.  Unless there is evidence which suggests a more appropriate basis is available[83], I have assumed that the prepaid royalty was earned as revenue evenly over the duration of the arrangement.  I also note that under IFRS any income arising from royalties required separate disclosure[84].

## 2.9    My summary conclusions in relation to Misstatements arising from transactions which contain timing errors

2.9.1    As I explain above, in order to recognise revenue under IFRS, the entity must have transferred to the buyer the "*significant risks and rewards of ownership of the goods*"[85].  IFRS provides examples of situations where an entity might retain the significant risks and rewards of ownership of the goods, including "*when the goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity*"[86].  In such situations, IFRS requires revenue to be deferred until the installation process is complete.

---

[83] For example, periodic reports showing the sales of Autonomy software made by the counterparty, or confirmation from the counterparty as to the value of sales made
[84] IAS 18, paragraph 35(b)[iv]
[85] IAS 18, paragraph 14(a)
[86] IAS 18, paragraph 16(c)

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

2.9.2     A number of the Software Focus Transactions were sales of goods which included a significant installation process and, in certain instances, it was projected that the installation process would be ongoing for a number of months before the software could "go live". However, Autonomy recognised the revenue from the sale of this software before the installation was complete.  In such instances a Misstatement therefore arises.  In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

Table 2.12: Software Focus Transactions with Misstatements arising from transactions which contain timing errors[87]

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---------|---|----------------------------------|-----------------------------------------------------------------|
| Q3 2009 | 027 | Pfizer | 4.5 |
| Q4 2009 | 044 | Goldman Sachs | 2.0 |
| Q2 2010 | 057 | BNP Paribas | 2.7 |
| Q3 2010 | 064 | Xcel Energy | 3.2 |
| Q3 2010 | 072 | Mattel | 3.7 |

2.9.3     In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the revenue when the installation was complete.

## 2.10     My summary conclusions in relation to Misstatements arising from transactions which contain errors of valuation

2.10.1     IFRS requires revenue to be recognised at the "*fair value*"[88] of the consideration received or receivable[89].   Whilst in most instances, the fair value of the consideration received or receivable is the amount of cash (or cash equivalents) received, there are exceptions.

2.10.2     Where an entity enters into a transaction with a counterparty which it subsequently acquires (or from whom it subsequently acquires trade and assets)[90], the amount of the cash or cash equivalents receivable in a transaction might not be an indicator of the fair value of consideration.   This is because the parties may be subsidising the transaction via the exchange of consideration notionally related to the business combination.   In such situations, the acquiring entity is therefore required under IFRS to determine[91]:

---

[87] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to two Software Focus Transactions (not including certain other trivial adjustments).  I now do not consider the adjustments in relation to these two Software Focus Transactions necessary

[88] IAS 18 defines fair value as follows: "*Fair value is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction*".  (IAS 18, paragraph 7)

[89] IAS 18 explains that "*The amount of revenue arising on a transaction is usually determined by agreement between the entity and the buyer or user of the asset. It is measured at the fair value of the consideration received or receivable taking into account the amount of any trade discounts and volume rebates allowed by the entity*".  (IAS 18, paragraph 10)

[90] The acquisition of an entity (or certain trade and assets of an entity) is referred to as a "*Business Combination*"

[91] IFRS 3 "*Business Combinations*" ("**IFRS 3**"), paragraph 51 (with guidance at IFRS 3, paragraph B50)

**mazars**

(a)     whether the previous transactions with the acquired entity were separate from the acquisition, or whether, in substance, the transactions formed part of the acquisition; and, if the latter

(b)     what the "*fair value*" of the transactions was, with such amounts included in the total value of the consideration.

2.10.3   When these requirements are applied, parties would be prevented from artificially inflating or deflating the purchase price of an acquisition via the simultaneous transfer of assets at below or above their fair value.

2.10.4   I have identified one Software Focus Transaction in respect of which Autonomy engaged in a number of transactions with a counterparty in the period prior to a business combination.  This resulted in Misstatements as follows:

(a)     Autonomy failed to determine that certain transactions were linked to the business combination, and therefore failed to assess the fair value of the transaction; and

(b)     for transactions which Autonomy did consider to be part of the business combination, the fair value determined by Autonomy was misstated.

2.10.5   In my opinion, the following Software Focus Transactions gave rise to such Misstatements:

**Table 2.13: Software Focus Transactions with Misstatements arising from errors of valuation[92],[93]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue recognised in relation to Software Focus Transaction ($m) |
|---|---|---|---|
| Q2 2011 | 096 | Iron Mountain - OEM | 16.5 |

2.10.6   In order to correct these Misstatements, it is necessary to reverse the amount of revenue that had been recognised, and instead recognise the revenue at its fair value.

---

[92] Notwithstanding the errors of valuation, Software Focus Transaction #096 would have nevertheless given rise to a Misstatement as it was accounted for as a sale of goods despite partially relating to a royalty arrangement (see Section 2.8 above)

[93] As a result of further information I have now seen, the conclusions summarised in this table have developed compared with my conclusions in My Hussain Report in relation to one Software Focus Transaction (not including certain other trivial adjustments)

# 3    Summary of my opinion in relation to hardware sales transactions

## 3.1    Introduction

3.1.1    I am instructed to review hardware sales transactions reported by Autonomy during the Relevant Period as revenue and give my opinion on whether these sales were properly accounted for and disclosed in accordance with the applicable accounting standards.  In this section of my report, I provide a summary of my opinion.

## 3.2    The starting point for my analysis: the hardware sales transactions reported by Autonomy as revenue during the Relevant Period

3.2.1    As noted in Section 2 above, using the Quarterly Revenue Breakdowns (which I have found agree to the total revenue reported in the quarterly financial statements), I have identified the revenue reported by Autonomy in each quarter during the Relevant Period (apart from Q3 2011) that arose from hardware sales transactions.  I have identified the hardware sales revenue by comparing transactions in the Quarterly Revenue Breakdowns with the transactions recorded in general ledger[94] account "*470000 – Hardware Revenue – CDF*" (the "**Hardware Ledger**")[95], which, at face value, appears to be the ledger in which Autonomy recorded the revenue from hardware sales transactions.  The Hardware Ledger is helpful because in addition to the relevant customer name, it records other information, such as invoice numbers, that are not recorded on the Quarterly Revenue Breakdowns.  My analysis is provided in Appendix D.

3.2.2    The total revenue reported by Autonomy arising from hardware sales transactions in each period is shown in Table 3.1:

---

[94] The general ledger is the hub of the accounting system, with each general ledger account dedicated to a particular type of transaction (such as revenue from hardware transactions) or to a category of party with whom the entity transacts (such as suppliers or related companies)
[95] I have used downloads from the Autonomy general ledger

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**mazars**  Summary of independent expert accounting opinions of Steven Brice FCA

**Table 3.1: Total revenue arising from hardware sales transactions reported by Autonomy in the Relevant Period (apart from Q3 2011)[96],[97]**

| Quarter | Hardware revenue ($m) |
|---------|----------------------|
| Q1 2009 | 0.0 |
| Q2 2009 | 6.2 |
| Q3 2009 | 38.0 |
| Q4 2009 | 9.4 |
| Q1 2010 | 11.8 |
| Q2 2010 | 31.1 |
| Q3 2010 | 26.8 |
| Q4 2010 | 35.5 |
| Q1 2011 | 20.1 |
| Q2 2011 | 20.9 |
| **Total** | **199.9** |

3.2.3    Given the materiality ranges identified in Table 2.5, with the exception of Q1 2009 (in which no hardware revenue was recognised) the revenue recognised from hardware transactions was material.

3.2.4    According to the Hardware Ledger, the revenue arising from hardware sales transactions is comprised of over 1,000 hardware sales transactions.  In order to address my instructions, it is necessary to identify a smaller population of transactions to focus upon.  I have therefore identified invoices from the Relevant Period (apart from Q3 2011) of more than $1 million[98].  It is these transactions I will focus on in order to address my instructions (the "**Hardware Focus Transactions**")[99],[100].   The Hardware Focus Transactions are summarised by the quarter in which each invoice was posted to the Hardware Ledger in Table 3.2 below and a full list by client and invoice is provided in Appendix E.

---

[96] These are hardware sales of Autonomy, Inc. only.  There are also small amounts of hardware sales in ASL and Autonomy ETalk totalling approximately $3 million over the period Q1 2009 to Q2 2011

[97] I note that hardware revenue in each of Q3 2009, Q4 2009 and Q1 2010 have been updated since my Interim Report.  An explanation of the changes is included in Appendix D

[98] As noted in footnote 14 above, the witness statement of Mr Welham in the High Court Proceedings, dated 14 September 2018, explained that the Deloitte audit team undertook "*audit work in respect of all sales made by Autonomy of more than $1m*".  On the basis that this testing threshold of $1 million is not unreasonable, I have adopted it in my testing of the hardware sales transactions

[99] I do not have a complete population of relevant documents for all of the Hardware Focus Transactions, and I have not identified any documents for one Hardware Focus Transaction

[100] I note that in My Hussain Report I was instructed to "*review the lists identifying Autonomy's Top 40 Contracts and Top 40 Customers provided to HP as part of the due diligence process with my software and hardware samples, noting any apparent omissions from those lists*" (My Hussain Report, paragraph 1.2.3(e)).  I noted three hardware transactions which were omitted from the Top 40 Contract list and 10 customers omitted from the Top 40 Customer list.  The three hardware transactions which were omitted remain Hardware Focus Transactions and therefore my conclusions in this regard have not changed

**mazars**

Table 3.2: Summary of the Hardware Focus Transactions[101]

| Quarter | Total value of Hardware Focus Transactions ($m) |
|---------|------------------------------------------------|
| Q3 2009 | 34.2 |
| Q4 2009 | 3.5 |
| Q1 2010 | 14.3 |
| Q2 2010 | 15.2 |
| Q3 2010 | 12.0 |
| Q4 2010 | 17.1 |
| Q1 2011 | 7.5 |
| Q2 2011 | 7.9 |
| **Total** | **111.7** |

3.2.5    Autonomy therefore reported total revenue relating to the Hardware Focus Transactions during the Relevant Period (apart from Q3 2011) of $111.7 million.  This is around 5.4%[102] of the total revenue reported by Autonomy in these quarters during the Relevant Period.

## 3.3    Overview to my summary conclusions

3.3.1    For each of the Hardware Focus Transactions, I have sought to identify contemporaneous information pertaining to the transaction in order to understand its underlying substance and economic reality.  This information primarily comprises:

(a)    documents sent between Autonomy and its hardware suppliers, such as agreements, quotes, purchase orders, and invoices;

(b)    documents sent between Autonomy and its customers, such as agreements, quotes, purchase orders and invoices and delivery documents;

(c)    audit working papers where relevant; and

(d)    general ledger postings (including the Hardware Ledger) and other underlying accounting information.

3.3.2    In summary, I understand from the contemporaneous information that:

(a)    the majority of transactions recorded in the Hardware Ledger appear to be simply resales to customers of products purchased from third parties (such as Dell or EMC).

---

[101] It is apparent that in, for example, Q1 2010, the total value of the Hardware Focus Transactions is greater than the total hardware revenue in Q1 2010.  This is because I have selected the Hardware Focus Transactions from invoices posted in each quarter.  Journals also posted to the Hardware Ledger in Q1 2010 reduce the total quantum of invoices posted in this quarter
[102] Being $111.7 million / $2,086.1 million

I have not seen any evidence to suggest that Autonomy software was loaded onto this hardware before its onward sale to a third party customer;

(b)     the products purchased from third parties were mostly hardware products although, in certain transactions, part of the products sold appear to have been third party software;

(c)     most of these sales were made at a loss to Autonomy, because the price at which the hardware was sold by Autonomy was less than the price at which it had been purchased;

(d)     initially, the cost of purchasing the hardware was primarily reported in Autonomy's quarterly financial statements in both "*Cost of revenues*" and "*Sales and marketing*" costs (often applying a 50:50 split).  In mid-2010 the practice changed and most of the cost of purchasing the hardware was reported as a "*Cost of revenues*" with primarily just the loss that Autonomy made on each sale being reported as "*Sale and marketing*" costs; and

(e)     journals posted in the Hardware Ledger moved the recognition of revenue from hardware sales transactions between quarters.

3.3.3   Having identified the underlying substance and economic reality of the Hardware Focus Transactions[103], I have then considered whether these transactions were properly accounted for and disclosed in accordance with IFRS.  Based upon the information I have seen, my overview conclusions are as follows:

(a)     in breach of the requirements of IFRS, Autonomy inappropriately accrued or deferred the recognition of revenue arising from certain hardware sales transactions between reporting periods.  In addition, Autonomy recognised revenue for certain hardware sales before the revenue recognition criteria of IFRS had been met.  This led to material misstatements in the revenue reported by Autonomy during the Relevant Period;

(b)     in breach of the requirements of IFRS, Autonomy inappropriately reported part of the cost of purchasing the hardware as being a cost of "*Sales and marketing*".  This led to material misstatements in the reported "*Cost of revenues*" (and thus the

---

[103] For those Hardware Focus Transactions where sufficient relevant documents were provided to me

mazars

computed "*Gross profit*"), as well as a material misstatement in the reported cost of "*Sales and marketing*"; and

(c)  in breach of the requirements of IFRS, Autonomy did not make any disclosure about the existence of a material amount of revenue arising from hardware sales transactions.

3.3.4   I address each of these areas in turn in Sections 3.4 to 3.6 below.

## 3.4   My summary conclusions in relation to the inappropriate accrual or deferral of revenue arising from hardware sales transactions between reporting periods and the inappropriate early recognition of hardware sales

3.4.1   The recognition of revenue from the sale of goods is required by IFRS to take place on the date that the transfer of the "*significant risks and rewards of ownership of the goods*" takes place[104].  In most cases, the date of the transfer of the risks and rewards of ownership of the goods "*coincides with the transfer of the legal title or the passing of possession to the buyer*"[105].

3.4.2   In the Hardware Ledger, there are a number of journals which defer revenue recorded following the posting of invoices for specific named customers to the subsequent quarter.  In addition, in four quarters journals were posted which either accrued revenue for unnamed customers (that is, brought forwards the date on which the revenue was reported) or deferred revenue from unnamed customers (that is, delayed the date on which the revenue was reported), as follows[106]:

(a)  two journals meant that $6.2 million of revenue was accrued and recognised in Q2 2009 rather than in Q3 2009;

(b)  two journals meant that $7.7 million of revenue was deferred and not recognised in Q1 2010 and instead was recognised in Q2 2010;

(c)  one journal meant that $7.8 million of revenue was deferred and not recognised in Q2 2010 and instead was recognised in Q3 2010; and

---

[104] IAS 18, paragraph 14
[105] IAS 18, paragraph 15
[106] Hardware Ledger

**mazars**

(d)     one journal meant that $3.9 million of revenue was deferred and not recognised in Q1 2011 and instead was recognised in Q2 2011.

3.4.3   In practice, there are various reasons why an entity might appropriately post journals which have the result of accruing or deferring revenue between reporting periods.  For example:

(a)     an entity may accrue revenue (that is bring forwards the reporting of revenue) because the relevant posting in the ledger had not been made (perhaps because there had been a delay in the issuance of the invoice) but the goods had been delivered and the revenue recognition criteria of IFRS had been met; and

(b)     an entity may defer revenue (that is delay the recognition of the revenue) because there had been a delay in the delivery of the goods meaning that the revenue recognition criteria of IFRS had not been met at the period end.

3.4.4   I have sought to review the information underpinning the sales transactions that were accrued or deferred from one period to another, and I have identified that, in certain instances, journals or other entries posted by Autonomy were not appropriate.  These journals meant that revenue arising from hardware sales was misstated in two reporting periods; the period in which the income is recognised was overstated and the period in which the revenue should have been reported was understated.  In addition, the available evidence around shipment and delivery for some of my Hardware Focus Transactions demonstrates that revenue was recognised before the revenue recognition criteria of IFRS were met.  Where the quantum of any such misstatements is material, the financial statements cannot be said to have been prepared in accordance with IFRS.

3.4.5   I provide examples below:

Example of inappropriate accrual of income: the reporting of $6.0 million of revenue in Q2 2009 rather than Q3 2009

3.4.6   Autonomy accrued $6 million in the Hardware Ledger in Q2 2009 and recognised this as revenue (rather than in Q3 2009).  This revenue represents a sale by Autonomy to Morgan Stanley of $6 million of Hitachi Data Systems ("**HDS**") hardware which was ordered by Morgan Stanley[107], invoiced to Morgan Stanley by Autonomy[108], shipped to Morgan Stanley[109] and invoiced by HDS to Autonomy[110] all in Q3 2009.  The revenue recognition criteria of IFRS

---

[107] HP-SEC-01654186-01654188
[108] HP-SEC-01654189
[109] HP-SEC-01654198-01654212 and HP-SEC-01654193-01654196
[110] HP-SEC-01654191

**mazars**

were therefore not met until Q3 2009 and revenue should not have been recognised until this quarter.  The sales invoice was posted to the Hardware Ledger in Q3 2009, but the reversal of the accrual recognised in Q2 2009 meant that the net impact on revenue in Q3 2009 was $0.

3.4.7    In conclusion, revenue in Q2 2009 was overstated by $6 million and revenue in Q3 2009 was understated by $6 million.  More detail about this transaction is provided in Appendix G.

*Example of inappropriate deferral of income: the reporting of $5.6 million of revenue in Q3 2010 rather than Q1 2010*

3.4.8    Two journals posted to the Hardware Ledger in Q1 2010 had the effect of deferring $7.75 million of sales from Q1 2010 to a later quarter, including $5.6 million resales of HDS hardware to Morgan Stanley[111].  This deferral of revenue from the resale of HDS hardware to Morgan Stanley comprised 23 separate invoices.  These are listed on an Autonomy tracking spreadsheet that also records the date the products were delivered against each invoice[112]. The products for each of these 23 invoices were delivered in Q1 2010.

3.4.9    One of these invoices is over $1 million in value and therefore was one of my Hardware Focus Transactions.  The documents available to me for this transaction show that in Q1 2010:

(a)    HDS provided a quote to Autonomy[113];

(b)    Morgan Stanley issued a purchase order to Autonomy[114];

(c)    Autonomy issued a purchase order to HDS[115];

(d)    the products were shipped to Morgan Stanley[116];

(e)    Autonomy issued its invoice to Morgan Stanley[117]; and

(f)    HDS issued its invoice to Autonomy[118].

---

[111] The two journals deferred revenue of $4.47 million and $3.28 million, in total $7.75 million.  A breakdown of the revenue deferred between customers is provided in the attachment to Mr Chamberlain's email to Cynthia Watkins on 8 April 2010. (HP-SEC-00100357-00100359)
[112] HP-SEC-01855197
[113] HP-SEC-01655154
[114] HP-SEC-01655149-01655150
[115] HP-SEC-01655152
[116] HP-SEC-01655153
[117] HP-SEC-01655147
[118] HP-SEC-01655155

mazars

3.4.10   The Master Purchase Agreement between Autonomy and Morgan Stanley dated 30 June 2009 states that title and risk of loss passes to Morgan Stanley upon shipment from the manufacturer and that the products are deemed accepted upon delivery to the specified address[119].  It is evident therefore that the revenue recognition criteria of IFRS were met in Q1 2010 and revenue should have been recognised in this quarter.  Given the remaining 22 invoices were also shipped in Q1 2010 and would have been covered by the same Master Purchase Agreement, it is reasonable in my opinion to assume that each of these sales also met the IFRS revenue recognition criteria in Q1 2010 and should have been recognised in this quarter.  Accordingly, revenue in Q1 2010 was understated by $5.6 million and revenue in Q3 2010 was overstated by this amount.

3.4.11   In Q2 2010, whilst the two journals referred to were reversed, a separate journal deferred $7.83 million of revenue from Q2 2010 to Q3 2010.  The $5.6 million of sales to Morgan Stanley were part of this deferral and therefore ultimately this revenue was not recognised until Q3 2010.

3.4.12   Deloitte included the transaction that is one of my Hardware Focus Transactions (and one other from the $5.6 million total) in its Q3 2010 hardware revenue testing and concluded that in their opinion the revenue should have been recognised in Q1 2010[120].

Example of inappropriate recognition of revenue before the revenue recognition criteria of IFRS had been met (1)

3.4.13   The deferral of $7.75 million referred to in paragraph 3.4.8 above also included the deferral of a $1.31 million sale of Dell hardware to SHI, with reference "WHE5P".  The attachment to Mr Chamberlain's email to Cynthia Watkins[121] demonstrates that as at 7 April 2011, it was intended that both this sale and a second sale of Dell hardware to SHI for $1.3 million with reference "WHE5Q" should be deferred, but one day later only WHE5P was to be deferred.

3.4.14   The documents available for these two transactions are summarised in Appendix G.  I conclude that the revenue recognition criteria of IFRS were not met with regards to either of these two sales in Q1 2010, specifically that the risks and rewards of ownership had not transferred to the buyer at 31 March 2010 because delivery of the hardware did not take place until April 2010.  Accordingly, an additional $1.31 million in revenue should have been deferred from Q1 2010 to Q2 2010.

---

[119] HP-SEC-01654676-01654684, clause 2 and clause 5
[120] Deloitte working paper "Q3-8130 Hardware Testing.xls"
[121] HP-SEC-00100357-00100359

**mazars**

Example of inappropriate recognition of revenue before the revenue recognition criteria of IFRS had been met (2)

3.4.15   Revenue of $2.524 million for a hardware sale to SHI was recognised in Q1 2011.  Documents relevant to this transaction are summarised in Appendix G.

3.4.16   Whilst the hardware had not been delivered until early Q2 2011, the quote provided by Autonomy to SHI provided that title passed to SHI from Autonomy upon Dell's delivery at Dell's plant to a common carrier and that Autonomy was responsible for delivering the products to SHI[122].

3.4.17   An email chain between Julia Perez of Dell and Jeffrey Guido of Autonomy[123] clearly sets out that on 31 March 2011 the hardware was in transit from a Dell facility in China to a Dell facility in Nashville where it would be processed, packaged and shipped.  In my view it is clear that as at 31 March 2011, the hardware had not been delivered by Dell to a common carrier and accordingly, the revenue recognition criteria of IFRS had not been met.  I therefore consider this revenue should not have been recognised until Q2 2011.

Example of inappropriate recognition of revenue before the revenue recognition criteria of IFRS had been met (3)

3.4.18   Revenue of $2.650 million for a hardware sale to SHI was recognised in Q2 2011.  Documents relevant to this transaction are summarised in Appendix G.

3.4.19   The purchase order reference for this sale was WHZM2[124] and an email from Julia Perez of Dell to Stephen Chamberlain and Poppy Prentis of Autonomy on 14 July 2011 states that order WHZM2 is "*in production – eta for orders to ship is 7/29*"[125].

3.4.20   The quote provided by Autonomy to SHI provided that title passed to SHI from Autonomy upon Dell's delivery at Dell's plant to a common carrier and that Autonomy was responsible for delivering the products to SHI[126].  However, it is apparent from the email referred to above the hardware was still in production and so cannot have been delivered by Dell to a common carrier as at 30 June 2011 and accordingly, the revenue recognition criteria of IFRS had not been met.  I therefore consider this revenue should not have been recognised until Q3 2011.

---

[122] HP-SEC-01654950-01654952
[123] HP-SEC-01654955-1654956
[124] HP-SEC-01654642
[125] HP-SEC-01867367
[126] HP-SEC-01654637-01654639

---

Video Monitoring Services ("**VMS**")

3.4.21   In addition to the examples of hardware revenue recognised in the wrong accounting quarter that are summarised above, the revenue attributable to hardware sales to VMS in Q4 2010 is considered to be overstated by $3.4 million.

3.4.22   These sales are linked to one of my Software Focus Transactions (SW-10-081 Video Monitoring Systems).  In that Appendix I conclude that three transactions between Autonomy and VMS are linked and that the net inflow of economic benefit to Autonomy across all three transactions of $2,604,066 should be allocated to the hardware sale.  Accordingly, revenue of $6 million recognised for these sales in Q4 2010 should be reduced by $3.4 million.

3.4.23   More detail is provided in Appendix G.

## 3.5   My summary conclusions in relation to the inappropriate reporting of all or part of the cost of purchasing the hardware as being a "*Sales and marketing*" expense

3.5.1   My review of the available information has identified that Autonomy reported part of the cost of purchasing the hardware that it would then sell to third parties as being a "*Sales and marketing*" expense[127].

3.5.2   In my view, pursuant to the requirements of IFRS, the cost to Autonomy of purchasing the hardware should have been reported as a "*Cost of revenues*" and not as a "*Sales and marketing*" expense for the following reasons:

(a)   pursuant to IFRS, "*inventories*" are assets "*held for sale in the ordinary course of business*"[128] and specifically "*encompass goods purchased and held for resale*"[129]. It is therefore clear that where goods are held at the end of the reporting period, this should be reported as part of inventory.  A reporting entity is required by IFRS to report in its financial statements the "*amount of inventories recognised as an expense during the period*"[130], and IFRS notes that this is "*often referred to as cost of sales*"[131].  In my view, "*cost of sales*" is analogous with "*cost of revenues*", being the term that Autonomy used.  Therefore, Autonomy was required to report as part

---

[127] For example, as described in the "*Strategic Deals Memorandum*", DEL00100362-DEC00100369
[128] IAS 2 "*Inventories*" ("**IAS 2**"), paragraph 6 defines inventories as follows: "*Inventories are assets: (a) held for sale in the ordinary course of business; (b) in the process of production for such sale; or (c) in the form of materials or supplies to be consumed in the production process or in the rendering of services*"
[129] IAS 2, paragraph 8
[130] IAS 2, paragraph 36(d)
[131] IAS 2, paragraph 38

Case 3:18-cr-00577-CRB   Document 297-7   Filed 01/17/24   Page 46 of 80

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of independent expert accounting opinions of Steven Brice
FCA

mazars

of its "*Cost of revenues*" the cost of all inventory (goods purchased and held for resale) recognised as an expense; and

(b)     in its 2010 consolidated financial statements Autonomy disclosed that:

   (i)     "*Cost of revenues*" included the "*costs of product media, product duplication, hardware and manuals*"[132], confirming that the cost of purchasing hardware for resale should be included in this cost component; and

   (ii)     "*sales and marketing costs comprise the costs of the sales force, commissions and costs of promoting new products and entering into new markets*"[133], confirming that the cost of hardware should not be included in this cost component.

3.5.3     I note that I have seen evidence that Autonomy justified its practice to report the cost of hardware as a cost of "*Sales and marketing*" by reference to there being a strategic partnership in place with the hardware suppliers[134].   However:

(a)     my review of the available information suggests that no such strategic partnership was in place – the transactional documents appear to reflect the buying and selling of hardware.   Where contemporaneous documents refer to the potential for marketing, this appears to be from Autonomy's perspective[135] or is at the sole discretion of the hardware supplier[136]; and

(b)     if, pursuant to a strategic partnership agreement, marketing was undertaken by the hardware supplier in addition to its supply of the hardware goods (and I have seen no evidence to suggest this was the case), the fair value of these services could be reported as part of the cost of "*Sales and marketing*" if the component of that cost could be reliably measured.   It would also need appropriate disclosure (including in the accounting policies reflected above).

3.5.4     As a result, in my view, the "*Cost of revenues*" in Autonomy's quarterly financial statements were understated and the reported costs of "*Sales and marketing*" were overstated.   Further, the computed gross profit and gross profit margin (which are both important measures of

---

[132] Autonomy's FY2010 Annual Report and Accounts, page 51
[133] Autonomy's FY2010 Annual Report and Accounts, page 52
[134] For example, as described in the "*Strategic Deals Memorandum*", DEL00100362-DEC00100369
[135] For example, the purchase orders issued by Autonomy to Dell, such as US-PWC 00002646
[136] For example, the "Joint Marketing Efforts" clause in Attachment B to the Value Added Reseller Agreement between Dell and Autonomy.   (US-PWC 00002327-00002338)

profitability) were also misstated.  Importantly, I have seen evidence that the users of the financial statements were particularly interested in the gross profit margin – for example in an earnings conference call from Q2 2010 an analyst at Piper Jaffray asked "*you saw that spike in appliance sales, that inventory moving through.  Did that have any gross margin impact?*" and an analyst at Nomura International asked "*I just wanted to come back to the gross margin […] So, is it possible that you might get in Q3/Q4 more of slightly lower margin hardware-related deals?*"[137].

## 3.6 My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions

3.6.1    Autonomy's financial statements disclose that the "*group is a software business*"[138] and do not make reference to Autonomy's sales of hardware products.  Importantly, the nature and economic realities of Autonomy's software sales transactions were significantly different to the nature and economic realities of Autonomy's hardware sales, for example:

(a)    whilst Autonomy described that its software business had a fixed cost base[139], which means that incremental revenue is additive to reported profit, the cost base for hardware sales was clearly not fixed (because every incremental sale required Autonomy to purchase the goods)[140]; and

(b)    whilst software was a high margin business, it is clear from my analysis of the Hardware Focus Transactions that the hardware business was a low margin business (and most of the Hardware Focus Transactions were actually loss making).

3.6.2    In addition to the significant difference between the two business models including a different nature and economic reality to the relevant transactions, by reference to the materiality thresholds in Table 2.5 the quantum of hardware sales was material.

3.6.3    Given the above, pursuant to the requirements of IFRS, Autonomy should have disclosed the existence of a material amount of revenue being generated from hardware sales transactions, which were significantly different in nature and economic reality to the software sales transactions that were described in the financial statements.  My conclusion is based upon the following:

---

[137] EMC-HP-026620 and EMC-HP-026623

[138] Autonomy's FY2010 Annual Report and Accounts, page 58

[139] "*A significant proportion of the group's cost base is fixed*".  (Autonomy's FY2010 Annual Report and Accounts, page 58)

[140] "*the business model drives enhanced performance though growing sales*".  (Autonomy's FY2010 Annual Report and Accounts, page 58)

**mazars**

(a)     IFRS requires "*fair presentation*", including the "*faithful representation*" of the effects of transactions[141].   In particular, fair presentation requires an entity to provide additional disclosures to "*enable users to understand the impact of particular transactions*"[142].   Without a separate disclosure in relation to the hardware sales transactions, users would not be able to understand their impact;

(b)     IFRS requires that an entity should "*present separately items of a dissimilar nature or function unless they are immaterial*"[143].   The hardware sales transactions were clearly items of a dissimilar nature and were material, and therefore should have been presented separately;

(c)     the Conceptual Framework to IFRS requires:

(i)     financial statements to "*represent economic phenomena in words and numbers*"[144] and for this information to not only represent relevant phenomena, but it must also "*faithfully represent the phenomena that it purports to represent*"[145].   The representation of a material amount of hardware sales as being software sales is not a faithful representation; and

(ii)     financial statements to be "*complete*"[146] in that they include *"all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations*"[147].   Of particular relevance to the hardware sales transactions, the Conceptual Framework further provides that "*For some items, a complete depiction may also entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature*"[148].   Explanations regarding the hardware sales transactions were therefore required in order to enable the users of the financial statements to understand how Autonomy was generating its revenue;

---

[141] IAS 1, paragraph 15
[142] IAS 1, paragraph 17(c)
[143] IAS 1, paragraph 29
[144] Conceptual Framework, paragraph QC12; equivalent guidance on "*Faithful Representation*" and "*Substance over form*" is found at paragraphs 33 to 35 of the Framework
[145] Conceptual Framework, paragraph QC12
[146] Conceptual Framework, paragraph QC12; equivalent guidance on "*Completeness*" is found at paragraph 38 of the Framework
[147] Conceptual Framework, paragraph QC13
[148] Conceptual Framework, paragraph QC13

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice FCA

**mazars**

(d)   IFRS required Autonomy to disclose the amount of revenue included in "*each significant category of revenue*"[149].   In my view, revenue from hardware sales transactions was a significant category of revenue and therefore required separate disclosure[150];

(e)   IFRS required Autonomy to disclose the amount of hardware inventory they had recognised as an expense during the period[151]; and

(f)   IFRS requires a reporting entity to disclose separate financial information (including revenue and segment profits) for each "*operating segment*"[152].   Had this information for hardware sales transactions been disclosed, the information would certainly have been helpful for the users of the accounts because it would have enabled them to understand the nature and financial effects of these transactions.   Autonomy would have been required to disclose this information if Dr Lynch, the chief operating decision maker of Autonomy[153], regularly reviewed the operating results relating to hardware in order to assess performance.   Even if Dr Lynch did not regularly review the operating results relating to hardware, meaning that Autonomy only had one operating segment, Autonomy was required by IFRS to report the revenues for "*each product and service, or each group of similar products and services*"[154].   This therefore required Autonomy to separately disclose the revenues for hardware sales[155].

---

[149] "*An entity shall disclose: (a) the accounting policies adopted for the recognition of revenue, including the methods adopted to determine the stage of completion of transactions involving the rendering of services; (b) the amount of each significant category of revenue recognised during the period, including revenue arising from: (i) the sale of goods; (ii) the rendering of services; (iii) interest; (iv) royalties; (v) dividends; and (c) the amount of revenue arising from exchanges of goods or services included in each significant category of revenue*".   (IAS 18, paragraph 35)

[150] I note irrespective of whether hardware sales are considered to be a "*significant category of revenue*", in my opinion disclosure is required under IFRS 8 paragraph 32 for each product and service (or each group of similar products and services).   Further, IAS 1.17(c) requires an entity to provide additional disclosures to "*enable users to understand the impact of particular transactions*" and ensure a fair presentation

[151]   "*The financial statements shall disclose… (d) the amount of inventories recognised as an expense during the period*".   (IAS 2, paragraph 36)

[152] IFRS 8 "*Operating segments*" ("**IFRS 8**"), paragraph 5

[153] Autonomy's FY2010 Annual Report and Accounts, page 58

[154] IFRS 8, paragraph 32

[155] The only reason for not doing so, per paragraph 32 of IFRS 8, is if "*the necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed*".   Not only was there no disclosure that the information on hardware revenues was not available, this information was clearly available as it was recorded separately in the Hardware Ledger

**mazars**

# 4 My summary conclusions in relation to the revenue streams reported by Autonomy from Q1 2010 onwards

## 4.1 Introduction

4.1.1 I am instructed to review the revenue streams reported by Autonomy during the Relevant Period and give my opinion on whether the description of these streams is consistent with the nature of the underlying transactions.  In this section of my report I provide a summary of my opinion.

## 4.2 The starting point for my analysis: the revenue streams reported by Autonomy in its commentary to the market

4.2.1 From Q1 2010 onwards, Autonomy reported the following revenue streams in the financial information published with or alongside its quarterly and annual financial statements[156]:

(a) "*IDOL Product*", which is described as licensed software paid for up-front with an ongoing support and maintenance stream;

(b) "*IDOL Cloud*", which is described as a Software-as-a-Service (SaaS) model;

(c) "*IDOL OEM*", which is where Autonomy's IDOL is embedded inside other software companies' products;

(d) "*Deferred revenue release*", which stems from support and maintenance contracts recognised in arrears; and

(e) "*Services*", which relate to third party and internal implementation consultants and training[157,158].

4.2.2 The sum of the revenues reported in these revenue streams agrees to the total revenues reported by Autonomy in its quarterly financial statements, as shown for the period Q1 2010 to Q2 2011 in the table below:

---

[156] These revenue streams were not reported in Autonomy's annual or quarterly financial statements themselves

[157] Refer to the Autonomy presentation "*Q3 09 Results 20 October 2009*" (HP-SEC-00025157-HP-SEC-00025179) for Autonomy's first identification of these revenue streams

[158] Given the low monetary value and nature of this revenue stream I have done no further analysis in respect of services

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

mazars   Summary of independent expert accounting opinions of Steven Brice FCA

**Table 4.1: Quarterly breakdown of revenue across the reported revenue streams from Q1 2010 to Q2 2011**

| $m | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 |
|---|---|---|---|---|---|---|
| IDOL Product | 46.0 | 62.4 | 58.3 | 84.3 | 54.4 | 68.5 |
| IDOL Cloud | 45.5 | 46.9 | 46.6 | 50.6 | 52.7 | 64.3 |
| IDOL OEM | 29.1 | 37.5 | 31.2 | 34.5 | 37.2 | 47.2 |
| Services | 11.4 | 10.9 | 10.2 | 9.5 | 9.0 | 8.8 |
| Deferred revenue release | 62.2 | 63.4 | 64.3 | 65.6 | 66.5 | 67.5 |
| **Total** | **194.2** | **221.1** | **210.6** | **244.5** | **219.8** | **256.3** |

4.2.3   The table above illustrates that the total of the recurring revenue streams, reported as IDOL Cloud and IDOL OEM, were generally increasing across the period, whereas IDOL Product revenue was fluctuating.  Additionally, the total reported IDOL Cloud and IDOL OEM revenues were 162.3% of IDOL Product revenues in Q1 2010 and 162.8% of reported IDOL Product revenues in Q2 2011 (with a peak of 165.1% in Q1 2011).

## 4.3   Applicable financial reporting requirements

4.3.1   The above-mentioned revenue streams were not reported in Autonomy's quarterly financial statements themselves but were instead disclosed to the market within the accompanying management commentary provided by Autonomy[159] alongside its quarterly financial statements.

4.3.2   Given Autonomy was listed on the London Stock Exchange, it was required to comply with the requirements of the Disclosure and Transparency Rule ("**DTR**").  The DTR:

(a)   required that Autonomy prepare a management report to accompany its annual financial statements.  Such management reports were required to provide a fair review of the business, including a balanced and comprehensive analysis of the financial performance[160];

(b)   required that Autonomy prepare a management report to accompany its interim financial statements[161].  Autonomy was required to also provide a responsibility

---

[159] For example by way of financial information published with its quarterly and annual financial statements, trading updates, results presentations, or investor Q&As

[160] "*The management report must contain: 1. a fair review of the issuer's business; and 2. a description of the principal risks and uncertainties facing the issuer.  The review required by DTR 4.1.8 R must: 1. be a balanced and comprehensive analysis of: a) the development and performance of the issuer's business during the financial year; and b) the position of the issuer's business at the end of that year, consistent with the size and complexity of the business; 2. include, to the extent necessary for an understanding of the development, performance or position of the issuer's business: a) analysis using financial key performance indicators; and b) where appropriate, analysis using other key performance indicators including information relating to environmental matters and employee matters; and 3. include references to, and additional explanations of, amounts included in the issuer's annual financial statements, where appropriate*".  (DTR, paragraphs 4.1.8 and 4.1.9)

[161] DTR, paragraph 4.2.7

statement attesting that the management report provided a fair review of the information required[162]; and

(c)    required Autonomy to make interim management statements within the first and second six months of its financial year[163], which were required to provide *inter alia* a general description of the financial performance during the relevant period[164]. Such statements, like all disclosures to the market, were covered by the requirement of the DTR that issuers take reasonable care to ensure that any information reported is not "*misleading, false or deceptive*"[165].

4.3.3    Further, it is my view that the above-mentioned revenue streams were an element of Autonomy's "*other financial reporting*", which is explained in the Preface to IFRS as being "*information provided outside financial statements that assists in the interpretation of a complete set of financial statements that assists in the interpretation of a complete set of financial statements or improves users' ability to make efficient economic decisions*"[166].

4.3.4    The Conceptual Framework explains that a fundamental qualitative characteristic of useful financial information is that it faithfully represents what it purports to represent[167], and is "*complete, neutral, and free from error*"[168].  As such, it is my opinion that the revenue streams reported by Autonomy to the market in its "*other financial reporting*" should have reflected Autonomy's definitions of those revenue streams.

4.3.5    Finally, I note that pursuant to the Companies Act 2006, Autonomy was required to prepare a fair review of its business and a balanced and comprehensive analysis of its financial performance[169].  In my opinion, this requirement is again consistent with a requirement that

---

[162] DTR, paragraph 4.2.10(3)

[163] DTR, paragraph 4.3.2

[164] DTR, paragraph 4.3.5

[165] DTR, paragraph 1.3.4

[166] Preface to IFRS, paragraph 7

[167] Conceptual Framework, paragraph QC4; equivalent guidance on "*Faithful Representation*" and "*Substance over form*" is found at paragraphs 33 to 35 of the Framework

[168] Conceptual Framework, paragraph QC12

[169] "*The business review must contain – a) a fair review of the company's business, and b) a description of the principal risks and uncertainties facing the company.  The review required is a balanced and comprehensive analysis of – a) the development and performance of the company's business during the financial year, and b) the position of the company's business at the end of that year, consistent with the size and complexity of the business.  In the case of a quoted company the business review must, to the extent necessary for an understanding of the development, performance or position of the company's business, include – a) the main trends and factors likely to affect the future development, performance and position of the company's business; and […] the review must, where appropriate, include references to, and additional explanations of, amounts included in the company's annual accounts*".  (Companies Act 2006, Section 417)

**mazars**

the revenue streams reported by Autonomy to the market in its "*other financial reporting*" should have reflected Autonomy's definitions of those revenue streams[170].

## 4.4   Overview to my summary conclusions

4.4.1   In my opinion, the revenue streams disclosed in Autonomy's "*other financial reporting*" did not faithfully represent the nature of the revenues generated by Autonomy, and did not constitute a fair and balanced analysis of Autonomy's financial performance.   I have reached this conclusion because:

(a)   certain Software Focus Transactions were reported as having generated IDOL OEM revenues, despite those Software Focus Transactions not matching Autonomy's depiction of the IDOL OEM revenue stream[171].   I note that for certain of these Software Focus Transactions I have proposed adjustments which would reduce the revenue recognised;

(b)   certain Software Focus Transactions were inappropriately reported as having generated IDOL Cloud revenues, despite those Software Focus Transactions not meeting Autonomy's depiction of the IDOL Cloud revenue stream.   I note that for certain of these Software Focus Transactions I have proposed adjustments which would reduce the revenue recognised;

(c)   sales of hardware were reported as having generated IDOL Product revenues, despite hardware sales not meeting Autonomy's depiction of the IDOL Product revenue stream; and

(d)   revenues associated with certain transactions were reported within both the IDOL OEM and IDOL Cloud revenue streams or within both IDOL OEM and deferred revenue release revenue streams[172].

---

[170] Moreover, I note that auditors performing reviews or audits or annual or quarterly information were required to review accompanying financial information to identify material inconsistencies between that information and the information presented in the quarterly or annual financial statements themselves.  (ISRE 2410 "*Review of Interim Financial Information Performed by the Independent Auditor of the Entity*" and ISA 720 A "*Other information and documents containing audited financial statements*")

[171] I note that throughout the Relevant Period, Autonomy reported revenue arising from its OEM business using various terms, including: "*IDOL OEM*", "*OEM derived revenues*" and "*IDOL OEM derived revenues*"

[172] And, as a consequence, were excluded from the IDOL Product revenue stream

**mazars**

## 4.5    My summary conclusions in relation to the reporting of the IDOL OEM revenue stream

4.5.1    "*IDOL OEM*" is not a term which is defined in IFRS.  However, in its "*other financial reporting*", Autonomy depicted its IDOL OEM revenue stream in the following ways:

(a)    in its presentation titled "*Q3 09 Results 20 October 2009*"[173], Autonomy described its "*OEM Dev*" revenue as comprising "*a development licence fee that is paid upfront and is non-refundable*" and "*OEM Ongoing*" revenue as "*Revenues from sales of OEMs' products*";

(b)    in its document "*Investor Relations Bulletin: 19 October 2010*"[174], Autonomy explained that "*IDOL OEM revenues do not generate deferred revenue as the royalties are paid quarterly in arrears*";

(c)    in its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010[175], Autonomy explained that "*IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products. IDOL is now embedded in most major software companies' products addressing most software vertical markets.  This is a particularly important revenue stream as it generates ongoing business across the broadest product set possible, in addition to up-front development licences*";

(d)    in its presentation titled "*Autonomy Q1 trading update*"[177], Autonomy described its IDOL OEM revenue stream as where customers "*Purchase a royalty-paying competitor's product – this model does not generate deferred revenue*"; and

(e)    in its presentation "*Autonomy Q2 and H1 Results*"[178], Autonomy described "*cloud and OEM*" as "*recurring models*".

4.5.2    As explained above, in my opinion, the transactions reported within the IDOL OEM revenue stream should have had characteristics which were consistent with Autonomy's depiction of the IDOL OEM revenue stream to the market.  In the light of Autonomy's own description of

---

[173] HP-SEC-00025157-HP-SEC-00025179
[174] SEC-AUSA5-EPROD-000492750
[175] Autonomy's FY2010 Annual Report and Accounts, page 15
[177] HP-SEC-00159120-00159133
[178] SEC-AUSA5-EPROD-000714279

the IDOL OEM revenue stream, in my opinion transactions classified as generating IDOL OEM revenue should have the following key characteristics:

(a)     the transaction should relate to a sale in which Autonomy's software was embedded into the customer's product for the customer to sell-on to third parties.  As such:

(i)     I do not consider that transactions to non-software companies are consistent with Autonomy's depiction of IDOL OEM revenue; and

(ii)    I do not consider that arrangements with software companies where the software company would simply sell-on Autonomy's software without first embedding it into its own product are consistent with Autonomy's depiction of IDOL OEM revenue; and

(b)     the transaction should generate recurring revenues for Autonomy[179].  As such I do not consider that transactions involving one-off, pre-paid royalties (where amounts were recognised immediately by Autonomy) are consistent with Autonomy's depiction of IDOL OEM revenue[180].

4.5.3    In Section 2 above I explained that I have reviewed the Software Focus Transactions and considered whether they were properly accounted for in accordance with IFRS.  Throughout that process I also considered whether, in my opinion, the Software Focus Transactions reported as giving rise to IDOL OEM revenues had characteristics which were consistent with Autonomy's depiction of the IDOL OEM revenue stream.

4.5.4    My analysis has identified that the following Software Focus Transactions were reported as generating IDOL OEM revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL OEM revenue stream:

---

[179] If disclosed as "*OEM Ongoing*"
[180] If disclosed as "*OEM Ongoing*"

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

**Table 4.2: Software Focus Transactions I have identified which were reported as generating IDOL OEM revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL OEM revenue stream**[181]

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as IDOL OEM ($m) |
|---------|------|----------------------------------|-----------------------------------|
| Q1 2010 | 048 | B of A | 8.9 |
| Q1 2010 | 049 | Filetek | 8.5 |
| Q2 2010 | 055 | Amgen Info Governance | 4.5 |
| Q2 2010 | 058 | MetLife DS | 7.0 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 066 | Vidient | 2.0 |
| Q3 2010 | 067 | Bank of America | 2.7 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q3 2010 | 072 | Mattel | 0.2 |
| Q4 2010 | 074 | Prisa | 9.0 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q4 2010 | 081 | VMS | 10.8 |
| Q1 2011 | 084 | Tottenham | 6.4 |
| Q1 2011 | 088 | Mcafee – Capax | 5.0 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | 092a | KPMG | 5.4 |
| Q2 2011 | 096 | Iron Mountain – OEM | 16.5 |
| Q2 2011 | 120 | Dell Hyatt - mt | 5.3 |
| Q2 2011 | 121 | USPS archive – mt | 7.0 |
| Q2 2011 | 102 | JPMC – EDD | 2.6 |
| Q2 2011 | 105 | UBS – capax | 7.7 |
| Q2 2011 | 106 | Rand | 2.3 |

## 4.6 My summary conclusions in relation to the reporting of the IDOL Cloud revenue stream

4.6.1 "*IDOL Cloud*" is also not a term which is defined in IFRS.  However, in its "*other financial reporting*", Autonomy depicted its IDOL Cloud revenue stream in the following ways:

(a) in its presentation titled "*Q3 09 Results 20 October 2009*"[182], Autonomy described its IDOL Cloud revenue as being "*Solutions for which the major party is executed in the SaaS or hosted model*".  Autonomy's description continued:

(i) "*In hosted, the customer has access to our IDOL software running on our hardware, single tenant*";

---

[181] I note that $3.7 million was recognised as IDOL OEM revenue in Q3 2010 in respect of Mattel.  In my opinion $0.2 million of this did not meet the revenue recognition requirements of IAS 18 in this quarter and should be reversed

[182] HP-SEC-00025157-HP-SEC-00025179

mazars

    (ii)   "*In SaaS, the customer has access to our IDOL software running on our hardware, multi tenant.  For hosted or SaaS, no licence revenues are generated*"; and

    (iii)   "*These customers may occasionally separately buy IDOL licence to run on their hardware systems for the purpose of feeding information to our hosted/SaaS system.  This licence sale is recognised as a normal software licence as Autonomy has no ongoing obligations in relation to it*";

(b)    in its document "*Investor Relations Bulletin: 19 October 2010*"[183], Autonomy explained that "*IDOL Cloud delivers Autonomy's IDOL Cloud delivers Autonomy's product on a Software as a Service (SaaS) basis, which is invoiced monthly in arrears and does not generate deferred revenue. As a result, any organic revenue growth analysis needs to bear in mind that headline rates of growth are understated given the shift away from license sales (recognised immediately) to subscription fees (recognised over time). SaaS revenues are generally considered to be higher quality over the long term given their predictable, sticky characteristics*";

(c)    in its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010[184], Autonomy explained that "*IDOL Cloud delivers Autonomy's IDOL on a Software-as-a-Service (Saas) model, which is generally invoiced monthly in arrears and generally does not generate deferred revenue. There are two key drivers of cloud revenues for Autonomy: the first and most significant relates to complex processing of information delivered as a service, the second relates to the quantity of data under management*"[185];

(d)    in its presentation titled "*Autonomy Q1 trading update*"[186], Autonomy described its IDOL Cloud revenue stream as "*Subscribe to our Software as a Service (billed monthly) – this model does not generate deferred revenue*"; and

(e)    in its presentation "*Autonomy Q2 and H1 Results*"[187], Autonomy described "*cloud and OEM*" as "*recurring models*".

---

[183] SEC-AUSA5-EPROD-000492750

[184] Autonomy's FY2010 Annual Report and Accounts, page 15

[185] Equivalent descriptions were included in Autonomy's "*Trading Update for the Quarter Ended March 31, 2011*" and "*Trading Update for the Quarter Ended 30 June 2011*"

[186] HP-SEC-00159120, page 105

[187] SEC-AUSA5-EPROD-000714279

**mazars**

4.6.2   As explained above, in my opinion, the transactions reported within the IDOL Cloud revenue stream should have had characteristics which were consistent with Autonomy's depiction of the IDOL Cloud revenue stream to the market.  In the light of Autonomy's own description of the IDOL Cloud revenue stream, in my opinion transactions reported as generating IDOL Cloud should have the following characteristics:

(a)   the transaction should be for the provision of ongoing services.  As such, (subject to the single exception set out in paragraph 4.6.3 below) I do not consider that transactions of the sale of software licences are consistent with Autonomy's depiction of IDOL Cloud revenue;

(b)   the majority of the revenue reported in the IDOL Cloud revenue stream should relate to transactions related to the complex processing of information delivered as a service, with transactions related to the hosting of data also being a significant contributor; and

(c)   the transaction should generate recurring revenue for Autonomy.  As such I do not consider that transactions involving the recognition of revenue in one-off, lumpsum amounts are consistent with Autonomy's depiction of IDOL Cloud revenue.

4.6.3   Autonomy's depiction of the IDOL Cloud revenue stream in its "*Q3 09 Results 20 October 2009*"[188] does explain that "*customers may occasionally separately buy IDOL licence to run on their hardware systems* […] *This licence sale is recognised as a normal software licence as Autonomy has no ongoing obligations in relation to it*".  In my opinion, this disclosure is unclear as to whether the "*licence sale*" is recognised within the IDOL Cloud revenue stream or within the IDOL Product revenue stream.  In any event, to the extent that the sale of a software licence was reported within the IDOL Cloud revenue stream, in my opinion:

(a)   the transaction should be for a software licence installed on the customer's hardware.  As such, I do not consider that transactions in which a software licence was purchased and installed on Autonomy's hardware are consistent with Autonomy's depiction; and

(b)   notwithstanding the above, from its "*Financial Overview*" provided alongside the financial statements for the year ended 31 December 2010 onwards[189], Autonomy's depiction of the IDOL Cloud revenue stream made no reference to the inclusion of

---

[188] HP-SEC-00025157-HP-SEC-00025179
[189] See, for example, Autonomy's FY2010 Annual Report and Accounts, page 15

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**Summary of independent expert accounting opinions of Steven Brice FCA**

mazars

software licences whatsoever.  As such from 31 December 2010, in my opinion no revenue related to the sale of a software licence should be reported as IDOL Cloud revenue.

4.6.4    In Section 2 above I explained that I have reviewed the Software Focus Transactions and considered whether they were properly accounted for in accordance with IFRS.  Throughout that process, I also considered whether, in my opinion, the Software Focus Transactions reported as giving rise to IDOL Cloud revenues had characteristics which were consistent with Autonomy's depiction of the IDOL Cloud revenue stream.

4.6.5    My analysis has identified that the following Software Focus Transactions were reported as having generated IDOL Cloud revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL Cloud revenue stream:

**Table 4.3: Software Focus Transactions I have identified which were reported as generating IDOL Cloud revenues despite having characteristics which were inconsistent with Autonomy's depiction of the IDOL Cloud revenue stream**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as IDOL Cloud ($m) |
|---------|-----|-------------------------------|------------------------|
| Q1 2010 | 046 | PMI (Discover) | 4.2 |
| Q1 2010 | 048 | B of A | 4.5 |
| Q1 2010 | 051 | Discover tech – Citi 32 cells | 5.5 |
| Q2 2010 | 053 | BP | 12.2 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q3 2010 | 063 | Citadel | 3.7 |
| Q3 2010 | 064 | Xcel Energy | 2.4 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 076 | Ahold | 2.8 |
| Q4 2010 | 077 | Amgen | 5.7 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q4 2010 | 080 | Microtech doi | 4.0 |
| Q4 2010 | 079b | capax baml | 1.7 |
| Q4 2010 | 079c | BAML extra | 3.5 |
| Q1 2011 | 086 | DB Restructure | 7.1 |
| Q1 2011 | 087 | Morgan Stanley DS | 5.0 |
| Q1 2011 | 089 | UBS | 8.0 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | 093 | Johnson & Johnson | 2.1 |
| Q2 2011 | 101 | ABBOTT LABS – dt | 8.6 |
| Q2 2011 | 120 | Dell Hyatt – mt | 5.3 |
| Q2 2011 | 102 | JPMC – EDD | 2.6 |
| Q2 2011 | 109 | USPS, eDiscovery | 6.3 |
| Q2 2011 | 117 | National Bank of Canada | 1.5 |
| Q2 2011 | 116 | Metlife | 5.5 |

**mazars**

## 4.7 My summary conclusions in relation to Autonomy's failure to disclose the existence of a material amount of hardware sales transactions in their other financial information

4.7.1   As mentioned above, in accordance with the DTR, Companies Act 2006 and the Conceptual Framework, Autonomy was required to provide a balanced and comprehensive analysis of its financial performance.   Of particular relevance to the hardware sales transactions, the Conceptual Framework further provides that for certain items a complete depiction may also involve explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature[190].

4.7.2   Furthermore, as mentioned in Section 3.6, in accordance with IFRS Autonomy was required to provide a fair representation and to present separately items of a dissimilar nature or function unless they are immaterial.  As such, Autonomy was required to disclose that revenue was being generated from the sale of hardware products.

4.7.3   However, as discussed in Section 3.6 above, in breach of IFRS, Autonomy did not include any disclosure on the existence of a material amount of hardware sales transactions.

4.7.4   My analysis has identified that the following hardware transactions were reported as generating revenue in the IDOL Product or deferred revenue release revenue streams, despite being hardware transactions which should have been disclosed separately:

---

[190] The Conceptual Framework states that "*For some items, a complete depiction may also entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature*".   (Conceptual Framework, paragraph QC13)

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

**mazars**   Summary of independent expert accounting opinions of Steven Brice FCA

**Table 4.4: Hardware transactions which were reported in the IDOL Product or deferred revenue release revenue streams**

| Quarter | Quarterly Revenue Breakdown name | Revenue reported as IDOL Product ($m) | Revenue reported as deferred revenue release ($m) |
|---------|----------------------------------|---------------------------------------|---------------------------------------------------|
| Q1 2010 | Fannie Mae | 1.3 | |
| Q1 2010 | Morgan Stanley | | 0.6 |
| Q1 2010 | SHI International Corp | | 5.2 |
| Q1 2010 | Dell - Morgan Stanley | | 4.7 |
| Q2 2010 | Insight | 2.5 | |
| Q2 2010 | JPMorgan Chase Bank N.A. | 0.5 | |
| Q2 2010 | Metro Business Systems | 1.3 | 3.5 |
| Q2 2010 | Morgan Stanley | 0.5 | 5.6 |
| Q2 2010 | SHI International Corp | 16.1 | |
| Q3 2010 | Insight | 2.4 | |
| Q3 2010 | SHI International Corp | 4.1 | |
| Q3 2010 | Zones, Inc | 10.5 | |
| Q3 2010 | Q2'Revenue - Hardware | | 8.7 |
| Q3 2010 | Low margin | 0.9 | |
| Q4 2010 | Amulet Hotkey | 1.1 | |
| Q4 2010 | Bank of New York Mellon | 1.4 | |
| Q4 2010 | Insight | 0.2 | |
| Q4 2010 | JPMorgan Chase Bank, N.A. | 1.7 | |
| Q4 2010 | Morgan Stanley | 6.3 | |
| Q4 2010 | Progressive Insurance | 1.2 | |
| Q4 2010 | SHI International Corp | 6.4 | |
| Q4 2010 | Low margin from deferred | | 2.1 |
| Q4 2010 | Toronto Police Service + Fannie Mae | 0.1 | |
| Q4 2010 | Union Pacific Railroad | 0.3 | |
| Q4 2010 | Video Monitoring Services | 6.0 | |
| Q4 2010 | Zones, Inc | 8.6 | |
| Q1 2011 | Amulet Hotkey | 1.9 | 2.1 |
| Q1 2011 | Bank of New York Mellon | 3.2 | |
| Q1 2011 | Insight | 0.4 | |
| Q1 2011 | JPMorgan Chase Bank, N.A. | 0.2 | |
| Q1 2011 | Northwestern Mutual Life | 0.1 | |
| Q1 2011 | SHI International Corp | 12.3 | |
| Q2 2011 | Amulet Hotkey | | 1.2 |
| Q2 2011 | SHI International Corp | 3.3 | |
| Q2 2011 | Closed – poppy | 12.4 | |
| Q2 2011 | Deferred Hardware | | 3.9 |

## 4.8   My summary conclusions in relation to the double reporting of the reported IDOL OEM and IDOL Cloud revenue streams

4.8.1   As shown in Table 4.1, Autonomy reported revenue across five revenue streams (IDOL Product, IDOL Cloud, IDOL OEM, service and deferred revenue release). Aggregating the revenues derived from these five revenue streams agrees to the total revenues reported in Autonomy's quarterly financial statements. This confirms that the revenues generated by an individual transaction should only be reported in one of the five revenue streams.

**mazars**

4.8.2    However, I have identified several instances in the Quarterly Revenue Breakdowns where the revenue generated from a single transaction was reported within both the IDOL OEM and IDOL Cloud revenue streams.  I set out these transactions in the table below[191]:

**Table 4.5: Transactions within the Quarterly Revenue Breakdowns which were reported within both the IDOL OEM and IDOL Cloud revenue streams[192]**

| Quarter | # | Quarterly Revenue Breakdown name | Revenue reported as both IDOL OEM and IDOL Cloud ($m) |
|---|---|---|---|
| Q1 2010 | N/A | EDD hosted | 3.5 |
| Q1 2010 | 048 | B of A | 4.5 |
| Q2 2010 | 059 | JPMC | 8.7 |
| Q2 2010 | N/A | EDD hosted | 3.2 |
| Q3 2010 | 065 | Amgen | 9.0 |
| Q3 2010 | 071 | EMC | 5.7 |
| Q4 2010 | 074 | Prisa | 0.9 |
| Q4 2010 | 079a | discovertech baml | 7.0 |
| Q1 2011 | N/A | GCPD | 0.2 |
| Q1 2011 | N/A | BBC | 1.7 |
| Q1 2011 | 091 | Prisa | 3.6 |
| Q1 2011 | N/A | ATG | 0.5 |
| Q2 2011 | 102 | JPMC - EDD | 2.6 |
| Q2 2011 | 120 | Dell Hyatt -mt | 5.3 |

4.8.3    It is my view that reporting a single transaction within both the IDOL OEM and IDOL Cloud revenue streams overstates these revenue streams in a manner which is inconsistent with the requirements and guidance of the Conceptual Framework, DTR and Companies Act 2006 set out in Section 4.3 above.

4.8.4    In addition to the above, two transactions were reported in both the IDOL OEM and deferred revenue release revenue streams.  I set out these transactions in the table below[193]:

---

[191] I note that these transactions were not double reported in Autonomy's total revenue disclosed to the market, because a consequence of the double reporting in the IDOL OEM and IDOL Cloud revenue streams meant that Autonomy's IDOL Product revenue stream was understated by an equivalent amount as the amount reported in the IDOL OEM revenue stream

[192] I note that I have removed $3.0 million of revenue relating to "*services + maintenance*" in Q1 2010 since my Interim Report

[193] I note that these transactions were not double reported in Autonomy's total revenue disclosed to the market, because a consequence of the double reporting in the IDOL OEM and deferred revenue release revenue streams meant that Autonomy's IDOL Product revenue stream was understated by an equivalent amount as the amount reported in the IDOL OEM revenue stream

**mazars**

Table 4.6: Transactions within the Quarterly Revenue Breakdowns which were reported within both the IDOL OEM and deferred revenue release revenue streams

| Quarter | Quarterly Revenue Breakdown name | Revenue recognised in both IDOL OEM and deferred revenue release ($m) |
|---------|----------------------------------|----------------------------------------------------------------------|
| Q1 2011 | ATG | 0.5 |
| Q1 2011 | BBC | 1.7 |

4.8.5    It is my view that reporting a single transaction within both the IDOL OEM and deferred revenue release revenue streams overstates these revenue streams in a manner which is inconsistent with the requirements and guidance of the Conceptual Framework, DTR and Companies Act 2006 set out in Section 4.3 above.

mazars

# 5    My review of the Taylor Report and the Levitske Report

## 5.1    Introduction

5.1.1    I am instructed to review and comment on the Taylor Report and the Levitske Report in so far as it is within the scope of my expertise.  In this section of my report I provide a summary of my opinions on the Taylor Report and the Levitske Report[194].  On the basis that this section is a summary of my opinions, where I do not comment on a particular conclusion or paragraph in the Taylor Report or Levitske Report, it should not be taken as my agreement with that conclusion or paragraph.

## 5.2    My summary comments on the Taylor Report

### Mr Taylor's first instruction

5.2.1    Mr Taylor states that he was instructed to set out his "*opinions and the bases thereon in respect of* [IFRS], *under which Autonomy prepared its financial statements during the* [Relevant Period]"[195].  This instruction is addressed in Sections 2 to 6 of the Taylor Report.

5.2.2    Mr Taylor limits his opinions to certain areas in IFRS, namely (i) revenue recognition, (ii) adjusting or restating the accounting treatment of transactions, (iii) disclosures and presentation, and (iv) the capitalization of expenses.  It is not entirely clear to me why Mr Taylor has limited his report to only these aspects of IFRS when compliance with IFRS is achieved by financial statements complying with all requirements in IFRS Standards[196].

5.2.3    Parts of Mr Taylor's summaries are either quotes taken from extant Standards within IFRS or mirror closely the narrative explanations provided in 2009 PWC IFRS Manual of Accounting.  As such, there are paragraphs within these sections of the Taylor Report where I do not disagree with what Mr Taylor has written.  However, my general observations on Sections 2 to 6 of the Taylor Report are as follows:

(a)    Mr Taylor addresses many aspects of IFRS at a high and generic level, without any application to the specifics and circumstances applicable to Autonomy during the Relevant Period;

---

[194] I have also received a copy of the Cerf Report but this does not refer to my Interim Report and primarily addresses matters that are outside of the scope of my expertise.  I therefore do not comment further on the Cerf Report
[195] Taylor Report, paragraph 1.1.3
[196] IAS 1, paragraph 16

(b)     Mr Taylor has not applied IFRS to any of the specific Software Focus Transactions or Hardware Focus Transactions which were considered in detail in my Interim Report.  As identified in paragraph 5.2.7 below, he has not provided an opinion on whether any of these transactions did or did not comply with IFRS; and

(c)     Mr Taylor places significant and repeated emphasis on the requirement for judgement to be applied in the application of IFRS.  Whilst IFRS does require the use of judgement, this does not mean that all judgements are reasonable nor that judgemental areas cannot result in accounting misstatements.  In my view, Mr Taylor is overemphasising the extent to which different judgements can reasonably justify materially different accounting treatments.

5.2.4     Further, there are a number of specific paragraphs in sections 2 to 6 of the Taylor Report with which I either disagree or, in my view, could be misleading without further comment.  I provide a summary of these comments in Appendix H.

### Mr Taylor's second instruction

5.2.5     Mr Taylor states that he has "*also been instructed to review and comment on* [my Interim Report]"[197].  Further, Mr Taylor explains that he has "*been asked to consider certain sections where Mr Brice provides an opinion on the application of IFRS and set out* [his] *observations on* [my] *opinions*"[198].  This instruction is addressed in Appendix 3 to the Taylor Report.

5.2.6     The sections in my Interim Report that Mr Taylor has been instructed to review are:

(a)     Sections 2.4 to 2.10, being my summary conclusions related to software sales transactions; and

(b)     Sections 3.4 to 3.6, being my summary conclusions related to hardware sales transactions.

5.2.7     First, and importantly, whilst Mr Taylor provides his opinion on certain statements that I have made in these sections of my Interim Report, Mr Taylor has not provided any opinion on:

(a)     whether the Software Focus Transactions or Hardware Focus Transactions complied with IFRS; nor

---

[197] Taylor Report, paragraph 1.1.5
[198] Taylor Report, paragraph 1.1.5

**mazars**

(b)     whether the financial statements issued during the Relevant Period complied with IFRS.

5.2.8   Second, Mr Taylor has not been instructed to review, and he has not commented, cited or in any way indicated that he has reviewed, the detailed appendices that underpin the sections of my Interim Report that he has been instructed to review.  As a result, in my view he has misunderstood the significance of many of the points that I made in my Interim Report.  For example, Mr Taylor disagrees that it would be appropriate to consider financial information of a counterparty, such as its financial statements, when determining whether to recognise revenue, on the basis that in his view it is not reasonable to expect a company to have obtained such contemporaneous information.  However, this view is contrary to my experience in practice, as well as the contemporaneous actions of Autonomy and its auditor Deloitte (who both sought and obtained financial information of counterparties when assessing whether revenue recognition criteria had been met).

5.2.9   Third, Mr Taylor has failed to identify that, whilst the sections of my Interim Report that he has been instructed to review summarise and provide examples of broad themes that apply to the transactions that I have reviewed, each transaction is often impacted by more than one of these themes.  For example, the revenue relating to Software Focus Transaction #040b "*Capax*" should not have been recognised for multiple reasons, as set out in Appendix F.  It is therefore important to consider the contemporaneous accounting evidence for each transaction on a cumulative basis.  The importance of considering information on a cumulative basis is an approach endorsed by auditing standards[199] which apply to auditors forming opinions on whether financial statements have been properly prepared in accordance with IFRS (or another financial reporting framework).

5.2.10  Fourth, Mr Taylor does not appear to have looked at any of the underlying contemporaneous accounting and other evidence upon which the conclusions in my Interim Report are based[200].  On this basis, I cannot see how Mr Taylor can provide opinions on statements I have made in my report without having undertaken any of the detailed work that I have undertaken in order to reach my conclusions.  It is, for example, inconceivable that an auditor would seek to provide opinions relevant to the appropriate accounting for a material transaction without having regard to any of the underlying documents.

---

[199] ISA 500 "*Audit Evidence*", paragraph A1

[200] Appendix 2 to the Taylor Report lists the documents he has relied upon.  This is limited to the 2009 PwC IFRS Manual of Accounting, three articles, various Autonomy annual report and accounts and quarterly results and various accounting standards and other accounting guidance documents

**mazars**

5.2.11   Fifth, Mr Taylor also makes reference to International Standards on Auditing ("**ISAs**").  Mr Taylor and I agree that ISAs are helpful in considering the software sales transactions and the hardware sales transactions, which is not surprising given that ISAs detail the objectives and requirements for an auditor conducting an audit of financial statements and provide guidance for the auditors to achieve those objectives and requirements.  However, Mr Taylor makes a number of points in his report that do not take into account or are contrary to the requirements and guidance of ISAs.  For example, in Appendix 3 to the Taylor Report, Mr Taylor states that the relevant conditions for revenue recognition set out in IAS 18 "*do not contain criteria related to the existence of a pattern of behaviour between a seller and a buyer*".  However, in my experience, the existence or emergence of a pattern of behaviour between Autonomy and a VAR can indicate that a sale transaction does not have economic substance.  The guidance to ISA 240 "*The Auditor's Responsibilities Relating to Fraud in an Audit of Financial Statements*" supports my experience, stating "*a retrospective review of similar management judgements and assumptions applied in prior periods may also provide insight about the reasonableness of judgements and assumptions supporting management estimates*"[201].   In my view, this guidance makes it clear that patterns of behaviour between a seller and a buyer are relevant to an assessment of whether the revenue recognition criteria of IAS 18 have been met.

5.2.12   Finally, there are a number of specific points in Mr Taylor's appendix with which I either disagree or, in my view, could be misleading without further comment.  I provide a summary of these comments in Appendix I.

## 5.3   My summary comments on the Levitske Report

5.3.1   Mr Levitske sets out his instructions at paragraphs 1.3.2 to 1.3.6 of the Levitske Report.  In summary, Mr Levitske has been instructed to "*advise regarding valuation process and relevant considerations in the process* [of the Transaction]"[202], which requires a consideration of the impact of certain[203] of the adjustments to revenue set out in my Interim Report and assess the impact of those adjustments on Autonomy's reported profit from operations (including profit from operation margins), reported cash flow, and reported year-over-year revenue growth.

5.3.2   I have a number of significant concerns with Mr Levitske's analysis, and therefore the observations that he makes, as I summarise below.  I understand from the Levitske Report

---

[201] ISA 240, Appendix 1

[202] Levitske Report, paragraph 1.1.1

[203] Mr Levitske has only been instructed to consider certain of the adjustments to revenue set out in my Interim Report because there are a number of adjustments that Mr Levitske has not been instructed to consider

**mazars**

that Mr Levitske is assuming, "*hypothetically, that the revenue accounting adjustments asserted in the VBOP and the Brice Report that I have relied upon in this Report are appropriate.  I have been asked to opine about the impact of applying those hypothetical adjustments to Autonomy's historical reported financial statements*"[204].  As explained further below, certain of the adjustments that Mr Levitske has made are not consistent with the adjustments in my report, nor the way that they were originally accounted for by Autonomy[205].  It is not clear to me whether this is because of further assumptions that Mr Levitske is instructed to make in his report, or whether these further assumptions are deemed by Mr Levitske to be appropriate.

### The periods of analysis considered by Mr Levitske

5.3.3    Whilst Mr Levitske is instructed to consider "*year-over-year revenue growth*", Mr Levitske is only instructed to consider the financial performance in Q1 and Q2 of 2010 ("**H1 2010**") compared with Q1 and Q2 of 2011 ("**H1 2011**").  As such, Mr Levitske's analysis makes no reference to a substantial number of adjustments to revenue that I have identified for Q3 and Q4 of 2010 and also no reference to the substantial number of adjustments to revenue that I have identified for 2009.

5.3.4    In my view, which is based upon my experience of undertaking financial statement analysis, whilst comparing H1 2010 with H1 2011 might be one relevant comparison, I would also expect analysis to be undertaken on various other periods, including for example:

(a)    the Last Twelve Months ("**LTM**"), being the period 1 July 2010 to 30 June 2011, compared with the twelve months prior to that, being the period 1 July 2009 to 30 June 2010 ("**LTM-1**");

(b)    the last quarter (being Q2 2011) compared with the equivalent quarter in the prior financial period (being Q2 2010); and

---

[204] Levitske Report, paragraph 2.1.4

[205] For example, (i) the adjustments relating to VAR transactions which Mr Levitske notes at paragraph 2.1.16 "*I was asked by counsel to assume that the related expense was recorded in the same period in which the select VAR transaction was recognised as revenue*".  However, this is not consistent with Autonomy's original reporting of the transactions; and (ii) the adjustments relating to hardware, which Mr Levitske notes at paragraph 2.1.9 "*I have been asked to opine about the impact of financial statement analysis in the context of a valuation of removing the hardware revenues in the Subject Period*".  However, this is not consistent with the adjustments I have made relating to hardware and ignores the fact that hardware sales did take place

**mazars**

(c)     analyses over a longer period of time.  I note that Mr Levitske's attachments all make reference to the "*Change*" in the period "*H1 2010 to H2 2011*"[206] but this appears to be a typographical error as these figures are not included in the Levitske Report.

5.3.5     In the remainder of this section, I have also set out the comparison of LTM-1 and LTM and of Q2 2010 with Q2 2011.  I note that this analysis is not exhaustive.

**The significance of the total impact on the reported revenue**

5.3.6     Whilst Mr Levitske makes a number of observations relating to the year-over-year revenue growth, he surprisingly does not place any significance on the fact that the adjustments lead to a significant reduction in Autonomy's reported revenue figures.   The decrease in the reported revenue figures would appear to be a significant conclusion given:

(a)     market expectations and reactions to Autonomy's reported revenue figures[207];

(b)     the importance of revenue that was placed by Deloitte when auditing Autonomy's financial statements; and

(c)     the nature and extent of market analysts' focus on aspects of Autonomy's revenue.

**Mr Levitske's adjustments relating to hardware**

5.3.7     In considering the impact of the adjustments relating to hardware, Mr Levitske has "*removed*"[208] from Autonomy's reported revenue <u>all</u> revenue generated from the sale of hardware.

5.3.8     However, as explained in Section 3 above, in my adjustments to revenue relating to hardware sales transactions, I have only made adjustments for certain hardware sales transactions and these adjustments relate to the timing of the revenue (not the removal of the revenue[209]).  For the avoidance of doubt, I have not concluded that the transactions did not take place and/or that these transactions should not have been reported as revenue[210].  I also understand that it is not disputed that the hardware transactions took place.  As such, Mr Levitske's approach of removing all revenue from hardware sales transactions and thus presenting a financial performance assuming the transactions did not take place is, in my view, not consistent with

---

[206] As opposed to "*H1 2010 to H1 2011*"

[207] For example, the FRC's Disciplinary Tribunal relating to Deloitte's audits and reviews during the relevant period found at paragraph 352 that "*on 6 October 2010 the share price dropped 20% because of a 3% adjustment to the full year revenue model*"
[208] Levitske Report, paragraph 2.1.10

[209] With the exception of one transaction of $3.4 million which I concluded should not have been recognised
[210] With the exception of one transaction of $3.4 million which I concluded should not have been recognised

an attempt to assess the impact of applying the accounting adjustments in my Interim Report to Autonomy's historical reported financial statements.

5.3.9    In Appendix J I have sought to reperform Mr Levitske's analysis but instead of removing all revenue from hardware sales transactions, I have instead adjusted the timing of revenue for certain transactions as identified in Section 3 above.  On the basis of his analysis Mr Levitske concluded that, after removing all hardware sales transactions, the revenue growth between H1 2010 and H1 2011 is greater (at 16.8%[211]) than the revenue growth originally reported by Autonomy (of 14.6%).  However, once this analysis is reperformed, the opposite conclusion is reached: the revenue growth after the relevant hardware adjustments have been made is 12.5%, less than the 14.6% originally reported by Autonomy.

5.3.10   Moreover, following the hardware revenue adjustments[212]:

(a)      the growth in revenue between LTM-1 and LTM is 9.2% compared with the revenue growth of 12.2% originally reported by Autonomy; and

(b)      the growth in revenue between Q2 2010 and Q2 2011 is 15.1% compared with the revenue of 15.9% originally reported by Autonomy.

5.3.11   Mr Levitske also concludes that, following his adjustments for the hardware sales transactions:

(a)      "*Autonomy would have had higher profits and higher profit margins*"[213].   This conclusion is because Mr Levitske has removed all hardware transactions from the reported financial performance of Autonomy.  On the basis that the transactions were primarily loss making, their removal would be expected to increase reported profits and reported margins.  However, as noted above, Mr Levitske's removal of all revenue and costs relating to hardware sales transactions is contrary to the adjustments that I proposed in Section 3 .  Indeed, subject to certain timing differences[214], the correction of the accounting for hardware sales transactions would not impact the reported profit or reported profit margins; and

(b)      "*Autonomy's cash flow would have been higher*"[215].  Again, this conclusion is based upon Mr Levitske's removal of all hardware sales transactions, rather than

---

[211] Levitske Report, Attachment A
[212] Appendix J
[213] Levitske Report, paragraph 3.1.2(a)
[214] With the exception of an amount of $3.4 million relevant to one transaction which I concluded should not have been recognised
[215] Levitske Report, paragraph 3.1.2(c)

adjustment to their timing[216].   I have not seen any evidence that suggests the hardware sales transactions led to a misstatement in the amount of reported cash.

### Mr Levitske's adjustments relating to software

5.3.12   Mr Levitske has been instructed to consider the impact of three categories of software transaction adjustments: (i) linked transactions, (ii) VAR transactions and (iii) multi-period hosting transactions.

5.3.13   In relation to these three categories, I have a number of significant concerns with the adjustments that Mr Levitske has made, including:

(a)   there are a number of figures used by Mr Levitske that do not agree to the adjustments in my Interim Report;

(b)   in relation to linked transactions and VAR transactions, Mr Levitske's methodology for adjusting for the relevant costs is, in my view, flawed.   This is because Mr Levitske has assumed in his analysis that these costs would not have been incurred and therefore he has added them back to the reported costs.   However, many of these costs had in fact been capitalised by Autonomy[217] and thus not reported as a cost.   As such, it is not appropriate to add them back; and

(c)   given the periods that Mr Levitske has analysed (to which I referred at paragraph 5.3.3 *et seq*. above), Mr Levitske has not made adjustments for many of the adjustments I have identified.   For example, in relation to linked transactions, Mr Levitske has only adjusted for two transactions, whereas during the Relevant Period I have identified eight transactions in this category[218].

5.3.14   I provide further explanation and analysis in relation to (a) and (b) in Appendix K.   This appendix shows that, correcting for Mr Levitske's error results in fundamentally different conclusions to those reached by Mr Levitske in his report.

5.3.15   Mr Levitske also concludes that in relation to linked transactions and VAR transactions that correcting the relevant accounting would likely increase the balance of cash.   However, this is not correct.   I have not seen any evidence which suggests that Autonomy's reporting of these transactions led to a misstatement in the amount of cash.   Mr Levitske's flawed

---

[216] With the exception of an amount of $3.4 million relevant to one transaction which I concluded should not have been recognised
[217] Or, in the case of one purchase, recognised as an expense a number of months after the recognition of the associated revenue
[218] Table 2.9

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

mazars

conclusion is seemingly because he considers the position as if the transactions had never happened (i.e. "*removing the revenues, related costs and expenses*"[219]) rather than the position had these transactions been appropriately accounted for.

5.3.16    In relation to the multi-period hosting transactions, Mr Levitske again concludes that correcting the relevant accounting would increase the balance of cash.  In my opinion, correcting the accounting for the multi-period hosting transactions would have no impact on the balance of cash at Autonomy.  It appears that Mr Levitske's identified increase in the balance of cash is assessed by reference to a calculation which includes a number of high-level assumptions which do not reflect my understanding of the specifics of the relevant multi-period hosting transactions.  For example, Mr Levitske assumes that the full amount of cash was received for these transactions and recorded upfront.  However, in many transactions, and as shown in the detailed appendices to my report, the balance of cash was not received upfront but was instead received at different points during the life of the contract.  For illustration, Mr Levitske examines in Attachment D to his report, Software Focus Transaction #059 "*JPMC*", in which $4.7 million of the total "*license fee*" of $8.7 million was in fact payable two years after the date of the contract[220].   Even when the accounting is amended to appropriately recognise revenue rateably over the contract, this does not imply that the related cash will be received at different times.

5.3.17    Moreover, in respect of multi-period hosting transactions, Mr Levitske also provides an analysis of the impact of recognising revenue over the duration of a contact compared with recognising the revenue upfront.  Mr Levitske identifies that the "*revenue is the same* […] *over the contract duration*"[221].  This is not a surprising conclusion as the difference is simply one of timing.  However, Mr Levitske does not stress the problem from a user of the financial statements' perspective of revenue being inappropriately accelerated.  Mr Levitske also concludes that where the revenue is spread over the life of the contract that "*the patterns of revenue and profit contributions* […] *are comparatively more predictable*"[222].   Importantly, I note that this revenue was reported by Autonomy as being part of IDOL Cloud (where a user of the financial statements would expect this revenue to be recurring and spread over the contract period (including future periods) but in fact all revenue from these contracts had already been recognised in full).

---

[219] Levitske, paragraph 2.1.24(b) and 2.1.24(c)
[220] Appendix F
[221] Levitske Report, paragraph 2.1.20(a)[i]
[222] Levitske Report, paragraph 2.1.21

**mazars**

5.3.18   Finally, I note that Mr Levitske has not been instructed to consider the impact of all of the software transaction adjustments that I have identified; adjustments of $14.4 million across H1 2010 and H1 2011 have been excluded from his analysis.  Had these adjustments been included, conclusions regarding the year-over-year revenue growth would be significantly different.  Following all identified adjustments relating to software sales transactions[223]:

(a)      growth between H1 2010 and H1 2011 is 8.0% compared with 14.6% originally reported by Autonomy;

(b)      growth between Q2 2010 and Q2 2011 is 1.9% compared with 15.9% originally reported by Autonomy; and

(c)      growth between LTM-1 and LTM is 9.6% compared with 12.2% originally reported by Autonomy.

### Total adjustments

5.3.19   In Attachment G of the Levitske Report, Mr Levitske calculates that after all revenue adjustments that he is instructed to make, the growth in revenue between H1 2010 and H2 2011 was 17.5% compared with 14.6% originally reported by Autonomy.

5.3.20   I have noted the many errors in Mr Levitske's calculations which mean that, in my view, this conclusion is fundamentally flawed.  Correcting for these errors and incorporating all of the adjustments to revenue that I have identified, results in significantly different conclusions[224]:

(a)      growth between H1 2010 and H1 2011 is 5.6% compared with 14.6% originally reported by Autonomy;

(b)      growth between Q2 2010 and Q2 2011 is 1.1% compared with 15.9% originally reported by Autonomy; and

(c)      growth between LTM-1 and LTM is 6.2% compared with 12.2% originally reported by Autonomy.

---

[223] Appendix J
[224] Appendix J

**mazars**

# 6    Summary of my overall conclusions

6.1.1    Based on the information I have seen, my summary conclusions are that, in Autonomy's financial statements[225] issued during the Relevant Period:

(a)    the revenue from software sales transactions was not reported in accordance with IFRS (as I identified in Section 2);

(b)    the revenue from hardware sales transactions was not reported or disclosed in accordance with IFRS (as I identified in Section 3); and

(c)    the descriptions of the IDOL OEM, IDOL Cloud and IDOL Product revenue streams were not reported or disclosed in accordance with the DTR, Conceptual Framework or Companies Act 2006 (as I identified in Section 4).

6.1.2    As a result, Autonomy's reporting – including both the financial statements and the commentary in the annual report – did not provide a faithful representation of Autonomy's financial performance during the Relevant Period.  The reports provided by Mr Taylor and Mr Levitske (in response to my Interim Report) do not lead me to change these conclusions.  I have set out my observations on these reports separately in Section 5.

6.1.3    By way of illustration, in the chart below I set out the revenue reported in respect of Q2 2011 by Autonomy broken down by revenue stream, as well as my assessment of that revenue (again broken down by revenue stream) had the financial statements been prepared in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006:

---

[225] Comprising quarterly accounts, interim accounts and annual reports

**mazars**

Figure 6.1: Revenue reported by Autonomy by revenue stream in Q2 2011 and my assessment of that revenue had it been reported in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006



6.1.4   As discussed in paragraph 4.2.3, in Q2 2011 the total of the reported IDOL Cloud and IDOL OEM revenues were 162.8% of reported IDOL Product revenues.  However, as can be seen from the figure above, the total of the IDOL Cloud and IDOL OEM revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements would have only made up 64.4% of the IDOL Product revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements.

6.1.5   Further, the chart above shows that, although reported revenues were split broadly evenly over the IDOL Product and IDOL Cloud revenue streams (with IDOL Cloud revenue making up 93.9% of IDOL Product revenue), in actual fact IDOL Cloud revenue was significantly less than IDOL Product revenue, at just 55.1%.  With respect to the IDOL OEM revenue stream, reported revenue made up 68.9% of reported IDOL Product revenue.  If the financial statements had been prepared in accordance with the relevant requirements IDOL OEM revenue would have made up only 9.4% of IDOL Product revenue.  In summary, if revenues had been reported in accordance with the relevant requirements, IDOL Product revenue would have been far greater than that of IDOL Cloud and IDOL OEM.

6.1.6   In addition, if revenue had been reported in accordance with the relevant requirements hardware would have made up 10.2% of total revenue.

6.1.7   In Appendix M I provide equivalent charts by quarter for Q1 2010 to Q1 2011.  These charts re-confirm the observations set out above.  Of particular importance in these charts are the hardware figures because they illustrate the importance of the hardware sales transactions to the reported growth of Autonomy during the Relevant Period (apart from Q3 2011).  By way of illustration, in the chart below I set out the reported quarterly revenue during the Relevant Period (apart from Q3 2011):

**Figure 6.2: Reported quarterly revenue during the Relevant Period (apart from Q3 2011)[226]**



6.1.8   The reported revenue growth of Autonomy was:

(a)   47.0%[227] when comparing 2008 with 2009; and

(b)   17.7%[228] when comparing 2009 with 2010.

---

[226] Table 2.1
[227] $739.7 million / $503.2 million − 1
[228] $870.4 million / $739.7 million − 1

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

6.1.9    The quarter on quarter reported revenue growth of Autonomy during the Relevant Period (apart from Q3 2011) is set out in the table below:

**Table 6.1: Quarter on quarter reported revenue growth during the Relevant Period (apart from Q3 2011)**

|  | Q1 2009 vs Q1 2010 | Q2 2009 vs Q2 2010 | Q3 2009 vs Q3 2010 | Q4 2009 vs Q4 2010 | Q1 2010 vs Q1 2011 | Q2 2010 vs Q2 2011 |
|---|---|---|---|---|---|---|
| Quarter on quarter growth | 49.6% | 13.3% | 9.9% | 9.6% | 13.1% | 15.9% |

6.1.10    I have also prepared a further chart which analyses the reported quarterly revenue excluding my assessment of hardware sales revenue during the Relevant Period (apart from Q3 2011). This therefore shows the reported quarterly revenue and growth of the underlying software business.  I have also included in grey the reported quarterly revenue of Autonomy.

**Figure 6.3: Reported quarterly revenue of the underlying software business during the Relevant Period (apart from Q3 2011)[229]**



6.1.11    The growth in reported quarterly revenue of the underlying software business was:

(a)    36.0%[230] when comparing 2008 with 2009 (compared with reported total growth of 47.0% over the same period); and

---

[229] For the avoidance of doubt, the line in Figure 6.3 labelled "*Reported quarterly revenue of the underlying software business*" is calculated as quarterly reported revenue less my assessment of hardware revenue
[230] $686.0 million / $503.3 million – 1

**mazars**

(b)        12.3%[231] when comparing 2009 with 2010 (compared with reported total growth of 17.7% over the same period).

6.1.12    The quarter on quarter growth in reported quarterly revenue of the underlying software business during the Relevant Period (apart from Q3 2011) is set out in the table below:

**Table 6.2: Quarter on quarter growth in reported quarterly revenue of the underlying software business during the Relevant Period (apart from Q3 2011)**

|  | Q1 2009 vs Q1 2010 | Q2 2009 vs Q2 2010 | Q3 2009 vs Q3 2010 | Q4 2009 vs Q4 2010 | Q1 2010 vs Q1 2011 | Q2 2010 vs Q2 2011 |
|---|---|---|---|---|---|---|
| Quarter on quarter growth | 37.2% | -3.3% | 28.4% | 0.4% | 13.5% | 24.9% |

6.1.13    As such, the hardware sales transactions were in my opinion contributing significantly to the overall reported revenue growth of Autonomy during the Relevant Period.

6.1.14    Moreover, I have identified in Section 2 of my report that the reported revenue figures were misstated in respect of software sales transactions and, in the chart below, I set out my assessment of the adjusted revenue figures in respect of software sales transactions.  This chart therefore shows the actual revenue generated by the underlying software business, and the associated revenue growth.  I have also included in grey the reported quarterly revenue of Autonomy and the reported quarterly revenue of the underlying software business.

---

[231] $765.2 million / $686.0 million - 1

**Figure 6.4: My assessment of the revenue of the underlying software business during the Relevant Period (apart from Q3 2011)**



6.1.15    Therefore, the growth in revenue of the underlying software business was:

(a)    15.2%[232] when comparing 2008 with 2009 (compared with reported total growth of 47.0% over the same period); and

(b)    12.3%[233] when comparing 2009 with 2010 (compared with reported total growth of 17.7% over the same period).

6.1.16    The quarter on quarter revenue growth of the underlying software business during the Relevant Period (apart from Q3 2011) is set out in the table below:

**Table 6.3: Quarter on quarter revenue growth of the underlying software business during the Relevant Period (apart from Q3 2011)**

|  | Q1 2009 vs Q1 2010 | Q2 2009 vs Q2 2010 | Q3 2009 vs Q3 2010 | Q4 2009 vs Q4 2010 | Q1 2010 vs Q1 2011 | Q2 2010 vs Q2 2011 |
|---|---|---|---|---|---|---|
| Quarter on quarter growth | 38.6% | 2.9% | 8.4% | 7.9% | 11.1% | 8.3% |

---

[232] $579.6 million / $503.2 million - 1
[233] $651.1 million / $579.6 million - 1

**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**

**Summary of independent expert accounting opinions of Steven Brice FCA**

6.1.17    In the chart below I have also included my assessment of the actual revenue from the IDOL OEM, IDOL Cloud and IDOL Product revenue streams from Q1 2010 to Q2 2011.  This chart is important as it shows the revenue and revenue growth generated by the recurring revenue streams (IDOL OEM and IDOL Cloud).

Figure 6.5: My assessment of the actual revenue generated by the IDOL OEM, IDOL Cloud and IDOL Product revenue streams during the Relevant Period (apart from Q3 2011)



6.1.18    As can be seen from the figure above, my assessment of the actual revenue generated by the IDOL OEM and IDOL Cloud revenue streams (i.e. those which generated recurring revenues) did not see significant growth (if any) over the period from Q1 2010 to Q2 2011.

6.1.19    It is in my view also worth noting that prior to and during the Relevant Period Autonomy had acquired a number of businesses, including Zantaz, Verity, Meridio, Iron Mountain and Interwoven.  These acquisitions would have also contributed to Autonomy's reported revenue growth during the Relevant Period.