# EXHIBIT 7

# 1    Appendix H - My comments on Sections 2 to 6 of the Taylor Report

## 1.1    Introduction

1.1.1    In Table 1.1, I respond to Mr Taylor's comments in Sections 2 to 6 of the Taylor Report.

Table 1.1: My response to Mr Taylor's report

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| 2.3.2 | Where principles are to be applied, there are circumstances where two different accountants, faced with the same transaction, would record the transaction in different ways.  That is not to say that one accountant is wrong and the other is right; instead, it is a recognized feature of the application of principles under IFRS that different, but valid, accounting results can be reached due to the application of differing management or accounting judgements. | I agree that the application of IFRS requires the use of judgement, and accept that in some circumstances, different accountants may on occasion reach conclusions which, whilst different from one another, are both reasonable and both result in a "fair presentation" being achieved.  Often after, *inter alia*, referring to guidance (such as accounting manuals issued by large accounting firms), in most cases the accounting for a transaction would ordinarily be expected to be treated in a materially consistent manner.

That is not to say however that matters that require the application of judgement cannot be "wrong".  If unreasonable judgement is used, the resulting accounting treatment may be incorrect and result in financial statements which do not comply with IFRS.  Indeed, in my experience, errors in the application of IFRS almost always relate to areas of judgement.

In my view, a judgement might be considered unreasonable if it does not encompass the qualitative characteristics of useful financial information: that is, the judgement does not result in financial information which is relevant |

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

**mazars**

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | and a "*faithful representation*"[1]. A faithful representation is one which is complete, neutral and free from error[2]. |
| | | With regard to the concept of a "*neutral*" presentation, the Framework explains: |
| | | "*to be reliable, the information contained in financial statements must be neutral, that is, free from bias. Financial statements are not neutral if, by the selection of presentation of information, they influence the making of a decision or judgement in order to achieve a predetermined result or outcome*"[3]. |
| | | Similarly, the Conceptual Framework defines neutral as: |
| | | "*A neutral depiction is without bias in the selection or presentation of financial information. A neutral depiction is not slanted, weighted, emphasised, de-emphasised or otherwise manipulated to increase the probability that financial information will be received favourably or unfavourably by users*"[4]. |
| | | A judgement may be considered unreasonable if it misuses, or fails to use, relevant facts and information which existed and which could have been taken into account by the preparer of the financial statements. For example, if a sale was made to a counterparty in serious financial difficulty, it would be unreasonable for a preparer to judge that an inflow of economic benefit was probable because they had ignored available information about the financial health of the counterparty. |
| 2.4.4 | No industry-specific guidance on revenue recognition for software was provided under IFRS. The same revenue recognition standard (IAS 18 (Revenue)) which was issued in 1993 and remained applicable until | Paragraphs 10-12 of IAS 8 "*Accounting Policies, Changes in Accounting Estimates and Errors*" ("**IAS 8**") set out how an entity should develop and |

---

[1] Conceptual Framework, paragraph QC5. Relevance and faithful representation (as a key pillar of reliability) were also qualitative characteristics in the Framework which preceded the Conceptual Framework the (Framework, paragraphs 26 and 33 for example)

[2] Conceptual Framework, paragraph QC12

[3] Framework, paragraph 36

[4] Conceptual Framework, paragraph QC14

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | 2018 (other than minor changes) applied equally to software as to any other product generating revenue. | apply an accounting policy in the absence of an IFRS that specifically applies to a transaction, other event or condition: |

*"In the absence of an IFRS that specifically applies to a transaction, other event or condition, management shall use its judgement in developing and applying an accounting policy that results in information that is:*

*(a) relevant to the economic decision-making needs of users; and*

*(b) reliable, in that the financial statements:*

*(i) represent faithfully the financial position, financial performance and cash flows of the entity;*

*(ii) reflect the economic substance of transactions, other events and conditions, and not merely the legal form;*

*(iii) are neutral, ie free from bias;*

*(iv) are prudent; and*

*(v) are complete in all material respects.*

*In making the judgement described in paragraph 10, management shall refer to, and consider the applicability of, the following sources in descending order:*

*(a) the requirements in IFRSs dealing with similar and related issues; and*

*(b) the definitions, recognition criteria and measurement concepts for assets, liabilities, income and expenses in the Framework*

*In making the judgement described in paragraph 10, management may also consider the most recent pronouncements of other standard-setting bodies that use a similar conceptual framework to develop accounting standards, other accounting literature and accepted industry practices, to the extent that these do not conflict with the sources in paragraph 11."*

Whilst I have not seen that Autonomy created its own accounting policy for software revenue, I understand from Deloitte's 2010 audit file of Autonomy Inc that when making judgements on the application of IAS 18, Autonomy

MAZARS

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | sometimes referred to the requirements of ASC 985-685-15 (formerly Statement of Position 97-2 "*Software Revenue Recognition*" ("**SOP 97-2**")). SOP 97-2 was cleared by the United States' Financial Accounting Standards Board ("**FASB**") which established accounting principles under US Generally Accepted Accounting Principles ("**US GAAP**"), and explains how companies applying US GAAP should account for software transactions.  The Accounting Standards Codification ("**ASC**") is developed and maintained by the FASB.  It is important to note that when referring to guidance from other accounting frameworks, such as US GAAP, care should be taken that the guidance used does not result in accounting treatments which conflict with the requirements of IFRS. |
| | | I also note that some limited, but relevant, guidance related to software transactions is provided in the Appendix to IAS 18. |
| 2.4.6 | It is against this background in the Relevant Period (i.e., the recent first-time adoption of IFRS, non-existent industry-specific guidance, the continuing introduction of new standards and interpretations, and an evolving product offering), that Autonomy was applying IFRS. | I disagree that during the Relevant Period, Autonomy can be properly categorised as a recent first-time adopter of IFRS.  As Mr Taylor has explained in paragraph 2.4.3, Autonomy first adopted IFRS in 2005, so the first set of financial statements in the Relevant Period (for the financial year ended 31 December 2009) was the fifth set that Autonomy had prepared under IFRS. |
| | | I also disagree that the "*continuing introduction of new standards and interpretations*" is especially relevant to the revenue recognition issues in this case.  As Mr Taylor explains in paragraphs 2.4.4 and 3.1.1, IAS 18: Revenue, which is the primary standard for determining when it was appropriate to recognise revenue for both software and hardware contracts in the Relevant Period, was in effect between 1993 and 2018 with only minor changes in the period. |
| 2.5.2 | As stated in paragraph 17 of IAS 1 (Presentation of Financial Statements), "*In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs*".  On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment. | I disagree that it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment.  As a primary observation, all standards of IFRS explicitly state that they should be read in the context of (i.e., applied with consideration to) the "*Preface to International Financial Report Standards*" and the Conceptual Framework / Framework. |

**mazars**

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | Moreover, when applying an individual standard such as IAS 18, preparers also need to consider the requirements of other relevant standards of IFRS. For example, IAS 10 "*Events after the Reporting Period*" ("**IAS 10**") explains the extent to which entities should take account of events which occurred after the end of the financial period, and these requirements clearly need to be adhered to when applying the requirements of IAS 18 in an appropriate manner[5]. |
| | | I therefore disagree with Mr Taylor's interpretation of IAS 1, paragraph 17, insofar as he asserts that it confirms that "*it is only in exceptional circumstances that an accountant would need to look outside of a <u>specific</u> IFRS to determine the appropriate accounting treatment*" [emphasis added]. Instead, I consider that IAS 1, paragraph 17 explains that the appropriate application of <u>all</u> IFRSs that are relevant to the entity will achieve a "*fair presentation*". |
| | | In addition, Mr Taylor does not comment on the rest of IAS 1, paragraph 17 despite reproducing it in footnote 9 of the Taylor Report.  For ease of reference, the full text of IAS 1, paragraph 17 is set out below: |
| | | "*In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs.  <u>A fair presentation also requires an entity</u>*: |
| | | (a)   *to select and apply accounting policies in accordance with IAS 8 Accounting Policies, Changes in Accounting Estimates and Errors. IAS 8 sets out a hierarchy of authoritative guidance that management considers in the absence of an IFRS that specifically applies to an item.* |
| | | (b)   *to present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information.* |
| | | (c)   *to provide additional disclosures when compliance with the specific requirements in IFRSs is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the* |

---

[5] IAS 18 itself provides no requirements regarding the accounting treatment of events which occurred after the reporting period

---

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *entity's financial position and financial performance*".   [Emphasis added]<br><br>It is therefore necessary for an entity to ensure it has also complied with paragraphs (a) to (c) above as well as the requirements of the specific relevant accounting standard. |
| 3.1.1 | […] by complying with IAS 18 (Revenue), an entity achieves a fair presentation with regard to the recognition of revenue. | Whilst I agree that IAS 18 is the primary standard applicable to the recognition of revenue, I disagree that a "*fair presentation*" can be achieved through compliance with IAS 18 alone.<br><br>First, and as noted above, IAS 18 itself states that it should be read in the context of the Framework / Conceptual Framework.  As such, when applying IAS 18 it is my opinion that preparers should appreciate that judgements reached when applying IAS 18 should be, *inter alia*, neutral and unbiased. The requirement for financial statements to be neutral and unbiased is not specifically mentioned in IAS 18 but is instead a principle which is pervasive to the application of IFRS.<br><br>Moreover, and as also explained above, there are a number of other standards which set requirements which can be directly relevant to the correct application of IAS 18, such as IAS 10 or IAS 8.  The requirements of these standards also need to be considered and adhered to in order to achieve a "*fair presentation*" with regard to the recognition of revenue.<br><br>Finally, IFRS itself recognises that there may be rare circumstances where complying with a requirement in IFRS would be so misleading it would conflict with the objective of financial statements set out in the Framework/Conceptual Framework, and so an entity can depart from that requirement to ensure fair presentation (subject to necessary disclosure)[6]. I note that in my opinion no departure was necessary from IFRS for the Software Focus Transactions or hardware transactions that I considered. |
| 3.1.3 | The more principles-based nature of IFRS, along with the lack of any industry-specific guidance on software revenue recognition and the | Whilst there are accounting items for which different accountants could reasonably form different conclusions (for example, the likelihood of a debtor |

---

[6] IAS 1, paragraphs 19 to 20

mazars

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | bespoke nature of the products offered by Autonomy, meant that IAS 18 (Revenue) required judgement in application.  As a result, different accountants could validly form different conclusions when presented with the same transactions, each of which could be appropriate under IAS 18 (Revenue). | balance being recovered), the resulting judgement must comply with the requirements of IFRS and be a faithful representation of the transaction, that is, it must be neutral and unbiased.<br><br>I have identified a significant number of software transactions and a limited number of hardware sales where, based on an examination of contemporaneous factual documents, correspondence and accounting entries, I have concluded that revenue was inappropriately recognised in the relevant quarter, by reference to the revenue recognition criteria of IAS 18.14[7] (and/or IAS 18.20 and/or IAS 18.29).<br><br>Whilst Mr Taylor suggests that a different accountant could form a valid different conclusion under IAS 18, he does not explain why, or even if, he disagrees with my assessment for each individual transaction, and I therefore do not know whether or not Mr Taylor considers that there is an alternative valid conclusion that could be applied in each situation.<br><br>Moreover, where I consider that Autonomy's accounting breached the requirements of IFRS, I do not consider that a reasonable accountant, with sight of the same information and evidence that I have seen, would reach a conclusion which materially differed from my own across such a significant number of transactions. |
| 3.2.4 | The IFRS Foundation (of which the IASB is part) published an annual "IFRS Briefing for Chief Executives, Audit Committees and Boards of Directors". This document sets out summaries of IFRS at a high level and in non-technical language for Chief Executives, members of Audit Committees, Boards of Directors, and others who want a broad overview of IFRSs and the business implications of implementing them. | The IFRS Foundation document "*IFRS Briefing for Chief Executives, Audit Committees and Boards of Directors*" is not a component of IFRS.<br><br>For the avoidance of doubt, in Autonomy's 2009 Financial Statements and 2010 Financial Statement, Dr Lynch confirmed that, to the best of his knowledge, the financial statements were prepared in accordance with IFRS[8]. |
| 3.2.9 | These examples would often be subject to specific clauses in the sales contract which would set requirements, obligations, or milestones to be | I disagree that there is no further commentary which could be used as guidance as to the meaning of the term "significant" in the phrase "*when the* |

---

[7] Indeed, in many instances, the Software Focus Transactions did not meet the criteria for revenue recognition for multiple reasons

[8] Autonomy's FY2009 Annual Report and Accounts, page 34 and Autonomy's FY2010 Annual Report and Accounts, page 43

**mazars**

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | reached. However, the use of the word "significant" in the third example when installation is part of the product being sold is notable. There is no further commentary on this threshold (e.g., whether the installation: (i) represented a "significant" amount of the revenue; (ii) was required before the buyer was required to pay; or (iii) would take a "significant" amount of time to complete). | *goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity*". <br><br> In particular, Illustrative Example 2 accompanying IAS 18 explains that "*Revenue is normally recognised when the buyer accepts delivery, and installation and inspection are complete.  However, revenue is recognised immediately upon the buyer's acceptance of delivery when: (i) <u>**the installation process is simple in nature**</u>, for example the installation of a factory tested television receiver which only requires unpacking and connection of power and antennae* […]*"* [emphasis added]. <br><br> In my opinion, this illustrative example shows that revenue should only be recognised on delivery of the goods when any "*installation*" element is relatively simple, and by extension any installation process that is not "*simple in nature*" should be considered "a *significant part of the contract*" for the purposes of applying IAS 18.16. |
| 3.2.13 | As with the examples provided when assessing the transfer of significant risks and rewards, these examples would often be subject to specific clauses in the sales contract which would identify specific rights and obligations.  While these examples are not an exhaustive list, if none of the five examples apply, then the likelihood increases that the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold. | The examples cited by Mr Taylor in this paragraph are drawn from the 2009 PWC IFRS Manual of Accounting, rather than IAS 18 itself.  I do not consider that Mr Taylor's comment "*if none of the five examples apply, then the likelihood increases that the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold*" is appropriate since, as Mr Taylor himself notes, the examples cited in the PWC IFRS Manual of Accounting are non-exhaustive. <br><br> Determining whether the entity retains continuing management involvement or effective control over the goods sold requires consideration of the transaction specific conditions which existed.  I would therefore not expect the PWC IFRS Manual of Accounting to provide a list of all possible factors which might be relevant to a consideration of whether the entity retains continuing managerial involvement over the goods sold.  It is entirely reasonable to expect that the transaction specific events and conditions which existed in relation to certain of the Software Focus Transactions would demonstrate that Autonomy retained continuing management involvement or effective control over the goods sold for reasons not stated in the PWC IFRS Manual of Accounting. |

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | I note that Mr Taylor's citation of the PWC IFRS Manual of Accounting is at odds with his claim that there was a "*lack of any industry-specific guidance on software revenue recognition*".  The PWC IFRS Manual of Accounting was a guide used by preparers of financial statements, and in my opinion it could be used to help determine whether the judgements reached by Autonomy in the Relevant Period were reasonable or unreasonable. |
| 3.2.14 | To the extent that there is any ongoing managerial involvement, an assessment must be made whether this would be considered equivalent to ownership and would therefore curtail revenue recognition. It is important to note that this assessment (along with the assessment of the other revenue recognition conditions) will be based on the situation at the time the sale is made – such conditions could subsequently change, and this would not impact the initial recognition of revenue. | I agree with Mr Taylor's comment that determining whether Autonomy retained managerial involvement or effective control over goods sold requires an assessment of the transaction specific conditions which existed at the time of the sale.<br><br>However, it is important to note that in some instances events will occur, or information will be obtained, after the date of a sale which provide evidence of conditions which existed as at the date of a sale.  IFRS requires that such events or information be taken into account when considering whether the revenue recognition criteria for a transaction had been met.<br><br>For example, Autonomy immediately continuing to negotiate with an end-user in relation to a sale of software which it had purportedly already sold to a VAR is an event which occurs after the sale to the VAR, but which could be evidence that, as at the time of the sale to the VAR, Autonomy intended to retain managerial involvement over the goods sold. |
| 3.2.25 | Where an uncertainty subsequently arises about the collectibility [sic] of an amount that has been recognized as revenue, the appropriate accounting treatment is generally not to adjust the amount of revenue, but rather to recognize the uncollectible amount as an expense (i.e., as a bad debt) when that uncertainty arises. This expense impacts net profit in the period in which it is recorded, but it does not impact revenue or gross profit in either the original period in which revenue was recognized nor the period in which the expense is recorded. The circumstances where the accounting for a transaction may be adjusted or restated by subsequent events is discussed further in section 4 below. | I do not agree with Mr Taylor's summary. If a preparer identifies an uncertainty regarding the collectability of a debt, consideration must be given to whether the uncertainty existed at the time of the original sale, or if the uncertainty arose due to events and conditions which only came to exists after the date of the sale.<br><br>If the former is the case, the revenue recognition criteria of IAS 18 had not been met and no revenue should be recognised on the transaction.<br><br>An example of this is where an entity sells goods to a customer who goes into administration shortly after the sale had completed.  In such a scenario, the fact that the customer has entered administration is persuasive evidence that, as at the date of the sale, it was not probable that the company would |

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | receive an inflow of economic benefit from the transaction, and no revenue should be recognised. |
| 3.4.10 | As a result, whether transactions are considered to be linked is another area of IAS 18 (Revenue) where judgement is required, and thus accountants can reach different, valid conclusions for the same transactions. | Where I have concluded that Software Focus Transactions are linked to a corresponding purchase made by Autonomy from its customer, based on the specific facts and circumstances, I do not expect that a reasonable accountant would reach a conclusion which differed materially from mine across such a significant number of transactions. |
| 3.5.1 | The use of "Value Added Resellers" (or VARs) was described in Autonomy's Annual Report and Accounts for 2009 and 2010 as "Autonomy's primary revenue channel". A reseller model typically results in goods or services being sold to the reseller, and then a subsequent separate sale is made between the reseller and an end-user. | Mr Taylor's description of how a reseller transaction "typically" operates is inconsistent with the typical operation of the Software Focus Transactions which involved a reseller. In those Software Focus Transactions, it was not typical for the reseller to enact a sale of the software with the end user; indeed, in most instances, the reseller never made any sale of the goods to the named end user. |
| 3.5.2 | Under IAS 18 (Revenue), revenue must be recognized when the conditions are met for the sale to the reseller, as the reseller is the customer. It is not necessary to consider the subsequent sale to any end-user by the reseller. | The Software Focus Transactions in which Autonomy made sales to VARs had a number of transaction specific characteristics which meant that the revenue recognition criteria of IAS 18 was clearly not met.

However, addressing Mr Taylor's general observation, I disagree that it is not necessary to consider the subsequent sale to any end-user by the reseller. In my opinion, such a consideration is necessary if, for example:

- the reseller's attempts to sell the product (or lack of attempts to sell the product) provide evidence that the original seller retained managerial control of the goods sold (thereby failing to satisfy the revenue recognition criteria); and

- the reseller's ability to pay the original seller was contingent on it first selling the goods to an end-user (in which case the revenue recognition criteria of IAS 18 would only be met when the uncertainty was removed, that is, when the reseller sold the goods to the end user). |

**mazars**

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| 3.5.7 | The example provided by Autonomy explains that an upfront non-refundable fee was payable upon the sale of the license to the OEM before the longer term sales volume-based licence fees became payable. For the upfront non-refundable fee to be recognized as revenue, it needs to meet the conditions for sale of goods under IAS 18.14. Revenue recognition for the later sales-based licence fees is then also assessed under IAS 18.14 based on the amount of product sold as reported by the OEM. | IFRS sets out different revenue recognition criteria for transactions involving the sale of goods, the provision of services, and the use of an entity's assets (such as a royalty arrangement).  The appropriate revenue recognition criteria to apply to a transaction is determined by the substance of the transaction itself.<br><br>The accounting policy identified by Mr Taylor implies that Autonomy was applying the revenue recognition criteria applicable to the sale of goods to all OEM transactions (the Software Focus Transactions I reviewed which were "*OEM*" transactions were royalty arrangements).<br><br>In my opinion it is clearly incorrect to apply the revenue recognition criteria applicable to the sale of goods to transactions which are, in substance, royalty arrangements[9].<br><br>Moreover, IAS 1 "*Presentation of financial statements*" paragraph 18, explains that "*An entity cannot rectify inappropriate accounting policies either by disclosure of the accounting policies used or by notes or explanatory material*". |
| 3.5.12 | Autonomy accounted for the revenue arising from these multiple-element transactions in two separate parts, both of which were subject to the conditions under IAS 18.14. | IFRS sets out different revenue recognition criteria for transactions involving the sale of goods, the provision of services, and the use of an entity's assets (such as a royalty arrangement).  The appropriate revenue recognition criteria to apply to a transaction is determined by the substance of the transaction itself.<br><br>The accounting policy identified by Mr Taylor implies that Autonomy was applying the revenue recognition criteria applicable to the sale of goods to hosting transactions (the Software Focus Transactions I reviewed which were "hosting" related to the provision of a service) over time. |

---

[9] I note that the 2009 PWC IFRS Manual of Accounting explains that "*an up-front non-refundable payment might be made to the entity by another party and then a royalty of one per cent of sales might be receivable thereafter.  In that situation, it would be appropriate to reflect the agreement's substance rather than its form and spread the up-front receipt over the expected number of sales to be made in the future where, in substance, the receipt is an advance royalty*" (2009 PWC IFRS Manual of Accounting, paragraph 9.226).  I do not know whether Mr Taylor considered this element of the 2009 PWC IFRS Manual of Accounting when he addressed my conclusions on OEM transactions

MAZARS

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | In my opinion, it is clearly incorrect to apply the revenue recognition criteria applicable to the sale of goods to transactions which are, in substance, the rendering of a service over time.<br><br>Moreover, IAS 1, paragraph 18, explains that "*An entity cannot rectify inappropriate accounting policies either by disclosure of the accounting policies used or by notes or explanatory material*". |
| 4.3.10 | As defined in IAS 8 (Accounting Policies, Changes in Accounting Estimates and Errors), the assessment of "materiality" is not wholly quantitative. | Materiality depends on the size and nature of an item, therefore the assessment of materiality is both quantitative and qualitative.  Whether an item is qualitatively material is as relevant as whether it is quantitatively material. |
| 4.3.17 | Examples of events which could occur after a transaction is recorded but which would not result in a retrospective restatement are:<br><br>(a) where a customer subsequently did not pay their debt […]<br><br>(b) where a separate, subsequent sale by a customer of the same goods to its end-user did not ultimately complete […]<br><br>(c) where a customer subsequently did not use the purchased goods in the manner contemplated by the parties at the time of the sale […]<br><br>(d)   where, having sold goods to a customer, the customer subsequently sells goods to the seller. | Mr Taylor provides four examples of "*events which could occur after a transaction is recorded but which would not result in a retrospective restatement*".<br><br>None of the examples cited by Mr Taylor are identified as examples of "*non-adjusting events*" in IAS 10 itself.<br><br>None of the example cited by Mr Taylor are identified as examples of "*non-adjusting events*" in the PWC IFRS Manual of Accounting.<br><br>I disagree with Mr Taylor's assertion that the four cited examples should be considered "*non-adjusting events*".  In each example cited, the correct application of IFRS requires the preparer to consider whether the events give evidence of condition which existed at the end of the reporting period (or as at the date of the initial transaction).  If the events do give evidence of conditions which existed as at the date of the reporting period (or as at the date of the initial transaction), the examples cited by Mr Taylor would be considering "adjusting events" and a retrospective restatement should be made.<br><br>I also note that Mr Taylor's example (a) in his comment on paragraph 4.3.17 does not accord with the circumstances outlined in IAS 10 paragraph 9(b)[i] where for example "*the bankruptcy of a customer that occurs after the* |

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *reporting period usually confirms*" that the customer was credit-impaired at the end of the reporting period. |
| 5.1.2 | IAS 18 (Revenue) indicates that "significant" revenue categories are the five groupings listed above but does not preclude additional "significant" categories being disclosed if the revenue recognized is not captured within those five categories.  Therefore, the "sale of goods" category captures the sales of all goods, with no additional requirement in IAS 18 (Revenue) for it (or any of the other categories) to include further sub-categories. | I consider that as hardware was a material category of revenue it should have been separately disclosed under IAS 18.35.  However, irrespective of whether hardware sales are considered to be a "*significant category of revenue*", in my opinion disclosure is required under IFRS 8 paragraph 32 for each product and service (or each group of similar products and services).    Further IAS 1.17(c) requires an entity to provide additional disclosures to "*enable users to understand the impact of particular transactions*" and ensure a fair presentation. |
| 5.2.4 | In addition to the segmental reporting, IFRS 8 (Operating Segments) also required certain entity-wide disclosures at a revenue-only level.  If a company provided a geographic split as its segmental reporting, under IFRS 8.32, it was required to "report the revenues from external customers for each product or service, or each group of similar products and services". | I disagree that IFRS 8.32 only comes into effect where a company has provided a geographic split as its segmental reporting.  This is not stated in IFRS 8.  IFRS 8.32 states:

"*An entity shall report the revenues from external customers for each product and service, or each group of similar products and services, unless the necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed.  The amounts of revenues reported shall be based on the financial information used to produce the entity's financial statements*".

The decision that Autonomy had only one Operating Segment was made on the basis that Dr Lynch, the Chief Operating Decision Maker, only reviewed and considered financial and resource information at a group level.  Deloitte noted that[10]:

- "*Whilst separate financial information is prepared (quarterly) for each business unit for the purpose of producing the group consolidation, in no way are these business units operated or monitored like individual companies/Operating Segments*";
- "*No forecasts are prepared on a business unit basis, and those in managerial positions within the group are not assessed or* |

---

[10] Deloitte's audit working paper "2241a IFRS 8 – Accounting for Operating segments (FY2010) memo", Exhibit to witness statement of Mr Welham in the UK Civil proceedings

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *rewarded on the financial performance of anything other than the group as a whole*"; and<br>• "*Mike Lynch also only ever reviews and considers financial and resource information at a group level, with no consideration given to individual product lines or business units*".<br><br>I have seen no evidence that an analysis of the similarity or otherwise of the various products and services was undertaken by Autonomy or Deloitte. This assessment is required in determining whether additional disclosure is required under IFRS 8.32. It is incorrect to suggest that this paragraph is only required where an entity has provided a geographic split as its segmental reporting.<br><br>Whether or not Autonomy correctly judged it had only one operating segment depends on whether Dr Lynch (as the Chief Operating Decision Maker) did or did not regularly review the operating results of hardware sales. I note that spreadsheets that were sent to Dr Lynch included more detail than just financial information at a group level only. For example, a spreadsheet titled "*group revenue 29th sept SH.xls.edc*" that was sent to Dr Lynch by Mr Hussain on 29 September 2009[11] included tabs titled "IDOL Europe", "IDOL US", "Iwov", "Cardiff", "etalk", "Zantaz" and "meridio" as well as a "revenue" tab. The Zantaz tab includes amounts that I can identify were recorded as hardware revenue in Autonomy's general ledger, refers to hardware in the comments and includes an analysis of sales of EMC products, the majority of which were sales of hardware.<br><br>I note that the FRC Disciplinary Tribunal[12] concluded that "*The software and the hardware were both physically and economically different products. We conclude, therefore, that the hardware sales should have been disclosed under IFRS 8 para 32*"[13]. |

---

[11] HP-SEC-02338481 and HP-SEC-02338482

[12] The FRC regulates UK firms providing audit services. The Disciplinary Tribunal heard the Formal Complaint brought by the FRC's Executive Counsel against Deloitte regarding Deloitte's audits of Autonomy for the 2009 and 2010 financial years.

[13] FRC Tribunal Report, paragraph 353

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| 5.2.5 | IFRS 8.32 permits grouping "similar products and services".  However, there is no commentary or guidance in IFRS 8 (Operating Segments) as to how "similar products and services" should be determined.  As a result, the definition of "similar products and services" is a matter of judgement. | Whilst IFRS 8.32 does not explain how an entity should assess the similarity or otherwise of its products, it is reasonable and appropriate to look for guidance elsewhere in accounting standards.

For the purposes of assessing whether operating segments can be aggregated, IFRS 8.12 requires that those operating segments have similar economic characteristics <u>and</u> that the segments are similar in <u>each</u> of the following respects:

*"(a) the nature of the products and services;*

*(b) the nature of the production processes;*

*(c) the type or class of customer for their products and services;*

*(d) the methods used to distribute their products or provide their services; and*

*(e) if applicable, the nature of the regulatory environment, for example, banking insurance or public utilities".*

It is apparent that the nature of the production process for hardware (physical construction) is completely different to software (writing code) and the methods by which hardware is distributed (transport) is completely different to the methods by which software is distributed (electronically).  It is also apparent that hardware and software have very different economic characteristics – Autonomy made a gross loss on the majority of its hardware sales but made gross profits in excess of 80% on its software sales.

If Autonomy had judged that hardware and software were separate operating segments, it would not have been permitted to aggregate these segments under IFRS 8.12 due to the dissimilar characteristics of hardware and software.

In my opinion, the evidence that hardware and software are dissimilar products is clear.  I have not seen an assessment by Autonomy that justifies why hardware sales were not separately disclosed under IFRS 8.32 and I note that Mr Taylor has not explained why hardware and software can reasonably be seen as similar products or why management's judgement not |

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| | | to separately disclose this information resulted in a faithful representation of its business.<br><br>As noted above, the FRC Disciplinary Tribunal concluded that hardware and software were physically and economically different products and should have been separately disclosed under IFRS 8.32. |
| 5.2.9 | The lack of any stated quantitative basis or threshold in IFRS 8.32 suggests a more qualitative approach is preferred, which is consistent with the "management approach" basis of IFRS 8 (Operating Segments). In other words, for purposes of segmental reporting under the IFRS 8, the standard for disclosure (i.e., management approach) is not the same as the standard of materiality (i.e., user approach). | I disagree. Under IFRS 8.32, the fact of whether Product A is dissimilar to Product B requires the application of judgement, however if it was judged that they were dissimilar products but Product A was not material to the entity (either quantitatively or qualitatively) then separate disclosure of the revenue earned from Product A would not be required.<br><br>PwC, in its publication "*A practical guide to segment reporting*"[14] poses the question "*What is the definition of 'material' where an entity is required to disclose separately material revenues and material non-current assets from an individual foreign country*", stating that "*IFRS 8 does not define the term 'material' for the purpose of determining whether an individual country's revenue or non-current assets should be separately disclosed*". Therefore, whilst this addresses disclosure in respect of individual foreign countries, PwC is addressing how to assess materiality when IFRS 8 does not provide a definition.<br><br>PwC's view is that:<br><br>"*The entity should consider materiality from **both quantitative and qualitative** perspectives. When considering materiality quantitatively, the standard uses the threshold of 10% or more in determining whether an operating segment is a reportable segment. Therefore, it may be appropriate to apply the same test to determine whether an individual country's revenue or assets are material for the purpose of separate disclosure*" [emphasis added].<br><br>I note that hardware sales were circa 7.3% of revenue in 2009, but 12.1% in 2010. |

---

[14] https://www.pwc.com/gx/en/ifrs-reporting/pdf/segment-reporting.pdf

**mazars**

| Paragraph of Mr Taylor's report | Mr Taylor's paragraph | My response |
|---|---|---|
| 5.2.10 | The underlying basis for IFRS 8 (Operating Segments) and the limited details on how to implement the entity-wide disclosures suggest a range of interpretations could have been made when implementing this new standard.  This is illustrated by a post implementation review of IFRS 8 by the IASB in July 2013.  In relation to entity-wide disclosures, the feedback noted that:<br><br>"*Many participants think that entity-wide disclosures are poorly understood … Many think that entity-wide disclosures are inconsistently applied across entities and it is claimed that regulators frequently challenge the entity-wide disclosure made*". | The response from the IASB to this point was:<br><br>"*We accept that the disclosures required are difficult to systematise and are often not reviewed by the CODM.  We think, however, that they provide useful information to investors and consequently we do not think that this area warrants any changes at this time*"[15].<br><br>Whilst entity-wide disclosures may have been poorly understood and not consistently applied across entities, the IASB confirmed that it considered such disclosure was useful and the fact that Autonomy made no entity-wide disclosures despite hardware being a very different product to software. |
| 5.3.3 | There is limited guidance in IFRS on where a specific expense should be recorded within the profit and loss account.  As a result, there is no explicit requirement or guidance under IFRS regarding how expenses should be allocated to particular line items in the financial statements. | Whilst IFRS does not explicitly prescribe how expenses should be allocated to particular line items in the financial statements, I refer to paragraph 3.5.2 of my report which notes that Autonomy's 2010 financial statements disclose that "*cost of revenues*" includes the cost of hardware (among other things) and that its disclosure of the components of sales and marketing costs does not include the cost of hardware.  In the absence of other disclosure therefore, a user of the financial statements would reasonably expect that the costs of hardware sales were included in the "*cost of revenues*" line in 2010. |

---

[15] Post-implementation Review: IFRS 8 Operating Segments, page 24

**mazars**

# 1 Appendix I – My comments on Appendix 3 to the Taylor Report

## 1.1 Introduction

1.1.1 Table 1.1 and 1.2 below, I set out my responses to Mr Taylor's observations in Appendix 3 to the Taylor Report.

**Table 1.1: My response to Mr Taylor's observations on Software Sales Transactions**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| 2.4.1 (b) / 2.4.1 (b) | I disagree that, under IAS 8 (Accounting Policies Changes in Accounting Estimates and Errors) and IAS 18 (Revenue), it is appropriate to consider correspondence between individuals within a counterparty in relation to a transaction to determine whether to recognize revenue. It is not reasonably expected that a company could have obtained such contemporaneous information. | In my experience, correspondence between individuals within a counterparty is appropriate where it provides evidence of conditions which existed in relation to the transaction which Autonomy could reasonably have been expected to have obtained or taken into account.

In my opinion, it is entirely reasonable to consider emails between individuals within a counterparty if the emails provide evidence of the internal knowledge within Autonomy regarding a Software Focus Transaction.  For example, in relation to Software Focus Transaction #049 "*file tech*", I referred to emails between Mr Bill Loomis and Mr Gary Szukalski of FileTek, Inc ("**FileTek**") in which Mr Bill Loomis records the notes of a "*Telecon*" which appears to have involved individuals at Autonomy, and which recorded Autonomy's description of a series of transactions and explanation to FileTek of when the transactions would occur.

Similarly, in my opinion it is entirely reasonable to consider emails between individuals within a counterparty if the emails provide evidence of conditions which existed and which Autonomy could reasonably be expected to have obtained and considered at the time of the Software Focus Transaction.  For example, in relation to Software Focus Transaction #040a "*Capax*" I referred to an email from Mr John Baiocco |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | of Capax Discovery, LLC ("**Capax Discovery**") in which he sets out the amounts owed to / from Autonomy and Capax Discovery, information which should also have been available to Autonomy. |
| | | I therefore disagree with Mr Taylor's observation that it is inappropriate to consider correspondence between individuals within a counterparty when determining whether it was appropriate to recognise revenue on the Software Focus Transactions when considered based on the relevant facts and circumstances. |
| 2.4.1 (d) / 2.4.1 (d) | I disagree that, under IAS 8 (Accounting Policies Changes in Accounting Estimates and Errors) and IAS 18 (Revenue), it is appropriate to consider financial information of a company's counterparty, such as financial statements and bank confirmations of payments or receipts to determine whether to recognize revenue. It is not reasonably expected that a company could have obtained such contemporaneous information.<br><br>To the extent a counterparty's financial statements are available to the company, they may be used in the company's assessment of collectibility [sic]. The assessment of collectibility [sic] is subject to judgement and may include other indicators of the counterparty's creditworthiness. | In my experience, financial information of a counterparty to a transaction (including, where relevant, financial statements), is information that could reasonably be expected to be obtained by an entity when determining whether revenue should be recognised in relation to a transaction. I therefore disagree with Mr Taylor's observation.<br><br>I note my position is consistent with both:<br><br>• Autonomy, who sought and obtained financial information of counterparties in certain instances. For example, on 14 April 2010 Mr Thomas Esterrich of MicroTech, LLC ("**MicroTech**") emailed Mr Stephen Chamberlain of Autonomy with an attachment which "*contains MicroTech's Corporate Information, as requested*"[1]; and<br><br>• Autonomy's auditor Deloitte, who sought financial information of counterparties in certain instances in the context of its assessment of whether the revenue recognition criteria of IFRS had been met. For example, in relation to Software Focus Transaction #066 ("*Vidient*"), Mr Thomas Murray of Deloitte emailed Mr Stephen Chamberlain of Autonomy requesting, *inter* |

---

[1] Refer to Software Focus Transaction #050 "*MicroTech*"

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | alia, "*Financial information to support the recoverability of the deal with Vidient Systems ($2.0 million licence deal)*"[2].<br><br>I therefore disagree with Mr Taylor's observation that it not reasonably expected that an entity would obtain financial information of a counterparty, such as financial statements and bank confirmations of payments or receipts to determine whether to recognise revenue. |
| 2.4.8 / 2.4.8 | I disagree that, under IAS 8 (Accounting Policies Changes in Accounting Estimates and Errors) and IAS 18 (Revenue), it is appropriate to consider a subsequent restatement of certain comparative figures to determine whether to recognize revenue. It is not reasonably expected that a company could have obtained such information contemporaneously. | IAS 8 states that prior period restatements should only be made when an entity has failed to use, or misused, evidence which was available (or could reasonably have expected to have been available) at the date the financial statements were authorised for issue.<br><br>As such, the Restatement is relevant context as it shows that the evidence available to Autonomy (or which should have been available to Autonomy) at the date Autonomy's financial statements were issued should have precluded the recognition of revenue on Software Focus Transactions.<br><br>Notwithstanding the above, and importantly, I note that none of the adjustments I have proposed in relation to the Software Focus Transactions are reliant on the Restatement. |
| 2.5.4 (a) / 2.5.4 (a) | I disagree that the significant risks and rewards of ownership of the goods had clearly not been transferred to the buyer if there was contemporaneous evidence that the buyer made no efforts to sell the goods it had acquired to a named end-user.<br><br>I disagree that the significant risks and rewards of ownership of the goods had clearly not been transferred to the buyer if there was contemporaneous evidence that the buyer could not have independently sold the goods it had acquired to a named end-user, even when the only route through which the buyer would have been | In my experience, determining whether the significant risks and rewards of ownership of goods have transferred to the buyer requires a consideration of the cumulative evidence of the transaction specific conditions which exists. Cumulative evidence may also help understand the substance (or lack of substance) behind the transaction.<br><br>In my opinion, there were multiple Software Focus Transactions where the cumulative evidence made it clear that the significant risks and rewards of ownership of the software had not transferred to the buyer at the transaction date. |

[2] HP-SEC-01929718

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | able to do so was via a restructuring of the end-users' existing contractual agreements with the seller.<br><br>If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer, it is not relevant whether the buyer made efforts to sell the goods to a named end-user. | I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions where I considered that Autonomy retained the significant risks and rewards of ownership of the goods sold. Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.5.4 (b) / 2.5.4 (b) | The evaluation of whether the seller retains continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold is made at the time of the sale. If the conditions for revenue recognition are satisfied at the time of the sale, then any subsequent changes would not affect the initial revenue recognized.<br><br>The seller is not prohibited from contacting the end-user after the sale to the buyer has completed. To the extent the seller continued to discuss the specific transaction with the end-user, it would be necessary to assess the seller's level of involvement and it would be a matter of judgement whether this was demonstrative of "continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold". | The determination of whether Autonomy retained continuing managerial involvement to the degree usually associated with ownership or effective control is based on the conditions which existed as at the time of the Software Focus Transaction. I do not consider this to be analogous to Mr Taylor's assertion that the determination is made "*at the time of the sale*".<br><br>Information obtained after the date of the Software Focus Transaction is relevant to an evaluation of whether Autonomy retained continuing managerial involvement of the goods sold if it provides evidence of conditions which existed as at the date of the Software Focus Transaction. For example, Autonomy immediately continuing to negotiate with an end-users even after it had completed a sale to a VAR is an event which occurs after the date of the time of the sale but gives evidence of conditions which existed as at the date of the sale.<br><br>In my opinion, a seller continuing to negotiate the sale of goods to an end-user, despite these goods having previously been "sold" to a different party, is a significant indicator that the seller has retained managerial control over the goods. I note that such a situation is consistent with the guidance of PwC quoted by Mr Taylor, specifically that "*Indicators of continuing managerial involvement or retention of control might include* [...] *The seller can control the future price of the item* [and] *The seller has control over the re-sale of the item to third parties (for example, the seller can control the selling price, timing or counterparty of any re-sale transaction or, alternatively, re-sale is entirely prohibited)*". |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | I agree with Mr Taylor's observation that a seller is not prohibited from contacting the end-user after a sale to a buyer has completed. Mr Taylor also comments that "*it would be necessary to assess the seller's level of involvement and it would be a matter of judgement whether this was demonstrative of "continuing managerial involvement to the degree usually associated with ownership or effective control over the goods sold"*", and I note my assessment as to whether Autonomy retained the continuing managerial involvement is based on my detailed review of each individual Software Focus Transactions |
| | | I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions where I considered that Autonomy retained managerial involvement over the goods sold to the degree usually associated with control.  Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.5.4 (c) / 2.5.4 (c) | Under IFRS, a threshold of a greater than 50% chance has been adopted in practice to assess probability. This assessment is subjective and is made at the time of the original sale, without the use of hindsight. Financial information about a buyer's cash position or profitability is not the only indicator of whether collectibility [sic] is probable. Subsequent purchases from a buyer, or subsequent evidence that a buyer did not pay its debt, do not form part of the original assessment of probability. | The determination of whether it was probable that Autonomy would receive an inflow of economic benefit from a Software Focus Transaction is based on the conditions which existed as at the time of the Software Focus Transaction.  I do not consider this to be analogous to Mr Taylor's assertion that the determination is made "*at the time of the original sale*". |
| | | In my opinion and experience, factors which could indicate that it is not probable that an entity could receive and inflow of economic benefit from a transaction include, *inter alia*: |
| | | • business practices, including the customer's (or VAR's) operating history, informal communications, or competitive pressures which indicate that the customer's (or VAR's) payment is largely contingent on the VAR making a sale of the products to an end-user; |

**mazars**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | • the financial health of the customer (or VAR), including whether the customer (or VAR) is under-capitalised or in financial hardship; and <br><br> • historical patterns of settlement (or conversely, lack of settlement) with a customer (or VAR) which suggest that in the absence of a deal with an end-user, debts were cancelled or settled only once Autonomy had made purchases from the customer (or VAR). <br><br> If information is obtained from events which occurred after the date of the Software Focus Transaction which gives evidence that, as at the date of the Software Focus Transaction, it was not probable that Autonomy would receive an inflow of economic benefit, this should be considered when determining whether the Software Focus Transaction met the revenue recognition requirements. For example, in my experience: <br><br> • a customer going into default soon after a sale is completed is often evidence that, as at the date of the initial sale, it was not probable that the seller would receive an inflow of economic benefit from the transaction; <br><br> • a customer making payments to the seller after the date of the initial sale only once the seller has committed to make purchases from the customer is often evidence that, as at the date of the initial sale, it was not probable that the seller would receive an inflow of economic benefit from the transaction; and <br><br> • a customer's debt being cancelled or written off after the date of the initial sale can be relevant to an assessment of whether, at the time of the initial sale, it was probable that the seller would receive an inflow of economic benefit from the transaction. This is particularly true if no events or conditions arose after the date of the transaction which caused the debt to be cancelled or written off. <br><br> In addition, information obtained from events arising after the Software Focus Transaction is relevant to a determination of whether the Software |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | Focus Transaction met the revenue recognition requirements if that information could reasonably have been expected to have been known or obtained by Autonomy.  For example, correspondence between individuals within a customer which highlights a customer's inability to pay is relevant to the application of IFRS, as it is reasonable to expect that Autonomy would have been able to obtain information on the financial health of the customer.<br><br>I note my conclusions as to whether it was probable that Autonomy would receive an inflow of economic benefit in relation to a sale is based on my reviews of the cumulative transaction specific evidence related to individual Software Focus Transactions.<br><br>I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions where I considered that it was not probable that Autonomy would receive an inflow of economic benefit from the transaction.  Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.5.6 / 2.5.6 | I disagree that additional requirements of IFRS need to be considered over and above the revenue recognition conditions of IAS 18 (Revenue).<br><br>The relevant conditions for revenue recognition are set out in IAS 18 (Revenue). If these conditions are met, then the financial statements are presumed to present a faithful representation of the transactions and events that they purport to represent. | As a primary observation I note Mr Taylor's view that there was "*No industry-specific guidance on revenue recognition for software was provided under IFRS*", and Mr Taylor footnotes the IAS hierarchy of authoritative guidance that management considers in the absence of an IFRS that specifically applies to an item[3].  Mr Taylor seems inconsistent when suggesting there is no industry guidance and then also citing the IAS 18 hierarchy.  I also note that Deloitte notes in its 2010 Audit File (Planning) that Autonomy looks outside of IAS 18.  Deloitte note that "*The critical accounting policy is IAS 18 revenue recognition, as revenue is the key driver.  Deloitte will assess whether revenue is appropriately recognised on a detailed basis.  Given guidance in IAS 18 is not always specific to software companies, Autonomy have traditionally looked* |

---

[3] IAS 8, paragraphs 10 to 12

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *towards ASC 985-605-15 (formerly SOP 97-1) for additional guidance*". It is therefore unclear why Mr Taylor did not consider (or did not address whether Autonomy should have also considered) the requirements and guidance of other standard setters outside of IFRS, including ASC 985-605-13 (formerly SOP 97-2) regarding software sales[4]. |
| | | The overarching principal of financial statements prepared in accordance with IFRS is that they present a "fair presentation". Indeed, IFRS explains that, whilst rare, there may be instances where an entity needs to deviate from the requirements of IFRS so as to ensure that a fair presentation is achieved.  As such I disagree that it is solely the requirements of IAS 18 that are relevant when considering whether revenue should have been recognised on the Software Focus Transactions. |
| | | Determining whether a Software Focus Transaction had economic substance requires a consideration of the cumulative evidence of the specific conditions which existed in relation to the Software Focus Transaction. |
| | | However, for the avoidance of doubt, if a transaction lacked economic substance, it goes without saying that the revenue recognition requirements of IAS 18 would not be met.  For example, it would not be probable that Autonomy would receive an inflow of economic benefit from a Software Focus Transaction that lacked economic substance. Similarly, if a Software Focus Transaction had no economic substance, it follows that there was no transfer of the risks and rewards of ownership of the goods, and Autonomy would maintain managerial control over the goods purportedly sold in the Software Focus Transaction. |
| 2.5.7 (a) / 2.5.7 (a) | I disagree that additional requirements of IFRS need to be considered over and above the revenue recognition conditions of IAS 18 (Revenue). | Mr Taylor's comments refer to the Software Focus Transactions relating to transactions with VARs. |

---

[4] Whilst Autonomy unequivocally stated that the Relevant Financial Statements were prepared in accordance with IFRS, I note that Autonomy did consider certain US GAAP guidance including ASC 985-605-13 (formerly SOP 97-2) when making judgements in relation to the application of IAS 18

MAZARS

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | The relevant conditions for revenue recognition are set out in IAS 18 (Revenue).<br><br>None of these conditions contain criteria related to the extent of negotiations or the timing within an entity's reporting period required to agree a transaction. If the IAS 18 (Revenue) conditions for revenue recognition are met, revenue is recognized. | Based on my experience, conditions which could indicate that a transaction did not have economic substance include instances where transactions are executed with VARs in a very short space of time (over a matter of hours), with little to no negotiation, and on the last day of an entity's reporting period.  It is therefore clear to me that these conditions are relevant to the evaluation of whether a Software Focus Transaction met the revenue recognition requirements of IFRS.<br><br>In his report, Mr Taylor refers to the International Standards on Auditing in the context of a discussion on materiality.  International Standards on Auditing set out the requirements of auditors when reaching a conclusion on whether financial statements have been prepared in accordance with an accounting framework such as IFRS.  It appears that Mr Taylor and I agree that International Standards on Auditing can provide useful guidance on what could be relevant to an evaluation of whether financial statements have been prepared in accordance with IFRS.<br><br>International Standard on Auditing 240 is titled "*The Auditor's Responsibilities Relating to Fraud in an Audit of Financial Statements*" ("**ISA 240**").  ISA 240 sets out requirements and guidance applicable to auditors when evaluating whether financial statements are materially misstated due to fraud.  In this context, ISA 240 explains that a "*fraud*" is defined as an intentional action that results in a misstatement of the financial statements[5].<br><br>It is my view the guidance contained within ISA 240 regarding the risk factors that could indicate the existence of fraudulent transactions is also helpful guidance to consider when evaluating whether a Software Focus Transaction had an economic substance.  To that end, ISA 240 highlights the following conditions as being "*risk factors*" which warrant consideration[6]: |

---

[5] It is my view that certain Software Focus Transactions did not have an economic substance.  I note that this is not the same as me making a legal determination as to whether a fraud has occurred
[6] ISA 240, Appendix A

**ʍazars**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | • "*Significant, unusual, or highly complex transactions, **especially those close to period end** that pose difficult "substance over form" questions*"; [emphasis added] and<br><br>• "*Use of business intermediaries for which there appears to be no clear business justification*".<br><br>In my opinion, the above guidance of ISA 240 makes it clear that evaluating conditions related to negotiations and timing can be highly relevant to the correct application of IFRS, especially if transactions were executed with VARs in a very short space of time (over a matter of hours), with little to no negotiation, and on the last day of an entity's reporting period. Consequently, where such conditions existed in relation to a Software Focus Transaction, they should be considered when determining whether it was appropriate to recognise revenue. |
| 2.5.7 (b) / 2.5.7 (b) | Under IFRS, a threshold of a greater than 50% chance has been adopted in practice to assess probability, not "realistic prospects". This assessment is subjective and is made at the time of the original sale, without the use of hindsight.<br><br>If collectibility [sic] is deemed to be probable, and the other conditions in IAS 18 (Revenue) for revenue recognition are met, then revenue is recognized. | I agree with Mr Taylor's observation that, in accordance with IAS 18, it needs to be probable that an entity will receive an inflow of economic benefit in order for an entity to recognise revenue.<br><br>In certain Software Focus Transactions, it is my view that there was no realistic prospect that the VAR would be able to pay the amounts owed to Autonomy in the absence of a transaction with the end-user. For Software Focus Transactions where this was the case, I consider it self-evident that the 50% probability threshold required for revenue recognition under IAS 18 would not have been met.<br><br>However, in my experience, there being no realistic prospect that a VAR would be able to pay the amounts owed to Autonomy in the absence of a transaction with the end-user can also be an indicator that a Software Focus Transaction had no economic substance. In this regard I note the guidance of ISA 240, which identifies the following as one of the "*Indicators*" that warrant consideration:<br><br>• "*The transactions involve previously unidentified related parties or parties that do not have the substance or the financial* |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *strength to support the transaction without assistance from the entity under audit*[7]. <br><br> In my opinion, the above guidance of ISA 240 makes it clear that it can be highly relevant to the correct application of IFRS if transactions were executed with VARs where there was no realistic prospect that the VAR would be able to pay the amounts owed to Autonomy in the absence of a transaction with the end-user (or assistance from Autonomy). Consequently, where such a condition existed in relation to a Software Focus Transaction, it should be considered when determining whether it was appropriate to recognise revenue. |
| 2.5.7 (c) / 2.5.7 (c) | I disagree that the significant risks and rewards of ownership of goods had not been transferred to the buyer if there was contemporaneous evidence that the buyer could not have independently sold the goods it had acquired to a named end-user, even when the only route through which the buyer would have been able to do so was via a restructuring of the end-users' existing contractual agreements with the seller. <br><br> I disagree that the significant risks and rewards of ownership of the goods had not been transferred to the buyer if there was contemporaneous evidence that the buyer was also a co-founder of a named end-user. <br><br> If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer, and the other conditions in IAS 18 (Revenue) for revenue recognition are met, then revenue is recognized. | I disagree with Mr Taylor's observation that "*If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer* […] *then revenue is recognized*". Applying IFRS requires a consideration of the transaction specific conditions which existed as at the date of each Software Focus Transaction, as opposed to just management's determination. <br><br> Based on my experience, conditions which could indicate that a transaction did not have economic substance include instances where the only apparent route through which the sale of the software licence to the named end-user could be achieved required a restructuring of existing contracts with Autonomy which the VAR was unable to enact. <br><br> In that regard I note the guidance of ISA 240, which highlights the following condition as being a "*risk factors*" which warrants consideration: <br><br> • "*Significant, unusual, or highly complex transactions, especially those close to period end that pose difficult "substance over form" questions*". <br><br> In my opinion, the above guidance of ISA 240 makes it clear that it can be highly relevant to the correct application of IFRS if the only apparent route through which the sale of the software licence to the named end- |

[7] ISA 240, paragraph A48

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | user could be achieved required a restructuring of existing contracts with Autonomy (which the VAR was unable to enact). Consequently, where such a condition existed in relation to a Software Focus Transaction, it should be considered when determining whether it was appropriate to recognise revenue.

Mr Taylor disagrees that the "*significant risks and rewards of ownership of goods had not been transferred to the buyer if there was contemporaneous evidence that the buyer was also a co-founder of a named end-user*". Mr Taylor's comment relates to an observation I made in relation to Software Focus Transaction #041, in which Autonomy sold software to MicroLink, LLC ("**MicroLink**") (liaising with Mr David Truitt, who co-owned MicroLink), for MicroLink to then sell to the end user, DiscoverTechnologies, LLC ("**DiscoverTech**", a company also co-owned by Mr David Truitt). As noted in my review of this Software Focus Transaction in Appendix F, I have seen nothing to explain the economic or commercial rationale for channelling this transaction through a reseller who was controlled by the same individual as DiscoverTech, rather than concluding the transaction with DiscoverTech directly. To that end, I note the following "*indicators*" and "*risk factors*" set out in the guidance of ISA 240[8], which in my opinion demonstrates that this conditions of Software Focus Transaction #041 was clearly relevant to an application of IFRS:

- "*Use of business intermediaries for which there appears to be no clear business justification*"; and

- "*The form of such transactions appears overly complex (for example, the transaction involves multiple entities within a consolidated group or multiple unrelated third parties)*". |
| 2.5.7 (d) / 2.5.7 (d) | The relevant conditions for revenue recognition are set out in IAS 18 (Revenue). These conditions do not contain criteria related to the existence of a pattern of behaviour between a seller and a buyer. | In my experience, the existence or emergence of a pattern of behaviour between Autonomy and a VAR can indicate that a Software Focus Transaction does not have an economic substance. |

---

[8] ISA 240, Appendix 1

**mazars**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain

Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | The history between a seller and a buyer can be considered in evaluating the IAS 18 (Revenue) conditions, such as collectibility [sic]. If the IAS 18 (Revenue) conditions for revenue recognition are met, then the transaction is presumed to have economic substance and revenue is recognized. | As explained in the guidance to ISA 240, "*a retrospective review of similar management judgements and assumptions applied in prior periods may also provide insight about the reasonableness of judgements and assumptions supporting management estimates*".  For example, the reasonableness of management's judgement as to whether the revenue recognition criteria for a Software Focus Transaction had been met could be called into question if there were multiple previous transactions with the VAR which had subsequently been reversed or cancelled.<br><br>In my opinion, the above guidance of ISA 240 makes it clear that pre-existing patterns of behaviour between Autonomy and a VAR can be highly relevant to the correct application of IFRS.  Consequently, when considering whether it was appropriate to recognise revenue in relation to a Software Focus Transaction, such patterns are relevant to the fact pattern and should be considered. |
| 2.5.7 (e) / 2.5.7 (e) | Revenue must be recognized if the IAS 18 (Revenue) conditions are met on a specific transaction, based on contemporaneous information.<br><br>In accordance with IAS 18 (Revenue), if an uncertainty subsequently arises concerning the collectibility [sic] of an amount previously recognized as revenue, no adjustment is recorded to the original revenue recognized. Rather, the uncollectible amount is recorded as an expense. | I disagree with Mr Taylor's observation.  As explained above, if information is obtained from events which occurred after the date of the Software Focus Transaction which gives evidence that, as at the date of the Software Focus Transaction, it was not probable that Autonomy would receive an inflow of economic benefit, this should be considered when determining whether the Software Focus Transaction met the revenue recognition requirements.  In my opinion, Autonomy cancelling amounts owed by the VAR in relation to a Software Focus Transaction, or facilitating the VAR's settlement of the amounts owed by first remitting cash to the VAR, provides evidence that, at the date of the Software Focus Transaction, it was not probable that the VAR would settle the amounts it owed.<br><br>For example, in relation to Software Focus Transaction #105 "*UBS Supervision and Archiving*", Autonomy made a "sale" of $7.664 million to Capax Discovery on 30 June 2011, but subsequently wrote the full amount off on 31 August 2011.  I am not aware of a specific event that took place between 30 June 2011 and 31 August 2011 that would result in a change to the "collectability" of the Capax Discovery debt.  In my opinion, the writing off of the amount owed by Capax Discovery is |

MAZARS

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | evidence which is relevant to an assessment of whether, at 30 June 2011, it was probable the Autonomy would receive an inflow of economic benefit from Capax Discovery in relation to the transaction. |
| 2.5.7 (f) / 2.5.7 (f) | Revenue must be recognized if the IAS 18 (Revenue) conditions are met on a specific transaction, based on contemporaneous information.<br><br>The subsequent payment of a commission after the completion of a transaction is a business decision. | In my opinion, the payment of a commission to a VAR in relation to a Software Focus Transaction, despite the VAR having no apparent involvement in the sale to the end-user, is a condition that indicates that the Software Focus Transaction had no economic substance. ISA 240 identifies that "*Causing an entity to pay for goods and services not received (for example* […] *kickbacks paid by vendors to entity's purchasing agents in return for inflating prices* […]*)*" is a potential method through which intentional accounting errors might be made.<br><br>I therefore consider it clear that the payment of commissions to VARs in relation to a Software Focus Transaction, despite the VAR having performed no apparent service to Autonomy, can be highly relevant to an appraisal of whether the Software Focus Transaction had any economic substance at the date of the transaction. |
| 2.6.1 / 2.6.1 | When assessing whether there is a link between different transactions relating to different goods and/or services, the only guidance in IAS 18 (Revenue) to make the assessment relates to determining "commercial effect", which requires judgement. | I agree with Mr Taylor's observation that judgement is required when assessing whether the revenue recognition criteria should be applied to two or more transactions together.<br><br>Appropriate judgement should lead to a presentation which provides a "*faithful representation*" of the economic substance of the transactions. A "*faithful representation*" is one of the fundamental qualitative characteristics of useful financial reporting and one of the components of a "*fair presentation*"; the overarching requirements of financial statements prepared in accordance with IFRS.<br><br>For example, in relation to Software Focus Transaction #036 "*Vidient Systems*", Autonomy and Vidient Systems, Inc ("**Vidient**") entered into a transaction whereby Autonomy "sold" products with a value of $2.5 million to Vidient, and on the following day purchased products from Vidient with a value of $3.0 million. Vidient was a loss making entity in the nine months to 30 September 2009 and a purchase of $2.5 million |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | would have largely eliminated its cash reserves. In my opinion, it would be unreasonable to judge that the "*commercial effect*" of Autonomy's sale to and purchase from Vidient could be understood without reference to one another, and similarly I am of the view it would be unreasonable to judge that accounting for these transactions separately would achieve a "*fair presentation*". |
| | | I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions which contained linked or reciprocal transactions. Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considered Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.6.3 / 2.6.3 | Transactions are considered to be linked if "*the commercial effect cannot be understood without reference to the series of transactions as a whole*". This is a judgement made contemporaneously.<br><br>I disagree that transactions being in close time proximity to each other, negotiated by the same individuals, or with their mutual existence acknowledged in the negotiations, means that they should be considered together – these are indicators that may be appropriate to consider whether such transactions are linked.<br><br>If the collectibility [sic] of a transaction is wholly dependent upon another transaction with the same counterparty, then it may be appropriate to consider them as linked. However, an assessment of collectibility [sic] needs to be performed to first establish the "wholly dependent" judgement.<br><br>I disagree that the lack of fair value assessments means that transactions should be considered together. A fair value condition is not referred to within IAS 18.13 and is not typically undertaken for each and every transaction of a company. | Mr Taylor states that he disagrees that "*transactions being in close time proximity to each other, negotiated by the same individuals, or with their mutual existence acknowledged in the negotiations, means that they should be considered together*". I agree with Mr Taylor's observation insofar as none of these factors are individually determinative of whether two transactions be accounted for as one.<br><br>However, in my experience, determining whether "*the commercial effect* [of a transaction] *cannot be understood without reference to the series of transactions as a whole*" requires a consideration of the cumulative evidence of the transaction specific conditions which exists. I have performed this consideration in Appendix F of my Interim Report, and I note that Mr Taylor has not addressed the transaction specific evidence I reviewed. He has also not explained his conclusion as to whether each Software Focus Transaction should have been considered together with certain other linked transactions entered into by Autonomy.<br><br>Mr Taylor disagrees that the lack of fair value assessments means that transactions should be considered together. For the avoidance of doubt, I do not suggest that a lack of fair value assessment means that transactions should be considered together. Instead, I considered that a lack of evidence existing to support the amounts payable by the parties |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | as being fair value was relevant to a consideration of whether the transactions should be considered together.<br><br>This is connected to the evidence I had seen that certain Software Focus Transactions (or their linked transactions) were entered into above the fair value of the products or services sold.  Mr Taylor has not provided any comments on whether this is relevant to whether Software Focus Transactions were linked to other transactions.  In my opinion it is clearly relevant.<br><br>I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions which contained linked or reciprocal transactions.  Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considered Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.7 / 2.7 | This section in the Brice Report concerns hosting transactions and how the related revenue should be recognized.<br><br>The Autonomy revenue recognition policy (as set out in both the 2009 and 2010 Annual Report and Accounts) states that Autonomy considered licenses, OEM and hosting transactions to be recognized as "sale of goods" – not rendering of services.<br><br>Mr Brice's opinion that these transactions were rendering of services is contrary to Autonomy's revenue recognition policy. As such, Mr Brice's comments suggest he disagrees with Autonomy's publicly disclosed accounting policy and presentation. | IFRS sets out different revenue recognition criteria for transactions involving the sale of goods, the provision of services, and the use of an entity's assets (such as a royalty arrangement).  The appropriate revenue recognition criteria to apply to a transaction is determined by the substance of the transaction itself.<br><br>The accounting policy identified by Mr Taylor implies that Autonomy was applying the revenue recognition criteria applicable to the sale of goods to hosting transactions (the Software Focus Transactions I reviewed which were "hosting" related to the provision of a service).<br><br>In my opinion it is clearly incorrect to apply the revenue recognition criteria applicable to the sale of goods to transactions which are, in substance, the rendering of a service.<br><br>Moreover, IAS 1 "*Presentation of financial statements*" paragraph 18, explains that "*An entity cannot rectify inappropriate accounting policies either by disclosure of the accounting policies used or by notes or explanatory material*". |

**MAZARS**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | As such, Mr Taylor's observation on Section 2.7 of my Interim Report only serves to identify a further error (or poorly presented accounting policies) in Autonomy's financial reporting during the Relevant Period.<br><br>I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions being accounted for as a sale of goods rather than the rendering of services. Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.8 / 2.8 | This section in the Brice Report concerns OEM transactions and how the related revenue should be recognized.<br><br>The Autonomy revenue recognition policy (as set out in both the 2009 and 2010 Annual Report and Accounts) states that Autonomy considered licenses, OEM and hosting to be recognized as "sale of goods" – no amounts were stated to be recognized as royalties.<br><br>Mr Brice's opinion that these transactions were royalties is contrary to Autonomy's revenue recognition policy. As such, Mr Brice's comments suggest he disagrees with Autonomy's publicly disclosed accounting policy and presentation. | IFRS sets out different revenue recognition criteria for transactions involving the sale of goods, the provision of services, and the use of an entity's assets (such as a royalty arrangement). The appropriate revenue recognition criteria to apply to a transaction is determined by the substance of the transaction itself.<br><br>The accounting policy identified by Mr Taylor implies that Autonomy was applying the revenue recognition criteria applicable to the sale of goods to OEM transactions (the Software Focus Transactions I reviewed which were "OEM" transactions were royalty arrangements).<br><br>In my opinion it is clearly incorrect to apply the revenue recognition criteria applicable to the sale of goods to transactions which are, in substance, royalty arrangements[9].<br><br>Moreover, IAS 1 "*Presentation of financial statements*" paragraph 18, explains that "*An entity cannot rectify inappropriate accounting policies either by disclosure of the accounting policies used or by notes or explanatory material*". |

---

[9] I note that the 2009 PWC IFRS Manual of Accounting explains that "*an up-front non-refundable payment might be made to the entity by another party and then a royalty of one per cent of sales might be receivable thereafter. In that situation, it would be appropriate to reflect the agreement's substance rather than its form and spread the up-front receipt over the expected number of sales to be made in the future where, in substance, the receipt is an advance royalty*" (2009 PWC IFRS Manual of Accounting, paragraph 9.226). I do not know whether Mr Taylor considered this element of the 2009 PWC IFRS Manual of Accounting when he addressed my conclusions on OEM transactions

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | As such, Mr Taylor's observation on Section 2.8 of my Interim Report only serves to identify a further error (or poorly presented policies) in Autonomy's financial reporting during the Relevant Period.<br><br>I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions being accounted for as a sale of goods rather than royalties. Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming that he considers Autonomy's original accounting for the Software Focus Transactions appropriate. |
| 2.9 / 2.9 | This section in the Brice Report concerns transactions which Mr Brice contends included a "significant installation process".<br><br>This is a judgement made contemporaneously. IAS 18 (Revenue) does not provide any guidance on what "significant" means in this context. | I agree that what constitutes a "*significant installation process*" is a matter of judgement. My conclusions on whether a Software Focus Transaction contained a "*significant installation process*" was based on my view of the transaction specific evidence.<br><br>I note that the 2009 PWC IFRS Accounting Manual referred to by Mr Taylor explains, in relation to software sales, that "*Where acceptance is subject to installation and inspection and the **installation process is simple (for example, involving unpacking and loading the software), revenue can be recognised immediately upon the buyer's acceptance of delivery**. However, if, as is often the case, the installation process is more substantial and there is more than an insignificant risk of non-acceptance, revenue recognition should be delayed until the installation and inspection process are complete and customer acceptance has occurred*"[10] [emphasis added]. Mr Taylor has not referred to this guidance when addressing my conclusions in relation to Software Focus Transactions with a "*significant installation process*".<br><br>I do not know whether Mr Taylor disagrees with the Misstatements I identified arising from transactions which contain timing errors. Mr Taylor does not express an opinion disagreeing with my opinions on individual Software Focus Transactions, nor does he express an opinion confirming |

---

[10] 2009 PWC IFRS Manual of Accounting, paragraph 9.101

mazars

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | that he considered Autonomy's original accounting for the Software Focus Transactions appropriate. |

**mazars**

Table 1.2: My response to Mr Taylor's observations on Hardware Sales Transactions

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| 3.5.2 (a) / 3.5.2 (a) | While under IFRS, the cost of inventory in a period must be recognized as an expense, I disagree that this means these costs are necessarily all reported as Cost of Sales. | I disagree that the cost of inventory in a period should be reported as anything other than cost of sales.

The full text of IAS 2.38 is "*The amount of inventories recognised as an expense during the period, which is often referred to as cost of sales, consists of those costs previously included in the measurement of inventory that has now been sold and unallocated production overheads and abnormal amounts of production costs of inventories. The circumstances of the entity may also warrant the inclusion of other amounts, such as distribution costs*" [emphasis added].

Amounts that comprise cost of sales can also be referred to as cost of revenues, which is in fact how Autonomy referred to such costs[11] or cost of goods sold ("**COGS**").

Autonomy's accounting policy for cost of revenues stated that it included hardware (paragraph 3.5.2 (b) (i)).

COGS is self-explanatory – it is the cost to the entity of the goods that it has sold to generate revenue. Where an entity has purchased hardware to sell to a third party, the cost of that hardware is a cost of the goods sold to the third party.

I note that when Autonomy deferred certain hardware sales in Q1 2010 (paragraphs 3.4.8 to 3.4.12 of my report), the full cost of the hardware was also deferred, including any amount that Autonomy intended to account for as a sales and marketing cost[12]. If a portion of the cost did represent a sales and marketing expense, it would not have been necessary or appropriate to record that as inventory. Rather it should have been recorded as a prepayment of expenses, to be recognised in |

---

[11] Autonomy's 2010 consolidated financial statements, Note 2.e)iii)

[12] For example, the Chamberlain email at HP-SEC-00100357-00100359 shows that the cost of the $5,648,474 sale of HDS hardware to Morgan Stanley was $7,343,016. Deloitte's working paper "Q1-2272 Z Consolidation" shows that the full cost was included in the cost of inventory

**_MAZARS_**

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice FCA

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | the profit and loss account as an expense when the marketing services were provided. |
| 3.6.2 / 3.6.2 | The materiality thresholds in Table 2.5 are not relevant to determining whether the hardware sales needed to be disclosed. Therefore, whether the hardware sales represented 5%, 10%, 15%, or some other percentage of Autonomy's revenue, nondisclosure could be reasonable. The relevant assessment was: (i) whether Autonomy had a single reportable operating segment under IFRS 8.5-10; and (ii) whether the hardware sales constituted a dissimilar product and service, or a group of dissimilar products and services, requiring separate disclosure under IFRS 8.32.<br><br>Both questions are a matter of judgement. Neither determination is quantitative under IFRS 8 (Operating Segments), which requires a more qualitative assessment, which is consistent with the "management approach" basis of IFRS 8. | I disagree that the materiality thresholds in Table 2.5 are not relevant to determining whether the hardware sales needed to be disclosed under the requirements of IFRS 8 and I note that this quantitative materiality threshold is just one part of the assessment of whether an item is material – whether an item is qualitatively material (i.e. material by its nature) is also required (paragraph 2.3.2).<br><br>IFRS 8.32 is a specific disclosure requirement where relevant to the entity.  IAS 1.31 confirms that "*An entity need not provide a specific disclosure required by an IFRS if the information is not material*", therefore confirming that if the information that is required to be disclosed under IFRS is material, the disclosure requirement must be complied with.<br><br>With regard to IFRS 8.32, the fact of whether Product A is dissimilar to Product B requires the application of judgement. However, if it was judged that they were dissimilar products but Product A was not material to the entity (either quantitatively or qualitatively) then separate disclosure of the revenue earned from Product A would not be required. |
| 3.6.3 (a) / 3.6.3 (a) | As noted in IAS 1.17, "In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs". On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment. The requirements for disclosure of revenue are covered by IAS 18 (Revenue) and IFRS 8 (Operating Segments). | I disagree.  For a set of financial statements to comply with IFRS, they must apply the requirements of all relevant IFRSs. Mr Taylor ignores the fact that IAS 1 applies to all general purpose financial statements.  The objective of IAS 1 is set out below:<br><br>"*This Standard prescribes the basis for presentation of general purpose financial statements to ensure comparability both with the entity's financial statements of previous periods and with the financial statements of other entities.  It sets out overall requirements for the presentation of* |

**mazars**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *financial statements, guidelines for their structure and minimum requirements for their content*"[13].<br><br>IAS 1 requires that:<br><br>"*An entity shall apply this Standard in preparing and presenting general purpose financial statements in accordance with International Financial Reporting Standards (IFRSs)*"[14].<br><br>Therefore, whilst IAS 18 prescribes how and when an entity shall recognise and disclose revenue, an entity is also required under IAS 1 to present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information and provide additional disclosures when compliance with the specific requirements in IFRSs is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance[15]. |
| 3.6.3 (b) / 3.6.3 (b) | As noted in IAS 1.17, "In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs". On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment. The requirements for disclosure of revenue are covered by IAS 18 (Revenue) and IFRS 8 (Operating Segments). | Mr Taylor does not comment upon the rest of IAS 1.17 despite reproducing it in footnote 9 of the Taylor report.  For ease of reference, the full text of IAS 1.17 is set out below:<br><br>"*In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs.  A fair presentation also requires an entity:*<br><br>*(a)   to select and apply accounting policies in accordance with IAS 8 Accounting Policies, Changes in Accounting Estimates and Errors. IAS 8 sets out a hierarchy of authoritative guidance that management considers in the absence of an IFRS that specifically applies to an item.* |

---

[13] IAS 1, paragraph 1
[14] IAS 1, paragraph 2
[15] IAS 1, paragraph 17 (b) and (c)

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *(b)* *to present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information.* <br><br> *(c)* *to provide additional disclosures when compliance with the specific requirements in IFRSs is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance".* [Emphasis added] <br><br> It is therefore necessary for an entity to ensure it has complied with paragraphs (a) to (c) above as well as the requirements of the specific relevant accounting standard, in this case IAS 18 and IFRS 8. <br><br> Despite his reliance on the introductory sentence of IAS 1.17, Mr Taylor has not explained why (and indeed if) he disagrees with my conclusions that Autonomy's accounting for certain hardware transactions did not comply with the requirements of IAS 18 or on what basis he is of the opinion that hardware and software are similar products such that separate disclosure under IFRS 8.32 was not required. |
| 3.6.3 (c) | As noted in IAS 1.17, "In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs". On this basis, it is only in exceptional circumstances that an accountant would need to look outside of a specific IFRS to determine the appropriate accounting treatment. The requirements for disclosure of revenue are covered by IAS 18 (Revenue) and IFRS 8 (Operating Segments). | I repeat my response to paragraph 3.6.3(b) above. |
| 3.6.3 (d) / 3.6.3 (d) | I disagree that IAS 18.35 required hardware sales to be separately disclosed. IAS 18.35 required revenue to be split into various categories including "sale of goods". There was no requirement under IAS 18.35 for Autonomy to disclose hardware outside the "sale of goods" category. | I consider that as hardware was a material category of revenue it should have been separately disclosed under IAS 18.35. However, irrespective of whether hardware sales are considered to be a "*significant category of revenue*", in my opinion disclosure is required under IFRS 8 paragraph 32 for each product and service (or each group of similar products and services).  Further IAS 1.17(c) requires an entity to provide additional disclosures to "*enable users to understand the impact of particular transactions*" and ensure a fair presentation |

**mazars**

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| 3.6.3 (e) / 3.6.3 (e) | I do not consider that the disclosure of inventory expensed requires hardware to be separately identified from other goods. | IAS2.36 (d) requires that "*the amount of inventories recognised as an expense during the period*" is disclosed in the financial statements. I agree that this paragraph does not require the hardware inventory expensed to be separately identified from other inventory expensed, however Autonomy generally had little or no inventory and sales of software did not require physical inventory.<br><br>If therefore Autonomy had disclosed inventory expensed in generating its hardware sales, it would have been apparent to the users of the financial statements that reported revenue was comprised of more than just software sales. |
| 3.6.3 (f) / 3.6.3 (f) | I disagree that it was necessary under IFRS 8 (Operating Segments) to separately disclose hardware sales.<br><br>Under IFRS 8.5, Autonomy disclosed that it had one operating segment and so provided a breakdown by geographic region – not between product or other segment.<br><br>Under IFRS 8.32, Autonomy was required to disclose revenues for groups of similar products and services. The determination of what constitutes "similar products and services" is an assessment based on management's approach.<br><br>Both questions are a matter of judgement. Neither determination is quantitative under IFRS 8 (Operating Segments), which requires a more qualitative assessment, which is consistent with the "management approach" basis of IFRS 8.<br><br>If, under IFRS 8.32, there was a determination of dissimilar goods, then IFRS 8.32 does not identify any quantitative level above which it is necessary to report. It may be that a company would seek guidance from elsewhere in IFRS 8 and could consider the 10% thresholds identified in IFRS 8.13 and IFRS 8.34. | <u>IFRS 8.5</u><br><br>I do not disagree that Autonomy disclosed it had only one operating segment under IFRS.  Whilst that determination is management judgement, the judgement must still comply with the requirements of IFRS 8.  IFRS 8.5 states:<br><br>"*An operating segment is a component of an entity:*<br><br>*(a) that engages in business activities from which it may earn revenues and incur expenses (including revenues and expenses relating to transactions with other components of the same entity),*<br><br>*(b) whose operating results are regularly reviewed by the entity's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance, and*<br><br>*(c) for which discrete financial information is available*".<br><br>There is no doubt that hardware sales met the conditions at (a) and (c). Autonomy.  It appears from Autonomy's financial statements that the judgement that it had only one operating segment was based on not meeting condition (b); Autonomy stated "*The company's chief operating decision maker is the group's Chief Executive Officer, who evaluates the*" |

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *performance of the company on a group wide basis and any elements within it on the basis of information from junior executives and group financial information and is ultimately responsible for entity-wide resource allocation decisions*"[16].<br><br>See also Deloitte's analysis that I have quoted in response to paragraph 5.2.4 in Appendix H.  Therefore, whether or not Autonomy correctly judged it had only one operating segment depends on whether Dr Lynch did or did not regularly review the operating results of hardware sales.<br><br>IFRS 8.32<br><br>IFRS 8.32 does not explain how an entity should assess whether the various products and services it sells are similar not.  However, that judgement must have a basis and the result of that judgement encompass the qualitative characteristics of useful financial information by being relevant and a faithful representation, i.e. be complete, neutral and free from error.<br><br>As IFRS 8.32 does not explain how an entity should assess the similarity or otherwise of its products, it is reasonable and appropriate to look for guidance elsewhere in accounting standards.  For the purposes of assessing whether operating segments can be aggregated, IFRS 8.12 requires that those operating segments have similar economic characteristics <u>and</u> that the segments are similar in <u>each</u> of the following respects:<br><br>"*(a) the nature of the products or services;*<br><br>*(b) the nature of the production processes;*<br><br>*(c) the type or class of customer for their products and services;*<br><br>*(d) the methods used to distribute their products or provide their services; and* |

---

[16] Autonomy's 2010 consolidated financial statements, Note 5

| Paragraph of my report (old / updated) | Mr Taylor's paragraph | My response |
|---|---|---|
| | | *(e) if applicable, the nature of the regulatory environment, for example, banking insurance or public utilities".* |
| | | It is apparent that the nature of the production process for hardware (physical construction) is completely different to software (writing code) and the methods by which hardware is distributed (transport) is completely different to the methods by which software is distributed (on-line). It is also apparent that hardware and software have very different economic characteristics – Autonomy made a gross loss on the majority of its hardware sales but made gross profits in excess of 80% on its software sales. |
| | | If Autonomy had judged that hardware and software were separate operating segments, it would not have been permitted to aggregate these segments under IFRS 8.12 due to the dissimilar characteristics of hardware and software. |
| | | In my opinion, the evidence that hardware and software are dissimilar products is clear. I have not seen an assessment by Autonomy that justifies why hardware sales were not separately disclosed under IFRS 8.32 and I note that Mr Taylor has not attempted to explain why hardware and software can reasonably be seen as similar products or explain why management's judgement not to separately disclose this information resulted in a faithful representation of its business. |
| | | Furthermore, as noted in Appendix H, PwC consider how an entity should consider materiality where there is no definition in IFRS 8 as follows: |
| | | *"The entity should consider materiality from **both quantitative and qualitative** perspectives. When considering materiality quantitatively, the standard uses the threshold of 10% or more in determining whether an operating segment is a reportable segment. Therefore, it may be appropriate to apply the same test to determine whether an individual country's revenue or assets are material for the purpose of separate disclosure"* [emphasis added]. |

**mazars**

## Appendix J: My corrected version of Mr Levitske's analysis of year-over-year revenue growth

| | | 2009 Q1 | 2009 Q2 | 2009 Q3 | 2009 Q4 | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | H1 2010 | H1 2011 | H1 growth % | Q2 growth % | LTM-1 | LTM | LTM growth % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | % | % | $000 | $000 | % |
| **Reported revenue** | *Note 1* | 129,779 | 195,192 | 191,606 | 223,111 | 194,180 | 221,125 | 210,556 | 244,505 | 219,793 | 256,250 | 415,305 | 476,043 | 14.6% | 15.9% | 830,022 | 931,104 | 12.2% |
| **HARDWARE** | | | | | | | | | | | | | | | | | | |
| Hardware adjustments | *Appendix G* | | (6,000) | 6,000 | - | 4,300 | 1,300 | (5,600) | (3,400) | (2,500) | (200) **Note 2** | | | | | | | |
| **Adjusted revenue (for hardware)** | | 129,779 | 189,192 | 197,606 | 223,111 | 198,480 | 222,425 | 204,956 | 241,105 | 217,293 | 256,050 | 420,905 | 473,343 | 12.5% | 15.1% | 841,622 | 919,404 | 9.2% |
| **LINKED TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Linked transactions adjustments | *Appendix F* | - | (8,571) | - | (10,500) | (8,500) | - | (7,683) | (4,750) | (6,448) | - | | | | | | | |
| **Adjusted revenue (for linked transactions)** | | 129,779 | 186,621 | 191,606 | 212,611 | 185,680 | 221,125 | 202,873 | 239,755 | 213,345 | 256,250 | 406,805 | 469,595 | 15.4% | 15.9% | 811,022 | 912,223 | 12.5% |
| **VAR TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| VAR transactions adjustments | *Appendix F* | (7,456) | (7,762) | (12,325) | (19,915) | (16,815) | 4,506 | (16,121) | (18,799) | (20,757) | (25,583) | | | | | | | |
| **Adjusted revenue (for VAR transactions)** | | 122,323 | 187,430 | 179,281 | 203,196 | 177,365 | 225,631 | 194,435 | 225,706 | 199,036 | 230,667 | 402,996 | 429,703 | 6.6% | 2.2% | 785,473 | 849,843 | 8.2% |
| **HOSTING TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Hosting transactions adjustments | *Appendix F* | (9,204) | (5,978) | 690 | (14,710) | (7,593) | (27,370) | (2,654) | (6,106) | (9,082) | (11,341) | | | | | | | |
| **Adjusted revenue (for hosting transactions)** | | 120,575 | 189,214 | 192,296 | 208,401 | 186,587 | 193,755 | 207,902 | 238,399 | 210,711 | 244,909 | 380,342 | 455,620 | 19.8% | 26.4% | 781,039 | 901,921 | 15.5% |
| **OTHER SOFTWARE TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Royalty arrangements | *Appendix F* | (5,000) | (4,360) | 385 | 385 | 385 | 385 | 396 | 418 | 418 | (1,832) | | | | | | | |
| Timing errors | *Appendix F* | - | - | - | (2,015) | - | (667) | (3,373) | 223 | 2,682 | - | | | | | | | |
| Errors of valuation | *Appendix F* | - | - | - | - | - | - | - | - | - | (15,818) | | | | | | | |
| **Adjusted revenue (for other software transactions)** | | 124,779 | 190,832 | 191,991 | 221,481 | 194,565 | 220,843 | 207,579 | 245,146 | 222,893 | 238,600 | 415,408 | 461,493 | 11.1% | 8.0% | 828,880 | 914,218 | 10.3% |
| **TOTAL ADJUSTMENT FOR SOFTWARE TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Software transaction adjustments | | (21,660) | (26,671) | (11,250) | (46,755) | (32,523) | (23,146) | (29,435) | (29,014) | (33,187) | (54,574) | | | | | | | |
| **Adjusted revenue (for software transactions)** | | 108,119 | 168,521 | 180,356 | 176,356 | 161,657 | 197,979 | 181,121 | 215,491 | 186,606 | 201,676 | 359,636 | 388,282 | 8.0% | 1.9% | 716,348 | 784,893 | 9.6% |
| **TOTAL ADJUSTMENT FOR SOFTWARE AND HARDWARE TRANSACTIONS** | | | | | | | | | | | | | | | | | | |
| Total adjustment | | (21,660) | (32,671) | (5,250) | (46,755) | (28,223) | (21,846) | (35,035) | (32,414) | (35,687) | (54,774) | | | | | | | |
| **Adjusted revenue (for software and hardware transactions)** | | 108,119 | 162,521 | 186,356 | 176,356 | 165,957 | 199,279 | 175,521 | 212,091 | 184,106 | 201,476 | 365,236 | 385,582 | 5.6% | 1.1% | 727,948 | 773,193 | 6.2% |

Note 1: HP-SEC-00567458 (Q1 2009), HP-SEC-00009847 (Q2 2009), HP SEC 00025166 (Q3 2009), HP-SEC-00097914 (Q4 2009), HP-SEC-00009127 (Q1 2010), FTIGJ00002722 (Q2 2010), HP-SEC-00155426 (Q3 2010) and HP-SEC-00024459 (Q4 2010), HP-SEC-00024002 (Q1 2011), HP-SEC-00564873 (Q2 2011)

Note 2: The adjustment of $3.400 million in Q4 2010 is explained at paragraph 3.4.22 of my report.  The amount in Q2 2011 is a net amount comprising: (i) a reversal of $2.500 million from Q1 2011 and, (ii) a further removal of $2.700 million which was then reversed in Q3 2011.

mazars

# 1   Appendix K: My comments on the analyses relating to software in the Levitske Report

## Issues with Mr Levitske's use of my work in his category "*Linked transactions*"

1.1.1   At paragraph 2.1.12 of the Levitske Report, Mr Levitske states:

"[My Interim Report] *alleges that Autonomy paid more to purchase goods from customers in certain alleged linked transactions than the same customer paid to purchase software from Autonomy.  From a financial statement analysis perspective, **eliminating the revenue from these transactions would also require reducing corresponding alleged linked costs and expenses**" [emphasis added].

1.1.2   In performing his analysis on the "*Alleged Linked Transactions*", Mr Levitske therefore:

(a)      removes the revenue recognised by Autonomy in relation to the "*Alleged Linked Transactions*"; and

(b)      adds back the "*Costs and Expenses Related to Alleged Linked Transactions*".  The costs and expenses figure used by Mr Levitske is the full value of the purchases made by Autonomy as part of the "*Alleged Linked Transactions*", and the full amount is added back as at the date of the purchase.

1.1.3   I disagree with Mr Levitske's adjustment at 1.1.2(b) above.  This is because Autonomy did not recognise any "*Costs and Expenses Related to Alleged Linked Transactions*" at the point of the initial sales.  Instead, Autonomy's purchases from its counterparties were "capitalised" on its balance sheet, and recorded as an amortisation expense over the estimated useful life of the "asset" it had purchased.

1.1.4   For example, on 31 May 2010, Autonomy paid FileTek, Inc ("**FileTek**") $11,518,214 in relation to a purchase of FileTek's "*StorHouse*" software and related maintenance.   However, Autonomy did not record a cost of $11,518,214 on 30 May 2010, but rather, as explained by Deloitte "*capitalised* [the purchased software] *as an intangible asset and is to be amortised over the life of the licence, being 5 years*"[1].  As such, the "*Costs and Expenses Related to the* [Software Focus Transaction #049]" recorded by Autonomy were $191,970 per month[2] for a

---

[1] Deloitte's Report to the Audit Committee on Q2 2010, page 10
[2] Or $575,910 per quarter

**mazars**

period of 60 months commencing in June 2010, as opposed to the $11,518,214 adjustment in May 2010 proposed by Mr Levitske[3].

1.1.5    I have corrected Mr Levitske's analysis in **Appendix L** to take account of the above, and note the following impacts on his conclusions:

(a)    Mr Levitske states that after adjusting for the "*Allegedly Linked Transactions*", the "*Profit from operations is now greater than reported during both the First Half of 2010 and the First Half of 2011*".  This is incorrect, as once the abovementioned error is corrected in Mr Levitske's analysis, profit from operations in H1 2010 and H1 2011 is actually **lower** than reported; and

(b)    Mr Levitske states that after adjusting for the "*Allegedly Linked Transactions*", the "*profit from operations margin, as a percent of revenue, is now greater for both the First Half of 2010 and the First Half of 2011*".  This is incorrect as once the abovementioned error is corrected in Mr Levitske's analysis, profit from operations margin, as a percent of revenue, is actually **lower**.

1.1.6    Mr Levitske also states, in his "*Summary Conclusion*", that if "*the revenues for linked transactions are removed along with corresponding costs and expenses: a) Autonomy would have had higher profits and higher profit margins*"[4].  For the reasons set out above, I disagree with Mr Levitske's conclusion.  Removing the revenues for linked transactions along with corresponding costs and expenses would actually have lead to Autonomy having lower profits and lower profit margins.

### Issues with Mr Levitske's use of my work in his category "*VAR Transactions*"

1.1.7    Mr Levitske's analysis of "*VAR Transactions*" is, to an extent, affected by the same issue as his analysis of the "*Alleged Linked Transactions*", insofar as certain "*VAR Transactions*" were only settled once Autonomy had first made purchases from the VAR.  Whilst Mr Levitske has adjusted the "*Costs and Expenses Related to Alleged VAR Transactions*", in his analysis all of the costs are adjusted as at the date of the sale from Autonomy to the VAR.  This is incorrect as:

---

[3] In the case of the "*Alleged Linked Transaction*" adjusted by Mr Levitske in relation to Software Focus Transaction #084 "*Tottenham*", I understand that Autonomy amortised the cost of sponsoring Tottenham Hotspur "*by reference to the number of Premier League home games played*" (see Deloitte's Report to the Audit Committee on the Q3 2010 Review, page 8).  As the "*Alleged Linked Transaction*" identified in relation to Software Focus Transaction #084 related to the sponsorship of Tottenham Hotspur in the 2011 / 2012 football season (which commenced in August 2011), I would not expect any expense to have been recorded in the Relevant Period

[4] Expert Report of Mr Levitske, paragraph 3.1.3 a)

**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
**Summary of independent expert accounting opinions of Steven Brice FCA**

(a)    in some instances Autonomy capitalised these costs, and recognised them as an amortisation expense over the estimated useful life of the "asset" it had purchased; and

(b)    in other instances, whilst Autonomy recorded the purchase as an expense, the date of Autonomy's purchase from the VAR was not in the same reporting period as the date of Autonomy's sale to the VAR.

1.1.8    Addressing each quarter in turn:

(a)    in Q1 2010, Mr Levitske identified costs and expenses related to "*linked payment*[s] *to VAR*" in the amount of $8.72 million.   This amount appears to relate to the following Software Focus Transactions:

(i)    Software Focus Transaction #050 "*MicroTech*".   This Software Focus Transaction was entered into on 31 March 2010 and Autonomy recognised revenue of $11.000 million on that date.   It appears that the "*linked payment*[s] *to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction were:

- a payment of $4,321,331 made by Autonomy on 31 December 2010 in relation to an Advance Technology Innovation Centre[5]. This amount was capitalised as an intangible asset on Autonomy's balance sheet recognised as an amortisation expense over three years[6].   As such, the "*Costs and Expenses Related to Alleged VAR Transactions*" figure used by Mr Levitske in relation to this payment should have been $120,037 per month[7], or $360,111 per quarter, starting from 1 January 2011; and

- a payment of $2,400,000 made by Autonomy on 30 June 2011, in relation to a purchase of "*DiscoverEngine*" software[8].   This amount was recorded as a "cost of sale" in Q2 2011 and therefore should be included in the "*Costs and Expenses Related to Alleged VAR Transactions*" in Q2 2011 in Mr Levitske's analysis;

---

[5] The full amount of the payment to MicroTech in relation to the Advance Technology Innovation Centre was $9.6 million
[6] Deloitte's Report to the Audit Committee on the 2010 Audit, page 18
[7] Being $4,321,331 / 36 months
[8] This payment was made to DiscoverTech, who I understand it is alleged then remitted the cash to MicroTech so as to enable them to settle their debt with Autonomy

**mazars**

    (ii)    Software Focus Transaction #045 "*FSA – Capax*".  This Software Focus Transaction was entered into on 31 March 2010 and Autonomy recognised revenue of $4.286 million on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $2,000,000 made by Autonomy to Capax Discovery on 29 June 2011 in relation to "*NearPoint Software Support*".  This amount was capitalised as an intangible asset on Autonomy's balance sheet, but because the transaction occurred on the last date of the Relevant Period, no "*Costs and Expenses Related to Alleged VAR Transactions*" should have been recorded in Mr Levitske's analysis;

(b)    In Q1 2011, Mr Levitske identified "*linked payment*[s] *to VAR*" in the amount of $11.64 million.  I have been unable to fully reconcile Mr Levitske's figure to my workings, but it appears to relate to the following Software Focus Transactions[9]:

    (i)    Software Focus Transaction #085 "*Bank of America - MT*".  This Software Focus Transaction was entered into on 30 March 2011 and Autonomy recognised revenue of $3.860 million on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $714,082 made by Autonomy to MicroTech in June 2011 in relation to a "*Maintenance and Support Agreement*".  My review of Autonomy's general ledger indicates that no expense was recorded in relation to this payment[10], and as such Mr Levitske's analysis should not include an adjustment in its regard;

    (ii)    Software Focus Transaction #088 "*McAfee – Capax*".  This Software Focus Transaction was entered into on 31 March 2011 and Autonomy recognised revenue of $5.000 million on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $6.000 million made by Autonomy to Capax Discovery on 31 August 2011 in relation to a "*Commercial Software License Agreement*".  Mr Levitske's analysis should not include an adjustment in relation to this payment as it post-dates the Relevant Period; and

---

[9] The total payments identified below come to $8.714 million

[10] The "double entry" to this payment appears to have been allocated to the general ledger code 291762, which is a balance sheet account, rather than an income statement account.  Refer to "*ORG BAT*" reference "*173396*" in Autonomy's general ledger for 2011

**mazars**

**United States v (1) Michael Richard Lynch (2) Stephen Chamberlain**
Summary of independent expert accounting opinions of Steven Brice
FCA

(iii)    Software Focus Transaction #091 "*Prisa*".  This Software Focus Transaction was entered into on 31 March 2011 and Autonomy recognised revenue of $3.600 million on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $4.400 million made by Autonomy on 30 June 2011, in relation to a purchase of "*DiscoverPoint Engine*" software.  This amount was recorded as a "*cost of sale*" in Q2 2011[11] and therefore should be included in the "*Costs and Expenses Related to Alleged VAR Transactions*" in Q2 2011 in Mr Levitske's analysis.  I note that the adjustment to be included in Mr Levitske's analysis in relation to this Software Focus Transaction should be $2.000 million, as Mr Levitske had previously determined that $2.400 million related to Software Focus Transaction #050 "*MicroTech*"; and

(c)    in Q2 2011, Mr Levitske identified "*linked payment to VAR*" in the amount of $8.2 million.  This amount appears to relate to Software Focus Transaction #121 "*USPS archive – mt*".  This Software Focus Transaction was entered into on 30 June 2011 and Autonomy recognised $7.000 million of revenue on that date.  It appears that the "*linked payment to VAR*" identified by Mr Levitske in relation to this Software Focus Transaction was a payment of $8.200 million made by Autonomy to MicroTech on 16 August 2011 in relation to an "*Autonomy Solution Stack*".  Mr Levitske's analysis should not include an adjustment in relation to this payment as it post-dates the Relevant Period.

1.1.9    In addition, Mr Levitske's analysis includes an adjustment line named "*VAR transactions allegedly recognized too early - ins*".  I take this adjustment to be a reference to instances where the revenue recognition criteria for a Software Focus Transaction was subsequently met after the initial VAR transaction (for example, when Autonomy reached a direct deal with a named end-user).  Whilst I understand the rationale for this adjustment, I am unable to reconcile the figure used by Mr Levitske to my workings.  Specifically:

(a)    in Q1 2010, Mr Levitske includes "*VAR transactions allegedly recongized too early - ins*" in the amount of $4.66 million.  Based on my understanding of Mr Levitske's adjustment, the appropriate figure to use should have been $8.156 million[12];

---

[11] Deloitte's Report to the Audit Committee on the Q2 2011 Review, page 7

[12] Being the revenue recognised in Q1 2010 arising from Software Focus Transactions #020 "*NSA*" ($3.500 million) and #038 "*Dell – Morgan Stanley*" ($4.656 million, noting that this is not the revenue recognition criteria being met, but is instead the reversal of a credit note raised which would not have been necessary if not for the original VAR transaction)

**mazars**

(b)      in Q2 2010, Mr Levitske includes "*VAR transactions allegedly recognized too early - ins*" in the amount of $10.07 million.  Based on my understanding of Mr Levitske's adjustment, the appropriate figure to use should have been $4.185 million[13];

(c)      in Q1 2011, Mr Levitske includes "*VAR transactions allegedly recognized too early - ins*" in the amount of $8.32 million.  Based on my understanding of Mr Levitske's adjustment, the appropriate figure to use should have been $2.262 million[14];

(d)      in Q2 2011, Mr Levitske includes "*VAR transactions allegedly recognized too early - ins*" in the amount of $10.69 million.  Based on my understanding of Mr Levitske's adjustment, the appropriate figure to use should have been $2.705 million[15]; and

(e)      from Q2 2010 onwards, Mr Levitske does not include the revenue release of $0.321 million relating to Software Focus Transaction #028.  Based on my understanding of Mr Levitske's adjustment "*VAR transactions allegedly recognized too early – ins*", this amount should be included.

1.1.10      Finally, Mr Leviske includes an adjustment called "*VAR transactions allegedly recognized too early – outs*" of $7.000 million in Q2 of 2011 which I understand relates to Software Focus Transaction #121.  Based on my understanding of this adjustment, it appears that Mr Leviske has included this as a Linked Transaction.  However, in Appendix F the primary basis for concluding that revenue should not be recognised is that it failed to meet the revenue recognition criteria of IAS 18 and consequently, to ensure a like-for-like comparison with the tables in my report, I have treated it as a VAR rather than a linked transaction.  This classification has no effect on the overall adjustment.

1.1.11      I have corrected and updated Mr Levitske's analysis in **Appendix L** to take account of the above, and note the following impacts on his conclusions:

(a)      Mr Levitske states that after adjusting for the "*VAR transactions*", the "*profit from operations margin, as a percent of revenue, is approximately unchanged for both the First Half of 2010 and the First Half of 2011*".  This is incorrect, as once the abovementioned errors are corrected in Mr Levitske's analysis, profit from operations margin in H1 2010 and H1 2011 is actually **notably lower** than reported; and

---

[13] Being the revenue recognised in Q2 2010 arising from Software Focus Transactions #046 "*PMI (Discover)*" ($4.185 million)

[14] Being the revenue recognised in Q1 2011 arising from Software Focus Transactions #040a "*Capax*" ($2.262 million)

[15] Being the revenue recognised in Q2 2011 arising from Software Focus Transactions #082 "*KPMG*" ($2.705 million)

**mazars**

(b)     Mr Levitske states that the "*rate of year-over-year change (growth) in profit from operations is lower than the year-over-year change based upon the originally reported amounts. However, profits are still growing*".  This is incorrect, as once the abovementioned errors are corrected, Autonomy's year-over-year profit actually fell from H1 2010 to H1 2011.

## Appendix L: My corrected version of Mr Levitske's analyses of the adjustments relating to software

| Alleged Linked Transactions | Q1 2010 | Q2 2010 | Q1 & Q2 2010 | Q1 2011 | Q2 2011 | Q1 & Q2 2011 | H1 2010 to H1 2011 | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Change | % Change |
| Revenue | $194.18 | $221.13 | $415.31 | $219.79 | $256.25 | $476.04 | $60.73 | 14.62% |
| *Alleged Linked Transaction Adjustments* | ($8.50) | - | ($8.50) | ($6.45) | - | ($6.45) | | |
| Total Revenue Less Alleged Linked Transaction Adjustments | $185.68 | $221.13 | $406.81 | $213.34 | $256.25 | $469.59 | $62.78 | 15.43% |
| Total Cost of Revenues | $36.08 | $45.22 | $81.30 | $39.23 | $48.49 | $87.72 | | |
| Operating Expenses | $84.98 | $98.90 | $183.88 | $95.94 | $124.80 | $220.74 | | |
| Total Cost of Revenues and Operating Expenses | $121.06 | $144.12 | $265.18 | $135.17 | $173.29 | $308.46 | | |
| *Costs and Expenses Related to Software Focus Transaction #049* | - | ($0.38) | ($0.38) [1] | ($0.58) | ($0.58) | ($1.15) [2] | | |
| *Costs and Expenses Related to Software Focus Transaction #084* | - | - | - | - | - | - [3] | | |
| Total Cost of Revenues and Operating Expenses Less Alleged Linked Transaction Adjustments | $121.06 | $143.74 | $264.80 | $134.59 | $172.71 | $307.31 | | |
| Profit from Operations | $73.12 | $77.01 | $150.13 | $84.62 | $82.96 | $167.58 | $17.45 | 11.62% |
| *% of Corresponding Revenue* | | | *36.15%* | | | *35.20%* | | |
| Profit from Operations with Adjustments | $64.62 | $77.39 | $142.01 | $78.75 | $83.54 | $162.28 | $20.27 | 14.27% |
| *% of Corresponding Revenue* | | | *34.91%* | | | *34.56%* | | |

**Source(s)**

All figures are sourced from Attachment B to the Expert Report of Mr Levitske, unless otherwise noted.

(1) Being two months' worth of amortisation changes incurred in relation to Autonomy's purchase of "Storhouse" software from FileTek, Inc, on 30 May 2010. The $11,518,214 cost was to be amortised over 5 years ($11,518,214 / 60 months = $191,970 per month)

(2) Being three months' worth of amortisation changes incurred in relation to Autonomy's purchase of "Storhouse" software from FileTek, Inc, on 30 May 2010. The $11,518,214 cost was to be amortised over 5 years ($11,518,214 / 60 months = $191,970 per month, or $575,910 per quarter)

(3) I understand that Autonomy amortised the cost of the Tottenham Hotspur shirt sponsorship by reference to the number of Premier League home games played. As the 2011 / 2012 football season commenced in August 2011, I would not expect there to be any sponsorship expense recorded in the Relevant Period.

| VAR Transactions | Q1 2010 | Q2 2010 | Q1 & Q2 2010 | Q1 2011 | Q2 2011 | Q1 & Q2 2011 | H1 2010 to H1 2011 | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Change | % Change |
| Revenue | $194.18 | $221.13 | $415.31 | $219.79 | $256.25 | $476.04 | $60.73 | 14.62% |
| *VAR transactions allegedly recognized too early - outs* | ($9.70) | - | ($9.70) | ($10.90) | ($28.60) | ($39.50) | | |
| *VAR transactions allegedly recognized too early - ins* | $8.16 | $4.51 | $12.66 [1] | $2.58 | $3.03 | $5.61 [1] | | |
| *VAR transactions allegedly linked to payment to VAR* | ($15.30) | - | ($15.30) | ($12.50) | - | ($12.50) | | |
| Total Revenue Less Alleged Linked Transaction Adjustments | $177.34 | $225.64 | $402.97 | $198.97 | $230.68 | $429.65 | $26.68 | 6.62% |
| Total Cost of Revenues | $36.08 | $45.22 | $81.30 | $39.23 | $48.49 | $87.72 | | |
| Operating Expenses | $84.98 | $98.90 | $183.88 | $95.94 | $124.80 | $220.74 | | |
| Total Cost of Revenues and Operating Expenses | $121.06 | $144.12 | $265.18 | $135.17 | $173.29 | $308.46 | | |
| *Costs and Expenses Related to Software Focus Transaction #045* | - | - | - [1] | - | - | - [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #050* | - | - | - [1] | ($0.36) | ($2.76) | ($3.12) [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #085* | - | - | - [1] | - | - | - [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #088* | - | - | - [1] | - | - | - [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #091* | - | - | - [1] | - | ($2.00) | ($2.00) [1] | | |
| *Costs and Expenses Related to Software Focus Transaction #121* | - | - | - [1] | - | - | - [1] | | |
| Total Cost of Revenues and Operating Expenses Less Alleged Linked Transaction Adjustments | $121.06 | $144.12 | $265.18 | $134.81 | $168.53 | $303.34 | | |
| Profit from Operations | $73.12 | $77.01 | $150.13 | $84.62 | $82.96 | $167.58 | $17.45 | 11.62% |
| *% of Corresponding Revenue* | | | *36.15%* | | | *35.20%* | | |
| Profit from Operations with Adjustments | $56.28 | $81.52 | $137.79 | $64.16 | $62.15 | $126.31 | ($11.48) | (8.33%) |
| *% of Corresponding Revenue* | | | *34.19%* | | | *29.40%* | | |

**Source(s)**

All figures are sourced from Attachment B to the Expert Report of Mr Levitske, unless otherwise noted. (I note there are some immaterial rounding differences to Attachment B to the Expert Report of Mr Levitske).

(1) Refer to Appendix K