# EXHIBIT 16

| | 8 | | VAR | | | | |
|---|---|---|---|---|---|---|---|
| **IRON MOUNTAIN** | | None | | | | | |

| Client treatment (Client Revenue Sc | $ |
|---|---:|
| License revenue recognised | 9,500,000 |
| Maintenance deferred | - |
| Hosting deferred | - |
| Services revenue | - |
| | 9,500,000 |
| Carve out % | 0% |
| Annualised carve out rate | 0% |
| Paid? | Partly |
| Payment Date | 6/2/2011 |
| Balance on A/R ($) | $6,000,000 |

| Invoice details | |
|---|---:|
| Invoice ref | 4000000 |
| Invoice date | 6/9/2011 |
| Invoiced from | Inc |
| | $ |
| Invoice total | 9,500,000 |
| VAR? | Yes |
| End User? | N/a |
| Maintenance period | N/a |

| Contract details | |
|---|---:|
| | VAR agreement |
| Contract date | 3-Jun-11 |
| Contract signed? | Yes |
| Acceptance criteria? | No |
| Payment terms | See below |
| License | 9,500,000 |
| Maintenance | - |
| Hosting | - |
| Services | - |
| Total | 9,500,000 |
| Delivery | N/a |

| Payment Terms | | |
|---|---:|---:|
| | $ | Due date |
| Inv 4000000 | 3,500,000 | 6/3/2011 |
| Inv 4000000 | 6,000,000 | 6/3/2012 |
| | 9,500,000 | |

**Details**

This deal is a VAR agreement between Autonomy Inc and Iron Mountain Management Inc (VAR). The effective date of the agreement is the closing date of the sale and purchase agreement pursuant to which Autonomy acquired from the VAR the entities and assets constituting the business. The deal was finalised on 3 June 2011 and therefore this is therefore the effective date of this contract.

The deal is for a total of $9,500,000 and is split into two parts, discussed below. Per the terms of the contract the fee is a one time, non refundable, non cancellable fee, discussed further below.

*Part 1 - $1,500,000*

This is referred to as the ARM prepaid licence fee. This is an agreement to enable the VAR to purchase Autonomy Records Manager (ARM) and Autonomy Oracle Fetch at a discount of 60% (for future onsale) until the ARM prepaid licence fee is exhausted. Thereafter fees for this product will be in accordance with the standard terms of the agreement. i.e. at 100% / no discount Management have recognised the full $1,500,000 up front as revenue.

The risk for this transaction is entirely with the VAR as if no sales are made Autonomy will retain the $1.5m. The commercial reasons for this part of the deals is that the VAR 's profitability is not capped i.e. they can set the price for the products at whatever they want to and still only pay 40% of the list price for it. This effectively works in substance in the same way as the royalty agreement below, other than for a limited number of purchases, Autonomy can purchase for 40% of the list price and sell for an unlimited amount, therefore only having to pay a royalty fee on each sale equal to 40% of the list price. Once that prepaid amount is used up, Iron Mountain would have to pay the full list price as their equivalent royalty - as it would not be commercially viable to try and then sell that software for more than Autonomy's own list price (as they could offer no USP for which a customer would pay a premium) then this effectively acts as a cap on the value of ARM licences that Iron Mountain are allowed to onsell.

Given that Autonomy have no obligations to the VAR in respect of this part of the deal, and that the payment is non refundable and non cancellable it is appropriate to recognise the $1.5m immediately as revenue.

*Part 2 - $8,000,000*

This is a prepaid royalty fee for the following software products. The royalty fee due when sold is shown below

| | |
|---|---|
| - Connected backup | 50% of fee charged by VAR to end user |
| - Nearpoint | 50% of fee charged by VAR to end user |
| - DRC-CM | 50% of fee charged by VAR to end user |
| - Livevault services | 50% of fee charged by VAR to end user |
| - Connected services | 50% of fee charged by VAR to end user |
| - Tape restoration services | 70% of fee charged by VAR to end user |

All of these software products were acquired from Iron Mountain in the sales and purchase agreement. Effectively Autonomy have purchased these products from Iron Mountain and then allowed them to continue selling these products for a royalty. Per the terms of the contract the first $8,000,000 fees will be offset against the upfront royalty fee, and thereafter fees will be due in accordance with terms of the agreement. There is also a note that states that in no event can the royalty fee due from the VAR to Autonomy for any given order be less than 40% of Autonomy's list price.

The risk for this transaction is entirely with the VAR as if no sales are made Autonomy will retain the $8m. Once the $8m has been reached the VAR will then start paying Autonomy the relevant % of fee for every subsequent sale. The commercial reasons for the deals lies in the % of fee that the VAR need to pay to Autonomy to sell the product that will have been negotiated down from 100% as the upfront payment increased. I.e. no upfront payment may have required the VAR to submit 90% of the fee charged, etc. Although the VAR's profitability is capped they retain the ability to sell the products at this lower %fee indefinitely.

Given that Autonomy have no obligations to the VAR in respect of this part of the deal, and that the payment is non refundable and non cancellable it is appropriate to recognise the $8m immediately as revenue.

It was also noted that per the contract terms second line support fees are payable to Autonomy from the VAR and shall be 10% of amounts paid by the end user to the VAR for the product and/or service products. This support fee is mandatory for the service products and for the first year of products. However, this has no impact in terms of revenue in this quarter.

Apart from the linking of the effective date to the closing date of the sale and purchase agreement, no other items were identified that link the Iron Mountain acquisition to this deal, with sufficient assurance being present to support that this is completely separate and at arms length. It should also be noted that this type of deal is not unusual for a VAR to enter into in order to secure more favourable terms.

It was noted that the receipt from Iron Mountain was received before the invoice was raised. This was because all payments and receipts to and from Iron Mountain were settled on the 02/06/11 to help ensure that the acquisition on the 03/06/11 run smoothly. Note only $3.5m was received in relation to this deal with the other $6m being due on 03/06/12. This poses no issues.

This deal does not contain maintenance or delivery as it is purely an upfront payment to sell Autonomy software at a discount. Per the terms of the contract this agreement commences on the effective date, i.e. 3 June 2011, and therefore the revenue should be recognised on this date.

Nothing else has been noted from review of the contract that would restrict recognising the revenue in Q2 2011.

**SATISFACTORY**

**Maintenance element**

N/a - as discussed in contract section

**SATISFACTORY**

**Collectability**

This invoice has been paid on the 2 June 2011 into the Wells Fargo bank account number 2000042670360. The total bank receipt from Iron Mountain was for $6,575k which includes $3,500k against this invoice. The receipt has been confirmed to bank statements.

**SATISFACTORY**

**Delivery**

N/a - as discussed in contract section

**SATISFACTORY**

**Revenue recognition**

a) The risks and rewards of ownership passed to the customer when the deal was signed. As all of Autonomy's obligations have been fulfilled the risks and rewards have been transferred.
b) Autonomy has not retained any managerial control.
c) The revenue can be measured effectively as it is stated on both the invoice and in the contract
d) It is probable that economic benefits will flow to Autonomy
e) There are no costs incurred in this transaction.

**SATISFACTORY**

**Conclusion**

**SATISFACTORY**