PATRICK D. ROBBINS (CABN 152288))
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorneys

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-6912
     Fax: (415) 436-7234
     Email: Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>MICHAEL RICHARD LYNCH AND<br>STEPHEN KEITH CHAMBERLAIN,<br><br>    Defendant. | Case No. CR-18-577 CRB<br><br>UNITED STATES' MOTION *IN LIMINE* # 3:<br>TO EXCLUDE EXPERT TESTIMONY<br><br>Trial Date:  March 18, 2024<br>Pretrial Conf.: February 21, 2024<br>Judge: Hon. Charles Breyer |

## TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................................1

II.   FACTUAL BACKGROUND ..........................................................................................1

      A.    The Brice Reports ...............................................................................................1

      B.    The Cerf Report ..................................................................................................2

      C.    The Taylor Report ...............................................................................................2

      D.    The Levitske Report ...........................................................................................3

III.  LEGAL STANDARD ......................................................................................................6

      A.    Expert Disclosure Obligations Under Federal Rule of Criminal Procedure 16 .................6

      B.    Federal Rule of Evidence 702 and *Daubert* ......................................................6

IV.   ARGUMENT ...................................................................................................................9

      A.    Mr. Cerf's Proposed Testimony Is Irrelevant ....................................................9

      B.    Mr. Taylor's Proposed Testimony Is Irrelevant and Inadmissible Under Rule 702 and *Daubert* ...........................................................................................10

      C.    Mr. Levitske's Proposed Testimony is Irrelevant and Inadmissible under Rule 702 and *Daubert* ...........................................................................................14

V.    CONCLUSION ..............................................................................................................19

i

# TABLE OF AUTHORITIES

## Cases

*City of Pomona v. SQM N. Am. Corp.*,
  750 F.3d 1036 (9th Cir. 2014) .................................................................. 7, 8

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007) ........................................................................ 9

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ................................................................... 7, 8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)........................................................................... 7, 8, 10

*DSU Med. Corp. v. JMS Co.*,
  296 F. Supp. 2d 1140 (N.D. Cal. 2003) ........................................................ 9

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
  254 F.3d 825 (9th Cir. 2001) ........................................................................ 8

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)................................................................................. 7, 8

*United States v. Filler*,
  201 F.3d , 2000 WL 123446 (9th Cir. Feb. 1, 2000) ..................................... 8

*United States v. Kyashuk*,
  29 F. 4th 1077 (9th Cir. 2022) ...................................................................... 6

*United States v. Perez*,
  662 F. App'x 495 (9th Cir. 2016) ................................................................. 6

*United States v. Scheffer*,
  523 U.S. 303 (1998)....................................................................................... 6

*United States v. Valencia-Lopez*,
  971 F.3d 891 (9th Cir. 2020) ........................................................................ 8

*United States v. Vera*,
  770 F.3d 1232 (9th Cir. 2014) ...................................................................... 7

## Rules

Fed. R. Evid. 104(a) .......................................................................................... 6

Fed. R. Evid. 401 .................................................................................... 1, 9, 10

ii

Fed. R. Evid. 402 ................................................................................................................ passim

Fed. R. Evid. 403 ................................................................................................................ passim

Fed. R. Evid. 702 ................................................................................................................ passim

Fed. R. Evid. 703 ...................................................................................................................... 6

Fed. R. Evid. 705 ...................................................................................................................... 6

Fed. R. Crim. P. 16 ............................................................................................................. 1, 6, 14

## I.      INTRODUCTION

On December 7, 2023, Defendant Dr. Michael Richard Lynch served expert reports for three expert witnesses he intends to call at trial—Philippe Cerf (the "Cerf Report"), Greg Taylor (the "Taylor Report"), and John Levitske (the "Levitske Report").  The government hereby moves to exclude the testimony of Mr. Cerf, Mr. Taylor, and Mr. Levitske under Federal Rules of Evidence 401, 402, 403, 702, and *Daubert*.  The proposed testimony is irrelevant and does not rest on reliable foundations anchored to the facts at hand.  Even if this testimony did have minimal probative value, that value is far outweighed by the risks of confusing the issues, misleading the jury, and wasting time.

Dr. Lynch has also failed to provide an adequate expert disclosure under Federal Rule of Criminal Procedure 16(b)(1)(C) with respect to Mr. Levitske and, should the Court deny this motion to exclude Mr. Levitske's testimony, the government respectfully requests a supplementary disclosure as discussed further below.

## II.      FACTUAL BACKGROUND

### A.      The Brice Reports

On November 8, 2023, the government served the expert report of its proposed expert, Mr. Steven Brice ("Brice Report 1").  *See* Declaration of Kristina Green in Support of Motion *in Limine* #3 ("Green Decl."), Ex. A.  In Brice Report 1, Mr. Brice analyzes numerous software and hardware sales transactions and renders opinions as to whether Autonomy appropriately recognized revenue and made adequate disclosures in accordance with the applicable accounting standards with respect to these transactions.

On December 7, 2023, Dr. Lynch served the expert reports of his three proposed experts, Mr. Philippe Cerf, Mr. Greig Taylor, and Mr. John Levitske.  These reports are described in more detail below.  In summary, Mr. Cerf provides general opinions regarding the "typical" acquisition process in the U.K.  Mr. Taylor outlines accounting standards relevant to the types of transactions flagged in Brice Report 1 and provides general "observations" where he disagrees with the conclusions drawn by Mr. Brice.  Mr. Levitske applies adjustments to Autonomy's financial statements based on certain assumptions and then draws opinions as to the impact these adjustments would have on cash flow, profits, profit margins, profit growth, and revenue growth, and the overall valuation of Autonomy at the

1    time of the acquisition.

2         On January 3, 2024, the government served a second expert report of Mr. Brice ("Brice Report

3    2"), which included Mr. Brice's review of software and hardware transactions that Mr. Brice opined

4    were not accounted for and/or disclosed in accordance with the applicable accounting standards, as well

5    as his opinions that rebutted statements made in the Taylor Report and Levitske Report.  *See* Green

6    Decl. Ex. B (Brice Report 2).

7         **B.    The Cerf Report**

8         According to the Cerf Report, Mr. Cerf's proposed testimony concerns the "typical approach and

9    considerations when a potential Bidder approaches a Target regarding M&A in the UK context," and a

10   general explanation of the due diligence process, interloper risk, deal negotiation, and deal execution

11   considerations in the U.K. acquisition context.  *See* Green Decl. Ex. C (Cerf Report) ¶¶ 6–48.  The Cerf

12   Report does not contain any opinions specific to the HP/Autonomy acquisition.  Rather, it merely

13   contains Mr. Cerf's general views as to how an acquisition process typically works in the U.K. context,

14   seemingly drawn from Mr. Cerf's experience working in the investment banking industry.  Based on the

15   Cerf Report, it does not appear that Mr. Cerf has reviewed any documents specific to this case in

16   forming his proposed opinions.

17        **C.    The Taylor Report**

18        Mr. Taylor's expert report indicates that his anticipated testimony will cover the "relevant

19   accounting standards, International Financial Reporting Standards ("IFRS"), under which Autonomy

20   prepared its financial statements during the period January 1, 2009 to September 30, 2011."  Green Decl.

21   Ex. D (Taylor Report) ¶ 1.1.3.  Mr. Taylor's opinions are based on a limited set of documents, namely

22   published accounting standards, a "2009 PWC IFRS Manual of Accounting," Autonomy's 2009 Annual

23   Report, Autonomy's 2010 Annual Report, and Autonomy's Q3 2009 Quarterly Results.  Taylor Report

24   Appendix ("App.") 2.  The majority of the Taylor Report contains Mr. Taylor's recitation of accounting

25   standards under the IFRS, such as the conditions required for revenue recognition.  *See* Taylor Report at

26   1–34.  Mr. Taylor also provides some comments regarding Autonomy's business model and revenue

27   streams, which are drawn from Autonomy's publicly filed financial statements, listed above.  *See, e.g.*,

28   Taylor Report ¶ 3.5.1 ("The use of 'Value Added Resellers' (or VARs) was described in Autonomy's

Annual Report and Accounts for 2009 and 2010 as '*Autonomy's primary revenue channel'*.  A reseller model typically results in goods or services being sold to the reseller, and then a subsequent separate sale is made between the reseller and an end-user.").  While Mr. Taylor's proposed testimony includes statements as to how revenue *should be* recognized under the accounting standards in various scenarios purportedly applicable to Autonomy, such as in the context of VARs, OEM deals, and hosting deals, the Taylor Report does not contain any opinions as to whether Autonomy *actually adhered* to the applicable accounting standards and disclosure requirements.  *See, e.g.*, Taylor Report ¶ 3.5.2 ("Under IAS 18 (Revenue), revenue must be recognized when the conditions are met for the sale to the reseller, as the reseller is the customer.  It is not necessary to consider the subsequent sale to any end-user by the reseller.").

Finally, Mr. Taylor was asked to consider Mr. Brice's opinions and provide "observations" where he disagreed with those opinions.  Taylor Report App. 3 ¶ A31.1.  Mr. Taylor himself notes that he was not "asked to opine on the specific facts or allegations related to any particular transactions." *Id.* As such, Mr. Taylor does not render opinions on whether, given the specific facts surrounding Autonomy's hardware and software transactions, Mr. Brice's opinions as to whether Autonomy appropriately recognized revenue and made adequate disclosures are correct.  Instead, Mr. Taylor contests the rationale supporting some of Mr. Brice's conclusions citing general accounting principles but does not base his "observations" on any specific facts that undermine Mr. Brice's conclusions.  For example, Mr. Taylor writes: "I disagree that the significant risks and rewards of ownership of goods had not been transferred to the buyer if there was contemporaneous evidence that the buyer made no efforts to sell the goods it had acquired to a named end-user. . . .  If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer, it is not relevant whether the buyer made efforts to sell the goods to a named end-user."  Taylor Report App. 3.2 (2.5.4(a)).  As this example demonstrates, Mr. Taylor assumes facts necessary to rebut Mr. Brice's conclusion without conducting any independent analysis to determine the propriety of management's determination and whether the facts actually support his critique of Mr. Brice's opinion.

### D.    The Levitske Report

Mr. Levitske's expert report focuses primarily on valuation.  Mr. Levitske states that, for

purposes of his analysis, he assumed "that the revenue accounting adjustments asserted in the VBOP[1] and the Brice Report . . . are appropriate" and "opine[d] about the impact of applying those hypothetical adjustments to Autonomy's historical reported financial statements."  Green Decl. Ex. E (Levitske Report) ¶ 2.1.4.  Mr. Levitske considers the impact of revenue adjustments on the "amounts of profit from operations, profit from operations margins, and the year-over-year percentage change or growth between the First Half of 2011 compared to the First Half of 2010."  Levitske Report ¶ 2.1.5.  Mr. Levitske divides the revenue adjustments he evaluated into the following categories: hardware transactions, allegedly linked transactions (also termed reciprocal transactions in the Brice Reports),[2] VAR (value added reseller) transactions, and multi-period hosting transactions.  *Id.*  Mr. Levitske states that he "applied the asserted revenue adjustments for the First Half of 2010 ["FH 2010"] and the First Half of 2011 ["FH 2011"] and also made corresponding reclassifications, timing adjustments or counter-transaction adjustments based upon information from the Brice Report and the VBOP, as well as certain assumptions I was asked to make."  *Id.* ¶ 2.1.7.  Mr. Levitske relied upon the following documents in conducting his analysis: the Brice Report 1, the VBOP, the "Rebaselining Exercise," Autonomy's interim results for the six months ended June 30, 2010 and six months ended June 30, 2011, Autonomy's annual report for the year ended December 31, 2010, British Pound/ U.S. Dollar spot exchange rates for 2011, and the Capital IQ Historical GBP USD Exchange Rate – March 2011.  Levitske Report App. 2.

With respect to hardware, Mr. Levitske writes that he was asked to opine about the impact of removing the hardware revenues on the financial statement analysis in the subject period (FH 2010 and FH 2011).  Levitske Report ¶ 2.1.9.  Therefore, Mr. Levitske removed the hardware-related revenue adjustments listed in the VBOP and "also removed the related costs that are already included in cost of goods sold ('COGS') and expenses as indicated in HP's 'Rebaselining' Summary (Rebaselining Exercise)."  Levitske Report ¶ 2.1.10.  Based on this exercise, Mr. Levitske opines that if the hardware

---

[1]    The VBOP refers to the Voluntary Bill of Particulars filed by the government on October 8, 2023.

[2]    These are transactions in which Autonomy entered into an agreement to sell product to a third party, but also entered into a transaction to buy product from that third party in such a way that the commercial effect of the transactions could not be understood without reference to one another.  Mr. Brice concludes that certain transactions are linked or reciprocal and so should have been accounted for together as linked under the IFRS.  Brice Report 2 § 2.6.

sales and related expenses are removed, (1) Autonomy would have had higher profit margins, (2) Autonomy's revenue percentage growth would have been higher, and (3) Autonomy's cash flow would likely have been higher. Levitske Report ¶ 3.1.2. Mr. Levitske also analyzed removing revenues and related costs associated with "alleged link transactions" and draws the same three conclusions. *Id.* ¶¶ 2.1.12, 2.1.13, 3.1.3.

With respect to the VAR transactions, Mr. Levitske removes the revenue and associated expenses in accordance with certain assumptions outlined in his report, *see* Levitske Report ¶¶ 2.1.14–2.1.18, and draws the following four conclusions: (1) Autonomy would have had lower profits, (2) Autonomy would have had a higher profit margin in FH 2010 and a lower profit margin in FH 2011, (3) Autonomy's revenue growth would have been lower, (4) Autonomy's cash flow would likely have been higher. Levitske Report ¶ 3.1.4. With respect to hosting transactions, Mr. Levitske "assumed the accuracy of the information in the Brice Report [1] which reclassified up-front license revenue to revenue recognized ratably, on a straight line basis over the contract durations," and opines: (1) revenue would have been spread over a longer period; (2) total amount of revenue and profit would have been the same; (3) the cash would have been received in the same time periods; (4) the result would be initially less revenue but the results would have indicated growth, plus future revenue and profit streams that are longer and steadier, for which the clients had already paid in full; and (5) the adjustments result in a net positive impact on cash flows during the Subject Period [FH 2010 and FH 2011]. Levitske Report ¶¶ 2.1.19–2.1.22, 3.1.5.

Finally, Mr. Levitske considers all of the revenue and cost adjustments covered in his report and renders the following opinions regarding the impact on cash flow: (1) the cash flow during FH 2010 is increased; (2) the cash flow during FH 2011 is increased; (3) in total, the amount of cash flow for combined FH 2010 and FH 2011 is increased; (4) the year-over-year percentage change for revenues (growth), after adjustments is greater; (5) the profit margin percentage for FH 2010 and FH 2011 are both greater; and (6) the year-over-year percentage change for profit from operations (growth), after adjustments is similar. Levitske Report ¶ 3.1.10. Mr. Levitske further opines that "[a]ll other things equal, higher expected cash flows contribute to higher valuation when analyzing a company." *Id.* Furthermore, Mr. Levitske opines that, "assuming the accuracy of the adjustments in the Brice Report

and the Rebaselining Exercise that I have relied upon, it is my opinion that, in isolation, the overall impact of the amounts of the adjustments alone discussed in this Report would not likely materially change the valuation of a well-established, mature operating company like Autonomy, as of the Valuation Date [August 18, 2011]."  Levitske Report ¶ 3.1.11.

## III.   LEGAL STANDARD

### A.   Expert Disclosure Obligations Under Federal Rule of Criminal Procedure 16

In December 2022, the expert disclosure requirements of Rule 16 were significantly enhanced for both the government and the defense.  If a defendant seeks to admit any testimony under FED. R. EVID. 702, 703, or 705, the defendant must disclose to the government in a timely manner, all of the following: 1) a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case in chief; 2) the bases and reasons for them; 3) the witness's qualifications, including a list of all publications authored in the previous 10 years, and 4) a list of all other cases in which, during the previous four years, the witness has testified as an expert at trial or by deposition.  FED. R. CRIM. P. 16 (b (1)(C)(iii).  The Rule 16 disclosure enhancements were implemented to prevent unfair surprise at trial due to incomplete or untimely-filed expert disclosures.

### B.   Federal Rule of Evidence 702 and *Daubert*

While criminal defendants are entitled to "present a complete defense," "[t]he accused does not have an unfettered right to offer testimony that is inadmissible under standard rules of evidence." *United States v. Kyashuk*, 29 F. 4th 1077, 1090–91 (9th Cir. 2022) (affirming district court's decision to exclude evidence that defendant believed was critical to his "sole defense" but the government sought to exclude as irrelevant under Federal Rules of Evidence 402 and 403); *see also United States v. Scheffer*, 523 U.S. 303, 308–09 (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.").  "The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."  FED. R. EVID. 104(a); *see also United States v. Perez*, 662 F. App'x 495, 497 (9th Cir. 2016) (noting preponderance of the evidence standard for threshold inquiry).  Faced with a proffer of expert testimony, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or

determine a fact in issue. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

A witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify in the form of an opinion or otherwise only if (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) the "testimony is based on sufficient facts or data"; (3) the "testimony is the product of reliable principles and methods;" and (4) the "expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702.

The district court must play a "gatekeeping" role, screening the proffered evidence to "ensure that any and all scientific or specialized testimony or evidence admitted "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 597; *accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 148–49 (1999); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014) ("[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'") (citing *Daubert*, 509 U.S. at 597).

In assessing reliability, the trial court must satisfy itself that expert testimony meets "a certain standard of reliability before it is admitted." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (hereinafter "*Daubert II*"). Expert opinion is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.*; *see also United States v. Vera*, 770 F.3d 1232, 1235 (9th Cir. 2014) ("expert opinions must rest on reliable methodology"). An "expert's bald assurance of validity is not enough"; rather "the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316. "The test of reliability is flexible." *City of Pomona*, 750 F.3d at 1044. The "trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable based on the particular circumstances of the particular case." *Id.* The "test is not the correctness of the expert's conclusions but the soundness of his methodology." *Id.* (internal citations and quotation marks omitted). The Supreme Court has set

forth certain factors that could bear on the assessment of the expert's reasoning or methodology, including "testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *Id.* These factors are meant to be helpful, not definitive or exhaustive. *See Daubert*, 509 U.S. at 593 ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test."); *accord Kumho Tire*, 526 U.S. at 141–42; *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) ("the reliability inquiry is a flexible one and the district court has broad latitude to determine what factors in *Daubert*, if any, are relevant to the reliability determination") (internal quotation marks and citations omitted). The Ninth Circuit has noted that "reliability becomes more, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based testimony." *Valencia-Lopez*, 971 F.3d at 898.

Even if an expert's opinion is reliable, the proposed testimony must also be relevant in order to be admissible—that is it must assist the trier of fact in determining a fact in issue. FED. R. EVID. 402 ("Irrelevant evidence is not admissible"); *see also Daubert*, 509 U.S. at 591-92; *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001); *United States v. Filler*, 201 F.3d 386, 2000 WL 123446, at *1 (9th Cir. Feb. 1, 2000) (affirming district court decision to exclude proposed expert testimony that other law enforcement agencies record suspect interviews and forensic psychiatrists usually have access to such recordings based on relevance because FBI, the investigative agency in the case, had a policy of not electronically recording suspect interviews). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *City of Pomona*, 750 F.3d at 1044 (internal quotation omitted).

Finally, even relevant evidence should be excluded if "its probative value is substantially outweighed by the danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal citations omitted); *see also Daubert II*, 43 F.3d at 1321 n.17 (stating federal judges must exclude proffered expert evidence under

Rules 702 and 403 unless "they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury").

The party who offers the expert testimony must prove its admissibility by a preponderance of the evidence.  *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1146-47 (N.D. Cal. 2003).

## IV.    ARGUMENT

### A.    Mr. Cerf's Proposed Testimony Is Irrelevant

Mr. Cerf intends to testify generally about the acquisition process in the U.K., seemingly drawing upon his experience working in the investment banking industry.  Mr. Cerf offers no opinions specific to HP's acquisition of Autonomy; indeed, the word "Autonomy" does not appear even once in his report.  Mr. Cerf's testimony is irrelevant and should be excluded under Federal Rules of Evidence 401, 402, 403, 702 and *Daubert.*

Relevance is a requirement for admissibility under *Daubert* and Rule 702.  *See, e.g.*, FED. R. EVID. 702(d) ("the expert's opinion reflects a reliable application of the principles and methods *to the facts of the case.*") (emphasis added); *see also* FED. R. EVID. 702, ad. comm. notes 2000 ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").  Mr. Cerf's broad opinions as to the "principal considerations," Cerf Report ¶ 1, surrounding the acquisition process when acquiring a U.K. public company, based on his own personal experience, are not relevant because they are not tied to specific facts of this case.  The Indictment, in summary, alleges that the defendants conspired with others and executed a scheme to defraud and to obtain money and property by making false and fraudulent representations.  "Expert" testimony from a non-percipient witness about how unrelated acquisitions of other unnamed U.K. public companies may occur is not pertinent to this inquiry.  Without a connection to the facts relevant here, Mr. Cerf's general assertions will do nothing more than confuse and mislead the jury, cause undue delay, and waste time, and should be excluded.  *See* FED. R. EVID. 402, 403.

**B.      Mr. Taylor's Proposed Testimony Is Irrelevant and Inadmissible Under Rule 702 and *Daubert***

The majority of Mr. Taylor's proposed testimony, as set forth in the body of the Taylor Report, should be excluded for lack of relevance under FED. R. EVID. 402, 403, 702, and *Daubert*.  Mr. Taylor's proposed testimony related to Mr. Brice's opinions, as set forth in Appendix 3 of the Taylor Report, should similarly be excluded as irrelevant and because that proposed testimony is not based on sufficient facts, nor the product of reliable principles and methods applied to the facts of the case.

The majority of the Taylor Report (34 of a total 42 pages including appendices) concerns Mr. Taylor's recitation of certain accounting standards, untethered to specific facts related to Autonomy.[3] Mr. Taylor does not offer any actual expert opinions as to the accuracy of Autonomy's financial statements or whether Autonomy complied with applicable accounting standards and disclosure requirements in making its financial statements.  To the extent Mr. Taylor does mention Autonomy in the body of his report, his comments are limited to statements about Autonomy's business and how it prepared its financial statements, drawn directly from Autonomy's publicly filed reports.  *See, e.g.*, Taylor Report ¶¶ 2.4.5, 2.6.1, 2.6.2, 3.2.26, 3.5.1, 3.5.4–3.5.12, 5.1.3, 5.2.3, 5.3.6, 6.1.2.  The jury does not require an "expert" to merely read statements from Autonomy's public financial reports.  Mr. Taylor's high-level, generic statements about applicable accounting standards, without any application to the specific facts underlying Autonomy's transactions, lack relevance and are inadmissible under FED. R. EVID. 401, 402, 702, and *Daubert.*

In Appendix 3 of the Taylor Report, Mr. Taylor sets forth "observations" where he disagrees with Mr. Brice's opinions regarding the software and hardware sales transactions contained in Brice Report 1.  *See* Taylor Report App. 3.  Any proposed opinion testimony in line with these observations should be excluded because it is not relevant, not based on sufficient facts or data, not the product of reliable principles and methods, and does not reflect a reliable application of principles and methods to the facts of the case.  FED. R. EVID. 702(b)–(d); *see also Daubert*, 509 U.S. at 589. 597 (holding expert

---

[3]      The government's expert, Mr. Brice, disagrees with the some of the statements made by Mr. Taylor regarding general accounting standards, but the government does not outline all of those issues here given that the overarching and predominant concern with the Taylor Report is its lack of relevance. *See* Brice Report 2, App. H (Mr. Brice's response to Mr. Taylor's comments on accounting standards).

testimony must rest on a reliable foundation and be relevant to the task at hand).  Mr. Taylor's Appendix 3 contains conclusory assertions that he disagrees with certain opinions of Mr. Brice, but Mr. Taylor's assertions are not anchored to any underlying facts that support his claim that Mr. Brice's conclusions are flawed.  Mr. Taylor's approach is perhaps not surprising given the extremely limited set of Autonomy-related documents upon which he chose (or was asked) to base his opinions.  *See* Taylor Report App. 2.  Mr. Taylor himself acknowledges this relevance issue, writing that he has "not been asked to opine on the specific facts or allegations related to any particular transactions."  Taylor Report App. 3 at 38.  Instead, Mr. Taylor merely states his disagreement with an opinion of Mr. Brice, citing either a general accounting standard that he claims contradicts Mr. Brice's opinion and/or adopting without analysis an assumption that the position Autonomy took in its financial reports was the result of a fair and appropriate application of relevant accounting standards to the underlying facts.  Mr. Taylor does not take steps to probe these assumptions nor engage in any independent, reliable analysis to determine whether Autonomy was *in fact* complying with the relevant accounting standards.  Therefore, Mr. Taylor's observations with respect to Mr. Brice's opinions fail to meet the requirements for admissibility set forth in Rule 702 and *Daubert* and should be excluded.

A few examples are sufficient to demonstrate Mr. Taylor's flawed approach and irrelevant and unreliable conclusions.  Mr. Taylor states, with respect to certain of Mr. Brice's opinions regarding VAR transactions, that he disagrees that the significant risk and rewards of ownership of the goods clearly had not been transferred to the buyer if there was contemporaneous evidence that that the buyer made no efforts to sell the goods it had acquired or could not independently have sold the goods.  Taylor Report App. 3 at 38.  The basis of Mr. Taylor's opinion is: "If management had determined that the significant risks and rewards of ownership of goods transferred to the buyer, it is not relevant whether the buyer made efforts to sell the goods to a named end-user."  *Id.* at 39.  This is not a relevant opinion based on the specific facts of the transactions at issue and it does not substantiate Mr. Taylor's critique of Mr. Brice's opinions.  Mr. Taylor does not probe underlying facts and render an opinion as to whether management's determination that the risks and rewards of ownership had been transferred *was appropriate* based on those facts and a fair application of the relevant accounting standards.  He merely attempts to bolster his position with an assertion that if management determined something than it must

1    be so.  Similarly with respect to VAR transactions, Mr. Taylor disagrees with Mr. Brice's opinion that

2    he has identified a number of software transactions where Autonomy retained continuing managerial

3    involvement in the software sold to the VAR, leading to Mr. Brice's conclusion that Autonomy should

4    not have recognized that revenue.  Mr. Taylor writes:

5              "The evaluation of whether the seller retains continuing managerial
             involvement to the degree usually associated with ownership or effective
6              control over the goods sold is made at the time of the sale.  If the conditions
             for revenue recognition are satisfied at the time of the sale, then any
7              subsequent changes would not affect the initial revenue recognized. . . .  To
             the extent the seller continued to discuss the specific transaction with the
8              end-user it would be necessary to assess the seller's level of involvement
             and it would be a matter of judgment whether this was demonstrative of
9              'continuing managerial involvement… .'"

10   Taylor Report App. 3 at 39.  Again Mr. Taylor does not exercise his independent judgment and offer an

11   expert opinion as to whether or not Autonomy retained managerial control based on the specific facts

12   associated with the software transactions.  For example, Mr. Taylor's critique fails to consider crucial

13   (or indeed any) facts surrounding Autonomy's VAR transactions, such as Autonomy's continued

14   negotiations and attempt to close sales with end customers even after the sale to the VAR, which as Mr.

15   Brice explains, are indicative of conditions existing at the time of sale that demonstrate that Autonomy

16   retained managerial control.  *See, e.g.*, Brice Report 2 App. I at 4.

17         With respect to certain of Mr. Brice's conclusions regarding hosting transactions, Mr. Taylor

18   writes: "The Autonomy revenue recognition policy (as set out in both the 2009 and 2010 Annual Report

19   and Accounts) states that Autonomy considered licenses, OEM and hosting transactions to be considered

20   as "sale of goods"—not rendering of services.  Mr. Brice's opinion that these transactions were

21   rendering of services is contrary to Autonomy's revenue recognition policy.  As such, Mr. Brice's

22   comments suggest he disagrees with Autonomy's publicly disclosed accounting policy and

23   presentation."  Taylor Report App. 3 at 40.  Again, this proposed testimony is irrelevant and not an

24   admissible expert opinion.  Mr. Taylor does nothing more than point out that Mr. Brice's opinion is

25   inconsistent with Autonomy's publicly disclosed statements.  An "expert" is not required to make that

26   point.  That point is obvious on the face of Mr. Brice's expert reports and proposed testimony.  The very

27   analysis that Mr. Brice undertook was to assess whether Autonomy's public financial reports

28   appropriately complied with accounting standards and point out where they differed.

1    Other statements in Appendix 3 further betray Mr. Taylor's lack of engagement with the facts

2    and the impact this has on his conclusions.  For example, he attempts to undermine Mr. Brice's

3    opinions, to the extent that they were based on information from a counterparty, by writing that it is "not

4    reasonably expected that a company could have obtained such contemporaneous information," referring

5    specifically to financial statements of a counterparty or correspondence within a counterparty.  *See, e.g.*,

6    Taylor Report App. 3 at 38.  However, as Mr. Brice notes in Brice Report 2, Autonomy and its auditor

7    did in fact obtain financial information of counterparties, such as Microtech and Vidient, and

8    participated in conference calls with counterparties, such as FileTek, as noted in those counterparty's

9    documents.  *See, e.g.*, Brice Report 2 ¶¶ 5.2.8, 5.2.10, App. I at 1–2.  Thus, it *was* reasonable for Mr.

10   Brice to look to some of these counterparty records in drawing his conclusions and Mr. Taylor would

11   have recognized that if he had looked at the underlying facts and records.  Mr. Taylor's observations

12   with respect to the hardware transactions are similarly inadmissible for lack of relevance and reliability.

13   For example, in disagreeing with Mr. Brice's opinion that it was necessary for Autonomy to separately

14   disclose hardware sales, Mr. Taylor merely states that it is a matter of management's judgment and, if

15   there was a determination of dissimilar goods (such that the hardware transactions should be disclosed

16   separately from software), it may "be that a company . . . could consider the 10% thresholds identified in

17   IFRS 8.13 and IFRS 8.34."  Taylor Report App. 3 at 42.  Consistent with Mr. Taylor's approach

18   throughout his report, he does not offer an expert opinion as to whether management's determination not

19   to separate out hardware sales was appropriate, nor does he consider the facts around the amount of

20   hardware Autonomy was selling, which could have affected this determination (such as the fact that

21   Autonomy had over $100mm in hardware sales revenue in 2010, which constituted over 12% of its total

22   revenue). *See* Brice Report 2 at 13 (Table 2.2).

23   Without engaging and analyzing the facts relevant to the specific software and hardware

24   transactions and rendering opinions as to whether Autonomy appropriately applied relevant accounting

25   standards to those facts, Mr. Taylor's report lacks any value to the trier of fact.  Mr. Taylor does not

26   apply a rigorous and reliable methodology nor offer any relevant expert opinions.  His proposed

27   testimony refuting Mr. Brice's conclusions stems from a cursory analysis that is not based on sufficient

28   facts or data, nor the product of reliable methods applied to those facts.  Mr. Taylor's proposed

testimony is inadmissible and should be excluded because it is irrelevant, does not rest on a reliable

foundation, and fails to comply with FED. R. EVID. 702.  To the extent there is even minimal probative

value to Mr. Taylor's proposed testimony, that is vastly outweighed by the risks of confusing and

misleading the jury and wasting time.  FED. R. EVID. 403.

**C.    Mr. Levitske's Proposed Testimony is Irrelevant and Inadmissible under Rule 702 and *Daubert***

Mr. Levitske's proposed testimony includes, among other things, his opinions as to the impact of

certain revenue adjustments on profit from operations, profit from operations margins, year-over-year

growth between FH 2010 and FH 2011, cash flow, and the valuation of Autonomy around August 18,

2011.  Levitske Report ¶¶ 1.3.1–1.3.7. 3.1.6–3.1.11.  Mr. Levitske focused his analysis on hardware

transactions, allegedly linked transactions (or reciprocal transactions), VAR transactions (to include

direct VAR transactions and allegedly linked VAR transactions), and hosting transactions.  Levitske

Report ¶¶ 1.3.3–1.3.6. Mr. Levitske claims that he relied on the VBOP and Brice Report 1 and that he

assumed the accuracy of the revenue adjustments in those two documents.  *Id.* ¶ 1.3.8(a).  Mr. Levitske's

proposed testimony is not the product of reliable principles and methods, not based on sufficient facts or

data, rests on inherently flawed assumptions, and is, in part, irrelevant.  As such, Mr. Levitske's

proposed testimony should be excluded.

As an initial matter, Mr. Levitske's expert disclosure fails to comply with FED. R. CRIM. P. 16's

expert disclosure requirements.  The Levitske Report includes broad statements outlining the revenue

and expense adjustments Mr. Levitske purports to make, and his attachments show the totality of his

adjustments in aggregate.  *See, e.g.*, Levitske Report ¶¶ 2.1.12, 2.1.16, 3.1.1–3.1.5, Att. A–F.  Rule 16,

however, requires that the defendant disclose a complete statement of all opinions the defendant intends

to elicit from the expert and the "bases and reasons for them."  FED. R. CRIM. P. 16(b)(1)(C)(iii).  In this

context, Rule 16 requires that Mr. Levitske disclose the bases supporting each of the adjustments made

in Attachments A–F of his report, namely the underlying transactions that drive each of the aggregate

adjusted numbers.  For example, Attachment C of the Levitske Report lists adjustments in Q1 2011 that

include (10.90m) for "VAR transactions allegedly recognized too early–outs," 8.32m for "VAR

transactions allegedly recognized too early–ins," (12.50m) for "VAR transactions allegedly linked to

1   payment to VAR," and (11.64m) for "Costs and Expenses Related to Alleged VAR transactions."

2   Levitske Report Att. C.  The Attachment does not list the underlying transactions that drive each of

3   these adjustments.  The Attachment and the body of the Levitske Report also do not define "VAR

4   transactions allegedly recognized too early – outs" and "VAR transactions allegedly recognized too

5   early – ins" nor Mr. Levitske's method for calculating these adjustments.  Although the government can

6   speculate as to the transactions driving each of Mr. Levitske's adjustments using the Brice Report 1, and

7   it has done its best to do so, there are some figures that the government's expert has been unable to

8   reconcile despite best efforts.  In any case, the government should not have to speculate as to the bases

9   for Mr. Levitske's adjustments.  The defendant has failed to provide a disclosure that satisfies Rule 16.

10  While the government believes Mr. Levitske's testimony should be excluded for the reasons stated

11  below; should that not happen, the government requests a supplementary disclosure that provides the

12  foundation for each of the adjustments made by Mr. Levitske, including specifying the transactions

13  driving his adjustments and his method for calculating any of the line items that are not self-explanatory

14  on their face, such as "VAR transactions allegedly recognized too early – outs" and "VAR transactions

15  allegedly recognized too early – ins."

16      Besides the disclosure issue, Mr. Levitske's proposed testimony fails to comply with Rule 702

17  and *Daubert* and should be excluded.  The Levitske Report betrays a flawed methodology, flawed

18  assumptions and, with respect to certain analyses, a lack of relevance, as discussed further below.

19      Mr. Levitske's analysis and opinions with respect to the hardware transactions lack relevance.

20  Mr. Levitske writes that he was asked to "opine about the impact on financial statement analysis in the

21  context of valuation of removing the hardware revenues in the Subject Period [FH 2010 and FY 2011]."

22  Levitske Report ¶ 2.1.9.  Mr. Levitske performed this analysis, removing hardware revenue and related

23  costs from the financial statements.  *See id.* ¶¶ 2.1.9–2.1.11, 3.1.2, Att. A.  This analysis, and any

24  conclusions drawn from it, however, bear no relevance to issues in the case.  The issue that Mr. Levitske

25  is striving to address, as he himself notes, is that the hardware transactions were "not segregated into a

26  separate disclosed line item in Autonomy's reported revenue."  Levitske Report ¶ 2.1.9.  The fact that

27  the hardware sales took place is undisputed.  Therefore, the government struggles to understand the

28  relevance of the analysis performed by Mr. Levitske, namely choosing to back out all hardware

transactions from the financial statements.  This method is also inconsistent with Mr. Levitske's claim that he applied adjustments from the VBOP and Brice Report 1—records that did not call for removing these transactions in their entirety.  Any conclusions drawn from Mr. Levitske's analysis are of no relevance and risk misleading and confusing the jury.  The government can posit a theory as to why Dr. Lynch asked Mr. Levitske to perform this adjustment—Dr. Lynch seeks a valuation analysis that demonstrates that cash flow and profits would have increased or remained the same despite any issues flagged in the Brice Reports. The hardware sales were low margin or loss-causing sales thus backing them out helps to increase profits and cash flow.   However, an irrelevant analysis that does not align with the facts, does not address an issue in dispute, and is drawn merely to satisfy the defendant's desired conclusion is irrelevant, risks misleading and confusing the jury, and should be excluded.

The government has the same concern with respect to Mr. Levitske's backing out of the VAR transactions and linked transactions from the financial statements.  *See, e.g.*, Levitske Report ¶¶ 3.1.3–3.1.4.  It is undisputed that these transactions occurred—the issue in the case is whether the accounting of these transactions and how Autonomy recognized revenue was appropriate.  As such, and as with the hardware "adjustments", analyses that merely back out these transactions as if they did not exist has no probative value and will not assist the jury in determining facts at issue.

In addition, Mr. Levitske's proposed opinions are based on flawed assumptions that are inconsistent with the facts of the case and are the product of flawed methodologies.  Some of these issues are set forth in the table below:[4]

| Transaction Type[5] | Levitske's Flawed Assumption (Explicit or Implied) | Reason Levitske's Assumption Is Flawed |
|---|---|---|
| Linked | Full cost ($11.52m) associated with $8.5m sale to FileTek in Q1 2010 was incurred in Q2 2010, so Levitske backed it out from Q2 2010.  Levitske Report Att. B | The cost associated with FileTek sale was capitalized and amortized[6] so Au.[7] in fact recognized an expense of |

---

[4]     This table is not intended to be exhaustive. It merely sets forth examples to demonstrate Mr. Levitske's flawed assumptions and methodology.  Additional issues with respect to Mr. Levitske's analysis are set forth in Brice Report 2, App. K.

[5]     For ease of reference, the government refers to transactions and adjustments using the terminology and categorizations used by Mr. Levitske in his report.

[6]     "Capitalized and amortized" refers to a cost that was recognized as an expense ratably over the useful life of the acquired intangible asset.

[7]     "Au." refers to Autonomy.

| Transaction Type[5] | Levitske's Flawed Assumption (Explicit or Implied) | Reason Levitske's Assumption Is Flawed |
|---|---|---|
| | | $191,970 per month starting from Q2 2010 over the course of 5 years (Au. did not record a cost of $11.5mm in Q2 2010). *See* Brice Report 2 App. K ¶ 1.1.4 (SFT[8] #49), App. L |
| Linked | Full cost ($7.01m) associated with $6.45m sale to Tottenham Hotspurs was incurred in Q1 2011, so Levitske backed it out from Q1 2011.  Levitske Report Att. B | The cost associated with the Tottenham Hotspur sale was capitalized and amortized starting from Q3 2011 (Au. did not record a cost of $7.01m in Q1 2011).  *See* Brice Report 2 App. K at 2 fn. 3 (SFT # 84), App. L |
| VAR | The related expense for the VAR revenue transaction was recorded in the same period in which the select VAR transaction was recognized in revenue.  Levitske Report ¶¶ 2.1.16, 2.1.24(c), Att. C.<br><br>For example, Levitske backed out $15.3m revenue and $8.72m expense in Q1 2010, and $7m revenue and $8.2m expense in Q2 2011. | In many transactions, the related expense for the VAR revenue was capitalized and amortized and/or occurred in a later quarter than the quarter in which the sale occurred.<br><br>For example, with respect to Q1 2010:<br>The $15.3m revenue reflects a $11m sale to MicroTech (SFT #50) and a $4.286m sale to Capax (SFT #45).[9]<br>The costs associated with these sales were $8.72m but Au. did not recognize those full costs as expenses in Q1, 2010. $4.3m of the cost for the MicroTech sale was capitalized and amortized over three years ($360,111 per quarter) starting from Q1 2011. $2.4m of the cost of the MicroTech sale was recorded as a cost of sale in Q2 2011 not Q1 2010.  The cost of the Capax sale ($2m) was paid on June 29, 2011, but Au. capitalized this expense so did not recognize it in either Q1 2010 or Q2 2011.  *See* Brice Report 2 App. K ¶ 1.1.8(a), App. L. |

---

[8]      "SFT #" refers to the Software Focus Transaction number relevant to this transaction as cited in the Brice Reports.

[9]      As outlined above, Mr. Levitske did not provide underlying data showing the transactions supporting the adjustments he made.  Therefore, the government and Mr. Brice have made their best efforts to determine the underlying transactions using the Brice Reports.

| Transaction Type[5] | Levitske's Flawed Assumption (Explicit or Implied) | Reason Levitske's Assumption Is Flawed |
|---|---|---|
| | | For example, with respect to Q2 2011, the $7m revenue reflects a sale to USPS, with a linked purchase of $8.2m to MicroTech.  Au. paid the $8.2m on Aug. 16, 2011 (Q3 2011); it was not incurred as an expense in Q2. 2011.  *See* Brice Report 2 App. K ¶ 1.1.8(c) (SFT #121), App. L. |
| Hosting | Full amount of cash was received and recorded up-front.  Levitske Report ¶ 2.1.24(d), Att. D.  For example, Levitske Att. D references SFT # 59 ($8.7m license sale to JP Morgan on June 30, 2010) and lists cash received as $8.7m in 2010. | In numerous transactions, the full cash amount was not received by Au. upfront but was instead received at different points during the life of the contract.  For example, with respect to SFT #59, the license fee sale to JP Morgan, $4.7m of the total $8.7m was in fact payable two years after the date of the contract so Au. did not receive $8.7m of cash in 2010.  *See* Brice Report 2 ¶ 5.3.16 (SFT #59). |

Mr. Leviske has made assumptions necessary to support the valuation conclusion Dr. Lynch wants to draw despite the fact that these assumptions do not align with the facts in the case.  Moreover, while the government might see the relevance of a defense expert that would opine that, even assuming Autonomy had properly accounted for the transactions at issue, its cash flow and valuation would not have been materially different or may have increased, Mr. Levitske does not engage in that analysis.  His methodology is far more superficial.  Mr. Levitske did not review the relevant transactions, make adjustments in accordance with appropriate accounting standards, and then draw his valuation and cash flow analysis assuming the correct accounting of the transactions.  Instead, he merely "backed out" transactions and made adjustments based on erroneous assumptions that do not align with the pertinent facts in the case.  Mr. Levitske concludes, based on his analysis, that removing the transactions causing accounting errors or disclosure errors would have resulted in higher expected cash flows, higher

valuation, and revenue growth of 17.5% between FH 2010 and FH 2011[10] compared to the 14.6% reported by Autonomy.  *See* Levitske Report at 22–23, App. G.  These conclusions are not surprising given that the hardware was generally sold at loss and that Autonomy paid more to VARs than it recouped through the sales to end customers because of the margin paid to the VARs.  But, as Mr. Brice effectively demonstrates, the flaws in Mr. Levitske's analysis and assumptions render his conclusions unreliable and inaccurate.  Mr. Brice attempted to re-perform Mr. Levitske's analysis, correcting for Mr. Levitske's errors and factually inaccurate assumptions, and he obtained significantly different results.  *See, e.g.*, Brice Report 2 ¶ 5.3.20 (revenue growth of 5.6% between FH 2010 and FH 2011).

Mr. Levitske's opinions are based on a flawed methodology and flawed assumptions that are inconsistent with the facts of the case.  Assumptions not drawn from relevant, real facts render any conclusions drawn from Mr. Levitske's analyses irrelevant, confusing, and misleading.  Mr. Levitske's opinions do not rest upon a reliable foundation and are not the product of reliable methods applied to the facts.  Therefore, Mr. Levitske's proposed testimony should be excluded for failing to satisfy Rules 402, 702 and *Daubert*.  Moreover, to the extent the Court considers there is even limited probative value in Mr. Levitske's anticipated testimony, that value is far outweighed by the risks of confusing and misleading the jury, causing undue delay, and wasting time.  FED. R. EVID. 403.

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court exclude the testimony of Dr. Lynch's experts, Mr. Cerf, Mr. Taylor, and Mr. Levitske.

//

//

//

//

//

//

---

[10]    The government believes Mr. Levitske made a typographical error in that he referred in his report to the second half of 2011. The government believes Mr. Levitske was actually reporting his findings on the growth rate between FH 2010 and FH 2011 (his subject period).

1

2    DATED:  January 17, 2024                     Respectfully submitted,

3                                                 PATRICK D. ROBBINS
                                                  Attorney for the United States
4                                                 Acting under Authority Conferred by 28
                                                  U.S.C. § 515.
5

6                                                 /s/ Kristina Green
7                                                 ROBERT S. LEACH
                                                  ADAM A. REEVES
8                                                 KRISTINA GREEN
                                                  ZACHARY G.F. ABRAHAMSON
9                                                 Assistant United States Attorneys

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28