Jonathan Matthew Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Dwight J. Draughon
Drew C. Harris
(Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN,<br><br>Defendants. | Case No.: 3:18-cr-00577-CRB<br><br>Judge: Hon. Charles Breyer<br><br>**DEFENDANT MICHAEL RICHARD LYNCH'S OPPOSITION TO THE UNITED STATES' MOTION *IN LIMINE* NO. 4 TO EXCLUDE POST-ACQUISITION EVIDENCE AND ADMIT CERTAIN POST-ACQUISITION STATEMENTS**<br><br>**(Government MIL No. 4)**<br><br>Date: February 21, 2024 at 2 p.m.<br>Court: Courtroom 6 – 17th Floor<br>Date Filed: January 31, 2024<br>Trial Date: March 18, 2024 |

DEFENDANT MICHAEL RICHARD LYNCH'S OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* NO. 4 RE: POST ACQUISITION EVIDENCE – 3:18-CR-00577-CRB

**TABLE OF CONTENTS**

**Page Nos.**

I.   INTRODUCTION ................................................................................................................ 1

II.  ARGUMENT ....................................................................................................................... 2

    A.   The Government's Motion Confirms that Dr. Lynch's Motion to Admit Post-Acquisition Evidence Should be Granted ................................................................ 2

    B.   To the Extent the Government is Permitted to Offer Post-Acquisition Evidence, Dr. Lynch Should be Afforded a Full and Fair Opportunity to Meet that Evidence with Post-Acquisition Evidence of His Own ........................................................ 3

        1.   The ASL Restatement and Christopher Yelland's and Antonia Anderson's Testimony about the Restatement Should be Precluded ............................... 3

        2.   If the Government's Proposed Post-Acquisition Evidence is Admitted, Dr. Lynch Should be Permitted to Test that Evidence through Cross-Examination and by Presenting Evidence that Establishes the Full Post-Acquisition Context ................................................................................... 4

            a.   Use of Post-Acquisition Evidence to Cross-Examine Mr. Yelland and Ms. Anderson and Provide Context ..................................................... 4

            b.   Use of Post-Acquisition Evidence to Cross-Examine Joel Scott and Provide Context ................................................................................... 6

            c.   Use of Post-Acquisition Evidence to Cross-Examine John Schultz and Provide Context ........................................................................... 9

III. CONCLUSION ................................................................................................................ 10

DEFENDANT MICHAEL RICHARD LYNCH'S OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE*
NO. 4 RE: POST ACQUISITION EVIDENCE – 3:18-CR-00577-CRB

i

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant Michael Richard Lynch respectfully submits this memorandum in response to the government's motion *in limine* to Exclude Post-Acquisition Evidence and Admit Certain Post-Acquisition Evidence. ECF No. 299 (G. MIL No. 4).

First, Dr. Lynch has no objection to the government's request for a ruling from the Court that both parties be required to provide notice and obtain prior approval before adducing evidence of events occurring after the October 2011 acquisition. Indeed, Dr. Lynch has already submitted a motion *in limine* seeking to admit post-acquisition evidence. ECF No. 288 (D. MIL No. 1).

Second, the government's motion confirms that Dr. Lynch's motion should be granted. Dr. Lynch's evidence is critical to understanding what happened before the acquisition and thus meets the government's test for admission of post-acquisition evidence, namely, that the post-acquisition evidence is relevant and material to what happened before the acquisition. As Dr. Lynch has explained in his motion seeking to admit post-acquisition evidence, the evidence is essential to establishing Dr. Lynch's innocence and rebutting the government's version of events. It is difficult to imagine a more relevant and admissible "lookback" than exculpatory evidence that establishes lack of misrepresentation, lack of materiality, lack of intent to defraud, and lack of motive, and that rebuts the government's allegation that HP's acquisition of Autonomy was "disastrous" for the company and that a "massive" fraud occurred. *Id*. at iv–vi.

Third, Dr. Lynch has already moved to preclude some of the government's proffered post-acquisition evidence and respectfully submits that those motions should be granted. *See* ECF No. 293 (D. MIL No. 2); ECF No. 294 (D. MIL No. 3). Dr. Lynch further submits, however, that he should be permitted to meet any post-acquisition evidence the government is allowed to present with exculpatory evidence of his own that puts the government's evidence in context and exposes the weakness and unreliability of that evidence. As demonstrated below, under that test, the government's proposed evidence opens the door to post-acquisition evidence Dr. Lynch has proffered. In other words, Dr. Lynch seeks a fair trial in which he has a full and

fair opportunity to defend against the allegations that have been leveled against him and to prove his innocence of those allegations, including by presenting relevant, admissible, and highly probative post-acquisition evidence.

## II.    ARGUMENT

### A.   The Government's Motion Confirms that Dr. Lynch's Motion to Admit Post-Acquisition Evidence Should be Granted

While the government couches its motion as one to "exclude" post-acquisition evidence, its motion in fact provides a blueprint for the admission of the post-acquisition evidence Dr. Lynch has proffered in his motion *in limine* seeking to admit post-acquisition evidence. ECF No. 288. That is because the government's theory for admitting post-acquisition evidence—that is, evidence of events that occurred after October 2011 when HP acquired Autonomy—is that the post-acquisition evidence must "constitute[] an appropriate and competent lookback or assessment of what happened before the acquisition prior to October 2011." ECF No. 299 at 1. Put another way, the evidence must reveal something relevant and material about pre-acquisition events. That is precisely what Dr. Lynch's proposed post-acquisition evidence does.

As Dr. Lynch explained in his motion *in limine*, his exculpatory post-acquisition evidence: (i) demonstrates that information HP alleges was withheld during the due diligence process—such as evidence of hardware sales or alleged accounting misconduct—was either not withheld during the due diligence process, and/or was not material to HP's decision to purchase Autonomy; (ii) counters the government's theory of the case by establishing that HP was not a victim of a massive fraud but instead scapegoated Autonomy for its own failure to integrate and support Autonomy following the acquisition; and (iii) supports Dr. Lynch's defense that he did not intend to defraud HP and that he had no motive or incentive to do so. ECF No. 288 at 2–15. Each one of the three purposes for Dr. Lynch's proposed exculpatory evidence thus reflects—or reveals something relevant and material about—what happened before the acquisition, just as what the government terms a "competent lookback or assessment" does. Dr. Lynch's post-acquisition evidence puts a spotlight on pre-acquisition events and exposes the government's claims for what they are: ill-conceived and unfounded allegations about purported accounting

misconduct that did not occur and that was manufactured after the fact to excuse HP's own failure to achieve the synergies it hoped to achieve following the acquisition. The evidence, in short, establishes Dr. Lynch's innocence. It should be admitted.

**B.     To the Extent the Government is Permitted to Offer Post-Acquisition Evidence, Dr. Lynch Should be Afforded a Full and Fair Opportunity to Meet that Evidence with Post-Acquisition Evidence of His Own**

Aside from confirming that Dr. Lynch's proffer of post-acquisition evidence rests on a solid foundation, Dr. Lynch's proffered evidence is also properly admissible as part of, and in response to, the government's own proffered post-acquisition evidence. Indeed, the government should not be permitted to cherry-pick certain post-acquisition events without allowing Dr. Lynch to present evidence that puts the government's selected "lookback" evidence in context. The government gives as examples of the "lookback" evidence that it seeks to admit: (1) testimony by Joel Scott about May 2012 whistleblower disclosures; (2) testimony by John Schultz about July 2012 statements made by Dr. Lynch to Mr. Schultz; and (3) testimony by Christopher Yelland and Antonia Anderson about a January 2014 restatement of Autonomy System's Limited ("ASL") financial accounts. Dr. Lynch has moved to preclude the ASL Restatement and testimony about the preparation of that restatement and how it purportedly relates to the accounts of Autonomy Corporation plc ("Autonomy Group"). ECF Nos. 293, 294. To the extent any of the government's proffered evidence is admitted, however, Dr. Lynch must be provided a full and fair opportunity to rebut that evidence, including by affirmatively presenting and cross-examining the government's witnesses regarding post-acquisition evidence.

**1.     The ASL Restatement and Christopher Yelland's and Antonia Anderson's Testimony about the Restatement Should be Precluded**

For reasons set forth in Dr. Lynch's motions *in limine* regarding the ASL Restatement and Mr. Yelland's testimony about the hypothetical impact of that restatement on ASL's parent company, Autonomy Group, Mr. Yelland's testimony and Ms. Anderson's testimony about the ASL Restatement should be precluded. ECF Nos. 293; 294. Dr. Lynch has reiterated those reasons for precluding the ASL Restatement and Mr. Yelland's and Ms. Anderson's testimony in

his opposition to the government's motion *in limine* to Admit Evidence of ASL's Restatement and Related Summary Charts.  The ASL Restatement is inadmissible because it is hearsay and does not qualify as a business record.  The restatement also lacks indicia of reliability and trustworthiness because it was created and filed to support HP's ongoing litigation efforts and because the methodology used to put the restatement together was unreliable.  *See* ECF No. 293.  Indeed, Mr. Yelland worked closely with the legal and accounting teams supporting HP's litigation efforts and deliberately and explicitly made sure that his efforts were aligned with theirs.  Additionally, Mr. Yelland's (and Ms. Anderson's) testimony about their purported analysis of the transactions underlying the ASL Restatement and the alleged relationship of those transactions to Autonomy Group accounts is irrelevant and inadmissible because it constitutes improper expert opinion testimony and is based on multiple layers of hearsay.  *Id*.  Finally, any probative value of the ASL Restatement (and there is none) and testimony about that document is far outweighed by its unfairly prejudicial impact and its confusion of the issues before the jury.  *Id*.  Nothing about the ASL Restatement or anything connected to it should be allowed into evidence.

### 2. If the Government's Proposed Post-Acquisition Evidence is Admitted, Dr. Lynch Should be Permitted to Test that Evidence through Cross-Examination and by Presenting Evidence that Establishes the Full Post-Acquisition Context

To the extent the Court disagrees with Dr. Lynch's position and permits Mr. Yelland and Ms. Anderson to testify about the ASL Restatement, Dr. Lynch should be permitted to cross-examine them fully and present post-acquisition evidence to expose the lack of credibility and trustworthiness of the restatement and any testimony about it.  The proffered post-acquisition evidence of Mr. Scott and Mr. Schultz, to the extent it is admitted, should likewise be subject to full and fair cross-examination and rebuttal based on post-acquisition events and evidence.

#### a. Use of Post-Acquisition Evidence to Cross-Examine Mr. Yelland and Ms. Anderson and Provide Context

While the government claims here that the ASL Restatement is relevant to prove "the truth or falsity of Autonomy's pre-acquisition representations" in its audited financial statements,

ECF No. 299 at 6, the government also maintains that the restatement "is relevant to showing . . . the magnitude of the necessary corrections" to Autonomy's accounts, and that the related summary charts, Tr. Ex. 2749, are probative of "the scale of the fraud at Autonomy." ECF No. 295 (G. MIL No. 1) at 2.  If the government is permitted to use the ASL Restatement to establish "the magnitude" and "the scale" of the alleged fraud at Autonomy, Dr. Lynch should be permitted to present evidence that the adjustments to revenues identified by Mr. Yelland had no impact on the valuation of Autonomy after the acquisition and that Autonomy was considered just as valuable, if not more so, after the alleged accounting misconduct had been discovered in 2012 as it was before the acquisition.  This evidence is directly relevant to establish lack of materiality, lack of motive, and lack of intent to defraud.

Thus, for example, HP internally concluded in Q3 2012 that Autonomy was worth *more* than what HP had recently paid for it, and determined at that time that no impairment against Autonomy's book value was required.  Notably, that valuation occurred *after* purported whistleblower Mr. Scott (also the subject of this motion and discussed *infra*) came forward, after Dr. Lynch had been terminated, and after HP had full visibility into the alleged accounting improprieties that it claims warranted the ASL Restatement.  Even after the write-down in November 2012, when HP claimed publicly that over $5 billion of the $8.8 billion write-down was attributable to accounting misconduct at Autonomy before the acquisition, EY concluded that revenue adjustments due to alleged accounting irregularities would not have had a material impact on HP's original valuation of Autonomy.  And the write-down itself was not in fact traceable to accounting irregularities or fraud, as internal HP documents from the lead-up to the write-down confirm.  Rather, the write-down was primarily driven by changes in forward-looking sales forecasts and expectations around synergies, as EY noted in a November 5, 2012, memorandum to HP regarding the impairment.  *See* ECF No. 288 at 5–6, 8–9.

These valuations of Autonomy from the post-acquisition period are just as relevant, if not more so, than Mr. Yelland's restatement in showing the "scale" of an alleged fraud at Autonomy in the pre-acquisition period and the "magnitude" of any necessary corrections.  Indeed, Mr. Yelland's own rebasing exercise in summer 2012 concluded that few corrections were actually

DEFENDANT MICHAEL RICHARD LYNCH'S OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* NO. 4 RE: POST ACQUISITION EVIDENCE – 3:18-CR-00577-CRB

5

required to comply with the International Financial Reporting Standards ("IFRS"). Dr. Lynch should be permitted to present such post-acquisition evidence—including evidence of Mr. Yelland's rebasing exercise, post-acquisition valuations of Autonomy, and evidence of the true accounting judgments behind the write-down that demonstrates that HP lied to the market when it attributed $5 billion of the write-down to fraud—to show that there was nothing "false" about Autonomy's accounts and that no "massive" fraud occurred.

Dr. Lynch should also be permitted to present evidence regarding the context in which the ASL Restatement was prepared that undermines its reliability and credibility, and the credibility of its principal author, Mr. Yelland. That evidence demonstrates—as recounted in detail in Dr. Lynch's motion *in limine* to Exclude the ASL Restatement, ECF No. 293—that the ASL Restatement was a by-product of HP's need to support its ongoing litigation efforts and that it was carefully designed to align with those efforts. Far from developing independently, based on a genuine, good faith investigation intended to uncover facts that in turn drive a conclusion, the Restatement put the cart before the horse: it began with a foregone conclusion—that a fraud must have occurred leading to a $5 billion write-down—and backfilled into that conclusion by second-guessing pre-acquisition accounting judgments and commercial strategies using incomplete and biased information. The context is critical to understanding the origins of the ASL Restatement, how it was developed, why it reached the conclusions that it did, and why those conclusions are not reliable. That context derives from post-acquisition evidence that should be admitted along with the ASL Restatement, if that document and any evidence related to it is admitted into evidence.

    **b. Use of Post-Acquisition Evidence to Cross-Examine Joel Scott and Provide Context**

The relevance and admissibility of Joel Scott's post-acquisition testimony is not apparent, and his post-acquisition evidence should therefore be precluded. However, if Mr. Scott is permitted to testify about post-acquisition events, Dr. Lynch should be permitted to cross-examine him to put any post-acquisition evidence he provides in context. The government proposes to have Mr. Scott testify about how, in spring 2012, "he became a whistleblower" after

DEFENDANT MICHAEL RICHARD LYNCH'S OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* NO. 4 RE: POST ACQUISITION EVIDENCE – 3:18-CR-00577-CRB

6

Dr. Lynch left HP-Autonomy, telling HP general counsel John Schultz about Autonomy's hardware resale practices and about how Autonomy's revenues declined following the acquisition when it no longer engaged in hardware resale deals or deals with resellers. ECF No. 299 at 3–4. The government argues that this portion of Mr. Scott's testimony is relevant because it corroborates "other aspects of Scott's testimony relating to his understanding of pre-acquisition events." *Id*. at 4. The government further suggests that Mr. Scott's testimony "is evidence of Dr. Lynch's control and intimidation over Autonomy" and "of the closeness with which Defendants held information regarding various Autonomy practices" because "Scott and others had incomplete understandings of the mechanisms for and purposes behind conduct at the center of the government's fraud case." *Id.*

As an initial matter, putting aside for the moment whether Mr. Scott was in fact a "whistleblower" who told HP things it did not already know, his testimony is neither relevant nor admissible, and it should also be excluded as more prejudicial than probative. Mr. Scott's testimony about becoming a "whistleblower" may help explain the sequence of events following the acquisition and why Mr. Schultz began asking questions about Autonomy's accounting practices in late spring 2012, leading to Mr. Schultz's interview of Dr. Lynch in July 2012. If the government is permitted to present such evidence for the purpose of explaining the sequence of the events following the acquisition, Dr. Lynch must be permitted the same latitude to present post-acquisition sequence-of-events evidence. But Mr. Scott's decision to approach Mr. Schultz after Dr. Lynch left and talk to him about hardware says nothing about what happened before the acquisition. Nor is the fact that Mr. Schultz was purportedly unaware of the hardware sales probative of anything, as there is no reason to believe—and the government provides no reason other than Mr. Scott's unexplained assumption—that the general counsel of HP would have or should have been aware of such sales. Mr. Scott's supposed "discomfort" about unspecified actions taken by Dr. Lynch and others upon leaving HP, *id*. at 3, also sheds no light on pre-acquisition events. And Mr. Scott's personal feelings and concerns—whatever they were and without any indication of what they were based on—are also not relevant or probative. Finally, the prejudicial and inflammatory conclusions the government seeks to draw from Mr. Scott's

DEFENDANT MICHAEL RICHARD LYNCH'S OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* NO. 4 RE: POST ACQUISITION EVIDENCE – 3:18-CR-00577-CRB

7

1  hesitancy to come forward before Dr. Lynch left and from the fact that Mr. Scott may not have
2  known everything there was to know about "various Autonomy practices" are entirely
3  unwarranted and inappropriate.  As described in the government's motion, the basis for these
4  conclusions amounts to no more than speculation and innuendo, particularly when there are
5  countless other explanations for Mr. Scott's actions and the supposed limitations on his
6  knowledge.  Mr. Scott's actions and feelings should not be the basis for casting aspersions on Dr.
7  Lynch's character.  For all of these reasons, Mr. Scott's evidence of post-acquisition events
8  should be precluded.
9        If the Court nonetheless permits Mr. Scott to testify about how and why he became a
10 "whistleblower," Dr. Lynch should be permitted to present evidence that puts Mr. Scott's post-
11 acquisition evidence in context.  Mr. Scott's proposed testimony raises questions about what
12 prompted him to come forward, which in turn opens the door to evidence about the sequence of
13 events leading up to Dr. Lynch's termination and the departure of other Autonomy employees
14 from HP.  Along the same lines, Mr. Scott's proposed testimony that it was Autonomy's
15 purported inability to sell hardware and its inability to use resellers post-acquisition that caused
16 Autonomy's substantial revenue misses in Q1 and Q2 2012 begs the question of whether
17 Autonomy in fact stopped selling hardware during those periods and what actually caused the
18 revenue misses.  As the evidence (including Dr. Lynch's anticipated testimony) will show, those
19 revenue misses were the result of HP's mismanagement, its failed integration efforts, and its
20 failure to achieve the synergies it projected post-acquisition.  Finally, contrary to the
21 government's positioning, Mr. Scott was not a "whistleblower" as to Autonomy's hardware sales,
22 which HP learned about during the due diligence period and which HP knowingly and
23 seamlessly continued after the acquisition.  Nor was Mr. Scott a "whistleblower" as to
24 Autonomy's accounting practices, as Autonomy's books and records, including its trial balances,
25 were an open book to HP immediately following the acquisition.  If Mr. Scott is permitted to
26 testify to his version of post-acquisition events, Dr. Lynch should be permitted, in the interests of
27 fairness and justice, to put that testimony into context and to challenge its veracity and import.
28

### c. Use of Post-Acquisition Evidence to Cross-Examine John Schultz and Provide Context

The government proposes to have Mr. Schultz, who became general counsel of HP in April 2012, testify about a meeting he had with Dr. Lynch in London in late June 2012 to discuss several topics, including:

> (1) modifications to Autonomy executive employment agreements effected around the time of Lynch's departure; (2) hardware resale deals executed with third parties in the years leading up to HP's acquisition; (3) deals between Autonomy and certain VARs in the years leading up to HP's acquisition; (4) Autonomy's financial performance following its acquisition by HP; and (5) Autonomy's restructuring of certain hosting deals in the years leading up to HP's acquisition.

ECF No. 299 at 4–5.  Contrary to the government's assertions, Dr. Lynch did not lie during the interview with Mr. Schultz.  Indeed, the idea that Dr. Lynch would have "misrepresented his knowledge of the scale" of Autonomy's hardware sales is absurd.  Nor did Dr. Lynch lie about the MicroLink acquisition.  Instead, it was Mr. Schultz who was wrong about MicroLink's debt, and the government has perpetuated the same falsehood.  In short, nothing about the Schultz interview shows consciousness of guilt on Dr. Lynch's part.

Regardless of the parties' differing positions regarding the veracity of Dr. Lynch's statements to Mr. Schultz, there can be no doubt that Dr. Lynch should be permitted to present post-acquisition evidence to put his interview with Mr. Schultz in context, to demonstrate his state of mind before and during the interview, and to establish that he had no intent to defraud HP or to mislead Mr. Schultz.  That context includes Dr. Lynch's experience as CEO of HP-Autonomy and what he witnessed as HP mismanaged the integration and failed to achieve the synergies it had projected would result from acquiring Autonomy, particularly where Mr. Schultz will testify about how he and Dr. Lynch discussed "Autonomy's financial performance following its acquisition by HP." *Id*. at 4.  Dr. Lynch should also be permitted to present evidence about how HP set out to blame Autonomy for HP's failings, eventually leading to the (utterly false and unsupported) announcement that purported accounting misconduct at Autonomy pre-acquisition was responsible for more than $5.5 billion of HP's November 2012 write-down of Autonomy.  Dr. Lynch should also, in fairness, be permitted to explain why he mentioned the British press to Mr. Schultz—as HP had already trashed Dr. Lynch's reputation in the press—and how Mr.

Schultz threatened to continue to impugn Dr. Lynch's integrity and reputation.  And indeed, HP did just that in an extensive and well-choreographed media campaign, code-named Project Sutton, that HP unleashed in connection with the announcement of the write-down.

Notably, Mr. Schultz was intimately involved in all of these events in 2012, including the orchestration of a false write-down cover story that blamed Autonomy for HP's failings, and Mr. Schultz himself made public statements about the basis for the write-down, the nature of the investigation that purportedly led to it, and the condition and transparency of Autonomy's financial accounts which are demonstrably false.  Those false statements in turn put Mr. Schultz, among others at HP, in the SEC's crosshairs when the SEC investigated HP's statements to the market at the time of the write-down and its basis for claiming that the majority of the write-down was attributable to accounting misconduct.  Questions about these events are thus not just relevant to demonstrate that there was no fraud, but also to challenge Mr. Schultz's credibility and motive for covering up what actually happened at HP in the lead-up to the write-down and in its aftermath.

### III. CONCLUSION

For the reasons stated herein, the Court should admit post-acquisition evidence to the extent it is relevant and material to establish what happened pre-acquisition and Dr. Lynch's post-acquisition evidence meets that test and should be admitted.  The ASL Restatement, along with testimony from Mr. Yelland and Ms. Anderson about that restatement, is inadmissible and should be excluded.  To the extent such evidence and testimony is admitted, however, and to the extent the proffered testimony of Mr. Scott and Mr. Schultz is admitted, Dr. Lynch should be permitted to present post-acquisition evidence that rebuts that evidence and puts it in its full context.

Dated: January 31, 2024              Respectfully submitted,


By:  _/s/ Christopher J. Morvillo_
Christopher J. Morvillo

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, NY 10019
Telephone:  (212) 878-3437
christopher.morvillo@cliffordchance.com

Jonathan Matthew Baum (SBN: 303469)
**STEPTOE LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Dwight J. Draughon
Drew C. Harris
(Admitted Pro Hac Vice)
**STEPTOE LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

*Attorneys for Defendant*
*Michael Richard Lynch*