# Exhibit A



Summary of Expert Opinions of Philippe Cerf

United States of America vs Michael Lynch and Stephen Chamberlain

7 December 2023

*Summary of Expert Opinions of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*



# Summary of Expert Opinions

**Background**

1. I, Philippe Cerf, of Martello Expert Services, Warnford Court, 29 Throgmorton Street, London EC2N 2AT, have been instructed by Clifford Chance LLP to provide a summary of the principal considerations surrounding the acquisition and takeover of a UK public company.

2. I attach my CV in Appendix A and would highlight that during my career I have been involved with multiple UK acquisitions advising both the buyer (i.e., the "**Bidder**") and the seller (i.e., the "**Target**").

3. I confirm that I have not authored or published any articles on this or any other topic over the past 10 years and further that during the past 4 years I have not testified as an expert at trial or by deposition.

4. I began my investment banking career in 1989, at First Boston in New York, then moved to Banque Indosuez as a Mergers and Acquisition ("**M&A**") Professional in Paris. In 1994, I moved to London to join Lehman Brothers. During my time at Lehman Brothers, I acted as both an M&A banker and industry coverage banker for industry verticals including technology, industrials, and healthcare. I was promoted to Managing Director in 2001.

5. I joined Credit Suisse in London as a Managing Director in the M&A Group, where I initially worked as a generalist M&A advisor while retaining coverage responsibility for a number of accounts principally in the technology space. I then took the position of co-Head of TMT EMEA while remaining a Vice Chairman of the EMEA M&A Group.[1] I also acted as co-Chairman of the Credit Suisse Investment Banking Committee Advisory Panel, which was asked to review all public M&A transactions, fairness opinions, and certain valuation presentations undertaken by Credit Suisse bankers in the EMEA region. I left Credit Suisse in June 2021 and have since acted as an independent advisor and board member.

---

[1] TMT refers to Technology, Media, and Telecommunications sectors.

*Summary of Expert Opinions of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*



**Bidder Approach**

6. In the following paragraphs, I have set out the typical approach and considerations when a potential Bidder approaches a Target regarding M&A in the UK context.

7. An approach by a potential Bidder is often made via the Chairman of the Target board. If the initial approach takes the form of a conversation, it would be followed up by a written indication of interest. This indicative, non-binding letter to the Target board would include a price or a price range at which the Bidder was prepared to launch a transaction. The initial bid letter would also include the principal conditions subject to which the Bidder was prepared to proceed to a firm bid.

8. In most cases, these conditions include the request for a period of due diligence as well as securing the unanimous recommendation of the Target board in favour of the transaction. Upon reception of the initial bid letter, the Target board would decide whether or not to engage with the Bidder and thereby facilitate an offer to its shareholders.

9. In most cases, UK boards are receptive to approaches from a well-financed Bidder at an attractive premium to the current share price. The Target board has a fiduciary duty to engage with such a Bidder and offer its shareholders the potential benefit of the premium on offer. Ultimately, the decision whether or not to accept an offer lies with the Target's shareholders (i.e., to tender their shares in an offer or vote for a merger transaction), the Board's duty is not to deprive the shareholders from the opportunity to opine on such offer.

10. The duty of the Bidder board is to be in a position to evaluate all aspects, strategic, operational, and financial, of the proposed transaction. The Bidder board will want to ascertain that their management team has built a convincing case that the transaction will have a positive financial impact for their shareholders. For the Bidder board, getting the necessary comfort around these aspects trumps any tactical considerations including conducting an expeditious process or reducing interloper risk.[2]

11. The time period required for the Bidder to present a firm offer to the Target's board is primarily related to the time required to complete their due diligence requirements. The negotiation of the terms of a deal can be done in a matter of days once the parties have agreed on a price.

---

[2] An interloper is a competing Bidder.

*Summary of Expert Opinions of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*



12. The Target has a duty to limit the disclosure of sensitive non-public information to the Bidder during the diligence process. As Bidders often also directly or indirectly compete with the Target, caution is required in the disclosures. Under UK takeover (i.e., acquisition) rules, any information made available to a Bidder needs to also be given to any potential interloper. Therefore, the Target has an additional reason to protect its most sensitive information as it could fall into the hands of a direct competitor if such a competitor were to approach the Target with a proposal to top the initial Bidder's offer.

13. The Target's board will typically seek to document a price negotiation that will result in a higher price at the announcement of a transaction than the Bidder's initial offer.

14. The Target board have some latitude in determining what they deem to be an attractive price and will use that negotiation leverage with the Bidder. Bidders are, in a majority of cases, reluctant to bypass the Target board and go directly to the Target shareholders without a recommended deal. In order to secure the Target board's recommendation, Bidders are usually prepared to engage in price negotiations which see their proposed deal price rise above the initial bid.

**Due Diligence**

15. Due diligence is a requirement of the Bidder to access non publicly disclosed information to assess any potential risks associated with the Target's business, operations, and financials. Due diligence also serves to refine any preliminary assumptions regarding the synergies that the transaction could generate and to flag any post-acquisition integration issues.[3] Other aspects, such as analysing any competition issues triggered by the transaction, can also be a due diligence topic.

16. The due diligence process to confirm a bid for a UK publicly listed company is a bespoke process. There are no general rules, and each due diligence process has its own unique characteristics. In particular, the length of the exercise and the scope of information made available to the Bidder is usually decided after a discussion between the parties. The UK Takeover Code is a set of rules and frameworks based on guiding principles for takeovers, first established in 1968.[4]

---

[3] Synergies are when the value of a merged firm is greater than the combined value of the two separate firms either as a result of increased revenue projections or as a result of delivering the same revenue from a reduced cost base.

[4] https://www.thetakeoverpanel.org.uk/the-code.

*Summary of Expert Opinions of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*



        The UK Takeover Code does not mandate that the Target disclose any particular information, and Targets do not have an obligation to provide information to Bidders, whether or not Bidders request the information.

17.    Both the Bidder and the Target usually seek to compromise on the scope of the information provided with an understanding between the parties that the focus of the process should be on material issues. The objective of both parties is to keep the due diligence process as efficient as possible to decrease uncertainty and to decrease the risk that the confidentiality of the process is broken due to a leak.

18.    In agreeing the length and scope of the due diligence there is a balance between the Bidder's requirement to acquire sufficient information to satisfy its board and the Target's desire to protect confidential information.

19.    In addition, the Target board needs to be constructive as they have a fiduciary duty to deliver the best possible transaction to their shareholders.

20.    In this context, the length and scope of the due diligence will predominantly be determined by the Bidder, who can decide when they are satisfied with the scope of disclosure. If information is important to a Bidder, then the Bidder will not conclude a deal unless, and until, it is provided. Depending on the complexity of the Target's business, the type of issues that the Bidder believes need to be investigated, and how detailed the Bidder wants its review to be, the length of the exercise can vary considerably.

21.    Bidders have a strong negotiation position and are generally able to secure what they believe to be a reasonable time frame and scope of investigations to access the required information.

22.    A limited number of senior managers of the Target including the Chief Executive Officer ("**CEO**") and the Chief Financial Officer ("**CFO**") are involved in the due diligence process. The CEO would typically be present in general discussions about the strategy and prospects of the Target. The CEO would be expected to engage in high-level discussions about financial prospects but would typically delegate more detailed discussions about the Target's operations and financials to other executives.

23.    The CFO will be involved in the more detailed discussions regarding the Target's financials and may ask other executives like the Chief Legal Officer to discuss risk areas they are more intimately familiar with. Depending on the issues to be discussed, the Target may involve a select number of other senior executives to cover topics including product, sales, research and

*Summary of Expert Opinions of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*



24. development, or human resources. In certain cases, Targets may limit discussions to a very small group (three to four people) of their senior executives. Involving a larger group and giving access to selected outside advisors would be a sign of relative openness to the Bidder conducting more thorough investigations.

24. From time to time a Bidder may request the opportunity to question the Target's auditors as part of the due diligence process. In my experience, auditor access or making a data room available are not normal practice and indicate a cooperative stance by a Target.

25. The due diligence process balances the requirements and obligations of both the Bidder and the Target and generally lasts between six and eight weeks. Whilst I have seen shorter due diligence periods with a highly motivated Bidder and longer periods for complicated transactions, throughout my career the majority fell into the six- to eight-week period. For longer due diligence periods, milestones can be agreed where the Bidder updates the Target at pre-agreed intervals throughout the process.

**Confidentiality**

26. Generally, both the Bidder and the Target will have a preference that the deal negotiation remains confidential until they are ready to publicly announce the transaction. However, the UK Takeover Code can mandate a public announcement in certain circumstances.

27. Where there is a significant movement in the Target share price during the offer period (the offer period starts at the point where the Bidder is seriously considering an offer for the Target, even before an actual approach to the Target has taken place), the UK Takeover Panel can mandate a public announcement.[5]

28. All share price movements are considered during the offer period, whether or not they are linked to a specific leak regarding the process. This risk is considered as part of the due diligence process; the longer the period and the more executives and advisors involved, the risk of share price movements either due to a leak or market developments increases.

29. If the UK Takeover Panel decides that a share price movement requires public disclosure of the proposed takeover, the Bidder has two choices. It can either make an offer announcement or an announcement that it has no intention to make an offer. The Bidder becomes subject to

---

[5] The UK Takeover Panel is an independent body, established in 1968, whose main functions are to issue and administer the UK Takeover Code and to supervise and regulate takeovers and other matters to which the UK Takeover Code applies.

*Summary of Expert Opinions of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*



what is referred to in the UK as the "*put up or shut up*" ("**PUSU**") regime. Under the PUSU regime, a Bidder will be given 28 days to state that it has the firm intention to make an offer or that it has no current intention of making an offer.

30. Therefore, confidentiality is key to completing a deal. For example, if a leak were to trigger the 28 days to make an offer under UK takeover rules and an eight-week due diligence period was needed, it would likely force the Bidder to abandon the deal.

**Interloper Risk**

31. At any point in the UK deal process there is always a risk that an interloper intervenes with a competing bid. This can be in response to a rumour, a coincidence, or after the deal is announced.

32. There are limited deal protection mechanisms available to bidders of UK listed companies. Break fees are rare and usually capped at 1% of the equity consideration.[6] Furthermore, the board of the Target has a fiduciary duty to consider any competing offers that might improve the outcome for the Target shareholders.

33. The general approach by Bidders is to try to announce a recommended transaction first and to put the onus on any interloper to top it before the deal becomes unconditional. Any competing bidder is therefore constrained by the timetable set by the transaction announced by the first Bidder.

34. A Bidder will also think about setting the price at a high enough value to deter any interloper from entering the process. This may result in the Bidder 'negotiating against themselves' (i.e., to put in a higher price than they would if they thought interloper risk were negligible).

35. To reduce interloper risk, the Bidder will typically ask for a non-solicitation provision. This means that the Target cannot actively look for a counteroffer. The Target has, however, an obligation to entertain any unsolicited bona fide approach from a potential competing bidder.

36. Any non-public information made available to a Bidder by the Target during the acquisition process must be made available to any other genuine party (i.e., an interloper) intending to bid for the Target. This is the case even where the interloper is a competitor and introduces the risk that confidential competitive information is handed over to a competitor in the event that the

---

[6] A break fee is a fee paid to a party as compensation for a broken deal or contract failure.

*Summary of Expert Opinions of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*



transaction does not proceed. Accordingly, the most confidential competitive information is disclosed, if at all, late in the process when a deal is almost certain.

37. Accordingly, the risk of an interloper entering the negotiations and usurping the original Bidder is significant and this will influence both Target and, in particular, Bidder behaviour.

**Deal Negotiation**

38. During the acquisition process, the Bidder needs to take into consideration its internal constraints including conducting due diligence and satisfying the Bidder board that the acquisition makes strategic and financial sense. At the same time, the Bidder must acknowledge the objectives of the Target's board which include getting the highest price for their shareholders and limiting the period of uncertainty before reaching a firm agreement between the parties.

39. A Bidder who has initiated transaction talks with a Target wants to retain the advantage of being ahead of any potential competition. To achieve this objective, a Bidder will typically make their best efforts to show the Target board that they are serious, prepared to deliver transaction terms that will satisfy the Target board, and to do this in an expeditious manner. The latter means that the Bidder must find a compromise between taking the appropriate time to conduct their due diligence and appearing to the Target board to move ahead as swiftly and efficiently as possible.

40. A Bidder is exposed to share price fluctuations during the period of negotiations with the Target board. If the share price improves during the negotiations, the attractiveness of the offer premium gets eroded.[7] As discussed above, a large movement in share price can also lead to a premature disclosure requirement. The only way to reduce market risk is to expedite the process leading to the announcement of a transaction. This is a tactical consideration that Targets will share.

**Deal Execution Considerations**

41. A Bidder will strive for a unanimous recommendation from the Target board and irrevocable undertakings from insiders holding shares to tender them or to vote for the transaction before

---

[7] The offer premium represents the degree to which the price offered to the bidder is above the prevailing market share price. If the share price rises, the offer premium (and hence the relative of attractiveness of the deal) declines.

*Summary of Expert Opinions of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*



the Bidder commits to this transaction. The purpose is to show shareholders that the transaction is strongly endorsed by their representatives and to create momentum for acceptance of the announced transaction by the market. Irrevocable undertakings can also be sought from institutional investors, but this is determined on a case-by-case basis depending on the shareholders involved and the perceived reception of the transaction by investors.

42. A deal price that is accompanied by a unanimous recommendation from the Target board and irrevocable undertakings from internal shareholders will also serve to discourage potential interlopers. At the margin, this may incentivise a Bidder to select a higher price that guarantees the Target's support.

43. When a firm intention to make an offer is made (via a rule 2.5 announcement),[8] it is binding on the Bidder. There is practically no exit for a Bidder once the conditions precedent to a deal are satisfied. A Bidder announcing an intention to make a firm offer for a listed UK company must therefore be satisfied that the strategic fit and quality of the Target as well as the terms of the transaction are beneficial to the Bidder's shareholders.

44. UK listed companies have very few tools to prevent or thwart unsolicited take-over approaches. There are no legal provisions such as poison pills or dual classes of shares to give the Target board additional negotiation leverage or the ability to block a transaction that is deemed unsatisfactory to the board.[9]

45. It is therefore common to retain defence advisors (financial and legal) in order to be fully prepared in case of an unsolicited approach. 'Being prepared' means, among other topics, that advisors will keep the board updated on a regular basis regarding developments in the company's share price and shareholder base, brief the board on valuation metrics including intrinsic valuation based on the company's internal financial projections and establish a list of potential suitors, usually the most credible strategic buyers who could consider a transaction with the Target.

46. A Target board in the UK can be assumed to be well prepared in particular on what constitutes the fair value of the company even in the event that an unsolicited approach occurs. The Target

---

[8] A rule 2.5 announcement is a bidder's announcement of a firm intention to make an offer under Rule 2.5 of the UK Takeover Code. Rule 2.5 specifies that a firm intention to make an offer should only be made when a bidder has every reason to believe that it can and will continue to be able to implement the offer.

[9] A poison pill is a defence strategy used by the directors of a public company to prevent activist investors, competitors, or other would-be acquirers from taking control of the company by buying up large amounts of its stock. A dual class of shares means that a company offers two types (or classes) of shares to differentiate between shares with different dividend payouts and voting rights.

*Summary of Expert Opinions of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*



board will also have been briefed on other relevant valuation metrics including the level of premia on the share price paid in precedent UK public acquisition transactions. While the level of such premia may fluctuate over time, it is generally acknowledged that a premium in the 20% to 40% range over recent average share prices would usually be considered as a level worth serious consideration by a Target board.

47. With the ordinary premium of an acquisition offer in the range of 20% to 40%, in my opinion, in ordinary circumstances an offer as high as 70% could not be ignored by the board and would also act as a deterrent to a potential interloper. [10]

48. Furthermore, a board or management that failed to engage with a highly desirable acquisition offer, such as a 70% premium would, in my opinion, run into a conflict with its shareholders. Ultimately, the shareholders have the authority to remove the board but these circumstances are rare.

Signed: _____

Philippe Cerf

Martello Expert Services, Warnford Court, London, EC2N 2AT

---

[10] The board would be expected to take advice on any acquisition offer. The advisors would present the board with a variety of valuation metrics on which to assess the share premium of the offer.



Summary of Expert Opinions of Philippe Cerf

Appendix A - CV of Philippe Cerf

7 December 2023



*Appendix A - CV of Philippe Cerf*
*United States of America vs Michael Lynch and Stephen Chamberlain*

## Philippe Cerf
Financial Expert

**Qualifications & Education:**

- Harvard Business School, Master of Business Administration (MBA)
- HEC Paris

**Non-Executive & Advisory:**

- Sep 2021 - Present: Louis Dreyfus Holding, Board Member
- Apr 2022 - Present: Giift, Board Member
- May 2023 - Present: Cube Software Group, Senior Advisor
- Apr 2023 - Present: Mircap Partners, Senior Advisor

**Areas of Expertise**

- Investment Banking
- Mergers and Acquisitions (Private and Public Transactions, Domestic and Crossborder, Buyside, Sellside, Fairness Opinions, Independent Valuations, LBOs, JVs, Recapitalisations)
- Corporate Finance (Debt and Equity Advisory, Leveraged Finance, IPOs, Equity Block Trades)
- Industry Focus: Technology

**Professional Experience Summary**

*A former investment banker with over 30 years direct deal and client experience in a variety of industries with a focus on the technology sector. Specialist in corporate finance, strategic advisory, and mergers and acquisitions. Moved in 1994 to London to join Lehman Brothers. During his time at Lehman Brothers, Philippe acted as both an M&A banker and industry coverage banker for industry verticals including technology, industrials, and healthcare, before being promoted to Managing Director in 2001. He joined Credit Suisse in London as a Managing Director in the M&A Group, initially working as a generalist M&A advisor while retaining coverage responsibility for a number of accounts principally in the technology space. Philippe then took the position of co-Head of TMT EMEA while remaining a Vice Chairman of the EMEA M&A Group, also acting as co-Chairman of the Credit Suisse Investment Banking Committee - Advisory panel, which was asked to review all public M&A transactions, fairness opinions, and certain valuation presentations undertaken by Credit Suisse bankers in the EMEA region. He left Credit Suisse in June 2021 and has since acted as an independent advisor and board member.*

**Jun 2021 - Present: Self-Employed**
Independent Advisor

**Oct 2008 - Jun 2021: Credit Suisse**
Managing Director

**1994 - 2008: Lehman Brothers**
Managing Director

**1990 – 1994: Banque Indosuez**
M&A Professional, Paris

**1989 – 1990: CS First Boston**
Corporate Finance Associate, NY