1  PATRICK D. ROBBINS (CABN 152288)
   Attorney for the United States
2  Acting Under Authority Conferred by 28 U.S.C. § 515

3  MARTHA BOERSCH (CABN 126569)
   Chief, Criminal Division
4
   ROBERT S. LEACH (CABN 196191)
5  ADAM A. REEVES (NYBN 2363877)
   KRISTINA N. GREEN (NYBN 5226204)
6  ZACHARY G.F. ABRAHAMSON (CABN 310951)
   Assistant United States Attorneys
7
        450 Golden Gate Avenue, Box 36055
8       San Francisco, California 94102-3495
        Telephone: (415) 436-7014
9       Fax: (415) 436-7234
        Email:  Robert.Leach@usdoj.gov
10
   Attorneys for United States of America
11
                    UNITED STATES DISTRICT COURT
12
                 NORTHERN DISTRICT OF CALIFORNIA
13
                     SAN FRANCISCO DIVISION
14

15  UNITED STATES OF AMERICA,          )  Case No. CR 18-577 CRB
                                       )
16         Plaintiff,                  )  UNITED STATES' OPPOSITION TO
                                       )  DEFENDANT MICHAEL RICHARD LYNCH'S
16      v.                             )  MOTION *IN LIMINE* NO. 5: TO EXCLUDE
                                       )  CERTAIN CATEGORIES OF EVIDENCE [ECF
17                                     )  No. 291]
   MICHAEL RICHARD LYNCH AND           )
18  STEPHEN KEITH CHAMBERLAIN,         )
                                       )  Pretrial Conference:  February 21, 2024, 2 p.m.
19         Defendants.                 )  Trial Date:  March 18, 2024
                                       )

20

21                          **INTRODUCTION**

22        The indictment here alleges that Dr. Michael Lynch and his co-conspirators "[i]ntimidat[ed],

23  pressure[ed], and [paid-off] persons who raised complaints about or openly criticized Autonomy's

24  financial performance" and "[i]ntimidat[ed] and pressure[ed] analysts and other persons who raised

25  questions about or openly criticized Autonomy's financial practices."  ECF No. 21 at 7.

26        During the *Hussain* case, the Court admitted evidence that Dr. Lynch and his co-conspirators

27  retaliated against Daud Khan, an analyst who was suspicious of Autonomy's financial performance.

28  Khan testified at length in *Hussain* and the parallel UK civil case about his interactions with Autonomy

1    and the steps Autonomy took to silence him – threatening him and his firm if they published negative

2    information, excluding him from analyst calls under the false pretense that regulatory authorities

3    believed he committed securities violations, and dangling investment banking business if his employer

4    would remove him from covering Autonomy.  The Court should admit such retaliation evidence again

5    here, as the evidence is relevant to Dr. Lynch's knowledge, intent, control, and consciousness of guilt

6    (and expressly alleged as a means and method of the conspiracy).  Indeed, the evidence is arguably more

7    probative against Dr. Lynch than it was against Hussain.

8    　　As it did in *Hussain*, the Court should also admit evidence that Dr. Lynch induced Joel Scott

9    (Lynch's General Counsel in the United States) to fire a whistleblower in Autonomy's finance

10   department, Brent Hogenson, as well as two of his subordinates (Percy Tejada and Reena Prasad).

11   Hogenson, Tejada, and Prasad are all expected to testify, and Hogenson raised his accounting concerns

12   directly with Dr. Lynch.  Scott's testimony from *Hussain* demonstrates that Dr. Lynch encouraged Scott

13   to fire Hogenson and cavalierly dismissed Scott's concerns about the lawfulness of his actions.  Dr.

14   Lynch persists in the claim that Hogenson was fired because of a payroll fraud investigation

15   (commenced *after* Hogenson came forward) but the timing and the witness testimony (Scott, Hogenson,

16   Tejada, and Prasad) will expose that for the pretext it was.  Dr. Lynch's retaliation, expressly alleged in

17   the indictment, is deeply probative of his knowledge, intent, control, and consciousness of guilt.  There

18   is no basis for exclusion.

19   　　The Court also should not issue a blanket order excluding evidence from 2008 or earlier.  The

20   government submits that Autonomy's struggles leading up to 2009, whether because of market

21   conditions or its inability to meet the organic-growth story it was projecting, provided incentive to resort

22   to the accounting shenanigans and loss-making hardware sales that boosted revenue in 2009, 2010, and

23   2011.  Any prejudice – and there is none – can be cured with an instruction.

24   　　For the reasons set forth in the government's motion *in limine* No. 2, the Court should admit Dr.

25   Lynch's repeated references to the Mafia and James Bond villains, which are probative of his

26   knowledge, intent, and control and the image Dr. Lynch purposefully sought to market as a master of the

27   universe.

28   　　In no event should the Court exclude the August 7, 2010 email by Dr. Lynch, evidence of money

1   Dr. Lynch's family made in the HP acquisition, or evidence of where events relevant to the indictment

2   took place.  The August 7, 2010 email – which was admitted without objection in *Hussain* as Exhibit

3   1038 – is a statement by the defendant about a multi-million-dollar possible transaction that Autonomy

4   ultimately failed to accomplish (yet booked through a reseller).  However crass and direct the language

5   Dr. Lynch chose (it contains only one actual profanity), it is probative of his intense control over

6   Autonomy and his close attention to detail on a key transaction.  There is no prejudice within the

7   meaning of Federal Rule of Evidence 403, let alone the extreme prejudice that would be necessary to

8   exclude such highly probative evidence.

9        Nor should the Court exclude evidence that Dr. Lynch – through a family member – actually

10   pocketed money (approximately \$16 million) from the HP acquisition.  This evidence is clearly relevant

11   to motive.

12        Finally, evidence such as photos of where events took place during the indictment are helpful for

13   the jury in consuming complex evidence and assessing Dr. Lynch's authority.  They should not be

14   excluded.

15        For these reasons, the Court should deny the motion.

16                          **ARGUMENT**

17   **I.**       **LEGAL STANDARDS**

18        Evidence is relevant if it has any tendency to make a fact of consequence more or less probable

19   than it would be without the evidence.  FED R. EVID. 401.  The basic standard of relevance is a liberal

20   one.  *See Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077 (9th Cir. 2019).  The Court "may

21   exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more

22   of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

23   or needlessly presenting cumulative evidence."  *See* FED. R. EVID. 403.

24        Federal Rule of Evidence 404(b) prohibits "[e]vidence of a crime, wrong, or other act … to

25   prove a person's character."  FED. R. EVID. 404(b)(1).  However, evidence of a crime, wrong, or other

26   act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation,

27   plan, knowledge, identity, absence of mistake, or lack of accident."  FED. R. EVID. 404(b)(2).

28

"We have uniformly recognized that the rule is one of inclusion and that other acts evidence is admissible whenever relevant to an issue other than the defendant's criminal propensity." *United States v. Mehrmanesh,* 689 F.2d 822, 830 (9th Cir.1982) (affirming narcotics conviction and admission of the defendant's prior smuggling activities). "So long as the evidence is offered for a proper purpose, such as to prove intent, the district court is accorded wide discretion in deciding whether to admit the evidence, and the test for admissibility is one of relevance." *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir. 1997) (affirming wire fraud conviction and admissibility of evidence of sexual contact in which defendant had engaged two witnesses while they were in their teens, approximately 13 years earlier, as prior bad acts evidence). Evidence of other crimes or acts is admissible under Rule 404(b), "'except where it tends to prove *only* criminal disposition.'" *United States v. Ayers*, 924 F.2d 1468, 1473 (9th Cir. 1991) (citations omitted) (affirming tax conviction and admissibility of false customs declaration for purposes of proving intent).

"Other acts evidence is admissible under Rule 404(b) if it (1) tends to prove a material point in issue; (2) is not too remote in time; (3) is proven with evidence sufficient to show that the act was committed; and (4) if admitted to prove intent, is similar to the offense charged." *United States v. Beckman,* 298 F.3d 788, 794 (9th Cir. 2002) (affirming narcotics conviction and finding testimony regarding defendant's prior drug run was admissible). "Evidence should not be treated as 'other crimes' evidence, however, and may therefore be admitted for all purposes, when the evidence concerning the other act and the evidence concerning the crime charged are 'inextricably intertwined.'" *United States v. Ripinsky*, 109 F.3d 1436, 1442 (9th Cir. 1997) (affirming bank fraud conviction and finding that evidence defendant diverted asbestos removal funds was properly admitted).

## II. THE COURT SHOULD NOT EXCLUDE EVIDENCE REGARDING DAUD KHAN

Applying these standards in *Hussain*, the Court admitted evidence of Autonomy's retaliation against Khan. The Court explained:

> The defense moved to exclude evidence that Hussain and his alleged coconspirators retaliated against Daud Khan, a market analyst, for questioning Autonomy's accounting by, among other things, excluding Khan from Autonomy's earning calls. *See supra* Part I.B.3.d. First, the defense contended that the evidence should be excluded under Rule 401 because it was irrelevant. *See* dkt. 151. On the contrary, the evidence gave rise to a permissible inference that Hussain sought to cover up the misrepresentations Autonomy was making to the market, which in turn made it more likely that he was aware of the

misrepresentations and involved in the alleged conspiracy. While Hussain argued that the government failed to tie the actions against Khan specifically to Hussain, in fact the government put on sufficient evidence for jurors to infer that Hussain knew about or directed the actions against Khan, given his role as a director of the company and his involvement in analyst calls. *See United States v. Boise*, 916 F.2d 497, 502 (9th Cir. 1990) (evidence of prior injuries relevant "only if the jury could reasonably conclude that the injuries occurred and that [the defendant] inflicted them"). Moreover, Khan testified that he had a face-to-face meeting with Hussain and other directors in which Lynch threatened consequences if he published an unfavorable note. Tr. at 2986–87 (Khan). The evidence was properly admitted.

*See* Order Denying Motions for New Trial and Judgment of Acquittal, *United States v. Hussain*, CR 16-642 CRB (N.D. Cal. Jul. 30, 2018), ECF No. 419 at 73-74; *id.* at 36 ("The government also introduced evidence that Hussain and his co-conspirators excluded a market analyst who had questioned Autonomy's revenue recognition and growth, Daud Khan, from quarterly earnings calls.").

The evidence is likewise properly admitted against Dr. Lynch. Dr. Lynch was not merely present at the face-to-face meeting Khan described in *Hussain*, he was the one who "threatened consequences if [Khan] published an unfavorable note." *Id.* at 74. Another witness, Marc Geall, testified in a pre-trial deposition that Lynch "cared too much" and paid "[a] lot of attention" to negative analysts like Khan. Thus, the fact that Dr. Lynch's agent, Kanter, made the pretextual FSA referral goes to the weight of the evidence, not its admissibility. Dr. Lynch is free to argue he lacked knowledge about what his consigliere was doing. Similarly, other witnesses such as Stouffer Egan are expected to testify that Dr. Lynch on occasion used the possibility of lucrative investment banking business to induce Autonomy customers into transactions, leading credence to Khan's account that Autonomy pressured JPMC to take him off of Autonomy coverage in order to win business.

In sum, Dr. Lynch's campaign against Khan was far from normal, deeply corroborated, and deeply probative of Dr. Lynch's state of mind, intent, and consciousness of guilt. It is specifically alleged in the indictment and was properly admitted in *Hussain*. It overlapped with the time frame of Autonomy's false statements to the market and HP, touched on the accuracy of Autonomy's financial reporting, and ties directly to Dr. Lynch. It is relevant, inextricably intertwined with the wire fraud offenses, and not excludable under Rules 403 or 404. It should be admitted here.

1

2

**III.     THE COURT SHOULD NOT EXCLUDE EVIDENCE OF THE TERMINATIONS OF HOGENSON, TEJADA, AND PRASAD**

3

In *Hussain*, the Court admitted evidence that Autonomy fired Brent Hogenson, Percy Tejada,

4

and Reena Prasad after they raised issued about Autonomy's accounting and collectability issues.  The

5

government anticipates similar evidence here:  In June 2010 Hogenson raised directly to Dr. Lynch

6

allegations of accounting improprieties.  Dr. Lynch engaged in an extensive back-and-forth with

7

Hogenson.  After Hogenson first came forward, Autonomy commenced an investigation into possible,

8

unrelated payroll fraud in the United States.  Although no evidence implicated Hogenson in a payroll

9

fraud, Dr. Lynch encouraged Scott to fire him.  Scott did so, along with Tejada and Prasad, who were

10

associated with Hogenson.  Scott felt like he lacked complete information and had concerns afterward,

11

which Dr. Lynch belittled.  Not long after Hogenson raised his allegations in June 2010, Dr. Lynch

12

pivoted to attempts to sell the company.

13

Lynch's interactions with Hogenson and his reaction to the allegations are central to this case.  In

14

admitting the evidence in *Hussain*, the Court reasoned:

15

> Hussain also moved to exclude evidence tending to establish that he retaliated
> against Brent Hogenson and other Autonomy employees for pointing out accounting

16

> irregularities during the period of the charged conduct. *See* dkt. 151. While the defense
> argued that Hussain "had little connection to these events," the testimony at trial was to

17

> the contrary. *See supra* Part I.B.3.d. The evidence was relevant and was properly
> admitted.

18

ECF No. 419 at 74.

19

Joel Scott's testimony in *Hussain* established that Lynch had a *greater* connection to these

20

events:

21

22

Q. Okay. On July 28th, 2010, did you fire Brent Hogenson?

23

A. Yes.

24

Q. Did you fire him in person or on a phone call?

25

A. On a phone call.

26

Q. Before that call, did you have a conversation with Mike Lynch?

27

A. I did.

28

1    Q. Take a moment and describe what Mr. Lynch said to you.

2    A. . . . I called Mike Lynch to let him know that I would be speaking to Brent and going
     through the allegations and getting his – his responses, and that I would decide what to do
3    after hearing his responses.  This was a very unusual circumstance for me because I'd
     never been authorized to terminate anybody else before at Autonomy; and it was made
4    abundantly clear to me that it was my decision whether to terminate Brent or not, and I
     wanted to let Mike know what my plan was before calling Brent.  So I spoke to Mike and
5    his direction to me was, "This is your decision; but if it were me and there was somebody
     that was really trying to destroy the company, I sure wouldn't want them around."
6
7    And then Mike asked me to record the call. And then Mike asked – or told me that when
     speaking with Brent, I ought to let him know that if he's planning to go public with his
8    allegations, that the – that the – the U.K. rules around slander – I'm forgetting the term –
     but the U.K. rules that are applicable are far more, I guess, robust than U.S. rules.
9
10   That was the substance of the conversation.

11   Q. Based on this call with Dr. Lynch, was it clear to you that Dr. Lynch wanted Mr.
12   Hogenson fired?

13   A.      Yes.

14   Q. Okay. And did you terminate his employment?

15   A. Yes.

16   Q. Why did you do that?

17   A. I had two – I had two competing things going on in my head. One was very clearly I
18   understood that my management wanted Brent gone and that there was – there was –
     there was no other option.  At the same time I felt like I had an independent – my own
19   independent reason, which I can describe.

20   Q. Well, you said my management wanted this. What did you mean?

21   A. I meant Mike Lynch, Sushovan Hussain, Steve Chamberlain.
22
     Q. And what did you mean they wanted it?
23
     A. I meant that – I mean that they wanted Brent terminated.
24
     *Hussain* Tr. at 2637-39.
25
          Scott added that Dr. Lynch essentially ratified Scott's decision and gleefully overlooked
26
     the potential that Scott had violated the law at Dr. Lynch's behest:
27
          Q. After you recorded the call with Mr. Hogenson, did you develop concerns you had
28        done something wrong?

1

2    A. Yes.

3    Q. Why?

4    A. Because it's illegal to record a call in California without the other person being aware.

5    Q. Was Mr. Hogenson aware?

6    A. No.

7    Q. Did you bring that information to Dr. Lynch's attention?

8    A. I did.

9    Q. And what did he say?

10

11   A. He was initially very dismissive. He told me it was cute how I was worried about
     something like a mouse, something that they would have been concerned about 10 years
12   earlier at the company.  And I explained – and then – and he also said, "Look, there's
     nothing to worry about. Autonomy, of course, will, you know, cover any – if anything
13   ever comes of this, like, Autonomy will cover you."  But that didn't really make me feel
     comfortable because that wasn't addressing my concern of the fact that, look, I'd just
14   done this thing and it's illegal; and, you know, where do I go? What am I – what ought I
     to do right now? And that, I think, got Mike a little uncertain about me, and so he started
15   probing about my relationship with Brent. He thought that perhaps Brent and I had some
     deeper relationship.
16

17   And I said, "No, that's not the case. This is what's concerning me."  And Mike then
     shared with me, "Listen, you have nothing to worry about.  Sushovan shares absolutely
18   everything with the auditors. We are on the right side of this," and gave me these general
     reassurances but didn't – you know, that was sort of where we left it on the phone
19   recording.

20

21   Q. After you fired Mr. Hogenson, did you learn additional information about what Mr.
     Hogenson was raising to the U.K. authorities?

22   A. Yes.

23   Q. How did you learn that?

24

25   A. Andy Kanter sent me several documents, including Brent's allegations, as well as a
     report prepared by, I believe, Autonomy's Audit Committee and outside auditors
26   addressing the specific allegations that Brent made.

27   Q. Did that alleviate your concerns?

28   A. No.

Q. Why?

A. It heightened them because when I read the details of the allegations and just the precise details of the allegations, it made me more concerned.

Q. Concerned why, Mr. Scott?

A. Concerned that Autonomy could potentially be doing something – be doing illegal transactions.

*Hussain* Tr. at 2641-43.

Dr. Lynch's retaliation against Hogenson, Tejada, and Prasad is deeply probative of his state of mind, intent, and consciousness of guilt.  It is specifically alleged in the indictment and was properly admitted in *Hussain*.  It overlapped with the time frame of Autonomy's false statements to the market and HP, touched on the accuracy of Autonomy's financial reporting, and ties directly to Dr. Lynch.  It is relevant, inextricably intertwined with the wire fraud offenses, and not excludable under Rules 403 or 404.  It should be admitted here.[1]

## IV.   THE COURT SHOULD NOT ISSUE A BLANKET ORDER EXCLUDING EVENTS PRIOR TO 2009

The conspiracy alleged in the indictment covers the period 2009 to October 2011.  Nonetheless, Autonomy's resort to accounting improprieties and disclosure violations, and its pivot to loss-marking hardware sales, raise the question: why?  The government anticipates analysts and others will testify about Autonomy's growth, and so-called "organic growth," from its software (IDOL) sales.  Evidence suggesting that, prior to 2009, growth was slowing or difficult to achieve is not a bad act, nor is it irrelevant.  To the contrary, it demonstrates motive, opportunity, plan, and more.  Accordingly, the Court should not issue a blanket order at this time.

## V.   THE COURT SHOULD NOT EXCLUDE EVIDENCE OF SO-CALLED "IRRELEVANT AND PREJUDICIAL EVIDENCE OF BEHAVIOR"

Dr. Lynch also moves to exclude vague categories of evidence he lumps into a bucket called "irrelevant and prejudicial evidence of behavior."  The Court should not issue a blanket order without

---

[1]   The government does not intend to offer evidence of the settlement agreements with Hogenson, Tejada, and Prasad, but reserves the right to do so depending on the cross-examination of the witnesses.

U.S.' OPP'N TO LYNCH MOT. *IN LIMINE* NO. 5 RE
CERTAIN CATEGORIES, CASE NO. CR 18-577 CRB          9

1   greater specificity and the opportunity to respond.

2        To the extent the defense seeks to exclude instances where Dr. Lynch compared Autonomy to

3   the Mafia or himself to a Mafioso, marketed himself as a James Bond villain, or drew attention to his

4   piranha tank to equate Autonomy as the lone, surviving piranha, the Court should deny the motion for

5   the reasons set forth in the government's Motion *in Limine* No. 2.  ECF No. 296.  Dr. Lynch

6   purposefully and repeatedly invoked the Mafia, Dr. No, and piranhas as a means to brandish an image as

7   an all-seeing tech titan to whom the rules do not apply.  He used that image to promote himself to the

8   market and HP.  It is not prejudicial to let the jury see what he presented.

9        To the extent the defense seeks to exclude bullying and intimidating, the Court should not issue a

10   blanket order.  The government is prepared to front instances where it thinks this issue may arise.  The

11   simple fact is some witnesses may have felt – and may still feel – intimidation from Dr. Lynch.

12   Witnesses should not be precluded from bearing witness to what they saw, heard, and did, and to explain

13   why.

## VI. THE COURT SHOULD NOT EXCLUDE EXHIBIT 1038, EVIDENCE THAT DR. LYNCH'S SPOUSE RECEIVED MONEY FROM THE SALE OF AUTONOMY SHARES TO HP, OR EVIDENCE OF WHERE THE EVENTS TOOK PLACE

16        Dr. Lynch draws particular attention to three categories of evidence he considers "irrelevant and

17   prejudicial."  They should not be excluded.

18        First, Lynch seeks to exclude an August 7, 2010 email about a possible transaction with the U.S.

19   Department of Veteran's Affairs.  Autonomy was never able to close the deal with the VA.  Desperate

20   for the revenue, Autonomy purported to sell the software for the VA to a reseller in the third quarter of

21   2010.  When the reseller could not pay, Autonomy purported to buy a greater dollar amount of software

22   from the reseller, which it applied to the reseller's debt days before HP committed to an acquisition.

23   Whether the transaction was appropriately accounted for and what Dr. Lynch knew are matters of

24   dispute in the trial.

25        The email was admitted in *Hussain* without objection.  And with good reason.  It is highly

26   probative of Dr. Lynch's knowledge of the sales pipeline, attention to detail, control, pressure on

27   subordinates, and disdain for excuses – not to mention his anxiety about the quarter.  Dr. Lynch wrote:

28

[T]his is the biggest deal in the quarter and  the idea that some no-name . . . is allowed to potential f this up and we are even having debates about charging them is a MAJOR MANAGEMENT FAILURE.  THIS CANNOT BE DELEGATED.  ALL of you own this.

Jim, stouff [Egan] . . . you need to be minute to minute experts on this deal, nothing is said to the customer with out it being cleared by someone senior, no meetings with out someone with a brain present, NO F-ing abdications  of responsibility or delegation.  If there is a problem I WANT TO KNOW ABOUT IT IN A F***ING MILLISECOND from all of you.

We cannot act like muppets on  a deal of this size…break the rules and do it right.

AND we will bid with anyone the customer wants us to , none of this Autonomy favorued nation shit anymore.

Mike

Ex. 1038 (ECF No. 291-4, Koeleveld Decl. Ex. 3).

These words speak volumes about Dr. Lynch's authority over Autonomy and his control.  There is one profanity in the last sentence – Lynch actually censured himself – but whatever the level of crassness the probative value is extraordinarily high.  The Ninth Circuit repeatedly has affirmed admissions of a defendant's statements even when laced with profanity.  *See United States v. Honeycutt*, 446 Fed. Appx. 838, 839 (9th Cir. 2011); *United States v. Meling*, 547 F.3d 1546 (9th Cir. 1995).  Exclusion here is not warranted.

Second, Dr. Lynch appears to seek to exclude evidence that his wife, Angeles Bacares, owned hundreds of thousands of Autonomy shares, sold them in the HP acquisition, and made approximately $16 million.  *See, e.g.*, ECF No. 236 at 7; ECF No. 239-13 & 14 (evidencing Bacares' receipt of money in Autonomy sale).  This evidence has tendency to show that Dr. Lynch – through his spouse – actually obtained money or property from the fraud.  *See* 18 U.S.C. § 1343 (criminalizing use of wires for schemes "for obtaining money or property").  It is clearly probative.  Dr. Lynch appears to argue that he made so much money from his own sale of Autonomy shares that he could not possibly have been motivated at all by his wife's profit.  Unsurprisingly, he cites no case even close to being on point.  This argument goes to weight not admissibility.

To be clear, the government does not seek to introduce evidence of "Lynch's family's wealth."

1   But evidence that the defendant's spouse was directly enriched through the transaction the government

2   alleges was fraudulent is highly relevant to motive and intent and the elements of the offense.  If Dr.

3   Lynch seriously wishes to make the argument that a $16 million gain to his wife on account on his fraud

4   is not evidence of motive or obtaining money or property, he is free to make it to the jury.

5        Finally, Lynch appears to move to exclude evidence of a "country home or the boat owned by

6   Dr. Lynch."  The government should be able to present photos of where meetings relating to the scheme

7   to defraud occurred.

8                                    **CONCLUSION**

9        For these reasons, the Court should deny the motion.

10   DATED:  January 31, 2024                    Respectfully submitted,

11                                               PATRICK D. ROBBINS
                                                 Attorney for the United States Attorney
12                                               Acting Under Authority Conferrred by
                                                 28 U.S.C. § 515
13
                                                 *Robert S. Leach*
14                                               _____
                                                 ROBERT S. LEACH
                                                 ADAM A. REEVES
15                                               KRISTINA N. GREEN
                                                 ZACHARY G.F. ABRAHAMSON
16                                               Assistant United States Attorneys

17

18

19

20

21

22

23

24

25

26

27

28