PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7014
    Fax: (415) 436-7234
    Email: Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 18-577-CRB |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT LYNCH'S MOTION *IN LIMINE* TO ADMIT POST-ACQUISITION EVIDENCE |
| v. | |
| MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN, | Pretrial Conference: February 21, 2024<br>Trial Date: March 18, 2024 |
| Defendant. | |

## INTRODUCTION

Six years ago, deep into the trial of former Autonomy Chief Financial Officer Sushovan Hussain, the defense called a witness to the stand. The witness was Cathie Lesjak, Hewlett-Packard's top finance executive at the time of the Autonomy acquisition. Hussain's lawyer began his examination and soon the parties were arguing outside the presence of the jury about what Hussain could elicit about HP around the time of the October 2011 acquisition. "The question," the Court said in colloquy with counsel, "is the crime itself, if it did occur, it occurred *before October* [2011], and the fact that [HP] mismanaged . . .

even if it's relevant, would introduce a whole host of issues that the Court would not entertain." *Hussain* Trial Tr. 5561:4-11.

Exactly.

A year later, events in England would prove the sagacity of this Court's concerns about the unwieldy nature of a retrospective into HP's integration of Autonomy. Embarking on "a 93-day trial which [the English judge] believe[d] may rank amongst the longest and most complex in English legal history," a United Kingdom court amassed a "trial bundle containing more than 36,000 documents" and reviewed closing submissions that alone spanned almost 5,000 pages (including "in aggregate some 10,000 footnotes").[1] Such was the price of the court's inquiry into various chapters of aftermath from HP's acquisition.

This Court has made plain its desire to avoid such a scorched-earth proceeding, which would raise profound difficulties for jurors while contributing little to the determination of facts relevant to the fraud claims here. Nothing in Lynch's motion to admit post-acquisition evidence should alter that conclusion. Lynch's proffered "materiality" evidence is a retread from *Hussain* that bears minimally, if at all, on the intrinsic capabilities of Autonomy's misrepresentations. And Lynch's so-called "rebuttal" evidence marks a naked attempt to shift the blame for the Autonomy debacle to HP itself. The Court should exclude the evidence in order to preserve a manageable trial focused on the facts that jurors will have to decide.

## ARGUMENT

I. **THE COURT SHOULD EXCLUDE THE POST-ACQUISITION EVIDENCE THAT LYNCH CLAIMS IS RELEVANT TO MATERIALITY.**

   A. **Lynch's view of the law would improperly convert materiality's objective standard into a subjective one.**

Lynch's effort to make this trial about HP's treatment of his "hugely successful cash-laden company," Mot. at 14:13-16, starts from a strained reading of materiality. That reading stretches an unobjectionable notion, that industry standards matter to determining the materiality of misstatements,

---

[1] *See ACL Netherlands BV v. Lynch*, [2002] EWHC 1178 (Ch) (May 17, 2022), 2022 WL 01557021 at ¶ 7.

U.S. OPP. TO LYNCH MIL RE
POST-ACQ EVIDENCE, CASE NO. CR 18-577 CRB    2

all the way to the point of subjectivity: "[M]ateriality must be judged in relation to HP," Lynch claims. Mot. at 4:8-9. Not so: As this Court described the law after the *Hussain* trial in July 2018, "materiality is an *objective standard*, and actual reliance is not an element of any of the charges the government brought." *See* Order Denying Motions for New Trial and Judgment of Acquittal (hereinafter "*Hussain* New Trial Order") at 61:25-27, *United States v. Hussain*, CR 16-642 CRB (N.D. Cal. Jul. 30, 2018), ECF No. 419 (quoting *United States v. Lindsey*, 850 F.3d 1009, 1014 (9th Cir. 2017) (emphasis added)). "The misrepresentation need only have an objective propensity to influence its intended target." *Id*. Lynch asks the Court to turn that statement on its head—just as Hussain tried in 2018. *See Hussain* Trial Tr. 5564:13-15 ("[Mr. Keker]: The issue that we see that is raised in this case is . . . what was material to HP in buying Autonomy[.] [The Court]: I thought the real issue under the law is whether it would be material *to an objective individual* hearing the same things.") (emphasis added). Lynch relies mainly on two cases for this position—*United States v. Bogucki*, No. 18-CR-00021-CRB, 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019), and *United States v. Galecki*, 89 F.4th 713 (9th Cir. 2023). But neither case requires the admission of Lynch's post-acquisition evidence.

As this Court may remember, *Bogucki* arose from a relationship between a company (coincidentally, Hewlett-Packard) and a bank, Barclays. The government alleged that a Barclays employee defrauded HP by misappropriating its confidential information and misleading the company about whether Barclays would take advantage of what HP disclosed. At trial, the Court granted a Rule 29 motion largely due to the relationship between Barclays and HP: The two "were engaged as principals at opposite sides of an arms-length transaction," the Court explained. *See* Order Granting Defendant's Rule 29 Motion at 3:26-28, *United States v. Bogucki*, No. 18-CR-00021-CRB (N.D. Cal. Mar. 4, 2019) ECF No. 217. And Barclays, the Court said, was free to hedge in anticipation of client trades. *Id*. at 4-5. Those rules of the road, so to speak, "matter[ed] because someone in [HP's] position would evaluate the statements Bogucki made to him against [that] backdrop." *Id*. at 5:8-9.

Defendant Lynch would draw from *Bogucki* permission to do what *Lindsey* says he may not: blame a victim's negligence for falling for a fraud. *See Lindsey*, 850 F.3d at 1015 ("A false statement is material if it objectively had a tendency to influence, or was capable of influencing, a lender to approve a loan. . . . This standard is not concerned with a statement's subjective effect on the victim, but only 'the

intrinsic capabilities of the false statement itself.'") (internal citation omitted). In truth, *Bogucki* tells a different story: The objective expectations of a party to a transaction—for example, the expectation that a publicly traded acquisition target would truthfully report its finances—are the critical lens through which evidence of fraud must be received.

*Galecki*—the second case invoked by Lynch to admit post-acquisition evidence—stands for the same principle. There, the Ninth Circuit considered the materiality of falsehoods related to a synthetic cannabinoid product. *See Galecki*, 89 F. 4th at 737. The product's manufacturer said that it was a "potpourri" and "not for human consumption." *Id*. But the government's trial evidence showed the product's "purchasers *all understood*, and were in on, the charade" and knew that the product could be smoked. *Id*. at 738 (emphasis added). That evidence consisted of testimony from various industry representatives about the state of knowledge about the "potpourri" *within the industry generally*. *See id*. (citing sales employee's testimony that "when she used the words 'spice or incense or potpourri' to refer to Zencense's products on sales calls to retailers, they 'knew what you were talking about.'"). The case hardly stands for—and indeed disclaims, *see id*. at 737—the proposition that the subjective knowledge of a single listener can render a falsehood immaterial.

Time and time again, the Ninth Circuit has rejected that contention, which would transform materiality into a subjective standard. *See, e.g.*, *Lindsey*, 850 F.3d at 1015 ("That the lenders here might have intentionally disregarded Lindsey's false statements has little relevance to whether those statements are intrinsically able to influence a decision."), *United States v. Farrace*, 805 F. App'x 470, 474 (9th Cir. 2020) ("The excluded evidence Farrace identifies pertains to the individual lenders' specific behavior and actual reliance on Farrace's statements, which are irrelevant to the materiality inquiry."), *United States v. Kuzmenko*, 775 F. App'x 272, 274 (9th Cir. 2019) ("[N]either individual victim lender negligence *or an individual victim lender's intentional disregard of relevant information* are defenses to wire fraud") (emphasis added).

Nor is it necessary to adduce Lynch's post-acquisition evidence to *rebut* the government's position that Autonomy's misrepresentations were material: As this Court explained in its order denying Hussain's new trial motion, the defense's task will be "to put on evidence that would tend to rebut or impeach the assertions of not only the HP witnesses but also the market analysts who testified that

U.S. OPP. TO LYNCH MIL RE
POST-ACQ EVIDENCE, CASE NO. CR 18-577 CRB     4

Autonomy's misrepresentations regarding its software sales were material— that is, increased the company's perceived value." *Hussain* New Trial Order at 62:14-17; *accord Lindsey*, 850 F.3d at 1016 ("Among other things, defendants can disprove materiality through evidence of the lending standards generally applied in the mortgage industry. . . . As long as defendants do not stray into evidence of the behavior of individual lenders . . . defendants may attack materiality though industry practice."). Put simply—adopting the right materiality standard leaves plenty of room for the defense.

### B. Evidence of HP executives' post-acquisition reactions to hardware revelations are not relevant to the materiality of Autonomy's misstatements.

Framed by these precedents, the post-acquisition reactions of HP executives such as Cathie Lesjak and Manish Sarin are not relevant to the materiality of Autonomy's falsehoods. *See* Mot. at 4-5. Indeed, the Court rejected a similar argument for adducing this evidence in *Hussain*: "Allowing the defense to argue that HP did not react to the news of hardware sales with sufficient surprise . . . would have produced a mini-trial on the issue of what HP learned when, how it reacted, and why[.]" *Hussain* New Trial Order at 64:5-9. Just so here. What's more, the record shows that the evidence proffered by Lynch would not lead to the inferences claimed.

Take Sarin, for example: Lynch wants to introduce a November 2011 e-mail thread between Sarin and an HP employee named Kathryn Harvey. *See* Mot. at 5:6-13. In the thread, Harvey tells Sarin that she "just learned" that Autonomy had "approx. $100M/ year in revenue coming from the sale of Dell HW products." *Id*. (quoting Trial Ex. 2451). Lynch now claims that Sarin "expressed no surprise or concern" at this e-mail, Mot. at 5:10, but overlooks the fact that Sarin's response *proves* that he did not know about Autonomy's naked hardware resales. *See* Declaration of Zachary G.F. Abrahamson in Support of the United States' Opposition to Defendant Lynch's Motion *in Limine* re: Post-Acquisition Evidence (filed herewith), Ex. A (Trial Ex. 2451) ("[Autonomy is] a predominantly software company with *little to no services or hardware*.") (emphasis added). Indeed, the Court drew this "contrary" inference from Sarin's response when the issue arose in *Hussain*: "This [e-mail] *does not suggest that Sarin 'knew the truth' about the hardware sales*—indeed, it suggests the contrary." *Hussain* New Trial Order at 63:21-22 (emphasis added).

Lynch's proffer regarding Lesjak's reaction is weaker still. Lesjak was less involved than Sarin

1  in HP's diligence of and negotiation with Autonomy, later testifying that HP's mergers team at the time
2  reported up to Chief Technology Officer Shane Robison—not to Lesjak. *Hussain* Trial Tr. at 5577:18-
3  25. So any inference about materiality that Lynch wants to take from Lesjak's understandings of
4  Autonomy is attenuated and would be subject to questions of whether—and, if so, to whom—Lesjak
5  conveyed her pre-acquisition understandings about Autonomy. As for the specific document that Lynch
6  brandishes as evidence that Lesjak knew about hardware, the record is clear and does not support Lynch:
7  In mid-November 2011, Ernst & Young sent HP a four-page PowerPoint deck ("Q4 EY CFO Session")
8  covering various business units within HP that included as one of four bullets on Autonomy, "Revenue
9  includes $115M of hardware." *See* Abrahamson Decl., Ex. B. That was it. The deck did not explain the
10 source of the "hardware" revenue, its customer composition, or the fact that Autonomy made those sales
11 at a loss. *Id*. So Lesjak—as she later told investigators in 2014—assumed that the comment referred to
12 appliances (roughly, hardware preloaded with software and intended for use primarily with that
13 software). *See* Abrahamson Decl., Ex. C at 10 (Report of Interview of Catherine Lesjak). Naked
14 hardware resales, Lesjak told investigators, would have raised concerns—and did, when Lesjak learned
15 of them through Joel Scott's May 2012 disclosures. So the November 2011 [Ernst& Young] "CFO
16 update" hardly changes the picture on the materiality of Autonomy's lies. It should be excluded.

**C. Evidence of HP's post-acquisition valuations of Autonomy is not relevant to materiality and should be excluded under Rule 403.**

19   Lynch claims that post-acquisition valuations of Autonomy—including valuations that HP
20 prepared and valuations that others did on HP's behalf—support an inference that "the accounting
21 irregularities were either known *to HP*, and/or were not material *to HP*." Mot. at 6:16-22 (emphasis
22 added). But as this Court knows, that's not the point—and anyway, the valuations do not support that
23 inference. They should be excluded under Rule 403.
24   HP's post-acquisition valuations do not produce the clean inference that Lynch submits and so
25 would lengthen the trial and confuse jurors. For example, Lynch's motion claims that one of HP's post-
26 acquisition valuations pegged Autonomy's worth at $13.7 billion. Because $13.7 billion exceeds
27 Autonomy's sale price, Lynch argues, the valuation shows that Autonomy's fraud was immaterial. *See*
28 Mot. at 5:25-6:4. But Lynch is comparing apples and oranges: HP had *valued* Autonomy pre-acquisition

at *$17 billion*—more than $3 billion over what the company thought Autonomy was worth once it started to investigate Lynch's fraud.[2] *See* Abrahamson Decl., Ex. C at 4. More to the point for this motion, introducing HP's post-acquisition valuations of Autonomy will require testimony from their creators about (at least) the scope of the exercises undertaken, assumptions underlying those exercises, and the extent to which market events or other unrelated factors influenced HP's post-acquisition view of Autonomy. Each post-acquisition valuation is its own can of worms and offers limited insight into how Autonomy's misstatements would have influenced an objective acquirer. They should be excluded.

### D. Evidence of Ernst & Young's reaction to HP's Autonomy write-down is not relevant to materiality and should be excluded under Rule 403.

Almost as an afterthought, Lynch asks to introduce evidence of Ernst & Young's reaction to HP's Autonomy write-down. *See* Mot. at 6:7-12. The Court should reject that request: The government does not plan to introduce evidence of the size of HP's Autonomy write-down. So the rebuttal value of Ernst & Young's response will be highly attenuated and require the introduction of entirely new events just to situate the response for the jury. Nor is the firm's chosen phrase—"materially impact"—some magic password for admitting the memorandum. The accounting definition of "material" differs from the definition that this jury will employ when deciding Lynch's guilt, and introducing competing definitions will confuse jurors and require extensive clarifying testimony. The Ernst & Young evidence should be excluded.

## II. THE COURT SHOULD EXCLUDE THE IMPROPER "REBUTTAL" EVIDENCE THAT LYNCH PROFFERS.

Beyond the purported "materiality" evidence discussed above, Lynch seeks to admit a kitchen sink of so-called "rebut[tal]" evidence about Autonomy's post-acquisition integration with HP. *See* Mot. at 7-13. That proffered evidence—which ranges from general accusations of mismanagement by HP to specific post-acquisition statements by third parties involved in the Autonomy fallout—should be

---

[2] The Court's observation in the context of hardware sales is instructive here: "If a reasonable buyer in HP's position would still have acquired Autonomy even if it had known of the hardware sales, *but would have paid less*, then the misrepresentations regarding hardware sales were material." *Hussain* New Trial Order at 63:2-5 (emphasis added).

largely excluded for a host of reasons.[3] Most importantly, the government does not intend to introduce evidence of the magnitude of HP's $8.8 billion writedown of Autonomy. So there will be no blame regarding a "massive multi-billion-dollar loss," Mot. at 7:27, for Lynch to rebut.[4] Evidence of HP's post-acquisition operational successes or failures, therefore, would only confuse jurors and prolong the trial. Below, the government addresses the various categories of evidence that Defendant Lynch proffers as his purported "rebut[tal]."

### A. The Court Should Exclude Defendant Lynch's Proffered Evidence of HP's "Integration Failures" in Early 2012.

The first category of so-called "rebut[tal]" evidence that Lynch describes relates to Autonomy's performance in early 2012. *See* Mot. at 9:1-16. Per Lynch, the company—then operating as a subsidiary of HP—underperformed because HP purportedly "failed to execute" a planned integration and bungled Autonomy's sales strategy. *Id*. This evidence should be excluded.

First, Lynch's purported "integration" evidence provides no insight into pre-acquisition facts that the jury must find: Lynch does not explain, for example, what inference jurors can draw about Lynch's pre-acquisition intent from the success or failure HP's Autonomy integration. The same goes for Lynch's purported evidence about HP's sales strategy.[5] Those relevance concerns drove this Court in *Hussain* to exclude evidence about HP's integration. *See Hussain* New Trial Order at 66:15-24 ("The relevance of this [extrinsic evidence relating to HP's integration of Autonomy and its failure to properly manage other acquisitions] is highly attenuated."). Indeed, as the Court observed then, "even a

---

[3] The government does not object to the admission of a July 2011 pre-acquisition cash flow model developed by HP in connection with due diligence. *See* Mot. at 8:7-24. But the government would object to the admission of evidence related to the attempted integration of Autonomy and HP's Vertica division after the deal's close.

[4] The government may, however, still describe Autonomy as "a Pinto" masquerading as "a Cadillac": Calling juror attention to a pre-acquisition discrepancy—between the story that Autonomy provided to HP and the truth at the time—is not the same as introducing the fallout from that discrepancy. The Court should not find that the door to post-acquisition evidence has opened whenever the government calls attention to the pre-acquisition magnitude of Autonomy's fraud.

[5] Compounding the problem, Lynch provides no description of what this purported evidence *is*—Lynch's own testimony, e-mails sent by HP employees, or testimony that Lynch expects to elicit from government witnesses. Given that lack of specificity, the government fears that each line of argument could necessitate a substantial response in the form of additional witnesses, extended re-direct examinations, or new exhibits.

U.S. OPP. TO LYNCH MIL RE
POST-ACQ EVIDENCE, CASE NO. CR 18-577 CRB    8

successful integration of Autonomy into HP would have been consistent with a finding that Hussain had committed fraud." *Id*. at 66:23-24. The evidence should be excluded.

### B. The Court Should Exclude HP's Post-Acquisition Valuations of Autonomy.

Evidence of HP's post-acquisition Autonomy valuations should also be excluded. Lynch describes this evidence as "interna[l] conclu[sions] that Autonomy was worth *more* than what HP had recently paid for it," Mot. at 9:19-20, and alludes elsewhere to valuations "created for HP by its consultants and auditors." Mot. at 5:22-24. As with other evidence proffered by Lynch, his broad-brush description of these valuations makes it difficult to assess their evidentiary import. But if Lynch is referring to work by Duff & Phelps, Economic Partners, or Ernst & Young, the Court heard this argument in *Hussain* and properly excluded the valuations. *See Hussain* New Trial Order at 67:13-68:12. As the Court said then, the purchase-price accounting prepared by Duff & Phelps and Economic Partners "took [Autonomy's] purchase price for granted in determining how to allocate that price" on HP's books. *Id*. The consultants "did not claim to reach a conclusion regarding whether the price was a fair or 'correct' one." *Id*. So the post-acquisition valuations have marginal relevance, and would require substantial accounting testimony to contextualize and explain. They should be excluded.

### C. The Court Should Exclude Defendant Lynch's Purported "Scapegoat" Evidence, Including Evidence of HP's Fall 2012 Impairment and Write-Down.

The Court should also exclude Lynch's purported evidence that HP "determined to scapegoat Autonomy for its own performance." Mot. at 9:27-11:6. Lynch does not even *attempt* to connect this evidence to some fact that would be relevant to the jury's adjudication of Lynch and Chamberlain's fraud. Absent from Lynch's argument is any explanation of how HP executives' fall 2012 deliberations shed any light on Defendants' pre-acquisition conduct or state of mind. As stated above, the government does not intend to adduce evidence of HP's write-down—with that line drawn, there is nothing for Lynch's supposed "scapegoat" evidence to rebut. Its introduction will only lengthen the trial and confuse the jury.

//
//

### D. The Court Should Exclude Evidence of HP's Deliberations About the November 2012 Write-Down, Including Ernst & Young's Views Thereon.

Lynch also seeks to admit evidence of HP's November 2012 Autonomy write-down and Ernst & Young's participation therein. The firm, Lynch claims, "disagreed with HP's stated reason for the write-down" and objected to language in an associated press release. Mot. at 11:7-22. Lynch claims that this evidence will rebut the government's description of the Autonomy acquisition as "disastrous," *id*. at 11:23-24, but—as the government has made clear—it has no intention of offering such a description.

Not only that, the admission of Ernst & Young's November 2012 memo would open a Pandora's box of evidence and add substantially to the trial. Faced with EY's memorandum, the government would have no choice but to provide the jury with context for how the memorandum came to be and evidence about the limits of its scope. Into the trial would come testimony about HP's decision to write down Autonomy, expert opinion about the principles driving such an exercise, and witnesses to testify about both the scope of EY's engagement and the ultimate propriety of the firm's conclusions—all to prove what, exactly, about acts done and statements made between one and three years earlier? The evidence about Ernst & Young's participation in the November 2012 write-down should be excluded.

### E. The Court Should Limit Evidence Proffered by Lynch to Impeach the Restatement Prepared by Christopher Yelland.

Lynch's final category of "rebut[tal]" evidence relates to the January 2014 restatement of Autonomy Systems Limited's accounts by Christopher Yelland. *See* Mot. at 12:6-13:12. Lynch seeks to introduce—as did Hussain—evidence that Yelland corresponded with employees of various firms involved in the Autonomy investigation while preparing his restatement. The government acknowledges that the Court admitted aspects of this evidence during Yelland's cross-examination in *Hussain*. But the government also notes that the Court ensured that Yelland could provide complete answers about the roles that those firms played and the context for their engagement. *See*, *e.g.*, *Hussain* Trial Tr. 5195-96 (Yelland testifying to back-and-forth with Morgan Lewis regarding rights of UK auditor to investigative information), 5199-200 (Yelland testifying to specific accounting usage of the term, "error," as opposed to the term, "misstatement").[6] The government respectfully requests that the Court take similar steps to

---

[6] As the Court later explained after Yelland responded to a question about Autonomy's 2011

preserve the integrity of Yelland's testimony here—or permit the government to do so on re-direct.

Finally, the government notes that the Court in *Hussain* appropriately cabined this impeachment evidence by precluding questions far afield of the restatement's inputs and mechanics. *See*, *e.g.*, *Hussain* Trial Tr. 5208:2-19 (sustaining objection to question about civil fraud litigation in UK). The government requests the same judicial management of Yelland's cross-examination here. There will be ample disagreement on opinion and facts more directly relevant to the falsity of Autonomy's representations—the Court should keep the scope of restatement-impeachment evidence narrow.

### III. THE COURT SHOULD LIMIT THE POST-ACQUISITION EVIDENCE PURPORTEDLY RELEVANT TO DEFENDANT LYNCH'S INTENT.

Lynch's last category of post-acquisition evidence relates to intent. The first part of this is well-trod ground: Lynch seeks to adduce evidence that Autonomy's books and records went to HP with the acquisition. Mot. at 14:1-12. That fact, Lynch says, is inconsistent with the allegation that Lynch intended to deceive HP through false accounting and other statements. *Id*.

The parties in *Hussain* dealt with this argument by stipulation: The government agreed that HP received Autonomy's books and records immediately after the deal closed, and Hussain argued from that stipulation in closing. *See*, *e.g.*, *Hussain* New Trial Order at 64:17-26 (quoting from the defense closing in *Hussain*, "When the deal closed on October 3rd, Hewlett Packard got all the books and records of Autonomy and it got the Deloitte work papers and could review them, and those work papers and books and records clearly showed—this is the stipulation that says that—clearly showed the hardware sales. You couldn't miss it."). The Court properly observed that admitting those books and records themselves "would have required testimony regarding bookkeeping practices and what the books did or did not show, further complicating a case that was already plenty complex." *Id*. at 65:3-4. A parallel stipulation here will save time and avoid juror confusion.

But Lynch's second ask for post-acquisition "intent" evidence is more problematic. The

---

accounts, "the reason I'm giving witnesses latitude in explaining, . . . is to enable the jury as the testimony comes in to gather -- to have a context and an explanation as to these statements because the Court feels that it is essential in this case, which is so -- which is an accounting case in many respects and not necessarily the familiar subject of any of us, that they get evidence in the context so that they can evaluate it properly." *Hussain* Trial Tr. 5222-23.

1  "explan[ations]" previewed by Lynch regarding HP's integration of Autonomy, Lynch's termination
2  from the company, and corporate politics following the exit of former HP CEO Leo Apotheker simply
3  have no bearing on the elements of the frauds alleged.[7] Like much of the post-acquisition evidence
4  discussed above, admitting Lynch's testimony about Autonomy's integration would open so many doors
5  that the jury would stay impaneled into June. That's also true of Lynch's proffered testimony regarding
6  "rumors" that "falsely impugn[ed]" him in the spring of 2012. *See* Mot. at 14:24-26. Describing those
7  rumors, examining their sources, and testing their veracity threatens a goose-chase through multiple
8  levels of hearsay and witnesses as-yet-unnamed. Such a digression should be precluded here—where
9  what matters is what Lynch knew about Autonomy's business practices, when he knew it, and what he
10 did with that information.

11    Finally, the Court should exclude Lynch's proffered testimony about HP's November 2012
12 write-down for the reasons given above in connection with other write-down evidence. *See* Mot. at
13 15:12-19. In a nutshell, the government will not open the door to the write-down's size because loss
14 isn't an element of fraud. *See Hussain* New Trial Order at at 66:19-24 ("Actual reliance and loss
15 causation are not elements of criminal fraud charges[.]"). Accordingly, and in the interest of juror time,
16 the Court should preclude Lynch's proffered testimony about HP's write-down.

## CONCLUSION

18    The Court should deny Defendant Lynch's motion *in limine* to admit post-acquisition evidence
19 for the reasons stated above.

---

[7] Indeed, Lynch's proffered explanations about how "Autonomy became essentially an unwanted stepchild," Mot. at 14:19, suggest that Lynch—like Hussain—may "improper[ly] attempt[] to encourage the jury to decide [his] guilt by weighing the relative culpability of [the defendant] and HP." *Hussain* New Trial Order at 60:8-10. The Court should preclude any Defendant's attempt to do so.

| | | |
|---|---|---|
| 1 | DATED: January 31, 2024 | PATRICK D. ROBBINS<br>Attorney for the United States Attorney<br>Acting Under Authority Conferrred by<br>28 U.S.C. § 515 |
| 4 | | By:     /s/ Zack Abrahamson<br>ROBERT S. LEACH<br>ADAM A. REEVES<br>KRISTINA N. GREEN<br>ZACHARY G.F. ABRAHAMSON<br>Assistant United States Attorneys |