PATRICK D. ROBBINS (CABN 152288))
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6912
    Fax: (415) 436-7234
    Email: Robert.Leach@usdoj,gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-577 CRB |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANTS' JOINT MOTION *IN LIMINE* NO. 6: TO PRECLUDE USE OF MISLEADING ACCOUNTING-RELATED TERMINOLOGY AND IMPROPER HYPOTHETICAL QUESTIONS |
| v. | |
| MICHAEL RICHARD LYNCH AND STEPHEN KEITH CHAMBERLAIN, | |
| Defendants. | Pretrial Conference: February 21, 2024, 2 p.m.<br>Trial Date: March 18, 2024 |

## I. INTRODUCTION

Defendants Dr. Michael Richard Lynch and Stephen Chamberlain move for an order to preclude "inaccurate and prejudicial use of accounting terminology" and to prohibit the government from asking certain questions about hypothetical scenarios. *See* Defendants' Motion *in Limine* No. 6, ECF No. 292 ("Def. Mot."). Defendants cannot try to sanitize the trial by muzzling witnesses and the government from using terminology that Defendants do not like. Furthermore, Defendants cannot prohibit the government from asking witnesses questions that bear on relevant issues in dispute because they hope to avoid the jury hearing answers that are detrimental to their case. The Court did not impose such bars in *Hussain* and should not do so here.

## II. ARGUMENT

Defendants have seemingly combed through the *Hussain* trial transcripts, found terminology and hypothetical questions that they believe hurt their case, and now seek an order from the Court barring the government and witnesses from using those terms and asking those questions. *See* Def. Mot. 1–15 (requesting prohibition on use of terms including "side letters", "inflated hardware revenue", "organic growth", "channel stuffing", "dark period", "reciprocal", and "round-trip"). The Court should reject Defendants' efforts to sanitize the trial by precluding the government and witnesses from using appropriate terminology and asking relevant questions.

The terminology Defendants seek to proscribe are terms that witnesses and Autonomy employees have used and with which they are familiar. To cite just a few examples:

(a) Christopher Yelland testified using the term "reciprocal" to describe a transaction. *Hussain* Tr. 5904:12–16 ("Q: Today do you have a recollection of the reason why the adjustment for Capax EDD was necessary? A. Yes, because it was reciprocal with a purchase from Capax Discovery, which on examination we found didn't really have economic substance.");

(b) Stouffer Egan testified as to his understanding of "quid pro quo", "reciprocal", and "round-trip" deals. *Hussain* Tr. 2008:6–24 ("Q: What is a quid pro quo deal? A: A deal where there are two components to the deal: One where we would sell something to the customer and one where we would buy something . . . do a reciprocal or opposite transaction, usually buying something from them….");

(c) Daud Kahn testified about Autonomy's "organic growth" and his understanding of that term. *See, e.g.*, *Hussain* Tr. 2990:6–2991:9 ("So very simply put at a very high level, I questioned the organic growth at the company and whether they were overstating profits in the company because profits were not matching cash . . . .  Q: Can you give us a very brief - - what do you mean by organic growth, to start with?  A: So companies that make no acquisitions from one period say, from a Q1 in one year to a Q1, Quarter 1, in another year, if there is no acquisitions, that's pure organic growth, so there is no implications of other  - - other acquisitions or anything else that can disrupt the calculated amount of growth.  So a company grows from a hundred million one year to 120 million another year, that's 20 percent growth.");

(d) Deloitte used the term "side letters" in its reports to Autonomy's Audit Committee.  *See, e.g.*, Declaration of Kristina Green In Support of United States' Opposition To Defendants' Joint Motion In Limine # 6 ("Green Decl."), Ex. A, at 24 ("Management confirm . . . that there were no side letters or arrangements in respect of this sale or use of any of its proceeds."); Green Decl. Ex. B, at 5 ("Management has confirmed that no revenue deals contained side letters or ongoing Autonomy performance requirements that were excluded from the signed sales contracts").  Witnesses from Deloitte confirmed their understanding of the term "side letter" when they testified.  *See, e.g.*, *Hussain* Tr. 3114:5–11 (Antonia Anderson discussing her understanding of the side letter clause cited in Ex. A, above);

(e) Mr. Hussain requested a "side letter" in an email to a reseller.  *See* Green Decl. Ex. C ("I also need a side letter (which will be disclosed) that has that in the highly unlikely event that kpmg do not extend then tikit can resell similar software . . . .")

(f) Steve Chamberlain used the term "side letters" in customer confirmation letters seeking confirmation of transactions for Autonomy to provide to Deloitte.  *See, e.g.*, Green Decl. Ex. D ("The items listed above were properly charged to our account and were unpaid as of 30th November 2009 and there are no side letters or other agreements in respect of the subject matter of this request . . . .");

(g) Brent Hogenson emailed Steve Chamberlain and Sushovan Hussain about the "serious issues of side letters that have impacted about 90% of software company restatements in the past," attaching a "Sales_Rep_Letter" about side letters, and asking if he should continue the process of having his team

2

sign this letter at the end of the quarter or discontinue. Mr. Chamberlain responded, "Discontinue. We only do this on an annual basis." *See* Green Decl. Ex. E;

(h) Autonomy's management representation letters to Deloitte for their annual audit of financial statements used the term "side letters." *See, e.g.*, Green Decl. Ex. F, at 2 ("**Specific Representations** . . . "No revenue deals containing side letters of ongoing Autonomy performance requirements that were excluded from the signed sales contracts.");

(i) In November 2009, Mr. Chamberlain noted in his notebook that he discussed or wished to discuss with Dr. Lynch "circular transactions", including "VMS, Microlink and Capax" and other "bad" business deals including "early rev rec." Green Decl. Ex. G;

(j) Autonomy used the term "organic growth" in providing background information to Manish Sarin, an employee of HP, before the HP/Autonomy acquisition closed. *See* Green Decl. Ex. H. Mr. Sarin testified about his understanding of "organic growth". *Hussain* Tr. 3477:15–19 ("What I mean by that is the sale of Autonomy's products - - that is not the products that they acquired, but Autonomy's products");

(k) Marc Geall used the term "channel stuffing" in describing a situation where a reseller had not sold product on to an end customer and explained his understanding of the term. *Hussain* Tr. 899:23–900:17 ("A: It would imply channel stuffing. . . . Channel stuffing is recognizing revenues before the customer or the end customer has received the product. Q: Why is - - why is that an issue? A: Because there's a risk that the customer never pays for the product, and you never actually receive the revenues."); and

(l) Christopher Yelland testified using the term "dark period" and explained that he understood that term to mean "the period between July and September of 2011. It's a period in which the results of Autonomy are not published." *Hussain* Tr. 5116:15–24.

Witnesses are entitled to testify about facts and records they personally observed, using terms they deem appropriate and with which they are familiar. FED. R. EVID. 602. In addition, inferences drawn from such observations are admissible as lay opinion testimony where the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized

3

knowledge within the scope of Rule 702." FED. R. EVID. 701.  Moreover, use of a particular term by a witness with personal knowledge of the term, based on his or her own understanding of the term, does not shift a lay witness' testimony into inadmissible "expert opinion" testimony.  *See, e.g.*, *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) ("A witness's specialized knowledge . . . does not render his testimony 'expert' as long as it was based on [facts personally perceived] and was not rooted exclusively in his expertise").  In addition, the government is permitted to describe in its opening statement evidence that the jury will hear through witness testimony or observe in admitted records.  The government is also permitted to use terms in its closing argument that fairly describe the evidence admitted at trial.

        Defendants argue that the use of certain accounting-related terms by non-expert witnesses will confuse and mislead the jury and cause undue prejudice.  *See e.g.*, Def. Mot. 8, 11.  That argument lacks merit.  To the extent the terms are used by non-expert witnesses, Defendants can establish on cross-examination the basis for the witness's understanding of the terms and elicit testimony either on cross-examination or through their own witnesses regarding alternative meanings of the terms.  It is up to the jury to decide how much weight to assign the witnesses' testimony and how to balance potentially conflicting views of certain transactions.

        Defendants also make *ipse dixit* assertions about the facts—issues that are within the province of the jury to decide—and then proceed to argue that because, in their opinion, certain types of transactions did not happen, the government and its witnesses should be precluded from using terms to describe those transactions.  *See, e.g.*, Def. Mot. 11 ("[Channel stuffing] did not occur here.  Resellers purchased Autonomy software when the risk of owning the product was mitigated by the prospect of a sale to an already-identified end-user.  No channel was blindly stuffed full of unwanted product, and no revenue was recognized unless Autonomy determined, with Deloitte's review and approval, that the reseller's debt was collectible."); *id.* at 14–15 ("There was nothing hidden or 'buried' from HP during the so-called dark period when Autonomy's books were prepared for the transition to HP.  To avoid such an inaccurate suggestion, the government and its witnesses should be instructed not to use the term 'dark period' at all."); *id.* at 8–9 (arguing there were no side agreements that altered the terms of contracts between the parties and to the extent side letters did exist they were not enforceable).  Defendants' conclusory assertions about what the evidence does or does not show cannot serve as a basis to bar

4

witnesses from using terms to describe events merely because, in Defendants' opinion, those events did not occur.

If Defendants are concerned about potentially misleading or confusing testimony, the appropriate cures are objections or cross-examination at trial, not a prophylactic bar. In *United States v. Makras*, the Honorable Richard Seeborg of the Northern District of California established this point in ruling on defendant's motion to prohibit the government from using the word "backdated" to describe a straight-note modification of a loan document that was created and signed in 2014 but which bore a date of December 2, 2013. No. 21-CR-402 RS. During a pretrial hearing on this motion, Chief District Judge Seeborg pointed out that defense counsel was free to use a different term and could "just deal with this on cross-examination." Green Decl. Ex. I, at 32–33. Chief District Judge Seeborg refused to preclude the government from using terms consistent with its theory of the case merely because the defendant argued those terms may have nefarious connotations:

> **The Court:** The Government has a theory. It was nefarious backdating. You think it was benign retroactive dating. I understand. The side can argue that. But the notion that the Government can't say the term because it suggests their theory of the case is a bit ridiculous because that's what they are saying. That's their contention in this case. . . .
>
> **[Defense Counsel]:** Let me respond. It is misleading and confusing in this case and should be, therefore, excluded under Rule 403 because this isn't the kind of case where the date has any real value. It doesn't give rise to a criminal act.
>
> **The Court:** That is something you can elicit in your examination. The idea that the Government - - that is almost as if saying, well, the Government can't say they are charging this Defendant with conspiracy. They are. And you are saying there is no conspiracy here. I mean, that - - so saying the Government can't use terms that suggest there was nefarious activity, I have something to tell you, they are claiming there was nefarious activity. So you know. I don't - - protecting you from a term the Government is using. I don't know if that's warranted. I understand the argument."

Green Decl. Ex. I at 33–34. Chief District Judge Seeborg's written order on defendant's motion was consistent with his views at the pretrial hearing. *See* Green Decl. Ex. J, at 3 ("The motion is denied. Makras is free to argue that it is not automatically misleading or otherwise wrongful to place a date on a

document that is earlier than when it was actually signed or an agreement was actually formed, and he is free to argue that it was not misleading or otherwise wrongful in this instance.").

This Court similarly declined defendants' request to prohibit the use of the term "backdating" in a stock-option backdating case that was before this Court in 2007. *See United States v. Reyes*, No. 06-556 CRB, ECF Nos. 218, 253. In *Reyes*, the Court provided a jury instruction explaining that "backdating" in and of itself is not a violation of criminal law. *See* Green Decl. Ex. K.

There is nothing unduly prejudicial, confusing, or misleading about the terms Defendants seek to exclude. Terms such as "reciprocal", "channel stuffing", "round-trip", and "inflated revenue" are all commonly used and easily understood terms that are well supported by the evidence. Indeed, they are far more probative than prejudicial and succinctly describe the variety of transactions undertaken by Autonomy. The defendants' motion to sanitize terminology that is well-supported by the record should not be countenanced. The government should be free to argue its theory of the case using words supported by the evidence, and Defendants are free to argue that there is no criminal activity suggested by the contested terms and to cure any purported discrepancies in the meaning of terms through cross-examination.

Finally, the Court should reject Defendants' request to bar questions about how witnesses might have reacted to various pieces of evidence. *See* Mot. at 15. Defendants describe these questions as "improper and prejudicial hypothetical questions" that "lack probative value." *See* Def. Mot. at 15:4-10. Not so: As the record from *Hussain* demonstrates, there is tremendous probative value in carefully tailored questions about the impact that specific evidence would have had on the specific acts of a witness. Nor are such questions precluded by law. Defendants' motion to exclude hypothetical questioning should be denied.

The Ninth Circuit and sister circuits have repeatedly affirmed the use of hypothetical questions in fraud trials. *See generally, e.g.*, *United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010) (district court overseeing securities fraud trial did not abuse discretion by allowing hypothetical questioning of fact witnesses to prove materiality); *United States v. Woods*, 335 F.3d 993, 997 (9th Cir. 2003) (noting victim testimony that "they would not have sent money to [telemarketer defendant] had they known it was for the purchase of magazines"); *United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013) ("As this

case illustrates, 'what-if-you-had-known' questions that present withheld facts to a witness are especially useful to elicit testimony about the impact of fraud."). In a fraud case such as this, the relevance of hypothetical questioning is obvious: The jury will have to find whether a defendant's fraudulent representations "were capable of influencing[] a person to part with money or property." Ninth Circuit Model Criminal Jury Instr. 8.124 (Wire Fraud). Thus, the government must be permitted introduce evidence that shows that an objective acquirer would view the facts in question as important to its purchase calculus.

Consistent with this authority, the government *and* the defense[1] in *Hussain* asked hypothetical questions to elicit relevant testimony. For example, former Deloitte auditor and Autonomy employee Antonia Anderson was asked about recognizing revenue from resold EMC hardware:

> [Mr. Leach]: If EMC had not shipped hardware with a purchase price of 5 million on or before June 30th, 2009, would that be relevant to your assessment of whether revenue was appropriately recognized?
>
> [Ms. Anderson]: Yes. It would have been relevant, yes.
>
> [Mr. Leach]: Why is that?
>
> [Ms. Anderson]: Because if the -- if that hardware hadn't been dispatched by that date, the revenue criteria wouldn't have been that. So the revenue on the deal shouldn't have been in the quarter.

*Hussain* Trial Tr. 2947:16-24.

Later in the trial, another Deloitte auditor—Lee Welham—was asked about a backdated deal between Spanish media company, Prisa, and DiscoverTech, an Autonomy reseller, that Autonomy recognized in 2011's first quarter. *See Hussain* Trial Tr. 3985:17-25. Welham said that he had not known about the backdating, at which point the government asked "[i]f this Discover Tech/Prisa transaction were agreed to in [the second quarter of 2011], would it be appropriate to recognize revenue?" *Id*. "No," Welham replied. *Id*.

A final example comes from the testimony of former Hewlett-Packard CFO Cathie Lesjak, the

---

[1] Examples of hypothetical defense questioning can be found in the testimony of, among others, Manish Sarin, *see Hussain* Trial Tr. 3669:24-3670:11 (asking "if hardware was not a major product category for Autonomy, it would be reasonable for them to assume that you were not interested in that category?"); and Leo Apotheker, *see id*. at 3831:11-18 (asking whether a bank sale comprising "millions and millions of dollars, and now you sell them hardware to put your software on" would constitute an "appliance").

lone witness called by the defense in *Hussain*. Near the close of Lesjak's cross-examination, the government asked, if Lesjak had known that "[Autonomy's] financial statements were overstated," would she have felt concerned? "Absolutely," Lesjak responded, "And I'm confident that if I had known about the fraud and that [former HP CEO] Leo [Apotheker] had known about the fraud, we wouldn't have done the deal." *Hussain* Trial Tr. 5581:14-19. Responses like these constitute competent testimony and are highly probative of the elements of the charges here.

Defendants' concerns with the types of questions employed in *Hussain*—and contemplated here—are misplaced. Defendants' first, unsupported contention—that hypothetical questions will always produce the government's desired response, *see* Def. Mot. at 15:14-17—is specious: Witnesses swear an oath to tell the truth, and Defendants' give no reason to suspect that responses to hypothetical questions will be anything other than truthful. Meanwhile, the lone case that Defendants cite—*Active Sports Lifestyle USA LLC v. Old Navy*, LLC, 2013 WL 11239385, at *9 (C.D. Cal. Nov. 21, 2013)—supports the government: There, the district court considered whether to admit a lay witness's testimony about a hypothetical case of trademark infringement. *Id*. Addressing specifically whether a lay witness could competently respond to hypotheticals, the court wrote that the testimony's proponent "appear[ed] to have the better of the argument on this issue," *id*., before limiting the testimony on other grounds. *Id*. Finally, the government has no intention of posing "anything's possible" hypotheticals. Carefully tailored questions about what witnesses would have done in response to specific evidence will contribute significantly to the jury's understanding of this case. They should be permitted.

**III.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny Defendants motion *in limine* to preclude the use of accounting-related terminology and hypothetical questions.

//
//
//
//
//

8

| | | |
|---|---|---|
| 1 | DATED: January 31, 2024 | Respectfully submitted, |
| 2 | | PATRICK D. ROBBINS |
| 3 | | Attorney for the United States Acting under Authority Conferred by 28 U.S.C. § 515. |
| 4 | | |
| 5 | | |
| 6 | | /s/ *Kristina Green* |
| | | ROBERT S. LEACH |
| 7 | | ADAM A. REEVES |
| | | KRISTINA GREEN |
| 8 | | ZACHARY G.F. ABRAHAMSON |
| | | Assistant United States Attorneys |