1  PATRICK D. ROBBINS (CABN 152288))
   Attorney for the United States
2  Acting Under Authority Conferred by 28 U.S.C. § 515

3  MARTHA BOERSCH (CABN 126569)
   Chief, Criminal Division
4
   ROBERT S. LEACH (CABN 196191)
5  ADAM A. REEVES (NYBN 2363877)
   KRISTINA N. GREEN (NYBN 5226204)
6  ZACHARY G.F. ABRAHAMSON (CABN 310951)
   Assistant United States Attorneys
7
        450 Golden Gate Avenue, Box 36055
8       San Francisco, California 94102-3495
        Telephone: (415) 436-6912
9       Fax: (415) 436-7234
        Email: Robert.Leach@usdoj.gov
10
   Attorneys for United States of America
11
                    UNITED STATES DISTRICT COURT
12
                 NORTHERN DISTRICT OF CALIFORNIA
13
                       SAN FRANCISCO DIVISION
14

15
   UNITED STATES OF AMERICA,            )   No. CR-18-577 CRB
16                                       )
            Plaintiff,                    )
17                                       )   DECLARATION OF KRISTINA GREEN IN
        v.                               )   SUPPORT OF GOVERNMENT'S OPPOSITION TO
18                                       )   DEFENDANTS' MOTION *IN LIMINE* #6:
   MICHAEL RICHARD LYNCH AND            )   TO PRECLUDE USE OF MISLEADING
19  STEPHEN KEITH CHAMBERLAIN,          )   ACCOUNTING-RELATED TERMINOLOGY AND
                                         )   IMPROPER HYPOTHETICAL QUESTIONS
20                                       )
            Defendants.                   )
21                                       )
                                         )
22  _____ )

23  I, Kristina Green, declare and state as follows:

24      1.  I am an Assistant United States Attorney for the Northern District of California assigned to

25  the prosecution of the above-captioned case.

26      2.      Attached hereto as Exhibit A is a true and correct copy of Deloitte's 2010 Interim Review

27  Report to the Audit Committee of Autonomy.

28

   GREEN DECL.
   18-CR-577 CRB                            1

3.      Attached hereto as Exhibit B is a true and correct copy of Deloitte's 2010 Q3 Review Report to the Audit Committee of Autonomy.

4.      Attached hereto as Exhibit C is a true and correct copy of an email sent from Sushovan Hussain to employees of Autonomy and Neil Araujo re: "Tikit and kpmg" on December 29, 2010.

5.      Attached hereto as Exhibit D is a true and correct copy of a letter Steve Chamberlain sent to Microlink on December 17, 2009.

6.      Attached hereto as Exhibit E are true and correct copies of emails between Brent Hogenson and Steve Chamberlain re: "Q4 2008 Sales Rep Letter.doc" sent on March 27, 2009.

7.      Attached hereto as Exhibit F is a true and correct copy of a letter sent from Autonomy to Deloitte on February 22, 2011.

8.      Attached hereto as Exhibit G is a true and correct copy of an excerpt of Steve Chamberlain's notebook.

9.      Attached hereto as Exhibit H is a true and correct copy of an email sent from Derek Brown to Manish Sarin on August 23, 2011 re: Background Information on Autonomy Organic Growth, and attaching a PDF entitled "Autonomy – Calculating Organic Growth".

10.     Attached hereto as Exhibit I is a true and correct copy of an excerpt of the pretrial conference transcript in *United States v. Makras*, 21-CR-402 RS.

11.     Attached hereto as Exhibit J is a true and correct copy of the Honorable Richard Seeborg's Order Re Motions *in Limine* in *United States v. Makras*, 21-CR-402 RS, ECF No. 109.

12.     Attached hereto as Exhibit K is a true and correct copy of the Court's jury instruction on "Backdating of Stock Options" given in *United States v. Reyes*, 6-CR-556 CRB, ECF No. 543.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

DATED:  February 1, 2024

_____/s/_____
KRISTINA GREEN
Assistant United States Attorney

# Exhibit A

Autonomy Corporation plc

Report to the Audit Committee
on the 2010 Interim Review

Final Report

DEL00057663

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0001

# Contents

Introduction                                                          1

1.      Key risks                                                     3

2.      Responsibility statement                                     14

Appendix 1: Adjustments                                              15

Appendix 2: Draft management representation letter                   16

Appendix 3: Additional matters                                       18

DEL00057664

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0002

# Introduction

We have pleasure in setting out in this document our report to the Audit Committee of Autonomy Corporation plc and its subsidiaries (together "the Group"or "Autonomy") on our review of the three and six months ended 30 June 2010 for discussion at the meeting scheduled for 20 July 2010. This report summarises the principal matters that have arisen from our review of the financial information within the half-yearly financial report for the six months ended 30 June 2010.

This introduction is not intended to be exhaustive but highlights the most significant matters to which we would like to bring to your attention. It should, therefore, be read in conjunction with the entire report and the appendices thereto.

| | |
|---|---|
| **Key findings on key risks and other matters** | We discuss within Section 1 the results of our review work in relation to key risks which have been identified as being significant to the Q2 and H1 results and press release. |
| **Review status** | We have substantially completed our review. Certain procedures remain outstanding and need to be finalised before we can issue our review opinion:<br>• Completion of our review of detailed analyses supporting the income statement;<br>• Completion of our internal review procedures including review of your press release; and<br>• Receipt of management representation letter (See Appendix 2 for suggested draft).<br>We will report to you orally in respect of any modifications to our findings that arise on completion of these matters. On satisfactory completion of the outstanding matters, we anticipate issuing an unmodified review report. |
| **Identified misstatements** | For our Q2 2010 review our materiality was $4.9 million (Q2 2009 $3.1 million, full year $20.0 million) for the quarterly income statement and $9.9 million (2009: $9.0 million) for the half year income statement. Both measures are based on profit before tax. This is consistent with the basis used to determine materiality for the previous year end audit.<br>Identified uncorrected misstatements reduce profit before tax for Q2 by $2.4 million and for H1 by $4.3 million, profit after tax by $1.8 million and $2.0 million respectively and net assets by $2.7 million and $6.0 million respectively. Management has concluded that the total impact of the uncorrected misstatements, both individually and in aggregate, is not material in the context of the financial statements taken as a whole, and we concur with their view. Details of our potential adjustments are included in Appendix 1. |
| **Accounting policies and financial reporting** | As part of our review, we consider the quality and acceptability of the Group's accounting policies and financial reporting and their consistency with the 2009 annual report. We have nothing to report in these areas. |

Report to the Audit Committee on the 2010 Interim Review Final Report  1

DEL00057665

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0003

# Introduction

| | |
|---|---|
| **Accounting and internal control systems** | As part of our review we have made enquiries of management regarding the control environment and the reliability of the management reporting process.  There were no significant changes since the 2009 year end and therefore we have not carried out any detailed testing of our understanding of internal controls. |
| | We are aware of the payroll fraud in the US, which management has engaged Kroll to investigate.  We understand that the fraud involved collusion between at least two members of the Autonomy Inc accounts team and has been perpetrated over a period of approximately five years.  Management's initial assessment is that no accounting adjustments are required to historical results because of this as the full amounts paid have been expensed. Management has set out its responses to this fraud in its paper to the Audit Comittee. |
| **Whistleblowing to the Audit Committee** | As you are aware during the past month the Head of Finance in the US has raised a number of queries over the accounting presentation for certain immaterial transactions in the 2009 accounts together with further queries over transactions which were in the process of being considered as part of the routine Q2 2010 close down process for the interim accounts.  This correspondence was sent to the Audit Committee, and ourselves, through the Group's whistleblowing process.  We have reviewed these questions and management's detailed responses and set these out, together with our responses, in Appendix 3 of this report. |
| | In summary, the challenges raised appear to arise from an incomplete understanding of the transactions in question.  It is evident that certain sensitive and/or commercial information is often only retained in the UK and is not transparent to the US finance team. As a result of not having visibility of the full facts it is possible to arrive at an incorrect interpretation of the relevant accounting treatment under International Financial Reporting Standards ("IFRS"). |
| | Management believes there are no new material facts emerging from the detailed questions and their investigation thereof and have therefore concluded that the matters raised have no material impact on the Group's 2009 financial statements.  We concur with their view. |
| | We have considered the questions posed in relation to 2010 as part of our planning for the Q2 2010 review and have addressed them where appropriate when performing our work. |
| **Independence** | In our professional judgement we are independent within the meaning of APB Ethical Standards for Auditors and the objectivity of the audit engagement partner and audit staff is not impaired. |

DEL00057666

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0004

# 1. Key risks

The results of our review procedures on key risks are set out below:

| Revenue Recognition |
| --- |

**Assumed risk of fraud in relation to revenue recognition**

Revenues for the quarter were $221 million (Q2 2009 - $195 million) and for the half year $415 million (HY09 - $325 million).

Management continues to apply a consistent approach which is compliant with IFRS to recognising revenues which includes performing credit checks, evaluating any ongoing managerial involvement and discharging obligations thereby ensuring that all of the provisions of International Accounting Standard 18, *Revenue*, ("IAS 18") have been satisfied.

As part of the Q1 2010 report to the Audit Committee, we communicated to you the key revenue deals for that quarter.  The most significant licence revenues recognised in Q2 2010 were with BP Exploration & Production Inc ($14.2 million), JP Morgan Chase ($9.1 million), Metropolitan Life Insurance Company ($7.5 million) and Tottenham Hotspur plc ($5.9 million).

Management has confirmed that no revenue deals contained side letters or ongoing Autonomy performance requirements that were excluded from the signed sales contracts.

**BP Exploration & Production Inc ("BP")**

This is a $14.2 million licence deal for an Introspect software licence. Support and maintenance has been carved out at the established fair value of 5% and in addition BP is required to pay separately for data ingestion, production and storage which has been charged at a per GB rate of $4 per GB of material introduced.  As this is a relatively unique deal, management has performed a cost plus exercise to demonstrate that the rate per GB represents a reasonable fair value.

**JP Morgan Chase ("JPMC")**

This is a $9.1 million deal with JPMC for a Zantaz Digital Safe licence. Support and maintenance has been carved out at the established fair value of 5%. The payment terms for this deal are spread over a two year period.

**Metropolitan Life Insurance Company ("Metlife")**

This is a $7.5 million licence deal for a suite of Autonomy software including Digital Safe. Support and maintenance has been carved out at 6% which is the higher of the rate per the contract and the established fair value.

**Tottenham Hotspur plc ("THFC")**

This is a $5.9 million licence deal to THFC for TeamSite, OpenDeploy, LiveSite, IDOL Server and Autonomy SPE software. Support and maintenance has been carved out at the established fair value of 5%. THFC have also purchased Optimost services, the revenue for which has been separately carved out by management ($50k).  Management has informed us that both this transaction and the sponsorship deal signed post period end are at fair value and arm's length terms.

DEL00057667

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0005

# 1. Key risks

**Revenue Recognition (continued)**

| | |
|---|---|
| Deloitte response | Our review of revenue contracts was designed to select large contracts, those containing non-standard terms, as well as a sample of all other contracts. Our review work noted that revenue recognition continues to be consistently applied in comparison with previous periods and in accordance with Group accounting policies and IFRS. |

**Carve out rates**

For each contract selected, we examined the terms and conditions of the contract to ensure that no unusual circumstances existed which might impact the recognition of revenue. We ensured that amounts recognised could reasonably be expected to be recoverable by inspecting payment history or credit checks where relevant. Furthermore where ongoing managerial involvement is necessary the carve out rates for revenues deferred were recalculated to ensure they were in line with Autonomy's standard carve out rates for support and maintenance and support services where relevant. It was noted that support and maintenance is included in the agreement with THFC at no additional cost as long as the strategic relationship between the two parties continues. This will continue for a minimum of two years and therefore we have proposed an adjustment in Appendix 1 ($0.3 milion) to carve out an additional year of support and maintenance from the licence fee on top of the one year carved out by management.

For all deals over $1 million we issued revenue confirmation requests direct to the customer. These were received in all cases except on the rare occasions where the legal department of certain large blue chip customers do not respond as a matter of policy.

**Payment terms**

The impact of extended payment terms offered to certain customers was considered to ensure that management is following the requirements of IAS 18 by discounting those amounts receivable to their present value.  This was the case in all except one instance. For most of these deals the impact of discounting is trivial, however for the JPMC deal the impact of discounting is estimated at $0.4 million. This has been included on our schedule of adjustments in Appendix 1.

In addition we noted that an early settlement discount has been agreed with BP which had not been classified correctly and we have included a reclassification adjustment to reduce both costs and revenue by $0.2 million in Appendix 1.

The Group has entered into a number of deals with payment terms greater than 365 days in the quarter. The total value of repayments due after 30 June 2011 is approximately $10 million.  This is as a result of the current economic climate and does not impact the recognition of revenue.

4   Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00057668

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0006

# 1. Key risks

| Deals with resellers | |
|---|---|
| | In Q1 2010, as previously reported to you, two deals sold to Microtechnologies LLC ("Microtech") in Q4 2009 were credited and resold directly to the two end users.  In our Q1 2010 report we highlighted that significant evidence of such further revenue reversals may jeopardise management's ability to recognise revenue at the point of sale to the reseller. Only one deal has been signed with the reseller Microtech during Q2 2010 for $270k and the overall level of software deals done this quarter through resellers is significantly reduced. |
| | During Q2 2010, a $6m licence deal originally signed with the reseller Capax Global from Q4 2009 was signed directly with the end user, Eli Lilly and a Q1 2010 $4.2 million deal with Discovertechnologies LLC was signed directly with the end user Philip Morris. The former remains in accounts receivable at 30 June 2010 and payment has been received for the latter.  The Capax / Eli Lilly deal is covered in more detail in Appendix 3. |
| Deloitte response | We note that management has responded to the concerns raised in Q1 2010 where for the first time we noted instances where deals had been credited and re-sold directly to end users. If Autonomy is required to maintain ongoing managerial duties in respect of reseller deals or if the reseller cannot demonstrate its ability to pay for goods received then it would not be appropriate to recognise revenue on delivery of the product.  Management acknowledge this position and further highlight that there have been no significant software sales to resellers in Q2 2010.  Management maintains that all reseller deals recognised in revenue have been appropriately assessed at the time of recognition of revenue to ensure that all criteria within IAS 18 have been met. |
| | We highlight to the Audit Committee that there is a large licence deal on which we reported on in Q1 2010 with Microtech where the end user is the Vatican ($11.5 million). Microtech is a customer with a long and established successful trading relationship with Autonomy.  At the date of issuing our report this amount is now overdue. We concurred with management at the point of recognition on the treatment of this amount but will monitor the progress of this balance again in our Q3 2010 review. To the extent cash is not received in Q3 2010, we will need to carefully consider recoverability of the balance.  As part of our Q2 2010 procedures we received confirmation from Microtech of the amount outstanding and the absence of any side agreements or ongoing performance criteria.  In addition, we held discussions with management to ensure that no issues had subsequently been identified which might impact the probability of recoverability of this balance. |
| | As a result of our work in this area we have not proposed any adjustments to revenues or receivables, but we will continue to focus carefully on this area in future reviews and audits. |

DEL00057669

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0007

# 1. Key risks

| Hardware sales | |
|---|---|
| **Presentation of costs associated with hardware sales** | Included in revenues for the quarter is $27.5 million of hardware sales. Q1 sales were $12.2 million.  In aggregate this represents over 9% of the Group's revenues in the six months to 30 June 2010. |
| | The majority of this ($26.3 million) is made up of sales of Dell hardware to SHI International (end user Bank of America for $16.9 million), Metro Business Systems Inc (end user UBS for $4.1 million) and Insight (end user Citi Group for $5.3 million). |
| | These are further examples of a number of strategic hardware trasactions completed by Autonomy to major international banks or other large blue chip companies completed in order to open up new market opportunities and to become the preferred supplier for all such clients' archiving requirements, including both software and hardware. |
| | Consistent with the hardware sales discussed in previous quarters' reports to the Audit Committee, these strategic sales have been made at a loss.  Management has taken all of the costs associated with the Dell hardware sales to cost of sales with the exception of the loss of approximately $3.8 million which has been allocated to sales and marketing expenses. Management's rationale for entering into these loss making contracts is that Autonomy is seeking to develop a long term strategic relationship with the end users in order to secure future profitable software sales. |
| | Management has prepared an analysis demonstrating the strong linkage between the loss making hardware sales and subsequent highly profitable software sales which indicates that for the $100 million of hardware sales made over the course of 2009 and 2010 to date (at a total loss of approximately $10 million), approximately $78 million of software deals have taken place with these customers over the same period and $20 million of hosted revenues have been generated for which there is a recurring revenue stream.  All of these subsequent amounts have been transacted at Autonomy's normal gross profit margin. |
| | Management has accounted for the revenues and costs associated with these deals on a gross basis as they and the customer consider Autonomy to be the principal in the arrangement.  This is based on Autonomy being the prime instigator in negotiating the deals - it has negotiated terms and selling price independently of the hardware provided and it bears the full credit risk for the transactions. |
| **Deloitte response** | We have reviewed management's analysis of the linkage between the loss making strategic hardware sales and subsequent profit making software sales and accept the decision taken by management to allocate the loss of $3.8 million to sales and marketing. We have reviewed the contracts and concur that it is appropriate to recognise the revenues and costs gross. |
| | Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q2 2010 press release. |

DEL00057670

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0008

# 1. Key risks

| Recoverability of accounts receivable | |
|---|---|
| Provision for doubtful debts | The net accounts receivable balance at 30 June 2010 is $208.3 million (31 March 2010 $211.4 million). The actual bad debt expense on the income statement in the quarter amounted to $3.8 million (Q1 2010 $2.7 million). The bad debt provision at 30 June 2010 stands at $23.5 million (31 March 2010 $20.3 million). |
| | Cash collection this quarter has been strong at $227.0 million, which has increased from $195.0 million in Q1 2010. As at close of business on 16 July 2010, total cash received since the period end was $13.2 million.  DSOs have fallen since Q1 2010 from 93 days to 80 days. The $14.2 million deal this quarter with BP has been paid in full which has had a significant impact on DSOs as this amount was paid within a day of signing the deal. |
| | Management continues to apply a detailed approach to credit control with increased scrutiny around the quarter end over potential exposure and the need to make a provision.  Management continues to work with the Latin American overdue accounts previously reported to the Audit Committee to ensure that these balances are provided for where appropriate.  As a result, a further $2.7 million has been provided for on amounts payable by Allotech, Integracion de Negocios and Telematica Lefic resulting in a net exposure on these accounts of $4.9 million.  The level of provision represents management's best estimate of the likely outcome of recoverability at this stage. |
| | Management also continues to monitor both cash collection and the level of bad debt provision as part of its routine procedures to support the overall appropriateness of the group's revenue recognition policies. |
| Deloitte response | We have reviewed customer correspondence and payment histories which support the conclusions reached by management. Where we required further clarification, a debtor confirmation has been received and we have reviewed customer correspondence. We have identified a difference in judgement in relation to the trade receivable for $0.3 million due from Firmware Inc which has been recorded in Appendix 1 as the amounts are now over two years old and there is no evidence that they are recoverable. |

DEL00057671

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0009

# 1. Key risks

| Acquisition accounting | |
|---|---|
| CA Technologies (Q2 2010) | On 9 June 2010, Autonomy acquired the trade and assets of the information governance business of CA Technologies Inc. The initial purchase consideration was $19.3 million, paid before the end of the quarter. The provisional accounting for the net liabilities acquired shows a fair value of $8.2 million and as a result, $27.5 million of goodwill and intangibles (combined) has been recognised on the acquisition. |
| | The acquisition has been accounted for in accordance with IFRS 3 (revised 2008) *Business Combinations* ("IFRS 3"). Management is yet to have a formal intangible valuation performed by Duff & Phelps and has therefore made an estimation of the likely intangibles value ($7 million) for the purposes of the Q2 2010 report, based on it being an asset deal with relatively low cost synergies and therefore a higher proportion of intangible assets than previous acquisitions. After taking account of the fair value of the trade and assets acquired, the residual goodwill balance is $20.5 million. |
| Deloitte response | We have reviewed the purchase agreement and the provisional acquisition accounting prepared by management and concur with management's accounting treatment at this stage. We note that the values attributed to separately identifiable intangibles are a management estimate at this stage before being professionally valued by Duff & Phelps. |
| Microlink (Q1 2010) | As reported to you in Q1 2010, Microlink was acquired in January 2010 for a purchase consideration of $55 million. Management continues to monitor its provisional fair values attributed to the assets and liabilities acquired. As required under International Accounting Standard 34 *Interim Reporting* ("IAS 34"), disclosure has been provided in the Q2 press release detailing the consideration and the fair value adjustments posted. The key fair value adjustment is to provide against $5 million of other debtors which are not considered to be recoverable, as noted in Appendix 3. |
| Deloitte response | We continue to review the provisional accounting adopted by management We note that the values attributed to separately identifiable intangibles are a management estimate at this stage before being professionally valued by Duff & Phelps. |

DEL00057672

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0010

# 1. Key risks

**Mercedes Benz Grand Prix Sponsorship**

|  |  |
|---|---|
|  | During the quarter, a Team Partner agreement was entered into with Mercedes Benz Grand Prix Limited whereby Autonomy will sponsor the Mercedes Formula One team in return for certain Team Partner rights which include marketing rights, right to use the Mercedes team logo and images, branding rights, hospitality days, driver and management days and loan of show car. The sponsorship will expire at the end of the 2011 calendar year. The fees due from Autonomy are £5.8 million ($8.8 million) for 2010. For 2011, more limited Team Partner rights have been agreed and as such the fee will be £3.2 million ($4.7 million) for 2011 unless Autonomy elects to increase to the same level as 2010, in which case the fee will be £6.2 million ($9.3 million). |
|  | Management has accounted for this as a prepayment, expensing the costs over the course of 2010 and 2011. This is in accordance with International Accounting Standard 38 *Intangible assets* ("IAS 38") that states that advertising and promotional activities should always be recognised as an expense rather than capitalising as an intangible asset. The modifications to IAS 38 make it clear that the expense should be recognised when the goods or services are received and therefore where a payment has been made in advance of this a prepayment should be held on the balance sheet. |
|  | Management has spread the total cost of £9.0 million over the 7 quarters of 2010 and 2011. However, as the advertising provided by Mercedes in 2011 is reduced compared to 2010 (as evidenced by the contract and the fact that an additional £3.0 million fee is due in order to receive the same level of advertising in 2011) either the maximum amount payable should be spread equally over the seven quarters or the two years should be considered separately. |
| Deloitte response | We have reviewed the Team Partner agreement and have proposed an adjustment in Appendix 1 increasing the Q2 2010 charge by $0.6 million in order to spread the maximum amount payable equally over 7 quarters as described above. |
|  | We will review the accounting treatment of the shirt sponsorship of Tottenham Hotspur in our Q3 2010 review, where similar considerations are likely to apply. |

DEL00057673

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0011

# 1.  Key risks

**Purchase of software from Filtek Inc ("Filetek")**

In May 2010, Autonomy entered into an agreement with Filetek to purchase for $11.5 million an extension to its initial licence purchased in Q4 2009.  The purpose of this extension over the original deal is to upgrade from a limited 1 PB of data processing capability to unlimited data processing and in addition to improve the security and confidentiality capabilities of the software.

As reported in Q4 2009, the technical and commercial rationale for Autonomy to purchase Filetek software is to provide Autonomy with the appropriate capability to link Structured Probabilistic Engine ("SPE") into established databases such as Oracle and SAP which provides a significant cost benefit to the customer.  The software has been capitalised as an intangible asset and is to be amortised over the life of the licence, being 5 years.

**Deloitte response**

We have considered this transaction in light of the fact that Autonomy have made significant sales transactions with Filetek.  We therefore look to ensure that the fair value of the relevant transactions is appropriate.  We have discussed the purchase with Pete Menell (CTO) to understand the technical rationale and have involved the use of one of our IT specialists.  We have seen the relevant purchase approvals from both the CFO and CEO and have reviewed the purchase agreement with Filetek.  We note that the initial software purchased from Filetek in Q4 2009 is already generating revenues, namely through the deal signed with Kraft in December 2009.  We concur with the accounting treatment adopted by management.

**Vacation accrual**

Management has reviewed the vacation accrual established in the US to ensure that it is in line with the most recent facts and circumstances and to ensure that it reflects the requirements of International Accounting Standard 19 *Employee Benefits* ("IAS 19").

We understand that management are in the process of changing the practice of paying out such amounts where possible, instead ensuring that leaving employees use up any outstanding vacation during their notice period.  On the basis of this judgement they have reduced the accrual by $1.4 million.

**Deloitte response**

As we have not yet seen evidence of the feasibility of achieving such a reduction in the vacation accrual we are not yet in a position to agree with management's judgement.

We have therefore proposed a judgemental adjustment in Appendix 1 to reinstate the $1.4 million vacation accrual.

---

10  Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00057674

# 1. Key risks

| Key risk | Deloitte response |
|---|---|
| **Capitalisation of research and development costs** | During the quarter a total of $9.8 million of software development costs have been capitalised (Q2 2009 $4.1 million). The amortisation charged for the quarter amounted to $3.9 million (Q2 2009 $1.8 million).  We have reviewed a sample of these costs and have verified that the criteria of IAS 38 have been satisfied. |
| **Accounting for share options** | Autonomy share options (and legacy Interwoven, Zantaz and Verity share options) have graded vesting terms.  These are typically a vesting cliff of 6 months, after which options vest over 36 months, vesting on a quarterly basis. The impact of this pattern of vesting is that the IFRS 2 charge should be higher during the early quarters of a share option scheme's life and decrease as tranches of options vest on a quarterly basis. Historically Autonomy has treated the share options as cliff vesting on the final date of the scheme and the charge is recognised evenly over the vesting period. |
| | During the prior year management recalculated the historic charge based on the graded vesting model which has indicated that a credit to the income statement of $1.5 million is required (with a corresponding entry to debit the stock compensation reserve). In Q1 and Q2 2010, the Group has recorded a charge to the income statement based upon the updated vesting model, but has not recorded the cumulative credit as at 31 December 2009 in the income statement. We have reviewed the charge for the period. We have proposed this again as a credit adjustment in Appendix 1. |
| **Support and maintenance carve out rates** | IAS 18 requires that the fair value of support and maintenance revenue is recognised over the period over which the support and maintenance services are provided. As many of Autonomy's sales include both licence and support and maintenance, it is necessary to assess the fair value of the support and maintenance in order that the correct amount is deferred at the recognition date of the licence revenue. There is an element of judgement involved over the percentage used. |
| | Management performed a full review of carve out rates and renewal rates during 2009 to support the revenue recognition policy as part of the 2009 year-end procedures. Nothing has come to light in the six months to 30 June 2010 to call into question the level of carve out.   During 2010 there have been no product recalls, litigations or warranty claims that might indicate that the level of carved out maintenance was inappropriate. Carve out rates remain stable which is a result of the stability of the IDOL architecture which is pervasive in all products. Management continues to monitor this position and will again perform a more detailed review of rates ahead of the year end.  We have tested the rates carved out for support and maintenance to ensure that the rates used on Q2 2010 licence sales are at the higher of the established fair value or the rate contracted in the signed agreement.  We concur with the accounting treatment adopted by management and have not noted any deviations. |

DEL00057675

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0013

# 1. Key risks

### Taxation

James Ferguson has acted as tax audit partner. James is independent of any tax related non-audit services provided and will be subject to rotation as a key audit partner in accordance with APB Revised Ethical Standards for Auditors. In particular, James is independent of the Deloitte transfer pricing team providing assistance with documenting Autonomy's transfer pricing position.

We have reviewed the tax workings and discussed key matters with management regarding the tax position of the key entities and major transactions in the period.

### Effective tax rate

The Income Statement taxation charge for the period is $33.7 million which corresponds to an estimated full year effective rate of 25.1% (FY 2009 28.0%). The expected effective tax rate at Q1 2010 was 27.8% and the Q2 2010 only effective rate is therefore 22.3% such that the effective tax rate for the half year is consistent with the full year effective rate of 25.1%.

The reduction in the estimated full year effective tax rate from that assumed at Q1 2010 is primarily driven by the following factors:

- Following further work by PwC during the quarter, the study summarising the availability of US tax losses in respect of acquisitions and other US tax loss restrictions (the "382 study") has now been completed and therefore management have identified additional losses in relation to Verity and Zantaz. The additional Virage losses per the study were recognised at 31 March 2010. The recognition of the additional losses in the quarter represents a 2.9% reduction in the effective tax rate from Q1;

- A tax provision of $4.8 million has been established during Q2 2010 for potential tax adjustments in the US arising from IRS enquiries into the group's US transfer pricing. This represents a 1.2% increase in the effective tax rate from the Q1 2010 rate;

- The remaining 1% reduction in the effective tax rate compared to Q1 2010 relates to a number of other factors such as updated estimates for R&D and the split of profits between the UK (taxed at 28%) and US (taxed at 40%).

The expected 2010 effective tax rate of 25.1% includes a number of items that would not be expected to be repeated in future years, primarily the additional recognition of US tax losses. Excluding these one-off adjustments, the effective tax rate would have been approximately 29%.

### Deferred taxes

The net deferred tax liability relating to US purchased intangibles offset by US tax losses expected to be recognised in the balance sheet is $74.8 million ($82.4 million at 31 December 2009). This is consistent with previous periods factoring in further amortisation of the intangibles, recognition of additional US tax losses and utilisation of US tax losses against US profits.

DEL00057676

**Confidential pursuant to Securities Exchange Act s.24(d).**

Exh 0979-0014

# 1.  Key audit risks

**Key audit risk**

**Transfer pricing**

As discussed with the Audit Committee in our Q1 2010 report, whilst the risk of any transfer pricing adjustment has been reduced through the work management have undertaken, there is still a significant risk of a transfer pricing enquiry in the US and as previously communicated to the Audit Committee the documentation to support the US position is not currently adequate.

Deloitte have been engaged to prepare extensive supporting transfer pricing documentation, compatible with US transfer pricing rules in respect of the value driver analysis being used. This work commenced at the end of Q2 2010 and is expected to be substantially complete before the submission of the US tax returns in Q3 2010 and finalised before the end of Q4 2010.

**Tax provision**

During the quarter management have established a provision for potential US tax adjustments resulting from IRS enquiries, in particular the group's transfer pricing position for the 2008-2010 years. This provision should be maintained on a consistent basis for future years taking into account changes in external factors.

**US tax losses**

As noted above in the effective tax rate section, PwC have completed their work on the S382 study allowing the recognition in the six months to 30 June 2010 of $55m of further losses acquired with the Virage, Verity and Zantaz businesses and this is reflected in the lower effective tax rate for the period. No further recognition of tax losses is expected in future periods and the reduction in effective tax rate is therefore a one-off event specific to the year ending 31 December 2010.

**Deloitte response**

We have reviewed each of the areas discussed above and we concur with accounting adopted by management. We identified a $0.3 million credit adjustment in respect of the lower effective rate that could have been achieved if the benefit of the amortisation of intangible assets from the CA acquisition had been taken into account.

DEL00057677

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0015

# 2.  Responsibility statement

This report has been prepared for the Board of Directors in that capacity and we therefore accept responsibility to you alone for its contents.  We accept no duty, responsibility or liability to any other parties, since this report has not been prepared, and is not intended, for any other purpose. It should not be made available to any other parties without our prior written consent.

**Deloitte LLP**
Chartered Accountants
Cambridge
19 July 2010

DEL00057678

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0016

# Appendix 1: Adjustments

The following uncorrected misstatements were identified during the course of our review:

| | Page | Q2 2010 | | H1 2010 | |
|---|---|---|---|---|---|
| | | Credit/ (charge) to current year income statement $'m | Increase/ (decrease) in net assets $'m | Credit/ (charge) to current year income statement $'m | Increase/ (decrease) in net assets $'m |
| Discounting of Capax Global deal with extended payment terms | n/a | - | - | (0.3) | (0.3) |
| IFRS 2 charge correction for revised model opening position | 11 | - | - | 1.5 | - |
| IFRS 2 charge correction for use of incorrect rate | 11 | 0.3 | - | 0.3 | - |
| Amortisation of acquired intangibles | n/a | - | - | (0.3) | (0.3) |
| Additional carve out on THFC deal | 4 | (0.3) | (0.3) | (0.3) | (0.3) |
| Discounting for extended payment terms JPMC | 4 | (0.4) | (0.4) | (0.4) | (0.4) |
| Adjustment to Mercedes sponsorship costs | 9 | (0.6) | (0.6) | (0.6) | (0.6) |
| Tax credit relating to amortisation of CA acquired intangibles | 13 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Total factual misstatements** | | (0.7) | (1.0) | 0.2 | (1.6) |
| Reversal of adjustment to vacation accrual | 10 | (1.4) | (1.4) | (1.4) | (1.4) |
| Reversal of revenue on Italian resellers (Auxilium and Computer Trading Srl) | n/a | - | - | (2.2) | (2.2) |
| Provision against Allotech de Colombia and Firmware trade receivable | n/a | (0.3) | (0.3) | (0.8) | (0.8) |
| **Total judgemental misstatements** | | (1.7) | (1.7) | (4.4) | (4.4) |
| **Total (pre-tax)** | | (2.4) | (2.7) | (4.2) | (6.0) |
| **Tax effect** | | 0.6 | 0.7 | 1.1 | 1.6 |
| **Total (post-tax)** | | (1.8) | (2.0) | (3.1) | (4.4) |

As discussed in section 2, there is an adjustment to reduce revenue and costs by $0.2 million.

We will obtain written representations from the Board of Directors confirming that after considering all these uncorrected items, both individually and in aggregate, in the context of the consolidated financial statements taken as a whole, they do not believe that any adjustments are required.

Report to the Audit Committee on the 2010 Interim Review Final Report   **15**

DEL00057679

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0017

# Appendix 2: Draft management representation letter

(Autonomy Letterhead)

21 July 2010

Deloitte LLP
City House
126-130 Hills Road
Cambridge
CB2 1RN

Dear Sirs

**Review of interim financial information of Autonomy Corporation plc**

This representation letter is provided in connection with your review of the balance sheet of Autonomy Corporation plc as of 30 June 2010 and the related statements of income, changes in equity and cash flows for the three and six month periods then ended and a summary of the significant accounting policies and other explanatory notes for the purposes of expressing a conclusion whether anything has come to your attention that causes you to believe that the interim financial information does not give a true and fair view of the financial position of Autonomy Corporation plc as at 30 June 2010, and of its financial performance and its cash flows in accordance with International Accounting Standard 34 as adopted by the European Union and the Disclosure and Transparency Rules of the United Kingdom's Financial Services Authority. We acknowledge our responsibility for the fair presentation of the interim financial information in accordance with International Accounting Standard 34 as adopted by the European Union and the Disclosure and Transparency Rules of the United Kingdom's Financial Services Authority.

We confirm, to the best of our knowledge and belief, the following representations:

- The interim financial information referred to above has been prepared and presented in accordance with International Accounting Standard 34 as adopted by the European Union and the Disclosure and Transparency Rules of the United Kingdom's Financial Services Authority.
- We have made available to you all books of account and supporting documentation, and all minutes of meetings of shareholders and the board of directors.
- There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial information.
- There has been no known actual or possible non-compliance with laws and regulations whose effects required consideration when preparing the interim financial information or that could have a material effect on the interim financial information in the event of non-compliance.
- We acknowledge responsibility for the design and implementation of internal control to prevent and detect fraud and error.
- We have disclosed to you all significant facts relating to any known frauds or suspected frauds that may have affected the entity.

**16**  Report to the **Audit Committee on the 2010 Interim Review Final** Report

DEL00057680

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0018

- We have disclosed to you the results of our assessment of the risk that the interim financial information may be materially misstated as the result of fraud.
- We believe the effects of uncorrected misstatements summarised in the accompanying schedule are immaterial, both individually and in the aggregate, to the interim financial information taken as a whole. A summary of such items is attached at Appendix 1.
- We confirm the completeness of the information provided to you regarding the identification of related parties.  In particular, we confirm that Microtechnologies LLC is not a related party.
- We confirm that the interim financial information has been prepared on the going concern basis.  We do not intend to liquidate the company or cease trading as we consider we have realistic alternatives to doing so.  We are not aware of any material uncertainties related to events or conditions that may cast significant doubt upon the company's ability to continue as a going concern.  We confirm the completeness of the information provided regarding events and conditions relating to going concern at the date of approval of the interim financial information, including our plans for future actions.
- Where relevant, the assumptions used in the presentation and measurement of fair values reflect our intent and ability to carry specific courses of action on behalf of the entity.
- The entity has satisfactory title to all assets and there are no liens or encumbrances on the entity's assets.
- We have recorded or disclosed, as appropriate, all liabilities, both actual and contingent.
- No events have occurred subsequent to the balance sheet date and through the date of this letter that may require adjustment to or disclosure in the aforementioned interim financial information.

We confirm that the above representations are made on the basis of adequate enquiries of management and staff (and where appropriate, inspection of evidence) sufficient to satisfy ourselves that we can properly make each of the above representations to you.

_____

Director

For & on behalf of Autonomy Corporation plc

DEL00057681

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0019

# Appendix 3: Additional matters

# Introduction

We have pleasure in setting out in this document our status report to the Audit Committee of Autonomy Corporation plc and its subsidiaries (together "the Group") for the matters arising from the email correspondence from Brent Hogenson (included in Appendix A) for discussion at the meeting scheduled for 20 July 2010.

At your request we have considered the email correspondence from Brent Hogenson, together with management's responses. As part of this review we have held discussions with the Group's Chairman, CEO, COO, CFO and Group Financial Controller.

On the basis of management's detailed review of the matters raised by Brent Hogenson they have concluded that there is no new material information provided that would have affected their key judgements taken at the time of preparing and presenting the 31 December 2009 financial statements. Management have therefore concluded that these matters raised have no material impact on the Group's 2009 financial statements. Based on our discussions with management, and the review work we have carried out, we concur with this view.

The email correspondence also sets out matters which appropriately fall to be treated within the 31 December 2010 financial statements and these will be considered by management as part of the interim accounts for the period to 30 June 2010. In accordance with our normal procedures we will consider these matters as part of our review of the interim accounts, and will report to the Audit Committee accordingly.

DEL00057682

**Confidential pursuant to Securities Exchange Act s.24(d).**

Exh 0979-0020

# Appendix 3: Additional matters

The responses on each of the matters arising from email correspondence Brent Hoggenson (see Appendix 1) are set out below:

| Question 1 | |
| --- | --- |
| Revenue transactions with resellers | See Appendix A |
| Management response | As background the Audit Committee are aware that the business regularly conducts transactions through resellers or valued added resellers ("VAR"). Our standard approach is to conduct such transactions under Master Service Agreements ["MSA"] which set out, inter alia, that the reseller takes full responsibility for the product once delivered from Autonomy and there are no rights of return. Revenue is appropriately recognised in accordance with the recognition criteria in paragraph 14 of International Accounting Standard 18 Revenue ("IAS 18") and Group accounting policies. |

The sale to Capax Discovery LLC ["Capax"] noted in the memorandum was set up under such an agreement. In determining whether it was appropriate to recognise revenue on this sale, the Autonomy management team considered at 31 December 2009 the information it normally considers, being the following matters:

- Evidence of a previous trading relationship with Capax, including an understanding of the quality of this customer. This indicated that it was probable that economic benefits associated with the transaction would flow to Autonomy;
- The ability of Capax to stand by its obligation to Autonomy, irrespective of its ability to onward sell the Autonomy product;
- The fact that Capax had been a regular payer of previous deals undertaken with Autonomy;
- The fact that an appropriately signed unconditional PO had been received setting out the value of the transaction. This PO was appropriately structured under an agreed and signed MSA;
- The fact that the Autonomy software had been appropriately despatched to Capax in Q4 '09; and
- The fact that no continued managerial involvement in the transaction was contractually required or forecast.

Additionally management were aware that an ultimate end user was identified - Eli Lilly ["Eli"] who are a major multi-national business that had a track record of purchasing Autonomy software ($22m). Indeed Autonomy had spent some time seeking to sell this product direct to Eli before ultimately selling it to Capax. The key feature that Capax was able to offer to Eli was an ongoing partner/ servicing arrangement.

As part of the Q1 review management had sight of a direct confirmation letter from Capax to Deloitte which confirmed the validity of the December 2009 invoice and further confirmed that there were no side agreements in place.

**Report to the Audit Committee on the 2010 Interim Review Final Report   19**

DEL00057683

Exh 0979-0021

# Appendix 3: Additional matters

| Question 1 (continued) |
|---|

**Management response**

Although Eli Lilly have subsequently chosen to transact directly with Autonomy in June 2010, does not detract from the fact that Autonomy contracted directly with Capax in December 2009. Autonomy delivered product to Capax and had transferred all risks and rewards of ownership of the goods by 31 December 2009. An Autonomy sales person has continued to stay involved with the transaction between Capax and the end user because it is in Autonomy's interests to stay close to the end user from a commercial perspective. Capax remain fully liable to Autonomy for the obligation under the PO signed in December 2009.

Management believe that based on the evidence available at 31 December 2009 the recognition of this sale in 2009 remains valid.

In response to other sub questions within Question 1 management note:

- The June 2010 bad debt provision against uncollected debts at that time has yet to be completed and will be prepared and reviewed as part of the routine interim close down for the six months ended on that time
- On the wider reseller revenue recognition point management highlight that between 1 January 2008 and 31 March 2010 the Group has generated operating profits of $531.8m and has generated operating cashflows of $550.9 m. Day's Sales Outstanding ["DSO"] in that period have remained within the 85-90 day range that management set as a key performance indicator ["KPI"]. DSO's are expected to be at a lower level than the KPI range noted above at the end of Q2 2010 – likely 80 days. Management are not aware of any material concerns over the group's revenue recognition policies.

**Deloitte response**

We have discussed and reviewed management's views on the matter as summarised above and concur with the accounting policy in place. The determination of the revenue recognition on the Capax sale as at 31 December 2009 is consistent with our understanding of this transaction at that time.

As part of our audit for the year ended 31 December 2009, we performed audit procedures on the revenue contract with the reseller (Capax) to ensure that all criteria within International Accounting Standard 18 Revenue ("IAS 18") paragraph 14 were met. Given that all risks and rewards of the contract had been transferred to Capax by the year date and that it was probable that economic benefits would transfer to Autonomy, we concurred with management that it was appropriate to recognise the revenue on this contract.

As previously reported to the Audit Committee, our materiality guideline for the 2009 audit was $20 million. We confirm that this transaction was not material on this measurement.

We shall review the subsequent agreement signed direct to Eli Lilly as part of our Q2 2010 International Standards on Review Engagements 2410 ("ISRE 2410") review. We further note that our review of the Group's bad debt provision at 30 June 2010 has not yet been completed and will form part of our routine procedures on the interim results.

DEL00057684

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0022

# Appendix 3: Additional matters

| Question 2 | |
|---|---|
| EAS support revenues | See Appendix A |
| Management response | Autonomy contracted with Capax for sub contracting EAS support in October 2009. The amounts paid under the sub contracting agreement were Q4 09 $696,000 and Q1 10 $1,139,000 (for 2 quarters). This is an immaterial amount. |

Commercial rationale: The EAS product was not written by Autonomy but by a team acquired through the acquisition of Zantaz Inc who then subsequently left. The product was originally being maintained by a team based out of Ottawa (the office only dealt with this product). EAS had a very large number of customers with value below $15,000. Thus the maintenance per customer was a very low number – annualized approximately $4m. In addition IT staff in the small companies that bought EAS are often inexperienced and weak – so there were a large number of maintenance tickets raised relative to value. Margin for maintenance on general Autonomy sales are very different to EAS (sales are typically $400,000 upwards). Margins on Autonomy sales are much higher as the sales are 100 times larger and the customer has skilled IT staff. The situation with EAS support was that it was significantly loss making and caused us reputational issues in the market and with industry analysts (Gartner etc). Autonomy is also just not set up to support $1k products. Sadly, a great deal of correspondence on these points is available.

The EAS product was then superseded by a new product, DS Mail, and we closed down the Ottawa office. Capax took over the running of the maintenance for the hundreds of legacy EAS customers. Capax took over a number of staff from the Ottawa office. As we did not want to go to all our customers to reassign maintenance, we allowed Capax to be sub contractor. We did not and still do not have any maintenance specialists on EAS. Capax have subsequently gradually taken over the EAS customer maintenance directly. All of this is a natural and commercially expedient way of managing a "run-down" situation. Capax is a services oriented organization and values highly the chance to have relationships with a large number of customers which it can sell other services to.

This transaction is completely separate from any other transactions with Capax. Whereas previously Autonomy dealt with 100% of EAS tickets, Autonomy now deals with less than 25% and this is declining. There is a separate legal agreement with Capax, only when Autonomy receives cash from the customer is cash due to Capax and the commercial rationale is strong (running down Autonomy's involvement on support without sacrificing the customers). It is an immaterial transaction with a maximum annualized $4m of revenue affected compared to c $900m forecast and this will reduce as renewals will be transacted directly with Capax.

| | |
|---|---|
| Deloitte response | The EAS support services described above were not tested as part of our 2009 audit procedures on the grounds of immateriality, given that our materiality guideline was $20 million. As part of our procedures in 2010 we will consider these transactions within our interim review process and our year end audit process.   Such procedures will include an assessment as to whether there is any link between the provision of 2010 support services by Capax on the old Autonomy product and any other relationship between these parties. |

DEL00057685

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0023

# Appendix 3: Additional matters

| Question 3 | |
|---|---|
| Microlink | See Appendix A |
| Management response | The acquisition of Microlink LLC ["Microlink"] in Q1 2010 was fully considered and approved by the Board in December 2009. Detailed explanation of the strategic and commercial rationale for the acquisition, the purchase price assessment and the divestment of part of that business (DiscoverTech) ahead of acquisition is set out in a paper that was considered by the Board on 16 December 2009. At no stage whatsoever was the rationale for this acquisition to "provide a vehicle to write off outstanding invoices" as speculated by Brent Hogenson. This is wholly incorrect. As Microlink is cleared at the highest security level by the US Government, the company is subject to the highest level of financial and commercial probity. |

Relevant details of this acquisition are also disclosed within Note 31 to the 2009 Group accounts.

Management confirm that the acquisition process included legal transaction advice from its normal US Lawyers and that there were no side letters or arrangements in respect of this sale or use of any of its proceeds. Deloitte were provided with the full acquisition agreement, the schedules and ancillary agreements, the due diligence request lists and sight of the due diligence materials.

Microlink had previously been a customer of Autonomy for 8 years.  As management began to consider a potential acquisition of Microlink in Q3 2009 the Group ceased to transact with that business pending determination of the investment.  Previously we had revenues of approximately $66m with Microlink over a four year period and had received cash of $43m.

At 31 December 2009 $23m of receivables were outstanding from Microlink.  Substantially all of this balance fell within normal repayment dates. Comments included in Brent's email around this debt being written off are incorrect. Subsequent to the Group's acquisition further cash receipts of $6m were received against the year end receivable balance.  Approximately $7m of the receivable balance is in respect of Autonomy software that was being applied within the Microlink business and is on long payment terms. We will assess the accounting for this matter as part of our purchase accounting work in 2010. As part of our finalisation of the interim results, management will be continuing to monitor cash collection on these balances and complete our purchase accounting. All amounts outstanding from Microlink remain in the books of Autonomy.  We remain, however, committed to work with Microlink management to recover all amounts outstanding in full.

As part of our purchase accounting in 2010 we will be assessing the recoverability of related Microlink receivables and whilst this exercise has yet to be completed we anticipate that we will be booking a $5 million provision. Brent's email makes reference to a number of transactions with Microtechnologies LLC ["Microtech"] on 30 and 31 December 2009. Management are not aware of any related party (in the accounting sense) connection between this business and Microlink.  In the first 6 months of 2010 90% of the receivable from Microtech LLP outstanding as at 31 December 2009 has been settled.

Finally, for completeness, we note that it is very common for senior management to be actively involved in the significant sales of Autonomy product to third parties as reported within internal sales systems.

22  Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00057686

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0024

# Appendix 3: Additional matters

**Question 3 (continued)**

Deloitte response

The acquisition of Microlink LLC was considered as part of the post balance sheet events' work performed as part of our audit of the year ended 31 December 2009. In particular, we discussed with senior management the strategic and commercial rationale for the transaction; reviewed the paper presented to the Board in December 2009 and concluded that Microlink was not a related party in accordance with the guidance of International Accounting Standard 24 Related Party Disclosures ("IAS 24"). We also considered the requirements of International Accounting Standard 10 Events After the Reporting Period ("IAS 10"), to ensure that management had made all of the relevant disclosures required in the annual accounts. Our year end 2009 Audit Committee paper sets out in more detail the procedures we carried out in respect of the this post year end transaction.

As part of our audit procedures on revenue, we considered the December 2009 sales transactions with Microtech and reported back to the Audit Committee on those matters as part of our routine sample based review of significant contracts. We noted that all IAS 18 paragraph 14 criteria for recognition of revenue had been met and therefore concurred with management that recognition of revenue was appropriate.

We noted as part of our Q1 2010 review (performed in accordance with ISRE 2410 that the amounts due from Microtech in relation to these 2009 transactions were up to date and not overdue. We note that transactions with Microtech in 2010 would fall to be treated in the accounts for the year to 31 December 2010 and we will review again as part of our Q2 2010 ISRE 2410 review process.

Management have yet to complete the purchase accounting for this 2010 acquisition of Microlink as in accordance with International Financial Reporting Standard 3 Business Combinations 2008 ("IFRS 3"), they have 12 months from the date of the acquisition to do so. We will review these matters as and when that exercise is completed as such transactions appropriately fall to be treated in the financial statements for the year ended 31 December 2010.

DEL00057687

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0025

# Appendix 3: Additional matters

| Question 4 | |
|---|---|
| **Filetek transactions** | See Appendix A |
| **Management response** | FileTek, Inc, ("Filetek") products are OEM'ed into the Autonomy SPE product (launched in Q3'09). Subsequent sales have been very strong. The first OEM purchase of FileTek's Storhouse product in Q4'09 was limited by data volume. In Q2'10 our CTO confirmed that the data volumes were going to be exceeded so we negotiated an unlimited (by data volume) OEM. |
| | Mr Hoggenson has not had sight of the detailed analysis that was done to justify the appropriate fair value in Q4'09. The Q4 transactions were fully disclosed to the Audit Committee. Autonomy received quotes from CommVault, HP and Informatica as part of the due diligence process on the purchase and to ensure that the fair value of the intangible was appropriately stated. The second purchase in Q2'10 has yet to be reviewed by the auditors but there is no new technical information available that is different to when the previous discussions took place. |
| | Auxilliary point: An OEM gives the customer the right to sell the software many times over, thus OEMs are always of higher value. There are a number of comparable deals. |
| **Deloitte response** | The purchase of software from FileTek Inc in December 2009 was reviewed and considered as part of our audit for the year ended 31 December 2009.  This included consideration of the fair value of the licence acquired and discussions with the CTO Pete Menell. We involved a Deloitte IT technical expert to assist the audit team in understanding the technical and commercial rationale for the transaction and to ensure that it was appropriate to capitalise the amount in full as an intangible asset in accordance with International Accounting Standard 38 Intangible Assets ("IAS 38").  The sale to FileTek in December 2009 was also considered as part of the year end audit as part of our standard audit procedures on revenue.  We concur with management that the criteria of IAS 18 with regards to the recognition of revenue had been met at 31 December 2009. |
| | By virtue of their size these transactions were highlighted and fully discussed with the Audit Committee and our report of 1 February 2010 records our concurrence with management's treatment of these transactions. |
| | We understand from management that in the six months ended 30 June 2010 amounts outstanding from FileTek in respect of the December 2009 sales have been received in full. |
| | Transactions with FileTek in 2010 fall to be treated as items for the audit of the year ending 31 December 2010. |

DEL00057688

**Confidential pursuant to Securities Exchange Act s.24(d).**

Exh 0979-0026

# Appendix 3: Additional matters

**Questions 5 and 6**

| Acccrued liabilities | See Appendix A |
|---|---|
| Management response | Maintenance accruals – such accruals are only made where there is a contract with auto renewal provisions. Therefore, the customer is legally obligated to pay for the maintenance that it receives. The cumulative accrued balance was $4.2m at the end of Q1 2010 and compares with an annual c $190m of recognised maintenance revenue from the US. The only portion of this balance which we are monitoring closely over the course of 2010 is where the accrual has been recognised as maintenance revenue in the income statement but for which invoices have yet to be issued to the customer. |

Commissions - such accruals have been consistently calculated in accordance with our Group accounting procedures. Commissions are accrued when revenue is recorded and are calculated in accordance with the signed Compensation Plans. Where there is significant doubt over recoverability, i.e. where a provision has been made in part against a trade receivable, the related accrual will also be provided against. In the case of the amount in question, this is a unique scenario where the commission due is in relation to a number of long overdue Latin American trade receivables which have been discussed with the Audit Committee by management and the audit on a regular basis throughout 2009.

Vacation/PTO - US employees are entitled to accrue PTO subject to a cap depending on length of service. At each year-end a detailed calculation is prepared showing the maximum cash liability assuming everyone left on that date – as at end December 2009 this was $4.6m (this schedule was provided to the auditors during the year end audit). The provision carried forward was $3.3m. The PTO carry forward policy was made uniform across the US Group on 1 January 2010 so that all US based employees were subject to the same cap calculation and employees were given until September to reduce their carried forward to the cap level or lose the excess balance. Assuming all employees are at or below the cap level then the maximum liability would have been $4.2m. In addition, in practice there is very little cash expense incurred by the Group. We would reiterate that to pay the $4.2m all employees would have to leave – in practice this would take many years so even this number should be discounted to NPV.

Sales tax - We charge sales tax to our customers when relevant. This amount has no impact on the p&l and is paid over to the relevant state tax authorities as required. We have been audited for sales tax by New York state and possibly others. No adverse findings were identified. There would only be an exposure if we had not charged sales tax and we should have (has never happened) and the customer has not paid "use" tax on the asset and we could not invoice the sales tax. We do not agree that there is an exposure here and that the historic lvov policy of charging sales tax on all sales is inappropriate.

| Deloitte response | The matters raised in questions 5 and 6 relate to transactions originating in 2010. Management have yet to present to us their position on these matters as at 30 June 2010 as they have yet to complete their process of review on these accounts. Historically, we have found their accounting for these matters to be satisfactory and we concur with their current approach to these matters set out above. We will consider these accruals within our standard review Q2 2010 review and as part of our 2010 audit. |

DEL00057689

Confidential pursuant to Securities Exchange Act s.24(d).

# Appendix A: Email Correspondence from Brent Hogenson

**From:** Brent Hogenson [mailto:Brent.Hogenson@autonomy.com]
**Sent:** 26 June 2010 19:36
**To:** Knight, Rob (UK - St Albans); Knights, Richard (UK - Cambridge)
**Subject:** IMPORTANT AUDIT RELATED QUESTIONS
**Importance:** High

June 26, 2010

Dear Richard, Rob,

You may remember me from the work done by Deloitte during the acquisition of Interwoven by Autonomy in March 2009. I was the VP of Finance at Interwoven and have been promoted to the Chief Financial Officer in the Americas for Autonomy Group.

We consolidated the finance team in the Americas from all subsidiaries and business units during the second quarter of 2010. As part of this effort, I asked the Americas finance team to review all financial accounts, account reconciliations and significant transactions across all subsidiaries and business units in the Americas as I wanted to ensure that were no material issues within the Americas.

During this review, I identified a few questions and have reported these to Mike Lynch the CEO of Autonomy and have had further discussions with Mike Lynch and Andy Kanter the COO of Autonomy over the last week beginning June 22, 2010. Despite my requests, I have yet not been able to have any direct contact with the Audit Committee but have had a few conversations and exchange of letters with both Mike Lynch and Andy Kanter since June 22, 2010. Mike Lynch has requested that I not involve the Cambridge finance team, and as such, have not discussed these questions with the Group Chief Financial Officer or the Group VP of Finance. I am sending this letter to provide you with the opportunity to review these questions and ensure that they are properly recorded in our financial statements. To that end, set forth below is the related information to my questions. You may need to request additional information, that is not available to me, related to these questions from Autonomy to ensure that they are properly recorded in our financial statements.

26   Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00057690

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0028

# Appendix A: Email correspondence from Brent Hogenson

**Question #1) Is revenue properly recognized on reseller transactions where there may be no End User and the Autonomy sales team subsequently completes an agreement directly with the End User with substantially modified license terms from the standard reseller terms?**

Below is an example of a Capax transaction.

In Q4 2009, reseller Capax gave Autonomy an order for $6,286K for Eli Lilly (attached to this email), of which license revenue recognized in Q4 2009 was $5,987K. The $6,286K was due for payment from Capax on March 31, 2010. As part of our normal collection calls, the collection team contacted the customer to confirm the payment date. The collection team had a difficult time getting a response from the customer and, as this was a large amount, asked me to call the reseller. I called John Baicco, the Managing Partner at Capax, to follow up on the payment date. John asked me if I had discussed the agreement with two members of the Autonomy senior management team. I told him that I would but continued to request payment information. He then told me that the Eli Lilly deal had not closed in Q4 2009 and that he would not be able to make payment until the Eli Lilly closed and he had received payment from Eli Lilly.

In June 2010, Eli Lilly executed a License Agreement directly with Autonomy (attached to this email) for a total value of $5,567K and license value of $5,303K.

In reviewing the SMS customer notes (SMS tracks all Autonomy sales activity) related to Eli Lilly during the period of Q4 2009 through Q2 2010, there were many steps in the sales process required by the Autonomy sales team to complete the transaction with Eli Lilly subsequent to when we recognized revenue in Q4 2009. There was no mention of any steps or sales process to be performed by Capax. I have attached screen shots on meeting notes from SMS during this period.

The Autonomy Revenue policy requires that the license fees be fixed and determinable prior to recognizing revenue. IFRS IAS – 18 section 14 (c) states "the amount of revenue can be measured reliably." It is also potential that IFRS would view the agreement with the reseller as a consignment. The Autonomy Revenue policy is written very similar to the requirements under SOP 97-2 and in previous quarter earnings release presentations during 2009 where we report the quarterly results there has been a footnote on a slide that approximately states – where IFRS is silent as to revenue recognition Autonomy follows the requirements of SOP 97-2 (I am not sure of the exact wording but believe that this is close and should be able to be confirmed by reviewing the four quarterly earnings presentations provided during the 2009 earnings calls).

Do the items listed below call into question if the Capax agreement that was recognized as revenue in Q4 2009 was fixed and determinable under the Autonomy Revenue Policy, under IFRS could be measured reliably or a consignment transaction:

1) The payment from Capax is almost 90 days past the due date on their agreement and the Managing Partner stated that they would not pay Autonomy without payment from Eli Lilly
2) The Autonomy contract with Eli Lilly in June 2010 provides our right to designate the payee and we agree that payment to designated payee releases Eli Lilly of the payment obligation. Autonomy may designate payment under our Eli Lilly agreement to Capax and then Capax will pay Autonomy. I have attached an email from Cambridge finance which instructs the Americas finance team to create pro forma invoices and send them to Capax for them to send to Eli Lilly
3) Autonomy completed the agreement in June 2010 directly with Eli Lilly rather than a contract between Capax and Eli Lilly
4) The Autonomy sales channel was significantly involved in the ongoing sales effort without any mention of Capax in the SMS notes

DEL00057691

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0029

# Appendix A: Email correspondence from Brent Hogenson

5) The contractual terms between Autonomy and Eli Lilly have a contingency not included in the Capax agreement where acceptance testing is required against some of the licensed software
6) The contractual terms between Autonomy and Eli Lilly have added significant warranty provisions that were not included in the Capax agreement
7) The contractual terms between Autonomy and Eli Lilly have added a change in the maintenance service period for products subject to acceptance testing that was not included in the Capax agreement
8) Autonomy may deliver the most recent version of our products which will include any updates or upgrades from the shipment made to Capax in Q4 2009.  If not, Eli Lilly will not have the rights to the releases from R&D during Q4 2009 and Q2 2010
9) Autonomy does not have the right to invoice for products subject to acceptance testing until acceptance testing is complete

Please review the information above, the attached Capax Agreement, the attached Eli Lilly Agreement, the attached email from Cambridge finance on invoicing instructions and attached meeting notes from the SMS system and confirm that the revenue recognized from the Capax agreement in Q4 2009 was properly recorded in our financial statements in Q4 2009.  If it is not properly recorded in Q4 2009, Deloitte and the Audit Committee should consider the multiple similar reseller transaction recognized as revenue from 2008 through Q1 2010, many of which range between $1M and $11M per transaction and the impact on revenue reported within the financial statements during these periods.

Note that many significant payments due from resellers in the Americas on our accounts receivable aging reports remain unpaid significantly beyond the invoice due date and may be considered uncollectable or bad debt but not yet reserved for as of June 2010.  I am unsure if the invoices that remain unpaid on the aging have an end user related to each reseller agreement.  I have attached a spreadsheet named Problem Accounts 6_17 where the notes under the Updates column were made by the Americas collection team.  Also, note the amount past due from Microlink in Question #2 below.

**Question #2) Does the First Amendment to the VAR Agreement with Capax executed in October 2009 (attached to this email) have economic substance and is it properly recorded in the financial statements when considered with the Capax purchase agreements that potentially do not have end users but have payment terms spread into future periods that may somewhat relate in timing to the payments received under this First Amendment to the VAR Agreement with Capax?**

In considering the answer to this question, note that margins achieved by Autonomy on maintenance revenue is substantially greater than 15% and Autonomy is providing 85% of the revenue from EAS maintenance customers and the related cash payments from these EAS customers on their maintenance renewals.  Also, filter the Bill To column in the attached Problem Accounts 6_17 spreadsheet to Capax Global and review the outstanding invoices with significantly extended payment terms and the associated comments from the collection team in the Updates column.  As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

28  Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00057692

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0030

# Appendix A: Email correspondence from Brent Hogenson

**Question #3) Is there a financial statement impact with the potential related party relationships identified below on recorded revenue transactions?**

The following information is from a spreadsheet labeled Q4 2009 Closed Deals Final prepared by Cynthia Watkins, Corporate Controller of Autonomy, Inc.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue |
|---|---|---|---|
| 31-Dec | Microlink – Discovery LLC | MGMT | 2,000,000 |
| 30-Dec | MicroTech LLC –  (Blank) | MGMT | 9,523,810 |
| 31-Dec | MicroTech LLC –  Amazon | MGMT | 131,418 |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000 |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000 |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000 |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000 |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000 |

In Q1 2010 we invoiced the following (detail from the Problem Accounts 6_17 spreadsheet attached to this email):

| Inv Date | Revenue Summary | Sales Rep | Inv Amount |
|---|---|---|---|
| 31-Mar | Microtech LLC – Vatican | Blank | 11,550,000 |
| 31-Mar | Discover Technologies – Citi | Blank | 4,394,250 |

I have been told by the finance team in San Francisco that transactions without a sales rep identified are transactions where the end user has not completed the agreement by the end of the quarter in which Autonomy recognizes revenue.  The end user identified above may be a placeholder for an agreement to be negotiated subsequent to the invoice date.  Per the attached spreadsheet Q1 2010 Closed Deals 3.31.10, Manulife and Morgan Stanley may have closed with the end user in Q1 2010 as they are removed from the spreadsheet with negative numbers at the bottom of tab IDOL-K2-UltraSeek. There are many other transactions on the quarterly closed deals spreadsheets to these resellers that have been closed in on the last day of a quarter where the Sales Rep is MGMT throughout 2008 and 2009.

DEL00057693

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0031

# Appendix A: Email correspondence from Brent Hogenson

**Related Party Data:**

In February 2010, Autonomy acquired Microlink for $55M.  As part of the acquisition, Autonomy wrote off in approximately $16M of outstanding accounts receivable with due dates as follows:

| Due Date | Amount | |
|---|---|---|
| March 31, 2009 | 6,875,000 | 10 months past due |
| June 30, 2009 | 4,576,200 | 7 months past due |
| Sept 18, 2009 | 203,250 | 4 months past due |
| Sept 30, 2009 | 2,008,238 | 4 months past due |
| Feb 14, 2010 | 2,300,000 | (1) |
| Total | 15,962,688 | |

(1) The February 14th invoice above is writing off the Dec 31, 2009 invoice to Discovery Technologies, which had license revenue of $2,000,000 and maintenance of $300,000 for a total of $2,300,000.

Microlink's Address is as follows:
8330 Boone Blvd
Suite 300
Vienna, VA 22182
Phone: 703-556-4440
MicroTech's Address is as follows:
8330 Boone Blvd
Suite 600
Vienna, VA 22182
Phone: 703-691-1073

30   **Report to the Audit Committee on the 2010 Interim Review Final** Report

DEL00057694

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0032

# Appendix A: Email correspondence from Brent Hogenson

Discover Technologies has a very limited website.  There is a whitepaper titled Automation Speeds the Ability to Collaborate and Turbo-Charges the Enterprise Search User Experience.  The bottom of the pages of this whitepaper has the following information:

www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

I question if the Microlink transaction was partially done to provide a vehicle to 1) write off the $16M in outstanding invoices where a large percent were significantly past due and where there may be potential that there was no End User to pay Microlink; and 2) potentially provide a cash balance to pay invoices on reseller agreements where there may not be an End User due from potentially related party resellers.  As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

**Question #4) Have the barter transactions below been reviewed for the economic benefit and fair value on both sides of the transactions to ensure that they are properly recorded in our financial statements?**

Autonomy made the following purchases of software from FileTek, Inc.:

| December 31, 2009 | 10,367,280 |
|---|---|
| May 11, 2010 | 11,518,214 |

Autonomy sold the following license and maintenance revenue to FileTek as follows:

| December 31, 2009 | 8,480,000 IDOL Product |
|---|---|
| March 31, 2010 | 9,010,000 500 users Liquid Office plus some OEM product |

In a barter transaction, my understanding is that IFRS is not substantially different from GAAP and requires validation of the fair value and economic benefit on both sides of the transaction.  My information is limited; however, I have asked Sean Sullivan, Liquid Office Sales VP, for a low and high range of a liquid office transaction with 500 to 1000 users.  The range that he gave me was $300,000 to $1,000,000, which is only a part of the March 31, 2010 transaction and does not include the OEM product, which is difficult for me to find fair value.  As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

Report to the Audit Committee on the 2010 Interim Review Final Report   31

DEL00057695

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0033

# Appendix A: Email correspondence from Brent Hogenson

**Question #5) Is the revenue accrued and included in the Q1 2010 financial statements related to maintenance renewals expected to renew from customers who have not yet agreed to renew?**

In Q1 2010 a combined Autonomy, Inc, Etalk, Zantaz and Verity business units recorded a revenue accrual of $6,591K related to customers expected to renew their maintenance contracts where the service period had lapsed prior to March 31, 2010. The amount related to the maintenance renewals where the service period had not yet lapsed was recorded as deferred revenue. In our Q2 review as part of consolidating the Americas finance team, it was noted that this revenue accrual calculation expected a significant percentage of the maintenance renewals that were up to 12 months beyond the end of their last service period, to renew and these business units recorded the revenue for the lapsed service period in the Q1 financial statements. As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

**Question #6) Are the recorded liabilities and accruals within the financial statements applying IFRS properly and consistently calculated?**

In our Q2 review as part of consolidating the Americas finance team, it was noted that accruals and recorded liabilities across the business units of Autonomy, Inc, Etalk, Zantaz and Verity were either 1) not recorded at all; or, 2) not consistently calculated. The accruals in question primarily relate to:

1) Commissions and related payroll tax

2) Vacation/PTO

3) Sales Tax

As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

I will inform Mike Lynch and Andy Kanter that I have sent this email to you and provide them with a copy.

I look forward to your response.

Brent Hogenson

President Autonomy Interwoven

CFO Autonomy Americas
Tel: 408.953.7058
Mobile: 408.718.1376
E-mail: **brent.hogenson@autonomy.com**

**32** Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00057696

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0034

DEL00057697

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 0979-0035

Deloitte refers to one or more of Deloitte Touche Tohmatsu ('DTT'), a Swiss Verein, and its network of member firms, each of which is a legally separate and independent entity. Please see www.deloitte.co.uk/about for a detailed description of the legal structure of DTT and its member firms.

Deloitte LLP is the United Kingdom member firm of DTT.

This publication has been written in general terms and therefore cannot be relied on to cover specific situations; application of the principles set out will depend upon the particular circumstances involved and we recommend that you obtain professional advice before acting or refraining from acting on any of the contents of this publication. Deloitte LLP would be pleased to advise readers on how to apply the principles set out in this publication to their specific circumstances. Deloitte LLP accepts no duty of care or liability for any loss occasioned to any person acting or refraining from action as a result of any material in this publication.

© 2010 Deloitte LLP. All rights reserved.

Deloitte LLP is a limited liability partnership registered in England and Wales with registered number OC303675 and its registered office at 2 New Street Square, London EC4A 3BZ, United Kingdom. Tel: +44 (0) 20 7936 3000 Fax: +44 (0) 20 7583 1198.

**Member of Deloitte Touche Tohmatsu**

DEL00057698

**Confidential pursuant to Securities Exchange Act s.24(d).**

Exh 0979-0036

Exhibit B

Autonomy Corporation plc

Report to the Audit Committee
on the 2010 Q3 Review

Final Report

DEL00219437

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0001

# Contents

Introduction                                                    1

1.    Key risks                                                 3

2.    Other matters                                            8

3.    Taxation                                                 10

4.    Responsibility statement                                12

Appendix 1: Potential adjustments                             13

Appendix 2: Draft management representation letter            15

DEL00219438

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0002

# Introduction

We have pleasure in setting out in this document our report to the Audit Committee of Autonomy Corporation plc and its subsidiaries (together "the Group" or "Autonomy") on our review of the three and nine months ended 30 September 2010 for discussion at the meeting scheduled for 18 October 2010. This report summarises the principal matters that have arisen from our review of the financial information within the financial report for the three and nine months ended 30 September 2010.

This introduction is not intended to be exhaustive but highlights the most significant matters to which we would like to bring to your attention. It should, therefore, be read in conjunction with the entire report and the appendices thereto.

| Key findings on key risks and other matters | We discuss within Section 1 the results of our review work in relation to key risks which have been identified as being significant to the Q3 2010 results and press release.<br><br>In particular, we will focus at the Audit Committee meeting on:<br><br>• Those sales where we have concerns that all recognition criteria have been met (Poste Italiana, Sky Media); and<br>• Trade receivables where there is significant exposure (Microtechnologies LLC, Sales Consulting and Latin American debts). |
|---|---|

| Review status | We have substantially completed our review. Certain procedures remain outstanding and need to be finalised before we can issue our review opinion:<br><br>• Completion of our review of detailed analyses supporting the income statement;<br>• Completion of our internal review procedures;<br>• Review of your final press release;<br>• Receipt of tax opinion from PWC to support Interwoven acquisition cost tax provision release; and<br>• Receipt of management representation letter (See Appendix 2 for suggested draft).<br><br>We will report to you orally in respect of any modifications to our findings that arise on completion of these matters.  On satisfactory completion of the outstanding matters, we anticipate issuing an unmodified review report. |
|---|---|

**Report to the Audit Committee on the 2010 Interim Review Final Report   1**

DEL00219439

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0003

# Introduction

| Identified misstatements | We have used materiality of $4.3 million (Q3 2009: $3.6 million, full year $20.0 million) for the quarterly income statement and $14.2 million (2009: $12.6 million) for the income statement for the nine months ended 30 September 2010 and the Balance Sheet. Both measures are based on profit before tax. This is consistent with the basis used to determine materiality for the previous year-end audit. |
|---|---|
| | Identified uncorrected misstatements reduce profit before tax for Q3 2010 by $3.6 million and have no net impact profit after tax. Details of our potential adjustments for Q3 2010, together with those for the nine months ending 30 September 2010, are included in Appendix 1. Management has concluded that the total impact of the uncorrected misstatements, both individually and in aggregate, is not material in the context of the financial statements taken as a whole, and we concur with their view |
| Accounting policies and financial reporting | As part of our review, we consider the quality and acceptability of the Group's accounting policies and financial reporting and their consistency with the 2009 annual report. We have nothing to report in these areas. |
| Accounting and internal control systems | As part of our review we have made enquiries of management regarding the control environment and the reliability of the management reporting process. We note that following the fraud identified in Q2 2010, management has restructured the finance team across the Group in order to transfer a number of internal control processes previously operated in the US into the UK so that key controls are now operated, monitored and reviewed by senior members of the Group finance team based in Cambridge. |
| | This change in internal control has had no direct impact on our work for the purposes of our Q3 2010 review other than the more accurate allocation of cost of goods sold and operating expenses described on 8 below. We shall perform our audit work on the design and implementation of controls as part of our pre-year end work in the UK and US in November 2010. |
| Independence | In our professional judgement we are independent within the meaning of APB Ethical Standards for Auditors and the objectivity of the audit engagement partner and audit staff is not impaired. We are currently in the early stages of financial due diligence on Project Dynamo and have been asked to provide a proposal to provide tax advice on the structuring of the transaction. We have considered the threats to our audit independence and are satisfied that the safeguards in place are adequate. |

DEL00219440

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0004

# 1.  Key risks

The results of our review procedures on key risks are set out below:

| Revenue Recognition | |
|---|---|
| **Assumed risk of fraud in relation to revenue recognition** | Revenues for the quarter were $211 million (Q3 2009: $192 million) and for the 9 month period ended 30 September 2010 were $626 million (9M 2009: $517 million). |
| | Management continues to apply a consistent approach which is compliant with IFRS to recognising revenues which includes performing credit checks, evaluating any ongoing managerial involvement and discharging obligations thereby ensuring that all of the provisions of International Accounting Standard 18, *Revenue*, ("IAS 18") have been satisfied. |
| | The most significant licence revenues recognised in Q3 2010 were with the US Department of Veteran Affairs (through FileTek Inc) ($10.0 million), Amgen Inc (through Capax Discovery LLC) ($9.0 million) and EMC Corporation ($5.0 million). |
| | Management has confirmed that no revenue deals contained side letters or ongoing Autonomy performance requirements that were excluded from the signed sales contracts. |
| | **US Department of Veteran Affairs ("VA")** |
| | This is a $10 million licence deal for EAS and Digital Safe software which has been sold via the value added reseller FileTek Inc ("FileTek"). Management has considered the recoverability of the debt from the reseller in order to meet the recognition requirements of IAS 18 and has deemed that the payment history of this reseller and the $0.5 million upfront payment received is sufficient to recognise the revenue. Historically Autonomy has purchased software from FileTek but no purchases have been made by Autonomy from this reseller during this quarter (Q2 2010: $11.5 million). |
| | **Amgen Inc ("Amgen")** |
| | This is a $9.0 million Digital Safe licence deal sold to this end user via the value added reseller Capax Discovery LLC ("Capax"). Autonomy have introduced this customer to the value added reseller in order for them to carry out the professional services implementation work required to migrate Amgen from EAS mail to DS mail. On the basis that Capax are up-to-date with their payments on the majority of the Eli Lilly sale discussed in Q2 2010, management has concluded there are no concerns over recoverability that would impact revenue recognition. |
| | **EMC Corporation ("EMC")** |
| | This is a £5.0 million extension to the previous OEM Licence agreement signed with this customer. |
| | VA, Amgen and EMC are all significant organisations and there is not debt overdue and so management are confident of the ultimate recoverability of the revenues earned. |

DEL00219441

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0005

# 1. Key risks

**Revenue Recognition (continued)**

| | |
|---|---|
| Deloitte response | Our review of revenue contracts was designed to select large contracts, those containing non-standard terms, as well as a sample of all other contracts. Our review work noted that revenue recognition continues to be consistently applied in comparison with previous periods and in accordance with Group accounting policies and IFRS. |
| | For all deals over $1 million we issued revenue confirmation requests direct to the customer. These were received in all cases except on the rare occasions where the legal department of certain large blue chip customers do not respond as a matter of policy. |
| | For each contract selected, we examined the terms and conditions of the contract to ensure that no unusual circumstances existed which might impact the recognition of revenue. We ensured that amounts recognised could reasonably be expected to be recoverable by inspecting payment history or credit checks where relevant. Furthermore, where ongoing managerial involvement is necessary, the carve out rate for revenues deferred were recalculated to ensure they were in line with Autonomy's standard carve out rates for support and maintenance and support services, where relevant. |
| | We concur with management's treatment of the above deals. |
| | We note that no value added reseller deals have been reversed this quarter and resigned directly with the end user and this supports management's policy of revenue recognition at the point of sale to the value added reseller. |
| | We have included two licence revenue amounts of $2.7 million with Red Ventures S.r.l (to the end user Poste Italiana) and $0.3 million with Sky Media as judgemental adjustments in Appendix 1.  Based on the information provided and the previous history with Sky Media and Poste Italiana, we believe that there is currently insufficient evidence of recoverability and therefore that it is not appropriate to recognise revenue at this stage. |

DEL00219442

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0006

# 1.  Key risks

**Recoverability of accounts receivable**

**Provision for doubtful debts**

The net accounts receivable balance at 30 September 2010 is $222.5 million (30 June 2010: $208.3 million). The actual bad debt expense on the income statement in the quarter amounted to $3.1 million (Q2 2010: $3.8 million). The bad debt provision at 30 September 2010 stands at $26.4 million (30 June 2010: $23.5 million).

Cash collection this quarter has been $190.1 million (including cash from factored debts), which has decreased from $227.0 million in Q2 2010. At the quarter end, $20.0 million was received from the Royal Bank of Scotland as part of a non-recourse financing agreement. This is an increase in factored debts of $14 million compared to Q2 2010. Under this agreement Autonomy retains no credit risk and the amounts have been removed from the accounts receivable balance at 30 September 2010.

As at close of business on 15 October 2010, total cash received since the period end was $11.9 million.  DSOs have increased at Q2 2010 from 82 days (which was unusually low) to 90 days, but are in line with normal levels and ahead of the 97 days at the end of Q3 2009.  Management continues to apply a detailed approach to credit control with increased scrutiny around the quarter end over potential exposure and the need to make a provision.

**Microtechnologies LLC**

We reported in Q2 2010 that an amount of $11.5 million was due from Microtechnologies LLC ("Microtech") relating to a licence deal where the end user is the Vatican.  As at the date of this report, $11.0 million of this amount remains outstanding and is now overdue. Microtech is a substantial business which has a long history of buying from Autonomy and a good track record of payments. Management is in discussion with Microtech management to arrange a payment plan and is confident that payment will be received in due course.  We understand that Microtech has yet to receive the amounts due from its end user and as such is delaying payment to Autonomy.  As a result, this amount remains unprovided at this time.  We highlight that this is a significant balance which management will need to re-assess for the purposes of the 2010 year-end financial statements. Should a substantial proportion of this balance not be recovered by year end, provisioning will need to be considered.

**Latin American debts**

Management continues to work with the Latin American overdue accounts previously reported to the Audit Committee to ensure that these balances are provided for where appropriate.  A further $2.6 million has been provided for on amounts receivable from Allotech, Integracion de Negocios, Informese and Digital Data, resulting in a net exposure on these accounts of $3.4 million. Management has secured a promissory note from Integracion de Negocios confirming their intention to settle $1 million of their debt on 30 December 2010. No further amount has been provided against the amount due from Telematica Lefic as management continues to work with the customer to resolve their technical issues and receive payment. There is a net exposure on this account of $0.8 million.

**Sales Consulting SRL**

In Q4 2009, as previously reported to you, Autonomy entered into a licence agreement with Sales Consulting SRL for $2.5 million. At the time we concluded that there was insufficient persuasive evidence that the amount was recoverable and as such we proposed a judgemental adjustment to defer the revenue. This amount is currently more than over 90 days overdue and the judgemental adjustment for the toal unprovided debt of $2.4 million continues to be proposed at Appendix 1.

The level of provision represents management's best estimate of the likely outcome of recoverability at this stage.

Report to the Audit Committee on the 2010 Interim Review Final Report   5

DEL00219443

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0007

# 1. Key risks

| Recoverability of accounts receivable |
| --- |

| Deloitte response | We have reviewed customer correspondence and payment histories which support the conclusions reached by management. Where we required further clarification, we have reviewed customer correspondence. |
| --- | --- |
| | We note that an amount due from Verdasys Inc ($0.6 million out of total balance of $4.6 million) which has historically been a good payer, has become overdue.  We understand that management is actively talking to Verdasys management and that a successful funding round has recently been completed and therefore concur with management's treatment. |
| | We accept the approach adopted by management with regards to Microtech at this stage but we will expect to see substantial cash receipts in Q4 2010 if provisioning is to be avoided. |

6    Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00219444

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0008

# 1.  Key risks

| Hardware sales | |
|---|---|
| **Presentation of costs associated with hardware sales** | Included in revenues for the quarter is $26.0 million of hardware sales. Q2 2010 sales were $27.5 million. Q1 2010 sales were $12.2 million.  In aggregate these sales represent approximately 10% of the Group's revenues for the nine months to 30 September 2010. |
| | The revenue in the quarter is primarily made up of sales of Dell hardware to Zones Inc (end user H&R Block for $11.9 million) Morgan Stanley for $5.6 million, SHI International (end user Bank of America for $3.8 million), Metro Business Systems Inc (end user UBS for $2.2 million) and Insight (end user Citi Group for $2.3 million). |
| | Consistent with the hardware sales discussed in previous quarters' reports to the Audit Committee, these strategic sales to major purchasers of software in the future have been made at a loss.  Management has taken all of the costs associated with the Dell hardware sales to cost of sales with the exception of the loss of approximately $4.8 million (of which $3.0m relates to the deferred revenue release element) which has been allocated to sales and marketing expenses on the basis that these sales are only made at a loss in order to procure future, profitable software sales. $7.8 million relates to deliveries of hardware contracted in previous quarters. |
| | Management has extended its analysis demonstrating the strong linkage between the loss making hardware sales and subsequent highly profitable software sales which indicates that for the $118 million of hardware sales made over the course of 2009 and 2010 to date (at a total loss of approximately $15 million), approximately $75 million of major software deals have taken place with these customers over the same period and $28 million of hosted revenues have been generated for which there is a recurring revenue stream.  All of these subsequent amounts have been transacted at Autonomy's normal high gross profit margin. |
| **Deloitte response** | We have reviewed management's analysis of the linkage between the loss making strategic hardware sales and subsequent profit making software sales and given the scale and consistency in allocation with the prior quarter, accept the decision taken by management to allocate the loss of $4.8 million to sales and marketing. |
| | Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q3 2010 press release. |
| | It is likely that the questions raised at the Q2 2010 press conference are raised again at the Q3 2010 press conference and therefore suggest that it would be helpful to include narrative regarding the nature of these revenues in the quarterly report. |

DEL00219445

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0009

# 2.  Other matters

| Other matter | Deloitte response |
|---|---|
| Depreciation refinement | The accounting policy for depreciation of fixtures and equipment is between three and five years on a straight line basis. Previously hardware at data centres has been depreciated over three years but management considers that a seven year period more accurately represents the useful economic life of the hardware. As the accounting policy range is between three and five years management have chosen to restrict this to five years. A credit of $1.7 million has therefore been recognised in the income statement and represents the cumulative effect of moving to a five year UEL for Q1-Q3 2010. |
| | IAS 16 *Property, Plant and Equipment* requires that changes to the estimate of the UEL should be accounted for as a change in accounting estimate in accordance with IAS 8 *Accounting Policies, Changes in Accounting Estimates and Errors* i.e. prospectively by including it in profit or loss in the period of the change and future periods. IAS 34 *Interim reporting* clarifies that if such items are recognised and measured in one quarter of a financial year and the estimate changes in the next quarter of the year, the original estimate is adjusted in the second interim period, by catching up in the current period. The results of previous interim periods of the current year are not retrospectively restated. This is the treatment adopted by management. |
| Opex refinement in Q2 and Q1 | During Q2 management restructured its group finance function in order to bring more internal control processes into the UK from the US.  As a result of this process management identified a number of inconsistencies in the manner in which costs were being allocated between cost of good sold ("COGS") and the various operating expenses categories. This was adjusted on a prospective basis for the 2010 financial year.  Management has now completed this exercise during the course of Q3 2010 resulting in a further adjustment to cost allocation for Q1-Q3 2010. Management is now confident that all allocations are consistent and appropriate, and is satisfied that these reallocations do not represent restatements, nor require restatements of prior year comparatives. Management did however include a comment in the Q2 release that certain reclassifications between cost categories to ensure consistency across the Group had been made and we encourage them to repeat this in the Q3 release. |
| | We have reviewed management's calculations in both Q2 and Q3 2010 and are comfortable that the revised approach is more representative of the substance of the costs incurred in the period and that no restatements of prior quarters are required. |
| Sponsorship deals | As reported in Q2 2010 the costs of the Mercedes sponsorship is being spread evenly over the two years of the agreement. In our view the higher costs of sponsorship in year one should be spread accross the first year, resulting in a slightly higher charge – an adjustment increasing the changes in Q3 2010 by $0.6 million has been proposed at Appendix 1. |
| | A deal with Tottenham Hotspur was signed in Q3 2010 to cover at least the next two years. The $13.7 million costs of the 2010/11 football season appropriately spread by reference to the number of Premier League home games played. |
| | Management has assumed that Tottenham will not earn the bonus payment for winning the Premier League title this season. |

DEL00219446

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0010

# 2.  Other matters

| Other matter | Deloitte response |
|---|---|
| Vacation accrual | As reported in Q2 2010, management reduced the vacation accrual by $1.4 million on the basis of their intention to change the practice of paying out such amounts where possible, ensuring that leaving employees use up any outstanding vacation during their notice period.  As we have not yet seen evidence of the feasibility of achieving such a reduction in the vacation accrual we are not yet in a position to agree with management's judgement. We have therefore continued to propose a judgemental adjustment in Appendix 1 to reinstate the $1.4 million vacation accrual. |
| Acquisition accounting | Management continues to monitor its provisional fair values attributed to the assets and liabilities acquired as part of the acquisitions of Microlink in Q1 2010 and the trade and assets of the information governance business of CA Technologies Inc in Q2 2010. There have been no adjustments required to the fair values in Q3 2010. The values attributed to separately identifiable intangibles remain a management estimate at this stage before being professionally valued by Duff & Phelps. |
| | Management is currently aware of an issue whereby CA Technologies Inc are invoicing amounts in respect of unbilled contracts that Autonomy purchased from them. This is currently being investigated by management and as a result no receivable has been recorded to reflect amounts that will be recovered from them and the assets and liabilities acquired remain on a provisional basis. |
| | Following approval from Microlink's Proxy Board we have been able to engage Deloitte US to perform agreed upon review procedures to gain assurance over the Microlink results for Q3 2010. We are not able to do this from the UK due to restrictions on access to their records. The results of these limited procedures have not raised any significant issues. |
| Payroll fraud | An insurance claim has been made in respect of the amounts fraudulently paid out in the US. The claim was for approximately $2.6 million, but the maximum coverage under the policy is $1 million hence only this amount has been recognised as a receivable. We have reviewed the terms of the insurance cover and concur that this is sufficiently certain to be paid out based on our understanding of the US payroll issue, which has resulted in the payroll and cash clerks being imprisoned. We have proposed an adjustment to reclassify the receivable from trade debtors to other debtors. |

DEL00219447

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0011

# 3. Taxation

**Taxation**

James Ferguson has acted as tax audit partner. James is independent of any tax related non-audit services provided and will be subject to rotation as a key audit partner in accordance with APB Revised Ethical Standards for Auditors. In particular, James is independent of the Deloitte transfer pricing team providing assistance with documenting Autonomy's transfer pricing position.

We have reviewed the tax workings and discussed key matters with management regarding the tax position of the key entities and major transactions in the year.

**Effective tax rate**

The Income Statement taxation charge for the 9 month period is $46.9 million which corresponds to a full year effective rate of 24.2% (year ended 31 December 2009: 28.0%). The expected effective tax rate at Q2 was 25.1% and the Q3 only effective tax rate is therefore 22.0% such that the effective tax rate for the nine months is consistent with the full year effective tax rate of 24.2%.

During the quarter the forecast profit for the full year was reduced by circa $60 million. As a consequence of this reduction in the forecast, the effective tax rate has reduced by approximately 1%. To understand the impact on the effective tax rate of the changes in profit forecast the drivers on the effective tax rate need to be considered. Whilst the principal mechanism for allocating profits between the UK and US is the transfer pricing policy it uses a profit split methodology, and hence  the effective tax rate is not impacted by the lower forecast profits in this regard.

The relative effect of other tax adjustments, specifically; the UK R&D relief, the benefit of the US financing structure and the recognition of US losses, all of which lower the effective tax rate, becomes more pronounced with the lower forecast full year profit.

The expected 2010 effective tax rate of 24.2% includes a number of items that would not be expected to be repeated in future years, primarily the additional recognition of US tax losses. Excluding these one-off adjustments, the effective tax rate would be approximately 28.1% and is expected to be approximately this level in 2011 and future years.

**Deferred taxes**

The net deferred tax liability relating to US purchased intangibles offset by US tax losses expected to be recognised in the balance sheet is $87.0 million ($82.4 million at 31 December 2009). This is consistent with previous periods factoring in further amortisation of the intangibles, recognition of additional US tax losses and utilisation of US tax losses against US profit. The net deferred tax liability has increased during the period as there is a greater rate of utilisation of available US losses against US taxable profit than amortisation of the purchased intangibles even when including the additional US tax losses recognised as a result of  the completion of the s382 study.

10   Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00219448

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0012

# 3.  Taxation

| Key audit risk | |
|---|---|
| **Transfer pricing** | As previously communicated to the Audit Committee the Group's documentation to support the US transfer pricing position is not compatible with US transfer pricing rules. |
| | At the end of Q2 2010, Deloitte were engaged to prepare more extensive transfer pricing documentation, to support the internal transfer pricing methodology being applied by management. |
| | A significant amount of the underlying work on the transfer pricing project has been completed during Q3 2010 and management is comfortable that the interim conclusions of this work assist in supporting the position which the Group has taken in the tax returns filed by its US entities for the 2009 financial year. |
| | Preparation of the final transfer pricing documentation report, consistent with US regulations and transfer pricing compliance requirements, is still in progress. This work is expected to be completed by management and Deloitte during Q4 2010. |
| **Tax provision** | The total tax provision expected at 31 December 2010 is $9.8 million, comprising as follows: |
| | • $7.2m in respect of potential historic transfer pricing exposures already identified as at Q2 2010; and |
| | • $2.6m additional provision in the quarter in respect of some Interwoven acquisition costs, included as deductible expenses in the 2009 US tax return filing. |
| | Management should ensure that a consistent provisioning policy is followed in respect of the creation, and eventual release, of the Group's tax provisions. We do not consider this presents any unprovided exposure risks. |
| | Shortly before issuance of this report, we were informed that PWC have opined on the $2.6 million of Interwoven acquisition costs and as such we have included this as an adjustment to tax in Appendix 1. |

DEL00219449

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0013

# 4.  Responsibility statement

This report has been prepared for the Board of Directors in that capacity and we therefore accept responsibility to you alone for its contents.  We accept no duty, responsibility or liability to any other parties, since this report has not been prepared, and is not intended, for any other purpose. It should not be made available to any other parties without our prior written consent.

**Deloitte LLP**
Chartered Accountants
Cambridge
17 October 2010

12  Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00219450

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0014

# Appendix 1: Potential adjustments

The following uncorrected misstatements were identified during the course of our review:

| | Page | Quarter | Q3 2010 Credit/ (charge) to current year income statement $'m | Q3 2010 Increase/ (decrease) in net assets $'m | 9m 2010 Credit/ (charge) to current year income statement $'m | 9m 2010 Increase/ (decrease) in net assets $'m |
|---|---|---|---|---|---|---|
| Adjustment to Mercedes sponsorship costs | 8 | Q2/Q3 | (0.6) | (0.6) | (1.2) | (1.2) |
| Discounting of Capax Global deal with extended payment terms | | Q2 | - | - | (0.3) | (0.3) |
| Amortisation of acquired intangibles | | Q2 | - | - | (0.3) | (0.3) |
| Additional carve out on THFC deal | | Q2 | - | - | (0.3) | (0.3) |
| Discounting for extended payment terms JPMC | | Q2 | - | - | (0.4) | (0.4) |
| IFRS 2 charge correction for use of incorrect rate | | Q2 | - | - | 0.3 | - |
| IFRS 2 charge correction for revised model opening position | | Q1 | - | - | 1.5 | - |
| | | | | | | |
| **Total factual misstatements** | | | (0.6) | (0.6) | (0.7) | (2.5) |
| | | | | | | |
| Reversal of Red Ventures Srl (Poste Italiana) licence deal | 4 | Q3 | (2.7) | (2.7) | (2.7) | (2.7) |
| Reversal of Sky Media revenue as previous debts have not been recovered | 4 | Q3 | (0.3) | (0.3) | (0.3) | (0.3) |
| Reversal of adjustment to vacation accrual | | Q2 | - | - | (1.4) | (1.4) |
| Reversal of revenue on Italian resellers (Auxilium and Computer Trading Srl) | | Q2 | - | - | (2.2) | (2.2) |
| Provision against recoverability of Sales Consulting Srl* | 5 | 2009 | - | - | (2.4) | (2.4) |
| | | | | | | |
| **Total judgemental misstatements** | | | (3.0) | (3.0) | (9.0) | (9.0) |
| | | | | | | |
| **Total (pre-tax)** | | | (3.6) | (3.6) | (9.7) | (11.5) |
| Tax provision adjustments | | Q2/Q3 | 2.9 | 2.9 | 3.3 | 3.3 |
| **Tax effect (22% / 24%)** | | | 0.7 | 0.7 | 2.3 | 2.7 |
| | | | | | | |
| **Total (post-tax)** | | | - | - | (4.1) | (5.5) |

DEL00219451

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0015

# Appendix 1: Adjustments

We identified balance sheet reclassifications which reduce deferred revenue and increase other creditors by $4.5 million and reduce trade receivables and increase other receivables by $1.0 million.

* Management expects to be able to satisfy us that amounts due from Sales Consulting Srl are recoverable and therefore that this additional provision of $2.4 million is not required.

We will obtain written representations from the Board of Directors confirming that after considering all these uncorrected items, both individually and in aggregate, in the context of the consolidated financial information  taken as a whole, they do not believe that any adjustments are required.

14   Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00219452

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0016

# Appendix 2: Draft management representation letter

(Autonomy Letterhead)

21 October 2010

Deloitte LLP
City House
126-130 Hills Road
Cambridge
CB2 1RY

Dear Sirs

**Review of interim financial information of Autonomy Corporation plc**

This representation letter is provided in connection with your review of the balance sheet of Autonomy Corporation plc as of 30 September 2010 and the related statements of income, changes in equity and cash flows for the three and nine month periods then ended and a summary of the significant accounting policies and other explanatory notes for the purposes of expressing a conclusion whether anything has come to your attention that causes you to believe that the interim financial information does not give a true and fair view of the financial position of Autonomy Corporation plc as at 30 September 2010, and of its financial performance and its cash flows in accordance with the recognition and measurement criteria of IFRSs as adopted for use in the European Union and the basis set out in note 1 to the quarterly press release. We acknowledge our responsibility for the fair presentation of the interim financial information in accordance with the recognition and measurement criteria of IFRSs as adopted for use in the European Union and the basis set out in note 1 to the quarterly press release.

We confirm, to the best of our knowledge and belief, the following representations:

- The interim financial information referred to above has been prepared and presented in accordance with the recognition and measurement criteria of IFRSs as adopted for use in the European Union and the basis set out in note 1 to the quarterly press release.
- We have made available to you all books of account and supporting documentation, and all minutes of meetings of shareholders and the board of directors.
- There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial information.
- There has been no known actual or possible non-compliance with laws and regulations whose effects required consideration when preparing the interim financial information or that could have a material effect on the interim financial information in the event of non-compliance.
- We acknowledge responsibility for the design and implementation of internal control to prevent and detect fraud and error.
- We have disclosed to you all significant facts relating to any known frauds or suspected frauds that may have affected the entity.

Report to the Audit Committee on the 2010 Interim Review Final Report   15

DEL00219453

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0017

- We have disclosed to you the results of our assessment of the risk that the interim financial information may be materially misstated as the result of fraud.
- We believe the effects of uncorrected misstatements summarised in the accompanying schedule are immaterial, both individually and in the aggregate, to the interim financial information taken as a whole. A summary of such items is attached at Appendix 1.
- We confirm the completeness of the information provided to you regarding the identification of related parties.  In particular, we confirm that Microtechnologies LLC is not a related party.
- We confirm that the quarterly financial information has been prepared on the going concern basis.  We do not intend to liquidate the company or cease trading as we consider we have realistic alternatives to doing so.  We are not aware of any material uncertainties related to events or conditions that may cast significant doubt upon the company's ability to continue as a going concern.  We confirm the completeness of the information provided regarding events and conditions relating to going concern at the date of approval of the quarterly financial information, including our plans for future actions.
- Where relevant, the assumptions used in the presentation and measurement of fair values reflect our intent and ability to carry specific courses of action on behalf of the entity.
- The entity has satisfactory title to all assets and there are no liens or encumbrances on the entity's assets.
- We have recorded or disclosed, as appropriate, all liabilities, both actual and contingent.
- No events have occurred subsequent to the balance sheet date and through the date of this letter that may require adjustment to or disclosure in the aforementioned interim financial information.
- We have assessed the recoverability of the amount due from Microtechnologies LLC and are satisfied that the amount is recoverable in full and that no provision is required at this stage.
- No revenue deals contained side letters of ongoing Autonomy performance requirements that were excluded from the signed sales contracts.

We confirm that the above representations are made on the basis of adequate enquiries of management and staff (and where appropriate, inspection of evidence) sufficient to satisfy ourselves that we can properly make each of the above representations to you.

_____

Director

For & on behalf of Autonomy Corporation plc

16  Report to the Audit Committee on the 2010 Interim Review Final Report

DEL00219454

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 1183-0018



Deloitte refers to one or more of Deloitte Touche Tohmatsu ('DTT'), a Swiss Verein, and its network of member firms, each of which is a legally separate and independent entity. Please see www.deloitte.co.uk/about for a detailed description of the legal structure of DTT and its member firms.

Deloitte LLP is the United Kingdom member firm of DTT.

This publication has been written in general terms and therefore cannot be relied on to cover specific situations; application of the principles set out will depend upon the particular circumstances involved and we recommend that you obtain professional advice before acting or refraining from acting on any of the contents of this publication. Deloitte LLP would be pleased to advise readers on how to apply the principles set out in this publication to their specific circumstances. Deloitte LLP accepts no duty of care or liability for any loss occasioned to any person acting or refraining from action as a result of any material in this publication.

© 2010 Deloitte LLP. All rights reserved.

Deloitte LLP is a limited liability partnership registered in England and Wales with registered number OC303675 and its registered office at 2 New Street Square, London EC4A 3BZ, United Kingdom. Tel: +44 (0) 20 7936 3000 Fax: +44 (0) 20 7583 1198.

**Member of Deloitte Touche Tohmatsu**

DEL00219455

Exhibit C

| | |
|---|---|
| **From:** | Sushovan Hussain [sushovanh@autonomy.com] |
| **Sent:** | Wednesday, December 29, 2010 2:55 PM |
| **To:** | 'julied@autonomy.com'; 'andrewk-autonomy.com'; 'jon.coy@autonomy.com' |
| **Cc:** | 'Neil Araujo' |
| **Subject:** | Tikit and kpmg |

Neil is flying overnight to be in London tomorrow to close this deal out. I need a lawyer to be on hand. Suggest either jon or andy.

I also need a side letter (which will be disclosed) that has that in the highly unlikely event that kpmg do not extend then tikit can resell similar software, part of partnership etc. start with the fact that tikit has been an autonomy partner for many years, many customers. Please can I have this done tonight so that neil and I can review and submit in person tomorrow.

Separately I want a heads of agreement that says we will negotiate and buy 500 man days at £550 to be used over 18 months.

1

FOIA Confidential Treatment Requested

HP 0000374

Exh 1329-0001

Exhibit D



17 December 2009

**MICROLINK, LLC.**
**8330 BOONE BLVD.**
**3RD FLOOR**
**VIENNA, VA 22182**

Attn.  Alan Rizek,

We would appreciate your assistance in providing a verification of specific invoices payable to permit the completion of our annual audit.

Please confirm directly to our auditors, Deloitte LLP, City House, 126-130 Hills Road, Cambridge, CB2 1RY, UK quoting reference: **LPW,** that the invoices selected from your account and listed below were proper and were unpaid as of 30th November 2009.

| Invoice Number | Invoice Date | Due Date | Invoice Currency | Amount |
|---|---|---|---|---|
| 4889-ANA | 12/31/08 | 10/31/09 | USD | 1,375,000.00 |
| 4889-ANA | 12/31/08 | 01/31/10 | USD | 1,375,000.00 |
| 4889-ANA | 12/31/08 | 04/30/10 | USD | 1,375,000.00 |
| 4889-ANA | 12/31/08 | 07/31/10 | USD | 1,375,000.00 |
| 4889-ANA | 12/31/08 | 10/31/10 | USD | 1,375,000.00 |
| 4889-ANA | 12/31/08 | 01/31/11 | USD | 1,375,000.00 |
| 5590-ANA | 06/30/09 | 12/27/09 | USD | 536,625.00 |
| 5591-ANA | 06/30/09 | 12/27/09 | USD | 1,023,750.00 |
| 5592-ANA | 06/30/09 | 12/27/09 | USD | 241,993.50 |
| 5593-ANA | 06/30/09 | 12/27/09 | USD | 50,625.00 |
| 5595-ANA | 06/30/09 | 12/27/09 | USD | 66,969.00 |
| 5596-ANA | 06/30/09 | 09/28/09 | USD | 1,250,000.00 |
| 5596-ANA | 06/30/09 | 12/27/09 | USD | 1,250,000.00 |
| 5596-ANA | 06/30/09 | 04/06/10 | USD | 2,500,000.00 |
| 5597-ANA | 06/30/09 | 09/28/09 | USD | 136,264.25 |
| 5597-ANA | 06/30/09 | 12/27/09 | USD | 1,035,537.00 |
| 5600-ANA | 06/30/09 | 12/27/09 | USD | 80,797.50 |
| 5601-ANA | 06/30/09 | 09/28/09 | USD | 419,498.50 |
| 5601-ANA | 06/30/09 | 12/27/09 | USD | 1,258,495.50 |
| 5602-ANA | 06/30/09 | 12/27/09 | USD | 157,950.00 |
| 5813-ANA | 09/16/09 | 10/31/09 | USD | 163,143.85 |
| 5819-ANA | 09/18/09 | 12/17/09 | USD | 67,750.00 |
| 5819-ANA | 09/18/09 | 03/17/10 | USD | 203,250.00 |
| 5957-ANA | 09/30/09 | 11/29/09 | USD | 56,250.00 |
| 5957-ANA | 09/30/09 | 01/08/10 | USD | 168,750.00 |
| 5958-ANA | 09/30/09 | 11/29/09 | USD | 105,550.75 |
| 5958-ANA | 09/30/09 | 01/08/10 | USD | 316,652.25 |
| 5970-ANA | 09/30/09 | 12/29/09 | USD | 1,004,062.50 |
| 5970-ANA | 09/30/09 | 03/29/10 | USD | 3,012,187.50 |
| 5971-ANA | 09/30/09 | 12/29/09 | USD | 180,000.00 |
| 5971-ANA | 09/30/09 | 03/29/10 | USD | 540,000.00 |

Autonomy Inc, One Market Plaza, Spear Tower, Suite 1900, San Francisco, CA 94105
Tel: +1 415 243 9955  Fax: +1 415 243 9984

POS00138501

**K5/74/1**



Your prompt attention to this request will be greatly appreciated. If you could also fax a copy of your response to +44 (0)1223 350839 or eMAIL it to lwelham@deloitte.co.uk as well as mailing it to the above address it would be of great assistance. This is not a request for payment; please <u>do not</u> send your remittance to the auditors.

Yours faithfully

*Steve Chamberlain*
*VP Finance*

---

The items listed above were properly charged to our account and were unpaid as of 30th  November 2009 and  there are no side letters or other agreements in respect of the subject matter of this request, except as noted below:

Date: 12/30/09

Microlink LLC
Company

Signature

CFO
Title

Autonomy Inc, One Market Plaza, Spear Tower, Suite 1900, San Francisco, CA 94105
Tel: +1 415 243 9955  Fax: +1 415 243 9984

POS00138501

K5/74/2

Exhibit E

**To:** Steve Chamberlain[stephenc@autonomy.com]; Sushovan
Hussain[sushovanh@autonomy.com]
**Cc:** Anthony Bettencourt - Autonomy[anthonyb@autonomy.com]
**From:** Brent Hogenson
**Sent:** Fri 3/27/2009 12:44:50 PM
**Subject:** Q4_2008_Sales_Rep_Letter.doc
Q4_2008_Sales_Rep_Letter.doc

Steve, Sushovan

In past quarter we have asked our sales VPs, RSDs, Country Managers and any Account Executives that closed a significant transaction within the quarter--significant was generally $500K or above.  This letter ensures that our sales team is thinking about the serious issues of side letters that have impacted about 90% of software company restatements in the past.  Our team will expect to sign this letter at the end of Q1 as a normal process.  Do you want me to continue this process or discontinue?

Regards,

Brent



OIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00019223
US_SEC_EX 00000057
EXH 13021-0001

# Interwoven, Inc.

**To:**      Brent Hogenson, VP Finance
**Date:**    December 31, 2008
**Subject:** Verbal or Written Side Letters or Sales to Resellers

I confirm, to the best of my knowledge and belief, the following representations made to you during your review of the interim consolidated financial statements of Interwoven Inc. as of December 31, 2008 and for the three months then ended.

1. You have been provided with complete customer contracts and agreements.

2. There are no side letters or oral agreements with customers that would modify or supersede the terms of the purchase orders and/or contracts with these customers.

3. We have not promised any upgrade rights to customers nor have promised any services except as specifically stated in the related contract or purchase order and for which revenue has been appropriately deferred.

4. Except for the rights included in the customer agreements, our customers have not been granted any rights to return products nor extended payment terms and there are no unfulfilled performance guarantees for which revenue has been recorded.

5. No sales have been made during the quarter for which payment is contingent on the customer's obtaining financing from an outside funding source.

6. All shipments to partners, resellers, distributors or similar entities are for immediate delivery to customers. No shipments have been made in advance of dates necessary to meet customer delivery requirements. In addition, no revenue has been recognized on products in our possession or under our control.

7. No matters or occurrences have come to my attention during the quarter ended December 31, 2008 and through the date of this letter that would materially affect the recognition of revenue in the financial statements and related disclosures for the quarter ended December 31, 2008.

Name:_____

Title:_____

Date:_____

OIA CONFIDENTIAL TREATMENT REQUESTED

| | |
|---|---|
| **From:** | Steve Chamberlain [stephenc@autonomy.com] |
| **Sent:** | Friday, March 27, 2009 2:09 PM |
| **To:** | 'Brent Hogenson'; 'Sushovan Hussain' |
| **Cc:** | 'Anthony Bettencourt - Autonomy' |
| **Subject:** | RE: Q4_2008_Sales_Rep_Letter.doc |

Discontinue. We only do this on an annual basis.

Thanks

**Steve Chamberlain**
**VP, Finance**
**Autonomy**

Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ

Direct tel: 01223 448017
Mobile tel: 07795 601794
Fax: 01223 448040

E-mail: stephenc@autonomy.com
Web: www.autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

---

**From:** Brent Hogenson [mailto:Brent.Hogenson@autonomy.com]
**Sent:** 27 March 2009 16:45
**To:** Steve Chamberlain; Sushovan Hussain
**Cc:** Anthony Bettencourt - Autonomy
**Subject:** Q4_2008_Sales_Rep_Letter.doc

Steve, Sushovan

In past quarter we have asked our sales VPs, RSDs, Country Managers and any Account Executives that closed a significant transaction within the quarter--significant was generally $500K or above. This letter ensures that our sales team is thinking about the serious issues of side letters that have impacted about 90% of software company restatements in the past. Our team will expect to sign this letter at the end of Q1 as a normal process. Do you want me to continue this process or discontinue?

Regards,

Brent

1



OIA CONFIDENTIAL TREATMENT REQUESTED

**HP-SEC-00019225**

US_SEC_EX 00000059

EXH 13022-0001

# Exhibit F



22 February 2011


Deloitte LLP
126-130 Hills Road
Cambridge
CB2 1RY

Dear Sirs

This representation letter is provided in connection with your audit of the financial statements of Autonomy Corporation plc and its consolidated financial statements for the year ended 31 December 2010 for the purpose of expressing an opinion as to whether the financial statements give a true and fair view of the financial position of Autonomy Corporation plc as of 31 December 2010 and of the results of its operations, other recognised gains and losses and its cash flows for the year then ended in accordance with the applicable accounting framework and the Companies Act 2006.  We are aware that under Section 501 of the Companies Act 2006, it is an offence to mislead a company auditor.

We confirm, to the best of our knowledge and belief, the following representations.

**General representations**

Financial statements

1.      We understand and have fulfilled our responsibilities for the preparation of the financial statements in accordance with the applicable financial reporting framework and the Companies Act 2006 which give a true and fair view, as set out in the terms of the audit engagement letter.

2.      Significant assumptions used by us in making accounting estimates, including those measured at fair value, are reasonable.

3.      All events subsequent to the date of the financial statements and for which the applicable financial reporting framework requires adjustment of or disclosure have been adjusted or disclosed.

4.      The effects of uncorrected misstatements and disclosure deficiencies are immaterial, both individually and in aggregate, to the financial statements as a whole.  A list of the uncorrected misstatements and disclosure deficiencies is detailed in the appendix to this letter.

5.      We confirm that the financial statements have been prepared on the going concern basis.  We do not intend to liquidate the company or cease trading as we consider we have realistic alternatives to doing so.  We are not aware of any material uncertainties related to events or conditions that may cast significant doubt upon the company's ability to continue as a going concern.  We confirm the completeness of the information provided regarding events and conditions relating to going concern at the date of approval of the financial statements, including our plans for future actions.

Page 1

POS00165477

K15/366/1



*Information provided*

6.      We have provided you with all relevant information and access as agreed in the terms of the audit engagement letter and required by sections 499 and 500 of the Companies Act 2006.

7.      All transactions have been recorded and are reflected in the financial statements and the underlying accounting records.

8.      We acknowledge our responsibilities for the design, implementation and maintenance of internal control to prevent and detect fraud and error.

9.      We have disclosed to you the results of our assessment of the risk that the financial statements may be materially misstated as a result of fraud.

10.     We have disclosed to you all information in relation to allegations of fraud, or suspected fraud, affecting the entity's financial statements communicated by employees, former employees, analysts, regulators or others.

11.     We are not aware of any instances of non-compliance, or suspected non-compliance, with laws, regulations, and contractual agreements whose effects should be considered when preparing financial statements

12.     We have disclosed to you the identity of the group's related parties and all the related party relationships and transactions of which we are aware.

13.     All known actual or possible litigation and claims whose effects should be considered when preparing the financial statements have been disclosed to you and accounted for and disclosed in accordance with the applicable financial reporting framework. On the basis of legal advice we conclude that there are no material claims against the group.  No other claims in connection with litigation have been or are expected to be received.

14.     We have no plans or intentions that may materially affect the carrying value or classification of assets and liabilities reflected in the financial statements.

## Specific representations

*Revenue recognition*

15.     We confirm that based on our experience and judgement five per cent continues to represent the fair value of the maintenance and support services provided on greater than $1.0 million licence deals, unless a higher percentage is stated in the signed agreement. We have therefore used a five percent "carve out" rate for such larger sales, unless otherwise stated in the agreement.

16.     No revenue deals containing side letters of ongoing Autonomy performance requirements that were excluded from the signed sales contracts.

Page 2

Autonomy Corporation plc, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

POS00165477

**K15/366/2**



*Recoverability of trade receivables*

17.     We have assessed the recoverability of the amount due from Microtechnologies LLC and are satisfied that the amounts are recoverable in full and that no provision is required at this stage.

Classification of costs

18.     The directors confirm that the allocation of associated costs in respect of strategic hardware sold between "cost of goods sold" and "sales and marketing expense" appropriately reflect the nature of these items.

*Information provided*

19.     We have disclosed to you all relevant information in relation to the US Payroll Fraud that affects the entity or group and involves:

        (i).     management;

        (ii).    employees who have significant roles in internal control; or

        (iii).   others where the fraud could have a material effect on the financial statements.

*Non-current assets and impairment*

20.     We have considered the carrying value of all intangible assets and capitalised development costs and are satisfied that there are no issues of impairment. In the case of development costs, we consider that such costs have been incurred in the development of future products for which there is reasonable expectation that such products will generate future revenues to cover these balances.

21.     We have reviewed fixed assets and goodwill for impairment.  Our review comprised a comparison of the carrying amount and recoverable amount of the fixed assets or goodwill and, hence, involved consideration of the value in use.  The cash flows used in the calculation are consistent with the most up-to-date budgets and plans formally approved by management and are based on reasonable and supportable assumptions.  The discount rate used of 12.8%, in our view, represents the rate that the market would expect on an investment of equivalent risk.  As a result of this impairment review we are not aware of any events or changes in circumstances occurring during the period which indicate that the carrying amount of fixed assets or goodwill may not be recoverable.

22.     We confirm that the goodwill and intangible assets recognised on acquisition of the trade and assets of CA Technologies in the year have been calculated accurately on a basis consistent with the method used for previous Autonomy acquisitions. We also confirm that the goodwill and intangible assets recognised on acquisition of Microlink LLC have also been calculated accurately on a basis consistent with the method used for previous Autonomy acquisitions.

Autonomy Corporation plc, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

POS00165477

K15/366/3



23.     The forecast projections for the joint venture Open V have been considered. These projections support the carrying value of the investment in the joint venture and there is no evidence of material impairment to the carrying value of this investment.

*Financial statement disclosures*

24.     As a result of the inclusion of IDOL technology across all of the group's products and services, the generally fixed cost nature of overheads together with the absence of trading divisions, the Directors consider that the business has only one segment as defined by IFRS 8 "Operating Segments" and there is no further subdivision of the business on which the Chief Operating Decision Maker bases his decisions. The key financial data monitored by the Chief Operating Decision Maker is the revenue lists which aggregate group revenues by sales person.

25.     We confirm the completeness of the information provided regarding the identification of related parties, and the adequacy of related party disclosures in the financial statements. We have made enquiries of any key managers or other individuals who are in a position to influence, or who are accountable for the stewardship of the reporting entity and confirm that we have disclosed in the financial statements all transactions relevant to the group and we are not aware of any other such matters required to be disclosed in the financial statements, whether under IAS24 "Related party disclosures" or other requirements.   In particular we are satisfied that Mike Lynch's role as a non executive director of Blinkx plc does not require any involvement in the strategic operating decisions or policies of that company.

We confirm that the above representations are made on the basis of adequate enquiries of management and staff (and where appropriate, inspection of evidence) sufficient to satisfy ourselves that we can properly make each of the above representations to you.

Yours faithfully

*Sushovan Hussain*

Signed on behalf of the Board of Directors

Autonomy Corporation plc, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

POS00165477

**K15/366/4**

| Appendix 1 – Schedule of uncorrected misstatements | Quarter | Credit/ (charge) to current year income statement $'m | Increase/ (decrease) in net assets $'m |
|---|---|---|---|
| Provision against recoverability of Sales Consulting Srl | 2009 | (2.3) | (2.3) |
| IFRS 2 charge correction for revised model opening position | Q1 | 1.8 | - |
| Correction to FX movement on payment of Morgan Stanley invoice* | Q4 | (0.6) | (0.6) |
| Accrual for bonuses proposed for the CFO and CEO* | Q4 | (0.5) | (0.5) |
| **Total factual misstatements (pre-tax)** | | (1.6) | (3.4) |
| **Tax effect at effective rate (28%)** | | 0.4 | 1.0 |
| **Total factual misstatements (post-tax)** | | **(1.2)** | **(2.4)** |
| Provision against recoverability of AS Computadoras | Q2 | (1.4) | (1.4) |
| Provision against of Red Ventures Srl licence deal | Q3 | (2.7) | (2.7) |
| Reversal of revenue on Auxilium | Q2 | (2.0) | (2.0) |
| Provision against recoverability of Comercializadora Cobal | Q4 | (2.7) | (2.7) |
| Adjustment to Mercedes sponsorship costs | Q2/Q3 | (1.0) | (1.0) |
| Correction for revised approach to R&D capitalisation | Q4 | 1.7 | 1.7 |
| **Total judgemental misstatements** | | (8.1) | (8.1) |
| **Tax effect on the above at effective rate (28%)** | | 2.3 | 2.3 |
| **Total judgemental misstatements (post-tax)** | | **(5.8)** | **(5.8)** |
| **Total de-minimis misstatements** | | (2.3) | (2.3) |
| **Tax effect on the above at effective rate (28%)** | | 0.6 | 0.6 |
| **Total de-minimis misstatements (post-tax)** | | **(1.7)** | **(1.7)** |
| **Total misstatements (pre-tax)** | | **(12.0)** | **(13.8)** |
| **Total misstatements (post-tax)** | | **(8.7)** | **(9.9)** |

*These relate to adjustments identified after the Audit Committee report was issued on 26 January 2011.

**Income statement classification adjustments**

In addition to the misstatements noted above, we bring to your attention an income statement classification adjustment of $4.4 million from sales and marketing expense to cost of goods sold.  This relates to the assumed profit margin which management has allocated to the Q2 to Q4 hardware sales in the year.

**Balance sheet classification adjustments**

In addition to the misstatements noted above, we bring to your attention the following balance sheet classification adjustments:

- An increase to trade receivables and other creditors of $2.4 million. This relates to the net impact of a number of immaterial classification adjustments between trade receivables and creditors.

- An increase to non-current receivables and a decrease to cash and cash equivalents of $6.2 million.  This relates to restricted cash in relation to the building leases held by Autonomy Inc and Interwoven Inc, which is not recoverable within 12 months of the balance sheet date.

- An increase to other receivables and a decrease to trade receivables of $2.2 million. This relates to an invoice raised to Belgacom in advance of the contractual terms.

- An increase to trade receivables and a decrease to cash and cash equivalents of $1.2 million.  This relates to the reversal of an adjustment posted which incorrectly allocated cash received against debtor amounts.

- A decrease to deferred revenue and other receivables of $2.6 million.  This relates to the net impact of a number of immaterial classification adjustments between deferred revenue and other receivables.

**Disclosure deficiencies**

Below is a list of the uncorrected disclosure deficiencies:

- Directors report – creditor days for the group as required by Acc Regs Sch. 7:12.

- Acquisitions note 26 – the following items are required by IFRS 3 (2008):

  o The date of the acquisition; and
  o Separate disclosures for each acquisition in the period.

- Convertible loan note 22 – the following disclosures are required by IAS 1 (2007):

  o The group's objectives, policies and processes for managing its obligation to repurchase or redeem the convertible loan notes when required to do so by the instrument holders;
  o The expected cash outflow on redemption or repurchase of the convertible loan notes; and
  o Information about how the expected cash outflow on redemption or repurchase was determined.

- Segmental analysis note 5 – the following information is required by IFRS 8:

  o Total revenues to customers for each material country, including the country of domicile; and

- o   Total non-current assets for each material country, including the country of domicile.

Exhibit G

MRL MEETING.

- COMMERCIAL RATIONALE
  - EMC
- CIRCULAR TRANSACTIONS
  - VMS
  - MICROLINK
  - CAPAX

- "BAD" BUSINESS
  - SOUTH AMERICA
  - ITALY
  - EEPAD
  - EARLY REV REC
  - MAINTENANCE ROLL UPS.
  - EMC

- FINANCIAL STATEMENT ERASURE
  - DEBTORS
  - ACCRUED INCOME
  - DEFERRED RGRENUE

- COMBINED DEALS
  - HOW DO THEY GET RECORDED
- 2008 PROFITS
  - COMPARE ENTITY PROFITS.

| ETALK | ANDREW JOWER - CEO |
| VERITY | MOONEY CABAN - CMO    JOEL SCOTT |
| ZANTAZ | MIKE SULLIVAN - CEO |
| IWOV | RAFIQ - CTO. CEO |

- ZANTAZ, ETALK, VERITY.
  - REVIEW CURRENT ALLOCATIONS
    - BARGAINING POSITION, - 2009.
    - BIG DEALS - 2009
  - DO ANALYSIS OF 2007 | 8 | 9
  - 2005 | 2006 | 2007 | 2008 | 2009
  - LOOK AT LARGEST DEALS
  - ACCOUNTING PROFIT.

HP-SEC-01841228
Exh 20006-0135

# Exhibit H

**To:**     Sarin, Manish[manish.sarin@hp.com]
**Cc:**     Johnson, Andy (Corp Dev)[andyjohnson@hp.com]; Breya, Marge[marge.breya@hp.com];
Robison, Shane[shane.robison@hp.com]; 'Mike Lynch'[mrl@autonomy.com]; 'Sushovan
Hussain'[sushovanh@autonomy.com]
**From:**   Derek Brown
**Sent:**   Tue 8/23/2011 8:24:26 AM
**Importance:**   Normal
**Subject:**   Background information
Autonomy organic growth.pdf

Manish,


Here is the background information you requested.


Regards,


Derek



-----------------------------------


Autonomy        cid:image002.jpg@01CB4386.E4433700


Derek J. Brown


Autonomy Plc

Tel: +44 20 7104 5700

derek.brown@autonomy.com



**FOIA CONFIDENTIAL TREATMENT REQUESTED**                    HP-SEC-01674443


Exh 2332-0001

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-01674444

Exh 2332-0002



## Autonomy – *calculating organic growth*

Autonomy discloses its organic revenue growth calcu lation in each audited quarterly financial report.

**Background :** Some analysts have attempted to imply that Autono my's growth has been lower than the stated figure. We understand one of your competitor s is attempting to resurrect these old arguments, incorrectly stating that Autonomy's growth has been  driven acquisition; the organic growth number is manipulated by them to suit their argument.

The analysts also missed certain key points, in par ticular:

1. **Margin growth** . The acquired businesses were low to zero margin,   yet EPS growth is strong.

2. **Discontinued products** . None of the acquired products were continued so I  DOL growth is actually *understated* .

3. **Shift to the cloud** . These analysts give no consideration to the very       rapid growth in the cloud business and its depressing affect on short term gr owth numbers despite the singings being legal committed future revenue. This is explained in furt her detail below.

This game has largely ended as the last major acqui      sition was 2009 and so the real calculation is now trivial as discussed below.

<u>It is a simple calculation:</u>  in analysing organic growth Autonomy considers    **organic IDOL** growth to be the most meaningful performance metric for understandin g the momentum within the business.

**Definition:** Organic IDOL growth excludes the contribution from acquisitions, foreign exchange impact, services revenue (not a goal of the business) and d eferred revenue release (primarily maintenance inco me).

*Table 1: Quarterly core IDOL organic growth*

|  | Q1'09 | Q2'09 | Q3'09 | Q4'09 | Q1'10 | Q2'10 | Q3'10 | Q4'10 | Q1'11 | Q2'11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Organic IDOL growth | 19% | 19% | 16% | 18% | 29% | 19% | 10% | 13% | 19% | 15% |

*Source, Autonomy Corp. – as disclosed in quarterly financial releases*

*Table 2: Organic growth calculation – core IDOL*

|  | Ist half ('11 vs '10) | | Full year '10 vs '09 | |
|---|---|---|---|---|
|  | **17%** | | **17%** | |
| Total product | 324.2 | 267.5 | 574.0 | 490.5 |
| less: acqn | -9.6 | | | |
| FX | -1.6 | | 3.3 | |
| Add: Iwov q1'09 stub | | | | 4 |
|  | **313.0** | **267.5** | **577.3** | **494.5** |

*Source: Autonomy Corp.*

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-01674445

Exh 2332-0003



*Some of the more common analytical pitfalls...*

<u>Overstating the contribution from acquisitions</u>. We are surprised that this happens as Autonomy provides organic growth calculations in the supplementary data within its audited quarterly financial results. In recent quarters the effect of acquisitions has actually been immaterial.

No countering adjustment made for disposals in the period. When adjusting for acquisitions, the analysts fail to adjust for the services revenues Autonomy has typically discontinued immediately following an acquisition.

<u>Attempting to make simplistic adjustments for hardware revenue</u>. Autonomy makes a limited number of appliance-based sales, which contain a small amount of hardware revenue. Analysts typically fail to add just for the hardware that might have been in the year ago period and so typically come to erroneous conclusions that understate organic growth.

<u>Stripping out the fast growing parts of the business</u>. In some cases the fastest growing parts of the business were arbitrarily excluded from the calculation, e.g. IDOL OEM or IDOL Cloud, and the result then stated as 'core'.

<u>Failure to take account of the shift to the cloud</u>. Autonomy is one of the world's most successful cloud computing companies, witnessing a rapid shift to the cloud delivery model, as customers bypass IT departments and opt for a monthly subscription model. This has the effect of lowering near term recognised license revenue but of storing up high quality, recurring revenues in the future.

NB: Autonomy's published **'Commit'** metric reflects cloud signings and so is a better reflection of the underlying growth in that business. In Q2'11 the cloud-related Commit grew by 41% on an organic basis. This is compared to the 17% growth in recognised revenue, which obviously lags signings growth. IDOL Cloud is currently 36% of core IDOL sales.

> **Definition:** The Autonomy 'Commit' metric comprises all future revenue to which Autonomy is contractually entitled. As such, it includes deferred revenue (principally maintenance income) and the committed monthly spend for cloud customers.

<u>Misunderstanding the momentum in IDOL OEM</u>. Autonomy has consistently signed 10 to 15 OEM agreements per quarter for many years. These lead to royalty revenues which begin to flow around 2 years later as 3 rd party products with IDOL embedded come to market. Thus there is a **layering effect** as more and more products begin paying royalties each quarter.

Another key driver for OEM is the **royalty rate**, which averages around 4% but is ticking up as more functionality is licensed. IDOL OEM revenues grew by 27% in Q2'11 which is pure organic expansion. IDOL OEM is currently 26% of core IDOL sales.

> **Conclusion:** with 62% of core IDOL sales now derived from IDOL Cloud (41% annual growth in signings) and IDOL OEM (consistent 25-30% growth with high visibility), an important inflection point has been reached as these areas become the core engine of top line growth.

Exh 2332-0004



## *Autonomy and its acquisitions*

1) Autonomy has made 4 material acquisitions since inc eption. This is less than any other major software company (see chart below).

2) Autonomy's revenue has grown from $96 million to $1  .1 billion, a 49% CAGR since 2005. Stripping out the effects of acquisitions 60% of current FY'1  1 consensus revenue is organic.

3) All of the businesses that Autonomy has acquired ha  ve been low margin, averaging just 7% net profit margin. Even back in 2005, prior to any mate rial acquisitions, Autonomy achieved a 16% net profit margin which has now grown to >32%.

4) To put that another way, 90% of Autonomy's profit t oday is derived from organic growth.

5) Since 2005, Autonomy's market value has grown from   $450 million to $7.3 billion. Stripping out the acquisitions and the market performance, 68% of   this increase is attributable to management.



Number of Acquisitions since 2007

# Exhibit I

1   not -- frankly, I don't see it as a trial within a trial, this

2   particular issue; but I will go back and look at it; okay.

3       With respect -- and the last one is number 5.  This one is

4   pretty minor.  Whether or not to use the term "backdated,"

5   which I take it the Defense thinks is a loaded term and

6   suggests nefarious activity.  So why don't you say

7   "retroactively dated?"

8       **MR. ABRAHAMSON:**  May we request permission to suggest

9   that the date was wrong or false, Your Honor?  Our concern with

10  "retroactive" is it buys into the Defense's theory of this

11  document which was that it reflected a valid agreement.  And

12  that theory the Government strongly disputes, Your Honor.  And

13  so if we are permitted to -- go ahead, Your Honor.

14      **THE COURT:**  No, I'm --

15      **MR. ABRAHAMSON:**  Okay.  So if we are forced to suggest

16  that the date was retroactive, that is implicitly a concession

17  that this was a valid agreement as of December 2nd, 2013, when

18  the remainder of the evidence that the Government will adduce

19  at trial contradicts that theory.

20      They were not payments on the terms reflected in the note.

21  The note was signed by the Kellys in May of 2014 as opposed to

22  the date that Mr. Makras put on the document.

23      **THE COURT:**  Why, Mr. Gray, can't -- if the Government

24  uses the term "backdated," you can use a different term and

25  say, well, are you just -- isn't that just retroactively dated?

 1  I mean, why can't you just deal with this on cross-examination?

 2     I don't see why -- I'm actually, as a more general

 3  concept, policing what one side uses in -- the terms they use.

 4  It's a lawyer asking a question.  And I don't even -- in

 5  those -- when we get an objection, I object to the use of, it

 6  is assuming a fact not in evidence or whatever else, you know,

 7  the jury knows the lawyer is asking the question.  The cross

 8  examiner can use a different term.

 9     The jury can decide which term they think is more apt.

10  Why is this so dangerous that the Government can't use the

11  term?

12     **MR. GRAY:**  Because, as my colleague here just said,

13  the use of the term "backdated" implicitly subscribes to the

14  Government's theory of what happened in this case.

15     **THE COURT:**  That is the Government's theory.  Why

16  isn't -- you know --

17     **MR. GRAY:**  But it --

18     **THE COURT:**  Wait just a second.  The Government has a

19  theory.  It was nefarious backdating.  You think it was benign

20  retroactive dating.  I understand.  The sides can argue that.

21     But the notion that the Government can't say the term

22  because it suggests their theory of the case is a bit

23  ridiculous because that's what they are saying.  That's their

24  contention in this case.

25     **MR. GRAY:**  Excuse me, Your Honor.  It is much more

 1  than that.  There is no equivalence between using the term

 2  "backdated" and "retroactively dated."

 3      "Backdated" is a term that most people actually know and

 4  associate with sinister and implicit or criminal conduct.

 5          **THE COURT:**  Which is what the Government said goes on

 6  here.

 7          **MR. GRAY:**  Let me respond.  It is misleading and

 8  confusing in this case and should be, therefore, excluded under

 9  Rule 403 because this isn't the kind of case where the date has

10  any real value.  It doesn't give rise to a criminal act.

11          **THE COURT:**  That is something you can elicit in your

12  examination.  The idea that the Government -- that is almost as

13  if saying, Well, the Government can't say they are charging

14  this Defendant with conspiracy.  They are.  And you are saying

15  there is no conspiracy here.

16      I mean, that -- so saying the Government can't use terms

17  that suggest there was nefarious activity, I have something to

18  tell you, they are claiming there was nefarious activity.

19      So, you know, I don't -- protecting you from a term the

20  Government is using, I don't know if that's warranted.  I

21  understand the argument.

22      I will -- and by the way, my plan is I'm going to give you

23  an order on all of these motions, I hope before the end of the

24  week, so you will have them and you can build them into your

25  case.

# Exhibit J

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-cr-00402-RS-2 |
| Plaintiff, | |
| v. | **ORDER RE MOTIONS IN LIMINE** |
| VICTOR MAKRAS, | |
| Defendant. | |

Defense Motions

*Motion No. 1*

Defendant Victor Makras moves in limine to exclude all so-called "honest services fraud" evidence—*i.e.*, evidence relating to the crimes charged against his now-severed co-defendant Harlan Kelly, but which are not alleged against him. Rule 404 of the Federal Rules of Evidence may be at least tangentially relevant to some of the evidence in dispute, but not necessarily to all of it. Rule 404(b)(1) provides: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Here, none of the disputed evidence discussed in this motion relates to an "other crime, wrong, or act" *of Makras*, and of course is not offered to prove *his* character or that he acted in accordance with such character.

Rather, the evidence relates to the conduct of Kelley. At least some of it arguably is intended to support an inference that he has a character for dishonesty and that he acted in

accordance with that character to carry out his part of the conspiracy. The government insists, of course, that the purpose of the evidence is not to prove Kelly's "character" at all, but to explain the purpose of the alleged bank fraud, and Kelly's motives and intent in carrying it out. Section 404(b)(2) does expressly provide that evidence of other crimes/wrongs/acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

The admissibility of the challenged evidence in this trial, where Makras is the only defendant, is perhaps more easily analyzed under traditional rules of *relevance* and *prejudice*, rather than as a prototypical question under section 404. Under either analytical framework, however, this trial is about Makras' alleged participation in a conspiracy with Kelly to defraud and make false statements to Quicken loans—it is not about the other charges the government will be pursuing against Kelly. While more precise line drawing may need to be done at trial in light of the specific evidence that emerges, the following general rules will apply.

The government will be permitted to introduce evidence that Walter Wong performed contracting services on Kelly's house, and the timing of the billing and payments for those services. Absent a foundational showing that Makras knew or should have known of the alleged connection between Wong's conduct and his desire to "curry favor" with hopes of obtaining the city LED lighting contract, however, evidence on that topic will not be admitted. To the extent it might be tangentially relevant, its probative value is outweighed by it potential for undue prejudice.

*Motion No. 2*

Again, absent a foundational showing that Makras had any knowledge of the contents of Kelly's Form 700 disclosures, evidence on that topic will not be admitted. To the extent it might be tangentially relevant, its probative value is outweighed by it potential for undue prejudice.

United States District Court
Northern District of California

1    *Motion No. 3*

2    Makras seeks to exclude evidence that he was appointed to the San Francisco Employees'

3    Retirement System ("SFERS") Board in 2010; was elected President of SFERS on June 12, 2013,

4    and a day later, "acknowledged [Kelly's] help in securing this position," including by texting

5    Kelly to say "[t]hank[] you for all your help and support at SFERS." This evidence does not

6    implicate rule 404(b) at all. It may be of only limited relevance and probative value, but neither is

7    it unfairly prejudicial. It will not be excluded.

8

9    *Motion No. 4*

10   Makras moves to exclude evidence that on November 21, 2013, a real estate developer,

11   "J.M.," asked Makras for help obtaining Kelly's assistance as head of the PUC "in exempting one

12   of J.M.'s projects from a city permitting requirement"; that Makras conveyed J.M.'s request to Mr.

13   Kelly and texted Kelly to check on the status of J.M.'s request; and that "Mr. Kelly issue[d] J.M.

14   the exemption he was seeking from city permit requirements" on the same day that Makras texted

15   Kelly to check on the status of the request. This evidence is sufficiently relevant and not unduly

16   prejudicial. The government does not appear to contend there was anything improper in J.M.

17   seeking assistance from Makras, in Makras providing that assistance, or in Kelly issuing the

18   exemption. Whether or not an instruction to that effect would be warranted if Makras requests one

19   will be reserved for trial.

20

21   *Motion No. 5*

22   Makras seeks to preclude the government from using any form of the word "backdated" to

23   describe a document titled "Straight Note-Modification" that was created and signed in 2014, but

24   which bears a date of December 2, 2013. The motion is denied. Makras is free to argue that it is

25   not automatically misleading or otherwise wrongful to place a date on a document that is earlier

26   than when it was actually signed or an agreement was actually formed, and he is free to argue that

27   it was not misleading or otherwise wrongful in this instance.

28

CASE NO. 21-cr-00402-RS-2

United States District Court
Northern District of California

Government motions

*Motion No. 1*

The government seeks an in limine ruling that it will be able to introduce at trial various specified emails, text messages, and documents that it contends represent admissible statements of Kelly, as Makras' alleged co-conspirator. Makras opposes, suggesting instead that any rulings be deferred until trial, and/or that the court hold a separate evidentiary hearing, with witnesses, to determine the admissibility of the proffered coconspirator statements.

A statement by a co-conspirator is admissible if the government establishes by a preponderance of the evidence that 1) a conspiracy existed at the time the statement was made; 2) the defendant had knowledge of and participated in the conspiracy, and 3) that the statement was made in furtherance of the conspiracy. *United States v. Larson*, 460 F.3d. 1200, 1211 (9th Cir. 2006). "Once the conspiracy has been proven under these standards, only "slight evidence" is necessary to connect a coconspirator to the conspiracy. *See United States v. Perez*, 658 F.2d 654, 658 (9th Cir. 1981). Although insufficient on their own, the "district court may consider the coconspirator's statements themselves in determining whether the preliminary fact of a conspiracy has been proven by a preponderance of the evidence." *United States v. Knigge*, 832 F.2d 1100, 1103 (9th Cir. 1987) amended, 846 F.2d 591 (9th Cir. 1988) (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)); *United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993).

Here, with one exception, the government's motion has presented sufficient foundational evidence to conclude that the statements it seeks to introduce are conditionally admissible, subject to being stricken if necessary. *See United States v. Zemek*, 634 F.2d 1159, 1169 (9th Cir. 1980) ("[T]he order of proof is within the sound discretion of the trial court. . . . The procedure of conditionally admitting co-conspirator's statements subject to later motions to strike is well within the court's discretion."); *see also id* at 1169 n.13 ("In light of consistent Ninth Circuit precedent allowing conditional admission, we reject Janovich's argument for a mandatory pretrial determination.") The text from Kelly to Walter Wong on September 21, 2014 ("Btw, my loan was approved. We need to get together to chat how to reimburse you and rfp. I should get the money in

three weeks"), however, will not be ruled conditionally admissible, at least at this juncture.

    *Motion No. 2*

    The government's request to designate Phil Villanueva, a financial fraud investigator, as a summary witness is granted. The government will be held to its representation that it will provide in advance of trial Villanueva's CV, an estimate of the number of trials in which he has testified as a government witness, and the bates number ranges of the documents that he intends to summarize.

    *Motion 3*

    Concerned that Makras may argue negligence or oversight on the part of the underwriter means the allegedly false statements were not material, the government moves to exclude expert testimony that Quicken Loans was negligent in reviewing Kelly's mortgage application. The expert disclosure, however, reveals the expert does not intend to offer any such opinion, and the opposition disclaims any such argument. The government may be satisfied with that response, as it filed no reply to this particular motion.

    Makras's expert does intend to testify that "if Quicken had wanted to learn more about the $715,000 note and the $200,000 draw down obligation, its underwriters could have and would have asked." To the extent the government may wish to exclude such testimony, the motion is denied.

    *Motion No. 4*

    The government seeks a ruling that Makras's prior statements "are admissible if offered against him" but that he cannot offer his own prior statements. Makras correctly argues these issues can be addressed if and when they come up, in context, at trial. The government filed no reply on this motion. It is denied, without prejudice to specific offers of evidence, and specific objections, at trial.

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1  *Motion No. 5*

2   The parties have agreed to meet and confer regarding the use of any exhibits in opening

3 statements.

4

5  *Motion No. 6*

6   The government requests an order excluding all non-expert witnesses from trial (except, of

7 course, when testifying). See Fed. R. Evid. 615 ("At a party's request, the court must order

8 witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on

9 its own."). Makras did not object, except that the government originally sought permission for *two*

10 of its witnesses be exempted from the sequestration order. The government has now withdrawn its

11 request for the second witness to be exempted. The motion is granted, with an exemption for one

12 party witness per side.

13

14  *Motion No. 7*

15   Arguing FBI Form 302s are "often mishandled at trial," the government seeks an order

16 precluding Makras from quoting or introducing the Form 302s, publishing the Form 302s to the

17 jury, or otherwise suggesting to the jury that the Form 302s are statements of the witnesses.

18 Makras responds this is another issue not appropriately addressed in advance of trial, in a vacuum,

19 but that "he will of course comply with the Federal Rules of Evidence, and likewise expects the

20 government to do so." The motion is denied without prejudice to specific objections at trial.

21

22 **IT IS SO ORDERED**.

23

24 Dated: July 28, 2022

25

26           RICHARD SEEBORG

           Chief United States District Judge

27

28

# Exhibit K

1

2

# BACKDATING OF STOCK OPTIONS

3 Retroactively dating or pricing, or alternatively "backdating," stock-option grants or related

4 paperwork is not, in and of itself, a violation of the criminal law. The fact that options,

5 grant lists, committee minutes, or other paperwork may have been retroactively dated, or

6 that stock options may have been retroactively priced, does not by itself establish a criminal

7 violation of federal securities laws. However, evidence of such practices may be

8 considered by you, along with other evidence, in connection with the crimes charged in the

9 indictment. In other words, you may consider evidence of retroactive dating or pricing, or

10 "backdating," in light of the specific elements that must be proved in connection with each

11 of the counts charged.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28