PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7014
    Fax: (415) 436-7234
    Email:  Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 18-577 CRB |
| Plaintiff, | |
| v. | DECLARATION OF ZACHARY G.F. ABRAHAMSON IN SUPPORT OF THE UNITED STATES' OPPOSITION TO DEFENDANT CHAMBERLAIN'S MOTION *IN LIMINE* RE: CERTAIN CHAMBERLAIN E-MAILS |
| MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN, | |
| Defendant. | Pretrial Conference:  February 21, 2024<br>Trial Date:  March 18, 2024 |

I, Zachary G.F. Abrahamson, declare as follows:

1. I am a Special Assistant United States Attorney with the United States Attorney's Office for the Northern District of California ("USAO"). I am assigned to the prosecution of the above-referenced case. I make this declaration in support of the United States' Opposition to Defendant Chamberlain's Motion *in Limine* to Exclude Irrelevant Prejudicial Documents Pursuant to Federal Rule of Evidence 403.  The statements herein are based in part on personal knowledge and in part on information and belief from my review of documents in

this matter and my discussions with counsel for the government, law enforcement agents, and others.

2. Attached hereto as Exhibit A are true, correct, and highlighted copies of excerpts from the testimony of Michael Lynch in *ACL Netherlands BV v. Lynch*, [2002] EWHC 1178 (Ch) (May 17, 2022), 2022 WL 01557021.

3. Attached hereto as Exhibit B is a true and correct copy of Trial Exhibit 3060, a March 3, 2011 letter from Autonomy Corporation plc. to the Financial Reporting Review Panel.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed this 31st day of January 2024.

                                                             _____/s/_____

                                                 ZACHARY G.F. ABRAHAMSON
                                                 Special Assistant U.S. Attorney

# EXHIBIT A



Autonomy Corporation Limited and Ors v Michael Richard Lynch and Anor

Day 52

July 22, 2019

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900
Email: transcripts@opus2.com
Website: https://www.opus2.com

HP-SEC-02936121

1  and market Autonomy and try and drive Autonomy's
2  business forward. Again, it's industry standard.
3  Q. I suggest to you that the reason for producing a MAF
4  agreement in terms which suggested that McAfee were
5  being paid this money as a marketing assistance fee was
6  yet again to provide a false paper trail deliberately
7  designed to deceive Deloitte.
8  A. I completely disagree.
9  Q. Okay. I want to move on to a different transaction, the
10 DiscoverTech/Prisa one.
11       If you go to slide 16 {A/1.1/16}, this depicts the
12 transaction with DiscoverTech for end user Prisa for
13 which was recognised in Q1 2011. Do you see that?
14 A. Yes, I do.
15 Q. Prisa was a Spanish and Portuguese media company,
16 correct?
17 A. And Latin American, I believe, yes.
18 Q. And you knew that at the time, in Q1 2011?
19 A. Yes.
20 Q. Can we go to your witness statement at {C/51/138} just
21 to look at what you say at paragraph 338.
22       You say that:
23       "In Q1 2011, Autonomy was negotiating a deal with
24 Prisa. I received updates on Autonomy's discussions
25 with Prisa but I was not involved in the negotiations."

61

1       Mr Hussain was updating you very regularly on the
2  prospects of a deal being concluded, correct?
3  A. As part of the normal process that we've looked at many
4  times.
5  Q. And you then say:
6       "The deal with Prisa stalled and as a result
7  Autonomy sold software to DiscoverTech [...]"
8       Then going on to paragraph 339 you say:
9       "Autonomy recognised revenue on the reseller deal in
10 Q1 2011."
11      You go on to say:
12      "I was not involved in the process of preparing the
13 accounts."
14 A. Mm-hm.
15 Q. Just on this, can you go to {K17/215/1}, please. We
16 looked at this earlier in the context of hardware. Just
17 focusing on the word "Prisa", you obviously knew by this
18 point that there had been a reseller deal for end user
19 Prisa because -- after quarter end, yes?
20 A. Yes.
21 Q. And I put to you that the email demonstrates
22 a willingness to pick and choose what revenue to
23 recognise which you knew was improper, yes?
24 A. You're incorrect about that. After the end of the
25 quarter, my understanding is there are a series of

62

1  judgments that have to be made. One of them is to do,
2  for example, with creditworthiness, and in this quarter
3  DiscoverTech had submitted three orders and there was
4  a judgment to be made about whether DiscoverTech's
5  credit was worthy of having three or two or one, or
6  which of the two, and that decision had to be made.
7       At the same time there was also issues about whether
8  all of the necessary proof to meet all of the acceptance
9  criteria about hardware had been met. And this is part
10 of the normal process that happens past the quarter end
11 where all of the paperwork and the terms and the
12 evidence is reviewed.
13      So, for example, we've seen fair value quotes having
14 to be obtained, we've seen confirmations of things
15 having arrived in good order in things like hardware.
16 So this is part of the normal process of what is going
17 to be recognised, and those are decisions made by the
18 finance and legal department.
19 Q. Are you there describing a recollection from the time,
20 Dr Lynch, all the stuff about the DiscoverTech purchase
21 orders?
22 A. I'm sorry?
23 Q. Is that something you say you remember at the time, what
24 you just said?
25 A. I think I saw an email where there was a discussion of

63

1  the fact there were multiple purchase orders and what
2  they were going to do.
3  Q. But is this at the time? You say you saw an email --
4  A. I think there may be an email from the time, I'd have to
5  check.
6  Q. To you? My point is, is what you're saying supposed to
7  be your evidence about what you understood at the time?
8  A. I would definitely have understood at the time the
9  general principle I just outlined to you because what
10 happened at the quarter end was there would be complete
11 chaos in the last couple of days of the quarter as the
12 deals are done, then the deals start to come in, the
13 paperwork, over the next few days. Then they go through
14 legal and finance, so legal will check that there's no
15 amendments that make it not recognisable or acceptance
16 criteria, whatever. Then finance will look at it. As
17 we've seen, Mr Chamberlain then has to get together
18 evidence for whatever --
19 Q. Just leave aside the general approach. I asked you
20 whether you were aware at the time of issues about
21 DiscoverTech and collectability. Is that what you say
22 you understood at the time?
23 A. I don't have an explicit memory of it but I would --
24 I do believe that I saw some sort of email that was sent
25 to me about which deal was going to be taken or not, but

64

# EXHIBIT B

# Autonomy

BY POST

STRICTLY PRIVATE AND CONFIDENTIAL

- 3 MAR 2011
227/10 RF
via email

3 March 2011

Carol Page
Secretary
Financial Reporting Review Panel
Aldwych House
71-91 Aldwych
London
WC2B 4HN

Dear Ms Page,

Re   Letter dated 2 February 2011

We write in reply to your letter dated 2 February 2011 on behalf of the Financial Reporting Review Panel (the "Panel") to Mr Sushovan Hussain, Finance Director of Autonomy Corporation plc. A copy of your letter and this reply have been provided to Autonomy's auditors, Deloitte LLP.

We confirm that the issues raised in your letter are the same as those discussed in Autonomy's letter to the FSA dated 30 July 2010. In short, a comprehensive procedure was undertaken to investigate these matters when first raised, overseen by Autonomy's Audit Committee working with a different team at Deloitte LLP (i.e. separate from the historical audit team, led by the new Audit Engagement Partner who rotated onto the account in June 2010 and had no previous involvement in the audit process).

The investigation found no substantive issues relating to the points raised, that many points fell below the group's materiality threshold and that all relevant information had been previously supplied to Deloitte. Further, as you may be aware, Autonomy's accounts are reviewed quarterly by Deloitte. Thus each of the matters discussed below have now been reviewed by Deloitte as part of regularly quarterly reviews when the transactions occurred, their 30 June 2010 and 30 September 2010 quarterly reviews, and the annual audit, as well as the investigation mentioned above.

It appears to us that a former Autonomy employee sought to leverage regulatory and oversight bodies for his own gain. The employee's department was under investigation following the discovery of a significant payroll fraud (please note that the payroll issue had no affect on the accounts as amounts had already been expensed). The individual's employment was terminated as part of a reorganization of the department to ensure proper controls.

Since that time the individual in question confirmed under oath that he was incorrect or only had access to partial information, and thus was not in a position to reach appropriate

Page 1

US_FRRP 000007
Exh 3060-0001



conclusions, and that he did not discuss the matters appropriately with his superiors prior to raising questions. We fear that any agency that was contacted was not updated with the foregoing information since the initial approach.

With this in mind, set forth below are responses to your questions under the headings in your letter. For the sake of convenience, we have included a copy of the original text from your letter followed by our comment. A copy of the 19 July 2010 Appendix to the Deloitte report on the 2010 Interim Results to Autonomy's Audit Committee on these matters is attached.

**Transactions via value added resellers**

*Eli Lilly*

7. To the extent that the above sequence of events has been confirmed by the company, the Panel would then be grateful for information enabling it to understand why the group appears to have contracted with both Capax and Eli Lilly in respect of the same licences.

8. The Panel would also like to know when the revenues concerned were recorded in the group's consolidated accounts. If the revenues were recorded in the consolidated accounts for the quarter ended 31 December 2009, the Panel would then like to know how the group determined that it was in a position to recognise revenue relating to the sale of licences to Eli Lilly in that quarter if the agreement concerned was not executed until June 2010.

The facts the Panel were provided are incorrect in important areas, as set out in the Deloitte report and below. The subsequent re-review of this resale transaction concluded that the original accounting treatment was correct, and that no new information was provided.

In summary (and as discussed in detail in the Deloitte report) all revenue recognition criteria were met upon receipt of the original purchase order from Capax LLC, an independent valued added reseller (a "VAR"). The software was for use by Eli Lilly, a longstanding, key Autonomy customer. Software was being purchased to meet regulatory requirements. With all revenue recognition criteria met, and following receipt of a direct confirmation from the VAR regarding the validity of the December 2009 invoice, the transaction was recorded in December 2009. The total license value of the order was approximately $6 million, representing less than 1% of revenues in the year.

It was expected that the VAR and end user would be in contract as at 31 December 2009. However due to evolving regulatory requirements, conversations between Eli Lilly and Autonomy resumed in 2010, resulting in an agreement between Eli Lilly and Autonomy in June 2010. This was accommodated because of the relationship between the companies with Autonomy as a key supplier. The June 2010 agreement provides for Capax as VAR to invoice Eli Lilly directly. Capax remain fully liable to Autonomy for the obligation under the original purchase order, under which payments continue to be received. To the extent of overlap between the two orders revenue was only recognized once.

The transaction was thus reviewed at the 2009 year end by Deloitte and Autonomy's Audit Committee, and again in 2010 by the Deloitte investigation team and Autonomy's Audit Committee. No issues were raised and no new information arose.

Autonomy Corporation plc, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

US_FRRP 000008
Exh 3060-0002



*Kraft*

10. To the extent that the above sequence of events has been confirmed by the company, the Panel would then be grateful for information enabling it to understand why the company appears to have contracted with both Capax and Kraft for the same licences.

11. The Panel would also like to know when the revenues concerned were recorded in the group's consolidated accounts. If the revenues were recorded in the consolidated accounts for the quarter ended 30 September 2009, the Panel would then like to know how the group determined that it was in a position to recognise revenue relating to the sale of licences to Kraft in that quarter if the agreement concerned was not executed until December 2009.

12. Finally, the Panel would be grateful for information enabling it to understand why the group paid Capax a fee in respect of these transactions.

Again, the facts the Panel were provided are incorrect in important areas, as set out below. The subsequent re-review of this resale transaction concluded that the original accounting treatment was correct, and that no new information was provided.

Autonomy received a purchase order in Q3 2009 from Capax for Kraft (the global foods company) as end user. The transaction was reviewed by Deloitte and Autonomy's Audit Committee at the time, and all standard revenue recognition criteria were met, on the same basis as discussed in the Deloitte report regarding the Eli Lilly transaction. The total license value of the order was $4 million, representing approximately 0.5% of revenues in the year.

In an almost unique series of events, Kraft sought to enter into a different agreement directly with Autonomy in a subsequent quarter. The latter agreement provided for direct payment to Autonomy, so even though the VAR was already paying Autonomy for its order the original transaction was cancelled. No additional revenue was recognized from the second transaction. Payment has been received.

Capax is a leading provider of specialized software and professional services to Autonomy's customer base. For the original order Capax would earn a normal software resale margin of approximately 30% under the terms of its VAR agreement, and in fact could have blocked the cancellation of the binding original order. Given Capax's involvement in the original transaction, Capax was entitled under written agreements to a Marketing Assistance Fee of approximately 10%. Capax earned less from this revised arrangement than the original transaction.

*Maintenance Fees*

14. To the extent that the above account is true, the Panel would be grateful for information enabling it to understand the commercial considerations which led the group to allow Capax to retain such a high proportion of the fees concerned. The Panel would also like to know if Capax is or was a related party of the company as defined in IAS 24 "Related party disclosures".

The Panel appears to have been provided with selective facts built on incorrect assumptions, as set out in the Deloitte report and below. In summary, Capax is providing services directly

Page 3

Autonomy Corporation plc, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

US_FRRP 000009
Exh 3060-0003



to Autonomy customers on behalf of Autonomy for which Capax is being paid; this is different from a VAR retaining normal software resale margins. The two seem to have been confused in the original question. The review of Autonomy's subcontracting to Capax confirmed the arrangement, and no new information was provided.

As discussed in more detail in the Deloitte report, Capax is providing "first line support" to Autonomy customers for a discontinued line of software. This means that Capax (rather than Autonomy) employs people to answer customer questions and repair the software. Capax retains an 85% margin on a portion of this support revenue stream because it is doing all of the work. This is not software resale margin but rather payment for services that Capax is providing directly to Autonomy customers. Autonomy contracted this work to Capax based on a sound commercial rationale, discussed in the Deloitte report.

The work was subcontracted at the time to ensure a smooth transition. Since then Capax have gradually taken the work directly from clients (and now repay Autonomy a margin ranging from 15% to 30%). This support revenue was less than 0.5% of 2010 revenues.

There is no relationship between Autonomy and Capax that renders Capax a "related party" as defined in IAS 24 "Related Party disclosures". Autonomy has no ownership interest in Capax. Autonomy management has no control over Capax, nor does any member of Autonomy management have significant influence over Capax or over any members of Capax management.

**Accrual of commission payments**

16. To the extent that the above account is true, the Panel would be grateful for information enabling it to understand whether any commission had been accrued on the revenue concerned in the group's consolidated balance sheet at 31 December 2009 and for an indication of the amounts of commission that would normally have been accrued on such sales.

When this issue originally arose it was quickly shown that the facts underlying the question were based on false assumptions, as set out in the Deloitte report and below. The subsequent re-review concluded that there was no issue and that no new information was provided.

From time to time certain strategic transactions are handled by senior management in the group, for example large sales to senior executives at global firms, sales to sensitive government customers, etc.

It is the company's policy that management are not entitled to sales commission. There would be a conflict between management and the sales force, and a conflict of duties of loyalty, if management were eligible to receive sales commission. Management receive other incentive compensation approved by the board, such as annual bonuses and incentive share options. For example Autonomy's Global Head of Operations recently visited a key government customer and will complete the transaction, but is not eligible for commission.

As a result, transactions completed by management will not and should not accrue sales commission. In addition no commission will be accrued against a transaction for which a bad debt provision has been recorded.

Page 4

Autonomy Corporation plc, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

US_FRRP 000010
Exh 3060-0004



### MicroLink

19. To the extent that the above account is true, the Panel would be grateful for details of amounts owing to the group by MicroLink at the time of the acquisition and of the transactions under which amounts more than six months overdue at that date originally arose. The Panel would also be grateful for the company's comments as to why any such amounts had not been settled.

The acquisition of MicroLink LLC ("MicroLink") in January 2010 was reviewed in the ordinary course by Autonomy's board, its Audit Committee and its auditors, and re-reviewed by Deloitte. Treatment of the transaction was confirmed at each stage and no new information was provided. As at today's date outstanding debts are de minimis.

MicroLink is a supplier of software and services to US government accounts, with top level security clearances only obtained based on strict financial and commercial probity. Before acquisition MicroLink was a key VAR and customer of Autonomy for eight years. In the year following acquisition MicroLink's business has grown significantly. MicroLink continues to trade as a semi-autonomous part of Autonomy because of its U.S. government security clearances. MicroLink is overseen by an independent board composed mainly of retired senior military personnel.

At 31 December 2009, $23.0 million of receivables were outstanding from MicroLink. As at that date $16.25 million was not yet due, and $6.76 million was between two days and four days overdue. MicroLink continues to receive payment from its customers and as a consequence the outstanding balance of the items at 31 December 2010 was less than $1.4 million.

### MicroTech LLC and Discover Technologies

21. To the extent that the above account is true, the Panel would be grateful for information enabling it to understand the connections between MicroLink, MicroTech and Discover Technologies and the extent to which these companies are or were related to each other.

22. The Panel would also be grateful for details of amounts owing to the group by MicroTech and Discover Technologies at 30 June 2010, and recorded in the consolidated balance sheet at that date, and of the transactions under which any amounts overdue at that date originally arose. The Panel would also be grateful for the company's comments as to why any such amounts had not been settled and for details of any amounts written off regarding these debtors in the consolidated income statements for the year ended 31 December 2009 and for the six months ended 30 June 2010.

The relationship between MicroTech LLC and Discover Technologies and Autonomy is independent and at arms' length. We think the facts provided to the Panel were no more than partial at best, and were perhaps being used selectively to draw inferences.

In January 2010 Autonomy announced the acquisition of MicroLink "after disposal of a portion of the MicroLink business prior to the transaction". Discover Technologies was the business that was spun out of MicroLink, which was a different line of software independently developed by MicroLink's founders and not of value to Autonomy.

Autonomy Corporation plc, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

US_FRRP 000011
Exh 3060-0005



Discover Technologies is now an independent company. MicroLink and Discover Technologies briefly shared office space following the spin out, during a normal post-spin out transition period. An arms' length transition services agreement was negotiated between Autonomy and external lawyers for Discovery Technologies at the time. Nothing should be inferred from seeing the same address for both companies at the time, other than that the two companies share an address because they used to be related!

MicroTech LLC is completely separate, ten year old company doing government work. MicroTech has separate staff, offices, shareholders, customers, lines of business, etc. MicroTech and MicroLink are tenants on different floors of the same multi-story building in Virginia, together with about forty other companies. More about MicroTech can be found at www.microtech.net.

### Barter Transactions

24. To the extent that the above account is true, the Panel would be grateful for details of such transactions and of how the fair values used to record the transactions in the consolidated accounts were established.

Again, the facts the Panel were provided are incorrect in important areas, as set out below. As set out in the Deloitte report, the subsequent re-review of commercial dealings with FileTek concluded that the original accounting treatment was correct, and that no new information was provided.

Autonomy is one of the world's only suppliers of a key piece of software (called KeyView) which enables one piece of software to view text in another piece of software (the other main supplier is Oracle). Thus most major software companies buy software from Autonomy. Therefore if Autonomy ever buys software it is likely to be from a company that is also an Autonomy customer. FileTek is a long-standing Autonomy customer for this software.

FileTek was selected by Autonomy following receipt of multiple quotations as part of Autonomy's due diligence process. (It should be noted that some of the other potential suppliers, such as Symantec, also rely on Autonomy software.) FileTek products are incorporated into Autonomy software, for which sales have been strong, and were licensed at an arms' length fair price based on the quotations received.

Each transaction was reviewed in the ordinary course by Autonomy's Audit Committee and Deloitte, re-reviewed during the investigation, and confirmed. Fair value for the license by Autonomy was confirmed following a review by the separate technical team at Deloitte.

Page 6

Autonomy Corporation plc, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

US_FRRP 000012

Exh 3060-0006



### Maintenance Renewals

26. To the extent that the above account is true, the Panel would be grateful for information enabling it to understand how the group compiled this estimate and the extent to which the estimate was compiled on the basis of past experience.

27. The Panel would also like to understand whether such an accrual was made in the group's consolidated balance sheet at 31 December 2009 and, if so, the total amount concerned. The Panel notes that IAS 18 states that revenue from the rendering of services should be recognised by reference to the stage of completion of the transaction at the end of the reporting period. As the group does not appear to have rendered any services in these cases, the Panel would like to understand the basis on which such revenue was accrued.

As set out in the Deloitte report, Autonomy's approach to maintenance accruals were confirmed during review. Subsequent review has confirmed this position.

In summary, accruals are only made where there is a maintenance contract between Autonomy and its customer with automatic renewal provisions, ie the customer is legally obligated to pay for the maintenance they receive. The cumulative accrued balance was $4.2 million at the end of Q1 2009, less than 2% of maintenance revenue during the year and less than 0.5% of total revenue for the year.

### Conclusion

As always, we are available to provide any additional information which the Panel requires.

Autonomy hereby requests that this response be treated as confidential, in accordance with the Panel's procedure under Part 4, Section 48, and that it not be released to any other persons except as may be necessary to assist in the conduct of your inquiry.

Please contact me directly should you wish to obtain any further information.

Sincerely,

*Sushovan Hussain*

Sushovan Hussain
Finance Director


Att.

Cc:   Mr R S Webb, Chairman, Autonomy Corporation plc
      Deloitte LLP

Autonomy Corporation plc, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

US_FRRP 000013
Exh 3060-0007