PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6912
    Fax: (415) 436-7234
    Email: Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>MICHAEL RICHARD LYNCH AND<br>STEPHEN KEITH CHAMBERLAIN,<br><br>    Defendants. | Case No. CR-18-577 CRB<br><br>UNITED STATES' OPPOSITION TO DEFENDANT MICHAEL RICHARD LYNCH'S MOTION *IN LIMINE* # 4: TO LIMIT PROPOSED EXPERT TESTIMONY OF STEVEN BRICE<br><br>Pretrial Conference:  February 21, 2024, 2 p.m.<br>Trial Date:  March 18, 2024 |

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................................1

II.    BACKGROUND ............................................................................................................2

III.   LEGAL STANDARD ....................................................................................................4

IV.   ARGUMENT ..................................................................................................................7

      A.    Mr. Brice's Opinions Regarding Autonomy's Revenue Streams Are
           Admissible Under Fed. R. Evid. 702 ...............................................................7

           1.    Brice Report 2 § 4 ...............................................................................7

           2.    Mr. Brice is Qualified to Render the Opinions in Brice Report 2 § 4 ....................8

           3.    Mr. Brice's Opinions are Reliable and Relevant ...................................11

      B.    Mr. Brice's Opinions in Brice Report 2 § 2.7–2.10 Are Probative of Issues In
           Dispute and Admissible under Fed. R. Evid. 403 ............................................16

      C.    References to Foreign Legal Proceedings........................................................20

      D.    The Court Should Allow the Government to Admit the Opinions in Brice
           Report 2 ...........................................................................................................21

V.     CONCLUSION .............................................................................................................23

1

## <u>TABLE OF AUTHORITIES</u>

2

### <u>Cases</u>

3

*Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*,

4
   738 F.3d 960 (9th Cir. 2013) ................................................................................. 6, 16

5

*City of Pomona v. SQM N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014) ................................................................................. 5, 6

6

7

*Cooper v. Brown*,
   510 F.3d 870 (9th Cir. 2007) ..................................................................................... 6

8

*Daubert v. Merrell Dow Pharms., Inc.*,

9
   509 U.S. 579 (1993) ................................................................................................. 5, 6

10

*Daubert v. Merrell Dow Pharms., Inc.*, (*Daubert II*)
   43 F.3d 1311 (9th Cir. 1995) ..................................................................... 5, 12, 15, 18

11

12

*Doe v. Cutter Biological Inc., a Div. of Miles Lab. Inc.*,
   971 F.2d 375 (9th Cir. 1992) ..................................................................................... 10

13

*DSU Med. Corp. v. JMS Co.*,

14
   296 F. Supp. 2d 1140 (N.D. Cal. 2003) ..................................................................... 6

15

*Elosu v. Middlefork Ranch Inc.*,

16
   26 F. 4th 1017 (9th Cir. 2022) ......................................................................... 6, 14, 16

17

*Est. of Barabin v. AstenJohnson, Inc.*,
   740 F.3d 457 (9th Cir. 2014) ..................................................................................... 11

18

19

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
   254 F.3d 825 (9th Cir. 2001) ..................................................................................... 6

20

*Halterman v. Legato Software, a Div. of EMC Corp*

21
   No. C 04-02660 JW, 2006 WL 889496 (N.D. Cal. Apr. 5, 2006) ............................ 10

22

*Karmelich v. Transp. Maritima Mexicana S.A. de C.V.*,

23
   114 F.3d 1194, 1997 WL 289476 (9th Cir. May 29, 1997) ...................................... 10

24

*Kennedy v. Collagen Corp.*,
   161 F.3d 1226 (9th Cir. 1998) ................................................................................... 6

25

*Kumho Tire Co. v. Carmichael*,

26
   526 U.S. 137 (1999) ................................................................................................... 5

27

*Primiano v. Cook*,

28
   598 F.3d 558 (9th Cir. 2010) ..................................................................................... 6

*Pyramid Techs. Inc. v. Hartford Cas. Ins. Co.*,
    752 F.3d 807 (9th Cir. 2014) ...................................................................... 12, 16

*S.E.C. v. Daifotis*,
    No. C 11-00137 WHA, 2012 WL 2051193 (N.D. Cal. June 7, 2012)................................. 15

*Taylor v. Illinois*,
    484 U.S. 400 (1988)..................................................................................... 22

*Thomas v. Newton Int'l Enter.*,
    42 F.3d 1266 (9th Cir. 1994) ......................................................................... 10

*United States v. Bacon*,
    979 F.3d 766 (9th Cir. 2020) ......................................................................... 11

*United States v. Basinger*,
    60 F.3d 1400 (9th Cir. 1995) ......................................................................... 23

*United States v. Cruz-Escoto*,
    476 F.3d 1081 (9th Cir. 2007) ........................................................................ 15

*United States v. Figueroa-Lopez*,
    125 F.3d 1241 (9th Cir. 1997) ........................................................................ 23

*United States v. Finley*,
    301 F.3d 1000 (9th Cir. 2002) ............................................................ 5, 6, 10, 16, 21, 22

*United States v. Garcia*,
    7 F.3d 885 (9th Cir. 1993) ............................................................................ 10

*United States v. Hankey*,
    203 F.3d 1160, 1168, 1169 (9th Cir. 2000) ....................................................... 10, 11, 12

*United States v. Hermanek*,
    289 F.3d 1076, 1093–94 (9th Cir. 2002) ............................................................... 16

*United States v. Holguin*,
    51 F.4th 841 (9th Cir. 2022) ..................................................................... 10, 16

*United States v. Mendoza*,
    244 F.3d 1037 (9th Cir. 2001) ........................................................................ 22

*United States v. Nelson*,
    285 Fed App'x 491 (9th Cir. 2008) .................................................................... 11

*United States v. Pincombe*,
    817 Fed. Appx. 453 (9th Cir. 2020)................................................................... 10

*United States v. Rahm,*
    993 F.2d 1045 (9th Cir. 1993) ........................................................................ 10

*United States v. Ruvalcaba-Garcia,*
    923 F.3d 1183 (9th Cir. 2019) ................................................................. 12, 18

*United States v. Scholl,*
    166 F.3d 964 (9th Cir. 1999) ........................................................................ 22

*United States v. Valencia-Lopez,*
    971 F.3d 891 (9th Cir. 2020) .......................................................................... 5

*United States v. Vera,*
    770 F.3d 1232 (9th Cir. 2014) ........................................................................ 5

*United States v. W.R. Grace,*
    526 F.3d 499 (9th Cir. 2008) ........................................................................ 22

### **Rules**

Fed. R. Crim. P. 16(a)(1)(G)(vi) ........................................................................ 21

Fed. R. Crim. P. 16(d)(2)(C) ............................................................................ 21

Fed. R. Evid. 403 ........................................................................... 6, 16, 20

Fed. R. Evid. 702 ..................................................................... 4, 7 , 10, 15

## I.      INTRODUCTION

Defendant Dr. Michael Richard Lynch has moved to limit the proposed expert testimony of Steven Brice by excluding: (1) "opinions of Steven Brice regarding non-IFRS classification of revenue (Brice Report § 4)"; (2) "disagreements with Deloitte on accounting decisions based on the same information Deloitte considered (Brice Report §§ 2.7–2.10)"; and (3) "references to foreign legal proceedings against Dr. Lynch, Deloitte, and others".  *See* Defendant Michael Richard Lynch's Motion *in Limine* to Limit Proposed Expert Testimony of Steven Brice ("Def. Mot."), ECF No. 297.  The government opposes Defendant's motion to exclude Mr. Brice's opinions on "non-IFRS classification of revenue" and those where Mr. Brice disagrees with Deloitte, categories (1) and (2) above.  Mr. Brice is qualified to render opinions regarding Autonomy's classification of its revenue streams and those opinions rest upon a reliable foundation and are the product of a sound methodology.  Similarly, Mr. Brice's opinions regarding the software sales transactions are relevant and admissible, regardless of whether his opinions are consistent with those of Deloitte.  The fact that Deloitte may have reached a different determination with respect to certain transactions is not grounds for exclusion.  The government does not intend to elicit testimony from Mr. Brice regarding the outcome and findings of foreign legal proceedings against Dr. Lynch, Deloitte, and others, unless Defendants open the door to such testimony on cross-examination.

Defendant also moves to limit Mr. Brice's case-in-chief testimony to those opinions disclosed in his November 2023 report.  The government opposes this limitation.  Mr. Brice made minimal revisions to his report on topic areas already previously disclosed to Defendant.  Defendant claims that the government's "untimely disclosure" "prevented Dr. Lynch from securing responsive expert testimony on these topics."  Def. Mot. at viii.  That is not accurate. Mr. Brice's second report was disclosed on January 3, 2024.  At a court hearing held on January 10, 2024, Defendant requested leave to produce supplemental expert reports.  ECF No. 280.  The Court granted this request, which was unopposed by the government.  Defendant has had the opportunity and ample time to respond to the minimal revisions made in Mr. Brice's January report.  The fact that Defendant has chosen not to avail himself of that opportunity cannot now be used as grounds for exclusion.

## II.      BACKGROUND

On November 8, 2023, the government served the expert report of its proposed expert, Mr. Steven Brice ("Brice Report 1").  *See* Declaration of Kristina Green in Support of Motion *in Limine* #3 ("1/17/2024 Green Decl."), ECF No. 298, Ex. A.  In Brice Report 1, Mr. Brice analyzes numerous software and hardware sales transactions and renders opinions as to whether Autonomy appropriately recognized revenue with respect to these transactions and made adequate disclosures in accordance with the applicable accounting standards.  Brice Report 1 was divided into the following five sections: (1) Introduction; (2) summary of Mr. Brice's opinions related to software sales transactions; (3) summary of Mr. Brice's opinions related to hardware sales transactions; (4) summary of Mr. Brice's conclusions in relation to the revenue streams reported by Autonomy from Q1 2010 onwards; and (5) summary of Mr. Brice's overall conclusions.

On December 7, 2023, Dr. Lynch served the expert reports of his three proposed experts, Mr. Philippe Cerf, Mr. Greig Taylor, and Mr. John Levitske.  In summary, Mr. Cerf provides general opinions regarding the "typical" acquisition process in the U.K.  Mr. Taylor outlines accounting standards relevant to the types of transactions reviewed by Mr. Brice and provides general "observations" where he disagrees with the conclusions drawn by Mr. Brice.  Mr. Levitske applies adjustments to Autonomy's financial statements based on certain assumptions and then draws opinions as to the impact these adjustments would have on cash flow, profits, profit margins, profit growth, and revenue growth, and the overall valuation of Autonomy at the time of the acquisition.

On January 3, 2024, the government served a supplemental expert report of Mr. Brice ("Brice Report 2").  *See* 1/17/2024 Green Decl., ECF No. 298, Ex. B.  Brice Report 2 contains the same five sections as Brice Report 1, as well as an additional section rebutting Mr. Taylor and Mr. Levitske's reports (Brice Report 2 § 5).  The primary revisions between Brice Report 1 and Brice Report 2 are the following:

- Section 2: Mr. Brice made minor typographical revisions to clarify text.  He also added additional clarifying details to § 2.2.4, where he describes Autonomy's consistent pattern of achieving actual revenues at or very close to market analysts' expectations.  In Brice Report 2, Mr. Brice supplements his opinion on this point, noting that, in many quarters,

internal Autonomy records indicate that even Autonomy was not expecting that it would achieve market analysts' expectations.  Brice Report 2 does not include any additional software focus transactions that were not referred to in Brice Report 1.

- Section 3: Mr. Brice made minor typographical revisions to clarify text.  In addition, Mr. Brice supplemented the number of hardware transactions he provided as examples of the inappropriate accrual or deferral of revenue between reporting periods and the inappropriate early recognition of hardware sales.  In Brice Report 1, Mr. Brice discusses two examples related to the inappropriate accrual and deferral of revenues between quarters in Q2/Q3 2009 and Q1/Q3 2010.  *See* Brice Report 1 §§ 3.4.6–3.4.12, Brice Report 2 §§ 3.4.6–3.4.12.  In Brice Report 2, Mr. Brice discusses these same two examples as well as three additional examples of hardware transactions that involve the inappropriate recognition of revenue before the revenue recognition criteria of IFRS had been met.  *See* Brice Report 2 §§ 3.4.13–3.4.22; *see also* Declaration of Kristina Green in Support of Government's Opposition to Defendant's Motion *in Limine* #4 ("1/31/2024 Green Decl."), Ex A (App. G to Brice Report 2).

- Section 4: Mr. Brice made minor typographical revisions to clarify text.  In addition, Mr. Brice cites two examples of transactions that Autonomy reported in both its IDOL OEM and deferred revenue release revenue streams in support of his opinion that reporting a single transaction within both revenue streams overstates these revenue streams in a manner that is inconsistent with the relevant accounting guidance.  *See* Brice Report 2 §§ 4.8.4–4.8.5.  This issue of Autonomy double reporting certain transactions in two different revenue streams had already been addressed in Brice Report 1 with respect to IDOL OEM and IDOL Cloud revenue streams. The only revision Mr. Brice made in Brice Report 2 was to point out that this double reporting of transactions also occurred with respect to the IDOL OEM and deferred revenue release revenue streams.

- Brice Report 2, Section 5:  Brice Report 2 adds Section 5, which contains Mr. Brice's rebuttal opinions with respect to Mr. Taylor and Mr. Levitske's expert reports.  Appendices H-L of Brice Report 2 are also responsive to Defendant's expert reports.

- Brice Report 2, Section 6 (previously Brice Report 1, Section 5): In his summary of overall conclusions, Mr. Brice made minor typographical revisions and added comments responsive to Mr. Taylor and Mr. Levitske's reports.  Mr. Brice also supplemented his conclusions with a few additional charts and summary calculations that compare Autonomy's reported financial performance versus the financial performance using Mr. Brice's proposed adjustments over the period Q1 2009 – Q2 2011.  Brice Report 2 §§ 6.1.7–6.1.19.  These are just visual representations of analyses contained in the prior sections of Brice Report 1 and 2.  In addition, Mr. Brice supplemented his report with an Appendix M, which has charts that show the revenue reported by Autonomy by revenue stream compared with Mr. Brice's assessment of that revenue had the financial statements been prepared in accordance with the relevant requirements, broken down by quarter.  Brice Report 1 included such a chart for Q2 2011—a bar chart that allocated all of Mr. Brice's adjustments to the reporting revenue streams used by Autonomy and compared the "adjusted" performance with the "actual" performance.  *See* Brice Report 1 §§ 5.1.3–5.1.6.  In Appendix M of Brice Report 2, Mr. Brice provided additional charts reflecting the same analysis to incorporate the quarters Q1 2010 through Q1 2011.  *See* 1/31/2024 Green Decl., Ex B (App. M to Brice Report 2).  As with the other supplemental charts in Brice Report 2 § 6, the charts in Appendix M are just visual representations reflect analyses provided in the prior sections of Brice Report 1 and Brice Report 2.  *See* Brice Report 1 §§ 6.1.7, App. M.

On January 10, 2024, the Court held a hearing to address certain motions filed by Defendants Dr. Lynch and Mr. Chamberlain.  ECF No. 280.  During this hearing, Defendant Lynch sought leave to produce supplemental expert reports.  The Court granted this request, which was unopposed by the government.  To date, Defendant has not provided any supplemental expert reports.

## III.    LEGAL STANDARD

A witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify in the form of an opinion or otherwise if (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in

issue;" (2) the "testimony is based on sufficient facts or data"; (3) the "testimony is the product of reliable principles and methods;" and (4) the "expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702.

Faced with a proffer of expert testimony, the trial judge must determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. The court must also "ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact." *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002) (citing *Daubert*, 509 U.S. at 592–93).

The district court plays a "gatekeeping" role, screening the proffered evidence to "ensure that any and all scientific or specialized testimony or evidence admitted "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 597; *accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 148–49 (1999); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014) ("[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'") (citing *Daubert*, 509 U.S. at 597). "In evaluating proffered expert testimony, the trial court is a gatekeeper, not a factfinder." *City of Pomona*, 750 F.3d. at 1043 (internal citations and quotation marks omitted).

Expert opinion is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (hereinafter "*Daubert II*"); *see also United States v. Vera*, 770 F.3d 1232, 1235 (9th Cir. 2014) ("expert opinions must rest on reliable methodology"). "The test of reliability is flexible." *City of Pomona*, 750 F.3d at 1044; *accord United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) ("the reliability inquiry is a flexible one and the district court has broad latitude to determine what factors in *Daubert*, if any, are relevant to the reliability determination") (internal citations and quotation marks omitted). The "trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable based on the particular circumstances of the particular case." *City of*

*Pomona*, 750 F.3d at 1044.  The "test is not the correctness of the expert's conclusions but the soundness of his methodology." *Id.* (internal citations and quotation marks omitted); *accord Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998) ("the focus of the inquiry envisioned by Rule 702 must be on the principles and methodology underlying an expert's testimony, not the conclusions.").

Proposed expert testimony is relevant if it assists the trier of fact in determining a fact in issue. *See Daubert*, 509 U.S. at 591-92; *see also Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001); *City of Pomona*, 750 F.3d at 1044 ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.") (internal citations and quotation marks omitted).  "Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact."  *Finley*, 301 F.3d at 1008 (citing *Daubert*, 509 U.S. at 591).

"[W]hen an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony."  *City of Pomona*, 750 F.3d at 1044.  "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge."  *City of Pomona*, 750 F.3d at 1044; *see also Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").  The Ninth Circuit has cautioned that "[a] district court should not make credibility determinations that are reserved for the jury." *City of Pomona*, 750 F.3d at 1044.; *accord Elosu v. Middlefork Ranch Inc.*, 26 F. 4th 1017, 1024 (9th Cir. 2022) (" '[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'") (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)).

Federal Rule of Evidence 403 permits the exclusion of relevant evidence only if "its probative value is substantially outweighed by the danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

The party who offers the expert testimony must prove its admissibility by a preponderance of the evidence.  *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1146-47 (N.D. Cal. 2003).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.     ARGUMENT

### A.     Mr. Brice's Opinions Regarding Autonomy's Revenue Streams Are Admissible Under Fed. R. Evid. 702

In Section Four of his report, Mr. Brice sets forth his opinions as to whether Autonomy's descriptions of its revenue streams and total revenue reported in these revenue streams were consistent with the nature of the underlying transactions.  *See* Brice Report 2 § 4.  Mr. Brice is qualified to render opinions on whether Autonomy's reporting of its revenue streams complied with relevant accounting requirements and those opinions are the product of reliable principles and methods.

#### 1.     Brice Report 2 § 4

Mr. Brice and Defendant agree that, from Q1 2010 onwards, Autonomy reported the following revenue streams in the financial information published with or alongside its quarterly and annual financial statements: (1) IDOL Product; (2) IDOL Cloud; (3) IDOL OEM; (4) Deferred revenue release; and (5) Services.  *See* Brice Report 2 § 4.2.1.  As Defendant notes, these terms were not defined by the IFRS.  Def. Mot. at 9.  Instead, they were terms chosen by Autonomy to categorize its revenue streams. As part of his analysis, Mr. Brice assess how Autonomy described these revenue streams to the market in its public reports.  *See* Brice Report 2 § 4.2.1, § 4.5.1 (outlining how Autonomy describes IDOL OEM), § 4.6.1 (outlining how Autonomy describes IDOL Cloud).

In addition, Mr. Brice explains the relevant accounting principles that form the foundation for his opinions that Autonomy was not providing a fair and accurate depiction of its revenue streams to the market.  First, Mr. Brice explains that Autonomy was required to comply with the requirements of the Disclosure and Transparency Rule ("DTR") and he outlines the key requirements of the DTR.  *See* Brice Report 2 § 4.3.2 (management reports and statements required to provide "fair review" of the business and issuers must take reasonable care to ensure that any information reported is not "misleading, false or deceptive").  Second, Mr. Brice explains that Autonomy's disclosed revenue streams were an element of Autonomy's "other financial reporting", which, according to the IFRS, is information provided outside the financial statements that assists in their complete interpretation and improves users' ability to make economic decisions.  Brice Report 2 § 4.3.3.  Third, Mr. Brice explains that The Conceptual Framework requires that a "fundamental qualitative characteristic of useful financial information is that it faithfully

represents what it purports to represent, and is complete, neutral, and free from error." Brice Report 2 § 4.3.4 (internal quotation marks omitted).[1] Fourth, Mr. Brice explains that the Companies Act 2006 required Autonomy to "prepare a fair review of its business and a balanced and comprehensive analysis of its financial performance." Brice Report 2 § 4.3.5.[2]

Drawing on his knowledge of and experience with the applicable accounting standards, and applying that knowledge and experience to his analysis of Autonomy's software and hardware transactions, Mr. Brice, in summary, provides the following opinions: (1) Autonomy inappropriately reported certain software transactions as having generated IDOL OEM revenues despite these transactions not matching Autonomy's depiction of the IDOL OEM revenue stream; (2) Autonomy inappropriately reported certain software transactions as having generated IDOL Cloud revenues despite these transactions not matching Autonomy's depiction of the IDOL Cloud revenue stream; (3) Autonomy reported sales of hardware as having generated IDOL Product revenues, despite hardware sales not meeting Autonomy's depiction of the IDOL Product revenue stream; and (4) Autonomy double reported certain transactions in both the IDOL OEM and IDOL Cloud revenue streams, and within both the IDOL OEM and deferred revenue release streams. *See* Brice Report 2 § 4.4.1. Mr. Brice detailed the rationale and methodology that led to him forming these conclusions in his report. *See* Brice Report 2 §§ 4.5.1–4.8.5.

## 2.   Mr. Brice is Qualified to Render the Opinions in Brice Report 2 § 4

Defendant argues that Mr. Brice is "not qualified to opine on Autonomy's non-IFRS terms" and has no expertise on the portions of the DTR and Companies Act upon which he relies in part in rendering his opinions, thus his opinions should be excluded. Def. Mot. 9–10. This claim is nonsensical

---

[1]    The Conceptual Framework is a body of interrelated objectives and fundamentals. *See* Financial Accounting Standards Board, *Conceptual Framework: Elements*, https://www.fasb.org/page/PageContent?pageId=/projects/recentlycompleted/concframeelements.html&isstaticpage=true. The objectives identify the goals and purposes of financial reporting and the fundamentals are the underlying concepts that help achieve those objectives. *Id.* Those concepts provide guidance in selecting transactions, events, and circumstances to be accounted for, how they should be recognized and measured, and how they should be summarized and reported. *Id.*; *see also* Brice Report 2 § 2.3.1.

[2]    The Companies Act 2006 is the primary source of U.K. company law. Part 15 covers accounts and reports and sections within it (such as chapter 4) cover the directors' report. *See* https://www.legislation.gov.uk/ukpga/2006/46/contents.

1  given Mr. Brice's training, knowledge, and experience.

2      As Mr. Brice explains in his report and his resume, he is a Partner and Head of Accounting

3  Technical Services for Mazars Group, which is a company that specializes in audit, advisory, accounting

4  and tax services.  Brice Report 2 § 1.1.1.  In this role, Mr. Brice is required to know the DTR and

5  Companies Act.  Mr. Brice is also a Fellow of the Institute of Chartered Accountants in England and

6  Wales and has over 25 years of technical accounting experience.  *Id.* § 1.1.2.  He has a current Practising

7  Certificate and Responsible Individual status for audit work, which means that he can take responsibility

8  for audit work and sign audit reports.  *Id.* § 1.1.2.  Mr. Brice also has substantial expert accounting

9  experience on matters involving the "accounting treatment of particular transactions under various

10  accounting frameworks."  *Id.* § 1.1.3; *see also* 1/31/2024 Green Decl. Ex. C (Brice resume), at 1

11  ("Steven is an experienced accountant and has been specializing in financial reporting for over 25 years.

12  Steven regularly undertakes advisory work on complex accounting issues.  Steven is a technical

13  accounting specialist and regularly issues accounting opinions, particularly under IFRS.").  In order to

14  provide accounting and audit opinions, an accountant practicing in the United Kingdom has to determine

15  whether or not the company whose financial statements are being audited has complied with the

16  Companies Act.  Thus, by extension, Mr. Brice must have and does have knowledge of and experience

17  with the relevant portions of the Companies Act because that is a prerequisite to him performing his

18  accounting work.  Mr. Brice also served previously as a member of the Advisory Panel of the Financial

19  Reporting Council—a position that comes with the expectation that the member has knowledge of

20  relevant portions of the Companies Act.

21      Mr. Brice similarly has knowledge and experience with respect to the DTR.  As described above,

22  the DTR requires companies listed on the London Stock Exchange (such as Autonomy) to provide

23  management reports (the reports that accompany financial statements) that provide a fair review of the

24  business, are not misleading, deceptive, or false, and that are consistent with the financial statements.  In

25  order to provide audit opinions for listed companies, Mr. Brice has had to apply the DTR.  Specifically,

26  providing these audit opinions requires Mr. Brice to review the front section of companies' financial

27  reports (the text portions that precede the financial statements themselves) and confirm that they comply

28  with the DTR, among other requirements.  Mr. Brice's prior expert testimony has also involved the

DTR.  *S.E.C. v. Rio Tinto plc.* (July 2020), involved a U.K. equivalent project with the Financial Conduct Authority in which Mr. Brice was instructed to provide an expert opinion on the application of and compliance with the DTR.  *See* 1/31/2024 Green Decl. Ex. C, at 2.  In sum, Mr. Brice's training, experience, and expertise encompasses the DTR and the Companies Act, as well as the IFRS and other relevant guidelines mentioned in his report.

Mr. Brice is qualified by knowledge, experience, and expertise to render all opinions provided in his report.  Rule 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enter.*, 42 F.3d 1266, 1269 (9th Cir. 1994); *see also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) ("Likewise, in considering the admissibility of testimony based on 'some other specialized knowledge,' Rule 702 is generally construed liberally."); *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) ("An expert may be qualified to give expert testimony by 'knowledge, skill, experience, training, or education, which need only exceed 'the common knowledge of the average layman.' This standard is liberal.") (*citing* FED. R. EVID. 702 & *Finley*, 301 F.3d at 1007); *Doe v. Cutter Biological Inc., a Div. of Miles Lab. Inc.*, 971 F.2d 375, 385 (9th Cir. 1992) (holding trial court abused discretion in striking experts who were not licensed hematologists and stating "[o]rdinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession").

Any concerns about the extent of Mr. Brice's qualifications with respect to the DTR and Companies Act, do not warrant exclusion of his testimony.  Such questions go to the weight of the expert's testimony, not to its admissibility.  *See, e.g.*, *United States v. Rahm*, 993 F.2d 1045, 1413 (9th Cir. 1993) ("Any deficits in [the psychologist's] qualifications beyond her professional training go to the weight of her testimony rather than to its admissibility."); *United States v. Garcia*, 7 F.3d 885, 889 (9th Cir. 1993) ("[Expert's] lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert."); *United States v. Pincombe*, 817 Fed. Appx. 453, 455 (9th Cir. 2020) (stating defendant's attacks on expert's qualifications and methodology go to the weight expert's testimony not its admissibility); *Karmelich v. Transp. Maritima Mexicana S.A. de C.V.*, 114 F.3d 1194, 1997 WL 289476, at *1 (9th Cir. May 29, 1997) ("[A]ny lack of particularized expertise would go only to the weight of his testimony"); *Halterman v. Legato Software, a Div. of EMC Corp.*,

10

No. C 04-02660 JW, 2006 WL 889496, at *2 (N.D. Cal. Apr. 5, 2006) (holding Plaintiffs' two experts had the requisite credentials to qualify as accounting experts and that lack of specific experience in the industry at issue "goes to the weight of their testimony, not to the admissibility of their testimony.").

Finally, should the Court feel the need to assess Mr. Brice's credentials more closely prior to deciding on admissibility of the opinions in Section Four of his report, the appropriate course is for the Court to hold a pretrial hearing and voir dire Mr. Brice as to his qualifications. *See, e.g.*, *Hankey*, 203 F.3d at 1168–69 (district court "conducted extensive voir dire to assess the basis for and the relevance and reliability" of expert's testimony); *United States v. Nelson*, 285 Fed App'x 491, 493 (9th Cir. 2008) (noting trial court held pretrial hearing to consider expert's qualifications); *Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014) (holding district court "failed to assume its role as gatekeeper" when it excluded expert testimony for "dubious credentials" without conducting a *Daubert* hearing or assessing expert's findings), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020). Given Mr. Brice's extensive knowledge, training, and experience, however, the government does not feel a pretrial hearing is necessary here.

### 3.    Mr. Brice's Opinions are Reliable and Relevant

Defendant falsely contends that at "no time in [Brice's] 'analysis' does Brice apply any methodology or principle; he simply provides his subjective beliefs." Def. Mot. at 11. Mr. Brice's opinions are the product of reliable methods and principles. He analyzed specific transactions to determine whether Autonomy had properly accounted for those transactions; and he analyzed whether Autonomy attributed those transactions to the appropriate revenue stream by comparing the characteristics of those transactions with Autonomy's descriptions and definitions of its revenue streams to the market in its public documents. Mr. Brice was guided in rendering his opinions by the overarching principles set forth in the applicable accounting guidelines, which require, in sum, that Autonomy's management reports that accompanied its financial statements (where the revenue streams were outlined) had to provide a fair review of the business, consistent with the financial statements, and not be misleading or deceptive.

Mr. Brice's methodology is sound and the opinions drawn from his analysis admissible. Expert testimony is reliable if the "knowledge underlying it has a reliable basis in the knowledge and

experience of the relevant discipline." *Pyramid Techs. Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014).  "The test is not the correctness of the expert's conclusions but the soundness of his methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (internal citations and quotation marks omitted).  The *Daubert* factors for assessing reliability are "illustrative rather than exhaustive." *Daubert II*, 43 F.3d at 1317.  The district court has broad "latitude in deciding *how* to test an expert's reliability." *Hankey*, 203 F.3d at 1168; *accord Ruvalcaba-Garcia*, 923 F.3d at 1189 ("The reliability analysis is a malleable one tied to the facts of each case, and district courts are vested with broad latitude to decide *how* to test an expert's reliability and *whether or not* an expert's relevant testimony is reliable.") (citations omitted) (emphasis in original).

Mr. Brice sets forth the methodology used to reach his conclusions in Section Four of his report. His methodology is summarized below:

First, Mr. Brice identified the revenue streams reported by Autonomy in its financial reports. Brice Report 2 § 4.2.1.

Second, Mr. Brice confirmed that the revenue reported in each of these revenue streams tied to the total revenue reported by Autonomy in its financial statements, so confirming that Autonomy was indeed allocating its revenue amongst only those five identified revenue streams.  *Id.* §§ 4.2.2–4.2.3.

Third, Mr. Brice outlined the principles that guided him in reaching his opinions and that formed part of the foundation for those opinions, namely the relevant accounting and disclosure requirements set forth in the IFRS, DTR, The Conceptual Framework, and the Companies Act 2006 (discussed in more detail in Section IV(A)(1), above).  *Id.* §§ 4.3.1–4.3.5.

Fourth, Mr. Brice explains how Autonomy described and defined each of its revenue streams in its public communications to the market.  *See, e.g.*, *Id.* § 4.5.1(c) ("In its 'Financial Overview' provided alongside the financial statements for the year ended 31 December 2010, Autonomy explained that 'IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products. IDOL is now embedded in most major software companies' products addressing most software vertical markets.  This is a particularly important revenue stream as it generates ongoing business across the

1  broadest product set possible, in addition to up-front development licenses.'"); *id.* § 4.6.1(c) ([I]n its

2  'Financial Overview' provide alongside the financial statements for the year ended 31 December 2010,

3  Autonomy explained that 'IDOL Cloud delivers Autonomy's IDOL on a Software-as-a-Service (SaaS)

4  model, which is generally invoiced monthly in arrears and generally does not generate deferred

5  revenue."); *see also id.* §§ 4.5.1, 4.6.1.

6         Fifth, Mr. Brice explains, using his knowledge, training, experience, and the publicly disclosed

7  descriptions of Autonomy's revenue streams, what characteristics transactions should have in order to

8  fall within the revenue stream categorizations used by and defined by Autonomy, and, conversely what

9  types of transactions would not fall within Autonomy's defined revenue streams.[3]  For example, Mr.

10  Brice states that an IDOL OEM sale should "relate to a sale in which Autonomy's software was

11  embedded into the customer's product for the customer to sell-on to third parties.  As such: (i) I do not

12  consider that transactions to non-software companies are consistent with Autonomy's depiction of IDOL

13  OEM revenue . . . ."  Brice Report 2 § 4.5.2(a).  Similarly, Mr. Brice opines that for a transaction to fall

14  within the IDOL Cloud revenue stream as defined by Autonomy, the "transaction should be for the

15  provision of ongoing services" and "should generate recurring revenue for Autonomy."  Brice Report 2

16  § 4.6.2 (a), (c).

17         Sixth, Mr. Brice lists specific transactions and opines that Autonomy included these in either its

18  IDOL OEM or IDOL Cloud revenue streams despite those transactions having characteristics that were

19  inconsistent with how Autonomy described those revenue streams publicly to the market.  *See, e.g.*, §§

20  4.5.4, 4.6.5.  Far from being "subjective beliefs", as asserted by Defendant, these conclusions rest on a

21  solid foundation that is detailed in Mr. Brice's report.  Mr. Brice provides the bases for his opinions that

22  Autonomy did not properly account for transactions and reported certain transactions in revenue streams

23  that were inconsistent with the underlying characteristics of the transactions, thus failing to comply with

24

25  [3]      Defendant incorrectly states that Mr. Brice "defined his own characteristics."  Def. Mot. at 3.  A

26  plain reading of Mr. Brice's report shows that is not so.  Mr. Brice uses the definitions and descriptions of Autonomy's revenue streams that Autonomy itself provided in public-facing documents to the

27  market.  *See* Brice Report 2 §§ 4.5.1–4.5.2, 4.6.1–4.6.3.  Mr. Brice did not invent his own definitions. As Mr. Brice explains, he reviewed Autonomy's descriptions and then summarized and interpreted those

28  descriptions to explain the characteristics a transaction should have in order to fall within Autonomy's descriptions.

applicable accounting requirements.  *See* Brice Report 2 §§ 2–4; *see e.g.*, 1/31/2024 Green Decl. Exs. D

& E (analysis of software transactions SW-10-48; SW-11-91 sufficient to show these transactions did

not involve Autonomy embedding its software onto a customer's product for sale on to a third party (i.e.

not OEM sales)); 1/31/2024 Green Decl. Ex. F (analysis of software transaction SW-11-101,

Autonomy's sale to reseller Discover Technologies for purported sale to end customer Abbot Labs, in

which Autonomy recognized full license revenue of $9,000,000 upfront based on sale to the reseller and

there was no recurring revenue stream related to hosting as would be expected to meet the IDOL Cloud

revenue stream description).

Mr. Brice also opines that Autonomy failed to disclose a material amount of hardware sales

transactions and explains the basis for this opinion.  He cites the applicable accounting requirements and

explains that those required Autonomy to provide a fair representation in its financial reports and to

"present separately items of a dissimilar nature or function unless they are immaterial."  Brice Report 2

§§ 4.7.1 –4.7.4.  Mr. Brice then provides a list of all of the material hardware transactions that, in his

opinion, Autonomy inappropriately reported either in its IDOL revenue or deferred revenue release

streams.  Brice Report 2, Table 4.4.  Finally, Mr. Brice opines that Autonomy double-reported certain

transactions in multiple of its disclosed revenue streams. Again, Mr. Brice's methodology in reaching

his conclusions is clear—he reviewed Autonomy's quarterly revenue breakdowns and noted transactions

that were double reported in either the IDOL OEM and IDOL Cloud revenue streams or IDOL OEM

and deferred revenue release streams.  Brice Report 2 §§ 4.8.1–4.8.5.

As outlined above, Mr. Brice's opinions rest on a solid foundation and are the product of reliable

methods applied to the facts of the case.  Furthermore, his opinions are relevant and will be helpful to

the jury.  The "basic function of expert testimony" is "to help the trier of fact understand highly

specialized issues that are not within common experience." *Elosu*, 26 F.4th at 1026.  As evidenced by

the discussion above, and contrary to Defendant's assertions otherwise, Mr. Brice's analysis is not one

that can be easily replicated by the jury without the assistance of an expert in the field.  The crux of Mr.

Brice's analysis involved closely reviewing the details of numerous software and hardware transactions,

as well as, Autonomy's financial reports and statements, then deciding whether or not the specific

features of those transactions aligned with how Autonomy defined its own revenue streams such that

1   Autonomy appropriately and accurately disclosed its revenue streams.  The jury is not "well equipped",

2   Def. Mot. at 13, to perform this analysis.[4]  Mr. Brice's analysis was technical, time consuming, and

3   drew on his years of experience reviewing transactions and rendering accounting opinions.  Mr. Brice

4   had to look at how Autonomy recognized the revenue for each transaction in its general ledgers and

5   financial statements, review contracts, agreements, and communications about the transactions to

6   determine the underlying characteristics of the deal (such as whether Autonomy was recognizing an

7   upfront license fee, whether it was a hosting deal in which Autonomy was recognizing revenue over the

8   span of a period of time, or whether the sale was to a software third party that was embedding

9   Autonomy software in its own products or not), and finally had to apply his knowledge of relevant

10  accounting principles to the reviewed transactions in order to render opinions as to whether Autonomy's

11  reported revenue streams fairly and accurately depicted its underlying sales transactions.

12       In sum, Mr. Brice's opinions in Section Four of his report are the product of reliable principles

13  and methods applied to the facts of the case.  Fed. R. Evid. 702.  They are not, contrary to Defendant's

14  baseless assertions otherwise, subjective, unfounded beliefs.  While Defendant may disagree with Mr.

15  Brice's methodology that is not a basis for exclusion.  Mr. Brice has adequately explained his reasoning

16  and methods sufficient to satisfy the requirements of Rule 702.  *See* FED. R. EVID 702, 2000 adv. comm.

17  note ("trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-

18  reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an

19  accepted body of learning or experience in the expert's field, and the expert must explain how the

20  conclusion is so grounded."); *see also Holguin*, 51 F. 4th at 855–61 (admitting expert testimony where

21  reasoning was adequately explained); *Cf .Daubert II*, 43 F.3d at 1319 (holding expert must explain the

22

---

23  [4]      The cases cited by Defendant on this point are inapposite.  *See United States v. Cruz-Escoto*, 476
    F.3d 1081, 1088 (9th Cir. 2007) (excluding "expert" testimony that it is difficult to look in one direction
24  when your vehicle is pointed in the opposite direction because that is "within the understanding of a
    common juror"); *S.E.C. v. Daifotis*, No. C 11-00137 WHA, 2012 WL 2051193 (N.D. Cal. June 7, 2012)
25  (excluding expert opinions as to what investors "understood" or "should have understood," whether
    defendant "reasonably relied" on a certain process, and whether defendant "made" the alleged
26  misstatements).  Mr. Brice's opinions and analysis are not within the understanding of the common
    juror; nor do they "invade the province of the jury."  *Daifotis*, 2012 WL 2051193, at *5.  He is not
27  rendering opinions as to what investors understood or what was in the mind of the defendants—he is
    rendering opinions as to whether or not Autonomy's disclosures regarding its revenue streams complied
28  with relevant accounting requirements and fairly depicted Autonomy's actual revenue and underlying
    transactions.

methodology followed to reach his conclusions); *United States v. Hermanek*, 289 F.3d 1076, 1093–94 (9th Cir. 2002).

The district court is "not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969–70.  The government has met that burden.  "If the proposed testimony meets the thresholds of relevance and reliability, its proponent is entitled to have the jury decide upon its credibility rather than the judge." *Elosu*, 26 F. 4th at 1024 (internal citations omitted).  "Rule 702 instructs a district court judge to determine whether an expert had sufficient factual grounds on which to draw conclusions." *Id.* at 1025–26.  "Rule 702 does not license a court to engage in freeform fact finding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Id.* at 1026 (internal citations omitted); *see also Pyramid Techs.*, 752 F.3d at 813 ("Shaky but admissible evidence it to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").  If Defendant wants to challenge Mr. Brice's supposed "subjective beliefs," they can do so on cross examination.  *See Finley*, 301 F.3d 1000, 1014 (9th Cir. 2002) (finding any weaknesses in expert's opinion, "including the subjectivity of his conclusions" could be properly addressed on cross-examination).

## B.    Mr. Brice's Opinions in Brice Report 2 § 2.7–2.10 Are Probative of Issues In Dispute and Admissible under Fed. R. Evid. 403

In Sections 2.7–2.10 of his report, Mr. Brice reviews certain software transactions and opines that Autonomy made misstatements related to these transactions by (1) accounting for them as a sale of goods rather than the rendering of services; (2) accounting for them as a sales of goods rather than royalties; (3) accounting for them in a manner that contained timing errors; or (4) accounting for them in a manner that contained errors of valuation.  Brice Report 2 §§ 2.7–2.10.  Defendant argues that Mr. Brice's opinions should be excluded as irrelevant solely because Mr. Brice "relies on the same information that Deloitte reviewed in real time, but comes to a different conclusion on the proper accounting treatment."  Def. Mot. 5.  Defendant argues that because Mr. Brice does "not allege that Autonomy withheld key information from Deloitte or rely on information unknown to Deloitte" it is "irrelevant which expert—Brice or Deloitte is correct; an incorrect accounting decision without deceit is

16

not fraud." Def. Mot. 5–6.  Defendant misses the point.  Whether or not Autonomy withheld information from Deloitte is not the only nor even the key issue in dispute in this case; nor is that an issue upon which Mr. Brice was asked to opine.

As a threshold matter, the government does not agree with Defendant's assertion that for every transaction reviewed in Brice Report 2 §§ 2.7–2.10, "Brice relies on the same information that Deloitte reviewed in real time." Def. Mot. 5.  First, the government will not make general assumptions in the abstract about what Deloitte did and did not review.  Second, the basis for Defendant's statement appears to be his cherry-picked transactions in which Mr. Brice cited only to contracts in the body of report or appendices, which leads Defendant to claim that "Brice's opinions are based entirely on the contract language."  *See, e.g.*, Def. Mot. at 7, n 3 &4.  Mr. Brice reviewed approximately 29 transactions in §§ 2.7–2.10 of his report.  For approximately half of these transactions, Mr. Brice referenced additional documents besides the contracts in support of his opinions.  *See, e.g.*, 1/31/2024 Green Decl. Ex. G (software transaction SW-11-086 (DB Restructure)—Mr. Brice refers to excel model attached to email and other emails); 1/31/2024 Green Decl. Ex. H (software transaction SW-10-059 (JPMC)—Mr. Brice refers to emails); 1/31/2024 Green Decl. Ex. I (software transaction SW-09-044 (Goldman Sachs)—Mr. Brice refers to emails); Brice Report 2 § 2.7 Table 2.10 (referencing transactions SW-11-086 and SW-10-059), § 2.9 Table 2.12 (referencing transaction SW-09-044).  Furthermore, it bears mention that even for the transactions where Mr. Brice's report only cites to contracts, Mr. Brice had access to and reviewed numerous additional records related to those transactions when conducting his analysis and forming his opinions.  *See* 1/31/2024 Green Decl. Ex. J (Brice Report 2, App. B), p.1–5.  Nevertheless, for the sake of argument, the government assumes Defendant's claim that Mr. Brice and Deloitte reviewed the same information is true and responds to the arguments raised in Defendant's motion below.

Defendant's arguments to exclude Sections 2.7-2.10 of Brice Report 2 are premised on Defendant's incorrect assertion about the government's theory of fraud:  "The government's theory of fraud is not that Deloitte was a co-conspirator, but rather that Deloitte was misled by Autonomy into approving various accounting decision."  Brice Mot. at 5.  The government's theory of fraud is in fact much broader than that.  The government's theory of fraud is that Defendants Dr. Lynch, Mr.

17

1   Chamberlain, and others "engaged in a fraudulent scheme to deceive purchasers and sellers of

2   Autonomy's securities about the true performance of Autonomy's business, its financial performance

3   and condition, the nature of composition of its products, revenue and expenses and its prospect for

4   growth." ECF No. 21 (Superseding Indictment) ¶ 19; *see also id.* ¶ 30 (alleging scheme to defraud any

5   person in connection with securities of HPQ and to obtain by means of materially false representations,

6   money and property in connection with the purchase and sale of securities of HPQ). Autonomy's

7   misleading statements to its auditor, Deloitte, are just one of a plethora of "means and methods" by

8   which Autonomy executed its scheme to defraud. ECF No. 21 ¶ 22. This case does not turn only upon

9   whether and how *Deloitte* was misled by Autonomy. Rather, the issue in dispute is whether Defendants

10  Lynch, Chamberlain, and others at Autonomy made materially false and misleading statements to the

11  market to deceive purchasers and sellers of Autonomy securities and to defraud people in connection

12  with the purchase and sale of HPQ securities. The fact that Deloitte may have fallen victim to

13  Defendants fraudulent schemes or succumbed to external pressures is not grounds for excluding Mr.

14  Brice's testimony as irrelevant, confusing, unfairly prejudicial, and a waste of time. *See* Def Mot. 8.

15      The government agrees with Defendant that expert opinion testimony is relevant if it "logically

16  advances a material aspect of the party's case." *Ruvalcaba-Garcia*, 923 F.3d at 1188; *accord Daubert II*,

17  43 F.3d at 1315. Mr. Brice's proffered expert testimony does just that. His opinions speak directly to an

18  issue in dispute—whether Defendants and others made false and misleading statements and

19  representations in Autonomy's financial statements and elsewhere as part of their scheme to defraud

20  purchasers and sellers of Autonomy securities and in connection with the purchase and sale of securities

21  of HPQ. Assuming for the sake of argument that Deloitte did look at the exact same material as Mr.

22  Brice but reached a different conclusion, that is not grounds for exclusion. Defendant is free to cross-

23  examine Mr. Brice on these issues or else admit evidence of its choosing that shows Deloitte reached an

24  alternative conclusion. It is up to the jury to decide how much weight to give Mr. Brice's testimony.

25      It is also within the province of the jury to decide whether Autonomy misled Deloitte and how

26  much weight to give that in deciding the ultimate issue in dispute, namely whether Defendants executed

27  the scheme to defraud as alleged in the Superseding Indictment. Just because Deloitte reached different

28  conclusions from Mr. Brice (and arguably conclusions in line with what Autonomy wanted) cannot and

should not serve to shield Defendants from expert opinion testimony provided by Mr. Brice regarding the misstatements in Autonomy's financial statements and reports—evidence highly relevant to assessing whether Defendants misled the market about Autonomy's financial position.

In addition, Defendant incorrectly conflates the issue of what records Deloitte reviewed or may have had access to with whether Defendants acted with intent to defraud. *See* Def. Mot. 5–6. The question of whether Defendants acted with the intent to deceive or cheat is not measured solely by what records Deloitte reviewed (or had access to) with respect to certain specific transactions. That issue may be relevant but is certainly not determinative on the issue of Defendants' intent to defraud. And that issue is just one factor among many that the jury may weigh in considering whether Defendants executed a scheme to defraud and why Deloitte's conclusions may have differed from those of Mr. Brice. Other factors relevant to this determination include whether Autonomy and its executives misled Deloitte through their general course of dealing and communications with Deloitte, and whether Deloitte may have failed to exercise independent judgment and drawn conclusions in favor of Autonomy due to other motivations and pressures. It bears mention that the U.K. Financial Reporting Council found the following after investigating the actions of Deloitte:

> "[I]t is the wholesale nature of the failure of professional skepticism in relation to the accounting for the hardware sales and the VAR transactions as well as our findings of Misconduct and of breaches of Fundamental Principles, that make this case so serious. . . . We have described the market scrutiny that was the constant background pressure on these audits and reviews. The pressure on Autonomy to meet market expectations gave rise to a risk of misstatement through manipulation of the financial results to achieve a desired position. Deloitte, Mr. Knights and Mr. Mercer were well aware of the pressure and the risk. They were under pressure from Autonomy to accept its treatment of the hardware costs and the revenue from VAR transactions, rather than upset their client by challenging it. We recognize that on some occasions they stood firm and did not yield to this pressure, although, as we have explained there were usually where it was obvious that what Autonomy wanted to do was unacceptable. But there are only a few examples of this kind. . . . Deloitte's relationship with Autonomy was critical to the Cambridge office's financial success. This made it all the more important that Deloitte should be alive to the need to discharge is public interest duty reliably and independently and not yield to actual or apparent client pressure. Regrettably, for the reasons that we have given it signally failed to do this."

*Report In the Matter of: The Executive Counsel to the Financial Reporting Council and Deloitte, Richard Knights, Nigel Mercer* ¶¶ 774–776.  In sum, Mr. Brice's opinions are particularly relevant in this case where Deloitte was arguably yet another victim of Defendants' deceitful practices and course of conduct.  The fact that Deloitte may have reached conclusions different from that of Mr. Brice and supportive of how Autonomy was accounting for transactions does not warrant dismissal of Mr. Brice's opinions as irrelevant and cannot be used to prevent admission of evidence probative of Defendants' criminal conduct.

Mr. Brice's opinions are also admissible under Rule 403's balancing test.  They are of high probative value, as outlined above, and that probative value is not "substantially outweighed" by danger of unfair prejudice, confusing the issues, or wasting time.  FED. R. EVID. 403.  There is nothing unduly prejudicial or confusing about Mr. Brice's opinions, and Defendant fails to raise any meritorious argument that suggests otherwise.   Defendant merely asserts that, "Expanding on the already-lengthy list of disputed accounting topics would unnecessarily extend the trial and risk jurors getting confused about which topics involved alleged misrepresentations and which topics are mere differences in accounting treatment judgments." Def. Mot. 9.  This baseless argument amounts to nothing more than Defendant's desperate attempt to keep out evidence that he does not like—evidence of misstatements in Autonomy's financial statements—by suggesting that the jury may be confused because Deloitte reached a different conclusion and by making the obvious point that additional testimony may take additional time.  The high probative value of Mr. Brice's testimony is not substantially outweighed by risk of jury confusion or waste of time here.  The jury will be asked to determine whether Defendants made material misrepresentations with respect to Autonomy's financial reports as part of their scheme to defraud.  Mr. Brice's expert opinion evidence is a crucial part of that assessment.  If Defendant wants to argue that Deloitte made different accounting judgments then he is free to do so, but the existence of differing accounting opinions is not grounds for exclusion of Mr. Brice's testimony under FED. R. EVID. 403.

## C.      References to Foreign Legal Proceedings

Defendant asks that the Court prohibit references in Mr. Brice's testimony to the outcomes and findings of foreign legal proceedings. Def. Mot. 9–13.  Mr. Brice did not *rely* upon the findings of any

U.K. legal proceedings in forming his opinions.  As indicated in his report, he at times references certain findings of those proceedings merely to point out that those findings were consistent with the conclusions that he had independently drawn as a result of his analyses.  The government does not intend to elicit testimony from Mr. Brice about the findings or outcomes of U.K. legal proceedings unless Defendants open the door to such testimony through cross examination of Mr. Brice.  If, for example, Defendants try to suggest that Mr. Brice's analysis was flawed or his conclusions wrong because Deloitte reached different conclusions, the government may elicit testimony from Mr. Brice on redirect about how much weight he accorded Deloitte's accounting judgments and conclusions where they differed from his own, and why Mr. Brice may have chosen not to defer to Deloitte's accounting judgments.  In answering these questions, Mr. Brice may refer to the relevant findings from U.K. legal proceedings, such as the FRC's findings regarding Deloitte's lack of objectivity and independenmce and the pressure it faced from Autonomy.

### D. The Court Should Allow the Government to Admit the Opinions in Brice Report 2

Defendant seeks to limit Mr. Brice's case-in-chief testimony to the opinions disclosed in Brice Report 1 and to exclude any opinions from Brice Report 2 that are not responsive to Defendant's expert reports.  Def. Mot. 13–15.  Defendant argues that any additional opinions in Brice Report 2 that were not responsive to Defendant's expert reports were not timely disclosed under Rule 16 and thus should be excluded.  The government disagrees.  Defendant has had time and opportunity to respond to the few additional details in Brice Report 2, all of which were part of broader opinions already disclosed in Brice Report 1.  The absence of these supplemental details in Brice Report 1 was not the result of bad faith or strategy by the government, and Defendant does not suggest otherwise.  Exclusion is not an appropriate remedy here.

As an initial matter, Rule 16 contemplates and allows for the government to "supplement or correct its disclosures," which is what happened here.  Fed. R. Crim. P. 16(a)(1)(G)(vi).  Mr. Brice made minor corrections, provided a few additional examples in support of his opinions, and provided some supplementary charts summarizing his previously disclosed opinions.  The minor revisions to the report stem from Mr. Brice's further investigation of the complex facts underlying this case.  Even if the Court finds that the government did fail to meet its Rule 16 disclosure obligations, exclusion is not the

appropriate remedy given the circumstances.  "If a party fails to comply with [Rule 16], the court may,"

*inter alia*, "prohibit that party from introducing the undisclosed evidence; or enter any other order that is

just under the circumstances." FED. R. CRIM. P. 16(d)(2)(C),(D).  "Exclusion is an appropriate remedy

for a discovery rule violation only where the *omission* was willful and motivated by a desire to obtain a

tactical advantage." *Finley*, 301 F.3d at 1018 (citing *Taylor v. Illinois*, 484 U.S. 400, 415 (1988)).[5]  To

determine whether exclusion is warranted, courts should consider the "decisive value" of the evidence in

question.  *Id.* (citations omitted).  In addition, the court must weigh the importance of maintaining the

"integrity of the adversary process, which depends both on the presentation of reliable evidence and the

rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the

potential prejudice to the truth-determining function of the trial process." *Taylor*, 484 U.S. at 414–15.

The remedy of exclusion based on a discovery violation should not be "disproportionate to the conduct

of counsel." *United States v. Scholl*, 166 F.3d 964, 972 (9th Cir. 1999).

      The differences in the proffered case-in-chief testimony between Brice Report 1 and Brice

Report 2 are laid out in Section II, *supra*.  The revisions predominantly consisted of typographical

changes and the provision of a few additional transactional examples and charts that fall within the

general topic areas and opinions Mr. Brice had already disclosed in Brice Report 1.  Defendant has not

suffered any prejudice from those minor additions.  *See, e.g.*, *United States v. Mendoza*, 244 F.3d 1037,

1047 (9th Cir. 2001) ("We also conclude that the government's failure to comply with Rule 16 does not

warrant reversal.  We have stated that a violation of Rule 16 does not itself require reversal, or even

exclusion of the affected testimony.  The appellant must demonstrate prejudice to substantial rights to

justify reversal for violations of discovery rules.  The prejudice that must be shown to justify reversal for

a discovery violation is a likelihood that the verdict would have been different had the government

complied with the discovery rules, not had the evidence been suppressed.") (*citing United States v.*

---

[5]    The Ninth Circuit has suggested that a lower standard may apply where the government's right to present evidence is at issue as opposed to the defendant's, but it did not explicitly state how the standard may differ. *See United States v. W.R. Grace*, 526 F.3d 499, 515 (9th Cir. 2008) ("*Finley*, however, like *Taylor*, involved the defendant's right to present evidence, not the government's, and has no bearing here.").  The government believes the general principles set forth in *Taylor* and *Finley* should apply and that the district court can appropriately account for the fact that here the government's evidence is at issue as opposed to the defendant's when conducting the balancing test envisioned by *Taylor*.

*Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir. 1997)); *accord United States v. Basinger*, 60 F.3d 1400, 1407 (9th Cir. 1995) (holding reversal not required where defendant argued expert testimony elicited at trial was not timely disclosed under Rule 16 because there was no "prejudice to defendant's substantial rights" where defendant was informed about the relevant evidence that formed the basis of expert's testimony and the "district court offered [defendant] additional time to review reports and prepare for cross-examination."); *United States v. Quezada-Daza*, No. 99-30126, 2000 WL 1012969, at *1 (9th Cir. July 21, 2000) (affirming district court decision allowing government expert to testify despite government's failure to notice witness as expert under Rule 16 where district court gave appellants extra time to prepare for cross-examination and appellants did not object to remedy).

The government served Defendants with Brice Report 2 on January 3, 2024, two-and-a-half months in advance of trial.  Moreover, at a hearing on January 10, 2024, the Court granted the Defendant's request to produce supplemental expert reports.  This remedy was more than sufficient to cure any Rule 16 disclosure issue, particularly given the limited revisions and supplements made in Brice Report 2, and which were on topics in which Defendant and his experts were already well versed due to Brice Report 1.  To date, Defendant has not produced any supplemental expert reports.  Defendant has had ample opportunity to review the additions in Brice Report 2, prepare responses or prepare for cross-examination, and has been granted the opportunity to produce supplemental expert reports.  Defendant has chosen not to avail himself of this opportunity.  Given this record, exclusion of the supplementary opinions in Brice Report 2 is not appropriate.  The Court should find the case-in-chief and rebuttal opinions laid out in Brice Report 2 admissible.

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Defendant's motion to limit the proposed expert testimony of Steven Brice.

//

//

//

//

//

1   DATED:  January 31, 2024                    Respectfully submitted,

2                                               PATRICK D. ROBBINS
                                                Attorney for the United States
3                                               Acting under Authority Conferred by 28
                                                U.S.C. § 515.
4

5                                               /s/ *Kristina Green*
6                                               ROBERT S. LEACH
                                                ADAM A. REEVES
7                                               KRISTINA GREEN
                                                ZACHARY G.F. ABRAHAMSON
8                                               Assistant United States Attorneys

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24