1   PATRICK D. ROBBINS (CABN 152288)
    Attorney for the United States
2   Acting Under Authority Conferred by 28 U.S.C. § 515

3   MARTHA BOERSCH (CABN 126569)
    Chief, Criminal Division
4
    ROBERT S. LEACH (CABN 196191)
5   ADAM A. REEVES (NYBN 2363877)
    KRISTINA N. GREEN (NYBN 5226204)
6   ZACHARY G.F. ABRAHAMSON (CABN 310951)
    Assistant United States Attorneys
7
        450 Golden Gate Avenue, Box 36055
8       San Francisco, California 94102-3495
        Telephone: (415) 436-6912
9       Fax: (415) 436-7234
        Email: Robert.Leach@usdoj.gov
10
    Attorneys for United States of America
11
                        UNITED STATES DISTRICT COURT
12
                     NORTHERN DISTRICT OF CALIFORNIA
13
                          SAN FRANCISCO DIVISION
14

15  UNITED STATES OF AMERICA,              )   No. CR-18-577 CRB
                                           )
16          Plaintiff,                     )
                                           )
17      v.                                 )   DECLARATION OF KRISTINA GREEN IN
                                           )   SUPPORT OF GOVERNMENT'S OPPOSITION TO
18                                         )   DEFENDANT'S MOTION *IN LIMINE* #4:
    MICHAEL RICHARD LYNCH AND              )   TO LIMIT PROPOSED EXPERT TESTIMONY OF
19  STEPHEN KEITH CHAMBERLAIN,             )   STEVEN BRICE
                                           )
20                                         )
            Defendants.                    )
21                                         )
                                           )
22  _____)

23  I, Kristina Green, declare and state as follows:

24      1.  I am an Assistant United States Attorney for the Northern District of California assigned to

25  the prosecution of the above-captioned case.

26      2.      Attached hereto as Exhibit A is a true and correct copy of Appendix G to the expert

27  report of Mr. Steven Brice, served on January 3, 2024 ("Brice Report 2").

28      3.      Attached hereto as Exhibit B is a true and correct copy of Appendix M to Brice Report 2.

GREEN DECL.
18-CR-577 CRB                              1

4.     Attached hereto as Exhibit C is a true and correct copy of Appendix A to Brice Report 2, Mr. Steven Brice's resume.

5.     Attached hereto as Exhibit D is a true and correct copy of Software Focus Transaction SW-10-48, included in Appendix F to Brice Report 2.

6.     Attached hereto as Exhibit E is a true and correct copy of Software Focus Transaction SW-11-91, included in Appendix F to Brice Report 2.

7.     Attached hereto as Exhibit F is a true and correct copy of Software Focus Transaction SW-11-101, included in Appendix F to Brice Report 2.

8.     Attached hereto as Exhibit G is a true and correct copy of Software Focus Transaction SW-11-086, included in Appendix F to Brice Report 2.

9.     Attached hereto as Exhibit H is a true and correct copy of Software Focus Transaction SW-10-059, included in Appendix F to Brice Report 2.

10.     Attached hereto as Exhibit I is a true and correct copy of Software Focus Transaction SW-09-044, included in Appendix F to Brice Report 2.

11.     Attached hereto as Exhibit J is a true and correct copy of Appendix B to Brice Report 2, the documents upon which Mr. Brice relied.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

DATED:  January 31, 2024

_____/s/_____
KRISTINA GREEN
Assistant United States Attorney

# Exhibit A

**mazars**                                              10159-ANA – Software House International

| 10159-ANA – Hardware sale to Software House International ("SHI") | |
|---|---|
| **Amount of sample item:** | $2,650,586.40 |
| **Period initially recognised:** | Q2 2011 |
| **Date invoice posted to general ledger:** | 30 June 2011 |
| **Hardware supplier:** | Dell |

**How Autonomy originally reported the transaction**

| Sample | Quarter | Customer | Revenue recognised |
|---|---|---|---|
| 10159-ANA | Q2 2011 | SHI | $2,650,586.40 |

**Details of the transaction**

This was a sale of Dell hardware to SHI.  The sale was made at a loss to Autonomy of $261,273.60[1].

*Agreement with Dell:*

Dell and Autonomy entered into a Value Added Reseller Agreement in December 2009[2], under which Dell could sell and Autonomy purchase and remarket the "**Products**" defined as "*Dell-branded computer hardware and related products, including Software, as set forth in the Dell quotes issued under this Agreement.  Such Software may be subject to third party licensing agreements*".

As per Clause 15.1 set out below, the agreement was originally for a one-year term but automatically renewed unless either party terminated.  I have not seen any evidence or suggestion that either Autonomy or Dell had terminated this agreement before the end of Q2 2011.

- Clause 15.1: "*One Year Term.  The term of this Agreement is one (1) year beginning on the Effective Date. This Agreement will automatically renew for consecutive additional (1) year terms unless either Party notifies the other Party of its intent to terminate this Agreement at least thirty (30) Days before the end of the then-current term*".

Clauses that are relevant to the principles of revenue recognition are set out below:

- Clause 3.3: "*VAR's Pricing Freedom. Neither Dell nor any employee of Dell has any authority to determine or set VAR's resale pricing of the Products*".

- Clause 3.6: "*Relationship of the Parties. Dell and VAR are independent contractors. Neither Party will make any warranties or representations or assume any obligations on the other Party's behalf.  Neither Party is nor will claim to be a legal representative, partner, franchisee, agent or*

---

[1] Autonomy's invoice to SHI was for $2,650,586.40 [HP-SEC-01654633], Dell's invoice to Autonomy was for $2,911,860 [HP-SEC-01654643-01654658], a loss of $261,273.60
[2] US-PWC 00002327-00002338

**mazars**

| 10159-ANA – Hardware sale to Software House International ("SHI") |
|---|

*employee of the other Party except as specifically stated in this Agreement.  Each Party is responsible for the direction and compensation, and is liable for the actions of, its employees*".

- Clause 4.6: "*Shipping and Handling Options. Unless otherwise directed, Dell will ship Products using Dell's designated carrier. If Products are shipped via Dell's designated carrier, Dell will prepay all shipping and handling costs, and Dell will bear the risk of loss of, or any damage to, the Products during shipping.* [...]".

- Clause 5.3: "*Shipping Dates, Title and Inspection. Dell will estimate a ship date for all accepted Product Orders. Ship dates are estimates only and do not guarantee a delivery date to VAR or bind Dell to meet any specific delivery schedule. Title to hardware Products passes from Dell to VAR upon delivery of the Products by Dell to a common carrier for shipment to the location designated by VAR. Software Products may be shipped physically with hardware Products, or independently, including electronically, such as via FTP transfer*".

***Transaction documents***

- 21 June 2011: Dell provided quote number 588431486 to Autonomy for 1 Dell Latitude E6420 base unit and associated products, for $1,140.50 plus $15 shipping and handling, a total of $1,155.50 each[3].

- 21 June 2011: Autonomy provided a purchase quote number 588431486-AU to SHI for 2,520 Dell Latitude E6420 base units and associated products for a price of $1,036.82 plus $15 shipping and handling each, a total for all 2,520 of $2,650,586.40[4].   The purchase quote includes the following statement:

  "*Title to the products passes from Autonomy to SHI upon Dell's delivery at Dell's plant to a common carrier.  Autonomy shall be responsible for ensuring delivery of the Products to SHI. Except for the foregoing, Dell shall be responsible for all warranties, representations and/or obligations related to the products and services listed above.  Dell shall be solely liable to SHI for any failure to perform its obligations agreed to between Dell and SHI or otherwise related to the products and services described herein.  In the event of any conflict between the terms of this Purchase Order and either the terms of any agreement between Dell and SHI, or the terms of any SHI purchase order, the terms of this Purchase Quotation shall control.  No other terms and conditions apply to this Purchase Quotation*".

---

[3] HP-SEC-01654640-01654641
[4] HP-SEC-01654637-01654639

**mazars**                                             10159-ANA – Software House International

---

**10159-ANA – Hardware sale to Software House International ("SHI")**

- SHI issued Purchase Order WHZM2 to Autonomy for 2,520 Dell E6420s for a total price of $2,612,786.40[5]. Note the Purchase Order excludes the shipping of $15 per item, which would total $37,800 and take the total to $2,650,586.40.

- 27 June 2011: Autonomy issues Purchase Order WHZM2 to Dell for 2,520 systems described in Dell quotation 588431486 for a total of $2,911,860[6].  This equates to $1,155.50 each including shipping and handling costs.

- 28 June 2011: Autonomy issued invoice 10159-ANA to SHI for 2,520 E6420 products plus shipping and handling for a total of $2,650,586.40[7].  The invoice references Purchase Order WHZM2.

- 14 July 2011: In an email from Julia Perez of Dell updates Stephen Chamberlain and Poppy Prentis of Autonomy that order WHZM2 is "*in production – eta for orders to ship is 7/29*"[8].

- 22 July 2011: In an email Julia Perez of Dell confirms to Jorge Salazar and Julie Dolan of Autonomy that "*this PO should ship before the end July complete*"[9].

- 22 July 2011: An order tracking spreadsheet attached to an email from Julia Perez to Poppy Prentis, Jeffrey Guido and Stephen Chamberlain at Autonomy shows shipped dates between 19-21 July 2011[10].

- 24 July 2011: Dell issued invoice XFD9T1JK3C to Autonomy for a total of $2,911,860[11].  This referenced Purchase Order WHZM2.

---

**My view on when this transaction met the criteria of IAS 18 for revenue to be recognised**

Taking each of the five revenue recognition criteria of IAS 18:

a) as set out above, the quotation issued by Autonomy to SHI specified that title to the products passes from Autonomy to SHI upon Dell's delivery at Dell's plant to a common carrier, i.e. once Dell had delivered the products to the carrier for shipment to SHI, title passed to SHI.  It also states that Autonomy is responsible for ensuring delivery to SHI.  This suggests that whilst title transferred when the goods were shipped, the significant risks and rewards of ownership did not transfer to the buyer until delivery.  Regardless, the emails referred to above are clear that shipment did not take place until July 2011, i.e. Q3 2011;

---

[5] HP-SEC-01654635-01654636
[6] HP-SEC-01654642
[7] HP-SEC-01654633
[8] HP-SEC-01867469
[9] HP-SEC-01867467
[10] HP-SEC-01867473
[11] HP-SEC-01654643-01654658

| **10159-ANA – Hardware sale to Software House International ("SHI")** |
| --- |

b)  Autonomy did not retain any managerial involvement or control over the goods sold;

c)  revenue was clearly set out in the quotation provided by Autonomy to SHI;

d)  Autonomy was clearly obtaining economic benefits from this transaction as it was earning revenue; and

e)  the costs of the transaction were clearly set out in the quotation provided by Dell to Autonomy.

As this transaction would not meet all of the revenue recognition criteria until Q3 2011, revenue should have been recognised in this quarter, not in Q2 2011.

I note that Deloitte concluded that the recognition of this sale in Q2 2011 was satisfactory based on the following information[12]:

> Deloitte was unable to confirm delivery of the goods, or that the order had been fulfilled to the point in which the ownership of the goods passes to SHI. As an alternative, Deloitte obtained a debtor confirmation from SHI, on file at <8130.1>, that they do in fact owe Autonomy for the 2 invoices 10159-ANA and 9822-ANA.  As this has been confirmed, Deloitte can gain assurance that the goods have been delivered to SHI or that they are enroute to SHI. Satisfactory.

Whilst Deloitte obtained a debtor confirmation from SHI, in my view as Autonomy's invoice to SHI for this transaction was dated 28 June 2011, this could simply be SHI confirming they had received the invoice and recognised it related to an order they had made.  I consider that it is clear from the emails referred to above that none of the products that comprised this order were shipped until Q3 2011.

**My conclusion**

Revenue earned on this transaction of $2,650,586.40 should have been recognised in Q3 2011, not Q2 2011.   An adjustment is therefore required to reduce hardware revenue in Q2 2011 by $2,650,586.40 and increase hardware revenue in Q3 2011 by the same amount.

---

[12] Deloitte working paper "Q2 8130 Hardware Testing"

**mazars**                                                    **5614-ANA – Morgan Stanley**

| **5614-ANA – Hardware sale to Morgan Stanley** | |
|---|---|
| **Amount of sample item:** | $6,000,000.00 |
| **Period initially recognised:** | Q2 2009 |
| **Date invoice posted to general ledger:** | 31 July 2009 |
| **Hardware supplier:** | Hitachi Data Systems ("**HDS**") |

**How Autonomy originally reported the transaction**

| Invoice | Quarter | Customer/Description | Revenue recognised |
|---|---|---|---|
| Accrual | Q2 2009 | "RECORD MS MASS STORAGE ORDER" | $6,000,000.00 |
| Reverse accrual | Q3 3009 | "RECORD MS MASS STORAGE ORDER" | ($6,000,000.00) |
| 5614-ANA | Q3 2009 | Morgan Stanley | $6,000,000.00 |

**Details of the transaction**

This was a sale of HDS hardware to Morgan Stanley.  The sale was made at a small profit to Autonomy of $2,697.00[1].

*Agreement with HDS:*

HDS and Autonomy entered into a "One-Time Reseller Authorization Agreement" on 27 June 2009[2]. Under this agreement HDS authorised Autonomy to resell certain equipment (the "**Products**") to Morgan Stanley under the terms of Customer Agreement No. 00JLW022 dated 1 February 2001 between Morgan Stanley and HDS (the "**Supply Agreement**").  HDS would provide all services required to install and support the Products and provide the applicable warranties and indemnities.

The One-Time Reseller Authorization Agreement includes the following clauses that are relevant to revenue recognition:

- Clause 4: "*Payment shall be due thirty (30) days from the date of shipment of the Products. Title and risk of loss shall pass to Autonomy F.O.B. HDS distribution center and the Products shall be deemed accepted upon shipment*"; and

- Clause 5: "*No right of return is granted under this Agreement and all Product issues will be handled by HDS, on behalf of Autonomy, in accordance with the warranty and support terms of the Supply Agreement*";

---

[1] Autonomy's invoice to Morgan Stanley was for $6,000,000.00 [HP-SEC-01654189], HDS's invoice to Autonomy was for $5,997,303.00 [HP-SEC-01654191], a profit of $2,697.00.
[2] HP-SEC-01654860-01654861

mazars                                            5614-ANA – Morgan Stanley

| 5614-ANA – Hardware sale to Morgan Stanley |
|---|

Attachment A[3] states "*The Agreement will only include the below equipment for one time sale only. HDS will provide Autonomy with a quote for this one time transaction and such quote must be referenced in Autonomy's Purchase Order to HDS*".  The Products listed are:

- 40 x AMS2100 – HDSAMS2100-30x300GB Drives

- 8 x AMS 2300 – HDSAMS2300 60x300GB Drives

- 20 x AMS 2500 – HDSAMS2500 Mixed Drives

- 10 x AMS2300 – HDAMMS2300-195x 1TB Drives

- 4 x AMS2300 – HDSAMS2300-195x400GB Drives

*Transaction documents*

- 30 June 2009 – HDS provided Quote ID 5251967.001 for the Products listed in Attachment A as set out above[4] with a total purchase price of $5,997,303[5].  The document states "*This Quote will be governed by the terms and conditions of One Time Reseller Authorization Agreement ("Agreement") dated June 27, 2009*";

- 30 June 2009 – this transaction is referenced in a Letter Agreement between Autonomy and Morgan Stanley titled "RE: Purchase of Certain Hardware and Software from Autonomy, Inc.[6]. This Letter Agreement was for Morgan Stanley to purchase $20 million worth of HDS products (the "**Purchase Commitment**") for a price of $13.5 million pursuant to the Purchase Commitment, with the agreement "*contingent on Morgan Stanley submitting a purchase order to Autonomy on or before June 30, 2009 for Equipment, with an aggregate purchase price to Autonomy of*" $6 million and that this purchase order is "*in addition to, and not in place of, the purchase orders otherwise required to satisfy the Purchase Commitment*".  This Letter Agreement states "*Unless the parties agree otherwise in writing, title and risk of loss in and to the Equipment shall pass to Morgan Stanley F.O.B. Autonomy's warehouse, and acceptance shall be deemed to occur upon shipment in accordance with the Agreement.  Autonomy shall accept delivery of all Equipment from the Suppliers at its warehouse facilities*".  Whilst this Letter Agreement does not explicitly cover this $6 million sale, I have seen no written terms for the transfer of title and risk of loss for this sale and consider that this Letter Agreement is the best evidence of the terms that Morgan Stanley and Autonomy reached in Q2 2009;

---

[3] HP-SEC-01654863
[4] The only difference is the HDS Quote is for 52xAMS2100, rather than 40xAMS2100 per Attachment A.  I do not know why the numbers are different
[5] HP-SEC-01654197
[6] HP-SEC-01654885-01654859

| **5614-ANA – Hardware sale to Morgan Stanley** |
|---|

- 30 June 2009 – Autonomy Zantaz raised purchase order number PO09410-0 to HDS for Hitachi AMS Storage Solution for $5,997,303.00, referencing HDS Quote ID 5251967.0001[7];

- 1 July 2009 – Morgan Stanley issued Purchase Order NADO361176 for 1 x Bulk Premium MASS Storage Device for a price of $6 million[8];

- 6 July 2009 – Autonomy issued invoice 5614-ANA to Morgan Stanley for 1 x Bulk Premium MASS Storage Device for $6 million[9];

- 21 September 2009 – HDS issued invoice 7128700 to Autonomy for 1 x Hitachi AMS Storage Solutions for a price of $5,997,303[10].  The invoice references Quote ID 5251967.0001 and annotated on the invoice is "P.O.#D009410-0";

- 23 September 2009 – an email from HDS with the subject "*Shipments for Worksheet 5251967.001-1 Autonomy Inc. 19-AUG-09*" demonstrates that this order was not shipped until Q3 2009[11].

**My view on when this transaction met the criteria of IAS 18 for revenue to be recognised**

Taking each of the five revenue recognition criteria of IAS 18:

a) as set out above, the One Time Authorization Reseller Agreement provides that title and risk of loss shall pass to Autonomy F.O.B. HDS distribution centre and the Products are deemed accepted upon shipment.  The Letter Agreement (albeit this refers to but does not explicitly cover this $6 million sale, but was issued on 30 June 2009) states that title and risk of loss passes to Morgan Stanley at Autonomy's warehouse. Morgan Stanley did not raise its purchase order until 1 July 2009 and the shipping documents show that the Products were not shipped by HDS until August 2009.  It is therefore clear that the risks and rewards of ownership did not transfer to the buyer until Q3 2009;

b) Autonomy did not retain any managerial involvement or control over the goods sold;

c) revenue was clearly set out in Autonomy's invoice to Morgan Stanley;

d) Autonomy was clearly obtaining economic benefits from this transaction as it was earning revenue; and

e) the costs of the transaction were clearly set out in the quotation from HDS.

---

[7] HP-SEC-01654213
[8] HP-SEC-01654186-01654188
[9] HP-SEC-01654189
[10] HP-SEC-01654191
[11] HP-SEC-01654198-01654212

| **5614-ANA – Hardware sale to Morgan Stanley** |
|---|

As this transaction did not meet all of the revenue recognition criteria in Q2 2009, the revenue for this sale should not have been accrued in Q2 2009.  Revenue should not have been recognised until Q3 2009.

Deloitte audit work

It is apparent that Deloitte understood that this sale was actually the sale of $6m hardware supplied by EMC, not HDS.  For example, workpaper "8100B Morgan Stanley memo on the secured revenue" includes the following statement:

> We have held discussions with Sushovan Hussain, Group CFO, and Egan Stouffer, CEO of Autonomy Inc.  They have explained that they have a one time reseller agreement with HDS to purchase and on-sell product to Morgan Stanley.  We have sighted this agreement dated 27 June 2009.  This agreement is actually for the initial $6 million of hardware which Autonomy have already purchased for MS through their other hardware provider, EMC.  (see **8001B.3** and **8001B.4**)¶

Workpaper "8100A Morgan Stanley memo on hardware revenue" includes the following statement:

> On 29 June 2009, Autonomy Coporation plc ("Autonomy") entered into an agreement with EMC Inc. ("EMC") to purchase $9m of hardware. On 30 June 2009 Autonomy then entered into an agreement with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), for Morgan Stanley to purchase $6m worth of this hardware from Autonomy.¶

Deloitte state they have reviewed the fully signed Agreement between Autonomy and Morgan Stanley dated 30 June 2009[12], however the agreement that Deloitte reviews on "8100B Morgan Stanley memo on the secured revenue" discusses the agreement between Autonomy and Morgan Stanley for the supply of HDS hardware.

Deloitte explain that they have "*examined correspondence between Autonomy and Morgan Stanley over the completion of the order and Morgan Stanley's acceptance and beginning of the payment process as evidence of delivery of the hardware (and hence that shipment from EMC has taken place)*". Accordingly, Deloitte conclude title had passed at 30 June 2009[13].  The correspondence referred to is not referenced as being saved on the audit file.

In my view, it is clear from the contemporaneous documents summarised above that this transaction was in fact the sale of HDS hardware to Morgan Stanley and that title did not pass until Q3 2009.

**My conclusion**

Revenue of $6 million for this transaction should not have been accrued in Q2 2009 and should instead have been recognised in Q3 2009.  An adjustment is therefore required to reduce hardware revenue in Q2 2009 by $6 million and increase hardware revenue in Q3 2009 by $6 million.

---

[12] Workpaper "8100A Morgan Stanley memo on hardware revenue"
[13] Workpaper "8100A Morgan Stanley memo on hardware revenue"

**mazars**    6733-ANA and 6734-ANA – Software House International

| 6733-ANA and 6734-ANA – Hardware sales to Software House International ("SHI") | |
|---|---|
| **Amount of sample item:** | 6733-ANA - $1,269,100.00<br>6734-ANA - $1,269,100.00 |
| **Period initially recognised:** | Q1 2010 |
| **Date invoice posted to general ledger:** | 31 March 2010 |
| **Hardware supplier:** | Dell |

**How Autonomy originally reported the transaction**

| Sample | Quarter | Customer | Revenue recognised |
|---|---|---|---|
| 6733-ANA | Q1 2010 | SHI | $1,269,100.00 |
| 6734-ANA | Q1 2010 | SHI | $1,269,100.00 |

**Details of the transactions**

These transactions were sales of Dell hardware to SHI. The sales was made at a loss to Autonomy of $232,875 each (a loss of $190,375 each once the shipping and handling fee invoiced to SHI but posted separately to the general ledger is taken into account) [1]

*Agreement with Dell:*

Dell and Autonomy entered into a Value Added Reseller Agreement in December 2009[2], under which Dell could sell and Autonomy purchase and remarket the "**Products**" defined as "*Dell-branded computer hardware and related products, including Software, as set forth in the Dell quotes issued under this Agreement. Such Software may be subject to third party licensing agreements*".

As per Clause 15.1 set out below, the agreement was originally for a one-year term but automatically renewed unless either party terminated. I have not seen any evidence or suggestion that either Autonomy or Dell had terminated this agreement before the end of Q1 2010.

- Clause 15.1: "*One Year Term. The term of this Agreement is one (1) year beginning on the Effective Date. This Agreement will automatically renew for consecutive additional (1) year terms unless either Party notifies the other Party of its intent to terminate this Agreement at least thirty (30) Days before the end of the then-current term*".

Clauses that are relevant to the principles of revenue recognition are set out below:

- Clause 3.3: "*VAR's Pricing Freedom. Neither Dell nor any employee of Dell has any authority to determine or set VAR's resale pricing of the Products*".

---

[1] Autonomy's invoices to SHI were for $1,269,100 each (net of shipping and handling which was posted separately) [HP-SEC-01655817 and HP-SEC-01655834], Autonomy's purchase orders to Dell were for $1,501,975 (including shipping & handling) [HP-SEC-01655820 and HP-SEC-01655837], a loss of $232,875 on each transaction
[2] US-PWC 00002327-00002338

| 6733-ANA and 6734-ANA – Hardware sales to Software House International ("SHI") |
|---|

- Clause 3.6: "*Relationship of the Parties. Dell and VAR are independent contractors. Neither Party will make any warranties or representations or assume any obligations on the other Party's behalf.  Neither Party is nor will claim to be a legal representative, partner, franchisee, agent or employee of the other Party except as specifically stated in this Agreement.  Each Party is responsible for the direction and compensation, and is liable for the actions of, its employees*".

- Clause 4.6: "*Shipping and Handling Options. Unless otherwise directed, Dell will ship Products using Dell's designated carrier. If Products are shipped via Dell's designated carrier, Dell will prepay all shipping and handling costs, and Dell will bear the risk of loss of, or any damage to, the Products during shipping. […]*".

- Clause 5.3: "*Shipping Dates, Title and Inspection. Dell will estimate a ship date for all accepted Product Orders. Ship dates are estimates only and do not guarantee a delivery date to VAR or bind Dell to meet any specific delivery schedule.  Title to hardware Products passes from Dell to VAR upon delivery of the Products by Dell to a common carrier for shipment to the location designated by VAR.  Software Products may be shipped physically with hardware Products, or independently, including electronically, such as via FTP transfer*".

*Documents relevant to both transactions*

- 25 March 2010 – Dell issued quote# 534780788 for 1 OptiPlex 780 System for a price of $600.79 ($583.79 plus $17 shipping and handling)[3];

- 25 March 2010 - Autonomy issues purchase quote # 534780788-AU for 6,000 x Optiplex 780 systems at $507.64 plus $17.00 shipping and handling each, a total of $3,147,840.00 including shipping and handling[4].  This purchase quote states that "*Title to the products passes from Autonomy to SHI upon Dell's delivery at Dell's plant to a common carrier.  Autonomy shall be responsible for ensuring delivery of the Products to SHI. […]  In the event of any conflict between the terms of this Purchase Order and either the terms of any agreement between Dell and SHI, or the terms of any SHI purchase order, the terms of this Purchase Quotation shall control*";

*Transaction documents – 6733-ANA*

- 25 March 2010 – SHI issued purchase order WHE5Q for 2,500 x Optiplex 780 SFF E5300 4GB 1066MHZ hardware for a total price of $1,269,100, referencing Autonomy quote # 534780788[5];

- 25 March 2010 – Autonomy issued purchase order WHE5Q to Dell for 2,500 of "*System as described in the Dell quote number 534780788*" for a total of $1,501,975[6];

---

[3] HP-SEC-01655843-01655844
[4] HP-SEC-01655838-01655840
[5] HP-SEC-01655819
[6] HP-SEC-01655820

| 6733-ANA and 6734-ANA – Hardware sales to Software House International ("SHI") |
|---|

- 25 March 2010 – Autonomy issued invoice 6733-ANA for $1,269,100 plus $42,500 shipping and handling[7];

- March/April 2010 – Delivery documents: there are two separate dates on the delivery documents that reference purchase order number WHE5Q[8].  For many of the pages the explanation of these dates are not clear, but on some pages it appears as though the waybill date is the earlier date, which is 30-31 March 2010 for all but one page which has a waybill date of 1 April.  My understanding is that the second date, which is always dated April 2010 is the delivery date.

*Transaction documents – 6734-ANA*

- 25 March 2010 – SHI issued purchase order WHE5P for 2,500 x Optiplex 780 SFF E5300 4GB 1066MHZ hardware for a total price of $1,269,100, referencing Autonomy quote # 534780788-AU[9];

- 25 March 2010 – Autonomy issued purchase order WHE5P to Dell for 2,500 of "*System as described in the Dell quote number 534780788*" for a total of $1,501,975[10];

- 25 March 2010 – Autonomy issued invoice 6734-ANA for $1,269,100 plus $42,500 shipping and handling[11];

- 25 March 2010 – Dell issued invoice XDPNF5492CM to Autonomy for $1,501,975 (including shipping and handling), referencing purchase order WHE5P[12];

- March/April 2010 – Delivery documents: there are two separate dates on the delivery documents that reference purchase order number WHE5[13].  For many of the pages the explanation of these dates are not clear, but on some pages it appears as though the waybill date is the earlier date, which is either 30-31 March 2010 or 1-2 April 2010. My understanding is that the second date, which is always dated April 2010 is the delivery date.

**My view on when this transaction met the criteria of IAS 18 for revenue to be recognised**

Taking each of the five revenue recognition criteria of IAS 18:

---

[7] HP-SEC-01655817.  For this transaction and for the sale invoiced as 6734-ANA, Autonomy initially posted the shipping and handling fee to another general ledger account before moving this revenue into the hardware revenue account by journal.  For this reason, the amount of my sample item (selected by identifying all invoices over $1m from the general ledger) excludes the shipping and handling fee
[8] HP-SEC-01655821-01655833
[9] HP-SEC-01655836
[10] HP-SEC-01655837
[11] HP-SEC-01655834
[12] HP-SEC-01655841
[13] HP-SEC-01655846-01655859

**6733-ANA and 6734-ANA – Hardware sales to Software House International ("SHI")**

a) as set out above, the quotation issued by Autonomy to SHI specified that title to the products passes from Autonomy to SHI upon Dell's delivery at Dell's plant to a common carrier, i.e. once Dell had delivered the products to the carrier for shipment to SHI, title passed to SHI.  It also states that Autonomy is responsible for ensuring delivery to SHI.  This suggests that whilst title transferred when the goods were shipped, the significant risks and rewards of ownership did not transfer to the buyer until delivery;

b) Autonomy did not retain any managerial involvement or control over the goods sold;

c) revenue was clearly set out in the quotation provided by Autonomy to SHI;

d) Autonomy was clearly obtaining economic benefits from this transaction as it was earning revenue; and

e) the costs of the transaction were clearly set out in the quotation provided by Dell to Autonomy.

Deloitte tested both of these transactions on workpaper "Q1 – 8130b Revenue Deals > $1m Q1 2010" and concluded that:

---

**Inventory/Shipment 89-16**

It was noted in testing that deal 89-17 has been reversed by way of a consol adjustment <2272-Z> and the goods in transit have been recognised as inventory. This has been tested at <2272-Z>. In addition it was noted in testing that deal 89-16 had been shipped but had not been delivered. Per the VAR agreement with Dell dated 22/12/2009 title passes to Autonomy when Dell delivers the goods to a "common carrier", i.e. when shipment takes place. Therefore this deal should also  be reversed and as the goods had been shipped this should have been recognised as inventory. This has been taken to <2340>

[14]

---

Note that deal 89-17 relates to purchase order WHE5Q and deal 89-1 -6 relates to purchase order WHE5Q.

I understand therefore that Deloitte have concluded that title passed from Dell to Autonomy on shipment but that title had not passed to SHI because delivery had not taken place.

In fact, as noted above, Autonomy's purchase quote states "*Title to the products passes from Autonomy to SHI upon Dell's delivery at Dell's plant to a common carrier.  Autonomy shall be responsible for ensuring delivery of the Products to SHI*", i.e. title had passed to SHI on shipment but because Autonomy retained responsibility for ensuring the products were delivered to SHI, the risks and rewards

---

[14] I note that I have not identified this adjustment on working paper "2340 04 Evaluation of misstatements 09AAM"

| 6733-ANA and 6734-ANA – Hardware sales to Software House International ("SHI") |
|---|

of ownership had not passed.  Accordingly, not all of the revenue recognition criteria of IAS 18 had been met, and the revenue for both these sales should not have been recognised until Q2 2010.

**My conclusion**

Revenue of $1,269,100 on each of these transactions should have been recognised in Q2 2010.

Despite both invoices originally being posted in Q1 2010, it appears from Deloitte's working papers that one of these sales had already been deferred.  Therefore, an adjustment is required in respect of one of these sales and hardware revenue in Q1 2010 should be reduced by $1,269,100 and hardware revenue in Q2 2010 increased by this amount.

**mazars**                                     8743-8746-ANA – Video Monitoring Services

| 8743-8746-ANA – Hardware sales to Video Monitoring Systems | |
|---|---|
| **Amount of sample item:** | $6,004,066.90 |
| **Period initially recognised:** | Q4 2010 |
| **Date invoice posted to general ledger:** | 31 December 2010 |
| **Hardware supplier:** | Video Monitoring Services ("**VMS**") |

**How Autonomy originally reported the transaction**

| Invoice | Quarter | Customer/Description | Revenue recognised |
|---|---|---|---|
| 8743-ANA | Q4 2010 | VMS | $1,501,016.00 |
| 8744-ANA | Q4 2010 | VMS | $1,501,016.90 |
| 8745-ANA | Q4 2010 | VMS | $1,501,017.00 |
| 8746-ANA | Q4 2010 | VMS | $1,501,017.00 |

**Details of the transaction**

This was a sale of hardware to VMS that was in part of assets already owned by Autonomy and in part acquired from Insight for the purposes of resale to VMS[1].

The sale of this hardware is discussed in Appendix "SW-10-081 Video Monitoring Systems of America, Inc." as this transaction was entered into on the same day as a series of other transactions between Autonomy and VMS as summarised below:

- "*Product Schedule No. 6 to Autonomy Software License Agreement*" (the "**Software License Agreement**");

- "*Second Amendment to Software License Agreement*" (the "**Hardware Agreement**"); and

- "*First Amendment to Data Licensing Agreement*" (the "**VMS Purchase Agreement**").

As set out in "SW-10-081 Video Monitoring Services of America, Inc", in my view these three agreements were linked in such a way that the commercial effect of the three agreements could not be understood without reference to one another. As a result, and following the requirements of IAS 18.13, I concluded that the transactions should be considered together for the purposes of determining whether the criteria for revenue recognition had been met.

The three agreements resulting in a net inflow of economic benefit to Autonomy of $2,604,066. I consider that it is most appropriate to allocate this consideration to the sale of hardware as I have seen evidence indicating the fair value of hardware sold to VMS pursuant to the VMS Hardware Agreement was greater than this amount[2].

---

[1] Email from Sushovan Hussain to Richard Eads, subject "*Re: VMS Cost of Sale – Please Approve ASAP*" [HP-SEC-01655560-01655565] and Deloitte working paper "Q4-8130a Q4 2010 > $1m revenue testing", tab 10
[2] Specifically, the email from Chris Goodfellow requesting approval for a hardware purchase in relation to the VMS Hardware Sale in the amount of $5,846,546 [SEC-AUSA5-EPROD-000252336]

**mazars**

| 8743-8746-ANA – Hardware sales to Video Monitoring Systems |
|---|

Accordingly, an adjustment is required to reduce revenue attributable to these hardware sales to VMS from $6,004,067 to $2,604,066, a reduction of $3,400,001.

**Terms of the Hardware Agreement**

The Hardware Agreement[3] includes the following clauses relevant to revenue recognition:

- "*Delivery.  Title to and risk of loss with respect to the Hardware shall pass to VMS F.O.B. Autonomy's or an Autonomy-designated bonded warehouse.  Autonomy shall ship the Hardware to VMS at such location(s) within the United States of American* [sic] *as VMS shall designate and based on a schedule to be agreed by the parties' after execution of this Second Amendment and shall use commercially reasonable efforts to ensure that no unreasonable delay in such shipment is caused due to customs authorities or due to application of customs laws or other applicable importing or exporting laws of the countries in which the foregoing warehouses may be located.  Autonomy shall pay the cost of shipment and, further, shall pay any charges and fee imposed by applicable customs authorities in connection with shipments coming from outside the United States.  Autonomy shall indemnify and hold VMS and its assigns harmless from and against any loss in or physical damage to the Hardware during such time as the Hardware is in Autonomy's possession and under Autonomy's control and until such time as Autonomy has complied with all customs requirements for export and such Hardware is delivered to a common carrier for shipment to VMS hereunder*";

- "*Warranty.  Autonomy makes and VMS receives no warranty with respect to the Hardware. […]*"

- "*Maintenance; Installation.  Autonomy shall have no obligation to provide any maintenance and support services in connection with the Hardware.  All such services (if any) shall be provided by the third-party manufacturer or distributor of said equipment, to the extent purchased by VMS*".

***Timing of revenue recognition***

- 31 December 2010: Autonomy issued its invoices to VMS[4];

- 4 January 2011: Discussions took place about where to ship the VMS hardware[5];

| **My view on when this transaction met the criteria of IAS 18 for revenue to be recognised** |
|---|
| Taking each of the five revenue recognition criteria of IAS 18: |

---

[3] HP-SEC-01655546-01655549
[4] HP-SEC-01655539-01655542
[5] HP-SEC-01655543-01655545

**mazars**

| 8743-8746-ANA – Hardware sales to Video Monitoring Systems |
| --- |

a) The terms of the agreement with VMS specifies that both title and risk of loss pass to VMS at Autonomy's or an Autonomy-designated bonded warehouse;

b) Autonomy is considered, based on the Hardware Agreement, to have not retained any managerial involvement over the goods sold after delivery to Autonomy's or an Autonomy-designated bonded warehouse, although Autonomy retained responsibility for delivery to a common carrier for shipment to VMS.

c) revenue was clearly set out in the invoices issued by Autonomy to VMS;

d) Autonomy was clearly obtaining economic benefits from this transaction as it was earning revenue; and

e) the costs of the transaction were evidenced in the email from Mr Chris Goodfellow referred to above.

Deloitte audit work

Deloitte considered these sales of hardware on tab 10 of working paper "Q4-8130a Q4 2010 > $1m revenue testing" and noted the following:

- the total cost of the hardware was $6,410k ($2,866k purchased from Insight plus $3,544k already held by Autonomy);

- the hardware already held by Autonomy was recognised as a fixed asset at 31 December 2010 with a cost of $3,544k and a net book value of $498k. Therefore, much of the cost of this hardware had already been taken to the profit and loss account as a depreciation charge. Deloitte proposed an adjustment at the year end to move the value of $498k out of fixed assets and into cost of goods sold;

- Deloitte relied on the following when considering whether it was appropriate to recognise revenue at Q4 2010:

  - an email from Marvin Martin at Insight that the hardware being purchased from Insight was bonded and ready for shipment[6]; and

  - confirmation from Peter Menell (CTO) that the hardware already owned by Autonomy was assigned to VMS and VMS had acknowledged the passing of hardware title[7].

Deloitte concluded that the treatment and delivery was satisfactory.

---

[6] See HP-SEC-01655554-01655556 for a copy of this email

[7] This statement is referenced to document Q4-8130a.2. I note that this document includes an email confirmation from Peter Menell about hardware being assigned to customers, but does not include a confirmation from VMS that they had acknowledged the passing of hardware title

| 8743-8746-ANA – Hardware sales to Video Monitoring Systems |
|---|
| **My conclusion**<br><br>An adjustment is required to reduce revenue attributable to these hardware sales to VMS from $6,004,067 to $2,604,066, a reduction of $3,400,001.<br><br>I have relied on Deloitte's acceptance of the emails from Marvin Martin and Peter Menell to evidence transfer of risks and rewards in Q4 2010. |

mazars                                             **9172-ANA – Software House International**

| 9172-ANA – Hardware sale to Software House International ("SHI") | |
|---|---|
| **Amount of sample item:** | $2,523,931.20 |
| **Period initially recognised:** | Q1 2011 |
| **Date invoice posted to general ledger:** | 31 March 2011 |
| **Hardware supplier:** | Dell |

**How Autonomy originally reported the transaction**

| Sample | Quarter | Customer | Revenue recognised |
|---|---|---|---|
| 9172-ANA | Q1 2011 | SHI | $2,523,921.20 |

**Details of the transaction**

This was a sale of Dell hardware to SHI.  The sale was made at a loss to Autonomy of $248,623.20[1].

*Agreement with Dell:*

Dell and Autonomy entered into a Value Added Reseller Agreement in December 2009[2], under which Dell could sell and Autonomy purchase and remarket the "**Products**" defined as "*Dell-branded computer hardware and related products, including Software, as set forth in the Dell quotes issued under this Agreement.  Such Software may be subject to third party licensing agreements*".

As per Clause 15.1 set out below, the agreement was originally for a one-year term but automatically renewed unless either party terminated.  I have not seen any evidence or suggestion that either Autonomy or Dell had terminated this agreement before the end of Q1 2011.

- Clause 15.1: "*One Year Term.  The term of this Agreement is one (1) year beginning on the Effective Date. This Agreement will automatically renew for consecutive additional (1) year terms unless either Party notifies the other Party of its intent to terminate this Agreement at least thirty (30) Days before the end of the then-current term*".

Clauses that are relevant to the principles of revenue recognition are set out below:

- Clause 3.3: "*VAR's Pricing Freedom. Neither Dell nor any employee of Dell has any authority to determine or set VAR's resale pricing of the Products*".

- Clause 3.6: "*Relationship of the Parties. Dell and VAR are independent contractors. Neither Party will make any warranties or representations or assume any obligations on the other Party's behalf.  Neither Party is nor will claim to be a legal representative, partner, franchisee, agent or*

---

[1] Autonomy's invoice to SHI was for $2,523,921.20 [HP-SEC-01654946], Dell's invoice to Autonomy was for $2,772,554.40 [HP-SEC-01654958-01654973], a loss of $248,623.20.
[2] US-PWC 00002327-00002338

| **9172-ANA – Hardware sale to Software House International ("SHI")** |
|---|

*employee of the other Party except as specifically stated in this Agreement.  Each Party is responsible for the direction and compensation, and is liable for the actions of, its employees*".

- Clause 4.6: "*Shipping and Handling Options. Unless otherwise directed, Dell will ship Products using Dell's designated carrier. If Products are shipped via Dell's designated carrier, Dell will prepay all shipping and handling costs, and Dell will bear the risk of loss of, or any damage to, the Products during shipping.* […]".

- Clause 5.3: "*Shipping Dates, Title and Inspection. Dell will estimate a ship date for all accepted Product Orders. Ship dates are estimates only and do not guarantee a delivery date to VAR or bind Dell to meet any specific delivery schedule.  Title to hardware Products passes from Dell to VAR upon delivery of the Products by Dell to a common carrier for shipment to the location designated by VAR.  Software Products may be shipped physically with hardware Products, or independently, including electronically, such as via FTP transfer*".

*Transaction documents*

- 4 February 2011: Dell provided quote number 573245451 for 2,520 Dell Latitude E6410 Base Units and associated products.  The total quote was $2,772,554.4 (comprising products for $2,734,754.40 plus $37,800 shipping)[3].

- 4 February 2011: Autonomy provided quote number 573245451-AU to SHI for 2,520 Dell Latitude E6410 Base Units and associated products.  The total quote was $2,523,931.20 (comprising products for $2,486,131.20 plus $37,800 shipping)[4].  The quote includes the following statement:

  "*Title to the products passes from Autonomy to SHI upon Dell's delivery at Dell's plant to a common carrier.  Autonomy shall be responsible for ensuring delivery of the Products to SHI. Except for the foregoing, Dell shall be responsible for all warranties, representations and/or obligations related to the products and services listed above.  Dell shall be solely liable to SHI for any failure to perform its obligations agreed to between Dell and SHI or otherwise related to the products and services described herein.  In the event of any conflict between the terms of this Purchase Order and either the terms of any agreement between Dell and SHI, or the terms of any SHI purchase order, the terms of this Purchase Quotation shall control.  No other terms and conditions apply to this Purchase Quotation*".

- SHI issued Purchase Order WHUWU for 2,520 Dell Latitude E6410s and associated products for $2,486,131.20[5].  This Purchase Order is undated but gives a required shipment date of 3 March 2011.

---

[3] US-PWC 00002856-00002857
[4] HP-SEC-01654950-01654952
[5] HP-SEC-01654948-01654949

| 9172-ANA – Hardware sale to Software House International ("SHI") |
|---|

- 4 March 2011: Autonomy issued Purchase Order WHUWU to SHI for 2,520 of the systems described in Dell quote number 573245451 for $2,772,554.40[6].  The products were to be shipped to SHI.

- 8 March 2011: Autonomy issued invoice 9172-ANA to SHI, identifying the hardware products invoiced totalling $2,486,131.20 and the shipping and handling fee of $37,800, a total of $2,523,931.20[7].

- 5-6 April 2011: An email chain between Jeffrey Guido at Autonomy to Julia Perez at Dell, and forwarded to Helen Ku and Stephen Chamberlain at Autonomy, discusses the shipment status of Purchase Order WHUWU[8].  Ms Perez confirms that on 5 April 2011 this order was still in transit via Ocean Freighter.  Mr Guido provided the following further update on 6 April 2011:

  "*Here is a further update on the below item from SHI.  I got a message from Dell this morning stating that the order is on a boat from Dell's facility in China to Dell's facility in Nashville, TN where it will be processed and packaged then shipped to SHI in New Jersey.  This trip takes about three weeks and started in late March (Q1) and will arrive in Nashville in mid-April and New Jersey sometime after that.  It is my understanding that the items in transit now constitute the complete order and they have been allocated specifically to Autonomy and this particular order*".

- 15 April 2011: Dell issued invoiced XF937X2M7C to Autonomy for $2,772,554.40[9].  The invoice reference Purchase Oder WHUWU.

- 15 April 2011: Bills of Lading, which can be matched to this transaction by the Purchase Order Number WHUWU detail the "Ship From" address of Dell at 2 Dell Parkway Nashville, to SHI at 200 Varga Ln, Somerset, NJ[10].

---

**My view on when this transaction met the criteria of IAS 18 for revenue to be recognised**

Taking each of the five revenue recognition criteria of IAS 18:

a) as set out above, the quotation issued by Autonomy to SHI specified that title to the products passes from Autonomy to SHI upon Dell's delivery at Dell's plant to a common carrier, i.e. once Dell had delivered the products to the carrier for shipment to SHI, title passed to SHI.  At this point, the significant risks and rewards of ownership have transferred to the buyer.  The email from Mr Guido quoted above is clear that this would not have occurred until Q2 2011;

---

[6] HP-SEC-01654957
[7] HP-SEC-01654946
[8] HP-SEC-01654955-01654956
[9] HP-SEC-01654958-01654973
[10] HP-SEC-01654974-01654979

| 9172-ANA – Hardware sale to Software House International ("SHI") |
| --- |

b)  Autonomy did not retain any managerial involvement or control over the goods sold;

c)  revenue was clearly set out in the quotation provided by Autonomy to SHI;

d)  Autonomy was clearly obtaining economic benefits from this transaction as it was earning revenue; and

e)  the costs of the transaction were clearly set out in the quotation provided by Dell to Autonomy.

As this transaction did not meet all of the revenue recognition criteria until Q2 2011, revenue should have been recognised in this quarter, not in Q1 2011.

I note that Deloitte concluded that the recognition of this sale in Q1 2011 was satisfactory based on the following information[11]:

> Deloitte viewed an email chain between Julia Perez, Inside Sales Representative, from Dell and Jeffrey Guido, Autonomy, in regards to this shipment.  Julia had confirmed that PO WHUWU was shipped and in transit via Ocean Freighter as at 31/03/2011.  Deloitte viewed a contract agreement that stated that title to these products passes from Autonomy to SHI upon Dell's delivery of the goods to a common carrier.  As the goods are in transit to the final destination, this portion of the contract has been completed and Deloitte has determined that Autonomy is correct in recognizing revenue for Q1 2011.  Satisfactory.

The email chain referred to is not on the audit file and it is therefore not apparent whether Deloitte saw the update from Mr Guido on 6 April 2011 that is set out above.  I consider this update makes it clear that the products had not yet been dispatched to their final destination, SHI.  Rather, at the end of Q1 2011, the products were in transit from one Dell facility to another Dell facility and title to these products would not pass to SHI until they had been packaged and despatched to SHI which would not be until mid-April.

**My conclusion**

Revenue earned on this transaction of $2,523,931.20 should have been recognised in Q2 2011, not Q1 2011.  An adjustment is therefore required to reduce hardware revenue in Q1 2011 by $2,523,931.20 and increase hardware revenue in Q2 2011 by the same amount.

---

[11] Deloitte working paper "Q1 8130 Hardware Testing"

# Exhibit B

# 1 Appendix M – The revenue reported by Autonomy by revenue stream and my assessment of that revenue had the financial statements been prepared in accordance with the relevant requirements

## 1.1 Introduction

1.1.1 In Section 6 of my expert report I set out the revenue reported in respect of Q2 2011 by Autonomy broken down by revenue stream, as well as my assessment of that revenue (again broken down by revenue stream) had the financial statements been prepared in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006.  In this appendix I set out the same information by quarter for Q1 2010 to Q1 2011.

## 1.2 Q1 2010

1.2.1 In the chart below I set out the revenue reported in respect of Q1 2010 by Autonomy broken down by revenue stream, as well as my assessment of that revenue (again broken down by revenue stream) had the financial statements been prepared in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006:

**Figure 1.1: Revenue reported by Autonomy by revenue stream in Q1 2010 and my assessment of that revenue had it been reported in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006**



**mazars**

1.2.2   In Q1 2010 the total of the reported IDOL Cloud and IDOL OEM revenues were 162.3% of reported IDOL Product revenues.  However, as can be seen from the figure above, the total of the IDOL Cloud and IDOL OEM revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements would have only made up 96.8% of the IDOL Product revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements.

1.2.3   Further, the figure above shows that, although reported revenues were split broadly evenly over the IDOL Product and IDOL Cloud revenue streams (with IDOL Cloud revenue making up 98.9% of IDOL Product revenue), in actual fact IDOL Cloud revenue was significantly less than IDOL Product revenue, at just 76.7%.  With respect to the IDOL OEM revenue stream, reported revenue made up 63.4% of reported IDOL Product revenue.   If the financial statements had been prepared in accordance with the relevant requirements IDOL OEM revenue would have made up 20.1% of the IDOL Product revenue.  In summary, if revenues had been reported in accordance with the relevant requirements, IDOL Product revenue would have been far greater than that of IDOL Cloud and IDOL OEM.

1.2.4   In addition to this, if revenue had been reported in accordance with the relevant requirements hardware would have made up 9.7% of total revenue.

## 1.3   Q2 2010

1.3.1   In the chart below I set out the revenue reported in respect of Q2 2010 by Autonomy broken down by revenue stream, as well as my assessment of that revenue (again broken down by revenue stream) had the financial statements been prepared in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006:

United States v (1) Michael Richard Lynch (2) Stephen Chamberlain
Summary of independent expert accounting opinions of Steven Brice
FCA

Figure 1.2: Revenue reported by Autonomy by revenue stream in Q2 2010 and my assessment of that revenue had it been reported in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006



1.3.2    In Q2 2010 the total of the reported IDOL Cloud and IDOL OEM revenues were 135.4% of reported IDOL Product revenues.  However, as can be seen from the figure above, the total of the IDOL Cloud and IDOL OEM revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements would have only made up 68.2% of the IDOL Product revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements.

1.3.3    Further, the figure above shows that, although reported revenues were split broadly evenly over the IDOL Product and IDOL Cloud revenue streams (with IDOL Cloud revenue making up 75.2% of IDOL Product revenue), in actual fact IDOL Cloud revenue was significantly less than IDOL Product revenue, at just 44.2%.  With respect to the IDOL OEM revenue stream, reported revenue made up 60.1% of reported IDOL Product revenue.  If the financial statements had been prepared in accordance with the relevant requirements IDOL OEM revenue would have made up 24.0% of the IDOL Product revenue.  In summary, if revenues had been reported in accordance with the relevant requirements, IDOL Product revenue would have been far greater than that of IDOL Cloud and IDOL OEM.

1.3.4    In addition to this, if revenue had been reported in accordance with the relevant requirements hardware would have made up 16.3% of total revenue.

mazars

## 1.4    Q3 2010

1.4.1    In the chart below I set out the revenue reported in respect of Q3 2010 by Autonomy broken
down by revenue stream, as well as my assessment of that revenue (again broken down by
revenue stream) had the financial statements been prepared in accordance with IFRS, the
DTR, Conceptual Framework and Companies Act 2006:

**Figure 1.3: Revenue reported by Autonomy by revenue stream in Q3 2010 and
my assessment of that revenue had it been reported in accordance with IFRS,
the DTR, Conceptual Framework and Companies Act 2006**



1.4.2    In Q3 2010 the total of the reported IDOL Cloud and IDOL OEM revenues were 133.5% of
reported IDOL Product revenues.  However, as can be seen from the figure above, the total
of the IDOL Cloud and IDOL OEM revenues which would have been reported had the financial
statements been prepared in accordance with the relevant requirements would have only
made up 80.2% of the IDOL Product revenues which would have been reported had the
financial statements been prepared in accordance with the relevant requirements.

1.4.3    Further, the figure above shows that, although reported revenues were split broadly evenly
over the IDOL Product and IDOL Cloud revenue streams (with IDOL Cloud revenue making
up 79.7% of IDOL Product revenue), in actual fact IDOL Cloud revenue was significantly less
than IDOL Product revenue, at just 55.3%.  With respect to the IDOL OEM revenue stream,
reported revenue made up 53.6% of reported IDOL Product revenue.  If the financial
statements had been prepared in accordance with the relevant requirements IDOL OEM
revenue would have made up 24.8% of the IDOL Product revenue.  In summary, if revenues

**mazars**

had been reported in accordance with the relevant requirements, IDOL Product revenue would have been far greater than that of IDOL Cloud and IDOL OEM.

1.4.4    In addition to this, if revenue had been reported in accordance with the relevant requirements hardware would have made up 12.0% of total revenue.

## 1.5    Q4 2010

1.5.1    In the chart below I set out the revenue reported in respect of Q4 2010 by Autonomy broken down by revenue stream, as well as my assessment of that revenue (again broken down by revenue stream) had the financial statements been prepared in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006:

Figure 1.4: Revenue reported by Autonomy by revenue stream in Q4 2010 and my assessment of that revenue had it been reported in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006



1.5.2    In Q4 2010 the total of the reported IDOL Cloud and IDOL OEM revenues were 100.9% of reported IDOL Product revenues.  However, as can be seen from the figure above, the total of the IDOL Cloud and IDOL OEM revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements would have only made up 48.5% of the IDOL Product revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements.

1.5.3    Further, the figure above shows that, although reported revenues were split broadly evenly over the IDOL Product and IDOL Cloud revenue streams (with IDOL Cloud revenue making up 60.0% of IDOL Product revenue), in actual fact IDOL Cloud revenue was significantly less

than IDOL Product revenue, at just 37.4%.  With respect to the IDOL OEM revenue stream, reported revenue made up 40.9% of reported IDOL Product revenue.  If the financial statements had been prepared in accordance with the relevant requirements IDOL OEM revenue would have made up 11.1% of the IDOL Product revenue.  In summary, if revenues had been reported in accordance with the relevant requirements, IDOL Product revenue would have been far greater than that of IDOL Cloud and IDOL OEM.

1.5.4   In addition to this, if revenue had been reported in accordance with the relevant requirements hardware would have made up 15.1% of total revenue.

## 1.6    Q1 2011

1.6.1   In the chart below I set out the revenue reported in respect of Q1 2011 by Autonomy broken down by revenue stream, as well as my assessment of that revenue (again broken down by revenue stream) had the financial statements been prepared in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006:

**Figure 1.5: Revenue reported by Autonomy by revenue stream in Q1 2011 and my assessment of that revenue had it been reported in accordance with IFRS, the DTR, Conceptual Framework and Companies Act 2006**



1.6.2   In Q1 2011 the total of the reported IDOL Cloud and IDOL OEM revenues were 165.1% of reported IDOL Product revenues.  However, as can be seen from the figure above, the total

mazars

of the IDOL Cloud and IDOL OEM revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements would have only made up 87.9% of the IDOL Product revenues which would have been reported had the financial statements been prepared in accordance with the relevant requirements.

1.6.3    Further, the figure above shows that, although reported revenues were split broadly evenly over the IDOL Product and IDOL Cloud revenue streams (with IDOL Cloud revenue making up 96.8% of IDOL Product revenue), in actual fact IDOL Cloud revenue was significantly less than IDOL Product revenue, at just 59.7%.  With respect to the IDOL OEM revenue stream, reported revenue made up 68.3% of reported IDOL Product revenue.   If the financial statements had been prepared in accordance with the relevant requirements IDOL OEM revenue would have made up 28.1% of the IDOL Product revenue.  In summary, if revenues had been reported in accordance with the relevant requirements, IDOL Product revenue would have been far greater than that of IDOL Cloud and IDOL OEM.

1.6.4    In addition to this, if revenue had been reported in accordance with the relevant requirements hardware would have made up 9.6% of total revenue.

Exhibit C

**mazars**                                    *Curriculum Vitae of Steven Brice*

# Steven Brice

**Partner**
*Accounting Technical Services*

**Mazars LLP, London**
**30 Old Bailey, London, EC4M 7AU**

**T: +44 (0)20 7063 4410**

**E: steve.brice@mazars.co.uk**

## Overview

Steven is a Chartered Accountant and a Fellow of the Institute of Chartered Accountants in England and Wales (the ICAEW).

Steven is a Partner and Head of Accounting Technical Services (ATS) for Mazars LLP (Mazars), the UK firm of Mazars Group. Steven is an expert on accounting under International Financial Reporting Standards (IFRS) and UK GAAP (FRS 102). Steven is an experienced accountant and has been specialising in financial reporting for over 25 years. Steven regularly undertakes advisory work on complex accounting issues.

Steven is a technical accounting specialist and regularly issues accounting opinions, particularly under IFRS. He has a detailed knowledge of the application of accounting standards. Additionally Steven regularly reviews financial statements for technical compliance and also lectures on IFRS at seminars. As part of his work he regularly meets with Standard Setters, including the IASB and FRC.

Steven is also the lead partner for financial reporting valuations in the UK, which encompass purchase price allocations (PPA) assignments, intangible asset valuations and share-based payments.

As well as advising audit teams, Steven is a client facing technical specialist and has been instructed as an Expert Witness on a number of occasions. Consequently, Steven routinely works alongside the Forensic and Investigation Services team at Mazars. Steven has given oral evidence on several major forensic cases as an accounting expert.

Steven holds a current Practising Certificate and is a Responsible Individual ("RI") for audit work within Mazars and is also licenced within Mazars for valuation work.

**mazars**                                                    *Curriculum Vitae of Steven Brice*

---

## Professional summary

Professional:    Fellow of the Institute of Chartered Accountants in England and Wales (FCA)

Degree:          BSc Econ (Hons), Queen Mary College, University of London

---

## Career history

2005 to date:    Mazars LLP, Partner and Head of Mazars' Accounting Technical Services team

2000 – 2005:     Mazars LLP, Director, National Technical department

1995 – 2000:     Baker Tilly, Technical and Training department

1990 – 1995:     Baker Tilly[1], Audit department

---

## Expert testimony during the past four years

July 2019:       Korean Retail Investment Co and CPP Investment Board Private Holding v. Tesco Holding BV and Tesco Stores Limited
                 - Wrote reports and provided expert testimony in International Arbitration.

July 2020:       Securities and Exchange Commission v. Rio Tinto plc, Rio Tinto Limited, Thomas Albanese, and Guy Robert Elliott
                 - Wrote reports and deposed.

April 2020:      Perrigo Company Plc and Perrigo Ireland 2 v. Alychlo NV  and Holdco 1 BE NV
                 - Wrote reports and provided expert testimony in CEPANI arbitration.

July 2022:       Wired Orthodontics Limited v. The Commissioners for Her Majesty's Revenue and Customs
                 - Wrote reports and provided expert testimony in tax tribunal.

---

## Matters in which Steven has testified as an expert at trial or by deposition

- Confidential (2019). Expert Accountant at the International Dispute resolution Centre, London (under ICC Arbitration Rules). Following an acquisition of a large retail company the dispute concerned the alleged breach of SPA warranties in respect of a reference set of accounts prepared in accordance with IFRS.

---

[1] Including Casson Beckman which merged with Baker Tilly

**mazars**                                                    *Curriculum Vitae of Steven Brice*

## Technical expertise

- Steven is currently the Chair of the Corporate Reporting Faculty Board at the ICAEW.

- Steven is a member of the Technical Strategy Board ('TSB') at the ICAEW.

- Steven was appointed as a member of the Advisory Panel of the Financial Reporting Council ('FRC') until December 2021. Steven was also formerly a member of the Technical Advisory Group ('TAG') of the FRC.

- Steven is a member of the ICAEW's Valuation Special Interest Group and the Corporate Reporting Faculty. Steven is also a current member of the ICAEW Council.

---

## List of publications and articles from the last 10 years written, or contributed to, by Steven Brice

1. ICAEW - IFRS 16 Leases: Putting theory into practice (2017)

2. The Accountant - Common SME Standard for the EU (2015)

3. Hot Topics - Financial Reporting Newsletter Issue 5: Narrative reporting (2013)

4. Hot Topics - Financial Reporting Newsletter Issue 6: BIS (2013)

5. Hot Topics - Financial Reporting Newsletter Issue 7: Leases (2013)

6. Hot Topics - Financial Reporting Newsletter Issue 8: Companies Act 2006 (2013)

7. Hot Topics - Financial Reporting Newsletter Issue 9: FRS 102 (2014)

8. Hot Topics - Financial Reporting Newsletter Issue 10: EU accounting directive (2014)

9. Hot Topics - Financial Reporting Newsletter Issue 11: IFRS 15 Revenue from Contracts with Customers (2015)

10. Hot Topics - Financial Reporting Newsletter Issue 12: EU disclosure directive (2015)

11. Hot Topics - Financial Reporting Newsletter Issue 13: DP Macro hedging (2015)

12. Hot Topics - Financial Reporting Newsletter Issue 14: IFRS 9 Financial Instruments (2015)

13. Hot Topics - Financial Reporting Newsletter: IFRS 15 Revenue from Contracts with Customers (2015)

14. Hot Topics: IFRS 16 Leases (2016)

15. Financial Reporting Newsletter - FRS 102 'The Financial Reporting Standard applicable in the UK and Republic of Ireland' (2013)

3

**mazars**                                                *Curriculum Vitae of Steven Brice*

16. Converting to the New UK Accounting and Financial Reporting Regime - For UK Listed Groups (2013)

17. Corporate Reporting for pharma and life sciences – Climate-related reporting in financial statements (2022)

18. Corporate Reporting for pharma and life sciences - Pharma R&D trends and accounting implications (2022)

19. Corporate Reporting for pharma and life sciences – Reporting financial and non-financial measures (2022)

20. Corporate Reporting for pharma and life sciences - Spotlight on provisions and contingencies (2022)

21. C-Speak - Corporate reporting & AI - opportunities and risks (2023)

22. C-Speak - Reporting update:Cyber risk, resilience and regulation (2022)

23. C-Speak - Reporting update: ESEF - the difficult story of technological advancement in annual reports (2022)

24. C-Speak - Autumn 2021 - Latest developments in corporate reporting (2021)

25. By All Accounts (ICAEW) - Preparing for the 2022/23 reporting season (2022)

26. By All Accounts (ICAEW) - Preparing for the 2021/22 reporting season (2021)

27. COVID-19: financial reporting valuations in uncertain times (Mazars website) (2020)

28. Financial reporting implications of COVID-19 (Mazars website) (2020)

29. Accounting for legal costs and third party funding (2016)

30. Mazars Focus Topics – ESMA's public statement on IFRS 9 (2017)

31. Mazars Focus Topics - Transition to IFRS 16 (2017)

32. ICAEW (Financial Reporting Faculty) - Getting to grips with cyber risk (2022)

# Exhibit D

mazars

| SW-10-048 – Bank of America, NA ("B of A") | |
|---|---|
| Amount of sample item: | $8.915 million |
| Period initially recognised: | Q1 2010 |
| Date of contract: | 31 March 2010 |
| Total contracted amount: | $9.450 million |
| Reported revenue stream: | IDOL OEM: $8.915 million |
| | IDOL Cloud: $4.458 million |
| | IDOL Product: ($4.458 million) |

**Summary of the transaction**

This transaction relates to the "*Product License Schedule A-2.2*" between Bank of America, N.A. ("**Bank of America**") and Autonomy, dated 31 March 2010[1] (the "**March 2010 Product License Schedule**"). The March 2010 Product License Schedule was attached to the "*Application Service Provider and Software License Agreement*", dated 31 March 2009 (the "**March 2009 Agreement**")[2].

Pursuant to the March 2010 Product License Schedule, Autonomy granted Bank of America additional "*Software*", as defined in the Mach 2009 Agreement.  The additional "*Software*" listed in the March 2010 Product License Schedule was[3]:

- an expansion of the number of Bank of America users entitled to use the "*Software*" set out in the March 2009 Agreement from 40,000 to 105,000;

- "*Digital Safe Deduplication*";

- "*DSMail*"; and

- "*Bloomberg Capture Software*".

The additional "*Software*" set out in the March 2010 Product License Schedule was subject to the same restrictions as the "*Software*" set out in the March 2009 Agreement[4].

The fees set out in the March 2010 Product License Schedule were as follows[5]:

- a "*Software License Fee*" of $9,000,000;

- "*Annual Maintenance and Support Fees*" of $450,000.

---

[1] HP-SEC-01968903

[2] I consider the Bank of America March 2009 Agreement in SW-09-013

[3] HP-SEC-01968903, page 1

[4] That is, it was to be used "the archiving, supervision, storage, retention, retrieval and disposition of e-mail and other text-based communications between Forty Thousand (40,000) identifiable internal users" (i.e., the hosted "Digital Safe Services").

[5] HP-SEC-01968903, page 2

**MAZARS**

| SW-10-048 – Bank of America, NA ("B of A") |
|---|

Autonomy also undertook to provide Bank of America with "*training services related to the Software*". The cost of these "*training services*" was included in the "*Software License Fee*", was not to exceed $50,000 in "*calendar year 2010*" and $50,000 in "*calendar year 2011*"[6].

Autonomy's ledgers record that on 31 March 2010, Autonomy recognised license revenue of $8,914,762 in relation to the March 2010 Product Schedule.  On the same day, Autonomy recognised training revenue of $100,000 and deferred maintenance revenue of $435,238[7].

**Issues identified by Mazars**

**A. The substance of the Bank of America March 2010 Product License Schedule was not the sale of a good but was instead the provision of an ongoing hosting service**

In my view, the substance of the Bank of America March 2010 Product License Schedule was not the sale of a good but was instead the provision of an ongoing hosting service.  The March 2010 Product License Schedule did not alter the March 2009 Agreement other than to add to and expand the "*Software*" set out therein and as such, the following conditions of the March 2009 Agreement[8] apply in equal measure to the March 2010 Product License Schedule:

a) Bank of America's ability to use the "*Software*" set out in the March 2010 Product License Schedule was solely in relation to the "*the archiving, supervision, storage, retention, retrieval and disposition of e-mail and other text-based communications between* […] *identifiable internal users*" (i.e., the "*Digital Safe Services*").  The "*Digital Safe Services*" were themselves unambiguously defined as a "*proprietary **hosted** electronic communications management service*" (emphasis added) provided on equipment, software and network circuitries provided by Autonomy and for which Autonomy was operationally responsible;

b) the "*Software*" set out in the March 2010 Product License Schedule would be provided to Bank of America via an "*ASP model*"[9].  In my experience an "*ASP model*", which typically involves providers granting customers access to their software on a hosted environment and on servers maintained by the provider[10], almost invariably relates to the provision of a service over a set period of time, rather than the sale of goods; and

c) whilst the March 2009 Agreement did afford Bank of America the right to cease using the "*ASP model*" and instead install the "*Software*" set out therein on servers that it owned or operated, it does not appear that Bank of America ever exercised this right, and I have seen no evidence to suggest that it ever intended to.

---

[6] HP-SEC-01968903, page 3
[7] General ledger reference 6787-ANA
[8] Which lead me to conclude in SW-09-013 that the March 2009 Agreement was the provision of a hosting service
[9] "*Application Services Provider*"
[10] As was the case in the Bank of America March 2009 Agreement

**mazars**                                             Software Focus Transaction SW-10-048

| **SW-10-048 – Bank of America, NA ("B of A")** |
|---|

In light of the above, I do not consider that the commercial effect of the sale of the additional "*Software*" pursuant to the March 2010 Product License Schedule Agreement can be understood without reference to the provision of the hosted "*Digital Safe Archiving Services*" that Autonomy was simultaneously agreeing to undertake for Bank of America pursuant to the March 2009 Agreement.  IAS 18.13 therefore requires that I apply the revenue recognition criteria of IAS 18 to the series of transactions as a whole, and as such, in my opinion the March 2010 Product License Schedule should be accounted for as the provision of an ongoing hosting service.

IAS 18.20 requires that revenue arising from the rendering of services should be recognised by reference to the stage of completion of the transaction.  IAS 18.25 further explains that, for practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period of time, unless there is evidence that some other method better represents the stage of completion.

As such, it is my opinion that the consideration payable to Autonomy pursuant to the Bank of America March 2010 Product License Schedule should have been recognised as revenue as the hosting service was performed over the duration of the agreement.

**mazars**

| SW-10-048 – Bank of America, NA ("B of A") |
| --- |

**Conclusion and proposed adjustment**

In my opinion SW-10-048 did not satisfy the revenue recognition criteria of IAS 18 for the sale of goods, and the revenue recognised in Quarter 1 2010 in relation to SW-10-048 should be reversed.

In my opinion SW-10-048 did meet the revenue recognition criteria of IAS 18 regarding the provision of a hosting service over a set period of time.  As such the consideration due in relation to the March 2010 Product License Schedule should be recognised as revenue on a straight line basis over the duration of the agreement.

Autonomy recognised $8,915,000 of license revenue in relation to the March 2010 Product License Schedule.  Recognising this over the duration of the March 2010 Product License Schedule (i.e. over four years, until 31 March 2014) equates to revenue of $185,729 per month[11], or $557,188 per quarter[12].

Moreover, it is mandatory under IAS 18.35 for revenue arising from the sale of goods and revenue arising from the rendering of services to be disclosed separately.  In my view, revenue from SW-10-048 should have been disclosed as a rendering of services.

My proposed adjustments are as follows:

| SW-10-048 – Bank of America, NA ("B of A") | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Q1 2009 $000 | Q2 2009 $000 | Q3 2009 $000 | Q4 2009 $000 | Q1 2010 $000 | Q2 2010 $000 | Q3 2010 $000 | Q4 2010 $000 | Q1 2011 $000 | Q2 2011 $000 |
| **Original accounting** | | | | | | | | | |
| Revenue | - | - | - | 8,915 | - | - | - | - | - |
| **Proposed adjustment** | | | | | | | | | |
| Revenue | - | - | - | (8,915) | 557 | 557 | 557 | 557 | 557 |
| **Adjusted accounting** | | | | | | | | | |
| Revenue | - | - | - | - | 557 | 557 | 557 | 557 | 557 |

---

[11] $8,915,000 / 48 = $185,729
[12] $185,729 * 3 = $557,188

# Exhibit E

**mazars**

| SW-11-091 – Discover Technologies, LLC ("Prisa") | |
|---|---|
| **Amount of sample item:** | $3.600 million |
| **Period initially recognised:** | Q1 2011 |
| **Date of contract:** | 31 March 2011 |
| **Total contracted amount:** | $3.800 million |
| **Reported revenue stream:** | IDOL Cloud: $3.600 million |
| | IDOL OEM: $3.600 million |
| | IDOL Product ($3.600 million) |

**Summary of the transaction**

This transaction relates to a value added reseller agreement (the "**Reseller Agreement**") between Autonomy and Discover Technologies, LLC ("**DiscoverTech**"), dated 31 March 2011[1].

The software set out in the Reseller Agreement was an "*Introspect Discovery Solution*". The terms of the Reseller Agreement gave DiscoverTech the right to sublicence this software to the "*End-User*" Prisa.

The "*software licence fee*" set out in the Reseller Agreement was $3,600,000. The Reseller Agreement also included a "*first year support fee*" of $200,000[2].

On 31 March 2011 Autonomy recognised software licence revenue of $3,600,000 in relation to the Reseller Agreement. On the same day, Autonomy recorded a debtor of $3,800,000, reflecting the invoices raised in relation to the "*software licence fee*" and the "*first year support fee*"[3].

Prior to the DiscoverTech Reseller Agreement, Autonomy and Prisa had been in relation to a potential transaction to "*swipe the hosting business away from IBM*"[4], within internal emails indicating that the transaction was "*currently priced at €9.2 million over the 3 years*"[5]. However, no transaction with Prisa eventuated in Quarter 1 2011.

Autonomy's general ledgers record that the full amount owed by DiscoverTech pursuant to the DiscoverTech Reseller Agreement was cleared through four payments:

- two payments totalling $1,420,000[6] received on 30 June 2011; and

- two payments totalling $2,380,000[7] received on 30 September 2011.

---

[1] US-PWC 00004105, US-PWC 00004106, US-PWC 00004107, US-PWC 00004108
[2] US-PWC 00004105
[3] General ledger references 9593-ANA, 9594-ANA and 9595-ANA
[4] SEC-AUSA5-EPROD-000137759
[5] SEC-AUSA5-EPROD-000273482
[6] A payment of $470,000 and a payment of $950,000 [General ledger references CHK2207/9593 and CHK2208/9594]
[7] A payment of $1,900,000 and a payment of $480,000 [General ledger references 9594-ANA and 9595-ANA]

| SW-11-091 – Discover Technologies, LLC ("Prisa") |
| --- |
| It is unclear whether actual cash amounts were received by Autonomy in relation to the above. In an email dated 29 September 2011, Mr Stephen Chamberlain of Autonomy informed Mr David Truitt of DiscoverTech that amounts owed to Autonomy by DiscoverTech had instead been "*offset on our ledgers*" against amounts owed to DiscoverTech by Autonomy[8] (see below). |

**Issues identified**

**A.   The transaction did not meet the revenue recognition requirements of IAS 18.14**

In my view the transaction did not meet the revenue recognition requirements of IAS 18.14 for the following reasons:

   a)   at 31 March 2011 it does not appear that the risks and rewards of ownership of the software set out in the DiscoverTech Reseller Agreement had transferred to DiscoverTech, thereby failing to satisfy the criterion of IAS 18.14(a). I have reached this conclusion because the earliest correspondence I have seen between DiscoverTech and Autonomy in relation to the DiscoverTech Reseller Agreement was on 4 April 2011, on which date Mr Malcolm Hyson of DiscoverTech emailed an executed copy of the Reseller Agreement to a personal email address of Mr Stouffer Egan of Autonomy[9]. Moreover, I have seen no evidence to show that the software set out in the DiscoverTech Reseller Agreement was delivered to Mr Malcolm Hyson, as required by the Reseller Agreement; and

   b)   at 31 March 2011, Autonomy may have retained managerial involvement of the software set out in the MicroTech PO, thereby failing to satisfy the criterion of IAS 18.14(b). I have reached this conclusion because Autonomy and Prisa continued to discuss a potential transaction:

   i.   on 4 April 2011, Mr James Murray of Autonomy emailed, *inter alia*, Mr Chris Goodfellow and Mr Alvaro Etcheverry of Autonomy, under the subject "*Prisa Hosting*". Mr James Murray wrote "*Spoke with Sushovan and he wants you drive this deal this q. Have agreed with Rahul that we need to put in place a timetable, starting with a conf call on 20th April at 10 am and then a visit to Madrid for a couple of days the following week/first week of May. Please advise what works best for you and Alvaro will try to coordinate with Alicia as per Rahul's instructions to me Friday*"[10];

   ii.   on 19 April 2011, Mr Alvaro Etcheverry of Autonomy shared a "*Prisa update*", stating "*Latest update for Prisa hosting project after meetings with Rahul and Michel - Rahul is open for a deal with us but he said 7M is too much*"[11]; and

---

[8] SEC-AUSA5-EPROD-000690213

[9] Ex 1368. The attached Reseller Agreement is dated 31 March 2011. In an earlier conversation between Mr David Truitt and Mr Malcolm Hyson, Mr David Truitt noted "*Autonomy wants me to PDF an order, said that it will not change the date on the document if it is PDF?*" (Ex 1366)

[10] SEC-AUSA5-EPROD-000490730

[11] SEC-AUSA5-EPROD-000544285

**mazars**

| SW-11-091 – Discover Technologies, LLC ("Prisa") |
|---|

    iii.   with Mr Alvaro Etcheverry of Autonomy explaining in an email on 30 June 2011 "*After answering the RFP we are now facing the second stage in the process which is presentation and defense of our hosting/Cloud proposal*"[12].

My opinion that revenue should not have been recognised on SW-11-091 in Quarter 1 2011 is consistent with the findings of the Honourable Mr Justice Hildyard, who concluded in relation to this transaction "*In my judgement, recognition of revenue from* [SW-11-091] *was improper*"[13].

**B.  The DiscoverTech Reseller Agreement had no economic substance**

Notwithstanding the above, it is my opinion that the MicroTech PO had no economic substance. I have reached this conclusion because:

a)   the contractual terms of the DiscoverTech Reseller Agreement stipulated that DiscoverTech would be liable for the full $3,800,000 regardless of whether an end sale of the software to Prisa was completed. However, despite this significant risk:

    i.   DiscoverTech seemingly failed to make any enquiries as to the status of Autonomy's negotiations with Prisa in advance of executing the DiscoverTech Reseller Agreement; and

    ii.   I have seen no evidence to suggest that DiscoverTech made any attempts to sell the software set out in the DiscoverTech Reseller Agreement to Prisa;

In my opinion, DiscoverTech's actions in the face of the contractual terms of the Reseller Agreement undermine the economic and commercial substance of the DiscoverTech Reseller Agreement;

b)   as explained above, it appears that, whilst dated 31 March 2011, the DiscoverTech Reseller Agreement was actually executed by DiscoverTech on 4 April 2011. If this is correct, it raises serious concerns about the economic and commercial substance of the DiscoverTech Reseller Agreement, as it suggests that the arrangement was simply a method by which Autonomy could accelerate the recognition of revenue into Quarter 1 2011;

c)   whilst the amounts owed by DiscoverTech pursuant to the DiscoverTech Reseller Agreement were cleared on Autonomy's ledgers, I understand that this was facilitated by Autonomy:

    i.   paying DiscoverTech $4,400,000 on 30 June 2011, pursuant to an agreement titled "*Software Distributor Agreement*", subject to which Autonomy agreed to purchase DiscoverTech's "*DiscoverPoint Engine*" software (the "**Q2 2011 DiscoverPoint**

---

[12] Ex 891 (FL)
[13] Civil Judgment; VAR schedules, paragraph 691

| SW-11-091 – Discover Technologies, LLC ("Prisa") |
|---|

Engine Purchase")[14]. The Q2 2011 DiscoverPoint Engine Purchase gave Autonomy the right to distribute the DiscoverPoint Engine "*in connection with any IDOL Server shipped to Autonomy customers who license or purchase IDOL Server*". The a "*License Fee (incl. First Year Support)*"; or

ii.    undertaking to offset amounts owed by DiscoverTech against "*$3.2m due* [from Autonomy to DiscoverTech] *for invoices 1075 ($1.5m for 285 instances of Discover Engine) and invoice 1076 ($1.7m for Discover Point source code)*"[15].

In respect of these transactions, I note:

- as set out in SW-09-033 the "*DiscoverPoint Engine*" software asset was spun out of MicroLink, LLC ("**MicroLink**")[16] prior to Autonomy's acquisition of MicroLink. In the build up to that acquisition, Mr Sushovan Hussain described the product as "*yet not in production*"[17], and on 19 December 2009 a board paper prepared on in the build up to its acquisition of MicroLink noted that Autonomy did not "*believe there is a material business in DiscoverPoint*" and that the software was not "*materially different from technology Autonomy already has*"[18];

- as set out in SW-09-033 and SW-09-041, DiscoverTech had seemingly purchased (via the reseller MicroTech) Autonomy's "*Control Point Module*" and a "*IDOL Service Software*" for use in its "*Discover Point" application*", suggesting that the *"Discover Point"* application was potentially based on (or otherwise utilised) software to which Autonomy already had access;

- as set out SW-11-089/105, SW-11-116 and SW-11-117, whilst "*DiscoverPoint*" was included as an element of these sales, the inclusion of "*DiscoverPoint*" was not at the request of the customer and was instead inserted into the agreements at the request of Mr Sushovan Hussain. Moreover, as explained in SW-11-089/105, the inclusion of the "*DiscoverPoint*" did not cause any change to the transaction price being negotiated;

- the Honourable Mr Justice Hildyard concluded, in relation to both the Q2 2011 DiscoverPoint Engine Purchase and the Q3 2011 DiscoverPoint Source Code

---

[14] Ex 880. I understand that it is alleged that part of payment was remitted by DiscoverTech to another company, MicroTech, LLC ("**MicroTech**"), thereby enabling MicroTech to settle amounts due to Autonomy due in relation to SW-10-050. The Chief Operating Officer of MicroTech was Mr Steve Truitt, brother of Mr David Truitt, the owner of DiscoverTech
[15] SEC-AUSA5-EPROD-000487281
[16] Mr Dave Truitt was co-owner of MicroLink
[17] HP-SEC-01955651
[18] HP-SEC-01955864

| SW-11-091 – Discover Technologies, LLC ("Prisa") |
|---|

Purchase, that "*the predominant driver for both purchases was the need to assist DiscoverTech*"[19];

If it is found that the abovementioned payments were facilitated by Autonomy first contriving to make purchases from DiscoverTech, then in my opinion this further undermines the economic and commercial substances of the DiscoverTech Reseller Agreement; and

d) I have reviewed other samples involving DiscoverTech and found that they also do not appear to have an economic substance[20]. Whilst not determinative, in my opinion this is relevant context when reaching a view of the economic substance of this transaction.

IFRS requires that transactions are accounted for in a manner which reflects their economic substance and not merely their legal form. It is my view that the DiscoverTech PO had no economic substance and as such I do not consider that any accounting entries should have been made in relation to it.

My opinion that the DiscoverTech PO had no economic substance, and that no revenue should have been recognised in respect of SW-11-091, is consistent with the findings of the Honourable Mr Justice Hildyard, who concluded in relation to this transaction "*In my judgment, both Defendants knew that the sale in* [SW-11-091] *lacked substance and in reality transferred no risk or control of the software*"[21].

**Conclusion and proposed adjustment**

In my opinion SW-11-091 did not satisfy the revenue recognition criteria of IAS 18 and the revenue recognised in Quarter 1 2011 in relation to SW-11-091 should be reversed.

My adjustment is summarised in the table below:

| SW-11-091 – Discover Technologies, LLC ("Prisa") | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Q1 2009 $000 | Q2 2009 $000 | Q3 2009 $000 | Q4 2009 $000 | Q1 2010 $000 | Q2 2010 $000 | Q3 2010 $000 | Q4 2010 $000 | Q1 2011 $000 | Q2 2011 $000 |
| **Original accounting** | | | | | | | | | |
| Revenue | | | | | | | | 3,600 | |
| **Proposed adjustment** | | | | | | | | | |
| Revenue | | | | | | | | (3,600) | |
| **Adjusted accounting** | | | | | | | | | |
| Revenue | | | | | | | | | |

---

[19] Civil Judgment; VAR Schedules, paragraph 688
[20] See, for example, SW-10-046 and SW-10-051
[21] Civil Judgment; VAR Schedules, paragraph 698

Exhibit F

**mazars**

| SW-11-101 – Discover Technologies, LLC ("ABBOTT LABS – dt") | |
|---|---|
| **Amount of sample item:** | $8.611 million |
| **Period initially recognised:** | Q2 2011 |
| **Date of contract:** | 30 June 2011 |
| **Total contracted amount:** | $9.450 million |
| **Reported revenue stream:** | IDOL Cloud: $8.611 million |

**Summary of the transaction**

This transaction relates to a value added reseller agreement (the "**Reseller Agreement**") between Autonomy and Discover Technologies LLC ("**DiscoverTech**"), dated 30 June 2011[1].

The software set out in the Reseller Agreement was the "*Autonomy SLD Software*"[2]. The terms of the Reseller Agreement gave DiscoverTech the right to sublicense this software to the "*End User*" Abbott Laboratories ("**Abbott**").

The "*License Fee*" set out in the Reseller Agreement was $9,000,000. The Reseller Agreement also included a "*Maintenance Fee*" of $450,000[3].

On 30 June 2011, Autonomy recognised license revenue of $9,000,000 in relation to the DiscoverTech Reseller Agreement. On the same day, Autonomy recorded a debtor of $9,450,000, reflecting the invoices raised in relation to the "*License Fee*" and "*Maintenance Fee*"[4].

Abbott was, at the date of the DiscoverTech Reseller Agreement, already a customer of Autonomy. During Quarter 2 2011, Autonomy and Abbott had been in discussions[5] to amend their pre-existing "*Master Professional Services Agreement*"[6] so as to include "*Autonomy's proprietary SLD legal discovery software*". However, no deal between Autonomy and Abbott was reached in Quarter 2 2011, with Autonomy noting that "*Client just pulled the plug. They are not comfortable making any commit at this time*"[7].

On 23 September 2011, Mr David Wilner of DiscoverTech emailed Mrs Jane Snider requesting that the DiscoverTech Reseller Agreement be cancelled[8]. Subsequently, on 29 September 2011, Autonomy raised credit notes with a combined value of $9,450,000, reversing the debtor raised pursuant to the DiscoverTech Reseller Agreement. Each credit note contained the narrative "*Crediting out per S.Chamberlain, Discovertech (ABBOTT) has cancelled this order per email 9/29/11*"[9].

---

[1] Ex 981
[2] Ex 981, page 10
[3] Ex 981, page 10
[4] General ledger references 10231-ANA, 10232-ANA, 10233-ANA and 10234-ANA
[5] See, for example, Ex 1428 and Ex 1430
[6] See, for example, the draft amendment to the "*Master Professional Services Agreement*" at US-PWC 00001628 to US-PWC 00001632
[7] Ex 983
[8] 17 DTech Abbott (HP-SEC-01494583 - HP-SEC-01494639)

---

**mazars**

---

**Issues identified by Mazars**

**A.  The transaction did not meet the revenue recognition requirements of IAS 18.14**

In my view the transaction did not meet the revenue recognition requirements of IAS 18.14 for the following reasons:

a)  at 30 June 2011, the risks and rewards of ownership of the software set out in the DiscoverTech Reseller Agreement had not transferred to DiscoverTech, thereby failing to satisfy the criterion of IAS 18.14(a). I have reached this conclusion because, whilst the DiscoverTech Reseller Agreement stated that it was "*non-cancellable purchase commitment*"[10], when Mr David Wilner requested that the agreement be cancelled, Autonomy obliged by crediting the full amount owed in by DiscoverTech in relation to the DiscoverTech Reseller Agreement. In my opinion, this indicates that DiscoverTech had never, in substance, accepted the risks of ownership of the software set out in the DiscoverTech Reseller Agreement (that is, the risk that a transaction with Abbott would not eventuate);

b)  at 30 June 2011, Autonomy retained managerial involvement of the software set out in the DiscoverTech Reseller Agreement, thereby failing to satisfy the criterion of IAS 18.14(b). I have reached this conclusion because Autonomy and Abbott continued to negotiate amendments to their pre-existing "*Master Professional Services Agreement*" in Quarter 3 and Quarter 4. I note that these continuing negotiations commenced on 5 July 2011[11], i.e. 3 working days after the DiscoverTech Reseller Agreement was executed; and

c)  at 30 June 2011, it was not reasonable to conclude that Autonomy would receive an inflow of economic benefit from DiscoverTech in relation to the DiscoverTech Reseller Agreement and as such the transaction did not satisfy the criterion in 18.14(d). I have reached this conclusion because, as noted above, the amounts owed by DiscoverTech in relation to the DiscoverTech Reseller Agreement were credited by Autonomy upon Mr David Wilner's request. In my opinion, this indicates that the DiscoverTech Reseller Agreement did not give rise in a probable inflow of economic benefit to Autonomy, but rather an inflow of economic benefit from the DiscoverTech Reseller Agreement would only become probable if / when Abbott had itself agreed to purchase the software set out in the DiscoverTech Reseller Agreement.

**B.  The DiscoverTech Reseller Agreement had no economic substance**

Notwithstanding the above, it is my opinion that the DiscoverTech Reseller Agreement had no economic substance. I have reached this conclusion because:

a)  As noted above, despite the DiscoverTech Reseller Agreement being notionally "*non-cancellable*"[12], on 29 September 2011 Autonomy raised credit notes with a combined value of $9,450,000 in relation to the DiscoverTech Reseller Agreement following a request from Mr David Wilner to cancel the agreement. As also noted above, in my opinion this suggests that, in substance:

mazars

---

[10] Ex 981, page 8
[11] Ex 1440
[12] Ex 981, page 8

i.   the DiscoverTech Reseller Agreement did not transfer the risks and rewards of ownership of the software set out therein from Autonomy to DiscoverTech; and

ii.   the DiscoverTech Reseller Agreement would have only given rise to a probable inflow of economic benefit to Autonomy in the event that Abbott itself agreed to purchase the software set out in the DiscoverTech Reseller Agreement.

Given these conclusions, I do not consider that an economic substance could reasonably be attributed to the DiscoverTech Reseller Agreement.

b)   the contractual terms of the DiscoverTech Reseller Agreement stipulated that DiscoverTech would be liable for the full $9,450,000 regardless of whether an end sale of the software to Abbott was completed. However, despite this significant risk:

i.   DiscoverTech seemingly failed to make any enquiries as to the status of the status of Autonomy's negotiations with the Abbott in advance of executing the DiscoverTech Reseller Agreement; and

ii.   I have seen no evidence to suggest that DiscoverTech made any attempts to sell the software set out in the DiscoverTech Reseller Agreement to Abbott;

In my opinion, DiscoverTech's actions in the face of the contractual terms of the Reseller Agreement undermine the economic and commercial substance of the DiscoverTech Reseller Agreement;

c)   the speed at which the DiscoverTech Reseller Agreement was finalised, alongside the fact that the DiscoverTech Reseller Agreement was raised on the last day of Autonomy's quarterly reporting period, calls into question the economic substance of the DiscoverTech Reseller Agreement. Autonomy was informed that Abbott would not be agreeing to a deal on 30 June 2011[13], and the DiscoverTech Reseller Agreement was executed on the same day. Whilst not stated in relation to this exact transaction, I note that Executive Counsel of the FRC similarly noted that "*the sudden introduction of VARs into these established relationships should have raised concerns about the commercial substance of their involvement*"[14];

d)   I have reviewed other samples involving DiscoverTech and found that they also do not appear to have an economic substance[15]. Whilst not determinative, in my opinion this is relevant context when reaching a view of the economic substance of this transaction.

IFRS requires that transactions are accounted for in a manner which reflects their economic substance and not merely their legal form. It is my view that the DiscoverTech Reseller Agreement had no economic substance and as such I do not consider that any accounting entries should have been made in relation to it.

My opinion that the DiscoverTech Reseller Agreement had no economic substance is consistent with the findings of the Honourable Mr Justice Hildyard, who concluded in relation to this transaction "*All in*

| SW-11-101 – Discover Technologies, LLC ("ABBOTT LABS – dt") |
|---|

*all, I accept the Claimants' case that* [SW-11-101] *lacked any real substance. To my mind, it once again exemplifies Autonomy's use of VAR deals predicated on an end-user deal even if those responsible knew the prospects of an end-user deal to be weak simply to plug gaps in revenue. It is a further illustration of a well-established pattern and its latter stage development of taking revenue even when the prospect of any real receipt was uncertain*"[16].

### Conclusion and proposed adjustment

In my opinion SW-11-101 did not satisfy the revenue recognition criteria of IAS 18 and the revenue recognised in Quarter 2 2011 in relation to SW-11-101 should be reversed.

My adjustment is summarised in the table below:

| SW-11-101 – Discover Technologies, LLC ("ABBOTT LABS – dt") | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Q1 2009 $000 | Q2 2009 $000 | Q3 2009 $000 | Q4 2009 $000 | Q1 2010 $000 | Q2 2010 $000 | Q3 2010 $000 | Q4 2010 $000 | Q1 2011 $000 | Q2 2011 $000 |
| **Original accounting** | | | | | | | | | |
| Revenue - | - | - | - | - | - | - | - | - | 8,611 |
| **Proposed adjustment** | | | | | | | | | |
| Revenue - | - | - | - | - | - | - | - | - | (8,611) |
| **Adjusted accounting** | | | | | | | | | |
| Revenue - | - | - | - | - | - | - | - | - | - |

---

[13] Ex 1438
[14] FRC Sanctions, paragraph 426
[15] See, for example, SW-10-046, SW-10-051 and SW-11-091
[16] Civil Judgement, VAR Schedules, paragraph 742

# Exhibit G

mazars

| SW-11-086 – Deutsche Bank AG ("DB Restructure") | |
|---|---|
| **Amount of sample item:** | $7.100 million |
| **Period initially recognised:** | Q1 2011 |
| **Date of contract:** | 31 March 2011 |
| **Total contracted amount:** | $7.455 million |
| **Reported revenue stream:** | IDOL Cloud: $7.100 million |

### Summary of the transaction

This transaction relates to the "*Seventeenth Amendment to Agreement for Email Restoration Services*" between DB Services New Jersey, Inc. ("**Deutsche Bank**") and Autonomy, dated 31 March 2011[1] (the "**Seventeenth Amendment**").  The Seventeenth Amendment amended the terms of the "*Agreement for Email Restoration Services*", dated 4 October 2005, as amended (the "**Master Agreement**").

In September 2010 Autonomy began discussions with Deutsche Bank in relation to a potential restructuring of its pre-existing hosting arrangement[2].  No deal eventuated in Q4 2010, and discussions recommenced in February 2010.  During these discussions, Autonomy prepared various models which compared the "*Future*" costs Deutsche Bank would incur based on its pre-existing hosting agreements against the costs Deutsche Bank would incur under Autonomy's proposed restructuring.  The last of these models was prepared on 24 March 2011[3], and estimated a five-year cost saving to Deutsche Bank in the amount of c.$8.6 million, achieved via the following restructure:

- Deutsche Bank would purchase a "*License*" from Autonomy for $7,100,000[4];

- Autonomy would provide "*Volume credits*" to Deutsche Bank in the amount of $1,220,000[5];

- Autonomy would reduce the cost of pre-existing "*Maintenance & Support*" from $575,000 per annum to $355,000 per annum; and

- Autonomy would halve the pre-existing monthly data storage rates from between $0.0276 to $0.0092 per megabit to between $0.01335 to $0.00445 per megabit[6].

The terms of Autonomy's restructure were enacted in the Seventeenth Amended as follows:

- Deutsche Bank were granted the "*Seventeenth Amendment Software*", which comprised "*the current versions*" of "*Digital Safe Software version 9*" with various functionalities.  The "*Seventeenth Amendment License Fee*" payable by Deutsche Bank was $7,100,000[7];

---

[1] HP-SEC-01941618
[2] See, for example, HP-SEC-01938682 and HP-SEC-01938695
[3] HP-SEC-01941130
[4] HP-SEC-01941618, page 2
[5] HP-SEC-01941130
[6] HP-SEC-01941618, page 4
[7] HP-SEC-01941618, page 2

**mazars**

| SW-11-086 – Deutsche Bank AG ("DB Restructure") |
|---|

- Autonomy granted Deutsche Bank an "*Archiving Volume Credit*" of up to $1,220,000 across two years[8];

- Autonomy replaced the pre-existing "*Annual Support Fee*" payable by Deutsche Bank with the "*Seventeenth Amendment Annual Support Fee*" of $355,000 per annum; and

- Autonomy reduced the cost of the "*Archiving Fees*" to those specified in its model of 24 March 2011;

The "*License Term*" of the Seventeenth Amendment was to 31 March 2016[9].

Autonomy's ledgers record that on 31 March 2011, Autonomy recorded license revenue of $7,100,000 in relation to the Seventeenth Amendment.  On the same day, Autonomy recognised a debtor of $7,455,000, reflecting the invoices raised in relation to the "*Seventeenth Amendment License Fee*" and the "*Seventeenth Amendment Annual Support Fee*".

**Issues identified by Mazars**

**A.  The substance of the Seventeenth Amendment was not the sale of a good but was instead the provision of an ongoing hosting service**

In my view, the substance of the Seventeenth Amendment was not the sale of a good but was instead the provision on an ongoing hosting service.  This is because I do not consider that the commercial effect of the sale of the "*Seventeenth Amendment Software*" can be understood without reference to the wider restructuring of Deutsche Bank's pre-existing agreements with Autonomy enacted by the Seventeenth Amendment.  I have reached this conclusion because:

a)  nothing in the Seventeenth Amendment reduced or diminished the extent or level of the hosted services Autonomy was providing to Deutsche Bank and, whilst the timing of the payments changed, the net effect of the Seventeenth Amendment was an anticipated cash saving to Deutsche Bank.  As such, from Deutsche Bank's perspective, the Seventeenth Amendment meant that it would receive the same service from Autonomy for less money.  In my view this suggests that the provision of the "*Seventeenth Amendment Software*" in the Seventeenth Amendment was incidental to Deutsche Bank, other than as a way to access the proposed savings;

b)  the specific software included in the Seventeenth Amendment appears to have been selected due to Deutsche Bank's desire to avoid having to write off software assets it had acquired from Autonomy previously.  For example:

   i.  in an email on 23 September 2010, Mr Sushovan Hussain of Autonomy noted that "*The net of the meeting is that* [Deutsche Bank] *need a way to not write off the un capitalized*

---

[8] HP-SEC-01941130
[9] HP-SEC-01941618, page 1

| SW-11-086 – Deutsche Bank AG ("DB Restructure") |
|---|

portion of the existing license.  Please work out a way – my view is not to write off the existing license by extend by 3 years"[10]; and

    ii.    in an email on 18 March 2011, Mr Stouffer Egan wrote to, *inter alia*, Mr Sushovan Hussain and Mr Stephen Chamberlain of Autonomy saying "*I need to provide* Deutsche Bank] *with a few bullets as to why they should continue amortizing their current DigitalSafe license as our new deal is additive*"[11];

In my opinion, this indicates that the actual software included in the Seventeenth Amendment was inconsequential to Deutsche Bank and would not have been acquired but for the wider restructuring; and

c)    Autonomy's proposals to Deutsche Bank in the lead up to the Seventeenth Amendment were always in relation to the restructuring as a whole, with a focus on the aggregated estimated cash saving it would provide.  For example:

    i.    In an email on 21 September 2010, Mr Dan Manners of Deutsche Bank described Autonomy's initial approach in the following terms: "*I was just contacted by autonomy about a quarter end deal proposal.*  [Deutsche Bank] *is also in discussion around a banking deal and autinmy* [sic] *believes there are some creative ways that we might be able to merge both deals, extend our contract to 2015, reduce our storage rates significantly and save us 5mm over the next 5 years*"[12];

    ii.    in an email on 23 September 2009 to Deutsche Bank[13], Mr Michael Sullivan of Autonomy explained that he had a "*very compelling offer*" which would save Deutsche Bank "*$5.7m , or 21% over five years*".  Whilst the sale of a "*software license*" was an element of this proposal, the specific software to be licensed was not identified; and

    iii.    the various models circulated by Autonomy to Deutsche Bank during the negotiations for the Seventeenth Amendment identify the sale of a license as an element of the proposed restructuring, but do not specify what the software license would be.

As it is my view that the commercial effect of the sale of the "*Seventeenth Amendment Software*" cannot be understood without reference to the broader restructuring enacted by the Seventeenth Amendment, IAS 18.13 requires that I apply the revenue recognition criteria of IAS 18 to the series of transactions as a whole.  It is my opinion that the Seventeenth Amendment, and the pre-existing arrangement it amended were, in substance, related to the provision of an ongoing hosting service.

---

[10] HP-SEC-01938704
[11] HP-SEC-01940081
[12] HP-SEC-01938695
[13] HP-SEC-01938701

| SW-11-086 – Deutsche Bank AG ("DB Restructure") |
|---|

IAS 18.20 requires that revenue arising from the rendering of services should be recognised by reference to the stage of completion of the transaction.  IAS 18.25 further explains that, for practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period of time, unless there is evidence that some other method better represents the stage of completion.

As such, it is my opinion that the "*Seventeenth Amendment License Fee*" should have been recognised on a straight-line basis over the five year term of the Seventeenth Amendment.

### Conclusion and proposed adjustment

In my opinion SW-11-086 did not satisfy the revenue recognition criteria of IAS 18 for the sale of goods, and the revenue recognised in Quarter 1 2011 in relation to SW-11-086 should be reversed.

In my opinion SW-11-086 did meet the revenue recognition criteria of IAS 18 regarding the provision of a hosting service over a set period of time.  As such the consideration due in relation to the Seventeenth Amendment should be recognised as revenue on a straight line basis over the duration of the agreement.  This equates to a hosting service fee of $118,333 per month[14], or $355,000 per quarter[15].

Moreover, it is mandatory under IAS 18.35 for revenue arising from the sale of goods and revenue arising from the rendering of services to be disclosed separately.  In my view, revenue from SW-11-086 should have been disclosed as a rendering of services.

My adjustment is summarised in the table below:

| SW-11-086 – Deutsche Bank AG ("DB Restructure") | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Q1 2009 $000 | Q2 2009 $000 | Q3 2009 $000 | Q4 2009 $000 | Q1 2010 $000 | Q2 2010 $000 | Q3 2010 $000 | Q4 2010 $000 | Q1 2011 $000 | Q2 2011 $000 |
| **Original accounting** | | | | | | | | | |
| Revenue | | | | | | | | 7,100 | |
| **Proposed adjustment** | | | | | | | | | |
| Revenue | | | | | | | | (7,100) | 355 |
| **Adjusted accounting** | | | | | | | | | |
| Revenue | | | | | | | | | 355 |

---

[14] $7,100,000 / 60 months = $118,333 per month
[15] $118,333 * 3 = $355,000 per quarter

Exhibit H

**mazars**

| SW-10-059 – JPMorgan Chase Bank, N.A. ("JPMC") | |
|---|---|
| **Amount of sample item:** | $8.700 million |
| **Period initially recognised:** | Q2 2010 |
| **Date of contract:** | 30 June 2010 |
| **Total contracted amount:** | $9.135 million |
| **Reported revenue stream:** | IDOL Cloud: $8.700 million |
| | IDOL OEM: $8.700 million |
| | IDOL Product: ($8.700 million) |

**Summary of the transaction**

This transaction relates to the "*Software License and Maintenance Schedule*" between JPMorgan Chase Bank, N.A. ("**JPMC**") and Autonomy, dated 30 June 2010[1] (the "**Software License Schedule**").

The Software License Schedule incorporated the terms and conditions of the "*Master Agreement*" between JPMC and Autonomy, dated 30 June 2009 (the "**Master Agreement**").

On the same day as the Software License Schedule, JPMC and Autonomy also executed the document "*Autonomy ASP Schedule*"[2] (the "**Service Schedule**").  The Service Schedule explained:

"*JPMC desires to engage Supplier to provide archiving services in connection with all data not currently stored by Supplier through a direct relationship with Supplier ("Firmwide Archiving").  In connection with the Firmwide Archiving, Supplier shall receive, process, store, and make available to JPMC the data transmitted to Supplier for such services.  Such services may involve Supplier utilizing certain software previously licensed to JPMC under separate written agreement (the "Licensed Software")*"[3].

The Services Schedule continued:

"*Supplier shall provide to JPMC the Firmwide Archiving services through provision of certain dedicated "Digital Safe Services"* […] *The "Digital Safe Services" shall mean the archiving, storage, and retrieval services offered by Supplier through the Digital Safe system, including any and all applicable hardware, infrastructure and proprietary software (the "Licensed Software") which provide the ability to archive, retain and retrieve data in accordance with the archive, retention and retrieval functionality*"[4].

In exchange for the above services, JPMC would pay Autonomy, *inter alia*:

- "*Digital Safe Storage Fees*" of $0.000194 per megabit per month[5]; and

- additional fees for other services, charged at agreed rates as used by Autonomy.

---

[1] HP-SEC-00738065
[2] HP-SEC-00738065
[3] HP-SEC-00738065, page 15
[4] HP-SEC-00738065, page 15
[5] HP-SEC-00738065, page 31

| SW-10-059 – JPMorgan Chase Bank, N.A. ("JPMC") |
|---|

The abovementioned "*Licensed Software*" was sold to JPMC pursuant to the Software License Schedule, subject to which Autonomy granted JPMC the following:

- "*Digital Safe Software*", consisting of:

  o "*Digital Safe Archive System Software*";

  o "*Audit Center Software*";

  o "*Live Capture Agent Software (Exchange)*"; and

  o "*Live Capture Agent Software (Notes)*"[6].

The "*License Fees*" payable in relation to the "*Licensed Software*" were $8,700,000, payable in three instalments ending two years after the "*Scheduled Effective Date*"[7].

The Software License Schedule also included "*Annual Software Maintenance Fees*" in the amount of 5% of the "*License Fees*".

Autonomy's ledgers record that on 30 June 2010, Autonomy recorded license revenue of $8,700,000 in relation to the Software License Schedule[8].

**Issues identified by Mazars**

**A.  The substance of the Software License Schedule was not the sale of a good but was instead a component of an ongoing hosting service**

In my view, the substance of the Software License Schedule was not the sale of a good but was instead a component of an ongoing hosting service.  This is because I do not consider that the commercial effect of the sale of the "*Licensed Software*" can be understood without reference to the data collection and hosting services set out in the Service Schedule.  I have reached this conclusion because:

a) Autonomy's proposals to JPMC were focussed on the costs and benefits of the Software License Schedule and the Service Schedule collectively, rather than as separate agreements. For example, in an email on 30 June 2010, Mr Stouffer Egan described the "*deal*" as "*an $8.6M software license with lowered hosting rates, paid for over time so similar to your current set up but lesser*".  He went on to explain "*It is not a typical purchase per se, it's a change to contract that lower current expenditure commitments*" and that "*by signing JPMC saves*" $23.1 million over five years[9];

b) JPMC's internal evaluation of the Software License Schedule and Service Schedule appraised both agreements together as if they were a single deal.  Indeed, the "*Benefits*" identified by JPMC in relation to the two agreements all related the aggregate financial position of JPMC

---

[6] HP-SEC-00738065, page 7
[7] HP-SEC-00738065, page 7
[8] General ledger "ORG BAT" numbers 147307 and 147151 with the description "JP MORGAN CHASE & CO"
[9] SEC-AUSA5-EPROD-000709734

**mazars**                                                                    Software Focus Transaction SW-10-059

| SW-10-059 – JPMorgan Chase Bank, N.A. ("JPMC") |
|---|

over the duration of the Service Schedule, as compared to the financial position it would have been in under a pre-existing hosting arrangement with IBM[10].  I have seen nothing to suggest that JPMC would have acquired the "*Digital Safe Software*" in the absence of the ongoing hosting service that Autonomy was simultaneously providing; and

c) JPMC was already receiving services akin to the "*Digital Safe Services*" in relation to a separate set of data collected from Washington Mutual (see SW-09-022).  JPMC did not have to purchase the "*Digital Safe Software*" in order to receive that service, and it is unclear why they would purchase a license for the "*Digital Safe Software*" to receive the "*Digital Safe Services*" other than as a mechanism from which it could achieve a lower overall hosting cost over the duration of the Service Schedule[11].

In light of the above, I do not consider that the commercial effect of the sale of the "*Licensed Software*" pursuant to the Software License Schedule can be understood without reference to the provision of the hosting "*Services*" that Autonomy had simultaneously agreed to undertake for JPMC pursuant to the Services Schedule.  IAS 18.13 therefore requires that I apply the revenue recognition criteria of IAS 18 to the series of transactions as a whole, and as such, in my opinion the consideration payable in relation to the Software License Schedule should be accounted for as the provision of an ongoing hosting service.

IAS 18.20 requires that revenue arising from the rendering of services should be recognised by reference to the stage of completion of the transaction.  IAS 18.25 further explains that, for practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period of time, unless there is evidence that some other method better represents the stage of completion.

As such, it is my opinion that the "*License Fee*" of the JPMC Software License Schedule should have been recognised on a straight-line basis over the five year term of the JPMC Services Schedule.

---

[10] SEC-AUSA5-EPROD-000709675

[11] As compared against the hosting costs it would have otherwise incurred from IBM

| SW-10-059 – JPMorgan Chase Bank, N.A. ("JPMC") |
| --- |

**Conclusion and proposed adjustment**

In my opinion SW-10-059 did not satisfy the revenue recognition criteria of IAS 18 for the sale of goods, and the revenue recognised in Quarter 2 2010 in relation to SW-10-059 should be reversed.

In my opinion SW-10-059 did meet the revenue recognition criteria of IAS 18 for the rendering of services, as it was an element of an ongoing provision of a data collection and hosting service.  As such, the consideration due in relation to the Software License Schedule should be recognised as revenue on a straight line basis over the five year term of the Services Schedule.

Autonomy recognised $8,700,000 of license revenue in relation to the Software License Schedule. Recognising this over the five year duration of the Services Schedule equates to revenue of $145,000 per month[12], or $435,000 per quarter[13].

Moreover, it is mandatory under IAS 18.35 for revenue arising from the sale of goods and revenue arising from the rendering of services to be disclosed separately.  In my view, revenue from SW-10-059 should have been disclosed as a rendering of services.

My proposed adjustments are as follows:

| SW-10-059 – JPMorgan Chase Bank, N.A.("JPMC") | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Q1 2009 $000 | Q2 2009 $000 | Q3 2009 $000 | Q4 2009 $000 | Q1 2010 $000 | Q2 2010 $000 | Q3 2010 $000 | Q4 2010 $000 | Q1 2011 $000 | Q2 2011 $000 |
| **Original accounting** | | | | | | | | | |
| Revenue - | - | - | - | - | 8,700 | - | - | - | - |
| **Proposed adjustment** | | | | | | | | | |
| Revenue - | - | - | - | - | (8,700) | 435 | 435 | 435 | 435 |
| **Adjusted accounting** | | | | | | | | | |
| Revenue - | - | - | - | - | - | 435 | 435 | 435 | 435 |

---

[12] $8,700,000 / 60 = $145,000
[13] $145,000 * 3 = $435,000

Exhibit I

**mazars**

| SW-09-044 - The Goldman Sachs Group ("Goldman Sachs") | |
| --- | --- |
| **Amount of sample item:** | $2.015 million |
| **Period initially recognised:** | Quarter 4 2009 |
| **Date of contract:** | 22 December 2009 |
| **Total contracted amount:** | $2.337 million |

### Summary of the transaction

This transaction relates to a "*Standard Sales Agreement*" agreement between The Goldman Sachs Group, Inc. ("**Goldman Sachs**") and Autonomy, dated 22 December 2009[1] (the "**Sale Agreement**").

The software sold pursuant to the Goldman Sachs Sale Agreement included, *inter alia*, the "*WorkSite Software*" and "*IDOL IUS Software*"[2].

The "*License Fee*" set out in the Goldman Sachs Sale Agreement was $2,015,000.  The Sale Agreement also included an "*Annual Support Fee\* (for year 1)*" in the amount of $322,400.

On 31 December 2009 Autonomy recognised software licence revenue of $2,015,000 in relation to the Goldman Sachs Sale Agreement.  On the same day Autonomy recorded a debtor $2,337,400, reflecting the invoice it raised on that date in respect of the "*License Fee*" and the "*Annual Support Fee\* (for year 1)*"[3].

Autonomy's ledgers record that Goldman Sachs paid Autonomy $2,337,400 in three tranches, on 31 March 2010[4], 31 May 2010[5] and 30 September 2010[6].

Clause 13 of Order Schedule No. 1 in the Goldman Sachs Sale Agreement relates to "*Extended Warranty*", and reads: "*Solely for the Software set forth under this Order Schedule No. 1, the warranty period set forth in Section 8(A) of the Agreement shall be modified from "ninety days from delivery of the Software" to "nine (9) months from delivery of the Software".  Additionally, the phrase "In the event Autonomy determines that it is unable to repair or replace such noncompliant Software and provided that Customer provided Autonomy written notice of breach of warranty within the ninety (90) day period, the applicable Software license Fees paid by customer will be refunded, upon the return of the nonconforming Software" shall be modified to read "in the even that Autonomy reasonably determines that it is unable to repair or replace such noncompliant Software in a reasonable period of time, and provided that Customer provided Autonomy written notice of breach of warranty within the*

---

[1] HP-SEC-02067881
[2] HP-SEC-02067881, page 14
[3] HP-SEC-02067881, page 15
[4] A payment of $701,220 (General ledger reference "*WT032310/6346*")
[5] A payment of $818,090 (General ledger reference "*WT050710/6346*")
[6] A payment of $818,090 (General ledger reference "*WT09/14/6346*")

## SW-09-044 - The Goldman Sachs Group ("Goldman Sachs")

nine (9) month period, the applicable Software License Fees and Support Fees for year 1 paid by Customer will be refunded, upon the return of the nonconforming Software"[7].

Clause 15 of Order Schedule No. 1 in the Goldman Sachs Sale Agreement relates to "*Professional Services*", and reads:  "*Notwithstanding anything in this Agreement to the contrary, Autonomy shall make available to Customer certain Professional Service in connection with installation and implementation of the Software a rate of $1,650.00 per consulting day.  Such Professional Services shall be subject to the parties' mutual agreement of a Statement of Work setting forth the scope of such services and any other terms pertinent thereto.  For avoidance of doubt, the Professional Services associated with the deployment of the initial 3,100 users shall be subject to a 100% retain, of which Customer shall have sole decision making authority to release to Autonomy upon acceptance of the Software into Customer's environment*"[8].

On 19 January 2010 Autonomy prepared a document titled "*Autonomy Statement of Work; Client Onboarding Solution; Phase One: Analysis and Design*"[9] (the "**Goldman Sachs SOW**").  The Goldman Sachs SOW was "*exclusively governed by, and subject to, the* [Sale Agreement]".

The "*Engagement Summary*" of the Goldman Sachs SOW was "*The Client Onboarding group at Goldman Sachs is responsible for the process of gathering and validating new client documentation to enable GS to begin working with new clients. The proposed Client Onboarding Solution comprised of IDOL, WorkSite, TeleForm and IUS will enable greater automation and certainty of operation in the process of onboarding new clients at Goldman Sachs;  The core components of the solution will be delivered in to production at the end of Phase 1 with full WorkSite and TeleForm deployments following in a later Phase. This SOW defines the work required for the Analysis and Design of Phase 1 only; all implementation work will be covered in a subsequent SOW;  The tasks below will be performed on a time and materials basis and assumes a Start Date of January 25th 2010*"[10].

The estimated number of man hours for the implementation tasks set out therein was 1,604, and the "*Target Date*" for the "*First run of indexed content from data sources*" (the final "*Deliverable*" in the Goldman Sachs SOW), was 22 April 2010[11].

### Issues identified by Mazars

#### A. Autonomy recognised revenue in relation to the transaction before the risks and rewards of ownership had transferred to the customer

In my view, Autonomy recognised the revenue associated with the Goldman Sachs Sale Agreement before the risks and rewards of ownership of the software set out therein had transferred to Goldman

---

[7] HP-SEC-02067881, page 15
[8] HP-SEC-02067881, pages 15 and 16
[9] HP-SEC-02067537
[10] HP-SEC-02067537, page 2
[11] HP-SEC-02067537, pages 4 and 5

**SW-09-044 - The Goldman Sachs Group ("Goldman Sachs")**

Sachs, and as such the transaction did not meet the revenue recognition requirements of IAS 18.14(a).  I have reached this conclusion because:

a) the Goldman Sachs Sale Agreement contained an extended warranty for a period of nine months, during which time Goldman Sachs could return, for a full refund, "*noncompliant Software*".  Moreover, the "*Professional Services*" clause of the Goldman Sachs Sale Agreement confirmed that Goldman Sach's acceptance of the software set out therein would be following "*installation and implementation*" services to be performed by Autonomy[12];

b) email conversations around the date of the Goldman Sachs Sale Agreement identify that the software still had to be implemented by Goldman Sachs, and that Autonomy would bear the risk if implementation was not successful, for example:

   i. on 23 December 2009 Mr Joel Scott of Autonomy wrote "*I can't say for certain, but I don't think that is true.  In short, they maintain that they are not ready to fully deploy nor do they know the scoping involved, they are willing to forego the license fees for us to recognize the revenue, but they want the right to bail on the project without taking on proserv costs*"[13]; and

   ii. on 23 December 2009, Mr Sushovan Hussain of Autonomy wrote "*Wayne and Brent - Well done on closing a $2,015,000 licence plus $750k services deal at Goldmans Sachs (Idol, worsksite and scrittura). Pete – flagging to you quite a lot of services required to implement*"[14];.

c) whilst only in draft, the Goldman Sachs SOW sets out a number of tasks required for the successful installation, configuration and implementation of the software set out in the Goldman Sachs Sale Agreement.  Moreover, the implementation tasks set out in the Goldman Sachs SOW were not insignificant, requiring 1,604 man hours to complete[15].

IAS 18.16(c) explains that scenarios in which "*goods are shipped subject to installation and the installation is a significant part of the contract which has not yet been completed by the entity*" are examples of scenarios where the seller retains the risks and rewards of ownership, even after goods have been delivered.  Based on the factors set out above, it is my opinion that SW-09-044 is analogous with the scenario cited in IAS 18.16(c).

Moreover, it was Autonomy's stated accounting policy that:

"*If an acceptance period is required, revenues are recognised upon the earlier of customer acceptance or the expiration of the acceptance period.  […]  If significant post-delivery obligations*

---

[12] HP-SEC-02067881, page 15
[13] HP-SEC-02066596
[14] HP-SEC-02066901
[15] HP-SEC-02067537, pages 4

MAZARS

| SW-09-044 - The Goldman Sachs Group ("Goldman Sachs") |
|---|

exist or if a sale is subject to customer acceptance, revenues are deferred until no significant obligations remain or acceptance has occurred"[16].

In my view, the implementation tasks set out in the Goldman Sachs SOW were "*significant post-delivery obligations*".  As such, Autonomy's stated accounting policy required that revenue from the Goldman Sachs Sale Agreement be deferred until "*no significant obligations remain or acceptance has occurred*".  In my opinion, this occurred upon completion of the implementation tasks set out in the Goldman Sachs SOW.

### Conclusion and proposed adjustment

In my opinion SW-09-044 did not satisfy the revenue recognition criteria of IAS 18 and the revenue recognised in Quarter 4 2009 in relation to SW-09-044 should be reversed.

In my opinion the revenue recognition criteria of IAS 18 were met when Autonomy completed the implementation tasks set out in the Goldman Sachs SOW.  The "*Target Date*" for the completion of all of the implementation tasks set out in the Goldman Sachs SOW was 22 April 2010.  When making my adjustment I have assumed that this "*Target Date*" was met, meaning that the revenue recognition criteria of IAS 18 were met in Quarter 2 2010.

My adjustment is set out in the table below:

| SW-09-044 - The Goldman Sachs Group ("Goldman Sachs") | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Q1 2009 $000 | Q2 2009 $000 | Q3 2009 $000 | Q4 2009 $000 | Q1 2010 $000 | Q2 2010 $000 | Q3 2010 $000 | Q4 2010 $000 | Q1 2011 $000 | Q2 2011 $000 |
| **Original accounting** | | | | | | | | | |
| - | - | - | 2,015 | - | - | - | - | - | - |
| **Proposed adjustment** | | | | | | | | | |
| - | - | - | (2,015) | - | 2,015 | - | - | - | - |
| **Adjusted accounting** | | | | | | | | | |
| - | - | - | - | - | 2,015 | - | - | - | - |

---

[16] Autonomy's Annual Report and Accounts, 31 December 2009, page 44

# Exhibit J

**mazars**

# Appendix B - Documents I have relied upon

## Summary of expert accounting opinions (including appendices)

| Document | Date | Reference |
|---|---|---|
| Report titled "*Explanatory Memorandum to the Tribunal Report*" in the matter of The Executive Counsel to the Financial Reporting Council versus (1) Deloitte LLP (2) Richard Knights (3) Nigel Mercer | Undated | NA |
| Autonomy Corporation plc Report to the Audit Committee on the Q2 2009 Review | 14-Jul-09 | DT-AS2 00133-00154 |
| Autonomy Corporation plc Report to the Audit Committee on the Q3 2009 Review | 16-Oct-09 | HP-SEC-01662523-01662547 |
| Autonomy Q1 2011 trading update | NA | HP-SEC-00159120-00159133 |
| Autonomy Q2 and H1 Results | 27-Jul-11 | SEC-AUSA5-EPROD-000714279 |
| Autonomy tracking spreadsheet | NA | HP-SEC-01855197 |
| Autonomy's FY2009 Annual Report and Accounts | 22-Feb-10 | NA |
| Autonomy's FY2010 Annual Report and Accounts | 22-Feb-11 | NA |
| Autonomy's quarterly financial statements, Q1 2009 | 2009 | HP-SEC-00567458 |
| Autonomy's quarterly financial statements, Q2 2009 | 2009 | HP-SEC-00009847 |
| Autonomy's quarterly financial statements, Q3 2009 | 2009 | HP-SEC-00025166 |
| Autonomy's quarterly financial statements, Q4 2009 | 2009 | HP-SEC-00097914 |
| Autonomy's quarterly financial statements, Q1 2010 | 2010 | HP-SEC-00009127 |
| Autonomy's quarterly financial statements, Q2 2010 | 2010 | FTIGJ00002722 |
| Autonomy's quarterly financial statements, Q3 2010 | 2010 | HP-SEC-00155426 |
| Autonomy's quarterly financial statements, Q4 2010 | 2010 | HP-SEC-00024459 |
| Autonomy's quarterly financial statements, Q1 2011 | 2011 | HP-SEC-00024002 |
| Autonomy's quarterly financial statements, Q2 2011 | 2011 | HP-SEC-00564873 |
| Companies Act 2006 | 08-Nov-06 | NA |
| Disclosure and Transparency Rules | 01-Jan-06 | NA |
| Documentation confirming the delivery of Hitachi Data Systems hardware to Morgan Stanley | 19-Aug-09 | HP-SEC-01654198-01654212 |
| Documentation confirming the shipment of hardware to Morgan Stanley | 09-Feb-10 | HP-SEC-01655153 |
| Email communication between Mr Stephen Chamberlain and Cynthia Watkins, titled "*Revenue Adjustments*" | 08-Apr-10 | HP-SEC-00100357-00100359 |
| Email communication between Mr Chris Restivo and Mr Gennis Reyes, titled "*RE: Packaging Slip for Morgan Stanley Hardware Orders*" | 24-Sep-09 | HP-SEC-01654193-01654196 |
| FY09 General Ledger | 2009 | NA |
| FY10 General Ledger | 2010 | NA |
| FY11 General Ledger | 2011 | NA |
| IAS 1: Presentation of Financial Statements | 01-Jan-09 | NA |
| IAS 18: Revenue | 01-Jan-10 | NA |
| IAS 2: Inventories | 01-Jan-09 | NA |
| ISA 320: Materiality in planning and performing an audit | 15-Dec-09 | NA |
| IAS 8: Accounting Policies, Changes in Accounting Estimates and Errors | 01-Jan-05 | NA |
| IFRS 3: Business Combinations | 01-Jul-09 | NA |
| IFRS 8: Operating Segments | 01-Jan-09 | NA |
| Investor Relations Bulletin | 19-Oct-10 | SEC-AUSA5-EPROD-000492750 |
| Invoice issued by Autonomy to Morgan Stanley | 26-Jan-10 | HP-SEC-01655147 |
| Invoice issued by Autonomy to Morgan Stanley | 07-Jun-09 | HP-SEC-01654189 |
| Invoice issued by Hitachi Data Systems Corporation to Autonomy | 21-Sep-09 | HP-SEC-01654191 |
| Invoice issued by Hitachi Data Systems Corporation to Autonomy | 25-Feb-10 | HP-SEC-01655155 |
| ISA 720: Other information and documents containing audited financial statements | 15-Dec-09 | NA |
| ISRE 2410: Review of Interim Financial Information Performed by the Independent Auditor of the Entity | 15-Dec-06 | NA |
| Master Purchase Agreement between Autonomy and Morgan Stanley | 30-Jun-09 | HP-SEC-01654676-01654684 |
| My Hussain Report | 31-Oct-17 | NA |
| Order confirmation issued by Autonomy to Morgan Stanley | 01-Jul-09 | HP-SEC-01654186-01654188 |
| Purchase Order issued by Autonomy to Dell | 14-Apr-10 | US-PWC 00002646 |
| Purchase Order issued by Autonomy to Hitachi Data Systems Corporation | 26-Jan-10 | HP-SEC-01655152 |
| Purchase Order issued by Morgan Stanley to Autonomy | 25-Jan-10 | HP-SEC-01655149-01655150 |
| Q3 09 Results 20 October 2009 | 20-Oct-09 | HP-SEC-00025157-HP-SEC-00025179 |
| Quarterly Revenue Breakdowns from Q1 2009 to Q2 2011 | 2009 - 2011 | SEC-AUSA5-EPROD-000641095 |
| Quarterly Revenue Breakdowns from Q1 2009 to Q2 2010 | 2009 - 2010 | HP-SEC-00739428 |
| Quote issued by Hitachi Data Systems to Autonomy | 20-Jan-10 | HP-SEC-01655154 |
| Deloitte audit working paper titled "*Strategic Deals Memorandum*" | 14-Oct-09 | DEL00100362-DEC00100369 |
| The Conceptual Framework | Sep-10 | NA |
| The Framework | Apr-01 | NA |
| Value Added Reseller Agreement between Dell and Autonomy | 22-Dec-09 | US-PWC 00002327-00002338 |
| "*Report to the Audit Committee on the Q1 2009 Review*" | 20-Apr-09 | NA |
| "*Report to the Audit Committee on the Q2 2009 Review*" | 14-Jul-09 | NA |
| "*Report to the Audit Committee on the Q3 2009 Review*" | 16-Oct-09 | NA |
| "*Report to the Audit Committee on the 2009 Audit*" | 01-Feb-10 | NA |
| "*Report to the Audit Committee on the Q1 2010 Review*" | 20-Apr-10 | NA |
| "*Report to the Audit Committee on the 2010 Interim Review*" | Undated | NA |
| "*Report to the Audit Committee on the Q3 2010 Review*" | Undated | NA |
| "*Report to the Audit Committee on the 2010 Audit*" | 26-Jan-11 | NA |
| "*Report to the Audit Committee on the Q1 2011 Review*" | Undated | NA |
| "*Report to the Audit Committee on the Q2 2011 Review*" | Undated | NA |
| Deloitte audit working paper titled "*Q3-8130 Hardware Testing.xls*" | NA | NA |
| Conference Call Transcript | 22-Jul-10 | EMC-HP-026620 |
| Conference Call Transcript | 22-Jul-10 | EMC-HP-026623 |
| Witness Statement of Mr Welham | 14-Sep-18 | NA |
| PwC publication titled "*A practical guide to segment reporting*" | NA | NA |
| Sales reconciliation spreadsheet dated 30 June 2010 | 30-Jun-10 | HP-SEC-00739256 |
| Spreadsheet dated 30 December 2010 | 30-Dec-10 | HP-SEC-00739191 |
| Spreadsheet dated 6 July 2011 | 06-Jul-11 | HP-SEC-00739432 |
| Purchase Quotation provided by Autonomy to SHI | 04-Feb-11 | HP-SEC-01654950-01651952 |
| Email chain between Julia Perez of Dell and Jeffrey Guido of Autonomy | 05-Apr-11 | HP-SEC-01654955-1654956 |
| Purchase order WHZM2 | 27-Jun-11 | HP-SEC-01654642 |
| Email from Julia Perez of Dell to Stephen Chamberlain and Poppy Prentis of Autonomy | 14-Jul-11 | HP-SEC-01867367 |
| Purchase Quotation provided by Autonomy to Dell Latitude | 21-Jun-11 | HP-SEC-01654637-01654639 |
| ISA 500: Audit Evidence | 01-Jan-09 | NA |
| PWC IFRS Manual of Accounting | 01-Jul-05 | NA |
| Deloitte audit working paper "*2241a IFRS 8 - Accounting for Operating segments (FY2010 memo*" | 23-Jan-11 | NA |

**mazars**

# Appendix B - Documents I have relied upon

**Summary of expert accounting opinions (including appendices)**

| Document | Date | Reference |
|---|---|---|
| Email from Mr Hussain to Dr Lynch | 29-Sep-09 | HP-SEC-02338481 |
| Spreadsheet titled "*group revenue 29th sept SH.cls.edc*" | NA | HP-SEC-02338482 |
| Post-implementation Review: IFRS 8 Operating Segments | 05-Jul-05 | NA |
| Email chain between Mr Murray of Deloitte and Mr Chamberlain of Autonomy | 18-Oct-10 | HP-SEC-01929718 |
| Deloitte working paper titled "*Q1-2272 Z Consolidation*" | NA | NA |
| Email from Mr Chamberlain to Cynthia Watkins, Matt Stephan and Lisa Harris | 08-Mar-10 | HP-SEC-00100357-00100359 |
| Summary of Independent Expert Accounting Opinions of Greig Taylor FCA | 07-Dec-23 | NA |
| Expert Report of John Levitske | 07-Dec-23 | NA |
| ISA 240: The Auditor's Responsibilities Relating to Fraud in an Audit of Financial Statements | Oct-09 | NA |
| IAS 10: Events after the Reporting Period | 2007 | NA |
| Preface to International Financial Reporting Standards | undated | NA |

**mazars**

# Appendix B - Documents I have relied upon

**Software Focus Transactions**

| # | Company | Disclosure Range |
|---|---------|------------------|
| 011 | Capax Discovery, LLC | US-PWC 00003702 to US-PWC 00003713; US-PWC 00004090 to US-PWC 00004102; HP-SEC-01945451; HP-SEC-01945516; HP-SEC-01944683; Ex 187 (JB) to Ex 191 (JB); Ex 201 (JB) to Ex 207 (JB); Ex 209 (JB) to Ex 284 (JB); Ex 285 (DS) to Ex 295 (DS); Ex 296 (JH) to Ex 297 (JH); Ex 455 (CW) to Ex 469 (CW); Ex 1041 to Ex 1061; Ex 1268 to Ex 1276; Ex 1473 to Ex 1521;<br>FBI 100005853 to FBI 100005870;  FBI 100005905 to FBI 100005910;<br>HP-SEC-01913768; HP-SEC-01945225; HP-SEC-01958606;  HP-SEC-01958608;  HP-SEC-01958609;<br>US-FBI 00000009 to US-FBI 00000025<br>HP-SEC-02165818; HP-SEC-02165819; HP-SEC-02165820 |
| 012 | Verdasys, Inc | HP-SEC-01928628 to HP-SEC-01929959; HP-SEC-01877500 to HP-SEC-01877508 and HP-SEC-01928960 |
| 013 | Bank of America, NA | US-PWC 00003469 to US-PWC 00003521; HP-SEC-01968918; HP-SEC-01974605 |
| 016 | Serious Fraud Office | HP-SEC-01979556; and HP-SEC-01979616 |
| 017 | Integracion de Negocios en Tecnologia de Informacion SA DE CV | HP-SEC-01989662 to HP-SEC-01990145; HP-SEC-00739372 |
| | | HP-SEC-01944220 to HP-SEC-01944680; HP-SEC-01928983; HP-SEC-01981471 |
| 018 | EMC Corporation | HP-SEC-01931754 to HP-SEC-01938179; HP-SEC-02099471 to HP-SEC-02099511; and Ex 680 (BS) |
| 019 | Video Monitoring Systems of America, Inc | HP-SEC-01979648 to HP-SEC-01989293;<br>Ex 127 (BL) to Ex 175 (BL); Ex 176 (GS) to Ex 186 (GS); Ex 798 (RW) to Ex 812 (RW); Ex 813 (SE) to Ex 831 (SE); Ex 916; Ex 1504;<br>US-PWC 00002092 to US-PWC 00002094;<br>HP-SEC-01930972; HP-SEC-01931369; HP-SEC-01931128; HP-SEC-01930259; HP-SEC-01931423; HP-SEC-01931349; HP-SEC-01929991; HP-SEC-01930063 |
| 020 | MicroLink, LLC (for all US Intelligence Community users) | HP-SEC-02132805 to HP-SEC-02132832<br>HP-SEC-01989644; HP-SEC-01989645; HP-SEC-01989646; HP-SEC-01989647; HP-SEC-01989648; HP-SEC-01989649; HP-SEC-01989650; HP-SEC-01989651; HP-SEC-01989652; HP-SEC-01989653; HP-SEC-01989654; HP-SEC-01989655; HP-SEC-01989656; HP-SEC-01989657; HP-SEC-01989658; HP-SEC-01989659 |
| 022 | J P Morgan Chase Bank, NA | HP-SEC-02114309 to HP-SEC-02125830;<br>US-PWC 00004234 to US-PWC 00004306 |
| 026 | Capax Discovery, LLC (End User: Kraft) | HP-SEC-01944681 to HP-SEC-01949727;<br>Ex 034 (BH); Ex 187 (JB), Ex 202 (JB); Ex 205 (JB); Ex 461 (CW); Ex 868; Ex 998; Ex455(CW) and Ex 1009 |
| 027 | Pfizer, Inc | HP-SEC-01903795 to HP-SEC-01906415;<br>US-PWC 00003422 to US-PWC 00003437;<br>SEC-AUSA5-EPROD-000290539 |
| 028 | MicroLink, LLC (End User: IBM) | HP-SEC-02067899 to HP-SEC-02073006<br>HP-SEC-01989644; HP-SEC-01989645; HP-SEC-01989646; HP-SEC-01989647; HP-SEC-01989648; HP-SEC-01989649; HP-SEC-01989650; HP-SEC-01989651; HP-SEC-01989652; HP-SEC-01989653; HP-SEC-01989654; HP-SEC-01989655; HP-SEC-01989656; HP-SEC-01989657; HP-SEC-01989658; HP-SEC-01989659 |
| 032 | Charles Schwab & Co., Inc. | HP-SEC-01911034 to HP-SEC-01915444<br>HP-SEC-01955574 to HP-SEC-01958947; |
| 033 | MicroTech, LLC (End User: Discover Technologies, LLC) | Ex 076 (TE) to Ex 117 (TE); Ex 392 (JC); Ex 1300; Ex 1303; Ex 440 (Argy); Ex 080 (TE); Ex 083 (TE)<br>US-FBI 0000037 to US-FBI 0000052; US-FBI 0000217 to US-FBI 0000231;<br>US-PWC 00000781 to US-PWC 00000797<br>Ex 1127 to Ex 1144;Ex 1614 to Ex 1621; |
| 035 | Morgan Stanley & Co., Incorporated | US-PWC-00002168 to US-PWC-00002184; US-PWC-0002225 to US-PWC-00002236; HP-SEC-01654042 to HP-SEC-01656240; HP-SEC-01952407 to HP-SEC-01955573; HP-SEC-02125831 to HP-SEC-02132804 |
| 036 | Vidient Systems, Inc | Ex 120 (TJ); Ex 399 (JC); Ex 403 (JC); Ex 1136; Ex 1139; Ex 1304; Ex 440 (Argy)<br>HP-SEC-01876990 to HP-SEC-01877646;<br>US-PWC 00003444 to US-PWC 00003458; US-PWC 00003462 to US-PWC 00003464; US-PWC 00003466 |
| 038 | MicroTech, LLC (End User: Morgan Stanley & Co) | HP-SEC-01955572; HP-SEC-01955486; HP-SEC-01952822; HP-SEC-01952732; HP-SEC-01952730; HP-SEC-01952739; HP-SEC-01952883; HP-SEC-01952753; HP-SEC-01952847; HP-SEC-01955215; HP-SEC-01952738; HP-SEC-01952763; HP-SEC-01954433; HP-SEC-01954557; HP-SEC-01954590 |
| 039 | FileTek, Inc | HP-SEC-01979648 to HP-SEC-01989293; HP-SEC-01982770<br>Ex 127 (BL); Ex 129 (BL); Ex 132 (BL); Ex 137 (BL); Ex 139 (BL); Ex 141 (BL); Ex 142 (BL); Ex 144 (BL); Ex 177 (GS); Ex 178 (GS); Ex 812 (RW); Ex 813 (SE); Ex 814 (SE); Ex 815 (SE); Ex 817 (SE); Ex 916; Ex 1504;<br>US-PWC 00002092 to US-PWC 00002094<br>HP-SEC-02050275 to HP-SEC-02050735; Ex 206 (JB); Ex 225 (JB); Ex 455(CW) |
| 040a | Capax Discovery, LLC (End User: Eli Lilly and Company) | Ex 207 (JB); Ex 213 (JB); Ex 216 (JB); Ex 1009; Ex 1044; Ex 192 (JB)<br>US-PWC 00003702 to US-PWC 00003713; HP-SEC-01949663; HP-SEC-00383974; HP-SEC-01944683; HP-SEC-02165838<br>HP-SEC-02050275 to HP-SEC-02050735; HP-SEC-02165817; HP-SEC-01944683; HP-SEC-02165824; HP-SEC-02165829 |
| 040b | Capax Discovery, LLC | Ex 188 (JB); Ex 198 (JB) to Ex 200 (JB); Ex 208 (JB); Ex 275 (JB); Ex 533 (JS); Ex 1045; Ex 455 (CW)<br>HP-SEC-01916053; HP-SEC-01955540; HP-SEC-01927229;<br>US-PWC 00004103 to US-PWC 00004104 |
| 041 | MicroLink, LLC (End User: Discover Technologies, LLC) | HP-SEC-01989294 to HP-SEC-01989661; HP-SEC-01955881; HP-SEC-01958884;<br>HP-SEC-01956798; HP-SEC-01957678 to HP-SEC-0195782; HP_SEC-01955864; HP-SEC-01955650; HP-SEC-01955651 |
| 043 | Sales Consulting S.r.l. (End User: Poste Italiane) | HP-SEC-01906416 to HP-SEC-01908027; HP-SEC-00739372; HP-SEC-01981471<br>Ex 014 (BH); Ex 1504 |
| 044 | The Goldman Sachs Group | HP-SEC-02065220 to HP-SEC-02067898 |
| 045 | Capax Discovery, LLC (End User: The Financial Services Authority) | HP-SEC-00001737 to US-PWC 00002031; US PWC 00002047 to US-PWC 00002050; US PWC 00002080 to US-PWC 00002082; US PWC 00003702 to US-PWC 00003713; US-PWC-00004090 to US-PWC-00004102<br>Ex 275 (JB); Ex 201 (JB); Ex 1475; SEC-FBI-000430074<br>HP-SEC-00281885 to HP-SEC-00282310 (provided within SEC-FBI-000430074); HP-SEC-01944683<br>HP 0000505 to HP 0000506 (provided within SEC-AUSA4-000208495) |
| 046 | Discover Technologies, LLC (End User: Philip Morris International Management SA) | HP-SEC-01958948 to HP-SEC-01959410; HP-SEC-01955864 |
| 048 | Bank of America, NA | US-PWC 00000802 to US-PWC 00000803; US-PWC 00003469 to US-PWC 00003521; US-PWC 00003757 to US-PWC 00003805; HP-SEC-01968903 |
| 049 | FileTek, Inc | HP-SEC-01979648 to HP-SEC-01989293; HP-SEC-01981103<br>Ex 130 (BL) to Ex 131 (BL); Ex 134 (BL); Ex 137 (BL); Ex 142 (BL); Ex 144 (BL) to Ex 145 (BL); Ex 147 (BL); Ex 149 (BL); Ex 151 (BL); Ex 185 (BL); Ex 861; Ex 1504; Ex 148 (BL); Ex 139 (BL) |

**mazars**

# Appendix B - Documents I have relied upon

**Software Focus Transactions**

| # | Company | Disclosure Range |
|---|---------|------------------|
| 050 | MicroTech, LLC (End User: Vatican Library, for the project entitled "Digitalizzazione dell'Archivio della Biblioteca Apostolica Vaticana") | US-PWC 00000686; US-PWC 00000713; US-PWC 00000836 to US-PWC 00000837; US-PWC 00000864 to US-PWC 00000890; US-PWC 00000931 to US-PWC 00000933; US-PWC 00000972 to US-PWC 00000978; US-PWC 00001026; US-PWC 00001117 to US-PWC 00001119; US-PWC 00001159 to US-PWC 00001160; US-PWC 00001205 to US-PWC 00001207; US-PWC 00001650 to US-PWC 00001653; US-PWC 00001694 to US-PWC 00001697; US-PWC 00001729 to US-PWC 00001736; US-PWC 00002032 to US-PWC 00002033; US-PWC 00002056 to US-PWC 00002073; US-PWC 00002090; US-PWC 00002113 to US-PWC 00002115; US-PWC 00002140<br>US-FBI 0000953;<br>Ex 083 (TE) to Ex 088 (TE); Ex 095 (TE); Ex 097 (TE) to Ex 098 (TE); Ex 103 (TE); Ex 104 (TE); Ex 107 (TE) to Ex 109 (TE); Ex 112 (TE); Ex 120 (TJ); Ex 124 (TJ) to Ex 126 (TJ); Ex 380 (TE) to Ex 381 (TE); Ex 384 (TE); Ex 408 (JC) to Ex 409 (JC); Ex 411 (JC) to Ex 412 (JC); Ex 432 (JC); Ex 439 (Argy) to Ex 441 (Argy); Ex 463 (CW) to Ex 466 (CW); Ex 532; Ex 534 (JS) to Ex 535 (JS); Ex 537 (JS) to Ex 539 (JS); Ex 543 (JS); Ex 713 (JS); Ex 873 to Ex 887; Ex 1122 to Ex 1123; Ex 1305; Ex 1308 to Ex 1309; Ex 1322; Ex 1383 to Ex 1384; Ex 1393; Ex 1396 to Ex 1397; Ex 1401; Ex 1403; Ex 1449 (AA); Ex 1488; Ex 1521 to Ex 1525; Ex 1536; Ex 1560 to Ex 1561; Ex 1566; Ex 1570<br>HP-SEC-01927164; HP-SEC-01958113; HP-SEC-01958169 to HP-SEC-01958172 |
| 051 | Discover Technologies, LLC (End User: Citigroup Technology Inc) | HP-SEC-02056784 to HP-SEC-02063236; HP-SEC-01959392; HP-SEC-01955864<br>Ex 071 (RP); Ex 1241; Ex 1510; Ex 1550 |
| 053 | BP Exploration & Production Inc. | HP-SEC-00739372; HP-SEC-01648480; HP-SEC-01648704; HP-SEC-01648708 |
| 057 | BNP Paribas SA | HP-SEC-02014215 to HP-SEC-02047598 |
| 058 | Metropolitan Life Insurance Company | HP-SEC-01648557 to HP-SEC-01648704;<br>US-PWC 00003635 to US-PWC 00003664 |
| 059 | J P Morgan Chase Bank, NA | US-PWC 00003665 to US-PWC 00003701; US-PWC 00004234 to US-PWC 00004306; HP-SEC-00738065; SEC-AUSA5-EPROD-000709734; SEC-AUSA5-EPROD-000709675 |
| 062 | Red Ventures S r L | HP-SEC-01906416 to HP-SEC-01908027; HP-SEC-01959411 to HP-SEC-01959976; HP-SEC-01960659 |
| 063 | Citadel, LLC | HP-SEC-01648660 |
| 064 | Xcel Energy Services, Inc. | HP-SEC-02090175 to HP-SEC-02099468; HP-SEC-00739438 |
| 065 | Capax Discovery, LLC (End User: Amgen) | HP-SEC-01991253 to HP-SEC-02001655; HP-SEC-01949663; HP-SEC-01975552; HP-SEC-01975553<br>US-PWC-00000673 to US-PWC-00000993; US-PWC-00003627 to US-PWC-00003634; US-PWC-00003716 to US-PWC-00003718; US-PWC 00004090 to US-PWC 00004102<br>FTIGJ00000256 to FTIJ00000276<br>Ex 1053; Ex 485 (MM); Ex 280 (JB)<br>HP-SEC-01876990 to HP-SEC-01877646 |
| 066 | Vidient Systems, Inc | US-PWC 00003444 to US-PWC 00003458; and US-PWC 00003838 to US-PWC 00003839; PR00012814; SEC-AUSA5-EPROD-000645619; SEC-AUSA5-EPROD-000526703; SEC-AUSA5-EPROD-000532229; SEC-AUSA5-EPROD-00085410; US-PWC 00003462 to US-PWC 00003464 |
| 067 | Bank of America, NA | US-PWC-01962451 to HP-SEC-01979647; HP-SEC-01968098<br>US-PWC 00000798 to US-PWC 00000803; US-PWC 00003754 to US-PWC 00003756 |
| 069 | FileTek, Inc (End User: United States S Veterans Administration Authority) | HP-SEC-01959977 to HP-SEC-01962450; HP-SEC-01927217; HP-SEC-02130397; HP-SEC-01985669; HP-SEC-01988484<br>Ex 820 (SE); Ex 827 (SE) to Ex 828 (SE) |
| 071 | EMC Corporation | HP-SEC-01931754 to HP-SEC-01938179; HP-SEC-02099471 to HP-SEC-02099511 |
| 072 | Government Communications Planning Department | HP-SEC-01949728 to HP-SEC-01951616;<br>US-PWC 00003829 to US-PWC 00003836; HP-SEC-00739372 |
| 076 | Koninklijke Ahold NV | HP-SEC-01877717 to HP-SEC-01891317; HP-SEC-00739372 |
| 077 | Amgen, Inc | HP-SEC-01991253 to HP-SEC-02001655; and US-PWC 00003946; HP-SEC-00738249 |
| 078 | Bank of America, NA | Ex 1175; Ex 1591 to Ex 1592; Ex 1594; Ex 1597 to Ex 1600; Ex 1602; Ex 1604 to Ex 1605;<br>US-PWC 00000804 to US-PWC 00000831; US-PWC 00000834; US-PWC 00000840; US-PWC 00003469 to US-PWC 00003472;<br>HP-SEC-01970140; HP-SEC-01971029; HP-SEC-01976340; HP-SEC-01973903; HP-SEC-01974605; HP-SEC-01968098 |
| 079 | Bank of America | HP-SEC-01962451 to HP-SEC-01979647; HP-SEC-01968339; HP-SEC-01968834; HP-SEC-00739438; HP-SEC-1955864<br>US-PWC 00000768 to US-PWC 00000993;US-PWC 00000682; US-PWC 00000863; US-PWC 00003473 to US-PWC 00003521; US-PWC 00000816 to US-PWC 00000819; US-PWC 00000822 to US-PWC 00000826; US-PWC 000700702; US-PWC 00003854 to US-PWC 00003856; US-PWC 00003906 to US-PWC 00003913; US-PWC 00000673 to US-PWC 00000675; US-PWC 00000911 to US-PWC 00000913;US-PWC 00000961 to US-PWC 000000963; US-PWC 00000682; HP-SEC-01949663; US-PWC 00004090 to US-PWC 00004102<br>Ex 243 (JB); Ex 1364; Ex 1587 to Ex 1606; Ex 245 (JB); Ex 256 (JB)<br>HP-SEC-01897569 to HP-SEC-01899010; HP-SEC-01958725 |
| 080 | MicroTech, LLC (End User: Department of Interior) | Ex 706 (JS) to Ex 712 (JS); Ex 1331 to Ex 1332; Ex 1456 (AA); Ex 440 (Argy); Ex 710 (JS)<br>FTIJ00001590 |
| 081 | Video Monitoring Systems of America, Inc | HP-SEC-01585904; HP-SEC-01930015; HP-SEC-01930301; HP-SEC-01930307; HP-SEC-01930935; HP-SEC-01931083; HP-SEC-01931128; HP-SEC-01931314; HP-SEC-01931360; HP-SEC-01931472; HP-SEC-01931520 to HP-SEC-01931521; HP-SEC-01961937; HP-SEC-01973704; US-PWC 00003935 to US-PWC 00003938; SEC-AUSA4-000154762; SEC-AUSA4-000184567; SEC-AUSA4-000152549; SEC-AUSA4-000153026; SEC-AUSA4-000183362; HP-SEC-02099988 |
| 082 | Tikit Limited (End User: KPMG International Co-operative) | US-PWC 00000001 – US-PWC 00004153; FTIGJ00001535; HP-SEC-00739372; SEC-AUSA5-EPROD-000379559; SEC-AUSA5-EPROD-000368663; SEC-AUSA5-EPROD-000379505; SEC-AUSA5-EPROD-000366183 |
| 084 | Tottenham Hotspur Plc | HP-SEC-01990146 to HP-SEC-01991249; HP-SEC-00739372<br>US-PWC 00003947 to US-PWC 00003954<br>HP-SEC-01962451 to HP-SEC-01979647 |
| 085 | MicroTech, LLC | US-PWC 00000895; US-PWC 00003473 to US-PWC 00003521<br>FTIGJ00001502; Ex 722 (JS) |
| 086 | Deutsche Bank AG | HP-SEC-01938180 to HP-SEC-01943277; HP-SEC-02099512 to HP-SEC-02099516. |
| 087 | Morgan Stanley & Co., Incorporated | HP-SEC-01952498; HP-SEC-01952500; HP-SEC-01952623; HP-SEC-02125831 to HP-SEC-02132804; Ex 1195; and Ex 1224; Ex 1620; HP-SEC-01953826; HP-SEC-01952500; HP-SEC-01952623<br>Ex 278 (JB); Ex 277 (JB); Ex 280 (JB); Ex 489 (MM) to Ex 492 (MM); |
| 088 | Capax Discovery, LLC (End User: McAfee, Inc) | US-PWC-02050626; HP-SEC-01916077; HP-SEC-01916129<br>US-PWC 00004084 to US-PWC 00004089; HP-SEC-01949663; HP-SEC-01928300; HP-SEC-01928301; US-PWC 00004090 to US-PWC 00004102<br>Ex 260 (JB); |
| 089 | Capax Discovery, LLC (End User: UBS) | HP-SEC-01915545 to HP-SEC-01928627; HP-SEC-01949663<br>US-PWC 00001190; US-PWC 00001208 to US-PWC 00001209; US-PWC 00001222 to US-PWC 00001269; US-PWC 00001271 to US-PWC 00001323; US-PWC 00001338 to US-PWC 00001356; US-PWC 00001405 to US-PWC 00001540; and US-PWC 00003702 to US-PWC 00003713; US-PWC 00004090 to US-PWC 00004102 |
| 090 | MicroTech, LLC (End User: Bank of Montreal) | HP-SEC-01891318 to HP-SEC-01897568; HP-SEC-02099516;<br>Ex 1261; Ex 1529; Ex 1532; Ex 1573; Ex 1581; Ex 120 (TJ)<br>US-PWC 00001260<br>HP-SEC-01955863; HP-SEV-01955651; HP-SEC-01955864 |
| 091 | Discover Technologies, LLC (End User: Prisa) | US-PWC 00003840 to US-PWC 00003853; US-PWC-00004105 to US-PWC-00004108<br>Ex 880; Ex 891; Ex 892; Ex 958; Ex 1366 to Ex 1368; Ex 1406; Ex 1407<br>FTIFJ00001500 |
| 093 | Johnson and Johnson Services, Inc. | HP-SEC-01889011 to HP-SEC-01901240 |
| 096 | Iron Mountain Information Management, Inc | HP-SEC-02145810 to HP-SEC-02148439; SEC-AUSA5-EPROD-000532167; HP-SEC-01935899; HP-SEC-01935901; HP-SEC-01931913; HP-SEC-01937900; HP-SEC-01938065 |

**mazars**

# Appendix B - Documents I have relied upon

**Software Focus Transactions**

| # | Company | Disclosure Range |
|---|---------|------------------|
| 101 | Discover Technologies, LLC (End User: Abbott Laboratories) | HP-SEC-01494583 to HP-SEC-01494639<br>Ex 981; Ex 982 to Ex 983; Ex 1427 to Ex 1428; Ex 1430; Ex 1434; Ex 1438; Ex 1440 to Ex 1445; Ex 1586<br>US-PWC 00001604 to US-PWC 00001605; US-PWC 00001631 to US-PWC 00001641; US-PWC 00001645 to US-PWC 00001649; US-PWC 00001654 to US-PWC 00001669; US-PWC 00001698 to US-PWC 00001703; US-PWC 00001628 to US-PWC 00001632 |
| 102 | J P Morgan Chase Bank, NA | US-PWC 00004214 to US-PWC 00004230; US-PWC 00004233 to US-PWC 00004306; SEC-AUSA5-EPROD-000694316; SEC-AUSA5-EPROD-000175504; SEC-AUSA5-EPROD-000147649; SEC-AUSA5-EPROD-000187985<br>Ex 278 (JB); Ex 277 (JB); Ex 280 (JB); Ex 489 (MM) to Ex 492 (MM); |
| 105 | Capax Discovery, LLC (End User: UBS) | HP-SEC-02050626; HP-SEC-01916077; HP-SEC-01916129<br>US-PWC 00004084 to US-PWC 00004089; HP-SEC-01949663; HP-SEC-01928300; HP-SEC-01928301; US-PWC 00004090 to US-PWC 00004102 |
| 106 | Rand Worldwide, Inc | HP-SEC-01908028 to HP-SEC-01911033; HP-SEC-01909820 |
| 109 | United States Postal Service | Ex 1033; Ex 1310 to Ex 1321; Ex 1533; Ex 1536; Ex 1538; Ex 1541;<br>US-PWC 00004194 to US-PWC 00004211; HP-SEC-01648699; HP-SEC-01648557; HP-SEC-01648585; SEC-AUSA5-EPROD-000465086; HP-SEC-01955651; HP-SEC-01955864; SEC-AUSA5-EPROD-00398258 |
| 115 | Bank of Montreal | HP-SEC-01891318 to HP-SEC-01897568; and HP-SEC-02099516 |
| 116 | Metropolitan Life Insurance Company | HP-SEC-01648557; HP-SEC-01648585; HP-SEC-01648588; HP-SEC-01648618; HP-SEC-01648699; HP-SEC-01648701;<br>US-PWC 00003635 to US-PWC 00003664; SEC-AUSA5-EPROD-000465086; HP-SEC-01955651; HP-SEC-01955864; SEC-AUSA5-EPROD-000398258 |
| 117 | National Bank of Canada | HP-SEC-01901241 to HP-SEC-01903794; HP-SEC-02099517; HP-SEC-01901840; HP-SEC-01902428; HP-SEC-01902852; HP-SEC-01903006; HP-SEC-01903290; HP-SEC-01903294; HP-SEC-01903298; HP-SEC-01903316; HP-SEC-01902959; HP-SEC-01955651; HP-SEC-01955864; SEC-AUSA5-EPROD-000398258 |
| 120 | Discover Technologies, LLC (Distributor: Dell, End User: Hyatt) | HP-SEC-02160925 to HP-SEC-02165816; and HP-SEC-00770189<br>US-PWC 00001669; and US-PWC 00004182 to US-PWC 00004193<br>Ex 493 (MM) to Ex 494 (MM); Ex 499 (MM); Ex 541 (JS); Ex 730 (JS) to Ex 731 (JS); Ex 1555 to Ex 1556 |
| 121 | MicroTech, LLC (End User: Hewlett Packard) | Ex 115 (TE); Ex 117 (TE); Ex 125 (TJ) to Ex 126 (TJ); Ex 542 (JS); Ex 547 (JS); Ex 1188; Ex 1253; Ex 1311; Ex 1401 to Ex 1402; Ex 1533 to Ex 1535; Ex 1538; Ex 1539 to Ex 1544; Ex 1566; Ex 1569 to Ex 1570; Ex 440 (Argy); Ex 1540<br>US-PWC-00000864; HP-SEC-01898951 |

**mazars**

# Appendix B - Documents I have relied upon

**Hardware Focus Transactions**

| Company | Reference |
|---|---|
| 5614-ANA Morgan Stanley | HP-SEC-01654189; HP-SEC-01654191; HP-SEC-01654860-01654861; HP-SEC-01654863; HP-SEC-01654197; HP-SEC-01654885-01654859; HP-SEC-01654213; HP-SEC-01654186-01654188; HP-SEC-01654198-01654212; Workpaper "*8100A Morgan Stanley memo on hardware revenue*" |
| 6733 and 6734-ANA Software House International | HP-SEC-01655817; HP-SEC-01655834; HP-SEC-01655820; HP-SEC-01655837; US-PWC 00002327-00002338; HP-SEC-01655843-01655844; HP-SEC-01655838-01655840; HP-SEC-01655819; HP-SEC-01655821-01655833; HP-SEC-01655836; HP-SEC-01655837; HP-SEC-01655834; HP-SEC-01655841; HP-SEC-01655846-01655859; Working paper "*2340 04 Evaluation of misstatements 09AAM*" |
| 8743-8746 ANAVideo Monitoring Services | HP-SEC-01655560-01655565; Working paper "*Q4-8130a Q4 2010 > $1m revenue testing*"; SEC-AUSA5-EPROD-000252336; HP-SEC-01655546-01655549; HP-SEC-01655539-01655542; HP-SEC-01655543-01655545; HP-SEC-01655554-01655556 |
| 9712-ANA - Software House International | HP-SEC-01654946; HP-SEC-01654958-01654973; US-PWC 00002327-00002338; US-PWC 00002856-00002857; HP-SEC-01654950-01654952; HP-SEC-01654948-01654949; HP-SEC-01654957; HP-SEC-01654955-01654956; HP-SEC-01654974-10654979; Working paper "*Q1 8130 Hardware Testing*" |
| 10159-ANA - Software House International | HP-SEC-01654633; HP-SEC-01654643; US-PWC 00002327-00002338; HP-SEC-01654640-01654641; HP-SEC-01654637-01654639; HP-SEC-01654635-01654636; HP-SEC-10654642; HP-SEC-01867469; HP-SEC-01867467; HP-SEC-01867473; HP-SEC-01654643-01654658; Working paper "*Q2 8130 Hardware Testing*" |