# Exhibit B

Autonomy Digital Limited (no. 4413470)<br>
Autonomy Europe Holdings Limited (no. 4597369)<br>
Autonomy Corporation Limited (no. 3175909)<br>
Autonomy Systems Limited (no. 3063054)<br>
Hewlett-Packard Vision Limited (no. 07741000)<br>
Interwoven UK Limited (no. 3781249)<br>
Longsand Limited (no. 4598955)<br>
Meridio Limited (no. NI 039935)<br>
Zantaz UK Limited (no. 5803939)<br>
<br>
Cain Road<br>
Amen Corner<br>
Bracknell<br>
Berkshire<br>
RG12 1HN

18 December 2013

FAO Mr Joshi
Companies House
Crown Way
Cardiff CF14 3UZ

DX 33050 Cardiff

Dear Mr Joshi

**FILING OF ACCOUNTS FOR YEARS ENDED 31/10/11 AND 31/10/12**

1.1    We are directors of the nine companies listed above (the "**Autonomy Companies**")[1]. We request that, in relation to Meridio Limited, this letter is forwarded to Mr Kane.

1.2    Since 18 September 2012, we have been corresponding regularly with Companies House in a number of letters in relation to the accounts for the Autonomy Companies for the years ended 31 October 2011 and 31 October 2012 being overdue. We have now received notice that unless accounts are filed within 28 days from the date of each relevant notice, criminal proceedings might be commenced against the relevant directors.

1.3    On 13 November 2013 (*before receipt of the relevant notices*), Mr Roberto Putland spoke with Mr Joshi regarding the substantial difficulties facing the directors in finalising the relevant accounts. In the course of this conversation, Mr Joshi invited us to write again to the Registrar of Companies explaining these difficulties and the reasons why a prosecution of the directors would not be in the public interest and in any case was defensible under 451(2) of the Companies Act 2006 ("**CA 2006**"), since all reasonable steps were and are being taken to ensure the relevant accounts are filed as soon as practicable. Mr Putland spoke to Mr Joshi and Mr Kane again on 10 December 2013 to inform them that this written submission would be delivered shortly.

---

[1]   For Hewlett-Packard Vision Limited only, FY2011 accounts will not be prepared, as the company was not in existence at a date that required FY2011 accounts. Hewlett-Packard Vision Limited will prepare FY2012 accounts.

1

LON27749722

FOIA Confidential Treatment Requested

HP-SEC-01575569

1.4 The purpose of this letter is therefore to explain the delays in filing accounts for the Autonomy Companies and the efforts which we, as directors, have made and continue to make to prepare such accounts and ensure compliance with the Autonomy Companies' statutory filing obligations.

1.5 At Appendix 2 is a table setting out the dates on which correspondence has been received from Companies House and the dates of responses. This correspondence then follows in the same Appendix.

1.6 As set out in greater detail below, the background to the difficulties we have encountered, and continue to encounter, in preparing accounts for the Autonomy Companies was the acquisition of these companies by a wholly-owned subsidiary of Hewlett Packard Company ("**HP**") in October 2011.

1.7 All of the current directors of the Autonomy Companies are HP-appointees who had no involvement with these companies before this acquisition. During 2012, we uncovered very serious accounting irregularities in the Autonomy Companies which relate to the period before their acquisition by HP. It was obviously necessary to investigate these irregularities, before accounts could be drawn up and audited in compliance with the CA 2006. These investigations have proved very challenging, given the poor quality of the Autonomy Companies' books and records and the number of accounting irregularities unearthed. Despite the significant resources committed by the Autonomy Companies and the wider HP group, the process of investigating and resolving irregularities is not yet complete. The accounting irregularities have been reported to the relevant criminal authorities in the US and the UK and HP continues to cooperate fully with the Serious Fraud Office and Financial Reporting Council, each of which is investigating Autonomy pre-acquisition.

1.8 Given the number of accounting irregularities which have been discovered and the resources which we have committed in an effort to resolve these irregularities, we firmly believe that we have taken, and are continuing to take, all reasonable steps to ensure that the Autonomy Companies comply with their filing obligations. In particular, the Autonomy Companies have engaged legal, financial and other advisers to assist with investigation of the accounting irregularities, and have paid fees to legal advisers, Freshfields Bruckhaus Deringer LLP of over £150,000 to date. This is in addition to the substantial fees paid to other advisers assisting the HP group in assessing the impact of this fraud. We have also been working with our current auditors Ernst & Young LLP ("**EY**") for the past 11 months to complete the audit which has involved providing extensive information to allow EY to complete their work, which is still ongoing. EY's audit fees to date are £1.6m reflecting the effort incurred so far.

1.9 We have carefully considered the additional work which must be completed before accounts for the Autonomy Companies can be finalised. We have regular discussions with our auditors EY, and we are confident that we will be able to deliver final audited accounts for each of the Autonomy Companies for the financial year ended 31 October 2011 by no later than 1 March 2014. We request that the Registrar of Companies grant us an extension until that date before handing over this matter to the Prosecuting Solicitor. As you will appreciate it is only following the filing of these accounts that work can commence on the accounts for the year ended 31 October 2012. Hence, we intend to file these accounts as soon as possible following filing of the 2011 accounts and in any case by 30 June 2014. In the extraordinary circumstances of this case, we do not believe that a prosecution of the directors for failing to file accounts would be in the public interest. Furthermore, we believe that the directors have a robust defence to any such claim under section 451(2) of the CA 2006.

2

FOIA Confidential Treatment Requested

HP-SEC-01575570

1.10   We would be happy to meet with you or arrange a telephone conference at your convenience to give you more detail if required. Please do not hesitate to contact us if that is the case.

## 2. BACKGROUND

### 2.1   October 2011 – Takeover

2.1.1   HP acquired indirect control of the Autonomy Companies following a public takeover in October 2011. For six months after HP's acquisition of the Autonomy Companies (i.e. until April 2012), notwithstanding board replacements made by HP, the operational management of these companies remained unchanged. Appendix 1 sets out the board appointments and resignations from each of the Autonomy Companies since October 2011.

2.1.2   Prior to HP's acquisition of the Autonomy Companies, the accounting year for these companies ended on 31 December. Deloitte LLP ("**Deloitte**") acted as auditors of the Autonomy Companies. Immediately following HP's acquisition, HP brought the end of the Autonomy Companies' accounting year back to 31 October, in order to bring it into line with HP's own accounting year. Deloitte continued to act as auditors of the Autonomy Companies.

2.1.3   In the period October 2011 to April 2012, the Autonomy Companies continued their usual accounting and audit process and throughout that time the directors fully expected to be able to file accounts by April 2012.

### 2.2   Initial Suspicions of Irregularities

2.2.1   In May 2012, financial results for the Autonomy Companies for the second quarter of the 2011-2012 accounting year (February to April 2012) were prepared. These results were substantially below HP's expectations. The poor results led to the exit of the former senior management team of the Autonomy Companies in late May and June 2012.

2.2.2   Following the departure of the former senior management team, HP's legal team began their own investigation into the accounting practices of the Autonomy Companies and the disclosures which had been made to HP before its acquisition of these companies. In June 2012, HP engaged Morgan Lewis (a US law firm) and PricewaterhouseCoopers ("**PwC**") (forensic accountants) to assist HP's legal team in a forensic investigation into the business and accounting practices of the Autonomy Companies. This focussed on a study of a sample of revenue transactions of various types and a more general review of emails and interviews with internal and external individuals.

2.2.3   During this time period, the Autonomy Companies' finance team began performing a high-level review of all large revenue transactions to determine the broad scale and nature of issues and provide a first assessment of the true level of historic revenues for the Autonomy Companies.

### 2.3   Identification of revenue recognition issues and Deloitte's resignation

2.3.1   Accounts for Autonomy Corporation Limited ("**ACL**") for the year ended 31 October 2011 were due to be filed by 30 April 2012. Accounts for the other Autonomy Companies for that financial year were due to be filed by 31 July 2012. During the first six months of 2012, employees within the Autonomy Companies' finance team worked together with Deloitte on the preparation of these accounts. The plan was that accounts for the 31 October 2011 financial period for all nine Autonomy Companies would be ready for filing by 31 July 2012.

FOIA Confidential Treatment Requested

2.3.2    The former Chief Financial Officer of the Autonomy Companies did not complete accounts before his departure in April 2012. Upon his appointment, the new Chief Financial Officer, Mr Yelland, pushed to accelerate the preparation of accounts for all of the Autonomy Companies.

2.3.3    Mr Yelland's team continued to work with Deloitte on the preparation of accounts for the Autonomy Companies for the year ended 31 October 2011. Apart from these revenue recognition irregularities, Mr Yelland's team considered the audit and accounts to be broadly complete by October 2012 and a set of draft accounts was prepared by the Autonomy Companies.

2.3.4    Meanwhile, the continued investigations into the pre-acquisition revenue recognition and business practices of the Autonomy Companies confirmed, by October 2012, that there were very serious accounting irregularities in relation to these companies. This led to a number of actions in November 2012. First, HP wrote down the value of its investment in the Autonomy Companies by $8.8 billion. Further, HP made disclosures as to the accounting improprieties identified, the failures to give appropriate disclosures and misrepresentations which had been made to it.

2.3.5    By November 2012, HP, given the scale of the accounting irregularities which had emerged, concluded that it would not be appropriate for Deloitte to continue to audit the Autonomy Companies for the year ended 31 October 2011. This was because Deloitte had been responsible for the audit of the accounts for these companies for the year ended 31 December 2010. It was clear to HP, by November 2012, that these earlier accounts contained fundamental errors. We therefore invited Deloitte to resign, which they did by letter dated 14 December 2012.

2.4    **EY Appointment and Initial Work**

2.4.1    As a result of Deloitte's removal, HP was forced to appoint replacement auditors. EY was appointed pursuant to an engagement letter dated 15 February 2013.

2.4.2    The Autonomy Companies and EY had an initial target to complete accounts for the Autonomy Companies for the financial year ended 31 October 2011 between April and June 2013. These accounts would need to include adjusted figures for the year ended 31 December 2010. The directors of the Autonomy Companies based this time estimate on certain assumptions, including (i) save for the revenue recognition issues identified, the Autonomy Companies' accounting records would be reasonably accurate and complete and (ii) the information already prepared to support the Deloitte audit would be adequate for EY to complete their audit.

2.4.3    However, it became apparent, as a result of work undertaken by the Autonomy Companies in January and February 2013 that this time estimate would not be realistic for the following reasons:

- extensive and pervasive errors across all areas of the financial statements had by this time been identified, not limited to revenue recognition as initially thought;
- transactions prior to 2011 had to be revisited because of our concerns about prior period errors. This work proved especially challenging since detailed knowledge of these transactions at Autonomy was severely limited as a result of personnel departures;
- we encountered difficulties in locating reliable evidence to verify the transactions from first principles - throughout the process we have encountered a lack of documentation supporting historic accounting entries;
- our concerns over the completeness and accuracy of previously recorded transactions has made preparing the financial statements more time-consuming; and
- ongoing investigations by various external authorities in the UK and US.

FOIA Confidential Treatment Requested

2.4.4  This led to a realisation in February 2013 that the directors' original plan to use the previously drafted accounts as a basis on which to layer on revenue adjustments was no longer viable. Instead a fundamental review was required of every aspect of the accounting - recreating the accounts from first principles in some areas and re-examining the details of all significant entries in others. In parallel EY had to reconsider the scope of their testing in order to assure that, once errors had been corrected, the risk of residual errors were below the low materiality levels set. This change increased the audit testing work required through, for example, much increased sample sizes and the assistance that the audit team then needed from the Autonomy finance team to locate and explain further information.

2.4.5  Given the poor accounting systems, poor documentation of transactions, lack of proper fixed asset registers and the inability to use the documentation of the former directors as evidence of the real substance of transactions, the effort to gather evidence to re-construct or re-examine all aspects of accounting for the Autonomy Companies for the financial years 2009 to 2011 was and is highly labour intensive. In February 2013, a decision was made to substantially increase the volume and seniority of the personnel and other resources available for investigating and resolving these issues. In this regard, the following steps were taken:-

(1)  the responsibilities of Mr Yelland were changed so that he would focus predominantly on the preparation of statutory accounts and interrelated continuing accounting investigations and for these companies;

(2)  the responsibilities of each of (i) Mr Andrew Miskin, a HP Finance manager, (ii) Ms Antonia Anderson, the revenue director for the Autonomy Companies and (iii) Ms Andrea Elliot-Smith, a revenue analyst, were changed so that these three employees were focused predominantly on the preparation of accounts for the Autonomy Companies;

(3)  a manager, Mr Michael Flint, led (and continues to lead) the Tax and Statutory Reporting team within the Autonomy Group, which is responsible for financial reporting. The element of Mr Flint's team responsible for the UK accounts was increased in size from two to four persons. Further, it was stripped of other responsibilities and directed to focus on the preparation of statutory accounts;

(4)  the directors of the Autonomy Companies sought and obtained assistance from other teams within the HP group, including the Autonomy Companies' revenue and financial control teams based in the US, HP's tax and legal departments and where necessary by HP's group financial controllership in the US; and

(5)  the directors of the Autonomy Companies also employed two accounting managers from PwC from April to June 2013 as secondees to provide additional revenue and technical resources.

2.4.6  The revised target for this team was to prepare draft accounts by the end of July 2013, suitable for final review.

2.5  **July 2013 onwards**

2.5.1  By July 2013, as a result of the work by the Autonomy Companies, we concluded that, although certain areas of work remain outstanding, we had a broad understanding of the scale of the accounting irregularities relating to these companies, the extent of the corrections required and

how these irregularities could be dealt with by means of appropriate disclosures in the accounts. Although a significant number of open issues existed at this point, which would subsequently need to be audited, draft accounts were prepared together with disclosures. These were delivered to EY for their review in August 2013 along with various draft memos which set out the work done and management's conclusions.

2.5.2   The expected outcome of this review was for EY to prepare a response which would include EY's comments on explanations given to them for entries in the accounts and the draft accounting disclosures.

2.5.3   As directors of the Autonomy Companies, we were acutely conscious of the fact that accounts for the Autonomy Companies were now significantly overdue. Accordingly, in August and September 2013, we continued to work to complete the preparation of the financial statements and worked closely with EY to allow EY to complete the audit work and to deliver a draft audit opinion, or identify any necessary further work which the Autonomy Companies would need to carry out before this opinion could be provided.

2.5.4   On 2 October 2013, senior HP personnel met with EY to discuss the urgent need to progress the accounts and subsequent audit with all haste. It was noted that the preparation of draft accounts was progressing slowly because of the lack of books and records available, the need to go back to original source materials to verify and correct numerous errors and make adjustments and the lack of historic knowledge available (paragraph 2.5.8 below gives more detail around these issues), but the directors were accepting of this time delay, being aware of the extremely high standard of accuracy required for accounts to be filed and the need to conclude as much as possible on these issues in order to prepare accounts suitable for audit. EY agreed to provide a draft audit opinion, feedback on disclosures on key issues and a formal memorandum explaining outstanding issues already identified by the Autonomy directors and EY.

2.5.5   HP engaged PwC in October 2013 to assist with further investigation work involving PwC conducting a detailed review of emails which contained accounting instructions given on behalf of the Autonomy Companies before their takeover by HP. The purpose of this review is to identify any additional potential accounting issues and to validate the conclusions which the directors of the Autonomy Companies have reached regarding the correction of historical accounting errors and the re-statement of the accounts for these companies.

2.5.6   On 28 October 2013, we received from EY the memorandum which they had promised at the 2 October 2013 meeting. EY identified 19 matters which required further consideration as part of completing the preparation of the financial statements. It was decided that a detailed response to each of the 19 matters be prepared which could then be used as the basis of disclosures in the accounts.

2.5.7   In the interests of brevity, this letter does not detail all 19 separate issues, which are all of a technical accounting nature, but we would be happy to discuss any or all of the open issues with you in more detail if you would like specific examples of the accounting issues being resolved.

2.5.8   For context, all the work that has taken place in the period March 2013 onwards has been of a nature far greater than would normally be the case for companies of this size and nature, and significantly more than the directors anticipated when the work was started. This is as a result of number of errors found and increasing scope:

(a)     Errors identified

FOIA Confidential Treatment Requested

To date management in their preparation of the financial statements, and EY in their audit, have identified:

- Over 350 adjustments to be recorded to the trial balances as originally prepared by previous management;
- Adjustments and amendments to be made to not only the 2011 year end, but also to the 2010 comparatives and the opening balance sheet at 1 January 2010 (reflecting errors identified in the 2009 and 2008 reported results). The fact that management have had to look back to prior year amounts has significantly increased the work required to be completed by management in their preparation of the financial statements and by EY in its work for the purposes of the audit;
- Substantial intra-group transactions with the wider Autonomy Group which require investigation; and
- A number of complex issues which require legal and specialist input, for example on revenue and taxation.

(b)     Scope Increase

At the commencement of the audit given the known allegations regarding revenue, the materiality thresholds for each of the Autonomy Companies used by EY were set at the lowest level under EY methodology from which the level of audit testing to be performed was initially determined. Also, EY are unable to rely on any framework of controls related to detailed accounting policies and procedures in their audit planning and must therefore test a higher proportion of transactions in order to gain reasonable assurance that each of the balance sheet and profit and loss account captions do not contain material errors. This is in contrast to procedures in a more normal environment, where auditors may test smaller samples of transactions to confirm that the framework of accounting controls is operating properly and then rely upon that framework. As a result, the level of planned detailed testing of transactions and balances has had to be increased significantly.

Furthermore once EY testing had commenced, and contrary to what we had understood to be the initial expectations of management, significant and pervasive errors were identified in most account balances in addition to the known and expected issues in revenue. The error rates required EY to further extend the sample sizes covering larger portions of all account balances being tested in detail for both the current and prior periods (in this case EY have had to complete work not just on the period ended 31 October 2011 but also on the years ended 31 December 2010, 2009 and 2008 which goes beyond what would normally happen). When completing a substantive audit in the absence of a control framework EY are required to obtain original audit evidence to support all sampled items from the origin of the transaction right through to final reporting. As noted above, locating original audit documentation has proved to be a difficult exercise for management and has been compounded by the greater level of information required as a result of the increased extent of sample sizes.

### 2.6     Outstanding Accounting Issues

2.6.1   The concerns raised by the errors identified and the scope increase required us to enter a new, more prolonged closing phase to the preparation of the accounts and EY audit. This is despite the resources which HP and the Autonomy companies have dedicated to the task of resolving historical accounting irregularities.

FOIA Confidential Treatment Requested

2.6.2    The scale of these resources again should be emphasised: in addition to the sums of money expended, a dedicated Autonomy finance team of up to nine staff including three of the most experienced and senior members of the Autonomy finance team have been devoted in the main to resolving accounting irregularities for the purpose of preparing statutory accounts.

2.6.3    Our target is to complete the resolution of all outstanding issues by the end of December and to deliver revised draft accounts to EY by 14 January 2014.  On this basis, and having discussed the timetable with EY, we are confident that the audit process of the 31 October 2011 accounts will be completed by 1 March 2014.  We would look to start work on the 31 October 2012 accounts in parallel with our current work on the 2011 accounts.  We expect the process on the 2012 accounts to be significantly less problematic than the 2011 accounts, as we will have a firm opening balance sheet to start from and the period is post-acquisition, meaning record keeping and administration is much easier.  We expect to be able to file the 2012 accounts by 30 June 2014.

2.6.4    We refer to the letter from EY appended to this letter at Appendix 3.

3.    **DELIVERY OF ACCOUNTS**

The directors of the Autonomy Companies are acutely aware, as they always have been, of their statutory filing obligations.  They continue to take very seriously the omission to file accounts for these companies for the years ended 31 October 2011 and 31 October 2012.  We continue to work diligently with appropriate assistance from outside advisers to bring to a conclusion these accounts and to file the accounts to 31 October 2011 by no later than 1 March 2014 and the accounts for 31 October 2012 shortly thereafter.

8

_____
Chris Yelland
Director

Autonomy Systems Limited
Longsand Limited
Meridio Limited
Interwoven UK Limited
Autonomy Digital Limited
Zantaz UK Limited

_____
Sergio Letelier
Director

Autonomy Corporation Limited
Autonomy Europe Holdings Limited
Autonomy Systems Limited
Longsand Limited
Hewlett-Packard Vision Limited

LON27749722

FOIA Confidential Treatment Requested

HP-SEC-01575577

_____  
Chris Yelland  
Director

Autonomy Systems Limited  
Longsand Limited  
Meridio Limited  
Interwoven UK Limited  
Autonomy Digital Limited  
Zantaz UK Limited

_____  
Sergio Letelier  
Director

Autonomy Corporation Limited  
Autonomy Europe Holdings Limited  
Autonomy Systems Limited  
Longsand Limited  
Hewlett-Packard Vision Limited

FOIA Confidential Treatment Requested
HP-SEC-01575578

## Appendix 1: Details of Changes in Directors

Details of changes (blue is current directors, red former Autonomy directors, others in black are annotated)

Autonomy Corporation Limited
- S E Letelier – executive director (Appointed 30 November 2011)
- J Shaikhali – executive director (Appointed 30 November 2011)
- J Bloomer – non executive director (Resigned 14 November 2011)
- R Gaunt – non executive director (Resigned 14 November 2011)
- F Kelly – non executive director (Resigned 14 November 2011)
- J McMonigall – non executive director (Resigned 14 November 2011)
- R Webb – non executive director (Resigned 14 November 2011)
- S Hussain – executive director (Resigned 30 November 2011)
- M Lynch – executive director (Resigned 30 November 2011)

Autonomy Europe Holdings Limited
- S T Hussain (resigned 18 November 2011)
- S E Letelier (appointed 30 November 2011)
- J Shaikhali (appointed 18 November 2011)

Autonomy Systems Limited
- Sushovan Hussain resigned on 27 September 2011
- Andrew Kanter resigned on 30 May 2012
- Sergio Letelier appointed on 25 May 2012
- Christopher Yelland appointed on 5 July 2012
- Nicholas Wilson appointed on 31 August 2012 and resigned on 29 November 2012 (HP UK MD who was appointed but then resigned)
- Roberto Putland appointed on 25 May 2012 and resigned on 24 April 2013 (HP UK head of legal who was appointed but then resigned)
- Joel Scott appointed on 12 June 2012 and resigned on 31 August 2012 (AU's head of legal who went on leave of absence in late 2012)

Longsand Limited
- S T Hussain (resigned 7 June 2012)
- S E Letelier (appointed 7 June 2012)
- J Shaikhali (appointed 7 June 2012 and resigned 18 September 2012)
- C Yelland (appointed 18 September 2012)
- S Blanchflower (appointed 18 September 2012)

Meridio Limited
- Andrew Kanter (resigned on 3 July 2012)
- Sushovan Hussain (resigned on 3 July 2012)
- Christopher Yelland (appointed 3 July 2012)
- Nicholas Wilson (appointed 23 August 2012 and resigned 29 November 2012)
- Roberto Putland (appointed 29 November 2012 and resigned 24 April 2013)

10

FOIA Confidential Treatment Requested                                    HP-SEC-01575579

Interwoven UK Limited
- Sushovan Hussain (resigned 9 July 2012)
- Christopher Yelland (appointed 9 July 2012)
- Nicholas Wilson (appointed 6 August 2012 and resigned 29 November 2012)
- Roberto Putland (appointed 29 November 2012 and resigned 18 July 2013)

Autonomy Digital Limited
- Andrew Kanter (appointed 3 June 2011 and resigned 4 July 2012)
- Sushovan Hussain (appointed 3 June 2011 and resigned 4 July 2012)
- Christopher Yelland (appointed 4 July 2012)
- Nicholas Wilson (appointed 6 August 2012 and resigned 29 November 2012)
- Frank Ippolito (resigned 3 June 2011) (came to AU as head of HR with the acquisition of the Digital business from Iron Mountain in June 11 – still holds this position but no longer needed as a director)
- John Lawrence (resigned 3 June 2011) (A former Iron Mountain employee who did not join Autonomy)
- Roberto Putland (appointed 29 November 2012 and resigned 24 April 2013)

Zantaz UK Limited
- Sushovan Hussain (resigned 9 July 2012)
- Andrew Kanter (resigned 9 July 2012)
- Christopher Yelland (appointed 9 July 2012)
- Nicholas Wilson (appointed 6 August 2012 and resigned 29 November 2012)
- Roberto Putland (appointed 29 November 2012 and resigned 24 April 2013)

Hewlett-Packard Vision Limited
- S E Letelier (appointed 15 August 2011)
- J Shaikhali (appointed 10 January 2012)
- Paul T Porrini (appointed 15 August 2011and resigned 10 January 2012)
- Catherine A Lesjak (appointed 15 August 2011 and resigned 10 January 2012)

11

FOIA Confidential Treatment Requested                                    HP-SEC-01575580

## Appendix 2: Companies House Correspondence

|   | Autonomy Companies to Companies House | Response from Companies House |
|---|---|---|
| 1. | Email from J Francis (HP Corporate Counsel) to Companies House dated 18 September 2012 | Email from J Joshi (Compliance Case Officer, Companies House) to J Francis dated 21 September 2012<br><br>Email from M McAnally (NI Compliance, Companies House) to J Francis dated 24 September 2012 |
| 2. | Email from J Francis to Companies House dated 21 November 2012 requesting telephone conference | Email noting response of Companies House in a telephone call between Companies House and J Francis dated 21 November 2012 |
| 3. | Email from J Francis to Companies House dated 21 November 2012 | Email from J Joshi to J Francis dated 27 November 2012 |
| 4. | Email from J Francis to Companies House dated 4 December 2012<br><br>Letter from S Letelier (Director, Autonomy Corporation Limited) to The Registrar of Companies dated 4 December 2012 sent under cover of an email from J Francis to Companies House dated 4 December 2012 | Email from J Joshi to J Francis dated 6 December 2012<br><br>Email from J Kane (Companies House) to J Francis dated 11 December 2012 |
| 5. | Email from J Francis to Companies House dated 20 December 2012 | Email from M McAnally to J Francis dated 21 December 2012<br><br>Email from J Joshi to J Francis dated 24 December 2012 |
| 6. | Email from J Francis to Companies House dated 31 January 2013 | Email from D Hendy (Compliance Case Officer, Companies House) to J Francis dated 31 January 2013 |
| 7. | Email from J Francis to Companies House dated 28 February 2013 | Email from J Joshi to J Francis dated 7 March 2013<br><br>Email from J Kane to J Francis dated 8 March 2013 |
| 8. | Email from J Francis to Companies House dated 27 March 2013 and follow up enquiry dated 18 April 2013 | Email from J Joshi to J Francis dated 9 April 2013<br><br>Email from J Kane to J Francis dated 10 April 2013 |

12

| | | |
|---|---|---|
| 9. | Email from J Francis to Companies House dated 27 June 2013 | Email from A Humphreys (Companies House) to J Francis dated 8 July 2013<br><br>Email from A Clugston (NI Compliance, Companies House) dated 8 July 2013 |
| 10. | Email from J Francis to Companies House dated 25 July 2013 | Email from J Joshi to J Francis dated 26/29 July 2013<br><br>Email from J Kane to J Francis dated 29 July 2013 |
| 11. | Email from J Francis to Companies House dated 31 July 2013<br><br>Email from J Francis to Companies House dated 13 August 2013 | Email from D Prewett (Extensions Team, Companies House) to J Francis dated 13 August 2013<br><br>Email from A Humphreys to J Francis dated 20 August 2013 |
| 12. | Email from J Francis to Companies House dated 18 September 2013 | Email from J Joshi to J Francis dated 19 September 2013<br><br>Email from C Rea (Compliance Case Officer, Companies House) to J Francis dated 19 September 2013 |
| 13. | Email from J Francis to Companies House dated 19 September 2013 | Email from J Joshi to J Francis date 20 September 2013 |
| 14. | Email from R Putland (Vice President & Associate General Counsel, HP) to Companies House dated 31 October 2013 | Email from J Joshi to R Putland dated 5 November 2013<br><br>Email from J Kane to R Putland dated 11 November 2013 |
| 15. | | 28 day warning letters in relation to:<br>- Meridio Limited dated 13 November 2013<br>- Hewlett-Packard Vision Limited dated 16 November 2013<br>- Autonomy Europe Holdings Limited dated 16 November 2013<br>- Autonomy Corporation Limited dated 16 November 2013<br>- Autonomy Systems Limited dated 23 November 2013 |

See separate zip file provided for all correspondence

13

LON27749722

FOIA Confidential Treatment Requested                                    HP-SEC-01575582

## Appendix 3: EY Letter

14

LON27749722

FOIA Confidential Treatment Requested

HP-SEC-01575583




Ernst & Young LLP  Tel: + 44 118 928 1100
Apex Plaza       Fax: + 44 118 928 1101
Forbury Road     ey.com
Reading
RG1 1YE

**Private and confidential**
Mr Joshi
Companies House
Crown Way
Cardiff CF14 3UZ

18 December 2013

Direct line: +44 118 928 1354

Email: dhales@uk.ey.com

Dear Sir

1. We confirm that we were appointed auditors of the Autonomy Companies on 15 February 2013.

2. In light of the well publicised issues surrounding the financial statements of Autonomy, we have been working to resolve numerous complex issues in the audit.

3. The directors have informed us that they are working to file the accounts of the Autonomy Companies for the year ending 31 October 2011 with the Registrar of Companies by 1 March 2014 and the accounts for the year ending 31 October 2012 shortly thereafter.

Yours sincerely

Dave Hales
Partner, Ernst and Young LLP

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London SE1 2AF, the firm's principal place of business and registered office.

FOIA Confidential Treatment Requested                                   HP-SEC-01575584