Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Dwight J. Draughon
Drew C. Harris
(Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone:  (212) 878-3437
christopher.morvillo@cliffordchance.com


*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

## NORTHERN  DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:18-cr-00577-CRB |
| Plaintiff, | Judge: Hon. Charles Breyer |
| vs. | **DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN FURTHER SUPPORT OF HIS MOTION *IN LIMINE* TO ADMIT POST-ACQUISITION EVIDENCE** |
| MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN, | |
| Defendants. | **(Lynch MIL No. 1)** |
| | Date:  February 21, 2024 at 2 p.m. |
| | Court:  Courtroom 6 – 17th Floor |
| | Date Filed:  February 7, 2024 |
| | Trial Date:  March 18, 2024 |

# TABLE OF CONTENTS

**Page Nos.**

I.     INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ....................................................................................................... 2

    A.    DR. LYNCH'S PROFFERED EVIDENCE IS FOCUSED AND TAILORED TO THE GOVERNMENT'S PROOF AND ELEMENTS OF THE OFFENSE .......... 2

    B.    DR. LYNCH'S PROFFERED EVIDENCE DEMONSTRATES THAT NO MATERIAL MISREPRESENTATIONS WERE MADE TO HP ........................ 4

        1.    The Materiality Inquiry Properly Considers Whether the Information Allegedly Withheld from HP was Objectively Capable of Influencing HP, the Intended Target of the Alleged Fraud ....................................................... 4

        2.    The Proffered Evidence Demonstrates that No Material Information was Withheld from HP ........................................................................................ 6

    C.    DR. LYNCH'S PROFFERED EVIDENCE REBUTS THE GOVERNMENT'S EVIDENCE ......................................................................................................... 9

        1.    Dr. Lynch's Evidence is Necessary to Provide Context for, and Attack the Credibility of, the Government's Proffered Post-Acquisition Evidence ....... 9

        2.    Dr. Lynch's Rebuttal Evidence is Focused and Targeted ........................... 13

    D.    DR. LYNCH SHOULD NOT BE PREVENTED FROM TESTIFYING ABOUT POST-ACQUISITION EVENTS THAT DEMONSTRATE HIS OWN LACK OF INTENT AND MOTIVE AND PROVE HIS INNOCENCE .............................. 14

III.    CONCLUSION .............................................................................................. 15

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF HIS MOTION *IN LIMINE* TO ADMIT POST-ACQUISITION EVIDENCE (LYNCH MIL NO. 1) – 3:18-CR-00577-CRB

i

1

**<u>TABLE OF AUTHORITIES</u>**

2

<u>Page Nos.</u>

**Cases**

3

4
*United States* v. *Bogucki*,
    No. 18-CR-00021-CRB-1, 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) .............................. 4, 5

5

6
*United States* v. *Foley*,
    783 F.3d 7 (1st Cir. 2015).................................................................................................... 5

7

8
*United States* v. *Galecki*,
    89 F.4th 713 (9th Cir. 2023) ............................................................................................ 4, 5

9

10
*United States* v. *Green*,
    698 F. App'x 879 (9th Cir. 2017)........................................................................................ 5

11

12
*United States* v. *Plany*,
    711 F. App'x 392 (9th Cir. 2017)........................................................................................ 4

13

14
*United States* v. *Rivera*,
    686 F. App'x 470 (9th Cir. 2017)........................................................................................ 5

15
*United States* v. *Wagner*,
    739 F. App'x 440 (9th Cir. 2018)........................................................................................ 4

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **SUMMARY OF ARGUMENT**

2      Defendant Michael Richard Lynch respectfully submits this reply in further support of his

3  motion *in limine* to offer post-acquisition evidence that is essential for him to mount a full and

4  fair defense.  The evidence Dr. Lynch seeks to offer is tailored and focused on rebutting the

5  government's arguments.  First, Dr. Lynch's proffered evidence demonstrates that no material

6  misrepresentations were made to HP.  Second, the proffered evidence undermines the credibility

7  of key government witnesses.  Finally, Dr. Lynch should be permitted to testify about post-

8  acquisition events that show his lack of motive and intent and thereby establish his innocence.

9  The government should not be permitted to present a conveniently tailored and misleading

10  narrative about the events following the acquisition while Dr. Lynch is precluded from

11  presenting exculpatory evidence from the same period that proves his innocence.  Due process

12  requires that his motion be granted.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.      INTRODUCTION

As Dr. Lynch established in his opening brief, the exculpatory post-acquisition evidence he has proffered (i) demonstrates that information allegedly withheld from HP was either not in fact withheld from, or was not material to, HP's decision to acquire Autonomy; (ii) rebuts the government's allegation that HP was defrauded and suffered substantial losses; and (iii) proves that Dr. Lynch did not intend to defraud HP and had no motive or incentive to do so.  In short, the evidence demonstrates Dr. Lynch's innocence.

In response, the government raises the specter of lengthy and drawn-out proceedings with the introduction of post-acquisition evidence, citing the U.K. civil proceedings as an example of what would supposedly occur if the trial included evidence of post-acquisition events.  ECF No. 314 (G. Opp. to D. MIL No. 1) at 1–2.  The government's scare tactics notwithstanding,[1] the post-acquisition evidence Dr. Lynch seeks to introduce is focused, targeted exculpatory evidence directed at elements of the offense—including whether alleged misrepresentations occurred, whether those alleged misrepresentations were material, and whether Dr. Lynch intended to defraud anyone.  As Dr. Lynch's opening brief explained, each piece of proffered evidence meets the government's proof and undermines the credibility of the government's witnesses and evidence.

The government ignores that showing and maintains that Dr. Lynch's evidence is not material, arguing that his "rebuttal" evidence amounts to no more than a blame-shifting exercise.  ECF No. 314 at 2.  The government also completely ignores how its own motion *in limine* to admit post-acquisition evidence, *see* ECF No. 299 (G. MIL No. 4), necessarily requires the

---

[1] From the government's telling, one would think that the U.K civil trial was entirely about an "inquiry into various chapters of aftermath from HP's acquisition."  ECF No. 314 at 2.  That is incorrect.  While the trial was undeniably long, only a small portion was devoted to the post-acquisition period, with the bulk of the proceedings focused on HP's allegations of fraud during the pre-acquisition period, including as to 37 reseller transactions, six so-called "reciprocal" deals, several so-called "other transactions," hardware sales and disclosures, hybrid hosting transactions, OEM deals and disclosures, and the pre-acquisition due diligence period.  In any event, given that the U.K. civil trial followed U.K. civil procedures and practices, any effort to draw lessons about trial length from that proceeding is misplaced.

1   admission of the post-acquisition evidence Dr. Lynch has proffered, as Dr. Lynch has explained

2   in his response.  *See* ECF No. 305 (D. Opp. to G. MIL No. 4).  Viewed as a whole, the briefing

3   regarding post-acquisition evidence demonstrates that the government seeks to control the post-

4   acquisition narrative by presenting only its own cherry-picked evidence, without allowing Dr.

5   Lynch to counter the government's narrative with evidence that shows that he is innocent.  For

6   the reasons set forth below and in Dr. Lynch's opening brief, the government's skewed

7   presentation should be rejected, and Dr. Lynch's proffered evidence should be admitted.[2]

8   **II.     ARGUMENT**

9           **A.      DR. LYNCH'S PROFFERED EVIDENCE IS FOCUSED AND TAILORED
                       TO THE GOVERNMENT'S PROOF AND ELEMENTS OF THE**
10                    **OFFENSE**

11          Dr. Lynch's motion identifies the focused, targeted evidence that he seeks to introduce.

12   As to each piece of evidence, Dr. Lynch has described in his motion precisely what element of

13   the offense or government allegation the evidence will meet.  Much of the evidence will come in

14   through Dr. Lynch's own testimony; the evidence will also come in through cross-examination of

15   the government's witnesses, including Christopher Yelland, Antonia Anderson, John Schultz,

16   and Joel Scott, the witnesses the government has identified in its own motion to admit post-

17   acquisition evidence.  *See* ECF No. 299.  Some defense witnesses may also testify about post-

18   acquisition events; during her recent deposition, for example, Lisa Harris testified about the

19   "mapping" exercise HP conducted in order to "map" Autonomy's accounts onto HP's accounts

20   immediately upon the deal closing in early October.  As Ms. Harris explained, that mapping

21   exercise began *before* the acquisition closed and continued *after* the closing, and made clear that

22   Autonomy engaged in standalone hardware sales, which were accounted for separately, and

23

24   _____

     [2] The government cites repeatedly to the Court's discretionary rulings in the *Hussain* proceedings
25   to bolster its arguments.  Those rulings are not binding here, especially since the government has
     made clear that this case is not a repeat of the *Hussain* trial.  Indeed, Dr. Lynch was not a party to
26   those prior proceedings and comes to these proceedings entitled to a clean slate protected by the
     presumption of innocence.  Notably, this is not just a question of Dr. Lynch's "involvement" in
27   something that has been already established.  Rather, the government must start from scratch
     here:  nothing has been established, certainly not that a fraud occurred or that anyone participated
28   in it.  Mr. Hussain's conviction means nothing in these proceedings.

which had to be "mapped" onto HP's systems.  Contrary to the government's fears, Ms. Harris's testimony was concise and straightforward, and her deposition was not unduly prolonged by testimony about the mapping exercise, which demonstrated HP's awareness of hardware sales before the closing and continuing into the post-acquisition period.

Dr. Lynch expects other post-acquisition evidence to be similarly focused and straightforward.  Indeed, Dr. Lynch has no interest in unduly prolonging the trial.  Nor is Dr. Lynch interested in casting blame on HP for any improper purpose.  Rather, his post-acquisition evidence is designed to put the lie to the government's core allegations about how HP was allegedly misled and how it allegedly suffered losses as a result.  The government repeatedly disclaims an intent to prove that HP suffered a massive loss as a result of an alleged fraud, but that disclaimer cannot be taken seriously when the government reserves the right, for example, to argue that HP purchased a Pinto when it thought it was buying a Cadillac.  ECF No. 314 at 8. Indeed, a Cadillac is worth many times more than a Pinto; the comparison thus obviously suggests a massive financial fraud.  Along the same lines, the government maintains that the restatement of the accounts of Autonomy's U.K. operating subsidiary, Autonomy System's Ltd. ("ASL") (hereinafter the "ASL Restatement"), should be admitted to establish the "magnitude of the necessary corrections" to Autonomy's accounts, and that the related summary charts, *Hussain* Tr. Ex. 2749, are probative of "the scale of the fraud at Autonomy."  ECF No. 295 (G. MIL No. 1) at 2.  Thus, there is no doubt, despite the government's hollow disclaimer, that the jury will understand that the government is alleging a fraud with a massive financial impact, and Dr. Lynch is entitled in his defense to respond to that allegation by establishing—through targeted, focused post-acquisition evidence—that HP was not defrauded and got exactly what it bargained for.

**B.    DR. LYNCH'S PROFFERED EVIDENCE DEMONSTRATES THAT NO MATERIAL MISREPRESENTATIONS WERE MADE TO HP**

**1.    The Materiality Inquiry Properly Considers Whether the Information Allegedly Withheld from HP was Objectively Capable of Influencing HP, the Intended Target of the Alleged Fraud**

The government tries to remove HP from the materiality equation by positing that the only question of any relevance is what some hypothetical "objective" purchaser of Autonomy might have found to be material.  If that were the case, then the government would not be asking HP witnesses like Leo Apotheker, Manish Sarin, and Andy Gersh whether knowledge of Autonomy's standalone hardware sales—assuming they truly were not aware of them—would have made a difference in their decision to purchase to Autonomy.  But context does matter, as *Bogucki* and *Galecki* make clear.  Indeed, in *Bogucki*, the entire focus of the materiality inquiry was the course of dealings between Barclays and HP, and whether HP would have truly expected Bogucki to be completely honest about his trading intentions where neither side expected honesty in the course of their arms-length dealings.  *United States v. Bogucki*, No. 18-CR-00021-CRB-1, 2019 WL 1024959, at \*7 (N.D. Cal. Mar. 4, 2019).  The "rules of the road," in other words, were evaluated from the perspective of HP.  *Id.*

Likewise, in *Galecki*, the question was not whether any hypothetical purchaser of "potpourri" that was "not meant for human consumption" would understand that the product contained cannabis and was meant to be smoked, but whether the actual purchasers—retail smoke shops that sold cannabinoid products—would understand that the product was not an air freshener.  *United States v. Galecki*, 89 F.4th 713, 737–38 (9th Cir. 2023).  To make that very point, the government called not just any observer, but an employee from one of the retail shops.  *Id.* [3]

---

[3] Indeed, courts routinely allow the prosecution to introduce evidence from alleged victims of a scheme to assess materiality.  *See*, *e.g.*, *United States v. Wagner*, 739 F. App'x 440, 441 (9th Cir. 2018) (district court "did not abuse its discretion in allowing the government to present [a fraud examiner for a victim's bank]'s testimony to establish the materiality" of defendant's representations); *United States v. Plany*, 711 F. App'x 392, 394 (9th Cir. 2017) (evidence from

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF HIS MOTION *IN LIMINE* TO ADMIT POST-ACQUISITION EVIDENCE (LYNCH MIL NO. 1) – 3:18-CR-00577-CRB

4

1     In arguing to the contrary, the government confuses the need for an "objective"

2  assessment of the capability of the information to influence the recipient with the "subjective"

3  effect—i.e., the actual effect, meaning whether the recipient "subjectively" believed or relied on

4  the information, or negligently failed to confirm or deny the information.  While subjective belief

5  is indeed not relevant, that does not mean, as the government suggests, that the inquiry turns only

6  on "industry practice" without considering "the persons *to whom the statement is addressed.*"

7  *Galecki*, 89 F.4th at 737 (emphasis original).  Rather, "materiality must be assessed in the

8  context in which the communications occurred; in consequence, [not only] industry practices,

9  [but also] agreements between the parties, and other information known to the parties at the time

10  of the allegedly false statements are relevant to assessing those statements' materiality."

11  *Bogucki*, 2019 WL 1024959, at *2 (citing *United States v. Green*, 698 F. App'x 879, 880 (9th Cir.

12  2017)).

13     Accordingly, HP's specific circumstances and perspective is critically important in

14  understanding what was material and what was not.  Evidence (including post-acquisition

15  evidence) that establishes that the information allegedly withheld from HP was not objectively

16  material to HP—including evidence that the allegedly withheld information was known to HP

17  and did not affect HP's valuation of Autonomy—is relevant to the materiality inquiry.

18  Furthermore, the fact that information is not material undermines any motive or incentive to

19  withhold that information from the recipient.  Such evidence is therefore central to Dr. Lynch's

20  defense and establishing his innocence.

21

22

23

24

---

25  victim-bank employee regarding forged draw requests was properly admitted to assess

26  materiality); *United States v. Rivera*, 686 F. App'x 470, 472 (9th Cir. 2017) (testimony by FEMA
administrator that mail fraud defendants' representations were capable of influencing payment

27  decisions supported jury's materiality assessment); *United States v. Foley*, 783 F.3d 7, 14 (1st
Cir. 2015) (victim testimony that they would not have engaged in transactions but for

28  misrepresentations was evidence that misrepresentations were material).

### 2.     The Proffered Evidence Demonstrates that No Material Information was Withheld from HP

The government has made whether HP was in fact aware of Autonomy's hardware sales and whether it was in fact aware of Autonomy's accounting practices a centerpiece of its case. Dr. Lynch must therefore be able to present evidence that HP was aware of Autonomy's hardware sales and how it accounted for reseller transactions, purchases from customers, hosting transactions, OEM sales, and the like.  As Dr. Lynch has explained, evidence from the post-acquisition period does just that.  For example, post-acquisition events put the lie to claims from witnesses like Mr. Sarin, Mr. Gersh, and Cathie Lesjak that the only hardware sales they heard of during the due diligence period were appliance sales—that is, sales of hardware that were related to sales of software.  Yet, as Ms. Harris explained in her deposition, and as internal HP emails and spreadsheets show, HP continued Autonomy's standalone hardware sales after the acquisition, at the same margins as before the acquisition, i.e., at a loss.  Thus, post-acquisition hardware sales and the projected revenues from those sales demonstrate that HP knew exactly what Autonomy was selling and how it was accounting for it, and nothing about the alleged non-disclosure of those sales could have been material to the acquisition.[4]

It is thus not surprising that HP witnesses like Mr. Sarin and Ms. Lesjak were not surprised, and did not cry foul, when they received emails and other documents after the acquisition that discussed standalone hardware sales.  The government offers alternative explanations for their reactions and responses, but that does not mean that the evidence does not support the inference Dr. Lynch seeks to draw from it:  that HP was not surprised by standalone hardware sales because those sales were not of any real consequence in the context of Autonomy's overall performance.  Indeed, if the test for admitting evidence were whether it supported more than one inference, then the government's case at trial would be short to non-existent.  Dr. Lynch is also entitled to test the credibility of the government's witnesses' explanations.  For example, Ms. Lesjak's claim that the $100 million in hardware sales

---

[4] Mr. Yelland himself approved payments to Dell for the hardware Autonomy resold, so he can easily be questioned about such post-acquisition sales.  Mr. Yelland also prepared the revenue forecasts that included the loss-generating hardware sales.

1    mentioned in a three-slide deck that was sent to her in October 2011 related to appliances is

2    simply not credible, given the amount of revenues that would be generated if that were the case.

3    Mr. Sarin's efforts to downplay the implications of the email from Kathryn Harvey likewise ring

4    hollow.[5]  The government should not be permitted to present testimony from HP witnesses to

5    establish materiality without allowing the defense an opportunity to adduce evidence that

6    undermines such testimony.  In sum, the defense should be permitted—via cross-examination

7    and by presenting evidence of continued standalone hardware sales post-acquisition—to

8    establish that HP's claim that it did not know about the hardware sales is false.

9          Post-acquisition valuations of Autonomy are likewise probative of materiality and

10   relevant to Dr. Lynch's intent and motive, as Dr. Lynch argued in his opening brief.  ECF No.

11   288 (D. MIL 1) at 5–6, 8–10.  As noted earlier, the government itself seeks to demonstrate, via

12   Mr. Yelland's ASL Restatement, the "magnitude" and "scale" of the fraud, *see* ECF No. 295 at 2;

13   *supra* II.A, but the government seeks to preclude other valuations that demonstrate that the

14   alleged accounting misconduct had no material impact on HP's valuation of Autonomy.  The

15   government cannot choose to admit the post-acquisition accounting evidence it likes while

16   precluding the analyses it doesn't like.  The valuations proffered by Dr. Lynch undermine the

17   government's allegation that a fraud occurred and impugn the relevance and credibility of Mr.

18   Yelland's restatement.  The valuations must, in fairness, be admitted.

19          For example, in summer 2012, *after* the purported whistleblower had come forward about

20   hardware sales and alleged accounting improprieties, and *after* HP had had access to Autonomy's

21   books and records for almost a year, HP concluded that Autonomy was worth $13.7 billion—$2

22   billion *more* than HP paid for it—and determined that no impairment was necessary against

23   Autonomy's book value.[6]  Barely a couple of months later, HP announced an $8.8 billion write-

24

25   ─────────────────

26   [5] Notably, Mr. Sarin was cross-examined about this email during the *Hussain* trial.  Dr. Lynch
     expects to cross-examine Mr. Sarin about this issue and is also seeking to admit the email in
27   question.

28   [6] The $13.7 billion valuation also exceeded HP pre-acquisition standalone valuation of
     Autonomy, not considering synergies, of $10.3 billion.

1    down.  While that announcement attributed more than $5 billion to alleged accounting

2    improprieties, internal HP emails and documents (including documents prepared by Mr. Yelland)

3    demonstrate that virtually none of the write-down was attributable to alleged accounting

4    misconduct.  Mr. Yelland had come to essentially the same conclusion in the rebasing exercise

5    he conducted in summer 2012, determining that few changes needed to be made to Autonomy's

6    accounts.  And Deloitte likewise resisted any efforts to restate Autonomy's accounts and was

7    fired as a result.  Even after the write-down, EY concluded that revenue adjustments due to

8    alleged accounting irregularities would not have had a material impact on HP's original valuation

9    of Autonomy, and therefore the "known accounting errors [do] not materially impact the

10   valuation" at the time of the acquisition.  ECF No. 288 at 5–6.

11       In other words, Mr. Yelland's restatement is only one of many post-acquisition analyses

12   of Autonomy's performance.  All of these analyses are relevant to the question of what

13   Autonomy was worth taking hardware sales and alleged accounting misconduct into account.

14   Thus, the valuations all perform a "lookback assessment" function—they consider past

15   performance and are relevant to forecasting future performance.  The government should not be

16   permitted to present its valuation without permitting Dr. Lynch to present competing versions.

17       The government complains that EY's valuation will confuse the jury because it applies a

18   different "materiality" standard from the fraud allegation, but that complaint does not undermine

19   the probative value of EY's analysis, which is not materially different from the types of

20   valuations HP relied upon in valuing Autonomy pre-acquisition and in making impairment

21   assessments after the acquisition.  The government's complaint also rings hollow where the

22   government has expressed no concern whatsoever about competing definitions of various

23   accounting-related terms in opposition to Dr. Lynch's motion to limit the use of such terms.  *See*

24   ECF No. 315 (G. Opp. to D. MIL No. 6).  In that opposition, the government suggests that any

25   confusion can be cleared up via cross-examination.  Here, if there is any concern about EY's use

26   of "material impact" language (and there is not), the jury can be provided with an instruction

27   about any difference in usage and meaning, as occurs without issue in cases involving testimony

28   about accounting materiality.

1    The government's concerns about prolonging the trial with evidence of other valuations

2    are also misguided.  The government's test for admission for post-acquisition evidence is one-

3    sided:  it gets to cherry-pick evidence like the ASL Restatement to present to the jury, but any

4    counter-evidence that "prolongs the trial" must be excluded.  That cannot be the test.  To quote

5    the government where it is the one seeking to offer evidence:  the fact that "additional testimony

6    may take additional time" is an "obvious point." *See* ECF No. 318 (G. Opp. to D. MIL No. 4) at

7    20.  Here, that "additional testimony" is relevant, admissible evidence critical to Dr. Lynch's

8    defense.  Moreover, the evidence—which is focused and limited—will not unduly prolong the

9    trial.  Evidence about the different valuations can be offered through cross-examination of Mr.

10   Yelland, who served as CFO of HP-Autonomy after Mr. Hussain left and who was therefore at

11   the center of HP's post-acquisition accounting and valuation efforts regarding Autonomy,

12   including the write-down.  The valuation evidence should be admitted.

   **C.    DR. LYNCH'S PROFFERED EVIDENCE REBUTS THE
           GOVERNMENT'S EVIDENCE**

           **1.    Dr. Lynch's Evidence is Necessary to Provide Context for, and Attack
                   the Credibility of, the Government's Proffered Post-Acquisition
                   Evidence**

17   In opposing Dr. Lynch's proffer of post-acquisition evidence, the government completely

18   ignores the myriad ways its own proffer of post-acquisition evidence opens the door to Dr.

19   Lynch's evidence.  Dr. Lynch is seeking a level playing field, where he has a full and fair

20   opportunity to rebut the government's case and demonstrate his innocence of the crimes charged.

21   The post-acquisition evidence Dr. Lynch seeks to admit is a crucial part of that defense.

22   To provide one example of how the government's position is a one-way street, the

23   government repeatedly insists that Dr. Lynch should not be permitted to present evidence about

24   HP's mismanagement of Autonomy and its failure to achieve the synergies it projected at the

25   time of the acquisition.  Thus, the government has no objection to evidence of HP's pre-

26   acquisition valuation of Autonomy (which relied heavily on projected synergies), but objects to

27   any mention of HP's failed efforts to achieve those synergies by integrating Autonomy with its

28   Vertica division to create a combined structured-unstructured data powerhouse.  *See* ECF No.

---

314 at 8 n.3.  The government likewise seeks to preclude other "integration" evidence, which it claims provides no insight into the pre-acquisition facts that the jury must find.  *Id.* at 8; *see also id.* at 12.[7]  The government forgets, however, that it intends to call (1) former HP General Counsel John Schultz to discuss his June 2012 interview of Dr. Lynch, which included a discussion of Autonomy's Q1 and Q2 2012 revenue misses, and (2) purported whistleblower Joel Scott who supposedly alerted HP to Autonomy's hardware sales and use of resellers and how Autonomy's revenue misses resulted from Autonomy's inability to engage in such practices after the acquisition.  *See* ECF No. 299 at 2–4.  What actually happened to Autonomy after the acquisition in Q1 and Q2 2012 is thus plainly called into question by the government's own evidence.  Dr. Lynch should be permitted to testify about the events he himself witnessed—what he saw, heard, and did—leading up to his termination from HP, the write-down, and the allegations against him, because those events bear on Dr. Lynch's state of mind during his interview with Schultz and demonstrate lack of any intent to defraud.  But in no case should only the government's witnesses be permitted to discuss what happened to Autonomy after the acquisition without allowing the defense to elicit testimony that rebuts the government's theory.

Post-acquisition evidence puts the government's proposed evidence from Mr. Scott, Mr. Schultz, Mr. Yelland, and Ms. Anderson in context and demonstrates its lack of reliability and credibility.

### a.      Joel Scott

If Mr. Scott testifies about how and why he became a whistleblower in May 2012, after Dr. Lynch was terminated, Dr. Lynch must be permitted to test Mr. Scott's version of events through cross-examination and evidence of his own.  That evidence will demonstrate that Mr. Scott was not in fact a whistleblower as to hardware sales and accounting irregularities, suggesting in turn that HP used those purported "revelations" as cover for its allegations of accounting misconduct in connection with the write-down in November 2012.  Indeed, HP was aware of the hardware sales before the acquisition and continued them seamlessly after the

---

[7] Dr. Lynch is not seeking to admit evidence regarding HP's other integration failures, such as its failure to integrate Palm, which resulted in a series of multi-billion-dollar write-downs.

1  acquisition, and HP's valuations of Autonomy demonstrate that the alleged accounting

2  misconduct was not material to HP.  As noted earlier, Mr. Scott's testimony would also open the

3  door to evidence about what caused Autonomy's revenue misses in Q1 and Q2 2012.

### b.  John Schultz

5  Post-acquisition evidence likewise provides context for Mr. Schultz's anticipated

6  testimony about his interview with Dr. Lynch in late June 2012.  Given the government's heated

7  allegations that Dr. Lynch lied during that interview and threatened Mr. Schultz, purportedly

8  demonstrating consciousness of guilt, Dr. Lynch must be permitted to describe the events that led

9  up to the interview and about which he was questioned.  Those events include the post-

10  acquisition events that led to his termination, including HP's mismanagement of Autonomy, its

11  failure to achieve projected synergies, the revenue misses in Q1 and Q2 2012, and rumors sown

12  by HP about accounting improprieties.  As Dr. Lynch will explain, it was those rumors—and the

13  way in which HP had already trashed Dr. Lynch's reputation and integrity in the press—that

14  prompted Dr. Lynch to remind Mr. Schultz that he also had press contacts.  Yet, the government,

15  in a remarkable turn of events, maintains that Dr. Lynch must not be allowed to describe those

16  rumors because "examining their sources, and testing their veracity threatens a goose-chase

17  through multiple levels of hearsay and witnesses as-yet-unnamed."  ECF No. 314 at 12.

18  Needless to say, the government has not taken the same tack in response to Dr. Lynch's motions

19  to preclude rumor, speculation, innuendo, and misleading terminology, insisting in those

20  oppositions that any concerns about such evidence can be addressed through cross-examination

21  and argument.  *See generally* ECF No. 311 (G. Opp. to D. MIL No. 5); ECF No. 315.  Putting

22  aside the government's inconsistent approach, the question here is not the truth of the rumors, but

23  their effect on Dr. Lynch and his response to them.  That context is properly part of any evidence

24  regarding the interview with Mr. Schultz.

25  In addition to providing context, the post-acquisition evidence undermines Mr. Schultz's

26  credibility and is thus properly the subject of cross-examination.  Mr. Schultz was in the middle

27  of various key post-acquisition events:  he spoke with Mr. Scott, made inquiries in response to

28  Mr. Scott's "revelations," interviewed Dr. Lynch, and served as chief legal adviser to HP as HP

1   considered whether to take a write-down in November 2012 and how to describe the basis for

2   that write-down in its public disclosures.  While much of what Mr. Schultz said and did is still

3   cloaked behind HP's assertion of attorney-client privilege, it is clear from what Dr. Lynch has

4   been able to examine that Mr. Schultz was central to post-acquisition events and that his

5   credibility was severely undermined by those events.

6        Most striking in this regard are Mr. Schultz's statements at the time of the write-down,

7   each of which is demonstrably false.  Mr. Schultz claimed that:

8
- a "thorough investigation" supported HP's allegations against Autonomy, when the investigation conducted by Morgan Lewis & Bockius and PwC had barely

9       gotten off the ground;

10
- that HP's investigation was prompted by a whistleblower who reported about hardware sales that were previously unknown to HP, when HP knew about the

11      hardware sales all along (and continued them after acquisition); and

12
- that Autonomy's books and records were in disarray, making it difficult to uncover the alleged accounting misconduct purportedly responsible for more than

13      $5 billion of the write-down, when Autonomy's records were fully in order and available to HP immediately after the acquisition.

14

15  Mr. Schultz was also in the middle of discussions about how to characterize the reason for the

16  write-down—discussions that make clear that HP's statements about its reasons for the write-

17  down were false.  Those disclosures were later investigated by the SEC, when it became

18  abundantly clear that HP had no basis for its claims.  Mr. Schultz's involvement in all of these

19  events goes directly to his bias and credibility, and Dr. Lynch should be able to explore these

20  events fully with Mr. Schultz on cross-examination.

21                  **c.      Christopher Yelland and Antonia Anderson**

22       Post-acquisition events leading up to the write-down and its aftermath are similarly

23  central to putting Mr. Yelland's preparation of the ASL Restatement (with Ms. Anderson's help)

24  in context and challenging the credibility of Mr. Yelland's testimony.[8]  As noted earlier, the

25

26  _____

27  [8] The government does not object to cross-examination of Mr. Yelland regarding his
    coordination with law firms and accounting firms that were conducting an investigation on HP's
    behalf in preparation for litigation, ECF No. 314 at 10–11, which was also permitted in the

28  *Hussain* trial.

---

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF HIS MOTION *IN LIMINE* TO
ADMIT POST-ACQUISITION EVIDENCE (LYNCH MIL NO. 1) – 3:18-CR-00577-CRB

1    Restatement is only one of several post-acquisition analyses of Autonomy's financial

2    performance after the acquisition.  Moreover, the write-down exercise itself—as emails

3    involving Mr. Yelland will confirm—was a mockery of an impairment exercise, with billions of

4    dollars appearing and disappearing literally overnight via calculations that HP's own finance

5    team called "crazy" and "nonsensical."  Once the write-down was announced to the market,

6    however, it became Mr. Yelland's task—the evidence shows—to restate ASL's accounts in such

7    a way as to buttress the write-down's pre-ordained conclusion.

8         To support the notion that "fraud" requiring a five-billion-dollar write-down had

9    occurred, Mr. Yelland relied on the legal and accounting teams conducting an investigation of

10   Autonomy's accounting practices to support HP's litigation efforts and to make every possible

11   accusation of improper revenue recognition.  As evidence Dr. Lynch has obtained since the

12   *Hussain* trial makes clear, for months, Yelland and the litigation team met, exchanged

13   arguments, and edited each other's drafts to ensure that the ASL Restatement and litigation

14   position of HP were aligned to corroborate the write-down.  The entire process—from the

15   various valuations of Autonomy, to Mr. Yelland's rebasing exercise, to the write-down itself, and

16   to the eventual preparation of the Restatement—goes directly to Mr. Yelland's bias and

17   credibility and thoroughly undermines the ASL Restatement.

18        The government is seeking to establish, via the ASL Restatement, that the alleged

19   accounting misconduct had a material impact on the valuation of Autonomy.  In response, Dr.

20   Lynch should be permitted to present evidence that the adjustments to revenues identified by Mr.

21   Yelland in the ASL Restatement had no material impact on the valuation of Autonomy after the

22   acquisition and that Autonomy was considered just as valuable, if not more so, after the alleged

23   accounting misconduct had been discovered in 2012 as it was before the acquisition.  Such

24   evidence goes to materiality and motive.

25        **2.      Dr. Lynch's Rebuttal Evidence is Focused and Targeted**

26        As demonstrated by the foregoing discussion, each of the pieces of evidence that Dr.

27   Lynch seeks to admit to rebut the government's version of events and establish that there was no

28   fraud, *see* ECF No. 288 at 7–13, is directly responsive to the post-acquisition evidence being

1    offered by the government.  In the interests of fairness and justice, Dr. Lynch should be

2    permitted to present that evidence.

**D.      DR. LYNCH SHOULD NOT BE PREVENTED FROM TESTIFYING**
3    **ABOUT POST-ACQUISITION EVENTS THAT DEMONSTRATE HIS**
      **OWN LACK OF INTENT AND MOTIVE AND PROVE HIS INNOCENCE**
4

5          As Dr. Lynch explained in his opening brief, what he himself saw, heard, and did after he

6    became CEO of HP-Autonomy bears directly on his state of mind and demonstrates that he had

7    no intent, motive, or incentive to defraud HP.  *Id*. at 12–14.  The government fights Dr. Lynch's

8    proposed testimony at every step, apparently taking the view that Dr. Lynch should not be

9    permitted to testify about any post-acquisition events.  In the government's view, Dr. Lynch must

10   accept a bare stipulation that he worked at HP after the acquisition and that Autonomy's books

11   and records were transferred to HP immediately after the deal closed.[9]  ECF No. 314 at 11.  The

12   government further asserts that testimony about Autonomy's performance in Q1 and Q2 2012

13   would be "problematic," evidence regarding Dr. Lynch's termination has "no bearing on the

14   elements of the fraud alleged," and Dr. Lynch should not be permitted to mention misguided

15   rumors sown by HP about accounting improprieties or to discuss how HP tarnished his

16   reputation and impugned his integrity.  *Id*. at 11–12.

17         The government's attempt to unfairly limit Dr. Lynch's testimony should be rejected, and

18   Dr. Lynch should be permitted to defend himself by testifying about post-acquisition events,

19   including those described above.  That such exculpatory evidence might add to the length of the

20   trial is certainly no reason to preclude it.  Dr. Lynch cannot defend himself against the

21   government's allegations—which arise from HP's allegation that it was defrauded—without

22   providing the jury with his perspective as to what happened and how and why he has been

23   accused of fraud.  Artificially ending his narrative on October 3, 2011, and not permitting him to

24   explain what happened post-acquisition to his highly successful company with a magical product

25   that was putting more and more cash in the bank every year until it was acquired by HP would

26

27   [9] As noted earlier, Ms. Harris's deposition testimony provides critical details about HP's
     "mapping" exercise and the transfer of Autonomy's trial balances to HP that a bare-bones
28   stipulation does not capture.  *See supra* section II.A.

1    cripple his defense.  To be clear, the purpose of that evidence is not to "blame" HP, but to

2    demonstrate what was and what was not objectively material to HP and to provide the jury with

3    the critical insight into Dr. Lynch's state of mind that only Dr. Lynch can provide.

4    **III.    CONCLUSION**

5          For the foregoing reasons, the Court should grant Dr. Lynch's motion *in limine* to admit

6    post-acquisition evidence.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

Dated: February 7, 2024                    Respectfully submitted,

2

3

By:  _/s/ Christopher J. Morvillo__

4

Christopher J. Morvillo

5

Christopher J. Morvillo

6

Celeste L.M. Koeleveld
Daniel S. Silver

7

(Admitted Pro Hac Vice)

8

**CLIFFORD CHANCE US LLP**
31 West 52nd Street

9

New York, NY 10019
Telephone:  (212) 878-3437

10

christopher.morvillo@cliffordchance.com

11

12

Jonathan M. Baum (SBN: 303469)
**STEPTOE LLP**

13

One Market Street

14

Steuart Tower, Suite 1070
San Francisco, CA  94105

15

Telephone:  (510) 735-4558
jbaum@steptoe.com

16

17

Reid H. Weingarten
Brian M. Heberlig

18

Michelle L. Levin
Nicholas P. Silverman

19

Dwight J. Draughon

20

Drew C. Harris
(Admitted Pro Hac Vice)

21

**STEPTOE LLP**
1114 Avenue of the Americas

22

New York, NY 10036
Telephone:  (212) 506-3900

23

24

*Attorneys for Defendant*
*Michael Richard Lynch*

25

26

27

28

DEFENDANT MICHAEL RICHARD LYNCH'S REPLY IN SUPPORT OF HIS MOTION *IN LIMINE* TO
ADMIT POST-ACQUISITION EVIDENCE (LYNCH MIL NO. 1) – 3:18-CR-00577-CRB

16