PATRICK D. ROBBINS (CABN 152288))
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6912
    Fax: (415) 436-7234
    Email: Robert.Leach@usdoj,gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-577 CRB |
| Plaintiff, | UNITED STATES' MOTION TO ADMIT SETTLEMENT AGREEMENTS WITH REENA PRASAD, BRENT HOGENSON, AND PERCY TEJEDA |
| v. | |
| MICHAEL RICHARD LYNCH AND STEPHEN KEITH CHAMBERLAIN, | Trial Date: March 18, 2024<br>Judge: Hon. Charles Breyer |
| Defendant. | |

The government moves to admit the settlement agreements Autonomy entered into with Reena Prasad, Brent Hogenson, and Percy Tejeda. These settlement agreements are highly probative of Defendants' scheme to defraud and are admissible under Federal Rule of Evidence 408. And the Defendants have opened the door to the agreements' admission—including by arguing in opening and eliciting on cross-examination evidence implying that Autonomy properly terminated Brent Hogenson for cause. The Court admitted this evidence in *Hussain* and should do so again here. 16-CR-462, ECF No. 419 at 74.

## I.     FACTUAL BACKGROUND

Count 1 of the Superseding Indictment alleges a variety of means and methods that the Defendants used to execute their scheme to defraud, one of which was "intimidating, pressuring, and paying-off persons who raised complaints about or openly criticized Autonomy's financial practices and performance." ECF No. 21 (Superseding Indictment), ¶ 22(i). Reena Prasad, Percy Tejeda, and Brent Hogenson were each terminated by Autonomy for pretextual reasons after they raised concerns about Autonomy's financial practices. After they were terminated, Autonomy entered into settlement agreements with each of them in which Autonomy agreed to pay them in exchange for their silence.

Reena Prasad was terminated on July 30, 2010, after she had repeatedly escalated concerns around resellers not paying Autonomy because they lacked valid end users or had not closed deals with end users (factors that, under a legitimate transaction, should not have impacted whether or not the resellers paid Autonomy). *See* Green Declaration in Support of United States' Motion to Admit Settlement Agreements ("Green Decl."), Ex. 1614 (Prasad Settlement Agreement). Ms. Prasad has testified that, when she escalated those concerns to Mr. Chamberlain, she was told to go "hands off" and cease trying to collect payments from resellers central to this case, including MicroTech, MicroLink, and Capax. If permitted, Ms. Prasad is expected to testify that on the day she was terminated she was not provided with any reason for her termination other than that her employment was at-will. Ms. Prasad's termination came shortly after she was interviewed for what she understood to be an investigation into a payroll issue at Autonomy. (Ms. Prasad did not have any role with respect to payroll.) On March 16, 2011, Autonomy and Ms. Prasad entered into a settlement agreement in which

Autonomy agreed to pay $75,000 to release Autonomy from all claims related to her employment. Ms. Prasad, for her part, agreed not to discuss the settlement with others aside from a few exceptions. Green Decl. Ex. 1614. Ms. Prasad's settlement agreement documented the pretextual reasons that Autonomy used to justify her termination, stating that Autonomy alleged she violated company policies related to, "among other things, the authorization of payments to third parties and internal company investigations." Green Decl. Ex. 1614 at 1. As established during her testimony today, Ms. Prasad was responsible for *collecting payments* from third parties—she was not responsible for *authorizing payments to third parties*. Ms. Prasad's settlement agreement also required that, if she received a subpoena or document demand requesting any of the "Settlement Information, including any related documents or correspondence between the parties or any testimony related to such documents or correspondence, Prasad shall immediately notify Autonomy of the receipt of such subpoena or deposition notice or document demand, and shall cooperate in any effort by Autonomy to object to or quash such subpoena, or object to or obtain a motion for a protective order related to such deposition notice or document demand." Green Decl. Ex. 1614, at 5. The settlement agreement further provided that: "Prasad understands that time is of the essence in responding to such a subpoena or deposition notice or document demand, and any delay in notifying Autonomy of the receipt of such a document shall be severely prejudicial to Autonomy, and therefore shall be deemed a material breach of this agreement." *Id.*

Like Ms. Prasad, Mr. Tejeda was terminated on July 30, 2010. He also worked in the finance department at Autonomy as the Director of Revenue. Autonomy entered into a settlement agreement with Mr. Tejeda on March 20, 2011. Mr. Tejeda's agreement noted that he, like Ms. Prasad, had alleged that he was terminated in violation of whistleblower protection laws. Green Decl. Ex. 1623. Mr. Tejeda's settlement agreement was similarly structured to Ms. Prasad's and he was paid $105,000 by Autonomy. *Id.*

Ms. Prasad and Mr. Tejeda's settlement agreements with Autonomy should not be viewed in a vacuum. They must be viewed in the context of Mr. Brent Hogenson and the events surrounding his termination. Ms. Prasad reported up to Mr. Hogenson. As evident from documents already admitted and expected to be admitted, Mr. Hogenson was aware of Ms. Prasad's concerns and he incorporated the

issues she was finding into a set of concerns that he escalated to Dr. Lynch in June 2010. *See, e.g.*, Green Decl. Ex. 13037, 10094. Mr. Hogenson elevated his concerns to Deloitte (Autonomy's auditor) on June 26, 2010. Green Decl. Ex. 3789, at 28–34. As described below, he also elevated his concerns about Autonomy's potentially misleading financial statements to regulatory authorities.

On July 26, 2010, Mr. Hogenson sent a letter to the Financial Services Authority ("FSA") in the United Kingdom and wrote that he was motivated to inform them of his concerns because he wanted to "ensure that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors." Green Decl. Ex. 1012, at 1. Two days later, on July 28, 2010, Autonomy terminated Mr. Hogenson. Green Decl. Ex. 13059 (Hogenson Settlement Agreement).

On July 30, 2010, Autonomy sent a letter in response to the FSA. *See* Green Decl. Ex. 1542, ¶ 4. On August 20, 2010, Mr. Hogenson notified the Securities and Exchange Commission ("SEC") in the United States of his concerns, forwarding the SEC the letter that he had sent to the FSA on July 26, 2010. Green Decl. Ex. 6256.

In addition, Mr. Vaidyanathan testified today that he believed Mr. Hogenson had also indicated that he intended to elevate his concerns to the Serious Fraud Office ("SFO") in the U.K. In November 2010, Autonomy entered into a settlement agreement with Mr. Hogenson in which, in exchange for his silence, Autonomy agreed to pay him $750,000. Green Decl. Ex. 13059, at 1. Similar to Ms. Prasad, Mr. Hogenson's settlement agreement also provided that each party must cooperate in any effort by the other party to "object to or quash" any subpoena for documents or testimony related to information concerning his employment at Autonomy. Green Decl. Ex. 13059, at 5. On February 2, 2011, the Financial Reporting Review Panel ("FRRP"), a "body authorized under the Companies Act 2006 to review and investigate the annual accounts and directors' reports of public and large private companies" sent a letter to Autonomy requesting additional information related to financial concerns raised by Mr. Hogenson. Green Decl. Ex. 1542. All of these events took place *before Autonomy entered into its settlement agreements with Ms. Prasad and Mr. Tejeda* in March 2011.

## II.     ARGUMENT

Federal Rule of Evidence 408 provides that evidence of "furnishing . . . a valuable consideration in compromising or attempting to compromise the claim" and "conduct or a statement made during

3

compromise negotiations about the claim" are not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(1). Rule 408 allows, however, a court to "admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving **an effort to obstruct a criminal investigation or prosecution**." Fed. R. Evid. 408(b) (emphasis added). Rule 408 is inclusive not exclusive—it provides a list of examples, not intended to be exhaustive, for which evidence of settlement agreements may be admitted. The settlement agreements at issue here fall squarely within this exception. The government would be admitting the settlement agreements not for the purpose of proving or disproving the validity of the witnesses' termination claims but to establish a concerted effort by Autonomy to obstruct any criminal investigations into its false and misleading financial statements—the primary concern that motivated Mr. Hogenson to send his letter to the FSA. By the time Autonomy entered into the settlement agreements with Mr. Hogenson, Ms. Prasad, and Mr. Tejeda, it was well-aware of the potentially criminal nature of the concerns that Mr. Hogenson was surfacing. The settlement agreements therefore reflect Autonomy's attempts to "buy off" witnesses to a crime. *See* Fed. R. Evid. 408, adv. comm. note ("An effort to 'buy off' the prosecution or a prosecuting witness in a criminal case is not within the policy of the rule of exclusion.").

The facts clearly establish the intent behind these agreements: Mr. Hogenson, Mr. Tejeda, and Ms. Prasad all worked in the same department. They were fired within days of each other for pretextual reasons after becoming aware of and raising financial concerns to Mr. Chamberlain and Dr. Lynch. Indeed, Joel Scott's testimony in *Hussain* established that Ms. Prasad was fired for raising her head above the "parapet." Trial Tr. 2644:1–3 (I recall [Mr. Hussain's] words with respect to –with respect to Reema [sic] that she had raised her head above the parapet and that he wanted her gone.").

The government did mention the terminations of Mr. Hogenson, Mr. Tejeda, and Ms. Prasad in its 404(b) notice, but this was in the context of noticing Dr. Lynch's treatment of the analyst Daud Kahn, who Dr. Lynch also punished for raising questions about Autonomy's financial reporting. Green Decl. Ex. A. The government provided this notice out of an abundance of caution. It has always been the government's position that the terminations and ensuing settlement agreements with the finance employees constituted part of the scheme to defraud as explicitly alleged in the Superseding Indictment.

4

1  ECF No. 311 at 8–9.

2      In a pretrial filing regarding this topic, filed in advance of the pretrial conference in February
3  2024, the government wrote that it did not intend to offer evidence of the settlement agreements, but
4  reserved the right to do so depending on the cross examination of the witnesses.  ECF No. 311 at 9 n.1.
5  The Defendants' opening statements this week have opened the door to this evidence and given this
6  issue heightened importance.  During Dr. Lynch's opening statement, Mr. Weingarten stated:

> Hogenson, the whistleblower. **You heard a story that a CFO in the United States came forward, made allegations about the accounting, and Mike fired him because he didn't want those allegations to get out in the open and blow the lid off Autonomy.** That's the implication of what you heard this morning.
>
> **We say bunk.** This guy Hogenson was presiding over the largest accounting fraud in the history of Autonomy. People under him for about a year were stealing. He never caught it. An investigation started, and then, lo and behold, Hogenson files a whistleblower complaint. In the course of the original investigation, allegations surface about Hogenson himself. And he's going -- he's on the witness list, and I'm looking forward to this. **We're going to settle this one in court. Who is right here?**
>
> They say Mike fired him. And Mike didn't fire him, Joel Scott fired him because the whistleblowing. **We're saying he was fired because of his own conduct. His own conduct over and over and over again made him completely unqualified to be the CFO of a public company.** And you're going -- it's all going to be before you, and you can use this as a litmus test. Who is pushing the envelope too far? Is the Government? Did they properly say Mike Lynch misbehaved?

26  Tr. 367:23-368:20 (emphasis added).

27      Mr. Chamberlain's opening statement also discussed Mr. Hogenson's elevation of
28  concerns to Deloitte and attributed much weight to the fact that Deloitte reviewed and

5

closed out these concerns. Mr. Chamberlain's counsel suggested that this course of events was indicative of Mr. Chamberlain's state of mind that there actual wrongdoing behind Mr. Hogenson's allegations. Trial Tr. 433:22–435:1 ("This is a whistleblower dealing with accounting issues that we, Deloitte, have signed off on . . . . Now, take a step back and say what is the importance of this with regard to Mr. Chamberlain and his statement of mind? . . . . And after that challenge, the auditors say all of this accounting is good. That, again, provides comfort to Mr. Chamberlain that he's performing his job in good faith."). What defense counsel did not say is that Mr. Hogenson was terminated and paid $750,000 shortly after raising his concerns with Deloitte—surely another factor that arguably went to his state of mind concerning potential wrongdoing.

Joel Scott's testimony in *Hussain* established that Dr. Lynch was the driving force behind the terminations. This testimony was cited extensively in the government's pretrial brief on this subject. To the extent Defendants argue that these terminations were outside Dr. Lynch's control, the government refers the Court to its prior brief. ECF No. 311, at 6–9 (citing Trial Tr. 2641–43).

### III. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court admit the evidence pertaining to Ms. Prasad, Mr. Hogenson, and Mr. Tejeda's terminations.

DATED: March 19, 2024

Respectfully submitted,

PATRICK D. ROBBINS
Attorney for the United States
Acting under Authority Conferred by 28 U.S.C. § 515.

/s/ *Kristina Green*
ROBERT S. LEACH
ADAM A. REEVES
KRISTINA GREEN
ZACHARY G.F. ABRAHAMSON
Assistant United States Attorneys

6