PATRICK D. ROBBINS (CABN 152288))
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6912
    Fax: (415) 436-7234
    Email: Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>   v.<br><br>MICHAEL RICHARD LYNCH AND<br>STEPHEN KEITH CHAMBERLAIN,<br><br>    Defendant. | No. CR-18-577 CRB<br><br>DECLARATION OF KRISTINA GREEN IN SUPPORT OF GOVERNMENT'S MOTION TO ADMIT SETTLEMENT AGREEMENTS WITH REENA PRASAD, BRENT HOGENSON, AND PERCY TEJEDA |

I, Kristina Green, declare and state as follows:

    1.  I am an Assistant United States Attorney for the Northern District of California assigned to the prosecution of the above-captioned case.

    2.    Attached hereto as Exhibit 1614 is a true and correct copy of Reena Prasad's settlement agreement.

3.     Attached hereto as Exhibit 1623 is a true and correct copy of Percy Tejeda's settlement agreement.

4.     Attached hereto as Exhibit 13037 is a true and correct copy of an email from Brent Hogenson to Dr. Lynch, dated June 22, 2010.

5.     Attached here as Exhibit 10094 is a true and correct copy of an email from Brent Hogenson to Dr. Lynch, dated June 23, 2010.

6.     Attached hereto as Exhibit 3789 is a true and correct copy of an email Brent Hogenson sent to Deloitte, dated June 26, 2010.

7.     Attached hereto as Exhibit 1012 is a true and correct copy of a letter Brent Hogenson sent to the Financial Services Authority, dated July 26, 2010.

8.     Attached hereto as Exhibit 13059 is a true and correct copy of Brent Hogenson's settlement agreement.

9.     Attached hereto as Exhibit 6256 is a true and correct copy of an email Brent Hogenson sent to the SEC, dated August 20, 2010.

10.    Attached hereto as Exhibit 1542 is a true and correct copy of a letter the Financial Reporting Review Panel sent to Autonomy, dated February 2, 2011.

11.    Attached hereto as Exhibit A is a true and correct copy of the government's 404(b) notice.


I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

DATED:  March 19, 2024

_____/s/_____
KRISTINA GREEN
Assistant United States Attorney

# EXHIBIT 1614

**CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE**

This Confidential Settlement Agreement and Release of All Claims (hereafter "Agreement") is entered into this *16* day of March, 2011 (the "Effective Date") between Reena Prasad ("Prasad"), and Autonomy Corporation plc, a public limited company of the United Kingdom, Autonomy, Inc., a New Jersey Corporation, and Interwoven, Inc., a Delaware Corporation ( together with its or their affiliates or subsidiaries referred to herein as "Autonomy" or the "Company") (Autonomy and Prasad are collectively referred to herein as the "Parties").

WHEREAS, Prasad's last day of employment with Autonomy was July 30, 2010 (the "Termination Date");

WHEREAS, a dispute has arisen between Prasad and Autonomy regarding Autonomy's employment of Prasad and its termination thereof in that Prasad alleges that she was terminated in violation of federal whistleblower protection laws and California-based public policy, and in that Autonomy alleges that Prasad breached her employment agreement with Autonomy and violated Company policies relating to, among other things, the authorization of payments to third parties and internal company investigations;

WHEREAS, each Party denies the other's allegations that they engaged in any improper or illegal conduct and Autonomy, Inc. and Autonomy Corporation plc deny being Prasad's employer and contend she was employed solely by Interwoven, Inc.; and

WHEREAS, to settle their dispute and to avoid the costs and inconvenience of litigation and appeals, the parties have negotiated a settlement of the disputed claims which is set forth below;

THEREFORE, in exchange for the good and valuable consideration set forth herein, the adequacy of which is specifically acknowledged, the Parties hereby agree as follows:

1. <u>Consideration</u>. In addition to the covenants and mutual releases contained herein, the Parties agree to the following consideration for signing this Agreement:

    (a)   <u>Payment by Autonomy</u>: Autonomy agrees to pay Prasad the total sum gross of Seventy Five Thousand Dollars ($75,000.00) ("the Payment"), less deductions and withholdings required by law and payable by one check to Prasad for gross amount of Fifty Five Thousand Dollars $55,000.00 and another to her counsel for gross amount of Twenty Thousand Dollars $20,000.00. Autonomy shall use commercially reasonable efforts to mail Payment ten (10) business days after the Effective Date. Other than Company's obligation and right to withhold federal, state and local taxes, Prasad will be responsible for any and all taxes, interest, and penalties that may be imposed with respect to the payments contemplated by this Agreement and agrees to indemnify and defend the Company for any consequence to Company arising from her failure to pay taxes. Prasad acknowledges and represents that the Company has paid all salary, wages, bonuses, accrued vacation, severance, dues, fees, stock, stock options, vesting, commissions and any and all other benefits and compensation due to her in full.

United States District Court
Northern District of California

**Trial Exhibit 1614**

Case No:   <u>CR 18-0577 CRB</u>
Date Entered: _____
By: _____
Deputy Clerk

SEC-PRASAD-E-0000004

Exh 1614-0001

(b)    Declaration by Prasad:  Prasad agrees to execute a declaration relating to her knowledge of Autonomy's accounts receivable and other accounting policies and practices.  The Parties shall only use such declaration, if ever, exclusively in the manner outlined therein.  A copy of the declaration shall be signed by Prasad and forwarded to and accepted by Autonomy as a condition precedent for this Agreement to take effect.  Unless otherwise indicated in the declaration itself, which language shall be controlling notwithstanding any provision of this Agreement, the declaration shall be deemed part of the "Settlement Information" described in paragraph 6 below and shall be subject to the confidentiality requirements set forth in paragraph 6 below.

2.    Release by Prasad.  Prasad, on behalf of herself and her executors, heirs, representatives and assigns, hereby releases and forever discharges Autonomy and all predecessors, successors and their respective parent corporations, affiliates, related, and/or subsidiary entities, and all of their past and present directors, shareholders, officers, partners, agents, insurers, accountants and attorneys, and all other persons acting by, through, under or in concert with any of them (collectively, the "Autonomy Releasees"), from any and all claims, debts, demands, accounts, judgments, rights, causes of action, equitable relief, damages, costs, charges, complaints, obligations, promises, agreements, controversies, suits, expenses, compensation, responsibility and liability of every kind and character whatsoever (including, but not limited to, attorneys' fees and costs), whether in law or equity, known or unknown, asserted or unasserted, suspected or unsuspected (collectively, "Claims"), which Prasad has or may have had against any of the Autonomy Releasees based on any events or circumstances arising or occurring on or prior to the date hereof, including without limitation any and all claims relating to or arising from Prasad's employment relationship with Autonomy and/or the termination of that relationship; (2) all claims related to Prasad's compensation or benefits from the Company, including wages, salary, bonuses, commissions, vacation pay, expense reimbursements (to the extent permitted by applicable law), severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (3) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (4) all tort claims, including without limitation claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (5) all federal, state, and local statutory claims, including without limitation claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990, the federal Worker Adjustment and Retraining Notification Act (as amended) and similar laws in other jurisdictions, the Employee Retirement Income Security Act of 1974 (as amended), the Family and Medical Leave Act of 1993, and the California Fair Employment and Housing Act (as amended) and similar laws in other jurisdictions.  This Agreement includes a release of claims of discrimination or retaliation on the basis of workers' compensation status, but does not include workers' compensation claims for benefits.  Prasad warrants and represents that she is unaware of any basis for filing a claim for workers compensation benefits.

3.    Knowing and Voluntary Release.  Prasad acknowledges that the waiver and release is knowing and voluntary.  Prasad further acknowledges that he/she has been advised by the Company in writing of the following: a) she has the right to consult with an attorney of her choice before accepting this offer; and b) she has seven days from the date this offer is received to consider this offer;

SEC-PRASAD-E-0000005

Prasad agrees that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to (a) any obligations incurred under this Agreement; (b) any vested rights under pension or retirement plans; (c) any rights Prasad may have to indemnification under California Labor Code Section 2802; (d) any obligations which cannot be released by law; and (e) any rights Prasad may have to unemployment benefits under applicable state law; and (f) any right Prasad may have to participate in an EEOC, SEC, or FSA investigation, hearing or proceeding, provided, however, that by signing this Agreement, Prasad understands and agrees that Prasad is waiving the right to bring a lawsuit against Autonomy and the Autonomy Releasees and waives her right to any personal recovery in any action brought by the EEOC or any other state, federal, or other governmental agency on her behalf.

4.    Release by Autonomy  Autonomy, on behalf of itself and all predecessors, successors and their respective parent corporations, affiliates, related, and/or subsidiary entities, and all of their past and present directors, shareholders, officers, partners, employees, agents, insurers, and attorneys, and all other persons acting by, through, under or in concert with it hereby agrees to release and forever discharge Prasad, on behalf of herself and her executors, heirs, representatives and assigns, (collectively, the "Prasad Releasees"), from any and all claims, debts, demands, accounts, judgments, rights, causes of action, equitable relief, damages, costs, charges, complaints, obligations, promises, agreements, controversies, suits, expenses, compensation, responsibility and liability of every kind and character whatsoever (including, but not limited to, attorneys' fees and costs), whether in law or equity, known or unknown, asserted or unasserted, suspected or unsuspected (collectively, " Released Claims"), which Autonomy has or may have had against such persons or entities based on any events or circumstances arising or occurring on or prior to the date hereof, including without limitation any and all claims arising out of or relating to Prasad's employment relationship with Interwoven and/or Autonomy or the termination of that relationship, Prasad's employment agreement with Autonomy, but excluding any claims for embezzlement, fraud, misuse or misappropriation of trade secrets or noncompliance with any obligations under this Agreement or any agreement referenced in paragraph 20 of this Agreement.

5.    Waiver of Unknown Claims.  The Parties acknowledge that they have been advised of and are familiar with the provisions of California Civil Code Section 1542, which provides as follows:

**"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

Being aware of section 1542, the Parties hereby expressly waive any rights they may have thereunder, as well as under any other statutes or common law principles of similar effect. Thus, notwithstanding the provisions of section 1542, or any other statue of common law principle of similar effect, and to implement a full and complete release of all claims, the Parties expressly acknowledge this Agreement is intended to include in its effect, without limitation, all claims not known or suspected to exist in their favor at the time of signing this Agreement,

SEC-PRASAD-E-0000006

Exh 1614-0003

and that this Agreement contemplates the extinguishment of any such Claims or Released Claims. The Parties warrant they have read this Agreement, including this waiver of California Civil Code section 1542, and have consulted counsel about this Agreement and specifically about this waiver of section 1542, and that they understand this Agreement and the section 1542 waiver. The Parties therefore freely and knowingly enter into this Agreement. The Parties acknowledge that they may later discover facts different from or in addition to those they now know or believe to be true regarding the matters released or described in this Agreement, and even so agree the releases and agreements contained in this Agreement shall remain effective in all respects notwithstanding any later discovery of any different or additional facts. The parties assume any and all risk of any mistake in connection with the true facts involved in the matters, disputes or controversies described in this Agreement or with regard to any facts now unknown relating to those matters.

6.   No Future Claims or Lawsuits. Prasad represents that she has not filed or initiated, and promises that she will not hereafter file or initiate, any compliance review, action or proceeding, claim, arbitration or lawsuit, or participate in the same, individually or as a member of a class, against any of the Autonomy Releasees under any contract (express or implied) or any federal, state or local law, statute or regulation pertaining in any manner to any of the Released Claims. Without limiting the foregoing, Prasad warrants and represents that she has no basis for initiating a claim under the SOX civil whistleblower provision (18 USA Section 1514A ("Section 1514A")) and acknowledges and agrees that there would be no jurisdiction over Autonomy to do so and, in event that she ever initiates such a claim, she will immediately instruct any agency or court to dismiss it with prejudice.

7.   Nondisparagement. Prasad agrees that neither she nor anyone acting by, through, or in concert with her, shall, orally or in writing, disparage, denigrate, defame, or slander, Autonomy or its business, directors, officers, employees, products, services or business practices or any the Autonomy Releasees; Employee also agrees not to tortiously interfere with the Company's actual or prospective business relationship or expectancies. Autonomy agrees that neither it nor its officers shall, orally or in writing disparage, defame, or slander Prasad. In addition, Prasad agrees to direct any request for job reference/verification to Company's Head of US Human Resources (currently, Susan Solat) and, in that case, Autonomy will provide only Prasad's dates of employment, last position held, and salary. Notwithstanding the foregoing, nothing herein is intended to or shall prohibit either Prasad or Autonomy from testifying truthfully if called to do so.

8.   Confidentiality. The Parties hereby agree to maintain in confidence the existence of this Agreement, the contents and terms of this Agreement and all prior drafts and negotiations, and the consideration of this Agreement (hereinafter collectively referred to as the "Settlement Information"). The Parties agree, covenant, and promise that, except to the extent required by law, they shall keep confidential and not publicize or disclose the Settlement Information in any manner whatsoever, whether in writing or orally, to any person, directly or indirectly, or by or through any agent or representative, other than to the following: (1) their attorneys; (2) their accountants; (3) their tax consultants or financial advisors; (4) Prasad's immediate family and fiancé, and (5) such other representatives or entities required by law and/or court order. With respect to any individuals referred to in this Paragraph, subparts (1) through (5) to whom the

SEC-PRASAD-E-0000007

Exh 1614-0004

Parties disclose any Settlement Information, the Parties agree that they will inform such individual(s) that the information is strictly confidential and may not be reviewed, discussed or disclosed, orally or in writing with any other person, organization or entity. The parties agree that any such individual(s) in this Paragraph, subparts (1) through (5), to whom the Settlement Information is disclosed, shall be deemed to be an agent of Prasad for the purpose of assessing liability, and any breach of confidentiality by any such individual(s) shall be deemed to be a material a breach of this Agreement by Prasad. In the event of any inquiry about the disputed matters resolved by this Agreement, the Parties agree to respond only that the matter was resolved.

Prasad covenants that prior to execution of this Agreement she has discussed the potential for litigation based on Autonomy's termination of her employment only with the following persons (1) her counsel, Cliff Palefsky, Esq. and Scott Stillman, Esq.; (2) her Father, Nand Prasad; (3) her Mother, Mildred Prasad; (3) her sister, Sonia Quesada; (4) her brother-in-law, Ramon Quesada; (5) her fiancé, Uygar Ozkan; (6) her uncle who is an attorney, Patrick Nakamura; (7) Brent Hogenson; (8) Percy Tejada; (9) Jessica Martens; (10) her friend Josh Dang; (11) her friend Yvonne Borell; (12) her psychiatrist; and (13) her therapist.

In the event that a Party is required by law or court order to disclose, publicize, or to permit, authorize, or instigate the disclosure of any Settlement Information, in whole or in part, the disclosing Party must notify the other Party in writing, with a copy by electronic mail, as provided for in paragraph 13 below, at least ten (10) business days prior to the disclosure in order to provide the other Party with the opportunity to object to such disclosure. To the extent a subpoena or document demand is issued to Prasad or to any of the individuals identified in subparts (1) to (5) above requesting any of the Settlement Information, including any related documents or correspondence between the Parties or any testimony related to such documents or correspondence, Prasad shall immediately notify Autonomy of the receipt of such subpoena or deposition notice or document demand, and shall cooperate in any effort by Autonomy to object to or quash such subpoena, or object to or obtain a motion for a protective order related to such deposition notice or document demand. Prasad understands that time is of the essence in responding to such a subpoena or deposition notice or document demand, and any delay in notifying Autonomy of the receipt of such a document shall be severely prejudicial to Autonomy, and therefore shall be deemed a material breach of this Agreement.

Nothing in this Section shall preclude the Parties from disclosing this Agreement, or the Settlement Information, in the event of a breach to allow the non-breaching party to enforce its rights under the Agreement. Such disclosure shall be limited to those provisions necessary to remedy the breach. In the event of a dispute between the Parties, the Party moving to enforce the terms of this Agreement shall use its or her best efforts to preserve the confidentiality of this Agreement. Any such enforcement action shall be filed exclusively in the arbitration forum set forth in paragraph 19 below, and, in any subsequent petition to confirm or set aside an arbitration award in court, the Parties shall use their best efforts to file

SEC-PRASAD-E-0000008

Exh 1614-0005

any Settlement Information set forth in their subsequent motions, oppositions or reply briefs, under seal.

The Parties understand that confidentiality is a paramount concern in entering into this Agreement. The breach of this confidentiality provision by either Prasad or any of the individuals set forth in subparts (1) through (5) above, or a material breach of any other provision of this Agreement by Prasad, shall automatically entitle Autonomy to recover the entire consideration paid to Prasad under paragraph 1(a) of this Agreement and all other damages, plus interest, costs, and attorneys' fees involved in recovering such damages.

9.   No Admission of Liability. Each party agrees and understands this Agreement constitutes a compromise settlement of disputed claims. The furnishing of the consideration for this Agreement shall not at any time for any purpose be deemed or construed by the Parties or by anyone else as an admission of liability or responsibility by either Party or by any of the respective Releasees. Each party further agrees and understands that Prasad and Autonomy enter into this Agreement solely for the purpose of avoiding the expense and inconvenience of litigation.

10.   No Assignment of Claims. The parties represent that they have not heretofore assigned or transferred, nor purported to assign or transfer, to any person or entity, any of the Claims or Released Claims or any portion thereof or any interest therein.

11.   No Reliance on Representations. The Parties acknowledge that in entering this Agreement, they do not rely and have not relied upon any representation or statement made by either party or by any of their agents, representatives or attorneys, with regard to the subject matter, basis, or effect of this Agreement or otherwise, except as expressly stated in this Agreement.

12.   Choice of Law. This Agreement shall in all respects be governed and construed in accordance with the laws of the State of California, including all matters of construction, validity and performance, without regard to conflicts of law principles.

13.   Notices. All notices, demands or other communications regarding this Agreement shall be in writing and shall be sufficiently given if either personally delivered or sent by overnight delivery, with a copy via electronic mail, addressed as follows:

If to Autonomy:

Joel Scott, COO and General Counsel of Autonomy, Inc. (joels@autonomy.com)

One Market Street Spear Street Tower, Suite 1900, San Francisco, CA 94105

If to the Employee:

Reena Prasad
956 Helena Dr.
Sunnyvale, CA  94087

SEC-PRASAD-E-0000009

Exh 1614-0006

14.    Severability.  Except as otherwise specified below, should any portion of this Agreement be found void or unenforceable for any reason by a court of competent jurisdiction, the parties intend that such provision be limited or modified so as to make it enforceable, and if such provision cannot be modified to be enforceable, the unenforceable portion shall be deemed severed from the remaining portions of this Agreement, which shall otherwise remain in full force and effect.  If any portion of this Agreement is so found to be void or unenforceable for any reason in regard to any one or more persons, entities, or subject matters, such portion shall remain in full force and effect with respect to all other persons, entities, and subject matters.  This paragraph shall not operate, however, to sever either party's obligation to provide the binding release to all entities intended to be released hereunder.

15.    Understanding and Authority.  The parties understand and agree that all terms of this Agreement are contractual and are not a mere recital, and represent and warrant that they are competent to covenant and agree as herein provided.

16.    Voluntary and Knowing.  This Agreement is executed voluntarily and without any duress or undue influence on the parties hereto.  The parties acknowledge that:

(a)    They have had a reasonable time within which to consider this Agreement before executing it;

(b)    They have read this Agreement;

(c)    They have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice or that they have voluntarily declined to seek such counsel;

(d)    They understand the terms and consequences of this Agreement and of the releases it contains;

(e)    They knowingly and voluntarily agree to all of the terms set forth in this Agreement; and

(f)    They are fully aware of the legal and binding effect of this Agreement.

17.    Entire Agreement.  This Agreement, contains the entire, final and exclusive agreement of the parties and no promise made by any party or by any officer, attorney, or agent of any party that is not expressly contained in this Agreement shall be binding or valid.  Any modification of any provision of this Agreement, to be effective, must be in writing and signed by all parties.

18.    Binding Effect.  Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

19.    Arbitration.  In the event of any dispute or claim arising out of this Agreement or any dispute related in any manner whatsoever to Prasad's employment with Interwoven and/or Autonomy, the Parties agree that all such disputes shall be fully and finally resolved by JAMS in

SEC-PRASAD-E-0000010

Exh 1614-0007

San Francisco, California. Moreover, Prasad agrees that any discovery in such an action will be governed by a confidentiality agreement on terms acceptable to Autonomy and that she hereby stipulates to entry of a protective order consistent with the foregoing. Autonomy and Prasad irrevocably submit to the exclusive jurisdiction of any state or federal court located in or for Santa Clara County, California over any suit, action or proceeding arising out of or relating to or concerning the employment relationship that is not otherwise arbitrated or resolved according to the preceding two sentences. This includes any suit, action or proceeding to compel arbitration or to enforce an arbitration award. Notwithstanding the foregoing, nothing herein shall preclude Autonomy from bringing any action or proceeding in any other court for the purpose of enforcing the provisions of the agreement to arbitrate. This mutual agreement to arbitrate does not prevent Prasad filing administrative claim with the Labor Commissioner, EEOC or DFEH, but any ensuing lawsuit would then have to proceed in arbitration and not in Court. This agreement to arbitrate is entered into solely in the context of an individually negotiated severance agreement.

20.    Proprietary Information. Prasad confirms that she has signed and remains bound by the terms and conditions of the Employee Confidential Information and Inventions Agreement dated May 18, 2001 and any other agreement concerning confidential or proprietary information of Autonomy, all of which are incorporated by reference into this Agreement and survive following this Agreement. Without limiting obligations from the foregoing sentence, Prasad represents and agrees that she has returned to the Company: all computer equipment, home office equipment or other business equipment and other property belonging to the Company and/or its affiliates, including, but not limited to, building keys, software, records, performance, research information, any and all documents, files, notes, emails, memoranda, databases, computer files, software, research projects and/or computer programs relating to the Company's business; lists of Company customers or leads or referrals to prospective customers; computers, parking passes, computer disks (or other computer-generated files or data) or copies thereof created on any medium, prepared or obtained by her or others in the course of or incident to her employment with the Company that was in her custody, possession or control. Without limiting the rights and obligations under the foregoing sentence, if Prasad later discovers that she has retained any property, proprietary or confidential information (including, but not limited to, proprietary or confidential information contained in any electronic documents or e-mail systems in her possession or control), Prasad also agrees immediately upon discovery to send an email to the Company according to paragraph 13 as to the nature and location of the property or information that she has retained so that the Company may arrange to remove, recover, and/or collect such information. The Payment and other benefits under this Agreement will not be paid or provided until all Company property has been returned to Company.

21.    No Future Relationship. Prasad agrees not to apply for employment with Autonomy, or any of its current or later-acquired subsidiaries or affiliates, and forsakes any right to be employed by any of them. Company's (or any of its current or later-acquired subsidiaries' or affiliates') refusal to employ Prasad shall not be the basis of any cause of action against any of them.

22.    Cooperation. Prasad agrees to provide reasonable cooperation to the Company in connection with any pending or future litigation or arbitration brought against the Company and in any investigation the Company may conduct.

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed the foregoing on the dates shown below.

Reena Prasad

Signature: _Reena D Puasad_

Date: _March 16_ , 2011

**Approved as to form:**

McGuinn Hillsman & Palefsky

By: _____

Cliff Palefsky

Attorneys for Reena Prasad

Date: _3/18/11_ , 2011

Autonomy Corporation PLC, Autonomy, Inc., and Interwoven, Inc

Signature: _____

Date: _3/21_ , 2011

**Approved as to form:**

Futterman Dupree Dodd Croley Maier LLP

By: _____

Daniel Croley

Attorneys Autonomy Corporation PLC, Autonomy, Inc., and Interwoven, Inc

Date: _3/21_ , 2011

SEC-PRASAD-E-0000012

Exh 1614-0009

# EXHIBIT 1623

## CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Confidential Settlement Agreement and Release of All Claims (hereafter "Agreement") is entered into this *20th* day of March, 2011 (the "Effective Date") between Percy Tejeda ("Tejeda"), and Autonomy Corporation plc, a public limited company of the United Kingdom, Autonomy, Inc., a New Jersey Corporation, and Interwoven, Inc., a Delaware Corporation (together with its or their affiliates or subsidiaries referred to herein as "Autonomy" or the "Company") (Autonomy and Tejeda are collectively referred to herein as the "Parties").

WHEREAS, Tejeda's last day of employment with Autonomy was July 30, 2010 (the "Termination Date");

WHEREAS, a dispute has arisen between Tejeda and Autonomy regarding Autonomy's employment of Tejeda and its termination thereof in that Tejeda alleges that he was terminated in violation of federal whistleblower protection laws and California common law;

WHEREAS, each Party denies the other's allegations that they engaged in any improper or illegal conduct and Autonomy, Inc. and Autonomy Corporation plc deny being Tejeda's employer and contend he was employed solely by Interwoven, Inc.; and

WHEREAS, to settle their dispute and to avoid the costs and inconvenience of litigation and appeals, the parties have negotiated a settlement of the disputed claims which is set forth below;

THEREFORE, in exchange for the good and valuable consideration set forth herein, the adequacy of which is specifically acknowledged, the Parties hereby agree as follows:

1.    Consideration. In addition to the covenants and mutual releases contained herein, the Parties agree to the following consideration for signing this Agreement:

(a)    Payment by Autonomy: Autonomy agrees to pay Tejeda the total sum of One Hundred and Five Thousand Dollars ($105,000.00) ("the Payment"), less deductions and withholdings required by law, $38,322.00 of which shall be paid in full satisfaction of Tejeda's severance claim. Autonomy shall use commercially reasonable efforts to mail Payment ten (10) business days after the Effective Date. Other than Company's obligation and right to withhold federal, state and local taxes, Tejeda will be responsible for any and all taxes, interest and penalties that may be imposed with respect to the payments contemplated by this Agreement and agrees to indemnify and defend the Company for any consequence to Company arising from his failure to pay taxes. Tejeda acknowledges and represents that the Company has paid all salary, wages, bonuses, accrued vacation, severance, dues, fees, stock, stock options, vesting, commissions and any and all other benefits and compensation due to him in full.

(b)    Affidavit by Tejeda: Tejeda agrees to execute an affidavit (or declaration under penalty of perjury) relating to his knowledge of Autonomy's accounting policies and practices. The Parties shall use such affidavit, if ever, exclusively in the manner outlined therein. A copy of the affidavit shall be signed by Tejeda and forwarded to and accepted by Autonomy as a condition precedent for this Agreement to take effect. Unless

1



**EXHIBIT**

*59*

SF-3853

US_SEC_EX 00000418

Exh 1623-0001

otherwise indicated in the affidavit itself, which language shall be controlling notwithstanding any provision of this Agreement, the affidavit shall be deemed part of the "Settlement Information" described in paragraph 6 below and shall be subject to the confidentiality requirements set forth in paragraph 6 below.

2.  Release by Tejeda. Tejeda, on behalf of himself and his executors, heirs, representatives and assigns, hereby releases and forever discharges Autonomy and all predecessors, successors and their respective parent corporations, affiliates, related, and/or subsidiary entities, and all of their past and present directors, shareholders, officers, partners, agents, insurers, accountants and attorneys, and all other persons acting by, through, under or in concert with any of them (collectively, the "Autonomy Releasees"), from any and all claims, debts, demands, accounts, judgments, rights, causes of action, equitable relief, damages, costs, charges, complaints, obligations, promises, agreements, controversies, suits, expenses, compensation, responsibility and liability of every kind and character whatsoever (including, but not limited to, attorneys' fees and costs), whether in law or equity, known or unknown, asserted or unasserted, suspected or unsuspected (collectively, "Claims"), which Tejeda has or may have had against any of the Autonomy Releasees based on any events or circumstances arising or occurring on or prior to the date hereof, including without limitation any and all claims relating to or arising from Tejeda's employment relationship with Autonomy and/or the termination of that relationship; (2) all claims related to Tejeda's compensation or benefits from the Company, including wages, salary, bonuses, commissions, vacation pay, expense reimbursements (to the extent permitted by applicable law), severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (3) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (4) all tort claims, including without limitation claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (5) all federal, state, and local statutory claims, including without limitation claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990, the federal Worker Adjustment and Retraining Notification Act (as amended) and similar laws in other jurisdictions, the Employee Retirement Income Security Act of 1974 (as amended), the Family and Medical Leave Act of 1993, and the California Fair Employment and Housing Act (as amended) and similar laws in other jurisdictions. This Agreement includes a release of claims of discrimination or retaliation on the basis of workers' compensation status, but does not include workers' compensation claims for benefits. Tejeda warrants and represents that he is unaware of any basis for filing a claim for workers compensation benefits. This release and this Agreement shall be effective only upon Tejeda's receipt of the payment specified in paragraph 1(a) above by the deadline specified therein. Autonomy's failure to make such a payment shall render this entire Agreement null and void and of no legal force or effect.

3.  Knowing and Voluntary Release. Tejeda acknowledges that the waiver and release is knowing and voluntary. Tejeda further acknowledges that he has been advised by the Company in writing of the following: a) he has the right to consult with an attorney of his choice before accepting this offer; and b) he has seven days from the date this offer is received to consider this offer;

Tejeda agrees that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to (a) any obligations incurred under this Agreement; (b) any vested rights

2

under pension or retirement plans; (c) any rights Tejeda may have to indemnification under California Labor Code Section 2802; (d) any obligations which cannot be released by law; and (e) any rights Tejeda may have to unemployment benefits under applicable state law; and (f) any right Tejeda may have to participate in an EEOC, SEC, or FSA investigation, hearing or proceeding, provided, however, that by signing this Agreement, Tejeda understands and agrees that Tejeda is waiving the right to bring a lawsuit against Autonomy and the Autonomy Releasees and waives his right to any personal recovery in any action brought by the EEOC or any other state, federal, or other governmental agency on his behalf.

4.     <u>Release by Autonomy</u>  Autonomy, on behalf of itself and all predecessors, successors and their respective parent corporations, affiliates, related, and/or subsidiary entities, and all of their past and present directors, shareholders, officers, partners, employees, agents, insurers, and attorneys, and all other persons acting by, through, under or in concert with it hereby agrees to release and forever discharge Tejeda, on behalf of himself and his executors, heirs, representatives and assigns, (collectively, the "Tejeda Releasees"), from any and all claims, debts, demands, accounts, judgments, rights, causes of action, equitable relief, damages, costs, charges, complaints, obligations, promises, agreements, controversies, suits, expenses, compensation, responsibility and liability of every kind and character whatsoever (including, but not limited to, attorneys' fees and costs), whether in law or equity, known or unknown, asserted or unasserted, suspected or unsuspected (collectively, "Released Claims"), which Autonomy has or may have had against such persons or entities based on any events or circumstances arising or occurring on or prior to the date hereof, including without limitation any and all claims arising out of or relating to Tejeda's employment relationship with Interwoven and/or Autonomy or the termination of that relationship, Tejeda's employment agreement with Autonomy, but excluding any claims for embezzlement, fraud, misuse or misappropriation of trade secrets or noncompliance with any obligations under this Agreement or any agreement referenced in paragraph 20 of this Agreement. Autonomy represents and warrants to Tejeda that it is unaware of any basis for filing a claim for embezzlement, fraud, misuse or misappropriation of trade secrets against him.

5.     <u>Waiver of Unknown Claims</u>.  The Parties acknowledge that they have been advised of and are familiar with the provisions of California Civil Code Section 1542, which provides as follows:

**"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

Being aware of section 1542, the Parties hereby expressly waive any rights they may have thereunder, as well as under any other statutes or common law principles of similar effect. Thus, notwithstanding the provisions of section 1542, or any other statue of common law principle of similar effect, and to implement a full and complete release of all claims, the Parties expressly acknowledge this Agreement is intended to include in its effect, without limitation, all claims not known or suspected to exist in their favor at the time of signing this Agreement, and that this Agreement contemplates the extinguishment of any such Claims or Released Claims. The Parties

US_SEC_EX 00000420

Exh 1623-0003

warrant they have read this Agreement, including this waiver of California Civil Code section 1542, and have consulted counsel about this Agreement and specifically about this waiver of section 1542, and that they understand this Agreement and the section 1542 waiver. The Parties therefore freely and knowingly enter into this Agreement. The Parties acknowledge that they may later discover facts different from or in addition to those they now know or believe to be true regarding the matters released or described in this Agreement, and even so agree the releases and agreements contained in this Agreement shall remain effective in all respects notwithstanding any later discovery of any different or additional facts. The parties assume any and all risk of any mistake in connection with the true facts involved in the matters, disputes or controversies described in this Agreement or with regard to any facts now unknown relating to those matters.

6.     No Future Claims or Lawsuits. Tejeda represents that he has not filed or initiated, and promises that he will not hereafter file or initiate, any compliance review, action or proceeding, claim, arbitration or lawsuit, or participate in the same, individually or as a member of a class, against any of the Autonomy Releases under any contract (express or implied) or any federal, state or local law, statute or regulation pertaining in any manner to any of the Released Claims. Without limiting the foregoing, Tejeda warrants and represents that he has no basis for initiating a claim under the SOX civil whistleblower provision (18 U.S.C. Section 1514A ("Section 1514A")) and acknowledges and agrees that there would be no jurisdiction over Autonomy to do so and, in event that he ever initiates such a claim, he will immediately instruct any agency or court to dismiss it with prejudice.

7.     Nondisparagement. Tejeda agrees that neither he nor anyone acting by, through, or in concert with him, shall, orally or in writing, disparage, denigrate, defame, or slander, Autonomy or its business, directors, officers, employees, products, services or business practices or any the Autonomy Releasees; Employee also agrees not to tortiously interfere with the Company's actual or prospective business relationship or expectancies. Autonomy agrees that neither it nor its officers shall, orally or in writing disparage, defame, or slander Tejeda. In addition, Tejeda agrees to direct any request for job reference/verification to Company's Head of US Human Resources (currently, Susan Solat) and, in that case, Autonomy will provide only Tejeda's dates of employment, last position held, and salary. Notwithstanding the foregoing, nothing herein is intended to or shall prohibit either Tejeda or Autonomy from testifying truthfully if called to do so.

8.     Confidentiality. The Parties hereby agree to maintain in confidence the existence of this Agreement, the contents and terms of this Agreement and all prior drafts and negotiations, and the consideration of this Agreement (hereinafter collectively referred to as the "Settlement Information"). The Parties agree, covenant, and promise that, except to the extent required by law, they shall keep confidential and not publicize or disclose the Settlement Information in any manner whatsoever, whether in writing or orally, to any person, directly or indirectly, or by or through any agent or representative, other than to the following: (1) their attorneys; (2) their accountants; (3) their tax consultants or financial advisors; (4) Tejeda's spouse, and (5) such other representatives or entities required by law and/or court order. With respect to any individuals referred to in this Paragraph, subparts (1) through (5) to whom the Parties disclose any Settlement Information, the Parties agree that they will inform such individual(s) that the information is strictly confidential and may not be reviewed, discussed or disclosed, orally or in writing with any other person, organization

4

US_SEC_EX 00000421

Exh 1623-0004

or entity.  The parties agree that any such individual(s) in this Paragraph, subparts (1) through (5), to whom the Settlement Information is disclosed, shall be deemed to be an agent of Tejeda for the purpose of assessing liability, and any breach of confidentiality by any such individual(s) shall be deemed to be a material a breach of this Agreement by Tejeda.  In the event of any inquiry about the disputed matters resolved by this Agreement, the Parties agree to respond only that the matter was resolved.

Tejeda covenants that prior to execution of this Agreement he has discussed the potential for litigation based on Autonomy's termination of his employment only with the following persons (1) his counsel, Christopher Cooke, Esq. and Jeffrey W. Kobrick of Cooke Kobrick & Wu, LLP; (2) Brent Hogenson (before Mr. Tejeda's termination from Interwoven); and (3) his wife.

In the event that a Party is required by law or court order to disclose, publicize, or to permit, authorize, or instigate the disclosure of any Settlement Information, in whole or in part, the disclosing Party must notify the other Party in writing, with a copy by electronic mail, as provided for in paragraph 13 below, at least ten (10) business days prior to the disclosure in order to provide the other Party with the opportunity to object to such disclosure.  To the extent a subpoena or document demand is issued to Tejeda or to any of the individuals identified in subparts (1) to (5) above requesting any of the Settlement Information, including any related documents or correspondence between the Parties or any testimony related to such documents or correspondence, Tejeda shall immediately notify Autonomy of the receipt of such subpoena or deposition notice or document demand, and shall cooperate in any effort by Autonomy to object to or quash such subpoena, or object to or obtain a motion for a protective order related to such deposition notice or document demand.  Tejeda understands that time is of the essence in responding to such a subpoena or deposition notice or document demand, and any delay in notifying Autonomy of the receipt of such a document shall be severely prejudicial to Autonomy, and therefore shall be deemed a material breach of this Agreement.

Nothing in this Section shall preclude the Parties from disclosing this Agreement, or the Settlement Information, in the event of a breach to allow the non-breaching party to enforce its rights under the Agreement.  Such disclosure shall be limited to those provisions necessary to remedy the breach.  In the event of a dispute between the Parties, the Party moving to enforce the terms of this Agreement shall use its or his best efforts to preserve the confidentiality of this Agreement.  Any such enforcement action shall be filed exclusively in the arbitration forum set forth in paragraph 19 below, and, in any subsequent petition to confirm or set aside an arbitration award in court, the Parties shall use their best efforts to file any Settlement Information set forth in their subsequent motions, oppositions or reply briefs, under seal.

The Parties understand that confidentiality is a paramount concern in entering into this Agreement.  The breach of this confidentiality provision by either Tejeda or any of the individuals set forth in subparts (1) through (5) above, or a material breach of any other provision of this Agreement by Tejeda, shall automatically entitle Autonomy to recover the entire consideration paid to Tejeda under paragraph 1(a) of

5

US_SEC_EX 00000422

Exh 1623-0005

this Agreement and all other damages, plus interest, costs, and attorneys' fees involved in recovering such damages.

9.      No Admission of Liability.  Each party agrees and understands this Agreement constitutes a compromise settlement of disputed claims.  The furnishing of the consideration for this Agreement shall not at any time for any purpose be deemed or construed by the Parties or by anyone else as an admission of liability or responsibility by either Party or by any of the respective Releasees.  Each party further agrees and understands that Tejeda and Autonomy enter into this Agreement solely for the purpose of avoiding the expense and inconvenience of litigation.

10.     No Assignment of Claims.  The parties represent that they have not heretofore assigned or transferred, nor purported to assign or transfer, to any person or entity, any of the Claims or Released Claims or any portion thereof or any interest therein.

11.     No Reliance on Representations.  The Parties acknowledge that in entering this Agreement, they do not rely and have not relied upon any representation or statement made by either party or by any of their agents, representatives or attorneys, with regard to the subject matter, basis, or effect of this Agreement or otherwise, except as expressly stated in this Agreement.

12.     Choice of Law.  This Agreement shall in all respects be governed and construed in accordance with the laws of the State of California, including all matters of construction, validity and performance, without regard to conflicts of law principles.

13.     Notices.  All notices, demands or other communications regarding this Agreement shall be in writing and shall be sufficiently given if either personally delivered or sent by overnight delivery, with a copy via electronic mail, addressed as follows:

If to Autonomy:

Joel Scott, COO and General Counsel of Autonomy, Inc. (joels@autonomy.com)

One Market Street Spear Street Tower, Suite 1900, San Francisco, CA 94105

If to the Employee:

Percy Tejeda
6825 Fox Cliff Way
Elk Grove, CA 95758

14.     Severability.  Except as otherwise specified below, should any portion of this Agreement be found void or unenforceable for any reason by a court of competent jurisdiction, the parties intend that such provision be limited or modified so as to make it enforceable, and if such provision cannot be modified to be enforceable, the unenforceable portion shall be deemed severed from the remaining portions of this Agreement, which shall otherwise remain in full force and effect. If any portion of this Agreement is so found to be void or unenforceable for any reason in regard to any one or more persons, entities, or subject matters, such portion shall remain in full force and effect with respect to all other persons, entities, and subject matters. This paragraph shall not operate, however, to sever either party's obligation to provide the binding release to all entities intended to be

6

US_SEC_EX 00000423

Exh 1623-0006

released hereunder.

15.   Understanding and Authority.   The parties understand and agree that all terms of this Agreement are contractual and are not a mere recital, and represent and warrant that they are competent to covenant and agree as herein provided.

16.   Voluntary and Knowing.   This Agreement is executed voluntarily and without any duress or undue influence on the parties hereto.   The parties acknowledge that:

(a)   They have had a reasonable time within which to consider this Agreement before executing it;

(b)   They have read this Agreement;

(c)   They have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice or that they have voluntarily declined to seek such counsel;

(d)   They understand the terms and consequences of this Agreement and of the releases it contains;

(e)   They knowingly and voluntarily agree to all of the terms set forth in this Agreement; and

(f)   They are fully aware of the legal and binding effect of this Agreement.

17.   Entire Agreement.   This Agreement, contains the entire, final and exclusive agreement of the parties and no promise made by any party or by any officer, attorney, or agent of any party that is not expressly contained in this Agreement shall be binding or valid.   Any modification of any provision of this Agreement, to be effective, must be in writing and signed by all parties.

18.   Binding Effect.   Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

19.   Arbitration.   In the event of any dispute or claim arising out of this Agreement or any dispute related in any manner whatsoever to Tejeda's employment with Interwoven and/or Autonomy, the Parties agree that all such disputes shall be fully and finally resolved by JAMS in San Francisco, California.   Moreover, Tejeda agrees that any discovery in such an action will be governed by a confidentiality agreement on terms acceptable to Autonomy and that he hereby stipulates to entry of a protective order consistent with the foregoing. Autonomy and Tejeda irrevocably submit to the exclusive jurisdiction of any state or federal court located in or for Santa Clara County, California over any suit, action or proceeding arising out of or relating to or concerning the employment relationship that is not otherwise arbitrated or resolved according to the preceding two sentences.   This includes any suit, action or proceeding to compel arbitration or to enforce an arbitration award. Notwithstanding the foregoing, nothing herein shall preclude Autonomy from bringing any action or proceeding in any other court for the purpose of enforcing the

7

US_SEC_EX 00000424

Exh 1623-0007

provisions of the agreement to arbitrate. This mutual agreement to arbitrate does not prevent Tejeda filing administrative claim with the Labor Commissioner, EEOC or DFEH, but any ensuing lawsuit would then have to proceed in arbitration and not in Court. This agreement to arbitrate is entered into solely in the context of an individually negotiated severance agreement.

    20.   <u>Proprietary Information</u>. Tejeda confirms that he has signed and remains bound by the terms and conditions of the Employee Invention Assignment and Confidentiality Agreement dated February 14, 2002 and any other agreement concerning confidential or proprietary information of Autonomy, all of which are incorporated by reference into this Agreement and survive following this Agreement. Without limiting the foregoing obligations, Tejeda represents and agrees that he has returned to the Company: all computer equipment, home office equipment or other business equipment and other property belonging to the Company and/or its affiliates, including, but not limited to, building keys, software, records, performance, research information, any and all documents, files, notes, emails, memoranda, databases, computer files, software, research projects and/or computer programs relating to the Company's business; lists of Company customers or leads or referrals to prospective customers; computers, parking passes, computer disks (or other computer-generated files or data) or copies thereof created on any medium, prepared or obtained by him or others in the course of or incident to his employment with the Company that was in his custody, possession or control, including but not limited to a laptop (with hard drive installed as last used) and two personal hard drives that contain Company and personnel information; provided, however, that Tejeda may remove the personal information before giving the hard drives to the Company. Without limiting the rights and obligations under the forgoing sentence, if Tejeda later discovers that he has retained any property, proprietary or confidential information (including, but not limited to, proprietary or confidential information contained in any electronic documents or e-mail systems in his possession or control), Tejeda also agrees immediately upon discovery to send an email to the Company according to paragraph 13 as to the nature and location of the property or information that he has retained so that the Company may arrange to remove, recover, and/or collect such information. Severance benefits and other benefits under this Agreement will not be paid or provided until all Company property has been returned to Company.

    21.   <u>No Future Relationship</u>. Tejeda agrees not to apply for employment with Autonomy, or any of its current or later-acquired subsidiaries or affiliates, and forsakes any right to be employed by any of them. Company's (or any of its current or later-acquired subsidiaries' or affiliates') refusal to employ Tejeda shall not be the basis of any cause of action against any of them.

    IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed the foregoing on the dates shown below.

US_SEC_EX 00000425

Exh 1623-0008

Percy Tejeda

Signature: _____

Date: _____3/16_____, 2011

Approved as to form:

Cooke Kobrick & Wu LLP

By: _____
Christopher Cooke
Attorneys for Percy Tejeda

Date: _____3/16_____, 2011

Autonomy Corp. PLC, Autonomy, Inc. and Interwoven, Inc.

Signature: _____

Date: __3 | 20__, 2011

Approved as to form:

Futterman Dupree Dodd Croley Maier LLP

By: _____
Daniel Croley
Attorneys Autonomy Corporation PLC,
Autonomy, Inc., and Interwoven, Inc.

Date: _____3/17_____, 2011

9

United States District Court
Northern District of California

**Trial Exhibit 1623**

Case No:    CR 18-0577 CRB
Date Entered: _____
By: _____
Deputy Clerk

US_SEC_EX 00000426

Exh 1623-0009

# EXHIBIT 13037

# REDACTED
# REDACTED
# REDACTED
# REDACTED
# REDACTED
# REDACTED
# REDACTED

FOIA Confidential Treatment Requested



**EXHIBIT**

2/

BHOGE001277

US_SEC_EX 00000118

EXH 13037-0001

**From:** Brent Hogenson
**Sent:** Tuesday, June 22, 2010 4:36 PM
**To:** 'Mike Lynch'
**Subject:** CONFIDENTIAL

Dear Mike,

We consolidated the finance team in the Americas during the second quarter of 2010. As part of this effort, I asked the team to review all financial accounts and account reconciliations across all business units in the Americas as I wanted to ensure that any issues were identified.

During this review I became concerned that Autonomy may have engaged in multiple material transactions with resellers of our software where the available information suggests that we may have materially misstated revenue and income within our reported financial statements in 2008, 2009 and Q1 2010. The evidence that I have gathered suggests that members of your senior management team and other employees may have been engaging in seven and eight figure transactions with resellers where 1) there was no end user and the reseller does not have the ability make the payments under the agreement; 2) there appear to be resellers with related party relationships on revenue transactions; and 3) there appear to be barter transactions where the economic benefit on both sides of the transaction appears to be materially overstated. I consider this a qualifying disclosure made in good faith based upon the evidence currently available to me.

I request a meeting with the audit committee prior to the release of Autonomy's Q2 2010 financial statements to review these matters and ensure that material misstatements, if any, are corrected prior to releasing future financial statements.

I would appreciate your prompt response to my request

**Brent Hogenson**

**President Autonomy Interwoven**

**CFO Autonomy Americas**
**Tel: 408.953.7058**
**Mobile: 408.718.1376**
**E-mail: brent.hogenson@autonomy.com**

FOIA Confidential Treatment Requested

BHOGE001278

US_SEC_EX 00000119

EXH 13037-0002

Brent,

Thank you for your email, which is obviously a surprise to me. As you include no examples in your email, as a first step I would like to understand the evidence you have for these concerns as this is of course an important matter which can only be properly understood with all the facts. I've cc'd Andrew Kanter, the group's General Counsel, on this email to help with the follow-up.

At this stage until I understand why your concerns have arisen, which requires more information underlying your comments, I would like to avoid involving Sushovan and the rest of the finance team to preserve the integrity of the review. Thus please do not discuss this matter with them.

I've reviewed your message below very closely. My understanding of accounting is of course not as experienced as yours, and so admittedly my accounting questions below may be incorrect or inaccurate. However it does seem to me that there may be some inherent false assumptions in your email mainly around the differences between US GAAP and IFRS. Thus in any reply it is very important that make sure you are applying the correct standards in order to end up with an accurate and clear determination of whether there indeed any material issues.

In order to provide an accurate statement of the questions as part of any review, it is important to quickly ascertain whether your concerns have arise due to:

a)      Misunderstandings of IFRS tests versus US GAAP tests;
b)      the fact that (as you correctly state) you have access to only half of the jigsaw puzzle and whether the other pieces have already been given to the auditors and Audit Committee (which, as you state, you have not been a part of) and they have taken them into account and already made suitable decisions;
c)      An accounting policy weakness;
d)      false information being provided to Autonomy or you have information Autonomy does not have which changes its current view; or
e)      the fact that matters you raise have already been identified and considered as a failing by the Audit Committee and have been addressed.

Below I've set out what I think the core questions are, and what I think Andy and I need to gain a full picture. As I read your email to me, the cases you state fall into four categories

1a) No evidence of sell-through by a reseller

I think I am right in saying although this is a test under US GAAP it is not one under IFRS, so I do not quite understand what you are raising here. As a matter of conservatism I expect Autonomy to embrace the old US GAAP idea so as to prevent 'channel stuffing'. However given the generally excellent cash collection from resellers this would appear not to be a problem. I believe that as part of the audit pack deals usually state the intended end user and I understand this is reviewed by the auditors for all deals over $100k.

You may not be aware but over the years we have had unfortunately had a small number of frauds

BHOGE001279

US_SEC_EX 00000120

EXH 13037-0003

in this area in your region. However the processes detected the abnormalities, the issues were brought to the Audit Committee, suitable actions taken and processes put in place (which remain to this day). No material effect occurred.

After you've given thought to the above, what would be helpful for Andy and I to understand is whether you are stating that misleading information under the necessary IFRS tests was provided and, if so, please give specific examples.

1b) Resellers with an inability to pay

As I'm sure you are aware, the auditors independently directly request evidence of ability to pay, at random in relation to all deals above $100k and also in relation to any specific deals of their choosing. This is a process that is run independent of the company.

I am unclear whether you are saying that some of this evidence is flawed, and if so please can you give specific examples. Also given that for all large deals this is usually discussed explicitly at the Audit Committee, does not the payment record on these deals provide comfort on the levels of materiality set by the auditors and the Audit Committee?

2) Related Party transactions.

I'm unclear what you mean by "related party relationships". Is the concern around relationships between the company's directors and its customers? As you should be aware from the annual report, all of these transactions are disclosed in various forms and in detail in the annual report (and there are none that I'm aware of). Or is the concern about relationships between third parties who may also be customers of Autonomy? In any event to the extent we are aware these are also explicitly discussed with the auditors and at the Audit Committee.

Thus, again in order for Andy and I to provide proper insight, can I ask whether you have any examples where these disclosures were not made to the auditors that should have been?

3) Overstated barter deals

Given the nature and size of our business occasionally transactions will arise between ourselves and a third party in both directions. IFRS is clear on how this is handled (which I understand is different to US GAAP), and as part of their review the auditors have to obtain third party evidence of the valuations of the parts. For the larger deals like this I understand that the valuations and process is discussed at the Audit Committee for each deal.

Do you have evidence that the third party valuations obtained by the auditors are in some way incorrect?

I hope I have fairly put the matters from your email into context above, and as you'll see I think the questions require specific information, some of which as you note may not have been available to you. Thus in order to quickly get a prima facie analysis of the situation I suggest we start with Q1

BHOGE001280

US_SEC_EX 00000121

EXH 13037-0004

2010 as the large transactions in that quarter are fresh in the minds of those involved. Please by return can you list the deals you have concerns with along with the reasons and Andy and I as a first step will investigate what information was known and considered already but the auditors and share this with you. We can then compare notes. In the interests of speed I would suggest at this time we limit ourselves to material deals, i.e. those over the $5m materiality threshold set by the auditors. If there are any particular cases you wish to bring to my attention below this limit in that period then of course that is fine. However I would appreciate your examples by return today.

Please be careful to state whether you believe information given to Autonomy is misleading, or you have not had sight of some other piece of the puzzle that would alleviate your concerns. Please also make sure you are referring to IFRS not USGAAP, as that is our accounting schema. Given that Andy and I are not accounting experts, reference to the IFRS rule would be helpful.

You may not be aware but Autonomy's accounts have just been through a thorough six month review by the UK accounting standards body as part of their routine process for FTSE100s and no rev rec points were found. As a coincidence just this last year the Deloitte auditor team also had their Autonomy Audit processes audited by their professional regulator and passed with flying colours.

Obviously if your Q1 evidence points to an issue of which the auditors and the Audit Committee are not aware then we will move to the next stage and consider the other periods. I think it is important to have all the pieces of the puzzle on the table before deciding what to do next, which I understand is normal for these types of things.

I have tried to make sure we take a conservative view and so any potentially more complex deals by virtue of size, relations or that the customer is a supplier are normally explicitly referred to the auditors and then the Audit Committee with a lot of extra information.

So at this point, it seems to me that either you know something I don't or I have the missing pieces of the puzzle which would address your questions. I appreciate you only have access to a subset of the information required , and may not be an expert on IFRS being US based . Taking into account the fact that you are not involved at all in the audit it is clear to me that in any case you are acting in good faith and I appreciate your efforts. If once we have compared the missing pieces if we still have issues we will rapidly take this to the next level.

I would ask that until we have performed the next step that the language you use is a little more moderate as until we confirm your concerns are valid and not just an artefact of partial information I would not want to inadvertently run the risk of accusing the innocent as emails have been known to escape. I would suggest you use the usual encryption.

I am maintaining an open mind and we await your specifics

Mike

FOIA Confidential Treatment Requested

EXHIBIT 10094

**To:**       Mike Lynch[mrl@autonomy.com]
**Cc:**       Andy Kanter[andrewk@autonomy.com]
**From:**    Brent Hogenson
**Sent:**    Wed 6/23/2010 6:38:03 PM
**Importance:**          **Normal**
**Subject:**  CONFIDENTIAL
Return Letter to Mike.doc.edc

Mike,

This is the response per your request this morning.

Brent

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-02338140
EXH 10094-0001

June 23, 2010

Dear Mike,

Thank you for your response to the confidential email sent by me to you on June 22nd 2010.  I appreciate your acknowledgement that I am acting in good faith.

Per your request, I will provide an example in each of the three areas.  However, the three examples will only be a part of the information gathered which has caused me concerns as to the potential of financial statement misstatements.  I reiterate my desire to speak directly with the Audit Committee prior to the release of the Q2 2010 financial statements.

The accounting standards for the matters below are IAS – 18 Revenue section 6 Recognition criteria – sale of goods; and, the Autonomy Revenue Recognition Policy from the 2009 Annual Report, which I have added below for reference.

**Concern #1) there is no end user and the reseller does not have the ability make the payments under the agreement**

Below is an example of a Capax transaction. The information gathered has similar transactions with resellers including Capax Global, Capax Discovery, Microlink (prior to the acquisition in Q1 2010), Microtech and Discovery Technologies.

In Q4 2009, reseller Capax gave Autonomy an order for $6.3M for Ely Lilly, of which license revenue recognized in Q4 2009 was approximately $6.0M.  The $6.3 was due for payment from Capax on March 31, 2010.  As part of our normal collection calls, our collections team contacted the customer to confirm the payment date.  The collection team had a difficult time getting a response from the customer and as this was a large amount asked me to call.  I called John Baicco, the Managing Partner at Capax, to follow up on the payment date.  John asked me if I had discussed with two members of the senior management team, who I will not name in this document.  I told him that I would but continued to request payment information.  He then told me that the Ely Lilly deal had not closed with Ely Lilly and that he would not be able to make payment until Ely Lilly closed and he had received payment from the customer.

In June 2010, Ely Lilly closed in a License Agreement between Ely Lilly and Autonomy for a total value of $5.6M and license value of $5.3M.  The software sold is primarily the same products from the Q4 2009 Capax agreement, except there is a lot more detail related to authorized use and data volume.

In reviewing the SMS customer notes related to Ely Lilly during the period of Q4 2009 through Q2 2010, there were many steps in the sales process required by the Autonomy sales team to complete the transaction subsequent Q4 2009.  There was no mention of any steps or sales process to be performed by Capax.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-02338141
EXH 10094-0002

The Autonomy Revenue policy requires that the license fees be fixed and determinable prior to recognizing revenue. IFRS IAS – 18 section 14 (c) states "the amount of revenue can be measured reliably." Since the amount of license revenue changed from $6.0M in Q4 2009 to $5.3M in Q2 2010 it calls into question if the $6.0M was fixed and determinable or could be measured reliably as of Q4 2009. In addition the statement from the Managing Partner of Capax that he would not be able to pay until he was paid by the customer raises a significant question as to whether the collectability was probable in Q4 2009.

Additional data points:

Email form Steve Chamberlain on June 22, 2010 related how to handle invoicing and the revenue shortfall. There are additional email trails associated with the Ely Lilly transaction not included in this document.

**From:** Stephen Chamberlain [mailto:stephenc@autonomy.com]
**Sent:** Tuesday, June 22, 2010 8:23 AM
**To:** Percy Tejeda
**Cc:** 'J. Livius Guiao'
**Subject:** Lilly

Percy – depending on how discount is allocated need to instruct Capax to invoice first instalment. I need to talk to Sushovan and Stouffer regarding the overall shortfall. When they get paid they will need to pass on to us to start to settle their amount due to us.

Please prepare pro-forma invoice for Capax to send to Lilly and I will check with Sushovan prior to sending out.

Thanks

**Steve Chamberlain**
**VP, Finance**
**Autonomy**

This was an attached spreadsheet to the email above:

| Eli Lilly agreement | Pro-rated discount | | | Discount all applied to ALH | | |
|---|---|---|---|---|---|---|
| | Contract | Pro-rate discount | Adjusted | Contract | Discount on ALH | Adjusted |
| DS licence | 3,953,564 | (947,493) | 3,006,071 | 3,953,564 | | 3,953,564 |
| ALH | 2,941,069 | (643,709) | 2,297,360 | 2,941,069 | (1,591,202) | 1,349,867 |
| Discount | (1,591,202) | | | (1,591,202) | | |
| Net licence | 5,303,431 | | 5,303,431 | 5,303,431 | | 5,303,431 |
| | | | | | | |
| DS maintenance | 157,898 | 60% | 157,898 | 157,898 | | 157,898 |
| ALH maintenance | 107,273 | 40% | 107,273 | 107,273 | | 107,273 |
| | | | | | | |
| Total fees | 5,568,602 | | 5,568,602 | 5,568,602 | | 5,568,602 |

| Capax PO | |
| --- | --- |
| Licence | 5,986,827 |
| S&M | 299,342 |
| Total fees | 6,286,169 |

| Shortfall | 717,567 |
| --- | --- |

**Concern #2) there appear to be resellers with related party relationships on revenue transactions**

The following information is from a spreadsheet labeled Q4 2009 Closed Deals Final prepared by Cynthia Watkins, Corporate Controller of Autonomy, Inc.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue |
| --- | --- | --- | --- |
| 31-Dec | Microlink – Discovery LLC | MGMT | 2,000,000 |
| 30-Dec | MicroTech LLC – (Blank) | MGMT | 9,523,810 |
| 31-Dec | MicroTech LLC – Amazon | MGMT | 131,418 |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000 |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000 |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000 |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000 |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000 |

In Q1 2010 we invoiced the following (detail from the Problem Accounts spreadsheet):

| Inv Date | Revenue Summary | Sales Rep | Inv Amount |
| --- | --- | --- | --- |
| 31-Mar | Microtech LLC – Vatican | Blank | 11,550,000 |
| 31-Mar | Discover Technologies – Citi | Blank | 4,394,250 |

I have been told by the finance team in San Francisco that transactions without a sales rep identified are transactions where the End User has not completed the agreement by the end of the quarter. Manulife and Morgan Stanley both closed in Q1 2010, copies of agreements available, rather than Q4 2009. For the remaining transactions above, I have not found any support of them closing with an End User. There are many other transactions to these resellers that come in on the last day of the quarter where the Sales Rep is MGMT throughout 2008 and 2009.

**Related Party Concern:**

In February 2010, Autonomy acquired Microlink for $55M. As part of the acquisition, Autonomy wrote off in purchase accounting approximately $16M of outstanding accounts receivable with due dates as follows:

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

| Due Date | Amount |
|---|---|
| March 31, 2009 | 6,875,000 |
| June 30, 2009 | 4,576,200 |
| Sept 18, 2009 | 203,250 |
| Sept 30, 2009 | 2,008,238 |
| Feb 14, 2010 | 2,300,000 |
| Total | 15,962,688 |

The February 14th invoice above is writing off the Dec 31, 2009 invoice to Dicovery Technologies, which had license revenue of $2,000,000 and maintenance of $300,000 for a total of $2,300,000.

Microlink's Address is as follows:
8330 Boone Blvd
Suite 300
Vienna, VA 22182
Phone: 703-556-4440

MicroTech's Address is as follows:
8330 Boone Blvd
Suite 600
Vienna, VA 22182
Phone: 703-691-1073

Discover Technologies has a very limited website.  There is a whitepaper titled Automation Speeds the Ability to Collaborate and Turbo-Charges the Enterprise Search User Experience.  The bottom of the pages of this whitepaper has the following information:
www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

Without drawing any conclusion, I am concerned that the Microlink transaction was partially done to provide a vehicle to 1) write off the $16M in outstanding invoices where there may be potential that there was never an End User; and 2) provide a cash balance to pay invoices due from potential related parties.

**Concern #3) there appear to be barter transactions where the economic benefit on both sides of the transaction appears to be materially overstated**

Autonomy made the following purchases of software from FileTek, Inc.:
December 31, 2009     10,367,280
May 11, 2010          11,518,214

HP-SEC-02338144
EXH 10094-0005

Autonomy sold the following license and maintenance as follows:

December 31, 2009          8,480,000 IDOL Product
March 31, 2010             9,010,000 500 users Liquid Office

In a barter transaction, accounting requires that you have 3rd party validation of the value on both sides of the transaction.  My information is limited, however, I have asked Sean Sullivan, Liquid Office Sales VP, for a low and high range of a liquid office transaction with 500 to 1000 users.  The range that he gave me was $300,000 to $1,000,000.

Without drawing any conclusion, I am concerned that we paid more than fair value for the software purchased from FileTek providing funds to pay more than fair value for the software sold to Filetek and recognized as revenue.

These are examples of the information gathered during Q2 2010 and I request a meeting with the audit committee prior to the release of Autonomy's Q2 2010 financial statements to review these matters and ensure that material misstatements, if any, are corrected prior to releasing future financial statements.

I look forward to your response.

Brent


Revenue Recognition Policy
From the 2009 Annual Report

e) Revenue Recognition

The group discloses revenue within two categories, namely sale of goods and rendering of services, as required by IAS 18. During 2009 there has been no change to the group's revenue recognition policies in any respect. The nature of the transactions that the group has entered into during 2009 is the same as in 2008 in all respects. To assist the reader in understanding the group's business the accounting policy set forth below has been reviewed and clarified,
but does not represent any change in the group's accounting policy for the recognition or measurement of revenue.

Revenue is measured at the fair value of the consideration received or receivable and represents amounts receivable for goods and services provided in the normal course of business, net of discounts and sales taxes.

Deferred revenues primarily relate to archiving and customer support and maintenance fees, which have been invoiced to the customer prior to the performance of these obligations. Deferred revenue is recognised rateably over the term of the contract, usually over a period of one to three years.

i) Sale of goods

The group sells its products as licenses to resellers, OEMs and direct to end-users together with associated support and maintenance. In addition, the group also sells some of its products on a subscription basis.

Revenues from software license agreements are recognised where there is persuasive evidence of an agreement with a customer (contract and/or binding purchase order), delivery of the software has taken place, collectability is probable and the fee has been contractually agreed and is not subject to adjustment or refund (i.e is fixed and determinable). If an acceptance period is required, revenues are recognised upon the earlier of customer acceptance or the expiration of the acceptance period. Revenue is recognized on contracts providing that the customer passes defined creditworthiness checks. If significant post-delivery obligations exist or if a sale is subject to customer acceptance, revenues are deferred until no significant obligations remain or acceptance has occurred.

The group enters into OEM and reseller arrangements that typically provide for fees payable to the group based on licensing of the group's software to third party customers. Sales are generally recognised as reported by the OEM or reseller and is based on the amount of product sold. Sales are recognised if all products subject to resale are delivered in the current period, no right of return policy exists, collection is probable and the fee is fixed and determinable.

Revenues from customer support and maintenance are recognised rateably over the term of the support period. If customer support and maintenance is included free or at a discount in a license agreement, these amounts are allocated out of the license fee at their fair market value based on the value established by independent sale of the customer support and maintenance to customers. Support and maintenance consists primarily of the supply of products, such as patches and updates, to the standard software.

Product revenues from the hosted business are separated, using the residual method, into capture and archiving. Revenues for capture are recognised in the period in which they are delivered. Revenues for archiving are recognised over the period that the customers have access to the group's software and proprietary storage technology. Product revenues from the hosted business relate to the execution of production operations on computers which the company runs in its data centres. Revenues are generated from the use of our software and computers and from us maintaining the data. Customers commit for periods between one month and up to three years. Revenues are generated in two different ways:

- o    Paid up front, usually one to three years, in which case the group has an obligation to process the data using the group's software and archive for the contracted length of time using the group's proprietary storage technology. Revenues are allocated between capture and archiving using the residual method, with the archiving element deferred and recognized rateably over the contracted period of archiving.
- o    Paid on a pay-as-you-go basis, in which case the charge is based on the volumes of data ingested and stored each month. Revenues for pay-as-you-go customers are recognized on a monthly basis as the product is made available to customers. There is no deferred revenue in relation to these customers.

ii) Rendering of services

Consulting and training revenues are included within rendering of services.

Consulting revenues are primarily related to implementation services performed on a time and materials basis under separable service arrangements related to the installation of the group's software products. Revenues from consulting and training services are recognised as services are performed. If a transaction includes both license and service elements, license fee revenue is recognised upon shipment of the software, provided services do not include significant customisation or modification of the base product and the payment terms for licenses are not

EXH 10094-0007

subject to acceptance criteria. In cases where license fee payments are contingent upon the acceptance of services, revenues from both the license and the service elements are deferred until the acceptance criteria are met.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

EXHIBIT 3789

Autonomy Corporation plc

Report to the Audit Committee
on the 2010 Interim Review

Final Report

United States District Court
Northern District of California

**Trial Exhibit 3789**

Case No:      CR 18-0577 CRB
Date Entered: _____
 By: _____
          Deputy Clerk

K9/433/1

C002257711

# Contents

Introduction                                                                 1

1.      Key risks                                                            3

2.      Responsibility statement                                            14

Appendix 1: Adjustments                                                     15

Appendix 2: Draft management representation letter                          16

Appendix 3: Additional matters                                              18

K9/433/2

_002257711

# Introduction

We have pleasure in setting out in this document our report to the Audit Committee of Autonomy Corporation plc and its subsidiaries (together "the Group" or "Autonomy") on our review of the three and six months ended 30 June 2010 for discussion at the meeting scheduled for 20 July 2010. This report summarises the principal matters that have arisen from our review of the financial information within the half-yearly financial report for the six months ended 30 June 2010.

This introduction is not intended to be exhaustive but highlights the most significant matters to which we would like to bring to your attention. It should, therefore, be read in conjunction with the entire report and the appendices thereto.

| | |
|---|---|
| **Key findings on key risks and other matters** | We discuss within Section 1 the results of our review work in relation to key risks which have been identified as being significant to the Q2 and H1 results and press release. |
| **Review status** | We have substantially completed our review. Certain procedures remain outstanding and need to be finalised before we can issue our review opinion: <br> ∞   Completion of our review of detailed analyses supporting the income statement; <br> ∞   Completion of our internal review procedures including review of your press release; and <br> ∞   Receipt of management representation letter (See Appendix 2 for suggested draft). <br><br> We will report to you orally in respect of any modifications to our findings that arise on completion of these matters.  On satisfactory completion of the outstanding matters, we anticipate issuing an unmodified review report. |
| **Identified misstatements** | For our Q2 2010 review our materiality was $4.9 million (Q2 2009 $3.1 million, full year $20.0 million) for the quarterly income statement and $9.9 million (2009: $9.0 million) for the half year income statement.  Both measures are based on profit before tax.  This is consistent with the basis used to determine materiality for the previous year end audit. <br><br> Identified uncorrected misstatements reduce profit before tax for Q2 by $2.4 million and for H1 by $4.3 million, profit after tax by $1.8 million and $2.0 million respectively and net assets by $2.7 million and $6.0 million respectively.  Management has concluded that the total impact of the uncorrected misstatements, both individually and in aggregate, is not material in the context of the financial statements taken as a whole, and we concur with their view.  Details of our potential adjustments are included in Appendix 1. |
| **Accounting policies and financial reporting** | As part of our review, we consider the quality and acceptability of the Group's accounting policies and financial reporting and their consistency with the 2009 annual report.  We have nothing to report in these areas. |

K9/433/3

002257711

EXH 3789-0003

# Introduction

| Accounting and internal control systems | As part of our review we have made enquiries of management regarding the control environment and the reliability of the management reporting process.  There were no significant changes since the 2009 year end and therefore we have not carried out any detailed testing of our understanding of internal controls. |
| --- | --- |
| | We are aware of the payroll fraud in the US, which management has engaged Kroll to investigate.  We understand that the fraud involved collusion between at least two members of the Autonomy Inc accounts team and has been perpetrated over a period of approximately five years.  Management's initial assessment is that no accounting adjustments are required to historical results because of this as the full amounts paid have been expensed. Management has set out its responses to this fraud in its paper to the Audit Comittee. |

| Whistleblowing to the Audit Committee | As you are aware during the past month the Head of Finance in the US has raised a number of queries over the accounting presentation for certain immaterial transactions in the 2009 accounts together with further queries over transactions which were in the process of being considered as part of the routine Q2 2010 close down process for the interim accounts.  This correspondence was sent to the Audit Committee, and ourselves, through the Group's whistleblowing process.  We have reviewed these questions and management's detailed responses and set these out, together with our responses, in Appendix 3 of this report. |
| --- | --- |
| | In summary, the challenges raised appear to arise from an incomplete understanding of the transactions in question.  It is evident that certain sensitive and/or commercial information is often only retained in the UK and is not transparent to the US finance team.  As a result of not having visibility of the full facts it is possible to arrive at an incorrect interpretation of the relevant accounting treatment under International Financial Reporting Standards ("IFRS"). |
| | Management believes there are no new material facts emerging from the detailed questions and their investigation thereof and have therefore concluded that the matters raised have no material impact on the Group's 2009 financial statements.  We concur with their view. |
| | We have considered the questions posed in relation to 2010 as part of our planning for the Q2 2010 review and have addressed them where appropriate when performing our work. |

| Independence | In our professional judgement we are independent within the meaning of APB Ethical Standards for Auditors and the objectivity of the audit engagement partner and audit staff is not impaired. |
| --- | --- |

**2   Report to the Audit Committee on the 2010 Interim Review Final** Report

U002257711

EXH 3789-0004

# 1. Key risks

The results of our review procedures on key risks are set out below:

| Revenue Recognition |
| --- |

| | |
| --- | --- |
| **Assumed risk of fraud in relation to revenue recognition** | Revenues for the quarter were $221 million (Q2 2009 - $195 million) and for the half year $415 million (HY09 - $325 million). |

Management continues to apply a consistent approach which is compliant with IFRS to recognising revenues which includes performing credit checks, evaluating any ongoing managerial involvement and discharging obligations thereby ensuring that all of the provisions of International Accounting Standard 18, *Revenue*, ("IAS 18") have been satisfied.

As part of the Q1 2010 report to the Audit Committee, we communicated to you the key revenue deals for that quarter.  The most significant licence revenues recognised in Q2 2010 were with BP Exploration & Production Inc ($14.2 million), JP Morgan Chase ($9.1 million), Metropolitan Life Insurance Company ($7.5 million) and Tottenham Hotspur plc ($5.9 million).

Management has confirmed that no revenue deals contained side letters or ongoing Autonomy performance requirements that were excluded from the signed sales contracts.

**BP Exploration & Production Inc ("BP")**

This is a $14.2 million licence deal for an Introspect software licence. Support and maintenance has been carved out at the established fair value of 5% and in addition BP is required to pay separately for data ingestion, production and storage which has been charged at a per GB rate of $4 per GB of material introduced.  As this is a relatively unique deal, management has performed a cost plus exercise to demonstrate that the rate per GB represents a reasonable fair value.

**JP Morgan Chase ("JPMC")**

This is a $9.1 million deal with JPMC for a Zantaz Digital Safe licence. Support and maintenance has been carved out at the established fair value of 5%. The payment terms for this deal are spread over a two year period.

**Metropolitan Life Insurance Company ("Metlife")**

This is a a $7.5 million licence deal for a suite of Autonomy software including Digital Safe. Support and maintenance has been carved out at 6% which is the higher of the rate per the contract and the established fair value.

**Tottenham Hotspur plc ("THFC")**

This is a $5.9 million licence deal to THFC for TeamSite, OpenDeploy, LiveSite, IDOL Server and Autonomy SPE software. Support and maintenance has been carved out at the established fair value of 5%. THFC have also purchased Optimost services, the revenue for which has been separately carved out by management ($50k).  Management has informed us that both this transaction and the sponsorship deal signed post period end are at fair value and arm's length terms.

# 1. Key risks

| Revenue Recognition (continued) |
| --- |

| Deloitte response | Our review of revenue contracts was designed to select large contracts, those containing non-standard terms, as well as a sample of all other contracts. Our review work noted that revenue recognition continues to be consistently applied in comparison with previous periods and in accordance with Group accounting policies and IFRS. |
| --- | --- |
| | **Carve out rates** |
| | For each contract selected, we examined the terms and conditions of the contract to ensure that no unusual circumstances existed which might impact the recognition of revenue. We ensured that amounts recognised could reasonably be expected to be recoverable by inspecting payment history or credit checks where relevant. Furthermore where ongoing managerial involvement is necessary the carve out rates for revenues deferred were recalculated to ensure they were in line with Autonomy's standard carve out rates for support and maintenance and support services where relevant. It was noted that support and maintenance is included in the agreement with THFC at no additional cost as long as the strategic relationship between the two parties continues. This will continue for a minimum of two years and therefore we have proposed an adjustment in Appendix 1 ($0.3 milion) to carve out an additional year of support and maintenance from the licence fee on top of the one year carved out by management. |
| | For all deals over $1 million we issued revenue confirmation requests direct to the customer. These were received in all cases except on the rare occasions where the legal department of certain large blue chip customers do not respond as a matter of policy. |
| | **Payment terms** |
| | The impact of extended payment terms offered to certain customers was considered to ensure that management is following the requirements of IAS 18 by discounting those amounts receivable to their present value.  This was the case in all except one instance. For most of these deals the impact of discounting is trivial, however for the JPMC deal the impact of discounting is estimated at $0.4 million. This has been included on our schedule of adjustments in Appendix 1. |
| | In addition we noted that an early settlement discount has been agreed with BP which had not been classified correctly and we have included a reclassification adjustment to reduce both costs and revenue by $0.2 million in Appendix 1. |
| | The Group has entered into a number of deals with payment terms greater than 365 days in the quarter. The total value of repayments due after 30 June 2011 is approximately $10 million.  This is as a result of the current economic climate and does not impact the recognition of revenue. |

K9/433/6

L002257711

EXH 3789-0006

# 1. Key risks

| Deals with resellers | |
|---|---|
| | In Q1 2010, as previously reported to you, two deals sold to Microtechnologies LLC ("Microtech") in Q4 2009 were credited and resold directly to the two end users.  In our Q1 2010 report we highlighted that significant evidence of such further revenue reversals may jeopardise management's ability to recognise revenue at the point of sale to the reseller. Only one deal has been signed with the reseller Microtech during Q2 2010 for $270k and the overall level of software deals done this quarter through resellers is significantly reduced. |
| | During Q2 2010, a $6m licence deal originally with the reseller Capax Global from Q4 2009 was signed directly with the end user, Eli Lilly and a Q1 2010 $4.2 million deal with Discovertechnologies LLC was signed directly with the end user Philip Morris. The former remains in accounts receivable at 30 June 2010 and payment has been received for the latter.  The Capax / Eli Lilly deal is covered in more detail in Appendix 3. |
| Deloitte response | We note that management has responded to the concerns raised in Q1 2010 where for the first time we noted instances where deals had been credited and re-sold directly to end users. If Autonomy is required to maintain ongoing managerial duties in respect of reseller deals or if the reseller cannot demonstrate its ability to pay for goods received then it would not be appropriate to recognise revenue on delivery of the product.  Management acknowledge this position and further highlight that there have been no significant software sales to resellers in Q2 2010.  Management maintains that all reseller deals recognised in revenue have been appropriately assessed at the time of recognition of revenue to ensure that all criteria within IAS 18 have been met. |
| | We highlight to the Audit Committee that there is a large licence deal on which we reported on in Q1 2010 with Microtech where the end user is the Vatican ($11.5 million). Microtech is a customer with a long and established successful trading relationship with Autonomy.  At the date of issuing our report this amount is now overdue. We concurred with management at the point of recognition on the treatment of this amount but will monitor the progress of this balance again in our Q3 2010 review. To the extent cash is not received in Q3 2010, we will need to carefully consider recoverability of the balance.  As part of our Q2 2010 procedures we received confirmation from Microtech of the amount outstanding and the absence of any side agreements or ongoing performance criteria. In addition, we held discussions with management to ensure that no issues had subsequently been identified which might impact the probability of recoverability of this balance. |
| | As a result of our work in this area we have not proposed any adjustments to revenues or receivables, but we will continue to focus carefully on this area in future reviews and audits. |

K9/4337

L002257711

EXH 3789-0007

# 1. Key risks

| Hardware sales | |
|---|---|
| **Presentation of costs associated with hardware sales** | Included in revenues for the quarter is $27.5 million of hardware sales. Q1 sales were $12.2 million.  In aggregate this represents over 9% of the Group's revenues in the six months to 30 June 2010. |
| | The majority of this ($26.3 million) is made up of sales of Dell hardware to SHI International (end user Bank of America for $16.9 million), Metro Business Systems Inc (end user UBS for $4.1 million) and Insight (end user Citi Group for $5.3 million). |
| | These are further examples of a number of strategic hardware trasactions completed by Autonomy to major international banks or other large blue chip companies completed in order to open up new market opportunities and to become the preferred supplier for all such clients' archiving requirements, including both software and hardware. |
| | Consistent with the hardware sales discussed in previous quarters' reports to the Audit Committee, these strategic sales have been made at a loss.  Management has taken all of the costs associated with the Dell hardware sales to cost of sales with the exception of the loss of approximately $3.8 million which has been allocated to sales and marketing expenses. Management's rationale for entering into these loss making contracts is that Autonomy is seeking to develop a long term strategic relationship with the end users in order to secure future profitable software sales. |
| | Management has prepared an analysis demonstrating the strong linkage between the loss making hardware sales and subsequent highly profitable software sales which indicates that for the $100 million of hardware sales made over the course of 2009 and 2010 to date (at a total loss of approximately $10 million), approximately $78 million of software deals have taken place with these customers over the same period and $20 million of hosted revenues have been generated for which there is a recurring revenue stream.  All of these subsequent amounts have been transacted at Autonomy's normal gross profit margin. |
| | Management has accounted for the revenues and costs associated with these deals on a gross basis as they and the customer consider Autonomy to be the principal in the arrangement.  This is based on Autonomy being the prime instigator in negotiating the deals - it has negotiated terms and selling price independently of the hardware provided and it bears the full credit risk for the transactions. |
| **Deloitte response** | We have reviewed management's analysis of the linkage between the loss making strategic hardware sales and subsequent profit making software sales and accept the decision taken by management to allocate the loss of $3.8 million to sales and marketing. We have reviewed the contracts and concur that it is appropriate to recognise the revenues and costs gross. |
| | Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q2 2010 press release. |

K9/433/8

C002257711

EXH 3789-0008

# 1. Key risks

| Recoverability of accounts receivable | |
|---|---|
| **Provision for doubtful debts** | The net accounts receivable balance at 30 June 2010 is $208.3 million (31 March 2010 $211.4 million). The actual bad debt expense on the income statement in the quarter amounted to $3.8 million (Q1 2010 $2.7 million). The bad debt provision at 30 June 2010 stands at $23.5 million (31 March 2010 $20.3 million). |
| | Cash collection this quarter has been strong at $227.0 million, which has increased from $195.0 million in Q1 2010. As at close of business on 16 July 2010, total cash received since the period end was $13.2 million.  DSOs have fallen since Q1 2010 from 93 days to 80 days. The $14.2 million deal this quarter with BP has been paid in full which has had a significant impact on DSOs as this amount was paid within a day of signing the deal. |
| | Management continues to apply a detailed approach to credit control with increased scrutiny around the quarter end over potential exposure and the need to make a provision.  Management continues to work with the Latin American overdue accounts previously reported to the Audit Committee to ensure that these balances are provided for where appropriate.  As a result, a further $2.7 million has been provided for on amounts payable by Allotech, Integracion de Negocios and Telematica Lefic resulting in a net exposure on these accounts of $4.9 million.  The level of provision represents management's best estimate of the likely outcome of recoverability at this stage. |
| | Management also continues to monitor both cash collection and the level of bad debt provision as part of its routine procedures to support the overall appropriateness of the group's revenue recognition policies. |
| **Deloitte response** | We have reviewed customer correspondence and payment histories which support the conclusions reached by management. Where we required further clarification, a debtor confirmation has been received and we have reviewed customer correspondence. We have identified a difference in judgement in relation to the trade receivable for $0.3 million due from Firmware Inc which has been recorded in Appendix 1 as the amounts are now over two years old and there is no evidence that they are recoverable. |

K9/433/9

U002257711

EXH 3789-0009

# 1. Key risks

| Acquisition accounting | |
|---|---|
| **CA Technologies (Q2 2010)** | On 9 June 2010, Autonomy acquired the trade and assets of the information governance business of CA Technologies Inc.  The initial purchase consideration was $19.3 million, paid before the end of the quarter.  The provisional accounting for the net liabilities acquired shows a fair value of $8.2 million and as a result, $27.5 million of goodwill and intangibles (combined) has been recognised on the acquisition. |
| | The acquisition has been accounted for in accordance with IFRS 3 (revised 2008) *Business Combinations* ("IFRS 3").  Management is yet to have a formal intangible valuation performed by Duff & Phelps and has therefore made an estimation of the likely intangibles value ($7 million) for the purposes of the Q2 2010 report, based on it being an asset deal with relatively low cost synergies and therefore a higher proportion of intangible assets than previous acquisitions. After taking account of the fair value of the trade and assets acquired, the residual goodwill balance is $20.5 million. |
| **Deloitte response** | We have reviewed the purchase agreement and the provisional acquisition accounting prepared by management and concur with management's accounting treatment at this stage.  We note that the values attributed to separately identifiable intangibles are a management estimate at this stage before being professionally valued by Duff & Phelps. |
| **Microlink (Q1 2010)** | As reported to you in Q1 2010, Microlink was acquired in January 2010 for a purchase consideration of $55 million.  Management continues to monitor its provisional fair values attributed to the assets and liabilities acquired.  As required under International Accounting Standard 34 *Interim Reporting* ("IAS 34"), disclosure has been provided in the Q2 press release detailing the consideration and the fair value adjustments posted.  The key fair value adjustment is to provide against $5 million of other debtors which are not considered to be recoverable, as noted in Appendix 3. |
| **Deloitte response** | We continue to review the provisional accounting adopted by management  We note that the values attributed to separately identifiable intangibles are a management estimate at this stage before being professionally valued by Duff & Phelps. |

K9/433/10

002257711

EXH 3789-0010

# 1.  Key risks

**Mercedes Benz Grand Prix Sponsorship**

During the quarter, a Team Partner agreement was entered into with Mercedes Benz Grand Prix Limited whereby Autonomy will sponsor the Mercedes Formula One team in return for certain Team Partner rights which include marketing rights, right to use the Mercedes team logo and images, branding rights, hospitality days, driver and management days and loan of show car. The sponsorship will expire at the end of the 2011 calendar year. The fees due from Autonomy are £5.8 million ($8.8 million)  for 2010. For 2011, more limited Team Partner rights have been agreed and as such the fee will be £3.2 million ($4.7 million) for 2011 unless Autonomy elects to increase to the same level as 2010, in which case the fee will be £6.2 million ($9.3 million).

Management has accounted for this as a prepayment, expensing the costs over the course of 2010 and 2011. This is in accordance with International Accounting Standard 38 *Intangible assets* ("IAS 38") that states that advertising and promotional activities should always be recognised as an expense rather than capitalising as an intangible asset.The modifications to IAS 38 make it clear that the expense should be recognised when the goods or services are received and therefore where a payment has been made in advance of this a prepayment should be held on the balance sheet.

Management has spread the total cost of £9.0 million over the 7 quarters of 2010 and 2011. However, as the advertising provided by Mercedes in 2011 is reduced compared to 2010 (as evidenced by the contract and the fact that an additional £3.0 million fee is due in order to receive the same level of advertising in 2011) either the maximum amount payable should be spread equally over the seven quarters or the two years should be considered separately.

**Deloitte response**

We have reviewed the Team Partner agreement and have proposed an adjustment in Appendix 1 increasing the Q2 2010 charge by $0.6 million in order to spread the maximum amount payable equally over 7 quarters as described above.

We will review the accounting treatment of the shirt sponsorship of Tottenham Hotspur in our Q3 2010 review, where similar considerations are likely to apply.

K9/433/11

002257711

EXH 3789-0011

# 1. Key risks

**Purchase of software from Filtek Inc ("Filetek")**

In May 2010, Autonomy entered into an agreement with Filetek to purchase for $11.5 million an extension to its initial licence purchased in Q4 2009.  The purpose of this extension over the original deal is to upgrade from a limited 1 PB of data processing capability to unlimited data processing and in addition to improve the security and confidentiality capabilities of the software.

As reported in Q4 2009, the technical and commercial rationale for Autonomy to purchase Filetek software is to provide Autonomy with the appropriate capability to link Structured Probabilistic Engine ("SPE") into established databases such as Oracle and SAP which provides a significant cost benefit to the customer.  The software has been capitalised as an intangible asset and is to be amortised over the life of the licence, being 5 years.

**Deloitte response**

We have considered this transaction in light of the fact that Autonomy have made significant sales transactions with Filetek.  We therefore look to ensure that the fair value of the relevant transactions is appropriate.  We have discussed the purchase with Pete Menell (CTO) to understand the technical rationale and have involved the use of one of our IT specialists.  We have seen the relevant purchase approvals from both the CFO and CEO and have reviewed the purchase agreement with Filetek.  We note that the initial software purchased from Filetek in Q4 2009 is already generating revenues, namely through the deal signed with Kraft in December 2009.  We concur with the accounting treatment adopted by management.

**Vacation accrual**

Management has reviewed the vacation accrual established in the US to ensure that it is in line with the most recent facts and circumstances and to ensure that it reflects the requirements of International Accounting Standard 19 *Employee Benefits* ("IAS 19").

We understand that management are in the process of changing the practice of paying out such amounts where possible, instead ensuring that leaving employees use up any outstanding vacation during their notice period.  On the basis of this judgement they have reduced the accrual by $1.4 million.

**Deloitte response**

As we have not yet seen evidence of the feasibility of achieving such a reduction in the vacation accrual we are not yet in a position to agree with management's judgement.

We have therefore proposed a judgemental adjustment in Appendix 1 to reinstate the $1.4 million vacation accrual.

K9/433/12
002257711

EXH 3789-0012

# 1.  Key risks

| Key risk | Deloitte response |
|---|---|
| **Capitalisation of research and development costs** | During the quarter a total of $9.8 million of software development costs have been capitalised (Q2 2009 $4.1 million). The amortisation charged for the quarter amounted to $3.9 million (Q2 2009 $1.8 million).  We have reviewed a sample of these costs and have verified that the criteria of IAS 38 have been satisfied. |
| **Accounting for share options** | Autonomy share options (and legacy Interwoven, Zantaz and Verity share options) have graded vesting terms.  These are typically a vesting cliff of 6 months, after which options vest over 36 months, vesting on a quarterly basis. The impact of this pattern of vesting is that the IFRS 2 charge should be higher during the early quarters of a share option scheme's life and decrease as tranches of options vest on a quarterly basis. Historically Autonomy has treated the share options as cliff vesting on the final date of the scheme and the charge is recognised evenly over the vesting period. |
| | During the prior year management recalculated the historic charge based on the graded vesting model which has indicated that a credit to the income statement of $1.5 million is required (with a corresponding entry to debit the stock compensation reserve). In Q1 and Q2 2010, the Group has recorded a charge to the income statement based upon the updated vesting model, but has not recorded the cumulative credit as at 31 December 2009 in the income statement. We have reviewed the charge for the period. We have proposed this again as a credit adjustment in Appendix 1. |
| **Support and maintenance carve out rates** | IAS 18 requires that the fair value of support and maintenance revenue is recognised over the period over which the support and maintenance services are provided. As many of Autonomy's sales include both licence and support and maintenance, it is necessary to assess the fair value of the support and maintenance in order that the correct amount is deferred at the recognition date of the licence revenue. There is an element of judgement involved over the percentage used. |
| | Management performed a full review of carve out rates and renewal rates during 2009 to support the revenue recognition policy as part of the 2009 year-end procedures. Nothing has come to light in the six months to 30 June 2010 to call into question the level of carve out.   During 2010 there have been no product recalls, litigations or warranty claims that might indicate that the level of carved out maintenance was inappropriate. Carve out rates remain stable which is a result of the stability of the IDOL architecture which is pervasive in all products. Management continues to monitor this position and will again perform a more detailed review of rates ahead of the year end.  We have tested the rates carved out for support and maintenance to ensure that the rates used on Q2 2010 licence sales are at the higher of the established fair value or the rate contracted in the signed agreement.  We concur with the accounting treatment adopted by management and have not noted any deviations. |

K9/433/13

002257711

EXH 3789-0013

# 1.  Key risks

Taxation

James Ferguson has acted as tax audit partner. James is independent of any tax related non-audit services provided and will be subject to rotation as a key audit partner in accordance with APB Revised Ethical Standards for Auditors. In particular, James is independent of the Deloitte transfer pricing team providing assistance with documenting Autonomy's transfer pricing position.

We have reviewed the tax workings and discussed key matters with management regarding the tax position of the key entities and major transactions in the period.

*Effective tax rate*

The Income Statement taxation charge for the period is $33.7 million which corresponds to an estimated full year effective rate of 25.1% (FY 2009 28.0%). The expected effective tax rate at Q1 2010 was 27.8% and the Q2 2010 only effective tax rate is therefore 22.3% such that the effective tax rate for the half year is consistent with the full year effective tax rate of 25.1%.

The reduction in the estimated full year effective tax rate from that assumed at Q1 2010 is primarily driven by the following factors:

∞ Following further work by PwC during the quarter, the study summarising the availability of US tax losses in respect of acquisitions and other US tax loss restrictions (the "382 study") has now been completed and therefore management have identified additional losses in relation to Verity and Zantaz. The additional Virage losses per the study were recognised at 31 March 2010. The recognition of the additional losses in the quarter represents a 2.9% reduction in the effective tax rate from Q1;

∞ A tax provision of $4.8 million has been established during Q2 2010 for potential tax adjustments in the US arising from IRS enquiries into the group's US transfer pricing. This represents a 1.2% increase in the effective tax rate from the Q1 2010 rate;

∞ The remaining 1% reduction in the effective tax rate compared to Q1 2010 relates to a number of other factors such as updated estimates for R&D and the split of profits between the UK (taxed at 28%) and US (taxed at 40%).

The expected 2010 effective tax rate of 25.1% includes a number of items that would not be expected to be repeated in future years, primarily the additional recognition of US tax losses. Excluding these one-off adjustments, the effective tax rate would have been approximately 29%.

*Deferred taxes*

The net deferred tax liability relating to US purchased intangibles offset by US tax losses expected to be recognised in the balance sheet is $74.8 million ($82.4 million at 31 December 2009). This is consistent with previous periods factoring in further amortisation of the intangibles, recognition of additional US tax losses and utilisation of US tax losses against US profits.

K9/433/14

002257711

EXH 3789-0014

# 1.  Key audit risks

| Key audit risk |
| --- |

**Transfer pricing**

As discussed with the Audit Committee in our Q1 2010 report, whilst the risk of any transfer pricing adjustment has been reduced through the work management have undertaken, there is still a significant risk of a transfer pricing enquiry in the US and as previously communicated to the Audit Committee the documentation to support the US position is not currently adequate.

Deloitte have been engaged to prepare extensive supporting transfer pricing documentation, compatible with US transfer pricing rules in respect of the value driver analysis being used. This work commenced at the end of Q2 2010 and is expected to be substantially complete before the submission of the US tax returns in Q3 2010 and finalised before the end of Q4 2010.

**Tax provision**

During the quarter management have established a provision for potential US tax adjustments resulting from IRS enquiries, in particular the group's transfer pricing position for the 2008-2010 years. This provision should be maintained on a consistent basis for future years taking into account changes in external factors.

**US tax losses**

As noted above in the effective tax rate section, PwC have completed their work on the S382 study allowing the recognition in the six months to 30 June 2010 of $55m of further losses acquired with the Virage, Verity and Zantaz businesses and this is reflected in the lower effective tax rate for the period. No further recognition of tax losses is expected in future periods and the reduction in effective tax rate is therefore a one-off event specific to the year ending 31 December 2010.

**Deloitte response**

We have reviewed each of the areas discussed above and we concur with accounting adopted by management. We identified a $0.3 million credit adjustment in respect of the lower effective rate that could have been achieved if the benefit of the amortisation of intangible assets from the CA acquisition had been taken into account.

EXH 3789-0015

# 2. Responsibility statement

This report has been prepared for the Board of Directors in that capacity and we therefore accept responsibility to you alone for its contents. We accept no duty, responsibility or liability to any other parties, since this report has not been prepared, and is not intended, for any other purpose. It should not be made available to any other parties without our prior written consent.

**Deloitte LLP**
Chartered Accountants
Cambridge
19 July 2010

K9/433/16

C002257711

EXH 3789-0016

# Appendix 1: Adjustments

The following uncorrected misstatements were identified during the course of our review:

| | Page | Q2 2010 | | H1 2010 | |
|---|---|---|---|---|---|
| | | Credit/ (charge) to current year income statement $'m | Increase/ (decrease) in net assets $'m | Credit/ (charge) to current year income statement $'m | Increase/ (decrease) in net assets $'m |
| Discounting of Capax Global deal with extended payment terms | n/a | - | - | (0.3) | (0.3) |
| IFRS 2 charge correction for revised model opening position | 11 | - | - | 1.5 | - |
| IFRS 2 charge correction for use of incorrect rate | 11 | 0.3 | - | 0.3 | - |
| Amortisation of acquired intangibles | n/a | - | - | (0.3) | (0.3) |
| Additional carve out on THFC deal | 4 | (0.3) | (0.3) | (0.3) | (0.3) |
| Discounting for extended payment terms JPMC | 4 | (0.4) | (0.4) | (0.4) | (0.4) |
| Adjustment to Mercedes sponsorship costs | 9 | (0.6) | (0.6) | (0.6) | (0.6) |
| Tax credit relating to amortisation of CA acquired intangibles | 13 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Total factual misstatements** | | (0.7) | (1.0) | 0.2 | (1.6) |
| Reversal of adjustment to vacation accrual | 10 | (1.4) | (1.4) | (1.4) | (1.4) |
| Reversal of revenue on Italian resellers (Auxilium and Computer Trading Srl) | n/a | - | - | (2.2) | (2.2) |
| Provision against Allotech de Colombia and Firmware trade receivable | n/a | (0.3) | (0.3) | (0.8) | (0.8) |
| **Total judgemental misstatements** | | (1.7) | (1.7) | (4.4) | (4.4) |
| **Total (pre-tax)** | | (2.4) | (2.7) | (4.2) | (6.0) |
| **Tax effect** | | 0.6 | 0.7 | 1.1 | 1.6 |
| **Total (post-tax)** | | (1.8) | (2.0) | (3.1) | (4.4) |

As discussed in section 2, there is an adjustment to reduce revenue and costs by $0.2 million.

We will obtain written representations from the Board of Directors confirming that after considering all these uncorrected items, both individually and in aggregate, in the context of the consolidated financial statements taken as a whole, they do not believe that any adjustments are required.

K9/433/17

002257711

EXH 3789-0017

# Appendix 2: Draft management representation letter

(Autonomy Letterhead)

21 July 2010

Deloitte LLP
City House
126-130 Hills Road
Cambridge
CB2 1RN

Dear Sirs

**Review of interim financial information of Autonomy Corporation plc**

This representation letter is provided in connection with your review of the balance sheet of Autonomy Corporation plc as of 30 June 2010 and the related statements of income, changes in equity and cash flows for the three and six month periods then ended and a summary of the significant accounting policies and other explanatory notes for the purposes of expressing a conclusion whether anything has come to your attention that causes you to believe that the interim financial information does not give a true and fair view of the financial position of Autonomy Corporation plc as at 30 June 2010, and of its financial performance and its cash flows in accordance with International Accounting Standard 34 as adopted by the European Union and the Disclosure and Transparency Rules of the United Kingdom's Financial Services Authority. We acknowledge our responsibility for the fair presentation of the interim financial information in accordance with International Accounting Standard 34 as adopted by the European Union and the Disclosure and Transparency Rules of the United Kingdom's Financial Services Authority.

We confirm, to the best of our knowledge and belief, the following representations:

∞    The interim financial information referred to above has been prepared and presented in accordance with International Accounting Standard 34 as adopted by the European Union and the Disclosure and Transparency Rules of the United Kingdom's Financial Services Authority.
∞    We have made available to you all books of account and supporting documentation, and all minutes of meetings of shareholders and the board of directors.
∞    There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial information.
∞    There has been no known actual or possible non-compliance with laws and regulations whose effects required consideration when preparing the interim financial information or that could have a material effect on the interim financial information in the event of non-compliance.
∞    We acknowledge responsibility for the design and implementation of internal control to prevent and detect fraud and error.
∞    We have disclosed to you all significant facts relating to any known frauds or suspected frauds that may have affected the entity.

K9/433/18

002257711

EXH 3789-0018

∞     We have disclosed to you the results of our assessment of the risk that the interim financial information may be materially misstated as the result of fraud.

∞     We believe the effects of uncorrected misstatements summarised in the accompanying schedule are immaterial, both individually and in the aggregate, to the interim financial information taken as a whole. A summary of such items is attached at Appendix 1.

∞     We confirm the completeness of the information provided to you regarding the identification of related parties.  In particular, we confirm that Microtechnologies LLC is not a related party.

∞     We confirm that the interim financial information has been prepared on the going concern basis.  We do not intend to liquidate the company or cease trading as we consider we have realistic alternatives to doing so.  We are not aware of any material uncertainties related to events or conditions that may cast significant doubt upon the company's ability to continue as a going concern.  We confirm the completeness of the information provided regarding events and conditions relating to going concern at the date of approval of the interim financial information, including our plans for future actions.

∞     Where relevant, the assumptions used in the presentation and measurement of fair values reflect our intent and ability to carry specific courses of action on behalf of the entity.

∞     The entity has satisfactory title to all assets and there are no liens or encumbrances on the entity's assets.

∞     We have recorded or disclosed, as appropriate, all liabilities, both actual and contingent.

∞     No events have occurred subsequent to the balance sheet date and through the date of this letter that may require adjustment to or disclosure in the aforementioned interim financial information.

We confirm that the above representations are made on the basis of adequate enquiries of management and staff (and where appropriate, inspection of evidence) sufficient to satisfy ourselves that we can properly make each of the above representations to you.

_____

Director

For & on behalf of Autonomy Corporation plc

K9/433/19

002257711

EXH 3789-0019

# Appendix 3: Additional matters

# Introduction

We have pleasure in setting out in this document our status report to the Audit Committee of Autonomy Corporation plc and its subsidiaries (together "the Group") for the matters arising from the email correspondence from Brent Hogenson (included in Appendix A) for discussion at the meeting scheduled for 20 July 2010.

At your request we have considered the email correspondence from Brent Hogenson, together with management's responses. As part of this review we have held discussions with the Group's Chairman, CEO, COO, CFO and Group Financial Controller.

On the basis of management's detailed review of the matters raised by Brent Hogenson they have concluded that there is no new material information provided that would have affected their key judgements taken at the time of preparing and presenting the 31 December 2009 financial statements. Management have therefore concluded that these matters raised have no material impact on the Group's 2009 financial statements. Based on our discussions with management, and the review work we have carried out, we concur with this view.

The email correspondence also sets out matters which appropriately fall to be treated within the 31 December 2010 financial statements and these will be considered by management as part of the interim accounts for the period to 30 June 2010. In accordance with our normal procedures we will consider these matters as part of our review of the interim accounts, and will report to the Audit Committee accordingly.

K9/433/20

002257711

EXH 3789-0020

# Appendix 3: Additional matters

The responses on each of the matters arising from email correspondence Brent Hoggenson (see Appendix 1) are set out below:

| Question 1 | |
|---|---|
| **Revenue transactions with resellers** | See Appendix A |
| **Management response** | As background the Audit Committee are aware that the business regularly conducts transactions through resellers or valued added resellers ("VAR").  Our standard approach is to conduct such transactions under Master Service Agreements ["MSA"] which set out, inter alia, that the reseller takes full responsibility for the product once delivered from Autonomy and there are no rights of return. Revenue is appropriately recognised in accordance with the recognition criteria in paragraph 14 of International Accounting Standard 18 Revenue ("IAS 18") and Group accounting policies. |
| | The sale to Capax Discovery LLC ["Capax"] noted in the memorandum was set up under such an agreement.  In determining whether it was appropriate to recognise revenue on this sale, the Autonomy management team considered at 31 December 2009 the information it normally considers, being the following matters: |
| | ∞  Evidence of a previous trading relationship with Capax, including an understanding of the quality of this customer. This indicated that it was probable that economic benefits associated with the transaction would flow to Autonomy;<br>∞  The ability of Capax to stand by its obligation to Autonomy, irrespective of its ability to onward sell the Autonomy product;<br>∞  The fact that Capax had been a regular payer of previous deals undertaken with Autonomy;<br>∞  The fact that an appropriately signed unconditional PO had been received setting out the value of the transaction. This PO was appropriately structured under an agreed and signed MSA;<br>∞  The fact that the Autonomy software had been appropriately despatched to Capax in Q4 '09; and<br>∞  The fact that no continued managerial involvement in the transaction was contractually required or forecast. |
| | Additionally management were aware that an ultimate end user was identified - Eli Lilly ["Eli"] who are a major multi-national business that had a track record of purchasing Autonomy software ($22m). Indeed Autonomy had spent some time seeking to sell this product direct to Eli before ultimately selling it to Capax. The key feature that Capax was able to offer to Eli was an ongoing partner/ servicing arrangement. |
| | As part of the Q1 review management had sight of a direct confirmation letter from Capax to Deloitte which confirmed the validity of the December 2009 invoice and further confirmed that there were no side agreements in place. |

K9/433/21

002257711

EXH 3789-0021

# Appendix 3: Additional matters

| Question 1 (continued) | |
|---|---|
| **Management response** | Although Eli Lilly have subsequently chosen to transact directly with Autonomy in June 2010, does not detract from the fact that Autonomy contracted directly with Capax in December 2009. Autonomy delivered product to Capax and had transferred all risks and rewards of ownership of the goods by 31 December 2009. An Autonomy sales person has continued to stay involved with the transaction between Capax and the end user because it is in Autonomy's interests to stay close to the end user from a commercial perspective. Capax remain fully liable to Autonomy for the obligation under the PO signed in December 2009. |
| | Management believe that based on the evidence available at 31 December 2009 the recognition of this sale in 2009 remains valid. |
| | In response to other sub questions within Question 1 management note: |
| | ∞   The June 2010 bad debt provision against uncollected debts at that time has yet to be completed and will be prepared and reviewed as part of the routine interim close down for the six months ended on that time |
| | ∞   On the wider reseller revenue recognition point management highlight that between 1 January 2008 and 31 March 2010 the Group has generated operating profits of $531.8m and has generated operating cashflows of $550.9 m. Day's Sales Outstanding ["DSO"] in that period have remained within the 85-90 day range that management set as a key performance indicator ["KPI"]. DSO's are expected to be at a lower level than the KPI range noted above at the end of Q2 2010 – likely 80 days. Management are not aware of any material concerns over the group's revenue recognition policies. |
| **Deloitte response** | We have discussed and reviewed management's views on the matter as summarised above and concur with the accounting policy in place. The determination of the revenue recognition on the Capax sale as at 31 December 2009 is consistent with our understanding of this transaction at that time. |
| | As part of our audit for the year ended 31 December 2009, we performed audit procedures on the revenue contract with the reseller (Capax) to ensure that all criteria within International Accounting Standard 18 Revenue ("IAS 18") paragraph 14 were met. Given that all risks and rewards of the contract had been transferred to Capax by the year date and that it was probable that economic benefits would transfer to Autonomy, we concurred with management that it was appropriate to recognise the revenue on this contract. |
| | As previously reported to the Audit Committee, our materiality guideline for the 2009 audit was $20 million. We confirm that this transaction was not material on this measurement. |
| | We shall review the subsequent agreement signed direct to Eli Lilly as part of our Q2 2010 International Standards on Review Engagements 2410 ("ISRE 2410") review. We further note that our review of the Group's bad debt provision at 30 June 2010 has not yet been completed and will form part of our routine procedures on the interim results. |

K9/433/22

002257711

EXH 3789-0022

# Appendix 3: Additional matters

| Question 2 | |
|---|---|
| **EAS support revenues** | See Appendix A |
| **Management response** | Autonomy contracted with Capax for sub contracting EAS support in October 2009. The amounts paid under the sub contracting agreement were Q4 09 $696,000 and Q1 10 $1,139,000 (for 2 quarters). This is an immaterial amount. |
| | Commercial rationale: The EAS product was not written by Autonomy but by a team acquired through the acquisition of Zantaz Inc who then subsequently left. The product was originally being maintained by a team based out of Ottawa (the office only dealt with this product). EAS had a very large number of customers with value below $15,000. Thus the maintenance per customer was a very low number – annualized approximately $4m. In addition IT staff in the small companies that bought EAS are often inexperienced and weak – so there were a large number of maintenance tickets raised relative to value. Margin for maintenance on general Autonomy sales are very different to EAS (sales are typically $400,000 upwards). Margins on Autonomy sales are much higher as the sales are 100 times larger and the customer has skilled IT staff. The situation with EAS support was that it was significantly loss making and caused us reputational issues in the market and with industry analysts (Gartner etc). Autonomy is also just not set up to support $1k products. Sadly, a great deal of correspondence on these points is available. |
| | The EAS product was then superseded by a new product, DS Mail, and we closed down the Ottawa office. Capax took over the running of the maintenance for the hundreds of legacy EAS customers. Capax took over a number of staff from the Ottawa office. As we did not want to go to all our customers to reassign maintenance, we allowed Capax to initially be sub contractor. We did not and still do not have any maintenance specialists on EAS. Capax have subsequently gradually taken over the EAS customer maintenance directly. All of this is a natural and commercially expedient way of managing a "run-down" situation. Capax is a services oriented organization and values highly the chance to have relationships with a large number of customers which it can sell other services to. |
| | This transaction is completely separate from any other transactions with Capax. Whereas previously Autonomy dealt with 100% of EAS tickets, Autonomy now deals with less than 25% and this is declining. There is a separate legal agreement with Capax, only when Autonomy receives cash from the customer is cash due to Capax and the commercial rationale is strong (running down Autonomy's involvement on support without sacrificing the customers). It is an immaterial transaction with a maximum annualized $4m of revenue affected compared to c $900m forecast and this will reduce as renewals will be transacted directly with Capax. |
| **Deloitte response** | The EAS support services described above were not tested as part of our 2009 audit procedures on the grounds of immateriality, given that our materiality guideline was $20 million. As part of our procedures in 2010 we will consider these transactions within our interim review process and our year end audit process.   Such procedures will include an assessment as to whether there is any link between the provision of 2010 support services by Capax on the old Autonomy product and any other relationship between these parties. |

K9/433/23

C002257711

EXH 3789-0023

# Appendix 3: Additional matters

| Question 3 | |
|---|---|
| **Microlink** | See Appendix A |
| **Management response** | The acquisition of Microlink LLC ["Microlink"] in Q1 2010 was fully considered and approved by the Board in December 2009. Detailed explanation of the strategic and commercial rationale for the acquisition, the purchase price assessment and the divestment of part of that business (DiscoverTech) ahead of acquisition is set out in a paper that was considered by the Board on 16 December 2009. At no stage whatsoever was the rationale for this acquisition to "provide a vehicle to write off outstanding invoices" as speculated by Brent Hogenson. This is wholly incorrect. As Microlink is cleared at the highest security level by the US Government, the company is subject to the highest level of financial and commercial probity. |
| | Relevant details of this acquisition are also disclosed within Note 31 to the 2009 Group accounts. |
| | Management confirm that the acquisition process included legal transaction advice from its normal US Lawyers and that there were no side letters or arrangements in respect of this sale or use of any of its proceeds. Deloitte were provided with the full acquisition agreement, the schedules and ancillary agreements, the due diligence request lists and sight of the due diligence materials. |
| | Microlink had previously been a customer of Autonomy for 8 years.  As management began to consider a potential acquisition of Microlink in Q3 2009 the Group ceased to transact with that business pending determination of the investment.  Previously we had revenues of approximately $66m with Microlink over a four year period and had received cash of $43m. |
| | At 31 December 2009 $23m of receivables were outstanding from Microlink.  Substantially all of this balance fell within normal repayment dates. Comments included in Brent's email around this debt being written off are incorrect. Subsequent to the Group's acquisition further cash receipts of $6m were received against the year end receivable balance.  Approximately $7m of the receivable balance is in respect of Autonomy software that was being applied within the Microlink business and is on long payment terms. We will assess the accounting for this matter as part of our purchase accounting work in 2010. As part of our finalisation of the interim results, management will be continuing to monitor cash collection on these balances and complete our purchase accounting. All amounts outstanding from Microlink remain in the books of Autonomy.  We remain, however, committed to work with Microlink management to recover all amounts outstanding in full. |
| | As part of our purchase accounting in 2010 we will be assessing the recoverability of related Microlink receivables and whilst this exercise has yet to be completed we anticipate that we will be booking a $5 million provision. Brent's email makes reference to a number of transactions with Microtechnologies LLC ["Microtech"] on 30 and 31 December 2009. Management are not aware of any related party (in the accounting sense) connection between this business and Microlink.  In the first 6 months of 2010 90% of the receivable from Microtech LLP outstanding as at 31 December 2009 has been settled. |
| | Finally, for completeness, we note that it is very common for senior management to be actively involved in the significant sales of Autonomy product to third parties as reported within internal sales systems. |

K9/433/24

D002257711

EXH 3789-0024

# Appendix 3: Additional matters

**Question 3 (continued)**

**Deloitte response**

The acquisition of Microlink LLC was considered as part of the post balance sheet events' work performed as part of our audit of the year ended 31 December 2009. In particular, we discussed with senior management the strategic and commercial rationale for the transaction; reviewed the paper presented to the Board in December 2009 and concluded that Microlink was not a related party in accordance with the guidance of International Accounting Standard 24 Related Party Disclosures ("IAS 24"). We also considered the requirements of International Accounting Standard 10 Events After the Reporting Period ("IAS 10"), to ensure that management had made all of the relevant disclosures required in the annual accounts. Our year end 2009 Audit Committee paper sets out in more detail the procedures we carried out in respect of the this post year end transaction.

As part of our audit procedures on revenue, we considered the December 2009 sales transactions with Microtech and reported back to the Audit Committee on those matters as part of our routine sample based review of significant contracts. We noted that all IAS 18 paragraph 14 criteria for recognition of revenue had been met and therefore concurred with management that recognition of revenue was appropriate.

We noted as part of our Q1 2010 review (performed in accordance with ISRE 2410 that the amounts due from Microtech in relation to these 2009 transactions were up to date and not overdue. We note that transactions with Microtech in 2010 would fall to be treated in the accounts for the year to 31 December 2010 and we will review again as part of our Q2 2010 ISRE 2410 review process.

Management have yet to complete the purchase accounting for this 2010 acquisition of Microlink as in accordance with International Financial Reporting Standard 3 Business Combinations 2008 ("IFRS 3"), they have 12 months from the date of the acquisition to do so. We will review these matters as and when that exercise is completed as such transactions appropriately fall to be treated in the financial statements for the year ended 31 December 2010.

K9/433/25
L002257711

EXH 3789-0025

# Appendix 3: Additional matters

| Question 4 | |
|---|---|
| **Filetek transactions** | See Appendix A |
| **Management response** | FileTek, Inc, ("Filetek") products are OEM'ed into the Autonomy SPE product (launched in Q3'09). Subsequent sales have been very strong. The first OEM purchase of FileTek's Storhouse product in Q4'09 was limited by data volume. In Q2'10 our CTO confirmed that the data volumes were going to be exceeded so we negotiated an unlimited (by data volume) OEM. |
| | Mr Hoggenson has not had sight of the detailed analysis that was done to justify the appropriate fair value in Q4'09. The Q4 transactions were fully disclosed to the Audit Committee. Autonomy received quotes from CommVault, HP and Informatica as part of the due diligence process on the purchase and to ensure that the fair value of the intangible was appropriately stated. The second purchase in Q2'10 has yet to be reviewed by the auditors but there is no new technical information available that is different to when the previous discussions took place. |
| | Auxilliary point: An OEM gives the customer the right to sell the software many times over, thus OEMs are always of higher value. There are a number of comparable deals. |
| **Deloitte response** | The purchase of software from FileTek Inc in December 2009 was reviewed and considered as part of our audit for the year ended 31 December 2009.  This included consideration of the fair value of the licence acquired and discussions with the CTO Pete Menell. We involved a Deloitte IT technical expert to assist the audit team in understanding the technical and commercial rationale for the transaction and to ensure that it was appropriate to capitalise the amount in full as an intangible asset in accordance with International Accounting Standard 38 Intangible Assets ("IAS 38").  The sale to FileTek in December 2009 was also considered as part of the year end audit as part of our standard audit procedures on revenue.  We concur with management that the criteria of IAS 18 with regards to the recognition of revenue had been met at 31 December 2009. |
| | By virtue of their size these transactions were highlighted and fully discussed with the Audit Committee and our report of 1 February 2010 records our concurrence with management's treatment of these transactions. |
| | We understand from management that in the six months ended 30 June 2010 amounts outstanding from FileTek in respect of the December 2009 sales have been received in full. |
| | Transactions with FileTek in 2010 fall to be treated as items for the audit of the year ending 31 December 2010. |

K9/433/26

D002257711

EXH 3789-0026

# Appendix 3: Additional matters

| Questions 5 and 6 | |
|---|---|
| Accrued liabilities | See Appendix A |
| Management response | Maintenance accruals – such accruals are only made where there is a contract with auto renewal provisions. Therefore, the customer is legally obligated to pay for the maintenance that it receives. The cumulative accrued balance was $4.2m at the end of Q1 2010 and compares with an annual c $190m of recognised maintenance revenue from the US.  The only portion of this balance which we are monitoring closely over the course of 2010 is where the accrual has been recognised as maintenance revenue in the income statement but for which invoices have yet to be issued to the customer. |
| | Commissions - such accruals have been consistently calculated in accordance with our Group accounting procedures. Commissions are accrued when revenue is recorded and are calculated in accordance with the signed Compensation Plans. Where there is significant doubt over recoverability, i.e. where a provision has been made in part against a trade receivable, the related accrual will also be provided against.  In the case of the amount in question, this is a unique scenario where the commission due is in relation to a number of long overdue Latin American trade receivables which have been discussed with the Audit Committee by management and the audit on a regular basis throughout 2009. |
| | Vacation/PTO - US employees are entitled to accrue PTO subject to a cap depending on length of service. At each year-end a detailed calculation is prepared showing the maximum cash liability assuming everyone left on that date – as at end December 2009 this was $4.6m (this schedule was provided to the auditors during the year end audit). The provision carried forward was $3.3m. The PTO carry forward policy was made uniform across the US Group on 1 January 2010 so that all US based employees were subject to the same cap calculation and employees were given until September to reduce their carried forward to the cap level or lose the excess balance. Assuming all employees are at or below the cap level then the maximum liability would have been $4.2m.  In addition, in practice there is very little cash expense incurred by the Group. We would reiterate that to pay the $4.2m all employees would have to leave – in practice this would take many years so even this number should be discounted to NPV. |
| | Sales tax - We charge sales tax to our customers when relevant. This amount has no impact on the p&l and is paid over to the relevant state tax authorities as required. We have been audited for sales tax by New York state and possibly others. No adverse findings were identified. There would only be an exposure if we had not charged sales tax and we should have (has never happened) and the customer has not paid "use" tax on the asset and we could not invoice the sales tax. We do not agree that there is an exposure here and that the historic lwov policy of charging sales tax on all sales is inappropriate. |
| Deloitte response | The matters raised in questions 5 and 6 relate to transactions originating in 2010.  Management have yet to present to us their position on these matters as at 30 June 2010 as they have yet to complete their process of review on these accounts.  Historically, we have found their accounting for these matters to be satisfactory and we concur with their current approach to these matters set out above. We will consider these accruals within our standard review Q2 2010 review and as part of our 2010 audit. |

K9/433/27

002257711

EXH 3789-0027

# Appendix A: Email Correspondence from Brent Hogenson

**From:** Brent Hogenson [mailto:Brent.Hogenson@autonomy.com]
**Sent:** 26 June 2010 19:36
**To:** Knight, Rob (UK - St Albans); Knights, Richard (UK - Cambridge)
**Subject:** IMPORTANT AUDIT RELATED QUESTIONS
**Importance:** High

June 26, 2010

Dear Richard, Rob,

You may remember me from the work done by Deloitte during the acquisition of Interwoven by Autonomy in March 2009.  I was the VP of Finance at Interwoven and have been promoted to the Chief Financial Officer in the Americas for Autonomy Group.

We consolidated the finance team in the Americas from all subsidiaries and business units during the second quarter of 2010.  As part of this effort, I asked the Americas finance team to review all financial accounts, account reconciliations and significant transactions across all subsidiaries and business units in the Americas as I wanted to ensure that were no material issues within the Americas.

During this review, I identified a few questions and have reported these to Mike Lynch the CEO of Autonomy and have had further discussions with Mike Lynch and Andy Kanter the COO of Autonomy over the last week beginning June 22, 2010.  Despite my requests, I have yet not been able to have any direct contact with the Audit Committee but have had a few conversations and exchange of letters with both Mike Lynch and Andy Kanter since June 22, 2010.  Mike Lynch has requested that I not involve the Cambridge finance team, and as such, have not discussed these questions with the Group Chief Financial Officer or the Group VP of Finance.  I am sending this letter to provide you with the opportunity to review these questions and ensure that they are properly recorded in our financial statements.  To that end, set forth below is the related information to my questions.  You may need to request additional information, that is not available to me, related to these questions from Autonomy to ensure that they are properly recorded in our financial statements.

K9/433/28
002257711

EXH 3789-0028

# Appendix A: Email correspondence from Brent Hogenson

**Question #1) Is revenue properly recognized on reseller transactions where there may be no End User and the Autonomy sales team subsequently completes an agreement directly with the End User with substantially modified license terms from the standard reseller terms?**

Below is an example of a Capax transaction.

In Q4 2009, reseller Capax gave Autonomy an order for $6,286K for Eli Lilly (attached to this email), of which license revenue recognized in Q4 2009 was $5,987K. The $6,286K was due for payment from Capax on March 31, 2010. As part of our normal collection calls, the collection team contacted the customer to confirm the payment date. The collection team had a difficult time getting a response from the customer and, as this was a large amount, asked me to call the reseller. I called John Baicco, the Managing Partner at Capax, to follow up on the payment date. John asked me if I had discussed the agreement with two members of the Autonomy senior management team. I told him that I would but continued to request payment information. He then told me that the Eli Lilly deal had not closed in Q4 2009 and that he would not be able to make payment until the Eli Lilly closed and he had received payment from Eli Lilly.

In June 2010, Eli Lilly executed a License Agreement directly with Autonomy (attached to this email) for a total value of $5,567K and license value of $5,303K.

In reviewing the SMS customer notes (SMS tracks all Autonomy sales activity) related to Eli Lilly during the period of Q4 2009 through Q2 2010, there were many steps in the sales process required by the Autonomy sales team to complete the transaction with Eli Lilly subsequent to when we recognized revenue in Q4 2009. There was no mention of any steps or sales process to be performed by Capax. I have attached screen shots on meeting notes from SMS during this period.

The Autonomy Revenue policy requires that the license fees be fixed and determinable prior to recognizing revenue. IFRS IAS – 18 section 14 (c) states "the amount of revenue can be measured reliably." It is also potential that IFRS would view the agreement with the reseller as a consignment. The Autonomy Revenue policy is written very similar to the requirements under SOP 97-2 and in previous quarter earnings release presentations during 2009 where we report the quarterly results there has been a footnote on a slide that approximately states – where IFRS is silent as to revenue recognition Autonomy follows the requirements of SOP 97-2 (I am not sure of the exact wording but believe that this is close and should be able to be confirmed by reviewing the four quarterly earnings presentations provided during the 2009 earnings calls).

Do the items listed below call into question if the Capax agreement that was recognized as revenue in Q4 2009 was fixed and determinable under the Autonomy Revenue Policy, under IFRS could be measured reliably or a consignment transaction:

1) The payment from Capax is almost 90 days past the due date on their agreement and the Managing Partner stated that they would not pay Autonomy without payment from Eli Lilly
2) The Autonomy contract with Eli Lilly in June 2010 provides our right to designate the payee and we agree that payment to designated payee releases Eli Lilly of the payment obligation. Autonomy may designate payment under our Eli Lilly agreement to Capax and then Capax will pay Autonomy. I have attached an email from Cambridge finance which instructs the Americas finance team to create pro forma invoices and send them to Capax for them to send to Eli Lilly
3) Autonomy completed the agreement in June 2010 directly with Eli Lilly rather than a contract between Capax and Eli Lilly
4) The Autonomy sales channel was significantly involved in the ongoing sales effort without any mention of Capax in the SMS notes

K9/433/29
U002257711

EXH 3789-0029

# Appendix A: Email correspondence from Brent Hogenson

5) The contractual terms between Autonomy and Eli Lilly have a contingency not included in the Capax agreement where acceptance testing is required against some of the licensed software
6) The contractual terms between Autonomy and Eli Lilly have added significant warranty provisions that were not included in the Capax agreement
7) The contractual terms between Autonomy and Eli Lilly have added a change in the maintenance service period for products subject to acceptance testing that was not included in the Capax agreement
8) Autonomy may deliver the most recent version of our products which will include any updates or upgrades from the shipment made to Capax in Q4 2009.  If not, Eli Lilly will not have the rights to the releases from R&D during Q4 2009 and Q2 2010
9) Autonomy does not have the right to invoice for products subject to acceptance testing until acceptance testing is complete

Please review the information above, the attached Capax Agreement, the attached Eli Lilly Agreement, the attached email from Cambridge finance on invoicing instructions and attached meeting notes from the SMS system and confirm that the revenue recognized from the Capax agreement in Q4 2009 was properly recorded in our financial statements in Q4 2009.  If it is not properly recorded in Q4 2009, Deloitte and the Audit Committee should consider the multiple similar reseller transaction recognized as revenue from 2008 through Q1 2010, many of which range between $1M and $11M per transaction and the impact on revenue reported within the financial statements during these periods.

Note that many significant payments due from resellers in the Americas on our accounts receivable aging reports remain unpaid significantly beyond the invoice due date and may be considered uncollectable or bad debt but not yet reserved for as of June 2010.  I am unsure if the invoices that remain unpaid on the aging have an end user related to each reseller agreement.  I have attached a spreadsheet named Problem Accounts 6_17 where the notes under the Updates column were made by the Americas collection team.   Also, note the amount past due from Microlink in Question #2 below.

**Question #2) Does the First Amendment to the VAR Agreement with Capax executed in October 2009 (attached to this email) have economic substance and is it properly recorded in the financial statements when considered with the Capax purchase agreements that potentially do not have end users but have payment terms spread into future periods that may somewhat relate in timing to the payments received under this First Amendment to the VAR Agreement with Capax?**

In considering the answer to this question, note that margins achieved by Autonomy on maintenance revenue is substantially greater than 15% and Autonomy is providing 85% of the revenue from EAS maintenance customers and the related cash payments from these EAS customers on their maintenance renewals.  Also, filter the Bill To column in the attached Problem Accounts 6_17 spreadsheet to Capax Global and review the outstanding invoices with significantly extended payment terms and the associated comments from the collection team in the Updates column.  As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

**28  Report to the Audit Committee on the 2010 Interim Review Final** Report

002257711

EXH 3789-0030

# Appendix A: Email correspondence from Brent Hogenson

**Question #3) Is there a financial statement impact with the potential related party relationships identified below on recorded revenue transactions?**

The following information is from a spreadsheet labeled Q4 2009 Closed Deals Final prepared by Cynthia Watkins, Corporate Controller of Autonomy, Inc.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue |
|----------|---------------------|-----------|-------------|
| 31-Dec | Microlink – Discovery LLC | MGMT | 2,000,000 |
| 30-Dec | MicroTech LLC –  (Blank) | MGMT | 9,523,810 |
| 31-Dec | MicroTech LLC –  Amazon | MGMT | 131,418 |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000 |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000 |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000 |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000 |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000 |

In Q1 2010 we invoiced the following (detail from the Problem Accounts 6_17 spreadsheet attached to this email):

| Inv Date | Revenue Summary | Sales Rep | Inv Amount |
|----------|-----------------|-----------|------------|
| 31-Mar | Microtech LLC – Vatican | Blank | 11,550,000 |
| 31-Mar | Discover Technologies – Citi | Blank | 4,394,250 |

I have been told by the finance team in San Francisco that transactions without a sales rep identified are transactions where the end user has not completed the agreement by the end of the quarter in which Autonomy recognizes revenue.  The end user identified above may be a placeholder for an agreement to be negotiated subsequent to the invoice date.  Per the attached spreadsheet Q1 2010 Closed Deals 3.31.10, Manulife and Morgan Stanley may have closed with the end user in Q1 2010 as they are removed from the spreadsheet with negative numbers at the bottom of tab IDOL-K2-UltraSeek. There are many other transactions on the quarterly closed deals spreadsheets to these resellers that have been closed in on the last day of a quarter where the Sales Rep is MGMT throughout 2008 and 2009.

K9/433/31

002257711

EXH 3789-0031

# Appendix A: Email correspondence from Brent Hogenson

**Related Party Data:**

In February 2010, Autonomy acquired Microlink for $55M.  As part of the acquisition, Autonomy wrote off in approximately $16M of outstanding accounts receivable with due dates as follows:

| Due Date | Amount | |
|---|---|---|
| March 31, 2009 | 6,875,000 | 10 months past due |
| June 30, 2009 | 4,576,200 | 7 months past due |
| Sept 18, 2009 | 203,250 | 4 months past due |
| Sept 30, 2009 | 2,008,238 | 4 months past due |
| Feb 14, 2010 | 2,300,000 | (1) |
| Total | 15,962,688 | |

(1) The February 14th invoice above is writing off the Dec 31, 2009 invoice to Discovery Technologies, which had license revenue of $2,000,000 and maintenance of $300,000 for a total of $2,300,000.

Microlink's Address is as follows:
8330 Boone Blvd
Suite 300
Vienna, VA 22182
Phone: 703-556-4440
MicroTech's Address is as follows:
8330 Boone Blvd
Suite 600
Vienna, VA 22182
Phone: 703-691-1073

K9/433/32

002257711

EXH 3789-0032

# Appendix A: Email correspondence from Brent Hogenson

Discover Technologies has a very limited website.  There is a whitepaper titled Automation Speeds the Ability to Collaborate and Turbo-Charges the Enterprise Search User Experience.  The bottom of the pages of this whitepaper has the following information:

www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

I question if the Microlink transaction was partially done to provide a vehicle to 1) write off the $16M in outstanding invoices where a large percent were significantly past due and where there may be potential that there was no End User to pay Microlink; and 2) potentially provide a cash balance to pay invoices on reseller agreements where there may not be an End User due from potentially related party resellers.  As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

**Question #4) Have the barter transactions below been reviewed for the economic benefit and fair value on both sides of the transactions to ensure that they are properly recorded in our financial statements?**

Autonomy made the following purchases of software from FileTek, Inc.:

| | |
|---|---|
| December 31, 2009 | 10,367,280 |
| May 11, 2010 | 11,518,214 |

Autonomy sold the following license and maintenance revenue to FileTek as follows:

| | |
|---|---|
| December 31, 2009 | 8,480,000 IDOL Product |
| March 31, 2010 | 9,010,000 500 users Liquid Office plus some OEM product |

In a barter transaction, my understanding is that IFRS is not substantially different from GAAP and requires validation of the fair value and economic benefit on both sides of the transaction.  My information is limited; however, I have asked Sean Sullivan, Liquid Office Sales VP, for a low and high range of a liquid office transaction with 500 to 1000 users.  The range that he gave me was $300,000 to $1,000,000, which is only a part of the March 31, 2010 transaction and does not include the OEM product, which is difficult for me to find fair value.  As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

K9/433/33

002257711

EXH 3789-0003

# Appendix A: Email correspondence from Brent Hogenson

**Question #5) Is the revenue accrued and included in the Q1 2010 financial statements related to maintenance renewals expected to renew from customers who have not yet agreed to renew?**

In Q1 2010 a combined Autonomy, Inc, Etalk, Zantaz and Verity business units recorded a revenue accrual of $6,591K related to customers expected to renew their maintenance contracts where the service period had lapsed prior to March 31, 2010.  The amount related to the maintenance renewals where the service period had not yet lapsed was recorded as deferred revenue.  In our Q2 review as part of consolidating the Americas finance team, it was noted that this revenue accrual calculation expected a significant percentage of the maintenance renewals that were up to 12 months beyond the end of their last service period, to renew and these business units recorded the revenue for the lapsed service period in the Q1 financial statements.  As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

**Question #6) Are the recorded liabilities and accruals within the financial statements applying IFRS properly and consistently calculated?**

In our Q2 review as part of consolidating the Americas finance team, it was noted that accruals and recorded liabilities across the business units of Autonomy, Inc, Etalk, Zantaz and Verity were either 1) not recorded at all; or, 2) not consistently calculated.  The accruals in question primarily relate to:

1) Commissions and related payroll tax

2) Vacation/PTO

3) Sales Tax

As Chief Financial Officer in the Americas, I ask you to confirm that the above information has been reviewed by Deloitte and does not have an impact on our reported financial statements.

I will inform Mike Lynch and Andy Kanter that I have sent this email to you and provide them with a copy.

I look forward to your response.

**Brent Hogenson**

**President Autonomy Interwoven**

**CFO Autonomy Americas**
**Tel: 408.953.7058**
**Mobile: 408.718.1376**
**E-mail: brent.hogenson@autonomy.com**

K9/433/34
D002257711

EXH 3789-0004

K9/433/35
002257711

Deloitte refers to one or more of Deloitte Touche Tohmatsu ('DTT'), a Swiss Verein, and its network of member firms, each of which is a legally separate and independent entity. Please see www.deloitte.co.uk/about for a detailed description of the legal structure of DTT and its member firms.

Deloitte LLP is the United Kingdom member firm of DTT.

This publication has been written in general terms and therefore cannot be relied on to cover specific situations; application of the principles set out will depend upon the particular circumstances involved and we recommend that you obtain professional advice before acting or refraining from acting on any of the contents of this publication. Deloitte LLP would be pleased to advise readers on how to apply the principles set out in this publication to their specific circumstances. Deloitte LLP accepts no duty of care or liability for any loss occasioned to any person acting or refraining from action as a result of any material in this publication.

© 2010 Deloitte LLP. All rights reserved.

Deloitte LLP is a limited liability partnership registered in England and Wales with registered number OC303675 and its registered office at 2 New Street Square, London EC4A 3BZ, United Kingdom. Tel: +44 (0) 20 7936 3000 Fax: +44 (0) 20 7583 1198.

**Member of Deloitte Touche Tohmatsu**

K9/433/36

C002257711

EXH 3789-0036

# EXHIBIT 1012

| | |
|---|---|
| **From:** | Brent Hogenson |
| **Sent:** | Monday, July 26, 2010 12:16 PM |
| **To:** | whistle@fsa.gov.uk |
| **Subject:** | Qualified Disclosure Questions |
| **Attachments:** | Finance concerns; 2009-10-01 - First Amend to Capax VAR Ahreement.pdf; FW: Lilly; Capax December 2009 Agreement.pdf; FW: Capax; Capax Kraft Q3 2009.pdf; Capax Payment Schedule.xls; RE: Commission Payments; discover whitepaper.pdf; Eli Lilly June 2010 Agreement.pdf; Eli Lilly SMS Meetings.doc; Incident; Kraft December 2009 Agreement.pdf; Letter to Capax Dec 29 2009.pdf |

July 26, 2010

Intelligence Department
The Financial Services Authority
25 The North Colonnade
Canary Wharf
London E14 5HS
011442070669200

<table>
<tr><td>United States District Court<br>Northern District of California<br><br>**Trial Exhibit 1012**<br><br>Case No:   CR 18-0577 CRB<br>Date Entered: _____<br>By:   _____<br>           Deputy Clerk</td></tr>
</table>

Dear FSA Agent,

**My Background:**
My name is Brent Hogenson and I am the Chief Financial Officer in the Americas for Autonomy Corporation PLC (stock symbol AU), which is traded on the London Stock Exchange. I became an employee of Autonomy when Autonomy acquired Interwoven Inc. in March 2009 where my role was Vice President of Finance from 2003 through 2009. Autonomy promoted me to CFO of Americas in mid 2009 and approved the consolidation of the Autonomy finance teams in the Americas at multiple subsidiaries and business units under a finance leadership team that I recommended in April 2010. I am a Certified Public Accountant in the State of California and spent the early part of my accounting career at Arthur Andersen in the audit division. I am 49 years old and have been in finance leader roles for the past 20 plus years of my career primarily with companies listed on the NASDAQ stock exchange. This is the first time in my career that I have sent a potential whistle blowing letter to a regulatory agency.

My only motive for sending this letter to the FSA is to ensure that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors. Autonomy has treated me very well since the acquisition of Interwoven in March 2009, noted by the following:

1) I have been promoted twice in the past 5 quarters, first to the CFO of Americas and second to the President of Interwoven.
2) My base salary has been significantly increased during an economic period where few employees received an increase to base salary
3) I have received almost 100% of my quarterly bonus for the past 5 quarters in a period where few employees received that high of a percentage of their potential quarterly bonus
4) I have received multiple new stock option grants over the past 5 quarters
5) At the annual sales meeting in January 2010, I was one of a very few (approximately 15 out of all operations/sales employees) that received an award for performance in 2009
6) I have been a significant part of the Interwoven/iManage operations/sales management which performed well in the last 5 quarters and I believe that we also performed well in Q2 2010. Therefore, my job satisfaction has been quite high.

1

7) I have restricted stock units that vest in June and July 2010, where the approximate value exceeds $150k—a significant value to me.

Prior to June 22, 2010 when I reported my concerns to Mike Lynch, CEO of Autonomy, Autonomy had treated me very well and I had no motive other than to ensure that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors.

**Upfront Disclosure:**
Before proceeding to the questions that I have raised related to our financial statements there is one issue that should be acknowledged. On June 25, 2010, the finance team in Americas working with the Human Resources Department identified a potential fraudulent activity from the Autonomy Inc. team in San Francisco. This team reported into the Corporate Controller in the Americas who reported into the VP of Finance in Cambridge between 2005 through mid 2009 and to me between mid 2009 through today.

Autonomy started an investigation after we received a notice from EDD when a terminated payroll employee applied for unemployment insurance (see attached email titled Incident). This employee applied for unemployment insurance when we terminated her for payroll errors found in our Q2 review initiated when we consolidated the finance functional leaders on the Americas team. I have attached an email titled Termination Approval which documents the payroll errors and has the termination approval on May 26th. The investigation subsequent to June 25, 2010 has identified that four employees of Autonomy, Inc. and the San Francisco finance team, including the Corporate Controller, are potentially involved and that the fraudulent payroll activity has been occurring since 2005 or 2006. The Corporate Controller has been placed on leave until the investigation is complete.

I would acknowledge that this fraudulent activity has occurred for many years including a short period while I have been CFO of Americas and that it was also found due to actions taken at my recommendation to consolidate the Americas finance teams. I would also like to be very clear that I had no knowledge of this fraudulent activity prior to June 25, 2010 and specifically when I reported my concerns to Mike Lynch on June 22, 2010.

**Introduction to the Questions:**
We consolidated the Autonomy finance team in the Americas from all subsidiaries and business units under functional finance leaders during the second quarter of 2010. As part of this effort, I asked these functional finance leaders to review all financial accounts, account reconciliations and significant transactions across all subsidiaries and business units in the Americas as I wanted to ensure that there were no material issues within the Americas.

During this Q2 internal review, the functional finance leaders, who report to me in the Americas, identified a few questions and I have provided additional detail below and in the attachments to this email. On June 22, 2010, I reported these questions to Mike Lynch, the CEO of Autonomy, and requested a meeting with the Audit Committee. There were numerous telephone discussions and exchanges of emails over the following few days. However, I did not have confidence that my questions would get to the Audit Committee in a complete form. On June 26, 2010, I sent my questions directly to Deloitte, Autonomy Auditors, and sent a copy of the email to Mike Lynch. Also on July 7, 2010, Percy Tejeda, the Director of Revenue in the America, who brought many of the questions below to my attention during this Q2 internal review, documented his concerns from our review in an email to me, which I have attached to this email named Percy Finance Concerns.

On July 22, 2010, Autonomy released first half 2010 financial statements in a press release and had an earnings call with analysts and investors. Between June 26, 2010 and July 22, 2010 I had numerous email exchanges with Autonomy management and the Senior Member of the Autonomy Audit Committee. However, neither the Audit Committee nor Deloitte have contacted me prior to July 26, 2010 or any member of the functional finance

2

leaders in the Americas to further understand the questions detailed below.  On July 26, 2010, I had a conference call with members of the Audit Committee and the COO of Autonomy.  On this call I was asked if I had any further questions to those previously provided and then told that none of my questions were serious in nature.  I expressed that I was uncomfortable and not confident about the company's procedures and concerned by the nature and lack of response to my questions and that it appeared that my questions were closed by Autonomy without a serious review or even discussion with me.  Therefore I am sending my questions below and the attached documents directly to the FSA.

**Questions:**
**#1) Is revenue properly recognized on reseller transactions where there may be no End User and the Autonomy sales team subsequently completes an agreement directly with the End User?**

Below are two examples of a reseller transaction where in both examples Capax is the reseller.

**Example One:**
In Q4 2009, reseller Capax gave Autonomy an order for $6,286K for Eli Lilly (attached to this email named Capax December 2009 Agreement), of which license revenue recognized in Q4 2009 was $5,987K.  The $6,286K was due for payment from Capax on March 31, 2010.  As part of our normal collection calls, the collection team contacted Capax in early June, 2010 to confirm the payment date.  The collection team had a difficult time getting a response from Capax and, as this was a large amount, asked me to call the reseller.  The Director of Credit and Collections in the Americas and I called John Baicco, the Managing Partner at Capax, to follow up on the payment date.  John asked me if I had discussed the agreement with two members of the Autonomy senior management team.  I told him that I would but continued to request payment information.  He then told me that the Eli Lilly deal had not closed in Q4 2009 and that he would not be able to make payment until the Eli Lilly deal closed and he had received payment from Eli Lilly.

In June 2010, Eli Lilly executed a License Agreement directly with Autonomy (attached to this email named Eli Lilly June 2010 Agreement) for a total value of $5,567K and license value of $5,303K.  The transaction executed by Autonomy directly with Eli Lilly was $719K less than the reseller transaction recognized as revenue in Q4 2009.

In reviewing the SMS customer notes (SMS tracks all Autonomy sales meeting activity) related to Eli Lilly during the period of Q4 2009 through Q2 2010, I discovered that, following the revenue recognition in Q4 2009, there were still many pending steps in the sales process requiring the Autonomy sales team to complete in order to close the transaction with Eli Lilly.  There was no mentioning of any steps or sales process to be performed by Capax in the SMS notes.  I have attached screen shots of meeting notes from SMS during this period to this email named Eli Lilly SMS Meetings.

The Autonomy Revenue Policy requires that the license fees be fixed and determinable prior to recognizing revenue.  IFRS IAS – 18 section 14 (c) states "the amount of revenue can be measured reliably."   Based on Autonomy's Revenue Policy and IFRS guideline, I believe that the agreement with the reseller, Capax, could potentially be viewed as a consignment.  The Autonomy Revenue policy is written very similarly to the requirements under SOP 97-2 and in previous quarter earnings release presentations during 2009 where Autonomy reported the quarterly results there was a footnote on a slide that approximately stated – where IFRS is silent as to revenue recognition Autonomy follows the requirements of SOP 97-2 (I am not sure of the exact wording but believe that this is close and should be able to be confirmed by reviewing the four quarterly earnings presentations provided during the 2009 earnings calls).  Also see Question 6 below.

Do the items listed below call into question if the Capax (Eli Lilly) Agreement that was recognized as revenue in Q4 2009 was fixed and determinable under the Autonomy Revenue Policy and could be measured reliably under IFRS?

3

HP-SEC-00008341
Exh 1012-0003

1) The payment from Capax is more than 90 days past the due date on their agreement and the Managing Partner stated that they would not pay Autonomy without payment from Eli Lilly.
2) The Autonomy contract with Eli Lilly in June 2010 grants Autonomy right to designate the payee and Autonomy agrees that payment to designated payee releases Eli Lilly of the payment obligation. Autonomy might have designated payment under our Eli Lilly agreement to Capax and have Capax pay Autonomy. I have attached an email from Cambridge finance named Cambridge Inv Instructions, which instructs the Americas finance team to create pro forma invoices and send them to Capax for them to send to Eli Lilly.
3) Autonomy completed the agreement in June 2010 and closed the deal directly with Eli Lilly, not through a contract between Capax and Eli Lilly
4) The Autonomy sales channel was significantly involved in the ongoing sales effort without any mentioning of Capax's involvement in the SMS notes subsequent to recognizing revenue in Q4 2009.
5) The contractual terms between Autonomy and Eli Lilly have a contingency clause where acceptance testing is required against some of the licensed software; however, the contingency clause was not included in the Capax agreement.
6) The contractual terms between Autonomy and Eli Lilly have added significant warranty provisions that were not included in the Capax agreement.
7) The contractual terms between Autonomy and Eli Lilly have added a change in the maintenance service period for products subject to acceptance testing that was not included in the Capax agreement.
8) Autonomy does not have the right to invoice Eli Lilly for products subject to acceptance testing until acceptance testing is complete


**Example Two:**
In Q3 2009 Capax signed an order with Autonomy (attached to this email named Capax Kraft Q3 2009) where the End User was identified as Kraft and Autonomy recognized a $4M license fee as revenue in Q3 2009. In December 2009, Kraft executed a License Agreement directly with Autonomy (attached to this email named Kraft December 2009 Agreement) with a license fee of $4M. In a letter from the Autonomy COO of Americas to Capax on December 29, 2010 (attached to this email named Letter to Capax Dec 29 2009), Autonomy agreed to remove the payment obligation due from Capax related to the signed Kraft order in Q3 2009 and pay Capax a one time fee of $400K in exchange of Capax not to collect or attempt to collect from Kraft (even though Capax never had an agreement with Kraft or an obligation from Kraft to pay Capax). Based on the above information, should Autonomy recognize the Capax revenue in Q3 2009?


**Additional Information:**
There are many significant payments due from resellers in the Americas on our accounts receivable aging reports that remain unpaid and significantly beyond the invoice due date. These invoices may be considered uncollectable but are not yet reserved for as of June 22, 2010. However, Autonomy stated in its 2009 Annual Report and the presentations to investors during the earnings calls that its bad debt is only less than 1% of its revenues. There have been discussions between legal and finance in the Americas with many of these resellers where it has been noted that many of these invoices remain past due as a result of no end user agreement. I have attached a spreadsheet named Problem Accounts where the notes under the Updates column were made by the Americas collection team. Also, note the amount past due from Microlink in Question #3 below.


Commission payments to sales reps are generally not accrued or paid when the reseller agreement is recognized as revenue but rather if and when the end user transaction is complete.


There are multiple similar reseller transactions to these two examples which have been recognized as revenue from 2008 through Q1 2010, many of which range between $1M and $11M per transaction. To ensure you have complete information, I attached to this email the past nine quarterly revenue spreadsheets dating back to

4

HP-SEC-00008342
Exh 1012-0004

Q1 2008-named QX 20XX Closed Deals.  These spreadsheets were prepared by the Corporate Controller of Autonomy, Inc, Zantaz, Etalk and Verity (Subsidiaries or Business Units) working out of the San Francisco Autonomy office.  I have reviewed these spreadsheets and highlighted in yellow potentially similar transactions to the two examples above of reseller transaction, which are primarily transactions where the Sales Rep is only identified as MGMT.  If the terms of the reseller agreements are not final or Autonomy has significant work remaining to close the deal with the end user, the cumulative effect of the potential reseller transactions without an end user agreement may be material to the Autonomy Financial Statements between 2008 and Q1 2010.

**#2) When Autonomy contractually agrees to potentially overpay a reseller for services performed, does the potential overpayment impact current license revenue transactions with the same reseller where the payment of the license transaction is due from the reseller in future periods that may be similar in timing to the potential overpayment by Autonomy to the reseller for services?**

I have attached the following documents to this email:
1) 2009-10-01 First Amend to Capax Var Agreement
2) Problem Accounts – filter the Bill To column to Capax Global and review the future payment terms along with the comments in the Updates column.
3) Capax Payment Schedule – details payments due to and due from Capax
4) Capax Increase payment by 125K – Autonomy agrees to increase monthly payments to Capax for EDD by $225K and Support by $125K

In considering the answer to this question, note that the 2009-10-01 First Amend to Capax Var Agreement allows Capax to invoice Autonomy customers for the maintenance fees in current and future annual periods.  Capax will pay Autonomy 15% of the maintenance fees collected from Autonomy customers supported by Capax and keep 85% of the maintenance fees collected.  The historical profit margin achieved by Autonomy on maintenance revenue is approximately 85%, but in this amendment we are providing Capax with a revenue stream into the future of 85% of the collected maintenance fees.  If you filter the Bill To column in the attached Problem Accounts spreadsheet to Capax Global and review the outstanding invoices with significantly extended payment terms and the associated comments from the collection team in the Updates column, you may note that it is possible that Autonomy has provided 85% of the collected maintenance fee to Capax to cover the future payments due from Capax where there may not be an end user agreement.

**#3) Is there a financial statement impact from the potential related party relationships identified below on recorded revenue transactions?**

The following information is from the attached spreadsheet labeled Q4 2009 Closed Deals prepared by the Corporate Controller of Autonomy, Inc.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue |
|---|---|---|---|
| 31-Dec | Microlink – (1) | MGMT | 2,000,000 |
| 30-Dec | MicroTech LLC – (1) | MGMT | 9,523,810 |
| 31-Dec | MicroTech LLC – Amazon | MGMT | 131,418 |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000 |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000 |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000 |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000 |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000 |

(1) The end user on these transactions is Discover Technologies.  See related parties section of this question below.

5

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008343
Exh 1012-0005

Per the attached email named Commission Payments on Reseller Deals, there was no commission accrued on these deals in Q4 2009 when Autonomy recognized revenue in the Q4 financial statements.

In Q1 2010 we invoiced the following (detail from the Problem Accounts spreadsheet attached to this email):

| Inv Date | Revenue Summary | Sales Rep | Inv Amount |
|---|---|---|---|
| 31-Mar | Microtech LLC – Vatican | Blank | 11,550,000 |
| 31-Mar | Discover Technologies – Citi | Blank | 4,394,250 |

I have been told by the finance team in San Francisco that transactions without a sales rep identified are transactions where the end user has not completed the agreement by the end of the quarter in which Autonomy recognizes revenue. The end user identified above may be a placeholder for an agreement to be negotiated subsequent to the invoice date. Per the attached spreadsheet Q1 2010 Closed Deals, Autonomy may have closed the deals with Manulife and Morgan Stanley in Q1 2010 as they are removed from the spreadsheet with negative numbers at the bottom of tab IDOL-K2-UltraSeek. There are many other transactions on the quarterly closed deals spreadsheets to these resellers that have been closed on the last day of a quarter where the Sales Rep is MGMT throughout 2008 and Q1 2010.

**Related Party Data:**

In February 2010, Autonomy acquired Microlink for $55M. At the time of the acquisition, Autonomy had approximately $16M of outstanding accounts receivable with due dates as follows:

| Due Date | Amount | |
|---|---|---|
| March 31, 2009 | 6,875,000 | 10 months past due |
| June 30, 2009 | 4,576,200 | 7 months past due |
| Sept 18, 2009 | 203,250 | 4 months past due |
| Sept 30, 2009 | 2,008,238 | 4 months past due |
| Feb 14, 2010 | 2,300,000 | (1) |
| Total | 15,962,688 | |

(1) The February 14th invoice above is an invoice to Discovery Technologies, which had license revenue of $2,000,000 and maintenance of $300,000 for a total of $2,300,000.

In the attached email named Q210 Sales Commission Accrual you will find the following statement and a list of transactions related to Microlink from 2007 through 2009 where there has been no commission accrual. Note the comment below from the email written by a Sales Operations employee at Autonomy Inc. in San Francisco which states "Microlink not expecting the deals to close." There are a large number of deals identified in this email following the statement below:

- Below is a list of past Microlink deals. No accrual has been reflected for these deals on the accrual worksheet. I believe these will be written off. Also, I listed the Microlink deals that are no longer being tracked for commission purposes due to Microlink not expecting the deals to close.

Microlink's Address is as follows:
8330 Boone Blvd
Suite 300
Vienna, VA 22182
Phone: 703-556-4440

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

MicroTech's Address is as follows:
8330 Boone Blvd
Suite 600
Vienna, VA 22182
Phone: 703-691-1073

Discover Technologies has a very limited website.  There is a whitepaper titled Automation Speeds the Ability to Collaborate and Turbo-Charges the Enterprise Search User Experience.  The bottom of the pages of this whitepaper (attached to this email named Discover Whitepaper) has the following information:
www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

Is it possible that the Microlink acquisition in Q1 2010 was partially done to provide a vehicle to 1) remove the $16M in outstanding invoices where a large percent were significantly past due and where there may not be an End User to pay Microlink; and 2) potentially provide a cash balance to pay invoices on reseller agreements with potential related parties (MicroTech and Discovery Technologies) where there may not be an end user.

**#4) Have the barter transactions below been reviewed for the economic benefit and fair value on both sides of the transactions to ensure that they are properly recorded in our financial statements?**

Autonomy made the following purchases of software from FileTek, Inc.:
December 31, 2009          10,367,280
May 11, 2010              11,518,214

Autonomy sold the following license and maintenance revenue to FileTek as follows:
December 31, 2009          8,480,000 IDOL Product
March 31, 2010            9,010,000 500 users Liquid Office plus some OEM product

In a barter transaction, my understanding is that IFRS is not substantially different from GAAP and requires validation of the fair value and economic benefit on both sides of the transaction.  My information is limited; however, I have asked Sean Sullivan, Liquid Office Sales VP, for a low and high range of a liquid office transaction with 500 to 1000 users.  The range that he gave me was $300,000 to $1,000,000, which is only a part of the March 31, 2010 transaction and does not include the OEM product, which is difficult for me to find fair value.

**#5) Does the revenue accrued and included in the Q1 2010 financial statements related to maintenance renewals reflect the potentially possible renewals from customers who have not yet agreed to renew expired maintenance agreements?**

In Q1 2010 a combined Autonomy, Inc, Etalk, Zantaz and Verity business units recorded a revenue accrual of $6,591K related to an estimate of customers renewing their maintenance contracts where the service period had lapsed prior to March 31, 2010.  In our Q2 internal review as part of consolidating the Americas finance team, it was noted that this revenue accrual calculation assumed a significant percentage (almost 100%) of the maintenance renewals that were up to 12 months beyond the end of their last service period and these business units recorded the revenue for the lapsed service period in the Q1 financial statements.  In our Q2 internal review, we recalculated the potential renewal revenue associated with these accounts using reasonable renewal percentages based upon the length of time from the end of the last maintenance service period and noted that the Q1 2010 revenue accrual was potentially overstated by $4.8M.  All judgment accounts including accruals and reserves are specifically the responsibility of the finance team at the Autonomy head office in Cambridge.

7

**#6) Is it possible that a regular user of the market may be mislead by the following statements within the information either known or provided to analysts and investors by Autonomy in the Annual Report and/or the web presentation along with the quarterly earnings calls in 2009?**

1) Autonomy is a publicly traded company listed on the London Stock Exchange and would generally follow IFRS and IAS 18 as it applies to revenue recognition.
2) In the Autonomy earnings release presentations to analysts and investors during 2009 there was a footnote on a slide that approximately stated – where IFRS is silent as to revenue recognition Autonomy follows the requirements of GAAP or SOP 97-2 (I am not sure of the exact wording but believe that this is close and should be able to be confirmed by reviewing the four quarterly earnings presentations provided during the 2009 earnings calls).   This has been noticed and discussed between multiple members of the finance teams in both the Americas and Cambridge.
3) The Autonomy Revenue Policy from the 2009 annual report includes the following:
   a. Revenues from software license agreements are recognized where there is **persuasive evidence of an agreement** with a customer (contract and/or binding purchase order), **delivery of the software has taken place**, **collectability is probable** and the **fee** has been contractually agreed and is not subject to adjustment or refund (i.e. **is fixed and determinable**).
   b. Paragraph 8 of SOP 97-2 is as follows:
   "revenue should be recognized when all of the following criteria are met.
   • **Persuasive evidence of an arrangement** exists.
   • **Delivery has occurred**.
   • The vendor's **fee is fixed or determinable**.
   • **Collectability is probable**."
   I have highlighted the words or phrases that are the same or similar between a. and b. above.

Is it possible that the items above provide a false or misleading impression as to if Autonomy follows SOP 97-2 for revenue recognition, to a regular user of the London Stock Exchange when buying or selling Autonomy stock?

**<u>Finally:</u>**
The purpose of this letter to the FSA is to provide assistance in ensuring that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors.  I am concerned that Autonomy will deflect the focus on the six questions above by focusing attention on the item identified in the Upfront Disclosure section.  I agree that the Upfront Disclosure section is important; however, I also believe that it is important to address the six questions asked above.

Not all of the attachments identified in this email will fit in the size requirements of one email.  Therefore, I will send additional emails with the attachments that are not sent with this email.

Please confirm the receipt of these emails by return email.  I will be available at your request to answer any questions.

Regards,

**Brent Hogenson**
**President Autonomy Interwoven**
**CFO Autonomy Americas**
**Tel: 408.953.7058**
**Mobile: 408.718.1376**
**E-mail: brent.hogenson@autonomy.com**

8

**FOIA CONFIDENTIAL TREATMENT REQUESTED**                                    **HP-SEC-00008346**
Exh 1012-0008

**From:** Percy Tejeda
**Sent:** Wednesday, July 07, 2010 7:20 PM
**To:** Brent Hogenson
**Cc:** Percy Tejeda
**Subject:** Finance concerns

Hi Brent,

I wanted to follow up with you regarding certain items that I noted during the review process related to the reorganization of the Americas finance organization (effective late April 2010). As we have discussed during the periodic meetings we have had throughout May and June 2010 related to this review process, I have been reviewing the processes and calculations performed by the revenue teams of Autonomy Inc (San Francisco), Zantaz (Pleasanton) and e-Talk (Dallas). This review was to make sure I understood the current policies and procedures in place for each unit, so as to further my understanding of the applicable revenue cycles. During this review, I noted 4 areas of concerns that I raised to you during these meetings, which I felt warranted further scrutiny. Can you provide me with an update on the status of these areas of concerns? Specifically, I want to make sure that these concerns have been heard at the appropriate level of Autonomy, to ensure that the accounting for the transactions described below is correct or, if it is not, that appropriate accounting adjustments are made. The following is a summary of these concerns and some background as well.

Concern 1 - Eli Lilly/Capax resale license order

In May 2010, as part of my increased responsibility regarding Autonomy Americas revenue contracts, I was sent by Livius Guiao (Autonomy Corporate Counsel), a draft of a license agreement between Autonomy, Inc. and Eli Lilly that was currently being negotiated. I reviewed the contract and identified certain clauses in such contract that I believed would affect the revenue recognition of the transaction, as currently drafted. I sent the draft contract and my revenue recognition concerns – i.e. extended warranty and product acceptance—to Steve Chamberlain for his input and guidance, as this was one of the first transactions that I was reviewing for non-Interwoven business. Steve responded back to me that I needed a bit of background on this deal and followed-up with a phone call, telling me that the license revenue associated with the Eli Lilly license transaction had already been recognized in Q4 2009 (in the amount of $6.0 million in license revenue), and that he would send me the contract from Q4 2009 (between Autonomy and Capax) – which he did. He then stated that he noted that there would be a shortfall in license revenue between the license transaction with Capax in Q4 2009 and the contract currently being negotiated between Autonomy and Eli Lilly – and that Matt Stephan (Autonomy Finance Manager) should raise such shortfall to Sushovan Hussain.

I raised this to your attention, since I had concerns regarding the timing of revenue recognition associated with the Q4 2009 transaction, and whether this was indicative of a practice of Autonomy (and could there be more).

In mid June 2010, I was notified that the license agreement between Autonomy and Eli Lilly did close, and such contract included the acceptance language for one of the products and specific warranty for another. During the week of June 21, I received various e-mails from Steve instructing me to reach out to Livius in Autonomy Legal to determine how a discount included in the Autonomy / Eli Lilly contract should be allocated between the fees for the product subject to acceptance and the rest of the fees. Once such determination was done by Livius, Steve asked me to then create a proforma invoice for the fees that would not be subject to acceptance and send such proforma invoice to Capax, so that they could then send an invoice on their paper to Eli Lilly, to get paid and then, presumably, to pay Autonomy on the invoices due from the Q4 2009 license transaction. I responded back to Steve that I was not comfortable with doing that. He then proceeded to call me at least 4 times and walked me through on the phone what needed to be done. I did not create such proforma invoice nor contact Capax. Instead, I forwarded to you the e-mails I had received from Steve related to the Q4 2009 transaction, as well as the instructions he had sent me.

On June 25, the Order Entry team reached out to me regarding the system status of the Autonomy/Eli Lilly contract signed in June, as the order had been entered as a new order. I sent a note to Steve to provide guidance and he responded back stating that Autonomy should not be billing this order and then asked Joel Scott (COO of Autonomy Americas) whether Autonomy should ship the software to Eli Lilly. Joel responded on June 28 that delivery to Eli Lilly should occur. During the week of June 28, Mark Langowski (VP Operations of Autonomy) stated that the June order in the system could not stay as "contingent" in the Autonomy order entry system and needed to be moved forward. He directed the Order Entry team to process the order. I believe I sent you these e-mails as well.

The Autonomy / Eli Lilly order from June 2010 was not billed by Autonomy and my understanding is that license revenue on such June 2010 contract was not recognized.

Concern 2 – Quarter-end Maintenance Revenue Accrual

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00008392**
Exh 1012-0009

As part of our review process associated with the reorganization of the Americas Finance organization, I requested copies of the Q1 2010 revenue schedules submitted to Corporate for the Autonomy, Inc., Zantaz and e-Talk groups, as well as the related supporting calculations. In reviewing the maintenance revenue schedules, I identified that a large portion of the quarterly maintenance revenue booked by Autonomy, Inc./Verity, Zantaz and e-Talk had historically been booked by posting a journal entry at the end of the quarter, to accrue maintenance revenue for maintenance contracts that had not yet been renewed but that were likely to renew. Since the dollar amount of such journal entries were significant when compared to the total quarterly maintenance revenue (approx. 25% - 50%), I raised this to your attention.

To better understand the support for these journal entries, I reviewed and discussed (in May 2010) the calculation and the source reports used in such calculations with the accounting staff that booked such entries. I identified the following:

- Autonomy, Inc. – Such calculation was done by Cynthia Watkins at the end of Q1. She used a "configurations" report out of Oracle that would identify the support contracts that were showing as "Active" in the system. She would then calculate the applicable maintenance revenue associated for the period from the last expiration date through the quarter-end date, and use such report to support her journal entry. She referred to such journal entry amount as a standing journal entry and that the amount was somewhat fixed and the report was just used to support such amount. I asked her if she consulted with the Autonomy Renewals team in determining the likelihood of the renewals and whether the "configurations" report was accurate. She mentioned that she did not consult with the Renewals team. When she walked me through the report, we noticed that for the March report, the report included a line item for a renewal for Eli Lilly, which had approximately $1.5 million of back maintenance revenue associated with it. Cynthia stated that the line item was an error, as Eli Lilly had done a deal in Q3 2009, that no longer made the maintenance renewal opportunity for Eli Lilly valid – and could be viewed as a potential error. Based on that observation, I inquired with the Autonomy Renewals team to understand the "configurations" report in more detail (as this one potential error could signal that there were more potential errors in such source report) and Emily Raynal, Autonomy Renewals specialist, stated that such report could have potentially erroneous data, as a renewal that had been declined would need to be updated manually within the system to show as "declined" but that this practice of correcting the status within Oracle may not consistently happen. She also mentioned that she was not usually consulted by Cynthia when such accrual calculation was done.

- E-Talk – Such calculation was done by Courtney Linxwiler, Controller of e-Talk. During my conversation with her, she walked me through her process, which included making an assessment (with consultation with the e-Talk Renewals and Collection teams) of the risk associated with non-renewal. The assessments were "low", "moderate" and "high" and Autonomy's policy was to accrue for the maintenance revenue associated with the renewal opportunities that had been assessed as "low" and "moderate". She mentioned that Autonomy have always been aggressive with such assessment and that for the March accrual 2010, she originally had submitted an revenue accrual amount of approximately $1.5M and was directed to review the calculation again to find more revenue, at which time she stated that she changed the assessment for certain accounts from "high" to "moderate", which resulted in a revised revenue accrual amount of approximately $1.7 million. In addition, when I reviewed the supporting schedule used in the calculation, I noted various renewal opportunity line items that dated back more than 1 year from the March 31, 2010 date, and asked Courtney why the team felt that such items were likely to renew. She said that once in a while, a renewal for a contract with an expiration date that is more than 1 year old would come in, so they left such items in the report.

- Zantaz - This calculation was performed by Ying Liu, Controller of Zantaz. During my conversation with her, she walked me through her process and we walked through the report that she used to make such calculation. She mentioned that she received the schedule from a financial analyst and then calculated the amount associated with any non-current contracts for the respective last expiration date until the applicable quarter-end. I asked her whether she consulted with the Renewals team to determine probability of renewal and she said no. I asked her if she verified the accuracy of the report and she said no. I discussed such report with Melissa Buhagiar, Autonomy Renewals specialist, and asked her whether such report was used by her to identify renewal opportunities and she stated that such report may not be accurate and may not be reflecting an accurate renewal status, given that such report is created and updated manually. I requested that Melissa do a quick review of the March 31, 2010 report and identify any potential errors in such report. The items identified by Melissa accumulated to a potential difference in maintenance revenue of approximately $500K.


Concern 3 – Age of Invoices and Bad Debt Provisions

As part of the review process related to the Finance reorganization, Reena Prasad and I requested copies of the March 31, 2010 accounts receivable aging reports and bad debt reserve detail. Upon reviewing such detail, it was noted that many invoices were significantly past due and that a specific provision for such invoices had not been assigned to them.

FOIA CONFIDENTIAL TREATMENT REQUESTED

Reena, as part of her review process, would look into such specific accounts and determine why such delinquent invoices had not been reserved for.  I had not heard an update on this but this was concerning when I reviewed the aging reports and specific reserve items.

Concern 4 – Capax EAS support outsourcing arrangement
At the end of December 2009, Phil Smolek, Financial Analyst for Zantaz, left Autonomy and one of the duties that he did was assigned to my team (at the direction of Jim Crumbacher, Autonomy Associate General Counsel) as he needed someone to do the calculations.
As part of an arrangement that was entered into by Autonomy in October 2009, Autonomy agreed to outsource the support obligations for certain Autonomy EAS product customers to Capax, at a cost of 85% of the renewal value to be paid to Capax.  Phil provided the workbook supporting his calculations and walked myself and Maureen Lara through the calculation.  From December 2009 – March 2010, Maureen would do the calculation and identify the amount per the calculation.  Commencing in January 2010, Jim Crumbacher would direct Maureen and me (or forward directions from Andy Kanter, COO of Autonomy) to add an additional monthly amount of $125,000 to the calculated amount needed to be paid to Capax.  The explanation given to us at the time was that the expected outsourcing for EAS support was not going as originally projected.  Such amount would be added to the PO request and such request was sent to Andy Kanter and Sushovan Hussain, CFO of Autonomy, and both approved each month's PO amount.
In February 2010, Jim requested a schedule of payments from Finance, which would show the amount of payments made by Autonomy to Capax under the EAS support outsourcing arrangement, as well as for EDD processing activities.  Since Maureen nor I were involved in calculating the amounts for the EDD processing activities, we requested such amounts from Jane Allen, Zantaz Finance.  In putting together the initial schedule, there were certain round amounts included in the EDD processing payment (including a $500,000 payment in December).  When I asked Jim about this, he said just to list it as "EDD Services".  In the schedule, such payments under both  arrangements were then compared against payments made by Capax for a transaction where Capax was to pay approximately $12,450,000 to Autonomy.  Such schedule then resulted in a net amount.   We prepared the initial schedule in March 2010, and were requested to update such schedule on an as-requested basis.
In May 2010, when I first was made aware of the Capax / Eli Lilly arrangement from Q4 2009 (as detailed in Concern 1 above), I started to have concerns regarding the nature of the payments made to Capax (as Capax had been the reseller involved in the Q4 2009 Eli Lilly order) under the EAS outsourcing and EDD processing arrangements (many of which did not have supporting calculations, to the best of my knowledge), and, in the schedule template provided by Jim, such payments were netted against payments due/made by Capax under a payment schedule.   I raised these concerns to you as there appeared to be the potential that such arrangements could be tied to each other.

Please advise if you have updates on these concerns I raised.
Kind regards,


**Percy Tejeda**
Director of Revenue
Autonomy Interwoven
Tel: 408.953.7157
Mobile: 916.420.0995

E-mail: percy.tejeda@autonomy.com
Visit www.autonomy.com

FOIA CONFIDENTIAL TREATMENT REQUESTED                    HP-SEC-00008394
                                                                          Exh 1012-0011

This document produced in native file format only

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008347
Exh 1012-0012

**From:** Percy Tejeda
**Sent:** Monday, June 28, 2010 3:03 PM
**To:** Brent Hogenson
**Subject:** FW: Capax

---

**From:** James Crumbacher [mailto:jamesc@autonomy.com]
**Sent:** Friday, February 12, 2010 10:18 AM
**To:** Percy Tejeda
**Subject:** FW: Capax

Percy, we need to get the amount of the PO issued to Capax for the EAS support increased by $125K per month, per Andy Kanter and Stouffer below.  Can you please be sure that happens?

**Jim Crumbacher**
Associate General Counsel
Autonomy, Inc.
One Market
Spear Tower, 19th Floor
San Francisco, CA 94105
Phone: (415) 625-1447
Mobile: (415) 439-9434
Email: jamesc@autonomy.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

---

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** Friday, February 12, 2010 3:31 AM
**To:** 'James Crumbacher'
**Cc:** 'Stouffer Egan'
**Subject:** RE: Capax

There's an increase in the outsourced EDD by $225k and support by $125k.  Can you do an updated PO for each?  This is for Jan and Feb.

---

**From:** James Crumbacher [mailto:jamesc@autonomy.com]
**Sent:** 11 February 2010 20:23
**To:** 'James Crumbacher'; 'Andrew Kanter'
**Subject:** RE: Capax

Hi, Andy,  Stouffer just stopped in and said you have some information for me on this.  Can you let me know what I can do to assist in raising the PO for the EDD work?  Thanks.

**Jim Crumbacher**
Associate General Counsel
Autonomy, Inc.
One Market
Spear Tower, 19th Floor
San Francisco, CA 94105
Phone: (415) 625-1447

1

Mobile: (415) 439-9434
Email: jamesc@autonomy.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

**From:** James Crumbacher [mailto:jamesc@autonomy.com]
**Sent:** Tuesday, February 09, 2010 11:17 AM
**To:** 'Andrew Kanter'
**Subject:** RE: Capax

Hi, Andy,

Following up on this matter.  What can I do to help move the EDD processing piece of this along?  Let me know, as John B. Capax is calling.  Thanks.

**Jim Crumbacher**
Associate General Counsel
Autonomy, Inc.
One Market
Spear Tower, 19th Floor
San Francisco, CA 94105
Phone: (415) 625-1447
Mobile: (415) 439-9434
Email: jamesc@autonomy.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

**From:** James Crumbacher [mailto:jamesc@autonomy.com]
**Sent:** Thursday, February 04, 2010 2:48 PM
**To:** 'Andrew Kanter'
**Subject:** Capax

Andy,

I talked with Stouffer, and we're not lagging on paying Capax for EDD...it seems we're lagging in actually sending them EDD work we said we'd send.  There's apparently a certain amount of work (dollar value) that we intend to send their way...Stouffer says you have those numbers.  If you can get me the applicable numbers, I'll work with the Boston team to get work farmed out to Capax in those amounts (that way, we can raise a PO against that work and get them paid). Please let me know how much EDD work we intend to send Capax's way.

On EAS, my understanding from Finance is that they've submitted PO requests for the EAS support, and are working on finalizing the terms of a new support order to take into account additional "subcontracted" customers.

**Jim Crumbacher**
Associate General Counsel
Autonomy, Inc.
One Market
Spear Tower, 19th Floor
San Francisco, CA 94105
Phone: (415) 625-1447
Mobile: (415) 439-9434
Email: jamesc@autonomy.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008368
Exh 1012-0014



# Automation Speeds the Ability to Collaborate and

# Turbo-Charges the Enterprise Search User Experience

Malcolm Hyson

Discover Technologies

CTO





**Automating Expertise, Profiles, and Ability to Collaborate
Turbo-Charges the Enterprise Search User Experience**

## Contents

Introduction ........................................................................................................3

Introducing DISCOVERPOINT – A MOSS-based Search and Collaboration Tool.......4

The Discover Technologies Extensible Search Framework ........................................

Automation Speeds the Ability to Collaborate ......................................................5

Enterprise Social Networking Enhances Organizational Collaboration....................5

Next Steps .........................................................................................................6

About Discover Technologies................................... **Error! Bookmark not defined.**

About the Author ...............................................................................................8

www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008381
Exh 1012-0016



**Automating Expertise, Profiles, and Ability to Collaborate
Turbo-Charges the Enterprise Search User Experience**

## Introduction

Enterprise search platforms continue gaining acceptance within corporate environments. The ability to leverage a single application to search an increasing number of information sources and content types is spearheading successful deployment of enterprise search technologies. However, an ever increasing pool of information has diluted the user's ability to quickly find relevant information. Moreover, as more types of content are introduced into an enterprise (blogs, wikis, tweets), retrieval and rendering of these results become increasingly more complex, has caused productivity losses and a decreasing enterprise search system return on investment (ROI).

With content being constantly created and updated, knowledge workers must have a way to automatically select the right pieces of content and share information across the enterprise. In other words, they must possess the right enterprise search and collaboration tool. This tool must be designed to automatically locate, categorize and deliver relevant content to the user.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008382
Exh 1012-0017



**Automating Expertise, Profiles, and Ability to Collaborate**

**Turbo-Charges the Enterprise Search User Experience**

---

### The Discover Technologies Extensible Search Framework

Discover Technologies developed its Extensible Search Framework (MXSF) framework with extensibility in mind from the beginning and for easy integration with the MOSS search center architecture. MXSF allows organizations to deliver the enhanced capabilities of enterprise search in conjunction with an internal collaboration platform without changing the current MOSS user search experience.

Discover Technologies' architecture, based on the .NET framework, supports the use of any enterprise search engine. While it's not unusual to spend significant portions of a corporate IT budget to design, implement, and deploy an enterprise search, the creation of the end user experience is sometimes overlooked. However, if you don't deliver a usable and compelling UX, organizations soon come to the realization that users view the system as not meeting their needs, and may even abandon their usage.

That problem is solved with our framework. No code is required to add custom fields, configure the front-end UX, modify the result display, both the format and what is presented to the user.

## Introducing DiscoverPoint – A MOSS-based Search and Collaboration Tool

Discover Technologies' DiscoverPoint offers the best of enterprise search, collaboration and corporate networking by bringing the user the power of all three components into the familiarity of Microsoft's SharePoint. DiscoverPoint is the linchpin for leveraging these technologies and simplifying information discovery.

With these powerful traits, DiscoverPoint significantly reduces the amount of time knowledge workers spend searching for critical information and related subject matter experts they require for effective collaboration. Aside from these benefits, DiscoverPoint makes enterprise search proactive.

It easily and automatically propels to new levels of utilization the most important and best content in an organization; that is, the people themselves, whose minds author, store and maintain valuable data.

Plus, the perennial problems that disparate information poses are eliminated. With DiscoverPoint, silo organizations working on the same project at the same time and not knowing it are a thing of the past.   Even in small matters, DiscoverPoint deals with pockets of the proverbial "failures to communicate" within companies and does away with them.

---

www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008383
Exh 1012-0018



## Automation Speeds the Ability to Collaborate

As a knowledge worker completes more searches, he or she builds search tracks. These tracks help other knowledge workers find each other through related searches and form the basis for knowledge workers to build their community of experts. Those communities are further built on the content they have created, and group memberships. Building a community of interest gives the knowledge worker instant accessibility to others within the organization with similar search tracks and speeds their ability to collaborate.



However, not all search engines have this ability. Moreover, for those that do, they don't have the ability to automate this process. Automation is key to the success of any organization that relies on accurate, synthesized, and approved information. A high level of automation can keep you abreast of the latest information without having to reconstruct the search. Put another way, the knowledge worker becomes proactive, rather than reactive and can immediately begin the analysis needed on data, instead of wasting more time searching.

## Enterprise Social Computing Enhances Organizational Collaboration

Businesses have started embracing the benefits of social networking. As social networking popularity grows, Discover Technologies believes Enterprise 2.0 will become a standard way employees conduct business. For the company with workers scattered around the globe all working on a similar projects, the ability to use their SharePoint portal similar to Facebook elevates the portal to a crucial level of business process and designed to create a highly efficient user

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008384
Exh 1012-0019



**Automating Expertise, Profiles, and Ability to Collaborate**
**Turbo-Charges the Enterprise Search User Experience**

experience. Thus, knowledge workers can more easily and quickly find data they need and use SharePoint to collaborate with internal experts.

Functions include:

- Automatically pushes information based on previous searches and documents viewed
- Easily form groups or communities that are related to their particular interest.
- Create posts and status updates from within SharePoint.
- Recommend experts or members from the knowledge worker's community



OCS integration along with Expert results. Also shown is the ability to immediately see an Expert's recent documents or posts to evaluate their ability to provide assistance with your particular issue.

## Next Steps

Even organizations investing in a centralized document management system are finding that the popularity of SharePoint and other portals create additional places where users may store documents. The key reason for portals' success is their ease of use and they provide users with a common interface. Unfortunately, as more content gets added to these sites, your original document management solution becomes less and less relevant. In an ideal situation knowledge workers can use the organizational search engine that has indexed content across all data stores throughout an organization, all within the corporate portal. Consequently, an enterprise search system of this caliber saves the knowledge worker valuable

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008385
Exh 1012-0020



**Automating Expertise, Profiles, and Ability to Collaborate
Turbo-Charges the Enterprise Search User Experience**

time and effort since the information is displayed in one location using a common interface.

Therefore, as an initial step toward achieving optimal search and collaboration, company management must ask questions like:

- "How do different people within my company find each other when they need information on the same subject?"
- "How much time are they spending conducting searches?"
- And more importantly, "How many items of importance are not found because my knowledge workers aren't searching for them?"



Discover Technologies Enterprise Networking brings a new era of collaboration to the organization. In addition to posting and commenting, you can be notified when one of your colleagues has added new content to the system. This is another way AIS provides proactive searching to bring your knowledge workers the information they need.

Discover Technologies is available to help answer your questions and can provide the right choice for resolving search and collaboration issues. There are several reasons Discover Technologies is the best selection. Its development team has unparalleled experience with search and collaboration, hence considerably reducing risk for companies. The company's expertise, reputation, and credibility in the collaboration and search market are well documented with successful completion of multiple SharePoint platform customer projects and continue to exploit new and innovative search concepts and their integration into the enterprise. In the area of platform expertise, a team of unrivaled technical professionals has developed and continues to enhance Discover Technologies' software suite. These professionals use supported best practices from an enterprise search perspective and Microsoft development practices.

www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008386
Exh 1012-0021



**Automating Expertise, Profiles, and Ability to Collaborate**

**Turbo-Charges the Enterprise Search User Experience**

## About the Author

Malcolm Hyson is Chief Technology Officer at Discover Technologies. He is responsible for development and implementation of feature rich, dynamically-searchable software products. With more than 16 years experience, he has successfully planned, coordinated and managed large-scale information technology projects and programs. Mr. Hyson's work with global integrators has given him tremendous insights and perspectives helping him to earn the respect of his colleagues and information technology executives. Mr. Hyson received a B.S. in Computer Science from George Mason University.

www.DiscoverTechnologies.com  |  703-556-4400  |  info@microlinkllc.com

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008387
Exh 1012-0022

PURCHASE ORDER   Exhibit "B" from AUTONOMY VALUE ADDED RESELLER AGREEMENT ("Agreement")

September 30, 2009 ("Effective Date")

| From : | Capax Discovery, LLC ("VAR")<br>1955 Wehrle Drive, Williamsville, NY 14231-0490 |

| To: | Autonomy, Inc.<br>One Market<br>Spear Tower, 19th Floor<br>San Francisco, CA 94105 |

This Purchase Order is issued under and pursuant to a Value Added Reseller Agreement dated June 30, 2009, entered into between Autonomy and VAR ("the Agreement").

The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement provided Autonomy has signed this Purchase Order accepting it.  All other terms and conditions contained in the Agreement shall remain in full force and effect.

| 1. | Software | : | **Licensor Archiving Solution, comprised of the following proprietary software products:** |

| | | a. | Digital Safe |
| | | b. | Digital Safe Retention-Deletion |
| | | c. | Digital Safe Audit Center Software |
| | | d. | Digital Safe Storebuffer |
| | | e. | Digital Safe Universal Access |
| | | f. | Digital Safe Deduplication |
| | | g. | Digital Safe Connector |
| | | h. | Aungate Legal Hold |
| | | i. | Autonomy IDOL Server Connectors:<br>• All connectors made generally and commercially available by Licensor as of the Schedule Effective Date |
| | | j. | Aungate Real-Time Policy Management (RTPM) |

| 2. | Languages | : | English |
| 3. | Platform | : | Windows |
| 4. | Number of Copies | : | One each of (1) above |
| 5. | Number of Instances | : | One each of (1) above per Server below |
| 6. | Number of Servers | : | Kraft may install and use the Software in (1) above on a unlimited number of Servers  for production and non-production use, all owned or leased and controlled by Kraft |

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

7. Authorized Use : Kraft shall use the Software in connection with archiving, searching, indexing, and culling documents, data, and communications generated by up to 55,200 internal Kraft Users, and for no other purpose. Kraft may use the Digital Safe Audit Center Software referenced in Section 1(b) above in connection with exporting a maximum of 20GB of internal Kraft data per month.

8. Territory of Software Installation : Australia, Germany, and United States of America. Additional territories for installation subject to the parties' mutual written agreement.

9. Kraft Technical Support Contacts : Name: _____
Phone: _____
E-mail: _____

Name: _____
Phone: _____
E-mail: _____

10. License Fee : $4,000,000.00 US Dollars, invoiced immediately

11. Maintenance Fee (first year) : 5% of License Fee per annum for Support Services, first year to be invoiced immediately and thereafter invoiced annually in advance of each anniversary of the License Commencement Date. Notwithstanding anything in the Agreement to the contrary, Licensor shall not increase the Maintenance Fee due hereunder for the first three (3) years of Support Services.

12. License and Maintenance Fee Payment Terms : 60 days from receipt of invoice

13. Delivery Address : Shipped EXWorks point of manufacture (per Incoterms 2000) via electronic delivery, such as via FTP transfer.

14. License Commencement date : On Schedule Effective Date

15. License Expiry Date : The Licensed Software is licensed for a perpetual term from the License Commencement Date, subject to termination pursuant to Agreement.

16. Software Escrow : Upon Kraft's request and at Kraft's sole cost and expense, Licensor agrees to place the source code for the Software in Licensor's standard third party source code escrow, for release if Licensor enters into bankruptcy proceedings or ceases to operate its business as a going concern, and then for the sole use to support Kraft's and/or a Kraft Entity's use of the Software as permitted in this Schedule and under the Agreement.

VAR signature

Name    John BAROCCO

Title    Managing Director

Date:    9/30/09

Order Accepted by Autonomy

Date    9/30/09

FOIA CONFIDENTIAL TREATMENT REQUESTED

Mozilla Firefox

File  Edit  View  History  Bookmarks  Tools  Help

https://intranetuk.autonomy.com/intranet/leads4/reports/sales_stats.aspx

Most Visited    Getting Started    Latest Headlines

EIP  |  https://intra...es_stats.aspx ×  |  Autonomy's Board of Direc... ×  |  HR US  |  What is Cu

| 114740 | Lockheed Martin | autonomy | | | 5/10/2010 | Entered by Jeffc: Rina is still waiting on a "date" to engage will request an amendment over the weekend and present week. |
| 1413919 | Altria Client Services | autonomy | loni | 5/14/2010 | | Entered by Jeffc: Will send more Red/Blue books. They are archiving solution (to replace EV) and EC4/Legal Hold. significant deal in Q3/Q4. |
| 1459012 | Lockheed Martin | autonomy zantaz | Roman.Kreslavsky | 5/17/2010 | | Entered by Roman.Kreslavsky: Conflict of schedule, B... rescheduling the meeting to an earlier tim |
| 1459012 | Lockheed Martin | autonomy zantaz | Roman.Kreslavsky | 5/17/2010 | | Entered by Jeffc: need to send additional content and sche We'd to continue the discussion and move this t |
| 114740 | Lockheed Martin | autonomy | | | 5/17/2010 | Entered by Jeffc: We will put the amendment together aft customer forum in NY on the 8th. |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 5/18/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 5/18/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1348888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 5/18/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 5/19/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 5/19/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1348888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 5/19/2010 | Entered by Jeffc: Good meeting with many lilly team mem was one of 6 meetings throughout the 2 days for the blue |
| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 5/26/2010 | Entered by Jeffc: This is a good deal and we should hav Working with hosting group to get technical discussion a between their remote sites (globally), but this shoul |
| 1425811 | Hall, Render, Killian, Heath & Lyman, P.C. | autonomy | | | 6/1/2010 | Entered by Jeffc: good meeting, they have litigation proces outsource yet, they will be looking at that later in |
| 84882 | Simon Property Group, Inc. | | juliam | 6/2/2010 | | Entered by Jeffc: good meeting, but not going to happen down-selected to the final 2 and they will engage a boardro of this month/early July. |
| 1348888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 6/2/2010 | Entered by Jeffc: should be signing hte agreement on Mond be complete on Monday. |
| 1333354 | Colgate Palmolive | autonomy cardiff | natalie | | 6/3/2010 | Entered by Jeffc: good meeting, follow up meeting o... discuss/outline POC for this project to move forward |

Done

HP-SEC-00008395
Exh 1012-0025



| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 5/26/2010 | Entered by Jeffc: This is a good deal and we Working with hosting group to get technical c between their remote sites (globally), but |
| 1425811 | Hall, Render, Killian, Heath & Lyman, P.C. | autonomy zantaz | | | 6/1/2010 | Entered by Jeffc: good meeting. they have litiga outsource yet. they will be looking at |
| 94882 | Simon Property Group, Inc. | | juliam | 6/2/2010 | | Entered by Jeffc: good meeting, but not going down-selected to the final 2 and they will engag of this month/early J |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 6/2/2010 | Entered by Jeffc: should be signing hte agreem be complete on Mon |
| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 6/3/2010 | Entered by Jeffc: good meeting. follow up discuss/outline POC for this project to m |
| 1442751 | Time Warner | etalk | MartaL | | 6/3/2010 | Entered by Jeffc: they are going forward with ar new opportunity there till later in the year whe solution for the Enterprise (not) |
| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 6/7/2010 | Entered by Jeffc: good meeting with follow-up n through the poc requiremen |
| 114740 | Lockheed Martin | autonomy | | | 6/8/2010 | Entered by Jeffc: discussed pricing and probab have some solution challenges they're holding them resolve. |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 6/8/2010 | Entered by Jeffc: good meeting. they are very c with us and then we'll move i |
| 1428132 | Huron Consulting Group Inc. 6th Failover | autonomy | Autumng | | 6/8/2010 | Entered by Jeffc: good meeting and chris was v get some tech involvement to move them to software. |
| 1333354 | Colgate Palmolive | autonomy cardiff zantaz | natalie | | 6/8/2010 | Entered by Jeffc: good meeting and we're ma announced intent to buy CA RM, which car |
| 1461688 | Bristol Myers Squibb | autonomy | Rochelle.Lao | 6/10/2010 | | Entered by Rochelle.Lao: BMS can't meet to Thursday. Rescheduled for Thur |
| 1461688 | Bristol Myers Squibb | autonomy | Rochelle.Lao | 6/17/2010 | | |
| 54 (revised 44) | | | | | 10 | 39 | 1 (missing) |

This revised meeting count is the sum of non-cancelled face-to-face customer meetings minus incomplete r

FOIA CONFIDENTIAL TREATMENT REQUESTED

Mozilla Firefox

File   Edit   View   History   Bookmarks   Tools   Help

https://intranetuk.autonomy.com/intranet/leads4/reports/sales_stats.aspx

Most Visited    Getting Started    Latest Headlines

| EIP | https://intra...es_stats.aspx × | Autonomy's Board of Direc... | HR US | × |

| | 1350601 | UBS | | | | 1/12/2010 | Entered by Jeffc: trying to get an understandin process and why AUTN is perceived a 'dis |
|---|---|---|---|---|---|---|---|
| | 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 1/13/2010 | Entered by Jeffc: Very good meeting througho different team members), but all very positive Autonomy hosting of th |
| | 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 1/13/2010 | Entered by Jeffc: Good meeting with Blane. He is Goodfellow said we would have these this pa immediately following the Digital Safe project (a |
| | 1425811 | Hall, Render, Killian, Heath & Lyman, P.C. | autonomy zantaz | | | 1/13/2010 | Entered by Jeffc: good meeting with Karin, their forward that may require our help in the next |
| | 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 1/14/2010 | Entered by Jeffc: good meeting with Becky, she br of year (Mike Harrington is gone and LouCarrol reports to the CFO, no |
| | 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | 1/14/2010 | | Entered by Jeffc: Very good meeting througho different team members), but all very positive Autonomy hosting of th |
| | 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | 1/14/2010 | | Entered by Jeffc: Very good meeting througho different team members), but all very positive Autonomy hosting of the archive, mostly focused with me and Jim Burtofl |
| | 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | 1/14/2010 | | Entered by Jeffc: Very good meeting througho different team members), but all very positive Autonomy hosting of the archive, mostly focused with me and Jim Burtofl |
| | 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | 1/14/2010 | | Entered by Jeffc: Very good meeting througho different team members), but all very positive Autonomy hosting of the archive, mostly focused with me and Jim Burtofl |
| | 1428132 | Huron Consulting Group Inc. 6th Failover | autonomy | Autumng | | 1/19/2010 | Entered by Jeffc: Chris noted that he would be at at the show in New |
| | 1325113 | Lockheed Martin - Electronic Document Discovery | aungate | katyae | | 1/19/2010 | Entered by Jeffc: This meeting is rescheduled f will be present and best we all get together to |
| | 1347267 | Capital One | autonomy | | | 1/20/2010 | Entered by Jeffc: Brutal meeting but in the end, w Brown were with me). Lots of work to do to ge committed to Recommind for Search (including L with ECA. |

Done

HP-SEC-00008397
Exh 1012-0027

Mozilla Firefox

File   Edit   View   History   Bookmarks   Tools   Help

https://intranetuk.autonomy.com/intranet/leads4/reports/sales_stats.aspx

Most Visited    Getting Started    Latest Headlines

| EIP | https://intra...es_stats.aspx × | Autonomy's Board of Direc... × | HR US | × | What |

| 1333354 | Colgate Palmolive | cardiff zantaz | natalie | 2/1/2010 | | ...manager and records manager bits. They have a RM project in... to call them in the next week or so. |
| 1443149 | Kelley Drive & Warren Records | autonomy | Rochelle.Lao | 2/3/2010 | | Entered by jeromej; WORKSHEET NOTES: Legal outsourcer... No real business applies. Follow up meeting is not n... management/imanage |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 2/9/2010 | Entered by Jeffc: Good meeting wht the DS team in Pleasan... team noted they were very impressed with our thoroughnes... vision. |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 2/9/2010 | Entered by Jeffc: Good meetings with team and I expect htey v... is a viable option for htem ... then it becomes a business g... |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 2/10/2010 | Entered by Jeffc: Good meetings with team and I expect htey v... is a viable option for htem ... then it becomes a business g... |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 2/10/2010 | Entered by Jeffc: Good meetings with team and I expect htey v... is a viable option for htem ... then it becomes a business g... |
| 1401485 | Zimmer Holdings, Inc. | autonomy | loni | 2/11/2010 | | Entered by Jeffc: Had to cancel this meeting due to Lilly mee... Fran and Vegas. Working on rescheduling but no communic... note sent cancelling. |
| 1444615 | Ernst & Young | autonomy | eugeneq | 2/16/2010 | | Entered by Jeffc: They needed to reschedule so all 3 coul... |
| 1375971 | UBS | aungate zantaz | | | 2/17/2010 | Entered by Jeffc: visited wiht Peter over dinner. "officially/ "unofficially" told me they chose to move forward with PSS... agreement wiht them. They are becomming frustrated that th... that continues, they will dump them and cal... |
| 1331919 | Time Warner Inc. | autonomy | | | 2/18/2010 | Entered by Jeffc: continue working with Peter/Lorina over th... AUTN's position on shared services and our offerin... |
| 1331919 | Time Warner Inc. | autonomy | | | 2/18/2010 | Entered by Jeffc: provided red book and will work with Lorina... archiving and governance within the clo... |
| 114981 | Freescale Semiconductor, Inc. | autonomy | | | 2/19/2010 | Entered by Jeffc: Sent over Optimost content for htem to read o... an Optimost-focused meeting moving for... |
| 98192 | Treadright | autonomy | | | 2/19/2010 | Entered by Jeffc: good meeting, they are doing some work for... want me to present to them in early Ap... |
| 114740 | Lockheed Martin | autonomy | | | 2/22/2010 | Entered by Jeffc: working with Aero to get them happy wiht wh... IDOL from Alta Vista |
| 1444615 | Ernst & Young | autonomy | eugeneq | 2/23/2010 | | Entered by Jeffc: rescheduled for mid-week this week, will wo... reschedued. |
| 1313187 | Avalon Consulting | | | | 2/23/2010 | Entered by Jeffc: follow up wiht Joe in 2 weeks to schedule tin... in dc. |

Done

Mozilla Firefox

File   Edit   View   History   Bookmarks   Tools   Help

https://intranetuk.autonomy.com/intranet/leads4/reports/sales_stats.aspx

Most Visited    Getting Started    Latest Headlines

| EIP | https://intra...es_stats.aspx × | Autonomy's Board of Direc... × | HR US |

| 114981 | Freescale Semiconductor, Inc. | autonomy | | | 3/15/2010 | Entered by Jeffc: Good meeting. I thi... who |
| 1345888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 3/16/2010 | Entered by Jeffc: requested by Li |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 3/16/2010 | Entered by Jeffc: requested by Li |
| 1442751 | Time Warner | etalk | MartaL | 3/17/2010 | | Entered by Jeffc: good meeting with Lor... the works and we're go |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS | autonomy zantaz | | | 3/18/2010 | Entered by Jeffc: deal is moving forward... well. I think we |
| 1428918 | Eli Lilly~Legal Hold Opportunity | autonomy | | | 3/18/2010 | Entered by Jeffc: good meeting with lo... foward with the |
| 1446212 | LR Capstone | autonomy cardiff | KathrynB | 3/23/2010 | | Entered by Jeffc: They have a need, b... Technologies to do what they need wit... forward with them to see if the |
| 65 (revised 52) | | | | 15 | 37 | 0 |

The revised meeting count is the sum of non-cancelled face-to-face customer meetings r



| Proposals Breakdown | |
| --- | --- |
| LeadId | Company |
| 1441118 | City of Arlington, TX |
| 1375971 | UBS |
| 100376 | Alcon Research |
| 71307 | Alcon Labratories |
| 94882 | Simon Property Group, Inc. |
| 1346888 | Eli Lilly~Digital Safe Transition from EAS |
| 1428918 | Eli Lilly~Legal Hold Opportunity |
| 114740 | Lockheed Martin |
| 1426463 | Pierpont Communications, Inc. |
| 114981 | Freescale Semiconductor, Inc. |
| 1333354 | Colgate Palmolive |

Done

FOIA CONFIDENTIAL TREATMENT REQUESTED

This document produced in native file format only

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008369
Exh 1012-0030

**EXHIBIT B**

**PURCHASE ORDER   Exhibit "B" from AUTONOMY VALUE ADDED RESELLER AGREEMENT ("Agreement")**

December 31, 2009

| From : | Capax Discovery, LLC ("VAR")<br>1955 Wehrle Drive, Williamsville, NY 14231-0490 |
|---|---|

| To: | Autonomy, Inc.<br>One Market<br>Spear Tower, 19th Floor<br>San Francisco, CA 94105 |
|---|---|

This Purchase Order is issued under and pursuant to a Value Added Reseller Agreement dated June 30, 2009, entered into between Autonomy and VAR ("the Agreement").

The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement provided Autonomy has signed this Purchase Order accepting it. All other terms and conditions contained in the Agreement shall remain in full force and effect.

| | | | |
|---|---|---|---|
| 1. | End User | : | Eli Lilly and Company |
| 2. | Software | : | Licensor Archiving Solution, comprised of the following proprietary software products: |
| | | | a. Digital Safe |
| | | | b. Digital Safe Retention-Deletion |
| | | | c. Digital Safe Audit Center Software |
| | | | d. Aungate Legal Hold (Notification, Preservation & Collection) |
| | | | e. Aungate Real-Time Policy Management (RTPM) |
| 3. | Languages | : | English |
| 4. | Platform | : | Windows |
| 5. | Number of Instances | : | One each of (1) above per server below |
| 6. | Number of Servers | : | End User may install and use the Software on an unlimited number of Servers for production and non-production use, all owned or leased and controlled by End User. |
| 7. | Authorized Use | : | End User shall use the Software in connection with archiving, searching, indexing, preserving and collecting documents generated by up to 50,000 internal End User Users, and for no other purposes. |
| 8. | Territory of Software Installation | : | United States |
| 9. | Licensee Technical Support Contacts | : | Name: _____<br>Phone: _____<br>E-mail: _____ |

FOIA CONFIDENTIAL TREATMENT REQUESTED

Name: _____
Phone: _____
E-mail: _____

| | | |
|---|---|---|
| 10. License Fee | : | $5,986,827.00 US Dollars, invoiced immediately |
| 11. Maintenance Fee (first year) | : | $299,342.00 US Dollars, invoiced immediately |
| 12. License Fee and Maintenance Fee Payment Terms | : | 90 days from receipt of invoice |
| 13. Delivery Address | : | Shipped ExWorks point of manufacture (per Incoterms 2000) via electronic delivery, such as FTP transfer. |
| 14. License Commencement Date | : | On Schedule Effective Date |
| 15. License Expiry Date | : | None, subject to termination pursuant to Agreement. |

VAR signature

Name        John Barocco

Title         PArTner

Date:        12/31/09

Order Accepted by Autonomy

Date         12/31/09

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

## Licensing Schedule

**This Licensing Schedule ("Schedule")** is executed as of this December 18, 2009 (**"Schedule Effective Date"**) by and between **Autonomy, Inc., ("Licensor")** and **Kraft Foods Global, Inc. ("Kraft")**. This Schedule is issued under and subject to the terms and conditions of the Master License Agreement by and between Licensor and Kraft dated December 10, 2007 (the **"Agreement"**). Capitalized terms not otherwise defined in this Schedule shall have the meanings given them in the Agreement. Licensor represents that it is a "Licensor Affiliate" of Interwoven, Inc., as such term is defined under the Agreement.

### PRODUCTS OR SERVICES

Subject to payment in full of the fees hereunder and subject to the terms and conditions of the Agreement and of this Schedule, the following software (the "Software") shall be licensed for use by Kraft:

| | | | |
|---|---|---|---|
| 1. | Software | : | **Licensor Archiving Solution, comprised of the following proprietary software products:** |

        a.    Digital Safe

        b.    Digital Safe Retention-Deletion

        c.    Digital Safe Audit Center Software

        d.    Digital Safe Storebuffer

        e.    Digital Safe Universal Access

        f.    Digital Safe Deduplication

        g.    Digital Safe Connector

        h.    Aungate Legal Hold

        i.    Autonomy IDOL Server Connectors:
- All connectors made generally and commercially available by Licensor as of the Schedule Effective Date

        j.    Aungate Real-Time Policy Management (RTPM)

| | | | |
|---|---|---|---|
| 2. | Languages | : | English |
| 3. | Platform | : | Windows |
| 4. | Number of Copies | : | One each of (1) above |
| 5. | Number of Instances | : | One each of (1) above per Server below |
| 6. | Number of Servers | : | Kraft may install and use the Software in (1) above on a unlimited number of Servers for production and non-production use, all owned or leased and controlled by Kraft |
| 7. | Authorized Use | : | Kraft shall use the Software in connection with archiving, searching, indexing, and culling documents, data, and communications generated by up to 55,200 internal actively-archiving Kraft Users (as defined by the active directory list to be provided by Kraft from time to time but no less frequently daily), and for no other purpose. Kraft may use the Digital Safe Audit Center Software referenced in Section 1(b) above in connection with exporting a maximum of 20GB of internal Kraft data per month. |

Licensing Schedule - Page 1 of 6

FOIA CONFIDENTIAL TREATMENT REQUESTED

| | | | |
|---|---|---|---|
| 8. | Territory of Software installation | : | Australia, Germany, and United States of America. Additional territories for installation subject to the parties' mutual written agreement. |
| 9. | Kraft Technical Support Contacts | : | Name: _____<br>Phone: _____<br>E-mail: _____<br><br>Name: _____<br>Phone: _____<br>E-mail: _____ |
| 10. | License Fee | : | $4,000,000.00 US Dollars, invoiced immediately and payable as follows:<br><br>• US $3,500,000.00 shall be payable net 30 days from the date of invoice<br>• US $500,000.00 shall be payable net 120 days from the date of invoice |
| 11. | Maintenance Fee (first year) | : | 5.0% of License Fee per annum for Support Services, first year to be invoiced immediately and thereafter invoiced annually in advance of each anniversary of the License Commencement Date. Notwithstanding anything in the Agreement to the contrary, Licensor shall not increase the Maintenance Fee due hereunder for the first three (3) years of Support Services. |
| 12. | License and Maintenance Fee Payment Terms | : | Licensee Fee payable as provided in Section 10 above. Maintenance Fees are net 60 days from receipt of invoice. Fees may be paid to Licensor or its designated payee. |
| 13. | Delivery Address | : | Shipped EXWorks point of manufacture (per Incoterms 2000) via electronic delivery, such as via FTP transfer. |
| 14. | License Commencement date | : | On Schedule Effective Date |
| 15. | License Expiry Date | : | The Licensed Software is licensed for a perpetual term from the License Commencement Date, subject to termination pursuant to Agreement. |
| 16. | Software Escrow | : | Upon Kraft's request and at Kraft's sole cost and expense, Licensor agrees to place the source code for the Software in Licensor's standard third party source code escrow, for release if Licensor enters into bankruptcy proceedings or ceases to operate its business as a going concern, and then for the sole use to support Kraft's and/or a Kraft Entity's use of the Software as permitted in this Schedule and under the Agreement. |
| 17. | Additional Users | : | Provided Kraft is not otherwise in breach of its respective obligations hereunder, for a period of Twenty-Four (24) months from the Schedule Effective Date: |

     (a) Kraft may license the Digital Audit Center Software referenced in Item 1 above for use in connection with exporting Kraft data in excess of the amount of data authorized pursuant to Section 7 above, in increments of 10TB per each such additional license, such to payment of an additional license fee in an amount equal to Fifty Thousand United States Dollars (US $50,000.00) per additional license , plus an amount equal to 5% of such additional license fee for the first year of Maintenance Services in connection therewith, and subject to the parties' mutual execution of an amendment or Licensing Schedule reflecting same.

     (b) Kraft may license the Software in Item 1 above for use by Kraft in connection with Users in excess of the 55,200 internal Kraft Users

Licensing Schedule - Page 2 of 6

FOIA CONFIDENTIAL TREATMENT REQUESTED

otherwise authorized pursuant to Item 7 above, in increments not less than 1,000 additional Users, subject to payment of the Discounted Additional License Fee as set forth in the table below, plus an amount equal to 5% of such Discounted Additional License Fee for the first year of Maintenance Services in connection therewith, and subject to the parties' mutual execution of an amendment or Licensing Schedule reflecting same.

| Number of Users Added | Discounted Additional License Fee |
|---|---|
| 1,000 – 4,999 Additional Users | US $100.00 per Additional User |
| 5,000 – 9,999 Additional Users | US $95.00 per Additional User |
| 10,000 + Additional Users | US $88.00 per Additional User |

<u>Maintenance and Support</u>:  Notwithstanding anything in the Agreement to the contrary, Licensor shall provide maintenance and support services for the Software in Section 1 above in accordance with Licensor's standard terms of maintenance and support attached hereto as Exhibit LS-1 ("Support Services").  The initial effective date of Support Services is the License Commencement Date.  All support matters must be logged into and initiated through the Licensor electronic helpdesk system by Kraft. Licensor will not be liable for any failures or delays arising as a result of Kraft's failure to properly log tickets, nor shall any support provided outside of the system be a waiver of these terms.

**This Licensing Schedule shall be null and void and of no effect unless signed and returned by Kraft to Licensor on or before December 18, 2009.**

This Licensing Schedule is executed by Licensor and Kraft, effective as of the Schedule Effective Date.

Autonomy, Inc.                                  Kraft Foods Global, Inc.:

By: _christopher Egan_                          By: _Lisa Ward_

Title: _CEO_                                    Title: _Sr. Buyer_

Date: _12-18-09_                                Date: _12/22/09_

Licensing Schedule - Page 3 of 6

HP-SEC-00008374
Exh 1012-0035

**Exhibit LS-1**
**Maintenance and Support**

For all licensees who purchase support services, Licensor provides support in English in the form of Error Corrections, Software Updates, and Telephone Hotline Support ("Support Services") to up to two (2) designated technical contacts. The term of Support Services shall be for one (1) year terms commencing from the Commencement Date, as renewed annually thereafter. Support Services will automatically be renewed for additional one (1) year periods on the Commencement Date unless Kraft notifies Licensor in writing of its desire not to renew Support Services at least thirty (30) days prior to the end of the existing Support Services period. If Kraft fails to pay any Maintenance Fee when due, Licensor reserves the right to withhold provision of Support Services until receipt of such payment. By way of example and not of limitation, continued availability of Support Services following any automatic renewal shall be deemed conclusive evidence of renewal by Kraft. Support Services are provided only for (i) the current release of the Product, and (ii) the most recent previous release of the Product for six months following availability of the current release.

DESCRIPTION OF SERVICES PROVIDED DURING A SUPPORT PERIOD

A) Error Corrections. Licensor shall exercise commercially reasonable efforts to correct any error reported by Kraft in the current unmodified release of the Product in accordance with the priority level reasonably assigned to such error by Licensor. If a reported error has caused the Product to be inoperable, or Kraft's notice to Licensor states that the reported error is substantial and material with respect to Kraft's use of the Product, Licensor shall use its reasonable commercial efforts to correct expeditiously such error or to provide a software patch or bypass around such error. Kraft acknowledges that all reported errors may not be corrected. Licensor shall have no obligation to support: (i) altered, damaged or modified Software or any portion of the Software incorporated into other software; (ii) problems caused by Kraft's negligence, abuse, misapplication or use of the Software other than as specified in the Documentation, or other causes beyond the control of Licensor; or (iii) Software installed on a system that is not supported by Licensor. Licensor shall have no liability for changes in Kraft's hardware necessary to use the Software due to a workaround or maintenance release.

B) Software Updates. Licensor provides, at no additional cost, one (i) copy of documentation and one (i) copy of, or authorization to copy, new maintenance releases of the Product, which are not designated by Licensor as new products for which it charges a separate fee ("Updates"). Licensor, may in its sole discretion, modify the Product and deliver Software Updates to its customers which may add new and/or eliminate existing features, functions, operating environment and/or hardware platforms to the Product.

C) Telephone Hotline Support. Licensor provides telephone assistance to all licensees who have purchased Support Services. Telephone Hotline Support hours of operation are from 8 am to 5 pm Local Time Monday through Friday excluding Licensor recognized holidays. Support telephone numbers and email addresses may be found on Licensor's website at www.autonomy.com. Licensor Support personnel are available to answer questions related to Licensor's supported products and how they perform with compatible hardware systems. Assistance in the development of custom applications for Licensor's products is not included in standard hotline support. If licensees wish to acquire such support, it is available through Licensor's Consulting group at the then-current consulting rates.

PRIORITY LEVELS OF ERRORS

In the performance of Support Services, Licensor applies the following priority ratings to problems reported by licensees.

A) Priority I Errors.

Description: Program errors, which prevent some function or process from substantially meeting the functional specification, which seriously affect the overall performance of the function or process and for which no work-around is known.

Licensor Response: Licensor shall promptly initiate the following procedures: (1) assign a senior Licensor engineer to correct the error; (2) notify senior Licensor Management that such errors have been reported and that steps are being taken to correct the error; (3) provide Kraft with periodic reports on the status of corrections; (4) commence work to provide Kraft with a work-around until final solution is available; (5) provide final solution to Kraft as soon as it is available.

B) Priority II Errors.

Description: Program errors, which prevent some function or process from substantially meeting the functional specification, but which have a reasonable work-around.

Licensing Schedule - Page 4 of 6

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008375
Exh 1012-0036

Licensor Response: Licensor shall provide a work-around to Kraft and shall exercise commercially reasonable efforts to include the fix for the error in the next software maintenance release.

C) Priority III Errors.

Description: Program errors, which prevent some portion of a function from substantially meeting functional specification but which do not seriously affect the overall performance of the function.

Licensor Response: Licensor may include the fix for the error in the next major release of the Product.

## LICENSEE'S OBLIGATIONS RELATING TO SUPPORT SERVICES

Kraft shall provide cooperation and assistance to Licensor in Licensor's efforts to provide Support Services. Such cooperation and assistance include but are not limited to:

A) a reasonable and timely response to Licensor's requirements and communications;

B) the timely transmittal and release to Licensor of appropriate and accurate documentation and information;

C) the prompt review and analysis of the work performed by Licensor;

D) making facilities and personnel available to assist Licensor when and if reasonably requested.

E) providing information as Licensor may reasonably request to provide the Support Services and ensuring that such information is accurate and complete;

F) providing access to the Kraft's premises and/or facilities as are reasonably necessary for the performance of the Support Services;

G) being responsible for ensuring that any equipment and/or hardware belonging to or furnished by Kraft is properly installed and is sufficient and suitable for its purpose and that any adjustments, which may be required, are carried out expeditiously;

H) ensuring that all relevant licenses and permissions are obtained where the provision of the Support Services necessitates Licensor's use of third party software;

I) maintaining a reasonable number of certified Licensor support engineers;

J) being responsible for maintaining backups of its data, or otherwise protecting its data against loss, damage or destruction before any services are performed by Licensor;

K) Kraft shall be responsible for all Systems Administration functions, including but not limited to:

    i)    Database Set-up and Maintenance
    ii)   Operating Systems Maintenance
    iii)  Client Software installation, as required
    iv)  Maintenance of Minimum hardware and software requirements
    v)   Virus Scanning software installation and maintenance
    vi)  Software license management (physical security of Licensor media and necessary 3rd party software media)
    vii) Third party software and operating system patches and virus protection updates

## REMOTE SUPPORT

Licensor requires remote access to Kraft's system to enable remote troubleshooting and corrective action work. Kraft shall make available for the Software execution, at the location designated in the Product Schedule, equipment and the Platform in accordance with Licensor's environment specifications. Kraft shall provide remote access for the Software for as long as Licensor provides Support Services for the Software. Serviceability of Kraft's Site(s) is dependent on remote access to Kraft's system and an active Kraft contact. Kraft is responsible for providing Licensor

Licensing Schedule - Page 5 of 6

HP-SEC-00008376
Exh 1012-0037

with remote access dial-up telephone numbers and passwords or Virtual Private Networking (VPN) connectivity. Licensor will provide remote support upon approval from Kraft on an Licensor request or through verbal confirmation. Kraft acknowledges that Licensor may at times access Kraft's system in order to review recent corrective actions and their impact on Kraft's system performance.  If remote access is not granted, Kraft shall be invoiced in accordance with Licensor's then-current time and materials rates; additionally, if, in Licensor's reasonable opinion, the problem requires Licensor to provide on-site Support Services, Kraft will reimburse Licensor for travel and other expenses actually incurred in connection with performance of such Support Services as approved in advance in writing by an authorized Kraft representative.  .

Licensing Schedule – Page 6 of 6

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008377
Exh 1012-0038

# SECOND AMENDMENT
## TO
## COMMERCIAL UNMODIFIED SOFTWARE LICENSE AGREEMENT WITH MAINTENANCE SERVICES

ELI LILLY AND COMPANY AND ITS AFFILIATES ("Lilly") and AUTONOMY, INC. ("Licensor") as parties to the Commercial Unmodified Software License Agreement with Maintenance Services (the "**Agreement**") effective as of June 27, 2008, desire to amend that Agreement via this Second Amendment to the Agreement (the "**Amendment**"), as of June 15, 2010 ( the "**Amendment Effective Date**"). Lilly and Licensor may each be referred to as a "**Party**" and, collectively, as the "**Parties.**" In consideration of the mutual promises and covenants set forth in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Addition of Section 5.9.** Section 5.9 of the Agreement is hereby inserted as follows:

   "*5.9 Acceptance Testing. Any Product furnished by Licensor (except as expressly identified in an applicable Exhibit B as not being subject to Acceptance Testing), shall be subject to Acceptance Testing as follows:*

   *5.9.1 Following initial delivery of the Product (the "Delivery Date") or, with respect to the ALH Software, the date on which Autonomy completes (or would have completed but for the unreasonable delay of Lilly) the implementation, installation, setup, configuration, and other services necessary for Lilly to use and test the ALH Software (including testing of the ALH Software as it relates and interoperates with other Products) (the "Start Date"), Lilly shall, within four (4) months from the Delivery Date (or in the case of the ALH Software, the Start Date), as may be extended in accordance with Section 5.9.3 below (the "Acceptance Period"), operate the Product to determine in Lilly's reasonable estimation, whether: (i) the Product performs in material (such materiality determination to be in Lilly's reasonable discretion) accordance with its applicable Documentation and Specifications; (ii) meets any facilities usage or run time limits and standards agreed upon in writing between the parties; (iii) any other acceptance criteria which may be agreed upon in writing between the parties and identified as additional Acceptance Criteria in such writing (for purposes of the ALH Software listed in Exhibit B-2, the criteria set forth in Exhibit J-2 shall apply, and shall be deemed Acceptance Criteria related thereto); and (iv) the Product otherwise meets the requirements as expressly set forth in the Agreement ((i)-(iv) are collectively referred to herein as the "Acceptance Criteria").*

   *5.9.2 If the Product materially conforms, in Lilly's reasonable discretion, to the Acceptance Criteria, Lilly shall so notify Licensor in writing by completing Exhibit L, Product Acceptance Certificate by the end of the Acceptance Period and the Product, Documentation and Deliverables shall be deemed to be accepted. In such case, the Acceptance Date shall be the date that the software satisfactorily completes all of the tests specified above.*

   *5.9.3 If the Product fails to meet the Acceptance Criteria, Lilly shall notify Licensor of such failure in writing by the end of the Acceptance Period, and Licensor shall have a reasonable time in which to correct, modify, or improve the non-conforming Product to cause it to meet the Acceptance Criteria. After submission of the corrected, modified or improved Product, Lilly shall have*

1

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

*thirty (30) additional calendar days to reconduct all Acceptance Testing as described in this Section. This process shall be repeated as may be necessary until the Product is accepted or deemed accepted hereunder; provided, however, that if the Product is not deemed accepted or accepted hereunder within one-hundred eighty (180) days after the Delivery or Start Date, as the case may be ("Extended Acceptance Period"), Lilly shall have the right and option to cancel its purchase of the nonconforming Product(s).*

*5.9.4   Maintenance.   To the extent Lilly has purchased Maintenance Services from Licensor, such Maintenance Fees for Products not subject to Acceptance Testing shall begin to accrue as of the Delivery Date, and such Maintenance Fees for Products subject to Acceptance Testing shall begin to accrue as of the Acceptance Date, both of which to be subject to the provisions of Section 5.9.5.1 below.*

*5.9.5   Failure to Pass Acceptance Testing.   If the Product fails to materially conform, within Lilly's reasonable discretion, to the Acceptance Criteria within the Extended Acceptance Period, then Lilly may, at its sole discretion, elect any or all of the following options:*

*5.9.5.1   Lilly may terminate the Agreement to the extent it applies to Lilly's purchase of the nonconforming Product(s) and remove the Product failing to meet the requirements described herein.   If Lilly has licensed from Licensor any additional Products that may not be operated without the nonconforming Product ("Related Products"), Lilly may elect to also terminate its licenses for those Related Products or accept a corresponding, mutually agreed upon discount or refund in the fees to such Related Products.   If Lilly has licensed from Licensor any additional Products whose functionality is substantially and adversely affected by the removal of a non-conforming Product, Licensor shall discount or refund to Lilly a mutually agreed upon portion of the fees to such affected Product that corresponds to the reduced functionality thereof.   Lilly's license to the nonconforming Product and any Related Products (if Lilly elects to terminate its license to such Related Products) will be deemed terminated and Lilly will receive a full reimbursement (or discount, if Lilly so elects) from Licensor within thirty (30) days for any and all fees that it may have paid for the nonconforming Product(s) (including terminated Related Products) and related Maintenance Services and any other related implementation, setup, installation, configuration, or other such services.   Lilly may, at its sole option, extend the Acceptance Period or Extended Acceptance Period subject to Lilly's right to cancel and obtain reimbursements if the Product is not repaired within such extension period.*

*5.9.5.2   Lilly may, at its sole option, accept a workaround developed by Licensor for any Product failing to meet the Acceptance Criteria, contingent upon a mutually agreed upon discount in the License and any related Maintenance Fees and implementation fees charged to Lilly for such Product.*

*5.9.6   Deemed Acceptance.   In the event Lilly does not complete and deliver to Licensor a Product Acceptance Certificate by the end of the Acceptance Period*

2

BDDB01 6079010v17

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00008355**
Exh 1012-0040

*or Extended Acceptance Period, as the case may be, the applicable Products shall be deemed accepted by Lilly as of the end of the applicable Acceptance Period or Extended Acceptance Period. Licensor shall deliver to Lilly written notice of the expiration of the Acceptance Period at least thirty (30) days (the "Minimum Notice Period") but no more than forty-five (45) days prior to the end of such Acceptance Period. If Licensor fails to deliver or delays such written notice in accordance with the terms of this Section 5.9.6, the Product shall not be deemed accepted until the Minimum Notice Period has elapsed from the date Lilly receives such notice.*

*5.9.7 Invoicing. In no event may Licensor invoice Lilly for any Product until such Product has been accepted by Lilly in accordance with this Section 5.9."*

2. **Clarification.** For the avoidance of doubt, the unnumbered section between Sections 6.1.1 and 6.2 of the Agreement shall remain as-is.

3. **Amendment to Section 6.1.1.** Section 6.1.1 of the Agreement is hereby deleted in its entirety and restated as follows:

*"6.1.1 At delivery and throughout the Warranty Period, the Software shall substantially (such question of substantiality to be in Lilly's reasonable discretion) perform in accordance with the Specifications and the Documentation supplied by Licensor to Lilly with the Software. Further, throughout their respective Warranty Periods, all Software listed in Exhibit B and the Digital Safe Software listed in Exhibit B-2 shall substantially (such question of substantiality to be in Lilly's reasonable discretion) perform in accordance with the applicable Specific Warranty set forth on Exhibits J and J-2, respectively. This warranty applies only to problems discovered by Lilly during the aforesaid Warranty Period and then reported to Licensor either during the Warranty Period or within five (5) days thereafter. Licensor shall not be responsible to the extent failures are caused by: (a) Lilly's failures to use the Software in accordance with instructions included in the documentation provided to Lilly by Licensor; or (b) the modification of the Software by any person other than Licensor, its employees, agents, affiliates or subcontractors (unless such modification was suggested by Licensor)."*

4. **Amendment to Section 25.2.** Section 25.2 of the Agreement is hereby deleted in its entirety and restated as follows:

*"25.2 Except for each party's confidentiality obligations hereunder, infringement indemnification, and Lilly's obligations to protect Licensor's intellectual property rights and restriction on use of Product, in no event will Licensor or its licensors, or Lilly, be liable for any special, indirect, incidental, punitive or consequential damages (including, without limitation, loss of profits and business interruption), regardless of the form of action, even if the claim was reasonably foreseeable or if the party was advised of the possibility of such damages, arising out of or in connection with their respective obligations under this Agreement."*

5. **Addition of Section 38.** Section 38 of the Agreement is hereby inserted as follows:

*"Section 38    Compliance with Regulations and Lilly and Policies*

*38.1 In the performance of its obligations under this Agreement, Licensor shall comply with all (i) Applicable Laws, (ii) the Lilly policies described in Sections*

3

BDDB01 6079010v17

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00008356**
Exh 1012-0041

*38.1.1 and 38.1.2 below, and (iii) any Lilly policies and professional standards which may be mutually agreed upon in writing between the parties.*

> *38.1.1  Applicable provisions of the Anti-Bribery Commitments for Lilly Procurement Contracts as revised by Lilly from time to time and published at http://supplierportal.lilly.com or otherwise made available to Licensor;*

> *38.1.2  Any instructions or policies set forth by Lilly which relate to compliance by Lilly or its Affiliates with any US or other Governmental Authority mandates, settlements, or adjudications, including the Corporate Integrity Agreement (the "CIA") between Lilly and the Office of Inspector General, US Department of Health and Human Services, dated January 14, 2009, and any disclosure requirements set forth hereunder.*

> *38.2  All the requirements of this Section are in addition to all of Licensor's other obligations under this Agreement."*

**6.  Amendment to Exhibit A.**  Section A.1.50 of Exhibit A is hereby deleted and replaced with the following:

> *"Warranty Period, for Products subject to Acceptance Testing, is the period of time beginning upon the Acceptance Date and expiring six (6) months thereafter, or, for Products not subject to Acceptance Testing, the period of time beginning upon the Delivery Date and expiring twelve (12) months thereafter."*

**7.  Amendment to Exhibit B.**  Exhibit B-2 to this Amendment is hereby incorporated into the Agreement as Exhibit B-2 thereunder.

**8.  Amendment to Exhibit J.**  Exhibit J-2 to this Amendment is hereby incorporated into the Agreement as Exhibit J-2 thereunder.

**9.  Addition of Exhibit L to the Agreement.**  Pursuant to this Amendment, an Exhibit L to the Agreement shall be issued to provide for Deliverable acceptance on Exhibit L.  Such Exhibit L is attached hereto as Schedule 1 and is incorporated by reference.

**10. Counterparts.**  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**11. Effectiveness.**  This Amendment shall become effective upon the execution hereof by both Parties.

**12. Continuing Effect.**  Other than as expressly modified in this Amendment, all of the terms and conditions of the Agreement shall continue in full force and effect.  This Amendment shall be deemed a part of, and incorporated by reference into, the remainder of the Agreement.

IN WITNESS WHEREOF, the parties have executed this Second Amendment to the Agreement as of the date of the last signature below.

4

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008357
Exh 1012-0042

| ON BEHALF OF AUTONOMY, INC.: | ON BEHALF OF ELI LILLY AND COMPANY: |
|---|---|
| Signed: | Signed: |
| Name: Joel Scott | Name: |
| Title: COO | Title: |
| Date: June 15, 2010 | Date: |

BDDB01 6079010v17

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008358
Exh 1012-0043

| ON BEHALF OF AUTONOMY, INC.: | ON BEHALF OF ELI LILLY AND COMPANY: |
|---|---|
| Signed: | Signed: |
| Name: | Name: EDWARD J. ROBERSON |
| Title: | Title: SR. DIRECTOR |
| Date: | Date: June 15, 2010 |

5

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008359
Exh 1012-0044

<u>**Schedule 1**</u>

**Exhibit L IT Product Acceptance Certificate**

Licensor Name:

PO #:

Lilly Customer Name:

Submitted Deliverable(s):

| Date Submitted | Description | Date Rejected | Acceptance Date | Acceptance on behalf of Lilly (Printed Name) | Signature |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

Rejected Submissions:

| Date Submitted | Description | Date Rejected | Acceptance Date | Acceptance on behalf of Lilly (Printed Name) | Signature |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

**TERMS AND CONDITIONS MAY NOT BE ADDED TO THIS DOCUMENT**

6

BDDB01 6079010v17

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008360
Exh 1012-0045

## EXHIBIT B-2: SOFTWARE AND FEES

| Product | Term | Subject to Acceptance Testing | Authorized Use | Data Volume | Price |
|---|---|---|---|---|---|
| Digital Safe Software, including: <br>   Audit Center | Perpetual | No | 35,000 Mailboxes | Unlimited internal enterprise data | $3,953,564.00 |
| ALH, including: <br>   Notification Module <br>   Collection and Preservation Module <br>   Real Time Policy Management | Perpetual | Yes | 45 internal named users; up to 35,000 desktops, for Investigation and Discovery | Unlimited internal enterprise data | $2,941,069.00 |
| Software discount | N/A | N/A | N/A | N/A | <$1,591,202.00> |
| Total Net License Fee | N/A | N/A | N/A | N/A | $5,303,431.00 |
| Digital Safe Annual Maintenance and Support | One (1) year | N/A | N/A | N/A | $157,898.15 |
| ALH Annual Maintenance and Support | One (1) year | N/A | N/A | N/A | $107,273.40 |
| ***TOTAL*** | | | | | ***$5,568,602.50*** |

1. Languages : English

2. Platform : Windows

3. Number of Developers : Five (5) concurrent, internal developers may access the Software solely for development purposes.

4. Territory of Software installation : United States of America

5. Licensee Technical Support Contact : Name:   Paul Susemichel <br> Title:    Associate Consultant - IT <br> Phone  317.277.9950 <br> Email:   psusemichel@lilly.com

6. License and Support Fee Payment Terms : The ALH license fee and ALH Annual Maintenance and Support Fee shall be invoiced upon the Acceptance Date. All other fees set forth above shall be invoiced immediately. All fees shall be due and payable in accordance with the terms of the Agreement, as amended.

7. Delivery : Software is shipped EXW point of manufacture (per Incoterms 2000) via electronic delivery.

8. Additional Terms : At Licensor's discretion and express direction, Lilly shall (i) submit any purchase order (or other order document) for the Products set forth above, and/or pay any fees due hereunder, to Licensor's expressly designated payee (which Licensor shall deem to be satisfaction of Lilly's payment obligations hereunder). Notwithstanding the foregoing, Lilly's rights and obligations shall not otherwise be affected by submission of a purchase

7

BDDB01 6079010v17

order (or other order document), or payment of fees to a third party, and Licensor shall continue to be bound by its obligations under the Agreement and all amendments thereto. For the avoidance of doubt, any and all refunds due to Lilly by Licensor under the Agreement, as amended, shall be an obligation of Licensor, not any third party to which Lilly may direct payment. The annual maintenance fees shall be five percent (5%) of the net purchase price after all discounts are applied.  Such five percent (5%) pricing shall be fixed for five (5) years following the date of purchase.

8

BDDB01 6079010v17

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008362
Exh 1012-0047

**EXHIBIT J-2:**
**DIGITAL SAFE SPECIFIC WARRANTY AND ADDITIONAL ALH ACCEPTANCE CRITERIA**

# 1.0 ALH – ACCEPTANCE CRITERIA

The ALH Software, provided it is appropriately configured per mutually agreed upon and documented configuration settings, and/or the corresponding Autonomy Administration, and/or User Guide Documentation, will contain the capabilities outlined below, in addition to and/or as documented in the respective product documentation.

## 1.1 Legal Notices/Notifications

The system shall enable Lilly to create, modify, distribute and manage status of a minimum of 100 active legal matter notifications.   Management includes:

- distributing notices within a 12-hour period, which can include attachments, to 25,000 custodians provided adequate connectivity to the Lilly directory and the email system is available to the ALH system.
- custodian shall be able to complete surveys/interviews in one or more sessions without loss of data due to timeout
- near real-time tracking of custodian acknowledgement status received and processed by ALH
- summary notification of custodian change in employment status
- automated sending of reminder notices within a 12-hour period of the scheduled time, provided adequate connectivity to the Lilly directory and the email system is available to the ALH system.

The software shall allow for litigation business users to access near real-time reports/views into all actions related to custodian notifications received and processed by ALH, including:

- Delivery of notifications
- Custodian acknowledgment of notifications
- Survey/Interview responses
- Delivery/Acknowledgement status summary at the custodian and matter levels

Custodians shall have the ability to access/review active notices addressed to them, even if the notice may have been removed from the custodian's mailbox.  The system shall allow at least 5,000 concurrent users on the system Web Desktop. Excluding network latency, the Web Desktop is expected to support a typical server-side response to a page request in a minute or less.

## 1.2 Custodian Management

The solution shall not be limited by a single point of integration for the purpose of aggregating workforce (employee, contactors, collaborators) into a name normalized database.  The solution will allow Lilly to be able to feed data from one or more data sources for the purpose of updating workforce records provided these feeds are all provided in an Autonomy-specified fashion and normalized format.

## 1.3 Policy Management

Creating and modifying policies in ALH shall integrate with the hosted archive.   The following types of policies must be supported:

9

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008363
Exh 1012-0048

### 1.3.1 Preservation/Hold Policies

Implementing a preservation policy against the Digital Safe including for the application of business retention shall not be functionally limited in the number of parameters chosen from the system-available list used to define the preservation policy criteria. The policy criteria shall allow for combinations of supported search criteria predefined and configured within the software and related index, including, but not limited to:

- keywords and/or phrases, up to 6,000 characters
- Boolean expressions
- wild cards
- Date restrictions (single or multiple ranges)
- Custodian list (including custodians identified within any expanded distribution list metadata)
- Metadata (such as document type, form type, e.g. voice mail and instant message types)
- Predefined workbooks created in Investigator within the hosted solution

### 1.3.2 Collect Policies/Tasks

ALH will implement a related collection task in Digital Safe, which can use a workbook in Investigator within the hosted solution.

Implementing a collection task against the Digital Safe shall include options for: 1) not collecting documents previously collected for that matter; and 2) exact de-duplication and thread de-dulication of e-mail.

The solution shall provide tracking of the collection options chosen and collection status, including data volume/counts as a result of the collection process as well as any known exceptions that may have occurred.

For future platform growth the solution architecture shall allow Lilly to collect from other supported data repositories (including SharePoint and Documentum), accessible through the system network, provided suitable network connectivity and bandwidth exists.

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008364
Exh 1012-0049

## 2.0 DIGITAL SAFE - WARRANTY

During the Warranty Period, the Digital Safe platform, provided it is mutually discussed and appropriately configured per Autonomy's recommendation and/or the corresponding Administration and User Guide Documentation, will interoperate with ALH and Investigator, and provide the ability to process supported content allowing for archive, search, and export of electronically stored information (ESI) in a repeatable manner via the capabilities outlined below, in addition to and/or as documented in the respective product documentation. The Digital Safe shall be capable of supporting 12 concurrent search, workbook and collection tasks.

### 2.1 Archive - Ingestion

The archive shall allow for the ability to buffer, process, store and index content from a live journaling stream from the Lilly Microsoft Exchange 2010 system without any loss of data once said data has been successfully delivered to the Digital Safe system.

### 2.2 Preservation / Hold Enforcement

The software shall not have limitations on the number of active preservations (represented by associated policies within Digital Safe). The Digital Safe shall enforce policies from ALH for the purpose of document-level retention.

### 2.3 Query/Search Execution

The archive platform will index an email and its attachments as a combined entity in the system such that a search in that system will return a single result for the combined email and attachment even where the email body matches only one criterion and the attachment another from the same query (i.e. a search for "Foot AND Ball" would return said email as a result if "Foot" was in the email and "Ball" was in an attachment of said email). The combined object shall consist of all recognized attached, embedded and nested documents inside a single email.

The archive shall be able to execute 10 concurrent queries. Queries originating in either ALH or Investigator shall allow for combinations of search criteria predefined and configured within the software and related index, including, but not limited to:

- keywords and/or phrases, up to 6,000 characters
- Boolean expressions
- wild cards
- Date restrictions (single or multiple ranges)
- Custodians (including custodians identified within any expanded distribution list metadata and name normalized data)
- Metadata (such as document type, form type, e.g. voice mail and instant message types)
- Predefined workbooks created in Investigator within the hosted solution

### 2.4 Workbook

Investigator shall allow 10 users to simultaneously initiate work booking of query result sets. Investigator shall not be limited by the number of workbooks within the system. An individual record within the system should not be limited by the number of workbooks associated with the individual record.

11

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008365
Exh 1012-0050

## 2.5 Collect/Export and Related Tasks

The Digital Safe shall execute collection tasks initiated from ALH.  Collection/Export from the Digital Safe shall be capable of 10 concurrent collections/exports, with minimal impact to live stream ingestion and other system processes (i.e. policy management and workbook creation).

The system shall allow for an average daily export (de-duplicated and threaded content, compressed) volume of 15-20 GB per day.  With advance notice the capacity can be increased to meet needs of increased volume.

Execution of collection tasks initiated from ALH against the Digital Safe shall include options for:  1) not collecting documents previously collected for that matter; and 2) exact de-duplication and thread de-duplication of e-mail.

The Digital Safe shall provide data to ALH regarding the tracking of collection status, including  data volume/counts, as a result of the collection process, as well as any known exceptions that may have occurred.

The software shall be able to export content from the Digital Safe archive in configured/predetermined batch file size and placed in a predetermined system network-accessible FTP location mutually defined by Lilly and Autonomy.

## 2.6 Content Disposition

The software shall be capable of supporting manual or semi-automated methods of purging/disposing of aged archive system-managed content without active holds applied via integration with ALH.

Content managed by the system archive must be sufficiently locked/protected in the archive whenever one or more active preservation/hold policies apply to the stored object.

BDDB01 6079010v17

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008366
Exh 1012-0051

| From: | Kerrie Wheelock Clark [kwheeloc@autonomy.com] |
|---|---|
| Sent: | Monday, June 28, 2010 11:21 AM |
| To: | Brent Hogenson |
| Subject: | Incident |

Hello Brent,

Friday morning June 25th, I was contacted by Tina Wali from Human Resources in regards to a letter that she had received from the California EDD offices.
The notice was asking Autonomy to verify the earnings of Lourdes Dionosio who had been terminated 06/01/2010 and was requesting Unemployment funds.

Upon looking at the EDD notice I could see clearly that something was wrong.  The employee earned an annual salary of $63,000.00 per year.  However the earnings for this employee for 2009 showed $449,740.00.
I contacted ADP and had them open a case (Case # 9762631-1) in order to get further documentation and details of these earnings.

At the same time I went into the employees profile in ADP and could see that the employee had been paid "Other" earnings throughout 2009, and part of 2010.  I notified ADP of this and requested that they pull copies of the employees W2's for me.  Right now I have 2005, 2006, 2007, 2008, and 2009 ordered and should receive these today or tomorrow.  The employee was not employed prior to 2005.

Because we had recently transitioned over to the new ADP platform, all historical data pertaining to the employees earnings prior to 2009 were not available to me.  That is why I was left to rely on ADP to pull reports.

The ADP representative informed me that after running a wage report for Autonomy, Lourdes Dionosio had earned $1,188,608.68 from mid 2007, 2008, 2009, and part of 2010.  He could not go back any further than that due to there limitations on historical data on certain types of reports.

After I got off the phone with ADP. and after much thought as to the magnitude of the situation and all possible ramifications, I ran an Earnings report for 2009 for earnings code "O – Other".  This report would be able to tell me which employees in Q4 2009, and Q1 and Q2 2010 were paid these types of earnings.  Upon running this report I found that there was not one, but two employees receiving payments just about every pay period ranging from $7,000.00 to $49,000.00.

I contacted ADP again and requested that all W2's for this second employee Hannah Yau be run for 2005 thru 2009. I expressed to ADP that we needed as much as they could pull as far back as they could pull it for both employees.

Right now I am still waiting on W2 copies for these two employees for 2005 thru 2008.  I am also expecting to receive numerous reports that will document or support these findings.

Hope this helps.

Thanks Brent,
Kerrie


*Kerrie Wheelock-Clark*
*Autonomy and Verity Payroll*

*160 E. Tasman Dr.*
*San Jose, CA  95134*

Phone: 408) 953-7222
Efax:   408) 716-2734

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008378
Exh 1012-0052

Email: kwheeloc@autonomy.com

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00008379**
Exh 1012-0053



December 29, 2009

**SENT VIA ELECTRONIC MAIL**

Capax Discovery, LLC
Attn: Mr. John Baiocco
1955 Wehrle Drive
Williamsville, NY 14231-0490

Autonomy, Inc.
One Market Street
Spear Tower, 19th Floor
San Francisco, CA
94105

Phone: (415) 243 9955
Fax: (415) 243 9984
www.autonomy.com

       Re:     Revised Payment Arrangement

Dear Mr. Baiocco:

As you know, Capax Discovery LLC ("Capax") and Autonomy, Inc. ("Autonomy") are parties to that certain Value added Reseller Agreement dated as of May, 2009 (the "Agreement"), and the purchase order thereunder dated September 30, 2009 (the "PO"), pursuant to which Capax purchased certain products and services for resale to Kraft Foods Global, Inc. ("Kraft"). In accordance with the terms of the PO, Capax is obligated to pay to Autonomy license fees in the amount Four Million Dollars (US $4,000,000.00). However, Kraft has indicated to Autonomy that it shall pay to Autonomy directly the license fees due for the software to be licensed to Kraft in connection with the PO. Accordingly, Autonomy shall cancel the license fees due from Capax pursuant to the PO, subject to the terms of this letter. For clarification, the parties acknowledge that, subject to the terms hereof, neither party shall have any further liability or obligation with respect to the PO.

1.       Capax agrees that it has not collected, and shall not collect or attempt to collect from Kraft any license fees related to software to be licensed to Kraft pursuant to the PO, and any and all rights Capax may have to receive such fees are hereby assigned, transferred and conveyed to Autonomy.

2.       Capax hereby represents and warrants that it has not encumbered any rights being assigned hereunder.

3.       Upon execution hereof, Autonomy shall pay to Capax a one-time fee of Four Hundred Thousand Dollars (US $400,000.00). Further, upon receipt by Autonomy of all license fees due from Kraft for software licenses granted in connection with the PO, Autonomy shall refund to Capax any license fees paid by Capax and received and acknowledged by Autonomy under the PO prior to the date hereof; the parties acknowledge that such amount to be refund totals Four Hundred Thousand Dollars (US $400,000.00). Payment of the amounts described in this Section 3 shall constitute payment in full for any and all fees due to Capax from Autonomy arising out of or in any way relating to the PO and/or the software, hardware and/or services licensed and/or provided to Kraft in connection with the transaction contemplated by PO. For avoidance of doubt, except for the foregoing amount expressly set forth in this Section 3, Autonomy shall owe to Capax no additional fees, costs or other amounts, whether pursuant to the Agreement, the PO or otherwise, related to or arising out of any transaction with Kraft.

4.       Once duly executed by Capax below, this letter shall constitute a valid and binding written agreement (the "Letter Agreement") between Capax and Autonomy dated effective as of December 23, 2009. This Letter Agreement is entered into pursuant to the terms of the Agreement; however, in the event of conflict or inconsistency between the terms of the

FOIA CONFIDENTIAL TREATMENT REQUESTED



Autonomy

Agreement and the terms of this Letter Agreement, this Letter Agreement shall prevail.  The parties expressly agree that this Letter Agreement and the applicable terms of the Agreement as incorporated herein supersede all prior or contemporaneous, oral or written understandings, representations, conditions, and other communications between the parties relating to the subject matter hereof.

Please sign below to acknowledge agreement by Capax to the terms set forth above.

Very truly yours,

Joel Scott
Chief Operating Officer

ACKNOWLEDGED, AGREED AND CERTIFIED AS TO THE ABOVE:

CAPAX DISCOVERY, LLC

By: _____

Name: _Thomas Leonard on behalf of John Baiocco_

Title: _Director Solution Sales_

Date: _Dec 29 2009_

HP-SEC-00008371
Exh 1012-0055

**First Amendment**
**to**
**Autonomy, Inc. Value Added Reseller Agreement**

Autonomy, Inc., ("Autonomy"), Capax Discovery, LLC, , Capax Global, LLC, Capax Discovery LTD  and Capax Global LTD hereby enter into this First Amendment ("First Amendment"), effective as of October 1, 2009 ("First Amendment Effective Date") to amend the Autonomy, Inc. Value Added Reseller Agreement between the parties dated May 2009 (the "Agreement") as amended, as follows:

WHEREAS, VAR (as defined in Section 3 below) is currently authorized to perform certain support Services for existing licensees and customers of Autonomy's EAS Product(s) (such customers hereinafter the "EAS Customers"); and

WHEREAS, the parties desire to further define the plan and scope of those support Services and expand VAR's right and capability to provide such support Services for such EAS Customers;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in the Agreement, the receipt adequacy, and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **Capitalized Terms**.  Any capitalized terms not defined herein shall have the meaning set forth in the Agreement.

2. **Term**.  The parties agree that the Effective Date of the Agreement is May 30, 2009.

3. **Capax Global, LLC**.  By the parties' execution below and as such term is defined and used therein, the term "VAR" shall be deemed to include  Capax Discovery, LLC ("Discovery") and/or Capax Global, LLC ("Global") and/or Capax Discovery LTD ("Discovery LTD") and/or Capax Global LTD ("Global LTD").  For clarification, either Discovery or Global or Discovery LTD or Global LTD may serve as "VAR" under the Agreement, as same is amended hereunder.  By signature below, each of Global, Discovery LTD and Global LTD hereby agrees to be bound by the terms and conditions of the Agreement.

4. **Scope of Support Services; Training and Transition**.

   a. Scope.  The parties acknowledge and agree that VAR shall provide only "first-line" and "second-line" support to and for the benefit of EAS Customers.  For clarification, "first-line" and "second-line" support shall be deemed to include receiving telephone, email, or web-based support requests from EAS Customers, initial troubleshooting in conjunction with such EAS Customers (on their use of the EAS software only) in order to assist EAS Customers with such support requests, coordinating with Autonomy to respond thereto, and timely responding to EAS Customers' requests for telephone, email, or web-based support Services.  As used herein, such support Services shall be hereinafter referred to as "Front Line EAS Support".  In performing Front Line EAS Support, VAR shall refrain, without Autonomy's prior written consent and approval, from logging, indicating, or confirming with an EAS Customer or other third party requesting support Services on an EAS Customer's behalf that a given support request representing an "error", "defect", "change request", or any other similar designation may give rise to an implication that the EAS software licensed to such EAS Customer is defective, requires an upgrade or update to its features or functionalities, or requires a bug fix or workaround in order to properly function.  In performing Front Line EAS Support, VAR shall not, in any event other than as contemplated in Section 6, inform EAS Customers that it serves as the role of "subcontractor", or otherwise disclose to EAS Customers for which VAR provides Front Line EAS Support that VAR, and not Autonomy, is providing such Front Line EAS Support.

      i. VAR Support Personnel.  VAR shall be solely responsible for hiring all required personnel in order to adequately provide the Front Line EAS Support contemplated hereunder.  VAR  shall be responsible for the performance of background investigation checks on employees hired by VAR to perform Front Line EAS Support hereunder, which shall include, at a minimum, verification of (A) previous employment; (B) criminal history including, at a minimum, a county-level criminal convictions search in the counties of the employee's current and previous residences and work locations for the past seven (7) years; (C) personal identity, including a trace of the employee's Social Security Number to verify his/her identity; and (D) education, including a verification of the employee's highest degree earned. VAR shall ensure that applicable employees performing Front Line EAS Support shall have successfully passed a drug test or, if the employees undergoing testing are enrolled in a comprehensive drug-free workplace program, have successfully passed a urine specimen drug test, except to the extent such testing is precluded by applicable law.  All employees hired by VAR to provide Front Line EAS Support shall successfully complete Autonomy standard EAS SE certification and training at Autonomy's cost.

      ii. Support Facilities.  All Front Line EAS Support shall be performed utilizing Autonomy's existing support infrastructure.  Autonomy will make available to VAR, at no additional charge, its telephone support line and its email and web-based support systems, in order to facilitate VAR's provision of Front Line EAS

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008349
Exh 1012-0056

Support to and for the benefit of EAS Customers as required by this Agreement. Further, Autonomy will make available to VAR, at no additional charge, reasonable desk space and office facilities in Autonomy's support facility located in Calgary, Alberta, Canada (or in such other location as the parties may mutually agree) for up to five (5) of VAR's support personnel; provided, however, VAR shall be responsible, at its sole cost and expense, for procuring office space and facilities for any additional employees providing Front Line EAS Support. VAR and Autonomy shall each designate one (1) person to serve as senior liaison for purposes of coordinating the Front Line EAS Support to be performed by VAR hereunder and the other support Services to be performed by Autonomy, as well as for escalation of support issues raised by EAS Customers.

b.  <u>Transition Period</u>.  Commencing on the First Amendment Effective Date and for a period of six (6) months thereafter, or a lesser period, subject to Autonomy's approval (hereinafter the "<u>Transition Period</u>"), the parties shall work together in good faith to (i) commence and complete training for the applicable VAR personnel providing Front Line EAS Support, and (ii) begin transitioning to VAR, pursuant to this First Amendment, EAS Customers for purposes of VAR providing Front Line EAS Support therefore. VAR shall assign personnel to work with Autonomy support personnel in Autonomy's Calgary support facility (or such other facility(ies) as the parties may mutually agree), in order for such personnel to become sufficiently trained on the use of Autonomy support facilities and adherence to Autonomy support policies and procedures. Autonomy shall provide copies of training materials and technical documentation, together with the related softcopy documentation including but not limited to the training manuals, the training presentations, and training wm images, in native and editable format regarding the EAS Products as may reasonably be required to facilitate training of VAR's support personnel and for purposes of enabling VAR to provide specialized custom client training for EAS Customers from time to time. During the Transition Period, Autonomy may commence subcontracting EAS Customers to VAR, pursuant to Section 4 below. Further, during said Transition Period and with written consent from Autonomy and subject to any contractual and/or other legal obligations of Autonomy or VAR, VAR may commence contacting EAS Customers who licensed the EAS Products through other resellers of Autonomy or its affiliates, for purposes of assuming support obligations for such EAS Customers. At the end of the Transition Period, the parties shall meet in good faith and if VAR has demonstrated to Autonomy's reasonable satisfaction that (a) its personnel have successfully completed the training and certification required hereunder, and (b) it is capable of providing the Front Line EAS Support as contemplated hereunder without adverse impact to Autonomy and/or the EAS Customers, or their respective business operations, VAR shall become designated Autonomy's "preferred EAS provider", and Autonomy shall commence subcontracting and/or referring, as the case may be, EAS Customers to VAR for purposes of Front Line EAS Support.

5.  **Subcontracting EAS Support.**   As set forth in Section 6.5 of the Agreement, VAR may, from time to time, submit purchase orders to Autonomy relating to VAR's purchase of certain support Services from Autonomy, and, further, has the right to provide support to and for the benefit of EAS Customers. As set forth in this First Amendment, the parties agree that, from time to time and subject to Autonomy's agreements, including with the applicable EAS Customers, Autonomy may subcontract Front Line EAS Support for select EAS Customers to VAR by executing and submitting to VAR a Support Order, in form and content as is set forth on Attachment 1 to this First Amendment and which is incorporated into the Agreement by this reference (hereinafter a "<u>Support Order</u>"). Each such Support Order shall state with specificity, the following information:

(a)  The name of the EAS Customer the support Services for which are being subcontracted to VAR, including the name and contact information of any named support contacts for such EAS Customer;

(b)  The date on which the applicable annual support and maintenance period for such EAS Customer is scheduled to become renewed;

(c)  The number of months remaining on the then current and paid-up support and maintenance period (such remaining period the "<u>Remaining Maintenance Term</u>");

(d)  The configuration of EAS software licensed to such EAS Customer, including (i) parent and child server configuration, (ii) Client Access License configuration, and (iii) aggregate number of Client Access Licenses licensed by such EAS Customer.

(e)  The annual support and maintenance fee actually paid by such EAS Customer for the then-current support and maintenance period (the "<u>Current Annual Fee</u>");

(f)  The annual support and maintenance fee anticipated to be paid by such EAS Customer for each subsequent annual renewal of support and maintenance Services (the "<u>Renewal Annual Fee</u>"); and

(g)  The date upon which the Support Order shall become effective.

Upon VAR's acceptance of a Support Order from Autonomy (which may be evidenced by its signature thereon or its performance of the support Services subcontracted thereunder), VAR shall perform Front Line EAS Support to and for the benefit of the EAS Customer identified in such Support Order. In consideration therefore, Autonomy shall pay VAR the following fees with respect to each EAS Customer the Front Line EAS Support for which is subcontracted hereunder:

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008350
Exh 1012-0057

(a) *Remaining Term Fee*: For each month then remaining in the EAS Customer's Remaining Maintenance Term, Autonomy shall pay to VAR an amount equal to eighty-five percent (85%) of 1/12th of the Current Annual Fee; and

(b) *Renewal Term Fee*: For each month commencing upon such time as the EAS Customer renews its annual maintenance and support services with Autonomy and subject to the EAS Customer's payment of the applicable annual maintenance and support services fee for such annual renewal, Autonomy shall pay to VAR an amount equal to eighty-five percent (85%) of 1/12th of the Renewal Annual Fee (provided, however, in the event the actually amount paid by the EAS Customer is different than the Renewal Annual Fee, the amount due hereunder shall be determined by reference to such actual amount paid by the applicable EAS Customer).

For clarification, the Remaining Term Fee and Renewal Term Fee more fully described in subsections (a) and (b) above shall be paid monthly and in advance. The parties acknowledge that no Renewal Term Fee shall become due and owing for any EAS Customer that fails or declines to renew its annual maintenance and support services with Autonomy. Further, Autonomy's obligation to pay the Remaining Term Fee and/or Renewal Term Fee above shall be contingent on Autonomy receiving payment from each applicable EAS Customer. Autonomy shall provide reasonable reports, but no less frequently than once per calendar quarter, setting forth the aggregate number of EAS Customers subcontracted under this First Amendment and the number of such EAS Customers that renewed annual maintenance and support services during the applicable calendar quarter. The parties shall work together in good faith to facilitate the support services contemplated hereunder.

6. **Support for Reseller EAS Customers.** Upon completion of the Transition Period (or upon such earlier date, as determined by Autonomy), VAR may commence providing Front Line EAS Support directly for EAS Customers who licensed EAS Products through another authorized reseller or distributor of Autonomy (such EAS Customers hereinafter "Indirect EAS Customer"). In such event, Autonomy shall provide reasonable assistance to VAR to facilitate VAR's contracting directly with such Indirect EAS Customers for the provision of Front Line Support, which may include providing VAR with reasonable information regarding the date the then-current term of maintenance and support services for each such Indirect EAS Customer is set to expire, subject always to any confidentiality obligations of Autonomy. For each Indirect EAS Customer with respect to which VAR agrees to provide Front Line EAS Support, VAR shall pay to Autonomy an amount equal to fifteen percent (15%) of the applicable maintenance and support services fee paid by such Indirect EAS Customer to VAR. Such sum shall be paid annually to Autonomy upon such Indirect EAS Customer's renewal of their maintenance and support services through VAR. VAR shall provide Autonomy with written notice of each Indirect EAS Customer with respect to which it agrees to provide Front Line EAS Support, and shall report to Autonomy no less frequently than once per calendar quarter on the aggregate maintenance renewal fees collected therefrom in each such quarter.

7. **Term and Termination.** The term of this First Amendment shall commence on the First Amendment Date and terminate on the date it becomes terminated pursuant to this Section 7. Autonomy may terminate this First Amendment and/or any Support Order hereunder upon not less than sixty (60) days prior written notice to VAR. Further, Autonomy may terminate this First Amendment pursuant to Section 14.2 of the Agreement. VAR may terminate this First Amendment or any Support Order hereunder in the event Autonomy materially breaches its obligations hereunder or thereunder and fails to cure such material breach within thirty (30) days of the date of VAR's notice thereof. In the event this First Amendment becomes terminated, all applicable Support Orders hereunder shall immediately become terminated. A Support Order shall automatically become terminated with respect to a particular EAS Customer upon such time as such EAS Customer has terminated its maintenance and support services. Upon termination of a Support Order hereunder, the parties shall work in good faith to transition Front Line EAS Support services for the affected EAS Customers thereunder to an alternative provider of such services (which may be Autonomy); in connection therewith, VAR agrees that, upon Autonomy's reasonable request and subject to the parties' continued obligation to pay fees due hereunder, VAR shall continue providing Front Line EAS Support Services for such affected EAS Customers for a period of up to six (6) months from the date an applicable Support Order became terminated. Upon termination of an applicable Support Order, VAR shall immediately return to Autonomy all information concerning the affected EAS Customer(s) thereunder, and such information shall at all times remain Confidential Information of Autonomy under Section 19 of the Agreement. Termination of a Support Order hereunder shall not relieve Autonomy of any obligation to make payment thereunder prior to the effective date of such termination, and termination of this First Amendment shall not relieve VAR of its obligation to payment in connection with any Indirect EAS Customer prior to the effective date of such termination.

8. **Integration.** Except as expressly amended and supplemented hereby, the Agreement shall remain in full force and effect. In the event of any inconsistency between the provisions of this First Amendment and the provisions of the Agreement, the terms of this First Amendment shall control and take precedence.

**[signature page follows]**

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008351
Exh 1012-0058

IN WITNESS WHEREOF, each of VAR and Autonomy has caused this First Amendment to be signed and delivered by its duly authorized representative First .

**Autonomy, Inc.:**

Signed:

Name: Andrew Kanter

Title: Company Secretary

Date: 10 OCT 2009

**Capax Discovery, LLC:**

Signed:

Name: John BAIOCCO

Title: Managing Partner

Date: 10/12/07

**Capax Global, LLC:**

Signed:

Name: John BAIOCCO

Title: Managing Partner

Date: 10/12/07

**Capax Discovery LTD:**

Signed:

Name: John BAIOCCO

Title: Managing Partner

Date: 10/12/09

**Capax Global LTD:**

Signed:

Name: John BAIOCCO

Title: Managing Partner

Date: 10/12/09

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**HP-SEC-00008352**
Exh 1012-0059

**Attachment 1 to First Amendment**

**Sample Support Order**

**SUPPORT ORDER NO.** [████████████████]

**Effective Date:** [DATE]

| From : | Autonomy, Inc. (on behalf of itself and its affiliate, ZANTAZ, Inc.)<br>One Market Plaza<br>Spear Tower, 19th Floor<br>San Francisco, CA  94015 |
|---|---|

| To: | [VAR]<br>[VAR ADDRESS] |
|---|---|

This Support Order is issued under and pursuant to that certain First Amendment to the Autonomy, Inc. Value Added Reseller Agreement dated October [████], 2009 entered into between Autonomy and VAR (the "First Amendment" and, together which such Agreement, the "Agreement").  This Support Order shall become effective as of the Effective Date above.

The terms set forth below to the extent they contradict the Agreement shall supersede the Agreement provided Autonomy has signed this Support Order and VAR has accepted it, in accordance with the First Amendment.  All other terms and conditions contained in the Agreement shall remain in full force and effect.  By execution below, Autonomy shall engage VAR to perform Front Line EAS Support to and for the benefit of the following EAS Customers, pursuant to the terms of the Agreement and First Amendment.

| EAS Customer (name, contact information) | Scheduled Maintenance and Support Renewal Date | Remaining Maintenance Term (in months) | EAS Configuration and Software Information | Current Annual Fee (fee paid for current annual support term) | Renewal Annual Fee (anticipated fee for renewal of annual support services) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**This Support Order shall be subject to the terms of the Agreement and First Amendment.**

**Autonomy signature:** _____
**Print Name:** _____
**Print Title:** _____
**Date:** _____

**Order Accepted by VAR:** _____
**Date:** _____

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008353
Exh 1012-0060

| From: | Laura Dann [ldann@autonomy.com] |
| Sent: | Monday, June 28, 2010 12:39 PM |
| To: | Brent Hogenson |
| Subject: | RE: Commission Payments |

Hi Brent.

Currently no commissions have been paid on the deals listed below.  The deals were entered into Oracle as Non-Commission and are reflected in the commission report as House – Non Commissions.  The information highlighted in green in the table below is a summary of the information I have on file.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue | Company Name |
|----------|---------------------|-----------|-------------|--------------|
| 31-Dec | Microlink – Discovery LLC | MGMT | 2,000,000.00 | DISCOVER TECHNOLOGIES, LLC |
| 30-Dec | MicroTech LLC –  (Blank) | MGMT | 9,523,810.00 | DISCOVER TECHNOLOGIES, LLC |
| 31-Dec | MicroTech LLC –  Amazon | MGMT | 131,418.00 | AMAZON.COM LLC |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000.00 | AVAYA COMMUNICATIONS |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000.00 | HONEYWELL CORPORATION |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000.00 | KPMG - US & CANADA |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000.00 | MANUFACTURERS LIFE INSURANCE |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000.00 | MORGAN STANLEY |
| 31-Dec | Capax – Eli Lilly | MGMT | 5,987,000.00 | ELI LILLY AND COMPANY |

Thanks,
Laura

**From:** Brent Hogenson [mailto:Brent.Hogenson@autonomy.com]
**Sent:** Sunday, June 27, 2010 12:54 PM
**To:** Laura Dann
**Subject:** Commission Payments

Hi Laura,

Have we paid commissions to sales reps for the transactions below?  If yes, who was the sales rep, how much commission was paid and what month was the commission paid.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue |
|----------|---------------------|-----------|-------------|
| 31-Dec | Microlink – Discovery LLC | MGMT | 2,000,000 |
| 30-Dec | MicroTech LLC –  (Blank) | MGMT | 9,523,810 |
| 31-Dec | MicroTech LLC –  Amazon | MGMT | 131,418 |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000 |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000 |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000 |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000 |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000 |
| 31-Dec | Capax – Eli Lilly | MGMT | 5,987,000 |

Thanks,

1

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008400
Exh 1012-0061

**Brent Hogenson**
**President Autonomy Interwoven**
**CFO Autonomy Americas**
**Tel: 408.953.7058**
**Mobile: 408.718.1376**
**E-mail: brent.hogenson@autonomy.com**

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-00008401
Exh 1012-0062

| From: | Percy Tejeda |
|---|---|
| Sent: | Tuesday, June 22, 2010 10:32 PM |
| To: | Brent Hogenson |
| Subject: | FW: Lilly |
| Attachments: | Lilly and Capax.xls |

FYI.

**From:** Stephen Chamberlain [mailto:stephenc@autonomy.com]
**Sent:** Tuesday, June 22, 2010 8:23 AM
**To:** Percy Tejeda
**Cc:** 'J. Livius Guiao'
**Subject:** Lilly

Percy – depending on how discount is allocated need to instruct Capax to invoice first instalment. I need to talk to Sushovan and Stouffer regarding the overall shortfall. When they get paid they will need to pass on to us to start to settle their amount due to us.

Please prepare pro-forma invoice for Capax to send to Lilly and I will check with Sushovan prior to sending out.

Thanks

**Steve Chamberlain**
**VP, Finance**
**Autonomy**

Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ

Direct tel: 01223 448017
Mobile tel: 07795 601794
Fax: 01223 448040

E-mail: stephenc@autonomy.com
Web: www.autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged  information.  If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone.  Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies.  No reliance may be placed on this message without written confirmation from an authorised representative of the company.  Autonomy Systems Limited, Registered Office:  Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00008348
Exh 1012-0063

# EXHIBIT 13059

## CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Confidential Settlement Agreement and Release of All Claims (hereafter "Agreement") is entered into this ___ day of November, 2010 (the "Effective Date") between Brent Hogenson ("Hogenson"), and Interwoven, Inc., a Delaware Corporation (referred to herein as "Interwoven" or the "Company"), on behalf of itself and its parents, including but not limited to Autonomy Corporation plc and Autonomy Inc., predecessors, successors and their respective parent corporations, affiliates, related, and/or subsidiary entities, and all of their past and present directors, shareholders, officers, partners, employees, agents, insurers, and attorneys, and all other persons acting by, through, under or in concert with it (collectively referred to as the "Parties").

WHEREAS, Hogenson's last day of employment with Interwoven was July 28, 2010 (the "Termination Date");

WHEREAS, a dispute has arisen between Hogenson and Interwoven and its ultimate parent corporation Autonomy Corporation plc, a public limited company organized and existing under the laws of England and Wales and Autonomy, Inc., a New Jersey Corporation ("Autonomy"), in that Hogenson alleges that Interwoven wrongfully terminated the employment of Hogenson, and in that Interwoven alleges that Hogenson breached his employment agreement and violated Company policies;

WHEREAS, each Party denies the other's allegations that they engaged in any improper or illegal conduct; and

WHEREAS, to settle their dispute and to avoid the costs and inconvenience of litigation and appeals, the parties have negotiated a settlement of the disputed claims which is set forth below;

THEREFORE, in exchange for the good and valuable consideration set forth herein, the adequacy of which is specifically acknowledged, the Parties hereby agree as follows:

1.    Consideration.  In addition to the covenants and mutual releases contained herein, the Parties agree to the following consideration for signing this Agreement:

(a)    Payment by Interwoven:  Interwoven agrees to pay Hogenson the total sum gross of Seven Hundred Fifty Thousand Dollars ($750,000.00) (the "Payment"). Interwoven or Autonomy shall wire the Payment one business day after Hogenson's execution of the Agreement.  Such wire shall be sent to: the Bergeson LLP Trust Account, Union Bank of California, 99 Almaden Blvd., Suite 200, San Jose CA, 95113, Routing No. 122000496, Trust Account/IOLTA No. 4740007896.  The receipt of the Payment by Hogenson in the manner specified herein shall be a condition precedent to the enforcement by Autonomy of any term of this Agreement and failure to deliver such shall be a material breach of this Agreement by Autonomy.  Hogenson will be responsible for any and all taxes, interest, and penalties that may be imposed with respect to the payments contemplated by this Agreement (including, but not limited to, those imposed under Internal Revenue Code Section 409A) and agrees to indemnify and defend the Company for any consequence to Company arising from his failure to pay his personal and individual taxes.  Hogenson  acknowledges and represents that the Company has

**EXHIBIT**

43

SF - 3853

Page 1 of 9

FOIA Confidential Treatment Requested

BHOGE003250

US_SEC_EX 00000278

EXH 13059-0001

paid all salary, wages, bonuses, accrued vacation, severance, dues, fees, stock, stock options, vesting, commissions and any and all other benefits and compensation due to him in full.

(b)    Affidavit by Hogenson:  Hogenson shall deliver an affidavit relating to his knowledge of Autonomy's accounting policies and practices.  The Parties shall use such affidavit, if ever, exclusively in the manner outlined therein.  A copy of the affidavit shall be signed by Hogenson and forwarded to Autonomy contemporaneously with the execution of this Agreement, the receipt of which by Autonomy is a condition precedent to the enforcement by Hogenson of any term of this Agreement and failure to deliver such shall be a material breach of this Agreement by Hogenson.  Unless otherwise indicated in the affidavit itself, which language shall be controlling notwithstanding any provision of this Agreement, the affidavit shall be deemed part of the "Settlement Information" described in paragraph 6 below and shall be subject to the confidentiality requirements set forth in paragraph 7 below.

2.    Release by Hogenson.

(a)    Hogenson, on behalf of himself and his executors, heirs, representatives and assigns, hereby agrees to release and forever discharge Autonomy and all predecessors, successors and its and their respective parent corporations, affiliates, related, and/or subsidiary entities, and all of their past and present directors, shareholders, officers, partners, agents, insurers, and attorneys, and all other persons acting by, through, under or in concert with any of them (collectively, the "Autonomy Releasees"), from (1) any and all claims, debts, demands, accounts, judgments, rights, causes of action, equitable relief, damages, costs, charges, complaints, obligations, promises, agreements, controversies, suits, expenses, compensation, responsibility and liability of every kind and character whatsoever (including, but not limited to, attorneys' fees and costs), whether in law or equity, known or unknown, asserted or unasserted, suspected or unsuspected (collectively, "Claims"), which Hogenson has or may have had against any of the Autonomy Releasees based on any events or circumstances arising or occurring on or prior to the date hereof, including without limitation any and all claims relating to or arising from Hogenson's employment relationship with Interwoven and/or the termination of that relationship; (2) all claims related to his compensation or benefits from the Company, including wages, salary, bonuses, commissions, vacation pay, expense reimbursements (to the extent permitted by applicable law), severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (3) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (4) all tort claims, including without limitation claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (5) all federal, state, and local statutory claims, including without limitation claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990, the federal Worker Adjustment and Retraining Notification Act (as amended) and similar laws in other jurisdictions, the Employee Retirement Income Security Act of 1974 (as amended), the Family and Medical Leave Act of 1993, and the California Fair Employment and Housing Act (as amended) and similar laws in other jurisdictions, but not including claims under the federal Age Discrimination in Employment Act of 1967, as amended that may arise after the date you sign this Agreement.  This Agreement includes a release of claims of discrimination or retaliation on the basis of workers' compensation status, but does not include workers' compensation claims for benefits.  Hogenson warrants and represents that he is unaware of any basis for filing a claim for workers compensation benefits.

FOIA Confidential Treatment Requested

BHOGE003251
US_SEC_EX 00000279

EXH 13059-0002

(b)     Hogenson agrees that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to (1) any obligations incurred under this Agreement; (2) any vested rights under pension or retirement plans; (3) any rights Hogenson may have to indemnification under California Labor Code Section 2802 or any other applicable statute, agreement, and/or bylaws or articles of incorporation of Interwoven and/or Autonomy; (4) any obligations which cannot be released by law; (5) any rights Hogenson may have to unemployment benefits under applicable state law; and (6) any non-waivable right Hogenson may have to file a charge, testify or participate in an EEOC, SEC, or FSA investigation, hearing or proceeding, provided, however, that by signing this Agreement, Hogenson understands and agrees that Hogenson is waiving the right to bring a lawsuit against Autonomy and the Autonomy Releasees and waives his right to any personal recovery in any action brought by the EEOC or any other state, federal, or other governmental agency on his behalf.

3.     Release by Interwoven   Interwoven, on behalf of itself and all predecessors, successors and their respective parent corporations, affiliates, related, and/or subsidiary entities, including but not limited to Autonomy Corporation plc and Autonomy Inc., and all of their past and present directors, shareholders, officers, partners, employees, agents, insurers, and attorneys, and all other persons acting by, through, under or in concert with it hereby agrees to release and forever discharge Hogenson, on behalf of himself and his executors, heirs, representatives and assigns, (collectively, the "Hogenson Releasees"), from any and all claims, debts, demands, accounts, judgments, rights, causes of action, equitable relief, damages, costs, charges, complaints, obligations, promises, agreements, controversies, suits, expenses, compensation, responsibility and liability of every kind and character whatsoever (including, but not limited to, attorneys' fees and costs), whether in law or equity, known or unknown, asserted or unasserted, suspected or unsuspected (collectively, " Released Claims"), which Interwoven has or may have had against such persons or entities based on any events or circumstances arising or occurring on or prior to the date hereof, including without limitation any and all claims arising out of or relating to Hogenson's employment relationship with Interwoven or the termination of that relationship, Hogenson's employment agreement with Interwoven, and any and all Company policies including but not limited to those related to authorization of payments to third parties, internal company investigations, and the preservation of evidence.

4.     Waiver of Unknown Claims.  The parties acknowledge that they have been advised of and are familiar with the provisions of California Civil Code Section 1542, which provides as follows:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

Being aware of said code section, the Parties hereby expressly waive any rights they may have thereunder, as well as under any other statutes or common law principles of similar effect. Thus, notwithstanding the provisions of section 1542, or any other statue of common law principle of similar effect, and to implement a full and complete release of all claims, the Parties expressly acknowledge this Agreement is intended to include in its effect, without limitation, all Claims not known or suspected to exist in their favor at the time of signing this Agreement, and

FOIA Confidential Treatment Requested

BHOGE003252
US_SEC_EX 00000280

EXH 13059-0003

that this Agreement contemplates the extinguishment of any such Claim or Released Claims. The Parties warrant they have read this Agreement, including this waiver of California Civil Code section 1542, and have consulted counsel about this Agreement and specifically about this waiver of section 1542, and that they understand this Agreement and the section 1542 waiver. The Parties therefore freely and knowingly enter into this Agreement. The Parties acknowledge that they may later discover facts different from or in addition to those they now know or believe to be true regarding the matters released or described in this Agreement, and even so agree the releases and agreements contained in this Agreement shall remain effective in all respects notwithstanding any later discovery of any different or additional facts. The parties assume any and all risk of any mistake in connection with the true facts involved in the matters, disputes or controversies described in this Agreement or with regard to any facts now unknown relating to those matters.

5.     Affirmation Regarding Claims Asserted. Except as to the claims explicitly identified in Hogenson Affidavit, and except as to Hogenson's written communications with the FSA on or about July 26, 2010, July 28, 2010, August 4, 2010, and August 15, 2010 and written communications with the SEC on or about August 20, 2010 and August 21, 2010, copies of which have been provided to Autonomy, and oral communications with the FSA on three separate occasions approximately between July 26 and August 7, 2010 relating to non-substantive administrative matters. Hogenson represents that he has not filed or initiated any compliance review, action or proceeding, claim, arbitration or lawsuit, or participated in the same, individually or as a member of a class, against any of the Autonomy Releasees under any contract (express or implied) or any federal, state or local law, statute or regulation pertaining in any manner to any of the Released Claims.

6.     Nondisparagement. Hogenson agrees that neither he nor anyone acting by, through, or in concert with him, shall, orally or in writing, disparage, defame, or slander, Autonomy or its business, directors, officers, products, services or business practices, or any of the Autonomy Releasees to the extent doing so would disparage, defame, or slander, Autonomy (including, without limitation, Interwoven) or its business, directors, officers, products, services or business. Hogenson also agrees not to tortiously interfere with Autonomy's actual or prospective business relationship or expectancies, provided, however, that nothing in the Section 6 shall prohibit Hogenson from engaging in any act allowed by law not otherwise prohibited by this Section 6. Autonomy and Interwoven agrees that neither it nor anyone acting by, through, or in concert with it shall, orally or in writing disparage, defame, or slander Hogenson, including but not limited to Hogenson's job performance during his employment by Interwoven, his behavior, or his character. Hogenson and Interwoven agree to direct any request for job reference/verification relating to Hogenson's employment at Interwoven to the Company's Head of Human Resources (currently, Susan Solat) and, in that case, Interwoven will provide only Hogenson's dates of employment, last position held, and salary. Notwithstanding the foregoing, and subject to compliance with the terms of this Agreement, nothing herein is intended to or shall prohibit either Hogenson or Autonomy from responding or testifying truthfully if called upon and legally required to do so in any court action, administrative proceeding, regulatory proceeding, investigation, or if otherwise compelled by legal process to do so.

7.     Confidentiality. The Parties hereby agree to maintain in confidence the existence of this Agreement, the contents and terms of this Agreement, the consideration of this Agreement and Hogenson further agrees to maintain in confidence all Interwoven and/or Autonomy

FOIA Confidential Treatment Requested

BHOGE003253
US_SEC_EX 00000281

EXH 13059-0004

Proprietary Information (as such term is defined in the Interwoven Employee Invention Assignment and Confidentiality Agreement executed by Hogenson on or about November 19, 2003) as well as any and all other internal information related to Interwoven and/or Autonomy, its business, and his employment relationship therewith but excluding the fact that Hogenson was employed by Interwoven, his dates of employment and his title (hereinafter collectively referred to as the "Settlement Information"). The Parties agree, covenant, and promise that, except to the extent required by law, they shall keep confidential and not publicize or disclose the Settlement Information in any manner whatsoever, whether in writing or orally, to any person, directly or indirectly, or by or through any agent or representative, other than to the following: (1) their attorneys; (2) their accountants; (3) their tax consultants or financial advisors; (4) Hogenson's spouse, and (5) such other representatives or entities required by law and/or court order. With respect to any individuals referred to in this Paragraph, subparts (1) through (5) to whom the Parties disclose any Settlement Information, the Parties agree that they will inform such individual(s) that the information is strictly confidential and may not be reviewed, discussed or disclosed, orally or in writing with any other person, organization or entity. The parties agree that either Hogenson's or Interwoven's or Autonomy's (or any of their respective agent's) breach of this Section 7's agreement to maintain in confidence the Settlement Information shall be a material breach of this Agreement, the non-exclusive remedy for which shall be monetary damages caused by said breach , which in the case of Hogenson shall be deemed to be no less than the consideration paid to Hogenson under paragraph 1(a) of this Agreement, plus interest, costs, and attorneys' fees involved in recovering such damages. It shall be no defense in such an action for Hogenson to claim that the disclosure of Settlement Information was inadvertent, mistaken, justifiable, excusable, immaterial, advised by counsel or resulted in minimal or no harm to Interwoven. In the event of any inquiry about the disputed matters resolved by this Agreement, the Parties agree to respond only that the matter was resolved.

Hogenson covenants that prior to execution of this Agreement he has discussed the potential for litigation based on Interwoven's termination of his employment only with the following persons (1) his spouse; (2) Chris Junker; (3) Percy Tejada; (4) Mr. Tejada's counsel, Chris Cooke, Esq., through Hogenson's counsel; (5) Reena Prasad, (6) Ms. Prasad's counsel, Cliff Palefski, Esq, through Hogenson's counsel; and (7) Ganesh Vaidyanathan.

In the event that a Party is required by law and/or court order to disclose, publicize, or to permit, authorize, or instigate the disclosure of any Settlement Information, in whole or in part, the disclosing Party must notify the other Party in writing, with a copy by electronic mail, as provided for in paragraph 12 below, at least ten (10) business days prior to the disclosure in order to provide the other Party with the opportunity to object to such disclosure. To the extent a subpoena or document demand is issued to one of the Parties requesting any of the Settlement Information, including any related documents or correspondence between the Parties or any testimony related to such documents or correspondence, that Party shall as soon as reasonably practicable notify the other Party of the receipt of such subpoena or deposition notice or document demand within two (2) business days of becoming aware of receipt, and shall cooperate in any effort by the other Party to object to or quash such subpoena, or object to or obtain a motion for a protective order related to such deposition notice or document demand.

Nothing in this Section shall preclude the Parties from disclosing this Agreement, or the Settlement Information, in the event of a breach to allow the non-breaching party to enforce its rights under the Agreement. Such disclosure shall be limited to those provisions necessary to

FOIA Confidential Treatment Requested

BHOGE003254
US_SEC_EX 00000282

EXH 13059-0005

remedy the breach.  In the event of a dispute between the Parties, the Party moving to enforce the terms of this Agreement shall use its or his best efforts to preserve the confidentiality of this Agreement.  Any such enforcement action shall be filed exclusively in the arbitration forum set forth in paragraph 18 below, and, in any subsequent petition to confirm or set aside an arbitration award in court, the Parties shall use their best efforts to file any Settlement Information set forth in their subsequent motions, oppositions or reply briefs, under seal.

8.     No Admission of Liability.  Each party agrees and understands this Agreement constitutes a compromise settlement of disputed claims.  The furnishing of the consideration for this Agreement shall not at any time for any purpose be deemed or construed by the Parties or by anyone else as an admission of liability or responsibility by either Party or by any of the respective Releasees.  Each party further agrees and understands that Hogenson and Interwoven enter into this Agreement solely for the purpose of avoiding the expense and inconvenience of litigation.

9.     No Assignment of Claims.  The parties represent that they have not heretofore assigned or transferred, nor purported to assign or transfer, to any person or entity, any Claim or any portion thereof or any interest therein.

10.     No Reliance on Representations.  The Parties acknowledge that in entering this Agreement, they do not rely and have not relied upon any representation or statement made by either party or by any of their agents, representatives or attorneys, with regard to the subject matter, basis, or effect of this Agreement or otherwise, except as expressly stated in this Agreement.

11.     Choice of Law.  This Agreement shall in all respects be governed and construed in accordance with the laws of the State of California, including all matters of construction, validity and performance, without regard to conflicts of law principles.

12.     Notices.  All notices, demands or other communications regarding this Agreement shall be in writing and shall be sufficiently given if either personally delivered or sent by overnight delivery, with a copy via electronic mail, addressed as follows:

    If to Interwoven:

    General Counsel
    One Market, Spear Tower, 19th Floor
    San Francisco, CA 94105
    Phone:  415 243-9955
    Fax: 415 243-9984
    Email:  joels@autonomy.com

    If to Hogenson:

    Brent Hogenson
    10668 Flora Vista Ave
    Cupertino, CA 95014
    bphogenson@gmail.com

    and

FOIA Confidential Treatment Requested

BHOGE003255
US_SEC_EX 00000283

EXH 13059-0006

Daniel J. Bergeson, Esq.
Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110
Phone: 408 291-6200
Fax: 408 297-6000
Email: dbergeson@be-law.com

13.     Severability.  Except as otherwise specified below, should any portion of this Agreement be found void or unenforceable for any reason by a court of competent jurisdiction, the parties intend that such provision be limited or modified so as to make it enforceable, and if such provision cannot be modified to be enforceable, the unenforceable portion shall be deemed severed from the remaining portions of this Agreement, which shall otherwise remain in full force and effect.  If any portion of this Agreement is so found to be void or unenforceable for any reason in regard to any one or more persons, entities, or subject matters, such portion shall remain in full force and effect with respect to all other persons, entities, and subject matters.  This paragraph shall not operate, however, to sever either party's obligation to provide the binding release to all entities intended to be released hereunder.

14.     Understanding and Authority.  The parties understand and agree that all terms of this Agreement are contractual and are not a mere recital, and represent and warrant that they are competent to covenant and agree as herein provided.

15.     Voluntary and Knowing.  This Agreement is executed voluntarily and without any duress or undue influence on the parties hereto.  The parties acknowledge that:

> (a)     They have had a reasonable time within which to consider this Agreement before executing it;
>
> (b)     They have read this Agreement;
>
> (c)     They have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice or that they have voluntarily declined to seek such counsel;
>
> (d)     They understand the terms and consequences of this Agreement and of the releases it contains;
>
> (e)     They knowingly and voluntarily agree to all of the terms set forth in this Agreement; and
>
> (f)     They are fully aware of the legal and binding effect of this Agreement.

16.     Entire Agreement.  This Agreement, contains the entire, final and exclusive agreement of the parties and no promise made by any party or by any officer, attorney, or agent of any party that is not expressly contained in this Agreement shall be binding or valid.  Any modification of any provision of this Agreement, to be effective, must be in writing and signed by all parties.

FOIA Confidential Treatment Requested

BHOGE003256
US_SEC_EX 00000284

EXH 13059-0007

17.  <u>Binding Effect</u>.  Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

18.  <u>Arbitration</u>.  In the event of any dispute or claim arising out of this Agreement or any dispute related in any manner whatsoever to Hogenson's employment with Interwoven, the Parties agree that all such disputes shall be fully and finally resolved by JAMS in San Francisco, California.  Interwoven shall pay all JAMS' arbitration fees in excess of the amount of court fees that would be required if the dispute were decided in a court of law.  Each side shall bear its or his own remaining fees, costs, and expenses in the arbitration, and the arbitrator may apportion fees as provided by law.

19.  <u>Proprietary Information</u>.  Hogenson confirms that he has signed and remains bound by the terms and conditions of the Interwoven Inventions and Proprietary Rights Assignment Agreement, incorporated by reference in his initial offer letter, to which terms and conditions he consented on or about March 15, 2001.

20.  <u>No Future Relationship</u>.  Hogenson agrees not to apply for employment with Interwoven, or any of its current or later acquired subsidiaries or affiliates, and forsakes any right to be employed by any of them.  The Company's (or any of its subsidiaries' or affiliates') refusal to employ Hogenson shall not be the basis of any cause of action against either or any of them.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

FOIA Confidential Treatment Requested

BHOGE003257
US_SEC_EX 00000285

EXH 13059-0008

21.    <u>Cooperation</u>.  Hogenson agrees to provide reasonable cooperation to the Company in connection with any pending or future litigation or arbitration brought against the Company and in any investigation the Company may conduct.  The Company shall compensate Hogenson for his time at the rate of $200 per hour and shall advance Hogenson's expenses including, but not limited to, any travel expenses airfare, hotel, car rental, etc.) that he may incur with the prior written permission of the Company in connection with providing the Company with the cooperation requested.  Notwithstanding the foregoing, nothing herein is intended to or shall prohibit Hogenson from testifying truthfully in connection with any litigation, arbitration, or investigation should he be compelled by law or court order to do so.

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed the foregoing on the dates shown below.

Brent Hogenson                              Interwoven, Inc

Signature: _____        Signature: _____

Date: November 18, 2010                     Date: _____, 2010

Approved as to form:                        Approved as to form:

BERGESON, LLP

By: _____         By: _____
       Daniel J. Bergeson

Attorneys for Brent Hogenson                Attorneys for Interwoven, Inc

Date: November 19, 2010                      Date: _____, 2010

Page 9 of 9

FOIA Confidential Treatment Requested

21.   <u>Cooperation</u>.  Hogenson agrees to provide reasonable cooperation to the Company in connection with any pending or future litigation or arbitration brought against the Company and in any investigation the Company may conduct.  The Company shall compensate Hogenson for his time at the rate of $200 per hour and shall advance Hogenson's expenses including, but not limited to, any travel expenses airfare, hotel, car rental, etc.) that he may incur with the prior written permission of the Company in connection with providing the Company with the cooperation requested.  Notwithstanding the foregoing, nothing herein is intended to or shall prohibit Hogenson from testifying truthfully in connection with any litigation, arbitration, or investigation should he be compelled by law or court order to do so.

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed the foregoing on the dates shown below.

Brent Hogenson                           Interwoven, Inc

Signature: _____      Signature: _____

Date: _____, 2010             Date: __11/19_____, 2010

Approved as to form:                     Approved as to form:

BERGESON, LLP                            FUTTERMAN DUPREE DODD CROLEY
                                         MAIER LLP

By: _____             By: _____
    Daniel J. Bergeson                       Daniel A. Croley

Attorneys for Brent Hogenson             Attorneys for Interwoven, Inc

Date: _____, 2010             Date: Nov. 19_____, 2010

Page 9 of 9

FOIA Confidential Treatment Requested

# EXHIBIT 6256

| From: | Brent Hogenson [bphogenson@gmail.com] |
|---|---|
| Sent: | Friday, August 20, 2010 3:30 PM |
| To: | DickeM@sec.gov |
| Subject: | Letter to the FSA |
| Attachments: | 2009-10-01 - First Amend to Capax VAR Ahreement.pdf; Cambridge Inv Instructions.msg; Capax December 2009 Agreement.pdf; Capax Increase Payment by 125K.msg; Capax Kraft Q3 2009.pdf; Capax Payment Schedule.xls; Commission Payments on Reseller Deals.msg; discover whitepaper.pdf; Eli Lilly June 2010 Agreement.pdf; Eli Lilly SMS Meetings.doc; Incident.msg; Kraft December 2009 Agreement.pdf; Letter to Capax Dec 29 2009.pdf; Percy Finance concerns.msg; Problem Accounts.xls; FSA Letter July 26 2010.doc |

August 20, 2010

Michael Dicke, Esq.
Associate Regional Director
Securities & Exchange Commission
San Francisco Regional Office
44 Montgomery Street, Suite 2600
San Francisco, CA 94104
Dear Mr. Dicke,
Attached please find a July 26, 2010 letter that I sent to the Financial Services Authority with respect to Autonomy Corporation PLC. The letter was sent by email with attachments to whistle@fsa.gov.uk. Margaret Pell an Associate with the FSA confirmed receipt of the email with attachments and informed me that the email with attachments had been forwarded to an FSA investigator.
I am submitting this letter to you pursuant to Section 922 of the Dodd-Frank bill. There are a number of attachments that are referenced in the July 26, 2010 letter to the FSA, which some will need to be sent to you by a separate email due to the size of the attachments. Please note that the letter to the FSA has been named FSA Letter July 26 2010.
I am available for discussion as required.
Regards,
Brent Hogenson

EXHIBIT 1542



# Financial Reporting Review Panel

Aldwych House, 71-91 Aldwych, London WC2B 4HN
Telephone: 020 7492 2300    Fax: 020 7492 2479
www.frc.org.uk/frrp

Mr R S Webb
Chairman
Autonomy Corporation plc
Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ

2 February 2011

Cc: Mr S Hussain, Chief Financial Officer

Dear Mr Webb

1.  As you know the Financial Reporting Review Panel is a body authorised under the Companies Act 2006 to review and investigate the annual accounts and directors' reports of public and large private companies.  The Panel has also been appointed by the Secretary of State to keep under review periodic reports that are produced by issuers of listed securities.

2.  I enclose a list of the Panel's full membership and a copy of its operating procedures to assist you in understanding the Panel's role and its working approach.

3.  The report and accounts of Autonomy Corporation plc ("Autonomy" or "the company") for the year ended 31 December 2009 and for the six months ended 30 June 2010 have recently come to the Panel's attention in connection with the following issues.  The Panel is considering whether to open a formal enquiry in respect of these matters.  In order to enable the Panel to decide I am writing to ask whether you would be willing to provide some background and further explanation of the issues raised.

4.  The Panel has also received a copy of the company's letter to the FSA dated 30 July 2010, which may relate to the same issues, and from which it appears that the group may already have investigated some or all of the matters concerned. If this is the case, the Panel would be grateful for a summary of those investigations and their findings and of any steps subsequently taken by the company to address those issues.  In particular, the Panel would be grateful for a copy of the report made by the company's auditors, Deloitte, to the audit committee referred to in the letter to the FSA.

The Financial Reporting Council Limited is a company limited by guarantee
Registered in England number 2486368.  Registered Office:  As above

A part of
the Financial Reporting Council

FOIA CONFIDENTIAL TREATMENT REQUESTED

**Transactions via value added resellers**

5. The accounting policy for revenue recognition states that, where the company sells licences and an acceptance period is required, then revenues are recognised on the earlier of customer acceptance or the expiration of the acceptance period.

*Eli Lilly*

6. It has been alleged to the Panel that, in the quarter ended 31 December 2009, Capax, a value added reseller ("VAR"), gave an order to Autonomy worth some $6m in respect of the supply of licences to Eli Lilly, an end user, which was recorded in the revenue of one of the company's US subsidiaries for that quarter. Subsequently, in June 2010, Eli Lilly executed a licence agreement directly with Autonomy for a similar amount. It has also been alleged that no monies were collected from Capax prior to June 2010. The Panel would be grateful for the company's comments on the truth or otherwise of this account.

7. To the extent that the above sequence of events has been confirmed by the company, the Panel would then be grateful for information enabling it to understand why the group appears to have contracted with both Capax and Eli Lilly in respect of the same licences.

8. The Panel would also like to know when the revenues concerned were recorded in the group's consolidated accounts. If the revenues were recorded in the consolidated accounts for the quarter ended 31 December 2009, the Panel would then like to know how the group determined that it was in a position to recognise revenue relating to the sale of licences to Eli Lilly in that quarter if the agreement concerned was not executed until June 2010.

*Kraft*

9. It has been alleged to the Panel that, in the quarter ended 30 September 2009, Capax gave an order to Autonomy worth some $4m in respect of the supply of licences to Kraft, an end user, which was recorded in the revenue of one of the company's US subsidiaries for that quarter. Subsequently, in December 2009, Kraft executed a licence agreement directly with Autonomy for a similar amount. It is understood that, in December 2009, the group relieved Capax of its obligations under the order given to the company and itself paid Capax a fee of some $400,000. The Panel would be grateful for the company's comments on the truth or otherwise of this account.

10. To the extent that the above sequence of events has been confirmed by the company, the Panel would then be grateful for information enabling it to understand why the company appears to have contracted with both Capax and Kraft for the same licences.

HP-SEC-00384060
Exh 1542-0002

11. The Panel would also like to know when the revenues concerned were recorded in the group's consolidated accounts. If the revenues were recorded in the consolidated accounts for the quarter ended 30 September 2009, the Panel would then like to know how the group determined that it was in a position to recognise revenue relating to the sale of licences to Kraft in that quarter if the agreement concerned was not executed until December 2009.

12. Finally, the Panel would be grateful for information enabling it to understand why the group paid Capax a fee in respect of these transactions.

*Maintenance fees*

13. It has been alleged to the Panel that the group has allowed Capax to invoice certain Autonomy customers directly for the maintenance fees due on licence agreements and that Capax is, in some cases, allowed to retain 85% of such fees compared to a more normal 15%. The Panel would be grateful for the company's comments on the truth or otherwise of this account.

14. To the extent that the above account is true, the Panel would be grateful for information enabling it to understand the commercial considerations which led the group to allow Capax to retain such a high proportion of the fees concerned. The Panel would also like to know if Capax is or was a related party of the company as defined in IAS 24 "Related party disclosures".

**Accrual of commission payments**

15. It has been alleged to the Panel that no sales commission had been accrued in the balance sheet of one of the company's US subsidiaries at 31 December 2009 in respect of a number of transactions on which significant revenue had been recorded in the consolidated income statement at that date. The transactions are said to involve the VARs Capax, MicroLink and MicroTech. The Panel would be grateful for the company's comments on the truth or otherwise of this account.

16. To the extent that the above account is true, the Panel would be grateful for information enabling it to understand whether any commission had been accrued on the revenue concerned in the group's consolidated balance sheet at 31 December 2009 and for an indication of the amounts of commission that would normally have been accrued on such sales.

HP-SEC-00384061
Exh 1542-0003

**MicroLink**

17. Note 31 to the accounts for the year ended 31 December 2009 states that, during the first quarter of 2010, the group announced the acquisition of MicroLink, LLC, a leading Autonomy reseller targeting U.S. state and federal government accounts. The note continues that the acquisition was for a purchase price of $55m in cash, after a disposal of a portion of the MicroLink business, and is based on a zero net working capital position. The note also states that the additional disclosures required by IFRS 3 were expected to become available in the first half of 2010. The Panel notes that it appears that certain of the required disclosures were not available in time for the interim accounts to 30 June 2010 due to the purchase price allocation not having been finalised.

18. It has been alleged to the Panel that MicroLink owed one of the company's US subsidiaries some $16m at the time of the acquisition and that the great majority of this receivable was more than six months overdue as at that date. The Panel would be grateful for the company's comments on the truth or otherwise of this account.

19. To the extent that the above account is true, the Panel would be grateful for details of amounts owing to the group by MicroLink at the time of the acquisition and of the transactions under which amounts more than six months overdue at that date originally arose. The Panel would also be grateful for the company's comments as to why any such amounts had not been settled.

**MicroTech, LLC and Discover Technologies**

20. It has been alleged to the Panel that significant receivables were outstanding at 30 June 2010 from these two companies. It has been further alleged that MicroTech, LLC shares an address with MicroLink, LLC and therefore may be related to that entity while the Discover Technologies website at one stage gave the following e-mail address for further information – info@microlinkllc.com. In addition, the Panel has been informed that the Discover Technologies website gave the same postal address as that listed for MicroLink and MicroTech. The Panel would be grateful for the company's comments on the truth or otherwise of this account.

21. To the extent that the above account is true, the Panel would be grateful for information enabling it to understand the connections between MicroLink, MicroTech and Discover Technologies and the extent to which these companies are or were related to each other.

22. The Panel would also be grateful for details of amounts owing to the group by MicroTech and Discover Technologies at 30 June 2010, and recorded in the consolidated balance sheet at that date, and of the transactions under which any amounts overdue at that date originally arose. The Panel would also be grateful for the company's comments as to why any such amounts had not been settled and for details of any amounts written off regarding these debtors in the consolidated income statements for the year ended 31 December 2009 and for the six months ended 30 June 2010.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**Barter transactions**

23. It has been alleged to the Panel that the group entered into a number of significant barter transactions with a company called FileTek, Inc between 31 December 2009 and 30 June 2010. The Panel would be grateful for the company's comments on the truth or otherwise of this account.

24. To the extent that the above account is true, the Panel would be grateful for details of such transactions and of how the fair values used to record the transactions in the consolidated accounts were established.

**Maintenance renewals**

25. It has been alleged to the Panel that an amount of some $6.5m was accrued in the balance sheets of certain of the company's US subsidiaries at 31 March 2010 which related to an estimate of customers who would renew their maintenance contracts where the service period had lapsed prior to 31 March 2010. The Panel would be grateful for the company's comments on the truth or otherwise of this account.

26. To the extent that the above account is true, the Panel would be grateful for information enabling it to understand how the group compiled this estimate and the extent to which the estimate was compiled on the basis of past experience.

27. The Panel would also like to understand whether such an accrual was made in the group's consolidated balance sheet at 31 December 2009 and, if so, the total amount concerned. The Panel notes that IAS 18 states that revenue from the rendering of services should be recognised by reference to the stage of completion of the transaction at the end of the reporting period. As the group does not appear to have rendered any services in these cases, the Panel would like to understand the basis on which such revenue was accrued.

28. I would like to stress that I am merely asking for help in considering whether or not the Panel should pursue further the matters that have been raised. My letter should not be construed to imply that the Panel has opened a formal enquiry into the accounts of the company, nor that it has any intention of doing so.

29. Further information about the Panel and how it operates, including a summary of 'Frequently Asked Questions', may be found on the Panel's web-site at www.frc.org.uk/frrp/. You should note that our operating procedures govern the terms on which the Panel receives information. No stipulation which conflicts with those terms will be effective unless agreed by the Panel in writing.

30. If you would like to talk about any aspect of this letter, please contact me and I will be pleased to help. I would be grateful if you could acknowledge receipt of this letter together with an indication of when the Panel might expect a substantive response.

31. I look forward to hearing from you.


Yours sincerely

**CAROL PAGE**
**Secretary**


> United States District Court
> Northern District of California
>
> **Trial Exhibit 1542**
>
> Case No:   CR 18-0577 CRB
> Date Entered: _____
> By: _____
>      Deputy Clerk

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

# EXHIBIT A

1  PATRICK D. ROBBINS (CABN 152288)
   Attorney for the United States Attorney
2  Acting Under Authority Conferred by 28 U.S.C. § 515

3  THOMAS A. COLTHURST (CABN 99493)
   Chief, Criminal Division
4
   ROBERT S. LEACH (CABN 196191)
5  ADAM A. REEVES (NYBN 2363877)
   KRISTINA GREEN (NYBN 5226204)
6  Assistant United States Attorneys

7      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
8      Telephone: (415) 436-7014
       Fax: (415) 436-7234
9      Email: Robert.Leach@usdoj.gov

10 Attorneys for United States of America

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14  UNITED STATES OF AMERICA,              )  Case No. CR 18-577 CRB
                                           )
15          Plaintiff,                     )  UNITED STATES' NOTICE PURSUANT TO
                                           )  FEDERAL RULE OF EVIDENCE 404(b)
16      v.                                 )
                                           )  Trial Date: March 18, 2024
17  MICHAEL RICHARD LYNCH AND              )  Pretrial Conference: February 21, 2024
    STEPHEN KEITH CHAMBERLAIN,             )
18                                         )
            Defendants.                    )
19  _____)

20

21          Pursuant to the Court's June 30, 2023 Scheduling Order, and Federal Rule of Evidence 404(b),

22  the United States respectfully gives notice that it intends to offer at trial the following evidence:

23          At a meeting with Defendant Michael Lynch and others in 2008, Daud Khan was threatened

24  Autonomy would "take steps" if he published a research note. *See, e.g.*, US_FBI_E-00013468; Hussain

25  Trial. Tr. at 2986-88. After the meeting Autonomy was going to give alleged evidence of wrongdoing

26  by Khan to the United Kingdom's Financial Services Authority if Khan published a research note. *See*

27  US_FBI_E-00013469; Hussain Trial Tr. at 2992-95. Khan was prohibited from attending analyst

28  conference calls from Q2 2008 through 2009. *See* US_FBI_E-00013470; Hussain Trial Tr. at 2992-95.

Lynch also caused Brent Hogenson, Percy Tejada, and Reena Presad to be fired and approved settlements of potential whistleblower claims by them.  *See, e.g.*, Hussain Trial Tr. at 2618-48.  In addition, Autonomy, with Chamberlain's knowledge, made false and misleading statements in letters to the Financial Reporting Review Panel of the Financial Reporting Council between 2010 and 2011.  *See, e.g.*, Hussain Trial Tr. at 4913-79.

The foregoing evidence is relevant to show intent, preparation, plan, knowledge, absence of mistake, and lack of accident.  Lynch's threats to analysts and retaliation against whistleblowers evidences his intent to deceive and defraud and consciousness of guilt.  Chamberlain's lies to regulators evidences his intent to deceive and defraud and conscious of guilt.

Count Seventeen alleges numerous overt acts in furtherance of the alleged conspiracy.  In the event any defense motion to dismiss Count Seventeen is granted in whole or in part, the United States respectfully gives notice that it intends to offer at trial evidence of those overt acts, which are relevant to showing intent, preparation, plan, knowledge, absence of mistake, and lack of accident with respect to Counts One through Sixteen.

The United States reserves the right to change, modify, or supplement this notice as it prepares for trial.

DATED:  October 30, 2023

PATRICK D. ROBBINS
Attorney for the United States Attorney
Acting Under Authority Conferrred by
28 U.S.C. § 515

By:     *Robert S. Leach*
_____
ROBERT S. LEACH
ADAM A. REEVES
KRISTINA GREEN
Assistant United States Attorneys