Volume 4

Pages 795 - 1051

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | NO. 3:18-CR-00577-CRB |
| ) | |
| MICHAEL RICHARD LYNCH and ) | |
| STEPHEN KEITH CHAMBERLAIN, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

San Francisco, California
Wednesday, March 20, 2024

TRIAL TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    PATRICK D. ROBBINS
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, California 94102
            BY:  ROBERT S. LEACH
                    KRISTINA GREEN
                    ADAM A. REEVES
                    ASSISTANT UNITED STATES ATTORNEYS

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Rhonda L. Aquilina, No. 9956, RMR, CRR, CRC
                    Jennifer Coulthard, No. 14457, RMR, CRR, FCRR
                    Official United States Court Reporters

**APPEARANCES:   (CONTINUED)**

For Plaintiff:
                          U.S. DEPARTMENT OF JUSTICE
                          Antitrust Division
                          450 Golden Gate Avenue, Room 10-0101
                          Post Office Box 36046
                          San Francisco, California 94102
                    BY:   **ZACHARY G.F. ABRAHAMSON**
                          **TRIAL ATTORNEY**

For Defendant Lynch:

                          CLIFFORD CHANCE US LLP
                          31 West 52nd Street
                          New York, New York 10019
                    BY:   **CHRISTOPHER MORVILLO, ATTORNEY AT LAW**


                          STEPTOE & JOHNSON LLP
                          1330 Connecticut Avenue, NW
                          Washington, D.C. 20036
                    BY:   **REID H. WEINGARTEN, ATTORNEY AT LAW**
                          **BRIAN M. HEBERLIG,  ATTORNEY AT LAW**

                          STEPTOE & JOHNSON LLP
                          One Market Plaza
                          Steuart Tower, Suite 1070
                          San Francisco, California 94105
                    BY:   **JONATHAN M. BAUM, ATTORNEY AT LAW**


For Defendant Chamberlain:

                          BIRD, MARELLA, RHOW, LINCENBERG,
                           DROOKS & NESSIM LLP
                          1875 Century Park East, 23 Floor
                          Los Angeles, California 90067
                    BY:   **GARY S. LINCENBERG, ATTORNEY AT LAW**
                          **RAY SEILIE, ATTORNEY AT LAW**

**UNITED STATES COURT REPORTERS**

```
 1                          I N D E X

 2   Wednesday, March 20, 2024 - Volume 4
     GOVERNMENT'S WITNESSES                         PAGE   VOL.
 3
     PRASAD, REENA (RECALLED)
 4    (PREVIOUSLY SWORN)                             807    4
     Direct Examination resumed by Ms. Green        807    4
 5   Cross-Examination by Mr. Sielie               864    4
     Cross-Examination By Mr. Heberlig:            951    4
 6   Redirect Examination By Ms. Green             989    4

 7   VAIDYANATHAN, GANESH
      (PREVIOUSLY SWORN)                           1008    4
 8   Cross-Examination resumed By Mr. Seilie:     1008    4

 9

10                        E X H I B I T S

11   TRIAL EXHIBITS                        IDEN   EVID   VOL.

12    807                                          808    4

13    829                                          810    4

14    844                                          811    4

15    857                                          818    4

16    861                                          812    4

17    864                                          878    4

18    890                                          833    4

19    923                                          837    4

20    3297                                         853    4

21    3308.6                                      1021    4

22    5862                                         882    4

23    07761                                        955    4

24    7762                                         958    4

25    7762.1                                       959    4
```

```
 1                    E X H I B I T S

 2   TRIAL EXHIBITS                        IDEN   EVID   VOL.

 3   9658                                         870    4

 4   9660                                         907    4

 5   9661                                         910    4

 6   9663                                         924    4

 7   9664                                         1014   4

 8   9665                                         1016   4

 9   9666                                         1017   4

10   9667                                         1034   4

11   9673                                         1015   4

12   9700                                         885    4

13   9701                                         888    4

14   9702                                         1030   4

15   9703                                         1031   4

16   11929                                        829    4

17   13078                                        886    4

18   13086                                        814    4

19   15388                                        827    4

20   15399                                        844    4

21   15401                                        846    4

22   15404                                        855    4

23   16046                                        1026   4

24

25
```

```
 1   Wednesday - March 20, 2024                        9:00 a.m.

 2                   P R O C E E D I N G S

 3                       ---o0o---

 4        (Proceedings were heard out of presence of the jury:)

 5        THE COURT:  Let the record reflect all parties are

 6   present, jury is not present.

 7        So let's take care of the juror issue.  We have the

 8   Assistant U.S. Attorney here.

 9        Good morning.  You want to identify yourself for the

10   record.

11        MS. PAIDIPATY:  Good morning, Sailaja Paidipaty.

12        THE COURT:  Good morning.  And you are an Assistant

13   U.S. Attorney?

14        MS. PAIDIPATY:  I am, Your Honor.

15        THE COURT:  And there's been some testimony in the

16   case that one of the jurors reached out to you on I think two

17   different occasions.  What do you know about that?  What can

18   you tell us?

19        MS. PAIDIPATY:  That's correct, Your Honor.  I first

20   met the potential, not the potential, the juror in December of

21   2021 at a friend son's birthday party.  The juror is the

22   boyfriend of the cousin of my friend, and that's how we were

23   both at this party.

24        A few months later a friend -- my friend introduced the

25   two of us via email, indicating that the juror wanted to
```

**PROCEEDINGS**

 1   discuss potentially going to law school.

 2        We had a few email communications to set up a call.  A few

 3   months later we just kept missing each other a little bit, and

 4   we scheduled a call.  I have some recollections of that call.

 5   This happened in spring of May of 2022.  We briefly discussed I

 6   believe this would have been a career pivot for the individual,

 7   and so I briefly discussed career and law, law school, the cost

 8   of law school.

 9        Since May of 2022, I had no contact with this person until

10   last week.

11        On March 13th, the juror emailed me saying that he had

12   been accepted into Northwestern Law School and was wondering if

13   I would be willing to chat with him a little bit more about

14   thinking about law school.  And at the end of the email he said

15   that he may have jury service coming up sometime soon and so he

16   may be around the federal building.

17        I responded the following day, which was March 14th,

18   saying I'd be happy to chat with him some more, and I suggested

19   a few times.  And then I asked, you know, when do you have jury

20   service?  About 15 minutes later he responded saying:  I'm

21   actually here today, and it's a criminal case.  Let me know if

22   it would be inappropriate for us to meet if I'm selected.

23        Until that time I had no clue that he was called for

24   service here.  And on that date -- and so at that point I

25   stopped communicating with him and have not had any contact

**PROCEEDINGS**

 1    with the juror since.

 2            **THE COURT:**  Thank you for coming in.  You're excused.

 3            **MS. PAIDIPATY:**  Thank you, Your Honor.

 4            **THE COURT:**  Let's turn now to the issue of the rule --

 5    of the question of the settlement agreements, okay, with

 6    respect to the -- I think only with respect to the witness who

 7    is presently testifying.  Though I know that some of what I say

 8    may be relevant to Mr. Hogenson, but right now we're dealing

 9    with Ms. Prasad.  And I don't know about Mr. Tejeda yet, is

10    that it?

11            **MS. GREEN:**  Yes, Mr. Tejeda.

12            **THE COURT:**  All right.  So the first thing, and I

13    think we're -- the Government wants to introduce the settlement

14    agreement.  We'll start with that.  I think it is inadmissible

15    under 408.  It's hard to read that.  It's prohibited.  And then

16    does it fall within an exception of proving an effort to

17    obstruct a criminal investigation or prosecution?

18        So the Government points to the paragraph dealing with you

19    must object if subpoenas come in or testify or whatever.

20        I mean, let's see, did I have the -- I don't know that I

21    presently have it in front of me, but there is a paragraph, I

22    guess it's on my desk, but there is a paragraph that deals with

23    how to respond to process, if there is a process.  And the

24    Government argues, as I understand it, that that's an attempt

25    to obstruct justice.

**PROCEEDINGS**

1          I guess as a matter of law that's the argument.

2          The defense comes in and says he's used all the time.

3   It's common in agreements that it's used all the time, and that

4   it's common in agreements is not an attempt to obstruct

5   justice, it just means that obstruction of justice is pretty

6   widespread.

7          However, I think the Government hasn't met its burden, and

8   I don't know that it can meet its burden that it constitutes an

9   obstruction of justice, that's number one.

10         Number 2, it can be -- it's pretty much of a, in a sense,

11  a collateral.  Though it has some relevance, and I'll get to

12  that in a minute, to the proceedings.

13         I don't think the document has relevance, particular

14  relevance to this proceeding.  When I say the proceeding, I

15  mean this trial.

16         I do think that, one, that she was fired is relevant.

17  It's clearly relevant in my mind.  She was at a point where she

18  observed what she believed to be inexplicable conduct by

19  Autonomy, enormous accounts receivables were just either

20  written off or not pushed, and so forth and so on.  There may

21  be explanations.  There may be explanations to some of them.

22  But there's also -- it's a reasonable inference as well that

23  they didn't want to push these things because they were -- they

24  had within them, embedded within them accounting issues that

25  were serious accounting issues, and so that is a reasonable

**PROCEEDINGS**

1    inference a jury could form.

2        So, I think the fact that she was terminated is relevant,

3    and I think she can say that, that she was terminated.  That

4    she was paid money in exchange for a release of claims I think

5    falls within 408(a).  I think it's a prohibitive use.  It just

6    says evidence of the following is not admissible on behalf of

7    any party either to prove or disprove the centrality of the

8    amount of disputed claim.

9        Well, I guess the disputed claim was whether she was

10   wrongfully terminated.  She believes she was, and in exchange

11   for that she received $50,000 and a discharge of the claim.

12       So I sort of think maybe, you know, maybe 408(a) is sort

13   of directed to a different thing, but I'm not convinced that it

14   somehow comes in.  I mean, if there's some case out there that

15   says it only applies, it only applies to where the issue

16   involved in the lawsuit in front of the Court is the claim

17   itself, like a wrongful -- if this was a suit for wrongful

18   termination, could you bring it in, that sort of thing.

19   There's an argument that that's really what it means.  But I

20   don't know, I think it's broader than that.

21       In any event, at this point I'm not going to allow it, but

22   I am going to allow her to testify that she was wrongfully

23   terminated, and further, further -- and that's it, the

24   circumstances of her firing.

25       Now, my friends on the other side of the aisle, you start

1   to probe on that, I think she can say what -- you know, I don't

2   know that what I've said now is out, will not be -- will remain

3   out.  I don't know.  I haven't figured it out yet.  I guess I

4   have to wait and see what you're going to -- what the

5   cross-examination is, which may leave you in the uncomfortable

6   position of just sort of leaving it alone that she was -- that

7   she believed she was wrongfully terminated.  Okay.  That's her

8   claim, then it just sits there.

9       Now, you know, if you leave no stone unturned, then all

10  the stones will be turned.  But at that point I think I can try

11  to restrict the -- right before it I think I could cabin it the

12  way I've cabined it at this point, but I have no confidence

13  that it's not susceptible to being changed, and really it's in

14  your hands.  It's totally in your hands.  Don't blame me.  It's

15  up to you.

16      So, like any trial lawyer, you make a decision as to

17  whether or not -- I think you have to be careful about argument

18  on this thing as well.  I don't want to hear any argument that

19  if she had a wrongful termination claim, why didn't she bring

20  it or something like that?

21      I mean, you're not going to do that anyway, but you've got

22  to really -- you've got to think it through as to how you want

23  to deal with it in light of what -- what this is, in light of

24  what my ruling is on this thing.  Not going to get into that

25  she's upset or that she has PTS or whatever, Post Traumatic

**PROCEEDINGS**

1    Syndrome or anything else.  I find that to be prejudicial as

2    well.

3        Okay.  So is there any confusion over anything that I've

4    said, because, you know, I'd like to bring the jury in and just

5    recommence.

6        See, I really don't want argument on this, if you don't

7    mind.

8            **MR. HEBERLIG:**  No, not with this witness.

9            **THE COURT:**  Oh, yes, we'll have to revisit with

10   Hogenson, no question about it.

11           **MR. HEBERLIG:**  And Tejeda, I believe.

12           **THE COURT:**  Yeah, and I'm not trying to speak for all

13   times.  I'm just trying to say this, you know, this sort of --

14           **MR. HEBERLIG:**  The only thing we'd like to do to just

15   supplement the records, the briefs obviously late at night, we

16   did identify after we filed the brief is a representative

17   example of a typical severance agreement that contains language

18   like that.

19           **THE COURT:**  You can supplement the record any way you

20   want to supplement the record.  I don't care.  You can put it

21   in the dictionary as far as I'm concerned.  I don't care about

22   how you build your record the way you want to build your

23   record, that's your right.

24       Okay.  Let's bring in the jury.  Yes.

25           **MS. GREEN:**  Can I have just two minutes?

1    **THE COURT:**  Okay.  Yes, and we'll bring in the jury in

2    five minutes, okay.

3                    (Pause in the proceedings.)

4     **THE COURT:**  I think I have to caution the jury not to

5    read articles.  I think that there are a lot of articles.  I

6    sometimes read them and I sometimes don't.  I would hope that a

7    juror wouldn't read that, but you never know, and you don't

8    know things like members of the family.  Of course they would

9    say, hey, have you seen this article; is this what happened

10   yesterday, and so forth.  So I think I'll caution them again

11   because you can't caution them too many times.

12    **MR. REEVES:**  Thank you, Your Honor.

13    **THE COURT:**  Okay.  Bring in the jury.  Good morning.

14    (jurors enter courtroom)

15             (Proceedings were heard in the presence of the jury:)

16    **THE COURT:**  Please be seated.

17   Let the record show all jurors are present, parties are

18   present.

19   Ladies and gentlemen of the jury, thank you for being so

20   prompt.  Appreciate it.  And we are ready to proceed.

21    **MS. GREEN:**  Thank you, Your Honor.

22    **THE COURT:**  And I'll just say, from time to time we

23   may start a bit late.  We're trying to take care of things, and

24   it's really going to expedite the trial for you, so it's not

25   like we're not working on it.

```
 1         Okay.  Thank you.  Go ahead.
 2              MS. GREEN:  Thank you.
 3                        REENA PRASAD,
 4   Called as a witness for the GOVERNMENT, having been previously
 5   duly sworn, testified further as follows:
 6                   DIRECT EXAMINATION  (resumed)
 7   BY MS. GREEN:
 8   Q.   Thank you for coming in this morning, Ms. Prasad.
 9   A.   Of course.
10   Q.   I want to put back on the screen the admitted Exhibit 797
11   just to get us back in the frame of mind of what we were
12   talking about yesterday?
13   A.   All right.
14              MS. GREEN:  Thank you, Ms. Scott.
15         And let's zoom in on the MicroTech paragraph, please, the
16   MicroTech paragraph.  Thank you.
17   BY MS. GREEN:
18   Q.   Okay.  So this was that email from May 4, 2010 that we
19   looked at yesterday; is that correct?
20   A.   That's correct.
21   Q.   From yourself to Mr. Hogenson?
22   A.   Yes, it is.
23   Q.   We're going to be talking about MicroTech again today.
24         As of this email, what had you been told about the
25   MicroTech account?
```

PRASAD - DIRECT / GREEN

1   A.   I had been told to be hands off in terms of collections.

2   Q.   And who had told you that?

3   A.   Mr. Chamberlain.

4        MS. GREEN:   Okay.   Let's look at Exhibit 807, please.

5   We would like to admit?

6        THE COURT:   837?

7        MS. GREEN:   807.

8        THE COURT:   807 admitted.

9        (Trial Exhibit 807 received in evidence.)

10       MS. GREEN:   And can we zoom in on the email, please?

11  BY MS. GREEN:

12  Q.   Despite being directed to go hands off on MicroTech

13  payments, did you nevertheless still make some efforts to try

14  and collect?

15  A.   I did.

16  Q.   And why is that?

17  A.   It was a large amount coming, you know, coming towards --

18  I wanted to make sure that there was attention to it, and I

19  wanted to just confirm if I could work to coordinate payment.

20  Q.   And what is the date of this email?

21  A.   The date is May 10th of 2010.

22  Q.   And who were you writing this to?

23  A.   My superior, Mr. Brent Hogenson.

24  Q.   And he reported out to Mr. Chamberlain; is that correct?

25  A.   Yes, that's myself understanding.

PRASAD - DIRECT / GREEN

1    Q.    And the subject line:  MicroTech 13.5 million; is that

2    correct?

3    A.    That's correct.

4    Q.    And how much of that was coming to you on June 29th?

5    A.    $12,967,500.

6    Q.    You write (As read) The tricky part will be getting --

7          Well, let me start with the sentence before that.

8          (As read) Thanks for reaching out to Joel to determine if

9    there is any additional information he may be able to share on

10   this account prior to reaching out to their CFO Tomas

11   Esterrich.

12         Who was Tomas Esterrich?

13   A.    Mr. Esterrich was the CFO of MicroTech.

14   Q.    And then you write (As read) The tricky part will be

15   getting him to commit to pay for the $13 million before the end

16   of the quarter.  Your help on this is appreciated."

17         And then you provide his information below?

18   A.    Mm-hmm, yes.

19   Q.    So you escalated this 13.5 million collection issue to

20   Mr. Hogenson; is that right?

21   A.    I did, yes.

22   Q.    Did you foresee difficulty getting paid at this point?

23   A.    Yes, I did, that's correct.

24   Q.    Let's look at Exhibit 861, please.

25         **THE COURT:**  861 admitted.

```
 1              MS. GREEN:  Oh, I apologize.  Let's look at

 2    Exhibit 829, please.

 3              THE COURT:  Okay.  861 not admitted.  829.

 4              MS. GREEN:  Yes, please.  Thank you, Your Honor.

 5              THE COURT:  829 admitted.

 6              (Trial Exhibit 829 received in evidence.)

 7    BY MS. GREEN:

 8    Q.   Did you follow up with MicroTech again regarding that

 9    $13.5 million payment?

10    A.   Yes, I did.

11              MS. GREEN:  And let's zoom in on your bottom email,

12    please.  Thank you so much.

13    BY MS. GREEN:

14    Q.   What was the date of this email?

15    A.   The date was May 28th, 2010.

16    Q.   And were you sending this to Mr. Esterrich at MicroTech?

17    A.   That's correct.

18    Q.   And what were you asking Mr. Esterrich there?

19    A.   I was looking to coordinate the payment, the payments that

20    he owed us before the end of the quarter.

21    Q.   And as of Q2 2010, did we see the $13.5 million owed here

22    in this table?

23    A.   Yes, that's correct.

24    Q.   And do you see the $11.5 million invoice there?

25    A.   I do, it's right above it.
```

PRASAD - DIRECT / GREEN

1  Q.   And we looked at that briefly yesterday.  Is that the

2  invoice for the purported Vatican deal?

3  A.   That's correct.

4  Q.   And let's zoom out, please.  And then we see a response

5  from Mr. Esterrich right above that.  How did he respond to

6  you?

7  A.   He just briefly said "I'm working on it."

8  Q.   Let's look at Exhibit 844, please.

9         THE COURT:  844 admitted.

10        (Trial Exhibit 844 received in evidence.)

11        MS. GREEN:  And let's zoom in on the bottom half of

12  the page, Mr. Hassan.  Thank you so much.

13  BY MS. GREEN:

14  Q.   So we're now about a week or so later.

15       Did you write an email to Brent Hogenson on June 24th,

16  2010?

17  A.   Yes, I did.

18  Q.   What was the subject line of your email?

19  A.   It was very clear:  "Please call MicroTech CFO regarding

20  their outstanding 13.5 million due in June."

21  Q.   So you were again escalating this payment issue with

22  MicroTech?

23  A.   I was.

24  Q.   Let's go to Exhibit 861, please.

25        THE COURT:  861 admitted.

PRASAD - DIRECT / GREEN

1              (Trial Exhibit 861 received in evidence.)

2    BY MS. GREEN:

3    Q.   We're going to shift to talking about another reseller,

4    but before I get there, with respect to MicroTech at this point

5    in time, how were you foreseeing difficulty in getting that

6    payment in on time?

7    A.   Oh, yes, definitely.

8    Q.   Focusing now on Discovery Technologies.

9    A.   Okay.

10   Q.   Was that another reseller?

11   A.   Yes, that's correct.

12   Q.   And let's look at Exhibit 861.  And can we zoom in on the

13   email, please?

14        Is this an email that you wrote on June 15th, 2010?

15   A.   Yes, that's correct.

16   Q.   And who did you write this email to?

17   A.   I sent it to Mr. Sushovan Hussain and Mr. Stouffer Egan

18   with a copy to Mr. Brent Hogenson and Mr. Steve Chamberlain.

19   Q.   And what was the subject line of this email?

20   A.   "Discovery Technologies LLC 1.7 million payment due in

21   June."

22   Q.   Did you also experience issues collecting payments from

23   this Autonomy reseller?

24   A.   Yes, that's correct.

25   Q.   And could you please read the first -- just the first

 1  three sentences of your email?

 2  **A.**    (As read) My collections team has not been able to make

 3  any progress with Discovery Technologies.  We have not been

 4  able to confirm the status of the 1.7 million payment due on

 5  June 29th, 2010.  The customer continues to claim that they are

 6  in discussions with you regarding this order.

 7       Should I continue?

 8  **Q.**    That's good for now.

 9       What were you trying to communicate there?

10  **A.**    I was trying to communicate that I was not able -- my team

11  and I were not able to confirm that payment was tracking to be

12  made, and that the reseller was telling us that they were

13  having higher-level discussions with executive management.

14  **Q.**    Were they telling you that in the context of you

15  attempting to get payment?

16  **A.**    Yes, that's correct.

17  **Q.**    And then you write (As read) Please provide some

18  background information and advise how hard we should be

19  pressing them to pay up this quarter.

20       I want to focus on that question.  Why did you ask how

21  hard you should be pressing this quarter?

22  **A.**    I was asking because I had been told that that was another

23  hands-off account, and that there's something else going on

24  that I'm not aware of.

25  **Q.**    And who informed you of that, that it was a hands-off

PRASAD - DIRECT / GREEN

 1   account?

 2   **A.**    That was Mr. Chamberlain.

 3   **Q.**    The discussions that you referenced with senior executives

 4   in the company, had you been involved in those?

 5   **A.**    No.

 6   **Q.**    And at the end you write "I am very concerned this may be

 7   at risk."

 8   **A.**    Mm-hmm, yes.

 9   **Q.**    The payment, what did you mean by that?

10   **A.**    Basically, as I mentioned, my team was not able to confirm

11   if or when that would be paid.  It wasn't tracking for payment.

12   **Q.**    So at risk of not being paid; is that right?

13   **A.**    That's correct.

14   **Q.**    I would like to look at Exhibit 13086 very briefly.

15            **THE COURT:**  1386?

16            **MS. GREEN:**  13086.

17            **THE COURT:**  13086 admitted.

18            (Trial Exhibit 13086 received in evidence.)

19            **MS. GREEN:**  I know this is small.  Mr. Hassan, can we

20   focus on the top half and try to make that a bit bigger?

21   Thanks.

22   **BY MS. GREEN:**

23   **Q.**    Is this an email from Mr. -- and I apologize if I didn't

24   say his name correctly -- Gennis Reyes?

25   **A.**    That's correct.

1    **Q.**   To you?

2    **A.**   Yes, it is.

3    **Q.**   And who was Mr. Gennis Reyes?

4    **A.**   Mr. Reyes was a member of my team.  He was a collector,

5    and he worked out of the San Francisco office.

6    **Q.**   And this email is dated June 18, 2010; is that right?

7    **A.**   That's right.

8    **Q.**   And what's the subject line of this email?

9    **A.**   The subject is MicroTech and Filetek.

10   **Q.**   And did he provide attachments of activities for both

11   companies?

12   **A.**   Yes, he did.

13   **Q.**   What did you understand the reports that he was attaching

14   to generally be?

15   **A.**   A listing of outstanding invoices, or for this situation

16   the invoices, payments, and the ones that were outstanding.

17   **Q.**   Kind of like a payment tracking report, would that be

18   right?

19   **A.**   Sure, yes.

20   **Q.**   And let's take a very quick look at the attachment.

21        Did he attach the two activities' reports?

22   **A.**   Yes, he did.

23        **MS. GREEN:**  Could we go to page 4, please, Mr. Hassan,

24   and can we zoom in on page 4?  A bit bigger I think.  You could

25   just do the top half of the page just so we can see what it is.

PRASAD - DIRECT / GREEN

1    BY MS. GREEN:

2    Q.   Is this the activity report for MicroTech?

3    A.   Yes, it is.

4         MS. GREEN:   And if we go to the next page, please,

5    Mr. Hassan, and make it bigger, please.

6    BY MS. GREEN:

7    Q.   We see the invoice is the same, 13.5 outstanding; is that

8    right?

9    A.   That's correct.

10        MS. GREEN:   And let's go to the next page, please, and

11   zoom in on that table, please.   Is -- maybe the page after

12   that, please, Mr. Hassan, page 6.

13   BY MS. GREEN:

14   Q.   And is this the activity report for Filetek?

15   A.   That's correct.

16   Q.   Was Filetek another Autonomy reseller?

17   A.   Yes, it was.

18   Q.   And how much did Filetek owe as of this date?

19   A.   They owed 4 -- approximately $4.5 million.

20        MS. GREEN:   We can take that down.   Thank you,

21   Mr. Hassan.

22   BY MS. GREEN:

23   Q.   Did you observe around this time period and, you know,

24   during the time period when we've been looking at these emails,

25   anything about Autonomy was continuing to do business or make

1  sales to these resellers and customers that were not paying

2  their invoices on time?

3  **A.**   Yes, I believe so.  Yes, that's correct.

4  **Q.**   Yes, you noticed they were still doing business?

5  **A.**   That's correct.

6  **Q.**   Did that give you concern?

7  **A.**   Yes, it did, it gave me concern.

8  **Q.**   Why is that?

9  **A.**   Because if I'm -- if they haven't -- if a customer or a

10  reseller is not paying their invoices or some of their

11  invoices, and their balance is high and getting older, what's

12  to say that they will pay new deals on the invoices?

13  **Q.**   We're going to focus on the write-offs.

14      Did you discuss the problems we've been seeing about

15  collecting payment from Autonomy's resellers with

16  Mr. Chamberlain?

17  **A.**   Sorry, can you repeat that?

18  **Q.**   Did you discuss the issues you were having collecting

19  payment with Mr. Chamberlain?

20  **A.**   Yes, I did, fairly frequently.

21  **Q.**   And at some point in time did you recommend that Autonomy

22  take any action to deal with this sort of past due debt on its

23  books?

24  **A.**   Yes, that's correct.

25  **Q.**   What did you recommend?

1    **A.**   For the very old invoices sitting on the accounts

2    receivable, I reviewed them and made recommendation for

3    specific write-offs.

4    **Q.**   And in terms of recommending write-offs, was that because

5    you felt there were going to be issues over getting those

6    payments in?

7    **A.**   Absolutely, that they were deemed uncollectible or there

8    would be significant issues, yeah.

9    **Q.**   What factors do you consider in deciding whether to

10   recommend a write-off?

11   **A.**   There's various factors, how old the invoice is and what

12   the problems are behind that, and if it's deemed uncollectible

13   or not.

14   **Q.**   And you mentioned this yesterday, but just to clarify for

15   the jury.  When it's written off, does that mean it's taken off

16   the accounts receivable?

17   **A.**   That's correct.

18   **Q.**   Let's look at Exhibit 857, please.

19        **THE COURT:**  857 admitted.

20        (Trial Exhibit 857 received in evidence.)

21        **MS. GREEN:**  Thank you, Mr. Hassan.  Can we make the --

22   thank you so much.

23   **BY MS. GREEN:**

24   **Q.**   Did you write an email to Mr. Brent Hogenson on June 14th,

25   2010?

PRASAD - DIRECT / GREEN

1   A.   Yes, I did.

2   Q.   And what was the subject line of that email?

3   A.   "Problem and high risk accounts as of June 11th, 2010."

4   Q.   And then just looking at your first sentence, you write

5   (As read) Here is the problem account list that I put together

6   per your request.

7        What is a problem account list?

8   A.   A list of customers and resellers, partners that myself

9   and my team are experiencing problems collecting.

10  Q.   Great.  And then you say (As read) Can we plan to review

11  this together or with Steve while he is here this week?  I am

12  hoping we will be able to write off the bankrupt customers and

13  accounts included in the write-off column, at least the items

14  already reserved for this month.

15       So you mentioned can we plan to review this together or

16  with Steve while he was here this week.

17       Who is Steve a reference to?

18  A.   That's a reference to Mr. Chamberlain.

19  Q.   Was Mr. Chamberlain visiting the San Jose office that

20  week?

21  A.   Yes.

22  Q.   Did Mr. Chamberlain visit the Autonomy office in

23  California on more than one occasion?

24  A.   Yes, on multiple occasions.

25  Q.   So were you putting together this information in

PRASAD - DIRECT / GREEN

1  preparation for that meeting?

2  **A.**   I was, that's correct.

3  **Q.**   You also write (As read) we should also discuss the plan

4  for the Latin America accounts where we do not have end users

5  or the deals that have been deemed dead.  Steve is quite

6  familiar with these accounts and has quite a bit of historical

7  knowledge insight on these.

8       What did you mean by this?

9  **A.**   In attempting to collect from many of our Latin America

10  customers and resellers primarily, my team and myself had quite

11  a bit of difficulty.

12      I'm referencing the resellers in this case because I'm

13  saying that there's no end users or I've been informed that

14  there's no end users established or the deals are deemed dead.

15      So I'm mentioning that Mr. Chamberlain had -- before I

16  took over the accounts, Mr. Chamberlain had more of the

17  historical knowledge and information, and then I took that over

18  and followed up and then, you know, continued to learn more

19  information about these accounts.

20  **Q.**   So it was your understanding that Mr. Chamberlain was

21  already aware of this issue when you were writing this email?

22  **A.**   Yes, definitely.

23  **Q.**   And the reference to where we do not have end users, was

24  this an issue for you because it was affecting your ability to

25  collect payment?

```
1   A.    Yes, absolutely.

2   Q.    And why is that?

3   A.    Similar to, as mentioned yesterday, if the end user is not

4   in place or there's not a firm deal in place, then the reseller

5   won't be receiving payment from the end user, and my

6   understanding was that was the primary reason; they were not

7   paying us.

8   Q.    Was there an Excel attachment entitled Problem Accounts

9   attached to this email?

10  A.    Yes, there was.

11  Q.    And we're going to look at that in a moment, but did you

12  discuss these problems accounts with Mr. Chamberlain when he

13  came to San Jose that week?

14  A.    Yes, that's correct.

15        MS. GREEN:   Let's look at page 3, please.  Could we

16  make it bigger, Mr. Hassan?  Maybe a little bigger, including

17  the comment box.  Can we ensure that the comment box is fully

18  shown?  Thank you so much.

19  BY MS. GREEN:

20  Q.    Okay.  Problem Accounts Summary as of 6/11/2010.

21        Here's your summary.  Did you write a comment?

22  A.    Yes, that's my comment, mm-hmm.

23  Q.    And what did you write there?

24  A.    In the yellow box there I wrote (As read) High risk:  Does

25  not include 13.6 million for MicroTech.  Does include
```

UNITED STATES COURT REPORTERS

PRASAD - DIRECT / GREEN

1  15.6 million of Capax and 1.2 million of Citi, 1.7 million

2  Deutsche Bank, and 3.2 million J.P. Morgan Chase Bank.

3  **Q.**   Okay.  And the number that we see, the 24.9 million net

4  due high risk, you're indicating that number doesn't even

5  include the 13.5 million owed by MicroTech; is that correct?

6  **A.**   That's correct.  If that were added it would be much

7  higher.

8  **Q.**   And, again, you're using the term "high risk" here.  I

9  assume you were being consistent in your use of that term in

10  terms of meaning difficulties collecting; is that right?

11  **A.**   That's correct.

12  **Q.**   And as of this writing, Capax owes 15.6 million still; is

13  that correct?

14  **A.**   Yes, that's correct.

15  **Q.**   Let's look at page 4, please.  There was a full

16  spreadsheet attached.  Is this an excerpt of that spreadsheet

17  that shows the invoices for Capax?

18  **A.**   Yes, that's correct.

19      **MS. GREEN:**  Okay.  I know it's small, so we're going

20  to zoom in on some of the key points here.

21      So can we zoom in on the column that says "bill to,"

22  Mr. Hassan, just to make that bigger?

23  **BY MS. GREEN:**

24  **Q.**   Okay.  So here do we see the invoices issued to Capax?

25  **A.**   I do.

1     **MS. GREEN:**  Okay.  Let's zoom out.  And can we zoom in

2   on the customer name column just so we can all see that?

3   **BY MS. GREEN:**

4   **Q.**   What does this column represent?

5   **A.**   It represents the end user or in Capax's situation it was

6   I believe direct to them.  But the others are re-sell -- resale

7   deals with an end user of Eli Lilly and then the Financial

8   Services Authority.

9   **Q.**   Is that sometimes referred to as FSA?

10  **A.**   That's correct, mm-hmm.

11  **Q.**   Okay.  So we see 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 about,

12  I'm counting quickly, but let's look at some of the next

13  columns.

14  **A.**   Okay.

15     **MS. GREEN:**  Can we zoom in on the Eli Lilly invoice,

16  please, Mr. Hassan?

17  **BY MS. GREEN:**

18  **Q.**   Okay.  How much was due on that Capax invoice related to

19  the Eli Lilly purported deal end user?

20  **A.**   How much was due was 6 -- a little over 6.2 million,

21  almost $6.3 million.

22  **Q.**   Okay.  And let's zoom out, please.  Can we focus on the

23  FSA amount due, those invoices?  I know that's small, so I'm

24  going to read it out, but on three of the four invoices with

25  the purported end customer of FSA was the amount due over one

PRASAD - DIRECT / GREEN

1    million for each of those invoices?

2    **A.**    There's one of them for 450,000.

3    **Q.**    And then the other three are over a million?

4    **A.**    That's correct, all over a million, one million dollars.

5           **MS. GREEN:**    Okay.  And let's zoom out, please.  And

6    can we zoom in on the past due column on the right, please?

7    Thank you.

8    **BY MS. GREEN:**

9    **Q.**    "Days past due," does that reflect how many days past due

10   payment some of these invoices are?

11   **A.**    Yes, that's correct.

12   **Q.**    Okay.  Let's zoom out, please.

13          It looks like the Eli Lilly deal is 72 days past due as of

14   this point; is that right?

15   **A.**    That's correct, that's in red.

16          **MS. GREEN:**    Okay.  I want to focus on the updates

17   column, so let's look at that and let's zoom in.

18          Can we try that again so it's not -- thank you so much,

19   Mr. Hassan.

20   **BY MS. GREEN:**

21   **Q.**    Okay.  For the -- for the first five invoices here, you

22   write the same update:  (As read) 5/28 RP - we bought their

23   software and they bought ours.  Will not pay until we pay but

24   more complex issues involved.

25          Is that an update that you wrote, Ms. Prasad?

PRASAD - DIRECT / GREEN

1    A.    It is, and those are my initials, RP.

2    Q.    And what did you mean with that update?

3    A.    With that update I was informed that this was information

4    I received that they -- they wouldn't pay until we released

5    payment to them, and that there were additional issues involved

6    that I was not aware of all the details.

7    Q.    Issues that you hadn't been involved in -- you hadn't been

8    made aware of?

9    A.    At a high level, correct.

10   Q.    And a higher level, you're referring to executives above

11   you?

12   A.    That's right, yes.

13   Q.    And so there's an indication here that there's a deal with

14   Capax buying some of your stuff, Autonomy stuff, Autonomy

15   buying some of Capax's stuff.  Is that what you mean when you

16   say we bought their software and they bought ours?

17   A.    That's correct.

18   Q.    And this payment isn't going to come in until Autonomy

19   pays Capax?

20   A.    That's correct.

21   Q.    Okay.  Let's look at the row below that, and very below

22   that is the Eli Lilly invoice.  I could show that to you again

23   if you need to, but can you see that?

24   A.    Yes, I can.

25         MS. GREEN:   Okay.  So let's go back to the updates

PRASAD - DIRECT / GREEN

1    column for the Eli Lilly invoice, please.  Let's zoom in the

2    whole updates column please, Mr. Hassan, so we can do this

3    together.  Great.

4    **BY MS. GREEN:**

5    **Q.**   So the Eli Lilly update says (As read) 5/28 RP, per JB no

6    EU, should close in Q2, payment unlikely?

7    **A.**   Mm-hmm.

8    **Q.**   Another comment you had provided?

9    **A.**   Yes, it is.

10   **Q.**   And what were you communicating here?

11   **A.**   Okay.  There's abbreviations, so RP is myself again, and

12   when I say "per JB, I'm referring to Mr. John Baiocco who was

13   an executive at Capax, and he had informed me that there was no

14   end user for this deal, but they were working on it.  Hopefully

15   it would close in Q2, but I'm coding it as payment is unlikely

16   definitely for the quarter and unknown.

17   **Q.**   Did you view payment as unlikely because of what

18   Mr. Baiocco had told you about there being no end user?

19   **A.**   Yes.

20   **Q.**   And I believe we talked about Mr. Baiocco yesterday, but

21   was this one of the issues you had escalated up to

22   Mr. Chamberlain?

23   **A.**   Yes, that's correct.

24   **Q.**   And then also in the invoices below that, which were the

25   FSA invoices, you have the same comment written for all four of

1    those "5/28 RP per JB no EU?"

2    **A.**   That's correct, and we discussed that yesterday.  I spoke

3    with Mr. Baiocco by phone in May, and he had informed me that

4    that was the case.  There was no end user.

5    **Q.**   And, again, did you foresee issues getting payment then?

6    **A.**   Yes.

7    **Q.**   Is that why these are in your problem accounts list?

8    **A.**   That's correct.

9    **Q.**   And when you escalated these issues to Mr. Chamberlain,

10   what was his response?

11   **A.**   His response was to be hands off, that -- to stop chasing

12   payment.

13           **MS. GREEN:**   Okay.  So you have this meeting with --

14   thank you, Mr. Hassan.

15   **BY MS. GREEN:**

16   **Q.**   You have this meeting with Mr. Chamberlain in San Jose.

17   We were in the time frame of end of June 2010.  After that

18   meeting did you again escalate payment collection issues with

19   Capax to Mr. Chamberlain?

20   **A.**   Yes.

21   **Q.**   Let's look at Exhibit 15388, please.

22           **THE COURT:**   15 --

23           **MS. GREEN:**   15388.

24           **THE COURT:**   15388 admitted.

25           (Trial Exhibit 15388 received in evidence.)

1          **MS. GREEN:**  And let's just zoom in on the first three

2    quarters of the page to make Ms. Prasad's email bigger, please.

3          Thank you so much, Mr. Hassan.

4    **BY MS. GREEN:**

5    **Q.**   Is this an email from you to Mr. Chamberlain on June 23,

6    2010?

7    **A.**   Yes, it is.

8    **Q.**   What's the subject line of that email?

9    **A.**   The subject is "Capax help needed."

10   **Q.**   You write (As read) I have been trying to call John

11   Baiocco at Capax but have not received a call back.  Then you

12   mention some issues with invoices, how much was coming due at

13   the end of June.

14   **A.**   At the end of June I have not received any additional --

15   sorry, one moment.

16         An additional 1 million, a little over 1 million by the

17   end of June.

18   **Q.**   And then we see your last sentence here, (As read) please

19   press him to pay all items below highlighted, and kindly CC me.

20         What were you asking of Mr. Chamberlain here?

21   **A.**   I was asking for assistance in reaching out to Capax

22   executives and to request payment, and to include me in that so

23   I could be aware of what the result was, what was going on.

24   **Q.**   Fair to say this is another example of you escalating the

25   payment collection issue with Capax with Mr. Chamberlain?

PRASAD - DIRECT / GREEN

1    **A.**   Yes, it is.

2    **Q.**   Let's look at Exhibit 11929, please.

3         **THE COURT:**  11299?

4         **MS. GREEN:**  11929.

5         **THE COURT:**  11929.

6         **MS. GREEN:**  Yes, Your Honor.  Thank you.

7         **THE COURT:**  11929 admitted.

8         (Trial Exhibit 11929 received in evidence.)

9         **MS. GREEN:**  We're going back to talk about some of the

10   communications regarding MicroTech in this period.

11        Let's go to page 2, please.  And can we zoom in on the

12   email from Ms. Prasad to Mr. Esterrich on June 24th, Yep.

13   Thank you so much.

14   **BY MS. GREEN:**

15   **Q.**   Is this an email that you wrote to Mr. Esterrich and

16   Mr. John Cronin on June 24th, 2010?

17   **A.**   Yes, that's correct.

18   **Q.**   And what's the subject line of that email?

19   **A.**   "MicroTech invoices."

20   **Q.**   Who was -- we've already heard that Mr. Esterrich was the

21   CFO of MicroTech; is that right?

22   **A.**   Yes.

23   **Q.**   Who was Mr. John Cronin?

24   **A.**   Mr. John Cronin was an individual that worked with

25   MicroTech.

PRASAD - DIRECT / GREEN

1    Q.    I'm not going to read out all this email, but why were you

2    sending this email to Mr. Esterrich and Mr. Cronin?

3    A.    I'll just review it really quickly.

4    Q.    Take your time.

5    A.    I'm requesting their assistance in making payments on

6    these outstanding and past due invoices before the end of the

7    quarter by June 30th, and trying to expedite it as quickly as

8    possible.

9    Q.    And we see all the outstanding or some of the outstanding

10   invoices listed there again totaling 13.5 million?

11   A.    Yes.

12   Q.    The 11.5 million Vatican invoice there still at the

13   bottom; is that right?

14   A.    That's correct, and the top ones are, you know, indicate

15   how past due they are.

16         MS. GREEN:    Okay.  Let's zoom out of that so you can

17   see the email above this.  Thank you.

18   BY MS. GREEN:

19   Q.    Did Mr. Cronin respond directly to you in this email

20   chain?

21   A.    No, he did not.

22   Q.    Who is this an email from?

23   A.    It's from Mr. Cronin.

24   Q.    And who is it to?

25   A.    It's to Mr. Chamberlain.

**PRASAD - DIRECT / GREEN**

1   Q.   And did Mr. Cronin forward your email to Mr. Chamberlain

2   and write:  "See inquiry below?"

3   A.   He did, I remember this.

4   Q.   Why do you remember this?

5   A.   Because it was a little bit odd to me.  He wasn't

6   responding to me, but he was responding to Autonomy and left me

7   out of that.

8   Q.   Well, specifically he was responding to Mr. Chamberlain?

9   A.   That's correct.

10  Q.   And left you out of that?

11  A.   That's correct.

12  Q.   Did you get a sense that discussions about amounts owed

13  with resellers were being had with Mr. Chamberlain that you

14  were not involved with?

15  A.   Yes.

16  Q.   Okay.  Let's look at -- zoom out of this, and let's look

17  at the email you then got on page 1, please, and let's zoom in

18  on the bottom email from Mr. Chamberlain.

19        Mr. Chamberlain then writes an email to you, same chain,

20  and where it says "let me chase."

21  A.   Yes.

22  Q.   What did you understand him to mean by that?

23  A.   That I should not chase the payment or work to collect the

24  payment.

25  Q.   Okay.  And then let's -- let's zoom out of this, and let's

PRASAD - DIRECT / GREEN

1  look at your response back to Mr. Chamberlain.

2      You say (As read) Sorry, Steve, I understand.  Flying too

3  quickly.  Should I hold off on Capax as well?  They had

4  1.5 million by end of quarter, but we have not yet received it.

5      Is that right?

6  A.   That's right.

7  Q.   What were you asking Mr. Chamberlain here?

8  A.   I'm asking him if Capax also -- that I should not collect

9  on Capax as well because I had previously been told that it was

10  hands off.  It's end of the quarter, and I wanted clarification

11  and confirmation that's what he was asking me to do.

12  Q.   And previously being told that was hands off by

13  Mr. Chamberlain; is that right?

14  A.   That's correct.

15  Q.   Okay.  And let's see Mr. Chamberlain's response.

16      He responds back to you, "Chase Capax for all except Lilly

17  and FSA."

18      What did you understand him to mean by this?

19  A.   He's telling me specifically not to collect or chase

20  payment for the Eli Lilly and the FSA deals and invoices.

21  Q.   Based on your experience in collections prior to Autonomy,

22  I think yesterday you said you had been doing collections for

23  about 9 to 10 years at this point?

24  A.   That's correct, mm-hmm.

25  Q.   How typical was it for you to be told by a senior

**PRASAD - DIRECT / GREEN**

1  executive to not be chasing payment on outstanding invoices?

2  **A.**    Pretty rare, very rare.

3  **Q.**    And, again, when Mr. Chamberlain became involved, did you

4  retain visibility on what happened with those invoices?

5  **A.**    The ones asked to be hands off on, no.

6          **MS. GREEN:**  Could we please look at Exhibit 890.

7          **THE COURT:**  819 admitted.

8          **MS. GREEN:**  890.

9          **THE COURT:**  890, admitted.

10          (Trial Exhibit 890 received in evidence.)

11  **BY MS. GREEN:**

12  **Q.**    Let's go to page 2, please.  We're going to shift topics

13  for a second, because this email is on a slightly different

14  topic, and let's zoom in on the email from Matt Stephan.

15      Did Matt Stephan write you an email on June 24th, 2010?

16  **A.**    Yes, he did.

17  **Q.**    Is there a CC to Mr. Percy Tejeda?

18  **A.**    That's correct.

19  **Q.**    I think you said yesterday he was director of revenue; is

20  that right?

21  **A.**    That's right.

22  **Q.**    And the subject line is Debtor Confirms - Urgent?

23  **A.**    Yes.

24  **Q.**    What are debtor confirms?

25  **A.**    Debtor confirms are letters that are generated, sent out,

1    created that reflect an out -- for customers or resellers

2    with -- that reflect outstanding invoices and the amount that

3    we show is outstanding at a certain point in time, and those

4    are sent to the customers or resellers to confirm that what

5    they show was outstanding matches what they show that it

6    matches, and then they sign off on that, and then those letters

7    are sent to our auditors.

8    Q.    And is it -- what is your understanding for why the

9    auditors want those letters?

10   A.    They want to confirm that both sides match.

11   Q.    Both sides agree on the amount owed essentially?

12   A.    Correct, correct.

13   Q.    As a reminder, who did Matt Stephan report to?

14   A.    Mr. Stephan reported to Mr. Chamberlain.

15   Q.    The email -- the first paragraph of the email says (As

16   read) I'm being chased by Steve who is in turn being chased by

17   the auditors for these letters.  Could you please prioritize

18   them for first thing today?

19        Who is "Steve" a reference to?

20   A.    Mr. Chamberlain.

21   Q.    And what did you understand Mr. Stephan to be

22   communicating here?

23   A.    That the auditors asked Mr. Chamberlain who asked

24   Mr. Stephan who asked myself to create these letters, and that

25   it was urgent.

1    Q.   And I want to focus on the paragraph below that (As read)

2    Also, when preparing the Discovery Technologies letter, could

3    you make it a generic letter (i.e. just give it the standard

4    Autonomy logo, SF office address) and add in invoice 4710-ASL,

5    dated 31st of March 2010, due June 29th, 2010, outstanding

6    amount of 3.5 million.

7         Do you see that?

8    A.   I do.

9    Q.   What did you understand this request to be about?

10   A.   It's -- my understanding of this request was that

11   Mr. Stephan was asking me very specific -- to put very specific

12   information on the letter that I created that would go out to

13   the, in this case, reseller, and to add with those dates the

14   amount of 3.5 million showing as outstanding.

15   Q.   Did this request concern you or strike you of interest?

16   A.   Yes, I remember this clearly.

17   Q.   And why is that?

18   A.   Because it was an odd request, because I had worked on

19   debtor confirms for years, and I was being asked to add

20   something that did not match my accounts receivable reports.

21   So what I showed as outstanding did not include this amount.

22        **MS. GREEN:**  And let's go to page 1, please, and let's

23   zoom in on your email, and let's zoom in on just -- yep, the

24   text paragraph, because I know it's long.

25   \\\

PRASAD - DIRECT / GREEN

1    BY MS. GREEN:

2    Q.    So you respond back to Mr. Stephan, and I only want to

3    focus on one paragraph in here, Discovery Technologies (As

4    read) I have included the below details you requested in the

5    letter though it differs from what is on my 5/31 aging.

6    A.    Yes.

7    Q.    Is that a reference to what you just testified about?

8    A.    Yes, I created the letter, but I was communicating to him

9    that it does not match what I have.

10         MS. GREEN:    And let's go to page 16, please, and let's

11   zoom in on some of the text of the letter.    Great.

12   BY MS. GREEN:

13   Q.    Is this a copy of the letter that you attached that

14   included that amount?

15   A.    That's correct.

16   Q.    And that's for Discovery Technologies; is that right?

17   A.    That is correct.

18   Q.    And I think as part of this request you also prepared the

19   letter related to MicroTech; is that right?    And we can go to

20   page 25.

21   A.    Yes, I believe that was on the list.

22   Q.    And is this just an example of one of the other letters

23   you created for MicroTech?

24   A.    Yes, it is.

25   Q.    And is that list the 13.5 I think outstanding on this one?

UNITED STATES COURT REPORTERS

 1    **A.**    Yes, I believe it is.  Yes, it looks like that.

 2    **Q.**    About that amount?

 3    **A.**    That's correct.

 4    **Q.**    Let's look at Exhibit 923, please.

 5              **THE COURT:**  Exhibit?

 6              **MS. GREEN:**  923.

 7              **THE COURT:**  923 admitted.

 8              (Trial Exhibit 923 received in evidence.)

 9    **BY MS. GREEN:**

10    **Q.**    I want to turn back to your interactions with

11    Mr. Chamberlain after that San Jose meeting.

12    **A.**    Okay.

13              **MS. GREEN:**  Let's go to page 5, please.  And can we

14    zoom in on the email?  Let's include the top so we can see who

15    was writing it and everything.  Thank you, Mr. Hassan.

16    **BY MS. GREEN:**

17    **Q.**    Did you write an email to Mr. Steve Chamberlain on

18    June 22, 2010?

19    **A.**    I did, yes.

20    **Q.**    Subject line "Provisions?"

21    **A.**    Yes.

22    **Q.**    (As read) And as we discussed when you were out here,

23    would you be able to speak with Sushovan regarding the

24    possibility of crediting/writing off all invoices on the aging

25    that are fully provided for or have gone bankrupt or out of

PRASAD - DIRECT / GREEN

1  business.

2     Who was Sushovan?

3  A.  That was in reference to Mr. Sushovan Hussain who was

4  Autonomy's CFO.

5  Q.  Did you send this email in order to follow up on your

6  proposed write-off discussion that had happened in San Jose?

7  A.  Yes, that's correct.

8  Q.  And did you speak with Mr. Chamberlain on multiple

9  occasions about these proposed write-offs?

10 A.  Yes.

11 Q.  Let's look at page 4, please.

12    Did you follow up with Mr. Chamberlain again on June 29th,

13 2010?

14 A.  Yes, a few days later, correct.

15 Q.  I want to focus on one line in here.

16    Was Brent Hogenson copied on this email?

17 A.  Yes.

18 Q.  You write again (As read) In terms of credit/writing off

19 some of our most problematic, dead, and bankrupt accounts, can

20 you please let me know what the expectations would be by

21 June 30th?  I can prepare credit requests once you and Brent

22 have reviewed.  If you would like me not to take action (sic)

23 these at this time, please confirm and we'll carry these

24 accounts over to Q3.

25    What were you asking with respect to "if you would like me

1    not to take action?"

2    **A.**    If he did not want me to have -- request that they be

3    written off and cleared from the accounts receivable.

4    **Q.**    Okay.  Let's go to page 1, please, and let's look at the

5    bottom email from Steve Chamberlain.

6         Did Mr. Chamberlain write an email back to you on

7    June 29th, 2010?

8    **A.**    Yes, he did.

9    **Q.**    Can you read Mr. Chamberlain's email, please?

10   **A.**    I think part of it is --

11   **Q.**    Yeah, we'll go to the next page when you get there.

12   **A.**    Sure.  (As read) If you let me have a summary of what has

13   already been written off this quarter I can determine how much

14   more write-offs we can take.  We need to do this gradually as

15   this is a metric we provide to market.

16   **Q.**    "A ramp," is that right, the next two words?

17   **A.**    Yes, I'm sorry, yes, "a ramp."

18             **MS. GREEN:**    And let's go to the next page, please.

19   Perfect.

20   **BY MS. GREEN:**

21   **Q.**    And so it continues onto the next page, and please read

22   the final sentence starting with "a ramp."

23   **A.**    "A ramp up in the percentage would ring alarm bells."

24   **Q.**    What did you understand Mr. Chamberlain to be

25   communicating to you here?

PRASAD - DIRECT / GREEN

1  A.    What I understood from this was he was asking me to let

2  him know how much we've written off already, and that he would

3  determine how many more write-offs could take place that

4  quarter, and he's saying that we have to do it gradually,

5  meaning not -- I would think not all at once because it's a

6  metric or measure we provide to the market, to the public,

7  investors, all of that.

8  Q.    What about the reference to "ringing alarm bells?"

9  A.    A ramp up, so if the percentage of those write-offs grew

10 significantly or grew a certain percentage, it would ring alarm

11 bells, meaning cause concern.

12 Q.    And you had been involved in write-offs since 2000; is

13 that fair to say?

14 A.    That's correct.

15 Q.    Based on your experience handling write offs, was public

16 response to a write-off a factor in your mind that should be

17 considered in whether or not deciding whether or not to do a

18 write-off?

19 A.    Not in my mind, and not in my opinion.

20 Q.    And what do you believe should be the factor considered

21 when deciding whether to do a write-off?

22       MR. SEILIE:  Objection, lacks foundation.

23       THE COURT:  Overruled.

24 BY MS. GREEN:

25 Q.    You may answer.

PRASAD - DIRECT / GREEN

1  **A.**    Can you repeat the last part?

2  **Q.**    Sure.  What you do you believe the factors that should be

3  decided in order to do a write-off, in your mind?

4          **MR. SEILIE:**  Same objection.  This is improper

5  opinion.  This should be expert opinion.

6          **THE COURT:**  Overruled.  Go ahead.

7          **THE WITNESS:**  Whether or not the invoice is deemed

8  collectible.

9  **BY MS. GREEN:**

10  **Q.**    Did Mr. Chamberlain's response surprise you?

11  **A.**    Yes.

12  **Q.**    And let's go to page 1, the top email, please.

13         Did you respond back to Mr. Chamberlain that you would

14  wait for a report -- well, you gave him something, and you said

15  (As read) please let me know how much more we can write off

16  this quarter, and I will put a list together, essentially; is

17  that right?

18  **A.**    That's correct.

19  **Q.**    Okay.  Around this point in time, after you received this

20  email, did you have any discussions with Mr. Stephan about this

21  proposal to write items off?

22         **MR. HEBERLIG:**  Objection, Your Honor.

23         **THE COURT:**  Overruled.

24         **THE WITNESS:**  Yes, I did.

25  \\\

 1   BY MS. GREEN:

 2   Q.    And what was that discussion?

 3            MR. SEILIE:  Objection.

 4            MR. HEBERLIG:  Objection.

 5            MR. SEILIE:  Hearsay.

 6            THE COURT:  Well, number one, I don't know that it's

 7   necessarily introduced for the truth of the matter.  It's

 8   introduced for what her state of mind is.

 9            Ladies and Gentlemen, let me just try to explain hearsay a

10   bit to you.

11            Hearsay, the definition of hearsay is it's a statement

12   made out of court, that is, at some previous time, and it's

13   introduced for the truth of the matter.  Typical hearsay is

14   someone told me that it's raining outside.  Now, that would be

15   hearsay if in fact you want to prove that it's raining outside.

16   But if what you want to do is show why the person who hears the

17   statement gets an umbrella, it explains why that person got an

18   umbrella.  The person has got an umbrella because he or she was

19   told that it's raining outside.  That's not hearsay, even

20   though it's the same statement, but it's not hearsay because

21   it's not being introduced for the truth.  It's being introduced

22   to see what effect that statement had on the person who heard

23   the statement.

24            So you can go to law school and study that for years and

25   you still may not know the answer to it.  But that's the

PRASAD - DIRECT / GREEN

1   general rule about hearsay, and so this is being introduced as

2   to she was -- she had a conversation with somebody --

3           THE WITNESS:  That's correct.

4           THE COURT:  -- the witness had a conversation with

5   somebody and was told something, and as a result she thought

6   something or did something, and that's called the state of

7   mind.

8       Okay.  You may proceed.

9           THE WITNESS:  Okay.

10  BY MS. GREEN:

11  Q.   Okay.  So what can you tell us about that?

12  A.   Can you repeat the question, please?  I'm thinking of

13  umbrellas.

14  Q.   So did you have a discussion with Mr. Matt Stephan in the

15  context of trying to better understand this response from

16  Mr. Chamberlain about the alarm bells and the public response

17  to write-offs?

18  A.   Yes, I did.

19  Q.   And what was that conversation?

20  A.   I had a conversation when Mr. Stephan was in visiting the

21  office I was working in in San Jose.  We were discussing

22  collections.  I don't remember all the details of that

23  conversation, but he asked me to come down the hall into a

24  conference room, so I followed him there.  He had his computer,

25  and he pulled up on his laptop, I believe it was -- I believe

1    it was an Autonomy web site page online, and he had told me

2    that he was showing me there was a measure that's public, and

3    we had to -- I don't remember the exact words, but manage,

4    manage that.

5    **Q.**    And was it your understanding that Mr. Stephan was having

6    this discussion with you to help you understand the concerns

7    Mr. Chamberlain had indicated in this email about the

8    write-offs?

9    **A.**    Yes, that's correct, that was my understanding.

10   **Q.**    Let's look at Exhibit 15399.

11           **THE COURT:**  15399 admitted.

12           (Trial Exhibit 15399 received in evidence.)

13   **BY MS. GREEN:**

14   **Q.**    And this is part of the same chain?

15   **A.**    Okay.  Mm-hmm.

16           **MS. GREEN:**  Let's zoom in on the bottom email from

17   Mr. Chamberlain, please.

18   **BY MS. GREEN:**

19   **Q.**    So you -- we had been discussing -- you had asked

20   Mr. Chamberlain about how much more you can write off; do you

21   remember that?  Mr. Chamberlain responds back to you with a

22   copy to Brent Hogenson and says (As read) We can cope with

23   about a further 1 million this quarter on top of what has

24   already gone through.  Subject, you propose something to me,

25   and I can approve for processing today?

PRASAD - DIRECT / GREEN

1    **A.**    Yes.

2    **Q.**    Was it your understanding he was indicating to you they

3    could have about 1 million, in his mind, of --

4    **A.**    Additional write-offs.

5    **Q.**    Let's look at the top email, please, your email back to

6    Mr. Chamberlain.

7          This is your email back to Mr. Chamberlain.  What's the

8    date of this email?

9    **A.**    The date is June 30th.

10   **Q.**    And is Mr. Hogenson copied?

11   **A.**    Yes, he is.

12   **Q.**    And you write (As read) I have actually been working on

13   the attached spreadsheet for both you and Brent.  It includes

14   my recommendations for write-offs, and it also provides my

15   provision recommendations; is that right?

16   **A.**    That's correct, mm-hmm.

17   **Q.**    Can you read your second paragraph, please?

18   **A.**    After a thorough review of the aging reports, it is my

19   opinion that there are numerous accounts that should be

20   "cleaned up/written off" or have been deemed "high risks" and

21   should be reserved for accordingly.

22   **Q.**    In reference to the high risk and problem accounts we've

23   been discussing up until now; is that right?

24   **A.**    Yes.

25   **Q.**    Okay.  You provided attachments with proposed write-offs

1    to Mr. Chamberlain; is that right?

2    **A.**    I did, yes.

3    **Q.**    We're going to look at those attachments in a moment, but

4    first let's look at Exhibit 15401.

5            **THE COURT:**  15401 admitted.

6            (Trial Exhibit 15401 received in evidence.)

7            **MS. GREEN:**  And let's start on the bottom of page 1.

8    Can you just zoom in on the email from Mr. Chamberlain?  We'll

9    have to go on to the next page, but let's start with that.

10       Oh, great.  Thank you, Mr. Hassan.

11   **BY MS. GREEN:**

12   **Q.**    Okay.  So you had sent him some spreadsheets in that email

13   we just saw.  Is this Mr. Chamberlain's response back to you?

14   **A.**    Yes, it is, a few days later.

15   **Q.**    And, again, Mr. Hogenson is copied; is that right?

16   **A.**    Yes, he is.

17   **Q.**    What's the date of this email?

18   **A.**    July 4th, 2010.

19   **Q.**    So in response to what you sent him, he says,

20   Mr. Chamberlain says (As read) All the details you have an

21   (sic) each.  I need to understand what new information you have

22   obtained to reach your conclusion that these need to be

23   provided, since they were not provided for last quarter.

24       Is that right?

25   **A.**    That's right.

1          **MS. GREEN:**  And let's go back to your response to

2     Mr. Chamberlain.  So let's go back to page 1, please, and let's

3     zoom in on your email back to Mr. Chamberlain.

4     **BY MS. GREEN:**

5     **Q.**    Did you respond to Mr. Chamberlain's request?

6     **A.**    That's correct, yes.

7     **Q.**    This is dated same date, July 4th, 2010?

8     **A.**    Yes.

9     **Q.**    You write (As read) I am attaching the spreadsheet that

10    you requested with some additional comments.  Please refer to

11    the column marked "comments for Steve."  This column includes

12    the latest information obtained on these accounts this quarter,

13    and I am recommending provisions for each of these line items.

14         You mention you discussed with Brent.  Okay.  One moment.

15         You used the term "provisions" here.  What is a provision?

16    **A.**    A provision is -- oh, I think we've heard the word

17    previously as reserves also.  Setting -- setting monies aside

18    for invoices that are high risk, invoices, payments that are

19    high risk of not being paid within a certain time frame.

20    **Q.**    So setting money aside for payments that you think might

21    not be coming in, potentially?

22    **A.**    That's right.

23    **Q.**    And did you attach a spreadsheet to this email?

24    **A.**    I did, yes.

25    **Q.**    And we're going to look at that now, but just did you add

PRASAD - DIRECT / GREEN

1   a column with comments for Steve to it?

2   A.   I did.

3            MS. GREEN:   Okay.  Mr. Hassan, can you open the

4   attached Excel spreadsheet, please, and go to tab 1?

5        Okay.  Can we make tab 1 a bit bigger?

6   BY MS. GREEN:

7   Q.   Is this the summary of your proposed write-offs for

8   Mr. Chamberlain?

9   A.   Yes, there's -- the top is the recommended provisions.

10  The bottom is the recommended write-offs.

11  Q.   Let's go to tab 2, please.  I know this is small, so we're

12  going to have to zoom in on certain pages.

13       And the summary is sort of the summary of invoices and

14  your comments to Mr. Chamberlain on these invoices?

15  A.   That's right.

16  Q.   Okay.  We're going to be looking, scrolling down the

17  spreadsheet, but does column -- let's start -- I want to be

18  able to see the headings, please.

19       Does column C indicate the entity or customer reseller

20  that has the invoice?

21  A.   Yes, that's correct.

22  Q.   And column G, is that the invoice total?

23  A.   Yes.

24  Q.   And do we have the due date to the left of that in column

25  F?

PRASAD - DIRECT / GREEN

1   **A.**   I do, yes.

2   **Q.**   In the collectible column, what does that column

3   represent?

4   **A.**   Whether or not I believe it will be collected -- if it's a

5   problem, there's different coding I think there.

6   **Q.**   Does "PROB" stand for problem?

7   **A.**   Yes.

8   **Q.**   Okay.  And then you provide an updates column in column J;

9   is that right?

10  **A.**   Yes.

11  **Q.**   So does column J reflect -- so the initial comments or

12  updates you gave to justifying why you thought these invoices

13  should be written off?

14  **A.**   Yes.

15  **Q.**   And column K. next to it says "customer."

16       Is that a reference to the purported end customer for the

17  deal?

18  **A.**   Yes.

19  **Q.**   We then have the purple column, column O; is that your

20  sort of proposed write-off amount?

21  **A.**   Yes.

22  **Q.**   And finally column P.  It's a little hidden, but do you

23  see that box?  Is that the comment --

24       **MS. GREEN:**  Can we just put -- zoom in and just put

25  your cursor on the orange cell, please, Mr. Hassan?

**UNITED STATES COURT REPORTERS**

PRASAD - DIRECT / GREEN

```
 1              THE WITNESS:  Yes, that's comments for Steve.
 2    BY MS. GREEN:
 3    Q.   So that's the additional column you added for
 4    Mr. Chamberlain; is that right?
 5    A.   Yes, that's what he requested.
 6    Q.   Okay.  This is a long spreadsheet, but I'm only going to
 7    focus on a very few rows of it.
 8    A.   Okay.  Yes.
 9    Q.   Have you previously reviewed this whole spreadsheet?
10    A.   Yes.
11    Q.   What was your understanding as to one of the primary
12    reasons Autonomy was not receiving payment from the resellers
13    with whom it had transacted?
14    A.   One of the primary reasons was that there were -- either
15    the end user deal was not solid in place, confirmed, or
16    possibly did not exist.
17    Q.   And there are notes to that effect in this spreadsheet?
18    A.   Yes.
19              MS. GREEN:  Okay.  We're just going to go to row 26.
20    Great.  And let's just look at one cell, so let's just look at
21    row P26, please.  I just want to give one example of that?
22              THE WITNESS:  Sure.
23    BY MS. GREEN:
24    Q.   And in your "comments for Steve" column you wrote (As
25    read) Customer withholding payment and it has been determined
```

UNITED STATES COURT REPORTERS

PRASAD - DIRECT / GREEN

```
 1   that they don't have a valid end user.

 2       Is that an example of what you just described?

 3   A.  That's an example.

 4       MS. GREEN:  And can you scroll one cell down, please,

 5   Mr. Hassan.

 6   BY MS. GREEN:

 7   Q.  You see the same comment for the invoice below that?

 8   A.  That's correct.

 9       MS. GREEN:  Okay.  Let's scroll down to row 60,

10   please, Mr. Hassan.  Thank you so much.  And let's go all the

11   way to the left, please, column A, row 60.

12       And row 61, so can we scroll to the right now and go to

13   P60 and 61?  Sorry, I know this is moving around with the

14   spreadsheet.

15       THE WITNESS:  That's fine.

16   BY MS. GREEN:

17   Q.  What comment did you write to Mr. Chamberlain for those

18   invoices?

19   A.  "No, valid end user and partner won't pay."

20       MS. GREEN:  Okay.  And let's go down to row 100 to 103

21   which represent Capax invoices, so let's go to the column A,

22   please, Mr. Hassan.

23   BY MS. GREEN:

24   Q.  Do you see Capax invoices listed here?

25   A.  Yes.
```

UNITED STATES COURT REPORTERS

PRASAD - DIRECT / GREEN

1  Q.    In rows 100 to 103?

2  A.    Those are ones we've discussed.

3          MS. GREEN:  And let's look at your column J for those,

4  so we can -- let's zoom in a little bit, Mr. Hassan, so that --

5  perfect.

6  BY MS. GREEN:

7  Q.    Column J for those invoices, your initial comment "per JB

8  no EU," we've already discussed that was in a previous exhibit

9  when you had communicated that to Mr. Chamberlain?

10  A.    Correct, per Mr. Baiocco there was no end user.

11  Q.    And let's look at what you added in the "comments to

12  Steve" column.  Actually, hold there for one second, column K.

13  What purported end customer was on these invoices?

14  A.    That particular one was the Financial Services Authority

15  which we also discussed is also known as FSA.

16  Q.    And is that the one listed for the four invoices here?

17  A.    Yes.

18  Q.    And let's go to the right, please.  Well, actually,

19  pausing there for a second.

20        These are all designated as problem accounts in your

21  spreadsheet, right?

22  A.    That's correct, column H.

23  Q.    Column H, great.  And let's go to your columns comments

24  for Steve -- comments for Steve Chamberlain column.  You have

25  the same comment for Mr. Chamberlain for all of these.  You

PRASAD - DIRECT / GREEN

1    wrote:  Risky - no end user, question mark.

2         What were you communicating there?

3    A.   That collecting payment is risky and noting that there was

4    no end user.

5    Q.   Was that one of the reasons why you were considering this

6    risky?

7    A.   Yes.

8    Q.   You foresaw some problems collecting payments there?

9    A.   That's correct.

10   Q.   Let's look at Exhibit 3297, which is a continuation of

11   this chain.

12            THE COURT:   3297 admitted.

13            (Trial Exhibit 3297 received in evidence.)

14            MS. GREEN:   Thank you, Mr. Hassan.

15        And let's zoom in on the email so Ms. Prasad can see it.

16   BY MS. GREEN:

17   Q.   Did Mr. Chamberlain respond back to you on July 5th, 2010?

18   A.   Yes, he did.

19   Q.   Was Mr. Hogenson copied?

20   A.   Yes, he was.

21   Q.   Could you please read out, and let's -- we're focusing on

22   that Capax FSA line.

23   A.   All right.  (As read) Capax FSA, "risky, no end user?" is

24   a question:  What information do you have to suggest there is

25   no end user?  You have proposed a full provision when payments

PRASAD - DIRECT / GREEN

1    are not yet due so you must have some new -- some clear

2    evidence on this.  Please provide.

3    Q.    And then with respect to Digital Data, was that another

4    customer or reseller of Autonomy?

5    A.    Yes.

6    Q.    Had there also been invoices with respect to Digital Data

7    listed in your spreadsheet?

8    A.    Yes.

9    Q.    It says (As read) you need more data.  You have proposed a

10   provision without getting the additional data, question mark.

11         So these were questions that Mr. Chamberlain had written

12   to you on July 5th, 2010; is that right?

13   A.    Yes.

14   Q.    How did Mr. Chamberlain's response to your proposed

15   write-offs in July 2010 strike you?

16   A.    I remember this email.  This -- I was surprised by this

17   email.  I thought it was strange.  It felt a little more

18   abrupt, because I believed that Mr. Chamberlain had the

19   background information and knowledge about these accounts.

20   Q.    And did you believe that because you had been having

21   discussions with Mr. Chamberlain, as we've seen today, prior to

22   this point about the issues with these accounts?

23   A.    Yes, I didn't quite understand why he was challenging me.

24   I felt like he was challenging me.

25   Q.    And you said you didn't feel he quite understood why he

PRASAD - DIRECT / GREEN

1   was challenging you?

2   A.   Correct.

3   Q.   And why is that?

4   A.   Because I thought -- because I believed he had the

5   background information on these accounts already.

6   Q.   Let's look at Exhibit 15404, which is your response back

7   to Mr. Chamberlain.

8           THE COURT:   1504?

9           MS. GREEN:   15404.

10          THE COURT:   15 --

11          MS. GREEN:   15404.

12          THE COURT:   15404.

13          MS. GREEN:   Yes, Your Honor.   Thank you.

14          THE COURT:   Okay.   Admitted.

15          (Trial Exhibit 15404 received in evidence.)

16   BY MS. GREEN:

17   Q.   Did you respond back to Mr. Chamberlain?

18   A.   Yes, I did.

19   Q.   It's a long email, so we may highlight certain portions of

20   it.   But focusing just on the top, did you write this email to

21   Mr. Chamberlain on July 6th, 2010?

22   A.   Yes, in response to his, yes.

23   Q.   And was Mr. Hogenson copied?

24   A.   Yes, he was.

25   Q.   Okay.   We're going to look at just a few items in here.

1    **A.**    Of course.

2    **Q.**    Did you provide information in this email to

3    Mr. Chamberlain about, in response to what I think you have

4    just described as him challenging your write-offs?

5    **A.**    Mm-hmm, yes.

6        **MS. GREEN:**  Okay.  Let's look at paragraph 1.  Can we

7    zoom in on that paragraph, please.

8    **BY MS. GREEN:**

9    **Q.**    AS Computadoras, is that another Autonomy customer?

10   **A.**    It is, I believe in Latin America.

11   **Q.**    And was this one of the entities that had been on your

12   spreadsheet?

13   **A.**    Yes.

14   **Q.**    And let's just look at one sentence here: (As read) The

15   update I received by phone from Neil G. on 6/8/2010 stated that

16   this was not a viable order and that the document was signed as

17   a favor to Fernando (VP at the time).  Unfortunately, I do not

18   have much more information than that as the customer is not

19   responding.

20       So what were you communicating with respect to this issue?

21   **A.**    I was communicating that I was -- that I personally spoke

22   with an employee of Autonomy who had informed me that it wasn't

23   a good order, and that it was signed off as a favor from the

24   customer to the previous Autonomy vice-president at the time.

25       **MS. GREEN:**  And let's zoom out of there for a second,

 1    and let's zoom in on the Capax FSA paragraph.

 2    **BY MS. GREEN:**

 3    **Q.**    Could you please read out what you wrote back to

 4    Mr. Chamberlain regarding Capax FSA?

 5    **A.**    (As read) My notes indicate that at the end of May, John

 6    B, meaning John Baiocco, had stated (via phone) that this was

 7    not a "done deal," therefore, I've coded this as a "high risk"

 8    account.  Toward the end of June, you asked me to refrain from

 9    contacting Capax in regards to Eli Lilly and FSA.  My

10    understanding was that the entire FSA deal was at risk, so that

11    is why my recommendation was for all components and not just

12    the invoice that was due.

13    **Q.**    What were you conveying to Mr. Chamberlain here?

14    **A.**    Why I had marked that particular -- those particular

15    invoices as problematic and high risk of not being collected.

16    **Q.**    And does this note accurately reflect a summary of your

17    understanding as to what happened with the Capax invoices and

18    your interactions with Mr. Chamberlain on collecting some of

19    those invoices?

20    **A.**    Yes, this summarizes that, mm-hmm.

21    **Q.**    And is this the reason why, when we were looking at the

22    prior email, you had said you found it -- I think you used the

23    word "odd?"

24    **A.**    Yes.

25    **Q.**    Because you felt that Mr. Chamberlain knew or understood

PRASAD - DIRECT / GREEN

1  that there were collection issues with the accounts that you

2  were recommending; do you remember that?

3  **A.**    Yes, I did find it odd, because we had been discussing

4  communicating about it, and he had asked me to hold off on

5  chasing, and I'm referring to that information.

6  **Q.**    You're referring to that information here?

7  **A.**    Yes, that's correct.

8  **Q.**    And when you write you view the entire FSA deal at risk,

9  by that do you mean not collectible?

10  **A.**    Highly risky that it would be collectible, yeah.  Yes, to

11  answer your question, yes.

12  **Q.**    I know that was a lot of back-and-forth.  So when you were

13  sending Mr. Chamberlain these emails about bad debt that you

14  thought should be written off, did you notice any sort of

15  change in your relationship with Mr. Chamberlain?

16  **A.**    Yes.

17  **Q.**    Could you describe that for us, please?

18  **A.**    I remember -- so we were closing the end of June, end of

19  the quarter.  We had a lot of frequent communication.  When I

20  started sending -- I had been hoping to clean up and write off

21  before the end of the quarter, but that got carried over, so

22  we're having those discussions.

23       When I initiated those discussions, there was a little

24  period of time that he went basically radio silent, which was

25  unusual because he was usually always on line, always

1    communicating.  So that was odd to me.  And then I received

2    these types of responses, the ones that felt more challenging

3    and odd, yeah.

4    **Q.**    Why did they feel odd?

5    **A.**    Because, again, I felt that he had the background

6    information.  He was -- he had the details and he was asking me

7    about them.

8    **Q.**    A few weeks after this July 6th, 2010 email, on or around

9    July 22, 2010, were you asked to move from the San Jose office

10   where you worked to the San Francisco office?

11   **A.**    Yes, I don't remember the exact date, but, yes, I was.

12   **Q.**    And was that move immediate, effective immediately,

13   essentially?

14   **A.**    Yes, it was.

15   **Q.**    Did you ask for that move?

16   **A.**    No.

17   **Q.**    You live in San Jose?

18   **A.**    I live close to the office in San Jose.

19   **Q.**    What was your understanding for why you were told to move?

20   **A.**    My understanding was that there was a payroll issue that

21   was being investigated, and I received an email stating

22   something about like effective immediately that I would be

23   reporting to the San Francisco office and working there.

24   **Q.**    There was a fair amount today and yesterday about your job

25   responsibilities with respect to collections --

PRASAD - DIRECT / GREEN

1   **A.**   Yes.

2   **Q.**   -- collecting payment.  Did you have any role or

3   responsibilities with respect to handling payroll?

4   **A.**   No, no visibility.  My hands were not in payroll, never.

5   **Q.**   We have mentioned Mr. Hogenson a couple of times today.

6   How was your relationship with Mr. Hogenson while you were

7   working with him?

8   **A.**   My relationship was good with Mr. Hogenson, professional.

9   **Q.**   While you were working at Autonomy, did you come to learn

10   that Mr. Hogenson had raised certain concerns about the

11   finances to Dr. Lynch?

12   **A.**   Can you repeat the question?

13   **Q.**   While you were working at Autonomy, did you come to learn

14   that Mr. Hogenson had raised certain concerns with respect to

15   finances to Dr. Lynch?

16   **A.**   Yes, that was my understanding.

17   **Q.**   And how did you come to learn that?

18   **A.**   Mr. Hogenson shared that with me.

19   **Q.**   We've looked a lot today about sort of your findings,

20   concerns with respect to --

21   **A.**   Collections.

22   **Q.**   -- collections; is that right?

23   **A.**   That's right.

24   **Q.**   Do you know whether your findings or issues, did they have

25   any role -- were you involved at all in the concerns that

PRASAD - DIRECT / GREEN

```
 1  Mr. Hogenson was putting together?
 2  A.   Yes, that's correct, I believe my findings were definitely
 3  part of that.
 4  Q.   Even if your findings were part of what Mr. Hogenson
 5  collected?
 6  A.   Yes, in order to escalate that.
 7  Q.   Do you know what, if anything, happened to Mr. Hogenson
 8  after he escalated his concerns?
 9  A.   I don't know the exact timing, but he was terminated from
10  the company.
11  Q.   Let's go back to your move to the San Francisco office.
12  A.   Okay.
13  Q.   Shortly after -- so that was around the end of July; is
14  that fair, 2010?
15  A.   Yes.
16  Q.   Shortly after you moved to the San Francisco office, were
17  you interviewed in connection with some type of internal
18  investigation at Autonomy?
19  A.   I was.
20  Q.   And you've mentioned this payroll issue; was that your
21  understanding of what the investigation was at the time?
22  A.   That's correct, that was my understanding.
23  Q.   And how soon after you moved to the San Francisco office
24  were you interviewed, approximately?
25  A.   Very quickly, very soon after.
```

PRASAD - DIRECT / GREEN

1   **Q.**   About within a week, perhaps?

2   **A.**   Oh, definitely.

3   **Q.**   Okay.  And, again, did you have anything to do with

4   payroll at that time?

5   **A.**   No.

6   **Q.**   After you were interviewed, did you learn that Mr. Tejeda

7   was terminated?

8   **A.**   Yes, I did.

9   **Q.**   How did you find that out?

10  **A.**   Mr. Tejeda was also asked to report to the San Francisco

11  office.  He had worked in the San Jose office with myself, so

12  both of us started reporting to the San Francisco office.  And

13  we didn't have actual offices, it was very last minute, so we

14  were sitting next to each other just kind of make-shift work

15  areas.

16       And Mr. Tejeda was asked to come into a meeting.  I was

17  not in that meeting.  So he went into a room with other

18  individuals, and then he came out and collected his belongings

19  but left his computer, his laptop.  So I was sitting there, and

20  he had been terminated.  And he, I believe, was escorted out or

21  at least out of that area.

22  **Q.**   Did anything happen to you at that point?

23  **A.**   Yes.

24  **Q.**   What happened to you?

25  **A.**   Immediately following that same day, after Mr. Tejeda was

PRASAD - DIRECT / GREEN

1    fired -- sorry.

2    **Q.**    Take your time.  It's okay.

3    **A.**    After Mr. Tejeda was fired, I was asked to come in to a

4    conference room with two members of our legal department.

5    **Q.**    And what happened then?

6    **A.**    I'm okay.  I'm not crying.  Just hard to talk.  I'm sorry.

7    **Q.**    It's okay.  Take your time.

8    **A.**    I sat down, and there were two attorneys in the room, and

9    I was also -- they informed me that my employment was

10   terminated effective immediately, yeah.

11   **Q.**    Did you ask why you were being terminated?

12   **A.**    Yes.  I remember I was in shock, and I didn't understand.

13   So I asked -- one of the attorneys was Mr. Joel Scott.  I asked

14   Mr. Scott why I was being fired, and he did not give me a

15   reason.  Neither of the attorneys gave me a reason, and they

16   said effective immediately I would have to leave.  And they --

17   and I believe Mr. Scott's response was that I was an at-will

18   employee, and that they could let me go at any point in time

19   for whatever reason.

20   **Q.**    Did you feel that your termination from Autonomy was

21   justified?

22   **A.**    I absolutely did not.

23        **MS. GREEN:**  One moment, Your Honor.

24        Thank you, Your Honor.

25        **THE COURT:**  Okay.  Ladies and Gentlemen, we're going

PRASAD - CROSS / SEILIE

```
 1    to take our recess now.  We'll be in recess until five after
 2    11:00.
 3        Remember the admonition given to you:  Don't discuss the
 4    case, allow anyone to discuss it with you, form or express any
 5    opinion.
 6        Thank you.
 7        (Jurors exit courtroom.)
 8                    (Recess taken at 10:44 a.m.)
 9                (Proceedings resumed at 11:07 a.m.)
10        (Jurors enter courtroom)
11            (Proceedings were heard in the presence of the jury:)
12            THE COURT:  Please be seated.
13        Sorry?
14            MR. SEILIE:  Your Honor, there may be -- there are two
15    exhibits I may refer to that are tucked into the front pocket
16    of the cross-examination binder.
17            THE COURT:  Okay.  Thank you.
18        Let the record reflect all jurors are present, parties are
19    present.  You may proceed.  Cross-examination.
20                    CROSS-EXAMINATION
21    BY MR. SEILIE:
22    Q.   Good morning, Ms. Prasad.
23    A.   Good morning.
24    Q.   My name is Ray Seilie, and I represent Steven Chamberlain.
25    I have a few questions for you.
```

UNITED STATES COURT REPORTERS

PRASAD - CROSS / SEILIE

1   **A.**   Sure.

2   **Q.**   Ms. Prasad, are you a certified accountant?

3   **A.**   No, I'm not.

4   **Q.**   And were you ever part of any meetings with Autonomy's

5   upper management regarding overall sales strategy?

6   **A.**   I don't believe so.

7   **Q.**   Your responsibility was collections?

8   **A.**   Yes.

9   **Q.**   And you were made responsible for collections and credit

10  for all of the U.S.-based Autonomy companies in April 2010; is

11  that correct?

12  **A.**   That's when I received the title.

13  **Q.**   And before Autonomy you worked for Interwoven, correct?

14  **A.**   That's correct.

15  **Q.**   You didn't work on collections before you started working

16  at Interwoven, correct?

17  **A.**   Specifically -- not specifically collections.

18  **Q.**   So the only places where you worked on collections were at

19  Interwoven and Autonomy, correct?

20  **A.**   Where I managed them, yes.

21  **Q.**   So when you testified that you found something unusual

22  when you were working for Autonomy, what you were saying was

23  that it was different from the way you did things at

24  Interwoven, correct?

25  **A.**   Yes, I don't remember what that was in reference to, but,

PRASAD - CROSS / SEILIE

1    yes, I believe so.

2    Q.    Your role at both Interwoven and Autonomy was to deal with

3    collections from customers who owed money, correct?

4    A.    Can you repeat that?

5    Q.    Your role at both Interwoven and Autonomy was related to

6    collections?

7    A.    I had other responsibilities at Interwoven.

8    Q.    But you didn't need knowledge of accounting principles to

9    deal with collections, right?

10   A.    Collections specifically, no.

11   Q.    Your job was basically to reach out to customers who owed

12   payment?

13   A.    Yes, when I managed collections, yes.

14   Q.    You would check on the status of their payment?

15   A.    Yes.

16   Q.    And if you needed to, you would escalate the outstanding

17   receivable?

18   A.    My team would reach out to customers, and they would

19   escalate to me when I managed collections.

20   Q.    And sometimes you would need to escalate it further?

21   A.    That's correct.

22   Q.    For example, some customers, back when you were working

23   for Interwoven, some customers you would have a hard time

24   collecting from, and you might ask Mr. Hogenson to try with the

25   same customer?

PRASAD - CROSS / SEILIE

1   A.   I -- I didn't report to Mr. Hogenson directly.  My first

2   round might have been my superior at the time, which was

3   Mr. Tejeda.

4   Q.   Oh, so you would escalate the issue to somebody?

5           MS. GREEN:  Objection, vague.

6           THE CLERK:  Use your mic.

7           THE COURT:  I'm sorry, what?

8           MS. GREEN:  Sorry.  Objection, vague.

9           THE COURT:  Well, are you referring to a particular

10  point in time during her employment; is that what you were

11  saying?

12  BY MR. SEILIE:

13  Q.   While you were working for Interwoven, there would be

14  times when customers wouldn't respond to your efforts to

15  collect, and you might need to escalate that concern to

16  somebody else?

17  A.   Can I ask a question?

18  Q.   Yes.

19  A.   Can you clarify, I mean, escalate in which way?

20  Q.   You would ask somebody else to help you collect from a

21  customer?

22  A.   Yes, with my involvement.

23  Q.   There was nothing wrong with the fact that you would ask

24  somebody else to help collect from a customer from whom you

25  were having difficulty collecting?

PRASAD - CROSS / SEILIE

1  **A.**   I'm -- that was a rare occurrence, so I'm struggling to

2  think of an example.

3  **Q.**   But when you asked somebody else to help you collect a

4  customer's debt that you were having trouble with, you didn't

5  think you were doing anything wrong by asking somebody else to

6  get involved?

7         **MS. GREEN:**  Objection, foundation.

8         **THE COURT:**  Overruled.  Go ahead.

9         **THE WITNESS:**  If I involved other individuals, no, it

10  was a combined effort to collect.

11  **BY MR. SEILIE:**

12  **Q.**   Right.  And there was nothing wrong with making a combined

13  effort to collect?

14  **A.**   Can I clarify that?

15  **Q.**   No, I'd just like you to answer.

16         **THE COURT:**  No, go ahead.  Yes, you can clarify what

17  you mean.

18         **THE WITNESS:**  Because you used the word "in an effort

19  to collect."  In my previous -- what I'm thinking about at

20  Interwoven, I would generally still be responsible for driving

21  the collection portion, but if there was a problem, I would

22  involve members of other departments, a sales executive or a

23  finance executive, but it was very different than handing off

24  the account to an executive and being hands off.

25  \\\

PRASAD - CROSS / SEILIE

1    BY MR. SEILIE:

2    Q.    And all I'm asking is when you were working for Interwoven

3    and you got other departments involved, you didn't think you

4    were doing anything wrong, right?

5    A.    No.

6    Q.    Sometimes customer contacts might be high-level executives

7    of the customer, right?

8    A.    Customer contacts?

9    Q.    Yes.

10   A.    Yes.

11   Q.    Sometimes they might want to deal with certain

12   salespeople; they might want to deal with other folks at the

13   company, right?

14   A.    Are you asking in regards to collections?

15   Q.    Yes.

16   A.    Possibly.

17   Q.    Now, theoretically, if a customer refused to pay for long

18   enough, you could further escalate a debt, an outstanding

19   receivable to legal, correct?

20   A.    Just so I'm clear, could you repeat that again?

21   Q.    If a customer continued to refuse to make a payment that

22   they owed for a long enough time, eventually you could escalate

23   that debt to legal, correct?

24   A.    What period of time are you talking about?

25   Q.    Anytime you were working at collections.

UNITED STATES COURT REPORTERS

PRASAD - CROSS / SEILIE

1   **A.**   At Interwoven or Autonomy?

2   **Q.**   Well, let's talk about Interwoven for now.

3   **A.**   At Interwoven I would involve legal.

4   **Q.**   Yes.  And legal might try to do something like negotiate a

5   payment plan with the customer?

6   **A.**   Not typically.

7   **Q.**   They wouldn't -- they would just -- would they -- if

8   everything failed, would they sue the customer?

9   **A.**   I can't think of an occasion where they sued the customer,

10  that I was aware of.

11  **Q.**   But legal got involved in the collections process?

12  **A.**   They -- my experience with legal was that they might draft

13  a payment demand letter on my be -- in terms of collections.

14  **Q.**   And that payment demand letter might include some

15  reference to potential legal remedies?

16  **A.**   Possibly, yes.

17  **Q.**   Now, when Interwoven was first acquired in Autonomy in

18  2009, you remained focused on Interwoven's receivables for a

19  while, right?

20  **A.**   That's correct.

21          **MR. SEILIE:**  If we could look at Exhibit 9658.

22          **THE COURT:**  9658 admitted.

23          (Trial Exhibit 9658 received in evidence.)

24          **MR. SEILIE:**  If we could pop that up.

25  \\\

PRASAD - CROSS / SEILIE

1   BY MR. SEILIE:

2   Q.   This is an email -- if we could zoom in Mr. Eltiste on the

3   overall email.

4        This is an email from Mr. Chamberlain to your group and a

5   number of others working in the Autonomy U.S. group, right?

6   A.   I'm just going to read it.

7   Q.   Sure.

8   A.   Okay.

9   Q.   Okay.  And this was an email that Mr. Chamberlain sent you

10  and a number of others before the end of 2009?

11  A.   Yes.

12  Q.   This is before you took over the director of collections

13  position for the Autonomy -- for Autonomy's American

14  operations?

15  A.   December 2009, I believe I had the responsibilities,

16  but -- for managing all of Autonomy's U.S. --

17  Q.   Well, you received the title in April 2010, correct?

18  A.   That's correct.

19  Q.   And December 2009 is before April 2010, correct?

20  A.   Yes, but I was already assuming the responsibilities

21  before that.

22  Q.   April 2010 is when Brent Hogenson -- when you started

23  discussing the issues that we -- you talked about in your

24  direct examination, correct?

25            THE COURT:  Okay.  Rephrase the question.

UNITED STATES COURT REPORTERS

1        MR. SEILIE:  I'll withdraw that question.

2        THE WITNESS:  Yeah.

3   BY MR. SEILIE:

4   Q.   Now, if you look at the CC line, there are a number of

5   individuals like Helen Ku and Ying Liu who were not involved in

6   the Interwoven aspect of Autonomy's operations, correct?

7   A.   That's correct.

8   Q.   And Mr. Chamberlain was including them still on these

9   collections emails, correct?

10  A.   That's correct.

11  Q.   Now, Mr. Chamberlain encourages you to keep pushing

12  payments on collections; do you see that?

13  A.   Yes.

14  Q.   He also tells you to call him about significant accounts

15  that are stuck, correct?

16  A.   Yes.

17  Q.   And that's a reference to customers from whom you're

18  having trouble collecting money that they owe?

19  A.   That's correct.

20  Q.   And one of the examples of a strategy he proposes is he

21  could offer an early settlement discount; do you see that?

22  A.   Yes.

23  Q.   And the idea is to offer to discount an existing

24  receivable in order to encourage the customers to pay more

25  quickly?

PRASAD - CROSS / SEILIE

1   A.   That's correct.

2   Q.   There's nothing wrong with a company agreeing to take less

3   money for quicker payment, right?

4   A.   That's correct, I believe so.

5   Q.   Now, once you were promoted to the position of Director of

6   Collections, you started focusing on debts owed to other

7   Autonomy's companies in the U.S., correct?

8   A.   I started working on that prior to the promotion title.

9   Q.   But at some point between the end of 2009 and 2010 you

10  started looking, focusing on these other companies?

11  A.   Yes.  And my screen went off.  I don't know if that's --

12  Q.   You started part --

13          THE CLERK:  One moment.  All the screens went dark.

14          MR. SEILIE:  I think that might have been on purpose.

15          THE WITNESS:  Oh, okay.  Apologies.

16  BY MR. SEILIE:

17  Q.   You started participating in calls with Mr. Chamberlain

18  and Mr. Tejeda about outstanding debts?

19  A.   Could you start the first part of that question again?

20  Q.   So in the April 2010 time frame, you started participating

21  in these calls you talked about with Mr. Chamberlain and

22  Mr. Tejeda regarding outstanding debts?

23  A.   April 2010, one moment.  I believe it was prior to that.

24  Q.   But at some point in -- do you remember exactly when?

25  A.   Specifically when what?

PRASAD - CROSS / SEILIE

1    Q.    When did you start getting on these calls with

2    Mr. Chamberlain and Mr. Tejeda regarding outstanding debts?

3    A.    There were various calls, some were scheduled with various

4    offices, some were individuals, some were with other people.

5    Q.    At what point in time did you start having calls with

6    Mr. Chamberlain and Mr. Tejeda about all of the receivables for

7    Autonomy's U.S. operations?

8    A.    I don't remember having specific calls just with those two

9    at that time frame.

10    Q.    Well, did you have calls with those two, and maybe others?

11          THE COURT:    When you talk about calls, are you talking

12    about telephone calls or are you talking about emails or what

13    are you talking about?

14    BY MR. SEILIE:

15    Q.    Well, I can link this back to your testimony.

16          So you testified that you had many calls where you updated

17    Mr. Chamberlain.

18    A.    That's correct.

19    Q.    Right.  And when did those start?

20    A.    I can't recall exactly when.  I can't recall when that

21    started.

22    Q.    Do you think it was before you became Director of

23    Collections for all of the Americas?

24    A.    I believe so.

25    Q.    Okay.  Now, as a result of your new position, you were

**PRASAD - CROSS / SEILIE**

 1   responsible for collecting from customers with whom you hadn't

 2   communicated before, right?

 3   **A.**   Can you repeat that?

 4   **Q.**   Now that you were in charge of Autonomy's U.S. operations

 5   writ large and not just Interwoven's, you became responsible

 6   for some customer accounts that you hadn't dealt with before,

 7   right?

 8   **A.**   That's correct.

 9   **Q.**   Other people throughout the Autonomy organization had been

10   handling these accounts before you took over as Director of

11   Collections for U.S.-based companies?

12   **A.**   Just to clarify, you're saying when I was director, but I

13   took on the -- assumed the responsibilities prior to being

14   promoted.

15   **Q.**   Okay.  But before you assumed those -- whenever it is you

16   assumed those responsibilities, and I understand you don't

17   recall --

18   **A.**   Okay.  I don't recall exactly the date.

19   **Q.**   Right.  Whenever you assumed those responsibilities, you

20   started dealing with customers you hadn't dealt with before,

21   correct?

22   **A.**   At some point.

23   **Q.**   And until the point whenever it was in 2010 or 2009 when

24   you assumed responsibility for these customers, you hadn't

25   communicated with these customers at all, correct?

PRASAD - CROSS / SEILIE

1   A.    Before I -- can you repeat that?  It's a little --

2          THE COURT:  Well, are you asking her before she

3   communicated with the customers had she communicated with the

4   customers?

5          MR. SEILIE:  I'm asking before she -- whenever it is

6   that she assumed responsibility for Americas collections --

7          THE WITNESS:  Okay.

8          MR. SEILIE:  -- did she communicate with these

9   customers.

10         THE COURT:  Before then?

11         MR. SEILIE:  Yes.

12         THE COURT:  Before you assumed responsibilities with

13  customers that were greater than the Interwoven customers, more

14  customers, had you communicated with them?

15         THE WITNESS:  It depends.  It depends because some of

16  our customers were the same customers.  Some of our -- they

17  overlapped.  So, yes, I had spoken with some of these

18  customers.

19  BY MR. SEILIE:

20  Q.    When you were working, looking only at Interwoven's

21  receivables, did you ever deal with Capax?

22  A.    I don't believe so.  I don't recall.

23  Q.    Did you ever deal with MicroTech?

24  A.    I don't remember.  I don't believe so.

25  Q.    Did you ever deal with DiscoverTech?

PRASAD - CROSS / SEILIE

1    **A.**    I don't remember.

2    **Q.**    Did Interwoven have receivables outstanding from

3    DiscoverTech before you assumed responsibilities?

4    **A.**    I can't be certain.  I don't remember.

5    **Q.**    It's over 15 years, about 15 years ago, right?  You're

6    having trouble remembering specifics?

7    **A.**    I don't remember that specific question, yeah.

8    **Q.**    Now, if we could take a look at -- well, actually, I want

9    to go back to something you testified about.

10    **A.**    Sure.

11    **Q.**    You testified repeatedly that with respect to some of

12    these reseller customers, like DiscoverTech, MicroTech and

13    Capax, Steven Chamberlain had called them hands-off accounts?

14    **A.**    I don't know if that's the exact word he used, hands-off,

15    don't chase, stop collections, basic --

16    **Q.**    So Mr. Chamberlain didn't use the word "hands-off," that

17    was something either you or the prosecutors came up with?

18    **A.**    I don't remember the exact phrase.

19    **Q.**    But Mr. Chamberlain would tell you in some situations not

20    to pursue a particular receivable; is that essentially what you

21    were trying to say?

22    **A.**    That's correct.

23         **MR. SEILIE:**  Now, let's look at Exhibit 864.  I

24    believe it's already in evidence.

25         **THE COURT:**  Exhibit 864.

PRASAD - CROSS / SEILIE

```
1              MR. SEILIE:  And in this email --

2              THE COURT:  Wait.  Wait.  Wait.  I'm just trying to

3    see whether it's in evidence.

4              THE CLERK:  Not yet.

5              THE COURT:  I don't think it is.

6              THE WITNESS:  I don't have it.

7              MR. SEILIE:  It's a Government exhibit.  I'd move it

8    in.

9              THE COURT:  Well, there are 23,000 Government

10   exhibits, so which -- however, the ones I care about are the

11   ones that are in evidence.

12        864 has not been.  Do you want it in evidence?

13             MR. SEILIE:  Yes.

14             THE COURT:  Okay.  864 admitted.

15             THE CLERK:  Thank you.

16             (Trial Exhibit 864 received in evidence.)

17   BY MR. SEILIE:

18   Q.   So this is an email on June 15th, 2010.  You're

19   communicating with Sushovan Hussain and Stouffer Egan about an

20   account, amounts owed by Discover Technologies.

21        Do you see that?

22   A.   Yes, we've seen this one.

23   Q.   So you're trying to collect the $1.7 million payment from

24   DiscoverTech, right?

25   A.   That's correct.
```

PRASAD - CROSS / SEILIE

1  Q.  And you escalate the issue to -- you're having trouble

2  collecting, right?

3  A.  Yes.

4  Q.  You ask Mr. Hussain and Mr. Egan to follow up, right?

5  A.  I'm just rereading it.  That's correct.

6  Q.  And you asked for some background information and for

7  advice on how hard we should be pressing them to pay up this

8  quarter; do you see that?

9  A.  Yes.

10  Q.  And the reason you asked that is because you understand

11  that there might be some sensitivities on the business end

12  about continuing to pursue collections for a customer, right?

13  A.  I didn't know what the sensitivities were.

14  Q.  You didn't know any of the context surrounding the sale

15  that resulted in the receivable, correct?

16  A.  Any of the context of the sale?  I would have had access

17  to the contract.

18  Q.  Okay.  But you didn't have the context surrounding any

19  discussions, correct?

20  A.  I -- I don't believe so.

21  Q.  You didn't --

22  A.  I don't remember the specifics of that.

23  Q.  You needed more information about the preexisting

24  relationship with the customer, correct?

25  A.  I, I was asking them for the background information that

PRASAD - CROSS / SEILIE

1    was going on.

2    **Q.**    And the reason you emailed Mr. Egan is because he was --

3    you understood that he was DiscoverTech's contact, right?

4    **A.**    You mean an Autonomy employee?

5    **Q.**    The Autonomy employee who was the main contact with

6    DiscoverTech.

7    **A.**    I did not know that.

8    **Q.**    But you understood that Mr. Hussain and Mr. Egan were the

9    ones who might have more information about the context of this

10   receivable that might help you strategize on collections,

11   right?

12   **A.**    For the background information, yes.

13   **Q.**    Now, you testified about another reseller called

14   MicroTech; do you recall that?

15   **A.**    Yes, I did.

16   **Q.**    You called it a hands-off account; do you remember saying

17   that?

18   **A.**    I did.

19   **Q.**    And you said that it was Steve Chamberlain who told you it

20   was a hands-off account; do you remember that?

21   **A.**    Yes.

22   **Q.**    It was actually somebody in the U.S. who told you that,

23   wasn't it?

24   **A.**    I don't recall that.

25          **MR. SEILIE:**    If we could pull up Exhibit 797.

PRASAD - CROSS / SEILIE

```
1              THE COURT:  Okay.  797 admitted.

2              MR. SEILIE:  I believe that is in evidence.

3              THE CLERK:  Yes, it is.

4              THE COURT:  Yes, 797 is in evidence.  Thank you.

5    BY MR. SEILIE:

6    Q.   And if we could zoom in on the line that starts "High Risk

7    Microtech."

8         Now, you say (As read) As mentioned, the Autonomy Inc.

9    team had indicated that this was a hands-off account.

10        Do you see that?

11   A.   Yes.

12   Q.   Now, do you understand that the Autonomy Inc. team is a

13   U.S.-based company and part of the U.S. group?

14   A.   I believe I might have miswrote that.

15   Q.   Okay.  So when you said Autonomy Inc. team, you actually

16   meant Steven Chamberlain?

17   A.   I meant the U.K. team.  I meant out of the U.K. office.

18   Q.   All right.  So you didn't understand that Autonomy Inc.

19   was a U.S.-based company when you wrote this?

20   A.   No, that's not what I'm saying.  I believe it was a

21   mistake in what I wrote, a typo or mistype.

22   Q.   You understood that Mr. Chamberlain did not work for

23   Autonomy Inc., correct?

24   A.   I don't know the answer to that.

25             MR. SEILIE:  If we could look at Exhibit 5862.  I
```

UNITED STATES COURT REPORTERS

 1  think that's on the Government's list, Your Honor.

 2          **THE COURT:**  5862 admitted.

 3          (Trial Exhibit 5862 received in evidence.)

 4          **MR. SEILIE:**  Again, can we show that, please?

 5      Let's start at the very end of this document.  Up a little

 6  bit.  One more page there's a paragraph that says -- that

 7  starts with "We are closing our quarter on 6/30."  There we go.

 8  And if we could look at the signature block preceding that

 9  email first, just to situate ourselves.

10  **BY MR. SEILIE:**

11  **Q.**   This is an email from you to Tomas Esterrich and John

12  Cronin involving MicroTech invoices; do you see that?

13  **A.**   I do.

14  **Q.**   It's dated June 24th, 2010, correct?

15  **A.**   Yes.

16  **Q.**   And this is after you expressed a belief that MicroTech

17  was a hands-off account, right?

18  **A.**   Yes.

19  **Q.**   Now, Mr. Cronin forwarded your email to Mr. Chamberlain.

20  I think you did go over this in your Direct?

21  **A.**   Yes, he did.

22  **Q.**   So we can do this quickly, just to resituate ourselves.

23  Mr. Chamberlain forwards the email and told you to let him

24  chase MicroTech; do you see that?

25  **A.**   Yes.

PRASAD - CROSS / SEILIE

1  Q.   So when you described the account as a hands-off account,
2  you didn't mean literally hands off by everybody, right?
3  A.   Hands off to myself or my team.
4  Q.   Exactly.  And somebody else was going to handle
5  communications with the client, correct, customer?
6  A.   That's what it says.  I mean, that's what is implied.
7  Q.   And you actually respond to this and say you understand
8  what he's doing, right?
9       If we could look at the next email?
10 A.   No, not that I understand what he's doing.
11 Q.   You understand his instruction to you?
12 A.   I under -- what I understood was that I would not be the
13 one, I should not collect on it.
14 Q.   And then you volunteer (As read) Should I hold off on
15 Capax as well?  They had 1.5 million by end of quarter, but we
16 have not received it.
17      Do you see that?
18 A.   Yes, I do.
19 Q.   Capax is another company that you described as a hands-off
20 account?
21 A.   Yes.
22 Q.   Okay.  So if we look at the response, Mr. Chamberlain
23 tells you "Chase Capax for all except Lilly and FSA" --
24 A.   That's correct.
25 Q.   -- correct?

PRASAD - CROSS / SEILIE

1    A.    Yes.

2    Q.    So he actually told you to continue chasing several Capax

3    accounts or receivables, correct?

4    A.    The direct invoices.

5    Q.    Right.  And he said just hold off on the two invoices

6    regarding -- relating to Lilly and FSA?

7    A.    That's correct.

8    Q.    Now, when he says "chase," he means you should feel free

9    to go ahead and contact the customer representatives directly,

10   right?

11   A.    I believe so.

12   Q.    He's not trying to keep you out of the loop and exclude

13   you from communicating with these customers, correct?

14   A.    In regards to specific invoices.

15   Q.    But he's fine with you talking to Capax representatives,

16   right?

17   A.    I believe so, yes.

18   Q.    He's just asking you to let other people deal with some of

19   their invoices?

20   A.    The problematic ones, yes.

21   Q.    And you had actually been doing exactly that, right?

22   A.    Doing exactly what?

23   Q.    You had only been focusing on the -- on the Capax accounts

24   except for Lilly and FSA, right?

25   A.    Initially, no, I was following up on all of them.

PRASAD - CROSS / SEILIE

1    Q.    Well, if we could look at the next email.  (As read)

2    Thanks, that is what I have been doing.  Will continue to

3    press.

4        So you had been already doing what Mr. Chamberlain told

5    you to do, which was chase Capax except for Lilly and FSA,

6    correct?

7    A.    He had told me that prior, so that's what I was saying

8    that I had been doing, and I was confirming that he wanted me

9    to continue not collecting on those reseller deals.

10   Q.    Now, on some occasions you would actually ask

11   Mr. Chamberlain to help you with collections with some of these

12   resellers, right?

13   A.    I believe so.

14        MR. SEILIE:  If we could look at Exhibit 9700.

15        THE COURT:  9700 admitted.

16        (Trial Exhibit 9700 received in evidence.)

17   BY MR. SEILIE:

18   Q.    If we could focus on the bottom email, Ms. Prasad.

19   A.    Yes.

20   Q.    It says -- you asked Mr. Chamberlain to help you get Capax

21   to pay some of its accounts?

22   A.    Yes, that's the day before.

23   Q.    You called -- tried to call John Baiocco at Capax.  Never

24   received a call back?

25   A.    From that call, correct.

PRASAD - CROSS / SEILIE

1   Q.   Right.   Are you aware that after this, if we could look at

2   the next email, after this Mr. Chamberlain forwards the email

3   to Stouffer Egan copying Sushovan Hussain and asks Mr. Egan to

4   help; do you see that?

5   A.   I do.

6   Q.   Do you know who Mr. Stouffer Egan is?

7   A.   He was a high level in sales, I believe.

8   Q.   Let's move on to the topic of MicroLink.

9        MR. SEILIE:   You can take that down Mr. Eltiste.

10  BY MR. SEILIE:

11  Q.   Now, you testified again or yesterday that you were told

12  not to pursue collections from MicroLink.   This was another of

13  what you called a hands-off account, right?

14  A.   MicroLink, not MicroTech?

15  Q.   Yes.

16  A.   MicroLink.   MicroLink, yes, that's correct.

17  Q.   Okay.   You said, I think your testimony was that it was

18  Mr. Chamberlain who told you to stop pursuing collections from

19  MicroLink; is that right?

20  A.   Yes, that's correct.

21        MR. SEILIE:   If we could pull up Exhibit 13078.   I'm

22  not sure if this was introduced yesterday.

23        THE COURT:   13078 admitted.

24        (Trial Exhibit 13078 received in evidence.)

25  \\\

PRASAD - CROSS / SEILIE

1   BY MR. SEILIE:

2   Q.   So if we could take a look at that first email, it was

3   actually Matt Stephan who told you to stop trying to collect

4   from MicroLink, correct?

5   A.   I don't see the email.

6   Q.   It's not in front of you?

7   A.   No, I have a blank screen.  Okay.  Now I see it.  One

8   moment, please.

9   Q.   Sure.

10          THE COURT:  It's in evidence.

11          THE CLERK:  Yes, it is.

12          THE WITNESS:  Can you repeat the question, please?

13   BY MR. SEILIE:

14   Q.   It was actually Matt Stephan who was the one who directly

15   communicated to you that you should not worry about collecting

16   from MicroLink, correct?

17   A.   I'm referring to a previous email, and I'm not sure what

18   email that is.

19   Q.   Okay.  We might be looking at it soon.

20   A.   Okay.

21   Q.   Did you have an understanding that at that point MicroLink

22   was part of Autonomy?

23   A.   At the time I don't know.

24          MR. SEILIE:  If we could pull up Exhibit 9701.

25          THE COURT:  9701 admitted.

PRASAD - CROSS / SEILIE

```
1              (Trial Exhibit 9701 received in evidence.)

2    BY MR. SEILIE:

3    Q.   And start with the first email in the document, which I

4    think is on the second page.

5    A.   Okay.

6    Q.   So this is an email -- yes, so this is an email sent by

7    you to Matt Stephan and Steve Chamberlain copying Mr. Tejeda,

8    correct?

9    A.   Yes, April 24th, yes.

10   Q.   You asked -- this is April 24th, and just to put a marker

11   on it, the previous email was sent in May 2010; do you remember

12   that?

13   A.   Sorry, I don't -- I believe you.

14   Q.   Okay.  We can go back to it if we need to.

15   A.   That's fine.

16   Q.   Now, here you're asking -- you received an attached AR

17   from MicroLink, right?

18   A.   Mm-hmm.

19   Q.   And you're asking Mr. Stephan and Mr. Chamberlain about

20   what you should do with it, right?

21   A.   I'm asking him specific questions.

22   Q.   Now, at this point, based on your first question, you were

23   aware that there was some kind of relationship between Autonomy

24   and MicroLink, correct?

25   A.   It looks like it.
```

PRASAD - CROSS / SEILIE

1    Q.   And then you make a suggestion about potentially doing an

2    offset and consolidating; do you see that, number 2?

3    A.   I do.  I'll just read it.  I see that.

4    Q.   Now, you were a little surprised that even though

5    MicroLink had a relationship with Autonomy, it was generating

6    an AR; is that the reason you sent this email?

7    A.   I don't remember.

8    Q.   Okay.  Well, if we look at the next email from Matt

9    Stephan, Mr. Stephan provides an explanation, and he says,

10   "MicroLink is a wholly-owned subsidiary of the group;" right?

11   A.   Yes.

12   Q.   And he says there's some complications because MicroLink

13   has high-level security clearances and is now being owned by a

14   U.K.-based parent; do you see that?

15   A.   I do.

16   Q.   And he says because of the clearances, they need to -- the

17   U.K. company needs to continue billing the subsidiary; do you

18   see that?

19   A.   Sorry, where does it say that?

20   Q.   (As read) To ensure we don't jeopardize the clearances, we

21   need to keep them at an arm's length, hence, we will continue

22   to bill them for the deals they close with end customers.

23        Do you see that?

24   A.   I do.

25   Q.   And then he says (As read) at the consolidated level, the

PRASAD - CROSS / SEILIE

1    AR and AP are moved to Intercompany, and they cancel each other
2    out, so you should also exclude them from your cash collection
3    forecasts.
4        Do you see that?
5    A.   I do.
6    Q.   So Mr. Stephan provided a full explanation of what was
7    going on with MicroLink in this email he sent on April 26th,
8    correct?
9    A.   I believe so, yes.
10   Q.   And just essentially he's saying that even though Autonomy
11   now owns MicroLink, there will still be some AR generated by
12   MicroLink; do you see that?
13   A.   I do.
14   Q.   But you shouldn't be trying to collect that AR because
15   it's just kind of there for an accounting reason, correct?
16   A.   I'm sorry, where does he -- he says don't collect?
17   Q.   It says, exclusion -- you should also exclude them from
18   your cash collection forecasts and performance tracking, et
19   cetera?
20   A.   But it doesn't say that I shouldn't collect.
21   Q.   Okay.  So you -- so when it says that you should exclude
22   them from your cash collection forecasts, that means you
23   shouldn't expect to receive any cash from that company,
24   correct, from that receivable?
25   A.   I believe so, but I'm not sure.

PRASAD - CROSS / SEILIE

1    Q.   Why don't you tell us, what's a cash collection forecast?

2    A.   A cash collection forecast would be what is expected to be

3    collected.  We had other cash forecasts internal against

4    internal goals and what I was measured on.

5    Q.   Okay.  But when you say -- so cash collection forecast is

6    an estimate of what cash you expect to collect?

7    A.   That's correct.

8    Q.   Matt Stephan is telling you don't expect to collect any

9    cash from this receivable or from MicroLink, correct?

10   A.   That's correct.

11   Q.   And he's saying AR and AP will be moved to an

12   inter-company account and knocked out on consolidation, right?

13   A.   I see that.

14   Q.   And Mr. Tejeda asks if the same should be done for DSO; do

15   you see that?

16   A.   I do not.  Yes, I see that.

17   Q.   And Matt Stephan said you should treat it all as

18   intercompany, correct?

19   A.   That's correct.

20   Q.   Now, let's look back at the very first email in this

21   document, the one you sent, because I want to put a pin in

22   something here.

23       So in the second suggestion, and you should read it

24   carefully, you asked:  "Does it make sense to offset, i.e. we

25   remove our AR and they remove their payables?"

PRASAD - CROSS / SEILIE

1    **A.**    That's correct.

2    **Q.**    What did you mean by that?

3    **A.**    If -- I'm not sure, but I believe if it was a wash of some

4    sort.

5    **Q.**    So in other words, you're suggesting some kind of

6    accounting activity that's designed to make sure that the AR

7    doesn't stay on Autonomy Inc.'s books; is that a fair

8    characterization of that?

9    **A.**    I believe so.

10   **Q.**    Okay.  So let's look at Exhibit 3312, which you went over

11   with the Government, and I believe is in evidence.

12       This email, I just -- let's start with the email at the

13   bottom of the first page.

14       So you went over this -- you weren't included on this, but

15   it was forwarded to you.  This was sent about -- this was sent

16   later, not about a month later but maybe a few weeks later; do

17   you see that?

18   **A.**    I see that.

19   **Q.**    Okay.  You went over this first email with the prosecutor

20   yesterday?

21   **A.**    Yes, that's correct.

22   **Q.**    And it was your testimony that this wiped out MicroLink's

23   existing AR to Autonomy, right?

24   **A.**    Say that again.  If it wiped out their existing AR?  Yes,

25   I believe so.

PRASAD - CROSS / SEILIE

1    Q.   Okay.  Now, in a later part of the email that the

2    prosecutor didn't show you, Ms. Harris actually details exactly

3    what she wants done, right?  If we look at the top of the next

4    page, the two ledger entries at the next page.

5        So the total entries that you will make will be to, and

6    then she spells out exactly what entries you will make, right?

7    A.   I did not make entries.

8    Q.   Sorry.  She spells out the entries that ought to be made

9    to whomever was responsible for making the entries?

10   A.   I believe so.  This wasn't addressed to me.

11   Q.   Right.  Do you know how to read accounting entries like

12   this, so you don't know what any of this means?

13   A.   I mean, debit and credit.

14   Q.   Okay.  So do you see that there's a credit to the AR for

15   Autonomy Inc.?

16   A.   That's what it looks like.

17   Q.   And then there's a debit for the same amount to the

18   intercompany account; do you see that?

19   A.   I see that.

20   Q.   So the AR is being removed from Autonomy Inc.'s books,

21   right?  But it's being moved to the inter-company account,

22   right?

23   A.   I believe so.

24   Q.   Right.  So the AR is just being moved to another account,

25   in this email or in those two ledger entries?

1    **A.**    I believe so.  I'm not confident.

2    **Q.**    Now, what they were essentially doing here was removing

3    the AR and removing the payables, right?  It's essentially the

4    offsetting action you had proposed in April?

5    **A.**    I believe so.  I proposed it in words that I'm seeing, but

6    this is not the portion that I would normally --

7    **Q.**    I understand.  And Matt Stephan also said that this is

8    what needed to be done back on April 24, correct?

9    **A.**    Yes, I believe so.

10    **Q.**    All right.  We can take that down.

11        Now, I'm going to go over the discussion of write-offs

12    that you had with Mr. Chamberlain in June and July 2010.  I

13    think you just discussed that this morning.

14    **A.**    Yes.

15    **Q.**    Now, one of the things you discussed with Mr. Chamberlain

16    was about write-offs and provisions; do you remember that?

17    **A.**    Yes.

18    **Q.**    And just for the jury, I'm going to clarify some

19    terminology here.  Now, a provision is an internal accounting

20    entry that basically balances out a receivable that you don't

21    think will be collected; is that a fair description?

22    **A.**    That we don't think will be collected or is high -- in my

23    world, if it's high risk or potentially problematic, yes.

24    **Q.**    I think you said uncollectible in your testimony, right?

25    **A.**    When I was referring to write-offs.

PRASAD - CROSS / SEILIE

1  Q.   Write-offs, okay.  So a provision is where you see there's

2  some risk and then you put in some kind of accounting term that

3  basically says we're probably not going to collect this debt?

4  A.   There is -- that's correct, we're reserving for.

5  Q.   So if a customer owes one million dollars, a provision of

6  the debt would show up as an accounting entry that says

7  negative one million, something like that?

8  A.   I'm not sure what the accounting entry would show.

9  Q.   Okay.  Internally, though, if somebody is looking at the

10  record and it shows a provision, it demonstrates that the

11  company doesn't expect to collect the debt?

12  A.   I'm not sure if that's entirely accurate.

13  Q.   You would only put in a provision if you think there's a

14  significant risk that the company can't collect the debt?

15  A.   I prefer that definition, the significant risk.

16  Q.   Okay.  Now, a write-off basically erases the receivable

17  completely, right?

18  A.   Yes, it basically does.

19  Q.   In the books if a customer owes one million and you decide

20  to write it off, that's gone from the books?

21  A.   In that scenario, yes.

22  Q.   Often a company would first treat a bad debt as a

23  provision and then write it off, right?

24  A.   Let me just think that through.  Depending on the timing,

25  if the provision was reserved for previously and knowledge that

PRASAD - CROSS / SEILIE

1    it wasn't totally uncollectible, then that could be the case.

2    Q.    And a provision has an impact on a company's profit and

3    loss, right?

4    A.    I'm not involved in that.  I was not involved in that

5    portion.

6    Q.    So you didn't understand what the accounting significance

7    was of a provision?

8    A.    I understood that there was an accounting significance,

9    and that it rolled into our financials, but I don't know the

10    specifics of how that's reflected.

11    Q.    Autonomy had a different approach to write-offs and

12    provisions than you were used to at Interwoven, right?

13    A.    Yes.

14    Q.    Interwoven, when you were working for Interwoven, the

15    company would write off unpaid receivables more aggressively?

16    A.    Compared to Autonomy.

17    Q.    Right.  And Autonomy was a little slower to approve

18    provisions and write-offs?

19    A.    Significantly slower.

20    Q.    Now, there's a considerable ambiguity in what constitutes

21    an uncollectible bad debt that needs to be written off, right?

22    A.    A certain level.

23    Q.    A consider, right, considerable ambiguity?

24    A.    There's ambiguity.

25    Q.    And you don't have any knowledge or training in IFRS

**PRASAD - CROSS / SEILIE**

1   accounting rules as to what constitutes a bad debt and when a

2   write-off must be taken, correct?

3   **A.**   Do I have training in that; is that what you asked?

4   **Q.**   Yes, you don't have any knowledge or training in IFRS

5   accounting rules as to what constitutes a bad debt and when a

6   write-off must be taken?

7   **A.**   I do not have formal training.

8   **Q.**   Now, two different companies could have two different ways

9   of dealing with old debts, right?

10  **A.**   Yes.

11  **Q.**   So, for example, one company might want to keep chasing a

12  customer who owes money for years and years and years, right?

13  **A.**   That's an option, yes.

14  **Q.**   And another might want to try for a year, give up, and

15  just write off the debt?

16  **A.**   Yes.

17  **Q.**   Nothing inherently wrong or illegal about either of those

18  approaches, right?

19  **A.**   According to the IFRS structure?

20  **Q.**   Well, you don't have any knowledge of why it would be

21  improper for one company to choose one approach to collections

22  versus another, right?

23  **A.**   My understanding is that once it's deemed uncollectible

24  and the value is -- I mean, it's not going to be collected, the

25  value is basically zero, and at that point or at some point

PRASAD - CROSS / SEILIE

1    after that it would be -- it should be written off.

2    Q.   Well, let's focus on what you just said, when it's deemed

3    uncollectible.  Now, a human being makes the judgment on

4    whether a debt is uncollectible, right?

5    A.   Yes.

6    Q.   There's no computer program that just decides?

7    A.   That's correct.

8    Q.   So there could be various circumstances that inform when

9    you decide that a debt is uncollectible?

10   A.   That's correct.

11        MR. SEILIE:  If we could look at Exhibit 923.

12   BY MR. SEILIE:

13   Q.   Now, this is the first email you send to Mr. Chamberlain

14   that results in the discussion of write-offs that we went over.

15        If we could start with the first email on June 22nd, 2010

16   at 11:23 p.m.  Now --

17   A.   One moment, I don't have it.

18   Q.   Mine is quicker than yours.

19   A.   That's okay, I have it now.

20   Q.   Here, you ask Mr. Chamberlain if he could speak with

21   Sushovan Hussain regarding the possibility of crediting/writing

22   off all invoices on the aging that are fully provided for or

23   have gone bankrupt/out of business.

24        Do you see that?

25   A.   Yes.

PRASAD - CROSS / SEILIE

1   Q.   So your initial recommendation to Mr. Chamberlain was:  I

2   want to write off some debts that are fully provided for, which

3   means it's already been deemed high risk, right?

4   A.   Can I clarify what this -- what I meant?

5   Q.   I'm asking you what "fully provided for" means.  It means

6   that the entire debt is high risk, right?

7   A.   If it's fully provided for and part of my write-off

8   recommendations.

9   Q.   Correct.  But this is what your -- what you say in this

10  email is that you want to credit or write off invoices that are

11  fully provided for or have gone bankrupt/out of business,

12  correct?

13  A.   That is what I wrote, and I was just explaining the

14  background.

15  Q.   Right.  So the two categories of debts that you proposed

16  writing off to Mr. Chamberlain were debts that were fully

17  provided for already at that point and companies that were

18  bankrupt or out of business?

19  A.   That's not what I meant.

20  Q.   But that's what you wrote?

21  A.   Those are the words that I wrote, but there was an

22  understanding of what I meant.

23  Q.   The prosecutor can go over your different understanding of

24  the words you wrote.

25       If we can look at the next document.  You follow up with

PRASAD - CROSS / SEILIE

1   Mr. Chamberlain again, here you say "crediting writing off some

2   of our most problematic, dead and bankrupt accounts;" do you

3   see that?

4   A.    Yes.

5   Q.    And then you say that if Mr. Chamberlain doesn't think

6   there should be a write-off or Mr. Hussain doesn't think there

7   should be a write-off, please confirm and we will carry these

8   accounts over to Q3, correct?

9   A.    Yes, that's what I said.  Yes, that's correct.

10  Q.    And Mr. Chamberlain's response, if we could go to the next

11  email, you went over this, he asks you for a summary, right?

12  A.    He asks me for a summary of what's already been written

13  off, yes.

14  Q.    Right.  He tells you that the write-off percentage is a

15  metric that Autonomy provides to the market?

16  A.    Mm-hmm.

17  Q.    That means that it was reviewed and audited by Autonomy's

18  auditors, right?

19  A.    That the measure was reviewed and audited?

20  Q.    Correct.

21  A.    I don't know that.

22          THE COURT:  Excuse me?

23          THE WITNESS:  I don't know that.

24          THE COURT:  You're saying this sentence means that

25  auditors have reviewed it?

PRASAD - CROSS / SEILIE

1    BY MR. SEILIE:

2    Q.   No, I'm saying the fact that it's provided to the market

3    means that auditors are reviewing it, correct?

4            THE COURT:  Well, wait a minute.

5            THE WITNESS:  I don't know that.

6            THE COURT:  Well, wait a minute.  Wait a minute.  Wait

7    a minute.  You're asking her because it says "this is a metric

8    we provide to market."  And you're saying that means that

9    auditors have actually reviewed that metric and allowed it to

10   go to the market; is that -- listen to me.

11           MR. SEILIE:  Yes, but I can withdraw it, Your Honor.

12           THE COURT:  Listen to me.  Is that your question?

13           MR. SEILIE:  Yes.

14           THE COURT:  All right.

15           MS. GREEN:  Objection.

16           THE COURT:  Sustained.

17           MR. SEILIE:  Okay.  We'll get back to that later when

18   it's --

19           THE COURT:  Well, I don't know whether we'll get back

20   to it or not.  Just ask your question.

21   BY MR. SEILIE:

22   Q.   Now, he's telling you here that it's important to exercise

23   some judgment over when a debt should be written off, right?

24   A.   He's -- you're saying he's telling me to exercise

25   judgment?

PRASAD - CROSS / SEILIE

1    Q.    Well, he's saying that in general some judgment needs to

2    be exercised and when to take a write-off, right?

3              MS. GREEN:    Objection, misstates the evidence in this

4    document.

5              THE COURT:    Sustained.

6    BY MR. SEILIE:

7    Q.    He's saying you need to do this gradually because the

8    metric is provided to the market?

9    A.    No, he's not saying I need to do it gradually.

10   Q.    He's saying we need to do this gradually?

11   A.    Correct.

12   Q.    Right.    And you're not aware of any IFRS accounting

13   requirements that require --

14             THE COURT:    She's not -- now, wait a minute.    Slow

15   down, because I don't want to be here all day.    I mean, I will

16   be here all day, we'll all be here all day, but not these types

17   of questions.

18        She has already testified she is not conversant with the

19   standards that you have alluded to, so I don't think you should

20   ask more questions about that unless some -- unless she says

21   something about the standards of accounting, so forth.    But

22   she's not the witness on that subject.    She's the person who

23   collects accounts payable.    That's what her job is.

24             THE WITNESS:    Thank you.

25   \\\

PRASAD - CROSS / SEILIE

1    BY MR. SEILIE:

2    Q.   Well, just on that point, you know, Mr. Chamberlain refers

3    to the write-off percentage being something provided to the

4    market.

5         Are you familiar with the DSO metric?

6    A.   Yes, I am.

7    Q.   What's the DSO metric?

8    A.   It's the Days Sales Outstanding.  I think I was asked that

9    yesterday also.  It measures how quickly customer -- on average

10   how quickly customers are paying their bills, their invoices.

11   Q.   Do you know whether that number is disclosed to the

12   market?

13   A.   I believe so, yes.

14   Q.   So you respond to Mr. Chamberlain and provide the

15   requested summary, correct?  If we move up.

16   A.   Yes, aging clean up, so that would be write-offs, and

17   provisions.

18        MR. SEILIE:  Now, if we could look at the attachment,

19   which is Exhibit 923-7.  And if we could look at the actual

20   Excel spreadsheet.  I guess we could just look at this and try

21   to do some math in our heads.

22   BY MR. SEILIE:

23   Q.   So the highlighted numbers at the bottom, those represent

24   the amounts being written off already for that quarter for each

25   of these entities, right?

PRASAD - CROSS / SEILIE

1   **A.**   I believe so, if that's what was attached, I believe so.

2   **Q.**   And if you add them up, you know, I think there's

3   another --

4   **A.**   150 or something.

5   **Q.**   -- there's an entry up there that's about 651,000.

6        Can we scroll up a little bit?

7        So if you take these numbers --

8   **A.**   Those three numbers --

9   **Q.**   You see the total there, just the total line at the

10  very --

11  **A.**   Oh, the total?

12  **Q.**   Yeah.  I want you only to look at the specifics this time.

13       So that's 651, and if you add that to the numbers that are

14  in the other one, it's about a million dollars in proposed

15  write-offs?

16  **A.**   I'm sorry, can you go back?  I didn't see that.

17  **Q.**   Sure.

18  **A.**   So you're saying the total here, yes, is 651.  And then

19  where did you see the million?

20  **Q.**   And then if you go to the next page and look at the other

21  totals for the other entities, the highlighted numbers --

22  **A.**   Autonomy --

23  **Q.**   I'm saying if you add 651 plus 263,000 plus 153,928 plus

24  27,189, that's about a million bucks?

25  **A.**   Oh, yes, what had already been written off with what was

 1   proposed.

 2            MR. SEILIE:  So if we could go to Exhibit 9659.

 3            THE COURT:  9659 admitted.

 4            MR. SEILIE:  Actually, we could just use 15399 for

 5   consistency.

 6            THE COURT:  Well, wait, wait, wait, you don't want

 7   this one?

 8            MR. SEILIE:  No, it's the same as the Government's

 9   exhibit.  I made a note here.

10            THE COURT:  Okay.  And which one is the Government's

11   exhibit?

12            MR. SEILIE:  15399, which has already been admitted.

13            THE COURT:  Great.  Okay.

14   BY MR. SEILIE:

15   Q.   All right.  If you can go to Mr. Chamberlain's email in

16   the first or in the bottom of the first page?

17   A.   Yes.

18   Q.   It says (As read) We can cope with about a further one

19   million this quarter on top of what has already gone through.

20   Suggest you propose something to me, and I can approve for

21   processing today.

22        Do you see that?

23   A.   I do.

24   Q.   That's his response.  So after reviewing your previous

25   summary, Mr. Chamberlain asks you to propose about a million

PRASAD - CROSS / SEILIE

1  dollars in further write-offs, right?

2  **A.**   He doesn't ask me to propose a million dollars.  He says

3  we can cope with a million dollars more.

4  **Q.**   He says you can cope, and then he asks you to propose

5  something?

6  **A.**   Sure, yes.

7  **Q.**   Did you think you could just ignore the first line, that

8  wasn't what he was asking you to do?

9  **A.**   No, he says "I suggest you propose something."  He's

10  giving me the limit and then asking me to propose what I think

11  should be written off.

12  **Q.**   Okay.  So you respond with a spreadsheet, if we could go

13  to the next email.

14      We can look -- you can look at this if you want, but you

15  attach -- you respond to Mr. Chamberlain with a spreadsheet

16  that includes your recommended write-offs and provisions,

17  correct?

18  **A.**   That's correct.

19  **Q.**   Now, if we could look at the spreadsheet and just the

20  summary page and zoom in to the summary.

21      Now, you recommend $35 million in proposed provisions,

22  right?

23  **A.**   Yes.

24  **Q.**   It's about -- and you also recommend 14 million or almost

25  15 million in write-offs?

PRASAD - CROSS / SEILIE

1    A.    That's correct.

2    Q.    Now, you say that the recommended write-offs are included

3    in the above provisions, right?

4    A.    Sorry, yes.

5    Q.    So that's about 20 million more in recommended provisions,

6    right?

7    A.    Yes.

8    Q.    And if we could go back to your email at 15399.  You don't

9    provide any explanation of why, despite Mr. Chamberlain's point

10   that they could take one million more, you're recommending

11   35 million?

12   A.    Yes.

13   Q.    There's no explanation in there about that difference,

14   right?

15   A.    That's -- that's correct.

16   Q.    And now, Mr. Chamberlain actually responds very quickly,

17   if we could look at Exhibit 9660.

18           THE COURT:  Has that been admitted?

19           MR. SEILIE:  It has not.

20           THE COURT:  9660 admitted.

21           (Trial Exhibit 9660 received in evidence.)

22   BY MR. SEILIE:

23   Q.    This is the same day as the previous email we were looking

24   at, July 1st?

25   A.    One moment.  One moment.

PRASAD - CROSS / SEILIE

1    Q.    Sorry.

2    A.    That's okay.  That's correct, that's the email chain.

3    Q.    Right.  And he responds and thanks you for it, right?

4    A.    Yes.

5    Q.    He says that you've done an amazing job on cash

6    collection?

7    A.    Yes.

8    Q.    You did a good job collecting payment, payments from

9    customers who owed money to Autonomy.  That's what that means,

10   right?

11   A.    Correct.

12   Q.    And he tells you that on provisions he will go -- he says,

13   if we could highlight (As read) As usual, we will walk through

14   the debtor's list with the auditors account by account and all

15   the other relevant factors, including the information provided

16   by Brent.  We get these balances independently confirmed by the

17   auditors each quarter and walk through the latest collection

18   evidence we have with them.

19        Do you see that?

20   A.    I see that.

21   Q.    He says (as read) We follow the auditors direction, and if

22   any provisions are required over and above those in the books,

23   they will be recorded or they will get recorded as a

24   consolidation adjustment and pushed down when Lisa completes

25   pushdown journals.

PRASAD - CROSS / SEILIE

1    Do you see that?

2  **A.**   I see that.

3  **Q.**   So Mr. Chamberlain at this point advised you that he was

4  going to go over outstanding customer accounts with the

5  auditors and follow their recommendations, correct?

6  **A.**   That's what he said.

7  **Q.**   And if we could highlight the sentence starting with

8  "write-off."

9    (As read) Write-off is a real last resort and effectively

10  eliminates our ability to pursue the debts through legal

11  avenues.

12    Do you see that?

13  **A.**   Yes.

14  **Q.**   He also tells you that write-offs don't affect profit and

15  loss statements, so their timing isn't really that important,

16  correct?

17  **A.**   Yes.

18  **Q.**   You had no reason to doubt the accuracy of anything

19  Mr. Chamberlain said in this email, right?

20  **A.**   With the -- first paragraph I was not involved with the

21  conversations with the auditors, so I can't be certain, and

22  then he's talking about the collection, latest collection

23  information, but he would need to have that from me.

24  **Q.**   Right.  So you weren't involved enough in the process to

25  know anything about the accuracy of what Mr. Chamberlain was

PRASAD - CROSS / SEILIE

1  saying in this email, correct?

2  **A.**   Say that again, please.

3  **Q.**   You weren't involved in discussions with the auditors?

4  **A.**   That's -- in these conversations with the auditors?

5  **Q.**   Correct.

6  **A.**   That's correct.

7  **Q.**   So you had no reason to doubt that Mr. Chamberlain was

8  going to go through these accounts with the auditors, correct?

9  **A.**   I didn't know either way.

10  **Q.**   Now, if we could go to Exhibit 9661.

11       **THE COURT:**   9661 admitted.

12       (Trial Exhibit 9661 received in evidence.)

13  **BY MR. SEILIE:**

14  **Q.**   If you -- now, I think you went over part of this with the

15  prosecutor, but let's look at the email from Mr. Chamberlain on

16  July 2nd.

17  **A.**   All right.

18  **Q.**   Which I think is a few pages down.  Yeah, "have had a

19  look."

20       This is a separate -- he basically responds separately to

21  the same email where you sent him your proposal, right?

22  **A.**   All right.

23  **Q.**   Do you see that?

24  **A.**   I see that.

25  **Q.**   He replies a second time in response to your write-off

**PRASAD - CROSS / SEILIE**

1    proposal?

2    A.    Yes.

3    Q.    This is a day later, right?

4    A.    Sorry, I'm not sure.  You mean afterwards?

5    Q.    After you sent him your write-off proposal.

6    A.    I believe so.

7    Q.    And he says -- he says he's had a look at the bad debt

8    provision recommendations.  And he asks you at the bottom (as

9    read) Can you let me have a summary by return of the new

10    information during Q2 that has led you to the conclusion for

11    your proposed additional provision.

12        Correct?

13    A.    Yes.

14    Q.    He's just asking you for more information to support the

15    provisions that you're recommending?

16    A.    He's specifically asking me for new information.

17    Q.    Because the -- and he's -- so he's asking you what new

18    information supports the provision, correct?

19    A.    Yes.

20    Q.    These are debts that had been reviewed sometimes in prior

21    quarters, right?

22    A.    Yes, definitely.

23    Q.    Right.  And they hadn't been provided for in those

24    previous quarters?

25    A.    That's true.

PRASAD - CROSS / SEILIE

1    Q.    So he's asking you what new information supports the

2    provisions in this quarter, correct?

3    A.    I -- I believe so, yes.

4    Q.    And looking at this email today, do you understand what

5    he's asking you to do?

6    A.    He's asking me to provide new information as to why I'm

7    proposing these provisions.

8    Q.    Now, if you look at your response that crosses the next

9    two pages, it says (As read) Steve, I can work on providing

10   more information to you regarding the proposed provision

11   recommendations.  Please let me know what specific type -- what

12   type of specific information you're looking for.

13   A.    Yes.

14   Q.    And his response is "all the details you have on each,"

15   correct?

16   A.    Yes.

17   Q.    So you asked Mr. Chamberlain what information he wanted

18   from you, and that's why he asked you for all of the details on

19   each, right?

20   A.    Yes.

21   Q.    Now, before you respond -- if we could look at the next

22   email in this document, before you respond to Mr. Chamberlain,

23   you actually ran it by Mr. Hogenson, right?

24   A.    Yeah, I'm just reading that.

25   Q.    Will you look at the top email?

PRASAD - CROSS / SEILIE

1   A.   Yeah, I don't think I read that before.  One moment.

2   Okay.

3   Q.   And you said that you added a column to the spreadsheet

4   that included comments to respond to Mr. Chamberlain, correct?

5   A.   Yes.

6   Q.   I think we saw -- we went through that or you went through

7   that spreadsheet earlier with the Government, right?

8   A.   Couple of items on it, yes.

9   Q.   Yes.  Now, you told Mr. Hogenson that you included

10  comments that were not overly detailed; do you see that?

11  A.   Yes.

12  Q.   So Mr. Chamberlain asks you to provide all the details you

13  have on each of your recommended provisions, you prepare a

14  spreadsheet, you send it to Brent Hogenson, and you say, "I

15  have not been -- I included comments that are not overly

16  detailed," correct?

17  A.   Mr. Chamberlain asked me for what new details I had.

18  Q.   And your response was you provided comments that were not

19  overly detailed, correct?

20  A.   That's my -- yeah, that's my comment.

21  Q.   If we could look at Exhibit 15401.

22       Now, this is -- you send Mr. Chamberlain the spreadsheet

23  that you just went over with Mr. Hogenson, right?

24  A.   I did, yes.

25  Q.   Now, if we could look at the spreadsheet again, and let's

1   look through the Autonomy tab.  So column P, let's situate

2   ourselves, are the comments for Steve, right?

3   **A.**   All right.

4   **Q.**   Now, these are debts owed to Autonomy itself, right,

5   Autonomy Inc.  Sorry.

6   **A.**   Uh...

7   **Q.**   If you look at the tabs at the bottom, there's Autonomy,

8   Interwoven, Zantaz, and eTalk?

9   **A.**   Yeah, these are owed to Autonomy specifically.

10  **Q.**   Okay.  If you look at a couple of these entries, so let's

11  look at Exhibit 9662.01, and look at row -- that's row 27, if

12  we look at column P?

13          **THE COURT:**  Is 9662 in evidence?

14          **MR. SEILIE:**  Oh, sorry.  This is the same document,

15  it's 15401, Your Honor.  I made an incorrect reference.

16  **BY MR. SEILIE:**

17  **Q.**   If we look at row 27, I don't know if there's any way to

18  blow that up, but it says (As read) Legal has not been able to

19  make much progress this quarter, customer withholding payment,

20  and it has been determined that they don't have a valid end

21  user.

22          That's the new information that you provided to

23  Mr. Chamberlain?

24  **A.**   I mean, it may have been the information he already had or

25  had been provided before.

PRASAD - CROSS / SEILIE

1    Q.   But in response to Mr. Chamberlain's request for new

2    information, this is what you provided?

3    A.   This is my attachment that I sent to him, but I'm not

4    saying that this is new information.

5    Q.   Understood.  But in response to his request for new

6    information in Q2 that supports your provisions, this is the

7    document that you sent him, correct?

8    A.   That's correct.

9    Q.   So this is the language you included in response to that

10   request by Mr. Chamberlain?

11   A.   Yes, but I just want to make sure.  It's not new

12   information.

13   Q.   Now, do you recall that in your original email your

14   request was -- what you wrote to Mr. Chamberlain was that you

15   wanted to take write-offs for companies that had gone bankrupt

16   or were out of business?

17   A.   I recall that.

18   Q.   You don't say here that Allotech was bankrupt or out of

19   business, correct?

20   A.   That's correct.

21   Q.   They were just refusing to pay, correct?

22   A.   I believe so.

23   Q.   And in another email Mr. Chamberlain had told you if you

24   write off the debt, Autonomy would no longer be able to pursue

25   legal avenues for collection, correct?

PRASAD - CROSS / SEILIE

 1    **A.**    That is correct, yes.

 2    **Q.**    Now, you would agree that there's often an uncertainty

 3    regarding whether collections efforts would be successful,

 4    right?

 5    **A.**    Yes.

 6    **Q.**    Some customers might, after repeated attempts, finally pay

 7    off a debt that they owe?

 8    **A.**    Possibly, yes.

 9    **Q.**    And with all that in mind in this case, you're

10    recommending taking a write-off of almost a million dollars

11    owed by a company that was neither bankrupt nor out of

12    business, correct?

13    **A.**    That's correct.

14    **Q.**    Okay.  So let's look at rows 100 to 103.

15         Now, this -- these are the items on Capax, and I want to

16    make a brief comparison here.  If we could -- I'm going to have

17    to juggle between two spreadsheets, but if we could look at the

18    spreadsheet attached to Exhibit 857, which is already in

19    evidence.

20         **THE COURT:**  Well, I think we're going to take our

21    recess here.

22         Ladies and Gentlemen of the Jury, we're going to be in

23    recess until 1:00 o'clock.

24         Remember the admonition given to you:  Don't discuss the

25    case, allow anyone to discuss it with you, form or express any

PRASAD - CROSS / SEILIE

```
 1   opinions.
 2       (Jurors exit courtroom.)
 3           (Proceedings were heard out of presence of the jury:)
 4       THE COURT:  Okay.  Let the record reflect the jurors
 5   have left.
 6       Approximately how much more do you have?
 7       MR. SEILIE:  Let me check.  Maybe half an hour, 45
 8   minutes, hopefully.
 9       THE COURT:  Okay.
10       MR. SEILIE:  Kind of depends on the witness, Your
11   Honor.
12       THE COURT:  Sure.  Do you have any?
13       MR. HEBERLIG:  I do.  I'm hoping about 15 minutes.
14       THE COURT:  Okay.  All right.  Thank you very much,
15   everybody.
16           (Luncheon recess was taken at 12:15 p.m.)
17   AFTERNOON SESSION                          1:02 p.m.
18           (Proceedings were heard in the presence of the
19       jury:)
20       THE COURT:  Please be seated.  Let the record reflect
21   all jurors are present, parties are present.  You may proceed.
22       MR. SEILI:  Thank you, Your Honor.
23   BY MR. SEILI:
24   Q.  Ms. Prasad, if we could take a quick look at Exhibit 857.
25   Do you recognize this email as the email you sent to
```

1    Mr. Hogenson in which you initially identified a problem in

2    high-risk accounts that you wanted to discuss with

3    Mr. Chamberlain?

4    **A.**    Yes.

5    **Q.**    Now, if we can take a look at the spreadsheet that's

6    attached, and if you look at the details.

7    **A.**    I'm sorry, what did you say?

8    **Q.**    If we could look at the details tab back to the Capax

9    items that you went over with the government.  Do you recall

10   going over those?

11   **A.**    A couple of items from here?  Yes.

12            **MR. SEILI:**    And if we could just take a quick look at

13   them.  Okay.  Could we go to page 4 of the PDF version of the

14   spreadsheet, please -- to speed this up -- and zoom in on the

15   Capax entries.

16   **BY MR. SEILI:**

17   **Q.**    And I think if we -- if we look at the five at the bottom,

18   there's an entry for Eli Lilly and Company.  Do you see that?

19   **A.**    Yes.

20   **Q.**    And I think -- and you -- I think you went over that with

21   the government, right?

22   **A.**    Yes.

23   **Q.**    Okay.  If we could jump back to exhibit -- I think it's

24   15401.  Now, do you remember that this is the spreadsheet with

25   the two -- that you sent to Mr. Chamberlain with the new

**PRASAD - CROSS / SEILIE**

1  information he was requesting to support the provision

2  recommendations you had?

3  **A.**   Yes.  I mentioned that it was not necessarily new

4  information that I was including there.

5  **Q.**   But it was the response to Mr. Chamberlain's request?

6  **A.**   It was -- the spreadsheet was sent to him in response to

7  his request, but the information was not new.

8  **Q.**   This is that spreadsheet, right?  The attachment to this

9  is that spreadsheet?

10  **A.**   The one you were scrolling through?

11  **Q.**   Yes.

12  **A.**   Yes, I believe so.

13  **Q.**   All right.  If we could look at the spreadsheet and go

14  back to the rows regarding Capax.

15      Now, there isn't an entry there for the Eli Lilly one --

16  right? -- among the four Capax Global items?

17  **A.**   I don't see it there.

18  **Q.**   Now, let's take a close look at these Capax entries.  If

19  we could look -- hopefully you and the jury can see, but row

20  F -- or sorry -- column F is the column that shows the due

21  dates for each of these invoices, correct?

22  **A.**   Yes, that's correct.

23  **Q.**   And, you know, this email was sent in June 2010 or this

24  spreadsheet was prepared in June 2010, maybe July?

25  **A.**   I think there was a date on the summary, perhaps, or --

1        **MR. SEILI:**  If we could peek back at the email just to

2   get the exact date of this.

3   **BY MR. SEILI:**

4   Q.   All right.  So July 4th, 2010, right?

5   A.   Okay.  And it says -- yes.  And it says provision 630, so

6   that was in June.

7   Q.   Okay.  So if we look back -- go back to that part of the

8   spreadsheet.  Now, if we look at the Capax items, there's 450

9   that was due on April 30th, right?

10  A.   Sorry, the Capax items -- yeah, 450,000.

11  Q.   Right.

12  A.   That's correct.

13  Q.   And then a little over a million that's due on March 30th,

14  2011?

15  A.   That's right.

16  Q.   That's the next year?

17  A.   Yes.

18  Q.   It's not due yet?

19  A.   Correct.

20  Q.   This is not an overdue invoice?

21  A.   That's correct.

22  Q.   If you look at the next one, this one is due in 2012, more

23  than a year?

24  A.   Yes, and the following year as well.

25  Q.   And it's for $1.5 million?

PRASAD - CROSS / SEILIE

1    **A.**    Yes.

2    **Q.**    And then the next one is for 2013?

3    **A.**    Yes.

4    **Q.**    Almost three years after this email?

5    **A.**    That's correct.

6    **Q.**    Not overdue?

7    **A.**    Correct.

8    **Q.**    And you recommend a full provision for each those items,

9    right?

10   **A.**    Can you scroll up?  What is the header -- I mean the title

11   of column N?

12   **Q.**    You can scroll up and look.

13   **A.**    Yes, that's correct.

14   **Q.**    So you recommend a full provision of that debt on June

15   30th, 2010, some of which are for invoices that aren't due for

16   over two years, correct?

17   **A.**    Yes.

18   **Q.**    Now, if we could look at row 179 to look at some more of

19   the comments that you've provided to Mr. Chamberlain.  Now,

20   that comment if we could look -- I think one way to do this

21   might be to click there and look at the top where you could see

22   the full comment.

23       Now, this one's -- the reason you provide is that there

24   are negotiations, emails between legal departments.  Neil said

25   that they were talking to Mike Mooney and Joel, need more

PRASAD - CROSS / SEILIE

1   information, they don't have an order.  Do you see that?

2   **A.**   I see that.

3   **Q.**   So there are negotiations ongoing, correct?

4   **A.**   I don't know how old that comment is.

5   **Q.**   Sorry, I didn't catch that.  What did you say?

6   **A.**   I'm sorry.  I don't know how old that comment is, the

7   status.  I don't know from what time period that status was

8   received.

9   **Q.**   That -- that comment is one that you put in column P,

10  which is the column where you respond to Mr. Chamberlain,

11  right?

12  **A.**   It is, but I also said that that wasn't necessarily new

13  comments.

14  **Q.**   I understand, but this is the column where you put your

15  responses to Mr. Chamberlain, correct?

16  **A.**   That's correct.

17  **Q.**   Okay.  So your response to Mr. Chamberlain when he asks

18  you for more information is that there are negotiations ongoing

19  between the legal teams of these companies, right?

20  **A.**   Neil said they're talking -- yes.  That's what I wrote.

21  Yes, that's correct.

22  **Q.**   And you also say you need more information, correct?

23  **A.**   Let me just see.  I said I need more information referring

24  to from the internal people.

25  **Q.**   And based on the information you don't have and the

PRASAD - CROSS / SEILIE

1   ongoing negotiations, you recommend a full provision of

2   $275,000, correct?

3   **A.**   That is what I'm including on this spreadsheet, yes.

4   **Q.**   Let's look at another example.  If you look at row 324.

5   So in this one you say that the reason you believe this

6   should -- a new provision should be added -- and actually, in

7   this one you recommend both a provision and a write-off,

8   correct?

9   **A.**   If column -- I believe so if column N and O --

10  **Q.**   Well, let's make sure we have it right.  So column N you

11  agreed when it said you were recommending a new provision?

12  **A.**   Column N?

13  **Q.**   Yes.

14  **A.**   Yeah, okay.

15       **MR. SEILI:**  And if we could scroll up to column O, the

16  heading.

17       **THE WITNESS:**  That's correct.

18  **BY MR. SEILI:**

19  **Q.**   So you were recommending both to provide and then

20  immediately write off this debt, correct?

21  **A.**   That was not my intention.  My recommendation -- what I

22  was requesting was a write-off.

23  **Q.**   That's what you wrote down here. You said you want a new

24  provision as of June 30th and a new write-off as of June 30th,

25  correct?

PRASAD - CROSS / SEILIE

 1   **A.**   I'm sorry, where do you see that?  You're just saying

 2   because it's in the columns -- in the --

 3   **Q.**   Correct.

 4   **A.**   I believe I was requesting a write-off, if it's not

 5   written off, to reserve for.

 6   **Q.**   And the reason you provide is you have not received an

 7   order from the customer, no software delivered to any end user

 8   yet.  Do you see that?

 9   **A.**   Yes, I do.

10   **Q.**   Now, you actually received a customer confirmation letter

11   from this customer later that month, didn't you; Informese?

12   **A.**   What do you mean by customer confirmation letter?

13   **Q.**   Well, let's take a look.  So if we could go to

14   Exhibit 9663.

15            **THE COURT:**  I'm sorry, what is it?

16            **MR. SEILI:**  9663.  Sorry.  This isn't in yet.

17            **THE COURT:**  9?

18            **MR. SEILI:**  9663.  Sorry.

19            **THE COURT:**  9663.  Admitted.

20            (Trial Exhibit 9663 received in evidence)

21   BY MR. SEILI:

22   **Q.**   If we go down to the bottom of the email now -- oh, one

23   more -- I think it's on the next page.

24   **A.**   Okay.

25   **Q.**   So it said you received a signed confirmation letter from

**UNITED STATES COURT REPORTERS**

PRASAD - CROSS / SEILIE

1  Informese.  That's the customer that we were just talking

2  about?

3  **A.**  I'm sorry, where does it say Informese.

4  **Q.**  In the email from Mr. Rothman to you.

5  **A.**  Requested auditing letter?  Oh.  Above that.  Sorry.  I

6  apologize.  Yes, I see that.

7  **Q.**  Okay.  And then you pass it on to Mr. Chamberlain,

8  correct?

9  **A.**  Yes, I believe so.  Yes, I see that.

10  **Q.**  And you said you also forwarded it to Matt Stephan?

11  **A.**  I did.  He originally requested the letters.

12  **Q.**  Now, if you look at the next email from Mr. Chamberlain,

13  he says, "We do not filter any of these.  They go to auditors

14  in state they have come in unless the customer has clearly made

15  a mistake.  In this case they acknowledged the debt and

16  mistakenly think they have the right to withhold payment until

17  their customer has accepted.  This is not part of our terms

18  with them."  Do you see that?

19  **A.**  I see that.

20  **Q.**  And if we look at the next email from Mr. Rothman.

21      Do you know who Neil is in this context?

22  **A.**  I'm sorry.  I'm -- I'm blanking right now.  I'm sorry, I

23  don't.

24  **Q.**  Is it possibly somebody involved -- you had like some sort

25  of sales relationship?

PRASAD - CROSS / SEILIE

1   **A.**   That's what I -- I believe he's in sales.

2   **Q.**   And Mr. Rothman tells Mr. Chamberlain, "Neil confirmed

3   that he did not reach any agreement with Informese related to

4   the qualifier they inserted in the confirmation letter.  This

5   caught both him and me by surprise and was not discussed by

6   either of us with Informese."  Do you see that?

7   **A.**   I see that.

8   **Q.**   And then the final email from Mr. Chamberlain, "I actually

9   thought the qualifier was helpful.  It acknowledged the debt

10  and also highlighted their ignorance to the terms of their

11  reseller agreement with us.  We should take this opportunity to

12  remind them of their obligations to pay, that they are

13  independent of them getting paid by their Chilean customer, and

14  that we expect to be paid."  Do you see that?

15  **A.**   Yes.  That's what I had done.

16  **Q.**   And then he said, "Happy to discuss payment terms but

17  great opportunity to get this dialogue moving," correct?

18  **A.**   Yes.

19         **MR. SEILI:**  If we could go back to the spreadsheet,

20  15401.  I think it was row 324.

21  **BY MR. SEILI:**

22  **Q.**   So a couple days after you sent this out, you actually

23  receive a confirmation that acknowledges the debt by that

24  customer, correct?

25  **A.**   I believe so, yes.

PRASAD - CROSS / SEILIE

1    Q.    If a write-off -- if Autonomy had accepted your write-off

2    recommendation, they would have stopped chasing that customer

3    completely, correct?

4    A.    That's correct, yes.  And so if a write-off wasn't issued,

5    I was asking for a reserve.

6    Q.    So if we look at row 356.  Now, there are several rows

7    here of a debt owed by a company called Integracion

8    de Negocios.  I'm sure I've butchered that.  Do you see -- I

9    want to focus on the first row.

10   A.    Okay.

11   Q.    But do you see that in your explanation to Mr. Chamberlain

12   it says, "Legal working on payment plan and response to

13   partner."  Do you see that?

14   A.    Yes.  That's an old update.

15   Q.    And this is an invoice of 15,000?

16   A.    Yes.

17   Q.    You recommend writing -- or sorry.  You recommend

18   providing against the full 15,000, correct?

19   A.    Yes, I do.

20   Q.    And you're basically -- you basically want to tell --

21   you're saying it's probable that Autonomy is unlikely to

22   collect a single dollar off of this debt, right?

23   A.    I'm sorry, can you repeat what row N is, or column N?

24   Q.    I will represent to you that row N is the -- is the

25   provision.

1    **A.**    Correct.  I think you said that -- is that what you said?

2    Can you repeat the question?

3    **Q.**    So your recommendation is to provide against the full

4    amount of the invoice in this particular row, right?

5    **A.**    Yes, to reserve, not write off, correct.

6    **Q.**    And then immediately below the next row for the same

7    customer, Intergracion it says "See above."  You're basically

8    saying same reason?

9    **A.**    I am.

10    **Q.**    And the reason you've provided is legal is working on a

11    payment plan in a response to the partner, correct?

12    **A.**    Repeat the question.

13    **Q.**    The reason that you're providing to Mr. Chamberlain in his

14    request for more information is that legal is working on a

15    payment plan in a response to partner, correct?

16    **A.**    No.

17    **Q.**    That's the information you provided, though -- right? --

18    if you go back to row 356?

19    **A.**    But you're saying that's the reason I'm recommending the

20    provision, the only reason.

21    **Q.**    I'm not saying that.

22    **A.**    Oh.

23    **Q.**    I'm saying that's the information you provided to

24    Mr. Chamberlain in his request that you provide information in

25    support.

PRASAD - CROSS / SEILIE

 1  **A.**    You're correct, yes.

 2  **Q.**    Okay.  And then you say "See above," that means you have

 3  the same reason for that invoice, right?

 4  **A.**    That's correct.

 5  **Q.**    Now, if you go through -- I think it is row -- well, let's

 6  take a look at row 366 if you scroll down.

 7        Now, this is a $1.7 million invoice, same point that you

 8  made before, there was -- legal is working on a payment plan,

 9  and you've recommended a full provision for this amount,

10  correct?

11  **A.**    That's correct.  Would you mind letting me see the

12  comments in column J?  I mean if you could just click on

13  what's -- yes, please.

14  **Q.**    Well, that's -- that's the information -- if we could

15  scroll -- actually, let's just go through that.  If we could

16  look at the heading for column J, it says "Updates."  So you

17  would provide some updates in that spreadsheet, right?

18  **A.**    That's correct.

19  **Q.**    But in response to Mr. Chamberlain's request for new

20  information, you added this column, column P, and that's the

21  information you provided to him --

22  **A.**    That's correct.

23  **Q.**    -- in response to his request for more information?

24  **A.**    That's correct.

25  **Q.**    Now, if we could highlight 33 or, sorry, 337N through

1    378N, and if you look through this, I'll represent that they

2    all reflect Intergracion, and they all say "See above" in

3    column P, right?

4    A.    That's correct.

5    Q.    Same customer, correct?

6    A.    That's correct.

7    Q.    And I think one column might have been added there, but --

8    at the top.  I think it might need to be 338N.  I just want to

9    make sure I get this right.  Yeah.  So if you start on 356 I

10   guess, yes, 356 through 378.

11        All right.  Now, this is Microsoft Excel.  I'm asking you

12   to look down at the bottom right corner.

13   A.    Uh-huh.

14   Q.    The count of the invoices you're proposing to write off is

15   23, right?

16   A.    That's correct --

17   Q.    This --

18   A.    -- no.  Apologies.  Is that the write-off column?  You

19   just said "write-off."

20   Q.    No, sorry.  The provision column.  You proposed 23 new

21   provisions related to this --

22   A.    I proposed the provisions to reserve for it, correct, not

23   write off.

24   Q.    And the total amount that would be -- that you were asking

25   to provide for is 6.2 million or so?

PRASAD - CROSS / SEILIE

 1    **A.**    Yes.

 2    **Q.**    And all of this is for a customer for whom legal is

 3    working on a payment plan, correct?

 4    **A.**    At this time I don't know if they were working on a

 5    payment plan.

 6    **Q.**    That was the information you provided to Mr. Chamberlain

 7    after he asked you for information, correct?

 8    **A.**    The spreadsheet was, but I did not say at what point that

 9    was.

10    **Q.**    That's what you wrote down on the spreadsheet was that

11    legal was working --

12         **THE COURT:**    Let -- slowly.

13    **BY MR. SEILI:**

14    **Q.**    Now let's look at Exhibit 3297.

15         Now, Mr. Chamberlain responds -- and I think you went over

16    this with the government.    I want to look carefully at your

17    responses.    So I don't think we went over this item, but for AS

18    Computadoras, he asked you to send an email from customer

19    stating they will not pay, "Not aware of this."    Do you see

20    that?

21    **A.**    I see that.

22    **Q.**    And the reason he said that is because you had told him

23    there was an email from the customer saying that they wouldn't

24    pay, right?

25    **A.**    I'm sorry, did we go over that?

PRASAD - CROSS / SEILIE

1    Q.   I don't think we did, so let's take a look at 15401, it's

2    the spreadsheet.

3    A.   This was years ago.

4    Q.   I understand.

5    A.   Yeah.  I can't remember what that is.

6         MR. SEILI:  If we could look for the row on AS

7    Computadoras.  It's going to be towards the top.  I believe C

8    is in roughly alphabetical order.

9         THE WITNESS:  Oh, I'm sorry.  I thought you were going

10   to show me the email.

11   BY MR. SEILI:

12   Q.   No.  I'm going to show you what you told Mr. Chamberlain.

13   A.   Okay.

14   Q.   Okay.  So if we look at AS Computadoras in column P --

15   A.   Yes.

16   Q.   -- you told Mr. Chamberlain "Partner sent email stating

17   they will not pay."  Do you see that?

18   A.   I do.

19   Q.   And you wrote that?  That was the reason you provided

20   Mr. Chamberlain for that particular provision?

21   A.   Yes, I believe so.  I mean, that's included on this

22   spreadsheet, yes.

23   Q.   And you're the one who included these items on the

24   spreadsheet, right?

25   A.   Either I included them or I reviewed them.

PRASAD - CROSS / SEILIE

1  Q.   So if we go back to 3297, Mr. Chamberlain is just asking

2  you to send the email that you've cited as support for the new

3  provision, correct?

4  A.   Yes.

5  Q.   And he reminds you -- on Capax he asks you for some more

6  information to suggest there's no end user and that you've

7  proposed a full provision when payments are not yet due.  Do

8  you see that?

9  A.   Yes, I see that.

10 Q.   And that's accurate -- right? -- the payments were not yet

11 due?

12 A.   I'd have to look at -- were all of them not yet due?

13 Q.   I think one of them -- 450 was due and about 4.5 million

14 was not due, correct?

15 A.   Yes, so there was some that were past due at this point.

16 Q.   But you proposed a full provision for everything,

17 including the amounts that were not yet due even for two and a

18 half years, correct?

19 A.   That's correct.

20 Q.   For digital data -- I think we went over this one.  It

21 says you need more data -- I think you used the word

22 "information," but he's asking you for that information, right?

23 A.   And I meant I need more information from the executive

24 team.

25 Q.   Right.  But he's asking -- he's saying you've proposed a

PRASAD - CROSS / SEILIE

1  provision without getting the additional information, correct?

2  A.   Additional information, correct.

3  Q.   Intergracion, which we went over the spreadsheet for, you

4  know, you saw that you said legal was working on a payment

5  plan, right?

6  A.   Yes.

7  Q.   So Mr. Chamberlain said let's follow up with legal, right?

8  A.   Yes, which had been done.

9  Q.   And then he tells you -- I think this is the second time

10 he mentions it to you -- "As previously noted, we will work

11 through these with the auditors."  Do you see that?

12 A.   I do.

13 Q.   Nowhere in here does he tell you or get mad at you for

14 sending that spreadsheet to him, right?

15 A.   No.

16 Q.   Now, if we go to Exhibit 15404, you responded -- you

17 respond to Mr. Chamberlain.  I think -- I believe you -- this

18 is already in evidence.  Let's look at the AS -- your

19 explanation of the AS Computadoras provision.

20 A.   Okay.

21 Q.   Now, just to resituate everybody --

22 A.   Okay.

23 Q.   -- this is the one where you said there was an email from

24 an executive saying they would not pay.  Do you remember that?

25 A.   I do remember that.

PRASAD - CROSS / SEILIE

1    Q.    And Mr. Chamberlain asks you where is the email?

2    A.    Yes.

3    Q.    And you say, "We do not have an actual email response from

4    the customer, but Antonio has called this customer on multiple

5    occasions.  They are avoiding speaking with him regarding

6    payment," correct?

7    A.    That's correct.

8    Q.    So you admitted that you didn't have the email that you

9    said you did in the initial spreadsheet that you sent to

10   Mr. Chamberlain?

11   A.    I made a mistake, yes.

12   Q.    Yes.

13   A.    And that's what I'm saying.

14   Q.    If you look at the next line about Capax -- I think we

15   looked at this earlier, but you had a previous conversation

16   with Mr. Chamberlain asking you to refrain from contacting

17   Capax in regard to Eli Lilly and FSA, correct?

18   A.    Yes.

19   Q.    Now, in that email we went over, he didn't tell you to

20   write off $4.5 million or, sorry, provide against $4.5 million

21   in outstanding invoices for Capax, right?

22   A.    Who?

23   Q.    Mr. Chamberlain.

24   A.    Did Mr. Chamberlain ask me to reserve $4.5 million?

25   Q.    Yeah.  He did not ask you to do that?

PRASAD - CROSS / SEILIE

1   A.   I don't do the reserves --

2   Q.   Right.

3   A.   -- so correct.

4   Q.   But you recommended a reserve?

5   A.   What's that?

6   Q.   You recommended a reserve in this case?

7   A.   I recommended what -- I made the recommendations, correct.

8   Q.   And according to this email, that was based entirely on

9   Mr. Chamberlain's instruction that you stop chasing that

10  particular invoice?

11  A.   For -- sorry, for the FSA --

12  Q.   Correct.

13  A.   -- deal?

14  Q.   That's what you wrote here.

15  A.   No.

16  Q.   You wrote here that "My entire understanding was that

17  the -- sorry.   "Towards the end of June, you asked me to

18  refrain from contacting Capax in regards to Eli Lilly and FSA."

19  A.   Yes.

20  Q.   "My understanding was that the entire FSA deal was at

21  risk, so that is why my recommendation was for all components

22  and not just the invoice that was due."

23  A.   But the statement before my recommendation was based off

24  of because it wasn't a done deal.

25  Q.   Done deal.

PRASAD - CROSS / SEILIE

 1          But the recommendation to provide for the future -- the

 2     invoices that weren't due was because Mr. Chamberlain had

 3     apparently told you not to chase that down; is that correct?

 4     **A.**   No, that's not correct.  No, that's not correct.

 5     **Q.**   Mr. Baiocco's just told you that this was not a done deal,

 6     correct --

 7     **A.**   And he would not be paying.

 8     **Q.**   -- those were his words?

 9               (Reporter seeks clarification.)

10     **Q.**   Mr. Baiocco's words to you were "This was not a done

11     deal"?  That's what you wrote down here.

12     **A.**   Correct.

13     **Q.**   He didn't say anything else; he said this was not a done

14     deal?

15     **A.**   No, that's not all he said.

16     **Q.**   Okay.  What you wrote to Mr. Chamberlain was that "John

17     Baiocco had stated via phone that this was not a done deal,

18     therefore I have coded this as a high-risk account."  That's

19     the information you provided to Mr. Chamberlain in response to

20     his request for explanations for your recommendations, correct?

21     **A.**   That was what I provided.  That is partly -- that's a

22     statement that I said that he said it's not a done deal, but

23     there was more to the conversation.

24     **Q.**   Okay.  But you didn't tell Mr. Chamberlain any of that

25     additional information in this explanation, correct?

PRASAD - CROSS / SEILIE

1    A.    In this explanation, no, but he was aware.

2    Q.    You did not write that down, his explanation -- in

3    response to his explanation for new information that supported

4    your provision recommendation, correct?

5    A.    I feel like that's -- could you repeat all components of

6    that question?

7    Q.    You did not write that additional information from

8    Mr. Baiocco in this email, correct?

9    A.    Which additional information, the one I'm saying that I'm

10   referring to --

11   Q.    Correct.

12   A.    -- from the phone conversation?

13   Q.    Yeah.  Beyond what you wrote here.  It's a simple

14   question.

15   A.    That's correct.  In this email I'm not outlining the

16   entire conversation I had with the executive.

17   Q.    All right.  And if we can look at the next explanation for

18   Intergracion.

19        Now, you say you're working with legal and sales on an

20   ongoing basis in regards to this account, correct?

21   A.    That's correct.

22   Q.    And they said they were going to push for prompt 50K

23   payment?

24   A.    Yes.  They were going to try to press for a 50K payment.

25   Q.    And so you had this conversation -- and just to place this

PRASAD - CROSS / SEILIE

1  in time -- it says you spoke with both of them today and

2  understand that they are going to press them for a prompt 50K

3  payment at this time, right?

4  A.  Yes.

5  Q.  So you talked to legal and sales on the day you sent this

6  response to Mr. Chamberlain, correct?

7  A.  I'm assuming so.  I don't recall those conversations, but

8  that's what I wrote.

9  Q.  So you didn't have that conversation with legal and sales

10 before you recommended the full provision of the -- of all of

11 the amounts for Intergracion, correct?

12 A.  I had multiple conversations, so yes, I had conversations

13 with both of those groups before this.

14 Q.  But you didn't press them, and you didn't have this

15 discussion about asking for a 50 -- this was new information to

16 you that they were going to press for a prompt 50K payment?

17 A.  I'm sure we pressed for a prompt payment.  I don't know if

18 it was 50K previously.

19 Q.  And if we could go down to Digital Data.  Here you

20 explain -- now you admit that the customer actually proposed a

21 payment plan in this, right?

22 A.  Give me one moment, please.

23 Q.  Highlight the sentence starting with "Neil left me a

24 voicemail today."

25 A.  I see.  Yes.  Sales had informed me that they were

PRASAD - CROSS / SEILIE

1    offering a payment plan.

2    **Q.**    And Autonomy had rejected this plan initially, right?

3    **A.**    Yes.

4    **Q.**    And yet, even though there was an ongoing negotiation

5    where the customer had offered a payment plan --

6    **A.**    Of course, yes.

7    **Q.**    -- you were proposing a full provision, correct?

8    **A.**    Yes, I was.

9    **Q.**    Now, you said after this email exchange Mr. Chamberlain

10   went radio silent?

11   **A.**    After this email chain?  No, that's not what I said.

12   **Q.**    Was it before?

13   **A.**    It was before.

14   **Q.**    Was it in the beginning of July --

15   **A.**    Yes.

16   **Q.**    -- roughly?

17        Now, June 30th, 2010, that was the end of the quarter,

18   right?

19   **A.**    And I believe I had correspondence with him then.

20   **Q.**    Right.  And roughly a couple -- are you aware that roughly

21   a couple days after the end of the quarter, Deloitte's auditors

22   come in and start reviewing Autonomy's financial statements?

23   **A.**    I do.

24   **Q.**    So at that point around, you know, a couple of days after

25   the end of June -- and you understood Mr. Chamberlain was

PRASAD - CROSS / SEILIE

1    working on -- on communicating with Autonomy's auditors,

2    correct?

3    **A.**    Sorry.  Am I able to correct what I said?  I believe so,

4    but I don't know when the auditors are on site.

5    **Q.**    Sure.

6    **A.**    No.

7    **Q.**    But that's the end of -- that's a couple days after the

8    end of the quarter -- right? -- when he went radio silent?

9    **A.**    I assume that it would be around that timeframe, but I was

10   not -- you asked me something specific.  I did not know that.

11   **Q.**    Now, let's -- we've gone through this long exchange, and I

12   want to briefly go over, you know, you testified that you

13   wanted -- well, strike that.

14          You proposed writing off some debts from bankrupt

15   companies and companies that were out of business, correct?  Do

16   you remember that first email you sent?

17   **A.**    I remember the email I sent, yes.

18   **Q.**    And Mr. Chamberlain responded to you and asked you for how

19   much had already been provided or written off that quarter,

20   correct?

21   **A.**    I don't know.  Was that only in regards to bankrupt and

22   out-of-business customers?  Is that what you're saying?

23   **Q.**    In response -- in response to your query about writing off

24   more debts --

25   **A.**    Correct.

PRASAD - CROSS / SEILIE

1  **Q.**  -- Mr. Chamberlain asked you for information about --

2  **A.**  That's correct.

3  **Q.**  -- how much had already been written off?

4  **A.**  That's correct.

5  **Q.**  He then says we can deal with 1 million more dollars in

6  writeoffs, correct?

7  **A.**  That's correct.

8  **Q.**  In response you propose $35 million in writeoffs, correct?

9  **A.**  Was that writeoffs or provisions?

10  **Q.**  Provisions and writeoffs --

11  **A.**  Yeah --

12  **Q.**  -- was 35 million.

13  **A.**  -- 35 million was not writeoffs.  You asked me just now if

14  it was writeoffs, I believe.

15  **Q.**  There was 35 million in provisions and writeoffs, correct?

16  We can look at the document.

17  **A.**  No, no, no.

18       **MS. GREEN:**  Objection, compound question.

19       **THE WITNESS:**  The writeoffs, I believe, were about 15

20  million or something like that.

21  **BY MR. SEILI:**

22  **Q.**  Now, let's take a look at Exhibit 9659 or, sorry, 15399,

23  the spreadsheet, the summary.  I'll represent that this is the

24  initial proposal that you sent Mr. Chamberlain.

25  **A.**  Uh-huh.

PRASAD - CROSS / SEILIE

1  Q.   The summary, if we could look at the summary tab.

2  A.   Yes.

3  Q.   Okay.  So total recommended provisions is 35 million and

4  it says that the -- although there's a separate write-off block

5  there it says that those writeoffs are included in the above

6  provisions, correct?

7  A.   That's correct.  I think --

8  Q.   So in total there was -- you were recommending 35 million

9  in some combination of provisions and writeoffs, correct?

10 A.   That is correct.

11 Q.   And you proposed some provisions for millions of dollars

12 in invoices that weren't due for years, right?

13 A.   That's correct.

14 Q.   You proposed provisions for millions of dollars in debts

15 where you knew the legal teams were negotiating a payment plan,

16 correct?

17 A.   I don't know if they were in -- currently.  I don't know

18 if that was a current status.  I can't remember.  But I don't

19 believe it was.

20 Q.   And at least twice in your email conversation

21 Mr. Chamberlain reassured you that the aging receivables were

22 going to be reviewed by the time of these audits, correct?

23 A.   That's what he stated.

24 Q.   And you have no reason to doubt that that's what they did,

25 correct?

PRASAD - CROSS / SEILIE

1    A.    I'm not sure.

2    Q.    You have no reason to doubt that those -- that Autonomy's

3    debts were reviewed by its auditors, correct?

4            MS. GREEN:   Objection, foundation.

5            THE COURT:   Overruled.

6            THE WITNESS:   I have -- can you repeat the question?

7    BY MR. SEILI:

8    Q.    You, Reena Prasad, are not aware of any information that

9    would allow you to know one way or another about whether

10   Autonomy's auditors reviewed these receivables that you've been

11   talking about, correct?

12   A.    That's correct.

13   Q.    Let's take a look at a few more issues.  If we could go to

14   Exhibit 890.

15         I think you discussed this email with the government.

16   Now, this is -- you prepared some draft audit confirmation

17   letters that Matt Stephan asked you to prepare, correct?

18   A.    What do you mean by draft?

19   Q.    I think these are probably unsigned audit confirmation

20   letters, right?

21   A.    I prepared the initial letters.

22   Q.    Right.

23   A.    Yes.

24   Q.    Matt Stephan asked you to prepare them?  We can look at

25   the preceding email if we need to.

PRASAD - CROSS / SEILIE

1    A.    That's correct.

2    Q.    Okay.  And the purpose of these confirmations was to allow

3    Autonomy's auditors to verify debts to customers, right, or

4    debts owed by customers?

5    A.    Debts owed by customers, outstanding invoices, correct.

6    Q.    And the letters would actually say that the customer

7    should respond directly to Deloitte?

8    A.    That's correct.

9    Q.    And Mr. Stephan asked you to prepare one for Capax,

10   correct?

11   A.    That's correct.

12   Q.    He asked you to prepare one for DiscoverTech, correct?

13   A.    That's correct.

14   Q.    He asked you to prepare one for Microtech, correct?

15   A.    That's correct, yes.

16   Q.    Now let's take a look at the comment that the prosecutor

17   discussed with you regarding Discovery Technologies in the

18   email.

19   A.    Yes.

20   Q.    It says that you've included the below details you

21   requested even though it differs from what is on my 5/31 aging.

22   Do you remember discussing that line with the government?

23   A.    I do.

24   Q.    Now let's take a look at the DiscoverTech letter, which is

25   at 890-16.  And if we look at the invoice -- now, just to set

PRASAD - CROSS / SEILIE

1    this up, you were in charge of collections for the US-based

2    companies run by Autonomy, correct?

3    **A.**    Can you clarify what you mean by US-based companies?

4    **Q.**    Autonomy, Zantaz, Interwoven.  I'm forgetting a few,

5    but . . .

6    **A.**    All of the -- all of those entities, that's correct.

7    **Q.**    You were not responsible for collections from the UK

8    entity, correct?

9    **A.**    That's correct.

10   **Q.**    Now, if you look at the invoice the number is 4710ASL.  Do

11   you see that?

12   **A.**    I see that.

13   **Q.**    What does ASL mean there?

14   **A.**    I don't remember.  I don't recall.

15   **Q.**    Are you aware that it stands for Autonomy Systems Limited?

16   **A.**    That rings a bell.

17   **Q.**    Is Autonomy Systems Limited the UK company or the US

18   company?

19   **A.**    The UK company.

20   **Q.**    And you don't have access to the UK's ledgers, correct?

21   **A.**    I don't remember.  There's different systems we were

22   using.

23   **Q.**    And if we look again, just to look at the text of the

24   letter, if we could highlight, this is addressed directly to a

25   representative of DiscoverTech, correct?

PRASAD - CROSS / SEILIE

1   **A.**   Yes, that's correct.

2   **Q.**   And it asks them to "Please confirm directly to our

3   auditors, Deloitte, that the invoices selected from your

4   account and listed below were proper and unpaid as of the

5   date," correct?

6   **A.**   Yes.

7   **Q.**   All right.  If we could move to Exhibit 13090.  This is in

8   evidence.

9        Now, this email is a conversation you went over with the

10  prosecutor.  Do you remember that yesterday -- from yesterday?

11  **A.**   Yes, I do.  Yes.

12  **Q.**   All right.  Let's look at the first email.  In the very

13  first email, Mr. Chamberlain informs you that a number of deals

14  have been financed through Barclay's, correct?

15  **A.**   Yes.

16  **Q.**   If we could take a look at the email.

17       Do you see that on May 7th Mr. Chamberlain lists a bunch

18  of deals and says they were financed through Barclay's?

19  **A.**   Yes.

20  **Q.**   Now, the prosecutor jumped to an email from May 12th.  If

21  we could jump to that email the way the prosecutor did and look

22  at Mr. Chamberlain's response.

23       Now, you testified that Mr. Chamberlain then asked you to

24  give you a list of other customers to finance, correct?

25  **A.**   Yes.

PRASAD - CROSS / SEILIE

1   Q.   Now, when you reviewed this email with the prosecutor, you

2   agreed with her characterization that it was Mr. Chamberlain's

3   idea to finance more customers.  Do you remember that?

4          MS. GREEN:  Objection, misstates testimony.

5          THE COURT:  I'll allow it.  Go ahead.

6          THE WITNESS:  I'm not sure exactly.

7   BY MR. SEILI:

8   Q.   When you reviewed this yesterday, do you recall this

9   testimony?  You were shown this email --

10  A.   Yes.

11  Q.   -- prosecutor asks you who approved -- what was

12  Mr. Chamberlain doing here, and you said Mr. Chamberlain was

13  asking us to finance or look for more customers to finance.

14  That's how you described it, correct?

15  A.   I believe so.

16  Q.   Now, let's take a look at the email that the prosecutors

17  skipped, which is below this email, and that's on 13090-6.  So

18  this is immediately after Mr. Chamberlain says, "We financed a

19  few deals through Barclay's."  Mr. Tejeda says, "Thanks for

20  this note.  I believe that the underlying request is to

21  identify any other installment payment items are being

22  considered for financing."  He then references a list you

23  provided --

24  A.   Yes.

25  Q.   -- right?  And he says it would make sense to attempt to

PRASAD - CROSS / SEILIE

1    finance those if we had not yet done so, correct?

2    **A.**    Yes, I see what it says.

3    **Q.**    So Mr. Tejeda says that it would make sense to finance

4    some other deals, correct?

5    **A.**    One moment.  I'm just reading it.

6          Yes, he does make that comment there, yes.

7    **Q.**    And then Mr. Chamberlain responds and asks for a list.

8    Isn't that what happened in this email?

9    **A.**    Just because I'm a little bit confused, was this first or

10   was the reference to the blue chip first?

11   **Q.**    The blue chip is after Mr. Tejeda's email, and you can

12   verify that by scrolling through the document.

13   **A.**    Yeah, sorry.  I just wasn't sure which order.

14         So to answer your question, yes, I believe so.

15   **Q.**    So when Mr. Chamberlain is asking you to suggest some more

16   customers, he's responding to Mr. Tejeda's idea?

17   **A.**    I believe so, if that's the order of the emails.

18   **Q.**    And when you went over this email yesterday, this email

19   conversation, you didn't independently remember that it was

20   Mr. Tejeda's idea, right?

21   **A.**    I remember that email.  Is the question I didn't remember

22   it was him that recommended financing?

23   **Q.**    Well, yesterday when you were discussing this email, you

24   didn't mention Mr. Tejeda at all.

25   **A.**    I don't think we talked about that.  Did we talk about

PRASAD - CROSS / SEILIE

1   that particular email?

2   **Q.**   We did not, correct?

3   **A.**   Correct.

4   **Q.**   Now, Ms. Prasad, you and I have never spoken before,

5   correct?

6   **A.**   That's correct.

7   **Q.**   But you've actually spoken with the government several

8   times, correct?

9   **A.**   What's several?  Not very many.

10  **Q.**   Well, you've met with them -- you met with them in 2013?

11  **A.**   Yeah, I believe so.  I don't remember what year it was,

12  but yes.

13  **Q.**   You also met with Hewlett Packard's lawyers around then?

14  **A.**   There was a big table of many people.

15  **Q.**   You met again with the prosecutors in 2018?

16  **A.**   Yes, that's correct.

17  **Q.**   And you've met with them several times in the last month

18  to prepare for this trial, correct?

19  **A.**   Not several times.

20  **Q.**   A few times?  More than once?

21  **A.**   More than once.  Different people, though.  It wasn't the

22  same people from years past.

23  **Q.**   Are you aware that my team has tried to get in touch with

24  you to speak about your potential testimony a few times?

25  **A.**   No, never.

PRASAD - CROSS / HEBERLIG

```
1   Q.   But we've never agreed to speak before today?

2   A.   I'm sorry.  Are you saying you contacted me?

3   Q.   We've attempted to get in touch with you before.  Are you

4   aware of that?

5   A.   No.

6   Q.   Okay.  But we haven't spoken before today?

7   A.   No.  That's correct.

8            MR. SEILI:  One moment.

9                (Discussion held off the record.)

10           MR. SEILI:  No further questions.

11           THE COURT:  Cross?

12           MR. HEBERLIG:  May I proceed, Your Honor?

13           THE COURT:  Sorry?

14           MR. HEBERLIG:  May I proceed?

15           THE COURT:  Oh, yes, please.

16           MR. HEBERLIG:  Thank you, sir.

17                      CROSS-EXAMINATION

18   BY MR. HEBERLIG:

19   Q.   Good afternoon, Ms. Prasad.

20   A.   Hi.  Good afternoon.

21   Q.   My name is Brian Heberlig.  I represent Mike Lynch.

22   A.   Hello.

23   Q.   You and I haven't met before either, right?

24   A.   I don't believe so, no.

25   Q.   Nice to meet you.
```

PRASAD - CROSS / HEBERLIG

1   A.   Nice to meet you.

2   Q.   Am I correct that you also have never met Mike Lynch?

3   A.   I met him once, I believe.

4   Q.   Okay.  At sort of a meet-and-greet at the office?

5   A.   It was in the office, yes.

6   Q.   And you've never had a one-on-one conversation with him,

7   correct?

8   A.   I think we exchanged some words.

9   Q.   In a solo conversation?

10  A.   I believe so.  Just a brief interaction.

11  Q.   All right.  Pleasantries; "Nice to meet you, what do you

12  do for the company," kind of thing?

13  A.   I can't remember exactly.

14  Q.   Fair to say you never have discussed the subject matter

15  that you've gone through in your testimony over these last few

16  days with Mr. Lynch?

17  A.   That's correct.

18  Q.   Okay.

19  A.   Yes.

20  Q.   Now, just a couple of questions about your function

21  collecting cash for the Americas Group.

22       First of all, fair to say that every company has some

23  risky and bad debt?

24  A.   I would think so.

25  Q.   If it wasn't hard to collect, there wouldn't be a need for

UNITED STATES COURT REPORTERS

PRASAD - CROSS / HEBERLIG

1   a team of professionals led by a dogged collector like

2   yourself; is that fair?

3   **A.**   Yeah, I would think so.

4   **Q.**   All right.  And you focused, in your testimony, on the

5   difficult-to-collect accounts because that was one key

6   component of your job, right?

7   **A.**   Yes.

8   **Q.**   Another aspect of your job I'd like to just explore

9   briefly is you also were in charge of collecting the good

10  accounts, if you will, the accounts that paid?

11  **A.**   That's correct.

12  **Q.**   And Autonomy every quarter, like I assume every business,

13  kept track of the amount of cash it collected per quarter?

14  **A.**   That's correct, yes.

15  **Q.**   And your team played a role in that function?

16  **A.**   Yes.

17  **Q.**   And just so we're on the same page, I'm not planning to

18  ask you any accounting questions, as I understand you're not an

19  accountant?

20  **A.**   Uh-huh.  That's correct.

21  **Q.**   But I do want to, if you're able to answer these

22  questions, try to identify the difference between a cash

23  collection and revenue.  So bear with me.  Am I right that a

24  cash collection is not necessarily the same thing as revenue

25  recognized by the company?

PRASAD - CROSS / HEBERLIG

```
 1   A.   That's correct.

 2   Q.   Without getting into sort of what they are --

 3   A.   Oh, okay, yes.

 4   Q.   -- sometimes there are judgments needed to determine when

 5   to recognize revenue, correct?

 6   A.   Yes.

 7   Q.   But with respect to cash, it's literally the cash that

 8   comes into the bank account during the quarter, correct?

 9   A.   Yes.

10   Q.   There's no judgment involved whatsoever?

11   A.   If the cash comes in, the cash comes in, yes.

12   Q.   Cash is cash.  If it hits the bank account before June

13   30th, it's in the second quarter; if it hit July 1st, it's in

14   the third, right?

15   A.   Yes.

16   Q.   Okay.  And it doesn't involve -- you can't count something

17   in cash collections that's based on an IOU or a promise or I'll

18   get it to you next week.  It's got to actually be cash in the

19   account, right?

20   A.   Yes.

21   Q.   All right.  Let me just briefly show you an exhibit to try

22   to get a sense of what you did with the other part of your job.

23   That's Exhibit 07761.

24        THE COURT:  07761.

25        MR. HEBERLIG:  61.
```

PRASAD - CROSS / HEBERLIG

```
 1              THE COURT:  Admitted.
 2              (Trial Exhibit 07761 received in evidence)
 3              MR. HEBERLIG:  Thank you.
 4    BY MR. HEBERLIG:
 5    Q.   And if we could just start with the bottom email on the
 6    chain, please.
 7         So this is around the same time period that we've been
 8    discussing or that you've been discussing in your testimony; is
 9    that fair?
10    A.   Yes.
11    Q.   All right.  And this is an email from you to
12    Mr. Chamberlain with a copy to Mr. Hogenson subject "Cash
13    collections," right?
14    A.   Yes.
15    Q.   And I'm not going to read all of it, but in short, this is
16    your report to Mr. Chamberlain copying Mr. Hogenson about the
17    progress the company has made on cash collections as of the
18    morning of the last day of the quarter.  Is that what that
19    looks like?
20    A.   That's what that looks like, yes.
21    Q.   And you're reporting to him that for the "As of last night
22    we've collected $172.4 million."
23    A.   Yes.
24    Q.   And is that the amount of money that's come in during the
25    preceding quarter?
```

UNITED STATES COURT REPORTERS

1    A.    I'm sorry?  Could you --

2    Q.    Yeah.

3    A.    You mean prior to June -- I mean June 30th and prior?

4    Q.    Yeah.  As reporting to him on the last day -- this is the

5    last day --

6    A.    Yes, that current quarter, that money had come in, in the

7    current quarter, right?

8    Q.    And the court reporter is going to get very mad at me if

9    we talk over each other.

10    A.    I'm sorry.

11    Q.    It's okay.  If you just wouldn't mind letting me finish my

12    question before you answer.

13    A.    Sure.

14    Q.    Okay.  So this is the last day of the second quarter of

15    2010?

16    A.    Yes.

17    Q.    And so the number you're providing here is the tally as of

18    that morning for the preceding three months?

19    A.    Correct.

20    Q.    Okay.  And if we can go up to the -- oh, I'm sorry, before

21    we do, you also say, "While we're at 172.4, we're tracking to

22    collect 185.4."  Do you see that?

23    A.    Yes.

24    Q.    All right.  And then let's see how we did in the next

25    email in the chain.  So this is now that same day but after the

1    close of the banking world, right?  It looks like it's a little

2    before midnight?

3    A.    That's correct.

4    Q.    And this would have been a busy time the last day of the

5    quarter, I assume, for you and your team?

6    A.    Yes.

7    Q.    And your report to Mr. Chamberlain is -- and to

8    Mr. Hogenson -- "We're still working to finalize the cash

9    numbers.  As of today, it looks like it will land around 184

10   million."  Do you see that?

11   A.    Yes.

12   Q.    So pretty close to what you had estimated that morning,

13   give or take about $500,000?

14   A.    I believe so, yes.

15   Q.    And that reflects on the last day of the quarter you

16   collected roughly $10 million from Autonomy's customers?

17   A.    I believe so, yes.

18   Q.    And was that fairly typical that when the quarter would be

19   closed, a lot of people pay their bills on the last day of the

20   period?

21   A.    Yes.

22   Q.    All right.  Now let's look a couple of days later on July

23   8th.  This is a different -- different exhibit, 7762.

24         MR. HEBERLIG:  That's not yet in evidence, Your Honor.

25         THE COURT:  Sorry, what is it?

PRASAD - CROSS / HEBERLIG

1          **MR. HEBERLIG:**  It's 7762.

2          **THE COURT:**  7762 admitted.

3          (Trial Exhibit 7762 received in evidence)

4          **MR. HEBERLIG:**  Thank you.

5     All right.  And then if we can just enlarge the message

6  and the to/from.  Great.

7  BY MR. HEBERLIG:

8  Q.   So this is you now with just a few -- well, maybe about a

9  week later, July 8th.  You're reporting to a broader group of

10  people.  Now it includes not only Mr. Chamberlain and

11  Mr. Hogenson but Mr. Hussain and a variety of other individuals

12  at Autonomy, correct?

13  A.   Yes.

14  Q.   And this is -- this is your report.  This is what the team

15  has collected in cash in Q2, 2010.  And by "Your team," I mean

16  the Americas collection team, right?

17  A.   That's correct.

18  Q.   All right.  So in the end you achieved a little bit more

19  than you predicted on the last day, 185 million -- roughly

20  185.2 million?

21  A.   Yes.

22  Q.   And this also has a breakdown of the split between the

23  various American businesses there, correct?  Do you see that in

24  the summary?

25  A.   I do.

PRASAD - CROSS / HEBERLIG

1  Q.  And we've heard some testimony about those in this trial,

2  but of the four companies outlined there, Autonomy, Inc., the

3  legacy Autonomy company, was responsible for more than twice

4  the amount of any other entity; is that correct?

5  A.  Yes.

6  Q.  $101 million compared to the rest?

7  A.  Yes.

8  Q.  Now, you attached to your message a spreadsheet that says

9  "Cash all entities Q2, 2010 final."  Do you see that?

10  A.  I see that.

11  Q.  And I'd like to just display that briefly to see what

12  those look like.  That's Exhibit 7762.1, just the attachment to

13  this email.

14          THE COURT:  7760?

15          MR. HEBERLIG:  62.1.

16          THE COURT:  62.1?

17          MR. HEBERLIG:  Yes, sir.

18          THE COURT:  Admitted.

19          (Trial Exhibit 7762.1 received in evidence)

20  BY MR. HEBERLIG:

21  Q.  And before we look at this in a little more detail, would

22  this process that's reflected in the email here be something

23  that occurred every quarter after the books were closed, your

24  team would report out on the amount of cash collected?

25  A.  Yes, we'd report the cash collected.

PRASAD - CROSS / HEBERLIG

1    Q.    All right.  And would you provide sort of a summary

2    spreadsheet like we're looking at here?

3    A.    I would if I was in charge of the collections at the time.

4    Q.    Okay.  So let's take a look at this.  I think just

5    highlight the upper left table very quickly.  I believe this is

6    the same table that you had pasted into your email.  Do you see

7    that?  Those are the four companies again and the total, right?

8    A.    Yes.

9    Q.    And now I'd like to go to the second -- I guess it's the

10   fourth tab for Autonomy.  Does it look like you have separate

11   reports for each of the entities there --

12   A.    It does.

13   Q.    -- reflecting their individual cash collections?

14   A.    It does.

15          MR. HEBERLIG:  All right.  So let's start at the top

16   of the Autonomy tab, please.  And if we can make that larger.

17   I think we only need to see through the column J, perhaps.  Can

18   you go any bigger than that?  All right.  So -- and get all the

19   way to the left, please, on the spreadsheet okay.

20   BY MR. HEBERLIG

21   Q.    Okay.  So, again, these are all Autonomy Inc. collections,

22   the American Autonomy company, right?

23   A.    Uh-huh.

24   Q.    And what this reflects is the date of the payment in

25   column C, right?

PRASAD - CROSS / HEBERLIG

1    A.    Yes.

2    Q.    And obviously the first payment was the first day of the

3    quarter, April 1st, 2010?

4    A.    Yes.

5    Q.    And we won't go through every one, I promise you, but they

6    go all the way down to the end of the quarter June 30th.

7         Column D would reflect the customer who paid the money,

8    correct?

9    A.    Yes.

10   Q.    And of course we see the amount and some other information

11   like the invoice number.

12        I would just like to highlight a few of these to give a

13   flavor of the types of businesses that were paying money to

14   Autonomy.

15        So if we could go first to -- well, we'll start with the

16   first one.   No. 3 is Deloitte.   That's an accounting firm,

17   correct?

18   A.    Yes.

19   Q.    And so apparently not only were they the auditors for

20   Autonomy, but they were using its software in some manner?

21   A.    Uh-huh.   Yes.

22   Q.    All right.   Line 6, Pfizer.   That's a big pharmaceutical

23   company, correct?

24   A.    That's correct.

25   Q.    Line 24, Morgan Stanley, we've heard of them.   That's a

PRASAD - CROSS / HEBERLIG

1    big financial institution?

2    A.    Yes.

3    Q.    Line 35 -- try to go through these quickly, and I'm just

4    picking some representative examples -- AT&T, the big

5    telecommunications company?

6    A.    Another big company, yes.

7    Q.    Line 49 we see there the Naval Criminal Investigative

8    Service.  You're familiar with them, what that is?

9    A.    No.

10   Q.    Okay.  How about line 56, Home Box Office, the

11   entertainment company?

12   A.    Yes.

13   Q.    Line -- I'm going to jump a few of these.  How about line

14   139?  This is a big cruise line company, Carnival Cruise?

15   A.    Yes.

16   Q.    Line 264, Harvard University, a major university in the

17   United States?

18   A.    Yes, it's a major university.

19   Q.    I skipped over some others, but there were some other

20   university customers of Autonomy?

21   A.    I don't remember.

22   Q.    How about 295, one a little closer to home, San Jose

23   State?

24   A.    Yes.

25   Q.    All right.  Let me pause then at line 342 for a moment.

1  You see there that that's BP Exploration and Production?

2  **A.**    Yes.

3  **Q.**    Do you recognize that as the oil company British

4  Petroleum?

5  **A.**    Yes, I believe so.

6  **Q.**    That was the largest or if not the largest, close to the

7  largest collection for the quarter at just under $14 million.

8  Do you see that one?

9  **A.**    I do.

10  **Q.**    Do you remember that as a -- as a major contract that

11  Autonomy won for eDiscovery services provided to BP in the wake

12  of the Deep Water Horizon disaster?  Does that ring a bell to

13  you?

14  **A.**    I don't remember what was occurring at that time.  I

15  remember very vaguely the BP payment, but I don't remember --

16  **Q.**    What it was for?

17  **A.**    -- what it was for.

18  **Q.**    Okay.

19      Now, there are payments on this list from a number of

20  Autonomy's resellers, are there not?  And I won't keep you in

21  suspense.  Let's look at a few.  Tab 1 -- excuse me -- line

22  169.

23      All right.  You see there there's a $4.5 million payment

24  from a company called FileTek?

25  **A.**    Yes.

PRASAD - CROSS / HEBERLIG

1  Q.   I misspoke.  I didn't mean to refer to them as a reseller,

2  but do you recognize them as a company that Autonomy did

3  business with?

4  A.   I recognize the name, yes.

5  Q.   All right.  And how about line 317?  I think this came up

6  in your testimony.  You recognize Microtech, correct?

7  A.   Yes, I did, yes.

8  Q.   And they made a payment during the quarter of a little

9  over $55,000?

10 A.   That's right.

11 Q.   And then down to line 346, please.  We see another payment

12 from FileTek $4.5 million, right?

13 A.   Yes.

14 Q.   So that's two payments from FileTek to Autonomy, cash in

15 the bank of $9 million plus, right?

16 A.   The two FileTeks?

17 Q.   Yes.

18 A.   Yes.

19 Q.   And that -- you put aside revenue, but that's cash money

20 in the bank?

21 A.   Correct.

22 Q.   And then finally at lines 366 and 367, we see a couple of

23 payments from Capax Discovery, right?

24 A.   Yes.

25 Q.   And that's a reseller you testified about.  One was for a

PRASAD - CROSS / HEBERLIG

1   little over $1 million and the other was for 290,000 and change

2   or 287.  Do you see that?

3   **A.**   Yes.

4   **Q.**   And just keep in mind, I may come back to this, but the

5   date of these payments was that last day of the quarter --

6   right? -- June 30th, 2010, after we'd seen some emails where

7   you were chasing them for payment, right?

8   **A.**   Yes.

9   **Q.**   Okay.  Now --

10           **MR. HEBERLIG:**  We can take that down.

11  **BY MR. HEBERLIG:**

12  **Q.**   You testified about some of the concerns you had with

13  respect to collections related to Autonomy's debts owed by

14  resellers.  Do you remember that?

15  **A.**   I do.

16  **Q.**   And am I right that one of the concerns you expressed was

17  that -- sorry.

18      One of the concerns you express with respect to

19  collectibility of those debts related to whether there was an

20  end user associated with that sale to the reseller.

21  **A.**   An end user -- a solid deal with an end user, yes.

22  **Q.**   And if there was -- in your view or if you received

23  information from the customer that there wasn't a solid deal

24  with the end user, that caused you some concern with respect to

25  collectibility?

1    A.    That as well as them telling me they wouldn't pay until

2    they were paid.

3    Q.    Okay.  So they was a combination.  Sometimes you were told

4    that.  Other times -- am I right? -- that you heard there was

5    no end user but without that specific information?

6    A.    I'm not sure.

7    Q.    Okay.  You don't remember right now?

8    A.    I don't remember because I would be calling in regard or I

9    would be following up in regards to collections --

10   Q.    Okay.

11   A.    -- and trying to get the payment.  And if they weren't

12   paying, then they weren't paying.  They were telling me they

13   weren't paying, and they were giving me that information.

14   Q.    So while we're on the subject, I think one specific

15   example you gave of that related to Capax and Mr. Baiocco?

16   A.    Yes.

17   Q.    All right.  And as I -- if I understood you correctly,

18   please correct me if I'm wrong, he said words to the effect of

19   I'm not -- we're not paying Autonomy until we get paid from an

20   end user?

21   A.    I'm sorry, is that what --

22   Q.    Words to the effect -- I'm just trying to make sure I

23   understand your testimony.

24         Did he report to you when you were trying to collect the

25   debt from Capax that unless we get paid from an end user and

```
 1    the end user deal has fallen through or -- I don't want to put
 2    words in your mouth -- we're not prepared to pay Autonomy.
 3         Why don't you just tell me what he said to you.
 4    A.   I don't remember the whole conversation.
 5    Q.   Okay.
 6    A.   At the time I would have known; I documented everything.
 7    Q.   Okay.  How about just the gist, then, of what you
 8    remember?
 9    A.   It depends on which invoices you're talking about.
10    Q.   How about let's take the FSA intended end user deal.
11    That's the one we saw where you proposed the complete -- I
12    can't remember now if it's provision or write-off, one of the
13    two, for those three invoices we saw that weren't due for
14    roughly a year or more.  Do you remember that generally?
15    A.   Yes.  And I -- it wouldn't have been a write-off.
16    Q.   Okay.
17    A.   I would not propose a write-off --
18    Q.   Fair enough.
19    A.   -- I don't believe so.
20    Q.   It doesn't really matter for present purposes, but you
21    recall that exchange and the end user, the FSA?
22    A.   I do.
23    Q.   Okay.  And so recognizing that you can't give us a
24    quote --
25    A.   Okay.
```

PRASAD - CROSS / HEBERLIG

1  Q.   -- what was the conversation you had with him with respect

2  to that deal?

3  A.   That there -- the end user didn't -- it wasn't a done

4  deal, I remember that --

5  Q.   Yes.

6  A.   -- because I inserted that.

7       And it wasn't a done deal, the end user wasn't in place,

8  and they wouldn't pay us until they were paid.

9  Q.   Right.

10 A.   I'm trying to think back to the conversation, but that --

11 Q.   That sums it up roughly?

12 A.   I mean there was more discussion but that's -- that's part

13 of it.

14 Q.   All right.  So focus on that.

15 A.   Okay.

16 Q.   My questions are focused on that.

17 A.   Sure.

18 Q.   I believe you also testified on direct that you understood

19 that not withstanding that situation -- right? -- that the end

20 user deal wasn't solid --

21 A.   Yes.

22 Q.   -- that Autonomy had a contract with the reseller, and the

23 reseller was still, I think you put it, on the hook?

24 A.   I did.

25 Q.   Okay.  So in this instance where Mr. Baiocco shared that

1    information with you, you understood they were still

2    contractually obligated to pay Autonomy, right?

3    **A.**   That was my understanding, and that's what I believed.

4    **Q.**   And now the payments that they owed Autonomy -- okay? --

5    let me focus on that, one of them had already come due, the

6    450,000, correct?  Do you remember that?

7    **A.**   Which one was that, please?

8    **Q.**   The FSA.

9    **A.**   Oh.  The FSA.

10   **Q.**   I'm still focused on FSA.

11   **A.**   Okay.  Sure.

12   **Q.**   So there was one payment of 450 that had just come due at

13   the end of June; do you remember that?

14   **A.**   That's right.

15   **Q.**   And then there were three payments that totaled

16   4.5 million that didn't come due for either one, two or three

17   years?

18   **A.**   That's correct.

19   **Q.**   So in the situation that Mr. Baiocco was in -- and I don't

20   mean to single him out; his company -- he didn't owe the

21   significant majority of the money yet to Autonomy, and an end

22   user deal hadn't been firmed up.  Am I correct that he could

23   have sold to a different end user before those bills were due

24   and then paid Autonomy?

25         **MS. GREEN:**   Objection, calls for speculation.

PRASAD - CROSS / HEBERLIG

1              THE COURT:  Overruled.

2              THE WITNESS:  Can I answer?

3         The first part of your question I don't believe.  You

4    said --

5    BY MR. HEBERLIG:

6    Q.   Which part?

7    A.   The very first part where you said -- could you repeat the

8    exact -- what you said?

9    Q.   I will do my best.

10   A.   All right.  Just the first --

11   Q.   I'll set it up again. I'm sorry.  450 already became due

12   about a week ago when you had those exchanges, but the 4.5 not

13   for another one, two or three years.

14   A.   That's correct.

15   Q.   Okay.  So you're with me so far?

16   A.   No, no, I was with you.  I just -- I wasn't agreeing to

17   the first part of what you said.

18   Q.   Well, my question was, was it not Capax and Mr. Baiocco's

19   prerogative if the intended end-user deal had fallen through

20   but their money wasn't yet due to Autonomy --

21   A.   Okay.

22   Q.   -- to try to sell the software to someone else, get paid

23   and pay Autonomy?

24   A.   I understand.  I think you said that it was -- it was not

25   outstanding as of that date -- excuse me.  It was not owed to

PRASAD - CROSS / HEBERLIG

```
 1   Autonomy or something to that effect, but even though it had
 2   pushed-out payment terms, it was still outstanding and owed to
 3   Autonomy, just at a future date.
 4   Q.    Right.
 5   A.    Yes.  So it wasn't past due, but it was still outstanding.
 6   Q.    So do you agree with then the premise that I just
 7   suggested that it wasn't yet due --
 8   A.    Uh-huh.
 9   Q.    -- and therefore Capax could go and find a different
10   end user, sell the software to it, get the money, pay Autonomy
11   before the bills were due?  Save that 450.  I understand that
12   that was due.
13   A.    Uh-huh.
14   Q.    Could they have done that?
15   A.    I believe so.
16   Q.    Okay.  And had those bills been written off -- they
17   couldn't have.  Let's start there.
18   A.    Sure.
19   Q.    Right?  Had the bills been written off before they were
20   due, that scenario I just proposed would not have been
21   possible, correct?
22   A.    Are you referring to me proposing a write-off for those,
23   because I think it was a reserve, not a write-off.
24   Q.    Let's start with a write-off.  Had you -- I just said had
25   you proposed a write-off --
```

PRASAD - CROSS / HEBERLIG

1  A.    Okay.

2  Q.    -- that scenario, you no longer collect because it's wiped

3  off the books, right?

4  A.    Sorry, I'm just focusing on what you're saying.

5        Yes, that's correct.

6  Q.    All right.  And a provision, while not written off the

7  books, would effectively wipe out the entire balance from the

8  profit and loss statement because you'd have to record a

9  reserve for the full amount of the revenue that you'd already

10  recognized, right?

11  A.    I made the initial recommendation.  I don't know -- I was

12  not involved in the after -- after making the recommendation, I

13  was not involved in the approval or the financial statements.

14  Q.    Okay.

15  A.    Uh-huh.

16  Q.    I'm going to move on from that topic.  Let me just very

17  quickly --

18        MR. HEBERLIG:  I only have a few left, Your Honor --

19  BY MR. HEBERLIG:

20  Q.    -- show you a document that you went through in your

21  direct examination, which was exhibit in evidence 15388.

22        THE COURT:  All right.

23        MR. HEBERLIG:  And if we could enlarge down through

24  the table, please.

25  \\\

1   BY MR. HEBERLIG:

2   Q.   Just to sort of move this along, I'll try to paraphrase.

3   This was part of the exchange with Mr. Chamberlain about

4   chasing Capax for payment, correct?

5   A.   Yes.

6   Q.   And you itemized in this table the money that Capax owed

7   Autonomy but had not yet paid?

8   A.   Yes.

9   Q.   I just want you to focus on the very first and the very

10  last entry.  So the first entry there was for $287,000, and it

11  was 159 days past due, correct?

12  A.   Correct.

13  Q.   A pretty old piece of debt?

14  A.   Yes.

15  Q.   And then the last one at the bottom was a million, million

16  50, but that wasn't due for another seven days after this email

17  was sent, correct?

18  A.   Yes.

19  Q.   All right.  So not yet due but coming up soon?

20  A.   Yes.

21  Q.   All right.

22          MR. HEBERLIG:  Now, if we could -- I don't know if we

23  can do a side by side, but can we compare -- if not, we'll jump

24  back -- that to the payment receipt information we reviewed

25  just a moment ago, which was Exhibit 772 -- sorry -- 7762.1 at

1    lines 366 and 367.

2        I'm testing Bret's skills here.

3    **BY MR. HEBERLIG:**

4    **Q.**    All right.  So if you bear with us for one second, if we

5    can jump down to -- if you recall, this was the spreadsheet of

6    money in the door, money in the bank in the second quarter of

7    2020, right?

8    **A.**    Yes.

9    **Q.**    At lines 366 and 367 were payments by Capax to Autonomy in

10   the amounts reflected there, right?

11   **A.**    Yes.

12   **Q.**    And if we look at column H, that identifies the particular

13   invoice number that's being paid, right?

14   **A.**    Yes.

15   **Q.**    So the first one for $1,050,000, Invoice No. 6410, matches

16   the bottom entry on the chart you had provided to

17   Mr. Chamberlain?

18   **A.**    Yes, it does.

19   **Q.**    So that one not yet due, paid by Capax on the last day of

20   the quarter, no issue, right?

21   **A.**    Yes.  It was paid when it was due.

22   **Q.**    Okay.  And the other one, 287,000 and change, Invoice

23   No. 5589, was also reflected on your chart, correct?  That was

24   the first entry --

25   **A.**    That's correct --

PRASAD - CROSS / HEBERLIG

1   Q.   -- in the chart?

2   A.   -- yes.

3   Q.   And if we can now take down the spreadsheet but leave up

4   the chart, that was the one that was 159 days past due, right?

5   A.   Yes.

6   Q.   And that is an indication that sometimes even old debts

7   get paid by customers, correct?

8   A.   Yes.

9   Q.   And had that debt been written off -- I'm not suggesting

10  you proposed it, but let's say someone else had come along and

11  said, "You know what, we're 120 days past due, let's write that

12  one off the books," had that occurred, that money couldn't have

13  come in the door, right?

14  A.   It could have come in the door.  You mean --

15  Q.   It was no longer -- it was no longer on the books and

16  records of the company as account receivable as soon as it's

17  written off, right?

18  A.   Yes.

19  Q.   Okay.  And as we saw in some of the earlier email

20  exchange, that meant for Autonomy's purposes you stopped

21  chasing.  The debt's been written off?

22  A.   Yes.

23          MR. HEBERLIG:  All right.  We can take that down.

24  BY MR. HEBERLIG:

25  Q.   Again, very briefly, a few questions about Microtech.  And

PRASAD - CROSS / HEBERLIG

1   just to frame you remember you were shown some emails and asked

2   some questions about a particular Microtech transaction for the

3   intended end user, the Vatican Library?

4   A.   That's correct.

5   Q.   Now, when assessing -- you remember that that was a fairly

6   significant size debt, right?

7   A.   Yes, several million.

8   Q.   Right.  When assessing -- maybe not specific to that debt,

9   but when assessing the collectibility of any debt that you were

10  chasing, was a relevant factor in your analysis a company's

11  payment history with Autonomy?

12  A.   When assessing -- what was that, you said?

13  Q.   I'm not specific to Vatican right now, but let's say

14  you're chasing any debt, okay?  You've got your list of 20

15  debts.  You're trying to figure out should I recommend a

16  provision, should I not.  Was a relevant factor in your

17  consideration the customer's payment history with Autonomy?

18  A.   That was -- that would have been considered, yes.

19  Q.   Okay.  And generally speaking, we'll look at some

20  specifics, but a customer with a good payment history, regular

21  bills thereto, regular payments back from, would be more likely

22  to pay their bills than a brand-new customer with which you had

23  no payment history; is that fair?

24  A.   You said it would be more -- what was it, the word you

25  used?

PRASAD - CROSS / HEBERLIG

1   Q.   Well, maybe I'll phrase it a different way because

2   obviously if you've got a brand-new customer that was Goldman

3   Sachs, they might be --

4   A.   Exactly.  That's what I was thinking, so . . .

5   Q.   Okay.  But all things being equal in the type of customer

6   you're looking at, so sort of a middle-of-the-road company --

7   A.   All right.

8   Q.   -- all things equal if you had one that was a pre-existing

9   customer with a long history of bills and payments back and

10  forth and one that was brand-new, generally speaking, the one

11  with the payment history is probably a better bet to pay you

12  again; is that fair?

13          MS. GREEN:  Objection, calls for speculation.

14          THE COURT:  Sustained.  Sustained.

15          THE CLERK:  Use your mic.

16          THE COURT:  It depends.

17  BY MR. HEBERLIG

18  Q.   Okay.  Well, I'll descend from the general to the

19  specifics.

20  A.   Okay.

21  Q.   Let's look at a document you were shown on your direct

22  examination, and that is Exhibit 13086.  And just let's

23  highlight the top part in the message.

24          All right.  So just to sort of reorient you, do you recall

25  that this was around the time of the emails we saw where you

1  were discussing the FileTek situation, and in this email you

2  received from a colleague some information about Microtech and

3  FileTek, right?

4  **A.**   He sent me an activities report it looks like.

5  **Q.**   Yes.  And I think you looked at these on direct, but let

6  me just if we may quickly display -- we'll start with Microtech

7  at page 4.

8      You call these activity reports?

9  **A.**   This would have been generated from a different -- in the

10  San Francisco office.  I did not run these.

11  **Q.**   But is -- am I right that this whatever you call it

12  effectively is the payment history of Microtech and Autonomy?

13  **A.**   I believe so.

14      **MR. HEBERLIG:**  Can we enlarge just the table and the

15  heading?  You don't need to go that high.  Well, let's start

16  there.

17  **BY MR. HEBERLIG:**

18  **Q.**   All right.  So this appears to be beginning in June of

19  2006.  We'll see where it ends, but I believe, based on the

20  email, it would be roughly in June of 2010.  So give or take

21  four years of experience with Microtech?

22  **A.**   Yes.

23  **Q.**   And if we could just sort of slowly scroll down.  Is

24  what's reflected here -- let's pause for a second so we don't

25  get dizzy.

PRASAD - CROSS / HEBERLIG

1    The first one where it says "Invoice," that would be a
2 bill that Autonomy sent to Microtech?

3 A.    Yes.

4 Q.    And then below where it says "Cash receipt," am I right
5 that those would reflect occasions on which Microtech paid its
6 bill to Autonomy?

7 A.    Paid its bill or a portion of its bill.

8 Q.    When they sent cash to Autonomy --

9 A.    Some cash came in, yes.

10 Q.    -- right?

11        MR. HEBERLIG:  So let's just sort of slowly scroll
12 down here to see over the four years what the experience is.
13 And if we can pause at the end of December 2009.

14 BY MR. HEBERLIG:

15 Q.    We see there an invoice to Microtech of $10 million -- do
16 you see that? -- December 31, 2009.

17 A.    Yes.

18 Q.    And if we scroll down just a bit, we see that that was
19 promptly paid by Microtech.  Cash receipt, $10 million, money
20 in the bank, right?

21 A.    Yes, just a few days later.

22 Q.    And let me -- let me rephrase.  I don't know whether
23 that's the exact same transaction?

24 A.    I don't either.

25 Q.    Perhaps it's a coincidence of dollar amount, but either

1   way, Microtech paid $10 million in early January 2010, right?

2   A.   Yes, that's correct.  They paid $10 million.

3   Q.   And when is it says, "Cash receipt," that's not an IOU,

4   that's not "We just signed a contract with Microtech," that is

5   cash money in the bank?

6   A.   Yes, I believe so.

7        MR. HEBERLIG:  And let's just scroll a little bit

8   more.

9   BY MR. HEBERLIG:

10  Q.   And we see toward the bottom there's that larger invoice

11  that you described, the $11.5 million invoice for the intended

12  end user, the Vatican, correct?

13  A.   Yes.

14        MR. HEBERLIG:  And let's go to the second page, I

15  think we're near the end, and just enlarge that, please.

16  BY MR. HEBERLIG:

17  Q.   And we see there the grand total at the bottom, the ins

18  and outs over the years leads to still money owed of

19  13.5 million of which 11.5 is that Vatican Library-related

20  transaction, correct?

21  A.   Yes.

22  Q.   And all told -- and I won't make you count them, but

23  it's -- we see roughly an experience of more than 20 payments

24  of various sizes over those four years from Microtech to

25  Autonomy in cash, correct?

PRASAD - CROSS / HEBERLIG

1    **A.**    Yes.  I see several.  I don't know how many.

2    **Q.**    All right.  Well, it's in evidence.  Let's not take the

3    time to count them.

4         Let's go back out to the email and just see.  There was a

5    second attachment for a company called FileTek.  Do you see

6    that?

7    **A.**    I do.

8    **Q.**    And let's just look at what their payment history was with

9    Autonomy.  And that's on page 6 of the document.

10        **MR. HEBERLIG:**  And can we enlarge that table?

11   **BY MR. HEBERLIG**

12   **Q.**    This is the same sort of table, correct?

13   **A.**    Yes.

14   **Q.**    All right.  So not quite the same extensive, you know,

15   multiyear history with FileTek, but am I right this does show

16   regular invoicing to FileTek and corresponding payment

17   therefrom?

18   **A.**    Yes.

19   **Q.**    And then, you know, as of the date of this summary,

20   there's still $4.5 million outstanding, correct?

21   **A.**    Yes.

22   **Q.**    And that looks like it's roughly from an invoice of about

23   three months ago, 3/31/10?

24   **A.**    Yes, I see it.

25   **Q.**    If those amounts correspond.

**PRASAD - CROSS / HEBERLIG**

1    A.    Yeah.

2    Q.    Do you see that?

3    A.    Yes, I see that.

4    Q.    I mean the $4.5 million payment there appears to be half

5    of that amount?

6    A.    I'm not sure what they were -- I can't tell --

7    Q.    Fair enough.

8    A.    -- without more information.

9    Q.    Fair enough.

10          But again, where it says "Cash receipt," this is cash in

11   the bank that FileTek paid to Autonomy, correct?

12   A.    Correct.

13   Q.    Now bear with me one second.

14          MR. HEBERLIG:  You can take that one down, please.

15   BY MR. HEBERLIG:

16   Q.    Just a couple more.  I just wanted to clarify.  So there

17   was some testimony about these auditor confirmation letters

18   that your group played a role in?

19   A.    I believe it was myself.

20   Q.    Or yourself individually?

21   A.    I believe so, yes.

22   Q.    And just so we're all on the same page, those are when

23   Autonomy would send a letter to its customer who owed it money

24   with a request that the customer sign the letter confirming the

25   information and forwarding it to the auditors at Deloitte.  Was

PRASAD - CROSS / HEBERLIG

1   that the sort of program?

2   A.   I know I did it for this particular request.  I'm not sure

3   if I -- how often I was involved in previous quarters.

4   Q.   I see.  This may have been a one-off assignment?

5   A.   I'm not sure.  I can't remember.

6   Q.   I guess my question -- and if this wasn't a factor, that's

7   fine, we'll move on, but was a factor in assessing the

8   collectibility of these outstanding debts, was it relevant to

9   your assessment whether the client or customer had signed and

10  returned one of these letters to the auditors?

11  A.   I don't believe so.

12  Q.   So that wasn't a factor that -- they were just confirming

13  the debt due, but it wouldn't necessarily factor into whether

14  you would view it as collectable?

15  A.   I didn't receive them.  I didn't see them.

16  Q.   Fair enough.  Well, you saved us ten minutes.

17  A.   Okay.  In general unless they accidentally sent it to me,

18  I would not receive them.

19  Q.   Okay.  Let me ask you about another one of the

20  government's exhibits.  It's 857 in evidence.

21       Do you remember, this was again in this June timeframe

22  where you sent an Excel spreadsheet to Mr. Hogenson, identified

23  as problem in high-risk accounts.  Do you remember going

24  through this on direct?

25  A.   I do.

PRASAD - CROSS / HEBERLIG

1  Q.   All right.  I just wanted to go to the attachment which

2  was 875 page 2.  It could have been a native spreadsheet.  I

3  believe it was.  Here we go.

4       Do you remember taking a look at this in your direct?

5  A.   Yes.

6  Q.   My question --

7       MR. HEBERLIG:  Could we make it a little larger on the

8  comment there from Ms. Prasad?

9  BY MR. HEBERLIG

10 Q.   So I'm not going to go through the details of this, but I

11 did want to ask you about the comment you included there.

12      So you said "High risk doesn't include" and then there's

13 the entry there for Microtech, but you said that "The high risk

14 accounts do include," and then you list some other companies

15 including, if I'm reading this correctly, Citibank, Deutsche

16 Bank, and J.P. Morgan Chase Bank.  Am I reading that correctly?

17 A.   Yes.

18 Q.   So your conclusion, when you submitted the list of

19 high-risk accounts to Mr. Hogenson, were that those three,

20 among the world's largest financial institutions, weren't going

21 to pay their bills?

22 A.   Those particular invoices there were problems.  I don't

23 remember what the background was.

24 Q.   You don't recall the details?

25 A.   I don't recall the details from this, but they were --

1  they were problematic, and they were at high-risk of being

2  collect -- not being collected.

3  Q.  So even among the most successful and financially

4  lucrative companies in the world could have a bad debt with a

5  company like Autonomy -- right? -- it wasn't just the dead

6  beats?

7  A.  Could have a bad debt?  And do you mean -- what do you

8  mean by --

9  Q.  Just that.  So it's possible bad debts don't have to

10  involve companies teetering on bankruptcy.  They can involve

11  some of the largest, most powerful financial institutions in

12  the world, right?

13  A.  To answer your question, yes.  That's not what I'm putting

14  out there, though.  I'm not saying this is a bad debt.

15  Q.  Okay.  It's high risk for a different reason?

16  A.  High risk was for provisions.

17     Write-off for me -- I want to make the distinction because

18  writeoffs were what I considered bad debt to be written off.

19  Q.  Terminology.  I'm sorry.  So but you substitute the word

20  "provision," I guess I said "bad debt."  Even some of the

21  world's most successful companies could have debts that needed

22  to be provided for?

23  A.  Yes, and my understanding was that those were risky, high

24  risk.

25  Q.  Okay.  Last document that you were shown on direct, and

 1    this is document 13090 in evidence.

 2         And let's just look at the email first, but I'm most

 3    interested in the attachment.

 4         MR. HEBERLIG:  Can you enlarge the email, please?

 5    BY MR. HEBERLIG

 6    Q.   I think this may have come up at the end of the last

 7    examination, but this was when you had the back and forth with

 8    Mr. Tejeda and Mr. Chamberlain about financing some potential

 9    debts to Autonomy, right?

10    A.   Yes.

11    Q.   And the spreadsheet that's attached, it's titled "Not Due

12    Q2 2010."  I think this came up in your direct examination.  Do

13    you remember that being a summary of debts that were not past

14    due but instead had due dates that were after the end of the

15    second quarter?

16    A.   Yes.

17         MR. HEBERLIG:  Let's take a look at that spreadsheet,

18    which is -- yes.

19         And can you just enlarge as much as you can there?  And if

20    we can go to the Autonomy, Inc., tab, which is I think where

21    the government focused its efforts, and I'm only interested in

22    the top portion -- right? -- summing up to $23 million.  Can

23    you make it a little bigger, please?

24    BY MR. HEBERLIG

25    Q.   Okay. Do you see that table as part of the Autonomy, Inc.,

PRASAD - CROSS / HEBERLIG

1  summary in the spreadsheet?

2  A.   Yes.

3  Q.   And just so we're on the same page, those are a variety of

4  debts that had invoices that were not due as of the end of June

5  2010?

6  A.   Yes.

7  Q.   So some future payment date, correct?

8  A.   That's correct.

9  Q.   And I think the government observed in its questions to

10  you that there are some resellers on the list like Capax and

11  MicroLink?

12  A.   Yes.

13  Q.   All right.  But then there are some other companies as

14  well, correct?

15  A.   Yes.

16       MR. HEBERLIG:  And if we can -- I believe we have the

17  ability to do this -- can we sort the due date of this document

18  to go from date order descending from soonest to be paid to

19  latest to be paid?

20  BY MR. HEBERLIG

21  Q.   All right.  Do you see that that's just resorted the

22  information so that now instead of it being categorized by

23  customer, it's categorized by the earliest due date to the

24  latest due date?

25  A.   Yes.

PRASAD - CROSS / HEBERLIG

1   Q.   And am I right that the resellers are still in there, but

2   they're sort of sprinkled in with the other non-reseller

3   customers of Autonomy, correct?

4   A.   Yes, based off the due dates.

5   Q.   So the oldest due date there is for Siemens Medical.  Are

6   you familiar with that company --

7   A.   Yes.

8   Q.   -- a medical organization?

9   A.   Yes, I am.

10  Q.   All right.  And then there are some old debts on there for

11  a company called Verdasys.  Do you know that company?

12  A.   I'm not too familiar with that company.

13  Q.   But it's not one of the resellers that you testified

14  about, correct?

15  A.   Not one that I testified about, no.

16  Q.   And then there's Carnival Cruise Lines and Holland America

17  Lines.  They, too, have some extended debt term?

18  A.   Yes.

19  Q.   And so long story short, this is not a phenomenon that's

20  unique to Autonomy's arrangements with resellers; am I correct?

21  A.   Having pushed out payment terms?

22  Q.   Yes.

23  A.   No, it's not a phenomenon.

24  Q.   This reflects that there were many other businesses that

25  too had extended payment terms, correct?

PRASAD - REDIRECT / GREEN

1  A.   Yes, there is on this list.

2        MR. HEBERLIG:   Okay.   That's all I have.   Thank you

3  very much.

4        THE WITNESS:   Sure.

5        THE COURT:   Okay.   Let's take our recess ladies and

6  gentlemen of the jury.   We'll be in recess until a quarter of

7  3:00.   Remember the admonition given to you.   Don't discuss the

8  case, allow anyone to discuss it with you, form or express any

9  opinion.   We'll resume at 2:45.

10        (Recess taken at 2:27 p.m.)

11        (Proceedings resumed at 2:46.m.)

12        THE COURT:   Let the record reflect all jurors are

13  present, parties are present.   You may proceed.

14                    <u>REDIRECT EXAMINATION</u>

15  BY MS. GREEN

16  Q.   Thank you, Ms. Prasad.

17  A.   You're welcome.

18  Q.   We're not going to go through every point that, Mr. Seilie

19  and Mr. Heberlig raised with you. I just want to touch on a few

20  of those points.

21  A.   Of course.

22  Q.   This is a very brief one.   Could we -- Mr. Seilie had been

23  speaking to you about Mr. Chamberlain telling you to go hands

24  off on payments and him being -- asking you where the "hands

25  off" term came from.   Do you remember that?

PRASAD - REDIRECT / GREEN

1    A.    Can you just remind me the names of --

2    Q.    No, I'm so sorry.

3    A.    No, I'm sorry.

4    Q.    Mr. Seilie is the individual that spoke with you first --

5    A.    Thank you.

6    Q.    -- Mr. Chamberlain's lawyer, and Mr. Heberlig is the

7    individual who spoke with you second.

8    A.    Yes.  The hands off.

9    Q.    Yes.  And who do you remember telling you that, to go

10   hands off on payments?

11   A.    Mr. Chamberlain.

12        MS. GREEN:  And could we look at Exhibit 797 very

13   briefly, please.

14   BY MS. GREEN:

15   Q.    And just zooming in on that Microtech paragraph that

16   Mr. Seilie had shown you.  You have quotation marks around the

17   "hands off."  Is that an indication of the term that,

18   Mr. Chamberlain used?

19   A.    I believe so, yes.

20   Q.    We can move on to talk about Capax.  I know you spoke

21   about that at length with Mr. Seilie, but I'm only going to

22   touch on a couple of points there.

23   A.    Okay.

24   Q.    He had -- and I can pull up emails if you need to be

25   refreshed.  He was talking to you -- Mr. Seilie was talking to

PRASAD - REDIRECT / GREEN

1   you about Mr. Chamberlain -- the discussion with

2   Mr. Chamberlain about not checking -- not chasing on certain

3   payments with Capax.  Do you remember that?

4   A.   Yes.

5   Q.   Okay.  And Mr. Seilie had said something along the lines

6   of:  So he only asked you to not chase on two -- two invoices,

7   Eli Lilly and FSA.  Do you remember that?

8   A.   I remember that.

9            MS. GREEN:  Okay.  Let's look at Exhibit 857, page 4,

10  please.  And let's zoom in on the bottom, near the bottom rows,

11  please, starting with "Eli Lilly."

12       It's very small, so I'll just call it out.  There are, in

13  fact, one, two, three, four, five payments from Capax related

14  to Eli Lilly and FSA; is that right?

15  A.   That's right.

16  Q.   And the Eli Lilly payment was over $6 million?

17  A.   Yes.  It was the largest.

18  Q.   It was the largest one.

19       And the FSA, three of those four payments were all over 1

20  million; is that right?

21  A.   Yes, it was.  That's correct.

22  Q.   And zooming out of this and looking at the whole table,

23  were those payments I just discussed the largest payments on

24  this table?

25  A.   The largest invoices?

PRASAD - REDIRECT / GREEN

1   Q.   Yes.

2   A.   Yes, they were.  They were the end user -- end user

3   orders -- invoices.

4   Q.   So the payments that, Mr. Chamberlain was telling you to

5   not chase were the invoices that were for the largest amounts;

6   is that right?

7   A.   That's right.

8   Q.   And the ones with the reseller, the reseller deals?

9   A.   That's correct.

10  Q.   I'm going to keep this up for a moment because this also

11  touches on another point that Mr. Seilie made.  He spoke to you

12  at length about Exhibit 15404, and I will remind you what that

13  was.

14  A.   Okay.

15  Q.   That was that spreadsheet that you sent at the end to

16  Mr. Chamberlain that you remember had the comments for Steve --

17  A.   Yes.

18  Q.   -- column P, I think.

19  A.   Yes.

20  Q.   You sent that to him, I think, in early July, 2010?  Yes.

21  Early July?

22  A.   I'm sorry.  It was definitely early July when we were

23  having the discussions.

24  Q.   Was it --

25  A.   I can't remember the date I sent it.  I believe so.

UNITED STATES COURT REPORTERS

PRASAD - REDIRECT / GREEN

1   Q.   Was that the final spreadsheet you looked at in that chain

2   where you added the columns --

3   A.   Yes.

4   Q.   -- comments for Steve?

5   A.   Yes.

6   Q.   When you had been discussing that with Mr. Seilie, I

7   believe you were trying to communicate, in response to some of

8   his questions, that this was not reflective of all of the

9   discussions you had had with Mr. Chamberlain on those accounts;

10  is that right?

11  A.   Definitely.  Yes, that's correct.

12        MS. GREEN:   And I want to use this as an example, so

13  let's go back to that -- this email, please, the first page,

14  and let's zoom in on this email.

15  BY MS. GREEN

16  Q.   So I'm just going to use this as one example.  This was an

17  email that you had written to Mr. Hogenson in June 14th, 2010,

18  in preparation for that meeting that you were having with

19  Mr. Chamberlain in San Jose, correct?

20  A.   Yes, that's correct.

21  Q.   Put together to discuss these problem and high-risk

22  accounts?

23  A.   Yes.

24  Q.   So this was prepared in advance of that Exhibit 15404

25  spreadsheet that we saw --

1  A.    That's correct.

2  Q.    -- with Mr. Seilie?

3        MS. GREEN:  And then let's go back to page 4, please.

4        And let's focus on -- page 4, please.  Thanks.  And let's

5  look at the updates column, please.

6  BY MS. GREEN:

7  Q.    And we looked at this on direct, so I'm not going to spend

8  much time on it, but you had talked us through those comments

9  that you were writing --

10 A.    Yes.

11 Q.    -- in preparation for that meeting with Mr. Chamberlain

12 flagging a number of issues here.  The first row was about "We

13 bought their software, they bought ours, will not pay until we

14 pay but more complex issues involved"; is that right?

15 A.    Yes, that's right.

16 Q.    And for the Eli Lilly and FSA deals you had written "Per

17 JB," John Baiocco --

18 A.    That's correct.

19 Q.    -- "no end user"?

20 A.    Yes.

21 Q.    An example of these prior communications, discussions you

22 had had with Mr. Chamberlain about those issues, right?

23 A.    Yes.  I had had those discussions prior to this, yes.

24 Q.    And prior to sending him that spreadsheet with the

25 comments to Mr. Chamberlain --

PRASAD - REDIRECT / GREEN

1    **A.**    Yes.

2    **Q.**    -- correct?

3    **A.**    Definitely, yes.

4    **Q.**    One more question while this is up.

5         Mr. Heberlig had shown you -- Mr. Heberlig being the

6    individual you spoke with second --

7    **A.**    Yes.  Thank you.

8    **Q.**    -- he had shown you a spreadsheet, and I can pull it up if

9    you need it, but he was talking you through cash payments that

10   had come in to Autonomy.  Do you remember that?

11   **A.**    You mean the activities reports?

12   **Q.**    No.  It was a spreadsheet.

13   **A.**    Ah.  It was a spreadsheet.  Yes.  Attached to my cash

14   collections for the quarter?

15   **Q.**    Yes.  And I can give you the exhibit number just so the

16   record is clear.  Or Mr. Heberlig can help me with that one,

17   but give me a second.

18        7762, I believe, but I will just confirm it.  Yes.  7762.

19   It was a spreadsheet that showed the cash coming in from

20   certain entities to Autonomy.  Do you remember that?

21   **A.**    Yes, at the end of the quarter.  I mean in July, beginning

22   of July.

23   **Q.**    It was in the context of you discussing with him cash

24   payments that were coming in that quarter.

25   **A.**    Was it the "Congratulations you" -- that one and "Here's

1    the attached"?

2    Q.    I think it was just -- yeah, it was the attachment that

3    showed the cash that came in --

4    A.    Uh-huh.

5    Q.    -- and he pointed out some invoices that had been paid.

6    A.    I was telling them, correct?  I'm sorry, I'm not sure

7    which --

8    Q.    Let's pull up 7762.

9    A.    Thank you.

10            MR. HEBERLIG:  Oh, could we switch over.

11            THE CLERK:  Sure.

12            MS. GREEN:  I just want to make sure that --

13            THE WITNESS:  I apologize.  I can't remember.

14    BY MS. GREEN

15    Q.    Oh, no apologies.  And I think you'd been walking

16    through --

17    A.    Yes.

18    Q.    Do you remember this?

19    A.    Yes.

20    Q.    Okay.

21    A.    That was the one that was attached to the email.

22    Q.    Uh-huh.

23        When Mr. Heberlig was showing you cash payments that had

24    come in, did you see a cash payment from Capax for $6 million

25    related to the Eli Lilly deal?

PRASAD - REDIRECT / GREEN

1   A.   I can't remember right now.

2   Q.   Okay.

3   A.   Sorry.  I can't remember -- I want to be sure about the

4   amount and --

5   Q.   Yeah.  I think it was on the Autonomy tab.

6   A.   Yes, I saw a payment.  I just wanted to -- did you say 6

7   million?

8   Q.   6 million.  I believe the ones he showed you were 1

9   million, but I want you to be comfortable.

10  A.   That's what I -- yes, I saw the 1 million.

11  Q.   You saw the 1 million, correct?

12       Do you remember receiving payment for the $6 million Eli

13  Lilly-Capax deal?

14  A.   I don't recall.  Sorry, you're referring to it.  I'm

15  looking for it but --

16  Q.   Did you see it with Mr. Heberlig?

17  A.   I don't believe so.

18  Q.   Uh-huh.  And was that Capax 6 million Eli Lilly deal one

19  of the deals that Mr. Chamberlain had told you not to chase?

20  A.   Yes, it was.

21  Q.   And this one might be easier to remember because it's a

22  larger number, the Microtech Vatican deal.  You discussed that,

23  I believe, with Mr. Heberlig as well?

24  A.   That's correct, yes.

25  Q.   Did you see when Mr. Heberlig was walking you through the

PRASAD - REDIRECT / GREEN

1  cash payments, did he show you an $11.5 million payment coming

2  in from Microtech?

3  **A.**    No.  I think I would remember that one.

4  **Q.**    And that was another deal that Mr. Chamberlain had told

5  you to go hands off on; is that right?

6  **A.**    That's correct.

7  **Q.**    I just want to look at this very briefly.  It was

8  Exhibit 9701 that was shown to you by Mr. Seilie related to

9  MicroLink.  I can use the --

10        **THE CLERK:**  Do you want defense to show it?

11        **MS. GREEN:**  That would be great because it's a defense

12  exhibit, if they don't mind.  Thank you so much.

13        And I think it was page 2.  Oh, yes, this one.

14  **BY MS. GREEN:**

15  **Q.**    I'm just going to ask you one question about this.

16  Mr. Seilie spent some time with you on this; it related to

17  MicroLink.  And I think this was an email from you.  "Yes, we

18  have these receivables on our books" and you wrote "And I

19  assume that they have the same AP on their side.  Have we been

20  able to validate this?"  Did you ever receive validation about

21  what was on the AP side of MicroLink's books?

22  **A.**    I don't believe so.

23  **Q.**    Give me a moment.  I'm just trying to be efficient with

24  your time.

25  **A.**    That's fine.  Let's me breathe.

PRASAD - REDIRECT / GREEN

1   Q.   These are the last questions.

2        So you spent a lot of time with both Mr. Heberlig and

3   Mr. Seilie talking about the writeoffs, the provisions, and I

4   want to just go back to Mr. Chamberlain's communication with

5   you early in that process.  So let's look at Exhibit 923, page

6   1.  And you looked at this with Mr. Seilie, I believe, and also

7   earlier today.

8   A.   There's just a delay.

9   Q.   Sorry?

10  A.   I don't have it yet.

11       MS. GREEN:  Switch it back to Mr. Hasan.  Sorry about

12  that.

13       THE CLERK:  Sorry.

14  BY MS. GREEN:

15  Q.   Okay.  And let's focus on Mr. -- the bottom --

16  Mr. Chamberlain's email, so the bottom and the end of it, yeah.

17  A.   Okay.

18  Q.   So by 2010 you had been doing collections since your

19  Interwoven days starting in 2000, which is about --

20  A.   It was ten years.

21  Q.   -- ten years?

22       Okay.  And have been involved in recommending writeoffs

23  since then?

24  A.   Part of it.

25  Q.   Part of your job?

 1    **A.**    Uh-huh.  When I went at such a senior level, I would give

 2    the feedback and share that with the person that would.

 3    **Q.**    And Mr. Chamberlain's response to your initial suggestions

 4    about writeoffs was "We need to do this gradually as this is a

 5    metric we provide to market.  A ramp-up in this percent would

 6    ring alarm bells."

 7            **MR. SEILI:**  Objection, Your Honor, this is leading,

 8    asked and answered, cumulative.  It's just repeating direct.

 9            **THE COURT:**  Overruled.

10    **BY MS. GREEN:**

11    **Q.**    In your mind, how is the public perception of this metric

12    relevant to whether to recommend a write-off, if at all?

13            **MR. SEILI:**  Same objections.  This is cumulative, Your

14    Honor.

15            **THE COURT:**  This is redirect examination.  Go ahead.

16    **BY MS. GREEN:**

17    **Q.**    You can answer.

18    **A.**    Sure.  I believe I --

19            **MR. SEILI:**  Objection, Your Honor.

20            **THE COURT:**  Well, wait.  I thought I did rule.  Didn't

21    I?

22            **MR. SEILI:**  Oh.  I thought you didn't.

23            **THE COURT:**  I'm sorry.  Maybe I faded.  Yeah.

24    Overruled.

25            **MR. SEILI:**  Okay.

**UNITED STATES COURT REPORTERS**

1          **THE COURT:**  It's redirect examination.  The government

2     is asking the witness what the explanation is, however she's

3     phrased it, with respect to a question that you asked, so I

4     don't know how it's cumulative.

5          **THE WITNESS:**  Would you mind repeating it?  I

6     understand, but I just want to make sure.

7          **MS. GREEN:**  Yeah.

8          **THE COURT:**  Start all over again.

9     **BY MS. GREEN:**

10    **Q.**   So his -- Mr. Chamberlain's response to you initially was,

11    "We need to do this gradually as this is a metric we provide to

12    market.  A ramp-up in this percent would ring alarm bells."

13         How, in your mind is public perception or market

14    perception or market having alarm bells relevant, if at all, to

15    the decision whether or not to do a write-off?

16    **A.**   I wouldn't think that should be taken into account.

17    **Q.**   What do you think should be taken into account?

18    **A.**   My -- my understanding is that writeoffs would be

19    independent -- the decision to write off would be independent

20    of the public or market awareness or perception or should be --

21    **Q.**   Uh-huh.

22    **A.**   -- separate.

23         The writeoffs would be what's considered bad debt;

24    cleaning up, non-collectible.  So the uncollectible items and

25    writeoffs, I wouldn't think, should be -- or the metric

 1   shouldn't be managed by public perception.

 2   **Q.**   And as head of collections and your role in collections,

 3   do you think that you had, or at least to the best of your

 4   abilities, paying attention to what invoices you felt were

 5   collectable, high risk?

 6   **A.**   Yes.  Absolutely.

 7   **Q.**   Mr. Seilie, again, it was in context to -- of that

 8   spreadsheet with the comments for Steve Chamberlain column --

 9   **A.**   Okay.

10   **Q.**   -- and he spent a lot of time flagging what he believed

11   were issues, lack of complete detail in your comments to

12   Mr. Chamberlain.  And we've already addressed part of that; we

13   looked at Exhibit 857 earlier.

14       I want to show you Exhibit 15404 very briefly, which is

15   the follow-up email to that.

16   **A.**   Okay.

17   **Q.**   And let's focus on the first paragraph, which is the

18   paragraph Mr. Seilie -- one of the paragraphs Mr. Seilie

19   discussed with you.

20   **A.**   Okay.

21   **Q.**   Here, as you discussed with Mr. Seilie, you corrected one

22   of your comments and Mr. Seilie spent time on this.  You write

23   "We do not have an actual email response from the customer"

24   because the customer had not been responding.

25       What Mr. Seilie didn't discuss with you and what I would

1  just want to point you to is the end of that paragraph.  "The
2  update I received by phone from Neil G on 6/8/10 stated that
3  this was not a viable order and that the document was signed as
4  a favor to a VP at the time."  (As read.)
5      So this mistake that Mr. Seilie was calling out was just a
6  difference between whether you received an email containing the
7  substantive information or a phone call about the information;
8  is that right?
9  **A.**   I believe so and -- yeah.
10 **Q.**   Yeah.
11 **A.**   I think I'm just right to clarify and correct that.
12 **Q.**   It was a call not an email?
13 **A.**   Uh-huh.
14 **Q.**   And let's move out of that -- out of that for a second.
15 One moment.  And then zooming in on the Capax paragraph that
16 Mr. Seilie also discussed with you.  Again, here were you
17 providing additional information to Mr. Chamberlain about why
18 you had listed the Capax FSA accounts in your risk -- list of,
19 you know, high-risk problem accounts?
20 **A.**   Yes.
21      And it's because, as you wrote here, Mr. Chamberlain had
22 asked you to refrain from contacting Eli Lilly, and it was your
23 understanding that the entire FSA deal was at risk; is that
24 right?
25 **A.**   Yes, that's correct.

PRASAD - REDIRECT / GREEN

1    Q.    And prior to this, you had had that -- we had seen your

2    problem account spreadsheet that talked about the discussion

3    you had with John Baiocco about there being no valid end user

4    for these deals; is that right?

5    A.    Yes, that's correct.

6    Q.    Are both -- I think it was actually Mr. Heberlig who, when

7    he was showing you the cash payments that were coming in, he

8    had been talking to you about whether the debts were actually

9    past due -- do you remember that? -- or whether the payment

10   date was further out in time for that invoice?

11        And I'm not -- I haven't given you a specific --

12   A.    Okay.

13   Q.    -- but you remember a discussion?

14   A.    Yes.  I'm not sure which one, but yes.

15   Q.    Yeah.  And going back to Exhibit 857, page 4, and zooming

16   in on the Eli Lilly 6.5 million debt, please.

17        The Eli Lilly 6.2 million payment, that was actually a

18   past due invoice, right?

19   A.    Yes, that was a past due invoice.

20   Q.    Seventy-two days past due in fact?

21   A.    That's correct.  The ones that are positive numbers in red

22   were the number of days past due as of the date of this report,

23   which was even earlier, so it was older?

24   Q.    Mr. Heberlig had showed you an activities report for

25   Microtech and FileTek -- I believe it was Exhibit 13086 -- and

1    had walked you through some of those payments.

2    A.    Yes, that's correct.

3            MS. GREEN:   And let's go to page 4 of this, which is

4    one of the pages Mr. Heberlig focused you on.  Can we zoom in?

5    Can we make it a little bit bigger?  I know it's hard.

6    BY MS. GREEN:

7    Q.    Was this the activity report from Microtech that you

8    looked at with Mr. Heberlig?

9    A.    That's the one we looked at, yes.

10            MS. GREEN:   And let's zoom out of that portion and

11    focus in on the bottom half of that table, please, with the --

12    no.  Higher up.  Yeah.  From there.  That looks good.

13    BY MS. GREEN:

14    Q.    You discussed this $10 million payment that came in from

15    Microtech on January 6, 2010.  Do you see that?

16    A.    I see that.

17    Q.    Do you know from where Microtech obtained funds to pay

18    Autonomy?

19    A.    Do I know where they got the funds?  I don't believe I

20    know that, no.

21    Q.    Were you aware that just a few --

22            MR. HEBERLIG:   Objection.  She said she wasn't aware.

23            THE COURT:   Sustained.

24    BY MS. GREEN:

25    Q.    Do you believe -- we spent a lot of time today looking at

PRASAD - REDIRECT / GREEN

1   issues flagged in some of your -- you know, issues you were

2   raising, you've discussed that with myself, Mr. Heberlig and

3   Mr. Seilie.  Do you believe that you were working hard for

4   Autonomy?

5   **A.**    I was working very hard for Autonomy.

6   **Q.**    And Mr. Heberlig showed you emails related to cash

7   collection and I only saw it briefly, but around the end of

8   June 2010 it looked like you were doing a good job especially,

9   you know, particularly in the cash collection --

10  **A.**    Uh-huh.

11  **Q.**    -- department.  I think I saw an email where it said you

12  had received 110 percent of your target.  Do you remember that?

13  **A.**    Yes.  That was correct.

14  **Q.**    And that was around the end of June 2010, do I remember

15  that correctly?

16  **A.**    That's correct.

17  **Q.**    Okay.

18  **A.**    I think the emailed might have been in July.

19  **Q.**    Might have been July?

20  **A.**    Uh-huh.

21  **Q.**    And July, that's --

22  **A.**    Or June or July, yeah.

23  **Q.**    And so, you know, you had been working collections,

24  raising issues that you saw; fair to say that?

25  **A.**    That's correct.

PRASAD - REDIRECT / GREEN

1   **Q.**   Trying to do a good job on the cash collection?

2   **A.**   Yes.

3   **Q.**   And then you were terminated in July, correct?

4   **A.**   Yes.

5   **Q.**   And when the day that that happened, did you receive --

6   did you receive any reason for that besides that you were hired

7   at will?

8            **MR. HEBERLIG:**  Object to the scope, Your Honor.

9   Outside the scope.

10           **THE COURT:**  I'll allow it.  Go ahead.

11  **BY MS. GREEN:**

12  **Q.**   Is that right?

13  **A.**   Did I get any reason for my -- besides at-will employment?

14  **Q.**   Yeah.

15  **A.**   No.  And I asked.

16  **Q.**   Do you believe you were terminating for raising --

17           **THE COURT:**  I get it.  I'm going to sustain any

18  further questions.

19           **MS. GREEN:**  That's okay.  One moment, Your Honor.

20       That's it.  Thank you, Your Honor.

21           **THE COURT:**  Okay.  Anything further?

22           **MR. HEBERLIG:**  No, sir.

23           **THE COURT:**  Okay.  Anything further?

24           **MR. REEVES:**  Could we please have one moment, please?

25           **MR. SEILI:**  Nothing further, Your Honor.

**UNITED STATES COURT REPORTERS**

VAIDYANATHAN - CROSS / SEILIE

```
 1              MS. GREEN:  Thank you.

 2              THE COURT:  Okay.  You're excused.  Thank you very

 3    much for coming.

 4              THE WITNESS:  Thank you very much.

 5                        (Witness excused.)

 6              THE COURT:  Okay.  Are we resuming the witness?

 7              MR. LEACH:  Yes, Your Honor.

 8              THE COURT:  Okay.

 9         Okay.  Let me remind you you're still under oath and if

10    you would scoot forward and speak clearly and slowly.

11              THE WITNESS:  Yes.

12              THE COURT:  Appreciate it.  Go ahead.

13                   CROSS-EXAMINATION    (resumed)

14    BY MR. SEILI:

15    Q.   Good afternoon, Mr. Vaidyanathan.  Did I get that right?

16    A.   Yes, you did.

17    Q.   Welcome back.

18         Now, you testified about a conversation you had with Steve

19    Chamberlain in around June 2010 the last time you testified.

20    Do you remember that?

21    A.   Yes.

22    Q.   That conversation focused on a list of issues that you

23    prepared at Mr. Hogenson's request, correct?

24    A.   Correct.

25    Q.   And at that point in time, just to resituate everybody,
```

1  this was right after you had assumed new roles regarding

2  Autonomy's US-based companies?

3  **A.**    Correct.

4  **Q.**    And your discussion with Mr. Chamberlain focused on the

5  issues you had identified in that spreadsheet, correct?

6  **A.**    That is correct.

7  **Q.**    Now let's look at that spreadsheet one more time,

8  Exhibit 3315.  And if we could just go straight to the

9  spreadsheet.  And we don't have to go over every item, but

10  there are some issues about accounts payable processing, right?

11  There's the -- correct?

12  **A.**    Which one are you referring to?

13  **Q.**    I'm looking at the open item No. 2 I think related to

14  processing payroll.

15  **A.**    Okay.  That's payroll.

16  **Q.**    Yeah.

17        **MR. SEILI:**  And then we could -- if we keep going

18  down, there's an issue about recons somewhere there.

19        We don't have to zoom in, we can just scroll page by page

20  unless the witness has trouble reading.

21        **THE WITNESS:**  No.

22  **BY MR. SEILI:**

23  **Q.**    There are some items about accounts payable, there's some

24  items that are under "General," and I think you testified

25  yesterday that those general items, they didn't include

1  anything about sales to resellers, right?

2  **A.**    No.

3  **Q.**    And that general list also didn't include any mention of

4  roundtrips, correct?

5  **A.**    No.

6  **Q.**    And now you listed some sales tax issues I think on the

7  next page.

8  **A.**    Yes.

9  **Q.**    Now, at the time you prepared this list and had the

10  discussion about these issues with Mr. Chamberlain, sales tax

11  was actually the most significant item you had in your mind,

12  right?

13  **A.**    Sales tax was significant because, you know, it's tax

14  related and you need to get that right.

15  **Q.**    Now, do you -- it was your estimate that the cumulative

16  dollar amount of all of the items on this list that you went

17  over with Mr. Chamberlain was around $2.5 million?

18  **A.**    I don't remember the number off the top of my head.

19  **Q.**    If you could refresh your recollection by looking at the

20  binder that I provided you.

21  **A.**    Okay.

22  **Q.**    If you look on --

23      Now I'll just situate this.  You provided some testimony

24  to the SEC in about 2014.  Do you remember that?

25  **A.**    Yes.

1    Q.   If you look at the transcript under tab 2 -- and I

2    apologize in advance for how small the text is --

3         THE COURT:  Okay.  Wait a minute.  Hold on.

4         MR. SEILI:  It's just refreshing memory.

5         THE COURT:  Okay.  Let me look at it.

6      This is in your 3500 materials?

7         MR. SEILI:  Correct.

8         THE COURT:  And you want him to look at tab 2?

9         MR. SEILI:  Tab 2.  Exhibit 20064.02-29.

10        MR. LEACH:  Counsel, can I get a copy?

11        MR. SEILI:  I don't know that I have --

12        THE COURT:  All right.  Is this a particular page?

13        MR. LEACH:  Yes.  Page 110 starting with the question:

14   So what was the cumulative dollar amount for these items?

15        THE COURT:  Okay.  Okay.

16        MR. SEILI:  Please feel free to read anything you need

17   in that transcript to get context.

18        THE COURT:  Well, so just read to yourself the

19   response, okay?  Just to yourself.

20        THE WITNESS:  Yes.

21   BY MR. SEILI:

22   Q.   Does that refresh your recollection about what the

23   approximate cumulative total dollar value was of all of the

24   items you listed with Mr. Chamberlain?

25   A.   Yes.

VAIDYANATHAN - CROSS / SEILIE

1   Q.   And was that amount about 2.5 million?

2   A.   Roughly.

3   Q.   You said upwards of 2.5 million?

4   A.   Yeah.

5   Q.   And about 2 million of that 2.5 million was related to a

6   sales tax accounting issue, correct?

7   A.   Yeah.  That was a high-level estimate, could be up or

8   down.

9   Q.   Getting back to the list -- you can close the binder --

10  you've listed other issues with inventory, capitalized

11  software, and I think you've already went over the last item

12  about FileTek, correct?

13  A.   Correct.

14  Q.   Now, nothing in this list references concerns about

15  resellers that didn't have end users locked in yet, right?

16  A.   Correct.

17  Q.   Nothing on this list references what you've been calling

18  "roundtrip transactions," correct?

19  A.   Correct.

20  Q.   And you just said -- you described this list as a

21  comprehensive list of the issues that you discussed with

22  Mr. Chamberlain on June 2010, correct?

23  A.   That's correct.

24  Q.   So during that June 2010 meeting with Mr. Chamberlain, you

25  did not raise any concerns about resellers without end users or

1   about roundtrips, correct?

2   A.   Correct, because I didn't know.

3   Q.   Now, Mr. Chamberlain eventually thanked you for raising

4   the issues on that list, didn't he?

5   A.   Yes.

6           MR. SEILI:  If we could look at Exhibit 918 and if we

7   could just zoom in, I believe the jury has already seen this.

8   BY MR. SEILI:

9   Q.   He drops you a note regarding your efforts this quarter

10  and he's basically praising about the issues that you raised,

11  correct?

12  A.   Correct.

13  Q.   He notes the shortfalls you identified?

14  A.   Yes.

15  Q.   And as we just discussed, the most important shortfall he

16  identified was about something that related to sales tax

17  collection, correct?

18  A.   Correct.

19  Q.   And he wants to work together with you to remedy these

20  shortfalls?

21  A.   Correct.

22  Q.   He suggests adding more resources to the bookkeeping team?

23  A.   Yes.

24          MR. SEILI:  Now, if we could look at Exhibit 9664.

25  I'd ask to admit that exhibit.

```
 1              THE COURT:  9664.

 2              MR. SEILI:  Yes.

 3              THE COURT:  Admitted.

 4              (Trial Exhibit 9664 received in evidence)

 5   BY MR. SEILI:

 6   Q.   You responded to Mr. Chamberlain's -- we'll wait for the

 7   document to get up on the screen.

 8        You responded to Mr. Chamberlain's email?

 9              MR. SEILI:  If we could zoom in on the first part of

10   the document.

11   BY MR. SEILI:

12   Q.   Do you see that?

13   A.   Yes.

14   Q.   You thank him for his confidence, correct?

15   A.   Yes.

16   Q.   And you say you're going to give these issues the

17   attention that they need once the dust settles after this

18   quarter end?

19   A.   Yes.

20   Q.   And the quarter end period is a very busy period of time

21   right?

22   A.   That is correct.

23   Q.   So you can't really address long-term issues that aren't

24   urgent at that time because there are so many issues coming up?

25   A.   Correct.  You need to close the books, correct.
```

VAIDYANATHAN - CROSS / SEILIE

1    Q.    Right.

2              MR. SEILI:  If we could look at Exhibit 9673.  I'd ask

3    to admit that exhibit.

4              THE COURT:  9673 admitted.

5              (Trial Exhibit 9673 received in evidence)

6    BY MR. SEILI:

7    Q.    Well, Mr. Chamberlain -- we don't need to focus on this,

8    he says, "Anything else you need, I will be off to bed shortly"

9    do you see that at the bottom?

10   A.    Yes.

11   Q.    And if we can zoom in on your response it says, "You've

12   been a big help.  I won't bug you today.  Hopefully, you can

13   get some sleep," and then he talks about the sales tax issues

14   that we just went over, right?

15   A.    Right.

16   Q.    Now, Mr. Chamberlain actually caused Pricewaterhouse

17   Coopers to come in and help you figure out how to fix the sales

18   tax problem, right?

19   A.    Did we go to PWC?  I think we, did yeah.

20   Q.    So you told Mr. Chamberlain about this issue with sales

21   tax, which was the biggest concern on your mind in June 2010,

22   correct?

23   A.    Yes, yes.

24   Q.    Mr. Chamberlain immediately retains Pricewaterhouse

25   Coopers to help you fix that issue, correct?

VAIDYANATHAN - CROSS / SEILIE

```
 1   A.    Yes.

 2   Q.    And you told Mr. Chamberlain he had been a big help?

 3   A.    Yes.

 4            MR. SEILI:  And if we can turn to Exhibit 9665.

 5            THE COURT:  9665 admitted.

 6            (Trial Exhibit 9665 received in evidence)

 7   BY MR. SEILI:

 8   Q.    Looking at Mr. Chamberlain's email.

 9         Now, this is a few days later, after the prior discussion

10   we went over.

11         Mr. Chamberlain is checking in with you again, right?

12   A.    Yes.

13   Q.    He tells you he knows about some extracurricular

14   activities at the moment?  Sorry.  We need a verbal answer for

15   the court reporter.

16   A.    Yes.  Yes.  Sorry.

17   Q.    Is that referring to the payroll fraud investigation?

18   A.    Yes.

19   Q.    And he thanks you for your hard work, correct?

20   A.    Yes.

21   Q.    And suggests you take a few days off?

22   A.    Yes.

23   Q.    And you respond again by thanking him, right?

24   A.    That's correct.

25            MR. SEILI:  And if we could show Mr. Vaidyanathan's
```

VAIDYANATHAN - CROSS / SEILIE

1  email.

2  **BY MR. SEILI:**

3  **Q.**    You say, "Will try to delegate as much as I can, it's just

4  that we have too much going on and I wanted to make sure that I

5  got a better handle by the time we got to Q2," correct?

6  **A.**    Yes.

7  **Q.**    And the reason you need a better handle is you're fairly

8  new with having to deal with the entirety of Autonomy America's

9  issues, right?

10  **A.**    Correct.

11  **Q.**    So you needed to get past the end of the quarter period,

12  which is very busy, correct?

13  **A.**    Plus we had a fraud going on, yes.

14  **Q.**    Right, and we had the investigation going on, correct?

15  **A.**    The fraud piece.  The investigation -- I don't know if it

16  was around that time or immediately after.  I'm a little hazy

17  on the timeline there.

18  **Q.**    And just to be precise, when you're referring to "fraud,"

19  you're referring to the payroll fraud issue that we discussed?

20  **A.**    That's the only fraud I was aware of.

21  **Q.**    Right.

22     If we could go to Exhibit 9666.

23        **THE COURT:**  9666 admitted.

24        (Trial Exhibit 9666 received in evidence)

25  \\\

```
 1   BY MR. SEILI:
 2   Q.   Now, three weeks later Mr. Chamberlain checks in again --
 3   right? -- this is in July?
 4   A.   Uh-huh.
 5   Q.   He asks if you've taken him up on the offer to take your
 6   family to dinner, right?
 7   A.   Yes.
 8   Q.   And he asks -- he suggests that your families get
 9   together?
10   A.   Yes.
11   Q.   You responded that you'd love to if we go to his email,
12   correct?
13   A.   Yes.  Yes.
14   Q.   Now, nothing in these emails suggests that you had
15   outstanding concerns that he failed to address, correct?
16   A.   That is correct.
17   Q.   Just shifting topics a bit, you testified about credit
18   hunts.  Do you remember that?
19   A.   Yes.
20   Q.   Now, the purpose of a credit hunt, based on your
21   understanding, was to make sure Autonomy was not overstating
22   costs and not understating revenue; is that fair?
23   A.   Well, revenue and costs are different things, but
24   understating expenses, yes, sir.
25   Q.   Right.  So --
```

1  **A.**   We wanted to make sure that the liability side of the

2  balance sheet was properly stated, which means you would

3  release the liabilities to expense.

4  **Q.**   So you reviewed it to make sure that that part of the

5  books was properly stated, correct?

6  **A.**   Yes.

7  **Q.**   And to provide one of -- an example of what you might try

8  to find if a credit hunt, Autonomy might have a reserve against

9  an accounts receivable that had, in fact, actually had been

10  collected.  That's a possibility, right?

11  **A.**   Yes, that's a possibility.

12  **Q.**   And if that happens, you would want to take away that

13  reserve because it's actually collected?

14  **A.**   That's correct.  Correct.

15  **Q.**   That's the kind of detail that Mr. Chamberlain was asking

16  you to hunt for, correct?

17  **A.**   Yes.  He was wanting to look for -- he was wanting all the

18  controllers to basically look for areas where we could find

19  liabilities that we could release to the P&L, that's correct.

20  To the income statement, P&L.

21  **Q.**   Now, you said it was, I think you used the word, "unusual"

22  to focus on only one side of the balance sheet --

23  **A.**   That's correct.

24  **Q.**   -- do you remember that?

25  **A.**   Yes.

1  Q.    Now, during these credit hunts, just to make sure I

2  understand what you did here, you would go through Autonomy's

3  records carefully and your goal was to make sure you weren't

4  overstating costs; is that accurate?

5  A.    Well, the goal when you close the books -- is the question

6  regarding closing the books or on this specific topic?

7  Q.    Oh.  On the specific topic of credit hunts what you said

8  was unusual was the fact that you were focusing on not

9  overstating costs.  Is that accurate?

10  A.    Yes.  We were focused only on making sure we were

11  releasing items that were overstating costs to the P&L, yes.

12  Q.    Now, you know Autonomy had auditors, right?

13  A.    Of course.

14  Q.    You spoke to the auditors?

15  A.    Of course.

16  Q.    Now, when auditors review financial statements, one of

17  their jobs is to make sure that a company isn't overstating

18  revenue, for instance, right?

19  A.    Yes.

20  Q.    And another one of their jobs is to make sure that the

21  company is not understating costs, correct?

22  A.    True.

23  Q.    So those are different sides of the same coin.  The

24  auditors are looking to make sure there's no understating of

25  costs, correct?

1    A.    Yes.

2    Q.    And what you were being asked to do was to make sure there

3    was no overstating of costs?

4    A.    True.

5    Q.    Both sides of the coin were being handled in that process,

6    correct?

7    A.    Well, from an auditor standpoint that's correct.

8    Q.    And you actually participated in these credit hunts,

9    right?

10   A.    Yes.  I was asked to look for them, I went and looked.

11   Q.    If we could look at Exhibit 3303-6.

12         THE CLERK:    330 . . .

13         THE COURT:    I'm sorry, 330.

14         MR. SEILI:    I'm sorry.  3308.6.  I said the wrong one.

15         THE COURT:    3308.6 admitted.

16         (Trial Exhibit 3308.6 received in evidence)

17   BY MR. SEILI:

18   Q.    If we could zoom -- this is a lengthy email.  We can look

19   at it in detail if you'd like, but this is an email that you

20   sent to Mr. Chamberlain copying Brent Hogenson and Percy Tejeda

21   suggesting some revenue modifications and expense modifications

22   in response to a credit hunt --

23   A.    Yes.

24   Q.    -- correct?

25   A.    Yes.

1   Q.   And you actually managed to identify, if we look at the

2   bottom line, the total summary P&L, we find additional revenue

3   of 111K, correct?

4   A.   Uh-huh.

5   Q.   And, you know, you can look through these items in detail,

6   but you didn't make any of these items up, did you?

7   A.   No.  No.

8   Q.   You looked at the evidence and these items were supported

9   by the evidence?

10  A.   Absolutely.

11  Q.   You were performing your job in good faith?

12  A.   Yes.

13  Q.   And you also looked at expense records.  You did that in

14  good faith, correct?

15  A.   Yes.

16  Q.   And if you look at the third to bottom line "In summary, a

17  comfortable 130K," you -- after your diligent review of expense

18  records you say that there is 130K and an optimistic 214K in

19  expense savings, right?

20  A.   Yes.

21  Q.   And the reason there's a range there is there's some

22  ambiguity and judgment calls in determining --

23  A.   True.

24  Q.   -- what the final number would be, right?

25  A.   True.

VAIDYANATHAN - CROSS / SEILIE

1    Q.   Now, Mr. Chamberlain responds by forwarding what you found

2    to Lisa Harris, correct?  Do you see that?

3    A.   Yes.

4    Q.   And these reflect -- and he copies you?

5    A.   Yes.

6    Q.   And these are the line items that would reflect the

7    suggestions that you've made, right?

8    A.   Yes.

9    Q.   Ms. Harris was the one who oversaw the cost accounting?

10   A.   Yes.

11   Q.   And Mr. Chamberlain is summarizing the accounting entries

12   that would result from your recommendations, correct?

13   A.   Yes.

14        MR. LEACH:  Your Honor, if I may, we're on 3308.5,

15   which is not in evidence right now.

16        THE COURT:  I thought I admitted it.

17        MR. LEACH:  The whole document?

18        MR. SEILI:  I would move --

19        THE COURT:  I don't know what -- I haven't seen it

20   so --

21        MR. SEILI:  I move to admit 3308, Your Honor.

22        THE CLERK:  That was admitted.

23        MR. SEILI:  I think that was admitted yesterday.

24   That's what I thought.

25        THE CLERK:  That was admitted on March 18th.

1          THE COURT:  Okay.  It's the first government exhibit.

2          MR. LEACH:  It was the .5 that I heard admitted, and I

3    just want to make sure the whole document is in.

4          THE CLERK:  It was .6.

5          MR. SEILI:  Yeah.

6    BY MR. SEILI:

7    Q.   If we go to page 2, 3308-2.  Now if we -- I guess we have

8    to continue on to the next page, but you actually continue

9    searching and find additional evidence of some expenses that

10   you thought could be recategorized.  Do you see that?

11   A.   Yes.

12   Q.   And at the bottom it says, "This totals 412K in releases"?

13   A.   Correct.

14   Q.   And, you know, just to provide one example, under bad debt

15   it shows that there's a customer you previously didn't expect

16   to pay and now he's expected to pay, right?

17   A.   Correct.

18   Q.   And as before, all of this was supported by the evidence.

19   You weren't making any of this up?

20   A.   That's correct.

21   Q.   And if we could scroll up.

22        You provide some more support for some of the items if we

23   look through the rest of the email.  Please let me know if

24   you'd like to pause, but if we -- if we go up, you've provided

25   some more details for the items.  Do you see that?

1   **A.**    Yes.

2   **Q.**    And at the very end, if we could go to the first page --

3   well, we could just see you provide a final total at the bottom

4   of this page.  Do you see that?

5   **A.**    Yes.

6   **Q.**    And your boss, Mr. Hogenson, recommends that you deserve

7   to be rewarded for your hard work.  Do you see that?

8   **A.**    Yes.

9   **Q.**    And all of this work you performed in good faith and in

10  adherence to accounting standards, right?

11  **A.**    That is correct.

12  **Q.**    Moving to another topic, you testified about cost

13  accounting yesterday, right?

14  **A.**    Yeah.

15  **Q.**    And you testified that cost accounting also sometimes

16  involves the exercise of judgment?

17  **A.**    Correct.

18  **Q.**    And at times you would actually attempt to exercise

19  judgment in a way that would result in a more favorable cost

20  allocation for Autonomy, right?

21  **A.**    I don't understand the question.

22       **MR. SEILI:**  Well, let's look at the document.  If we

23  could pull up Exhibit 16046.  I think I'd request to admit

24  that.

25       **THE COURT:**   160 --

**UNITED STATES COURT REPORTERS**

1           MR. SEILI:  46.  I think that's a government exhibit.

2           THE COURT:  -- 46.  Admitted.

3           (Trial Exhibit 16046 received in evidence)

4    BY MR. SEILI:

5    Q.   If we could go to the email on in the first part of this

6    chain.  All right.  So you're receiving an email from Aaron

7    Greer.  Do you see that?

8    A.   Yes.

9    Q.   And let's look at your response.

10          MR. SEILI:  And can we highlight from "Hi Lisa" to the

11   bottom or from the email sig block to -- right.

12   BY MR. SEILI:

13   Q.   "We have an item sitting in prepaid for about 264K

14   procured for potential Deloitte deal" and then it says, "Should

15   we be expensing this or capitalizing this?"  And you say "If we

16   can make a case against potential internal reuse, then it

17   should be capitalized and if we can make a case around it being

18   resold to others, we can leave it as it is until we get through

19   the preacquisition period."  Do you see that?

20   A.   Yes.

21   Q.   Now, this email reflects you weren't exactly concerned

22   about how to code a certain cost, correct?

23   A.   That's correct.

24   Q.   There wasn't a black and white answer here, right?

25   A.   It was the information you needed to make a determination,

VAIDYANATHAN - CROSS / SEILIE

1    correct.

2    **Q.**    It depended on the specifics of how this particular

3    hardware was being used?

4    **A.**    Correct.

5    **Q.**    So you asked Ms. Harris?

6    **A.**    Yes.

7    **Q.**    And then you suggested if you could make a case around a

8    potential internal misuse, reuse, it should be capitalized?

9    **A.**    Correct.

10   **Q.**    And you weren't suggesting doing anything improper when

11   you said if we could make a case, right?

12   **A.**    If that fixed asset was capable of being used internally

13   for Autonomy's books, then it's a fixed asset and should be

14   capitalized.

15   **Q.**    Now, Ms. Harris forwards your question and copies you,

16   forwards your question to Mr. Chamberlain and copies you.  Do

17   you see that?

18   **A.**    Yes.

19   **Q.**    And Mr. Chamberlain's response -- if we could highlight

20   that -- he says, "We need to find out what actually happened to

21   the hardware.  Presume it must have been he reused internally,

22   in which case it is fixed asset.  We cannot guess."  So he's

23   saying we actually need to find out what happened, correct?

24   **A.**    Yes.

25   **Q.**    He says we cannot guess on these accounting decisions?

```
 1   A.   Agreed.
 2   Q.   Moving topics to Mr. Hogenson.  You testified about
 3   Mr. Hogenson's termination, right?
 4   A.   Yes.
 5   Q.   Now, you were not involved in any of the discussions about
 6   the reasons for his termination, were you?
 7   A.   No.
 8   Q.   You had a speculation that Mr. Hogenson was fired because
 9   he escalated concerns about accounting to management, right?
10   A.   That is correct.
11   Q.   You also speculated that Mr. Tejeda and Ms. Prasad were
12   terminated for similar reasons?
13   A.   That is correct.
14   Q.   Now, you had concerns, as we just saw, that you escalated
15   to Mr. Chamberlain, right?
16   A.   Yes.
17   Q.   Mr. Chamberlain helped you resolve those issues, right?
18   A.   Yes.
19   Q.   And you were not fired?
20   A.   Yes.
21   Q.   You were -- you kept working for Autonomy for more than a
22   year after Mr. Hogenson was terminated?
23   A.   That is correct.
24   Q.   And after your colleagues were terminated, you asked
25   Mr. Chamberlain why you weren't fired, right?
```

VAIDYANATHAN - CROSS / SEILIE

1    **A.**    That's correct.

2    **Q.**    And even though you'd raised these issues with him, he

3    told you, you hadn't done anything inappropriate?

4    **A.**    That's correct.

5    **Q.**    You recall Mr. Chamberlain said he heard that there was no

6    evidence of wrongdoing by you?

7    **A.**    Yeah.  He said you didn't do anything inappropriate.

8    **Q.**    Now, you testified that after Mr. Hogenson's termination,

9    you were more hesitant to ask questions because you were

10   worried about your job security.  Do you remember that

11   testimony?

12   **A.**    Yes.

13   **Q.**    In fact, you continued to ask questions when you had some,

14   right?

15   **A.**    I always asked questions, but I would always make sure

16   that they were not regarding the resellers.

17   **Q.**    And --

18   **A.**    The number of questions I asked about resellers

19   dramatically declined.

20        **MR. SEILI:**  Well, then let's look at an example,

21   Exhibit 9702.  And if we could look at the bottom email.

22        Oh, this isn't in evidence.  Sorry, Your Honor.  If we

23   could --

24        **THE COURT:**  Which one is this?

25        **MR. SEILI:**  9702.

VAIDYANATHAN - CROSS / SEILIE

```
1           THE COURT:  90 --

2           MR. SEILI:  702.

3           THE COURT:  9072?

4           THE CLERK:  9702.

5           THE COURT:  9702.

6           MR. SEILI:  Yes.

7           THE COURT:  Thank you.  In evidence.

8           (Trial Exhibit 9702 received in evidence)

9    BY MR. SEILI:

10   Q.   If we could look at the bottom email there.  We don't need

11   to read through this whole thing but, you know, this is July

12   28th, 2011, right?

13   A.   Uh-huh.

14   Q.   This is more than a year after Mr. Hogenson's termination?

15   A.   Yes.

16   Q.   You expressed detailed concerns about the process for cash

17   posting and concerns about the billing system?

18   A.   Correct.

19   Q.   And you -- you even apologized for coming across as

20   impertinent, right?

21   A.   Yeah.

22   Q.   Mr. Chamberlain responds, if we can look at that.  He

23   says, "Ganesh-firstly, it does not come across as impertinent.

24   You should always feel free to share your views with us, they

25   are highly valued."  Correct?
```

VAIDYANATHAN - CROSS / SEILIE

1    A.    Yes.

2    Q.    And he addresses both of your concerns individually?

3    A.    Yes.

4    Q.    Now, on the issue of resellers, your testimony was that

5    when you would raise these issues with Mr. Chamberlain, he

6    would tell you that everything was okay because Deloitte

7    reviewed everything and was fine with it?

8    A.    That is correct.

9    Q.    And you had no reason to doubt that that was true, right?

10   A.    I didn't doubt it.

11   Q.    And you were never terminated?

12   A.    No.

13   Q.    Now, if we could look --

14          MR. SEILI:    I'd like to introduce Exhibit 9703.

15          THE COURT:    9703 admitted.

16          (Trial Exhibit 9703 received in evidence)

17   BY MR. SEILI:

18   Q.    If we could look at the bottom email.  Lee Welham is one

19   of Deloitte's editors [sic], right --

20   A.    Yes.

21   Q.    -- or editors.  Auditors, right?

22   A.    Yes, auditor.

23   Q.    He's sending this email directly to you?

24   A.    Yes.

25   Q.    He's not including anyone else?

VAIDYANATHAN - CROSS / SEILIE

1   A.   Yes.

2   Q.   He asks you -- and this is -- just to situate, this is on

3   February 21st, 2011, right?

4   A.   Correct.

5   Q.   The following year after Mr. Hogenson's termination?

6   A.   Correct.

7   Q.   Saying "Hi Ganesh, I hope you are well."  He's saying --

8   he's talking about the statutory audit opinion later today.

9   "Can you confirm in your role as Director of Account USA

10  whether you were aware of any events or circumstances which

11  need to be brought to our attention which would impact our

12  ability to sign the statutory audit opinion."  Do you see that?

13  A.   Yes.

14  Q.   If we could look at your response.  "In my capacity as

15  Director of Accounting of the US, I can confirm that I am not

16  aware of any material events or circumstances that may impact

17  your ability to sign off on our audit opinion."

18       That was your response to Lee Welham, the auditor for

19  Autonomy, correct?

20  A.   Correct.

21  Q.   He was an independent auditor of Autonomy, not part of the

22  company.

23  A.   Yes, but there's one small thing that we should focus here

24  on.

25  Q.   Well, you can focus on that --

VAIDYANATHAN - CROSS / SEILIE

1          **THE COURT:**  What is it?

2          **THE WITNESS:**  An auditor will not sign off on a

3    financial statement unless he gets a confirmation from a senior

4    member of the accounting team about any subsequent events that

5    may have occurred after the balance sheet date that might

6    impact his opinion.

7    **BY MR. SEILI:**

8    **Q.**   And you said there were none.  And you said there were

9    none?

10   **A.**   Yes.

11   **Q.**   Now, during the time you worked with Steven Chamberlain

12   you respected him, right?

13   **A.**   Absolutely.

14   **Q.**   You enjoyed working with him, right?

15   **A.**   I did.

16   **Q.**   You viewed him as a voice of reason in Autonomy's

17   Cambridge office, right?

18   **A.**   Absolutely.

19   **Q.**   You thought he would make a great CFO at another company,

20   right?

21   **A.**   Yes.

22   **Q.**   Presumably that's because you thought he had integrity?

23   **A.**   Yes.

24   **Q.**   He was always straightforward with you?

25   **A.**   He was.

1    **MR. SEILI:**  And if we could show -- look at

2   Exhibit 9667.

3           **THE COURT:**  9667 admitted.

4           (Trial Exhibit 9667 received in evidence)

5   **BY MR. SEILI:**

6   **Q.**   This is an email that you sent after you find out

7   Mr. Chamberlain is leaving Autonomy and becoming a CFO?  And

8   you voice all of the points that you've mentioned before,

9   right?

10          **MR. LEACH:**  Object as to the time period, Your Honor.

11          **THE COURT:**  Is this 2012?

12          **MR. SEILI:**  This goes to credibility and addresses the

13  points before Your Honor.

14          **THE COURT:**  Sustained.  It's not admitted at this

15  point.  It's stricken.  The jury is instructed to disregard.

16  **BY MR. SEILI:**

17  **Q.**   But you've communicated all of the things we've said about

18  Mr. Chamberlain to him before, correct?

19  **A.**   I always enjoyed working with Steve.

20  **Q.**   Now, we've never spoken to each other before today, right?

21  **A.**   Yes.

22  **Q.**   Are you aware that I've tried to -- tried more than once

23  to speak to you about -- to discuss your testimony in this case

24  on behalf of Mr. Chamberlain?

25  **A.**   Yes.

VAIDYANATHAN - CROSS / SEILIE

1    Q.   And you declined, right?

2    A.   Yes.

3    Q.   You were willing to speak to HP's lawyers in 2014, right?

4    A.   Yes.

5    Q.   And you voluntarily met with prosecutors when they

6    approached you I think maybe in 2018?

7    A.   Yes.

8    Q.   That was after they served you with a subpoena to testify

9    in front of a grand jury?

10   A.   Yes.

11   Q.   And after they told you that they were investigating

12   criminal charges against Mr. Hussain and others, right?

13   A.   Yes.

14   Q.   Had you obtained your citizenship at that point?

15   A.   Yes.

16   Q.   Okay.  And you spoke with the government again last

17   November, right?

18   A.   Yes.

19   Q.   And several more times in the last few months, right?

20   A.   Two times.

21   Q.   Two times?

22   A.   Yes.

23   Q.   But then I asked to speak with you on behalf of

24   Mr. Chamberlain and you refused, right?

25   A.   Yes.

1    Q.   You declined to speak with the attorneys representing

2    someone you considered to have integrity and to be the voice of

3    reason in the Cambridge office of Autonomy, right?

4    A.   I declined to speak with you, that's correct.

5    Q.   Did you ever decline a request from the government to

6    speak to them?

7    A.   No.

8          MR. SEILI:   No further questions.

9          THE COURT:   How long?

10         MR. LEACH:   Half an hour.

11         THE COURT:   Okay.  Ladies and gentlemen, we're going

12   to take our recess now.  We will resume tomorrow at 9:15.

13   Remember the admonition given to you.  Don't discuss the case,

14   allow anyone to discuss it with you, form or express any

15   opinion.  Thank you.

16       Okay.  You may step down.

17         (Proceedings were heard outside the presence of

18          the jury:)

19

20         THE COURT:   Okay.  Let the record reflect the jurors

21   have left.

22       So who wants to go first?

23         MR. LINCENBERG:   I would like to.

24         MR. LEACH:   I would like to go first, Your Honor, if I

25   could.

PROCEEDINGS

1      MR. LINCENBERG:  I would too.

2      THE COURT:  Well, maybe I should get one of those

3  arrows that they use in high school basketball.

4      MR. LEACH:  I'm going to lose that one.

5      MR. LINCENBERG:  Well, my -- I will say I want to

6  raise, while it's timely, this exhibit.

7      THE COURT:  I guarantee you it will be timely.  I mean

8  if we're talking about distant testimony that you would go

9  second.  It would not be viewed as a waiver that somehow is

10  untimely.

11      MR. LINCENBERG:  All right.  I will defer to my

12  colleague.

13      THE COURT:  There you go.

14      MR. LEACH:  First jump ball I've ever won.

15      Your Honor, in that line of questioning about meeting with

16  the government, I heard my friend on the other side in

17  connection with an investigation of Mr. Hussain and I'd like to

18  look at the record, but I'm very concerned that the defense has

19  injected prior proceedings here in a way that is going to have

20  this jury wondering whether is Shushovan Hussain.

21      I heard the name Hussain and --

22      THE COURT:  Well, the record is the record.  I don't

23  know, I didn't hear.  I mean, I -- I didn't pay attention to it

24  to that extent.

25      MR. LINCENBERG:  I didn't even pick up on it.  I guess

PROCEEDINGS

 1    that was stated, and that should not have been.

 2          MR. SEILI:  My apologies, Your Honor.  I shouldn't

 3    have said that.

 4          MR. REEVES:  The question was:  Did you meet with the

 5    government in connection with criminal charges against

 6    Mr. Hussain.  That's what was asked.

 7          MR. SEILI:  I think it was investigating criminal

 8    charges, and I meant to say Mr. Chamberlain --

 9          MR. WEINGARTEN:  Not charges, an investigation.

10          MR. SEILI:  -- and others.

11          THE COURT:  Well, I know but what am I going to do?

12    If I say something about it, it only highlights, so . . .

13          MR. LINCENBERG:  We need to be careful to avoid it.

14          THE COURT:  Yeah.

15          MR. LINCENBERG:  I didn't even pick up on it, but we

16    need to be careful to avoid it.

17          THE COURT:  Okay.

18          MR. LEACH:  I just want to flag it, Your Honor, we're

19    not requesting an instruction now but the defense has said a

20    lot about prior proceedings.  The government has been very

21    careful in how it refers to those proceedings, and I'm just

22    concerned this jury is going to be wondering where is

23    Mr. Hussain now.

24          THE COURT:  I think actually the only part of the

25    proceedings that I can recall in terms of examination was

PROCEEDINGS

```
 1   looking at a Grand Jury transcript.  There was that.  I don't
 2   think it's been unduly mentioned.  If you're going to refresh a
 3   person's recollection or impeach the person, generally you have
 4   to have some reference to a prior proceeding, but, again --
 5            MR. LINCENBERG:  And our goal --
 6            THE COURT:  -- let's be careful.
 7            MR. LINCENBERG:  -- is to say "prior proceeding" and
 8   not -- so certainly try to be careful of that.
 9            THE COURT:  Okay.  Let's -- let's move on.  I don't
10   know that there's anything that we should be doing.
11            MR. LINCENBERG:  Can I go now?
12            MR. LEACH:  Be my guest.
13            MR. LINCENBERG:  Your Honor, I'd like to focus on
14   Exhibit 9667 that we just showed with -- I'm going to call him
15   Ganesh because I can't pronounce his last time.
16            THE COURT:  The document -- I recall seeing the
17   document.  It was dated in 2012.
18            MR. LINCENBERG:  Yes, but it is a document that the
19   witness is discussing his dealings with Mr. Chamberlain during
20   the entire time period they worked together, which is at issue.
21       I understand the Court is trying to limit a discussion of
22   conduct after the sale, but there's loads and loads of
23   statements that people are making in 2012, 2013, 2014, that are
24   being referred to where they're talking about a witness and
25   this is a good example of that.  This is Ganesh, who was saying
```

1  in January of 2012 --
2          THE COURT:  First of all, he has said it -- there were
3  like ten questions.
4          MR. LINCENBERG:  Right.
5          THE COURT:  There were a whole series of questions --
6          MR. LINCENBERG:  Right.
7          THE COURT:  -- and he said it, said it, said it, he's
8  fine and so forth, he got along with him and he didn't have a
9  problem with it and on and on and on.  So, I mean, this is
10 entirely cumulative to all of that.  You're not impeaching him
11 with it.  You're introducing it -- you're introducing it for
12 character evidence of a character of Mr. Chamberlain, that's
13 what you're doing, because he's not -- he's not denying any of
14 the accolades that he's given Mr. Chamberlain in the nine
15 preceding questions.
16         MR. LINCENBERG:  Your Honor, the government spent a
17 lot of time on the direct examination with this witness trying
18 to draw out whatever inference they could about misconduct by
19 my client --
20         THE COURT:  Yes.
21         MR. LINCENBERG:  -- and here is this gentleman stating
22 something that is contradictory to that.
23         THE COURT:  And that's character evidence.
24         MR. LINCENBERG:  It's not just character evidence.
25         THE COURT:  No, it is character evidence, isn't it?

PROCEEDINGS

```
1              MR. LINCENBERG:  No, Judge.

2              THE COURT:  Well, what is it?

3              MR. LINCENBERG:  It goes to -- it's impeachment

4   evidence, in part, against the allegations because nobody is

5   going to -- nobody is going to credibly give the testimony that

6   the government's inferring that this witness gave suggesting

7   that my client was doing something improper, but he writes to

8   him in January of 2012 that "The company that you will be going

9   to is lucky.  You leave a very big void that is hard to fill.

10  You have many people on the US team who will now sadly start

11  thinking about losing the one voice of reason in finance in

12  Cambridge."

13       Their position is that Mr. Chamberlain was not the voice

14  of reason --

15             THE COURT:  So in other words --

16             MR. LINCENBERG:  -- and he was motivated.

17             THE COURT:  Thank you.  I think I understand your

18  point.

19       So in other words, they can ask -- they can ask this

20  witness -- if I let it in they can ask this witness, well, how

21  can you write this letter in light of the things that you did,

22  or let's go through the things that he did.  We -- you know,

23  you testified he did A, B, C, D, E, so how can you write this

24  letter.  They can ask him that, right?

25             MR. LINCENBERG:  They can try to impeach their own
```

PROCEEDINGS

```
 1   witness, that's fine.
 2           THE COURT:  Okay.
 3           MR. LEACH:  I asked this witness what Mr. Chamberlain
 4   said to him in July of 2010.  I didn't ask does he think he'll
 5   be a good CFO.  I didn't ask if he thinks he's a nice guy.  I
 6   asked him what Steve Chamberlain said about these reseller
 7   deals in July of 2010, and Steve Chamberlain's statements came
 8   into evidence.  This is just bolstering a witness with
 9   statements that aren't inconsistent.
10           MR. LINCENBERG:  And that is a vast understatement of
11   what they suggest that they asked of him.  They suggested that,
12   Mr. Chamberlain was -- was -- that there were bad deals, that
13   Mr. Chamberlain was pushing him and they brought out and
14   suggested that this guy was, therefore, afraid to raise things
15   in the future.  He wasn't afraid to raise anything with my
16   client because my client dealt with him honestly, and it is
17   reflected in this Exhibit 9667.
18           THE COURT:  Why isn't that correct?
19           MR. LEACH:  This is hearsay, this is after the fact.
20           THE COURT:  Well, this is hearsay.  I mean, well, it's
21   hearsay but it's -- it's introduced for this person's state of
22   mind --
23           MR. LINCENBERG:  Right.
24           THE COURT:  -- not for the truth that he's a terrific
25   host.
```

PROCEEDINGS

```
 1            (Reporter seeks clarification.)

 2        THE COURT:  Am I fading?  It's not for the truth of

 3   the matter, so it's not hearsay.

 4        Well --

 5        MR. LEACH:  Then what's it impeaching, Your Honor?

 6   The witness has said --

 7        THE COURT:  Well, because the person said -- the

 8   person said why is it impeaching?  Person said I saw this

 9   person commit 12 of the worst crimes I've ever seen and then --

10   and then a week later he says this is a great person.  I think

11   that's called -- I think that's impeachment.

12        MR. LINCENBERG:  Right.

13        THE COURT:  I mean, how do you -- how do you reconcile

14   the things that he said he did?  And you can say he didn't say

15   anything, but he did.  He said a number of things -- at least I

16   heard him say a number of things -- so I mean, I think it does

17   come in and I think it's -- I think you can respond to it.

18        MR. LINCENBERG:  Your Honor --

19        THE COURT:  I think so.  I think as a matter of law

20   it's all right, I mean, matter of evidence, I think it comes

21   in.

22        MR. LINCENBERG:  Your Honor, I'd like to raise one

23   other issue and I --

24        THE COURT:  Let me just sit for a minute.  Let me just

25   absorb that ruling.  Just one minute.  I want to savor it for a
```

PROCEEDINGS

 1    moment.

 2        Okay.  I'm rested now.  Go ahead.  The next thing.

 3            MR. LINCENBERG:  I'm sorry, Your Honor.

 4            THE COURT:  No.  Go ahead.

 5            MR. LINCENBERG:  Your Honor -- and I raise this

 6    because I don't want to keep doing it in the future if the

 7    Court is going to reject it.

 8        I turned to my colleague and said you should -- you should

 9    object on redirect that a lot of this is asked and answered and

10    cumulative.  And I get it, it's hard for the Court to know

11    where somebody's going, they're re-laying the foundation, but

12    are we going to have redirects which, you know, mostly are just

13    repeating the direct examination?  And, if so, should we be

14    getting up for recross --

15            THE COURT:  No.

16            MR. LINCENBERG:  -- and repeating the cross after

17    that?

18            THE COURT:  No, you shouldn't after that.  You

19    shouldn't.  Is that your question?

20            MR. LINCENBERG:  This is where the trial --

21            THE COURT:  I've answered it.

22            MR. LINCENBERG:  This is where the trial is going to

23    go on and on and on and on if everybody just keeps repeating

24    the points they made.

25            THE COURT:  It's going to go on and on and on even if

```
 1   you don't repeat.

 2           MR. LINCENBERG:  Exactly.

 3           THE COURT:  Okay.  Here's the thing about redirect.

 4   Here's the basic rule, as I understand it is what is allowed to

 5   go back on -- and that is a hashing and a rehashing or a

 6   rehashing of what's been hashed -- is if a question has been

 7   asked about a, quote, document, a statement or something like

 8   that, and even though it was addressed in direct, in redirect

 9   they're entitled to -- to question on it in order to, in their

10   view, correct or adjust or give context to the entire

11   statement.  So you're quite right.  That's been asked and

12   answered.  It was asked -- it was asked in the initial

13   examination.  However, that is redirect.  Redirect is not

14   limited to new things because -- because it's beyond the scope.

15   It's the other side, the other objection that we haven't talked

16   about.

17       So I let -- I let a party do it.

18       Now, what I don't -- what I try to do when I'm paying

19   attention is limit that to just make your point and move on

20   rather than let's hear the ten reasons of why it's done.

21       So that's -- it's a judgment call.  I like to make sure

22   that everybody gets one -- basically one full fair shot at the

23   witness.  I haven't restricted to any cross I don't think, nor

24   have I cut off the direct.  But obviously if I see there's some

25   repetition here, yes, I'll go on.
```

1    And, you know, I'm not telling you don't make an

2 objection, but I'm not shy about running -- I'm not -- I'm not

3 about to hear a side present its case twice in their -- in the

4 examination of a witness, so, you know, I'll try to be alert to

5 that so you don't have to step up.

6    On the other hand, you're free to make any objection you

7 want to make.  That's for the record.

8            **MR. LINCENBERG:**  Fair enough.  Thank you.

9            **THE COURT:**  All right.

10            **MR. LEACH:**  One additional point, Your Honor.

11            **THE COURT:**  Yes.

12            **MR. LEACH:**  I believe the defense has opened the door

13 to the settlements based on the cross-examination of Ms. Prasad

14 and the cross-examination of Mr. Vaidyanathan.

15    Starting in reverse order, for Mr. Vaidyanathan, they

16 tried to put him in a separate bucket from Ms. Prasad,

17 Mr. Tejeda and Mr. Hogenson and the implication is that those

18 three did something wrong but Mr. Vaidyanathan did not.

19    The only effective way to respond to this is the evidence

20 of what Autonomy actually did was attempt to silence those

21 three witnesses.  They're, you know, essentially trying to

22 raise the implication of why they were fired without permitting

23 the government to respond in an effective way, and I just think

24 they've opened the door to that.

25            **THE COURT:**  Well, I must tell you the defense, I

**PROCEEDINGS**

 1  thought, showed complete restraint in not going into it

 2  whatsoever.  I so frightened them that I -- that they were

 3  going to open the door that they just -- they just sat like,

 4  you know, cadets at West Point.

 5      **MR. LEACH:**  Respectfully, Your Honor, I don't think

 6  they did that.

 7      **THE COURT:**  It was amazing.  I've never seen such

 8  admirable behavior and restraint --

 9      **MR. HEBERLIG:**  That was our intention.

10      **THE COURT:**  -- from people from New York.

11      **MR. HEBERLIG:**  Washington.  Washington.

12      **THE COURT:**  Oh, Washington.  That's even worse.

13      **MR. HEBERLIG:**  Maybe worse.

14      **MR. LEACH:**  Your Honor, Mr. Seilie --

15      **THE COURT:**  All right.  I take it back.  No comments

16  on Washington.

17      Yes?  I guess you could -- I know that it's changed it.  I

18  mean, you can make your record.  I don't feel it's changed it.

19  They didn't go into it.  You know, what their cross was devoted

20  to in terms of Mr. Chamberlain's counsel was to raise questions

21  as to her responsiveness to requests that were made.

22      Okay.  I guess, to some extent, that provides the basis

23  for their argument that she was dismissed based upon

24  dissatisfaction with her performance and they said -- they will

25  say this was her performance that we demonstrated it by a

**PROCEEDINGS**

 1    number of documents.

 2         Your response to that, I suppose, it wasn't, and you can

 3    say whatever you want to say, but I don't want to get into why

 4    she was fired.  I mean, I've been -- you know, it's -- I'm not

 5    saying that's true of every other witness who comes in, but it

 6    is true of her I think anyway.

 7              **MR. REEVES:**  Thank you, Your Honor.

 8              **THE COURT:**  Thank you.

 9              **MR. REEVES:**  I have one last process point.

10              **THE COURT:**  A last one?  Do you mean there are no

11    more?  This is it?

12              **MR. REEVES:**  It will be it for me unless my colleague,

13    Mr. Leach has more.

14              **THE COURT:**  Go ahead, Mr. Reeves.  Let's hear the last

15    one.

16              **MR. REEVES:**  It really has to do with the implications

17    of the Court's with regard to Exhibit 9667.

18              **THE COURT:**  Okay.  Maybe I could look at it.

19              **MR. REEVES:**  Well, no.  I think you've been clear

20    about this recommendation by Mr. Vaidyanathan for

21    Mr. Chamberlain, that's clear.  My point is I thought the

22    ruling of the Court with regarded to evidence that happens

23    after the closing of the acquisition, on or around October

24    2011, was that the evidence stays out unless the party seeks

25    advanced notice and ruling from the Court.

PROCEEDINGS

1          **THE COURT:**  Yes --

2          **MR. REEVES:**  If that's the case --

3          **THE COURT:**  -- that was my ruling.  That was my

4    ruling.  However, the way I interpret my ruling is that if

5    somebody said something subsequent to the date of acquisition,

6    which relates back to what the person did during or

7    preacquisition, it's entirely possible it's relevant.  It's

8    entirely possible it's relevant.  After all, the restatement --

9          **MR. REEVES:**  Yes.

10         **THE COURT:**  -- is something that occurred after but

11   relates back to the -- relates back to the incident itself,

12   so --

13         **MR. REEVES:**  But the question is --

14         **THE COURT:**  Well, but this is -- and by the way, this

15   is also -- you know, this was cross-examination.  This was --

16   this was -- what do they call that material?  Is it 3500

17   material?  I don't know.  Is that what it's called?  Because

18   there's no obligation to produce it and so forth if you're

19   going to use it.

20       Anyway, no, I haven't changed my ruling.

21         **MR. REEVES:**  Judge, does --

22         **THE COURT:**  And I don't find that they ran afoul of my

23   ruling.

24         **MR. REEVES:**  I'm not saying that they did.  I'm

25   looking down the road.  I'm thinking about --

**UNITED STATES COURT REPORTERS**

**PROCEEDINGS**

```
 1              THE COURT:  Don't be.  Don't look too far down.  Do me
 2     a favor.
 3              MR. REEVES:  Does the Court want --
 4              THE COURT:  It's dark out there.  There's no light.
 5     You just -- we're in day three of this.
 6              MR. REEVES:  Last question or last attempt at a
 7     question, Your Honor.
 8          Does the Court want notice of when we're going to do that
 9     or --
10              THE COURT:  Do what?
11              MR. REEVES:  Use information that happens after the
12     closing of the acquisition.
13              THE COURT:  Well, you have to use your judgment.  I
14     mean, you see what I'm -- what I'm --
15              MR. REEVES:  Very well.  We will.  Thank you, Your
16     Honor.
17              THE COURT:  What I'm -- you see the way I've
18     approached this issue and just use judgment.  I mean, nobody's
19     going to go -- yeah, you know, get too excited about anything
20     one way or the other, but if I find there to be -- it's a
21     breach of the Court's direction, then, you know, it will pose a
22     lot of problems.  Sometimes it's -- you know, there -- there
23     could be problems.  So that's why -- and everybody's got to
24     follow the rules.
25          Well, there we are.  Okay.  So tomorrow I assume you will
```

**PROCEEDINGS**

1    finish with this witness; you're almost finished.

2    　　　　　**MR. LEACH:**  Yes.

3    　　　　　**THE COURT:**  And we have another witness, right?

4    　　　　　**MR. LEACH:**  We do, Your Honor.

5    　　　　　**THE COURT:**  Okay.  And is that witness going to take

6    the full day?

7    　　　　　**MR. LEACH:**  I expect it will take much of the day.  We

8    have another witness after that if we get there, so . . .

9    　　　　　**THE COURT:**  Okay.  Okay.  Thank you.  We'll see you

10   tomorrow.

11   　　　　　**MR. REEVES:**  Thank you.  Goodnight.

12   　　　　　(Adjourned at 4:03 p.m.)

13   　　　　　　　　　　　　　　--oOo--

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES COURT REPORTERS**

1

2                          __CERTIFICATE OF REPORTERS__

3              We certify that the foregoing is a correct transcript

4       from the record of proceedings in the above-entitled matter.

5

6

7       _____
        RHONDA AQUILINA, RMR, CRR
8       Official Court Reporter
        CA CSR# 9956

9

10      _____
        JENNIFER L. COULTHARD, RMR, CRR
11      Official Court Reporter
        CA CSR#14457

12

13      DATED:  MARCH 20, 2024

14

15

16

17

18

19

20

21

22

23

24

25