# Exhibit D

**To:** 'Mike Lynch'[mrl@autonomy.com]
**From:** Andrew Kanter
**Sent:** Thur 8/5/2010 5:08:45 AM
**Importance:** Normal
**Subject:** attorney client confidential
Fwd: FW: Qualified Disclosure Questions

original email

United States District Court
Northern District of California

**Trial Exhibit 10479**

Case No:   CR 18-0577 CRB
Date Entered: _____
By:   _____
Deputy Clerk

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02339805
EXH 10479-0001

| | |
|---|---|
| **To:** | Joel Scott[joels@autonomy.com] |
| **From:** | Brent Hogenson |
| **Sent:** | Wed 8/4/2010 5:32:52 PM |
| **Subject:** | Fwd: FW: Qualified Disclosure Questions |

---------- Forwarded message ----------
From: **Brent Hogenson** <Brent.Hogenson@autonomy.com>
Date: Wed, Jul 28, 2010 at 11:02 AM
Subject: FW: Qualified Disclosure Questions
To: bphogenson@gmail.com

**From:** Brent Hogenson
**Sent:** Monday, July 26, 2010 9:16 AM
**To:** 'whistle@fsa.gov.uk'
**Subject:** Qualified Disclosure Questions

July 26, 2010

Intelligence Department

The Financial Services Authority

25 The North Colonnade

Canary Wharf

London E14 5HS

011442070669200

Dear FSA Agent,

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02339806
EXH 10479-0002

**My Background:**

My name is Brent Hogenson and I am the Chief Financial Officer in the Americas for Autonomy Corporation PLC (stock symbol AU), which is traded on the London Stock Exchange. I became an employee of Autonomy when Autonomy acquired Interwoven Inc. in March 2009 where my role was Vice President of Finance from 2003 through 2009. Autonomy promoted me to CFO of Americas in mid 2009 and approved the consolidation of the Autonomy finance teams in the Americas at multiple subsidiaries and business units under a finance leadership team that I recommended in April 2010. I am a Certified Public Accountant in the State of California and spent the early part of my accounting career at Arthur Andersen in the audit division. I am 49 years old and have been in finance leader roles for the past 20 plus years of my career primarily with companies listed on the NASDAQ stock exchange. This is the first time in my career that I have sent a potential whistle blowing letter to a regulatory agency.

My only motive for sending this letter to the FSA is to ensure that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors. Autonomy has treated me very well since the acquisition of Interwoven in March 2009, noted by the following:

1) I have been promoted twice in the past 5 quarters, first to the CFO of Americas and second to the President of Interwoven.

2) My base salary has been significantly increased during an economic period where few employees received an increase to base salary

3) I have received almost 100% of my quarterly bonus for the past 5 quarters in a period where few employees received that high of a percentage of their potential quarterly bonus

4) I have received multiple new stock option grants over the past 5 quarters

5) At the annual sales meeting in January 2010, I was one of a very few (approximately 15 out of all operations/sales employees) that received an award for performance in 2009

6) I have been a significant part of the Interwoven/iManage operations/sales management which performed well in the last 5 quarters and I believe that we also performed well in Q2 2010. Therefore, my job satisfaction has been quite

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02339807
EXH 10479-0003

high.

7) I have restricted stock units that vest in June and July 2010, where the approximate value exceeds $150k—a significant value to me.

Prior to June 22, 2010 when I reported my concerns to Mike Lynch, CEO of Autonomy, Autonomy had treated me very well and I had no motive other than to ensure that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors.

**Upfront Disclosure:**

Before proceeding to the questions that I have raised related to our financial statements there is one issue that should be acknowledged. On June 25, 2010, the finance team in Americas working with the Human Resources Department identified a potential fraudulent activity from the Autonomy Inc. team in San Francisco. This team reported into the Corporate Controller in the Americas who reported into the VP of Finance in Cambridge between 2005 through mid 2009 and to me between mid 2009 through today.

Autonomy started an investigation after we received a notice from EDD when a terminated payroll employee applied for unemployment insurance (see attached email titled Incident). This employee applied for unemployment insurance when we terminated her for payroll errors found in our Q2 review initiated when we consolidated the finance functional leaders on the Americas team. I have attached an email titled Termination Approval which documents the payroll errors and has the termination approval on May 26th. The investigation subsequent to June 25, 2010 has identified that four employees of Autonomy, Inc. and the San Francisco finance team, including the Corporate Controller, are potentially involved and that the fraudulent payroll activity has been occurring since 2005 or 2006. The Corporate Controller has been placed on leave until the investigation is complete.

I would acknowledge that this fraudulent activity has occurred for many years including a short period while I have been CFO of Americas and that it was also found due to actions taken at my recommendation to consolidate the Americas finance teams. I would also like to be very clear that I had no knowledge of this fraudulent activity prior to June 25, 2010 and specifically when I reported my concerns to Mike Lynch on June 22, 2010.

**Introduction to the Questions:**

We consolidated the Autonomy finance team in the Americas from all subsidiaries and business units under functional finance leaders during the second quarter of 2010. As part of this effort, I asked these functional finance leaders to review all financial accounts, account reconciliations and significant transactions across all subsidiaries and business units in the Americas as I wanted to ensure that there were no material issues within the Americas.

During this Q2 internal review, the functional finance leaders, who report to me in the Americas, identified a few questions and I have provided additional detail below and in the attachments to this email. On June 22, 2010, I reported these questions to Mike Lynch, the CEO of Autonomy, and requested a meeting with the Audit Committee. There were numerous telephone discussions and exchanges of emails over the following few days. However, I did not have confidence that my questions would get to the Audit Committee in a complete form. On June 26, 2010, I sent my questions directly to Deloitte, Autonomy Auditors, and sent a copy of the email to Mike Lynch. Also on July 7, 2010, Percy Tejeda, the Director of Revenue in the America, who brought many of the questions below to my attention during this Q2 internal review, documented his concerns from our review in an email to me, which I have attached to this email named Percy Finance Concerns.

On July 22, 2010, Autonomy released first half 2010 financial statements in a press release and had an earnings call with analysts and investors. Between June 26, 2010 and July 22, 2010 I had numerous email exchanges with Autonomy management and the Senior Member of the Autonomy Audit Committee. However, neither the Audit Committee nor Deloitte have contacted me prior to July 26, 2010 or any member of the functional finance leaders in the Americas to further understand the questions detailed below. On July 26, 2010, I had a conference call with members of the Audit Committee and the COO of Autonomy. On this call I was asked if I had any further questions to those previously provided and then told that none of my questions were serious in nature. I expressed that I was uncomfortable and not confident about the company's procedures and concerned by the nature and lack of response to my questions and that it appeared that my questions were closed by Autonomy without a serious review or even discussion with me. Therefore I am sending my questions below and the attached documents directly to the FSA.

**Questions:**

**#1) Is revenue properly recognized on reseller transactions where there may be no End User and the Autonomy sales team subsequently completes an agreement directly with the End User?**

Below are two examples of a reseller transaction where in both examples Capax is the reseller.

**Example One:**

In Q4 2009, reseller Capax gave Autonomy an order for $6,286K for Eli Lilly (attached to this email named Capax December 2009 Agreement), of which license revenue recognized in Q4 2009 was $5,987K. The $6,286K was due for payment from Capax on March 31, 2010. As part of our normal collection calls, the collection team contacted Capax in early June, 2010 to confirm the payment date. The collection team had a difficult time getting a response from Capax and, as this was a large amount, asked me to call the reseller. The Director of Credit and Collections in the Americas and I called John Baicco, the Managing Partner at Capax, to follow up on the payment date. John asked me if I had discussed the agreement with two members of the Autonomy senior management team. I told him that I would but continued to request payment information. He then told me that the Eli Lilly deal had not closed in Q4 2009 and that he would not be able to make payment until the Eli Lilly deal closed and he had received payment from Eli Lilly.

In June 2010, Eli Lilly executed a License Agreement directly with Autonomy (attached to this email named Eli Lilly June 2010 Agreement) for a total value of $5,567K and license value of $5,303K. The transaction executed by Autonomy directly with Eli Lilly was $719K less than the reseller transaction recognized as revenue in Q4 2009.

In reviewing the SMS customer notes (SMS tracks all Autonomy sales meeting activity) related to Eli Lilly during the period of Q4 2009 through Q2 2010, I discovered that, following the revenue recognition in Q4 2009, there were still many pending steps in the sales process requiring the Autonomy sales team to complete in order to close the transaction with Eli Lilly. There was no mentioning of any steps or sales process to be performed by Capax in the SMS notes. I have attached screen shots of meeting notes from SMS during this period to this email named Eli Lilly SMS Meetings.

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

HP-SEC-02339810
EXH 10479-0006

The Autonomy Revenue Policy requires that the license fees be fixed and determinable prior to recognizing revenue. IFRS IAS – 18 section 14 (c) states "the amount of revenue can be measured reliably." Based on Autonomy's Revenue Policy and IFRS guideline, I believe that the agreement with the reseller, Capax, could potentially be viewed as a consignment. The Autonomy Revenue policy is written very similarly to the requirements under SOP 97-2 and in previous quarter earnings release presentations during 2009 where Autonomy reported the quarterly results there was a footnote on a slide that approximately stated – where IFRS is silent as to revenue recognition Autonomy follows the requirements of SOP 97-2 (I am not sure of the exact wording but believe that this is close and should be able to be confirmed by reviewing the four quarterly earnings presentations provided during the 2009 earnings calls). Also see Question 6 below.

Do the items listed below call into question if the Capax (Eli Lilly) Agreement that was recognized as revenue in Q4 2009 was fixed and determinable under the Autonomy Revenue Policy and could be measured reliably under IFRS?

1)  The payment from Capax is more than 90 days past the due date on their agreement and the Managing Partner stated that they would not pay Autonomy without payment from Eli Lilly.

2)  The Autonomy contract with Eli Lilly in June 2010 grants Autonomy right to designate the payee and Autonomy agrees that payment to designated payee releases Eli Lilly of the payment obligation. Autonomy might have designated payment under our Eli Lilly agreement to Capax and have Capax pay Autonomy. I have attached an email from Cambridge finance named Cambridge Inv Instructions, which instructs the Americas finance team to create pro forma invoices and send them to Capax for them to send to Eli Lilly.

3)  Autonomy completed the agreement in June 2010 and closed the deal directly with Eli Lilly, not through a contract between Capax and Eli Lilly

4)  The Autonomy sales channel was significantly involved in the ongoing sales effort without any mentioning of Capax's involvement in the SMS notes subsequent to recognizing revenue in Q4 2009.

5)  The contractual terms between Autonomy and Eli Lilly have a contingency clause where acceptance testing is required against some of the licensed software; however, the contingency clause was not included in the Capax agreement.

6)  The contractual terms between Autonomy and Eli Lilly have added significant warranty provisions that were not included in the Capax agreement.

FOIA CONFIDENTIAL TREATMENT REQUESTED

7) The contractual terms between Autonomy and Eli Lilly have added a change in the maintenance service period for products subject to acceptance testing that was not included in the Capax agreement.

8) Autonomy does not have the right to invoice Eli Lilly for products subject to acceptance testing until acceptance testing is complete

**Example Two:**

In Q3 2009 Capax signed an order with Autonomy (attached to this email named Capax Kraft Q3 2009) where the End User was identified as Kraft and Autonomy recognized a $4M license fee as revenue in Q3 2009. In December 2009, Kraft executed a License Agreement directly with Autonomy (attached to this email named Kraft December 2009 Agreement) with a license fee of $4M. In a letter from the Autonomy COO of Americas to Capax on December 29, 2010 (attached to this email named Letter to Capax Dec 29 2009), Autonomy agreed to remove the payment obligation due from Capax related to the signed Kraft order in Q3 2009 and pay Capax a one time fee of $400K in exchange of Capax not to collect or attempt to collect from Kraft (even though Capax never had an agreement with Kraft or an obligation from Kraft to pay Capax). Based on the above information, should Autonomy recognize the Capax revenue in Q3 2009?

**Additional Information:**

There are many significant payments due from resellers in the Americas on our accounts receivable aging reports that remain unpaid and significantly beyond the invoice due date. These invoices may be considered uncollectable but are not yet reserved for as of June 22, 2010. However, Autonomy stated in its 2009 Annual Report and the presentations to investors during the earnings calls that its bad debt is only less than 1% of its revenues. There have been discussions between legal and finance in the Americas with many of these resellers where it has been noted that many of these invoices remain past due as a result of no end user agreement. I have attached a spreadsheet named Problem Accounts where the notes under the Updates column were made by the Americas collection team. Also, note the amount past due from Microlink in Question #3 below.

Commission payments to sales reps are generally not accrued or paid when the reseller agreement is recognized as revenue but rather if and when the end user transaction is

FOIA CONFIDENTIAL TREATMENT REQUESTED

complete.

There are multiple similar reseller transactions to these two examples which have been recognized as revenue from 2008 through Q1 2010, many of which range between $1M and $11M per transaction. To ensure you have complete information, I attached to this email the past nine quarterly revenue spreadsheets dating back to Q1 2008-named QX 20XX Closed Deals. These spreadsheets were prepared by the Corporate Controller of Autonomy, Inc, Zantaz, Etalk and Verity (Subsidiaries or Business Units) working out of the San Francisco Autonomy office. I have reviewed these spreadsheets and highlighted in yellow potentially similar transactions to the two examples above of reseller transaction, which are primarily transactions where the Sales Rep is only identified as MGMT. If the terms of the reseller agreements are not final or Autonomy has significant work remaining to close the deal with the end user, the cumulative effect of the potential reseller transactions without an end user agreement may be material to the Autonomy Financial Statements between 2008 and Q1 2010.

**#2) When Autonomy contractually agrees to potentially overpay a reseller for services performed, does the potential overpayment impact current license revenue transactions with the same reseller where the payment of the license transaction is due from the reseller in future periods that may be similar in timing to the potential overpayment by Autonomy to the reseller for services?**

I have attached the following documents to this email:

1) 2009-10-01 First Amend to Capax Var Agreement

2) Problem Accounts – filter the Bill To column to Capax Global and review the future payment terms along with the comments in the Updates column.

3) Capax Payment Schedule – details payments due to and due from Capax

4) Capax Increase payment by 125K – Autonomy agrees to increase monthly payments to Capax for EDD by $225K and Support by $125K

In considering the answer to this question, note that the 2009-10-01 First Amend to Capax Var Agreement allows Capax to invoice Autonomy customers for the maintenance fees in current and future annual periods. Capax will pay Autonomy 15% of the maintenance fees collected from Autonomy customers supported by Capax and keep 85%

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02339813
EXH 10479-0009

of the maintenance fees collected. The historical profit margin achieved by Autonomy on maintenance revenue is approximately 85%, but in this amendment we are providing Capax with a revenue stream into the future of 85% of the collected maintenance fees. If you filter the Bill To column in the attached Problem Accounts spreadsheet to Capax Global and review the outstanding invoices with significantly extended payment terms and the associated comments from the collection team in the Updates column, you may note that it is possible that Autonomy has provided 85% of the collected maintenance fee to Capax to cover the future payments due from Capax where there may not be an end user agreement.

**#3) Is there a financial statement impact from the potential related party relationships identified below on recorded revenue transactions?**

The following information is from the attached spreadsheet labeled Q4 2009 Closed Deals prepared by the Corporate Controller of Autonomy, Inc.

| Inv Date | Reseller – End User | Sales Rep | Lic Revenue |
|---|---|---|---|
| 31-Dec | Microlink – (1) | MGMT | 2,000,000 |
| 30-Dec | MicroTech LLC – (1) | MGMT | 9,523,810 |
| 31-Dec | MicroTech LLC – Amazon | MGMT | 131,418 |
| 31-Dec | MicroTech LLC - Avaya | MGMT | 360,000 |
| 31-Dec | MicroTech LLC - Honeywell | MGMT | 1,800,000 |
| 31-Dec | MicroTech LLC - KPMG | MGMT | 153,000 |
| 31-Dec | MicroTech LLC – Manu Life | MGMT | 1,080,000 |
| 31-Dec | MicroTech LLC – MS | MGMT | 4,656,000 |

(1) The end user on these transactions is Discover Technologies. See related parties section of this question below.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02339814
EXH 10479-0010

Per the attached email named Commission Payments on Reseller Deals, there was no commission accrued on these deals in Q4 2009 when Autonomy recognized revenue in the Q4 financial statements.

In Q1 2010 we invoiced the following (detail from the Problem Accounts spreadsheet attached to this email):

| Inv Date | Revenue Summary | Sales Rep | Inv Amount |
|---|---|---|---|
| 31-Mar | Microtech LLC – Vatican | Blank | 11,550,000 |
| 31-Mar | Discover Technologies – Citi | Blank | 4,394,250 |

I have been told by the finance team in San Francisco that transactions without a sales rep identified are transactions where the end user has not completed the agreement by the end of the quarter in which Autonomy recognizes revenue. The end user identified above may be a placeholder for an agreement to be negotiated subsequent to the invoice date. Per the attached spreadsheet Q1 2010 Closed Deals, Autonomy may have closed the deals with Manulife and Morgan Stanley in Q1 2010 as they are removed from the spreadsheet with negative numbers at the bottom of tab IDOL-K2-UltraSeek. There are many other transactions on the quarterly closed deals spreadsheets to these resellers that have been closed on the last day of a quarter where the Sales Rep is MGMT throughout 2008 and Q1 2010.

**Related Party Data:**

In February 2010, Autonomy acquired Microlink for $55M. At the time of the acquisition, Autonomy had approximately $16M of outstanding accounts receivable with due dates as follows:

| Due Date | Amount | |
|---|---|---|
| March 31, 2009 | 6,875,000 | 10 months past due |

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-02339815
EXH 10479-0011

| | | |
|---|---|---|
| June 30, 2009 | 4,576,200 | 7 months past due |
| Sept 18, 2009 | 203,250 | 4 months past due |
| Sept 30, 2009 | 2,008,238 | 4 months past due |
| Feb 14, 2010 | <u>2,300,000</u> | (1) |
| Total | 15,962,688 | |

(1) The February 14th invoice above is an invoice to Discovery Technologies, which had license revenue of $2,000,000 and maintenance of $300,000 for a total of $2,300,000.

In the attached email named Q210 Sales Commission Accrual you will find the following statement and a list of transactions related to Microlink from 2007 through 2009 where there has been no commission accrual. Note the comment below from the email written by a Sales Operations employee at Autonomy Inc. in San Francisco which states "Microlink not expecting the deals to close." There are a large number of deals identified in this email following the statement below:

- Below is a list of past Microlink deals. No accrual has been reflected for these deals on the accrual worksheet. I believe these will be written off. Also, I listed the Microlink deals that are no longer being tracked for commission purposes due to Microlink not expecting the deals to close.

Microlink's Address is as follows:

8330 Boone Blvd

Suite 300

Vienna, VA 22182

Phone: 703-556-4440

MicroTech's Address is as follows:

8330 Boone Blvd

Suite 600

Vienna, VA 22182

Phone: 703-691-1073

Discover Technologies has a very limited website. There is a whitepaper titled Automation Speeds the Ability to Collaborate and Turbo-Charges the Enterprise Search User Experience. The bottom of the pages of this whitepaper (attached to this email named Discover Whitepaper) has the following information:

www.DiscoverTechnologies.com | 703-556-4400 | info@microlinkllc.com

Is it possible that the Microlink acquisition in Q1 2010 was partially done to provide a vehicle to 1) remove the $16M in outstanding invoices where a large percent were significantly past due and where there may not be an End User to pay Microlink; and 2) potentially provide a cash balance to pay invoices on reseller agreements with potential related parties (MicroTech and Discovery Technologies) where there may not be an end user.

**#4) Have the barter transactions below been reviewed for the economic benefit and fair value on both sides of the transactions to ensure that they are properly recorded in our financial statements?**

Autonomy made the following purchases of software from FileTek, Inc.:

| | |
|---|---|
| December 31, 2009 | 10,367,280 |
| May 11, 2010 | 11,518,214 |

Autonomy sold the following license and maintenance revenue to FileTek as follows:

December 31, 2009        8,480,000 IDOL Product

March 31, 2010           9,010,000 500 users Liquid Office plus some OEM product

In a barter transaction, my understanding is that IFRS is not substantially different from GAAP and requires validation of the fair value and economic benefit on both sides of the transaction. My information is limited; however, I have asked Sean Sullivan, Liquid Office Sales VP, for a low and high range of a liquid office transaction with 500 to 1000 users. The range that he gave me was $300,000 to $1,000,000, which is only a part of the March 31, 2010 transaction and does not include the OEM product, which is difficult for me to find fair value.

#5) Does the revenue accrued and included in the Q1 2010 financial statements related to maintenance renewals reflect the potentially possible renewals from customers who have not yet agreed to renew expired maintenance agreements?

In Q1 2010 a combined Autonomy, Inc, Etalk, Zantaz and Verity business units recorded a revenue accrual of $6,591K related to an estimate of customers renewing their maintenance contracts where the service period had lapsed prior to March 31, 2010. In our Q2 internal review as part of consolidating the Americas finance team, it was noted that this revenue accrual calculation assumed a significant percentage (almost 100%) of the maintenance renewals that were up to 12 months beyond the end of their last service period and these business units recorded the revenue for the lapsed service period in the Q1 financial statements. In our Q2 internal review, we recalculated the potential renewal revenue associated with these accounts using reasonable renewal percentages based upon the length of time from the end of the last maintenance service period and noted that the Q1 2010 revenue accrual was potentially overstated by $4.8M. All judgment accounts including accruals and reserves are specifically the responsibility of the finance team at the Autonomy head office in Cambridge.

#6) Is it possible that a regular user of the market may be mislead by the following statements within the information either known or provided to analysts and investors by Autonomy in the Annual Report and/or the web presentation along with the quarterly earnings calls in 2009?

1)   Autonomy is a publicly traded company listed on the London Stock Exchange

and would generally follow IFRS and IAS 18 as it applies to revenue recognition.

2) In the Autonomy earnings release presentations to analysts and investors during 2009 there was a footnote on a slide that approximately stated – where IFRS is silent as to revenue recognition Autonomy follows the requirements of GAAP or SOP 97-2 (I am not sure of the exact wording but believe that this is close and should be able to be confirmed by reviewing the four quarterly earnings presentations provided during the 2009 earnings calls). This has been noticed and discussed between multiple members of the finance teams in both the Americas and Cambridge.

3) The Autonomy Revenue Policy from the 2009 annual report includes the following:

a. Revenues from software license agreements are recognized where there is **persuasive evidence of an agreement** with a customer (contract and/or binding purchase order), **delivery of the software has taken place**, **collectability is probable** and the **fee** has been contractually agreed and is not subject to adjustment or refund (i.e. **is fixed and determinable**).

b. Paragraph 8 of SOP 97-2 is as follows:

"revenue should be recognized when all of the following criteria are met.

- **Persuasive evidence of an arrangement** exists.

- **Delivery has occurred**.

- The vendor's **fee is fixed or determinable**.

- **Collectability is probable**."

I have highlighted the words or phrases that are the same or similar between a. and b. above.

Is it possible that the items above provide a false or misleading impression as to if Autonomy follows SOP 97-2 for revenue recognition, to a regular user of the London Stock Exchange when buying or selling Autonomy stock?

**Finally:**

The purpose of this letter to the FSA is to provide assistance in ensuring that the

Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors. I am concerned that Autonomy will deflect the focus on the six questions above by focusing attention on the item identified in the Upfront Disclosure section. I agree that the Upfront Disclosure section is important; however, I also believe that it is important to address the six questions asked above.

Not all of the attachments identified in this email will fit in the size requirements of one email. Therefore, I will send additional emails with the attachments that are not sent with this email.

Please confirm the receipt of these emails by return email. I will be available at your request to answer any questions.

Regards,

**Brent Hogenson**

**President Autonomy Interwoven**

**CFO Autonomy Americas**
**Tel: 408.953.7058**
**Mobile: 408.718.1376**
**E-mail: brent.hogenson@autonomy.com**