# EXHIBIT 2

R Webb QC, 1st, RW1

IN THE HIGH COURT OF JUSTICE                                Claim No. HC-2015-001324

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**BUSINESS LIST (ChD)**

**B E T W E E N :**

**(1) ACL NETHERLANDS BV (as successor to AUTONOMY CORPORATION LIMITED)**
**(2) HEWLETT-PACKARD VISION BV**
**(3) AUTONOMY SYSTEMS LIMITED**
**(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY INC**

**Claimants**

**- and -**

**(1) MICHAEL RICHARD LYNCH**
**(2) SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

**WITNESS STATEMENT OF ROBERT STOPFORD WEBB QC**

I, **ROBERT STOPFORD WEBB QC**, of 7-8 Essex Street London WC2R 3LD, will say as follows:

1. The facts and matters set out in this statement are true to the best of my knowledge and belief. Where facts and matters are not within my own knowledge, I identify the source of my information and belief. In this statement, I comment on things I did not necessarily know at the time. I have tried to distinguish between matters I knew at the time and matters I have learned during this litigation.

2. I have not attached the documents to which I refer in this witness statement. I understand that references to document numbers in this witness statement in bold text refer to those document identification numbers used by the parties in this matter.

**My Background**

3. I was called to the Bar in 1971 and took silk in 1988. I have been a Bencher at Inner Temple since 1997. I was Head of Chambers at 5, Bell Yard for ten years, from 1988 to 1998. I am still a door tenant at Brick Court Chambers in London.

4. I was General Counsel for British Airways between 1998 and 2009 and for Rolls-Royce between 2012 and 2015. I have also held non-executive directorships and chairman

R Webb QC, 1st, RW1

positions with various British companies including the London Stock Exchange (2001 to 2015), BBC (2007 to 2012) and Argent Ltd (2009 -2012).

5. I was the Non-Executive Chairman of Autonomy from mid 2009 until its acquisition by HP in 2011.

6. I am currently the Chairman of Darktrace Limited and Luminance, amongst other roles.

**Sale motivation**

7. I have been asked to respond to a statement made by Mr Robison, who states at paragraph 11 of his statement that he believed that Mr Quattrone of Qatalyst Partners was assisting Autonomy's management in finding a buyer for Autonomy in early 2011. I have been asked whether I was aware of any plan by the management of Autonomy to find a buyer for the company in 2011.

8. When I became Chairman of Autonomy in May 2009, I was not aware of any need or particular desire on the part of the company's management team to sell the company. That remained the position for the duration of my Chairmanship of the company. It was a public company so management desire would not have been conclusive - shareholders have the final say.

9. My perspective was that the company was doing extremely well and there were no signs of distress to motivate the management to sell the company. Autonomy was never short of cash. Its product was highly regarded and in great demand.

**Culture at Autonomy**

10. I have been asked to respond to statements by HP's witnesses about the culture of working at Autonomy. I have seen the statement of Mr Youngjohns, who joined in 2012 but who describes stories that he heard about Autonomy's management prior to the purchase by HP. He describes, in paragraphs 24 to 26, an "environment of fear and competition" and "paranoia" within Autonomy while it was under the management of Dr Lynch and Mr Hussain.

11. When I joined the company as Non-Executive Chairman, I was their first chairman. I was new to the tech industry and it was a very different atmosphere from other places I had been involved with previously (e.g. BBC). Dr Lynch and I had initially met while we were both on the BBC Board. I did diligence on Dr Lynch and the management and Autonomy before joining, including speaking with Deloitte, and was satisfied. They were well regarded. I had never worked with people like Dr Lynch and Sushovan Hussain, but I came to admire them, and was impressed. They were very keen to drive the business. They were entrepreneurial business builders.

12. While I was Chairman, I tried to get to know the company and be as approachable as possible. For example, I would visit the open-plan office from time to time to speak to people and attend annual sales kick-offs. I would ask staff about their role and what it was like working at Autonomy. The consistent impression I had was that Autonomy was fast-paced and had an entrepreneurial feel to it. It was hard-driving, competitive

R Webb QC, 1st, RW1

and a demanding place to work, particularly in Sales. However, I did not come across anything that crossed the line beyond that. My impressions were that the atmosphere was one of excitement, rather than apprehension and fear. People seemed to enjoy the pace, the ambition of the company, and the challenge and the rigour of working for Autonomy. The Sales' kick-off had positive atmosphere.

13. I have been asked if I recall an employee called Marc Geall, who claims to have had a conversation with me in May 2010. I remember the name but could not now put a face to him. He was not in finance but was, I think, in investor relations. I have no recollection at all of the conversation he claims to have had with me at an event as he was leaving in May 2010. If he had been giving me new or material financial information I would have asked him to write it down and I would have referred it, in any event, to management or to the Audit Committee or to the auditors' back-up team as appropriate. I do not believe he gave me any such information and would have been surprised if he had, given that he had ready and easy access, not only to management but also to the Audit Committee and to Deloitte.

14. I tried to be approachable for concerns by being visible in the office and to the executive but without crossing from a non-executive to an executive role, which I never had. The impression I had was that the sales' force thought they were hard driven but that they enjoyed the challenges and the rewards. They, the scientists and the analysts seemed proud of their products.

**Brent Hogenson**

15. I have been asked to respond to the evidence of Mr Welham of Deloitte relating to Deloitte's response to accounting questions raised by Brent Hogenson in June 2010. At paragraph 314 of his statement, Mr Welham states that he was not shown correspondence from Mr Hogenson which implicated unnamed senior management.

16. I did not deal substantively with the issues raised by Mr Hogenson nor the response to these issues by the Audit Committee and auditors. I am not an accountant nor financially qualified. Accounting within publicly listed companies is specialised and accounting in tech companies even more so. As a lawyer, this was not my area of expertise.

17. Management invited me to sit in on an occasional Audit Committee meeting. When I did so, I listened to a conversation between John McMonigall, a non-executive director of Autonomy and then chairman of the Audit Committee (in person) and Mr Hogenson (by phone). My impression of the conversation was that Mr Hogenson was being given the opportunity to say everything he had to say, but he was simply repeating things that he had already raised with Mr McMonigall and Deloitte and which they had already dealt with.

18. I am aware that Mr Hogenson was paid out a sum of money when he was dismissed. I recall that Dr Lynch was not in favour of making any payment to Mr Hogenson, because he regarded Mr Hogenson's raising of accounting issues as a red herring to distract attention from a payroll fraud that had been uncovered in Mr Hogenson's team. My own view was that, in the absence of evidence that Mr Hogenson was himself guilty of

wrongdoing, the company should pay him the normal sums payable, as unpalatable as that may have been for some in management, and that is what happened.

**Hardware sales and disclosure**

19. I have been asked to respond to the evidence of Mr Khan, an analyst who covered Autonomy at JPMorgan Cazenove, in which he states, at paragraph 25, that had he known about the existence and scale of Autonomy's resale of third party hardware, his valuation of the company would have been significantly lower and the disclosure would have had a significant adverse effect on Autonomy's share price. I have also seen the evidence of Mr Morland of Astaire Securities, who states at paragraph 37 of his witness statement that he was astonished when he first heard of the quantum of Autonomy's hardware sales. He goes on to refer at paragraph 38 to the absence of disclosure referring to hardware in Autonomy's accounts and at paragraph 41 he states that the resale of third-party hardware is something "altogether different" from the sale of appliances. I have also seen the evidence of Mr Welham from Deloitte who states, at paragraph 194 of his witness statement, that I encouraged Autonomy to include supplementary metrics in Autonomy's results' announcements.

20. I can remember occasionally discussing hardware sales and accounting for hardware. I was not a member of the Audit Committee, but I attended Audit Committee meetings once or twice and met with Deloitte from time to time. I do not recall the context of the conversation, but I remember someone explaining the sales of hardware using an analogy along the lines of "*if you sell long playing records, sometimes you have to sell a few gramophones*", which I thought was a light-hearted dig at my generation. I do not recall the discussions around the disclosure of hardware being particularly heated. There was a discussion and the conclusion was to account for hardware sales in whatever way Deloitte said the company was required to account for it.

21. If Deloitte had any concerns, they could have contacted me easily. I feel confident they would have done so had any issues arisen. They never did.

**Analysts**

22. I did not ever meet or speak with analysts on specific matters but I was aware there were analysts who challenged Autonomy's accounting, disclosure and style of management. I knew there were differing views on Autonomy's financial reporting from analysts. I had heard gossip that certain analysts were assisting short sellers, but other people said they were from respected houses and were entitled to their views. To me, it was the usual noise of different points of view being dealt with in different ways. There seem to me to have been a robust process within Autonomy for dealing with these questions. The CFO had just won a CFO of the Year award from his peers and was well respected; the Audit Committee was strong and knowledgeable and the auditors were Deloitte. There was debate around the reporting but as far as I know the auditors were happy with everything that was said and done. I thought it important for Autonomy to have strong financial controls, which I thought they had.

23. I have been shown a letter dated 2nd February 2011 **{D001354520}** which I signed to Hermes, investors in the company whom I met occasionally. I valued their advice. They

R Webb QC, 1st, RW1

asked good questions about, e.g. governance, acquisitions, executive pay (then, as now, a hot topic) and financial reporting. The letter is taken from an initial draft provided by management and is self-explanatory.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true

Signed …………………………

       1 November 2018

Dated…………………………..

R Webb QC, 1st, RW1

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
BUSINESS LIST (ChD)

**CLAIM No. HC-2015-001324**

**B E T W E E N:**

(1)     ACL NETHERLANDS (as successor to AUTONOMY CORPORATION  LIMITED)
(2)     HEWLETT-  PACKARD   VISION BV
(3)     AUTONOMY SYSTEMS      LIMITED
(4)     HEWLETT-PACKARD ENTERPRISE NEW JERSEY INC

**Claimant**

- and –

(1)     MICHAEL    RICHARD    LYNCH
(2)     SUSHOVAN    TAREQUE    HUSSAIN

**Defendants**

_____

**WITNESS STATEMENT**

**OF R S WEBB QC**

_____

Clifford Chance LLP
10 Upper Bank Street
Canary Wharf
London
E14 5JJ

Ref:     70-40538856/KXN

Tel:     020 7006 1000
Fax:     020 7006 5555

R Webb QC, 1st, RW1

Claim No.  HC-2015-001324

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
BUSINESS LIST (ChD)

**B E T W E E N :**

(1) ACL NETHERLANDS BV
(as successor to AUTONOMY CORPORATION LIMITED)

(2) HEWLETT-PACKARD VISION BV

(3) AUTONOMY SYSTEMS LIMITED

(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY INC

**Claimants**

- and –

(1) MICHAEL RICHARD LYNCH

(2) SUSHOVAN TAREQUE HUSSAIN

**Defendants**

_____

**INDEX TO THE WITNESS STATEMENT OF
OF ROBERT STOPFORD WEBB QC**
_____

| Paragraph | Document ID |
|---|---|
| 23 | D001354520 |