1    Jonathan M. Baum (SBN: 303469)            Christopher Morvillo (Admitted Pro Hac Vice)
     **Steptoe LLP**                           Celeste L. Koeleveld (Admitted Pro Hac Vice)
2    One Market Street                         Daniel S. Silver (Admitted Pro Hac Vice)
3    Steuart Tower, Suite 1070                 **Clifford Chance US LLP**
     San Francisco, CA 94105                   31 West 52nd Street
4    Telephone: (510) 735-4558                 New York, NY 10019
     jbaum@steptoe.com                         Telephone: (212) 878-3437
5                                              christopher.morvillo@cliffordchance.com
6    Reid H. Weingarten (Admitted Pro Hac Vice)
     Brian M. Heberlig (Admitted Pro Hac Vice)  *Attorneys for Defendant*
7    Michelle L. Levin (Admitted Pro Hac Vice)  *Michael Richard Lynch*
8    Nicholas P. Silverman (Admitted Pro Hac Vice)
     Drew C. Harris (Admitted Pro Hac Vice)
9    **Steptoe LLP**
     1114 Avenue of the Americas
10   New York, NY 10036
11   Telephone: (212) 506-3900

12

13                    **UNITED STATES DISTRICT COURT**

14                   **NORTHERN DISTRICT OF CALIFORNIA**

15

16   UNITED STATES OF AMERICA,          Case No.: 3:18-cr-00577-CRB

17              Plaintiff,              Judge: Hon. Charles Breyer

18        vs.                          **DEFENDANT MICHAEL RICHARD**
                                        **LYNCH'S OPPOSITION TO HP'S**
19   MICHAEL RICHARD LYNCH and          **MOTION TO QUASH RULE 17**
     STEPHEN KEITH CHAMBERLAIN,         **SUBPOENA**
20
               Defendants.             Date: April 8, 2024
21                                      Time: 4:00 p.m.
22                                      Court: Courtroom 6 – 17th Floor

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................. i

SUMMARY OF THE ARGUMENT .............................................................................. v

ARGUMENT .................................................................................................................. 1

I.     The Subpoenaed Evidence Is Necessary to Refute the ASL Restatement ......................... 1

       A.     HP's and the Government's Claim that the ASL Restatement Represents
              Yelland's Independent Conclusions ......................................................... 1

       B.     The Falsehood of HP's and the Government's Claim about Yelland's
              Independence is Revealed ........................................................................ 2

       C.     The Government Continues the False Narrative in Motions in Limine
              Regarding Admissibility of the ASL Restatement .................................... 5

       D.     The Subpoena ............................................................................................ 5

II.    The Subpoena Complies With Fed. R. Crim. P. 17 ......................................................... 6

       A.     The Subpoenaed Evidence Is Relevant ....................................................... 6

       B.     The Subpoenaed Evidence Is Admissible ................................................... 7

       C.     The Subpoenaed Evidence Is Specific ........................................................ 7

III.   The Subpoenaed Evidence Is Not Privileged ............................................................... 10

       A.     HP's Blanket Assertion of Privilege Fails to Carry Its Burden and Should Be
              Rejected ................................................................................................... 10

       B.     HP's Privilege Claim Fails on the Merits ................................................. 11

              1.     Communications and Documents Drafted to Prepare and File the ASL
                     Restatement Are Not Privileged ................................................... 11

              2.     Any Privilege Has Been Waived ................................................... 12

IV.    The Court Correctly Rejected HP's Rule 17(h) Argument In Hussain ............................ 14

V.     The Subpoena Is Necessary to Protect Dr. Lynch's Fifth and Sixth Amendment
       Rights to Present a Full and Fair Defense to the ASL Restatement and Any Related
       Testimony from Yelland, Anderson, or Brice ................................................................ 15

CONCLUSION ............................................................................................................ 16

Defendant Lynch's Opposition to HP's Motion to Quash Rule 17 Subpoena
Case No. 3:18-cr-00577-CRB

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Burlington N. & Santa Fe Rwy. v. U.S. Dist. Ct.*,
  408 F.3d 1142 (9th Cir. 2005) ................................................................10

*Chevron Corp. v. Pennzoil Co.*,
  974 F.2d 1156 (9th Cir. 1992) ...............................................................12

*Clarke v. Am. Commerce Nat'l Bk.*,
  974 F.2d 127 (9th Cir. 1992) .................................................................10

*In re Diasonics Securities Litig.*,
  No. C83–4584, 1986 WL 53402 (N.D. Cal., June 15, 1986) ...................12

*In re Grand Jury Subpoena (Torf)*,
  357 F.3d 900 (9th Cir. 2004) .................................................................11

*Great Am. Assur. Co. v. Liberty Surplus Ins. Corp.*,
  669 F. Supp. 2d 1084 (N.D. Cal. 2009) ..................................................13

*Hernandez v. Tanninen*,
  604 F.3d 1095 (9th Cir. 2010) ...............................................................13

*In re Juniper Networks, Inc. Secs. Litig.*,
  No. 08-cv-246 JW (pvt), 2009 WL 4644534, at *2 (N.D. Cal. Dec. 9, 2009)........12

*Medinol, Ltd. v. Boston Scientific Corp.*,
  214 F.R.D. 113 (S.D.N.Y. 2002) ............................................................12

*Middlesex Retirement Sys. v. Quest Software, Inc.*,
  No. 06-cv-6863-DOC-rnb, 2009 WL 10673943 (C.D. Cal. July 8, 2009), *aff'd*,
  2009 WL 10675586 (C.D. Cal. Sept. 18, 2009) ......................................12

*N. Pacifica, LLC v. City of Pacifica*,
  274 F. Supp. 2d 1118 (N.D. Cal. 2003) ..................................................11

*In re Oracle Secs. Litig.*,
  No. 01-cv-988-MJJ, 2005 WL 6768164 (N.D. Cal. Aug. 5, 2005) ...........13

*Palantir Techs. Inc. v. Abramowitz*,
  No. 18-mc-80132-JSC, 2020 WL 5500418 (N.D. Cal. Sept. 11, 2010)......12

*Tennenbaum v. Deloitte*,
  77 F.3d 337 (9th Cir. 1996) ...................................................................12

ii

*Toolate v. Borg*,
   828 F.2d 571 (9th Cir. 1987) ........................................................................15

*United States v. Aguilar*,
   No. CR 07-00030 SBA, 2008 U.S. Dist. LEXIS 63114, *18 (N.D. Cal. Aug.
   1, 2008) ..........................................................................................................8

*United States v. Colima-Monge*,
   No. 96-cr-305, 1997 WL 325318 (D. Or. June 6, 1997)...................................6

*United States v. El Paso Co.*,
   682 F.2d 530 (5th Cir. 1982) .......................................................................12

*United States v. Gas Pipe, Inc.*,
   No. 14-cr-298, 2018 WL 5262361 (N.D. Tex. June 18, 2018)...........................9

*United States v. Hussain*,
   No. 16-cr-462, 2018 WL 1091083 (N.D. Cal. Feb. 28, 2018).........................13, 14

*United States v. Hussain*,
   No. 16-cr-462, Dkt. 64 (N.D. Cal.) ..................................................... *passim*

*United States v. Jack*,
   No. 07-cr-266, 2009 WL 425982 (E.D. Cal. Feb. 20, 2009) ...........................10

*United States v. Jesenik*,
   No. 20-cr-228, 2020 WL 7406541 (D. Or. Dec. 17, 2020) ............................15

*United States v. MacKey*,
   647 F.2d 898 (9th Cir. 1981) (per curiam)........................................................8

*United States v. Martin*,
   278 F.3d 988 (9th Cir. 2002) .......................................................................10

*United States v. McGregor*,
   No. 12-cr-200 (WHA), 2012 WL 6019581 (N.D. Cal. Dec. 3, 2012)....................7

*United States v. Nixon*,
   418 U.S. 683 (1974).........................................................................v, 6, 7, 8, 9

*United States v. Olson*,
   No. 13-cr-14, Dkt. 339 (E.D. Wash. May 23, 2014) ......................................15

*United States v. Osborn*,
   561 F.2d 1334 (9th Cir. 1977) ......................................................................10

*United States v. Rainey*,
   No. 12-cr-291, Dkt. 510 (E.D. La. June 1, 2015) ...........................................15

iii

*United States v. Reyes,*
    239 F.R.D. 591 (N.D. Cal. 2006) ...................................................v, 7, 8, 9

*United States v. Richey,*
    632 F.3d 559 (9th Cir. 2011) .........................................................11

*United States v. Ruehle,*
    583 F.3d 600 (9th Cir. 2009) .........................................................10

*United States v. Sager,*
    227 F.3d 1138 (9th Cir. 2000) .........................................................6

*United States v. Salsedo,*
    607 F.2d 318 (9th Cir. 1979) .........................................................13

*United States v. Textron,*
    577 F.3d 21 (1st Cir. 2009) (en banc) ...........................................11

*United States v. Villa,*
    503 F. App'x 487 (9th Cir. 2012) ..................................................8

*Weil v. Inv./Ind., Res. & Mgm't, Inc.,*
    647 F.2d 18 (9th Cir. 1981) .....................................................10, 12

**Other Authorities**

Fed. R. Civ. P. 26 ...............................................................................14

**SUMMARY OF THE ARGUMENT**

The government has long maintained—consistent with HP's claims—that the ASL Restatement is reliable evidence of the falsity of Autonomy's 2009 and 2010 financial statements because it represents Christopher Yelland's independent review of Autonomy's books and records, the so-called "trolley" of documents the government used as a demonstrative during the *Hussain* trial. That narrative is false. In fact, as demonstrated by documents, testimony, and Yelland's March 2024 witness statement, the ASL Restatement was based on arguments crafted by litigation counsel and their accountants (Morgan Lewis and PwC). Yelland and his team received these arguments along with purported witness statements from interviews conducted by Morgan Lewis/PwC and work product from Morgan Lewis/PwC that guided Yelland's team to restating the transactions that would best advance HP's litigation interests. The record is incomplete, however, because HP has shielded—and continues to shield—the true basis for Yelland's review behind false claims that Yelland did not rely on PwC or Morgan Lewis and an unfounded privilege claim. The purpose of Dr. Lynch's subpoena for records from HP (the "Subpoena") is to complete the record with relevant, admissible and specific records that reveal the true basis for the ASL Restatement.

The subpoenaed records are essential to Dr. Lynch's defense against the ASL Restatement. The Subpoena was issued "in good faith and is not intended as a general fishing expedition." *United States v. Nixon*, 418 U.S. 683, 700 (1974). HP claimed in *Hussain*—and the government has since repeated—that Yelland's team did not utilize the internal investigation's work in reaching his opinions in the ASL Restatement. HP's claim was false. Weeks after the government argued to the Court on February 21, 2024 that Yelland did not rely upon the internal investigation in reaching his conclusions, the government finally asked Yelland if that was true. From the government's March 12, 2024 memorandum:

> When looking at individual transactions YELLAND looked at a number of evidence sources including contracts, invoices, cash tracing, **PWC's forensic accounting investigation, and the interview summaries of interviews conducted by legal investigators** with certain members of the AUTONOMY staff and some of the resellers. Within PWC's forensic accounting investigation support YELLAND reviewed

1

2
```
evidence the PWC team had found in addition to summary reports
prepared by PWC about certain transactions.
```

Silverman Decl. Ex. A (Mar. 12, 2024 FD-302).  This is consistent with Yelland's UK civil trial

testimony that the ASL Restatement was shaped and affected by the material from PwC and that

he considered PwC's and Morgan Lewis work to be a valuable input.

To undermine the purported independence and reliability of the ASL Restatement, the

defense seeks "the interview summaries of interviews conducted by legal investigators with

certain members of Autonomy staff and some of the resellers" upon which Yelland relied, along

with the evidence from "the PWC team" including "summary reports prepared by PwC about

certain transactions" that Yelland identified in his recent interview with the government.  The

defense seeks the arguments about revenue recognition that Yelland received from PwC and

Morgan Lewis, and any analyses of the weaknesses of these arguments.  Put differently, the

defense seeks the bases of the opinions contained in the ASL Restatement.

Documentary evidence and testimony proves that Yelland's team received work product,

conclusions, and arguments from PwC and Morgan Lewis during the lead-up to the ASL

Restatement.  HP does not deny that these conversations took place because it cannot.  That is

the specific category of evidence the Subpoena is designed to obtain from HP.

HP's argument boils down to a misunderstanding of Rule 17 and basic privilege law.  As

to Rule 17, HP makes cursory arguments about relevance and admissibility, but the subpoenaed

documents are just as relevant as the ASL Restatement to which they pertain.  If the opinions in

the ASL Restatement are relevant, then so are the bases for those opinions.  And HP's argument

that a trial subpoena cannot seek documents for impeachment is based on early return subpoena

precedent; it is flatly contradicted by trial subpoena precedent and common sense.

HP focuses its argument on specificity, where it tries to get the Court to adopt a test

requiring subpoena proponents to know the contents of subpoenaed documents ahead of time.

HP's proposed test is foreclosed by controlling precedent, this Court's holding in *United States v.*

*Reyes*, and this Court's statement in *Hussain* that any Subpoena to HP for documents should be

treated with "latitude" because the documents had not yet been produced, and as a result, "you

1   don't know what you don't know."[1]

2       HP next attempts a blanket claim of privilege, but Ninth Circuit law is clear that claiming

3   privilege requires specificity as to each record the claimant seeks to withhold.  HP has not done

4   so, and as a result, its privilege claim is inoperative.  Even if the Court reaches the merits of HP's

5   privilege claim, HP's argument is riddled with flaws, any one of which would be fatal.

6       Communications to accountants for the purpose of preparing financial statements are not

7   privileged—both attorney-client privilege and work product doctrine require that the

8   predominant purpose of the communication be seeking legal advice or preparing for litigation.

9   Even if a privilege ever existed and was claimed with the requisite specificity, however, it was

10  waived long ago.  HP first waived any privilege by disclosing purportedly privileged documents

11  to outside auditors Ernst & Young in order to perform a financial statement audit.  HP then

12  independently waived privilege again by disclosing and referencing the contents of purportedly

13  privileged documents to DOJ, the SEC, the *Hussain* jury, and the UK civil court.  In short, HP's

14  sword-and-shield tactics should not be countenanced, and its privilege claims should be rejected.

15      Dr. Lynch needs the subpoenaed evidence to put on a full and fair defense.  If the Court

16  decides to quash the Subpoena, then it should either dismiss the charges or exclude the ASL

17  Restatement from evidence.  Such a remedy is necessary to avoid violating Dr. Lynch's Fifth and

18  Sixth Amendment rights.

---

[1] May 10, 2017 Hr'g at 18, *United States v. Hussain*, No. 16-cr-462, Dkt. 64 (N.D. Cal.).

Defendant Lynch's Opposition to HP's Motion to Quash Rule 17 Subpoena
Case No. 3:18-cr-00577-CRB

## ARGUMENT

I. **The Subpoenaed Evidence Is Necessary to Refute the ASL Restatement**

    A.     **HP's and the Government's Claim that the ASL Restatement Represents Yelland's Independent Conclusions**

HP and the government have repeatedly argued that the opinions in the ASL Restatement were based on Christopher Yelland reviewing the "trolley" of business records and documents that sat in the corner of the courtroom in *Hussain*.[2]  Yelland testified that he reached the conclusion to restate Autonomy's 2010 financial statements based on his summer 2012 review, not the November 2012 write-down or subsequent arguments from PwC or Morgan Lewis.[3] Yelland testified that the opinions in the ASL Restatement were based on his team's "examination" of business records, "findings," and "inquiries."[4]  The Court heard the testimony and argument and was left with the impression that Yelland prepared the ASL Restatement based on his review of documentary evidence.[5]  Yelland did not disclose the truth that the opinions in

---

[2] *See, e.g.*, HP Reply Supp. Mot. to Quash at 9, *Hussain*, Dkt. 119 (Sept. 18, 2017) ("PwC's work was not used as the basis for . . . any aspect of the accounting adjustments HP deemed appropriate in relation to the Autonomy entities."); Gov't Opp. to Mot. to Exclude Test. at 2, 4, 8-9, *Hussain*, Dkt. 203 (Jan. 22, 2018) (the ASL Restatement opinions were "based upon [Yelland's] review of Autonomy business records"); *Hussain* Tr. at 4769-70, 4782 (Apr. 13, 2018) (arguing the ASL Restatement was based on the examination of business records by "two people," Yelland and Anderson); Br. of Appellee, *Hussain*, 2019 WL 6248137, at *42-43 (9th Cir. Nov. 15, 2019) ("Yelland and Anderson conducted an extensive review of the books and records of Autonomy Systems Limited (ASL) . . . . This review established that ASL's prior publicly filed financial statements were wrong, and U.K. law required Yelland and Anderson to restate them.  In January 2014, ASL filed the restatement . . . for the ten months that ended October 31, 2011, restating ASL's publicly reported revenue and retained earnings for 2010 and 2009."); *see also* Addendum to Ex. 2749, Dkt. 230 at 21-42 (identifying the purported business records as forming the basis for Yelland's Autonomy Group restatement charts, without referencing any information provided by Morgan Lewis and PwC).

[3] *Hussain* Tr. at 5041-42 (Apr. 16, 2018).

[4] *Hussain* Tr. at 5044-45, 5094-5125 (Apr. 16-17, 2018).  Yelland denied "work[ing] closely with Morgan Lewis" in the ASL Restatement preparation process and the only collaboration with PwC that he admitted was "in [PwC's] investigation[,] they needed the cooperation of the Autonomy finance team . . . ."  *Id.* at 5187-88 (Apr. 17, 2018).

[5] Because Yelland believed that Autonomy's 2009-2010 financial statements were incorrect, Yelland "raised concerns," and "[Yelland] and his group" worked on the ASL Restatement, completing "their" work in early 2014. *Hussain*, 2018 WL 3619797, at *9 (July 30, 2018).  The Court cited "Yelland's calculations," "Yelland's work," and "Yelland's conclusions" in referencing related evidence.  *Id.* at 9 & n.156; *see also, e.g.*, *Hussain* Tr. at 5059-60 (Apr. 16, 2018) ("[Yelland] identified the documents, he said he reviewed the documents, and he came to conclusions. . . . [The documents] form the basis of his conclusion . . . .").  The Court relied on Yelland's testimony regarding the ASL Restatement to conclude that "Autonomy's revenue recognition was improper" on eighteen deals, citing to "Yelland's" opinions, including multiple deals where those opinions trace directly back to PwC and Morgan Lewis.  2018 WL 3619797, at *3-7 & nn. 22, 41, 45, 48, 49, 50, 55, 58, 59, 60, 61, 69, 77, 88, 98, 104, 107,

---

the ASL Restatement were based on, and at times directly taken from, PwC's and Morgan Lewis's investigation and arguments against revenue recognition.

HP and the government continued to peddle this false narrative in response to Dr. Lynch's motions in limine and his subpoena.[6]  When Dr. Lynch moved to exclude the ASL Restatement citing evidence that it was based on arguments and opinions from PwC and Morgan Lewis,[7] the government assured the Court that Dr. Lynch was "overstating the extent of Mr. Yelland's reliance on anything from PwC or Morgan Lewis," and in fact he "reli[ed] on the underlying records," not litigation counsel and its investigator.[8]  In response to the Subpoena, HP has continued to gaslight Dr. Lynch and the Court by claiming that the basis for the ASL Restatement is the trolley documents, not the litigation arguments and opinions from PwC and Morgan Lewis.[9]

### B.    The Falsehood of HP's and the Government's Claim about Yelland's Independence is Revealed

This story was **false** from the beginning.  Three weeks ago, the government finally asked Yelland for the complete and entire basis for the ASL Restatement and demonstrative charts.  In

---

111, 117, 120, 124.  The Court later noted that Hussain had failed to offer sufficient "impeachment evidence" on the ASL Restatement.  *Id.* at *32.

[6] Gov't Opp. to Lynch MIL No. 3 to Exclude Opinion Test. at 4, Dkt. 313 (Jan. 31, 2024) (ASL Restatement opinions were "based upon [Yelland's] review of Autonomy business records"); Mot. at 2 ("Yelland and his finance team at HP (including Anderson) analyzed and revised Autonomy's previously issued financial statements. . . . This resulted in . . . the 'ASL Restatement' . . . ."); *see also* Addendum to Ex. 2749, Dkt. 230 at 21-42 (listing "the underlying business records from Autonomy and/or HP which form the basis of the Summary of Adjustments to [ASL]'s Restated Accounts . . . organized by transaction(s) and in alphabetical order," but not identifying any of the information provided to Yelland by Morgan Lewis and PwC and incorporated into the Restatement, as Yelland has now conceded to the government the information was so incorporated).

[7] Dkt. 293; Dkt. 293-6; Dkt. 293-7; Dkt. 293-8; Dkt. 293-9;; Dkt. 293-12; Dkt. 293-13; Dkt. 293-14; Dkt. 293-15; Dkt. 293-16; Dkt. 293-19; Dkt. 294; Dkt. 294-1; Dkt. 294-5; Dkt. 294-6; Dkt. 294-7; Dkt. 294-8; Dkt. 294-9; Dkt. 294-10.

[8] Feb. 21, 2024 Hr'g Tr. at 18-19; *accord id.* at 6 (stating the Court's understanding of the government's position that Yelland's opinions are based on the "business records that Yelland and Anderson used to do their work").

[9] Mot. at 2 ("Yelland and his finance team at HP (including Anderson) analyzed and revised Autonomy's previously issued financial statements. . . . This resulted in . . . the 'ASL Restatement' . . . ."); *see also* Mar. 5, 2024 email from Susan Resley to Christopher Morvillo et al. (Silverman Decl. Ex. B) (stating "[w]e believe that the documents were previously produced to the DOJ" and citing to the trolley documents, in response to Dr. Lynch's request for documents related to "the bases for Chris Yelland's opinions and conclusions in preparing and filing the 2014 restatement of ASL's 2010 accounts and the filing of ASL's 2011 accounts").

2

response, **Yelland confirmed that Dr. Lynch is correct: the opinions were based on the PwC and Morgan Lewis investigation**.  The FBI memorandum of Yelland's March 12, 2024 interview states:

> When looking at individual transactions YELLAND looked at a number of evidence sources including contracts, invoices, cash tracing, PWC's forensic accounting investigation, and the interview summaries of interviews conducted by legal investigators with certain members of the AUTONOMY staff and some of the resellers.  Within PWC's forensic accounting investigation support YELLAND reviewed evidence the PWC team had found in addition to summary reports prepared by PWC about certain transactions.

Silverman Decl. Ex. A at 1.  Yelland thus conceded what the defense has argued all along: that Yelland relied on PwC and Morgan Lewis' investigation, the arguments and opinions of which were fed to him and Anderson while preparing the ASL Restatement.

This is consistent with the documents and testimony previously cited by Dr. Lynch,[10] and with a January 30, 2014 memorandum from Ernst & Young in which they explain that "Autonomy has used the findings from PwC's work . . . in preparing the [ASL Restatement]." Silverman Decl. Ex. F at 6 (MLAT_AU 00091301).  This included using PwC's work on Project Baron (PwC's initial revenue recognition investigation), Project Marquess (PwC's investigation of "transactions with little commercial substance," "deception of the auditors," and other theories), and Project Viscount (PwC's assistance to US legal counsel on a "summary" of revenue recognition conclusions and researching additional transactions, and preparing what became Yelland's summary charts).  *Id.*  Put simply by Ernst & Young, "Autonomy has reflected [PwC's] finding in the adjustments [in the ASL Restatement," and "[PwC's] work … has resulted in significant adjustments being made" in the ASL Restatement.  *Id.* at 8.

This use of PwC's work affected Yelland's opinions.  Before working with PwC and Morgan Lewis, on November 16, 2012, Yelland stated that "in [his] opinion," **no** "restatement of

---

[10] As Dr. Lynch explained in MIL No. 2, after *Hussain*, Yelland conceded that the ASL Restatement work was "shaped and affected" by reviewing PwC and Morgan Lewis's work product.  Dkt. 293-6 at 24:8-18 (calling PwC and Morgan Lewis' work product "certainly a valuable input into the [ASL Restatement]").

the prior year's results" was necessary because the accounting disagreements in prior year did not rise to the level of "fundamental error."[11]   Four days later, on November 20, 2012, HP accused Dr. Lynch of fraud, claiming that a $5.7 billion write-down was due to revenue recognition fraud.  That accusation of fraud led to the cancellation of Yelland's then-planned November 30, 2012 filing, and the consequent preparation of January 31, 2014 ASL Restatement, which—contrary to Yelland's November 16 opinion—accused Autonomy's financial statements of "fundamental errors."

Yelland and his team worked with PwC and Morgan Lewis to justify HP's accusation of fundamental errors.  They received work product, interview summaries, reports, documents, and transactions lists from PwC and Morgan Lewis.[12]  They met with PwC and Morgan Lewis to receive "briefings" and discuss the ASL Restatement.[13]  They emphasized the need to "ensure alignment" to protect HP's "legal position," by for example, agreeing on whether recognizing license revenue immediately was permissible ("judgmental and a matter of policy") or impermissible ("clearly wrong"),[14] and by agreeing to restate transactions based on PwC and Morgan Lewis' interviews despite contrary contemporaneous "documentary evidence."[15]  In short, Yelland's team worked together with PwC and Morgan Lewis to develop an ASL Restatement that would justify HP's 2012 accusations and support civil and criminal litigation against Dr. Lynch.

---

[11] Under then-existing versions of IAS 8.33-8.39, a restatement is only required in case of "fundamental errors," which were defined as errors that have "such a significant effect on the financial statements of one or more prior periods that those financial statements can no longer be considered to have been reliable. . . ."  In other words, Yelland believed that ASL's financial statements were still reliable, but HP's litigation interests and fraud referrals required taking the position that the statements were *not* reliable, and that would require a restatement.

[12] Dkt. 293 at 3-4; Dkt. 293-15.

[13] Dkt. 293 at 4; Dkt. 293-13 (Mar. 22, 2013); Dkt. 293-14 (Apr. 23, 2013); Dkt. 293-15 (May 2, 2013).

[14] Dkt. 293 at 4; Dkt. 293-6; Dkt. 293-7.

[15] Dkt. 293-8; Dkt. 293-9 at 25.

1

2

### C.     The Government Continues the False Narrative in Motions in Limine Regarding Admissibility of the ASL Restatement

3

4

5

6

7

8

9

10

11

12

13

The parties vigorously disputed whether the ASL Restatement is admissible.[16]  While Dr. Lynch argued that HP's motive to exaggerate the existence or magnitude of improper accounting made the document unreliable, the government successfully argued that the origins, motivations, and trustworthiness of the Restatement are questions for the jury.[17]  In response to evidence of the ASL Restatement adopting advocacy arguments to second-guess good-faith differences in accounting judgment, the government suggested that Dr. Lynch had not presented enough evidence.[18]  The government's argument is wrong, but it is also a potential conclusion that the jury could erroneously reach.  The jury deserves to hear the truth: the ASL Restatement was drafted to substantiate HP's November 2012 claims in which they mischaracterized disagreement over accounting treatment as "fraud" and exaggerated the size of that fraud while referring Dr. Lynch and others for prosecution.

14

### D.     The Subpoena

15

16

17

Dr. Lynch therefore issued the Subpoena.  The Subpoena compels production of one specific set of documents: "*records and communications . . . relating to the bases for the [ASL Restatement]*."  Silverman Decl. Ex. C (Subpoena).  HP has already gathered these documents in

18

19

20

21

22

23

24

25

26

27

28

---

[16] *See generally* Dkt. 293, 294, 295, 308, 312, 313, 331, 332, 335; Feb. 21, 2024 Hr'g Tr.; Feb. 28, 2024 Hr'g Tr.

[17] *See, e.g.*, Gov't MIL No. 1 to ASL Restatement & Related Summary Charts at 7, Dkt. 295 (Jan. 17, 2024) (arguing that defense arguments that "go to the weight that should be afforded the Restatement, which Defendants will be free to make through cross-examination of Mr. Yelland, Ms. Anderson, and their process."); Gov't Opp'n to Def't MIL No. 2 to Exclude ASL Restatement at 1-2, Dkt. 312 (Jan. 31, 2024) ("All of Dr. Lynch's arguments go to the weight of this highly probative evidence and do not justify exclusion."); *id.* at 5-6 (argument that "Yelland's 'collaboration with Morgan Lewis and PwC went beyond receiving and relying upon their investigation work product' . . . goes to the weight" (citation omitted)).

[18] *See* Gov't Reply Supp. MIL No. 1 to Admit ASL Restatement & Related Summary Charts at 2-3, Dkt. 335 (Feb. 7, 2024) ("[T]he defense claims the Restatement is not trustworthy and is . . . a statement of HP attorneys and [PwC]. . . . Not only does this go to the weight of the evidence, it is wrong.  The evidence cited by the defense to support the claim that Yelland and Anderson abandoned all independence and free will is belied by its limited citations.").

5

order to litigate against Dr. Lynch.  To minimize the burden on HP,[19] Dr. Lynch provided three examples of the type of documents that would relate to the bases for the ASL Restatement: Yelland's communications with identified entities regarding the ASL Restatement and/or PwC and Morgan Lewis' investigation; Anderson's communications with the same entities regarding the same topics; and HP's documents and communications that "explain[] the bases for restating each of the transactions at issue in the ASL Restatement."  *Id.*  This evidence—which is focused, relevant, and admissible—is necessary to litigate how much (or little) weight the jury should give the ASL Restatement, assuming the ASL Restatement is admitted into evidence.

## II.     The Subpoena Complies With Fed. R. Crim. P. 17

Under Rule 17, "[a] subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise."  *Nixon*, 418 U.S. at 698.  In order to evaluate whether a subpoena is "unreasonable or oppressive" under *Nixon*, the Court considers whether the evidence requested is (1) relevant, (2) admissible, and (3) specific.  *Id.* at 700.  The *Nixon* evaluation is a practical one accounting for the circumstances, such as the previously undisclosed nature of the tapes in that case.  *See id.*  Here, the requested evidence is relevant, admissible, and specific, and the Subpoena complies with Rule 17.

### A.     The Subpoenaed Evidence Is Relevant

The Court has ruled (over Dr. Lynch's continuing objection) that the ASL Restatement is admissible.[20]  The Subpoena seeks evidence of "the bases for the Restatement."  Silverman Decl. Ex. C.  If the opinions in the ASL Restatement are relevant, then the bases for those opinions are relevant.  *Cf. United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000) ("To tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant

---

[19] *See, e.g.*, *United States v. Colima-Monge*, No. 96-cr-305, 1997 WL 325318 (D. Or. June 6, 1997) (holding that list of examples made subpoena diminished the burden on the responsive party by increasing the specificity and avoiding any potential fishing expedition).

[20] HP argues that the documents are not relevant because they go "beyond the scope of the indictment" and relate to activities after October 2011.  Mot. at 10.  While the defense would agree with that sentiment if the Restatement were inadmissible, the Court has ruled otherwise.

information.").  To evaluate the ASL Restatement's opinion of what the 2010 financial statements should have said, the jury must understand the bases of that opinion.[21]  If the ASL Restatement is relevant evidence of falsity and/or materiality, then Dr. Lynch's responsive evidence to challenge that conclusion is equally relevant.

**B.      The Subpoenaed Evidence Is Admissible**

The requested evidence is admissible to impeach Yelland's sources and to impeach Yelland himself if he testifies about the ASL Restatement, its creation, or its meaning.[22]  The evidence is also admissible to impeach Brice if he testifies that he relied on the Restatement.

HP argues that Rule 17 subpoenas cannot be used to obtain impeachment evidence, but HP is wrong.[23]  This is a trial subpoena, not an early-return subpoena, and trial subpoenas can seek impeachment evidence.  *E.g.*, *United States v. McGregor*, No. 12-cr-200 (WHA), 2012 WL 6019581, at *2 (N.D. Cal. Dec. 3, 2012) (denying motion to quash subpoena for impeachment evidence); *United States v. Jack*, No. 07-cr-266, 2009 WL 425982, at *3 (E.D. Cal. Feb. 20, 2009) ("To the extent the defense wishes to seek exculpatory or impeachment materials from the personnel files of local law enforcement officers in some way involved in this investigation, it is suggested, as it was at the hearing on this motion, that counsel proceed by way of subpoena if necessary."); *United States v. Reyes*, 239 F.R.D. 591, 601 (N.D. Cal. 2006); *see also United States v. Ellis*, 13-cr-818-PJH (dmr), 2017 WL 1164172, at *5 & n.2 (N.D. Cal. Mar. 29, 2017) (holding that subpoena may seek "records to attack the basis for anticipated expert testimony").

**C.      The Subpoenaed Evidence Is Specific**

The Subpoena is limited to documents relevant to the bases of a single corporate decision

---

[21] HP argues that the documents are not relevant because of the Court's limits on Anderson's and Yelland's testimony.  Mot. at 10 (citing Feb. 28, 2024 Tr. at 13).  HP misses the point.  The government intends to introduce the ASL Restatement, and the responsive documents go directly to evaluating that evidence, regardless of who testifies about it, be it Yelland, Anderson or Steven Brice.

[22] This is equally true of Anderson's emails and any testimony from Anderson about the Restatement.  Yelland's testimony in *Hussain* makes clear that he relied on arguments emailed to Anderson and claimed those emails as a part of "our inquiries" that form the basis of his opinion.  Dkt. 293 at 4-6; Dkt. 293-8; Dkt. 293-9; Dkt. 294-1.

[23] HP's only citation is to a quote from *Nixon* about early-return subpoenas.  That quote does not apply here.

during the discrete time period leading up to that decision.  In essence, HP argues that "[t]he theoretical existence of documents, the contents of which Lynch purports to have no idea about, cannot serve as the basis for a Rule 17 request." Mot. at 5; *see id.* at 1 (arguing that Rule 17 does not permit "a blind fishing expedition seeking unknown evidence" (quoting *United States v. Villa*, 503 F. App'x 487, 489 (9th Cir. 2012)); Mot. at 8 ("The specificity requirement 'is not satisfied if a defendant does not know what the evidence consists of or what it will show.'" (quoting *United States v. Aguilar*, No. CR 07-00030 SBA, 2008 U.S. Dist. LEXIS 63114, *18 (N.D. Cal. Aug. 1, 2008)).[24]  HP's argument that a subpoena proponent must have precise knowledge of the responsive documents' contents has been firmly rejected by precedent from this Court and appellate courts.[25]  HP seizes on counsel's comment that "we don't know what we don't have," but this Court correctly observed in *Hussain* that the "fact [that] you don't know what you don't know" with respect to a subpoena to HP merits "**latitude** [on] specificity," not quashal.[26]  In other words, observing that specificity is a practical inquiry, the Court observed that subpoenas like Dr. Lynch's must be given latitude, not that they are prohibited.

This Court's holding in *Reyes* is particularly instructive.  There, the defendant issued subpoenas to law firms who conducted an internal investigation regarding option grant backdating.  The Court held that the subpoenas for all documents related to the internal

---

[24] HP also appears to argue that a defendant cannot seek any documents not required by Rule 16.  *See* Mot. at 5 ("Rule 17(c) does not permit a defendant to bypass the limitations of discovery provided by the government pursuant to Rule 16.").  Dr. Lynch is not seeking discovery and he is dealing with a party that the Court has held is not subject to Rule 16.  Rule 16 does not require third parties to produce documents.  Were HP correct that trial subpoenas broader than Rule 16 are prohibited, then there would be no such thing as a trial subpoena to a third party.  That is not the law.

[25] *United States v. MacKey*, 647 F.2d 898, 901 (9th Cir. 1981) (per curiam) ("Because the government has not yet seen the documents, it would be unreasonable to expect a more detailed connection be provided between the contents of the documents and the ultimate facts at issue in the case."); *Reyes*, 239 F.R.D. at 599 (citing *Nixon*, 418 U.S. at 700).  In *Nixon*, the Court explained that Rule 17(c) is intended to permit a party to inspect documents "in advance of the time that they are offered in evidence . . . for the purpose of enabling the party to see . . . whether he wants to use them," 418 U.S. at 699 n.11, 700 (citation omitted) (holding specificity was satisfied by "a sufficient likelihood" of responsive tapes containing relevant conversations even though the "contents of the subpoenaed tapes could not at that stage be described fully")—a purpose that would be nonsensical were knowledge of the documents' contents required.

[26] May 10, 2017 Hr'g at 18, *Hussain*, Dkt. 64 (emphasis added).

---

8

1   investigation or its conclusions—including all documents related to "determinations about

2   measurement dates for option grants and what type of accounting to apply to option grants"[27]—

3   were sufficiently specific, but a subpoena to the company for all "any and all information related

4   to stock options issued between 1994 and 1999" was too broad.  239 F.R.D. at 599-600, 605-06.

5   The Court reasoned that the subpoena for documents related to the investigation and its

6   conclusions "demands access to a discrete set of existing written materials, within the possession

7   of the subpoenaed parties, that pertain to events and conversations that actually occurred and

8   relate to specific subject matter."  *Id.* at 599.  "As the Supreme Court has noted, the proponent of

9   a subpoena cannot be expected to identify the materials he seeks in exacting detail, when (as

10  demonstrated by the fact that he must employ a subpoena) he does not have access to them."  *Id.*

11  (citing *Nixon*, 418 U.S. at 700).[28]  That forecloses HP's argument.

12         Dr. Lynch has demanded production of documents related to the decision to restate

13  ASL's financials—a decision that actually occurred and that is narrower than the complete

14  internal investigation at issue in *Reyes*.[29]  He does not seek all communications from hundreds of

15

16  _____

17  [27] *Reyes*, Dkt. 64, at *5.  The relevant subpoena required production of "all reports, notes, memoranda, comments or
18  conclusions made in connection with [the] internal investigation in 2004 and 2005 related to any option grant . . .
    including determinations about measurement dates for option grants and what type of accounting to apply to option
19  grants"; "interview summaries, notes, and memoranda, in whatever form . . . related to the [2004-2005] interviews
    of [the company's] employees in connection with [the] internal investigation into options issues"; among other
20  requests.  *Id.*

21  [28] HP's two other arguments based on *Reyes* are of no moment.  First, HP criticizes the request for covering
    "October 1, 2011 [to] January 31, 2014," Mot at 9, but that is the time period during which Yelland and HP formed
22  opinions about the transactions and decided to restate the 2009-2010 financial results.  The time leading up to
    November 20, 2012 shows Yelland's then-existing opinion that limited transactions were incorrectly accounted for
23  and no restatement was necessary.  The time from November 20, 2012 shows how Morgan Lewis, PwC, and others
    brought about the opinions in the ASL Restatement.  Second, HP claims that there are "hundreds of thousands of
24  emails, letters, chat logs, SMS/text messages, voicemails, phone logs, notes, reports, memoranda, agreements, and
    other records from hundreds of custodians" that are responsive to the Subpoena.  Mot. at 9.  This is vastly
25  overstated.  Only documents that "relat[e] to the bases for the restatement" are responsive.  This cannot amount to
    "millions of pages," as HP ominously suggests, particularly since it elsewhere states that it has produced one million
26  pages in the other litigation and PwC's work only involved reviewing 22,000 documents.  Silverman Decl. Ex. F at
    7.  Moreover, HP has likely collected emails from the most relevant custodians and reviewed these documents
27  relevant to the civil litigation in the UK (which HP filed), and the Hussain case in the US (which HP initiated and in
    which HP assisted the prosecution).  The request is not unduly burdensome.

28  [29] *See, e.g., United States v. Gas Pipe, Inc.*, No. 14-cr-298, 2018 WL 5262361, at *3 (N.D. Tex. June 18, 2018)
    (denying motion to quash subpoena for seven categories of documentary evidence relevant to the bases and

9

custodians or all documents authored by an employee or any similarly broad category.  He seeks documents on one discrete issue directly implicated by a contested piece of evidence, the ASL Restatement.  He has more than satisfied the specificity prong.

## III.    The Subpoenaed Evidence Is Not Privileged

"Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed."  *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (quoting *Weil v. Inv./Ind., Res. & Mgm't, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981)).  "The privilege stands in derogation of the public's right to every man's evidence and as an obstacle to the investigation of the truth, and thus, it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle."  *Id.* (cleaned up).  Based on these principles, courts have traditionally scrutinized claims of privilege with suspicion.  Here, HP's claim does not stand up to even passing scrutiny for two reasons.  First, HP makes an invalid blanket assertion of privilege and fails to properly invoke privilege over each record it seeks to withhold.  Second, the communications for the purpose of preparing financial statements were never privileged and any privilege has been waived.

### A.    HP's Blanket Assertion of Privilege Fails to Carry Its Burden and Should Be Rejected

"A party claiming the privilege must identify specific communications and the grounds supporting the privilege as to each piece of evidence over which privilege is asserted."  *United States v. Martin*, 278 F.3d 988, 1000 (9th Cir. 2002) (citing *United States v. Osborn*, 561 F.2d 1334, 1339 (9th Cir. 1977)).  "Blanket assertions" like that of HP are "extremely disfavored"; instead, to merit protection, "the privilege must ordinarily be raised as to each record" the recipient wishes to withhold.  *Clarke v. Am. Commerce Nat'l Bk.*, 974 F.2d 127, 129 (9th Cir. 1992); *Burlington N. & Santa Fe Rwy. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir. 2005) (holding that "boilerplate objections or blanket refusals" were insufficient).  HP has not

---

reliability of a witness's opinion testimony including documents "regarding the process" of reaching such a determination and "documents reflecting any concern, doubt, or contrary or conflicting opinions").

Defendant Lynch's Opposition to HP's Motion to Quash Rule 17 Subpoena
Case No. 3:18-cr-00577-CRB

1  attempted to make any specific showing and it therefore fails to sustain its burden as to any

2  privilege argument.

3  **B.    HP's Privilege Claim Fails on the Merits**

4  **1.    Communications and Documents Drafted to Prepare and File the
   ASL Restatement Are Not Privileged**

5

6  The Subpoena seeks communications and documents drafted for the purpose of preparing

7  and filing the ASL Restatement.  Attorney-client privilege applies only to documents drafted "for

8  the purpose of obtaining legal advice."  *See United States v. Richey*, 632 F.3d 559, 566 & n.3

9  (9th Cir. 2011) (quoting *United States v. Gurtner*, 474 F.2d 297, 299 (9th Cir. 1973)); *N.*

10  *Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003) ("[L]egal advice

11  must predominate for the communication to be protected.") (citation omitted).  Similarly, work

12  product protection applies only to documents drafted "because of anticipated litigation [that]

13  would not have been created in substantially similar form but for the prospect of litigation."

14  *Richey*, 632 F.3d at 568 (quoting *In re Grand Jury Subpoena (Torf)*, 357 F.3d 900, 908 (9th Cir.

15  2004); *see also* Fed. R. Civ. P. 26 adv. comm. note ("Materials assembled in the ordinary course

16  of business . . . are not [protected] under [work product doctrine].").  In either scenario, the

17  purpose of the communication or document must be legal advice or litigation, not the preparation

18  of financial statements.

19  Here, the purpose of the subpoenaed communications and documents was to prepare and

20  file the ASL Restatement.  Regardless of whether a subset was initially privileged, the

21  communications and documents transmitting them to Yelland's team are not.  *See, e.g.*, *United*

22  *States v. Textron*, 577 F.3d 21, 30 (1st Cir. 2009) (en banc) (holding that work product

23  transmitted "to support a financial statement and the independent audit of it" is not privileged).

24  Put differently, either preparing and filing the ASL Restatement was motivated predominantly by

25  the duty to prepare financial statements—in which case responsive documents are not

26  privileged—or it was motivated predominantly by litigation—in which case *Jasper* is

27  distinguishable and the ASL Restatement is inadmissible.  There is no scenario in which the

28

11

1  motivations underlying the ASL Restatement were so enmeshed with litigation that its bases are

2  privileged and yet the ASL Restatement is an admissible business record within the ordinary

3  course of business.

4  ## 2.  Any Privilege Has Been Waived

5  HP bears the burden of proving that each of the withheld documents is protected by the

6  attorney-client or work-product privileges *and that the privilege has not been waived*.  *See e.g.*,

7  *Palantir Techs. Inc. v. Abramowitz*, No. 18-mc-80132-JSC, 2020 WL 5500418, at *2 (N.D. Cal.

8  Sept. 11, 2010) (citing *Weil*, 647 F.2d at 25).  The "principal purpose" of waiver doctrine "is to

9  protect against the unfairness that would result from a privilege holder selectively disclosing

10  privileged communications to an adversary, revealing those that support the cause while

11  claiming the shelter of the privilege to avoid disclosing those that are less favorable."

12  *Tennenbaum v. Deloitte*, 77 F.3d 337, 340-41 (9th Cir. 1996)).  The privilege "may not be used

13  both as a sword and a shield."  *Palantir*, 2020 WL 5500418, at *2 (quoting *Chevron Corp. v.*

14  *Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)).  HP has not carried its burden to prove non-

15  waiver.  Instead, HP has waived privilege twice over.

16  First, HP waived privilege by sharing otherwise purportedly privileged materials on the

17  same revenue recognition decisions with auditors Ernst & Young, hoping that Ernst & Young

18  would fall in line and sign off on the restatement.[30]  Disclosure to an outside auditor like Ernst &

19  Young effects a waiver of both attorney-client privilege and work product protection.[31]

20

21

---

22  [30] HP shared the purportedly privileged materials referenced in § I with Ernst & Young.  *See generally* Silverman Decl. Ex. F.

23  [31] *In re Juniper Networks, Inc. Secs. Litig.*, No. 08-cv-246 JW (pvt), 2009 WL 4644534, at *2 (N.D. Cal. Dec. 9,

24  2009) ("[E]ven if the attorney-client privilege initially attached to the communications, the Audit Committee's disclosure of the substance of the communications to Juniper's outside auditors effected a waiver of the privilege.");

25  *Middlesex Retirement Sys. v. Quest Software, Inc.*, No. 06-cv-6863-DOC-rnb, 2009 WL 10673943, at *6 (C.D. Cal. July 8, 2009) (holding that disclosure of work product to independent auditor waives work product protection), *aff'd*,

26  2009 WL 10675586 (C.D. Cal. Sept. 18, 2009); *Medinol, Ltd. v. Boston Scientific Corp.*, 214 F.R.D. 113, 116 (S.D.N.Y. 2002) (holding that privilege was waived by disclosure to outside auditor Ernst & Young because "in order for auditors to properly do their job, they must not share common interests with the company they audit"); *In*

27  *re Diasonics Securities Litig.*, No. C83–4584, 1986 WL 53402 (N.D. Cal., June 15, 1986); *United States v. El Paso Co.*, 682 F.2d 530, 540-41 (5th Cir. 1982) (holding that privilege was waived as to workpapers shared with audit

28  accountant and as to memoranda underlying those work papers); *see also Chevron Corp.*, 974 F.2d at 1162

---

Defendant Lynch's Opposition to HP's Motion to Quash Rule 17 Subpoena
Case No. 3:18-cr-00577-CRB

1   Consistent with that waiver, when Ernst & Young produced documents in response to the

2   MLAT, it did not assert privilege over those documents, and HP did not try to claw them back.

3   That was not "inadvertent," as HP now argues with exclusive reliance on inadvertent disclosure

4   cases.[32]  It was deliberate and perfectly correct, because any privilege had been waived.

5           Second, while HP has vigorously tried to shield the full basis for the ASL Restatement in

6   this case, it has disclosed and repeatedly referenced the portion of those purportedly privileged

7   communications that it believes to be favorable.  When HP disclosed interview memoranda and

8   work product regarding the bases of the ASL Restatement, it acknowledged that it was disclosing

9   privileged documents, *see, e.g.*, Silverman Decl. Ex. E (cover letter asserting that produced

10  records used by Yelland as purported bases were subject to work product and attorney-client

11  privilege), making a subject-matter waiver inevitable. *United States v. Hussain*, No. 16-cr-462,

12  2018 WL 1091083, at *2 (N.D. Cal. Feb. 28, 2018) ("The possibility of this type of selective

13  disclosure is exactly why specific waivers of the protection act as complete waivers with respect

14  to 'all other communications on the same subject.'" (quoting *Hernandez v. Tanninen*, 604 F.3d

15  1095, 1100 (9th Cir. 2010))).  Similarly, referencing a privileged communication's content

16  waives privilege over communications on that subject matter.  *See, e.g.*, *United States v. Salsedo*,

17  607 F.2d 318, 320 (9th Cir. 1979) (referencing contents of a document waived work product

18  protection as to the entire document); *In re Oracle Secs. Litig.*, No. 01-cv-988, 2005 WL

19  6768164, at *10 (N.D. Cal. Aug. 5, 2005) ("Oracle waived any attorney-client and work product

20  privileges over the [committee] report [and supporting memoranda] when it allowed [other

21  parties] to repeatedly refer to the contents of the report without objecting to the references or

22  moving to seal[.]").  Privilege holders cannot "us[e] the work-product doctrine [or attorney-

23

24

---

25  ("Pennzoil concedes that the district court was correct in ordering disclosure of the documents actually provided to
26  the outside auditor.").

    [32] Mot. at 11-13.  Even if HP's argument was relevant, HP fails to carry its burden of proving that the production
27  was involuntary, and the waiver is therefore valid.  *Great Am. Assur. Co. v. Liberty Surplus Ins. Corp.*, 669 F. Supp.
    2d 1084, 1087 (N.D. Cal. 2009) (holding that privilege and work-product protection were waived because movant
28  "has not met the burden of proving that the communication was involuntarily sent").

privilege] as a switch that allows it to turn over to the government material that advances its interests, while withholding material that does not."  *Hussain*, 2018 WL 1091083, at *2.

In *Hussain*, Yelland testified over and over to the information that he received from PwC and Morgan Lewis, albeit by referring to that information generally (without identifying PwC and Morgan Lewis as its sources) as "our inquiries."  Dkt. 294-1.  This testimony waived any privilege.  *E.g.*, *Moeller v. Taco Bell Corp.*, No. 02-cv-5849-PJH (jl), 2009 WL 10710495, at *4 (N.D. Cal. Oct. 6, 2009) ("Waiver is justified precisely because of the unfairness resulting from a party submitting testimony while simultaneously withholding documents that its adversary might need to contest that testimony.").  HP also produced *numerous* documents quoting and referring to the purportedly privileged communications.  *See, e.g.*, Dkt. 293-9 at 44-45 (justifications for decisions including (1) reference to the content of "[d]iscussions that PwC held with [other witnesses]"; (2) quoting an email from Morgan Lewis to PwC relating the contents of other interviews; (3) referring to interview minutes received from PwC and Morgan Lewis on Capax and McAfee; (4) referring to PwC's findings on use of ATIC on Vatican and Microtech; (5) referring to "[d]iscussion with Morgan Lewis" on Microtech and HP); Dkt. 293-8 (email from PwC to Anderson, ccing Morgan Lewis' Susan Resley and providing PwC and Morgan Lewis' advice regarding arguments for restating Filetek transactions despite contemporaneous "documentary evidence" supporting Autonomy's accounting); Silverman Decl. Ex. D at 8-9 (Mem. of Interview of Joel Scott (11/20/12) (HP-SEC-00329234)) (representative example of witness interview summaries disclosing purportedly privileged information from HP related to same subject matter sought in subpoena).  These references to the content of communications regarding the bases of the ASL Restatement waived any privilege—assuming one ever existed—on that topic.

## IV.   The Court Correctly Rejected HP's Rule 17(h) Argument In Hussain

In *Hussain*, this Court evaluated an identical argument from HP and determined that the history of Rule 17(h) forecloses HP's argument.  2018 WL 1091083, at *2 (N.D. Cal. Feb. 28, 2018) (holding that Rule 17(h) only applies to statements in the government's possession).  The

1    Court's ruling in *Hussain* was sound, and HP raises no new arguments.

2    **V.    The Subpoena Is Necessary to Protect Dr. Lynch's Fifth and Sixth Amendment
3            Rights to Present a Full and Fair Defense to the ASL Restatement and Any Related
             Testimony from Yelland, Anderson, or Brice**

4            If credited as a neutral opinion about Autonomy's pre-acquisition accounting, the ASL

5    Restatement is potentially devastating.  *Hussain* Tr. at 4775 (Apr. 13, 2018) (Government:

6    "[T]he restatement kills them."); *id.* at 4808 ("[T]he restatement . . . is relatively crucial for us . .

7    . .").  To ensure that the jury gets the evidence necessary to evaluate the Restatement and weigh

8    its probative value, Dr. Lynch needs the subpoenaed documents.  To admit the Restatement or

9    related testimony while denying Dr. Lynch's ability to compel the evidence necessary to defend

10   himself would violate his Fifth and Sixth Amendment rights.  If the Court quashes the Subpoena

11   then it should either dismiss the charges or exclude the ASL Restatement from evidence.

12           Courts commonly grant remedial relief where a witness's invocation of a privilege

13   interferes with the defendant's ability to put on a full and fair defense.[33]  Where a third party's

14   refusal to produce evidence in response to a subpoena violated a defendant's right to present a

15   full defense, at least one court has even dismissed the affected count.  *See* Tr. at 283-85, *United*

16   *States v. Rainey*, No. 12-cr-291, Dkt. 510 (E.D. La. June 1, 2015) (remedying violation of the

17   right to present a full defense by dismissing count and, in the alternative, excluding all evidence

18   related to that requested by the defendant).  *Id.* at 285-86.  Just as in *Rainey*, where the defendant

19   needed subpoenaed evidence to rebut the government witnesses' version of the investigation's

20   origins, here, Dr. Lynch needs the subpoenaed evidence to rebut Yelland's version of the ASL

21   Restatement's origins.  In order to protect Dr. Lynch's right to put on a full and fair defense, the

22   Court must enforce Dr. Lynch's subpoena.  If it does not, it should dismiss the Superseding

23   Indictment or, in the alternative, exclude the ASL Restatement.

24

25   _____

26   [33] *See, e.g., Toolate v. Borg*, 828 F.2d 571, 572 (9th Cir. 1987) ("Ordinarily, when a testifying witness cannot or will
     not be cross-examined, the appropriate relief . . . is to strike the direct testimony of the witness and to instruct the
27   jury to disregard it.") (citation and quotation marks omitted); *United States v. Jesenik*, No. 20-cr-228, 2020 WL
     7406541, at *7 (D. Or. Dec. 17, 2020) (piercing attorney-client privilege in light of potential Brady materials); Order
28   at *2, *6, *United States v. Olson*, No. 13-cr-14, Dkt. 339 (E.D. Wash. May 23, 2014) (same).

Defendant Lynch's Opposition to HP's Motion to Quash Rule 17 Subpoena
Case No. 3:18-cr-00577-CRB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons stated herein, the Court should deny HP's motion to quash.

Dated: April 1, 2024

Respectfully submitted,

/s/ Brian M. Heberlig
Reid H. Weingarten (Admitted Pro Hac Vice)
Brian M. Heberlig (Admitted Pro Hac Vice)
Michelle L. Levin (Admitted Pro Hac Vice)
Nicholas P. Silverman (Admitted Pro Hac Vice)
Dwight J. Draughon (Admitted Pro Hac Vice)
Drew C. Harris (Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900

Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510) 735-4558
jbaum@steptoe.com

Christopher J. Morvillo (Admitted Pro Hac Vice)
Celeste L. M. Koeleveld (Admitted Pro Hac Vice)
Daniel S. Silver (Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

Defendant Lynch's Opposition to HP's Motion to Quash Rule 17 Subpoena
Case No. 3:18-cr-00577-CRB