# EXHIBIT D



DATE: November 20, 2012
SUBJECT: Memorandum of Interview with Joel Scott – November 15, 2012

| Tab. No. | Document Description |
|---|---|
| 1 | 11/23/09 – Emails between Livius Guiao, Chamberlain, Sullivan, Hussain, Scott |
| 2 | 12/28-29/09 – Emails between Hussain, Chamberlain, Scott and Egan |
| 3 | 4/22/10 – Email between Scott and Hussain |
| 4 | Purchase Order between Dell, Autonomy and AIG |
| 5 | 9/15/09 – Email from Hussain to Sullivan |
| 6 | Agreement between Autonomy and Microtech for federal cloud platforms |
| 7 | Proposal for MicroTech and Vatican Library, Email dated 1/1/2011 between Scott, Egan and Hussain |

I. **Introduction**

On November 15, 2012, Leslie Caldwell, Susan Resley and Martha Stolley, all of MLB, conducted an in-person interview of Joel Scott ("Scott"), Autonomy's former General Counsel. Josh Drew of HP participated by phone. Andrew Purdy and Kate Emminger, both of MLB, also attended the interview. The interview lasted approximately two and a half hours and was in connection with HP's internal investigation of HP's acquisition of Autonomy. Prior to the interview, Scott turned over his laptop computer for imaging.

Ms. Caldwell provided Scott with "Upjohn Warnings" by advising him that the interview was part of HP's internal investigation, that it was privileged and that Scott should keep the discussion confidential. Ms. Caldwell further advised Scott that MLB represents HP and therefore, HP could choose to waive the privilege at its discretion.

**Background and Responsibilities**

Scott grew up in Canada and attended Stanford Law School. After law school he worked at Gibson Dunn, then worked for several small tech companies including Brocade, and Snowcap. He began working as Associate General Counsel for Autonomy in October or November of 2005, right before Autonomy purchased Verity. Scott believed he became General Counsel, the

Morgan, Lewis & Bockius LLP

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329234

title he now holds, sometime in 2009.

Scott's title changes were not contemporaneous with changes in his work duties – Scott described them as "separate paths". When Scott began as Associate General Counsel, his job was to manage all sales transactions in the Americas. His boss was Autonomy's COO, Frank Pau ("Pau"). When Scott started, Autonomy employed around 250 people and its revenue was approximately $70 million. As Scott's responsibilities changed, he was asked to oversee various programs and departments. For example, Scott oversaw all US facilities work, HR, sales hires, inside sales for the Americas, the SF office and other various projects. Scott said it's always been hard to describe his core job function, but that he enjoyed the variety. He attributed this variety to the fact Autonomy was very unstructured. Around 2009, Scott wasn't sure what one task would be dominating his time, but thought he spent most of his time interviewing potential salespeople.

When Scott first started, he reported to Pau and later Scott reported to Andy Kanter ("Kanter"). Even while reporting to Pau, Scott had frequent, though inconsistent, contact with Kanter. Scott described Kanter's communications as "transactional" and "very short". Scott never felt friendly with Kanter. Kanter was mostly in the UK, as were Mike Lynch ("Lynch"), Sushovan Hussain ("Hussain"), and Pete Menell. Lynch visited the US for a month each March, but the other three visited only a few days each year. When Scott began reporting to Kanter, Scott would attend offsite management meetings a couple times a year. The meetings were usually in the UK or Europe. Scott had never been to the Cambridge office until a few months before this interview, and had spent maybe "10 minutes" in the London office.

II. **Discussion with John Schultz Regarding Autonomy's Practices**

In April or May 2012, Scott received a phone call from John Schultz ("Schultz"). He believed the call concerned "a funny thing with Mike", maybe the severance agreement or something along those lines. During this phone call, Scott asked to meet with Schultz. Something that came up during the call triggered Scott to describe several issues he was aware of during his tenure at Autonomy, Scott met with Schultz, and other members of HP's legal team, Gabriel Buigas, Kristin Major and Tom Perkins at HP's headquarters.

He believed Lynch had already left Autonomy at the time of the meeting, because after the acquisition Lynch directed the staff not to interact with HP at all and to direct all communication through Lynch or Kanter. Scott believed this directive was no longer in force when he spoke with Schultz and therefore, Lynch was likely no longer at the company.

Scott requested the meeting with Schultz because he wanted to ensure HP had the same visibility into Autonomy that Scott did. Scott was surprised that Schultz was unaware of the issues. Scott didn't remember bringing anything with him to the meeting, which lasted a few hours.

At the meeting, Scott told Schultz about Autonomy's practices concerning hardware sales, and resellers. He also discussed Brent Hogenson's allegations. They also discussed OEM agreements with companies already acquired by Autonomy and reciprocal deals where Scott was unconvinced the products Autonomy purchased were actually being used.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329235

III. **Hardware**

Scott was not involved with hardware ("HW") transactions, but knew there were many. Scott recalled deals with HDS, EMC, and maybe Dell, where Autonomy would purchase HW and resell to end users it at a 10% discount. Scott believed that 5% went back to the OEM and a 5% discount was passed on to the end user, so that Autonomy "sat in the middle." Scott recalled a Master Agreement with many attached P.O.s. Scott believed HW sales began around 2010 or 2011. Scott said he could "count on a couple of hands" the number of appliances sold with Autonomy software. Scott reviewed an email that discussed possible appliances utilizing Dell HW and Autonomy software. He did not recall any agreement with Dell. (Tab 1).

Scott didn't recall the first HW transaction but said Mike Sullivan ("Sullivan") drove most of the sales, at least with EMC. Scott believed Sullivan was likely also the interface with Dell. Scott thought the HDS interface was likely Stouffer Egan ("Egan").

Scott speculated there were HW sales of somewhere between $15 and $40 million each quarter. He was not sure if the hardware sales were used to fill revenue gaps, but thinks Hussain may have told Sullivan to "sell X dollar amount of HW."

Even though Sullivan was based in Boston, Scott interacted frequently though inconsistently with Sullivan. Scott thought he had a good relationship and reasonable friendship with Sullivan, stating they would sometimes talk or have a beer together. Scott had this sort of relationship with many members of the US management team. Sullivan and Scott talked about HW deals, but not in detail.

Scott did recall hearing that HW revenue was captured in OEM revenue. He wasn't sure where he had heard it or who had said it, but he thought he had heard it.

Scott didn't know what was relayed to the market about HW sales.

    A. *Rationale of HW Sales*

Egan explained to Scott that HW sales helped maintain its profit margin. With HW sales, Autonomy could continue to grow revenues while keeping the margins in check. Egan believed that if the margins kept going up, the stock price would face pressure. Scott didn't think this rationale made much sense. He may have asked "Why take a loss on HW sales?"

    B. *"Strategic Partnership with EMC"/ General Relationship with EMC*

Scott didn't believe there was a strategic partnership between Autonomy and EMC. Scott thought Autonomy may have looked at acquiring one part of EMC's business, but didn't think it was related to a strategic partnership. EMC and Autonomy completed an OEM business with RSA. Scott thought there were several OEM deals with EMC, but didn't recall their sizes and didn't believe they were part of a strategic relationship. Scott recalled "real" talk about developing an appliance but he never saw anything "very robust".

Scott never saw anything explaining the end of EMC's relationship with Autonomy.

FOIA CONFIDENTIAL TREATMENT REQUESTED      HP-SEC-00329236

Scott didn't recall a Q309 purchase of $45 million of hardware from EMC, where Autonomy sold to customers for $36 million. He thought the numbers didn't seem right because it's such a big discount.

    C.    *Dell HW Sales*

Scott wasn't sure of any marketing efforts with Dell. (*See* last email in the chain on Tab 1). Scott was not aware of an agreement with Dell or EMC to develop an appliance, but he thought it was possible. Scott recommended that we ask Hussain or Sullivan. Scott wasn't sure what the end of the email meant ( Tab 1: Hussain wrote "This is ok as long as there is autm software included"), but it made him question his presumption that the HW deals didn't include Autonomy software.

When shown a string of December 2009 emails regarding Morgan Stanley, (Tab 2), Scott surmised that it was an "Stouffer deal." Scott speculated that it was related to Arcpliance because it refers to HW with Autonomy software loaded on it. Scott speculated the email referred to a deal pushed by the Autonomy salesperson, TJ LaPore. Scott reiterated he wasn't sure if this was the deal they were talking about. He did remember that Egan wanted the deal to get done, and Morgan Stanley wanted a commitment for deeply discounted hardware. Scott had no recollection of two P.O.s. Scott said it wouldn't have surprised him if Autonomy couldn't get the HW deal done, but could at least ship the software. He added that Livius Guaio was primarily responsible for drafting the hardware agreements and working with Chamberlain.

    D.    *Arcpliance and Appliance Development*

At one point, Hussain, Lynch, Egan and Menell pushed to enter the appliance market. Scott thought the push was prompted because Clearwell, an e-discovery company, was cutting into the market share.

Scott was not aware of an agreement with Dell or EMC to develop an appliance, but he thought it was possible. Scott recommended asking Hussain or Sullivan.

Scott recalled a press release about Arcpliance, but didn't recall a formal agreement with any HW company for it. Scott never saw or touched an Arcpliance. He recalled a few sales of Arcpliance, but nothing very large.

Scott remembered attempts to design a HW sales template for an appliance, but it was never completed because there were too many challenges in adapting their software sales template. Scott thought this was typical of Autonomy because the company itself wasn't very structured.

    E.    *Hardware Accounting Practices*

Scott didn't know how the quarterly number was determined, but guessed that Hussain would tell Sullivan how much HW to sell. Scott described a "brick wall" around company revenue information, so he didn't know if the number was determined in order to fill revenue gaps. Hussain handled the revenue and set the goals. Based on Hussain's personality, Scott believed

FOIA CONFIDENTIAL TREATMENT REQUESTED    HP-SEC-00329237

Hussain set the numbers and told people to go get it done. Scott suggested Sullivan would know more because Scott wasn't involved in the actual sales, other than papering the deals and maybe working with HDS.

When asked about an April 22, 2010 email about allocating funds to marketing (Tab 3), Scott couldn't remember the context. He speculated that an auditor told them Autonomy couldn't allocate a portion to marketing and so Scott went back to see if Hussain still wanted the HW deals if it couldn't be allocated to marketing.

When Scott questioned Autonomy's accounting practices, Hussain was very clear that every accounting practice was vetted by the auditors. Scott had never heard of specific issues with the auditors, but described Hussain as "pretty tenacious", intense and aggressive. Thus, Scott could imagine Hussain fighting with the auditors to get his way. However, Scott had no first hand dealings with the auditors and stressed this was only speculation.

    F.    *P.O.s and Marketing Expenses*

Scott signed the P.O.s that were brought to him by Jorge Salazar ("Salazar").[1] Salazar would bring him approximately 20 P.O.s at a time, so guessed there would be 50 or 60 P.O.s per quarter. Scott believed someone working with Sullivan told Salazar what P.O.s to create. Scott described his involvement in the approval process as essentially "scribble [ing] on the P.O.s". The P.O.s would look like the document in Tab 4, which Scott identified as a deal with Dell and AIG. Scott wasn't sure if the format was specific to Dell, but recalled the P.O.s looking similar to that document.

The prices on the POs varied. Some were as low as $100, or even $7. Scott always assumed the items purchased were servers, but agreed that a server wouldn't be sold for $7. Scott did not recall seeing orders for notebooks or mice.

Scott believed that marketing language was included in the P.O.s for a purpose, but didn't recall specifics. Scott recalled discussions around allocating part of the HW cost as marketing expense. . Scott believed that the marketing angle would be been driven by Hussain, rather than by Dell.

    G.    *Bonuses*

There was a period in which Scott reviewed all sales compensation. The reviews didn't happen on a consistent basis, and Scott said he struggled with the task because he felt he couldn't make an "educated decision" about the compensation.

Scott remembered he was cc'ed on an email from Hussain, describing a $200,000 bonus that Sullivan was to receive for HW sales. Hussain approved the bonus. The bonus surprised Scott and Scott thought it was crazy because he didn't think someone could receive a bonus for selling HW. But when Scott asked Sullivan about it, Sullivan would just laugh it off or downplay it.

---

[1] Salazar began work at Autonomy in 2006 or 2007 and is currently a Contract Manager at Lithium. Salazar left Autonomy before the HP acquisition when Agnes Pak became General Counsel at Lithium.

-5-

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329238

Regarding an email dated 9/15/09 from Hussain to Sullivan regarding a bonus for "extracting" a letter from EMC (Tab 5), Scott thought the email was consistent with other things he'd heard, but Scott had never heard of the $50,000 specifically.

IV. **Resellers**

Scott was uncomfortable with how Autonomy used resellers. Scott believed resellers were used when a deal would not close in a particular quarter.

Scott raised the issue with Kanter and Scott felt "the answer was very clear". He was told that as long as there was a reasonable belief the deal would close, then the revenue could be taken from a reseller sale. Kanter added that if the deal did not close, Kanter and Hussain would deal with it. Scott also asked Chamberlain and Hussain, but eventually concluded that the UK's IFRS rules were different from GAAP and thus the practice was legitimate.

Scott believed there was always an end user for the reseller deals, and thought Hussain's forecast sheets would confirm this belief. However, Scott clarified there were some European deals with which he had no visibility.

Scott believed the reseller took the risk and would be on the hook if the end user deal didn't go through. If the end user deal went through, the reseller would get a 10% margin. Scott wasn't sure of the resellers' size and thought they were relatively small companies. He wasn't sure if or how they had the financial wherewithal to cover large deals. Scott speculated if the resellers were truly on the hook for a deal that didn't go through, the resellers would have financial problems.

Scott recalled that Autonomy purchased products and services from the resellers. He said that some of the deals made no sense for Autonomy. For example, Autonomy OEM'ed some of Discovertech's technology. Making inbound OEM deals was not typical for Autonomy, so it seemed odd to Scott.

Scott guessed Egan would make the call to involve the reseller, because Scott couldn't figure how else the reseller would know about the deal.

Scott didn't know how or if Autonomy sales persons received commission when resellers stepped in. Hussain or Chamberlain would have decided the compensation issue, but Scott guessed that the sales people got compensated at the time the deal was recognized. Scott surmised that maybe there wasn't a consistent practice.

    A. *Vatican Library Deal*

Scott had heard of the Vatican deal because it was big. Scott thought it was a $30 million deal. Hussain, Pete, Fernando Eugini, and Corrado Broli were involved. Scott thought it was likely driven by Hussain or Pete. Scott would have expected to hear a lot of buzz if it had closed even though it was a European deal. Scott believed he would have heard if the deal had closed during the annual sales meeting when the Salesperson of the Year award was given. He never heard of the deal closing.

FOIA CONFIDENTIAL TREATMENT REQUESTED    HP-SEC-00329239

Scott didn't recall that Microtech stepped in as a reseller, but that possibility didn't surprise him. It didn't surprise him because he felt there were only a few resellers Autonomy dealt with, specifically Capax, Microtech and Microlink. Scott believed Egan had conversations with Microlink and Microtech.

Re $2.3 million write off of Vatican sale in 2011: Hussain rarely wrote off debt and Scott said Autonomy was still chasing bills in Latin American that had not been paid for years. Thus, Scott found it odd that Autonomy would have written off some of what Microtech owed. It suggested to him that the end user deal never came though.

    B.    *Microtech Purchase Agreements*

Scott said it was hard to distinguish between Microtech, Microlink and Discovertech because they were all related. Scott believed Dave Truitt connected all three, and perhaps Tim Wharton. Wharton would occasionally call Scott and ask for help when Autonomy owed any of those entities. Scott would follow up with Chamberlain or Hussain.

When Autonomy purchased Microlink, Scott was asked to be the conduit. Because Microlink was subject to a proxy agreement, Autonomy was not allowed to be very involved in Microlink's business.

Scott knew of other purchase agreements for services from either Microtech or Microlink, but wasn't sure exactly which company. Any purchase agreement would be related to software services, such as installation. Scott remembered a "mobile unit" project in which the unit (which he compared to a bus) would showcase different products to the federal government. Scott thought the project started independently, but Autonomy later funded part of it. Scott thought the project was a good idea because Autonomy's federal sales were "anemic" and thought this project could assist.. However, Scott didn't think Autonomy had the "discipline" for utilizing the project. Scott thought this project occurred around 2011.

Scott was asked about an August 15, 2011 agreement between Autonomy and Microtech for Federal Cloud Platform which he signed on behalf of Autonomy (Tab 6), Scott thought it was odd that the contracting party was Autonomy UK (versus Autonomy, Inc). Scott further thought it was odd that the agreement was governed by California law when Autonomy UK was the party. Scott thought the agreement might have been for the mobile unit discussed above, and thought the named amount of $8.2 million sounded like the amount of that project. Scott remembered a detailed proposal for the mobile unit, but didn't remember the contract specifically, and didn't recall seeing this document. Scott recalled that the proposal was "very light on the contract". Scott recalled a flurry of activity or rush around this contract, but didn't remember much more about timing. He noted the date on the agreement was August 15, and thought a rush would have made more sense on a date closer to the end of the quarter. Scott didn't recall any rush to pay on it, nor an email to pay $8.2 million. However, Scott stated he wouldn't have been surprised by an email requesting an immediate $8.2 million payment. When asked to speculate whether the $8.2 million agreement could have been designed to pay an amount Microtech owed Autonomy, Scott agreed with that assumption. Scott speculated that since Microtech or Microlink didn't have the financial wherewithal to cover deals that weren't

-7-

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329240

closed with an end user, this contract would enable Microtech or Microlink to pay Autonomy. Thus, if there was a rush to pay Microlink or Microtech, it's likely so they could turn around and pay Autonomy quickly.

### C. Capax/Amgen/Bank of America

Scott knew less about Capax, but thought of it in the "same bucket" as Microtech. Scott thought Egan had the relationship with Capax. Scott recalled drafting an agreement to sublicense Autonomy's EDD technology at a very large discount, perhaps around 80%. Scott thought it was a legitimate deal but didn't understand why they would get such a large discount.

#### 1. Amgen

Scott recalled an Amgen Q310 deal because it was a big deal. Scott wasn't sure of the exact timing, but remembered doing a few different deals with Amgen. Scott was pretty sure they committed to $15 million because Amgen has recently begun complaining that the EDD software doesn't work the way they thought it would. He does not know when the Amgen deal closed, i.e., did it close in 2010. He also does not know if the deal was cancelled or if and when Capax stepped in as the reseller.

#### 2. Bank of America

Scott recalled the Bank of America deal was a restructure, where a hosting fee was replaced with an upfront license fee. Scott surmised the structure had to do with revenue recognition. Hussain and Egan were both heavily involved, as were Chamberlain and Jim Krawkowski, the salesperson. Hussain was driving the deal. Livius Guaio drafted the contract. Scott was on site for the three days of negotiations, but wasn't sure when the deal closed.

Mike Mooney ("Mooney") was taken off the Bank of America deal, but Scott didn't recall why.[2] He offered his views on the subject and compared Mooney to Egan. He described Egan as a "great evangelist" but not a great salesperson, whereas Mooney was a great negotiator. Scott described Egan as "essentially Lynch's son", so Scott thought that if Egan wanted in on a big deal, he would get it and Mooney couldn't do much about it. Scott reiterated he wasn't positive this is what happened, but it was his assumption.

Scott recalled that two different resellers became involved with the Bank of America deal, but didn't remember the deal closing in a specific quarter. Scott recalled a paragraph in the Bank of America agreement providing that Bank of America would pay a third party (versus Autonomy directly). Scott thought this allowed the two resellers to invoice Bank of America. Scott had no idea why the deal was broken up between two resellers, but thought that maybe neither reseller had the financial wherewithal to take the whole deal. Scott believed Egan would have driven the deal with the resellers.

---

[2] Mooney had advised us during his interview that he had been involved with the deal, but was taken off.

-8-

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329241

Scott thought Capax was involved. He did not recall the 12/31/10 letter between Capax and Autonomy in which Capax cancelled the 9.45 million agreement with Amgen and replaced it with a $9.45 million reseller agreement with Bank of America. (Tab 8) He thinks that Microtech or Discovertech was involved as a reseller as well (it was DiscoverTech). He was not sure how or if the resellers dealt with each other, but thought one reseller may have given another reseller a P.O. Scott didn't believe he drafted the actual deal, but remembered creating the "deal flow".

### D. *Department of Veteran Affairs/FileTek*

Scott didn't remember much about the Veteran Affairs deal. He recalled it was a big deal, maybe around $4 - 7 million, but he wasn't sure. He thought perhaps a reseller stepped in, and surmised it was Microlink or Microtech.

After Scott was told FileTek was involved with the V.A. deal, he said that was "interesting" because FileTek wasn't a large reseller, unless there were deals he didn't know about. Scott knew Autonomy OEM'd a deal with FileTek and purchased FileTek's technology. Scott didn't think it made sense, but Pete, Hussain, Lynch and Kanter were all adamant it was great technology that would compress the storage in the Digital Safe product.

Gary Szakowski, FileTek's President, used to work at Autonomy. Scott believed that Autonomy received a good discount for the software compared to the list price, but wasn't sure if it was the best use of Autonomy's money. Scott said it seemed like Autonomy legitimately received software. When asked about any connection between a VA reseller deal and Autonomy's purchase of FileTek software, Scott's assumed the numbers "tied off" and that Autonomy purchased FileTek software was because there was a reseller deal where an end user didn't finalize.

### E. *Viadent*

Viadent was a company owned by Pau, Scott's former Autonomy boss. Autonomy OEM'ed Viadent into their security and surveillance products. Scott recalled a $3 million project. Scott remembered that Vidient then OEMed Autonomy's product and that they were excited to have the product. Scott remembered that Autonomy paid Vidient, but then thought Vidient went bankrupt before Vidient paid Autonomy. Scott thought Autonomy bought more software than it sold to Vidient.

### F. *Tikit*

Scott didn't know much about Tikit other than it was an international partner. Scott thought it was a partner of iManage, which Autonomy acquired as part of the 2009 Interwoven acquisition. Scott was friendly with Neil Araujo ("Araujo"), who leads the iManage business. Scott remembered that Hussain pushed Araujo for Tikit to take a resale deal. Scott thought the end user was KPMG. However, Araujo needed to be convinced the risk was worth it and that all would end well. Scott wasn't sure if Autonomy offered Tikit any protection, but thought he had seen other deals where two different end users were offered for security purposes.

FOIA CONFIDENTIAL TREATMENT REQUESTED　　　　　HP-SEC-00329242

### G. *Prisa*

Scott identified the Prisa deal as suspicious because currently Prisa is refusing to pay their bills.

## V. **OEM**

Scott remembered Autonomy had about 300 OEM deals, but 90% of them were for KeyView, a very small product. KeyView is a "file cracker", used for reading the words in pdfs, or other types of files. Thus, to say that there were 300-400 OEM deals was, to Scott, "a lot of spin".

Scott did recall hearing that HW revenue was captured in OEM revenue. He wasn't sure where he had heard it or who had said it, but he thought he had heard it.

Scott thought claims that OEM IDOL was growing quickly would be hard to substantiate and felt it "didn't sound right at all". Scott admitted there could be something he wasn't aware of, but nothing he knew of would support that claim.

KeyView, which Scott thought was 90% of the OEM business Autonomy had, was originally called IDOL Keyview, so perhaps when Autonomy said that IDOL OEM was growing, it was because KeyView was once called IDOL KeyView. Keyview was frequently sold in OEM deals.

Scott couldn't see how Bank of America would ever be an OEM client because adding value on top of the Autonomy product before reselling is fundamental to the idea of OEM. OEM is not just a pass through deal.

At first Scott wasn't sure why the OEM revenue would be more attractive. He later guessed that high OEM revenue would give the impression Autonomy was becoming a "de facto platform", like Oracle, and that everyone was using Autonomy technology. He also speculated that OEM revenue usually has royalties attached, and perhaps that revenue stream might be attractive because it will grow.

At first, Hussain didn't want any royalties or annuities with the OEM business, which angered the sales team. One salesman, Chad Reynol, was so mad at this policy that he left Autonomy. However, around 2009 or 2010, Hussain changed the policy and said every OEM deal should have a royalty component, even for a small amount.

### A. *Tottenham Hotspurs*

Scott learned about this deal a week before the interview. Scott believed Tottenham Hotspurs did an original deal, then a repurchase and it never resold. Tottenham bought a website with the goal of selling it to another soccer club, but apparently Tottenham was never happy with the site and has yet to resell it. Scott thought there seemed to be more involved in the Tottenham deal because the team had Autonomy logos on their jerseys, but Scott didn't know details about that.

Scott was very surprised the Tottenham deal was booked as IDOL OEM. Scott described the Tottenham deal as having two aspects. First, there was the hosting and consulting for the website. Second, there were the resales of the website. Scott didn't believe that either of these

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329243

were possible OEM transactions because Tottenham wouldn't have built anything on top of the Autonomy product for resale, it would have just been a straight resale.

## VI. General

### A. Quarter End

Every quarter end had around 50 deals going on at the same time. Scott described the quarter end as "crazy".

### B. Blinx

Blinx was an Autonomy video technology that was spun out of Autonomy and traded in the UK around 2006. Autonomy sold some software to Blinx, and maybe Aurasma sold or bought from Blinx. Scott believed there were definite transactions going both ways.

### C. DVL Games/Kanter

Scott recently received an email that was sent to Kanter's old email address containing an offer letter for a job. The offer letter was virtually identical to Autonomy's offer letter. Later, Scott received a copy of an agreement between Autonomy and DVL for five years, with no right to terminate and 3% net. The agreement gave DVL use of all the Erasma technology. Scott found this agreement shocking because Erasma was Lynch's "baby" and Kanter had signed it a few days before he left Autonomy.

### D. Bonuses

Scott didn't know specifically about any other bonuses besides the Sullivan HW bonus (see HW section above), but said that things operated "pretty haphazardly" so he wouldn't be surprised if Lynch or Hussain approved off cycle bonuses. Scott supposed Egan or Nicole Eagan would be at the top of that list. Scott couldn't think of any bonuses specifically, but said he wasn't surprised by the concept. Scott wasn't familiar with the "Mike Lynch" bonus. Scott mentioned an employee of the year awarded by Lynch, but Scott thought the bonus attached to that award was something small, like a weekend trip.

### E. Email from Hussain to Scott About Checks (Last Page, Tab 7)

This email refers to making sure checks from resellers are "appropriately" dated. Scott thought this email, on the last page of the tab, was regarding checks that were mailed on Friday and therefore cashable on Friday, but not received until Saturday. Thus, they would check the dates to make sure it was in the quarter it was supposed to be. The email was not asking a customer to back date a check, i.e. to December 31.

### F. Deloitte

Scott had no first hand visibility into Deloitte. However, Scott questioned Autonomy's practices several times and was always told every practice was vetted with the auditors, and that

-11-

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329244

Autonomy used UK accounting standards, not GAAP rules. When Brett Hogenson made his allegations, there was a review process and everyone said everything was ok, although Scott didn't remember what topics were included in the review. Scott concluded everything was appropriate under IFRS. Scott also recalled being told by Kanter that the UK auditors have personal liability if Deloitte signed off on inappropriate accounting practices.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329245