# EXHIBIT F



Ernst & Young LLP
1 More London Place
London
SE1 2AF

Tel: + 44 207 951 2000
Fax: + 44 207 951 1345
ey.com

# Internal memorandum

To:    Autonomy audit files                                    30 January 2014

cc:    Marcus Butler (Secondary Audit Engagement Partner)
       Dave Hales (Lead Audit Engagement Partner)
       Bob Forsyth (EQR Partner)
       John Smart (FIDS Partner)
       Elizabeth Stanton (PPD Partner)
       Robert Overend (PPD Partner)

From:  Audit team and FIDS

## CONFIDENTIAL AND LEGALLY PRIVILEGED - AUTONOMY

**Contents**

**Part 1**

**Section 1 – Purpose of Memorandum**

**Section 2 – Background**

**Section 3 – EY considerations**

Section 3.1 – Relevant guidance
Section 3.2 – Scope of investigations
Section 3.3 – Persons conducting the investigations
Section 3.4 – Investigation process
Section 3.5 – Summary of our interactions relating to these investigations
Section 3.6 – Findings of investigations
Section 3.7 – Conclusion of investigations
Section 3.8 – Inquiries made of investigative team
Section 3.9 – Compliance with laws and regulations

**Section 4 – Conclusion and rationale thereof**

**Part 2**

**Section A – Audit procedures and considerations**

Section A.1 – Audit Procedures Performed
Section A.2 – Other Audit Considerations

**Section B – Conclusion and rationale thereof**

**Section C – Review and Approval**

**Appendix A** – GAPM 2.11 and EMEIA Supplement to GAPM 2.11

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London SE1 2AF, the firm's principal place of business and registered office.

MLAT_AU 00091301

**EY**
Building a better
working world

2

**Part 1**

**Section 1 - Purpose of memorandum**

The purpose of this memorandum is to document our considerations and conclusions regarding investigations conducted by Hewlett Packard ("HP") into allegations of financial irregularities at Autonomy, prior to its acquisition by HP, on EY's audit testing under ISA 240, ISA 250 and the firm's procedures for responding to allegations of financial improprieties made by whistleblowers. These allegations are directed at the Autonomy group, of which the Autonomy UK subsidiaries form a part. As context, the Autonomy group has UK subsidiaries which contributed approximately 10% of the revenue of the Autonomy group in 2011.  Autonomy US contributes 85% of the revenue, with the remaining 5% distributed across other Autonomy subsidiaries.

EY are engaged to audit the local statutory accounts for Autonomy Corporation Limited (Autonomy parent company) and the UK subsidiaries for the 10 month period ending 31 October 2011 and subsequent periods.  Deloitte were the auditors for the year ended 31 December 2010 and earlier.

Autonomy was acquired by HP in October 2011. HP is an EY SEC client and hence this local statutory work has been referred to us as part of the overall audit engagement that EY has with HP.

**Section 2 - Background**

Following the departure of Autonomy founder Mike Lynch in May 2012, an internal whistleblower made allegations that there had been a series of questionable accounting and business practices at Autonomy prior to the acquisition by HP.  In response, HP commenced an investigation, supported by Morgan Lewis & Bockius ("Morgan Lewis") and PricewaterhouseCoopers ("PwC"), in order to determine whether the concerns identified were supportable.  The findings of this investigation have been shared with the SEC and SFO, who have determined that they will pursue their own investigations.

On 20 November 2012 HP announced that it had made a non-cash impairment charge of $8.8 billion related to Autonomy in the fourth quarter of its 2012 fiscal year.  HP stated that it had launched an internal investigation into these issues after a senior member of Autonomy's leadership team came forward, following the departure of Autonomy founder Mike Lynch, alleging that there had been a series of questionable accounting and business practices at Autonomy prior to the acquisition by HP.  HP's press release stated that former members of Autonomy's management team had used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company prior to Autonomy's acquisition by HP and that these efforts appear to have been a wilful effort to mislead investors and potential buyers, severely impacting HP management's ability to fairly value Autonomy at the time of the deal. HP attributed more than $5 billion of this impairment charge to these alleged improprieties, with the balance linked to the recent trading value of HP stock.

In summary, the public allegations raised by HP against the former management team of Autonomy are classified as follows:

▶    Accounting improprieties

▶    Misrepresentations

▶    Disclosure failures

Examples of accounting improprieties and disclosure failures provided by HP are that hardware sales with little or no associated software content were improperly classified as "licence revenue" and that licencing transactions with value-added resellers were used to inappropriately accelerate revenue recognition, or to create revenue where no end-user customer existed at the time of sale.

In the accompanying earnings conference call Meg Whitman stated that "the Board relied on audited financials, audited by Deloitte, not brand X accounting firm but Deloitte and, by the way, during our very extensive due diligence process, we hired KPMG to audit Deloitte, and neither of them saw what we now see after someone came forward to point us in the right direction".

MLAT_AU 00091302



All these accusations are being made in the public domain.

***Section 3 – EY considerations***

*3.1 – Relevant guidance*

In light of the allegations, we have considered the following guidance in planning our audit.

1. *ISA 240 – The Auditor's responsibilities relating to fraud in an Audit of Financial Statements*

    ISA 240, paragraphs 12 – 47 provide guidance to the auditor relating to responsibilities regarding fraud.

    In order to comply with the requirements of this ISA, we have performed the following;

    ▶ Maintained professional scepticism in relation to the matter in hand

    ▶ Made appropriate inquiries of management

    ▶ Identified and assessed the risk of material mis-statement due to fraud

    ▶ Appropriately responded to identified risks of material mis-statement due to fraud

    ▶ Obtained appropriate written representations

    ▶ Made appropriate communication to Those Charged with Governance

    ▶ Included in the audit file documentation of the assessment an understanding of identified items (See all sections)

2. *ISA 250 – Considerations of Laws and Regulations in an Audit of Financial Statements*

    ISA 250, paragraphs 18 – 29 provide guidance to the auditor relating to responsibilities when non-compliance with laws or regulations is either identified or suspected.

    In order to comply with the requirements of this ISA, we have performed the following:

    ▶ Obtained an understanding of the nature of the alleged act and its circumstances

    ▶ Discussed with management

    ▶ Assessed the impact on other aspects of the audit

    ▶ Communicated to those charged with Governance

    ▶ Included in the audit file documentation of the alleged non-compliance and results of the discussions with management

3. *GAPM 2.11 and EMEIA Supplement - Responding to allegations of financial improprieties made by whistleblowers*

EY
Building a better
working world

4

The EY guidance on "Responding to allegations of financial improprieties made by whistleblowers", contained in GAPM 2.11 and the related EMEIA supplement, is set out in Appendix A.  In order to comply with the requirements of this guidance, we have performed the following:

▶   Assessed the client's response to the allegations

▶   Assessed the results of the client's investigation

The rest of this section of the memorandum deals with our assessment of the client's response to the allegations and the related results.  Details of our audit approach are set out in part 2 of this memorandum.

*3.2 - Scope of investigations*

During FY'12 HP launched an internal investigation related to certain matters identified after the Company's acquisition of Autonomy.   As part of this investigation, HP engaged Morgan Lewis and in turn Morgan Lewis engaged PwC.

PwC US have been engaged by Morgan Lewis to complete certain procedures as detailed below.  PwC UK was engaged by PwC US to perform the work.  The engagement letter was agreed with PwC US based on existing HP relationships in the US and the liaison with Morgan Lewis. PwC US were involved in providing guidance but PwC UK have been leading the work performed.

PwC were initially engaged to review 27 transactions, identified by HP, for which revenue was recognised by Autonomy in 2010 or 2011 for the purpose of forming a preliminary view as to whether the revenue was appropriately recognized under IFRS.  The review included reading contracts, review of other accounting data gathered, interviews of Autonomy employees, and some limited access to emails. The transactions were selected by HP drawing on input from the internal investigation and legal review. The 27 transactions selected fell into 5 categories that are currently being investigated by HP– hardware, value added resellers ("VARs"), hosting, barter and other. The majority of the transactions were originally recorded within Autonomy Inc which is a US entity in the Autonomy group. PwC has performed a significant amount of work on the review of these transactions and has provided some draft reports to Morgan Lewis and HP.  We have seen only their draft interim report dated 6 March 2013.   PwC has not made any final conclusions nor have they provided any final reports on this phase of work, which is known as Project Baron.

PwC were also asked to help prepare for and participate in an HP meeting with the Serious Fraud Office "SFO" and the Financial Reporting Council "FRC".  The meeting with the SFO was an undertaking on behalf of HP to help provide information related to the investigation.   The meeting with the FRC was at the request of the FRC and again to provide some background and details on the investigation to date.  PwC did not provide a report during either of these meetings.

PwC has also carried out a number of additional tasks:

▶   Review some specific transactions from 2009 and some "other issues of interest" including data gathering and analysis relating to revenue reporting and the reporting of the business performance in the Annual Report (e.g., disclosures on the amount of IDOL OEM revenue).

▶   Review transactions in the dark period, between the announcement of the acquisition by HP on 18 August 2011 and completion of the acquisition 3 October 2011.

▶   Review transactions with a number of specific resellers.

Although no reports have been issued in respect of these additional exercises, the results have been shared with management to assist them in preparation of the accounts.

Autonomy also asked PwC to conduct further investigative work focusing on accounting for costs and directions given by senior management; this is Project Marquess.



5

PwC has also been asked to undertake Project Viscount for US legal counsel, to prepare a new report covering their prior work on revenue recognition, to prepare a rebased profit and loss account for ACL for 2009, 2010 and the two quarters to October 2011 and to investigate a number of further transactions.

Finally, PwC is also carrying out Project Duchess, an investigation into the Autonomy audit carried out by Deloitte.

In the US HP's shareholders have initiated a lawsuit accusing HP and CEO Meg Whitman of failing to reveal soon enough in 2012 that the company may have overpaid for Autonomy or suspected fraud.  HP has engaged Proskauer Rose LLP ("Proskauer") to assist the Company in defending this action.  The EY US team auditing HP have reviewed the findings of this work. PwC have been assisting Proskauer as Projects Viscount and Duchess.  These investigations are not seeking to discover new information but rather to consider and present the known information for a different purpose.

In addition to supporting PwC in their work, Morgan Lewis also produced presentations for HP for meetings with the SEC and the SFO and handled data requested by the SEC subpoena.

*3.3 - Persons conducting the investigations*

HP engaged Morgan Lewis and in turn Morgan Lewis engaged PwC as part of the HP investigation.

The Morgan Lewis team is led by three partners, with support from additional team members, as follows:

Leslie R Caldwell, Partner (US)
Susan D Resley, Partner (US)
Martha B Stolley, Partner (US)
Shana R. Cappell, Associate (US)
Joanna Winogrodzki, Practice Technology Senior Analyst (US)

Profiles of the lawyers on the Morgan Lewis team can be found at **11 ALL Morgan Lewis team profiles.**

Morgan Lewis is a well known, reputable firm that regularly assists clients with regulatory investigations and inquiries.  We have obtained and reviewed the profiles of the key people involved in the engagement and believe they have the appropriate skills and experience to complete the project.  In particular, Leslie R. Caldwell specialises in internal investigations and defence of companies accused of violations by the government and regulators such as the SEC.  Morgan Lewis is an unrelated third party and EY believes they are sufficiently objective to participate in the investigation.

The PwC team is comprised of two groups – an accounting advisory team and a forensics team.  Team members are as follows:

| *Forensic team:* | *Accounting Advisory:* |
|---|---|
| David Marston, Partner (US) | James Wong, Partner (UK) |
| John Tracey, Partner (UK) | Peter Hogarth, Partner (UK) |
| Will Kenyon, Partner (UK) | David Walters, Director (UK) |
| Nigel Curl, Director (UK) | Melissa Nussbaum, Snr Manager (UK) |
| John Archibald, Snr Manager (UK) | Patrick Wong, Manager (UK) |
| Fay Newport, Manager (UK) | Joe Jennings, Manager (UK) |
| Rebecca Rossiter, Manager (UK) | |
| Alister Smith, Manager (UK) | |

The PwC team CVs and profiles can be found at **11 ALL PwC Team profiles**

PwC is a well known, reputable firm that regularly provides forensic and accounting advisory services.  We have considered the competence of the team through EY's past experience with PwC through FIDS engagements.  Specifically, John Smart from EY FIDS has worked directly with John Tracey who is leading the PwC investigation team in the UK and Will Kenyon, another PwC UK forensic partner. Additionally, we have worked with John Tracey in

**EY**

Building a better
working world

6

the support of another investigation matter for HP.   PwC is an unrelated third party and EY believes they are sufficiently objective to participate in the investigation.   We have also obtained and reviewed the profiles of the people involved in the PwC engagement and believe they have the appropriate skills and experience to complete the project as currently scoped.

*3.4 - Investigation process*

Autonomy has used the findings from PwC's work on Projects Baron, Marquess and Viscount in preparing the UK statutory accounts for the period ended 31 October 2011.  As described below, we have held a series of meetings and calls with both Morgan Lewis and PwC to establish and assess the investigation process followed in preparing PwC's interim Project Baron report and the joint PwC and Autonomy Project Marquess briefing note.  These are detailed in the various meeting records but are summarised below.

Data

In May 2012 HP engaged Morgan Lewis to assist with an internal investigation.  HP identified the sources and custodians they considered relevant to the investigation and collected the documentation.  The data collected was then provided to Morgan Lewis and loaded into their review platform Axcelerate for use in investigation.

Project Baron

PwC were initially engaged to review 27 transactions, identified by HP, for which revenue was recognized by Autonomy in 2010 or 2011 for the purpose of forming a preliminary view as to whether the revenue was appropriately recognized under IFRS.

Morgan Lewis created a list of search terms in conjunction with HP's in house legal counsel; these terms were refined through discussion with PwC and then applied to the data.  Morgan Lewis then reviewed the resulting documents to identify approximately 700 documents relating to revenue recognition which they classified as hot or warm.  Documents were segregated by deal.  Morgan Lewis provided PwC with spreadsheets containing high level summaries of these hot and warm documents, together with the documents themselves.  Morgan Lewis also gave PwC access to their Axcelerate review platform to allow PwC to conduct any further searches they considered necessary.

Morgan Lewis used the documents identified in interviews with a number of witnesses.  PwC was invited to interviews of any accounting personnel.  The summaries of all these interviews were also made available to PwC.

PwC assigned each deal to an individual in their team.  These individuals reviewed the documents in the relevant folder, tagging each as responsive or not.  PwC had access to Autonomy staff and accounting systems and records, including the deal binders, and to the chronologies and interview summaries prepared by Morgan Lewis.  PwC could also carry out their own ad hoc searches in Axcelerate in order to build the fact patterns for each deal.  Their findings are set out in the draft Project Baron report, with the documentation supporting their findings produced as exhibits to that report.

Project Marquess

We raised concerns with management that Project Baron had focused only on revenue; they agreed  that consideration should be given as to whether there had been more widespread manipulation of reported results.  Based on the findings of Project Baron management identified a number of objectives for a wider review, as follows:

1        To identify costs not booked in the correct period

2        To identify the use of marketing assistance fees

3        To identify transactions with little commercial substance

4        To identify inducements offered to employees to obtain documentation to support accounting entries

MLAT_AU  00091306

EY

Building a better
working world

7

5       To identify behaviours aimed at deception of the auditors

6       To identify payments (refunds) in one subsidiary relating to a sale in another

7       To identify information about specific issues or transactions - Open V, Realise, Autonomy NA Holdings

8       To identify transactions posted to the intercompany accounts with no commercial substance

Search terms, dates and custodians were identified for each of these objectives and refined in discussion between management, PwC and EY.  Morgan Lewis then ran the searches using these parameters.  Because of concerns over privilege, Morgan Lewis removed from the resulting population 3,246 unique documents dated after 3 October 2011 which included the name of anyone on HP's legal team, as well as 307.documents reviewed and identified as privileged for selected custodians (101 documents were identified as privileged but linked documents such as emails and attachments were include in the number withheld).  In total 3,553 documents were excluded for privilege as they contained, or were presumed to contain, legal advice.  This left around 22,000 documents for PwC's review.

PwC reviewed the documents for evidence relating to the objectives, classifying them as relevant or not relevant.  They produced a spreadsheet with supporting documentation for the Autonomy team to review.

The Autonomy team then carried out a further review to determine whether the evidence indicated that any adjustment was required, documenting their work.

*3.5 - Summary of our interactions relating to these investigations*

We have had the following interactions with PwC and Morgan Lewis relating to the investigations:

1.   A call was held with PwC on 14 December 2012 to understand the nature and scope of the work being performed.  Notes of this call are held on the GamX at **11 ALL EY PwC Call 14 Dec 2012.**

2.   A meeting was held with PwC on 18 December 2012 for the purpose of understanding the scope of work performed by PwC as well as the findings to date from their investigation.  Meeting minutes are held at **11 ALL PwC Memo.**

3.   PwC provided EY with a copy of their draft Project Baron investigation report, appendices and exhibits.  For confidentiality purposes these documents are held on the supplementary GamX at **11 Autonomy PwC Report**, **11 Autonomy PwC Report Appendices, 11 Autonomy PwC Report Exhibits 1** and **11 Autonomy PwC Report Exhibits 2.**

4.   A meeting was held with PwC and Autonomy on 22 March 2013 to discuss the findings of the PwC draft Project Baron report noted above and the notes from this meeting are held at **11 ALL Autonomy PwC Meeting Minutes 22 March.**

5.   A series of calls has been held with Morgan Lewis to understand the nature and scope of the work that has been performed and the notes from these calls are held on the supplementary GamX at **11 ALL Morgan Lewis meeting minutes 25 June to 17 December 2013**.

6.   We have been provided with access to approximately 600 of the documents tagged by Morgan Lewis as hot or warm and performed a limited review of these for the purposes of our audit.  Details are held on the supplementary GamX at **11 ALL EY review of ML hot and warm documents**.

7.   A meeting was held with PwC and Autonomy on 20 January 2014 to review the investigation process followed by PwC and Autonomy in preparing the draft Project Baron and Project Marquess reports and to



8

discuss the findings of those investigations.  The notes from this meeting are held at **11 ALL Project Marquess & Baron EY PwC Meeting 20 Jan 2014 Minutes**.

8.  A subsequent call was held with Morgan Lewis on 22 January 2014 to confirm the number and nature of documents withheld from Project Marquess due to legal privilege.  The notes from this meeting are held at on the supplementary GamX at **11 ALL Project Marquess ML call 22 Jan 2014**.

9.  Autonomy provided EY with a copy of their briefing note on the scope and findings of Project Marquess, together with a supporting spreadsheet and workpapers.  For confidentiality purposes these documents are held on the supplementary GamX at **11 ALL Project Marquess briefing note - Relevance Review 17 Jan 2014**.  We have discussed these with Autonomy.

10.  A call was held with PwC on 23 January 2014 to discuss the scope of work of Projects Viscount and Duchess.  The notes from this meeting are held on the supplementary GamX at **11 ALL Project Viscount and Duchess EY PwC call 23 Jan 2014 minutes**.

*3.6 - Findings of investigations*

The findings of the PwC Project Baron investigation and the investigation report, along with the appendices and exhibits can be found on the supplementary GamX at **11 Autonomy PwC Report, 11 Autonomy PwC Report Appendices, 11 Autonomy PwC Report Exhibits 1** and **11 Autonomy PwC Report Exhibits 2.**   A summary of the PwC report can be found on the main GamX at **11 ALL EY Summary of PwC Report.**

The detailed scope of the Autonomy and PwC Project Marquess investigation, findings and workpapers can be found on the supplementary GamX at **11 ALL Project Marquess briefing note - Relevance Review 17 Jan 2014 and 11 ALL Project Marquess Relevance Review summary and further review areas 1.**

The only reports produced by Morgan Lewis were presentations to the SEC and the SFO which are more limited in content than PwC's Project Baron report.  However, ML also produced summaries of 56 of the 57 interviews they carried out.  These can be found on the supplementary GamX at **11 ALL Interview Summaries** with the follow up on the main GamX at !11 Interview Summaries Follow Up together with EY's notes of the key matters arising from review of those summaries.

We have not been provided with the findings of PwC's Project Viscount investigation but PwC have advised that Autonomy has reflected the findings in the adjustments recorded to the accounts.

*3.7 - Conclusion of investigations*

The key investigations relevant to our audits of the UK subsidiaries of the Autonomy group for the period ended 31 October 2012 are Projects Baron and Marquess.

Project Baron was the initial investigation conducted into 27 revenue transactions. Although PwC has not issued a final report, their work is complete and has resulted in significant adjustments being made, impacting both UK direct and transfer pricing revenue.

Project Marquess was scoped and undertaken by management, with the assistance of PwC, in order to investigate areas of risk directly for the purpose of the preparation of the UK financial statements.  This work is now complete. The review identified no findings directly responsive to the objectives of the searches and risks relevant to the investigation scope.  The review did result in three errors being identified and adjusted by management.  All other items raised have been appropriately followed up by management or were related to known issues for which relevant risk considerations have already been made, or adjustments have already been recorded.

Project Viscount and Project Duchess are being undertaken in order to defend HP against various shareholder law suits related to the acquisition of Autonomy, as well as to determine what actions are open to HP to make civil claims against various parties.  As such, these investigations are not seeking to discover new information, but rather to



9

consider and present known information for a different purpose.  Therefore the fact that these investigations have not concluded is not expected to impact directly on the preparation of these accounts.

The timing and status of investigations by the SFO, the DoJ and the SEC are at this stage not known.  However, it is anticipated that these will be based on the evidence obtained by HP through its own investigations, the accounting impact of which has been reflected in these financial statements.  The uncertainty concerning the outcome of these investigations has been clearly disclosed in the accounts.

*3.8 - Inquiries and challenges made of investigative team*

A summary of the key inquiries and challenges made of PwC and Morgan Lewis are as follows;

▶   Scope and focus of the investigation

▶   Potential limitations on data collection or scope

▶   Focus of investigation once scoped

▶   Investigation process

▶   Details of individuals interviewed

▶   Findings from the investigation

▶   Interaction with regulatory authorities e.g. SFO, SEC etc

▶   Evidence of documentation and other

In addition to the records of our interactions with both parties as set out in section 3.4, a summary of the specific questions and answers that we put to PwC in our meeting of 22 March 2013 is held at **11 ALL EY PwC Report – PwC Questions and Answers.**

We have sought to test the investigation process to establish whether we can rely on it for audit purposes.  We have held a series of discussions with Morgan Lewis and PwC to understand their investigation process as described above.  We observed that the data which has been used as the basis of searches performed was mainly live data and excluded documents and emails which had been deleted prior to the collection date, as Autonomy had no back up process in place. PwC has given us a walkthrough of the results of their investigations for Projects Baron and Marquess.  Whilst we have not had access to all the data collected and produced during their investigations, we have not identified anything in our discussions that causes us concern about the investigation processes that Morgan Lewis or PwC have followed.

We have sought to test whether there has been any bias in the process of identifying documents relating to revenue recognition.  Morgan Lewis has provided us with access to 600 of the 700 hot and warm documents provided to PwC for their investigation, plus any family documents, a total of just over 2000 items.  Morgan Lewis will not give us access to any documents after the HP acquisition date of 3 October 2011 as these are subject to legal privilege.  We have selected a random sample of the hot and warm documents received and based on the testing carried out to date on the sample items we have reviewed we have not identified any evidence that contradicts the findings of the PwC report, nor have we found any evidence of information being presented in an unbalanced manner.

*3.9 – Compliance with laws and regulations*

According to paragraph 3 of ISA 250, it is the responsibility of management, with the oversight of those charged by governance, to ensure that the entity's operations are conducted in accordance with the provisions of laws and regulations, including compliance with the provisions of laws and regulations that determine the reported amounts

MLAT_AU  00091309



and disclosures in an entity's financial statements.  The investigations described above have been designed by management to identify material misstatements in the financial statements.  However, the findings of the investigations may indicate non-compliance with laws and regulations.

Under the Companies Act 2006 the directors are responsible for keeping adequate accounting records that are sufficient to show and explain the company's transactions and disclose with reasonable accuracy at any time the financial position of the company.  Given the significant adjustments made by management to the prior year comparatives and the results and balance sheet for the period ended 31 October 2011, it is possible that there has been a breach of these requirements.

The findings of Project Baron identify some unusual incentive arrangements with resellers and customers.  These are likely to be scrutinised by the regulators for compliance with the relevant anti-bribery legislation.

Management has disclosed its findings to the appropriate regulatory bodies, principally the SEC and the SFO.  The financial statements of the Company disclose that these investigations are in progress and that their outcome cannot be determined at this time.  They also disclose that the investigations could result in fines, other penalties or civil actions being imposed on or asserted against the Company, which it is not possible to estimate at this time.

Under ISA 250, the objectives of the auditor in respect of compliance with laws and regulations are:

a)  To obtain sufficient appropriate audit evidence regarding compliance with the provisions of those laws and regulations generally recognised to have a direct effect on the determination of material amounts and disclosures in the financial statements

b)  To perform specified audit procedures to help identify instances of non-compliance with other laws and regulations that may have a material effect on the financial statements

c)  To respond appropriately to non-compliance or suspected noncompliance with laws and regulations identified during the audit.

Management's investigations have identified potential non-compliance with laws and regulations.  We have reviewed the findings of the investigations and discussed the possible consequences with the Company's legal counsel.  We are satisfied that the potential impact of the Company's non-compliance with laws and regulations is appropriately disclosed in the financial statements.  As required by paragraphs 25 to 27 of ISA 250, we have addressed this matter in our audit opinion.

***Section 4 – Conclusion and rationale thereof***

1.  We believe the investigative teams to be competent.

2.  The focus of the initial investigations undertaken was to identify any accounting irregularities in revenue recognition in the Autonomy group rather than to ensure that the statutory accounts for the UK Autonomy entities present a true and fair view.  This weakness has in part been addressed by the extension of scope to include Project Marquess, to examine areas other than revenue, but given that the initial findings of this work identified three further adjustments, we consider it to be likely that further investigation may identify additional adjustments.  We do not therefore consider the scope of the investigations to have been as thorough and appropriate as we would wish.

3.  There was a limitation in scope for the investigation teams in terms of data availability.  The data which has been used as the basis of investigative searches performed was mainly live data and excluded documents and emails which had been deleted prior to the collection date, as Autonomy had no back up process in place.  Whilst the inclusion of data from a number of custodians increases the chances that a particular email or document may be found from just one of the parties involved, the data set is incomplete.



11

4.   There was a further limitation in scope in that the former management of Autonomy were not available for interview, although in practice they would have been unlikely to be open about the past.  Where available, their electronic data has been included in the investigation.

5.   There is also limitation in scope in terms of the time available for investigation.  Companies House has granted a final extension to the Company to file its 2011 accounts by 31 January 2014 or the Company will be struck off.  This means that the accounts needed to be prepared on the basis of the evidence identified to date.

6.   The work that Autonomy management has been able to undertake in closing the books and preparing the financial statements has been limited in a number of respects by the information that was available to them. Consequently they have been unable to provide to us sufficient and appropriate audit evidence to enable us to form an opinion as to whether a number of types of transaction and key balances are completely and appropriately recorded. If additional evidence was available to management, including further information from the ongoing investigations, further adjustments might be required to the financial statements.

7.   We were concerned that there might be bias in the investigations, in order to support the significant write down in the investment made by HP.  We addressed this matter specifically with PwC, both in discussion and in our detailed review of their work, and are satisfied that PwC has, and has been required to by professional expectations, presented a balanced view.  In addition, the evidence provided to support the adjustments made is consistently aimed at improving results and it is unlikely that there is a residual body of evidence which none of the investigating teams has yet found which would support an alternative position.

8.   We have been unable to access complete documentation in our review of the investigations undertaken due to privilege.  We have sought and received reassurance from the investigative teams that there is nothing contained in the privileged documentation that would contradict the conclusions Autonomy management has reached, which is supported by evidence we have reviewed.

9.   The potential impact of the Company's non-compliance with laws and regulations is disclosed in the financial statements.

In conclusion, whilst we are satisfied that adjustments to the accounts made by Autonomy management are supported by appropriate documentation, we consider the lack of complete information available to be a limitation of scope.  This is reflected in our audit opinion.  We have also included an emphasis of matter in our opion to highlight the potential impact of the Company's non-compliance with laws and regulations as disclosed in the financial statements.



**Part 2**

*Section A – Audit Procedures and considerations*

*A.1 – Audit Procedures Performed*

*Audit team structure and designation*

▸ We have ensured the team is appropriately senior, experienced, and have been fully briefed on all issues (see <span style="color:red">Team Skills and Qualifications</span> section in <span style="color:red">11 ALL Autonomy ASM</span>, <span style="color:red">11 ALL Team Briefing Minutes 7 Jan 2013</span>, <span style="color:red">11 ALL - Tax FIDS EQR Team Brief Agenda</span>, and TPE minutes).

▸ The engagement is designated as close monitoring which will result in an EQR review and all workpapers being detail reviewed by an audit manager and above.

▸ As well as the EQR review, we will have an FRG review of all accounts to ensure disclosures are complete and appropriate.

*Review of HP Investigation work*

We have conducted a shadow investigation of the PwC investigations – see:

<span style="color:red">**11 ALL PwC Memo**</span>
<span style="color:red">**11 Autonomy PwC Report**</span>
<span style="color:red">**11 Autonomy PwC Report Appendices**</span>
<span style="color:red">**11 Autonomy PwC Report Exhibits 1**</span> and <span style="color:red">**11 Autonomy PwC Report Exhibits 2.**</span>

<span style="color:red">**11 ALL Project Marquess briefing note - Relevance Review 17 Jan 2014**</span>
A summary of the PwC Project Baron report can be found on the main GamX at <span style="color:red">**11 ALL EY Summary of PwC Report.**</span>

▸ We will assess the appropriateness of their scope and do additional procedures on the results of that investigation as considered necessary.

▸ We will conduct a shadow investigation of Morgan Lewis's role in HP's investigations to understand the implications for the statutory audits of the UK subsidiaries and perform additional procedures as considered necessary

*Audit testing thresholds and quality of audit documentation*

▸ We will conduct all PSP's, using the lowest testing thresholds as defined by GAM and will ensure all MicroStarts reflect the correct High+SC CRA.

▸ Our revenue recognition testing will be based on a % coverage of revenue and will then be revisited after consideration of appropriate adjustments and the sample extended to gather sufficient coverage over the revenue for the purpose

We will ensure all documentation is original.

*Revenue recognition*



13

- We will obtain key customer contracts to be scrutinised by the revenue recognition experts on the team to specifically review the contracts for appropriate accounting.  See **Team Skills and Qualifications** section in **11 ALL Autonomy ASM**.

- We will look to directly confirm terms and conditions with customers, to confirm the terms and conditions as well as gain assurance over completeness of potential side letters.

- We will review all hardware sales in the UK for appropriateness in terms of the accounting treatment as gross rather than net and also with regard to the

- As the risk around bad debt provisioning relates to the inappropriate revenue recognition rather than the creditworthiness of the customers, bad debt provision completeness and valuation will be agreed into the revenue recognition procedures as noted above.

- We will review all items in the Income Statement which are labelled as Marketing Assistance or Partner Referral fees to ensure that they have been accounted for appropriately.

- We will perform a review of 2010 contracts and 2009 contracts where necessary to assess the impact of any potential adjustments on the opening balance sheet as well as the 2011 revenue.

- We will review unadjusted and adjusted items arising from the 2010 audit and the 2011 half year review for appropriateness to identify whether additional adjustments are required.

*Provisions and unrecorded liabilities*

- We will perform a search for unrecorded liabilities for the twelve months following year end and will then extend our procedures throughout the entire period to date.

- We will obtain calculations for commissions and payroll and test them to the lowest thresholds per GAM, obtaining copies of contracts and agreements to corroborate year end balances.

*Journal testing*

- The EY audit team, with support from FTDS, will perform additional extended testing of non standard journal entries. This will initially focus on profiling the data (e.g. user activity levels, timing of postings, weekend / holiday activity, back-posting, values (including round sums etc), high risk account activity and unusual account pairs) based on a template compiled by UKI FTDS. This will be augmented by testing focused on the allegations, including:

  - The value and timing of journals around quarter ends

  - Words associated with the higher risk transactions e.g. marketing assistance

As new information comes to light, these focused tests may need to be refined or adjusted.

*A.2 – Other Audit Considerations*

The following considerations regarding the impact on the audit have also been made;



14

**Impact on management assertions**

4.   *Who in Autonomy was aware of these issues and when did they become aware of these issues?*

HP who acquired Autonomy in October 2011 was made aware of the financial irregularities in July 2012, after the departure of the final member of the former management team and the detailed review of contacts and revenue recognition by the incoming VP of finance, from HP.

Specifically, HP identified concerns over the following members of the former management team:

Mike Lynch – former CEO
Sushovan Hussain – former CFO
Andrew Kanter – former Co. Sec
Steve Chamberlain - former Group Financial Controller

All of the above left Autonomy in the period from October 2011 to May 2012, with the most significant departure being that of Mike Lynch who left in May 2012.

We have no concerns regarding the senior management team who are now in place – specifically Chris Yelland who is the Finance Director and who has many years of experience in HP finance and Sergio Latellier, a senior lawyer in HP's EMEA legal team. We should however note that there are a number of personnel within the current Autonomy finance team who were in place underneath Steve Chamberlain in the period prior to the HP acquisition.  Most notably:

Lisa Harris – financial controller (resigned as of April 2013)
Michael Flint – tax controller
Antonia Anderson – revenue recognition controller (joined May 2011 and was previously a member of the Deloitte audit team for Autonomy).

5.   *How this new information affects the audit evidence we can rely on from these individuals?*

Lisa Harris, Michael Flint and Antonia Anderson have been cooperating with HP as they progress with the investigation and are seen as helpful and key to successfully understanding the extent of any previous inappropriate activity.  We will ensure that the evidence and information provided by them during the audit is subject to appropriate challenge, validation and review.

It should also be noted that since Lisa Harris announced her intention to leave Autonomy and join Mike Lynch at Invoke Capital we have ceased all communication with Lisa and all of our audit enquiries are directed through other members of the finance team and furthermore no audit documentation has been shared with her.

**Impact on internal control environment**

1.   *What internal controls failures led to these financial irregularities?*

The key internal control failure related to complete management override by the former management team.

Please also refer to **11 ALL ELC Deficiencies Impact on Audit Approach** for a summary of entity level control deficiencies identified.  Our review of the key processes also identified control deficiencies, which has led us to adopt an entirely substantive audit approach.

All these control deficiencies were in place throughout the 10 month period ended 31 October 2011

2.   *What remediation steps has Autonomy taken in order to address any control gaps?*

During the course of the year ended 31 October 2012, HP have implemented additional controls at Autonomy including appropriate management oversight and detailed review of revenue recognition involving the use of checklists to provide more robustness to the revenue recognition process.



3.  *How effective are any remediation steps taken by Autonomy and would EY expect any additional controls not currently envisaged by Autonomy?*

    We have not tested any remediation steps taken by Autonomy to date as these were only implemented during the year ended 31 October 2012 and hence have no impact on the period ended 31 October 2011.

**Impact on financial statements and public announcements**

1.  *What is the financial impact of the financial irregularities that have been discovered?*

    a.  Incorrect revenue recognition through:

        ▸   Fictitious revenue

        ▸   Manipulation of revenue to include amounts in the incorrect period

        ▸   Incorrect recognition of revenue to overstate results

        ▸   Potential side arrangements not appropriately reflected in the accounts

        ▸   Barter transactions and reciprocal arrangements which have not been reflected to record the overall substance of the transaction

        ▸   Revenue overstatement by inappropriate recognition of transactions as gross rather than net in the P&L

        ▸   P&L presentation manipulated to improve margins

    b.  Manipulation of results through understatement of provisions involving estimates or judgement and omission of required disclosures.

    c.  Manipulation of results through over capitalisation of assets involving estimates or judgement, specifically internally generated software and goodwill.  Also, capitalised amounts could be overvalued and require impairment that has not been recognised.

2.  *Are there any public disclosures that need to be made or remedied as a result of the financial irregularities?*

    a.  The alleged financial irregularities have been communicated to both the SFO and SEC.

    b.  The financial statements disclose that investigations by the SFO and the SEC are underway and that they could result in fines, other penalties or civil actions being imposed on or asserted against the Company, which it is not possible to estimate at this time.

3.  *Company actions regarding having in place "adequate procedures" under the Bribery Act*

    The Bribery Act came into force on 1 July 2011, during the period of the financial statements.  There is no requirement for the Company to have "adequate procedures" in place, although if it could demonstrate that this was the case, this could be used as a defence against any prosecution under the Bribery Act.  It will be for the SFO's investigation to determine whether the Company has breached the requirements of the Bribery Act.

4.  *Communication to those charged with Governance*

    Please refer to the Letter to those Charged with Governance



16

5.   *Management Representation*

Appropriate standard representation from management in relation to Fraud will be obtained at the time of signing the financial statements.

*ISA 240 – The Auditor's responsibilities relating to fraud in an Audit of Financial Statements*

ISA 240, paragraphs 12 – 47 provide guidance to the auditor relating to responsibilities regarding fraud.

In order to comply with the requirements of this ISA, we have performed the following;

- ▶   Maintained professional scepticism in relation to the matter in hand

- ▶   Made appropriate inquiries of management

- ▶   Identified and assessed the risk of material mis-statement due to fraud

- ▶   Appropriately responded to identified risks of material mis-statement due to fraud

- ▶   Obtained appropriate written representations

- ▶   Made appropriate communication to Those Charged with Governance

- ▶   Included in the audit file documentation of the assessment an understanding of identified items (See all sections)

6.   *ISA 250 – Considerations of Laws and Regulations in an Audit of Financial Statements*

ISA 250, paragraphs 18 – 29 provide guidance to the auditor relating to responsibilities when non-compliance with laws or regulations is either identified or suspected.

In order to comply with the requirements of this ISA, we have performed the following:

- ▶   Obtained an understanding of the nature of the alleged act and its circumstances

- ▶   Discussed with management

- ▶   Assessed the impact on other aspects of the audit

- ▶   Communicated to those charged with Governance

- ▶   Included in the audit file documentation of the alleged non-compliance and results of the discussions with management

7.   *GAPM 2.11 and EMEIA Supplement*

Ernst & Young guidance in relation to "Responding to allegations of financial improprieties made by whistleblowers" is contained in GAPM 2.11 and the related EMEIA supplement. As part of our procedures relating to this matter, we have ensured we are aware of the requirements and have complied with them.

See Appendix A for the guidance.



17

***Section B – Conclusion and rationale thereof***

We believe that we have conducted sufficient work for audit purposes and have concluded that the disclosures given in the financial statements are appropriate to the circumstances noted above.

MLAT_AU 00091317



APPENDIX A

**2.11  RESPONDING TO ALLEGATIONS OF FINANCIAL IMPROPRIETIES MADE BY WHISTLEBLOWERS**
**[5/06]**

**2.11.1  BACKGROUND AND APPLICABILITY**

For the purpose of this policy, an allegation of financial improprieties by a whistleblower includes any communication to our client's management or its audit committee (or those charged with governance, hereafter referred to as "audit committee") or to us, alleging:

•  Manipulation of financial results by management or employees

•  Misappropriation of assets by management or employees

•  Intentional circumvention of internal controls

•  Inappropriate influence on related party transactions by related parties

•  Intentionally misleading the auditors

•  Other allegations of illegal acts or fraud

This policy does not address allegations involving non-financial matters unless such allegations raise questions about management integrity.  However, whenever we become aware of non-financial whistleblower allegations that we believe would be of interest to management or the audit committee, we inform them of the allegations.

Whistleblower allegations may provide evidence of potential inappropriate financial activities that may result in a misstatement of financial statements.  Some of these allegations might be communicated to us.  Others might be communicated to our client.  The global audit engagement letter template now requires that our client apprise us of the existence of any whistleblower allegations.[1]  Many clients have processes for addressing whistleblower allegations and the risk of fraud.

In performing our audits, we perform procedures under ISA 240, "Auditor's Responsibility to Consider Fraud in the Audit of Financial Statements," that include inquiries of management and others, including those charged with governance, as to the existence of any allegations of fraud and obtaining specific representations that all whistleblower allegations coming to their attention have been disclosed to us.  These audit procedures may lead to evidence of whistleblower allegations that should be addressed under this policy.  We also should establish an understanding among our audit engagement team members regarding the proper disposition of allegations made to us, or that come to our attention outside the formal processes established by our clients.

This guidance applies to all whistleblower communications that allege financial improprieties or raise questions about management integrity regardless of the source, the client's view of their veracity or the results of any internal or audit committee investigation.  In some cases, we might be able to determine that the amounts involved are potentially material to a financial statement amount or disclosure (that is, equal to or exceeding TE).  In other situations, the allegations might not provide enough information about the alleged improprieties to enable us to

---

[1]      In accordance with US SEC rules to implement Section 301 of the Sarbanes Oxley Act of 2002 (the Act), public company audit committees of US SEC registrants are required to establish procedures for receiving, retaining and addressing allegations from whistleblowers regarding accounting, internal control or auditing matters and for the confidential, anonymous submission by employees regarding questionable accounting or auditing matters.

**EY**
Building a better
working world

determine whether the effects potentially could be material to the financial statements.  In either case, we follow this guidance to make sure the allegations are appropriately communicated and, when appropriate, investigated.

### 2.11.2    WHISTLEBLOWER ALLEGATIONS RECEIVED BY THE FIRM

Whistleblower letters or other communications may be delivered to the firm via the engagement team, the local office, the national office, the global organization, or in many other ways.  The allegations in these communications may relate to specific items in the financial statements, management integrity, audit issues, or other matters.  It often is difficult to determine if the allegations relate to significant issues or if they are frivolous.  However, given the potentially serious nature of whistleblower allegations, all communications are subjected to appropriate review and audit attention.

**Upon receipt, all whistleblower allegations should be communicated to the partner in charge of the audit, the independent reviewer, the country and Area PPD and the General Counsel's office**[2].  We communicate the allegations received by us to our client's management and the audit committee.  However, we should not communicate the allegations to any person who is the subject of the allegation, although we may decide that is appropriate to do so at a later date.  (For example, we may want to make inquiries of the individual as an investigation of the matter unfolds.)

We use our judgment when determining the appropriate client representative(s) to inform of the allegations.  If the allegations involve senior management and the company has an audit committee or an equivalent group, it may be appropriate to communicate only with the audit committee chair.  Or, if the allegations relate to the chief financial officer, the communication may need to go to the chief executive officer or perhaps the owners of a privately held business.  In any case, the communication with the client should be at a level at least one reporting level above the subject of the allegations.  Generally, communication should involve at least the client's general counsel and the chair of the audit committee.

**The Area PPD should approve our planned communication approach.**  In addition, as described further below, for any whistleblower allegation received by the firm, even if the client determines—and we agree—that the whistleblower allegation is so frivolous that no investigation or report is required, **the partner in charge of the audit prepares a memorandum documenting that conclusion.  The memorandum is forwarded to the Area PPD for review and approval, and the final memorandum is provided to the General Counsel's office**.

### 2.11.3    WHISTLEBLOWER ALLEGATIONS RECEIVED BY THE CLIENT

Whistleblower allegations may come to the client in several different ways.  For example, they may be raised in communications to the audit committee using a hot line established by the company or its audit committee, or through other means.  Our engagement letter specifies our understanding with the client regarding the importance of our timely and full access to these allegations and any internal investigation of them.  We establish protocols with management and the audit committee to provide for our review of any such information coming to the attention of management or the audit committee, as well as the ultimate investigation and disposition of any findings and corrective actions taken by the client.  **Any failure to obtain timely access to allegations with potential material implications on the financial statements and the results of any related investigation constitutes a scope limitation**.

When a whistleblower allegation is received from the client through any of the means discussed above, it should be assessed for:

1.     Relevance to the audit;

---

[2]     As used in this policy, the term "General Counsel's office" includes the General Counsel's office or other integral legal department within a country or Area practice, or, in instances in which an internal legal department does not exist, any other appropriate department within a country or Area practice, as specified in local policies.

MLAT_AU 00091319



2.      Materiality; and

3.      Credibility.

That assessment may be made by any executive on the engagement team, but must be reviewed and approved, along with the original form of the allegation (letter, transcript or article), by the partner in charge of the audit.  The independent reviewer also should be apprised of the allegation.  **If the allegations involve potential financial statement misstatements of TE or greater, allegations of fraud by the client or others against the auditor, or raise questions about management integrity, the partner in charge of the audit and the independent reviewer discuss the nature of the allegations with the Area PPD or designee.**

### 2.11.4   WHISTLEBLOWER ALLEGATIONS MADE TO OTHER THAN THE FIRM OR THE CLIENT

Whistleblower allegations may be made in articles or other communications of which the client or the engagement team may not be aware.  While we are not responsible for monitoring internet message boards or other similar forums, we should be aware of the coverage of our clients in the major business and industry press.  Articles in periodicals and other sources not directly associated with the client can contain allegations of wrongdoing that may affect the fairness of the financial statements.  The engagement team should be sensitive to negative articles that may raise issues regarding the fairness of the financial statements or the integrity of management.

Regardless of how we obtain negative information regarding our clients, once we have such information, it should not be ignored.  Any issues raised regarding potential financial statement misstatements or management integrity should be pursued in accordance with the policies described herein in a similar manner as if the allegations were received by the client.

### 2.11.5   ASSESSING THE RESULTS OF RESPONSES TO WHISTLEBLOWER ALLEGATIONS

Irrespective of the manner in which we become aware of whistleblower allegations of financial improprieties, we follow up on the allegations as described below.

#### 2.11.5.1 Assessing the client's response

Many clients have established processes within their systems of internal control that address whistleblower allegations and the risk of fraud.  When an allegation is received, clients should develop a plan to address the whistleblower's allegations.

In connection with our communications regarding whistleblower allegations, we develop an understanding with management and the audit committee regarding our need to be informed of their planned approach for investigating the allegations and the results they obtain.  Often, clients will engage legal counsel and/or fraud and forensic specialists to perform the investigation.  We must make it clear to the client and its legal counsel and specialists that we need to be allowed access to the results of the investigation for us to issue our opinion on the financial statements.  Needless conflict with our client can be avoided if we develop an understanding with our client at the outset of an engagement about our ability to have access to the results of any investigation.  When the client determines, and we agree, that the whistleblower allegation is so frivolous that no investigation or report is required, the partner in charge of the audit prepares a memorandum documenting that conclusion.  **If the allegation of impropriety deemed frivolous was received initially by the firm, the memorandum is provided to the Area PPD for review and approval, and the final memorandum is provided to the General Counsel's office**.

Once the client has developed its plan for the investigation, we review the plan to determine if it appears to be adequate to investigate the allegation in a thorough manner and to provide us with the information we will need to assess the accuracy of the allegations and/or their effect on our report, if any.  In some cases, we may need to provide guidance to our client in developing an appropriate plan.  **Clients often ask us to assist in the investigation.  However, our doing so should be approved by the Area PPD**.  In addition, if we are assisting in



an investigation, we consider whether the procedures that we perform for the client should be performed by members of the audit engagement team or by members of a separate team not otherwise associated with the audit. The engagement team also considers consultation with other professionals within the firm, such as fraud and forensic specialists, regarding the adequacy or performance of the plan.  We must be very alert to independence considerations whenever our client contemplates engaging any of our personnel (irrespective of service line or sub-service line) for investigatory assistance.  The partner in charge of the audit should refer to the global independence policy for guidance on permitted versus prohibited services, and should consult with the Area PPD and with independence professionals as necessary.

### 2.11.5.2 Assessing the results of the investigation of whistleblower allegations

Once the client's investigation is complete, or earlier if a reporting period (annual or interim reporting) intervenes, the partner in charge of the audit must review the results of the client's investigation of the allegations. The review should include access to the results of the report issued, if any, by the group performing the investigation.  If no report is issued, the partner in charge of the audit and the Area PPD, or designee, meet with the responsible group to interview them on the results of their investigation.  Evidence should be examined in support of significant factual matters.

The partner in charge of the audit should prepare a memorandum summarizing the investigation and findings and concluding on the adequacy of the procedures performed by the client and the need for any adjustment to the financial statements or modifications to our previously issued or future reports.  The independent reviewer reviews and approves the memorandum.  **In every instance in which the whistleblower allegation initially was received by the firm, regardless of the outcome, the memorandum must be reviewed by the Area PPD and provided to the General Counsel's office**.

If the allegations were determined to be frivolous, no further actions are necessary, except as described above for situations in which the firm initially received the allegation of an impropriety.  **If the allegations were determined to be other than frivolous and involve amounts approaching or exceeding TE, but not requiring restatement or adjustment, then the partner in charge of the audit and the independent reviewer should challenge our audit approach for the area that was the subject of the allegations to determine that our audit procedures are appropriate in light of this new information.  If necessary, our audit approach should be revised.  In determining appropriate actions to take, we consider not only quantitative materiality factors but also qualitative materiality factors, especially when the allegations involve potential fraud against the auditor or raise questions about management integrity.  Consultation with the Area PPD is required.**

**If current period adjustments are required as a result of the investigation, the Area PPD and the Global PPD should be immediately informed and they must be consulted during the process.  If previously issued financial statements must be restated as a result of the investigation, then the requirements are the same and the General Counsel's office also should be immediately informed.**

If the investigation is not considered to have adequately addressed the whistleblower allegations, or if we are denied access to the investigator and the report, the partner in charge of the audit and either the independent reviewer or the Area PPD meet with the client to discuss our concerns.  If the client adequately responds, then that response should be subject to the aforementioned procedures.  **If we are unable to reach an acceptable resolution, we discuss the client situation with the Area PPD, Area Director – Q&RM, Global PPD and Global Managing Partner – Q&RM to address whether the client should be continued.**

MLAT_AU 00091321



**EMEIA Supplement to GAPM 2.11**

Responding to allegations or indicators of improprieties affecting financial statements or raising question concerning management's integrity

January 2012

This guidance supplements and should be read in conjunction with our Global Policy GAPM section 2.11 "Responding to allegations of financial improprieties made by whistleblowers". It details under the Area PPD delegation framework the responsibilities of Sub-area PPD and how they should interact with Sub-area FIDS leader or designees (refer to Appendix A for FIDS sub-area whistleblower contact list) and GCO. It also establishes protocols that should be followed when responding to allegations or indicators of improprieties affecting financial statements or that raise questions concerning management's integrity, to ensure appropriate and timely communication and, where necessary, investigation.

**1-   Reminder of required consultations and advance approvals and/or notifications to Sub-area PPD and Area PPD :**

Overall principle, is that, in any event, Sub-area PPD must consult Area PPD when:

1. A significant risk to the firm, our partners and people, or our reputation
2. Setting a precedent to the firm or having widespread implications for an industry
3. Possible challenge by regulators, litigants, the media or others
4. Expectation by our client that we bring the firm's extensive resources to address a sensitive issue

**1.1- Whistleblower allegations require consultation with Sub-area and Area PPD in accordance with GAPM 2.11 and as accumulated in GAPM 2.6 – *Consultations* as follows :**

| Consultation requirements per GAPM 2.6 | Consultant | EMEIA supplement |
|---|---|---|
| 1- For any whistleblower allegations that involve amounts that are determined to be more than clearly inconsequential, but not requiring restatement or adjustment. | Sub-Area PPD | Sub-area FIDS and GCO to be notified |
| 2- If current period adjustments are required as a result of an investigation into whistleblower allegations. If previously issued financial statements must be restated as a result of the investigation, then the requirements are the same, and the General Counsel's office is also required to be consulted. | Sub-Area PPD Area PPD GCO | Sub-area FIDS to be involved |
| 3- If the investigation is not considered to have adequately addressed the whistleblower allegations, or if we are denied access to the investigator and the report, the partner in charge of the audit and the Sub-Area PPD meet with the client to discuss our concerns. If the client adequately responds, then that response should be subject to the requirements within GAPM 2.11.5.2 *Assessing the results of the investigation of whistleblower allegations*. If we are unable to reach an acceptable resolution, the partner in charge of the engagement consults to address whether the client should be continued. | Area PPD | Sub-area FIDS to be involved |

MLAT_AU 00091322



23

**Building a better working world**

## EMEIA Supplement to GAPM 2.11

Responding to allegations or indicators of improprieties affecting financial statements or raising question concerning management's integrity

January 2012

**1.2 Advance approvals and notifications are also required from Sub-area PPD in GAPM 2.11 as accumulated in GAPM 2.8 – *Advance approvals and notifications* in the instances listed below :**

1- Upon receipt, all whistleblower allegations received by the firm are required to be communicated to the partner in charge of the engagement, the engagement quality reviewer, the Sub-Area PPD and the General Counsel's office. The Sub-Area PPD provides advance approval of our planned communication approach to the appropriate client representative(s). In addition, even if the client determines—and we agree—that the whistleblower allegation is clearly inconsequential that no investigation or report is required, the partner in charge of the audit prepares a memorandum documenting that conclusion. The memorandum is forwarded to the Sub-Area PPD for review and approval, and the final memorandum is provided to the General Counsel's office.

2- For any whistleblower allegations received by the client that involve potential financial statement misstatements of TE or greater, allegations of fraud by the client or others against the auditor, or raise questions about management integrity, the partner in charge of the engagement and the engagement quality reviewer notify the Sub-Area PPD of the allegations.

This EMEIA Supplement requires the involvement of Sub-area FIDS and notification of GCO in addition to the above requirements in both instances.

<u>2 – Scope</u>

The scope of this guidance is consistent with GAPM 2.11 as follows :
An allegation or indicator of impropriety affecting financial statements or raising question concerning management's integrity, includes any communication to our client's management or its audit committee or to us alleging:

- Manipulation of financial results by management or employees
- Misappropriation of assets by management or employees
- Intentional circumvention of internal controls
- Inappropriate influence on related party transactions by related parties
- Intentionally misleading the auditors
- Other allegations of illegal acts or fraud

Consistent with GAPM 2.11 this guidance does not address allegations involving non-financial matters unless such allegations raise questions about management integrity. However, whenever we become aware of non-financial whistleblower allegations that we believe could be of interest to management or the audit committee, we inform them of the allegations.

MLAT_AU  00091323



24

**EMEIA Supplement to GAPM 2.11**

Responding to allegations or indicators of improprieties affecting financial statements or raising question concerning management's integrity

January 2012

<u>3 – Protocol to follow at each key step of the process</u>

Given the potentially serious nature of allegations, it is critical that they are given timely attention by appropriate professionals. To that end, this guidance includes requirements for early involvement Sub-area PPD, Sub-area FIDS leader, Area PPD and GCO.

**3.1 – Assessing the allegation**

**As soon as an allegation is received by the firm or by external sources, or if a professional is aware of an allegation on a client engagement (either directly or through other channels), Sub-area PPD should be informed within one business day.**

Sub-area PPD will immediately notify Sub-area FIDS leader and GCO of the allegation received in the most appropriate manner and provide immediate support to the engagement partner as follows.

Sub-area PPD and Sub-area FIDS leader will appoint designees in the country (or sub-area) to assist the engagement partner in assessing the allegation as to its :
1) relevance to the audit,
2) materiality and
3) credibility.

That assessment should be made together by the engagement partner and appointed professionals from PPD and FIDS and documented in an "Allegation Assessment Memorandum" (memorandum). Sub-area PPD and Sub-area FIDS leader should review and approve that memorandum. **If the allegation involves potential financial statement misstatements of TE or greater, the Sub-area PPD, should in addition to approving the memorandum, forward the final memorandum to Area PPD, Area FIDS Leader and GCO.** GCO will assess the proper course of action based on the nature and seriousness of the allegation.

**3.2 – Establishing an action plan**

**3.2.1 - Communicating the allegation to the client (in case it was received directly by the Firm)**

When an allegation was received directly by the firm, the first step is to communicate to the appropriate individuals at the client. Based on the results of the assessment of the allegation, Sub-area PPD and Sub-area FIDS leader should agree with the engagement partner on the most appropriate communication approach with client management and audit committee. The communication with the client should be at a level at least one reporting level above the subject of the allegations.

**3.2.2 – Involving FIDS in following up on the allegation**

**Based on the assessment of the allegation, Sub-area PPD and Sub-area FIDS leader should ensure the audit team involves FIDS to either appropriately shape the response to the investigation or challenge the response provided by the client.** Once an allegation comes to light, clients will often consider the need to engage legal counsel and/or fraud or forensic specialists to perform an investigation of the allegations received. It is therefore crucial that FIDS are involved from the outset.

**3.2.2.1 – Challenging the client's response**

MLAT_AU 00091324



25

**Building a better working world**

**EMEIA Supplement to GAPM 2.11**

Responding to allegations or indicators of improprieties affecting financial statements or raising question concerning management's integrity

January 2012

In the event that the client has developed its investigation plan without utilizing our FIDS practice, **Sub-area PPD and Sub-area FIDS leader, or designees, should review the adequacy of the investigative plan and by whom the plan is, or will be, executed** to determine if it appears to be adequate to provide us the information we will need to assess the accuracy of the allegations and/or their effect on our report, if any. If our FIDS professionals do not conduct the investigation, Sub-area PPD and Sub-Area FIDS leader, or designees, should together with the engagement partner decide on the extent of shadow procedures to be conducted by FIDS. The engagement partner should inform the client that our FIDS professionals will "shadow", where applicable, the investigation to ensure that appropriate EY input is provided as the investigation is being performed. Shadow investigation procedures performed by FIDS may include, but are not limited to, reviewing the scope and steps in the investigation plan, information gathering including electronic data and interviews and analysis of accounting records and accounting treatments relating to the allegations.

**3.2.2.2 – Involve FIDS to perform the investigation**

In many cases, it may be appropriate for our FIDS team to perform the investigation for the client under a separate engagement agreement with either the Audit Committee or a special Board of Directors committee overseeing the client's response to the allegations.  Sub-area PPD and Sub-area FIDS leader, or designees, together with the engagement partner should develop and document the investigative plan in a memorandum that should be reviewed by GCO.
Sub-area PPD should also assist the audit team in enabling appropriate consultations regarding independence with respect to FIDS involvement based on the above.

**3.3 – Assessing the results of the investigation**

Once the client's investigation is complete, the engagement partner must review the report and is required, in consultation with FIDS, to prepare a memorandum summarizing the investigation and findings and concluding on the adequacy of the procedures performed by the client and the need for any adjustment to the audit scope, or to the financial statements or modifications to our previously issued or future audit reports. As well as the findings arising from the investigation, the assessment should consider if the results indicate any concerns over management integrity and what implications these have for the audit scope.

In the event that FIDS performed the investigation, FIDS and the engagement partner should issue a memorandum providing the conclusion of the investigation.

In both cases, the results of the investigation and memorandum should be reviewed by Sub-area PPD and Sub-area FIDS leader to determine if we agree with the evaluation made of the allegation and the impacts on our audit or previously issued audit report in accordance with required GAPM 2.6 consultation requirements above.

MLAT_AU 00091325