Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Drew C. Harris
(Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone:  (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

# NORTHERN  DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:18-cr-00577-CRB |
| Plaintiff, | Judge: Hon. Charles Breyer |
| vs. | **DEFENDANT MICHAEL RICHARD LYNCH'S MOTION TO CLARIFY SCOPE OF JOEL SCOTT TESTIMONY REGARDING POST-ACQUISITION EVENTS** |
| MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN, | |
| Defendants. | Court:  Courtroom 6 – 17th Floor<br>Date Filed:  April 16, 2024<br>Trial Date:  March 18, 2024 |

## I.   PRELIMINARY STATEMENT

Regarding Joel Scott's testimony, the Court has ruled**:**

> The following post-acquisition testimony from Joel Scott is ADMISSIBLE:  (1) the
> disclosures he made involving pre-acquisition events; (2) when he made such
> disclosures; and (3) to whom he made such disclosures.  The rest of . . . Joel Scott's
> proffered testimony, including as to the circumstances surrounding Lynch's
> departure from HP, is INADMISSIBLE.

Order re: Government Motion in Limine No. 4, ECF No. 369.  In light of this ruling, the defense
seeks to understand the permissible scope of references to post-acquisition evidence during the
examination of Mr. Scott.

While the Court has made clear that Mr. Scott may not testify about "the circumstances
surrounding Lynch's departure from HP," it is not clear what Mr. Scott will be permitted to say
about why he came forward when he did and how Mr. Schultz reacted to the information he
provided.  Absent such context, Mr. Scott's testimony about his post-acquisition "disclosure" is
irrelevant, and ought to be precluded altogether.

Indeed, since the Court has ruled the crime was complete on October 3, 2011 and the
only question is whether HP was defrauded in its decision to acquire Autonomy, it is unclear
how testimony about when HP purportedly discovered that it had been defrauded is even
relevant.  Either HP was defrauded or it wasn't.  When it figured it out is beside the point.

Further, permitting Mr. Scott to testify about his decision to come forward to HP's
General Counsel in May 2012 requires that the defense be permitted to explore the factors that
motivated Mr. Scott's decision, such as HP's pending decision to appoint Christopher Egan,
rather than Mr. Scott, to manage the Autonomy business, as well as the dire state of Autonomy's
business at that point as a result of sustained mismanagement by HP.

## II.     BACKGROUND

### A.     Mr. Scott's Prior Testimony about Post-Acquisition Events

In the *Hussain* trial, Mr. Scott testified that, after Dr. Lynch left HP-Autonomy, Mr. Schultz called him to request contact information for Dr. Lynch, and that during that call, they discussed HP's displeasure about the terms of severance agreements of senior Autonomy executives who had recently left HP.  Mr. Scott testified that he found questions about the severance agreements unsettling, and it made him wonder about things he had wondered about during his time at Autonomy, including questions that had been raised by Brent Hogenson about certain accounting matters.  Mr. Scott then testified that he asked Mr. Schultz if he knew about Autonomy's hardware sales, expecting him to say yes, but to his surprise, Mr. Schultz did not know about the hardware sales.

### B.     The Government's Proffer Regarding Mr. Scott's Testimony

In pretrial motions, the government sought to have Mr. Scott testify, as he had in the *Hussain* trial, about certain events in late May 2012, after Dr. Lynch, Mr. Hussain, and other HP-Autonomy executives had left the company.  According to the government's proffer, Mr. Scott met with Mr. Schultz and made "a series of disclosures about Autonomy business practices that now lie at the center of the government's fraud allegations," including (i) "Autonomy's resort to hardware resale deals for topline revenue, and how those revenues had fallen away after HP acquired the company," ECF No. 299 at 4 (G. MIL 4) (citing Abrahamson Decl., ECF No. 299-1, Exhibit A), and (ii) "the topic of value-added resellers ("VARs") and how Autonomy's revenue declined when it stopped relying on VAR deals." *Id.*  The government argued that Mr. Scott's evidence about these post-acquisition events would be relevant:  (i) to "corroborate other aspects of Scott's testimony relating to his understanding of pre-acquisition events";  (ii) as "evidence of Dr. Lynch's control and intimidation over Autonomy," in that Mr. Scott was reluctant to come forward before Dr. Lynch left; and  (iii) to show the "closeness with which Defendants held information regarding various Autonomy practices," as evidenced by the "incomplete understandings [Scott and others had] of the mechanisms for and purposes behind conduct at the center of the government's fraud case." *Id.*

Mr. Schultz has explained that Mr. Scott came forward just before Memorial Day weekend to talk about the second quarter "miss" in Autonomy's financials.  Mr. Scott drove down to Palo Alto to Mr. Schultz and explained how some of Autonomy's business practices may explain the miss.  Scott told Schultz about the hardware deals and how Autonomy was not able to continue selling hardware after the acquisition.  Scott also talked to Schultz about the VARs.  Scott gave him a limited explanation but thought if Deloitte looked at it then it must have been okay.  Mr. Schultz then had a series of meetings with Mr. Scott over the next week, which in turn led to more meetings.  According to Mr. Schultz, Mr. Scott's coming forward "tipped the first domino," leading to his efforts to investigate Autonomy's revenue generation and accounting practices.  *See id.*; Abrahamson Decl., ECF No. 299-1.

## III.    MR. SCOTT'S ANTICIPATED TESTIMONY ABOUT POST-ACQUISITION EVENTS

Now that the Court has ruled that Mr. Scott may testify about "the disclosures he made involving pre-acquisition events" in late May 2012 to Mr. Schultz, and that "the rest of . . . Joel Scott's proffered testimony, including as to the circumstances surrounding Lynch's departure from HP, is INADMISSIBLE," it is not clear what Mr. Scott will be permitted to testify about and what the defense will be permitted to raise on cross-examination.

### A.    HP's Knowledge of Autonomy's Hardware Sales and Accounting Practices

Presumably, one point of testifying about a "disclosure" is to argue that HP—or at least its General Counsel, Mr. Schultz—was not aware of the "pre-acquisition events," meaning the hardware sales and the VAR deals that Mr. Scott described to Mr. Schultz, who appeared surprised to hear about these events and asked follow-up questions and scheduled follow-up meetings with Mr. Scott.  The point may also be to pinpoint a time when HP became aware that it had been defrauded.

If that is indeed the point of Mr. Scott's testimony, the defense must be permitted to present evidence that HP was aware of Autonomy's hardware sales and VAR deals long before Mr. Scott came forward, and that evidence ought to include post-acquisition evidence that

establishes that HP knew about hardware.  Specifically, the defense should be permitted to present evidence that:

(i)    Autonomy's hardware sales were apparent from its general ledger and trial balances, which, as Lisa Harris testified at her deposition, were provided to HP's David Duckworth in connection with the account mapping exercise already begun before the deal closed on October 3, 2011, and continued after the deal closed to get Autonomy's accounts aligned with HP's accounts;

(ii)    Manish Sarin received information about the hardware sales shortly after the deal closed;

(iii)    Both KPMG and EY identified the hardware sales in their analyses of Autonomy's accounts for HP;

(iv)    EY provided a two-page slide deck to Cathie Lesjak in November 2011 that specifically identified $100 million in hardware sales;

(v)    Autonomy continued to resell hardware—including Dell hardware—exactly the same way after the acquisition as it had done before the acquisition, a fact that was notable because Dell was, of course, a main competitor of HP's;

(vi)    Mr. Yelland was asked to approve invoices for Autonomy's continued hardware sales in April and May 2012, and the approval process made clear that the hardware was being sold at a loss; and

(vii)    Mr. Yelland included hardware sales at a loss in projected revenues for Autonomy for the third and fourth quarters of 2012.[1]

In short, to the extent the point of Mr. Scott's testimony is to establish that he was a "whistleblower" who made HP aware of Autonomy's hardware sales and other accounting practices, the only fair response is for the defense to be permitted to establish that nothing of the

---

[1] Some of this evidence of HP's knowledge of post-acquisition hardware sales, including Autonomy's continued resales of Dell hardware, was presented in the *Hussain* trial, but the defense seeks confirmation that all of this evidence is admissible here.

sort happened in May 2012 because HP was already aware of the hardware sales and other accounting practices, a fact that is confirmed by post-acquisition evidence.

### B.     The Context for Mr. Scott's Post-Acquisition Evidence

If Mr. Scott is permitted to suggest that Mr. Schultz (and by extension others at HP) was not aware of the hardware sales, the defense should in fairness be permitted to present evidence, including post-acquisition evidence, that puts the lie to that claim.  The same goes for any other alleged accounting misconduct that Mr. Scott described to Mr. Schultz.

For example, if Mr. Scott is permitted to testify that he came forward to explain to Mr. Schultz why Autonomy's Q1 and Q2 2012 performance had been poor, that would open the door to evidence that Autonomy's poor performance in Q1 and Q2 2012 was due not to an inability to sell hardware (which in fact continued after the acquisition) or engage in reseller transactions, but rather to HP's failure to integrate Autonomy and support its sales efforts.  Absent that added context, Mr. Scott's "disclosure" has no relevance and instead poses the risk of substantial prejudice to Dr. Lynch, with no means of mitigating that risk.  Indeed, the jury may well assume that Dr. Lynch departed because the alleged fraud was discovered, an assumption that is contrary to fact and highly prejudicial.

If the purpose of the government's post-acquisition evidence from Mr. Scott is to explain the sequence of events leading to the fraud charges in this case, Dr. Lynch should be allowed to present his version of that sequence of events, which is that HP didn't "discover" any purported "fraud" in 2012.  HP decided to attribute its write-down of Autonomy's value in November 2012 to accounting misconduct, rather than to its own failure to achieve the synergies it projected when it acquired Autonomy.  That version of events is supported, at least in part, by valuations of Autonomy both before and after the write-down that show that the hardware sales and accounting practices did not have a material impact on HP's valuation of Autonomy.

## IV.     CONCLUSION

In light of the foregoing, the defense asks that the court either preclude Mr. Scott's irrelevant testimony regarding post-acquisition events or permit the defense a full opportunity to

---

1    question Mr. Scott about his motivations for deciding to make these "disclosures" in May 2012,

2    including the context of his decision and the state of the company at that time.

Dated: April 16, 2024

Respectfully submitted,

By:  _/s/ Celeste L.M. Koeleveld__
Celeste L.M. Koeleveld

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, NY 10019
Telephone:  (212) 878-3437

Jonathan M. Baum (SBN: 303469)
**STEPTOE LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Drew C. Harris
(Admitted Pro Hac Vice)
**STEPTOE LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

*Attorneys for Defendant*
*Michael Richard Lynch*

---