# EXHIBIT 3



Ernst & Young LLP
303 Almaden Boulevard
San Jose, California 95110

Tel: +1 408 947 5500
www.ey.com

| | |
|---|---|
| **To:** Hewlett-Packard Company Audit Files | 5 November 2012 |
| **Cc:** Jeff Lang, Engagement Quality Reviewer | |
| Abdul Lakhani, Professional Practice Director | |
| **From:** Jamie Teuscher, Manager | |
| Kirk Parrish, Engagement Partner | |
| Brian Outland, Engagement Partner | |
| Kevin Asher, Coordinating Partner | |

## Autonomy Goodwill Impairment

### Executive Summary

Accounting Standards Codification 350 requires that goodwill not be amortized but instead be tested for impairment at least annually, unless impairment indicators are present during the interim financial reporting period between the annual impairment test. Hewlett-Packard Company ("HP" or "the Company") adopted an annual goodwill assessment date of August 1, the first day of its fiscal fourth quarter. Accordingly, the Company performed its annual goodwill impairment test as of August 1, 2012 for each of the eight reporting units with allocated goodwill: Enterprise Storage, Servers and Networking ("ESSN"), Enterprise Services ("ES"), Technology Services ("TS"), HP Software ("HPSS"), Autonomy Software ("AUIM"), Personal Systems Group ("PSG"), Imaging and Printing Group ("IPG"), and HP Financial Services ("HPFS").

Consistent with the Company's past practices, the Company engaged Duff & Phelps ("D&P") to assist in establishing the fair values included in the goodwill impairment analysis. We have documented and concluded elsewhere that D&P are considered competent and objective in accordance with Statement of Auditing Standards 73 *Using the Work of a Specialist*. Based on Step 1 of the goodwill impairment test, it was determined that the Autonomy reporting unit had a fair value less than the current carrying value indicating impairment. Therefore, the Company completed a Step 2 analysis concluding that the implied fair value of the goodwill was less than the carrying amount by $5.8 billion. The Company also concluded that an impairment of $2.3 billion of finite-lived intangible assets exists as of the measurement date.

**Issue**

1. Do we concur with management's conclusion of the Step 1 analysis that the Autonomy reporting unit carrying amount exceeded the fair value indicating impairment?

2. Do we concur with management's conclusion on the Step 2 analysis of the Autonomy reporting unit that a $2.3 billion impairment of finite-lived intangibles and $5.8 billion impairment of goodwill exist as of the measurement date?

3. Do we concur with management's proposed timing of the impairment charge related to the Autonomy reporting unit?

**Response**

A member firm of Ernst & Young Global Limited

EY-HP-ALAK-EM-000038
Confidential Treatment Requested by Ernst & Young LLP

1. We concur with management's conclusion of the Step 1 analysis that the Autonomy reporting unit carrying amount exceeded the fair value indicating impairment.

2. We concur with management's conclusion on the Step 2 analysis and the impairment of the finite-lived intangible assets and goodwill at August 1, 2012.

3. We concur with management's conclusion that the impairment charge should be recorded in the Company's Q4 2012 financial results.

**Relevant Authoritative Guidance**

- Accounting Standards Codification 350, Intangibles – Goodwill and other ("ASC 350")
- Accounting Standards Codification 360, Property, Plant and Equipment ("ASC 360")
- Accounting Standards Codification 280, Segment Reporting ("ASC 280")
- Accounting Standards Codification 820, Fair Value Measurement ("ASC 820")

**Detailed Discussion**

**Background**

HP is a leading global provider of products, technologies, software, solutions and services to individual consumers, small- and medium-sized businesses, and large enterprises, including customers in the government, health and education sectors. The Company has undergone tremendous change since 2002 when Carly Fiorina engineered the merger with Compaq which at the time was the largest merger in the IT industry. The Board of Directors removed Carly Fiorina in January 2005 and hired Mark Hurd as CEO who oversaw a tremendous period of growth and the benefit of the synergies from the Compaq merger. HP was able to reestablish the confidence of the market by delivering results to the market and consistently growing revenue over from 2005 to 2010. During that time the stock price more than doubled and HP's market cap reached $120 billion. In 2008 and 2009 HP completed the $13 billion acquisition of EDS and $1.2 billion acquisition of Palm to further expand the breadth of HP's product offering and transform HP from a company of products to a provider of solutions as well as compete in new and developing markets (i.e, mobile devices). HP was also operationally focused and aggressive in cutting costs across the Company. In August 2010 Mark Hurd resigned from HP under unusual circumstances and the Board of Directors hired Léo Apotheker as CEO. Léo Apotheker came from a software background (SAP) with little experience running a Company the size of HP or with a hardware business. Léo Apotheker oversaw the integration of Palm and release of the first product post-acquisition which was not successful. The Company then decided to abandon the integration and development of the Palm (tablet and phone) products, and subsequently wrote off the related assets and goodwill. The operational shortfalls combined with the macroeconomic changes resulted in underperformance across all business units. In August 2011, Léo Apotheker announced that the Company would be acquiring Autonomy and evaluating strategic alternatives for the Company's PC reporting unit. His goal was to transform HP into a more profitable enterprise services business by getting out of the low-end commodity business similar to the strategy of IBM years earlier. In September 2011, less than 1 year from his appointment and subsequent to the announcement of the Autonomy acquisition and PC evaluation, the Board of Directors replaced Léo Apotheker with Meg Whitman, an existing director. Since hiring Léo Apotheker the Company lost over $50 billion in market cap of which $20 billion was lost during the time period between the announcement of the purchase of Autonomy and spin-off of PSG and hiring of Meg Whitman.



Hewlett-Packard Company
Page 3

The executive turnover throughout the years left the Company with no clear consistent strategy. While the short-term cost cuts overseen by Mark Hurd resulted in shareholder value at the time through appreciation of the stock, some believe that it also prevented the Company from being able to move and adapt to the changing market and innovate its product lines. The cost cutting and layoffs in the services business resulted in lower service delivery quality and reduced margins, including losses, on significant outsourcing arrangements which led in part to the impairment of the ES goodwill in the third quarter of fiscal 2012. These problems were compounded by macroeconomic factors as consumers and businesses reduced their spending on IT equipment and the increased competition from foreign service firms. The market capitalization has continued to decrease over the last year primarily due to the long-term nature of the strategy and lack of consistent operational performance. For fiscal year ended October 31, 2012, the Company reported revenue of $120 billion compared to $127 billion in 2011. Since 2010 the Company's market capitalization has decreased from $120 billion to current levels of approximately $28 billion. The decrease in market capitalization fell below book value during HP's third quarter. In light of the significant operating challenges, market dynamics and stock price decrease, HP has appropriately evaluated its goodwill, intangible and other long-lived assets for impairment. During the third quarter the Company recorded an $8 billion impairment of its Enterprise Services ("ES") business goodwill. The focus of this memo relates to the fourth quarter impairment of the Autonomy goodwill and finite-lived intangible assets. Autonomy was acquired by HP in October 2011 for $11.1 billion. Autonomy, a UK based public company with revenues of $600 million a year. Autonomy is engaged in the analysis of structured and unstructured data to provide meaningful insight and correlations that may not always be clearly apparent.

The following table summarizes the goodwill balance by reporting unit as of August 1, 2012 before impairment as well as the result of the 2012 annual impairment test and the passing margin for the respective reporting unit for fiscal years 2012 and 2011.

| (in mm) | Goodwill 8/1/12 | Concluded Fair Value | Carrying Value | FY12 Passing Margin $ | FY12 Passing Margin % of CV | Impairment Applicable | FY11 Passing Margin $ | FY11 Passing Margin % of CV |
|---|---|---|---|---|---|---|---|---|
| IPG | $2,485 | $16,600 | $3,933 | 12,667 | 322% | No | $21,750 | 561% |
| PSG | $2,498 | $11,600 | $2,701 | 8,899 | 330% | No | $11,418 | 319% |
| ESSN | $7,759 | $13,400 | $9,577 | 3,823 | 40% | No | $16,228 | 171% |
| HPSS | $7,740 | $8,900 | $8,170 | 730 | 9% | No | $2,894 | 38% |
| AUIM | $6,890 | $2,200 | $10,091 | - | - | Yes | N/A | N/A |
| ES[1] | $0 | $5,200 | $7,156 | - | - | No | $1,324 | 8% |
| TS | $9,417 | $14,600 | $7,314 | 7,286 | 100% | No | $12,737 | 180% |
| HPFS | $144 | $2,600 | $1,610 | 990 | 62% | No | $433 | 22% |

[1] The Company recorded a full impairment of ES goodwill in Q3 based on a preliminary analysis which was finalized in Q4. The carrying value is greater than fair value is primarily due to the intangibles which are not impaired. We have separately documented our conclusions regarding the ES impairment tests.

The Company completed the acquisition of Autonomy ("AUIM") in October 2011 for a total purchase price of $11.1 billion. The Company has concluded that Autonomy meets the criteria of a reporting unit. This reporting unit was led by Mike Lynch the former CEO of Autonomy and Sushovan Hussain the former CFO of Autonomy until the third quarter of fiscal 2012. In acquiring the business, HP saw significant synergies across all business units that would allow them to access opportunities that Autonomy on its own was unable to and HP was unable to provide with its then current product portfolio.

The Company announced during the Q2 press release that Bill Veghte, Chief Strategy Officer and EVP Software would be taking over Autonomy and Mike Lynch and Sushovan Hussain would be leaving the Company. These departures were not inconsistent with the Company's past history of recent acquisitions where the "C-Suite" executives did not remain at HP.

**ASC 350 Step 1 test – AUIM Reporting Unit**

A member firm of Ernst & Young Global Limited

EY-HP-ALAK-EM-000040
Confidential Treatment Requested by Ernst & Young LLP



Hewlett-Packard Company
Page 4

The Company has selected the first day of the Company's fourth quarter, August 1, as the date to perform the annual impairment test for goodwill as it coincides with the time frame where the business units are preparing bottom up forecasts for the next fiscal year and longer-term outlook of business performance based on the expectation of the future market, internal initiatives and overall strategy.

The first step of the goodwill impairment test (the "Step 1" test) is to identify potential impairment. Under this step, the Company determines the fair value of the reporting units and then compare to the carrying amounts, including goodwill. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test (the "Step 2" test) is performed to measure the amount of impairment loss, if any.

To determine fair value of its reporting units, HP has historically used a combination of an Income Approach using a discounted cash flow model ("DCF") and a Market Approach using a market multiples analysis of comparative companies. The concluded fair value is typically arrived at using a weighting of fair value measures from the two approaches. The fair value is weighted more heavily or 100% towards the income approach if the comparable companies used in arriving at a market value are not considered "highly comparable". Below is a summary of the fair values under the different valuation approaches, the weighting and concluded fair value of Autonomy as of the August 1 annual impairment test and the acquisition date.

| (in millions) | | August 1, 2012 |
|---|---|---:|
| Fair value | Income approach | $2,200 |
| | Market approach | $3,000 |
| Weighting | Income approach | 100% |
| | Market approach | 0% |
| Concluded fair value | | $2,200 |
| Carrying value | | $10,091 |
| Net difference | | ($7,891) |

The significant decline in fair value of the Autonomy reporting unit from the purchase price of $11.1 billion to the $2.4 billion is a result of three changes in the valuation inputs:

- Change in discount rate from 10% to 16% - $3.6 billion
- Lower forecasted revenues and margins - $2.8 billion
- Reduction in projected synergies (in addition to the reduction of the forecast) - $2.5 billion



The discount rate is discussed below in more detail. The increase stems from the market capitalization reconciliation process and increased valuation risk factors. The lower revenue and margins are due to the operational changes that the Company plans to make in Autonomy as part of its revised long-term plan. Given the poor performance in the current year the Company now believes a much

A member firm of Ernst & Young Global Limited



longer integration will be required to achieve growth in Autonomy. Lastly, given the difficulty in selling core products, the Company has reduced the value of synergies that were forecasted with other businesses to focus on the development and sales of the core product offering. Some examples are combining Autonomy products with IPG equipment to handle the processing and storage of mortgage applications or insurance claims or combining with the HP Security portfolio to analyze and classify security events.

*Market approach*

The comparable competitors used in the market approach were EMC, Oracle, SAP, and Salesforce.com. These comparable companies are in different markets operating with different market dynamics than Autonomy. For instance Salesforce.com is a leader in cloud computing (i.e., purely subscription model) with a long history of operating losses. Oracle and EMC derive large portions of their revenue from the sale of their proprietary hardware equipment which means the presence of a supply chain, hardware support and warranty, as well as hardware research and development. Oracle and EMC also have traditional software licensing businesses (perpetual license model only). Oracle also has a strong market acceptance of their ERP platform (i.e., a well established product offering with strong indicators of maintenance renewals). SAP is also a traditional software licensor with a similarly strong market acceptance of their ERP platform. In contrast Autonomy does not have strong market acceptance for its product portfolios, derives a small proportion of revenue through the resale of non-proprietary hardware, and has a hybrid software model between traditional licensing and cloud based solutions. Due to the inclusion of non-comparable businesses the Company was unable to identify truly comparable companies. As such, the Company weighted 100% to the income approach due to the uniqueness of the Autonomy products and the fluidity of the business model combined with the lack of comparable competitors.

*Income approach*

The income approach is computed using a DCF model employing a residual year growth rate concept. The value is derived using key assumptions made by HP management and a model developed by D&P. The estimated concluded fair value using the Income approach for the Autonomy reporting unit was $2.2 billion. The two most significant inputs to a DCF calculation are the cash flow forecast and discount rate. We discuss HP's overall process for developing each of these two below.

*Prospective Financial Information ("PFI")*

PFI represents the estimated future cash flows from the operation of a business, operating unit or asset group that management discounts to develop a fair value measurement at a particular date. In the case of the Autonomy goodwill impairment analysis, the PFI represents the underlying forecasted cash flow assumptions upon which D&P's income valuation approach is built. We considered whether the assumptions used in the development of the PFI are consistent with the method and other assumptions used to develop the fair value measurement (e.g., discount rates, market multiples, etc.).

ASC 350-20-35 states that "the fair value of a reporting unit refers to the price that would be received to sell the unit as a whole in an orderly transaction between market participants at the measurement date." The guidance indicates quoted market prices are the best indicator of fair value, if available. However, if quoted market prices are not available, the estimate of fair value should be based on a valuation technique that is consistent with the objective of measuring fair value (e.g., multiple of earnings, multiples of revenue, and DCF). A discounted cash flow technique is often the best available technique with which to estimate the fair value of a group of net assets (such as a reporting unit). Those cash flow estimates must incorporate assumptions that market participants would use in their

A member firm of Ernst & Young Global Limited


estimates of fair value. If market participant information is not available, the Company may use its own assumptions. Those cash flow estimates must be based on reasonable and supportable assumptions and consider all available evidence.

Typically, the cash flow forecasts used in the annual impairment analysis are based on a combination of the Company's long-range Strategic Planning and Review ("SPAR") process and the ASPIRE forecast, which is a twelve-month outlook. These forecasts are reviewed by the Corporate Controller, CFO, CEO and Investor Relations and are the basis with which the Company provides earnings guidance to the market. The forecast used in the valuation of the Autonomy reporting unit was substantially the same forecast that was used in the HP Securities Analyst Meeting held on October 3, 2012 where the Company presented their guidance for fiscal 2013. The forecast used in the DCF model was presented before inter-segment eliminations consistent with the ASC 350 analysis of the other reporting units. The Company often approaches its customers with an integrated solution, offering products from across its product suite. While each of the reporting units realizes some revenue from the transactions, there are also intercompany transactions that get eliminated in consolidation being included in the expected reporting unit revenue streams. For the purposes of this valuation, reporting unit revenue is measured before consideration of any intercompany elimination. We have considered if the elimination of this revenue / operating profit in the valuation of the individual reporting units would be considered necessary for the purposes of the analysis. We determined that the Autonomy reporting unit, if segregated from the whole of HP, would likely retain some element of the intercompany revenue (which would then be third party in nature). It is also likely that HP would need to develop other alliances or partnerships to offer customers similar products and services in order to facilitate overall transactions. However, management does not believe it is appropriate to eliminate the intercompany arrangements in computing the reporting unit fair values, as the reporting unit results are reasonable approximations of stand-alone revenue.

Within the Autonomy business unit the annual cash flow forecast process resulted in a significant reduction of the forecasted revenue and profitability due to the lower than expected growth of the Autonomy product and the Company's inability to achieve the perceived synergies that were envisioned at the date of acquisition. As discussed above the total decrease in value due to the Autonomy forecast changes is $3.5 billion. Below is a summary of the forecast at acquisition and the forecast used in the Step 1 test:

| Forecast as of: | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Residual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| October 3, 2011 (Acquisition date) | Revenue | $1,403 | $1,591 | $1,779 | $1,961 | $2,148 | $2,343 | $2,546 | $2,758 | $2,973 | $3,092 |
| | Growth rate | 15.3% | 13.4% | 11.8% | 10.2% | 9.6% | 9.1% | 8.7% | 8.3% | 7.8% | 4.% |
| | OP % | 37.7% | 40.1% | 43.3% | 43.5% | 43.6% | 43.6% | 43.6% | 43.7% | 43.7% | 43.7% |
| August 1, 2012 | Revenue | $763 | $840 | $972 | $1,122 | $1,304 | $1,494 | $1,694 | $1,922 | $2,175 | $2,581 |
| | Growth rate | 5.4% | 10.1% | 15.7% | 15.5% | 16.2% | 14.6% | 13.4% | 13.4% | 13.2% | 5% |
| | OP % | 6.3% | 14.9% | 19.9% | 21.9% | 26.9% | 27.0% | 27.2% | 27.4% | 27.6% | 29% |

The forecast was prepared for 10 years through fiscal 2022 and revenue is projected to grow annually between 5% and 16% during that period. The residual revenue growth rate for the Autonomy reporting unit is 5% which is a conservative residual rate for a Company operating in the software industry. It is the same growth rate used in the valuation of the HPSS reporting unit and has been consistently used in prior years for HPSS. The growth rate is higher than in the residual year primarily due to synergies that the Company believes it will be able to realize as it further integrates Autonomy. The majority (approximately 72%) of the value from the DCF is in the residual value therefore we don't take exception to the inclusion of the synergies. We compared the forecasted growth of revenue to historical results and noted that Autonomy grew revenue by 47% in 2009 and 18% in 2010 and 2011 while the revenue shrank by 36% in the year of acquisition.

The residual operating margin is forecasted to be 29%. The operating margin is expected to increase annually from 6% in fiscal 2013 to 28% in fiscal 2022. Similar to the revenue growth rate, a reasonable operating margin in the software business is 30% which is at the lower end of the spectrum of software companies. The margin increase is primarily achieved through slower growth in field selling



Hewlett-Packard Company
Page 7

costs than the revenue growth. We compared the forecasted margin to historical results and noted that Autonomy margin was 36% in 2009, 32% in 2010, 42% in 2011 and approximately 0% in 2012, the first year of acquisition.

The forecasted revenue growth and increase in operating margin are also due to the continued development of the Autonomy product offerings. The Company's primary technology is the Intelligent Data Operation Layer ("IDOL") server which collects indexed data and stores in a proprietary structure. The proprietary structure allows for the data to be analyzed quickly across many different contexts. As the Company continues to develop IDOL and structure the product offerings around it, the reporting unit will be able to better leverage the technology in the operating results.

The forecast is based on pre-tax amounts; however, to apply a DCF approach, after tax amounts are required. The Company has a relatively lower effective tax rate than most relevant software market participants with the rate being 10% to 20% lower (excluding discrete items). It is unlikely that a hypothetical buyer would be able to achieve the same rate as the Company given their diverse offerings so the Company uses the average effective tax rate for the past 5 years of comparable software companies used in the market approach. This amounts to a 25% tax rate applied to the Autonomy forecast.

*Discount rate*

The projected future cash flows are converted into their present values using a discount rate computed for each reporting unit. A weighted average cost of capital ("WACC") is computed for the Autonomy reporting unit based on inputs specific to the market in which the reporting unit operates. The inputs to determine WACC are subjective, and the resulting rate is very sensitive to relatively small changes in these inputs. The valuation approach calculates the WACC by considering many factors including, but not limited to, the mix of debt to equity that would be used to capitalize by a market participant, as well as an investor's required return on those debt and equity investments.

The computed WACC is adjusted by two risk premiums. The first risk premium is based on the reporting unit's inability to accurately forecast and the inability to execute against the current forecast. Generally, if a reporting unit consistently missed revenue growth or operating margin forecasts the risk premium is 50 basis points, and if both are missed it is 100 basis points. Autonomy was adjusted 100 basis points given their recent history of missing both the revenue and operating forecasts. The second risk premium is an incremental risk premium based on the market's perception of the Company's ability to execute against its forecasts. The computed WACC and risk premiums for the Autonomy reporting unit at the date of the impairment test and at the date of acquisition were as follows:

|  | August 1, 2012 | October 3, 2011 |
| --- | --- | --- |
| Computed WACC | 10.00% | 10.10% |
| Risk Premium – Performance risk | 1.00% | 0.00% |
| Risk Premium – Incremental risk | 5.00% | 0.00% |
| Concluded discount rate | 16.00% | 10.10% |

The increase in the discount rate had the largest impact on the reduced valuation of the Autonomy reporting unit. On acquisition the Business Enterprise valuation used a 10.1% discount rate. The Company used a 16% discount rate in the valuation of Autonomy as of August 1, 2012. Using the same forecast at acquisition with a 16% discount rate instead of 10% results in at $5.4 billion reduction in the value of Autonomy.

*Market cap reconciliation*

A member firm of Ernst & Young Global Limited



In conjunction with the Company's annual goodwill impairment analysis, the Company compares the sum of the fair values of all reporting units to HP's market capitalization. The excess of the sum of fair values above market cap is the implied control premium. HP evaluates the reasonableness of this implied control premium by comparing it to historical trends of premiums offered in acquisitions in related industries. Although there has been a wide range of premiums offered for specific transactions, Bloomberg calculated the average historical premiums for transactions in the last year in the industries in which HP operates (the Computer Hardware Industry and Computer Software and Services Industry). These average premiums have ranged from 27% to 32%. The sum of the fair value of the reporting units resulted in an imputed enterprise share price on a marketable, controlling basis of $22.98 on August 1, 2012 compared to a market traded price of $17.66 representing a premium of 30.1%, this compares to a control premium of 28.3% and 31.5% in 2011 and 2010, respectively.

*Determination of Carrying Amount*

ASC 350 requires that assets and liabilities be reassigned to the reporting unit and two criteria should be met. For an asset or liability to be assigned to a reporting unit: 1) the asset will be employed in, or the liability relates to, the operations of the reporting unit; and 2) the asset or liability will be considered in determining the fair value of the reporting unit. In addition, the assignment of assets and liabilities to the reporting units is intended to identify all of the assets and liabilities that would be necessary for the reporting unit to operate on a standalone business.

HP's internal and external reporting systems do not require the business units to identify the organization who owns the assets or liabilities when originally recorded. This results in the Company not being able to systematically generate segmented or reporting unit specific balance sheets necessary to complete its ASC 350 impairment test. In addition, some assets and liabilities are employed in the operations of multiple reporting units and are required to be assigned using a reasonable allocation methodology. As a result, the Company has developed a model to allocate assets and liabilities to the reporting units. The model is designed to measure the performance of the reporting units by calculating a "return on invested capital" (the "ROIC Model"). The ROIC Model is used to make resource allocation decisions and was designed with the goal of using it for the annual impairment tests, as well as for other operational purposes.

Using the ROIC Model, the Company has assigned or allocated assets and liabilities to each of the reporting units using two levels of allocation. The first level consists of assets and liabilities that are specifically identified as being "owned" by the business segments per the Company's external reporting systems (information directly from BW, HP's SAP general ledger). The second level includes amounts allocated or assigned based upon specific drivers for a particular account (e.g., accounts payable is allocated by total materials standard costs and overhead product costs). This second level also includes allocations based upon a clearly and closely related proxy (e.g., accrued compensation is allocated based upon a proxy for headcount by business segment). The Company applied the ROIC in a consistent manner compared to the last annual goodwill impairment test.

### ASC 350 Step 2 analysis

Based on the Step 1 test, the carrying amount of Autonomy reporting unit exceeded its fair value indicating impairment. Accordingly, the second step of the goodwill impairment test was performed to determine the impairment charge, if any. The second step of the goodwill impairment test, used to measure the amount of impairment loss, compares the implied fair value of the reporting unit goodwill with the carrying amount of that goodwill. If the carrying amount of the reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. Because the impairment model uses a comparison of the fair value and the carrying value as the initial measure of impairment, ASC 350-20 requires that if an impairment test of goodwill and any other asset is required at the same time, impairment tests of all other assets should be completed and reflected in the carrying amount of the reporting unit prior to the completion of the goodwill impairment test.



The Company determined whether the finite-lived intangible assets were impaired based on the undiscounted cash flows expected from the use of the assets. Due to the significant reduction in the forecast described above the Company failed on the undiscounted cash flows test. To determine the impairment the Company compared the carrying amount of the finite-lived long lived assets to their fair values as of August 1, 2012. The valuation methodology used was the same as was used at the date of acquisition given the short passage of time and no significant changes in the underlying Autonomy business other than the updated future cash flows. The Company also reduced the customer retention rates due to a decrease in support renewals from increased pressure on more consistent pricing for PCS under HP's VSOE accounting policies which was higher than Autonomy would have charged for PCS. The royalty rate was also reduced due to the lower projected margins. Below is a summary of the categories of intangible assets and the values as of August 1, 2012 and acquisition:

| (in millions) | August 1, 2012 | October 3, 2011 | Change |
|---|---|---|---|
| Existing technology | $643 | $3,039 | ($2,396) |
| Maintenance agreements | $103 | $161 | ($58) |
| Subscriber base (Cloud) | $6 | $306 | ($300) |
| Customer contracts | $40 | $289 | ($249) |
| OEM agreements | $15 | $353 | ($338) |
| Trade name – Autonomy | $24 | $116 | ($92) |
| Trade name – IDOL | $11 | $50 | ($39) |
| Order backlog | $0 | $11 | ($11) |
| Total | $842 | $4,325 | ($3,483) |

The fair value of the acquired finite-lived intangible assets was $842 million compared to $4.3 billion at the date of acquisition. The Company compared the fair value of the finite-lived intangible assets acquired ($842 million) to the carrying value as of August 1, 2012 ($3.9 billion) to record an impairment of finite-lived intangible assets of approximately $3.1 billion. As a result of the impairment of the finite-lived intangible assets, the Company recorded a benefit of $820 million related to the reversal of the deferred tax liabilities related to the book and tax differences of the finite-lived intangible assets. Below is a summary of the impact on the carrying value of the Autonomy net assets:

| (in millions) | | |
|---|---|---|
| Autonomy net assets at 8/1/12 (excluding goodwill) | | $3,184 |
|     Impairment of intangibles | ($3,100) | |
|     Deferred tax liability reversal | $820 | |
| Change in net assets due to intangible impairment | | ($2,280) |
| Autonomy net assets after intangible impairment | | $904 |

The implied fair value of goodwill is determined in the same way that goodwill is recognized in a business combination. The implied fair value of goodwill is calculated by deducting the fair value of all net assets of the reporting unit from its fair value (as determined in Step 1), including determining the fair value of any unrecognized intangible assets (including in-process research and development). The remaining fair value of the reporting unit after assigning fair values to all of the reporting unit's assets and liabilities represents the implied fair value of goodwill for the reporting unit. This assignment is performed only for the purpose of measuring goodwill impairment and does not result in a change in basis of the recognized net assets or in the recognition of any unrecognized assets of the reporting unit. The excess of the fair value over the amounts assigned to its assets and liabilities is the implied fair value of goodwill. Below is a summary of the Step 2 calculation for the Autonomy reporting unit:

| (in millions) | |
|---|---|
| Fair value of Autonomy | $2,200 |

A member firm of Ernst & Young Global Limited

EY-HP-ALAK-EM-000046
Confidential Treatment Requested by Ernst & Young LLP



Hewlett-Packard Company
Page 10

|  |  |  |  |
|---|---|---|---|
| Autonomy adjusted net assets (from above) |  |  | $904 |
| Fair value adjustments | Intangibles | $130 |  |
|  | Deferred revenue | $88 |  |
|  | Tax impact | ($62) |  |
| Total Step 2 fair value adjustments |  |  | $156 |
| Autonomy net assets at fair value |  |  | $1,060 |
|  |  |  |  |
| Implied fair value of goodwill |  |  | $1,140 |
| Carrying value of goodwill |  |  | $6,890 |
| Impairment of goodwill |  |  | $5,750 |

The Company considered the assets and liabilities of Autonomy noting that the deferred revenue and intangibles are generally the accounts that are adjusted in purchase price accounting. To determine the fair value of the finite-lived intangibles the Company engaged D&P to complete a valuation of the finite-lived intangibles. Based on the valuation performed by D&P the finite-lived intangibles created by the Company since the date of acquisition were valued at $130 million. The concluded value of the acquired and created finite-lived intangible assets represented 44% of the fair value of the reporting unit which is approximately the same proportion of the purchase price on the date of acquisition.

The Company adjusted the deferred revenue to represent the legal performance obligation to be assumed in a business combination by an acquiring entity. The valuation of the deferred revenue was determined using a cost build up approach using a market participant's estimate of the costs that would be incurred to fulfill the obligation plus a normal profit margin. The methodology is consistent with the Company's purchase price accounting on acquisition. The Company segregated the deferred revenue between license sales, post contract support ("PCS"), hosting services, and professional services. The adjustment above is primarily the write off of 100% of deferred license sales since the date of acquisition as there is minimal cost to deliver future services. The Company also included the tax effect of the deferred revenue write-off which is to reduce the deferred tax asset due to the different treatment under book and tax of deferred revenue.

Timing of impairment charge recognition

We believe that the impairment charge in its entirety is the result of a change in accounting estimate, and as such should be recognized in HP's fiscal Q4 2012. At the time the Company was preparing to acquire Autonomy, HP had certain valuation models that showed that a purchase price in upwards of $17 billion was within a market range. The ultimate negotiated purchase price of $11 billion at the time was based on its market valuations which appeared like a reasonable price. This difference in purchase price versus the higher end of the valuation ranges coupled with the external trends around software valuations especially considering the long term growth trends in the Big Data, Enterprise Search, Enterprise Information Archiving and Enterprise Content Management businesses appeared to reflect a reasonable market price and possibly a discount from what others might have possibly negotiated. Also at the acquisition date, IDC and Gartner both forecasted significant growth in these markets through 2016 with compounded annual growth rates up to 23%. Further based on our screening for Software and Services (S&S) transactions closed in the period from August 2008 through August 2012, which had transaction multiples reported in Capital IQ, there seemed to be an ongoing strength in the software industry as revenue multiples from these transactions ranged from 1.4X to 18.4X with an average of 5X revenue. The multiple dynamics and valuations for market participants within the software industry further supported the view of the valuation at the time of the acquisition. HP's long term view of the revenue projections for the HP Software business and the Autonomy business during fiscal 2011 through Q3 2012 remained unchanged.

During the third quarter of fiscal 2012 the Company considered whether the performance of Autonomy to date compared to the expectations as well as changes in leadership were indicators of impairment. The Company concluded that while the results were not in



line with expectations, it had not dismissed the long-term forecasted results that were underlying the deal value. The Company believed that the lack of strong leadership and culture in Autonomy were the reason for the underperformance compared to forecast. Autonomy's revenues were below plan which stemmed in part from moving to a Software as a Service ("SaaS") model whereby revenue is recognized over a contract period rather than upfront as license revenue. The overall outlook in the software data analytics industry still showed significant growth potential and while the current year targets were missed the Company believed they would achieve the long term market growth rates.

Regulation S-X requires disclosures of risks and uncertainties that could affect the fairness of presentation of financial data at an interim date. Disclosures should include, for example, significant changes since the end of the most recently completed fiscal year in estimates inherent in the preparation of financial statements. In Q3 2012 the Company has expanded the disclosure in the Q3 Form 10-Q to acknowledge the increased risk of impairment within the HP Software and Autonomy reporting units, consistent with the increased risk disclosures related to the Services business in prior periods. We believe this is appropriate disclosure given the recent economic events and the fact the Company, through the annual forecasting process, is evaluating the long term growth goals in Q4 2012.

Further, at the 2009 AIPCA SEC Conference the SEC staff made it clear that they expect registrants to disclose for each reporting unit with a material amount of goodwill that is "at risk" (i.e., it is reasonably likely that the reporting unit might fail a future Step 1 impairment test under ASC 350, Intangibles-Goodwill and Other). The SEC staff acknowledged that the need for these disclosures increases as the amount by which the fair value of a reporting unit exceeds its carrying amount decreases. However, the SEC staff stated that no bright lines exist and registrants must apply judgment to determine whether a reporting unit's goodwill is considered "at risk." In light of these requirements HP added disclosures about the Software and Autonomy goodwill to the Q3'12 form 10-Q. Refer to Exhibit I below for the proposed disclosures.

Given Autonomy's operating performance, the Company disclosed the following in their 3rd quarter 10-Q:

> "During its fourth quarter of fiscal 2012, HP will perform its annual goodwill impairment review for all of its reporting units as of August 1, 2012. If there are changes in HP's stock price, or significant changes in the business climate or operating results of its reporting units, HP may incur additional goodwill impairment charges. The Software segment includes $14.6 billion of goodwill, of which $7.7 billion relates to the legacy HP software business and $6.9 billion relates to the Autonomy acquisition. Based on HP's last annual goodwill impairment review completed as of August 1, 2011, the excess of fair value over carrying value of the legacy HP software business was 38% of the carrying value, which is lower than that of HP's other reporting units. At the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value."

We documented our considerations of impairment as part of our third quarter review, and concluded that while the business had underperformed there were not indicators of impairment for the Autonomy reporting unit at the end of the third quarter of fiscal 2012 that would warrant an interim impairment test. The Company did believe that there was a risk of impairment upon completion of its annual test and therefore decided to make the disclosure regarding the potential impairment in the Software and Autonomy reporting units.

On November 20, 2012 as part of the Company's press release of its annual financial information for fiscal 2012 the Company disclosed its impairment charge and indicated that "<u>the majority of this impairment charge is linked to serious accounting improprieties, disclosure failures and outright misrepresentations at Autonomy Corporation plc that occurred prior to HP's acquisition</u>



of Autonomy and the associated impact of those improprieties, failures and misrepresentations on the expected future financial performance of the Autonomy business over the long-term."[1]

The Company also disclosed that they initiated an internal investigation into these issues after a senior member of Autonomy's leadership team came forward subsequent to the departure of Mike Lynch on May 23, 2012. The initial results of the Company's ongoing investigation culminated in late Q4 2012. Given the nature of these allegations, the timing that they were alleged to have occurred (i.e prior to acquisition), as well as the ongoing investigation, the Company considered what period the impairment charge should be recognized. These considerations are further documented below.

*Prior period considerations*

The Company considered whether a restatement of 2011 was appropriate. The Company considered EY's FRD *Intangibles – Goodwill and Other*, which states the following (emphasis added):

> "There is no requirement to test goodwill for impairment on the date of acquisition. In addition, paragraph BC382 of the Basis for Conclusions on Statement 141(R) states that:
>
>> "The Boards acknowledged that overpayments are possible and, in concept, an overpayment should lead to the acquirer's recognition of an expense (or loss) in the period of the acquisition. However, the Boards believe that in practice any overpayment is unlikely to be detectable or known at the acquisition date. That is, the Boards are not aware of instances in which a buyer knowingly overpays or is compelled to overpay a seller to acquire a business. Even if an acquirer thinks it might have overpaid in some sense, the amount of overpayment would be difficult, if not impossible, to quantify. *Thus, the Boards concluded that in practice it is not possible to identify and reliably measure an overpayment at the acquisition date.* Accounting for overpayments is best addressed through subsequent impairment testing when evidence of a potential overpayment first arises."
>
> "We believe that this guidance suggests that an entity should test the acquired goodwill (whether provisionally determined or final) for impairment if impairment indicators exist. In addition, if the goodwill assessment date follows shortly after an acquisition, a goodwill impairment test should be performed irrespective of the status of the accounting for the business combination."

At the date of acquisition (HP's fiscal 2011) and prior to Q4 2012 the Company was not aware of the impact on the financial results of the issues described above. . Additionally the acquisition date of October 3, 2011 was less than 30 days from the Company's fiscal year end. The measurement period of the acquisition was substantially complete in Q1 2012. The only measurement remaining in process related to the accounts relating to certain service contracts (i.e. accounts receivable, deferred revenue and deferred cost).

*Change in estimates*

ASC 250-10-45-17 states the following:

> "A change in accounting estimate shall be accounted for in the period of change if the change affects that period only or in the period of change and future periods if the change affects both. A change in accounting estimate shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods or by reporting pro forma amounts for prior periods.

---

[1] Q4 2012 Hewlett-Packard Earnings Release

A member firm of Ernst & Young Global Limited

EY-HP-ALAK-EM-000049
Confidential Treatment Requested by Ernst & Young LLP


Hewlett-Packard Company
Page 13

As previously discussed, the Company's impairment charge stems from several factors including, but not limited to, changes in the forecast of Autonomy, changes in the expected synergies from being combined with HP, changes in market dynamic, as well as changes in some of the detailed assumptions commonly used in valuation exercises of this nature. These factors, amongst many others, <u>are estimates.</u> These estimates changed in Q4 based on a number of reasons including, but not limited to:

- Revising its Autonomy 2013 forecast as part of the Company's preparation for the securities analyst meeting on October 3)
- New Autonomy management evaluated its long-term strategy, business plan, the competitive landscape and the market acceptability of the autonomy products in developing its long-term business forecast in mid October 2012. This analysis underlies the forecast utilized in the impairment analysis.
- Changes to the baseline financials originally assumed stemming from the internal investigation were also completed in the mid-October 2012 through November 2012 period. Such changes related primarily to :
    - Previous hardware revenue classification
    - Treatment of certain sales with resellers
    - Accounting for certain upfront fees
    - Lack of disclosures in original financial statements
- Misrepresentations which were recently discovered which were made by former Autonomy management

Below is the presentation that was given to the Board of Directors by George Kadifa, EVP, HP Software that "walks" from the internal $17 billion value at the date of acquisition to the $2.2 billion fair value:




Hewlett-Packard Company
Page 14

## HP PRIVATE
## Base Case Comparison to Original IRB Valuation



| | $17.1 | $1.3 | $1.8 | $2.9 | $5.3 | $5.8 | $2.2 |
|---|---|---|---|---|---|---|---|
| | Total DCF Value 8/11/2011 | Effect of Rebaselining Revenue (A) | Effect of Lower Growth Rates (B) | Effect of Lower Margins (C) | Effect of Lower Synergies (D) | Base Case Value at 10% WACC | Base Case Value at 16% WACC (E) |

## HP PRIVATE
## Value Erosion Factors

| Value Erosion Factor | Description | IRB Assumptions | Current Assumptions |
|---|---|---|---|
| A. Overstated pre-acquisition revenue | Negative adjustment to re-baseline Autonomy revenue, backing out HW resale, SaaS to license conversions, and other issues | FY11 revenue of $989M | FY11 revenue of $775M |
| B. Lower revenue growth rate in the forward-looking plan | Accounts for lower revenue growth in Autonomy (-2% license growth in 2011) and overweight mix of Protect revenue (~74% of revenue). Projecting below-market growth for Protect driven primarily by previous underinvestment. | Standalone CAGR of 11% | Standalone CAGR of 7% |
| C. Lower operating margins in the forward-looking plan | Reflects re-baselined FY11 margins of 25% and FY10 margins of 42%, and accounts for higher mix of SaaS and previous under-investments | 41% | 29% |
| D. Challenges with realizing the original synergy assumptions | Fewer and delayed incremental synergies; time required to develop pan-HP synergy platform (IPG, EG, and SW) | $140M revenue in FY12 $2,091M revenue in FY18 | Zero revenue in FY12 $427M revenue in FY18 |
| E. Premium to the weighted average cost of capital (discount rate) | Account for market perceptions of execution risk to arrive at a reasonable implied premium of the sum of the fair values of all of HP's businesses to the overall company market value | 10% | 16% |

A member firm of Ernst & Young Global Limited

EY-HP-ALAK-EM-000051
Confidential Treatment Requested by Ernst & Young LLP



Hewlett-Packard Company
Page 15

Each of the assumptions underlying the decrease in value are considered accounting estimates consistent with the guidance in ASC 250.

Furthermore, as previously discussed, August 1 is the Company's annual impairment test date. This requires the Company to perform a Step 1 evaluation. The Autonomy reporting unit failing the Step 1 evaluation causes the Company to perform a Step 2 analysis. As a result of the Company's annual impairment date in Q4 and failing Step 1, the Company was required to test the intangible assets for impairment and measure the implied goodwill to determine if the intangible assets or goodwill were impaired as of August 1, 2012, the annual goodwill test date. As a result of this requirement to perform the annual test on the Company elected date of August 1, the Company identified an impairment charge and consistent with ASC 350, the charge should be recorded in Q4 2012.

Conclusion

Based on the supporting authoritative guidance and the relevant facts and circumstances we concur with management's conclusion of the Step 1 analysis that the Autonomy reporting unit carrying amount exceeded the fair value indicating impairment and management's conclusion on the Step 2 analysis and the impairment of the finite-lived intangible assets and goodwill at August 1, 2012. Additionally we concur that recording this impairment charge during Q4 2012 is appropriate.

A member firm of Ernst & Young Global Limited

EY-HP-ALAK-EM-000052
Confidential Treatment Requested by Ernst & Young LLP