# EXHIBIT C

**mazars**   Software Focus Transaction SW-09-013

| SW-09-013 – Bank of America, NA ("Bank of America") | |
|---|---|
| **Amount of sample item:** | $9.204 million |
| **Period initially recognised:** | Q1 2009 |
| **Date of contract:** | 31 March 2009 |
| **Total contracted amount:** | $9.675 million |

**Summary of the transaction**

This transaction relates to the "*Application Service Provider and Software License Agreement*" between Bank of America, N.A. ("**Bank of America**") and Autonomy, dated 31 March 2009[1] (the "**March 2009 Agreement**").

Pursuant to the March 2009 Agreement, Autonomy granted Bank of America a "*perpetual, worldwide, non-exclusive, non-assignable and non-transferable except as provided herein license to install, use and copy*" in relation to, *inter alia*, Autonomy's:

- "*Digital Safe Archive System Software w/DOL*"
- "*Audit Center Software*";
- "*Digital Supervisor Software*";
- "*Bloomberg Adaptor Software*";
- "*Data Deduplication Software*"; and
- "*Singlecast Supervision (S6) Software*".

This software was licensed "*solely in conjunction with the archiving, supervision, storage, retention, retrieval and disposition of e-mail and other text-based communications between Forty Thousand (40,000) identifiable internal users* […]".

The March 2011 Agreement also stipulated that Autonomy would provide Bank of America with the "*Services*", which included, *inter alia*, the "*Digital Safe Services*". The "*Digital Safe Services*" were the "*proprietary hosted electronic communications management service that utilizes the Digital Safe*". These services were to be provided on a "*Digital Safe System*", which was the "*equipment, software, services, data, and network circuitries for which* [Autonomy] *is responsible, which are used to provide the Digital Safe, and for which* [Autonomy] *is operationally responsible*". The "*Services*" would continue until the "*Expiration Date*" of the March 2009 Agreement, being 31 March 2014.

Regarding the software set out therein, the March 2009 Agreement stated that "[Autonomy] *shall initially host the Software for the benefit of Bank of America on* [Autonomy's] *systems in an ASP*[2] *model.*

---

[1] HP-SEC-01974605

[2] "*Application Services Provider*"

**mazars**

| SW-09-013 – Bank of America, NA ("Bank of America") |
|---|

*Should Bank of America cease, in accordance with the terms of this Agreement, using the Software in an ASP model or should the Application Services provided hereunder otherwise cease for any reasons, Bank of America may instead install and use the Software on systems, computers or serves owned, controlled or operated under the direction of Bank of America during the remainder of the license term […]*". The March 2009 Agreement further confirmed "[Autonomy] *shall be responsible for maintaining the infrastructure required to provide the Services, including the hosted server on which the Software is installed*".

The fees set out in the March 2009 Agreement were as follows:

- a "*Software License Fee*" of $9,300,000;

- "*Annual Maintenance and Support Fees*" of $465,000;

- "*Monthly Storage Fees*" of between $0.0009375 per megabit per month and $0.0005833 per megabit per month, depending on location and the year of the storage; and

- "*Audit Services*" of $150 per hour and "*Other Professional Services*" of $175 per hour.

Autonomy also undertook to provide Bank of America with "*training services related to the Software*". The cost of these "*training services*" was included in the "*Software License Fee*", was not to exceed $50,000 in "*calendar year 2009*" and $50,000 in "*calendar year 2010*".

Autonomy's ledgers record that on 31 March 2009, Autonomy recognised license revenue of $9,204,762 in relation to the March 2009 Agreement. On the same day, Autonomy recognised training revenue of $100,000 and deferred maintenance revenue of $406,238.

**Issues identified by Mazars**

A. **The substance of the Bank of America March 2009 Agreement was not the sale of a good but was instead the provision of an ongoing hosting service**

In my view, the substance of the Bank of America March 2009 Agreement was not the sale of a good but was instead the provision of an ongoing hosting service. I have reached this conclusion because:

a) Bank of America's ability to use the "*Software*" set out in the March 2009 Agreement was in relation to the "*the archiving, supervision, storage, retention, retrieval and disposition of e-mail and other text-based communications between Forty Thousand (40,000) identifiable internal users*" (i.e., the "*Digital Safe Services*"). The "*Digital Safe Services*" were themselves unambiguously defined as a "*proprietary **hosted** electronic communications management service*" (emphasis added) provided on equipment, software and network circuitries provided by Autonomy and for which Autonomy was operationally responsible;

b) The Bank of America March 2009 Agreement confirmed that Autonomy was to "***initially host***

mazars

Software Focus Transaction SW-09-013

| SW-09-013 – Bank of America, NA ("Bank of America") |
|---|
| *the Software for the benefit of Bank of America* on [Autonomy's] *system*"; <br><br> c) The Bank of America March 2009 Agreement confirmed that Autonomy's provision of the "*Software*" was via an "*ASP model*"[3]. In my experience an "*ASP model*", which typically involve providers granting customers access to their software on a hosted environment and on servers maintained by the provider[4], almost invariably relates to the provision of a service over a set period of time, rather than the sale of goods; <br><br> d) whilst the March 2009 Agreement did afford Bank of America the right to cease using the "*ASP model*" and instead install the "*Software*" set out therein on servers that it owned or operated, it does not appear that Bank of America ever exercised this right, and I have seen no evidence to suggest that it ever intended to. <br><br> In light of the above, I do not consider that the commercial effect of the sale of the "*Software*" pursuant to the March 2009 Agreement can be understood without reference to the provision of the hosted "*Digital Safe Archiving Services*" that Autonomy was simultaneously agreeing to undertake for Bank of America pursuant to the agreement. IAS 18.13 therefore requires that I apply the revenue recognition criteria of IAS 18 to the series of transactions as a whole, and as such, in my opinion the March 2009 Agreement should be accounted for as the provision of an ongoing hosting service. <br><br> IAS 18.20 requires that revenue arising from the rendering of services should be recognised by reference to the stage of completion of the transaction. IAS 18.25 further explains that, for practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period of time, unless there is evidence that some other method better represents the stage of completion. <br><br> As such, it is my opinion that the consideration payable to Autonomy pursuant to the Bank of America March 2009 Agreement should have been recognised as revenue as the hosting service was performed over the duration of the agreement. |

---

[3] "*Application Services Provider*"

[4] As was the case in the Bank of America March 2009 Agreement

| **SW-09-013 – Bank of America, NA ("Bank of America")** |
|---|
| **Conclusion and proposed adjustment** |

In my opinion SW-09-013 did not satisfy the revenue recognition criteria of IAS 18 for the sale of goods, and the revenue recognised in Quarter 1 2009 in relation to SW-09-013 should be reversed.

In my opinion SW-09-013 did meet the revenue recognition criteria of IAS 18 regarding the provision of a hosting service over a set period of time. As such the consideration due in relation to the March 2009 Agreement should be recognised as revenue on a straight line basis over the duration of the agreement.

Autonomy recognised $9,204,000 of license revenue in relation to the March 2009 Agreement. Recognising this over the duration of the March 2009 Agreement (i.e. over five years, until 31 March 2014) equates to revenue of $153,400 per month[5], or $460,200 per quarter[6].

Moreover, it is mandatory under IAS 18.35 for revenue arising from the sale of goods and revenue arising from the rendering of services to be disclosed separately. In my view, revenue from SW-09-013 should have been disclosed as a rendering of services.

My proposed adjustments are as follows:

| **SW-09-013 – Bank of America, NA ("Bank of America")** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Q1 2009 $000 | Q2 2009 $000 | Q3 2009 $000 | Q4 2009 $000 | Q1 2010 $000 | Q2 2010 $000 | Q3 2010 $000 | Q4 2010 $000 | Q1 2011 $000 | Q2 2011 $000 |
| **Original accounting** Revenue | 9,204 | - | - | - | - | - | - | - | - | - |
| **Proposed adjustment** Revenue | (9,204) | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 |
| **Adjusted accounting** Revenue | | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 |

---

[5] $9,204,000 / 60 = $153,400
[6] $153,400 * 3 = $460,200