# EXHIBIT J

Autonomy Corporation plc

# Report to the Audit Committee on the 30 June 2011 Interim Review

## Final Report

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036231

Exh 2013-0001

# Contents

Introduction                                                                                    1

1.      Key risks                                                                              3

2.      Other matters                                                                         12

3.      Taxation                                                                              14

4.      Presentation in the half-yearly financial report                                     16

5.      Accounting and internal control systems                                              17

6.      Responsibility statement                                                             18

Appendix 1: Potential adjustments                                                            19

Appendix 2: Draft management representation letter                                           21

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036232

Exh 2013-0002

# Introduction

We have pleasure in setting out in this document our report to the Audit Committee of Autonomy Corporation plc and its subsidiaries (together "the Group" or "Autonomy") on our interim review of the six months ended 30 June 2011 for discussion at the meeting to be held on 25 July 2011. This report summarises the principal matters that have arisen from our review of the financial information within the Condensed Financial Statements for the quarter and six months ended 30 June 2011 ("Q2 2011", "H1 2011").

This introduction is not intended to be exhaustive but highlights the most significant matters which we would like to bring to your attention. It should, therefore, be read in conjunction with the entire report and the appendices thereto.

| Key risks and other matters | |
|---|---|
| **The recoverability of certain trade receivables continues to be the key risk** | We discuss within Section 1 the results of our review work in relation to key risks which are significant to the H1 2011 results and press release. |
| | In particular, we will focus at the Audit Committee meeting on: |
| | • Iron Mountain Digital acquisition accounting; |
| | • The appropriateness of revenue recognition; |
| | • Transactions in the quarter with Value Added Resellers (Capax Global, Microtechnologies LLC and Discover Technologies LLC) and the growth in the related recoverable balances; and |
| | • Trade receivables where there is significant exposure and therefore judgement as to collectability. These are primarily the Latin American and Italian debtors we have previously discussed, although we note management has provided an extra $5 million against them. |
| | We discuss within Section 2 the results of our review work in relation to other matters which are relevant to the H1 2011 release, in particular: |
| | • Strategic hardware sales; |
| | • Purchase of DiscoverPoint software from Discover Technologies LLC; and |
| | • Capitalisation of research and development expenditure. |
| | In addition, there are the following matters which we have identified as relevant to the H1 2011 review for which we have no matters to report to you. |
| | • Finalisation of the Microlink and CA Technologies acquisition accounting; and |
| | • Management override of controls. |

| Review status | |
|---|---|
| **Our review is substantially complete** | We have substantially completed our review. Certain procedures remain outstanding and need to be finalised before we can issue our review opinion: |
| | • Receipt of two revenue confirmations outstanding; |
| | • Review of the CA Technologies acquisition report; |
| | • Receipt of confirmation from RBS on the final list of approved non-recourse sale of receivables; |
| | • Completion of our internal review procedures; |
| | • Review of the half year press release; |
| | • Receipt of management representation letter (suggested draft is attached in Appendix 2). |
| | We will report to you orally in respect of any modifications to the findings or opinions contained in this report that arise on completion of these matters. On satisfactory completion of the outstanding matters, we anticipate issuing an unmodified review report. |

DEL00036233

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 2013-0003

# Introduction

| Potential adjustments | |
|---|---|
| **Known adjustments increase profit before tax for H1 2011 by $1.5 million** | For our Q2 2011 review our materiality was $5.5 million (Q2 2010: $4.9 million, full year 2010 $22.5 million) for the quarterly income statement and $11.1 million (2010: $9.9 million) for the half year income statement. Both measures are based on profit before tax. This is consistent with the basis used to determine materiality for the previous year end audit. |
| | Known adjustments increase profit before tax for H1 2011 by $1.5 million. |
| | Judgemental adjustments increase profit before tax for H1 2011 by $0.3 million. |
| | Total adjustments after tax would decrease net assets by $7.3 million at 30 June 2011. Details of our potential adjustments are included in Appendix 1. |
| | The impact on the prior year retained earnings is a function of the 2010 year end audit adjustments on the 30 June 2011 balance sheet. The Group's retained earnings at 30 June 2011 were $857.2 million, with total net assets of $2,232.9 million. |
| | Management has concluded that the total impact of the uncorrected misstatements, both individually and in aggregate, is not material in the context of the financial statements taken as a whole, and we concur with their view. |

| Accounting and internal control systems | |
|---|---|
| **There were no significant changes to the controls in the existing group during the period** | As part of our review we have made enquiries of management regarding the control environment and the reliability of the management reporting process.  In particular we have made enquiries about the control processes in place surrounding the newly acquired Iron Mountain Digital business. |
| | We have noted during our interim review procedures that the integration of the Iron Mountain Digital business into Autonomy's existing general ledger system (DDS), and the significant increase in the volume of transactions now being processed, has meant that it took longer than expected to produce a number of key reports due to the reliance on manual reconciliations. Given that the acquisition was completed on 3 June 2011 this is not surprising and we note that this does not give rise to concern over the accuracy of the results of Iron Mountain Digital included within the Group's results for the period to 30 June 2011. |
| | We have also noted that a number of cheques dated pre quarter end apparently came under Autonomy's control post quarter end. The amount was not material to the balance sheet and management is implementing new collection procedures to ensure that evidence is retained to support the fact that the cheques were under the Group's control at quarter end. |
| | Our findings and recommendations are outlined in section 5. |
| | We have been advised that there were no significant changes to the underlying Group controls which would impact the interim results and therefore we have not carried out any detailed testing of our understanding of internal controls. |

| Independence | |
|---|---|
| **We confirm we remain independent** | In our professional judgement we are independent within the meaning of APB Ethical Standards for Auditors and the objectivity of the audit engagement partner and audit staff is not impaired. |
| | During H1 2011 we performed the financial due diligence on the Iron Mountain Digital acquisition for a fee of £215,000. This work involved members of the audit team but has no direct bearing on our interim review or full year audit work. |
| | We have recently been engaged to provide tax advisory services as part of 'Project A' for which we have agreed a fee of £150,000. This work is being performed by a separate tax advisory team and led by a tax advisory partner who is independent of the audit team. |

DEL00036234

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 2013-0004

# 1.  Key risks

The results of our work on key risks are set out below:

## Iron Mountain Digital acquisition accounting

**Iron Mountain Digital was acquired for a total consideration of $400.9 million**

On 3 June 2011 Autonomy acquired certain trade and assets of the Iron Mountain Digital business ("IMD") from Iron Mountain Inc. ("Iron Mountain") for a purchase consideration of $400.9 million, which includes a provisional working capital adjustment. In accordance with IFRS 3 (2008) management has also expensed transaction costs totalling approximately $3 million through exceptionals during the quarter.

**Acquisition accounting**

The table below summarises the provisional fair values allocated to the assets and liabilities acquired:

| Net assets acquired | Initial value $'m | Fair value adj. $'m | Final value $'m |
|---|---|---|---|
| Intangible assets | - | 200.0 | 200.0 |
| Tangible fixed assets | 36.8 | - | 36.8 |
| Trade debtors | 34.2 | - | 34.2 |
| Deferred tax liability | - | (8.0) | (8.0) |
| Other debtors | 10.6 | - | 10.6 |
| Corporation tax liability | (1.5) | - | (1.5) |
| Accruals and other payables | (4.8) | (24.9) | (29.7) |
| Provisions | (13.4) | (4.0) | (17.4) |
| Deferred revenue | (31.7) | 11.7 | (20.0) |
| **Total net assets acquired** | **30.2** | **174.8** | **205.0** |
| Goodwill | - | - | 195.9 |
| **Consideration paid** | **395.4** | **5.5** | **400.9** |

The acquisition has been accounted for in accordance with IFRS 3 (2008) *Business Combinations* ("IFRS 3"). Management is yet to have a formal external intangible valuation performed by Duff & Phelps and has therefore made an estimation of the likely intangibles value ($200 million) for the purposes of the H1 2011 report.

Management's estimate is based on a goodwill impairment review performed by Duff & Phelps for Iron Mountain as part of the 31 December 2010 group audit process. That goodwill impairment review outlines the values associated with the related intangibles within the Digital Division of Iron Mountain and is considered by management to largely reflect the fair value of the intangibles acquired.

Through the knowledge gained from the completion of the acquisition due diligence and from the post acquisition period, management has made a number of provisional fair value adjustments to the opening balance sheet. We recognise these items as requiring adjustment from our financial due diligence work.

Management has also performed a fair value analysis on a $1.5 million IDOL licence sale made by Autonomy to Iron Mountain at the time of the acquisition, which was deemed to be at less than fair market value. In accordance with paragraph B50 of IFRS 3 (2008) management has determined that this transaction is linked to the business combination. Therefore, in accordance with paragraph 38 of IFRS 3 (2008), the asset transferred must be fair valued and included as part of the total consideration paid to Iron Mountain. This has resulted in a $5.5 million increase to the fair value of the consideration paid (and therefore goodwill) and total post acquisition revenue of $7.0 million recognised. Management has determined fair value with reference to seven similar sized licence deals. An average licence value was calculated for sales where IDOL search was the core product offering. This generated a value of $10.6 million, but did include one significant outlier. Excluding this outlier the revised average was $7.4 million. Management has therefore determined that an appropriate estimation of fair value is $7.0 million.

We concur that management's treatment is in line with the guidance in IFRS 3 (2008) and that fair value has been determined on a reasonable basis, using a comparative group of similar sized deals to similar sized organisations.

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 2013-0005

# 1.  Key risks

**Iron Mountain Digital acquisition accounting (continued)**

**Trading performance and transactions in the quarter**

As the acquisition took place on 3 June 2011, then the trade and assets of IMD have been consolidated into the Group's H1 2011 results for a period of 27 days. In that period, the business generated underlying revenues of approximately $20 million, much of which had been fully 'IDOLised', plus an additional $9.5 million of revenues from a prepaid royalty licence sale to Iron Mountain to on-sell the IMD suite of products. Management estimate the non-IDOL portion of these revenues to be approximately $8 million. In the same period the business had operating costs of around $10 million (excluding exceptional costs).

**Deloitte response**

**Acquisition accounting**

We are in the process of reviewing the purchase agreement and the provisional acquisition accounting prepared by management, which under IFRS 3 (2008) can be adjusted and finalised within twelve months of the acquisition date. As part of our work we will agree the numbers per the Duff & Phelps report back to that recorded as a fair value adjustment. This work is still ongoing at this time and we will report to you orally on our findings at the audit committee meeting.

We note that the values attributed to separately identifiable intangibles are a management estimate at this stage before being independently valued by Duff & Phelps. This is reasonable given the proximity of the acquisition date to the half year end.

**Trading performance and transactions in the quarter**

We are in the process of performing a review on the opening balance sheet of the acquired business, which involves identifying and understanding significant variances from the Q1 2011 balance sheet reported in our financial due diligence report.

We are currently in discussion with management to understand its rationale for its estimate of non-IDOL revenues generated through the IRM Digital division in the quarter.  We shall report to you orally with respect to our conclusions on this work.

**Acquisition disclosure considerations for the H1 2011 press release**

Given the nature of the acquisition and its contribution to the H1 2011 results, management are considering the following:

- how the results of the acquired business will impact the calculation of key metrics reported to analysts, such as organic growth and cash conversion; and
- the extent and format of the disclosures required to be made about the acquisition under IFRS 3 (2008) and IAS 34 in the H1 2011 press release. Further guidance on the disclosure requirements of IFRS 3 (2008) and IAS 34 can be found in section 4.

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036236

Exh 2013-0006

# 1.  Key risks

## Revenue recognition

| | |
|---|---|
| **Revenue continues to be appropriately recognised in accordance with IFRS** | Revenues for the quarter were $255.5 million (Q2 2010: $221.1 million) and for the half year were $475.2 million (H1 2010: $415.3 million). |

Management continues to apply a consistent policy to recognising revenues which includes ensuring revenue is being recognised in the appropriate period, assessing the probability of recoverability, evaluating any ongoing managerial involvement and discharging obligations thereby ensuring that all of the provisions of International Accounting Standard 18, *Revenue* ("IAS 18") have been satisfied.

As part of the Q1 2011 report to the Audit Committee, we communicated to you the key revenue deals for that quarter. The most significant (> $3 million) licence revenues recognised in Q2 2011 are summarised in the table below.

| Customer/(End user) | Page | Software provided | Nature of the licence | Licence revenue |
|---|---|---|---|---|
| Iron Mountain | 3 | IDOL | Perpetual | $7.0 million |
| Iron Mountain | 4 | Compliant archive | Prepaid royalty | $9.5 million |
| Microtech (Hewlett Packard) | | Compliant archive | 5 year term | $7.0 million |
| Capax Global (UBS) | | Consolidated Archive | Perpetual | $7.7 million |
| Discover Tech (Abbott Labs) | See below | eDiscovery (IMD) | 2.5 year term | $9.0 million |
| Discover Tech (Dell-Hyatt) | See below | Server backup (IMD) | 5 year term | $5.3 million |
| Metropolitan Life | | Compliant archive | Term extension | $5.5 million |
| US Postal Service | 6 | eDiscovery | 2 year term | $5.3 million |
| National Bank of Canada | | Consolidated Archive | 5.5 year term | $3.0 million |
| | | | | **$59.3 million** |

### Sales to Discover Technologies LLC of IMD software

In the quarter there have been two significant sales of the recently acquired IMD software by Autonomy to Discover Technologies LLC.

The first was a $9 million 2 ½ year term licence for the Stratify Legal Discovery product allowing the end user Abbott Laboratories to store up to 10 TB of data from up to 250 users.

The second was a $5.3 million 5 year term licence for the LiveVault server backup software allowing the end user Dell (as the preferred information technology supplier to Hyatt) to store up to 250 TB of data.

Both of these sales reflect the fact that by the end of Q2 2011 the IMD products had been fully integrated into Autonomy's core IDOL platform and these sales represent the type of opportunity that management believes exists for large scale applications of the newly acquired products amongst large multinational organisations.

DEL00036237

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 2013-0007

# 1.  Key risks

| Revenue recognition (continued) | |
| --- | --- |
| Deloitte response | **Application of IFRS and review work performed**<br><br>Our review of revenue contracts was designed to select large contracts, those containing non-standard terms, as well as a sample of other contracts. Our review work noted that revenue recognition continues to be consistently applied in comparison with previous periods and in accordance with Group accounting policies and IFRS. For each contract selected, we examined the terms and conditions of the contract to ensure that no unusual circumstances existed which might impact the recognition of revenue. We ensured that amounts recognised could reasonably be expected to be recoverable by inspecting payment history or credit checks where relevant. Furthermore, where ongoing managerial involvement is necessary, the carve out rate for revenues deferred were recalculated to ensure they were in line with Autonomy's standard carve out rates for support and maintenance and support services, where relevant.<br><br>For all deals over $1 million we issued revenue confirmation requests direct to the customer. In addition to us receiving third party confirmations, management has confirmed (and we will ask the Board to represent to us) that no revenue deals contained side letters or ongoing Autonomy performance requirements that were separate from the signed sales contracts.<br><br>In assessing the appropriateness of revenue recognition in the quarter, management has applied judgement in the following area:<br><br>• There are strong indicators from the US Postal Service's ("USPS") most recent financial report that the company has significant liquidity constraints due to the need to make $6.7 billion of employee benefit payments to the US Government in the foreseeable future. Despite that fact, management is satisfied that the amount of $5.3 million due from USPS is recoverable on the basis that whilst the company does have some liquidity constraints, the company reported cash of $0.9 billion at 31 March 2011 and is of a sufficient size to meet the required payments under this agreement, the first of which ($3.3 million) is due at the end of July. In addition, management is of the view that the US Government is highly unlikely to allow USPS to fail.<br><br>We concur with management's treatment of revenue recognition. |

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036238

Exh 2013-0008

# 1.  Key risks

### Sales to significant Value Added Resellers

**Sales to the three largest Value Added Resellers contributed revenue of $28.6 million in Q2 2011 and $52.1 million in H1 2011**

In Q2 2011 there have been four licence deals in excess of $1 million (Q1 2011: six) sold through the three largest Value Added Resellers, which in aggregate account for revenues of $28.6 million (Q1 2011: $23.5 million). The revenues were recognised between these resellers as follows: Discover Technologies LLC ("Discover Tech"): $13.9 million (Q1 2011: $5.4 million); Capax Global ("Capax"): $7.7 million (Q1 2011: $13 million); and Microtechnologies LLC ("Microtech"): $7 million (Q1 2011: $5.1 million).

At 30 June 2011, total amounts due from these resellers (including sales to them for their own use) was $73.5 million (31 March 2011: $54.7 million, 31 December 2010: $41.4 million), which accounts for 24% of the Group trade receivables balance (31 March 2011: 21%).

The graph below outlines the total quarterly accounts receivable balance for these resellers and the projected balance, which assumes the receipt of future payments on their due dates:



Of the total amount outstanding at 30 June 2011, $7.8 million was overdue > 90 days (31 March 2011: $8.5 million); $2.3 million of that balance relates to the amount due from Microtech on the sale to the Vatican (see page 9 for further details). Cash from these customers received in the quarter was $10.3 million (Q1 2011: $19.3 million). Per their contractual payment terms, amounts due from these resellers in Q3 2011 is $36.1 million (as shown above in the projected movement from Q2 2011 to Q3 2011).

Over the past several years Autonomy has built up key strategic relationships with each of these VARs and, since 2009, over $128 million of sales have been recognised to these three resellers. In addition, these VARs from time to time provide goods and services to Autonomy in areas such as marketing assistance, product support and OEM software. During the quarter Autonomy has paid Capax approximately $3 million for support fees in respect of EAS and EDD, $2 million for support fees in relation to the newly acquired Nearpoint software, and $0.9 million for marketing assistance services in managing the Bank of America relationship. Autonomy has also paid Discover Tech $4.4 million for a DiscoverPoint software licence that allows it to on sell up to 800 instances of that software to new and existing IDOL customers. This licence purchase is discussed in more detail on page 13.

Management continues to monitor the Group's exposure to these resellers and assesses the likelihood of collectability when considering the appropriateness of revenue recognition on sales to these resellers.

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036239

Exh 2013-0009

# 1.  Key risks

| Sales to significant Value Added Resellers (continued) |
| --- |

| **Deloitte response** | Management should continue to monitor the amounts due from these resellers to ensure that payments continue to be made in line with their payment terms and that upfront revenue recognition continues to be appropriate. |
| --- | --- |
| | We note that cash of approximately $80 million has been received from these VAR's over the last two years. |
| | As part of our review procedures we have reviewed the transactions between Autonomy and the VARs to ensure that the relevant approvals were received from the CFO and CEO of the Group before payment was made. We have also reviewed the terms of the agreements with the VARs to ensure that there is no linkage to the licence sales made by Autonomy in the quarter and that the transactions would have been conducted at arm's length; this has been corroborated through the receipt of revenue confirmations received from Capax and Discover Tech stating that there are no side agreements relating to the licence revenue deals. |
| | Given the level of cash received from these VARs in the quarter and the fact that management is working to receive payment on the outstanding amounts, we concur with management's judgement around the recognition of revenue on sales to these VARs. We note that management should continue to review this position carefully on an ongoing basis, specifically in relation to the receipts totalling $36.1 million expected to be received in Q3 2011. |
| | Based on our discussions with management and our review of both the licence deals and purchases made during the quarter, we concur with management's conclusion that these transactions are independent of one another. We also conclude that the transactions would appear to be conducted at arm's length. |

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036240

Exh 2013-0010

# 1.  Key risks

### Provision for doubtful debts

**In Q2 2011 management has posted an additional provision of $6 million in response to the increase in amounts overdue by > 180 days**

**Accounts receivable ageing and provisioning**

The net accounts receivable balance at 30 June 2011 is $299.8 million (31 March 2011: $263.2 million, 31 December 2010: $267.6 million), which includes $34.2 million of acquired trade debtors associated with IMD. Excluding the impact of IMD accounts receivable has increased by $2.4 million since 31 March 2011.

The bad debt provision at 30 June 2011 stands at $42.5 million (31 March 2011: $26.9 million, 31 December 2010: $29.3 million), which includes $12.4 million in relation to IMD. The bad debt charge for the quarter was $6.9 million, which is up significantly from $2.3 million in Q1 2011 and $3.3 million in Q4 2010. This increase in the current quarter bad debt charge is driven by a further provision of $6 million made by management against overdue Latin American and Italian debtors.

| Debtor category | Gross balance $'m | Provision $'m | Net exposure $'m |
|---|---|---|---|
| Large multinationals/other VARs | 248.1 | (30.7) | 217.4 |
| Significant VARs | 73.5 | - | 73.5 |
| Latin American debtors | 11.6 | (7.9) | 3.7 |
| Italian debtors* | 9.1 | (3.9) | 5.2 |
| **Total accounts receivable** | **342.3** | **(42.5)** | **299.8** |

*In addition to the provision shown above, there is also a deferred revenue offset of $1.5 million in relation to the Italian debtors, bringing net exposure down to $3.7 million

**Cash collection and non-recourse sales of receivables**

Cash collection in Q2 2011 has been $224.0 million, which has decreased from $228.2 million in Q1 2011 and $193.8 million in Q4 2010. This compares to revenue in Q1 2011 of $219.8 million, meaning cash collection has been 102% of the prior quarter's revenue.

Cash received in the quarter from the non-recourse sale of receivables was $26.4 million (Q1 2011: $20 million; Q4 2010: $12.3 million).

DSOs have increased from 94 days in Q4 2010 to 100 days in Q2 2011, which is down from 102 days in Q1 2011. This decrease from Q1 2011 has been driven by a combination of further provisioning by management and strong cash collection in the quarter. We note that extended payment terms in excess of 90 days are still being given on licence sales and this is likely to mean that DSOs will increase over the remainder of the year until overdue amounts are recovered and payment terms offered are able to return to normal levels, i.e. ranging between 30 – 90 days.

Management continues to apply a detailed approach to credit control with increased scrutiny around each quarter end over potential exposure and the need to make a provision.

**Microtechnologies LLC ("Microtech")**

We reported in Q1 2011 that $7.0 million remained outstanding from Microtech relating to the $11.0 million licence deal where the end user is the Vatican. In total $4.7 million has been received from Microtech during Q2 2011, bringing the amount outstanding at 30 June 2011 to $2.3 million. Management considers the cash received in the quarter to be good evidence of Microtech's liquidity and it remains confident that payment will be received on the remaining amount in due course.

We concur with management's view that no provision is required against the remaining balance.

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036241

Exh 2013-0011

# 1.  Key risks

**Provision for doubtful debts (continued)**

**Italian value added resellers**

As a result of management making a further provision of $2.3 million against overdue amounts from Italian value added resellers, the residual exposure on large contracts outstanding from this territory has reduced to $3.7 million (31 March 2011: $6 million; 31 December 2010: $7 million). No cash has been received during the quarter.

The principal amounts outstanding are Sales Consulting S.r.l. ($0.9 million net owing from 2009 sales), Red Ventures ($1.9 million owing from a sale completed in Q3 2010) and Auxilium ($0.9 million owing from a sale completed in Q3 2010). Management is continuing to push for payment on these overdue amounts and considers the current level of provision to be adequate.

We are pleased to note the additional provision made, but continue to propose adjustments against the remaining $3.7 million exposure, given the lack of cash receipts.

We also reflect the fact in our adjustment schedule that the additional provisions made in the quarter relate, in our view, to earlier periods.

**Latin American debts**

As a result of management making a further provision of $2.7 million against overdue amounts from Latin America, the residual exposure on large contracts outstanding from this territory is $3.7 million (31 March 2011: $6.6 million; 31 December 2010: $7.0 million). The principal amounts outstanding are Comercializadora Cobal ($1.8 million owing from sales completed in Q3 and Q4 2010), AS Computadoras y Servicios ($0.5 million owing from a sale completed in Q4 2009) and Integracion de Negocios ($1.3 million owing from sales completed between Q2 2008 and Q1 2010). During the quarter the only cash received was $0.2 million received from Integracion de Negocios. Management is continuing to push for payment on these overdue amounts.

We are pleased to note the additional provision made, but continue to propose adjustments against the remaining $3.7 million exposure, given the lack of cash receipts.

We also reflect the fact in our adjustment schedule that the additional provisions made in the quarter relate, in our view, to earlier periods.

**Novartis**

We reported to you in Q1 2011 that an amount of $2.5 million was outstanding from Novartis, following a licence breach by Novartis, which triggered the invoicing of additional licence fees by Autonomy. A meeting took place in May between executive management (including the Group's COO) and Novartis to progress the matter and following that meeting another meeting has been scheduled for late July 2011 to try and reach a final settlement. Management has not provided against this amount as they are confident that payment of at least $2.5 million will be received in due course.

Management will update us at the Audit Committee meeting as to the progress made to date at recovering this amount.

**JP Morgan Chase**

Amounts owed by JP Morgan Chase in excess of 180 days overdue total $3.4 million at 30 June 2011. These relate to sales made in Q3 2010 which were due for payment in early Q4 2010. This delay in payment is due to the time taken for JP Morgan Chase to approve the payment internally and management has been working with JP Morgan Chase to resolve this payment issue. As such, it remains confident that payment will be received in due course. Note that $7.3 million has been received from JP Morgan Chase during Q2 2011 against previously overdue amounts.

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036242

Exh 2013-0012

# 1.   Key risks

**Provision for doubtful debts (continued)**

|  | **Realise Limited** |
| --- | --- |
|  | At 30 June 2011 amounts overdue from Realise by more than 180 days totalled $2.1 million. This overdue amount relates to a sale made to Realise in Q2 2010 for on-sale to Credit Suisse and was due for payment in Q3 2010. As management has a close working relationship with Realise Limited (Autonomy holds a minority shareholding in the company), it is confident that payment will be received in due course given its knowledge of the deal with the end user. |
| **Deloitte response** | We have reviewed customer correspondence, payment histories and cash collections which support the conclusions reached by management, except where stated above. |
|  | In addition to the individually significant amounts outlined above, we note that there is approximately $8.8 million in aggregate of smaller debts which are more than 180 days overdue (31 March 2011: $4.6 million; 31 December 2010: $5.8 million). The increase in this overdue balance from 31 March 2011 is due to the increased ageing of these smaller balances. As part of their provisional acquisition fair value accounting, management has provided for all IMD debtors overdue by more than 90 days as these amounts are not deemed to be recoverable. We encourage continued strong management focus on all overdue debts in Q3 2011. |
|  | **Conclusion** |
|  | The provisioning of doubtful debts is clearly a highly judgemental area and management approaches the process in a diligent manner. Historically Autonomy has had slow paying customers, and has had a good track record of being paid, and a relatively low bad debt history. |
|  | However, as previously reported to you in Q4 2010 and Q1 2011, our work has led us to believe that a larger provision would be prudent and we are pleased to note that management has increased their overall bad debt provision this quarter by $6 million, providing against some of the key outstanding amounts reported previously. In addition to the potential adjustments noted above, we note that the ageing of debt has continued to worsen. |
|  | We accept that the magnitude of any additional provision, as indicated by our potential adjustments, would not be material to the balance sheet taken as a whole. |
|  | Given the level of judgement involved in applying bad debt provision against a large number of significant debts, together with the growth and current size of the Group, we recommend that management considers implementing a more structured provisioning policy and we would be happy to discuss this with them in due course. |

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036243

Exh 2013-0013

# 2.   Other matters

| Strategic hardware sales | |
|---|---|
| **Strategic hardware sales contributed revenue of $20.9 million in Q2 2011 and $41.0 million in H1 2011** | Hardware revenues for the quarter were $20.9 million (Q2 2010: $27.5 million; Q1 2011: $20.1 million), made up of new sales of $16 million and a release from deferred revenue of $4.9 million. Hardware revenues for the half year were $41.0 million (H1 2010: $39.7 million). This represents approximately 8% of the Group's revenues for Q2 2011 and 9% of the Group's revenues for H1 2011. |
| | The most significant hardware revenues recognised in Q2 2011 were with SHI International Corporation (on behalf of Bank of America) ($8.8 million), JP Morgan Chase ($5.7 million), Bank of New York Mellon ($3.1 million) and Amulet Hotkey ($2.3 million). |
| | Consistent with the hardware sales discussed in previous quarters' reports to the Audit Committee, these strategic sales to major purchasers of software (now and in the future) have been made at a small loss. |
| | Management has taken all of the costs associated with these hardware sales to cost of sales with the exception of the loss of approximately $2.5 million, which has been allocated to sales and marketing expenses on the basis that these sales are only made at a loss in order to procure further, profitable software sales. As discussed and agreed at the year end Audit Committee meeting, no adjustment has been made to impute a normal level of profit on such sales. The total loss recognised within sales and marketing expense for the half year was $4.5 million. |
| | Management has further extended its analysis determining the strong linkage between the loss making hardware sales and subsequent highly profitable software sales. This continues to show a high degree of correlation between hardware sales and much more profitable licence sales to the same companies. |
| **Deloitte response** | We have reviewed management's analysis of the linkage between the loss making strategic hardware sales and subsequent profit making software sales and given the scale and consistency in allocation with the prior quarters, accept the decision taken by management to allocate the loss to sales and marketing expense. |

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036244

Exh 2013-0014

# 2.   Other matters

| **Purchase of DiscoverPoint software from Discover Technologies LLC** | |
|---|---|
| DiscoverPoint software was purchased in the quarter for $4.4 million in order to secure licence sales of $10.5 million | During Q2 2011 Autonomy purchased a $4.4 million perpetual reseller licence from Discover Technologies LLC for their product DiscoverPoint. This purchase was made such that Autonomy could complete a number of IDOL based licence revenue sales with Bloomberg, National Bank of Canada and MetLife, who all required the advanced Microsoft SharePoint connectivity provided by the DiscoverPoint product and not currently offered by the Autonomy products they were purchasing. Licence revenues subsequently generated from the above sales totalled $10.5 million. |
| | As the above sales utilised all of the allowable instances of DiscoverPoint that Autonomy was allowed to re-sell under the licence agreement, the cost of this licence has been expensed. |
| | Given the intrinsic nature of this licence purchase to the ultimate licence sales made by Autonomy, this cost is considered to be a direct cost of sale and has been recorded within cost of sales. |
| Deloitte response | As part of our review procedures we have obtained and reviewed the DiscoverPoint software licence agreement and we have traced the amount, which was paid in the quarter, to appropriate authorisations and bank payment. |
| | To understand the technical and commercial rationale of this purchase and the linkage with the sales noted above, we have held discussions with the Group's Chief Research Officer and other members of management where appropriate. |
| | We concur with management's accounting treatment. |

| **Capitalisation of research and development expenditure** | |
|---|---|
| Development costs of $11.1 million have been capitalised in the quarter | During the quarter a total of $11.1 million of software development costs has been capitalised (Q2 2010: $9.8 million). The amortisation charged for the quarter amounted to $5.7 million (Q2 2010: $3.9 million). The amount capitalised in the quarter included approximately $1 million in relation to the development of the new Aurasma product. |
| Deloitte response | We have tested a sample of costs capitalised in the quarter and have verified that the criteria of IAS 38 have been satisfied. As part of our work we have held a discussion with the Group's Chief Research Officer to understand the numerous development projects and how economic benefits are to be derived from each. |
| | We understand that over 1 million free downloads of Aurasma have taken place since its launch and that a number of developer/OEM contracts have been signed with advertising companies. Based on data supporting the potential value of the Augmented reality market, management's view is that it is probable that sufficient future economic benefits will be derived from this product to support the carrying value of the costs capitalised. Based on our review of this market data we concur with management's view. |
| | Management should continue to review the amounts capitalised in relation to Aurasma to ensure that the criteria of IAS 38 continue to be met with regards the probability of deriving sufficient future economic benefits to support the carrying value of the intangible asset. Management should also consider the period over which they will amortise this intangible and ensure that amortisation commences at the point revenue starts to be generated. |

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036245

Exh 2013-0015

# 3.  Taxation

## Effective tax rate ("ETR")

| The 2011 projected ETR is 26.0%, increased from 2010 as the one-off recognition of US tax losses is not repeated | | 2010 | Q1 2011 | Q2 2011 |
|---|---|---|---|---|
| | UK corporation tax rate | 28.0% | 26.5% | 26.5% |
| | Tax effect of non-deductible expenses | 0.4% | 0.4% | 0.4% |
| | Tax effect of non-taxable income | (1.2%) | (1.1%) | (1.4%) |
| | Research and Development tax credits | (1.2%) | (1.2%) | (1.6%) |
| | Recognition of tax losses (s382 study) | (5.8%) | - | - |
| | Other differences (including tax provision) | 1.3% | 0.2% | (0.4%) |
| | Effect of overseas tax rates | 1.5% | 2.2% | 2.5% |
| | Effective tax rate for the year | 23.0% | 27.0% | 26.0% |

The key drivers which impact the current year ETR have been reviewed and discussed with management. These are broadly as expected, with the additional reduction in the main rate of UK corporation tax from 1 April 2011 to 26% announced in this year's budget.

As a result of the revision to the ETR for the full year, the ETR for Q2 2011 is 25.0% (Q2 2010: 22%), bringing the overall ETR for H1 2011 in line with the full year estimate of 26.0%.

**Deloitte response**

The full year ETR per management's tax workings is 26.0% (Q1: 27.0%). The principal movements in the effective tax rate from last year are set out above. We would draw your attention to the following key points:

- The benefit of the US financing structure is expected to increase as a result of the additional amounts added in respect of financing the Iron Mountain Digital acquisition.
- The UK deduction for R&D has increased in line with the revised draft of the claims to be included in the 2010 UK corporation tax returns and the continuing increase in R&D expenditure.

These movements are consistent with our expectations and our review of the tax workings.

## Tax Provision for US Transfer Pricing

**The tax provision expected at 31 December 2011 is $7.5 million in respect of potential future US enquiries into the Group's transfer pricing**

The brought forward tax provision, as at 31 December 2010, is $7.5m in respect of potential historical transfer pricing exposures, comprising:

- $1.2m in respect of the adoption of the transfer pricing process in 2007;
- $6.3m based on a sensitivity analysis using an increase in US taxable profits of approximately 15% for the 2008-2011 years.

**Deloitte response**

Whilst the transfer pricing documentation work done supports the overall levels of US profitability, the tax provision established does not appear unreasonable as a prudent measure in respect of a potential US tax authority enquiry into the Group's transfer pricing.

Management should continue to provide for the potential exposure on a consistent basis until it is appropriate to begin releasing the provision for older years or following the conclusion of an enquiry by the IRS.

The transfer pricing documentation for the 2007-2009 years remains to be finalised and this should be concluded in Q3 2011. Further consideration should also be given to extending the analysis to cover the 2010-2011 periods and the Iron Mountain Digital acquisition.

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036246

Exh 2013-0016

# 3. Taxation

| Tax compliance and management | |
|---|---|
| **Late filings in the UK and completion of transfer pricing documentation** | The Group has a relatively complex tax profile, with major operations in the UK and US. It operates relatively sophisticated transfer pricing policies. |
| | In addition, the Group is acquisitive, buying and integrating businesses. |
| | The Group are currently late in making tax filings in respect of the Senior Accounting Officer ("SAO") in the UK. The position is expected to be remedied by the end of the month. |
| **Deloitte response** | The delay in completing the transfer pricing documentation and the SAO filings are indicative of a lack of resource within the finance function to deal with all taxation matters. |
| | We consider that it is important for management to recruit suitable resource. This has been previously agreed by management but not yet implemented. |

| Iron Mountain Digital | |
|---|---|
| **Cash tax benefits are expected from the Iron Mountain Digital structuring, but no impact on ETR** | The tax structuring of the Iron Mountain Digital acquisition is expected to result in a cash tax benefit in respect of UK tax deductions available for the goodwill and intangibles acquired in the UK. |
| **Deloitte response** | Management is in the process of finalising the valuation of the Iron Mountain Digital acquisition, which will inform the calculation of the corresponding current tax benefit. |
| | We understand that this will be completed during Q3 2011, but is not expected to significantly impact the effective tax rate, as any current tax benefits will be offset by corresponding deferred tax movements. |

DEL00036247

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 2013-0017

# 4.  Presentation in the half-yearly financial report

As outlined in our introduction, we have not yet completed our review of the 2011 half-yearly financial report, but we would like to draw your attention to the following item at this stage.

## Disclosures around the IMD acquisition

| | |
|---|---|
| **Description** | International Accounting Standard 34 ("IAS 34"), *Interim financial reporting* requires that, if a business combination has occurred during the interim period, then the entity must disclose all of the details prescribed for annual financial statements by International Financial Reporting Standard 3 ("IFRS 3") (2008). |
| | IFRS 3 (2008) requires that the acquirer should disclose information that enables users of its financial statements to evaluate the nature and financial effect of a business combination that occurs during the reporting period. In particular, disclosure must be given on the following areas: |
| | • Details of the business combination; |
| | • A qualitative description of the factors that make up the goodwill recognised; |
| | • Details of the fair value of the consideration transferred at the acquisition date; |
| | • Details of the assets and liabilities acquired as part of the business combination; |
| | • The amounts of revenue and profit of the acquiree since the acquisition date included in the consolidated statement of comprehensive income for the reporting period; and |
| | • The revenue and profit of the combined entity for the current reporting period as though the acquisition date had been as of the beginning of the reporting period. |
| | Given that the acquisition was only completed on 3 June 2011, a number of ongoing elements such as finalisation of the opening balance sheet working capital adjustment means that it is not possible for management to make all of the above disclosures in the H1 2011 interim condensed financial statements. However, management will include in the note to the interim condensed financial statements a description of the nature of the business combination along with narrative outlining the following key metrics: |
| | • Total consideration (excluding working capital adjustment) of $400.9 million; |
| | • Total net assets acquired of $205.0 million, which includes a provisional estimate of intangible assets of $200.0 million; and |
| | • Provisional goodwill recognised of $195.9 million. |
| | As is consistent with disclosures made around previous acquisitions, management will also outline the fact that it is not practicable for them to determine the effect of the acquisition for the period from the acquisition to the end of the financial period, as the Group's core IDOL product has been integrated into the acquired software, meaning it is no longer practicable to determine the portion of the result that specifically relates to the acquired business on a stand-alone basis. |
| **Deloitte response** | Given the short time period between the acquisition date and the half year end, and the way in which the Group integrates its core IDOL technology into acquired businesses, we concur with management's proposed disclosures for the H1 2011 interim condensed financial statements. |
| | Management will make reference in the notes to the interim condensed financial statements that the short time period since the acquisition has meant they are unable to make full disclosures about the acquisition at this stage. |
| | Our audit of the opening balance sheet of IMD and the management's finalisation of the provisional acquisition accounting will take place before Q3 2011 and we will update you on the progress of that work as part of our Q3 report to the Audit Committee. |

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036248

Exh 2013-0018

# 5.  Accounting and internal control systems

## Control observation

During the course of our review we identified two significant control observations, which are detailed below.

| Ability of the Group's financial accounting systems to cope with the enlarged size of the Group | |
|---|---|
| Description | We noted through our quarterly planning processes that the integration of the acquired IR Digital group was completed in an efficient timeframe and a number of key logistical and operational systems were transferred across to Autonomy systems effectively pre quarter end. |
| | We did however note that due to the increased transactional volumes experienced from a finance perspective, a number of reports took longer to produce due to the reliance on manual reconciliations. |
| Recommendation | We recommend that a review of the accounting systems and procedures be performed to ensure that the relevant systems in place are sufficient to process the volume of data expected now that the group has expanded in size. |
| Management response | Management is in the process of undertaking this review. |

| Recording of cash receipts around quarter end | |
|---|---|
| Description | We noted through our quarterly review of bank reconciliations that a number of cheques dated pre quarter end apparently came under Autonomy's control post quarter end. |
| Recommendation | We recommend that where cheque payments are due to be collected at the end of a quarter, management ensures that there is evidence to support the fact that the cheques were under the Group's control at quarter end. |
| Management response | Management accept this point and will alter their procedures going forward to ensure that evidence is retained to support the fact that the cheques were under the Group's control at quarter end. |

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036249

Exh 2013-0019

# 6.   Responsibility statement

While our report includes suggestions for improving accounting procedures, internal controls and other aspects of your business arising out of our procedures, we emphasise that our work was performed with regard to our responsibilities under ISRE (UK & Ireland) 2410 'Review of interim financial information'. We make these suggestions in the context of our review but they do not in any way modify our opinion which relates to the financial information included in the half-yearly financial report as a whole.  Equally, we would need to perform a more extensive study if you wanted us to carry out a comprehensive review for deficiencies in existing systems and present detailed recommendations to improve them.

This report has been prepared for the Board of Directors, as a body, and we therefore accept responsibility to you alone for its contents.  We accept no duty, responsibility or liability to any other parties, since this report has not been prepared, and is not intended, for any other purpose. It should not be made available to any other parties without our prior written consent.

**Deloitte LLP**
Chartered Accountants
Cambridge
24 July 2011

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036250

Exh 2013-0020

# Appendix 1: Potential adjustments

| | Credit/ (charge) to Q2 2011 income statement $'m | Credit/ (charge) to H1 2011 income statement $'m | Increase/ (decrease) in net assets $'m | Credit/ (charge) to previous years' income statements $'m |
|---|---|---|---|---|
| **Factual misstatements** | | | | |
| Provision against recoverability of Italian and South American debtors* | 2.0 | 2.2 | (3.6) | (5.8) |
| Provision against recoverability of Telematica Lefic | (0.7) | (0.7) | (0.7) | - |
| Fair value carve out adjustment on MetLife, USPS, Discover Tech (Abbott Labs) and Johnson & Johnson | (0.1) | (0.5) | (0.5) | - |
| Discounting revenue for payment terms > 1 year | - | (0.2) | (0.2) | - |
| Adjustment to costs incorrectly recognised in Q1'11** | | 0.7 | (0.4) | (1.1) |
| **Total known misstatements (pre-tax)** | **1.2** | **1.5** | **(5.4)** | **(6.9)** |
| **Tax effect (27%)** | (0.3) | (0.4) | 1.5 | 1.9 |
| **Total known misstatements (post-tax)** | **0.9** | **1.1** | **(3.9)** | **(5.0)** |
| **Judgemental misstatements** | | | | |
| Provision against recoverability of Italian and South American debtors*** | 1.9 | 1.9 | (3.7) | (5.6) |
| Provision against recoverability of Zenith Gulf Security | (0.4) | (0.4) | (0.4) | - |
| Provision against recoverability of Skymedia Srl | (0.3) | (0.3) | (0.3) | - |
| Provision against recoverability of Knowledge Capital | - | (0.8) | (0.8) | - |
| Fair value carve out adjustment on Serious Fraud Office, IMD and Johnson & Johnson | (1.1) | (1.4) | (1.4) | - |
| Adjustment to write off share option NI capitalised into R&D | (0.3) | (0.3) | (0.3) | - |
| Adjustment to Mercedes sponsorship costs | 0.8 | 1.6 | 0.6 | (1.0) |
| Correction for revised approach to R&D Capitalisation | - | - | 1.7 | 1.7 |
| **Total judgemental misstatements (pre-tax)** | **0.6** | **0.3** | **(4.6)** | **(4.9)** |
| **Tax effect (27%)** | (0.2) | (0.1) | 1.2 | 1.3 |
| **Total judgemental misstatements (post-tax)** | **0.4** | **0.2** | **(3.4)** | **(3.6)** |
| **Total misstatements (pre-tax)** | **1.8** | **1.8** | **(10.0)** | **(11.8)** |
| **Total misstatements (post-tax)** | **1.3** | **1.3** | **(7.3)** | **(8.6)** |

*This amalgamates our potential adjustments against amounts due from Auxilium, Sales Consulting, AS Computadoras and Integracion de Negocios.

**This amalgamates the following potential adjustments reported to you in Q1 2011: Dynamo costs, Morgan Stanley FX difference and accrual for CFO/CEO bonuses.

***This amalgamates our potential adjustments against amounts due from Comercializadora Cobal and Red Ventures S.r.l.

DEL00036251

Confidential pursuant to Securities Exchange Act s.24(d).

Exh 2013-0021

# Appendix 1: Potential adjustments

We have identified a cash flow statement reclassification which decreases net cash used in investing activities and cash generated by operations by $2 million.

We will obtain written representations from the Board of Directors confirming that after considering all these uncorrected items, both individually and in aggregate, in the context of the consolidated financial statements taken as a whole, no adjustments are required.

We only report to you uncorrected misstatements that are not clearly trivial which includes greater than $0.1 million for Q2 2011 and $0.2 million for H1 2011.

**Confidential pursuant to Securities Exchange Act s.24(d).**

DEL00036252

Exh 2013-0022

# Appendix 2: Draft management representation letter

*(Autonomy Letterhead)*

*Address*

*Our Ref: NJM/LPW*                                                           *Date: [ ]*

Dear Sirs

**Review of interim financial information of Autonomy Corporation plc**

This representation letter is provided in connection with your review of the balance sheet of Autonomy Corporation plc as of 30 June 2011 and the related statements of income, changes in equity and cash flows for the three and six month period then ended and a summary of the significant accounting policies and other explanatory notes for the purposes of expressing a conclusion whether anything has come to your attention that causes you to believe that the interim financial information does not give a true and fair view of the financial position of Autonomy Corporation plc as at 30 June 2011, and of its financial performance and its cash flows in accordance with International Accounting Standard 34 as adopted by the European Union and the Disclosure and Transparency Rules of the United Kingdom's Financial Services Authority. We acknowledge our responsibility for the fair presentation of the interim financial information in accordance with International Accounting Standard 34 as adopted by the European Union and the Disclosure and Transparency Rules of the United Kingdom's Financial Services Authority.

We confirm, to the best of our knowledge and belief, the following representations:

**General representations**

1.   The interim financial information referred to above has been prepared and presented in accordance with International Accounting Standard 34 as adopted by the European Union and the Disclosure and Transparency Rules of the United Kingdom's Financial Services Authority.

2.   We have made available to you all books of account and supporting documentation, and all minutes of meetings of shareholders and the board of directors.

3.   There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial information.

4.   There has been no known actual or possible noncompliance with laws and regulations whose effects required consideration when preparing the interim financial information or that could have a material effect on the interim financial information in the event of noncompliance.

5.   We acknowledge responsibility for the design and implementation of internal control to prevent and detect fraud and error.

6.   We have disclosed to you all significant facts relating to any known frauds or suspected frauds that may have affected the entity.

7.   We have disclosed to you the results of our assessment of the risk that the interim financial information may be materially misstated as the result of fraud.

8.   We believe the effects of uncorrected misstatements summarized in the accompanying schedule are immaterial, both individually and in the aggregate, to the interim financial information taken as a whole. A summary of such items is attached at Appendix 1.

9.   We confirm the completeness of the information provided to you regarding the identification of related parties.

10.   We confirm that the interim financial information has been prepared on the going concern basis. We do not intend to liquidate the company or cease trading as we consider we have realistic alternatives to doing so. We are not aware of any material uncertainties related to events or conditions that may cast significant doubt upon the company's ability to continue as a going concern. We confirm the completeness of the information provided regarding events and conditions relating to going concern at the date of approval of the interim financial information, including our plans for future actions.

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036253

Exh 2013-0023

# Appendix 2: Draft management representation letter

11. Where relevant, the assumptions used in the presentation and measurement of fair values reflect our intent and ability to carry specific courses of action on behalf of the entity.

12. The entity has satisfactory title to all assets and there are no liens or encumbrances on the entity's assets.

13. We have recorded or disclosed, as appropriate, all liabilities, both actual and contingent.

14. No events have occurred subsequent to the balance sheet date and through the date of this letter that may require adjustment to or disclosure in the aforementioned interim financial information.

**Specific representations**

*Revenue recognition*

15. We confirm that based on our experience and judgement five per cent continues to represent the fair value of the maintenance and support services provided on greater than $1 million licence deals, unless a higher percentage is stated in the signed agreement. We have therefore used a five percent "carve out" rate for such larger sales, unless otherwise stated in the agreement.

16. No revenue deals contained side letters of ongoing Autonomy performance requirements that were separate from the signed sales contracts.

*Recoverability of trade receivables*

17. We have assessed the recoverability of the amount due from Novartis, Realise and in respect of the Italian and South American debtors noted in your report to the Audit Committee dated 23 July 2011, and are satisfied that the amounts are recoverable in full and that no provision is required at this stage.

*Classification of costs*

18. The directors confirm that the allocation of associated costs in respect of strategic hardware sold between "cost of goods sold" and "sales and marketing expense" appropriately reflect the nature of these costs.

We confirm that the above representations are made on the basis of adequate enquiries of management and staff (and where appropriate, inspection of evidence) sufficient to satisfy ourselves that we can properly make each of the above representations to you.

_____

Director

For & on behalf of Autonomy Corporation plc

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036254

Exh 2013-0024

Confidential pursuant to Securities Exchange Act s.24(d).

DEL00036255

Exh 2013-0025

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited ("DTTL"), a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see www.deloitte.co.uk/about for a detailed description of the legal structure of DTTL and its member firms.

Deloitte LLP is the United Kingdom member firm of DTTL.

© 2011 Deloitte LLP. All rights reserved.

Deloitte LLP is a limited liability partnership registered in England and Wales with registered number OC303675 and its registered office at 2 New Street Square, London EC4A 3BZ, United Kingdom. Tel: +44 (0) 20 7936 3000 Fax: +44 (0) 20 7583 1198.

**Member of Deloitte Touche Tohmatsu Limited**

**Confidential pursuant to Securities Exchange Act s.24(d).**

DEL00036256

Exh 2013-0026