# EXHIBIT 7

**EXHIBIT 8231**



**Ernst & Young LLP**
Compass House
80 Newmarket Road
Cambridge CB5 8DZ

Tel: 01223 557000
Fax: 01223 557001
www.ey.com/uk

## Internal memorandum

To:        The Files of Hewlett-Packard EMEA                    11 November 2011

From:      Adam Milburn-Smith & Gwennan Oakes

Cc:        Marcus Butler & Rebecca Norris

Subject:   **Autonomy – Audit File Review**

### Purpose

In August 2011, HP made an offer to the shareholders of Autonomy Corporation plc ("Autonomy") to acquire the issued share capital of Autonomy for £25.50 per share resulting in an acquisition price of $10.3bn. Following shareholder acceptance, HP acquired control of Autonomy on 3 October 2011.

Upon instruction from the US Primary Team, as part of the opening balance sheet procedures we performed a review of the Deloitte audit working papers for the year ended 31 December 2010, under the provisions of a hold harmless letter. The review of the work papers was undertaken by Adam Milburn-Smith and Gwennan Oakes (both Senior Managers), Marcus Butler (HP UK Partner) and Rebecca Norris (HP EMEA Partner) at the Deloitte Cambridge offices on 2 – 4 November 2011 inclusive.

This memorandum sets out the key audit and accounting areas identified from both the work paper review and discussions with Lee Welham (Senior Manager, Deloitte) and Tom Murray (Manager, Deloitte) and discusses the observations made by us during our review. The purpose of this memo is not to conclude on the appropriateness of Autonomy's accounting treatment under US GAAP nor IFRS. We document these areas for consideration during the audit procedures performed on Autonomy's opening balance sheet and any procedures performed over the policy harmonisation between HP and Autonomy.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London SE1 2AF, the firm's principal place of business and registered office.

‑ll ERNST & YOUNG                                                                    2

## Interaction with management and Audit Committee

- *Corporate governance and the tone at the top*
  Autonomy is an entrepreneurial business with the control environment managed from the UK, primarily by Mike Lynch (CEO), Sushovan Hussain (CFO) and Steve Chamberlain (VP Finance). All contracts with revenues in excess of $100k were reviewed in the UK either by Steve Chamberlain or Poppy Prentice (Financial Controller EMEA). The Audit Committee at Autonomy met with the auditors on a quarterly basis to discuss the findings from each of the quarterly reviews.

- *Recent Board Changes*
  Following analyst pressure the Audit Committee and the Board of Directors was expanded over the course of 2010 with the appointment of 2 non-executive directors (Jonathan Bloomer and Frank Kelly) and the appointment of a new chairman (Robert Webb). This led to an increase in the formalisation of the Audit Committee process and a more robust independent challenge to the board. We understand the intention was to increase the number of non-executive directors further during the course of 2011/12.

- *Whistle blowing and centralisation of key controls in UK*        *important*
  The control environment was further centralised in the UK during Q2 2010 when:
  - A payroll fraud amounting to $2.6m was identified in the US involving the collusion of a payroll and a finance clerk; and
  - The former US controller made various allegations through the whistle blowing channel surrounding revenue on contracts and management practices. The allegations were investigated by Deloitte who concluded that the claims were unsubstantiated.

- *Formalisation of policies and procedure*
  Due to the speed of growth of the group, policies and procedures have not been formally documented. However management believe that there are sufficient appropriate controls in place to mitigate the risk of material misstatements to the financial statements.

- *Consideration of US GAAP knowledge help by UK management*
  From discussions with Deloitte we understand the UK finance operation has limited US GAAP knowledge as the group financial statements were prepared under IFRS. However management had concluded that the key principals of US GAAP software revenue recognition were followed. The purpose of this memorandum is not to conclude on whether we concur with management assessment in relation to the principles of US GAAP and is documented here as an observation made from Deloitte.

**≡J ERNST & YOUNG**

## Overview of the audit process

- *Components*

  The audit procedures for the group accounts were primarily undertaken by Deloitte Cambridge. For group reporting purposes the only reporting offices were:

  - o  Deloitte Mclean in respect of MicroLink – due to the security clearance required to review certain MicroLink contracts, specific agreed upon procedures were undertaken with a formal interoffice clearance being obtained;

  - o  Deloitte China in respect of the investment in Open V – In 2010 a desktop review was undertaken by Deloitte Cambridge. In 2009, limited procedures were undertaken by Deloitte China with the audit procedures being reviewed by Deloitte Cambridge. No formal interoffice clearance was obtained; and

  - o  Deloitte Dallas and Deloitte San Francisco in respect of Autonomy Inc, eTalk, Verity, Zantaz and Interwoven – limited audited procedures performed over expenses, fixed assets, cash, other debtors and creditors which were all deemed to be of low risk. The audit working papers were reviewed by Deloitte Cambridge. No formal interoffice clearance was obtained.

  The final working papers of Deloitte China, Dallas and San Francisco were retained by Deloitte Cambridge and incorporated into the UK team's work papers and the conclusions performed by Deloitte Cambridge. The statutory audit requirements of the overseas subsidiaries of Autonomy were performed by a variety of firms.

- *Audit approach*

  Deloitte performed a substantive audit of Autonomy, with the exception of Zantaz (digital archiving revenue stream) where a controls- based approach was adopted. No controls were tested given the substantive nature of the revenue approach whereby every contract over $1m was reviewed, which amounted to approximately 100 contracts per year being approximately 80% of licence revenues. A sample of contracts greater than $100k were also audited.

- *Audit differences*

  We observed that the level of audit adjustments were individually and in aggregate below the materiality set by Deloitte of $22.5m. The Audit Committee report identified unadjusted factual audit adjustments of $0.4m and judgemental adjustments of $5.8m both of which would reduce the reported profit. A further adjustment was identified relating to income statement presentation, reclassifying sales and marketing costs to cost of goods sold amounting to $4.4m in relation to the treatment of the hardware revenue and cost of sales. Further discussion of this is documented below.

EY-HP-WP-11-000768
Confidential Treatment Requested by Ernst & Young LLP

EXH 8231.0003

**ᴱᴵ Eʀɴꜱᴛ & Yᴏᴜɴɢ**                                                                4

## Areas of audit risk

We reviewed the Audit Committee presentation to understand the audit risk areas identified by Deloitte. These audit risks are summarised below.

- **Revenue recognition**

### *Overview of Deloitte audit approach including confirmations*
Deloitte audited all contracts with license revenue in excess of $1m, approximately 15 – 20 per quarter, and a sample of approximately 15 contracts with license revenues in excess of $100k. For all contracts tested, Deloitte sent an accounts receivables confirmation letter which included a statement whereby customers also confirmed that no side letters were in place.  As part of our file review, we reviewed a sample of Deloitte's contract write-ups for the deals in excess of $1 million, and any memorandum identified on file applicable to revenue recognition matters. No contracts were held on file and therefore the items noted below were identified through our review of the work papers only.

### *Maintenance VSOE*
We reviewed the work papers which documented the VSOE testing performed for maintenance over the deals with license revenue in excess of $1m and observed that the VSOE rate was 5% for this band of contracts.  The work papers did not document what was included in maintenance (e.g, phone support, updates, bug fixes, etc.). However, if Autonomy was able to sale maintenance at a higher percentage (e.g. 18% based on historic practices of Interwoven) Autonomy would charge and defer maintenance revenue for that higher rate.  Maintenance VSOE rate was set at 5% or higher, if dictated by the contract rate and this was concluded in the working papers to represent the VSOE band.

To test the VSOE rate, Deloitte tested 43 new license deals of which 23 were at 5% and the remaining 20 were exceptions. Reasons for the exceptions included:
- VSOE set at the historic rate;
- no support in the contract; and
- premium level of services provided.

For maintenance renewals, 83% were renewed at the original contract rate.   We focused our review of the VSOE test for this band of customer; however, we observed that the VSOE rates were higher for deals less than $1m.

HP will be required to assess whether Autonomy has VSOE under US GAAP and HP policy, including an assessment of whether the 5% VSOE rate is substantive.

### *Extended payment terms*
Based on the review of the Deloitte contract write ups we observed that payment terms varied from 30 days to having extended payment terms staggered over a 4 year period. The audit file did not conclude on what the standard payment terms were for Autonomy. All license revenues were recognised upfront irrelevant of the payment terms. HP will be required to assess the implications of the extended payment terms under US GAAP and HP policy.

### *Hosting*
Upfront non-refundable fees

**⫶⫶ ERNST & YOUNG**

5

*945m
Revenue
(unntredes
F4 4*

Autonomy recognised a non-refundable upfront fee relating to hosting services.  The contracts related to these hosting services were not available on the Deloitte audit files.  HP will need to consider how to account for these non-refundable up-front fees under US GAAP considering the guidance set out in SAB Topic 13 which indicates that the receipt of such up-front fees is not a separate earnings process that should result in revenue being recognized for the following reasons:

- The terms, conditions and amounts of these fees typically are negotiated in conjunction with the pricing of all the elements of the arrangement.
- The customer would ascribe a significantly lower, and perhaps no, value to elements ostensibly associated with the up-front fee in the absence of the registrant's performance of other contract elements (e.g., the Cloud Services).
- The vendor does not sell the initial rights, products or services separately (i.e., without the vendor's continuing involvement).

*Different forms of hosting arrangements*
Per discussion with Deloitte senior manager, Autonomy has hosting contracts whereby the customer does not have the right to take possession of the software and also has hosting contracts whereby the customer does have the contractual right to take possession of the software at any time during the hosting period.   In fact, he identified one instance whereby the customer took possession of the software without significant penalty and the customer was able to run the software on its own hardware.

HP will also need to consider whether these hosting arrangements are subject to accounting under software revenue recognition guidance or should be accounted for as a service contact in accordance with the provisions of MEA guidance and the general revenue recognition guidance of SAB Topic 13.

**Hardware sales**
During FY10 we observed that Autonomy purchased hardware from third parties (e.g. Dell) of $115m and sold this to customers for $105m as part of its goal to become the end to end supplier of archiving services for its customers. The associated cost of this hardware was split between cost of sales ($94m) and sales & marketing ($21m) which results in an 11% margin recognised on the hardware sales. The recognition of a margin was considered appropriate by management. However, Deloitte recorded an audit adjustment in relation to this margin. In addition, we observed that Autonomy concluded that it was appropriate to account for these pass through sales on a gross basis. HP will be required to assess the appropriate accounting and policies for hardware sales under US GAAP and HP policy.

**Reciprocal Arrangements**
We observed reciprocal arrangements; Autonomy signed sponsoring agreements with both Mercedes Benz Grand Prix and Tottenham Hotspur in a similar period to when a license sale was also made to these parties for $1.6m and $5.8m respectively. We did not observe any consideration or conclusions over whether these were reciprocal arrangements, and therefore whether there were any accounting implications, on the audit file. The sponsorship agreement with Mercedes Benz will terminate at the end of the FY11 season (end of November 2011) and the sponsorship arrangement with Tottenham is for a maximum of a 5 year period with a break clause at the end of the 2011/12 season.  HP will be required to assess the appropriate accounting and policies for these type of transactions under US GAAP and HP policy.

EY-HP-WP-11-000770
Confidential Treatment Requested by Ernst & Young LLP

**EXH 8231.0005**

**ᴲ ERNST & YOUNG**

**Linked Transactions**

We observed that Autonomy made several sales to the same customers, either directly or through value added resellers. However we did not observe any documentation around whether these were considered linked transactions and therefore we cannot conclude whether there are any accounting implications should these be considered linked transactions.  HP will be required to assess the appropriate accounting and policies for linked transactions under US GAAP and HP policy.

**OEM arrangements**

We observed that Autonomy had several OEM arrangements. These arrangements had various methods of compensating Autonomy in addition to a license fee, including through a royalty payable to Autonomy or a profit sharing agreement. No audit work papers were observed around the accounting for any OEM royalty / profit sharing revenue recognised.

**VAR arrangements, including sell-in model**

Autonomy sold through several value added resellers and revenue was recognised on a sell-in model to the reseller. No contracts were held on file for us to review and conclude on the appropriateness of the sell-in methodology. HP will be required to assess the appropriate accounting and policies for the sell-in methodology under US GAAP and HP policy.

**Concessions**

We observed that Deloitte had documented instances of potential concessions, including a sale to a value added reseller of a license in one quarter that was credited the following quarter due to the reseller's end customer no longer wishing to purchase the product. In addition, it was documented that concessions had been made when a license was sold to a reseller which was subsequently credited and the sale was made directly by Autonomy to the end customer. Deloitte had concluded that they were only aware of three credit notes being raised, two of which had been in FY10, and therefore these were exceptional items with specific commercial reasons and subsequently there was no impact on the accounting.

**Warranty**

The Deloitte work papers highlighted the warranty clauses over some contracts and we observed that the terms of the warranty varied. No warranty carve-out or provision was made as management had concluded that there was no historical evidence of a warranty being paid owing to the reliable performance of the product. HP will be required to assess the appropriate accounting and policies for warranty under US GAAP and HP policy.

**Contingent revenue**

We observed that Autonomy had a claim against Novartis for breaching the number of allowable users. Prior to Autonomy reaching an agreement with the customer over the claim an invoice was raised to that customer and the revenue was recognised amounting to $2.4m. HP will need to consider the appropriate policy and accounting under US GAAP for these types of transactions.

**ᴇᴜ ERNST & YOUNG**

- **Recoverability of accounts receivables, unbilled receivables and debt factoring**

*Recoverability*

As mentioned above, the Group typically makes sales to Value Added Resellers (VAR) for onward sale through to the end user. Due to the model this would typically result in some VAR's withholding payment until the end customer had paid and therefore worsening the aging of receivables.

As at 31 December 2010, the receivables profile was as follows:

|                   | Total | >90 days overdue |
| ----------------- | ----- | ---------------- |
|                   | $m    | $m               |
| Gross receivables | 293.6 | 71.4             |
| Provision         | (26.0) | (26.0)          |
| Net receivables   | 267.6 | 35.4             |

At the balance sheet date, $191.3m is not yet due, of which $16.6m is due after more than one year from the balance sheet date. The most significant debts as at 31 December 2010 were with Capax ($22.9m), JP Morgan ($13.0m), Promotora ($11.5m), VMS ($11.4m) and Microtech ($10.9m).

We noted from a review of the Deloitte audit work papers, that debts with several Italian VAR's had not been collected and at 31 December 2010 amounted to $7m. A judgemental audit adjustment was proposed for the un-provided element as management considered that the unprovided element was recoverable. From discussions with Deloitte it was noted that in 2011 Autonomy had placed two geographies, South America and Italy, on cash accounting given the historical credit risk observed.

EY-HP-WP-11-000772
Confidential Treatment Requested by Ernst & Young LLP

EXH 8231.0007

ᴫ **ERNST & YOUNG**

**Factoring**

In Q3'10 the Group entered into a debt factoring arrangement with RBS. The audit working papers indicated that the agreement had been reviewed as part of the Q3 2010 review and that the debts are sold without recourse and all risks and rewards are transferred to RBS once the debt has been sold. Accordingly, both the Group and Deloitte concluded it was appropriate that the factoring agreement is accounted for off balance sheet under IFRS. At 31 December 2010, the factored debts amounted to $4m; however we understand from discussion with Lee Welham that the level of debts factored during FY11 has increased significantly to $45m as at the acquisition date. HP will need to determine the appropriate accounting treatment of the factoring arrangements under US GAAP.

**Unbilled receivables**

Included in the balance sheet at 31 December 2010 are unbilled receivables amounting to $34.4m. From the samples tested by Deloitte, we observed that a number of these items were due to future maintenance where the amounts have yet to be billed (with the corresponding credit deferred).

- **Carrying value of investments**

Two significant investments identified in the 31 December 2010 balance sheet were an investment in Blinkx plc of $59.5m and an investment in Open V of $4.7m.

Autonomy has a 35.4% shareholding in Open V, a Chinese entity, and accounts for it as an associate as no individual party has control over Open V.

Blinkx plc is held as an available for sale asset whereby it is revalued at each balance sheet date (based upon the market value of the shares) with the increase or decrease being recorded against reserves. The investment arose in May 2007, when Blinkx plc was demerged from Autonomy and listed on the AIM in London. As part of the transaction, each of the Autonomy shareholders received a similar shareholding in Blinkx plc and Autonomy retained a shareholding in Blinkx plc. The work papers included a consideration as to whether the investment in Blinkx plc led to a related party and whether Blinkx plc should be consolidated as Autonomy held 13.86% of the share capital of Blinkx plc and Mike Lynch holds approximately a 7.8% shareholding and is a director of both entities. Deloitte concluded that Mike Lynch does not have significant influence to impact the financial direction of Blinkx plc as he is a non-executive director of Blinkx. Accordingly the investment was not consolidated or disclosed as a related party.

- **Litigation and claims**

We observed in the audit work papers that Deloitte held detailed discussions with Andy Kanter (COO and legal counsel) and circularised letters to the key legal advisors of the group to gain an understanding of any litigation and claims. No material items were identified by Deloitte; however, we did observe that there are various patent claims outstanding for which the outcome is not yet certain. Of the items observed we note that there was a payroll fraud for which Autonomy are expecting to receive $1m from insurance providers. This amount was recorded as an asset. In addition, there was an investigation by the Chinese authorities into Open V as part of a wider action against internet search engines; however, no formal proceedings have been instigated.

- **Tax**

The effective tax rate of the group for FY10 reduced to 23% compared to 28% for FY09. The reduction arose following the completion of the s382 study in Q2'10 whereby Autonomy recognised a deferred tax

Confidential Treatment Requested by Ernst & Young LLP

**EXH 8231.0008**

**ᴣ𝗝 ERNST & YOUNG**

asset on US tax losses primarily due to the previous US acquisitions of etalk, Verity, Zantaz and Interwoven. We understand that, based upon forecast results, these losses will be utilised in 2011 and the future effective tax rate will increase to 28-29%.

- **Related parties and associated transactions**

  Other than the comments included above in respect of the investments in Blinkx plc and Open V no other observations of note were observed in relation to related party transactions.

- **Sponsorship arrangements**

  Refer to the section above in relation to reciprocal arrangements.

- **Management override of controls**

  As required by ISAs, management override of controls was identified as a fraud risk. Deloitte's procedures focused on the sampling of journals to ensure that they were appropriately authorised and consideration of fraud risks in all areas.

- **Other**

  This memo does not outline our observations in relation to the carrying value of goodwill and intangibles, acquisition accounting and attributing fair values, capitalisation of internally generated product development costs nor accounting for the convertible bond as we understand that these items will not have an impact following acquisition accounting.

EY-HP-WP-11-000774
Confidential Treatment Requested by Ernst & Young LLP

**EXH 8231.0009**