# Exhibit 1

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD

# FEDERAL BUREAU OF INVESTIGATION

Date of entry    12/15/2014

ANTONIA FRANCES ANDERSON, born 12/29/1980, resides at Flat 9, 197 Huntington Rd., Cambridge, UK, was interviewed at the San Francisco Regional Office of the United States Securities and Exchange Commission (SEC). Ed Swanson, Nathan Bays and Alex Swann represented Anderson during the interview.

Present during the interview for the SEC were Cary Robnett, Samantha Choe and Michael Vandenberg. Special Agent Leland Castro and Marlene Smith were present from the FBI. AUSA Robert Leach was present for the United States Attorney's Office (USAO).

Anderson was interviewed pursuant to a proffer agreement with the SEC and a letter of immunity from the USAO. After providing the identities of all present during the interview and providing standard SEC admonishments, Anderson provided the following information:

Anderson is currently the Director of Revenue for Hewlett Packard's Autonomy subsidiary. Anderson graduated from Oxford University (1999 -- 2003) with a degree in Chemistry. She worked for the National Health Service for less than a year as a Scientific Administrator. In 2004, Anderson joined Deloitte through the accountancy training program. Anderson was an auditor from 2004 to 2011. Anderson earned her license as a Chartered Accountant in 2007. At the end of 2007, she joined the Autonomy audit team as an assistant manager. Her first project was to audit the Zantaz acquisition by Autonomy. Members of the Autonomy audit team at Deloitte included Richard Knights, Rob Knight, Lee Welham, Poppy Prentis and Matt Stephan. In May 2011, Anderson joined Autonomy as an employee of the Cambridge finance team.

Anderson's prior experience is in IFRS. She has had fairly limited exposure to United States GAAP as some of her clients were UK subsidiaries of US

Investigation on   10/17/2014   at   San Francisco, California, United States (In Person)

File #   318A-SF-2582907-302     Date drafted   11/17/2014

by   CASTRO LELAND G, Keigan M. Park

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

companies. Autonomy was her only software company client but she did have other tech companies as clients such as Xaar and Domino. Anderson estimated that she spent one third of her time on Autonomy.

Anderson recalled that Steven Chamberlain was a former Arthur Andersen and Deloitte employee.

Anderson was not sure at the time but became aware that Autonomy had made statements about being in compliance with SOP 97-2 and IFRS was silent on the issue. Deloitte did not test SOP 97-2 as part of its Autonomy testing. Anderson recalled that there were physical copies of Deloitte guidance/literature On IFRS.

**DELOITTE AUDITS**

At the end of every review or audit, Autonomy gave a list of the period's revenue transactions to the audit team. The more senior members of the audit team were responsible for auditing the larger transactions while the junior members took the smaller ones. As an assistant manager, Anderson audited the larger revenue transactions and as she progressed and became the manager, she reviewed the work of the assistant managers. Part of her responsibilities included attending audit planning meetings.

Anderson recalled making the first draft of the quarterly Audit Committee reports; other audit team members provided input to her for the reports. She recalled participating in six Audit Committee reports.

During the audit, Steven Chamberlain usually provided the first line of answers for issues. At times, Sushovan Hussain and Pete Menell provided answers. Anderson did not recall Mike Lynch personally providing information to her team.

Anderson attended one Audit Committee meeting, possibly the Q3 2009 meeting. These meetings are usually attended by Deloitte partners and Welham.  In the meeting which she attended, Anderson remembered a discussion of the loss making hardware sales issue. The Audit Committee was surprised that Autonomy was selling hardware; one of the members asked for more information on the hardware sales. It seemed to Anderson that this was the first time the audit committee members had heard of these hardware sales.

With regards to press and earnings releases from Autonomy, Deloitte received drafts for comments prior to their release. Chamberlain was involved with the press and earnings releases.

Anderson characterized Autonomy as an aggressive client in terms of

accounting policies/positions. Anderson attended meetings at Deloitte where the partner briefed the team that Autonomy faced pressure to meet street earnings results. Also, Autonomy finance personnel would identify issues to Deloitte where they thought they were being aggressive or pushing the envelope. Anderson noted that Autonomy either proactively identified aggressive positions or kept silent and waited for Deloitte to ask depending on the issue at hand.

To mitigate Autonomy's aggressiveness, Deloitte performed a lot more testing on its quarterly reviews compared to other client's reviews. An example was that Deloitte performed detailed testing on Autonomy's interim quarter's sales transactions including reviewing the sales contracts.

At the time of the Deloitte audits, Anderson was not aware or did not think Autonomy was manipulating its financials.

In 2009, Autonomy had Supplemental Revenue breakouts as part of its earnings release. Anderson did not know the reason Autonomy provided this breakout. Deloitte did not audit this breakout but reviewed it for consistency. Anderson recalled reviewing spreadsheets which contained average selling price information for different types of revenue. Anderson did not recall reviewing these in detail but recalled agreeing the totals to the profit and loss statement and not the breakouts.

At the time, Anderson did not know that Autonomy was classifying hardware sales as IDOL sales or OEM sales. Anderson recalled that the general ledger did not breakout sales by type.

As part of her work, Anderson reviewed and discussed proposed adjustments that were part of the Audit Committee report. She also listened to some of the Autonomy earnings calls (possibly Q1 2010) but this was mostly done by the partners and Welham.

**EXHIBIT 908 -- 10/5/2009 ANDERSON AUDIT MEMO ON EMC HARDWARE AND EXHIBIT 1003 -- PRINCIPAL OR AGENT MEMO**

Anderson recalled that she had been tasked into researching the principal versus agent issue regarding Autonomy's loss making sales of EMC hardware. The documented commercial rationale on the first page was provided by Hussain in meetings with Anderson and Welham. Anderson recalled that the information provided by Hussain to Anderson and Welham with regards to this issue and documented on the memo were face-to-face and likely over several conversations.

Ex. 908 -

On page 2, the "Background" portion was her and Welham's best effort to document Hussain's statements during the meeting. The "Brainchild" referred to the creation of an appliance product that Hussain said Michael Sullivan was leading.

On page 3, the "Development" section was provided by Hussain, not EMC. With regards to the "Allocation of costs between cost of goods sold and marketing" on page 4, Anderson stated she did not have other clients which allocated costs out of COGS. Typically, there would be debate on whether a cost should be allocated between sales and marketing or an administrative expense.

The principal versus agent issue was a factor in determining whether Autonomy could show the revenue and cost of the hardware transaction in a gross or net format of the income statement.

With regards to the statement that Autonomy directly negotiated the transaction with Bloomberg (on page 5), this information was provided by Autonomy. If Autonomy was merely inserted into the deal between Bloomberg and EMC, this would've been important in the analysis of principal versus agent. Anderson did not know that Autonomy was just inserted into the deal or that the agreement was that Autonomy paid EMC 20-25% over the agreed-upon purchase price between Bloomberg (or any of EMC's customers) and EMC.

**EXHIBIT 910 -- 10/14/2009 HUSSAIN MEMO ON EMC**

This memo was obtained from Autonomy and represented management's position on the EMC transactions. Anderson thought that this memo was prepared for Deloitte. The e-mail starting on page 4 of the exhibit was likely related to Deloitte wanting a confirmation from EMC as to the standard reseller margins. Anderson was not sure if this was the case.

According to Hussain, Autonomy and EMC had joint marketing activities and that Autonomy was creating an appliance for EMC to sell. Anderson did not see other evidence from EMC of these marketing activities aside from the e-mail chain on this exhibit. Deloitte relied on Autonomy management's statements and on the e-mail for the cost allocation percentages of the hardware. The supposed joint marketing element between Autonomy and EMC was important to Deloitte in considering this cost allocation breakout.

(Agent Note: SA Keigan Park attended this part of the interview and took notes for the following section relating to Ex. 910.)

Hussain told her that Autonomy needed to sell hardware at a loss in order to continue or be chosen as a strategic supplier for customers. These

318A-SF-2582907-302

Continuation of FD-302 of __Interview of Antonia Frances Anderson__ , On __10/17/2014__ , Page __5__ of __17__

customers might have ceased being Autonomy customers if the hardware was not sold to them at a cheap price. These customers might have included Bank of America but Anderson was unsure and this strategic supplier explanation might have been for the Dell transactions. These customers were existing Digital Safe customers.

Anderson recalled there were discussions between Autonomy and Deloitte on the potential need to disclose the hardware sales and its nature in the press/earnings releases. Anderson did not characterize the discussion as a conflict between Deloitte and Autonomy. She also recalled that if the hardware sales increased, then there would have been more discussions on whether to disclose this in the earnings/press releases.

**EXHIBIT 995 -- 10/15/2009 HENDERSON E-mail**

Stuart Henderson was a Deloitte partner. Henderson's concerns in this e-mail regarding Microlink was in regards to Microlink's outstanding payables to Autonomy and the purchase of Microlink software by Autonomy in Q3 2009. This was to address the issue that the outstanding payables at the time were independent of Autonomy's software purchase and that the purchase was at fair value. At the time, Anderson was not concerned that Autonomy was engaging in round-trip transactions.

**EXHIBIT 996 -- 10/16/2009 EMAIL WITH ATTACHED Q3 2009 AUDIT COMMITTEE REPORT**

Bates number ending in XX517 -- Anderson recalled that Deloitte did some testing on the appliance sales. Anderson recalled that Kraft had originally sold to a reseller named Capax. According to Autonomy, this $4 million sale went through Capax because Capax would eventually perform services work for Kraft.

Bates number ending in XX522 -- Anderson did not call testing the Microlink receivables.

Bates number ending in XX526 -- With regards to the $5.2 million purchase of Microlink AIS software, Anderson did not recall if she was in the meeting with Pete Menell discussed in this exhibit. Also, she did not recall tracking the sales generated by this purchase as part of the testing.

**Q4 2009**

**EXHIBIT 1446 -- 1/5/2010 MURRAY E-mail WITH ATTACHED AUDIT PLANNING MEETING MINUTES**

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of  Interview of Antonia Frances Anderson  , On  10/17/2014  , Page  6 of 17

Anderson recalled she was at these meetings. With regards to page 2 of the exhibit regarding Murray's comments on the Vatican Library, this may have been obtained from meetings with Chamberlain and Lisa Harris prior to the audit to go over the upcoming issues.

Page 3 -- Anderson did not know the meaning of Chris Robertson's comment regarding "Autonomy seemed pushed".

Page 4 -- AIU meant Audit Inspection Unit which is an external agency. Anderson did not know much about this goodwill impairment issue. She did not think that Autonomy's goodwill asset was impaired.

In page 5 "Accounting for the costs associated with loss making hardware sales" and "must scrutinize" - Anderson recalled that Deloitte was looking to see if new hardware sales were occurring. Anderson did not remember being told by Autonomy that EMC had terminated its relationship with Autonomy prior to year-end. Anderson did not recall a Credit Suisse-EMC hardware sale.

**EXHIBIT 1447 -- 1/20/2010 MURRAY E-mail WITH ATTACHED OUTSTANDING LIST**

With regards to Microlink on the last page of the exhibit, Anderson recalled receiving the Microlink balance sheet from Autonomy. She did not recall speaking with Dave Truitt. Anderson recalled being told by Autonomy that there were restrictions on what Microlink/Autonomy could show the Deloitte UK audit team. Anderson recalled that Deloitte UK engaged their Deloitte United States personnel to review Microlink's sales contracts. The Deloitte US personnel corresponded with Alan Rizek. Anderson recalled being told by the Deloitte US team that the contracts were heavily redacted.

Anderson recalled Deal 170 on the first page of the spreadsheet which was the sale of software to Discover Technologies. However, she did not remember how collectability from Discover Tech was assessed by Deloitte.

**EXHIBIT 1448 - 1/15/2010 ANDERSON E-mail TO CHAMBERLAIN**

Anderson recalled that she was researching the ownership of Microtech to address related party issues. Anderson recalled that members of the Truitt were involved in Microlink, Microtech, Discover Tech and Autonomy. Anderson was trying to sort the relationships between the companies and the Truitt. Anderson recalled speaking with Chamberlain and Kanter about this.

**EXHIBIT 1449 -- 6/29/2010 ANDERSON MAIL TO KNIGHTS WITH ATTACHED MICROLINK ACQUISITION MEMO**

Anderson authored the attached Microlink memo. On page 2 of the memo,

Anderson did not remember if Deloitte received the Microlink profit and loss statements to verify Autonomy's stated Microlink margin of 10%.

On page 3, with regards to the list of outstanding receivables from Microlink, Anderson recalled Chamberlain telling her that most of these resales through Microlink did not close with the end-user. Anderson also recalled that Microlink had been recording its EDD license purchase from Autonomy on a piecemeal basis; Microlink was only accruing the amounts that were due in the coming year.

Anderson recalled that the intercompany receivables and payables between Autonomy in Microlink were eliminated in consolidation. The Microlink receivables from the end-users may have been adjusted and Chamberlain had explained the adjustments to them.

Anderson recalled that after the acquisition of Microlink, there were no more resales of software through Microlink for an end-user.

On page 5, with regards to the related party issue, Anderson did not know that Dave Truitt was an owner of Microtech. As documented in the memo, she had only known about Dave Truitt having ownership interests in Microlink and Discover Tech. Anderson would have wanted to know about the Microtech ownership as Autonomy had done a lot of deals with Microtech as a reseller and would have documented this relationship in the workpapers. The issue being addressed in this section was whether the fact that Microlink was being acquired at year end 2009 influenced Microlink into entering into the sell in transactions during 2009. There would have been representations that there were no side letters involving Microlink and Autonomy likely provided by Hussain or Kanter.

Anderson recalled that the Microlink balance sheet was provided by Chamberlain at a later date and reviewed by Deloitte thereafter. Anderson did not recall seeing an external valuation of Microlink until well after the acquisition. Anderson recalled that Autonomy stated that the Microlink acquisition was a much smaller acquisition relative to Autonomy's other acquisitions, that there was no need for a third-party valuation and that Autonomy could handle the acquisition internally.

On page 1, with regards to the $10 million sale of software to Discover Tech with Microtech as a reseller, Anderson did not know how either company came up with the cash to pay Autonomy or the sale had to go through Microtech as a reseller as opposed to sellin directly to Discovertech. Anderson recalled that there was a lot of discussion during the audit that Autonomy was paying a lot of money for Microlink ($55 million) and had a history of reselling/selling software to Microtech, Microlink, and Discover Tech. Anderson recalled discussions at Deloitte on whether these were

barter transactions. Anderson did not recall how Deloitte got comfortable with respect to this issue.

**EXHIBIT 918 -- 1/16/2010 WELHAM E-mail TO ANDERSON**

At the time, the Deloitte team was surprised with the Kraft deal going direct with Autonomy in Q4 2009. Deloitte had been told that the end-user deal with Kraft and Capax was near final and that the VAR deal with Capax was full and final with obligations taken by Capax. Anderson did not remember anyone saying Kraft going direct was a one off occurrence but suspected that there was such a statement from Autonomy because Deloitte would have disagreed and not allowed more sell ins to resellers if this kept occurring. Anderson did not know why Capax was paid $400,000.

Anderson recalled that the Q4 2009 Microtech -- Morgan Stanley deal was also reversed in Q1 2010. Anderson stated that these were judgment calls by the partners on this resale deals going direct issue. The partners would have made a judgment call on whether to reserve against these transactions or to not let Autonomy record the revenues. Anderson stated that there was little or no involvement by Autonomy personnel with the end-users after the deals had gone through a reseller.

**EXHIBIT 920 -- Q4 2009 AUDIT COMMITTEE REPORT**

Bates number ending in XX956 -- with regards to be Filetek purchase and sale, Anderson did not think she had talked to Menell with regards to this issue. Another Deloitte auditor had talked to him. Anderson recalled there was a software purchase and sale memo with respect to Filetek from management in the workpapers.

Bates number ending in XX958 -- Anderson recalled reviewing the purchase order for the Dell laptops. Anderson did not know why Autonomy was purchasing Dell laptops if EMC was their strategic partner. Anderson did not remember the explanation given by Autonomy regarding the reason why the Morgan Stanley deal went through Microtech.

Bates number ending in XX970 -- Anderson did not recall the specific concerns of the FRRP regarding Autonomy's revenue recognition policies and presentation.

**Q1 2010**

**EXHIBIT 1018 -- AUDIT MEMO ON Q1 2010 RESELLER REVENUE REVERSALS**

Bates number ending in XX8049 -- Anderson confirmed that Hussain provided information that Autonomy had notified the Vatican of the resale of the

software to Microtech. With regards to the reversal of the Microtech -- Morgan Stanley transaction (as the deal was signed directly with Morgan Stanley in Q1 2010), Anderson recalled Deloitte focusing on this issue. She did not recall that the direct deal with Morgan Stanley was for a hardware sale while the Microtech -- Morgan Stanley transaction was portrayed as software and hardware sale.

**EXHIBIT 1450 - 4/14/2010 DELOITTE E-mails**

These e-mails address the related party issues with regards to Dave Truitt, Microlink and Discover Tech (see previous discussion in Exhibit 1449). Anderson did not remember consideration that Truitt, as an employee of Autonomy, might he influenced to enter into resale agreements (Microtech and Discover Tech).

**EXHIBIT 923 -- Q1 2010 AUDIT COMMITTEE REPORT**

Bates number ending in X977 -- Anderson recalled a discussion with Chamberlain or Hussain, possibly both, with respect to the reversals of the Morgan Stanley and Manufacturers life transactions. They both characterized the deals going direct with the end-users as "isolated incidents". Deloitte would have wanted an explanation from Hussain on this matter.

Bates number ending in X979 -- Anderson recalled that there was a $3.8 million proposed reclassification adjustment related to the resale of Dell hardware at a loss. The $3.8 million represented cost of the hardware which Autonomy classified as sales and marketing expense. Deloitte's proposed adjustment of $3.8 million did not exceed the materiality threshold of the review. Anderson commented that there are other factors that could affect proposals for adjustments other than the materiality threshold such as the amount of a specific line item.

**Q2 2010**

**EXHIBIT 928 -- 7/5/2010 Q2 2010 DELOITTE PLANNING MEETING MINUTES**

Anderson thought that Richard Knights continued to be involved in the Autonomy engagement for Q2 2010 to maintain continuity during the transition to Nigel Mercer as the lead partner. Anderson did not recall why the issue of Microlink's revenue came about (page 1 of exhibit).

Brent Hogenson - Anderson found out about the Brent Hogenson complaint from Welham and/or Knights. Anderson was certainly surprised that these allegations were made. She recalled being worried about missing something during the reviews and audits.

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of  Interview of Antonia Frances Anderson  , On  10/17/2014  , Page  10 of 17

With regards to the discussion on "Deliberate manipulation of results" on page 2 of the exhibit, Anderson's opinion was that there was pressure on Autonomy to meet results. Anderson was surprised that it was documented in the minutes that there was no pressure to manipulate results. Anderson thought that this must have been written by a junior member of the audit team.

**EXHIBIT 922 -- Q2 2010 AUDIT COMMITTEE REPORT**

Bates number ending in XX666 -- Chamberlain told Anderson that Hogenson had gotten the "wrong end of the stick" (misunderstood) by being in the United States and not privy to all the information regarding the transactions. Anderson reiterated that the work relied on their audit steps and upon discussions with Autonomy management regarding these issues. At the time, Deloitte felt that they were aware of the issues raised by Hogenson and had addressed these during its review or audits.

Anderson recalled Chamberlain mentioning to her and Welham that Percy Tejeda had the same concerns. Chamberlain stated that Percy was a good guy but was coerced by Hogenson and as a result, Autonomy had to let go of Tejeda and other members of Hogenson's team.

Bates number ending in XX669 -- Anderson did not recall discussions at Deloitte as to why there was no mention of the resellers not being involved in closing the end-user deals. However, her understanding was that Autonomy was not involved after selling to resellers and it was the resellers who were closing the transactions with the end-users. Autonomy management made these representations to Deloitte.

Bates number ending in XX688 - At the time Anderson's understanding was that Filetek software, Storhouse, was driving the sales of Autonomy's SPE product. This was Autonomy's rationale for purchasing Storhouse. At present, Anderson now knows that the Filetek software had no value to Autonomy. She came to this conclusion from a discussion with Sean Blanchflower. Anderson talked to Blanchflower as part of her project to review the inventory of software purchased by Autonomy and capitalized on the balance sheet. The list of software which did not have any value to Autonomy included VMS software, Filetek (Storhouse), Microtech ATIC and Capax software. Anderson concluded that the software demonstrations provided to Deloitte during the audit were fictitious.

In hindsight, Hogenson was totally right and Deloitte relied too much on Autonomy management.

With regards to Filetek software being used in a solution for Kraft, she recalled that this was a rationale provided by either Chamberlain or

Hussain. Anderson opined that either Hussain told this to Chamberlain who then provided to Deloitte or Hussain provided this directly to Deloitte. Anderson did not see evidence of Filetek software being included in a solution for Kraft.

Anderson stated that she was part of the team that supported the subsequent restatements of Autonomy's financial statements with Ernst & Young as part of a statutory audit. As part of this work, Anderson reviewed contracts and noted that Autonomy should have carved out a larger amount for services work out of its license revenue. The amounts that Autonomy used as a carveout for services were much less than the actual work that was being performed for services. As a result, more license revenue was recognized up front by Autonomy than it should have recognized.

**EXHIBIT 969 – SPREADSHEET: SOFTWARE SALES SUPPORTING HARDWARE SALES**

Anderson recalled that the spreadsheet was provided to Deloitte to support the claim that the loss making hardware sales generated software sales for Autonomy. This analysis was provided by Chamberlain and the explanation/theory was provided by Hussain.

**Q3 2010**

**EXHIBIT 924 -- Q3 2010 AUDIT COMMITTEE REPORT**

Bates number ending in XX441 -- With regards to the Filetek – Veteran's Affairs transaction, Anderson did not recall who told her that Filetek was a value added reseller. Anderson did not recall if Deloitte received Filetek's financial statements. Anderson did not know why Deloitte was looking at the recoverability issue in this report.

Bates number ending in XX445 -- Anderson did not remember the questions raised at the Q2 2010 press conference regarding the hardware sales. Anderson recalled that Autonomy was resistant to any changes to the financial statements and disclosures suggested by Deloitte. Her impression was that Autonomy did not want to disclose the nature of the hardware sales because it was not part of their core business.

**Q4 2010**

**EXHIBIT 1451 -- 12/9/2010 DELOITTE AUDIT PLANNING MEETING MINUTES**

Anderson did not know why a hardware discussion was included in the goodwill impairment section on page 3 of the exhibit. On page 4 of exhibit, under Acquisition Accounting, the comment about Autonomy acquiring companies with significant deferred revenues was made to address the

possible impact on Autonomy's revenues if the deferred revenues were taken into revenues.

**EXHIBIT 1452 -- 1/14/2011 E-mail TO ANDERSON**

This e-mail relating to Capax and Microtech was in regards to concerns that payments to these resellers by Autonomy were being used to pay back Autonomy. At the time, Anderson concluded that this was not the case

The statutory audit by Ernst & Young, UK involved Dave Hales and Marcus LNU. The write-down of software purchased by Autonomy included the Discover Tech software.

**EXHIBIT 1453 -- 1/20/2011 E-mails**

Anderson stated that Welham worked on the $9.6 million ATIC purchase. She thought that possibly Hussain or Chamberlain brought this issue up to Deloitte. Anderson did not remember why the payment terms were very short period

**EXHIBIT 979 -- Q4 2010 AUDIT COMMITTEE REPORT**

Bates number ending in XX965 -- Anderson recalled that there was a $6 million payment from Microtech. Her understanding of the ATIC was that it was a joint facility with Microtech which Autonomy recorded an intangible asset.

Bates number ending in XX963 -- The Bank of America deal was such a large transaction that no one reseller wanted to be liable for the whole transaction. The 8a status with regards to the resellers was provided by Hussain.

Bates number ending in XX968 -- Anderson did not remember who provided information about the profit margin of a hardware reseller being 5% (relating to the $4.4 million adjustment by Autonomy to reduce cost of goods sold and increase sales and marketing expense).

**EXHIBIT 1454 -- 1/25/2011 ANDERSON E-mail WITH ATTACHED OUTSTANDING LIST**

Anderson stated that the $3.5 million "revenue consolidation of adjustment" with Steve (Chamberlain) on the "person requested from" column for Bank of America (see item 20 on attached spreadsheet) was characterized as a "last minute revenue adjustment after quarter end". She was also told that it was revenue from an additional deal. Anderson could not fully explain this issue. "Michael" was Michael Flynn, a Deloitte auditor, was assigned to address this issue.

Anderson stated that she resigned from Deloitte in February 2011 and was not part of the Autonomy audit from February to May. She worked on her other clients prior to leaving on May 9, 2011. Chamberlain offered her a position at Deloitte during the audit wrap-up dinner between Deloitte and Autonomy. One of her first tasks at Autonomy was to handle the Iron Mountain acquisition. Neither Hussain nor Chamberlain gave her guidelines on sharing information with Deloitte auditors. Anderson's title at Deloitte was Group Financial Accountant. She initially reported to Lisa Harris, who was the Group Financial Controller. Poppy Prentis was the Europe Financial Controller. Both Harris and Prentis were former Deloitte auditors. Prentis enjoyed her work at Autonomy.

Anderson's salary was 60,000 GBP per year. Anderson did not have any equity as part of her compensation.

By September 2011, Anderson worked correctly for Chamberlain. In November 2011, Prentis quit Autonomy as she was tired of working for Hussain and because she was pregnant. Anderson recalled that Prentis had share options at Autonomy. Anderson was not close to Matt Stephan, who had left by the time she joined Autonomy.

**EXHIBIT 1455 -- 6/15/2011 MURRAY E-mail WITH ATTACHED AGENDA FOR DELOITTE-AUTONOMY MEETING**

Though Anderson attended this meeting with Deloitte, she did not have responsibility over revenue deals at Autonomy. Amherst did not know about the Discover Tech reseller transactions in Q2 2011 or the purchase of Discover Tech software. The Iron Mountain transaction was an all cash transaction.

**EXHIBIT 1456 -- 10/1/2011 E-mails TO ANDERSON**

Anderson did not recall this discussion involving the crediting of the Microtech -- Department of Interior transaction or that it went direct.

**HP ACQUISITION**

Anderson did not know about the acquisition and recalled that she was in the US with Prentis at the time. Prentis also did not know about the acquisition. Anderson knew about the adjustments to deferred revenues involving six deals made during the acquisition period and directed by Chamberlain. The explanation given was the products had not yet been delivered to the customer/end users. She recalled that these were resale transactions and that the adjustments reduced revenue and increased deferred revenues.

FD-302a (Rev. 05-08-10)

Case 3:18-cr-00577-CRB    Document 467-21    Filed 05/01/24    Page 15 of 18

318A-SF-2582907-302

Continuation of FD-302 of  Interview of Antonia Frances Anderson  , On  10/17/2014  , Page  14  of  17

With regards to the KPMG due diligence, Anderson recalled Hussain telling the team to be careful about giving information to KPMG because there were a lot of questions and they (Autonomy Finance) might be overwhelmed. The guidance given with regards to providing information was to talk to Chamberlain before responding to information requests.

**EXHIBIT 1457 -- 10/24/2011 ANDERSON E-mail**

The items highlighted in yellow were ones that Anderson did not know the answers to. Chamberlain responded directly to KPMG.

Anderson stated that from May 2011 (start of Autonomy employment) to June 2012, she did not see anything that contradicted her understanding of Autonomy's financial statements while at Deloitte. The "bombshells" came after the departure of Autonomy's legacy management.

**EXHIBIT 1458 -- 11/4/2011 HUSSAIN E-mails**

Anderson did not know what Hussain was referring to when he wrote, "make sure the analysis shows hardware as license, the $1.3 m is also license".

**EXHIBIT 1459 -- 11/24/2011 ANDERSON E-mail WITH ATTACHED SPREADSHEET**

The term "flash" means updates to the budget on a continuous basis until the end of the time period. On the spreadsheet, the forecast column was based on queries to salespeople by the same. The SMS calls were also used to update the forecast. Towards the end of the quarter, Hussain wanted daily updates Anderson did not remember where the Dell and Hitachi hardware sales were included in the spreadsheet.

With regards to the Citibank deal in Q1 2012, Anderson recalled that the issue was that the hardware was not shipped to Citibank at the end of the quarter. She also recalled that the contract was sent late to Citibank but did not remember the reason for this. Paul Curtis told her that revenue should only be recognized upon delivery based on HP's policies. In IFRS, revenue recognition on undelivered hardware was allowable with just a "ready letter".

**EXHIBIT 1460 -- 3/12/2012 CHAMBERLAIN E-MAIL AND EXHIBIT 1461 -- 3/16/2012 HUSSAIN E-MAIL AND EXHIBIT 1462 -- 3/16/2012 BROWN E-mail TO ANDERSON AND EXHIBIT 1463 -- 3/16/2012 HUSSAIN AND ANDERSON EMAILS AND EXHIBIT 1464 - 3/20/2012 CHAMBERLAIN/ANDERSON/HUSSAIN E-mails AND EXHIBIT 1465 -- 3/21/2012 CHAMBERLAIN E-mail**

These exhibits relate to request of information by HP in Exhibit 1460. Meeta Sunderwala's first request was to segregate direct sales from sales

to resellers (indirect channel). Another request was to calculate the amount of hardware sales by Autonomy. Hussein asked Anderson to calculate the amount of hardware sales for Dell hardware only. Exhibit 1462 related to the calculation of Dell hardware sales. The calculation for Dell hardware sales amounted to a little less than 10%.

In Exhibit 1464, Anderson thought that she was going to reply to Sunderwala with her findings. However, Chamberlain responded instead in Exhibit 1465. Anderson recalled walking Chamberlain through the hardware calculation. Chamberlain told her a couple of weeks before this e-mail that he was leaving Autonomy because he was offered a CFO position at another company in Cambridge.

Anderson stated she knew who Sunderwala was at the time and did not think the request for this information was out of the ordinary.

Anderson stated that the way Hussain directed her to answer the question with regards to the amount of Autonomy's hardware sales was "crafty" (i.e. only including Dell hardware sales). In retrospect, Anderson thought that the answers were misleading. Anderson stated that despite only mentioning Dell on the e-mail (Exhibit 1460), she knew that HP was looking for all hardware sales. If all hardware sales were included in the calculations, the percentage would've been greater than 10%. At the time, Anderson thought that Hussain and Chamberlain did not want to talk about Autonomy's hardware sales and to confirm an amount greater than 10% would have led to more questions from HP.

Anderson did not have discussions with Hussain or Chamberlain about being uncomfortable with the hardware calculation. Anderson recalled she was very clear with Chamberlain as to how she came up with the calculation as she walked him through the calculation to make sure she had gotten it right. Anderson stated that it was Hussain and Chamberlain who told her to exclude non-Dell related hardware sales. Anderson found out later from Hussain or Chamberlain that HP ordered them to stop selling Dell hardware.

**EXHIBIT 1466 -- 2/3/2012 CHAMBERLAIN E-mails**

This set of emails related to $5.5 million of revenue which Chamberlain made Anderson record in the quarter ended 1/31/2012. This took the form of an adjustment to release deferred revenue into revenue for $5.5 million for delivery of services that had not been billed but performed by quarter end. During the days leading up to the end of the quarter, Anderson was tracking the amount of these revenue accruals for quarter end on behalf of Hussain and Chamberlain. She recalled providing Chamberlain and Hussain updates on the amounts. Chairman thought that the services revenue accruals were too low. Initially, Chamberlain asked her to look into hardware sales to find

318A-SF-2582907-302

Continuation of FD-302 of  Interview of Antonia Frances Anderson  , On  10/17/2014  , Page  16  of  17

more revenue but this was not enough.  Chamberlain then made Anderson record the $5.5 million accrual which Chamberlain wrote about in an e-mail to Hussain on page 2 of the exhibit. Chamberlain said Anderson could reverse the entry in the next quarter if she could not find support for the entry. Anderson did not think HP knew about the accrual at the time.

At the time, Anderson did not think Hussain or Chamberlain were manipulating the numbers. Anderson tried hard to find support for the accrual but could not find any support. Anderson then went to Hussain to ask permission to reverse the previous quarter's accrual which would have meant Autonomy would have started the quarter with a negative $5.5 million sale figure. Hussain did not agree to the reversal.

Anderson felt that Chamberlain deceived her into recording this revenue accrual.

**EXHIBIT 1467 -- 10/11/2011 E-mails**

Anderson recalled that Chamberlain was not pleased that she had sent this information to Price Waterhouse. Chamberlain even asked if the document had a password. Anderson had sent this to Price Waterhouse as she had done the work and she was trying to prove herself. At the time, Anderson was becoming frustrated with her rule in Autonomy was even looking for another job.

**EXHIBIT 1468 -- 3/8/2012 E-mails**

Anderson recalled that Brossard had asked her for historical 2009 to 2011 Virage Media bin sales. At the time she felt that Chamberlain instructing her to check with him or Hussain prior to providing information to HP was to spare her from doing unnecessary work.  Brossard's request would have been a lot of work for her. At the time, she did not think that Hussain and Chamberlain were trying to hide information from HP.

**HP INVESTIGATION**

Anderson's role in the forensic investigation conducted by HP started when the legal department asked her to look into some issues, including the hardware sales. She been working on some of these issues as part of the statutory audit.

In hindsight, Deloitte was misled by Autonomy on such issues as the hardware sales and the software reseller transactions. Anderson specifically cited the Vatican deal where she recalled Hussain went into specific details to provide the commercial rationale for going through the reseller. There were no real end-users with some of these reseller

transactions. Pete Menell also provided detailed explanations to Deloitte during the audits and reviews. Autonomy's representations that there were no side agreements with the VARs were "rubbish". The VARs just signed paper to make a margin fee. In hindsight, Deloitte should have followed up on (OEM) sales figures relating to the software purchased from the VARs.

Anderson told Prentis that she was being interviewed by the US Government regarding the statutory audit. Anderson has not discussed the transactions or the results of the forensic findings with Prentis out of confidentiality. Anderson and Prentis continue to be friends and see each other occasionally. They do not normally talk about what happened at Autonomy, but when they do, Prentis attributes the fight between HP and Autonomy to differing accounting cultures. Prentis thinks Autonomy was merely being aggressive while HP is very conservative with its approach to accounting and thus the disagreement between the two. Anderson keeps silent when Prentis talks to her about the issue.

Most of the times when they get together, Prentis tells Anderson that Hussain wants Anderson to leave HP and work for them. The most recent discussion was in August 2014. Anderson has declined the job offers made by Hussain through Prentis.

Anderson ran into Chamberlain approximately a year and a half ago at a charity event. She could not recall the exact date but thought that it was after Chamberlain left Autonomy. Lisa Harris hated working for HP and left in early 2013.

**EXHIBIT 1469 -- 11/8/2011 E-Mails WITH ATTACHED SPREADSHEET**

Anderson commented that the spreadsheet attached was prepared by Lisa Harris. Anderson stated that the hardware line item under Revenue Forecasts and Actuals had been inappropriately manually zeroed out.