# Exhibit 3



DATE:   December 13, 2012

SUBJECT:   Memorandum of Interview with Antonia Anderson – December 6, 2012

I. **Interview Overview**

On December 6, 2012, Susan Resley and Martha Stolley of Morgan Lewis and Bockius ("MLB"), and John Archibald of PwC conducted an in person interview with Antonia Anderson ("Anderson"), Autonomy's current Director of Revenue. The interview was held at the Cambridge offices of Autonomy ("AU"). Owen Hammond of MLB also attended. The interview lasted approximately one and one-half hours and was in connection with HP's internal investigation of former Autonomy management and Autonomy's business and accounting practices.

At the beginning of the interview, Ms. Resley explained that MLB is interviewing multiple Autonomy employees to gather facts about what happened at Autonomy before the HP acquisition. Ms. Resley told Anderson that HP and MLB had reported certain issues to the Securities and Exchange Commission ("SEC") and to the UK's Serious Fraud Office ("SFO"). Ms. Resley requested that Anderson speak openly during the interview and clarified that the interview was not a deposition. Ms. Resley advised that Anderson could offer opinion and speculate, as long as Anderson could explain a rational basis for this speculation.

Ms. Resley provided Anderson with "Upjohn Warnings" by advising Anderson the interview was part of HP's internal investigation, that it was privileged and that Anderson should keep the discussion confidential. Ms. Resley further advised Anderson that MLB represents HP and therefore, HP can choose to waive the privilege at its discretion.

Because of Anderson's tenure on the Deloitte audit team, much of the interview focused on her work at Deloitte. At the end of the interview, Anderson expressed concern how the discussion of her time with Deloitte would be treated, given that HP, not Deloitte owned the privilege. She recalled signing a confidentiality agreement with Deloitte. Resley emphasized that the investigation was fact gathering and was focused, in part, on former management's representations to its outside auditors.

II. **Background and Responsibilities**

Anderson joined AU in May 2011 as Group Financial Accountant, which was a new role created following the Iron Mountain acquisition. Prior to joining AU, Anderson worked for seven years at Deloitte, where she was assigned to the engagement team for AU. She recalled that Steve Chamberlain ("Chamberlain") had mentioned during the 2010 year-end "wrap up" meal that he was expanding the team and, to Anderson, it seemed like a good time for her to move on.

Anderson's first large project at AU was to prepare a working capital summary for Iron Mountain, which was submitted by August 2011. She then started her current role as Revenue Director in September or October 2011, shortly before Poppy Prentis ("Prentis") resigned. Prentis left for personal reasons (she became pregnant, and is now no longer working). Anderson knows Prentis well, as Prentis was also on the Deloitte audit team. Anderson and Prentis had "overlapped" on the audit team for approximately one year. Prentis left Deloitte for another company and then joined AU, about 18 months before Anderson did. Prentis is a good friend of Anderson's and they see each other regularly.

III.   **Work on the AU Audit Team with Deloitte**

    A.   Overview

Anderson had no specific software accounting background before joining the AU audit team. Since she was junior at that time, she learned much of what she now knows from working on the AU engagement.

The accounting for the Zantaz acquisition was the first large piece of work Anderson was involved in with the AU audit team. The last major matter that Anderson worked on was the AU 2010 year-end audit. Anderson was Audit Manager and reported to Lee Welham (Senior Manager) and Nigel Mercer (Partner). Richard Knights was the prior engagement partner and his role most likely ended with the 2009 year-end audit. (Rob Knight was also previously on the team as a Director, but ceased to be involved once he was promoted to partner.)

There was little partner involvement in the verification of individual transactions. This was delegated to junior partners and below. Partners led the audit committee calls and, although Anderson attended some of them, she did not play an active role. Chamberlain and Sushovan Hussain ("Hussain") were the main contacts at AU, the latter having contact with Deloitte on all the large deals. Hussain provided an "outline" of the deals to Deloitte. Certain questions were "filtered upwards" to Hussain. Anderson, Welham and Chamberlain had initial contact; then certain issues were escalated to a discussion between Hussain and Mercer (or Knights, during his tenure on the audit team). An example of an issue that was escalated was the booking of hardware sales as marketing expenses rather than as COGS.

Deloitte held private sessions with management and possibly the audit committee, although Anderson could not recall the details of these.

Anderson did not recall Deloitte taking issue with fact that the CFO (Hussain) was driving sales. She noted (from her experience of working at AU) that a customer often expected to see senior management present on the deal negotiations.

Anderson described a "healthy working relationship" between AU and Deloitte. The audit team raised issues and got "push back," but also got answers to their questions. She noted that, in the Cambridge finance sector, "everyone generally knows everyone." Anderson agreed with the proposition that it was "prestigious" to be auditing AU, as it was a high profile, listed company.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329001
EXH 5001-0002

Anderson did not think that Deloitte failed to push AU management from fear of losing them as a client. She explained that there were methods and processes to be followed. Ultimately, the decisions on the "judgmental areas" were made by the partner, and she never had cause to question their work. She stated that Knights and Mercer would not have "signed off" on the financials if they were not happy with the explanations provided by management. Anderson also noted that AU undertook voluntary quarterly reporting when it was not required. As a result, there was no perceived lack of transparency.

    B.    Quarterly reviews

The focus of the quarterly reviews was usually revenue, since this was identified as a risk area, and any large value deals. Every deal of $1m was looked at, as well as a sample of deals over $100,000. The audit team checked that the applicable revenue recognition criteria were satisfied and assured themselves that they had addressed their concerns through discussions with AU and requests for further information. One such area of concern was poor reseller payment history – i.e., slow pay.

    C.    Vatican Library

Anderson recalled that Deloitte raised the Vatican Library deal with AU because Microtech was the reseller, and there was a large receivable balance (in the region of $10m, she thought). Anderson noted that Microtech had a high volume of deals, so it would not have been unusual for there to have been an outstanding balance against it. She believed the receivable re Vatican Library was resolved when Microtech paid its balance. Anderson recalled that Hussain and Peter Menell ("Menell") described the transaction to Deloitte.

Anderson remembered that the value of the deal initially was presented as between $80-$100m. There were then delays to the project and, finally, the deal "went through Microtech." The contract with Microtech was the first, and possibly the only, contract Anderson saw in relation to the Vatican Library deal. Anderson recalled that there was intense secrecy surrounding the deal and that the individuals that AU was dealing with at the Vatican were given code names, such as "Papyrus." She also remembered Menell was very proud of the deal and that he showed off a gift he was given by the Vatican, which was some kind of relic. Anderson was not sure whether the deal with the Vatican closed. She did not know why Microtech became involved but was sure there would have been a discussion with Deloitte about this.

Anderson now understands that the Vatican Library deal was never closed. Fernando Lucini told her that another company is now involved in this work and that the equipment given to the Vatican is being recovered.

    D.    Resellers

        1.    Use of Resellers in Deals

Anderson said that, as she understood it, the reseller took the risk and reward of the underlying software deal and, as a result, AU recognized the revenue upfront. If there was any mechanism in the contract that enabled a reseller to be refunded or that allowed the reseller to deliver the

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329002
EXH 5001-0003

software onwards to a third party, "this was different." According to Anderson, there might have been a couple of instances of this, but the issue arose in very few cases.

Deloitte's testing involved assessing whether the software was delivered and whether the payment history of the reseller suggested "payability." Resellers with a history of large deals in which they paid demonstrated "payability" for purposes of revenue recognition. If concerns were raised, Deloitte would request the financial statements for the reseller. Deloitte did not conduct any follow-up to see whether the deal with the end user closed. Sometimes the resellers paid when the invoice was raised but other times it had to be "raised as an adjustment." Anderson noted that many Italian resellers often proposed adjustments and had no payment history. Anderson stated that there was a general reluctance to post an adjustment, but there was nothing unusual about it; the same was true of all companies.

Anderson was surprised to learn that there were occasions when the reseller had not paid, but she emphasized that this happened in only a couple of cases. Further, she did not recall any examples of resellers trying to cancel a contract when/if they were unable to sell – i.e., there were no "returns." [Anderson stood by this statement despite her learning of the existence of at least one side letter – e.g., the Tikit situation.] The other contracts she saw were direct arrangements with the end user, although there were very few such arrangements. Generally there were not many cases where AU demonstrated that it was taking on the risk.

    2.    AU's Purchases from resellers

        a.    Purchases from Microtech

Anderson recalled conversations about AU's need to purchase a mobile unit (from Microtech in 2010) and stated that, if the necessity had been justified, the purchase would have been deemed reasonable. Anderson said that she remembered Hussain explaining the need for the unit but she could not remember the purpose of the unit either for AU or for Microtech. There was no direct contact between Deloitte and Microtech.

        b.    Software Purchases from Resellers

Deloitte made inquiries to ensure that the software AU purchased had a standalone value. For example, Menell would have been asked about the purpose of each software purchase. Another test of a legitimate purchase was to validate that the software had been loaded into the delivery system. She did not recall specific AU software purchases.

When asked if she felt Deloitte was misled about AU's purchases, Anderson said that she recalled Menell providing justifications at the time (though she could not recall any details). She said that now that she has learned that there was no value for AU in some of these purchases, "it feels strange."

    E.    Hardware transactions

Anderson recalled seeing hardware sales sold at a loss beginning in 2009. These were described to Deloitte as part of a strategy to become a "one stop shop" for customers who wanted to

-4-

streamline their purchase. These customers were described as "big spenders" with AU and the exercise therefore was profitable overall. Anderson described a memorandum that was produced by AU to describe the basis of these sales. It was a "white paper" for action, rather than an analysis of specific sales, but it specified how much certain AU customers were spending, in support of the proposition that the strategy was working.

Anderson could not recall the types of hardware that were purchased, although she did remember seeing orders for "huge amounts" of laptops, in relation to some issues raised by Deloitte.

Anderson recalled participating in an Audit Committee call during which hardware sales were discussed. "It was always suggested that the hardware sales were a one-off, and would be reduced in the future," she commented. On the call, the non-executive directors of AU expressed some concern that the hardware sales "were not Autonomy's business." Deloitte's view was that if the sales continued at their highest previous level (she could not remember the rate of this "tipping point," possibly more than 10%), AU would have to disclose the hardware sales as a separate line item.

Anderson assumed that the sales never reached the "tipping point" again since the hardware sales were never ultimately disclosed as a separate line item. She only attended two calls during which this issue arose and the discussion was led both times by Hussain, Chamberlain, and Richard Knights (for Deloitte).

The hardware costs initially were booked as "marketing" expenses, but Anderson said the line item may have changed. According to Anderson, Deloitte would have a lot of documentation on this issue, and Deloitte's conclusions (and the basis for them) would have been reflected in their work papers. Additionally, it is possible that Deloitte's work papers contain notes of discussions with Chamberlain or Hussain. Copies of the purchase orders probably would not have been kept, though the orders most likely would have been referenced in a spreadsheet. The "white paper" describing AU's justifications for the sales as marketing expenses certainly would have been in Deloitte's work papers.

### IV. Working for AU

#### A. Overview

The culture at AU was one of hard work. There was a hard push towards the quarterly review, and then a "lull." Anderson did not feel that she was under pressure to do anything she was uncomfortable with during her time at AU. She has seen things which, in hindsight, were different than how AU management presented them to Deloitte.

#### B. Reseller deals

Anderson remarked that, now that she is "on the AU side," it appeared that there are more cases of resellers not paying than she was aware of when she was at Deloitte. She noted, however, that auditors do not get to see everything: "everyone puts on their best performance for the auditors."

-5-

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329004
EXH 5001-0005

One example of a reseller deal with an "unclean trail" that she has seen since coming to the "AU side" is the Bank of America ("BoA") deal. It appeared to have been negotiated as a direct contract with BoA (in which case no revenue could be recognized), but it "purported to be a reseller deal" since a contract was also held with the reseller. If this had been raised without Anderson's knowledge, it would have been discussed with Hussain and Chamberlain and reflected in the work papers.

    C.    Professional services

Another "surprise" to Anderson was the accounting treatment of professional services and consulting. While certain products – e.g., "off-the-shelf" products – required minimal consulting work and, therefore, no need to account for the difference between the consulting and the cost of the license, other products/licenses had "huge requirements" that were not accounted for. Anderson saw situations where the accounting of the maintenance portion of the contract was "very underplayed" – i.e., the work estimates in the contracts were "ridiculously low" in comparison with the work that was ultimately carried out. In some cases, the description of the services to be provided was in a different contract than the software license contract, and the former often was not supplied to Deloitte. Anderson believed this was done so that AU could collect the revenue for the maintenance element of the contract upfront, on delivery of the license.

Anderson cited the Euronews deal in early 2011 as an example – the maintenance contract was signed separately from the software license and only the license contract was provided to Deloitte. The license agreement showed $100,000 of services; however, the separate maintenance contract showed the cost of the services as approximately $1m.

    D.    Purchases from resellers

Anderson cited a conversation she had with Sean Blanchflower ("Blanchflower") regarding AU's purchases from resellers. Blanchflower told Anderson that the EMC purchase was simply hardware and software that AU did not need. "Not knowing what value purchases had calls into question the other side," she explained.

Anderson said she was aware of various other "unclear" deals but could not recall the specifics.

    E.    Hardware sales

Anderson explained that because Deloitte had agreed on the approach and because everything she saw was consistent with what AU previously had disclosed to Deloitte, she did not see any reason to change anything when she began her role in AU Revenue.

    F.    Acquisition of AU by HP

Anderson described changes in the way AU management dealt with accounts after the HP acquisition.

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329005
EXH 5001-0006

All financial matters were discussed with Hussain. He insisted that everything be funneled through him and prioritized. Anderson did not draw any conclusions about this at the time but noted that the inferences might be quite different in the context of current events. Anderson began to report to Lisa Harris, who in turn reported to Chamberlain.

Anderson was asked by Chamberlain and Hussain to adjust journal entries at the end of Q1 2012 – specifically, she was asked to add $5.5m to the revenue figures across "four streams". Hussain and Chamberlain gave Anderson the impression that the original figures were lower than expected and told Anderson to confirm and check that no revenue had been missed. Hussain and Chamberlain advised her that if they were mistaken, the revenue would be reversed to the amounts she had recorded. However, the figures "went through" as Hussain and Chamberlain had requested. Anderson did not know whether there was anything suspicious or strange, but felt uncomfortable.

Anderson explained that the revenue was ultimately reversed in the following quarter. As a result, AU had to begin the next quarter on a "negative." Anderson said she later reminded Hussain of this when they went through the forecasts together and had to insist on it when he complained that targets were too low. AU therefore started that quarter "way off" its targets. It seemed obvious to Anderson from the SMS that the licenses they had forecasted were not going to close and she approached Hussain for permission to de-commit from the forecasted figures. Hussain refused to de-commit.

Generally speaking, the revenue targets were "ludicrous" and far beyond the capacity of the business, although she was aware that Boston Consulting Group did some business models for AU. Anderson's impression was that Mike Lynch and Hussain derived the target figures on the basis of AU's ability to utilize the HP sales force and client book. However, "AU did not understand what the processes at HP involved." She stated that the HP way of doing things was much more bureaucratic than what AU was used to. Even in her role, Anderson found it difficult to work out how to get some things done. The sales team treated a request from HP as a pipeline deal but "did not realize that it had to go through 20 approvers at HP."

Anderson noted that Hussain was aware of what there was in terms of recurring revenue streams and he constantly was "interrogating" sales, as well as negotiating the large deals himself. There was no lower level input on forecasting.

G.   Announcement by HP

Following the announcement by HP on November 20, 2012, Anderson spoke to Prentis. She did not discuss her interactions with PwC. Instead, they talked about how "people [Deloitte] knew all about the hardware" and there was nothing illegal about selling hardware. What is more, Deloitte was satisfied that the level of hardware sales did not exceed approximately 10% of revenue. She felt that it did not need to be disclosed separately and in retrospect believes that nothing was hidden between AU and Deloitte; both knew how much hardware was being sold and how it was reported. Anderson reiterated her belief that, because of Deloitte's warning, if the level of hardware sales had increased, then AU would have disclosed it separately. She did not believe that Deloitte "let them off."

FOIA CONFIDENTIAL TREATMENT REQUESTED

HP-SEC-00329006
EXH 5001-0007