# Exhibit 5

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    02/09/2024

Antonia (Halstead) Anderson (ANDERSON), previously interviewed, was interviewed at Sheraton House, Castle Park, Cambridge, CB3 0AX, United Kingdom (UK). Also present for the interview was Assistant United States Attorney Adam Reeves and Swanson & McNamara LLP Attorneys August Guggenheim and Ed Swanson as counsel for ANDERSON. After being advised on the identities of the interviewing parties and the nature of the interview, ANDERSON provided the following information:

**Rebasing Exercise**

Initially the rebasing exercise focused on deals over $1,000,000. This initial search was to determine which deals were problematic and determine if further work was needed. The rebasing exercise evolved from there. The rebasing exercise was used to establish an operational baseline for the financials that future projections could be accurately made from. The rebasing exercise also focused on ensuring the financial figures were correct from an accounting standpoint.

The rebasing exercise was prompted by a PWC request and a request from Joel Scott and evolved from there. ANDERSON focused on the restatement of statutory accounts, not the valuation. PWC and Chris Yelland (YELLAND) worked on the valuation portion of the rebasing exercise. YELLAND oversaw internal discussions at Hewlett-Packard (HP) related to the valuation changes.

ANDERSON never felt motivated to just find issues while working on the rebasing exercise. ANDERSON advised she wanted to move on and work on other things. ANDERSON spent years working on the rebasing exercise.

**Information Anderson Already Knew**

ANDERSON learned additional information she did not know while she worked at Deloitte, AUTONOMY, or HP through her participation in the United States (US) v. Hussain trial and the UK civil trial. The EDD invoices related to Capax were not new to ANDERSON, as they were part of the rebasing exercise. Details about the Microlink acquisition were new to ANDERSON. The MicroLink

---

Investigation on  01/18/2024  at  Cambridge, United Kingdom (In Person)

File #  318A-SF-2582907-302                            Date drafted  01/26/2024

by  Britta F. Huebsch

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

US_FBI_E-00030246

acquisition was not included in the rebasing exercise because it did not fall under the deal review categories covered. The transactions with Filetek were not new to ANDERSON and were included in the rebasing exercise.

**Stephen Chamberlain (CHAMBERLAIN)**

A few times during the AUTONOMY audit, CHAMBERLAIN would instruct the audit team to speak to HUSSAIN about specific deals. This happened with at least one deal per quarter. At the time ANDERSON thought that AUTONOMY did not let him get involved in all deals. Now ANDERSON believed that CHAMBERLAIN knew about all the deals but did not want to talk to the auditors about them as a way to keep his hands clean. ANDERSON's impression was that CHAMBERLAIN saw it as HUSSAIN pushed the suspicious deals and therefore HUSSAIN had to do the talking. ANDERSON advised that if one reviewed the AUTONOMY deals deal by deal it would be hard to justify how CHAMBERLAIN would not have had knowledge of the suspicious deals.

ANDERSON spoke with CHAMBERLAIN in 2010 about the termination of Ganesh Vaidyanathan (VAIDYANATHAN) and Percy Tejeda (TEJEDA). CHAMBERLAIN expressed that VAIDYANATHAN and TEJEDA were terminated because of their loyalty to Brent Hogenson (HOGENSON) and that HOGENSON had influenced them too much. HOGENSON had raised concerns about AUTONOMY. HOGENSON raising concerns impacted not only HOGENSON but also members of his team.

**Exhibit 37 – 31 March 2009 Management Representation Letter**

The statement "We have made available all records" in the letter was AUTONOMY's attestation that it provided Deloitte with access to everything and nothing was withheld. This also implied that side agreements were disclosed. In later versions of the management representation letter, disclosure of all side letters became a separate bullet. As an auditor there were not any steps that really could be taken to ensure that everything was provided; the process was reliant on the company providing everything.

**AUTONOMY's Financials in USD**

For the audit, AUTONOMY's materiality was calculated in US dollars (USD). This was likely because AUTONOMY's consolidated financials were in USD because the majority of their revenue was earned in USD.

**Exhibit 531 – Email Subject: Microlink/Microtech**

The audit team inquired whether Microtech was a separate entity from Microlink and therefore if the transactions between the two were standalone or affiliated. The audit team also raised questions about Microlink's

318A-SF-2582907-302

Continuation of FD-302 of (U) Interview of Antonia Anderson , On 01/18/2024 , Page 3 of 3

outstanding debt balance prior to AUTONOMY's acquisition of Microlink.

**Exhibit 979 – Audit Report Interim 2010**

The audit work related to Filetek worked to justify that Filetek software had standalone value to AUTONOMY.

US_FBI_E-00030248