# EXHIBIT B

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD

# FEDERAL BUREAU OF INVESTIGATION

Date of entry  07/13/2016

ANTONIA ANDERSON, date of birth December 29, 1980, was re-interviewed at the United States Attorney's Office, 450 Golden Gate Avenue, 11th floor, San Francisco, California. Ed Swanson and August Gugelmann represented ANDERSON during the interview. ANDERSON was interviewed pursuant to a proffer agreement with the United States Attorney's Office. Assistant United States Attorney Robert Leach, Forensic Accountant Marlene Smith, Special Agent Lester Kwok, and Special Agent Keigan Park were also present for the interview.

After being advised of the identities of the interviewers and the nature of the interview, ANDERSON provided the following information:

ANDERSON had first seen the "Top 40 Customer List" approximately one month prior to the interview. ANDERSON was tasked with recreating the list from HP-Autonomy's records. ANDERSON had no insight into how the list was originally prepared.

**HP-SEC-01692481 – Tab 1 of Top 40 Customer Analysis Spreadsheet**

ANDERSON copied the yellow section from HP-SEC-01671097, an e-mail from Steven Chamberlain which attached a customer list including revenue from 2009 to Q2 2011. The data in this section came from three Autonomy billing systems; ERP, the legacy Autonomy system, NIBS, the legacy Zantaz System, and Softrax, the legacy Interwoven system. The systems were created to capture all of Autonomy's sales orders and customer billing information.

The rest of the information on the spreadsheet was ANDERSON's work towards recreating the Top Customer list. The section with the light blue header contained all revenue from 2010 to Q2 2011. The dark blue section contained revenue from 2010 to Q2 2011, excluding transactions marked as hardware. ANDERSON included these sections due to her desire to recreate the Top Customer list attached to an e-mail in HP-SEC-01671112.

ANDERSON was confident that she went through a similar process to recreate the list of customers under the green heading. This was due to the fact

| Investigation on | 07/05/2016 | at | San Francisco, California, United States (In Person) |

File # 318A-SF-2582907-302   Date drafted 07/05/2016

by Keigan M. Park, KWOK LESTER

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of   (U) Interview of Antonia Anderson - July 5, 2016   , On 07/05/2016 , Page 2 of 10

that her numbers, which were derived directly from ERP, NIBS, and a previously downloaded copy from Softrax, matched the numbers in the yellow section.

ANDERSON was directed to the row containing information for Bank of America. For the ERP and NIBS data, ANDERSON extracted a new statement from those systems. For the Softrax data, ANDERSON obtained a report which was previously run on the system and saved in HP-Autonomy's books and records. This was sent to ANDERSON by CARRIE CLARK, who was the person currently responsible for managing the Quarterly and Monthly Softrax reports. These reports are currently stored on a shared drive at HP-Autonomy. The Softrax column was marked as "TBD" since ANDERSON originally focused on ERP and NIBS. The Softrax data was then added to the spreadsheet and the TBD should now be deleted.

In regard to the dark blue section, it did not appear to ANDERSON that hardware resale transactions were included in the customer analysis list in HP-SEC-01671113. Removing the transactions which were labeled hardware in the ERP system helped to remove some of the differences between the original list and the final customer list. For example, SHI is a customer on the list, for which all of the revenue was hardware. Once the hardware revenue was removed, the transaction did not appear on the list.

When looking at the Bank of America row, there was the same number in the light blue section as the dark blue section. Since the billing system contained zero hardware, there was nothing to exclude. ANDERSON knew that all of the loss making hardware transactions went through ERP. There were other contracts which contained an "element" of hardware. For example, storage cells which were sold to Citibank. Only the loss making hardware transactions listed in ERP, through Autonomy Incorporated, had the separate hardware code. ANDERSON made no attempt to further exclude hardware revenue by eliminating amounts in NIBS or Softrax.

ANDERSON was asked if she knew what the $1.4 million difference between her calculated numbers in the dark blue section and the number in the Top Customer list was the result of, to which she responded "no." The $33.3 million in ERP was the combination of license, support, and services. ANDERSON had not looked to see what contracts made up the total amount.

**Morgan Stanley Row**

From 2010 to Q2 2011, there was $14.5 million in revenue within ERP, and $18.8 million in NIBS, for a total of $33.3 million. If you removed the hardware in ERP, the result was a decrease of $17.9 million, which resulted

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of (U) Interview of Antonia Anderson - July 5, 2016 , On 07/05/2016 , Page 3 of 10

in a calculated total of $15.5 million versus the reported value of $18.9 million. ANDERSON was asked how the hardware number was larger than the ERP number. ANDERSON explained that the way she calculated the customer revenue number was to take all of the revenue where Morgan Stanley was the end user. The $14.5 million included a contract which was placed with MicroTech. Within the 2010 to Q2 2011 timeframe, the MicroTech transaction was reversed. If it was excluded, the original ERP number would have been higher. The total revenue number for Morgan Stanley was really $33.4 million not $18.9 million.

[Agent Note: At this point in the interview, Special Agent Kwok exited the interview.]

ANDERSON was asked about her time as a Deloitte auditor assigned to the Autonomy engagement. ANDERSON indicated she was familiar with the accounting treatment used for the hardware transactions. ANDERSON was asked if the accounting treatment reflected the nature of the substance of the transactions, to which ANDERSON indicated that she had not seen any evidence confirming the explanation for the transactions provided by Autonomy management. ANDERSON clarified that she had not seen anything to suggest the hardware sales were part of a marketing campaign.

**SHI**

ANDERSON was asked if the $56 million in revenue through SHI was completely excluded from the Top 40 Customers by revenue list, to which ANDERSON said "correct." ANDERSON was asked if the revenue was included within another customer, to which she responded "there isn't mathematically anywhere it would be hiding."

**Citigroup**

The $5.775 million difference within the green section is due to the fact that the deal with Discover Technology was added to the Citigroup line. The numbers in the row were a combination of both direct deals with Citigroup and a transaction which was booked through Discover Tech.

**JPMC**

ANDERSON noted that revenue with hardware for JPMC was $30.3 million versus the $22.2 million with the hardware excluded.

**IBM**

For the Top Customer list that was produced to HP, the revenue for IBM was

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of  (U) Interview of Antonia Anderson - July 5, 2016  ,On  07/05/2016  ,Page  4  of  10

split out into individual end users. This included a split into IBM-Amex and IBM-Metlife. The other IBM end users were too small to make the list; however, if you combined them they would make up the difference between the IBM total versus IBM-Amex and IBM-Metlife numbers.

**KPMG**

ANDERSON was directed to the KPMG row and asked about the $21.9 million in total 2010 to Q2 2011 revenue versus the $15.4 million in the Top Customer list. The $6.5 million difference related to a transaction with Tikit with the end user KPMG, which was excluded from the KPMG total in the Top Customer list. ANDERSON's total included the total revenue from both KPMG and any reseller transactions with KPMG listed as the end user. ANDERSON explained that she could have also just shown billings direct to the end user and excluded the reseller transactions to get to the reported number.

**Discover Tech**

The Top Customer list included nothing for Discover Tech. The Abbott Labs and Dell/Hyatt transactions were both broken out by the end users.

**Zones**

The number relating to revenue from Zones was not included on the list and ANDERSON was not able to find any Zones related end users which were included in the list. ANDERSON was asked if it appeared to her that there was an effort made to purposely strip out hardware sales from the Top Customer list, to which she replied "yes."

**VMS**

The difference between the recalculated number and the Top Customer list was due to a hardware sale. Once this sale was taken out, there was no difference in the numbers. The 2010 transaction with VMS was different than the transactions with Zones and SHI.

**HP**

ANDERSON was asked if the $7.35 million difference in her recalculated numbers and the submitted Top Customer list was equivalent to the June 2011 HP-MicroTech deal, to which she responded that "sounds right." ANDERSON then verified that this was the case using data from her laptop.

**Vatican Library**

US_FBI_E-00017655

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of (U) Interview of Antonia Anderson - July 5, 2016 , On 07/05/2016 , Page 5 of 10

ANDERSON indicated the total revenue number she calculated for the Vatican included both deals with MicroTech and Auxilium. The $11.55 million number listed on the Top Customer list only included MicroTech. The difference was roughly equivalent to the Auxilium transaction.

**Prisa**

ANDERSON was asked if the $13.97 million listed on the Top Customer list included reseller deals, to which she responded that it included the $3.8 million deal with Discover Tech.

**Amulet Hotkey**

ANDERSON was asked if the Top Customer list excluded $9.5 million in hardware revenue which was sold to Amulet Hotkey, to which she responded "yes." ANDERSON was asked if some portion of that $9.5 million in hardware revenue was included in another customer's total, to which she responded "no."

**Insight**

ANDERSON was asked if $9.1 million in hardware revenue through Insight was excluded from the Top Customer list, to which she responded "yes" it was not included in the Top Customer list.

**Bank of New York Mellon**

ANDERSON was asked if she was able to match the revenue numbers associated with Bank of New York Mellon in the green section, to which she responded "yes." ANDERSON was then asked if all of the revenue from Bank of New York Mellon was excluded from the Top Customer list, to which she responded that once the hardware revenue was excluded from the total, it seemed to her that Bank of New York Mellon was excluded from the list since the total was not large enough to be listed.

ANDERSON was asked if Bank of New York Mellon was a software customer of Autonomy's, to which she responded "possibly" but at a small value.

**UBS**

ANDERSON explained that the UBS number was increased due to the deal with Capax. The Capax deal was added to the UBS line to get to $16.4 million.

**McAfee**

US_FBI_E-00017656

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of (U) Interview of Antonia Anderson – July 5, 2016 , On 07/05/2016 , Page 6 of 10

ANDERSON was asked to explain the $1.093 million difference between her calculated numbers and that present in the Top Customer list. ANDERSON posited that there was $5.7 million in revenue from 2010 to Q2 2011. $5.25 million of that was through deals with Capax, the balance being direct deals between Autonomy and McAfee.

**Metro Business Solutions**

ANDERSON was asked if $6.6 in hardware revenue from Metro Business Solutions was excluded in the Top Customer list, to which she responded "yep."

**HP-SEC-1692481 – Tab 2 – "Compare to Final"**

The yellow section was taken from the Top 40 Customers 2010-2011 attachment (HP-SEC-01671113).

**HP-SEC-01692972**

The exhibit contained ANDERSON's analysis on Top Contracts.

The square on the left of the spreadsheet, labeled Original list, was from the Top 40 Contracts List (HP-SEC-01671114). The columns with the blue header were columns produced by ANDERSON in order to recreate the values on the list from Autonomy's records.

In order to complete the task given to her, to create a list of the Top 40 Contracts, ANDERSON looked in Autonomy's billing systems. She then extracted the billing for the period in question and ordered the information by sales order number.

Netsuite was another billing system which was the result of Autonomy's acquisition of Iron Mountain in June of 2011.

**Bank of America**

When searching ERP, there was no contract in the billing system that was as large as the $22.5 million listed for Bank of America. ANDERSON posited this was a combination of reseller deals from Discover Technologies and Capax.

**UBS**

This was treated similarly to Bank of America and the total listed on the Top Contract list seemed to be a combination of reseller deals.

US_FBI_E-00017657

**BP**

There was a sales order for BP listed in ERP for $14.2 million. It was the largest order ANDERSON found in the ERP data.

**Iron Mountain – pship**

ANDERSON found the order in Netsuite.

**Notes on analysis by sales order number**

ANDERSON advised that since she had combined items by their sales order number, if deals with a reseller were credited, the net would be "nil" and would not be reflected on the list. This was true of the listed $3.5 million reseller transaction between Autonomy, Discover Tech, and Bank of America.

**Observations regarding missing contracts**

ANDERSON was asked about the five hardware transactions she listed in this section. Each of the orders had a sales order number in ERP. If Autonomy management ran ERP and ordered the list by value these transactions would have been included. ANDERSON was asked if who ever created the list would have had to make a decision to specifically exclude these orders, to which she responded "yes."

ANDERSON was asked if the other transactions she listed which were above $2.9 million had to be specifically excluded as well, to which she responded "yep."

**Iron Mountain**

The Iron Mountain order was listed in ERP as a $1.575 million transaction, which was billed at that amount to Iron Mountain. Autonomy's accounting department increased the value of the transaction to $5.5 million. ANDERSON indicated that Iron Mountain was only responsible for paying $1.575 million. This was listed on the spreadsheet since the value in ERP was $1.575 million, but if the creator of the Top 40 Contract list knew the accounting, it should have been included.

ANDERSON advised that the majority of the numbers in her spreadsheet correlated with the amount of revenue that was recognized on the

transactions; however, a portion of those numbers would have included support and maintenance fees which would have been deferred to a later period.

**Hardware Deals**

ANDERSON indicated that the actual values of individual orders were listed on the spreadsheet. Orders to SHI and Insight did not make the Top Contracts list since the orders were tiny.

**HP-SEC-01692972 – tab 2**

The tab in the spreadsheet labeled "ERP By Order" was ANDERSON's effort to show the true Top 40 Contracts list for 2010-2011.

**Original List**

ANDERSON was asked if any of the contracts on the original Top 40 Contract list included a pure hardware sale, to which she responded "no."

Morgan Staley – DS was a NIBS deal, meaning it was a Zantaz deal. Therefore, it was likely a Digital Safe hosting deal, not a pure hardware sale.

ANDERSON was asked if hardware was excluded from the VMS transaction listed as number 25 on the list, to which she responded "yep."

**Journal Entry in February of 2012**

**HP-SEC-01693511 – February 3, 2012, E-mail from Stephen Chamberlain to Antonia Anderson**

The exhibit included an e-mail CHAMBERLAIN sent to SUSHOVAN HUSSAIN when the finance department was working on closing Autonomy's Q1 2012 accounts. CHAMBERLAIN then forwarded his e-mail to ANDERSON.

ANDERSON recalled that the process of closing Autonomy's books was accelerated. This left less time to process accruals and other things at the end of the quarter. Accruals related to things not yet billed and the release of deferred revenue. Accruals were things where Autonomy had done the work, but had not yet billed the customers.

The ledgers mentioned by CHAMBERLAIN in his e-mail referred to the balance sheets of all of the companies within the Autonomy group. Each of them had a listing for deferred revenue. CHAMBERLAIN was saying in his e-mail that

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of (U) Interview of Antonia Anderson - July 5, 2016 , On 07/05/2016 , Page 9 of 10

the revenue looked low and that they had not released enough from deferred revenue. The e-mail explained that CHAMBERLAIN was looking at the books and records and ANDERSON would have gone to him to tell him the revenue numbers for each of the entities. CHAMBERLAIN said from this information, the numbers looked very low. The e-mail may have been written in ANDERSON's presence and CHAMBERLAIN informed ANDERSON that Autonomy needed to accrue the listed amounts.

ANDERSON recalled a conversation with CHAMBERLAIN prior to this e-mail. ANDERSON could not recall telling CHAMBERLAIN "no" that these amounts did not need to be accrued, since CHAMBERLAIN had more experience with the numbers. ANDERSON would have gone away, looked at the records and thought more about it, then come back and informed CHAMBERLAIN that she did not see where these accruals would come from. ANDERSON asked CHAMBERLAIN to send this e-mail to her, so that she had a record of CHAMBERLAIN asking her to do this.

**HP-SEC-01693508**

The documents in the exhibit related to the journal entries which were done to reflect the accruals listed in CHAMBERLAIN's e-mail. HP-SEC-01693508 related to the "emea 0.5m" in the maintenance line. HP-SEC-01693509 included the rest of the accruals in CHAMBERLAIN's e-mail. HP-SEC-01693508 were journal entries for the UK entity. HP-SEC-01693509-510 related to US entities. Item numbers beginning with "17" related to Interwoven, "26" to Zantaz Inc, "62" to Autonomy Inc, and "67" to eTalk Inc.

**HP-SEC-01693514 - February 3, 2012, e-mail from ANDERSON to HUSSAIN**

ANDERSON's e-mail to HUSSAIN confirmed the numbers after she had entered the accruals. The accruals resulted in Autonomy's total revenue being $221.5 million.

The forecasted numbers were those which were discussed within the quarter. The license number would come from the sales team. The other numbers came from deferred revenue .

The right hand column included HUSSAIN's forecast. The finance group had a weekly meeting with Hussain where he would say what he was expecting in each category and would go through each number on a white board. The other numbers stayed pretty much the same so the update was more concerning the license number.

After entering the accruals, ANDERSON went back to CHAMBERLAIN and said she was unable to find anything to substantiate them so Autonomy needed to

FD-302a (Rev. 05-08-10)

318A-SF-2582907-302

Continuation of FD-302 of (U) Interview of Antonia Anderson - July 5, 2016, On 07/05/2016, Page 10 of 10

release them. CHAMBERLAIN told her that the deadline had passed and the accruals would need to be released in Q2. ANDERSON was unsure exactly when this conversation took place, but it would have been very close to the start of February. ANDERSON advised that she may have even contacted each of the revenue managers from the other entities and had them look for numbers to substantiate the accruals. ANDERSON was sure she had looked through deferred revenue.

**HP-SEC-01693516 - February 15, 2012, e-mail from ANDERSON to HUSSAIN**

ANDERSON attached the revenue report to her e-mail. This report was built from the SMS (Sales Management System) forecast and was sent to HUSSAIN so that he could see it. ANDERSON also included the item in her e-mail about the $5.5 million in accrued entries to continue to alert HUSSAIN to them. ANDERSON's conversation with CHAMBERLAIN, where she told him she was unable to substantiate the accruals, would have happened before this. There was a separate conversation she had with CHAMBERLAIN about how to get HUSSAIN to recognize this point. CHAMBERLAIN told her to remind HUSSAIN when there was a forecast update.

**HP-SEC-01693530 - March 11, 2012, E-mail from Hussain to Anderson**

The e-mail chain contained ANDERSON's response to what entries related to the negative $5.5 million in revenue.

At the time of the e-mail, ANDERSON thought HUSSAIN was asking if these accruals were standard. ANDERSON then likely spoke to HUSSAIN on the phone.

ANDERSON kept bringing the issue up to HUSSAIN to prevent him from being upset by it at the end of a quarter. ANDERSON was asked if she was also raising the issue repeatedly to remind HUSSAIN it was his responsibility as well, to which she responded "yes."

ANDERSON was asked if she ever got pushback on reversing the accruals. HUSSAIN would say something like "can you go look to see if we should be making accruals like this?" Any pushback took the form of saying we should find a way to be making these accruals.

US_FBI_E-00017661