PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6912
    Fax: (415) 436-7234
    Email: Robert.Leach@usdoj,gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-577 CRB |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT MICHAEL RICHARD LYNCH'S MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERT TESTIMONY ON SO-CALLED "MERE DIFFERENCES OF OPINION" |
| v. | |
| MICHAEL RICHARD LYNCH AND STEPHEN KEITH CHAMBERLAIN, | |
| Defendants. | Trial Date: March 18, 2024 |

**TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................................1

II. ARGUMENT ........................................................................................................................2

    A. Autonomy Misled Deloitte Regarding Transactions in Brice Report §§ 2.7–2.10 .................................................................................................................3

        1. § 2.7 – Hosting Transactions .........................................................................3

        2. § 2.8 – OEM Royalty Transactions ..............................................................9

        3. § 2.9 – Timing Errors ..................................................................................11

        4. § 2.10 – Valuation Errors (Iron Mountain) .................................................11

    B. Defendant Cannot Claim Good Faith Reliance on Deloitte's Opinions to Shield Himself from Criminal Liability and Limit the Scope of Mr. Brice's Opinions .................................................................................................................12

III. CONCLUSION ...................................................................................................................15

## I. INTRODUCTION

Defendant Dr. Michael Richard Lynch has moved a second time to limit the proposed expert testimony of Steven Brice on four categories of transactions where, according to Defendant, "Brice's opinion amounts to no more than difference of judgment with Deloitte based on the same documentary evidence." ECF No. 455 at 3 ("Def. Mot."). Defendant previously sought to exclude these same sections of Mr. Brice's report, and the Court denied that motion. *See* ECF No. 297 at 5–9 ("Def. Pretrial Mot."); ECF No. 318 at 16–20 ("Gov. Opp. to Def. Pretrial Mot."); ECF No. 358 (Order Denying Def. Pretrial Mot.). The Court should do so again here.

First, there *is* evidence that Autonomy deceived Deloitte with respect to these transactions by providing misleading information or withholding relevant information that may have impacted Deloitte's accounting judgment. Second, the scheme to defraud in this case concerns the falsity of the financial statements as a whole—the government has not alleged a fraud count on each individual transaction that rolls up into the overall reported revenue numbers. Defendant conflates two separate elements of the charged crimes: (1) intent to defraud; and (2) material false or fraudulent statements or omissions made as part of the scheme. Mr. Brice's evidence is relevant to the latter—the overall scope of the falsity in Autonomy's reported revenue figures and the appropriate adjustment if Autonomy had accounted for its transactions correctly. Mr. Brice should be permitted to testify as to the overall scope of the misstatements, regardless of whether each transaction he reviewed also separately could stand as evidence of the intent to defraud. The Court should resist Defendant's efforts to limit the scope of Mr. Brice's testimony by parsing out each individual transaction, essentially conducting a mini-trial on each one, and deciding whether each individual transaction *standing alone* could satisfy *every single element* of a fraud count by itself. Whether or not Deloitte reviewed the same information as Mr. Brice is not dispositive to guilt in this case. That is one factor Defendant may point to in arguing there was no intent to defraud, but that is not a basis to cabin Mr. Brice's testimony as to the overall scope of the misstatements, particularly where the record is replete with evidence that Deloitte did not receive complete, accurate information. As the auditors have testified in this case, where an auditor is lied or does not receive full information as to any part of an audit, that creates a management integrity issue and

taints the entire audit. Defendant cannot pick and choose certain transactions and claim good-faith reliance on the accounting judgment of Deloitte on certain transactions while Autonomy simultaneously misled Deloitte on other transactions.

Well-established Ninth Circuit and other appellate court authority—which the defense simply ignores—soundly rejects the Defendant's suggestion that Deloitte's opinion limits the scope of relevant evidence. *See SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 467 (9th Cir. 1985) ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance.") (internal citations and quotation marks omitted); *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979) ("Although certified by accountants as prepared in accordance with generally accepted accounting principles, the financial statements are nevertheless the representations of management. . . . [T]he jury could have inferred that defendants, knowing that the financial statements were false and misleading, wilfully filed them with the intent to conceal the bank's losses . . . . that Ernst & Ernst certified the financial statements without requiring adjustments, did not alter the fact that defendants knew statements did not properly reflect the overtrade transactions. . . . There was evidence on the basis of which the jury could properly find, notwithstanding the Ernst & Ernst advice and certification, that defendants knowingly and wilfully filed materially false and misleading financial statements."); *United States v. Simon*, 425 F.2d 796, 805–06 (2d Cir. 1969) ("Proof of compliance with generally accepted standards was evidence which may be very persuasive but not necessarily conclusive that [defendant] acted in good faith, and that the facts as certified were not materially false or misleading.").

For these reasons, and as set forth below, the Court should deny the motion and permit Mr. Brice to testify to the full scope of his opinion.

## II.    ARGUMENT

The full scope of Mr. Brice's opinion is relevant to assessing the scale of the misstatements in Autonomy's reported revenue figures in the relevant period. Defendant seeks to make Deloitte the arbiter of fraud in this case. That is the province of the jury, not Deloitte. As the evidence in this case

has made clear, the onus for providing accurate, financial statements to the public lies with Autonomy *not* Deloitte.  Defendant cannot restrict Mr. Brice's testimony by equating the scope of the scheme to defraud with Deloitte's audit opinion.  The level of information provided to Deloitte may be relevant to intent to defraud, but it is not dispositive as to guilt.  And, where evidence establishes that Autonomy lied or concealed material facts from its auditor, Defendant cannot then cite good-faith reliance on Deloitte as a defense and as a means for preventing the government from presenting evidence on the scale of the falsity in Autonomy's financial statements.  Furthermore, the relevance of Mr. Brice's testimony must not be judged solely within the four corners of what he cited in footnotes of his report.  Where evidence has come into the record that Deloitte did not receive complete, accurate information on certain types of transactions, the government should be allowed to present evidence, through Mr. Brice, as to the impact of those transactions on Autonomy's reported revenue figures.

> **A.     Autonomy Misled Deloitte Regarding Transactions in Brice Report §§ 2.7–2.10**
>
> **1.     § 2.7 – Hosting Transactions**

Mr. Brice opines that Autonomy should have recognized revenue related to certain hosting transactions ratably over the period of time in which the hosting services were to be performed because the commercial effect of the software license could not be considered without reference to the ongoing hosting service.  *See* Green Decl. Ex. A (Brice Report), § 2.7.5.

Deloitte's alleged approval of the accounting treatment for the hosting transactions, which recognized the full license portion of the hosting deal upfront as a sale of goods, was premised on false suggestion conveyed by Autonomy management that customers purchasing these hosting solutions (mostly financial institutions) were transitioning (or intending to transition) to hosting their data themselves inhouse as opposed to using an outsourced hosting solution like that provided by Autonomy. Autonomy management cited *one* example to Deloitte where a bank had elected to host its data inhouse (a Citigroup 2008 deal).  Autonomy used that example to suggest other customers intended to and had the ability to do the same.  For example, a Deloitte memo in which Deloitte outlined its reasoning for its revenue recognition decision with respect to a Deutsche Bank hosting deal stated the following:

- "The commercial reasoning for this license deal is consistent with the current trend in the market place – i.e. more and more financial institutions are transitioning to bringing services in house as opposed to

> outsourcing which has in the past been the preferred choice. Such a transition will allow the customer in question to be totally responsible for any liability of storing the data. An example seen by Autonomy in Q1 2008 was the move taken by Citigroup to negotiate a First Archive contract whereby Digital Safe and EAS license were brought in house and paid upfront. Whilst Deutsche Bank have not taken this step as yet, they fact that they have entered into a license agreement for Digital Safe effectively gives them the right to move Digital Safe archiving inhouse, similar to the approach taken by Citigroup.
>
> The above facts were identified during our review of the contract with DB and were confirmed through discussions with the CTO, Pete Menell, on 30 June 2008 and by the Financial Controller and CFO on 1 July 2008."

*See* Green Decl. Ex. 7823; *see also* Green Decl. Ex. 14722 (Deloitte revenue recognition workpaper for Morgan Stanley Q4 2009 $12m hosting deal stating, "The commercial rationale for this deal is that by having the Digital Safe software . . . MS can store and manage their data to meet regulatory requirements. This is something that we have evidenced a number of large multinational banks doing throughout 2009. Note that per discussion with Sushovan Hussain (CFO) and Pete Menell (CTO), we note that in the long term they hope that MS will move towards the model adopted by Citigroup, in that they will both manage and archive their data in-house").

Lee Welham, one of the Deloitte auditors, confirmed that these representations from Autonomy were critical to Deloitte's decision to accept Autonomy's upfront revenue recognition of the license fee for hosting transactions in the relevant period, as opposed to viewing the transactions as a hosting package and accounting for the revenue ratably. Welham testified as follows:

> Q: But you're familiar with the Citigroup transaction that occurred a little bit before this?
>
> A: I am, yes.
>
> Q: That was a big hosting deal between Autonomy and Citigroup, right?
>
> A: Yes.
>
> Q: So it was taking all of the data that was stored at Autonomy and moving it to Citigroup's in-house facilities, correct?
>
> A: Yes, so I think they stored at their own location essentially.

U.S. OPP. TO MOT. IN LIMINE RE: BRICE        4
18-CR-577 CRB

Q: Okay. And that information was important in the accounting analysis of these deals because it reflected that the software, the DigitalSafe software could be used independent of Autonomy's data servers, right?

A: Yes.

Q: And because of that fact, it was a factor that allowed Deloitte to agree that the software license had independent value?

A: Yes.

Q: Independent of the services?

A: Yes.

Q: And when you reach that conclusion, that allows you to recognize revenue upfront for the license charged to the customer, right?

A: Yes.

Q: And to sum up, and maybe we don't need to go through the rest of the memos, that's what Autonomy proposed to do with its revenue recognition on these data hosting deals, correct?

A: Yes, they delivered the license to the customer.

Q: And Deloitte concurred that that was an appropriate accounting treatment?

A: Correct.
…
Q. Do you see that [Exhibit 7824] is another Deloitte memorandum from just the next quarter involving another big deal with Morgan Stanley along the same lines?

A: Okay.

Q: I guess my question is, without going through this in great detail. You remember that once the precedent was established around this time period, that the big financial institutions could bring, and some did, bring their data in-house. That provided the framework for the accounting treatment of these deals, correct?

A: Yes, I think it was an important factor.

Q: …Going forward Deloitte reviewed many of such deals of Autonomy's and concurred that the accounting treatment was appropriate, right?

         A: Correct.

Tr. 3851:4–3853:13.  Antonia Anderson testified similarly that management conveyed to Deloitte that the license contained within the hosting agreements had independent value to the customer.  Tr. 7063:4–9 ("So we asked questions to understand the nature of the contract and the situation with the customer, and it was explained that the customer is purchasing a standalone license for the software . . . that they can use and has value to them because they would be able to use that software by themselves in the absence of Autonomy services."); *see also* Tr. 7064:3–9 (confirming Deloitte was told banks had the ability to use Digital Safe independently, separate from services provided by Autonomy); Tr. 7066:6–12 (testifying with respect to the Bank of America 2009 hosting deal that Autonomy told Deloitte the customer could use Digital Safe without Autonomy services and that, if in fact Digital Safe was too hard to implement independently by the customer that would affect the accounting).

        Autonomy mislead Deloitte into believing that hosting transactions in the relevant period (2009-2011) were similar to the Citigroup deal in that the customers valued the license independent from the hosting services and that these customers had a real interest in using the software license to take their data in-house and host the data themselves rather than use the hosting services of Autonomy.  In reality, other than Citigroup (which was a 2008 deal), no other Digital Safe customer implemented an on-premise Digital Safe in 2009-2011 without Autonomy's hosting assistance, and even Citigroup required Autonomy's assistance in hosting its data.  *See* Tr. 5363:9–13 (Chris Goodfellow testimony); *see also* Tr. 5600:23–5603:23 (Roger Wang testifying that the license provided in the hosting deals was part of the "package deal" and that "nothing comes to mind" when trying to think of a customer that used Digital Safe without also buying hosting services); Tr. 5634:15–25 (Roger Wang testifying that he did not know of "any customer that ran Digital Safe on any significant scale independently and even Citigroup required Autonomy's assistance).  As Roger Wang testified, this was in part due to the complexity of Digital Safe, which meant it was not an easy software for a customer to pick up and use independently without Autonomy's hosting assistance/managed services.  Tr. 5601:19–5603:4 (testifying that Digital Safe was "very complex software" and a "big massive cloud-distributed system); 5633:11–5634:13 (Roger Wang describing Digital Safe as requiring "handholding", being a

"complicated environment to troubleshoot", and requiring "a lot of tribal knowledge on how things worked.").

The testimony of witnesses from Morgan Stanley and (as anticipated) Bank of America, two of the customers of the hosting contracts listed in §2.7 of the Brice Report, confirms that these banks did not attribute independent value to the license separate and apart from the hosting services, and that the banks viewed these deals as the purchase of hosted services from Autonomy. Al Furman, from Morgan Stanley, testified that, from 2008-2011, (1) Morgan Stanley did not consider operating a Digital Safe without also obtaining hosting services from Autonomy; (2) Morgan Stanley entered into the 2009 and 2011 deals with Autonomy to obtain cost savings for Autonomy's hosting of its data; and (3) Morgan Stanley would not have paid the large license fee associated with these deals if Autonomy had not also been providing hosting services as part of the deal. Tr. 6685:19–22, 6686:11–14, 6698:25–7, 6750:24–6751:5. Reagan Smith, from Bank of America, is expected to provide similar testimony this week.

Autonomy also misled Deloitte into believing that the license carried independent value and commercial substance (separate from the hosting services) by including new software into the deal package that the hosting customer did not request or need, but that Autonomy management nevertheless told Deloitte was an integral part of the deal that the customer valued. A clear example of this is the Morgan Stanley 2009 $12m hosting deal, which included "SPE" as part of the Digital Safe software package. Green Decl. Ex. 459. The Deloitte workpaper assessing the commercial rationale for the $12m license fee in this deal stated:

> "The current agreement requires the payment of a one-time license fee of $12.0m. As noted above, the software provided to MS under this agreement is the same as under the original agreement, *with the key exception that the new version of Digital Safe provided to MS is integrated with SPE*. SPE is a new Autonomy product, launched in Q3 2009. SPE gives additional functionality to IDOL, which allows it to search structured information such as databases. . . . In order to understand the commercial rationale for this purchase by MS and to establish how significant the addition of SPE is (in order to justify the $12m price tag) we have *held discussions with Pete Menell (CTO). Pete noted that . . . . What the addition of SPE allows MS to do is to sort and archive all of their structured data from their transactional databases. . . . In Pete's opinion, from MS's point of view, when compared to other options for archiving all of their global structured data, a price of $12m is tiny.*"

Green Decl. Ex. 14722 (emphasis added). Autonomy did not tell Deloitte that, as of the time of this deal, SPE was not integrated into Digital Safe so a customer could not in fact use SPE's functionality. Tr. 5315:25–5317:19 (Chris Goodfellow testimony). Nor did Autonomy tell Deloitte that Morgan Stanley, when it entered into this deal, did not know what SPE was and that SPE was not a factor in Morgan Stanley's decision to enter into this deal. Tr. 6688:20–6689:4, 6690:7–12 (Al Furman testimony). Similarly, with respect to the 2011 Morgan Stanley hosting deal, Autonomy included Filetek Storhouse as part of the software Morgan Stanley was supposedly "licensing" but seemingly did not inform Deloitte that (1) Filetek software was not integrated into the Digital Safe at the time, (2) Morgan Stanley had not requested this software, (3) Morgan Stanley did not know what this software was at the time, and (4) this software did not play any role in Morgan Stanley's decision to enter into the hosting deal. *See, e.g.*, Tr. 5328:25–5330:1 (Chris Goodfellow testimony); Tr. 6696:2–17 (Al Furman testimony).

Lee Welham testified that it would have been relevant to Deloitte's accounting judgment of the hosting deals if Deloitte had known that the customers did not attribute any independent value to the license they were receiving as part of the hosting deals and that despite the structuring of these deals, the customers were receiving the same hosting service that they had been receiving previously. Tr. 4007:18–4008:15; *see also* Tr. 7063:13–17 (Antonia Anderson testifying that if customer does not value the standalone license, the license revenue should not be recognized upfront and should have been recognized ratably as a services arrangement).

Finally, Defendant is incorrect that Deloitte and Mr. Brice relied upon the same documents (i.e. the contracts) in analyzing the hosting deals. A few examples are provided below:

1. Morgan Stanley 2009 deal: Mr. Brice reviewed an email from Stouffer Egan to Mr. Hussain in which Mr. Egan drafted an email to Morgan Stanley describing the Morgan Stanley restructured hosting deal as "purely financial and causes savings" and "sign and save", indicating that the attraction of this deal was merely to provide cost savings to Morgan Stanley for hosting. Green Decl. Ex. 16680.

2. Morgan Stanley 2009 deal: Mr. Brice reviewed a draft agreement that showed Autonomy had priced the license at $12m even before it added SPE to the agreement, so contradicting the information conveyed to Deloitte that SPE was a key differentiator in this deal.  Green Decl. Ex. 16678.

3. Charles Schwab 2009 deal: Mr. Brice reviewed an email from Schwab to Autonomy in which Schwab requested a lower "license" fee and pointed out that "we do not intend to take the software."  Green Decl. Ex. 16670.

4. Amgen 2010 deal: Mr. Brice reviewed a proposal Autonomy sent to Amgen, which highlighted that the license fee was related to the "archiving service."  Green Decl. Ex. 16785.

5. JPMorgan 2010 deal: Mr. Brice reviewed an email from Stouffer Egan to JPMorgan in which he explained, "Format of deal is an $8.6m software license with lowered hosting rates, paid for over time so similar to your current set up but lesser. . . . It is not a typical new purchase per se, it's a change to contract that lowers current expenditure commitments."  Green Decl. Ex. 16454.  This email confirms that Autonomy was pitching these restructured hosting deals as just a continuation of the prior hosting services at a lower price (i.e. Autonomy was aware that the customer did not independently value the standalone license).

There is a wealth of evidence that Autonomy misled Deloitte with respect to the true substance of the hosting deals, the intent of the customers purchasing these deals, and the value these customers attributed to the standalone license portion of these deals.  Autonomy—not Deloitte—had access to full information but withheld that from Deloitte.  As the testimony of the Deloitte witnesses established, access to complete, accurate information pertaining to these deals would have been relevant to its views as to the appropriate accounting treatment.  Mr. Brice should thus be allowed to testify as to how the reported revenue figures would have changed if Autonomy had correctly accounted for the hosting transactions.

    **2.**    **§ 2.8 – OEM Royalty Transactions**

Mr. Brice opines that Autonomy improperly accounted for three deals as a sale of goods (i.e. recognizing the fee upfront) as opposed to royalties, which would have required the revenue to have

been recognized on an accrual basis in accordance with the terms of the royalty arrangement. Brice Report § 2.8. These three deals were Verdasys (Q1 2009), EMC (Q2 2009), and Rand (Q2 2011). Mr. Brice's view is that Deloitte did not apply the correct accounting standard in reviewing the revenue recognition for these deals. The government will argue that Autonomy falsely accounted for these deals because other evidence in the record establishes that these deals were in fact royalty arrangements, and should have been accounted for as such. Again, Mr. Brice's testimony is relevant to quantify the scale of these adjustments should the jury credit the evidence that Autonomy falsely accounted for these deals.

Mr. Collet, who was head of OEM sales at Autonomy, testified about the OEM sales Autonomy engaged in in the 2009-2010 period (while he was at Autonomy), including Verdasys and EMC. Mr. Collet repeatedly testified that these were royalty deals and that, even when Autonomy sought to restructure these deals to include a larger upfront payment, these payments should be considered "pre-paid . . . royalties" in exchange for foregoing future royalty payments, not license sales. Tr. 6249:2–18. Mr. Collet also testified that Dr. Lynch instructed him not to tell investors that Autonomy was entering into deals involving upfront pre-paid royalties. Tr. 6252:3–22. Indeed, when one investor asked follow-up questions as to whether Autonomy was engaging in this practice, Dr. Lynch instructed Mr. Collet to write back that the upfront payment "covers the first quarter of royalties when [the customer] starts shipping two years later," "[i]t is not normal for our customers to pay upfront royalties", and "[w]e aim to maximize the royalty stream, not the upfront"—statements which Mr. Collet testified were false given the true nature of the OEM deals. Tr. 6261:7–6263:6. Mr. Collet specifically reviewed both the EMC and Verdasys agreements and confirmed they both involved "pre-paid royalties." Green Decl. Ex. 17295 (Rand was outside the scope of his review). On cross-examination, despite defense counsel's best efforts, Mr. Collet declined to agree with counsel that these deals were in fact license fee arrangements not royalties. *See, e.g.*, Tr. 6312:21–6313:1, 6320:4–23. The Deloitte workpaper on Verdasys, cited by Defendant, describes this deal much as defense counsel strived to describe it with Mr. Collet—a sale of "nonrefundable prepaid *sublicense fees."* Given Dr. Lynch's strenuous efforts to prevent Mr. Collet describing these deals as upfront pre-paid royalty deals with outsiders, it is not surprising that similar messaging would have been used in describing these deals to Deloitte when

justifying the accounting treatment (although as discussed above, whether or not Deloitte agreed with Autonomy's accounting of these deals is not dispositive).[1]

### 3. § 2.9 – Timing Errors

In § 2.9 of the Brice Report, Mr. Brice opines that Autonomy improperly recognized revenue from certain software transactions too early because the agreements involved significant installation processes, thus revenue should not have been recognized until the installation process was complete. Defendant incorrectly asserts that Mr. Brice and Deloitte on the same documents with respect to these transactions (the contracts). Mr. Brice, however, relied not only on the contracts but also on the statements of works, which outlined the time expected to install the software with the customer. *See, e.g.*, Green Decl. Ex. B (Pfizer Q3 2009 analysis) (Goldman Sachs Q4 2009 analysis) (both referencing statements of work reviewed as well as contracts).

### 4. § 2.10 – Valuation Errors (Iron Mountain)

Autonomy recognized $16.5m in revenue in Q2 2011 related to a software sale agreement and reseller agreement it entered into with Iron Mountain. Autonomy acquired Iron Mountain assets in May 2011. Because Autonomy entered into transactions with Iron Mountain, as well as acquiring assets, Autonomy had to assess the related nature of the transactions and the acquisition, and the fair value of the transactions. Brice Report § 2.10.2. Mr. Brice opines that Autonomy misstated the fair value and that the revenue recognized should be reversed. Brice Report §§ 2.10.3–2.10.6.

As a threshold matter, it bears mention that Deloitte would not have applied the same level of diligence to its review of this transaction as it may have done in a year end audit, given that this was only a quarterly review (Deloitte never audited the Q2 2011 transactions because of the HP acquisition). Put simply, Deloitte never opined Autonomy's Q2 2011 financial statements gave a true and fair view. As such, Defendant should not be permitted to exclude Mr. Brice's discussion of this transaction on the basis that Deloitte purportedly "signed off" on this accounting. Daud Kahn, one of the analysts who

---

[1] The government also notes that Mr. Brice reviewed documentation in addition the contract that confirmed this deal should be accounted for as a royalty arrangement. Specifically, EMC wrote an email to Autonomy that it did not want to renew the software maintenance portion of the agreement because "we [EMC] do not use the software." Green Decl. Ex. 16586.

testified, explained that there's a "difference between an audit or a substantial audit and a review" and that in the latter an auditor may just tap numbers into a calculator, look at assumptions and see if the calculation seems reasonable. Tr. 4971:4–13.

In any case, Mr. Brice relied upon information in reaching his conclusions that it is not apparent Deloitte received from Autonomy or reviewed. For example, Mr. Brice reviewed emails from Mr. Hussain in which he indicated that Autonomy would waive over $15m in costs/liabilities associated with the Iron Mountain acquisition, if Iron Mountain agreed to enter into a reseller agreement and pay approximately $6m more for this agreement than the previous offer it had made (which was an offer of $5m). Green Decl. Ex. 17286, Ex. 17289. These emails confirmed to Mr. Brice that the reseller agreement should have been considered as related to the acquisition (contrary to Deloitte's view). In addition, Defendant incorrectly asserts that, with respect to the fair value study related to the software agreement, *Deloitte chose* the comparable sales. Def. Mot. 6. Emails related to this fair value study, however, show that this is incorrect. *Steve Chamberlain* chose the comparable transactions for the fair value study and *passed those on to Deloitte*. Deloitte accepted Mr. Chamberlain's analysis—it did not independently conduct its own. Green Decl. Ex. 15879. Mr. Chamberlain provided this fair value study to Deloitte to justify Autonomy recognizing $7m in revenue related to the software agreement, despite the software being sold to Iron Mountain for only $1.5m (so Autonomy inflated the value of the contract by $5.5m). Finally, the comparable transactions Mr. Chamberlain cited in his fair value assessment to justify the $7m uplift in recognized revenue are all transactions which Mr. Brice has found to be misstated for failing to meet revenue recognition criteria and where there is evidence Deloitte was either lied to or did not receive full information from Deloitte, including Capax, Filetek, VMS, Capax (linked and VAR transactions). *Id.*

### B. Defendant Cannot Claim Good Faith Reliance on Deloitte's Opinions to Shield Himself from Criminal Liability and Limit the Scope of Mr. Brice's Opinions

Defendant wants the Court to engage in a piecemeal assessment of each transaction underlying the financial statements, decide whether each individual transaction standing alone meets the elements for fraud, and keep out any evidence where that is not the case. That is not the appropriate analysis here.

Mr. Brice should be allowed to render his opinion as to the correct adjusted revenue figures given the information Autonomy had available to it at the time because that establishes the scale of the alleged false statements in this case. The government does not need to separately establish that each individual transaction standing alone also establishes intent to defraud in order to admit Mr. Brice's full opinion. Furthermore, Deloitte is not the final arbiter of whether Defendants engaged in fraud. Mr. Brice is providing a relevant opinion as to the full scope of the false statements – whether or not Deloitte agreed with him in every single respect, and what information Deloitte may or may not have received, may be relevant evidence but is not dispositive as to Defendants' guilt and should not be used as a basis for excluding parts of Mr. Brice's report.

This case alleges that Defendants engaged in a scheme to defraud by, among other things, making misrepresentations in their financial statements. Responsibility for the accuracy of financial statements and disclosures lies with company management not its auditor. Tr. 7043:19–23 (Antonia Anderson testifying that it is management's "responsibility to prepare the financial statements accurately" and Deloitte in conducting an audit "doesn't takeover that responsibility on behalf of the directors"); *see also SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 467 (9th Cir. 1985) ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance.") (internal citations and quotation marks omitted); *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979) ("Although certified by accountants as prepared in accordance with generally accepted accounting principles, the financial statements are nevertheless the representations of management. . . . [T]he jury could have inferred that defendants, knowing that the financial statements were false and misleading, wilfully filed them with the intent to conceal the bank's losses . . . . that Ernst & Ernst certified the financial statements without requiring adjustments, did not alter the fact that defendants knew statements did not properly reflect the overtrade transactions. . . . There was evidence on the basis of which the jury could properly find, notwithstanding the Ernst & Ernst advice and certification, that defendants knowingly and wilfully filed materially false and misleading financial statements."); *United States v. Simon*, 425 F.2d

796, 805–06 (2d Cir. 1969) ("Proof of compliance with generally accepted standards was evidence which may be very persuasive but not necessarily conclusive that [defendant] acted in good faith, and that the facts as certified were not materially false or misleading.").

In addition, the record is replete with evidence that Autonomy either provided false information to Deloitte or withheld relevant information from Deloitte related to numerous transactions that rolled up into its reported financial statements. Where a defendant or his co-conspirator deceives an auditor, the entirety of the auditor's work is tainted by that deceit. Defendant cannot then use a fraudulently procured auditor opinion as a shield. Nor can Defendant cite certain piecemeal instances where its auditor may have received complete information as a basis to prevent the admission of relevant evidence from the government's expert as to the scale of the fraud. Auditors render an opinion as to the financial statements *as a whole* not on individual transactions. Tr. 7044:6–7045:4 (Antonia Anderson testimony). When an auditor is lied to on even just one transaction, that creates a "wider" problem because it goes to a "management integrity issue" that prevents the auditor from doing its job effectively. Tr. 3438:21–3439:10, 3473:13–21 (Lee Welham testimony). As Antonia Anderson testified, an auditor "has to rely on the fact" that management "are truthfully and completely providing everything to the auditor" and, if management fails in that responsibility, an auditor cannot render an opinion on the financial statements. Tr. 7057:10–20.

Based on the evidence in the record, Defendant cannot use Deloitte's assessment of certain transactions nor argue good-faith reliance on certain of its opinions to prevent the admission of relevant evidence from Mr. Brice. *See Cenco v. Seidman & Seidman*, 686 F.2d 449, 454–57 (7th Cir. 1982) ("Auditors are not detectives hired to ferret out fraud . . . . [Where] fraud permeat[es] the top management . . . . the corporation should not be allowed to shift the entire responsibility for the fraud to its auditors."); *Untied States v. Weiner*, 578 F.2d 757, 784–86 (9th Cir. 1978) ("Generally accepted accounting principles instruct an accountant what to do in the usual case where he has no reason to doubt the affairs of the corporation are being honestly conducted. Once he has reason to believe that basic assumption is false, an entirely different situation confronts him. . . . [T]he ordinary examination directed to the expression of an opinion on financial statements is not primarily or specifically designed

and cannot be relied upon, to disclose defalcation and other similar irregularities"); *S.E.C. v. Yuen*, 272 F. App'x 615, 617–18 (9th Cir. 2008) ("[T]here was ample evidence that Yuen did not make a full disclosure to the auditors, and thus the district court properly rejected the good faith reliance defense."); *United States v. Colasurdo*, 453 F.2d 585, 594 (2d Cir. 1971) ([W]hile reliance upon accountants' advice might be highly persuasive although not conclusive, misleading accountants . . . is a strong indication of the falsity and misleading nature of the filing actually made."); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) ("Here, there is evidence suggesting defendants failed to disclose material information to their accountants.  If it is true . . . defendants will not be able to rely on their accountant's advice as proof of good faith."); *Mosier v. Stonefield Josephson*, 815 F.3d 1161, 1168 (9th Cir. 2016) (company that knows of and participates in fraud cannot have justifiably relied on "audits to uncover a fraud of which it already was aware"); *Compare United States v. Crooks*, 804 F.2d 1141, 1450 (9th Cir. 1986) ("Reliance on advice of counsel is not an absolute defense, but it is a factor to be considered in assessing good faith and intent.  Counsel must however, have been fully informed of all relevant facts, unbiased, and competent.").

### III.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Defendant's motion to limit the proposed expert testimony of Steven Brice.

DATED:  May 8, 2024

Respectfully submitted,

PATRICK D. ROBBINS
Attorney for the United States
Acting under Authority Conferred by 28 U.S.C. § 515.

/s/ *Kristina Green*
ROBERT S. LEACH
ADAM A. REEVES
KRISTINA GREEN
ZACHARY G.F. ABRAHAMSON
Assistant United States Attorneys