*Edited for publication*

# EXPLANATORY MEMORANDUM TO THE TRIBUNAL REPORT

## THE EXECUTIVE COUNSEL TO THE FINANCIAL REPORTING COUNCIL

### -and-

### (1)  DELOITTE LLP
### (2)  RICHARD KNIGHTS
### (3)  NIGEL MERCER

The FRC has published the report of the Disciplinary Tribunal (**the Tribunal**) appointed under paragraph 9(2) of the Accountancy Scheme to hear the Formal Complaint brought by the FRC's Executive Counsel against Deloitte LLP (**Deloitte**), Richard Knights and Nigel Mercer concerning their conduct in relation to (i) the audit of the financial statements of Autonomy Corporation plc (**Autonomy**) for the financial years ended 31 December 2009 and 31 December 2010, and (ii) the review of the financial results for Autonomy for the periods ended 30 September 2009, 31 March 2010, 30 June 2010, 30 September 2010, 31 March 2011 and 30 June 2011, and to make determinations in relation to Adverse Findings against Deloitte, Mr Knights and Mr Mercer, sanctions and costs (**the Tribunal Report**).

The sole purpose of the Tribunal was to hear and determine the Formal Complaint made against Deloitte, Mr Knights and Mr Mercer, and brought by the FRC's Executive Counsel, and to do so on the basis of the evidence and arguments relied on by those parties.

The Tribunal Report follows a public hearing. No individual director, member of management or employee at Autonomy was a party to the Tribunal hearing. The Tribunal did not invite, receive or consider any witness evidence from any director, member of management at, or employee of Autonomy, and no such individual was represented at the Tribunal's hearings. Further, the Tribunal did not invite or receive comments or representations on the terms of the Tribunal Report from any such individuals prior to the Tribunal Report being finalised.

It was not necessary for the Tribunal to have, and the Tribunal did not receive or consider, the evidence from individuals at Autonomy (including from its finance department, Audit Committee and board) and from others (including investors and corporate brokers) that was presented in the High Court civil proceedings brought by a subsidiary of Hewlett Packard (Claim Number HC2015-001324) which was heard between March 2019 and January 2020. Judgment in that matter has not yet been given.

**The Tribunal has not made, and should not be taken to have made, any finding against any individual or entity other than Deloitte, Mr Knights and Mr Mercer (including Autonomy, or any individual who was a director, member of management or employee at Autonomy).**

**It would not be fair to treat any part of the Tribunal's findings, including any part(s) of the Tribunal Report, as constituting or evidencing findings against anyone other than Deloitte, Mr Knights and/or Mr Mercer.**

*Edited for publication*

The published Tribunal Report anonymises several third parties, who are instead identified by ciphers. To assist readers with the intelligibility of the Tribunal Report, and in order to understand the nature of the Misconduct found, the relationship between the cipher and the nature of the third party is set out below.

| Cipher | Third party |
|---|---|
| D (number) | A person who worked for Deloitte LLP. |
| A (number) | A person who worked for Autonomy Corporation. |
| AS (number) | A subsidiary of Autonomy Corporation. |
| TP (number) | A third party. |
| TP4, TP5, TP10, TP17, TP18, TP22, TP24 | Value added resellers. |
| TP6, TP7, TP8, TP9, TP14, TP15, TP19, TP20, TP25 | End users. |

*Edited for publication*

**IN THE MATTER OF:**

**THE EXECUTIVE COUNSEL TO THE FINANCIAL REPORTING COUNCIL**

**-and-**

**(4)  DELOITTE LLP**
**(5)  RICHARD KNIGHTS**
**(6)  NIGEL MERCER**

**The Rt Hon Lord Dyson (Legal Chair)**

**Mr J. Gordon Jack (Accountant Member)**

**Mr Stuart Hill (Lay Member)**

---

**REPORT**

---

## Table of Contents

(1)   INTRODUCTION .................................................................................................5

(2)   MEANING OF MISCONDUCT UNDER THE SCHEME .............................................9

(3)   THE RELEVANT STANDARDS OF CONDUCT ......................................................10

(4)   ALLEGATION 1: HARDWARE SALES ................................................................11

(5)   ALLOCATION OF COSTS OF PURCHASE OF HARDWARE FY 09:
      ALLEGATIONS 1.1, 1.2, and 1.4 (Deloitte and Mr Knights)......................17

      (A)   The pre-Q3 09 position ...............................................................17
      (B)   From Q3 09 to Q2 11: introduction ............................................17
      (C)   Q3 09 .........................................................................................20
      (D)   Conclusion on costs allocation Q3 09..........................................40
      (E)   Q4 09 and FY 09 .........................................................................46
      (F)   Q4 09 and FY 09 as a whole ........................................................49
      (G)   Conclusion on Q4 09 and FY 09 costs allocation .......................51

(6)   ALLEGATIONS 1.4(a) AND (b) (DELOITTE AND MR KNIGHTS) .......................53

      (A)   Allegation 1.4(a) ........................................................................53
      (B)   Allegation 1.4(b) ........................................................................53
      (C)   Conclusion on allocation of costs in FY 09 .................................56

(7)   ALLOCATION OF COSTS OF PURCHASE OF HARDWARE FY 10:
      ALLEGATIONS 1.3, 1.5 and 1.6 (Deloitte, Mr Knights and Mr Mercer) ...................56

      (A)   Q1 10 and Allegation 1.3 ............................................................56
      (B)   Q2 10: Allegations 1.5 and 1.6(a) ...............................................61
      (C)   Conclusion ..................................................................................73

(8)   Q3 10, Q4 10 and FY 10 ................................................................................73

      (A)   Q3 10 ...........................................................................................74
      (B)   Q4 10 and FY 10 .........................................................................76
      (C)   Conclusion ..................................................................................81
      (D)   Misleading statements in FY Report and Accounts (Allegation 1.6(b)) ..............81

(9)   DISCLOSURE OF HARDWARE SALES IN THE FY 09 AND THE FY 10
      ACCOUNTS: ALLEGATIONS 1.1 AND 1.5 (Deloitte, Mr Knights and Mr Mercer). 83

      (A)   The principal applicable standards ...............................................83
      (B)   The analysts' evidence ................................................................84
      (C)   Deloitte's and Mr Knights' consideration of the need to disclose the hardware
            sales in FY 09 .............................................................................86
      (D)   Deloitte's and Mr Mercer's consideration of the need to disclose the hardware
            sales in FY 10 .............................................................................94
      (E)   Was disclosure of the hardware sales in FY 09 and FY 10 required by IFRS 8
            para 32 and/or IAS 1 paras 15 and 17? .......................................99
      (F)   IAS 1 paras 15 and 17 ................................................................102
      (G)   FY 09 ...........................................................................................103
      (H)   FY 10...........................................................................................104
      (I)   Were Deloitte, Mr Knights and Mr Mercer culpable of Misconduct?...............104

(J) Conclusion ...........................................................................................106

(10) ALLEGATION 2: PERVASIVE FAILINGS AS TO VAR TRANSACTIONS .........107

(A) Principal accounting standards...........................................................109
(B) Some preliminary points ....................................................................111
(C) Deloitte's audit work on the VAR transactions .................................112
(D) Q1 09 and Q2 09 reviews...................................................................113
(E) Q3 09 review ......................................................................................114
(F) Conclusion on Q3 09..........................................................................119
(G) Q4 09 / FY 09 audit............................................................................120
(H) Conclusion on Q4 09 and FY 09 .......................................................125
(I) Q1 10 review ......................................................................................127
(J) Conclusion on Q1 10 review..............................................................134
(K) Q2 10 Review.....................................................................................137
(L) Conclusion on Q2 10 review..............................................................145
(M) Q3 10 Review.....................................................................................152
(N) Conclusion on Q3 10..........................................................................157
(O) Q4 10 /FY 10 audit.............................................................................160
(P) The audit file on the TP3 Transaction (Allegation 2.3) .....................161
(Q) Did Deloitte and Mr Mercer fail to exercise sufficient professional scepticism in relation to the TP3 transaction and the TP5/TP2 unwind and to obtain sufficient appropriate audit evidence? ........................................................................164
(R) Conclusion on the TP3 transaction ....................................................171
(S) Alleged failure to update in the FY 10 audit the Q1 10 workpaper on the TP25 transaction which had recorded that "there are no indicators that this deal with TP18 is not recoverable"..................................................................................172
(T) Conclusion on the TP25 transaction ..................................................173
(U) Q1 11 Review.....................................................................................174
(V) Q2 11 Review.....................................................................................177
(W) Autonomy's Revenue Recognition Policy: Allegations 2.1(c) and 2.2(c)..........181

(11) ALLEGATION 3.1: MR KNIGHTS' BREACH OF FUNDAMENTAL PRINCIPLE (a) and SECTION 110 OF THE CODE OF ETHICS IN FAILING TO CORRECT [AUTONOMY]'S MISLEADING STATEMENT TO THE FRRP AT THE MEETING ON 13 JANUARY 2010..................................................................................183

(12) ALLEGATION 4: MR MERCER'S BREACH OF FUNDAMENTAL PRINCIPLE (c) OF THE CODE OF ETHICS IN FAILING TO CORRECT AUTONOMY'S LETTER TO THE FRRP DATED 3 MARCH 2011 ...................................................................188

(A) Was the investigation undertaken by the A10 Team led by Mr Mercer? ...........190
(B) Was the A10 Team different from the historic audit team?................192
(C) Conclusion ........................................................................................193

(13) ALLEGATION 5: MR KNIGHTS' LOSS OF OBJECTIVITY .................................194

(A) Conclusion on Allegation 5................................................................211

(14) OVERALL CONCLUSION ON CULPABILITY....................................................212

(15) SANCTIONS...................................................................................................216

*Edited for publication*

(A)     Introduction ................................................................................................216

(B)     The Guidance ..............................................................................................217

(C)     Step 1: the nature and seriousness of the Misconduct .........................................219

(D)     Step 2: identify the potentially appropriate sanction or combination of sanctions
.................................................................................................................233

(E)     Step 3: Consider any relevant aggravating or mitigating circumstances ............247

(16)   CONCLUSION ON SANCTIONS ............................................................................257

(17)   COSTS.......................................................................................................258

## (1)    INTRODUCTION

1.    This is the Tribunal's decision on the Executive Counsel's Amended Formal Complaint pursuant to paragraph 7(11) of the Accountancy Scheme of 8 December 2014 ("the Scheme") with respect to:

    (i)    Deloitte LLP ("Deloitte"), which at all material times was a member firm of the Institute of Chartered Accountants in England and Wales ("the ICAEW");

    (ii)    Mr Richard Knights, who was at all material times a partner of Deloitte and a member of the ICAEW; and

    (iii)    Mr Nigel Mercer, who also was at all material times a partner of Deloitte and a member of the ICAEW.

2.    As respectively a member firm and members of the ICAEW, the Respondents are a Member Firm and Members for the purpose of the Scheme.

3.    The Amended Formal Complaint that has been referred to us concerns Deloitte's, Mr Knights' and Mr Mercer's conduct in relation to (i) the audit of the financial statements for Autonomy Corporation plc ("Autonomy") for the financial years ended 31 December 2009 ("FY 09") and 31 December 2010 ("FY 10) and (ii) the review of the financial results for Autonomy for the periods ended 30 September 2009 ("Q3 09"), 31 March 2010 ("Q1 10"), 30 June 2010 ("Q2 10"), 30 September 2010 ("Q3 10"), 31 March 2011 ("Q1 11") and 30 June 2011 ("Q2 11") (to which we shall refer collectively as "the Relevant Period").

4.    At all material times, Autonomy was a highly profitable technology company engaged in the business of selling Intelligent Data Operating Layer ("IDOL") software.  Its total revenue in the period 2009, 2010 and the first half of 2011 ("H1 11") was approximately $2.1 billion with operating profits of $756 million and cash generated by operations of $842 million.  The vast bulk of its profit was derived from sales of software licences. Its business model was unusual in that it derived very little of its revenue from professional services in installing and maintaining its software products.  […]

*Edited for publication*

5.      Autonomy's Annual Reports and Accounts presented the impression that it was a software company achieving outstanding and ever-increasing success, attributable to growing sales of IDOL software.  The only references to hardware were to the sale of so-called "*appliances*".  An appliance was hardware with pre-installed IDOL software, which Autonomy's Annual Reports said was used by customers with "*an urgent need to deploy IDOL*".  The Annual Reports described appliance sales as a small part of the business, with a "*not dissimilar*" margin profile to its sales of software licences, being around 90%.

6.      Key figures from Autonomy's financial results and financial position for the years ended 31 December 2008 to 31 December 2010 and the half year to 30 June 2011 are summarised as follows:

| Year ended 31 December | 2008 | 2009 | 2010 | Half Year to 30 June 2011 |
|---|---|---|---|---|
| **Revenue** | $503m | $740m | $870m | $476m |
| **Gross Profit** | $439m | $602m | $702m | $388m |
| **Gross Profit (adj)** | $458m | $652m | $759m | $417m |
| **Operating Profit** | $186m | $272m | $316m | $168m |
| **Operating Profit (adj)** | $207m | $329m | $377m | $202m |
| **Gross margin** | 87% | 81% | 81% | 82% |
| **Gross margin (adj)** | 91% | 88% | 87% | 88% |

"Gross Profit" as shown above is Revenue less Cost of Goods Sold ("COGS") and before charging costs of, for example, Research and Development ("R&D") and Sales and Marketing ("S&M"), which are deducted in arriving at Operating Profit.

7.      Deloitte conducted the audits of Autonomy's financial statements from the financial year ended 31 December 2003 (FY 03) to FY 10 inclusive.  Deloitte conducted its Autonomy audits and reviews from its office in Cambridge, where Autonomy had its headquarters.  Autonomy was the only FTSE 100 company audited from Deloitte's Cambridge office.  Autonomy was and remained an important client for Deloitte and, in particular, its Cambridge office.  In May 2009, Mr Knights (who had been the Engagement Partner for the Autonomy audit from FY 05 and Deloitte's Cambridge

*Edited for publication*

Office Senior Partner since June 2007) reported to D3 ([a senior member of Deloitte]) that:

> *"At a personal level the Autonomy relationship is critical to the financial success of the Office.....We have set ourselves a target of increasing revenues to this FTSE company by >20%"*

8.    The Engagement Partner is the person in an accountancy firm who is responsible for the audit engagement and its performance, and for the auditor's report that is issued on behalf of the firm.

9.    Mr Knights was also Joint Engagement Partner for the Q1 10 review period (together with D2).  While Mr Knights did not review any of the work papers for the Q2 10 review, nor did he sign the "PSR docket" for that period, he was involved in the Q2 10 review, in particular providing input on hardware accounting and with Deloitte's investigation into matters raised by Autonomy's Head of Finance in the Americas, A10. The precise extent of Mr Knights' involvement in Q2 10 is in dispute.

10.    Mr Knights qualified as a Chartered Accountant on 1 February 1988 and became a partner of Deloitte in 1993.  He was based in the Cambridge office from 1999.  He (and Deloitte) gave an unqualified audit opinion in respect of Autonomy's financial statements for FY 09.  At the direction of, amongst others, Mr Knights, Deloitte also gave unqualified review opinions in relation to the Q3 09 and Q1 10 financial results.

11.    Mr Mercer qualified as a Chartered Accountant on 1 February 1986.  He became a partner of Deloitte in 1994.   Mr Knights was Senior Partner of the Cambridge Office from 2007 until 2011, when Mr Mercer succeeded him.

12.    Mr Mercer was the Engagement Partner for Autonomy for the period Q2 10 to Q2 11 inclusive.  He (and Deloitte) gave an unqualified audit opinion in respect of Autonomy's financial statements for FY 10.  Deloitte at Mr Mercer's direction also gave unqualified review opinions in relation to each quarter's financial results from Q2 10 to Q2 11.

13.    Deloitte's audit engagement team for Autonomy generally consisted of an Audit Engagement Partner, a director, a senior manager, a manager, an assistant manager, several audit seniors and up to three reviewers.  The reviewers were known as the

*Edited for publication*

Engagement Quality Assurance Review Partner ("EQAR"), the Independent Review Partner ("IRP") and the Professional Standards Reviewer ("PSR").  They reviewed various documents, including Deloitte's Report to the Audit Committee and certain workpapers, and Autonomy's draft results and press releases.  Each of the reviewers signed a "PSR docket" at the end of the reporting periods confirming their approval of the audit or review opinion (as the case may be).  The Engagement Partner could not sign off an audit opinion or review report (in the case of a quarterly review) until the PSR docket was signed by the EQAR, the IRP and the PSR.

14.    Deloitte carried out quarterly and interim reviews in accordance with the International Standard on Review Engagements (UK and Ireland) 2410 ("ISRE 2410").  As a matter of practice on the Autonomy audit, Deloitte carried out more work during its Q1, Q2 and Q3 reviews than would typically be carried out as part of the quarterly review process.  In practice, the work which Deloitte undertook on revenue in relation to its quarterly reviews for Autonomy went beyond what was required for the purposes of a review and extended to audit work in respect of all sales made by Autonomy of more than \$1 million, so as to reduce the amount of testing necessary at the year-end.

15.    Each quarter, the Deloitte team would have a planning meeting and fraud discussion one or two weeks before the quarter end and, for the year-end audit, they would have both an audit planning meeting and a "*planning and fraud*" discussion.

16.    The testing carried out by the Deloitte team in respect of key risks in accordance with the audit or review plan was documented in the working papers held in the audit or review files.  These work papers recorded the procedures performed and the conclusions reached to support the reviewers' and auditors' opinions.  Deloitte then prepared a report for the Audit Committee which typically met around the 20th of the month after the quarter-end month for the quarterly reviews, and a month after the year-end for the year-end audits.

17.    The Audit Committee meetings were generally attended by [two individuals from] Autonomy and a few members of the Deloitte audit team, including the relevant Engagement Partner(s) for the time being.  […]. Mr Knights attended the Audit

Committee meetings for Q3 09, FY 09, Q1 10 and Q2 10.  Mr Mercer attended the meetings for Q2 10, Q3 10, FY 10, Q1 11 and Q2 11.

18.    The Report to the Audit Committee set out the Deloitte team's findings and matters they felt should be brought to the attention of the Audit Committee.  A draft of the Report would be sent to Deloitte's reviewers (the IRP, the EQAR and PSR) for their review and approval before it was sent to the Audit Committee.

19.    The Amended Formal Complaint makes five allegations that the conduct of Mr Knights, Mr Mercer and Deloitte fell significantly below the standards reasonably to be expected of them in that:

(i)    they failed adequately to challenge Autonomy's accounting and disclosure of its purchases and sales of "*pure hardware*" i.e. third-party computer hardware without any pre-installed Autonomy software;

(ii)   they failed adequately to challenge Autonomy's accounting for transactions with value-added resellers ("VARs") and failed to ensure that the accounting treatment that it adopted was consistent with its disclosed accounting policy;

(iii)  Mr Knights failed to correct a misleading statement made [on behalf of Autonomy] in a meeting with the Financial Reporting Review Panel ("the FRRP") on 13 January 2010 (this is also said to have constituted a lack of integrity);

(iv)   Mr Mercer failed to correct a false or misleading statement in a letter from Autonomy to the FRRP dated 3 March 2011; and

(v)    Mr Knights lost his objectivity during his engagement with Autonomy in the period from the Q3 09 review to the end of the Q2 10 review.

## (2)    MEANING OF MISCONDUCT UNDER THE SCHEME

20.    The Executive Counsel asks the Tribunal to find that the Respondents were culpable of "Misconduct" within the meaning of para 2(1) of the Scheme. This states that Misconduct means:

"*an act or omission or series of acts or omissions, by a Member or Member Firm in the course of his or its professional activities (including as a partner, member, director, consultant, agent, or employee in or of any organisation or as an individual) or otherwise, which falls significantly short of the standards reasonably to be expected of a Member or Member Firm or has brought, or is likely to bring, discredit to the Member or the Member Firm or to the accountancy profession*"

21.   It appears to be common ground that we should apply the approach propounded by the Tribunal in *Executive Counsel v Deloitte & Touche and Einollahi (MG Rover)* 2 September 2013 (paras 18 and 24).  This approach has been applied in subsequent Tribunal decisions such as *Newsham* (5 September 2014) at paras 15-18.  It was also referred to with apparent approval by Singh J in *Baker Tilly v FRC* [2015] EWHC 1398 (Admin) at paras 94-98.

22.   Misconduct is therefore conduct which is a significant departure from the conduct reasonably to be expected of a Member or Member Firm.  Mere carelessness or negligence is not sufficient, nor is a failure to act in accordance with good practice or in a way in which most or many members of the profession would have acted.  The conduct must cross the threshold of real seriousness.

## (3)    THE RELEVANT STANDARDS OF CONDUCT

23.   Where necessary, we shall refer to the relevant APB Ethical Standards and applicable Fundamental Principles and requirements of the ICAEW Code of Ethics.

24.   At all material times, Autonomy prepared its financial statements under the International Financial Reporting Standards ("IFRS") as adopted by the European Union.  The IFRS include International Accounting Standards ("IASs") and International Financial Reporting Interpretation Committee interpretation notes, which have been adopted by the European Financial Reporting Advisory Group.

25.   The Framework for the Preparation and Presentation of Financial Standards ("the Framework") and the Conceptual Framework for Financial Reporting ("the Conceptual Framework") also gave assistance to preparers of financial statements and to auditors in considering whether financial statements conformed with IASs.

26.     In relation to the conduct of the FY 09 audit, the technical and professional standards to which the Fundamental Principles made reference included the auditing framework contained in the International Standards on Auditing (UK & Ireland) ("ISAs").  These were introduced on 22 December 2004 and (with certain exceptions) applied to audits of financial statements in respect of periods commencing on or after 15 December 2004.

27.     In relation to the conduct of the FY 10 audit, the technical and professional standards to which the Fundamental Principles made reference included the auditing framework contained in the International Standards on Auditing (UK & Ireland) as clarified, revised or introduced in October 2009 ("the Updated ISAs"). The Updated ISAs apply to audits of financial statements for periods ending on or after 15 December 2010.

28.     We shall refer to the relevant accounting standards when we deal with the individual Allegations made in the Amended Formal Complaint.

## (4)     ALLEGATION 1: HARDWARE SALES

29.     The Executive Counsel's Amended Formal Complaint makes the following allegations against Deloitte, Mr Knights and Mr Mercer in relation to the treatment of Autonomy's pure hardware sales in FY 09 and FY 10:

> *"In relation to the audit of Autonomy's financial statements for the periods FY 09 and FY 10, the conduct of Deloitte, Mr Knights and Mr Mercer fell significantly short of the standards reasonably to be expected of, respectively, a Member Firm and Members in each of the following respects:*
>
> *1.1   Deloitte and Mr Knights issued an unqualified audit opinion in the financial year ended 31 December 2009, having failed to obtain sufficient appropriate evidence that Autonomy's financial statements gave a true and fair view of Autonomy's state of affairs, and/or presented information in a manner that provided relevant, reliable, comparable and understandable information, or provided adequate disclosures, in the absence of disclosure of the existence, nature and/or extent of transactions in pure hardware.*
>
> *1.2   Deloitte and Mr Knights issued an unqualified audit opinion in the financial year ended 31 December 2009, having failed to obtain sufficient appropriate audit evidence from which to draw a reasonable conclusion as to the appropriateness of Autonomy's accounting treatment relating to the allocation of the costs of purchasing the pure hardware sold.*

1.3   *Deloitte and Mr Knights recognised in the Q1 10 review that the allocation to Sales and marketing of part of the cost of purchasing the pure hardware sold was inappropriate and that it had been done on the same basis as in the FY 09 financial statements, but failed to consider whether the FY 09 financial statements needed revision.*

1.4   *Deloitte and Mr Knights:*

   (a)   *failed to exercise sufficient professional scepticism when assessing and following up information which was made available to them by [Autonomy] and the results of their own audit procedures concerning Autonomy's explanations for loss-making pure hardware sales and the related cost allocation policy, despite it being apparent that the cost allocation policy was potentially a departure from IFRS intended to assist Autonomy to achieve a particular presentation of Autonomy's financial position, financial performance and/or cash flows; and*

   (b)   *failed to act competently when presented with misleading statements in Autonomy's Annual Report and Accounts for the year ended 31 December 2009, and/or ensure that the information in Autonomy's Directors' Report for that year was materially consistent with the financial statements.*

1.5   *Deloitte and Mr Mercer issued an unqualified audit opinion in the financial year ended 31 December 2010, having failed to obtain sufficient appropriate evidence that Autonomy's financial statements gave a true and fair view of Autonomy's state of affairs, and/or presented information in a manner that provided relevant, reliable, comparable and understandable information, or provided adequate disclosures, in the absence of disclosure of the existence, nature and/or extent of transactions in pure hardware.*

1.6   *Deloitte and Mr Mercer:*

   (a)   *failed to exercise sufficient professional scepticism when assessing and following up information which was made available to them by [Autonomy] and the results of their own audit procedures concerning Autonomy's explanations for loss-making pure hardware sales and the related cost allocation policy, despite it being apparent that the cost allocation policy was potentially a departure from IFRS intended to assist Autonomy to achieve a particular presentation of Autonomy's financial position, financial performance and/or cash flows; and*

   (b)   *failed to act competently when presented with misleading statements in Autonomy's Annual Report and Accounts for the year ended 31 December 2010, and/or ensure that the information in Autonomy's Directors' Report for that year was materially consistent with the financial statements.*

*As a result of the above:*

(1) *Deloitte and Mr Knights (in respect of the audit for the financial year ended 31 December 2009) failed to comply with the requirements of ISA 200, ISA 300, ISA 500, ISA 560, ISA 700 and ISA 720A & 720B, and failed to act in accordance with Fundamental Principle (c) 'Professional Competence and Due Care' and Section 130 (paragraph 130.1(b)) in the Code of Ethics (2006).*

(2) *Deloitte and Mr Mercer (in respect of the audit for the financial year ended 31 December 2010) failed to comply with the requirements of ISA 200 (Updated), ISA 500 (Updated), ISA 700 (Updated) and ISA 720A & 720B (Updated), and failed to act in accordance with Fundamental Principle (c) 'Professional Competence and Due Care' and Section 130 (paragraph 130.1(b)) in the Code of Ethics (2011)."*

30.   Particulars of these allegations are given at paragraphs 82 to 112 of the Amended Formal Complaint.  These paragraphs contain a huge amount of detail.  It will be necessary to examine some of this.  At this stage, it is sufficient to refer to the summary of the Particulars set out at paras 83 to 87:

> *"83. If Autonomy's accounting treatment relating to the allocation of the costs of purchasing pure hardware was inappropriate and inconsistent with the applicable financial reporting framework, there was a high risk of material misstatement in Autonomy's FY 09 and FY 10 financial statements.*
>
> *84. Consequently, ISA 200 and ISA 500 required Deloitte and Mr Knights, and ISA 200 (Updated) and ISA 500 (Updated) required Deloitte and Mr Mercer, to obtain commensurately sufficient appropriate audit evidence, and to exercise a sufficient level of professional scepticism before issuing their audit opinion.*
>
> *85. Further, ISA 700 required Deloitte and Mr Knights, and ISA 700 (Updated) required Deloitte and Mr Mercer, to consider whether:*
>
> *85.1. The financial statements adequately disclosed the significant accounting policies selected and applied;*
>
> *85.2. The accounting policies selected and applied were consistent with the applicable financial reporting framework, and were appropriate in the circumstances;*
>
> *85.3. The information presented in Autonomy's financial statements was relevant, reliable, comparable and understandable, and*
>
> *85.4. The financial statements provided adequate disclosures to enable the intended users to understand the effect of the transactions in*

*pure hardware on the information conveyed in the financial statements.*

86. *Moreover, ISA 720A & 720B required Deloitte and Mr Knights, and ISA 720A & 720B (Updated) required Deloitte and Mr Mercer, to consider whether other information (including in the Directors' Report) in documents containing the FY 09 and FY 10 audited financial statements was consistent with the financial statements.*

87. *However, as set out below:*

87.1. *Deloitte, Mr Knights and Mr Mercer omitted during the course of the reviews and audits adequately to test Autonomy's accounting treatment of the costs of the pure hardware sold.*

87.2. *Although Deloitte, Mr Knights and Mr Mercer had identified that Autonomy was under considerable external pressure to meet revenue expectations, audit and review evidence that Autonomy was using pure hardware sales to meet those targets was not properly considered and in any event was not followed up by further testing.*

87.3. *Such audit testing as Deloitte, Mr Knights and Mr Mercer performed during the FY 09 and FY 10 audits was in any event inadequate and insufficient to enable them to reach a conclusion as to the appropriateness of Autonomy's reported results.*

87.4. *Accordingly, Deloitte, Mr Knights and Mr Mercer failed to obtain sufficient appropriate audit evidence to support Autonomy's accounting treatment and further failed to exercise sufficient professional scepticism when assessing and following up information provided by [Autonomy] and the results of Deloitte's own testing.*

87.5. *Deloitte, Mr Knights and Mr Mercer also failed adequately to consider whether Autonomy's disclosure was sufficient, failed to act competently when presented with misleading statements in Autonomy's Annual Report and Accounts, and failed to ensure that the information in the Directors' Report was consistent with the financial statements.*

87.6. *Finally, Deloitte and Mr Knights failed to consider whether the FY 09 financial statements needed revision after recognising in the Q1 10 review that the allocation to Sales and marketing of part of the cost of purchasing the pure hardware sold was inappropriate, even though this had been done on the same basis as in the FY 09 financial statements."*

31.  Stripped to its essentials, the Amended Formal Complaint in relation to the hardware sales is that Deloitte, Mr Knights and Mr Mercer fell significantly short of the professional standards reasonably to be expected of an auditor in the financial years FY

09 and FY 10 in relation to their acceptance of (i) Autonomy's *accounting treatment of the allocation* of the costs of purchasing pure hardware, and (ii) its *failure to disclose* the existence of pure hardware sales in its Accounts.

32.   A company which sells hardware is engaged in a different line of business from a company which sells software. There is an important commercial difference in the nature of the products and thus of the business conducted. A new unit of software is cheap to make once the product has been created. The result is that a software business has much higher margins than a hardware business, and also has the potential for rapid profit growth once the fixed overheads have been covered.

33.   Historically, Autonomy's business was founded on its IDOL software product. Autonomy described itself in its FY 09 and FY 10 Annual Reports and Accounts as a "*pure software model*".   These explained that:

(i)   because a "*significant proportion of the group's cost base is fixed….the business model drives enhanced performance through growing sales and accordingly group wide revenue generation is the key performance metric that is monitored by the chief operating decision maker*"; and

(ii)   "*after the cost base has been covered, for every extra dollar of revenue that comes in significant benefits can fall straight through to the bottom line*".

34.   The Investors' Question Board on its website amplified these comments:

*"after the cost base has been covered, for every extra dollar of revenue that comes in, you simply take off nine cents to get to the gross margin, and then a further ten cents which is paid in commissions… That leaves 81 cents which fall straight through to the bottom line…*

*Historically, companies that have achieved these levels often diversify into hardware or other areas, which has a big impact on operating margin. For Autonomy, it's hard to see what other areas could be valuable enough to warrant such a large departure from the pure software model".*

35.   Thus, revenue was a particularly important metric for Autonomy.  In its Annual Reports and Accounts for FY 09 and FY 10, Revenue was first on the list of Autonomy's "*financial highlights*" and first on its list of "*key performance measures*".

*Edited for publication*

36.     Deloitte knew that there was a risk that Autonomy might seek to overstate its revenue and was aware that analysts valued Autonomy based on its ability to grow revenue.  For example, therefore, Deloitte recorded as the first of its external factors including key performance indicators in its Strategic Audit Planning for Q1 09 to Q3 09 words to the effect:

> *"Analysts value Autonomy based on its ability to grow revenue.  They are concerned about operating profits but revenue has tended to be the main performance indicator in the past".*

37.     Deloitte documented that Autonomy was under "*considerable external pressure to meet revenue expectations*" in each of the eight Interim Review Work Program documents prepared in the period Q1 09 to Q2 11.

38.     Being a FTSE 100 company professing such exceptional results, Autonomy was subject to intense analyst interest and its share price was very sensitive to changes in both revenue and gross margins.  Deloitte was aware of market expectations and the value of Autonomy's share price.  Thus, for example, it recorded in each of the Interim Review Work Program documents prepared in the period Q1 09 to Q3 09 that "*The Group's share price is extremely sensitive to changes in revenues which are outside market expectations.*"

39.     The extent of this sensitivity was apparent from, for example, the stock market's reaction to Autonomy's Q3 10 Trading Statement in which the company announced that it expected to:

> "*review [its] internal model for the full year with a revenue reduction of around 3% on current consensus and commensurate changes to other parameters.  On this basis, our internal model would show full year revenue growth of 17%, organic revenue growth of around 12% and year-on-year growth of profit before tax of approximately 20%.*"

40.     The share price immediately fell by 20%.  This was described in an internal Deloitte email as the share price falling "*off a cliff*".  D10, Senior Manager on the audit engagement team, stated:

> "*This [is] what a 3% revenue reduction to full year model does*".

41.      To similar effect, when Autonomy's Q3 09 reported gross margin fell 6% below the Q3 08 figure (92% to 86%), its share price fell by 9%.

## (5)    ALLOCATION OF COSTS OF PURCHASE OF HARDWARE FY 09: ALLEGATIONS 1.1, 1.2, and 1.4 (Deloitte and Mr Knights)

### (A)    The pre-Q3 09 position

42.      Prior to Q3 09, Autonomy's hardware sales had been small other than in respect of the exceptional TP6 project and the H1 09 supplies to TP19; were all made as part of a package, together with bigger sales of software licences; were made at minimal margins with no suggestion of there being a premium paid to the hardware supplier or discount to the customer; and were sold alongside higher revenue-generating licences and services.  At most, about $10.7 million of revenue from hardware sales to TP6 plus about $3 million from smaller sales were recognised in Autonomy's revenue figures for 2008.  Most of the 2008 hardware revenue was from the sale of storage cells to TP6.  Storage cells include software, so the figure of $10.7 million overstates the revenue from hardware. Although we received a considerable amount of evidence about the hardware sales in 2008 and H1 09, we do not consider that we need to make detailed findings about it.  That is because it is not in issue that from Q3 09 onwards Autonomy started purchasing and selling pure hardware on a scale and in a way that differed significantly from previously.   As D10 explained at para 51 of his first witness statement, *"[s]ales in Q3 2009 onwards were different from previous hardware sales we had seen Autonomy make because they were, in general, on a larger scale, and included the payment of a premium to the hardware supplier and a discount to the customer"*.

### (B)    From Q3 09 to Q2 11: introduction

43.      From at least Q3 09, Autonomy's revenue figures were bolstered by substantial sales of pure hardware. Its financial reports failed to disclose these sales and so gave the impression that its business was unchanged. It is the Executive Counsel's case that the Annual Reports were positively misleading in that they said that the business was unchanged and referred to Autonomy as a "*pure software*" business. The non-disclosure

of the pure hardware sales and these misleading statements led users of the reports to believe, wrongly, that the growth in Autonomy's annual revenue figures reflected increased sales of its software, when in fact a substantial part of the revenue came from sales of pure hardware. Autonomy was selling pure hardware not at its usual approximately 90% gross margin, but for less than cost price: i.e. at a loss. By FY 10, it was Autonomy's internal view (not communicated to the market) that the level of sales being made was equivalent to that of a hardware reseller.

44.   The pure hardware sales were disguised in Autonomy's Annual Reports and Accounts in two ways, which are both the subject of Allegations in the Amended Formal Complaint: (1) the costs of making the pure hardware sales were allocated in large part to S&M, rather than COGS, which reduced the impact on Autonomy's closely-watched gross profit margin; and (2) the reports did not disclose the fact that Autonomy was making substantial pure hardware sales and described it as a pure software business (and equivalent expressions).

45.   It is the Executive Counsel's case that the documents show that many individuals at Deloitte expressed serious concerns about these matters, particularly in Q3 09 when the "*strategic hardware marketing initiative*" of selling pure hardware at a loss first arose. The response to their concerns was often not documented but the gist seems to have been that Mr Knights, as the Audit Engagement Partner at the time, took the view that [Autonomy's] position was acceptable and his view held sway.

46.   Deloitte's Reports to the Audit Committee recorded that Autonomy recognised revenue from pure hardware sales between Q3 09 and Q2 11 as follows:

| Period | Revenue from sales of pure hardware ($) | Fraction of period revenue (%) |
|--------|------------------------------------------|--------------------------------|
| Q3 09 | 36,000,000 | 19 |
| Q4 09 | 11,700,000 | 5.2 |
| FY 09 | 47,700,000 | 6.4 |
| Q1 10 | 12,200,000 | 6 |
| Q2 10 | 27,500,000 | 12 |

*Edited for publication*

| | | |
|---|---|---|
| **Q3 10** | 26,000,000 | 12 |
| **Q4 10** | 29,000,000 | 12 |
| **FY 10** | 94,700,000 | 10.9 |
| **Q1 11** | 20,400,000 | 9 |
| **Q2 11** | 20,900,000 | 8 |

47.   The schedule below sets out details for the quarters Q3 09 to Q2 11, half years HY2 09 to HY 1 11 and full years FY 09 and FY 10 of inter alia Autonomy's reported gross revenue, hardware revenue, cost of hardware and how the cost was allocated, gross profit as reported and recalculated gross profit (excluding hardware loss allocated to S&M).  It is taken from Exhibit NM1.  We have ignored the minor corrections that were made to it in the updated version annexed to the Respondents' Closing Submissions:

| | Reported Gross Revenue | Hardware Revenue | Gross revenue excluding Hardware | Hardware as % of Revenue | Cost of Hardware | Allocated to S&M | Reported Gross Profit | Gross Profit % as reported | Recalculated Gross Profit (excluding Hardware loss to S&M) | Recalculated Gross Profit % | Difference in Gross Profit % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **QUARTERS** | | | | | | | | | | | |
| Q3 09 | 191.6 | 36.0 | 155.6 | 18.8% | 45.4 | 28.0 | 164.0 | 85.6% | 136.0 | 71.0% | -14.6% |
| Q4 09 | 223.1 | 11.7 | 211.4 | 5.2% | 15.3 | 9.4 | 199.4 | 89.4% | 190.0 | 85.2% | -4.2% |
| Q1 10 | 194.2 | 12.2 | 182.0 | 6.3% | 13.9 | 3.8 | 172.6 | 88.9% | 168.8 | 86.9% | -2.0% |
| Q2 10 | 221.1 | 27.5 | 193.6 | 12.4% | 31.3 | 3.8 | 190.8 | 86.3% | 187.0 | 84.6% | -1.7% |
| Q3 10 | 210.6 | 26.0 | 184.6 | 12.3% | 30.8 | 4.8 | 184.4 | 87.6% | 179.6 | 85.3% | -2.3% |
| Q4 10 | 244.5 | 29.0 | 215.5 | 11.9% | 33.0 | 8.4 | 211.0 | 86.3% | 202.6 | 82.9% | -3.4% |
| Q1 11 | 219.8 | 20.4 | 199.4 | 9.3% | 22.4 | 2.0 | 194.2 | 88.4% | 192.2 | 87.4% | -1.0% |
| Q2 11 | 256.3 | 20.9 | 235.4 | 8.2% | 23.4 | 2.5 | 223.3 | 87.1% | 220.8 | 86.1% | -1.0% |
| **HALF YEARS** | | | | | | | | | | | |
| HY2 09 | 414.7 | 47.7 | 367.0 | 11.5% | 60.7 | 37.4 | 363.4 | 87.6% | 326.0 | 78.6% | -9.0% |
| HY1 10 | 415.3 | 39.7 | 375.6 | 9.6% | 45.2 | 7.6 | 363.4 | 87.5% | 355.8 | 85.7% | -1.8% |
| HY2 10 | 455.1 | 55.0 | 400.1 | 12.1% | 63.8 | 13.2 | 395.4 | 86.9% | 382.2 | 84.0% | -2.9% |
| HY1 11 | 476.0 | 41.3 | 434.7 | 8.7% | 45.8 | 4.5 | 417.4 | 87.7% | 412.9 | 86.7% | -1.0% |
| **FULL YEARS** | | | | | | | | | | | |
| FY 09 | 739.7 | 48 | | 6.5% | 60.8 | 37.8 | 651.9 | 88.1% | 614.1 | 83.0% | -5.1% |
| FY10 | 870.4 | 94.7 | | 10.9% | 109 | 20.8 | 758.8 | 87.2% | 738 | 84.8% | -2.4% |

**(C)    Q3 09**

48.    In Q3 09, Autonomy paid $45.4 million to TP42 ("TP42") for pure hardware which it sold for $36.6 million to TP6, TP37 and TP12, thereby making a loss of $8.8 million. This revenue accounted for 19% of revenue for the quarter, and over 50% of the revenue increase from Q3 08.  These hardware sales were not disclosed to the market in the Q3 09 press release or anywhere else.

49.    Autonomy allocated $17.1m of the $45.4m purchase price to COGS. It allocated the remaining $28.4m to S&M.  The effect of this cost allocation was to improve its gross margin for Q3 09 from 71% to 86%.

50.    On 5 October 2009, [Autonomy] sent D10 (Deloitte Senior Manager) and D11 (Deloitte Audit Manager) two documents: (i) a spreadsheet, which summarised the figures for all three Q3 09 hardware customers on the first page followed by supporting sheets broken down by customer; and (ii) a two-page memo headed "*Review of strategic transactions and partnerships with very large organisations – Audit memo (Q2 and Q3 2009)*". The latter document was the first draft of what became the Strategic Deals Memorandum ("the SDM").

51.    The draft SDM included the following:

> "**Accounting summary**
>
> *In delivering the $65m of strategic deal revenues, Autonomy has incurred approximately $45m of partnership costs. The margin of 30% which compares to a group operating margin of between 40% and 45% for 2009.*
>
> *With respect to the TP42 partnership specifically, the cost to Autonomy in Q3 comprises three elements: the cost of the goods and the two elements which make up the premium paid for marketing and development costs to be incurred. The standard reseller margin for TP42 distribution channels — to which Autonomy is entitled - is 45% so the cost of goods sold represents $20.1m (55% of customer selling price). As previously noted the reseller profit margin of $16.5m, normally retained by Autonomy, has been passed to TP42 and as an additional incentive to deepen and widen the relationship — through development of the TP42 cells to make directly compatible with the Digital Safe - a further $8.8m has been paid to TP42.*
>
> *The balance of $8.8m will be expensed over the next three quarters. This amount represents a contribution to TP42's development costs and is being expensed*

> *over the period during which Autonomy is expected to benefit. TP42 has confirmed that they expect to spend those $'s over the next few quarters (we have assumed 06'10) and Autonomy is expecting to generate additional benefit through further sales in that period".*

52.  The spreadsheet and draft SDM therefore made it clear that [Autonomy] proposed to allocate (i) 55% of the selling price of the Q3 09 hardware ($20.1 million) to COGS; (ii) the remainder of the selling price ($16.5 million) to S&M, and (iii) the loss ($8.8 million) to R&D.   The spreadsheet described these three categories as "*normal wholesale price*", "*Marketing incentive*" and "*Development contribution*", respectively.

53.  D11 prepared a workpaper on the TP42 hardware sales which D10 annotated on 6 October 2009.  He wrote against a reference to the standard wholesale price of the goods "*How can we evidence this*?", commented on the allocation to S&M *"!!! That is a nice incentive*" and said that the allocation to R&D "*makes no sense*".   The Executive Counsel observes that this response by D10 is evidence of scepticism on his part at this stage.

54.  The outstandings list sent by Deloitte to Autonomy at 10.14 on 7 October 2009 recorded that D11 had requested "*TP42 delivery notes / POD*" and "*TP42 signed agreement*". The latter shows an appreciation that there needed to be evidence of the agreement between TP42 and Autonomy pursuant to which the alleged sales and marketing services were being provided.

55.  On 7 October 2009, D6 circulated a draft email to Mr Knights, D11 and D10 which set out a list of points on which he said further documentation was needed.  D6 in his evidence said that this list was the product of discussion within the audit team.  His precise role in the Deloitte audit team is unclear.  He was appointed a partner in June 2010.

56.  Mr Knights responded to the draft by saying "*Do you need to include a comment that they need to explain what is being recognised as COGS and what is below gross profit and why this is acceptable*".

57.  In his final email of 7 October 2009 to [Autonomy] and Mr Knights, D6 said that the documentation needed to be progressed to cover *inter alia* "*the exact nature of the*

*benefit you are getting from doing this deal at a loss*" and the "*rationale for showing the costs associated with the hardware purchase below the line rather than as a cost of sale*".

58.     Mr Knights accepted in evidence (Day 4/126:17) that the first version of the SDM begged questions, and D10 said (Day 12/105:7-8) that it was very confusing.   Mr Knights (Day 4/144:7-11) and D6 (Day 8/31:6-7) accepted that, at this point, there was a lot more that Deloitte needed to understand.

59.     The Executive Counsel submits that the true position is that the draft SDM cried out for an explanation and that it is clear that Deloitte appreciated that they could not accept the proposed allocation based on this material alone.   But the Executive Counsel contends that the Deloitte team's reaction was understated and that they failed to exercise proper professional scepticism, including considering the draft SDM in the context of the earlier hardware sales. In particular:

(i)     The proposed allocation had the effect of moving the gross margin from 71% to 86%.  This assertion called for rigorous professional scepticism;

(ii)    The draft SDM stated that Autonomy was selling products cheaply to major institutions, in order to cement its role as their IT supplier. But it then also said that Autonomy had paid a premium to the suppliers of the hardware, TP42 and TP44.   These apparently different explanations of the loss called for careful investigation;

(iii)   The draft SDM said that it was describing strategic transactions entered into in Q2 09 as well as Q3 09.  Deloitte should have asked why this had not been mentioned in Q2 09; why it said that the Q3 09 sales involved the return of the "*normal reseller margin*" and payment of a premium to TP42 when this had not been said of the TP42 supplies to TP19 in Q2 09; and how was the alleged quantum of the marketing premium consistent with the fact that the Q2 09 sales had been fulfilled at cost.

(iv)   The draft SDM asserted that Autonomy was "*entitled*" to a "*standard reseller margin for TP42 distribution channels*" of 45%. The Executive Counsel submits that Deloitte should have questioned the meaning of this comment. If it was a reference to discounts normally offered by TP42 to its own customers, it was inconsistent with the way in which the margin had been applied, which was at the time to treat 45% of the price paid <u>to</u> Autonomy by Autonomy customers as a S&M expense. If it was a reference to a margin "normally" made by resellers of TP42 manufactured goods it made no sense: why should there be any such thing as a "normal" margin and, in any event, how would TP42 know about sales to which it was not privy?

60.   There is no documentary record of these points having been discussed by Deloitte at the time. D10 said that he could not now remember what he discussed. Mr Knights emphasised that this was a first draft of the SDM and he did not know how much detail the team had gone into at the time. D10 said that Deloitte told [Autonomy] that the draft SDM was confusing and that it then evolved substantially. He recalled that his first and primary concern was the proposal to capitalise $8.8 million of costs.

61.   The TP12 page of the spreadsheet showed that Autonomy had paid TP42 only 35% of the list price for much of the hardware. D6 said in cross-examination (Day 8/85:17-19) that he understood that Autonomy "*had paid more than the market price of the hardware to receive more than the hardware*". This was indeed the gist of the contentions made by the draft SDM. However, the spreadsheet showed that Autonomy had received a discount from list price and meant that [Autonomy's] proposal was to treat just 15% of the list price as COGS. D10 agreed (Day 12/115:9-10) that "*it sounds very odd that they would pay a sixth of the list price, yes*", and Mr Knights accepted (Day 4/134:121) that this "*seems odd*". D7, the EQAR partner, was not aware of this at the time, and said (Day 8/183:4-Day 8/184:23) that it would have led him to ask further questions had he been made aware of it.

62.   The Executive Counsel submits that it is to be inferred that no-one looked at this spreadsheet with a questioning mind at the time.

63.     Deloitte also obtained the transactional documentation between Autonomy and TP42 – the contract, purchase orders, quotes and invoices.  These made no mention of sales or marketing services to be provided by TP42. The contract was a reseller agreement which permitted Autonomy to resell TP42 goods. The purchase orders, quotes and invoices evidenced straightforward purchases of goods. The quotes and purchase orders also showed that Autonomy was paying much less than TP42's list price.

64.     The Executive Counsel submits that Deloitte failed to give sufficient consideration to the transactional documents.   These were inconsistent with the contention that Autonomy was paying a premium to TP42 for marketing because they:

(i)     Showed simple purchases of goods, without more; and

(ii)    Showed that Autonomy was receiving a *discount* from TP42.

65.     There is no trace of Deloitte identifying these inconsistencies with [Autonomy's] assertions.  D10 said (Day 12/112:25-Day 12/113:4) that this "*wasn't something we were focussed on*" and D6 said (Day 8/75:12) that he had no recollection of identifying that Autonomy had received a discount from list price.

66.     [Autonomy] wanted to capitalise part of the hardware costs.  On 7 October 2009, D11 and D10 met [Autonomy] and told [them] that Autonomy could not capitalise any of the hardware costs.  They were representing the view of the Deloitte team.  Mr Knights agreed with his team and stood firm with Autonomy on this issue.  He had what he described as "*quite a bruising encounter*" between himself and [Autonomy].  Great reliance is placed by Mr Knights and Deloitte on the stand that was taken by Mr Knights on this issue.

67.     D6 said in his evidence (witness statement para 14 and Day 8/31:4-7) that the draft SDM was a long way from what Deloitte needed to be comfortable.  In his email of 7 October, he requested from Autonomy (a) a summary of the TP42 deal; (b) a clear explanation of the commercial rationale and the nature of the appliance to be developed by TP42; (c) details to support the presentation of the deals on a principal, as opposed to agent basis; and (at Mr Knights' suggestion) (d) an explanation of the rationale for showing

hardware costs in S&M.  Deloitte submits that it was appropriately sceptical about the draft SDM at this stage.

68.     [Autonomy] circulated a revised version of the SDM on the same day, incorporating further detail to explain that Autonomy was acting as principal, and the proposed capitalisation of $8.8 million of the costs of developing an appliance.  Deloitte examined closely whether Autonomy was acting as principal or agent, and was particularly exercised about the capitalisation issue.

69.     It rejected the proposed capitalisation of $8.8 million as Autonomy had not demonstrated that the future economic benefits were probable.   Mr Knights communicated Deloitte's conclusion on this issue to [Autonomy] some time before 12 October 2009.

70.     Deloitte also identified on about 8 October 2009 that Autonomy had not provided evidence to support the standard reseller margins that it had used in calculating the allocation of costs between COGS and S&M.

71.     On 9 October, [Autonomy] forwarded to Deloitte an email exchange between AS4 (CEO of AS3, a subsidiary of Autonomy) and TP21 (Head of Worldwide Sales at TP42) on 18 September 2009.  AS4's email ("the first TP42 email") included:

> *"As you know, we have standardized on TP42 storage for our own hosted offerings and we often recommend TP42 products to our customers. The purpose of the program is to strengthen our relationship with enterprise customers in the NYC region by offering them TP42 information management products at attractive pricing. We will focus primarily on existing Autonomy Enterprise customers in the financial sector, but other companies may be added as we mutually agree.*
>
> *Under the program, Autonomy offers to purchase products from TP42 at a price consisting of:*
>
> *(1)  TP42's discounted price to Autonomy, which typically will represent a discount off list price but will be determined on a deal by deal basis.*
>
> *(2) Plus a marketing Incentive supplied to TP42 to be determined on a deal by deal basis.*
>
> *Autonomy will in-turn, sell TP42 hardware to the end customers at discounted pricing…. ".*

72.   TP21's reply said: "*This looks like a great program and we are excited to participate in it.*"

73.   At about the same time, [Autonomy] also provided the purchase and fulfilment agreement between TP42 and Autonomy, TP42's quotes for the hardware for TP37, TP12 and TP6, and the Autonomy purchase orders to TP42.

74.   In relation to the content of the first TP42 email the Executive Counsel submits that:

(i)   The only marketing program described is <u>Autonomy's</u> program of marketing to its own customers.

(ii)   TP21's reply - "*This looks like a great program and we are excited to participate in it*" - can only sensibly be understood as referring to this same Autonomy program.

(iii)   The only reference to Autonomy paying anything to TP42 is the single line whereby Autonomy said that it offered to pay "*a marketing Incentive supplied to TP42 to be determined on a deal by deal basis*". This was no more than an offer and on a deal-by-deal basis.  It invited the question whether anything had actually been agreed.

(iv)   D10 accepted all of this in cross-examination (Day 12/139:3-12):

"*Q. So the only reference in this email to marketing by TP42 or a marketing arrangement between Autonomy and TP42 was the offer by Autonomy to pay a marketing incentive, wasn't it?*

*A. Yes, I think when you read this email, that's the only reference to the -- to the marketing incentive. That's where those words come up, yes.*

*Q. So what it doesn't do is set an arrangement whereby TP42 has agreed to do some marketing for Autonomy.*

*A. I don't think it says that, no.*"

75.   Moreover, Deloitte's own evidence shows that they appreciated that this email was inadequate as review/audit evidence:

(i)     D6's response on the same day was "*Helpful but not enough to substantiate a $25m marketing element*". In his oral evidence (Day 8/54:9-Day 8/54:22) he confirmed that he "*wasn't yet comfortable that I had sufficient evidence to quantify the marketing element*" and accepted that he "*wanted to get more evidence to properly understand the transaction*".

(ii)    Mr Knights accepted in his evidence (Day 4/171:24) that "*of course*" the email did not provide a granular analysis of a marketing campaign to $25 million "*So we had to think about how we would then get any further evidence that we might need in order for us to conclude*".

(iii)   D10 agreed that this "*wasn't the best evidence*" (Day 12/143:22).

76.    The best evidence of Deloitte's view at the time is that it continued to press Autonomy for more documentation. Thus:

(i)     On 12 October 2009 D6 asked [Autonomy] whether there was "*a set marketing programme or any further information available which can help us to quantify the marketing element — e.g. a joint marketing plan or similar?*"

(ii)    D10 repeated that request the following evening, after a discussion with [Autonomy] about the outstandings list, saying that the "*key outstanding points*" included "*Confirmation from TP42 on reseller margin and their marketing and support programme*".

(iii)   Mr Knights' draft of the SDM (or TP42 paper) which he sent to Autonomy on the evening of 13 October 2009 (see paras [82 and 83] below) was replete with further requests for documents and information.

77.    More generally, on 12 October 2009 D10 sought to write up the text of the Report to the Audit Committee on the accounting treatment of the hardware sales and was unable to do so. Of the figures then proposed for the allocation of the hardware sales he wrote "*The rationale for this is that ...*" and he annotated this with the comment "*this is where I begin to struggle*".

*Edited for publication*

78.   In their oral evidence, the Deloitte witnesses fixed on D6's words in his message to D10 dated 9 October 2009 that he suspected that this was all they would get from TP42.  But the Executive Counsel submits:

(i)    If Autonomy was party to this marketing agreement, Autonomy would have had access to documents that evidenced it.

(ii)   Deloitte could have asked to speak to AS4, who had apparently negotiated the agreement with TP42.

(iii)  If there really was a marketing "programme", this would be evidenced in writing and Autonomy would itself have evidence of actual or planned events, such as trade fairs and meetings with customers.

79.   She also submits that there is no evidence of any scepticism on the part of Deloitte concerning the first TP42 email or the circumstances in which it was provided. They should have asked:

(i)    Why had it taken until 9 October for Autonomy to supply this email dated 18 September 2009?

(ii)   Why had the agreement or arrangement not been mentioned at the planning meeting on 21 September 2009, when hardware was on the agenda? The Deloitte witnesses confirmed that they had learned of the marketing arrangement only on or about 5 October when [Autonomy] sent the SDM to D10 and D11.

(iii)  How was it that Autonomy had told Deloitte in the 5 October 2009 version of the SDM that it had agreed to return the normal reseller margin of 45% to TP42 and pay a premium of 20-25% towards development costs when the first TP42 email said that the payment was to be a single marketing incentive, to be determined on a deal-by-deal basis? D10 confirmed (Day 12/145:15 and Day 12/146:24) that no-one compared the two versions of the alleged agreement.

80.   The Executive Counsel submits that Deloitte's scepticism should have increased further when [Autonomy] sent Deloitte another spreadsheet on 12 October 2009 which

evidenced discounts provided by Autonomy to its customers.  Deloitte should have asked how this was consistent with the assertion that Autonomy had paid a premium to TP42, rather than making losses because it was offering discounts to customers.

81.    Deloitte draws attention to [Autonomy's] email to Deloitte of 12 October 2009, forwarding an email sent on the same day by [Autonomy], which explained: (a) the nature of the relationship with suppliers (including TP42); (b) that the driving force for the sales was coming from customers; (c) that Autonomy had accepted that paying for the marketing effort of suppliers was a "*major long term benefit*"; (d) that TP42 and Autonomy were developing "*an appliance*"; (e) that the costs allocation was supported by evidence of reseller margins; and (f) that the *"non-reseller margin monies*" were being used to incentivise the supplier's salesforce, provide discounts to customers, provide funds for the development of the appliances, and to hold marketing programmes. Mr Knights (para 106 of his first witness statement) explains that this email:

> "*...provided further detail on the strategic hardware sales. This provided more colour on the information provided to date, including that the "non reseller margin monies" (that is, the costs allocated as a marketing incentive) "are being used to incentivise the TP42, hds, acs salesforce, provide discounts to [the] customer, provide funds for the development of the appliances, to hold marketing programs (e.g. we attended a major TP42 marketing event for TP12 last week which we would not have without the marketing dollars)".*"

82.    But the evidence shows that Deloitte had not yet reached the position where they considered that they had sufficient evidence to support the cost allocation for hardware sales.  On the evening of 13 October 2009, Mr Knights emailed [Autonomy] what he called a "*draft of your TP42 paper*" from his wife's email account.  He wrote in his email:

> "*after a glass or two of red wine and a plate ful of Mrs K medieval pasta i've had a stab at writing the Autonomy paper on TP42 -*
>
> *This needs to come form [sic] you to us.*
>
> *I need it to sqaure [sic] the position on COGS allocation - i've still not seen anything from TP42.*
>
> *If it is useless please re-write but hopefully it points in the right direction. As per our discussion on [an individual at Autonomy]'s ideas the paper goes through this analysis - you need to beef it up - the one key area is setting out*

*quite what "sales and marketing" type of stuff or further product development stuff TP42 might provide you.*

*Please improve this and together with the TP42 email I'm hoping this will move to where it needs to be.*

*I do need to run through this with [the above individual at Autonomy] as well tomorrow.*

*As mentioned above this was rattled out pretty quickly and fortified with a few liveners so as a modest bookkeeper it would benefit from the cutting edge of you software gurus .....!!".*

83.     Mr Knights' draft of the TP42 paper included the following:

> *"**Q3 Transaction***
>
> *During Q3 Autonomy entered into a $45m purchase of hardware and additional sales and marketing support [pick up words per TP42 PO/ documentation]. This transaction was appropriately approved and authorized by in accordance with our standard business procedures. The hardware component of this transaction was used to supply our own customers [TP37/ TP6 ???/] with equipment for their existing data warehousing and storage functions. [[..] ...please improve]. Our intention is to use this opportunity to further exploit software opportunities with these organisations.*
>
> *The revenue recognized on these hardware sales in the Q is $36m. The transactions with each of these customers was appropriately structured such that Autonomy acted as principle to these transactions.*
>
> *The key accounting consideration is the recognition of the $45m of costs associated with the transaction, with particular reference to the allocation of costs between COGS and Sales and Marketing. <u>The allocation of $45m between hardware and other marketing services is not established in the purchase order or invoice from TP42. [can you comment here on how the $45 m was arrived at ???]</u>*
>
> *The Autonomy rationale for the transaction was to combine the delivery of hardware to key customers (thereby beginning to develop the recognition of being an application player) together with making an investment in the growing relationship with TP42.*
>
> *<u>[I need help explaining what TP42 and you think you will be getting. Trade sales/ customer meetings ??? This is the part that [an individual at Autonomy] was alluding to this morning – so can you put some ideas in here]</u>*
>
> *To determine the appropriate allocation of costs between COGS and Sales and marketing the executive management have received confirmation from TP42 of the standard reseller margins that it would expect to see in the sale of its hardware through a third party. (see appendix XX. Insert confirmation ) This*

*Edited for publication*

> *demonstrates that in normal situations a range of [37.5% - 50 % ….check I've not seen this yet] is the standard reseller margin.*
>
> *On this basis we have allocated 50% of the $45m cost to COGS with the remaining costs being represented as Sales and Marketing expense. Having reviewed this allocation the directors have concluded that this represents the fair and appropriate split of the costs of this transaction with TP42."* (emphasis added).

84.    The Executive Counsel submits that Mr Knights' draft of the memo and his covering email showed his appreciation that Deloitte did not at that time have sufficient evidence to support the cost allocation that Autonomy was proposing.  The words that we have emphasised provide particularly striking evidence that Mr Knights understood that more information was required to justify the cost allocation.  Mr Knights explained in his evidence (e.g. Day 4/178:7 – Day4/179:14) that he was trying to obtain any further information for the purposes of his call with [Autonomy] the following day.  He denied that he considered it essential to obtain further evidence of the agreement with TP42 to provide marketing.

85.    The only further evidence that Autonomy provided to Deloitte in relation to the Q3 09 allocation was an email exchange about TP42's typical pricing ("*the second TP42 Email*").  TP46 (Regional Partner Manager at TP42) had emailed AS4 on 13 October 2009 saying "*our typical pricing for entry level partners in our [name] program is 36% off [product name 1] and 57% off on [product name 2]*".

86.    The Executive Counsel submits that (i) the second TP42 email did not provide evidence of a profit margin ordinarily made by an entity such as Autonomy selling hardware to a customer; and (ii) Deloitte failed to give any proper consideration to the evidential effect of this email, and failed to bring any adequate professional scepticism to bear on it.

87.    Mr Knights claimed (Day 4/196-198) that the second TP42 email evidenced the standard profit that an TP42 hardware reseller would make when selling TP42 hardware, and justified Autonomy applying that margin to the selling price of the hardware to generate the price that Autonomy would allegedly have paid but for paying a marketing incentive to TP42.

88.   His thinking was as follows.  Autonomy calculated the COGS by asking TP42 what margins it would expect to see a reseller make on the sale of TP42 hardware.  Autonomy then reverse-calculated what the cost of the hardware (if sold for $36 million) would have been if Autonomy had earned that gross margin on the sale.  That gave a COGS of some $17 million, and hence a gross profit of around $19 million.  Autonomy then split the difference between the $17 million and the $45 million and treated the difference between the $36 million price at which Autonomy had sold the goods and the $45 million at which it had bought them as R&D costs, and the difference between the $17 million and the $36 million as S&M costs.  This was explained in the first version of the SDM.

89.   But the Executive Counsel says that:

(i)    The second TP42 Email identified typical pricing for "*entry level*" resellers in TP42's "*[name] program*". The natural meaning of these words is that the pricing is for prices offered by TP42 to customers purchasing goods from it. Accordingly, the email did not provide evidence of the margin resellers normally made on their own on-sale to 3rd party customers.

(ii)   There was no basis for assuming that Autonomy was, or was equivalent to, an entry level partner in the [name] programme. Mr Knights admitted he did not ask what such a partner was (Day 5/9:8-11).

(iii)  The spreadsheet supplied by Autonomy to Deloitte and the TP37 and TP12 invoices and quotes showed that Autonomy had obtained a discount from the TP42 list prices at levels comparable to the discounts referred to in this email. Accordingly, the natural conclusion to draw was that Autonomy had *received* the discount referred to in the email, rather than paying a premium over and above normal pricing.

90.   Mr Knights' evidence on this point was in contrast to D6's. D6 said that he understood the email as evidence of discounts typically provided by TP42 to resellers (Day 8/76:19).  This *is* consistent with the wording of the email but it is inconsistent with how the email was actually applied by Autonomy (which was to generate a nominal

profit on the sale to Autonomy's customers, not a discount from the price paid to TP42). Furthermore, the assertion which D6 understood to be made – that Autonomy had not received this discount because it was paying a premium for marketing – was contradicted by the spreadsheet, quotes and invoices.

91.   The events of 14 October 2009 were the subject of careful analysis at the hearing. At 09.30, [Autonomy] sent Mr Knights (but it seems no-one else) a further version of the SDM. This did not attach the TP42 emails. There is no evidence that anyone ever read this version of the SDM.  It ended by saying that Autonomy had allocated 50% of the $45m hardware costs to COGS. This was inconsistent with the position adopted in the final version of the SDM sent shortly thereafter.

92.   Also at 09.30, Mr Knights emailed [Autonomy] in advance of a call with [Autonomy], referring to the engine "*running a little hot*" and to the allocation issue as "*one key matter*".  He set out 3 potential "*landing areas*" for the allocation: (i) all the costs to COGS, "*and therefore shown in the gross margin*"; (ii) allocating the $9m loss to S&M; or (iii) some other split, which "*does need to be fully supported*".

93.   At 10.18, Mr Knights forwarded [Autonomy's] 09.30 version of the SDM to D10. At 10.19, [Autonomy] sent the final version of the SDM, with both TP42 emails attached, to Mr Knights, D6, and D10.

94.   At some point between 10.20 and 11.00, D10 and Mr Knights spoke to [Autonomy]. In relation to this:

(i)    Mr Knights and D10 both said that they participated in a phone call to [Autonomy] on 14 October 2009 in which they went through the SDM with [them] (para 119 of Mr Knights' first witness statement and para 94 of D10's first witness statement).  If so, the call cannot have started before 10.20 because Deloitte did not have the final version of the SDM until then; indeed, D10 had not seen any version of it since the 5 October 2009 original draft.

(ii)   The call had definitely taken place by 11.40 because Mr Knights sent an email to the reviewers then which forwarded the SDM to them.

(iii)  The call was probably over by 11.00 because D10 was due to join a call then to discuss other aspects of the audit, a call which he said he probably would have participated in as planned.

(iv)  It follows that D10 had had virtually no opportunity to review the updated SDM and the second TP42 email by the time of the discussion with [Autonomy].

95.  There is no further record of any input on the part of the audit team (D10, D11 and D15 (an Assistant Manager and later a Manager at Deloitte)) on the merits of the Q3 09 cost allocation prior to Mr Knights' message to Autonomy at 16.31 accepting the proposed treatment.

96.  At 11.40, Mr Knights sent the SDM with the 2 attached TP42 emails to the Deloitte reviewers, D13, D2 and D7 and asked "*Can each of you please consider*". They had not received these documents before. At 13.54, Mr Knights chased the reviewers for their comments.

97.  D13 replied at 13.55 saying "*I am ok with it*". She was the PSR reviewer: she was concerned with whether the firm's policies, practices and procedures had been adhered to.

98.  D7 replied at 14.30 saying that he would like some clarifications, including on the question whether the level of promotional spend and R&D spend was intended to be ongoing.

99.  At 16.13, Mr Knights sent an email to the reviewers which claimed to have received their individual comments and to summarise where "*we*" have got to. The summary included the statement "*We recognise that the costs should be split between COGS and sales marketing and r&d*". It also said that the analysis provided by Autonomy was sufficient for Q3 09 purposes but did not set a principle for similar transactions, that there would be an expectation that any future sales of hardware would be priced/costed at appropriate market rates and that there would always need to be clear evidence of the different component parts of any purchase.

100.    At 16.31, prior to receiving any further comments from the reviewers on the proposed treatment, Mr Knights sent a message to [Autonomy], not copied to anyone at Deloitte, which accepted the allocation.

101.    At 16.32, D2 replied for the first time that day. He proposed amending the text to say that the costs *may* be split rather than *should* be split and added the caveat, "*provided this is reflective of the underlying commercial substance of the transaction*".  At 16.35, Mr Knights responded "*Agreed*", but did not pass on the amendment to Autonomy.

102.    The Audit Committee had little time to consider the Q3 09 issues. They were sent papers shortly before 22.00 on 15 October 2009 for the 16.00 meeting the next day.   The Deloitte Report to the Audit Committee included the following:

> "*[Autonomy] has produced a detailed paper which sets out the background to these transactions. We have discussed with [Autonomy] the commercial rationale for entering into a loss-making contract. We have agreed the cost of the hardware and support costs to purchase orders provided to Autonomy by TP42. We have agreed the revenue to purchase orders from the three end users, evidence of delivery prior to year end and Autonomy sales invoices. In addition, we have received revenue confirmations from TP6 and TP37 and have seen that the TP37 receivable has been debt factored with TP35.*
>
> *We have reviewed the agreements in place between TP42 and Autonomy and between Autonomy and the end users and concur with [Autonomy's] treatment of the revenues and costs on a gross basis.*
>
> *[Autonomy] has confirmed that all of these transactions have been appropriately conducted at arms length and this is also to be confirmed in our standard representation letter.*
>
> *We recognise that the costs may be split between cost of goods sold and sales and marketing expenses, provided this is reflective of the underlying commercial substance of the transaction. The analysis provided by [Autonomy] is sufficient for splitting the costs in Q3 2009 and we consider the transaction to be fairly stated.*
>
> *However the following points should be noted:*
>
> - *the allocation does not set a principle for similar transactions – all of which would need to be considered on their own merit;*
> - *there would be an expectation that any future sales of hardware would be priced at appropriate market rates; and*
> - *there will always need to be clear evidence of the different component parts of any purchase between hardware and other services.*

> *In the event that hardware sales in the year are significant there may be a requirement to disclose the quantum and nature of these sales in the year end financial statements. Given the size and nature of these transactions, the Directors will need to consider carefully the narrative disclosures in the Q3 earnings release. This may be of particular relevance to discussion of key customers, sales and gross margins"*

103. The Report, therefore, stated that Deloitte approved the cost allocation and had "*agreed the cost of the hardware and support costs to purchase orders provided to Autonomy by TP42*" (emphasis added). The Executive Counsel submits that it was incorrect to state that the purchase orders evidenced the support costs as well as the hardware costs. Mr Knights accepted this in cross-examination, although he characterised it as "*a slight inconsistency*" (Day 5/50:21 – Day 5/51:8).

104. Generally, the Executive Counsel submits that there was insufficient explanation for the Audit Committee to appreciate the paucity of and inconsistencies within the evidence that Deloitte had seen. The document gave the impression that the allocation was properly supported by evidence. This was not a report which enabled the Audit Committee members to reach a view on the merits of the allocation for themselves.

105. On 19 October 2009, Autonomy sent Deloitte its representations on behalf of the full board of directors in relation to the Deloitte review for Q3 09.  This included the following representation:

> *"The directors have reviewed the significant purchases of hardware and support services from TP42 in the quarter together with the subsequent sales of this TP42 equipment by Autonomy to its customers. They are satisfied that all of these transactions were conducted on arms length terms and that Autonomy acted as the principal on these equipment sales. Additionally the directors confirm that the allocation of associated costs in respect of the acquired TP42 hardware and services between "cost of goods sold" and "sales and marketing expense" appropriately reflects the nature of these items."*

106. On 20 October 2009, Autonomy announced its results for Q3 09 and the nine months ended September 2009, holding a conference call with analysts at 9.30.  Autonomy's reported Q3 09 revenues were $191.6 million, in line with its pre-announced figures of $191 to $193 million. 20% of that revenue was derived from pure hardware sales and the TP5 / TP14 Agreement (to which we shall come later).

107.    The final press release used the words "*Record Q3 results with strong organic growth*" and said that "*The unexpected demand for our new product programs had a small depressing effect on gross margins. We do not expect this to be a trend*".  It made no reference to hardware.

108.    D10 listened to the Q3 09 earnings call.  [Autonomy] told the market that the increased S&M expenditure was attributable to the launch of the IDOL SPE product.

109.    Deloitte followed the market's reaction to these results and so knew that Autonomy's share price fell and that investors were concerned by the fall in gross margins.  The press coverage was sufficiently bad for D3 ([a senior member of Deloitte])) to email Mr Knights asking him to confirm there were "*no accounting issues re revenue recognition and acquisitions*".

110.    Despite the difficulties in Q3 09, Mr Knights emailed [Autonomy] on 4 November 2009 to say that Deloitte was "*totally comfortable*" with the Q3 09 numbers. As for Q4 09, he said: "*speaking to [Autonomy] I share the view that achieving the expected Q4 software sales is absolutely key*".  The Executive Counsel submits that it is apparent from this that:

(i)    Mr Knights was telling [Autonomy] one thing whilst Deloitte's internal view was another. The reviewers and D6 at least had been anything but "*comfortable*" in relation to the cost allocation and the non-disclosure of the hardware sales (see paras [295] et seq below); and

(ii)    Mr Knights had been talking to [Autonomy] about what was needed for Autonomy to meet market expectations.

111.    Deloitte makes the important general point that the revenue generated by the hardware sales was correctly recognised, and all of the costs incurred were correctly quantified and accounted for within the income statement.  The effect of the hardware sales was to increase Autonomy's revenues, but reduce its profits. It says that this was accurately recorded in the financial statements.  Accounting standards require that evidence be obtained as to whether costs have been incurred and whether such costs should be

capitalised, as these facts will have a direct impact on profit. But accounting standards do not specifically prescribe how costs should be allocated within the income statement, save that under the functions method they fall to be allocated according to their substantive function. That requires an exercise of judgment on the part of [Autonomy] under IAS 1 para 103. [Autonomy] explained to Deloitte that the loss-making hardware sales were concluded solely for strategic marketing purposes, in the pursuit of future profitable software sales. This was a one-off initiative. Deloitte was entitled in the exercise of their judgment to accept this explanation.

112.  Mr Knights accepted that the starting point was that the purchase price of the hardware should be allocated to COGS. This was why he sent an email to D6 on 7 October 2009 in the terms set out at para [56] above. He noted, however, that there were no rules at the time under the accounting standards or the Companies Act concerning cost allocation and that it was "*very much a judgment point*". He accepted, however, that there had to be a rationale and evidence to support the allocation.

113.  Mr Knights' opinion was therefore that there was no right or wrong answer to the allocation question. It was a judgmental matter with a range of acceptable answers. He said (Day 5/10:19) – (Day5/11:3):

> "…*from an auditing perspective we were looking at the shape of this transaction in the round. We were comfortable with the approach of applying a residual-based approach to it and by that I mean we were trying to get evidence for both the marketing aspect of it and also the hardware cost of it. In the event, we got evidence that supported the hardware allocation and we were content that the remaining –or the residual amount could be treated as sales and marketing".*

114.  In this approach, he was supported by Mr Richard Coates, Deloitte's independent expert. Deloitte says that, in assessing the conduct of Mr Knights and his audit team, it is important to have in mind that they imposed three important caveats which Mr Knights recorded in his email to [Autonomy] on 14 October 2009 and which were repeated by Deloitte in its Audit Committee Report. These were:

(i)     The Q3 09 allocation did not set a principle for similar transactions, all of which would need to be considered on their merits;

(ii)   There would be an expectation that any future sales of hardware would be priced at appropriate market rates; and

(iii)   There would always need to be clear evidence of the different component parts of any purchase between hardware and other services.

115.   This approach reflected Deloitte's understanding that the strategic marketing strategy referred to in the various versions of the SDM was a one-off initiative, rather than an attempt to position Autonomy as a hardware reseller: see para 123 of Mr Knights' first witness statement and Mr Knights' evidence (Day 5/45:8-13).

116.   Mr Knights confirmed that he understood that the TP42 contract documents only referred to the purchase of products (without mention of marketing) and did not establish the commercial rationale of the transactions for the purposes of the allocation. This made it necessary to look for other evidence.  Mr Knights thought that there was nothing unusual in the absence of contractual documents to support S&M expenditure, especially as the arrangement had in this case been agreed at a high level between TP21 and AS4.

117.   Deloitte submits that Mr Knights reasonably took the AS4/TP21 email exchange to provide support for the view that there was a marketing programme for which TP42 had been paid, entirely consistently with what Deloitte were being told.  In fact, Deloitte pressed for more.  Mr Knights explained that he agreed with D6's response to the first TP42 email that it was "*Helpful but not enough*" and that they should press Autonomy for more evidence.

118.   In the event, they did in fact obtain further evidence from TP42 on their standard reseller margins.  These margins allowed a residual method calculation to work backwards from the revenue to calculate the COGS and then take the remainder to S&M.  The reseller rates provided an indication of the gross profit a reseller would expect to achieve.  This served as a notional proxy for the profit margins Autonomy might have sought if it were in fact engaged in the sale of hardware for its own sake.  This foregone "profit" together with the actual net loss on the sales was allocated to S&M because Autonomy would

not otherwise have concluded the transactions at all.  That is conceptually and logically sound methodology.

119.   Mr Knights also relied on what [Autonomy] told him during the important conversation they had on the morning of 14 October 2009 on the marketing programme (Day 4/177:21-25) and his email to [Autonomy] that morning as to which , Mr Knights said: (Day 4/205:14)

> *"…I think what I was seeking to achieve there was to say, okay, what is the status of our position and our evaluation of the evidence and, as at 8.30 in the morning of Wednesday, 14th, we had not yet finalised our view on what the allocation should look like because we were still working on that. And one of the key things that was still outstanding was to get confirmation as to what the commercial or economic perspective of all of this was, as seen through the eyes of [Autonomy], because that was also playing an important part in how we determined whether or not the costs allocation appropriately reflected the economic substance of the transaction…."*

120.   Deloitte's position on allocation at Q3 09 was also confirmed by the representation letter sent by [Autonomy] on 19 October 2009 and was fully endorsed by the Q3 09 reviewers.

121.   Deloitte's concluded position was reported in detail in its Q3 09 Audit Committee Report which set out the detailed explanation of the hardware sales and the allocation and effectively summarised the commercial substance of the strategy.  The full Report and Deloitte's position were then debated in detail at the Audit Committee Meeting on 16 October 2009.

122.   In short, Deloitte submits that the evidence against it comes nowhere near crossing the Misconduct threshold.  Mr Knights was faced with a difficult situation.  There were concerns about the allocation of the pure hardware costs.  These were fully and carefully explored. It contends that it was an entirely reasonable exercise of judgement on the part of Mr Knights to accept Autonomy's allocation subject to the three caveats mentioned at para 114 above.

**(D)   Conclusion on costs allocation Q3 09**

123.   First, the purchase and sale of pure hardware in Q3 09 was quite different from anything that Autonomy had previously done in relation to hardware.  It was on a much larger

scale. It was also ostensibly (for the first time) in pursuance of a new marketing strategy. Deloitte was aware of this. That is why it asked so many questions about the hardware sales in Q3 09 and in particular about the SDM. If the purchase and sale of pure hardware had been no more than a continuation of what had gone on before, the allocations proposed by Autonomy would not have caused such a stir in the Deloitte team.

124.   Secondly, we reject the suggestion made by Mr Knights that the proposed allocation in Q3 09 was likely to be "short term" or something of a "*one-off*" initiative. In its closing submissions, Deloitte referred to the "*short term nature of the initiative*". Deloitte had no reason to believe that Autonomy intended this to be "*short term*" or a "*one off*". The SDM itself made it clear that Autonomy had embarked on a new strategy for the future. Deloitte well understood this: see in particular the first and second of the three caveats referred to at para [114] above. There would have been no need for such caveats if the Q3 09 approach had been a *"one off"*. The caveats are also revealing of some concern on the part of Deloitte that the allocation that it was approving might not be justified.

125.   Thirdly, Mr Knights' reliance on the opinions expressed by the reviewers at the time is misplaced for the following reasons:

(i)   The reviewers did not have the same knowledge as the audit team. For example, they were not privy to the discussions that Mr Knights had with [Autonomy]. The analysis of the events of 13 and 14 October 2009 shows that the reviewers were given very little time to consider the revised version of the SDM and the significance of the second TP42 email (see paras [96] et seq above). Mr Knights was under pressure to sign off the Q3 09 review and that pressure was communicated by Mr Knights to the reviewers.

(ii)   The role of the reviewers was different from that of the audit team. Thus, for example, D7 (Day 8/185:18 et seq) was asked about his response on 14 October to the SDM. In his response, he said that he thought that further clarification was required (see para [98] above). In answer to the question whether he expected the SDM to come back to him for sign-off, D7 said that it was a matter for the audit team. D12 (Deloitte PSR for Autonomy from Q2 10 to Q2 11) said (Day

*Edited for publication*

16/53:23) that it was not his function to make an assessment about whether there was evidence to support an allocation to S&M in any particular amount. That was a matter for the audit team. D2 (Day 15/25:1) was asked about a change that he proposed to the draft Audit Committee Report. He agreed that he left it to Mr Knights to deal with the question of whether the hardware costs were reflective of the underlying commercial substance.

(iii) In any event, the reviewers had repeatedly expressed their concerns about the allocation of the hardware costs. Mr Knights frequently said in his evidence that the decision to accept Autonomy's allocation was a team decision (the team including the reviewers). But the resolution of these concerns and the ultimate decision whether to accept Autonomy's allocation was a matter for which Mr Knights as the Engagement Partner had to take responsibility.

126.    Fourthly, Deloitte's reliance on [Autonomy's] representation letter of 19 October 2009 cannot be accorded much weight. We accept that the letter is not irrelevant, but what [Autonomy] says is no substitute for sufficient audit evidence on which to base an audit opinion. It cannot seriously be doubted that auditors should view such representations with scepticism. The history that we have set out above in some detail shows that there were ample grounds for scepticism in this case.

127.    Fifthly, Mr Knights' reliance on the fact that the Audit Committee accepted the Deloitte Report for Q3 09 is also misplaced. The report stated that Deloitte had approved the cost allocation but did not give a proper explanation of its reasons for doing so. The Committee had little time to consider the papers. More importantly, it was not an expert body of accountants. It was not reasonable for Mr Knights to rely on it to make a judgment on the validity of his approval of Autonomy's allocation of costs. These were technical issues. For example, it would not have been reasonable for him to rely on the Committee for confirmation that his view that the evidence obtained from TP42 about reseller margins was convincing.

128.    In our summary of the history of events relating to the Q3 09 Review, we have made a number of references to submissions made by the Executive Counsel about the conduct of Deloitte. We do not propose to express our conclusions on each of these submissions,

although we are in no doubt that there is real force in many, if not most, of them.  We can summarise the position in the following way.

129.   Mr Knights and the audit team rightly appreciated that the first version of the SDM was confusing and raised important questions (see paras [54 to 61] above).  The proposed allocation had the effect of moving the gross margin from 71% to 86%.  This was a very significant difference which called for rigorous professional scepticism on the part of Deloitte.  The need for heightened scepticism was all the greater because the transactional documentation obtained between Autonomy and TP42 made no mention of sales or marketing to be provided by TP42: the contract was simply a reseller agreement.

130.   The First TP42 email did not evidence an agreement that TP42 would provide marketing services to Autonomy in return for payment of a fee.  The best evidence of Deloitte's view at the time was that it continued to press Autonomy for more documentation.  Thus on 12 October 2009, D6 asked [Autonomy] whether there was "*a set marketing programme or any further information available which can help us to quantify the marketing element—e.g. a joint marketing plan or similar*?"  D10 repeated this request the following evening, saying the "*key outstanding points*" included *"Confirmation from TP42 on reseller margin and their marketing and support programme".*   Mr Knights' 13 October 2009 draft of the SDM was replete with further requests for documents and information.

131.   On 12 October 2009, D10 sought to write up the text of the Report to the Audit Committee on the accounting treatment of the hardware sales and was unable to do so.  He stated the figures then proposed for the split and wrote "*the rationale for this is that …..*" and added the comment "*this is where I begin to struggle*".

132.   Deloitte's scepticism should have increased further when [Autonomy] sent Deloitte another spreadsheet on 12 October 2009 which evidenced discounts provided by Autonomy to its customers.  How was this consistent with the assertion that Autonomy had paid a premium to TP42?

133.   The only further evidence that Autonomy provided to Deloitte in relation to the Q3 09 allocation was the second TP42 email.  All that this email evidenced was the discount offered by TP42 to customers purchasing goods from it who were "*entry level partners*".

134.   There is no evidence that anyone from Deloitte addressed their mind to what the second TP42 email said and whether it was consistent with the other evidence and the assertions made by [Autonomy].  The Deloitte team as a whole did not receive this email until 10.19 on 14 October 2009, when they received it as an attachment to the final version of the SDM.  As we have already said, there is no record of the audit team (D10, D15 and D11) being involved in the consideration of the allocation evidence during 14 October.

135.   When pressed on whether he had considered the consistency between the second TP42 email and other information, Mr Knights repeatedly said that he relied on his team to do this.  But there is no evidence that the team actually considered the email.  It is true that D10 joined Mr Knights in the phone conversation with [Autonomy] between 10.20 and (probably) 11.00 on 14 October 2009 (see para [95] above). But that was the extent of the input of D10 and the other members of the audit team before Mr Knights' message sent to Autonomy at 16.31 accepting its allocation.

136.   As for the reviewers, neither D2 nor D7 approved Mr Knights' decision before it was communicated to Autonomy. D7 said at 14.30 on 14 October 2009 that he would like some clarification of the draft SDM.  He said in evidence that it was a matter for the audit team to resolve the issue.  As for the second TP42 email, he did not seek to "*drill down*" into the detail himself (Day 8/194:23).

137.   D2's evidence was that Autonomy's cost allocation was not his preferred one.  He was concerned about whether the allocation was reflective of the underlying commercial substance and he left the evidential question of whether the costs were actually marketing costs to Mr Knights: Day 15/22:24 to Day 15/25:11.

138.   We are satisfied that Mr Knights alone took the decision to accept [Autonomy's] allocation of $28 million to S&M.

139.   The essential question for Deloitte when considering the allocation of hardware costs was whether there was sufficient appropriate audit evidence that the commercial substance of the $45 million paid by Autonomy to TP42 was expenditure of $28 million on S&M and $17 million for COGS.  We accept that this question involved a degree of judgment.  The issue is whether Deloitte's acceptance of the allocation fell within the range that could be accepted by a reasonable auditor applying the audit rules.  For all the reasons that we have given, we have concluded that no reasonable auditor could have accepted the allocation of $28 million to S&M.

140.   The obvious starting point was that the cost of purchasing goods should be allocated to COGS; and the obvious starting point for ascertaining the cost of the purchase of the hardware was the TP42 quotations and invoices, Autonomy purchase orders and the agreement between TP42 and Autonomy.  Costs could be allocated to S&M only if there was appropriate evidence that money had really been spent on S&M, and not on COGS.  All of this was well understood by Deloitte at the time. It was why Deloitte told the Audit Committee in Q3 09 that costs could be split between COGS and S&M "*provided this is reflective of the underlying commercial substance of the transaction*" and why the Deloitte witnesses all agreed that the starting point was that the costs of purchasing goods were to be allocated to COGS.

141.   No sufficient appropriate evidence was obtained either of the cost of the hardware or of the expenditure on S&M.  The evidence consisted of the SDM, the two TP42 emails and a paragraph in the quarterly [Autonomy] representation letter. This evidence was:

(i)    Inconsistent with the contractual documentation, which showed straightforward conventional sales of goods;

(ii)   Not probative of the existence of any marketing relationship between TP42 and Autonomy; and

(iii)  In the case of the SDM, inconsistent with the evidence in the [Autonomy] spreadsheet and the contractual documentation that Autonomy had received a discount from TP42's list prices.

142.   There was no objective basis for Mr Knights' change of position between (i) that displayed in the searching email and draft paper that he sent to [Autonomy] on the evening of 13 October 2009 and (ii) his approval of the allocation which he communicated to [Autonomy] at 16.31 on the following day.  The only new evidence that was sent to Deloitte during that period of less than 24 hours was the second TP42 email which, for the reasons that we have given, could not reasonably have convinced Mr Knights that the allocation was appropriate.  The decision to approve the allocation bears all the hallmarks of having been made in a hurry under client pressure.  Deloitte had been anxiously considering the allocation of the hardware purchase costs for at least ten days and time was running out.  The next meeting of the Audit Committee was imminent and Deloitte had to write a report for the meeting.  […]

143.   In our opinion, Mr Knights should not have endorsed the allocation.  We have reached the clear conclusion that Deloitte and Mr Knights failed to obtain sufficient appropriate audit evidence from which to draw the reasonable conclusion that Autonomy's accounting treatment of the costs of purchasing pure hardware was justified.  This was no mere error of judgment.  Mr Knights knew or ought to have known that there was no evidence to justify the allocation of $28 million to S&M in Q3 09.  In approving the allocation, he fell significantly below the standards reasonably to be expected of an auditor and was culpable of Misconduct.

144.   The reason why the conduct of Mr Knights and Deloitte in Q3 09 is so important in these proceedings is because the final cost allocation for the Q3 09 review was carried forward into and formed the basis of the FY 09 audit (there having been no separate review for Q4 09).

(E)   **Q4 09 and FY 09**

145.   In Q4 09, Autonomy purchased $15.3 million of pure hardware. The hardware was purchased from TP44 ($8.8 million), TP42 ($5.3 million) and TP40 ($1.2 million), and was sold at a loss for a total of $10.9 million. Autonomy allocated $9.4 million of the purchase cost to S&M, leaving a COGS of $5.9 million.  Autonomy's purported justification for these so-called "*strategic appliance sales"* remained as being "*to incentivise the hardware wholesalers to partner with Autonomy*" (see workpaper "*Q4*

*strategic appliance deals*" Q4 09 8195, dated 31 January 2010).  Autonomy split the costs of purchasing the TP40 hardware equally between COGS and S&M, and allocated 62.5% of the costs of purchasing the TP42 and TP44 hardware to S&M (with the remainder of the costs being allocated to COGS).

146.   If all the costs of purchasing pure hardware which had been allocated to S&M in FY 09 had instead been treated as COGS, Autonomy's gross profit would have been 83% instead of the reported 88%.

147.   The Q4 09 results were not separately reviewed but merged with the annual results and were subject to the year-end audit.  It is not in issue that Deloitte's Q4 09 review work stood as the audit work for FY 09.

148.   Deloitte's only workpaper in relation to the cost allocation of the FY 09 pure hardware sales was Q4 09 8195.   It recorded that Autonomy had said that it had paid the Q4 09 hardware manufacturers more for the hardware than it had sold the goods for "*in order to incentivise the hardware wholesalers to partner with Autonomy*".

149.   Deloitte accepted the TP42 hardware allocation of 62.5% to S&M and 37.5% to COGS because it was in line with that used in Q3 09 for similar sales of TP42 equipment.  No further evidence was obtained as regards TP42 beyond what had been obtained in Q3 09.  The shortcomings that we have found in relation to Q3 09 were therefore repeated at the year-end.

150.   The Executive Counsel submits that, whereas it might have been said in Q3 09 that further evidence was not required because Deloitte were only conducting a review, the same could not be said at the year-end.

151.   Moreover, she submits that Deloitte's failure in Q4 09 was all the worse because the audit team made no attempt to revisit the question of what evidence was available. The gist of their evidence about Q3 09 was that they believed that no further evidence was available then. But if the programme of seminars, customer meetings and trade shows promised by the SDM was real, there certainly should have been evidence of them by Q4 09.

152.   It is common ground that the costs of purchasing the TP44 hardware were allocated in the same way as the TP42 costs (on the basis of the TP42 evidence from Q3 09).  The Executive Counsel submits that this was wrong for the same reasons as it was in relation to Q3 09 and also wrong for three further reasons:

(i)     The cost allocation was based on purported S&M services to be carried out by TP42. There was no evidence of TP44 providing such services.

(ii)    [Autonomy] had told Deloitte in Q3 09 that it had tried to establish a strategic relationship with TP44, but chose not to do so, because (as was stated in the SDM) "*the TP44 business culture and speed / flexibility was not compatible with Autonomy*". The cost allocation was thus premised on a strategic relationship for which Deloitte had no evidence, having been told in the prior quarter that Autonomy had <u>not</u> established such a relationship.

(iii)   This hardware had been sold to TP19 as part of Autonomy's obligations under the agreement concluded between the two in Q2 09. Deloitte failed to look back to that contract, as it should have done.

153.   As to (iii), in Q2 09 all the costs of the hardware sold to TP19 had been allocated to COGS; but Autonomy had now allocated 62.5% of the costs to S&M.  Mr Knights' claimed justification for this change was (as he said on Day 6/63:21-24) that "*the purpose for which [Autonomy] went into… this deal in Q4 being different from, as we understood it, the purpose in Q1* [sic]".  The Executive Counsel submits that there is no evidence of this.  The purpose of the Q4 09 sales was to fulfil Autonomy's pre-agreed commitments.

154.   Furthermore, in Q2 09 Autonomy had agreed to sell TP19 $20 million of equipment for just $13.5 million, on the basis that Autonomy could obtain a discount equivalent to the discount which TP19 could obtain directly from TP44. Thus the notion that Autonomy would have made a 62.5% profit on these sales absent a premium paid to TP44 was inconsistent with the agreement under which Autonomy agreed to pass on a discount.

155.    Autonomy split the cost of purchasing the TP40 hardware equally between COGS and S&M.  This was on the claimed basis that, as recorded in the workpaper, Autonomy's purchase orders to TP40 said: "*for Autonomy purposes, the value of these transactions has been apportioned as follows: equipment/services 50% and marketing support 50%*". The purchased hardware included laptops, keyboards, mice and cable locks.

156.    The Executive Counsel submits that it is obvious that this was not good audit evidence. It carried no weight because it was self-generated by Autonomy.  Mr Knights said in cross-examination (Day 6/69:9-20) that he took this point and "*if I had seen the purchase order, I would have probably formed much the same judgement that it didn't really add anything of significance*", and "*standing back now, I don't think I would have placed too much reliance on that for cost allocation purposes*".

157.    But Mr Knights signed off the Q4 09 Strategic Appliance deals workpaper which relied on the TP40 purchase order only to approve Autonomy's cost allocation.  D10 accepted that the workpaper relied on evidence of the purchase order, and then said (Day 13/115:12-13): "*which I don't think is good evidence, if I'm being honest*".

158.    The workpaper also stated that Autonomy's agreement with TP40 "*makes reference to the Marketing Promotion Program but without specifying the % of costs that are considered to be for marketing*".  But the TP40 agreement dated 18 December 2009 provided limited details about the relationship and specific marketing services to be undertaken by selling, saying that TP40 would, in its sole discretion, "*explore*" and, to the extent reasonably requested or approved by Autonomy, "*pursue*" S&M efforts on behalf of itself and Autonomy. It did not contain a figure for payment for marketing services.

**(F)    Q4 09 and FY 09 as a whole**

159.    The Executive Counsel submits that:

(i)    Deloitte's audit planning failed to give any proper consideration to the risk of deliberate manipulation (asking what might go wrong?) or to plan audit work to meet that risk.

(ii)   Deloitte failed to approach the FY 09 audit with appropriate professional scepticism.

(iii)   Mr Knights' comments that there was no pressure to meet analysts' expectations evidence his loss of objectivity.

160.   Deloitte's FY 09 year-end planning meeting and fraud discussion was held on Monday 4 January 2010.  When discussing "*Deliberate manipulation of results*", Mr Knights said: "*No instances noted, likely to meet/exceed analysts expectations so no pressure to take aggressive positions for the results*".

161.   The Executive Counsel submits that this was an extraordinary comment given what had happened in Q3 09.  It ignored the fact that Autonomy had only met market revenue expectations in Q3 09 by selling $36.6 million of pure hardware, which it was unwilling to disclose to the market, and would have had to report a gross margin of 71% but for the allocation of $28m of the hardware costs to S&M. As D2 rightly said during the same meeting, Autonomy had been "*pushed*" to meet estimates in Q3 09.

162.   When setting out the external factors which affected the overall audit strategy, Deloitte's Strategic Audit Planning memorandum for FY 09 recorded one key risk to be "*expenditure growth without commensurate growth in revenues*".  Yet the paper stated, "*Autonomy had produced strong results over a sustained period*" and "*Nothing has emerged from… our three quarterly reviews that would indicate an issue in respect of these external factors. The operations of the business continue to perform in line with expectations and previous years*".  The Executive Counsel submits that the huge sales of pure hardware in Q3 09 showed that this very risk had eventuated.  Deloitte should have identified the risk that [Autonomy] might have entered into the hardware sales in order to meet revenue targets.

163.   The Strategic Audit Planning memorandum *was* the audit plan for the FY 09 audit. The Executive Counsel submits that it failed to consider "*what might go wrong*?" in relation to the hardware sales.  It failed to give critical thought to the audit procedures that were necessary in relation to the risks of misstatement which arose from them.

164.   The Audit Committee Report for 2009 dated 1 February 2010 referred to the loss-making hardware sales.  It included the following response from Deloitte:

> "*As noted in our Q3 2009 report, the costs may be split between cost of goods sold and sales and marketing expenses provided this reflects the underlying commercial substance of the transaction as there is no direct guidance within IFRS over where the costs should be presented. We expect that any future hardware sales would be priced at appropriate market rates. We have agreed the revenue to purchase orders from the end users, evidence of delivery pre year end and Autonomy sales invoices. We have reviewed the agreements in place between the hardware supplier and Autonomy and Autonomy and the end users and concur with [Autonomy's] treatment of the revenues and costs on a gross basis. [Autonomy] has confirmed that all of these transactions have been appropriately conducted at arm's length and this is also to be confirmed again in our standard representation letter.*"

165.   Deloitte makes the same general points here as it does in relation to the costs allocation in respect of Q3 09 (see para [111] above).  Deloitte submits that, in the light of (i) the evidence Deloitte had already obtained in relation to the SDM and standard reseller margins in Q3 09; (ii) the fact that the figures were significantly below the 2009 materiality threshold of $20 million; and (iii) the fact that the accounting practice had been consistently applied, Deloitte acted reasonably in accepting the TP42 allocation. The costs of the TP44 transaction ($8.8 million) were allocated on the same basis. Deloitte was aware from Q3 09 that Autonomy had been seeking to establish a strategic relationship with TP44.  The 50:50 split in the costs of the TP40 sales ($1.2 million) was a matter of judgment and the amounts were well below the materiality threshold.

166.   Furthermore, Deloitte was reasonably entitled to rely on the representation that it obtained from the Board of Directors which stated that they confirmed that the allocation between COGS and S&M "*appropriately reflect the nature of these items*".

167.   Deloitte also relies on the fact that (i) the loss-making hardware sales were again referred to in detail in the Audit Committee Report on the 2009 Audit and that on 29 January 2010, the Q4 09 PSR Docket was signed off by the audit team and reviewers; and (ii) the loss-making hardware sales in Q4 09 had decreased significantly.  This is said to be consistent with the tailing off of a one-off initiative.

**(G)   Conclusion on Q4 09 and FY 09 costs allocation**

168.    We have reached the clear conclusion that Deloitte and Mr Knights failed to obtain sufficient appropriate audit evidence from which to draw the reasonable conclusion that Autonomy's accounting treatment of the costs of purchasing pure hardware was justified.  This was no mere error of judgment.  We have explained at paras [123 to 144] above why Mr Knights knew or ought to have known that there was no evidence to justify the allocations made by Autonomy of $28 million to S&M in Q3 09 and why his conduct fell significantly below the standard reasonably to be expected of an auditor. Since no separate review was conducted for Q4 09 and the Q3 09 review was the basis of the FY 09 audit, it follows without more that Mr Knights and Deloitte issued an audit opinion for FY 09 without having sufficient evidence from which to draw a reasonable opinion as to the appropriateness of the allocation.  For that reason alone, he was culpable of Misconduct in giving an unqualified audit opinion in FY 09.

169.    Mr Knights' failure to exercise adequate professional scepticism in relation to [Autonomy's] assertions about the Q3 09 hardware costs allocation was compounded by his acceptance of [Autonomy's] assertions about the Q4 09 hardware costs allocation.  With specific reference to Q4 09, Mr Knights claimed that it had been right to say that the hardware sales were not a fundamental change to Autonomy's business because Deloitte understood the Q3 09 expenditure to reflect a one-off marketing campaign (Day 6/34:18-24).  But this ignores the fact that the SDM stated that the purpose of the marketing expenditure was to develop appliances and to become a hardware supplier to major financial institution customers.

170.    Mr Knights said (Day 6/37:4-8) that the hardware revenues were no different from any other revenues in terms of meeting revenue targets.  But they obviously were, because the "*strategic*" hardware sales were new and loss making.

171.    Mr Knights also said (in the same passage) that he had no recollection of any greater sense of pressure on Autonomy in Q4 09 than in the past. We reject this evidence since (i) in Q3 09 Autonomy had only made its revenue target by selling $36 million of hardware at a loss; (ii) Autonomy's share price had dropped after the Q3 09 results; and (iii) Mr Knights was well aware of the adverse commentary in the financial press following the Q3 09 results, including comment on Autonomy's true underlying rate of growth.

172.     In view of our conclusion in relation to the allocation of the cost of purchasing hardware from TP42 in Q3 09, we do not find it necessary to deal in detail with Deloitte's treatment of the costs of purchasing hardware from TP42, TP44 and TP40 in Q4 09. Suffice it to say that Deloitte was unable to provide any convincing answer to the Executive Counsel's submissions which we have summarised above: TP42 (paras 149-151), TP44 (paras 152-154) and TP40 (paras 155-158).

## (6)     ALLEGATIONS 1.4(a) AND (b) (DELOITTE AND MR KNIGHTS)

### (A)     Allegation 1.4(a)

173.     In substance, this allegation is an amplification of Allegation 1.2, but with a specific reference to lack of adequate professional scepticism. We have already explained why we consider that the allegation has been proved. There is no doubt that Deloitte and Mr Knights did a great deal of work on the issue of the loss-making hardware purchases. But they failed to obtain real evidence of spend on marketing at the Q3 09 stage and did not carry out any further work at the FY 09 audit to validate the S&M costs claimed by Autonomy. With the further elapse of time since the initial allocation in Q3 09, there should have been more evidence of these costs and they should have insisted on seeing it. By not doing so, they were culpable of a failure to exercise sufficient professional scepticism. No-one seems to have considered whether Autonomy was trying to manipulate the financial results, although the possibility of this was identified in the audit planning.

### (B)     Allegation 1.4(b)

174.     The statements in Autonomy's Annual Report and Accounts for FY 09 which the Executive Counsel alleges were misleading in view of the hardware sales were:

(i)     The statement in the Business Overview that "*Autonomy is one of the very rare examples of a pure software model*"; that Autonomy "*ships a standard product*"; and that its model meant that "*after the cost base has been covered, for every extra dollar of revenue that comes in significant benefits can fall straight through to the bottom line*".

(ii)   The statement in the Financial Review that the increase in S&M expenses from $135.2 million in 2008 to $170.8 million in 2009 was "*primarily due to increased advertising, additional headcount and an increase in sales commissions*".

(iii)   The statement in the Revenue Recognition accounting policy at Note 2 that "*The nature of the transactions that the group has entered into during 2009 is the same as in 2008 in all respects*".

(iv)   The statement in Note 5 that "*The group is a software business that utilises its single technology in a set of standard products … As a result, no analysis of revenues by product type can be provided*".

175.   Deloitte makes much of the limited scope of the auditors' duties under ISA 720 and submits that it was not required to audit statements made in the "front half" of the reports.  We do not find it necessary to deal with the distinction between "sign-posting" and "cross-referencing" that was debated before us.  Mr Knights did not say that Deloitte was not required to engage with the statements summarised at para 174 above as a matter of principle.  Clearly, if anything misleading in the "front half" of a report came to its attention, it was under a duty to do something about it.   Deloitte's case is that none of the statements was misleading.  We now turn to the points that he and Deloitte made.

176.   The response to the statement at para 174(i) above is that, if the allegedly misleading statement is read in the light of the entire passage from which it has been extracted, it was not misleading or at least Mr Knights acted reasonably in not considering it to be misleading.  The entire passage includes the words "*Many software companies have a large percentage of revenues that stems from professional services…..In contrast, Autonomy ships a standard product that requires little tailoring*…".  Both Mr Knights and D10 explained that they understood the expression "*pure software model*" to mean that the Autonomy model was to be contrasted with that of a company which also provided professional services: see the evidence of Mr Knights (Day 6/91:20-Day 6/94:2) and para 129(a) of D10's first witness statement.  Deloitte submits in any event that, since the audit team did not subjectively conclude that the words "*pure software model*" were in context misleading, they were under no duty to report on that point.

177.  We disagree.  On any fair reading of the statement, it meant not only that Autonomy did not provide professional services, but that what it *did* provide was the sale of software and (by implication) nothing else of significance.  If Mr Knights had read this statement carefully, we think he must have understood it in this way, particularly since he knew that Autonomy had made substantial sales of pure hardware in Q3 09 and Q4 09 which it was refusing to disclose.  In Q3 09, the sale of hardware represented 18.8% of total revenue.  In any event, Mr Coates rightly accepted that it was wrong to describe the hardware sales as falling straight to the bottom line (Day 21/75:12 and /77:21) although he insisted that the description was not materially misleading (which in our view it clearly was).

178.  As regards the statement at para 174 (ii) above, Mr Knights and D10 accepted that, on re-reading these words, they did not fully explain the increase in S&M expenses in the year.  We consider that, in view of its intense consideration of how to deal with the hardware sales in Q3 09 and its allocation of $28 million of the purchase costs to S&M, Autonomy's failure to make any reference to these costs clearly made this statement misleading.

179.  As for the statement at para 174 (iii) above, Deloitte says that it understood that the loss-making hardware sales did not represent a new line of business but were ancillary to and aimed at increasing sales of its existing core IDOL software product.  We do not agree.  The statement said that the nature of the transactions that the group had entered into during 2009 was the same as in 2008 "*in all respects*".  It was not.

180.  As for para 174 (iv), Deloitte accepts that it was possible to extract data on hardware sales, but revenue spreadsheets were not broken down by [Autonomy] consistently and the spreadsheets set out revenue streams rather than strictly "*product types*".  More importantly, it says that the focus of the statement was on the fact that software was Autonomy's core business and this was true.  But in our view, this statement must be read in the light of the others including, in particular, the statement that Autonomy was a "*pure software model*".  By making the incorrect statement that "*as a result*" no analysis of revenues by product type could be provided, Autonomy gave credence to its misleading assertion that it was a pure software model.  Furthermore, in the context of

IFRS 8 para 32, Mr Coates (rightly) accepted that hardware and software are different products (Day 21/109:13).

181.   We conclude that all four statements were materially misleading and that Deloitte and Mr Knights failed to act competently when presented with them in Autonomy's Annual Report and Accounts for FY 09.

**(C)     Conclusion on allocation of costs in FY 09**

182.   For the reasons that we have given, we find Allegations 1.1, 1.2 and 1.4 have been proved.  In so far as these Allegations are concerned with Autonomy's failure to *disclose* the sales of pure hardware, we shall address them after we have considered the issue of the allocation of hardware costs in FY 10.

**(7)     ALLOCATION OF COSTS OF PURCHASE OF HARDWARE FY 10: ALLEGATIONS 1.3, 1.5 and 1.6 (Deloitte, Mr Knights and Mr Mercer)**

**(A)     Q1 10 and Allegation 1.3**

183.   In Q1 10, Autonomy bought $13.9 million of hardware from TP40, and sold it for $12.2 million, thereby making a loss of $1.7 million. These sales were of servers, laptops, keyboards and mice.  Deloitte said in its Report to the Audit Committee for Q1 10 that:

> *"Given the period that has elapsed since these initial deals were transacted and the fact that we expected these to be more one-off in nature, we conclude that it would be more appropriate to reflect all of the costs of hardware sold in cost of goods sold…."*

184.   Despite this, Autonomy allocated $3.8 million of the $13.9 million cost to S&M, leaving a COGS of $10.1 million. Since it sold the goods for $12.2 million, this meant it booked a gross profit of $2.1 million.

185.   This allocation was made despite much concern expressed to Autonomy by Deloitte. Both of the Q1 10 reviewers objected to Autonomy's proposed allocation of costs to S&M:

(i)   D14 (the new PSR) told the audit team on 16 April 2010 that she was:

> *"struggling to see how you can put together a persuasive argument for showing the cost of hardware as a marketing cost rather than a cost of sale – does this not disguise the fact that margins will indeed fall as a result of doing more hardware deals?"*

(ii)  Two days later, she commented:

> *"I feel pretty uncomfortable about this – it seems that the magnitude of these hardware sales will grow and have been occurring over a period of months – how long can they really be deemed to be marketing and not a cost of sales. It strikes me that this is a way of them preserving gross margin which I am not sure is right – we should discuss on Monday"*

(iii) D1 (the new IRP) commented: "*I do not undesrstand [sic] how such an alalcoation [sic] can be correct?*"  He later said: "*I do not like this approach but may not be material*".  In his oral evidence he confirmed that his view had been that all the costs of purchasing the hardware should be in COGS absent a clear reason to the contrary (Day 15/145:7-18).

186.  D2, now acting as Joint Engagement Partner, also objected:

> "*What's the point at which they accept that this is now business as usual and should all be accounted for within gross margin? Let's discuss again with Richard — I'm really not keen on this becoming routine accounting*".

187.  He later told Mr Knights:

> *"Agree with the conclusion and particularly supportive of showing the unadjusted component as a disclosure deficiency.*
>
> *Richard, my instinct is that we should be reinforcing this very directly with [Autonomy] — i.e. we really do expect this not to be a recurring/business as usual adjustment. Having it as a rolling immaterial disclosure deficiency isn't a great answer and there must be a point at which breaking a new strategic market becomes business as usual."*

188.  The only reason why Deloitte eventually accepted Autonomy's allocation of $3.8m was because they considered it to be immaterial. This is clear from Mr Knights' email to [Autonomy] sent on 18 July 2010 in which he said that "*we only got comfortable with this in Q1 on immateriality grounds*".  Deloitte reported to the Audit Committee on 20 April 2010 that materiality was $5 million for the purposes of the quarterly report.

189.    On 19 April 2010, D10 reported to D2 and Mr Knights:

> *"Following some debate with [Autonomy], they have agreed to reflect an adjustment of $4m out of S&M and into cost of sales. The rationale for this adjustment is that after some debate they agree that sales of laptops and servers which have no direct link to a "strategic alliance" should be COGS and no[t] S&M. They are continuing to reflect those sales where they have deliberately paid more for the hardware in order to gain a strategic alliance as S&M.*
>
> *I think this is the best outcome we could have achieved and it puts a marker in the sand that hardware sales cannot be randomly attributed between operating costs and COGS on a quarterly basis. I think we should include the remaining adjustment which comes out of COGS, i.e. $3.8m as a disclosure deficiency and comment on this in our pack. It is not material and flags that we would not expect such classification going forward."*

190.    On the same day, D10 emailed D1:

> *"Allocation of COGS/Sales and marketing - they argue that they would never sell hardware at a loss and the only reason they are doing so is not only to incentivise their customers to buy through Autonomy but also to encourage a strategic partnership between Autonomy and key hardware suppliers so these hardware suppliers, such as TP42 and HDS develop and market the one Autonomy archiving solution. Therefore the argument is that they are buying the [sic] selling hardware at a loss because part of the costs is sales and marketing in relation to the new product being developed. We are working with [Autonomy] at the moment to obtain an updated calculation because some of the hardware sales in Q1 are not related to this but instead are genuine resell of computer hardware which appear to have no strategic benefit to Autonomy from a sales and marketing perspective on Digital Safe. This is an outstanding area which I shall update you on later today"*

191.    These were the same grounds as had been advanced by Autonomy previously for allocation of part of the cost of hardware to S&M and which were objectionable for the reasons that we have explained above in our consideration of the Allegations in relation to Q3 09 and FY 09.

192.    D10 then forwarded to Mr Knights and D2 an email from [Autonomy] in which [Autonomy] said that the hardware costs could be split into two categories, the first relating to servers (as to which [the email] said "*[TP44] are developing appliances and providing similar levels of support to TP42*") and the second "PCs", which [the email] described as "*resale of TP40 equipment*". D10's comment to Mr Knights and D2 was:

> *"I would suggest that at a stretch we* may *be able to conclude the (1) is consistent with what we have seen before, albeit not much action since Q3 on progress on this strategy.*
>
> *However, on (2) I would suggest that selling cheap hardware to institutions whom we are selling licence to is just another cost of generating the licence sale and therefore all COGS. What is your view? I cannot see another way around this"*

193. Mr Knights responded: "*I don't think that where we have plain vanilla hardware sales there is an argument to split the cost…. It seems to me that we have made a point and are left with a remainder which has some rationale and is not material*".

194. At this point D14 sent her comments on the near-final draft Report to the Audit Committee (which was finalised and sent to the Audit Committee that evening). She was evidently under the impression that no allocation was to take place:

> *"Don't think the hardware sales piece on pg 4 is finalised yet – I had understood they would quantify adjustment to be booked so all goes through CoS not marketing?"*

195. Later that afternoon she sent her "*Updated file review pts*" which, as on 16 April 2010, contained her comment on workpaper 2330 (the Interim Review Summary Memorandum):

> *"Am struggling to see how you can put together a persuasive argument for showing the cost of hardware as a marketing cost rather than a cost of sale – does this not disguise the fact that margins will indeed fall as a result of doing more hardware deals?"*

196. She finally signed off on this later that evening, after being told "*This has now been updated. The adjustment that they have made is $4m which will remain as a proposed adjustment in our pack to reverse this*", *i.e.* having been told that Deloitte was telling Autonomy that it should be reversed.

197. D2 also reiterated his support for showing the allocation as a deficiency, *i.e.* for saying that the allocation was wrong.  He wrote to Mr Knights:

> *"Agree with the conclusion and particularly supportive of showing the unadjusted component as a disclosure deficiency.*

> *Richard, my instinct is that we should be reinforcing this very directly with [Autonomy] — i.e. we really do expect this not to be a recurring/business as usual adjustment. Having it as a rolling immaterial disclosure deficiency isn't a great answer and there must be a point at which breaking a new strategic market becomes business as usual"*

198.    Mr Knights replied "*I agree. We can re inforce at the AC meeting*".

199.    As we have said, the Report to the Audit Committee for Q1 10 (which was issued by Deloitte on the evening of 19 April 2010) included the comment:

> *"Given the period that has elapsed since these initial deals were transacted and the fact that we expected these to be more one-off in nature, we conclude that it would be more appropriate to reflect all of the costs of hardware sold in cost of goods sold…".*

200.    The Report recorded that Deloitte understood that [Autonomy] had allocated $3.8 million to S&M, and that this was "*based on the previous analysis prepared for the TP42 sales in Q3 2009*".  It then said that:

> *"Based on the limited information available, we have included the $3.8 million as a classification adjustment in Appendix 1 and would not expect to see such amounts in sales and marketing in subsequent quarters".*

201.    The Executive Counsel submits that this shows that Deloitte and Mr Knights recognised that the allocation to S&M of part of the cost of purchasing pure hardware sold in Q1 10 had been made on the same basis as in the FY 09 financial statements and for that reason was inappropriate. In these circumstances, she submits that Deloitte should have considered whether the FY 09 financial statements needed revision.  It is common ground that they did not do so.

202.    Deloitte disputes that it was under an obligation to reconsider the FY 09 accounting since no "*new fact*" had been identified during the Q1 10 review within the meaning of ISA 560 "*Subsequent events*".  ISA 560 paragraph 14 states that action may be required if "*… after the financial statements have been issued, the auditor becomes aware of a fact which existed at the date of the auditor's report and which, if known at that date, may have caused the auditor to modify the auditor's report, the auditor should consider whether the financial statements need revision, should discuss the matter with management, and should take the action appropriate in the circumstances*".

203.   In response, the Executive Counsel says that this ignores the terms of:

(i)   IAS 8 para 5, which has a broad definition of "*prior period error*", which includes "*oversights or misinterpretations of facts*";

(ii)   IAS 10, which provides that adjusting events after the reporting period include the discovery of fraud or error; and

(iii)   IAS 8 para 13, which states that accounting policies are to be applied consistently. This was, in effect, a change in accounting policy.

204.   We see considerable force in the points made by the Executive Counsel and accept that it may be that Mr Knights' failure to consider whether the FY 09 financial statements needed revision was negligent.  But we are not persuaded that such negligence crossed the threshold of Misconduct as contended in Allegation 1.3.

**(B)   Q2 10: Allegations 1.5 and 1.6(a)**

205.   In Q2 10, Autonomy bought $31.3 million hardware from TP40 and sold it for $27.5 million, thereby making a loss of $3.8 million.  This was a big increase in purchases and sales on the prior quarter (Q1 10 purchases and sales were $13.9 million and $12.2 million respectively). The Q2 10 hardware sales represented 12% of revenue for the quarter.

206.   Autonomy announced record first quarter revenues of $194.2 million.  It also supplied "*supplemental metrics to assist in the understanding and analysis of Autonomy's business*" which analysed the $194 million into three figures: "*Product including hosted and OEM*", "*Service revenues*" and "*Deferred revenue release (primarily maintenance)*". The first category was further analysed into "*IDOL Product*", "*IDOL Cloud*" and "*OEM derived revenues*". From Q1 10 onwards, revenue from the pure hardware sales was included within "IDOL Product" in the quarterly reports.

207.   The Q1 10 quarterly report thus gave no indication that there had been substantial pure hardware sales in that quarter.

*Edited for publication*

208.  Autonomy's balance sheet for Q1 10 included inventory of $10.25 million.  The unchallenged evidence of TP28 (an analyst at TP38) is that this was an exceptional number, at least 20 times what analysts were used to seeing. This led a number of analysts, including TP28, to ask questions on the Q1 10 earnings call, held on 21 April 2010.

209.  During the call, Autonomy attributed the inventory to hardware that was to be used in sales of Arcpliance.  In particular:

(i)  TP30 of TP33 asked "*what the Arcpliance or appliance sales and hardware sales would have been in a normal quarter?*", to which [Autonomy] responded that it "*would be a fraction of that kind of number*". TP30's note published after the call described Autonomy's estimated Q2 growth as "*prudent when one considers that appliance sales including hardware with a value of at least $10m (compared to a more normal $2-3m), have already been concluded and the value of the software attached to that hardware is likely of equal or greater value*".

(ii)  TP29 of TP31 asked: "*can you just clarify the $10m or so of hardware revenue?*" [Autonomy] responded: "*TP29, I think you may have misunderstood what that revenue is. It's not hardware revenue. What it is is the selling of an appliance… It's merely a way of allowing customers in time critical situations to get the software up and running as soon as possible…*" TP29' note published the day after the call set out his understanding that "*software is the main component of Arcpliance sales*" and "*$10m of hardware could correlate with $20-40m of software*".

(iii)  TP28 asked what the revenue would be for $10 million of inventory, to which [Autonomy] replied: "*What I would say is that the software component of the revenue is far higher than the hardware component. So the software is still the bit that dominates in terms of the cost of an Arcpliance. It's not the hardware; it's the software*".

210.    Mr Knights (Day 7/183:10-23) and D10 (Day 13/199:16-/200:2) both accepted in cross-examination that statements made by [Autonomy] about hardware sales during the Q1 10 call were incorrect.

211.    D10, D9 and D15 all dialled in to this earnings call. It is inconceivable that they would have missed the fact that analysts had been misled into thinking that the inventory balance was Arcpliance, rather than pure hardware with no IDOL.

212.    We consider it likely that Mr Knights was aware that Autonomy had told the market on this call that its hardware sales were appliances. Deloitte's correct rejection of Autonomy's treatment of the allocation of pure hardware costs in Q1 10, their awareness of how Autonomy had allocated the costs of purchasing pure hardware in 2009 and of how it was presenting such purchases to the market should have further heightened their scepticism when considering the statements it made in the remaining quarters of 2010 and FY 10.

213.    Autonomy allocated $3.8 million of the Q2 10 hardware costs to S&M.  Deloitte accepted this allocation despite the fact that they had indicated that the allocation of $3.8 million to S&M in Q1 10 was wrong and they knew that [Autonomy] had publicly made statements about Autonomy's hardware inventory in the Q1 10 earnings conference call which were inconsistent with Deloitte's knowledge of Autonomy's business.  As we set out below, there is also considerable evidence that reviewers were expressing their disagreement with the proposed Q2 10 allocation.

214.    Thus on 15 July 2010, D2 made comments on a draft of the Q2 10 Interim Review Summary Memorandum. On the "Cost of Revenue" section, he wrote:

> *"Have they now done away with the practice of transferring a portion of the cost to sales & marketing expense?"*

215.    And on the next page, under the heading "Sales and Marketing" by the sentence "*[insert details of element included from hardware sales]*", he wrote:

> *"See my comment above. Why are they still doing this? I thought we'd put the marker down very clearly that it needed to stop"*

*Edited for publication*

216.   As Deloitte recorded in its report to the Audit Committee for Q2 10, Autonomy stated that the purpose of that quarter's sales of TP40 hardware was not to partner/develop appliances with hardware sellers, but "*to develop a long term strategic relationship with the end users in order to secure future profitable software sales*". Autonomy allocated $3.8 million to S&M, being the difference between the price it paid for the hardware and the price for which it sold it. This allowed Autonomy to recognise a nil gross profit margin.

217.   On 16 July 2010, D2 sent D10 his comments on Deloitte's draft Report to the Audit Committee.  Next to the paragraph which said:

> "*We have reviewed [Autonomy's] analysis of the linkage between the loss making hardware sales and subsequent profit making software sales and concur with the decision taken by [Autonomy] to allocate the total loss of $XX million to sales and marketing. [detail any immaterial reclassification if number is higher than loss]*"

he wrote:

> "*Still struggling with why, given the revenues are accounted for in revenue why the full cost wouldn't go to cost of goods sold*".

218.   Later that day, [Autonomy] sent D10, Mr Mercer and Mr Knights what [they] described as a "*memo to support the current costs allocation*". [They] said:

> "*You should review each of the purchase quotations for every order this quarter as well as they are fundamental to our arguments*".

219.   [Their] point was, as [they] explained on the first page of the memo, that:

> "*The cost allocation of 50% to COGS and 50% to sales and marketing is consistent with the quotations provided to the hardware vendors*"

and that 50% was

> "*effectively a commission payment to the hardware vendors for allowing us to secure the sole supplier relationship with the banks*".

220.   The purchase orders sent by Autonomy to the hardware vendors included the following legend:

> *"For Autonomy purposes, the value of these transactions has been apportioned as follows: equipment/services 50% and marketing support 50%".*

221. When D15 saw the wording appended to Autonomy's purchase orders in Q2 10, he emailed D10:

> *"Oh dear.... have you read this?? They have specifically stated on the PO template that TP40 are paying for 50% product and 50% joint funding of the sales and marketing program.... That is how they expect to get around the COGS/S&M split??"*

222. Mr Mercer sent the memo on to Mr Knights, with the following message:

> *"They haven't listened to you on this one! This just is not going to work - just about got [D2] happy with a few million of loss being reallocated. D10 seeing [Autonomy] now to tell [them]. Sparks likely to fly. May need your help, N".*

223. On 17 July 2010, D1 (the IRP) sent D10 his comments on the draft report to the Audit Committee.  Beside the paragraph "*We have reviewed [Autonomy's] analysis of the linkage between the loss making hardware sales and subsequent profit making software sales and concur with the decision taken by [Autonomy] to allocate the total loss of $XX million to sales and marketing. [detail any immaterial reclassification if number is higher than loss]*" D1 wrote:

> *"How large – there is no logic to this analysis the links between software and ghaardware sales would mean that everrthing should be in gross profit [sic]"*

224. D10 replied to D1's point as follows:

> *"Hardware cost allocation of the loss on the contract to marketing. Rationale is that they would not sell hardware at a loss in the normal course of events. However, what they are doing is selling hardware to predominantly large banks at a price which is way below what they could get elsewhere so as to "open the door" for future software transactions. Their view is that as these deals are more speculative in nature, i.e. akin to marketing costs it is appropriate to reflect some portion of the cost in marketing. Whilst our view is that choosing a percentage is very judgemental and difficult to concur upon, the allocation of the loss is certainly something which is over and above a normal cost of sale therefore [Autonomy] believes it is appropriate to take at least this portion of the costs to marketing.*"

225. D1 did not accept this. On 19 July 2010 he replied:

> "*I do not agree re 4 - how large is this? Also the arguments you are presenting in the audit committee do not work. You are linking it to software sales which is probably correct but the only thing that argument supports is not providing against stock. If we are also making significant profits on linked software sales then that would strongly suggest that all the related hardware losses are also in gross margin*".

226. On the afternoon of 18 July 2010, Mr Knights sent D10 and Mr Mercer an email commenting briefly on the draft Report to the Audit Committee (the "Audit Committee Pack", or "ACP") in the following terms:

> "*Nice to see NJM's tenure continues the record results theme !!!*
>
> *ACP looks to be getting there – only one large remaining hurdle ???*
>
> *R*"

227. The "*one large remaining hurdle*" was the hardware sales. D10 replied to Mr Knights and Mr Mercer "*I have a call with [Autonomy] tonight so will let you know where they are on cogs*".

228. At 17.38 on 18 July 2010, Mr Knights sent an email to D10 in which he said "*I spoke to [initial] Saturday and said best we can do is to park the loss in sales cost*".

229. At 21.21, Mr Knights sent another email, this time addressed to [Autonomy], Mr Mercer and D10 […], saying that the proposed COGS position (*i.e.* the 50:50 split) was "*not something our compliance people will get comfortable with*". He proposed as "*my solution*" recording the hardware sales at nil gross margin for IFRS reporting and taking the loss as a selling expense (*i.e.* S&M). He ended, "*Just to be totally clear all of us fully get the strategic element to this and the opportunity to open up new markets. The evidence of follow through sales is apparent*".

230. In their witness statements:

(i) Mr Knights says (para 188 of his first witness statement) that his recollection is that the allocation of the loss to S&M had been Mr Mercer's suggestion, and that he (Mr Knights) had understood from discussions with Mr Mercer and D10 on Friday 16 July 2010 that allocating the loss on the transaction to S&M was a treatment that the review team was prepared to accept.

(ii)   D10 (para 157 of his first witness statement) says that he recollects that he and Mr Mercer discussed this "*with D5 (a partner in National Accounting and Audit ("NAA") and specialist in revenue recognition issues) and he agreed with that approach*".

231.   There is no documentary evidence that D5 agreed with Autonomy's allocation.  D5 did not give oral or written evidence in these proceedings.

232.   On the evening of 18 July 2010, [Autonomy] emailed to Mr Knights, Mr Mercer and D10 a draft [...] report to the Audit Committee. [The covering email] said:

> "*Gents – draft attached. The main issue is to get across the line on the COGS. [Name 1] will discuss with D10. Also [Name 2] has strong views on this in terms of the business rationale and it may be worthwhile interviewing him. I will go up to Cambridge tomorrow to discuss this and Dynamo.*
>
> *Ps – Dynamo pricing has been agreed today so we are a go.*
>
> *Regards*
>
> *[...]*"

233.   At 21.21 that evening Mr Knights emailed [Autonomy], Mr Mercer and D10 [...] in reply to [Autonomy's] email.  Mr Knights' email stated (the emphasis is in the original):

> "*All*
>
> *The proposed COGS position is not something our compliance people will get comfortable with, and we've already highlighted our position on this with the AC in Q1 setting out that we only got comfortable with this in Q1 on immateriality grounds.*
>
> ***But there is a solution that makes sense*** *– particularly as in the Q1 call you already highlighted the $10m of hardware in inventory which you highlighted was to be sold in Q2.*
>
> *My solution would be :*
>
> •   *Record the hardware sales at nil gross margin for IFRS reporting*
>
> •   *Take the "loss" as a selling expense — (around $4-5m i think)*
>
> •   *The market already knows that you will be making Q2 hardware sales as you highlighted this at Q1 and had inventory on the b/s. So any IFRS gross*

*margin one off drop is reasonable and can be explained as part of the strategy.*

- *In the **adjusted gross margin** strip back out the hardware element to a "normalised" level and add an explanation -*

*Bv the time you wrap up the $10m hardware b/f and the$ 4-5 m that is in selling expense surely we are almost there??*

*Just to be totally clear all of us fully get the strategic element to this and the opportunity to open up new markets . The evidence of follow through sales is apparent –*

*I'm flying between 10.00 am and 5 pm tomorrow ,*

*Surely this makes sense ?*

*Happy to discuss.*

*R"*

234.    Autonomy accepted this solution. By an email on the evening of Monday 19 July 2010, [Autonomy] sent D10 the finalised note from [Autonomy] for the Audit Committee meeting on the following day.  In relation to gross margins, the note recorded:

> *"Gross margins - were 86% (versus 89% in Q1'10) after excluding the amortisation of purchased intangibles ($14.5m). We have charged the cost of the lower margin sales to the cost of sales line even though we had agreed with our suppliers that the [sic] 50% of the cost would be used for marketing purposes. These lower margin sales have generated significant new software business for us (over $80m of sales have been associated with these sales over the past few quarters). The auditors concur with this prudent approach".*

235.    Autonomy's Q2 10 quarterly financial report, released at 7.00 on 22 July 2010, reported in their "*Financial Highlights*":

> *"gross margins (adj.) at 88%"*

and then under the heading "*Gross Profits and Gross Margins*":

> *"Gross margins (adj.) for the six months ended June 30, 2010 were 88%, compared to 89% for the first six months of 2009. ... Gross margins (adj.) for the second quarter of 2010 were 86%, compared to 88% for the second quarter of 2009. ... The small variation in gross margins in Q2 2010 was in line with our expectations due to the sales mix including appliances as discussed last quarter".*

236.    The Q2 10 and H1 10 2010 Report to the Audit Committee dated 19 July 2010 included the following:

> *"Consistent with the hardware sales discussed in previous quarters' reports to the Audit Committee, these strategic sales have been made at a loss. [Autonomy] has taken all of the costs associated with the TP40 hardware sales to cost of sales with the exception of the loss of approximately $3.8 million which has been allocated to sales and marketing expenses. [Autonomy's] rationale for entering into these loss making contracts is that Autonomy is seeking to develop a long term strategic relationship with the end users in order to secure future profitable software sales.*
>
> *[Autonomy] has prepared an analysis demonstrating the strong linkage between the loss making hardware sales and subsequent highly profitable software sales which indicates that for the $100 million of hardware sales made over the course of 2009 and 2010 to date (at a total loss of approximately $10 million), approximately $78 million of software deals have taken place with these customers over the same period and $20 million of hosted revenues have been generated for which there is a recurring revenue stream. All of these subsequent amounts have been transacted at Autonomy's normal gross profit margin.*
>
> *[Autonomy] has accounted for the revenues and costs associated with these deals on a gross basis as they and the customer consider Autonomy to be the principal in the arrangement. This is based on Autonomy being the prime instigator in negotiating the deals - it has negotiated terms and selling price independently of the hardware provided and it bears the full credit risk for the transactions.*
>
> ***Deloitte response***
>
> *We have reviewed [Autonomy's] analysis of the linkage between the loss making strategic hardware sales and subsequent profit making software sales and accept the decision taken by [Autonomy] to allocate the loss of $3.8 million to sales and marketing. We have reviewed the contracts and concur that it is appropriate to recognise the revenues and costs gross.*
>
> *Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q2 2010 press release".*

237.    Six members of the audit team (including Mr Mercer) dialled into the Q2 10 analysts conference call on 22 July 2010.  Analysts raised a number of questions about gross margin and the inventory seen on the balance sheet in Q1 10 (which they understood to be related to appliances). Mr Mercer made manuscript notes on the questions which analysts had raised. For example, an analyst from TP52 asked:

*Edited for publication*

"*Just quickly, I just want to dig into the gross margin question a little. First of all, you saw that spike in appliance sales, that inventory moving through. Did that have any gross margin impact? And then leading on from your comment about that customer requiring additional processing, how quickly can we see that gross margin come back up to the 89% to 90% level?"*

238.   Other analysts, from TP33 and TP47, returned to the same subject. Analysts' published notes after the call included for example (from TP33):

> *"**Margins – "noisy", but still showing progress***
>
> *Margins are likely to stay in focus, and while we think Q2's gross margin dip was well-flagged (and appliance sales will continue to impact Q3), management does need to do a better job at flagging one-off events that might or have impacted underlying trends"*

And from TP45 TP48:

> "***Margins also disappoint but this looks more one-off in nature***
>
> *The other major disappointment in the results was on margins. The gross margin fell to 86% despite management assurances on the investor question board that the sale of stock would not impact on the gross margin."*

239.   That was a reference to the answer which Autonomy had given on its investor question board on its website:

> "*2nd June 2010*
>
> *Is it safe to assume that Arcpliance gross margins are the same as for any other way that a customer chooses to purchase your technology?*
>
> *Although the margins on the individual sales are a little lower, because the value proposition of the Arcpliance is virtually all in the software element it is only a small effect. Also, because there is little training or services associated with these solutions this has a counteracting effect, so overall the Q2'10 sales you mention are not expected to materially impact group gross margins and therefore you would expect them to be within the usual Autonomy range"*

240.   The Executive Counsel submits that, without any justification, Deloitte went back on the position that they had reached in their Q1 10 Report to the Audit Committee dated 20 April 2010, namely that all of the hardware costs should be accounted for in COGS and that they would not expect to see such amounts in S&M again.  Mr Knights put forward the idea of "*parking*" the loss on the sales in S&M, describing this as "*my solution*", which Mr Mercer endorsed and adopted.  Deloitte failed to exercise proper

scepticism in relation to the loss leader approach to accounting for the hardware sales accounting treatment.

241.    Furthermore, in Q2 10, and each successive quarter, [Autonomy] produced a schedule which listed the customers to whom Autonomy had sold hardware and identified whether it sold software to them as well.  The Report to the Audit Committee for Q2 10 stated that Autonomy had prepared an analysis which it said demonstrated "*the strong linkage between the loss making hardware sales and subsequent highly profitable software sales*".  The Executive Counsel submits that Deloitte gave no critical thought to this. In fact, and as Deloitte would have appreciated had they brought a questioning mind to bear on the document:

(i)     It did not show that customers bought software because they had bought hardware from Autonomy. Many of the hardware customers were large existing clients of Autonomy, such as TP37, TP6, TP39 and TP12; and

(ii)    The biggest software sales had been made pursuant to existing volume contracts between the end user and Autonomy.

242.    D10 conceded (Day 14/28:1-10) that Deloitte did not test whether there was actually any relationship between the hardware and the software sales.  D12 agreed (Day 16/39:1-3) that the schedule "*does not show a clear link between any individual hardware sale and a specific software sale*".

243.    More generally, the Executive Counsel submits that Deloitte failed to give critical thought to whether accounting for the loss as a marketing expense was consistent with the IFRS rules. There were powerful arguments against this.  In particular, D10's email of 19 April 2010 had said: "*I would suggest that selling cheap hardware to institutions whom we are selling licence to is just another cost of generating the licence sale and therefore all COGS*".

244.    She also says that the audit engagement team's actions were not supported by the reviewers. Thus:

(i)   D1 only accepted the allocation because it was immaterial (Day 15/146:14-18), and said at the time that "*the links between software and ghaardware [sic] sales would mean that everrthing [sic] should be in gross profit*". At para 28 of his witness statement, he said that "*intuitively (whatever the commercial substance of these sales) the proposed allocation felt wrong and might prevent the fair presentation of the results*".

(ii)  D2's dissatisfaction with that quarter's cost allocation had been set out in his earlier comments on the draft Report to the Audit Committee: see para [217] above. The Executive Counsel submitted that the Tribunal should find that he also only accepted this allocation because it was immaterial to the quarter.

(iii) D12 agreed that materiality "*did come into my consideration as part of [the] assessment*" (Day 16/34:21-22). D12 admitted (Day 16/37:7 to Day 16/38:1) that he did not know that [Autonomy] had initially claimed that 50% of the costs represented a commission payment; nor did he know that the loss position was something that had been proposed by Deloitte as a compromise solution.

245.   Deloitte's decision to approve the allocation to S&M lacked professional scepticism because:

(i)   They failed to give thought to the significance of the fact that they were rejecting their client's factual contention that they had paid a marketing commission to the hardware sellers.

(ii)  Their approach was coloured by their failure to identify the risk of the client deliberately manipulating the financial results. The minutes of the planning and fraud discussion meeting on 5 July 2010 record that, yet again, Mr Knights commented "*Deliberate manipulation of results – Autonomy is likely to meet / exceed analysts expectation so there is no pressure to manipulate results*".

246.   Deloitte places considerable weight on its rejection of Autonomy's suggestion that 50% of the cost of the hardware should be allocated to S&M as being effectively a commission payment to hardware vendors. Mr Mercer said that Deloitte made it

absolutely clear to Autonomy that this was not acceptable (Day 11/101:10-15 and Day 11/102:15-19).   Faced with this robust challenge, [Autonomy] backed down and accepted the solution proposed in Mr Knights' email of 18 July 2010 (see para [234] above).   Mr Mercer insisted that this solution was his own, but that it was adopted by Mr Knights.   We discuss the issue of whose solution it was when we deal with Allegation 5 at paras [743] to [752] below.

247.   This solution had been agreed with D5 as both Mr Mercer and D10 said in evidence. At the time, D5 was a Deloitte Partner in its National Accounting and Audit Department. Deloitte submitted that, in seeking the endorsement of D5, Mr Mercer acted prudently and in accordance with the standards reasonably to be expected of a member of the ICAEW.

**(C)**   **Conclusion**

248.   We have seen nothing in the points made by Mr Mercer and Deloitte that convincingly counters the submissions of the Executive Counsel (which we accept).   It is true that Mr Mercer (and Mr Knights) rejected Autonomy's commission payment solution.   That is hardly surprising because there was no basis for it.   But no or no adequate explanation has been given for their adopting a position which was contrary to that which they had adopted in relation to Q1 10, namely that it would be more appropriate to reflect all of the hardware costs in COGS (see para 199 above).   In our judgment, Mr Mercer (who associated himself with the solution proposed in Mr Knights' email) and Deloitte failed to exercise sufficient professional scepticism in the respects described by the Executive Counsel.

249.   We explain at paras [736] to [742] below why we consider Mr Knights' email of 18 July 2010 is evidence of a loss of objectivity on his part.   He was under pressure from his client.   […] Time was running out because the Audit Committee meeting was imminent. Mr Knights' solution affords Deloitte no defence to the Allegations made in respect of Q2 10.

**(8)**   **Q3 10, Q4 10 and FY 10**

**(A)    Q3 10**

250.    Autonomy contended in its report to the Audit Committee for Q3 10 that the quarter's sales of TP40 hardware were only made at a loss in order to procure future software sales from end users.  On this basis, it allocated the $4.8 million shortfall in the sum it received on selling the hardware (as against the sum it had paid for it) to S&M, giving it a nil gross profit margin. Deloitte accepted this allocation.

251.    Deloitte remained alive to the fact that analysts were concerned to understand what affected the gross margin figure but were not aware that it was affected by sales of pure hardware. In the Report to the Audit Committee for Q3 10, Deloitte wrote under the heading "*Key risks*" "*Presentation of costs associated with hardware sales*":

> "*Included in revenues for the quarter is $26.0 million of hardware sales. Q2 2010 sales were $27.5 million. Q1 2010 sales were $12.2 million. In aggregate these sales represent approximately 10% of the Group's revenues for the nine months to 30 September 2010.*
>
> *... these strategic sales ... have been made at a loss. [Autonomy] has taken ... the loss of approximately $4.8 million [on the quarter's hardware sales] to sales and marketing expenses on the basis that these sales are only made at a loss in order to procure future, profitable software sales. ...*
>
> *... Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q3 2010 press release.*
>
> *It is likely that the questions raised at the Q2 2010 press conference are raised again at the Q3 2010 press conference and therefore suggest that it would be helpful to include narrative regarding the nature of these revenues in the quarterly report.*"

252.    As in relation to Q2 10, Autonomy prepared an analysis purportedly demonstrating a "*strong linkage*" between the pure hardware sales and subsequent software sales. This was described as follows in the Report to the Audit Committee for Q3 10:

> "*[Autonomy] has extended its analysis demonstrating the strong linkage between the loss making hardware sales and subsequent highly profitable software sales which indicates that for the $118 million of hardware sales made over the course of 2009 and 2010 to date (at a total loss of approximately $15 million), approximately $75 million of major software deals have taken place with these customers over the same period and $28 million of hosted revenues*

> *have been generated for which there is a recurring revenue stream. All of these subsequent amounts have been transacted at Autonomy's normal high gross profit margin".*

253.  The "*analysis*" prepared by Autonomy was in workpaper Q3 10 8130a.   Deloitte annotated it to say:

> *"This spreadsheet has been prepared by the client to analyse contracted hardware sales each quarter versus software sales and hosted revenue generated with the same customers. This shows that $102m of software and hosted revenues has been generated at autonomy's normal high gross margins compared to hardware sales of $118m at a loss. This provides support for the commercial rationale provided by [Autonomy] that they sell hardware to these customers in order to secure the software sale and as such the loss on the hardware sale is recorded as a sales and marketing expense".*

254.  Mr Mercer said at para 102 of his first statement that the analysis was considered each quarter, tested to the sales ledger and reviewed "*at a senior level (that is, D15, D10 and me*".

255.  The Executive Counsel submits that Deloitte and Mr Mercer failed to treat it with an appropriate level of professional scepticism.   D1 was sent the draft Report to the Audit Committee for Q3 10 and returned it to D10 with his comments on 15 October 2010. The paragraph submitted to D1 said:

> *"We have reviewed [Autonomy's] analysis of the linkage between the loss-making strategic hardware sales and subsequent profit making software sales and accept the decision taken by [Autonomy] to allocate the loss of $4.8 million to sales and marketing".*

256.  D1 annotated the figure "$4.8 million" and wrote:

> *"Surely we only accept on the grounds of materiality – this does not work otherwise"*

257.  Deloitte's Report to the Audit Committee did not propose an adjustment.   D10 sought to overcome D1's objection to the allocation by inserting into the paragraph of the Report to the Audit Committee quoted at paragraph [256] above the words that we have underlined below so that it read:

> *"We have reviewed [Autonomy's] analysis of the linkage between the loss making strategic hardware sales and subsequent profit making software sales*

> *and given the scale and consistency in allocation with the prior quarter, accept the decision taken by [Autonomy] to allocate the loss of $4.8 million to sales and marketing*".

258. Deloitte's Report containing this finalised wording was sent to the Audit Committee […]  at 17:37 on 17 October 2010, for the meeting at 11:30am the following day.

259. On 18 October 2010, D2 emailed to D10 and D15 (with a copy to Mr Mercer) his comments on the draft quarterly financial report. He annotated the proposed statement by [Autonomy] "*The gross margin has snapped back to usual levels from Q2 2010, and increased year on year*" with the comment:

> *"Have we bridged what's caused this? Are we comfortable it's not just due to accounting presentational changes and this represents the underlying story too?"*

260. That was a reference to a two percentage point movement in gross margin, from 86% for the quarter Q2 10 to 88% for the quarter Q3 10.  At para 116 of his first witness statement, Mr Mercer dismissed the changes made by the allocation as "*very small*". D2 ([…]) rightly recognised in his comment the significance to users of Autonomy's accounts of such changes in gross margin, which would have left Autonomy's gross margin well below the target range stated in the FY 09 Accounts as 89-92%.

261. Although the detail of what happened in Q3 10 differed from what happened in Q2 10, as a matter of substance little changed.  Q3 10 does not call for separate treatment by us.

**(B)    Q4 10 and FY 10**

262. The FY 10 financial statements included $94.7 million in revenue from sales of pure hardware. This was 10.9% of revenue for the year.  Autonomy allocated $20.8 million of the costs of purchasing this hardware to S&M in the FY 10 income statement.  This had the effect of moving the gross margin from 84.8% to 87.2%.

263. In January 2011, [Autonomy] proposed for the first time to take a 5% gross profit margin on the hardware sales from Q2 10 to Q4 10.  Workpaper Q4-2010-8117 recorded Deloitte's disagreement with this proposal.  The Audit Committee Report for Q4 10

*Edited for publication*

recorded Deloitte's rejection of the 5% gross profit margin proposal.  Deloitte also stated in the Report:

> *"We have reviewed [Autonomy's] analysis of the linkage between the loss making strategic hardware sales and subsequent profit making software sales and given the scale and consistency in allocation with the prior quarters, accept the decision taken by [Autonomy] to allocate the loss of $4.0 million to sales and marketing expense in Q4."*

264.   Deloitte required and received a representation letter dated 22 February 2011 from the Board of Directors confirming that costs had been properly allocated between COGS and S&M.

265.   As noted above, and as alleged at para 106 of the Amended Formal Complaint (and admitted at para 93 of the Amended Defence), Autonomy subjected the costs of purchasing the pure hardware in FY 10 to three different cost allocation treatments:

(i)   In Q1 10, the justification for pure hardware sales was said to be for the development of a TP40 appliance and to build a strategic relationship with TP40. Autonomy sought to recognise a gross profit margin of 30% on these sales, with the remaining $3.8 million of the costs of purchasing the hardware being allocated to S&M. Deloitte proposed a classification adjustment for this sum and said that it would not expect to see such amounts in S&M in subsequent quarters.

(ii)   In Q2 10 and Q3 10, Autonomy said that the purpose of the sales of hardware was no longer to partner or develop appliances with TP40 (or indeed TP42 or TP44), but to develop relationships with end customers in order to secure from them future software purchases. Autonomy sought to allocate to S&M the loss on the pure hardware sales, being $3.8 million in Q2 10 and $4.8 million in Q3 10, which Deloitte accepted.

(iii)   This rationale was repeated in Q4 10, with Autonomy again allocating the roughly $4 million loss made on the hardware sales to S&M, giving them a nil profit margin on the sales. Once again, Deloitte accepted this approach.  However, Autonomy also sought to revise its accounting for Q2 10, Q3 10 and Q4 10, arguing (as we have stated above) that it should in fact take a 5% gross profit

margin on the sales from those quarters, leading to a further $4.4 million being allocated to S&M in Q4 10.  Deloitte did not accept this accounting treatment and proposed an adjustment to reclassify those $4.4 million of costs into COGS.  But Autonomy did not make that adjustment.

266.  The Executive Counsel submits that Deloitte and Mr Mercer failed to treat Autonomy's shifting justifications for the cost allocation with an appropriate degree of professional scepticism and to consider whether they were simply made to achieve a particular presentation of Autonomy's financial performance. Deloitte admits that no questions were asked about the previously disclosed "*growing relationship*" with TP42 and TP44, nor what had been the effect of Autonomy's substantial payments for S&M: see para 107 of the Amended Formal Complaint and para 94.8 of the Amended Defence. That manifested a lack of professional scepticism.

267.  The analysis prepared by Autonomy each quarter from Q2 10 onwards which was said to demonstrate a "*strong linkage*" between the pure hardware sales and subsequent software sales did not constitute a suitable basis for Autonomy's accounting treatment in FY 10.  Deloitte and Mr Mercer failed to treat it with an adequate level of professional scepticism; and their audit testing was inadequate.  On this, the Executive Counsel makes three principal points:

(i)     Autonomy's analysis did not demonstrate any such linkage and was not a suitable basis for its cost allocation approach. Contrary to para 122 of Deloitte's written representations in response to the proposed Formal Complaint that it showed "*linkage between the hardware sales and software sales which generated profits significantly in excess of any loss relating to the hardware sales*", it was neither sufficient nor appropriate audit evidence to that effect.

(ii)    In any event, such "*linkage*" would not justify the allocation of costs to S&M.  At para 98 of their Amended Defence, the Respondents said that the linkage "*justified the allocation of costs to sales and marketing because it demonstrated that the majority of customers who were purchasing hardware were also purchasing software*". That would not make the losses incurred on the hardware sales a marketing expense rather than COGS. It would be contrary to the relevant

accounting standards (including IFRIC 13) to record discounts or other incentives used to induce a current sale as marketing expenses, but Deloitte and Mr Mercer did not consider the possibility that the discounts were simply aimed at inducing the current sale. Further, the analysis did not confirm the existence of separately identifiable marketing costs, nor any costs to which a fair value could be ascribed: no reasonable accountant would have accepted that the discounts amounted to S&M costs.

(iii)   If any hardware sales were "linked" as alleged, Deloitte and Mr Mercer should have considered whether the sale of hardware and of later software should have been linked in accordance with IAS 18 para 13 ("Identification of the transaction").

268.   More generally, Deloitte had (rightly) reached the view in Q1 10 that all of the hardware costs should be allocated to COGS and yet Autonomy continued to allocate figures fractionally below quarterly and annual materiality to S&M.  This should have sounded clear alarms about whether an allocation was being made to achieve a particular financial result contrary to IAS 8 para 8.  The alarms should have been all the clearer because:

(i)   The continued allocations to S&M improved the gross margin figures which Deloitte knew were a key financial metric;

(ii)   That of itself enabled Autonomy to conceal the hardware sales from the market; and

(iii)   The year-end audit took place against the background of the falls in the value of Autonomy's shares in early October 2010 and December 2010.

269.   Mr Mercer explicitly disowned any knowledge of what had happened in Q1 10 on the grounds that those events took place before he assumed his position as the Audit Engagement Partner in succession to Mr Knights (Day 11/153:12-15).  But Mr Mercer was responsible for auditing the Q1 10 costs.  He made no attempt to follow through

what Deloitte had been told over the course of the year, still less to compare it with the explanations in FY 09.

270.   Finally, as we have said, Autonomy proposed a further 5% profit margin across the hardware sales for Q2 10, Q3 10 and Q4 10 to S&M, thereby adding $4.4 million bringing the total for the year to $20.8 million. Autonomy alleged that this was appropriate on the basis that its level of sales was equivalent to that of a hardware reseller and such a reseller would "*expect to make a modest profit margin on such sales*": see the Report to the Audit Committee for Q4 10.   As to this, the Executive Counsel says:

(i)   Deloitte should have questioned how this supposed 5% margin sat with the allegation made in FY 09 that Autonomy would have made a 62.5% profit but for the payment of a premium to the hardware suppliers;

(ii)   This retrospective adjustment ought to have been a further alarm bell: it brought the total allocation to S&M for FY 10 to a figure fractionally below quantitative materiality.  This had all the hallmarks of the numbers being managed to achieve a particular result; and

(iii)   Deloitte appreciated that there was no evidential or accounting basis for this additional 5%.  In the Report to the Audit Committee, it said: "*In our judgement, the change in the accounting for the associated costs and the recognition of an assumed 5% gross profit margin does not better reflect the nature of these transactions*."  Deloitte and Mr Mercer should have followed through with this train of thought and appreciated that this cast doubt on the veracity of the assertions made by Autonomy in relation to hardware sales more generally.

271.   Deloitte makes the same general points in relation to Q4 10 and FY 10 as it has done in relation to Q3 09 and FY 09 (see para [111] above).

272.   It also points out that the overall proposed allocation to S&M for FY 10 in respect of hardware sales was $20.8 million, which was below its year-end materiality figure of $22.5 million.

273. Moreover, it carried out checks on the Q4 10 hardware-software linkage analysis and was satisfied that it provided directional evidence supporting the view that selling hardware at a loss might generate future software work: see para 102 of Mr Mercer's first witness statement.

274. For Q2 10 to Q4 10, Autonomy maintained that it had refocused its strategy on to the financial institution customers, but that it was selling hardware to them at a modest loss in order to promote future software sales. This was not a "shifting justification", but a change in strategy. Mr Mercer and his audit team carefully considered the reasoning before accepting a different and much reduced allocation of costs to S&M.

275. Mr Mercer confirmed that it was Deloitte's view that the proposed 5% profit margin was unacceptable (Day 11/151:10-14). He said that there was nothing inconsistent in rejecting this proposal while continuing to accept the good directional evidence supporting the existence of [Autonomy's] marketing strategy in Q4 09. He rejected the suggestion that he and Deloitte had failed to apply proper scepticism in looking back at the Q1 10 loss-making hardware sales (Day 11/153:23-Day 11/154:6).

**(C)    Conclusion**

276. We accept the Executive Counsel's submissions. The points that we have summarised at paras [267] and [268] above are particularly telling. We acknowledge that Deloitte exercised professional scepticism in rejecting the 5% gross profit margin proposal. This was an important point, but it does not meet the main thrust of the allegation. We also repeat what we have said at para [248] above as to why we have accepted the Executive Counsel's submissions in relation to Q2 10. They apply equally to Q4 10 and FY 10. We are satisfied that Mr Mercer and Deloitte did not exercise sufficient professional scepticism in considering the hardware sales in Q4 10 and FY10.

**(D)    Misleading statements in FY Report and Accounts (Allegation 1.6(b))**

277. The Executive Counsel submits that the following statements in the FY 10 Report and Accounts were misleading in view of the hardware sales:

(i)      The statement in the Business Overview that "*Autonomy is one of the very rare examples of a pure software model*". The paragraph went on to say that Autonomy "*ships a standard product*" and that its model meant that "*after the cost base has been covered, for every extra dollar of revenue that comes in significant benefits can fall straight through to the bottom line*".

(ii)     The statement in Note 5 that "*The group is a software business that utilises its single technology in a set of standard products … As a result, no analysis of revenues by product type can be provided*".

278.   In our opinion, both of these statements were materially misleading for the same reasons as we have already held that the corresponding statements in relation to FY 09 were also misleading: see paras 174 (i) and (iv) and 176 to 180 above; and Deloitte and Mr Mercer failed to act competently when presented with  them in Autonomy's Annual Report and Accounts for FY 10.

279.   D10 repeatedly recognised that the description of Autonomy as a "*pure software*" model or business was misleading during his review of the FY 10 documents:

(i)      On 22 January 2011 he ringed the words "*pure software*" in the draft press release, writing "*this is a little misleading because the Group does sell hardware as well*".

(ii)      On 31 January 2011, he highlighted the same words in a later version of the same document, this time writing "*is it appropriate to say this given the hardware sales in the Q*".

(iii)     On 4 February 2011 D10 twice ringed the words "*pure software*" in the draft "front end" of the Annual Report and Accounts, writing "*But it sells h/w also*" and "*H/W sales also – should there not be a comment on these or explain included with IDOL Product*".

280.   These documents were put to D10 (Day14/93:13 – Day14/105:7). He attempted to explain them away by saying that the words about pure software were always in the context of services. The Executive Counsel submits that the words that he ringed in the

report (i) appear under the heading "*financial model*"; and (ii) are irrelevant to the misleading nature of the statement. His evidence was also highly confused, see *e.g.* the incomprehensible evidence at {Day 14/103:20-22} that "*the reader of the accounts here might be confused because clearly the hardware sales are depressing the high margin software sales. So the two are presented together, which is acceptable*".

281.   We find D10's attempts to explain away these documents unconvincing.   But our conclusion at para [278] above does not depend on our taking any particular view of the evidence of D10.

## (9)   DISCLOSURE OF HARDWARE SALES IN THE FY 09 AND THE FY 10 ACCOUNTS: ALLEGATIONS 1.1 AND 1.5 (Deloitte, Mr Knights and Mr Mercer).

282.   It is not in dispute that the fact that the revenue figures included pure hardware sales was not disclosed in Autonomy's 2009 and 2010 accounts.   The Amended Formal Complaint alleges that Autonomy needed to tell the market that the hardware sales figures were 6.4% and 10.9% respectively of the total sales figures for FY 09 and FY 10 in order to give a true and fair view of the state of Autonomy's affairs. It says that disclosure was necessary in order to give a fair presentation of Autonomy's financial performance and cash flows in accordance with IAS 1 paras 15 and 17 and because disclosure was required by IAS 1 paras 29 and 138(b) and IFRS 8 paras 1, 22(b) and 32.

## (A)   The principal applicable standards

283.   IAS 1 provides:

> "*15. Financial statements shall present fairly the financial position, financial performance and cash flows of an entity. Fair presentation requires the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework. The application of IFRSs, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation.*
>
> *.....*

*17 In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs. A fair presentation also requires an entity:*

*.....*

*(b) to present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information"*

284.   IFRS 8 provides:

"*1 An entity shall disclose information to enable users of its financial statements to evaluate the nature and financial effects of the business activities in which it engages…*

*….*

*32 An entity shall report the revenues from external customers for each product and service, or each group of similar products and services, unless the necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed….*"

285.   Mr Coates repeatedly asserted in his evidence that the question whether disclosure of the hardware sales was required was "*a difficult one*". It is not in dispute that the question whether the applicable standards required disclosure of the hardware sales did involve questions of fact and degree and some judgment.  The Executive Counsel submits that this was not a borderline case.  She says that the standards clearly and unequivocally required disclosure.

286.   It is because questions of judgment are involved that we propose to start by setting out in some detail Deloitte's and Mr Knights' consideration of the need to disclose hardware sales in FY 09 and Deloitte's and Mr Mercer's consideration of the need in FY 10.  But as a preamble to that, we shall start with a summary of the evidence of the analysts as to how they would have viewed the hardware sales if they had been disclosed to them.

**(B)**   **The analysts' evidence**

287.   We heard evidence from two analysts, TP32 and TP28, and the Executive Counsel has also relied on the transcripts of evidence of other analysts in other proceedings.

288.   TP32 was an analyst at TP27. He stated at para 37 of his witness statement:

> "*When I first heard about the quantum of these hardware sales, long after HP's acquisition of Autonomy, I was astonished. Autonomy had consistently told investors and the analyst community that it was a pure software company; and pure software companies, as I (and I believe the analyst community generally) understand them, do not resell third-party hardware, certainly not in the quantities referred to above*"

289. When cross-examined in [other legal proceedings], he said that the news that Autonomy had sold approximately US$100m of hardware during 2010 would have been "*awesomely surprising*" and would have had a "*massive impact*" on how analysts and the investment community in general perceived Autonomy. They would have had to "*completely reassess*" the way that they valued the company. This evidence and other evidence from him and other analysts that we set out below derives from [two separate legal proceedings]. Deloitte has not adduced evidence to contradict it.

290. TP28 was an analyst at TP38. He stated at para 22 of his witness statement:

> "*I now understand ... that according to Deloitte's Reports to the Audit Committee, in Q3 and Q4 2009 Autonomy resold approximately $48 million of pure hardware (i.e. third-party computer hardware without any pre-installed Autonomy software), that in 2010 it resold in the region of $100 million of such hardware and that in the first half of 2011 it resold approximately $41 million of such hardware. I first heard about the existence of such hardware sales when HP announced its huge writedown of Autonomy in late 2012. However, it was not until much more recently, in the context of [another trial](in which I was asked to, and did, give evidence), that I learnt about the scale of the reselling. I was shocked. I had followed Autonomy very closely for a number of years, read all of its quarterly press releases, its annual reports and any other publicly available literature about Autonomy and had attended (or listened in to) most, if not all, of the earnings calls. However, I had no idea about the hardware reselling*"

291. He said that he had no idea that Autonomy was selling hardware in 2009. This information would have had a negative impact on his valuation of the company and, in his opinion, would have caused a negative reaction to the share price of at least 30%.

292. TP29 was an analyst at TP31. In his view, if the market had known of the 2009 hardware sales, the impact on Autonomy's stock in 2010 and early 2011 would have been "*significantly negative*".

293. TP34 was an analyst from 1998 to 2008, initially at TP38 and latterly at TP50 and TP51. In 2008 he joined the Autonomy group as CEO of its AS2 business. After 6 to 9 months he was persuaded to become head of investor relations for Autonomy. He left Autonomy in mid-2010 and joined TP41, resuming work as an analyst. He was unaware of the hardware sales in Q2, Q3 and Q4 10. If he had been aware of them, they would have indicated that Autonomy was:

> "*a totally different type of business and a totally different business model, which would have had a very different valuation … it would have indicated that this wasn't a pure software business, and that there was much lower margin revenue stream included in its – in its P&L, and it would have had a correspondingly low evaluation [sic]*"

294. In [other] litigation, TP26, the TP13 partner (then a Managing Director) who led TP13's due diligence work on HP's potential acquisition of Autonomy, described his and his team's reaction to learning, post-acquisition, about the hardware sales:

> "*[W]hen Autonomy records provided to TP13 during its post-acquisition 'closing balance sheet' engagement reflected substantial hardware sales (upwards of approximately $40 million in the first six months of 2011), my team and I were astonished… my team and I had no knowledge before the acquisition that Autonomy was making substantial hardware sales: we understood that occasionally Autonomy made appliance sales (i.e. where Autonomy's software was pre-loaded on hardware), but it had not crossed our minds that Autonomy resold third-party hardware on a standalone basis. […]*
>
> *I recall noting that the 2010 Annual Report referred (at pages 13 and 16) to Autonomy's 'pure software' model. … I understood it to mean that the company's revenues derived almost entirely from software sales. I did not understand any statements in the Annual Reports (or anywhere else, for that matter) to disclose that Autonomy's reported revenues included revenue from the sale of third-party hardware that included no Autonomy software.*"

**(C)   Deloitte's and Mr Knights' consideration of the need to disclose the hardware sales in FY 09**

295. D7, D6 and D2 all expressed concerns about the non-disclosure of the hardware sales and the risk of misleading the market. It appears from para 29 of D7's witness statement that when he learned of the fact that 20% of Autonomy's revenue in Q3 09 came from hardware sales, he "*thought that Autonomy could not give a balanced narrative without referring to them*". In an email of 14 October 2009 to Mr Knights, he wrote:

"*My earlier comments re disclosure of hardware sales in Q3 to avoid potential embarrassment at the full year when the segmental disclosures pop out, I see as critical. This represents c20% of sales in the Q so I don't see how they can give a balanced view if they don't cover it in the narrative. If it is such a strategically important initiative, I assume they would want to talk about it. I look forward to seeing the words.*"

296.   In contrast with D7's clear view, on 14 October 2009 Mr Knights sent an email to [Autonomy] (which he did not copy or forward to anyone else at Deloitte) committing Deloitte to the position that disclosure *might* be necessary if hardware sales were in a *later* period to *become* material (thus ignoring the fact that they *were* material in Q3 09 as they clearly were). Mr Knights' email did not say that the hardware sales *must* be disclosed in Q3 09. Mr Knights said in the email (emphasis added):

"*One additional point to be considered at the year end will be whether under IFRS you <u>could</u> be required to disclose hardware sales - particularly <u>if they became material</u> to the numbers. Whilst this is a year end matter, if disclosure did become necessary and in the absence of any previous indication through the year, it would be the first time that this information would be made available to your investor and analyst community. This might be worthy of some consideration at Q3?*"

297.   D7 repeated his view on 15 October 2009, amending the draft Report to the Audit Committee to read: "*In the event that Hardware sales in the year are significant there ~~may~~ <u>will</u> be a requirement to disclose the quantum and nature of these sales in the year end financial statements*".

298.   D7 also wrote a note on page 5 of this draft report against the words "*Revenues for the quarter were $191.6 million*" saying "*against market expectations of software sales of ...*". In his oral evidence, D7 agreed that his point was that the revenue figures expected by the market for this quarter were expected software figures, because "*the company, as I'm sure has been rehearsed many times, had a pure software revenue model*".

299.   D6 shared this view, commenting on 15 October 2009 that the wording of the Report to the Audit Committee should be made "*STRONGER*" (his capital lettering), and suggested: "*In order for the users to be presented with a balanced view of the Group's financial performance for the quarter, to the extent the Q3 release makes reference to the revenues and costs, appropriate disclosure of size and nature of these transactions must be made*".

*Edited for publication*

300.   On 15 October, Mr Knights marked up Autonomy's draft quarterly report of its Q3 09 results. The draft stated as the first two highlights under the heading "*Third Quarter 2009 Highlights*":

> "• *Continued strong adoption of next generation combined Autonomy and Interwoven technologies*
>
> • *Record revenues, up 51% from Q3 2008 including strong organic growth and full quarter post-Interwoven integration*"

It made no mention of the size of hardware revenues or costs, or indeed of hardware at all. Nor, in his mark-up which he sent to D10, D6 and D11, did Mr Knights seek to introduce any reference to the size of the hardware revenues. The nearest he came to referring to hardware was to make a reference to "*Autonomy's first move into the emerging appliance technology sector*".

301.   On 16 October 2009 D7 commented on Autonomy's press release:

> "*As anticipated I am deeply concerned by the total lack of reference to the fact that nearly 20% of their Q3 revenues representing a major strategic change in the nature of their business attracts no comment…unless in my haste before my 1130 meeting I have missed it. They don't even seem to mention the customers to whom these highly material hardware sales have been made. I will take a fair amount of convincing that this is appropriate".*

302.   D7 said in his oral evidence that he sent his comment to "*try and stimulate a reaction to a point that I thought, as a team, it had been agreed that they were going to apply pressure to get fuller disclosure in the earnings release*" (Day 8/205-206). He described himself as "*irritated*" and "*relatively upset*". D7's comment was dealt with only in the sense that Mr Knights assured him in his reply that he (Mr Knights) would be discussing this at the Audit Committee meeting.

303.   Mr Knights' response to D7 (copied to D10 and D2 and forwarded by Mr Knights to D6) was to say "*Moving the battle ship slowly*" and to advise that [Autonomy's] report was going to include the following:

> "*during the quarter we saw some of our customers promote Autonomy to strategic supplier status. This led them to adopt a broader set of our solutions in a number of significant deals*".

304. D2 made clear in his email of 16 October 2009 that he shared D7's concerns. He pointed out that Autonomy's proposed wording of its press release to say "*the unexpected demand for our new product programs had a small depressing effect on gross margins*" did not explain things sufficiently. He said that the drop in margin [to 86%] was "*quite significant (given how stable they normally are)*" and "*presumably attributable largely due to the fact that they've sold a significant amount of hardware at a significantly lower margin than their normal software products*". He thought that analysts would be bound to ask a lot of questions.

305. D6 later commented on the press release to similar effect, saying:

> "*The three deals done for hardware are very different in nature to historic software revenue and account for c. 15% of revenue and reduce net profits by 20%. In order to give a balanced view of the business I would like to see an expansion of this point to set out that this is no longer solely software*"

306. There was also a long series of emails about the inclusion of supplementary metrics in Autonomy's press release. In relation to this:

(i) Autonomy initially sought to include revenue from the hardware sales in a non-IFRS metric, "*IDOL organic growth*".

(ii) Mr Knights was immediately alive to the problem that hardware sales were not IDOL organic growth, but said in his email sent on 15 October to A11 […] that "*with some word smithing*" it might be possible to achieve what Autonomy wanted. This was clearly a reference to giving the impression of revenue growth whilst avoiding disclosing that 20% of revenue came from hardware sales.

(iii) Mr Knights also identified to [Autonomy] on 16 October that his "*biggest concern will be that hardware sales were neither IDOL based or organic !!*". The reference to "*organic*" shows that Mr Knights understood (rightly) that general references to growth would be read by the market as references to software sales growth.

(iv) D6 said to Mr Knights that, if Autonomy did not want to talk about hardware, the solution could be to "*remove comments about organic growth and idol growth*".

307. Mr Knights said in evidence that he pushed Autonomy to disclose the hardware sales. But it is to be noted that:

(i) He did not ensure the final Report to the Audit Committee for Q3 09 or Q4 09 contained clear and unequivocal advice that the hardware sales must be disclosed. His own first draft wording for the report was that "*the board should consider how best to communicate this new opportunity to the shareholders as these revnues [sic] are not driven from the organic IDOL technology of the Group*" but the final version of the report merely said: "*In the event that hardware sales in the year are significant there may be a requirement to disclose the quantum and nature of these sales in the year end financial statements*".

(ii) The minutes of the Audit Committee meeting on 16 October 2009 contain no record of Mr Knights saying that the hardware sales needed to be disclosed, whether in Q3 09 or at the year end.

(iii) Mr Knights engaged in "*word-smithing*" which facilitated the non-disclosure of the hardware sales. He proposed that the following words be added to [Autonomy's] speech to the market: "*during the quarter we saw some of our customers promote Autonomy to strategic supplier status. This led them to adopt a broader set of our solutions in a number of significant deals*".   D6 said in an email on 16 October that it "*could be read as [if] they have bought more IDOL*". In his oral evidence (Day 8/95:15-25), D6 confirmed his view that the market might be misled by general words:

> "Q. *Yes, well, the proposed wording is: "During the quarter we saw some of our customers promote Autonomy to strategic supplier status."*
>
> A. *Yes.*
>
> Q. *You say, top of the page: "It could be read as they have bought more IDOL."*
>
> A. *Yes.*
>
> Q. *And I'm asking you why you thought the market might read it in that way?*
>
> A. *Because it doesn't contain an explicit statement about hardware."*

308.    The final press release for Q3 09 used the words "*Record Q3 results with strong organic growth*" and said that "*The unexpected demand for our new product programs had a small depressing effect on gross margins. We do not expect this to be a trend*".  It made no reference to hardware.

309.    In the event, the financial report for Q3 09 included the following wording: "*During the quarter we saw some of our large customers promote Autonomy to strategic supplier status. This has led them to adopt a broader set of our solutions in a number of significant deals*". It made no mention of hardware.

310.    In the supplementary metrics including a breakdown of revenues (which were being included for the first time and following discussions between Autonomy and the Financial Reporting Review Panel ("FRRP")), the quarterly financial report wrapped the $36m of pure hardware sales into the line described as "*Product including hosted and OEM $125m*". More than a quarter of that "*Product including hosted and OEM*" was in fact pure hardware.

311.    The quarterly financial report was released at 7.00 on 20 October.  The Q3 09 earnings conference call with analysts took place at 9.30. Deloitte (including D10) dialled in as usual.  [Autonomy] told the market that the increased S&M expenditure was attributable to the launch of the IDOL SPE product.  We think it likely that D10 applied his attention to what was said by Autonomy and the analysts although he denied this.  He knew that it was important to do so.

312.    [Autonomy] announced that "*If you look at how Autonomy's doing in the market, well, obviously, at a time when software companies have been hit with negative growth, we've been doing very well*".  [Autonomy] went on to "*give you some more color on revenue. ... Product sales, which include OEM and hosted, showed strong growth at $125 million versus $92 million in Q3 '08*". No mention was made of the $36 million of loss-making pure hardware sales.

313.    The sole mention of hardware in the call was in the context of appliances: [Autonomy] said that during the quarter Autonomy had implemented:

>    "*The Quick start initiative. This was where we went to strategic customers, people like certain governments agencies, some of our largest customers, and*

> *we said, rather than us sit in the committee and tell you what this thing does and have long meetings, what we'll do is we'll turn up, we'll turn up with a piece of hardware, we'll plug it in, we'll give you some people, we'll turn it on and we'll make it work. And this is by far the most effective way of doing it, because it gets around all of the red tape that you have in dealing with these things".*

314. [Autonomy] explained that the slight drop in gross margin was as a result of the Quick Start program:

> "*Moving on to gross margins. At 86% this quarter, we saw the effect of a couple of percentage points of the over-demand on the Quick Start program for the new product release.*"

315. Deloitte followed the market's reaction to the quarterly results and therefore knew that Autonomy's share price fell and that investors were concerned by the fall in gross margins.  D10 circulated an article in the Financial Times of 21 October to Mr Knights, D6 and others at Deloitte which said: "*investors were concerned by a fall in gross margins from 92% to 86%, sending the shares down 138p to £14.57*".  The press coverage was sufficiently bad for D3 ([a senior member of Deloitte])) to email Mr Knights asking him to confirm there were "*no accounting issues re revenue recognition and acquisitions*".

316. Despite the difficulties in Q3 09, in an email sent on 4 November 2009 which is referred to at paras [110] and [111] above (which was not copied or forwarded to anyone else at Deloitte), Mr Knights gave [Autonomy] his "*observations ... A quick overview of the Q 3 position now that the dust has settled*". He wrote:

> "*We are totally comfortable with the numbers as reported to the Audit Committee and in the release.*
>
> *.......*
>
> *Depending on how the revenues map out in Q4 and for the year, the Board will need to consider the level of disclosure (if any) of 'appliance' revenues, although this may be an evolving feature to the disclosure".*

317. As for Q4 09, he said: "*Speaking to [Autonomy] I share the view that achieving the expected Q4 software sales is absolutely key*". It is apparent from this that:

*Edited for publication*

(i)   Mr Knights was telling [Autonomy] one thing whilst Deloitte's internal view was another. The reviewers and D6 at least had been anything but "*comfortable*" with the non-disclosure of the hardware sales and the cost allocation; and

(ii)   Mr Knights had been talking to [Autonomy] about what was needed for Autonomy to meet market expectations.

318.   In the FY 09 audit, Mr Knights applied his mind specifically to the question of IFRS 8 para 32. On 25 January 2010, D10 wrote to [Autonomy] (copied to Mr Knights and D11) to say that:

> "*One of the disclosure requirements in IFRS 8 relates to breaking down revenues/services into their component parts*".

He then set out the wording of IFRS 8 paragraph 32 and added:

> "*This requirement is over and above that of IAS 18 which requires revenues to be broken down by revenue type as per the 5 categories of revenue defined by the standard.*"

319.   D10 made the following suggestion to Autonomy which did not involve disclosing the pure hardware sales:

> "*Given that in your analysts presentations, you talk about the three virtual brands, Protect, Promote and Power, I was wondering whether these are the three categories into which you could break revenues for the purposes of the above disclosure requirement.*"

320.   [Autonomy] replied that Autonomy would:

> "*… show Sale of goods and Rendering of services.*
>
> *This groups all sales of similar product – e,g IDOL but breaks out services in accordance with IAS 18*"

321.   Far from pressing Autonomy to disclose the pure hardware sales, Mr Knights' response in his email of 25 January to [Autonomy] and D10 was to say that the issue would need some more thought, as the FRRP (which he referred to as "*the headmaster*") was likely to take an interest:

"*I think the sale of goods/rendering of service works for IAS 18, but the IFRS 8 point seems to go over and above IAS 18.*

*This will need some more thought as the headmaster is bound to be on this!!*

*R*"

322.    Later the same day, Mr Knights sent a private email to [Autonomy] (not copied or forwarded to anyone else at Deloitte) titled "IFRS 8":

"*[name] (quick word to the wise...)*

*There is a tricky para in IFRS 8 that forces disclosure of products that are sold. This is over and above the disclosure of IAS 18 (into sale of goods /rendering of services etc).*

*D10 has put forward a sensible thought but [*an individual at Autonomy*] has shot this down. (see D10's email earlier)*

*This is not going to easily go away and we know the headmaster is looking for you to be on the button on IFRS 8. You will need to tick all the boxes on IFRS 8 - so this looks to be the trickiest point so far.*

*D5 (who joined us at the panel) is also lending his thoughts...*

*Richard*"

323.    The Executive Counsel submits that IFRS 8 paragraph 32 was indeed "*tricky*" for Autonomy, given its wish not to disclose the pure hardware sales.  She says that it required their disclosure; Mr Knights' email to [Autonomy] was inappropriate; and he should have told [Autonomy]  that pursuant to IFRS 8 paragraph 32, the pure hardware revenue had to be disclosed.

**(D)    Deloitte's and Mr Mercer's consideration of the need to disclose the hardware sales in FY 10**

324.    Deloitte reported to the Audit Committee on Tuesday 20 April 2010 that for the quarterly financial report, materiality was $5.0 million and:

"*Included in the revenues for the quarter is $12.2 million of hardware sales. … As consistent with the hardware sales reported to the Audit Committee in our Q3 and Q4 2009 reports, these sales have been made at an overall loss*"

325.    The Q1 10 quarterly financial report announced:

> "*Record first quarter revenues of $194.2 million (versus analysts' consensus of $193 million)*"

326.   It supplied "*supplemental metrics to assist in the understanding and analysis of Autonomy's business*" which analysed the $194 million into three figures:

> "*Product including hosted and OEM $121m*
>
> *Service revenues $11m*
>
> *Deferred revenue release (primarily maintenance) $62m*"

327.   "*Product including hosted and OEM*" – which in fact included $12.2m of pure hardware sold in the quarter – was further analysed into:

> "*IDOL Product $47m*
>
> *IDOL Cloud $45m*
>
> *OEM derived revenues $29m*"

328.   The analysis was also set out in the slides which accompanied the presentation to analysts:

| "*Revenue Type $m*        | *Q1 2010* |
| ------------------------- | --------- |
| *IDOL Product*            | *47*      |
| *IDOL Cloud*              | *45*      |
| *OEM Dev*                 | *3*       |
| *OEM Ongoing*             | *26*      |
| *Deferred Revenue Release* | *62*     |
| *Services*                | *11*      |
| *Total*                   | *194*"    |

329.   From then until Q2 11, the pure hardware was included within "*IDOL Product*" in the quarterly reports and was endorsed by Deloitte as such.

330.    The report for Q1 10 therefore gave no indication that there had been pure hardware sales in the quarter, let alone pure hardware sales more than twice the amount of materiality for the quarter.

331.    The importance of analysts' ignorance of the pure hardware sales was obvious from the interest they took at the Q1 10 earnings conference call on 21 April 2010 in the striking presence in the Q1 10 balance sheet of Inventory of over $10 million (see para [209] above). In the Q1 10 analysts' conference call, a number of analysts asked about the Inventory:

(i)     [Autonomy] was asked by TP28, "*the $10m that has gone into inventory, I'm just wondering what the revenue would be for that amount of inventory and when we are likely to see that*". His reply was:

"*Okay. So the first question was on the Arcpliance. I'm afraid we are not going to give you an exact number, because that's rather commercially sensitive. What I would say is that the software component of the revenue is far higher than the hardware component. So the software is still the bit that dominates in terms of the cost of an Arcpliance. It's not the hardware; it's the software*".

(ii)    Other analysts came back to the question. TP29 from TP31 asked for clarification of whether the consensus numbers for Q2 10 included the "*hardware revenue*". [Autonomy] replied:

"*TP29, I think you may have misunderstood what that revenue is. It's not hardware revenue. What it is is the selling of an appliance. So you may be familiar with the TP43 appliances or the TP36 appliances. We have very little interest in just selling hardware, and consequently the revenue that that goes for is not related to the hardware cost. It's solely a component of that sale. So what we are not doing here is acting as a generic company that resells hardware, like a Morse or something like that. Obviously those people do that business and we have no interest in it. It's merely a way of allowing customers in time critical situations to get the software up and running as soon as possible…*"

332.    Accordingly, Deloitte knew that despite Autonomy's answers to their questions, the analysts did not know that the hardware was pure hardware, contained no IDOL component (and indeed could not: it was comprised of items such as thousands of laptops, keyboards and mice), and far from being sold "*in time critical situations to get the software up and running as soon as possible*" was, so Deloitte was now told, being sold as a loss-leader to stimulate profitable software sales in the future.

333.    During the Q2 10 earnings call (which Mr Mercer and five other Deloitte employees listened to), analysts asked questions about the Q2 10 gross margin of 86.3% (and the H1 10 margin of 87.5%).  TP49 (of TP52) asked how quickly gross margin would be up to 89% to 90%.  They were told that the reason for the gross margin movement was appliance sales.  They were not told about the hardware sales.

334.    Deloitte knew that Autonomy's share price dropped 20% when it announced a 3% reduction in its year end revenue expectation on 6 October 2010.  There was intense interest in Autonomy's revenue figures and real rate of underlying growth as a result. Mr Mercer was aware of this because he obtained a number of analyst reports on 13 October so that he could understand what was being said.

335.    Deloitte in its Report to the Audit Committee for FY 10 (issued on 26 January 2011) recorded that [Autonomy] were saying (in the context of seeking to book a 5% gross profit on pure hardware which it was selling at a loss) that it considered that "*the level of sales being made is equivalent to that of a hardware reseller*".   It also said:

> "*Given the increasing significance of hardware sales to the Group's revenues, and the <u>resultant impact on the gross and operating margin</u> in the quarter and full year results, we expect appropriate explanation to be given in the 2010 Annual Report*" (emphasis added).

336.    Mr Mercer wrote on a draft of this report against the text set out above "*need to talk about hardware sales in Accounts > 10% of sales*".  In his evidence (Day 11/159:17-21) in answer to the question "*….the words you wanted to say were that, because hardware was more than 10 per cent, that needed to be disclosed, weren't they?*", Mr Mercer replied: "*I wanted to make the point that the sales were over 10 per cent, yes*".

337.    D10 wrote a comment on a draft of the Q4 10 press release dated 23 January 2011 which stated that the explanation of gross margins needed to be rewritten "*to reflect reality of what is in the balance*".  Mr Mercer wrote the word "*agreed*" against this.  In his evidence (Day 11/156:10-11), Mr Mercer confirmed that this was a reference to the hardware sales and "*we would have preferred them to have made some comments about that*".

338.   Mr Mercer wrote on another draft of the press release, against the reference to approximately 5% revenue coming from services, "*if talking about this why not talk about hardware sales—which are double this level*".

339.   On 30 January 2011, Mr Mercer reviewed the IFRS 8 workpaper 2241a which concluded that Deloitte concurred with [Autonomy's] conclusion that Autonomy continued to have just one Operating Segment, namely IDOL and recorded that:

> "• *No separate information on strategic hardware sales is presented or discussed at analyst presentations; and*
>
> • *No mention of these sales/this product offering is made on the company website*".

340.   On 3 February 2011, D10 signed off IFRS 8 workpaper 2241d. This concluded that [Autonomy] had appropriately disclosed a breakdown of revenue (despite the breakdown making no mention of the pure hardware sales, and indeed including them within the category "IDOL Product").

341.   On 4 February 2011, D10 reviewed and annotated in manuscript the draft FY 10 Annual Report. He ringed the words "*pure software*" in the sentence "*Autonomy is one of the very rare examples of a pure software model*" and wrote "*But it sells h/w also*" (see para [279 (iii)] above).

342.   On 5 February 2011, Mr Mercer signed off IFRS 8 workpaper 2241d, in the same form as reviewed by D10 on 3 February 2011. Mr Mercer said at paras 14 and 15 of his second witness statement that D15 had sent D5 a draft of the workpaper, and that the workpaper stated in relation to IFRS 8 para 32 "*[Autonomy] tracks all licence and strategic hardware sales as a single body of sales, being sales of goods*". The finalised workpaper did say that, but the draft sent to D5 did not; and there is no evidence that D5 was informed of the pure hardware sales, let alone that they comprised 10.9% of revenue for the year.

343.   Deloitte says that Mr Mercer again pushed for disclosure in the Audit Committee report for Q3 10:

> *"Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin on the quarter and half year results we would expect appropriate explanation to be given in the Q3 2010 press release.*
>
> *It is likely that the question raised at the Q2 2010 press conference are raised again at the Q3 2010 press conference and <u>therefore suggest that it would be helpful to include narrative regarding the nature of these revenues in the quarterly report.</u>"* (emphasis added)

344.    Mr Mercer said (paras 142-151 of his first witness statement) that the audit team considered the disclosure of the loss-making hardware sales that was made in the FY 10 Financial Statements was fair and did not consider that any statement in the Annual Report was misleading or materially inconsistent with the Financial Statements.  The wording to which Mr Mercer was referring read: "*Cost of license revenues includes the cost of royalties due to third party licenses, costs of product media, product duplication, hardware and manuals*".  And yet Deloitte recorded in the Audit Committee Report for FY 10 that:

> *"Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and full year results, we expect appropriate explanation to be given in the 2010 Annual Report".*

**(E)    Was disclosure of the hardware sales in FY 09 and FY 10 required by IFRS 8 para 32 and/or IAS 1 paras 15 and 17?**

**IFRS 8 para 32**

345.    Deloitte says that an important part of the background is that IFRS 8 was a new standard in 2009 and FY 09 was the first time that Autonomy had applied it.  On 4 January 2010, the FRRP issued Press Notice PN 124 to highlight "*the challenge of implementing new segmental reporting requirements*" and its 2011 Annual Report (issued in September 2011) stated:

> *"The Panel also observed a failure by many companies to disclose the entity-wide information by the standard, which relates to information about products and services, geographical areas and major customers".*

346.   Mr Southwood adopted what Deloitte submits was an extreme and entrenched position. He said in his second report:

> *"3.2.2 In my view, no reasonable accountant would accept that hardware was not different in nature or a different product to software…*
>
> *3.2.5 … irrespective of whether hardware sales were a separate operating segment at year end, the fact that material amounts of revenue during FY09 had been derived, not from the sale of software licences but, from the sale of third party hardware inventory would be disclosable under IFRS 8 paragraph 32."*

347.   Deloitte makes the point that this evidence was at odds with the views Mr Southwood had expressed in his 2014 draft report and was not credible. He concluded in that report that IFRS 8 para 32 did not require disclosure of the hardware sales. Deloitte submits that it is a real weakness in his evidence that he has now concluded that no reasonable auditor could have reached the conclusion he himself reached in 2014. Mr Southwood was cross-examined about his change of mind. His answer was that (i) the 2014 report was a draft report, which (ii) he had to write very quickly when he was inundated with material to consider. He did not have sufficient material at that time to form a concluded view. In 2014 he had not formed a final view because he had not received or analysed all the relevant material. He produced a further draft report in May 2015 in which he expressed the firm view that the hardware sales should have been disclosed in order to give a fair presentation as required by IAS 1 paras 15 and 17. His 2018 report represented his considered final thoughts from which he was not deflected despite sustained cross-examination. In his 2019 report he said that disclosure was also required under IFRS 8 para 32. We are satisfied that Mr Southwood reached his final view on this issue after the most careful consideration, when he was not under the pressure that he felt when he wrote his first draft. In our judgment, his evidence was not undermined, still less fatally damaged, by the cross-examination.

348.   Deloitte also submits that Mr Southwood's opinion was demonstrably too extreme. For example, he criticised Mr Coates' view that a 10% threshold should be applied to para 32 even though he (Mr Southwood) referred to that figure in paras 21.1.34-35 of his first draft report (albeit in the context of segmental disclosure).

349.   Autonomy purported to comply with para 32, stating in note 5 of the FY 09 and FY 10 Financial Statements that, because the Group was a software business, which utilised

its single technology in a set of standard products, no analysis of revenues by product type could be provided.

350.    Mr Coates himself agreed that hardware and software are different product types.  In the Experts' Joint Memorandum dated 16 September 2019, Mr Coates said: "*In my opinion, the hardware sales were prima facie a separate product type from software sales, but I consider that a reasonable auditor could have taken a different view in the context of this business*…"   He also accepted (Day 21/109:13) that hardware and software are different products: "*I would say they do feel like separate products. They seem quite different*".   In our view, he was right to do so.

351.    The difference between the two is well explained by TP32 at para 41 of his witness statement:

> "*The resale of third-party hardware, with no software, is something altogether different from the sale of appliances with pre-loaded software.  Both are hardware, and therefore likely to have a negative impact on margins, but the latter is closer to software than the former.  Software companies' gross margins tend…to be very high, typically between 85% and 90%...By contrast, hardware resales have wafer-thin margins, and companies in that business tend to attract relatively low valuations.   In addition to low margins, other reasons for the lower valuation attributed to hardware companies include their inferior cash generation, the difficulty for them of scaling quickly (and hence of achieving the kind of growth rates that software companies can)…*"

352.    Mr Coates argued that there was no requirement to disclose the hardware sales because they were immaterial. IAS 1 para 7 defines "*Material*" in the following way: "*Omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements*".  Mr Coates said that the hardware sales could not reasonably be expected to have influenced the economic decisions of users of the Financial Statements in FY 09 or FY 10.  We disagree.  The sums were well above audit materiality.  And a statement that 6.4% (FY 09) or 10.9% (FY 10) of the total revenue for the year came from loss-making hardware sales rather than the high gross margin sales of software clearly *would* reasonably have been expected to influence the economic decisions of users.  That is why the evidence of TP32 is important.  We also infer that this is why, despite Deloitte's endeavours, Autonomy persistently refused to disclose the hardware sales.  Further evidence that disclosure of the hardware sales could reasonably have

influenced the market is (i) the fact that Autonomy's share price fell dramatically on 21 October 2009 as a result of the announcement of the fall in gross margin from 92% to 86% (see para [313] above) and (ii) on 6 October 2010 the share price dropped 20% because of a 3% adjustment to the full year revenue model (see para [334] above.)

353.   The software and hardware were both physically and economically different products. We conclude, therefore, that the hardware sales should have been disclosed under IFRS 8 para 32.

354.   But it does not follow that Deloitte, Mr Knights and Mr Mercer are to be criticised for not insisting on disclosure pursuant to IFRS 8 para 32.  Deloitte's position on IFRS 8 para 32 is supported by Mr Coates who recognised that there were arguments for and against disclosure, but ultimately confirming that the conclusion reached by Deloitte on a difficult matter of judgment was reasonable.  We bear in mind (i) Mr Coates' evidence; (ii) the fact that Mr Southwood's initial view expressed in his draft report of 2014 was that disclosure was not required by IFRS 8 para 32; (iii) that this was a new standard and, it seems, was causing some difficulty in the profession; and (iv) it was only in 2019 that the Executive Counsel raised the argument that this standard was relevant to disclosure in this case.

355.   With some hesitation, we have concluded that neither Mr Knights nor Mr Mercer was culpable of Misconduct in relation to this issue.

**(F)    IAS 1 paras 15 and 17**

356.   Deloitte places considerable weight on the fact that Mr Southwood relied in his reports on the fair presentation requirements of IAS 1 paras 15 and 17 and his acceptance that, as set out in IAS 1 para 17, in virtually all circumstances, compliance with IFRS results in fair presentation and this reflects what can be expected of a reasonable auditor: Day 18/106:11-17.  Mr Coates said repeatedly that he could not imagine a scenario in which it was considered that disclosure was not required in accordance with IFRS, but was necessary for the Financial Statements to be fairly presented in accordance with IAS 1: for example, at Day 21/95:5-15.

357. But since we have concluded that there was a breach of IFRS 8 para 32, this point does not arise. We must therefore address the details of the IAS 1 paras 15 and 17 issue.

358. The Executive Counsel's case in a nutshell is that the non-disclosure of the hardware sales in the Financial Statements resulted in their not fairly presenting Autonomy's financial position and not providing reliable information about it. We are in no doubt that the failure to disclose the hardware sales in FY 09 and FY 10, coupled with the misleading statements to which we refer at paras [360] to [365] below, was a serious breach of IAS 1 paras 15 and 17. The Financial Statements did not give a fair presentation of the company's financial position and performance and did not provide reliable information about it. It was also a serious breach of IFRS 8 para 1 since Autonomy did not disclose information to enable users of its Financial Statements to evaluate the nature and financial effects of the business activities in which it engaged. The evidence of the analysts about their reactions when they learnt about the hardware sales is powerful evidence that these standards required their disclosure.

359. This non-disclosure was exacerbated by a number of misleading statements.

**(G)    FY 09**

360. The FY 09 Financial Statements referred to the Business Overview which stated that Autonomy was a "*pure software model*" (see paras [174] and [277] above) so that:

> "*after the cost base has been covered, for every extra dollar of revenue that comes in significant benefits can fall straight through to the bottom line*".

361. At note 5, under the heading "*Segmental Analysis*":

> "*The group is a software business that utilises its single technology in a set of standard products….As a result no analysis of revenues by product type can be provided.*"

362. In view of the scale of the pure hardware sales, both of these statements were misleading. Nor was it true that no analysis of revenues by product type could be provided. Deloitte's reports to the Audit Committee set out in each quarter what the hardware revenue for the quarter had been.

363.  Note 2, under the heading "*Significant Accounting Policies…(e) Revenue recognition*" stated:

> "*The nature of the transactions that the group has entered into during 2009 is the same as in 2008 in all respects*".

364.  In view of the decision in 2009 to embark on "*strategic hardware sales*" in material amounts, this statement too was misleading.

## (H)   FY 10

365.  The FY 10 Financial Statements repeated the misleading FY 09 Business Overview statements set out at para 360 above and note 5 set out at para 361 above.

366.  The Executive Counsel says that the basis on which Mr Coates (wrongly) maintained that the 2009 hardware sales did not need to be disclosed was that they constituted less than 10% of revenue.  But in 2010, they constituted 10.9% of revenue.  This was plainly material and should have been disclosed on Mr Coates' own evidence.  The hardware sales were no longer a one-off initiative (if they ever were). They had become an established part of Autonomy's business after substantial sales during six successive quarters from Q3 09.  Autonomy had told Deloitte in its Report for the Audit Committee for Q4 10 that the level of sales was "*equivalent to that of a hardware reseller*".

367.  As Deloitte knew, the Q2 10 gross margin of 86.3% (and 87.5% for the half year) had been explained in Autonomy's Q2 10 and H1 10 Financial Report as "*in line with our expectations due to the sales mix including appliances as discussed last quarter.*"

## (I)   Were Deloitte, Mr Knights and Mr Mercer culpable of Misconduct?

368.  Deloitte denies that it, Mr Knights and Mr Mercer can properly be criticised for failing to insist that the hardware sales be disclosed.  Both Mr Knights and Mr Mercer accepted that gross margin was an important metric but Autonomy identified twelve KPIs in its Financial Statements and chose four for its highlighted performance at a glance on the first page of its Annual Report and Accounts, namely revenue, operating profit, cash generated from operations and earnings per share.  Gross margin was one of the twelve.  Both Mr Knights and Mr Mercer said that they did not consider it to be so important

that disclosure of the loss-making hardware sales was necessary to achieve a fair presentation.

369.   Deloitte submits that the many comments by Mr Knights, Mr Mercer and Deloitte employees in contemporaneous documents relied on by the Executive Counsel do not indicate that they considered that disclosure was required. They pressed Autonomy to disclose the hardware sales.  To decide not to go further was a reasonable judgment to make.  It was supported by the reviewers and has been supported by Mr Coates in his expert evidence.

370.   Deloitte's overarching response is that Mr Knights in 2009 and Mr Mercer in 2010 encouraged Autonomy to consider making disclosure. They did not consider that they were in a position to insist on disclosure, since no Accounting Standard required it and, as a matter of professional judgment, they did not consider that the failure to disclose the sales in the Financial Statements was an omission which compromised their truth or the fairness of their presentation when read as a whole.

371.   Mr Knights added a comment to the draft Audit Committee Report for Q3 09 to make clear the nature and extent of the hardware sales and the need for the Autonomy Board to consider disclosure:

> *"Revenues for the quarter were $191.6 million (Q3 2008 $127.1 million) against market expectation of $182m Included in the revenues for the quarter is $36m of hardware sales to three key customers (see page* ~~6~~*5).which represent 19% of the total revenue of the period. These hardware sales did not include any IDOL software component and reflect Autonomy's early targeting of the emerging market of appliance solutions. <u>The board should consider how best to communicate this new opportunity to the shareholders as these revnues [sic] are not driven from the organic IDOL technology of the Group</u>"* (emphasis added).

372.   Mr Mercer considered that disclosure of the hardware sales would be helpful.  He tried to encourage [Autonomy] to give greater disclosure beginning in Q2 10, but he was mindful of the fact that it was a matter of judgment for them to decide what they disclosed.  He expressed his views in fairly strong terms and added the comment to the Audit Committee report on 16 July that Deloitte "*would expect appropriate explanation to be given in the Q2 2010 press release"*.

373.    Deloitte also emphasises that ISA 720 makes clear that the auditor's responsibility is only to read the information in the Annual Report in order to identify any material inconsistencies with the audited Financial Statements.  The auditor is not required to verify or report on the completeness of the information in the directors' report.

**(J)    Conclusion**

374.    We have set out above many of the references in the documents to serious concerns expressed by Mr Knights, Mr Mercer and various Deloitte employees about Autonomy's refusal to disclose the hardware sales.  If they had not considered that disclosure was necessary in order to avoid misleading the market, it is inconceivable that Mr Knights and Mr Mercer would have persisted in trying to persuade Autonomy to make disclosure (as they say they did).  Autonomy offered them no explanation (certainly no cogent one) as to why the sales should not be disclosed.  A suggestion has been made in these proceedings that there may have been reasons of commercial confidentiality.  There is no evidence to support this speculative suggestion.  In any event, commercial confidentiality cannot be used as a cloak to produce financial statements that are likely to mislead the market.

375.    But we do not accept the evidence of Mr Knights and Mr Mercer that they pressed Autonomy to make disclosure.  As regards Mr Knights, we repeat what we have said at paras [307] to [322] above.  The conduct of Mr Knights that we have described in these paragraphs is inconsistent with his pressing Autonomy to disclose the hardware sales.  So too is the suggested additional comment to the Q3 09 Audit Committee Report that we have underlined at para [371] above.  At most, Mr Knights made suggestions to Autonomy as to what it should *consider* doing and said that there *may* be a requirement to disclose.  The statement "*we are totally comfortable with the numbers as reported to the Audit Committee and in the release*" (email of 4 November 2009) and the tone and substance of his email to [Autonomy] of 25 January 2010 clearly show that Mr Knights was not in fact pressing Autonomy to disclose the hardware sales.

376.    As for Mr Mercer, there is no evidence in the contemporaneous documents that he pressed Autonomy to disclose the hardware sales either: see paras [323 to 343] above.  His statement that it would be "*helpful"* to include "*narrative regarding these revenues*"

in the Q3 10 Audit Committee Report was no more than a *suggestion*. The nearest Mr Mercer came to pressing Autonomy for disclosure was the statement in this report (repeated in the Audit Committee Report for FY 10) that Deloitte *expected* appropriate explanation to be given "*given the increasing significance of hardware sales to the Group's revenues*". But no such appropriate explanation was given.

377. Both Mr Knights and Mr Mercer knew that the hardware sales would be of great interest to the market. That is why D7, D6s and D2 were so concerned about the non-disclosure and why Autonomy was so reluctant to disclose. That is also why Mr Knights engaged in "*word smithing*" to facilitate the non-disclosure.

378. In our opinion, Deloitte, Mr Knights and Mr Mercer should have insisted that the hardware sales were disclosed in the Financial Statements for FY 09 and FY 10. They should have refused to sign unqualified audit opinions unless and until the hardware sales were fairly disclosed and should have required the misleading statements in the Directors' Reports to be corrected. Without disclosure of the level of hardware sales in FY 09 and FY 10, the Financial Statements did not give a true and fair view of Autonomy's state of affairs in these two years. This was a major failure to comply with IAS 1 paras 15 and 17. Deloitte and Autonomy knew that the market was acutely sensitive to any changes in revenue and gross margin and that disclosure of pure hardware sales at the level that occurred in FY 09 and FY 10 would be likely to have a substantial adverse effect on Autonomy's share price. In our judgment, in failing to insist that the hardware sales were disclosed and signing unqualified audit opinions, Deloitte, Mr Knights and Mr Mercer fell seriously short of the standards to be expected of a reasonable auditor and are culpable of Misconduct.

## (10)   ALLEGATION 2: PERVASIVE FAILINGS AS TO VAR TRANSACTIONS

379. The Allegations are:

> "*In relation to the review and audit of Autonomy's financial results for the periods Q3 09 – Q2 11 inclusive, the conduct of Deloitte, Mr Knights and Mr Mercer fell significantly short of the standards reasonably to be expected of a Member Firm and Members as follows:*
>
> *As against Deloitte and Mr Knights (Allegation 2.1) and as against Deloitte and Mr Mercer (Allegation 2.2), as a result of the following taken together:*

(a)   *Deloitte, Mr Knights and Mr Mercer failed to exercise sufficient professional scepticism when assessing and following up information concerning the VAR Transactions that was made available to them by [Autonomy] and the results of their own procedures.*

(b)   *Deloitte, Mr Knights and Mr Mercer failed to plan and/or execute appropriate audit and review procedures in respect of whether revenue should have been recognised on the sale to the VAR in the VAR Transactions.*

(c)   *Deloitte and Mr Knights issued an unmodified audit opinion in FY 09, and Deloitte and Mr Mercer issued an unmodified opinion in FY 10, having failed to obtain sufficient appropriate audit evidence, or to design or perform audit procedures to obtain sufficient appropriate audit evidence, from which to draw a reasonable conclusion that Autonomy's accounting treatment of revenue from software sold to resellers was consistent with its Significant Accounting Policy regarding Revenue Recognition on Sale of Goods. Accordingly, it was inappropriate for Deloitte, Mr Knights and Mr Mercer to declare that the financial statements presented a true and fair view.*

*And, as against Deloitte and Mr Mercer, as a result of the following allegation on its own:*

2.3   *Deloitte and Mr Mercer failed to ensure that the audit file for FY 10 contained sufficient appropriate evidence to enable an experienced auditor to understand: the structure of a $23.5 million software licences deal sold to TP3, the audit work undertaken on the transaction and specifically how the individual components and amounts related to the transaction were ultimately recorded in the financial statements. In addition, Deloitte and Mr Mercer failed to complete their planned procedures, including obtaining representations they planned to obtain to establish that the likelihood of a direct transaction was not probable, and they failed to obtain evidence and/or copies of completed agreements with the VARs involved in the deal before signing the audit report.*

*As a result of the above:*

(1)   *Deloitte and Mr Knights (in respect of the audit for the financial year ended 31 December 2009 and the reviews for the periods ended 30 September 2009, 31 March 2010 and 30 June 2010) failed to comply with the requirements of ISA 200, ISA 300, ISA 315, ISA 330, ISA 500, ISA 700 and ISRE 2410, and failed to act in accordance with Fundamental Principle (c) 'Professional Competence and Due Care' and Section 130 (paragraph 130.1(b)) in the Code of Ethics (2006).*

(2)   *Deloitte and Mr Mercer (in respect of the audit for the financial year ended 31 December 2010 and for the reviews for the periods ended 30 June 2010, 30 September 2010, 31 March 2011 and 30 June 2011) failed to comply with the requirements of ISA 200 (Updated), ISA 230 (Updated), ISA 300 (Updated), ISA 315 (Updated), ISA 330 (Updated), ISA 500 (Updated),*

*Edited for publication*

> *ISA 560 (Updated), ISA 700 (Updated) and ISRE 2410, and failed to act in accordance with Fundamental Principle (c) 'Professional Competence and Due Care' and Section 130 (paragraph 130.1(b)) in the Code of Ethics (2011)."*

380. Particulars of these allegations are given in great detail at paras 113 to 198 of the Amended Formal Complaint.  It is not necessary to set these out here.  The principal points relied on by the Executive Counsel are mentioned below.

**(A)    Principal accounting standards**

381. Most of these are sufficiently summarised in the Amended Formal Complaint and the summary of the Particulars above.  We should record the important point that the experts agree that all transactions needed to be accounted for in accordance with their substance and economic reality and not merely their legal form: see Mr Southwood's first report at para 6.10.1-6.10.2 and Mr Coates' report at para 7.29.  It is common ground that IAS 18 para 14 sets out specific accounting criteria for revenue recognition:

> *"Revenue from the sale of goods shall be recognised when all the following conditions have been satisfied:*
>
> *(a)   The entity has transferred to the buyer the significant risks and rewards of ownership of the goods;*
>
> *(b)   The entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;*
>
> *(c)   The amount of revenue can be measured reliably;*
>
> *(d)   It is probable that the economic benefits associated with the transaction will flow to the entity; and*
>
> *(e)   The costs incurred or to be incurred in respect of the transaction can be measured reliably.*

382. ISRE 2410 contains standards and guidance for the review of interim financial information performed by auditors.  Para 6 provides that auditors should "*plan and perform the review with an attitude of professional scepticism".*  Para 20 provides:

> *"A review ordinarily does not require tests of the accounting records through inspection, observation or confirmation. Procedures for performing a review of interim financial information are ordinarily limited to making inquiries,*

> *primarily of persons responsible for financial and accounting matters, and applying analytical and other review procedures, rather than corroborating information obtained concerning significant accounting matters relating to the interim financial information."*

Para 29 provides:

> *"When a matter comes to the auditor's attention that leads the auditor to question whether a material adjustment should be made for the interim financial information to be prepared, in all material respects, in accordance with the applicable financial reporting framework, the auditor should make additional inquiries or perform other procedures to enable the auditor to express a conclusion in the review report".*

383.  Deloitte (supported by Mr Coates) makes the point that it carried out Autonomy's quarterly and half-year interim reviews in accordance with ISRE 2410. It submits that Allegation 2 is based on the false premise that, since the revenue testing in each quarter was intended to form part of the year-end work, it had to comply with year-end standards.

384.  The Executive Counsel responds that, as is stated at para 23 of the Statement of Agreed Facts, in conducting quarterly reviews throughout the year, Deloitte chose to seek evidence on revenue sufficient to support the year-end audit opinion, so as to reduce the amount of new testing necessary at the year-end.  In other words, the detailed testing that Deloitte conducted in Q1, Q2 and Q3 *was* the audit testing.  Accordingly, Mr Coates' insistence that the work done on revenue recognition on the various transactions in Q1, Q2 and Q3 was adequate under ISRE 2410 merely stored up the problem until the year-end, when the work had to comply with auditing standards.

385.  The Executive Counsel has other strings to her bow in relation to ISRE 2410.  First, in the context of the cumulative red flags in this case (to which we refer below), para 20 of ISRE 2410 does not help Deloitte because it sets out what is "*ordinarily*" required and the red flags made it increasingly obvious that the situation was not ordinary.  Secondly, para 6 requires the reviewer to maintain an attitude of professional scepticism, making a critical assessment of the validity of evidence obtained.  On the facts of this case, Deloitte failed to do this.  Thirdly, as will be apparent from our review of the evidence below, para 29 was engaged on the facts of this case.  Even Mr Coates

accepted that A10's emails (para [484] et seq below) took one to this provision: see Day 20/147:22 to Day 20/148:6.

**(B)    Some preliminary points**

386.    Allegation 2 concerns seven transactions between Autonomy and Value-Added Resellers (VARs) under which Autonomy recognised revenue of more than $55 million in total.  Each transaction was purportedly an outright sale of software by Autonomy to the VAR on terms whereby the whole price was payable by the VAR to Autonomy upon delivery of the software, regardless of whether the VAR had been paid by an end-user or had even entered into a contract with an end-user.

387.    The Executive Counsel submits that Deloitte failed to exercise professional scepticism in relation to the true nature of any of these transactions and failed to obtain sufficient appropriate audit evidence that the revenue recognition criteria under IAS 18 para 14 had been met.  Her case is that Deloitte should not have signed unqualified audit opinions based on the audit evidence that it obtained.  She submits that Deloitte's audit approach was to rely exclusively on the terms of the contracts between Autonomy and the VARs and (in some cases) on the "*revenue confirmations*" from the VARs, whereby the VARs confirmed that money was payable in accordance with the contract terms.

388.    The Executive Counsel says that each of the seven VAR transactions contained many or all of the following features:

(i)     Autonomy had sought but failed to sell a licence to a specific end-user in a particular period, the end-user being an existing direct customer of Autonomy;

(ii)    Autonomy had instead sold the software to a VAR on the last day of the period and produced [m]anagement accounts which recognised the whole of the revenue on that sale in that period;

(iii)   The software was specific to the end-user;

(iv)    Deloitte had little or no evidence as to (a) the likelihood of a sale between the VAR and the end-user, let alone the price of such a sale or when it might occur,

and (b) any rationale for why the end-user would purchase software from the VAR (rather than Autonomy); and

(v)     Deloitte usually had insufficient evidence that the VAR could pay for the software if it did not sell the software on to the named end-user.

389.    The Executive Counsel says that these common factors were all apparent to Deloitte at the point of revenue recognition and should have raised serious concerns about the commercial substance of the sales.   Moreover, further evidence came to Deloitte's knowledge after Autonomy had recognised revenue on each of these sales, which should have raised yet further questions for the next transaction.   Over time, Deloitte also saw or should have seen a pattern whereby in relation to all of these contracts:

(i)     Autonomy continued to negotiate directly with the end-user, and almost always concluded a direct deal with it;

(ii)    The VAR was frequently slow to pay its debt due to Autonomy, often not paying until an agreement with the end-user had been signed;

(iii)   Autonomy then relieved the VAR of its liability to pay Autonomy.

390.    The pattern of concluding a sale to a VAR and later selling directly to an end-user was a feature of several contracts.   The Executive Counsel submits that this was a clear "red flag" to which Deloitte did not respond in any meaningful way, but instead continued to accept [Autonomy's] treatment of revenue from VAR sales without proper investigation.

**(C)     Deloitte's audit work on the VAR transactions**

391.    Planning for its quarterly reviews involved the Deloitte audit team meeting members of the Autonomy finance team shortly before the period end.   At the beginning of the reviews, Autonomy would send Deloitte a spreadsheet of deals entered into in that quarter worth more than $100,000.   Deloitte would review the spreadsheet to determine which deals it would test further.

392.   As we have said, it is not in dispute that Deloitte carried out audit procedures whilst conducting the quarterly reviews, to reduce the amount of new testing needed at the year end. As D10 put it in his evidence in [other] litigation at para 23 of his witness statement:

> *"in practice the nature of the work we undertook on revenue in relation to our quarterly reviews for Autonomy went beyond what was required for the purposes of a review. We used the opportunity to undertake audit work in respect of all sales made by Autonomy of more than $1m, as well as undertaking audit work in relation to a sample of smaller value sales transactions"*

393.   Workpaper 8001 was a permanent note recording Deloitte's revenue testing approach in respect of licence revenue. The following tests were said to be performed:

(i)   The amounts in the signed contract were agreed to the amounts booked to the general ledger;

(ii)   The contracts were checked against signed purchase orders;

(iii)   The delivery dates were checked as being pre-quarter end;

(iv)   Amounts carved out for maintenance were checked;

(v)   The recoverability of the debt was assessed by considering each customer; and

(vi)   Any unusual terms of the contract were summarised, and revenue recognition considered in the light of them.

**(D)   Q1 09 and Q2 09 reviews**

394.   In Q1 09, Autonomy sold a software licence for $1.6 million to a […]VAR, TP4 for resale to the named end-user TP9.  TP4 was a new VAR for Autonomy with a small capital base.  Deloitte concluded that Autonomy could recognise revenue on the sale. Deloitte did not investigate whether there was actually a contract in place between TP4 and the end-user.  In Q2 09, it discovered that there was not.  Deloitte came to the view that the VAR could pay without payment from the end-user, but that Autonomy was now less likely to be paid.  Autonomy later wrote off the debt.

395.   Although the TP4 deal is not one of the seven transactions on which the Executive Counsel relies directly, she submits that this experience should have alerted Deloitte to the fact that it could not assume that a VAR would have entered into, or be negotiating, a deal with a named end-user.  This was the first of what she refers to as "red flags", namely key events which came to Deloitte's attention which she submits should have been identified as concerns and taken into account when determining the relevant audit procedures.

396.   Deloitte says that this deal was easily distinguishable from the other VAR transactions and is irrelevant.  First, Autonomy and Deloitte had developed special concerns about sales into Latin America in the first half of 2009.  Secondly, the workpaper stated that the software in question had actually been delivered to the end-user by 31 March 2009.  Mr Knights said that this was very good evidence that the end-user deal was close to completion, so that it was reasonable to consider that collectability was a foregone conclusion.  Thirdly, there had been a local fraud.  It was not that the negotiation with the end-user had failed.  Rather, there had never been a prospect of a deal with the end-user.  Deloitte therefore says that the TP4 transaction is of no relevance.

397.   We accept the Executive Counsel's submission so far as it goes, but for the reasons given by Deloitte, it does not go very far.

**(E)    Q3 09 review**

398.   On 30 September 2009, Autonomy sold a software licence for $4 million to TP5 for on-sale to the end user TP14 ("the TP5/TP14 Agreement").  TP5 was a new VAR, set up in 2009 as a subsidiary of TP5.  Autonomy's sales to TP5 were made as individual purchase orders under a Value Added Reseller Agreement dated 30 June 2009.

399.   The TP5/TP14 Agreement made clear that the software sold to TP5 could only be installed and used by TP14. Payment of the entire $4 million was due from TP5 in 60 days.  Deloitte's work on this agreement was contained in workpaper Q3 09 8140b.  It followed the typical layout for Deloitte's licence revenue testing in respect of VAR transactions. It recorded that:

(i) Autonomy had held in depth discussions with TP14 before the end of Q3 09 and Deloitte had seen evidence of meetings between TP14 and Autonomy from July 2009 to the end of Q3 09 on "SMS" (i.e. Sales Management System, internal software used by Autonomy to track its sales process from the initial point of contact with the customer to the final preparation of the contract). Autonomy was thus close to finalising a sale with TP14;

(ii) TP14 "*could not*" finalise the deal before 15 October 2009, *i.e.* after the quarter end;

(iii) Autonomy had sold the software to TP5 "*in order to secure the deal during Q3 2009*"; and

(iv) Autonomy was continuing to negotiate directly with TP14 after the period end to agree the terms of a services agreement relating to the software sold.

400. There is no record in the workpaper of any evidence that TP5 had had any prior involvement in discussions with TP14. The Executive Counsel submits that there was no reason to think that TP14 would want to enter into a deal with TP5. This VAR was a very new reseller and Deloitte had no evidence that it would be in a position to offer services which would be of interest to TP14. By contrast, TP14 was an existing customer of Autonomy, having concluded a Master Licence Agreement with Autonomy in December 2007. Moreover, if TP5 failed to sell the software to TP14, it would have to pay Autonomy $4 million in 60 days without having any income of its own. Deloitte had no evidence as to how TP5 would fund the purchase if TP14 did not purchase the software from it.

401. The Executive Counsel submits that in all the circumstances Deloitte should have been sceptical about the genuine commerciality of the TP5/TP14 Agreement and whether its substance was consistent with its legal form. It should have considered whether the sale to TP5 (i) might lack commercial substance; (ii) might not have met all the criteria of IAS 18 para 14; and (iii) should be linked to an ultimate sale by TP5 to TP14 within the meaning of IAS 18 para 13.

402. The Executive Counsel submits that Deloitte's workpaper shows that it had information that suggested that Autonomy's deal with TP14 might have been "parked" with TP5 until it could be completed directly the next quarter:

    (i)    TP14 had been a long-standing customer of Autonomy;

    (ii)    Autonomy was close to finalising a sale to TP14 during Q3 09;

    (iii)    TP14 could not finalise the deal until Q4 09;

    (iv)    Autonomy sold the software to TP5 "*in order to secure the deal during Q3 2009*"; and

    (v)    Autonomy was continuing to negotiate with TP14 in Q4 09.

403. At the same time, Deloitte had little or no evidence that (i) TP5 and TP14 had had any discussions; (ii) TP14 would want to purchase the licence from TP5; (iii) TP5 had anything to offer TP14; (iv) TP5 would be able to pay Autonomy without payment from TP14; (v) TP5 would be able to sell the software to anyone other than TP14; and (vi) the larger TP5 Group would support TP5 if required to do so.

404. Without revenue from the TP5/TP14 Agreement, Autonomy would have fallen short of its pre-announced revenues by 1.8%.  The Executive Counsel says that this is relevant to (i) the risk of misstatement by recognising revenue too early; (ii) the professional scepticism which Deloitte should have brought to bear; and (iii) the pressure on Deloitte to approve the recognition of revenue from this transaction.

405. Deloitte should have considered the risk that there was not and never would be an agreement between TP5 and TP14 and should have asked questions such as whether a deal had actually been concluded and whether Autonomy was continuing to negotiate a direct deal with TP14; and should have sought evidence of the deal and negotiations.

406. By early/mid-October 2009, Deloitte had reached the conclusion that revenue from this transaction could not be recognised unless there was a deal in place between TP5 and TP14.  This is clear from:

(i)     The fact that Deloitte asked [Autonomy] for evidence that TP5 had closed the deal with TP14 which was required because (in the words of [a] Senior Finance Manager at Autonomy) "*it would probably be difficult for TP5 to prove that they could pay us if they did not get paid by TP14*" (see his email to [Autonomy] dated 9 October); and

(ii)    Several draft workpapers and drafts of the Reports to the Audit Committee all stated that "*In order to recognise the revenue on this deal an agreement needs to be in place between TP5 and TP14 as TP5 would not have the resources to meet [t]his debt without recovering from TP14*".  These included the Report to the Audit Committee (and Interim Review Summary Memorandum) dated 13 October 2009 and the Report to the Audit Committee (and Interim Review Summary Memorandum) dated 14 October 2009.

407.    Deloitte changed its mind as to the need for evidence of such an agreement on 15 October 2009. This is apparent from the draft Report to the Audit Committee sent by D11 to Mr Knights at 15.22 that day.  The words that we have quoted at para 406(ii) above were deleted from the draft despite the fact that the audit team had not obtained <u>any</u> further information about the status of the deal between TP5 and TP14.

408.    D10 said at para 272 of his first witness statement that the only reason why Deloitte had referred to the need for an agreement between TP5 and the end-user was that it would have been "*helpful*" for revenue recognition.  Mr Knights said (Day 5/130:15-18) that Deloitte was merely "*interested*" in whether a deal had been completed because "*as auditors, we tend to have an interest in whether or not an end user had completed its negotiations*".

409.    The Executive Counsel makes the point that these assertions are contradicted by the documents: Deloitte unequivocally held the view that revenue should not be recognised unless there was an agreement between TP5 and the end-user (see para 406 above).  She says that there is no explanation for Deloitte's *volte face* and she asks us to infer that, facing an imminent deadline for circulation of the Report to the Audit Committee, Deloitte simply withdrew its stipulation in order to sign off the Report and the results of its quarterly review.

410.    Who was responsible for this change of position?  The Executive Counsel says that it was Mr Knights.  Although Mr Knights was at pains to say that all important decisions were team decisions, we are satisfied that Mr Knights was responsible for it.  D10's evidence was that the change would not have been made without Mr Knights' knowledge (Day 13/23:5-8).  Mr Knights had seen the wording of the draft Reports (quoted at para 406 (ii) above). He then saw the tracked change wording in which it had been deleted and a conclusion had been reached that it was appropriate to recognise the revenue "*As TP5 are up-to-date with their payment terms with Autonomy, and all other revenue recognition criteria have been met*" and did not dissent from it.

411.    Deloitte says that it ultimately concluded that TP5's financial position was sufficiently strong that the revenue from TP5 under the TP5/TP14 Agreement could be recognised in Q3 09.  It also relies on the fact that the reviewers all approved the audit team's conclusions, signing the Q3 09 PSR Docket on 19 October 2009.

412.    It submits that it reasonably concluded that the criteria stated in IAS 18 para 14(a) and (b) were satisfied.  It reviewed the Master Agreement with TP5, noting that it contained no unusual terms from a revenue recognition perspective and that ownership of the licence passed pursuant to the agreements made under it.  Mr Knights was subjected to searching cross-examination about this transaction.  He said (Day 5/117-118) that the risks and rewards of ownership had passed to TP5 and he was satisfied that Autonomy did not retain any managerial control.  He considered that the fact that TP5 paid $400,000 up front to Autonomy confirmed that the deal had commercial substance.

413.    He rejected the suggestion that it was necessary to investigate whether there was any reason for TP14 to choose to deal with TP5 or for TP14 to have a commercial reason for doing so.  Deloitte says that Mr Knights and his team were right to focus on the contractual relationship between Autonomy and TP5, so that the status of the discussions between TP5 and TP14 were irrelevant.

414.    As regards the IAS 18 para 14(d) criterion, it is true that early in the Q3 09 review process, Deloitte had been interested in the status of the agreement between TP5 and TP14 from a collectability perspective and continued to press Autonomy for information about it.  The workpapers and draft Q3 09 Audit Committee Reports to

which we have referred at para 406(ii) above were early drafts.  When it became clear that the deal between TP5 and TP14 was not going to complete before the end of the review period, Deloitte decided to focus on TP5's resources.  Mr Knights concluded that there was sufficient evidence to show that it was probable that the economic benefit of the transaction would flow to Autonomy and that the IAS 18 para 14(d) criterion would be satisfied.  He said (Day 5/125:18-23) that the fact that TP5 had paid Autonomy $400,000 up front was good evidence that it would be able to pay before it had received money from TP14; and Deloitte's earlier testing, which had shown that TP5 was part of a solvent and fast-growing group of companies, provided the comfort that Deloitte needed on collectability in Q3 09.

415.  Mr Knights' ultimate judgment was that the collectability criterion was met and that the prospect that TP14 would be paying TP5 was a "*nice to have*" but not a "*must have*": see Day 5/112:25 and elsewhere.

416.  Deloitte submits that the revenue recognition work was, as is common ground, a matter of judgment and there is no basis on which it could be said that the judgment reached by Mr Knights and Deloitte was unreasonable, still less so unreasonable as to amount to Misconduct.

**(F)   Conclusion on Q3 09**

417.  The key point is that by early/mid-October 2009, Deloitte had reached the considered position that the revenue payable under the TP5/TP14 Agreement could not be recognised in Q3 09 because, in its judgment, TP5's ability to pay Autonomy was dependent on concluding an agreement with TP14: see the documents referred to at para [406] above. There is nothing in the contemporaneous documentation to show why Deloitte changed its mind on this point.  In our view, the fact that TP5 had made an up-front payment of $400,000 was hardly sufficient evidence that it would be able to pay the balance of $3.6 million before the quarter end unless it was paid by TP14.  TP5 was a new lightly capitalised company.  No or no adequate explanation has been suggested as to why Deloitte changed its mind on this important issue at the time.

418.    Mr Coates relied on several facts as justifying the recognition of the revenue from the TP5/TP14 Agreement.  These included that Autonomy continued to negotiate with TP14 to provide support to TP5 and help them close the deal (para 9.24 of his report).  But there is no evidence that this was the reason for these direct negotiations.  He (and Deloitte) also suggested that TP5 took the risk that the deal with Autonomy would not be completed because they would earn a substantial return for doing so (see para 462(1) of Deloitte's Written Opening and para 460 of Deloitte's Written Closing).  But there is no or no adequate evidence of this either.  We do not need to examine these points further because, as we have said, the most important feature of Deloitte's conduct in relation to the revenue payable under the TP5/TP14 Agreement was that it changed its mind about the need for evidence that TP5 and TP14 had entered into a binding agreement for the sale of the software licence.

419.    We accept the submissions of the Executive Counsel that, for the reasons that she has given, Deloitte failed to apply appropriate professional scepticism and failed to make additional inquiries or perform adequate review procedures in relation to whether the TP5/TP14 agreement met the IAS 18 para 14 criteria.

**(G)    Q4 09 / FY 09 audit**

420.    On 22 December 2009, Autonomy and TP14 concluded a direct agreement for a licence fee of $4 million.  The software sold by Autonomy to TP14 was identical to that sold by Autonomy to TP5 the previous quarter, as was the price.  Six days later, Autonomy cancelled the $4 million licence fee due from TP5; refunded the $400,000 paid up-front by TP5, and paid TP5 a further sum of $400,000 described as a "*one-time fee*".  Deloitte did not investigate the implications of this development for the recognition of the TP5/TP14 Agreement revenue in Q3 09.  This direct deal was not reported to the Audit Committee.  The Executive Counsel relies on the reversal of the TP5/TP14 Agreement as part of the sixth "red flag" (being the "*pattern of VAR agreements followed by direct deals*").

421.    She submits that Deloitte should have asked why the deal went direct, why Autonomy cancelled the sale to TP5 and paid it $400,000 and whether it should have known that it was probable that it would go direct before it signed its Q3 09 opinion.

422.   In its FY 09 audit, Deloitte considered another software licence sold by Autonomy to TP5.  This was for a price of almost $6 million and was sold on 31 December 2009, for on-sale to TP7 ("TP7" and "the TP5/TP7 Agreement").  The TP5/TP7 Agreement made it clear that the software could only be installed and used by TP7.  Payment of the licence fee was due from TP5 within 90 days of receipt of the invoice.  Failing to recognise revenue on this transaction would have meant that Autonomy missed its pre-announcement revenues by more than $6 million.

423.   Deloitte also considered several sales through the VAR TP18 ("TP18"). TP18 was a small VAR, whose most recent financial results showed net assets of $2.8m and net profits of $2.5m.  Despite this, TP18 had bought almost $20m of software from Autonomy in Q4 09 alone, for nine different end-users. These included software for:

(i)     TP19, for a fee of $4,888,800 ("the TP18 / TP19 Agreement"), and

(ii)    TP15, for a fee of $1.08 million ("the TP18/TP15 Agreement").

424.   The two transactions which are under the spotlight in relation to Q4 09/FY 09 are the TP5/TP7 Agreement and the TP18/TP19 Agreement.

425.   Deloitte's work on Autonomy's sales to TP18 is recorded in workpaper Q4 09 8140a, which was signed off by D10 and Mr Knights on 14 and 15 January 2010 respectively.

426.   Several features of these transactions were similar to those of the TP5/TP14 Agreement which had now gone direct.  Deloitte had also obtained information which the Executive Counsel submits suggested that the relevant accounting criteria for revenue recognition might not have been met.  In particular:

(i)     Autonomy had been in detailed discussions with TP7 up to the year end.  Deloitte knew that the proposed direct deal was at a well-advanced stage: this suggested that Autonomy might have had a continuing managerial involvement in the transaction;

(ii)    Autonomy had long direct selling relationships with both end-users: the sudden introduction of VARs into these established relationships should have raised concerns about the commercial substance of their involvement;

(iii)   Both VARs could only sell the software to the end-user named in the licence.  But despite relying on the finances of the end-user when assessing whether the debt was recoverable, Deloitte had no evidence as to the likelihood of such deals being concluded;

(iv)    There was insufficient evidence that the VARs would be able to pay for the licences unless they concluded a deal with the end-user.

427.    On 16 January 2010, D10 sent an email to Mr Knights ("the D10 email").  This is the Executive Counsel's alleged second red flag.  It was in these terms:

>   "*I identified a case yesterday of where a deal was done through TP5 (a reseller) in Q3 with end user TP14 which was then subsequently reversed in Q4 and done directly with TP14 instead. I have discussed with [an Autonomy Manager] and he provided me with a letter they sent to TP5 basically telling them that TP14 would prefer to do the deal with Autonomy directly but for TP5's inconvenience they would give TP5 $400,000. This has been appropriately accounted for in Q4 2009.*
>
>   *However, it does call into question a couple of deals which I have seen done in Q4 2009 through TP5 and potentially through TP18 whereby large institutions with whom Autonomy have a great direct selling relationship have gone through TP5 (such as TP7) or TP18 (such as TP19) on the last day of the year. From a legal perspective, the agreements in these cases are with the resellers so there is no issue with regards to revenue recognition when you look at the evidence presented. My only concern is that from a commercial perspective these deals would appear to be the same as the TP14 deal in Q3 and I would expect that both TP7 and TP19 will go direct to Autonomy during the course of Q1 2010.*
>
>   *What is your view on this? From talking to [that Autonomy Manager], he admits that what I have described above may well happen but did say that if for whatever reason TP7 or TP19 a deal [sic], the resellers have the legal obligation to pay Autonomy and must then find another end user to whom they could sell the software.*" (underlining added).

428.    The Executive Counsel submits that, in the light of the D10 email, any reasonable auditor would have addressed a whole range of concerns that had now obviously arisen.  In particular, the TP19 and TP7 Agreements mentioned by D10 might not have met the

IAS 18 para 14 criteria and might have lacked economic substance.  The statement that D10 *expected* the deals to go direct and that [Autonomy] admitted that the deals "*may well*" be cancelled should have raised concerns that Autonomy had retained continuing managerial involvement in the deals and might not receive the economic benefit of the sales.

429.   D10's comments were not addressed in the workpapers containing Deloitte's audit work on these two deals, which D10 and Mr Knights had already signed off.  Mr Knights did not reply in writing to D10's email and D10's email was not kept on the Audit File.  The Executive Counsel submits that any reasonable auditor would have addressed its mind to the issues raised by the email, but Deloitte did not do so adequately or at all in the workpapers containing the audit work on the TP19 or TP7 Agreements or any other workpaper considering sales through TP5 and TP18.

430.   The only evidence of what Deloitte did is (i) a short workpaper to ensure that revenue had not been double-counted and (ii) a document comprising two pages of analytical work.  The first of these, although necessary, did not address the key issues relating to revenue recognition that had emerged.  As for (ii), on 15 January 2010, Mr Knights asked D15 and D10 to prepare an "*over arching revenue work paper....of an analytical nature to step back and look at the appropriateness of revenue recognition".* But Mr Knights' email did not focus on the issue of the TP5/TP14 reversal or the implications of the TP7 and TP19 Agreements being expected to go direct (the email pre-dated the D10 email).  The Executive Counsel submits that the "analytical work" requested by Mr Knights was not a substitute for the procedures that Deloitte should have performed.

431.   In summary, she submits that Deloitte failed to plan or perform the FY 09 audit with an appropriate level of professional scepticism.  She also submits that it failed to change the audit plan in response to the red flags of the reversal of the TP5/TP14 Agreement and the D10 email, in particular to make specific enquiries as to the probability that VAR sales would go direct or be cancelled in later quarters.

432.   Deloitte addressed Autonomy's direct sale to TP14 in workpaper 8140a.2 "*Memo on the TP14 contract*".  No additional revenue was recognised as a result of the reversal and Deloitte concluded that the accounting treatment was satisfactory.

433.   The TP18/TP19 and TP5/TP7 Agreements were addressed in workpaper 8140a "*Revenue deals over $1M*".   Under the heading "*Collectability*", the text included the following:

> "*When considering the recoverability of a deal done through the VAR, we must consider firstly whether the VAR is able to meet its contractual commitments to Autonomy and secondly whether the end user is able to meet its contractual commitments to the VAR*".

434.   As regards the TP18/TP19 Agreement, Deloitte had obtained a confirmation from TP18 early in the FY 09 audit (signed by the company's COO), but then decided to insist on receiving a confirmation from the company's CFO.  This confirmation was provided on 2 February 2010, in advance of Deloitte signing off on the FY 09 audit.  Mr Coates rejected the challenge to the adequacy of the work done by Deloitte to assess collectability, and in particular the question of the likelihood of TP18 paying Autonomy absent a deal with TP19.  In his opinion, there was sufficient evidence to conclude that TP18 was paying its debts to Autonomy.  This included the fact that it made a payment of $10 million to Autonomy in January 2010.

435.   As regards the TP5/TP7 Agreement, Mr Knights did not accept that it was indistinguishable from the TP5/TP14 Agreement.  He pointed to the Maintenance testing section of the relevant work paper which read: "*An important point to note with this deal is that Autonomy will only be providing second line support to the reseller's first line support*".  This reflected Deloitte's understanding that TP5 would be adding value in the TP7 deal.  As for collectability, the important points were that:

(i)   The presence of what appeared to be a well-advanced end-user deal with TP7 in the background provided comfort that TP5 was likely to be in funds;

(ii)   The workpaper recorded that TP5 had paid Autonomy $1.3 million in Q4 09, $1.9 million in Q1-Q3 09 and had only $400,000 outstanding at the year end.

436.   No revenue confirmation was found on file, although Deloitte had sought one.  But a debtor confirmation from TP5, confirming the amount owing and that there had been no side letters or other agreements, was received subsequently in Q1 10 and added to

the Audit File.  For FY 09, Deloitte also obtained confirmations from Autonomy's sales teams that there were no side agreements or other arrangements.

437.  Deloitte criticises the evidence of Mr Southwood on the grounds that it is coloured by hindsight and the knowledge of what happened in Q2 10.  There was no reasonable basis for concluding in FY 09 that the TP7 deal was being "parked" with TP5.  It was sufficient for Deloitte to consider the revenue recognition issue with an appropriate scepticism (which it did).

438.  In summary, Deloitte says that the recognition work that it did was extensive and sceptical.  Moreover, it involved matters of judgment.  There is no basis on which it could be said that Deloitte's conclusion was unreasonable, still less so unreasonable as to amount to Misconduct.

439.  As regards the TP5/TP14 reversal, Mr Knights said that this was the first time in his five years as Engagement Partner that he had seen a transaction reverse in this way and he and his colleagues looked at it closely (Day 6/191:20).  Both Mr Knights and D10 said that they understood that the reason for the reversal was that TP14 (not Autonomy) had wanted to do a direct deal.  Deloitte says that the reversal did not call into question the decision taken in Q3 09 to recognise the revenue.  One reversal worth $4 million was not a reason to change the testing of Autonomy's deals at the time.

440.  Deloitte accepts that the D10 email raised questions, but says that the issues raised were debated and considered within the audit team and with [Autonomy].  Deloitte reasonably concluded that the revenue on the TP18/TP19 and TP5/TP7 Agreements could be recognised for the reasons recorded in the relevant workpapers.

(H)    **Conclusion on Q4 09 and FY 09**

441.  The direct sale to TP14 (and the reversal of the TP5/TP14 Agreement) and the D10 email were striking developments which should have set alarm bells ringing in the ears of Mr Knights and Deloitte.  We accept the submissions of the Executive Counsel which we have summarised at paras [428] to [431] above.  Deloitte should have asked why (i) TP14 had refused to deal with TP5 and (ii) Autonomy had paid $400,000 to TP5.  The

obvious answer to (i) was that TP14 had only ever intended to contract directly with Autonomy.   Mr Knights claimed (Day 6/190:21-25) that "*two months later, roughly, something changed whereby the—TP14 <u>decided</u> it wanted to deal with Autonomy, not TP5*" (emphasis added).  We reject this.  There was no evidence that TP14 had been negotiating with TP5 for two months and that then something changed.  Indeed, D10 said (para 284 of his first witness statement) "*TP14 had <u>refused</u> to transact with TP5*" (emphasis added).  As for (ii), Deloitte should have explored the reason for this payment and considered whether it was to reward TP5 for parking the deal until Autonomy could sign a direct deal with TP14.

442.   D10's email could not have been clearer: he *expected* the two deals to go direct and [Autonomy] admitted that this "*may well happen*".   D10 was right to say that from a *commercial* perspective, these two deals appeared to be the same as the TP5/TP14 Agreement.  There is no evidence of Deloitte or Mr Knights addressing their minds to the issues raised by the D10 email. In particular, there is no evidence that Deloitte asked [Autonomy] what discussions were taking place between Autonomy and these VARs, or between Autonomy and the end-users or between the VARs and the end-users.

443.   The reversal of the TP5/TP14 Agreement was significant.  This was the first time that any deal had gone direct to an end-user and the sale to a VAR cancelled.  But the D10 email made it clear that there were likely to be others.  This should have set alarm bells ringing in the ears of Mr Knights.

444.   We have summarised at para [426] above the similarities between TP5/TP14 Agreement and the TP18/TP19 and TP5/TP7 Agreements.  All these facts raised serious concerns over the commercial substance of the sales and whether IAS 18 para 14 had been satisfied.  They were not addressed in the Deloitte workpapers, despite being plainly relevant.  We reject Deloitte's submission that the TP5/TP7 Agreement was materially distinguishable from the TP5/TP14 Agreement. The difference relied on (para [435] above) is not material.

445.   Mr Knights claimed (Day 6/200:1-2) that "*just having ongoing negotiations didn't cause us to have concerns about revenue recognition*".   He gave similar evidence in para 262(a) of his first witness statement that Autonomy's ongoing involvement in the

deal was to help TP5 to secure the sale with TP7.  We accept the submission of the Executive Counsel that this attitude shows an obvious lack of professional scepticism on the part of Mr Knights.  This is all the more remarkable in the light of the D10 email, in which D10 made it clear that he *expected* the negotiations to lead to direct deals in the future.  This was powerful evidence to which Mr Knights paid little or no regard. He failed to apply his mind sufficiently to whether the IAS 18 para 14 criteria were satisfied.

446.   Finally, as regards the collectability of the revenue under the TP18/TP19 Agreement, there was  insufficient evidence that TP18 would be able to pay for the licence unless it concluded a deal with TP19.  It had net assets of $2.8 million, which was barely 10% of the $20 million of software which it had bought from Autonomy in Q4 09 alone and less than the price due under the TP18/TP19 Agreement alone.  Nor did Deloitte have any evidence as to its liabilities.

447.   Taking all these factors into account, we are satisfied that, by issuing an unmodified audit opinion in FY 09 without obtaining sufficient audit evidence in relation to the TP18/TP19 Agreement and the TP5/TP7 Agreement, Deloitte and Mr Knights fell significantly short of the standards reasonably to be expected of a Member Firm and Members and were culpable of Misconduct.

## (I)   Q1 10 review

448.   On 4 January 2010, Autonomy acquired TP17, a VAR to which it had previously sold software licences.

449.   Two deals sold through TP18 in Q4 09 were unwound and replaced with direct deals between Autonomy and the end-user (these were further transactions which formed part of the Executive Counsel's sixth red flag):

(i)     On 19 February 2010, Autonomy completed a direct sale of hardware for $5,288,800 to TP19.  On 30 March 2010, Autonomy issued a credit note to TP18 for $4,888,800 unwinding the entirety of the TP18/TP19 Agreement.

(ii)     On 26 March 2010, Autonomy concluded a direct agreement with TP15 for a total fee of $2,334,500.  This included the sale of Digital Safe, which Autonomy had sold to TP18 under the TP18/TP15 Agreement. On 31 March 2010, Autonomy issued a credit note to TP18 for $1,184,000 unwinding the whole of the TP18/TP15 Agreement.

450.   Deloitte was aware that these deals had gone direct at the latest by 7 April 2010 when Autonomy sent it a spreadsheet of revenue deals greater than $100,000 for Q1 10.  D10 forwarded the spreadsheet to Mr Knights saying "*there is lots to talk about in here*".

451.   In its Q1 10 Report to the Audit Committee, Deloitte stated:

> "*[Autonomy] alerted us to the fact that two deals sold to TP18 in Q4 2009 have been credited in this quarter and resold directly to the two end users. This was as a result of the end users wanting to transact directly with Autonomy. This reduced the profit in the period by approximately $4 million. As there is no significant history of deals being reversed in this way, management has recognised the revenue at the point of sale to the reseller. [Autonomy] has confirmed that these were isolated incidents which are not expected to be repeated in future periods".*

452.   There is further evidence that the two deals went direct because the end-users wanted to transact directly with Autonomy: see, for example, page 11 of Deloitte's Interim Review Summary Memorandum for the period ended 31 March 2010.  On page 8 of the workpaper Q1 2010 8130a, Deloitte recorded that [Autonomy] had told them that TP19 had insufficient budget in their financial year to purchase the licence and that this was the reason why the TP19 Agreement with TP18 was replaced with a direct deal in the following quarter with Autonomy.

453.   On 7 April 2010 (the same day as D10 found out that two TP18 deals had gone direct), he prepared a spreadsheet called "*Autonomy Q1 2010 revenue notes*".  It contained two sheets on the second of which he listed six deals done in Q1 10 through "*key resellers*". They included:

(i)     One sale through TP18 for the end-user TP25 for a total fee of $11.5 million ("the TP18/TP25 Agreement");

*Edited for publication*

(ii)   Two sales through the "TP24", a new company to which Autonomy had sold software for the first time in Q1 10.  One of these was for the end-user TP6 and the other for TP20 (the "TP24/TP6 Agreement" and the "TP24/TP20 Agreement" respectively).

454.   D10 wrote in a note next to each of these three agreements "*Revenue too early*".  The spreadsheet concluded in a red box that the total amount of "*revenue too early*" was $24,970,914.  In his evidence (Day 13/150:18 to 13/151:1), D10 denied that these were deals that he expected to reverse at the time.

455.   The Executive Counsel submits that Deloitte should have realised that the large numbers of direct sales replacing licences sold to VARs represented a significant risk that revenue was being accelerated and that it should have amended its testing procedures accordingly.  She says that it should have considered whether these cancellations were part of a pattern.  Her case is that Deloitte did none of these things.

456.   What steps were taken to address D10's concerns?  D10 (para 320 of his first witness statement) refers to the Interim Review Summary Memorandum for Q1 10, but that contains no substantive analytical review work.

457.   Next, reference has been made to the so-called "*Channel stuffing email*" sent by D10 to Mr Knights on 12 April 2010 with an extract from an internal Deloitte Q&A on IAS 18 para 14.  The Q&A was directed at situations where manufacturers accelerate revenue by selling more products to wholesalers than they can resell to end customers.  D10 told Mr Knights that the guidance provided that "*even in instances of Channel Stuffing, you should recognise the revenue but you should do so net of expected returns*".  D10 then stated that as only three deals had been "returned" over the previous five years, expected returns were *de minimis.*  The Executive Counsel says that the Q&A guidance actually stated that the first step was to consider whether the IAS 18 para 14 criteria were met.  D10's assertion that "*returns*" were *de minimis* reflected the attitude that was adopted by Deloitte.  For example, on 16 April 2010 D15 wrote to [an Autonomy Senior Finance Manager]:

> *"I am trying to get hold of the number of >$1m deals sold through resellers in 2009 so that I can document that the reversal of several of these deals is a very low proportion".*

458.   The Executive Counsel submits that the position that the reversals were too limited in number to be important was indefensible, Autonomy had entered into 18 VAR deals over $1 million in 2009 with a total revenue of $57.6 million.  Deloitte now knew that three of them had gone direct and the TP4 sale had effectively been unwound. D10 had predicted that the TP5/TP7 Agreement could well be added to the list.

459.   On 12 April 2010, D15 emailed [an Autonomy Senior Finance Manager] telling him to re-issue the revenue confirmations that had already been sent to include wording that there were no side agreements between Autonomy and the VAR.  D15 had forgotten that the confirmations received already addressed side agreements.

460.   D10 prepared a workpaper which was not retained on the Audit File and which addressed the sale to TP25.  There is no evidence that it was seen by the Joint Audit Engagement Partner (D2) or anyone else in the audit team or any of the reviewers.

461.   Deloitte's Report to the Audit Committee for Q1 10 said: "*any further evidence of revenue reversals may jeopardise [Autonomy's] ability to recognise revenue at the point of sale to the reseller*".  The Executive Counsel submits that this was an insufficient response to the concerns that D10 had raised about revenue recognition.  It did not mention that the TP5/TP14 Agreement had reversed or that D10 had foreseen the TP19 reversal and expected others in future quarters.

462.   We need to revert to the TP18/TP25 Agreement.  This was the most significant licence revenue reported to the Audit Committee in Q1 10.  Failing to recognise revenue from this agreement would have meant that Autonomy would have missed consensus revenues by some $10 million. Deloitte's work on this deal is set out in workpaper Q1 10 8130a with a revenue confirmation obtained, although it was not retained on the Audit File. Deloitte knew that Autonomy had been negotiating with TP25 for some time.

463.   The main evidence of Deloitte's analysis of this deal is contained in D10's "*Revenue sales to approved resellers*" workpaper dated 16 April 2010.  The stated objective of the paper was "*to ensure that revenue from resellers is recognised in an appropriate manner and therefore in accordance with IAS 18*".  The paper included the following:

> "*We have performed the following to ensure that revenue recognition is appropriate:*
>
> • *Reviewed the signed contract between Autonomy and TP18;*
>
> • *Seen evidence of delivery to the reseller pre period end;*
>
> • *Seen the sales invoice to ensure dates pre period end;*
>
> • *Received a signed confirmation from the CFO at TP18 confirming that the revenue deal is valid and also confirming that no side agreements exist between Autonomy and TP18;*
>
> • *Held discussion with [Autonomy] to understand the rationale for contracting through TP18;*
>
> • *Received [an Autonomy] representation letter signed by the Board of Directors confirming that the revenue deals recognised to resellers are valid and are not planned to be reversed from revenue and sold directly in subsequent quarters;*
>
> • *Ensured that all criteria in IAS 18 with regards to revenue recognition have been met, specifically that the risks and rewards of ownership have been transferred to the reseller; and*
>
> • *Reported the matter on the reversal to the Audit Committee*"

464.   The Executive Counsel submits that the work done by Deloitte on the TP18/TP25 Agreement fell short of what was required in the following respects:

(i)   It should have undertaken more procedures to evaluate the commercial rationale of the transaction and to ensure that it had substance and that TP18 was not merely acting as an agent (it did not explain the reason for the involvement of TP18);

(ii)   It failed to address the possibility of the cancellation of the agreement and its replacement by a direct deal in a later quarter: this omission was particularly striking in the light of the two cancellations of sales to TP18 in the quarter alone;

(iii)   It had no evidence as to the likelihood of a deal between TP18 and TP25 and did not consider why TP18 would be willing to accept the risk of such a deal failing

*Edited for publication*

to materialise when the licence could not be sold to anyone else without Autonomy's approval: it failed to consider whether this indicated continuing managerial involvement by Autonomy, a failure to transfer the risks and rewards of ownership and/or retention of effective control over the software; and

(iv)   It obtained insufficient evidence as to whether TP18 could pay Autonomy without payment from TP25. This should have been of particular concern given the overall size of the debt due from TP18 (then $13.5 million) and its thin capitalisation. The Executive Counsel notes that Deloitte relies on the fact that the debt due under this agreement was, in the end, mostly paid, but she submits that later events cannot be used retrospectively to justify the approval of revenue in Q1 10.

465.   In short, the Executive Counsel submits that Deloitte failed to apply sufficient professional scepticism and failed to make additional inquiries or perform other procedures in light of what they knew, which suggested that revenue from the TP18/TP25 Agreement did not meet the criteria of IAS 18 para 14.

466.   Deloitte submits that the Q1 10 work that it undertook was greatly in excess of that required by ISRE 2410 for the purposes of quarterly reporting.

467.   As regards the TP18/TP19 Agreement, Deloitte says that the explanation that TP19 had insufficient budget to purchase the software licence and instead had decided for its own commercial reasons to enter into a sale for hardware was plausible. It was also understandable that, for commercial reasons, Autonomy might have wished not to want to have to enforce its rights against TP18 in view of TP18's trading history. Mr Knights denied that the information available to Deloitte at the time suggested that the deal lacked commercial substance and had been "parked" with TP18. In any event, the direct deal between Autonomy and TP19 was a sale of hardware. Accordingly, it is wrong to describe it as a "reversal" falling within the alleged growing pattern of cancellations and direct deals.

468.   Deloitte relies on the evidence of D10 (Day 13/149:12-21) who said that the few cancellations were not sufficient to build up a clear pattern of reversals. It was not

inappropriate for Deloitte to describe the two TP18 reversals in its Q1 10 Report to the Audit Committee as "*isolated incidents*". Notwithstanding this, Deloitte continued to probe and push [Autonomy] for further evidence to establish whether there was a history of reversals (as demonstrated by the emails between D15 and [an Autonomy Senior Finance Manager] which showed that there had been 18 VAR deals over $1 million in the past year, of which only three had not proceeded). This was very sceptical and appropriate early stage review work. The elevation by the Executive Counsel of D10's spreadsheet of 7 April 2010 shows the poverty of her allegation.

469. As for the workpaper dated 16 April 2010 (see para [463] above), Mr Knights and D10 accepted that it contained some errors. These included that (contrary to what the paper said) they had not sought a representation from the Board of Directors on the status of the VAR transactions. But these errors were not corrected because the work paper was not added to the Audit File. The complete factual position was correctly recorded in the work papers that were finalised and added to the Q1 10 file later. Nevertheless, the work paper provided further good evidence of the careful consideration that Deloitte was applying.

470. Deloitte sought and obtained from Autonomy financial information about the VARs for the purposes of the Q1 10 review. Thus:

(i)    On 15 April 2010, [Autonomy] had provided Deloitte with a letter from TP5 signed by TP11, its Managing Partner, which spoke to the financial strength of TP5: this letter was added to the Audit File.

(ii)   On 14 April 2010, [Autonomy] had provided Deloitte with a letter from TP18, signed by its CFO TP23, which said that TP18's annual revenue in FY 2009 was $185 million and was projected to be $305 million in FY 2010. In addition, TP18 had access to a line of credit in excess of $10 million. This letter too was added to the Audit File.

(iii)  Finally, as regards TP24, [Autonomy] drew attention to the fact that it had paid the 20% and 25% upfront payments in respect of its transactions with Autonomy on time and that, "*given this and the end users*", [Autonomy] was comfortable.

471.   As regards the TP18 / TP25 Agreement, Mr Southwood said that the work done on revenue recognition was inadequate and that Deloitte should have taken more steps to understand TP18's rationale.  Deloitte submits that Mr Southwood did not explain how this testing would be executed.  It did demonstrate sufficient scepticism.  Amongst other things, it considered TP18's financial history, obtained a revenue confirmation, and carefully assessed whether the IAS 18 para 14 criteria were satisfied.

472.   In summary, Deloitte submits that it more than complied with its ISRE 2410 obligations.

**(J)    Conclusion on Q1 10 review**

473.   It is true that, this being a review, the relevant accounting standard was ISRE 2410.  Mr Coates made much of this fact to argue that the review standards were substantially less demanding than those applicable to a year-end audit.  But as we have said at paras [384 to 385] above, on the facts of this case, this argument does not assist Deloitte, not least because it chose to examine the evidence at the review stage by reference to the audit standards set out in IAS 18 para 14 so as to reduce the amount of work that it would have to carry out at the audit stage.  This is clear from, for example, the "*Revenue sales to approved resellers*" paper to which we have referred at para [463] above.

474.   The two significant developments during Q1 10 were (i) the reversal of the two TP18 deals that had been recognised in Q4 09 and (ii) D10's spreadsheet dated 7 April 2010 in which he noted against three agreements the comment "*Revenue too early*".

475.   The first of these developments showed that the expectations expressed by D10 in the D10 email were well-founded.  Deloitte makes much of the fact that the TP18 / TP19 Agreement was replaced with a direct deal for the sale of hardware, not software.  But that does not affect the main thrust of the Executive Counsel's argument that the earlier deal between Autonomy and TP18 was replaced by a direct deal for a similar amount between Autonomy and TP19. It was this predicted replacement which cast doubt on whether the revenue should have been recognised in the previous quarter.  In any event, the TP18/TP15 Agreement was unquestionably replaced with a direct equivalent deal between Autonomy and TP15.

476.    The fact that TP19 and TP15 wanted to deal directly with Autonomy rather than TP18 should have been a matter for concern.  We have referred at para [452] above to Deloitte saying that [Autonomy] had told them that TP19 had insufficient budget in their financial year to purchase the licence and that this was the reason why the TP18 / TP19 Agreement was replaced with a direct deal in the following quarter with Autonomy; and we have referred at para [467] above to Deloitte's defence of that statement.  But we prefer the explanation given by Deloitte to the Audit Committee that *both* end-users wanted to transact directly with Autonomy.  This is the only explanation for the TP15 direct sale.  It is also more likely that this is why the TP18 / TP19 Agreement went direct. TP19 was a large, longstanding direct customer of Autonomy which had bought around $50 million of software and hardware from it in the recent past.  There was no hint in Deloitte's report that either TP19 or TP15 wished to deal with Autonomy directly for any other reasons than that they did not wish to deal with TP18.

477.    The fact that the warnings given in the D10 email had eventuated so soon should have set alarm bells ringing in the ears of Mr Knights and his team.  It was not good enough for Deloitte to inform the Audit Committee in its Q1 10 Report that the two reversals were mere "*isolated incidents which are not expected to be repeated in future periods*". There was no basis for treating the reversals so lightly.  In particular, Deloitte had no hard evidence from which it could confidently conclude that it did not expect a repeat in the future.  In fact, that expectation was somewhat contradicted by the statement in the same report that any further evidence of revenue reversals might jeopardise [Autonomy's] ability to recognise revenue at the point of sale to the reseller: see para 461 above.  That statement did not sit easily with the statement that the isolated incidents were not expected to be repeated.

478.    The second development added to the significance of the first.  In the context of the reversals, D10's statement on 7 April 2010 that he considered that almost $25 million worth of revenue was being recognised too early should have been a matter of the greatest concern to Mr Knights and his team.  D10 in his evidence sought to play down the significance of this statement by saying, for example, that he did not expect these deals to reverse at the time.  In our view, he had no basis for saying this, not least because it was inconsistent with the D10 email.  On any view, there was a real risk that some or all of the deals would be reversed.  But more importantly, what he said on the

spreadsheet reflected his view at the time that the revenue was being recognised too early.

479.  We have set out at paras [456] to [461] above the steps that Deloitte took in response to D10's concerns.  We accept the submissions of the Executive Counsel that we have summarised in these paragraphs.  In the circumstances of this case and in the light of what we have referred to as the two significant developments, the steps taken were wholly inadequate to meet D10's concerns.   Deloitte *said* that it was applying the criteria of IAS 18 para 14, but what matters is what it *did.*  We would emphasise two points.  First, we reject Deloitte's *de minimis* point.  As the Executive Counsel says, Autonomy had entered into 18 VAR deals over $1 million in 2009 with a total revenue of $57.6 million.  Secondly, Deloitte was right to seek revenue confirmation evidence from the VARs.  But in the context of this case, Deloitte should have viewed that evidence with considerable scepticism.  By itself, it could not bear much weight.

480.  Finally, we turn to the TP18/TP25 Agreement.  We have set out at para [464] above the Executive Counsel's submissions as to the respects in which Deloitte's work on this transaction fell short of what was required.  We accept these submissions.  It is no answer to these submissions to point to the various steps that Deloitte *did* take.  The question is whether those steps were adequate.  We would add the following points:

(i)    Deloitte knew that Autonomy had been in detailed discussions with the TP25 before the sale to TP18; it was even told on 4 January 2010 at its 2009 year end "*planning meeting and fraud discussion*" that Autonomy had "*recently secured large deal with TP25 (highly confidential at present) but this is not likely to be recognised in the period*".

(ii)   There was no good explanation of why TP25 would want to purchase the licence from TP18. Deloitte relied on [Autonomy] representations ([…]) that TP18 would be "*working directly with another third party with regards the integration and installation of this software into the wider project and  TP25 computer systems*".  But this did not explain the involvement of TP18, since it was a third party (not TP18) that was said to be carrying out the integration / installation work. The apparent inability or unwillingness of Autonomy to provide those services should

have been a matter requiring investigation by Deloitte, since this was a huge and prestigious project and Autonomy *did* provide professional services itself.

(iii)   Mr Coates stated at para 11.20(c) of his report that "*TP18 was confident it could complete the deal with TP25… which is why it accepted the risk*".  But this view has no evidential support and it appeared to be premised entirely on the fact that TP18 bought the licence. After the three reversals, Deloitte could no longer assume that the VAR's mere purchase of a licence showed it was confident it could sell the licence on.

(iv)   Deloitte and Mr Knights should also have considered more carefully the overall size of the debt due from TP18, and whether the revenue should be deferred until TP18 had paid Autonomy; if TP18 could not sell the licence to TP25, it would need to have exhausted its cash reserves and drawn down on its line of credit, as Mr Coates accepted (Day 20/91:23-25).

481.   In short, we accept the Executive Counsel's submission that to a serious degree Mr Knights and Deloitte failed to apply appropriate professional scepticism and failed to make additional inquiries or perform other procedures in the light of what they knew, which suggested that revenue from the TP18/TP25 Agreement did not meet the criteria of IAS 18 para 14.   In our opinion, the conduct of Mr Knights and Deloitte fell significantly short of the standards reasonably to be expected of a Member Firm and a Member of the ICAEW and amounted to Misconduct.

**(K)    Q2 10 Review**

482.   On 5 July 2010, Deloitte held its Q2 Planning Meeting and Fraud Discussion.  The minutes of the meeting recorded that Deloitte had identified as a "*significant risk*" "*Sales made direct to end users where a recent deal through a VAR has taken place*". The minutes also noted that Deloitte did not expect this to continue.  Two further VAR deals were replaced with direct deals between Autonomy and the end-user in this quarter (these were further transactions making up the Executive Counsel's sixth red flag):

(i)     Autonomy entered into a direct deal with TP20 on 6 June 2010 for a licence fee of $4.2 million, replacing the TP24/TP20 Agreement which had been signed in the previous quarter.  Autonomy issued TP24 with a credit note on 1 July 2010, writing off the whole of the debt due;

(ii)    Autonomy also concluded a direct deal with TP7 for a licence fee of $5,303,431 on 15 June 2010 ("the Autonomy / TP7 Agreement"), replacing the TP5/TP7 Agreement which had been made in the previous quarter.

483.    As the Executive Counsel points out, these were the fourth and fifth VAR agreements to be replaced with direct deals in future quarters.  We repeat that Deloitte had said to the Audit Committee in its report for Q1 10 "*any further evidence of revenue reversals may jeopardise [Autonomy's] ability to recognise revenue at the point of sale to the reseller*" (emphasis added).   In its report to the Audit Committee on the Q2 10 Interim Review dated 19 July 2010, it stated that in its previous report, it had said that "*significant evidence of such further revenue reversals may jeopardise [Autonomy's] ability to recognise revenue at the point of sale to the reseller*" (emphasis added).

484.    On 26 June 2010, A10, Autonomy's Chief Financial Officer in the Americas emailed Mr Knights and D6 ("the First A10 Email") (this is the Executive Counsel's fourth red flag).  He set out a list of six questions for Deloitte the first of which was: "*Is revenue properly recognized on reseller transactions where there may be no End User and the Autonomy sales team subsequently completes an agreement directly with the End User with substantially modified license terms from the standard reseller terms?*"

485.    A10 gave the TP5 / TP7 Agreement as an example. He recorded that when TP5 had failed to pay the sum outstanding by the due date, he had called TP11 (its Managing Partner) who had told him that a TP5 / TP7 deal had not closed in Q4 09, and that he would not be able to make payment until it had closed and TP5 had been paid.

486.    A10 also said that Autonomy's SMS showed numerous communications between Q4 09 and Q2 10 between Autonomy and TP7, with no suggestion that Autonomy would be assisting TP5.  He referred to Autonomy's accounting policy and IAS 18 para 14, before setting out nine items, and asked Deloitte to consider whether these called into

question whether revenue from the TP5 / TP7 Agreement was correctly recognised in FY 09. These items included the fact that Autonomy's finance department had been instructed to create pro forma invoices to send to TP5, for it to send on to TP7. He also said that, if the revenue had not been properly recognised in FY 09, Deloitte and the Audit Committee "*should consider the multiple similar reseller transaction[s] recognized as revenue from 2008 through Q1 2010*".

487. In this email, A10 also:

(i)   discussed the TP18/TP25 and TP24/TP6 Agreements (both signed in Q1 10), saying that these transactions "*may be a placeholder for an agreement to be negotiated subsequent to the invoice date*";

(ii)  questioned whether Autonomy had cancelled sales through TP18 for the end-users TP15 and TP19 (as indeed it had); and

(iii) asked whether Autonomy's acquisition of TP17 "*was partially done to provide a vehicle to 1) write off the $16M in outstanding invoices where a large percent were significantly past due and where there may be potential that there was no End User to pay TP17*".

488. A10 sent a second email on 7 July 2010, this time to Mr Knights, D6, A11 and the Audit Committee ("the Second A10 Email"). This is the Executive Counsel's fifth alleged red flag. It forwarded an email from A9, Autonomy's Director of Revenue in the US, in which he set out four areas of concern that he felt warranted further scrutiny.

489. A9 said that he had raised the TP5 / TP7 Agreement with A10 because he "*had concerns regarding the timing of revenue recognition associated with the Q4 2009 transaction, and whether this was indicative of a practice of Autonomy (and could there be more)*". A9 explained that, after Autonomy had signed a direct deal with TP7, he had been directed by [Autonomy] to prepare pro forma invoices to be sent to TP5, so that the latter could send these to TP7 to be paid. He also confirmed that Autonomy had shipped the software to TP7, not TP5.

*Edited for publication*

490.    A10 said in the First A10 Email:

> *"In reviewing the SMS customer notes (SMS tracks all Autonomy sales activity) related to TP7 during the period of Q4 2009 through Q2 2010, there were many steps in the sales process required by the Autonomy sales team to complete the transaction with TP7 subsequent to when we recognized revenue in Q4 2009. There was no mention of any steps or sales process to be performed by TP5."*

491.    A10 made clear to Deloitte that Autonomy continued to negotiate with TP7 as if the sale to TP5 in Q4 09 had never happened even to the extent of reducing the price agreed with TP5 by 10% and reducing the number of authorised users. The Executive Counsel submits that this suggested that Autonomy had retained continuing managerial involvement in the sale after Q4 09 and that the Q4 09 price was not fixed as required by Autonomy's accounting policy.  Despite this, there was no workpaper from Deloitte which considered the accounting and/or disclosure impact of the Autonomy/TP7 Agreement and whether it remained appropriate for Autonomy to recognise the revenue from the TP5 deal at the point of sale to TP5 on 31 December 2009.

492.    The Q2 10 Planning and Fraud Discussion considered "*Sales made direct to end users where a recent deal through a VAR has taken place".*  D15 said that there was a "*need to ensure we are satisfied with revenue recognition on any VAR deals in the quarter*" adding "*Don't expect this to continue*".

493.    In its report dated 19 July 2010 to the Audit Committee, Deloitte referred to the reversals of the TP5/TP7 and TP24/TP20 Agreements and the fact that the $11.5 million due from TP18 to Autonomy in respect of the TP25 deal had not yet been paid.  The report continued:

> *"At the date of issuing our report this amount is now overdue. We concurred with [Autonomy] at the point of recognition on the treatment of this amount but will monitor the progress of this balance again in our Q3 2010 review. To the extent cash is not received in Q3 2010, we will need to carefully consider recoverability of the balance. As part of our Q2 2010 procedures we received confirmation from TP18 of the amount outstanding and the absence of any side agreements or ongoing performance criteria. In addition, we held discussions with [Autonomy] to ensure that no issues had subsequently been identified which might impact the probability of recoverability of this balance. As a result of our work in this area we have not proposed any adjustments to revenues or receivables, but we will continue to focus carefully on this area in future reviews and audits."*

494.   In Appendix 3 to this report, Deloitte set out in detail the history of the TP5/TP7 transaction and its review of the evidence.  The relevant parts of the Appendix are:

> *"[**Autonomy**] **response**…..In determining whether it was appropriate to recognise revenue on [the TP5/TP7] sale, [Autonomy] considered at 31 December 2009 the information it normally considers being the following matters:*

> - *Evidence of a previous trading relationship with TP5, including an understanding of the quality of this customer.  This indicated that it was probable that economic benefits associated with the transaction would flow to Autonomy;*

> - *The ability of TP5 to stand by its obligation to Autonomy, irrespective of its ability to onward sell the Autonomy product;*

> - *The fact that TP5 had been a regular payer of previous deals undertaken with Autonomy;*

> - *The fact that an appropriately signed unconditional PO had been received setting out the value of the transaction…*

> - *The fact that the Autonomy software had been appropriately despatched to TP5 in Q4 '09; and*

> - *The fact that no continued managerial involvement in the transaction was contractually required or forecast.*

> *Additionally [Autonomy] were aware that an ultimate end user was identified—TP7 who are a major multi-national business that had a track record of purchasing Autonomy software ($22m).  Indeed Autonomy had spent some time seeking to sell this product direct to TP7 before ultimately selling it to TP5.  The key feature that TP5 was able to offer to TP7 was an ongoing partner/ servicing arrangement…..*

> *Although TP7 have subsequently chosen to transact directly with Autonomy in June 2010, does not detract from the fact that Autonomy contracted directly with TP5 in December 2009.  Autonomy delivered product to TP5 and had transferred all risks and rewards of ownership of the goods by 31 December 2009.  An Autonomy sales person has continued to stay involved with the transaction between TP5 and the end user because it is in Autonomy's interests to stay close to the end user from a commercial perspective.  TP5 remain fully liable to Autonomy for the obligation under the PO signed in December 2009.*

> *...*

> ***Deloitte response*** *We have discussed and reviewed [Autonomy's] views on the matter as summarised above and concur with the accounting policy in place. The determination of the revenue recognition on the TP5 sale as at 31 December 2009 is consistent with our understanding of this transaction at that time.*

> *As part of our audit for the year ended 31 December 2009, we performed audit procedures on the revenue contract with the reseller (TP5) to ensure that all criteria within [IAS 18] paragraph 14 were met.  Given that all risks and rewards of the contract had been transferred to TP5 by the year date and that it was probable that economic benefits would transfer to Autonomy, we concurred with [Autonomy] that it was appropriate to recognise the revenue on this contract.*
>
> *As previously reported to the Audit Committee, our materiality guideline for the 2009 audit was $20 million.  We confirm that this transaction was not material on this measurement…"*

495.   If Deloitte had  adequately reviewed a copy of the direct agreement, Deloitte would have appreciated that section 5.9 of it stated that one part of the software delivered by Autonomy (ALH software) was subject to a minimum 4-month period of acceptance testing by TP7, which only began once Autonomy had completed the implementation, installation, setup and configuration of the software.  Autonomy's accounting policy stated that, if a software licence contained an acceptance period, revenue was only recognised "*upon the earlier of customer acceptance or the expiration of the acceptance period*". There is no evidence that Deloitte considered whether TP7 had accepted the software in Q2 10 (or at all).

496.   As for the TP18 / TP25 Agreement, Deloitte, Mr Knights and Mr Mercer had obtained specific information showing that there was a risk that it had not met the requirements of IAS 18 para 14 in Q1 10.  For example, A10 had sent with the First A10 Email a spreadsheet which recorded that [Autonomy] had said that the revenue on the TP18 / TP25 Agreement "*will not be paid…for quite some time*".  The Executive Counsel submits that this suggested it might not have been probable in Q1 10 that Autonomy would receive the economic benefit from the sale.

497.   The spreadsheet also recorded that TP5 and TP18 did not have any end-users for numerous licences they had bought from Autonomy.  The same was true for sales through other VARs such as TP10. The Executive Counsel submits that this suggested that it might have been appropriate to approach deals with VARs (and TP18 in particular) with a heightened level of professional scepticism, because the VAR might have been unable to pay its debts without first receiving payments from the end-user.

498.  Five deals sold through VARs had now been sold direct to the end-user, including those sold through TP18.  The Executive Counsel submits that this suggested that Autonomy might have been continuing to negotiate with TP25 in Q2 10 in an attempt to complete a direct sale and, accordingly, that it might have retained continuing managerial involvement after Q1 10.  Despite this, Deloitte carried out no enquiries to provide evidence of either the status of negotiations between TP18 and TP25, or the likelihood and timing of payment by TP18.

499.  The Executive Counsel makes the point that this all took place in the context of Deloitte having concluded (during its work on TP17) that software licences without an active end-user agreement could not be sold on to any end-user. Yet no procedures were carried out in Q2 10 to establish whether there was such an agreement between TP18 and TP25. Had Deloitte undertaken such procedures, it may well have concluded that it was not probable in Q1 10 that Autonomy would receive the economic benefit from its sale to TP18.

500.  Deloitte's general response is that the work in Q2 10 was subject to ISRE 2410 standards and its work went beyond what was required.

501.  Mr Mercer (who had taken over as Engagement Partner from Mr Knights) explained at para 183 of his first witness statement that he was aware that Deloitte was already carefully considering Autonomy's revenue recognition in relation to sales to VARs in the light of developments in FY 09 and Q1 10 and had put down a marker on reseller deals in Q1 10.  Mr Mercer and Deloitte sought [Autonomy's] responses to the matters raised in the A10 emails and reported on their investigation in Appendix 3 to the Q2 10 Audit Committee Report.  The investigation was comprehensive and the additional evidence in the form of the revenue confirmation that had been provided by TP5 in the course of the Q1 10 review gave additional assurance that the revenue recognition in FY 09 had been correct.

502.  Mr Mercer said (Day 10/52:4 to 10/54:24) that the discussion that A10 had with TP11 was about the timing of the payment of TP5's debt and not about whether TP5 was obliged to pay Autonomy (which it was).  Mr Mercer said that Deloitte knew that

historically Autonomy had been paid by TP5.  This was one of the factors that Deloitte took into account in making the original decision to recognise the revenue.

503.   It was also relevant to Deloitte's thinking that, unlike previous reversals of VAR transactions, the TP5/TP7 transaction was not a straightforward cancellation and reversal.  The VAR agreement between Autonomy and TP5 for $6 million remained in place; TP7 paid TP5 for the licence at the lower price of $5.5 million; TP5 delivered the software to TP7; TP5 then paid $5.5 million to Autonomy; and Autonomy insisted that TP5 make up the difference in value of $0.5 million from revenues it was going to generate through the provision of its ongoing services to TP7.  The possibility that at some time in the future TP7 might wish to contract directly with Autonomy was irrelevant to the question of whether it had been right to recognise the revenue in Q4 09.  Deloitte also submits that this transaction did not fit the pattern of reversals alleged by the Executive Counsel.  In short, nothing arising from the A10 emails called into question the recognition of revenue in respect of the TP5/TP7 Agreement in Q4 09.

504.   Deloitte submits that the attachments to the Second A10 Email were not evidence of reversals.  Mr Mercer was right to say (Day 10/79:5-8): "[*t*]*his is a list of items that A10 thinks might reverse.  We know for a fact that the vast majority of them didn't reverse*".  Nevertheless, Deloitte took the A10 emails seriously and the investigation into their contents by Deloitte was an appropriate and considered response.

505.   Deloitte also submits that its revenue recognition work on the TP24/TP20 transaction is not the subject of the Amended Formal Complaint.

506.   As regards the TP18/TP25 Agreement, Mr Mercer said that he and his team were "*all over*" it.  They carefully considered the debt owing to Autonomy in Q2 10 and Mr Mercer said that he was entirely comfortable with the decision to recognise the revenue in Q1 10.  The response set out in the Q2 10 Report to the Audit Committee (see para 494 above) was reasonable.  Mr Mercer (Day 10/75:1-25) said that the fact that TP18 had not paid the sum due to Autonomy by Q2 10 did not demonstrate that the recognition of the revenue in Q1 10 was incorrect.  Deloitte had to make a judgment: was it probable that the economic benefits of the transaction would be received by Autonomy?

507.    Mr Mercer said (Day 10/40:10-10/41:31) that Deloitte had discussed the Q2 10 transactions with [Autonomy] and had received assurances that they understood the revenue recognition rules.   Deloitte points out that there had only been one deal of any significance with a VAR in Q2 10.   It says that the correct response was to put down another marker in the Q2 10 Report to the Audit Committee part of which we have quoted at para 494 above.   The report also said:

> "*In our Q1 2010 report we highlighted that significant evidence of such further revenue reversals may jeopardise [Autonomy's] ability to recognise revenue at the point of sale to the reseller….*
>
> *We note that [Autonomy] has responded to the concerns raised in Q1 2010 where for the first time we noted instances where deals had been credited and re-sold directly to end users.   If Autonomy is required to maintain ongoing managerial duties in respect of reseller deals or if the reseller cannot demonstrate its ability to pay for the goods received then it would not be appropriate to recognise revenue on delivery of the product…*"

508.    In summary, Deloitte submits that it did everything that was required of an auditor conducting the Q2 10 review.   The revenue recognition work was a matter of judgment. It contends that there is no basis for saying that the judgment it reached was unreasonable, still less so unreasonable as to amount to Misconduct.

## (L)    Conclusion on Q2 10 review

509.    The concerns raised and the facts disclosed by the two A10 emails were important and should have led Deloitte to seriously question Autonomy's revenue recognition policy with respect to the VARs.   When Deloitte learnt from A10 that the TP5/TP7 Agreement had now gone direct, this should have troubled Mr Knights.   He knew that D10 had said that he expected that this transaction would go direct and had concerns that Autonomy was using VAR sales to accelerate revenue.   He knew that A10 had asked Deloitte to consider whether the communications between Autonomy and TP7 called into question whether revenue under the TP5/TP7 Agreement was correctly recognised in FY 09: see para [486] above.

510.    Deloitte had told the Audit Committee in its Q1 10 report that any further evidence of revenue reversals might jeopardise Autonomy's ability to recognise revenue at the point of sale to the VAR.   We do not accept Deloitte's submission (see para [503] above) that

the TP5/TP7 transaction did not fit into the pattern of cancellations and reversals.  The fact that the direct deal did not precisely match the original Autonomy/TP5 deal is immaterial to the revenue recognition issue and was understood to be immaterial by Deloitte at the time.  Deloitte reported the direct deal to the Audit Committee by saying that "*a $6m licence deal originally with the reseller TP5 from Q4 2009 was signed directly with the end user*".   It is clear that the original deal between Autonomy and TP5 was in substance replaced by the direct deal between Autonomy and TP7.

511.  A10 also asked Deloitte and the Audit Committee to "*consider the multiple similar reseller transaction[s] recognized as revenue from 2008 through Q1 2010*": see para [486] above.  So A10 was raising questions about reseller deals more generally, and not only by reference to the TP5/TP7 Agreement.

512.  Deloitte also found out during Q2 10 that the TP24/TP20 deal had gone direct.  This was another transaction which was listed "*Revenue too early*" in D10's spreadsheet prepared in Q1 10.  There were now five deals that had gone direct, but Deloitte did not ask why this had occurred. The pattern that was emerging in Q2 10 was of existing clients of Autonomy, with no stated reason for using a VAR, going direct where the only evidence of negotiations was of direct dealings between the end-user and Autonomy.

513.  Deloitte's response to A10's six questions was set out in Appendix 3 to its Q2 10 report to the Audit Committee (see para [494] above).  The Executive Counsel submits that its response was inadequate because:

(i)    Deloitte accepted (without corroboration) the [Autonomy] assertions that (a) the "*key feature that TP5 was able to offer to TP7 was an ongoing partner/ servicing arrangement*" and (b) Autonomy had remained involved "*with the transaction between TP5 and the end user*", despite A10 attaching SMS records which evidenced discussions between Autonomy and TP7 alone;

(ii)   It did not investigate (a) the possibility of a side agreement between TP5 and Autonomy, (b) the fact that there was no input from TP5 in the sale to TP7, or (c) whether TP5 was in fact able to pay the debt in Q4 09, given the comments of

A10 and TP11 (see para [485] above). Evidently the VAR had never signed a deal with the end user, nor was there any suggestion that it was ever likely to have done so; and

(iii)   Mr Mercer said (para 196 of his first witness statement) that he did not consider this reported conversation between A10 and TP11 to be evidence that TP5 was not obliged to make this payment. He imagined that A10 would have spoken to TP11 in his debt collection capacity (as he had no responsibility for revenue accounting) and TP11 was merely saying that payment might be delayed, as frequently happens in commerce. Deloitte knew that TP5 was a regular partner of Autonomy and considered that it was very unlikely that TP5 would choose to renege on a contractual       obligation to Autonomy.   But although A10's conversation with TP11 *might* have merely been about debt collection, there was a good chance that it was *in fact* about a side agreement between [Autonomy] and TP5. Deloitte did not ask this question, which they should have done.

514.   We consider that the Executive Counsel's submissions are well-founded.  We would add that Deloitte's Appendix 3 Response placed too much weight on the fact that "*[a]lthough TP7 have subsequently chosen to transact directly with Autonomy in June 2010, does not detract (sic) from the fact that Autonomy contracted directly with TP5 in December 2009*".  If the mere fact that Autonomy had entered into a contract with a VAR during the quarter in which the revenue was expected from that contract were a decisive or even a powerful reason for recognising the revenue in that quarter, IAS 18 para 14 would be a dead letter.  In the circumstances of this case, including the A10 emails and the pattern of reversals and direct deals and D10's warnings in the D10 email, the existence of the contract was merely the starting point for a proper investigation with appropriate scepticism.  Of itself, it was only one of many factors and one to which, in our view, Deloitte should have given little weight.

515.   D10 admitted (Day 14/44:15-14/45:2 and Day 14/50:22-25) that he did not know why the two deals had gone direct in Q2 10 but said "*it wasn't really our concern*".  His view was that Deloitte had accepted revenue in 2009, and any other facts post-period end could not change that. We do not accept that this was an appropriate approach because (i) post-period end facts could well provide evidence of what the position was at the

point of sale in 2009; and (ii) the only sensible way of testing whether Autonomy had retained continuing managerial involvement was to compare the position before and after its sale to the VAR, which necessarily required considering events after the sale.

516.  [Autonomy] had told Mr Knights in an email sent on 27 June 2010 in relation to A10's questions that A3 (of Autonomy's Audit Committee) "*would only like to focus on material matters*".   In an email sent on 28 June 2010 to Mr Mercer, Mr Knights characterised this as "*the instruction from [Autonomy]*".  The materiality guideline for FY 09 was $20 million.  D10 said at paras 447 and 452 of his first witness statement that he was told on or about 5 July 2010 that the primary concern was to determine "*whether the points raised had a material impact on the accuracy of the 2009 annual financial statements*" and that Deloitte's draft responses to A10 "*noted that the [TP5/TP7] transaction was immaterial*".  Deloitte's conclusion in its Q2 10 Report to the Audit Committee on the TP5/TP7 Agreement was that this deal was not material to the FY 09 results.

517.  By (i) focusing only on transactions for $20 million or more in response to [Autonomy's] instruction, (ii) not considering the other transactions mentioned in the First A10 Email which were similar to the TP5/TP7 transaction and (iii) not considering the implications for recognising revenue under reseller transactions in the future, Mr Knights' and Deloitte's conduct fell significantly below the standards reasonably to be expected of a Member Firm and a Member and amounted to Misconduct. The implementation of  [Autonomy's] *instruction* to focus on material matters also betrayed a lack of objectivity on the part of Mr Knights which we discuss further when we address Allegation 5.  The proper focus of Deloitte's investigation was a matter for Mr Knights' judgment and not client instruction.  We should add that, if the materiality of a transaction was determinative of the question whether to recognise the revenue that would flow from it, the concerns expressed by D10 in the D10 email could easily have been disposed of; and it would have been a complete answer to D10's note against various transactions mentioned in his spreadsheet ("*Revenue too early*") none of which was worth $20 million.

518.  There were other failures on the part of Deloitte to investigate the TP5/TP7 and TP18/TP25 transactions in response to A10's emails.   As regards the TP5/TP7

transaction, Mr Knights (Day 7/132:8-13) accepted that one possible interpretation of what A10 said in his first email about a conversation he had had with TP11 was that there had been a side discussion between [Autonomy] and TP5.  But no-one from Deloitte contacted A10 or TP11 to explore whether there was such a side agreement.

519.  A10 made clear that he had seen no evidence that TP5 had had any involvement in the onward sale to TP7.  Mr Knights conceded (Day 7/133:9-12) that Deloitte had not focused on whether Autonomy's negotiations with TP7 involved TP5.  A10 now told Deloitte that they had not.  This new information raised a risk that the deal between Autonomy and TP5 had no commercial substance.  But this was not investigated by Deloitte.

520.  The First A10 Email raised two clear pieces of evidence that it may not have been probable at the point of sale in FY 09 that TP5 could pay the debt due to Autonomy and that payment was contingent on receipt of payment from TP7.  First, TP11 told A10 that "*the TP7 deal had not closed in Q4 2009 and that he would not be able to make payment until the TP7 [sale] closed and he had received payment from TP7*".  Secondly, A10 explained that the direct Autonomy/TP7 Agreement included a clause which enabled Autonomy to put TP5 in funds to pay the debt it owed Autonomy.

521.  It was clear from the First A10 Email and the direct Autonomy/TP7 Agreement that there were differences between the original Autonomy/TP5 Agreement and the direct Autonomy/TP7 Agreement.  For example, the software licensed directly to TP7 had fewer users and was 10% cheaper than that licensed to TP5.  It also had a minimum four-month period of acceptance testing by TP7, which only began once Autonomy had completed the implementation, installation, setup and configuration of part of the software licensed to TP7. These continuing negotiations suggested that Autonomy retained continuing managerial involvement in the sale after Q4 09.

522.  Finally, the Second A10 Email shows that D10 was wrong to speculate in cross-examination (Day 14/36:18) that TP5 delivered the software to TP7.  A9 made clear in his email to A10 sent on 7 July 2010 that it was Autonomy that had shipped the software to TP7.

523.    A10 referred to both the TP18/TP25 and the TP24/TP6 Agreements in the First A10 Email.  They had both been described by D10 as "*Revenue too early*" in his spreadsheet in Q1 10.  A10 had said that neither of these deals had a committed end-user in place, and they "*may be a placeholder for an agreement to be negotiated subsequent to the invoice date*" (the invoice date for both was 31 March 2010).  This raised questions about Autonomy's ongoing managerial involvement in these sales, suggesting that the sale to the VARs lacked commercial substance while Autonomy continued to negotiate directly with the end-user.  Deloitte did not investigate these matters.

524.    A10 had sent Deloitte a spreadsheet which contained comments on overdue debts, which recorded that [Autonomy] had said that the revenue on the TP25 Agreement "*will not be paid….for quite some time*".  This suggested that it might not have been probable in Q1 10 that Autonomy would receive the economic benefit from the sale.  The significance of this statement does not seem to have been considered by Deloitte.

525.    The fact that the spreadsheet recorded that TP5 and TP18 did not have end-users for many licences they had bought from Autonomy suggested that it would have been appropriate for Deloitte to approach deals with them with a heightened degree of professional scepticism, because they might have been unable to pay their debts without first receiving payments from the end-user.

526.    Nor did Deloitte test whether there was an agreement in place between the VAR and the end-user, or whether Autonomy was continuing to negotiate directly with the end-user.

527.    More generally, Mr Knights' evidence (para 327 of his first witness statement) was that his approach to the First A10 Email was coloured by the fact that it made no allegations of fraud, impropriety or financial irregularity, but instead focused on accounting questions.  If that really was his view, he plainly misinterpreted the email.  To be fair to Mr Knights, the Deloitte's response in Appendix 3 to the Q2 10 report to the Audit Committee purported to consider whether the IAS 18 para 14 criteria had been met.  But its focus on the existence of a contract between Autonomy and the VAR and on the materiality issue deflected Mr Knights and Deloitte from responding to A10's emails

with the appropriate degree of professional scepticism and exploring the questions to which we have referred above.

528.   A10 expressly used the words "*may be a placeholder for an agreement to be negotiated subsequent to the invoice date*" to describe sales which D10 had previously flagged as "*Revenue too early*", i.e. the TP18/TP25 and TP24/TP6 Agreements.   A10 was suggesting that Autonomy's deals may have been "parked" with these VARs while Autonomy continued to negotiate with the end-user. It should have been a matter of great concern to Deloitte, Mr Knights and Mr Mercer that by the end of Q2 10, five transactions between Autonomy and VARs had gone direct.   A clear pattern had emerged.

529.   Deloitte had told the Audit Committee in its report for Q1 10 "*any further evidence of revenue reversals may jeopardise [Autonomy's] ability to recognise revenue at the point of sale to the reseller*".   In Q2 10, Deloitte became aware of evidence of two further revenue reversals.   And yet in its Q2 10 report to the Audit Committee, it said: "*As a result of our work in this area we have not proposed any adjustments to revenues or receivables, but we will continue to focus carefully on this area in future reviews and audits*".   For the reasons that we have given, the work done by Deloitte fell short of the standards reasonably to be expected of an auditor.   The warning it gave in its Q1 10 report should have been followed in the report for the following quarter by a clear statement that the revenues should not have been recognised.   The continuing policy of "wait and see" was inadequate.

530.   We have earlier noted (para [483] above) that in its report to the Audit Committee on the Q2 Interim Review dated 19 July 2010, Deloitte stated that in its previous report it had said that any "*significant*" evidence of further revenue reversals may jeopardise [Autonomy's] ability to recognise revenue at the point of sale to the reseller.   The previous report did not include the word "*significant*". Its introduction in the later report must have enabled Deloitte to feel more comfortable about not making adjustments to revenues or receivables despite the reversals.   In our judgment, Deloitte should have stuck to its guns and applied the approach it set out in the Q1 10 report.   It had no grounds for not doing so.   In any event, we consider that the two further revenue reversals (the fourth and fifth) did amount to significant evidence of revenue reversals,

especially when viewed against the background of the two A10 emails, the D10 email and D10's 7 April 2010 spreadsheet. A pattern of reversals was emerging as had been predicted by A10 and D10.  It had obvious serious implications for revenue recognition to which Deloitte should have reacted firmly.  It failed to do so.

531.   In our opinion, Deloitte and both Mr Knights and Mr Mercer were responsible for the Q2 10 review because, although Mr Knights had been replaced by Mr Mercer as the Engagement Partner, Mr Knights continued to be heavily involved and by his actions assumed responsibility for the review work in this quarter.

532.   For all the reasons that we have given, the conduct of Mr Knights fell seriously below that reasonably to be expected of an auditor and amounted to Misconduct. As the Engagement Partner, Mr Mercer had overall responsibility for the work done in this quarter and for substantially the same reasons as the conduct of Mr Knights, his conduct also fell seriously below that reasonably to be expected of an auditor and amounted to Misconduct.

**(M)   Q3 10 Review**

533.   The relevant developments in Q3 10 were:

(i)   Autonomy, TP24 and TP6 entered into a tripartite agreement in respect of a transaction that had been concluded between Autonomy and TP24 in Q1 10 (the "TP24 / TP6 Agreement", a further transaction within the Executive Counsel's sixth "red flag"); and

(ii)   Autonomy sold a software licence to TP5 for a fee of $9 million for the end-user TP2 ("the TP5 / TP2 Agreement") and the revenue was recognised by Autonomy.

534.   Deloitte's case generally is that the review work was subject to ISRE 2410 and that the work it did went beyond what was required.

535.   At the Q3 10 Planning Meeting and Fraud Discussion, Deloitte again identified the possibility of sales made direct to end users following a VAR transaction as a significant risk (rolled forward from Q1 10).  With reference to deals where Autonomy initially

sold through a VAR and then signed up directly with the end user, they stated that they needed to ensure they were satisfied on the revenue recognition criteria. They recorded that they did not expect such direct replacement sales to continue. Q3 10 was the fourth quarter in a row in which this is exactly what occurred.

536.   Autonomy had sold a software licence for TP6 through TP24 on 31 March 2010: see para [453(ii)] above. It subsequently completed a direct sale of storage cells (hardware with embedded software) to TP6 with effect from 10 August 2010. It entered into a three-party agreement with TP24 and TP6 which provided that (i) Autonomy would deliver TP6's purchase order to TP24, which would process and facilitate delivery of the products to TP6; and (ii) Autonomy would receive payment from TP6 "*on behalf of*" TP24, and would be responsible for paying those fees to TP24.

537.   When Deloitte discovered this deal, it sought an explanation from [Autonomy]. Its consideration of this transaction appears in workpaper Q3 10 5351 which included:

> "*These balances have not been paid directly by TP24, but have been settled by TP6 for the following reasons:*
>
> *TP24 had not traded with TP6 before, and TP6 are very strict about only trading with approved suppliers. The processes to become an approved supplier takes a long time, and so it would not have been possible to make TP24 an approved supplier before the due date on the invoice owed to Autonomy.*
>
> *Autonomy is however an approved supplier of TP6, and so a 3 party agreement was created whereby TP6 would transact directly with Autonomy and settle the gross debt with them, bypassing TP24. In the process, the debtor from TP24, which is aged here, would be forgiven.*"

538.   The Executive Counsel submits that this was, for all practical purposes, the replacement of a software sale to TP24 (in Q1 10) with a hardware/software sale to TP6 (in Q3 10) which fitted the pattern of reversals of VAR deals followed by direct deals with the end-user that D10 had identified in his 7 April 2010 spreadsheet. He had shown in the spreadsheet the $5.5 million sale by Autonomy to TP6 on 31 March 2010 as the first item in the list of six "*Deals done in Q1 2010 through key resellers*" saying about it in the "*Notes*" column "*Revenue too early*".

539.   She submits that the pattern did not merely lie in the fact that it was a further deal with a VAR that had gone direct, but it also had other shared characteristics with other VAR deals:

(i)     TP6 was a longstanding direct customer of Autonomy's;

(ii)    Deloitte's original Q1 10 workpaper had not identified any reason for Autonomy using a VAR;

(iii)   The deal with TP24 had been made on the last day of the quarter; and

(iv)    TP6 was not willing to contract with the VAR.

540.   Deloitte submits that the TP24/TP6 transaction did not fit the pattern for which the Executive Counsel contends.  It was a one-off tripartite processing agreement pursuant to which (i) TP24 would process and fulfil TP6's order for the software, (ii) TP6 would pay Autonomy, and (iii) Autonomy would receive and process payment on behalf of TP24.  Deloitte points out that D10 had considered in Q1 10 whether the TP24/TP6 transaction might be part of an emerging pattern and that is why he included it in his spreadsheet; but it relies on the fact that D10 said in evidence (Day 14/61:7) the transaction had not been replaced by a direct deal between Autonomy and TP6: it was "*quite a different set of circumstances*".

541.   Accordingly, Deloitte says that its statement in the Q3 10 Audit Committee report dated 17 October 2010 that "*no value added reseller deals have been reversed this quarter and resigned directly with the end user*" was entirely correct.

542.   We accept the Executive Counsel's submissions and do not accept D10's characterisation of the tripartite agreement.  It is true that the later agreement was tripartite in form, whereas the earlier one was not.  But this difference was not material to whether the sums payable under the Q1 10 TP24 / TP6 Agreement should have been recognised in Q1 10.  The essential point was that TP24's obligation to pay Autonomy under the earlier agreement was replaced by TP6's obligation to pay Autonomy under the tripartite agreement.  As to that, Deloitte's Q3 10 debt workpaper was explicit that

the effect of the tripartite agreement was not that TP24's debt would be paid, but that it would be forgiven and Autonomy would receive payment on its direct sale instead, "*bypassing*" TP24:

> "*TP24 had not traded with TP6 before, and TP6 are very strict about only trading with approved suppliers. The processes to become an approved supplier takes a long time, and so it would not have been possible to make TP24 an approved supplier before the due date on the invoice owed to Autonomy.*
>
> *Autonomy is however an approved supplier of TP6, and so a 3 party agreement was created whereby TP6 would transact directly with Autonomy and settle the gross debt with them, bypassing TP24. In the process, the debtor from TP24, which is aged here, would be forgiven*".

543. It is true that Autonomy sold different things under the two agreements: the TP24/TP6 Agreement was for a software licence (to be delivered via electronic delivery) and the tripartite agreement was for storage cells (hardware with embedded software) to be delivered and installed at TP6's data centres[…].  But the essential point is that the revenue due from TP6 to Autonomy under the tripartite agreement was treated by the three parties to that agreement as a replacement for what was owed by TP24 to Autonomy; and Autonomy wrote off TP24's debt.

544. Consistently with these arrangements, Autonomy did not collect the revenue from the original sale, but on making the subsequent sale to TP6, forgave the debt owed by TP24. This called into question whether, from a commercial point of view (as opposed to a legal perspective), the risks and rewards of ownership of the licence had transferred to the VAR in the original sale.

545. In our view, Deloitte was wrong to tell the Audit Committee in Q3 10 that no Autonomy deal with a VAR had been reversed and replaced by a direct deal with the end-user in that quarter.  It is to be noted that A10 had specifically flagged the sale to TP24 in Q1 10 as a sale where the end-user "*may be a placeholder for an agreement to be negotiated subsequent to the invoice date*".

546. On 30 September 2010, Autonomy concluded the TP5 / TP2 Agreement.  The software sold included Digital Safe.  The licence contained a clause which provided that, if TP2 had failed to issue an order within 90 days, TP5 could transfer the licence to a different

*Edited for publication*

user within 12 months.  If Autonomy had not recognised revenue from this agreement, it would have fallen short of pre-announced revenues by more than $4 million.

547.    The Executive Counsel submits that this clause ("the Alternate End User clause") was unusual and merited heightened scepticism.  Deloitte's view at the time is reflected in its workpaper Q3 2010 8130a "*Revenue deals over $1m Q3 2010*":

> "*This clause gives TP5 some flexibility to find an alternative end user in the evnet [sic] of failing to reach an agreement with TP2. We are aware that in the past on two occasions, TP5 signed deals with Autonomy but then had to cancel the deal due to its failure to reach an agreement with end users, because at that time, TP5 didn't have such flexibility to source another end user. Therefore this added clause gives us some comfort that TP5 don't have to cancel the deal even though it fails to reach an agreement with TP2*".

548.    Deloitte concluded that this clause materially lowered the risk of non-payment from TP5.  But the Executive Counsel says that it would be rare for two end-users to be in the market for an identical software licence with identical specifications and restrictions and there was no evidence that there was a market for a $9 million licence for Digital Safe.  Deloitte and Mr Mercer should have sought clear evidence that there was an existing agreement between TP5 and TP2 (or at least the likelihood of such a deal) or that the software was marketable to an alternative end-user.  They did not do so.

549.    It is unclear whether they believed that such an agreement existed or whether one did not in fact exist.  Deloitte's workpaper Q3 2010 8130a relied on TP2's financial position when assessing the recoverability of the debt, which assumed that there was a deal between TP5 and TP2. But the workpaper also relied on TP5's ability to sell the software to a different end user.

550.    The deal also shared characteristics of previous VAR sales which had gone direct. TP2 was an established direct customer of Autonomy; there was no suggestion that TP5 would be adding anything to the sale; and Deloitte had no evidence that a deal had been or would be concluded.  Autonomy had made two sales to TP5 followed by direct sales in the last three quarters alone.  A lack of negotiations between TP5 and TP2 might have indicated continuing managerial involvement by Autonomy or a failure to transfer the risks and rewards of ownership of the licence.

551.   Deloitte nonetheless concluded that the sale met the requirements of IAS 18 para 14, although it gave insufficient consideration to whether TP5 was acting purely as agent or whether the deal was backed up by commercial substance, particularly in the light of the Alternate End User clause.

552.   Deloitte concluded that the debt was recoverable from TP5, despite the fact that it was small and thinly-capitalised and had existing debts to Autonomy of $22 million, $3 million of which was overdue.  Deloitte needed further evidence before concluding that it could pay without first being paid by TP2.

**(N)   Conclusion on Q3 10**

553.   We repeat the answer we have earlier given to Deloitte's general point that the work was subject to ISRE 2410 standards.  It purported to apply the revenue recognition criteria set out in IAS 18 para 14 in order to facilitate its year end audit work.  In these circumstances, our view is that its work must be judged by reference to those revenue recognition criteria.

554.   As regards the TP24/TP6 transaction, we repeat paras [533] to [545] above.  This was the latest in the series of sales to VARs previously recognised as revenue that had been cancelled, written off or replaced by a direct deal with the end-user:  TP4/TP9 (Q2 09), TP5/TP14 (Q4 09), TP18/TP19 (Q1 10), TP18/TP15 (Q1 10), TP5/TP7 (Q2 10) and TP24/TP20 (Q2 10).   The forgiving of TP24's debt should have been particularly troubling to Deloitte because the TP24/TP6 Agreement had been flagged up in the First A10 Email.  It called into question whether from a commercial perspective the risks and rewards of ownership of the licence had transferred to TP24 in the original sale.  Despite this, Deloitte told the Audit Committee that no VAR deals had been reversed and re-signed directly with the end-user in this quarter.  There was no basis for this statement and it should not have been made.

555.   As regards the TP5/TP2 Agreement, this should have been identified by Deloitte as a potential continuation of the pattern.  It was a sale to TP5, one of the "key resellers" mentioned by D10 in his 7 April 2010 spreadsheet and in relation to which the TP5/TP14 and TP5/TP7 Agreements had now gone direct.  For that reason alone,

Deloitte and Mr Mercer should have applied a high degree of professional scepticism to the TP5/TP2 Agreement.  To this should be added the following points made by the Executive Counsel which we accept:

(i)     The sale to TP5 for TP2 for $9 million was twice the level of quarterly materiality of $4.3 million;

(ii)    Without the revenue from the sale to TP5, Autonomy would have reported results of $202 million rather than $211 million i.e. well below the range of $206 million to $211 million which it had given at the Q2 10 earnings call on 22 July 2010;

(iii)   Like TP14, TP7, TP19, TP20 and TP6, TP2 was an established direct customer of Autonomy; and

(iv)    There was no evidence that TP5 had been involved in negotiations with TP2.

556.    The Alternate End User clause was a further ground for concern.  Deloitte conducted no procedures and obtained no evidence to support its assertion that this clause provided additional comfort.  In fact, the clause recognised that there was a risk that TP2 might not buy the licence from TP5.  Any reasonable reviewer would have appraised this risk by seeking evidence of the likelihood of a deal between TP5 and TP2 and considered the likelihood of an on-sale to a different end-user in the event that there was no deal between TP5 and TP2.  Deloitte and Mr Mercer did neither.

557.    As the Executive Counsel points out, there were strong indicators against the feasibility of an alternate on-sale which any critical assessment would have noted:

(i)     Despite the previous history of direct sales, there was no instance of a request to Autonomy for permission to sell the licence to a different end-user having been made; and

(ii)    The $9 million licence was of an order of magnitude far greater than the average Autonomy selling price.

558.    We accept the submission of the Executive Counsel that, in these circumstances, there was an obvious risk that revenue from other transactions with VARs was being incorrectly recognised and Deloitte should have amended their audit and/or review procedures to consider the problem more widely.  But it did not do so.

559.    As regards the assessment of collectability and whether TP5 had the ability to pay for the $9 million licence without first receiving payment from TP2, Deloitte and Mr Mercer downplayed the scale of the problem.  In its workpaper 8130a, it presented TP5's overdue debts of $3 million in the following way: "*Our review of the debtors ledger highlights that there is totally $22m debt due from TP5 as at 30 Sept. 2010, of which $19m is not over due yet*".

560.    $450,000 of this $3 million overdue debt related to the sale of a licence to TP5 for the end user TP8, which should have been paid by 30 April 2010 but which was 5 months overdue by 30 September 2010. $2.6 million was overdue on the TP5/TP7 Agreement, which should have been paid on 31 March 2010 and was therefore 6 months overdue. So the debt was significantly overdue.

561.    Under the TP5/TP2 Agreement, TP5 was due to pay $945,000 within 30 days and $4,252,500 within 90 days. The Alternate End User clause gave it the right to sub-licence to an alternative end user if TP2 did not issue a contract or order within 90 days. It was therefore contemplated that there might not be any interval between TP5 having to pay the $4,252,500 and its becoming entitled to license the software to an alternative end user (if it could find one). This emphasised that, unless the $9 million licence was readily saleable, the collectability of the revenue if TP2 did not contract with TP5 was dependent on TP5's own resources, which Deloitte had inadequately considered: the workpaper did not refer to external evidence which might support TP5's financial position and whether it had the ability to pay for the software licences without first receiving payment from the end user.

562.    As to whether TP2's financial strength increased the probability of economic benefits flowing to Autonomy from Autonomy's sale to TP5, the workpaper included no consideration of why TP2 would want to make the purchase through a VAR.

563.   For all these reasons, Deloitte and Mr Mercer fell seriously short of the standards reasonably to be expected of an auditor conducting a review by reference to the requirements of IAS 18 para 14.  They were culpable of Misconduct.

**(O)   Q4 10 /FY 10 audit**

564.   The allegations are that:

    (i)   Deloitte and Mr Mercer failed to ensure that the audit file for FY 10 contained sufficient appropriate audit evidence to enable an experienced auditor to understand the structure of a $23.5 million software licences deal sold to TP3, the audit work undertaken on the transaction and specifically how the individual components and amounts related to the transaction were ultimately recorded in the financial statements (Allegation 2.3);

    (ii)   Deloitte and Mr Mercer failed to exercise sufficient professional scepticism in relation to the TP3 transaction (including the unwinding of the TP5/TP2 transaction) and to obtain sufficient appropriate audit evidence in relation to it; and

    (iii)   Deloitte and Mr Mercer failed to update the Q1 10 workpaper on the TP18 / TP25 Agreement which had recorded that "*there are no indicators that this deal with TP18 is not recoverable*".  They should have done so.

565.   It will be necessary to consider some of the detail of the TP3 transaction, but at this stage the following will suffice to set the scene.  In FY 10, Autonomy recognised revenue in respect of three transactions comprising part of the TP3 transaction, namely the $7 million TP24 transaction (wrongly described in Deloitte's workpapers as a $9 million transaction), the $3.5 million TP24 transaction and the $1.6 million TP5/TP16 transaction.  Deloitte was also informed that Autonomy had received a letter from TP5 requesting Autonomy's agreement to TP5 selling or "re-assigning" the $9 million licence that it had purchased for TP2 in Q3 10 (under the TP5/TP2 Agreement) to TP3.  This was the fourth element of the overall TP3 transaction, but it did not in the event happen until Q1 11.

*Edited for publication*

**(P)     The audit file on the TP3 Transaction (Allegation 2.3)**

566.  ISA 230 "*Audit Documentation*" provides: (emphasis added)

> *"Objective*
>
> 5.     The objective of the auditor is to prepare documentation that provides:
>
>> (a)     **A sufficient and appropriate record of the basis for the auditor's report**; and
>>
>> (b)     Evidence that the audit was planned and performed in accordance with ISAs (UK and Ireland) and applicable legal and regulatory requirements.
>
>> ...
>
> *Requirements*
>
> ...
>
> Documentation of the Audit Procedures Performed and Audit Evidence Obtained
>
> Form, Content and Extent of Audit Documentation
>
> 8. The auditor shall prepare audit documentation **that is sufficient to enable an experienced auditor, having no previous connection with the audit, to understand**: (Ref: Para. A2-A5, A16-A17)
>
>> (a)     The nature, timing and extent of the audit procedures performed to comply with the ISAs (UK and Ireland) and applicable legal and regulatory requirements; (Ref: Para. A6-A7)
>>
>> (b)     The results of the audit procedures performed, and **the audit evidence obtained**; and
>>
>> (c)     **Significant matters arising during the audit, the conclusions reached thereon,** and **significant professional judgments made in reaching those conclusions**. (Ref: Para. A8-A11)".
>
> ...
>
> Application and Other Explanatory Material
>
> ...
>
> A5. Oral explanations by the auditor, on their own, do not represent adequate support for the work the auditor performed or conclusions the auditor reached, but may be used to explain or clarify information contained in the audit documentation".

567.  Mr Mercer accepted that the diagram in the "*Memo: Structure of TP3 Deals in Q4 2010*" workpaper ("the TP3 workpaper") was incomplete and in what it did say "*unfortunately, some of the numbers weren't quite right*" either (Day 11/9:14-17 and Day 11/14:15-16). D10 also accepted that there were inaccuracies in the workpapers (first witness statement paras 385 and 398).

568.  Mr Coates' report (paras 14.6 and 14.7) accepted that there were "*a number of errors within the working papers and the report to the audit committee*" and that the working papers alone were insufficient to understand the work undertaken. He said that, in order for an experienced auditor to understand the work undertaken, it had also been necessary for him to consider the explanations given by Mr Mercer and D10 in their witness statements.  Para A5 of ISA 230 permits the use of oral explanations to clarify audit documentation in complex transactions (such as the TP3 transaction).   Mr Coates concluded (at para 14.9) that, when the working papers and the explanations contained in the witness statements were considered together, it was possible for an experienced auditor to understand the audit work undertaken by Deloitte.

569.  In addition to relying on the explanations contained in the witness statements of Mr Mercer and D10, Mr Coates also stated (Day 21/20:16-19), that the errors in the audit documentation were merely typographical ("*only a small number of typos on the workpapers, but, unfortunately it was with a couple of the numbers and, unfortunately, you couldn't easily follow it through with the numbers not tying across*").

570.  The Executive Counsel submits that:

(i)    the scale of the errors went well beyond a few typographical mistakes; and

(ii)   in any event the test is whether the audit documentation is sufficient to enable an experienced auditor, having no previous connection with the audit, to understand the results of the procedures performed and the evidence obtained. Oral explanation and clarification cannot redeem a file which is incomprehensible as it stands.

571.    Deloitte submits that, although the diagram in the TP3 workpaper was incomplete, it was an outline of the deal based on the information available to it at the time. The diagram was not the full picture, as there was narrative that followed it. But, taken as a whole, the workpaper explained the overall rationale for the deal and Deloitte then tested the constituent transactions in separate revenue-recognition workpapers. Regard should also be had to the updated version of the TP3 workpaper which contained comments from D10 on 25 January 2010 evidencing the development of Deloitte's understanding of the transaction as the audit progressed.

572.    In short, Deloitte submits that the admitted errors in the figures were not material and did not undermine the clarity of the audit work. The components of the overall transaction and its four parts were fully and properly audited.

573.    It is not in dispute that this was a complex transaction. At paras 460 to 468 of her Closing Submissions, the Executive Counsel has analysed the descriptions of the structure and commercial rationale of the transaction in the TP3 workpaper, the workpapers written in respect of its constituent parts and the Report to the Audit Committee dated 26 January 2011. She submits that the workpapers were incoherent and incomplete.

574.    We do not find it necessary to consider all of the points made by her on the details of the transaction. It is sufficient for present purposes to note that the structure diagram contained in the TP3 workpaper omitted two elements of the deal, namely (i) a sale to TP24 for $3.5 million and (ii) the reassignment of the $9 million TP5/TP2 licence to TP3. The Executive Counsel submits that the structure of the transaction as a whole could not be properly understood without these elements being included.

575.    In our view, there is no answer to this submission unless it is legitimate to have regard to what is said in the witness statements of Mr Mercer and D10. Mr Coates accepts that. We do not consider that para A5 of ISA 230 can be invoked to make good these major omissions. The focus of ISA 230 para 8 is on the "*audit documentation*" which is required to be sufficient to enable an experienced auditor, having no previous connection with the audit, to understand it. If major omissions could be made good by oral explanation or clarification, ISA 230 para 8 would be undermined and serve no

useful purpose.  The focus would not be on the audit documentation and that would defeat the evident purpose of the provision.  In our view, the object of para A5 is to permit recourse to explanation or clarification of something that is not clear in the documentation; it does not permit making good major omissions from the documentation.

576.   We should add that the updated version of the TP3 workpaper dated 25 January 2011 which included D10's comments did not make good these omissions.  Since this version was not included in the Audit File, we do not in any event see how it helps Deloitte.

577.   We conclude, therefore, that the documentation requirements set out in ISA 230 para 8 were not satisfied and that Deloitte and Mr Mercer fell short of the standards of competence in relation to documentation reasonably to be expected of an auditor.  But we do not consider that the failings were so serious as to amount to Misconduct.

**(Q)   Did Deloitte and Mr Mercer fail to exercise sufficient professional scepticism in relation to the TP3 transaction and the TP5/TP2 unwind and to obtain sufficient appropriate audit evidence?**

578.   The Executive Counsel submits that:

(i)     The TP3 transaction in Q4 10 had a total value of $23.1 million or alternatively $23.5 million and was quantitatively material to the FY 10 audit;

(ii)    There were by this time powerful reasons to be concerned as to the commerciality of the deals with TP5 and TP24 which were component parts of the TP3 transaction;

(iii)   Deloitte failed to give sufficient and critical consideration to whether it was probable that Autonomy and TP3 would transact directly for the licences sold to TP5 and TP24, despite preparing a workpaper which said that if this was probable, those sales would not meet the requirements of IAS 18 para 14; and

(iv)    Deloitte failed to give sufficient and critical consideration to whether the Autonomy/TP2 transaction made commercial nonsense of the suggestion that TP5

had bought a licence for TP2 in Q3 10 but was now proposing to assign that licence to TP3.

579.   As regards the submission recorded at para [578(i)] above, it is unnecessary to decide whether the correct figure is $23.1 million or $23.5 million, since either way the transaction was in excess of quantitative materiality for FY 10 which was $22.5 million. We reject Deloitte's argument that the TP3 transaction was not material.  It was largely based on the unsustainable proposition that the $9 million TP5/TP2 licence was excluded.  As D10 said (para 389(d) of his first witness statement), the TP5/TP2 licence was "*to be re-assigned to TP3*" as one of "*the components of the deal*".  It also flies in the face of the fact that the TP3 transaction was the first item on the agenda for the 12 January 2011 audit planning meeting.

580.   We propose to take the submissions summarised at para 578 (ii) and (iii) together, because they are interrelated.  The Executive Counsel contends that there were several reasons for Deloitte to be concerned about the TP3 VAR deals.

581.   First, TP3 was an established customer of Autonomy, having purchased software, hardware or other services from Autonomy many times in 2009 and 2010 alone, paying about $30 million.

582.   Secondly, the revenue from the TP3 deal was necessary in order to meet analysts' consensus expectation of revenue for FY 10 of $870 million.  Autonomy announced its revenues for the year on 1 February 2011 as $870 million "*in line with analyst consensus estimates*".

583.   Thirdly, Deloitte was aware of the sensitivity of Autonomy's share price to revenue expectations, including that when on 6 October 2010 Autonomy had announced a 3% revenue reduction to its full year model, the share price had fallen by 20% overnight.

584.   Fourthly, Deloitte was told at the audit planning meeting on 15 December 2010 that Autonomy had an outstanding deal for $20 million for TP3.  Its workpaper Q4 2010 8130b "*Revenue deals over $1 million*" included references to negotiations with TP3

being ongoing: "*we understand per our discussions with [Autonomy] that cash from the TP3 deal will be forthcoming very soon once the whole deal closes*".

585.    Fifthly, Deloitte knew that TP5 and TP24 had been introduced into the TP3 deal as "*middle men*" so that Autonomy could gain "*significant revenue and profit inflows*" in 2010 rather than 2011.  The 8130b3 workpaper "*Memo: Structure of TP3 deals in Q4 2010*" referred to Autonomy approaching TP5 and TP24 to discuss with them "*whether they would be happy to be the 'middle men' for this deal, and sign for some of the discrete elements prior to the deal with TP3 and TP18 completing*".

586.    Sixthly, Deloitte knew that Autonomy had sold four licences for over $1 million to TP5 since Q3 09 and there were issues with each of them.  Thus:

(i)     the TP14 licence sold on the last day of Q3 09 had gone direct in Q4 09 (prompting the D10 email);

(ii)    the TP7 licence sold on the last day of Q4 09 (which had been a subject of the D10 email) had gone direct in Q2 10;

(iii)   the TP2 licence sold on the last day of Q3 10 (which the Q4 10 workpaper 8130b recorded had not been paid and was "*sitting as one of the older TP5 items payable to Autonomy*" but "*will soon be recoverable*" on the basis that "*terms of the licence previously sold to TP5 for onsale to TP2 … are altered such that they can on sell that licence to TP3 as part of the concluding PO of the deal*"); and

(iv)    the licence to TP8 sold on the last day of Q1 2010 which D10 had flagged in his spreadsheet of 7 April 2010 as "*Revenue too early*" and which the Q4 10 debtor testing had shown as one on which money had been due since April.

587.    Seventhly, Deloitte was aware that Autonomy had previously sold only two licences to TP24, both of which had been replaced by direct deals (TP6 and TP20).  Both of these had been flagged as "*Revenue too early*" in D10's 7 April 2010 spreadsheet and had gone direct in a subsequent quarter.  In these circumstances, there was only one

Case 3:18-cr-00577-CRB   Document 476-1   Filed 05/08/24   Page 169 of 270

*Edited for publication*

conclusion that could reasonably be reached about the probable fate of the TP24/TP3 transactions: they too would probably be the subject of direct deals.

588.    Some contracts between Autonomy and VARs in FY 10 included a direct sale clause which explicitly provided for the possibility that Autonomy might enter into a direct sale with the end-user in a later period.  Deloitte prepared a workpaper on this clause, Q4 10 8130b.2 "*Changes to VAR Agreement – IAS 18 considerations*", which the Executive Counsel says rightly recorded that the probability of Autonomy completing a deal with the end-user was relevant to revenue recognition at the point of sale to the VAR, in particular as regards IAS 18 paras 14(a) and 14(b) since "*the clause does not transfer risk to the VAR, and Autonomy would clearly retain managerial involvement until the deal direct with the end user has been signed.*"

589.    On the specific question of whether the clause affected the probability of direct deals (and whether the economic benefits of a VAR transaction would flow to Autonomy) Mr Mercer and D10 both confirmed that this was a question that Deloitte carefully considered in order to assess whether direct deals were now more likely: see Mr Mercer (Day 10/156:12 to Day 10/157:5) and D10 (Day 14/129:12-22).  Para 249 of Mr Mercer's first witness statement records that the Deloitte team:

(i)    Analysed historic sales trends, noting that from about 60 VAR sales each year, occurrences which would trigger the clause would be very rare;

(ii)    Established from a historical average of 2009/10 that fewer than one VAR transaction per quarter had become a direct deal; and

(iii)    Considered the previous VAR transactions and reasonably concluded that they did not alter the analysis.

590.    The Executive Counsel's case is that Deloitte failed to perform any procedures to establish whether it was probable that Autonomy would sell to TP3 the licences which Deloitte understood Autonomy had sold to TP5 and TP24 for TP3 as the end-user.

591. Workpaper Q4 8130b.2 stated: "*To gain additional assurance we have sought representation from [Autonomy] with respect to their assessment that the likelihood of sales direct to end users for deals where there is currently a PO with a VAR is remote*". A draft [letter of] representation was prepared ("*We consider the likelihood of end users entering into a direct agreement with the Group in respect of VAR purchase orders received by 31 December 2010 is remote*").  However, it was deleted by D10 less than four hours before the draft representation letter was circulated to the Audit Committee, and no representation was included in the final letter.  Mr Mercer said at para 250 of his first witness statement that it was "*not necessar*y", and that he only "*seek[s] representations from [Autonomy] as to material items where the audit evidence obtained is insufficient*".

592. The Executive Counsel responds that a representation should be obtained from [Autonomy] where "*other sufficient appropriate audit evidence cannot reasonably be expected to exist*" (see ISA 580 para 4), but that would only explain D10's deletion if other sufficient appropriate audit evidence was sought; however, it wasn't. The failure to obtain evidence about the likelihood of the deal going direct was a failure to perform a planned and key audit procedure.

593. Deloitte's case is that it produced satisfactory workpapers in respect of each of the TP24 $7 million transaction, the TP5/TP16 $1.6 million transaction and the TP24 $3.5 million transaction.  As regards the first of these TP24 transactions, the workpaper explained that the transaction was part of the wider TP3 transaction.  So far as collectability was concerned, the debtor balance was nil and TP24 had already paid the first $1 million on time.  Mr Mercer drew attention to the revenue confirmation received from TP24 in FY 10.  He said (Day 11/22:18-23) that the revenue confirmation and the payment of $1 million was "*pretty strong evidence*" that this was an appropriate transaction that had been appropriately recognised.

594. As regards the TP5/TP16 transaction, the workpaper Q4 2010 8130b explained that the transaction was part of the wider TP3 transaction.  It recorded the overall trading relationship with TP5, noting that Autonomy had received $17.9 million from TP5 on numerous deals since 2009 and that $3.8 million had been received in Q4 10.  The fact that the cash from TP3 had not yet been received by TP5 was not Deloitte's primary

consideration.  The trading history showed that TP5 "*has always been very good about paying down amounts that are outstanding*".

595.    Deloitte denies that the TP5/TP16 transaction was the latest in a pattern of transactions that had gone direct. The TP5/TP14 Agreement was the only transaction that had been replaced by a direct deal in Q4 09; the direct deal in respect of the software sold under the TP5/TP7 Agreement had not released TP5 from its obligations; and TP5 still remained liable in respect of the TP5/TP2 Agreement.  Deloitte accepts that it might be the case that a revenue confirmation was not obtained by Deloitte until 1 February 2011 after the relevant paperwork had been signed off (although it is not clear because the sign off dates are not reliable).  But the confirmation was obtained by Deloitte well before the FY 10 financial statements were signed off on 22 February 2011.

596.    The second TP24 transaction for $3.5 million was considered by Deloitte in its Consolidated Adjustment Testing paper for Q4 2010. It was identified late and concerned the same product as the initial $7 million TP24 transaction, simply extending the licence to an unlimited number of users.  The audit testing on collectability and contractual terms for the earlier transaction applied equally here. Deloitte also received an additional revenue confirmation from TP24.  Mr Mercer was asked in cross-examination about the email he sent to D10 on 28 January 2011 asking what the $3.5 million transaction was.  It is clear that he did not know what it was.  Deloitte submits that, in the context of around $870 million of revenue, this showed an exemplary degree of attention from an Engagement Partner.

597.    So far as the Executive Counsel's submission recorded at para [578(iv)] above is concerned, as we have previously noted, the TP5/TP2 Agreement was a $9.4 million deal signed in Q3 10 between TP2 (as end-user) and Autonomy (through TP5 as VAR). The Autonomy/TP2 Agreement was signed on 21 December 2010 for $3.5 million.

598.    The Executive Counsel submits that Deloitte failed (i) sufficiently to understand the TP2 aspect of the TP3 transaction; and (ii) to consider the inter-relationship between the TP5/TP2 Agreement and the Autonomy/TP2 Agreement.

599.  As regards (i), the Executive Counsel says that Deloitte's failure to understand the TP2 aspect of the transaction is demonstrated by its omission from the "*Memo: Structure of TP3 Deals in Q4 2010*".

600.  As regards (ii), in its workpaper on the Q4 10 Autonomy/TP2 Agreement, Deloitte noted the possibility that this was the Q3 10 TP5/TP2 Agreement going direct:

> "*In Q3 2010, a \$9.4m deal was signed between TP2 (end user) and Autonomy Inc via TP5(VAR), and as at 31/12/2010 the full amount is still outstanding, with 50% of it now 30 days overdue. Therefore there is a risk that the Q4 deal is in essence TP2 purchasing the same software with Autonomy directly.*"

601.  In considering that risk, Deloitte then noted that the TP5/TP2 Agreement had been for "*DSMail*" and that the Autonomy/TP2 Agreement was:

> "*to purchase ... an add-on module for DSMail... Therefore it is considered that the current deal is in addtion [sic] to the Q3 2010 license as it allows TP2 to extend the functionality ...*"

602.  The Executive Counsel submits that this was completely undermined by the proposal – not properly considered but merely mentioned in passing elsewhere in the audit workpapers – that the TP5/TP2 Agreement would be "*re-assigned*" to TP3.  If that were the case, TP2 would be buying an "*add-on*" under the Autonomy/TP2 Agreement without having bought the software to which it was the "*add-on*".  If the elements of the TP3 transaction had been properly identified and considered by Deloitte, as they should have been, this nonsense would have been exposed.

603.  Instead, Deloitte signed off the audit without having obtained sufficient appropriate audit evidence. It asked for full documentation covering the TP3 deal from as early as 13 January 2011, including the inter-VAR contracts and those between TP18 and TP3. It never received that documentation during its audit.  It was still requesting it on 11 April 2011: see its Request List of that date.  There was not, as there should have been, a workpaper considering the impact of the "re-assignment" on the recognition of the Q3 10 revenue under the TP5/TP2 Agreement, or on the wider TP3 deal.

604.  Deloitte contends that it understood how the re-assignment of the TP5/TP2 licence fitted within the wider TP3 transaction.  Mr Mercer was questioned about this (Day 11/36:14

to Day 11/42:11).  He said that he was satisfied that he and his team would have been on top of the detail and alive to any inconsistency.

**(R)      Conclusion on the TP3 transaction**

605.    Deloitte undoubtedly did a considerable amount of work on the four elements of the TP3 transaction.  Appendix 8 to its Closing Submissions summarises the work done under the headings "Review of Agreements", "Collectability", "Revenue Confirmation", "Delivery of software", "Cash Received" and "Debtor Confirmation".  Deloitte says that the decision to recognise revenue was a reasonable exercise of judgment on its part.

606.    In our view, the seven factors listed at paras [581] to [587] above when taken together were real reasons for concern about whether the TP3 VAR deal satisfied the IAS 18 para 14 criteria.  There were issues in relation to the four TP5 transactions.  Two of the Autonomy/TP5 deals had been replaced by direct deals and concerns had been expressed about TP5's ability to pay.  Deloitte should have been particularly concerned about the two TP24 transactions.  There had only been two previous transactions between Autonomy and TP24 (TP6 and TP20) and both of these had been flagged as "*Revenue too early*" in D10's 7 April 2010 spreadsheet and had gone direct in a subsequent quarter.  We are not impressed by Deloitte's answer to the two TP24 transactions that they represented only a small part of the VAR transactions recognised in Q4 10.  They were significant transactions which Deloitte rightly treated as meriting consideration in workpapers.

607.    Against the background of the history of recognising revenue in VAR transactions with TP5 and TP24 where deals had gone direct, Deloitte should have performed procedures to establish whether it was probable that Autonomy and TP3 would transact directly for the licences which Deloitte understood Autonomy had sold to TP5 and TP24 for TP3 as the end-user.  It failed to do so.  It is revealing that D10 deleted a draft [Autonomy] representation saying that the likelihood of end-users entering into a direct agreement with Autonomy in respect of orders received by 31 December 2010 was "*remote*".  In our view, it was not.  Such a representation was necessary, though not sufficient, audit evidence.

608.   As regards the "re-assignment" of the TP5/TP2 licence, Deloitte had no substantive answer to the Executive Counsel's submissions which we accept.

609.   We conclude that Deloitte and Mr Mercer fell short of the standards reasonably to be expected of experienced auditors.  They failed to exercise adequate professional scepticism in relation to the TP3 transaction and the TP5/TP2 unwind.  But having regard to the points made by Deloitte and the audit work that it carried out, we are not persuaded that their failings were so serious as to amount to Misconduct.

**(S)    Alleged failure to update in the FY 10 audit the Q1 10 workpaper on the TP25 transaction which had recorded that "there are no indicators that this deal with TP18 is not recoverable"**

610.   The Q1 10 workpaper on the TP18/TP25 Agreement was included in the FY 10 Audit File without being updated.  The Executive Counsel submits that it should have been updated and that Deloitte failed to perform any updated procedures on the agreement and to consider whether it was appropriate to recognise revenue on the transaction in FY 10 at all.

611.   By the time of the year-end audit Deloitte knew that:

(i)    The $11 million TP18/TP25 Agreement in Q1 10 had been twice the size of the next biggest VAR sale that quarter;

(ii)    Autonomy had been negotiating the sale with TP25 for some time, but had sold the licence to TP18 on the last day of the quarter;

(iii)    D10 had flagged the sale in his 7 April 2010 spreadsheet as potentially "*Revenue too early*";

(iv)    A10 had flagged the TP25 transaction (along with the TP24/TP6 transaction) as troubling: "*[t]he end user identified above may be a placeholder for an agreement to be negotiated subsequent to the invoice date*".  He had also reported of the debt due on it that [Autonomy] had said: "*will not be paid this for quite some time*";

(v)  Deloitte had reported to the Audit Committee in Q3 10 that it understood that TP18 was delaying payment because it had not received payment from the end-user; and

(vi)  Deloitte had been told at the audit planning meeting on 16 December 2010 that TP25's "[*reference*] *deal*" was "*still ongoing*" and that there had been a recent meeting between [Autonomy] and TP25, but "*nothing signed that will mean TP18 gets paid*".

612.  The Executive Counsel submits that these factors raised serious questions as to whether the IAS 18 para 14 criteria for revenue recognition had been met for the TP18/TP25 Agreement, including in particular whether Autonomy was exercising continuing managerial involvement.  There was also a question as to the commercial reality of the proposition that Autonomy had transferred the risks and rewards of ownership of the transaction to TP18.  She further submits that an appropriately sceptical auditor would have considered whether, in the light of TP18's evident difficulty in paying the debt, Autonomy was making payments to TP18 to enable it to pay Autonomy.  The workpaper Q4 10 5301A "*Trade receivables Overview*" (which only addressed the recoverability of trade receivables) did not ask that question.  At the very least, Deloitte should have spoken to sales, marketing or legal teams to supplement its understanding of the transaction.  It did not do so.

613.  Deloitte relies on the evidence given by Mr Coates (Day 21/38:17 to Day 21/34:16) that there was nothing at FY 10 that would have led the reasonable auditor to revisit the revenue recognition work done earlier in the year, especially as the debt was being paid by TP18 (it seems that $4 million had been paid by the year-end).  But he later accepted (Day 21/43:17 to Day 21/44:7) that he would be concerned not just as to whether the debt was a bad debt, but whether the revenue was appropriately recognised in the first place.

**(T)**     **Conclusion on the TP25 transaction**

614.  Apart from Mr Coates' initial assertion (which, in effect, he later retracted), Deloitte had no answer to this allegation.  The FY 10 audit should have updated the Q1 10

workpaper on the TP25 transaction: it was no longer justifiable to record that there were no indicators that this deal with TP18 was not recoverable.  It was also clear that the $11 million revenue should not have been recognised in the first place.

615.   In failing to update the Q1 10 workpaper and reflect the true position in the FY 10 audit, Deloitte and Mr Mercer fell short of the standards reasonably to be expected of an auditor. But we do not consider that the failings were so serious as to amount to Misconduct.

**(U)    Q1 11 Review**

616.   The relevant matters arising in the Q1 11 Review are that: (i) an Autonomy subsidiary (AS1) entered into an agreement with TP13 for $10.7 million corresponding to the transaction between Autonomy and the VAR TP22 for TP13 in Q4 10; and (ii) Deloitte learned that on 8 February 2011 Autonomy concluded an agreement with TP3  ("the 2011 TP3 Agreement") for the sale of licences for $19.5 million corresponding with those sold in Q4 10 to TP24 ($7 million and $3.5 million) and TP5/TP2 ($9 million) for onward sale to TP3.

617.   As regards the TP22/TP13 transaction, Deloitte and Mr Mercer became aware in the Q1 11 review that a direct sale had been signed with TP13 in the Q1 11 review on a deal signed with the VAR TP22 on 31 December 2010.  Deloitte had been told at the FY 10 audit planning meeting on 15 December 2010 that Autonomy had an outstanding $8 million deal for TP13.  TP13 was an existing direct client of Autonomy.  The workpaper recording the direct sale (Q1 11 8130b "*Q1 2011>$1m revenue testing*") signed off by Mr Mercer recorded:

> "*This direct sale by Autonomy….replaces the sale previously being made by TP22 to TP13*"

618.   The Executive Counsel submits that this was another instance in the pattern of large sales to a VAR at the end of a quarter, for an end-user which was an established direct customer of Autonomy, later followed by a direct sale by Autonomy to the end-user. It should have increased the professional scepticism of any reasonable reviewer as to whether it was probable that other similar sales to VARs would also go direct in

subsequent quarters.  This is another transaction within the Executive Counsel's sixth red flag.

619.    Deloitte points out that the workpaper also explained that [Autonomy] had said that "*as stated in the December 2010 VAR agreement, the VAR may resell the software to another end user and it has the legal obligation to pay for the license fee and therefore it is up to the VAR to reassign the software if required*".  It follows that, so far as Deloitte was aware at the time, the original deal with the VAR had not been cancelled and the VAR remained on risk and had to reassign the software to a different end-user in the light of the direct deal with TP13.

620.    In view of the limited scope of the Executive Counsel's submission in relation to this transaction, we can take it shortly.  There had by now been a significant pattern of transactions between Autonomy and VARs which had been replaced by direct transactions between Autonomy and the end-user.  The fact that there were variations in the detail of these transactions does not undermine the Executive Counsel's point.  The larger the number of such transactions, the greater the need for professional scepticism by any reasonable reviewer as to whether it was probable that other similar transactions with VARs would also go direct in the future.

621.    As regards the 2011 TP3 Agreement, D10 chased [Autonomy] for "*the final agreement for the TP3 deal*" and received it on 15 April 2011.  He accepted (Day 14/154:7-11) that the software listed in the agreement was the same software as had been the subject of the VAR transactions in Q4 10.  It is likely that D10 reviewed the agreement (as he should have done) and noticed that it was dated 8 February 2011 and that it was a direct agreement between Autonomy and TP3.

622.    The Executive Counsel submits that Deloitte should have (i) queried why it had not been told about the 2011 TP3 Agreement prior to the FY 10 Audit Report (which was dated 22 February 2011); and (ii) reported to the Audit Committee that (a) it had not been informed about the 2011 TP3 Agreement in the course of the FY 10 audit (as it should have been); and that (b) had it been so informed, it would have considered this agreement for revenue recognition in Q1 11 rather than the components of the TP3 transaction in FY 10.

623. She also submits that, on seeing that the 2011 TP3 Agreement had been signed on 8 February 2011, Deloitte should have considered whether there was a prior period error within the meaning of IAS 8 para 5, but it failed to do so.  IAS 8 para 5 provides that:

> "*Prior period errors are omissions from, and misstatements in, the entity's financial statements for one or more prior periods arising from a failure to use, or misuse of, reliable information that: (a) was available when financial statements for those periods were authorised for issue; and (b) could reasonably be expected to have been obtained and taken into account in the preparation and presentation of those financial statements*".

624. Mr Southwood (para 6.18.120 of his first report) noted that there was no workpaper in the Q1 11 file which considered a prior period error under IAS 8.  He said that, in the light of this provision, Deloitte should have taken into account the evidence that a direct deal had been signed on 8 February 2011 and considered:

> "*[i]n particular, whether this information 'was available when the financial statements … were authorised for issue', i.e. before 22 February 2011, and whether this information was something which 'could reasonably have been expected to be obtained'.*"

625. Deloitte relies on the evidence of Mr Mercer and D10 who confirmed their understanding that, notwithstanding the 2011 TP3 Agreement, TP3 would still transact with TP18 as intended (in order to take advantage of its s 8A status), so that the agreement did not change the overall TP3 transaction as Deloitte understood it: see Mr Mercer's first witness statement para 240 and Day 11/54:10-19 and D10's first witness statement paras 411-420. It was similar to the arrangement concluded in Q2 10 in relation to the TP5/TP7 Agreement, but with another layer of VARs: the VARs remained on risk and liable to Autonomy, and the end-user contracted with Autonomy, but received the software from a VAR and paid the VAR at Autonomy's direction. It was therefore very different from the TP5/TP14 transaction.

626. We accept that there were differences in form between the TP5/TP7 transaction and the components of the TP3 transactions, but the important point was that in each case the transaction ended with a direct deal between Autonomy and the end-user.  Deloitte has provided no convincing answer to the limited submissions of the Executive Counsel which we have summarised at paras [622] and [623] above.  We accept them.

*Edited for publication*

**(V)**   **Q2 11 Review**

627.   The two relevant events that occurred during this quarter were that (i) Autonomy entered into an agreement on 30 June 2011 with TP24 for the sale for $9 million of a software licence for onward sale to TP1 ("the TP24/TP1 Agreement"); and (ii) Autonomy paid TP5 $900,000 on 1 April 2011 for "*marketing assistance*".

628.   The Executive Counsel submits that, by the time of the Q2 11 review, a number of matters should have led Deloitte to consider the information made available to it by [Autonomy] and the results of its own procedures with heightened professional scepticism.  In particular, nine sales of software licences to VARs previously recognised as revenue had now been cancelled, written off or replaced by a direct deal with the end-user. Three of these were with TP24: TP6, TP20 and most recently TP3.

629.   She says that Deloitte and Mr Mercer failed to apply appropriate professional scepticism and to make inquiries or perform procedures to enable them to conclude whether anything had come to their attention leading them to conclude that the Q2 11 results had not been prepared in accordance with IFRS. In particular, they had obtained information which suggested that the relevant accounting criteria may not have been met.

630.   The software sold to TP1 was "SLD software" which was a hosted product.  This meant that the sale to TP24 for onward sale to TP1 would need a hosting agreement with Autonomy (since TP24 did not offer hosting). This was apparent from Deloitte's comments in its Q2 2011 workpaper 8130c "*Revenue deals over $1m (TP24-TP1)*":

> "*The deal is a VAR sale, with TP24 purchasing the following software for onsale to TP1: Autonomy SLD Software (… TP53 [product name]…)…*
>
> *There is no indication, based on the contract with TP24 that any hosting on Autonomy servers is given as part of this agreement. As SLD is a  hosted product and TP24 do not offer hosting, in order to use the software, TP1 would also have to have an agreement either direct or through TP24 with Autonomy for this hosting…*"

631.   The Executive Counsel submits that Deloitte and Mr Mercer should have asked why TP24 would purchase a licence for sale to TP1 which required hosting services to be provided to TP1 by Autonomy without there being an agreement for those services.

This was plainly relevant to the commercial rationale for the sale to TP24: it showed that a further agreement was needed (most naturally this would be a direct agreement). Deloitte and Mr Mercer do not appear to have questioned the commercial rationale for TP24 purchasing a software licence without hosting services.

632.    She makes the further point that there was no clear rationale for TP1 to purchase a licence from TP24 rather than Autonomy: while Mr Mercer sought an explanation of the commercial rationale from [Autonomy], no response is documented on the Audit File.  Deloitte and Mr Mercer recorded in the 8130c workpaper that TP24 frequently acted as a VAR by "*adding value by performing implementation work*" and that by purchasing the licence through TP24, TP1 would "*be able to satisfy the US government requirement to trade with S. 8a Veteran Owned Businesses*".  Deloitte and Mr Mercer appear to have accepted these statements at face value without verifying them.  The Executive Counsel submits that the statements were questionable against the background that three of TP24's previous transactions with Autonomy had subsequently gone direct.  Deloitte and Mr Mercer made no attempt to verify that TP24 was in fact S.8a accredited.

633.    The Executive Counsel says that they should have considered whether TP24 was negotiating with TP1 or whether there was an agreement in place between them and, if not, why TP24 would be willing to accept the risks of ownership of the software licence which was specific to TP1 (and which could not be used without an attendant hosting agreement), without there being some expectation or understanding that its payment to Autonomy would only be made if a deal with TP1 was ultimately completed. They should have considered whether, if no negotiations were taking place between TP24 and TP1, Autonomy had retained continuing managerial involvement to the degree usually associated with ownership, particularly in circumstances where TP24 allegedly held the significant risks and rewards of ownership of a $9 million licence.

634.    Deloitte's response is as follows.  The work it did exceeded that required by ISRE 2410 as is apparent from its workpaper.  It obtained a satisfactory explanation of the commercial rationale behind the transaction from [Autonomy].  It obtained a signed revenue confirmation from TP24 confirming that the debt was properly payable and that there were no side letters or agreements.  Deloitte and Mr Mercer noted that SLD was a

hosted product and TP24 did not offer hosting, so that TP1 would need to have an agreement for hosting (either through TP24 or direct with Autonomy). As a result, Deloitte proposed an adjustment to remove the $390,000 carved out for hosting from revenue to deferred revenue in the income statement. This was recorded as a current year known misstatement. Overall, there was compelling evidence that the risk had passed to TP24 and that it was appropriate to recognise the revenue in Q2 11.

635.  We see the force of the points made by the Executive Counsel and it may be that Deloitte and Mr Mercer fell short of the standards reasonably to be expected of a competent reviewer. But we regard this as a borderline case and are in any event not persuaded that any shortcomings were so serious as to amount to Misconduct.

636.  As for the second relevant event that occurred during this quarter, the Executive Counsel submits that Deloitte and Mr Mercer failed to consider with adequate professional scepticism the $900,000 "*marketing assistance*" payment made by Autonomy to TP5 on 1 April 2011.

637.  A9 had said in the email forwarded to Deloitte by A10 (see para [488] above) "*Concern 4 – TP5 EAS support outsourcing arrangement:*

> "*In putting together the initial schedule, there were certain round amounts included in the EDD processing payment (including a $500,000 payment in December). When I asked [name] about this, he said just to list it as "EDD services"….*
>
> *I started to have concerns regarding the nature of the payments made to TP5 (as TP5 had been the reseller involved in the Q4 2009 TP7 order) under the EAS outsourcing and EDD processing arrangements (many of which did not have supporting calculations, to the best of my knowledge), and, in the schedule template provided by [name], such payments were netted against payments due/made by TP5 under a payment schedule. I raised these concerns to you as there appeared to be the potential that such arrangements could be tied to each other.*"

638.  In Q2 11, Deloitte considered what was described as a "*marketing assistance*" fee paid by Autonomy to TP5. The workpaper "*Q2-2011-5200-VAR purchases-memo*" said that its objective was:

> "*To review the nature of payments to key VAR's in the quarter in order to understand the commercial drivers behind these transactions.*"

639.   The first payment considered in the workpaper was what was described as:

>    "*$0.9m marketing assistance in maintaining TP3 relationship*"

640.   The payment was said to be:

>    "*an up front payment to TP5 in relation to costs they will incur in providing support to TP3; one of Autonomy's most significant relationships. TP5 themselves are a longstanding partner of Autonomy, and this payment reflects the fact that by performing the role of first line support, TP5 are required to have significant technical capacity in place. This payment is to assist in this. Autonomy does not receive any asset in return, this payment is a one off and does not come with any contractual commitments from TP5*".

641.   By this time Autonomy had entered into a direct deal with TP3 which left it unclear what "*support to TP3*" TP5 would be providing (without any contractual commitment to do so). The Executive Counsel submits that the arrangement was clearly uncommercial. Yet the workpaper records:

>    "*Conclusion*
>
>    *No issues noted with [Autonomy's] treatment of these items. All appear to be arm's length transactions, that are appropriately authorised by [Autonomy].*"

642.   Deloitte and Mr Mercer take their stand on what they said in the workpaper.  Mr Coates (para 16.12 of his report and Day 21/66:11 to Day 21/67:16) rejected the Executive Counsel's case that they should have been suspicious.  In his evidence, however, Mr Coates accepted that the payment did "*seem unusual but clearly Deloitte have looked at it and it appears to be properly authorised*".  Although $900,000 was a "*big number*", it was not a "*material*" number.

643.   In our opinion, Deloitte and Mr Mercer failed to consider this payment with adequate professional scepticism.  It was a large sum which Autonomy was not liable to pay TP5. In these circumstances and particularly in the light of A9's concerns, Deloitte and Mr Mercer should have insisted on a more detailed and convincing explanation of the rationale for the payment.  Mr Coates' justification for this unusual payment (that Deloitte and Mr Mercer had looked at it and it appeared to be properly authorised) is insufficient.  Here too, Deloitte and Mr Mercer failed to apply the standards reasonably

to be expected of a competent reviewer.  But we are not persuaded that the shortcoming was so serious as to amount to Misconduct.

**(W)   Autonomy's Revenue Recognition Policy: Allegations 2.1(c) and 2.2(c)**

644.   Autonomy's Accounting Policy on the sale of goods was contained in Note 2(e)(i) to its accounts.  It included the following:

> *"1.   The group sells its products as licenses to resellers, OEMs and direct to end-users together with associated support and maintenance. In addition, the group also sells some of its products on a subscription basis.*
>
> *2.   Revenues from software license agreements are recognised where there is persuasive evidence of an agreement with a customer (contract and/or binding purchase order), delivery of the software has taken place, collectability is probable and the fee has been contractually agreed and is not subject to adjustment or refund (i.e. is fixed and determinable). If an acceptance period is required, revenues are recognised upon the earlier of customer acceptance or the expiration of the acceptance period. Revenue is recognized on contracts providing that the customer passes defined credit-worthiness checks. If significant post-delivery obligations exist or if a sale is subject to customer acceptance, revenues are deferred until no significant obligations remain or acceptance has occurred.*
>
> *3.   The group enters into OEM and reseller arrangements that typically provide for fees payable to the group based on licensing of the group's software to third party customers. Sales are generally recognised as reported by the OEM or reseller and is based on the amount of product sold. Sales are recognised if all products subject to resale are delivered in the current period, no right of return policy exists, collection is probable and the fee is fixed and determinable".*

645.   The Executive Counsel submits that a reasonable reader of the Policy would have understood it to mean that Autonomy generally recognised revenue on sales to VARs only when the VAR had sold the software to its end-user; and that the amount of revenue recognised by Autonomy was based on the amount of product sold by the VAR to the end-user.  It is common ground that Autonomy in fact recognised revenue on licence sales at the point of sale to the VAR.

646.   She says that Deloitte had no basis for concluding that Autonomy's accounting treatment of revenue from software sold to resellers within the FY 09 and FY 10 Financial Statements was consistent with the Policy.

647.   She further submits a reasonable reader of the Policy would have understood it as follows.  Para 1 describes three sources of revenue: (i) software licences with resellers, OEMs and end-users; (ii) support and maintenance; and (iii) subscription sales.   Paras 2 and 3 deals with software licence revenue.  Para 2 deals with revenue from end-users or "customers".  It does not cover revenue from resellers.  Revenue from resellers is covered in para 3.  Accordingly, para 3 of the Policy applies to Autonomy's sales to VARs.

648.   Deloitte's factual witnesses say that they understood para 2 to apply to the VAR sales. Mr Coates supported this interpretation.  Mr Southwood supported that advocated by the Executive Counsel.

649.   Deloitte submits that para 2 is entirely general and applies to all three sources of revenue.  The "*customers*" to which it refers include VARs.  Revenue on sales to VARs is therefore recognised when there is persuasive evidence of an agreement, delivery has taken place, collectability is probable and the fee is fixed or determinable.  By contrast, para 3 applies to OEM or reseller arrangements "*that typically provide for fees….based on licensing….to third party customers*".   The classic example is royalty-based arrangements.  The sales to the VARs do not provide for a price based on licensing to the end-users.

650.   We prefer the submissions of the Executive Counsel.  We accept that, but for the existence of para 3, the word "*customer*" in para 2 would naturally bear a general meaning so as to include a reseller.  But paras 2 and 3 must be read together.  The express reference to resellers in para 3 strongly points to para 2 not applying to them. In our view, para 2 does not apply to all three sources of revenue.

651.   The natural meaning of the Policy is that para 2 applies to sales to end-users and para 3 applies to sales to resellers.  Para 3 applies to *all* forms of revenue derived from reseller agreements.  We see no reason for holding that it applies only or principally to royalty-based arrangements.

652.   We have reached our conclusion without regard either to the evidence relied on by the Executive Counsel that there were some readers who understood the Policy in the way

for which she contends or to the evidence relied on by Deloitte that there were some readers who understood it in the way for which it contends.

653.   We can well understand why some readers were confused as to what the Policy meant. For that reason, we do not feel able to hold that the interpretation that was applied by Deloitte, Mr Knights and Mr Mercer was an unreasonable interpretation.

654.   It seems to us that Deloitte may properly be criticised for accepting a policy that was unclear and confusing.  But that is not the allegation that it faces in these proceedings. Accordingly, we dismiss Allegations 2.1(c) and 2.2(c).

## (11)   ALLEGATION 3.1: MR KNIGHTS' BREACH OF FUNDAMENTAL PRINCIPLE (a) and SECTION 110 OF THE CODE OF ETHICS IN FAILING TO CORRECT [AUTONOMY]'S MISLEADING STATEMENT TO THE FRRP AT THE MEETING ON 13 JANUARY 2010

655.   The Allegation in the Amended Formal Complaint is:

> *"3.1 In relation to Mr Knights' failure to correct a misleading statement by [Autonomy] at a meeting with the Financial Reporting Review Panel on 13 January 2010 the conduct of Deloitte and Mr Knights fell significantly short of the standards reasonably to be expected of a Member Firm and Members in that they failed to act in accordance with Fundamental Principle (a) 'Integrity' and Section 110 (paragraphs 110.1 and 110.2) of the Code of Ethics (2006).*
>
> *3.2 [is no longer pursued]."*

656.   Deloitte does not dispute the accuracy of what [Autonomy] is recorded as having told the FRRP at this meeting:

> *"[Autonomy] gave an overview of the company's activities. The company was a pure software business with less than 5% of its revenue coming from services. It did not engage in major capital projects while its r&d expenditure was largely on people. Its software was supplied either by download or on discs. As a consequence, it enjoyed high margins, typically generating a gross margin of c .90% and was very cash generative."*

657.   The allegation against Mr Knights is that he (and Deloitte) breached Fundamental Principle (a) "*Integrity*" and section 110 of the Code of Ethics (2006).  Fundamental Principle (a) reads:

> *"A professional accountant should be straightforward and honest in all professional and business relationships".*

658. "Section 110: Integrity" includes the following:

> "*110.2 A professional accountant should not be associated with reports, returns, communications or other information where they believe that the information:*
>
> *a. Contains a materially false or misleading statement;*
>
> *b. Contains statements of information furnished recklessly….*"

659. Further guidance on what "*Integrity*" means in the context of auditing appears from the APB Ethical Standard 1 which states at para 7:

> *"Integrity is a prerequisite for all those who act in the public interest. It is essential that auditors act, and are seen to act, with integrity, which requires not only honesty but a broad range of related qualities such as fairness, candour, courage, intellectual honesty and confidentiality".*

660. The Executive Counsel alleges that [Autonomy's] statement was materially misleading in that:

(i)     it conveyed that 95% of Autonomy's revenue came from its sales of software; and

(ii)    this was fortified by the statement that as a consequence of that revenue split, the company enjoyed high margins typically of around 90%.

661. The Amended Formal Complaint alleges that, by failing to say anything to correct [Autonomy']s misleading statement to the FRRP, despite his knowledge that there was a risk that it was misleading, Mr Knights was reckless and accordingly breached Fundamental Principle (a) and section 110 of the Code of Ethics. Mr Knights knew that the FRRP had asked Autonomy to provide it with a better understanding of how Autonomy's revenue arose. He also knew that, in that context, the statement that Autonomy was a pure software company with less than 5% of its revenue coming from services could be materially misleading. It was unreasonable for Mr Knights to run the risk of misleading the FRRP, given that it had expressly sought an explanation of how Autonomy's revenue arose.

*Edited for publication*

662. The Executive Counsel does not allege that Mr Knights acted dishonestly or that he intended the FRRP to be misled. Her case is that, by not correcting [Autonomy]'s statement at the meeting or afterwards, he knowingly took a risk that it would be misled and therefore acted recklessly.

663. It is common ground that recklessly allowing others to be misled is a failure of integrity by a professional person: see *Batra v FCA* [2014] UKUT 214 (TCC) at para 15, *SRA v Wingate and Evans* [2018] EWCA Civ 366 at paras 95-101. See also *R v G* [2003] UKHL 50 at para 32.

664. The Executive Counsel submits that proof of Mr Knights' motives is not an essential ingredient of the allegations that he was reckless. But she submits that Mr Knights' motivation was that he knew that Autonomy did not want to disclose that it sold pure hardware; and that if he corrected what [Autonomy] had said, that would make it very difficult for Autonomy to justify not disclosing those sales in the future, upset his client and damage his good relations with it.

665. Deloitte makes the following points in answer to Allegation 3. First, the Executive Counsel must prove that Mr Knights *subjectively knew* that there was an appreciable risk that the FRRP would be misled by [Autonomy]'s statement. Secondly, the risk had to be a real and unacceptable risk and one which it was unreasonable for Mr Knights to take. Thirdly, in determining whether Mr Knights subjectively appreciated a risk of the FRRP being misled, the starting position is that it is inherently more likely that he acted innocently, or at worst carelessly, than that he knowingly remained silent. It is inherently improbable that Mr Knights appreciated that [Autonomy]'s statement was misleading and yet did not correct it. Fourthly, it is striking that the other Autonomy representatives who were present at the meeting (including A7 and A11) equally did not intervene. They must have shared Mr Knights' understanding of the import of [Autonomy]'s statement. If Mr Knights was reckless, then so too must A7 and A11 have been reckless. That, submits Deloitte, is inherently unlikely.

666. Mr Knights was cross-examined at length about this (Day 6/118:14 to Day 6/171:5). Deloitte submits that he steadfastly maintained the position that he did not regard Autonomy's description of itself as a "*pure software*" company in the correspondence

leading up to Q3 09 as misleading.  Autonomy regarded itself as a pure software company because it was not selling services.  He did not understand [Autonomy] to be saying (or implying) that less than 5% of revenue came from services and the rest from software sales.  It did not cross his mind at the time that what [Autonomy] said in that one sentence was inappropriate or misleading.

667.  We find that Allegation 3.1 has been proved.  First, on any fair reading of his statement read as a whole, [Autonomy] was telling the FRRP that all of Autonomy's revenues came from sales of software save for less than 5% which came from the sale of services and this was why the company enjoyed high margins.  If (contrary to our view) he was to be understood as saying anything about the contribution to revenue of sales of hardware, it was that such contribution was less than 5%.  Either way, what [Autonomy] was telling the FRRP was untrue.

668.  Secondly, by its letter dated 30 November 2009, the FRRP had told Autonomy that it wished to gain a better understanding of the company and its operations at a meeting.  The first topic that it identified for discussion was "*the principal ways in which [Autonomy's] revenue arises and how these ways are represented in the accounting policy for revenue recognition*".  Autonomy's covering letter to the draft response provided to the FRRP on 11 January 2010 confirmed that it would be "*ready to discuss…[t]he principal ways in which the company's revenue arises*".  [Autonomy] was answering this question when [they] described Autonomy as a pure software business.  This is a further reason why Mr Knights would have understood that there was a real risk that FRRP would believe [Autonomy]'s statement to mean that all revenues came from software save for a small services element.

669.  Thirdly, Mr Knights understood the difference between the margins on hardware and software sales.  It had been the reason why there had been such a prolonged and difficult debate (both internally at Deloitte and with Autonomy) over the disclosure issue in Q3 09.  Mr Knights knew that it was a sensitive subject and that Autonomy was refusing to disclose the hardware sales.  We do not accept that Mr Knights did not consider that there was a real risk that [Autonomy]'s statement would mislead the FRRP about the source of Autonomy's revenues.  Mr Knights is an intelligent man.  He had been closely involved in the difficult and prolonged discussions about disclosure of the hardware

sales.  He also knew that it was highly material to how Autonomy was viewed in the market whether it was a pure software company or a company which engaged to a significant extent in the sale of pure hardware.

670.  Fourthly, the argument based on the presence at the meeting of A7 and A11 carries little weight.  Neither of them gave evidence to us.  This makes it difficult for Deloitte to mount the argument.  More importantly, neither of them had the same degree of knowledge of the detail of the sources of Autonomy's revenue as Mr Knights.  They were not privy to the internal communications at Deloitte which expressed serious concern about the non-disclosure of the hardware sales and the risk of misleading the market.  […]. The one document before us that went directly to A7's knowledge is the email of 23 October 2009 from [Autonomy] to A1, copied to A7's PA. In this email, [Autonomy] said: "*The market is already aware we sell hardware, something we have done for 5 years or so".*  The Executive Counsel suggests that this may explain why A7 might have assumed that he did not need to raise the hardware sales at the meeting.  But this is speculation.  The important point is that A7 may not have been on top of the detail.  Without the benefit of hearing from him, we are not willing to make any assumptions about his state of mind on this issue.  We make the same point in relation to A11 […].

671.  Fifthly, we accept that the inherent probabilities are a matter to be taken into account.  Mr Knights is a very experienced senior accountant in a large firm of accountants.  Any tribunal would start from the position of assuming that such a professional has acted with propriety and integrity and that is what we have done.  But that is no more than a starting point.  The outcome of these proceedings depends on a careful and dispassionate analysis of a huge amount of evidence.

672.  We are satisfied that Mr Knights acted with lack of integrity in failing to correct [Autonomy]'s statement at the meeting or shortly thereafter.  He must have known that it was materially misleading and that there was a real risk that the FRRP would be misled by it.  We regret to say that we do not find credible Mr Knights' evidence that he did not consider at the time (and, he says, still does not consider) that there was a real risk that [Autonomy]'s statement would mislead the FRRP.  In our view, the natural and proper meaning of the statement is that which we have explained at para [667] above.

If Mr Knights had applied his mind honestly and conscientiously to what [Autonomy] said, he would have reached the conclusion that there was a real risk that [Autonomy]'s statement would mislead the FRRP.  Mr Knights must have appreciated that this statement was of central importance to the FRRP.  One of the matters that the FRRP had said it wanted to discuss was the principal sources of Autonomy's revenue.  Mr Knights knew that the sale of pure hardware was one of the principal sources of its revenue and that it was important to Autonomy not to disclose this fact.  All the more reason why Mr Knights should have corrected [Autonomy]'s statement.

## (12)   ALLEGATION 4: MR MERCER'S BREACH OF FUNDAMENTAL PRINCIPLE (c) OF THE CODE OF ETHICS IN FAILING TO CORRECT AUTONOMY'S LETTER TO THE FRRP DATED 3 MARCH 2011

673.   The Allegation in the Amended Formal Complaint is:

> *"In relation to Mr Mercer's failure to correct a false or misleading statement in a letter from Autonomy to the Financial Reporting Review Panel sent on 3 March 2011, copied to Deloitte, the conduct of Deloitte and Mr Mercer fell significantly short of the standards reasonably to be expected of a Member Firm and Members in that they failed to act in accordance with Fundamental Principle (c) 'Professional Competence and Due Care' in the Code of Ethics (2011)."*

674.   Fundamental Principle (c) of the Code of Ethics (2011) provides:

> *"A professional accountant shall comply with the following fundamental principles:…*
>
> *(c) **Professional Competence and Due Care** – to maintain professional knowledge and skill at the level required to ensure that a client or employer receives competent professional services based on current developments in practice, legislation and techniques and act diligently and in accordance with applicable technical and professional standards".*

675.   Autonomy had an exchange of correspondence in 2010 with the Financial Services Authority ("FSA") (as it then was) in relation to its investigation into the matters that had been raised by A10.

676.   By its letter dated 30 July 2010 ("the FSA Letter") Autonomy sought to assure the FSA that A10's concerns had been thoroughly and independently investigated.  Autonomy

said that the investigation had been carried out by "*an independent Deloitte team*" ("the A10 Team") and said that the process:

> "*involved an independent investigation by a team separate to our normal audit team at Deloitte*".

677.   On 2 February 2011, the FRRP wrote to Autonomy saying that it was considering whether to open a formal enquiry into various matters relating to the accounts for FY 09 and H1 10.  It said that it had received a copy of the FSA Letter from which it appeared that Autonomy:

> "*may already have investigated some or all of the matters concerned.  If this is the case, the Panel would be grateful for a summary of those investigations and their findings…*"

678.   On 11 February 2011, A11 informed Mr Mercer of the FRRP's letter and asked Deloitte to review Autonomy's draft response which referred to the A10 investigation having been overseen by the Audit Committee and an "*independent team at Deloitte (ie independent of our normal audit team)*".

679.   The draft was considered by a number of individuals at Deloitte.  Both D10 and Mr Mercer said that the A10 Team should not be described as "*independent*" of the audit team.  The final version of Autonomy's response to the FRRP incorporated some of Mr Mercer's suggested changes.  It replaced the words "*independent of our normal audit team*" with "*separate from the historical audit team.*"

680.   Autonomy's reply to the FRRP was sent on 3 March 2011.  It stated that the issues raised by the FRRP were the same as those discussed in the FSA Letter.  It also included the following statement:

> "*In short, a comprehensive procedure was undertaken to investigate these matters when first raised, overseen by Autonomy's Audit Committee working with a different team at Deloitte LLP (i.e. separate from the historical audit team, led by the new Audit Engagement Partner who rotated onto the account in June 2010 and had no previous involvement in the audit process)*"

681.   The Executive Counsel submits that:

(i)     the investigation undertaken by the A10 Team had been led by Mr Knights, the Audit Engagement Partner whose work was being questioned by A10, rather than by the new Audit Engagement Partner, Mr Mercer; and

(ii)    the A10 Team comprised members of the historic audit team, reviewing their own work, and was not an independent team; it was not a different team and was not separate from the audit team.

682.   In consequence, she says that the FRRP Letter was misleading; and Deloitte and Mr Mercer failed to act in accordance with Fundamental Principle (c) (and were guilty of Misconduct).

683.   The issues that arise in relation to Allegation 4 are:

(i)     was the investigation undertaken by the A10 Team led by Mr Mercer?

(ii)    was the A10 Team different from the historic audit team?

(iii)   if the answer to (i) and/or (ii) is no, were Deloitte and Mr Mercer in breach of Fundamental Principle (c) in failing to correct the letter to the FRRP and did their failure to correct the letter amount to Misconduct?

**(A)     Was the investigation undertaken by the A10 Team led by Mr Mercer?**

684.   Mr Knights was the Audit Engagement Partner in the period to which Mr  A10's questions  were primarily directed.  He was also the initial point of contact for A10.  He wrote up [Autonomy's] responses to each of A10's six questions, together with Deloitte's comments on the responses, on the evening of 2 July 2010.  These were new documents created by Mr Knights by compiling the information he had received earlier that day from D11, D15 and D9.

685.   On 7 July 2010, Mr Knights sent the final draft of the responses on the A10 concerns to [Autonomy] and on the following day sent the final document to them.  He did not send a copy of either document to Mr Mercer.

686.    Mr Knights presented the results of Deloitte's investigation into the A10 concerns in an appendix to the Report to the Audit Committee for Q2 10.  On 26 July 2010, Autonomy arranged a video conference to take place between A11, A3, A7 and A10.  A11 invited Mr Knights, but not Mr Mercer, to join.  Mr Knights was the point of contact for each of A10, [Autonomy], the Audit Committee and the audit team throughout the A10 investigation.

687.    In August 2010, Mr Knights emailed [Autonomy] setting out the costs for the A10 review.  He explained: "*[t]he fee is £22,400 which comprises my time, manager review time ticking through the information, drafting of the submission to the AC and the appropriate risk review*".  There was no reference to Mr Mercer's time.  In fact, until 28 June 2010, when Mr Knights forwarded [Autonomy]'s draft responses to A10's questions, Mr Mercer only charged for six hours' time to Autonomy (for attending a meeting and doing some preliminary reading on 11 June and attending an introductory lunch and product demonstration on 23 June).  He did, however, charge 19 hours' time between 1 and 9 July 2010 when A10's questions were being investigated.

688.    Deloitte says that Mr Mercer led the A10 review and that, although Mr Knights was involved in gathering information, he did not lead it.  Mr Mercer said that he met D8 (Deloitte Audit Partner) on 1 July 2010 to agree the scope of the investigation and the members of the investigation team; he oversaw the direction and review of the investigation work; and finalised Deloitte's Audit Committee Report, setting out the investigation team's findings.  In short, he said that he oversaw the direction of the investigation. He did not agree with the minutes of the Q2 10 Audit Committee meeting of 20 July 2010 which referred to Mr Knights having "*discussed matters raised by A10*".  These minutes are important.  They include the following:

> "*Mr Mercer commenced by noting that Deloitte had substantially completed its review of the quarter and that the results were where they expected them to be. Mr Mercer continued his review by discussing adjustments and misstatements and process.*
>
> *Mr Knights then discussed matters raised by A10, referring the Directors to Deloitte's report on the matter. Mr Knights highlighted that the matter had been brought to Deloitte's attention at the very outset of the process and that senior management took appropriate measures, maintaining an entirely open dialog with the board and senior management. As a result of their review, Mr Knights reported that Deloitte was entirely comfortable that nothing had emerged from*

> *the correspondence required to change 2009 accounts. Mr Knights suggested that the matter probably arose from A10 only having access to information within his realm, rather than at the group level. Mr Knights concluded by reiterating that management has been open and transparent; nothing has arisen that is news or new information; and most points have already been shared with the Audit Committee".*

689.   The minutes show clearly that Mr Knights had assumed responsibility for much if not all of the detail of the A10 review.  Mr Mercer disputed the accuracy of this part of the minutes (Day 9/124:10-15).  But there was no challenge to the minutes at the time and we consider that there is no reason to doubt their accuracy.  We reject Deloitte's attempt to distance Mr Knights from it.

690.   Deloitte also relies on the evidence of D10 (Day 19/38:15-25 to Day 19/41:1-10), D6 (para 53 of witness statement and Day 8/164:18 to Day 8/165:2) and D15 (Day 14/215:8 to Day 14/217:3) all of whom said that Mr Mercer led the investigation.  Deloitte submits that there is no reason to reject this evidence.

691.   But in our view, it is clear that Mr Mercer led the review only in the sense that he had by now succeeded Mr Knights as the Audit Engagement Partner and for that reason was responsible for signing off the Q2 10 results.  It is, therefore, not surprising that some of Mr Mercer's colleagues considered that he led the investigation.  The real question, however, is whether Mr Knights (the historical Audit Engagement Partner) took the leading role in the A10 review.  In our view, it is clear that he did.  Mr Mercer did not lead the investigation in any practical sense.  Indeed, there is no evidence that Mr Mercer provided any substantive input into Deloitte's responses to A10's questions.  That is not surprising because these questions were essentially directed to the period when he was not the Engagement Partner, but Mr Knights was.

**(B)      Was the A10 Team different from the historic audit team?**

692.   The Executive Counsel submits that the following were members of both the historic audit team and the A10 Team: D11, D9, D15, D10 and D6.  Deloitte agrees, save that it does not accept that D6 was a member of the historic audit team.  As to this, it relies on the evidence of D6 himself who said (Day 8/117:1 to Day 8/129:14) that he did not regard himself to be part of the 2009 audit team and was not so regarded by others at

Deloitte at the time.  Deloitte accepts that he was involved in the Q3 09 hardware costs issues and was listed in Deloitte's FY 09 strategic and audit planning document as one of the "*Core members of the audit team*".  He explained this as having been rolled forward from previous versions of the document or because someone had taken the view that it was prudent to keep his name on the list because he had some involvement (Day 8/118:5-15).  He had only billed 20 hours to the FY 09 audit code.

693.    In our view, there can be no doubt that D11, D9, D15, D10 and D6 were all members of both the historic audit team and the A10 Team.  The fact that D6's involvement in the historic audit team was limited is a quibble. He was a member of it.

694.    Deloitte submits that the Reviewers D12, D1 and D2 were all involved to varying degrees in considering and providing comments on the responses to A10's questions. They were not, of course, members of the historic audit team.  Contrary to Deloitte's case, they all confirmed in their evidence that they were not part of the team that investigated A10's questions: D12 (Day 16/18:19), D1 (Day 15/162:3-8) and D2 (Day 15/101:10-15).

695.    We accept the submission of the Executive Counsel that the Reviewers cannot fairly be described as members of the A10 Team.  The principal members of the A10 Team under the leadership of Mr Knights were D10 and D6, with input also from D11, D9 and D15.

696.    We conclude, therefore, that the A10 Team was *not* different from the historic audit team.

**(C)      Conclusion**

697.    We have reached the clear conclusion that the wording of the letter of the 3 March 2011 was seriously misleading.  It emphasised the fact that the A10 review was led by the new audit partner (i.e. Mr Mercer) but concealed the fact that the crucial judgments had been made and conclusions reached by Mr Knights, even if they had also been endorsed by Mr Mercer.

698.   It must have been obvious to Mr Mercer that, if the FRRP had been told the full story about the involvement of Mr Knights in the A10 review and had been told that the A10 Team was not different from the historic audit team, this might have influenced its decision whether to open a formal enquiry of its own.   The fact that Mr Mercer suggested changing the word "*independent*" to "*different*" in the draft response (see para [679] above) shows that he appreciated the sensitivity of the issue.   He understood (rightly) that it would have been misleading to describe the A10 Team as "*independent*" of the audit team. The same thinking should have led him to reject the description of the A10 Team as being "*different*" to or "*separate from*" the historic audit team.

699.   The wording of the letter was carefully crafted to mislead the FRRP and deflect it from following up A10's concerns with an investigation of its own.   Deloitte has not suggested that, if Mercer knew or ought to have known that the 3 March 2011 letter was misleading, his failure to correct the letter was not a breach of Fundamental Principle (c).   Deloitte and Mr Mercer owed a duty to the FRRP not to mislead it.   We consider that the failure to correct the impression conveyed by the letter that Mr Knights had played no part in the A10 review and that the A10 Team was different from the historic audit team was a clear breach of that duty. This is not a borderline case.   Their conduct fell significantly short of the standards reasonably to be expected of a Member Firm and Members and it amounted to Misconduct.

## (13)   ALLEGATION 5: MR KNIGHTS' LOSS OF OBJECTIVITY

700.   The Allegation in the Amended Formal Complaint is that:

> "*5 In relation to Mr Knights' engagement with Autonomy in the period from the Q3 09 review to the end of the Q2 10 review, Mr Knights failed to act with objectivity and, accordingly, he and Deloitte failed to act in accordance with Ethical Standard 1 'Integrity, Objectivity and Independence' and/or Fundamental Principle (b) 'Objectivity' and Section 120 (paragraph 120.1) in the ICAEW's Code of Ethics (2006)*".

701.   The standards which Mr Knights is alleged to have breached are:

(i)   APB Ethical Standard 1 para 6 of which states: "*Auditors shall conduct the audit of the financial statements of an entity with integrity, objectivity and independence*".

(ii)   Fundamental Principle (b) of the Code of Ethics (2006) which states: "*A professional accountant should not allow bias, conflict of interest or undue influence of others to override professional or business judgements*".

(iii)   Section 120.1 of the Code of Ethics (2006) which states: "*The principle of objectivity imposes an obligation on all professional accountants not to compromise their professional or business judgement because of bias, conflict of interest or the undue influence of others*".

702.   Para 9 of APB Ethical Standard 1 expands on what "*objectivity*" means:

> "*Objectivity is a state of mind that excludes bias, prejudice and compromise and gives fair and impartial consideration to all matters that are relevant to the task in hand, disregarding those that are not*".

703.   Para 10 explains that the need for auditors to be objective arises from the fact that many of the important issues involved in the preparation of financial statements relate to questions of judgment, rather than fact.

704.   Para 11 concludes:

> "*The auditor's objectivity requires that an impartial opinion is expressed in the light of all the available audit evidence and the auditor's professional judgment. Objectivity also requires that the auditor adopts a rigorous and robust approach and is prepared to disagree, where necessary, with the directors' judgments*".

705.   Section 100 of the Code of Ethics (2006) explains that an accountant's obligation of objectivity is part of the profession's public interest responsibility:

> "*Acting in the public interest involves having regard to the legitimate interests of clients, government, financial institutions, employers, employees, investors, the business and financial community and others who rely upon the objectivity and integrity of the accounting profession to support the propriety and orderly functioning of commerce*"

706.   Paragraph 120.2 further explains that:

> "*A professional accountant may be exposed to situations that may impair objectivity. It is impracticable to define and prescribe all such situations. Relationships that bias or unduly influence the professional judgement of the professional accountant should be avoided*".

707.    There is a helpful analysis of what is meant by a lack of objectivity on the part of an auditor at paras 593 to 605 of the *Equitable Life* decision of the Joint Disciplinary Scheme Appeal Tribunal. It includes:

> *"596 [that for lack of objectivity] something significantly more serious is required than mere incompetence or inadvertence…*
>
> *……*
>
> *603. In general terms, an allegation of lack of objectivity and independence will in our judgment be likely to succeed against an auditor if it be proved that there was some systemic or structural defect of a relatively fundamental nature in his approach to the performance of his functions, or to a significant part of those functions, which served materially to undermine his status and/or his authority vis a vis those whom it was his duty to protect. Absent proof of such a defect, the allegation may be harder to establish.*
>
> *…..*
>
> *605 At the same time, it is in our view of crucial importance in this context to recognise the desirability of a positive ongoing relationship between an auditor and his client; that is to say, a cordial professional relationship in the course of which information can be freely exchanged and discussion of issues arising in the course of the audit can take place freely in a frank and constructive atmosphere. The existence of such a relationship does not suggest any lack of objectivity and independence on the part of the auditor. On the contrary, the maintenance of such a relationship is in our view strongly to be encouraged as being of benefit both to the auditor and to the client in promoting and facilitating the more effective and efficient performance by the auditor of his functions."*

708.    An important issue is whether the Executive Counsel has to prove that there was a systemic or structural loss of objectivity on the part of Mr Knights. Deloitte submits that the charge of loss of objectivity is very serious and requires proof of a systemic or structural failing. We accept (and it is common ground) that loss of objectivity is a very serious charge. We do not, however, accept that it necessarily requires proof of a systemic or structural failing. The Tribunal at para 603 of its decision in the *Equitable Life* case rightly chose its words carefully. An allegation is "*likely*" to succeed where a systemic or structural failing is proved; and absent such a defect, the allegation "*may be harder to establish*". We agree. It all depends on the circumstances and is a question of fact and degree. A single failing *may* be enough if it is sufficiently flagrant and egregious. A significant number of unconnected failings which are not individually serious enough to demonstrate loss of objectivity may cumulatively be sufficiently serious to meet the test.

709.   Deloitte submits that it is impossible to reconcile the allegation that Mr Knights lacked objectivity with the many occasions where he disagreed with [Autonomy] and stood his ground in the face of resistance and reported the issue to the Audit Committee.  We accept that, in judging whether the allegation of loss of objectivity has been proved, we should take into account *all* the relevant evidence and this includes examples of Mr Knights standing up to Autonomy.  But we cannot accept that the allegation should be rejected in relation to the seven matters on which the Executive Counsel relies simply because there were other occasions when Mr Knights can be seen to have maintained his independence and integrity.  The entirety of the evidence must be weighed.

710.   Deloitte also makes a number of further points, including the following.  First, there was no challenge to the evidence of Mr Mercer and various Deloitte employees that Mr Knights was an inquisitive, skilled, honest and robust auditor who formed very good and effective relationships with his team and his clients.  There was nothing wrong with Mr Knights' informal approach to communicating with Autonomy.

711.   Secondly, Deloitte operated a collective decision-making approach requiring at least three partners and one senior professional standards reviewer to consider the judgments and conclusions taken on every audit, review or Audit Committee report.  All the judgments made by Mr Knights on the relevant issues were considered and tested within the audit team; and were discussed with and ultimately supported and signed off by all of the Deloitte reviewers.  Deloitte also submits that the substantive evidence of all its witnesses fatally undermines the Executive Counsel's thesis that Mr Knights gave in to pressure from [Autonomy] and allowed his judgment to be overborne.  The fact that all of the relevant issues and judgments were reported to the Audit Committee in each quarter is the clearest evidence of objectivity.

712.   As regards the first of these points, we accept that the fact that Mr Knights formed very good relationships and adopted an informal approach with [Autonomy] does not even raise a *prima facie* case of loss of objectivity.  We refer to and adopt para 605 of the decision in *Equitable Life* (see para 707 above).

713.   As for the second point, we accept that, if a decision made by Mr Knights was supported by all the Deloitte reviewers and the audit team at the time, that would be strong

evidence that the decision was not infected by loss of objectivity on his part.  But it would not necessarily be decisive.  There are no hard and fast rules.  Whether there was a loss of objectivity by Mr Knights in relation to any decision depends on an assessment of *all* the evidence that relates to the decision.

714.   With this introduction, we now turn to consider the seven matters relied on by the Executive Counsel in support of Allegation 5.

715.   In summary, these are:

(i)      Mr Knights' approach to the Strategic Deals Memorandum ("SDM");

(ii)     Mr Knights' approach to the risk that Autonomy would manipulate its results;

(iii)    Mr Knights' internal suggestion that Autonomy might include a misleading statement in its Q2 10 press release;

(iv)    Mr Knights' indifference to concerns expressed by Deloitte's independent reviewers;

(v)     Mr Knights' conduct in the course of the A10 investigation;

(vi)    Mr Knights' conduct in relation to the January 2010 meeting with the FRRP; and

(vii)   Mr Knights' lack of professional scepticism as alleged in Allegations 1 and 2.

**(i)     Approach to the SDM**

716.   This was the key piece of audit evidence relied on by Deloitte to sign off the treatment of the hardware costs in Q3 09 and FY 09: see paras [48] to [172] above.  The Executive Counsel submits that the tenor of the covering email that Mr Knights sent from his wife's email address to [Autonomy] at 22.00 hours on 13 October 2009 with his draft of the SDM was evidence of the over-familiarity of his relationship with [Autonomy] (see para [82] above).  Furthermore, the fact that the email was not copied to his own or

any other Deloitte email address is indicative of an individual who had lost sight of how he should act as a professional.

717.   We refer to para [51] et seq above for a comprehensive account of what happened in relation to the SDM and to our conclusion on the costs allocation in Q3 09 at paras [123] to [143].   We highlight the following points.   In his email of 22.00 hours on 13 October 2009 and his draft of the paper, Mr Knights identified further information that he required from Autonomy to support the allocation of costs between COGS and S&M and the allocation of $28 million to S&M.   We have emphasised the relevant passages in the draft at para [83] above.   This was information that Mr Knights knew was important and of great interest to the market.   That is why he and his colleagues spent so much time on the issue and why he referred to the engine as "*running a little hot*" and to the allocation issue as "*one key matter*" in his email to [Autonomy] sent at 9.30 on 14 October.   We do not accept Mr Knights' evidence that he did not regard it as essential to obtain further information of the agreement with TP42 to provide marketing. The passages that we have emphasised in the draft paper show that he plainly did consider it essential to obtain this further information (as objectively it was).

718.   The Executive Counsel submits that there was no evidential basis for Mr Knights' move from the position that he expressed at 22.00 hours on 13 October to that which he expressed at 16.31 on 14 October (para [100] above) when he accepted Autonomy's allocation.   The only further piece of evidence that he had was the Second TP42 email and we repeat what we have said about that at paras [133] to [136] above.

719.   Mr Knights spoke to [Autonomy] during the morning of 14 October.   Events moved fast between the time of that conversation and Mr Knights' acceptance of the Autonomy allocation at 16.31.   The Executive Counsel submits that the reviewers had very little opportunity to comment: see paras [95 to 101].   D13 said "*I am ok with it*"; D7 said that he would like some clarifications; and D2 responded to Mr Knights at 16.32 that the text should be amended to say that the costs *may* be split rather than *should* be split "*provided this is reflective of the underlying commercial substance of the transaction*". In short, the allocation did not receive the unqualified support of the reviewers.

720.   Deloitte submits that Mr Knights remained objective about the allocation throughout. He kept an open mind, pushing Autonomy to provide as much evidence as it could and waiting until all the available evidence was in and the matter had been fully discussed internally before reaching a conclusion.   Asking for the bare minimum would have meant getting less than the bare minimum.   Mr Knights' requests of 13 October 2009 were aimed at obtaining as much evidence as possible, which would then be assessed for sufficiency.   The totality of the evidence and explanations obtained was sufficient to support Mr Knights' conclusion on the proposed allocation, in agreement with the audit team and with the final approval of all three reviewers.   The suggestion that it could amount to a lack of objectivity for a senior Audit Partner to request a range of evidence to support a conclusion, not ultimately get all of it, but still find he can reasonably reach that conclusion, is unsustainable.

721.   We do not accept Deloitte's submissions. In his draft of the SDM paper, Mr Knights had properly identified the important areas of further information that were required.   In our view, by early on 14 October 2009 at the latest, [Autonomy] was applying a great deal of pressure on Mr Knights to agree that sufficient information had been provided to enable him to agree to the Autonomy draft.   The tenor of his email to [Autonomy] at 9.30 on 14 October is revealing of the pressure. The fact that Mr Knights gave the reviewers inadequate time to consider the draft and that he agreed to Autonomy's allocation at 16.31 without the backing of the reviewers (except D13) and without even waiting for D2's response is further evidence that Mr Knights was yielding to [Autonomy]'s pressure.   We do not accept that Mr Knights' conclusion was endorsed by his audit team or, with the exception of D13, the reviewers.

722.   In our view, it is significant that in his email to the reviewers sent at 16.13 on 14 October, Mr Knights said that the analysis provided by Autonomy was sufficient for Q3 09 purposes; but that it did not set a principle for similar transactions; that there would be an expectation that any future sales of hardware would be priced/costed at appropriate market rates; and that there would always need to be clear evidence of the different component parts of any purchase.   This shows that he had reservations about the allocation but was willing not to press the point this time.   In our view, this is further evidence that Mr Knights was willing to yield to [Autonomy] on this occasion but would not, without more, be willing to do so in the future.

723. In our opinion, in agreeing Autonomy's allocation of the hardware costs, Mr Knights failed to act with objectivity. Contrary to para 11 of APB Ethical Standard 1, he did not adopt a "*rigorous and robust approach*" and was not prepared to disagree with Autonomy's judgments as to the proper allocation.

**(ii)    Risk that Autonomy would manipulate its results**

724. On 4 November 2009, Mr Knights emailed [Autonomy] and said in relation to the Q3 09 review "*[s]peaking to [Autonomy] I share the view that achieving the expected Q4 software sales is absolutely key*". On 4 January 2010, the audit team held its FY 09 planning meeting and fraud discussion. Mr Knights told the meeting that Autonomy was "*likely to meet/exceed analysts expectations so no pressure to take aggressive positions for the results*".

725. On 6 January 2010, Autonomy pre-announced to the market that it "*expects to report 2009 Full Year results in line with analyst consensus estimates of revenues of approximately $740 million"*.

726. On 16 January 2010, D10 sent Mr Knights the D10 email saying that he expected that both the TP5 / TP7 and TP18 / TP19 Agreements which Autonomy had booked in Q4 09 would go direct in Q1 10.

727. Mr Knights knew that Autonomy's share price was extremely sensitive to changes in revenues that were outside market expectations and that these expectations had been achieved in part by selling some $50 million of pure hardware at a loss and potentially by accelerating revenue on (at least) the TP5 / TP7 and TP18 / TP19 Agreements.

728. The Executive Counsel submits that these facts should have weighed heavily on an objective auditor's mind, but there is no evidence that Mr Knights paid any heed to them.

729. On 22 January 2010, in the section of workpaper Q4 09 2321 "Overall review of the financial statements" concerning cost of revenue, Mr Knights amended the sentence "*However, there have been an increasing number of hardware sales made in recent*

*quarters, with a total of $36.6m recognised in Q3 2009 and $12.3m recognised in Q4 2009*" as follows:

> "*However, <u>during the year</u> there have been an increasing number of hardware sales made in recent quarters, with a total of $36.6m recognised in Q3 2009 and $12.3m recognised in Q4 2009. <u>Autonomy have taken a commercial decision to break into the lucrative software and appliance market and as such have sold these products at competitive prices so as to demonstrate their commitment to the customer base. This has had a slight dampening impact on the overall gross margins for the year, however these transactions are not a significant component of revenues</u>*".  (In the final version, the word "*slight*" was removed from the phrase "*slight dampening*").

730.   The Executive Counsel submits that, against the background of his previous statement that it was "*absolutely key*" that Autonomy should achieve the expected sales in Q4 09, and of Autonomy having told the market that it expected to report revenues "*in line with analyst consensus estimates*", if Mr Knights had retained his objectivity, he could not have written a comment that the hardware transactions were "*not a significant*" component of revenues. Mr Knights had lost his ability to see that these sales were different in nature to Autonomy's software sales and their undisclosed existence was, on any view, highly significant.

731.   At the Q2 2010 planning meeting and fraud discussion on 5 July 2010, Mr Knights said: "*Deliberate manipulation of results - Autonomy is likely to meet/exceed analysts expectations so there is no pressure to manipulate results*".  The Executive Counsel submits that this statement was even more remarkable because, by then, there had been four successive quarters in which analysts' revenue expectations had only been met as a result of pure hardware sales and/or end of quarter transactions with VARs.

732.   Deloitte denies that any of this is evidence of lack of objectivity on the part of Mr Knights.  As regards the email of 4 November 2009, it relies on the evidence of Mr Knights that this comment arose from a discussion of the role of acquisitions in Autonomy's business model as against its core software business and draws attention to the other sentence in the relevant bullet point of the email which stated: "*Equally I can see that there may be opportunities for possible corporate transactions*".  It says that Mr Knights was simply endorsing the view that the focus had turned away from acquisition to the core business.  We cannot accept this interpretation of the email.  Mr

*Edited for publication*

Knights was making two points one of which was that achieving the Q4 software sales was "*absolutely key*".  This reflected Mr Knights' opinion and, in view of the extreme sensitivity of the share price to changes in revenues that were outside market expectations, he was right.

733.   As regards the 4 January 2010 meeting, Deloitte submits that we should accept the unchallenged and uncontracted evidence of D10 (para 527 of his first witness statement) that he would *"not have understood Richard to mean that there was no need to be alert to the pressure on Autonomy to manipulate results because [Autonomy] had indicated that targets were expected to be met, which would not have made any sense"*.  We accept that, if this statement had stood alone, it would not have been a sufficient basis on which to make a finding of loss of objectivity.

734.   As regards the passage in workpaper Q4 09 2321 on which the Executive Counsel relies, Mr Knights explained in his first witness statement (paras 399-400) that, by making the amendment, he was merely putting forward a view as to the relative size of the income from the loss-making hardware sales as compared with the wider business: 6.4% of Autonomy's total sales in 2009. He said that he honestly believed that the effect of the loss-making hardware sales was limited because the sales of hardware did not constitute a significant proportion of total revenue over the year and were ancillary to the software revenues.

735.   We reject this explanation.  Mr Knights knew that, if disclosed, the hardware sales would have had a significant dampening impact on Autonomy's  share price.  That is why Autonomy was so resistant to the disclosure.  For the same reason, he must have known that the revenue from hardware sales was a significant component of Autonomy's revenues in 2009.  In stating that the hardware transactions were not a significant component of revenues and in the other respects relied on by the Executive Counsel, we are satisfied that Mr Knights was not expressing a fair and impartial opinion.  He had lost his objectivity.

**(iii)   Misleading statement in the draft Q2 10 press release**

736.   Over the weekend of 17-18 July 2010, Mr Mercer asked Mr Knights for his input in relation to the draft Q2 10 press release.  Mr Knights' response to Mr Mercer (copied to D10) included the following:

> *"Need to squeeze something in on Hardware – bear in mind they did have $10m of hardware held in inventory at the end of Q1 2010 and it was discussed with the analysis [sic] – perhaps they could use this as the way to note that [1] "As described in our Q1 2010 release we held hardware inventory of $10m at 31 march 2010.  We have now shipped this hardware inventory and hardware/product sales in Q2 were $30m"........[2] -the analysts may deduce that the 30m represents the sale of opening hardware of 10m plus some related software ???? This could even then go onto say that ....[3] "this had a one off 3% [or whatever] dampening impact on Q2 gross margin. We expect gross margin to return to normal levels in the second half of the year.*
>
> *.....*
>
> *Perhaps the key message to share with the Audit comm. In dialogue on the performance is that in the 12 months to 30 June 2010 there has been approx. $100m of Hardware sales at nil margin or at a loss.  This is about 12% of revenues over that time and it is placing inevitable tension on maintaining the historic profit margins—Bear in mind that $100m of software sales would tend to generate $90m of gross margin and around $50m of operating margin—so this is the shortfall so to speak."*

The numbering of [1], [2] and [3] in the first paragraph has been added by the Executive Counsel for ease of exposition.

737.   She submits that:

(i)   It is clear that the quotation at [1] would have been misleading.  It would have conveyed the message that the inventory of $10 million held at the end of Q1 had been sold for $30 million during Q2 10. This was not true: the $10 million inventory had been described to analysts at the Q1 2010 earnings conference call on 21 April 2010 as $10m in appliances, whereas the $30m revenue in Q2 10 was derived from sales of pure hardware, the supplies for which had (to at least a very large extent) been purchased during the quarter.

(ii)   The comment at [2] shows Mr Knights pointing out that the analysts would or might interpret the statement in this way.

*Edited for publication*

(iii) The proposed wording at [3] would also have been misleading, or at very least risk being so. Mr Knights had no basis to believe that any of the hardware sales were one-off. Nor did he have any basis to believe that it would be right to expect gross margin to "*return to normal levels in the second half of the year*".

738. Deloitte submits that Mr Knights' response is not evidence of lack of objectivity on his part.  It makes the following points:

(i) Mr Knights was trying his best to help Mr Mercer (the new Engagement Partner) to ensure that Autonomy provided *additional* disclosure about the loss-making hardware sales;

(ii) The final paragraph of Mr Knights' response is inconsistent with the suggestion that Autonomy might include a misleading statement in its press release;

(iii) In his evidence (Day 7/197-198), Mr Knights said that the "*????*" amounted to a warning to his colleagues not to adopt this language and that he was saying that it was really important that they should identify that there were $30 million of hardware sales and make sure that it was not confusing by putting in the fact that the sales had an impact on gross margin; and

(iv) Neither Mr Mercer nor D10 understood Mr Knights as suggesting that the press release should be misleading.

739. We accept that in the final paragraph of his response, Mr Knights was telling Mr Mercer that the Audit Committee should be told that 12% of revenues in the 12 months to 30 June 2010 were attributable to hardware sales.  But the focus of the allegation of Mr Knights' lack of objectivity is on the first paragraph quoted at para [736] above.

740. We do not accept that on any fair reading of this paragraph, including the inclusion of "*????*", Mr Knights was warning his colleagues *not* to use the language suggested in [1].  On the contrary, he was suggesting the wording in [1] as a possibility and supplementing it with the further suggestion that the statement could go on to use the wording in [3].  As the Executive Counsel says:

(i)      Why did Mr Knights propose the wording at [1] if he did not consider that it was a possible message to convey?

(ii)     Including "*????*" would be a grossly inadequate way of warning Mr Mercer and D10 not to convey the message.

(iii)    The further proposed wording at [3] is inconsistent with the words at [2] being intended to tell them "*don't say this*".

741.    Nor can we read Mr Knights' response as telling his colleagues that it was really important that they should identify that there were $30 million of hardware sales and that these had an impact on gross margin.  Whatever he intended to say (and however Mr Mercer and D10 now say they understood Mr Knights' response), that is not what the words said or could reasonably be understood as saying.

742.    We note that the Executive Counsel does not allege that Mr Knights was proposing that Autonomy make a dishonest statement to the market.  But we accept her submission that Mr Knights was searching for ways for Autonomy to avoid being frank with users of the financial results.  He made a proposal for the Q2 10 press release for which there was no justification and which showed that he was not acting dispassionately and with objectivity.

**(iv)   Indifference to concerns expressed by reviewers**

743.    This allegation is centred on the email that Mr Knights sent to [Autonomy], Mr Mercer and D10 on 18 July 2010 which we have cited at para [233] above and which for convenience we reproduce here (the emphasis is in the original):

> "*All*
>
> *The proposed COGS position is not something our compliance people will get comfortable with, and we've already highlighted our position on this with the AC in Q1 setting out that we only got comfortable with this in Q1 on immateriality grounds.*
>
> ***But there is a solution that makes sense*** *– particularly as in the Q1 call you already highlighted the $10m of hardware in inventory which you highlighted was to be sold in Q2.*

*My solution would be :*

- *Record the hardware sales at nil gross margin for IFRS reporting*

- *Take the "loss" as a selling expense — (around $4-5m i think)*

- *The market already knows that you will be making Q2 hardware sales as you highlighted this at Q1 and had inventory on the b/s. So any IFRS gross margin one off drop is reasonable and can be explained as part of the strategy.*

- *In the **adjusted gross margin** strip back out the hardware element to a "normalised" level and add an explanation -*

*By the time you wrap up the $10m hardware b/f and the$ 4-5 m that is in selling expense surely we are almost there??*

*Just to be totally clear all of us fully get the strategic element to this and the opportunity to open up new markets. The evidence of follow through sales is apparent –*

*I'm flying between 10.00 am and 5 pm tomorrow ,*

*Surely this makes sense ?*

*Happy to discuss.*

*R"*

744. Para 245 of the Amended Formal Complaint makes detailed reference to the concerns expressed by the reviewers about the way in which Autonomy wished to deal with the hardware costs issue.  We have referred to some of their comments above: see, for example, paras [214]-[215] and [217] (D2) and paras [223] and [225] (D1).  Para 245 of the Amended Formal Complaint refers to more.  We do not find it necessary to refer to them in detail.

745. In the email of 18 July 2010 itself, Mr Knights stated that the proposed COGS position was not something "*our compliance people*" (i.e. the reviewers) were comfortable with.  There is no doubt that he was aware of their concerns about the non-disclosure of the amount of hardware sales.

746. The Executive Counsel submits that this email shows that Mr Knights had lost his objectivity because:

(i)     He identified with Autonomy: his sense of oneness is evident from the language he used, *e.g.* "*my solution*" and "*surely <u>we</u> are almost there??*" (emphasis added).

(ii)    He made no attempt to analyse the merits of this proposal as a matter of accounting.

(iii)   He was advocating this position, ending his message "*Just to be totally clear all of us fully get the strategic element to this*" (this was directed to his colleagues at Deloitte).

(iv)    His "*solution*" was designed to help Autonomy explain a drop in gross margins without disclosing its hardware sales. His email is explicit in saying that the gross margin "*can be explained*" by the Q1 10 inventory, which the market knew about.

(v)     His final assertion that "*[t]he evidence of follow through sales is apparent*" was simply wrong.

747.    Deloitte denies that the email is indicative of a loss of objectivity on the part of Mr Knights.  The review of all the work done on both hardware and VARs during Mr Knights' tenure shows that the reviewers played a critical role and that he engaged with and relied on them heavily.  D7, D2 and D1 all gave evidence that their experience was that he was not indifferent to them.

748.    Deloitte also points out that in Q2 10 Mr Knights was no longer the Engagement Partner and Mr Mercer and his team were responsible for communicating with the reviewers and providing sign-off.  It submits that the suggestion that the email shows Mr Knights viewing "*his role as mediating between what [Autonomy] would like and what his partners would be prepared to tolerate*" (as alleged at para 245.1 of the Amended Formal Complaint) is baseless.

749.    Deloitte's case is that the email forms part of a robust review challenge (with which Mr Knights agreed) and Deloitte's rejection of [Autonomy's] proposed costs allocation in Q2 10.  As both Mr Mercer and Mr Knights confirmed, the allocation proposal Mr Knights described in the email was in fact Mr Mercer's idea.  Mr Knights' decision to

describe it as "*my solution*" was simply to convey to Autonomy that he had considered it and was in agreement with it.

750. We find this evidence unconvincing.  It is difficult to see why Mr Knights would have used the words "*my solution*" if the solution had not indeed been his idea.  But even if the solution was Mr Mercer's idea, that cannot of itself be a defence to the allegation of loss of objectivity by Mr Knights.  Mr Knights embraced it as *his own* solution.  We reject his attempt to distance himself from it.

751. As for the substance of the email, it seems to us that there is no answer to the Executive Counsel's submissions.  Mr Knights was writing as an advocate of the solution that he was proposing.  The language was not that of an auditor acting independently of his client striving to achieve a proper solution.  Rather it was that of an auditor who was seeking to achieve a solution that would satisfy his client's wish to meet the market's expectations in the face of the reviewers' objections.  The words "*we are almost there*" and "*all of us fully get the strategic element to this and the opportunity to open up new markets*" are those of an advocate, not an independent auditor.

752. We are satisfied that Mr Knights had lost his objectivity when he sent the email of 18 July 2010.

**(v)    Mr Knights' conduct in the course of the A10 investigation**

753. We have referred to A10's two emails and Deloitte's response to them in some detail at paras [484] to [532] above.  At para 246 of the Amended Formal Complaint, the Executive Counsel relies on four matters as evidence of Mr Knights' loss of objectivity in relation to his conduct of the A10 investigation.  In our opinion, only one of these requires examination here.  The others are allegations of lack of adequate professional scepticism, but do not raise a *prima facie* case of loss of objectivity.

754. But the allegation that does call for comment arises from [Autonomy]'s "*instruction*" to Mr Knights that Deloitte should only focus on material matters: see paras [516] and [517] above. Deloitte points out that the "*instruction*" followed a conversation [at Autonomy involving] A3 (a senior member of the Audit Committee). It submits that

this was a reasonable and sensible instruction from A3, showing that he wanted Deloitte to investigate the matters raised by A10 quickly, focussing on material matters, and get an understanding of what was behind them. Mr Knights rightly relayed this suggestion to Mr Mercer. There was no lack of objectivity on the part of Mr Knights.

755.   We reject this submission. The effect of the instruction would have been to focus only on transactions of $20 million or more and not to consider the other transactions mentioned in the First A10 Email which were similar to the TP5/TP7 transaction or to consider the implications for recognising revenue under reseller transactions in the future. Even if this had been a reasonable and sensible policy decision to make, it should have been made by Mr Knights exercising his own judgment and not in obedience to a client instruction.

756.   But we do not accept that the instruction was a proper response to the concerns expressed by A10 which had also been expressed by D10 in the D10 email. As we have said at para [517] above, if the materiality of a transaction was determinative of the question whether to recognise the revenue that would flow from it, these concerns could easily have been disposed of; and it would have been a complete answer to D10's note against various transactions mentioned in his spreadsheet ("*Revenue too early*") none of which was worth $20 million.

757.   Deloitte also makes the point that, despite the instruction, it did in fact consider all of the matters raised by A10. We do not need to decide whether this is true. That is because the gravamen of the allegation is that Mr Knights accepted [Autonomy]'s instruction and at least purported to carry it into effect. We consider that, by doing so, he failed to show rigorous and robust independence of his client and lacked objectivity.

**(vi)      Conduct in relation to 13 January 2010 meeting with FRRP**

758.   The parties' respective submissions and our response to them are set out in detail in relation to Allegation 3 at paras [655] to [672] above. We have set out our reasons for concluding that Mr Knights acted with a lack of integrity in failing to correct [Autonomy]'s misleading statement that Autonomy was "*a pure software business with less than 5% of its revenue coming from services*". For the same reasons, we are of the

opinion that he also displayed a lack of objectivity.  This was no mere failure to act in accordance with the professional standards reasonably to be expected of an auditor.

### (vii)   Lack of professional scepticism as alleged in Allegations 1 and 2

759.   We have set out our findings in detail above and explained why we have found that Mr Knights was culpable of lack of professional scepticism and Misconduct.  We are not, however, persuaded that the shortcomings of Mr Knights that we have identified are evidence of a lack of objectivity on his part.  The Executive Counsel has not pointed to any particular act or omission which is indicative of a lack of objectivity.  It is not good enough simply to rely on the totality of Mr Knights' shortcomings.  We reject this allegation.

### (A)   Conclusion on Allegation 5

760.   We have dealt with each of the seven matters relied on by the Executive Counsel. We have reached clear conclusions on each of them without considering the alleged four structural threats to Mr Knights' objectivity on which she relies.  These are: (i) the importance of Autonomy as a client of Deloitte and the Cambridge office in particular; (ii) Mr Knights' identification of the relationship with Autonomy as important to his personal success; (iii) the close personal relationship between Mr Knights and Autonomy executives; and (iv) [ …].

761.   We do not propose to deal with the Executive Counsel's submissions on these alleged threats and Deloitte's detailed responses to them.  The existence of some or all of these threats may explain *why* Mr Knights behaved as he did.  But what matters for present purposes is *how* he behaved and not why he behaved in a particular way.  Accordingly, we have not taken the alleged threats into account in reaching our conclusions on Allegation 5.

762.   Finally, we return to para [709] above.  As we have said, in judging whether the allegation of loss of objectivity had been proved, it is necessary to take into account *all* the relevant evidence and this includes examples of Mr Knights standing up to Autonomy.  The high watermark of his doing this was his and Deloitte's resistance to

[Autonomy's] wish to capitalise the hardware costs.   On 7 October 2009, D11 and D10 met [Autonomy] and told [them] that Autonomy could not capitalise any of these costs. They were representing the view of the entire Deloitte team, including D6, D2 and D7. Mr Knights agreed with them all and stood firm against Autonomy on this issue.   He had what he described as "*quite a bruising encounter*" with [Autonomy].   Great reliance is placed by Mr Knights and Deloitte on the stand that was taken by Mr Knights.

763.   In reaching our conclusions on Allegation 5, we have taken this into account.   But it does not affect our decision for the following reasons.   First, it was not seriously arguable that the hardware costs could properly be capitalised.   This should not have been a difficult battle for Mr Knights to win.   Secondly, even if there was a real issue as to whether these costs could be capitalised, in our judgment, Mr Knights' resistance to Autonomy on this issue carries little weight when set against the weight that we consider should be given to the six particular instances of loss of objectivity that the Executive Counsel has established to our satisfaction.   As we have said, the entirety of the evidence that bears on the loss of objectivity issue must be weighed.   In our judgment, the scales come down heavily in favour of loss of objectivity.

## (14)   OVERALL CONCLUSION ON CULPABILITY

764.   These proceedings are concerned with the conduct of Deloitte, Mr Knights and Mr Mercer in relation to the audit of Autonomy's financial statements for FY 09 and FY 10 and the review of its financial results over the Relevant Period (from Q3 09 to Q2 11). Mr Knights was the Engagement Partner until Q1 10. Mr Mercer was the Engagement Partner from Q2 10 until the end of the Relevant Period.

765.   For the reasons that we have set out above, the Executive Counsel has proved many of the allegations that are set out in the Amended Formal Complaint.   The most serious of these are of Misconduct through a failure to act in accordance with Fundamental Principle (c) "Professional Competence and Due Care" (against both Mr Knights and Mr Mercer), through a lack of integrity (against Mr Knights) and through a loss of objectivity (against Mr Knights).

766.    We have explained at paras [20] to [22] the definition of Misconduct within the meaning of the Accountancy Scheme.   In the context of these proceedings, it is conduct which falls *significantly* short of the standards reasonably to be expected of a Member or a Member Firm of the ICAEW.   It crosses the threshold of real seriousness. The allegations of lack of integrity and of loss of objectivity are also of the utmost seriousness.

767.    The following is a summary of our principal findings.

768.    Deloitte and Mr Knights were culpable of:

(i)     Misconduct in relation to (i) the allocation of hardware costs in Q3 09 and Q4 09/FY 09; (ii) the non-disclosure of the hardware sales in FY 09; (iii) the recognition of revenue from sales to VARs in Q4 09/FY 09, Q1 10 and Q2 10;

(ii)    lack of professional scepticism as contended in Allegation 1.4(a);

(iii)   lack of integrity in breach of Fundamental Principle (a) and section 110 of the Code of Ethics in failing to correct [Autonomy]'s misleading statement to the FRRP at the meeting on 13 January 2010; and

(iv)    loss of objectivity in breach of Fundamental Principle (b) and section 120.1 of the Code of Ethics and para 6 of APB Ethical Standard 1 in the six respects described at paras [716] to [758] above.

769.    Deloitte and Mr Mercer were culpable of:

(i)     Misconduct in relation to (i) the non-disclosure of the hardware sales in FY 10; (ii) the recognition of revenue from sales to VARs in Q2 10 and Q3 10; and (iii) the failure to correct Autonomy's letter dated 3 March 2011 to the FRRP;

(ii)    lack of professional scepticism in relation to (i) the allocation of hardware costs in Q2 10, Q3 10 and Q4 10/FY 10; and (ii) the recognition of revenue from sales to VARs in Q4 10/FY 10, Q1 11 and Q2 11; and

(iii)   lack of professional competence in breach of Fundamental Principle (c) of the Code of Ethics in relation to the audit documentation for the TP3 transaction in FY 10.

770.   This has been an enormous case.  The oral evidence occupied approximately 20 days. We heard oral opening and closing submissions from counsel over several days.  We have considered voluminous written evidence.  The experts' reports alone run to hundreds of pages.  The parties' written opening and closing submissions run to approximately 1,200 pages.  The primary documentation is vast.  Much of it is complex and extremely detailed.  We have not dealt with every point that has been raised orally and in writing. Instead, we have endeavoured to concentrate on the principal points, although it was inevitable that we would descend into a good deal of detail.  The fact that we have not mentioned a piece of evidence, or even a submission, does not mean that we have ignored it.  We have considered and taken into account all the oral and written evidence and submissions that we have received and all the primary material to which we were taken at the hearing and which is referred to in the written evidence.

771.   We are conscious of the fact that the allegations that have been made by the Executive Counsel and the conclusions that we have reached are extremely serious for Deloitte, Mr Knights and Mr Mercer. Deloitte is a very large internationally renowned firm.  Mr Knights and Mr Mercer are both accountants with long experience of auditing.  Our findings will inevitably be damaging to their reputations as well as to that of Deloitte. We have not reached our conclusions lightly.  But we are also acutely aware that Deloitte, Mr Knights and Mr Mercer were under a public interest duty to uphold the reliability of the reporting of Autonomy (which is a FTSE 100 company).  Para 4 of the APB Ethical Standard 1 provides:

> *"Public confidence in the operation of the capital markets and in the conduct of public interest entities depends, in part, upon the credibility of the opinions and reports issued by the auditor in connection with the audit of the financial statements.  Such credibility depends on beliefs concerning the integrity, objectivity and independence of the auditor and the quality of the audit work performed"*

772.   This public interest duty is critical.  Regrettably, for the reasons that we have set out in considerable detail above, we have found that Deloitte and, in particular Mr Knights,

but also to a lesser extent Mr Mercer, were culpable of serious and serial failures in the discharge of this duty.

773. We acknowledge that Deloitte did a great deal of careful appropriate work on the Autonomy accounts during the Relevant Period. Many workpapers and reports were written and other detailed documents produced. There was no shortage of effort or manpower. Neither Mr Knights nor Mr Mercer was deprived of the resources that they needed to discharge their duties properly.

774. Some of the allegations that we have found proved are the result of mistakes or erroneous judgments which, with the benefit of hindsight, can be seen to have been wrong. It may be said that some of the allegations of failure to exercise professional scepticism fall into this category. But it is the wholesale nature of the failure of professional scepticism in relation to the accounting for the hardware sales and the VAR transactions as well as our findings of Misconduct and of breaches of Fundamental Principles that make this case so serious.

775. We have described the market scrutiny that was a constant background pressure on these audits and reviews. The pressure on Autonomy to meet market expectations gave rise to a risk of misstatement through manipulation of the financial results to achieve a desired position. Deloitte, Mr Knights and Mr Mercer were well aware of the pressure and the risk. They were under pressure from Autonomy to accept its treatment of the hardware costs and the revenue from VAR transactions, rather than upset their client by challenging it. We recognise that on some occasions they stood firm and did not yield to this pressure, although, as we have explained, these were usually where it was obvious that what Autonomy wanted to do was unacceptable. But there are only a few examples of this kind.

776. Autonomy was an important client for Deloitte generally, and for the Cambridge office in particular. It was the only FTSE 100 company audited from that office. Deloitte's relationship with Autonomy was critical to the Cambridge office's financial success. This made it all the more important that Deloitte should be alive to the need to discharge its public interest duty reliably and independently and not yield to actual or apparent

client pressure. Regrettably, for the reasons that we have given, it signally failed to do this.

## (15)   SANCTIONS

### (A)   Introduction

777.   In the light of our findings above, which were sent to the parties in draft before the Sanctions and Costs hearing (which took place on 9 and 10 July 2020), the Executive Counsel submits that the following sanctions are appropriate:

(i)   In relation to Deloitte:

- A Severe Reprimand.

- A Condition/Direction that Deloitte provide a Root Cause Analysis of the reasons for the Misconduct, why the firm's processes and controls did not prevent the Misconduct and whether the firm's current processes would lead to a different outcome.

- A fine of £15 million.

(ii)   In relation to Mr Knights:

- Exclusion as a Member of the ICAEW for a recommended period of 7 years.

- A fine of £500,000.

(iii)   In relation to Mr Mercer:

- A Severe Reprimand.

- A fine of £250,000.

778.   There are three sources of rules and guidance.  These are: (i) The Scheme; (ii) The Accountancy Regulations dated 8 December 2014 ("*the Regulations*"); and (iii) The Sanctions Guidance revised with effect from 1 June 2018 ("*the Guidance*").

779.   We have also been assisted by the Independent Review of the FRC's Enforcement Procedures Sanctions, produced in October 2017 ("*the Sanctions Review*").

780.   When a Tribunal has made a finding that a Member or Member Firm has committed Misconduct (known in the Scheme as an "*Adverse Finding*"), it may order such sanctions as are contained in Appendix 1 to the Scheme. The four sanctions which are relevant in this case are (i) Severe Reprimand, (ii) Condition/Direction, (iii) Fine, and (as regards Mr Knights only) (iv) Exclusion as a Member of the ICAEW.

**(B)    The Guidance**

781.   Paragraph 3(ii) of the Scheme requires the Tribunal to have regard to the Guidance. Paragraph 7 of the Guidance provides that Tribunals should consider any principles emerging in cases decided by previous Tribunals, and may have regard to sanctions imposed in such cases. However, the Tribunal must:

> *"determine the sanction which they think appropriate on the facts and circumstances of the case before them and should not feel constrained by the sanctions imposed (or not imposed) in earlier cases to impose a sanction which they do not think appropriate."*

782.   Paragraph 9 of the Guidance states the objectives for imposing sanctions in the following terms:

> *"9.    In determining the appropriate sanction, a Tribunal should have regard to the reasons for imposing sanctions for Misconduct in the context of professional discipline. Sanctions are imposed to achieve a number of objectives, namely:*
>
> *a.    to declare and uphold proper standards of conduct amongst Members and Member Firms and to maintain and enhance the quality and reliability of accountancy work;*
>
> *b.    to maintain and promote public and market confidence in the accountancy profession and the quality of corporate reporting and in the regulation of the accountancy profession;*

> c.  to protect the public from Members and Member Firms whose conduct has fallen significantly short of the standards reasonably to be expected of that Member or Member Firm; and
>
> d.  to deter members of the accountancy profession from committing Misconduct.
>
> The primary purpose of imposing sanctions for acts of Misconduct is not to punish, but to protect the public and the wider public interest."

783.  Paragraph 10 provides that the Tribunal should impose sanctions which:

> "a.  improve the behaviour of the Member or Member Firm concerned;
>
> b.  are tailored to the facts of the particular case and take into account the nature of the Misconduct and the circumstances of the Member or Member Firm concerned;
>
> c.  are proportionate to the nature of the Misconduct and the harm or potential harm caused;
>
> d.  eliminate any financial gain or benefit derived as a result of the Misconduct; and
>
> e.  deter Misconduct by the Member, Member Firm or others."

784.  Paragraphs 13, 14 and 15 set out general considerations that the Tribunal should take into account when determining which sanction or combination of sanctions to impose:

> "13.  A Tribunal should consider the full circumstances of each case and the seriousness of the Misconduct involved before determining which sanction or combination of sanctions to impose on the Member or Member Firm. …
>
> 14.  In deciding which sanction or combination of sanctions to impose, a Tribunal should have regard to the principle of proportionality. In assessing proportionality, a Tribunal should consider whether a particular sanction is commensurate with the circumstances of the case, including the seriousness of the Misconduct found and the circumstances of the Member or Member Firm concerned.
>
> 15.  The seriousness of the Misconduct found should be determined by reference to a number of factors. These include the nature of the Misconduct, the level of responsibility of the Member or Member Firm in committing the Misconduct and the actual or potential loss or harm caused by the Misconduct. The extent to which intent,

> *recklessness, knowledge of the risks or likely consequences, negligence or incompetence are involved will vary".*

785.    Paragraph 18 of the Guidance sets out the normal six-stage approach to determining the sanction (with cross-references to the relevant paragraphs in the Guidance):

> "*a.    assess the nature and seriousness of the Misconduct found by the Tribunal (paragraphs 20 to 24);*
>
> *b.    identify the sanction or combination of sanctions that the Tribunal considers potentially appropriate having regard to the Misconduct identified in a. above (paragraphs 25 to 55);*
>
> *c.    consider any relevant aggravating or mitigating circumstances and how those circumstances affect the level of sanction under consideration (paragraphs 60 to 65);*
>
> *d.    consider any further adjustment necessary to achieve the appropriate deterrent effect (paragraphs 66 and 67);*
>
> *e.    consider whether a discount for admissions or settlement is appropriate (paragraphs 68 to 74); and*
>
> *f.    decide which sanction(s) to order and the level/duration of the sanction(s) where appropriate*"

786.    Paragraph 21 sets out 23 non-exhaustive factors on which a Tribunal will normally base its assessment of the nature and seriousness of the Misconduct.  We refer to some of these in our consideration of the application of the Guidance to the facts of this case.

## (C)     Step 1: the nature and seriousness of the Misconduct

### *Factor (a): the financial benefit derived from the Misconduct*

787.    This is the first factor listed in paragraph 21, although the Executive Counsel submits that it is of less significance than some of the other factors.  She does not suggest that any identifiable fees were earned as a direct consequence of the Misconduct.  She says, however, that the Misconduct must have furthered Deloitte's relationship with Autonomy and that the Respondents must therefore have derived significant financial benefit from that relationship.

788. Deloitte had been Autonomy's auditor with effect from FY03. In the Relevant Period, it was remunerated for its work in relation to Autonomy as follows:

    (i)    FY 09: audit fees of $1,777,000 (£1,104,000) plus non-audit fees of $764,000 (£475,000), totalling $2,541,000 (£1,579,000);

    (ii)    FY 10: audit fees of $1,530,000 (£975,000) plus non-audit fees of $1,199,000 (£764,000), totalling $2,729,000 (£1,739,000);

    (iii)    Q1 and Q2 11: workpapers record that the Q1 and Q2 11 reviews comprised audit or quarterly review fees of £320,000 and non-audit fees of £215,000, making a total of £535,000.

789. As we have said at para [7] above, Autonomy was an important client for Deloitte generally, and particularly for the Cambridge office. It was the only FTSE 100 company audited from that office. The fees received from Autonomy were critical to the financial success of the Cambridge office (see para [776] above).

790. The fees set out at para [788] above amount to almost £4 million. The Executive Counsel submits that we should bear in mind the size of this sum when considering the size of the appropriate fines.

791. Deloitte says that neither it nor Mr Knights or Mr Mercer derived, or intended to derive, any financial benefit for themselves from the Misconduct. Their conduct did not add to the audit or other engagement fees received by Deloitte, or the remuneration received by Mr Knights and Mr Mercer. It also submits that it is pure speculation to suggest that the Misconduct must have furthered Deloitte's relationship with Autonomy.

792. We accept that it is impossible to know whether Deloitte would have earned the audit and non-audit fees that it did earn from Autonomy if the Misconduct had not occurred. But we are satisfied that, by yielding to the pressure from Autonomy to agree its treatment of the hardware sales and VAR revenue, Deloitte did further its relationship with Autonomy and is thereby likely to have derived some unquantifiable financial benefit from the Misconduct.

*Factor (b): the gravity and duration of the Misconduct*

793.  The Misconduct that we have found was very serious and wide-ranging.  It included failures of professional scepticism, failures to obtain sufficient appropriate audit evidence, failures adequately to challenge materially misleading statements in Autonomy's Annual Reports and Accounts, failures to insist on disclosure in those Accounts, two audit engagement partners permitting the regulator (FRRP) to be misled by Autonomy on two separate occasions (on one occasion Mr Knights acting with reckless lack of integrity) and multiple losses of objectivity on the part of Mr Knights.

794.  Our Report is replete with very serious findings of Misconduct. These are reflected in our conclusions, viz (with emphasis added):

(i)  "*The allegations that have been made by the Executive Counsel and the conclusions that we have reached are extremely serious for Deloitte, Mr Knights and Mr Mercer… Our findings will inevitably be damaging to their reputations…*" (para [771]);

(ii)  "*This public interest duty* [Para 4 of the APB Ethical Standard 1] *is critical…we have found that Deloitte and, in particular Mr Knights, but also to a lesser extent Mr Mercer, were culpable of serious and serial failures in the discharge of this duty*" (para [772]);

(iii)  "*… it is the wholesale nature of the failure of professional scepticism in relation to the accounting for the hardware sales and the VAR transactions as well as our findings of Misconduct and of breaches of Fundamental Principles that make this case so serious*" (para [774])*; and*

(iv)  "*Deloitte's relationship with Autonomy was critical to the Cambridge office's financial success. This made it all the more important that Deloitte should be alive to the need to discharge its public interest duty reliably and independently and not yield to actual or apparent client pressure. Regrettably, for the reasons that we have given, it signally failed to do this*" (para [776]).

795.    In detail, we have made findings of Misconduct against Deloitte and Mr Knights relating
to:

(i)     Failing to act appropriately given the absence of disclosure of the pure hardware
sales in the FY 09 Annual Report and Accounts – Allegation 1.1 (paras [182] and
[374-378]);

(ii)    Insufficient audit evidence relating to the pure hardware sales in Q3 09 and FY
09 generally – Allegation 1.2 (paras [123-144] and [168-172]);

(iii)   Lack of professional scepticism relating to the hardware sales in Q3 09 and FY
09 generally – Allegations 1.2 and 1.4(a) (paras [123-144] and [168-173]);

(iv)    Failing to act competently when presented with misleading statements in the
Annual Report and Accounts and/or materially inconsistent information in the
Directors' Report for FY 09 – Allegation 1.4(b) (paras [174-182]);

(v)     Lack of professional scepticism, failure to make additional inquiries or perform
adequate review procedures, and/or failure to obtain sufficient audit evidence as
regards sales to VARs in Q3 09, FY 09, Q1 10 and Q2 10 – Allegations 2.1(a)-(b)
(paras [417-419], [441-447], [473-481] and [509-532]);

(vi)    Lack of integrity in recklessly failing to correct a misleading statement by
[Autonomy] at the FRRP meeting on 13 January 2010 – Allegation 3.1 (paras
[667-672]); and

(vii)   Losses of objectivity in the period from the Q3 09 review to the end of the Q2 10
review – Allegation 5 (paras [716-763]).

796.    We have also made findings of Misconduct against Deloitte and Mr Mercer relating to:

(i)     Failing to act appropriately given the absence of disclosure of the pure hardware
sales in the FY 10 Annual Report and Accounts – Allegation 1.5 (paras [374-
378]);

(ii)   Lack of professional scepticism relating to the hardware sales in Q2 10 and FY 10 generally – Allegations 1.5 and 1.6(a) (paras [248-249] and [276]);

(iii)   Failing to act competently when presented with misleading statements in the Annual Report and Accounts and/or materially inconsistent information in the Directors' Report for FY 10 – Allegation 1.6(b) (paras [277-278]);

(iv)   Lack of professional scepticism, failure to make additional inquiries or perform adequate review procedures, and/or failure to obtain sufficient audit evidence as regards sales to VARs in Q2 10, Q3 10 and Q1 11 – Allegations 2.2(a)-(b) (paras [509-532], [553-563] and [622-626]); and

(v)   Lack of competence in failing to correct a false or misleading statement in Autonomy's letter to the FRRP dated 3 March 2011 – Allegation 4 (paras [697-699]).

797.   The findings of loss of objectivity and lack of integrity against Mr Knights and Deloitte are particularly serious and unusual.  So too are the findings that all the Respondents failed to correct misleading statements made to the FRRP. In Mr Knights' case, he recklessly allowed the FRRP to be misled by [Autonomy] in January 2010 as to the source of Autonomy's revenues (software as opposed to pure hardware). Mr Mercer failed to correct Autonomy's letter dated 3 March 2011 regarding the A10 review, which we have found was "*seriously misleading*" and "*carefully crafted to mislead the FRRP*", and we have described Mr Mercer's conduct as "*a clear breach of that duty [viz. not to mislead the FRRP]. This is not a borderline case*" (paras [697-699]).

798.   Mr Plewman rightly accepts that we have made serious findings of Misconduct, but he submits that the most serious findings need to be set in context.  As regards the finding of lack of integrity against Mr Knights which is the subject of Allegation 3.1, he emphasises that this was an isolated incident.  There has been no allegation (or finding) that Mr Knights acted recklessly or with a lack of integrity on any other occasion.  There is no finding that Mr Knights intended the FRRP to be misled or was aware that it was being misled; only that he was reckless as to the possibility that it might be misled.

799.   Mr Plewman emphasises that Allegation 4 is also the subject of an isolated incident concerning a single line in the letter written by Autonomy; and he points out that Mr Mercer sought to persuade Autonomy to revise the letter (albeit insufficiently). He stresses that we have found no more than that Mr Mercer failed to exercise due care and competence in not correcting Autonomy's letter to the FRRP.

800.   Mr Plewman also reminds us that it was never part of the Executive Counsel's case (and there is no finding) that the FRRP was in fact misled on either of these two occasions.

801.   As regards Allegation 5, Mr Plewman submits that our findings of loss of objectivity relate to specific instances rather than Mr Knights' conduct of the audits and reviews as a whole.  He points out that we have rejected the seventh particular of loss of objectivity, namely Mr Knights' lack of professional scepticism as alleged in Allegations 1 and 2 (para [759] above).

802.   As regards the findings of Misconduct in relation to Allegations 1 and 2, Mr Plewman makes a number of points including:

(i)   The issues and standards relevant to both the hardware sales and VARs were all identified by the Respondents in each of the relevant reviews and audits, considered by the audit and review teams, and reported to the Audit Committee. The findings of Misconduct are not that issues were not identified, or that they were ignored, but that the judgments that were made on those issues were culpably wrong;

(ii)   We have made no findings of systemic or pervasive problems with Deloitte's audit approach to Autonomy in FY 09 or FY 10.  There is no allegation or evidence that the fundamentals of the financial statements of Autonomy were materially misstated.  Rather, the focus of the findings is on the professional judgments reached and the level of scepticism applied in relation to (a) the disclosure and cost allocation of the hardware sales and (b) the timing of recognition of revenue for five specific VAR transactions;

(iii)    The hardware sales represented 6.5% of revenue in FY 09 and 10.9% of revenue in FY 10.  The relevant VAR transactions were seven licence deals with VARs worth $1 million or more between Q3 09 and Q2 11. The total value of the five VAR transactions in respect of which we have found Misconduct was $35 million, which represented 2.2% of the total Autonomy revenue in 2009 and 2010;

(iv)    There is no analysis which shows that the revenue of the five VAR transactions ought never to have been recognised at all.  If the revenue should have been recognised only at the point when there was a sale to the ultimate end-user, then the impact on FY 09 and FY 10 would be well below audit materiality.  The net effect on revenue for FY 09 was -$10.6 million against audit materiality of $20 million; and for FY 10 it was -$1.8 million against audit materiality of $22.5 million;

(v)    Allegations 1 and 2 are only concerned with two areas of a much larger body of audit and review work carried out by Deloitte for Autonomy in FY 09 and FY 10 that has never been challenged;

(vi)    The Allegations are essentially limited to two financial periods, namely FY 09 and FY 10; and

(vii)   None of the Misconduct that we have found is continuing.  It is now very much historic; and the Executive Counsel acknowledges that Mr Knights' and Mr Mercer's Misconduct is unlikely to be repeated because they both have now retired.

803.    We do not consider that the points made by Mr Plewman detract from the seriousness of the Misconduct.  It is the very fact that there were six distinct and separate instances of loss of objectivity that makes this a bad case.   Moreover, as Ms Sabben-Clare says, none of them occurred during a "moment of madness".  The true position is that on several occasions, Mr Knights bowed to client pressure at exactly the point in time when an audit partner should have resisted it.  These were critical moments in each audit.  It is unknowable what would have happened if Mr Knights had stood firm and not yielded

to the pressure.  But it is clear that these issues mattered very much to Autonomy and Mr Knights was well aware of this.

804.  Nor were the acts of Misconduct which gave rise to Allegations 3 and 4 "moments of madness".  As regards Allegation 3, Mr Knights had ample opportunity to identify and address the risk that the FRRP would be misled by a description of Autonomy's business as "*pure software*".  [Autonomy]'s description had also been given in answer to questions which the FRRP had raised in a letter before the 13 January 2010 meeting. Mr Knights saw this letter on 7 December 2009.  He had a preparation meeting with Autonomy the day before the meeting.

805.  As regards Allegation 4, we refer to paras [673-699] above.  Mr Mercer saw Autonomy's draft response to the FRRP on 11 February 2011 and suggested material changes to it.  His contribution to the letter was carefully considered.

806.  We have carefully considered and taken into account the points that we have summarised at para [802] above.  It is true that, as Mr Plewman points out, the Misconduct could have been even more serious than it was.   But that is not a reason for downgrading the seriousness of the Misconduct that we have found. Our task is to determine the sanctions that we think are proportionate to that Misconduct.

807.  Overall, despite all the points that Mr Plewman has made, he rightly accepts the seriousness of the Misconduct that we have summarised at para [794] above.  Although there have been no allegations or findings of dishonesty, this is a case of very serious Misconduct.

*Factors (c) and (n): whether the Misconduct caused or risked the loss of significant sums of money; and whether the Misconduct adversely affected, or potentially adversely affected, a significant number of people in the United Kingdom (such as the public, investors or other market users, consumers, clients, employees, pensioners or creditors)*

808.  The Misconduct adversely affected (or, at the very least, potentially adversely affected) a significant number of people inside (and indeed outside) the UK. Autonomy was a FTSE 100 company which was the subject of much investment and public interest. Its

peak market capitalisation was c. £4.4 billion ($6.45 billion). It described itself in its Annual Report and Accounts for 2009 and 2010 as "*one of the three largest software companies in Europe*" and "*a global leader in infrastructure software*".

809.   The Misconduct enabled Autonomy to present a misleading picture of its financial position. It professed that it had not only weathered the 2008/9 financial crisis, but thrived: its FY 09 Accounts proclaimed that it had "*excelled in an otherwise tumultuous year for the global economy and the software industry*" and its FY 09 and FY 10 Accounts described it as "*one of the best performing software companies in the world*". The Chairman's Report for 2009 noted that Autonomy had been the best performing FTSE stock since 2004.  Its apparent financial results were in fact propped up by undisclosed sales of hardware and sales to VARs which were later reversed or replaced.

810.   We have found that Autonomy was subject to intense analyst interest and its share price was very sensitive to changes in both revenue and gross margins. We have given two examples of this: the 9% share price fall in Q3 09 when Autonomy's Q3 09 reported gross margin fell 6% below the Q3 08 figure and the 20% share price fall in Q3 10 following the full-year revenue reduction of just 3%.  This latter fall was a drop of £3.70 per share at a time when Autonomy had 242 million shares in issue, i.e. a total short-term loss in value of c. £0.9 billion.

811.   It was clear from the analysts' evidence that, if Deloitte had required Autonomy to present the truth surrounding its pure hardware sales to the market, there would have been a significant effect on the market. TP32 (TP27) gave unchallenged evidence that the news that Autonomy had sold approximately US$100m of hardware during 2010 would have been "*awesomely surprising*" and would have had a "*massive impact*" on how analysts and the investment community in general perceived Autonomy. The evidence of TP28 (TP12), TP29 (TP31) and TP34 (TP41), which was also unchallenged, was that this revelation would have led to a fundamental reassessment of Autonomy's value. We refer to paras [287-294], [358] and [378] above.

812.   Mr Plewman makes the following points:

(i)     Whether and to what degree the share price was in fact affected by the Misconduct which is the subject of Allegations 1 and 2 is unknown.  There has been no expert evidence as to the effect of these issues on Autonomy's share price and it cannot be assumed that they had any effect at all.  The opinions of the analysts should not be given much weight: they were not expert witnesses and they constituted a small section of analysts;

(ii)    As even TP28 and TP32 accepted, the share price may react strongly in the short term to deviations from market expectations, but it inevitably returns to reflect the fundamentals of the business;

(iii)   In the event, Autonomy was purchased by HP at almost twice the market capitalisation of the shares: the price could not have been substantially driven by Autonomy's reported profits (let alone its reported gross profit); so that

(iv)   The most that can be said is that the issues might have affected the share price; but it cannot be assumed that they did so or that anyone suffered loss.

813.    The significance of the analysts' unchallenged evidence is not diminished by the lack of expert evidence.  We see no reason not to accept it as a reliable indicator of how the market would have reacted if it had been aware of the true position.  Autonomy was acutely aware of the sensitivity of the market and the importance of the views of the analysts.  In our opinion, it is inevitable that what Mr Plewman describes as reactions to short term deviations in market expectations risked the loss of significant sums of money by shareholders.  It is no answer to say that in due course Autonomy was sold to HP for almost twice the market capitalisation of the shares.

*Factors (d), (f) and (g): whether Misconduct involving a failure to comply with professional standards was intentional or unintentional; whether it involved a failure to act with integrity; and whether it was dishonest, deliberate or reckless*

814.    We have found that Mr Knights' failure to correct [Autonomy]'s misleading statement at the FRRP meeting on 13 January 2010 was reckless and amounted to a lack of

integrity.  He understood that there was a real risk that the FRRP would be misled: we refer, in particular, to para [669] above.

815.  The Executive Counsel submits that Mr Knights' loss of objectivity on multiple occasions was more serious than "mere" incompetence.  He yielded to client pressure when accepting the hardware cost allocation in Q3 09 despite having reservations about it (paras [142] and [722]).  She contends that this must have been a conscious decision.  In FY 09, when Mr Knights described the pure hardware sales as "*not a significant component of revenues",* we have found that he must have known that revenue from hardware sales *was* a significant component of revenues (para [735]).   In Q2 10, Mr Knights searched for ways for Autonomy to avoid being frank with users of the financial results when proposing wording for the Q2 10 press release (para [742]); acted as an advocate for his client (rather than an independent auditor) when proposing his "*solution*" for the hardware cost allocation (para [751]); and accepted his client's […] instruction regarding the scope of Deloitte's A10 review (paras [754-757]).

816.  Mr Plewman emphasises the fact that we have not found any dishonesty on the part of Mr Knights or Mr Mercer and that, with the exception of the subject of Allegation 3.1, we have not found any recklessness on the part of either partner.  He also makes the point that the Misconduct that we have found in Allegations 1 and 2 was not intentional.  As regards Allegation 5, Mr Plewman submits that it was not alleged and we have not found that Mr Knights *consciously* acted without objectivity.

817.  It is true that we have not made any findings of dishonesty or (with the exception of Allegation 3.1) of recklessness. In relation to Allegation 5, however, we consider that Mr Knights' acts were "*intentional*" within the meaning of sub-paragraph 21(d) of the Guidance and not "*unintentional"*.  He intended to do what he did and he must have appreciated that he was bowing to client pressure. The Executive Counsel does not allege (and we have not found) that he knew that he had lost his objectivity or did so deliberately.

***Factor (e): the nature, extent and importance of the standards breached***

818.   We have found that Deloitte and, in particular Mr Knights, but also to a lesser extent Mr Mercer, were culpable of "*serious and serial failures*" to discharge their "*critical*" public interest duty to uphold the reliability of the reporting of Autonomy.  Although some of the allegations proved were the result of mistakes or erroneous judgments, we have concluded that it "*is the wholesale nature of the failure of professional scepticism in relation to the accounting for the hardware sales and the VAR transactions as well as our findings of Misconduct and of breaches of Fundamental Principles that make this case so serious*" (para [774]).

819.   As the Executive Counsel points out in her written submissions to us, the standards that were breached in this case go to the heart of auditors' duties.  Mr Knights' Misconduct extended to breaches of three of the five fundamental principles with which professional accountants are required to comply: (i) integrity, (ii) objectivity, and (iii) professional competence and due care. Mr Knights and Mr Mercer separately failed to prevent the FRRP from being misled. Both of them failed to act with professional scepticism, which is at the heart of an auditor's role. Each of the relevant standards breached is of fundamental importance, and they were breached in persistent and widespread ways.

### *Factors (j) and (k): whether the Misconduct was isolated, or repeated or ongoing and, if the latter, the length of time over which the Misconduct occurred*

820.   Mr Knights' losses of objectivity took place in October 2009 (the SDM), January 2010 (the FRRP meeting), July 2010 (the A10 investigation, the draft Q2 10 press release and his "*my solution*" email); and his approach to the risk that Autonomy would manipulate its results took place throughout the period November 2009 to July 2010. His Misconduct relating to hardware and VARs occurred throughout Q3 09 to Q2 10.

821.   Mr Mercer's Misconduct occurred from Q2 10 (VARs and A10), Q3 10 (VARs), throughout the FY 10 audit (hardware), and into March 2011 (the letter to the FRRP) and Q1 11 (VARs).

822.   The Misconduct spanned two audit engagement partners and three financial periods. It was therefore repeated and ongoing.  The Respondents do not contest any of this.

***Factor (r): whether the Misconduct could undermine confidence in the standards of conduct in general of Members and Member Firms, and/or in financial reporting and/or corporate governance in the United Kingdom and/or in the profession generally***

823.   In our view, it is self-evident that the serious and serial failures of the public interest duties that we have found, and the failure of one of Deloitte's audit engagement partners to act with integrity and objectivity, could seriously undermine confidence in the standards of conduct of Members and Member Firms in general, together with financial reporting and corporate governance in the UK, and in the profession generally.

824.   The Respondents do not dispute this.  They submit, however, that it is also relevant that we have not found that this was a case entailing systemic problems with Deloitte's general audit approach or methodology.  We consider this separately in the following three paragraphs.

***Factor (s): in the case of a Member Firm, the effectiveness of its relevant procedures, systems or internal controls and/or its implementation of ISQC 1 (or its equivalent)***

825.   Mr Plewman relies on the fact that the Reviewers played an important role in the audits. But the review process did not reveal Mr Knights' loss of objectivity and did not stop the serial failings of professional scepticism or lack of sufficient and appropriate audit evidence that we have found.

826.   Mr Plewman also makes the points that (i) we have made no specific finding in the earlier part of this Report that the review system itself was ineffective; and (ii) the Reviewers also reviewed a larger amount of other review and audit work for Autonomy which has never been questioned.

827.   We are not impressed by either of these points. Our detailed review of the facts and our findings show that the review system was *in fact* ineffective to prevent the Misconduct. The shortcomings were substantial and widespread.  That is why it is of little significance that other review and audit work for Autonomy has not been questioned. The history of what occurred shows that Deloitte's relevant procedures, systems and internal controls were ineffective to prevent the Misconduct.  That is why Deloitte has

sensibly agreed that it should provide a Root Cause Analysis of the reasons for the Misconduct, why its processes and controls did not prevent the Misconduct and how its current processes would lead to a different outcome.

***Factor (p): whether it is likely that the same type of Misconduct will recur***

828.   Deloitte says that Misconduct such as that which is the subject of Allegations 3.1, 4 and 5 is intrinsically unlikely to recur.  They concern two audit engagement partners both of whom have now retired.  We accept this.

829.   As for Misconduct such as that which is the subject of Allegations 1 and 2, Deloitte submits that this is unlikely to recur for a number of reasons.  First, since the Relevant Period "*enhanced audit reports*" have been introduced in relation to listed companies. ISA (UK) 701 now requires auditors to disclose "*Key audit matters*".  Deloitte says that this means, for example, that the fact that the audit team considered that disclosure of the hardware sales was desirable would now be visible to readers of the financial statements.  Secondly, D4 (Deloitte's Managing Partner for Quality, Risk and Security) refers in his first witness statement to Deloitte's Audit Transparency Report for 2019, which notes that 84% of Deloitte's audit engagements reviewed by the FRC that year were rated as good or requiring only limited improvement.  Thirdly, as we have stated, Deloitte has agreed to the Executive Counsel's proposal that it provides a Root Cause Analysis of the reasons for the Misconduct.

830.   We accept that these factors are likely to reduce the risk of a recurrence of the type of Misconduct that is the subject of Allegations 1 and 2.  But we are unable to decide whether such Misconduct is likely to recur.

***Factor (t): in the case of a Member Firm, when the Member Firm's senior management became aware of the Misconduct and what action was taken at that point***

831.   The Executive Counsel submits that it can reasonably be inferred that Deloitte's senior management must have been aware of the matters relevant to this investigation for several years. There has been no acceptance by senior management of any Misconduct and no action in response to it.

832.    Deloitte says that its senior management were not aware of any Misconduct in relation to the Autonomy audits and could not therefore have taken any action at the time.   It submits that the critical point is that they were not aware of the Misconduct until they read the findings in our Draft Report; and on learning of these findings, they expressed regret and apologised and have been working with the Executive Counsel to agree the terms of a Root Cause Analysis Condition.

833.    We do not have sufficient material to enable us to determine whether senior management were aware of the Misconduct at any time during the Relevant Period.  But they were certainly aware of the investigation by the Executive Counsel which commenced in February 2013.  This did not cause them to take any action to try to ensure that such Misconduct did not recur.  There is no evidence that such changes as were made in their processes were inspired by a recognition that there had been Misconduct in relation to Autonomy.  Although it cooperated with the investigation, Deloitte contested all the many allegations that were made by the Executive Counsel every inch of the way.  There were no admissions or concessions.  The expressions of regret and apology appeared for the first time in the witness statements made after the Draft Report had been circulated.

*Factors (u), (v) and (w): whether the Member caused or encouraged other individuals to commit Misconduct; whether the Member held a senior position and/or supervisory responsibilities; and whether the Member was solely responsible for the Misconduct*

834.    It is not suggested by the Executive Counsel that Mr Knights or Mr Mercer caused or encouraged other members of their teams (or anyone else) to commit the Misconduct.

835.    But as audit engagement partners for Q3 09 to Q1 10 (in the case of Mr Knights) and Q2 10 to Q2 11 (in the case of Mr Mercer), they both held senior and supervisory responsibilities, being the most senior members of the audit team for Autonomy.

**(D)     Step 2: identify the potentially appropriate sanction or combination of sanctions**

**Deloitte**

***Severe Reprimand***

836.   Reprimands serve three main purposes: (i) signalling to a Member or Member Firm a Tribunal's disapproval of its conduct; (ii) communicating that disapproval to the wider profession and public through publication; and (iii) marking a Member's or Member Firm's disciplinary record, serving to alert the FRC, a Tribunal or Participant when deciding on appropriate action or sanctions in respect of any future Misconduct.

837.   Paragraph 8.13 of the Sanctions Review states:

> *"A Severe Reprimand is obviously more serious than a Reprimand and is appropriate if there has been seriously defective audit or accountancy work or serious negligence.  A Reprimand is likely to be appropriate only where the failings are not of any great seriousness and by a first-time offender"*

838.   This is patently a case in which a Severe Reprimand is justified.  Deloitte does not dispute that this is the correct starting point.  Paragraph 17 (a) of the Guidance states that, if the seriousness of the Misconduct is such as to merit a Severe Reprimand, it will ordinarily be appropriate for it to be ordered in conjunction with another sanction.

***Condition/Direction that Deloitte provide a Root Cause Analysis of the reasons for the Misconduct***

839.   It has been agreed that such an analysis be provided.  The wording of the Condition has also been agreed by both parties (save for the date, on which we heard submissions at the Sanctions and Costs Hearing). It is that:

> "*Deloitte provide a Root Cause Analysis of the reasons for each finding of Misconduct, in a form agreed between the Executive Counsel and Deloitte.  The Root Cause Analysis will be:*
>
> (i)    *led by an individual from Deloitte who has not had any involvement with the audits of Autonomy Corporation plc, the Executive Counsel's Investigation or the Disciplinary Tribunal proceedings;*
>
> (ii)   *submitted to the FRC in draft form by 27 November 2020; and*
>
> (iii)  *updated and finalised by Deloitte to address any questions and enquiries raised by the Executive Counsel following receipt of the draft*."

***Fine***

*Edited for publication*

840.   It is not in dispute that this is an appropriate case for a fine to be imposed on Deloitte as well as a Severe Reprimand.  The issue is in relation to the quantum of the fine.  The Executive Counsel submits that the starting point should be £15 million and that this figure should not be increased or decreased by reason of aggravating or mitigating circumstances or for any other reason. Deloitte submits that the starting point should be in the region of £7 million.   It contends that there are mitigating factors which should reduce the fine to £5.95 million.

841.   We shall first consider the starting point figure without regard to mitigating and aggravating or any other factors.

842.   Paragraph 34 of the Guidance provides that in cases where a Tribunal considers that a fine is appropriate, it should aim to impose a fine that (i) is proportionate to the Misconduct and all the circumstances of the case; (ii) will act as an effective deterrent to future Misconduct; and (iii) will promote public confidence in the regulation of the accountancy profession and in the way in which Misconduct is addressed.

843.   Paragraph 35 states that, in undertaking the assessment, a Tribunal will normally take into consideration (i) the seriousness of the Misconduct; (ii) in the case of a Member Firm, its size/financial resources and the effect of a Fine on its business; (iii) in the case of a Member, his financial resources and the effect of a fine on that Member and his future employment; and (iv) the factors set out in paragraph 21 (we have addressed the relevant factors at paras [787] to [835] above.)

844.   The Sanctions Review did not recommend a tariff or guidelines, but paragraph 5.31 gave the following guidance:

> *"it may be helpful to consider what should be the sort of maximum fine for a major firm in a serious case. As to that it seems to us that, if one of the Big 4 firms was guilty of seriously bad incompetence, in respect of the audit of a major public company, where the errors were measured in nine figures or more and there had in consequence been either widespread actual loss or the risk thereof, a financial penalty of £10 million or more (before any discount) could be appropriate as being;*
>
> *(a)   commensurate with the seriousness of the wrongdoing;*
>
> *(b)   a meaningful deterrent; and*

(c)     *sufficient to meet the primary objectives of sanctions.*

*That assumes that the failings did not involve dishonesty or conscious wrongdoing. If they did, the figure could be well above that."*

845.   The Executive Counsel submits that the present case falls squarely within this guidance. It involves a Big 4 firm guilty of seriously bad incompetence in respect of the audit of a major public company, where the errors were measured in nine figures or more leading to the risk of widespread losses. She therefore submits that £10 million is the correct starting point without regard to any conscious wrongdoing.

846.   It is not disputed that Deloitte is vicariously liable for the acts and omissions of Mr Knights and Mr Mercer: see paragraph 5(11)(i) of the Scheme which states that "*anything said, done or omitted by an employee of a Member Firm within the scope of his employment, either actual or ostensible, or as an agent of the Member Firm within the scope of his authority, either actual or ostensible, shall be taken as having been said, done or omitted by that Member Firm*". The Executive Counsel submits that our findings in relation to Allegations 3 and 5 require the Fine to be increased substantially to reflect Mr Knights' loss of objectivity and lack of integrity.

847.   Our attention has been drawn to a number of Tribunal decisions and Settlement Agreements in other Misconduct cases. We refer to some of these below. The Executive Counsel submits that these show that fines of £6 million or more have become the norm in cases involving serious audit Misconduct, even where the errors have not been measured in nine figures.

848.   Much of the debate before us related to (i) the application of paragraph 5.31 of the Sanctions Review to the facts of this case; and (ii) the decision in *PWC and Stephen Denison re BHS* (Settlement Agreement 31 May 2018) ("*the BHS case*").

849.   As regards paragraph 5.31, the Executive Counsel submits that Deloitte's errors are to be measured in nine figures or more and that they caused widespread actual loss or the risk thereof. Mr Plewman submits that its errors cannot be measured in a sum which comes anywhere close to the nine figures threshold. He relies on the fact that the Misconduct was confined to the allocation of costs within the income statement to S&M of $37.8 million in FY 09 and $20.8 million in FY 10. He also makes the point that the

total value of the five VAR Transactions in relation to which we have found Misconduct was $35.1 million.

850.    The hardware sales accounted for $47.6 million of revenue in FY 09 and $94.7 million of revenue in FY 10 i.e. a total value of $142.3 million.   Deloitte says that the nine figures threshold figure stated in paragraph 5.31 should be applied audit by audit.  We do not accept this.  Paragraph 5.31 is intended to provide guidance as to the level of fine that is appropriate in particularly serious cases.  It would be wrong to treat a case where, say, the errors in each of three successive audit years are measured at £75 million (total £225 million) as being less serious and attracting a lower starting point fine than a case where the error is in a single year, but is measured at £150 million.  In any event, even if Deloitte's approach were correct, the hardware sales that were not disclosed in FY 10 had a value of £94.7 million i.e. not far short of the paragraph 5.31 figure of £100 million.

851.    We have found that there was Misconduct in relation to the non-disclosure of hardware sales for FY 09 and FY 10 whose total value was $142.3 million.  To use the language of the Sanctions Review, there were therefore "*errors*" measured in nine figures.  They gave rise to widespread actual loss or the risk thereof.  We refer to and repeat paras [378], [810] and [813] above.  This was a major failure to comply with IAS 1 paras 15 and 17 which was likely to have had a substantial adverse effect on Autonomy's share price.  We are therefore satisfied that, on an application of paragraph 5.31 of the Sanctions Review, £10 million is the correct starting point.

852.    Paragraph 5.31 states that the fine could be well above that sum in the case of dishonesty (not relevant here) and conscious wrongdoing (which is relevant).  Recklessness is not specifically mentioned in paragraph 5.31, but we are in no doubt that it is encompassed within "*conscious wrongdoing*".  So too in our view is loss of objectivity: see para [817] above.  We have made a specific finding of recklessness by Mr Knights in relation to Allegation 3.1.    We accept the submission of Ms Sabben-Clare that conscious wrongdoing in paragraph 5.31 refers to all wrongdoing that involves a *mens rea* that is more culpable than negligence and involves any breach of the Ethical Standards over and above the requirement for professional competence.    It follows that, on an

application of paragraph 5.31, the correct starting point for a fine on Deloitte should be more than £10 million and could be well above that figure.

853.    We turn to the *BHS* case**.**  PwC was fined £6.5 million in respect of its audit of BHS (£10 million reduced to £6.5 million for early settlement) together with a Severe Reprimand, Conditions and Costs.  The audit partner, Stephen Denison, was fined £325,000 (£500,000 reduced to £325,000 for early settlement) together with a Condition not to perform audit work for 15 years.  He also gave an Undertaking to remove his name from the register of statutory auditors and not reapply for 15 years.  The Executive Counsel submits that the present case is more serious than the *BHS* case.  Deloitte submits that it is less serious.  The relevant facts appear in the Particulars of Fact and Acts of Misconduct ("*PFAM*").

854.    In this paragraph, we summarise what Deloitte says about that case.  The admitted Misconduct pervaded multiple areas of the audits of Sir Philip Green's Taveta Group (which included the BHS Group), namely audit supervision, review and planning; loss of objectivity and independence; impairment of fixed assets and investments; the treatment of loans; and the failure to obtain sufficient evidence to conclude that the income statement figures were not materially misstated.  Many of the errors were in the hundreds of millions of pounds.  PwC failed even to address the fundamental basis on which the financial statements were drawn up, namely whether BHS was likely to continue as a going concern.  In the event, BHS fell into administration with a £571 million pension deficit about 14 months after the auditors signed off on a going concern assumption in the financial statements, with huge losses to creditors, shareholders and employees. There were also material misstatements of c.£200 million in Taveta 2's financial statements (in respect of the value of BHS) and of c.£217 million in Arcadia's financial statements (in respect of debts owing from BHS). The audit partner, Mr Denison, had spent a mere two hours on the audit.  Moreover, he had committed a very serious breach of the Principle of Integrity by dishonestly making false statements as to the date on which he had signed the audit opinion.

855.    The Executive Counsel responds that this characterisation of the *BHS* case is inaccurate or exaggerated in a number of respects.  First, it glosses over the fact that the loss of objectivity was the failure "*to guard against the self-interest <u>threat</u> created by the*

*substantial fees they generated in providing non-audit services to the Taveta Group*"
(para 34 of the PFAM) (emphasis added).  Para 36 stated: "*nor is it suggested that the
objectivity of Steve Denison (or any other member of the audit team) was in fact
impaired*".  We accept the submission that Mr Denison's failure to guard against threats
to his objectivity was far less serious than Mr Knights' actual loss of objectivity on six
separate occasions spread across nearly a year.

856.   Secondly, Mr Denison's lack of integrity consisted in his backdating the audit opinion
by three days.  His explanation for doing this was "*because that was neater and because
that accorded with the client's expectations*" (para 83.4 of the PFAM).  It had not been
possible for him to sign the document on 6 March as he had planned to do.  This was
plainly a breach of the Principle of Integrity, but it was not a very serious breach.  In
our view, Mr Knights' lack of integrity in failing to correct [Autonomy's] misstatement
to the FRRP about the software sales was more reprehensible than Mr Denison's
backdating of the audit opinion by three days.

857.   Thirdly, Deloitte's description of the *BHS* case suggests that (i) the company was unable
to continue as a going concern and (ii) Mr Denison's failings were the cause of BHS
falling into administration.  In fact the PFAM contain no finding that BHS was unable
to continue as a going concern; and do not state or imply that the settlement was on the
basis that Mr Denison was directly responsible for the losses suffered by creditors,
shareholders and employees.

858.   In summary, the Executive Counsel submits that the *BHS* case concerned (i) one audit
partner, not two; (ii) one audit (not two audits and numerous interim reviews); (iii)
overwhelmingly very serious findings of incompetence; and (iv) no instances of loss of
objectivity.

859.   We accept the Executive Counsel's submissions.  Overall, for the reasons she gives, the
findings we have made are substantially more serious than those which were the subject
of the *BHS* case.  For that reason, a fine substantially higher than the £10 million
imposed in that case (before discount) is the correct starting point in this case.  A fine
substantially higher than the £10 million starting point stated at paragraph 5.31 of the
Sanctions Guide is also justified by reason of our findings of recklessness and loss of

objectivity. The six findings of loss of objectivity by Mr Knights are particularly egregious.

860.   Nevertheless, Mr Plewman seeks to support the starting point figure of £7 million by reference to the fines imposed in a number of other cases.  We leave out of account the cases which pre-date October 2017 (the date of the Sanctions Review) because it is common ground that sanctions have become more severe since the date of that report. We now refer to some of these cases.

861.   In *PwC, Jaskamal Sarai and Arif Ahmad re Redcentric* (Audit Enforcement Procedure Decision Notice, 22 May 2019), PwC was fined £6.5 million in respect of its audit of the AIM listed company Redcentric plc.  This figure was discounted to £4.55 million for admissions and early disposal alongside a Severe Reprimand, a Condition, a Declaration and costs.  The two partners were each fined £200,000 (discounted to £140,000 for admissions and early resolution) and each received a Severe Reprimand. The Misconduct concerned the audits for two audit years and the restatements of the financial statements for one year by reducing net assets by £15.8 million and profit after tax by £9.5 million.  The Misconduct related to audit planning, audit work on cash, revenue and debtors and costs and liabilities.  There was a "*serious lack of competence in conducting the audit work".*   In our view, the lack of competence was of a substantially lower order than in the present case and the sums involved did not bring the case within the scope of paragraph 5.31 of the Sanctions Review; nor was it accompanied by any recklessness, loss of objectivity or other conscious wrongdoing.

862.   In *Deloitte and Helen George re Serco* (Settlement Agreement, 20 February 2019), Deloitte was fined £6.5 million in respect of its audits of a subsidiary company of Serco Group plc (discounted for settlement to £4.225 million), alongside a Severe Reprimand, a Condition and costs.  The partner was fined £150,000 (discounted to £97,500 for settlement) and received a Severe Reprimand.  The Misconduct concerned two audit years and amounted to a failure to identify the risk of fraud on a UK Government Department and inadequate professional scepticism.  The negligence concerned a relatively small sum.  There was no recklessness, loss of objectivity or other conscious wrongdoing.

863.  In *KPMG, Mark Taylor and Anthony Hulse re ESML* (Tribunal Decision, 1 February 2019) ("*the ESML case*"), KPMG was fined £6 million in respect of the audits of Syndicate 218, alongside a Severe Reprimand, a Condition and costs.  The two partners each received a Severe Reprimand and a fine of £100,000.  The Misconduct related to the audits of the financial statements for two audit years.  It comprised insufficient enquiries on the claims file review process and a failure to act on warning signs in the Syndicate's claims reserves and therefore a failure to obtain sufficient appropriate evidence to provide unqualified audit opinions for two years.  The Tribunal noted that the findings were of a "*very serious nature*" which affected an area "*at the core of the enterprise's processes, namely, reserving, and the audit failure was, in respect of a critical area of that process, namely, case reserves, complete*" (para 557 of the Decision).  The Tribunal treated the case as very serious, although it did not involve wholesale audit failures in separate areas or a lack of integrity. The consequences of the audit negligence and deficient file reviews could not be quantified, although the sums removed from the Syndicate's reserves were well over 9 figures (para 599).  This was a bad case of incompetence and lack of professional scepticism.  There was a risk that the accounts had been misstated, but no finding that they had in fact been misstated.  In this respect, the case is very different from the present case in which we have found that the financial reports did not give a true and fair view without disclosure of the hardware sales.  Further, there were no findings of recklessness, loss of objectivity or other conscious wrongdoing in that case.

864.  We do not accept that these three cases support the proposition that a sum in the region of £7 million is the correct starting point for the fine that should be imposed on Deloitte in the present case.  First, all of them were cases of incompetence only. Secondly, none of them involved proved misstatements affecting sums in excess of £100 million. Thirdly, none of them involved findings of recklessness, loss of objectivity or other conscious wrongdoing.  In short, the present case is far more serious than any of these cases.

865.  We should also mention *FRC v KPMG and Walker re Co-operative Bank plc* (Settlement Agreement, 8 February 2019) to which our attention was drawn by Mr Plewman.  KPMG was fined £5 million (reduced to £4 million for settlement) and the audit partner was fined £125,000 (reduced to £100,000 for settlement).  The Misconduct

concerned two areas of one audit year in relation to acquired loan notes.  The Settlement Agreement records (para 8) that the Executive Counsel in that case regarded the Misconduct as involving *inter alia* a failure to exercise professional scepticism; not involving dishonesty, recklessness or a failure to act with integrity; relating to one audit year only; and relating to discrete areas of the audit and not pervasive.  The facts and Misconduct in that case were so far removed from the present case that we do not find it of assistance.

866.  To summarise, we do not consider that any of the cases relied on by Mr Plewman supports a fine of £7 million as being the correct starting point here.  The Misconduct in the present case was so serious that, applying the guidance that we derive from paragraph 5.31 of the Sanctions Guide, we consider that an appropriate and proportionate starting point is a fine substantially greater than £10 million. We reach this conclusion because (i) a fine substantially higher than £10 million is justified by paragraph 5.31 of the Sanctions Review; and (ii) this case is substantially more serious than the *BHS* case in which a starting point fine of £10 million was imposed.

867.  In our view, a fine of £15 million is the appropriate starting point having regard to the factors stated in paragraphs 34 and 35 of the Guidance (see paras [842] and [843] above). As regards the seriousness of the Misconduct, we have already highlighted the fact that it was committed over two audit years by two partners; the incompetence was egregious and in discrete areas; Mr Knights' lack of integrity; and, above all, Mr Knights' loss of objectivity in six discrete respects.

868.  We need to address paragraph 35(b) of the Guidance which provides that a Tribunal will normally take into consideration "*in the case of a Member Firm, its size/financial resources and the effect of a Fine on its business*"; and paragraph 36 which states:

> "*In the majority of cases involving the imposition of a Fine on a Member Firm, the amount of revenue generated by the firm or the business units(s) involved in the Misconduct will be a factor to be taken into account when assessing the size of Fine which would be necessary, in the circumstances of the particular case, to act as a credible deterrent*"

869.  Mr Plewman submits that it will be the audit unit of Deloitte's business that will bear the cost of the Fine and that the proportionality of the Fine and its deterrent potency

should be viewed by reference to its effect on that unit.  Even if we were to confine our attention to the resources of Deloitte's audit unit, we do not consider that this point would justify a reduction of the Fine to below what would otherwise be appropriate. Deloitte's most recent financial statements (for FY 19) show a total revenue of c.£3.4 billion and an operating profit of c.£450 million spread across five business units.  Audit and directly-related services accounted for c.£469 million of the total revenue (about 14%) and c.£92 million of operating profit (about 20%).  The audit unit can well afford to pay a Fine of £15 million.  Deloitte has not suggested otherwise.

870.   Deloitte has given no evidence that a large fine would cause it to restrict the range of audit work it carries out or cease auditing entirely.  As a Big 4 firm with the finances set out above, there is no reason to think that a fine of £15 million would have this effect.

871.   We accept the submission of Ms Sabben-Clare that for the size of the fine to be a credible deterrent (both to Deloitte and other Member Firms) we must take these very large profit and revenue figures into account.  Other firms which have not committed Misconduct would rightly expect to see the fine imposed on one of the world's largest accountancy firms to be one reflecting its stature, revenues and profitability.  A £15 million fine would be just 3% of Deloitte's operating profits for FY 19 and less than 0.5% of its revenues for FY 19.

872.   Subject to any aggravating, mitigating or other relevant circumstances, we consider that a fine of £15 million is appropriate in order to achieve the objectives stated at paragraph 9 of the Guidance (see para [782] above).  It is in the wider public interest that a severe fine be imposed in a case as bad as this case.  We consider the issue of aggravating and mitigating circumstances (Step 3) below.

**Mr Knights**

*Exclusion Order*

873.   The Guidance states:

> *"51.   The ability to exclude a Member from membership with one or more Participants exists because certain Misconduct is so damaging to the*

> *wider public and market confidence in the standards of conduct of Members and in the accountancy profession and the quality of corporate reporting in the United Kingdom that removal of the Member's professional status is the appropriate outcome in order to protect the public or otherwise safeguard the public interest.*
>
> ….
>
> 53.  *Where the Misconduct is fundamentally incompatible with continued membership of a Participant, exclusion is likely to be the appropriate sanction.*
>
> 54.  *The factors set out in paragraph 50 will normally be relevant considerations when a Tribunal is considering whether to order Exclusion…."*

874.  Most of the factors set out in paragraph 50 of the Guidance (which are relevant to whether Preclusion is appropriate) go to the seriousness of the Misconduct and repeat factors which we have already addressed.

875.  The Executive Counsel has drawn our attention to a number of precedents in which Exclusion Orders were made.  In *Eric Healey re Nichols and the University of Salford* (Settlement Agreement, 9 July 2018), Mr Healey, one of Grant Thornton's former audit partners, was excluded from the ICAEW for a recommended period of five years.  The facts were that Mr Healey was culpable of Misconduct involving serial knowing and reckless breaches of the Fundamental Principle of Objectivity in agreeing to act on the audit committees of two clients of Grant Thornton while providing consultancy services to the firm.  Mr Plewman submits that Mr Healey's failures were much more serious than those of Mr Knights.  We do not agree.  Mr Healey's failings concerned lack of independence rather than the conduct of an audit.  It was a very different kind of case.

876.  We have already referred to the *BHS* case.  By agreement, Mr Denison was made subject to a Condition not to perform audit work for 15 years and undertook to remove his name from the register of statutory auditors and not to reapply for 15 years.  Mr Plewman relies on the fact that the Executive Counsel did not press for an Exclusion Order.  We have already explained why, serious though it was, we do not consider that it was as serious a case as the present case: see paras [855] to [859] above.  There would have been a strong argument for a substantial period of Exclusion, but the parties were able

to agree a Condition which excluded Mr Denison (who had not retired) from acting as an auditor for a period of 15 years.

877.   In *Robert Napper re AssetCo* (Settlement Agreement, 29 March 2017), Mr Napper, an audit partner of Grant Thornton, was excluded for a recommended period of three years. It appears that Mr Napper had retired from audit practice.  There were no allegations of recklessness or lack of integrity against him.  His was a much less serious case than that of Mr Knights.

878.   In *Paul Newsham re Worthington Nicholls* (Disciplinary Tribunal, 5 September 2014), Mr Newsham was excluded for three years.  Mr Plewman emphasises the fact that the Tribunal found 35 breaches of standards against Mr Newsham "*which had an inevitable impact upon the reliability of the financial statements [of WNG] over a three-year period*" and included seven complaints of recklessness in relation to the conduct of the interim 2006 audit which was a "*critical audit from the perspective of investors*".   In response, Ms Sabben-Clare says (i) the Tribunal did not apply a test of danger to the public; (ii) Mr Knights' failings were more extensive and more serious than those of Mr Newsham, because they included a number of losses of objectivity; (iii) the Newsham Tribunal's starting point was that the four year period of Exclusion sought by the Executive Counsel was appropriate and this was reduced on account of Mr Newsham's personal mitigating circumstances (see paras 168 et seq of the Report); and (iv) this was a case which pre-dated the Sanctions Review.

879.   In addition to these precedents, Mr Plewman has drawn our attention to the *ESML* case, in which no Exclusion Order (or even a Condition) was sought against Mr Hulse, a senior audit engagement partner.  Mr Plewman relies on the Tribunal's comment at para 616 of its Report: "*Mr Hulse is now retired from practice and the Executive Counsel accepts that any Condition in respect of practice as an accountant would serve no useful purpose. We agree….*".   But the Executive Counsel did seek an Exclusion Order in relation to Mr Taylor, who was the Member in Business respondent to the proceedings. This was ordered in the light of his serious failings of competence, even though there was no loss of objectivity, recklessness or lack of integrity.

880.    We have derived limited assistance from these precedents.  None of the cases to which our attention has been drawn is as serious as that of Mr Knights.  They suggest that an Exclusion Order of seven years (as proposed by the Executive Counsel) would be a severe, but not inappropriate, starting point before consideration of aggravating and mitigating factors and any other relevant circumstances.  We shall return to this issue when we consider those factors.

### Fine

881.    The Executive Counsel submits that a fine of £500,000 should be imposed on Mr Knights.  Deloitte has confirmed that it will meet any fine imposed on Mr Knights and Mr Mercer.  This is not a ground for increasing the fine beyond that which would otherwise be appropriate were it to be paid by Mr Knights and Mr Mercer personally: see paragraph 42(a) of the Guidance.  But it does mean that we do not need to consider possibly reducing an otherwise appropriate fine on the grounds that it might have serious financial implications for them.

882.    In the cases set out at paras [853] to [863] above, the audit partners received fines (before any discount for settlement) ranging from £100,000 (Messrs Taylor and Hulse in the *ESML* case), £150,000 (Ms George in the *Serco* case), £200,000 (Messrs Sarai and Ahmad in the *Redcentric* case) and £500,000 (Mr Denison in the *BHS* case).  Ms Sabben-Clare submits that, given the seriousness of Mr Knights' Misconduct, which is more serious than that of Mr Denison in *BHS,* a fine of £500,000 is the appropriate starting point. Mr Plewman submits that a fine of £250,000 is the appropriate starting point.

883.    We take into account the fact that, with the exception of the *BHS* case, no case has been cited to us in which the individual auditor was fined a sum in excess of £200,000 (before discount).  But both sides have rightly focused on the *BHS* case as the most relevant comparator. We have already explained why we consider the Misconduct by the Respondents in the present case is worse than that found in the *BHS* case and this is in large measure attributable to the Misconduct of Mr Knights.

*Edited for publication*

884.   In our view, a fine of £250,000 would not adequately reflect Mr Knights' Misconduct which is substantially more serious than that in any of the cases relied on by Mr Plewman and more serious than that of Mr Denison in the *BHS* case.  Subject to the impact of any aggravating and mitigating factors, a fine of £500,000 is proportionate to Mr Knights' Misconduct and all the circumstances of the case and is appropriate to act as a deterrent to future Misconduct in the accountancy profession and to promote public confidence in the regulation of the profession and in the way in which Misconduct is addressed.

## Mr Mercer

### *Severe Reprimand*

885.   Deloitte accepts that a Severe Reprimand is the appropriate starting point.

### *Fine*

886.   The Executive Counsel submits that the appropriate starting point in the case of Mr Mercer is a fine of £250,000.  She accepts that his Misconduct is less serious than that of Mr Denison in *BHS,* but she submits that it is more serious than that of the engagements partners in *Redcentric* (and the other cases to which we have referred).  In particular, she highlights the fact that Mr Mercer inappropriately signed an unqualified audit opinion in FY 10 and that he failed to correct Autonomy's misleading letter dated 3 March 2011 to the FRRP.

887.   We accept the Executive Counsel's submission.  Mr Mercer's Misconduct was serious and covered the period from Q2 10 to Q2 11 and encompassed non-disclosure of the hardware sales, allocation of hardware costs, recognition of revenue from sales to VARs.  It was, however, significantly less serious than that of Mr Knights.  We consider that a fine half the size of that imposed on Mr Knights fairly reflects their respective culpability.

## (E)   Step 3: Consider any relevant aggravating or mitigating circumstances

### *Aggravating factors affecting all the Respondents*

888. Paragraph 61 of the Guidance sets out examples of events or behaviour that we may conclude aggravated the Misconduct.  The Executive Counsel submits that there are several such aggravating factors in this case.

889. The first is factor (a) "*the Member or Member Firm failed to bring the Misconduct to the attention of the FRC (or to the attention of another appropriate regulatory, disciplinary or enforcement authority) quickly, effectively or completely*".  Ms Sabben-Clare says that the Respondents did not bring the Misconduct to the attention of any authority at any time.  Mr Plewman responds that the Respondents were not aware of the Misconduct until the Tribunal published its Draft Report and that this cannot be a relevant aggravating factor in a case where a Member or Member Firm has defended allegations of Misconduct in good faith.  We accept that factor (a) does not readily fit the facts of this case.  It is unrealistic to suppose that this factor is directed at those who committed the acts of Misconduct themselves; and it is not said that Deloitte's senior management were aware of the Misconduct before the FRC commenced its investigation in 2013.  We do not give weight to factor (a).  We should also point out that the Executive Counsel does not rely on factor (c) "*in the case of a Member Firm, that Member Firm's senior management were aware of the Misconduct …but failed to take steps to stop or otherwise prevent the Misconduct*".

890. The second factor relied on by the Executive Counsel is factor (e) "*no remedial steps have been taken since the Misconduct was identified, either on the Member's or Member Firm's own initiative or as directed by the FRC or another regulatory authority*".  In short, the Respondents failed to recognise that they were culpable of Misconduct as they should have done.  Mr Plewman responds that (i) Deloitte has engaged with the Executive Counsel since the Draft Report was published about an appropriate Root Cause Analysis Condition; and (ii) there has been no finding of inadequacy in Deloitte's audit systems.  We do not consider that the failure to take remedial steps prior to the publication of our Draft Report is an aggravating factor. The Respondents contested the Allegations as they were entitled to do.  By taking this course, they lost the benefit of the mitigation that early admissions would have attracted.  But it did not aggravate their culpability. In our view, the Misconduct in this case was first "*identified*" when the Draft Report was published.

891.   The third factor relied on by the Executive Counsel is factor (k) "*the Member or Member Firm has a poor disciplinary record*".  Deloitte has been the subject of three findings of Misconduct under the Scheme relating to audits in 2006, 2007, 2008, 2011 and 2012 and corporate finance work.  These were in the cases of *MG Rover* (2015), *Aero Inventory* (2016) and *Serco* (2019).  Mr Plewman says that these findings should be judged in the context of Deloitte having signed thousands of audit reports every year (13,500 in 2019 alone).  We accept that little weight should be accorded to factor (k).

892.   The fourth factor is factor (g) "*the Misconduct was repeated and/or occurred over an extended period of time*".  We accept that this factor is present here, but we have already taken it into account in assessing the seriousness of the Misconduct.

893.   The fifth factor is factor (m) "*in the case of a Member, if that Member held a senior position and/or supervisory responsibilities*".  Mr Knights and Mr Mercer held senior positions and had supervisory responsibilities. We consider that we have sufficiently taken this into account in our starting point sanctions.

894.   Overall, we are not persuaded that any of these factors justify increasing the Sanctions above what it is otherwise appropriate to impose.

***Mitigating factors in relation to Mr Knights***

895.   Paragraph 62 of the Guidance sets out examples of events or behaviour that we may conclude mitigate the Misconduct and so should be taken into account when deciding the sanction to be imposed.  We turn to the factors relied on by Mr Plewman.

896.   The first factor on which he relies is factor (l) "*the Member or Member Firm has demonstrated contrition and/or apologised for the Misconduct*".  We accept that this is capable of being a mitigating factor. We do not accept the point made by the Executive Counsel at para 28.2(a) of the Executive Counsel's Reply submissions that mitigating factors must be "*things connected with or arising out of the Misconduct which in some way lessen its seriousness*".  Factors (i) ("*a good compliance history and disciplinary record*") and (k) ("*in the case of a Member, personal mitigating circumstances*") are examples of factors which are not connected with or arise out of the Misconduct.

*Edited for publication*

897.   Mr Knights' third witness statement is carefully worded.  So far as material, he says:

> *"12. I recognise that the Tribunal has found that the judgements I reached in relation to allocation of the costs of and disclosure of the loss-making hardware sales, and income recognition on certain transactions with value-added resellers, were flawed.  The Tribunal has concluded that those judgments were insufficiently sceptical of [Autonomy's] explanations and motivations.  I regret any error or misjudgement, albeit that I honestly believed at the time that my judgements were appropriate and that I had approached [Autonomy's] explanations properly and sceptically.*

> *13.   The Tribunal's findings that I was reckless in failing to correct a statement made by [Autonomy] to the FRRP and of a loss of objectivity are devastating to me.  At the time I sincerely believed that I was approaching my work with care and attention, always conscious of my professional and ethical obligations as an auditor.*

> *...*

> *15   Further, although I reached judgments which the Tribunal has found were flawed, at the time I believed them to be supported by my audit team and by the team of reviewers.  The accounting issues and audit judgements were clearly set out in the audit workpapers and also reported to those charged with governance.  They were not hidden in any way.*

> *...*

> *18.   I make these points to provide context to the Tribunal's findings against me, but in no way to diminish the seriousness of them, which I of course acknowledge and regret."*

898.   We have set these passages out in order to give the full flavour of Mr Knights' reaction to the findings of Misconduct.  It is true that he has expressed "*regret*" for "*any error or misjudgement*", but he then says that the findings have been "*devastating*" to him and that he honestly believed that he was acting appropriately.   In our judgment, this falls well short of an apology and an unequivocal expression of contrition.  An expression of regret is not the same as an apology.  We are left with the impression that Mr Knights may not even now accept that he did anything wrong.  That would be consistent with the fact that he and the other Respondents fought this case on every issue to the very end.

899.   The second factor on which Mr Plewman relies is factor (f) "*the Misconduct was an isolated event that is most unlikely to be repeated*".  We reject the characterisation of

Mr Knights' Misconduct as "*isolated*". The Misconduct in relation to the allocation of hardware costs covered Q3 09, Q4 09/FY 09; the non-disclosure of hardware sales occurred in FY 09; and the recognition of revenue from sales to VARs covered Q4 09/FY 09, Q1 10 and Q2 10.  Moreover, there were six discrete instances of loss of objectivity.  We do, however, accept that Mr Knights is most unlikely to commit further acts of Misconduct.  That is because he has retired from Deloitte as a result of these proceedings and has no intention of practising as an auditor in the future.

900.  Thirdly, Mr Plewman relies on factor (g) "*neither the Member nor the Member Firm stood to gain any profit or benefit from the Misconduct*".  We refer to and repeat paras [787] to [792] above.  We accept that he did not stand to gain a quantifiable direct profit or benefit from the Misconduct.  But he stood to further Deloitte's relationship with Autonomy thereby deriving benefit from it as a partner of the Firm.

901.  Fourthly, Mr Plewman relies on a number of other points which he submits lessen the seriousness of the Misconduct.  These include the fact that: (i) the Misconduct did not arise from a failure to consider the relevant issues; (ii) Mr Knights worked diligently and spent many hours on the Autonomy audits and reviews; and (iii) there were occasions when Mr Knights challenged [Autonomy] on their accounting proposals.  But we have already taken these points into account in assessing the seriousness of the Misconduct.

902.  Fifthly, Mr Plewman relies on a number of "*personal mitigating factors*" (factor (k)). First, in a long audit career (including 25 years as an audit partner working for a number of FTSE 100 and FTSE 250 companies) Mr Knights has had a previously unblemished disciplinary record and compliance history. Secondly, he has produced a number of positive references which speak to his character and professionalism.  Thirdly, the FRC's investigation and these proceedings have had a devastating effect on his personal and professional life.  He describes this in some detail at paras 19 to 27 of his third witness statement. As a result of the investigation, he retired in July 2018, three years earlier than he had planned.  The investigation and the proceedings (over a seven year period) have been a "*deeply hurtful, exposing and distressing experience, and a constant source of anxiety and stress*".  Fourthly, Mr Knights estimates that being forced to take early retirement will have reduced his pre-tax income between July 2018 and May 2021

(when he intended to retire) by more than £2 million.  Moreover, he wanted to take on other work after leaving Deloitte, but he has found it impossible to do so in the light of these proceedings.  He has not even been able to take on voluntary work, such as acting as a school governor.

903.    We do not consider that these personal factors justify making any reduction in the Sanctions that would otherwise be appropriate.  Most auditors have an unblemished disciplinary record and compliance history and we would expect that most would be able to produce good character references.  Mr Knights' good character and good record do not mitigate the seriousness of his Misconduct.  The loss of income is the result of his early retirement and was the predictable consequence of the investigation into the Misconduct.  He enjoys a good pension and has considerable assets.  In our view, the loss of income is not a mitigating factor.  We accept that Mr Knights has suffered stress and anxiety in consequence of the investigation and proceedings in the way that he describes. This is regrettable, but it is the foreseeable effect of a process which was bound to be complex and lengthy and was made more so by his contesting every allegation. We note that paragraph 3.8 of the Sanctions Review recommended that there should be included in the Guidance as a relevant factor "*the impact on the Member or Member Firm [Statutory Auditor or the Statutory Audit Firm] of their involvement in the investigation and the disciplinary proceedings*". But this recommendation was not accepted.

904.    We also refer to what Sir Thomas Bingham MR said in *Bolton v Law Society* [1994] 1 WLR 512 at 519B-F:

> "*Because orders made by the tribunal are not primarily punitive, it follows that considerations which would ordinarily weigh in mitigation of punishment have less effect on the exercise of this jurisdiction than on the ordinary run of sentences imposed in criminal cases.*"

He said therefore that, unlike in a criminal context, it is not right in this context to put much weight on personal hardship as mitigation. The sanction is not imposed as punishment, but to protect the profession's most valuable asset, its collective reputation. He added:

> *"The reputation of the profession is more important than the fortunes of any individual member.  Membership of a profession brings many benefits, but that is a part of the price."*

905. Sixthly, Mr Plewman says that the Respondents have co-operated extensively with the FRC/Executive Counsel on the investigation and in these proceedings.  Paragraph 63 of the Guidance provides:

> *"It is a requirement that Member Firms and Members will cooperate with an investigation conducted under the Scheme.  In order for cooperation to be considered as a mitigating factor at the point of determining appropriate sanction it will therefore be necessary for the Member Firm or Member to have provided an exceptional level of cooperation.  Non-exhaustive examples of conduct which may constitute such cooperation include:*
>
> *a.    Self-reporting to the FRC and/or bringing to the attention of the FRC any facts and/or matters which may constitute an allegation of Misconduct; and*
>
> *b.    Volunteering information or documentation not specifically requested but which the Member Firm/Member nevertheless considers may assist the investigation"*

906. The Respondents have annexed to their Submissions for the Sanctions Hearing Appendix 2 which contains a chronology of the information and documentation that they have provided to the FRC over the past seven years.  We accept that the Respondents co-operated in the investigation. But at paras 20-22 of his first witness statement, Mr Twomey (a Senior Lawyer in the Enforcement Division of the FRC) says that he is not aware of any self-reporting to the FRC or volunteering of information or documentation not specifically requested by the FRC. In response, the Respondents contend that Appendix 2 demonstrates an exceptional level of co-operation in what has been an enormous case.  They say that it shows, in particular, that they volunteered information/documentation not requested by the FRC with a view to assisting the investigation. They cite as an example of this the detailed presentation that they gave to the FRC on 6 June 2013 to explain the audit approach to the hardware sales and certain VAR transactions. The presentation was proposed by Deloitte and the FRC used the occasion as an opportunity to put questions to them.

907. We are not persuaded that, viewed overall, the co-operation was exceptional.  It is true that there are many entries in Appendix 2. But as the Executive Counsel points out,

almost all of them are in respect of conduct that was commonplace and required by the Scheme viz: sending audit files relevant to the investigation, responding to information requests, attending interviews and submitting responses to allegations. The single item that the Respondents highlight as being exceptional was a presentation more than seven years ago. Ultimately, what is exceptional is a question of fact and degree and to some extent a matter of judgment. We do not consider that this presentation shows an exceptional level of co-operation.

908.  Seventhly, Mr Plewman relies on the fact that the Respondents have co-operated with the Serious Fraud Office and US authorities in their investigations into Autonomy's business and senior individuals at Autonomy. This is to Mr Knights' credit, but we are unable to assess the extent of the co-operation of any of the Respondents with these authorities. In the context of this case, we do not regard it as a significant factor.

909.  Finally, Mr Plewman submits that there was an unwarranted delay in the conduct of the investigation (seven years between the date of its commencement until the hearing). He contends that this is a factor which should be taken into account in reducing the Sanctions that it would otherwise be appropriate to impose. He highlights two particular periods of delay: (i) five months between the receipt of the Zolfo Cooper Report by the FRC on 16 January 2014 and June 2014 when Mr Southwood was instructed; and (ii) almost two and a half years between Mr Southwood's early draft report in October 2014 and the service of the Proposed Formal Complaint on 21 March 2017.

910.  We do not consider that there was delay in this case such as would justify reducing the Sanctions. Delay is not mentioned in the Guidance as a factor relevant to the determination of Sanctions. In the *ESML* case, however, the Tribunal said at para 544:

> "We believe that delay could be relevant only in an exceptional and compelling case where, for example, (1) the FRC, without reasonable justification or excuse, had prolonged proceedings inordinately; and (2) as a result of such inordinate and unreasonable delay, the imposition of a sanction that would otherwise be justified was rendered disproportionate".

911.  It seems to be common ground that this guidance is correct. We agree with it. Mr Twomey describes in some detail the chronology of the investigation at paras 5 to 19 of his first witness statement. The investigation was a massive and complex exercise

which involved the scrutiny of huge numbers of documents and their assessment by independent experts.  Lawyers, both solicitors and counsel, were heavily involved throughout the seven year period.  It was a very labour intensive and difficult exercise.  We are not persuaded that it could have been properly undertaken more quickly.  If we are wrong about that, we are certainly not persuaded that there has been inordinate and unreasonable delay.

912.  Having reviewed the mitigating factors urged upon us so far, we see no reason to reduce the Fine to below £500,000.  There is one further consideration prayed in aid by Mr Plewman in support of his contention that the Exclusion Order should be reduced from the period that we would otherwise consider to be appropriate.  As we have said at para [880] above, an Exclusion Order of seven years would be a severe, but not inappropriate, sanction to impose.  The reality is that, by virtue of his early retirement, Mr Knights will not undertake any audit work again.  Mr Plewman submits that exclusion from the ICAEW would prevent him from taking on any other professional or wider community roles in his retirement should he wish to do so.  He says that such a sanction is not warranted on grounds of public protection: it would simply be a punishment.  Ms Sabben-Clare responds that Mr Knights would only be prevented from taking on professional or community roles for which he needed to be a member of ICAEW.

913.  We are in no doubt that an Exclusion Order is required although Mr Knights has no intention of undertaking audit work in the future.  The Exclusion Order is required not as a punishment or to protect the public from Mr Knights. It is to maintain and promote public confidence in the accountancy profession and in its regulation, as well as to deter other members of the profession from committing Misconduct.

914.  But we are required to consider "*the full circumstances of each case*" (paragraph 13 of the Guidance).  We consider that the fact that Mr Knights will not undertake audit work in the future is a relevant circumstance, although we do not regard it strictly as a mitigating factor.  Taking it into account, we think that the Exclusion Order should be reduced from seven to five years. Accordingly, we make an Exclusion Order with a recommendation that it be for five years.

***Mitigating factors in relation to Mr Mercer***

915. Most of the factors relied on by Mr Knights as mitigating factors are also relied on by Mr Mercer.  We need only refer to matters which are particular to Mr Mercer.   As regards paragraph 62(l) of the Guidance (contrition and apology), Mr Mercer says the following in his third witness statement:

> *"13.  The Tribunal has found me to have committed Misconduct in respect of parts of Allegations 1 and 2, and Allegation 4.  I regret any misjudgements, but I wish to emphasise that at all times I believed I was acting properly and all my judgements were made in good faith and to the best of my abilities as an experienced auditor.*
>
> *...*
>
> *25   In summary, I would respectfully ask that the Tribunal take into account the following matters:*
>
> *...*
>
> *(b)   I recognise the seriousness of the Tribunal's findings, but I wish to repeat that at all times I sought to act to the best of my abilities and in good faith".*

916. We consider that Mr Mercer's reaction to our findings (like that of Mr Knights) falls short of being an apology and an unequivocal expression of contrition.

917. It is right to record that, like Mr Knights, Mr Mercer previously had an unblemished disciplinary record and compliance history.  He retired as an auditor as a result of these proceedings in 2016, five years before he planned to retire.  His accountancy career spanned 34 years (including 22 years as an audit partner), working on the audit of more than 100 clients (including a number of FTSE 100 and FTSE 250 companies).

918. In our view, none of the factors relied on by Mr Mercer justifies a reduction of the Fine below the sum of £250,000.

### *Mitigating factors in relation to Deloitte*

919. The factors relied on in mitigation of Deloitte's culpability are largely the same factors as those that are relied on in mitigation of the culpability of Mr Knights and Mr Mercer.  We have taken account of all the points made in the witness statement of D4 dated 2 June 2020. We wish to comment specifically on two of them. First, he says at para 26

that nothing came to the wider firm's attention at the time about the conduct of Mr Knights or Mr Mercer. We do not consider that this mitigates Deloitte's culpability. The firm is vicariously responsible for the Misconduct of these two senior partners. Secondly, at para 6 of his statement, D4 says:

> *"As the Tribunal recognised, these were judgemental issues. At the time these judgements were made Deloitte believed they were reasonable, but accepts that the Tribunal has found that they were not and regrets and apologises that, in the respects described in the Tribunal's report, the audits and reviews did not meet professional standards"*

920.  We accept that this is an apology and comes much closer to being an unequivocal expression of contrition than the corresponding statements by Mr Knights and Mr Mercer. But we do not consider that it justifies a reduction in Sanction. Deloitte as a firm has not sought to distance itself from Mr Knights and Mr Mercer. It contested the case every inch of the way. It was, of course, entitled to take this course and that is not an aggravating factor. But in view of the position taken by Mr Knights and Mr Mercer and the fact that Deloitte made no admissions of culpability during the proceedings, we do not consider that there are any mitigating factors available to it which are not available to Mr Knights and Mr Mercer.

## (16)   CONCLUSION ON SANCTIONS

921.  For the reasons that we have given, the Sanctions that we order are as follows:

(i)    In relation to Deloitte:

- A Severe Reprimand.

- A Condition / Direction that by 27 November 2020 Deloitte provide a Root Cause Analysis of the reasons for the Misconduct, why the firm's processes and controls did not prevent the Misconduct and whether the firm's current processes would lead to a different outcome.

- A Fine of £15 million.

(ii)   In relation to Mr Knights:

- Exclusion as a Member of the ICAEW for a recommended period of 5 years.

- A Fine of £500,000.

(iii)   In relation to Mr Mercer:

- A Severe Reprimand.

- A Fine of £250,000.

## (17)   COSTS

922.   Paragraph 9(8)(ii) of the Scheme gives us the power to order payment of "*the whole or part of the costs of, and incidental to, the investigation and the hearing of the Formal Complaint*" and to determine the amount of such payment.  The Respondents accept that we should order that they pay the Executive Counsel's reasonable costs of the investigation and proceedings in relation to the issues on which we have found Misconduct.  But there is disagreement between the parties as to what deductions should be made from the total costs incurred by the Executive Counsel.

923.   During the hearing, Mr Plewman submitted that we should determine the Executive Counsel's costs in principle; and that, if the parties were then unable to agree the amount, the costs should be assessed by us (or possibly by a Costs Judge).  Such a course was adopted in the case of *Connaught* (12 April 2017).  But as Ms Sabben-Clare points out, that was by agreement and the Executive Counsel has not agreed to this course here.  We plainly have no power to ask a Costs Judge to determine the costs.  In the absence of agreement, the Scheme clearly requires us to determine the costs payable by the Respondents.   Accordingly, we decline to adopt the course suggested by Mr Plewman.

924.   It is common ground that it is not necessary or appropriate to make any orders for costs against Mr Knights and Mr Mercer personally.  This is because Deloitte has agreed to meet any costs order that is made against Mr Knights and Mr Mercer and it is in a position to do so.  It is therefore only necessary for a costs order to be made against Deloitte as a firm.

*Edited for publication*

*Summary of costs claimed*

925.   The following costs are agreed:

(i)    The Tribunal's costs in the sum of £317,931.62; and

(ii)   The Executive Counsel's costs in the sum of £94,214.38 (plus VAT) in respect of the Sanctions Phase of the proceedings from 22 April 2020 (when the Draft Report was first circulated) to 10 July 2020.

926.   The Executive Counsel claims that she has incurred overall costs of £5,605,073.88 in respect of the investigation and proceedings until the conclusion of the hearing on culpability on 22 November 2019.  These costs are divided into three Phases:

(i)    Phase 1: £1,909,945.28 from 11 February 2013 until the service of the Proposed Formal Complaint on 21 March 2017;

(ii)   Phase 2: £715,488.43 from 22 March 2017 until the service of the Formal Complaint on 17 May 2018; and

(iii)  Phase 3: £2,979,640.17 from 18 May 2018 until the conclusion of the Tribunal hearing on 22 November 2019.

927.   All the above figures are exclusive of VAT.

928.   In addition to the agreed sum of £94,214.38 referred to above, the Executive Counsel seeks an order that the Respondents pay £4,626,140.65 of her overall costs in respect of the investigation and proceedings until the conclusion of the hearing on culpability on 22 November 2019.  This reduced figure is based on deductions for:

(i)    The costs of replacing counsel and solicitors;

(ii)   [Other matters redacted]; and

(iii)  […].

*Edited for publication*

929.   It is agreed in principle that these deductions should be made.   However, the Respondents do not accept the Executive Counsel's allocation (subject to various deductions) of 75% of her overall costs of the investigation and proceedings against the Respondents.

930.   At the costs hearing, Mr Plewman submitted that we should order the Executive Counsel to produce documents to enable the Respondents to challenge the overall costs claimed by her.   He submitted that the summary information that has been provided is insufficiently detailed to enable the Respondents to assess whether the costs claimed are reasonable and properly relate to the investigation and proceedings against the Respondents.   He argued that it was not fair to the Respondents that they should be compelled simply to accept the Executive Counsel's costs and apportionments at face value.   They should be permitted to examine the fee notes and invoices and the supporting narratives.   We rejected Mr Plewman's submissions at the hearing.   We now explain why we did so.

### *Our reasons for not ordering the Executive Counsel to produce documents in support of her overall costs*

931.   We refused to make the order sought by the Respondents for reasons which are substantially based on the evidence contained in Mr Twomey's second witness statement.

932.   […].

933.   […]

934.   […]

935.   […]

936.   […]

937.   […]

938.  […]

939.  […]

940.  We now return to the question of why we refused to order the Executive Counsel to produce the documents requested by the Respondents.  It is important to bear in mind that these are not civil proceedings subject to the Civil Procedure Rules.  We accept that, in complex civil litigation, it would be highly unusual not to order a detailed assessment of costs and, in the absence of agreement, not to require the production of all relevant documents.  But para 9(8) of the Scheme gives us an unfettered discretion as to how to deal with the issue of costs. We accept, of course, that this discretion must be exercised fairly.  The submissions that we have received on costs have been detailed. That is perhaps not surprising in view of the large sums at stake.  The hourly rates of the counsel and solicitors engaged by the Executive Counsel have now been agreed as has the number of hours worked.  The issues concern the apportionments made and (as we shall shortly explain) certain other points of principle.  We might have been willing to order the production of the documents sought by the Respondents if there were real grounds for believing that the costs apportionments made by the Executive Counsel were wide of the mark.  But we are satisfied that the Executive Counsel and her team have been astute to make careful, fair and reasonable assessments. The Respondents do not question their good faith.  In our view, nothing would be gained by requiring the production of the documents.  There would simply be more expense and more delay. We do not consider that fairness requires something akin to a detailed assessment of costs in this case.   We accept the apportionment of 75:25 for which the Executive Counsel contends.

### Remaining issues

941.  The Respondents have advanced the following further reasons why there should be deductions from the costs claimed by the Executive Counsel:

(i)     Costs were incurred in pursuing allegations that were not established;

(ii) Costs were incurred in pursuing the allegation of dishonesty against Mr Knights that was abandoned;

(iii) Costs were incurred in investigating matters that were not the subject of allegations in the Amended Formal Complaint; and

(iv) A deduction should be made for the long delay in the prosecution of these proceedings.

*(i)*     ***Costs referable to allegations that were not established***

942. Mr Plewman relies in particular on the fact that:

(i) We found that the Respondents were not culpable of Misconduct for not insisting on disclosure of the hardware sales in FY 09 and FY 10 pursuant to IFRS 8 paragraph 32 (paras [354]-[355] above).

(ii) Allegation 3.2 against Mr Knights, alleging a breach by him of Fundamental Principle (c) in relation to Autonomy's 3 March 2011 letter to the FRRP, was not pursued at the Culpability hearing;

(iii) We did not uphold Allegation 1.3 that Deloitte and Mr Knights failed to consider in the Q1 10 review whether the FY 09 financial statements required revision (para [204]);

(iv) We did not uphold Allegation 2 concerning Deloitte's and Mr Mercer's work on the TP3 Transaction in Q4 10/FY 10 (para [609]) and Allegation 2.3 concerning Deloitte's audit file documentation for the same transaction (para [577]);

(v) We did not uphold Allegation 2 concerning Deloitte's and Mr Mercer's work on the TP18/TP25 Transaction at FY 10 (para [615]);

(vi) In respect of Allegation 2 concerning Deloitte's and Mr Mercer's work on VARs in Q1 11, we accepted the limited submissions of the Executive Counsel (paras [622]-[623]), but did not state that we found Misconduct;

(vii)   We rejected Allegation 2 concerning Deloitte's and Mr Mercer's Q2 11 work on the TP24/TP1 Transaction and their alleged failure properly to consider Autonomy's payment to TP5 in Q2 11 (paras [635] and [643]);

(viii)  We dismissed Allegations 2.1(c) and 2.2(c) concerning Autonomy's Revenue Recognition Policy (paras [653]-[654]); and

(ix)    We dismissed the seventh allegation of loss of objectivity and three of the four elements of the particulars concerning the A10 Investigation (paras [753]-[757] and [759]).

943.   He submits that substantial costs were incurred on both sides in relation to these allegations.  He says that it would be unfair and unprincipled to award costs against the Respondents in respect of allegations where we have not found Misconduct (although in several such cases we have found that they committed other less serious errors). The Scheme is targeted at Misconduct: if a respondent successfully resists a charge of Misconduct, this should be reflected in a reduction of the costs awarded against it.  He suggests a deduction of 20% from all of the Phase 1-3 costs.

944.   We reject Mr Plewman's submissions for the reasons given by Ms Sabben-Clare.  The starting point is paragraph 5(1) of the Scheme which states:

> "*A Member or Member Firm shall be liable to investigation under this Scheme only where, in the opinion of the Conduct Committee:*
>
> (i)    *(a) the matter raises or appears to raise important issues affecting the public interest in the United Kingdom ("the first criterion"); and*
>
> *(b) there are reasonable grounds to suspect that there may have been Misconduct ("the second criterion")*"

945.   These two criteria were plainly satisfied in this case and Mr Plewman does not seek to argue otherwise.  There were reasonable (indeed ample) grounds to suspect that there may have been Misconduct on the part of the Respondents which justified an investigation and, in the light of the investigation, the institution of proceedings.

946.   At para [19] above, we have summarised the Allegations made in the Amended Formal Complaint under five headings.  All five have been upheld.  The Respondents' approach

has been to examine sub-issues in relation to many of which we have found breaches of professional standards on their part, albeit that some of them were not sufficiently serious to amount to Misconduct.

947.   At the start of an investigation, it is difficult and will often be impossible to know which issues will ultimately lead to findings of Misconduct.  The Tribunal in *Connaught* (para 365) accepted that "*necessarily an investigation is begun when there may be little hard information as to whether there has been any Misconduct*".  It is to some extent "*a voyage of discovery*".  We agree.

948.   We accept Ms Sabben-Clare's submission that, where Misconduct is subsequently found, it is usually fair and right for the losing Member or Member Firm to bear the whole of the costs of the investigation and subsequent proceedings, rather than the profession as a whole.  It is possible to envisage a case where, say, only one of many allegations of Misconduct is established and it would not be fair and right to order the Member or Member Firm to bear all of the costs of the investigation and proceedings.  But the present case comes nowhere near being such a case.

949.   The Executive Counsel accepts that there may be cases where it would be unjust for the Member or Member Firm to pay all the costs of the investigation.  But this requires the respondent to show that there were costs which ought reasonably to have been avoided: see *Connaught* at para 372.  We accept that there is no basis for disallowing costs of an allegation that has not been established unless it was unreasonable in all the circumstances for the Executive Counsel to pursue it: see *Connaught* at para 360.  We have carefully considered the nine points made by Mr Plewman which we have summarised at para [942] above. In our view, they do not support the proposition that the Executive Counsel was unreasonable to pursue any of the allegations of Misconduct which were not established.  Indeed, as we understand it, Mr Plewman does not go so far as to contend that it was unreasonable to pursue any of these allegations.  His point is simply that the allegations were not established.  That is not a sufficient reason to deprive the Executive Counsel of any of the costs she incurred that are referable to the allegations.

950.   Finally, we emphasise that investigations and proceedings under the Scheme are categorically different from civil litigation where it is not uncommon to reduce a successful claimant's costs if it does not succeed on all the issues in a case.

### (ii)   *Costs of pursuing the allegation of dishonesty against Mr Knights which was abandoned*

951.   An allegation of dishonesty was raised against Mr Knights in the Proposed Formal Complaint and then withdrawn.  The Respondents acknowledge that some of the factual material underlying this allegation came to form part of Allegation 5 in the Formal Complaint. They say that Deloitte and Mr Knights had to expend significant time prior to the Formal Complaint responding to and resisting the allegation, but they do not seek to set off these costs against the costs payable to the Executive Counsel.  Mr Plewman submits that the allegation was based on a misreading of the documents and should not have been made.

952.   We do not accept that the costs of pursuing the allegation should be disallowed.  As Ms Sabben-Clare points out, the proposed allegation arose from the email that Mr Knights sent from his wife's computer late on 13 October 2009: see paras [82] to [84] above. The allegation was that Mr Knights failed to act with integrity, independence and objectivity in sending the email from his wife's email address, not copying it to any Deloitte email address and stating the following day to the Reviewers that the SDM was "*client produced*".  In the circumstances, it was not unreasonable for the Executive Counsel to consider that there was *prima facie* evidence to support the plea of dishonesty and to include it in the Proposed Formal Complaint.

953.   The procedure of serving a Proposed Formal Complaint is to enable representations to be made and considered by the Executive Counsel.  That is what happened here.  The costs of this part of the procedure are part and parcel of the investigation and the proceedings.  In any event, we are not persuaded that the additional costs that resulted from this proposed allegation were more than minimal in the scheme of the case as a whole: all of the facts relating to it were also relevant to allegations of Misconduct that were proved.

*(iii)*    *Costs of investigating matters that were not the subject of the Amended Formal Complaint*

954.    It is not in dispute that the FRC investigated issues that were not eventually covered in the Formal Complaint.  The Respondents give the following examples:

(i)    The draft Zolfo Cooper Report, produced on 16 January 2014, dealt with issues that did not feature in the proposed or final Formal Complaint, namely: barter transactions; hosting transactions; whether Mr Mercer acted on a non-audit transaction while engaged as an audit partner; whether Mr Mercer breached Ethical Standard 1; whether materiality was appropriate; and Autonomy staff bonuses;

(ii)    The draft Zolfo Cooper Report also investigated three VAR transactions which formed no part of the proposed or final Formal Complaint;

(iii)    At least 73 of the 463 pages of Mr Southwood's first draft report dated 24 October 2014 dealt with issues which did not appear in the proposed or final Formal Complaint, namely materiality, barter transactions, Ethical Standard 3 and three VAR transactions; and

(iv)    Mr Southwood's first draft report also considered [a separate matter (redacted)].

955.    Without access to the underlying detail, the Respondents' best estimate of the cost of these issues (based on a review of the Zolfo Cooper Report and Mr Southwood's first draft report) is that there should be a deduction of 20% of the Executive Counsel's Phase 1 costs to reflect these points.

956.    Mr Twomey says at paras 29 to 31 of his second statement that he has reviewed the invoices of Zolfo Copper and Mr Southwood in relation to the Phase 1 costs.  He explains that in most instances they did not particularise in detail the costs relating to specific issues and he says that it is only possible to assess the costs relating to matters which were not included in the Formal Complaint by looking at the work output described in the reports.  He concludes that, if a deduction is required to be made in

respect of matters that were investigated but not pursued, it should be no more than 10% of the total Phase 1 costs.

957.    But Ms Sabben-Clare submits that there should be no deduction in principle.  She says that it is unsurprising that not all the matters that were investigated were ultimately the subject of allegations.  This is true in most large and complex cases.  It reflects a considered approach to framing allegations in such cases.  In order to discharge her regulatory function properly, the Executive Counsel must search widely and investigate thoroughly matters that may be relevant. The investigation that was conducted in this case was necessary in view of the public concern about Autonomy's financial reporting.  Our findings have resoundingly vindicated the decision to investigate the Respondents' responsibility.

958.    In summary: (i) the whole of the investigation was caused by the apparent problems with Autonomy's financial reporting; (ii) we have found that something had gone badly wrong with Autonomy's reporting and the Respondents were culpable of Misconduct; and (iii) it was reasonable to investigate the further matters listed at para [954(i) to (iii)] above.  It is striking that the Respondents do not say that it was unreasonable to investigate them.

959.    [redacted].

### *(iv)   Deduction of costs for delay*

960.    The Respondents contend that a deduction should be made from the Executive Counsel's recoverable costs on account of the long delay in conducting the investigation and the proceedings.  They suggest a further deduction of 20% of all the Phase 1-3 costs.  They rely on the fact that in *Connaught,* the Tribunal deprived the Executive Counsel of 15% of his costs on account of excessive delay in that case.  The Tribunal said that some of the costs were "*excessive and avoidable*" (para 369) and added at para 370:

>    *"We would in any event wish to mark our dissatisfaction with the delay, which meant that these proceedings were hanging over Mr Harrison for much longer than was necessary, by reducing the costs that would otherwise be ordered to be paid by the Respondents".*

*Edited for publication*

961.    We reject this as a ground for reducing the costs that it would otherwise be appropriate for the Respondents to pay.  First, we do not accept that there has been inordinate or unreasonable delay: we repeat paras [909 to 911 above].  Even if we are wrong about that, the Respondents have not identified any additional costs that were unreasonably incurred as a result of the delay.  It is not good enough merely to point to delay.  Finally, if it were necessary to do so, we would respectfully disagree with the approach adopted in *Connaught* of making a deduction of costs that it would be otherwise appropriate to require the Respondents to pay in order to mark our "*dissatisfaction*" with the delay. We are not aware of such an approach having been taken in other cases.  If the costs were reasonably and unavoidably incurred, then the fact that the process took too long is not a ground for disallowing the Executive Counsel part of those costs.

## CONCLUSION ON COSTS

962.    For the reasons that we have given, we reject all of the reasons advanced by the Respondents for reducing the Executive Counsel's costs below the sum she claims. Accordingly, we order Deloitte to pay the total sum of £5,038,286.65 (to which VAT will be added if applicable) comprising:

(i)     £317,931.62 (Tribunal's costs);

(ii)    £94,214.38 (Executive Counsel's costs of the Sanctions Phase); and

(iii)   £4,626,140.65 (Executive Counsel's overall costs of the investigation and proceedings until the end of the trial).