# EXHIBIT A

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12                    TRANSCRIPTION OF TAPE
13          SCOTT000000001 - Recorded Phone Call
14              (JOEL SCOTT and BRENT HOGENSON)
15
16
17
18
19
20
21
22
23
24       Transcribed by:
25       Linda M. Klea, BSBA, CSR 12468, RPR
```

EXH. 08598-001
Lynch_DOJ_00000030

```
1              SCOTT000000001 - Recorded Phone Call (Joel

2      Scott and Brent Hogenson, John and Chris)

3

4              JOEL SCOTT:  Okay.  So -- get his number.

5              (Dial tone/phone ringing.)

6              PHONE:  Your call has been forwarded to an

7      automatic voice message system.

8              (Dial tone/phone ringing.)

9              BRENT HOGENSON:  Hello, this is Brent.

10             JOEL SCOTT:  Hi, Brent.  It's Joel.

11             BRENT HOGENSON:  Hey, Joel.

12             JOEL SCOTT:  Uh -- still an okay time?

13             BRENT HOGENSON:  Still an okay time.

14             JOEL SCOTT:  Okay.

15             BRENT HOGENSON:  I got your e-mail about

16     serious questions.  And, you know, if you got

17     serious questions, you know, I want to take it

18     seriously.

19             JOEL SCOTT:  So I've got John and Chris

20     here.  And what I'd like to start off --

21             BRENT HOGENSON:  Are they both part of

22     Discovery -- Discovery Economics?

23             JOEL SCOTT:  Yes.

24             JOHN:  Yes.

25             BRENT HOGENSON:  Okay.  Great.  I just
```

EXH. 08598-002
Lynch_DOJ_00000031

```
1      want to make sure I know who John and Chris are.
2             JOEL SCOTT:  Okay.  So I what I want to
3      start off with is asking -- just making sure that
4      I've got the facts right on these partner
5      payments --
6             BRENT HOGENSON:  Sure.
7             JOEL SCOTT:  -- that they asked about.  So
8      there's a -- there's a number here, some with
9      pretty high numbers.  And can you just tell me, did
10     you get prior approval for each of these?
11            BRENT HOGENSON:  So I guess what you'd
12     have to do is give me a little bit of detail around
13     them, Joel.
14            JOEL SCOTT:  Okay.
15            BRENT HOGENSON:  And then I can probably
16     give you a little bit of fact pattern around
17     the -- the payments that we do on finder fees when
18     we take deals direct through resellers -- not
19     through resellers but from customers that have been
20     identified by resellers.
21            JOEL SCOTT:  Okay.  Well, the first one is
22     Codan.  And it looks like that's the end user
23     customer.  And, by the way, I mean, you guys can
24     feel free to speak up.
25            JOHN:  Yeah.
```

ABRAMS, MAH & KAHN

3

EXH. 08598-003
Lynch_DOJ_00000032

```
 1              JOEL SCOTT:  The partner is -- I guess the
 2     reseller partner is IEEE, and the amount of payment
 3     is $103,000.
 4              BRENT HOGENSON:  Okay.  Yeah, I'd have to
 5     look at the -- the packages on these, guys, because
 6     I'm afraid that I might give inaccurate information
 7     without looking at the -- the actual transaction
 8     packages, the revenue packages.  I can talk in
 9     generalities around, you know, what has occurred,
10     you know, since the acquisition.
11              JOEL SCOTT:  Okay.  Well, then let's start
12     with that.
13              BRENT HOGENSON:  Sure.  If you want me to
14     go down that page, I'm happy to try and do that
15     with you.
16              JOEL SCOTT:  Okay.  Why don't you tell me,
17     in generalities, what has occurred since the
18     acquisition?
19              BRENT HOGENSON:  Do you have -- do you
20     have any specific questions?
21              JOEL SCOTT:  Well, I guess, tell me the
22     process.  Well, what I'm looking at here is a check
23     request form that's signed by you for $103,000 from
24     last month.  And I just --
25              BRENT HOGENSON:  Just, in general, guys,
```

ABRAMS, MAH & KAHN

4

EXH. 08598-004
Lynch_DOJ_00000033

1    the iManage business -- and I think I explained it

2    to the folks from Discovery Economics yesterday --

3    the iManage business has a very large channel of

4    resellers, a lot of small regionally-based

5    resellers.  Most of the transactions on the iManage

6    business come in direct on partner paper or

7    reseller paper.  There are occasions where we take

8    deals direct, either because the end customer

9    doesn't want to go through the reseller or there's

10   an SOW that needs to be negotiated and they need

11   one vote to choke or potentially the reseller

12   didn't earn all of the -- the reseller fee

13   associated with it.

14         And in -- in those cases, we've taken the

15   deal direct, identified through a negotiation with

16   the sales channel with percentage that gets paid

17   back to the reseller as a finder's fee, 10 percent

18   --

19         JOEL SCOTT:  So is that -- is that amount

20   ever run through the U.K. or approved by the U.K.?

21         BRENT HOGENSON:  Just let me finish for

22   just a second and then I think you'll get to the

23   answer that you want.

24         Um -- to the best my knowledge, the

25   percentage on what is paid as a reseller, the

EXH. 08598-005
Lynch_DOJ_00000034

```
 1    finder fee to the reseller are always lower than
 2    the reseller's percentage that they get as part of
 3    the deals that they bring to us contractually.
 4    Therefore, this is a contractual payment.  And the
 5    way we viewed it is, it's been a contractual
 6    payment.
 7            The first time that we went through the
 8    process on paying the finder's fees, we did go back
 9    to the U.K. and we did get approval on it.  They
10    did understand the process.  But after that, we've
11    treated it like utilities or rent, being a
12    contractual payment, and I'm not sure that we've
13    gone back to the U.K. on these payments subsequent
14    to the first time post-acquisition.
15            JOEL SCOTT:  And how come?
16            BRENT HOGENSON:  I think I explained that.
17    Because we viewed them as contractual payments like
18    rent and like utilities.
19            JOEL SCOTT:  Okay.  And did you ever --
20            BRENT HOGENSON:  And they were always
21    lower than -- than the -- the fees associated with
22    the reseller's contract.
23            JOEL SCOTT:  Yeah.  I guess, did you ever
24    get Sushovan's authorization to do that?
25            BRENT HOGENSON:  Yeah.  I can remember
```

EXH. 08598-006
Lynch_DOJ_00000035

1    specifically, Joel, what the approval was when we

2    went back the first time.  I can tell you that

3    there were discussions on the pro- -- on the

4    process.  I actually believe you were even included

5    on those discussions on the process.  I can't

6    remember the exact timing and, you know, my memory

7    is not quite that good.

8            JOEL SCOTT:  All right.  I'll tell you,

9    based on -- based on what I hear, it's very

10   troubling.  It's very troubling, because it sounds

11   like decisions are getting made here based on the

12   appropriate percentage of payment.  And decisions

13   are getting made to issue payment without U.K.

14   visibility.  And that, to me, raises a big red

15   flag.

16           So there's a number of these -- a number

17   of these deals that I'm curious about, but it

18   sounds like you don't have any specific

19   recollection of the details around them.  I mean,

20   Conyers is -- is one.

21           And do you have any recollection about

22   that?

23           BRENT HOGENSON:  I'd have to -- you know,

24   before I try to get down the path of recalling it,

25   and -- I think I'd have to get, you know, the

EXH. 08598-007
Lynch_DOJ_00000036

```
1    revenue packages and take a look at them.  But I'm
2    happy to do that.
3            JOEL SCOTT:  Uh-huh.  Do you -- so in
4    this -- in this process when you authorize a check
5    to be cut, do you require an invoice to be received
6    from the reseller before you get the check cut?
7            BRENT HOGENSON:  The process that we
8    followed -- and, guys, we followed this process on
9    the -- on the iManage transaction with these
10   resellers going back six, seven years.  I've been
11   with iManage since 2001.
12           Um -- it is the -- the negotiation of the
13   finder's fee amount occurs between the sales
14   channel and the reseller.  And -- and,
15   historically, it's always been between the folks
16   who manage the reseller channel and they have been
17   with the business for a long period of time.
18   Barbara Stein, specifically.
19           Um -- they then provide us with detail on
20   what's been negotiated.  And we track through, and
21   as agreed with Sushovan, I remember one time
22   specifically that Sushovan did want us to make sure
23   of before we paid any of the reseller's finder
24   fees, and that is, is that we had payment received
25   from the end customer.  And that, we have
```

EXH. 08598-008
Lynch_DOJ_00000037

1    absolutely made sure of.  We always had payment

2    from the -- from the end customer prior -- prior to

3    making payment back to the reseller.

4             JOHN:  Is a purchase order also required

5    for this type of transaction?

6             BRENT HOGENSON:  Oh, like I said, it goes

7    back -- we always treated it as a contractual

8    issue, going back to the contract and the -- the

9    amount being paid was always less, to the best of

10   my knowledge, than the contract -- the contract

11   amount with the reseller on the transaction.

12            JOEL SCOTT:  And -- and I am curious,

13   because I did have a look at the underlying

14   contract.  It's a reseller -- it contemplates a

15   reseller relationship, it doesn't contemplate a

16   referral fee concept.  So, contractually, how --

17   how do you -- how do you square that?

18            BRENT HOGENSON:  You know, there's a lot

19   of times where these aren't just finder's fees,

20   Joel.  These are -- these are deals that we've

21   determined, as a company, that we want to take

22   direct.

23            (Simultaneous speaking.)

24            JOEL SCOTT:  And who makes that -- sorry.

25   Who makes that decision?

ABRAMS, MAH & KAHN

9

EXH. 08598-009
Lynch_DOJ_00000038

```
1              BRENT HOGENSON:  I'd say it's part
2     of -- it's part of the consolidated group that
3     makes that decision.  But, you know, a lot of it's
4     made in conference calls with the sales team.  You
5     know, Araujo has been involved in it.  Chris Junker
6     historically has been involved in it.  Um.  And --
7     and, obviously, it's a negotiation with the
8     customer.  And it's, you know, back to the
9     contractual percentage.  That, to my knowledge, is
10    always lower than the contractual percentage in the
11    contract.
12             JOEL SCOTT:  Okay.  And you know that
13    you're not authorized to issue payments above -- I
14    don't know if it's the $5,000 threshold --
15             JOHN:  I think it's 10.
16             JOEL SCOTT:  -- or the $10,000 threshold
17    without getting Sushovan or Mike's sign-off.
18             BRENT HOGENSON:  Well, per the recent
19    e-mails that have come over from Steve, everything
20    over $5,000 that gets paid goes back to Cambridge
21    for -- for review and approval.
22             Prior to that, um, my limit was $10,000,
23    excerpt for where they were rent, utilities,
24    contractually-approved payments, and we always
25    treated those as things that had been approved
```

EXH. 08598-010
Lynch_DOJ_00000039

```
 1    within the contract.
 2            But I do understand the procedures going
 3    forward.
 4            JOEL SCOTT:  Yeah.  I'm just -- I'm still
 5    thinking -- I'm thinking not just these recent
 6    e-mail, but historically.
 7            So you understand that prior to Steve's
 8    e-mail, you were authorized to make payments of 10K
 9    or less with your and another person's sign-off?
10            BRENT HOGENSON:  I -- I would phrase it
11    slightly differently than that, Joel.
12            JOEL SCOTT:  Okay.
13            BRENT HOGENSON:  Say that -- um, I was
14    authorized to approve expenditures of 10K or
15    greater.  But where a contract had already been
16    signed, I didn't -- I didn't view that as an
17    approval of expenditure because the approval of
18    expenditure had already occurred.
19            JOEL SCOTT:  Okay.  And even though there
20    was no -- there was no contract and referral fee in
21    the agreement, you interpreted the agreement to
22    include a referral fee concept?
23            BRENT HOGENSON:  Remember, not all of
24    these are referral or finder's fees.  Some of these
25    we've just determined that we wanted to take them
```

EXH. 08598-011
Lynch_DOJ_00000040

```
 1    direct.  And so the percentage, you know, could be
 2    higher in scope than what are just a general
 3    finder's fee might be but always lower than the
 4    percentage included in the reseller's contract.
 5         JOEL SCOTT:  Right.  And, um, obviously
 6    considerably higher than any referral fees we would
 7    pay under our standard referral fee arrangements.
 8         BRENT HOGENSON:  Not higher than what the
 9    iManage business has historically paid.
10         JOEL SCOTT:  I'm talking about Autonomy.
11         BRENT HOGENSON:  Yeah, I -- you know,
12    that -- that -- you probably have better knowledge
13    than I have.
14         JOEL SCOTT:  Okay.  Well, again, I
15    would -- I would expect you to have that knowledge.
16    So it's -- it's surprising that you don't have that
17    knowledge.  But I understand -- I understand the
18    partner payments.
19         What I hear from you is that there are a
20    number of transactions, you don't know them
21    offhand, where payments were made.  You would
22    authorize the approval; you would interpret it as a
23    contractual obligation; and, on that basis, felt
24    that you were authorized to make that approval.
25         BRENT HOGENSON:  And -- and we had gone
```

EXH. 08598-012
Lynch_DOJ_00000041

```
1    back to Cambridge the first time right after the
2    acquisition --
3              JOEL SCOTT:  Uh-huh.
4              BRENT HOGENSON:  -- within two or three
5    months of the acquisition.
6              JOEL SCOTT:  Uh-huh.
7              BRENT HOGENSON:  Probably amongst the
8    acquisition.  And had discussions around the
9    process.  And I thought it was pretty clear from
10   those discussions, but if there's been confusion,
11   then --
12             JOEL SCOTT:  You thought that you were
13   authorized to somehow make -- make these payments?
14             BRENT HOGENSON:  I thought that we were
15   clear that they were contractual payments.  Yes.
16             JOEL SCOTT:  Uh -- okay.  Tell me about --
17             JOHN:  Also --
18             JOEL SCOTT:  Sorry.
19             JOHN:  -- more to this particular one,
20   the --
21             JOEL SCOTT:  Yeah.
22             JOHN:  -- it looks like the -- when
23   the commission was actually calculated to the
24   salesperson, there wasn't any offset on the
25   finder's fee.
```

ABRAMS, MAH & KAHN

13

1           JOEL SCOTT:  Okay.  So I guess what about

2    that?  What about that?  How does that work, Brent?

3           BRENT HOGENSON:  Well, so when we

4    calculated the commissions and the sales operation

5    fee, we've -- the policy and the procedure is to

6    remove and pay on the net basis to the sales rep.

7    And it's not just for the finder's fee, it's for

8    things what we're selling third party product.

9           The way it's been viewed internally, and

10   the way I view it, is that software licenses have

11   an incredibly high gross margin.  Where we're

12   selling something as part of a transaction, and

13   that part of the transaction doesn't have the same

14   gross margin as a normal software license fee does,

15   then it needs to be removed and we should only be

16   paying commission to the sales rep, you know, with

17   a high incentive compensation rate, um, only on the

18   net license fees after removing the pieces or

19   components that don't receive the same similar high

20   gross margins.

21          So, very similar finder's fees, you know,

22   fees that we paid back to resellers or when

23   we're -- when we're invoicing third party product,

24   we always, you know, try to have that removed from

25   the commission calculation prior to paying

EXH. 08598-014
Lynch_DOJ_00000043

1    commissions.

2            If you found an example where, you know,

3    having done that correctly, then that was an error.

4    And, you know, occasionally errors do happen.  And

5    when they do happen, we try and correct them in the

6    next, you know, payroll or commission run.

7            JOEL SCOTT:  Uh-huh.  Okay.  Well, you

8    know, just sticking with this -- with this one cart

9    in line, I mean, I don't -- it sounds like you

10   don't have a lot of firsthand recollection of it.

11   But it -- it also seems like there's a number of

12   things that were done outside of process here.  Um,

13   over compensating for commission, not getting the

14   approval.  Um, I haven't found any PO or invoice

15   from uh -- from the uh --

16           JOHN:  Codan?

17           JOEL SCOTT:  -- partner here.  Um, so

18   it --

19           BRENT HOGENSON:  It'll link back --

20           JOEL SCOTT:  -- it just boggles my mind,

21   frankly.

22           BRENT HOGENSON:  It'll link back into the

23   spreadsheet that Cindy Johnson tracks.

24           JOEL SCOTT:  Yeah.

25           BRENT HOGENSON:  And Cindy Johnson can

EXH. 08598-015
Lynch_DOJ_00000044

```
 1    work -- can then link it back into probably Barbara
 2    Stein or Carol Rajunas, who is negotiating these
 3    partner fees with the -- the reseller.
 4            JOEL SCOTT:  Right.  Does -- do you -- do
 5    you take Cindy's sheet and go through it with
 6    Steve?  Does -- does Cindy do that?
 7            BRENT HOGENSON:  We did that, but -- and
 8    that is what we had done the first time.  We went
 9    through this with -- back in Cambridge right after
10    the acquisition.
11            JOEL SCOTT:  Okay.  And then --
12            BRENT HOGENSON:  I remember we had sent
13    over the sheet.
14            JOEL SCOTT:  Uh-huh.
15            BRENT HOGENSON:  You know -- my
16    recollection of the guidelines is, you know, let's
17    make sure that they're below the reseller
18    percentage, and let's make sure that, you know, we
19    get paid from the end customer prior to paying
20    these -- these reseller fees.  That's my
21    recollection.  It could be faulty because it's a
22    long time ago.
23            JOEL SCOTT:  What, um -- what's your
24    understanding of your authorization to -- to write
25    off, um, any amounts?
```

ABRAMS, MAH & KAHN

16

```
 1              BRENT HOGENSON:  Well, I think
 2     recently -- and this isn't just with
 3     the -- the -- the -- the recent, you know, e-mail
 4     from Steve that, you know, identified, you know,
 5     the $5,000 payment approval and review by
 6     Cambridge.
 7              But there was an e-mail that came over.
 8     My understanding it was about a few months back.
 9     And that e-mail, you know, clarified that, you
10     know, he wanted to review anything over $20,000
11     that was a credit memo, and we've been following
12     that since his e-mail.
13              JOEL SCOTT:  Okay.  And so you -- you're
14     saying that you didn't know that, um, Cambridge
15     required review of amounts --
16              BRENT HOGENSON:  Of credit memos?
17              JOEL SCOTT:  -- of any credits or
18     writeoffs above $20,000?
19              BRENT HOGENSON:  No, I was not aware of
20     that.
21              JOEL SCOTT:  All right.  What about, um,
22     Onstream?  Onstream is -- is something that you
23     signed off on just recently.
24              BRENT HOGENSON:  What is Onstream?
25              JOEL SCOTT:  Onstream is a customer that
```

EXH. 08598-017
Lynch_DOJ_00000046

```
1    Reena had sent to collections.  And --
2              BRENT HOGENSON:  Yeah.
3              JOEL SCOTT:  -- you signed off on a -- a
4    collection amount of approximately $75,000.
5              BRENT HOGENSON:  Oh, I remember.  I
6    remember.  Well, just my signing off on it alone
7    wasn't going to be enough to have it written off.
8    We -- we should still follow the -- the procedures
9    that -- that Steve had and go back to Steve just
10   like, you know, first approval on a -- on an
11   expense authorization.  It still required more than
12   just mine to write it off.
13             JOEL SCOTT:  Did you communicate that to
14   Reena?
15             BRENT HOGENSON:  The team understood it.
16   Yeah.
17             JOEL SCOTT:  Are you sure about that?
18   Because that --
19             BRENT HOGENSON:  Yeah, absolutely.
20             JOEL SCOTT:  -- definitely is -- is not my
21   understanding.
22             BRENT HOGENSON:  And I think -- I think
23   actually Steve was involved in that.  I think Steve
24   had an e-mail on that -- on that thread too.  But
25   Reena -- Reena has most of the detail on it.  But
```

ABRAMS, MAH & KAHN
18

EXH. 08598-018
Lynch_DOJ_00000047

```
1    they absolutely understood and knew that they had
2    to go back to Steve before we could have credit
3    memos on anything greater than $20,000.
4              JOEL SCOTT:  Give me a moment.
5              JOHN:  Do you have that?  Is this good?
6              JOEL SCOTT:  Yeah.  Okay.  Well, what I
7    see from Reena is that finance has agreed to
8    $76,000 to be paid in installments spelled out.
9              BRENT HOGENSON:  Well --
10             JOEL SCOTT:  And that, you know --
11             BRENT HOGENSON:   -- I think we should --
12   we should ask whether she had the approval from
13   Steve also.  If she hasn't gotten the approval from
14   Steve also, then that was a mistake and -- and
15   we'll need to correct that process.  But I believe
16   that she probably already had that approval from
17   Steve too.
18             JOEL SCOTT:  Okay.  Well, Reena's
19   indicated that she did speak with you and it was
20   approved to proceed with the -- the settlement
21   amount.
22             BRENT HOGENSON:  It definitely had my
23   approval on it, but my approval wasn't enough.  You
24   know, it would have been the first line approval,
25   and it needed to have -- to have the approval from
```

ABRAMS, MAH & KAHN
19

EXH. 08598-019
Lynch_DOJ_00000048

```
1    Steve also.  So she did have my approval on it;
2    that's absolutely correct.
3              JOEL SCOTT:  It seems that she didn't
4    understand, based on her conversation with you or
5    --
6              BRENT HOGENSON:  Okay.
7              JOEL SCOTT:  I obviously wasn't part of
8    that conversation, but --
9              BRENT HOGENSON:  No.
10             JOEL SCOTT:  -- direction was to have it
11   paid or have it settled.
12             BRENT HOGENSON:  Okay.  How old was
13   the -- how old was the outstanding receivable, guy?
14             JOEL SCOTT:  Uh -- I don't know.
15             BRENT HOGENSON:  There -- was it more than
16   a year?
17             JOEL SCOTT:  Yeah.  It was more than a
18   year.
19             BRENT HOGENSON:  Was it more than two
20   years?
21             JOEL SCOTT:  I don't know.
22             JOHN:  It was almost 600 days past due.
23             BRENT HOGENSON:  So it was
24   almost -- almost two years old.  And how much were
25   we collecting?
```

EXH. 08598-020
Lynch_DOJ_00000049

```
 1              JOHN:  Out of 281,000?

 2              CHRIS:  Seventy-six.

 3              JOHN:  Seventy-six.

 4              BRENT HOGENSON:  All right.  I understand

 5     that there's a potential that Reena may not have

 6     understood the policy or, you know, that she needed

 7     to go back and get Steve's approval.  I -- I recall

 8     that Steve was in the loop on this.  But, you know,

 9     I don't have the information right in front of me.

10     It doesn't sound like a bad business decision.

11              JOEL SCOTT:  No.  What I'm concerned about

12     is -- is not whether you think it's a good or bad

13     business decision.  What I'm concerned about is

14     whether you're getting the right approvals or

15     directing your team to get the right approvals.

16              BRENT HOGENSON:  Yeah.  And, you know, we

17     make -- how many -- how many decisions on approvals

18     do we make on a quarterly basis?  Probably

19     thousands; right?

20              JOEL SCOTT:  Uh-huh.

21              BRENT HOGENSON:  So if -- if -- I mean, if

22     what you're finding there are a few exceptions

23     where errors have been made, then we'll have to

24     correct -- correct those few exceptions.  I get

25     that.
```

EXH. 08598-021
Lynch_DOJ_00000050

```
 1              JOEL SCOTT:  Yeah.  I -- I'll keep going.
 2              BRENT HOGENSON:  Okay.
 3              JOEL SCOTT:  So what's your understanding
 4    of when we stop issuing payments in any given
 5    quarter?  At what point do we stop writing checks,
 6    if ever?
 7              BRENT HOGENSON:  Well, I think that we
 8    would get directive from Cambridge to stop writing
 9    checks.  I know that that occurred a couple times
10    in the early -- early, right after the acquisition.
11    And primarily, it was a reflection of how
12    collections were going within the quarter to where
13    if collections were really, really strong, then we
14    would pay as much as we possibly could.
15              And if collections were a little bit
16    light, we wanted to maintain the cash balances as
17    much as we could, so we checked on the payment of
18    checks.
19              But I don't -- to the best of my
20    recollection, guys, I've never heard that we had a
21    policy not to pay checks after X date.  We always
22    had, you know, an -- an instruction from Cambridge
23    and/or from Steve saying, you know, hey, don't
24    issue any checks after X on a specific quarter, if
25    that applied.
```

EXH. 08598-022
Lynch_DOJ_00000051

```
 1              JOHN:  You know, yesterday we talked about
 2    on the other side the cash receipts, and you said
 3    there was a consistent policy on the --
 4              BRENT HOGENSON:  No --
 5              JOHN:  -- if the check was in transit.
 6              BRENT HOGENSON:  I remember our discussion
 7    yesterday, and it was really more of a discussion
 8    around not payments going out --
 9              JOHN:  Yeah.  Cash receipts coming in.
10              BRENT HOGENSON:  -- but customers coming
11    into our shop.  And there was a question from Reena
12    in the end of June.  I think it must have been on
13    June 30th because we were talking about, you know,
14    procedures for payments in transit.  And when
15    payments in transit occurred, you know, what I'd
16    asked Reena was, "What was the policy that
17    Cambridge has on these?"
18              And her response back to me was that
19    "Cambridge would recognize the cash payment as a
20    payment received if it has left the customer's hand
21    and out of their control," which from an accounting
22    standpoint is a perfectly acceptable answer.  And,
23    you know, as I responded back to Reena, and I think
24    I responded yesterday, um, this just needed to be
25    applied consistently on a quarterly basis.  And
```

EXH. 08598-023
Lynch_DOJ_00000052

```
1    that was the -- that was the discussion that I

2    think we had yesterday.

3              JOHN:  Yeah.

4              JOEL SCOTT:  So this Freeman Group, what

5    was it that you --

6              JOHN:  Oh, Freeman?  That was 7500.  Yeah.

7    Freeman, they were the competitor.  We

8    refunded -- made a refund to them.

9              So the question is, was there approval

10   from Cambridge on this?

11             BRENT HOGENSON:  Guys, I'm -- I'm not

12   following the conversation on the side.

13             JOHN:  Okay.  There was a -- do you have

14   a --

15             JOEL SCOTT:  So I guess Freeman Group was

16   a company that paid us for -- was it a tech

17   services agreement or some services agreement?

18             JOHN:  Yeah.

19             JOEL SCOTT:  And it looks like you asked

20   that the amount be refunded?

21             BRENT HOGENSON:  Uh, you know what, I -- I

22   don't have the specifics in front of me, and I

23   don't -- I don't recall it offhand.

24             JOEL SCOTT:  Okay.

25             JOHN:  Yeah.  I guess Brenda asked.  Okay.
```

ABRAMS, MAH & KAHN

24

```
1              BRENT HOGENSON:  Again, please try to
2    remember that, you know, we have hundreds or
3    thousands of transactions that occur on a quarterly
4    basis.  So --
5              JOHN:  This was a July transaction.
6              BRENT HOGENSON:  -- I don't memorize every
7    one of them.
8              JOEL SCOTT:  Yeah, this is -- this is this
9    month, Brent.
10             JOHN:  Returning moneys to partners that
11   compete with us now, we don't want to provide a
12   copy of our software today.
13             BRENT HOGENSON:  Oh, oh, oh.  I remember
14   this one.  So if my recollection is correct, when
15   we charged -- the iManage group, once again, was a
16   large number of resellers, they charged a partner
17   fee to become a partner and be active within a
18   calendar year.
19             My understanding is, it was determined
20   that this -- this partner was a competitor and they
21   had already paid their partner fee, so we returned
22   their partner fee when we canceled them as being a
23   partner.  And, yes, I think that is correct.
24             JOHN:  What was the approval process on
25   that, do you recall?
```

EXH. 08598-025
Lynch_DOJ_00000054

```
 1              BRENT HOGENSON:  You know, since we were
 2      returning fees and canceling out of the
 3      arrangement, um -- I guess I treated it as if it
 4      was a contractual fee that we were just returning.
 5      And they were no longer doing any work for us, so I
 6      thought it was our obligation to return the fee.
 7      How much was it?
 8              JOHN:  $7,500.
 9              BRENT HOGENSON:  And -- and my approval
10      level was?
11              JOHN:  In July?  On this date?  Might have
12      been 5,000 by it.
13              JOEL SCOTT:  I don't know.
14              JOHN:  Yeah.
15              JOEL SCOTT:  So --
16              JOHN:  We also talked about refunds for
17      customer overpayments.
18              BRENT HOGENSON:  Oh, yeah, absolutely.
19              JOHN:  And you mentioned that, you know,
20      you didn't really see the need to go to the U.K. on
21      that because it was kind a no-brainer, you know, if
22      a customer has overpaid us, regardless of the
23      amount, it's appropriate to refund it.
24              BRENT HOGENSON:  Well, if a -- if a clerk
25      is taking money at a restaurant or a store and
```

EXH. 08598-026
Lynch_DOJ_00000055

1    there is an overpayment, and they provide the right

2    amount of change back?  Absolutely.  There are --

3    there are -- and it's surprising the number of

4    overpayments that customers have.  And I think I

5    explained this yesterday to you folks.

6         IManage and Interwoven, the process is to

7    send out proforma invoices on maintenance renewals

8    90 days in advance.  And then when a customer

9    agrees to renew their maintenance, then we'll send

10   out a real invoice and we'll recognize it as

11   revenue within the system, or deferred revenue as

12   the case may be.

13        Um -- you'd be surprised how many times

14   customers will actually pay both the proforma

15   invoice and the real invoice.  In the case where

16   customers have paid both the proforma invoice and

17   the real invoice, I've absolutely returned the

18   money.

19        JOHN:  So you don't see that as something

20   you really need to go to Cambridge on regardless of

21   the amount?

22        BRENT HOGENSON:  John -- John, just to

23   return somebody's money that they've overpaid us?

24        JOHN:  Yeah.

25        BRENT HOGENSON:  No.  I didn't.  I'm

EXH. 08598-027
Lynch_DOJ_00000056

1    sorry.

2              JOEL SCOTT:  Okay.  And when a reseller

3    wants to -- or not when a reseller -- when a

4    customer wants to cancel their maintenance halfway

5    through the year, and they want to -- they want to

6    --

7              BRENT HOGENSON:  Well, that's contractual.

8    That comes back to a contractual issue.  Because if

9    they've got a hind contract with us where we tell

10   them that, you know, we will refund moneys upon

11   notice if they -- unused maintenance; it's

12   typically unused maintenance.

13             JOEL SCOTT:  Uh-huh.

14             BRENT HOGENSON:  That's a contractual

15   issue.  Just take a look at the contract, because

16   we've never -- whether -- to the best of my

17   knowledge, we've never let a customer cancel a

18   maintenance contract without -- without reviewing

19   the contract and noting the language in the

20   contract if they have that ability.

21             And then if -- if there is a contractual,

22   you know, obligation from us to refund moneys once

23   they've canceled it, then absolutely.

24             JOEL SCOTT:  Okay.  On Office Information

25   of Australia --

EXH. 08598-028
Lynch_DOJ_00000057

1          BRENT HOGENSON:  OIA?

2          JOEL SCOTT:  Yeah.  Maintenance renewals,

3     what's your understanding on signing up renewals

4     through a -- through a partner versus doing it

5     directly and -- and whether that's -- that's

6     something that you ought to bubble up?

7          BRENT HOGENSON:  Well, I think this has --

8     this has been a practice that goes well beyond the

9     acquisition.  I mean, we've had OIA in Australia

10    for as far back as I remember.  And, you know,

11    they're -- they're the ones that actually helped

12    iManage break into the Australian market and still

13    have a great deal of -- of influence with our

14    customers, legal customers in the Australian

15    market.

16         JOEL SCOTT:  Uh-huh.

17         BRENT HOGENSON:  So I think that -- you

18    know, go back and look at the OIA agreement.  Even

19    when you did the acquisition, those agreements, I

20    think, were signed -- signed prior to the

21    acquisition and/or reviewed by legal if there was

22    any amendment subsequent.  I don't think we're --

23    you know, there's anything going on with OIA that's

24    not within their contractual agreement to the best

25    of my knowledge.

EXH. 08598-029
Lynch_DOJ_00000058

```
 1              JOEL SCOTT:  No.  It's not about whether
 2    it's in their agreement, it's about -- my question
 3    is more about -- I guess, having the practice of
 4    renewing maintenance with these folks as a
 5    maintenance provider without -- without getting
 6    that run through the U.K. or -- or having U.K.
 7    approval on that.  Again, I don't know enough facts
 8    around this, but it sounds like the dollars are --
 9    are actually quite large.
10              BRENT HOGENSON:  All right.  I think that
11    the -- you know, there's a number of block legal
12    customers in Australia that do first line support
13    through OIA.
14              JOEL SCOTT:  Uh-huh.
15              BRENT HOGENSON:  So, yeah, I don't think
16    that's a change in practice at all.  Actually,
17    interactional.
18              JOEL SCOTT:  A change in practice from
19    iManage or Interwoven base?
20              (Simultaneous speaking.)
21              BRENT HOGENSON:  You know, I don't think
22    that there's been any change in practices of, you
23    know -- I -- you know, I kind of vaguely remember
24    even having a discussion on this with -- with their
25    folks because, you know -- you know, quite frankly,
```

EXH. 08598-030
Lynch_DOJ_00000059

1    over the last three, four, five, years, I've often

2    considered that we should be taking that business

3    direct and -- and setting up a support channel in

4    Australia because of the amount of money that we

5    end up paying OIA.

6         And I know that Neil Araujo and Chris

7    Junker were working on even bringing some of the

8    folks over from the OIA team as employees.  It just

9    never completely came about.

10        JOEL SCOTT:  Do you know if that's

11   something that had U.K. involvement?

12        BRENT HOGENSON:  You know, I think -- I

13   think you'd have to ask Neil whether it did or

14   whether it didn't.  I don't know.

15        JOEL SCOTT:  Okay.  Well, I'll tell you,

16   Brent, so far on --

17        JOHN:  Yeah, we had one other thing we

18   talked about yesterday, this 488,000 of Digital

19   Safe revenue that's been unbilled.

20        JOEL SCOTT:  Okay.

21        JOHN:  You know, and why that happened.

22   Do you want to kind of run through that again?

23        BRENT HOGENSON:  Uh, I think I talked to

24   you about it yesterday.  Told you that you probably

25   needed to talk to Percy about that specific

EXH. 08598-031
Lynch_DOJ_00000060

1     transaction.

2              JOEL SCOTT:  How do you -- how do you

3     monitor that we are actually invoicing what we're

4     supposed to be invoicing?  How do you -- how do you

5     check on that?

6              BRENT HOGENSON:  Oh, we follow it through

7     on the -- the revenue sheets that are generated.

8     Every day, I think, it is through the end of the

9     quarter.

10             JOEL SCOTT:  Okay.  Well, I guess I'm

11    asking because if we're missing a half a million

12    dollars, I'm curious as to the process that -- that

13    you implement or received.

14             BRENT HOGENSON:  I'm not sure that -- you

15    know, I'm not sure that we're missing a half

16    million dollars, but, you know, I don't have -- I

17    don't have the details on that one specifically,

18    guys.  I'd have to look at it.

19             JOEL SCOTT:  Okay.  Well, these -- these

20    different things that we're talking about, I

21    think -- do you have another one?

22             JOHN:  You want to talk about the other

23    one?

24             JOEL SCOTT:  Yeah.  I do.

25             JOHN:  Okay.

EXH. 08598-032
Lynch_DOJ_00000061

```
 1              JOEL SCOTT:  But I just want to put that
 2    aside.
 3              JOHN:  Okay.
 4              JOEL SCOTT:  Um, I'll tell you, Brent, the
 5    thing that really concerns me the most is, the
 6    sense I get is you're okay approving payments or
 7    instituting processes and not running that up
 8    through the U.K. for approval.  Issuing checks,
 9    crediting back moneys.  And, you know, this is
10    obviously a non-exhaustive list, and it seems that
11    you won't know the details around certain of these
12    transactions that -- that we're talking about, or
13    you can't remember them offhand.
14              But it's -- it's deeply disturbing that
15    you'd be issuing payments of, you know, $100,000,
16    $60,000, $20,000, $50,000, without bubbling any of
17    -- or credits back or what have you -- without
18    running this back through the U.K.
19              BRENT HOGENSON:  Well, I think you're
20    making a relatively broad statement about payments,
21    and we've gone through them in detail so I've kind
22    of made my comments on our discussion at the detail
23    level rather than the broad statement level and --
24    I don't think I discussed a lot of these payments
25    were contractual payments, and I --
```

EXH. 08598-033
Lynch_DOJ_00000062

```
 1              JOEL SCOTT:  But you know what, I
 2      fundamentally disagree with that.
 3              BRENT HOGENSON:  Okay.
 4              JOEL SCOTT:  I don't see them as
 5      contractual.  There's nothing in the contracts.  As
 6      far as I know, there's never been an authorization
 7      for you to issue payments or give you -- deputize
 8      you with approval to -- to sign off on those
 9      payments.  I don't see it.  You know?  I don't see
10      it anywhere.
11              BRENT HOGENSON:  You didn't bring up rent
12      payments.
13              JOEL SCOTT:  I didn't -- you know what, I
14      didn't bring up rent payments.  And it's not -- as
15      I said, this discussion isn't exhaustive, but this
16      is an issue that, you know, that has surfaced.  And
17      it's an issue that makes me very concerned to -- to
18      see, you know, what I -- what I've got in front of
19      me are forms where you've signed off and said "pay
20      this as soon as possible."  And I've got multiple
21      ones of them.  And that is -- that's a problem.  I
22      -- frankly, I can't get my head around it.
23              And you're giving me a rationalization.
24      But, you know, that's frankly all that I see.  As
25      it is, it's a post hoc rationalization that says
```

ABRAMS, MAH & KAHN

EXH. 08598-034
Lynch_DOJ_00000063

1    this was contractual without a -- without a
2    contract.  So that's -- you know, that's a problem.
3           And that's a problem when you're
4    overseeing the rest of this organization where I'm
5    finding embezzlement.  Now, I want to talk about
6    that for a minute.  Because in the e-mail that you
7    sent, you gave me a breakdown of each individual
8    and how much -- you know, you said 85, 15 percent.
9    Help me understand.  How did you -- how did you
10   come up with that?
11          BRENT HOGENSON:  I got all the individual
12   records from ADP going to back to 2005, by the
13   month.
14          JOEL SCOTT:  Okay.  How is it that you
15   have them all?
16          BRENT HOGENSON:  I asked for them.
17          JOEL SCOTT:  Who did you ask for them?
18          BRENT HOGENSON:  Kerrie.
19          JOEL SCOTT:  Why would you have done that?
20          BRENT HOGENSON:  Because I wanted to
21   understand, you know, what percentages and -- and
22   time frames we were dealing with.
23          JOEL SCOTT:  When did you ask her for
24   that?
25          BRENT HOGENSON:  Yesterday.

EXH. 08598-035
Lynch_DOJ_00000064

1          JOEL SCOTT:  Do you recall you and I

2     having a specific discussion about the fact that I

3     wanted the investigation to remain completely

4     independent and to keep you out of it?

5          BRENT HOGENSON:  I do.

6          JOEL SCOTT:  I wanted to keep everybody

7     out of it.  So why would you have then gone and

8     asked for this information?

9          BRENT HOGENSON:  I think that,

10    subsequently, when you invited me up to the

11    San Francisco office to talk to the finance team,

12    um, and you gave me further results of the

13    investigation, you know, I considered to be part of

14    it at that point in time.

15         JOEL SCOTT:  Okay.  I -- did I tell you

16    that -- that I was now going to share all the

17    information with you, that the investigation was

18    concluded, or that you could go ahead and ask for

19    any information that you want?

20         BRENT HOGENSON:  Uh -- not specifically, I

21    don't think.

22         JOEL SCOTT:  Yeah.  I don't think so

23    either.  So I got to tell you, putting aside the

24    financial issues, when I see what I saw, which is

25    you essentially trying to get into the

EXH. 08598-036
Lynch_DOJ_00000065

1    investigation and use your influence with people

2    that report directly under you to try and get your

3    own picture of an investigation that I specifically

4    told you, you are to keep out of, I find extremely

5    disturbing.

6           Now, one other thing that John mentioned

7    that I would like to ask you about is this trip

8    that you took to Chicago.

9           BRENT HOGENSON:  Sure.

10          JOEL SCOTT:  So can you tell me what the

11   purpose of the trip was?

12          BRENT HOGENSON:  It was to -- to spend

13   some time in the Chicago office.  And then also to

14   meet with Rafiq and go through, you know, the sales

15   pipeline for Q2 and talk about our sales strategy

16   for Q2.

17          JOEL SCOTT:  For Q3.

18          BRENT HOGENSON:  Q3.  Sorry.  Yes.  Thank

19   you.

20          JOEL SCOTT:  So can you tell me

21   exactly -- tell me -- tell me about that trip.

22   When did you get there?

23          BRENT HOGENSON:  You know, I can't

24   remember the exact timing, guys.

25          JOEL SCOTT:  Okay.  Well, how many days

ABRAMS, MAH & KAHN

37

EXH. 08598-037
Lynch_DOJ_00000066

1    did you spend there?

2              BRENT HOGENSON:  I spent about a day and a

3    half, a day and a quarter there.

4              JOEL SCOTT:  Okay.  And what did you do in

5    your time there?

6              BRENT HOGENSON:  I was in the Chicago

7    office and I met with Rafiq.

8              JOEL SCOTT:  Okay.  Who else did you meet

9    with?

10             BRENT HOGENSON:  Oh, I had conversations

11   with -- with Barbara Stein and Kevin Hicks and a

12   number of folks around the office.

13             JOEL SCOTT:  Okay.  But your only meeting

14   was your meeting with Rafiq?

15             BRENT HOGENSON:  I'm the president of

16   Interwoven, guys, and -- and the CFO of Americas.

17   The Chicago office is a big office.  And going back

18   to the Chicago office I wouldn't think would be all

19   that unusual.

20             JOEL SCOTT:  So the only real substantive

21   meeting was the meeting with Rafiq and, otherwise,

22   it was just talking to different folks in the

23   office?

24             BRENT HOGENSON:  And -- and making sure

25   that, you know, I had a presence back there and --

EXH. 08598-038
Lynch_DOJ_00000067

```
 1    uh, you know.
 2              JOEL SCOTT:  And -- and when did you meet
 3    with Rafiq?
 4              BRENT HOGENSON:  Uh, it was around -- I
 5    think it was around 1:00 o'clock in the afternoon,
 6    but the timing may be off by a little bit.
 7              JOEL SCOTT:  And how long did you spend
 8    together?
 9              BRENT HOGENSON:  I don't know.  It was
10    probably a couple of hours.
11              JOEL SCOTT:  And where did you meet?
12              BRENT HOGENSON:  We, uh -- we met and went
13    out for lunch.
14              JOEL SCOTT:  Okay.  And what did you talk
15    about at lunch?
16              BRENT HOGENSON:  We talked about, you
17    know, the sales process.  We talked about Q3.  We
18    talked about the customers.  We talked about
19    strategy.
20              JOEL SCOTT:  Okay.  And can you get
21    more -- did you talk about -- did you go through
22    your specific list of Q3 accounts?
23              BRENT HOGENSON:  We talked about the
24    pipeline.
25              JOEL SCOTT:  Okay.  And did you get into
```

EXH. 08598-039
Lynch_DOJ_00000068

1    specific detail with respect to specific accounts?

2            BRENT HOGENSON:  All right.  Some accounts

3    we did talk a little bit in detail on.  I mean, I

4    don't understand the -- the questioning on the trip

5    to Chicago.  I don't find it to be all that

6    unusual.

7            JOEL SCOTT:  One of the expenses that you

8    had listed on your trip that you submitted was for

9    a dinner with the Chicago team at the Rosebud.

10           Can you tell me about that?

11           BRENT HOGENSON:  I canceled that off and

12   paid for that one myself.

13           JOEL SCOTT:  Okay.  But can you just tell

14   me about it?  Who was it with?

15           BRENT HOGENSON:  It was with members of

16   the Chicago office, but I didn't want to charge it

17   into the office so I paid for it myself.

18           JOEL SCOTT:  Okay.  Well, you did submit

19   it.  You know, it came across my desk.  So I'm

20   curious who -- who was it with?

21           BRENT HOGENSON:  Guys, since I paid for it

22   myself, I -- I don't think I need to go into that

23   level of detail.

24           JOEL SCOTT:  Okay.  And what was

25   the -- what was the purpose of that meeting?

ABRAMS, MAH & KAHN
40

EXH. 08598-040
Lynch_DOJ_00000069

1            BRENT HOGENSON:  Once again, I paid for it
2    myself.  It was in off-hours time.
3            JOEL SCOTT:  Uh-huh.
4            Okay.  Well, Brent, I got to tell you,
5    what I see is a pattern of financial irregularities
6    and mismanagement.  Um, I see unauthorized partner
7    payments where you're committing company dollars
8    well in excess of what you're authorized to.  And I
9    see a pattern of practices that, frankly, I don't
10   understand.  I genuinely don't understand.
11           And I -- I -- I wish I could make sense of
12   it, but I can't.  Um.  So I -- I don't think the
13   word -- I think that we're at a -- I think we're at
14   a point here where I cannot afford to have you, um,
15   retained in the position that you're in.  When
16   I -- when I -- when I see situations --
17           BRENT HOGENSON:  Can you make that
18   decision?
19           JOEL SCOTT:  Say again.
20           BRENT HOGENSON:  Do you make that
21   decision?
22           JOEL SCOTT:  I can make that decision.
23           BRENT HOGENSON:  Who -- who authorizes you
24   to make that decision?
25           JOEL SCOTT:  I can make that decision.

EXH. 08598-041
Lynch_DOJ_00000070

```
1              BRENT HOGENSON:  Who -- who authorizes you
2      to make that decision?
3              JOEL SCOTT:  So, Brent,
4      here -- here -- here's the problem that I have.
5      The problem that I have is, I'm trying to do an
6      investigation into the U.S. finance organization
7      which results from an embezzlement that comes to
8      light a couple of months ago.  I see things --
9              BRENT HOGENSON:  But one that didn't have,
10     you know -- there was never any conclusive evidence
11     that it had anything to do with either my team in
12     San Jose or myself.
13             JOEL SCOTT:  I see things that tell me
14     that you're doing things that you're not authorized
15     to do.  I also see things that tell me that you're
16     interfering with my investigation in ways that
17     don't make me at all comfortable.
18             Now, you know, I know that there is -- so,
19     look, on that basis, Brent, I can't -- I can't
20     afford to have you -- to have you in the office or
21     to keep you around at Autonomy.  It doesn't make
22     sense to me.
23             BRENT HOGENSON:  Who makes that decision?
24             (Simultaneous speaking.)
25             JOEL SCOTT:  I'm telling you right now.
```

EXH. 08598-042
Lynch_DOJ_00000071

```
 1              BRENT HOGENSON:  Who makes that decision?
 2              JOEL SCOTT:  I'm telling you right now.
 3    And, look, if you want to appeal it, you can appeal
 4    it.  But based on what I've been doing with, um --
 5    um -- John and Chris and the specifics that I'm
 6    seeing and, frankly, the answers that I'm not that
 7    happy with on how you've inserted yourself, you
 8    know, both in -- in the investigation business and
 9    other things that just don't seem right to me, I --
10    I can't afford to have you -- to have you employed
11    here.
12              BRENT HOGENSON:  So what is it that you're
13    telling me?
14              JOEL SCOTT:  I'm telling you that,
15    unfortunately, I -- we've got to let you go as of
16    today.
17              BRENT HOGENSON:  So you've made the
18    decision that today's my last day?
19              JOEL SCOTT:  Yeah.  Yeah.  And, um -- you
20    know, I've seen the e-mails that have gone back and
21    forth obviously between you and Andy and Sushovan,
22    and I have steered clear of that.  So, you know, I
23    can tell you -- well, this is -- I can tell you a
24    couple things.
25              One, I can tell you that I haven't been
```

EXH. 08598-043
Lynch_DOJ_00000072

1    involved with that, and my decision is completely

2    independent of, um-- of any -- any statements or

3    claims that you're making to, um -- Andy or

4    Sushovan or outside auditors or Deloitte or what

5    have you.  What I do understand is that that matter

6    is -- has been finally concluded and any concerns

7    that you arose were -- or that you made were based

8    on bits and pieces.  And -- though I don't know

9    details, I -- you know, I can read those e-mails

10   certainly.

11           BRENT HOGENSON:  Okay.  All right.  Can I

12   ask a couple of questions?

13           JOEL SCOTT:  Uh --

14           BRENT HOGENSON:  I'd like to ask whether

15   there was any part of this decision that was

16   related to the questions that I've raised to the

17   Audit Committee, Deloitte, or the FSA?

18           JOEL SCOTT:  Look, Brent, one thing -- one

19   -- I've already told you my answer to that.

20           BRENT HOGENSON:  So --

21           JOEL SCOTT:  Just a second ago, I told you

22   my answer to that.

23           BRENT HOGENSON:  -- you're saying that

24   there was no part of your decision --

25           JOEL SCOTT:  I've already given you my

EXH. 08598-044
Lynch_DOJ_00000073

```
1      answer.  But, look, Brent, I don't want to debate
2      it.  I do not -- I do not want to debate where I'm
3      coming down on this.
4              BRENT HOGENSON:  I'm just trying to get an
5      answer.
6              JOEL SCOTT:  Okay.  I've given you my
7      answer on it.
8              BRENT HOGENSON:  Was there any -- so I --
9      I take it to mean that there was no part of the
10     decision that, you know, reflected at all on the
11     questions that I raised to Deloitte, the
12     Audit Committee, or the FSA?
13             JOEL SCOTT:  Look, Brent, what I see here
14     are financial irregularities.  What I see here is
15     mismanagement.  And what I see here is a lack of
16     clarity.  When you tell me things like you book a
17     company trip -- and I'm just giving this as an
18     example -- to go have a meeting, you know, an
19     urgent company trip to go have a meeting while
20     somebody else is in the U.K. at that time, and the
21     whole of your meeting is for a one- or two-hour
22     lunch and you've got other expenses on there that
23     you then take off after the fact and don't want to
24     tell me about, that raises concerns for me.
25             When I tell you that I'm investigating a
```

EXH. 08598-045
Lynch_DOJ_00000074

1    matter and I do not want you involved in that

2    matter, I will come to you when I have questions,

3    and you tell me that you've gone to one of your

4    direct reports and asked for certain information,

5    that tells me that there's a problem.

6            When I have folks show me payments that

7    you're not authorized to make, and you've made them

8    and you tell me that there is a contractual basis.

9    Without a contract, that tells me that there is a

10   problem.  And unfortunately, what I don't see is

11   one instance or two instances, but I see a pattern.

12   And that pattern is disconcerting.  So I -- you

13   know, that -- that's ultimately where it is.

14           BRENT HOGENSON:  There was no part of the

15   decision that was related back to my question with

16   Deloitte or the FSA?

17           JOEL SCOTT:  I've given it to you.  The

18   reason for your termination is for -- is that I see

19   financial irregularities and I see mismanagement.

20   And I -- I don't think I can be any clearer on

21   that.

22           BRENT HOGENSON:  And who did you talk to

23   about --

24           JOEL SCOTT:  Brent, I'm not -- I'm not

25   going to debate it.  Okay.  I am not going to

ABRAMS, MAH & KAHN

46

EXH. 08598-046
Lynch_DOJ_00000075

1    debate it.

2              BRENT HOGENSON:  I'm not trying to debate

3    it.  I just asked who you talked to.

4              JOEL SCOTT:  So let's walk through next

5    steps for a minute.  Now, whatever you want to do

6    on that side --

7              BRENT HOGENSON:  You won't tell me who you

8    talked to.

9              JOEL SCOTT:  Whatever you want to do on

10   your side, you know, as I said, I've been CC'd

11   on -- on these e-mails.  Um -- so you can -- you

12   can engage with, you know, FSA.  You can engage

13   with whoever you want on -- on -- on your

14   allegations.

15             BRENT HOGENSON:  So --

16             JOEL SCOTT:  But I am going to -- I am

17   going to step out of that.  The only thing I will

18   say, Brent, is it sounds like, based on what I see,

19   that you've made allegations based on partial

20   information.  The rest of the information --

21             (Simultaneous speaking.)

22             JOEL SCOTT:  The rest of the information

23   got -- got Deloitte and the um -- um, I guess it

24   was Deloitte -- to conclude that -- um -- there was

25   no basis for -- for your claims.  Obviously,

EXH. 08598-047
Lynch_DOJ_00000076

1    you -- you will do whatever it is that, um, you

2    know, you feel is appropriate.

3           I would say that, you know, if you -- and

4    this is just in line with -- I think -- I think it

5    was Andy's statement, it may have been Sushovan's

6    statement.  Obviously, if -- if you decide that you

7    want to continue outside normal channels, um,

8    after -- after it's been concluded that you --

9    whatever allegations you made don't have a basis,

10   it would look malicious.  And I would -- this is

11   Joel to Brent talking, this is not anything other

12   than that -- I'd probably talk to a U.K. attorney

13   to understand libel laws in the U.K. because I know

14   that they're different from -- from the U.S.

15          So, look, here's what I'm going to do.  I

16   would like to get your equipment, and I will get

17   your stuff returned to you.  I'm going to have

18   somebody collect it from you.  In line with -- with

19   ordinary procedures, I would ask you to follow

20   protocol, recognize that you do have ongoing

21   obligations to the company.  Adhere to those

22   obligations.  Do not --

23          BRENT HOGENSON:  Can you tell me what

24   those obligations are?

25          JOEL SCOTT:  If you --

EXH. 08598-048
Lynch_DOJ_00000077

1              BRENT HOGENSON:  I'd like to get a copy of
2     those obligations.
3              JOEL SCOTT:  Yeah.  If you go to your --
4     I'm happy to provide you with a copy of your
5     employment agreement.
6              BRENT HOGENSON:  Yeah.  I'd like a copy of
7     anything that I've got signed within my employment
8     agreement, please.
9              JOEL SCOTT:  Uh-huh.  Uh, I would ask you
10    to cease and desist from using any company
11    equipment, to preserve it.  And because you decided
12    to not come into the office today, um, I'm going to
13    have somebody collect that equipment from -- from
14    your house.
15             And I will -- I will get a package pulled
16    together for you.  And I will -- I will have that
17    delivered to you.
18             BRENT HOGENSON:  Okay.  So just if you
19    could have somebody schedule the pickup of the
20    equipment from my house and give me a list of what
21    they think that is so that I can get it ready.
22             JOEL SCOTT:  Well, what -- what company
23    equipment do you have?
24             BRENT HOGENSON:  I've got my computer.
25             JOEL SCOTT:  Okay.  Do you have a company

EXH. 08598-049
Lynch_DOJ_00000078

```
1    cell phone?
2             BRENT HOGENSON:  I've got a cell phone.
3    I'd like to keep my number, though, so I'd like to
4    find a way to keep my number, if possible.
5             JOEL SCOTT:  Do you have any external hard
6    drives with company information on them?
7             BRENT HOGENSON:  No.
8             JOEL SCOTT:  All right.  And any thumb
9    drives with company information on it?
10            BRENT HOGENSON:  No.
11            JOEL SCOTT:  Any other company electronic
12   equipment?
13            BRENT HOGENSON:  Not that I'm aware of.
14            JOEL SCOTT:  Okay.
15            JOHN:  And any hard copy?
16            JOEL SCOTT:  Yeah.  Any hard copy
17   information?  Company --
18            BRENT HOGENSON:  I'd have to look, guys.
19   You know, I'd have to look.  I'm not completely
20   sure I don't have thumb drives or hard copy
21   information of company stuff.  I'd have to look.
22   And I don't have that answer.
23            JOEL SCOTT:  Okay.  Well, I would like to
24   collect that now.  I'm going to ask somebody to --
25   to head over there straightaway.  And I will get
```

EXH. 08598-050
Lynch_DOJ_00000079

```
1    your -- I will get your stuff dealt with, and I'll
2    get you a check, and I'll get you whatever files
3    you're entitled to get -- to receive.
4              BRENT HOGENSON:  Okay.
5              JOEL SCOTT:  All right.  Thank you.
6              BRENT HOGENSON:  Sure.  Bye.
7              JOEL SCOTT:  Okay.  Let me just
8    doublecheck on that.  All right.
9              (Tape ended.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ABRAMS, MAH & KAHN

EXH. 08598-051
Lynch_DOJ_00000080

```
 1        REPORTER'S CERTIFICATE OF AUDIO FILE TRANSCRIPTION

 2

 3            I, LINDA M. KLEA, a Certified Shorthand

 4    Reporter for the State of California, do hereby

 5    declare:

 6            The foregoing is a transcription of an

 7    audio file;

 8            The foregoing represents a true and correct

 9    transcription of said audio file to the best of my

10    ability to hear and discern what is contained

11    thereon;

12            Identities of persons speaking on the tape

13    were provided either by statements made on the tape

14    itself, to the best of my ability to determine those

15    identities, or with the assistance of a

16    representative of said audio file.

17

18

19

20            _____
              LINDA M. KLEA, BSBA, CSR No. 12468, RPR
21

22

23

24

25
```

ABRAMS, MAH & KAHN
52

EXH. 08598-052
Lynch_DOJ_00000081