Jonathan M. Baum (SBN: 303469)
**Steptoe LLP**
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA  94105
Telephone:  (510) 735-4558
jbaum@steptoe.com

Reid H. Weingarten
Brian M. Heberlig
Michelle L. Levin
Nicholas P. Silverman
Drew C. Harris
(Admitted Pro Hac Vice)
**Steptoe LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 506-3900

Christopher J. Morvillo
Celeste L.M. Koeleveld
Daniel S. Silver
(Admitted Pro Hac Vice)
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Telephone:  (212) 878-3437
christopher.morvillo@cliffordchance.com

*Attorneys for Defendant*
*Michael Richard Lynch*

# UNITED STATES DISTRICT COURT

## NORTHERN  DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>MICHAEL RICHARD LYNCH and<br>STEPHEN KEITH CHAMBERLAIN,<br><br>    Defendants. | Case No.: 3:18-cr-00577-CRB<br><br>Judge: Hon. Charles Breyer<br><br>**DEFENDANT MICHAEL RICHARD LYNCH'S RULE 29(A) MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT 16**<br><br>Court:  Courtroom 6 – 17th Floor<br>Date Filed:  May 20, 2024<br>Trial Date:  March 18, 2024 |

1

2

## TABLE OF CONTENTS

3
**Page**

I.   THE ALLEGATIONS ................................................................................................ 1

II.   THE EVIDENCE AT TRIAL ................................................................................. 2

III.  APPLICABLE LAW ............................................................................................... 4

   A.   Motion for Judgment of Acquittal (Fed. R. Crim. P. 29) ................................. 4

   B.   Securities Fraud (18 U.S.C. § 1348) .............................................................. 5

IV.  ARGUMENT .......................................................................................................... 6

   A.   "In Connection With" the Purchase of HPQ Securities ................................... 6

      1.   No Evidence Links Dr. Lynch to the Allegedly False Statements in HP's Press Release ..................................................................................... 6

      2.   Dr. Lynch's Irrevocable Undertaking Did Not Warrant that the Allegedly False Statements in the Press Release Were True .................... 7

      3.   Autonomy's Prior Financial Statements Were Not Issued by Dr. Lynch "In Connection With" Trades in HPQ Securities ............................ 8

   B.   Scheme or Plan to Defraud or By Means of Materially False or Fraudulent Pretenses, Representations, or Promises .......................................................... 10

   C.   Intent to Defraud ........................................................................................... 10

   D.   The Court's Prior Ruling in *Hussain* Is Readily Distinguishable .................. 11

V.   CONCLUSION ...................................................................................................... 12

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    651 F.2d 615 (9th Cir. 1981)...................................................................................... 8

*Briceno v. Scribner*,
    555 F.3d 1069 (9th Cir. 2009)................................................................................... 5

*Burks v. United States*,
    437 U.S. 1 (1978) ...................................................................................................... 4

*Cosby v. Jones*,
    682 F.2d 1373 (11th Cir. 1982) ................................................................................ 5

*Curley v. United States*,
    160 F.2d 229 (D.C. Cir. 1947) ................................................................................. 5

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    395 F.3d 25 (2d Cir. 2005)....................................................................................... 9

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ................................................................................................. 5

*Juan H. v. Allen*,
    408 F.3d 1262 (9th Cir. 2005) ................................................................................. 5

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
    630 F.3d 866 (9th Cir. 2010) ................................................................................... 9

*SEC v. Stein*,
    906 F.3d 823 (9th Cir. 2018) ................................................................................... 5

*SEC v. Zandford*,
    535 U.S. 813 (2002) ................................................................................................. 8

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008) ................................................................................................. 9

*Stoyas v. Toshiba Corp.*,
  896 F.3d 933 (9th Cir. 2018) ................................................................. 8

*United States v. Andujar*,
  49 F.3d 16 (1st Cir. 1995) ..................................................................... 5

*United States v. Coscia*,
  866 F.3d 782 (7th Cir. 2017) ................................................................. 5

*United States v. Hussain*,
  972 F.3d 1138 (9th Cir. 2020) ....................................................... passim

*United States v. Valle*,
  807 F.3d 508 (2d Cir. 2015) .................................................................. 5

*United States v. Wright*,
  835 F.2d 1245 (8th Cir. 1987) ............................................................... 5

**Statutes and Rules**

15 U.S.C. § 78j(b) .................................................................................. 8

18 U.S.C. § 1348 .............................................................................. passim

Fed. R. Crim. P. 29 ................................................................................ 4

**Other Authorities**

2A Charles Alan Wright & Peter Henning,
Federal Prac. & Proc. Crim. §462 (4th ed. Apr. 2002 update) ...................... 4

## **SUMMARY OF ARGUMENT**

Count 16 of the Superseding Indictment charges Dr. Lynch with committing securities fraud in connection with the purchase and sale of HPQ securities by willfully causing HP to make false statements in its press release announcing the acquisition.  Yet the government has failed to adduce any evidence connecting Dr. Lynch with the statements in HP's press release; to the contrary, the evidence shows that HP obtained that information from publicly available financial statements, and the government presented no evidence that Dr. Lynch drafted, contributed to, approved, or even reviewed the HP press release before it was published.  And any effort to connect Dr. Lynch with statements in the HP press release indirectly, based on Dr. Lynch's prior approval of Autonomy's historic publicly available financial statements, is too attenuated to sustain a conviction for actions taken "in connection with" purchases and sales of HPQ securities, particularly where it cannot be said that information in Autonomy's publicly available financial statements was published for inclusion in HP's press release and directed at HPQ investors.

The government has further failed to show that the statements in HP's press release were false or that Dr. Lynch possessed the requisite intent to commit securities fraud.

The government invites the jury to speculate as to the connection between Dr. Lynch and the statements in HP's press release, but absent any evidence linking Dr. Lynch to the press release, any evidence of falsity, or any evidence of Dr. Lynch's fraudulent intent vis-à-vis HP or its investors, no rational jury could sustain a conviction on the securities fraud count. Accordingly, Dr. Lynch's Rule 29(a) motion for a judgment of acquittal as to Count 16 should be granted.

Count 16 charges Dr. Lynch with committing securities fraud in connection with the purchase and sale of HPQ securities, in violation of 18 U.S.C. §§ 1348 and 2, by willfully causing HP to make materially false statements in its press release announcing the acquisition. No evidence has been presented at trial, however, linking Dr. Lynch to the statements in HP's press release. To the contrary, Andy Johnson testified that HP obtained information for inclusion in its press release from Autonomy's publicly filed financial statements. While Dr. Lynch signed an irrevocable undertaking that references an "attached draft press announcement," no such document is attached to the irrevocable undertaking and Leo Apotheker testified that the "press announcement" referenced in the undertaking was an announcement issued by Autonomy, not HP. Accordingly, the government has offered no evidence showing any connection between the document Dr. Lynch signed and HP's press release. Absent any such evidence tying Dr. Lynch to the document Nigel Upton said he relied on when purchasing HPQ securities, it cannot be said that Dr. Lynch committed securities fraud "in connection with" HPQ securities. Nor has the government adduced evidence that the statements in HP's press release were false, or that Dr. Lynch had the requisite intent to defraud. Indeed, there is no evidence in the record that Dr. Lynch even knew what the press release would say before it was published.

The Court should grant a judgment of acquittal on Count 16.[1]

## I.    THE ALLEGATIONS

According to the Superseding Indictment, in HP's press release issued on August 18, 2011:

> HP emphasized that "Autonomy's recent operating and financial performance has been strong." HP also stated that "[o]ver the last five years, Autonomy has grown its revenues at a compound annual growth rate of approximately 55 percent and adjusted operating profit at a rate of approximately 83 percent." Among the acquisition's "[s]trategic and financial benefits," HP said Autonomy would enhance HP's financial

---

[1] This briefing addresses only Dr. Lynch's arguments as to Count 16. Dr. Lynch is moving for a judgment of acquittal as to all counts in the Superseding Indictment at the close of the government's case, and respectfully reserves his right to submit briefing on the other counts at a later date determined by the Court.

profile because "Autonomy's strong growth and profit margin profile complement[ed] HP's efforts to improve its business mix by focusing on enterprise software and solutions. Autonomy [had] . . . a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010."

SI ¶ 9. The Superseding Indictment further alleges that, "to induce the offer by HP," Dr. Lynch "executed a letter irrevocably undertaking to accept [HP's] offer, agreeing to recommend the offer to others, and warranting that all information provided by him for inclusion in any document issued in connection with the offer was true and accurate in all respects and not misleading in any respect."  SI ¶ 23.bb.

## II.    THE EVIDENCE AT TRIAL

Only three witnesses—Nigel Upton, Leo Apotheker, and Andy Johnson—provided any evidence that relates to Count 16.

Nigel Upton, a former HPQ shareholder, testified that he relied on HP's press release, Exhibit 2295 (which, as discussed below, is distinct from the "Press Announcement" referenced in the irrevocable undertaking), in deciding to purchase HPQ shares.  *See* Koeleveld Decl., Exhibit 1 (Tr. Ex. 2295).  Upton testified about the importance to him of certain statements in the HP press release, *see* Tr. at 5279-84, but did not offer any testimony or evidence linking those statements to Dr. Lynch.

Leo Apotheker, the former CEO of HP, testified about HP's press release, Exhibit 2295, and the irrevocable undertaking, Exhibit 2308, confirming the lack of any connection between the two or to Dr. Lynch.  *See* Koeleveld Decl., Exhibit 1 (Tr. Ex. 2295); Koeleveld Decl., Exhibit 3 (Tr. Ex. 2308).  Specifically, Mr. Apotheker noted that the irrevocable undertaking, which refers to an "attached draft press announcement," did not, in fact, attach anything.  Tr. at 6231-32 (discussing Exhibit 2308).  The contents of that "draft press announcement"—whatever it was— therefore could not have been ascertained or verified by Dr. Lynch at the time, nor can the jury draw any conclusion today about the contents of that document.

Mr. Apotheker further testified that the "Press Announcement" referred to in the irrevocable undertaking was a document that was to be published by Autonomy, not HP, and therefore could not have been the HP press release.  Tr. at 6233:21–25 ("Q. And so it's apparent from the face of this language that the press agreement to which Mike Lynch referred and was warranted was an Autonomy press agreement, not any press agreement by Hewlett Packard, correct? A. Correct.").  Mr. Apotheker also pointed out that the irrevocable undertaking's warranty clause was limited in scope by language restricting the warranty to the accuracy of "information provided by me," meaning that "it covered information provided by Mike Lynch," but that "Mike did not represent in this paragraph that all information provided by any Autonomy employee during due diligence was true and accurate."  *Id*. at 6230 (discussing Exhibit 2308 at 4).  Mr. Apotheker agreed that Dr. Lynch "couldn't confirm the accuracy of any disclosures he wasn't aware of."  *Id*.  Mr. Apotheker also testified that it was HP, not Dr. Lynch, who prepared the HP press release.  *Id*. at 6234.  Mr. Apotheker could not say whether Dr. Lynch was even shown the HP press release prior to its publication.  *Id*.

Andy Johnson testified about HP's offer to acquire Autonomy, Exhibit 2306, which Johnson referred to as a "press release."  *Id*. at 7844-45.  But this document is different from the HP press release that announced the Autonomy acquisition, Exhibit 2295, and that Nigel Upton relied upon in purchasing HPQ shares in August 2011, because it is not a statement directed at HPQ shareholders.  *See id*. at 5278–79.[2]  Johnson testified that the information about Autonomy

---

[2] Because it is not a statement directed at HPQ shareholders, Exhibit 2306 is not a proper basis for a conviction on Count 16.  First, the Superseding Indictment quotes from Exhibit 2295 (the HP press release) and not Exhibit 2306, the document that Andy Johnson testified about.  The Superseding Indictment quotes the HP press release as discussing "[s]trategic and financial benefits," SI ¶ 9, but that capitalization is consistent with Exhibit 2295 (*see* Koeleveld Decl., Exhibit 1, at 3), *not* with Exhibit 2306 (*see* Koeleveld Decl., Exhibit 2, at 14).  Second, Exhibit 2306 was issued pursuant to the UK Takeover Code and was directed toward Autonomy shareholders, not HPQ shareholders.  *See* Koeleveld Decl., Exhibit 2 (Tr. Ex. 2306) at 28 (". . . Autonomy Shareholders in the United States should be aware that this announcement, the Offer Document and any other documents relating to the Offer have been or will be prepared in

in the document he referred to as a "press release," Exhibit 2306, was drawn from "Autonomy's published financial statements." *Id.* at 7844–45. [3] He further confirmed that Dr. Lynch was not privy to any HP announcement until the last minute, *see id.* at 8364–65, and had no input into that announcement.

Paragraph 9 of the Superseding Indictment identifies allegedly false information in HP's press release (Exhibit 2295). As the foregoing summary of the evidence demonstrates, however, the government has failed to adduce any evidence connecting Dr. Lynch with the financial statements contained in that press release. To the contrary, the government's evidence is that Dr. Lynch *did not provide* those numbers; they were taken from publicly available information. Dr. Lynch's signing of the irrevocable undertaking in England and HP's issuance of its press release in California are an ocean and a continent apart. The government has also failed to establish the falsity of the statements in HP's press release or that Dr. Lynch acted willfully with the intent to defraud any purchasers of HPQ securities.

## III.   APPLICABLE LAW

### A.   Motion for Judgment of Acquittal (Fed. R. Crim. P. 29)

"After the government closes its evidence . . . , the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a) (emphasis added); *see, e.g., Burks v. United States*, 437 U.S. 1, 10 n.5 (1978) (reaffirming the mandatory nature of this rule); *accord* 2A Charles Alan Wright & Peter Henning, *Federal Prac. & Proc. Crim.* §462 (same). Rule 29(a) "implements 'the requirement that the prosecution must establish a prima facie case by its own evidence before the

---

accordance with the City Code and the United Kingdom disclosure requirements, format, and style, all of which differ from those in the United States.").

[3] Notably, though HP's press release, Exhibit 2295, and the "press release" identified by Mr. Johnson, Exhibit 2306, are not the same document, the two documents contain similar information about Autonomy. It is therefore fair to infer that the information about Autonomy in HP's press release, Exhibit 2295, was obtained from "Autonomy's published financial statements," just as the information in Exhibit 2306 was, as confirmed by Mr. Johnson.

defendant may be put to his defense.'" *Id.* (citation omitted).   Although the court must "look at the evidence in the light most favorable to the government," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), where mere speculation, rather than reasonable inference, supports the government's case, *see Juan H. v. Allen*, 408 F.3d 1262, 1277–79 (9th Cir. 2005), or where there is a "total failure of proof of [a] requisite" element, *Briceno v. Scribner*, 555 F.3d 1069, 1079 (9th Cir. 2009), entry of a judgment of acquittal is required.

"If 'reasonable' jurors 'must necessarily have a reasonable doubt' as to guilt, the judge 'must require acquittal, because no other result is permissible within the fixed bounds of jury consideration.'" *Jackson*, 443 U.S. at 318 n.11 (quoting *Curley v. United States*, 160 F.2d 229, 232–33 (D.C. Cir. 1947)) (alteration marks omitted).   "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (citations omitted); *see also United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995); *United States v. Wright*, 835 F.2d 1245, 1249 (8th Cir. 1987)*; Cosby v. Jones,* 682 F.2d 1373, 1383 (11th Cir. 1982).

## B.     Securities Fraud (18 U.S.C. § 1348)

The federal criminal securities fraud statute "prohibits executing a 'scheme or artifice' 'to defraud any person in connection with any' U.S.-registered security, 18 U.S.C. § 1348(1), or 'obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any' U.S.-registered security, *id.* § 1348(2)." *United States v. Hussain*, 972 F.3d 1138, 1145 (9th Cir. 2020).   In *Hussain*, the jury was instructed on four elements:  (1) the defendant "knowingly executed or attempted to execute a scheme or plan to defraud or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises"; (2) "the statements made or facts omitted as part of the scheme were material"; (3) the defendant "acted with the intent to defraud"; and (4) "the scheme was in connection with the purchase or sale of securities of Hewlett-Packard

company." *Id.* at 1146 (citing *SEC v. Stein*, 906 F.3d 823, 830 (9th Cir. 2018); *United States v. Coscia*, 866 F.3d 782, 796 (7th Cir. 2017)).

## IV.    ARGUMENT

The government has failed to present evidence satisfying the elements of the securities fraud statute, 18 U.S.C. § 1348.  Most fundamentally, the government has introduced no evidence connecting Dr. Lynch to HP's press release.

### A.    "In Connection With" the Purchase of HPQ Securities

#### 1.    No Evidence Links Dr. Lynch to the Allegedly False Statements in HP's Press Release

The government's theory, as set forth in the Superseding Indictment, is that Dr. Lynch willfully caused HP to issue false statements about Autonomy in its press release announcing the acquisition.  Yet the government has presented no evidence that Dr. Lynch provided any of the financial information contained in the HP press release, or even that he was aware of the contents of the press release prior to its issuance.  To the contrary, Andy Johnson confirmed that the "information was drawn from Autonomy's published financial statements."  Tr. at 7844–45. That testimony is fatal to Count 16.

Further, the government adduced no evidence that HP shared its press release with Dr. Lynch in advance.  Leo Apotheker did not recall HP sharing its press announcement with Dr. Lynch in advance.  *See* Tr. at 6234 ("A. I don't remember the exact sequence of what was shared with Mike Lynch. . . . Q. And you don't have any knowledge one way or another whether HP even shared its press agreement with Mike in advance; its press announcement? A. I don't remember that.").  There is accordingly no evidence in the record that Dr. Lynch provided any information to HP for inclusion in its press release or had any role in the promulgation of that document.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.     Dr. Lynch's Irrevocable Undertaking Did Not Warrant that the Allegedly False Statements in the Press Release Were True

The government showed Mr. Apotheker the irrevocable undertaking, Exhibit 2308, and pointed to the warranty clause, which provides:  "Having made all reasonable inquiries, any information provided by me for inclusion in the Press Announcement, the Offer Document, and any other announcement made or document issued in connection to the offer is and will be true and accurate in all respects and not misleading in any respect."  Koeleveld Decl., Exhibit 3 (Tr. Ex. 2308) at 4; *see also* Tr. at 6218–19.  However, the government failed to make the crucial next step, showing that this warranty clause had anything to do with the press release that HP actually issued.

Mr. Johnson has testified that the information about Autonomy in what he referred to as a "press release," Exhibit 2306, came from publicly available information, meaning it could not have been "provided by [Dr. Lynch] for inclusion" in Exhibit 2306.  And as noted earlier, the information in Exhibit 2306 parallels the information in Exhibit 2295, about which Mr. Upton testified.

Second, the government has presented no evidence about what "draft press announcement," if any, was attached to the irrevocable undertaking signed by Dr. Lynch.  *See* Koeleveld Decl., Exhibit 3 (Tr. Ex. 2308).  As the irrevocable undertaking itself makes clear, and as Leo Apotheker testified, there was no attachment at all.  It therefore cannot be said that Dr. Lynch provided *any* information for inclusion in a "Press Announcement," much less whether that information was inaccurate or misleading.  In addition, the language of the irrevocable undertaking makes clear, as Mr. Apotheker confirmed, that any "Press Announcement" referred to in that undertaking is a document to be issued by Autonomy, not HP.  *See* Tr. at 6233 (noting that the "Press Announcement" is a document that will be released "pursuant to a resolution of the board of directors of the Company," meaning Autonomy).

Third, as Mr. Apotheker agreed, the warranty clause in the irrevocable undertaking is limited in scope:  the language is restricted to "information provided by me [*i.e.*, by Dr. Lynch]."

1   That excludes information provided by others, for example, during the due diligence process.

2   Tr. at 6230.  As Mr. Apotheker acknowledged, Dr. Lynch could not be expected to warrant the

3   truth and accuracy of information provided by others to which he was not privy.  *Id.*

4   Finally, the purpose of the irrevocable undertaking was for Dr. Lynch to commit to

5   accepting HP's offer to acquire his shares and to recommend to other Autonomy shareholders

6   that they do the same.  Given that purpose, it makes sense that the reference in the warranty

7   clause is to information being "provided by [Dr. Lynch]" pertaining to his Autonomy shares and

8   his commitment to sell those shares to HP, not information from other sources that HP included

9   in its press release about the acquisition.

10  For all of these reasons, there is no basis for connecting the irrevocable undertaking to

11  HP's press release.

12                    **3.    Autonomy's Prior Financial Statements Were Not Issued by Dr.
                              Lynch "In Connection With" Trades in HPQ Securities**

13

14  Having failed to establish that HP obtained the information in its press release from Dr.

15  Lynch or that the warranty in Dr. Lynch's irrevocable undertaking is linked to HP's press

16  release, the government might argue that because HP relied on Autonomy's prior financial

17  statements in drafting the press release, those prior financial statements should be imputed to Dr.

18  Lynch for the purposes of Count 16.  This is incorrect as a matter of law.

19  "[F]or fraud to be 'in connection with the purchase or sale of any security,' it must

20  'touch' the sale—i.e., it must be done to induce the purchase at issue."  *Stoyas v. Toshiba Corp.*,

21  896 F.3d 933, 951 (9th Cir. 2018) (quoting *Arrington v Merrill Lynch, Pierce, Fenner & Smith,*

22  *Inc.*, 651 F.2d 615, 619 (9th Cir. 1981)).  It follows that a fraudulent scheme is not "in

23  connection with" securities for the purposes of § 10(b) of the Securities Exchange Act (15 U.S.C.

24  § 78j(b))—which contains similar "in connection with" language to that in 18 U.S.C. § 1348—

25  when the alleged fraud and a transaction in securities are "independent events."  *SEC v.*

26  *Zandford*, 535 U.S. 813, 820 (2002).  As the Court in *Zandford* explained, the federal securities

27

28

fraud statutes cannot be construed "so broadly as to convert every common-law fraud that happens to involve securities into securities fraud." *Id.* at 819–20.

The alleged fraudulent statements must be directly tied to the alleged purchase or sale of securities.  In *Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008), the Court rejected the argument that a public company's counterparties in fraudulent transactions are liable under § 10(b) for the public company's subsequent misstatements, holding that even though the reliance of investors on a company's inaccurate financials was a "natural and expected consequence," section 10(b) "does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way."  *Id.* at 160–62; *see also Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 872 (9th Cir. 2010) (fraud is in connection with securities where securities were the "lynchpin" of the fraud); *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 37 (2d Cir. 2005) (holding that the securities transactions must be "integral" to the fraud), *rev'd on other grounds*, 547 U.S. 71, 88 (2006).

Count 16 requires action by Dr. Lynch taken "in connection with" HPQ securities.  Yet the publication months or years earlier of Autonomy's financials is an "independent event" from the publication of HP's press release in August 2011, and such "independent events," if anything, only "affected the price of [HPQ] securit[ies] in some attenuated way."  *Stoneridge Investment Partners*, 552 U.S. at 160–62.  Dr. Lynch could not have foreseen or intended (and there is no evidence that he did foresee or intend) at the time that Autonomy's prior financial statements were published that they would be incorporated into a document that caused investors to buy HPQ securities, and the historical Autonomy financial statements therefore could not have been "done to induce the purchase at issue"—i.e., purchases of HPQ securities by investors like Mr. Upton.  Nor can it be said, as a factual matter, that Dr. Lynch provided the information in Autonomy's publicly available financial statements "for inclusion" in HP's press release on August 18, 2011.

*     *     *

Because the government has presented no evidence connecting Dr. Lynch to the statements in HP's press release, no reasonable juror could find that Dr. Lynch engaged in a scheme "in connection with" HPQ securities based on HP's press release.

**B.     Scheme or Plan to Defraud or By Means of Materially False or Fraudulent Pretenses, Representations, or Promises**

A conviction under § 1348 requires "a scheme or plan to defraud or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises", and that "the statements made or facts omitted as part of the scheme were material." *Hussain*, 972 F.3d at 1146.  But here, the government has made no attempt to show that any statement in the HP press release was false.  Although the government highlighted certain statements in the press release to former HPQ stockholder Nigel Upton, *see* Tr. at 5279–84, it did not present any evidence challenging the veracity of those specific statements, instead apparently hoping that the jury would assume that the statements are false.  This is not sufficient; the government bears the burden of proving that the statements in the HP press release were materially false, and here, it has not met that burden.

**C.     Intent to Defraud**

To violate the federal criminal securities fraud statute, the defendant must have "acted with the intent to defraud." *Hussain*, 972 F.3d at 1146.  Because the government has not proved that there were any false statements in the HP press release and has not proved that Dr. Lynch had any involvement with preparing or approving the press release, there is no evidence that Dr. Lynch acted with the requisite intent to defraud HPQ investors; in fact, he did not act in connection with HPQ investors at all.  As discussed above, even if Dr. Lynch were to be assigned strict responsibility for the contents of all of Autonomy's prior public financial publications, it does not follow that, by approving those publications in the past, he somehow intended to defraud Hewlett Packard, let alone HPQ's stockholders.  Indeed, even the Superseding Indictment itself alleges that Dr. Lynch executed the irrevocable undertaking "to induce the offer by HP," SI ¶ 23.bb, not to induce investors like Nigel Upton to purchase HPQ

securities.  Moreover, because there is no evidence on the record that Dr. Lynch even knew what the HP press release would say, he could not have intended to deceive HPQ stockholders through that press release.

**D.    The Court's Prior Ruling in *Hussain* Is Readily Distinguishable**

The government pursued a nearly identical securities fraud count in *United States v. Hussain*.  In that case, the Ninth Circuit upheld the conviction because a reasonable jury could have found that Hussain's "approval" of the HP press release "reflected a fraudulent scheme 'in connection with' U.S. securities."  *Hussain*, 972 F.3d at 1140.  Specifically, the Ninth Circuit in *Hussain* relied on evidence that Hussain signed an irrevocable undertaking that purportedly *attached and referred to* a draft of the HP press release that was the subject of Count 16 against Mr. Hussain, and held that in signing the irrevocable undertaking the attached the draft press release, "Hussain affirmed that the information in the [HP] press release 'provided by me' was 'true and accurate'":

> The letter Hussain signed attached a "draft press announcement," and Hussain affirmed that the information included in the press release "provided by me" was "true and accurate in all respects and not misleading in any respect." A press release is a primary method of informing the market about an acquisition. And it can hardly be a surprise—especially to a sophisticated executive like Hussain—that investors could and would base their trading decisions on it. . . . Given the evidence presented at trial, Hussain's assurances that the financial information in the press release was accurate was sufficiently "in connection with" U.S. securities.

*Id.* at 1147–48.  But as this Court has made clear, this case is not *United States v. Hussain*: there is no "rule of the case" based on the *Hussain* proceedings, *see* Transcript of Proceedings at 12, *United States v. Lynch*, No. 3:18-cr-577-CRB-1 (June 23, 2023) (ECF No. 191), and the government's case against Dr. Lynch must be evaluated in light of the evidence presented in this trial.

Critically, the government in this case has failed to offer any evidence that there actually was a press release attached to anything signed by Dr. Lynch, or that Dr. Lynch provided input

into HP's press release.  The HP press release that is the subject of the Superseding Indictment was neither attached to Dr. Lynch's irrevocable undertaking nor referenced by it.  Second, Andy Johnson testified in this case that HP prepared the challenged statements in the press release using Autonomy's publicly available financial information.  Tr. at 7844–45.  There was no such testimony, from Mr. Johnson or anyone else, in the *Hussain* trial.

Third, the government has not proved that the challenged statements in the press release were false.  While the government similarly failed to make this showing in *Hussain*, Hussain did not raise this argument in his Rule 29 motions.  *See United States v. Hussain*, 3:16-cr-00462-CRB (N.D. Cal.), ECF Nos. 354, 408.

## V.    CONCLUSION

For the foregoing reasons, this Court should grant a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) with respect to Count 16.

1    Dated: May 20, 2024                        Respectfully submitted,

2

3                                               By:   _/s/ Celeste L.M. Koeleveld__
                                                Celeste L.M. Koeleveld
4
                                                Christopher J. Morvillo
5                                               Celeste L.M. Koeleveld
                                                Daniel S. Silver
6                                               (Admitted Pro Hac Vice)
                                                **CLIFFORD CHANCE US LLP**
7                                               31 West 52nd Street
                                                New York, NY 10019
8                                               Telephone:  (212) 878-3437
9
                                                Jonathan M. Baum (SBN: 303469)
10                                              **STEPTOE LLP**
                                                One Market Street
11                                              Steuart Tower, Suite 1070
                                                San Francisco, CA  94105
12                                              Telephone:  (510) 735-4558
13
                                                Reid H. Weingarten
14                                              Brian M. Heberlig
                                                Michelle L. Levin
15                                              Nicholas P. Silverman
                                                Drew C. Harris
16                                              (Admitted Pro Hac Vice)
                                                **STEPTOE LLP**
17                                              1114 Avenue of the Americas
                                                New York, NY 10036
18                                              Telephone:  (212) 506-3900
19
                                                *Attorneys for Defendant*
20                                              *Michael Richard Lynch*

21

22

23

24

25

26

27

28
     _____
     DEFENDANT MICHAEL RICHARD LYNCH'S RULE 29(A)
     MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT 16
     3:18-CR-00577-CRB
     13