1   PATRICK D. ROBBINS (CABN 152288))
    Attorney for the United States
2   Acting Under Authority Conferred by 28 U.S.C. § 515

3   MARTHA BOERSCH (CABN 126569)
    Chief, Criminal Division
4
    ROBERT S. LEACH (CABN 196191)
5   ADAM A. REEVES (NYBN 2363877)
    KRISTINA N. GREEN (NYBN 5226204)
6   ZACHARY G.F. ABRAHAMSON (CABN 310951)
    Assistant United States Attorneys
7
        450 Golden Gate Avenue, Box 36055
8       San Francisco, California 94102-3495
        Telephone: (415) 436-6912
9       Fax: (415) 436-7234
        Email: Robert.Leach@usdoj.gov
10
    Attorneys for United States of America
11
                    UNITED STATES DISTRICT COURT
12
                 NORTHERN DISTRICT OF CALIFORNIA
13
                      SAN FRANCISCO DIVISION
14

15  UNITED STATES OF AMERICA,              )   No. CR-18-577 CRB
                                           )
16          Plaintiff,                     )
                                           )
17      v.                                 )   DECLARATION OF KRISTINA GREEN IN
                                           )   SUPPORT OF GOVERNMENT'S MOTION *IN
18  MICHAEL RICHARD LYNCH AND              )   LIMINE*: TO STRIKE POST-ACQUISITION
    STEPHEN KEITH CHAMBERLAIN,             )   TESTIMONY OF LISA HARRIS
19                                         )
                                           )
20                                         )
            Defendant.                     )
21                                         )
                                           )
22  _____ )

23  I, Kristina Green, declare and state as follows:

24      1.  I am an Assistant United States Attorney for the Northern District of California assigned to

25  the prosecution of the above-captioned case.

26      2.      Attached hereto as Exhibit A is a true and correct copy of Lisa Harris' deposition

27  transcript.

28

3.      Attached hereto as Exhibit B is a true and correct copy of Lisa Harris' first U.K. witness statement, dated November 16, 2018 ("1st Harris Stmt.").

4.      Attached hereto as Exhibit C is a true and correct copy of Lisa Harris' second U.K. witness statement, dated September 6, 2019 ("2nd Harris Stmt.").

5.      Attached hereto as Exhibit D is a true and correct copy of David Duckworth's U.K. witness statement, dated February 8, 2019 ("Duckworth Stmt.")

6.      Attached hereto as Exhibit E is a true and correct copy of an excerpt of David Duckworth's U.K. trial testimony.

7.      Attached hereto as Exhibit F is a true and correct copy of Lisa Harris' flight records.

8.      Attached hereto as Exhibit G is a true and correct copy of an email chain between Lisa Harris and David Duckworth, dated November 2, 2011.

9.      Attached hereto as Exhibit H is a true and correct copy of an email chain between Lisa Harris, David Duckworth, Steve Chamberlain, and others, dated October 19, 2011.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

DATED:  May 21, 2024

_____/s/_____
KRISTINA GREEN
Assistant United States Attorney

GREEN DECL.
18-CR-577 CRB                    2

# Exhibit A



# Transcript of Lisa Harris

**Date:** January 30, 2024
**Case:** United States -v- Lynch, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1              IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4   - - - - - - - - - - - - - - - - - - - - - - - - - - X

5   UNITED STATES OF AMERICA,

6          Plaintiff,

7      v.                          Case No.

8   MICHAEL RICHARD LYNCH and        3:18-CR-00577-CRB

9   STEPHEN KEITH CHAMBERLAIN,

10         Defendants.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - X

12

13       HYBRID VIDEOTAPED DEPOSITION OF LISA HARRIS

14         Webex videoconferencing link available

15

16

17

18

19

20

21  Tuesday, January 30, 2023

22  at:  9:10 a.m. local UK time,

23  taken at: Clifford Chance, 10 Upper Bank Street, London,

24  E14 5JJ, United Kingdom

25  Court Reporter:  Sherry Yan, RPR, CSR 14442

Transcript of Lisa Harris
Conducted on January 30, 2024                           2

```
1                    A P P E A R A N C E S

2                         (In person)

3   On behalf of Plaintiff:

4         DEPARTMENT OF JUSTICE

5         UNITED STATES ATTORNEY'S OFFICE

6             Northern District of California

7             450 Golden Gate Avenue, 11th Floor

8             San Francisco, CA 94102

9             (415) 436 7200

10       BY:  ADAM A. REEVES, ESQ.

11   and

12        FEDERAL BUREAU OF INVESTIGATION

13            935 Pennsylvania Avenue, NW

14            PA-400, North

15            Washington, DC 20535

16            (202) 324 3000

17       BY:  BRITTA F. HUEBSCH, ESQ.

18

19

20

21

22

23

24

25
```

Transcript of Lisa Harris
Conducted on January 30, 2024                    3

```
1                    A P P E A R A N C E S
2                         (In person)
3    On behalf of Defendant Stephen Keith Chamberlain:
4          BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS,
5          LINCENBERG & RHOW, P.C.
6               1875 Century Park East,
7               23rd Floor
8               Los Angeles, CA 90067-2561
9               (310) 201 2100
10        BY:  GARY S. LINCENBERG, ESQ.
11             RACHEL CAPATA, ESQ.
12
13   On behalf of Defendant Michael Richard Lynch:
14        STEPTOE LLP
15             1330 Connecticut Avenue, NW
16             Washington, DC 20036
17             (202) 429 3000
18        BY:  BRIAN HEBERLIG, ESQ.
19             GALEN KAST, ESQ.
20             MICHELLE LEVIN, ESQ.
21
22
23
24
25
```

Transcript of Lisa Harris
Conducted on January 30, 2024                4

```
1                  A P P E A R A N C E S
2                      (In person)
3    On behalf of Witness Lisa Harris:
4         SEYFARTH SHAW LLP
5             620 8th Avenue
6         32nd Floor
7         New York, NY  10018
8             (212) 218-5500
9         BY:  ELLEN M. MURPHY, ESQ.
10
11   Also Present:
12   Stephen Keith Chamberlain, Defendant
13   Marshall C. Derks, American Citizen Services Chief
14   Linda Fleet, Videographer
15
16           R E M O T E   A P P E A R A N C E S
17                    (Via Webex)
18   Dr. Michael Lynch, Defendant
19   Ella Fellows
20   Larysa Kern
21   Megan Mellert, Special Agent
22   William Lanier
23   Avi Rejwan
24   Chris Morvillo
25   Drew Harris
```

Transcript of Lisa Harris
Conducted on January 30, 2024                    5

```
1                    I N D E X

2

3    LISA HARRIS                              Page

4    Direct Examination by Mr. Lincenberg        9

5    Cross-Examination by Ms. Levin             78

6    Cross-Examination by Mr. Reeves           133

7    Redirect Examination by Mr. Lincenberg    215

8    Recross-examination by Ms. Levin          222

9

10                   EXHIBITS

11   PLAINTIFF'S                      (STIPULATED)

12   EXHIBITS          FOR IDENTIFICATION   IN EVIDENCE

13

14        813              147              208

15        12990            153              208

16        16076            155              208

17        3311             160              208

18        16927            179              208

19        (only Bates HP-SEC-01648787-797 in evidence)

20        3363             191              208

21        3364             195              208

22        3365             196              208

23        3383             197              208

24        3384             200              208

25        3386             201              208
```

Transcript of Lisa Harris
Conducted on January 30, 2024                6

```
1    PLAINTIFF'S                         (STIPULATED)

2    EXHIBITS          FOR IDENTIFICATION   IN EVIDENCE

3         3388                202               208

4         3389                203               208

5         3391                203               208

6         3392                204               208

7         3396                204               208

8         3401                205               208

9         3402                205               208

10        3403                206               208

11        3405                206               208

12

13   DEFENDANT'S EXHIBITS   FOR IDENTIFICATION    IN EVIDENCE

14   (STEPHEN CHAMBERLAIN)

15        9547                 39                42

16        9548                 43                44

17       15288                 48                49

18       15289                 52                53

19       15726                 53                --

20        9549                 60                60

21        9550                 60                61

22        9551                 65                65

23        9552                 67                --

24        9525                 74                --

25
```

Transcript of Lisa Harris
Conducted on January 30, 2024                    7

| | | | |
|---|---|---|---|
| 1 | DEFENDANT'S EXHIBITS | FOR IDENTIFICATION | IN EVIDENCE |
| 2 | (STEPHEN CHAMBERLAIN) | | |
| 3 | 9553 | 75 | -- |
| 4 | 9556 | 220 | 221 |
| 5 | | | |
| 6 | DEFENDANT'S EXHIBITS | FOR IDENTIFICATION | IN EVIDENCE |
| 7 | (MICHAEL LYNCH) | | |
| 8 | 7504 | 110 | 112 |
| 9 | 4209 | 112 | 114 |
| 10 | 4626 | 114 | 115 |
| 11 | 7505 | 118 | 119 |
| 12 | 5073 | ("already admitted) | 126 |
| 13 | 11488 | 126 | -- |
| 14 | 4072 | 127 | -- |
| 15 | 1531 | 127 | -- |
| 16 | 3311-1 | 223 | -- |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1                    Tuesday, January 30, 2024, 9:10 a.m.

2                    VIDEOGRAPHER:  Here begins Media No. 1, in the

3      videotaped deposition of Lisa Harris, in the matter of

4      United States of America versus Michael Richard Lynch

5      and Stephen Keith Chamberlain, in the United States

6      District Court for the Northern District of California,

7      Case No.  18-577 CR B.

8                    Today's date is January the 30th, 2024, and

9      the time on the video monitor is 9:10 a.m.

10                   The videographer today is Linda Fleet, on

11     behalf of Planet Depos.

12                   This video deposition is taking place at

13     Clifford Chance, 10 Upper Bank Street, London E14 5JJ,

14     United Kingdom.

15                   The court reporter today is Sherry Yan, on

16     behalf of Planet Depos.

17                   Would counsel please voice identify themselves

18     and state whom they represent.

19                   MR. LINCENBERG:  Yes.  I am Gary Lincenberg.

20     I represent Mr. Chamberlain, who is present.

21                   MS. LEVIN:  This is Michelle Levin.  I

22     represent Dr. Lynch who is also present by video today.

23                   MR. REEVES:  Good morning.  Adam Reeves, for

24     the United States.

25                   MS. MURPHY:  Ellen Murphy, for Ms. Harris.

Transcript of Lisa Harris
Conducted on January 30, 2024                    9

1           VIDEOGRAPHER:  Would the Consular Office

2     please administer the oath.

3     //

4     //

5     WHEREUPON,

6                     LISA HARRIS,

7     having been first duly sworn/affirmed by Marshall C.

8     Derks, American Citizen Services Chief, Embassy of the

9     United States of America, was examined and testified as

10    follows:

11

12                    DIRECT EXAMINATION

13    BY MR. LINCENBERG:

14          I think we've largely covered the preliminaries.

15    This is a deposition that is in connection with CR

16    18-577 CRB, US versus Lynch and Chamberlain.  There is a

17    stipulation, the Order from Judge Breyer and stipulated

18    to by the parties that govern this deposition.

19          We are here in London on January 30th of 2024,

20    taking the testimony of Ms. Harris.

21          Mr. Reeves, anything to add?

22          MR. REEVES:  I just want to establish on the

23    record that both Defendants are present and that Dr.

24    Lynch is present and listening by the videoconferencing

25    mechanism that we have.

Transcript of Lisa Harris
Conducted on January 30, 2024                    10

```
1                 MR. LINCENBERG:   Okay.

2        Q.    Good morning, Ms. Harris.

3        A.    Good morning.

4        Q.    Can you state your full name for the record?

5        A.    It's Elizabeth Jane Harris.

6        Q.    Okay.  And do you go by Lisa commonly?

7        A.    Yes, I do.

8        Q.    Where are you currently work with?

9        A.    I work for DVL Technology Limited.

10       Q.    What type of company is that?

11       A.    It's a service company.  It supports ICP

12   London Limited, an investment company.

13       Q.    Where is that located?

14       A.    It's in Cambridge.

15       Q.    Cambridge, England?

16       A.    Yes.

17       Q.    And how long have you worked for that company?

18       A.    Since 2013.

19       Q.    What is your position there?

20       A.    I'm Director of Finance Manager.

21       Q.    What did you do before working for that

22   company?

23       A.    I was Finance Controller at Autonomy Systems

24   Limited.

25       Q.    And when did you start at Autonomy?
```

Transcript of Lisa Harris
Conducted on January 30, 2024                    11

1          A.    I think in 2005.

2          Q.    Okay.  And when did you leave?

3          A.    In May 2013.

4          Q.    What's your educational background?

5          A.    I got a degree from University of Sheffield in

6    Maths & Business Studies, and I'm a Chartered

7    Accountant.

8          Q.    What year did you graduate from the University

9    of Sheffield?

10         A.    In 1984.

11         Q.    Okay.  Where did you work before coming to

12   Autonomy in 2005?

13         A.    I started my career after university, KPMG,

14   and after that, I worked for one of their companies --

15   clients called Babson Brothers.

16               Then I worked for Pearl Assurance, and then

17   Cambridge County Council.

18         Q.    And KPMG one of the major -- the Big Four

19   accounting firms?

20         A.    Yes.

21         Q.    When you were at Autonomy, beginning in 2005,

22   in what department did you work?

23         A.    In the Finance Team.

24         Q.    What positions did you hold during your tenure

25   at Autonomy?

1      A.    I started as Financial Controller, and left as

2   Group Financial Controller.

3      Q.    What was the difference between Financial

4   Controller and Group Financial Controller?

5      A.    Well, I just took over the consolidation of

6   the accounts role of subsidiaries into the consolidated

7   accounts.

8      Q.    Approximately when did you become Group

9   Financial Controller?

10      A.    I honestly don't remember.  I'm sorry.

11      Q.    Was it around 2009?

12      A.    It could well have been, yes.

13      Q.    Okay.  As the Financial Controller, you

14   mentioned you were involved in the consolidation of the

15   different subsidiaries of the different companies owned

16   by Autonomy.  What did that involve?

17      A.    A bit of mathematical exercise.  It was adding

18   together all the numbers from the accounting packs from

19   all the subsidiary companies, putting through the

20   consolidation adjustments to net off into company

21   debtors and creditors and things that, you know,

22   shouldn't be grossed up on the consolidated balance

23   sheet; put through any order adjustments.

24      Q.    And so I take it there's different metrics.

25   For example, a payroll.  Would that involve

Transcript of Lisa Harris
Conducted on January 30, 2024                    13

1    consolidation of the payroll numbers?

2         A.   So the consolidation would be as to the profit

3    & loss, which would include payroll cost and also the

4    balance sheet.

5         Q.   Would that include account payable teams that

6    would prepare numbers on behalf of the different

7    subsidiaries and then report them in?

8         A.   So the accounts payable teams were actually

9    transitional.  So they'd be involved in paying suppliers

10   and everything, but the accountants and the financial

11   controllers and all the subsidiaries would prepare the

12   packs and information.  So the trial balances, the

13   balance sheets, the profit & loss, and that's what

14   they'd submit in a standard format for me to

15   consolidate.

16        Q.   And did your work involve more costs or

17   revenues?

18        A.   I wasn't too involved in revenue accounting;

19   it was on the cost side.

20        Q.   All right.  So would you then be dealing with

21   different Autonomy accounting and clerical personnel

22   throughout the world?

23        A.   Yes, yeah.

24        Q.   And the goal was then to accurately capture

25   the costs to the financial statements?

Transcript of Lisa Harris
Conducted on January 30, 2024                    14

1       A.   All the numbers and the costs, the revenues,

2  the assets, the liabilities.

3       Q.   And focusing on 2009 to 2011, who do you

4  recall reporting to you?

5       A.   Reporting to me in that period, Helen Bradley

6  -- I don't know if she was in that period or a little

7  later -- she was in that period reporting to me.

8            Directly reporting to me, Michael Flynn,

9  Katherine Moore, Katie Baker; quite a few people in the

10 UK.

11      Q.   Okay.  Was there an Adam Barry?

12      A.   Yes, yes.  That was in the latter part of

13 period, yes.

14      Q.   And then others who just don't come to mind

15 right now?

16      A.   Yes.

17      Q.   And who did you report to?

18      A.   I reported to Stephen Chamberlain.

19      Q.   Were there accountants in the Cambridge Office

20 whose role was to focus mainly on revenue?

21      A.   Yes.

22      Q.   And in the 2009 through 2011 time period, who

23 were they?

24      A.   The last part of it was Antonio Anderson.

25 Before that, it was Poppy Prentis, now Poppy Gustafsson.

1            And I don't know if Matt Stephen was in that
2    period, if he had left already.
3        Q.   If I represent to you that he left in early
4    2011, does that refresh your memory that he was involved
5    in some of the revenue accounting during that time
6    period?
7        A.   Yes, it does.
8        Q.   And so about how many people worked in the
9    Finance Department in Cambridge during that time?
10       A.   I'd say 12 to 20 people.
11       Q.   Your office was located in Cambridge?
12       A.   Yes, in the Autonomy building, the Finance
13   Team.
14       Q.   I am going to focus you on that office and ask
15   you some questions about the culture of the UK Finance
16   Department, again, focusing on 2009 to 2011.  Can you
17   describe the layout of the office?
18       A.   Yeah.  We were on the first floor -- not the
19   ground floor but the one above -- it was a big, open
20   plan area.  At one end was the Legal Team who had like
21   their separate office, and then all the Finance were
22   just like in a big, open plan area.
23            Steve's desk was near the door.  There's all
24   the files on the left, out at the other end of the
25   office, facing in, and the rest of the Team were in a

1    sort of clusters of desks.

2         Q.   Okay.  So could you overhear what different

3    people on the floor were saying?

4         A.   Yes, yes.

5         Q.   And you mentioned that Mr. Chamberlain's desk

6    was near the door.  That was still in the open floor?

7         A.   Oh, yes, yes, it's all just one big room.

8         Q.   So about how far would you say you sat from

9    Mr. Chamberlain?

10        A.   That'd be the length of this room.

11        Q.   So maybe 20 feet?

12        A.   20, 30 feet, yeah.

13        Q.   Okay.  And how often would you speak with Mr.

14   Chamberlain?

15        A.   All day.

16        Q.   And where would the conversations take place?

17        A.   It could be, leaving our desks as we are

18   walking down; by the -- in the kitchen, if making a cup

19   of tea; in the lunchroom.  Just a normal office

20   atmosphere, where you just talk to people.

21        Q.   When Mr. Chamberlain spoke with others in the

22   office there, would those conversations, to your

23   knowledge, generally also take place in that office

24   area?

25        A.   Yes.

Transcript of Lisa Harris
Conducted on January 30, 2024                    17

1      Q.   Did the open plan nature of the office have an
2   effect on the daily work culture in your department?
3      A.   Just a very open -- just a very
4   straightforward culture.  Everyone hears what's going
5   on.  You know, you could hear what everyone else was
6   doing.  If you needed to jump in because somebody had
7   got something wrong or whatever, you could just tell --
8   to do that.
9      Q.   So people worked collaboratively?
10     A.   Yes.
11     Q.   Do you recall any accounting issues where Mr.
12  Chamberlain asked you to discuss them privately out of
13  the earshot of people?
14     A.   No.  The only thing he'd discuss privately
15  with me privately would be salary suggestions, with
16  obvious reasons.
17     Q.   And can you describe Mr. Chamberlain's style
18  of supervision?
19     A.   Very hands-on, very open, just, you know,
20  straightforward.
21     Q.   Who was Mr. Chamberlain's direct supervisor?
22     A.   That was Sushovan Hussain.
23     Q.   What was his position?
24     A.   He was the CFO.
25     Q.   Did he work in that office there?

1      A.   No.  He was based in London.

2      Q.   Now, did you then -- you've mentioned this

3  earlier.  You also worked with Finance Department

4  employees who were based in the United States?

5      A.   Yes.

6      Q.   And did some of them join Autonomy after the

7  acquisition in 2009 of a company called Interwoven?

8      A.   Yes.

9      Q.   Was Ganesh Vaidyanathan one of those

10 employees?

11     A.   Yes.

12     Q.   What kinds of work did the former Interwoven

13 employees perform for Autonomy in the US Finance arena?

14     A.   So Interwoven obviously had their own finance

15 team.  So they had all the roles.  Ganesh was the sort

16 of the Finance Controller.  He oversaw the team and put

17 together the numbers.  They have their own accounts

18 payable, accounts receivable, payroll, et cetera, teams.

19     Q.   Okay.  And so with regard to, for example,

20 Interwoven transactions, would they book entries into

21 the books that would then be forwarded to you for

22 consolidation?

23     A.   Yes.  So the prime books of record for their

24 books of record, and then what they sent over was what

25 we call a consolidation pack; so the balance sheet, the

Transcript of Lisa Harris
Conducted on January 30, 2024                    19

1    profit & loss, the trial balance.

2         Q.   And if it came to a question of accounting

3    judgment such as where costs should be categorized, was

4    that done in the US or was that the responsibility in

5    the UK Office?

6         A.   So from the UK, we -- my responsibility was to

7    try and make sure that everyone did things consistently,

8    so in particular, in the new acquisition where the US

9    GAAP being so different, it's not so intuitive for the

10   teams to do things the same way that we did them, but we

11   needed everything to be consistent so when we

12   consolidate it, it makes sense.

13             It's not different people putting different

14   things in different buckets.

15             So initially they would do the posting.  I

16   would review it just over the periods of time; everyone

17   was singing from the same hymn sheet.

18        Q.   Now, when you say with US GAAP being so

19   different.  So different from what?

20        A.   IFRS, which was how --

21        Q.   That's the UK Accounting Standards?

22        A.   Well, international financial reporting

23   standards.

24        Q.   And to your knowledge, going back and

25   focusing, let's say, in late 2009/early 2010, were any

Transcript of Lisa Harris
Conducted on January 30, 2024                    20

1   members of the Interwoven accounting team trained to use

2   IFRS Accounting Standards?

3        A.   No.  All the companies we acquired, everyone

4   used the US GAAP.  That was just across the board in

5   America.

6        Q.   So if there was a question of determining how

7   IFRS Standards would apply to a transaction, where would

8   those questions and answers be?

9        A.   They would ask myself.  I think the biggest

10  difference is from the revenue side, so you know, if

11  they talk to the revenue accountants.

12       Q.   Okay.  Let me focus in on end of the quarter

13  reviews, end of the quarter audits.  Now, during that

14  time period did you interact with auditors from

15  Deloitte?

16       A.   Yes.

17       Q.   For what purpose?

18       A.   Technically it wasn't called an audit for the

19  quarter -- that was only a year end -- but it was

20  effectively an audit.  So they would be on site from day

21  before.  They would be obviously reviewing the

22  consolidation -- so sort of top down view and also

23  looking at detailed transactions in a sort of bottom up

24  review.  They're doing a very detailed review of all the

25  numbers.

Transcript of Lisa Harris
Conducted on January 30, 2024                    21

1        Q.    When you say they would be on site, tell us
2    what you mean.
3        A.    So those are big meeting room that was like
4    just down the corridor from where Finance Team sat.  So
5    they were based in there, set themselves up, and then
6    they would come through to the Finance Team to collect
7    files, to ask questions, just sort of wandering out, and
8    also we'd wander down to their room, you know, if they
9    asked for some information, then we got it, and then
10   we're going to take the files down there or going to
11   talk to them down there.
12       Q.    When you say they would come into the Finance
13   Office -- the big office there -- would they have to ask
14   permission to enter or --
15       A.    No.  They had tax and everything.  They are
16   entitled to go anywhere, look at anything anytime they
17   wants.  That's the rules.
18       Q.    And about how long would each review take?
19       A.    I think the quarterly ones takes about three
20   weeks, from memory.
21       Q.    And the year end audits?
22       A.    That took longer, and that also involved
23   Deloitte's in America going on site in America to
24   basically look at the cost accounting over there.  So
25   maybe six weeks?  Two months?

Transcript of Lisa Harris
Conducted on January 30, 2024                     22

1      Q.   At the beginning of the audit -- I know that

2   the quarters are reviews -- if I just use the word

3   audit?

4      A.   Yeah.  Okay.  It was effectively that.

5      Q.   So at the beginning of the audit process, was

6   there any type of initial planning meeting?

7      A.   Yes.

8      Q.   And who would be involved in that in the '09

9   through the 2011 time period?

10      A.   So the auditors, '09, Rob Knight of Lee Wallin

11   was the audit manager by then.  The audit partner, which

12   was Richard Knight.  There was Steve, myself -- would be

13   the Head Revenue Accounting, so Stephen, Poppy, Antonio

14   was the -- Antonio those days.

15           I don't know if Sushovan would join those or

16   maybe -- only he was up in Cambridge at that time.

17      Q.   And what would be discussed at those planning

18   meetings?

19      A.   Just to go through what happened in the

20   quarter financially, if there was anything different,

21   anything new, any big deals, and just timetable, the

22   audit approach which was basically the same every time

23   but just logistics.

24      Q.   Would the initial planning meeting generally

25   take place before or after the end of the quarter?

Transcript of Lisa Harris
Conducted on January 30, 2024                    23

1        A.    Before the initial meetings.

2        Q.    Just before the end of the quarter?

3        A.    I don't know exactly when.  Two weeks before,

4    maybe.  It was close but not right on top of it.

5        Q.    And after the planning meeting, and then the

6    quarter ends, the auditors would come back and begin

7    their audit?

8        A.    Yes.  So they'd come in quite early on before

9    we got all the numbers to do the consolidation, but they

10   start auditing the revenue from that day before, I'd

11   say, because that was the main activity, what they were

12   focused on.

13         So they'd be on site from then.  They have all

14   the revenue information they needed to audit.  They'd be

15   coming in and out, getting the files, asking questions,

16   and then probably about a week, the consolidation was

17   finished, and they'd start reviewing that, start delving

18   into the cost side of things.

19       Q.    How many people from Deloitte would be on site

20   at a time during that time period?

21       A.    Maybe six to eight at a time.

22       Q.    And what did you understand the purpose of the

23   audit to be?

24       A.    They were thoroughly checking the

25   consolidation numbers, basically what they were

Transcript of Lisa Harris
Conducted on January 30, 2024                    24

1   reporting on would be the press release, but that's fed

2   from all the data that feeds into it.

3          So they were checking in detail the numbers,

4   so financial policies, and just everything to do with

5   it.

6      Q.   Okay.  And how would they go about checking

7   for accuracy?  Tell the members of the jury some of the

8   things that they would do to check for accuracy?

9      A.   So when they were looking up, for instance,

10  revenue transactions and license sales, they would have

11  a complete list of everything that happened in the

12  quarter.  It made up a number in the consolidation, and

13  then they would look at the detail of what's in there.

14  They would look at everything over; so for a certain

15  limit -- probably a hundred thousand pounds -- they're

16  looking at the detail.  They look at the file for that

17  transaction.  They look at the proof of delivery.

18         They look at the purchase orders, all the

19  information, and but also pick a sample of the smaller

20  ones.  So everything that they were auditing and

21  checking, they kind of do all the big ones and a sample

22  of the little things.

23     Q.   So when you mentioned some of the different

24  types of documents, they would look at proof of

25  delivery, audit account information and so forth.  Is it

1   fair to say that they were requiring verification from

2   more than one source?

3       A.   Yes.  I mean, that is an audit.  You never

4   take one's word for everything.  So you always look at

5   the original documentation.  If it's a purchase invoice,

6   you want to see the actual purchase invoice that came

7   through the post in those days, and you can tell if

8   it's, you know, if it's been forwarded, came in an

9   envelope, you know, they can know that's the original

10  document.

11          If they are looking at a creditor or a debtor

12  or revenue, then they would actually write to the

13  customers, to the suppliers, and say, "Can you tell us

14  what you think the balance you owe to Autonomy --

15  Autonomy owed you on this date was?"

16          For the banks, they don't just take what it

17  says in the bank statement.  They actually write to the

18  banks and say, "Can you confirm the balance of the bank

19  at this date?"

20          So they don't take anything at face value

21  because otherwise they are not doing their job.

22      Q.   Just to go off on a tangent, when you say

23  "came through the post."  During the 2009-2010 time

24  period, were a lot of the checks coming in from US

25  customers still coming in as checks versus wires?

Transcript of Lisa Harris
Conducted on January 30, 2024                    26

1       A.    So for America and also Canada, they would pay
2    by check, which obviously we don't really sort of do in
3    Europe, but they'd actually send them directly to the
4    bank.  For the most part, occasionally they came to the
5    UK, and then you'd have to FedEx and to the bank.  For
6    the most part, they sent them directly to the bank, and
7    the bank would scan them and credit them to our account.
8           So you could see -- you'd actually have a
9    photocopy from the bank of what that check was, if they
10   hadn't seen the original document.
11      Q.    So with regard to customers who pay by check,
12   did that take a longer time for those records to come in
13   versus wires?
14      A.    Yes, definitely.  A wire is same day.  It's
15   there, and you've got the bank statement that says who
16   it's from.  The checks, because they actually post them
17   through US Post, so it's the time it takes to post it --
18   America's quite -- could take a long time.
19          And the Canadian ones could take even longer
20   because they'd come into the American bank account and
21   take to get cleared.
22      Q.    Now, in the context of the audits and the work
23   you are doing, are you familiar with the concept of
24   professional scepticism?
25      A.    Yes.

1      Q.   What does that mean to you?

2      A.   Just not take anything at face value, and

3  because it's the auditor's job -- they're not being rude

4  -- but just making sure on everything.

5      Q.   And when you say it's the auditor's job, how

6  does that -- your understanding, how does that term

7  apply to the auditor's work?

8      A.   So when they are checking everything, they are

9  checking -- not just taking one's word for it -- they're

10  looking, like I say, the third-party confirmation.  So

11  it's the customers, suppliers, banks, et cetera.

12     Q.   And in the context of audits, if I use the

13  term independent enquiries, do you know what I am

14  referring to?

15     A.   I think you are talking about when the

16  auditors would ask questions of, say, customers.

17     Q.   So they would themselves make independent

18  enquiries?

19     A.   Oh, yes.

20     Q.   Okay.  In your view, in this '09 through 2011

21  time period, did Deloitte conduct their audits with

22  professional scepticism?

23     A.   Yes, they were very thorough.

24     Q.   Did Autonomy's Finance Department assist the

25  auditors with the review steps?

Transcript of Lisa Harris
Conducted on January 30, 2024                    28

1        A.   We'd help them find documents and things --
2   find these out.
3        Q.   And to answer with questions?
4        A.   Yes.
5        Q.   In the entire time that you were at
6   Autonomy -- let's just focus on 2009 to 2011 -- do you
7   ever recall a time where you refused to answer a
8   question from the Deloitte auditors?
9        A.   No, no.
10       Q.   During these post end of quarter audit
11  processes -- three to four weeks, depending on the
12  quarter -- what kind of hours was your team working?
13       A.   It'd be long hours.
14       Q.   By long hours, what do you mean?
15       A.   Obviously to get there, 8 in the morning
16  probably -- I'm taking a guess -- some of your work done
17  before the auditors come in, and obviously they are
18  taking up a lot of your time or most of your time, and
19  it could be until 8 or 9 o' clock at night.
20       Q.   And what about weekends?
21       A.   Yes, we'd come in at weekends if needed.
22       Q.   And in connection with the consolidation
23  adjustments, what would you be working on that during
24  that time period?
25       A.   So the consolidation itself was the sort of

Transcript of Lisa Harris
Conducted on January 30, 2024                          29

1    thing -- it was just like a big spreadsheet.  It had a
2    column for each of the different businesses, and there
3    are these numbers -- Interwoven numbers, et cetera ---
4    and they all get added to totals.
5            We do the consolidation adjustments, which is
6    setting up debtors and creditors, and things like that,
7    and then we'd have a separate column for each adjustment
8    that happened after that original consolidation we put
9    together, and it could be audit adjustments, things that
10   the auditors had found and wanted us to, you know, need
11   to be adjusted for.
12           It could be things that we had found in
13   hindsight -- because the consolidation's put together in
14   just a week, like I said, the checks, for instance, from
15   America, that haven't cleared yet, you know, so the --
16   isn't what we thought; it was actually more money that
17   -- people had written checks before the end of the
18   quarter.  We only knew about them later on.
19   Q.   And so in the course of all of this work, as
20   you're getting more information, are adjustments being
21   made to bottom line numbers?
22   A.    Well, it would be each of the adjustment was
23   the full trial balance, so any adjustment went in, you'd
24   see the detail of it, you know, debit list, debit
25   debtors, credit cash, or whatever the adjustment is,

1    it's there in its totality; so you can see it.

2              And then the final consolidated numbers, the

3    original consolidation as adjusted for all the numbers.

4        Q.   Okay.  And would you communicate directly with

5    the auditors on these issues?

6        A.   Yes.  So it tend to be Tom Murray that was

7    looking after the consolidation from the auditor side.

8    He sat next to me at my desk, and we'd just go through

9    all the adjustments because it's just easier to do it

10   like that.

11             He can see what's being done, and then he can

12   ask his questions, and it's easy to then just drill down

13   on the detail because he's got the information there on

14   the computer or in the shelves behind the files.

15       Q.   Okay.  Did you ever intentionally withhold any

16   information from Tom Murray?

17       A.   No.

18       Q.   Did Mr. Chamberlain ever ask you to hide

19   anything from Deloitte?

20       A.   No.

21       Q.   Did any of the auditors ever tell you that

22   they believed you were withholding information?

23       A.   No.

24       Q.   During the three to four week audit process,

25   when did the consolidation process occur, meaning, was

1    it more at the beginning or middle or end?

2         A.   It was -- that week, so the auditor who are

3    already on site, doing their -- looking at revenue

4    numbers.  I would do the consolidation.  It would be

5    finished in a week, but then, it was like a living

6    document; so any audit adjustments that came in, so the

7    late checks that have come into the bank -- I don't know

8    -- we found more information to change or accrue or, you

9    know, just that would be part of that living document.

10        Q.   Okay.  And with that living document, were

11   there some adjustments that were continued to be made

12   late in the audit process?

13        A.   Yes.

14        Q.   With regard to adjustments that were made late

15   in the audit process, did that affect the way that

16   Deloitte would view them?

17        A.   I mean that's a lot more in your face, as it

18   were.  So I think you got the original consolidation,

19   which is hundreds of thousands of transactions all added

20   up there, and then each audit adjustment is a column on

21   it.

22             So it's absolutely in full detail that one

23   adjustment is completely in the face of the auditor; so

24   it'd get more scrutiny, but it definitely gets

25   scrutinized.

1      Q.   Okay.  And on a day-to-day process, on a daily

2  basis, to your knowledge, was Mr. Hussain involved in

3  the audit process?

4      A.   He would be not so in the detail, in the

5  day-to-day stuff, but there are certain questions that

6  he would know more about so the auditors would talk to

7  him.

8      Q.   From your experience, did those tend to be the

9  higher level item or items where there were judgment

10  calls being debated?

11      A.   Yeah, yeah, because he was Head of sales as

12  well as CFO, so he could be the bigger sale deals that

13  he knew more about.

14      Q.   When Mr. Hussain came to Cambridge, do you

15  recall where he would work?

16      A.   I assume in one of the meeting rooms or the

17  boardroom.

18      Q.   Do you ever recall in these -- 2009-2011, I

19  assume there were times you heard him speaking with Mr.

20  Chamberlain?

21      A.   Yes.  So if he wanted to come and talk to

22  Steve, he'd phone him or he'd come down to see him at

23  his desk or, you know, we might meet him at the lunch

24  queue or, you know.

25      Q.   Do you recall ever hearing him asking Mr.

1    Chamberlain to conceal something from Deloitte?

2          A.    No.

3          Q.    Do you ever recall hearing arguments between

4    Mr. Chamberlain and Mr. Hussain?

5          A.    Not an argument -- I remember them discuss

6    accounting things, but it's not -- that's nothing he'd

7    get that passionate about.

8          Q.    Do you recall, separate from the accounting

9    issues, what about in terms of, for example, the amount

10   of workload that you were doing or the expectations

11   about timing?  Do you recall anything in that regard?

12         A.    I want to say not arguments.  I mean, Steve

13   would it clear to Sushovan that people were working

14   really hard, working really late, could he please stop

15   just asking more questions and let's get on with it, but

16   so -- that's not an argument; it's just like a normal

17   discussion.

18         Q.    In terms of the team working hard, from your

19   experience, did that apply to Mr. Chamberlain as well?

20         A.    Yes, he worked very hard.

21         Q.    Can you give us some insight into that?

22         A.    So he would take calls from Sushovan quite

23   late in the evening.  As I say, he was quite hands on,

24   so you -- if you like, look at the schedules, some

25   numbers.  He'd review the consolidation.  He'd basically

1    check all my work as well.  Yeah, he would be working --

2    I'd say pretty longer hours than the rest of us because

3    Sushovan had a habit of calling so quite late at night.

4        Q.   In your interactions with him, were those

5    often this time period also in the evening hours and on

6    the weekends?

7        A.   Yes, yes.

8        Q.   And do you recall from time to time there

9    would be disagreements with Deloitte about how something

10   should be categorized?

11       A.   Could be a difference of opinion.  I mean, the

12   majority of stuff was just bread and butter,

13   straightforward.

14       Q.   But with regard to areas where there were

15   differences of opinion, did you ever hear Mr.

16   Chamberlain try to pressure Deloitte to approve an

17   accounting decision that Deloitte disagreed with?

18       A.   No.  They're just having an open discussion.

19       Q.   Okay.  So just to summarize.  From your

20   vantage point and experience during the '09 through 2011

21   time period, was it your impression that Deloitte

22   exercised professional judgment and acted with

23   professional independence?

24       A.   Yes.  I'd say that they did a very thorough

25   audit.

1      Q.    Okay.  Now, during this time period, were you

2   aware that Autonomy was selling hardware?

3      A.    Yes.

4      Q.    Okay.  Were you involved in Autonomy's

5   reporting of hardware sales in any way?

6      A.    Nothing of the consolidation.  So I would have

7   the numbers.  I would be consolidating, but they tended

8   -- sales tended to be in America.

9      Q.    Okay.  And what about the costs side of

10   purchasing hardware?  Did you have involvement there?

11      A.    It's only really the consolidation.  So Ganesh

12   did a lot of the -- because there's a lot of work

13   involved in getting the right cost with the right sale;

14   so we would invoice a customer -- it might just be just

15   one line on the invoice for software and hardware

16   together or just be, you know, a little bit broken out.

17          That we would just sell this package, but

18   actually what would come through from Dell would be

19   hundreds and hundreds of little invoices.  some were

20   delivered; some were not.

21          It was like a really quite complicated

22   tracking exercise that Ganesh had to do to tie in the

23   invoices from Dell for the cost of the hardware to the

24   sale.  It's like a one to very many transactions.

25      Q.    Okay.  Did you have an understanding of

Transcript of Lisa Harris
Conducted on January 30, 2024                    36

1    Management's purpose for the hardware sales at that
2    time?
3         A.   I asked Steve what it was, and he explained to
4    me -- and it made sense -- it was just to get in front
5    of the big American customers to make the deal.  They
6    wanted to see the whole deal.  They wanted to see the
7    big name.  They wanted to see this sort of trusted
8    American name of Dell, you know, where Autonomy was just
9    a little UK company, hold onto the shirttails of the
10   hardware and get in front of the customers that way.
11        Q.   Okay.  And did Autonomy keep track of its
12   hardware sales in its general ledger?
13        A.   Yes.
14        Q.   How so?
15        A.   So we had, for the coding structure, the kind
16   of like the what-is part of the coding, we had a
17   separate code for the hardware revenue from all the
18   other kinds of revenues.  You had licenses.  You had
19   support.  You had training.  You had different codes for
20   that.
21             Hardware sales, I think was 470000.  It was a
22   coding that we need for that.
23             Then in cost of sales, we had different codes,
24   different types of cost of sales, and they had a
25   separate one for hardware cost of sales, which is of

Transcript of Lisa Harris
Conducted on January 30, 2024                    37

1    570000.
2            Then there's also a separate code for the sort
3    of marketing element of the hardware.
4        Q.   Okay.  Were these codes accessible to
5    Deloitte?
6        A.   Yeah, because one of the documents they got
7    was a trial balance, which is the line by line, about
8    maybe 200 lines of different categories of costs,
9    revenue, assets, and liabilities.
10       Q.   Did anyone ever tell you to conceal these
11   hardware sales and how you reported the accounting --
12       A.   No.  You couldn't because it was completely in
13   your face.
14       Q.   Okay.  At any point did you become aware of a
15   discussion with Deloitte over whether hardware costs
16   should be recorded as costs of goods versus sales and
17   marketing?
18       A.   So traditionally, the -- of a certain split
19   done when Richard Knight was the audit partner, and when
20   Nigel Mercer took over as audit partner because they
21   have to sort of rotate every few years, he had obviously
22   done the detailed review and everything before he took
23   over the audit, and he wasn't happy with the split.
24            He thought that there should be a larger
25   proportion of the costs going to cost of sales rather

Transcript of Lisa Harris
Conducted on January 30, 2024                    38

1    than marketing costs.

2        Q.    Okay.  So I am going to represent to you that

3    the first quarter that Nigel Mercer was the audit

4    partner was the second quarter of 2010.

5            So you are saying there was a certain

6    allocation in the first quarter when Richard Knight was

7    the partner of the cost in sales and markets versus cost

8    of goods sold, and then in the second quarter Mr. Mercer

9    raised questions and suggested that a greater proportion

10   should be assigned to --

11       A.    That's his opinion --

12            MR. REEVES:  I object.  There is a lack of

13   foundation as to how she knows this.

14       Q.    BY MR. LINCENBERG:  And in the second quarter,

15   there was a discussion about assigning more to the cost

16   of goods sold?

17            MR. REEVES:  Objection.

18            THE WITNESS:  So yes.  So Nigel Mercer, Steve,

19   myself, and the audit manager -- I think Lee at the time

20   -- all sat around the table and he talking through his

21   arguments of why he thought more should go to cost of

22   sales and marketing.

23            Steve was talking about a point of view, "I

24   have always done it that way," and obviously also "don't

25   want to just change for the sake of it," and so, yeah,

1    it was just a discussion, and so it came to an agreement

2    of where it could kind of settled.

3        Q.   So you were at the table, a part of those

4    discussions?

5        A.   Yeah, at the latter end of it, yes, because

6    obviously I had to critically make adjustments in the

7    consolidation.

8        Q.   Okay.  So when Mr. Mercer determined that more

9    of the allocation should be the cost of goods sold, that

10   was what happened, as far as you recall?

11       A.   Yes.

12       Q.   All right.  Let me show you what's been marked

13   as identification Exhibit 9547.

14            (Exhibit 9547 -- premarked by counsel -- for

15   identification.)

16            And I am going to start on Page 2 and take you

17   through the e-mails so you can see --

18            MR. REEVES:  I am sorry, can I see the top?

19            Thank you very much.

20       Q.   BY MR. LINCENBERG:  So starting on the bottom,

21   there is an e-mail dated July 18th, from Sushovan

22   Hussain to several of the Deloitte folks, copying Mr.

23   Chamberlain; subject, Audit committee pack.

24            There's this discussion that the main issue is

25   to "get across the line on the COGS."

Transcript of Lisa Harris
Conducted on January 30, 2024                    40

1          Now, let me go through some of these e-mails
2    until it gets up to the e-mail involving you and then
3    ask some questions.
4          So if we move up the page.  We then have Mr.
5    Chamberlain on the same day sending an e-mail to Mr.
6    Hussain, saying:  "They're pretty entrenched on the COGS
7    argument...think the MRL conversation is a must."
8          Now, before we go to the next e-mail.  You are
9    not on this e-mail; right?
10   A.   Correct, yeah.
11   Q.   What do you understand this to mean:  "Think
12   the MRL conversation is a must"?
13   A.   Well, from the previous one, David suggested
14   that the auditors could talk to Mike to explain the
15   rationale why, you know, we're doing these deals
16   involving hardware and software and why we believe it's
17   not just a straight revenue cost but actually, some of
18   this is marketing, it's, you know, get the business.
19   Q.   Okay.  "They are pretty entrenched on the COGS
20   argument."
21        Do you understand this to be Mr. Chamberlain
22   noting that the Deloitte folks are taking a firm view
23   that a greater amount of the cost should be --
24   A.   That Nigel was, yes, as opposed to what
25   Richard Knight.

1      Q.    Just because the court reporter is taking us

2   both down.   Let me try and finish my question first, and

3   then we can --

4      A.    Sorry.

5      Q.    -- so going up the chain of the e-mail, we

6   then have Mr. Hussain to Mr. Chamberlain, responding:

7   "Any joy with cutting the non h/w cogs?"

8           And then if we go up the e-mail further, we

9   have Mr. Chamberlain forwarding this thread to you and

10  writing:   "FYI, we need to drill right down in to the

11  rest of the COGS line i.e what is in their that is not

12  HW?"

13          Do you recognize this to be an e-mail chain

14  where the last e-mail was is coming from Mr. Chamberlain

15  to you on the issue of the breakdown between cost of

16  goods sold versus sales of marketing and hardware sales?

17     A.    Yes, that was just talking about "let's look

18  at the rest of cost of goods as opposed to just the

19  hardware."

20     Q.    And what do you understand to be taking place

21  where Mr. Chamberlain's asking you to drill down in this

22  area?

23     A.    So because we were changing our percentage of

24  the hardware, cost of -- going into cost of sales, it

25  was taking up too -- to do a really thorough of

1    everything else.  So cost of goods sold to anything in

2    there that shouldn't be.

3         Like I said, because the US teams were used to

4    reporting on the US GAAP before acquiring the companies,

5    they hadn't necessarily done everything, moved over

6    everything to be the way that we would do it, so there

7    were inconsistencies, I think particularly was in

8    Zantaz, where they were coding a lot of things to cost

9    of sales; that in the other businesses, we were coding

10   to other areas which you've got to be consistent;

11   otherwise the consolidation makes no sense.

12        So it's to drill down and see, "Okay.  Let's

13   look up what else is there.  Is everything else correct,

14   what's been allocated to cost of sales as opposed to

15   other costs."

16   Q.   Did you see anything improper with this

17   exercise?

18   A.   No.  In fact, probably just more a shame that

19   I hadn't done it earlier because Nigel's stance on the

20   hardware had kind of given us the impetus to actually go

21   and do what should've been done anyway.

22   Q.   Okay.  We move to admit Exhibit 9547.

23        (Exhibit 9547 offered in evidence.)

24        Now, would Deloitte then have needed to review

25   any adjustments to Autonomy's books at this point?

1       A.    Yes, because this would've been after they had

2    received the quotation pack; so after had done the

3    initial consolidation, to get any adjustment is

4    separately identified, completely in your face.  They

5    would definitely look at that.

6       Q.    Okay.  And when you note "completely in your

7    face," this is one of the issues being discussed two and

8    a half weeks into the audit process?

9       A.    Yes.

10      Q.    Let me show you what's been marked as Exhibit

11   9548.

12            (Exhibit 9548 -- premarked by counsel -- for

13   identification.)

14            This is a one-page e-mail.

15            So starting with the earliest e-mail, we have

16   Mr. Hussain.  Do you recognize this as an e-mail from

17   Mr. Hussain to you, Steve, and Matt, July 9th of 2010;

18   subject line being, US costs for the low margin

19   business?

20      A.    Yes, I do recognize that.

21      Q.    Mr. Hussain writes:  "The US team has put in

22   the complete costs but of course they don't know that we

23   are deferring some revenues."

24            When he wrote that, what did you understand

25   that to mean.

Transcript of Lisa Harris
Conducted on January 30, 2024                    44

1      A.   That at the time that the US teams had been
2    processing the invoices -- sales invoices and cost
3    invoices -- they were just doing it based on the bits of
4    paper they received.
5           They didn't know whether the deals had
6    actually gone, the revenues could be recognized whether
7    delivery had fully happened, whether the customer had
8    accepted it.
9      Q.   Okay.  I move to admit 9548.
10          (Exhibit 9548 offered in evidence.)
11          And then if we go up the e-mail.  It looks
12   like you then respond by saying:  "Doing the analysis
13   now."
14          What did you mean by that?
15     A.   So Matt Stephan, who got these revenue
16   account, he's got more information about what deals have
17   actually closed, where, you know, they're gonna cross
18   the line, everything's been achieved for us to allow us
19   to recognize revenue, he will have that in a spreadsheet
20   format.
21          Then I'd be looking at what the subsidiary
22   teams had posted to DDS, which is our accounting system,
23   so literally it's just bits of basic paper that come
24   through the post from the supplier -- from Dell --  and
25   then just ticking back, you know, one report against the

1    other to see whether they are complete, what's missing,

2    what's different between the two.

3        Q.   So if we apply -- we discussed about your job

4    duties, are you basically conducting your own audit, if

5    you will, over the books?

6        A.   Yeah, just making sure that, yeah, that it's

7    correct, with the top down view from the revenue,

8    Finance Team and the bottom up view from the accounts

9    payable clerks in America that had just got an invoice

10   through the post and put it on the system, actually then

11   just reconciling the two to make sure that what's on the

12   system is complete and accurate and everything that

13   should be there.

14       Q.   And when you use the term "top down" and

15   "bottom up," what are you referring to in general?

16       A.   Sorry.  So top down is you know that the

17   revenue deals, you know, we've made a sale to this

18   customer and they've accepted it and everything's been

19   delivered, and you know, we've got everything so we can

20   recognize this deal.

21            And then bottom up is actually the clerks in

22   America have just received a pile of invoices through

23   the post.  They put them on the system.  That's just

24   detail but a big picture of what it adds up into.

25            So it's just reconciling the two.

1      Q.   So the people higher up, let's say Mr.

2    Hussain, may have a sense of what the deals were --

3      A.   Yes.

4      Q.   -- but the documents have to be gathered

5    before this actually can be recorded in such and such a

6    way from the bottom up?

7      A.   Yes.  So it could be that not everything's

8    been recorded because of the invoices haven't been

9    received by the team, so they are missing, and there

10   would be need to be accrued.

11         It could be they've received invoices and

12   posted them, which is the right thing to do, but then

13   whether you know that that deal hasn't not gone through,

14   they shouldn't go to cost of sales, or to wherever

15   they've been posted.  They need to be back down or into

16   prepayments.

17     Q.   In looking at whether hardware sales should be

18   recognized or deferred, you mentioned some elements that

19   you are looking at.  Reconciling the books and the like

20   is one of them.  Also, whether that the check has

21   cleared yet on a US sale?

22     A.   I don't think we had to -- we weren't

23   recognizing on a cash basis.  So the check from the

24   customer would be to clear the debtor, not to recognize

25   the revenue.  Obviously it's a pretty strong argument to

1   recognize a revenue if the customer's actually paid for

2   it.  That's the most undisputable you've got, really.

3        Q.   Okay.  Fair enough.  Then going up the e-mail

4   chain -- we're still on Exhibit 9548 -- there is an

5   e-mail from you.  Are you then here following up with

6   the conclusions or reporting on the results of your

7   work?

8        A.   Yes.  So I have checked into the detail

9   indeed, yes, what the Accounts Payable Teams have posted

10  so Sushovan know what they've done.

11           And then Matt who's the revenue accountant; so

12  he understands what the answer should be, you know, what

13  bills are actually being recognized.  He can then just

14  do the adjustments to make sure that the details of what

15  should go in the ledgers agrees with what we know should

16  be there.

17       Q.   And when you write, "I could confirm US team

18  have posted all the invoices 50/50 to cost of goods sold

19  in marketing," what does that mean?

20       A.   So when they received an invoice from Dell for

21  maybe a hundred dollars -- because would be hundreds of

22  invoices for one transaction -- they see the invoice for

23  a hundred dollars, and they're going, "Okay.  I'll post

24  50 dollars to cost of sales, 50 dollars to marketing,"

25  and they've done that individually with each of these

Transcript of Lisa Harris
Conducted on January 30, 2024                    48

1    hundreds of invoices.

2         Q.   And was it your understanding throughout the

3    course of July that that 50/50 allocation had been

4    approved by the Deloitte auditors?

5         A.   So that would be what would've been

6    historically, so that's what Richard Knight as a partner

7    and Deloitte auditors would have been happy with.

8         Q.   Your memory is that it was previously 50/50 in

9    change or that it changed to 50/50 or you don't recall?

10        A.   It didn't change to 50/50; it changed to

11   90/10.

12        Q.   Okay.  Let me show you Exhibit 15288.

13             (Exhibit 15288 -- premarked by counsel -- for

14   identification.)

15             And let me ask you.  When you say your

16   recollection is that it changed to 90/10, the 90 being

17   what?

18        A.   90 percent, to cost of sales;

19             10 percent, to marketing.

20        Q.   Okay.  Looking at 15288 for identification.

21             (Exhibit 15288 -- premarked by counsel -- for

22   identification.)

23             Does this appear to be an e-mail from Mr.

24   Chamberlain to Cynthia Watkins, copying you and Matt

25   Stephan, dated April 8th, 2010; with the subject line,

1    Revenue adjustments?

2         A.   Yes, it is.

3         Q.   I move to admit Exhibit 15288.

4              (Exhibit 15288 offered in evidence.)

5              And who is Cynthia Watkins?

6         A.   She was the Financial Controller for Autonomy,

7    Inc., and sort of the lead finance person in the

8    American teams.

9         Q.   Let's move to and start from the bottom of the

10   e-mail thread on Page 2 of this document.

11             I correct myself.  It's two pages but one

12   e-mail.  So let's go back to the top.

13             So first, does there appear to be an

14   attachment of a Q1 2010 hardware Excel spreadsheet?

15        A.   Yes, it says, spreadsheet attached.

16        Q.   Now, in the e-mail, Mr. Chamberlain first

17   writes:  "I apologise for the constant changing of your

18   numbers.  Powers greater than me are making these

19   decisions and whilst I understand them I know they will

20   be causing you a lot of pain.  I will make sure this is

21   remembers when it comes to sorting out Q1 bonuses."

22             So first, when the term "powers greater than

23   me," who do you understand that to be referring to?

24        A.   I assume that'd be Sushovan.

25        Q.   And what's your understanding as to why Mr.

Transcript of Lisa Harris
Conducted on January 30, 2024                    50

1    Chamberlain is apologizing?

2         A.   Because he knows that the whole team -- the

3    American team and the UK team -- are working late, and

4    he empathizes with that.

5         Q.   If we move down the e-mail.  Mr. Chamberlain

6    then writes:  "We need to make adjustments to revenue

7    which affects hardware revenue and costs as well as

8    normal licence."

9              And then the first part is:  "Defer Capax

10   (FSA) - 4.2 million dollars."

11             What does that refer to?

12        A.   I believe that Capax is a customer, and that

13   is a sale that had originally worked as that the revenue

14   could be recognized, and now we believe that the revenue

15   cannot be realized.

16        Q.   Were you involved in that Capax sale?

17        A.   No.  We didn't really get involved in revenue

18   accounting.

19        Q.   Okay.  And if we go down to "Defer additional

20   hardware deals as per attached -- some ins and outs from

21   last nights schedule."

22             What do you understand this to be referring

23   to?

24        A.   So the attached schedule is a list of hardware

25   sales and listing which one should be deferred so we

Transcript of Lisa Harris
Conducted on January 30, 2024                    51

1    shouldn't be recognizing them.

2        Q.   Okay.  And then if we look at -- one or two

3    questions on this e-mail.

4            If we go back up a moment.  What did you

5    understand Mr. Chamberlain's reference to bonuses to be

6    referring to?

7        A.   He was just confirming to Cynthia that he

8    understood that she's working really late and that he

9    appreciates her she's doing that, it's perhaps

10   unreasonable, but he will make amends in terms of

11   bonuses.

12           He knows that she deserve a bonus for putting

13   in the extra effort and doing the extra mile.

14       Q.   And after the adjustments were made, would

15   Deloitte review them to make sure they were accurate?

16       A.   Yes.  I mean, any adjustment is gonna get a

17   lot of detailed review.

18       Q.   And did Mr. Chamberlain ever instruct you to

19   defer a hardware cost that, to your knowledge, the

20   evidence did not support?

21       A.   No, because as you say, Deloitte would be all

22   over it, checking in great detail, but also Sushovan as

23   CFO and also the Head of Sales, he would know about

24   these big sales.  He would know if actually there were

25   over the line or not over the line, if a customer's

Transcript of Lisa Harris
Conducted on January 30, 2024                    52

1    really accepted them or not.

2         Q.   Okay.  Let's go to Exhibit 15289.

3              (Exhibit 15289 -- premarked by counsel -- for

4    identification.)

5              Does this exhibit appear to be an e-mail from

6    Mr. Chamberlain to Ms. Watkins, copying Matt Stephan and

7    you; subject, Revenue adjustments - READ THIS FIRST?

8         A.   Yes, it is.

9         Q.   Then if we take a look through this.  Mr.

10   Chamberlain writes:  "Cynthia, we have all taken pity on

11   you and processed the adjustments already."

12             And then if we can move down a bit.  There's

13   No. 1 deals with Capax.

14             No. 2 deals with hardware.

15             Now, earlier I believe with you mentioned that

16   hardware revenue was coded 470000; and costs coded

17   570000.

18             Is this what you are referring to?

19        A.   Yes.

20        Q.   So what do you understand this e-mail to be --

21   and then at the bottom, Mr. Chamberlain says to Ms.

22   Watkins:  "Thanks for all of your efforts last night"?

23             What do you understand Mr. Chamberlain to be

24   communicating in the Subpoint 2, dealing with hardware?

25        A.   So he was telling Cynthia that is where he

1    processed the journals in DDS, which is our accounting

2    system for the deferral of the hardware revenue.

3        Q.   So this is a followup on the earlier e-mail

4    that we looked at?

5        A.   Yes, in the first e-mail, he's asking her to

6    do it, like sympathize, like he was asking us to work

7    really late on something.

8            The second e-mail, he said, "Oh, actually,

9    we've done it" and just confirming why things are being

10   posted; so she's got full knowledge and access of what's

11   been changed on her books.

12           MR. LINCENBERG:  We move to admit 15289.

13           (Exhibit 15289 offered in evidence.)

14       Q.   Now let me show you a document, which is

15   marked as Exhibit 15726 for identification.

16           (Exhibit 15726 -- premarked by counsel -- for

17   identification.)

18           This document has two e-mails to it.  If we go

19   down to the bottom.  So the first e-mail is an e-mail

20   from Mr. Chamberlain to Mr. Hussain, April 12 of 2011;

21   subject is, Numbers.  It discusses three options with

22   what the margin percentage would be and the earnings per

23   share.

24           Do you understand that?

25       A.   Yes.

Transcript of Lisa Harris
Conducted on January 30, 2024                              54

1      Q.   Okay.  And then if we move up the page, we see
2  that Mr. Chamberlain is forwarding this to Poppy
3  Gustafsson and yourself.
4           "These are the options and the impacts if he
5  calls again."
6           Do you see that?
7      A.   Yes, I do.
8      Q.   Okay.  What is Mr. Chamberlain asking you to
9  do here?
10     A.   So Sushovan likes to do quite a lot of the
11 sort of what-if analysis or "what if that happened,"
12 "what if that happened," "what if that happened," "can
13 you run the numbers if that happened"; just a lot of
14 "can you just see what would look like" or "what would
15 that look like," and obviously being, as usual, doing
16 that, and Steve forwarding on the e-mail he sent to
17 Sushovan earlier so that if Sushovan couldn't get a hold
18 of Steve -- because I imagine it's already quite late at
19 night and he was possibly having a home life and
20 whatever -- If Sushovan called us because he couldn't
21 get a hold of Steve, we had the information there just
22 to reiterate to him.
23     Q.   Okay.  So let me break down what you've just
24 discussed.  You mentioned that Mr. Hussain would
25 frequently want to run through the maths on different

Transcript of Lisa Harris
Conducted on January 30, 2024                      55

1   scenarios?

2        A.   Yes.

3        Q.   And so that as you are going through the end

4   of quarter time period, he can understand, "All right.

5   If it ends up being that Prisa's recognized or deferred

6   or whatever, this is the impact it will have on those

7   margins" and so forth?

8        A.   Yes.

9        Q.   All right.  And would you sometimes run the

10  math on that?

11       A.   Yes, yeah, we do the calculations.

12       Q.   When you received this e-mail, did it trouble

13  you at all?

14       A.   No.  As I say, Steve is really hands on so he

15  could do all the calculations himself, and it'd

16  obviously sort of protect us somewhat from the constant

17  "what if that happened" or "what if that happened" or

18  "what would that do," you know, trying to do this to be

19  constantly be like just "what it would look like if it

20  did this instead."

21            So he could do the calculations, the maths

22  himself.

23       Q.   So if various scenarios plays out, this is

24  what the math is gonna look like?

25       A.   Yes -- and so as to what customers are going

Transcript of Lisa Harris
Conducted on January 30, 2024                    56

1    to -- deals they actually are going to accept as being

2    delivered to their satisfaction.

3         Q.   All right.  And that was something frequently

4    done that you'd run through the math on different

5    scenarios?

6         A.   Yes, yes.

7         Q.   Okay.  And then so with regard to hardware, I

8    guess you would've been involved on the costs side?

9         A.   We just wanted, you know, the accounting side,

10   just the, you know, consolidate the numbers together,

11   and if we're adjusting it, identifying all the things

12   that you'd need to defer out.

13        Q.   So when, for example, under No. 1, it says,

14   defer 3.6 million of hardware.

15             What is that referring to?

16        A.   Prisa is a customer name, so it's saying if we

17   can recognize the Prisa deal but some of the hardware

18   can't be recognized, you know, this is what the impact

19   would be.

20             If we can't recognize Prisa, but it's hardware

21   we can recognize instead.

22             It's just like, as I say, it's just gonna like

23   "what if this," "what if that" or "what if that

24   happened."

25        Q.   Okay.  And if a decision -- by the way, do you

Transcript of Lisa Harris
Conducted on January 30, 2024                                    57

1    know whether any of these three options even ended up

2    being the end numbers?

3        A.   I don't know.  I mean, often not.  There was

4    just -- Sushovan was very time consuming, very

5    demanding, but just he wanted to have it all there ready

6    so that when the quarter closed and he was in the

7    corner, talking to investors, he had all this knowledge

8    and information and he knew he could just answer

9    questions like that on any -- if he's asked.

10       Q.   Okay.  And whatever the ultimate numbers would

11   show for Prisa or BBC or hardware sales, those would all

12   be reviewed by Deloitte?

13       A.   Yes.

14       Q.   Okay.  Let's move to the next topic.  Around

15   June of 2010, did you become aware that Autonomy was

16   buying a company called MicroLink?

17       A.   Yes.

18       Q.   And as part of that acquisition, did you

19   perform any accounting work to help reconcile the two

20   companies' books and records?

21       A.   Yes.  So normally when company buys another

22   company and normally when we're acquiring companies, you

23   want to do like a deep diving to their books and records

24   so you know what you are buying, you do all the fair

25   value adjustments, et cetera.

1          MicroLink's a little different because they

2     are an American company, and I think that's -- I think

3     when a government deal, that meant that only US eyes

4     could look at their books; so we couldn't go and sort of

5     delved into the detail.  We had to just rely on the

6     information that Alan Rizek had sent us.

7          Q.   Okay.  And I noted around June of 2010 is -- I

8     may have been wrong with the date -- but you came to

9     understand sometime in early 2010 there was an

10    acquisition?

11         A.   Yeah, yeah.

12         Q.   Okay.  All right.  So were you involved at all

13    in identifying debts that MicroLink owed to Autonomy at

14    the time of the acquisition?

15         A.   So we had to look at anything that was

16    intercompany because when MicroLink's not a subsidiary

17    when it's completely separate company, its trade

18    creditors, third party and that the companies owe each

19    other.

20          As soon as it become subsidiary, it's

21    intercompany debt; so it has to match up, and then it

22    should really get moved into intercompany account rather

23    than being in trade debtors, trade creditors.

24         Q.   Okay.  And then when it gets moved, how was it

25    accounted for?  Is it zeroed out?

Transcript of Lisa Harris
Conducted on January 30, 2024                    59

1      A.    It was zeroed out on consolidation.  So a

2    standard consolidation adjustment, the intercompany

3    account, which are certain code, just all go on the same

4    line, and they all come to zero because everyone's in

5    the intercompany account, once you add them all

6    together, are going to come to zero.  That's the whole

7    point of it, but the intercompany account is a balance

8    sheet account, not an accounts receivable, accounts

9    payable account.

10      Q.    And just to look at another sample.  Was HP a

11    customer of Autonomy?

12      A.    I believe it was.

13      Q.    So in connection with HP's purchase of

14    Autonomy, what's your understanding as to what would

15    happen with HP's debt?

16          MR. REEVES:  Objection.  Foundation.

17          THE WITNESS:  I would assume that under US

18    GAAP, they would do the same as we do in the IFRS in

19    that you move everything to intercompany, so I think

20    zeroed around consolidation; otherwise you would be

21    inflating -- as a group, you'd inflating your debtors or

22    creditors numbers, if you're showing debts and credits

23    that are actually to yourself.

24      Q.    Now, going back to MicroLink.  Let me show you

25    Exhibit 9549 for identification.

Transcript of Lisa Harris
Conducted on January 30, 2024                    60

1          (Exhibit 9549 -- premarked by counsel -- for

2     identification.)

3          Does 9549 appear to be an e-mail from you to

4     Alan Rizek of MicroLink, April 28th, 2010; subject, AP

5     with Autonomy?

6     A.    Yes, it is.

7     Q.    I would move to admit 9549.

8          (Exhibit 9549 offered in evidence.)

9          Now, who was Alan Rizek?  Do you recall?

10    A.    He was Head of Finance or Chief -- guy that we

11    dealt with at MicroLink.

12    Q.    So when you say, "Hi Alan, Could you give me a

13    list of the invoices from Autonomy that make up the

14    $9,087,688 that we are writing off against the asset in

15    your books," what does that refer to?

16    A.    So because with, MicroLink we couldn't see the

17    detail, and he came to just sort of send me the numbers

18    for the detail behind the balance of 9 million so I

19    could tick it off against the equivalent in Autonomy's

20    books, so we can just do the -- to get them into company

21    just to even them out.

22    Q.    All right.  Let me direct you to Exhibit 9550.

23         So 9550, go down to the bottom first.

24         (Exhibit 9550 -- premarked by counsel -- for

25    identification.)

Transcript of Lisa Harris
Conducted on January 30, 2024                                61

1           So 9550, if we go down to the bottom first.

2    9550 consists of two e-mails in the thread.  First,

3    looking at the earlier one in time.

4           Does this appear to be an e-mail from you May

5    18th of 2010 to Ken Wong and Ganesh Vaidyanathan,

6    copying Percy Tejeda, Alan Rizek, and Poppy, about

7    accounts receivable posting in Autonomy books?

8        A.   Yes, that's right.

9        Q.   And I would move 9550 into evidence.

10          (Exhibit 9550 offered in evidence.)

11          So you write there:  "I need you to post dummy

12   cash as per the attached."

13          Do you see that?

14       A.   Yes, I do.

15       Q.   What did you mean when you use the phrase

16   "dummy cash" in this e-mail?

17       A.   So we needed to move the answers out to trade

18   debtors and trade creditors into each company account.

19   They could also automatically net off a consolidation,

20   but things that were accounts receivable and accounts

21   payable, you can't post journals.  You could only post

22   invoices, credit notes, cash.

23          That's the only way you can communicate with a

24   ledger.  So the only way to get the system to take those

25   invoices out is to post dummy cash, and then in the

1    normal ledger you move that cash from cash to the

2    intercompany account, and that's the only way to because

3    you just can't communicate with the accounts receivable

4    and accounts payable software any other way than by

5    posting those transactions.

6        Q.   When you say it's the only way, is that also

7    what you understand to be the normal way in your 20-30

8    plus years of accounting --

9        A.   Yes.  You don't have to post dummy cash or

10   dummy invoices, but dummy cash is easier because

11   invoices, they -- file returns, sales tax returns, all

12   sorts of things like that, whereas cash, you post dummy

13   cash.  You can then correct it in the ledger because you

14   can do a journal from there to the intercompany account

15   where you actually wanted it to go, and it doesn't

16   affect or touch other things, other reports.

17       Q.   Is the use of this term dummy cash -- may not

18   be familiar to the members of the jury -- is that a

19   phrase or a term used by accountants during

20   consolidations?

21       A.   Certainly in the UK.

22       Q.   All right.  And in your experience, would it

23   be clear to someone receiving these entries that they're

24   for dummy cash and not real cash?

25       A.   Yes, yeah.  We were all accountants.

Transcript of Lisa Harris
Conducted on January 30, 2024                    63

1      Q.   Did you include a dummy cash entry to deceive
2    auditors into believing that MicroLink had made payments
3    to Autonomy that it had not made?
4      A.   No.  Again, it'd be really obvious to an
5    auditor because they are also accountants, and they
6    could see that the cash posting then goes from bank to
7    intercompany.
8      Q.   And is it typical to use offsetting accounting
9    entries to reconcile the accounting records of two
10   merging companies?
11     A.   Yes, because as I say, you don't want to gross
12   up debtors and creditors; otherwise it's a consolidated
13   entity.  You're saying to the outside world, "These are
14   all our debtors," but actually, some of them are
15   internal to other companies in the group.  They are not
16   debtors on a consolidation basis.
17     Q.   Did the inclusion of this dummy cash entry
18   have any impact on Autonomy's reported revenues?
19     A.   No.
20     Q.   Did it have any impact on Autonomy's reported
21   profits?
22     A.   No.  Just balance sheet transaction.
23     Q.   All right.  Did Mr. Rizek or Tejeda or
24   Vaidyanathan or Wong ever protest the use of the term
25   "dummy cash"?

Transcript of Lisa Harris
Conducted on January 30, 2024                    64

1      A.    No.   I mean, they are kind of used to us using
2   slightly different language because they were English,
3   not American; but we kind of got to learn each other's
4   vocabulary.
5      Q.    Okay.   So moving to the next e-mail in 9550.
6   We then have a response from Mr. Vaidyanathan:   "Hi
7   Lisa, I was reviewing the MicroLink adjustment...wanted
8   to understand it a little better."
9           He asks you a number of questions.
10          What is your understanding as to why
11  Vaidyanathan was asking you these questions?
12     A.    He was reviewing the US books -- Autonomy,
13  Inc.'s books, and he's just trying to, like we all do,
14  double check that everything's right, understanding, and
15  just to make sure that everything's done correctly,
16  checking each other's work.
17     Q.    And did you supervise him?
18     A.    Yes.
19     Q.    Okay.   Did any of his questions raise concerns
20  about use of the dummy cash entries?
21     A.    No, no.   That was literally just a way of
22  moving things from trades debtors and trade creditors
23  into these company accounts so they get naturally
24  knocked out on consolidation because they're internal
25  debts; they are not true trade debtors, trade creditors

Transcript of Lisa Harris
Conducted on January 30, 2024                    65

1    after the acquisition.

2          Q.   Let's just move to one more exhibit:  9551.

3               (Exhibit 9551 -- premarked by counsel -- for

4    identification.)

5               Does this appear to be -- go down to the

6    e-mail where Mr. Vaidyanathan -- so if we look down.

7    This is a two-page thread, and the earlier e-mail has

8    Mr. Vaidyanathan writing to you, and then in red, there

9    appears to be some responses to the questions?

10         A.   Yes.  That's my response to Ganesh.

11         Q.   By the way, did you consult with Mr.

12   Chamberlain before providing these answers?

13         A.   I honestly don't remember.

14         Q.   Would you have needed to with this?

15         A.   I don't think so.

16         Q.   Okay.  All right.  I think even dummies like

17   me understand this part now.

18              Let's move on to -- I would move to admit

19   Exhibit 9551.

20              (Exhibit 9551 offered in evidence.)

21              Let's move on to a next topic.  We have been

22   going about an hour and ten minutes.  I thought we would

23   go, let's say, another 20-30 minutes, if you are okay?

24   If at anytime you want a break, let me know.

25         A.   I am fine.  Thank you.

1      Q.   Was there a time that you became involved in

2   providing information to HP prior to its purchase of

3   Autonomy?

4      A.   You mean after the announcement, before the

5   deal closed?

6      Q.   Yes; so late 2011?

7      A.   Yes.

8      Q.   And what was your involvement?  What were you

9   doing?

10      A.   So very first of all, my hat was meeting with

11   David Duckworth, who was part of the American

12   Acquisition Team.

13      Q.   From HP?

14      A.   From HP, in Pleasanton at Zantaz Offices,

15   where we were going through the mapping of the nominal

16   ledger codes.  So Autonomy had a certain coding

17   structure that we used, so, for example, 470000 was what

18   we used to denote hardware sales of the HP which had

19   their own coding structure and their own numbers and

20   letters that they associate with the account.

21           And so it was just a big mapping exercise to

22   say, "Well, this one and Autonomy's numbers goes to this

23   one and HP's numbers."

24      Q.   And as part of your discussions with Mr.

25   Duckworth, did you talk at all about whether it would

Transcript of Lisa Harris
Conducted on January 30, 2024                    67

1    makes sense for Autonomy to start selling HP hardware

2    instead of Dell hardware after the acquisition?

3        A.   He certainly mentioned it.  It just seemed a

4    little rude, really, selling competitors' hardware.

5        Q.   And did Mr. Duckworth express any surprise

6    about the fact that Autonomy was selling hardware?

7        A.   No.  I mean, he had obviously seen all our

8    codings before because he had actually done his own

9    first draft of all the mappings before we even turned up

10   for the meeting.

11       So he had looked at what all the codes were,

12   and I say the coding structure was, you know,

13   descriptions made it really obvious what they were.

14       Q.   And during this process in your meetings and

15   work with Mr. Duckworth, did anyone from Autonomy ever

16   instruct you to conceal from HP anything relating to

17   hardware sales?

18       A.   No -- the work they could've done anyway

19   because they had all the information.

20       Q.   Let me show you what's been marked as Exhibit

21   9552 for identification.

22       (Exhibit 9552 -- premarked by counsel -- for

23   identification.)

24       MR. LINCENBERG:  Just for the record, as an

25   aside, Mr. Reeves, I mentioned at the beginning of the

Transcript of Lisa Harris
Conducted on January 30, 2024          68

1    earlier depositions that I'd be going into areas that it
2    was not clear whether they would be determined relevant
3    or not by a court, and without claiming relevance here
4    or not, I am going to explore these areas to preserve
5    certain testimony.
6          MR. REEVES:  I understand.  I am relying on
7    the court's order that any objection by the Government
8    is preserved as to relevance, hearsay, and things of
9    that nature, and the court's ruling with regard to the
10   severance.
11         MR. LINCENBERG:  Yes.
12    Q.   I am showing you an e-mail dated March 22,
13   2012, from Mr. Vaidyanathan to Chris Yelland, and it
14   says, Dell Payment Due, approximately 942,000 dollars.
15         "Hi, Chris.  I need your approval to pay Dell
16   an amount of $942,072.33.  This is for the hardware
17   orders that we source from them and sell through to our
18   customers at a loss of approximately 10%."
19         So from reading this e-mail, what is your
20   understanding of what Mr. Vaidyanathan is asking Mr.
21   Yelland?
22    A.   So Ganesh is just asking for final approval to
23   make that payment -- it's a large amount of money -- to
24   Dell.  He's explaining that he's already done all the
25   checks that he needs to do.  He's made sure that the

Transcript of Lisa Harris
Conducted on January 30, 2024                    69

1    hardware invoices are reconciled to the sales invoices

2    that the customers pay, et cetera.

3          So it's just the final approval to send that

4    large amount of money out the door.

5        Q.   Okay.  And this is for a hardware sale to

6    customers?

7        A.   Yes, I mean it would be for -- could be for

8    more than one sale.  That's just the amount that's due

9    to be paid that week.

10       Q.   Okay.  And if we move down the Page --

11            MR. REEVES:  Counsel, could I please see the

12   top of the e-mail?  I'm sorry for the interruption.

13            MR. LINCENBERG:  This is the top of the -- let

14   me go through all of the e-mails.  Let's start from the

15   bottom and go to the top.

16       Q.   Let's just start at the bottom.  We have an

17   e-mail from Vivian Tran.  Two e-mails from Vivian Tran.

18   And then if we go up, we have the e-mail I was

19   discussing, and then if we go further up.

20            Does that appear to be an e-mail from Mr.

21   Yelland to Mr. Vaidyanathan and you on this subject?

22       A.   Yes, it is.

23       Q.   And then we see Mr. Yelland saying:  "I'm not

24   effective until 1 April - really the 10th due to

25   vacation.  In the meantime it would be appropriate for

Transcript of Lisa Harris
Conducted on January 30, 2024                              70

1    Lisa to be the approver in my and Steve's absence."

2              Do you recall approximately when Mr.

3    Chamberlain left the company?

4        A.   I am not great on dates, but reading this, it

5    looks like it was in the spring of 2012.

6        Q.   Okay.  And did Mr. Yelland ever express any

7    surprise to you about the fact that Autonomy had bought

8    hardware from Dell for resale?

9        A.   No.  Everyone knew because would've been quite

10   a lot of conversations about, really, we should be HP's

11   hardware and not the competitor's hardware.

12       Q.   Okay.  And those were conversations you had

13   with Mr. Yelland?

14       A.   Mr. Yelland and so many other people.

15       Q.   Let's pull this exhibit down.  Now, you

16   mentioned Matt Stephan.  I want to ask you a couple of

17   questions about Mr. Stephan.  When did you first

18   interact and work with him?  Was that before he was at

19   Autonomy or when he first came to Autonomy?

20       A.   I believe he might have been an auditor

21   before, and then obviously he moved to work for

22   Autonomy.

23       Q.   When you say you believe he might have been an

24   auditor, do you believe he might have been an auditor at

25   Deloitte before?

Transcript of Lisa Harris
Conducted on January 30, 2024                    71

1      A.    Yes, sorry, at Deloitte's, yes.

2      Q.    He eventually then joined the Autonomy Finance

3  Department?

4      A.    Yes.

5      Q.    And in what capacity?  I believe you mentioned

6  it earlier but if --

7      A.    So he looked after revenue accounting.

8      Q.    All right.  And did Mr. Stephan work in that

9  same open office area as you?

10     A.    Yes.

11     Q.    Did you regularly speak with him?

12     A.    Yes.

13     Q.    Did Mr. Stephan and Mr. Chamberlain have

14  conversations in your earshot?

15     A.    Yes.

16     Q.    And how frequently?

17     A.    Daily; many times a day.

18     Q.    During your time working for Autonomy, did Mr.

19  Stephan ever express dissatisfaction to you with the way

20  Autonomy was accounting for revenue?

21     A.    No.

22     Q.    Did he ever say that he believed Autonomy's

23  revenue statements were inaccurate?

24     A.    No.

25     Q.    Did he ever say he thought Mr. Chamberlain was

1    not being upfront with Deloitte?

2        A.   No.

3        Q.   Let me show you Exhibit 9548 again.  Focusing

4    you on this e-mail -- July 9th of 2010, where you're

5    writing to Mr. Hussain and copying Mr. Chamberlain and

6    Mr. Stephan -- this was the e-mail where you say:  "I

7    could confirm US team have posted all the invoices 50/50

8    to COGS sold in marketing."

9             Did Mr. Stephan play a role on the revenue

10   side in connection with deferrals?

11       A.   Deferring revenue, yes.

12       Q.   And in connection with that process, did Mr.

13   Stephan communicate with you what he was doing to verify

14   that revenue -- actually, we should focus on the next

15   line, where you say:  "We will make the adjustment to

16   take out the cost associated with deferred revenue etc -

17   I will go through the necessary with Matt when he has

18   finished with Revenue as the two adjustments are tied

19   in."

20            Do you see that?

21       A.   Yes.

22       Q.   In connection with the deferral process, did

23   Mr. Stephan communicate with you what he was doing to

24   verify that revenue should be deferred instead of

25   recognized?

1          A.    No, not in detail, but obviously the

2     principles -- I didn't check his work or anything.  He

3     was going through to make sure the deals could all be

4     recognized because it wasn't just as straightforward as

5     you've invoiced the customer, therefore you can

6     recognize it.

7                It's a bit more complicated than that.

8          Q.    By complicated, does that relate back to

9     factors like evidence of delivery?

10         A.    Yes, customer acceptance and so forth.

11         Q.    Okay.  Do you know whether Mr. Stephan

12    communicated with Deloitte's auditors about the

13    deferrals?

14         A.    Oh, yes, he had done that in detail.

15         Q.    And did he ever suggest to you that he was

16    hiding anything from Deloitte?

17         A.    No.  I don't think he would've done.  He

18    wouldn't have hid anything from them, you know, even if

19    he was asked to -- he just wasn't a dishonest person.

20         Q.    Did he ever tell you that he was asked to

21    support recognition when the evidence supported

22    deferral?

23         A.    No.

24         Q.    Did you have an understanding of why he left

25    Autonomy in March of 2011?

1        A.    I believe it was sort of private issues.  His

2    wife wanted to go back to Australia.

3        Q.    Was it your understanding from talking to him

4    that he left on good terms?

5        A.    Yes.

6        Q.    Let me show you Exhibit 9525.

7              (Exhibit 9525 -- premarked by counsel -- for

8    identification.)

9              So I am showing you an e-mail from Mr.

10   Chamberlain to a number of people at Autonomy, including

11   you, dated April 9th, 2010; subject line, Credit hunt.

12             Do you recognize this as an e-mail in that

13   timeframe on that topic?

14       A.    Yes, I do.

15       Q.    In the e-mail, Mr. Chamberlain writes:  "Nice

16   meal for two approved by SH for the winner.  The winner

17   does not necessarily mean the biggest number.  The best

18   qualitative entry wins the prize."

19             So first, focusing on the subject line, Credit

20   hunt.

21             What does the phrase mean to you?

22       A.    We would've been at this sort of stage where

23   sort of into the quarterly review, we thought we'd

24   closed all our numbers, but then just going through and

25   double checking everything and looking at stuff that's

Transcript of Lisa Harris
Conducted on January 30, 2024                              75

1    come in -- with hindsight -- coming after the date, just

2    make sure if there's anything that we need to capture,

3    you know that, with hindsight, that we didn't know about

4    when we closed the books originally.

5          Q.   Okay.  Was Mr. Chamberlain here asking you to

6    invent credits that did not exist?

7          A.   No, and it could be credits or debits.  It's

8    just that he made it a sort of jokey, kind of make it

9    like a fun -- you know, just making it a jolly spin on

10   it.

11         Q.   And did you believe there was anything wrong

12   with searching for credits that had not been accounted

13   for?

14         A.   No.  It's just literally with hindsight going

15   through -- a lot of it would be checks received at a

16   bank that we did not know about until this all appeared

17   in the bank account maybe a week or so later.

18         Q.   Okay.  Let's look at Exhibit 9553.

19              (Exhibit 9553 -- premarked by counsel -- for

20   identification.)

21              We'll start at the bottom.  This is three

22   pages on this e-mail thread.  We have -- the e-mail

23   we've just showed, and now there's a thread up that is

24   from Cynthia Watkins, responding to Mr. Chamberlain on

25   the Credit hunt subject.

Transcript of Lisa Harris
Conducted on January 30, 2024                      76

1          And if we go down, she says:  "One thought,

2   has the FileTek software been implemented, as a large

3   part of the fee is associated with granting access to 60

4   customers, maybe we can argue amortizing as customers

5   are assigned, looks like we are OEM their product.  Your

6   thoughts!!"

7          And then if we move up the e-mail chain.  We

8   see Mr. Hussain saying:  "Excellent idea - why should we

9   amortize over one year and not 3 years.  Deserves the

10  dinner!"

11         And then if we look up, we see Mr. Chamberlain

12  responds, saying:  "Not as simple as that.  We are

13  already amortizing over 3 years.  The question is

14  whether we should defer the start point."

15         And if we move up a little further, we see Mr.

16  Chamberlain saying:  "That would be more difficult given

17  our accounting policy.  Oh well."

18         So does this appear to be an example where Ms.

19  Watkins believes that she found a credit.  Mr.

20  Chamberlain says, "Nice try but I believe that it's not

21  as simple as that, and not necessarily agreeing to

22  that."

23         MR. REEVES:  Objection.  No foundation.  She's

24  just reading someone else's e-mail.

25         THE WITNESS:  Yes.  So Cynthia's come up -- we

Transcript of Lisa Harris
Conducted on January 30, 2024                    77

1    all looked at different things, what if we do this?

2    Could we do this differently?  What about that?  What

3    about this?

4              As I say, it's the simple things like checking

5    through bank statements for late cash.

6              So she said all about this, emphasizing the

7    software that we use in our software, and she said,

8    "Actually, no.  We are already doing that.  We're

9    already accounting for it, like that, correctly."

10        Q.   BY MR. LINCENBERG:  So it's just an example.

11   Ms. Watkins seems to find something.  Mr. Chamberlain

12   says, "That won't work"?

13        A.   Yeah.

14             MR. REEVES:  Objection.

15        Q.   BY MR. LINCENBERG:  That's your understanding?

16        A.   Yes, that is, yeah.

17        Q.   By the way, all of this -- this is April

18   11th -- all of this is going on during the time period

19   when everybody's very busy in all the other work

20   involving the audit?

21        A.   Yes.

22        Q.   Okay.  And if a credit was found late in the

23   audit process that should be recognized, what was your

24   understanding as to whether it would've been reviewed by

25   Deloitte?

Transcript of Lisa Harris
Conducted on January 30, 2024                    78

1      A.   It'd be, say, consolidation adjustment.  It

2  would be separately identified, and definitely reviewed

3  in detail by Deloitte.

4      Q.   And did Mr. Vaidyanathan ever, during the work

5  you did with him, question you regarding the propriety

6  of searching the records for credits?

7      A.   No.  It's just -- we were all very time

8  pressured.  You put together all your numbers, and you

9  are now doing a review.

10      Q.   Okay.  Let's take a 15-minute break.

11           Go off the record.

12           VIDEOGRAPHER:  Thank you.

13           Going off the record.  The time is 10:42.

14           (Break.)

15           VIDEOGRAPHER:  Back on the record.  The time

16  is 11:06.

17           MR. LINCENBERG:  And I have nothing further.

18  Thank you, Ms. Harris.

19

20                   CROSS-EXAMINATION

21  BY MS. LEVIN:

22      Q.   Ms. Harris, how are you?  I am Michelle Levin.

23  I represent Dr. Lynch.  Good morning.

24      A.   Good morning.

25      Q.   So just a few questions about where Dr. Lynch

Transcript of Lisa Harris
Conducted on January 30, 2024                79

1   worked at Autonomy.  In what office Dr. Lynch primarily

2   work out of?

3        A.   Weren't an office.

4        Q.   Okay.  And how often would he visit the

5   Cambridge office?

6        A.   Not very often at all.

7        Q.   When he would visit the Cambridge office,

8   where would he usually work?

9        A.   I presume in the boardroom.

10       Q.   Where is that in relation to where the

11  Financial Team's at?

12       A.   It was on the floor above.

13       Q.   So a different floor?

14       A.   Yes.

15       Q.   And how often would you interact with Dr.

16  Lynch while you worked at Autonomy?

17       A.   Face to face, probably never; very, very

18  rarely.

19            On e-mail, for certain large things that need

20  authorizing to be paid, I would e-mail him.

21       Q.   And how about by phone?  Did you interact by

22  phone?

23       A.   No.

24       Q.   Okay.  Did you generally work with him on

25  accounting matters?

1      A.    No.  He was not really involved on the finance

2   side of things.

3      Q.    Was he involved in accounting at all?

4      A.    No.  He was obviously technical, and I think

5   involved in marketing.

6      Q.    How would you describe Autonomy's culture?

7      A.    Open, straightforward, not so flowery and

8   wishy-washy, just mission statements and all of that

9   stuff.  Just people doing their job, all working for

10  same company, quite sort of a flat structure.

11     Q.    Okay.  Do you remember whether the office had

12  a fish tank with piranhas in it?

13     A.    We had two fish tanks.  Had a big one on the

14  ground floor with, I guess cracker, that sort of fish in

15  it.  Then up by the post drum, there's like a little

16  tank set in the wall with some little tiny piranhas in

17  it.

18     Q.    So the small fish tank with the tiny piranhas,

19  what --

20     A.    Just in front of the post room.

21     Q.    Was that intimidating to you?

22     A.    No.  They are really tiny.

23     Q.    The fish tank you mentioned in the lobby, what

24  type of fish did that have in there?

25     A.    Just sort of normal, like could be goldfish,

Transcript of Lisa Harris
Conducted on January 30, 2024                    81

1    cracker, whatever they are.  Cold water fish probably is
2    a better way to describe it.
3         Q.   So they're friendly fish?
4         A.   I don't know.
5         Q.   Okay.  Were you aware that the conference
6    rooms at the Autonomy Office were named after James Bond
7    characters?
8         A.   Yes.
9         Q.   Okay.  And was that intimidating to you?
10        A.   No.  It's just a sort of normal, blokeish
11   thing to do, which is sort of quite common in the UK for
12   sort thing.
13        Q.   Ms. Harris, you talked about your interactions
14   with the Deloitte Cambridge team.  Was the Deloitte
15   audit team based in Cambridge?
16        A.   Yes, they were.
17        Q.   And that's where you were based as well?
18        A.   Yes.
19        Q.   Is Cambridge a major city for technology
20   companies --
21        A.   Yes, it is.
22        Q.   Did the Deloitte audit team have experience
23   with technology companies?
24        A.   Yes.  They have like different departments
25   that deal with different businesses; so it was the

Transcript of Lisa Harris
Conducted on January 30, 2024                    82

1    technology part of Deloitte auditors does.

2         Q.    Was Deloitte Cambridge a substantial office?

3         A.    Yes.

4         Q.    You had talked about earlier about Deloitte's

5    review of major transactions -- all the transactions

6    over a certain threshold above $100,000 -- did Deloitte

7    also review major purchases by Autonomy?

8         A.    Yes.

9         Q.    Can you please describe what types of

10   information Deloitte had access to when reviewing these

11   purchases?

12        A.    So for purchases, it would be sort of the

13   approval for the purchase being made in the first place.

14   The invoice from the supplier, if it would be paid, the

15   proof of payment and so showing the bank transfer where

16   the payment had gone to, and if it hadn't been paid,

17   they would write to the supplier to ask them to say what

18   balance they thought Autonomy owed them at the end of

19   the year, and then compare them to what our record

20   showed.

21        Q.    Okay.  And did Deloitte also review

22   provisions, bad debts, and credits?

23        A.    Yes.

24        Q.    What type of information did they have

25   available to do that?

1      A.    So for the bad debt provision, we just

2   basically had for all the different account receivable

3   ledgers, the agent report with the list of invoicing and

4   showing when they are due, and then the provision is the

5   calculation based on age, basically; so 10% of

6   everything over 90 days, for example, and they can see

7   that calculation.

8           And they also look through to see anything

9   where maybe it was newer but hadn't been paid, you know,

10  if it's a big one, how do we know that that's definitely

11  gonna be paid, any communication with a customer that

12  suggests it won't, looking through the credit

13  controller's records of the conversations they've had

14  with customers; just basically looking at all the

15  detail.

16     Q.    Did you have any files available to you on the

17  cost side that were not made available to Deloitte?

18     A.    No.  They had access to everything.

19     Q.    How were Autonomy's financials presented to

20  the market?

21     A.    There's a quarterly report that went out, and

22  then there was investor's quarterly where the numbers

23  are represented.

24     Q.    And then was there an annual report?

25     A.    Yes.  So the annual statutory account as well.

1          Q.   What procedures were in place to ensure the

2     information in the press releases and the annual reports

3     was accurate?

4          A.   So in the actual documents themselves, there

5     was a big exercise that Deloitte would do independently

6     to the Finance Team, and also other people at Autonomy

7     just literally proofreading it, checking it, ticking

8     everything back, making sure the numbers tie back, the

9     notes tie back to the main account, everything tie back

10    with the source documents.  So just a lot of quality

11    control exercise on it.

12         Q.   And what do you mean by ticking?

13         A.   Just literally you've got the report in front

14    of you.  You look at the number.  You check the source

15    document.  You tick.  That one's checked.  You tick.

16    The next one's checked.  You check that adds up.  Just

17    quite a long process of detail, double checking

18    everything.

19         Q.   Okay.  Did Deloitte check every number in the

20    financial statements?

21         A.   Yes, they did.

22         Q.   Did they also review the narrative section of

23    the financial statements?

24         A.   Yes, they did.

25         Q.   Did Deloitte listen to Autonomy's earnings

Transcript of Lisa Harris
Conducted on January 30, 2024                              85

1    calls?

2         A.   Yes, I'm sure that they did; obviously wasn't

3    with them when they did but, yes.

4         Q.   Okay.  Let me turn your attention to bad

5    debts.

6         A.   Uh-huh.

7         Q.   If you could just explain what a bad debt is?

8         A.   So they are a doubtful debt; basically bad and

9    doubtful debt.  You make a provision for debtors based

10   on -- you make like individual provision if you think

11   something won't be paid, if customer's given you an

12   indication that they are not going to pay.

13        So when the credit controls would call them

14   up, say, "Oh, disputing this one.  We don't like it,"

15   you know, for whatever reason they don't want to pay.

16        But generally provision for doubtful debt,

17   which is based on aging.  We know that not a hundred

18   percent of customers will pay because in the real world,

19   that doesn't happen.  So to be reasonably prudent but

20   not over prudent, you just do a provision based on

21   percentage of certain debts, you know, for all the debts

22   over a certain age.

23        Q.   Was it fair to say that they are money that's

24   owed that's deemed no longer recoverable for a variety

25   of reasons?

Transcript of Lisa Harris
Conducted on January 30, 2024                          86

1        A.    Either deemed not recoverable or it's doubtful

2   they will be recovered.  Let's say a lot of it is just

3   based on the law of averages, just, you know, you know a

4   hundred percent won't come in, so you just do a

5   provision to -- you don't know which ones won't pay --

6   but to cover that eventuality.

7        Q.    In your experience, do companies typically

8   have some bad debts?

9        A.    Oh, yes, all companies do.

10       Q.    And why is that?  Can you explain that?

11       A.    Because in the real world, even though someone

12  owes you money, they bought a product, there could be

13  various reasons why they don't pay, from they've got

14  money problems, they never had any intention of paying,

15  they don't now have an issue with the product, or just

16  they are not very good at paying their debts.

17       Q.    Are you familiar with the concept called bad

18  debt reserve?

19       A.    Yes.

20       Q.    What is that?

21       A.    So when you provide for debt, you basically,

22  on the balance you've got your debtors -- your trade

23  debtors -- or accounts receivable, which is a debit

24  balance, and you create a balance sheet -- credit

25  balance -- to net off against it, which is a reserve

1    against doubtful debts.

2         Q.   Do companies typically take up bad debt

3    reserve?  Is that common?

4         A.   Oh, yes.  IFRS and the US GAAP -- everyone

5    does it.

6         Q.   And how do companies determine their bad debt

7    reserve?

8         A.   That is a pure judgment, really.  Some

9    companies are more prudent than other companies.  I

10   think as a whole, the US GAAP is more prudent than IFRS

11   because the IFRS, you can't be too prudent either

12   because otherwise you would be defrauding the tax

13   authorities because when you provide for debt, you make

14   this reserve, this provision, and you are also reducing

15   profit because it's a cost.  So you can't just do that,

16   reducing the amount of tax that you pay to the

17   Government.  You have got to be as right as you can

18   could be; so not under prudent, not over prudent.

19        Q.   You said -- you mentioned that bad debt

20   reserve is a matter of accounting judgment?

21        A.   Yes.

22        Q.   What does that mean?

23        A.   It's not something that's black and white that

24   you can say, "Oh, it's definitely gonna be this much."

25             You cannot foresee into the future and know

Transcript of Lisa Harris
Conducted on January 30, 2024                    88

1   exactly which debtors will default and which ones won't.

2   So it's your estimation based on past experience, the

3   knowledge of what's happened previously in that

4   particular country or that product or that area.  So

5   it's just your best estimate.

6       Q.   Could two identical companies determine their

7   bad debts differently?

8       A.   Yes.

9       Q.   I want to revisit the conversation that you

10  had earlier about the dummy cash posting regarding the

11  MicroLink acquisition.  Do you remember those questions?

12      A.   Yes.

13      Q.   I just want to be clear.  Does that adjustment

14  make the debt from the customer disappear?

15      A.   No.  It's just so that because the customer

16  and the supplier are both in the same group now, they

17  are disclosed separately and netted off because it's no

18  longer an external customer; it's an internal customer.

19  So it's just a movement from external to internal.

20      Q.   Okay.  Is that an internal accounting

21  adjustment?

22      A.   Yes -- it's literally just to say this is an

23  intercompany account; it's not an external third party

24  that owes us money.  It's one of our own.

25      Q.   Okay.  So it sounds like Autonomy can still

1   receive the money it's owed after the adjustment is

2   made; is that fair?

3        A.   Yeah.

4             MR. REEVES:  I object.  How does she know?

5             THE WITNESS:  It's just normal accounting

6   practice.  It's an intercompany account.  You settle in

7   an intercompany account, like you can settle it

8   third-party debt.

9        Q.   BY MS. LEVIN:  So just to be clear.  Is it

10  your understanding that the debt from the customer still

11  exists after that accounting adjustment is made?

12       A.   You talked about dummy cash before?

13       Q.   Yes.

14       A.   And intercompany -- so it's not an external

15  customer anymore; it's your own subsidiary.  So, yes, so

16  this intercompany balance where the subsidiary still

17  owes the money to the parent or the other around, and

18  you can settle intercompany accounts, send cash within

19  the companies within the group, just the same as if it

20  was external.

21       Q.   And if a customer still owed that subsidy

22  company, and that's the basis for the adjustment?

23       A.   So the intercompany, the dummy cash to clear

24  the money that MicroLink or Autonomy, Inc. owes to an

25  internal company, that's -- the customer is the internal

Transcript of Lisa Harris
Conducted on January 30, 2024                    90

1    company, so if another third-party customer owes money

2    to a subsidiary, that's not affected by this.

3        Q.   It's not affected?

4        A.   Yeah.  It's just internal where the customer

5    and the supplier are now part of the Autonomy group.

6        Q.   So to be clear.  If a third-party customer

7    owed money to MicroLink, after you know that adjustment

8    was made by you, that would still --

9        A.   That has nothing to do with third-party

10   customers; that's purely where MicroLink owes money to

11   Autonomy, Inc.

12           So the customer and the supplier just both

13   parts of Autonomy now.

14       Q.   Okay.  I am gonna turn your attention to

15   pre-acquisition -- well, let me ask this way.  Did

16   Autonomy undertake any sort of exercise before the HP

17   acquisition of trying to reconcile Autonomy's provisions

18   and bad debts with HP's accounting policies?

19       A.   We tried to, yes.

20       Q.   Okay.  And when did that exercise take place?

21       A.   So after it had been announced that the HP

22   acquired Autonomy.

23       Q.   Did Autonomy have any experience with this

24   sort of exercise?

25       A.   Yes.  So we'd always done it.  When we

Transcript of Lisa Harris
Conducted on January 30, 2024                    91

1    acquired companies, we go in, and we do the fair value

2    accounting adjustments, partially to change it from US

3    GAAP to IFRS accounting, which particularly affects

4    things like deferred revenue, but then also cleanup

5    basically.

6               You're taking on someone else's balance sheet.

7    You're taking on their debts.  So we might have

8    different opinion as to what we think is the provision

9    should be for bad debts.

10              We might have different opinion of how long an

11   asset should last or what a value should be given to the

12   fixed assets.  There'd be lots of area where we go in

13   and do the fair value accounting so that the balance

14   sheet that we then take into our books is as we would

15   have it, so it's under IFRS accounting, and it's with

16   our judgment of what bad debt should be, how long you

17   should appreciate assets for, all the various factors.

18        Q.    And why did Autonomy reconcile bad debts ahead

19   of the HP acquisition?

20        A.    To be helpful and to be prepared because we

21   knew that HP was gonna have a more prudent policy than

22   us because they account under the US GAAP.

23        Q.    Do you know whether you ended up making more

24   provisions for bad debts after the acquisition?

25        A.    Yes, we would've done because the HP judgment

1  of the position of what percentage you provide after

2  debt is a certain number of days old was a lot more

3  prudent.

4      Q.   A lot more prudent than what?

5      A.   A larger reserve.

6      Q.   So do you mean that HP's policy was more

7  prudent than you had anticipated --

8      A.   Yes.

9      Q.   In the third quarter of 2011, did Autonomy

10 also write off bad debts?

11     A.   Yes, as a cleanup exercise.  So debts that had

12 been fully provided; so for the value of a debt is in

13 the debtors and is also a negative amount in the

14 reserve, so just cleaning it up, so rather than have a

15 long list of invoices where we actually provided against

16 it, just cleaning it up so it's a more manageable list

17 that the company's taking over.

18     Q.   You said cleaning up.  What does that mean?

19     A.   Just removing the invoices, where they are

20 fully provided so it's no effect on the profit & loss

21 account.  We had already taken a hit for the cost of

22 that debt.  It's a provision for doubt debts.

23          But just rather than giving them a massive

24 list of debtors, reducing the list down to just the ones

25 we believe are collectible.

1      Q.   And does that have any impact on whether the

2   debt is gonna be received from the third party?

3      A.   No.  And we would always -- we would never

4   tell a customer that we've provided for the debt or

5   written off the debt.  They still owe it.  We don't

6   think our chances of them paying us are good.

7      Q.   Okay.  Did Autonomy try to hide these

8   writeoffs?

9      A.   No.  What we do, write off a debt, appears on

10  the transaction report as a writeoff, the word

11  "writeoff," and then the details of that invoice.

12     Q.   Uh-huh.  Were the writeoffs disclosed to HP's

13  accountants at KPMG?

14     A.   Yes, because they were looking at all the

15  transactions as well as the trial balance.  So they had

16  all the information, and it was of the area -- because

17  it's an area of judgment.  That's something they would

18  look at.

19     Q.   What was KPMG doing at that time?

20          MR. REEVES:  Objection.  Vague as to time.

21     Q.   BY MS. LEVIN:  Let me rephrase the question.

22  What was KPMG doing just after the acquisition?

23     A.   So they were on site at the Autonomy Offices,

24  and they were doing a very detailed review, looking at

25  the balance sheet and the profit & loss of Autonomy to

Transcript of Lisa Harris
Conducted on January 30, 2024                    94

1    make the recommended fair value adjustment.

2            So they worked with Roxanne Simpson on that.

3    So Roxanne Simpson would report to me with adjustments

4    that KPMG had suggested to be made.

5        Q.   Who's Roxanne Simpson?

6        A.   So she worked for HP.  I don't think she was

7    directly in the merger & acquisition team, but she

8    worked closely with David Duckworth, and she was there

9    at the first meetings that we had in Pleasanton.

10       Q.   Okay.  And as part of this process that KPMG

11   was undergoing, would you have expected them to review

12   the exceptional costs incurred during this transitional

13   period?

14       A.   Yes.  They were specifically given those.

15       Q.   Okay.  So you anticipated my next question.

16   Did Autonomy keep records of its financials during this

17   period?

18       A.   Yes, and the exceptional costs were coded to a

19   separate ledger code called exceptional costs.  So it

20   was really obvious that what was in there, and obviously

21   had all the detail of the transaction so you could see

22   exactly what it was as well as in our schedules, where

23   we had done the workings to calculate what to put in

24   there.

25       Q.   If HP wanted to understand what bad debts

1    Autonomy had written off in any particular time period,

2    was that information available?

3        A.    Yeah, because KPMG had it.  Roxanne Simpson

4    had it.  The HP team had it.

5        Q.    Was there anything improper about these

6    writeoffs in your view?

7        A.    No.

8        Q.    Let me turn your attention to hardware.  Do

9    you recall -- you had mentioned earlier today that in

10   the context of hardware sales, if you had been paid,

11   it's a pretty strong argument to recognize the revenue?

12       A.    Yes.

13       Q.    Can you just elaborate on that, please?

14       A.    There are different factors as to whether you

15   can recognize a sale.  Just simply you've invoiced a

16   customer isn't always enough.  You've gotta prove

17   delivery, it's gotta be accepted by the customer.

18   Obviously the hardware sales that -- intertwined with

19   the software that's also being sold, so the customer has

20   to accept the whole thing, and it isn't as easy and

21   straightforward as you'd expect it to be, but obviously

22   if the customer had already paid, then that's pretty

23   much showing that they have accepted it.

24       Q.    Okay.  So the payment is an indication that

25   they have accepted the --

1      A.    Normally that payment would come down the

2  line.  That would be an exception that they had actually

3  paid.

4      Q.    Okay.  You also answered some questions about

5  hardware deferrals; if you remember that?

6      A.    Uh-huh.

7      Q.    Can you please explain why hardware would be

8  deferred?

9           MR. REEVES:  Objection to foundation as to her

10 decision making.

11          THE WITNESS:  So what I understood from the

12 revenue accountant was there could be a variety of

13 factors:  delivery, reflect all the parts are being

14 delivered, say, Dell used to deliver literally hundreds

15 of invoices from Dell from one sale to a customer.

16          It could be that the customer's accepted it.

17 This could be -- as well because we were selling them

18 like package the whole deal, not just the hardware.

19     Q.    Okay.  Did there also need to be evidence from

20 the customer that the hardware was delivered in good

21 condition?  Is that another element?

22          MR. REEVES:  Objection.  Foundation.

23          THE WITNESS:  Yeah.  So the delivery notes

24 from Dell, say that they've shipped it, and then there'd

25 also be proof of delivery, but we do need customer

1    acceptance.

2        Q.   BY MS. LEVIN:  We also had some discussion

3    about the hardware sales being on the trial balance, and

4    we will get to that.

5        Can you just let us know how many people at

6    Autonomy in Finance knew about the hardware sales in the

7    accounting of them?

8        A.   People directly involved in accounting for

9    them would be the teams that sold the hardware.  So

10   Autonomy, Inc., for instance, was a company that would

11   do hardware sales, so it would be in their record, so

12   the purchase ledger team, the sales ledger team, the

13   accountants, they would all see it.

14       The Autonomy, Inc. ones, I will see it in

15   Cambridge.  We saw all the subsidiary books.

16       Q.   Would the hardware sales have been apparent to

17   anyone that had access to the trial balances?

18       A.   Yes.  So obviously someone like in Zantaz

19   wouldn't see Autonomy's trial balance necessarily, but

20   anyone who had access to our trial balances would see it

21   including, for instance, the payroll team.  They are

22   only posting to the payroll accounts, but they can see

23   the whole trial balance because it is a complete

24   document.

25       Q.   Do you have a sense of how many people in

1   Finance at Autonomy would have access to the trial

2   balance?

3       A.   I mean, access to all the trial balances would

4   probably be just the Cambridge team, but then in all the

5   different subsidiaries, their whole teams are going to

6   see the trial balance, so, you know -- I don't know --

7   50 accountants all together -- but everyone basically

8   could see the trial balance.

9       Q.   Okay.  Thank you.  I want to revisit your

10  discussions of Autonomy's hardware sales with HP.  Who

11  did you discuss hardware sales with at HP?

12          MR. REEVES:  Objection.  This is vague as to

13  time.

14      Q.   BY MS LEVIN:  Who did you discuss hardware

15  sales with after the acquisition at HP?

16      A.   So after the acquisition, it would be with

17  Chris Yelland, with John Blanc, with -- I am trying to

18  -- I'm sorry, I'm not very good with names -- Frank

19  Kennedy from Kelly or Kennedy.  A guy that worked with

20  Chris on the accounting.

21          And there were other Management accountants

22  that would sit with Chris as well, like a huge ensemble

23  basically.

24      Q.   Okay.  Did you discuss hardware with David

25  Duckworth?

1       A.   Yes.  That was after the announcement, before

2   the acquisition, as well as after the acquisition.

3       Q.   Okay.  And how about Roxanne Simpson?

4       A.   Yes.

5       Q.   And did you discuss hardware sales with

6   Gabriela Romero?

7       A.   Yes, because again, she was -- her team was

8   accepting the data, so when we were moving the data from

9   the Autonomy books into the HP books, we went through

10  the mapping exercise to get it into format, and it was

11  Gabriela's team that were pushing the information into

12  the finance systems of the HP side.

13      Q.   Let's just go through all those people.  Who's

14  David Duckworth?

15      A.   So he was on the mergers & acquisitions team,

16  and he was involved in initially the mapping exercise of

17  mapping Autonomy's nominal codes, nominal structure to

18  match HP so that we could transfer data from one system

19  to the other system.

20      Q.   Okay.  So that's mapping of Autonomy's general

21  ledger code structure to HP's; is that fair?

22      A.   Yes, that's right.

23      Q.   Okay.  And what did that mapping process

24  entail?

25      A.   So we had a meeting in Pleasanton, with the

Transcript of Lisa Harris
Conducted on January 30, 2024                    100

1   Zantac Offices, and David had already done some

2   preparation in advance.  He'd done what he thought the

3   mapping exercise would look like.

4           And then we just went through and talked

5   through every nominal code and cost -- that Autonomy had

6   so we could confirm that David's understanding of what

7   it was correct, and then he obviously knew the HP

8   structure so he could then say, "Okay.  That's right.

9   So this code here, hardware, for instance, does go to

10  that code on the HP side."

11      Q.   Okay, and you mentioned this meeting in

12  Pleasanton?

13      A.   Yes.

14      Q.   When did that occur?

15      A.   So that was the -- the very first thing that I

16  remember having anything involved with HP, so straight

17  after the announcement.

18      Q.   Is that after the announcement of the

19  acquisition and before the closing?

20      A.   It was certainly October/November 2011.

21      Q.   So just shortly after the announcement of the

22  HP acquisition?

23      A.   Yes.

24           MR. REEVES:  Objection.

25           THE WITNESS:  It was the very first exercise

1    that I did with anyone at HP.

2        Q.   BY MS. LEVIN:  Okay.  And who was at that

3    meeting?

4        A.   So I was the only one from the Autonomy side.

5    There was David Duckworth, Roxanne Simpson, and Gabriela

6    Romero over there all the time, and then various other

7    people from HP would either visit for a day or half a

8    day or on the phone to discuss certain things, like the

9    cash management team, to discuss the classification of

10   all our different bank accounts.  The person who did

11   that was on the phone.

12            John Blanc came and visited in person to go

13   through certain areas.

14       Q.   And who's Gabriela Romero?

15       A.   So she worked for HP.  Her team were involved

16   in the physical uploading of the Autonomy data into the

17   HP ledgers after being mapped.  So this is our monthly

18   reporting after the acquisition.

19       Q.   And who's Roxanne Simpson?

20       A.   She was -- I don't think she was officially

21   the M&A Team, but she's working closely with David

22   Duckworth, and she was the one that was working with

23   KPMG for all the fair value adjustments and basically

24   the journals they wanted to put through on our closing

25   balance sheet, HP's opening balance sheet.

Transcript of Lisa Harris
Conducted on January 30, 2024                    102

1        Q.    Was she part of the Financial Reporting
2    Division?
3        A.    I don't -- she was certainly part of a finance
4    team, but there was so many different finance teams.  I
5    don't know where it would actually fall in the
6    structure.
7        Q.    And you also mentioned John Blanc?
8        A.    Yes.
9        Q.    Who is he?
10       A.    So he, again, sort of finance background, I
11   believe, but he was -- initially, I think he was just
12   giving advice on where certain things should be coded,
13   but then later on he was also the one that took on the
14   rebasing exercise for Chris Yelland.  So he was the HP
15   person kind of day to day managing that.
16       Q.    And who's Chris Yelland?
17       A.    Chris Yelland took over from Steve as -- I
18   think he was originally CFO for Autonomy, but then he
19   became Financial Controller for Autonomy.
20       Q.    So after the acquisition, after Mr.
21   Chamberlain left, he reported to Mr. Yelland?
22       A.    Yes.
23       Q.    And what was Mr. Yelland like as a boss?
24       A.    He was -- not -- he didn't have so many social
25   skills.  He didn't really have conversation or talk or

Transcript of Lisa Harris
Conducted on January 30, 2024                      103

1    day-to-day stuff.  It was quite difficult working with

2    him.  I mean, he wasn't like rude or shouting or

3    anything.  He was just silent.

4            So initially he wanted me to share an office

5    with him, but after a little while I just moved out

6    because it's just absolute silence in there.  It was

7    just not a nice atmosphere.

8        Q.   Was he an expert in IFRS?

9        A.   No, because he worked for HP.  Even though all

10   the UK companies, they used US GAAP.

11       Q.   So I want to turn your attention back to that

12   meeting in Pleasanton.  With regard to hardware, what do

13   you remember discussing at that meeting?

14       A.   So obviously when we went through the coding,

15   we started with -- one of the first things that came up,

16   and David had mapped hardware revenue for same place as

17   software license revenue.

18           That's wrong because they are different.  They

19   really need to be in different codes because they are

20   different things, and he was very adamant, that, "No,

21   no.  In the HP world, it's just product."

22           They are concerned with product and services.

23   So in the HP books, he'd mapped hardware revenue and

24   license revenue to exactly the same code.

25       Q.   When you say "he," do you mean Mr. Duckworth?

1      A.   Sorry, yes, Mr. Duckworth.

2      Q.   So he was attempting to -- say that again?

3      A.   So he mapped hardware sales and software

4  license sales to exactly the same place, and I objected

5  to that, I said that can't be right; they're different

6  things; software license and hardware are not the same

7  thing.

8           And he said, "No, no.  In the HP world, they

9  are just product, so it goes to product sales."

10          So, again, just a different view, a different

11  way of coding it.  So they map two codes into one.

12     Q.   Okay.  And did you explain in that

13  conversation that Autonomy had coded it differently?

14     A.   Well, he could see we coded it differently, so

15  -- it was not like a big argument.  I said, "I don't

16  think that's right."

17          He said, "No.  In the HP world, that's right."

18          So he's the one that's the expert in the HP

19  nominal coding structure in their accounting, the way

20  they do things.

21     Q.   Okay.  You said he had access to the coding.

22  Does that mean he had access to Autonomy's general

23  ledger?

24     A.   So he had the trial balances, had the details

25  of all the coding.  I don't know if he had the dollar

1    amounts at that stage because he's really doing a

2    mapping exercise rather than the actual putting the data

3    in.

4        Q.   Okay.  But he had access to the trial balance

5    that describes the hardware sales --

6        A.   Yes.  So without -- I don't know if he had the

7    numbers and just didn't show them on his slides, but he

8    was using our coding structure or the detail of it.

9        Q.   How did Autonomy's trial balance describe

10   hardware sales?

11       A.   As hardware sales.

12       Q.   Okay.  And do you remember the code number for

13   -- was it hardware sales or hardware revenues?

14       A.   Hardware sales.  I always called it 470000,

15   but actually, they are all six digit codes.  So we had

16   47, all the zeros.

17            57, all the zeros, for the cost of sales.

18       Q.   And that was a separate line item on

19   Autonomy's general ledger?

20       A.   Yes.  All the cost of sales starting with the

21   5; all the sales starting with the 4; and then so the

22   rest of the codes.

23            So it's different for licenses, for training,

24   for support, for consultancy.  They just had different

25   coding.

1      Q.   And the description for hardware sales, was

2    that clear and written in all caps?

3      A.   I can't remember if it was all caps or not --

4      Q.   It was a separate line item?

5      A.   It's pretty clear, yeah.

6      Q.   Can you please describe the mapping and

7    transfer of Autonomy's financial information onto the HP

8    system?

9      A.   So for the opening balances and then for the

10   monthly accounting, we were still doing everything on

11   Autonomy's ledger, so in DDS, and then taking the

12   resulting trial balance numbers and mapping them into

13   from the Autonomy code onto the HP codes so Gabrielle's

14   team could then upload that as a journal into HP's

15   books.

16           It was a very complicated exercise that

17   involves running a macro that took 48 hours to run just

18   to do this really complicated exercise because it was

19   not straightforward one-to-one mapping.  It was many to

20   one, one to many.

21           It was just really, really messy; really

22   mathematically, incredibly complicated, for no purpose,

23   for no gain; just it had to be in this format to get in

24   their books.

25      Q.   Okay.  And when did that occur?

Transcript of Lisa Harris
Conducted on January 30, 2024                    107

1        A.   So that would occur every month end.

2        Q.   And when did it start for the first time?

3        A.   So it would've been the opening balance sheet

4   for HP closing balance sheet for Autonomy; so that

5   would've been September 2011, I think, and then October

6   was obviously the year end for HP.

7        Q.   Okay.  Did you go through this exercise

8   shortly after the acquisition was announced?

9        A.   So the KPMG came in to do all the fair value

10  adjustments and to decide what adjustments are needed to

11  the numbers, pretty soon after the announcement.

12       Q.   And would revenue from hardware sales have

13  been apparent to Mr. Duckworth and his team at that

14  time?

15       A.   Yes, and to KPMG.  We've got a code that says

16  "hardware sales."  It's really obvious.

17       Q.   Would hardware cost have been apparent to Mr.

18  Duckworth?

19       A.   Yes, again, because the code was hardware cost

20  of sales.

21       Q.   Did anyone at Autonomy ever tell you not to

22  disclose hardware sales to HP?

23       A.   No, and you couldn't disguise them.  They were

24  really, really obvious.

25       Q.   Did Mr. Duckworth ever express any surprise at

1    hardware sales?

2         A.   No, no, but he was just quite happy that the

3    SE orders get them together.  It's just product.  We

4    don't care about the split.

5         Q.   Did anyone from HP ask any questions about the

6    hardware sales?

7         A.   Not ask questions about it, no.  They were

8    happy with David's -- that where he said they should be

9    coded to was where they should be coded to.

10        Q.   Did you ever receive any information request

11   about hardware customers?

12        A.   No.  I expect anything like that would've gone

13   to revenue accountant.

14        Q.   Okay.  Did you have the impression that HP was

15   concerned about the hardware sales?

16        A.   No -- I mean obviously just apart from the

17   obvious surprises like "why are you still selling Dell

18   hardware when we're HP," but that was because we just

19   couldn't sell the HP.  It just wasn't -- the processes

20   just couldn't work that way.

21        Q.   And why is that?  What's your understanding of

22   why Autonomy couldn't sell HP hardware?

23             MR. REEVES:  That's not what she said.

24             THE WITNESS:  So we were not allowed to sell

25   HP hardware because there weren't internal agreement,

Transcript of Lisa Harris
Conducted on January 30, 2024                    109

1    internal memorandum of the in place.

2                So initially we actually sold some HP

3    hardware, but we didn't buy it.  We had to buy it from

4    like a third party, so like a reseller, but obviously we

5    couldn't get the stuff that we needed that way, but we

6    couldn't just directly buy and sell HP hardware.  So we

7    were still selling Dell hardware because that was the

8    only thing that was possible.

9        Q.   So just after the acquisition --

10       A.   The bureaucracy were just so heavy -- just

11   made it impossible to do that.

12       Q.   So after Autonomy was acquired, in order to

13   sell HP hardware, it had to go through a reseller?  Is

14   that what you said?

15       A.   So initially we could through some reseller,

16   but we couldn't get the quantities, so we were just

17   still through.  So we were selling Dell hardware when we

18   were a subsidiary of HP.

19       Q.   And you mentioned earlier that there was a

20   conversation with Mr. Yelland where there was a

21   discussion about this?

22       A.   Yes, and everyone's tried to see if we could

23   find a way of doing this because it was crazy to sell

24   Dell hardware, but no one at HP could make it happen

25   because the internal bureaucracy and mechanisms were

1    just not in place and wouldn't allow it, and, you know,

2    we were just used to Autonomy where everything's just

3    straightforward.  It was just -- just not being able to

4    actually get anything done.

5        Q.   Is this a discussion that you had with Mr.

6    Yelland --

7        A.   Yes.

8        Q.   Okay.  Do you remember when that was?

9        A.   It would've been early on when he started, so

10   that was, I think spring of 2012.

11       Q.   Let's take a look at what's marked for

12   identification as Exhibit 7504.

13            (Exhibit 7504 -- premarked by counsel -- for

14   identification.)

15            Do you recognize this as a January 2012 e-mail

16   exchange between Meeta Sundetwala, HP, and Mr.

17   Chamberlain, copying you regarding Dell payable?

18       A.   Yes, I do.

19       Q.   Okay.  So if we can go to the bottom.

20            Does Mr. Sundetwala know that KPMG has

21   identified an adjustment in respect to an amount due to

22   Dell?

23       A.   Yes.  She's actually a lady, but, yes.

24       Q.   Just after what?  I'm sorry.

25       A.   Meeta's a lady, not a mister.

1        Q.   Oh, I apologize, yes.  Does she request the

2    details as to the nature of the transaction that make up

3    this balance?  Do you see that?

4        A.   Yes, I can see that.

5        Q.   And how does Mr. Chamberlain respond?

6             If we could blow up the Dell payable.

7             Do you see in parenthesis, it says, SC.

8             Do you understand that to be a comment by Mr.

9    Chamberlain?

10       A.   Yes.

11       Q.   Do you see that he says:  "For certain

12   strategic accounts we also procure hardware as well as

13   software.  This will all be sourced via HP in future but

14   the process of setting up procurement via HP is

15   painfully slow"?

16       A.   Yes.

17       Q.   What did you understand that to mean?

18       A.   So we wanted to obviously sell HP hardware,

19   not Dell hardware, as subsidiary of HP, strange to sell

20   a competitor's hardware, but it's just really hard to do

21   it, and I thought I don't think we've ever achieved it.

22       Q.   And after that comment, does Ms. Sundetwala

23   ask what is the ballpark number of purchases from Dell

24   in a given quarter?  Do you see that?

25       A.   Yes.

1      Q.   And if we could scroll to the top.  Does that

2   top e-mail from Ms. Sundetwala to Mr. Chamberlain

3   indicate that a follow-up call was set up to discuss

4   this item and others?

5      A.   Yes.  She set up a call with Steve.

6      Q.   If HP wanted to look this information up

7   itself, could it have?

8      A.   Yeah.  I mean, HP is a very -- it's not like a

9   straightforward organization.  So probably Meeta

10  couldn't -- she'd have to ask someone in a different

11  team to look things up for her, but she could always ask

12  someone to do things for her.

13     Q.   So HP have access to all hardware revenue

14  balances and transactions?

15     A.   Yes --

16          MR. REEVES:  Objection as to timing.

17          THE WITNESS:  So yes, on an ongoing basis,

18  obviously everything was uploaded monthly into the HP

19  finance system to the journals that we sent to Gabriela.

20     Q.   BY MS. LEVIN:  I move Trial Exhibit 7504 into

21  evidence.

22          (Exhibit 7504 offered in evidence.)

23          If we could take a look at what's been marked

24  for identification as Exhibit 4209.

25          (Exhibit 4209 -- premarked by counsel -- for

1    identification.)

2          Is this an e-mail in March 2012 between you,

3    Chris Yelland, and Mr. Vaidyanathan, discussing a

4    payment for hardware?

5          A.   Yes.

6          Q.   Is this a request for Mr. Vaidyanathan to

7    approve a $9.4 million payment for Dell hardware?

8          A.   That's correct, yes; so final approval to make

9    the payment to Dell.

10         Q.   And was Mr. Yelland copied on this approval

11   request?

12         A.   Yes, he is.

13         Q.   Is Dell the same company that was being paid

14   for hardware on the prior hardware approval e-mail that

15   we saw?

16         A.   Yes.

17         Q.   And does it appear that Autonomy is selling

18   this hardware to a customer?

19         A.   Yes, that's correct.

20         Q.   And who's the customer mentioned in this

21   e-mail?

22         A.   AIG.

23         Q.   And what is the total amount of the sale to

24   AIG?

25         A.   $8.9 million.

1        Q.   Okay.  And what is the total amount of the

2   payment to Dell?

3        A.   $9.4 million.

4        Q.   Does it appear that Autonomy was selling this

5   hardware at a loss?

6        A.   Yes.  The hardware was always a loss leader.

7        Q.   Move to admit Trial Exhibit 4209.

8             (Exhibit 4209 offered in evidence.)

9             Let's take a look at one more e-mail.  That's

10   been marked for identification as Exhibit 4626.

11             (Exhibit 4626 -- premarked by counsel -- for

12   identification.)

13             Is this a July 2012 e-mail chain from Ms. Tran

14   to Mr. Yelland to you?

15        A.   Yes, that is.

16        Q.   This e-mail is dated July 10th, 2012.

17             Do you recall that Dr. Lynch had already left

18   Autonomy at this point?

19        A.   I don't know the exact date, but certainly

20   around that time, yes.

21        Q.   Okay.  Is Ms. Tran requesting that Mr. Yelland

22   approve a 2 million dollar payment for hardware to Dell?

23        A.   Yes.  It's just a regular weekly thing where

24   because it's such a large amount of money, the team in

25   America always get Chris's approval before they actually

1    send the payment.

2         Q.   Okay.  And what's Mr. Yelland's response?

3         A.   He's approved that payment being made.

4         Q.   I move Exhibit 4626 into evidence.

5              (Exhibit 4626 offered in evidence.)

6              Ms. Harris, did there come a time when you

7    learned that HP alleged that it didn't know about

8    Autonomy's hardware sales?

9         A.   Yes.  It was actually after I left Autonomy,

10   when I was working with the Invoke Group.  I was in the

11   London office and just chatting with Sushovan, just sort

12   of general talk, and he was talking about the things

13   that HP had accused him of, and one of them was he said

14   that they didn't know about the hardware sales, and I

15   was just like, "That's just absolute rubbish.  They knew

16   right from the get-go."

17        Q.   And why did you know that they knew right from

18   the get-go?

19        A.   Because the very first interaction I had with

20   HP was the mapping exercise that we'd done with David

21   Duckworth and various other people in Pleasanton, where

22   we discussed about the hardware sales and the hardware

23   cost of sales, and then obviously all my time at

24   Autonomy, you know, it was because we didn't suddenly

25   stop selling hardware.  It wasn't like HP acquired

1    Autonomy and there was a gap and then we start again.

2            It was always ongoing, so every week there

3    were payments need to be made to Dell.  Obviously the

4    management changed.  Whoever approved those payments

5    changed, but it was always out in the open.  It was

6    never hidden from anyone, and HP definitely knew all

7    about it right from the start.

8        Q.   When you say right from the start, do you mean

9    right after the acquisition?

10       A.   So after the announcement and before the

11   what's called the official acquisition when it went

12   final --

13       Q.   Final closing --

14       A.   Yes.

15       Q.   I want to turn your attention to HP's rebasing

16   exercise.  What did you understand -- first of all, were

17   you involved in that process?

18       A.   I was, yes.

19       Q.   And what did you understand the purpose of

20   rebasing exercise to be?

21       A.    It was to go back through the Autonomy

22   accounts from the period just before the acquisition,

23   and just to go through them, and see if there's anything

24   that now with hindsight or under the US GAAP could've

25   been accounted for differently.

Transcript of Lisa Harris
Conducted on January 30, 2024                    117

1          So provisions for bonuses or commissions, with
2     hindsight, what was actually paid out, 6 months, 12
3     months later, you know, if we had known that at the
4     time, what would that have been, with benefit of
5     hindsight.
6          The revenue team were looking at sales where
7     there would have been some consultancy work included in
8     the sales price and the amount being carved out for that
9     consultancy to recognize that revenue when the work is
10    done, looking to see with hindsight now look at been
11    done, how much work it actually took to do that.
12         Most of it on the revenue side was just US
13    GAAP, which they just account for things differently.
14       Q.   Was part of the purpose to look for errors in
15    the accounting?
16       A.   Yeah, just to find things that could support
17    the allegations.
18       Q.   What do you mean by that?
19       A.   To find something, to find anything that's
20    wrong basically.
21       Q.   Okay.  And why did you think that part of the
22    purpose was to find anything that was wrong?
23       A.   Because that's the words that were used when
24    John Blanc was talking to me.
25       Q.   Okay.  Do you remember what he said?

1      A.   Just "we want to go through these," "we want

2   to find anything that should've been a fair value

3   adjustment at the time of the acquisition."

4      Q.   Let's take a look at what's been marked for

5   identification as Exhibit 7505.

6           (Exhibit 7505 -- premarked by counsel -- for

7   identification.)

8           Is this an e-mail chain regarding financial

9   risks and purchase accounting, originally sent on May

10   31st, 2012, by Chris Yelland of HP to you?

11      A.   Yes, yeah.

12      Q.   Okay.  Do you see where Mr. Yelland tells you,

13   "for each issue, we need to capture what was wrong with

14   the acquisition balance sheet"?

15           Do you see that?

16      A.   Yes.

17      Q.   What did you understand Mr. Yelland to mean?

18      A.   So he wanted to look for anything that, with

19   hindsight, the fair value adjustments that KPMG had

20   made, didn't go far enough, you know, if anything was

21   under accrued on the cost side, if revenue would've been

22   captured differently.

23           A lot to do with hindsight, but bulk of the

24   revenue stuff was just kind of US GAAP differences.

25      Q.   First of all, I move Exhibit 7505 into

1    evidence.

2              (Exhibit 7505 offered in evidence.)

3              When you say "in hindsight," does that

4    indicate to you whether the original accounting under

5    IFRS was accurate or not?

6         A.   It's judgement or an estimation when you're a

7    year, two years down the line, you know the actual

8    number, but obviously the judgement and the estimation

9    that you make at the time is just best judgment.

10        Q.   You also mentioned differences between IFRS

11   and US GAAP?

12        A.   Yes.  That was a lot of that work that Antonia

13   and Vanessa was doing on the revenue side.  That's where

14   a lot of the differences.  So they were categorizing --

15   it's on the spreadsheet that I maintained that

16   categorized the differences, whether it's US GAAP, Red

17   Project -- which basically is hindsight -- know how much

18   time all this work took.

19        Q.   How long did the rebasing exercise go on for?

20        A.   It seemed to go on forever.  I don't know;

21   maybe like two months maybe.

22        Q.   Okay.  And what contributed to that length of

23   time?

24        A.   Just redoing the same thing over and over

25   again until a lot of -- John kept changing his mind or

Transcript of Lisa Harris
Conducted on January 30, 2024                    120

1   the powers above changed minds about what we were

2   actually looking and what we could classify as a fair

3   value adjustment would affect the balance sheet and what

4   was actually just hindsight so it -- the balance sheet.

5        Q.   Why were you doing the same exercise over and

6   over?

7        A.   They just couldn't make their mind up.  I

8   don't know.  Just changing, moving the goal post,

9   changing the rules.

10       Q.   Who was changing the rules?

11       A.   The messenger, the person that told us was

12  John Blanc, but I am assuming there's people above him,

13  directing him.

14       Q.   Did Mr. Blanc report to Mr. Yelland?

15       A.   I don't think he did report directly to him.

16  I think they were in different -- there were so many

17  different groupings of finance and whatever.  It was

18  pretty hard to work out where he was in the structure.

19       Q.   What did you understand to be the purpose --

20  strike that.  What did you understand HP to be looking

21  for?

22       A.   I think they were just looking for anything

23  that was wrong so they could say that the -- I mean, the

24  fair value of accounting had been done by KPMG and

25  Roxanne, but just anything that they think hadn't been

Transcript of Lisa Harris
Conducted on January 30, 2024                    121

1    caught that should've been caught, you know, anything

2    where basically --

3             MR. REEVES:  Can I see the top of Exhibit

4    7505, please?

5        Q.   BY MS. LEVIN:  You can continue your answer.

6        A.   Just anything that to say it's wrong with

7    Autonomy's accounting.

8        Q.   Did you get the impression that they were

9    looking to find fault?

10       A.   Yes, to some extent on that, probably more so

11   with the Ernst & Young audit.  When they moved the audit

12   from Deloitte to Ernst & Young, that's when they were

13   really looking to find anything, minute details.

14       Q.   Can you describe in a little bit more detail

15   what types of issues you found in the accounts during

16   this exercise?

17       A.   So it was same issues.  So on the revenue

18   side, most of it was categorized as just US GAAP

19   differences.  Under US GAAP, you wouldn't recognize

20   revenue that you would recognize under IFRS, what they

21   call the Red Project, which was, I think two or three

22   projects were the sale to the customer was an amount of

23   money for the whole bundle -- the license, the support,

24   and the consultancy time -- carved out, not recognized

25   revenue on the amount allocated to being called the

1   consultancy, but then obviously one or two years down

2   the line, the consultants happened, you know how much

3   time it actually took and why it was more than what had

4   been estimated.

5          And then on the cost side, with accrued

6   commission comparing to the actual commissions that had

7   been paid out; 6 months, a year, 18 months later.

8      Q.   And for these differences between US GAAP and

9   IFRS, did you understand that Mr. Blanc or Mr. Yelland

10  or anyone at HP reviewed Deloitte's work's to understand

11  what the basis was for the accounting decision under

12  IFRS?

13     A.   They weren't looking at the detail, no.  They

14  were just relying on Antonia to say, "This is what we

15  recognize under IFRS.  This is what would've been under

16  US GAAP."

17     Q.   And who was making the decision as to what

18  changes were being made?

19     A.   I say John Blanc was the person communicating

20  with us, but I got the impression that he was being told

21  what to do.

22     Q.   Did you share an office with Mr. Yelland

23  around this time?

24     A.    Initially I did.  Like I said, I didn't stay

25  in there very long because it was such a weird

Transcript of Lisa Harris
Conducted on January 30, 2024                    123

1   atmosphere.

2        Q.   Okay.  What did you do next?  Did you move to

3   --

4        A.   So I just moved out to the main office because

5   that wasn't been used before.  Before, we were all using

6   the same office, open plan, open conversations.  You

7   just kind of get a general feel of what's happening, not

8   just your own little silo.

9        Q.   During the time that you shared an office with

10  Mr. Yelland or after, did Mr. Yelland ever express any

11  concerns about Autonomy's accounting to you?

12       A.   No, no.  He was just more concerned with

13  setting up the -- because they stopped Deloitte doing

14  the audit of the UK accounts, statutory accounts --

15  Ernst & Young doing it instead.

16            A huge exercise to do, just the most detailed

17  audit imaginable.  They were told there's no limit on

18  how much you spend, you know, "we don't care the cost.

19  Just spend as much time as you want to find.  Go into

20  every single detail that you want to find as much as you

21  can that needs changing."

22       Q.   What did you understand the purpose of that to

23  be?

24       A.   Just to find things that were wrong, to say

25  that the accounts were wrong.  It also resulted in

Transcript of Lisa Harris
Conducted on January 30, 2024                    124

1    claiming tax back from the UK Government.  So I think

2    Autonomy had paid about 10 million pounds in tax, and

3    they redid the accounts, and we dropped them and then

4    claimed tax back from the Government, saying it wasn't

5    owed.

6         Q.   Uh-huh.  You mentioned that you got the

7    impression that Mr. Blanc was taking instructions from

8    people above him?

9         A.   Yes.

10        Q.   What gave you that impression?

11        A.   Just because he wouldn't give any lot of

12   reason why they're constantly changing as to whether to

13   say something should be included, shouldn't be included,

14   should be included, shouldn't have been included.  He's

15   sort of telling us to do that -- not -- why, "just the

16   way it is" sort of thing.

17        Q.   During this process or at anytime when you

18   were at HP/Autonomy, did anyone ever allege that there

19   was any missing cash at Autonomy?

20        A.   I think cash is one of the most

21   straightforward things.  It's in the bank.  You've have

22   your bank statement.  You've got your independent

23   verification from the bank.  Cash is there.

24        Q.   Were you aware that one of the metrics that

25   Autonomy disclosed in its earnings releases was cash

Transcript of Lisa Harris
Conducted on January 30, 2024                        125

1    generated from operations?

2        A.   Yes, in the cash flow statement.

3        Q.   Okay.  Does cash generated from operations

4    represent actual cash that Autonomy had access to?

5        A.   Yes.  So it's a profit, as adjusted from

6    movements from the working capital.  Go through the

7    actual change in the cash from the business activities.

8        Q.   Okay.  So in layman's term, that's cash in the

9    bank; right?

10       A.   Yes, yes.

11       Q.   Okay.  So would you agree that the metrics is

12   not an accounting construct?  It's actual cash that's in

13   the bank?

14       A.   Yes.  So it's the cash that's come from the

15   operations is the amount of the cash the bank's

16   increased by their normal day-to-day business of the

17   company, and then there could be increase from investors

18   paying more money and something else, but that's the

19   actual cash flow that's come from just the normal

20   business of the company, the sales, and the costs.

21       Q.   Okay.  It's there's essentially actual cash in

22   the bank and then also otherwise available to Autonomy?

23       A.   Yes.

24       Q.   Okay.  So if we can show Exhibit 5073, which

25   is already admitted.

Transcript of Lisa Harris
Conducted on January 30, 2024                    126

1            (Exhibit 5073 already offered in evidence.)
2            Ms. Harris, do you see that this is a chart of
3    cash generated by operations from 2005 to 2010.  Do you
4    see that title?
5        A.   Yes.
6        Q.   Okay.  So I am gonna show you a series of
7    earnings releases and ask you whether the information in
8    this chart accurately reflects information that is in
9    the earnings releases, okay?
10       A.   Uh-huh, yes.
11       Q.   So if we can bring up Exhibit 11488 at Page 8.
12           (Exhibit 11488 -- premarked by counsel -- for
13   identification.)
14           So let's go to first page first.  So is this a
15   Q4 2006 earnings release?
16       A.   Yes, that's right.
17       Q.   So if we can go Page 8.  This is, as you can
18   see, has the 2005 and 2006 year end date.  If we can go
19   the line item that says cash generated by operations.
20           Do you see the year end's numbers for 2005 and
21   2006?
22       A.   Yes.
23       Q.   Okay.  And if we could pull up Exhibit 5073
24   again.  Does that data match the chart for years 2005
25   and 2006?

Transcript of Lisa Harris
Conducted on January 30, 2024                    127

```
 1        A.   Yes, it does.

 2        Q.   And if we could bring up Exhibit 4072.

 3             (Exhibit 4072 -- premarked by counsel -- for

 4   identification.)

 5             Is this a Q4 2008 earnings release?

 6        A.   Yes.

 7        Q.   Okay.  If we can go to Page 7.  Does this

 8   contain 2007 and 2008 data for cash generated by

 9   operations?

10        A.   Yes.

11        Q.   So take a look at the figures for 2007 and

12   2008 year end, and if we can pull up Exhibit 5073 again.

13   Does this data match the chart for years 2007 and 2008?

14        A.   Yes, it does.

15        Q.   Okay.  And one more.  If we can pull up

16   Exhibit 1531.

17             (Exhibit 1531 -- premarked by counsel -- for

18   identification.)

19             First page, is this a Q4, 2010 earnings

20   release?

21        A.   Yes.

22        Q.   If we can go to Page 11.  If you could take a

23   look at the year end 2009 and 2010, cash generated by

24   operations.

25             And if we can pull up Exhibit 5073.
```

Transcript of Lisa Harris
Conducted on January 30, 2024                    128

1          Does this data match the chart for years 2009

2   and 2010?

3          A.   Yes.

4          MR. REEVES:  If we could please go back one

5   second?

6          Thank you.

7          Q.   BY MS. LEVIN:  So if we could pull up Exhibit

8   5073.  Between 2005 and 2010, what was happening to the

9   amount of cash Autonomy was bringing in every year?

10         A.   So cash generated by the operations was

11  increasing, so it was -- well, 17.7 million in 2005 and

12  over 363 in 2010.

13         Q.   Does this show massive growth in Autonomy's

14  cash?

15         A.   Yes.

16         Q.   And to be clear, this is actual cash and not

17  the product of an accounting adjustment?

18         A.   No.  This cash.  It's the movement to the

19  amount that cash's increased by the operations

20  activities.

21         Q.   Does this show a company that was generating a

22  good amount of cash?

23         A.   Yes.

24         Q.   And what does that mean with regard to the

25  underlying health of the business?

Transcript of Lisa Harris
Conducted on January 30, 2024                                    129

1        A.    So the company has funding to carry on to pay

2   its suppliers, to pay its staff, its debtors, its

3   customers are paying in; healthy cash flow.

4        Q.    Would you agree that this does not look like a

5   company that's flat lining?

6        A.    It certainly doesn't.

7        Q.    Now, would you agree that cash is important to

8   the business?

9        A.    Yes.

10       Q.    And would any of the accounting issues

11  identified during the rebasing exercise have any impact

12  on Autonomy's cash?

13       A.    No.   That is just purely provisions --

14       Q.    And why not?

15       A.    Sorry, so that was just the fact, accruals and

16  payments in the balance sheet.   They wouldn't affect the

17  cash line.   The cash does not change.

18       Q.    And why not?

19       A.    Because they are just things -- so an accrual

20  is just an estimate of what you are gonna need for

21  future costs.   So it's just an estimate of like a little

22  pot that you put aside.   It's not actual money.   The

23  money is not touched at all.

24       Q.    So for any adjustments that were made on the

25  accounting, that does not impact the cash?

Transcript of Lisa Harris
Conducted on January 30, 2024                    130

1      A.    No.   It doesn't impact the cash on the balance

2   sheet.

3      Q.    So this chart should still be accurate?

4      A.    Yes.

5      Q.    Thank you.   Ms. Harris, when did you leave

6   HP/Autonomy?

7      A.    I actually left in May 2013.

8      Q.    And why did you leave?

9      A.    I resigned because I wasn't happy there, and I

10  found another job.

11     Q.    What was your experience working at HP just

12  prior to your resignation?

13     A.    It's just summed up by pointless, just a lot

14  of work, a lot of exercise, just achieving nothing.

15  There's no longer accounts that you could see that,

16  "yes, these are Autonomy's numbers.   This is how

17  Autonomy's doing."

18          Everything was just merged in with other

19  businesses.   The processing was split between accounting

20  systems and HP systems, and much of this end up being

21  this enormous exercise to translate everything from

22  Autonomy's ledgers onto HP's ledgers at month end.   So

23  very time consuming, complicated, but ultimately -- like

24  we'd just have access to HP ledgers and just cut out all

25  this work.

1      Q.   What was your impression of HP's efforts to

2    integrating Autonomy into HP?

3      A.   I don't think -- certainly finance wise, there

4    is no integration.  They just could not -- it's such a

5    bureaucratic organization.  They could not really do

6    anything.  Sort of things we talked about at the

7    beginning like we could get economies of scale, we could

8    be -- Autonomy salespeople could sell HP products, and

9    at least that way, and HP salespeople could sell

10   Autonomy products.

11        Then you suddenly got this much larger sales

12   force.  So much potential with the acquisition to just

13   take it and really go somewhere with it.

14        Nothing happened because it was all

15   bureaucratic so we can't do this yet because we actually

16   have not got this agreement in place, and we can't do

17   that.  It was -- everything was just bound by red tape

18   and just bureaucracy.

19      Q.   Can you just elaborate on that?  Can you

20   provide some specific examples?

21      A.   Even the sites of wanting to sell HP hardware

22   rather than selling Dell hardware, it should be so

23   straightforward, but because they needed all these

24   internal memorandums in place that they hadn't put in

25   place and couldn't put in place for the 18 months I was

1   there, they hadn't managed it, we could not sell HP

2   hardware.

3           We were actually buying hardware from a

4   competitor to sell, giving Dell the profit rather than

5   HP the profit because they just couldn't get the

6   bureaucracy -- they couldn't put anything in place to

7   allow to do.

8           Like they couldn't give us access to the HP

9   accounting system after 18 months.  They could not work

10  it out to do it.

11      Q.   And how did you learn this?

12      A.   Well, of the -- not having access to the HP

13  accounting systems, I hadn't got access.  Selling the

14  Dell hardware, obviously we were still doing that

15  because even though we tried different routes and

16  things, we just couldn't the process to sell the HP

17  hardware.

18          The commissions teams, when they would like

19  got the commissions plans and how commissions being paid

20  to the sales people, there was just not this

21  cross-pollination.  There wasn't Autonomy people selling

22  HP products and vice versa.

23      Q.   Did you deal directly with the sales team

24  about commissions?

25      A.   Not with the commissions team, which was at --

Transcript of Lisa Harris
Conducted on January 30, 2024                    133

1    team.

2        Q.   And what did you understand their troubles to

3    be?

4             MR. REEVES:  Objection.  Foundation.

5             THE WITNESS:  Just that nothing was changing,

6    nothing was growing; what we had been promised of these

7    two companies coming together and all the potential,

8    everything was just dwindling.

9        Q.   BY MS. LEVIN:  Okay.  No further questions.

10   Thank you, Ms. Harris.

11            MR. REEVES:  Let's go off the record.

12            VIDEOGRAPHER:  Going off the record.  The time

13   is 12:16.

14            (Lunch break.)

15            VIDEOGRAPHER:  Back on the record.  The time

16   is 1:23.

17            MR. REEVES:  I just want to confirm that both

18   Defendants are present, Dr. Lynch by video.

19            Counsel?

20            SPECIAL AGENT MEGAN MELLERT:  Dr. Lynch is

21   present by video.

22            MR. LINCENBERG:  Yes.

23            MR. REEVES:  Okay.  Thank you.

24

25                      CROSS-EXAMINATION

1    BY MR. REEVES:

2         Q.   Good afternoon, Ms. Harris.  My name is Adam

3    Reeves.  I am one of the lawyers representing the United

4    States Government in this case.  We haven't met before

5    today, have we?

6         A.   No, we haven't.

7         Q.   And you haven't met with others representing

8    United States Government in this investigation for this

9    case, have you?

10        A.   No, I haven't.

11        Q.   All right.  Well, it's nice to meet you.

12   Thank you for being here.  I don't have too many

13   questions for you.  A few, though, okay?

14        A.   Uh-huh.

15        Q.   I think I would like to begin with your role

16   at Autonomy in the period that is the focus of the case.

17   Well, after you began there, you started in or around

18   2005; right?

19        A.   Yes, that's right.

20        Q.   Okay.  So the period that I would like to

21   focus is a little later than that -- from about 2009 to

22   2011 -- is that period clear to you?

23        A.   Yes.

24        Q.   All right.  During that period of time at

25   Autonomy -- between 2009 and 2011 -- your role at

Transcript of Lisa Harris
Conducted on January 30, 2024                    135

1    Autonomy within the Finance Department was primarily
2    focused on the accounting for costs and expenditures; is
3    that fair?
4         A.   Yes, on the consolidation and on the cost
5    side.
6         Q.   On the cost side and also on the consolidation
7    accounting for the Group of Autonomy Companies?
8         A.   Yes.
9         Q.   All right.  And that focused primarily on some
10   of the following topics.
11              Accounts payable?
12        A.   Yes.
13        Q.   Payroll?
14        A.   Yes.
15        Q.   Staff expenses?
16        A.   Yes.
17        Q.   All right.  And as you say, you also helped
18   with the consolidation of accounts for those types of
19   expenditures and costs that are rolling up to you from
20   the other business units at Autonomy?
21        A.   Yes.  So all subsidiary companies
22   consolidating the accounts were all of them.
23        Q.   When it was necessary, you would make
24   adjustments in the general ledger; is that correct?
25        A.   On the consolidation, I would make the

1    adjustments on the consolidation schedule because part

2    of consolidation, when you're adding together all these

3    companies, is to knock out the things that net off, so

4    you're not grossing up assets or liabilities on the

5    balance sheet.

6        Q.   Good.  And when you made the adjustments that

7    you are describing, were those decisions that you made

8    on your own or do you consult with others within

9    Autonomy about before you made them?

10       A.   A consolidation adjustment is just a standard

11   accounting adjustment.  Again, it's just -- so netting

12   off the things that match so that -- when you are

13   reporting as a group as a whole, you are not grossing up

14   revenues and costs, so assets or liabilities.

15       Q.   So there is a judgment on making certain you

16   are not doubling counting, you're not grossing up; is

17   that correct?

18       A.   On the actual consolidation process, yes.

19       Q.   And you would make those decisions to ensure

20   that there's no double counting or grossing up on your

21   own?

22       A.   Yes, I'd do the work, yes.

23       Q.   Okay.  Were there sometimes other adjustment

24   issues that you would make besides the consolidation

25   adjustments that you've described?

Transcript of Lisa Harris
Conducted on January 30, 2024                    137

1          A.    So after the consolidation was completed,

2     there would be post consolidation adjustments, which I

3     would show on the consolidation schedule, and they could

4     either be coming from work that had been done by

5     Autonomy or from the auditors.

6          Q.    Okay.  So I think we are talking now about

7     post consolidation adjustments?

8          A.    Yes.

9          Q.    For the post consolidation adjustments that

10    you are talking about, are those adjustments that you

11    would decide on your own or would you speak with others

12    before making them?

13         A.    I would be told to make them unless it was

14    something that I had found myself normally, to do with

15    revenue, I would be told about them, and I would report

16    them on the schedule.

17         Q.    If it had to do with revenue, you would be

18    told by others what to do, and you would then make the

19    adjustments?

20         A.    So the revenue accountants would tell me, yes,

21    what need to be done.

22         Q.    And who would that include?  Who would be

23    telling you about revenue adjustments?

24         A.    So revenue adjustments, I could be -- well, it

25    could be the auditors that are proposing it.  It could

Transcript of Lisa Harris
Conducted on January 30, 2024                        138

1   be -- Matt Stephan was revenue account at that time --

2   it could've come from many routes.  Steve could've told

3   me.  It could've come through Sushovan.

4        Q.   So Matt Stephan?  That's one person?

5        A.   Yes.

6        Q.   Stephen Chamberlain is another person?

7        A.   Yes, he could have been the one that tells me.

8        Q.   And Sushovan Hussain could've been the person

9   to tell you?

10       A.   Yes.

11       Q.   Might not happen very often but you leave open

12  the possibility that it did happen?

13       A.   Yes.

14       Q.   I guess the bottom line is that for the post

15  consolidation of adjustments, as they relate to revenue,

16  you are relying on others before you make the

17  adjustments, isn't that right?

18       A.   Yes -- just -- the trial balance, as it come

19  from subsidiary companies, they send to me, and I

20  include in the schedule.  The information comes from

21  lots of different sources.

22       Q.   Thank you.  I think you've been clear in the

23  course of your testimony -- but let's leave no doubt --

24  you had no direct role or responsibility between 2009

25  and 2011 for making accounting judgments about revenue

Transcript of Lisa Harris
Conducted on January 30, 2024                    139

1    at Autonomy; isn't that correct?

2         A.    Correct, yes, that would be the revenue

3    accountants that did that.

4         Q.    Others at Autonomy made those judgments about

5    revenue; isn't that correct?

6         A.    Yes.

7         Q.    We've gone through some of those people in the

8    list we just went through; correct?

9         A.    Yes.

10        Q.    But that also include Ms. Antonia Anderson,

11   who was one of the other people at Autonomy, making

12   judgments about revenue?

13        A.    Yes, under that period, Antonia's working

14   there.

15        Q.    Okay.  Did you have a good working

16   relationship with Ms. Anderson?

17        A.    Yes.

18        Q.    Nice person to work with?

19        A.    Yes.

20        Q.    And that continued after the acquisition by

21   HP/Autonomy for some period of time; correct?

22        A.    Yes.

23        Q.    No problems with Ms. Anderson?

24        A.    None at all.

25        Q.    Are you familiar with a term known as market

Transcript of Lisa Harris
Conducted on January 30, 2024                    140

1   assistance fees or MAFs?

2       A.   Yes.

3       Q.   What is an MAF?

4       A.   So it's sort of like commission.  So it's

5   where an external third-party company has introduced

6   Autonomy to a customer and maybe even various levels of

7   whether it's just a call introduction or they kinda

8   worked with them to get them to buy Autonomy product.

9       Q.   What kind of third-party company?  Like a

10  reseller?

11      A.   Resellers tended to be that they would buy the

12  software from Autonomy and sell it onto a third party.

13  So if the sale was done through a value-added reseller,

14  they could be providing additional services to the end

15  user, and they'd certainly also be taking the accounts

16  receivable risk because there's a risk that the customer

17  doesn't pay them.

18           So with a value-added reseller, our actual

19  seller relationship to the value-added reseller, and

20  they're selling onto the end user.

21           If there's a marketing assistance fee

22  involved, we're directly selling to the end user, and

23  the third-party company has just provided the

24  introduction and so helped make the sale.

25      Q.   So were there sometimes market assistance fees

Transcript of Lisa Harris
Conducted on January 30, 2024                      141

1    paid to resellers?

2         A.   I believe it could be, yes, it could be the

3    same company that does both.

4         Q.   Okay.  If you know, if it were the case that

5    the reseller was unable to sell to the end user,

6    Autonomy was able to sell to the end user, would the

7    circumstances in which reseller might then earn a market

8    assistance fee?

9         A.   Yes.  If they found a customer, and they've

10   done a lot of the selling talk to get them into the

11   product, get them to buy the product, but for whatever

12   reason the company wants to deal with Autonomy directly

13   rather than with the reseller, then, yeah, that's a

14   different service they would be providing.

15        Q.   Do you recall something like that happening

16   between 2009 and 2011, even if you don't remember a

17   specific deal?

18        A.   We certainly did have resellers, and we did

19   some market assistance fees in that period.

20        Q.   Good.  And was part of your duties and

21   responsibilities at Autonomy to, when it had been

22   earned, when it was appropriate, to ensure the payments

23   to the resellers or the third parties for these market

24   assistance fees?

25        A.   So if it was a marketing assistance fee, then

Transcript of Lisa Harris
Conducted on January 30, 2024                    142

1    that was purely an accounts payable item --

2         Q.   Does that come to you?

3         A.   It would come to the accounts payable team,

4    and then obviously if it's a big ticket item and a lot

5    of money, it would be come through to me to approve to

6    pay, and I would seek approval from the appropriate

7    person, probably Sushovan.

8         Q.   Okay.  You say probably Sushovan.  Do you

9    recall seeking approval from someone else from Autonomy

10   for a particularly large market assistance fees?

11        A.   If it was very, very large, it'd be Sushovan,

12   and then Mike.

13        Q.   Mike Lynch?

14        A.   Yes.

15        Q.   Okay.  If you remember, do you remember doing

16   that with Dr. Lynch today?

17        A.   Occasionally, yes, but that would be like the

18   -- like with threshold, you know, if it was over a

19   level, that Sushovan could approve.

20        Q.   Over a million dollars?

21        A.   Could be, yeah.

22        Q.   Okay.  You tell us.  You did it.

23        A.   I don't know the exact number.  I can't

24   remember the exact number, but occasionally it'd be

25   large enough that it would need to go to Sushovan and to

Transcript of Lisa Harris
Conducted on January 30, 2024                    143

1    Mike.

2         Q.   If large enough?

3         A.   Yes.

4         Q.   Throwing out a million dollar threshold --

5    just to help us ballpark that -- would you seek the

6    approval of both Dr. Lynch and Mr. Hussain for a market

7    assistance fee in excess of a million dollars?

8         A.   I don't know the exact threshold.  I can't

9    remember, but it would be in the millions, yes.

10        Q.   In the millions?

11        A.   Yes.

12        Q.   The largest ones?

13        A.   Yes.

14        Q.   Okay.  Good.  Were there other invoices for

15   which you sought approval before authorizing payment?  I

16   think, again, I think we are talking about the largest

17   invoices?

18        A.   Well, all invoices need approval before

19   payment, and then who you get to approve it depends on

20   what it is and the sales or the value.  So there were

21   like regular marketing or marketing events.  If they

22   were above a certain level, the colleague, you know, and

23   then he was Head of Marketing, or whatever.

24        Q.   If Autonomy was acquiring technology from

25   another company, software from another company, in the

Transcript of Lisa Harris
Conducted on January 30, 2024                    144

1    millions of dollars, and that company invoiced Autonomy

2    for in excess of a million dollars, would you have any

3    role in the payment of that invoice?

4         A.   I would ensure that it had all been authorized

5    before it was paid.

6         Q.   And how would you go about ensuring that it

7    had been authorized before it was paid?

8         A.   If it was a very large one, I would be the one

9    seeking the authorization.  So if it was software that

10   was often embedded in our software, it would be Pete

11   Manell to authorize it because he's the technical person

12   that knows what it does and that we are using it, again,

13   just based on purely monetary value, it would also go to

14   Sushovan.

15             If it was a very, very high limit, it would go

16   to Mike.

17             But that's just a mathematical -- if over a

18   certain amount, it needs signoff by the highest level,

19   just sort of showed good practice.

20        Q.   If Autonomy is buying software for a value in

21   excess of a million dollars?

22        A.   Again, I can't remember the exact thresholds.

23   It'd be in the millions before we need to go to Mike or

24   Sushovan -- Sushovan, a lower level.

25        Q.   Do you remember having to go to Dr. Lynch for

Transcript of Lisa Harris
Conducted on January 30, 2024                    145

1    approval to acquire software in the multiple millions of

2    dollars at any point?  Do you remember having to do

3    that?

4         A.   I think I probably would've had to do that,

5    yeah.  I don't remember specifically, but it sounds

6    reasonable.

7         Q.   Okay.  Any reason to believe that Autonomy

8    bought software from FileTek?

9         A.   Yes, that rings a bell, yeah.

10        Q.   In the amount of approximately 8 million

11   dollars?

12        A.   I don't remember the amount, but it was a

13   large purchase, yes.

14        Q.   A large purchase.  Did you go to Dr. Lynch to

15   seek approval before paying FileTek approximately 8

16   million dollars for its software?

17        A.   I don't remember if I did.  It would've

18   definitely gone to Pete Manell because as it goes

19   through the approval chain, Sushovan would not sign off

20   unless Pete had signed off because Pete signing off, you

21   know, is what we want, is arrived, is good quality, or

22   whatever, and then it would go to Sushovan.

23             And then if it's above a certain level, it

24   would go to Mike.  8 million could well be the size of

25   the deal to go to Mike.

Transcript of Lisa Harris
Conducted on January 30, 2024                    146

1      Q.   Dr. Manell doesn't have any role in approving

2    the payment of money.  He has a role in approving the

3    acquisition of the software for some set of technical or

4    business reasons.  Would you agree?

5      A.   He would approve both.  So he would approve --

6    we want to buy it, and we should buy it before we bought

7    it, and then he also approved that it's done, you know,

8    it does what it says, it's what we wanted.  He would

9    approve that we pay for it as well.

10     Q.   Okay.  If it rises to a sufficiently high

11   level, the approval process extends beyond Dr. Manell;

12   correct?

13     A.   Yes.

14     Q.   To Mr. Hussain; is that right?

15     A.   Yes.

16     Q.   And if it's high enough, then to Dr. Lynch?

17     A.   Yes.  As -- it's just a monetary level, so

18   whether it was a marketing event where we were holding a

19   big exposition, if that was above a certain level, it

20   would just go through the approval chain.

21          It's just basically based on the dollar amount

22   that's being approved.

23     Q.   Any reason to believe that between 2009 and

24   2011, all invoices in excess of 30,000 dollars needed to

25   be approved by Dr. Lynch himself?  Is that consistent

1    with your recollection?

2         A.   That seems too low a level.  That could be

3    from marketing events specifically rather than all

4    invoices.

5         Q.   Okay.  I would like to show you a few

6    documents, if I could, please.

7         A.   Uh-huh.

8         Q.   I'd show you what's been marked as Exhibit

9    813, please.

10             (Exhibit 813 -- premarked by counsel -- for

11   identification.)

12             This is an e-mail on or about May 13, 2013,

13   from you Ms. Harris to Mr. Vaidyanathan and to Poppy

14   Prentis; subject, filetek payments.

15             Do you see that?

16        A.   Yes.

17        Q.   At this time I offer Exhibit 813 in evidence.

18             (Exhibit 813 offered in evidence.)

19             Let's go through this a little bit.  Looks

20   like you write to Ganesh:  "Hi Ganesh, I think I agree

21   with you."

22             "Little software."

23             And then you describe something in response.

24             So "Little software," and there is this

25   paragraph about "Big software."

Transcript of Lisa Harris
Conducted on January 30, 2024                    148

1          Do you see that?

2      A.   Yes.

3      Q.   Are you familiar with e-mail?  Do you remember

4  it?

5      A.   Yes.

6      Q.   Good.  So you write:  "Big software - like the

7  Filetek licences should be coded to 171100" --

8  amortization -- "to 171600/691000 which falls under

9  intangibles and amortization - the amortization should

10  go to R&D expense I think - as should the amortization

11  on the capitalized R&D."

12          Do you see that?

13     A.   Uh-huh.

14     Q.   Can you explain the point that you're making

15  here?

16     A.   So Ganesh came from Interwoven, and he had

17  only accounted under US GAAP before.  So the way that we

18  accounted under IFRS is different in some places, and

19  it's not so intuitive, like US GAAP accounting isn't to

20  me.

21          So it was just explaining to him how we code

22  things so we could be consistent and get things in the

23  right place because you need to do things, coded them

24  the same way in all of the subsidiary companies, so that

25  when we all add it together in the consolidation,

Transcript of Lisa Harris
Conducted on January 30, 2024                    149

1    everything is consistent in the same category.

2         Q.   Are you assisting Mr. Vaidyanathan in any of

3    his learning curve now that he's part of Autonomy?

4    Would you say?

5         A.   Yes, because now he has to stop accounting

6    under US GAAP and start accounting under international

7    accounting.

8         Q.   Under IFRS?

9         A.   Yes.

10        Q.   Okay.  And there are some lines that you're

11   asking him to follow in order to comply with your coding

12   in order for Autonomy to comply with IFRS, are there

13   not?

14        A.   Yes, and also the actual nominal codes that we

15   use in Autonomy.

16        Q.   So there's sort of a right or wrong, "this is

17   the way we do it," and you might not understand because

18   you come from a US company that had reported under GAAP,

19   and now you're working for a UK company or a company

20   that reports under IFRS, "this is now we do it."

21             Is that the thrust of your point to Mr.

22   Vaidyanathan?

23        A.   Yeah, how we do it under IFRS, what the actual

24   code numbers are in the Autonomy ledgers because now we

25   are now on DDS -- the Autonomy accounting system --

Transcript of Lisa Harris
Conducted on January 30, 2024                    150

1    which has nominal codes, have different numbers to mean

2    different things, and also, he's taking over the

3    accounting for Autonomy, Inc. as well as Interwoven,

4    Inc.

5         Q.   Okay.  Let's drop down a little bit.  You

6    write here:  "As a general rule of thumb on where to

7    code costs."

8         A.   Yes.

9         Q.   You write:  "R&D = good."

10             "S&M," is that for sales & marketing?

11        A.   Yes.

12        Q.   " = neutral."

13             "G&A," is that --

14        A.   General & admin.

15        Q.   "General & admin" -- thank you.  Of course --

16   "equals bad."

17             And "cost of goods sold"?  COGS; right?

18        A.   Yes.

19        Q.   "Equals very bad."

20             What did you mean by that?

21        A.   So it's just a simple way for him to remember

22   how things get coded under IFRS, and just to kind of

23   bear in mind if it's going to R&D, that's likely to be

24   the same for IFRS and US GAAP; so there's probably no

25   need to rethink or check or asking questions under R&D.

1    Just go in there, and then obviously things that go to

2    cost of sales, that's a lot more that the code is cost

3    of sales under US GAAP then under IFRS.

4            So stop, think, you know, he could well not be

5    coding correctly -- correctly as in the way we code it

6    under IFRS.

7        Q.   Why would -- it seems like you are assigning a

8    moral judgment to these accounting standards, using a

9    term like "very bad"?

10       A.   No.  It's just where you have to stop and

11   think.  It's more likely things that he might

12   intuitively think goes to cost of sales because under US

13   GAAP, they would.  It's more likely they're not.

14           Things were intuitively, he thinks they should

15   go to R&D, that is probably right because there's not

16   much difference between the two standards.

17       Q.   Why is cost of goods sold, what it costs to

18   make Autonomy's products, why is that very bad, Ms.

19   Harris?

20       A.   Under US GAAP, they were coding things that

21   weren't cost of goods sold to that category; so staff

22   costs and like that.

23           So it's just a way of trying to help him know

24   how to code things so that they are consistent with the

25   rest of the Autonomy Group and under IFRS.

Transcript of Lisa Harris
Conducted on January 30, 2024                          152

1       Q.   How would Mr. Vaidyanathan know that, with you

2   telling him that it's just very bad?

3       A.   This is a shorthand e-mail.  We'd always have

4   conversations.  I was just jotting it down in a sort of

5   quick and simple way to remember things.

6       Q.   Did you have any discussions within the

7   Finance Department about minimizing the amount of

8   expense recognized as cost of goods sold under IFRS?

9            MR. LINCENBERG:  Objection.  Vague as to what

10  cost?

11           MR. REEVES:  Cost of goods sold.

12           MR. LINCENBERG:  Same objection.  Vague as to

13  which company you are referring to.

14      Q.   BY MR. REEVES:  My question pertains to the

15  time that you worked in the Finance Department at

16  Autonomy between 2009 and 2011.  Is that clear?

17      A.   Yes.

18      Q.   And you described having a lot of

19  conversations with the open floor plan and the many

20  people in the Finance Department and how interactive and

21  collaborative they were in the course of your direct

22  examination.  Do you remember that?

23      A.   Yes, I do.

24      Q.   Those are the conversations I'm talking about.

25      A.   So I never had conversations about trying to

Transcript of Lisa Harris
Conducted on January 30, 2024                                     153

1   minimize cost to a particular area.  We'd have lots of

2   conversations about what should this be coded, what does

3   this fall under; so double checking but not about saying

4   minimizing it to a certain cost center or a nominal

5   code.

6        Q.   So that never happened in your experience at

7   Autonomy?

8        A.   No.

9        Q.   Okay.  I would like to show you, if I could

10  Exhibit 20262.

11            I think we might need to come back to that

12  exhibit.

13            I'd like to show you what has been marked as

14  Exhibit 12990.

15            (Exhibit 12990 -- premarked by counsel -- for

16  identification.)

17            This is an e-mail from Mr. Hussain to you, Ms.

18  Harris, copying Mr. Chamberlain and Ms. Prentis, on or

19  about April 14th, 2011; subject, Q1?

20            Do you see this?

21       A.   Yes.

22       Q.   Are you familiar with this e-mail?

23       A.   Yes.

24       Q.   At this time I offer Exhibit 12990 in

25  evidence.

Transcript of Lisa Harris
Conducted on January 30, 2024                    154

1              (Exhibit 12990 offered in evidence.)

2              Looks like Mr. Hussain is saying:  "Apologies

3    upfront for this, i wouldn't be pushing if it wasn't

4    important."  Please could you look at."

5              And then there's a series of things he asked

6    you to look at.

7              Do you see that?

8         A.   Yes, I do.

9         Q.   Do you remember talking to Mr. Hussain about

10   this issue in or about April of 2011?

11        A.   I don't know if we had conversations on it but

12   certainly e-mailing him about it.

13        Q.   E-mailing him about it.  What do you recall?

14        A.   We were closing the first quarter of 2011, and

15   he wanted us to just all go through and see if certain

16   things were correct or maybe we had accounted for them

17   incorrectly or whether -- could get our judgment on

18   them.

19        Q.   And he raises a series of things you look at,

20   does he not?

21        A.   Yes.

22        Q.   If we drop down to the bottom of the document.

23   I think he then asks the question:  "Does this get to

24   25.6c?"

25              Do you see that?

Transcript of Lisa Harris
Conducted on January 30, 2024                    155

```
1        A.   Yes.

2        Q.   What is that a reference to, if you know?

3        A.   He's asking if we made that adjustment, what

4   would be the impact on the earnings per share.

5        Q.   Earnings per share.  So that's a stock price?

6        A.   No.  It's a metric that we report in the

7   quarterly report.

8        Q.   In the earnings per share?

9        A.   Yes.

10        Q.   All right.  What is 25.6c?

11        A.   25.6 cents per share, American money.

12        Q.   Dollars?

13        A.   Yes.

14        Q.   So that's in dollars?

15        A.   Yes.  Our reporting currency was dollars.

16        Q.   Okay.  The "c" threw me.  Sorry about that.

17             We would normally have dollar sign 25.60.

18             That's not what you did at Cambridge?

19        A.   No.  We're not American.  We just use

20   different symbology.

21        Q.   Thank you.  I think I am done with that.

22             I would like to show you Exhibit 16076, if I

23   could, please.

24             (Exhibit 16076 -- premarked by counsel -- for

25   identification.)
```

Transcript of Lisa Harris
Conducted on January 30, 2024                         156

1          This is a September 29th, 2011 e-mail.  Jumped

2    forward pretty far in our timeline, Ms. Harris; is that

3    clear to you?

4         A.   Yes.

5         Q.   It looks like it's an e-mail to a number of

6    people, including you, from Mr. Chamberlain, on or

7    around September 29th, 2011; subject, HP information

8    requests?

9         A.   Uh-huh.

10        Q.   Are you familiar with this e-mail?

11        A.   Yes.

12        Q.   Good.  This time I offer 16076 in evidence.

13             (Exhibit 16076 offered in evidence.)

14             This is after HP has announced its intention

15    to acquire Autonomy in or around August 2011, is it not?

16        A.   Yes.

17        Q.   And this is right as Autonomy, even as it's

18    transitioning amid that acquisition announcement, is

19    closing its 3rd quarter, 2011 quarter; right?

20        A.   Yes.

21        Q.   So this is just the day before the close of

22    the quarter on September 30th, 2011?

23        A.   Uh-huh.

24        Q.   Correct?

25        A.   Yes.

Transcript of Lisa Harris
Conducted on January 30, 2024                    157

1        Q.    So even though there's been this big
2   acquisition announcement, life goes on, work goes on for
3   Autonomy as a working business?
4        A.    Uh-huh.
5        Q.    All right.  So as we get to the end of Q3,
6   2011 for Autonomy in that transition period, there is
7   still work to be done in closing your quarter; right?
8        A.    Uh-huh.
9        Q.    Yes?
10        A.    Yes.
11        Q.    Unfortunately, I need to ask you to say yes.
12   Uh-huhs don't come through on the transcripts, okay?
13        A.    Okay.
14        Q.    So you are in the process of closing your
15   quarter; right?
16        A.    Yes.
17        Q.    And in the transition, as you close the
18   quarter, there's still a period of time after September
19   30th when you need to close your books for the quarter;
20   right?
21        A.    Yes.
22        Q.    It's just like all the quarters that you talk
23   about in that sense; is that fair?
24        A.    Yes.
25        Q.    And that's a lot of work for you even though

Transcript of Lisa Harris
Conducted on January 30, 2024                    158

1    there's business announcement of HP's intention to

2    acquire Autonomy; right?

3         A.   Yes.

4         Q.   So all the same accounting processes and

5    double checking and adjustments that are necessary to

6    close the quarters before the announcement still pertain

7    to Q3, 2011; would you agree?

8         A.   Yes.

9         Q.   Looks like if we could drop down a little bit.

10        Looks like Mr. Chamberlain is giving you a

11   direction about how to interact with HP in this time

12   period.  Do you agree?

13        A.   He's just asking that people coordinate

14   answers to questions or information through him, so it's

15   one point of contact giving consistent information.

16        Q.   That's not exactly what he says.  Let's read

17   the e-mail.

18        Mr. Chamberlain says:  "All - to ensure we

19   have a consolidated approach and minimize disruption

20   during the HP integration, please co-ordinate any

21   requests through me.  No one should be communicating

22   directly with HP without my knowledge."

23        Do you see that?

24        A.   Yes.

25        Q.   Did you follow this direction from Mr.

1    Chamberlain?

2         A.   I expect I did, yes.

3         Q.   Were you careful to -- sounds like it's an

4    important direction.  Did you follow it?

5         A.   Steve was really asking that people coordinate

6    all the information requests through him so he can

7    ensure that it was consistent information, consistent

8    communication with HP.

9         Q.   Maybe my question wasn't clear.  It's not what

10   I asked you.  My question was, did you follow Mr.

11   Chamberlain's direction that no one should be

12   communicating directly with HP without Stephen

13   Chamberlain's knowledge?

14             MR. LINCENBERG:  Objection.  Asked and

15   answered.

16        Q.   BY MR. REEVES:  Did you do that?

17        A.   I believe I would've done.  I don't remember

18   any situation when I didn't.

19        Q.   Okay.  To your knowledge, did others within

20   Autonomy follow Mr. Chamberlain's direction with regard

21   to direct communications with HP in this period?

22        A.   I don't know.  I would assume that they

23   would've, but obviously I don't know.

24        Q.   I think we have a little bit of technical

25   difficulty with regard to one exhibit that I think we

Transcript of Lisa Harris
Conducted on January 30, 2024                          160

1   can find and get into the deck.  For that reason, I am

2   going to ask that we stop the record just so we can fix

3   that problem, please.

4           VIDEOGRAPHER:  Going off the record.  The time

5   is 1:56.

6           (Break.)

7           VIDEOGRAPHER:  Back on the record.  The time

8   is 1:58.

9       Q.   BY MR. REEVES:  Thank you for that break.  I

10  think we found the exhibit.  I would like to show you

11  what has been marked as Exhibit 3311.

12          (Exhibit 3311 -- premarked by counsel -- for

13  identification.)

14          Can you see that on the screen?

15      A.   Yes, I could see the e-mail on the screen.

16      Q.   This is an e-mail from you Ms. Harris on or

17  around May 18th, 2010, to Mr. Vaidyanathan, with a copy

18  to Mr. Tejeda; and Alan Rizek at MicroLink; subject, AR

19  posting in Autonomy Inc books.

20          Do you see that?

21      A.   Yes, I do.

22      Q.   And then there is an attachment

23  Microlink.adj.xls.

24          Do you have an understanding as to what that

25  refers to?

1      A.   A spreadsheet showing the fair value

2  adjustments for MicroLink.

3      Q.   All right.  Good.

4           MR. LINCENBERG:  Counsel, I am going to note

5  that I believe we've just marked this as 9550.  Unless

6  this is a different version, this May 18th, 2010, is it

7  a different version?

8           MR. REEVES:  It has an attachment that I would

9  like to use.  I don't know that yours does.

10          MR. LINCENBERG:  Okay.  Just leave it as 3311,

11  and I'll just note -- we'll look at it later whether

12  it's different or the same version.

13          MR. REEVES:  That's fine.  I hope this is the

14  only time in this case that happens.

15     Q.   All right.  I'm sorry, you were describing the

16  attachment, Ms. Harris.  What is the attachment again,

17  please?

18     A.   It's an Excel spreadsheet about MicroLink

19  adjustments; so adjustments -- the fair value when we

20  acquire MicroLink.

21     Q.   And I will drop down to a portion of your

22  e-mail, if I could, to the second page.

23          A portion of the e-mail that reads:  "The $15

24  million represents the cost that we have adjusted in

25  Microlink books pre-acquisition such that Alan" --

Transcript of Lisa Harris
Conducted on January 30, 2024                    162

1    that's a reference to Mr. Rizek; right?

2         A.   That's right.

3         Q.   "Such that Alan is no longer showing these

4    invoices on his AP"?

5              What does AP stand for?

6         A.   Accounts payable or trade creditors.

7         Q.   "Such that Alan is no longer showing these

8    invoices on his accounts payable as due to Autonomy

9    anymore."

10             Do you see that?

11        A.   Yes, I do.

12        Q.   What did he mean by that?

13        A.   So this is amounts that were in accounts

14   payable on MicroLink's books and accounts receivable in

15   Autonomy, Inc.'s books that we need to adjust on

16   consolidation so that we don't have grossing up of

17   debtors and creditors.

18        Q.   And do you get more specific in the attachment

19   in the spreadsheet that you attach your e-mail about

20   exactly what is being adjusted in this way?

21        A.   Could I see it?

22        Q.   Of course you can.  This is Page 6 of the

23   exhibit.

24             Do you recognize Page 6 of the exhibit?

25        A.   So that looks like it's just a listing of the

1    invoices.

2        Q.   Is that the attachment to your e-mail?  Does

3    it look like your attachment?

4        A.   Yes, so it looks like it could be, yes.

5        Q.   Good.  And it's a listing of what is being

6    adjusted; correct?

7        A.   Yes, so not showing as third-party debtor

8    anymore because it's intercompany.

9        Q.   Okay.  And there was a discussion in your

10   direct examination about what you meant by posting dummy

11   cash.  Do you remember that?

12       A.   Yes.

13       Q.   And that's reflected in the schedule here;

14   right?

15       A.   Yes.  The dummy cash are the cash we need to

16   post to clear these out of trade debtors, trade

17   creditors, and get them into intercompany, which is a

18   balance sheet code, not a accounts receivable for the

19   accounts payable code.

20       Q.   And that's in the extreme right-hand column;

21   right?

22       A.   Yes.

23       Q.   So we are reading this correctly, and we'll

24   use a few examples, okay?

25       A.   Uh-huh.

Transcript of Lisa Harris
Conducted on January 30, 2024                    164

1          Q.   The first line, it looks like there's a

2   MicroLink invoice from Autonomy to MicroLink, dated on

3   or around December 31, 2008.

4          Do you see that?

5          A.   Yes, I do.

6          Q.   And the amount of that invoice was

7   approximately 6.8 million dollars; is that correct?

8          A.   Yes, that's correct.

9          Q.   In this May 2010 time period, it's being

10  adjusted in the way you've described in the exact

11  corresponding amount.  Do you agree?

12         A.   Yes.

13         Q.   All right.  Similarly, Line 2, there's another

14  invoice from Autonomy to MicroLink with a date of about

15  June 30th, 2009.

16         Am I reading this correctly?

17         A.   Yes.

18         Q.   And that invoice is for approximately 410,000

19  dollars?

20         A.   Yes.

21         Q.   And that's also being adjusted using the dummy

22  cash in the way you've described; correct?

23         A.   So it's been moved from third-party creditors

24  and debtors into intercompany because now Autonomy, Inc.

25  and MicroLink are in the same group.  They are not third

Transcript of Lisa Harris
Conducted on January 30, 2024                        165

1   parties anymore.  They are all part of the same

2   consolidation.

3        Q.   The intercompany; right?

4        A.   Yes.

5        Q.   I think you have been clear about that.  There

6   are similar adjustments that are happening as reflected

7   in the remainder of this schedule.  Would you agree?

8        A.   Yes.

9        Q.   Is that what your e-mail suggests that that's

10  totaling up to approximately 15 million dollars?

11       A.   Yes.

12       Q.   Okay.  All right.  Good.  Thank you very much.

13  I think the most exciting part of your direct might have

14  been about the conference rooms and fish tanks at

15  Autonomy.  You remember that testimony?

16       A.   Yes.

17       Q.   All right.  Are you familiar with the James

18  Bond films?

19       A.   Unfortunately, yes, because I'm married to a

20  middle-aged man.

21       Q.   Okay.  That means you have to watch too many

22  of them?

23       A.   Yes, every Christmas.

24       Q.   So are you familiar with some of the

25  characters in those films?

Transcript of Lisa Harris
Conducted on January 30, 2024                     166

```
1          A.    Yes.

2          Q.    Like Dr. No?

3          A.    Yes.

4          Q.    Like Goldfinger?

5          A.    Yes.

6          Q.    Like Man with the Golden Gun, the character in

7    that, Scaramanga?

8          A.    Yes.

9          Q.    Did Autonomy have conference rooms named after

10   Dr. No?

11         A.    I certainly remember Dr. No, yes.

12         Q.    Did Autonomy have a conference room that it

13   named after Goldfinger?

14         A.    I think it probably did.  I can't remember

15   them all exactly but, they all sound familiar.

16         Q.    Are you doing the best you can?

17         A.    Yes.

18         Q.    That's all we can ask.  Did Autonomy have a

19   storage room or another part of its business that was

20   known as the Scaramanga Room?

21         A.    Not that I was aware of, but then I wouldn't

22   really have any reason to go to the storage room.

23   That's where they kept props and marketing events and

24   stuff.

25         Q.    I think it's where a lot of tech may have
```

1    wound up.  So maybe you're not familiar with the

2    Scaramanga Room?

3         A.   I am not familiar with it, no.

4         Q.   So each of these conference rooms --

5    withdrawn.  Dr. No is an opponent of James Bond; right?

6         A.   They are all the Bond film villains, yes.

7         Q.   They're the villains; right?

8         A.   Yes.

9         Q.   So Autonomy is naming its conference rooms

10   after James Bond villains; right?

11        A.   Yes.

12        Q.   Okay.  I just want to make sure I got that

13   right.  I think you said it was common in the UK for

14   businesses to name their rooms after -- this is I think

15   what you said -- "James Bond characters."

16             Do you remember saying that?

17        A.   Yes.

18        Q.   How do you know that?

19        A.   Because every software company that I worked

20   for, they'd have their meeting rooms named -- could be

21   Star Wars characters.  It could be, you know, these are

22   software guys.  They find it amusing.  It's fine.

23        Q.   Doesn't sound like you find it as amusing?

24        A.   It's indifferent, you know.  You need to find

25   a name for a room.  It's not offensive.  Everyone will

Transcript of Lisa Harris
Conducted on January 30, 2024

1    know which one is which because they'll get to learn

2    them.  They are not difficult words to say.  It's fine.

3        Q.    I just want to pause on the fact that Autonomy

4    chose to name its conference rooms after the villains in

5    the James Bond movies; right?

6        A.    Yes.

7        Q.    Okay.  Good.  And I think you also said that

8    there were piranha in -- if I understood you

9    correctly -- one of the tanks at Autonomy's?

10       A.    So outside the post room, there was a little

11   tank set in the wall that had piranhas in that were only

12   that big.  So it wasn't the main fish tank; it's just a

13   little one.

14            I only remember it because the other side of

15   it was the photocopier, and we had the watertank next to

16   photocopier.  That was my only issue.

17       Q.    Okay.  Thank you for that.  Downstairs, there

18   was a much larger fish tank?

19       A.    Yes.

20       Q.    It's your best understanding that the larger

21   fish tank did not have the piranha?

22       A.    No.  It had bigger -- I don't know what fish

23   they were.  Maybe they are cold water fish but certainly

24   not -- I mean, the piranhas were just quite tiny.

25       Q.    How do you know this?  How do you know the

Transcript of Lisa Harris
Conducted on January 30, 2024                              169

1    difference between the fish?  How did you learn that?

2         A.   I knew that the people would refer to the

3    piranha tank.  We knew there were piranhas in there.

4    It's sort of quite disappointing because, never having

5    seen a piranha before, you'd expect something

6    impressively, and actually, literally -- comes to -- but

7    that size, still a black fish.

8         Q.   Good.  Thank you.  You were asked a number of

9    questions about the mapping exercise that you undertook

10   in the fall of 2011 involving Mr. Duckworth?

11        A.   Yes.  He was leading, yeah, I believe.

12        Q.   He was leading you.  And I think you

13   emphasized that -- was this one big meeting or were

14   there multiple meetings relating to mapping exercise?

15        A.   It was over several days; so it was one

16   ongoing meeting.

17        Q.   And that was in Pleasanton, California?

18        A.   Yes.

19        Q.   At the Zantaz Offices?

20        A.   Yes.

21        Q.   All right.  And multiple meetings.  I think

22   you described them as complex?

23        A.   Yes.

24        Q.   And at points may be a little messy, you

25   suggested?  Did I hear you correctly?  I thought you

Transcript of Lisa Harris
Conducted on January 30, 2024                    170

1    said aspects of it were messy?

2         A.   I don't remember saying messy -- a bit of

3    context or --

4         Q.   I just thought that was how you described the

5    meetings.  Why don't you tell us -- you're meeting for

6    multiple days in Pleasanton with Mr. Duckworth about a

7    complex mapping exercise, in your own words.  What was

8    that endeavor like for you?

9         A.   That was a series of meetings, fairly long

10   winded, obviously going through the initial mapping

11   exercise.  There's a couple of hundred codes, so

12   literally just starting at the top and going through

13   each code, describing what it means in Autonomy's books.

14             And then David had already mapped it to what

15   he thought it should go in HP's books, and the exercise

16   was just to confirm that, you know, yes, that is, now

17   that I've explained exactly what that code means, please

18   map it to the right place or change it if it needed

19   changing.

20        Q.   Okay.  I show you earlier the e-mail from Mr.

21   Chamberlain asking you not to have any direct

22   communications with HP on or around September 29, 2011.

23   Do you remember that?

24        A.   Yes, I do remember that.

25             MR. LINCENBERG:  I am going to object.

1    Misstates the e-mail.

2           MR. REEVES:  How does it misstate the e-mail?

3           MR. LINCENBERG:  It indicates, I think

4    coordinating it or don't have direct communications

5    without first --

6           MR. REEVES:  I'll withdraw the question.  I

7    will ask the question again.

8       Q.   Ms. Harris, do you recall earlier in this

9    cross-examination -- my examination with you -- me

10   showing you the e-mail from Mr. Chamberlain on or about

11   September 29, 2011, in which Mr. Chamberlain says:  "No

12   one should be communicating directly with HP without my

13   knowledge."

14          Do you remember me showing that to you?

15      A.   Yes.

16      Q.   Okay.  Do you remember your testimony that you

17   followed that instruction as best you could?

18      A.   Yes.

19      Q.   Perhaps with the assistance of that e-mail,

20   can you say that you're meeting with Mr. Duckworth after

21   September 29th, 2011?

22      A.   Yes.  I think it was October/November time.

23   It was Autumn 2011.

24      Q.   Autumn 2011, October/November timeframe?

25      A.   Yes.

Transcript of Lisa Harris
Conducted on January 30, 2024                    172

1        Q.   Good.   That's what you said before in that
2    timeframe?
3        A.   Yes.
4        Q.   Is this -- are you meeting with Mr. Duckworth
5    after Autonomy has closed its Q3 2011 books in the way
6    we also talked about today?
7        A.   I don't know if the books were fully closed at
8    that time or not.   I don't know the exact order of
9    events, but it's around the same time.
10       Q.   Around the same time?
11       A.   Yes.
12       Q.   Is it after -- can you say with confidence
13   it's after close of the quarter at least?   After
14   September 30th, 2009?
15       A.   I'm sure it was after the end of September.
16   I'm sure it was October or November.
17       Q.   All right.   Good.   Let me ask you a little bit
18   of a hypothetical question?
19       A.   Uh-huh.
20       Q.   If it's unclear, just let me know, okay?   Will
21   you do that?
22       A.   Yes.
23       Q.   If the acquisition did not close, if for
24   whatever reason, there was no closing of the final
25   acquisition of Autonomy by HP, there would be no need to

1    consolidate the books.  Would you agree with that?

2            MS. LEVIN:  Objection.  Speculative.

3            THE WITNESS:  I still need to consolidate

4    Autonomy's books, but Autonomy wouldn't need to

5    incorporate their numbers into HP --

6        Q.  BY MR. REEVES:  And you wouldn't need to have

7    the mapping exercise?

8        A.  You would dispend the mapping exercise.

9        Q.  You would dispend the mapping exercise?

10       A.  You'd no longer use it because you weren't

11   incorporating the -- sorry, you weren't incorporating

12   the numbers in.

13       Q.  Okay.  If the acquisition does not close, you

14   don't need to do the mapping exercise; right?

15       A.  If the acquisition doesn't go through, you

16   won't use the results of the mapping exercise.

17       Q.  I have reason to believe that the acquisition

18   did close on or about October 3rd, 2011.  Is that date

19   clear to you?  Did you know that?

20       A.  I don't remember the date of when it actually

21   closed.

22       Q.  Does that sound wrong to you for any reason?

23       A.  It doesn't sound wrong, no.  I just don't know

24   exactly when it was.

25       Q.  Okay.  Did the mapping exercise that you

Transcript of Lisa Harris
Conducted on January 30, 2024                    174

1   described having with Mr. Duckworth over October and

2   into November in the autumn of 2011, that happened after

3   Autonomy's sale to HP closed on or about October 3rd,

4   2011; isn't that right?

5              MS. LEVIN:  Objection.

6              THE WITNESS:  I don't remember the date

7   exactly when it closed, but I do recall when I went to

8   the meeting in October or November, yes, and David

9   Duckworth had already done the mapping before that

10  meeting; so we would have the meeting to confirm his

11  understanding.

12      Q.   BY MR. REEVES:  Moving forward into the next

13  year -- in 2012 -- starting sometime in or around the

14  summer of 2012.  Is that the approximate time period

15  that you worked on the so-called rebasing exercise?

16      A.   I don't know if it was summer, but it was

17  certainly 2012.

18      Q.   It's after Dr. Lynch and Mr. Hussain have left

19  HP --

20      A.   Yes, it was.

21      Q.   Okay.  Do you have reason to believe that

22  sometime in the June/July 2012 time period?  Does that

23  sound right to you?

24      A.   It sounds like it could be.  I don't remember

25  the dates exactly.

Transcript of Lisa Harris
Conducted on January 30, 2024                    175

1       Q.   All right.  And what was your role in the
2   rebasing exercise again?
3       A.   Primarily it was to just documenting the
4   result, so designing a spreadsheet, while we kept all
5   the results such that we reported, and then still
6   looking at the cost side of things.
7       Q.   So you document the results, and you would
8   look at some of the costs?
9       A.   Yes.
10      Q.   And looking at the cost is consistent with
11  your principal role throughout your time in Autonomy;
12  right?
13      A.   Yes, that's correct.
14      Q.   All right.  During this time, were you working
15  with Ms. Antonia Anderson?
16      A.   Yes, she was the revenue accountant.
17      Q.   And she had responsibility for questions
18  around the revenue accounting; correct?
19      A.   Yes.
20      Q.   All right.  And you didn't have the same
21  responsibilities as Ms. Anderson.  You were not
22  responsible for the revenue accounting?
23      A.   No.  I was just purely documenting all of the
24  results in one spreadsheet.
25      Q.   Okay.  All right.  Moving forward a little bit

Transcript of Lisa Harris
Conducted on January 30, 2024                    176

1   more in time to in or around early 2013?

2       A.   Uh-huh.

3       Q.   In or around February 2013?

4       A.   Yes.

5       Q.   At or around that time, you were terminated

6   from your job; is that correct?

7       A.   No, that's not correct.  I resigned.

8       Q.   I don't think I meant to imply something

9   different.  There was a termination agreement that you

10  entered into with HP in or around February 2013?

11      A.   I resigned from my job with Autonomy Systems

12  Limited.

13      Q.   At this point in time Autonomy Systems Limited

14  is owned and operated --

15      A.   It's owned by HP, yes.

16      Q.   So you are resigning from HP in that sense?

17      A.   I resigned from my job, yes.

18      Q.   All right.  And there's a termination

19  agreement for that?

20      A.   Yes.

21      Q.   And that's in or around February 2013; right?

22      A.   Yes.  That's when I resigned.

23      Q.   All right.  And at or around the time that you

24  resigned, at or around the time of the termination

25  agreement, in or around February 2013, you copied a lot

Transcript of Lisa Harris
Conducted on January 30, 2024                          177

1    of HP documents or Autonomy documents, did you not?

2         A.   So I was supposed to be going on garden leave

3    for three months because I was on three months' notice

4    period, but I was also required to still do the month

5    ends every month, and so I retained my copies of the

6    documents that I needed to do the month end reporting.

7    I was going to have to do that for the next three

8    months.

9         Q.   So is the answer to my question yes?

10        A.   Yes, the answer is yes.

11        Q.   You copied a lot of documents in or around

12   February 2013; right?

13        A.   Yes.

14        Q.   In fact, you copied approximately 60,000

15   documents, isn't that right?

16        A.   That sounds too vague.  It's only a little pen

17   drive.  I don't think there was -- that was just the

18   financial folder that I copied, which I did every month

19   anyway to make sure that I had the data there for next

20   month.

21        Q.   There were -- that began a long series of

22   dialogue between you and the people who represented you

23   in HP about that pen drive and about those documents;

24   right?

25        A.   Yes.

Transcript of Lisa Harris
Conducted on January 30, 2024                    178

1        Q.   And in the course of that, there was an

2   examination of the pen drive; right?

3        A.   I believe so, yes.

4        Q.   I think the basis for my number comes from

5   that process, and I believe the numbers are

6   approximately 60,000 documents.  Are you disputing that

7   number?

8        A.   It just sounds a lot because it was only the

9   finance folder.

10       Q.   I agree it sounds like a lot, but did you

11  disagree with that for some reason?

12       A.   As I said, it does sound like a lot.  I am

13  surprised that it would be that number.

14       Q.   Is it fair to say that you took a lot of

15  documents with you in or around February 2013?

16       A.   I just -- it'd be sort of my normal every

17  month, dump the finance folder onto my pen drive so I

18  could carry on working at home or should the servers go

19  down.

20       Q.   You didn't ask for HP's approval to take those

21  documents with you, did you?

22       A.   No, I didn't.  I just did what I needed to do

23  to being carrying on the closing month end even though I

24  was on garden leave.

25       Q.   And in fact, according to the terms of your

Transcript of Lisa Harris
Conducted on January 30, 2024                    179

1    termination agreement, you were not supposed to take

2    those documents?

3         A.   I agree I shouldn't have done that.

4         Q.   So you took documents when you were not

5    authorized to do that?

6         A.   That is correct, yes.

7         Q.   And those documents belong to Hewlett-Packard

8    Company, didn't they?

9         A.   To Autonomy, yes.

10        Q.   Well, Hewlett-Packard owns Autonomy; right?

11   Yes?

12        A.   Yes.

13        Q.   So those documents that you took are documents

14   that belonged to HP; right?

15        A.   They are, yes.  The monthly reporting file

16   that I needed to carry on doing, the monthly reporting,

17   even though I was on garden leave.

18        Q.   That belonged to HP; right, Ms. Harris?

19        A.   Yes.

20        Q.   And they did not belong to you?

21        A.   Correct.

22        Q.   I'd to show you what has been marked as

23   Exhibit 16927.

24             (Exhibit 16927 -- premarked by counsel -- for

25   identification.)

Transcript of Lisa Harris
Conducted on January 30, 2024                    180

1          I think I am offering only the -- there's a

2    cover letter, and I think I'm offering the portion of

3    the exhibit that has a following Bates numbers.  It's

4    the attachment to the cover letter.  It's

5    HP-SEC-01648787 through 797.  It's the resignation

6    letter, and then the attached employment agreement.

7          MR. LINCENBERG:  Counsel, you're offering not

8    that 2015 letter but just the attachment to it?

9          (HP-SEC-01648787 through 797 of Exhibit 9547

10   offered in evidence.)

11          MR. REEVES:  Yes, I am -- well, after I

12   authenticate it, that's what I intend to offer.  So you

13   know.

14          MR. LINCENBERG:  Okay.

15    Q.   BY MR. REEVES:  So we're looking at, I think

16   the fourth page of Exhibit 16927.  This is a letter on

17   or about February 13th, 2013, to you Ms. Harris.

18          Do you recognize this letter?

19    A.   Yes, I do.

20    Q.   And this is a letter relating to your

21   termination of employment.  Do you agree?

22    A.   Yes.

23    Q.   It looks like there's a portion of it that is

24   signed by you.  If we drop down three pages.

25          Do you recognize your signature on -- I've

Transcript of Lisa Harris
Conducted on January 30, 2024                                    181

1    used the Bates number because I don't have a version of

2    this as marked with the exhibit; so I am going to make

3    record of the page we're looking at, and then I'm gonna

4    ask you if that's your signature?

5         A.   Yes, it is my signature.

6         Q.   You are too fast for me.

7         A.   Sorry.

8         Q.   So I am showing you HP-SEC-01648789.  Now if

9    we drop to the top of that.

10             Do you recognize your signature?

11        A.   Yes, that is my signature.

12        Q.   All right.  And you are signing it on or about

13   February 13th, 2013?

14        A.   Yes.

15        Q.   All right.  This is at or about the time that

16   you resigned or were otherwise terminated by HP; is that

17   correct?

18        A.   I resigned from Autonomy, yes.

19        Q.   If you go to the third page, please.  In the

20   third full paragraph, this is the portion that I think

21   pertains to the term you used a moment ago, your garden

22   leave?

23        A.   Yes, that's right.

24        Q.   So you had garden leave until on or around May

25   10th, 2013?

1       A.    And yes, that's correct.

2       Q.    How do you describe what garden leave means?

3       A.    Garden leave should normally mean that you are

4  still an employee of the company, but you are no longer

5  required to work.

6       Q.    Okay.  At or about this time, did you have

7  reason to believe that there was a dispute going on

8  between HP and the former Autonomy team?

9       A.    I was aware of that, yes.

10       Q.    And HP in this time period is looking into

11  that.  Would that be fair to say?

12       A.    Yes, I was also aware of that, yes.

13       Q.    All right.  In the termination agreement, if

14  we go down to the fifth paragraph, there is a discussion

15  of your obligation of confidentiality.

16             Do you see that?

17       A.    Yes, I do.

18       Q.    Did you understand that you had an obligation

19  of confidentiality to Hewlett-Packard even after your

20  resignation that extended through your garden leave?

21       A.    Yes, though I would still say Autonomy.  I

22  don't feel like I was ever employed by

23  Hewlett-Packard -- but to Autonomy --

24       Q.    Well --

25       A.    -- yes, to Autonomy.

1          Q.   At this point -- I think we have said this but

2     let's be clear --

3          A.   Autonomy was a subsidiary of HP.

4          Q.   Okay.  So even as you are working for a unit

5     at HP, you are still working for Hewlett-Packard.  Do

6     you agree?

7          A.   I worked for a subsidiary, yes.

8          Q.   A subsidiary of Hewlett-Packard?

9          A.   Yes.

10         Q.   All right.  The termination agreement states

11    that:  "The obligation of confidentiality prohibit you

12    from making use of or disclosing to any third party any

13    trade secrets or Confidential Information of the

14    Company."

15              That's a reference to Autonomy/HP; correct?

16         A.   Yes.

17         Q.   "or information given to you in confidence,

18    and oblige you to use your best endeavours to prevent

19    any unauthorised disclosure of such information."

20         A.   Yes, that's what it says, yes.

21         Q.   Did you take that obligation of

22    confidentiality seriously, Ms. Harris?

23         A.   Initially, the reason why I had the copy of

24    the documents on my pen drive and why I took it with me

25    was because although I was supposed to be on garden

Transcript of Lisa Harris
Conducted on January 30, 2024                              184

1    leave, there was also verbal discussions where I wasn't
2    going to be on garden leave; I was still gonna do the
3    month end reporting for the next three months.
4           I was even told I couldn't take holiday over
5    Easter because that was gonna be at the end of April and
6    I need to be there; I need to be doing the reporting for
7    the month end.
8           So I had my pen drive information I needed to
9    carry on doing my job even though I was supposed to be
10   on garden leave because Chris Yelland told me that I was
11   not allowed to actually take holiday then.  I had to do
12   the three month end reports.
13      Q.   Okay.  Did you ask for Mr. Yelland or Autonomy
14   or HP's permission to take your pen drive?
15      A.   I didn't, no, but I was taking it to carry on
16   doing the work.  Even though I was supposed to be on
17   garden leave, they need me to close the month end for
18   three months.
19      Q.   Okay.  Is that what happened?
20      A.   Yes, that is what happened.
21      Q.   If we go to the next page.  There's an
22   obligation to continue the obligations around
23   confidentiality that extends beyond even the garden
24   leave; isn't that right?
25      A.   Yes, that's correct.

Transcript of Lisa Harris
Conducted on January 30, 2024                    185

1        Q.   They extend to as late as, I think in the
2    middle of the document, it suggests as late as November
3    11th, 2013.  Do you agree?
4        A.   Yes.
5        Q.   All right.  So there's an extended period of
6    time in which you're not allowed to disclose
7    confidential information?
8        A.   Yes.
9        Q.   Isn't that right?
10       A.   (Nodding.)
11       Q.   And then attached to the termination agreement
12   was your employment contract; is that right?
13       A.   I don't know if it was attached to --
14       Q.   Here?
15       A.   Yes.  I could see it now.
16       Q.   Are you familiar with this document?
17       A.   Yes.
18       Q.   Is this your employment agreement?
19       A.   Yes.
20       Q.   And it looks it starts as early as April 1st,
21   2005?
22       A.   Yes.
23       Q.   And on page 4, there's a further expression of
24   your requirements with regard to confidential
25   information.

Transcript of Lisa Harris
Conducted on January 30, 2024                    186

1          Do you see that?

2     A.   Yes.

3     Q.   All right.  And do you agree that this is an

4  elaboration of your obligations with regard to

5  confidentiality?

6     A.   Yes.

7     Q.   All right.  And here, it talks about that you

8  agree during your employment and at anytime thereafter,

9  you will not, without the prior written authorization of

10 the company, "make use of or disclose directly or

11 indirectly to any third party or parties or make use of

12 any of the trade secrets or other any confidential

13 information of the company or any other information

14 concerning the business of the company which you may

15 have received or obtained in confidence while in service

16 of the company."

17         Do you see that?

18    A.   Yes.

19    Q.   Do you agree that this is elaboration of your

20 responsibility or your obligation to keep the records of

21 the company, in this case Autonomy/HP, confidential?

22    A.   Obviously this was signed, it was Autonomy

23 Systems Limited.  That's the definition of the company,

24 but, yes.

25    Q.   Okay.  And that even if it was signed when it

Transcript of Lisa Harris
Conducted on January 30, 2024                    187

1    was Autonomy Systems Limited, it continued after the

2    acquisition when that company -- Autonomy -- had been

3    acquired by HP?

4         A.   Yeah, and I think the first letter you showed,

5    I think it still defined the company as Autonomy Systems

6    Limited, but yes, it was that same company.

7         Q.   Okay.  Just one more piece of this Page 5;

8    talks about the obligation to return data that you might

9    have.

10             This is page 5, Paragraph 14(d).

11             Are you familiar with this part of your

12   employment agreement?

13        A.   Yes, I am.

14        Q.   And would you agree that you are agreeing to

15   -- that you further agree that all data, drawings,

16   specifications or other documents, notes or media

17   supplied to you by the company were prepared by you in

18   the course of your employment and all rights therein

19   belong to the company and will be returned promptly on

20   request or on termination of your employment.

21             Do you see that?

22        A.   Yes.

23        Q.   Okay.  Did you return all the documents that

24   you had on your pen drive at the end of your employment?

25        A.   No.  At the end of garden leave, I didn't turn

Transcript of Lisa Harris
Conducted on January 30, 2024                    188

1    pen drive back.

2         Q.   You kept it; right?

3         A.   Yeah -- well, it was my pen drive.  I forgot

4    to delete the information on all -- deleted anyway.

5         Q.   And you started to use those documents, didn't

6    you?

7         A.   No, I didn't use those documents, but when I

8    was in the London Office of Invoke, talking to Sushovan,

9    he said that HP were accusing -- they never knew

10   anything about hardware sales, I was so incensed at

11   that, so I was like, "That's absolutely not true."

12             And then I thought, "Well, I thought there

13   might be something on this that proves it."

14             That's when I thought to look at it.

15        Q.   And you started to give Mr. Hussain some of

16   the documents on your pen drive; right?

17        A.   Yes, when he asked for them, I did.

18        Q.   And in turn, one request for information led

19   to another request for information.  You gave him a lot

20   of documents, didn't you?

21        A.   I let him have the pen drive, yes.

22        Q.   Okay.  And you did that even though you had

23   been obligated to return those documents to Autonomy/HP;

24   isn't that correct?

25        A.   That's correct, yes.

Transcript of Lisa Harris
Conducted on January 30, 2024                    189

1        Q.   And you did that because you wanted to help

2   Mr. Hussain; fair?

3        A.   Yeah.  I was so incensed by what he reported

4   to me what HP was saying, I wanted -- if I could help

5   him prove that they were not telling the truth.

6        Q.   I think you said that this process began

7   around the subject of hardware; right?

8        A.   Yes.

9        Q.   And your emphasis around the hardware, if I

10  heard you correctly -- you'll tell me if you disagree --

11  seems to center in a lot of ways on your experience in

12  the mapping exercise with Mr. Duckworth where -- the

13  question about hardware coding?  Would you agree?

14       A.   The first time -- that's the first time that I

15  was aware of HP knew about the hardware because David

16  had premapped everything, and when he came to the

17  meeting with all the coding, it clearly showed the

18  nominal codes for hardware sales and hardware cost of

19  sales.

20       Q.   Okay.  Good.  Thank you very much.  Do you

21  know a Ms. Vanessa Colomar?

22       A.   Yes.

23       Q.   Who's Ms. Colomar?

24       A.   She used to be the Communications Officer, I

25  believe, at Autonomy.  I think that was her job title,

Transcript of Lisa Harris
Conducted on January 30, 2024                              190

1    and then later on she worked at ICP London Limited.

2         Q.   ICT London Limited is Invoke capital?

3         A.   Yes.

4         Q.   She then -- Ms. Colomar worked directly with

5    Dr. Lynch?

6         A.   I believe, yes, they both worked in London, so

7    they would've done, yes.

8         Q.   And was Ms. Colmar's job Corporate

9    Communications Public Relations?

10        A.   Yes.

11        Q.   Did she have connections with the UK media,

12   for example, to the best of your knowledge?

13        A.   I don't know, but it sounds probable.

14        Q.   Okay.  During this time period, was there an

15   extended battle, so to speak, between HP and Autonomy in

16   the UK media, among other forms of press?

17             MR. LINCENBERG:  Objection to foundation.

18             THE WITNESS:  I just don't know, I am sorry.

19   I am not aware of -- it doesn't sound unlikely, but I

20   don't know.

21        Q.   BY MR. REEVES:  Okay.  You're sitting here

22   today, you are not aware of any ongoing series of

23   publications and articles about Autonomy's -- withdrawn

24   -- HP's claim of fraud and Autonomy's responses with

25   regard to those claims?

Transcript of Lisa Harris
Conducted on January 30, 2024                    191

```
 1        A.    Things would be reported in the news and
 2   newspapers, yes.
 3        Q.    So you do know about those?
 4        A.    But I wouldn't describe it as a battle.
 5   There's news reporting.
 6        Q.    How would you describe it?
 7        A.    News reporting of the claims that HP had made.
 8        Q.    Okay.  Was there responses by Autonomy about
 9   those claims, to the best of your knowledge?
10        A.    Not that I am aware of, but then I didn't go
11   looking for them either.
12        Q.    You ever read the Financial Times?
13        A.    No.
14        Q.    I'd like to show you what has been marked as
15   Exhibit 3363.  This is e-mail later than the time period
16   we're talking about -- roughly a year later -- on or
17   about February 11th, 2014, between you and Ms. Colomar.
18              (Exhibit 3363 -- premarked by counsel -- for
19   identification.)
20              Ms. Harris, do you recognize this?
21        A.    Yes.
22        Q.    Is that your personal e-mail address?
23        A.    Yes, it is.
24        Q.    lisah971@gmail.com?
25        A.    Yes.
```

Transcript of Lisa Harris
Conducted on January 30, 2024                          192

1        Q.   All right.  And at this point in time, in

2   February 2011, where were you working?

3        A.   DVL Technology Limited.

4        Q.   Okay.  And what is DVL?

5        A.   It's a subsidiary of ICP London Limited.

6        Q.   Subsidiary of Invoke Capital?

7        A.   There is no company in Invoke Company.  The

8   Invoke Group is a marketing term, but everyone takes it

9   to means ICP London Limited and their subsidiaries.

10       Q.   Are you familiar with the marketing term

11  Invoke Capital?

12       A.   Yes.

13       Q.   What is it?

14       A.   That's the name of the brand that's being

15  given to ICP London Limited.

16       Q.   Okay.  And what is ICP London Limited?

17       A.   It's a company -- investment company, invest

18  in software subsidiaries.

19       Q.   Who runs it?

20       A.   At the moment I'm the director of it, the sole

21  director.

22       Q.   Okay.  Well, that answers a future question of

23  mine.  My question might not have been clear enough.  In

24  2014, who ran ICP London Limited?

25       A.   So I think that Mike was the CEO.

Transcript of Lisa Harris
Conducted on January 30, 2024                                    193

1        Q.    Okay.  Is this the investment company that Dr.
2   Lynch created following his departure from HP?
3        A.    Yes.
4        Q.    All right.  And you worked with him there?
5        A.    I worked for a company --
6        Q.    DVL --
7        A.    Yes, yes, I worked for them, yes.
8        Q.    All right.  Did Ms. Colomar also worked for
9   ICP London Limited?
10        A.    Yes.
11        Q.    All right.  And you said today you are the
12   sole what of ICP?
13        A.    I am the sole director of ICP now.
14        Q.    We will come back to that.  So in or about
15   February 11th, 2011, you are sending Ms. Colomar an
16   address at mac.com; subject, schedules.
17              Do you see that?
18        A.    Yes, I do.
19        Q.    Is this one of the many e-mails in this period
20   you were sending to Ms. Colomar?
21        A.    Could be.  I don't know how many.  She was
22   printing things out for Sushovan because he didn't have
23   a printer.
24        Q.    Didn't have a printer.  Okay.  Does this
25   relate to some of the documents that you took with you

Transcript of Lisa Harris
Conducted on January 30, 2024                           194

1    from Autonomy when you departed?

2         A.   I believe it does, yes.

3         Q.   So are these historical Autonomy documents

4    that you are passing to Ms. Colomar?

5         A.   Yes, they are.

6         Q.   All right.  And in this case, this relates to

7    the first quarter of 2010, "closed deals report for US

8    companies filtered by Morgan Stanley."

9              Do you see that?

10        A.   Yes, I do.

11        Q.   Are you getting requests through Ms. Colomar

12   or Mr. Hussain for questions they have about documents

13   that you might have that answer questions that they

14   would like to have answered?

15        A.   I think it's more Mr. Sushovan wanting hard

16   copies of things, and so he'd ask that I send it to

17   Vanessa to print.

18        Q.   And how do you know that they want the closed

19   deals for Q1 2010?

20        A.   I would imagine that Sushovan had asked me.

21        Q.   Okay.  So Sushovan picks up the phone, "Hi,

22   Lisa.  Do you have in your pen drive closed deals

23   relating to Q1 2010?"

24             Is that how it worked?

25        A.   Could be, yes.  I don't know exactly but, yes,

Transcript of Lisa Harris
Conducted on January 30, 2024                    195

1    it's possible.

2         Q.   Mr. Hussain didn't have a printer in these

3    days?  Is that what you're saying?

4         A.   He didn't use a printer in the office, no.

5         Q.   Did he have a e-mail address?

6         A.   Yes, he would've done.

7         Q.   Why aren't you e-mailing this directly to Mr.

8    Hussain?

9         A.   Because he wanted them printed, so he asked me

10   to send them to Vanessa.

11        Q.   Okay.  I'd like to show you, if I could,

12   Exhibit 3364.

13             (Exhibit 3364 -- premarked by counsel -- for

14   identification.)

15             Is this another example of you providing Ms.

16   Colomar with documents requested from you by Mr.

17   Hussain?

18        A.   Yes.  I believe it would've been Sushovan who

19   would've asked me.

20        Q.   And you are giving it to Ms. Colomar?

21        A.   Yes.

22        Q.   There are a lot of these examples, aren't

23   there, Ms. Harris?

24        A.   I don't know, but you could probably can tell

25   me.

Transcript of Lisa Harris
Conducted on January 30, 2024                              196

1      Q.   We're gonna go through a bunch -- I think a
2   good sample -- but there are dozens?  Fair?
3      A.   Yeah, that sounds reasonable.
4      Q.   Okay.  Are you sending these to Ms. Colomar in
5   order to conceal Mr. Hussain's involvement in any way?
6      A.   No.  He didn't have a printer.  Vanessa had a
7   printer in her office.  He just asked me to send to her
8   so she can print them out for him.
9      Q.   And this also, Exhibit 3364, this is another
10  one seeking historical Autonomy information, this time
11  the March 31st, 2010 trial balance; right?
12     A.   Yes.
13     Q.   All right.  Let me show you Exhibit 3365.
14          (Exhibit 3365 -- premarked by counsel -- for
15  identification.)
16          I think in my excitement, I failed to offer
17  3363 into evidence, which I will do now -- and Exhibit
18  3364 into evidence, which I will do now.
19          (Exhibit 3363 offered in evidence.)
20          (Exhibit 3364 offered in evidence.)
21          Do you recognize Exhibit 3365, Ms. Harris?
22     A.   I could see that it's an e-mail.
23     Q.   Is this another example of information that
24  you are providing to Mr. Hussain and Ms. Colomar in the
25  manner you've described?

Transcript of Lisa Harris
Conducted on January 30, 2024                    197

1      A.   Yes.

2      Q.   All right.  If we go to the attachment.  Do

3  you recognize what this is?

4      A.   From the actual e-mail, it's described as

5  screen shot from write-off file.

6           So it's a screen shots from the spreadsheet of

7  invoices that were written off.

8      Q.   Invoices that were written off including the

9  Vatican Library deal in the third row?

10     A.   Yes.

11     Q.   Okay.  And that's in response to questions

12  that Mr. Hussain is asking you in 2014?

13     A.   I think he probably just asked for the

14  document.

15     Q.   I'd like to show you Exhibit 3383.

16           (Exhibit 3383 -- premarked by counsel -- for

17  identification.)

18           Is this example of the type of documents that

19  you were providing to Mr. Hussain and Ms. Colomar?

20     A.   I am not sure exactly what it was, but it was

21  attached to that, but it's something, again, that unless

22  Vanessa was to print for Sushovan.

23     Q.   Sushovan had asked for?

24     A.   I would assume so.

25     Q.   Do you make that assumption because that was

Transcript of Lisa Harris
Conducted on January 30, 2024                              198

1    true for all the documents that you were providing in

2    this time period?

3         A.   I'm pretty sure it was normally, if not

4    always, Sushovan that asked me to send things to Vanessa

5    to print.

6         Q.   Pick up the phone, call you by Mr. Hussain,

7    ask you to send it to Ms. Colomar?

8         A.   Yes -- or if I was in the London Office, it

9    would be just a face-to-face conversation.

10        Q.   Now, let's look at the attachment.  I think

11   it's a little bit different from some of the other

12   documents we've looked at.

13             This is an HP document from May 2013, isn't

14   it?

15        A.   It's certainly dated May 2013, yes.

16        Q.   How did you get this, Ms. Harris?

17        A.   I don't remember.

18        Q.   Okay.  You've testified putting a lot of

19   documents, maybe as many as 60,000 documents, on your

20   pen drive in February 2013?

21        A.   And every month thereafter because I -- always

22   was what I did was download the finance directory at the

23   end of the month close so that I've got the documents

24   available to do the next month end close.

25        Q.   All right.  This document is not a historical

1    Autonomy document.  Can we agree about that?

2          A.    Yeah, it says it's an HP document.

3          Q.    So you are providing Mr. Hussain HP documents

4    from as late as May 2013?

5          A.    That must've been in the finance drive, yes.

6          Q.    And that must've been something that he asked

7    for; right?  Or otherwise you wouldn't give it to him?

8          A.    He had a copy of the pen drive, so he knew

9    everything that was on there.

10          Q.    Good.  And now you are providing to Ms.

11    Colomar to give him a hard copy?

12          A.    I assume so.  I would imagine that's why.

13          Q.    And a part of this relates to, on Page 10 of

14    the exhibit, the integration of Autonomy into HP, does

15    it not?  Let's take a look at that slide.  Page 10.

16          Do you recognize this portion of the document

17    that you sent along?

18          A.    I obviously don't recognize it.

19          Q.    Are you familiar with some of Autonomy's

20    products in the 2009 through 2011 time period?

21          A.    I think so, yes.

22          Q.    Idol?  Ever hear of Idol?

23          A.    Idol, yes.  I was watching the main one.

24          Q.    And Idol marketed in different ways of using

25    Autonomy products like Protect.

Transcript of Lisa Harris
Conducted on January 30, 2024                    200

1          Are you familiar with that?

2     A.   I don't remember it, but it sounds probable.

3     Q.   What about Power or Promote?

4     A.   Those sound familiar, yes.

5     Q.   All right.  Thank you very much.  A few more

6  of these, and I cut back the number.

7          Let me show Exhibit 3384, please.

8          (Exhibit 3384 -- premarked by counsel -- for

9  identification.)

10         Is this another example of request that you

11  are getting for information from Mr. Hussain and Ms.

12  Colomar in the way you've described on or around March

13  5th, 2014?

14    A.   I believe it is, yes.

15    Q.   Relating to EMC; right?

16    A.   Yes.

17    Q.   A major customer or a client of Autonomy's

18  from 2009 to 2011?

19    A.   It's one of those queries not -- I can't

20  remember what EMC is, so I'm trying to read it.

21    Q.   Please.

22    A.   If it's reading the e-mail, it sounds like EMC

23  was the supplier because he was selling their product.

24    Q.   Are you confident that you are providing this

25  document in response to a question by Mr. Hussain in

Transcript of Lisa Harris
Conducted on January 30, 2024                           201

1   this time period?

2        A.   That's most likely the explanation, yes.

3        Q.   For the record, I am offering Exhibit -- all

4   of these exhibits relating to Mr. Harris, Ms. Colomar.

5   I think I left off with Exhibit 3383.  I am offering in

6   evidence.

7             (Exhibit 3383 offered in evidence.)

8             I am offering also this Exhibit 3384 in

9   evidence, please.

10            (Exhibit 3384 offered in evidence.)

11            This is another example of the type of

12  information that you are providing to Mr. Hussain in

13  this time period; right?

14       A.   Yes.

15       Q.   All coming from the documents that you took

16  from Autonomy/HP?

17       A.   From a backup, yes, where all the finance

18  folder is.

19       Q.   Let me show you Exhibit 3386, please.

20            (Exhibit 3386 -- premarked by counsel -- for

21  identification.)

22            Is this another example of the same type of

23  documents, Ms. Harris?

24       A.   Yes, it looks like it.

25       Q.   I offer 3386 in evidence.

Transcript of Lisa Harris
Conducted on January 30, 2024                          202

```
1              (Exhibit 3386 offered in evidence.)

2              This one relates to invoices pertaining to

3    Abbott Labs; is the correct?

4         A.   Yeah, that's what it say, yes.

5         Q.   That's another historical customer of

6    Autonomy's?

7         A.   Could be.  I am not so familiar with the

8    customers.  I don't always recognize the names.

9         Q.   So you just ran it down and found it when Mr.

10   Hussain asked you about it?

11        A.   So as I said, at such time I had the copy of

12   the pen drive, so he would be quite specific in asking

13   me what he needed.

14        Q.   Let me show you Exhibit 3388.

15             (Exhibit 3388 -- premarked by counsel -- for

16   identification.)

17             Is this another example, Ms. Harris?

18        A.   This is an e-mail from me to Vanessa and, yes,

19   it looks like it's an Autonomy document that would've

20   been attached.

21        Q.   That you are providing again in the way you've

22   described?

23        A.   Yes.

24        Q.   This time it relates to confirmations; is that

25   correct?
```

Transcript of Lisa Harris
Conducted on January 30, 2024                                    203

1      A.   The file says it's "confirms," so that could

2  be, but without seeing the documents, I don't know.

3      Q.   Let's look at Page 9.

4           Does this refresh your recollection that you

5  are providing Mr. Hussain in 2014 confirmations from

6  2009?

7      A.   So, yeah, these are the audit confirmations --

8  well, this is an audit confirmation.  Sorry.

9      Q.   This is another example of a document that you

10  took from Autonomy; right?

11      A.   Yes.  So the finance folder that I copied onto

12  my pen drive.

13      Q.   Let me show you what has been marked as

14  Exhibit 3389, please.

15           (Exhibit 3389 -- premarked by counsel -- for

16  identification.)

17           Is this another example, this time relating to

18  Capax, on or around March 15th, 2014?

19      A.   Yes, it is.

20      Q.   I offer Exhibit 3389.

21           (Exhibit 3389 offered in evidence.)

22           Let me show you Exhibit 3391, please.

23           (Exhibit 3391 -- premarked by counsel -- for

24  identification.)

25           Is this another example, Ms. Harris, this time

Transcript of Lisa Harris
Conducted on January 30, 2024                         204

1    on or around March 7th, 2014?

2         A.   Yes, sent July or March -- I don't know,

3    depends where it is printed, which way around the date's

4    going, but yes, that's an e-mail from me to Sushovan.

5         Q.   I think perhaps a more important point is that

6    you are again circulating historical Autonomy documents

7    to Mr. Hussain in 2014?

8         A.   Yes.

9         Q.   I offer Exhibit 3391, please.

10             (Exhibit 3391 offered in evidence.)

11             Let me show you Exhibit 3392.

12             (Exhibit 3392 -- premarked by counsel -- for

13   identification.)

14             Is this another example?

15        A.   Yes, it is.

16        Q.   I offer Exhibit 3392.

17             (Exhibit 3392 offered in evidence.)

18             Exhibit 3396, please.

19             (Exhibit 3396 -- premarked by counsel -- for

20   identification.)

21             Here, the subject is, TB totalling 724.

22             Do you know what that means?

23        A.   No, I am not sure what that means.

24        Q.   I think you are writing to Ms. Colomar:  "Hi

25   Vanessa, please find attached - if you print selection

1    on the consolidated tab it should fit onto one page.

2    This is the final Q3'11 TB from DDS."

3            What does that mean?

4        A.    That was Autonomy's financial system.

5        Q.    What does TB mean?

6        A.    Trial balance; sorry.

7        Q.    "with a column added to show the MicroLink

8    Revenue and thus the grand total"; is that right?

9        A.    That's what it says, yes.

10       Q.    And is this another example of the type of

11   information that you're providing to Mr. Hussain and Ms.

12   Colomar in this time period?

13       A.    So yeah, this is something that Sushovan wants

14   to be printed.

15       Q.    All right.  And then couple more I have.

16   Exhibit 3401.

17           (Exhibit 3401 -- premarked by counsel -- for

18   identification.)

19           Are you forwarding along in August 21, 2014

20   information about the MicroTech payment history?

21       A.    Yes, that's the spreadsheet.

22       Q.    I offer 3401 into evidence.

23           (Exhibit 3401 offered in evidence.)

24           Same set of questions for Exhibit 3402.

25           (Exhibit 3402 -- premarked by counsel -- for

Transcript of Lisa Harris
Conducted on January 30, 2024                          206

1    identification.)

2            This time relating to Discover Technologies in

3    or around September 2014?

4        A.  Yes.

5        Q.  Offer Exhibit 3402 into evidence.

6            (Exhibit 3402 offered in evidence.)

7            Let me show you 3403, please.

8            (Exhibit 3403 -- premarked by counsel -- for

9    identification.)

10           Is this another example, Ms. Harris?

11       A.  Yes, it is.

12       Q.  From in or around September 2014, again,

13   relating to Discover Tech?

14       A.  Yes.

15       Q.  It seems like a lot of work.  There's a lot of

16   e-mailing going on here?  Do you agree?

17       A.  Well, rather than Sushovan printing himself or

18   ask Vanessa to print it, he asked me to ask Vanessa to

19   print it, so yeah, there's a lot of e-mails.

20       Q.  I offer 3403 in evidence.

21           (Exhibit 3403 offered in evidence.)

22           Last one, let me show you Exhibit 3405.

23           (Exhibit 3405 -- premarked by counsel -- for

24   identification.)

25           Is this another example of information that

1    you were providing relating to Autonomy's historical

2    performance, this time relating to Discover Technology's

3    payment confirmations in or around September 2014?

4        A.   Yeah, that's something that Sushovan has asked

5    me to send to Vanessa to print.

6        Q.   I offer Exhibit 3405 in evidence.

7             (Exhibit 3405 offered in evidence.)

8             Let me just confer with my counsel.

9             MR. REEVES:  I think I have done a poor job of

10   making a record of the Government's intention to offer

11   in evidence all of these e-mails from Ms. Harris to Ms.

12   Colomar.  I can go through all of them again, if you

13   would like me to, and just make a record of what I am

14   offering, or I can ask if you agree that as a set, it's

15   clear in the record that the Government is asking to

16   offer all of these in evidence.

17            MR. LINCENBERG:  It is clear.

18            I object to your describing your job as being

19   poor.

20            It's clear, the record.

21            MR. REEVES:  Any objection from Dr. Lynch?

22   Would you like me to make a record?

23            MS. LEVIN:  As long as we are limited to the

24   exhibits that you've discussed today.

25            MR. REEVES:  Thank you very much.  I think we

Transcript of Lisa Harris
Conducted on January 30, 2024                    208

```
 1   are.  Thank you very much.
 2           MR. LINCENBERG:  No objection that you've
 3   offered them.
 4           MR. REEVES:  Correct.
 5           MR. LINCENBERG:  Right.
 6           MR. REEVES:  Thank you.
 7           (Stipulation among all counsels that all of
 8   the Government Exhibits that were identified and
 9   discussed today -- 30th January, 2024 -- were offered in
10   evidence.)
11       Q.  All right.  Thank you, Ms. Harris.  Just a few
12   more questions.  Today you said you work at DVL; is that
13   right?
14       A.  Yes, that's correct?
15       Q.  How many other employees work at DVL with you
16   today?
17       A.  No one else; just me.
18       Q.  Just you.  How long have you been the only
19   employee at DVL?
20       A.  Since March of this year.
21       Q.  March of 2023?
22       A.  Sorry, March of 2023.
23       Q.  Close to a year now?
24       A.  Yes.
25       Q.  And what are your duties and responsibilities
```

Transcript of Lisa Harris
Conducted on January 30, 2024                    209

1   at DVL today?

2          A.    Most of my time is devoted to supporting

3   Luminance Technologies Ltd., which is a company that ICP

4   invests in, and my time is recharged to them.

5          Q.    And who runs DVL?

6          A.    Its only purpose is to employ me, really, and

7   then my charge -- my cost of recharge to Luminance

8   Technologies Ltd.

9          Q.    Okay.  Who controls DVL?

10         A.    I guess me, but there isn't a lot of control.

11         Q.    Does Dr. Lynch have a role with regard to DVL?

12         A.    No.

13         Q.    DVL is a subsidiary of ICP?

14         A.    Yes, that's correct.

15         Q.    Does Dr. Lynch run ICP?

16         A.    No.  He used to be employed by ICP, but he

17   stopped taking a salary sometime ago.

18         Q.    Okay.  Does that mean he exercises no control

19   over ICP?

20         A.    It's not really anything to control.  ICP has

21   three employees.  I run the payroll.  We charge their

22   time to the companies that they're working for.  It's a

23   very straightforward business.  It's not really a lot to

24   control.

25         Q.    Isn't the fact that Dr. Lynch controls ICP and

Transcript of Lisa Harris
Conducted on January 30, 2024                    210

1    ICP controls DVL?

2         A.   ICP's the parent company, so ICP London

3    Limited is a hundred percent the parent company of DVL

4    Technology, but ICP London Limited, so it's now wound

5    down quite a lot.  The subsidiary companies that stopped

6    develop the software -- Luminance Technologies Ltd., now

7    spun out of it, and they're very much standalone

8    businesses; so ICP just doesn't really do very much

9    anymore.

10        Q.   I think that answers a piece, but my question

11   really is about Dr. Lynch.

12        A.   Uh-huh.

13        Q.   Isn't it fair to say that you today continue

14   to work for Dr. Lynch and perhaps in an indirect

15   corporate sense in the way you've described?

16        A.   Not really.  I mean I don't even have any

17   dealings with him.

18        Q.   Okay.

19        A.   But that's because the company's -- just not a

20   lot happening.  It's a very small company now.

21        Q.   Let's go back in time.  Was there a time when

22   Dr. Lynch ran in a sort of more active sense, DVL?

23        A.   No DVL, but ICP London Limited.

24        Q.   And for what period of time did Dr. Lynch run

25   ICP Limited?

1      A.   He was the CEO -- I would say until -- I think
2  certainly 2020, maybe 2021?
3      Q.   Okay.  So at least until in or around 2020,
4  would you say that you were working for Dr. Lynch at DVL
5  where DVL's controlled by ICP which is controlled by Dr.
6  Lynch?
7      A.   Yes.  I worked for Dr. Lynch.
8      Q.   Okay.  We can agree that through at least 2020
9  you were working fairly directly for Dr. Lynch?
10     A.   Not really working directly for him but he was
11  the CEO of the company.
12     Q.   He pays the bills, so to speak?
13     A.   He was the CEO, yes, so ultimately everyone
14  reported through to him.
15     Q.   Including you?
16     A.   Yes.
17     Q.   And that was the case, was it not, from the
18  time that you joined DVL until in or around 2020 in the
19  way you've described?
20     A.   Yes.
21     Q.   Where you worked basically for Dr. Lynch?
22     A.   He was the CEO.  So my -- originally my direct
23  reporting lines, I think would've been to Sushovan, and
24  then later on I probably reported through to management
25  to Dark Trace, and I was working primarily on Dark

Transcript of Lisa Harris
Conducted on January 30, 2024                              212

1    Trace's financials, which is one of the subsidiaries.

2         Q.   All right.  How did you come to get your job

3    at DVL in or around 2013?

4         A.   So I spoke to Jack Scottdale, who I knew from

5    Autonomy.  He was -- he worked high up in the technical

6    team there, and we're having discussion.  I said how

7    unhappy I was at Autonomy now and it was all changed.

8              He put me in touch because he at that point

9    worked for DVL Technology, and he put me in touch with

10   Susan Howard, and we had a discussion, and I was offered

11   a job there.

12        Q.   And Susan Howard works for Dr. Lynch, does she

13   not?

14        A.   I think she reported directly to Dr. Lynch at

15   that time, yes.

16        Q.   In that sense, are you being hired when you

17   joined DVL by Dr. Lynch?

18        A.   Recruited by Susan, but yes, she reports to

19   Dr. Lynch, so she would've -- it would've been

20   authorized.

21        Q.   You don't have any doubt that Michael Lynch

22   authorized your hiring at DVL --

23        A.   Yeah, he authorized it, yes.

24        Q.   Even though he's CEO, you didn't interact with

25   him that often.  Is it fair to say, Ms. Harris, that you

1    are working for Dr. Lynch at DVL?

2         A.   Dr. Lynch is the CEO of the parent company of

3    DVL so, yes, so if you follow the reporting lines.

4         Q.   You joined Autonomy in or around 2005, did you

5    not?

6         A.   Yes, that's right.

7         Q.   And you described in the course of your

8    testimony the extent to in which Dr. Lynch was the CEO

9    of Autonomy --

10        A.   Yes, he was.

11        Q.   -- throughout your career?

12        A.   Yes.

13        Q.   So through the reporting lines, as you've

14   described them, while you were at Autonomy, while Dr.

15   Lynch is the CEO and you were an employee there, is it

16   fair to say that you were working for Dr. Lynch at his

17   company?

18        A.   Well, I worked for the company -- the CEO of

19   the company, but it was not like a direct report.

20        Q.   And thereafter, after you left HP Autonomy in

21   2013, you continued to work for Dr. Lynch at DVL in the

22   way we've just gone through?  Would you agree?

23        A.   I work for DVL Technology, which is owned by a

24   company, of which Dr. Lynch was CEO, yes, but I didn't

25   work directly to him.

Transcript of Lisa Harris
Conducted on January 30, 2024                        214

1          Q.   I think you have been clear about that.  So it
2     seems like you have been working for companies run by
3     Dr. Lynch for going on 19 years.  Do you agree?
4          A.   Yes.
5          Q.   Okay.  It sounds like you enjoy working for
6     companies run by Michael Lynch.  Do you agree?
7          A.   I've enjoyed working at Autonomy, yes, and DVL
8     Technology.
9          Q.   Is it fair to say that you want to help Dr.
10    Lynch, if you can?
11         A.   I would always want to help someone that's
12    being persecuted, yes.
13         Q.   Okay.  And do you feel loyal to Dr. Lynch in
14    any way?
15         A.   Yes, obviously I feel loyal to people that I
16    know that -- yes.
17         Q.   Including Michael Lynch?
18         A.   Yes.
19         Q.   All right.  Today at DVL, as the solo
20    employee, you depend on Dr. Lynch, do you not, for your
21    job at DVL?
22         A.   No.
23         Q.   Why do you say that?
24         A.   Because he's not the primary shareholder.
25         Q.   So who sets your salary?  Who tells you what

Transcript of Lisa Harris
Conducted on January 30, 2024                    215

1    to do?

2         A.   No one tells me what to do because it's really

3    not -- it's not that sort of decision to be made.  I am

4    continuing to do what I have been doing for a long time,

5    which is process all the finances, make sure the bills

6    are paid, we charge the employees' time to the companies

7    that they work for.

8         Q.   And do you continue to get paid?

9         A.   Yes.

10        Q.   All right.  Do you depend on that income?

11        A.   Yes.

12        Q.   I think I am close to being done.  I suggest

13   we take a break because I think we have to change the

14   video.

15             MR. LINCENBERG:  15 minutes?

16             MR. REEVES:  Yes.

17             VIDEOGRAPHER:  Going off the record.  The time

18   is 3:08.

19             (Break.)

20             VIDEOGRAPHER:  Back on the record.  The time

21   is 3:30.

22        Q.   MR. REEVES:  Ms. Harris, thank you for that

23   break.  I have no further questions.  Thank you.

24

25                   REDIRECT EXAMINATION

1    BY MR. LINCENBERG:

2        Q.   Hi, Ms. Harris.  Just a few questions on what

3    we call redirect examination.

4             First, I'd like to go back to Exhibit 16927.

5    This is the February 13th, 2013 letter with Autonomy

6    Systems Limited after your resignation.  Counsel had

7    pointed out some of the paragraphs.  I want to just

8    direct your attention to the fourth paragraph on the

9    first page.

10            It's PDF Page 5, but it's the first Page of

11   what was marked as an exhibit.

12            So I am directing your attention to where it

13   say:  "During your notice period."

14            Is the notice period that garden leave period?

15       A.   So it's three months, yes, notice period.

16       Q.   Says:  "You will be placed on 'garden leave',

17   meaning that unless directed otherwise by the Company,

18   you are required to cease carrying out your duties, and

19   should not attend any office or have other contact" and

20   so forth.

21            Do you see that?

22       A.   Yes, I do.

23       Q.   In fact, you were directed to continue to do

24   duties as you've described in your earlier examination;

25   is that right?

Transcript of Lisa Harris
Conducted on January 30, 2024                          217

1      A.   Yes, I was.

2      Q.   And that work was being performed at home by

3 you?

4      A.   A mixture of at home, and then I was asked to

5 come into the office maybe two days a month and for

6 certain meetings with people.

7      Q.   And I see later in this paragraph, it says:

8 "You will be required to attend the office regularly to

9 provide handover and knowledge transfer" and so forth.

10          Do you see that?

11     A.   Yes.

12     Q.   And so as I understand your testimony, in

13 order to do your work at home, you needed the

14 financials?

15     A.   Yes, I needed the -- I just lifted the

16 directory, but yes, all the files are in there.

17     Q.   And in terms of which files you might need,

18 you wouldn't know before you lifted the directory; is

19 that right?

20     A.   It was pretty, as my part.  I just copied the

21 whole thing, and then I've got it all there, whatever

22 I'm going to need.

23     Q.   And you wanted to be able to be responsive to

24 questions that Mr. Yelland had to you, for example?

25     A.   Yes.

1        Q.    Did he ever object to your copying of the

2    financial directories so that you could do your work?

3        A.    Certainly I didn't make any objection to it.

4        Q.    Did he indicate an appreciation that you were

5    continuing to do this work even after you had given

6    notice you were resigning from the company?

7        A.    Yes.  I mean, he said he was grateful,

8    particularly that I couldn't take holiday or Easter

9    because Easter fell at month end.

10       Q.    Okay.  And at the conclusion of the garden

11   leave, did Mr. Yelland ever come to you and say, "All

12   right, Ms. Harris, I know that you are working with a

13   pen drive.  Can you please return it to me?"

14       A.    No, he didn't, and I didn't think about it

15   either.

16       Q.    Okay.  So let's move to Exhibit 16076.  This

17   was a September 9th, 2011 e-mail from Mr. Chamberlain to

18   a whole bunch of folks in the finance area.

19             Do you recall this one?

20       A.    Yes.

21       Q.    And Mr. Chamberlain writes: "to ensure we have

22   a consolidated approach."

23             Did you feel it was important for Autonomy to

24   have a consolidated approach in the communications with

25   HP during this time period?

Transcript of Lisa Harris
Conducted on January 30, 2024                          219

1        A.   To be consistent and not confuse people by

2   giving different messages.

3        Q.   All right.  When you say giving different

4   messages, do you recall there being multiple requests

5   from multiple people at HP oftentimes for the same

6   document?

7        A.   Yes.

8        Q.   And this, I notice, is right near the Autonomy

9   quarter end.  As of September 29th, HP had not yet

10  purchased Autonomy; right?

11       A.   I believe not.  I believe it was in October.

12       Q.   So the finance team had all of their regular

13  duties that they were doing at quarter end?

14       A.   Yes.

15       Q.   And at the same time they were getting a

16  duplicate request from different directions from

17  different people at Autonomy.  Was that your

18  understanding?

19       A.   We did ask HP -- the HP people, Roxanne, et

20  cetera, to just talk to us, just wanted to make sure

21  that, you know, again, everything was just consistent

22  and correct.

23       Q.   So to funnel their request through a central

24  people at this point so that we didn't have people

25  shuffling papers to different people at different times?

Transcript of Lisa Harris
Conducted on January 30, 2024                    220

1        A.    And not wasting time to three or four people

2   giving the same information when it's already done.

3        Q.    And so when Mr. Chamberlain says:  "To ensure

4   we have a consolidated approach and minimize disruption

5   during the HP integration," I take it that when all of

6   the work you were doing on your normal finance job,

7   there was a lot of disruption.  This was a major

8   transaction that was about to close?

9        A.    Yes.

10       Q.    And in the meantime, you were working for

11  Autonomy, which at that point was not owned by HP?

12       A.    Correct, yes.

13       Q.    Let me direct your attention to what I am

14  going to mark as Exhibit 9556.

15             (Exhibit 9556 -- premarked by counsel -- for

16  identification.)

17             And I will represent that a part of this

18  e-mail was shown to you when the Government had showed

19  to you an exhibit which they marked as 12990.

20             So if we move to the bottom of the second

21  page.

22             At the bottom of the first page, there's an

23  e-mail that my right honorable colleague showed to you

24  from Mr. Hussain April 14th of 2011; subject, Q1; and

25  then below it was some dialogue:  "Please could you look

Transcript of Lisa Harris
Conducted on January 30, 2024                    221

1    at" four different things.

2              And then:  "Does this get to 25.6c?"

3              Do you recall that?

4      A.   Yes, I do.

5      Q.   Let me show you the rest of this e-mail chain.

6    There then appears to be a response from you, dated

7    April 15th, 2011.

8              Do you see that?

9      A.   Yes, I do.

10     Q.   All right.  And I move to evidence Exhibit

11   9556.

12             (Exhibit 9556 offered in evidence.)

13             So in this April 15th, 2011 e-mail, and it

14   says it's at 21 minutes.

15             Would that be midnight or so?

16     A.   Yes.

17     Q.   Okay.  You write "Hi Sushovan, just on the

18   maths - if tax rate is 26.75%," so forth and so on.

19             Does it appear that you are providing him some

20   maths in connection with some of the items he had talked

21   about.

22     A.   Yes, because obviously he's doing a lot of

23   "what if this," "what if that," "what if the other",

24   giving him the parameters to feed into because he can do

25   it on his spreadsheet as well.

1          Q.    So he had given different options on how

2     things might come out.

3                He said, does this get to 25.6 cents.

4                And you're responding that it gets to 25.5

5     cents per share?

6          A.    Yes.

7          Q.    And then if we move to the top e-mail, you

8     write:  "Should have said - both options knock 1% off

9     CFFO - just FYI."

10               Do you see that?

11         A.    Yes.

12         Q.    And both options are the different options

13    that he's presenting to you to do the maths.  You do the

14    maths, and you know what it comes to; is that right?

15         A.    Yes.

16         Q.    Thank you.  Nothing further.

17

18                     RECROSS-EXAMINATION

19    BY MS. LEVIN:

20         Q.    Ms. Harris, just a few questions.  Ms. Harris,

21    prior to Autonomy's acquisition of MicroLink, was

22    MicroLink a customer of Autonomy?

23         A.    I believe it was, yes.

24         Q.    And did MicroLink have its own customers?

25         A.    Yes.

1        Q.   If MicroLink was acting as a reseller for

2    Autonomy, would MicroLink's customers be end users?

3        A.   Yes, that's right.

4        Q.   Okay.  With the adjustments made to

5    MicroLink's debt after the acquisition have any impact

6    on whether those third-party end user still owed any

7    debt?

8        A.   So it'd make no difference whatsoever because

9    those are MicroLink's customers.

10       Q.   If we could just bring up Exhibit 3311-1 for a

11   minute, the attachment?

12            (Exhibit 3311-1 -- premarked by counsel -- for

13   identification.)

14            In this spreadsheet that you looked a little

15   bit ago, in Column D, is a list of end users; is that

16   fair?

17       A.   Yes.

18       Q.   Okay.  And all of those end users to the

19   extent that they still owed debt, the adjustments that

20   were made would not have had any impact; correct?

21       A.   Not at all, because this is between Autonomy,

22   Inc.'s sales ledger and MicroLink's purchase ledger.

23   MicroLink's sales ledger is completely untouched.

24       Q.   So to the extent any of those end users were

25   to pay the debt that they owed, that would just go to

Transcript of Lisa Harris
Conducted on January 30, 2024                    224

1   Autonomy; is that fair?

2        A.   Well, it would go to MicroLink, which is now a

3   subsidiary of Autonomy.

4        Q.   Okay, but the point is that the money was

5   still owed; right --

6        A.   Yes.

7        Q.   -- and that didn't have any impact?

8        A.   No.

9        Q.   Okay.  Great.  Thank you.

10        I am going to turn your attention now to a

11   conversation you had with Mr. Duckworth about the

12   mapping exercise?

13        A.   Yes.

14        Q.   Do you remember that you had said that the

15   mapping exercise began after the HP announcement but

16   before or right around the time of the closing?  Do you

17   recall that?

18        A.   Yes, it was around that time.  It was in

19   October.

20        Q.   Okay.  So you don't recall the exact date, but

21   it's somewhere in October; is that fair?

22        A.   Yes, that's correct.

23        Q.   Would the mapping exercise have begun prior to

24   the closing to prepare for the transition?

25        A.   It was David had already done the mapping

Transcript of Lisa Harris
Conducted on January 30, 2024                    225

1    exercise, so before we went to the meeting in

2    Pleasanton, he had already done the mapping exercise

3    based on -- he obviously was the person with the best

4    knowledge of the HP accounts and codes, and his

5    understanding of the Autonomy codes from the description

6    on the trial balance, he had already mapped it based on

7    that, and then the meeting was to go through to confirm

8    and check.

9        Q.   So when you met with him, Mr. Duckworth had

10   already done the mapping exercise; is that fair?

11       A.   Yes.

12       Q.   And already had access to Autonomy's trial

13   balances?

14       A.   To the nominal codes, yes.  I don't know if he

15   had access to the actual dollar amounts that were

16   against each code at any particular in point, but he

17   certainly had this nominal code.  He's got this

18   description.

19       Q.   So when you met with him in October, he

20   already would have an understanding that Autonomy's

21   trial balance had a separate line item for hardware?

22       A.   Yes.

23       Q.   And that would've been mapped as 47000, as

24   you've explained before?

25       A.   Yes.

1      Q.    Okay.  I am going to turn your attention now

2    to the pen drive.  You were asked some questions about

3    that?

4      A.    Yes.

5      Q.    Why did you copy documents onto your pen

6    drive?

7      A.    So for me to do my job, I needed to have

8    access to the documents, for when I was working at home

9    or if I was working in the office and the servers went

10   out -- because all our accounting systems were

11   maintained by Varity employees, over in California

12   somewhere, in the Bay Area somewhere -- so basically the

13   time difference between us and them was so great if the

14   server went down, we couldn't work all morning until

15   they came online and could fix it.

16     Q.    And this was a practice you had well before

17   the acquisition?

18     A.    All the time, yes.  As you saw from the

19   e-mail, working at midnight, I don't want to be in the

20   office on my own then; work from home.

21     Q.    Okay.  And when you said you had put copies of

22   the documents onto your pen drive, does that mean that

23   the original files that were copied remain exactly as

24   they were?

25     A.    Yes.

Transcript of Lisa Harris
Conducted on January 30, 2024                    227

1        Q.    You didn't delete any of the original files;

2   right?

3        A.    No, because we still need them.

4        Q.    Okay.  Did you ever store documents on your

5   pen drive at the request of someone else?

6        A.    No.

7        Q.    Did Dr. Lynch ever ask you to copy documents

8   on your pen drive?

9        A.    No, he was not involved in finance or how it

10  worked.

11       Q.    Did Mr. Hussain ever ask you to copy documents

12  on your pen drive?

13       A.    No.

14       Q.    And you talked about how there came a time you

15  did disclose to Mr. Hussain some documents you had on

16  your pen drive; right?

17       A.    Yes.

18       Q.    Do you remember when that first happened?

19       A.    It was -- I know I was in the London Office.

20  It was when I first started working at DVL, and I was

21  having a conversation -- formal conversation with Mr.

22  Hussain, and he was saying about he was upset with the

23  accusations being made against him, particularly talked

24  about the accusation that HP didn't know about the

25  hardware sales even though, as I said, they got access

Transcript of Lisa Harris
Conducted on January 30, 2024                    228

1    to ledgers, they had access to the audit pack, the
2    reports, everything, and I said that -- I was incensed.
3    I was actually quite crossed because it was so wrong for
4    them to say that when it was so clearly untrue.
5            Then I remembered my pen drive, which was down
6    at the bottom of my handbag where it had been since I
7    left Autonomy, and I said, "There might be something on
8    here that just proves it" because I remember the initial
9    meeting with David Duckworth.
10       Q.   So it sounds like you provided the documents
11   to Mr. Hussain to help him; is that fair?
12       A.   Yes, because I felt he was being persecuted.
13       Q.   And after you provided those documents to Mr.
14   Hussain, are you aware that he then provided them to his
15   counsel?
16       A.   Yes.  He said that it was appropriate for him
17   to give a copy to his lawyer.
18       Q.   Okay.  Are you aware that the documents that
19   you shared with Mr. Hussain were eventually shared with
20   the Serious Fraud Office, with the Government?
21       A.   I wasn't aware.
22           MR. REEVES:  Objection.  Foundation.
23           THE WITNESS:  I wasn't aware of that.
24       Q.   BY MS. LEVIN:  Okay.  And were you aware that
25   the documents that you provided to Mr. Hussain were also

Transcript of Lisa Harris
Conducted on January 30, 2024                    229

1    shared with the Department of Justice?

2              MR. REEVES:  Objection.  Foundation.

3              THE WITNESS:  I do understand Sushovan told me

4    that his lawyer had then shared it with -- I thought

5    with the FBI -- but the American Government.

6         Q.   BY MS. LEVIN:  Okay.  Are you aware that when

7    the documents were shared with the American Government,

8    as you said, that was actually done before the e-mails

9    that were shown to you during your cross-examination?

10             MR. REEVES:  Objection.

11             THE WITNESS:  I struggle sometimes with the

12   timing.  I don't know exactly when it was, but it was

13   quite early on after I had given a copy of the pen drive

14   to Sushovan.  He told me he sent a copy to his lawyer.

15        Q.   BY MS. LEVIN:  Who then sent it along to the

16   Government; is that fair?

17             MR. REEVES:  I object --

18             THE WITNESS:  Yes, I believe --

19             MR. REEVES:  -- to be a basis for this --

20        Q.   BY MS. LEVIN:  Is that your understanding?

21        A.   Yeah.  Sushovan told me that his lawyer had

22   sent a copy to the American Authorities.

23        Q.   Okay.  Thank you.  No further questions.

24             MR. REEVES:  I have no questions.  Thank you.

25             MR. LINCENBERG:  So then this concludes the

Transcript of Lisa Harris
Conducted on January 30, 2024                         230

```
1    proceedings.
2             Thank you very much, Ms. Harris.
3             VIDEOGRAPHER:  Going off the record.  The time
4    is 3:49.
5             (The hybrid videotaped deposition for today
6    ended at 3:49 p.m., local UK time)
7                             *  *  *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                 CERTIFICATE OF COURT REPORTER

2

3                      I, Sherry Yan, RPR, CSR 14442, do

4    hereby certify that LISA HARRIS was duly sworn by

5    Marshall C. Derks, American Citizen Services Chief,

6    Embassy of the United States of America, that I took the

7    stenograph notes of the foregoing statement under oath

8    and that the transcript thereof is a true and accurate

9    record transcribed to the best of my skill and ability.

10                     I further certify that I am neither

11   counsel for, related to, nor employed by any of the

12   parties to the action in which the deposition was taken,

13   and that I am not a relative or employee of any attorney

14   or counsel employed by the parties hereto, nor

15   financially or otherwise interested in the outcome of

16   the action.

17

18

19

20   _____

21   Sherry Yan, RPR, CSR No. 14442

22   Date:  Wednesday, February 7, 2024

23

24

25
```

Exhibit B

First Defendant, L Harris, First Statement, 16 November 2018

Claim No. HC-2015-001324

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
BUSINESS LIST (ChD)

BETWEEN:

**(1) ACL NETHERLANDS BV**
**(as successor to AUTONOMY CORPORATION LIMITED)**

**(2) HEWLETT-PACKARD VISION BV**

**(3) AUTONOMY SYSTEMS LIMITED**

**(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY INC**

Claimants

– and –

**(1) MICHAEL RICHARD LYNCH**

**(2) SUSHOVAN TAREQUE HUSSAIN**

Defendants

_____

WITNESS STATEMENT OF
ELIZABETH "LISA" JANE HARRIS

_____

I, **ELIZABETH "LISA" JANE HARRIS**, of Maurice Wilkes Building, St John's
Innovation Park, Cowley Road, Cambridge CB4 0DS, will say as follows:

1.  The facts and matters set out in this statement are true to the best of my knowledge
    and belief. Where facts and matters are not within my own knowledge, I identify
    the source of my information and belief. In this statement, I comment on things I
    did not necessarily know at the time. I have tried to distinguish between matters I
    knew at the time and matters I have learned during this litigation.

2.  I have not attached the documents to which I refer in this witness statement. I
    understand that references to document numbers in this witness statement in bold

70-40538856

HP-SEC-02936946

text refer to those document identification numbers used by the parties in this matter. I have relied upon these documents to refresh my memory, and I refer to the specific content of a number of them. I also identify, where relevant, documents disclosed in these proceedings which form the source of my information and belief.

## Background

3.      I studied Mathematics and Business Studies at Sheffield University. After graduating in 1984, I took my first job at KPMG where I qualified as a Chartered Accountant in 1987. I was in the small to medium enterprise team at KPMG working with a range of different companies.

4.      In around 1990, I left to work for a KPMG client, Babson Brothers. After this, I moved to Cambridge to work for Capita Plc, a local government outsourcing company. I then took an 18-month contract with a local council.

5.      I started with Autonomy on 1 April 2005 in the finance team working on costs accounting, originally reporting to David Seary, but later reporting to Steve Chamberlain who joined in August 2005.

## Autonomy finance function structure

6.      I have read the statement of Mr Christopher Yelland, Autonomy's Chief Financial Officer (**CFO**) and later Financial Controller after the acquisition. In this part of my statement, I outline the finance team structure and respond to Mr Yelland's statements on the role of Deloitte as Autonomy's auditors and the interaction between Deloitte and the finance team.

7.      The finance team in Cambridge sat in an open plan office, with everyone within earshot of one another. We were able to share ideas and have discussions freely. Mr Chamberlain sat with us with a small table behind his desk where he would openly have discussions with, for example, the team, people from Deloitte, Autonomy's external auditors, and Sushovan Hussain, Autonomy's CFO.

8.      The UK finance team was responsible for all the accounting for the non-American countries and consolidation of all global accounts. There was also a team based in the Netherlands who did sales order processing for non-American sales.

70-40538856

HP-SEC-02936947

Accounting for Autonomy's American-based subsidiaries was somewhat separate. All American accounting was done by the American teams, who sent information to the UK team for consolidation. There were several teams in the US from Autonomy Inc and legacy Autonomy acquisitions including Etalk, Inverwoven, Zantaz and Iron Mountain. All teams reported to Mr Chamberlain.

9.    My role was in accounting for expenditure, looking after the payroll, Accounts Payable and Staff Expenses teams as opposed to revenue accounting. By way of explanation, Poppy Gustaffson, Antonia Anderson and Matt Stefan worked on revenue accounting. Ms Anderson initially worked under me in expenditure accounting but transferred to look after the revenue accounting teams when Matt Stefan moved back to Australia with his wife for family reasons. From my discussions with him, he wanted to continue working at Autonomy, and I understand he offered to do so from Australia {**D001209580**}. I never had the impression that Matt had been unhappy at Autonomy.

10.   I have been asked to respond to paragraph 16 of Mr Yelland's statement in which he says, "*there was no real business finance function*" at Autonomy. It is correct that Autonomy did not have a separate team that just looked at business finance. Mr Chamberlain oversaw both the business finance and finance processing areas because he worked closely with the business and put together the management accounts. He would "kick the tires" at a high level to make sure things were looking right. By way of comparison with HP, people who were doing the accounts (for example, Mr Frank Kennedy) were very far removed from the business. They were not involved in the day-to-day running of the company, so needed help to make sense of the numbers in a way that was never an issue at Autonomy.

11.   Since HP was much more isolated or siloed, it might have needed a specific team to understand the business more. Based on my observations working closely with him, and given his background, I did not think Mr Yelland had the same understanding of the Autonomy business as those previously managing the business finance aspects had. He came into the role of Autonomy CEO externally, and had a steep learning curve in understanding how its business operated, its customer base and products and services. Based on documents I have seen as part of these proceedings, I understand others shared my observations that Mr Yelland

70-40538856

HP-SEC-02936948

did not have the requisite insight to be Autonomy's CFO {**HP-SEC-00840763**}, {**POS00352589**}.

12. Mr Chamberlain also did forecasts pre-acquisition. HP took over the forecasts post-acquisition. I was not involved in forecasting as that was driven by the revenue team, but Autonomy used weekly meetings involving sales teams, legal and finance and really monitored sales metrics. It was a large time-commitment from all involved, but led to results. It was a numbers game; every sales person was required to have five meetings per week, and to deliver two proposals'. The odds were that a percentage of these would be successful. The Autonomy team were very experienced in what activity is needed to succeed in reaching sales targets and were focussed on driving the sales force to achieve their goals.

13. At paragraph 17 of his statement, Mr Yelland says his "*impression was that information that shed light on Autonomy's complete financial profile was shared freely amongst only a very limited group of people, namely Mr Hussain, Mike Lynch... and Andrew Kanter... and that it was shared with other in the business only on a limited and need-to-know basis.*" I disagree with this statement. From my point of view, Autonomy was very open. People were able to get information as and when they needed it. Of course, commercially sensitive information could not be shared with everyone, as there were security concerns. Things were not kept from people; they just knew the areas they needed to know. For example, the managers of the Zantaz sales teams did not share the details of their sales with the Autonomy sales teams, as these were not relevant to their roles. Such details were not shared with everyone, because that would have been inappropriate. At a global level, group information was consolidated in the UK. However, as I will discuss further below, the auditors had access to all information. In my view, information was shared appropriately.

14. At paragraph 21, Mr Yelland says that "*Autonomy did not have any [accounting policies and manuals].*" This was because, as compared to HP, Autonomy had a much more simplified structure. The finance department all sat together in an open plan office, so people could just ask each other questions, rather than having to refer to a formal manual. Autonomy did not have the huge formal bureaucracy that HP had but instead everyone understood and got on with their own job.

70-40538856

HP-SEC-02936949

First Defendant, L Harris, First Statement, 16 November 2018

**Deloitte and the audit process**

15.     I have been shown evidence being given by Mr Lee Welham of Deloitte in a witness statement. I have been asked to respond to Mr Welham's evidence about Deloitte's role as Autonomy's external auditors. In this section of my statement, I outline the audit process and give my impressions of Deloitte's work.

16.     As I recall, the Deloitte audit team comprised around six people on-site, plus a manager, the audit partner, and multiple assurance review roles. My interaction was mainly with the on-site audit staff and the manager.

17.     For Autonomy's audits the manager was initially Rob Knight, and later Mr Welham. In addition to the group audit, Deloitte also audited the individual subsidiary company accounts in the UK. For this reason, after the completion of the group audit, a few months later Deloitte revisited Autonomy to audit the accounts of its subsidiaries, meaning there was a further detailed account of the same numbers. The audit partner was Mr Richard Knights and later Mr Nigel Mercer. The assurance review roles were an Engagement Quality Assurance Review partner (**EQAR**), an Independent Review Partner (**IRP**), and a Professional Standards Reviewer (**PSR**) (the **Assurance Reviewers**). The EQAR's role was to review Deloitte's work against Deloitte's own policies and procedures. The IPR reviewed Deloitte's work so that it remained independent as part of its professional obligations. The IPR was invisible to Autonomy. The PSR was a specific accounting expert who reviewed Deloitte's work on specific areas from a very technical perspective.

18.     Although the finance team moved around a lot, as Autonomy expanded and took on more and more people, the audit team would always sit in an office close to the finance team. They had free reign to go about and talk to everyone. If, for example, they spoke to me they would be totally in earshot of everyone else in the finance team. This was helpful as someone might have known the answer to one of the audit team's questions and piped in. Mr Chamberlain would use his little meeting table to openly discuss things with Deloitte.

- 5 -

70-40538856

HP-SEC-02936950

*Audit Process*

19.  The Deloitte audit team would come in four days after the close of the quarter to start their review or audit. There would be a planning meeting which would involve discussing audit logistics (for example timing and testing) and updating Deloitte on Autonomy's business strategy or focus. Attendees would usually include Mr Stefan, Ms Anderson, Mr Chamberlain and myself. Mr Hussain might attend if he were in Cambridge at the time.

20.  Autonomy's financial year ran with the calendar year. Autonomy would produce information for the market quarterly. Deloitte would review these quarterly reports, but this was not a formal "audit". At the end of the year, there was the full audit. Deloitte's quarterly reviews went beyond a mere review. They were more like mini audits, particularly on the revenue side. The same amount of work went into the review of revenue as a year-end audit, however, the US Deloitte teams who audited expenditure areas based in the US were only involved at the year-end. More information was released to the market for the year-end audit.

21.  Deloitte would audit revenue first, looking at any transaction over a certain dollar amount (initially this was any deal over $100,000, but the threshold grew as the company and revenue grew). They were entitled to see anything and everything they wanted. The audit team would take away revenue and any other files of working papers and review them at their leisure. These files contained a lot of detail. For sales over $100,000, they would contain a copy of the fully executed contract, the customer's purchase order, proof of delivery and, if needed, the revenue working paper to explain why a decision or judgment had been made.

22.  The auditors checked everything they wanted, usually testing every item over their materiality threshold plus a sample of the rest (this was true for expenditure as well as revenue transactions). They could access whatever they wanted at any time. They used to come and help themselves to the documents. We also had copies of all the larger revenue transactions organised in orange folders which contained information for Deloitte to access quickly and easily whenever they needed.

23.  Deloitte also had an "outstanding list" which was a list of information Deloitte had requested, most of which could not be accessed immediately, as it could take some

70-40538856

HP-SEC-02936951

time to find. Items would get ticked off the outstanding list as they were provided to Deloitte. The audit senior and manager would meet regularly with the finance managers, including Steve Chamberlain, Poppy Gustafsson (nee Prentis), Antonia Anderson, Matt Stefan and myself. This involved attending informal catch-ups at the start of each day, and formal meetings every evening to go through this list and give estimates for delivery of outstanding items. During the course of the day, Deloitte's senior and manager would also catch up informally with any member of the finance function as and when needed.

24. Deloitte's on-site testing was undertaken by a mix of junior and senior Deloitte team members, who would provide the information to Mr Welham for review. By the end of the first week, I would have completed the consolidation (an Excel file) and passed a copy to the audit team for review. This would add together the information from the various subsidiaries and detail all the consolidation adjustments. Any adjustments that Autonomy had identified during the process, whether proposed by Deloitte or which otherwise needed to be included, would be added to the consolidation file as separately identifiable adjustments. Mr Welham would review his team's work and perhaps ask follow-up questions.

25. Mr Welham was not the decision maker for Autonomy's audits; he would compile the information and send it to the audit partner and the Assurance Reviewers for further review and decision making. The Audit partner and Assurance Reviewers would often have follow-up queries or clarifications, which Mr Welham and his team would address with us.

26. As is normal audit practice, and as outlined by Mr Welham at paragraphs 16 to 36, during its review, Deloitte carried out its "*own independent inquiries*" to "*obtain sufficient appropriate audit evidence*" and conducted its review "*with an attitude of professional scepticism*". Deloitte did this by (for example):

    (a)    reviewing Autonomy's prepared accounts and checking them back in detail to the consolidation and other supporting schedules;

    (b)    reviewing source documents for a large sample of transactions (such as invoices, POs, contracts, bank statements, proof of delivery);

70-40538856

HP-SEC-02936952

(c)     contacting third parties for verification (such as suppliers, customers, banks);

(d)     contacting internal parties for verification (such as technical team or sales people);

(e)     obtaining management representations; and

(f)     verifying and cross referencing everything (i.e. not simply relying on one source).

27.     Deloitte would start with transactions in the books and trace them back to their source. They did not simply rely on what we in the finance team or management told them was happening, as that is not an audit. I believe they required verification from more than just one source. Audit letters would always include a standard disclosure letter from management, but Deloitte could not (and would not) have relied on such representations in isolation, and there would have been a verification process. Deloitte would have brought their professional scepticism to every point and they appeared to be to be doing so. They were very professional and I considered that they did a very thorough review, producing a high quality audit; they did not skip over anything, so far as I could see.

28.     Any issues or disagreements between the finance team and Deloitte would be discussed openly with Mr Chamberlain on the round meeting table by his desk. By "disagreements", I mean differences in accounting judgments. Some decisions in accounting are black and white (for example, if someone has literally just made a mistake like not processing an invoice so the books do not line up) and some things are judgmental (for example, accrual for bonuses which require estimates of what the bonus will be). From a revenue perspective there were always areas that required judgment to be applied. For example, it is a judgment call whether someone is going to be able to pay their debts to allow revenue to be recognised. I never personally discussed collectability issues with Deloitte, as this was a revenue decision so would discussions would have taken place with Mr Chamberlain, Ms Gustafsson or Mr Stephan or Antonia Anderson. Given our close working relationship I observed these discussions taking place.

70-40538856

HP-SEC-02936953

29.    For the quarterly press releases and annual report, the finance department would pull information from the finance systems, which would be fed into a ledger package called DDS. From there, reports were produced and consolidated into Excel. Adjustments would then be made; sometimes the finance team would find some, sometimes Deloitte would find some. Deloitte would work backwards from the consolidated spreadsheet to prove the number in each column and look at the details and transactions behind it. Everything was compiled and calculated in excel, with the documents presented to the market prepared in Word. Both Deloitte and Autonomy did a detailed "ticking exercise" to ensure the transcribing between those two formats was correct. Deloitte also reviewed the narrative portion of quarterly statements in detail to ensure they were completely consistent with the numbers audited, and similarly with the annual statements to make sure the narrative was not at odds with the financials.

30.    Deloitte would prepare its Audit Findings report for presentation at the quarterly Audit Committee meetings. I understood that the Audit Committee was the final decision maker for all accounting and audit matters, not Mr Hussain. Mr Chamberlain prepared the quarterly reports and press releases for Mr Hussain to review. My understanding was that, although Mr Hussain did not prepare these reports, he was involved in presenting them, and had to make sure he could handle any questions about them.

*Impressions of Deloitte*

31.    I was confident Deloitte had performed its audit role well. My impression was that Deloitte's review was robust and that they were doing everything they should have in an audit/review, not least because they:

    (a)    conducted quarterly reviews, so had a very good understanding of Autonomy's business and consistent oversight of its accounts;

    (b)    had full access to all of Autonomy's information;

    (c)    are an internationally recognised and reputable firm;

    (d)    had multiple checks and balances through their layers of assurance review;

70-40538856

HP-SEC-02936954

(e)     conducted their reviews and audits in accordance with all the correct procedures; and

(f)     used the same team of staff for each review or audit, with the more junior members taking more senior roles as they progressed through Deloitte, so they knew and understood Autonomy's business very well.

32.     Mr Welham states that Deloitte were highly reliant on management representations (for example, at paragraphs 63 and 85 of his statement). Further, throughout his statement, Mr Welham is asked to assume Deloitte was not aware of all the relevant circumstances of particular transactions. This is at odds with my experience of Deloitte's diligent and thorough approach to the reviews and audits. In addition, I would have expected Deloitte's independent testing and multiple layers of assurance to have picked up such issues at the time. Indeed, these transactions were often discussed in detail, with Deloitte requesting, and receiving, many documents to confirm the accounting treatment used. In addition, and as noted in paragraph 17 above, once the group audit was complete, Deloitte revisited Autonomy a few months later to audit the same numbers again for the subsidiary accounts, providing extra layers of audit. If, for example, debtors had not paid in the time between the two audit rounds, that would have been audited further as a "post balance sheet event".

**Costs**

33.     I was not involved in the allocation of costs for loss-making hardware to sales and marketing expense. It was a more recent development at Autonomy, starting around Q3 2009. The accounting for this was managed by Ganesh Vaidyanathan who headed up the finance functions in the US following the departure of Cynthia Watkins. Mr Vaidyanathan had joined as part of the Interwoven acquisition.

34.     I was aware that Deloitte investigated the costs allocation, but they discussed the detail of this directly with Mr Chamberlain. I was also aware that Deloitte specifically addressed this point in their reports to the Audit Committee, since it required a judgment call to calculate the marketing value derived from facilitating the hardware for customers of our software {**D009016451**}.

HP-SEC-02936955

35.  My understanding was that costs were allocated to sales and marketing for loss-making hardware because hardware was being used as a loss-leader in the US to put Autonomy and Autonomy's software in front of big name US clients.

**Resellers**

36.  I did not have a lot of involvement with resellers as that was more revenue-based. I became involved when a reseller would invoice for a marketing assistance fee (**MAF**). I would not see the MAF at the contract stage. My team would receive the invoice and be responsible for paying it. I would verify through Ms Anderson, Ms Gustaffson and Mr Stefan to confirm the MAF was to be paid. I would also check the contract to check the payment terms.

37.  Where a contract was between Autonomy and a reseller, the reseller's margin would be to cover Receivables risk as well as their sales effort. Autonomy's contract with the reseller was clear, that the reseller was Autonomy's customer and that payment was not subject to the transaction between the reseller and the end-user. The reseller's margin was equivalent to a MAF, but could also include other elements in addition to the "commission" for brokering the deal, or introducing the client, such as providing installation or ongoing support. Resellers would make money from any margin on the sale. Sometimes, if a customer was particularly large, the reseller could not resell directly (for example, because they were not big or established enough to satisfy the end-user), so they would invoice a MAF for their involvement.

38.  Depending on the value of the MAF, different sign-off was needed. At the higher-level sign-off from Mr Hussain or Dr Lynch was needed. Dr Menell's sign-off would be on software purchased under reciprocal deals rather than MAFs.

39.  I was not aware of any side letters with resellers. I would only look to the terms of the contract or a master services agreement. I would look to see whether an agreement had been signed, what percentage had been agreed, and under what payment terms.

70-40538856

HP-SEC-02936956

First Defendant, L Harris, First Statement, 16 November 2018

**Sales and the sales team**

40. I was aware that the sales team work ramped up towards the end of every quarter. Deals often closed at the end of the quarter because customers knew Autonomy was on a quarterly cycle, so they knew they could get good deals then.

41. My primary involvement with the sales team related to paying staff expenses, commissions and salaries. Commission was paid in two tranches, 50 percent when the customer was invoiced and 50 percent when the invoice was paid. Sales commission plans were used to mathematically calculate a commission. They were pretty standard based on product type or region. The commission plan could be changed to incentivise sales people in different ways. For example, if Autonomy wanted people to target a particular product, they might add half a percent to the commission plan. The basics of a plan were not really changed, it was more that a plan was tweaked over time. Mr Hussain was involved in setting the incentives. As far as I was aware during the relevant period, hardware sales were not incentivised as Autonomy's goal was to sell software. However, I now understand that Mike Sullivan, who held senior roles including CEO of Autonomy Zantaz and Autonomy Protect, received some commission payments for hardware sales. I can see the benefit of Mr Sullivan being incentivised this way, given his role and Autonomy's strategic goal of selling hardware to drive increased software sales over the long-term and of developing deeper relationships with its key customers.

**Autonomy culture**

42. Autonomy had a busy and lively atmosphere, with lots going on. I found it an exciting place to work. I enjoyed the fact that there was not a lot of office politics or one-upmanship with people trying to advance themselves. It was just everyone knowing the business and working towards the same goal. That is not to say there was never pressure to get things done. Everyone knew what the forecasts were, and people were under pressure to hit targets, but not in an abnormal way.

*Dr Lynch*

43. I did not have a lot of interaction with Dr Lynch as he was predominantly based in London. Originally, he came to Cambridge about once a week, but that decreased

70-40538856

HP-SEC-02936957

after the business grew and there was a much larger area for him to spread himself over. Even when he was in Cambridge, I did not have much to do with him as he did not really have anything to do with the finance function. I might seek Dr Lynch's and Mr Hussain's approval for big invoices, but that was about it. He was always warm and polite and would say "hello" as he passed, but we did not work together as he did not have anything to do with accounting.

44.     I never felt any pressure or aggression from Dr Lynch. At most, when I knew he was coming to the Cambridge office, I would declutter my desk because I knew Dr Lynch liked a tidy office.

*Mr Hussain*

45.     Mr Hussain came to Cambridge about one day a week. He worked mostly with Mr Chamberlain, but the office was all very open plan, and nothing was secreted away. If Mr Hussain had any questions of the finance team, he would just come up and ask and there was no need to go through any formal processes.

46.     I saw Mr Hussain less frequently during the quarter, when he was more often in London. During this time, if he wanted anything he would just call. Towards the end of the quarter, we would speak a lot more because there was more to talk about with the quarter close.

**Post-acquisition**

47.     I have been asked to respond to Mr Yelland's evidence about what happened at Autonomy after the acquisition.

48.     From a finance perspective, three pieces of work were undertaken after the acquisition: the IFRS/US GAAP fair value adjustment undertaken by KPMG, the mapping and transfer of autonomy's financial information onto HP systems, and the rebasing exercise. I discuss these in detail below.

49.     I stayed at HP after the acquisition until around February 2013. My role nominally stayed the same reporting to Mr Chamberlain and then Mr Yelland in accounting for expenditure.

   70-40538856

HP-SEC-02936958

50. Mr Yelland was initially CFO but from February 2013 he became Financial Controller. I am not aware of the circumstances of this demotion, but I had the impression from other people in the HP team (like Mr Frank Kennedy) that Mr Yelland was moved sideways at HP into the Autonomy roll. It seemed he was moved out of the way and the gossip was that he was not particularly well regarded.

51. From my recollection, Mr Yelland was not particularly interested in IFRS, nor, based on documents I have been shown as part of these proceedings, did he consider himself an IFRS expert {POS000086980}. He did not appear to be running the rebasing exercise (which I discuss in further detail below). From my perspective he seemed much more interested in changing the numbers in Autonomy's accounts as much as he could, and I felt he was not bothered about keeping the good practices as Autonomy had. For example, Autonomy had always been sure to file accounts on time to avoid a fine. Mr Yelland was not as interested.

*KPMG IFRS/US GAAP fair value adjustment*

52. Right from the start, KPMG were doing the fair value accounting adjustments to go from IFRS to US GAAP as part of its work to prepare the opening balance sheet for Autonomy under US GAAP, which was subsequently audited by EY {POS00186565}. This was a huge exercise, much more detailed than an audit. KPMG were given all the information and went into very granular level of detail. They were working very closely with Roxanne Simpson on the fair value adjustments. They ended up with a long list of revalued information. My understanding is that about 90% of the differences KPMG found were just down to US-GAAP/IFRS differences. I was told that this work was not done before the acquisition as HP had just wanted to be quick to avoid other investors coming in and getting the information. KPMG did increase the value of fixed assets on Autonomy's books based on using less prudent useful life assumptions.

*Remapping*

53. Mr David Duckworth, from HPs Merger & Acquisitions team, oversaw the work to map Autonomy's general ledger code structure to HP's. This involved matching every one of Autonomy's finance codes to an equivalent in the HP system. Rather than transferring Autonomy to HP's systems, we maintained the Autonomy

70-40538856

HP-SEC-02936959

accounts and transferred the information over to the HP system at the end of every month. This process would take around three days' work each month. The month-end process just got worse and worse and so much time was wasted every month transferring things from Autonomy's ledgers to HP's. From my perspective, this exercise was a waste of time that never really worked properly as the coding blocks were too different to match properly.

*Rebasing*

54.    The rebasing exercise was led by John Blank. This work was completely different to KPMG's fair value adjustment work. The rebasing started in 2012 after KPMG had long since finished their review. The rebasing exercise primarily looked at revenue. The impetus was to find errors and prove things were incorrect. Helen Bradley, financial controller, and I looked at things from an expenditure focus (for example, commissions), but the bulk was about revenue. Ms Anderson initially citied the majority of revenue differences to be just the differences between IFRS and US GAAP.

55.    The exceptional costs identified at the time of acquisition were mainly bringing costs forward. Where Autonomy had costs in prepayments that were going to be recognised over time, the acquisition of Autonomy made it more prudent to recognise these costs up-front due to anticipated changes in business activity.

56.    The rebasing seemed to go on for months. It certainly was not just the six-week exercise Mr Yelland describes at paragraphs 40 of his statement. We were doing it over and over again. HP's view, delivered by Mr Blank, was that "*we want to show it like this*", so he would come back with some bizarre decisions.

57.    The audit of Autonomy's accounts by Ernst & Young was very much driven by Mr Yelland to look for any, and every, little mistake; it seemed like HP were looking for reasons to say they had been mis-sold the business. It was a fishing exercise. Normally with an audit, you would not look at every transaction. The Ernst & Young audit looked at every detail at a very granular level. Internally, the message certainly was not that it was a fair value exercise because that had been KPMG's role.

70-40538856

HP-SEC-02936960

First Defendant, L Harris, First Statement, 16 November 2018

58.   From my own work and observations, I understood it to be a review to find fault. I have been shown document {**POS00353188**}, which is an email chain between Ms Sunderwala, Mr Yelland and Betsy Branch in July 2012, suggesting that the rebasing exercise was very much focussed on identified fault with specific transactions with the benefit of hindsight. Likewise, document {**POS00350763**}, an email from Ms Sunderwala to Ms Branch referring to the "rebasing exercise" in quotes, shows HP were focussed on identifying fault with specific transactions, again with the benefit of hindsight, rather than engaging in a true rebasing exercise which would have reviewed the totality of Autonomy's business including costs.

59.   I disagree with Mr Yelland's characterisation of the rebasing exercise at paragraph 46 as "*a preliminary assessment of the true substance of the transactions in Autonomy's business [that] was not designed to determine the full and precise extent of any accounting improprieties.*" The rebasing exercise was not limited at all; it was "just to find anything you can". It seemed to me that finding accounting improprieties was exactly what it was for. Everyone's focus was on going over transactions again and again. HP had all the information and were drilling down on everything. It was not designed to look at the business as a whole, rather it was looking very closely at a few, limited transactions.

60.   I asked Mr Blank what the purpose of the review was, because it was clear to me it was not anything to do with IFRS. It was clear because the costs side did not have anything to do with IFRS; with costs, the accrued differences just come down to judgment. But I was still asked to look closely and find issues. Contemporaneous documents which I have been shown as part of these proceedings suggest that the rebasing exercise was about "*the P&L rebased for US GAAP and how HP would run the business*" {**POS00344768**}. This purported justification is also reflected in emails between Ms Anderson, Ms Yelland and PWC in August and September 2012. {**POS00363345**} (August 21, 2012) and {**POS00369286**} Sept 6, 2012: "*Management of Autonomy Corporation plc ("Autonomy") has performed an exercise to identify what the results of Autonomy would have been for its 2010 financial year and Q1-Q3 of 2011 if: (a) transactions with customers had been entered into on the basis that would have applied under Hewlett Packard Company ("HP") management; and (b) HP accounting policies and practices, which reflect the requirements of US GAAP, had been applied. This exercise is referred to as*

- 16 -                                                    70-40538856

HP-SEC-02936961

*"rebasing"*. Despite what these documents suggest, in my experience, the rebasing exercise was simply a fishing expedition to find fault with accounting decisions through hindsight. The work I was directed to do for the rebasing was focused on this goal.

61.   At the start of the rebasing exercise, there had been some interviews conducted by PWC along the lines of *"what was this judgement, would it be different if..."*. I was not asked to look into hardware costs categorisation because that work had been done by KPMG already.

*Hardware – HP knowledge*

62.   I have been asked to respond to My Yelland's evidence at paragraph 52, that *"HP was unaware of the fact or extent of Autonomy's sale of hardware (at a loss) that included no Autonomy software"* and that Mr Yelland had no *"insight into the business rationale for such [hardware] transactions"*.

63.   It is difficult for me to understand how HP could have been unaware of hardware sales. The ledger codings clearly separated hardware sales and costs from software. For example, 47000 referred to hardware revenue, 57000 referred to the cost of hardware, and there was also a specific marketing code for hardware costs attributable to sales and marketing. Documents showing the hardware sales were always available to KPMG and HP, and they could see them at any time. HP could see the same documents, and the relevant ledger codes were sent to Mr Duckworth as well as to KPMG. All of Autonomy's information was available for HP to see.

64.   Mr Yelland definitely knew about hardware; in early April, he had asked me *"why aren't you selling HP hardware?"* I was also copied into emails in which Mr Yelland approved the payment of an invoice for hardware.

65.   I believe he would have known the commercial rationale behind the sales because he would have spoken with Mr Vaidyanathan, who knew the details and rationale of hardware sales. I have also now seen an email in which Mr Vaidyanathan sought Mr Yelland's approval to pay an invoice of over $940,000 for hardware which he advised Autonomy sold at a 10% loss {**POS00444417**}. I believe they would have discussed hardware sales because the accounting could be quite complicated

70-40538856

HP-SEC-02936962

matching invoices to the customer (who received the hardware package), to the sometimes hundreds of invoices for Autonomy purchasing the different hardware components.

66.     Other people at HP were also aware Autonomy sold hardware. David Duckworth had already mapped the hardware codes in Autonomy's ledgers to "Product" in HPs ledgers, these were the same codes that software was mapped to in advance of a big meeting in Pleasanton, California about this in November 2011. The meeting was led by Mr Duckworth. Gabriele Romero (an IC & GL MADO Manager working at HP Global Business Services) and Roxanne Simpson (who worked in the Enterprise Financial Reporting division of HP) were also there, along with several other people. Lots of people also attended by phone. I asked Mr Duckworth how to code software as opposed to hardware. He said there is no coding difference in the HP system. They were not interested in showing hardware separate from software. To HP, it was all product and HP's view was that it was not separate (such as services would be). They had all our ledger codes long before that meeting. There was no discussion about hardware customers.

67.     There were never any information requests by anyone from HP about hardware or hardware customers. I would have expected Messrs Yelland or Duckworth to make a big deal of the hardware if it had been such a shock to HP.

*Autonomy finance team and accounts*

68.     At paragraphs 15 to 22 of his statement, Mr Yelland describes his impressions of Autonomy and its finance team. Mr Yelland never expressed any concerns about Autonomy's accounting. Nor had he discussed any need to "scale up". We shared an office, so there would have been ample opportunity for him to bring it up.

69.     It is true that the processes and systems in place at Autonomy were very different to those at HP. However, contrary to the concerns he now expresses in his statement, I believe Autonomy had appropriate systems in place. My experience was that HP's work systems were very bureaucratic. The politics and bureaucracy at HP made it very difficult to get anything done. To illustrate this point, even by the time I left HP after eighteen months, HP had not managed to organise my access to the HP system. Sales were blocked because internal agreements had not been set

70-40538856

HP-SEC-02936963

up in HP's internal system. Every time HPs hardware was sold they had to go through a team in India who maintained manual records outside of HP's accounting system. It seemed that everything at HP was about internal politics rather than focussing on making sales and controlling costs.

70.    There were so many meetings, back-to-back, which were, more often than not, unnecessary. It was very frustrating, as nothing ever seemed to get done despite the frequency and length of internal meetings. The culture was very different from Autonomy.

71.    There was no post-acquisition integration. Commission structures were not set up to make HP want to sell Autonomy products. Even Professor Frank Kennedy, a member of the Autonomy audit committee, spoke to me about how HP had difficulty integrating many of the businesses they had previously acquired, and that HP's acquisitions often led to large write-downs.

72.    I have been asked to respond to Mr Yelland's comment, at paragraphs 18 to 19 that there was "*an unwillingness by Autonomy freely to share information regarding its business with HP.*" This is not true. Mr Hussain never "*told the Autonomy finance team it could not share information with HP without first providing it to him... and obtaining his permission*" as Mr Yelland claims. It was true that things were not shared with every department, because some information is confidential. However, all detailed accounts were given to Mr Duckworth and Ms Ramirez. It all had to be mapped out and transferred to HP's books. I produced management accounts as best as she could without having access to the HP system. I would share that information with Mr Duckworth and Ms Ramirez, without going through Mr Hussain. I would also provide information to Mr Chamberlain, who in turn would give it to Meeta Sunderwala. Mr Hussain was not part of that. As I said above, everything at Autonomy was open and transparent to HP. People were able to get information as and when they needed it.

73.    I was not aware of any complaints from KPMG or EY regarding a lack of information from Autonomy. Post-acquisition, EY and KPMG had the same audit access as Deloitte previously had. However, EY did not really come and ask me any further questions. It seemed EY was more concerned with talking to the legal team and looking at contracts.

70-40538856

HP-SEC-02936964

First Defendant, L Harris, First Statement, 16 November 2018

*Resignation*

74.     I left HP because I had become unhappy in my role, and the lack of opportunities within the organisation. I felt my job had become unchallenging and unrewarding. Because information was slowly being shifted to the HP systems, to which I never had access, I became less and less involved in the monthly reporting, as I could not access the HP ledgers due to ongoing integration failures. I was simply collecting information from Autonomy's ledgers and taking it to the HP ledgers, but could not see the results of my work. I was surprised this inefficient and cumbersome practice had continued for almost eighteen months post-acquisition. I had no faith in HP's ability to integrate Autonomy into its systems, given HP's internal politics and slow-moving bureaucracy.

75.     The finance department had huge retention bonuses. It made it very hard to leave financially, but ultimately working at HP became an unhappy experience, and one that I no longer enjoyed.

76.     I was approached by Jack Stockdale, the current Chief Technology Officer of Darktrace, in early 2013 to join an Invoke company as finance manager. I had previously worked with Mr Stockdale at Autonomy before the HP acquisition, and he was aware that I was unhappy working at HP. I resigned in February 2013 to take up this offer, and was placed on gardening leave for three months. However, during this period I went into HP from time-to-time to run the month-end process. This was reflective of HP's ongoing and unresolved failure to integrate Autonomy into the broader HP business.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

Signed .............................

Dated... 16 November 2018

70-40538856

HP-SEC-02936965

First Defendant, L Harris, First Statement, 16 November 2018

**IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
BUSINESS LIST (ChD)**

**CLAIM No. HC-2015-001324**

**B E T W E E N:**

| | | |
|---|---|---|
| (1) | ACL NETHERLANDS (as successor to AUTONOMY CORPORATION LIMITED) | |
| (2) | HEWLETT- PACKARD VISION BV | |
| (3) | AUTONOMY SYSTEMS LIMITED | |
| (4) | HEWLETT-PACKARD ENTERPRISE NEW JERSEY INC | |

**Claimant**

– and –

| | | |
|---|---|---|
| (1) | MICHAEL RICHARD LYNCH | |
| (2) | SUSHOVAN TAREQUE HUSSAIN | |

**Defendants**

---

**WITNESS STATEMENT**

**OF ELIZABETH "LISA" JANE HARRIS**

---

Clifford Chance LLP
10 Upper Bank Street
Canary Wharf
London
E14 5JJ

Ref:      70-40538856/KXN

Tel:      020 7006 1000
Fax:      020 7006 5555

70-40538856

HP-SEC-02936966

First Defendant, L Harris, First Statement, 16 November 2018

Claim No.  HC-2015-001324

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
BUSINESS LIST (ChD)

B E T W E E N :

(1) ACL NETHERLANDS BV
(as successor to AUTONOMY CORPORATION LIMITED)

(2) HEWLETT-PACKARD VISION BV

(3) AUTONOMY SYSTEMS LIMITED

(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY INC

Claimants

- and –

(1) MICHAEL RICHARD LYNCH

(2) SUSHOVAN TAREQUE HUSSAIN

Defendants

INDEX TO THE WITNESS STATEMENT OF
ELIZABETH "LISA" JANE HARRIS

| Paragraph | Document ID |
|---|---|
| 9 | D001209580 |
| 11 | HP-SEC-00840763 |
| | POS00352589 |
| 34 | D009016451 |
| 51 | POS000086980 |
| 52 | POS00186565 |

- 22 -

70-40538856

HP-SEC-02936967

| 58 | POS00353188 |
|----|-------------|
|    | POS00350763 |
| 60 | POS00344768 |
|    | POS00363345 |
|    | POS00369286 |
| 65 | POS00444417 |

70-40538856

HP-SEC-02936968

Exhibit C

First Defendant, L Harris, Second Statement, 6 September 2019

IN THE HIGH COURT OF JUSTICE                    Claim No. HC-2015-001324

BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES

BUSINESS LIST (ChD)

B E T W E E N :

(1) ACL NETHERLANDS BV (as successor to AUTONOMY CORPORATION
LIMITED)
(2) HEWLETT-PACKARD VISION BV
(3) AUTONOMY SYSTEMS LIMITED
(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY INC

Claimants

- and -

(1) MICHAEL RICHARD LYNCH
(2) SUSHOVAN TAREQUE HUSSAIN

Defendants

SECOND WITNESS STATEMENT
OF ELIZABETH "LISA" JANE
HARRIS

I, ELIZABETH "LISA" JANE HARRIS, of Maurice Wilkes Building, St John's Innovation
Park, Cowley Road, Cambridge CB4 0DS, will say as follows:

1.    The facts and matters set out in this statement are true to the best of my knowledge and
      belief. Where facts and matters are not within my own knowledge, I identify the source
      of my information and belief.

2.    I have been shown a note drafted by Morgan Lewis dated 13 November 2012, which
      purports to record an interview I attended with PwC and Morgan Lewis
      {POS000464273}. I would like to set out my response to the note in this Second
      Statement.

3.    The note records an interview I gave PwC in November 2012. I had not seen a copy of
      the note until it was shown to me by Clifford Chance last week.

- 1 -                                          70-40538856

HP-SEC-02936969

4.   My initial reaction to the note is that in many respects it does not accurately represent my views, then or now. Parts of the note do not make sense to me and are inaccurate, in that I do not believe that I told PwC what I am recorded as saying. In other respects, the note appears to have been "spun" and is very selective in including the information I provided to PwC. Had I been shown the note at the time, I would have corrected it, but it was not provided to me.

5.   I was asked to meet with PwC at their offices in Cambridge. Two representatives from PwC met with me in a meeting room. I was told that lawyers from Morgan Lewis were on the telephone. Aside from a privilege warning at the beginning of the interview, I do not recall Morgan Lewis participating any further in the interview. I have no recollection of the HP individual whose name appears on the note. The purpose of the interview was described to me as a fact-finding discussion, for PwC to obtain more information regarding certain emails PwC had reviewed previously. I had previously met with Morgan Lewis in around May or June 2012.

6.   In the interview I was repeatedly asked questions about Autonomy's revenue reporting. I said several times I was responsible for cost accounting, not revenue.

   **Hardware**

7.   The note records a discussion about hardware transactions. As I made clear to PwC, I was not involved in accounting for hardware sales. The note states that I said that "*no normal processes were followed*" in relation to Dell hardware sales, and that "*it was done by senior management centrally*". This is a simplification of the point that I was making to PwC, namely that hardware sales were not undertaken by the salesforce generally, and were not tracked in the same way as software sales on the Sales Management System, which management used to manage the performance of the salesforce across the company. I did not think, nor did I suggest to PwC that there was anything sinister about that fact. Hardware sales were not "off the books" or hidden from the Finance Department or Deloitte.

8.   The note records that I did not forecast hardware sales, suggesting that hardware sales were not part of the company's normal forecasting process. In fact, I did not forecast *any* sales. I was not responsible for revenue accounting as I made clear to PwC.

70-40538856

HP-SEC-02936970

9. The note records that Mr Hussain negotiated hardware deals with clients, and that he personally *"released and shipped them"*. This makes no sense to me. As I understood, the sales were generally undertaken in the U.S. and shipped directly from the manufacturer to the customer. I have no reason to believe that Mr Hussain would have any personal involvement in the release and shipping of hardware.

10. The note records that I said that Dr Lynch *"worked very closely"* on hardware. I do not believe this to be true now, and I very much doubt I would have stated something to that effect then. I had very little personal contact with Dr Lynch, directly or, so far as I am aware, indirectly via the people with whom I interacted most frequently (Mr Chamberlain and other members of the finance team).

11. The note records that the rationale for the hardware sales was *"to report revenue — not to build relationships or anything"*. As I recall, during the interview I was explaining that when I first saw the hardware transactions it made no sense to me. To make sure the accounting was correct, as I explained to PWC, I followed up with Mr. Chamberlain about these transactions. He explained the rationale, as described in my First Statement—namely as a loss-leader to generate sales from the company's software clients mainly in America. I was not responsible for recording hardware sales or explaining them to Autonomy's auditors but was aware that hardware sales were reviewed by Deloitte as part of the regular audit process. I was not involved in hardware sales, or the accounting for hardware sales, and so I did not know the full extent of the rationale for hardware sales, beyond what Mr Chamberlain told me.

12. The note records that the sale of hardware was grouped with licences *"to obscure it from HP"*. This makes no sense to me. Hardware sales were undertaken from 2009 onwards. The HP acquisition was in 2011. If this statement is intended to be a description of Autonomy's books and records when HP bought the company, then the statement is not correct. Autonomy recorded hardware sales in the ledger separately from software sales. That is a matter of record. When integrating with HP's accounting system, I discussed with HP, in particular David Duckworth, Gabriela Romero and Roxanne Simpson, how hardware sales were reflected in the ledger. As part of the mapping exercise shortly after the acquisition in October and November 2012, we worked to move data across from Autonomy's finance systems to HP's finance system. This included entries for hardware sales and the cost of hardware sales. Mr Duckworth had already made the decision to group hardware sales together with software license

70-40538856

HP-SEC-02936971

sales in HP's finance system before we met. When I questioned this he explained that HP thought that the distinction between hardware and software sales was not material, and, according to Mr. Duckworth, it was all "product" from HP's perspective. This idea did not emanate from Autonomy and it was not hidden from HP.

13.     The note records me saying I "presumed" that the purpose of this practice was to show to investors that Autonomy's sales were increasing. I do not believe that I said this. I was aware that accounting for hardware sales was discussed with Deloitte and considered by the Audit Committee as I said in my First Statement, and I did not think then, and have no reason to think now, that the purpose of hardware sales was to show to investors that Autonomy's sales were increasing. Again, I was not involved here and so my knowledge is very limited.

14.     The note records Mr Hussain putting pressure on me to *"back more out of COGS"* in 2010, after Deloitte determined that virtually all of the costs of hardware sales should be recorded as COGS. The note suggests that I was instructed by Mr Hussain to take other costs out of COGS, the suggestion being that Autonomy would hide the costs of hardware sales. The note records that *"the pressure from Hussain increased"* and that I was instructed to *"keep the numbers the same"*. That is not what happened and I do not recall saying this to PwC. I had a discussion with Mr Chamberlain, not Mr Hussain, where I was asked to revisit cost allocation because the change in the percentage booked from hardware sales gave us the opportunity and the incentive to revisit the accounting and make sure that there was consistency of approach between different parts of Autonomy. This was a housekeeping exercise, not an instruction to do anything improper. One example I remember, which I probably would have given PwC, was that we found that Zantaz booked salary costs as COGS, whereas the rest of Autonomy booked them as salary. We moved those costs from COGS to salary.

**Other accounting practices**

15.     The note records, in the second paragraph on page four, that Mr Hussain "cajoled" and "pressured" both Ms Gustafsson and me to "cut costs" and "increase revenues". The note gives the impression that Mr Hussain acted improperly and in a threatening and hostile way towards me. That was not what was going on at all. In fact, I dealt mostly with Mr Chamberlain. Mr Hussain was not my direct supervisor. The note makes hardly

any reference to Mr Chamberlain, it is skewed towards portraying Mr Hussain in a bad light.

16. Mr Hussain *was* focussed on detail and he was a hard task master, but not in a threatening or inappropriate way. He was driven to run the company as effectively as possible and he kept a close eye on performance, particularly the sales force. My impression was that he was hard-working, details-oriented and trying to get things right. One example was his close oversight of sales, using purple and green spreadsheets to track the progress of a large number of transactions during the month. He would know if salespeople were falling behind on making calls, meeting customers or pursuing leads and he would hold them accountable for this. This is different to Mr Hussain being "controlling" in the context that the note attempts to establish.

17. I found his focus on detail and rigour frustrating at times, as I am sure everyone did. For example he would sometimes make last-minute decisions that meant working late to redo month-end consolidations. However, the references to arguments between me and Mr Hussain, where he would "storm off", the idea that I would threaten Mr Hussain that Deloitte would discover what he had done and that he should speak to Deloitte because I "*was not going to lie*", do not portray a picture that I recognise.

18. The second paragraph on page 4 of the note also refers to Mr Hussain making "*outrageous requests like avoiding depreciation*" and records me as saying that Ms Gustafsson and I "*would argue with Hussain about practices that were plainly wrong, like avoiding depreciation.*" While I do have some recollection of Mr Hussain saying something about depreciation, the note's characterisation of the comment is quite confused. My recollection is that whatever the suggestion was, the comment was intended to prompt the finance team to look at all areas of the balance sheet closely. I did not take it as an instruction to book costs in any way contrary to IFRS. I do not recall any instance of Mr Hussain directing me to book costs in an improper manner, nor engage in any other improper accounting practices. At no time did Mr Hussain want me to account for things in a way that was "plainly wrong" as the note suggests.

*"Imprudent practices"*

19. The note records a number of "imprudent practices". I address these in turn below:

HP-SEC-02936973

(a)     On page 4 there is a description of capitalisation of R&D costs and salary costs in Q1, changed to 6% amortisation halfway through Q3. Capitalisation of R&D was a change brought about by IFRS. We thought, and I thought, that the IFRS rule was imprudent and did not show the true picture of Autonomy's financial results, but we had to follow it nonetheless. The note seems to suggest that it was an "imprudent practice" specific to Autonomy. It was not.

(b)     On page 4 and 5 there is a reference to a $1.8m recovery that Autonomy was pursuing from individuals involved in a fraud case. I was told initially by Mr Hussain that we were pursuing this recovery. Several months later I was told by Mr Scott that we had never had planned to do so. As I recall, this was in response to a question from PwC where I was asked if Mr. Hussain had ever asked me to make an incorrect adjustment. This was the only example I could think of, and I was trying to answer PwC's questions as completely as possible. I do not know whether Mr. Hussain or Mr. Scott provided me with incorrect information or whether the whole thing was just a misunderstanding.

**"Other practices"**

20.    The note records me as saying that "*often revenue was deferred to another quarter, and Hussain always made that decision*". I was speaking here about hardware revenue, which I explained I was not involved in. To be clear, to my knowledge, revenue recognition was based solely on the facts such as whether hardware had actually been delivered and accepted, and nothing more. If the note suggests that there was anything inappropriate or improper about the deferral of revenue, that is not based on anything that I told PwC.

**Reseller transactions**

21.    The note records information I gave PwC about a write-off, under point 2 on page 6. The note incorrectly identifies this as being a write-off relating to reseller transactions, given it falls under Part V of the note. PwC had asked me specifically about my email to Mr Mobley cited in the note. In my response, I was not referring to reseller transactions, rather I was referring to the overall housekeeping exercise of writing off fully provided debtors, as reflected in the email. My recollection is that I was told by Mr Chamberlain to write-off all fully provided trade debtors, which I did. Mr

70-40538856

HP-SEC-02936974

Chamberlain subsequently asked me why I had written off all of the provided debtors and I told him that he had asked me to do so. He denied telling me to do so, so I undid the write-off. Either I was mistaken about his initial instruction, or he was. Either way, no harm was done. This exchange is misrepresented in the note, as it is included under reseller transactions when it was nothing to do with them.

22. The note goes on to describe pre and post-acquisition write-offs and provisions, ending with a passage where I am alleged to have said that I "*would have said something earlier if I had been allowed to talk about it or correct it, but Hussain prevented me*", and that I "*eventually presented little lists of these practices to come clean*", providing examples. The note is muddled at this point.

23. Autonomy went through an exercise, pre-acquisition, of trying to work out how HP would want to deal with provisions and bad debts under HP's own policies. We had been through this process ourselves when buying other companies. Autonomy's approach was to examine debts on a case by case basis, but we expected HP would have a more standardised approach, such as all debts over a certain age to have a percentage of the debt provided for. We went through this exercise ourselves, standardising our approach. After the acquisition, we learned that HP was more conservative than we had predicted, so we had to make more provisions.

24. There was nothing improper about any of this. It was a housekeeping exercise. There was nothing to "come clean" about and I was not prevented from discussing what we had done with HP. The examples that I am said to have given PwC illustrate this – not accruing bonuses, not getting back deposits when vacating buildings, not accruing commission for directors – these are housekeeping points. I note there is a reference to hardware allocations. I cannot explain that reference. It has nothing to do with provisions and bad debts, so far as I can tell, but it is possible that there was some housekeeping in that area that I mentioned.

### Dealings with Deloitte

25. The note records, at Section VI, information about Autonomy's dealings with Deloitte, and suggests that I would direct the auditors to Mr Hussain for answers to their questions as I did not "*like to lie*". The implication is that Mr Hussain was prepared to lie to Deloitte. That implication is false. If I was unable to answer a question from

- 7 -

HP-SEC-02936975

Deloitte, it would be because I was not involved with a particular process, for example where questions related to the revenue side. I would have told Deloitte to ask the relevant person because I didn't want to give them inaccurate information. It is possible that I expressed this to PwC as "*I'm not going to lie to the auditors*", but I very much doubt it.

26. I did not tell PwC that I was ever asked to lie to Deloitte, by Mr Hussain or anyone else. I did not lie to Deloitte and, so far as I know, no-one at Autonomy ever lied to Deloitte, including Mr Hussain. I cannot think of any example of a lie told by a colleague of mine at Autonomy to Deloitte. If PwC had asked me that question in November 2012, that is what I would have told them. The note records that I and others were instructed by Mr Hussain to "keep information" from HP. This was in fact just an instruction from Mr Chamberlain, on one occasion, to keep the full trial balance from one individual at HP because we thought she was not competent and would ask irrelevant questions about it, but we provided the full trial balance to KPMG at that time. We did not generally withhold information from HP.

**Other members of management**

27. The note ends with a section on other members of management. It contains several inaccuracies. Mike Lynch did not come to Cambridge "a lot". He very seldom came to Cambridge, and his visits were like a Royal visit. I have no idea whether Mr Chamberlain spoke with Dr Lynch frequently. I did not hear Mr. Chamberlain speaking to Dr Lynch frequently, but I really would not know one way or the other. Dr Lynch was definitely not "*involved in the accounting*".

**Conclusion on the note**

28. The note contains other inaccuracies that are less material. For example, the note states that Mr Hussain was "hands-on" with the invoicing system. He was not. I have sought in this statement to focus on material inaccuracies or areas where the context of my remarks was not captured. The Morgan Lewis note is not an accurate reflection of my evidence in these proceedings. My evidence is as set out in my First Statement.

70-40538856

HP-SEC-02936976

First Defendant, L Harris, Second Statement, 6 September 2019

## STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true.

Signed ......................

Dated ......6th September 2019

70-40538856

HP-SEC-02936977

First Defendant, L Harris, Second Statement, 6 September 2019

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**CLAIM No. HC-2015-001324**

**B E T W E E N:**

(1)     **ACL NETHERLANDS (as successor to**
**AUTONOMY CORPORATION LIMITED)**
(2)     **HEWLETT-     PACKARD     VISION BV**
(3)     **AUTONOMY SYSTEMS     LIMITED**
(4)     **HEWLETT-PACKARD ENTERPRISE NEW**
**JERSEY INC**

**Claimant**

– and –

(1)     **MICHAEL     RICHARD     LYNCH**
(2)     **SUSHOVAN     TAREQUE     HUSSAIN**

**Defendants**

---

### SECOND WITNESS STATEMENT

### OF ELIZABETH "LISA" JANE HARRIS

---

Clifford Chance LLP
10 Upper Bank Street
Canary Wharf
London
E14 5JJ

Ref:     70-40538856/KXN

Tel:     020 7006 1000
Fax:     020 7006 5555

– 10 –

70-40538856

HP-SEC-02936978

Exhibit D

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | D J Duckworth |
| 3. | Statement No | 1 |
| 4. | Date | 8 February 2019 |

**Claim No. HC-2015-001324**

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES
BUSINESS LIST (ChD)

**B E T W E E N:**

(1) **ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY
CORPORATION LIMITED)**
(2) **HEWLETT-PACKARD VISION BV**
(3) **AUTONOMY SYSTEMS LIMITED**
(4) **HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.**

**Claimants**

**-and-**

(1) **MICHAEL RICHARD LYNCH**
(2) **SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

---

**WITNESS STATEMENT OF DAVID JOHN DUCKWORTH**

---

I, DAVID JOHN DUCKWORTH of 1501 Page Mill Rd., Palo Alto, California STATE AS FOLLOWS:

1.      I am the Strategic Planning & Operations Manager of Print Marketing at HP Inc.  I make this Witness Statement on behalf of the Claimants in connection with the above-named proceedings.  In particular, the Claimants' solicitors have asked me to consider the Witness Statement of Elizabeth Harris dated November 16, 2018 ("**Harris 1**") and to respond to certain matters therein.

2.      Except where it otherwise appears, the facts and matters to which I refer in this Witness Statement are within my own knowledge and are true. Where facts are from another source, I identify the source and I believe them to be true.

3.      I have not attached the documents to which I refer in this Witness Statement. Instead I have provided document references for those documents. I understand that the document references are the Document Production IDs allocated to the documents by the parties as part of the disclosure in the current proceedings. In certain instances, I have relied upon these documents to refresh my recollections and refer to the specific content of a number of them.

C/40.13/1
HP-SEC-02934401

**Professional History and Background**

4.      I attended Santa Clara University where I graduated in 1987 with a Bachelor's Degree in Commerce and Economics.  I also have an MBA in Finance from the University of San Francisco.

5.      I have worked at Hewlett-Packard Company ("**HP**") (and later at HP Inc.) for more than 22 years in a variety of roles, primarily with a finance focus.  At the time of the Autonomy acquisition in 2011, I was HP's Mergers, Acquisitions, Divestitures and Outsourcing ("**MADO**") Finance Integration Project Manager (and had been for approximately 20 months).  Prior to that, I had been an Accounting and Finance Operational Policies Manager at HP for several years.  In November 2015, HP separated into Hewlett-Packard Enterprise Company and HP Inc., at which point I transitioned into a Print and PC Marketing Finance role and thereafter into my current strategic planning and operations position in Print Marketing at HP Inc.

**My role in the Autonomy integration**

6.      In my role as HP's MADO Finance Integration Project Manager, I was a member of the team with responsibility for the integration of Autonomy's financial systems and processes into HP's financial accounting structure following the Autonomy acquisition.  I was involved with this work for approximately 6 months, from October 2011 to March 2012, at which point I moved into a corporate development role within HP's M&A Integration team.

7.      My understanding at the time of the Autonomy acquisition was that the Autonomy integration process was to be relatively light touch, on the basis of an overarching plan for Autonomy to remain largely independent from the rest of the HP group.  Autonomy's senior leadership were very clear about both of those things.  Nevertheless, given HP's financial reporting obligations in respect of all legal entities within the HP group, there was necessarily work to be done to enable a process by which Autonomy's financial information could be included in HP's consolidated internal and external financial reports.   This process – which represented the most significant element of my role on the Autonomy financial integration – involved the mapping of Autonomy's financial information on a go-forward basis (i.e. from the point at which Autonomy was acquired by HP) from Autonomy's general ledger (known as DDS) to HP's consolidated general ledger (known as Lighthouse, abbreviated as LHGL).

**Mapping of Autonomy's financial data**

8.      The data mapping process involved, in the first instance, the creation of a spreadsheet which mapped (i.e. linked): (i) Autonomy's various legal entities to appropriate company codes within HP's financial systems; (ii) Autonomy's organizational structure to HP's management reporting units and cost center structure (for example assigning Autonomy R&D by entity to an appropriate HP cost center by company code); (iii) Autonomy's various general ledger accounts to HP's general ledger accounts; and (iv) Autonomy's product lines to HP's business areas to enable profit and loss reporting.  In order to assist with the population of the spreadsheet, we provided Autonomy's Finance team with HP's Accounting and Finance Manual (AFM) which documented, amongst other things, how HP's LHGL accounts were used and described the business areas utilized by HP for profit and loss reporting.  I (together with the rest of the

G/40.13/2
HP-SEC-02934402

finance integration team) then relied on Autonomy's detailed knowledge and understanding of its own accounting structures in order effectively to map the information.

9.  Once the mapping spreadsheet was in place (by the end of November 2011), Autonomy's financial activity could then be transferred into HP's financial systems on a monthly basis (from November 2011 onwards) – at a total monthly activity level rather than transactional level – utilizing this mapping spreadsheet.  While Autonomy Finance remained responsible and accountable within HP for the accuracy of its financial reporting (since HP did not have visibility of Autonomy's financial activity at a transactional level), this transfer of data ensured that HP had what it called "financial master data" in respect of Autonomy; that is, the information HP required for internal and external financial, legal and tax reporting.

10. I was told by my line-manager at the time, Kristen Walthall, that when she first explained to Autonomy the need for this mapping exercise as part of the financial integration workstream after the close of the Autonomy transaction, there was pushback from Dr. Lynch and Mr. Hussain.  Generally, the message from Dr. Lynch and Mr. Hussain in respect of financial inquiries was that HP simply needed to trust that Autonomy's financial information was accurate and that its systems and processes were operational.  The tone was set, right from the start, that Autonomy would share only limited information with HP and that the flow of information would be controlled by Dr. Lynch, Mr. Hussain and other members of legacy Autonomy senior management.

11. However, as explained at paragraphs 7 and 9 above, HP required a minimum level of information from Autonomy in order to meet HP's financial reporting obligations, both in respect of Autonomy's results and HP's own consolidated results.  Once it was made clear to Dr. Lynch and Mr. Hussain that this was non-negotiable, they agreed that the mapping exercise could take place and Stephen Chamberlain (at that time Finance VP at Autonomy) put me in touch with Ms. Harris who was, at that time, Autonomy's Financial Controller and looked after Autonomy's reporting.  Thereafter, I believe that Ms. Harris and the HP finance integration team worked well and collaboratively together to conduct the mapping exercise and to facilitate the transfer of Autonomy's financial activity to HP's financial systems on a monthly basis.

12. Ms. Harris notes at paragraph 53 of Harris 1 that the financial mapping exercise and monthly data transfer took place in lieu of Autonomy transactions being recorded directly onto HP systems.  That is correct and was necessarily the case: a full financial systems integration – even if it had been something which Autonomy wanted following the close of the acquisition (which I do not believe it did given the pushback on the more limited mapping exercise and the desire for Autonomy to remain largely independent) – takes a significant amount of time to complete due to country by country legal merger requirements and multiple transaction system migrations, and we needed a process to enable HP to report consolidated financials in the meantime.  Indeed, HP acquired approximately 10 companies during my 2 year tenure as MADO Finance Integration Project Manager and a similar financial mapping process was

C/40 13/3
HP-SEC-02934403

conducted for each of those companies (albeit with less pushback than was the case with Autonomy) following close and prior to a full finance integration.

13.    Ms. Harris also states that the mapping process "*would take around three days' work each month*"(paragraph 53 of Harris 1).  While it is correct that the financial month-end close and financial transfer process for Autonomy did take around 3 days' work, the majority of this time (approximately 2 days) was spent closing Autonomy's books (i.e. Autonomy's consolidated general ledger), as had been necessary prior to Autonomy's acquisition by HP.  In other words, that is work which Ms. Harris had to conduct in any event, regardless of the financial integration process.  The only difference was that, following the acquisition, Ms. Harris and her team had to conduct the work on an accelerated basis, in order to allow time for the resulting financial data to be transferred to HP.  After Autonomy's books had been closed, Ms. Harris would spend approximately one day transferring Autonomy's monthly financial activity from DDS to LHGL utilizing the mapping spreadsheet described above.

14.    Ms. Harris further states that "[*t*]*he month end process just got worse and worse*" and that, from her perspective, the exercise was "*a waste of time*" (paragraph 53 of Harris 1).  I do not agree with either of those statements:

(a)    The majority of the work was front-loaded by means of the mapping spreadsheet described above.  Once that had been settled, the monthly process – while time-consuming – was effectively mechanical in nature: Ms. Harris utilized the mapping spreadsheet to translate the monthly DDS activity to LHGL, via a journal voucher upload tool.  During my time as MADO Finance Integration Project Manager (i.e. the first six months following the Autonomy acquisition), I believe that the process ran more smoothly month on month.

(b)    Although Ms. Harris, focused only on Autonomy itself, may have viewed the mapping exercise and data transfer as a waste of time, the process was, as I have explained above, absolutely necessary for HP.  Ms. Harris' comment is characteristic of the Autonomy attitude, set from the top, immediately following the acquisition: there was a general reluctance to acknowledge that Autonomy was now part of a larger organization and that, as a result, certain things had to change (including the need to comply with HP policies and procedures).

15.    As I have explained at paragraph 12 above, HP conducted an equivalent financial mapping process for all of its acquisitions.  It is fair to say that the process for Autonomy was more time-consuming and complex than most of the other acquisitions with which I was involved.  However, this was not as a result of anything that HP did (or did not do).  Rather, the exercise was complex because Autonomy's financial structure and transaction systems were themselves extremely complex, primarily due to the significant number of companies which had been acquired by Autonomy over time and not fully integrated from a financial perspective, as well as the multiple intercompany billing relationships.  By way of example, there were approximately 70 different Autonomy legal entities that had to be mapped to company codes in HP's financial systems – with each entity requiring multiple costs centers to

C/40.13/4
HP-SEC-02934404

be mapped by function (Services, Support, Sales, R&D, Marketing and Administration) – and nearly 800 DDS general ledger accounts that needed to be mapped to HP's LHGL. Further, the monthly close process (outlined at paragraph 13 above) took a significant amount of time because Ms. Harris' team had to consolidate the financial results of all the different Autonomy entities (i.e. including those that had been acquired over time and which operated on different financial systems) into DDS before transferring the consolidated activity via the journal voucher upload tool from DDS to LHGL.

16.   HP provided significant support to Autonomy to make the financial mapping process as smooth as possible. By way of example, I was on site in Cambridge, UK for both the December 2011 month-end close and for the close of the first quarter of 2012 (in early February 2012) in order to assist with any logistical issues and to provide project management support for Ms. Harris' team.

17.   Ms. Harris comments at paragraph 69 of Harris 1 that HP's systems were "*very bureaucratic*" and that the "*politics and bureaucracy…made it very difficult to get anything done*". From a finance integration perspective (i.e. the process of which I had visibility), I do not think that those comments are fair. HP put in place appropriate policies, procedures, a governance oversight model and robust internal controls in order to ensure the integrity of its financial reporting which, following the acquisition, had to include Autonomy. Autonomy was not familiar operating in such an integrated environment – as demonstrated by its own lack of financial integration (see paragraph 15 above) – and struggled to adapt to being part of a much larger organization.

**Knowledge of Autonomy hardware sales**

18.   At paragraphs 63 and 66 of Harris 1, Ms. Harris suggests that I must have been aware of Autonomy's hardware sales given my involvement in the mapping of Autonomy's general ledger accounts – 2 of which included reference to hardware – from DDS to LHGL. Ms. Harris also refers, in general terms, to a third account "*for hardware costs attributable to sales and marketing*". I have reviewed the data mapping spreadsheet K24/248.1/1 .98382} for the purpose of preparing this Witness Statement but I cannot identify the account to which Ms. Harris refers.

19.   As a preliminary matter, I confirm that during my time as the MADO Finance Integration Project Manager, working on Autonomy's financial integration, I had no knowledge of the fact that Autonomy had been reselling third party hardware (without the inclusion of Autonomy software). The first I heard of those Autonomy hardware sales was much later on, after Dr. Lynch and other members of Autonomy's senior management team had left HP.

20.   The accounts to which Ms. Harris specifically refers at paragraph 63 of Harris 1 were 2 of nearly 800 Autonomy DDS GL accounts which were mapped to LHGL (by means of the mapping spreadsheet referred to at paragraph 8 above) in the period shortly after the Autonomy acquisition. I have no particular recollection of either of these accounts. While Ms. Harris is correct to say (at paragraph 66 of Harris 1) that the mapping exercise was discussed during a meeting in Pleasanton, California in November 2011, I do not recall any particular discussion at

C/40.13/5
HP-SEC-02934405

that meeting (or otherwise) about either of these accounts.  From recollection, the meeting in Pleasanton lasted about 3 hours.  We were therefore unable to go through the numerous general ledger accounts in any level of detail.  Indeed, the time spent on the *circa* 800 DDS accounts during that meeting was, on average, less than 15 seconds per account.

21.    Furthermore, the nature of the mapping process did not require me to consider the scope of the activity that flowed through the GL accounts or to examine any underlying transactions within the accounts (as explained at paragraph 9 above, the financial data was not transferred at a transactional level), let alone to consider the accounting treatment of those transactions or whether they were appropriate for Autonomy to be entering into.  Rather, my goal was to ensure that the accounts mapped appropriately to equivalent HP accounts, for example that an Autonomy payroll account mapped to an HP salaries and wages account.

22.    Autonomy DDS account "470000 460- HARDWARE REVENUE – CDF" (identified by Ms. Harris at paragraph 63 of Harris 1) was mapped to HP's "Trade Sales of Products" LHGL account (see K24/248.1/1 .98382}).  This mapping approach was consistent with that of the other Autonomy revenue accounts which were similarly mapped to "Trade Sales of Products".  There was no reason for me to pay attention to the particular nature of the products generating the revenue in those accounts as this LHGL account mapping was indeed accurate.  Indeed, as Ms. Harris explains at paragraph 66 of Harris 1, HP utilized its "Trades Sales of Products" LHGL account for all product sales, without distinguishing – at an account code level – between the nature of those products, e.g. between hardware and software.

23.    However, Ms. Harris is incorrect to say that the fact that HP did not distinguish, within the "Trade Sales of Products" account code, between hardware and software meant that HP had no interest in differentiating between the two.  On the contrary, HP had distinct product lines, referred to in LHGL as business area designations (BAs), for hardware and software which were utilized alongside the "Trade Sales of Products" account code to determine whether HP revenue would be recorded as hardware or software in the profit and loss statement.  This distinction was important for HP given that software revenue requires compliance with different revenue recognition policies than hardware revenue and typically has significantly higher gross margins than hardware revenue (which typically leads to higher software operating profit than hardware operating profit).

24.    By contrast, Autonomy had no product line (or BA) designation in respect of hardware.  As explained at paragraph 8 above, one of the key elements of the financial mapping process was to link Autonomy's product lines to HP's BAs, so enabling Autonomy financial information to flow through appropriately to HP's profit and loss statement.  During the mapping process, only 4 product lines (or BAs) were identified by Autonomy: (i) Autonomy License; (ii) Autonomy Support; (iii) Autonomy Services; and (iv) Autonomy SaaS (software as a service).  Hardware was not given a separate product line classification by Autonomy.  Instead, Autonomy's revenue from account "470000 460 – HARDWARE REVENUE – CDF" was classified by Autonomy as either license, support, services or SaaS and, as a result, was recorded in that

C/40.13/6
HP-SEC-02934406

way in HP's financial systems.  Autonomy hardware revenue was therefore not identifiable within HP's systems.

25.   I therefore do not agree with Ms. Harris' comments at paragraph 63 of Harris 1 that "[*a*]*ll of Autonomy's information was available for HP to see*". Autonomy did not share any DDS GL detail with HP Finance during the MADO integration process that I was engaged in; rather it used the mapping table to upload certain information into LHGL and only the LHGL information was available for HP to review.  HP Finance would not have been able to identify from the Autonomy financial information that was transferred to HP's systems on a monthly basis that Autonomy was generating hardware revenue: it could only see the amount of Autonomy revenue within the "Trade Sales of Products" classification and how that revenue was split as between license, support, services or SaaS.

26.   At paragraph 66 of Harris 1, Ms. Harris claims to have asked me, during the November 2011 meeting in Pleasanton, how to code software as opposed to hardware and that I responded that there was no coding difference in the HP system.  I have no recollection of such an exchange, but if the question was asked, I would have responded to the effect that HP distinguishes between hardware and software at a BA level rather than at an account level. Further, if I had understood Ms. Harris to be asking about how Autonomy should differentiate between hardware and software revenue (which would not necessarily have been my understanding of her question, which appears to focus on how software revenue should be coded), I would have explained that Autonomy would need to designate a product line (or BA) in respect of hardware (which, as explained above, Autonomy had chosen not to do).

27.   Even if I had understood Ms. Harris to be asking how to code hardware sold by Autonomy (or, indeed, had I given particular attention to the Autonomy hardware revenue account), I would still not have had the information required to understand the nature of those sales.  For example, it may well have been an indication that Autonomy sold package solutions providing software and hardware, (e.g. for storage).  It would not have informed me that Autonomy was reselling third party hardware on a standalone basis, i.e. without any software being added. As explained above, I had no knowledge of that practice and relied on Autonomy leadership to define the product lines (or BAs) relevant to their business.

28.   Furthermore, as I have also explained above, it was not my role to examine the underlying substance of Autonomy transactions, to establish whether those transactions were appropriate from an accounting perspective, or to question Autonomy's DDS financial reporting.  That was not the purpose of the mapping exercise.  Had I been told, or otherwise made aware, that Autonomy was reselling third party hardware on a standalone basis, I would have told Ms. Harris that Autonomy should add a hardware product line for profit and loss tracking purposes within HP's consolidated financial reporting.  I would not, however, have given consideration to those transactions from an accounting perspective as that was outside of my responsibilities and expertise.

C/40 13/7
HP-SEC-02934407

**Availability of Autonomy information to HP**

29.  Ms. Harris states, at paragraph 72 of Harris 1, that "*everything at Autonomy was open and transparent to HP. People were able to get information as and when they needed it*". Although, as I have said above, I generally found Ms. Harris to be cooperative and pleasant to work with, it was clear to me that she did not have the authority to share certain information with me and others at HP.   There were several occasions when Ms. Harris appeared uncomfortable answering questions which I (and other HP individuals, particularly Roxanne Simpson who was part of the HP finance integration team, with responsibility for purchase accounting) asked of her, while in other instances, Ms. Harris would pass requests which I (and other HP individuals) made of her to those more senior and then we would receive pushback in respect of those requests.   By way of example, on January 12, 2012, I requested certain financial information from Ms. Harris to provide to HP's Americas Controllership (responsible for HP Americas' accounting and financial reporting) and then received a response from Mr. Chamberlain (who had not been copied to my email to Ms. Harris), who was Finance VP at Autonomy, expressing surprise at the information sought by Americas Controllership and noting that "*Autonomy is operating as a standalone entity*" K24/425.1/1 }05950}.  Mr. Chamberlain copied Dr. Lynch and Mr. Hussain to his email.  I went back to Mr. Chamberlain to explain that I was trying to help by consolidating HP questions for Autonomy Finance (i.e. rather than multiple enquiries being raised directly with Autonomy Finance) K24/425.2/1 }064094}.  Mr. Chamberlain responded as follows: "*We are independent and are operating as such.  We have responsibility for and account for the full autonomy P&L. Questions on Autonomy should come from Cathie and Meg.  No one else should be interested*" K24/426.1/1 }064090}.

I believe that the facts stated in this Witness Statement are true.

.......................................................

SIGNED

*David Duckworth*

DAVID DUCKWORTH

.......................................................

DATED   February 8, 2019

C/40.13/8
HP-SEC-02934408

| | 1. | On behalf of | Claimants |
|---|---|---|---|
| | 2. | Initials/Surname of witness | D J Duckworth |
| | 3. | Statement No | 1 |
| | 4. | Date | 8 February 2019 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (CHD)**

**B E T W E E N:**

(1)     **ACL NETHERLANDS B.V. (AS SUCCESSOR TO**
**AUTONOMY CORPORATION LIMITED)**
(2)     **HEWLETT-PACKARD VISION BV**
(3)     **AUTONOMY SYSTEMS LIMITED**
(4)     **HEWLETT-PACKARD ENTERPRISE NEW**
**JERSEY, INC.**

**Claimants**

**-and-**

(1) **MICHAEL RICHARD LYNCH**
(2) **SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

---

**WITNESS STATEMENT OF DAVID JOHN**
**DUCKWORTH**

---

Travers Smith LLP
10 Snow Hill
London  EC1A 2AL
Tel: 020-7295 3000
Fax: 020-7295 3500
Ref: TPR/AAK/JJB/SEL

| | | |
|---|---|---|
| 1. | On behalf of | Claimants |
| 2. | Initials/Surname of witness | D J Duckworth |
| 3. | Statement No | 1 |
| 4. | Date | 8 February 2019 |

**Claim No. HC-2015-001324**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

B E T W E E N:

(1) **ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY**
**CORPORATION LIMITED)**
(2) **HEWLETT-PACKARD VISION BV**
(3) **AUTONOMY SYSTEMS LIMITED**
(4) **HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC.**

**Claimants**

-and-

(1) **MICHAEL RICHARD LYNCH**
(2) **SUSHOVAN TAREQUE HUSSAIN**

**Defendants**

---

**INDEX OF EXHIBITS TO THE**
**WITNESS STATEMENT OF DAVID JOHN DUCKWORTH**

---

| | Paragraph | Production ID |
|---|---|---|
| 1 | 18 | POS00198382 |
| 2 | 22 | POS00198382 |
| 3 | 29 | MRL00005950 |
| 4 | | POS000064094 |
| 5 | | POS000064090 |

HP-SEC-02934410

Exhibit E

1    yes?
2  A.  There was an early version of that mapping table that
3      needed to be used for the October close, the year end
4      close, so for the three-week period of time, the general
5      ledger mapping needed to be completed before that, that
6      month end close. But the extended mapping was needed
7      for the next fall monthly -- November monthly close
8      process.
9  Q.  When you were working with Autonomy, you dealt
10     primarily, didn't you, with Lisa Harris?
11 A.  Yes, that is correct.
12 Q.  Did you also deal with Mr Chamberlain?
13 A.  On a limited basis.
14 Q.  How often do you recall?
15 A.  I primarily worked with Lisa Harris. On occasion
16     questions that were asked to Lisa, she was not able to
17     answer and she would refer to Stephen Chamberlain and
18     Stephen Chamberlain would provide some response
19     thereafter.
20 Q.  And you didn't generally deal directly with Mr Hussain,
21     correct?
22 A.  I did not.
23 Q.  And you didn't deal with Dr Lynch?
24 A.  I did not.
25 Q.  And so far as concerns what you recall, your experience,

113

1      Mr Chamberlain put you in touch with Lisa Harris to work
2      on the mapping, yes?
3  A.  After about two weeks of requesting access after the
4      deal was closed, after about two weeks of enquiry about
5      starting the mapping process so that we were able to
6      show the financial results, Stephen Chamberlain did send
7      an email referring me to work with Lisa Harris, correct.
8  Q.  So far as you were aware, no one at Autonomy management
9      wanted to inhibit you from liaising with Ms Harris when
10     you were conducting your mapping?
11 A.  Not after that two-week period of time.
12 Q.  And Ms Harris and the HP finance integration team worked
13     well and collaboratively together to conduct the mapping
14     exercise, yes?
15 A.  Yes, I would agree to that.
16 Q.  And you didn't yourself encounter any resistance from
17     anyone at Autonomy to any aspect of the mapping
18     exercise, correct?
19 A.  Can you repeat the question, please?
20 Q.  You didn't yourself encounter any resistance from anyone
21     at Autonomy to any aspect of the mapping exercise?
22 A.  Once Lisa Harris was assigned to work with me, Lisa
23     worked very collaboratively with me in terms of
24     finishing the exercise.
25 Q.  Even before she was assigned, you didn't yourself

114

1      encounter any resistance, did you?
2  A.  That's not correct. We were under an extreme timetable
3      to get the general ledger mapping done in a very short
4      period of time, and there was approximately two weeks
5      between when we requested access to start the mapping
6      process before Mr Chamberlain had granted us access to
7      Lisa to start working with her.
8  Q.  You didn't yourself encounter any of that, did you?
9  A.  The only visibility I had of that was through my
10     manager, Kristen Walthall, and her verbal discussions
11     about how that was going.
12 Q.  And you don't know the detail of what was said or by
13     whom in that two-week period we're talking about,
14     correct?
15 A.  I don't recall specific language, but there was a clear
16     push-back on the ability for us to do the kind of
17     mapping exercise that we've done on the previous nine
18     acquisitions that I was involved with.
19 Q.  The HP offer for Autonomy became unconditional on
20     3 October 2011, yes? Do you recall that?
21 A.  Yes, I believe that is correct.
22 Q.  Could you go to bundle {K23/425.1/1}. This is an email
23     forwarded to you on 12 October 2011, so this is only
24     just over a week after the acquisition went
25     unconditional. If you look at the bottom, you'll see an

115

1      email from Mr Chamberlain to Mr Boggs, KPMG and the
2      title is "Trial balances for year ended 31 December 2010
3      and [year to date] 30 June 2011":
4          "Notes:
5          "Year ended 31 [December] 2010 and [year to date]
6      30 June 2011.
7          "These are prepared under IFRS.
8          "Every ledger is presented in US [dollars]."
9          So Mr Chamberlain is providing you trial balances
10     for Autonomy and its subsidiaries, yes?
11 A.  I was not copied on this email, on October 12, so I'm
12     not sure of the content but it must have been through
13     the Autonomy local ledger.
14 Q.  If you look at the top email, you will see that in due
15     course, this is forwarded to you. If we just trace the
16     emails up.
17 A.  Yes.
18 Q.  Immediately above that, Mr Boggs of KPMG forwards trial
19     balances to Mr Blank and Ms Sunderwala and others,
20     saying:
21         "Attached are the trial balances by legal entity as
22     of December 2010 and June 2011."
23         Mr Blank then provides them to you saying:
24         "See the attached. Is this helpful to you?"
25         So you were provided with these trial balances on

116

1    12 October 2011, weren't you?
2 A. So John Blank forwarded those to me as he worked in the
3    Palo Alto office with me and he knew I was anxious to
4    start the mapping exercise. However, there was no
5    context associated with the trial balance information
6    that was provided to me. I could not recall
7    specifically what was attached in this email, but I do
8    not -- I'm not contesting the fact that this was
9    forwarded to me from John Blank.
10 Q. We talked about this two-week period in which you had
11    difficulty getting financial information, but we're
12    right in the middle of this two-week period you talked
13    about here, and here is Mr Chamberlain freely providing
14    trial balances and ledgers to KPMG for passing on to HP,
15    correct?
16 A. So again, Stephen Chamberlain addressed these to
17    Steve Nessier who is in charge of tax for M&A(?)
18    activity. I'm not sure about Mr Boggs or Mr Gray, and
19    that was forwarded by Mr Boggs to Meeta Sunderwala and
20    Allison, who is on the technical accounting team, and
21    John Blank. John forwarded that to me, I think not
22    necessarily by direction of Mr Chamberlain.
23 Q. But we're in the middle of this two-week period you're
24    talking about, and Mr Chamberlain is obviously happy to
25    provide Autonomy's detailed financial information,

117

1    isn't he?
2 A. I wouldn't characterise it as that.
3 Q. It's what your email plainly shows, doesn't it?
4 A. Excuse me?
5 Q. It's what the emails plainly show, he's freely providing
6    this information?
7 A. So all I see, again, I wasn't copied on the original
8    email from Mr Chamberlain. All I see is that he
9    forwarded it to KPMG and the technical accounting team.
10    They were in the middle of doing the purchase accounting
11    activity for establishing the opening trial balance, and
12    I do not see any particular reference for Mr Chamberlain
13    to start the mapping exercise in order to do -- to track
14    the monthly activities.
15 Q. The mapping exercise is your job, it's your function,
16    isn't it? So you're unlikely to see something from
17    Mr Chamberlain, that's your role?
18 A. The request to Mr Chamberlain was that we needed to
19    start the mapping exercise to track the monthly
20    activity, and this did not start that process. The
21    process was started when Mr Chamberlain sent an email
22    introducing Kristen Walthall, myself, to Lisa Harris and
23    to suggest we get on with it.
24 Q. Shall we look at bundle {K23/425.2/1}
25        It's a spreadsheet, so you may need to look at it on

118

1    the screen.
2 A. I don't see a spreadsheet.
3 Q. If you just wait, it will come.
4        This is the trial balance forwarded by
5    Mr Chamberlain in his email, and if the Magnum operator
6    could go to the tabs at the bottom and go right across,
7    there's a lot of tabs, you have to go all the way across
8    to the tab which is actually tenth from the end, so keep
9    going. The tab on the left-hand side, "Autonomy INC
10    SF", if you open up that tab and if you scroll down to
11    row 157, you'll see there that Mr Chamberlain's trial
12    balance included hardware revenues. Do you see that at
13    item 470,000, yes?
14 A. I see the reference.
15 Q. You're familiar with that account number, aren't you,
16    470,000?
17 A. That account number was part of the mapping exercise
18    that we did after this process. I'm not necessarily
19    familiar with this particular spreadsheet.
20 Q. This is the trial balance and it's showing the general
21    ledger row for hardware revenue of 470,000, yes?
22 A. I understand that this is what that document says but
23    I do not recall reviewing this specific spreadsheet.
24 Q. Then if you go down to row 166, you can see that there's
25    COGS, row 570,000, COGS hardware.

119

1 A. Can you scroll down? I don't see that. I don't
2    question your …
3 Q. Row 166.
4 A. I can only see to row 78. Are you referring to the
5    rows, I can see row 78 on this screen, I don't see row
6    166. But I don't contest that there is --
7 Q. No, let's just clear this up.
8 A. I'm sorry, I see it. I'm missing the 1, I see it now.
9    Thank you.
10 Q. So you can see "COGS hardware", and that's 570,000 which
11    is also a general ledger account number that you're
12    familiar with, isn't it, for hardware costs?
13 A. Again, I was not familiar with it when this spreadsheet
14    was sent to me by John Blank but I am familiar with the
15    DDS account codes and the references in columns A, B and
16    C, but not familiar necessarily with the amounts in the
17    trial balance. That was not part of my process for
18    mapping.
19 Q. What we can see here is that, as at 12 October,
20    Mr Chamberlain was freely giving you and your colleagues
21    information about, amongst other things, Autonomy's
22    hardware sales even before you started the mapping
23    process, yes?
24 A. I disagree. So he provided the information to KPMG and
25    the technical accounting team that was establishing the

120

Exhibit F



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Encounter List**

05/21/2024 20:06 EDT                    Generated By: DACIA SONNTAG                    Page 1 of 2

| Last Name | First Name | DOB | Doc Type | Document Number | Date - Time (Eastern) | Carrier Code | Carrier Num. | I/O | Site | Insp | Type | Status | Updated Status | Ref | Arr Loc | Dep Loc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 11/18/2011 00:00 | UA | 930 | O | | Name No Name, No | APIS | ON BOARD | | | LHR | SFO |
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 11/13/2011 19:48 | UA | 931 | I | A281 | HERNANDEZ-FALLINER, ALFREDO | APIS | ON BOARD | | INS | SFO | LHR |
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 06/08/2011 00:00 | DL | 270 | O | | Name No Name, No | APIS | ON BOARD | | | LHR | BOS |
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 06/06/2011 13:48 | DL | 271 | I | A041 | RADWAY, ANTONIO | APIS | ON BOARD | | | BOS | LHR |
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 05/25/2011 00:00 | DL | 144 | O | | Name No Name, No | APIS | ON BOARD | | | LHR | BOS |
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 05/25/2011 00:00 | DL | 144 | | | Name No Name, No | APIS | | | | LHR | BOS |
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 05/23/2011 14:09 | DL | 271 | I | A041 | BENNETT, PHILIP | APIS | ON BOARD | | | BOS | LHR |
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 11/09/2010 00:00 | VS | 20 | O | | Name No Name, No | APIS | ON BOARD | | | LHR | SFO |
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 11/03/2010 18:58 | VS | 19 | I | A286 | WALKER, BRUCE | APIS | ON BOARD | | | SFO | LHR |
| HARRIS | ELIZABETH JANE | 10/13/1962 | P | 210524086 | 08/06/2010 00:00 | VS | 20 | O | | Name No Name, No | APIS | ON BOARD | | | LHR | SFO |
| HARRIS | ELIZABETH | 10/13/1962 | P | 210524086 | 08/03/2010 18:15 | VS | 19 | I | A286 | REINKING, PAUL | APIS | ON BOARD | | | SFO | LHR |
| HARRIS | ELIZABETH | 10/13/1962 | P | 307613055 | 10/21/2009 00:00 | VS | 18 | O | | Name No Name, No | APIS | ON BOARD | | | LHR | EWR |
| HARRIS | ELIZABETH | 10/13/1962 | P | 307613055 | 10/17/2009 19:22 | VS | 1 | I | A103 | ANDREOTTOLA, ANTHONY | APIS | PASSENGER | | | EWR | LHR |
| HARRIS | ELIZABETH | 10/13/1962 | P | 307613055 | 01/07/2009 00:00 | BA | 218 | O | | Name No Name, No | APIS | PASSENGER | | | LHR | DEN |
| HARRIS | ELIZABETH | 10/13/1962 | P | 307613055 | 12/28/2008 17:33 | BA | 219 | I | A337 | POSADA, JAVIER | APIS | PASSENGER | | | DEN | LHR |
| HARRIS | ELIZABETH | 10/13/1962 | P | 036031717 | 02/08/2008 21:38 | BA | 239 | I | A041 | MARKOWSKI, JOSEPH | AIRLINE (NOT API) | | | | BOS | LHR |

**Total Number of Records: 16**

| Legend |
|---|
| Loc |

**For Official Use Only / Law Enforcement Sensitive**



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Encounter List**

05/21/2024 20:06 EDT                    Generated By: DACIA SONNTAG                    Page 2 of 2

| Codes | Value |
|---|---|
| EWR | NEWARK INTERNATIONAL |
| LHR | LONDON / HEATHROW INTL |
| BOS | BOSTON / LOGAN INTL |
| DEN | DENVER INTERNATIONAL AIRPORT |
| SFO | SAN FRANCISCO INTL AIRPORT |

| Doc Type | |
|---|---|
| Codes | Value |
| P | P - PASSPORT |

| Site Code | |
|---|---|
| Codes | Value |
| A286 | A286 - CBP-SAN FRANCISCO, IAP TERM A |
| A041 | A041 - CBP-BOSTON, LOGAN AIRPORT |
| A281 | A281 - CBP-SAN FRANCISCO, IAP TERM G |
| A337 | A337 - CBP-DENVER, INTL AIRPORT |
| A103 | A103 - CBP-NEWARK, INTL AIR TERM B |

Exhibit G

| | |
|---|---|
| **From:** | Lisa Harris <lisah@autonomy.com> |
| **Sent:** | Wednesday, November 2, 2011 11:20 PM |
| **To:** | Duckworth, David <david.duckworth@hp.com> |
| **Subject:** | RE: just tried your line |

That made me giggle!

Mine (sensible work photo) below - + Scary Steve



**Name:** Lisa Harris
**Job Title:** Financial Controller
**Office:** Cambridge
**Country:** UK
**Email:** lisah@autonomy.com
**Phone Number:** +44 (0)
1223 448011 (Land Line)



**Name:** Stephen Chamberlain
**Job Title:** Vice President,
Finance
**Office:** Cambridge
**Country:** UK
**Email:**
stephenc@autonomy.com
**Phone Numbers:**
+44 (0) 7795 601794
(Mobile)
+44 (0) 1223 448017 (Land
Line)

Many thanks,

LISA HARRIS
Group Financial Controller
Autonomy, an HP company
Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ
UK
www.Autonomy.com
☎ +44 (0) 1223 448011
🖷 +44 (0) 1223 448040
✉ lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

POS000472710

**From:** Duckworth, David [mailto:david.duckworth@hp.com]
**Sent:** 02 November 2011 23:12
**To:** Lisa Harris
**Subject:** RE: just tried your line

*Lisa,*

*Understood.  That is the message we have been told as well.  Our team is focused on getting Autonomy financial information into HP's consolidated results.*

*GLI Phase 2 would indeed be quite challenging, so I do not want to get too derailed with that complexity.*

*GLI Phase 1 would be a GL feed after DDS MEC is complete to LH using our mapping tables (eliminating the manual intervention to translate into LHJV uploads).   This would help eliminate potential human error in the translation, but would still require the same level of due diligence to ensure the mapping tables are maintained accurately and that the financials can be reconciled between ledgers.*

*I would anticipate GLI phase 1 may not be available for until sometime after January MEC (not sure how long thereafter) and I have no idea if and when Phase 2 could be implemented.*

*Thanks for sharing Dave's info.  I will reach out to him to see if he can join a brief conf. call next week to prep for the following week.*

*Since we are sharing pictures, here is mine (so you can recognize me in Pleasanton)...*

*David*

---

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** Wednesday, November 02, 2011 3:29 PM
**To:** Duckworth, David
**Subject:** RE: just tried your line

Thanks David,

Dave's contact details are attached – the office address is correct.

I will need to attend on Friday as we do not export transactional level detail from our ledger (DDS) into the reporting views at the moment and this may not be something that we can do with the volume involved.  It is very important that all financial reporting is controlled from Cambridge which is remote from the server (which is in Pleasanton).

I'm sure that you wouldn't, but please can you make sure that you do not say anything to Dave that contradicts what Sushovan and Mike have told all the staff about this being a non-integration acquisition – staff are still very sensitive.



**Name:** Dave Mobley
**Job Title:** Sr Applications Analyst
**Office:** Pleasanton
**Country:** US
**Email:** dmobley@autonomy.com
**Phone Number:** +1 925 598 3091 (Land Line)

POS000472710

Many thanks,

LISA HARRIS
Group Financial Controller
Autonomy, an HP company
Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ
UK
www.Autonomy.com
☎ +44 (0) 1223 448011
🖷 +44 (0) 1223 448040
✉  lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged  information.  If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone.  Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies.  No reliance may be placed on this message without written confirmation from an authorised representative of the company.  Autonomy Systems Limited, Registered Office:  Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Duckworth, David [mailto:david.duckworth@hp.com]
**Sent:** 02 November 2011 22:04
**To:** Lisa Harris
**Subject:** RE: just tried your line

Thanks Lisa,

Sorry I was not able to drop off my conf. call as quickly as I hoped.

Roxanne and Gaby will have to travel regardless of the venue, so we will have 3 people traveling  (you, Gaby and Roxanne) to Pleasanton rather than 3 to Cambridge (Gaby, Roxanne and me).  We are cancelling our flights today and Gaby did incur some cancellation fees since she booked her flights 2 day ago, (Roxanne and I were able to cancel without fees since we booked last night).  Overall, probably similar costs either way.

Roxanne will not stay for the GLI, but Melanie (who is Palo Alto based) will join in Pleasanton.  Gaby and I will also attend the GLI discussion with Dave Mobley.

I can commute from San Jose.  It is up to you if you want to stay in Pleasanton or not.  I would anticipate full days during this week, so it is really up to you if you want to commute on BART or stay closer to your offices.  We would like to take the team out to dinner on Monday Night and Thursday Night to get to know each other, (but we are flexible on which nights).

We have planned the Autonomy Phase 1 discussion for Thursday which will need Finance, IT and GBS focus to automate the MEC process.  Phase 2 is scheduled for Friday which will be more IT and GBS focused on transaction level interfaces which you can probably skip (or cut out early in the day).  I will attend all day Friday.

I have attached a revised agenda.

Can Mel, Gaby and I speak to Dave Mobley ahead of the GLI workshop to get some architecture and other IT info requests into to him so that we can be more prepared the F2F?

If so, can you provide his phone # and email address?

Also, Is this the current address of Dave's office?

ZANTAZ, Inc.
5758 West Las Positas Blvd
Pleasanton CA 94588

POS000472710

david

---

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** Wednesday, November 02, 2011 2:34 PM
**To:** Duckworth, David
**Subject:** RE: just tried your line

Hi David,

Yes I am happy to meet in Pleasanton – makes sense to have just one person travelling!

I'm assuming it makes sense for me to fly out on the Sunday and back on the Friday evening?  I normally stay in San Fran and get the bart to Pleasanton but I can get a hotel nearer HP office if that makes more sense – I'm assuming that we are only talking IT interface for a day.

Many thanks,

LISA HARRIS
Group Financial Controller
Autonomy, an HP company
Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ
UK
www.Autonomy.com
☎ +44 (0) 1223 448011
🖷 +44 (0) 1223 448040
✉ lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged  information.  If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone.  Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies.  No reliance may be placed on this message without written confirmation from an authorised representative of the company.  Autonomy Systems Limited, Registered Office:  Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

---

**From:** Duckworth, David [mailto:david.duckworth@hp.com]
**Sent:** 02 November 2011 19:56
**To:** Lisa Harris
**Subject:** RE: just tried your line

Sorry.  Still on a call. We can discuss tomorrow.

Just wanted to confirm that you can support the change in venue to Pleasanton and we will have access info needed for this meeting to be successful.

---

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** Wednesday, November 02, 2011 12:17 PM
**To:** Duckworth, David
**Subject:** RE: just tried your line

Realize that means you are on a call – no worries – I leave her in 45mins to pick up my daughter so any time before then is good?

Many thanks,

LISA HARRIS

---

Group Financial Controller
Autonomy, an HP company
Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ
UK
www.Autonomy.com
☎ +44 (0) 1223 448011
🖨 +44 (0) 1223 448040
✉ lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** 02 November 2011 19:16
**To:** 'Duckworth, David'
**Subject:** just tried your line

Hi David,

Do you have a better number for me to call you on?

Many thanks,

LISA HARRIS
Group Financial Controller
Autonomy, an HP company
Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ
UK
www.Autonomy.com
☎ +44 (0) 1223 448011
🖨 +44 (0) 1223 448040
✉ lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

POS000472710

# Exhibit H

| | |
|---|---|
| **From:** | Lisa Harris |
| **Sent:** | Wednesday, October 19, 2011 10:04 PM |
| **To:** | Duckworth, David; Walthall, Kristen (MADO Finance) |
| **Subject:** | RE: Year-end reporting |

Hi David,

Tomorrow would be good – I normally leave the office at 8:00pm (noon in California) to pick up my daughter from school, so any time in your morning is good for me.

Many thanks,

LISA HARRIS
Group Financial Controller
Autonomy, an HP company
Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ
UK
www.Autonomy.com
☎ +44 (0) 1223 448011
📠 +44 (0) 1223 448040
✉ lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged information. If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone. Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies. No reliance may be placed on this message without written confirmation from an authorised representative of the company. Autonomy Systems Limited, Registered Office: Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Duckworth, David [mailto:david.duckworth@hp.com]
**Sent:** 19 October 2011 21:35
**To:** Walthall, Kristen (MADO Finance); Lisa Harris
**Subject:** RE: Year-end reporting

Lisa,

It is a pleasure to be introduced to you.

I would like to schedule sometime to discuss your financial structure, month end close process and how we can map Autonomy's financials results into HP's consolidated financial systems.

Please let me know when would be a convenient time and day to chat (preferably in your afternoon. I am in California near your SF Office).

Cheers,

POS000472636

K23/466.1/1

**David Duckworth**
Mergers & Acquisitions Finance Integration Manager
Enterprise Financial Reporting
Hewlett Packard
650-857-2534
david.duckworth@hp.com
MADO Finance Integration Website

---

**From:** Walthall, Kristen (MADO Finance)
**Sent:** Wednesday, October 19, 2011 1:23 PM
**To:** Lisa Harris; Duckworth, David
**Subject:** RE: Year-end reporting

HI Lisa:

As mentioned David will be managing the process with you.

David – please meet Lisa.

Kristen

**Kristen Walthall**
Director, Worldwide MADO Finance
HP, Enterprise Financial Reporting
Phone: 951-553-3033
Email: kristen.walthall@hp.com
Website: MADO Finance Integration Website

**From:** Lisa Harris [mailto:lisah@autonomy.com]
**Sent:** Wednesday, October 19, 2011 11:14 AM
**To:** Walthall, Kristen (MADO Finance); 'Stephen Chamberlain'; Sunderwala, Meeta
**Subject:** RE: Year-end reporting

Hi Kristen,

Yes – that would be fine!

Many thanks,

LISA HARRIS
Group Financial Controller
Autonomy, an HP company
Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ
UK
www.Autonomy.com
☎ +44 (0) 1223 448011
🖷 +44 (0) 1223 448040
✉ lisah@autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged  information.  If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone.  Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its

POS000472636

K23/466.1/2

associated companies.  No reliance may be placed on this message without written confirmation from an authorised representative of the company.  Autonomy Systems Limited, Registered Office:  Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

**From:** Walthall, Kristen (MADO Finance) [mailto:kristen.walthall@hp.com]
**Sent:** 19 October 2011 19:08
**To:** Stephen Chamberlain; Sunderwala, Meeta
**Cc:** Lisa Harris
**Subject:** RE: Year-end reporting

HI Steve:

We are definitely anxious to get going on that, but wanted to be sensitive to prioritization.  David Duckworth on my team will be "managing" the process to get Autonomy financial into the HP systems; account/entity mapping, timing, etc.

Can I have David contact Lisa directly?

Kristen

**Kristen Walthall**
Director, Worldwide MADO Finance
HP, Enterprise Financial Reporting
Phone: 951-553-3033
Email: kristen.walthall@hp.com
Website: MADO Finance Integration Website

**From:** Stephen Chamberlain [mailto:stephenc@autonomy.com]
**Sent:** Wednesday, October 19, 2011 10:57 AM
**To:** Walthall, Kristen (MADO Finance); Sunderwala, Meeta
**Cc:** Lisa Harris
**Subject:** Year-end reporting

Ladies – firstly, let me introduce Lisa Harris. Lisa is the Group Financial Controller and looks after the consolidation and reporting. We have plenty to do but one thing we don't yet have any information on and would like to get some as soon as possible is the year-end reporting process and timetable. I need to get the team ready for quarter end and ensure that we can meet the reporting requirements and timetable.

Thanks

**Steve Chamberlain**
**VP, Finance**
**Autonomy, an HP Company**

Cambridge Business Park
Cowley Road
Cambridge
CB4 0WZ

Direct tel: 01223 448017
Mobile tel: 07795 601794
Fax: 01223 448040

E-mail: stephenc@autonomy.com
Web: www.autonomy.com

The information contained in this message is for the intended addressee only and may contain confidential and/or privileged  information.  If you are not the intended addressee, please delete this message and notify the sender, and do not copy or distribute this message or disclose its contents to anyone.  Any views or opinions expressed in this message are those of the author and do not necessarily represent those of Autonomy Systems Limited or of any of its associated companies.  No reliance may be placed on this message without written confirmation from an authorised representative of the company.  Autonomy Systems Limited, Registered Office:  Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, Registered Number 03063054.

K23/466.1/3
POS000472636