PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States
Acting under Authority Conferred by 28 U.S.C. § 515

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
ADAM A. REEVES (NYBN 2363877)
KRISTINA N. GREEN (NYBN 5226204)
ZACHARY G.F. ABRAHAMSON (CABN 310951)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (202) 476-0280
     Fax: (415) 436-7234
     Email: zachary.abrahamson2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. Case No. CR 18-577 CRB |
|     Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANT MICHAEL RICHARD LYNCH'S RULE 29 MOTION TO DISMISS COUNT 16** |
|     v. | |
| MICHAEL RICHARD LYNCH and STEPHEN KEITH CHAMBERLAIN, | |
|     Defendants. | |

## INTRODUCTION

There is no question that a reasonable jury could conclude from the government's case that defendant Michael Richard Lynch executed a scheme to defraud in connection with shares of Hewlett-Packard. The government's evidence shows Dr. Lynch involved in the preparation of misleading lists purporting to describe Autonomy's top customers during HP's August 2011 confirmatory diligence. That evidence also shows that Dr. Lynch approved the circulation to HP of information about Autonomy's OEM business that obscured the company's involvement in questionable transactions. Right there—when Dr. Lynch is misleading his public company acquirer in pursuit of an $11 billion

acquisition—a jury could properly find Dr. Lynch guilty of securities fraud.

But that's not all.  On the day that HP announced its purchase of Autonomy, Dr. Lynch signed a warranty that "any information provided by me for inclusion" in an attached announcement, HP's offer, "*and any other . . . document issued in connection to the Offer*" was true and not misleading.  At that time—as the government's evidence has shown—Dr. Lynch had caused Autonomy for years to issue misleading financial statements.  And Dr. Lynch knew it.  Nevertheless, Dr. Lynch signed, and the announcements and offer documents issued in connection with HP's acquisition published Autonomy's falsehoods to HP's shareholders.

Finally, the government's evidence shows that in the months leading up to Autonomy's second quarter 2011 financial results, the prospect of an acquisition by HP became eminently foreseeable to Dr. Lynch.  He met repeatedly that spring with HP's mergers team, left its CEO in June with the impression that "[Dr. Lynch] wants to do the deal with HP," and questioned HP's top dealmaker that summer about Dr. Lynch's role *after* the acquisition.  Dr. Lynch knew then that any financial statement published by Autonomy would be reasonably calculated to influence transactions in the securities of its potential acquirer, HP.  And yet Autonomy's second quarter financials—issued July 27, 2011—perpetuated its fraud.  For this reason alone, a jury could properly convict.  Dr. Lynch's Rule 29 motion as to Count 16 should be denied.

## FACTUAL BACKGROUND

In December 2010, eight months before HP's purchase of Autonomy, Dr. Lynch turned his attention to an acquisition.  On December 10, 2010, Dr. Lynch's chief financial officer and co-conspirator Sushovan Hussain wrote about the dismal performance of Autonomy's flagship product IDOL in the United States.  *See* Declaration of Zachary G.F. Abrahamson in Support of United States' Opposition' to Defendant Michael Richard Lynch's Motion for Acquittal on Count 16 (filed herewith), Ex. A (Trial Ex. 1274).  "Really don't know what to do mike," Hussain wrote, "As I guessed revenue fell away completely . . . Everywhere I look at us idol it's bad."  *Id*.  Hussain urged that "radical action is required": "[R]eally radical, we can't wait any more."  *Id*.  Around the time of that e-mail, the evidence shows that Dr. Lynch met Frank Quattrone, a technology dealmaker.  *See* Abrahamson Decl., Ex. B (Trial Ex. 1553).  Per comments later made by Quattrone's firm, Dr. Lynch suggested a

"willingness to have discussions with potential suitors." *Id*.

Acquisition discussions with HP began in early 2011. On January 26, 2011, Quattrone sent an e-mail attaching information about Autonomy to the chair of HP's board of directors. *See* Abrahamson Decl., Ex. C (Trial Ex. 1519). Quattrone, per e-mailed comments by the board chair, was also "trying to connect" with HP's mergers chief, Shane Robison. *Id*. Barely a week after Quattrone's outreach found its way to HP's executives, Dr. Lynch was sitting in an HP conference room in Palo Alto pitching Autonomy. Dr. Lynch "did most of the talking" for Autonomy at that February 3, 2011 meeting, *see* Trial Tr. 7798:5-7, and left HP corporate development executive Andy Johnson with the impression that "[t]he products that [Autonomy] sold were just that, software." Trial Tr. 7806:14-7407:1.

A second meeting attended by Dr. Lynch and Quattrone followed on March 4, 2011. *See* Abrahamson Decl., Ex. D (Trial Ex. 2709). There, Autonomy walked HP through the company's products and financial performance, highlighting Autonomy's purported gross margins of ">90%." *See* Abrahamson Decl., Ex. E (Trial Ex. 1592) at 8, Trial Tr. 7807:7-25 (testimony of Andy Johnson re: relevance of Autonomy's gross margin presentation).

By June 2011, discussions between HP and Autonomy had progressed to the point of a sit-down between Dr. Lynch and HP CEO Leo Apotheker. *See* Abrahamson Decl., Ex. F (Trial Ex. 1865). Writing to Robison after the meeting on June 16, Apotheker flashed a green light: "[Autonomy] CEO wants to do the deal with HP and he believes that we are the ideal partner." *Id*. By the end of the month, Dr. Lynch had begun to contemplate his future *after* an HP acquisition of Autonomy. Robison on June 29 e-mailed Apotheker about a meeting that Robison had with Dr. Lynch. "Over dinner Mike had two interesting concerns/questions . . . ," Robison wrote, "Second, surprisingly, what am I going to do. Am I around? Not sure what was driving that…came back to that several times[.]" *See* Abrahamson Decl., Ex. G (Trial Ex. 4684).

On June 30—the day after Robison's e-mail—Dr. Lynch closed 2011's second fiscal quarter at Autonomy. The quarter perpetuated long-running aspects of Autonomy's fraud. For example, Autonomy recognized $9 million in revenue through a reseller, DiscoverTech, for a deal that the end user (Abbott Labs) had rejected on the quarter's last day. *See* Abrahamson Decl., Ex. H (Trial Ex. 1840) (e-mail from Autonomy's Mike Sullivan to Hussain, forwarding news that Abbott's general counsel

"veto'd" Autonomy deal and that there was "[n]othing left to be done").  In another case, Autonomy booked more than $7 million in revenue from a reseller deal even though Dr. Lynch himself received notice that the end user—coincidentally, Hewlett-Packard—had scrapped the deal before the quarter closed.  *See* Abrahamson Decl., Ex. I (Trial Ex. 1966).

Between the June 30 quarter-end and Autonomy's results announcement on July 27, HP's board approved pursuit of an acquisition of Autonomy.  *See* Abrahamson Decl., Ex. J (Trial Ex. 4805) at 3 (Board authorized Project Tesla with maximum price of $11.7 billion).  CEO Apotheker then called Dr. Lynch and suggested a meeting.  Trial Tr. 5894:15-19.  Against that backdrop—and notwithstanding the accounting problems latent in Autonomy's second quarter—Dr. Lynch signed off on a July 27 results announcement that trumpeted "record revenue of $256 million" and a quarterly gross margin of 88 percent.  *See* Abrahamson Decl., Ex. K (Trial Ex. 2023) at 1.  That announcement described how "Autonomy's core technology" was delivered across three categories: (1) IDOL Product, which Autonomy "normally delivered as licensed software," (2) IDOL Cloud, which Autonomy delivered "on a Software-as-a-Service (SaaS) model," and (3) IDOL OEM, where "Autonomy's IDOL is embedded inside other software companies' products."  *Id*. at 3.  The announcement nowhere disclosed or suggested that Autonomy in the first half of 2011 had resold $41 million in hardware.  *See* Abrahamson Decl., Ex. L (Trial Ex. 17499-0056).

Around this time, Apotheker and Dr. Lynch met and agreed on a transaction price range.  Trial Tr. 5894:15-5895:25 (Apotheker describing late July 2011 meeting with Dr. Lynch).  The agreement allowed HP to start confirmatory diligence and on July 29—just two days after Autonomy published its second quarter financials—the parties met to discuss the diligence.  HP diligence lead Manish Sarin summarized the meeting, noting at the outset that "[w]hile Mike / Tesla team is going to be open with information, their view is that much of the general / industry information on the company *is available in public filings* / analyst reports."  Abrahamson Decl., Ex. M (Trial Ex. 13575) (emphasis added).

HP's August 2011 confirmatory diligence then commenced, with Dr. Lynch participating in pieces that went to the heart of Autonomy's deception.  For example, on August 1, Sarin e-mailed Hussain to say that he was "*listening to Mike* / Peter on the products / R&D."  Abrahamson Decl., Ex. N

(Trial Ex. 2077) (emphasis added).  Notwithstanding Dr. Lynch's product briefing,[1] however, HP never became aware of Autonomy's sustained practice of reselling hardware.  *See* Trial Tr. 6227:25-6228:3 (testimony of Leo Apotheker), Trial Tr. 7843:6-13 (testimony of Andy Johnson).

Two days later, on August 3, Dr. Lynch received from Autonomy COO Andrew Kanter a purported "Copy of Top 40 Customer Analysis" for the years 2010 and 2011.  *See* Abrahamson Decl., Ex. P (Trial Ex. 15942).  Kanter asked Dr. Lynch to review the list, which purported to "provide[] recognized revenue by customer for software, hosted and maintenance," before Kanter uploaded it to HP's data room.  *Id.*  Kanter's list—and another later sent to Dr. Lynch by Hussain, *see* Abrahamson Decl., Ex. Q (Trial Ex. 15947)—misleadingly omitted references to Autonomy's hardware sales: For example, a table of "Top 40 contracts" that Dr. Lynch received listed contracts worth as little as $3 million, but omitted a $7 million agreement with hardware reseller Zones and a $6 million hardware sale to Video Monitoring Services.  *Id.*

Days later, on August 8, Dr. Lynch approved another fraudulent representation to HP—this time, regarding the nature of Autonomy's OEM business.  *See* Abrahamson Decl., Ex. R (Trial Ex. 15965). Earlier, HP had asked Dr. Lynch for a "list of top 20 oems."  *Id.*  On August 8, Hussain sent Dr. Lynch and Kanter an e-mail that purported to identify Autonomy OEM customers with contracts over $10 million.  *Id.*  But Hussain's list omitted certain problematic OEMs—notably FileTek, whose OEM agreements executed as part of Autonomy roundtrips totaled more than $16 million.  Dr. Lynch, however, responded "ok," *id.*; later, Autonomy uploaded to HP's data room an "OEM Analysis" containing the same names listed by Hussain and approved by Dr. Lynch.  *See* Abrahamson Decl., Ex. S (Trial Ex. 7472.17) (listing only EMC, HP, IBM, Iron Mountain, and Video Monitoring Services as OEM customers worth "Over $10m").

A week later, as HP's diligence entered its final days, Dr. Lynch became personally involved in Autonomy's decision to deny HP access to workpapers prepared by Autonomy's auditors at Deloitte. HP asked for the workpapers early in the confirmatory diligence and renewed its request in an August

---

[1] Dr. Lynch was also aware of a financial due diligence call slated for August 2, 2011.  *See* Abrahamson Decl., Ex. O (Trial Ex. 15930).  During that call, according to questions that Hussain sent Dr. Lynch, HP intended to ask about Autonomy's "sales model by product or vertical," *id.* at 4, and "revenue recognition for partners/OEMs," *id.* at 5, among other topics.

10 e-mail to Autonomy COO Andrew Kanter.  *See* Abrahamson Decl., Ex. T (Trial Ex. 2238) at 11 (identifying "Deloitte auditor working papers" among items that HP wanted released).  Had they been disclosed, the workpapers would have disclosed to HP myriad aspects of Autonomy's fraud, including the company's reseller practices, accelerated hosting deals, and hardware resales.  But on August 15— three days before the acquisition's announcement—Dr. Lynch told HP that it would receive "a conversation [with Deloitte] around audit process, recommendation and findings."  Abrahamson Decl., Ex. U (Trial Ex. 2251).

HP announced its acquisition of Autonomy on August 18, 2011.  That day, Dr. Lynch executed a warranty in connection with HP's offer for Autonomy.  *See* Abrahamson Decl., Ex. V (Trial Ex. 2308).  "[T]o the best of my knowledge, information and belief, having made all reasonable enquiries," Dr. Lynch swore, "any information provided by me for inclusion in the Press Announcement, the Offer Document, and any other announcement made or document issued in connection to the Offer, is and will be true and accurate in all respects and not misleading in any respect."  *Id*. at 4.

Two press announcements followed on August 18: an HP release, *see* Abrahamson Decl., Ex. W (Trial Ex. 2295), and an Autonomy release, *see* Abrahamson Decl., Ex. X (Trial Ex. 2306).  Both included the same core financial information about Autonomy.  *Compare* Trial Ex. 2295 at 3 (listing among deal's financial benefits, "Autonomy has a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010."), *with* Trial Ex. 2306 at 15 (listing same).

HP's formal offer for Autonomy set forth important information about the proposed transaction.  *See generally* Abrahamson Decl., Ex. Y (Trial Ex. 2307) ("Recommended Cash Offer for Autonomy Corporation plc"), Trial Tr. 7845:3-17 (testimony of Andy Johnson that Exhibit 2307 was "Hewlett-Packard's formal offer for the shares of Autonomy").  In particular, the document—which provided specific notice to investors in the United States, *see id*. at 2—included "Financial information relating to Autonomy" in an appendix.  *See id*. at v.  That appendix specifically "incorporated by reference into this document" the income statements from Autonomy's annual reports for 2008-2010, along with Autonomy's "Unaudited Interim Results for the Six Months ended 30 June 2011."  *Id*. at 51.[2]  Dr. Lynch

---

[2] That financial information was again incorporated by reference into the offer document on page

1   had approved the issuance of all these statements—in particular, he had approved the issuance of

2   Autonomy's 2011 financials around the time of price negotiations with Apotheker and on the eve of

3   HP's diligence.

4          After the deal's announcement, Dr. Lynch continued to take fraudulent actions designed to

5   secure the acquisition of Autonomy.  In early September 2011, Dr. Lynch responded to Alex Marshall

6   and Harald Collet's "joebloggs" e-mail casting doubt on the accuracy of Autonomy's OEM revenues.

7   *See*, *e.g.*, Abrahamson Decl., Ex. Z (Trial Ex. 4799).  In a rebuttal document sent to Robison, Dr. Lynch

8   made misleading claims about Autonomy's business.  For example, Dr. Lynch accused market analysts

9   of "manipulat[ing]" Autonomy's organic growth figures by "mak[ing] simplistic adjustments for

10   hardware revenue."  *Id*. at 4799-0003.  "Autonomy makes a limited number of appliance-based sales,"

11   Lynch claimed, "which contain a small amount of hardware revenue."  *Id*.  That response continued

12   Lynch's tradition of obscuring the scale of Autonomy's hardware resales from HP leadership.

13          On the basis of these and other facts, a grand jury indicted Dr. Lynch for conspiracy to commit

14   wire fraud, wire fraud, securities fraud, and conspiracy to obstruct.  *See* Dkt. 21.  The indictment's

15   securities fraud count—Count 16—charged Dr. Lynch by incorporating the fulsome conspiracy

16   allegations underlying the wire fraud counts and then setting forth the basic elements of §§ 1348 and 2:

17   "In or about August 2011, . . . [Dr. Lynch] did knowingly and intentionally execute, and attempted to

18   execute, a scheme and artifice (a) to defraud any person in connection with securities of HPQ, . . . and

19   (b) to obtain, my means of materially false and fraudulent pretenses, representations, and promises,

20   money and property in connection with the purchase and sale of securities of HPQ, . . . and did aid and

21   abet in the same."  *Id*. at ¶ 30.

22                                      **LEGAL STANDARD**

23   **A.      When Deciding a Motion for Acquittal, the Court Must Draw All Reasonable
            Inferences in Favor of the Prosecution.**

24          It is well-established that, when considering a motion for acquittal under Rule 29, the Court

25

26

27   ─────────────────
     52: "The financial information incorporated by reference into this document is contained in Autonomy's
     audited consolidated statutory accounts for the financial years ended 31 December 2010, 31 December

28   2009 and 31 December 2008 and Autonomy's unaudited interim results for the six months ending 30
     June 2011."  *Id*. at 52.

1  views the evidence in the light most favorable to the government and draws all reasonable inferences in

2  the government's favor.  "[T]he relevant question is whether, after viewing the evidence in the light

3  most favorable to the prosecution, any rational trier of fact could have found the essential elements of

4  the crime beyond a reasonable doubt."  *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir.

5  2002) (internal quotation omitted); *see also United States v. Salmonese*, 352 F.3d 608, 618 (2d Cir.

6  2003) (that inferences favorable to the defendant could also be drawn from the evidence is of no import

7  because "the task of choosing among permissible competing inferences is for the jury, not a reviewing

8  court").

9       The Court may not view the government's evidence in isolation, but must examine that evidence

10  as a whole.  *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005).  Circumstantial evidence and

11  reasonable inferences drawn from that evidence are sufficient to sustain a conviction.  *United States v.*

12  *Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992).  The Court must also credit both direct and

13  circumstantial evidence without evaluating or speculating on the weight the jury might give it.  *United*

14  *States v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000).

15      **B.**    **Section 1348's "in Connection with" Requirement Is Broadly Construed.**

16       Count 16 of the Superseding Indictment charges Dr. Lynch with securities fraud in violation of

17  18 U.S.C. §§ 1348 and 2.  That count's essential elements are as follows:

18         First, the defendant knowingly executed, or attempted to execute, a
19         scheme or plan to defraud, or a scheme or plan for obtaining money or
       property by means of false or fraudulent pretenses, representations, or
20         promises;

21         Second, the statements made or facts omitted as part of the scheme were
       material; that is, they had a natural tendency to influence, or were capable
22         of influencing, a person to part with money or property;

23         Third, the defendant acted with the intent to defraud, that is, the intent to
       deceive or cheat;

24         and Fourth, the scheme was in connection with the purchase or sale of
       securities of Hewlett-Packard Company.

25  *See Hussain*, 972 F.3d at 1146.

26       The Ninth Circuit addressed Section 1348's "in connection with" language in Hussain's case.

27  *See generally United States v. Hussain*, 972 F.3d 1138 (9th Cir. 2020).  Pointing to the appearance of

28

similar language in Section 10(b) of the Securities Exchange Act, the Ninth Circuit interpreted its

Section 10(b) precedents to find that Section 1348's "in connection with" language "is construed

broadly, not technically and restrictively."  *Hussain*, 972 F.3d at 1147 (citing *Freeman Invs., L.P. v. Pac.*

*Life Ins. Co.*, 704 F.3d 1110, 1117 (9th Cir. 2013)) (internal quotations omitted); *see also United States*

*v. Ramsey*, No. CR 19-268, 2022 WL 596378, at *12 (E.D. Pa. Feb. 28, 2022) ("In short, *any number of*

*actions or statements* might be 'in connection with' a security under § 1348[.]") (emphasis added).


# ARGUMENT

### A.    The Evidence of Dr. Lynch's Personal Involvement in HP's Acquisition of Autonomy is Sufficient to Sustain a Conviction for Securities Fraud.

There is ample evidence from which a jury could conclude that Dr. Lynch knowingly executed a

scheme to defraud in connection with securities of Hewlett-Packard.  As the foregoing facts makes clear,

Dr. Lynch took a personal role in Autonomy's diligence by HP, including by presenting on Autonomy's

products.  *See* Abrahamson Decl., Ex. N (Trial Ex. 2077), *supra*.  Yet multiple HP witnesses testified

that, over the course of HP's diligence, they did not learn that Autonomy resold tens of millions of

dollars of hardware on a quarterly basis.  *See* Trial Tr. 7843:6-13 (testimony of Andy Johnson), Trial Tr.

6227:25-6228:3 (testimony of Leo Apotheker).

In specific, critical moments where Autonomy might have disclosed to HP information about

hardware or questionable reseller practices, Dr. Lynch reviewed or affirmed misleading statements that

obscured Autonomy's fraud.  On August 3 and August 4, Dr. Lynch received misleading lists of top

contracts and customers that omitted hardware sales.  *See* Abrahamson Decl., Ex. P (Trial Ex. 15942)

(specifically requesting Dr. Lynch's review), Abrahamson Decl., Ex. Q (Trial Ex. 15947).  Had HP

known the scale of Autonomy's hardware resales, former CEO Leo Apotheker testified, "it would have

had a big impact on my—on my whole thought process about Autonomy."  Trial Tr. 6228:4-14.

Four days later, on August 8, Dr. Lynch approved a misleading list of Autonomy's top OEM

customers.  *See* Abrahamson Decl., Ex. R (Trial Ex. 15965).  One week after that, on August 15, Dr.

Lynch rejected HP's request for access to Deloitte's workpapers, which would have shed light on the

hardware, reseller, and other practices at the heart of Autonomy's fraud.  *See* Abrahamson Decl., Ex. U

(Trial Ex. 2251).  And *after* the deal went public and raised questions about Autonomy, Dr. Lynch sent HP assurances that included misleading claims about hardware and OEM deals.  *See* Abrahamson Decl., Ex. Z (Trial Ex. 4799).

In light of these facts, and drawing all reasonable inferences in the prosecution's favor, a reasonable jury could find that Dr. Lynch executed a scheme to defraud in connection with securities of Hewlett-Packard.

### B.    Dr. Lynch's August 18, 2011 Warranty is Sufficient to Sustain a Conviction for Securities Fraud.

Dr. Lynch's Rule 29 motion focuses on perceived deficiencies in the government's proof around a warranty that Dr. Lynch executed on August 18, 2011.  Boiled down, Dr. Lynch argues—first—that the warranty pertained only to information that he provided.  *See generally* Mot. at iv.  And second, Dr. Lynch argues that the government hasn't identified the "press announcement" that Dr. Lynch warranted. *See id.* at 1.

That argument unravels when taken step by step.  There are only two press announcements in this record associated with HP's acquisition of Autonomy: Exhibit 2295 and Exhibit 2306.  The jury may reasonably infer that one of those was attached to Dr. Lynch's warranty.  That matters because the two announcements overlap *exactly* on certain Autonomy financial information whose creation Dr. Lynch caused.  *Compare* Abrahamson Decl., Ex. W (Trial Ex. 2295) at 3 ("Enhances HP's financial profile: . . . Autonomy has a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010."), *with* Abrahamson Decl., Ex. X (Trial Ex. 2306) at 15 ("Enhances HP's financial profile: . . . Autonomy has a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010").  So regardless of *which* release the jury finds that Dr. Lynch reviewed, the statements at issue remain the same.

Moreover, there is no dispute as to the "Offer Document" about which Dr. Lynch warranted.  *See* Trial Tr. 7845:8-17 (testimony of Andy Johnson identifying Exhibit 2307 as "Hewlett Packard's formal offer for the shares of Autonomy").  As explained above, that document incorporated by reference

various Autonomy financial statements—including second quarter 2011 results that Dr. Lynch endorsed with knowledge that HP's acquisition was proceeding to diligence.  *See* Abrahamson Decl., Ex. Y at 51.

The jury may reasonably infer that Dr. Lynch, a detail-oriented founder-CEO who personally drove acquisition talks with HP, "provided" Autonomy's prior financial statements for inclusion in documents related to HP's offer.  Indeed, this record speaks volumes about Dr. Lynch's involvement in the minutiae of Autonomy: Mark Geall testified that Dr. Lynch made "all decisions for the business . . . even down to signing off relatively small invoices[.]"  Geall Dep. 44:19-45:6.  Harald Collet testified to an investor e-mail that Dr. Lynch ghost-wrote and directed him to send.  *See* Abrahamson Decl., Ex. AA (Trial Ex. 3118) *and* Trial Tr. 6257:22-6261:23.  Simply put, Dr. Lynch's warranty argument blinks the reality of Dr. Lynch's control over Autonomy and its engagement with HP.

### C.   Dr. Lynch's Approval of Autonomy's Second Quarter Financials in July 2011 is Sufficient to Sustain a Conviction for Securities Fraud.

In addition to Dr. Lynch's conduct relating to HP's diligence and announcement, a jury could properly find that his approval of fraudulent financials after starting acquisition talks with HP meets the "in connection with" element of § 1348.  Put simply, a jury could find that, when Dr. Lynch endorsed the publication of misleading accounts despite knowing that an acquisition was looming, he committed fraud "in connection with" the acquirer's shares.

Longstanding Ninth Circuit law holds that statements "reasonably calculated to influence the investing public" satisfy the nexus requirement of Section 10(b)—and, by extension, of Section 1348. The Ninth Circuit in *Hussain* applied just this standard, drawing from an earlier case—*McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir. 1996)—the principle that statements "reasonably calculated to influence those who trade securities" will satisfy Section 10(b)'s nexus requirement.  *See Hussain*, 972 F.3d at 1147 (quoting *McGann*, 972 F.3d at 394, 397).

In *McGann*, an accounting firm issued a misleading audit opinion that the firm knew would be included in the annual report of a public company.  *McGann*, 102 F.3d at 391.  The Ninth Circuit held that the misleading audit opinion was "reasonably calculated to influence the investing public," *id*. at 396-97, in part because the annual report disseminating the opinion served as "one of the primary

1  sources of information available to guide the decisions of the investing public." *McGann*, 102 F.3d at

2  397 (9th Cir. 1996), *see also S.E.C. v. Rana Rsch., Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (fraud

3  involving "a press release, annual report, investment prospectus or other such document" will "generally

4  me[e]t" Section 10(b)'s nexus requirement).

5     On the facts before this jury, Dr. Lynch sits in the same position as *McGann's* accounting firm

6  with respect to Autonomy's financials issued in July 2011 covering the year's first half and second

7  quarter.  At the time that Autonomy issued its second quarter 2011 financials, Dr. Lynch had presented

8  twice to HP's mergers team, conveyed enthusiasm for the deal to HP's CEO, and discussed his future

9  within a joined company with HP's top dealmaker.  A jury could reasonably infer that Dr. Lynch

10  therefore knew by July 27 that Autonomy's second quarter 2011 financials would inform HP's diligence

11  and feature in communications regarding the deal.

12     This jury has heard testimony that financial analysts closely monitored Autonomy's published

13  financials and that individual investors specifically relied on representations about Autonomy's second

14  quarter 2011 financials.  *See, e.g.*, Trial Tr. 4056:7-14, 4057:9-22 (testimony of David Toms identifying

15  Autonomy's financial statements as a source for research), Trial Tr. 5281:2-5282:4 (testimony of Nigel

16  Upton describing reliance on statements about Autonomy's recent and historical financial performance).

17  In view of this evidence and drawing all reasonable inferences for the prosecution, Dr. Lynch's approval

18  of fraudulent Autonomy financial statements after acquisition talks began and on the eve of HP's

19  confirmatory diligence comfortably addresses § 1348's "in connection with" requirement.

20                                            **CONCLUSION**

21     For the reasons stated, Dr. Lynch's motion for acquittal on Count 16 should be denied.

22

23

24

25

26

27

28

1   DATED:  May 27, 2024                    PATRICK D. ROBBINS
                                            Attorney for the United States Attorney
2                                           Acting Under Authority Conferrred by
                                            28 U.S.C. § 515
3

4
                                      By:   _____/s/ Zack Abrahamson_____
5                                           ROBERT S. LEACH
                                            ADAM A. REEVES
6                                           KRISTINA N. GREEN
                                            ZACHARY G.F. ABRAHAMSON
7                                           Assistant United States Attorneys

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28